___ LODGED
___ RECEIVED ___ COPY

MAR 2 8 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ M DEPUTY

# SEALED

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

United States of America,

                Plaintiff,

        v.

1. Michael Lacey
Counts 1-70, 81, 83-84, 86, 88-92

2. James Larkin
Counts 1-68, 80, 87

3. Scott Spear
Counts 1-68, 71-78, 85, 93

4. John "Jed" Brunst
Counts 52-70, 78-84, 86-93

5. Dan Hyer
Counts 1-68

6. Andrew Padilla
Counts 1-51

7. Joye Vaught
Counts 1-51

                Defendants.

CR-18-00422-PHX-SPL (BSB)

## INDICTMENT

VIO:   18 U.S.C. § 371
(Conspiracy)
Count 1

18 U.S.C. § 1952(a)(3)(A)
(Travel Act—Facilitate Prostitution)
Counts 2-51

18 U.S.C. § 1956(h)
(Conspiracy to Commit Money
Laundering)
Count 52

18 U.S.C. § 1956(a)(1)(B)(i)
(Concealment Money Laundering)
Counts 53-62

18 U.S.C. § 1956(a)(2)(A)
(International Promotional Money
Laundering)
Counts 63-68

18 U.S.C. § 1957(a)
(Transactional Money Laundering)
Counts 69-93

18 U.S.C. §§ 981, 982
21 U.S.C. § 853, 28 U.S.C. § 2461
(Forfeiture Allegations)

THE GRAND JURY CHARGES:

A.   <u>Introduction</u>

    1.    The website www.backpage.com ("Backpage") is notorious for being the

internet's leading source of prostitution advertisements. Backpage derives the overwhelming majority of its revenue from such ads. These practices have enabled Backpage to earn over $500 million in prostitution-related revenue since its inception.

2.   Backpage was created in 2004 by defendant MICHAEL LACEY ("LACEY"), defendant JAMES LARKIN ("LARKIN"), and a third individual, C.F. From 2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction. Additionally, LACEY and LARKIN have retained significant control over the website (and have continued receiving tens of millions of dollars of Backpage-related distributions) since purportedly selling their interests in Backpage in 2015.

3.   Defendant SCOTT SPEAR served as the Executive Vice President of one of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 4%.

4.   Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief Financial Officer of Backpage and several of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 6%.

5.   Defendant DAN HYER ("HYER") joined Backpage's marketing department in or around 2006 and served as Backpage's Sales and Marketing Director.

6.   Defendant ANDREW PADILLA ("PADILLA") served as Backpage's Operations Manager.

7.   Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant Operations Manager.

8.   The defendants identified above are referred to at times in this indictment as the "BACKPAGE DEFENDANTS."

9.   As explained in detail below, the BACKPAGE DEFENDANTS have utilized a variety of strategies to make it appear that the prostitution ads appearing on Backpage are actually ads for "escort" services, "adult" companionship, dating, or other lawful activities. For example, Backpage purports to bar customers from offering illegal services

- 2 -

and has periodically used computerized filters and human "moderators" to edit the wording of (or block) ads that explicitly offer sexual services in return for money.

10.    These strategies are a fiction designed to conceal the true nature of Backpage's ads and customers.    Indeed, the BACKPAGE DEFENDANTS have admitted—in internal company documents and during private meetings—that they know the overwhelming majority of the website's ads involve prostitution.    In one internal document, LACEY actually bragged about the company's contributions to the prostitution industry: "Backpage is part of the solution.    Eliminating adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . .    For the very first time, the oldest profession in the world has transparency, record keeping and safeguards."

11.    Notwithstanding    these    private    admissions,    the    BACKPAGE DEFENDANTS have taken pains to mislead the public, regulators, and law enforcement officials concerning the supposed sincerity of Backpage's efforts to prevent the publication of prostitution-related ads.    For example, after reviewing LACEY's written description of Backpage's contributions to the prostitution industry and editing practices, LARKIN instructed C.F. to prevent "any of the information in this being made public."    PADILLA, who helped supervise Backpage's moderators, threatened to fire any employee who acknowledged in writing that the "escorts" depicted in the website's ads were actually prostitutes: "Leaving notes . . . implying that we're aware of prostitution . . . is enough to lose your job over."    And in one internal document, Backpage's media strategy was described simply as "Do not acknowledge the prostitution."

12.    Many of the ads published on Backpage depicted children who were victims of sex trafficking.    Once again, although Backpage has sought to create the perception that it diligently attempts to prevent the publication of such ads, the reality is that Backpage has allowed such ads to be published while declining—for financial reasons—to take necessary steps to address the problem.    For example, for several years, Backpage's official policy, when presented with an ad featuring the prostitution of a child, was to delete the particular

1    words in the ad denoting the child's age and then publish a revised version of the ad. Such

2    editing, of course, did nothing to change the fact the ad featured the prostitution of a child—

3    it only created a veneer of deniability and helped Backpage's customers (*i.e.,* pimps

4    trafficking children) evade detection.

5         13.    Backpage has also contributed to the proliferation of ads featuring the

6    prostitution of children in other ways. For example, an anti-sex trafficking organization

7    once suggested that Backpage provide an automatic warning message whenever a customer

8    searched for particular terms indicative of the prostitution of a child. In response, C.F.

9    acknowledged the proposal was a good one but declined to adopt it because Backpage

10   would not derive any public-relations benefit from doing so: "This is a good idea but it is

11   not visible to AGs [state attorneys general] so it has little PR value. It is a low priority."

12   Backpage has also claimed it does everything in its power to alert the National Center for

13   Missing and Exploited Children ("NCMEC") whenever it becomes aware that a child is

14   being advertised on its website. However, the BACKPAGE DEFENDANTS implemented

15   policies to artificially limit such referrals. In one email, PADILLA instructed VAUGHT

16   that "if we don't want to blow past 500 [referrals to NMCEC] this month, we shouldn't be

17   doing more than 16 per day." In another training document, moderators were instructed

18   not to send emergency alerts to NCMEC in response to complaints filed by the

19   grandparents and other extended family members of children being advertised on the

20   website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

21        14.    Virtually every dollar flowing into Backpage's coffers represents the

22   proceeds of illegal activity. In fact, by 2015, the major credit card companies stopped

23   processing payments for Backpage and some banks closed Backpage's accounts out of

24   concern they were being used for illegal purposes. In response, the BACKPAGE

25   DEFENDANTS have pursued an array of money laundering strategies. These strategies

26   have included (a) instructing customers to send checks and money orders to particular Post

27   Office box, depositing those payments in bank accounts held in the name of entities with

28

- 4 -

no apparent connection to Backpage, and then giving customers a corresponding "credit" on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank accounts held in foreign countries and then redistributing the funds to certain BACKPAGE DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the United States (to conceal the nature of those funds and promote Backpage's ongoing operations), and (c) converting customer payments, and the proceeds of Backpage's business, into and out of cryptocurrency.

15.    The BACKPAGE DEFENDANTS have also engaged in other financial transactions designed to conceal their misconduct and evade seizure by law enforcement. For example, in November 2016, LACEY asked employees of an Arizona-based bank for advice on how to move his assets "offshore" to protect them from seizure by the government.   Soon afterward, $16.5 million in Backpage-derived cash was wired from LACEY's bank accounts in the United States to an overseas bank account in Hungary.

16.    For all of these reasons, the BACKPAGE DEFENDANTS are charged in this indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952), concealment, transactional, and international promotional money laundering (18 U.S.C. §§ 1956 and 1957), and/or conspiracy to commit these offenses (18 U.S.C § 371 and 1956).

B.    Backpage's Origins, Ownership, and Control

17.    LACEY and LARKIN are the founders of the *Phoenix New Times*, an alternative newspaper based in Arizona.   Over time, LACEY and LARKIN acquired several other alternative newspapers, which they came to operate through an entity called Village Voice Media Holdings ("VVMH").   Additionally, SPEAR served as VVMH's Executive Vice President and BRUNST served as VVMH's Chief Financial Officer.

18.    The publications within the VVMH newspaper chain routinely featured illegal prostitution ads.   In fact, more than 30 years ago, a federal court affirmed the conviction of the operator of a prostitution business (which masqueraded as a massage parlor) for publishing ads in the classified section of the *Village Voice*. *See United States*

- 5 -

*v. Sigalow*, 812 F.2d 783 (2d Cir. 1987).   The conviction was for violating 18 U.S.C. § 1952, one of the same crimes charged in this indictment.

19.    By 2000, the rise of the internet—and, in particular, the website www.craigslist.com ("Craigslist"), which offered free classified ads—began to significantly disrupt VVMH's business model, which depended on classified advertising revenue for survival.

20.    LACEY and LARKIN, with assistance from C.F., sought to address this threat by creating Backpage.  Their decision to create Backpage was later described in an internal company document as follows: "In 2004, in response to the Craigslist threat that was decimating daily newspapers, VVM launched its own online classified site, Backpage.com, named after the back page of VVM's print publication."

21.    During its first few years of operation, Backpage accounted for only a fraction of VVMH's overall revenue.  In January 2006, for example, VVMH estimated that Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage had "tremendous upside potential."

22.    This prediction proved prophetic.  By 2008, Backpage was generating over $5 million in annual profit.  This annual profit figure increased to over $10 million in 2009.

23.    In 2010, Craiglist chose to shut down its "adult" section due to the prevalence of ads for prostitution and other illegal services.   The BACKPAGE DEFENDANTS, sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share of this market.  In one internal document, LARKIN commented:  "Craigslist has folded . . . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . . We have with the Village Voice probably the longest run of adult content advertising in the US and it is, like it or not, in our DNA."

24.    This push was successful.  In internal documents, Backpage stated that it experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume." Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and

- 6 -

1    over $78 million in 2012.

2        25.    These figures dwarfed the profits that VVMH's print publications were

3    generating.  In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS

4    decided to get rid of VVMH's publishing business so they could focus on Backpage's

5    further development and expansion.    Accordingly, in or around November 2012, the

6    BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing

7    several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor

8    Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as

9    Backpage's parent companies.

10       26.    Following these transactions, LACEY held an ownership interest in Medalist

11   (and, therefore, in Backpage) of approximately 45%, LARKIN held an ownership interest

12   of approximately 43%, BRUNST held an ownership interest of approximately 6%, and

13   SPEAR held an ownership interest of approximately 4%.

14       27.    Backpage's annual profits continued to skyrocket during and after these

15   changes.  They grew to over $112 million in 2013 and over $134 million in 2014.

16       28.    In or around April 2015, LACEY, LARKIN, SPEAR, and BRUNST

17   purported to sell their ownership interests in Backpage and several related entities for

18   around $600 million to various Dutch entities.  These Dutch entities included Atlantische

19   Bedrijven, C.V., which agreed to purchase Backpage's U.S. operations for around $526

20   million, and UGC Tech Group C.V., which agreed to purchase Backpage's overseas

21   operations for around $77 million.

22       29.    In fact, these Dutch entities were controlled by C.F., who borrowed most of

23   the $600 million from entities controlled by the sellers to finance the purchase.  Due to this

24   financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant

25   financial interest in Backpage after the transactions were completed.

26       30.    Additionally, LACEY, LARKIN, SPEAR, and BRUNST retained significant

27   operational control over Backpage following these transactions.  For example, the April

28

- 7 -

2015 loan agreement required C.F. to sign a six-year employment agreement, required C.F. to provide the lenders with full access to Backpage's books and records, required C.F. to provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited C.F. from opening any new bank accounts on Backpage's behalf without the lenders' consent.

C.     Backpage's Knowledge And Facilitation Of Prostitution Ads

31.     By 2008, if not earlier, the BACKPAGE DEFENDANTS were aware that the overwhelming majority of the website's "adult" ads involved prostitution. Nevertheless, the BACKPAGE DEFENDANTS made a financial decision to continue displaying those ads.

32.     The BACKPAGE DEFENDANTS also sought to sanitize the ads by editing them—that is, by removing terms and pictures that were particularly indicative of prostitution and then publishing a revised version of the ad.  This process was sometimes referred to as "moderation."

33.     For example, in April 2008, C.F. wrote an email explaining that, although he was "under pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]" and result in "lost pageviews and revenue."  Thus, he instructed Backpage's technical staff to edit the wording of such ads, by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

34.     On February 26, 2009, C.F. received an email from the classified-ads manager of a newspaper within the VVMH chain asking why Backpage's terms of service purported to prevent customers from "suggest[ing] an exchange of sexual favors for money" in light of the fact that "[c]learly everyone on the entire backpage network breaks the rules."  In response, C.F. didn't dispute the author's characterization and explained that Backpage had simply added the terms of service at the behest of "our attorney in SF" in an

attempt to avoid liability in civil lawsuits.

35.     On May 25, 2009, SPEAR received an email summarizing a plan to begin "remov[ing] sex act pics and coded terms" from Backpage ads.  Later that day, C.F. forwarded this email to HYER with the explanatory note that "We do not intend to be a craig[slist] here, just get out the most egregious stuff."

36.     On March 8, 2010, C.F. testified in federal court (the United States District Court for the Southern District of Florida) in the criminal trial of a pimp who had used Backpage to post prostitution ads.  During his testimony, C.F. acknowledged the defendant had used the email address "Youngpimpin86" when posting the ads.   C.F. also acknowledged that the ads described one so-called escort as "five-foot-three, with a small waist and amazing ass you'll have to see to believe. XL, XL, XL, Lollipop" and described a different so-called escort as "discrete, sincere and extremely naughty. I am the type of girl who absolutely adores a man who understands the many desires of a young beautiful woman and how to accommodate a variety of fantasies."  This episode provided notice to Backpage that it was implausible to pretend such ads were merely offering lawful escort services.

37.     On September 1, 2010, PADILLA sent an email to HYER and C.F. stating that customers who engaged in "extreme and repeat" violations of Backpage's posting rules would have their ads deleted and be banned from the website.  However, PADILLA also stated the bans would only be temporary and that "we'll do everything we can to affect only the worst apples."

38.     On September 1, 2010, SPEAR received an email acknowledging that Backpage's moderators were being instructed to "Remove any sex act pics in escorts [ads]" and "Remove any illegal text in escorts [ads] to include any code words for sex act for money."

39.     On September 21, 2010, a group of state attorneys general wrote a letter to Backpage.   This letter observed that "ads for prostitution—including ads trafficking

children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether."   The letter acknowledged that this step would cause Backpage to "lose the considerable revenue generated by the adult services ads" but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized, in the marketplace provided by backpage."

40.     On September 25, 2010, C.F. wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund those customers' fees.  Thus, C.F. announced that Backpage would "go back to having our moderators remove bad content in a post . . . ."

41.     On September 30, 2010, C.F. testified in federal court (the United States District Court for the District of Minnesota) in the criminal trial of a pimp who had used Backpage to post prostitution ads.   During his testimony, C.F. acknowledged that Backpage's servers are located in Arizona and that the ads posted by the Minnesota-based defendant had therefore "traveled across state lines."

42.     On October 8, 2010, PADILLA sent an email (on which VAUGHT was cc'd) threatening to fire any Backpage employee who acknowledged, in writing, that a customer was a prostitute: "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . .  This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

43.     On October 16, 2010, PADILLA sent an email to a large group of Backpage employees (including HYER and VAUGHT).   The email had two attachments that provided guidance on how to "moderate" ads.  The first was a Powerpoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts.  Next to each picture was an instruction as to whether it should be

1   approved or disapproved by a Backpage moderator.  These instructions included "Approve.

2   Nude rear shots are okay as long the model is not exposing her anus or genitalia." and

3   "Approve.  Rear shot okay.  Transparent wet panties okay."  The second was an Excel

4   spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should

5   be "stripped" from ads before publication.  PADILLA concluded the email by stating:

6   "[I]t's the language in ads that's really killing us with the Attorneys General.  Images are

7   almost an afterthought to them."

8       44.    On October 16, 2010, PADILLA sent a separate internal email (which also

9   included HYER and VAUGHT as recipients).  In this email, PADILLA explained that "I'd

10  like to still avoid Deleting ads when possible," that "we're still allowing phrases with

11  nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

12      45.    On October 25, 2010, C.F. sent an email to SPEAR, HYER, and PADILLA

13  acknowledging that the "[i]llegal content removed" through Backpage's moderation

14  processes was "usually money for sex act."  This email also explained that, after the "sex

15  act pics are removed," the "ad text may stay."

16      46.    On October 26, 2010, HYER and PADILLA received an email explaining:

17  "We will not remove ads with vaginas or penis showing, just the images unless they are a

18  frequent offender.  We will not remove ads with rates under an hour, just the text with the

19  minimum rates.  Users need time to react to this change."

20      47.    On October 27, 2010, PADILLA sent an email to the head of a group of

21  contractors from India who had been hired to moderate Backpage's adult ads.  In this email,

22  PADILLA criticized the contractors for deleting too many ads, stated that this approach

23  was bad for business, and instructed the contractors to simply edit the ads to remove the

24  more-obvious language: "As long as your crew is editing and not removing the ad entirely,

25  we shouldn't upset too many users.  Your crew has permission to edit out text violations

26  and images and then approve the ad."

27      48.    On October 27, 2010, HYER sent an internal email stating that Backpage

28

- 11 -

1   was "editing 70 to 80%" of the ads it received from customers.  In other words, HYER

2   acknowledged that a large proportion of the ads originally submitted by Backpage's

3   customers contained text and pictures that were indicative of prostitution and that

4   Backpage was still choosing to publish those ads after editing them.

5       49.   On November 4, 2010, C.F. sent an email to Backpage's India-based

6   moderators (on which PADILLA was cc'd) explaining that "[m]any of the ads need to have

7   15 minute and 30 minute pricing removed" and that "I'm being evaluated by lawyers [*i.e.*,

8   state attorneys general] later this week so cleaning up old stuff is important."

9       50.   On November 17, 2010, HYER and PADILLA received an email

10  acknowledging that the term Lolita is "code for under aged girl" but explaining that this

11  term could simply be stripped out from ads (as opposed to refusing to publish the ad).  The

12  email also explained that customers should be allowed to include their identification

13  numbers from a notorious prostitution website, The Erotic Review:  "[A]llow users to put

14  in TER IDs (just no live links)."

15      51.   On November 30, 2010, LARKIN, SPEAR, and other Backpage

16  representatives participated in a conference call with representatives from NCMEC.

17  During this call, the Backpage representatives were advised that a large portion of the ads

18  on Backpage were blatant prostitution ads, that many of those ads featured children, and

19  that the posting of such ads was illegal in every state.

20      52.   In December 2010, HYER, PADILLA, and others exchanged a series of

21  emails entitled "Deep cleaning strip out."  These emails identified a lengthy list of terms

22  that were indicative of prostitution and discussed plans for removing the terms from the

23  old ads in Backpage's archives.  During this exchange, C.F. stated that Backpage wasn't

24  willing to delete the old prostitution ads because "our users love" having access them,

25  "[s]o, best to do deep cleaning and not kill a valuable feature."  C.F. later encouraged

26  Backpage's staff to complete the project quickly to avoid scrutiny:  "This task is urgent

27  since CNN is runing [sic] a report soon."

28
                                    - 12 -

53.    On January 13, 2011, HYER and PADILLA received an email summarizing instructions that had been provided to members of Backpage's technical staff.  It explained that the technical staff had been instructed "not to display the moderation log" in a particular section of Backpage's database "since we pdf this page for subpoenas.  I would rather not testify in court as to why my staff 'approved' . . . postings."

54.    In January 2011, LARKIN and LACEY met with a representative from NCMEC.  During this meeting, LACEY asked which types of sex ads would be acceptable from NCMEC's perspective.  When the NCMEC representative declined to say that any such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution is none of your business."

55.    On January 31, 2011, and February 1, 2011, C.F. engaged in an email exchange concerning whether to remove links to other prostitution websites (such as The Erotic Review) from expired Backpage ads.  C.F. stated that, although SPEAR and his "internet safety guy" were recommending that such ads be removed, he thought this would "be a stupid move" because it would hurt Backpage financially (by reducing the number of referrals from other sites).  C.F. added that "this overly zealous focus on moderation at the expense of other development is a lot of bullshit . . . ."

56.    On February 2, 2011, C.F. sent an email acknowledging that "[t]he strip out affects almost every adult ad."  In other words, C.F. acknowledged that "almost every adult ad" on Backpage was a prostitution ad that had been edited to remove the most damning text and pictures.

57.    On February 3, 2011, a Backpage customer who went by the name "Licks Alot" wrote an email to Backpage complaining that all of the pictures in one of her ads (entitled "Athletic SWF Guaranteed Low Mileage Boys!!!") had been deleted.  C.F. responded to "Licks Alot" by explaining that one of her photos had been removed because "[o]ur crazy internet safety experts do not want any genitalia showing up around the thong."  However, C.F. proceeded to apologize to "Licks Alot" over the removal of her

1   remaining photos, allowed her ad (which was obviously for prostitution) to remain on the

2   website, and offered her a free upgrade.

3         58.    On February 8, 2011, C.F. testified in federal court (the United States District

4   Court for the Middle District of Florida) in the criminal trial of a pimp who had used

5   Backpage to post prostitution ads.  During his testimony, C.F. authenticated one of the ads

6   the defendant had placed on Backpage, whose title was "Extra horny sexy newbie,"

7   confirmed that Backpage had allowed this ad to be posted multiple times in various East

8   Coast cities, and acknowledged that Backpage published "a lot" of similar ads.  This

9   episode provided further notice to Backpage that it was implausible to pretend such ads

10   were merely offering lawful escort services.

11         59.    On February 16, 2011, PADILLA sent an email to Backpage's India-based

12   moderators (on which VAUGHT was cc'd) explaining that Backpage was adopting a

13   "more lenient policy" and that he was instructing his Phoenix-based employees to "go easy

14   on some types of violations." PADILLA acknowledged this approach would "likely" result

15   in more "violations" but emphasized that "moderators should err on the side of the user."

16         60.    On February 16, 2011, PADILLA sent a separate email discussing whether

17   several terms should remain on Backpage's "filtered terms" list.  During this discussion,

18   PADILLA acknowledged—by placing quote marks around the term "companionship"—

19   that he didn't actually believe the women being advertised on Backpage were providing

20   lawful escort services: "[The term] implies some exchange of bodily fluids which kills our

21   'companionship' argument, but i don't think we've ever really gotten in trouble for it."

22         61.    On February 22, 2011, PADILLA received an email requesting Backpage's

23   "list of banned, stripped out adult terms."  In response, PADILLA sent an Excel

24   spreadsheet entitled "Phrase List 02211," which PADILLA described as "the latest greatest

25   version of the list."  The enclosed spreadsheet identified over 660 words or phrases that are

26   indicative of prostitution, including an array of terms that are suggestive of child

27   prostitution (*e.g.,* "lolita," "fresh," "high school," "tight," "young").  The spreadsheet

28

explained that most such terms were simply to be "filtered" from the ads in which they appeared.

62.     On February 23, 2011, PADILLA received an email concerning a particular ad that had recently been edited by Backpage's India-based moderators.  The ad was obviously for prostitution—its title was "new-new-new-put me in your favorite position" and the poster had attempted to include two photographs that violated Backpage's posting rules. In response, the India-based moderators had deleted both of those photos, as well as a third photo that depicted the prostitute's face, and then allowed the ad to be published. The email received by PADILLA did not criticize the moderators for allowing an obvious prostitution ad to be published after editing.  To the contrary, it emphasized that the ad should remain on Backpage and criticized the moderators for removing the third photo, threatening to fire them if they did it again: "2 out of 3 pics should have been removed. But [the] moderator deleted all three pics. This is plain wrong . . . . I would fire a moderator in Phoenix if they did this."

63.     In March 2011, LARKIN, LACEY, SPEAR, and other Backpage representatives met with representatives from NCMEC. During this meeting, the Backpage representatives were again advised that a large portion of the ads on Backpage were blatant prostitution ads.  The Backpage representatives also were advised they could be criminally prosecuted under federal law for their conduct.

64.     On April 5, 2011, PADILLA sent an email whose recipients included VAUGHT and the supervisor of Backpage's Indian moderation team.  The email was entitled "relaxed image standards" and included, as an attachment, a document that displayed a series of 30 nude and partially-nude photographs. Next to each picture was an instruction as to whether it should be approved or disapproved by a moderator.  One picture showed a woman sitting on a bed, wearing only a bra and panties, with her legs spread open and her hand partially covering her crotch.  The caption provided in part: "okay – but barely."

- 15 -

65.    Between April 2011 and March 2012, PADILLA, C.F., and others participated in an email exchange acknowledging that Backpage was deleting thousands of pictures from customer ads each week and seeking assistance in collecting all of the deleted pictures so they could be used for "entertainment" or to generate user "traffic for other projects." The email explained that the deleted pictures could be made available to the public on a new website called "nakedpics.backpage.com" or "badpics.backpage.com."

66.    On April 19, 2011, LARKIN and SPEAR received an email seeking permission to terminate the contract of a third-party vendor that had been receiving $17,000 per month to "remov[e] any nude pics" from the expired ads in Backpage's database. LARKIN responded: "do it!"

67.    On June 7, 2011, C.F. received an inquiry from a law enforcement official about a particular ad that included the term "amber alert." In response, C.F. acknowledged this might be "some kind of bizarre new code word for an under aged person." C.F. then forwarded this exchange to PADILLA and stated that he had instructed HYER to add "amber alert" to Backpage's "strip out" list. In other words, HYER, PADILLA, and C.F. did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

68.    On June 30, 2011, several Backpage representatives met with representatives from the office of the Washington State Attorney General. During this meeting, the Backpage representatives initially attempted to claim that no prostitution ads appeared on their website. In response, a representative from the Attorney General's office stated: "You mean to tell me that if someone responded to an advertisement, the woman they called for services would be offering to go out for coffee?" A Backpage representative responded to this question by looking at C.F., laughing, and acknowledging that Backpage couldn't "deny the undeniable."

69.    On July 27, 2011, C.F. sent an email to HYER and PADILLA, and a nearly-

1    identical email to LARKIN and LACEY, concerning the possibility of using age-

2    verification software. In this email, C.F. acknowledged the software might be beneficial

3    ("This might be our solution") but recommended against its wholesale adoption because it

4    would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

5          70.    On July 28, 2011, LACEY sent LARKIN a draft editorial entitled "BackPage

6    understood." In this document, LACEY bragged about Backpage's contributions to the

7    prostitution industry: "Backpage is part of the solution. Eliminating our adult advertising

8    will in no way eliminate or even reduce the incidence of prostitution in this country. . . .

9    For the very first time, the oldest profession in the world has transparency, record keeping

10    and safeguards." LACEY also acknowledged that Backpage used an automatic filter to

11    remove particular phrases from ads that were indicative of prostitution but still published

12    the ads after editing them.

13          71.    Soon afterward, LARKIN forwarded the editorial to C.F., with a cover note

14    cautioning against some of LACEY's statements "being made public" because "we need

15    to stay away from the very idea of 'editing' the posts, as you know." C.F., in turn, revised

16    the editorial to take out the paragraph lauding Backpage's contributions to the prostitution

17    industry.

18          72.    On August 5, 2011, Backpage received a letter from the mayor of Seattle.

19    This letter warned that "Seattle Police have identified an alarming number of juvenile

20    prostitutes advertised on Backpage.com since January 2010" and explained that Backpage

21    was dissimilar from other companies whose products and services are "occasionally or

22    incidentally" utilized by criminals because "[y]our company is in the business of selling

23    sex ads" and "your services are a direct vehicle for prostitution." The letter also

24    recommended that Backpage require in-person age verification for all of the "escorts"

25    depicted in its ads. Afterward, Backpage declined to adopt these recommendations.

26          73.    On August 15, 2011, PADILLA received an email containing an updated

27    version of Backpage's moderation guidelines. This six-page document provided the

28

following instructions concerning photographs: "Nude rear shots are okay as long the model is not exposing her anus or genitalia," "Transparent wet panties okay should not be able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]." The document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

74. On August 31, 2011, Backpage received a letter from the National Association of Attorneys General. This letter characterized Backpage as "a hub" for human trafficking, identified "more than 50 instances, in 22 states over three years, of charges filed against those trafficking or attempting to traffic minors on Backpage.com," and noted that "[n]early naked persons in provocative positions are pictured in nearly every adult services advertisement on Backpage.com and the site requires advertisements for escorts, and other similar 'services,' to include hourly rates. It does not require forensic training to understand that these advertisements are for prostitution."

75. On October 6, 2011, C.F. sent an email discussing various proposals for addressing "the under aged issue." With respect to one particular proposal, C.F. acknowledged it was a good one but recommended against adopting it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AG's [state attorneys general] so it has little PR value. It is a low priority."

76. In the fall of 2011, Backpage sought the assistance of a public relations firm based in Washington, D.C. On October 12, 2011, C.F. received a written copy of the firm's presentation. Later, some of the BACKPAGE DEFENDANTS attended a meeting at which the presentation was discussed in more detail. The presentation warned that Backpage's business practices would inevitably result in legal trouble ("One day the proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do not acknowledge the prostitution." The presentation also noted that the "ads on the backpage.com site" generally fall into three categories, one of which is "Pimps and Men Looking for Kids."

77.   On October 21, 2011, LARKIN received an email discussing whether the Backpage website should include a warning message concerning the prostitution of children.  This email contained the following joke:  "Andrew [PADILLA] thinks it to[o] heavy handed and thinks our web site name will be entrapment.com (Hilarious)."

78.   On November 16, 2011, HYER and PADILLA received an email asking for "urgent" assistance in eliminating the word "teen" from the ads appearing on Backpage's website:  "Remove ads with teens or remove the text teen from . . . ads."  The following day, PADILLA wrote back with an update that he had found "76 pages of results" and that he had simply "edited" all of the ads posted within the last two months (*i.e.,* allowed those ads to remain on the website after sanitizing them).

79.   Between around January and March 2012, many of Backpage's moderators (who were supervised in part by PADILLA and VAUGHT) underwent performance appraisals.  These appraisals revealed that many of the moderators did "not report young looking escorts."  Nevertheless, these moderators were allowed to keep their jobs, and sometimes were given strong overall performance ratings.

80.   On February 16, 2012, PADILLA sent an email to VAUGHT stating that Backpage should limit the number of child-exploitation referrals it was making to NCMEC:  "If we don't want to blow past 500 this month, we shouldn't be doing more than 16 a day."

81.   On February 23, 2012, C.F. was forwarded a legal notice claiming that several of Backpage's ads included copyrighted content from two competing websites called RubMaps.com and EroticMP.com.  C.F. also received copies of the underlying ads from the competing websites, which clearly involved prostitution.  In one of the ads, a customer stated that, in return for $45 and a $5 tip, he had received a "Blow Job . . . w/ condom" from a woman who "had nice breasts."  In a different ad, a customer stated that, in return for $60, he had oral and vaginal sex with a prostitute.  And in a different ad, a customer stated:  "Her bj was slow and erotic, and she was happy to go with whatever

position I wanted." When C.F. forwarded these materials to Backpage's staff, he was asked whether the corresponding ads appearing on Backpage's website should be removed immediately. C.F. replied that they should be allowed to remain on Backpage for another few weeks without any modification.

82.     On March 15, 2012, HYER received an email concerning the ads with the copyrighted material.  This email stated that the ads shouldn't be deleted and that Backpage's technical staff should merely "strip out" the names of the competing prostitution websites:  "Copyright infringement issue.  We need to strip out every appearance of rubmaps.com and eroticmp.com."  When a staff member sought more guidance, HYER interjected:  "We don't need to delete ads or users."

83.     On April 7, 2012, PADILLA was informed that a woman had contacted Backpage to report that one of the "escorts" depicted on the site was only 17 years old. The woman provided the juvenile's full name and birth year and further stated that the juvenile had been attempting to recruit the complaining party's daughter (who was 15).  In response, PADILLA instructed his staff to refuse to remove the ad because "she's isn't claiming her own daughter is in the ad."

84.     On April 8, 2012, LACEY sent an email emphasizing that "jim [LARKIN] and I believe in legalized prostitution" and stating that Backpage's efforts to prevent the prostitution of children on the site were "not perfect, by any means."

85.     On April 25, 2012, a Backpage representative spoke at a meeting of the New York City Council's Women's Issues Committee.  During this meeting, the representative stated it was better to have ads for sex work appear on Backpage than have them move to other places on the internet.  The representative further stated:  "I don't deny that Backpage is part of the problem, but the problem is the internet."

86.     On April 27, 2012, a woman wrote an email to Backpage's support department stating that her underage daughter had been kidnapped, drugged, and was being advertised as a prostitute against her will.  The email identified the specific phone number

associated with the ads (754-229-xxxx), stated that the ads appeared on a website called BackpagePics.com, and asked that the ads be removed immediately: "This is a drugged and held against her will child who had photos taken under threat and duress . . . . Please remove." This email was forwarded to PADILLA by a subordinate, who asked "should we respond?" PADILLA replied by explaining that, because the website BackpagePics.com wasn't owned by Backpage, there was no need to respond to the mother.

87.     On April 30, 2012 (three days later), the same woman wrote another email to Backpage's support department. In this email, the woman stated that "I have contacted backpage on several occassions [sic] to remove these pictures which were posted against her will and while she was drugged and held captive. I have yet to receive a reply." This time, the woman provided a link to her daughter's ad on Backpage (not BackpagePics.com), which included the same phone number (754-229-xxxx) that had been included in the other ad.

88.     On May 1, 2012 (the next day), the same woman wrote a third email to Backpage's support department. In this email, the woman included a link to another ad on Backpage depicting her underage daughter and stated: "I also found a pix of my daughter within this url both girls are in protective custody." Later that day, the woman received an email from Backpage's support department stating: "The post is confirmed removed."

89.     Some of these emails were forwarded to LACEY and LARKIN. In response, LARKIN applauded Backpage's "good solid response" to the woman and remarked: "this whole rigamarole seems a little odd to me."

90.     On May 10, 2012, the television news station CNN ran an expose on Backpage that emphasized "how young some of these girls look" and deemed the website "a hub for the sex trade."

91.     On May 11, 2012, PADILLA sent an email to VAUGHT and other Backpage employees entitled "forbidden planet." Enclosed with the email was an Excel spreadsheet

that identified over 600 words and phrases that are indicative of prostitution. The spreadsheet also specified, for each word and phrase, whether an ad containing the offending language should be banned or whether Backpage should simply "strip term from ad" and then publish it after the revision.

92.    On July 12, 2012, PADILLA sent an email (which was also shared with VAUGHT) to the head of Backpage's Indian moderation team. In this email, PADILLA criticized the moderators for deleting too many ads and provided the following instruction: "I agree that 'over cautiousness' is as big of a problem as moderators that miss a lot of violations."

93.    In or around November 2012, a researcher at Arizona State University published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and that many of the ads depicted juvenile trafficking victims. On December 19, 2012, LACEY was forwarded a copy of the study's results. The researcher responsible for the study also met with a Backpage representative to propose various mechanisms for reducing or eliminating the prostitution of children on the website. Backpage declined to adopt these proposals.

94.    Between around September 2010 and October 2012, C.F. became aware that a particular Backpage customer, P.R., was posting prostitution ads. Rather than bar this customer from posting future ads, C.F. repeatedly restored her posting privileges and gave her advice on how to conform to Backpage's publication standards. The communications involving this woman's ads included the following:

•    On September 26, 2010, C.F. received an email from a woman who was obviously posting prostitution ads on Backpage. The woman, whose email address included the phrase "provider4u," wrote to complain that her escort ad ("50 Red Roses special – Dont Miss out !!!") had been removed even though "[o]ther women have more explicit ads than me and they are up!" The woman continued: "I can not afford to have this ad removed. This is the only way I can get by and if its not on all the time I will not

be able to pay my bills . . . . My fiancé is in jail and he is not able to help me at this point." In response, C.F. arranged for the woman to be allowed to continue posting ads.

• On October 6, 2010, C.F. received another email from the same woman. In this email, she complained that her most recent ad had been removed because it included an explicit picture of her body. She provided a copy of the picture to C.F. and stated: "If the person [who removed the ad] is such a prude well maybe they should check out the other women's ads in that [escorts] section." On November 15, 2010, C.F. wrote back to the woman to encourage her to edit the ad so it could be re-posted: "Ok, please try editing the ad now." After this exchange, the woman was permitted to resume posting ads on Backpage.

• On June 6, 2011, C.F. received another email from the same woman. It stated: "I would really appreciate it if you would please take the block off my ad for editing . . . . I wont post any more objectionable pics, ok?" In response, C.F. arranged for the woman's editing and posting privileged to be restored: "You should be able to edit now. Please let us know if you are still having any trouble." After this exchange, the woman resumed posting ads on Backpage.

• On July 14, 2012, C.F. received another email from the same woman. It stated: "would you please take the edit block off my ad. I need to change some info on it and update it. I promise i wont put no more nude pics in it, you have my word. . . . [M]y ad says: 50 red roses special – dont miss out." After this exchange, the woman was allowed to continue posting ads on Backpage.

• On September 17, 2012, C.F. received another email from the same woman. This time, she complained that Backpage was editing her ads (whose title continued to feature the obvious prostitution term "50 Red roses special") to remove the most explicit pictures. She stated: "I would like to know why my ad in the escort section of backpage keeps getting messed with. . . . [S]omeone keeps erasing the link to my pics on the ad. that is so wrong. I am being deprived of income that I sorely need . . . . There

are other woman posting pics on their ads that show more nudity . . . ." After this exchange, the woman was permitted to continue posting ads on Backpage.

• On October 16, 2012, the woman wrote another email to Backpage. In this email, she again complained about how Backpage was editing her ads to remove the most explicit pictures. She stated: "It is very hard for me to make any income from this ad as they continually go into my ad and remove the link from the ad that goes to my pictures. They wont allow me to post my pics on the ad yet other women with other ads show more nudity than my pictures ever did."

• This email was forwarded to VAUGHT and to PADILLA, who asked another Backpage employee to "dig into this one a little." On October 17, 2012, PADILLA received a follow-up email from his co-worker stating that the woman's ad had been posted on September 27, was still on the Backpage website, and that the pictures the woman had originally attempted to include in the ad (which had been stripped by Backpage) were "topless shots."

• Following these exchanges, between October 2012 and November 2015, the same customer was allowed to post over a dozen new ads on Backpage, many of which utilized the same identifying information, coded prostitution terms, and contact phone number as before.

95.    On January 7, 2013, VAUGHT was informed by a moderator that Backpage wasn't diligently pursuing reports of child exploitation: "We've supposedly been checking them, but some seem to be ignored. They get 'marked as read', but nothing gets done with them. It's aggravating and irresponsible."

96.    On June 6, 2013, Backpage received a letter from NCMEC recommending the adoption of several specific security measures to prevent the trafficking of children. The recommended security measures included (a) verifying the age and identity of users who submitted adult ads, (b) verifying the age and identity of individuals depicted in photographs within adult ads, (c) prohibiting the use of anonymous payment sources such

as prepaid credit cards, and (d) requiring users to utilize verified email addresses and telephone numbers.   Afterward, Backpage declined to follow any of these recommendations.

97.   On August 30, 2013, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email notifying them that "Chase [Bank] was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking."   In response, C.F. informed the group that he intended to begin "giv[ing] users free ads if they complain while we wait on directly transactions to another processor."

98.   On September 11, 2013, a Backpage representative made a presentation to the Arizona Governor's Task Force on Human Trafficking.   Following this presentation (which took place in Phoenix), the representative was asked whether there would be any "cons" to requiring verifiable identification of all escorts being advertised on Backpage's website.   In response, the representative did not identify any financial or logistical hurdles to the adoption of such a requirement.   Instead, the representative stated that such a requirement would simply cause Backpage to lose business to other prostitution websites like myRedBook.com or to overseas prostitution websites.   During this meeting, members of the task force also provided the representative with evidence showing that Backpage's moderation efforts were ineffective at preventing the publication of prostitution ads.

99.   On April 3, 2014, PADILLA and VAUGHT were forwarded an email that had been sent to Backpage by a credit card processing company in Canada.   The email stated that "[w]e have multiple user accounts that are paying for your services for what I understand to be prostitution advertisements" and sought information about "how you are processing these transactions."

100.   On April 14, 2014, LARKIN and BRUNST received an email from C.F. discussing why Backpage had experienced "past high growth" and identifying various ideas for achieving "future growth."   This email stated that Backpage had been the beneficiary of "[m]igration of content from other . . . marketplaces to the internet" and

identified one particular marketplace as a key source of Backpage's customers: "[N]et loss for brick and mortar marketplaces: Strip clubs, hotels, and gathering spots displaced by the internet." In other words, the email acknowledged that the supposed "escorts" advertising on Backpage were actually prostitutes (lawful escorts did not congregate at strip clubs, hotels, and other brick-and-mortar "gathering spots" during the pre-internet age). This email also attributed Backpage's success in part to its adoption of policies that allowed customers to post ads without leaving any meaningful identifying information—in a list of Backpage's advantageous policies, it identified "Anonymous," "Prepaid card friendly," "User can post paid ads without a valid email address," and "bitcoin."

101. On April 24, 2014, VAUGHT sent an email to Backpage's moderators (while cc'ing PADILLA). In this email, VAUGHT explained that if a moderator came across an ad containing a link to a "sex for money" website, the moderator should add the link to a list of banned terms but "don't bother removing it from the current ad."

102. On September 4, 2014, Backpage was served with a brief that had been filed by NCMEC in a lawsuit in Washington state court. In this brief, NCMEC criticized the sincerity of Backpage's efforts to prevent child sex trafficking: "Backpage has repeatedly claimed in public statements and court filings that it is working to reduce child sex trafficking on its website. The unpleasant reality is that Backpage publicizes carefully selected operational processes as a subterfuge to avoid increased scrutiny, while providing traffickers with easy access to an online venue to sell children for sex. In practice, Backpage's stated interest in doing something meaningful to stop child sex trafficking ads on its site is apparently overridden by the enormous revenue it generates from its escort ads, including ads selling children for sex."

103. On March 17, 2015, a law enforcement officer with the California Department of Justice spoke with a Backpage representative concerning the prevalence of blatant prostitution ads on Backpage. In response, the representative did not dispute the officer's characterization and said the internet and prostitution were not going away.

- 26 -

104.    On July 30, 2015, a document entitled "trainingJuly2015" was distributed to Backpage's moderators. This training manual specifically told moderators that, if they saw a photograph depicting "a person [who] looks young/minor," they should "approve dont delete the ad unless it has a banned term." The training manual also identified, under the heading "THESE ARE ALL OKAY," a long list of terms that are indicative of prostitution, such as "99% CUM BACK FOR MORE," "car service," and "lollipop special."

105.    In or around August 2015, as part of a lawsuit in Illinois, Backpage was served with an affidavit from a detective employed by the Seattle Police Department. In this affidavit, the detective avowed that "[t]o date, no Detective within the Seattle Police Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort' (person who charges simply for companionship with no offer of sex) or 'masseuse' (person offering legitimate and licensed massage therapy rather than sex) while responding to ads placed in these categories on Backpage.com" and that "every time the Seattle Police Department's Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity."

106.    In or around August 2015, during the same lawsuit in Illinois, Backpage was served with a different affidavit from a detective employed by the Boston Police Department. In this affidavit, the detective avowed that "Backpage.com is the number one site in Boston for prostitution and sex trafficking," that his unit had "[s]ince 2010 . . . arrested over 100 buyers of sex of both adults and minors through Backpage.com ads," and that "nearly all the cases we find associated with it [Backpage] involve pimp controlled prostitution."

107.    On October 7, 2015, PADILLA received an email from another Backpage employee (which was later forwarded to VAUGHT) disclosing that there were "massive numbers of live ads with banned terms and pictures out on the site."

108.    On December 9, 2015, Backpage received an email from a reporter stating that "[o]f the 359 sex trafficking incidents Toronto Police have been involved in since

- 27 -

2013, every single girl that was rescued was advertised on Backpage." The email also asked: "Why hasn't Backpage closed down the adult escort ads portion of its site like Craigslist when it's known that underage girls are being exploited via Backpage?"

109.    In or around January 2016, Company A was retained to serve as a payment processor for some of Backpage's websites. On April 29, 2016, Company A informed C.F. that it had conducted "a review of your website, and unfortunately we had to suspend your account . . . [because] advertising of illegal activities is strictly forbidden."

110.    Beginning in or around January 2016, Backpage's moderators were instructed to stop removing ads that contained the phrase "GFE." For example, on January 28, 2016, VAUGHT was sent an email from a Backpage moderator explaining that "As far as I am aware we are no longer removing ads for GFE." Similarly, on March 9, 2016, a Backpage moderator sent an email to his coworkers explaining that "Andrew [PADILLA] and I talked about the GFE thing, going forward we will not be removing ads for GFE" and clarifying "this includes even gfe with price." And again, on March 25, 2016, an email was sent to Backpage's moderation staff stating that "We are no longer removing ads for 'GFE' or 'PSE.'"

111.    In fact, the BACKPAGE DEFENDANTS repeatedly acknowledged that the term "GFE" (girlfriend experience) is a coded term for prostitution. For example:

•       On October 26, 2010, SPEAR, HYER, and PADILLA received an email from C.F. that explained: "No coded sex act for money: GFE, PSE, BBBJ, DATY, etc."

•       On May 4, 2011, HYER sent an email to PADILLA and others identifying GFE as a "code word" that should be forbidden.

•       On August 31, 2011, PADILLA and C.F. exchanged emails in which they discussed a list of 100 "solid sex for money terms." The list included "GFE = girlfriend experience."

•       On November 2, 2011, PADILLA and VAUGHT received an email from a co-worker identifying GFE in a list of "sex phrases and coded terms" that are "not

allowed."

112.   HYER, PADILLA, and other BACKPAGE DEFENDANTS periodically received a "Google alert" when articles discussing Backpage appeared in the news. Many of the news articles identified in these alerts discuss instances in which prostitutes who had been advertised on Backpage were kidnapped, raped, or murdered.

113.   In January 2017, after conducting a lengthy investigation, the Senate Subcommittee on Permanent Investigations ("Subcommittee") issued a 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking." This report concluded, among other things, that virtually all of Backpage's "adult" ads are actually solicitations for illegal prostitution services and that "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . . Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created."

114.   In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website. However, the prostitution ads simply migrated to other sections of the website, where they remain to this day.

D.   <u>International Operations</u>

115.   In addition to facilitating prostitution through its U.S. website, Backpage has also facilitated prostitution through its websites in foreign countries. In this context, Backpage often affirmatively creates the content of the illegal prostitution ads being published.

116.   Around 2013 or 2014, Backpage hired a Philippines-based company (Company B) in an attempt to increase the profitability of Backpage's international operations. Company B's employees were instructed to (1) visit rival prostitution websites in other countries, (2) obtain the email addresses of prostitutes who were posting ads on those websites (often by falsely posing as prospective customers), (3) use the information

from the other website to create a competing prostitution ad on Backpage (a process referred to internally as "preboarding"), and then (4) transmit the new ad to the prostitute, often using the previously-harvested email account information, in an attempt to persuade the prostitute to become a Backpage customer. Company B's employees were paid bonuses based on the amount of ad revenue they generated for Backpage using these techniques.

117.    Backpage's executives were fully aware of the plan to use Company B to create prostitution ads outside the United States. For example, on or around November 6, 2013, C.F. made a presentation to LARKIN, SPEAR, and BRUNST. Among other things, this presentation summarized Backpage's plans for "International Planning and Expansion." One of the plans was to use the Philippines as a "test" market and hire Filipino contractors to "contact by email leads, secure email address, add ad and email address in [computer system] and assign to American staff. American staff makes contact."

118.    On August 7, 2014, HYER sent an email stating that Company B was "an efficient and cost effective way for us to bring new users to backpage." This email also contained the following summary of how Company B would operate: "Process after hiring company offering BPO services: 1. Backpage provides BPO with sites, categories & countries to target. Backpage also provides sample 'scripts' and examples of phone calls. 2. BPO contacts users via phone from sites backpage provided, obtains user email address & permission to preboard ad. 3. BPO preboards ad as public user. 4. After ad is preboarded, users receive verification link to verify the ad." This email also stated that Backpage would offer a "bonus per verified authenticated ad."

119.    On April 10, 2015, a "five-year business plan" was emailed to LARKIN, BRUNST, SPEAR, and C.F. One of the goals for 2015 was "Off shore marketing staff in the Philippines to grow to 166 and main task is international market content acquisition." This email also included a separate attachment stating that HYER should be considered for promotion because "his strengths are strong marketing and revenue growth skills" and he

- 30 -

had been "heavily involved in the user experience development" and that VAUGHT should be considered for a promotion because "[h]er strengths include six years of experience managing moderators."

120.    On May 15, 2015, a Company B employee posing as a Backpage employee sent an email to an apparent prostitute. The subject line was "Offering Free Advertisement from Backpage.com" and the text of the email sought to persuade the prostitute to "upgrade your ad with sponsor placement or automatic repost." In response, the prostitute wrote back that she had "managed to activate my ad and could buy credits as well. thanks for your help. I'm traveling today to [London] how can I change my location." This email exchange was later forwarded by HYER to C.F. with a cover note stating: "[I]deal scenario for [Company B] agent – user activates ad, user purchases credit."

121.    On December 14, 2015, C.F. was part of an email exchange concerning an ad that had an IP address associated with Company B. This email contained the following description of Company B's process for creating and selling prostitution ads on Backpage: (1) "Staff found lead in assigned area." (2) "Staff entered all relevant into [database] (phone/email/etc.)" (3) "Staff called lead to discuss creation of free ad" (4) Staff created free ad for lead (verification email sent). (5) Staff followed under with an email reminding lead of phone conversation and detailing verification of ad."

E.    Select Victim Summaries

122.    Between in or around 2009 and 2013, Victim 1 was sold for sex, through the use of Backpage ads, in Ohio, Indiana, and Georgia. Victim 1's Backpage ads often included words and phrases that were indicative of prostitution, such as "roses" (money). On at least one occasion, Victim 1 contacted Backpage after a proposed ad had been rejected because it contained banned words and phrases. In response, a Backpage representative coached Victim 1 on how to re-write the ad using different words. Victim 1's trafficker took all of the money that was earned through her acts of prostitution.

123.    Between in or around 2009 and 2011, Victim 2 was sold for sex, through the

use of Backpage ads, in Arizona, Georgia, North Carolina, Texas, New York, New Jersey, and Louisiana.  Victim 2's trafficker drafted her Backpage ads and Victim 2 initially did not know she was being offered on Backpage.  The ads contained words and phrases to make customers believe Victim 2 was "barely legal" and also contained words and phrases indicative of prostitution, such as "roses" (money).

124.    Between in or around 2009 and 2012, Victim 3 was sold for sex, through the use of Backpage ads, in Colorado and North Dakota.  Victim 3's pimp instructed her to review existing prostitution ads on Backpage to learn how to draft her own ads.  During a portion of this period, Victim 3 was required by her pimp to make week-long trips to North Dakota to work as a prostitute.  During these trips, which would generate as much as $2,000 in prostitution-derived revenue each day, Victim 3 was forced to leave her children at home in the care of her pimp.

125.    In or around 2010, Victim 4 was sold for sex, through the use of Backpage ads, in Washington.  During this period, Victim 4 was a juvenile (15 years old).  Victim 4's pimp drafted the ads that were placed on Backpage.  The wording of these ads was edited by Backpage before publication.  The ads contained words and phrases such as "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL" and included pictures of Victim 4 in provocative positions showing her breasts and buttocks.

126.    Between in or around 2011 and 2016, Victim 5 was sold for sex, through the use of Backpage ads, in Massachusetts and Rhode Island.  During much of this period, Victim 5 was a juvenile (14-19 years old).  Victim 5's female pimp instructed Victim 5 that Backpage was the safest place to advertise because it did not require age verification. On one occasion, Backpage declined to accept a proposed ad that indicated Victim 5 was only 17 years old.  In response, the ad was simply resubmitted with a new (false) age of 19. On other occasions, Backpage removed provocative pictures of Victim 5 from ads and then allowed edited versions of the ads to be published.  Victim 5's Backpage ads included

words and phrases that were indicative of prostitution, such as "roses" (money) and "back door" (anal sex). Some of the customers who responded Victim 5's Backpage ads forced Victim 5 to perform sexual acts at gun point, choked her to the point of having seizures, and gang-raped her.

127. In or around June 2012, Victim 6 was sold for sex, through the use of Backpage ads, in Arizona. Her traffickers utilized Backpage ads that did not offer a specific person but instead generally offered a woman with a particular type of hair color and build. On June 22, 2012, Victim 6 was dispatched to a customer who had responded to a Backpage ad featuring "Nadia," who was described as a slender brunette woman. Upon her arrival at the location, Victim 6 was stabbed to death.

128. Between in or around 2012 and 2015, Victim 7 was sold for sex, through the use of Backpage ads, in Washington and Oregon. Victim 7's pimp drafted the ads that were placed on Backpage. The wording of these ads was edited by Backpage before publication. The ads contained provocative nude pictures of Victim 7.

129. Between in or around 2013 and 2014, Victim 8 was sold for sex, through the use of Backpage ads, in Maine, Connecticut, and Massachusetts. During this period, Victim 8 was a juvenile (15 years old). Victim 8's uncle, as well as his friends, placed the ads on Backpage, which included words and phrases that were indicative of prostitution, such as "roses" (money), "fetish friendly," and 150 for 1/2 hour, 200 for full hour. Through these ads, Victim 8 was forced to do "in-calls" (where she was raped in hotels) as well as "out-calls" (where she was raped at other locations chosen by the men paying for her).

130. In or around 2013, Victim 9 was sold for sex, through the use of Backpage ads, in Florida. Victim 9's pimp taught her how to use code words in her Backpage ads to indicate how much she was charging for certain sex acts. Victim 9 was brutally attacked by her trafficker, causing bruises and a fractured cheek bone.

131. Between in or around 2014 and 2015, Victim 10 was sold for sex, through

the use of Backpage ads, in California and Arizona. During some of this period, Victim 10 was a juvenile (17 years old). An associate of Victim 10's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire" and included pictures of Victim 10 in provocative positions showing her legs, stomach, shoulder, and buttocks.

132.   Between in or around 2014 and 2015, Victim 11 was sold for sex, through the use of Backpage ads, in Arizona, Colorado, Minnesota, Oregon, California, Montana, Nevada, New Mexico, and Utah. The Backpage ads contained words and phrases indicative of prostitution and included pictures of Victim 11 in provocative positions. On some occasions, Backpage would remove certain explicit photos from the ads but publish the remaining text and other photos. Victim 11's trafficker gave her drugs, took her identification documents, sexually assaulted her with a firearm, and forced her to work full-time as a prostitute.

133.   In or around 2015, Victim 12 was sold for sex, through the use of Backpage ads, in California and Arizona. Victim 12 was first advertised on Backpage in San Bernardino, California, but moved to the Phoenix metro area because the Super Bowl was being held there. Victim 12's advertisements on Backpage contained words and phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}" and included pictures showing Victim 12's legs, stomach, shoulders and buttocks.

134.   In or around 2015, Victim 13 was sold for sex, through the use of Backpage ads, in California. During this period, Victim 13 was a juvenile (15 years old). Victim 13 and her trafficker both posted the Backpage ads, which falsely represented that Victim 13 was 19 years old and showed pictures of her face and body. On at least one occasion, a Backpage representative contacted Victim 13 with instructions on how to fix an ad so it could be published.

135.   In or around June 2015, Victim 14 was sold for sex, through the use of a

Backpage ad, in Texas. This ad contained words and phrases such as "fun, young, exotic," "Ready to be your fantasy girl," "OUT CALLS ONLY," and "NO BLACK MEN" and included pictures of Victim 14's stomach, breasts, shoulders, and buttocks. On or around June 20, 2015, Victim 14 was murdered by a customer. Afterward, the customer attempted to destroy Victim 14's corpse by lighting it on fire. Victim 14's father later contacted Backpage to request that the ads showing his deceased daughter be removed. Backpage did not immediately comply with this request.

136. In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana. These ads contained words and phrases such as "Thick Glass of Chocolate Milk Looking for a GoodTime!!!" and "sexy certified freak" and contained pictures showing Victim 15's legs, shoulders and buttocks. On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will. In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.

137. In or around July and August 2015, Victim 16 was sold for sex, through the use of Backpage ads, in Michigan. These ads contained words and phrases such as "OUTCALLS ONLY," "Juicy Caramel Lady On Duty," "Sexy, Erotic Caramel Dream," and "No Thugs, Pimps Or Weirdos" and contained pictures showing Victim 16's breasts, legs, lips, buttocks, and face. On August 15, 2015, Victim 16 was murdered by a customer. Afterward, the customer dumped her corpse in a park.

138. Between in or around 2015 and 2016, Victim 17 was sold for sex, through the use of Backpage ads, in Arizona and California. Victim 17 averaged ten customers a day during this time and turned over all of her prostitution earnings (approximately $1,500 per day) to her pimp. An associate of Victim 17's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true!" and "Sorry, but NO BLACK MEN" and included pictures of Victim 17's buttocks and face.

- 35 -

F.     Money Laundering Activities

139.   Backpage's customers have overwhelmingly used the proceeds of criminal activity (*i.e.*, money earned from pimping and prostitution) when purchasing ads on Backpage.   In addition, because Backpage's publication of such ads is an independent crime (*e.g.*, violation of 18 U.S.C. § 1952), the fees it collects from customers posting prostitution ads—estimated at more than $500 million since 2004—constitute the proceeds of unlawful activity.

140.   For these and other reasons, banks and financial institutions have repeatedly refused to do business with Backpage.  In response, the BACKPAGE DEFENDANTS have pursued a variety of money laundering strategies.  For example, on August 27, 2013, C.F. was forwarded an array of emails from Backpage customers who were complaining that their credit card companies had refused to process Backpage-related transactions.   One customer wrote:  "Have you resolved the issue of Chase Bank not honoring payment for you for ethical reasons?"  C.F. forwarded these complaint emails to LARKIN, SPEAR, and BRUNST and proposed, as a "solution" to the problem, that Backpage reconfigure its website to fool credit card companies into believing the charges were being incurred on a different website.

141.   During a November 2013 presentation by C.F. to LARKIN, SPEAR, and BRUNST, C.F. again discussed strategies for fooling credit card companies into believing that Backpage-associated charges were being incurred on different websites, including a proposal to set up shell companies without any apparent connection to Backpage ("create new companies with new principals") and use their bank accounts to accept payment. Another "solution" was to "allow users to fund an account thru several other sites" that "have no adult or images."

142.   On November 6, 2013, LARKIN, SPEAR, and BRUNST received an email entitled "Options for the future of Backpage."  This email discussed various strategies for creating new entities to process Backpage-related payments "without ever disclosing ties

- 36 -

to Backpage."

143.   On April 1, 2015, BRUNST and C.F. were informed that Mastercard was "snooping around" Backpage and might stop processing payments for Backpage.   In response, C.F. offered several suggestions for setting up new payment channels that would conceal Backpage's involvement.   One such proposal was to begin routing Backpage-related transactions through banks located in the country of Mauritius.   In response, BRUNST stated: "Didnt we go down the Mauritius path once and the banks had the same issue with our content?"

144.   Notwithstanding these strategies, the three major credit card companies stopped doing business with Backpage.  On or about April 30, 2015, Backpage learned that American Express would no longer allow its cards to be used for any purchases in Backpage's adult section.  In or around July 2015, Backpage learned that Mastercard would no longer allow its cards to be used for Backpage-related transactions.  When discussing this decision, MasterCard stated that it "has rules that prohibit our cards from being used for illegal activities."  Around the same time, Backpage learned that Visa would no longer allow its cards to be used for Backpage-related transactions.   When discussing this decision, Visa stated that its "rules prohibit our network from being used for illegal activity."

145.   Similarly, some banks closed accounts that were held by Backpage (or Backpage-related entities) out of concern the accounts were being used for illegal purposes. For example, on April 2, 2014, BRUNST received a letter from U.S. Bank that was addressed to "Backpage.com."  The letter explained: "Dear Jed . . . please be advised that we have elected to close your Account with us."

146.   Backpage responded to these developments in several ways.  One was to encourage customers to send checks and money orders to a Post Office box held in the name of a seemingly-unrelated entity called Posting Solutions LLC ("Posting Solutions") and give such customers a corresponding credit on Backpage.  For example, on July 31,

- 37 -

2015, C.F. exchanged email correspondence with a representative from a payment processing company. In this email, C.F. identified himself as the CEO of Posting Solutions, described Backpage as a "brand" operated by Posting Solutions, and explained he was seeking to "find a way to position payments under another company."

147. The following episode provides an example of how the Posting Solutions payment process worked. On October 16, 2015, Backpage received an email from a customer complaining about her inability to pay for ads using a credit card. In response, a Backpage representative explained—in an email exchange later forwarded to VAUGHT— that "[i]f you would like to pay for upgrades or buy credits, we suggest posting with alternative payment methods such as Bitcoin. If you are in the United States, you can also pay by check or money order. Please make payable to 'Posting Solutions.' WE CAN ONLY ACCEPT CHECKS OR MONEY ORDERS MADE OUT TO 'POSTING SOLUTIONS.' Posting Solutions. Attn: Accounts. P.O. Box 192307. Dallas, TX 75219. Please send through the United States Postal Service. FedEx, UPS, or other mail delivery alternatives cannot deliver to a P.O. Box. When sending your payment please be sure to include your email address. Please do not make your payments out to backpage.com as we will no longer be able to accept them."

148. Between around September 2015 and June 2016, over $7.1 million of checks and money orders sent by Backpage customers were deposited in bank accounts held by Posting Solutions.

149. Backpage also utilized a different entity, called Website Technologies, LLC ("Website Technologies"), to process Backpage-related funds and took steps to make it appear that Backpage and Website Technologies were independent entities. For example, on March 10, 2014, BRUNST, SPEAR, and others participated in an email exchange with the subject line "Website Technologies vs Backpage (Vendors, audits, risk assessments, email)." During this exchange, one person stated "[C.F.] and I were just discussing company names and the possibility of updating our email addresses to

websitetechnologies.com." In response, BRUNST cautioned: "We need to think this thru or all the work to separate it from BP will be lost." Similarly, on April 3, 2014, BRUNST sent an email to SPEAR and others explaining that "[b]y May 1 we will have to be out of US Bank. We will move all banking under Website Technologies at [a different bank, BMO Harris]."

150.   In many instances, Backpage-related money that was initially deposited into accounts held by Posting Solutions was later transmitted to accounts held by Website Technologies. For example:

• On October 27, 2015, C.F. received an email entitled "Two packages coming your way! (Money Orders)." The email stated that two UPS packages filled with money orders were being sent—one containing $47,647.25 of money orders made out to Backpage and the other containing $52,251.48 of money orders made out to Posting Solutions.

• Similarly, on November 16, 2015, C.F. received an email entitled "Three packages sent today $441,408.69." The email stated that three packages filled with money orders were being sent—one containing $129,193.61 of money orders made out to Backpage, another containing $244,353.63 of money orders made out to Posting Solutions, and the last containing an additional $67,861.75 of money orders made out to Posting Solutions.

• And again, on January 29, 2016, a Posting Solutions account wired $2.4 million to a Website Technologies account. PADILLA and C.F. were both authorized signers on the recipient account.

151.   In addition to receiving millions of dollars from Posting Solutions, the Website Technologies accounts also served as the repository for millions of dollars of wires from international bank accounts controlled by Backpage-associated entities. For example, between January 2015 and December 2016, Website Technologies accounts received over $45.4 million in wire transfers from Backpage-associated bank accounts in Liechtenstein, over $30.1 million in wire transfers from Backpage-associated bank accounts in Iceland,

and over $3.9 million in wire transfers from Backpage-associated bank accounts in the Netherlands.

152.   In many instances, the next stage of the money-laundering process was for money to be wired from Website Technologies accounts to bank accounts held by a different entity called Cereus Properties LLC ("Cereus Properties").   The authorized signers on the Cereus Properties accounts included SPEAR and BRUNST.   Between around December 2015 and October 2016, Website Technologies accounts sent wire transfers totaling over $47 million to accounts held by Cereus Properties.

153.   Accounts held by Cereus Properties also received money directly from international bank accounts controlled by Backpage-associated entities.   For example, between around August 2016 and November 2016, Cereus Properties accounts received over $11.3 million in deposits and wire transfers from Backpage-associated accounts in the Netherlands.

154.   After money reached Cereus Properties, large portions of it were funneled back to Backpage or to certain BACKPAGE DEFENDANTS.   For example, between January 2016 and January 2017, LACEY (and LACEY's family members) received distributions totaling over $30.3 million and LARKIN separately received distributions totaling over $21 million.

155.   Backpage also furthered its money laundering efforts through the use of bitcoin processing companies.   Over time, Backpage utilized companies such as CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital to receive payments from customers and/or route money through the accounts of related companies.

156.   Backpage also furthered its money laundering efforts by developing ways for customers to purchase ads using gift cards issued by third-party vendors.  This process was described in a July 23, 2015, email exchange between various Backpage employees on which HYER and others were copied.  This exchange included the following: "[W]hat if we used a customers [sic] payment method, say visa prepaid card, to buy [bitcoin] from

1   our seller account . . . giving said bitcoin to our catch-all wallet elsewhere (instead of to

2   user), simultaneously adding credits/purchasing paid ad or upsells?   From the user's

3   perspective they just input their prepaid card and get their credits or purchase."

## COUNT 1

### (Conspiracy)

6   157.   The factual allegations in Paragraphs 1-156 are incorporated by reference

7   and re-alleged as though fully set forth herein.

8   158.   Beginning in or around 2004, and continuing through the present, in the

9   District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, HYER,

10  PADILLA, and VAUGHT, and others known and unknown to the grand jury, knowingly

11  and intentionally agreed, confederated, and conspired with each other, and with others

12  known and unknown to the grand jury, to commit the following offenses against the United

13  States:

14          a.      18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution).

### OBJECT OF THE CONSPIRACY

16  159.   The object of the conspiracy was to obtain money.

### MANNER AND MEANS OF THE CONSPIRACY

18  160.   The manner and means of the conspiracy are described in paragraphs 1-156

19  above, incorporated by reference and re-alleged as though fully set forth herein.

### OVERT ACTS

21  161.   Overt acts were committed in furtherance of the conspiracy, including but

22  not limited to those described in paragraphs 1-156 above, incorporated by reference and

23  re-alleged as though fully set forth herein.

24  In violation of 18 U.S.C. § 371.

## COUNTS 2-51

### (Travel Act—Facilitate Prostitution)

162.    The factual allegations in Paragraphs 1-161 are incorporated by reference and re-alleged as though fully set forth herein.

163.    On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214, and thereafter performed and attempted to perform an act that did promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as follows:

| Count | Date | Description |
|---|---|---|
| 2. | Sept. 10, 2013 | Publish ad depicting Victim 5 entitled "Get freaky Tuesday . . Come spend ur day with us – 19," with accompanying text "Doin incalls and outcalls" |
| 3. | Jan. 27, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 4. | Jan. 29, 2014 | Publish ad depicting Victim 8 entitled "Puerto Rican mami in walpole area INCALLS –19" after deleting one picture from the originally-submitted ad |
| 5. | Jan. 31, 2014 | Publish ad depicting Victim 8 entitled "Exotic latina, south portland area, ready to play, INCALLS, 30 min specials!!! – |

| | | |
|---|---|---|
| | | 19" after deleting one picture from the originally-submitted ad |
| 6. | Feb. 6, 2014 | Publish ad involving P.R. entitled "75 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 7. | Apr. 20, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 8. | May 7, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 9. | May 31, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 10. | July 1, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 11. | Aug. 19, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!" |
| 12. | Nov. 23, 2014 | Publish ad depicting Victim 10 entitled "New in Town Super Hot Skinny Mixed Cuban Girl With Long Black Hair – 18" after deleting picture from originally-submitted ad |
| 13. | Jan. 29, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asain Bombshell with a Nice & Tight {Booty} – 23" after deleting one picture from the originally-submitted ad |
| 14. | Jan. 31, 2015 | Publish ad depicting Victim 10 entitled "NEW IN TOWN sexy sweet European mixed Cuban California girl – 21" |
| 15. | Jan. 31, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asian mixed Bombshell – 23" after deleting one picture from the originally-submitted ad |
| 16. | Feb. 4, 2015 | Publish ad depicting Victim 11 entitled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy – 26," after |

| | | deleting pictures from originally-submitted ad |
|---|---|---|
| 17. | Feb. 18, 2015 | Publish ad depicting Victim 11 entitled "Alexis Foxx the HOTTEST in town!!!!! – 26," after deleting six pictures from the originally-submitted ad |
| 18. | Feb. 26, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 19. | May 18, 2015 | Publish ad depicting Victim 15 entitled "GORGEOUS ebony PLAYMATE Perfect Curves…Skills to make ur TOES CURL – 19," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" |
| 20. | May 19, 2015 | Publish ad depicting Victim 15 entitled "Hot & Driping Submissive Ebony Playmates – 20," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "We're ready to please and accommodate all of your needs and wants!!  With a mouth that'll ROCK your [] and a [picture of cat] that'll leave you purring for more" |
| 21. | July 1, 2015 | Publish ad depicting Victim 17 entitled "AbSoLuTeLy AmAziNg CoMe PLaY WiTh Me #1 MoST WaNtEd SwEeT SEXii PlAymate – 20," with accompanying text "By contacting me you agree that you are not affiliated with any form of law enforcement," PERFECT & Will satisfy your every need," and "IN/CALLS – ONLY" |
| 22. | July 2, 2015 | Publish ad depicting Victim 17 entitled "SeXy!! Exotic playmate Call me! the girl you NEED to See! – 20," with |

| | | accompanying text "I DO NOT OFFER 40$, 50$, 60$ SPECIALS" and "IN/CALLS – ONLY" |
|---|---|---|
| 23. | Aug. 13, 2015 | Publish ad depicting Victim 13 entitled "Young SEXY PUERTO RICAN – 19," which accompanying text "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" |
| 24. | Aug. 15, 2015 | Publish ad depicting Victim 16 entitled "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW – 23" |
| 25. | Sept. 13, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 26. | Nov. 28, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 27. | Apr. 21, 2016 | Publish ad entitled "Finally!!  PSE & GFE – Kimber Rae and MIA Marie Together BOOK NOW" |
| 28. | Nov. 3, 2016 | Publish ad entitled "GFEE New – 18" |
| 29. | Nov. 11, 2016 | Publish ad entitled "Mind blowing Tiffany. Incall in Taunton – 37," with accompanying text "Soft GFE . . . Im real and reviewed" |
| 30. | Nov. 14, 2016 | Publish ad entitled "Top Model  2016 Special  'Best Looking Young Asian' . . . – 22," with accompanying text "Sexy Asian Girl Incall Service" and "GFE" |
| 31. | Nov. 14, 2016 | Publish ad entitled "Sometimes It's All About The Journey, And  The  Destination…..Erectile  Dysfunctional  G  F  E Provider – 44," with accompanying test "You can find a few current reviews at T3R xxxxxx#" and "I have been EROS authenticated" |

| 32. | Nov. 19, 2016 | Publish ad entitled "The True (G)irl (F)riend (E)xperience… Visiting November 27th Sunday ~ PRE-BOOKING SPECIAL ~ - 100," with accompanying text "Let's blur restrictions between financial transaction & Romantic Connection" |
|---|---|---|
| 33. | Nov. 24, 2016 | Publish ad entitled "Top Asian Grand Opening 100% Young 100% Sexy  . . . – 23," with accompanying text "BEST INCALL IN TOWN!" and "GFE" |
| 34. | Nov. 26, 2016 | Publish ad entitled "I LOVE MEN!! I'm a GFE. OutCall and Incall with exception on the Incall!! – 42" |
| 35. | Dec. 20, 2016 | Publish ad entitled "OMG  Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24," with accompanying text "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" |
| 36. | Jan. 15, 2017 | Publish ad entitled "Real & Reviewed Girlfriend Theonesweet.weebly.com – 30," with accompanying text "250 G F E" |
| 37. | Apr. 4, 2017 | Publish ad entitled "KISSING & GFE KOREAN GIRLS – 20" |
| 38. | Apr. 11, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 39," with accompanying text "complete GFE experience" |
| 39. | July 3, 2017 | Publish ad entitled "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit – 20," with accompanying text "100% GFE with 100% no Pimps" |
| 40. | July 15, 2017 | Publish ad entitled "Ready for some fun daddy? This is your chance too have a amazing time - 21," with accompanying text "Slim body, nice tits, freaky, GFE" |

| 41. | July 15, 2017 | Publish ad entitled "New in town BiGBubble Booty SWEETLiPS HOT BODY – 24," with "GFE" in accompanying text |
| 42. | July 21, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 30," with accompanying text "complete GFE experience" |
| 43. | July 23, 2017 | Publish ad entitled "ASIAN GODDESS young – 20," with accompanying text "100% Discreet service" and "#GFE" |
| 44. | Jan. 26, 2018 | Publish ad entitled "GFE Service Available!   Private Encounters w/ Pampering Beauty" |
| 45. | Jan. 30, 2018 | Publish ad entitled "241 & white plans area  Carfun  Perfect Treat   Available No Rush," with "Sweet Sexy GFE" in accompanying text |
| 46. | Jan. 30, 2018 | Publish ad entitled "GFE REAL HOT Sweet DREAM AMAZING BEST RELAX" |
| 47. | Jan. 30, 2018 | Publish ad entitled "Tall, Slim & Sexy Luxe Goddess * NARCISA * Sensual Body Rub + Fetish Sessions," with accompanying text "gfe Hh: $160  H: $220" |
| 48. | Jan. 31, 2018 | Publish ad entitled "Exotic Asian Beauty," with accompanying text "I am an independent GFE with excellent massage skills" |
| 49. | Feb. 1, 2018 | Publish ad entitled "Nuru (Best GFE ever) incall only" |
| 50. | Feb. 6, 2018 | Publish ad entitled "Tuesday with Ashleigh. Available now," with "GFE" in accompanying text |
| 51. | Feb. 6, 2018 | Publish ad entitled "GFE  Kisskisspop 100% Real Photo Choice 9Asian girl Nurunude" |

In violation of 18 U.S.C. § 1952(a)(3)(A) and (b)(1)(i).

- 47 -

1

**COUNT 52**

2

**(Conspiracy To Commit Money Laundering)**

3      164.   The factual allegations in Paragraphs 1-163 are incorporated by reference

4   and re-alleged as though fully set forth herein.

5      165.   Beginning in or around 2004, and continuing through the present, in the

6   District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and

7   HYER, and others known and unknown to the grand jury, knowingly and intentionally

8   agreed, confederated, and conspired with each other, and with others known and unknown

9   to the grand jury, to commit the following offenses against the United States:

10          a.      18 U.S.C. § 1956(a)(1)(A)(i) (Promotional Money Laundering)

11          b.      18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering)

12          c.      18 U.S.C. § 1956(a)(2)(A) (Int'l Promotional Money Laundering)

13          d.      18 U.S.C. § 1956(a)(2)(B)(i) (Int'l Concealment Money Laundering)

14          e.      18 U.S.C. § 1597 (Transactional Money Laundering)

15   In violation of 18 U.S.C. § 1956(h).

16

**COUNTS 53-62**

17

**(Concealment Money Laundering)**

18      166.   The factual allegations in Paragraphs 1-165 are incorporated by reference

19   and re-alleged as though fully set forth herein.

20      167.   On or about the dates set forth below, each instance constituting a separate

21   count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY,

22   LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand

23   jury, knowing that the property involved in a financial transaction represented the proceeds

24   of some form of unlawful activity, conducted and attempted to conduct such a financial

25   transaction which in fact involved the proceeds of specified unlawful activity knowing that

26   the transaction was designed in whole and in part to conceal and disguise the nature, the

27   location, the source, the ownership, and the control of the proceeds of the specified

28

- 48 -

unlawful activity, as follows:

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 53. | May 18, 2016 | $1,476,505.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 54. | May 18, 2016 | $264,438.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 55. | May 31, 2016 | $3,171,675.80 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 56. | May 31, 2016 | $432,961.87 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 57. | June 20, 2016 | $842,878.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 58. | June 30, 2016 | $3,076,147.75 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 59. | July 27, 2016 | $3,252,681.62 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 60. | July 27, 2016 | $438,818.86 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 61. | Aug. 16, 2016 | $804,250.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 62. | Aug. 31, 2016 | $3,171,264.42 | Website Technologies (x2008) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(1)(B)(i).

**COUNTS 63-68**

**(International Promotional Money Laundering)**

168.   The factual allegations in Paragraphs 1-167 are incorporated by reference and re-alleged as though fully set forth herein.

169.   On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|-------|------|--------|-------------|
| 63. | Mar. 4, 2014 | $6,450.00 | U.S. Bank (x1165) to S.B. (web developer in India) |
| 64. | Aug. 5, 2016 | $5,005,732.86 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 65. | Sept, 22, 2016 | $2,916,955.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 66. | Oct. 3, 2016 | $354,050.84 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 67. | Nov. 2, 2016 | $2,726,170.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 68. | Nov. 15, 2016 | $351,403.54 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(2)(A).

- 50 -

## COUNTS 69-93

### (Transactional Money Laundering)

170.    The factual allegations in Paragraphs 1-169 are incorporated by reference and re-alleged as though fully set forth herein.

171.    On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|-------|-----------|------|--------|-------------|
| 69. | LACEY, BRUNST | Aug. 21, 2013 | $30,000.00 | Bank of America (x1793) to Stewart Title (partial payment for Sedona property) |
| 70. | LACEY, BRUNST | Sept. 13, 2013 | $62,491.47 | BMO Harris to Stewart Title (partial payment for Sedona property) |
| 71. | SPEAR | June 11, 2014 | $300,000.00 | National Bank of Arizona (x0178) to Spear Family Trust |
| 72. | SPEAR | June 20, 2014 | $200,000.00 | National Bank of Arizona (x0178) to TD Ameritrade |
| 73. | SPEAR | Nov. 4, 2014 | $1,000,000.00 | National Bank of Arizona (x0178) to UBS Financial |
| 74. | SPEAR | May 14, 2015 | $250,000.00 | National Bank of Arizona (x0178) to Lincoln National Life |
| 75. | SPEAR | May 26, 2015 | $50,000.00 | National Bank of Arizona (x0178) to Industrial Property |

| | | | | Trust |
|---|---|---|---|---|
| 76. | SPEAR | Nov. 3, 2015 | $300,000.00 | National Bank of Arizona (x0178) to Ally Bank |
| 77. | SPEAR | Dec. 1, 2015 | $200,000.00 | National Bank of Arizona (x0178) to Wells Fargo |
| 78. | SPEAR, BRUNST | Jan. 11, 2016 | $133,045.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |
| 79. | BRUNST | Jan. 26, 2016 | $101,974.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 80. | LARKIN, BRUNST | Feb. 3, 2016 | $1,507.944.00 | Cereus Properties (x6211) to Charles Schwab |
| 81. | LACEY, BRUNST | Mar. 1, 2016 | $1,692,020.00 | Cereus Properties (x6211) to Bank of America (x5554) |
| 82. | BRUNST | Apr. 1, 2016 | $220,944.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 83. | LACEY, BRUNST | June 27, 2016 | $397,9500.00 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 84. | LACEY, BRUNST | July 20, 2016 | $12,859,152.57 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 85. | SPEAR | July 22, 2016 | $50,000.00 | National Bank of Arizona (x0178) to Strategic Storage Trust II |
| 86. | LACEY, BRUNST | Aug. 2, 2016 | $16,243.00 | Cereus Properties (x6211) to Wells Fargo (x0495) |

| 87. | LARKIN, BRUNST | Oct. 6, 2016 | $1,206,356.00 | Cereus Properties (x6211) to Charles Schwab (x4693) |
|---|---|---|---|---|
| 88. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1967) |
| 89. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1972) |
| 90. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1986) |
| 91. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1991) |
| 92. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x2014) |
| 93. | SPEAR, BRUNST | Oct. 6, 2016 | $141,444.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |

In violation of 18 U.S.C. § 1957.

## FORFEITURE ALLEGATION ONE

[18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.      Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of this Indictment.  Each defendant so convicted shall forfeit to the United States the following:

a.      All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense.  Such property includes, but is not limited to, the real property located at the following addresses:

i.      1100 UNION ST #0700 SAN FRANCISCO CA 94109-2019

ii.      2043 PLEASANT HILL RD SEBASTOPOL CA 95472-4947

iii.      343 PRESIDIO AVE, SAN FRANCISCO, CA 94115

iv.      2755 FILLMORE ST, SAN FRANCISCO, CA 94123

v.      5300 STELLA LANE, PARADISE VALLEY, AZ 85253

vi.      16901 COLEGROVE DR., DALLAS, TX 75248

vii.      10647 NORTH STATE ROUTE 89A, SEDONA, AZ

viii.      493 ZINFANDEL LN, ST HELENA, CA 94574

ix.      5555 N. CASA BLANCA DR, PARADISE VALLEY, AZ 85253

x.      1308 E. 56TH ST UNIT 2, CHICAGO, IL 60637

Such property also includes, but is not limited to, funds held in the following bank accounts:

i.      Prosperity Bank account number XXXXX7188

ii.      Compass Bank Account number XXXXXX3873

iii.      Compass Bank Account number XXXXXX3825

iv. National Bank of Arizona Account number XXXX0178

v. National Bank of Arizona Account number XXXX0151

vi. National Bank of Arizona Account number XXXX3645

vii. Live Oak Bank Account Number XXXXXXXXXX2523

viii. Ascensus Broker Dealer Services Account Number XXXXX6943-01

ix. Ascensus Broker Dealer Services account Number XXXXX5280-01

x. First Federal Savings & Loan of San Rafael account number XXXX3620

xi. Republic Bank of Arizona account number XXXX1889

xii. Republic Bank of Arizona account number XXXX2592

xiii. Republic Bank of Arizona account number XXXX2912

xiv. Republic Bank of Arizona account number XXXX2500

xv. Republic Bank of Arizona account number XXXX1938

xvi. Bank of America Account number XXXXXXXXXXXX8225

xvii. Bank of America Account number XXXXXXXXXXXX7054

xviii. Bank of America Account number XXXXXXXXXXXX9342

xix. Bank of America Account number XXXXXXXXXXXX0071

xx. San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

xxi. Ally Bank Account Number XXXXXX6292

xxii. Branch Banking and Trust Bank account number XXXXXXXXX0218

xxiii. Green Bank Account number XXX4832

xxiv. Green Bank Account number XXXXXX4293

xxv. Plains Capital Bank account number XXXXXX1098

Such property further includes, but is not limited to, the following domain names:

i. atlantabackpage.com

ii. backpage.be

iii. backpage.com

iv. backpage.com.br

- 55 -

| | | |
|---|---|---|
| 1 | v. | backpage.cz |
| 2 | vi. | backpage.dk |
| 3 | vii. | backpage.ee |
| 4 | viii. | backpage.es |
| 5 | ix. | backpage.fi |
| 6 | x. | backpage.fr |
| 7 | xi. | backpage.gr |
| 8 | xii. | backpage.hu |
| 9 | xiii. | backpage.ie |
| 10 | xiv. | backpage.it |
| 11 | xv. | backpage.lt |
| 12 | xvi. | backpage.mx |
| 13 | xvii. | backpage.net |
| 14 | xviii. | backpage.no |
| 15 | xix. | backpage.pl |
| 16 | xx. | backpage.pt |
| 17 | xxi. | backpage.ro |
| 18 | xxii. | backpage.si |
| 19 | xxiii. | backpage.sk |
| 20 | xxiv. | backpage.us |
| 21 | xxv. | backpage-insider.com |
| 22 | xxvi. | bestofbackpage.com |
| 23 | xxvii. | bestofbigcity.com |
| 24 | xxviii. | bigcity.com |
| 25 | xxix. | chicagobackpage.com |
| 26 | xxx. | denverbackpage.com |
| 27 | xxxi. | newyorkbackpage.com |
| 28 | | |

xxxii.   phoenixbackpage.com

xxxiii.   sandiegobackpage.com

xxxiv.   seattlebackpage.com

xxxv.   tampabackpage.com

b.   To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

2.   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

## FORFEITURE ALLEGATION TWO

### [18 U.S.C. § 982(a)(1)]

1.   Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction under Counts 52 through 93 of this Indictment.  Each defendant so convicted shall forfeit to the United States the following:

a.   All right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in Counts 52 through 93 of this Indictment.  Such property includes, but is not limited to, the real property located at the following addresses:

i.   1100 UNION ST #0700 SAN FRANCISCO CA 94109-2019

ii.   2043 PLEASANT HILL RD SEBASTOPOL CA 95472-4947

- 57 -

iii.  343 PRESIDIO AVE, SAN FRANCISCO, CA 94115

iv.  2755 FILLMORE ST, SAN FRANCISCO, CA 94123

v.  5300 STELLA LANE, PARADISE VALLEY, AZ 85253

vi.  16901 COLEGROVE DR., DALLAS, TX 75248

vii.  10647 NORTH STATE ROUTE 89A, SEDONA, AZ

viii.  493 ZINFANDEL LN, ST HELENA, CA 94574

ix.  5555 N. CASA BLANCA DR, PARADISE VALLEY, AZ 85253

x.  1308 E. 56TH ST UNIT 2, CHICAGO, IL 60637

Such property also includes, but is not limited to, funds held in the following bank accounts:

i.  Prosperity Bank account number XXXXX7188

ii.  Compass Bank Account number XXXXXX3873

iii.  Compass Bank Account number XXXXXX3825

iv.  National Bank of Arizona Account number XXXX0178

v.  National Bank of Arizona Account number XXXX0151

vi.  National Bank of Arizona Account number XXXX3645

vii.  Live Oak Bank Account Number XXXXXXXXXX2523

viii.  Ascensus Broker Dealer Services Account Number XXXXX6943-01

ix.  Ascensus Broker Dealer Services account Number XXXXX5280-01

x.  First Federal Savings & Loan of San Rafael account number XXXX3620

xi.  Republic Bank of Arizona account number XXXX1889

xii.  Republic Bank of Arizona account number XXXX2592

xiii.  Republic Bank of Arizona account number XXXX2912

xiv.  Republic Bank of Arizona account number XXXX2500

xv.  Republic Bank of Arizona account number XXXX1938

xvi.  Bank of America Account number XXXXXXXXXXXX8225

xvii.      Bank of America Account number XXXXXXXXXXXX7054

xviii.     Bank of America Account number XXXXXXXXXXXX9342

xix.       Bank of America Account number XXXXXXXXXXXX0071

xx.        San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

xxi.       Ally Bank Account Number XXXXXX6292

xxii.      Branch Banking and Trust Bank account number XXXXXXXXX0218

xxiii.     Green Bank Account number XXX4832

xxiv.      Green Bank Account number XXXXXX4293

xxv.      Plains Capital Bank account number XXXXXX1098

Such property further includes, but is not limited to, the following domain names:

i.      atlantabackpage.com

ii.     backpage.be

iii.    backpage.com

iv.     backpage.com.br

v.      backpage.cz

vi.     backpage.dk

vii.    backpage.ee

viii.   backpage.es

ix.     backpage.fi

x.      backpage.fr

xi.     backpage.gr

xii.    backpage.hu

xiii.   backpage.ie

xiv.    backpage.it

xv.     backpage.lt

xvi.    backpage.mx

| | | |
|---|---|---|
| xvii. | backpage.net | |
| xviii. | backpage.no | |
| xix. | backpage.pl | |
| xx. | backpage.pt | |
| xxi. | backpage.ro | |
| xxii. | backpage.si | |
| xxiii. | backpage.sk | |
| xxiv. | backpage.us | |
| xxv. | backpage-insider.com | |
| xxvi. | bestofbackpage.com | |
| xxvii. | bestofbigcity.com | |
| xxviii. | bigcity.com | |
| xxix. | chicagobackpage.com | |
| xxx. | denverbackpage.com | |
| xxxi. | newyorkbackpage.com | |
| xxxii. | phoenixbackpage.com | |
| xxxiii. | sandiegobackpage.com | |
| xxxiv. | seattlebackpage.com | |
| xxxv. | tampabackpage.com | |

       b.     To the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

       2.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52 through 93 of this Indictment shall forfeit substitute property, if, by any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or

1  deposited with a third party; has been placed beyond the jurisdiction of the court; has been

2  substantially diminished in value; or has been commingled with other property that cannot

3  be divided without difficulty.

4                                            A TRUE BILL

5

6                                            S/
                                             FOREPERSON OF THE GRAND JURY
7                                            Date:  March 28, 2018

8  ELIZABETH A. STRANGE
   First Assistant United States Attorney
9  District of Arizona

10 JOHN P. CRONAN
   Acting Assistant Attorney General
11 Criminal Division, U.S. Department of Justice

12

13 S/
   KEVIN M. RAPP
14 DOMINIC LANZA
   MARGARET PERLMETER
15 JOHN J. KUCERA
   Assistant U.S. Attorneys

16 REGINALD E. JONES
   Senior Trial Attorney
17 U.S. Department of Justice, Criminal Division
   Child Exploitation and Obscenity Section
18

19

20

21

22

23

24

25

26

27

28