1  ELIZABETH A. STRANGE
First Assistant United States Attorney
2  District of Arizona

3  KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
4  MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
Assistant U.S. Attorneys
5  40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
6  Telephone (602) 514-7500

7  JOHN P. CRONAN
Acting Assistant Attorney General
8  Criminal Division, U.S. Department of Justice

9  REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
10  Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
11  Washington, D.C. 20530
Telephone (202) 616-2807
12  Attorneys for Plaintiff

13

14                    IN THE UNITED STATES DISTRICT COURT

15                        FOR THE DISTRICT OF ARIZONA

16
   United States of America,                    CR-18-00422-PHX-SPL (BSB)
17
                      Plaintiff,          **UNITED STATES' MOTION FOR
18                                          DETENTION PENDING THE
            v.                              IMPOSITION OF RELEASE
19                                          CONDITIONS**

20     2.  James Larkin

21
                      Defendant.
22

23          The   United   States   respectfully   seeks   the   detention   of   defendant   James

24  Larkin("Larkin") unless and until stringent release conditions are imposed.

25          As explained below, Larkin poses a significant risk of flight based on the nature

26  of the charges, his massive financial resources, his frequent international travels (he

27  was arrested returning from a European trip), his possession of significant international

28  assets (including a multi-million dollar property in France), and his current possession

1    of a passport.  These factors suggest that Larkin could easily flee the country and use

2    the wealth he has stashed overseas to live out the remainder of his life, in lavish style,

3    as a fugitive.

4         The United States also harbors concerns that Larkin could, if released without

5    conditions, pose a danger to the community.  As alleged in the 93-count indictment,

6    Larkin is one of the masterminds behind Backpage.com, the internet's most notorious

7    destination for prostitution advertisements, including advertisements depicting the

8    prostitution of children.  In its 14-plus years of existence, the website has helped

9    facilitate the victimization of untold thousands of victims of sex trafficking.

10   Paragraphs 122-138 of the indictment provide a powerful snapshot of such

11   victimization, including instances in which women trafficked via Backpage were

12   murdered and had their corpses desecrated.  Furthermore, although Larkin purported

13   to sell his interest in Backpage in 2015, he has continued receiving large Backpage-

14   related distributions since then and also appears to have retained a degree of

15   operational control over the company.

16        On the other hand, the United States also recognizes that Larkin is a United

17   States citizen with no prior criminal convictions who has abided by the release

18   conditions that were previously imposed in a related proceeding in California state

19   court.  Accordingly, the United States believes there are conditions that would likely

20   be sufficient to justify his release from pretrial custody.  Specifically, to ameliorate the

21   risk of flight, Larkin should be required to relinquish his passport, submit to electronic

22   monitoring, post a sizeable bond from sources that are not subject to forfeiture, provide

23   a complete accounting of his financial holdings, and be precluded from engaging in

24   any financial transactions without prior Court and government approval.  Additionally,

25   to ameliorate any danger to the community, Larkin should be precluded from taking

26   any steps to exercise control over Backpage.  However, unless and until such

27   conditions are imposed, Larkin should remain in custody.

28

**ARGUMENT**

**A.      Legal Standard**

As the Court is no doubt aware, "[t]he Bail Reform Act . . . requires a district court to order a defendant detained pending trial if 'no condition or combination of conditions will reasonably assure the appearance of the person as required.'" *United States v. Gentry*, 455 F. Supp. 2d 1018, 1019-20 (D. Ariz. 2006) (quoting 18 U.S.C. § 3142(e)).   This analysis involves a "two-step inquiry."   *Id.*   First, the Court must make a finding as to whether the defendant presents a "serious risk that such person will flee" if not detained. *Id.* at 1020 (quoting 18 U.S.C. § 3142(f)(2)(A)). The government bears the burden of proving such risk of flight by a preponderance of the evidence.   *Id.*   Second, if the defendant is likely to flee, the Court next must determine whether some set of conditions would sufficiently vitiate that risk.   *Id.* (citing 18 U.S.C. § 3142(g)).   "In making the determination whether conditions exist that would reasonably assure a defendant's appearance, Section 3142(g) requires the district court to take into account four statutory factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or community that would be posed by the person's release." *Id.*

In addition to seeking detention based on the risk of flight, the United States also may seek detention on the ground that the defendant poses a risk of danger to the community.   The government bears the burden of proving such danger by clear and convincing evidence. *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008) ("A finding that a defendant is a danger to any other person or the community must be supported by 'clear and convincing evidence.'") (quoting 18 U.S.C. § 3142(f)(2)(B)).

1          **B.      Flight Risk**

2                  The Court should find, for several reasons, that releasing Larkin without stringent

3          conditions would create a significant risk of flight.

4                  Nature And Circumstances Of Charged Offense.  Larkin is charged with a total of

5          70 felony crimes—specifically, one count of conspiracy, fifty counts of facilitating

6          prostitution in violation of the Travel Act, one count of conspiracy to commit money

7          laundering, ten counts of concealment of money laundering, six counts of international

8          money laundering, and two counts of transactional money laundering.  Many of these

9          counts, standing alone, carry a statutory maximum penalty of 20 years in prison.  The

10         indictment also describes the extreme toll that Larkin's conduct took on the many

11         victims who were sex-trafficked via the Backpage website and, separately, details the

12         extensive efforts that Larkin and others took to launder hundreds of millions of dollars

13         of Backpage-related revenues.  If convicted of all (or even a portion of) these charges,

14         Larkin—who is nearly 70 years old—faces the very real possibility of spending the

15         rest of his life in federal prison.  Such exposure creates a powerful incentive to flee.

16         *See, e.g., United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the

17         much graver penalties possible under the present indictment, the defendants have an

18         even greater incentive to consider flight."); *United States v. Anderson*, 384 F. Supp. 2d

19         32, 35 (D.D.C. 2005) (ordering pretrial detention in white collar case, even though the

20         defendant had no prior felony convictions and "no history of violent criminal activity,"

21         in part because "[t]he combined statutory maximum penalties for the federal crimes

22         with which Mr. Anderson is charged is 23 years. . . .  At 51 years old, Mr. Anderson

23         potentially could spend most of the remainder of his life in prison if convicted.").

24                 Strength Of The Evidence.  The strength of the evidence also supports a flight-

25         risk finding.  As an initial matter, the fact the grand jury has returned an indictment is

26         enough to meet the government's initial burden as to the strength-of-the-evidence

27         factor.  *See, e.g., United States v. Hamlin*, 2007 WL 2225868, *1 (E.D. Mich. 2007)

28         ("Under subsection (g)(2), from the a grand jury having passed an Indictment, there is

1   a definite weight of evidence against the Defendant."); *United States v. Bradshaw*,

2   2000 WL 1371517, \*4 (D. Kan. 2000) ("[T]he grand jury's indictment, standing alone,

3   establishes probable cause for purposes of the Bail Reform Act.").

4   In addition, the indictment in this case is a speaking indictment that sets forth,

5   in extensive detail, some of the evidence supporting the charges against Larkin, including

6   damning emails and internal company documents that Larkin wrote or received.  Finally,

7   the strength of the evidence is further bolstered by the fact that, in January 2017, the Senate

8   Permanent Subcommittee on Investigations ("PSI") issued a 50-page report entitled

9   "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  This report included,

10  among other things, a finding that "Backpage's public defense is a fiction.  Backpage has

11  maintained a practice of altering ads before publication by deleting words, phrases, and

12  images indicative of criminality, including child sex trafficking . . . . Those practices served

13  to sanitize the content of innumerable advertisements for illegal transactions—even as

14  Backpage represented to the public and the courts that it merely hosted content others had

15  created."

16  Notwithstanding all of this, the United States anticipates Larkin may argue that the

17  trajectory of the criminal case against him in California state court (in which pimping-

18  related charges were previously dismissed) somehow undermines the strength of the

19  evidence in this case.  Any such argument should be rejected.  In the California case, Larkin

20  was able to secure dismissal of the pimping-related charges by invoking section 230 of

21  the Communication Decency Act ("CDA"), which preempts state law in certain

22  circumstances.  Because this is a federal case involving violations of federal criminal

23  law, the CDA has no application.  *See* 47 U.S.C. § 230(e)(1) ("Nothing in this section

24  shall be construed to impair the enforcement of . . . [any] Federal criminal statute.").

25  Larkin may further argue that he has complied with the relatively lax release

26  conditions set by the California court (*e.g.*, access to his passport for international

27  travel, a waiver of appearance at court dates, a relatively low bond, no electronic

28  monitoring, etc.) and, therefore, he has inspired confidence that he is not a flight risk.

1    However, the California case is distinguishable from this case for several reasons that

2    give Larkin a greater motive to flee.  *First*, in the California prosecution there has yet

3    to be a probable cause determination. Here, Larkin is faced with a 70 counts charged

4    in a 61-page federal indictment.  *Second*, as noted above, the California prosecution

5    had legal hurdles as a result of section 230 of the CDA.  The CDA provides no such

6    defense here.  *Third*, the federal indictment is far more expansive that the California

7    indictment insofar that it includes international, concealment, and transactional money

8    laundering.  *Fourth*, the California indictment did not seek to forfeit any of Larkin's

9    assets. Here, the federal indictment seeks to forfeit every asset (*e.g.,* multiple homes,

10   international and domestic bank accounts, etc.)  that was purchased in whole or in part

11   with Backpage-generated revenue.  In sum, Larkin now has a greater motive to flee

12   the United States.

13          Defendant's History And Characteristics.  Larkin's history and characteristics

14   also support a flight-risk finding.  On the one hand, the United States acknowledges

15   that aspects of Larkin's background are favorable to him.  He is a United States citizen

16   with community and family ties who has never been convicted of a crime.

17   Additionally, he has appeared for every required court appearance in the California

18   case, has been permitted to travel internationally by the court in that case, and has

19   surrendered his passport to the California court following each such trip.

20          On the other hand, Larkin has access to significant amounts of money, including

21   money in foreign bank accounts.  For example:

22          • Paragraphs 26 and 139 of the indictment explain that Larkin once owned 45% of

23   Backpage and that Backpage has earned approximately $500 million in illicit revenue since

24   2004.

25          • Paragraph 154 of the indictment explains that, "between January 2016 and January

26   2017, LARKIN received [Backpage-related] distributions totaling over $21 million."

27          • Counts 80 and  87 of the indictment summarize instances in which massive

28   quantities of Backpage-related funds were transferred to or  from financial accounts held

by Larkin.

• Finally, the declaration of Special Agent Richard Robinson of IRS-CI, which is enclosed as an attachment to this pleading, provides additional details concerning Larkin's international financial transfers and activities.

For all of the reasons, Larkin has both the financial ability and access to foreign bank accounts to allow him to successfully escape prosecution.  *See, e.g., Anderson*, 384 F. Supp. 2d at 36 ("Anderson appears to have the ability not only to flee the District of Columbia and the United States without detection, but also to live comfortably and evade capture in foreign jurisdictions.  Mr. Anderson has traveled extensively, . . . has numerous international personal and business contacts, . . . [and] appears to have access to substantial assets overseas.").

Larkin also engages in frequent foreign travel.  Again, he was arrested returning from a European trip on April 6, 2018, and he owns a property in France.  Foreign connections, coupled with access to foreign funds, suggest an ability "to live comfortably" abroad, a consideration that supports a flight-risk finding.  *See, e.g., United States v. Hong Vo*, 978 F.Supp.2d 41, 45 (D.D.C. 2013) ("Vo's access to substantial assets overseas, combined with her experience living in Vietnam for the past two years, . . . demonstrate her ability not only to flee . . . the United States . . . but also to live comfortably and evade capture in foreign jurisdictions.") (internal quotation marks omitted); *United States v. Saani*, 557 F. Supp. 2d  97, 98-99 (D.D.C. 2008) ("Defendant's alleged access to funds in foreign bank accounts, and Defendant's alleged purposeful and illegal concealment of that access, is directly relevant to Defendant's flight risk.").

Danger To Community If Released.  The United States also harbors concerns that Larkin could, if released without conditions, pose a danger to the community.  The indictment expresses the grand jury's conclusion that Larkin was one of the masterminds behind a website that has contributed to the victimization of untold thousands of victims (including minors)  of sex trafficking.  Any future effort by Larkin

1     to exert control over Backpage would result in further victimization—and, thus, pose

2     a danger to the community.

3            <u>Conclusion</u>.  In sum, Larkin poses as serious risk of flight due to the severity the

4     charges (and penalties) he faces, his extensive foreign connections and financial resources,

5     and his expressed desire to conceal assets from the government.  Although Larkin will

6     presumably argue that this risk is minimal given that he did not flee despite being exposed

7     to charges in California and knowing he was under investigation in this case, "a pre-

8     indictment investigation and a post-indictment trial are two very different things."

9     *Anderson*, 384 F. Supp. 2d at 40 ("The defense has emphasized . . . that Mr. Anderson has

10     left the country and returned many times during the pendency of the government's

11     investigation into his business and investment activities.  His willingness to remain in and

12     repeatedly return to the United States despite the risk of indictment, the defense argues,

13     indicates that Mr. Anderson wishes to remain here to defend his good name and reputation

14     against attack in the criminal proceeding, even if it means, ultimately, risking his freedom.

15     The Court does not find this argument convincing. . . .  [A] pre-indictment investigation

16     and a post-indictment trial are two very different things.").

17     **C.**       **Danger To The Community**

18            In addition to seeking detention (at least temporarily) based on the risk of flight,

19     the United States also seeks detention on the ground that the Larkin could, if released

20     without conditions, pose a danger to the community.  On this point, the United States

21     simply re-incorporates the argument set forth above.  Any post-indictment effort by

22     Larkin to exert control over Backpage should be forbidden—the website poses a

23     danger to the community.

24     **D.**       **Potential Release Conditions And Request For *Nebbia* Hearing**

25            Because Larkin poses a serious risk of flight, the remaining question is "whether

26     any condition or combination of conditions" authorized under the Act "will reasonably

27     assure the appearance of [Larkin] as required." 18 U.S.C. § 3142(f).  The United States

28     believes that a package of suitable conditions could be crafted here.  Those conditions

1      should include (1) relinquishing his passport, (2) travel restrictions, (3) electronic

2      monitoring, (4) a sizeable bond based on assets that are not subject to forfeiture, (5)

3      providing a complete accounting of all financial holdings, and (6) being precluded

4      from engaging in any financial transactions (except routine, day-to-day expenditures

5      and mortgage payments on a primary residence) without prior Court and government

6      approval.

7              Courts have recognized that "there is much subjectivity in determining what amount

8      of bail will assure a defendant's appearance, and much of necessity must be left to the

9      discretion of the judicial officer who makes the initial determination." *See Wright, Leipold,*

10     *et al., Fed. Practice & Proc. Crim.* § 776 (4th ed. 2017 update).  Congress has also provided

11     significant guidance.  Under 18 U.S.C. § 3142(c)(1)(B), some of the statutorily-authorized

12     conditions are third-party custody, restrictions on a defendant's associations and travel

13     (including association with potential witnesses), periodic reporting, curfews, a bond with

14     solvent sureties, and "any other condition that is reasonably necessary to assure the

15     appearance of the person as required and to assure the safety of any other person and the

16     community."  The Act also contemplates a focus on the defendant's finances as a relevant

17     consideration.  18 U.S.C. § 3142(g)(3)(A) (person's history and characteristics include

18     "financial resources"); *id.* § 3142(c)(1)(B)(xi) and (xii) (authorizing release subject to

19     financial conditions).  For those reasons, courts have routinely determined that release

20     conditions in white collar cases should require the posting of substantial cash or other

21     assets, to be accompanied by a range of other restrictions (such as the surrender of passports

22     and travel limitations). *See, e.g., United States v. Brooks*, 872 F.3d 78, 83-84 (2d Cir. 2017)

23     ("The district court held a hearing and determined that Brooks was a flight risk on the basis

24     of his considerable wealth and the potential for access to foreign accounts if he fled the

25     country. . . .  The district court issued a Bail Release Order . . . granting Brooks's motion

26     for pre-trial release.  The Order included such restrictions as home detention monitored by

27     a private security firm, monitored conversations, independent auditing of bank accounts

28     and assets, and a prohibition on liquid assets being held overseas without the approval of

1   the U.S. Attorney's office.  Brooks and his family sureties also provided $48 million in

2   cash as security for the $400 million bond the court ordered."); *United States v. Dreier*,

3   596 F. Supp. 2d 831, 833 (S.D.N.Y. 2009) (release conditions included "(1) a $10 million

4   personal recognizance bond that, while not secured by cash, will be co-signed by

5   defendant's son, Spencer Dreier, and his mother, Mildred Dreier; (2) home detention, 24/7,

6   in his East Side apartment, secured not only by electronic monitoring but by on-premises

7   armed security guards, supplied by a company acceptable to the Government but paid for

8   by the defendant's relatives; (3) elimination of computer access, surrender of all travel

9   documents, and screening and searching of pre-approved visitors; (4) strict supervision by

10  Pre–Trial Services; and (5) ongoing cooperation with the court-appointed Receiver in

11  identifying and preserving all assets held directly or indirectly by defendant").

12          The United States also requests, should Larkin identify funds or assets that could be

13  used to secure a suitably-large bond, that the Court conduct an inquiry into the source of

14  those funds or assets.  The Bail Reform Act codified a district court's authority to conduct

15  such an inquiry, which is often called a *Nebbia* hearing.  18 U.S.C. § 3142(g)(4) ("[T]he

16  judicial officer . . . shall upon the motion of the Government . . . conduct an inquiry into

17  the source of the property to be designated for potential forfeiture or offered as collateral

18  to secure a bond, and shall decline to accept the designation, or the use as collateral, of

19  property that, because of its source, will not reasonably assure the appearance of the person

20  as required.").  Here, Larkin should not be permitted to use the proceeds of the charged

21  crime to secure his release pending trial.  *Cf. United States v. Sharma*, 2012 WL 1902919,

22  *4 (E.D. Mich. 2012) (holding that although "there is no iron-clad rule that a defendant

23  must show that collateral to support pre-trial release was lawfully acquired," "the

24  legislative history of the [Bail Reform] Act makes clear that Congress believed, in most

25  cases, the potential loss of the fruits of an alleged crime will not reasonably assure the

26  appearance of the defendant at trial" and that "[a]bsent exceptional circumstances, bail

27  funded in part from alleged criminal activity does not adequately assure the appearance of

28  the defendant; instead, as the Senate Committee found, forfeiture of the proceeds of a crime

1    is simply a business cost of avoiding prosecution, leaving the defendant no worse off than

2    before he engaged in criminal activity, but far better off than if in prison").

3        Finally, to reduce the risk that Larkin may be endangering the community, the Court

4    should impose the following conditions: (1) Larkin shall not engage directly or indirectly

5    in the control or operation of Backpage or a similar website, and (2) Larkin shall not

6    participate in, consult with, or otherwise support any business venture that offers or

7    publishes adult content similar to that available on Backpage.

8        Respectfully submitted this 9th day of April 2018.

9
                ELIZABETH A. STRANGE
                First Assistant United States Attorney
10
                District of Arizona

11
                JOHN P. CRONAN
                Acting Assistant Attorney General
12
                Criminal Division, U.S. Department of Justice

13
                */s Kevin Rapp*_____
                KEVIN M. RAPP
14
                DOMINIC LANZA
                MARGARET PERLMETER
15
                Assistant U.S. Attorneys

16
                REGINALD E. JONES
                Senior Trial Attorney
17
                U.S. Department of Justice, Criminal Division
                Child Exploitation and Obscenity Section
18

19

20

21

22

23

24

25

26

27

28

- 11 -