# ATTACHMENT A

## DECLARATION OF SPECIAL AGENT RICHARD ROBINSON

I, Special Agent Richard Robinson, declare:

## INTRODUCTION

1. I am a Special Agent with the Internal Revenue Service Criminal Investigation (IRS-CI) and have been employed in this capacity since 2004. During my law enforcement career, I have investigated multiple violations of federal law within the jurisdiction of IRS-CI.

2. During most of that time I was assigned to the Phoenix Field Office.  My primary responsibilities there included working on white collar crime investigations including, but not limited to, cases involving allegations of: bankruptcy fraud, mail fraud, wire fraud, money laundering, and income tax violations.   I have recently been reassigned as a Computer Investigative Specialist in the E-Crimes Section of IRS-CI.

3.  I have participated extensively in the investigation leading up to the indictment in United States v. Michael Lacey, et al.  This declaration is submitted in support of the government's request for pretrial detention of defendant JAMES LARKIN ("LARKIN"). If called upon, I could competently testify as set forth below:

4. The following is information based on my personal observations, the observations of other federal and state law enforcement agents, a review of records and evidence during the course of the investigation, and evidence obtained through search warrants and subpoenas.

**Transfers of Assets Abroad**

5.   Beginning at least as early as March 2016, LARKIN began a series of wire transfers from one investment account to various parties in France totaling over $750,000.  (See summary in Exhibit A)   LARKIN also sent over $300,000 from this same account to a bank account apparently in the names of LARKIN and his wife held with the institution Banque Wormser

Freres, a bank based in Paris, France. Wire request forms appear to bear signatures for both LARKIN and his wife. (See Exhibits A & B)

6. At least one of the wire transfers to France was to pay for renovation of an apartment at the address of 14, rue Saint Guillaume in Paris, France. The invoice for this renovation was sent by the billing company named A+B Kasha to LARKIN and his wife, listing their address as the French apartment. In my training and experience, the facts that LARKIN occupied the apartment and was renovating the apartment together indicate that LARKIN was likely the owner of said apartment. (See Exhibit C)

**Domestic Financial Account Activity**

7. From at least as early as January 2016, LARKIN made transfers from one of his investment accounts to other U.S. based accounts that he controls or appears to control. While I and other investigators have requested records related to these accounts, we have not yet received all of the records needed to trace these funds to their current state or final disposition. These transfers included (See also summary on Exhibit D):

    a. Three wire transfers totaling $20,000,000 sent to an account with Pershing, LLC in the name of the Acacia Conservation Fund, LP. Research into this entity revealed that it is an investment pool with both U.S. and foreign holdings.

    b. Three wire transfers totaling $16,250,000 sent to an account with The Northern Trust Company in the name of The Ocotillo Family Trust, a trust of which LARKIN and his wife have historically been the trustees. The Ocotillo Family Trust is also the name under which LARKIN'S homes in Paradise Valley, Arizona and Saint Helena, CA are held. While I have seen some documents indicating that at least $500,000 in funds from

this account were transferred to LARKIN'S aforementioned account in France, I have not yet received the records to determine the ultimate source or disposition of those funds.

c. Twenty wire transfers totaling $11,247,500 sent to an account at Wells Fargo Bank in the names of LARKIN and his wife.

d. Four wire transfers totaling $503,000 sent to an account at Wells Fargo Bank in the name of Magnolia Tree Holdings and LARKIN'S wife, Margaret Larkin.

e. LARKIN also transferred over $30,000 in three wires to an entity named Executive Aircraft Services in 2016.

**International Travel**

8. Despite facing pending prosecution for bank fraud and money laundering charges in California, LARKIN has been granted leave to travel internationally.  In fact, LARKIN recently traveled in the region around the United Kingdom and Ireland and was arrested upon his return to the U.S. on Friday, April 6.

9. Prior to that, LARKIN traveled to France from February 16, 2018 to February 24, 2018.

**Sources of Income**

10. LARKIN and his long-time business partner Michael Lacey ("LACEY") each made more than $100 million in profits from their beneficial ownership of Backpage.com since 2013, receiving over $30 million in each of the years from 2013-2015 based on reviews of tax and business documents.   Prior to that, LARKIN'S annual income was about $5 million or less.  The import of this is that the vast majority of LARKIN'S accumulated wealth and assets are new money derived from the promotion of prostitution by Backpage.com and related money laundering activities that are the subject of the recent indictment against LACEY, LARKIN and

other owners and employees of Backpage.com. As such, assets traceable to the proceeds from Backpage.com are subject to seizure and forfeiture allegations that accompany that indictment.

11. Forfeiture allegations were made in the indictment in this case with regard to LARKIN'S following domestic assets totaling over $5 million in estimated value:

| No. | Property | Last Sale Price or Approximate Value |
|---|---|---|
| 1 | ███████████████ Paradise Valley, AZ | $2,500,000 |
| 2 | ███████████████ Chicago, IL | $138,000 |
| 3 | ███████████████ Saint Helena, CA | $2,787,186 |

12. Since at least 2012, LARKIN has had no significant source of income that was not Backpage-derived. LARKIN'S salary from Cereus Properties, LLC in 2013 and 2014 was about $17 million and $27 million respectively. That is in addition to flow-through income from the holding company that owned Backpage of about $20 million and $22 million respectively.

13. In 2015, LARKIN'S income took on a more passive character. LARKIN ceased to receive a salary of more than $1 million, but he received over $14 million in interest income as a result of being 45% owner[1] of the company that holds the $600 million in promissory notes from the business entities that acquired Backpage and related companies.

14. While the Agave Rose Wine Company, LLC has inventory and assets, such as wine or liquor licenses in both Arizona and California, from 2012 to 2015 it did not appear to turn a profit.

**Continued Operation and Control of Backpage.com**

---

[1] According to the 2015 tax return for Medalist Holdings, Inc., LARKIN has a 42.759% interest in the company. However, trusts for both Ramon Larkin and Troy Larkin were each given a 1.181% interest in the company. Adding these three numbers together arrives at an ownership interest for LARKIN of 45.121%, exactly the same share as LACEY'S interest.

15. In reviewing both business documents and correspondence of Backpage.com and related entities over the course of the investigation, I noted that the owners of Medalist Holdings (LARKIN, LACEY, Jed Brunst (BRUNST) and Scott Spear (SPEAR)) retained some aspects of control over the Backpage entities even after the sale transactions in 2014 and 2015, in which Carl Ferrer (FERRER) bought ownership of the Backpage entities. For example, FERRER continued to report to BRUNST and SPEAR, and BRUNST and SPEAR continued to report to LARKIN.

16. Beneficial interest also remained with LARKIN, LACEY, BRUNST and SPEAR after the sale to FERRER.  As proof of this, contrast FERRER'S total income on his 2015 tax return of $1.2 million with LARKIN'S $32 million, even though they are dependent on the same sources of income and FERRER is doing the bulk of the work.

17. Similarly misleading was the claim that Backpage.com put on its site in January 2017 that it had closed down its Adult/Escort ad sections in response to government censorship.  From discussions with agents and detectives who work cases involving prostitution and human trafficking, I understand that the Women Seeking Men personals section of Backpage had a dramatic increase in the number of paid ads, and that the ads there were tied to prostitution from that time forward.   (Exhibit E)

18.  Even through last Friday, April 6, when Backpage ads for Women Seeking Men contained no text other than a phone number, the images strongly suggested that the ads were for prostitution.   (Exhibit F)

**Imminent Loss of CDA Protection**

19. The California indictment that led to LACEY and LARKIN being arrested in October 2016 was dismissed shortly thereafter by a judge who cited immunity granted by 15 U.S.C § 230 –

The Communications Decency Act (CDA). Several civil lawsuits and potential state-court prosecutions against Backpage, LACEY and LARKIN over the past several years have been dismissed under the CDA.

20. However, since that time, three important developments have undermined the CDA protection that LACEY and LARKIN had previously enjoyed:

   a. The U.S. Senate Permanent Subcommittee on Investigations publicly released a report in January titled *Backpage.com's Knowing Facilitation of Online Sex Trafficking*. The report was accompanied by an appendix containing underlying and supporting documents obtained by the subcommittee over the course of its investigation that demonstrated: (1) knowledge on the part of Backpage principals of the nature of Backpage's adult ads and efforts to sanitize those ads to conceal the nature (2) that over 90% of Backpage's revenue was derived from those adult ads and (3) that LACEY and LARKIN retained an interest in Backpage even though they had sold it in 2014 and 2015.

   b. Both the Senate and House passed bills to amend the CDA to eliminate immunity in cases where child sex trafficking is involved. Once signed into law, this amendment to the CDA would potentially open the floodgates for criminal prosecutions from any of the 50 states as well as innumerable civil lawsuits from and on behalf of victims of human trafficking promoted by Backpage.

   c. Federal charges have never been brought against LACEY and LARKIN for their promotion of prostitution and sex trafficking and money laundering. The CDA specifically provides no immunity to federal criminal charges.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief. Executed this 9th day of April 2018 at Phoenix, Arizona.


_s/Richard Robinson_____
Richard Robinson, Special Agent – Computer Investigative Specialist
Internal Revenue Service Criminal Investigation