# EXHIBIT A



MENU

 

SIGN UP
LOG IN

MORE

# WHAT'S MOM WORTH?: WHEN A WOMAN BECAME DEATHLY ILL IN SHERIFF JOE ARPAIO'S JAIL, GUARDS AND NURSES IGNORED HER AGONY



BY MICHAEL LACEY

   

98          6          0

THURSDAY, DECEMBER 9, 2010    |    5 YEARS AGO



Deborah Braillard, mother

**Deborah Braillard, mother**
*(1991)*

*Mom taught me to sew.*

*And I'm going to teach my own baby, Jennylee. Eventually.*

*Jennylee is a quick study for a 6-year-old.*

*She watches as I sew her Minnie Mouse costume. She is double-twice excited, though honestly, I think I like Halloween as much as she does, even if it is a gloomy time of year.*

*Come, sit here, Pumpkin, and watch now how I pin the paper pattern here on the cloth. You see that, sweetie? You cut this out while I trim the red polka dots for your bow.*

*Done.*

*You take a good look at these pieces and try to guess where they'll go. Mommy will be right back.*

As mother and daughter work inside their little trailer, outside, slate-stained cumulonimbus clouds menace, gray anvil domes await the strike.

Deborah ducks, briefly, into the tiny, plywood-framed bathroom for a little pick-me-up. When she emerges, the sweetness of this moment with Jennylee does not escape her notice.

But lightning in the darkness overcomes it.

Deborah shivers in spite of herself.

*Hey there, Pumpkin, here's the last part.*

*I'll just straight-stitch the seams, roll the fabric to make a hem, and secure the bow with a whip-stitch.*

*Let me iron up the white apron and spray it with starch to give it a little oomph.*

*You look perfect.*

*Wait! Wait! . . . Here, a little mascara, we'll make a black dot for your nose and whiskers. Hold still now, a little lipstick.*

*Okay, let's walk over to the community center.*

*Grandma will meet us there.*

*Jennylee, if you aren't the best mouse ever . . .*

**Jennylee Braillard, daughter**
*(2010 interviews)*

"Just about my first memory of my mom was the Minnie Mouse costume she made me at Gold Bar, which is where you can hook up your trailer just outside Monroe, Washington.

"I won first place that Halloween. My prize was a six-pack of root beer."

As Jennylee speaks, her own infant daughter, Kaylynn, coos and looks around, a bow tied to her little, full-moon head.

"My mom was always happy. She was nurturing, caring. She was my mom."

Her mother's ashes sit in a container in Jennylee's home in west Phoenix. The dust is such a small amount inside a little vessel; you'd hardly believe that someone's remains could amount to

so little.

It is a fact that Deborah Braillard did not always make good choices.

She died an agonizing death in a diabetic coma that would wring the life out of her over three weeks that seemed without end.

The bigger truth is that she was hurried on her way.

Deborah Braillard's passing is never far from Jennylee's thoughts; after all, she watched the worst of it.

"I was terrified to open the plastic bag with her ashes. I put mom in a big jewelry box. I think about taking her back to Gold Bar. That's where my grandmother and great grandmother are buried. It's been in the family forever. There are nature trails there . . .

"But I worry if something happens to my uncle who lives there [what would happen to Mom]."

**Consider:** In May 2010, researchers at the University of Wisconsin find that, in stressful situations, cortisol levels in girls soar. But for many of the young women, simply hearing their mother's voice is enough to wash away the anxiety, replacing the stress hormone with feelings of love.

Men have no such relief.

What happens between a mother and daughter comes from God.

**Tamela Harper, inmate**

*(2007 deposition)*

Tamela Harper is detained in Sheriff Joe Arpaio's jail when they put Deborah Braillard into her cell in January 2005.

"She was unconscious [on the evening of the 2nd]. She wasn't hardly there. She walked back to her bunk, and that was the last time I saw that lady walking. People were helping her. She was throwing up constantly. [Next day] that's when she started moaning and groaning and throwing up. She was basically unconscious at the time. She couldn't speak. She couldn't eat. The officers kept saying she was kicking heroin.

"She defecated on herself several times. There was no help for her. We kept telling the officers, you need to help her."

**Brenda Tomanini, inmate**

*(2007 deposition)*

Deborah Braillard threw up on other inmates, from her bunk to theirs. No guards, no nurses. The inmates, and Deborah, were alone on the 3rd.

On the morning of the 4th, medical asked to have Braillard brought into the clinic. But trusties could not wake the unconscious Deborah. She was left vegetating.

"I couldn't get Ms. Braillard up. Couldn't do it. She wouldn't respond to me at all. I could tell that she was breathing, but I couldn't get a response out of her.

"It just freaked me out because I don't think in my experience . . . I don't think she had been on drugs."

But the guards in the jail say different.

"Don't worry about Deborah Braillard. She's getting what she deserves. She's coming off drugs," is how Tomiani remembers it.

The inmates understand the drill, says Tomanini.

Tomanini described a retarded inmate brutalized for her sass.

"It broke my heart. I had to put my head under my blankets, and I cried. It broke my heart to see something like that."

Tomanini's experience with the medical clinic underscores the sense of neglect.

"I got sick and I was running a fever, and I had put a tank order in — that's what they call it for medical. And two months went along, and I didn't get any better. I was waiting for medical to call me . . . You had to fight to get medical attention.

**Consider:** It was standard procedure to collapse on the floor in order to get medical attention. Otherwise you might well be ignored by an overwhelmed medical clinic. Inmates report that guards would actually instruct them to drop, to collapse. Only then would a call — *man down!* — go out to the nurses.

**Deborah Braillard, mother**

*Do I think? I think not.*

*I am aware.*

*I am aware of the I-will-nots:*

*I will not see my granddaughter, Kaylynn, walk. I will not give her my finger to steady her early toddles. I will not go down a slide with her. I will not put a Band-Aid on her owie.*

*I will not get a chance to be a better grandmother than I was a mom. Ever.*

**Consider:** Deputies find methamphetamine in Braillard's purse about midnight on January 1, 2005. She is with a small group of users whose car breaks down in a parking lot on the west side when officers happen upon them.

She is admitted into the jail about 2 a.m. on January 2. Though the entire prison is videotaped around the clock, the sheriff is unable to produce any film of Deborah's early custody.

Historically, when inmates are killed or injured, Sheriff Arpaio loses evidence and incriminating video surveillance or produces video so degraded it is unwatchable.

Almost a full day after her initial booking, Braillard is transferred from the intake jail downtown to the all-female Estrella jail in west Phoenix. For the next 60 hours, guards at Estrella assume, mistakenly, that her wretched condition is the result of her kicking drugs.

This lethal mistake is aided and abetted by a poultice of organizational neglect combined with personal insensitivity that overwhelms thin outbreaks of humanity.

On the afternoon of January 4, 2005, guard Randall Harenberg calls the jail's medical clinic, 40 feet from where Braillard was held. No one comes to assess Braillard. The medical clinic has no record of his call. No jailer has any further contact with the clinic until the morning the ambulance arrives. No guard summons a supervisor.

Though nurses visit the cell twice a day to distribute pills, no deputy asks the nurses to look in on Braillard.

**Sandra Garfias, guard**

*(2007 deposition)*

"There was really nothing going on in the dorm that night [January 4], except we had one inmate kicking drugs. At the time that I worked, [medical] typically did not see inmates that were coming off drugs."

Nor is Garfias trained to differentiate which drug it is that someone might be coming off of.

She does understand that drug withdrawal can be lethal.

Still, she calls no one.

**Dr. Laura Pieri, board certified in psychiatry, neurology, and forensic medicine and past medical director of Arizona's West Yavapai Guidance Clinic and Windhaven Psychiatric Hospital. Currently in private practice.**

*(2010 interview)*

"Anyone in alcohol or barbiturate withdrawal needs medical supervision, and they need it immediately, as soon as you see the first sign. Of those who go into delirium tremens, the DTs, 20 percent die."

Dr. Pieri adds that science is discovering new and alarming facts about another class of drugs that can be lethal in withdrawal: slow-acting benzodiazepines. Commonly prescribed, and abused, such medications as Xanax, Halcium, and Librium, among others, can be toxic for those trying to kick.

**Sandra Garfias, guard**

*(2007 deposition)*

"I heard Braillard vomiting, more than twice, [on the evening of January 4].

"She had been throwing up, and I remember her saying her stomach hurt. I know that the inmates around her changed her bag because they asked me for a bag and also a change of clothing, because she had soiled herself . . . I told her [that] her stomach hurt because she was throwing up and coming off drugs."

In fact, Deborah Braillard is an insulin-dependent diabetic. She has not had insulin since her arrest January 1. Her body is shutting down. She is dying.

Garfias does not call medical. She checks Braillard's identification and moves on.

Did she say she was coming off drugs?

"No."

Was she moving at all?

"Yes, she was."

In what way?

"Squirming in the bed."

She looked uncomfortable?

"Yes."

You thought she was in pain?

"I don't know."

You just said she was holding her stomach. You thought she was in pain?

"Yes.

"I gave the other inmates a change of pants and underwear.

"I had to put them in a biohazard bag because I assumed she had defecated herself."

Was she speaking?

"She was just moaning . . . I don't know when it began. She was moaning when I came on shift . . . It was kind of loud."

You never had any training from the sheriff on inmates kicking drugs?

"No."

In the wee hours of the morning, Garfias extracts Braillard from her cell .

"At around 3 [a.m.], I put Deborah in what we call a boat, in the dayroom."

Garfias fills out the paperwork.

"At approximately 2:45, Deborah was placed in the dayroom due to the fact she's kicking and was groaning, yelling, and keeping the whole dorm up, and the dorm kept yelling at her to shut up."

Although Braillard is moaning, screaming, vomiting repeatedly, and soiling herself, Garfias does not call for medical. Instead, she deposits the woman *in* a blue plastic canoe stuffed with bedding in the empty dayroom.

"As far as her bothering me . . . that wouldn't bother me since I was going to be up all night anyway."

**Tamela Harper, inmate**

*(2007 deposition)*

"We could still hear Deborah in the dayroom making calls out for help. She was moaning. Basically, in a moan, you are wanting help in some sort of way. They wouldn't do anything that morning."

**Jennylee Braillard**

*(2010 interviews)*

"Even when I was little, I knew she was using . . . There was no difference between when Mom was using and when she wasn't. She took care of me. Made my meals. Besides her issues, she was a good mom. When she was in rehab [in Washington state], I'd spend every weekend there. Slept over. It was great. At one point, we went camping. Another time, there was a talent show, and all the people were really nice. All the families got involved. Mom and I and another girl and her mom, we all sang, 'Going to the Chapel.'"

But Jennylee noticed early that her mom always fell for the wrong guy. She collected animals and losers as if she were their patron saint.

"Needless to say, Mom met a guy in rehab, and they left the program. He nearly beat her to death in a hotel. The cleaning lady found her unconscious."

**Brenda Tomanini, inmate**

*(2007 deposition)*

"To think that the staff didn't care that this woman is moaning and groaning and she's pleading for help. I don't know what's wrong with you. There can be a whole lot of things wrong with you, but I would want to try to get you some type of medical attention."

At 7 a.m. on January 5, detention officers Stephanie Lieppert and Lucy Akpan start their shift. Garfias tells them the inmate in the dayroom is kicking drugs. They move Deborah Braillard out of the day room back to her cell.

**Tamela Harper, inmate**

*(2007 deposition)*

"That morning [January 5] they put her back in the main area in her bunk. She had another seizure. She had several seizures, as many as seven."

**Consider:** On January 4, at 8:17 p.m., a friend attempts to visit Braillard but is informed that Deborah is too sick to see anyone. An hour and a half later, at 9:42 p.m., another friend, Debbie Fouts, phones the jail and informs them that Braillard is a diabetic and apparently has not received her insulin.

Deputy Brenda O'Neil takes down the information during the conversation with Fouts about Braillard's insulin and faxes it to the jail's medical clinic, about 40 feet from where the inmate is vomiting and defecating and moaning.

Deputy O'Neil's fax violates all protocol. Because a fax is notoriously unreliable, policy insists the critical information be conveyed personally.

None of the nurses in the clinic looks at the fax. Not when it comes in. Not ever.

At 11 p.m. on January 4, Jennylee gets a call from a woman, a friend of Deborah's. Jennylee learns for the first time that her mom is locked up. She immediately calls the jail.

**Jennylee Braillard, daughter**

*(2010 interview)*

"I called the number they give you and got her booking number, her charges, but it's basically an automated answering machine."

> ### RELATED STORIES
>
> ## Prisoners Hang Themselves in Sheriff Joe Arpaio's Jails at a Rate That Dwarfs Other County Lockups

Jennylee then dashes over to her mom's house where she confronts her mom's boyfriend. He was with Deborah when she was arrested three nights earlier.

At 7 the next morning, Jennylee again phones the jail. She is put through to Dennis Flynn, risk manager with County Health. She informs him that her mother is an insulin-dependent diabetic who may not be receiving her medication.

"Was there any way he could get back to me?" she asks.

"No."

"He thanked me for calling and assured me something would be done. When I hung up, I didn't know what to do."

**Stephanie Lieppert, guard**

*(2007 deposition)*

"She threw up again after I moved her back into her cell [from the boat in the dayroom], and just knowing that she had been up that night vomiting and having diarrhea, that would indicate to me that someone needs to be seen."

She calls the medical clinic on the morning of January 5.

Is this the policy of the sheriff?

"No, it is not . . . We were given first-aid training, CPR training. They are very brief on the situation of kicking. We are not told to notify anyone in particular."

**Lucy Akpan, guard**

*(2007 deposition)*

After detention officer Garfias informed her that Braillard was kicking drugs, Akpan called the medical clinic on the morning of January 5.

It is Akpan's experience that the clinic is sometimes reluctant to respond to concerns about inmates' medical conditions.

"She started yelling and screaming — rolling, you know, in the boat . . . I said, 'She has to leave this place. She needs medical attention' . . . It's so devastating because I was, like, how can someone *do this to herself*?

"I'm a mother. I see sick people. I've seen sick children . . . I saw her yelling."

The medical clinic says it has no record of calls from guard Lieppert or guard Akpan.

**Tamela Harper, inmate**

*(2007 deposition)*

At 10 a.m. on January 5, ambulance attendants arrive at Estrella jail for Deborah Braillard.

"I was there for my Accu-Chek because I'm a diabetic.

"I saw her lying on the stretcher, and EMS was there helping her, and I heard one EMS ask the other one what was the vital signs. And when he told her the vital signs [116 over 63], they just looked at each other, like, *wow*. And that's when they took her out.

"The officer started yelling at me for me to sit down, and I started yelling at him, 'You were wrong for all that. You could have helped her.'

"I was told by the guard, 'Sit down and don't be looking at this. This is none of your concern.'

"Us inmates requested medical attention more than half a dozen times.

"They wouldn't do it. 'She's kicking.' 'Get over it. Deal with it. This is jail.' 'It was her fault that she did it to herself. What can we do?'"

**Jennylee Braillard, daughter**

*(2010 interviews)*

"I was living with my grandmother. After my uncle moved to Arizona, he convinced my

grandmother to move to Phoenix to escape Mom's drama. We came here in '95-'96. My mom moved to Spokane, and we all took a trip back to Washington to see her. We went out to dinner, but that was when I was angry with Mom. I didn't want to be apart. Didn't understand why she did the things she did. I ran out to the bathroom. Mom followed me, and we had serious discussion about all this, both crying. The thing I remember is her saying over and over that she loved me. She said she never hit me.

"I vented, and then things were fine between us. I had to accept who she was. She did take care of me. She was good to me.

"She visited Arizona twice, and that's when we learned, at the hospital, that she was a diabetic. It runs in the family.

"Shortly after that, she moved to Arizona. She drove her beat-up Datsun full of her stuff and lived with me and Grandma. We both worked in my uncle's pizza place. At first, there was conflict, because she tried to become boss in the house. But she improved herself in all areas. She was clean."

If Jennylee was content with the status quo, her mom was not. She stage-managed a romance for her daughter.

"She instigated this thing where I went out with [a] driver for the pizzeria. He had a buzzed head with a blue dot."

When the family pizza business closed its doors, mother and daughter went to work at a nearby Kentucky Fried Chicken.

**Consider:** Deputy Cindy Rodriguez does the intake interview of Deborah Braillard about 2 a.m. January 2. Officer Rodriguez is required to interview Braillard about her medical history. This is when the Sheriff's Office should've discovered that the inmate was an insulin-dependent diabetic.

But Rodriguez has no training and is learning on the job. She does not review the police report, which clearly shows Deborah Braillard is on medication.

Because those under arrest are often unreliable, untruthful, or unable to give a full accounting of their health, the national standard is that pre-existing medical records at the jail must be reviewed.

Deputy Rodriguez fails to examine Braillard's medical history on record with the jail, records from previous arrests that show clearly that Deborah is an insulin-dependent diabetic.

Without daily insulin injections, Braillard will go into a coma and die.

But intake officers are under pressure from Sheriff Joe Arpaio to process prisoners more quickly.

Computer records show that Officer Rodriguez entered the information into the database in 59 seconds.

Just as alarming, Sheriff Arpaio's records contain no "receiving screening" form for the time and date of Deborah's actual admission: 2:26 a.m. on January 2, 2005.

Instead, the receiving screening form produced by Maricopa County is dated after her intake. Days later, in fact — after Deborah already had been taken by ambulance to County Hospital, where she died. The receiving screening form is dated January 5, 2005, about 12 hours after Deborah was transported to the hospital.

A nurse in the jail explains why intake paperwork is filled out after a death.

She sees inmates admitted without ever being asked a single question.

"It is a custom, practice, and pattern."

**Deborah Braillard, mother**

*I lived my life thinking I'm a rebel. I'm not like my mother, all moody and sullen about life's hard knocks. Not me. I love the bad boys. I live the life. I did not join the system.*

*Now look at me.*

*Lost my Pumpkin, the only one I truly love.*

*I'm delusional, that's what I am. I'm not outside the system. I am the system. My every move is documented. Every shoplifting report, every security guard, every cop, the juvenile probation officer, the pre-sentence report, the confessions, the plea bargains, the motions, the booking slips, the credit card scams, the mug shots. I am as indelible as a fingerprint. I am the fully revealed cog.*

*A powder sniffer's closet has more willing witnesses than coat hangers. Every friend is weighing betrayal: When do I give up Deborah for a reduced sentence?*

*No one had a real job. We were all chameleons, scoring from each other and ripping each other off. Hell, they bust into my home with masks and guns and grab everything of value. You think those were strangers?*

*The Man owns the paperwork and the rights to my life.*

*My dodge isn't so artful after all.*

**Jennylee Braillard, daughter**

*(2010 interviews)*

"Driving anywhere with my mom was great. She had great taste in music. Once, I got my hair cut and she cut her hair just like mine. She was exciting and fun."

**Elaine Clayton, registered nurse,**

**County Health Services**

*(2007/2010 deposition and interviews)*

When guards Lieppert and Akpan called the medical clinic, they were informed that Deborah would be seen when there was a doctor.

Clayton was in the clinic when Dennis Flynn, acting upon the call from Jennylee regarding her mother's insulin, phoned to warn about Deborah's condition.

But Jennylee's phone call is noted as coming at 7 a.m.

Flynn, the County Health Services risk manager, did not relay her emergency message for two full hours. He phoned the clinic at 9 a.m.

Records show that the clinic did not call for Deborah Braillard until 9:45 a.m., nearly three hours after the daughter notified the county.

"They brought her into the clinic. She sat in the chair. She was very, very lethargic and placed on a stretcher. She was sweating and having a difficult time breathing.

"Breathing became more labored. She looked like death."

Clayton observed that there was no capacity for emergency response.

"The policy was: You called dispatch. Dispatch would then ask a number of questions: identity of inmate, where they were going, could they go in [a] county vehicle, or did they need an ambulance. Then, call [the] sergeant and supply more details. Then, dispatch selects an ambulance company, which must find the jail."

In this case, Clayton argued for the fastest possible response: Call 911.

Instead, CHS followed guidelines and called a commercial ambulance.

"It was the difference between life and death.

"There's a look and sound that people make when they are dying, and she looked and sounded like someone who was dying."

The ambulance arrived at 10 a.m., three hours after Jennylee had raised the red flag.

Clayton worked at CHS for two years before quitting in disgust.

"I saw some incredibly horrible things happen, and I saw no action being taken or visible action being taken to correct the incredible lack of competent healthcare."

**Jennylee Braillard, daughter**

*(2010 interviews)*

"When I got to the hospital [where Deborah was now in a coma], she looked horrible. She was chained to the bed with these big old metal chains. There was a tube down her throat. They said that because of the lack of oxygen she would never be the same. Right from the start, they wanted me to unplug her, but I wouldn't."

**Deborah Braillard, mother**

*By the time I left the sheriff's jail, the pain was much worse than childbirth.*

*Do you think Joe Arpaio understands how I suffered? Shoot, you think Joe Arpaio understands the agony of childbirth. Chop a man's finger off during Lamaze. That would be a start!*

*These guards are Arpaio's women. A wiser woman than me said it right: "Fear was invented by someone who never had the fear."*

*My life left me at both ends of my body: I soiled my pillow and soiled my pants. My body was so torqued it tried to escape in convulsions.*

*They looked past my death rattle and ripped me away from Pumpkin.*

*I scream to Jesus.*

**Elaine Clayton, R.N.**

*(2007/2010 depositions and interviews)*

"Inmates sent tank orders — kites — which were requests for medical care. CHS was supposed to prioritize those requests.

"Oftentimes, it would be days before any of them would be looked at . . . The chances of an appointment for care actually coming to fruition were small . . . They were backlogged by hundreds of appointments."

It wasn't simply that the medical clinic ignored inmates kicking drugs — they ignored everyone."There was a person in the jail with cancer on his tongue, and they made him wait to

see a doctor. He waited four or five months. When you have a cancerous growth, you see a doctor as soon as possible.

"Another one I'll never forget said, 'I need medical attention. I'm bleeding from my nose, rectum, and mouth.' That person came to the clinic, was not seen, and was returned to the jail. Second visit produced no results. Finally, jailers called on Saturday when I was in. I checked urine and bowel samples and found blood. When I went to get oxygen . . . I got the tank and turned it on. Nothing. The tank was empty. Her vital signs were not within normal limits. She was bleeding internally, and I called for an ambulance.

"The place is incredibly understaffed for both nurses and doctors. I was often the only licensed nurse. I had an aide with no skills. We dealt with 1,200 to 1,500 inmates. If a doctor was sick, no one covered. If there was a meeting, no doctor. They'd schedule 150 visits a day. If they saw 30, they felt good. Yeah, nurses did not respond to withdrawals. Any wonder?"

Although they should have known from their own records that Deborah was a diabetic dependent on insulin, that was no guarantee of treatment, according to Clayton.

"Arpaio brags that he only spends 15 cents a day on inmate food. Well, diabetics are costly because of their special diet and insulin. People are not seen when they are supposed to be treated. Chronic becomes acute. People end up in ICU."

Diabetics left for court at 2 in the morning without insulin.

"By evening, their Accu-Chek readings were 400 and above [normal is 80 to 100]."

"When I addressed this with detention . . . it went nowhere. Nurses working that time frame would simply refuse to perform an Accu-Chek or they wouldn't give insulin."

Clayton was depressed but not surprised by the culture she found in the jail.

"Sheriff Joe's personality permeated the jail. It is a Joe cult. He has the image of being tough. Saw [the] same attitude in [the] nursing staff. It was a magnet for bitter people. Inmates wouldn't be in jail if they hadn't done something wrong. They deserved what they got."

**Jennylee Braillard, daughter**

*(2010 interviews)*

"It was just so . . . weird. I talked to my mom on the first of January. Four days later, she's in ICU. She's in coma, and there is all this pressure from the doctors to pull the plug."

Twelve days after arriving at the hospital, on January 17, Deborah Braillard woke up. No one called her daughter, who arrived later that evening to learn the startling news.

"She woke up. She was responsive. She refused water because she wanted soda. She nodded her head to questions."

**Lisa Press, Deborah's friend**

*(2007 deposition)*

Press met Deborah in 2000. They were neighbors in west Phoenix and in the same methamphetamine circle. She bought from Deborah and used with Deborah.

"One thing about Debbie: I liked her as a person. I liked being over there with her, as opposed to the people I was living with. But I'd only see her three times a week because Debbie's house was so chaotic. There'd be 20 people in there sometimes. You know, all through the house."

In 2002, Lisa and everyone she was living with got busted. She quit using. Went cold turkey.

But she didn't lose her old friends. One druggy stole a cross that belonged to her son. It had enormous sentimental value. Debbie found the religious symbol and returned it to Lisa.

Then, Debbie needed a favor. She had to do a drug screening as part of her probation and wondered if the now-clean Lisa would do it for her.

"I just walked into the [Department of Motor Vehicles] and said I needed a duplicate because I lost my driver's license. They gave me a sheet of paper to fill out, and I put Deborah's address on it. They asked if I wanted the same photo they had on file, and I said, 'No, I'll take a new one.'"

Armed with phony identification, she went into a Treatment Assessment Screening Center for a urine analysis posing as Deborah Braillard.

"I was very nervous. I was talking myself out of it because I kept thinking . . . if my sister finds out. But I did it for her because she was a friend. I just felt bad for her. Plus, she gave me $50."

Press described a scene the rest of the world has a hard time coming to grips with.

"Meth makes you lose weight. Some people, it really affects their skin, their arms. People pick at their face. It messes with your teeth. You don't want to eat. You don't want to sleep. We just straighten things up. I mean, I don't know if you've ever seen a lot of people that do drugs. They collect a lot of things. They collect junk. We'd just organize it and listen to music."

Straight or stoned, Press remembered Jennylee.

"Jennifer would come by to see if her mother was okay. I know they had a good relationship, Deborah and her daughter. I know they were very close. That I do know. Debbie spoke highly of Jennifer."

**Jennylee Braillard, daughter**

*(2010 interviews)*

On the evening of January 17, Deborah's daughter arrived at the hospital only to learn that her mom had been awake earlier that same day. But now she was again unconscious.

"When I first got there, I took her hand, as I always did, and started talking to her. And she squeezed my hand."

The daughter's world was spinning out of control.

"I couldn't believe they didn't call me. The person I needed to talk to was her."

**Dr. Todd Wilcox, former director,**

**County Health Services**

*(2008 deposition)*

One month before Deborah Braillard was arrested, Dr. Todd Wilcox was hired by Maricopa County to revitalize and reform the clinic dispensing medical care inside Sheriff Joe Arpaio's jail.

This was the medical clinic, according to Arpaio's guards, whose nurses and doctors refused to see inmates who were kicking drugs.

Dr. Wilcox found a rat's nest but not rats.

"The people who work on the line level with CHS . . . want to do a good job. Nobody comes to work wanting to hurt anybody . . . They really want to take care of their patients . . . They are

heroes for working within the system."

But the system is a beast.

As long ago as 1996, the U.S. Department of Justice's Civil Rights Division found that Sheriff Joe Arpaio's jails violated the Constitution and that healthcare in them was "seriously deficient."

In 1997, Arpaio's jails were the only county jail, to be investigated by Amnesty International, which condemned the conditions in the sheriff's jails.

Yet not only were the details of the federal legal proceedings withheld from Dr. Wilcox, he was misled as to their import.

"The details of the amended judgment were not reviewed with us and, in fact, the information that was presented to us was that this was pretty much a dead case."

He was not shown the March 25, 1996, letter from the Department of Justice that found that detention officers were not responsive, that inmates were not adequately assessed during intake by personnel with sufficient medical training, and that appointments with healthcare were frequently missed.

He was never shown the 1999 binding agreement between the DOJ and the county regarding unconstitutional healthcare conditions. On page 3 of that letter, the sheriff promised that anybody doing intake screening of inmates would be appropriately trained by CHS. Furthermore, intake screeners would take a look at arrest reports as part of screening. (Braillard's intake deputy had not been trained, did not look at the police report that documented her need for medication, and blew through detailed paperwork. The screening process involved seven different computer screens that had to be individually filled out and saved. Yet Deputy Cindy Rodriguez did it, as noted, in 59 seconds)

Dr. Wilcox was not shown the 2000 Moore and Associates report that detailed the continued unconstitutional medical conditions in Arpaio's jails.

Nor was he shown the 2003 Bosch study that, yet again, pointed out the ever-present unconstitutional medical conditions.

"I am shocked at those documents . . . I have never seen any of those."

The Justice Department also determined that the sheriff's recordkeeping was a farce.

Dr. Wilcox found that the medical records were backlogged for a full year.

"When I toured the medical records, I found upwards of 60,000 pages of unfiled documentation in the medical record section."

He was ordered by county liaisons to the Board of Supervisors not to put the incriminating data in writing.

"We owed the county a report about the state of CHS . . . What we found [was not] legal, and we were instructed to pull those from the report and to brief them only verbally."

The report was prepared during the period that Deborah Braillard was incarcerated.

That same year, 2005, the jail saw its medical accreditation put in limbo.

"For the National Commission on Correctional Health Care, this is a remarkable event. NCCHC is a very positive organization. They try very hard to help agencies with changes and compliance.

"For them to put a facility on probation was a rather remarkable step for them," acknowledged

Dr. Wilcox.

**Deborah Braillard, mother**

*(1991)*

*The banging on the door is loud.*

*JESUS LORD!! COPS!*

*They start kicking in the freakin' door. Everyone's yelling. My God, my God, I can't get out. Where do I hide? I can't hide! Fuck, FUCK. Flush the drugs . . . Everyone's running around the house terri-fucking-fied.*

*Before anything could be dumped in the toilet, the cops were inside, and when the yelling settled down, they had all three of us.*

*They found eight bindles in my bedroom closet, and under my bed, a mirror, a cocaine pipe, and a few rocks.*

*Even now, my heart races when I think about it. WHY? WHY? WHY?*

*Thank God my mother's taking care of Jennylee.*

*I live with Jean Yvonne Ford in Kirkland, Washington. In February, Jean bought some cocaine from an undercover cop while carrying additional cocaine and a syringe in her bra, more drugs in every pocket, and a couple of thousand dollars cash — not to mention an accounting sheet with all of her drug transactions. Brilliant, right?*

*Under the circumstances, Jean got real cooperative.*

*Jean told the cops she had another four ounces of coke in her safe at home, as well as three grand in bills. She told the cops they could search her home and that they would find her son, Kenneth Rogers, Rene Duran, and me.*

*I admitted I sold the rocks for my rent. Smoked my fair share, too.*

*They read me my Miranda rights, which was about the first time that happened, but not the last.*

**Jennylee Braillard, daughter**

*(2010 interviews)*

"I have always been the type, if someone is in a coma, I believe they recognize you being there. One nurse told me, 'Just keep talking to her. She can hear you. I've seen some pretty wild things happen.'

"They cut her hair, which would have upset her. It upset me."

"And all the time, the doctors kept up the pressure to unplug her."

"We told them if her heart stopped, don't revive her."

Because Deborah's body retained fluids, she swelled grotesquely.

"The big enormous chain around her ankle . . . it was embedded in her leg. Her organs shut down."

Arpaio's deputy, stationed near Deborah, refused to unshackle the woman, though Jennylee said her mom was released from jail once she was sent to the emergency room.

Her feet had turned black. Her mouth was scabrous.

On January 23, three weeks after her arrest, a priest came into the hospital to visit.

Deborah Braillard had a Bible when she coded.

"I freaked and left the room."

The doctor came around the corner searching for Jennylee.

She screamed, "I know. I *know!"*

**Deborah Braillard, mother**

*There is no shock, but shock. There is no suffering, but suffering. There is no agony but agony. There is no death, but death. There is but death.*

**Dr. Todd Wilcox**

*(2008 deposition)*

Upon his arrival, Dr. Wilcox decided that the two principal reforms necessary to make healthcare in Sheriff Joe Arpaio's jail less deadly involved up-to-date health records and a thorough intake process.

"I firmly believed that."

But every attempt to computerize and improve the lax recordkeeping in the sheriff's jail was vetoed by county administrators working under the Board of Supervisors.

Wilcox's concerns about the intake process fared little better.

"Reviewing past medical history is really a critical element of the booking process."

Deborah Braillard was incarcerated three times in 2003, and in each instance, she was treated for diabetes. In 2005, no one — guard, nurse, doctor — looked at the records already on file with the jail that established, unequivocally, that she was insulin-dependent.

"Reviewing past medical history is so critical to us that we actually have a special box on our intake form that the nurses have to check and initial that they have reviewed past medical history."

Deborah Braillard, instead of being treated for diabetes, was presumed by guards to be kicking drugs.

"It's not an adequate response to attribute [her condition] to drug withdrawal. Absolutely not. That's just not appropriate. Even if it were drug withdrawal, that is serious. Drug withdrawal needs to be treated."

Over the four days Deborah Braillard was in Sheriff Joe Arpaio's custody, six guards would watch Braillard's agony. CHS has no record of any of them calling for medical assistance. Assume that is part of CHS' abysmal recordkeeping. The fact remains that not a single officer viewed her tortured "withdrawal" worthy of intervention. No jailer alerted a supervisor. Not a single guard mentioned Braillard's condition to the nurses who visited the cellblock twice a day to dispense pills. Why?

"I can tell you that the prevailing philosophy here is . . . tough on crime. We want people to be uncomfortable and not enjoy the jail stay. [Guards] are not proactive about making sure that things are going okay within the jails. Inmates have to fend for themselves in these jails . . . The end result [is] these jails are much more violent."

Although Dr. Wilcox focused on the tsunami of lost records and the unconstitutional admissions

process, he was, at times, simply stunned by the culture in Arpaio's lockups.

His medical specialty involved prosthetic limbs, braces, and certain kinds of compression socks used by burn victims.

"We would order them and [Sheriff Arpaio's] SWAT team would do a sweep and take everything away . . . Inmates need that, and those devices are expensive."

After three years, Dr. Wilcox was dispirited and alarmed.

The county did "nothing that was truly effective . . . because to truly fix the mismatch requires a significant investment in staff and resources . . . I felt my medical license was in jeopardy."

He resigned.

"It came to a crisis of conscience."

**Deborah Braillard, mother**

*By the time I got arrested in 2005, I'd had eight run-ins with the law. All petty misdemeanors. You couldn't look at me like a hardened criminal. Mostly, I am helpless and hopeless. Like someone in the shadows of a comic book.*

*I switched off cocaine a long time ago and got into methamphetamine, which is the poor woman's way. Meth is the original sin. Left Courtney Love with the shakes and never gave any woman any better. And yet, you love meth like you love a child: without reservation.*

*Meth makes you feel good. For days on end. You might look like Amy Winehouse but you feel like Grace Kelly — a chatty Grace Kelly.*

**Consider:** On September 25, 2008, the NCCHC moved beyond the censure of probation and formally revoked accreditation of Sheriff Joe Arpaio's jails going back to 2005 (when Braillard was incarcerated). Not only was the medical clinic stripped of certification, the NCCHC declared that the county had "provided false information" in pursuit of validation.

In 2008, U.S. District Judge Neil Wake found Sheriff Joe Arpaio's jail "unconstitutional" on a variety of fronts. In 2010, the 9th U.S. Circuit court of appeals upheld the ruling.

In November of this year, Maricopa County administrators discovered that Sheriff Arpaio maintained two sets of financial records. The data revealed that the sheriff misappropriated as much as $80 million that voters had earmarked for the jails. Instead of alleviating the horrendous conditions in the cells, the money was spent on the sheriff's more politically popular initiatives — like rounding up Mexican immigrants.

**Deborah Braillard, mother**

*Arpaio and his people all say I should have told them I was a diabetic. They claim I purposely didn't speak up, so that I'd end up in the infirmary.*

*Imagine that. I'm wallowing in my own excrement and vomit for days on end, convulsing like the bride of Frankenstein, and if I don't confess I'm a diabetic — then I deserve to die.*

*Did I want to escape into the infirmary?*

*Well, I'm not telling. But if that's my crime, it's a harebrained scheme at worst. Who wouldn't prefer an infirmary to a jail cell?*

*But apparently this wasn't the way to get there.*

**Jennylee Braillard, daughter**

*(2010 interviews)*

"When Mom was in the hospital, I'd go by her home and feed all the animals. She always had good pets and bad boyfriends. She had to mother all these losers. I give her credit for not using and trying her best. There were no drugs in her system, according to the blood test, when she died.

"The drug issue was a disease. I've tried to figure out what the drug addiction was about. It's a way of growing up. When she was young, all her brothers played around with drugs. Even though she was strong-willed, her drugs were a weakness. But also a comfort.

"After she died, our family divided up the animals. I took the pregnant dog. I raised 11 puppies and searched for loving homes. I found seven. Took the rest to Four Paws, a no-kill shelter, and they found homes for the remaining pups. Kept one for myself."

You know that Deborah Braillard took in men who abused her and drugs. It is also a fact that she came from a family that suffered depression and indulged in alcohol and drugs. You might say self-medication was as genetic as the diabetes.

Jennylee is on another path. She is married to Nathan, a manager at T.J. Maxx, and has built a life around her baby, whose full name is Kaylynn Ann. Deborah's middle name was Ann.

"I love being a mom. She is a lot of fun. I could not imagine a day without her."

Jennylee works at the Family Christian Bookstore and cherishes the memory of her mother.

"She didn't get to meet my husband. She hasn't seen my growth. I have a daughter. She has a granddaughter. She's not here physically but she is spiritually. I know she's out there. She gets glimpses of us, watches over us. Sees us."

Jennylee lives in hope.

"I have complete faith she'll have eternal life."

**Consider:** On April 21, 2006, Jennylee sued Sheriff Joe Arpaio, the county, and County Health Services. Those who believe legal actions are a lottery ticket that result in easy paydays do not grasp the particulars. The most brutal behavior in a cell block is legally defended by hard men and hard women; and in this particular case, they put the proposition to this young daughter: She didn't really know her mother all the well, did she?

The sheriff's team informed the court that Jennylee's "social interaction with her mom consisted mostly of alleged visits to her mother's home. Those visits were sporadic."

At most, three times a week and on weekends.

Jennylee "was so out of touch with her mother [that] she actually believed she was not on drugs at the time of her arrest."

In fact, an autopsy revealed no drugs in Braillard's body.

The sheriff's attorneys punctuated their point by shoving a mug shot of Deborah in front of Jennylee during a deposition.

Attorney Dennis Wilenchik then informed Jennylee that she had not tried hard enough to save her mother's life, that, if anything, it was *not* the brutality of the jail guards that killed Deborah Braillard, but rather an ineffectual daughter.

Although Jennylee spoke to the jail's risk manager at 7 a.m. on January 5, 2005, and informed him that her mother was an insulin-dependent diabetic needing immediate attention, the sheriff's

lawyer attacked the daughter for not doing enough.

Questions: "Do you think maybe you could have done something, [that] if you had done that, maybe [something could have been done quicker]? You don't think it would be helpful for you to go down to the jail if your mother's about to die to make sure that somebody does something?

"Maybe go down there and bang on the door and ask for some help?"

On October 21, 2008, the court granted motions for summary judgment, in effect, tossing out the federal aspect of the case after 30 months. The judge offered little comment while leaving the state action intact.

Attorney Michael Manning won a strongly worded reversal on appeal, and the entire Braillard case was reinstated. The sheriff's attorneys filed a petition for review, which will be heard by the Arizona Supreme Court on January 4.

**Consider:** The statements in this account are direct quotes from depositions, transcripts, interviews, and other official documents, though any culling of a record of such Dickensian complexity represents a coarse boiling, at best.

But the words of the dead mother are constructions.

Even a casual reader might ask: Pardon?

Deborah Braillard's thoughts are built, in part, upon personal remembrances, recollections, and a voluminous court record. Deborah Braillard's thoughts are further built by venting sentiments — brutal, yet dormant. when limited by that which is admissible.

The thoughts are my words.

Ralph Waldo Emerson said, "Fiction reveals truth that reality obscures." Deborah Braillard's words in this story, a tiny component of an otherwise verbatim accounting, are a small attempt to give voice to a woman left mute by justice.

**Jennylee Braillard, daughter**

*(2010 interview)*

"At first, there was anger. I could not understand how this could happen. That's why I sued.

"I've learned what happened to her: plain and simple cruelty. Maybe this lawsuit can change the system. That would be the biggest blessing."

"The light shines in the darkness, and the darkness did not overcome it." — John 1:5.

 Michael Lacey     Phoenix New Times     Phoenix New Times

SHARE THIS    

READ MORE | **NEWS**  | **LONGFORM**

💬 0 COMMENTS

## MORE NEWS



IMMIGRATION 

**Arizona Spends Nearly $367K to Honor Muslim Syrian Immigrant**

### UPCOMING EVENTS

TICKETS

Calgary Flames @ Arizona Coyotes G
*Fri., Nov. 27, 7:00pm*

TICKETS

Phoenix Suns vs. Golden State Warric
*Fri., Nov. 27, 7:30pm*

TICKETS

Pepsi Family 4 Pack : Arizona Coyote
*Sat., Nov. 28, 8:00pm*

TICKETS



ARIZONA

**Arizona Is One of the Most Dangerous States — but At Least We Beat Out Mississippi**



NEWS

**Abused Circus Elephant Nosey Gets Help From Arizona Congressman Raul Grijalva**

MORE NEWS 

©2015 Phoenix New Times, LLC. All rights reserved.

# EXHIBIT B



MENU

  

SIGN UP
LOG IN

**MORE**

# ARE YOUR PAPERS IN ORDER?

 BY MICHAEL LACEY

   

3                         0

THURSDAY, MARCH 12, 2009  |  7 YEARS AGO



One of Joe Arpaio's masked enforcers.

Elaine Sanchez understands Guadalupe, Arizona, as well as she understands her six children. She was born and raised in the village of 5,500 souls hard by the freeway and the conventional suburbs of Tempe and Phoenix.

Sheriff Joe Arpaio put Guadalupe on the nation's map during his anti-immigrant sweep last April.

It is Lent — in fact, a mere five days past Ash Wednesday. Already the Catholic community is deep in preparation for Easter Sunday. But more than piety grips Guadalupe. Elaine bounces Marcus, her toddler, on her knee and despairs of small-town gossip: "Everyone knows everyone here."

The 32-year-old lives in her childhood home. Tired nails, aged wood, and weary plasterboard make up the barest skin against the Sonoran Desert's heat and chill. Streetside, kids' clothing dries along the length of rickety chain-link. (Does anyone have more tops and bottoms than a 2-year-old?)

Nearby, two strapping sons sweep the dirt and rake. Their nascent facial hair cannot disguise a youngster's impulse to bound, or to punch a shoulder. Discovered leaping over a fence recently, they were questioned by law enforcement. Their explanation of their behavior was straightforward: hide-and-seek.

As the teenage boys tidy up, an unbalanced washing machine bangs against the outside of the

home while, yards away in the back, an abandoned van squats.

The broken-down Dodge, fast becoming a rusting rumpus room, is the stuff of story in the Sanchez home, as well as in Guadalupe at large.

Tracked for nearly a mile by Sheriff Joe Arpaio's deputies last May, when the Dodge still ran, Elaine became alarmed, and then terrified, as the lawmen followed closely without ever turning on their lights. Her anxiety surpassed anything associated with an ordinary ticket; her family had already exchanged tales about this sort of enforcement.

For more Joe Arpaio's abuses of power, see our special report section.

Elaine drove the van into her backyard. After banging on the back door and screaming for her own mother, she was wrestled to the ground by the sheriff's men. Sanchez's boys emerged from their home to find their mother flat in the dirt with a deputy's knee in her back as she was roughly handcuffed.

The light over her license plate was out.

This is not an unknown crime in Elaine's neighborhood.

Indeed, Elaine Sanchez was no stranger to the sheriff's deputies who'd wrangled with her on the ground; one of them later volunteered that he recognized her from an earlier visit.

Sanchez and her family believe they have been targeted by Sheriff Joe Arpaio's men as part of the fallout from the lawman's infamous anti-immigrant sweep in Guadalupe.


And here's the rub: In spite of their last name, none of the Sanchezes is Mexican. None of them is in the United States illegally.

All members of the Sanchez family are Yaqui Indians. They are all American citizens. They are as legal as the sheriff's family.

They are, however, brown.

On March 4, Congressman Bennie G. Thompson (D-Mississippi) worried aloud that the 287(g) program — the enabling act that turns cops into immigration officers — was "using minor traffic violations instead of major crimes" to harass Hispanics.

Thompson, chairman of the House Homeland Security Committee, has no idea.

The genteel concerns of an uninformed Mississippi legislator are so beside the point as to be quaint.

Motorists in Maricopa County are confronted today by deputies in ski masks, guns drawn.

Ski masks.

The slightest pretext elicits the question: Are your papers in order?

With this article, we begin an occasional series to introduce the people swept up in this madness. The individuals you will meet in this installment are all Americans. But eventually, you will also shake hands with illegal aliens.

Neighbors, one and all.

Earlier skirmishes at Pruitt's furniture store and the sheriff's illegal alien sweeps on Thomas Road, as well as in Cave Creek, were only warm-up exercises. The thrust to turn immigration enforcement into a reign of terror reached critical mass on April 3, 2008, in Guadalupe, Arizona.

Mounted horsemen, deputies in unmarked cars, and bulked-up lawmen with shaved heads faced off against villagers and protesters.

Sheriff Arpaio set up his massive command post in the parking lot of the Family Dollar store. Demonstrators, mostly Hispanic, ringed the parking lot chanting, holding signs, urging cars to honk. The glare from ubiquitous television lights competed with the flashing decks of squad cars.

Everywhere you looked, people, pedestrians, and drivers alike had been stopped. Are you a United States citizen? Is your car in perfect compliance with the minutiae of the state Motor Vehicle Division?

These are questions that play hell with the poor.

The massive two-day show of force — Arpaio said he employed 200 deputies and posse members — netted nine illegals.

And when the mayor of Guadalupe told Sheriff Joe Arpaio that he wasn't welcome to terrorize her neighbors, the lawman exploded in front of the media.

On April 3, Andrew Sanchez, Elaine's brother, drove friends and family right into the heart of history. Caught up in the moment, he honked his horn.

His show of support for the protest broke the law.

Like John the Baptist, Sanchez prepared the way for the sheriff; the night before the lawmen swooped into Guadalupe, Andrew ringed the town with signs warning the residents that Arpaio was coming.

On the day of the raid, Sanchez posted another hand-painted message: "If you are profiled or harassed, call me."

Andrew works as a resident program specialist at the Arizona State Hospital. More importantly, he has an automobile that functions. In a poor community, a man with a car is a busy fellow.

"Before the sun went below the mountains, people started gathering in anticipation of Arpaio," said Sanchez. "And people called me for rides to work. They were afraid to walk, afraid to drive themselves."

The daughter of a former elected official phoned. She'd been stopped while on foot and forced to produce identification. She asked Sanchez to take her to her home, where she had more anti-Arpaio signs.

"When we got to her house, she grabbed shoe polish," recalled Sanchez. "She wrote on my car window: 'Proud to be brown' and 'Go home, Arpaio.'"

After serving as an impromptu taxi driver, Sanchez picked up his sister Elaine, who was the swing-shift supervisor at Jack in the Box.

As they eased past the Family Dollar store and drove through Arpaio's "crime suppression," Sanchez tooted his horn.

He was promptly pulled over, and after producing registration, license, and proof of insurance, he was interrogated. Sanchez was ticketed for honking his horn. The lawmen commented upon the anti-Arpaio signs in his backseat and the greased windows asking the sheriff to leave Guadalupe.

Although a judge tossed the complaint, Sanchez believes strongly that Arpaio's deputies have targeted him and his family because he dared to speak out.

Later in April, on his way to a graduation party, Sanchez was pulled over once more, this time for a broken taillight.

Sanchez's brother-in-law, Manuel Valenzuela, borrowed Andrew's car in April to take his wife dinner where she works.

He operated the vehicle without a valid driver's license; when the deputies flashed their lights, he turned into his mother's yard instead of promptly pulling over.

Valenzuela claims the officers emerged from their car with guns drawn. They handcuffed and arrested Valenzuela.

He had driven Andrew's car with the high beams on.

Sanchez said that for all the officers knew, the person driving the car was Andrew himself. He is suspicious. His car was impounded, and the deputies made a number of calls to relatives announcing that they'd impounded Andrew's car.

That next month, on May 28, his sister Elaine was confronted in her own yard and arrested.

She was told that the light illuminating her license plate was out. But the officers who put her in jail never charged her with that offense. Indeed, as she drove south on Avenida del Yaqui, the deputies drove north, in the opposite direction. They had to make a U-turn to follow her.

They made the U-turn to follow her before they could see her rear license plate.

Elaine Sanchez was ordered to appear in court on July 1, 2008. A judge dismissed the disorderly conduct charge.

Sanchez and her kin believe that the deputies focused on her family to make a point: Political dissent does not change who runs Guadalupe.

Sheriff Joe Arpaio runs Guadalupe.

It is worth remembering that the mayor of Guadalupe's confrontation with Arpaio was on April 3, the first night of the immigration sweep.

The sheriff told the press that he'd been invited into Guadalupe by the village's administrators.

But on the night of the raid, Mayor Rebecca Jimenez handed Arpaio a press release calling for an end to the roundup. Guadalupe's leaders had not summoned the sheriff.

In front of rolling television cameras, Arpaio erupted.

"Forget the press release!" said the sheriff. "That doesn't matter. Action is what speaks . . . You said you didn't want us back here tomorrow. Is that what you said?"

"Yes," replied the mayor.

"Well, we *will* be back here tomorrow. Full force!"

Arpaio then threatened the mayor.

"If you don't like the way I operate, you go get your own police department," said the sheriff. "You've got 90 days to cancel your contract — 90 days. You wanna cancel it, feel free to."

Arpaio's troops did, indeed, return. The next day, his deputies circled the square during the confirmation ceremony of youngsters at Our Lady of Guadalupe Catholic church. Families terrified of being swept up in the dragnet avoided the religious rite or sent their children with others.

Two weeks later, on April 18, Sheriff Arpaio made good on his threat to Mayor Jimenez. He notified Guadalupe that it had 180 days to "study and research the law enforcement needs of the community and explore other law enforcement alternatives.

"I want nothing to do with [Mayor Jimenez] and the little town of Guadalupe," said Arpaio.

In the weeks that followed, the impoverished community learned that it could not afford to hire either Phoenix or Tempe to patrol its streets; Guadalupe had to swallow its pride. Jimenez was forced out as mayor, in part, by council members offended that she had raised Arpaio's ire and potentially lost the town its police services. A new mayor was installed, and the village approached Arpaio on bended knee and asked that he return.

This vengeance by Sheriff Arpaio was hardly an isolated act.

In an April 3 press release announcing his Guadalupe roundup of illegal immigrants, the sheriff took the time to attack former legislator Alfredo Gutierrez, who had dared to criticize Arpaio on Radio Campesina.

In a recent interview, Gutierrez said the retaliation went beyond words.

Gutierrez said that when he emerged from Portland's, a bar and restaurant on Central Avenue in downtown Phoenix, after his comments on the radio, he found Arpaio's plainclothes deputies waiting for him.

Gutierrez, who no longer drinks, had consumed nothing stronger than alcohol-free O'Doul's.

In any case, Sheriff Arpaio's men do not run sobriety checkpoints in downtown Phoenix, let alone stop individuals in this fashion.

Contacted by *New Times*, the Sheriff's Office did not respond when asked to comment on any of the claims made in this story except to say that the request for reaction "will be processed."

"It is just a fact of life," said Gutierrez. "Those of us who have spoken out are followed by Arpaio's men."

Andrew Sanchez, like Gutierrez, believes he is a target and that Arpaio is going after his family.

Arpaio's behavior during the April immigrant roundup garnered national attention and criticism from the *New York Times*, which noted in an editorial: "The Mayor of Guadalupe implored (Arpaio) to leave her community alone. State and county officials have pointed out that Sheriff Joe has ignored tens of thousands of outstanding criminal warrants while chasing day laborers and headlines."

This is not entirely accurate.

In fact, Arpaio's deputies found one warrant they could execute.

They served it on Elaine Sanchez's husband, Andrew Sanchez's brother-in-law, Manuel Valenzuela.

In January of this year, Valenzeula paid the $135 fine that resulted from the arrest by the Sheriff's Office last April.

One month later, on February 4, as he walked out of Soto's Store in Guadalupe, he was handcuffed and arrested on an outstanding warrant.

Manuel Valenzuela still owed 40 cents on the $135 ticket he'd paid off.

"In Guadalupe, you make a bad name in the town and everybody knows," explained Elaine Sanchez. "I've lived in the same home all my life. My aunt's next door, my uncle. You talk to

someone who's not your husband, they assume something. It's like community policing. There's no point in introducing someone. There are no strangers."

Andrew Sanchez believes that is the problem. In such a tiny place, he and his family are known all too well to Sheriff Arpaio's deputies.

On a recent weekend, he drove past the village square. Inside the dusty field sits a Catholic church. Next door is a Yaqui temple. Residents nearby have erected three crosses in anticipation of Easter.

On Holy Thursday, a Yaqui ceremony will unfold. *Chapayekas*, "long-nosed" soldiers who search for Jesus throughout Lent, will seize an effigy of Christ. The *fariseos* will then re-enact the crucifixion. But the message of resurrection inspires hope, and the Yaqui know how to resist the authorities.

Deer dancers, *caballeros*, *matachines*, and *pascolas* intervene on behalf of the people. You hear their rattles.

Then . . . something wondrous!

The *fariseos* and *chapayekas* are pelted with flowers.

The miracle of Christ's passion grips Guadalupe.

But it is not quite Easter Sunday. Not yet.

Meanwhile, Andrew Sanchez has found his own way to resist authority every Saturday morning in front of the community garden. Little kids ladle out drinks and pass out fliers announcing that they are raising funds "to help people who cannot afford to repair any broken taillights or tag lights, broken windshields, etc."

Everyone knows these children. They're the Sanchez kids: brothers, sisters, nieces, nephews.

The Sanchez family refuses to endure in the barrio's shadows.

They fight back with lemonade.

On Tuesday, March 10, the Civil Rights Division of the United States Justice Department notified Sheriff Arpaio that he was under investigation for "patterns or practices of discriminatory police practices and unconstitutional searches and seizures."

This response follows the call from four congressmen as well as the mayor of Phoenix for a federal probe into the sheriff's immigrant sweeps. One of those four congressmen, House Judiciary Committee Chairman John Conyers (D-Michigan), has promised hearings on Arpaio's immigration sweeps soon.

Belligerent and defiant, Arpaio announced that he would not be intimidated. He vowed to fight in court and, if necessary, to drop out of the federal 287(g) program and use state laws to hunt down immigrants. In a county that rejected Barack Obama and re-elected Joe Arpaio for the fifth time, the sheriff's posture palpitated with rabble-rousing indignation.

You'll have to excuse Huey Long's envy.

Crimson petals and lemonade, prayer and passive resistance — all have withered before Arpaio's reflexive sneer.

A new question is upon us:

Will subpoenas wipe the rictus of contempt for the Constitution from the sheriff's face, or is it Miller time for Mussolini?

 Michael Lacey    Phoenix New Times    Phoenix New Times

# Get the This Week's Top Stories Newsletter

Every week we collect the latest news, music and arts stories — along with film and food reviews and the best things to do this week — so that you'll never miss Phoenix New Times' biggest stories.

**GO**▸

SHARE THIS |    

READ MORE |  NEWS ▶   NEWS ▶

💬 0 COMMENTS

## MORE NEWS

 ARIZONA ▶

Arizona is One of the Most Dangerous States — but at Least We Beat Out Mississippi

### UPCOMING EVENTS

**TICKETS**
Calgary Flames @ Arizona Coyotes G
*Fri., Nov. 27, 7:00pm*

**TICKETS**
Phoenix Suns vs. Golden State Warri
*Fri., Nov. 27, 7:30pm*

**TICKETS**
Pepsi Family 4 Pack : Arizona Coyote
*Sat., Nov. 28, 8:00pm*

 NEWS ▶

 EDUCATION ▶

Abused Circus Elephant Nosey Gets
Help From Arizona Congressman
Raul Grijalva

Gilbert Anti-Abortion Textbook
Sticker Decision Didn't Violate
Arizona Law

MORE NEWS ⊕

©2015 Phoenix New Times, LLC. All rights reserved.

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE NO. 1, a minor child, by her parent and next friend MARY ROE, JANE DOE NO. 2, and JANE DOE NO. 3, a minor child, by her parents and next friends, SAM LOE and SARA LOE,<br><br>Plaintiffs,<br><br>v.<br><br>BACKPAGE.COM, LLC, CAMARILLO HOLDINGS, LLC (f/k/a VILLAGE VOICE MEDIA HOLDINGS, LLC) and NEW TIMES MEDIA HOLDINGS, LLC,<br><br>Defendants. | Civil Action No. 14-13870-RGS |

## DEFENDANTS' RESPONSE TO BRIEFS OF *AMICI CURIAE* COMMONWEALTH OF MASSACHUSETTS AND CITY AND COUNTY OF SAN FRANCISCO, *ET AL.*, IN SUPPORT OF PLAINTIFFS

BACKPAGE.COM, LLC, et al.

By Their Attorneys,

Robert A. Bertsche (BBO #554333)
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8000 (tel.); (617) 456-8100 (fax)
rbertsche@PrinceLobel.com
jpyle@PrinceLobel.com

James C. Grant (admitted *Pro Hac Vice*)
Ambika K. Doran (admitted *Pro Hac Vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
(206) 622-3150 (tel.); (206) 757-7700 (fax)
jimgrant@dwt.com
ambikadoran@dwt.com

# TABLE OF CONTENTS

I.      INTRODUCTION .......................................................................................................... 1

II.     ARGUMENT ................................................................................................................. 2

        A.      Amici's Assertions and Arguments Are Improper. .................................................. 2

        B.      This Court Deserves a More Balanced View of Sex Trafficking than
                Amici's "Understandings." ...................................................................................... 3

        C.      Amici's Factual Accusations about Backpage.com Are Improper and
                Contradict Their Laws, Experiences, and Statements. ........................................ 11

        D.      Amici Have Conceded Section 230 Bars Enforcement of State Laws. ................ 17

        E.      Amici Cannot Argue that Backpage.com is an "Information Content
                Provider," and Their Argument is Wrong............................................................. 21

III.    CONCLUSION ............................................................................................................ 27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*800-JR Cigar, Inc. v. GoTo.com, Inc.*,
    437 F. Supp. 2d 273 (D.N.J. 2006) ...................................................27

*Alvi Armani Med., Inc. v. Hennessey*,
    629 F. Supp. 2d 1302 (S.D. Fla. 2008) ............................................26

*Am. Libraries Ass'n v. Pataki*,
    969 F. Supp. 160, 168 (S.D.N.Y. 1997)...........................................18

*Anthony v. Yahoo! Inc.*,
    421 F. Supp. 2d 1257 (N.D. Cal. 2006) ...........................................26

*Atl. Recording Corp. v. Project Playlist, Inc.*,
    603 F. Supp. 2d 690 (S.D.N.Y. 2009)...............................................23

*Backpage.com, LLC v. Cooper*,
    939 F. Supp. 2d 805 (M.D. Tenn. 2013)............................................11

*Backpage.com, LLC v. Hoffman*,
    2013 WL 4502097 (D.N.J. Aug. 20, 2013) ......................................11

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012)....................................11, 17

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) ..........................................................17

*Cisneros v. Sanchez*,
    403 F. Supp. 2d 588 (S.D. Tex. 2005) ..............................................27

*Dart v. Craigslist, Inc.*,
    665 F. Supp. 2d 961 962, 969 (N.D. Ill. 2009) .............................11, 24

*Doe v. City of New York*,
    583 F. Supp. 2d 444 (S.D.N.Y. 2008)...............................................26

*Doe v. GTE, Corp.*,
    347 F.3d 655 (7th Cir. 2003) ............................................................26

*Doe v. MySpace, Inc.*,
    629 F. Supp. 2d 663 (E.D. Tex. 2009)...............................................23

*F.T.C. v. Accusearch, Inc.*,
    570 F.3d 1187 (10th Cir. 2009) ...............................................................................23, 24, 26

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
    521 F.3d 1157, 1174 (9th Cir. 2008) ..................................................................21, 22, 23, 24

*Fraley v. Facebook, Inc.*,
    830 F. Supp. 2d 785 (N.D. Cal. 2011) ...................................................................................26

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ...........................................................................23, 27

*Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*,
    418 F. Supp. 2d 1142 (D. Ariz. 2005) ...................................................................................27

*Jones v. Dirty World Entertainment Recordings LLC*,
    755 F.3d 398 (6th Cir. 2014) ................................................................................................25

*Katin v. Nat'l Real Estate Info. Servs., Inc.*,
    2009 WL 929554 (D. Mass. Mar. 31, 2009) ..........................................................................19

*L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*,
    121 F. Supp. 2d 147, 152 (D. Mass. 2000) ............................................................................20

*Lane v. First Nat'l Bank of Bos.*,
    871 F.2d 166 (1st Cir. 1989) ...............................................................................................3, 21

*Levitt v. Yelp! Inc.*,
    2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014) .............27

*M.A. v. Village Voice Media Holdings, LLC*,
    809 F. Supp. 2d 1041 (E.D. Mo. 2011) ............................................................................11, 26

*McCoy v. Mass. Inst. of Tech.*,
    950 F.2d 13 (1st Cir. 1991) .....................................................................................................21

*MCW, Inc. v. Badbusinessbureau.com, L.L.C.*,
    2004 WL 833595 (N.D. Tex. Apr. 19, 2004) ........................................................................27

*Moving & Storage, Inc. v. Panayotov*,
    2014 WL 949830 (D. Mass. Mar. 12, 2014) ..........................................................................26

*Nemet Chevrolet, Ltd. v. ConsumerAffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ......................................................................................17, 24, 27

*New England Patriots Football Club, Inc. v. Univ. of Colo.*,
    592 F.2d 1196 (1st Cir. 1979) ............................................................................................2, 11

*Pharm. Research & Mfrs. of Am. v. Concannon*,
    249 F.3d 66 (1st Cir. 2001), *aff'd sub nom. Pharm. Research & Mfrs. of Am.*
    *v. Walsh*, 538 U.S. 644 (2003) ........................................................................21

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ..........................................................................18

*Ray v. Ropes & Gray LLP*,
    961 F. Supp. 2d 344 (D. Mass. 2013) .............................................................19

*Santos v. SANYO Mfg. Corp.*,
    2013 WL 1868268 (D. Mass. May 3, 2013) ...................................................19

*Strasser v. Doorley*,
    432 F.2d 567 (1st Cir. 1970) .............................................................................2

*Swenson v. Yellow Transp., Inc.*,
    317 F. Supp. 2d 51 (D. Mass. 2004) ...............................................................19

*United States v. Certain Land Located in the Cnty. of Barnstable*,
    674 F.2d 90 (1st Cir. 1982) .............................................................................11

*Universal Commnc'ns Sys., Inc. v. Lycos, Inc.*,
    478 F.3d 413 (1st Cir. 2007) ...........................................................................24

*Weaver's Cove Energy, LLC v. R. I. Coastal Res. Mgmt. Council*,
    589 F.3d 458 (1st Cir. 2009) ...........................................................................21

**State Cases**

*Demetriades v. Yelp, Inc.*,
    228 Cal. App. 4th 294, 175 Cal. Rptr. 3d 131 (2014) .....................................26

*Gentry v. eBay, Inc.*,
    99 Cal. App. 4th 816, 121 Cal. Rptr. 2d 703 (2002) .......................................25

*Go-Best Assets Ltd. v. Citizens Bank of Massachusetts*,
    463 Mass. 50, 972 N.E.2d 426 (2012) ...........................................................18

*Hardin v. PDX, Inc.*,
    227 Cal. App. 4th 159, 173 Cal. Rptr. 3d 397 (2014) .....................................26

*Hill v. StubHub, Inc.*,
    727 S.E.2d 550 (N.C. Ct. App. 2012) .......................................................25, 26

*Milgram v. Orbitz Worldwide, Inc.*,
    419 N.J. Super. 305, 16 A.3d 1113 (Law Div. 2010) .....................................25

*NPS LLC v. StubHub, Inc*.,
  2009 WL 995483 (Mass. Super. Ct. Jan. 26, 2009) ............................................................25

**Federal Statutes**

47 U.S.C. § 230 .......................................................................................................... *passim*

**State Statutes & Municipal Ordinances**

Atlanta Code of Ordinances § 30-641 to -668 ...............................................................12

Colo. Rev. Stat. § 12.25.5-101 *et seq*. ..........................................................................12

Denver Mun. Code, § 7-320 ...........................................................................................12

Mass. Gen. Laws ch. 93A ..................................................................................1, 18, 19, 20

Mass. Gen. Laws ch. 265 ........................................................................................1, 12, 18

San Francisco Police Code Art. 15.6 § 1074.4 .............................................................12

**Rules**

Fed. R. Civ. P. 9(b) ...........................................................................................................19

Fed. R. Civ. P. 12(b)(6) .......................................................................................................1

**Other Authorities**

*APA Task Force Report Highlights Problem of Human Trafficking of US Women
  and Girls* (Mar. 12, 2014),
  http://www.apa.org/news/press/releases/2014/03/human-trafficking.aspx ..............................8

Bloomberg Law, News & Law Reports, at 1 ....................................................................4

*Child Prostitution: Raids Rescue 105 Young People*, N.Y. TIMES (July 29, 2013),
  http://mobile.nytimes.com/aponline/2013/07/29/us/politics/ap-us-child-sex-
  arrests.html?from=us ....................................................................................................15

Chris Matyszczyk, *Study:  Facebook replacing Craigslist for prostitutes*, CNET
  (Feb. 7, 2011), http://www.cnet.com/news/ study-facebook-replacing-
  craigslist-for-prostitutes ..................................................................................................6

Christina Bain, *et al*., *How to Responsibly Create Technological Interventions to
  Address the Domestic Sex Trafficking of Minors* (April 8, 2013),
  http://www.danah.org/papers/TechnologistsCSEC.pdf ..............................................4, 8

danah boyd, et al., *Human Trafficking and Technology:  A Framework for understanding the role of technology in the commercial sexual exploitation of children in the U.S.*, (2011), http://research.microsoft.com/en-us/collaboration/focus/education/htframework-2011.pdf .....................................................5, 6

danah boyd, *Combating Sexual Exploitation Online:  Focus on the Networks of People, not the Technology*, Statement to Attorney General Coakley, Hearing on Sexual Exploitation Online (Oct. 19, 2010), http://www.mass.gov/ago/docs/community/testimony/db.pdf .........................................6, 7, 9

danah boyd, *How Censoring Craigslist Helps Pimps, Child Traffickers and Other Abusive Scumbags*, HUFFINGTON POST (Sept. 6, 2010), http://www.huffingtonpost.com/danah-boyd/how-censoring-craigslist-_b_706789.html ......................................................................................7, 8, 10

Daniel Fisher, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, FORBES (Jan. 26, 2012), http://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution-ads-that-are-everywhere ...........................6

*Domestic Minor Sex Trafficking: Hearing before Senate Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 297-99 (2010) ........................................................................................20

Eliabieta Gozdziak & Micah Bump, Georgetown University Institute for the Study of International Migration, *Data and Research on Human Trafficking: Bibliography of Research-Based Literature* (Oct. 2008), https://www.ncjrs.gov/pdffiles1/nij/grants/ 224392.pdf ...........................................4

Gianna Caserta, *More than 60 men charged in HPD prostitution 'round-up,'* CLICK2HOUSTON (Mar. 4, 2015), http://www.click2houston.com/news/64-charged-in-hpd-prostitution-roundup-investigation/31605082..............................14

http://www.cityofboston.gov/cityclerk/dbasearch/Default.aspx?type_of_business=escort&order_by=file_number ..............................................................................12

http://www.yellowpages.com ...............................................................................12

*Human Trafficking in the United States:  Protecting the Victims*, Hearing Before Senate Judiciary Committee, 114th Cong. (Feb. 24, 2015) .................................4, 11

Institute of Medicine & National Research Council, *Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States* (Ellen Wright Clayton *et al.* eds., 2013), http://www.iom.edu/~/media/Files/Report%20Files/2013/Sexual-Exploitation-Sex-Trafficking/sextraffickingminors_rb.pdf ...........................................................9

Jennifer Musto, *Institutionalizing Protection, Professionalizing Victim Management: Explorations of Multi-Professional Anti-Trafficking Efforts in the Netherlands and the United States* (UCLA 2011) ............................................................8

Julie Ruvolo, *Sex, Lies and Suicide:  What's Wrong with the War on Sex Trafficking*, FORBES (June 26, 2012), http://www.forbes.com/sites/julieruvolo/2012/06/26/sex-lies-and-suicide-whats-wrong-with-the-war-on-sex-trafficking/ ....................................................................6, 7

Letter from AG Coakley, *et al*. to Sen. Rockefeller, *et al.* (July 23, 2013), https://www.eff.org/files/cda-ag-letter.pdf ............................................................20

Mark Latonero, *Human Trafficking Online, The Role of Social Networking Sites and Online Classifieds*, USC Annenberg Center on Communication Leadership & Policy (Sept. 2011) ..............................................................................5

Mark Latonero, *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, USC Annenberg Center on Communication Leadership and Policy (Nov. 2012), https://technologyandtrafficking.usc.edu/files/2012/11/HumanTrafficking2012_Nov12.pdf ................................................................................................... *passim*

Mark Masnick, *Oh Look:  Police Can Use Backpage.com To Track Down, Arrest & Convict Pimps & Prostitutes*, TECHDIRT (Oct. 2, 2012), https://www.techdirt.com/articles/20121002/07354820569/oh-look-police-can-use-backpagecom-to-track-down-arrest-convict-pimps-prostitutes.shtml........................7

Maureen McGough, *Ending Modern-Day Slavery: Using Research to Inform U.S. Anti-Human Trafficking Efforts*, National Institute of Justice, NIJ Journal No. 271 (Feb. 2013), http://www.nij.gov/journals/271/pages/anti-human-trafficking.aspx ..............................................................................................4

Megan Woolhouse, *Craigslist sex-ad ban doesn't end Web listings*, BOSTON GLOBE (Sept. 8, 2010)...............................................................................................7

Meredith Dank, *et al*., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, at 234 (March 2014), http://www.urban.org/UploadedPDF/413047-Underground-Commercial-Sex-Economy.pdf ........................................................................7

Michael Lindenberger, *Craigslist Comes Clean: No More 'Adult Services,' Ever*, TIME, (Sept. 16, 2010), http://content.time.com/time/nation/article/0,8599,2019499,00.html ......................7

National Institute of Justice, NIJ JOURNAL No. 271 (Feb. 2013), http://www.nij.gov/journals/271/pages/anti-human-trafficking.aspx ........................................4

O'Ryan Johnson, *Coakley reverses stance on site*, BOSTON HERALD, (Aug. 20, 2010) ...................................................................................................................20

*Oakland Man Accused Of Listing Teen On Sex Website Pleads Not Guilty*, CBS (Feb. 27, 2015), http://sanfrancisco.cbslocal.com/2015/02/27/oakland-man-who-listed-teen-on-web-for-sex-busted-by-website-pleads-not-guilty ...................15

Phillip Martin, *Two Years On, Mass. Human Trafficking Law Examined*, WGBH, (Aug. 19, 2013), http://wgbhnews.org/post/two-years-mass-human-trafficking-law-examined.........................................................................................4

Press Release, Washington AG, *McKenna announces agreement with Craigslist to crack down on illegal sex trade ads* (Nov. 6, 2008), http://www.atg.wa.gov/news/news-releases/mckenna-announces-agreement-craigslist-crack-down-illegal-sex-trade-ads...................................................16

Press Release, The White House, Remarks by the President to the Clinton Global Initiative (Sept. 25, 2012), http://www.whitehouse.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.................................9

Rachel Lewis Hilburn, *Websites with Adult Ads Contribute to Sex Trafficking of Kids; Law Officers Call the Sites Helpful*, WHQR (Mar. 4, 2015), http://whqr.org/ post/websites-adult-ads-contribute-sex-trafficking-kids-law-officers-call-sites-helpfu ...............................................................................10

Richard Estes & Neil Alan Weiner, *The Commercial Sexual Exploitation of Children In the U.S., Canada and Mexico*, University of Pennsylvania, Center for the Study of Youth Policy (Sept. 18, 2001, rev. Feb. 20, 2002), *quoted at* http://www.justfacts.com/sexuality.asp#f40 ...........................................................5

Ronald Weitzer, *New Directions in Research on Human Trafficking*, 653 ANNALS AM. ACAD. POL. & SOC. SCI. (May 2014)...............................................................4

Sadie Gurman, *Six Denver pimps arrested, 9 children saved as part of federal sting*, DENVER POST (July 29, 2013), http://www.denverpost.com/ci_23753147/six-denver-pimps-arrested-nine-children-saved-part ...................................................................................................15

Shared Hope International, *2013 Protected Innocence Challenge: A Legal Framework of Protection for the Nation's Children*, http://sharedhope.org/wp-content/uploads/2014/02/2013-Protected-Innocence-Challenge-Report.pdf...........................9

Sheldon Zhang, *Beyond the 'Natasha' story—a review and critique of current research on sex trafficking*, GLOBAL CRIME vol. 10, no. 3, at 179 (Aug. 2009) ......................4

State Attorney General Letter (Sept. 21, 2010), http://www.illinoisattorneygeneral.gov/pressroom/2010_09/Backpage_com9-20-2010.pdf.................................................................................................................7

Statement of AG Kamala Harris, *Human Trafficking*, http://oag.ca.gov/human-trafficking...................................................................................................................9

Stephanie Hanes, *Human Trafficking:  a misunderstood global scourge*, CHRISTIAN SCI. MONITOR (Sept. 9, 2012) http://www.csmonitor.com/World/Global-Issues/2012/0909/Human-trafficking-a-misunderstood-global-scourge..................................................4, 5, 8

Steve Johnson, *Sex online: Police target lucrative Internet prostitution trade*, SAN JOSE MERCURY NEWS (Jan. 12, 2015) .................................................................15

Vanessa Bouche, Thorn, *A Report on the Use of Technology to Recruit, Groom and Sell Domestic Minor Sex Trafficking Victims* (January 2015), https://www.wearethorn.org/resources-and-research/use-of-technology-in-domestic-minor-sex-trafficking .................................................................6, 8, 10

Women's Commission for Refugee Women and Children, *The U.S. Response to Human Trafficking:  An Unbalanced Approach* (May 2007), http://www.humantrafficking.org/uploads/publications/ustraff.pdf ........................................4

www.craigslist.org/about/help/Adult_Services_Posting_Guidelines ...........................................17

# I.      INTRODUCTION

On the eve of Backpage.com's deadline for its last brief concerning its Motion to Dismiss, the Massachusetts Attorney General ("AG") and six municipalities ("Cities")[1] filed two amicus briefs in support of Plaintiffs.  For the reasons set forth in the accompanying Motion for Leave, Backpage.com respectfully asks the Court to consider this Response, which addresses four points.

*First*, amici offer their "understanding" of the issue of sex trafficking, but the Court should have a more balanced account of the public discourse about the problem and how best to address it.  Although amici advocate shutting down websites such as Backpage.com, many experts agree censorship is a misguided and ineffectual approach to combat the problem, while technology and working with cooperative websites can be an important part of the solution.

*Second*, amici offer their own fact allegations, with the apparent aim of tainting the Court's view of Backpage.com.  Amici's partisan view of the facts is improper, especially here, because Backpage.com's Rule 12(b)(6) motion turns on whether Plaintiffs have sufficiently alleged plausible facts to support a claim (and, indeed, Plaintiffs have admitted the key facts establishing immunity under 47 U.S.C. § 230 ("Section 230")).  Moreover, the fact that amici frequently work with Backpage.com—and often praise the website for its cooperation and support of law enforcement—belie the accusations they now make.

*Third*, amici urge the Court to permit them to enforce state and local laws against Backpage.com, yet the AG has admitted several times that Section 230 preempts such laws in exactly this context.  Further, while the AG's office apparently endorses Plaintiffs' statutory claims (under c. 265 § 50 and c. 93A), the authority it cites supports Backpage.com's arguments for dismissal.

---

[1] City and County of San Francisco, City of Atlanta, City and County of Denver, City of Houston, City of Philadelphia, and City of Portland, Oregon.

***Finally***, amici make a new argument—that Backpage.com is an "information content provider" and thus exempt from Section 230 immunity—even though Plaintiffs expressly disclaimed this position.  This too is an improper amicus argument.  Nonetheless, under well-established authority interpreting Section 230, Backpage.com is not the "information content provider" for the ads about Plaintiffs (which can be the only basis for their claims).  Amici's new argument is simply another variation of the oft-rejected theory that parties can avoid Section 230 by alleging a website, by its nature, "encourages," "promotes" or "induces" content.

The Court should disregard the amicus briefs of the AG and the Cities, but even if it does not, it should reject their arguments.

## II.     ARGUMENT

### A.     Amici's Assertions and Arguments Are Improper.

In general, the briefs of the AG and the Cities consist of (1) amici's own accusations about (*i.e.*, attacks against) Backpage.com and efforts to endorse and embellish Plaintiffs' allegations; and (2) legal arguments Plaintiffs have not raised, and, in fact, have expressly disclaimed.  In both respects, amici's briefs are improper.

The role of amicus is not to offer a "highly partisan account of the facts," *New England Patriots Football Club, Inc. v. Univ. of Colo.*, 592 F.2d 1196, 1198 n.3 (1st Cir. 1979), and, indeed, "an amicus who argues facts should rarely be welcomed," *Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970).  This is especially true here because the Court is considering a 12(b)(6) motion, as to which the central issue is whether Plaintiffs have alleged (or can allege) plausible facts to pursue their claims—and Plaintiffs have admitted the only facts needed to decide the motion under Section 230 (*i.e.* third parties created and developed the ads).

Similarly, amici's legal argument that Section 230 does not protect Backpage.com because it is "an information content provider," *see, e.g.*, Cities Br. at 2, is also improper because

Plaintiffs expressly chose **not** to make this argument, *see* Opp. to Mot. to Dismiss at 15 n.5

("Plaintiffs do not contend at this stage of the litigation that Backpage.com is an 'information

content provider' …").  An amicus may not "interject into a case issues which the litigants,

whatever their reasons might be, have chosen to ignore."  *Lane v. First Nat'l Bank of Bos.*, 871

F.2d 166, 175 (1st Cir. 1989).

   If the Court considers amici's arguments, it should also consider Backpage.com's

response, as follows.

> **B.     This Court Deserves a More Balanced View of Sex Trafficking than Amici's
> "Understandings."**

   Both briefs offer amici's views about their "experience and understanding of the problem

of human trafficking generally, and sex trafficking in particular."  AG Br. at 2; *see also id.* at

2-8; Cities Mot. for Leave at 1-4; Cities Br. at 1.  Certainly everyone in this action—Plaintiffs,

their amici, **and** Backpage.com—agrees human trafficking is a horrendous crime that should be

addressed by intelligent laws and policies.  But it is also important to have a full and balanced

understanding of the issue of sex trafficking and experts' analyses of the problem and approaches

to combat it—not merely the "understandings" amici advance to support their arguments.

   Sex trafficking has become a high-profile public cause, championed by politicians,

celebrities, non-governmental organizations ("NGOs"), and others.  Although this has helped

raise public awareness, experts caution that laws, policy decisions, and law enforcement efforts

should be based on empirical data, not unsupported claims or anecdotal accounts.  Perhaps "in no

area of the social sciences has ideology contaminated knowledge more pervasively than in

writings on the sex industry.  Too often in this area, the canons of scientific inquiry are

suspended and research deliberately skewed to serve a particular political agenda."[2]  The concern

(and the consensus among experts) is that most writings about sex trafficking are not evidence-

based, but are premised on the views of groups seeking to advance political and moral agendas.[3]

For example, it is widely recognized there are no accurate estimates of the extent of sex

trafficking in the United States.[4]  Yet government authorities, NGOs, and others (including amici

---

[2] Sheldon Zhang, *Beyond the 'Natasha' story—a review and critique of current research on sex trafficking*, GLOBAL CRIME, vol. 10, no. 3, at 179 (Aug. 2009) (quoting GWU Professor Ronald Weitzer).

[3] Researchers at George Washington University comprehensively reviewed articles about trafficking and found they were not evidence-based, but relied on assertions by government agencies and NGOs advancing their views, while "[m]uch of the popular writing on human trafficking has been anecdotal or sensationalistic."  Ronald Weitzer, *New Directions in Research on Human Trafficking*, 653 ANNALS AM. ACAD. POL. & SOC. SCI., at 6 (May 2014).  *See also* Eliabieta Gozdziak & Micah Bump, Georgetown University Institute for the Study of International Migration, *Data and Research on Human Trafficking: Bibliography of Research-Based Literature*, at 43 (Oct. 2008), https://www.ncjrs.gov/pdffiles1/nij/grants/ 224392.pdf ("the dominant anti-trafficking discourse is not evidence-based but grounded in the construction of particular mythology of trafficking"); Christina Bain, *et al.*, *How to Responsibly Create Technological Interventions to Address the Domestic Sex Trafficking of Minors*, at 1 (April 8, 2013), http://www.danah.org/papers/TechnologistsCSEC.pdf (key findings from nineteen academic experts: "[A]ll too often, myths and public misunderstandings … drive political and legal agendas...."); Stephanie Hanes, *Human Trafficking:  a misunderstood global scourge*, CHRISTIAN SCI. MONITOR (Sept. 9, 2012), at 3, http://www.csmonitor.com/World/Global-Issues/2012/0909/Human-trafficking-a-misunderstood-global-scourge (quoting director of American University program on trafficking and forced labor: "the anti-domestic-sex-trafficking movement 'just took off and created its own industry,' in part because it touched upon a conservative social nerve"); Women's Commission for Refugee Women and Children, *The U.S. Response to Human Trafficking:  An Unbalanced Approach*, at 1 (May 2007), http://www.humantrafficking.org/uploads/publications/ustraff.pdf ("Another issue throwing trafficking protections off balance is the United States' policy which focuses government trafficking efforts on eradicating prostitution, which it conflates with sex trafficking.").

[4] *Human Trafficking in the United States:  Protecting the Victims*, Hearing Before Senate Judiciary Committee, 114th Cong. (Feb. 24, 2015), text from Bloomberg Law, News & Law Reports, at 1 (statement of Sen. Grassley:  "Reliable data of human trafficking victims within our country's borders is not readily available."); Maureen McGough, *Ending Modern-Day Slavery: Using Research to Inform U.S. Anti-Human Trafficking Efforts*, National Institute of Justice, NIJ JOURNAL No. 271 (Feb. 2013), http://www.nij.gov/journals/271/pages/anti-human-trafficking.aspx ("The data used to estimate the prevalence of human trafficking in the U.S. are lacking in scope and quality at the federal, state and local levels," and, as a result, "challenges also exist in gauging the effectiveness of the criminal justice system's response."); Gozdziak & Bump, *Data and Research on Human Trafficking*, at 13 ("there is little systematic and reliable data on the scale of" human trafficking, yet accurate information "is vital … to craft effective policies"); Phillip Martin, *Two Years On, Mass. Human Trafficking Law Examined*, WGBH, (Aug. 19, 2013), http://wgbhnews.org/post/two-years-mass-human-trafficking-law-examined ("It's not clear how many people in Massachusetts and New England are victims of human trafficking; and officials conceded that making that determination is difficult.").

here, *see* AG Br. at 3; Cities Br. at 1) often assert there are 100,000-300,000 underage sex trafficking victims in the country.  That misstates a 2001 study that suggested only that this many youth might be at risk because of their circumstances.[5]  As commentators have noted, "[h]ype over such high and inaccurate numbers … leads to a misguided response, at best" and, at worst, diverts resources and attention from real solutions to human trafficking.[6]

Similarly, while most agree "technology is increasingly playing a role in the practices and processes surrounding human trafficking," experts acknowledge "[w]e do not know if there are more human trafficking victims as a result of technology."[7]  In fact, no one—neither experts nor websites—can determine whether any given online post concerns sex trafficking.[8]  Experts caution that the increase in visibility due to technology should not lead to misguided decisions:

> Heightened visibility can easily prompt fear, as we become concerned about the things that we see that we don't like.  But the least productive thing that we can do with visibility is use it to generate fear.  While fear and outrage can propel us

---

[5] Hanes, *Human Trafficking*, at 3 (numbers came from 2001 University of Pennsylvania study estimating youths at risk of exploitation "because of an array of negative circumstances, from homelessness to drug addiction").  The Pennsylvania study actually stated that "[r]eliable estimates of the number of commercially sexually exploited children [CSEC] in the United States do *not* exist."  Richard Estes & Neil Alan Weiner, *The Commercial Sexual Exploitation of Children In the U.S., Canada and Mexico*, University of Pennsylvania, Center for the Study of Youth Policy, at 142 (Sept. 18, 2001, rev. Feb. 20, 2002), *quoted at* http://www.justfacts.com/sexuality.asp#f40.

[6] Hanes, *Human Trafficking*, at 3; *see also id.* (quoting American University director:  "You need to tailor your response to the reality [not] to the hype."); *id.* at 8 (funding is diverted, "prevention gets short shrift," and "[c]hildren most at risk of becoming trafficked … have difficulty getting help").

[7] danah boyd, et al., *Human Trafficking and Technology:  A Framework for understanding the role of technology in the commercial sexual exploitation of children in the U.S.*, at 1, (2011), http://research.microsoft.com/en-us/collaboration/focus/education/htframework-2011.pdf.  *See also* Mark Latonero, *Human Trafficking Online, The Role of Social Networking Sites and Online Classifieds*, USC Annenberg Center on Communication Leadership & Policy, at 11 (Sept. 2011), http://technologyandtrafficking.usc.edu/files/2011/09/HumanTrafficking_FINAL.pdf.

[8] Mark Latonero, *The Rise of Mobile and the Diffusion of Technology-Facilitated Trafficking*, USC Annenberg Center on Communication Leadership and Policy, at 19 (Nov. 2012), https://technologyandtrafficking.usc.edu/files/2012/11/HumanTrafficking2012_Nov12.pdf ("How an Internet service provider would actively determine or identify content that might signal human trafficking behavior remains unresolved."); *id.* at 22 (researchers applying analytic techniques cannot ascertain that any given ad concerns minor sex trafficking).

to act, driving policy by fear can easily backfire and harm those that we're trying to help."[9]

In short, "[f]ocusing on whether technology is good or bad misses the point; it is here to stay."[10]

It is also myopic to focus just on the Internet or any one website. Mobile communications (texting and apps) have "risen in prominence" and "are now of central importance in the sex trafficking of minors in the United States."[11] Pimps and johns increasingly are using gaming technologies such as Xbox Live and Sony Online Entertainment.[12] Even looking at just the Internet, traffickers and others misuse ***many*** websites,[13] including Facebook, MySpace, and Craigslist (still), Twitter, Tumbler, and others.[14]

---

[9] danah boyd, *Combating Sexual Exploitation Online: Focus on the Networks of People, not the Technology*, Statement to Attorney General Coakley, Hearing on Sexual Exploitation Online, at 1 (Oct. 19, 2010), http://www.mass.gov/ago/docs/community/testimony/db.pdf.

[10] boyd, *Human Trafficking and Technology*, at 1.

[11] Latonero, *The Rise of Mobile*, at iv. *See also* Vanessa Bouche, Thorn, *A Report on the Use of Technology to Recruit, Groom and Sell Domestic Minor Sex Trafficking Victims* (January 2015), https://www.wearethorn.org/resources-and-research/use-of-technology-in-domestic-minor-sex-trafficking (study reporting that while the Internet and cell phones increasingly are used by sex traffickers to meet, groom and exploit victims, they also provide significant opportunities for outreach and help to victims).

[12] boyd, *Human Trafficking and Technology*, at 7; Latonero, *The Rise of Mobile*, at 23 (platforms used to recruit or solicit minors include Mocospace.com and Xbox live).

[13] Latonero, *The Rise of Mobile*, at 28 ("traffickers and trafficked minors are not solely utilizing one ad site but rather draw upon a variety of sites and technologies, such as chat rooms, message boards, and text messages").

[14] For example, a study by a Columbia professor estimated that 83 percent of New York prostitutes have Facebook pages, and Facebook was becoming the leading online recruitment tool. Chris Matyszczyk, *Study: Facebook replacing Craigslist for prostitutes*, CNET (Feb. 7, 2011), http://www.cnet.com/news/study-facebook-replacing-craigslist-for-prostitutes. *See also* Daniel Fisher, *Backpage Takes Heat, But Prostitution Ads Are Everywhere*, FORBES (Jan. 26, 2012), http://www.forbes.com/sites/danielfisher/2012/01/26/backpages-takes-heat-for-prostitution-ads-that-are-everywhere ("Craigslist hasn't really gotten out of the business"); Bouche, *A Report on the Use of Technology*, at 18 (exploited youth reported using Craigslist, Facebook, Myspace and email accounts such as Yahoo Mail and Gmail); Julie Ruvolo, *Sex, Lies and Suicide: What's Wrong with the War on Sex Trafficking*, FORBES (June 26, 2012), http://www.forbes.com/sites/julieruvolo/2012/06/26/sex-lies-and-suicide-whats-wrong-with-the-war-on-sex-trafficking/ (if "we shut down Backpage, we're going to have to go back to Craigslist, because the sex ads are back," and "we're also going to have to shut down Facebook, Tumblr, Twitter, YellowPages.com and About.com because a research group found sex ads on all of these sites too"); Latonero, *The Rise of Mobile*, at 23, 28 (escort ads on Backpage.com also appeared on EroticMugShots.com, LocalEscortPages.com, MyProviderGuide.com, FindHotEscorts.com, AdultSearch.com, and

Nonetheless, state attorneys general (including the Massachusetts AG) pressured Craigslist to censor its adult services category, and when that campaign succeeded in 2010,[15] immediately (and have since) targeted Backpage.com.[16] But experts and law enforcement officials acknowledged that pressuring Craigslist to shutter adult advertising deprived law enforcement of a cooperative partner and represented a "missed opportunity to explore creative solutions to the problem of trafficking online."[17] They warn now against repeating this mistake with Backpage.com.[18] Closing one site causes content to move elsewhere, further underground and more likely beyond the jurisdiction and reach of law enforcement.[19] This has been referred

nsaPals.com; noting use of Facebook, MySpace, and Tagged.com); Meredith Dank, *et al.*, *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities*, Urban Institute, at 234 (March 2014), http://www.urban.org/UploadedPDF/413047-Underground-Commercial-Sex-Economy.pdf (sites used by sex workers included "Adam4Adam.com, Eros.com, Adult Search.com, TheEroticReview.com, Cityvibe.com, Myspace.com and a variety of chat lines, escort service websites, and communities like Livelinks.com and LiveJasmin.com").

[15] *See* Michael Lindenberger, *Craigslist Comes Clean: No More 'Adult Services,' Ever*, TIME, (Sept. 16, 2010), http://content.time.com/time/nation/article/0,8599,2019499,00.html.

[16] *See* State Attorney General Letter (Sept. 21, 2010), http://www.illinoisattorneygeneral.gov/pressroom/2010_09/Backpage_com9-20-2010.pdf.

[17] Latonero, *The Rise of Mobile*, at 26-27 (also quoting federal law enforcement agent stating "we don't like" losing Craigslist because they were "very pro-law enforcement" and "[i]f you shut that down, they're going to go somewhere else"); Megan Woolhouse, *Craigslist sex-ad ban doesn't end Web listings*, BOSTON GLOBE (Sept. 8, 2010) at B7 (interview of John Palfrey, Harvard Berkman Center for Internet and Society, noting that "[s]trategically, you have to go to the root causes, and not just focus on the intermediaries [*i.e.*, websites] but directly on the wrongdoers").

[18] Ruvolo, *Sex, Lies and Suicide* ("And now we're about to miss another opportunity with Backpage."); Mark Masnick, *Oh Look: Police Can Use Backpage.com To Track Down, Arrest & Convict Pimps & Prostitutes*, TECHDIRT (Oct. 2, 2012), https://www.techdirt.com/articles/20121002/07354820569/oh-look-police-can-use-backpagecom-to-track-down-arrest-convict-pimps-prostitutes.shtml ("No one seems to recognize that attacking Backpage instead of *those actually responsible* only makes it that much more difficult to track down the real criminals.").

[19] boyd, *Combatting Sexual Exploitation Online*, at 2 ("Going after specific sites … and attempting to eradicate the visibility does nothing to address the networks of supply and demand—and it simply pushes them to evolve and exploiters find new digital haunts and go further underground."); danah boyd, *How Censoring Craigslist Helps Pimps, Child Traffickers and Other Abusive Scumbags*, HUFFINGTON POST (Sept. 6, 2010), http://www.huffingtonpost.com/danah-boyd/how-censoring-craigslist-_b_706789.html (pimps and traffickers will "move on and invade a new service," perhaps "an offshore one that American law enforcement can do nothing about"; "Taking something that is visible and making it invisible makes a politician look good, even if it does absolutely nothing to help victims who are harmed.").

to—and criticized—as a "whack-a-mole" approach that fails to address root causes of the problem and makes efforts to prevent, pursue and prosecute traffickers more difficult.[20]

As the American Psychological Association has written:  "Preventing the trafficking of women and girls is a complex problem that requires cross-disciplinary research, training and education, public awareness and new policies at every level of government."[21]  Thus, many experts—and some lawmakers and NGOs—have come to realize that combatting underage sex trafficking requires a holistic approach addressing the factors that make youth vulnerable, improving outreach and prevention efforts, and providing support and rehabilitative services rather than criminalizing victims.[22]  For example, the National Research Council recently recommended funding to improve multi-sector collaboration to prevent, identify and respond to exploitation and trafficking of minors, focusing on vulnerable populations; enacting safe-harbor laws to treat those harmed by sex trafficking as victims; pursuing legal responses to perpetrators of sex trafficking, with an emphasis on deterring demand; implementing and strengthening laws to respond to and support victims; and setting a national research agenda to improve the evidence

---

[20] Latonero, *The Rise of Mobile*, at 26 (quoting Jennifer Musto, *Institutionalizing Protection, Professionalizing Victim Management: Explorations of Multi-Professional Anti-Trafficking Efforts in the Netherlands and the United States* (UCLA 2011)); *id.* ("shutting down one site does not address the root causes of the problem"); boyd, *How Censoring Craigslist Helps Pimps* ("Censorship online is nothing more than whack-a-mole, pushing the issue elsewhere or more underground.").

[21] *APA Task Force Report Highlights Problem of Human Trafficking of US Women and Girls* (Mar. 12, 2014), http://www.apa.org/news/press/releases/2014/03/human-trafficking.aspx.  *See also* Latonero, *The Rise of Mobile*, at 23.

[22] *See* Bain, *How to Responsibly Create Technological Interventions*, at 2-4 (urging increased emphasis on social services for at-risk youth, treating youth as victims, implementing intervention plans to help victims, and using technology to identify criminal activity and help vulnerable youth); Bouche, *A Report on the Use of Technology*, at 25-31 ("there is clearly a strong need for programs that assist [victims] in getting out," though most victims reported that no one reached out to them, and "[m]ultiple survivors mention the lack of help, understanding and compassion they received from law enforcement"); *see also id.* at 38-39 (recommendations); Hanes, *Human Trafficking*, at 8-9.

base for informed policy-making.[23]  Shared Hope International similarly has emphasized four

issues:  eliminating the demand for trafficking by punishing those who buy sex, prosecuting

traffickers without relying entirely on victim testimony, identifying victims as such rather than

criminals, and providing protection, services, and shelter to victims.[24]

Experts also advocate that technology should be a part of these broader approaches to

combat sex trafficking intelligently.[25]  "Instead of singling out these technologies [*e.g.*, websites,

mobile communications] as a root cause of trafficking," they should be used "to further the anti-

trafficking goals of prevention, protection, and prosecution."[26]  Websites and mobile platforms

are valuable tools in several ways.  They provide a digital trail to identify, track down and

prosecute traffickers (if law enforcement can work with cooperative online providers).[27]  They

---

[23] Inst. of Medicine & Nat'l Research Council, *Confronting Commercial Sexual Exploitation and Sex Trafficking of Minors in the United States*, at 5-16 (Ellen Wright Clayton *et al.* eds., 2013), http://www.iom.edu/~/media/Files/Report%20Files/2013/Sexual-Exploitation-Sex-Trafficking/sextraffickingminors_rb.pdf.  The NRC, the advisory arm of the National Academy of Sciences, conducted this study in response to a request from the Department of Justice.

[24] *See* Shared Hope International, *2013 Protected Innocence Challenge: A Legal Framework of Protection for the Nation's Children*, at 9, http://sharedhope.org/wp-content/uploads/2014/02/2013-Protected-Innocence-Challenge-Report.pdf.  The organization issues an annual report evaluating states based on their respective laws addressing sex trafficking and these policy goals.

[25] As President Obama has stated:  "Just as [traffickers] are now using technology and the Internet to exploit their victims, we're going to harness technology to stop them."  Press Release, The White House, Remarks by the President to the Clinton Global Initiative (Sept. 25, 2012), http://www.whitehouse.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

[26] Latonero, *The Rise of Mobile*, at iv (while, "increasingly, the business of human trafficking is taking place online and over mobile phones[,] the same technologies … can become a powerful tool to combat trafficking").  *See also* boyd, *Combatting Sexual Exploitation Online*, at 1 ("When it comes to the Internet and exploitation, most people lament the new opportunities for buyers and sellers to connect, but fail to realize how these very same structures also provide new opportunities to intervene because it's possible to 'see' the trade in entirely new light.").

[27] As California's Attorney General has noted, technology can provide a "digital trail" for law enforcement, prevent and disrupt human trafficking online, and provide new ways of outreach to victims and raising public awareness.  Statement of AG Kamala Harris, *Human Trafficking*, http://oag.ca.gov/human-trafficking.  *See also* Latonero, *The Rise of Mobile*, at iv-v ("Mobile communication may also represent a breakthrough for interventions by law enforcement and the anti-trafficking community" by providing "a trail of information and evidence" for "identifying, tracking, and prosecuting traffickers.").

present a "significant opportunity" to communicate with vulnerable youth "to prevent recruitment in the first place" and "inform young victims once they have been recruited about options to seek help."[28]  And, law enforcement can use websites to set up sting operations and thereby make online spaces too risky for criminals.[29]  Indeed, some have suggested that, because police monitor and use Backpage.com and the website cooperates with authorities, it has become a risky place for traffickers and criminals.[30]

Notably, none of these experts that have examined the role of technology in trafficking—including from Harvard, Wellesley, USC, and TCU—have advocated shutting down websites. Although perhaps not politically popular, some law enforcement officials have stated publicly that this is a bad idea because cooperative sites such as Backpage.com (and Craigslist before) are valuable resources in fighting sex trafficking.[31]  Indeed, in a recent hearing before the Senate Judiciary Committee, the Director of Iowa's Human Trafficking and Enforcement Prosecution Initiative responded to questioning about Backpage.com by saying we should "move cautiously

---

[28] Bouche, *A Report on the Use of Technology*, at 19.  *See also* Latonero, *The Rise of Mobile*, at v (technology can be used as a tool "to reach vulnerable communities and raise public awareness); boyd, *How Censoring Craigslist Helps Pimps* ("Visibility makes it easier to help victims.").

[29] boyd, *How Censoring Craigslist Helps Pimps* ("Woking with [websites] to collect data and doing systematic online stings can make an online space more dangerous for criminals," "[e]ventually … mak[ing] a space uninhabitable for criminals by making it too risky for them to try to operate there," while "[c]ensoring [a website] does absolutely nothing to hurt the criminals.").

[30] Laterno, *The Rise of Mobile*, at 31 (quoting detective who observed:  "No one uses Backpage anymore. Everyone thinks cops are on there now.").  *See also* Fisher, *Backpage Takes Heat* ("Backpage isn't the best place to run an illegal enterprise, at least if you want to keep your business secret from the cops.").

[31] Latonero, *The Rise of Mobile*, at 26-27 (quoting law enforcement official as saying Craigslist was "always very cooperative" and "we don't like it [that the site was shut down]," because "[i]f you shut that down, they're going to go somewhere else"); Rachel Lewis Hilburn, *Websites with Adult Ads Contribute to Sex Trafficking of Kids; Law Officers Call the Sites Helpful*, WHQR (Mar. 4, 2015), http://whqr.org/ post/websites-adult-ads-contribute-sex-trafficking-kids-law-officers-call-sites-helpful (quoting North Carolina detective saying Backpage.com is "an important tool for local law enforcement" and is "extremely cooperative," whereas if it was shut down, law enforcement would "los[e] investigative tools"; also quoting representative of North Carolina AG's office stating that "she's heard similar sentiments from other members of [the] law enforcement" community).

so that we don't remove one of the best tools that law enforcement currently has available."[32]

> ### C.   Amici's Factual Accusations about Backpage.com Are Improper and Contradict Their Laws, Experiences, and Statements.

Amici go on to offer their own accusations against Backpage.com.  As noted, this is improper—the Court should disregard an amicus that offers a "highly partisan account of the facts," *New England Patriots Football Club*, 592 F.2d at 1198 n.3, and briefs of this sort are "as far from an amicus as one can get," *United States v. Certain Land Located in the Cnty. of Barnstable*, 674 F.2d 90, 91 n.1 (1st Cir. 1982).  It is not appropriate for an amicus simply to malign a party in hopes of tainting the Court's view.  Here, amici's attacks against Backpage.com are not only improper, they are contradicted by amici's own laws, statements, and practices.

First, the AG asserts its "cursory review of the website" reveals that all escort ads "offer sex for sale," AG Br. at 10, and the Cities contend the "actual goods advertised [in the escort category] are illegal sex," Cities Br. at 13.  Attorneys General in Washington, Tennessee, and New Jersey made the same argument, and federal courts in those states rejected it, holding that escort ads on Backpage.com are constitutionally protected speech.  *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1282 (W.D. Wash. 2012); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 825 (M.D. Tenn. 2013); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *7 (D.N.J. Aug. 20, 2013).[33]  Moreover, amici's argument is incongruous, given that they ***permit*** escort services.  San Francisco, Atlanta and Denver all license and regulate escort services, and

---

[32] *Human Trafficking in the United States*, Hearing before Senate Judiciary Comm., at 24 (testimony of Mike Ferjak, acknowledging that websites provide "intelligence … to law enforcement to track and obtain data as far as how these people conduct their operations and where they're going to do it and all sorts of things").

[33] *Accord M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 962, 969 (N.D. Ill. 2009).

Colorado has an "Escort Service Code."[34]  The City of Boston has granted business name certificates to entities identifying their "type of business" as "escorts," "escort service," and "personal escort."[35]  Indeed, yellow page listings for the cities represented by amici reveal hundreds of escort services.[36]

The AG also attempts to dismiss Backpage.com's role in supporting law enforcement and helping rescue victims,[37] saying the website is responsive only "to varying degrees" and its "monitoring and reporting efforts … rarely yield results."  AG Br. at 10.  This hyperbole ignores the many times Backpage.com has cooperated with the AG's office (and the Cities), including in the very cases the AG cites to criticize Backpage.com.  The AG refers to cases in Dorchester and Everett, *see* AG Br. at 6, yet fails to mention Backpage.com supported both investigations.  In the Dorchester case, prosecutors acknowledged Backpage.com provided credit card information that led to identification of the defendant as well as "over one thousand pages of records related to these prepaid cards."[38]  In the case concerning an Everett massage parlor, agents traced the

---

[34] San Francisco Police Code Art. 15.6 § 1074.4, http://police.sanfranciscocode.org/15.6/1074.4; Atlanta Code of Ordinances § 30-641 to -668, http://atlanta.elaws.us/code/coor_ptii_ch30_artviii; Denver Mun. Code, § 7-320, http://denver-co.eregulations.us/code/coor_titleii_ch7_artxiii_div2_sec7-320; Colo. Rev. Stat. § 12.25.5-101 *et seq*.

[35] Registered names include:  "Exotic Day Dream Escort Service," "Sophistikatts Escort Agency," "A Plus College Escorts," "VIP Escort," "Erotic Pleasures," and "All Kinds of Adult Entertainment."  *See* http://www.cityofboston.gov/cityclerk/dbasearch/Default.aspx?type_of_business=escort&order_by=file_number.

[36] A yellow pages search for "escort service" in the cities represented by amici results in over 350 listings: Boston (61 listings), San Francisco (42), Atlanta (80), Denver (60), Houston (58), Philadelphia (21), Portland (32).  *See* http://www.yellowpages.com.

[37] The AG states that "seventy-five percent of the cases [the office] has prosecuted under our state human trafficking law … involve advertising on Backpage.com."  AG Br. at 7.  But this refers to just six of the eight cases the office has brought since M.G.L. c. 265, § 51 took effect three years ago, and none of the cases involving ads on Backpage.com concerned allegations of underage sex trafficking.  Moreover, pointing to the number of prosecutions that involve ads on Backpage.com speaks more to the fact that law enforcement routinely work with the site because of its help and cooperation.

[38] Commonwealth's Statement of the Case, at 8, *Commonwealth v. Leoney*, SUCR2013-10947.

defendant by locating her phone number on a Backpage.com ad, and the website fully complied with a subpoena, providing records dating back to 2013.[39]

In fact, Backpage.com has voluntarily responded to over 100 subpoenas and requests from Massachusetts law enforcement authorities in 2014 and 2015—including many from the AG's office.  Contrary to the AG's assertion that Backpage.com's "monitoring and reporting … rarely yield results," AG Br. at 10, for many or most subpoenas involving suspected child victims, Backpage.com previously reported the ads to the National Center for Missing and Exploited Children ("NCMEC").  Perhaps more telling, while amici now contend Backpage.com's cooperation is a ruse, more than thirty times law enforcement officials from the AG and the Cities have thanked and commended Backpage.com for its help,[40] as others across the country have done hundreds of times.  Some examples:

> You guys are fantastic thank you [from Massachusetts AG's office]
>
> Thank you so much, you have really gone above and beyond.  I always like working with your group because it is professional and prompt.[41]
>
> Thank you very much for your assistance.  By the way, as a Detective with the … Police, I deal with numerous hospitals, banks, cell phone companies, etc.  You guys have been by far the best and easiest to deal with.
>
> As usual your staff at Backpage.com is awesome!  Thank you for this additional information it helps out tremendously.
>
> Backpage staff.  Great job.  This will help in the investigation.  Thanks for further researching and going the extra mile.
>
> Thank you!  I appreciate your proactive efforts to protect our children.  Again, thank you.

---

[39] Commonwealth's Statement of the Case, at 4, *Commonwealth v. Cipriano*, SUCR2014-1309.

[40] Including from the Massachusetts AG's office, the Houston Police Department, and officials with the Cities of Houston, Portland, Denver, Atlanta, San Francisco and Boston.

[41] Backpage.com typically responds to law enforcement subpoenas and requests within forty-eight hours and often in the same day.

Thank you so much.  We have been waiting to obtain records from some of these sites. … Thank you very much for your assistance and attention to details.  I wish more companies were like this.[42]

Backpage is the very best thank you!!!!!!!!!!!! [from Massachusetts AG's office]

Thanks once again for going above and beyond what we ask of you.  Your team has always been helpful, diligent, and worked with a [sense] of urgency, and it is greatly appreciated.

[Y]our staff did a great job!  We appreciate Backpage's vigilance to help protect kids.  On our team over the weekend were the Secret Service, Department of Homeland Security, the United States Attorney's Office and several local law enforcement agencies and all commented on how effective Backpage was on getting the ads removed quickly and blocking future ads from the same posters.

I can't thank you and your staff enough for being so responsive and supportive of my and other law enforcement efforts concerning these cases.  Your company's level of cooperation is not the norm and makes a huge difference in our ability to target and ultimately arrest the offender. [from Massachusetts AG's office]

Amici further assert that "Backpage has taken various affirmative steps to maximize the security of the website for traffickers and to hinder law enforcement" by "remov[ing] advertisements for support groups or posts by law enforcement officers engaged in sting operations."  AG Br. at 12; Cities Br. at 11.  Again, amici offer no support[43] and their accusations are surprising, given their use of Backpage.com.  For example, the month before joining the Cities' brief, Houston police conducted a sting operation by placing ads on Backpage.com, arresting sixty men for soliciting prostitution.[44]  The week after San Francisco filed the Cities' brief, Bay Area authorities rescued an underage victim based on a tip from Backpage.com to

---

[42] In addition to providing its records, in several cases Backpage.com staff have also voluntarily conducted and provided further research (*e.g.*, concerning other websites where a victim was advertised).

[43] Vaguely alleging that Backpage.com removed some sting ad, without explaining the premise for such an allegation, is particularly unfair.  For example, if amici are referring to an instance when an ad was blocked because Backpage.com's filters or monitors determined it was improper, that would underscore the effectiveness of the website's policing, not that it was trying to hinder law enforcement.

[44] Gianna Caserta, *More than 60 men charged in HPD prostitution 'round-up,'* CLICK2HOUSTON (Mar. 4, 2015), http://www.click2houston.com/news/64-charged-in-hpd-prostitution-roundup-investigation/31605082.  It bears noting the Houston sting operation did not concern sex trafficking.

NCMEC, crediting the website's work for "helping [them] catch the suspect."[45]   Additionally, the

FBI (working with local law enforcement) has used Backpage.com for its annual "Operation

Cross-Country" efforts to target sex trafficking (including numerous arrests and rescues in San

Francisco and Denver), and Backpage.com has stated that it was "very, very pleased" with these

efforts.[46]   Indeed, Backpage.com conducts training of law enforcement officials across the

country, explaining how the website and its staff can help track down and convict sex traffickers.

Finally, although amici repeat the unsupported allegation that Backpage.com removes ads from

victim support groups, the website prominently features such ads.[47]

 Otherwise, amici endorse and seek to expand on Plaintiffs' allegations.   For example,

they assert Backpage.com creates content[48] in "'Sponsored Ads' by choosing images and text

from the full advertisement to highlight and by creating new text to summarize portions of the

original advertisement ...."  Cities Br. at 10; *see also* AG Br. at 12.   In fact, a sponsored ad is one

featured in search results for an additional fee, which is common on websites.[49]   The text of such

ads on Backpage.com is auto-generated by a function that selects portions of the ad text users

---

[45] *Oakland Man Accused Of Listing Teen On Sex Website Pleads Not Guilty*, CBS (Feb. 27, 2015), http://sanfrancisco.cbslocal.com/2015/02/27/oakland-man-who-listed-teen-on-web-for-sex-busted-by-website-pleads-not-guilty (quoting Santa Clara deputy district attorney).  *See also* Steve Johnson, *Sex online: Police target lucrative Internet prostitution trade*, SAN JOSE MERCURY NEWS, (Jan. 12, 2015), http://www.mercurynews.com/business/ci_27296210/sex-online-police-target-lucrative-internet-prostitution-trade (quoting San Francisco police lieutenant as acknowledging that Backpage.com makes "it easier for police to identify people selling or seeking to buy sex through online solicitations").

[46] *Child Prostitution: Raids Rescue 105 Young People*, N.Y. TIMES (July 29, 2013), http://mobile.nytimes.com/aponline/2013/07/29/us/politics/ap-us-child-sex-arrests.html?from=us; Sadie Gurman, *Six Denver pimps arrested, 9 children saved as part of federal sting*, DENVER POST (July 29, 2013), http://www.denverpost.com/ci_23753147/six-denver-pimps-arrested-nine-children-saved-part.

[47] *See* http://boston.backpage.com/FemaleEscorts (Children of the Night post stating "Want Out? National Free Help 24/7: 1-800-551-1300. Tired of Turning Tricks? Pimps Don't Care. We Do!").  Backpage.com pointed out this ad in its motion to dismiss, *see* Mem. in Supp. of Mot. to Dismiss at 7 n.4.

[48] Amici's argument that Backpage.com is an "information content provider" outside of Section 230—an argument Plaintiffs have eschewed—is discussed in Section II.E, below.

[49] *See* Mem. in Supp. of Mot. to Dismiss at 7 n.4.

create.[50]  This is readily apparent by comparing sponsored ads to the original ads, although amici ignore the obvious to allege Backpage.com itself creates the content—which it does not.

The AG casts aspersions about Backpage.com's charges for ads in the "adult entertainment" section, "unlike the rest of the site," AG Br. at 11-12, and while this is also not true (*e.g.*, fees are also charged for dating and some employment ads), it is more important to note why charges were added in the first place.  Charges for adult-oriented ads were instituted after an agreement between forty-three state attorneys general and Craigslist, when the AGs *requested* that charges be imposed to provide information for law enforcement.[51]

Amici also allege Backpage.com "strips 'metadata' from digital photographs uploaded in the Escorts section by using software at an additional expense."  Cities Br. at 10; *see* AG Br. at 12.  This is baseless as well.  Backpage.com does not "strip" metadata, intentionally or otherwise.  Rather, when users upload photos for ads—whether to sell household items, for dating, or in any other category on the website—the photos are resized so they can appear on the site, an automated process that does not capture or retain metadata.  This is also a common process for websites, including Facebook, Instagram, Twitter, Craigslist and others.  Here too, amici offer no plausible basis to show why common website practices are somehow nefarious.

Finally, amici's assertion that Backpage.com supposedly "coach[es]" posters to "facilitate[] illegal activity by helping it go undetected," Cities Br. at 11, is also argument, not fact.  This refers to the website's enforcement of its posting rules to prevent improper ads.[52]

---

[50] There is one exception.  The notice for Children of the Night is presented as a sponsored ad, *see supra* note 47, and the text is created by the organization.  All other sponsored ads are auto-generated.

[51] *See* Press Release, Washington AG, *McKenna announces agreement with Craigslist to crack down on illegal sex trade ads* (Nov. 6, 2008), http://www.atg.wa.gov/news/news-releases/mckenna-announces-agreement-craigslist-crack-down-illegal-sex-trade-ads.

[52] Plaintiffs' allegations apparently are based on efforts by Plaintiffs' lawyers to post numerous fake ads trying to test and evade Backpage.com's automated filters.  Shortly before Plaintiffs filed suit,

Most (or all) websites that host third-party content impose rules and restrictions, and many use filters and screening to block or remove improper content. This includes Facebook, YouTube, Craigslist, and Match.com, which have rules similar to or the same as Backpage.com's, even identifying and disallowing particular terms and phrases, as Backpage.com does.[53] Put simply, to paint Backpage.com's efforts to prevent improper content as a scheme to encourage such content is beyond the pale of fair argument. Moreover, to give credence to this argument would eviscerate Section 230, because, rather than police user content—one of Congress's express purposes—websites would be far better off to impose no rules or restrictions and do no monitoring, because they would only create liability risks by undertaking such efforts.[54]

### D. Amici Have Conceded Section 230 Bars Enforcement of State Laws.

Amici urge the Court to adopt a "reading of Section 230 [that] preserves the ability of local governments … to make and enforce local and state laws through their police powers." Cities Br. at 14; *see also* AG Br. at 20 (urging the Court apply Section 230 immunity so as not to "undermine laws enacted by the Commonwealth in the exercise of its traditional police powers").

---

Backpage.com's filters blocked a number of ads posted to the Boston website because of improper terms (*e.g.* "high school," "innocent schoolgirl," "sexy teen"). Backpage.com determined the ads came from a single IP address and blocked the address as well. The IP address is assigned to Ropes & Gray LLP.

[53] For example, Craigslist's "Adult Services Posting Guidelines" are essentially identical to Backpage.com's rules; they also prohibit (1) "content that is unlawful, obscene, or which advertises illegal services," (2) ads that "suggest or imply an exchange of sexual favors for money" including by using "any and all code words" (giving sexually explicit examples); (3) any "attempt to avoid detection of forbidden language by using spelling variations" (again providing explicit examples); and (4) "ads containing obscene images." *See* www.craigslist.org/about/help/Adult_Services_Posting_Guidelines. *See also* www.match.com/registration/membagr.aspx; www.facebook.com/communitystandards; www.youtube.com/t/community_guidelines.

[54] *See McKenna*, 881 F. Supp. 2d at 1273 (making Backpage.com or other websites liable for efforts to prohibit content would "create[] an incentive for online service providers *not* to monitor the content that passes through [their] channels[,] precisely the situation that [Section 230] was enacted to remedy"); *see also Nemet Chevrolet, Ltd. v. ConsumerAffairs.com, Inc.*, 591 F.3d 250, 258 (4th Cir. 2009) (plaintiff's claims would thwart Congress's purpose to "remove disincentives for the development and utilization of blocking and filtering technologies" (quoting 47 U.S.C. § 230(b)(4))); *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003).

The short answer is that, in Section 230, Congress **expressly preempted** state laws because its aim was to prevent government regulation of the Internet and eliminate a patchwork of different and potentially inconsistent state regulation.  *PSINet, Inc. v. Chapman*, 362 F.3d 227, 240 (4th Cir. 2004) (state efforts to regulate the Internet "highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation …." (quoting *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997)).  Indeed, the AG has acknowledged several times that Section 230 preempts enforcement of the Commonwealth's laws against classified ad websites such as Backpage.com and Craigslist.

The AG first purports to endorse Plaintiffs' claim under M.G.L. c. 265, § 50 (the Massachusetts anti-trafficking law), but ultimately supports Backpage.com's position.  Plaintiffs argue that any kind of direct or indirect assistance is enough to allege a business entity "knowingly aids or is a joint venturer in trafficking" under Chapter 265.  *See* Opp. to Mot. to Dismiss at 7; Surreply at 4.  But as Backpage.com has explained, this standard refers to aiding and abetting liability, meaning a defendant must know another party was engaged in sex trafficking, shared the intent to make it succeed, and participated in the illegal activity.  Reply on Mot. to Dismiss at 6-7 & n.10.  The AG actually supports this interpretation by citing *Go-Best Assets Ltd. v. Citizens Bank of Massachusetts*, 463 Mass. 50, 972 N.E.2d 426 (2012), *see* AG Br. at 14, which held that a bank could not be liable for aiding and abetting an attorney's fraudulent use of his bank account where there was no evidence the bank knew or shared his intent to misappropriate funds or actively participated in the misappropriation.  463 Mass. at 64.

The AG's attempt to support Plaintiffs' Chapter 93A claim fares no better.  The AG claims Plaintiffs need only show Backpage.com's website had an "overall effect" on "the relevant market" for "the illegal sale of children for sex" and therefore "[i]t is enough that the

plaintiffs were injured as an indirect result of Backpage.com's business conduct."  AG Br. at 15.
The AG bases this argument on cases in which plaintiffs claimed they were injured by unfair
trade practices of competitors in the same market.  *See, e.g.*, *Katin v. Nat'l Real Estate Info.
Servs., Inc.*, 2009 WL 929554, at *5-7, *10 (D. Mass. Mar. 31, 2009) (refusing to dismiss claims
by attorney plaintiffs alleging real estate settlement service providers were engaged in the
unauthorized practice of law, as plaintiffs sufficiently alleged lost business under the competitor
standing doctrine).  Such decisions have nothing to do with this case.  Plaintiffs do not allege
they were competitors of Backpage.com and harmed by its conduct in a market where they
competed.  Rather, they allege that if Backpage.com had not cooperated with law enforcement
and reported to NCMEC, public pressure would have shut down the site, and the pimps would
not have trafficked them.  *See* Mem. in Supp. of Mot. to Dismiss at 23-25.  This "hypothesized
chain of events falls far short of chapter 93A's causation requirement."  *Ray v. Ropes & Gray
LLP*, 961 F. Supp. 2d 344, 361 (D. Mass. 2013).[55]  Plaintiffs' claims also fail because they have
not alleged they suffered any injury as consumers, arising from a business transaction with the
website.  *See Swenson v. Yellow Transp., Inc.*, 317 F. Supp. 2d 51, 56-57 (D. Mass. 2004)
(dismissing Chapter 93A claim arising from auto accident, where plaintiffs contended the
defendant trucking company's policies encouraged speeding; "ch. 93A 'is intended to protect

---

[55] The AG additionally contends the Court should not require particularity for Plaintiffs' Chapter 93A
claims, citing state cases, but recognizing "federal courts have concluded otherwise."  AG Br. at 16 &
n.38.  Of course, Fed. R. Civ. P. 9(b) governs in this Court, no matter the pleading requirements in
Massachusetts courts.  And, in federal court, under the federal rule, Chapter 93A claims that sound in
fraud must be pleaded with particularity.  *See Santos v. SANYO Mfg. Corp.*, 2013 WL 1868268, at *6 (D.
Mass. May 3, 2013) ("Where a Chapter 93A action sounds in fraud, a plaintiff must plead such fraud with
particularity."); *see also* Mem. in Supp. of Mot. to Dismiss at 8.

against unfair and deceptive practices in trade, not unfair practices in general'" (quoting *L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.*, 121 F. Supp. 2d 147, 152 (D. Mass. 2000)).[56]

Most important, amici's entreaties that the Court should permit Plaintiffs' state-law claims directly contradicts the AG's admissions that Section 230 preempts such laws.  In 2010, when other state attorneys general demanded Craigslist eliminate the "adult services" section of the website, Attorney General Coakley refused to join because she believed Section 230 shielded online providers.[57]  Shortly thereafter, she joined the opposition against Craigslist, insisting the law "must change" to eliminate immunity.[58]  In 2010, the AG wrote to Congress that Section 230 immunity "may no longer be warranted,"[59] and later signed on to another letter to Congress urging amendment of Section 230 to exempt from immunity all state criminal laws.[60]  Now, the

---

[56] In *L.B. Corp.*, the Court granted summary judgment on the plaintiff's Chapter 93A claim against an adjacent landowner because "[i]n essence, plaintiff is complaining of excessive pumping from a well, not of unfair acts or practices in a commercial transaction."  121 F. Supp. 2d at 152.  The Court explained: "Chapter 93A is a consumer protection law that also encompasses business transactions.  It is intended to protect against unfair and deceptive practices in trade, not unfair practices in general.  Apart from claims of unfair competition, a plaintiff must allege some sort of transaction between the parties for liability to attach ….  This is the 'common thread' of 93A cases.  Plaintiff's position, if accepted would run the danger of converting any tort claim against a business into a Chapter 93A claim, because all torts encompass 'acts or practices' that could arguably be considered 'unfair.'  [T]his position tests the limits of common sense."  *Id.* (internal citations and quotation marks omitted).

[57] O'Ryan Johnson, *Coakley reverses stance on site*, BOSTON HERALD, (Aug. 20, 2010), http://nl. newsbank.com/nl-search/we/Archives?p_product=BNHB&p_theme=bnhb&p_action=search&p_ maxdocs=200&p_field_fselect-0=&p_text_fselect-0=coakley%20reverses%20stance&s_dispstring=all (coakley%20reverses%20stance)%20AND%20date(01/01/1970%20to%2003/04/2015)&p_field_date- 0=YMD_date&p_params_date-0=date:B,E&p_text_date-0=01/01/1970%20to%2003/04/2015)&xcal _numdocs=40&p_perpage=20&p_sort=YMD_date:D&xcal_useweights=no.

[58] Warren's Washington Internet Daily (Aug. 23, 2010) (quoting AG Coakley:  "At the present time, Craigslist and other 'providers and users of interactive computer services' are largely shielded from civil and criminal liability by Section 230 of the federal Communications Decency Act.  This must change." "Congress should take action and amend this statute to eliminate the immunity provision.").

[59] *Domestic Minor Sex Trafficking:  Hearing before Senate Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 297-99 (2010) (letter from AG Coakley to Reps. Scott and Gohmert, dated Sept. 15, 2010, stating "Section 230 provides [immunity] for interactive computer service providers that may no longer be warranted.").

[60] Letter from AG Coakley, *et al*. to Sen. Rockefeller, *et al.* (July 23, 2013), https://www.eff.org/files/cda- ag-letter.pdf.

20

AG asserts Section 230 does ***not*** preempt Plaintiffs' state-law claims, without explaining all the prior statements that such claims ***are*** preempted.

> **E.    Amici Cannot Argue that Backpage.com is an "Information Content Provider," and Their Argument is Wrong.**

Amici's central legal argument is that they contend Section 230 "does not apply for the additional reason that Backpage.com [is] an information content provider."  Cities Br. at 2; *id.* at 4-14; *see also* AG Br. at 17-20.  The Court should disregard this argument because Plaintiffs have expressly chosen ***not*** to make it, Opp.  to Mot. to Dismiss at 15 n.5 ("Plaintiffs do not contend at this stage of the litigation that Backpage.com is an 'information content provider' …").  *See Lane*, 871 F.2d at 175; *Weaver's Cove Energy, LLC v. R. I. Coastal Res. Mgmt. Council*, 589 F.3d 458, 467 (1st Cir. 2009) ("Amici cannot insert new arguments, not made by a party, into a case.").[61]  But even so, amici's argument is meritless.  Plaintiffs admit Backpage.com did not create or develop the ads about them (the ads were solely created by the pimps or others at their direction), and so, under well-established law, Backpage.com is not the "information content provider" and is fully entitled to Section 230 immunity.

Amici claim "early decisions … tended to characterize [Section 230] broadly … [but] did not consider or anticipate [websites] that were *also* information content providers," and "[i]n recent years, courts have developed a more nuanced approach."  Cities Br. at 4.  This misstates the law interpreting Section 230, which has been consistent for years.  In fact, in the case on which amici primarily rely, *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, the Ninth Circuit observed that courts have "adopt[ed] a relatively expansive definition of

---

[61] *See also Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 74 n.5 (1st Cir. 2001) ("Because these issues were raised for the first time on appeal by an amicus, not by a party, we do not consider them."), *aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644 (2003); *McCoy v. Mass. Inst. of Tech.*, 950 F.2d 13, 23 n.9 (1st Cir. 1991) ("To the extent that the amicus raises different grounds in support of reversal," a court should "decline to consider those grounds.").

'interactive computer service' and a relatively restrictive definition of 'information content provider.'"  521 F.3d 1157, 1174 (9th Cir. 2008) (en banc) (quoting *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)).  Since then, **every** federal circuit court that has addressed Section 230 has held it gives online providers broad immunity for claims based on third-party content.  *See* Mem. in Supp. of Mot. to Dismiss at 10-11.

Mischaracterizing parts of the decision in *Roommates.com*, amici contend a website is an information content provider beyond Section 230 protections if it "induce[s]" or "encourages" content in some fashion or "promote[s]" use of the website for "unlawful purposes."  *See* Cities Br. at 5-6; *see also* AG Br. at 18.  Actually, *Roommates.com* held the opposite.

Roommates.com was a website designed to match prospective roommates.  One portion of the site required users to make selections from prescribed menus about their gender, sexual orientation, and whether they lived with children, and to indicate their preferences about living with others based on the same criteria.  521 F.3d at 1161.  The plaintiffs alleged these criteria were discriminatory under federal and state fair housing laws.  *Id.* at 1162.  The Ninth Circuit refused to dismiss under Section 230, because the site authored and ***required*** users to answer questions to elicit discriminatory preferences, *id.* at 1166,[62] thus "materially contributing to [the] alleged unlawfulness" of the content at issue, *id.* at 1168.[63]  Courts applying *Roommates.com*

---

[62] *See, e.g.*, 521 F.3d at 1167 ("Roommate designed its search system … based on the preferences and personal characteristics that Roommate itself forces subscribers to disclose."); *id.* at 1170 n.26 ("it is Roommate that *forces* users to express a preference and Roommate that forces users to disclose the information that can form the basis of discrimination by others"); *id.* at 1172 ("Roommate does not merely provide a framework that could be utilized for proper or improper purposes; rather, Roommate's work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism is directly related to the alleged illegality of the site.").

[63] The Ninth Circuit stated:  "In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct."  521 F.3d at 1168.  Amici warp this language to suggest Section 230 immunity does not apply if a website "'materially contributes' to the underlying illegal conduct."  Cities Br. at 4.  As discussed in the text above, the Ninth Circuit said no such thing.

have interpreted it as "carv[ing] out only a narrow exception" that "turned entirely on the website's decision to **force** subscribers to divulge the protected characteristics and discriminatory preferences as a condition of using its services."  *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198-99 (N.D. Cal. 2009) (internal quotation marks omitted).[64]

However, the Ninth Circuit held that Roommates.com **was** entitled to immunity for a second part of the website, which allowed users to post "Additional Comments" of their own choosing.  521 F.3d at 1174.  The plaintiffs alleged Roommates.com encouraged subscribers to make discriminatory statements in comments by requiring discriminatory preferences in the registration process.  *Id.*  The Ninth Circuit disagreed, emphasizing that courts must reject such "encouragement" theories, as they would gut Section 230:

> [T]here will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality.  **Such close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged – or at least tacitly assented – to the illegality of third parties**.  Where it is very clear that the website directly participates in developing the alleged illegality – as it is clear here with respect to Roommate's questions, answers and the resulting profile pages – immunity will be lost.  **But in cases of enhancement by implication or development by inference** – such as with respect to the "Additional Comments" here – **section 230 must be interpreted to protect websites** not merely from ultimate liability, but from having to fight costly and protracted legal battles.

*Id.* at 1174-75 (bold emphasis added).

Amici also rely on *F.T.C. v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009).  Cities Br. at 7; AG Br. at 18-19.  The AG claims *Accusearch* held that a website that sold confidential, personal data provided by researchers was not entitled to immunity "even though it essentially

---

[64] *See also Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009) (finding *Roommates.com* "readily distinguishable" because it "was based solely on the fact that the content on the website that was discriminatory was supplied by Roommates.com itself"); *Doe v. MySpace, Inc.*, 629 F. Supp. 2d 663, 665 (E.D. Tex. 2009) (distinguishing *Roommates.com* because "[t]he Ninth Circuit repeatedly stated … that the Roommates.com website *required* its users to provide certain information as a condition of its use ….").

acted as an intermediary between the customers seeking the information and the researchers providing the information."  AG Br. at 19.  This is not a fair reading of *Accusearch* or its holding.  The website defendant in *Accusearch* was not a mere "intermediary" for content posted by third parties.  Rather, the defendant **retained** and **paid** the researchers to obtain the information (and then sold it to customers), which required violating or circumventing the Telecommunications Act by fraud or theft.  570 F.3d at 1192, 1199, 1200 ("By paying its researchers to acquire telephone records, knowing that the confidentiality of the records was protected by law, [the website] contributed mightily to the unlawful conduct of its researchers.").  Backpage.com did not hire or pay anyone to create and post the ads about Plaintiffs.

Fundamentally, *Roommates.com*, *Accusearch*, and the other cases amici cite do **not** support their assertion that application of Section 230 hinges on an "inducement" or "encouragement" test, *i.e.*, that immunity does not apply if plaintiffs allege a website generally encourages, induces, promotes or solicits unlawful content.  *See, e.g.*, Cities Br. at 5-6 & 9 n.5.[65] *Roommates.com* rejected this argument.  521 F.3d at 1174.  The First Circuit said the same in *Universal Communications Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 420-21 (1st Cir. 2007), holding that plaintiffs cannot override Section 230 by artful pleading challenging the "construct and operation" of a website.  *See also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256-57 (4th Cir. 2009) (website does not lose immunity because of allegations about its "structure and design" or that it "solicited" content).  And, contrary to amici's claim that courts' views of Section 230 have changed or become more "nuanced," the Sixth Circuit last

---

[65] For example, the Cities contend *Dart v. Craigslist, Inc*., 665 F. Supp. 2d 961 (N.D. Ill. 2009), "applied the inducement test to evaluate whether Craigslist had induced the posting of unlawful ads," Cities. Br. at 9 n.5, while, in fact, *Dart* **rejected** any "inducement" test.  *Id.* at 969 (rejecting "conclusory allegations … that Craigslist induces users to post ads for illegal services" because Section 230 "would serve little if any purpose if companies like Craigslist were found liable under state law for 'causing' or 'inducing' users to post unlawful content in this fashion").

year expressly rejected the "encouragement" argument.  In *Jones v. Dirty World Entertainment Recordings LLC*, 755 F.3d 398 (6th Cir. 2014), that court reversed a district court decision refusing to apply Section 230 on the premise that a gossip website "encourage[d] illegal … postings," holding that such an "encouragement" theory would "eclips[e] the immunity from publisher-liability that Congress established."  *Id.* at 413-14.  Amici do not mention *Jones* or any of the many other cases Backpage.com has cited rejecting the "encouragement" theory.  *See* Mem. in Supp. of Mot. to Dismiss at 15-19.

Amici's arguments are also flawed because they claim Plaintiffs can avoid Section 230 by alleging Backpage.com is an "information content provider" in some respect, without regard to whether any information provided by the website had anything to do with Plaintiffs' claims. *See, e.g.*, Cities Br. at 2; AG Br. at 18.  All websites create content, but that is irrelevant if a site did not create the content that is the basis for a plaintiff's claim.  *See Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 833 n.11, 121 Cal. Rptr. 2d 703 (2002) ("[T]he fact [plaintiffs] allege eBay is an information content provider is irrelevant if eBay did not itself create or develop the content for which [plaintiffs] seek to hold it liable.").  Amici ignore the longstanding interpretation of Section 230 that an "'entire website' approach is fatally flawed," *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 562 (N.C. Ct. App. 2012),[66] and an online provider can be liable only if it created or

---

[66] *Hill* dismissed the plaintiffs' claims asserting the StubHub website is designed to facilitate illegal ticket scalping.  Amici cite a different case, *NPS LLC v. StubHub, Inc.*, 2009 WL 995483, at *13 (Mass. Super. Ct. Jan. 26, 2009), *see* Cities Br. at 8, which refused to enforce Section 230 immunity on summary judgment, stating that "there is evidence in the record that StubHub materially contributed to the illegal 'ticket scalping' of its sellers."  Every court to consider *NPS* has rejected it.  *See, e.g.*, *Milgram v. Orbitz Worldwide, Inc.*, 419 N.J. Super. 305, 16 A.3d 1113, 1126-27 (Law Div. 2010) (finding online ticket marketplace immune; dismissing *NPS* as inconsistent with other cases, and noting it was "quite frankly, unclear … which facts the court used in reaching the conclusion that § 230 did not apply"); *Hill*, 727 S.E.2d at 563 ("declin[ing] to follow" *NPS* as "inconsistent with the decisions concluding that knowledge of unlawful content does not strip a website of [Section 230] immunity").

developed "the specific content that was the source of the alleged liability," *Accusearch*, 570 F.3d at 1198-99. *See* Mem. in Supp. of Mot. to Dismiss at 14-15.

Amici's attempts to cast Backpage.com as an "information content provider" have nothing to do with the ads about Plaintiffs, which can be the only premise of their claims. *See* Reply on Mot. to Dismiss at 2 (Plaintiffs have no standing otherwise). For example, amici cast aspersions about "sponsored ads" on Backpage.com, but no one has alleged anyone posted sponsored ads about Plaintiffs.[67] Amici incorrectly argue Backpage.com "strips" metadata from photos uploaded on the website, but there is no allegation Plaintiffs' victimization by their pimps was related in any way to missing metadata. Amici allege (also without any factual basis) that Backpage.com removed law enforcement "sting ads," but, again, no one has pointed to any such ads that could have had anything to do with Plaintiffs.

Otherwise, the cases amici cite to attempt to establish that courts "deny Section 230 immunity when websites create, induce or encourage the development of objectionable content," Cities Br. at 6, actually show only that websites may not be protected when they ***create*** content that is the basis of plaintiffs' claims.[68] Here, Plaintiffs admit Backpage.com did ***not*** create the

---

[67] Amici argue Backpage.com's revenues from sponsored ads "supports a rejection of immunity," Cities Br. at 10, but courts interpreting Section 230 have uniformly rejected this argument too. *See, e.g.*, *Hill*, 727 S.E.2d at 560 ("[t]he fact that a website elicits online content for profit is immaterial"); *M.A.*, 809 F. Supp. 2d at 1051 ("neither notice or profit make Backpage liable for the content and consequences of the ads posted by [the pimp]"); *see also Doe v. GTE, Corp.*, 347 F.3d 655, 659 (7th Cir. 2003).

[68] *See Alvi Armani Med., Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1306 (S.D. Fla. 2008) (allowing claim against defendant that "itself created tortious content"); *Doe v. City of New York*, 583 F. Supp. 2d 444, 449 (S.D.N.Y. 2008) (claim of hostile work environment stemming from defendant's emails); *Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159, 170, 173 Cal. Rptr. 3d 397 (2014) (patient education pamphlet provided by defendant online pharmacy that omitted warning about adverse side effects of drug); *Moving & Storage, Inc. v. Panayotov*, 2014 WL 949830, at *2 (D. Mass. Mar. 12, 2014) (claims based on website's statements about the accuracy of third-party reviews on site); *Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 313, 175 Cal. Rptr. 3d 131 (2014) (claims based on Yelp's "own statements regarding the accuracy of its filter," not "the statements of third parties (i.e., reviewers) on its website"); *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 801 (N.D. Cal. 2011) (Facebook not immune where it allegedly "create[d] new content"); *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006) ( "If …

ads about them, so these cases are inapposite.  Indeed, courts uniformly reject conclusory allegations that a website **may have** created the content at issue, recognizing that permitting such claims would defeat Section 230 and its purposes.[69]

Backpage.com is not an "information content provider" for the ads that are the basis of Plaintiffs' claims.  Those ads were created, authored, developed and posted by third-parties, which is exactly what Section 230 immunizes.

## III.   CONCLUSION

Amici's briefs improperly raise new accusations and legal arguments, detracting from (not aiding) this Court's review of Backpage.com's Motion to Dismiss.  The Court should disregard them.  But even if it considers the arguments, they do not support denying Backpage.com's Motion.  Plaintiffs have admitted the facts that establish Section 230, *i.e.*, that third parties created and posted the ads about them on Backpage.com.  As a matter of law, Section 230 bars Plaintiffs' claims.

---

Yahoo! manufactured false profiles, then it is an 'information content provider' itself"); *Hy Cite Corp. v. Badbusinessbureau.com, L.L.C.*, 418 F. Supp. 2d 1142, 1148-49 (D. Ariz. 2005) (defendant had provided content and paid for allegedly defamatory posts).

In fact, some of the cases amici cite did not even hold that websites were "information content providers." *See, e.g.*, *800-JR Cigar, Inc. v. GoTo.com, Inc.*, 437 F. Supp. 2d 273, 295 (D.N.J. 2006) (defendant not an "interactive computer service" eligible for Section 230 immunity); *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, 2004 WL 833595, at *9-10 (N.D. Tex. Apr. 19, 2004) (defendants were not interactive computer service; stating, in dicta, that even if they were, they did not dispute they "personally write and create numerous disparaging and defamatory messages"); *Cisneros v. Sanchez*, 403 F. Supp. 2d 588, 592 (S.D. Tex. 2005) (deciding whether Section 230 creates federal question jurisdiction; stating, in dicta, that "author" of defamatory statement is not entitled to immunity merely because he also administers the website hosting the content).

[69] *See Nemet Chevrolet*, 591 F.3d at 259 (rejecting allegations that website created content as "pure speculation and a conclusory allegation"); *Levitt v. Yelp! Inc*., 2011 WL 5079526, *1, *5 (N.D. Cal. Oct. 26, 2011) (rejecting as "entirely speculative" allegation that Yelp! posted false reviews to extort businesses to pay for advertising), *aff'd*, 765 F.3d 1123 (9th Cir. 2014); *Goddard*, 640 F. Supp. 2d at 1202 (rejecting plaintiff's "sweeping allegations" of Google's involvement in developing content).

Dated:  March 23, 2015.

Respectfully submitted,

s/      *Robert A. Bertsche*
Robert A. Bertsche (BBO #554333)
Jeffrey J. Pyle (BBO #647438)
PRINCE LOBEL TYE LLP
100 Cambridge Street, Suite 2200
Boston, MA 02114
(617) 456-8000 (tel.); (617) 456-8100 (fax)
rbertsche@PrinceLobel.com
jpyle@PrinceLobel.com

James C. Grant (admitted *pro hac vice)*
Ambika K. Doran (admitted *pro hac vice)*
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
(206) 622-3150 (tel.); (206) 757-7700 (fax)
jimgrant@dwt.com
ambikadoran@dwt.com

# EXHIBIT D

# U.S. Department of Justice
# **Federal Bureau of Investigation**

### is proud to recognize

### *Carl Ferrer*
***Vice President***
***Backpage.com***

for your outstanding cooperation and assistance in connection with an investigation of great importance. The FBI's ability to carry out its investigative responsibilities to the American people has been greatly enhanced through your help, and you can be very proud of your valuable contributions to the success achieved.

May 2011
*Date*

*Robert S. Mueller, III*
*Director*