# EXHIBIT G

2016 WL 7237305 (Cal.Super.) (Trial Order)
Superior Court of California.
Sacramento County

PEOPLE of the State of California,

v.

Carl FERRER et al, Defendants.

No. 16FE019224.
December 9, 2016.

**Trial Order**

Michael G. Bowman, Judge.

**Nature of Proceedings: COURT'S FINAL RULING ON DEMURRER**

**Introduction**

 **\*1** Defendants face charges for their respective roles in owning and operating an online classified advertisement website. Allegedly, through third party use of this website, women and young girls were sexually exploited. The Attorney General seeks to hold the Defendants criminally liable for the victimization of these women. The People of the State of California have a strong and legitimate interest in combating human trafficking by all available legal means. Moreover, any rational mind would concur that the selling of minors for the purpose of sex is particularly horrifying and the government has a right and a duty to protect these most vulnerable victims.

The State's legitimate interest is not absolute, however, and must be constrained by the interests and protections of the First Amendment to the U.S. Constitution. In that vein, the United States Congress has created the Communications Decency Act under 47 USC section 230 ("herein CDA"). The CDA forecloses suit against an online publisher when that suit is based on speech provided by a third party. (47 USC §230 (c) (1) and (e) (3).) By enacting the CDA, Congress struck a balance in favor of free speech by providing for both a foreclosure from prosecution and an affirmative defense at trial for those who are deemed an internet service provider.

In fact, this Court garners strength for its ruling from the legislative history (or lack thereof). The CDA was created in direct response to a legal decision holding an online publisher strictly liable for defamatory statements posted by third parties. (*See Stratton Oakmont v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229.) Since the creation of the CDA, several courts have construed the CDA's immunity provision broadly, such that close cases are resolved in favor of immunity.

(*Fair Housing Council of San Fernando Valley v. Roommates.com LLC* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.) Congress has had ample opportunity to statutorily modify the immunity provision if it disagrees with prevailing judicial application of this provision. Congress has not done so, and the current legal framework binds this Court.

The key question in this case is not whether speech in furtherance with human trafficking is protected free speech: clearly it is not. The issue to resolve is whether the Defendants should be entitled to immunity under the CDA for providing a forum for third party speech, or whether the defendants have crossed the line of merely providing a forum for speech to become actual creators of speech, and thus not entitled to immunity under the CDA.

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                    1

## Background

Backpage.com is one of the largest on-line classified advertisement services, through which users may post advertisements in a variety of categories. Posting an advertisement in the "Adult Services" category requires a fee. Through various levels of involvement with Backpage.com, Defendants find themselves facing criminal charges regarding certain advertisements placed in the "Adult Services" category. Carl Ferrer, Michael Lacey and James Larkin currently face a charge of conspiracy to pimp, and Ferrer faces multiple additional charges of pimping and pimping of a minor.

**\*2** The allegations are that Defendants conspired to create and organize a website that allows sex trafficking to take place. The People assert that Defendants created such a site, knowing that prostitutes and/or pimps use the site to advertise prostitution, and Defendants did so with the intent to derive support and maintenance from the prostitution resulting from the advertisements. The People allege that Defendants' plan has come to fruition and that they have derived financial support and maintenance from the prostitution resulting from the advertisements third parties pay Backpage.com to place. Allegedly, Defendants have also derived support from prostitution resulting from content "created" by Defendants themselves when they took content from the third party advertisements originally placed on Backpage.com and posted new advertisements on EvilEmpire.com and BigCity.com - sites also created and maintained by Defendant Ferrer.

On October 19, 2016, Defendants filed a demurrer to the felony complaint against them. Against the backdrop of unsuccessful attempts by the California and other state Attorneys General to shut down adult online advertising, the Defendants argue that the instant prosecution cannot go forward.

Defendants claim that the complaint and prosecution are: barred by the First Amendment, legally deficient under Section 230 of the Communications Decency Act ("CDA"), and devoid of any facts that constitute public offenses under the criminal statutes.

On November 16, 2016, this Court issued a tentative ruling on the matter, but allowed additional briefing. Both parties have filed additional arguments in response to the tentative ruling.

### *Court's legal analysis and ruling*

### 1. Complaint states facts that constitute public offenses

The Defendants argue that the court should grant the demurrer because the Complaint fails to allege any public offense. Rather, Defendants maintain, the People are pursuing a theory of prosecution based on allegations that third parties posted content allegedly relating to unlawful conduct. Defendant Ferrer also claims that the pimping charges against him are deficient because there is nothing to connect Ferrer to any of the advertisements associated with the nine victims. (Def. 24-25) All the defendants allege that the complaint's conspiracy charge is deficient because it does not address several elements of conspiracy. (Def. 25-26) The People claim that the complaint expressly alleges that Defendant Ferrer "knowingly and repeatedly took the earnings of victims engaged in prostitution because his livelihood depended on it." (Opp. 18) As to the conspiracy between all the defendants, the People assert that the complaint expressly alleges they conspired together to commit pimping for the purpose of further enriching themselves. (Opp. 19) The People maintain that level of specificity is all that is required to provide notice under Penal Code section 952. (Opp. 18-20) The People argue that Defendants' assertion that the complaint does not adequately state facts that constitute public offenses belies confusion between civil and criminal pleading requirements. (Opp. 20) As stated below, the key issue here is whether Defendants are able to claim immunity under the CDA. Such ability to claim liability would not necessarily render the complaint deficient. The charging instrument however, is sufficient in this case.

### 2. Defendants Challenge is Appropriately Raised in a Demurrer

The People claim that a demurrer is not the appropriate vehicle in which to raise a defense of immunity under the CDA. Rather, the People contend that such immunity may only be raised as an affirmative defense. This Court disagrees.

A demurrer to a criminal complaint lies only to challenge the sufficiency of the pleading and raises only issues of law. (Pen. Code, § 1004; *People v. McConnell* (1890) 82 Cal. 620; *People v. Biane* (2013) 58 Cal.4[th] 381, 388.) A defendant may demur only on delineated statutory grounds. (Pen. Code, § 1004; *People v. Saffell* (1946) 74 Cal.App.2d supp. 967, 972.) These include the ability to challenge the accusatory pleading on the ground that the pleading includes information that would be a bar to prosecution. (Pen. Code, § 1004(5). *See also People v. Goodman* (2014) 225 Cal.App.4th 950, 956.) The language of the CDA itself states, "*No cause of action may be brought* and no liability will may be imposed under any State or local law that is inconsistent with this section." (47 U.S.C. §230 (e) (3) (emphasis added).) This statutory language clearly demonstrates a legislative intent to provide both a bar to prosecution and an affirmative defense at trial

**\*3**  Stated more succinctly "…close cases, we believe, must be resolved in favor of immunity*, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged--or at least tacitly assented to--the illegality of third parties.*" *Fair Housing. Council v. Roommates.com, LLC, 521 F.3d 1157, 1174, 2008 U.S. App. LEXIS 7066, \*45, 36 Media L. Rep. 1545 (9th Cir. Cal. 2008* (emphasis added).

### 3. The First Amendment is implicated

Defendants contend that the First Amendment bars prosecution, as the People are seeking to prosecute individuals for the act of publishing third party content. However, the instant charges are not based on an overt attempt to criminalize the act of publication, and traditional First Amendment analysis is not required here. That is not to say that the First Amendment is not implicated. As noted, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA. Congress expressly intended to relieve online publishers from liability for publishing third-party speech. (47 U.S.C. § 230) Thus, the relevant question in this case is whether, and to what extent, Defendants' activities entitle them to protection of their First Amendment rights through the immunity provision of the CDA.

### a. Immunity Under the Communications Decency Act

The CDA provides immunity for online publishers and distributors of content generated by third parties. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.) Protection from the CDA is broken down into three parts. Conduct is shielded if the defendant (1) is a provider or user of an interactive computer service; (2) that the plaintiff seeks to treat as a publisher or speaker; (3) of information provided by another information content provider. (*Fields v. Twitter, Inc.* (2016 U.S. Dist. LEXIS 105768, \*8; *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 19; 47 U.S.C. §230.) "There has been near-universal agreement that section 230 should not be construed grudgingly." (*Doe, supra*, 817 F.3d at 118 [citations omitted].)

The second component is the instant source of dispute. Defendants assert that Backpage.com is an internet service provider that merely allows third parties to publish their content, and the instant prosecution seeks to impermissibly treat them as the speaker. The People respond that the CDA does not protect those who knowingly commit their own crimes on the internet. The People assert that Defendants should be viewed as content providers, and not entitled to immunity under the CDA.

### b. Content provision versus editorial functions

To determine whether defendant faces a claim that seeks to treat the defendant as a publisher or speaker of information provided by a third party, "'courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker'." (*Fields, supra*, 2016 U.S. Dist. LEXIS 105768, *10, *quoting Barnes v. Yahoo!, Inc.* 570 F.3d 1096, 1101-02.) Moreover, because distributors are included in the publisher category, distributors are also entitled to protection under the CDA. After all, publication includes every repetition and distribution of material. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45.) Under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune." (*Fair Housing Council of San Fernando Valley v. Rommates.com, LLC,* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.) The Ninth Circuit has recognized that although "there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality...Such close cases must be resolved in favor of immunity..." (*Id* at 1174.)

**\*4** Although the People acknowledge that third parties provided the content for the original advertisements placed on Backpage.com, the prosecution asserts that Defendants developed the content on BigCity.com and EvilEmpire.com by deliberately manipulating that original content to generate the advertisements placed on BigCity and EvilEmpire. The People assert that Defendants created "fake profiles" when "Backpage staff took images and information from Backpage escort ads and used them to create dating profiles on BigCity.com." (Ex 1, p2) In support of this claim, the People refer to an internal Backpage email that states "The content will be pre-populated with millions of images from backpage where we hope to extract two words of the title, the phone number, and age of the person. The images will need to be processed to where we crop an area most likely to give us a wholesome image." (Ex A) Backpage also added new information, "in line with the alleged purpose of the profile." This information was not taken from the original Backpage ad, and required staff to choose one of the following: "Interested in Men," "Interested in Women," or "Interested in Everyone." (Ex 1, p4) There were no links to the original Backpage ad and Defendants hoped to pitch BigCity as a dating site to Backpage.com escort users.

The People also allege that "Defendants took images and information from Backpage escort ads and used them to create a phone directory for female escorts on EvilEmpire.com." (Ex 1, p3) Customers could contact the escort directly from the number listed on EvilEmpire or through a link to original Backpage ad. The People acknowledge that the escort phone directory used "much of the same data that was selected to create a BigCity profile that was generated for that Backage escort user." (Ex 1, p5) However, EvilEmpire provides no opportunity for users to sign up, modify or contribute to entries. (Ex 1, p5)

In support of its claim that these actions constituted content creation, the People rely on *People v. Bollaert* (2016) 248 Cal.App.4[th] 699. In *Bollaert*, the defendant was convicted of extortion and unlawful use of personal identifying information. He set up two websites: a revenge porn site and a site which victims of the former could utilize to have their information removed, for a fee. To use the revenge porn site, defendant designed "required fields" that required a user seeking to post a photo of another person to input that other person's full name, age, location and Facebook link. Bollaert had the only user account; he looked at every single post and decided what would get posted, placed watermarks on each photographs to discourage re-posting by third parties, and kept a spreadsheet recording every post. Bollaert would not post pictures that he considered "garbage" which included those that did *not* include nude persons. (*Id* at 706) At trial, the jury rejected defendant's assertion that he was immunized as a service provider under the CDA.

On appeal, the Fourth District affirmed the conviction. The court noted that the immunity under the CDA was limited to interactive computer services that do not retain or acquire personal information with the intent to defraud, or that do not act as content providers. (*Id.* at 709-710.) In Bollaert's case, the evidence showed that he designed the revenge porn site specifically for the purpose of eliciting nude photos and private information of others. Bollaert then used that personal information for his own purposes, *i.e.*, for display on his website, to gain advertising income and to obtain payments from his removal website. The court found there was sufficient evidence that Bollaert retained the personal information with the intent to defraud the victims.

The court also rejected defendant's claim that he was entitled to immunity under the CDA because the evidence demonstrated he was a content provider. The court determined that Bollaert's affirmative acts in designing the website to *require* users to provide content that violated other persons' privacy did not entitle him to immunity under the CDA. The court based its conclusion and reasoning on the Ninth Circuit's *Roommates* decision, which also involved a website that was "designed to solicit" content that was unlawful. These acts were not neutral, but rather "materially contributed to the illegality of the content" such that the defendant became a content provider. (*Bollaert, supra,* 248 Cal.App. 4 th at 721.)

**\*5**  Defendants here contend that *Bollaert* is distinguishable from the instant case because in that case, the defendant Bollaert *required* the entry of unlawful information by the user, which fell into the narrow exception to immunity recognized by *Roommates.* (Def. Supp. 3) In contrast, Defendants argue, Backpage.com does not require users to enter unlawful information. This Court agrees with the Defendants.

In *Fair Housing v. Roommates.com* (9th Cir. 2008) 521 F.3d 1157, the defendant ran a website for the purposes of matching potential roommates together. In order to utilize the website, participants were required to answer a series of questions regarding a user's sex, sexual orientation and whether they will bring children to the household. Paid subscriptions provided access to detailed preferences from potential roommates. (*Id* at 1161-1162) The Fair Housing Councils of two cities sued Roommates, and alleged a violation of the Fair Housing Act and California housing discrimination laws. The Councils alleged that the website was acting as a housing broker in ways that it could not lawfully do off-line. (*Id* at 162.) The district court granted Roommate's motion to dismiss based on immunity provided by the CDA. The Ninth Circuit reversed.

The Ninth Circuit found that by creating the questions and choice of answers that a real estate broker was legally prohibited from asking and then requiring subscribers to answer them, Roommate became an information content provider and not immune under the CDA. (*Id* at 1164.) The court contrasted Roommate's impermissible behavior, where it both elicited the allegedly illegal content and made aggressive use of it in conducting its business, with permissible utilization of a neutral classification tool or search engine that does nothing to enhance the illegality of the content. (*Id* at 1172.)

Here, there are no allegations that Backpage required a third-party user to provide any protected information when the original ad is placed. As the information posted on EvilEmpire and BigCity is mostly taken from the original ad, Defendants did not "design to solicit" protected content as a condition to placing the ad. In fact, according to the exhibits attached by the People, Backpage moderators were instructed to look for offending material and remove it. (AG Supp. 6, Ex 9)

The People argue that Defendants actively "manipulated" the content provided by third parties so that they could profit from activity resulting from the ad placement. In light of the People's acknowledgement that the substance of the ads came from the original ad placed on Backpage, the only "manipulation" would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site. This is not prohibited activity.

Indeed, it generally falls within the scope of protected editorial functions. (*See Doe v. Backpage.com LLC* (1 st Cir. 2016) 817 F.3d 12, 20-21 [service providers' decisions on website structure, rules for posting and reposting are protected publisher functions] and *Fields v. Twitter, Inc.* (N.D. Cal 2016), 2016 U.S. Dist. Lexis 105768, *21 [protected publishing activity included decisions about what third party content may be posted or reposted online].) (*See also Jones v. Dirty World Entmt Recordings LLC* (6 th Cir. 2014) 755 F.3d 398-408-409 [Sixth Circuit adopting the "material contribution test" and determining that within the context of web hosting, a service provider must require third-parties to enter unlawful or actionable content to be deemed a content provider].

**\*6**  Undeterred, the People assert that content was created when one piece of information was added to BigCity profiles. In generating a BigCity ad, Backpage staff was required to choose "Interested in Men," "Interested in Women," and

"Interested in Everyone." This information was not taken from the original Backpage ad. Yet, as Defendants note, the People acknowledge that these headings were "in line" with the purpose of each profile. (Def. Supp. 4, fn3) This creation of a headline "in line" with the content of the ad was not a material contribution to the offensive nature of the material. (*See Phan v. Pham* (2010) 182 Cal.App.4[th] 323 [holding when Defendant's own acts material contribute to the illegality of the material, immunity under the CDA will be lost]. *See also Kimzey v. Yelp! Inc* (9th Cir 2016) 836 F.3d 1263, 1270 (Court found the service provider's creation and addition of a star rating system was best characterized as the kind of "neutral tool" operating on "voluntary inputs" determined to be permissible in *Roommates*.)

The People also accuse Defendants of creating "fake profiles" for BigCity postings, similar to *Anthony v. Yahoo! Inc* (N.D. Cal. 2006) 421 F.Supp.2d 1257. In that case, Plaintiffs belonged to an online dating service through Yahoo. Plaintiffs alleged that Yahoo created false profiles and sent those false and expired profiles to them as enticement to renew their dating service subscription. The court refused Yahoo's claim of immunity under the CDA at the dismissal stage. The court stated that the allegations that Yahoo created false profiles were sufficient to allow the case to go forward.

Here, the People have acknowledged that the content posted on EvilEmpire and BigCity were taken directly from the original Backpage ad. This is different than the allegation *in Anthony* that Yahoo created a profile for a person who did not exist and represented to others that the fictitious person in the profile was available to date.

The People maintain Backpage created content similar to in *J.S. v. Vill. Voice Media Holdings, LLC* (2015) 184 Wn.2d 95 J.S. In that case, advertisements featuring three minor girls were posted online on a site owned by Backpage. These girls became victims of sex trafficking and brought suit against Backpage. Backpage moved to dismiss the case on the basis of immunity provided by the CDA. The Washington Supreme Court refused to grant the motion to dismiss. (*Id* at 98-99.) The *J.S.* court stated that the case turned on whether Backpage merely hosted the advertisements or helped develop the content of those advertisements. (*Id* at 101)

Applying the applicable state standard for a motion to dismiss, the *J.S.* court found that the plaintiffs alleged facts that, if proved true, would show that Backpage did more than simply maintain neutral policies prohibiting or limiting certain content. Specifically, those allegations included that Backpage intentionally developed its website to require information that allows and encourages illegal trafficking of underage girls, developed content requirements that it knows will allow solicitors to evade law enforcement and that Backpage knows that the foregoing content requirements are a fraud and ruse actually aimed at helping pimps and prostitutes. (*Id* at 102.) The *J.S.* court found that it did not appear beyond a reasonable doubt that no facts existed that would justify relief, and denied Backpage's motion to dismiss. (*Id* at 103.)

Here, the People allege that Defendants "created" content and are not entitled to immunity. However, on the face of the allegations, Defendants have, at most, republished material that was created by a third party. The People allege that the content was taken from ads placed by Backpage Escort users and posted onto EvilEmpire.com. The declaration in support of Defendants' arrest warrant states that the ads placed in EvilEmpire.com were "essentially identical" to the ads placed by the third party on Backpage.com and that EvilEmpire was an "additional platform for Backpage Escort ads." This demonstrates republication, not content creation. Republication is entitled to immunity under the CDA. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 63.)

**\*7** Finally, the People assert that the Defendants' acts of pulling information from the original Backpage ad "constituted more than the mere reposting of information with 'slight' modifications." (AG Supp. 5) The People assert that when posting on BigCity, Backpage staff deleted all text, and converted the ad into a dating profile, contrary to the intent of the original ad poster. Yet, reposting content created by a third party is immune from liability for the offensive content under the CDA. (*Barrett v. Rosenthal* (2006) 40 Cal.4[th] 33, 63.) The act of reformatting original content to be placed on another site is also a traditionally protected editorial function. (*See Fair Housing Council of San Fernando Valley v. Roommates.com LLC* (9th Cir. 2008) 521 F.3d 1157, 1170-1171 [under the CDA, "any activity that can be boiled down

to deciding whether to exclude material that third parties seek to post online is perforce immune."].) Finally, assuming that the People's assertion is true; that the ad went from expressing intent to advertise prostitution to express a desire to "date," the People are essentially complaining that Backpage staff scrubbed [1] the original ad, removing any hint of illegality. (AG Supp. 5-6) If this was the alleged content "manipulation," the content was modified from being illegal to legal. Surely the AG is not seeking to hold Defendants liable for posting a legal ad; this behavior is exactly the type of "good Samaritan" behavior that the CDA encourages through the grant of immunity.

[1]     The internal Backpage email attached by the AG states, "The content [of BigCity] will be pre-populated with millions of images from backpage where we hope to extract two words of the title, the phone number, and age of the person. The images will need to be processed to where we crop an area most likely to give us a wholesome image." (Ex A)

The People's overall theory is that Backpage knew prostitution ads were placed on its main site and, in response, created two additional websites with the goal of encouraging that prostitution through increased ad placement. There are at least two problems with this theory. First, online publishers are not subject to notice liability. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45-46; *See also Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 407-408 [explaining that immunity under the CDA bars notice liability in an effort to maintain the robust nature of the internet and encourage self-regulation.) Next, both the People's "encouragement theory" and suggestion that by reposting the ads, Defendants are ratifying the content of the original ad, thereby becoming a content provider themselves, have been rejected by the courts. (*Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 413-414 [under the encouragement or ratification theory, service providers would be liable for inviting and commenting on illegal or actionable content, which impermissibly inflates the meaning of "development" to the point of eclipsing immunity from publisher-liability established by Congress]; *Ascentive LLC v. Opinion Corp.* (EDNY 2011) 842 F. Supp.2d 450, 476 [inviting postings then altering the way postings are displayed is not content development]; *Roommates, supra,* 521 F.3d at 1174 [encouragement, enhancement by implication or development by inference is protected conduct under the CDA]; *Black v. Google Inc* (N.D. Cal 2010) 2010 U.S. Dist. LEXIS 82905, *8 [even if defendants "sponsored or endorsed" an allegedly defamatory comment posted by a user, "the fact remains that Plaintiffs seek to hold it liable for content generated by a third-party" and defendants are entitled to immunity under the CDA].)

This Court finds *Kimzey v. Yelp! Inc* (9th Cir 2016) 836 F.3d 1263 helpful. Plaintiff Kimzey complained about offensive content in a negative business review posted on Yelp! and sought to hold Yelp! liable. Kimzey alleged that Yelp! Found the review on another website, reposted the offensive review on Yelp! and then republished the review as an advertisement or promotion on Google, all in an effort to increase online traffic to Yelp!. Kimzey's theory was that by repeatedly reposting the "found" review for Yelp!'s own use, Yelp! developed the content. (*Id* at 1267) The Ninth Circuit rejected Kimzey's "artful skirting of the CDA's safe harbor provision." (*Id* at 1266.)

*8   The Ninth Circuit noted that Kimzey never specifically alleged that Yelp! authored the content of the statements posted. Instead, the allegations were that Yelp! adopted the statements from another website and transformed them into its own stylized promotions. The court determined that the allegations were insufficient to avoid immunity under the CDA. (*Id* at 1268) The court also rejected Kimzey's "convoluted" theory that Yelp! transformed the review into its own advertisement with the creation and addition of a star rating system that accompanied the promotion. Although this characterization had "superficial appeal" for the court, the court found that accepting the theory would extend the concept of "content provider" too far and would render the CDA's immunity provision meaningless. (*Id* at 1269.) The court stated that "Nothing in the text of the CDA indicates that immunity turns on how many times an interactive computer service publishes 'information provided by another information content provider.'" (*Ibid*.)

In short, courts have repeatedly held that an online service provider is protected whether he publishes third-party content for the first time, or republishes it for the nth time. To find the source of the liability for the unlawful or actionable

content, one must trace the pedigree of the statement. (*Kimzey, supra*, 836 F.3d at 1268-1269; *Jones, supra*, 755 F.3d at 408-409; *Doe v. Friendfinder Network, Inc*, 540 F.Supp.2d 288, 295-296.)

### 4. Removal from Protection under the CDA

#### a. Victims' Intellectual Property Rights

The People assert that the CDA does not apply because Defendants violated the victims' rights of publicity when Defendants used the victims' likenesses posted in Backpage ads and used them either on BigCity or EvilEmpire sites without the victim's knowledge. In support, the People cite to *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12. (AG Supp. 9) In that case, plaintiffs brought claims against Backpage alleging an unauthorized use of a person's picture. Plaintiffs alleged that by garnering advertising revenues from advertisements placed by their traffickers, Backpage profited from the unauthorized use of the plaintiffs' photographs. The plaintiffs alleged that Backpage's use of their images cannot be written off as incidental because their pictures were "the centerpieces of commercial advertisements." (*Id* at 27.) The court found that although Backpage profited from the sale of advertisements, "it is not the entity that benefits from the misappropriation." Rather, the party who benefits from the misappropriation is the person who placed the original ad. The court stated "Matters might be different if Backpage had used the pictures to advertise its own services…" (*Ibid.*)

The People assert that the "matters [that] might be different" are present here, when Defendants used pictures and text from Backpage ads to generate new ads on two additional websites. In response, Defendants call attention to the fact that users posting on Backpage.com accept the website's Terms of Use, in which they assign all intellectual property rights and agree that their photos and content may be reposted. (Def. Supp. 10)

The right of publicity derives from the right of privacy. Generally, the right of privacy protects an individual's peace and quiet. The right of publicity, in turn, protects an economic interest a person has in the value of his identity. These privacy rights are personal. (*Hill v. National Collegiate Athletic Assn* (1994) 7 Cal.4[th] 1, 24.) Thus, the prosecutor does not have standing to assert this right on behalf of the victims. It is on that crucial fact that sets this case apart from *Doe v. Friendfinder Network Inc* (2008) 540 F.Supp. 2d 288, 304. (See AG Supp. 9) *Friendfinder* involved a civil plaintiff seeking damages for the violation of her right to publicity after an unknown person created a profile on her behalf, without her knowledge or consent, and *Friendfinder* used portions of that profile as advertisements to increase the profitability of their business. The court found the allegations sufficient to survive a motion to dismiss. (*Ibid.*)

**\*9** The People lack standing to assert this right. Moreover, existing case law indicates that these additional advertisements are permissible attempts at search engine optimization in an effort to increase the visibility of the information provided by the third party. (*See Asia Econ. Inst. V. Xcentric Ventures LLC* (C.D. Cal. 2011) 2011 U.S. Dist. LEXIS 145380, *19 [increasing the prominence of a page in internet searches do not amount to "creation or development of information"].) Indeed, the very purpose behind the third party's placing the ad on Backpage was to provide accessibility to the public on a large scale. (*Cf Ibid* [the purpose of consumer reports is to provide accessibility to the public on a grand scale and "increasing the visibility of a statement is not tantamount to altering its message"].)

#### b. Prosecution for pimping under Penal Code section 266H

The People maintain that Defendants' actions were not neutral, and they instead took an active role to further prostitution and seek to hold Defendants responsible for their own misconduct, not for the speech of others. "This is not a case against Backpage, a website; it is a case against three individual defendants who used multiple platforms to commercially sexually exploit vulnerable women and children." (AG, Supp 2)

This Court finds it difficult to see any illegal behavior outside of the reliance upon the content of speech created by others. The whiff of illegality is detected only when considering the alleged content of the statements contained in the ads. Indeed, the theory of prosecution requires the presumption that illegal content was contained in the ads, *i.e.*, that the ads were explicitly for prostitution. Under the prosecution's theory, Defendants would become liable at the point where information provided from third parties was transferred to the additional two websites because, according to the People, Defendants transferred the information intentionally to help to facilitate prostitution. (When prostitution transactions took place as a result of the ads, more ads would be placed.) Yet, the general actions required (absent consideration of speech content) to repost the ads would not be illegal. Thus, the prosecution depends on consideration of speech provided by a third party.

### i. Theory that Defendant's derived financial support from prostitution

The People maintain that Defendants may be prosecuted under the theory is that defendants derived support from the earnings of another's act of prostitution. (*See McNulty, supra*, 202 Cal.App.3d at 630 [stating the two theories of prosecution for pimping].) The People assert that the allegations are that the Defendants "knowingly derived support from prostitution earnings, *i.e.*, profited from prostitution" when they created EvilEmpire to improve Backpage's search results (search engine optimization) and created BigCity to expand Backpage's share of "online commercial sex market" and profits. The People maintain that pimping will be shown when the People demonstrate that Defendants acquired income from prostitution resulting from advertisements placed in Backpage.com. The People assert that Defendants agreed upon a business model to maximize the receipt of prostitution earnings and committed many overt acts in furtherance of this objective. (Opp. 3)

In support, the People cite to *People v. Grant* (2011) 195 Cal.App.4th 107. *Grant* discusses a distinction between financial support received by the prostitute (illegal) and funds paid by the prostitute for services rendered or other purposes (legal). The appellate court made clear that "the statutory prohibition does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Id* at 116. *See also Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn 7 [a natural reading of the pimping statute does not apply to an individual who provides a legitimate professional service to a prostitute even if paid with proceeds earned from prostitution, the service provider derives support from his own services]; *People v. Reitzke* (1913) 21 Cal.App.740, 742 [a legitimate defense to pimping is that a prostitute loaned the defendant money for the purpose of going into the saloon business, or for any other purpose except the purpose of being supported or maintained by the prostitute].)

**\*10** Here, there is no dispute that Backpage charged money for the placement of advertisements. Does this qualify as services rendered for legal purposes? Given the services provided by the online publisher, the answer to that question is yes. Providing a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA. This immunity has been extended by the courts to apply to functions traditionally associated with publishing decisions, such as accepting payment for services and editing. (*See e.g., Fields, supra*, 2016 U.S. Dist. LEXIS 105768, \*11-12 [Twitter immune against claims that it provided ISIS material support through use of its services because protected publishing activity included decisions about: what third party content may be posted online; monitoring, screening, and deletion of content; and whether to prevent posting].) In fact, the People acknowledge that the mere act of accepting money for postings is permissible. (Opp. 9) The case law is clear that, as discussed above, immunity is removed when the service provider affirmatively acts to create the offensive content.

This Court draws support for its conclusion from cases in other jurisdictions. In *Doe*, for example, the plaintiffs alleged that, beginning at age 15, they were trafficked through advertisements on Backpage.com and Backpage profited from their victimization. The plaintiffs filed suit against Backpage.com for violating the Trafficking Victims Protection Reauthorization Act ("TVPRA") which prohibits knowingly benefitting financially from sex trafficking. (*Doe, supra*, 817 F.3d at 15.) Plaintiffs' theory was that Backpage engaged in a course of conduct designed to facilitate sex traffickers'

efforts to advertise their victims on the website by only charging for posts made in the "Adult Entertainment" section, and allowing users to pay an additional fee for "Sponsored Ads," which increased the number of times the advertisement appeared. (*Id.* at 17.) Plaintiffs also alleged that Backpage tailored its posting requirements to make trafficking easier by not blocking repeated attempts to post and by allowing users to pay anonymously through prepaid credit cards or digital currencies. (*Id* at 16.)

Backpage moved to dismiss the suit under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion and found that the CDA provided immunity from the claims. On review, the First Circuit Court of Appeals affirmed the district court's ruling. The First Circuit rejected the plaintiffs' assertion that Backpage participated in an affirmative course of conduct and actual participation in sex trafficking. The court noted that the challenged were traditional publisher functions, and thus immune from suit under the CDA. (*Id.* at 20) The court also noted that the plaintiffs were harmed when they were trafficked through the advertisements. Without the content of those advertisements – which was created by a third party - there would be no harm. (*Id.* at 20.) The court dismissed the plaintiffs' assertion that Backpage's decisions about what measures to implement premise a deliberate attempt to make sex trafficking easier. The court stated, "Whatever Backpage's motivations, those motivations do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content." (*Id* at 21.) The court went on to state "even if we assume, for argument's sake, that Backpage's conduct amounts to 'participation in a [sex trafficking] venture' – a phrase that no published opinion has yet interpreted – the TVPRA claims as pleaded premise that participation on Backpage's actions as a publisher or speaker of third-party content. The strictures of section 230(c) foreclose such suits." (*Ibid.*) The First Circuit specifically held that "claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)." (*Id.* at 22.)

**\*11** Similarly, in *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041, the plaintiff sought to hold Backpage responsible for her victimization through sex trafficking that took place as a result of advertisements placed on Backpage.com. The plaintiff alleged that Backpage accepted a fee for such advertisements, knew that advertisements were for prostitution and "created information" by hosting a search engine, providing instructions for increased visibility of advertisements and allowed for anonymous payment. (M.A., *supra*, 809 F.Supp.2d at 1044.) The court granted the Defendant's motion to dismiss on the basis that the CDA provided immunity. The court reasoned that there was no allegation that Backpage was responsible for the actual development of any portion of the content of the advertisements or specifically encouraged the development of the offensive nature. (*Id* at 1052.) (See also Opp. 21; Def. 21-22)

Even in viewing the offer of proof of the evidence most favorable to the Attorney Generals office, this case is very similar to the above cases. As alleged here, the prostitution took place as a result of an advertisement placed by a third party. Backpage's decision to charge money to allow a third party to post content, as well as any decisions regarding posting rules, search engines and information on how a user can increase ad visibility are all traditional publishing decisions and are generally immunized under the CDA. In short, the victimization resulted from the third party's placement of the ad, not because Backpage profiting from the ad placement.

### Conclusion

The First Amendment "makes the individual, not government, the keeper of his tastes, beliefs, and ideas." *Paris Adult Theater I v. Slaton* (1973) 413 US 49, 73 (Douglas, J., dissenting). At the same time, the Court understands the importance and urgency in waging war against sexual exploitation. Regardless of the grave potential for harm that may result in the exercise of this article of faith, Congress has precluded liability for online publishers for the action of publishing third party speech and thus provided for both a foreclosure from prosecution and an affirmative defense at trial. **Congress has spoken on this matter and it is for Congress, not this Court, to revisit.**

**Court's ruling:**

Defendants' demurrer is GRANTED.

Defendants' request for judicial notice is DENIED.

Further court dates are vacated.

Bond is exonerated for each Defendant.

**Dated: December 9, 2016**

_____

**Honorable Michael G. Bowman**

**Judge of the Superior Court of California**

**County of Sacramento**

End of Document                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
**COUNTY OF SACRAMENTO**

| | | | |
|---|---|---|---|
| **DATE**: | | **DEPARTMENT**: | 8 |
| **JUDGE**: | Lawrence G. Brown | **CLERK**: | |
| **REPORTER**: | | **BAILIFF**: | |

People of the State of California            **CASE NO**. 16FE024013

vs.

Carl Ferrer, Michael Lacey, and
James Larkin,

Defendants

---

**Nature of Proceedings: Ruling on Defendants' Motion to Dismiss under Penal Code Section 1004**

<u>Introduction</u>

Backpage.com is one of the largest on-line classified advertisement services, through which users may post advertisements in a variety of categories. Posting an advertisement in the "Adult Services" category requires a fee. Through various levels of involvement with Backpage.com, Defendants have twice found themselves facing criminal charges in Sacramento County relating to certain advertisements placed in the "Adult Services" category.

The prosecution's theory is that Defendants conspired to create and organize a website that facilitates sex trafficking. The People assert that Defendants created such a site through Backpage.com, knowing that prostitutes and/or pimps use the site to advertise prostitution, and with the intent to maximize their own profits from the illegal sex trade. According to the People, this plan also included tricking credit payment processors into processing Backpage transactions, through the use of shell companies and fraudulent billing descriptors. Allegedly, the credit processors would not have processed the payments had they known they were doing business with Backpage.com. The People assert that Defendants' plan has come to fruition and they have derived massive financial support and maintenance from the prostitution.

<u>Background</u>

In 2016, Defendants faced various charges of pimping and conspiracy to pimp. The Honorable Michael G. Bowman SUSTAINED the Defendants' demurrer and dismissed the complaint. Judge Bowman found that it was apparent from the accusatory pleadings that the prosecution hinged on treating Defendants as the speakers

1

of the offensive conduct, when they were merely the publisher.  Prosecution under this theory could not go forward, as the Communications Decency Act ("CDA") provides immunity for online publishers and distributors of content generated by third parties.  (*See* 47 U.S.C. §230; *Barrett v. Rosenthal* (2006) 40 Cal.4[th] 33, 39.)

That same month, the Office of the Attorney General filed a new complaint, charging the same Defendants with conspiracy to commit money laundering (count 1), money laundering (counts 2-27), and conspiracy to commit pimping (count 28).  The People also allege three sentencing enhancements based on the amount of money involved in the financial transactions.  Defendant Ferrer also faces charges of pimping a minor under 16 years old (counts 29-31, 40), pimping a minor (count 32), pimping (counts 33-36, 39), and pimping a minor 16 years old (37-38).

On January 19, 2017, Defendants filed a Motion to Enforce the Court's Order of Dismissal; Alternative Demurrer; and Request to Transfer to Judge Bowman and Further Relief.  On January 23, 2017, the People filed an Opposition.  On March 6, 2017, Defendant filed a brief in further support for the above named Demurrer under Penal Code section 1004, and the People responded in further Opposition on March 8, 2017.  The People also filed a Motion to Strike the declaration of defense counsel and Defendants' Exhibits A-J, attached to the Motion of January 19, 2017.  On March 10, 2017, the parties addressed in open court Defendants' concerns of whether the complaint was sufficiently pled such that Defendants have been adequately apprised of the charges.  Of particular concern was the money laundering charges, which charged Defendants with money laundering under the transactional prong but did not specify the underlying criminal activity.  (See Penal Code §186.10(a)(2).)  The Court invited the People to consider amending the complaint.

The People submitted the First Amended Criminal Complaint to the Court on March 24, 2017.  This was deemed filed on April 28, 2017.  The First Amended Complaint added several allegations and overt acts that explained the theory of prosecution.  In particular, the People provided clarification that the money laundering charges are based on bank fraud, wire fraud and prostitution.  On May 26, 2017, Defendants addressed the amended charges in their Continued Demurrer to Dismiss the State's Complaint.  The People filed an Opposition on June 9th, and Defendants filed a Reply on June 23, 2017.

### Court's Legal Analysis and Ruling

The parties have briefed multiple issues that may be grouped into three categories.  Defendants argue that the prosecution constitutes harassment and should be curtailed.  Defendants also make several challenges to the pleadings and argue that procedural and facial defects prohibit the instant prosecution from going forward.  Finally, Defendants argue that the First Amendment bars the instant prosecution because it is based on impermissible interference with publisher functions.

I.   **Nature of the Prosecution**

    A.   <u>Basis for the prosecution</u>

Since at least 2010, public officials and state prosecutors have been pressuring Backpage to remove the "Adult Services" category from the website in an endeavor to combat sex trafficking.   With Backpage's refusal to comply, a philosophical disagreement between public officials and Backpage as to how best to combat sex trafficking is clearly present.  (See *Backpage.com, LLC v. Lynch*, 216 F.Supp.3d 96, 100, fn. 2.)  Defendants note the instant prosecution is one of a recent rash of attempts to assign liability for affiliation with Backpage. Defendants claim that in each case, including the previous prosecution dismissed by Judge Bowman, Backpage successfully argued that it was entitled to immunity under the CDA.  Defendants argue that in light of this clear immunity, the instant charges are brought in bad faith and the prosecution is vindictive.  Defendants argue that this is not the first time a government official has used coercive techniques to attempt to shut them down.  (See e.g., *Backpage.com, LLC v. Dart* (7th Cir. 2015) 807 F.3d 229 [in his professional capacity, Cook County Sheriff threatened Backpage.com business partners in an attempt to dry out Backpage business].)

Yet, perhaps another possible perspective is that there is a growing desire to hold online media accountable for their role in disseminating information leading to condemnable acts by third parties.  (See e.g., *Cohen v. Facebook, Inc.* E.D.N.Y. May 18, 2017) 2017 U.S. Dist. LEXIS 76701, *28-31 [seeking to hold Facebook liable for allowing Hamas to use its platform to encourage terrorist attacks]; and *Fields v. Twitter, Inc* (N.D. Cal. 2016) 217 F.Supp.3d 1116 [seeking to hold Twitter liable for providing ISIS an account to use for spreading extremist propaganda]. )

This Court need not decide whether this prosecution is brought in bad faith, nor is there a sufficient factual basis to do so, at this juncture.  As discussed below, whether this case proceeds depends, in part, on whether Defendants enjoy immunity against these new charges under the CDA.  This immunity was provided by Congress, and regardless of where Backpage floats on the tide of public opinion, the immunity must be modified by Congress.

### B.    The People's Investigation May Continue

Defendants also request this Court to enjoin further investigation by the People and to return the materials already seized as part of the investigation.  This argument is largely based on Defendants claim that this prosecution is brought in bad faith.  At this stage, there is insufficient justification for interference with the prosecutor's functions.  (Compare *Dart, supra,* 807 F.3d at 233 [Court finding letter sent by Sheriff "containing legal threats and demands" to sever contractual ties with Backpage was clear evidence of bad acts by government official].)  Thus, Defendants' request to enjoin the People from further investigation and to return the materials seized is denied.

## II.    Procedural and Facial Challenges to the Charges

### A.    Authority to File New Charges.

The parties dispute whether the instant prosecution may be initiated against Defendants.  Defendants argue the People are prohibited from re-filing charges after the original demurrer was SUSTAINED and maintain that the First Amended Complaint constitutes an improper attempt to reinstate that original complaint. Defendants argue that the People forfeited this opportunity by failing to follow the proper procedure to cure the defects in the previous complaint, as outlined in Penal Code sections 1007-1009.  Defendants also argue that re-

filing of charges is barred because the previous complaint was dismissed on constitutional grounds.  (See *People v. Pinedo* (2005) 128 Cal.App.4[th] 968, 972 [state and federal due process clauses limit the People's discretion to re-file charges].)

The People's position is that the granting of a demurrer does not bar the prosecution from filing a new complaint, even where the charges are the same.  "Even a dismissal in the superior court following an order setting aside an information or indictment is no bar to a future prosecution for the same offense." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 666, *citing People v. Van Eyk* (1961) 56 Cal.2d 471, 477; Pen. Code, § 999; see also Pen. Code § 1387.)  Nevertheless, the People represent that the instant charges are "substantially different" than those contained in the prior complaint and because the prior complaint was not dismissed with prejudice, the new charges are appropriate.

The Court finds the People may file the instant charges.  Judge Bowman dismissed the first complaint after finding the Defendants were entitled to immunity from prosecution under the Communications Decency Act.  While the CDA was established to protect the constitutional right to free speech, the immunity provision providing online publishers immunity from liability for third-party speech is statutory.  Thus, the dismissal was based on statutory legal grounds.  Generally, when charges are dismissed based on legal grounds, the prosecution may file a new complaint or seek a grand jury indictment.  (*Uhlemann, supra,* 9 Cal. 3d at 666.)  Moreover, Judge Bowman's ruling signaled that a prosecution based on treating publishers as the speaker was prohibited under the CDA.  This ruling would not prevent a prosecution under theories not subject to the immunity provision.  The People assert that the instant charges do not fall under the purview of the CDA.

B.   Jurisdiction

Defendants question whether California has jurisdiction over this prosecution.  Defendants argue that the allegation that they conducted transactions "throughout California," is insufficient because the People have not identified a single act actually committed in California.  Defendants argue that territorial jurisdiction may be raised in a demurrer and is subjected to pre-trial determination.  (See Penal Code §1004(1).)

A state is not prohibited from exercising jurisdiction over criminal acts that take place outside of its borders, if the results of the crime are intended to (and do) cause harm within the state.  (*People v Fortner* (2013) 217 Cal.App.4[th] 1360, 1363.)  California claims jurisdiction for offenses that fall under specific types of interstate situations.  (*Ibid*, citing *People v. Betts* (2005) 34 Cal.4[th] 1039, 1047.)  For example, under Penal Code section 27, a defendant may be punished under California law for any crime committed "in whole or in part" of the state.  Similarly, under Penal Code section 788, California has jurisdiction for offenses commenced out of state then consummated in California.  Finally, under Penal Code section 778a, California has territorial jurisdiction if the defendant does a preparatory act in California that is more than a *de minimis* act toward the completion of the offense.  (*Fortner, supra,* 217 Cal.App.4[th] at 1363-1365.)   In other words, California has territorial jurisdiction when "with intent to commit a crime" a person "does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state." (*People v. Renteria* (2008) 165 Cal.App.4th 1108, 1116.)

4

Here, the People contend that Defendants concocted a scheme to trick credit payment processors into processing payments for Backpage transactions when the processors would have otherwise declined.  The People contend that this misrepresentation influenced banks to release money to Defendants.  For jurisdictional purposes, the People contend that the acts of hosting a website and accepting credit payments for advertisement placement were non-*de minimis* parts of the overall scheme to defraud the banks.  In this way, Defendants arguably committed more preparatory acts in California than what was deemed sufficient in *People v. Betts* (2005) 34 Cal.4th 1039, 1047, where there was sufficient evidence that the defendant's intent to molest his step-granddaughters formed in California when he suggested they go with him on a long haul truck drive.  (*Id* at 1054-1056.)

This Court finds that California has jurisdiction over the instant charges.  Assuming, without deciding, that Defendants intended to conduct, and participated in, the scheme alleged by the People, hosting the website through which payments were processed under fraudulent conditions was more than a *de minimis* act toward the bank fraud.  The scheme would not have been as successful had it not been able to process payments for Backpage advertisements placed in California.  For purposes of establishing jurisdiction, these allegations are sufficient.

C.   <u>Case Assignment</u>

Defendants request that this Court transfer the case back to Judge Bowman for the sake of "efficiency and to prevent forum-shopping."  Defendants rely upon Penal Code section 1387, which provides exceptions to that general rule that the prosecution has an opportunity to re-file charges after one dismissal.  (Pen. Code § 1387(a).)  While section 1387 also serves to curtail prosecutorial harassment by placing limits on the number of times charges may be re-filed, these limitations do not dictate judicial assignment.  This Court can find no justification for assignment through a method other than through the normal procedure governed by local rules 10.32 and 10.50.  Defendants' request to have the case assigned to Judge Bowman is denied.

D.   <u>Judicial Notice</u>

Defendants have also requested this Court to take judicial notice of several documents attached as Exhibits A-J to their Motion filed on January 19, 2017.  The People request this Court to strike these exhibits and the accompanying declaration from defense counsel.

This Court has been expressly called upon to review the propriety of the re-filed charges in light of the previous dismissal.  Therefore, this Court takes judicial notice of the procedural history of the prior prosecution including the prior complaint and the Order granting Defendants' Demurrer.  (See *People v. Putney* (2016) 1 Cal.App.5th 1058, 1063, fn. 4 [taking judicial notice of the prior case's procedural history but not the truth of any facts involving the underlying charge]; *People v. Hill* (1998) 17 Cal.4th 800, 847 [taking judicial notice of unpublished decision in separate case].)

While the previously filed complaint and dismissal order is helpful to the resolution of the matters before this Court at this juncture, Defendants' other documents do not have the same utility.  (See *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564 [a court may take judicial notice of the truth of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments].)  The Defendants' request to take

judicial notice for all exhibits attached to the January 19th motion, other than the previous complaint and dismissal order, is denied.  The People's motion to strike these documents is SUSTAINED.

E.     Challenges under Penal Code section 1004.

A defendant may demur on delineated statutory grounds.  (Pen. Code, § 1004; *People v. Saffell* (1946) 74 Cal.App.2d supp. 967, 972.)   These include the ability to challenge: whether the facts stated constitute a public offense; defects on the face of the accusatory pleading; or on the grounds that the pleading includes information that would be a bar to prosecution.  (Pen. Code, § 1004.  *See also People v. Goodman* (2014) 225 Cal.App.4th 950, 956.)  Literal compliance with pleading requirements under Penal Code section 952 is insufficient if the accusation fails to give constitutionally adequate notice of what the accused must defend against.  (*People v. Jordan* (1971) 19 Cal.App.3d 362, 369.)  California's system of criminal pleading under section 952 relies in part upon the transcript of the grand jury hearing or preliminary examination which must be furnished to the defendant to inform him of particular circumstances of his offense not shown by the accusatory pleading. (*People v. Anderson* (1961) 55 Cal.2d 655, 657; *People v. Johnson* (1964) 230 Cal.App.2d 80, 86; *People v. Jordan* (1971) 19 Cal. App. 3d 362, 369-371.)

However, compliance with section 952 does not necessarily overcome a due process attack and may be challenged in a demurrer prior to preliminary hearing.  (*Lamadrid v. Municipal Court* (1981) 118 Cal.App.3d 786, 790; *Choung v. People of State of California* (1970) 320 F.Supp. 625, 629.)  (*See also Lott v. United States* (1962) 309 F.2d 115, 117 [offenses must be accurately described in an indictment; and if necessary to do so, the allegations must be expanded beyond the words of the statute in order to embrace all the ingredients necessary to the offense]; *United States v. Cruikshank* (1875) 92 U.S. 542, 558 [the object of the indictment is to furnish the accused with such a description of the charge against him as will enable him to make his defense and to inform him of the facts alleged; a crime is made up of acts and intent and these must be set forth in the indictment].)  The complaint must be given a reasonable interpretation and read as a whole with its parts considered in their context.  (*People v. Biane* (2013) 58 Cal.4[th] 381, 388.)

*1.   Money laundering premised on federal offenses.*

Defendants argue that the charges do not constitute a public offense because the People have no authority to base their state prosecution for money laundering upon violations of federal bank or wire fraud laws.  The People respond that California law allows the state to incorporate federal offenses by reference, and the California money laundering statute specifically contains such a reference.  This Court agrees with the People.

Penal Code section 186.10, subdivision (a), provides in pertinent part: "Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($ 5,000), or a total value exceeding twenty-five thousand dollars ($ 25,000) within a 30-day period, through one or more financial institutions (1) with the specific intent  to promote, manage, establish, carry on, or facilitate the promotion, management,

establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering."

Penal Code section 186.9 defines "criminal activity" as a criminal offense punishable under the laws of the state by imprisonment in the state prison or from a criminal offense committed in another jurisdiction punishable under the laws of that jurisdiction by death or imprisonment for a term exceeding one year.  (Pen. Code §186.9(e).)  Federal bank fraud, in turn, is punishable by imprisonment for a term of not more than 30 years.  (18 U.S.C. §1344.)  Similarly, federal wire fraud is punishable by not more than 20 years, absent special circumstances.  (18 U.S.C. §1343.)  Thus, it appears that federal bank and/or wire fraud may serve as the criminal activity underlying a charge of California money laundering.

### 2.   The First Amended Complaint is Sufficiently Pled.

Defendants also argue that even if a state money laundering prosecution may be predicated on a federal offense, the charges are uncertain and fail to adequately apprise them of the actions against which they must defend.  Despite the amendments to the charges, Defendants continue to assert a lack of specificity as to the transactions and monetary instruments allegedly involved in the money laundering.  Defendants assert that the People may not rely on a simplistic pleading under Penal Code section 952, but must satisfy constitutional due process requirements as well.  The People respond that they have complied with their pleading requirements and the case should be advanced to the preliminary hearing, where the full nature of the charges will become clear.

This Court agrees the complaint is not a model of clarity.  However, the nature of the charges and theories of prosecution are ascertainable from the amended charging instrument.  Specifically, the People now allege that Defendants conspired to orchestrate a bank fraud by misrepresenting to credit payment processors that they were not processing transactions from Backpage, and this misrepresentation would trigger a release of funds from banks.  The overt acts alleged clarify that Defendants created multiple classified websites, and when applying for (at least one) merchant account, Defendant Ferrer omitted any reference to Backpage, despite intending to process Backpage transactions through the account.  The People allege that credit payment processors, along with American Express, would not have knowingly processed the payments for Backpage and the banks would not have released funds absent Defendants' trickery.

These allegations provide sufficient notice for Defendants to understand the nature of the charges and prepare a defense.  Essentially, either Defendants did - or did not - materially represent to credit payment processors in a scheme to fraudulently obtain money from banks.  If Defendants did so, this may form the basis for a money laundering charge.  (Cf. *United States v. Mason* (9th Cir. 1990) 902 F.2d 1434, 1443[1] [federal money laundering conviction supported by evidence that bank would not have opened a merchant account had it known it was laundering credit charges for prostitution; the false representation to the credit processor influenced the bank's release of funds].)  The factual resolution to that question, however, is not at issue here.

---

[1] Overruled, on other grounds in part by *United States v. Doe* (9th Cir. 2013) 705 F.3d 1134, which was later withdrawn.  See also *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266.

What is at issue is whether the First Amended Complaint has been sufficiently pled to meet statutory and due process requirements.

This Court finds the First Amended Complaint provides Defendants notice of the offenses of which they are accused, and Defendants are adequately apprised of the conduct against which they must defend.  (Penal Code §952; *Lamadrid, supra,* 118 Cal.App.3d at 791.)  In fact, Defendants' knowledge of the nature of the charges and theory of prosecution has been demonstrated throughout the briefing process and during argument to the Court.  Therefore, the First Amended Complaint meets statutory and due process requirements and is sufficiently pled to go forward.

F.      Purported Defects in the Money Laundering Charges

To prove that the defendant is guilty of money laundering, the People must ultimately show the act of conducting financial transaction(s) of a minimum amount, within a certain time frame, and that when the defendant did so, he either intended to promote criminal activity or he knew that the money represented the proceeds of criminal activity or was derived directly or indirectly from the proceeds of criminal activity. (CALCRIM 2997)

1.      One Act, One Crime Concerns

Defendants argue that even if charges are sufficiently pled, the money laundering charges are fatally flawed because they are premised on the same acts as those allegedly constituting bank or wire fraud. Defendants argue that under the People's theory, the credit payments impermissibly constitute both the bank fraud and the money laundering.

Notably, the federal bank fraud statute punishes the fraudulent scheme, not necessarily the completion of the scheme.  The offender must acquire (or attempt to acquire) bank property by means of the material misrepresentation.  (*Loughrin v. United States* (2014) 134 S.Ct. 2384, 2393-2394.)  Because bank fraud may be completed upon attempting to effectuate the scheme, there exists a range of punishable behavior that is subject to factual determinations by the trier of fact.  That is separate and apart from the question at bar; *i.e* whether the charges are adequately pled.

Nevertheless, the parties draw attention to a problem identified by the federal courts that may arise when federal money laundering is based on federal bank or wire fraud, and suggest the same problem is present here. When the activity required to commit the fraud encompasses activity required to commit money laundering, the two offenses should merge into one offense under federal law.  (See e.g., *United States v. Wilkes* (9th Cir. 2011) 662 F.3d 524, 545-546 [if a successful bank fraud requires concealment of financial transactions, the defendants cannot be charged with that same act of concealment a second time, as relating to the commission of money laundering].)  Perhaps the most common "merger" problem arises when the court must parse out (or trace) the money involved in the underlying crime and money involved in the laundering.  As a result, there are a plethora of federal cases that discuss tracing the proceeds of the criminal activity in order to determine when the bank or wire fraud ends, and money laundering begins.  Indeed, the parties spend much time debating this issue.

8

Included in this discussion is the appropriate federal definition of "proceeds" for tracing purposes.  (Compare *United States v. Santos* (2008) 553 US 507 [plurality decision defining "proceeds" as profits rather than gross receipts] with *United States v. Grasso* (9th Cir. 2013) 724 F.3d 1077, 1091 [recognizing subsequent legislative amendment defining "proceeds" as including gross receipts of criminal activity].)

Despite the parties' request to weigh in on this vexing problem faced by federal courts, the difficulty in defining and tracing proceeds does not appear to so plague the California money laundering statute.  The bench notes in CALCRIM 2997 governing Money Laundering instruct, "If the definition of proceeds is an issue, see *United States v. Santos* – which holds that 'proceeds' in the federal money laundering statute means 'profits.'" There is no recognition of the legislative definition of "proceeds" enacted after *Santos*.  This signals an intentional divergence from federal law and provides us with a clear definition of the *type of money to be traced*.

Additionally, *People v. Mays* (2007) 148 Cal.App.4th 13, the lead case involving money laundering, provides guidance on *how to trace the money* from the underlying criminal activity on its path to be laundered. The *Mays* court determined that our "promotional" money laundering prong under subsection (a)(1) of Penal Code section 186.10 requires monetary transactions to be made with a specific intent to keep the criminal activity alive.  (*Id* at 29.)  Under this section, there is no need to trace any funds, since there is no requirement that the money to be derived from an illegal source in order to promote criminal activity.  (*Id* at 30)

However, under the "transactional" prong of subsection (a)(2), the requisite mens rea is knowledge that a monetary instrument represents criminal proceeds.  Under this subsection, tracing the source(s) of transactions is required.  Monetary instruments must be composed of the minimum statutory amount solely from criminal proceeds; it is insufficient merely to show the transaction was the right amount and from an account with comingled funds.  This requires the government to show: the defendant's entire business was illegal, there were deposits of the minimum statutory amount or more in criminally derived funds, or there was a transfer of all funds out of the account.  (*Mays, supra*, 148 Cal.App.4th at 32.)

Here, Defendants have been charged under both prongs of the money laundering statute.  This means Defendants are being charged with, essentially, either investing money into the underlying criminal scheme, or conducting transaction with profits from the scheme and the People must show that the profits came solely from that underlying criminal activity.  Regardless of whether the People will succeed in meeting their burden of proof, the theory and the charges under which they are proceeding appear to be valid under California law and adequately pled such that any defect does not bar prosecution.

2.      *Bank Fraud May be Premised on Intent to Defraud a Third Party*

Defendants argue that even if the "criminal activity" underlying a money laundering charge may be based on a federal bank charge, the instant allegations of bank fraud are facially deficient because Defendants had no relationship with the banks named in the First Amended Complaint and therefore could not have been victims of bank fraud.

The federal bank fraud statute states:  "Whoever knowingly executes, or attempts to execute, a scheme or artifice (1)  to defraud a financial institution; or (2)  to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of

false or fraudulent pretenses, representations, or promises; shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both."  (18 USC §1344.)

Subsection (1) requires intent to defraud a financial institution.  To act with the "intent to defraud" means to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself.  (*United States v. Brandon* (1st Cir. 1994) 17 F.3d 409, 425.)  Subsection (2) requires that a defendant "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice" and has two elements. First, the clause requires that the defendant intend "to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution." Second, the clause requires that the envisioned result—i.e., the obtaining of bank property—occur "by means of false or fraudulent pretenses, representations, or promises."  (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2388-2389.)  There must be a "relational" connection between the alleged false statements or representations and the obtaining of bank property, such that the misrepresentation is material.  (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2393.)

A material misrepresentation made to a third party may qualify if it induces the bank to depart with its property.  (See *United States v. Nguyen* 2017 U.S.Dist. LEXIS 32549, *18-19 and *Loughrin v. United States* (2014) 134 S.Ct. 2384, 2389 [both stating that bank fraud can cover deception of a non-bank custodian with a goal to obtain a bank's property].)  This theory of bank fraud has been pursued in other jurisdictions.  For example, in *United States v. McNeil* (9th Cir. 2003) 320 F.3d 1034, 1039, the defendant used fake identification to open an account for the purposes of receiving a false tax refund, with the ultimate goal of transferring money from the fake account to his own.  The 9th Circuit rejected the argument that the conviction was invalid because the true victim was the IRS and not the bank.  The court determined that the plan was two-fold; fraudulently obtain money from the IRS, then (after the bank becomes a holder-in-due-course) misrepresent to the bank that Defendant was ultimately entitled to the money.  (See also *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266, 309-310 [jury could find that misrepresentation made to deceive payment processor to continue to process payments when they would otherwise decline constitutes bank fraud];  *United States v. Johnson* (C.D. Ut. 2015) 2015 U.S.Dist. LEXIS 145102, *6 [submitting a fraudulent merchant account applications to a bank so that online sales could be processed can constitute bank fraud].)

By extrapolation, the instant allegations of bank fraud based on the theory that Defendants made a material misrepresentation to a credit payment processor, which induced a bank to depart with its property, may be proper and may serve as the predicate "criminal activity" for a state money laundering charge.

### 3.   *Money Laundering Based on Wire Fraud*

Defendants are also charged with both prongs of money laundering after violating the federal wire fraud statute under 18 USC section 1343.  Wire fraud is committed when: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for

the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both…."  (18 USCS § 1343.)

Wire fraud does not require proof that the defendant's conduct violated a separate law or regulation. Rather, wire fraud has only three elements: "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud." (*United States v. Green* (2010) 592 F.3d 1057, 1064, *quoting United States v. Shipsey* (9th Cir. 2004) 363 F.3d 962, 971.)  The scheme to defraud must only include an "affirmative, material misrepresentation." (*Green, supra,* 592 F.3d at 1064).

Here, Defendants are faced with two counts of money laundering based on wire fraud, listing American Express as the victim and describing the fraudulent behavior as "using interstate wires by using various payment entities to disguise the true nature of the transactions."  Factually, the People have alleged that American Express signaled its intent to discontinue processing Backpage's credit payments after May 1, 2015, but Defendants continued to process American Express transactions from Backpage.   The People also allege that Defendants created shell companies and engaged in factoring in order to obscure the nature and/or source of the credit payments.

In light of the general money laundering discussion above, this Court finds no reason to prevent prosecution for money laundering based on wire fraud.


## III.  Application of The First Amendment

In addition to the above facial attacks on the complaint, Defendants contend that the First Amendment bars prosecution for all charges, as the People are seeking to prosecute them for publishing functions.  However, the instant charges are not based on an overt attempt to criminalize the act of publication, and traditional First Amendment analysis is not required here.  Indeed, the money laundering charges based on bank and wire fraud, on their face, are not based on publication of third party speech at all.  Rather, they are based on the purported illegality of Defendants financial operations.  This Court finds that the immunity provision of the CDA is not triggered by the money laundering charges based on bank or wire fraud.  Thus, the following discussion is directed at the pimping charges faced by Defendant Ferrer and the money laundering charges based on prostitution.

That is not to say that the First Amendment is not implicated at all.  Indeed, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA. Congress expressly intended to relieve online publishers from liability for publishing third-party speech.  (47 U.S.C. § 230)

As noted above, Penal Code section 1004 allows for a demurrer on the basis that the complaint contains matter which, if true would legally bar the prosecution.  (Penal Code §1004.)  The language of the CDA itself states, "No cause of action may be brought and no liability will may be imposed under any State or local law that is inconsistent with this section."  (47 U.S.C. §230 (e) (3) (emphasis added).)  This statutory language clearly demonstrates a legislative intent to provide both a bar to prosecution and an affirmative defense at trial. Thus, the relevant question in this case is whether, and to what extent, Defendants' activity entitles them to protection of their First Amendment rights through the immunity provision of the CDA.


A.      Immunity Under the Communications Decency Act

The CDA provides immunity for online publishers and distributors of content generated by third parties. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.)  Protection from the CDA is broken down into three parts. Conduct is shielded if the defendant (1) is a provider or user of an interactive computer service; (2) that the plaintiff seeks to treat as a publisher or speaker; (3) of information provided by another information content provider.  (*Fields v. Twitter, Inc*. (N.D. Cal. 2016) 217 F.Supp.3d 1116, *1121; *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 19; 47 U.S.C. §230.)  "There has been near-universal agreement that section 230 should not be construed grudgingly."  (*Doe, supra*, 817 F.3d at 118 [citations omitted].)

To determine whether defendant faces a claim that seeks to treat the defendant as a publisher or speaker of information provided by a third party, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker."  (*Barnes v. Yahoo!, Inc.* 570 F.3d 1096, 1101-02.)  Moreover, because distributors are included in the publisher category, distributors are also entitled to protection under the CDA.  After all, publication includes every repetition and distribution of material.  (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45.)  Under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune."  (*Fair Housing Council of San Fernando Valley v. Rommates.com, LLC,* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.)  The Ninth Circuit has recognized that although "there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality…Such close cases must be resolved in favor of immunity…" (*Id* at 1174.)

As applied to the instant case, there are two possible theories of prosecuting Defendants for pimping.  A defendant can be convicted of pimping under a theory that involves actual solicitation of prostitution.  Alternatively, defendants may be prosecuted under the theory that defendants derived support from the earnings of another's act of prostitution. (*See People v. McNulty* (1988) 202 Cal.App.3d 624, 630 [stating the two theories of prosecution for pimping].)  The People rely on the second theory in asserting that Defendant Ferrer knowingly lived and derived support from prostitution earnings.

1.    *Theory that Defendant's derived financial support from prostitution*

The People maintain that pimping will be shown when the People demonstrate that Defendants acquired income from prostitution resulting from advertisements placed in Backpage.com.  Defendants maintain they merely accepted payment for a legitimate publishing function.

This Court finds *People v. Grant* (2011) 195 Cal.App.4th 107 helpful.  *Grant* discusses a distinction between financial support received by the prostitute (illegal) and funds paid by the prostitute for services rendered or other purposes (legal).   The appellate court emphasized that "the statutory prohibition does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities or for purposes other than the person's support and maintenance."  (*Id* at 116.  *See also Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn 7 [a natural reading of the pimping statute does not apply to an individual who provides a legitimate professional service to a prostitute even if paid with proceeds earned from prostitution, the service provider derives support from his own services]; *People v. Reitzke* (1913) 21

Cal.App.740, 742 [a legitimate defense to pimping is that a prostitute supplied defendant money for any purpose other than being supported or maintained by the prostitution].)

Here, there is no dispute that Backpage charged money for the placement of advertisements. Providing a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA. This immunity has been extended by the courts to apply to functions traditionally associated with publishing decisions, such as accepting payment for services and editing. (*See e.g.,Doe v. Backpage.com, LLC* (817 F.3d 12, 15, *petition for certiorari denied* January 9, 2017[decisions regarding posting standards and requirements, including accepting payments for posting, are not distinguishable from publisher functions].)

However, the People dispute the "services" at issue. The People argue that the Backpage website generated income through its "Escort" section, which invariably contained prostitution advertisements. Because these advertisements are not for legal services and Defendants were well aware of the nature of the advertisements, the People argue that any claim of immunity under the CDA is defeated. (Pre-trial proceedings, July 14, 2017) The People would have this Court determine that the services provided are based on the content of the advertisement rather than the forum on which the advertisement is posted. Yet, to hold Defendant responsible for the content of the advertisement would require holding a publisher liable as if he was the speaker of the content. Contrary to the People's claim, doing so directly triggers, not defeats, the immunity provision of the CDA.

However, that does not end our inquiry. Immunity may be removed if Defendants' conduct went beyond those of a publisher and constituted content creation. This may happen when a provider crosses the line from providing a neutral interactive service that simply replicates offending third party matter and instead takes active control of the content of a web posting. (*Doe v. Backpage.com LLC* (D.C. Mass 2015) 104 F. Sup.3d 149, 156.) In short, if a provider's acts "materially contribute" to the illegality of the material, immunity will be lost. (See *Fair Hous. Council v. Rommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1166 [defendant became a content provider by requiring an answer to discriminatory questions, defendant's unlawful questions sought unlawful answers as a condition to doing business]; *Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398-408-409 [a service provider must require third-parties to enter unlawful or actionable content to be deemed a content provider]; *FTC v. LeadClick Media* (2nd Cir. 2016) 838 F.3d 158, 175 [encouraging and managing another site to post fake news in order to boost web traffic and sales for client results in content creation]; and (*FTC v. Accusearch Inc.* (10th Cir. 2009) 370 F.3d 1187 [no immunity for company that created offensive content by paying researchers to illegally obtain phone numbers, then resold the numbers online].)

The People claim that Defendant Ferrer has gone a step beyond merely accepting payments for advertisements placed online. Allegedly, Defendant Ferrer created content, connected pimps and traffickers with purchasers, and helped them avoid law enforcement. The People allege that, through Backpage's posting guidelines, Defendant Ferrer encouraged, maintained and assisted illegal prostitution for purposes of his own financial gain.

       a.    Editing

The People allege Defendants created a moderation system where terms would be deleted or blocked by Backpage but the user would still be allowed to post the advertisement and compensate Defendants. The People

allege that "such edits would not change the users' intent….but merely create a disguise." (Amend. Comp. 26) The People allege that these actions resulted in blocking certain prostitution terminology, but coded or obscured language and pictures were allowed to be posted.  The People allege that Defendant Ferrer directed staff to delete or block words that were code for underage girls, but allowed the advertisement to be posted for a fee. (Amend. Comp.  26)  The People contend that this constitutes "material contribution" to the offensive material. (Pre-trial proceedings, July 14, 2017, p 26)

In light of the People's acknowledgement that Backpage's edits would not change the user's intent, there can be no material contribution to the offensive content.  Indeed, such actions generally fall within the scope of protected editorial functions.  (See *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12, 20-21 [service providers' decisions on website structure, rules for posting and reposting - even when previously blocked - are protected publisher functions] and *Fields v. Twitter, Inc.* (N.D. Cal. 2016) 217 F.Supp.3d 1116, 1122 [protected publishing activity included decisions about what third party content may be posted or reposted online].)

Even if the edits or posting rules allow advertisers to use coded language, this is insufficient to render the website operator a content provider.  The crucial distinction is between engaging in actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content, and responsibility for what makes the displayed content illegal or actionable.  (*Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 414 [].)  Here, it is the third-party who is responsible for the illegal content of the advertisement.

The People also allege that Defendants knew that the ads placed were for prostitution and Defendants purposefully crafted their posting procedures to maximize their profits from this prostitution.  Yet courts have refrained from presuming to know a publisher's motivations for editorial decisions.  First, "it is well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech."  (*Universal Commun. Sys. v. Lycos, Inc.* (1st Cir. 2007) 478 F.3d 413, 420, citing *Barrett v. Rosenthal* (2006) 40 Cal. 4th 33).  Thus, even if Backpage knew of the unlawfulness of the content of the ads, knowledge is insufficient to render Defendants liable.  This is true regardless of whether Backpage even exercised its editorial discretion and deleted or blocked certain terms from ads.  (See *Doe II v. MySpace Inc,* (2009) 175 Cal.App.4th 561, 571 [immunity under section 230 applies even when self-regulation is unsuccessful or unattempted]; *Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21 [rejecting claim that website operators should be liable for failing to provide sufficient protections to users from harmful content created by others].)

Additionally, in *Backpage.com v. McKenna* (Wash. W.D.C. 2012) 881 F.Supp.2d 1262, the court recognized the difficulty in assigning knowledge of a third-party's intent to a publisher when that third party places an ad with Backpage.  The court acknowledged that the pimp who publishes the advertisement certainly knows whether his offer is implicitly for sex, but expressed serious doubt that one could assign such knowledge to a publisher as to whether an advertisement "implicitly" offered sex.  If an online service provider publishes advertisements that employ coded language, a reasonable person could be misled to believe that facts exist when they do not: an advertisement for escort services may be just that. Moreover, if the offer is "implicit," a third

party cannot ascertain that which is being offered before the transaction is actually consummated – a fact not likely to be known by a publisher.  (*Id* at 1279.)

Finally, courts have stated that the motivation behind editorial decisions "do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content."  (*Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21.)  Immunity depends on the source of the information in the injurious statement, not the source of the statement itself.  (*Universal Commun. Sys. v. Lycos, Inc.,* (1st. Cir. 2007) 478 F.3d 413, 419-420 [immunity only applies when the information that forms the basis for the state law claim has been provided by "another information content provider"]; 47 U.S.C. §230 (c)(1).)

Here, the People acknowledge that advertisements are placed by third parties and Backpage's edits "would not change the users' intent."  Nor is there an allegation that Defendant(s) set up the website to require offensive content to be supplied, as in *Roommates, Bollaert* or *Dirty World*.  As such, there is no material contribution to the offensive content in the advertisements, and the allegations reference traditional publisher functions.

       b.     Use of Profile Information

The People also specifically allege that "Defendants created profiles for the victims named in [several] counts [ ] without their knowledge."  (Amend. Comp. 20, overt act 18)  These false or nonexistent profiles were "created from Backpage data and [then] used on other websites."  Allegedly, sometimes content that was edited out on Backpage was displayed on the affiliated websites of BigCity.com or EvilEmpire.com.  In doing so, Defendants unlawfully used another's image "for the Defendants' own commercial gain," and to advertise their own product.  (Amend. Comp. 25) The People claim that this "misappropriation" of the likeness of Backpage users resulted in content creation.  (Amend. Comp. 25)

Similar allegations were considered in *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 and *Anthony v. Yahoo! Inc* (N.D. Cal. 2006) 421 F.Supp.2d 1257.  The People cite *Anthony* as instructive.  (Opp. 12)  In *Anthony*, Plaintiffs belonged to an online dating service through Yahoo!.  Plaintiffs alleged that Yahoo! created false profiles and sent those false profiles to users as enticement to renew their dating subscription.  The court refused Yahoo!'s claim of immunity under the CDA at the dismissal stage.  The court stated that the allegations that Yahoo! actively created false profiles, not merely that Yahoo! failed to delete the expired profiles, were sufficient to allow the case to go forward.

In *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 , plaintiffs brought claims against Backpage alleging unauthorized use of a person's picture.  Plaintiffs alleged that Backpage used their photos to garner advertising revenues from their traffickers.  (*Id* at 27.)  The court found that although Backpage profited from the sale of advertisements, it was "not the entity that benefitted from the misappropriation."  Rather, the party who benefitted from the misappropriation was the original advertiser.  The court stated, "Matters might be different if Backpage had used the pictures to advertise its own services…"  (*Ibid.*)   (See also *Perkins v. LinkedIn Corp* (N.D. Cal. 2014) 53 F.Supp.3d 1222, 1247 [defendant was a content provider when defendant, in an effort to increase its own business, unilaterally crafted and sent membership invitation emails to users' contacts].)

The People assert that Defendant Ferrer falls under the above exceptions when he created and then used profile information to increase Backpage revenue. Yet the People acknowledge that the information used was "created from Backpage data." Thus, it is clear that Defendants did not fabricate the data, as in *Anthony*. There is no allegation that in taking the data from the Backpage ads, Defendants created the injurious nature of the material. (See *Doe v. Friendfinder Network, Inc.* (D.C. N.H. 2008) 540 F.Supp.2d 288, 295 [website operator is not a content provider when there is no indication it contributed to the injurious character of the content].) Moreover, the People's allegation that the purpose of these "new" posts was to direct web traffic back to Backpage demonstrates that if a person was interested in the reposted profile, the person was redirected to the ad on Backpage. While additional advertisement revenue may have been a byproduct of this redirection, the original poster gained increased visibility of his ad. Increased visibility to the classified ads posted by third parties permissibly leads to search engine optimization in an effort to increase the visibility of the information provided by the third party. (See *Asia Econ. Inst. V. Xcentric Ventures LLC* (C.D. Cal. 2011) 2011 U.S. Dist. LEXIS 145380, *19 [increasing the prominence of a page in internet searches do not amount to "creation or development of information"].) Indeed, the very purpose of the online advertising accessed by the third party in placing an ad in Backpage was to provide accessibility to the public on a large scale. (See *Ibid* [the purpose of consumer reports is to provide accessibility to the public on a grand scale and "increasing the visibility of a statement is not tantamount to altering its message"]; See also *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041 ["Whatever [Backpage] did to increase their profitability ad visibility, did not create the content of the offensive posted information."].)

c.     Overall Course of Conduct

The People attempt to establish a pattern of an overall course of conduct to indicate Defendants sought to structure their business to obtain maximum profits from the illegal sex trade. The People allege that Defendants "manipulated" advertisements to evade law enforcement detection. The People state, "In this way, rather than prevent a child from being sold for sex, the Defendants would knowingly profit from the child's commercial sexual exploitation and assist the trafficker to evade law enforcement." (Amend. Comp. 26)

The People maintain Backpage's conduct is similar to *J.S. v. Vill. Voice Media Holdings, LLC* (2015) 184 Wn.2d 95. In that case, advertisements featuring three minor girls were posted online on a site owned by Backpage. These girls became victims of sex trafficking and later brought suit against Backpage. Backpage moved to dismiss the case on the basis of immunity provided by the CDA. The Washington Supreme Court refused to grant the motion to dismiss. (*Id* at 98-99.) The *J.S.* court stated that the case turned on whether Backpage merely hosted the advertisements or helped develop the content of those advertisements. (*Id* at 101)

Applying the applicable state standard for a motion to dismiss, the *J.S.* court found that the plaintiffs alleged facts that, if proved true, would show that Backpage did more than simply maintain neutral policies prohibiting or limiting certain content. Specifically, those allegations included that Backpage intentionally developed its website to "require" information that allows and encourages illegal trafficking of underage girls, developed content requirements that it knows will allow solicitors to evade law enforcement and that Backpage

knows that the foregoing content requirements are a fraud and ruse actually aimed at helping pimps and prostitutes.  (*Id* at 102.)

Here, however, the factual allegations fall short of those alleged in *J.S.*.  There is no allegation that Defendants required information essential to the illegal trafficking of underage girls.  Instead, the People's allegations attempt to assign criminal liability to Defendants who offered an online forum, on which other people posted advertisements that led to prostitution, and that Defendants realized profits instead of "actively preventing" the sale of sex.  These allegations confuse moral obligations with legal ones and have been rejected in other jurisdictions.  For example, in *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041, Defendants were SUSTAINED immunity under the CDA for allegations that Backpage knowingly accepted a fee for advertisements leading to prostitution, and "created information" by hosting a search engine, providing instructions for increased visibility of advertisements and allowed for anonymous payment.  (*Id* at 1044.)  (See also *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 22 [rejecting the plaintiffs' assertion that Backpage participated in an affirmative course of conduct and actual participation in sex trafficking by charging for advertisements and allowing users to pay an additional fee for increased advertisement visibility and holding that "claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)."].)

As alleged here, the prostitution took place as a result of an advertisement placed by a third party. Thus, the only "manipulation" would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site.  Backpage's decision to charge money to allow a third party to post content, as well as any decisions regarding posting rules, search engines and information on how a user can increase ad visibility, are all traditional publishing decisions and are generally immunized under the CDA. In short, the victimization resulted from the third party's placement of the ad, not because Backpage profited from the ad placement.  (See *Doe, supra*, 817 F.3d at 20 [noting that the plaintiffs were harmed when they were trafficked through the advertisements whose content was created by a third party]; *Cohen v. Facebook, Inc.* (E.D.N.Y. May 18, 2017) 2017 U.S.Dist.LEXIS 76701, at *28-31 [Facebook immune from liability for allowing Hamas to use its platform to post offensive content that incited or encouraged terrorist attacks in Israel because although Facebook's role in publishing that content was an essential causal element of the claims, allowing liability to be imposed on that basis would inherently require the court to treat the defendant as the publisher or speaker of content provided by Hamas, and was impermissible under the CDA].)

B.      Money Laundering Based on Prostitution

The People charge Defendants with both prongs of money laundering based on a specific intent to promote prostitution in violation of 18 USC 1952, pimping in violation of Penal Code section 266h, or knowing the monetary instruments represented the proceeds of the prostitution.  (See counts 15-16)

Referred to as the "Travel Act," section 1952 prohibits travel in interstate commerce or use of interstate facilities with intent to promote unlawful activity.   (*United States v Villano* (10th Cir. 1976) 529 F2d 1046.) The Travel Act defines an "unlawful activity" as any crime of prostitution under state law.  (See *United States v.*

*Campione* (7th Cir. 1991) 942 F.2d 429, 434.). Section 1952 refers to state law only to identify the defendant's unlawful activity; it does not require that the state crime ever be completed or proved. (*Ibid.*)

Although the parties do not discuss these specific charges at length, the previous discussion of the CDA's immunity provision as it relates to the pimping charges informs the Court's analysis with respect to these charges.  As discussed above, the People are attempting to prosecute Defendants as if they were the speaker of the offensive content leading to prostitution, which is prohibited under the immunity provision of the CDA.  This Court rejected the People's claim that Defendants actually created the content that led to their ability to live and derive support and maintenance from prostitution proceeds, when the face of the complaint demonstrated that Defendants engaged in protected publisher functions.  Because this Court has rejected the prosecution based on the theory that Defendants engaged in pimping, their purported use of proceeds from prostitution cannot now serve as the basis for money laundering charges.  As this Court has already determined, Defendants provide an online forum for third-party speech, and their decision to charge money for such postings constitutes activity protected under the CDA.

<u>Conclusion</u>

As amply briefed by the parties, federal law provides broad immunity for internet service providers from both federal and state prosecutions. Indeed, the 9th Circuit federal appellate court has instructed such immunity be applied liberally.  The underlying public policy is to permit, and promote, the robust growth of the internet by shielding internet providers from facing suit over the content created by those posting on their sites.  If and until Congress sees fit to amend the immunity law, the broad reach of section 230 of the Communications Decency Act even applies to those alleged to support the exploitation of others by human trafficking.

However, immunity afforded to internet service providers is not without limit. Even the most ardent defenders of a vigorous world wide web would have to concede that if a provider engaged in their own criminal acts, versus those of their customers, immunity must fail.  And so it is in this case.  While the charges relating to pimping will not be allowed to proceed, the offenses pertaining to allegations that the Defendants themselves engaged in financial crimes, to include bank fraud and money laundering to disguise their business dealings, will survive the demurrer stage.

**Court's ruling:**

Defendants' request to enjoin further prosecutorial investigation and return of the materials seized is OVERRULED.

Defendants' request for judicial notice is OVERRULED, except as to the prior charges and orders granting the demurrer and dismissal.  Within that context, the People's motion to strike the remaining exhibits is SUSTAINED.

Defendants' request to assign the case to the Honorable Michael G. Bowman is OVERRULED.

Defendants' demurrer is SUSTAINED for counts 15-16, 28-40, OVERRULED as to the remainder of the charges.

**Dated:**

_____

**Honorable Lawrence G. Brown**
**Judge of the Superior Court of California**
**County of Sacramento**

# EXHIBIT I

# DOMESTIC MINOR SEX TRAFFICKING

# HEARING

BEFORE THE

## SUBCOMMITTEE ON CRIME, TERRORISM, AND HOMELAND SECURITY

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

_____

SEPTEMBER 15, 2010

_____

## Serial No. 111–146

_____

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://judiciary.house.gov

214



Mr. SCOTT. Thank you. I understand, Mr. Sensley, do you have
to leave shortly.

Chief SENSLEY. Sir, I have made other arrangements. Thank you.

Mr. SCOTT. Okay. Thank you. Then I will recognize myself for 5
minutes. And I will begin with Mr. Powell. Mr. Powell, you made
a promise to monitor posting. Is it logistically possible, with the
number of postings to actually review on an individual basis post-
ings on your site?

Mr. POWELL. Are you referring to the content that appears after
we removed the adult services category?

Mr. SCOTT. Either way.

215

Mr. POWELL. We have a number of technological measures that are used, along with some manual review that we feel does a good job at ensuring that the content that had previously appeared in the manually reviewed adult services category does not migrate to the other categories that appear on our site, the personals categories, other services categories. And, in addition to review by our staff of those categories in the past 10 days, the chart that Ms. McDougall referred to with respect to increase in traffic on Backpage seems to support that.

Mr. SCOTT. If someone is communicating with craigslist, can you identify, technologically identify which computer made that contact?

Mr. POWELL. Yes.

Mr. SCOTT. And so you can track the person, if necessary?

Mr. POWELL. Well, in cases where we have received a request from law enforcement, we release the records to the district attorneys, to the police officers, to the FBI agents and they use the information we capture to do that tracking.

Ms. MCDOUGALL. I can further elaborate if that is helpful.

Mr. SCOTT. Okay.

Ms. MCDOUGALL. What craigslist can provide is the e-mail address and IP address of the person that posted the ad. Craigslist can't from there identify the specific computer or individual. What you do then is contact, you can identify online who the service provider is for that IP address, and you can contact the service provider and get from them the information as to who owns that IP address. Law enforcement can do it by subpoena. You can do it in a civil suit by subpoena as well.

Mr. SCOTT. Ms. Hakes what laws apply to Internet providers like craigslist that would make them criminally liable for the postings?

Ms. HAKES. Mr. Chairman, I am not aware of any laws that would make them liable, unless there was evidence that craigslist was a participant specifically, whether they were, for example, conspiring with those who were misusing their site, that is, knowingly conspiring to violate the laws. What we have seen in the past——

Mr. SCOTT. What about if they are not actively conspiring? What about just intentional neglect? Or they just don't care?

Ms. HAKES. Mr. Chairman, I am not aware of any Federal statutes anyway with respect to neglect being the standard. In Federal law, the standard for prosecution would be knowing or willful. And when you are talking about in cases that have come up, the investigations that have been done by the FBI and others, I am not aware of anything that shows us that craigslist might be criminally liable.

Mr. SCOTT. Well I'm not talking about just craigslist. I'm talking about any of them. If there are no laws on the books now, are there any potential laws we could put on the books that would pass constitutional muster that would be helpful in tracking down people that make these postings?

Ms. HAKES. Mr. Chairman, the Department of Justice would be more than happy to work with the Committee and consult with you on whether or not there are tools with respect to the topic that you're discussing. However, I would say that I believe that at this point, we have the proper tools. We have what we need to pros-

216

ecute the guilty, that is, the people who are using the Internet, and it isn't just craigslist and of course it isn't just prostitution of children, it is sexual exploitation of children in all its forms. Many predators, many of those who would prey on children, utilize the Internet, misuse the Internet in order to prey on those children, to traffic in child pornography, to advertise children for child prostitution. And I don't think anyone would here would propose closing the Internet.

Mr. SCOTT. You have two parts of this transaction. One is the posting of the availability of the children, and the other is of the demand side. Are there any efforts to essentially set people up so that anyone who goes on the Internet searching for people can get ensnared in a sting operation?

Ms. HAKES. Yes, sir, Mr. Chairman. As a matter of fact, over the last year, in the western district of Missouri, Operation Guardian Angel has en in effect, and that is a law enforcement operation utilizing Internet service providers like craigslist to post adds suggesting that they have children who are underage that they would provide for sex. In Operation Guardian Angel, several people answered the ads. Several people made arrangements over the telephone to meet with who they thought would be underage children for sex and they were prosecuted for those crimes. And some of them received——

Mr. SCOTT. And what is the typical penalty when they get caught?

Ms. HAKES. They received very substantial sentences depending on the crime under which they were prosecuted. It ranges anywhere, as I said in my earlier statement for trafficking in children and child exploitation could be as little as 5 years. It could be as many as life.

Mr. SCOTT. The Dateline NBC with Chris Hansen——

Ms. HAKES. To Catch a Predator, yes, sir.

Mr. SCOTT. The penalties that they publish are in the matter of a months, a couple of months; is that not typical?

Ms. HAKES. No, sir. That would be State and local. In my experience, when I was assistant district attorney, some of the charges that are utilized in State and local offenses for enticing a child in certain jurisdictions might be misdemeanors. In Federal law however, it is a felony. And enticing a child over the Internet carries a mandatory minimum penalty of 10 years in prison.

Mr. SCOTT. Now how much cooperation is there, Federal State and local law enforcement in these investigations and prosecutions?

Ms. HAKES. Well, as I said in my statement, we are very strongly supportive of the Innocence Lost National Initiative. We believe that it has been extremely successful. And one of the things that we are doing in the National Strategy for Child Exploitation, Prevention and Interdiction, is working with all of our partners, community-based, law enforcement-based, industry-based, in order to establish what are the best practices that we are all engaging in, expanding our cooperation and collaboration with respect to child exploitation, and we are looking into whether or not the Innocence Lost National Initiative should be expanded from 38 task forces and working groups that exist now to more areas across the country.

# EXHIBIT J



Office of Legislative Affairs

---

Office of the Assistant Attorney General          *Washington, D.C.  20530*

JUL 3 0 2014

The Honorable John Barrow
U.S. House of Representatives
Washington, DC 20515

Dear Congressman Barrow:

This responds to your letter to the Attorney General dated May 25, 2011, regarding the commercial sexual exploitation of minors through websites such as Backpage.com.  We apologize for our lengthy delay in responding to your letter.

The Department recognizes and shares your grave concerns about the use of Internet sites to facilitate human trafficking, and we are committed to pursuing those who use these websites to illegally exploit minors.  The Department is vigorously prosecuting and obtaining convictions against perpetrators who have employed Internet advertising to facilitate human trafficking.  For example, in January 2014, the Department obtained a 262-month prison sentence against a Maryland man following his guilty plea to child sex trafficking.  In 2008, the defendant recruited a thirteen-year-old girl and prostituted her through advertisements on Craigslist.  After being arrested on a federal child sex trafficking charge, the defendant continued his involvement in prostitution by recruiting an adult female to prostitute for him, posting advertisements for her on Backpage.com, and retaining all monies she earned.  In April 2014, a Houston man pleaded guilty to two charges of trafficking children for commercial sex.  According to the plea agreement, from January through July 2012, the defendant forced young girls, who he knew were minors, into prostitution by using force, intimidation, depriving the victims of food, and supplying them with drugs and alcohol.  In order to gain the trust of victims, whom he met on social networking sites, he would tell them he was going to help them become models.  Instead, he picked them up, took them to motel rooms, and then raped them.  The victims were photographed, and their images were posted in online ads for prostitution.

Using current statutory tools, the Department has prosecuted Internet facilitators as well.  For example, last month, the Department filed charges against the operator of "myredbook.com" and seized the website's domain name.  According to information available on the publicly accessible website as of the date of its seizure by the FBI, myredbook.com purported to provide "Escort, Massage, and Strip Club Reviews."  Instead, however, the website hosted advertisements for prostitutes, complete with explicit photos, lewd physical descriptions, menus of sexual services, hourly and nightly rates, and customer reviews of the prostitutes' services.  The website used acronyms for numerous sex acts, which were defined in graphic detail in the website's "Terms and Acronyms" section.  Although the website could be accessed for free, myredbook.com charged fees for premier placement of prostitution

The Honorable John Barrow
Page Two

advertisements and for "VIP Memberships," which purportedly allowed customers access to
"private forums" and heightened capabilities to search reviews of the prostitution services.  The
Department charged two defendants with money laundering and use of mail and the Internet to
facilitate prostitution.

    We note that as a general matter, any prosecution of a website operator for conduct
related to child sex trafficking would require the Department to prove beyond a reasonable
doubt that the website operators actually knew or recklessly disregarded the fact that they were
accepting an advertisement that offers sex with a child for money or other
consideration.  Sufficient evidence of knowledge of a crime against a child is not indicated
where an advertisement on its face is for a legal service offered by someone who appears to be
an adult.  Where sufficient evidence exists, the Department will aggressively investigate and
prosecute, as appropriate.

    As the cases above illustrate, the Department is successfully employing the panoply of
tools created by Congress to attack human trafficking and Internet facilitation of prostitution.
Congress has given the Department a full range of criminal laws that can be applied to websites
hosting advertisements and providing other services that facilitate the sex trafficking of
children, so long as there is sufficient proof to establish all of the required elements of a
criminal offense.

    The protection of vulnerable populations, with special emphasis on child exploitation
and civil rights, is one of the Department's four priority goals.  Numerous components and
offices work together to create public awareness, deploy prevention programs, provide victim
services, facilitate meaningful research, educate and provide resources for state and local law
enforcement, investigate cases, and prosecute offenders.  We will continue to use the resources
and reach of the Department in our efforts to prevent and respond to human trafficking, whether
it takes place online or off.

    We hope this information helpful.  Please do not hesitate to contact this office if we may
provide additional assistance with this or any other matter.

                                        Sincerely,

                                        Peter J. Kadzik
                                        Assistant Attorney General

# EXHIBIT K



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General          *Washington, D.C. 20530*

FEB 2 7 2018

The Honorable Robert W. Goodlatte
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Chairman:

This letter presents the views of the Department of Justice (Department) on H.R. 1865, the "Allow States and Victims to Fight Online Sex Trafficking Act of 2017." The Department supports H.R. 1865. We applaud House and Senate legislative efforts to address the use of websites to facilitate sex trafficking and to protect and restore victims who were sold for sex online. The Department appreciates this opportunity to provide technical assistance to ensure that these goals are fully met through narrowly tailored legislation. The Department also notes that a provision in the bill raises a serious constitutional concern.

Every day, trafficking victims in America appear in online advertisements that are used to sell them for sex. The Department works diligently to hold the traffickers accountable for their crimes but faces serious challenges. This is due in part to the high evidentiary standard needed to bring federal criminal charges for advertising sex trafficking, but also because the Communications Decency Act (CDA), codified at 47 U.S.C. § 230, bars our state and local partners from bringing any criminal action that is inconsistent with that section. H.R. 1865 addresses both issues and would take meaningful steps to end the industry of advertising trafficking victims for commercial sex.

## TECHNICAL ASSISTANCE

Section 3(a) of the bill creates 18 U.S.C. § 2421A, a new federal offense that prohibits the use or operation of websites (and other means or facilities of interstate commerce) with the intent to promote or facilitate prostitution. The bill also provides for an aggravated felony if the defendant recklessly disregards that the crime contributed to sex trafficking as prohibited by 18 U.S.C. § 1591(a). Section 2421A would stand as a strong complement to existing federal laws.

The Honorable Robert W. Goodlatte
Page Two

However, the Department notes that Section 2421A as originally drafted is broader than necessary because it would extend to situations where there is a minimal federal interest, such as to instances in which an individual person uses a cell phone to manage local commercial sex transactions involving consenting adults. Therefore, the Department would support amending the language of Section 2421A so that Congress can clarify its intent to target traffickers using or operating interactive computer services, as follows (with a corresponding change to 2421A(b)): "Whoever, using a facility or means of interstate or foreign commerce or in or affecting interstate or foreign commerce, owns, manages, or operates an interactive computer service, as defined in Section 230(f) of Title 47, United States Code, or conspires or attempts to do so, with the intent to promote or facilitate prostitution shall be fined under this title, imprisoned for not more than 15 years, or both."

The Department believes that any revision to 18 U.S.C. § 1591 to define "participation in a venture" is unnecessary. Section 1591 already sets an appropriately high burden of proof, particularly in cases involving advertising. Under current law, prosecutors must prove that the defendant knowingly benefitted from participation in a sex trafficking venture, knew that the advertisement related to commercial sex, and knew that the advertisement involved a minor or the use of force, fraud, or coercion. *See Backpage.com, LLC v. Lynch*, D.D.C., Civil Action No. 15-2155, Docket 16 (Oct. 24, 2016). While well intentioned, this new language would impact prosecutions by effectively creating additional elements that prosecutors must prove at trial. In the context of the bill, which also permits states to bring actions for conduct equivalent to Section 1591, we are also mindful that this language could have unintended consequences as applied by the states.

Section 4 of H.R. 1865 also sets forth critical revisions to the CDA to permit state prosecutors to bring criminal actions related to sex trafficking and the use of the internet with the intent to promote or facilitate prostitution. The Department believes that the existence of this exception to the CDA will alter the landscape of the industry involved in advertising prostitution.

## CONSTITUTIONAL CONCERN

We note that Section 4 of H.R. 1865 states that the changes to the CDA "shall apply regardless of whether the conduct alleged occurred [sic], or is alleged to have occurred, before, on, or after such date of enactment." This raises a serious constitutional concern. Insofar as this bill would "impose[] a punishment for an act which was not punishable at the time it was committed" or "impose[] additional punishment to that then prescribed" it would violate the Constitution's Ex Post Facto Clause. *Cummings v. Missouri*, 4 Wall. 277, 325-326 (1867); *see Beazell v. Ohio*, 269 U.S. 167, 169-170 (1925); U.S. Const. art I, § 9, cl. 3. The Department objects to this provision because it is unconstitutional. We would welcome the opportunity to work with Congress to address this serious constitutional concern.

The Honorable Robert W. Goodlatte
Page Three


       Thank you for the opportunity to present our views in support of this legislation.  We hope this information is helpful, and we look forward to continuing to work with Congress on this important legislation.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.  The Office of Management and Budget has advised us that from the perspective of the Administration's program, there is no objection to submission of this letter.

                            Sincerely,

                            Stephen E. Boyd
                            Assistant Attorney General


cc:     The Honorable Jerrold Nadler
         Ranking Member

         The Honorable Ann Wagner
         U.S. House of Representatives