ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
DOMINIC LANZA (Cal. Bar No. 225989, dominic.lanza@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          v.<br><br>1.  Michael Lacey<br><br>                    Defendant. | CR-18-00422-PHX-SPL (BSB)<br><br>**UNITED STATES' REPLY IN SUPPORT OF MOTION FOR DETENTION PENDING THE IMPOSITION OF RELEASE CONDITIONS**<br><br>[Detention Hearing Set: April 11, 2018] |

The United States previously filed a motion explaining why defendant Michael Lacey ("Lacey") is a flight risk, and potential danger to the community, and thus should not be released from custody unless and until stringent release conditions are imposed. *See* CR 13.  In response, Lacey filed a pleading arguing that he should be released on his own recognizance with very modest conditions.  *See* CR 23.  Through this reply, the United States seeks to address Lacey's arguments.

A. **Nature And Circumstances Of Offense**

The United States showed in its motion that Lacey faces the real possibility of spending the rest of his life in prison if convicted of all or even some of the 79 counts with which he is charged.  *See* CR 13 at 4.  In his response, Lacey does not dispute that the charges are very serious and carry a substantial potential punishment—instead, he focuses on the other § 3142(g) factors.

B. **Strength Of The Evidence**

The United States argued in its motion that the strength-of-the-evidence factor supports a flight-risk determination because the grand jury has already returned an indictment, the indictment contains a detailed summary of some of the incriminating evidence against Lacey, and the United States Senate separately issued a 50-page report recognizing the criminal nature of Lacey's contributions to Backpage.  *See* CR 13 at 4-5.

In response, Lacey argues that the strength-of-the-evidence factor favors him because the theory underlying the indictment in this case has "been repeatedly litigated, and in each case, rejected on First Amendment grounds."  *See* CR 23 at 3-4.  *See also id.* at 11-12 ("Courts have uniformly held that Backpage's publishing and receiving payments for online ads is legal, such ads are constitutionally-protected speech, and the government cannot pursue criminal charges against a website operator based on accusations of generalized knowledge . . . .").  Lacey further asserts that he and Backpage have prevailed "without exception in every civil or criminal action in the past" (*id.* at 12) and that "no court, state or federal, has accepted the government's asserted theory of criminality in this case" (*id.* at 14).

Although a detention hearing is not the correct forum for addressing the ultimate merit of these arguments, the United States cannot help but point out that Lacey's claims are factually inaccurate.  *First*, Lacey is simply wrong in his claim that "no court" has ever accepted the theory that a website or website operator may be criminally prosecuted under federal law for knowingly facilitating prostitution.  In *United States v. Omuro*, N.D. Cal. No. CR 14-CR-336, the founder of the website www.myRedBook.com was convicted of

violating 18 U.S.C. § 1952—the very crime charged in this case.  In the factual basis of his plea agreement, Omuro admitted that "[t]he website hosted advertisements, the vast majority of which were posted by prostitutes containing their picture[s], and in most instances, the sexual services they offered, and their rates. . . .  The website also allowed site users to submit, search, and read reviews of the services offered by particular prostitutes. . . .  As such, the website promoted and facilitated the carrying on of prostitution throughout California, elsewhere in the United States, and Canada."  Similarly, in *United States v. Hurant*, E.D.N.Y No. CR 16-45, the founder of the website www.Rentboy.com was convicted of violating 18 U.S.C. § 1952.  In his sentencing memo, Hurant admitted he "was well aware . . . that the escort ads he posted . . . were thinly-veiled proposals of sexual services in exchange for money."[1]  And again, in 2012, the Department of Justice obtained the forfeiture of the website www.escorts.com based on similar conduct.  *See* https://archives.fbi.gov/archives/philadelphia/press-releases/2012/internet-escort-services-firms-charged-with-money-laundering-sentenced-in-federal-court.

The results in these cases are hardly surprising and easy to harmonize with the First Amendment.  Long ago, the Supreme Court recognized that "[w]e have no doubt that a newspaper constitutionally could be forbidden to publish a want ad . . . soliciting prostitutes."  *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973).  Put simply, the First Amendment does not protect speech promoting criminal conduct.  *See, e.g., United States v. Stevens*, 559 U.S. 460, 468-69 (2010) ("From 1791 to the present, . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never include[d] a freedom to disregard these traditional limitations.

---

[1]     *Hurant* has other parallels to this case.  In its *Hurant* sentencing memo, the government stated that although the Rentboy.com website "had disclaimers that claimed that the advertisements on the site were for companionship only and not for prostitution," the company's employees would often reject ads containing explicit offers of sex for money "but allow the ad to be resubmitted with different language.  In many cases, Rentboy.com employees would just edit the advertisement's language and approve it."

These historic and traditional categories long familiar to the bar—including obscenity, defamation, fraud, incitement, and *speech integral to criminal conduct*—are well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.") (citations omitted); *United States v. Meredith*, 685 F.3d 814, 819-20 (9th Cir. 2012) (applying "the First Amendment exception that allows the government to regulate speech that is integral to criminal conduct"); *United States v. Rahman*, 189 F.3d 88, 116-17 (2d Cir. 1999) ("[F]reedom of speech . . . do[es] not extend so far as to bar prosecution of one who uses a public speech . . . to commit crimes."). *See also Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980) ("[T]here can be no constitutional objection [under the First Amendment] to the suppression of . . . commercial speech related to illegal activity.").

*Second*, Lacey is also wrong in his claim that he and Backpage have prevailed "without exception" in all previous civil and criminal cases brought against them. In 2015, the Washington Supreme Court denied Backpage's and Lacey's motion to dismiss a civil lawsuit brought by three minor girls who had been "bought and sold for sexual services online on Backpage.com." *See J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015). The Court held that, because the plaintiffs had plausibly alleged that Backpage does "more than just provide a forum for illegal content" and affirmatively shapes the content of users' ads through "posting rules [that are] 'designed to help pimps develop advertisements that can evade the unwanted attention of law enforcement, while still conveying the illegal message,'" the plaintiffs should be permitted to conduct discovery "to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking." *Id.* at 718. Tellingly, in 2017, following extensive discovery, the trial judge in the *J.S.* case denied Backpage's motion for summary judgment. *See* Exhibit A. Afterward, Backpage agreed to enter into a confidential settlement with the plaintiffs. It is difficult to understand how Lacey considers this case to be part of an uninterrupted string of victories.

A recent decision from the District of Massachusetts further belies Lacey's representation that he has prevailed "without exception" in all previous Backpage-related cases. Less than two weeks ago—on March 29, 2018—the Hon. Leo Sorokin issued a five-page order denying in part a motion to dismiss that Lacey had filed in a civil case brought by a different underage victim who had been trafficked via Backpage. *See Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL 1542056 (D. Mass. 2018). The ruling explained that, because the plaintiff had made a plausible allegation that Backpage had "redrafted [her] advertisement . . . to suggest she was an adult," the alleged conduct was not covered by the CDA's grant of immunity. *Id.* at *1. Here, similarly, the indictment contains allegations that Backpage helped edit and redraft prostitution advertisements.

*Third*, although it is true that Lacey and Backpage have prevailed in a number of prior cases that sought civil remedies or that turned on whether Backpage could be prosecuted under state criminal law (*see* CR 23 at 11-12), those cases are easily distinguishable. First, those cases are distinguishable for the obvious reason that the CDA provides a broad grant of immunity in such contexts. This, however, is a case brought under federal criminal law—a context in which the CDA has no application. *See* 47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of . . . [any] Federal criminal statute."). Indeed, the successful prosecutions in the myRedBook.com, Rentboy.com, and escorts.com cases demonstrate that federal criminal liability may be imposed under these circumstances. Second, those cases are also distinguishable because, with one exception (*People v. Ferrer*), they were decided prior to the release of the PSI report in 2017. That report addressed documents and other evidence that were not available when the cited cases were decided. (So, too, did the grand jury investigation in this case.)

*Fourth*, and finally, Lacey's discussion of a 2013 ruling arising from a different grand jury investigation in the Western District of Washington (*see* CR 23 at 12) is particularly inappropriate. As an initial matter, the orders that Lacey has attached as Exhibits E and F to his pleading are, in fact, sealed orders that cannot be disclosed in this

fashion. Undersigned counsel has discussed this exact point with Lacey's counsel in the past. Furthermore, Lacey's counsel are aware of (and participated in) subsequent proceedings in which Lacey's current arguments concerning the relevance of the Western District of Washington orders were rejected.

C. **Defendant's History And Characteristics**

The United States argued in its motion that, although certain aspects of Lacey's history and characteristics are favorable to him, his extensive foreign assets, foreign travels, and efforts to hide multi-million dollar stashes of money overseas create a significant risk of flight. *See* CR 13 at 5-7.

Lacey responds by identifying certain awards he received during his publishing career, discussing his wrongful arrest in a prior unrelated case, touting his charitable and philanthropic contributions, emphasizing his ties to the community, and noting that he has abided by his release conditions in the California case. He also argues, in reliance on *United States v. Hoover*, 2014 WL 2094201 (D. Ariz. 2014), that "the mere opportunity to flee is not enough to justify detention."

These arguments are unavailing. As an initial matter, Lacey fails to acknowledge that multiple recipients of his Backpage-derived contributions have refused to accept (or attempted to give away) his money after learning of its provenance. *See, e.g.,* https://www.azcentral.com/story/news/politics/arizona/2017/04/18/rep-kyrsten-sinema-says-she-giving-away-backpage-owners-donations/100584648/. Additionally, the *Hoover* case does not support Lacey's position that he should be immediately released from custody without posting a significant bond. Indeed, the defendant in *Hoover* was similar in many respects to Lacey—Hoover was a "62-year-old U.S. citizen" with "no prior criminal history" who was "an experienced international traveler" and held extensive international assets. *Id.* at *3-4. These factors, along with others, led the magistrate judge in the *Hoover* case to conclude "there are no combination of release conditions that would reasonably assure that Hoover will appear at trial as required given his foreign connections to property and money; his international travel experience; his remarkable ability and

willingness to conceal money and property; [and other factors]." *Id.* at *12. Furthermore, although the district court in the *Hoover* case later authorized the defendant to be released with conditions, those conditions were similar to the conditions sought by the United States here (*e.g.,* a large bond).

D. **Danger To The Community**

In its motion, the United States argued that, because the Backpage website has contributed to massive victimization (*i.e.,* danger to the community), the Court should impose a release condition precluding Lacey from making any future efforts to exert control over the website. *See* CR 13 at 7. In his response, Lacey argues that no such danger exists because he sold his interests in Backpage in 2015 and because the website is no longer in operation. *See* CR 23 at 2 ("[The government] claims Mr. Lacey represents a danger to the community because of his connection to a website which he sold in 2015 . . . ."); CR 23 at 14 ("[T]he government has seized and shut down the website operated by Backpage. *A fortiori*, if he is released, he could not engage in the offense conduct for which he is accused.")

Notwithstanding the overheated rhetoric in Lacey's pleading, the parties' respective positions on the danger-to-the-community issue are actually quite similar. The United States simply wishes to ensure that Lacey does not make a *future* attempt to regain or exert control over Backpage. Lacey, meanwhile, appears to concede that he has no intention of doing so. Thus, the Court should impose the release condition the United States requested.

E. **Conclusion**

For all of the foregoing reasons, the Court should not release Lacey without first imposing the stringent release conditions detailed in the United States' motion, including the posting of a sizeable bond.

Furthermore, should Lacey identify funds or assets that could be used to secure a suitably-large bond, the Court should conduct an inquiry into the source of those funds or assets. The Bail Reform Act codified a district court's authority to conduct such an inquiry, which is often called a *Nebbia* hearing. 18 U.S.C. § 3142(g)(4) ("[T]he judicial officer

. . . shall upon the motion of the Government . . . conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required."). Here, Lacey should not be permitted to use the proceeds of the charged crime to secure his release pending trial. *United States v. Sharma*, 2012 WL 1902919, *4 (E.D. Mich. 2012) (holding that although "there is no iron-clad rule that a defendant must show that collateral to support pre-trial release was lawfully acquired," "the legislative history of the [Bail Reform] Act makes clear that Congress believed, in most cases, the potential loss of the fruits of an alleged crime will not reasonably assure the appearance of the defendant at trial" and that "[a]bsent exceptional circumstances, bail funded in part from alleged criminal activity does not adequately assure the appearance of the defendant; instead, as the Senate Committee found, forfeiture of the proceeds of a crime is simply a business cost of avoiding prosecution, leaving the defendant no worse off than before he engaged in criminal activity, but far better off than if in prison").

Respectfully submitted this 10th day of April 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

*/s Kevin Rapp*
KEVIN M. RAPP
DOMINIC LANZA
MARGARET PERLMETER
Assistant U.S. Attorneys

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section