1   ELIZABETH A. STRANGE
    First Assistant United States Attorney
2   District of Arizona

3   KEVIN M. RAPP (Ariz. Bar No. 14249, kevin.rapp@usdoj.gov)
    MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
4   PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
    ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
5   Assistant U.S. Attorneys
    JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
6   Special Assistant U.S. Attorney
    40 N. Central Avenue, Suite 1800
7   Phoenix, Arizona 85004-4408
    Telephone (602) 514-7500
8
9   JOHN P. CRONAN
    Acting Assistant Attorney General
10  Criminal Division, U.S. Department of Justice

11  REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
    Senior Trial Attorney, U.S. Department of Justice
12  Child Exploitation and Obscenity Section
    950 Pennsylvania Ave N.W., Room 2116
13  Washington, D.C. 20530
    Telephone (202) 616-2807
14  Attorneys for Plaintiff

15              IN THE UNITED STATES DISTRICT COURT

16                 FOR THE DISTRICT OF ARIZONA

17  | United States of America, | |
    | Plaintiff, | CR-18-422-PHX-SPL (BSB) |
18  | | |
    | v. | **UNITED STATES' REPLY IN SUPPORT OF MOTION TO DISQUALIFY COUNSEL (DWT FIRM)** |
19  | | |
    | Michael Lacey, et al., | |
20  | Defendants. | **[Reply to CR 180]** |
21

22              **INTRODUCTION AND SUMMARY OF ARGUMENT**

23          The law firm of Davis Wright Tremaine ("DWT") has represented Carl Ferrer, in

24  his individual capacity, in an array of different lawsuits and contexts over the past few

25  years.  Although some of these representations occurred after December 2016 (which is

26  when Ferrer was first asked to consider waiving future conflicts), others occurred before

27  December 2016 and were not covered by any conflict waivers.  Furthermore, the DWT

28  firm specifically agreed, in its initial engagement letter with Ferrer, to withdraw from

    representing Michael Lacey and James Larkin if a conflict later arose.

Such a conflict has now presented itself.  In April 2018, Ferrer pleaded guilty to Backpage-related charges and agreed cooperate in the pursuit of criminal charges against other Backpage principals, including Lacey and Larkin.  In response, the DWT firm filed a notice of appearance on behalf of Lacey and Larkin.  The ethical conflict posed by this arrangement—which is recognized by a well-developed body of case law precluding an attorney from serving as counsel in a criminal case if a prior client will be acting as a cooperator—prompted the United States to move to disqualify the DWT firm (*see* CR 118), and Lacey and Larkin have now filed an oversize opposition brief (*see* CR 180).

The factual omissions and misstatements in this brief are striking.  Notably, the defendants fail to disclose—in a brief dripping with incredulity at the very notion that any judge could perceive a conflict of interest here—that a judge recently disqualified the DWT firm from representing Lacey and Larkin in a Backpage-related civil case due to its prior representation of Ferrer.  The defendants' failure to mention this ruling, let alone attempt to reconcile their position and rhetoric with it, is difficult to fathom.

The defendants' brief also misstates the facts, in crucial ways, concerning the DWT firm's track record of representing Ferrer.  The gist of the defense's position is that (1) the DWT firm never really acted as Ferrer's individual counsel, but merely acted as some sort of umbrella counsel for the limited purpose of providing support to Ferrer's other attorneys, and (2) these limited representations of Ferrer were always made pursuant to joint representation agreements in which Ferrer expressly agreed to allow DWT to continue representing Lacey and Larkin if a future conflict arose.  Having conjured this particular set of circumstances, the defendants then cite various cases and ethics opinions suggesting that disqualification isn't required under them.

As the old saying goes, "Everybody is entitled to their own opinions, but not their own facts."  It is simply untrue that the DWT firm's prior representations of Ferrer were limited in scope and unrelated to his individual capacity.  Among other things, throughout 2015 and 2016, the DWT firm represented Ferrer (without obtaining any conflict waivers) in *Senate Permanent Subcommittee v. Ferrer*.  The title of this case should speak for

1    itself—it was a lawsuit against Ferrer—and the DWT firm confirmed in its notice of

2    appearance that it was "appear[ing] in this case as counsel for Carl Ferrer."  The *PSI* case

3    resulted in Ferrer, presumably at the DWT firm's advice, refusing to comply with a

4    congressional subpoena and being held in contempt of Congress—a finding the defense

5    will likely seek to use in this case to impeach Ferrer.  The conflicts posed by the DWT

6    firm's attempt to participate on both sides of this episode, and others like it, are self-evident.

7         The defendants' reliance on three "joint representation" agreements signed between

8    December 2016 and June 2017 fares no better.  In the first document, the DWT firm

9    specifically agreed to withdraw from representing Lacey and Larkin in the event of a

10   conflict with Ferrer, and the DWT firm wasn't even a party to the second or third

11   agreements.  Furthermore, to the extent the waivers in those documents are enforceable

12   (there are serious questions whether Ferrer gave informed consent), they merely preclude

13   Ferrer from seeking to disqualify the other participants' attorneys due to their receipt of

14   privileged information *during and as a result of* the joint representation.  Here, because the

15   DWT firm's relationship with Ferrer predates the agreements, the waivers are inapplicable.

16        Finally, the defendants also seek to avoid disqualification by arguing that Ferrer

17   waived confidentiality with the DWT firm (both expressly and by virtue of his decision to

18   cooperate) and based on a balancing of interests.  As explained below, these arguments are

19   unavailing and are based on additional misstatements of the facts and law.

                              **FACTUAL SUPPLEMENT**

21        Before addressing the merits of the defendants' legal arguments, it is necessary to

22   correct several key factual omissions and misstatements that appear in their brief.

23        • Disqualification Ruling:  On May 23, 2018—two weeks before the defendants

24   filed their brief—a judge in Washington state disqualified the DWT firm from representing

25   Lacey and Larkin in *R.O. v. Medalist Holdings*, a Backpage-related civil case, due to the

26   firm's prior representation of Ferrer.  Specifically, the court found the DWT firm's

27   continued participation would "create an injustice on the administration of justice" due to

28   "intertwined" conflicts.  *See* Exhibit A at 61:12-19 (May 23 hearing transcript); Exhibit B

(May 24 letter from DWT firm confirming disqualification).

• Nature Of Prior Representations:  The defendants repeatedly assert that the DWT firm has never really represented Ferrer in an individual capacity.  *See* CR 180 at 1 ("DWT has represented the Backpage parties collectively; Mr. Ferrer has had separate counsel representing him personally regarding potential criminal liability."); *id.* at 4-5 (claiming the firm DWT merely "appeared on behalf of Ferrer in order to represent the company").

This claim is inaccurate.  In its motion, the United States identified ten different lawsuits in which the DWT firm acknowledged—in its notice of appearance, its pleadings, and/or other correspondence—that it was representing Ferrer in an individual capacity.  *See* CR 118, Exhs. D, E, F, G, H, J, L, N, P, R.  In many of these instances, the DWT firm took pains to specify that it was representing both Ferrer and the Backpage entity and that the two were separate clients.  *See, e.g.,* CR 118, Exh. P ("My firm is counsel for Mr. Ferrer and Backpage, and I made that clear in my call.").  Finally, the enclosed declaration of Ferrer provides additional background concerning the wide array of matters in which the DWT has individually represented him over the years.  *See* Exhibit I, ¶¶ 4, 9-22.  Although the defendants may believe it is beneficial to their current litigating position to pretend these representations never occurred, the facts are not subject to serious dispute.

The *PSI* litigation is particularly noteworthy.  In October 2015, the PSI issued a subpoena to Ferrer for certain records.  Ferrer, represented by the DWT firm, declined to comply or show up for the hearing.  As a result, the Senate held him in contempt—the first such finding in decades—and initiated a lawsuit against him in federal court.  Backpage was not a party to this proceeding.  Afterward, the DWT firm filed a notice of appearance on Ferrer's behalf, *see* CR 118, Exh. D ("I appear in this case as counsel for: Carl Ferrer"), and litigated unsuccessfully on his behalf.

• Timing Of Joint Representation Agreements:  The defendants assert that all of the DWT firm's representations of Ferrer occurred pursuant to joint representation agreements under which Ferrer agreed to waive future conflicts.  *See, e.g.,* CR 180 at 1 ("DWT's representation of Backpage parties has been pursuant to agreements among the parties that

1   anticipated and addressed potential conflicts . . . .”).

2         This claim is also inaccurate.  As noted, the DWT firm individually represented

3   Ferrer in several matters before December 2016, including throughout 2015 and 2016 in

4   the *PSI* case.  These representations predated the execution of the first joint representation

5   agreement discussed in the defendants' pleadings—the December 12, 2016 engagement

6   letter.  The defendants' chronology also falters with respect to the criminal prosecution of

7   Ferrer, Lacey, and Larkin in California state court.  That case was initiated in September

8   2016, and the DWT firm made an appearance on Ferrer's behalf—and began obtaining

9   confidences from him—two months before the engagement letter was signed.  *See* Exhibit

10  C (DWT's notice of appearance filed in October 2016).

11        • <u>DWT's Role As Potential Fact Witness</u>:  The defendants' brief also fails to address

12  an additional development that is relevant to the conflict analysis.  The DWT firm has now

13  made clear that its strategy in this case, as well as other cases, will be to attempt to impeach

14  Ferrer by pointing to declarations and deposition testimony from earlier cases in which he

15  denied any wrongdoing at Backpage.  About two weeks ago, the DWT firm filed a pleading

16  in *Backpage v. Dart* stating that it intends to use Ferrer's prior statements to impeach his

17  guilty plea.  See Exhibit D at 13 ("Mr. Ferrer's statements in connection with his negotiated

18  plea agreements are inconsistent with his prior sworn testimony in certain respects, and he

19  will have to answer for the contradictions on his own.").  Similarly, the DWT firm

20  announced during a recent hearing in *R.O.* that "Ferrer may be subject to cross-examination

21  or discovery about his prior inconsistent statements."  *See* Exhibit A at 53-54.

22        The difficulty with this approach is that the DWT firm played a key role in

23  formulating Ferrer's prior statements.  For example, in June 2012, Ferrer submitted, as part

24  of a lawsuit brought by the DWT firm, a declaration in which he denied that Backpage was

25  engaged in any wrongdoing.  *See* Exhibit E.  The DWT firm's billing records from that

26  case show that several DWT attorneys helped edit and revise Ferrer's declaration.  *See*

27  Exhibit F at 12-13 (billing records for attorneys Stahl, Schattenkerk, and Doran on June

28  26, 2012). Similarly, in June 2013, the DWT firm filed a verified complaint on behalf of

Backpage in a declaratory judgment action. *See* Exhibit G at 1-16. To supply the necessary verification, the DWT firm obtained and submitted a declaration from Ferrer. *See* Exhibit G at 17. And again, in September 2016, the DWT firm submitted a declaration from Ferrer as part of a civil lawsuit in Washington state court. *See* Exhibit H.

The United States expects that, if Lacey and Larkin were to attempt to impeach Ferrer with these materials at trial, Ferrer would respond in part by explaining that the DWT firm drafted the declarations for him, provided him very little time to review the declarations before they were due, and placed pressure on him to sign the declarations. *See* Exhibit I (Ferrer declaration), ¶¶ 17-18. Avoiding such a spectacle—where defense counsel could become a fact witness midway through trial—is one of the reasons the United States sought to raise the ethical issues posed by this case well before trial.

## ARGUMENT

A.    The Defendants' "Informed Consent" Theory Is Unavailing

The defendants' primary argument is that disqualification isn't required because Ferrer signed three different "joint representation" agreements—a December 12, 2016 engagement letter, a December 30, 2016 common interest agreement, and a June 2017 joint defense agreement ("JDA")—in which he agreed that the DWT firm could continue representing Lacey and Larkin should a dispute arise. *See* CR 180 at 12-16.

Notably, the defendants' brief does not set forth the actual text of the waiver provisions contained in the three agreements. Instead, they have purported to summarize the agreements' waiver provisions in their brief. This approach is regrettable because the defendants' summaries are inaccurate. *See* Exhibit I (Ferrer declaration), ¶¶ 25-44. For example, the defendants suggest that, under the engagement letter, Ferrer acknowledged the DWT firm could continue representing Lacey and Larkin in the event of a dispute. *See* CR 180 at 14 ("Ferrer gave informed written consent to DWT's joint representation and to continued representation of others—Lacey, Larkin or Backpage-related entities they controlled—even if he decided to withdraw from the joint representation."). This is a deeply misleading characterization. In fact, the letter provides that "[i]f an incurable

conflict were to arise among the three of you . . . ***DWT will withdraw from representing*** ***each and all of you individually***, while continuing to represent Backpage.com . . . ." *See* CR 118, Exh. A at 1 n.1 (emphasis added).  In short, far from supporting the defendants' position, the engagement letter reinforces that the DWT firm cannot continue representing Lacey and Larkin here.  That is exactly what the DWT firm told Ferrer it would do.

As for the common interest agreement, the document wasn't signed by the DWT firm or any other lawyers.  *See* Exhibit I (Ferrer declaration), ¶¶ 28-38.  (Also, Ferrer's description of this document suggests it isn't covered by the attorney-client privilege.  If the Court agrees, it should order the defendants to provide a copy to the government.)

Finally, with respect to the JDA, the defendants' brief uses vague language to suggest it contains a clause under which Ferrer expressly agreed the DWT firm could continue representing Lacey and Larkin in the event of a dispute.  *See* CR 180 at 8 ("In the JDA, Ferrer again agreed not to seek disqualification of counsel even if he should withdraw from the agreement . . . and it was acknowledged that DWT was encompassed with the joint defense undertakings and protections.").  In fact, DWT was not a party to the JDA and declined to sign the document.  *See* Exhibit I, ¶ 42.  Thus, at most, the JDA might preclude Ferrer from seeking the disqualification of other defense attorneys, such as Mr. Piccarreta, who didn't represent him but were signatories to the agreement—something the United States hasn't done.

The defendants' reliance on the three joint representation agreements also fails for a different reason.  A joint representation agreement operates prospectively and permits a group of similarly-situated parties to begin sharing information with each other confidentially.  *See generally United States v. Stepney*, 246 F. Supp. 2d 1069, 1079-86 (N.D. Cal. 2003).  When a conflict waiver appears in such an agreement, it merely provides that a withdrawing defendant can't seek disqualification of other attorneys based on any sharing of confidential information that occurred *during, and as a result of*, the joint defense.  *Id.* at 1085 (excerpting model JDA, which provides that disqualification can't be sought due to the disclosure of "Defense Material or other information contributed by such

client *during the joint defense*") (emphasis added).  *See also United States v. Henke*, 222 F.3d 633, 638 (9th Cir. 2000) (conflict analysis in JDA cases turns on the nature of "the information about a former co-defendant/government witness *learned through joint defense meetings*") (emphasis added).  Here, the DWT firm's relationship with Ferrer didn't begin in December 2016, when the first engagement letter was signed, and wasn't limited to participating in post-December 2016 joint defense meetings with Ferrer.  Instead, the DWT firm individually represented Ferrer for several years before December 2016. The conflict waivers in the three joint representation agreements do not, and could not, encompass these earlier representations.  *See* Farhat & Russell, *Ethical Issues for White Collar Defense & Investigations Lawyers* (2014) at 4 ("[B]ecause communications occurring before the existence of or after the termination of the JDA will generally not be protected, defining the temporal scope is important.").

The defendants' conflict-waiver arguments also fail because there are serious questions whether Ferrer's decision to agree to the provisions can be characterized as "informed" consent.  For a conflict-waiver agreement to be valid, the client's attorney must have "communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."  *Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. & Power Dist.*, 810 F. Supp. 2d 929, 957 (D. Ariz. 2011) (quoting Ariz. ER 1.10).  Here, as discussed in paragraphs 27 and 36-37 of Exhibit I, no such explanation was provided—the possibility of pleading guilty and cooperating was never addressed by the DWT firm.  *Cf. Roosevelt Irrigation District*, 810 F. Supp. 2d at 957 (waiver invalid because it did not address the scenario that later resulted in a conflict). Furthermore, the defendants' suggestion that Ferrer's consent must have been informed because he was "independently represented" (*see* CR 180 at 15) is belied by the fact that the engagement letter and the common interest agreement were not even shared with the lawyers acting as Ferrer's personal criminal counsel at the time (*i.e.,* the Clarence Dyer firm and the HCM firm) when those documents were presented to Ferrer.  *See* Exhibit I, ¶¶ 27, 37.  Moreover, Ferrer was encouraged by Larkin's counsel *not* to consult with his

1   personal attorneys before signing the common interest agreement and Ferrer was pressured

2   to sign that document very quickly.  *See* Exhibit I, ¶ 28-37.

3        Finally, even if the three joint representation agreements did contain conflict

4   waivers that were otherwise valid and textually applicable, the Court would be free to

5   disregard them.  *United States v. Ross*, 33 F.3d 1507, 1524 (11th Cir. 1994) ("[T]rial courts

6   may refuse waivers of conflicts of interest to ensure adequacy of representation, to protect

7   integrity of court, and to preserve trial judge's interest to be free from future attacks over

8   adequacy of waiver and fairness of trial.") (citation omitted).  The ethical conflicts are so

9   stark here—the DWT firm seeks to represent Lacey and Larkin in a matter that is directly

10  adverse to Ferrer despite serving as Ferrer's individual counsel in more than a dozen cases

11  over the last six years, agreeing in its engagement letter to withdraw from the Lacey and

12  Larkin representations in the event of a dispute, being disqualified by other courts, and

13  potentially serving as a fact witness—that disqualification is warranted.

14  B.    <u>The Defendants' "No Disqualification In Cooperation Cases" Theory Lacks Merit</u>

15       The defendants contend that disqualification is never required when an individual

16  decides to withdraw from a joint representation agreement so he can cooperate.  *See* CR

17  180 at 16-18.  In support of this view, they cite *United States v. Almeida*, 341 F.3d 1318

18  (11th Cir. 2003), and *United States v. Wings*, 2007 WL 9676968 (N.D. Ga. 2007).

19       This argument is easily rejected.  In *Almeida*, two charged defendants (Fainberg and

20  Almeida) entered into a post-indictment "oral joint defense agreement," which Fainberg

21  withdrew from on the eve of trial so he could plead guilty and cooperate.  The trial judge

22  "precluded Almeida's counsel from using any information obtained from Fainberg in

23  connection with the joint defense" but the Eleventh Circuit reversed, holding that

24  Almeida's attorney shouldn't have been limited in this fashion because he'd never actually

25  served as Fainberg's attorney and thus didn't owe a duty of loyalty to him:  "A duty of

26  loyalty . . . does not exist in this situation and it is therefore improper to conclude that all

27  of the attorneys in the joint defense strategy session represent all of the participating

28  defendants."  *Id.* at 1323.  In reaching this result, the court made clear that was not

1    suggesting (as the defendants suggest here) that a cooperating defendant abandons *all* of

2    his claims of confidentiality and loyalty with *all* attorneys—instead, it was focusing

3    narrowly on the duties owed to a cooperator by an attorney who never individually

4    represented the cooperator and whose only relationship with the cooperator arose from

5    participation in a JDA:  "[W]e do not hold that accomplices always waive the privilege

6    when they testify on behalf of the government; nor do we hold that persons represented by

7    the same attorney always waive the privilege in the event that one of them becomes a

8    government witness against the other."  *Id.* at 1326.

9           Similarly, in *Wings*, two men (Wings and Lumdsen) entered into a joint defense

10   agreement, with each represented by separate counsel.  2007 WL 9676968 at *1.  Post-

11   indictment, Lumdsen decided to withdraw from the agreement, plead guilty, and cooperate

12   against Wings.  *Id.* at *2.  The government argued this changed circumstance required the

13   disqualification of Wings's attorney (Steel) but the district court disagreed, holding there

14   was no conflict because Steel had never served as Lumdsen's individual attorney:  "[O]nce

15   a defendant agrees to turn state's evidence, he has voluntarily surrendered any the

16   protections of attorney-client privilege, *at least as to counsel of a co-defendant with whom*

17   *he had a joint defense agreement*."  *Id.* at *4 (emphasis added).

18          Given this backdrop, *Almeida* and *Wings* are easily distinguishable.  This is not a

19   case where the DWT firm's conflicts arise solely from representing a client who happened

20   to be in a joint representation agreement with Ferrer.  To the contrary, the DWT firm has

21   repeatedly served as Ferrer's individual counsel, both before and after the joint

22   representation agreements were executed.

23   C.     The Privilege Waiver Arguments Are Inaccurate And Irrelevant

24          The defendants' next argument is that the disqualification motion must be denied

25   because Ferrer has waived his attorney-client privilege with DWT.  *See* CR 180 at 18-20.

26          This argument, which mirrors a similar argument made in the briefing related to the

27   HCM firm, is both inaccurate and irrelevant.  The United States incorporates by reference

28   its discussion in the HCM-related reply.  *See* CR 192 at 7-10.

D.    Disqualification Is Required Under These Facts

The defendants' last claim is that, even if the DWT firm's participation could be deemed to violate ER 1.9, the Court shouldn't order disqualification without first considering a multi-factor test that favors them.  *See* CR 180 at 20-23.

As an initial matter, the test cited by the defendants is inapplicable.  In *Alexander v. Superior Court*, 685 P.2d 1309 (Ariz. 1984), the Arizona Supreme Court clarified that this test should be applied only in circumstances where the former client never shared confidential information with counsel and where the sole basis for seeking disqualification is "the appearance of impropriety."  *Id.* at 1316-17.  Here, Ferrer has shared a wide array of confidential information with the DWT firm over a span of many years.  Thus, the disqualification rule embedded in ER 1.9—which is also reflected in the scores of disqualification cases cited in the United States' motion—is applicable.

In any event, the *Alexander* factors favor disqualification.  First, the motion was not filed for purposes of harassment.  The representation arrangements being pursued here are highly irregular, are opposed by Ferrer, have prompted disqualification in analogous federal criminal cases, and have already prompted another judge (in the *R.O.* case) to disqualify the DWT firm.  The case law affirmatively encourages prosecutors to seek disqualification in these circumstances.  The defendants' attempt to conjure a nefarious motive by pointing to asset-seizure efforts (*see* CR 180 at 21) is unavailing—the two issues are unrelated, and the asset-seizure orders were signed and approved by federal judges.

Next, the defendants' standing arguments lack merit.  This issue is addressed in the HCM-related reply, which is incorporated by reference.  *See* CR 192 at 10-11.

Finally, as for the argument that the ethical conflicts posed by the DWT firm's participation can be addressed through a limited-representation agreement that would authorize the DWT firm to eschew any trial-related responsibilities and focus only on First Amendment issues (*see* CR 180 at 22), this issue is addressed in the HCM-related reply, which is also incorporated by reference.  *See* CR 192 at 3-7.

Respectfully submitted this 13th day of June, 2018.

1

2

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

3

4

*/s Kevin Rapp*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

5

6

7

JOHN J. KUCERA
Special Assistant U.S. Attorney

8

9

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

10

11

12

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

13

## Certificate of Service

14

15

16

17

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Anne Chapman, Erin McCampbell, James Grant, Lee Stein, Paul Cambria, Robert Corn-Revere, Ronald London, Janey Henze Cook, John Littrell, Kenneth Miller, Thomas Bienart, Jr., Bruce Feder, Michael Kimerer, Rhonda Neff, KC Maxwell, David Wakukawa, Michael Piccarreta, Stephen Weiss.

18

19

*s/ Sally Hawley*
U.S. Attorney's Office

20

21

22

23

24

25

26

27

28