# Exhibit I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| UNITED STATES OF AMERICA, | CR-18-00422-PHX-SPL (BSB) |
|---|---|
| Plaintiff, | **DECLARATION OF CARL FERRER** |
| v. | |
| 1.    MICHAEL LACEY, and | |
| 2.    JAMES LARKIN, | |
| Defendants. | |

I, Carl Ferrer, declare:

1. I am the sole owner and Chief Executive Officer of Backpage.com, LLC ("Backpage.com"). I have personal knowledge of the matters set forth in this declaration and am competent to testify to them.

2. The briefs filed by counsel for Michael Lacey, James Larkin, and the other defendants in this case misrepresent my relationship with Davis Wright Tremaine LLP ("DWT") and Henze Cook Murphy PLLC ("HCM"), and the nature of the agreements I signed.

3. As an initial matter, it is incorrect that I "refused" to join the government's motion to disqualify DWT and HCM. I chose not to join the motion because I thought my participation was unnecessary.

4. I have long viewed both DWT and HCM as my personal lawyers. I am concerned that they continue to represent Messrs. Lacey and Larkin, who are now directly adverse to me. I expected that my personal lawyers would maintain allegiance and loyalty to me and not to anyone adverse to me.

- 1 -

**Henze Cook Murphy**

5. Tom Henze and Janey Henze Cook started representing me in 2012, in connection with a federal grand jury investigation in Seattle. At that time, I believed Mr. Henze and Ms. Henze Cook were serving as my personal counsel. I believed I could communicate with them and they would protect my confidences, and at all times maintain loyalty to me and protect my interests.

6. Over the past five years, Mr. Henze and Ms. Henze Cook have represented me in a variety of criminal and civil matters.

7. Mr. Henze represented me in my deposition in August 2015 in Backpage's case involving Cook County, Ill. Sheriff Tom Dart.

8. From 2012-2017, I looked to Mr. Henze as my lead personal lawyer. In October 2016, after the California charges were filed, the Clarence Dyer & Cohen firm also came in to represent me. During this time, I was also represented personally by DWT.

**Davis Wright Tremaine**

9. James Grant and his colleagues at DWT were brought on as lead counsel representing Backpage.com in the federal grand jury matter in Washington in 2012. In that role, they interviewed me about the facts in that investigation. I also understood that DWT was meeting with the prosecution in that investigation.

10. DWT has represented me, personally, in at least nine civil suits across the country, and in criminal matters in state court in California and federal court in Arizona.

11. My understanding has been that DWT represented me personally, even when they were also representing others, including Messrs. Larkin and Lacey. I believed DWT would be loyal to me and would protect my interests during and after this joint representation.

12. Over the past six years, I have worked closely with several DWT lawyers, including James Grant, Robert Corn-Revere, Andrew Lorentz, Dsu-Wei Yuen, Zana

Bugaighis, Eric Stahl, and others.

13. As part of this representation, I have had scores of phone conversations with Mr. Grant and his colleagues at DWT.

14. I have also exchanged hundreds of emails with Mr. Grant and other DWT lawyers. I never hesitated to send confidential communications seeking legal advice directly to DWT, and I did not feel the need to include other lawyers representing me on those communications.

15. I met in person at least 12 times with Mr. Grant and other DWT lawyers. We met in person in Phoenix, Dallas, Seattle, San Diego, Tucson, San Francisco, Washington, DC, Vancouver, British Columbia, and other cities. Tom Henze and Janey Henze Cook were sometimes present at those meetings, but other times, I met just with DWT.

16. During the six years they represented me, DWT's role has not been limited to providing representation relating to the First Amendment or the Communications Decency Act. In my role as CEO of Backpage.com, DWT provided legal advice concerning a range of additional legal issues, including credit card payment processing issues and cryptocurrency issues.

17. In the course of representing me in civil litigation, Mr. Grant and his colleagues at DWT drafted declarations for me to sign.

18. When they sent me draft declarations, neither Mr. Grant nor his colleagues at DWT advised me to discuss the declarations with separate counsel. Rather, Mr. Grant's practice was to direct me to sign the declarations DWT had drafted. More often than not, DWT only gave me a few hours between when they sent the draft declarations and when they needed me to return them signed.

19. Mr. Grant and his colleagues at DWT also personally represented me in the criminal case in California, starting in October 2016.

20. DWT's role in the California criminal case was not limited to First Amendment or CDA issues. It was my belief that James Grant was acting as counsel in

- 3 -

the California criminal case on behalf of all the defendants, and he interacted with the California Attorney General's Office in that matter on my behalf as well as on behalf of other defendants. I do not believe his role as counsel ended when the court ruled on the First Amendment/CDA issues.

21. Rather, Mr. Grant continued to serve as my personal counsel in that prosecution.

22. I believed DWT represented me and had a duty of loyalty to me.

**Conflict Waivers**

23. During the first several years when DWT represented me jointly with Backpage.com, Mr. Lacey and Mr. Larkin, I do not remember being advised about the scope and risks of joint representation. To the best of my recollection, I did not sign any engagement letter or advisement informing me of the risks of joint representation before I agreed to the joint representation.

24. The first engagement letter outlining the scope of DWT's joint representation of me, and Messrs. Larkin and Lacey, was signed on December 12, 2016.

25. I have reviewed the opposition brief filed by Messrs. Larkin and Lacey (Dkt. No. 180). In that brief, Larkin and Lacey assert that I gave informed written consent to DWT's joint representation of me, Mr. Larkin, and Mr. Lacey, even if we were to become adverse in a later criminal case. This is not true.

26. It was my understanding, after the signing of the joint representation agreement with DWT, that if any of the individual defendants became adverse to one another, that DWT would immediately cease representing all the previously represented individual defendants. I never agreed to waive all conflicts regarding such joint representation, and, especially, regarding criminal charges that may be brought against me in the future.

27. I did not consult with any independent lawyer before signing the joint representation letter with DWT, and no DWT attorney ever recommended that I do so.

I also do not recall ever discussing the nature of potential conflicts that may arise, or the potential impact on my interests with DWT or any other lawyer before signing this engagement letter.

28. I signed a second agreement with Mr. Lacey and Mr. Larkin on Dec. 30, 2016. This 10-page, single-spaced contract purports to manage civil, administrative or criminal actions that were pending then, or at any time in the future, including multiple state court civil matters, state criminal prosecution, attorney general criminal investigations, a federal grand jury investigation in this Court, and ongoing federal appeals.

29. That second agreement did not include DWT or any other lawyer, and DWT was not a party to that agreement. It only included me and the entities I controlled, and Messrs. Larkin and Lacey, and entities they controlled.

30. That second agreement was sent to me on Dec. 29, 2016, along with other documents, as part of a larger re-negotiation of the debt that I owed Mr. Lacey and Mr. Larkin from the sale of Backpage.com in April 2015.

31. The circumstances of that agreement were extremely stressful for me. I was a few days away from defaulting on the massive debt that I owed Mr. Larkin and Mr. Lacey as part of their sale of Backpage.com. I was having trouble making payments, and the "forbearance" that Mr. Larkin and Mr. Lacey had given me was about to run out. I felt I was about to lose the company and was facing financial ruin.

32. I remember feeling rushed and thinking that, because the document was being sent to me by Mr. Larkin's and Mr. Lacey's lawyers, I had no choice but to sign it.

33. There is a lot of verbiage in that 10-page agreement that I did not understand, but I understood that one purpose of that document was to strip me of my ability to control management of litigation that was described in the agreement.

34. I was given approximately 48 hours to review that agreement before it needed to be signed and returned to counsel for Mr. Larkin and Mr. Lacey.

35. When I signed that contract, I did not intend to waive any conflict of interest between me and my lawyers that existed at the time or could come to exist in the future, especially in a criminal case.

36. The possibility of future conflicts of interest among the parties was never discussed before I signed that agreement.

37. I never consulted with any independent attorney about this agreement. In fact, I was encouraged by Don Moon, an attorney who represented Mr. Larkin, not to discuss the agreement with my personal lawyers, because he said that doing so would be "a waste of time."

38. To the best of my recollection, I have never seen an executed version of that agreement that was signed by Mr. Larkin or Mr. Lacey.

39. Separate from those two agreements, both signed in December 2016 between me and Messrs. Larkin and Lacey, I signed a written joint defense agreement ("JDA") in June 2017, after the California prosecution was well underway and while the federal investigation in Arizona was intensifying.

40. The June 2017 JDA included a broad range of individuals who were targets and subjects of ongoing criminal investigations into Backpage. It was my understanding that this agreement was formed to allow the lawyers for the individual targets and subjects to share materials and access a shared database of Backpage.com documents.

41. It was not my understanding that, by signing the June 2017 JDA, I would be waiving any future conflicts of interest involving my own personal attorneys.

42. My understanding is that Mr. Grant, acting for DWT, expressly declined to sign the June 2017 JDA, and that DWT attorneys were never a part of that agreement.

43. My understanding of the June 2017 JDA is that it did not include any waiver of future conflicts based on ethical duties that a lawyer owed to former clients.

44. In sum, I never gave informed consent for DWT or HCM to continue representing others who are directly adverse to me in a criminal case.

- 6 -

**Privilege Waiver**

45. On April 5, 2018, I signed a Proffer/Interview Agreement. My intent in that agreement was to waive Backpage.com's corporate attorney-client privilege, not any personal privilege.

EXECUTED this __13th__ day of June, 2018.

_/s/ Carl Ferrer_
Carl Ferrer