Exhibit "A"

FILED
CLERK, U.S. DISTRICT COURT

8/1/18

CENTRAL DISTRICT OF CALIFORNIA
BY: CS _____ DEPUTY

1   Thomas H. Bienert, Jr., State Bar No. 135311
    tbienert@bmkattorneys.com
2   Kenneth M. Miller, State Bar No. 151874
    kmiller@bmkattorneys.com
3   Anthony R. Bisconti, State Bar No. 269230
    tbisconti@bmkattorneys.com
4   BIENERT, MILLER & KATZMAN, PLC
5   903 Calle Amanecer, Suite 350
    San Clemente, California 92673
6   Telephone (949) 369-3700
    Facsimile (949) 369-3701
7
8   Attorneys for James Larkin

9                IN THE UNITED STATES DISTRICT COURT

10             FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12  **In the Matter of the Seizure of:**          Case No. 2:18-cv-6742-RGK (MMAx)
                                                  18-MJ-00722
13  Any and all funds held in ███████
    ████████████ Account(s) xxxx1889,            Notice of Related Cases filed for:  18-MJ-
14  xxxx2592, xxxx1938, xxxx2912, and,           00712; 18-MJ-00713; 18-MJ-00715; 18-MJ-
    xxxx2500.                                     00716; 18-MJ-00718; 18-MJ-00719; 18-MJ-
15                                                00720; 18-MJ-00721; 18-MJ-00723; 18-MJ-
                                                  00724; 18-MJ-00751; 18-MJ-00797; 18-MJ-
16                                                00798; 18-MJ-00996; 18-MJ-00997; 18-MJ-
17                                                01427; and 18-MJ-1863

18                                                **NOTICE OF MOTION AND MOTION
                                                  TO VACATE OR MODIFY SEIZURE
19                                                WARRANTS; DECLARATIONS OF
                                                  JAMES LARKIN, MICHAEL LACEY,
20                                                JOHN BRUNST, SCOTT SPEAR,
                                                  MARGARET LARKIN, TROY LARKIN,
21                                                RAMONE LARKIN AND ANTOINETTE
22                                                THOMAS WITH EXHIBITS**

23                                                Hearing Information
24                                                Date:  August 29, 2018
                                                  Time:  1:30 p.m.
25                                                Place:
26                                                        255 E. Temple Street, 7th Fl.
27                                                        Los Angeles, CA 90012
28

─────────────────────────────────────────────
                        1

**TO THE COURT AND ALL PARTIES ENTITLED TO NOTICE:**

**PLEASE TAKE NOTICE** that on August 28, 2018 at 1:30 p.m., or as soon thereafter as counsel may be heard, claimant James Larkin will bring on for hearing the following motion to vacate and/or modify the seizure pursuant to Amended Seizure Warrant 18-MJ-00722 on the grounds that seizure violates his rights under the First, Fourth and Fifth Amendments to the United States Constitution. This motion is based upon this Notice, the attached Memorandum of Points and Authorities, the attached declarations and exhibits, and this Court's entire file.

Mr. Larkin has concurrently filed a Notice of Related Cases pursuant to Local Rule 83-1.3.2 identifying all related civil forfeiture actions of which he is aware, including case numbers: 18-MJ-00712; 18-MJ-00713; 18-MJ-00715; 18-MJ-00716; 18-MJ-00718; 18-MJ-00719; 18-MJ-00720; 18-MJ-00721; 18-MJ-00723; 18-MJ-00724; 18-MJ-00751; 18-MJ-00797; 18-MJ-00798; 18-MJ-00996; 18-MJ-00997; 18-MJ-1427; and, 18-MJ-1863. Mr. Larkin submits that all these actions should be consolidated and resolved in a single forum because the seizures are based on substantially the same facts, as are the arguments for vacating them.[1]

Dated: July 31, 2018                BIENERT, MILLER & KATZMAN, PLC

By: /s/ Thomas H. Bienert
Thomas H. Bienert
Kenneth M. Miller
Anthony R. Bisconti
Attorneys for James Larkin

---

[1] Local Rule 7-3 does not apply "in connection . . . with applications for temporary restraining orders or preliminary injunctions. . . ." "[A] pretrial order restraining assets . . . is a preliminary injunction for procedural purposes . . . ." *United States v. Roth*, 912 F.2d 1131, 1133 (9th Cir. 1990). Because this motion is in connection with a preliminary injunction, Local Rule 7-3 does not apply.

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................... 1

II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ....................... 3

      A.   Nature and Extent of Seizures ................................................. 3

            1.    Seizures Related to Carl Ferrer, Backpage.com LLC and
                  Affiliates........................................................................... 4

            2.    Seizures Directly from Claimant/Defendants ....................... 5

      B.   Rationale for the Civil Seizure Warrants Issued by This Court.................. 11

      C.   Publishing Activities and First Amendment Rulings........................ 12

III.  ARGUMENT................................................................................ 13

      A.   The Seizure of Assets Arising From the Operation of Backpage.com
           Violates the First Amendment and Must be Vacated ................... 13

            1.    The First Amendment Prohibits Pre-Conviction Seizures of
                  Publishing Assets ......................................................... 13

            2.    The First Amendment Prohibits Pre-Conviction Seizures of
                  Publishing Proceeds ....................................................... 15

      B.   Even if Seizure of Publishing-Related Assets or Proceeds Could be
           Justified, the Procedures Employed Here Were Constitutionally
           Deficient .................................................................................... 18

      C.   The Government's Probable Cause Showing Was Defective and Any
           Hearing on the Validity of the Seizures Will Require the Government
           to Satisfy a Heightened Burden of Proof ...................................... 20

            1.    The Versoza Affidavits Do Not Even Establish Probable Cause
                  that Claimant/Defendants Committed Any Crimes ............... 21

            2.    The Versoza Affidavits Omit Reference to Controlling Case
                  Law................................................................................ 22

            3.    The Versoza Affidavits Contain False and Misleading
                  Statements ..................................................................... 25

      D.   Any Hearing on the Validity of Seizures of Proceeds From Publishing
           Must Satisfy Both Fourth and First Amendment Requirements................. 29

            1.    The Government Must Link Any Seized Assets to Specific
                  Evidence of Illegal Activity on the Part of Claimant/Defendants ...... 30

            2.    The Government Must Support Any Seizure With More Than
                  the "Judgment" of a Law Enforcement Officer ................... 34

i

E.    Assuming, Arguendo, any Pre-trial Seizure Is Appropriate, these
      Seizures Are Overinclusive and Must Be Vacated ......................................... 36

      1.    By Seizing Virtually All of Claimants/Defendants' Assets, the
            Government Improperly Reached Assets That Have Nothing To
            Do With Backpage ............................................................................. 37

      2.    Non-Backpage Assets Cannot Be Seized Merely Because They
            Were Commingled With Backpage Assets ......................................... 38

      3.    The Government Has Improperly Seized Backpage Proceeds
            that are Clearly Not Criminal Proceeds ............................................. 40

IV.   THE SEIZURES VIOLATE CLAIMANT/DEFENDANTS' SIXTH
      AMENDMENT RIGHT TO COUNSEL ................................................................ 40

V.    CONCLUSION ............................................................................................................ 41

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

Page(s)

Cases

*Adult Video Ass'n. v. Barr*,
   960 F.2d 781 (9th Cir. 1992) ................................................................15, 17

*Adult Video Ass'n. v. Reno*,
   41 F.3d 503 (9th Cir. 1994) .........................................................................15

*American Library Ass'n. v. Barr*,
   956 F.2d 1178 (D.C. Cir. 1992)...................................................................17

*American Library Ass'n. v. Thornburgh*,
   713 F. Supp. 469 (D.D.C. 1989)..................................................................17

*Ashcroft v. Free Speech Coalition*,
   535 U.S. 234 (2002) .....................................................................................32

*Backpage.com, LLC v. Cooper*,
   939 F. Supp. 2d. 805 (D. Tenn. 2013).........................................................23

*Backpage.com, LLC v. Hoffman*,
   2013 WL 4502097 (D.N.J. 2013).................................................................23

*Backpage.com, LLC v. Lynch*,
   216 F. Supp. 3d 96 (D.D.C. 2016)...............................................................33

*Backpage.com, LLC v. McKenna*,
   881 F. Supp. 2d 1262 (W.D. Wash. 2012) ..................................................25

*Bantam Books, Inc. v. Sullivan*,
   372 U.S. 58 (1963) .......................................................................................19

*Bd. of Trustees v. State Univ. of N.J. v. Fox*,
   492 U.S. 469 (1989) .....................................................................................32

*Blount v. Rizzi*,
   400 U.S. 410 (1971) ...............................................................................19, 20

*Bright v. Firestone Tire & Rubber Co.*,

1     756 F.2d 193 (6th Cir. 1984 .......................................................................25

2    *Center for Democracy & Tech. v. Pappert*,

3     337 F. Supp. 2d 6067 (E.D. Pa. 2004 ........................................14, 15, 37

4    *Citizens United v. FEC*,

5     558 U.S. 310 (2010) ...............................................................................16

6    *Cohen v. Bd. of Supervisors*,

7     707 P.2d 840 (Cal. 1985).........................................................................23

8    *United States v. Crozier*,

9     777 F.2d 1376 (9th Cir. 1985) ................................................................21

10   *Curran v. Price*,

11    638 A.2d 93 (Md. 1994) ..........................................................................18

12   *Dart v. Craigslist, Inc.*,

13    665 F. Supp. 2d 961 (N.D. Ill. 2009)......................................................25

14   *Backpage.com, LLC v. Dart*,

15    807 F.3d 229 (7th Cir. 2015) .......................................................10, 24, 40

16   *Doe No. 1 v. Backpage.com, LLC*,

17    817 F.3d 12 (1st Cir. 2016) ...............................................................23, 24

18   *Elonis v. United States*,

19    135 S. Ct. 2001 (2015)............................................................................33

20   *Fort Wayne Books v. Indiana*,

21    489 U.S. 46 (1989) ...........................................................................passim

22   *Franks v. Delaware*,

23    438 U.S. 154 (1978) ................................................................................22

24   *Freedman v. Maryland*,

25    380 U.S. 51 (1965) ............................................................................19, 20

26   *In re Opinion of the Justices to the Senate*,

27    764 N.E.2d 343 (Mass. 2002)..................................................................18

28   *Keenan v. Superior Court of Los Angeles County*,

40 P.3d 718  (Cal. 2002)......................................................................................18

*Lee Art Theatre, Inc.*,

    392 U.S. ............................................................................................................37

*Luis v. United States*,

    136 S. Ct. 1083 (2016)......................................................................................43

*M.A. v. Village Voice Media Holdings, LLC*,

    809 F. Supp. 2d 1041 (E.D. Mo. 2011) ...........................................................23

*Marcus v. Search Warrant*,

    376 U.S. 717 (1961) ...................................................................................31, 37

*Matal v. Tam*,

    137 S. Ct. 1744 (2017)......................................................................................16

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r. of Revenue*,

    460 U.S. 575 (1983) .........................................................................................16

*Mishkin v. New York*,

    383 U.S. 502 (1966) .........................................................................................33

*Morrison v. Nat'l Australia Bank Ltd.*,

    561 U.S. 247 (2010) .........................................................................................43

*Pearce v. E.F. Hutton Grp., Inc.*,

    653 F. Supp. 810 (D.D.C. 1987)......................................................................25

*People v. Ferrer*,

    2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016)....................13, 23

*Quantity of Books v. Kansas*,

    378 U.S. 205 (1964) .........................................................................................31

*Roaden v. Kentucky*,

    413 U.S. 496 (1973) .............................................................................32, 35, 37

*Seres v. Lerner*,

    102 P.2d 91 (Nevada 2004) ..............................................................................18

*Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.*,

502 U.S. 105 (1991) ...................................................................................... 17

*Smith v. California*,

361 U.S. 147 (1959) ..................................................................................32, 33

*Southeastern Promotions, Ltd. v. Conrad*,

420 U.S. 546 (1975) ...................................................................................... 19

*Spokane Arcades, Inc. v. Brockett*,

631 F.2d 135 (9th Cir. 1980) ........................................................................ 16

*Stanford v. State of Texas*,

379 U.S. 476 (1965) ...............................................................14, 31, 36, 37

*State ex rel. Napolitano v. Gravano*,

60 P.3d 246 (Arizona App. 2002) ................................................................. 18

*U.S. v. Thirty-Seven Photographs*,

402 U.S. 363 (1971) ...................................................................................... 20

*United States v. $3,148,884.40 U.S. Currency (Seized From Accounts of Bital)*,

76 F. Supp. 2d 1063 (C.D. Cal. 1999)........................................................... 42

*United States v. $52,100 in U.S. Currency*,

No. 17-CV-2002-BAS-JMA, 2018 WL 1782934 (S.D. Cal. Apr. 13, 2018) ................ 21

*United States v. All Monies ($477,048.62) In Account No. 90-3617-3, Israel Disc. Bank,
New York, N.Y.*,

754 F. Supp. 1467 (D. Haw. 1991)................................................................. 41

*United States v. Approximately Six Hundred & Twenty Thousand Three Hundred &
Forty-Nine Dollars & Eighty-F*ive Cents, No. 13 CV 3966 RJD SMG,

2015 WL 3604044 (E.D.N.Y. June 5, 2015)................................................... 41

*United States v. California Publishers Liquidating Corp.*,

778 F. Supp. 1377 (N.D. Texas 1991)........................................................... 35

*United States v. Christakis*,

238 F.3d 1164 (9th Cir. 2001) ...................................................................... 22

*United States v. Contents in Account No. 059-644190-69*,

TABLE OF CONTENTS

253 F. Supp. 2d 789 (D. Vt. 2003) ........................................................................41, 42

*United States v. DeLeon,*

  979 F.2d 761 (9th Cir. 1992) ...............................................................................22

*United States v. Hall,*

  113 F.3d 157 (9th Cir. 1997) ...............................................................................22

*United States v. National Treasury Employees Union,*

  513 U.S. 454 (1995) ............................................................................................16

*United States v. One 1987 Mercedes Benz, 190E VIN: WDBDA28D*XHF373152,

  No. 90 C 3484, 1992 WL 198441 (N.D. Ill. Aug. 11, 1992) ..........................22

*United States v. Playboy Entertainment Group, Inc.,*

  529 U.S. 803 (2000) ......................................................................................16, 32

*United States v. Roth,*

  912 F.2d 1131 (9th Cir. 1990) ...............................................................................1

*United States v. Treatman,*

  408 F.Supp. 944 (C.D. Cal. 1976)........................................................................20

*Vance v. Universal Amusement Co., Inc.,*

  445 U.S. 308 (1980) ............................................................................................15


Statutes

18 U.S.C. § 371 .............................................................................................................1, 9

18 U.S.C. § 981(a)(1)(A) .........................................................................................41, 42

18 U.S.C. § 981(a)(1)(C) ................................................................................................10

18 U.S.C. § 982(a)(1)......................................................................................................10

18 U.S.C. § 984 ...............................................................................................................42

18 U.S.C. § 1591 ........................................................................................6, 23, 33, 34

18 U.S.C. § 1952 ..............................................................................................................6

18 U.S.C. § 1952(a) .....................................................................................................1, 9

18 U.S.C. § 1952(b)(2)....................................................................................................43

18 U.S.C. § 1963(d) ......................................................................................... 17

18 U.S.C. § 2421(A) ......................................................................................... 34

18 U.S.C. §§ 1956 and 1957 .......................................................................passim

18 U.S.C. §§ 1956(c)(7)(A) and 1961(1) .......................................................... 10

28 U.S.C. § 2461(c) .......................................................................................... 10

47 U.S.C. § 230(c)(1) ........................................................................................ 23

Cal. Penal Code § 647(b)(1) ............................................................................. 33

TABLE OF CONTENTS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Michael Lacey, James Larkin, Scott Spear, John Brunst, Dan Hyer, Andrew Padilla and Joye Vaught are named in an indictment from the District of Arizona alleging conspiracy to violate the Travel Act (18 U.S.C. § 371), facilitation of prostitution in violation of the Travel Act (18 U.S.C. § 1952(a)), conspiracy to commit money laundering, concealment money laundering, international promotional money laundering, transactional money laundering (18 U.S.C. §§ 1956 and 1957), and two (2) forfeiture counts.  The government has also obtained *at least* nineteen separate civil seizure warrants in the Central District of California (the "Seizures") for substantially all assets belonging to Claimant/Defendants Lacey, Larkin, Spear, and Brunst (the "Shareholder Defendants"), as well as assets belonging to their family members.  Because the Seizures arise from the same facts and are subject to the same defenses,[2] Larkin requests that challenges to the Seizures be resolved in a single proceeding.    Accordingly, Larkin expects that other Claimants/Defendants (and their family members where appropriate) will join this motion, in whole or in part, assuming this Court consolidates the challenges to the Seizures.

The criminal allegations against Claimant/Defendants stem from their involvement with "Backpage.com" (or simply "Backpage"), which was an on-line publisher of third-party advertisements until the government silenced it.   On March 28, 2018, the government sought and obtained civil seizure warrants in this Court for most of the accounts and domain names identified in a criminal indictment brought the same day against Claimant/Defendants in the District of Arizona.  In addition to the criminal charges, the indictment seeks to forfeit bank accounts, real property and domain names.  On April 6, 2018, the day the government revealed the criminal indictment to the Claimant/Defendants, it (i) executed the civil seizure warrants, arrested Claimant/Defendants, searched the homes and properties of Claimant/Defendants Lacey and Larkin and seized anything of value law

---

[2] *See* Notice of Related Cases and Request for Judicial Notice filed concurrently herewith.

enforcement could find, and (ii) executed United States Postal Service ("USPS") administrative seizure warrants on many of the properties subject to the civil seizure warrants and additional assets as well. On April 26, 2018, the government instituted a third wave of civil seizure warrants.

The government's efforts continue to this day. Backpage's owner and CEO has pled guilty, begun cooperating with the government, and agreed to forfeit his and Backpage's interest in millions of dollars worth of assets. Claimant/Defendants are still regularly receiving notices from the government and elsewhere of additional seizures. For example, on June 11, 2018, Larkin received notice in an email from his financial service provider (not the government) that an account containing over ▮▮▮▮▮ of his family's trust funds had a new owner: the "United States Marshal Service." On July 25, 2018, the government filed a superseding indictment in the District of Arizona that sought the criminal forfeiture of virtually all assets that had previously been seized civilly, plus additional accounts and real property. On July 27, 2018, Claimant/Defendants learned that the government had seized an account set up to receive moneys from the sale of their print media companies (not revenues from Backpage).

The government engaged in this nation-wide "takedown" of Backpage and virtually all of Claimant's/Defendants' assets, despite a long history of court decisions upholding Backpage's right to publish under the First Amendment, contrary to the government's theory of the case. The government did this by omitting material facts from its seizure warrant applications and blatantly mischaracterizing other evidence. The Seizures are an exercise in massive overkill, in which the government took preemptive steps not just to shutter a website but to use overlapping and redundant procedures to seize and tie up all Claimant/Defendants' assets and deprive them of any ability to mount an effective defense to pending criminal charges, as well as civil litigation across the country.[3] The

---

[3] Claimant/Defendants currently face no fewer than three separate trials from the same basic allegations: (1) a federal criminal trial in the District of Arizona; (2) a state criminal trial in Sacramento, California; and (3) a civil forfeiture trial or trials in the Central District of California.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

government's actions violate not just Claimant/Defendants' First, Fourth and Fifth Amendment rights, but their Sixth Amendment rights as well. As set forth below, the seizures suffer from fundamental common flaws that require that they be vacated:

*First*, the Seizures are void because they are predicated on the erroneous premise that the government may seize the assets or proceeds of a publishing enterprise before trial based on a showing of probable cause regarding illegal activity. *Second*, if the Court does not immediately vacate the Seizures, Claimant/Defendants are entitled to a prompt hearing on the validity of the Seizures, in which the government must satisfy a heightened burden of proof in which a showing of probable cause is inadequate and a law enforcement officer's broad pronouncements about the illegality of a website or the content on it will not suffice. *Third*, even without regard to the First and Fourth Amendments, the Seizures are markedly over-inclusive in violation of Claimant/Defendants' Fifth and Sixth Amendment rights. For all these reasons, the seizure warrants must be vacated, and Claimant/Defendants' property returned promptly.

## II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.   Nature and Extent of Seizures

Immediately after the government started arresting the Claimant/Defendants, with great fanfare, the United States government announced it had seized and closed the Backpage website, on which it posted this notice:



MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

As this was happening, and in some instances even before, the government instigated waves of *ex parte* asset seizures using various procedural tools with a goal of tying up or freezing all Claimant/Defendants' assets, asserting they were the proceeds of illegal activities associated with Backpage. Sorting out what assets initially were seized, what procedures the government had employed to effect the seizures, and what justifications it advanced to support the seizures of publishing infrastructure and assets took months. Claimants/Defendants do not believe the government has fully disclosed its past seizures, and the government continues to effect new seizures.

### 1. Seizures Related to Carl Ferrer, Backpage.com LLC and Affiliates

On April 5, 2018, Backpage.com's former owner and CEO, Carl Ferrer, pled guilty in the District of Arizona to one count of conspiracy to launder money and violate the Travel Act. *See* D. AZ. CR-18-464-PHX-DJH, Doc. No. 7. He also caused Backpage.com, LLC and certain affiliates to plead guilty to one count of money laundering. *See* D. AZ. CR-18-465-PHX-DJH, Doc. No. 8. On April 6, 2018, the government seized and shut down Backpage.[4] The government has aggressively sought assets of Ferrer, Backpage.com, LLC and affiliates, both before and after their "takedown" and guilty pleas.

Ferrer stipulated to forfeiting his interest in at least $2,596,481 worth of assets and Backpage's interest in at least $65,545,123 worth of assets. Exs. 6 & 7.[5] Ferrer also agreed to forfeit his and Backpage's interest in 264 separate domain names. Ex. 7. The government's actions obviously preclude Backpage and its affiliates from publishing

---

[4] Claimant/Defendants do not know whether the government executed the seizure warrant it obtained for the Backpage.com domain to take down the site, or whether Carl Ferrer simply shuttered Backpage in response to government pressure. Regardless, as noted above, several law enforcement agencies have taken credit for "seizing" Backpage. *See also Daily Journal*, "New Central District US Attorney Outlines Priorities" (May 10, 2018) ("Hanna said the LA office's asset forfeiture section played a critical role in the recent takedown of Backpage.com . . . .").

[5] Unless otherwise specifically noted, all exhibit references are to the Declaration of Anttoinette Thomas filed concurrently herewith.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

*anything.* The government is also attempting to forfeit any interest Claimant/Defendants may have in these same assets administratively—without judicial oversight.[6]

The government has also sought the forfeiture of additional assets in which Backpage and/or Ferrer had an interest.  Pursuant to a March 2018 civil seizure warrant, the government seized thirty-five (35) Backpage-related domain names and the funds held in an IOLTA account[7] for the benefit of ███████ containing an unknown amount of money.[8]   The Arizona indictment in which Claimant/Defendants are charged seeks forfeiture of these same assets.  And administrative seizure warrants issued by the United States Postal Service ("USPS Administrative Seizure Warrants") reached additional assets in which Backpage.com, LLC or its affiliates appear to have an interest, including: $106,981 from ███████; $499,910 from ███████; $248,970 from ███████; $50,000 from ███████; and, $148,221 in digital currency.

### 2.   Seizures Directly from Claimant/Defendants

Through waves of forfeiture proceedings, the government has seized assets from Claimant/Defendants and their families worth approximately: ███████ from Lacey; ███████ from Larkin; ███████ from Brunst; and ███████ from Spear.[9]  Ex. 8-001, 8-004, 8-005, and 8-006.[10]  The government's procedures are described in more detail below.  In short, the government purports to trace Backpage's publishing proceeds to all seized accounts, so all the seizures implicate the First Amendment.

---

[6] Claimant/Defendants are entitled to the advancement of defense costs and to indemnification from Backpage.com, LLC, its affiliates, and Ferrer.  An entity owned by Claimant/Defendants also has a security interest in the assets of Backpage.com, LLC and its affiliates, arising from the sale of Backpage to companies owned by Ferrer.  Because of the government's tactics, Claimant/Defendants and entities they control were forced to file Petitions in the District of Arizona, as well as administrative claims, asserting their interests in those assets.

[7] IOLTA stands for "interest on lawyer trust account." Presumably this was a lawyer's trust account.

[8] Additionally, the government seized one (1) account in the name of ███████ (who worked for Backpage.com, LLC and/or an affiliate), containing an unknown amount of money.

[9] The government also seized about ███████ from defendant Hyer, who is not joining this challenge.

[10] Larkin has separately filed a request for a judicial notice of the files for each of these cases.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

### a. Central District of California Civil Seizure Warrants

### i. March 2018 Seizure Warrants

On March 28, 2018, the government obtained at least thirteen (13) separate civil seizure warrants in the Central District of California for twenty-three separate domestic accounts, one safety deposit box and 35 separate domain names.[11]  In almost identical affidavits offered in support of the warrants, U.S. Postal Inspector Lyndon A. Versoza[12] swore that he believed most ads on the Backpage.com website related to prostitution in violation of California law, and sex trafficking in violation of 18 U.S.C. § 1591, and that Claimant/Defendants intended to facilitate those crimes in violation of the Travel Act, 18 U.S.C. § 1952.  Further, because those crimes are specified unlawful activities (or, "SUAs"), financial transactions with their proceeds allegedly violate federal money laundering laws, 18 U.S.C. §§ 1956 and 1957.  Versoza Aff. ¶¶13-18.  Based on these representations, the March 2018 seizure warrants were signed by the Honorable Patrick J. Walsh, United States Magistrate Judge.

Pursuant to these warrants, the government seized:

- Two accounts belonging to Lacey with a combined balance of at least ██████;

- Three accounts belonging to Larkin with a combined balance of about ████████[13] (and two additional accounts belonging to his sons with a combined balance of about ██████);

- Four accounts in Spear's name with a combined balance of at least ████████, two accounts in the name of ██████████ with a combined balance of about ████████, and one account in the name of Scott Spear and ██████████ with about ██████;

---

[11]  *See* case numbers 18-MJ-00711, 18-MJ-00712, 18-MJ-00713, 18-MJ-00715, 18-MJ-00716. Claimant/Defendants believe there have been additional warrants and seizures but have been unable to obtain any substantiating information from the government.

[12] *See* Ex. 1 (Versoza Affidavit).

[13] This included the seizure of ██████████ from account xxxx1938 at ██████████████. That money is unrelated to Backpage.com, as it is proceeds from the sale of print-media companies and the affidavit in support of the warrant to seize those funds gives no justification for the seizure of those funds. *See infra* at 10-11.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

- One account in the name of Brunst with about ▮▮▮▮▮;

- One account of Cereus Properties, LLC, a subsidiary of an entity owned by the Shareholder Defendants that collected the loan payments from the 2015 sale of Backpage to entities controlled by Ferrer, containing about ▮▮▮▮▮; and,

### ii.    April 2018 Seizure Warrants

On April 4, 2018, the government obtained another seizure warrant from Judge Walsh for seven (7) separate brokerage accounts in the name of the Brunst Family Trust, which had a combined balance of at least ▮▮▮▮▮ at the time of their seizure.[14]  Ex. 8-005.  The seizure warrant was again obtained with an affidavit from Inspector Versoza.  The probable cause portion of the affidavit was almost identical to his March 28 affidavit.

On April 9, 2018, the government obtained two more civil seizure warrants from Judge Walsh.  One was for a brokerage account in the name of Claimant Margaret Larkin (Claimant/Defendant Larkin's wife) which contained about ▮▮▮▮▮.  *Id.*  And another was for an account in the name of the Scott Spear and ▮▮▮▮▮ Family Trust, with a balance of about ▮▮▮▮▮.[15]  *Id.*  Both were obtained with affidavits by Inspector Versoza that contained probable cause allegations similar to those in the March 28 affidavits.

On April 26, 2018, the government sought and obtained an additional five (5) civil seizure warrants from the Honorable John E. McDermott, United States Magistrate Judge.  Again, they were based on a Versoza affidavit with similar probable cause allegations to the original March 28 affidavit.  Pursuant to these warrants,[16] the government seized:

- Six domestic accounts in the name of Lacey, containing about ▮▮▮▮▮ at the time of their seizure and one overseas account containing about ▮▮▮▮▮ at the time of seizure (Ex. 8-001);

- Three domestic accounts in the name of Larkin, containing about ▮▮▮▮▮ at the time of the seizure (Ex. 8-002); and,

---

[14] *See* case number 18-MJ-00798.

[15] *See* case numbers 18-MJ-00797 and 18-MJ-00718.

[16] *See* case numbers 18-MJ-00996, 18-MJ-00997, 18-MJ-00998, 18-MJ-00999, and 18-MJ-01001.  The government has not disclosed any information on 18-MJ-01000.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

- Eighteen separate foreign accounts controlled by Ferrer, Backpage.com, LLC, or its affiliates containing at least ▮▮▮▮▮▮ at the time of their seizure (Ex. 8-007-008; *see also* Exs. 6 & 7).

### iii.   June 2018 Seizure Warrant

On June 4, 2018, the government seized ▮▮▮▮▮▮ from a family trust account owned by Claimant/Defendant Larkin pursuant to a seizure warrant signed by the Honorable Jean P. Rosenbluth, United States Magistrate Judge.  The financial institution provided Mr. Larkin with a copy of the seizure warrant, but not the underlying affidavit. (The government gave no notice of the seizure whatsoever.)

### iv.   July 2018 Seizure Warrant

On July 27, Claimant/Defendants learned that the government has seized another account of ▮▮▮▮▮▮, account number xx4862.  This account received loan payments from the sale of Claimant's/Defendants' print media businesses.  The funds in the account are unrelated to Backpage.   Claimant/Defendants suspect the government has obtained other civil seizure warrants of which they have no notice.[17]

The civil seizures identified above brought the total amount of civil seizures (of which Claimant/Defendants are aware) to at least ▮▮▮▮▮, including

- ▮▮▮▮▮ from Claimant/Defendant Lacey and his family;
- ▮▮▮▮▮ from Claimant/Defendant Larkin and his family;
- ▮▮▮▮▮ from Claimant/Defendant Brunst and his family;
- ▮▮▮▮▮ from Claimant/Defendant Spear and his family; and
- ▮▮▮▮ from Cereus Properties, LLC.

*See* Ex. 8-001-007.

---

[17] Claimant/Defendants Larkin and Brunst have accounts to which they have been denied access, but for which they have not been formally or officially apprised of any seizure.  For example, the balance of Mr. Larkin's IRA account at ▮▮▮▮▮▮▮ went from about ▮▮▮▮ to ▮▮ with no notice of seizure or an explanation of how or why.  Presumably the government was involved.

### b.   Criminal Forfeiture Allegations in the Original District-of-Arizona Indictment

As stated above, Claimant/Defendants were named in an indictment filed March 28, 2018 in the District of Arizona, which contained two forfeiture counts.  *United States v. Lacey, et al.*, D.C. AZ. No. CR-18-00422-PHX-SPL (Doc. No. 3) at ¶¶ 157-171.  Almost all assets listed in the criminal forfeiture counts were already seized pursuant to the March 28 civil seizure warrants described above.[18]

The government's legal theory behind the criminal forfeiture allegations is similar to its theory behind the civil seizure warrants discussed above:  Claimant/Defendants supposedly violated the Travel Act by promoting prostitution through the publication of adult advertisements on Backpage, and all funds traceable to Travel Act violations are forfeitable under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).  Further, the alleged Travel Act violations are SUAs under the federal money laundering statutes.  *See* 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).  So financial transactions involving proceeds from these crimes allegedly violated federal money laundering statutes, 18 U.S.C. §§ 1956 and 1957.  Doc. 3 at 54 of 61.  Further, all funds traceable to violations of the money laundering statutes are forfeitable under 18 U.S.C. § 982(a)(1).  The linchpin of both of the government's criminal forfeiture theories is that Claimant/Defendants promoted prostitution through the publication of adult ads on Backpage.

### c.   USPS Administrative Warrants

Beginning on or about April 6, 2018, and continuing through at least May 2018, the USPS effected several *administrative* seizures.  These administrative seizures purport to reach about ▮▮▮▮▮ of assets from the Claimant/Defendants, including:

- ▮▮▮▮▮ from Lacey;
- ▮▮▮▮▮▮ from Larkin;

---

[18] In addition to the assets the government seized with the March 28 seizure warrants, the government also sought $▮▮▮▮▮ worth of real estate from Lacey and ▮▮▮▮▮ of real estate from Larkin.

1          •   ▮▮▮▮▮ from Brunst; and,

2          •   ▮▮▮▮▮ from Spear.

3   Ex. 8-001-007.  Unlike the civil and criminal seizures described above, the government is

4   trying to forfeit these assets "administratively" without any judicial oversight.  The bases

5   for these seizures is unclear as the government has not disclosed any supporting authority.

6                  **d.      Seizures Under Search Warrants after Government Raids**

7          On April 6, 2018, the government executed search warrants at properties owned by

8   Claimant/Defendants Lacey and Larkin.  The warrants authorized agents to seize, among

9   other things:

10          "Evidence of wealth, assets, and real estate obtained from the illicit activity"; and,

11          "Any property or proceeds resulting from money laundering. . . . to include
12          computers, currencies, coins, precious metals, artwork, jewelry, home furnishings
13          and vehicles."

14   Ex. 16.  Because the government's view is that all proceeds from Backpage.com are from

15   illicit activities, the warrants authorized the law enforcement officers to seize anything of

16   value that they found.  The agents did just that.  The government seized cars, cash, jewelry,

17   art work, computers, collectable coins and numerous other items.

18                  **e.      Criminal Forfeiture Allegations in Superseding Indictment**

19          The government's forfeiture efforts are continuing.  On July 25, the government filed

20   a superseding indictment in the District of Arizona.  The superseding indictment added

21   some counts, but its basic theory of liability is the same as the original indictment described

22   above.  The superseding indictment also added numerous forfeiture allegations.  While the

23   vast majority seek the forfeiture of items the government has already seized through other

24   means, it added 66 additional accounts and 16 pieces of real property that were not

25   previously subject to seizure.  These include houses that Claimant/Defendants purchased

26   before Backpage ever existed.[19]

27   _____

28   [19] About ▮▮▮▮▮ of these assets are also sought through the government's civil and criminal seizures.

10

### f. Additional Funds Frozen Because of Government Seizures

Mr. Larkin's wife (Claimant Margaret Larkin) was recently informed by ███████ ████████ that her six accounts would be closed, without a coherent explanation. These accounts relate to her separate business and have nothing to do with Backpage. In some cases, the government is informing attorneys that it intends to seize funds they have on retainer.

### B. Rationale for the Civil Seizure Warrants Issued by This Court

The underlying premise for all the Seizures flows from the same claim, that most ads on Backpage promote the violation of California laws against prostitution (in violation of the Travel Act) and/or violate federal law against human trafficking. Absent those assumptions, there is no predicate offense for purpose of the Travel Act allegations and no SUA under federal money laundering laws. In support of the warrants, Inspector Versoza, averred that he believed most ads on Backpage related to illegal activity based on (1) his visiting the site and posing as an advertising purchaser, Versoza Aff. ¶ 25; (2) reviewing ads on Backpage.com as well as the records of a few cases, *id*. ¶ 28; (3) reviewing documents from various governmental agencies and authorities, including a 2010 letter from state attorney's general demanding that Backpage.com stop accepting ads in the adult category, *id*. ¶ 29a; a Senate subcommittee report, *id*. ¶ 29c; a letter from the mayor of Seattle, *id*. ¶ 29d; (4) reviewing certain internal emails of Backpage personnel, *id*. ¶ 30; (5) "conversations with law enforcement officers around the country, *id*. ¶ 32; and (6) his "training and experience" suggesting that words appearing in ads were "consistent with sex trafficking." *Id*. ¶ 31a.

Inspector Versoza's Affidavit included no analysis of applicable law, including the numerous reported court decisions that considered and rejected identical allegations against Backpage's operations under applicable constitutional and statutory principles. Versoza's Affidavits do not mention that, in actions recently brought by the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

government's "partners" at the California Department of Justice,[20] the California courts had twice rejected the specific theory on which these seizures are based and dismissed charges that the operations of Backpage.com violated California law prohibiting prostitution. *See People v. Ferrer*, 2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016) ("*Ferrer I*"); *People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cty. Aug. 23, 2017) ("*Ferrer II*"). The Affidavits also contain numerous other misstatements and material omissions. For example, the Affidavits cherry-pick selected phrases in emails among various Backpage personnel to try to support the government's allegations, while omitting or distorting adjacent statements in the emails that directly contradict the government's theories. The legal sufficiency of the Affidavits is addressed below.

### C. Publishing Activities and First Amendment Rulings

Nearly all the assets the government seized in this case were derived from Claimant's/Defendants' activities as publishers. Those assets include assets earned from decades in the newspaper publishing before Backpage was created, as well as assets related to Backpage that are presumptively protected by the First Amendment. As explained below, those assets are not constitutionally subject to pre-conviction seizures. Inspector Versoza's averments of probable cause fall far short of the type of showing required to support seizures of assets related either to Backpage or non-Backpage assets.

---

[20] U.S. Department of Justice Press Release, April 9, 2018 ("Last Friday, the Department of Justice seized Backpage . . . I want to thank . . . our partners with the Texas and California Attorney Generals' offices. *** The effort to seize Backpage was led by the Justice Department[] . . . with significant support from . . . the office of the California Attorney General . . ."); State of California Department of Justice Press Release, April 9, 2018 ("Today, California Attorney General Xavier Becerra announced that the world's largest online brothel, Backpage.com, and affiliated websites have been seized and shut down. The website's closure follows a joint law enforcement effort involving the California Department of Justice (CA DOJ), United States Attorney's Office for the District of Arizona" and others.)

# III.   ARGUMENT

## A.   The Seizure of Assets Arising From the Operation of Backpage.com Violates the First Amendment and Must be Vacated

### 1.   The First Amendment Prohibits Pre-Conviction Seizures of Publishing Assets

The wholesale seizure of assets and property in this case is invalid regardless of whether the property constituted proceeds from Backpage or came from non-Backpage sources. For more than five decades, the Supreme Court has held repeatedly that any seizure or pretrial forfeiture of expressive materials and related assets requires "special protection," contrary to the general presumption that "any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause." *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989); *see also Stanford v. State of Texas*, 379 U.S. 476, 486 (1965) ("The point is that it was not any contraband of that kind which was ordered to be seized, but literary material."). In *Fort Wayne Books*, the Supreme Court invalidated a section of the Indiana RICO law that authorized the pretrial seizure of assets "subject to forfeiture" upon a showing of probable cause, which included all "property, real and personal, that 'was used in the course of, intended for use in the course of, derived from, or realized through' . . . racketeering activity." 489 U.S. at 51. The essential rationale underlying the seizure warrants the government obtained is constitutionally infirm.

In *Fort Wayne Books* the government obtained a forfeiture order based on a showing of probable cause, and the sheriff seized the real estate, publications, and other personal property of the defendants, padlocking three adult bookstores and hauling away their contents. *Id*. at 52. The Court held that the seizure violated the First Amendment because "[t]he remedy of forfeiture is not intended to restrain the future distribution of presumptively protected speech." *Id*.[21] The Supreme Court held the forfeiture order was

---

[21] This First Amendment rule cannot be circumvented by using "semantic device[s]." 489 U.S. at 65. Thus, it's immaterial whether the government attempts to sanitize the forfeiture by invoking some neutral sounding law. Regardless of whether it describes the underlying offense as violating the Travel Act or money laundering, any preemptive restriction on publishing activities is subject to strict First Amendment

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

1   unconstitutional even though the defendants in that case had 39 prior convictions for

2   violating the state's obscenity laws as predicate offenses and even if the materials subject

3   to seizure were themselves obscene.  Despite the fact the materials at issue could be

4   forfeitable *upon conviction*, the Court held "the seizure at issue here is unconstitutional."

5   489 U.S. at 65; *see also Center for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606,

6   649-650, 657 (E.D. Pa. 2004) (even for materials that may be "completely banned," *Fort*

7   *Wayne Books* requires that a court "make a final determination that the material is

8   [unprotected by the First Amendment] after an adversary hearing").

9        The Ninth Circuit extended this ruling to invalidate pretrial forfeiture provisions

10  of the federal RICO statute in *Adult Video Ass'n. v. Reno*, 41 F.3d 503 (9th Cir. 1994)

11  (readopting the court's earlier holding invalidating pretrial forfeitures as set forth in *Adult*

12  *Video Ass'n. v. Barr*, 960 F.2d 781 (9th Cir. 1992)).  The court explained that "the

13  reasoning of *Fort Wayne Books* is equally applicable to the federal RICO statute" and its

14  authorization of pretrial forfeitures of constitutionally-protected materials "is

15  unconstitutional on its face."[22]  It held that "[t]he First Amendment will not tolerate such

16  seizures until the government's reasons for seizure weather the crucible of an adversary

17  hearing."  *Id*.  The Ninth Circuit reiterated that it is not enough for the government to

18  show probable cause to support a forfeiture order.  *Id*.; *see Fort Wayne Books*, 489 U.S.

19  at 66 ("mere probable cause to believe a legal violation has transpired is not adequate to

20  remove books or films from circulation").[23]

21

22

23  scrutiny.  *Id*. at 66 ("the State cannot escape the constitutional safeguards of our prior cases by merely
    recategorizing a pattern of obscenity violations as 'racketeering'").

24  [22] *Barr*, 960 F.2d at 788.  There is an even greater concern about the premature forfeiture of
    constitutionally-protected materials under the federal law than under the state statute invalidated in *Fort*
25  *Wayne Books*.  Under the Indiana law, the government was required to show a prior conviction as a
    predicate act prior to forfeiture.  But the federal RICO statute only requires allegations of predicate
26  offenses.  Consequently, the Ninth Circuit found the First Amendment problems were heightened under
    the federal law.  *Id*. at 788 n.5.

27  [23] The same principles preclude seizing, or disabling access to, a website before conviction, on a mere
28  showing of probable cause.  *See Ctr. for Democracy and Tech. v. Pappert*, 337 F. Supp. 2d 606, 658 (E.D.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

1    In this case, the government violated these basic First Amendment rules by using

2  seizure authority to shut down the second largest classified ad website on the internet.

3  Whether the government executed the seizure warrant to close down Backpage (as it

4  claimed to do in its public announcements) or Carl Ferrer shut it down at the

5  government's direction is immaterial.  The critical issue here is the validity of the

6  seizure orders, and all seizures of website assets, domains, and financial proceeds

7  were predicated on the same showing of probable cause.  Any order that authorizes

8  shuttering a publishing enterprise prior to trial and conviction is plainly unconstitutional.

9  *Id*.; *cf. Vance v. Universal Amusement Co., Inc*., 445 U.S. 308, 315-16 (1980)

10  (invalidating nuisance abatement law that authorized business closure prior to final

11  adjudication); *Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135, 138-39 (9th Cir. 1980),

12  *aff'd mem*., 454 U.S. 1022 (1981) (same).  The same principles govern the seizure of

13  property and other assets of a publishing business, particularly where the government

14  is using the same assertions of probable cause to obtain authority to seize essentially

15  all the bank accounts and financial assets of Claimant/Defendants.

16            **2.    The First Amendment Prohibits Pre-Conviction Seizures of
                      Publishing Proceeds**

17

18    Seizures of bank accounts, financial assets, and other property of

19  Claimant/Defendants must be vacated because the government cannot preemptively seize

20  the profits or proceeds of publishing before conviction any more than it can seize the

21  publications themselves.  The Supreme Court has stressed that laws restricting or

22  suppressing speech "may operate at different points in the speech process," including (1)

23  "restrictions requiring a permit from the outset," (2) "*imposing a burden by impounding*

24  *proceeds on receipts or royalties*," (3) "seeking to exact a cost after the speech occurs," or

25  (4) "subjecting the speaker to criminal penalties."  *Citizens United v. FEC*, 558 U.S. 310,

26

27  _____

28  Pa. 2004) ("Although evidence of probable cause is sufficient to make an arrest, *Fort Wayne* holds that a
    finding of probable cause is not sufficient to completely remove a publication from circulation.").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

336-337 (2010) (citations omitted) (emphasis added). This follows from the well-established rule that depriving writers and publishers of compensation for their work violates the First Amendment.[24] The Court explained that its holding in *Fort Wayne Books* extends to preclude precisely the type of pre-conviction seizures of bank accounts and other assets as took place here:

> [W]e assume without deciding that bookstores and their contents are forfeitable (like other property such as a bank account or a yacht) when it is proved that these items are property actually used in, or derived from, a pattern of violations of the State's obscenity laws. *Even with these assumptions though, we find the seizure at issue here unconstitutional*.

*Fort Wayne Books*, 489 U.S. at 65; *see also id*. at 51 (invalidating pretrial forfeiture of assets, including all "property, real and personal, that 'was used in the course of, intended for use in the course of, *derived from, or realized through'* . . . racketeering activity'") (emphasis added); *American Library Ass'n. v. Thornburgh*, 713 F. Supp. 469, 484 n.19 (D.D.C. 1989) ("pre-trial seizure of non-expressive material [including 'printing presses, bank accounts, etc.'] *ex parte* from a business engaged in expressive material also is unconstitutional"), *rev'd on standing grounds sub nom. American Library Ass'n. v. Barr*, 956 F.2d 1178, 1194-96 (D.C. Cir. 1992) ("Plaintiffs may be correct that [the government's assertion of seizure authority] is so indefensible when it comes to wholesale pretrial seizures of expressive material that only the occasion is needed to pronounce its doom.").

The Court applied these principles to hold the First Amendment prohibits government action to seize proceeds derived from publishing activities under a forfeiture regime in *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd*., 502 U.S. 105 (1991). In that case the Court found that the government cannot "freeze" profits

---

[24] *See U.S. v. Nat'l Treasury Empl's Union*, 513 U.S. 454, 468-69 (1995); *U.S. v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) (reducing the profitability of a business can infringe the First Amendment because "[t]he distinction between laws burdening and laws banning speech is but a matter of degree"); *Matal v. Tam*, 137 S. Ct. 1744 (2017) (denial of the benefits of trademark registration violates the First Amendment); *cf. Minneapolis Star & Tribune Co. v. Minnesota Comm'r. of Revenue*, 460 U.S. 575, 583-84 (1983) (special taxes on the press act as "a form of prior restraint on speech").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

from the sale of a book under a statutory scheme that generally authorizes forfeiture of proceeds of crime and prejudgment attachment procedures to ensure that wrongdoers "do not dissipate their assets."[25]  The Court assumed without deciding that the income escrowed by the law "represents the fruits of crime," but nevertheless held that the law was "presumptively inconsistent with the First Amendment" to the extent it "imposes a financial burden on speakers because of the content of their speech."  *Id.* at 115.  Various similar state laws likewise have been invalidated as unconstitutional.[26]  In the wake of *Simon & Schuster,* the Department of Justice updated the U.S. Attorney's Manual to state that the forfeiture provisions involved, targeting "proceeds 'received or to be received' from First Amendment activity "and similar 'Son of Sam' laws have fallen into disuse because *there is little doubt, if any, that they are inconsistent with the First Amendment*."  USAM § 1104 (emphasis added); *see also id*. § 1105 (under *Simon & Schuster*, forfeiture laws "that single out the proceeds of speech concerning a crime committed by the speaker" are unconstitutional).

The First Amendment thus precludes the government's pre-trial actions to seize Claimant's/Defendants' bank accounts or other financial assets based on the allegation they represent illegal profits derived from Backpage.  As a matter of basic constitutional law, the government cannot assert that a website hosts illegal content and impose restrictions in

---

[25] *Id*. at 111.  In this regard, its purpose was identical to the RICO forfeiture provisions struck down in *Barr*, 960 F.2d at 788 (enjoining 18 U.S.C. § 1963(d) authorizing government action "to preserve the availability of property . . . for forfeiture").

[26] *See Seres v. Lerner*, 102 P.2d 91, 97-98 (Nevada 2004) (striking down Nevada law creating special cause of action allowing victims to sue to recover "all proceeds, regardless of the extent to which the work relates to the crime against the victim");  *Keenan v. Superior Court of Los Angeles County*, 40 P.3d 718 726 (Cal. 2002) (striking down California law that confiscates "all income from expressive materials, whatever their general themes or subjects"); *In re Opinion of the Justices to the Senate*, 764 N.E.2d 343, 350-51 (Mass. 2002) (finding Massachusetts' proposed "Son of Sam" law violated the First Amendment); *Curran v. Price*, 638 A.2d 93 (Md. 1994) (striking down Maryland law "because of the financial restrictions it placed on crime-related expression"); *see also State ex rel. Napolitano v. Gravano*, 60 P.3d 246, 255 (Arizona App. 2002) (upholding Arizona law to the extent forfeiture is restricted to the specific proceeds of racketeering and defendant is accorded full due process *before* seizure, including an adversary proceeding where the state has the burden of proof).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

advance of trial and conviction based on those allegations. *See Backpage.com, LLC v. Dart,* 807 F.3d 229, 230-31 (7th Cir. 2015) (enjoining Sheriff's actions to "suffocate" website financially based on allegations of illegality). Such a theory would permit the government to penalize speech by assuming the truth of the very point it must prove at trial. Consequently, this Court should immediately vacate all civil seizure warrants because they were predicated on the government's claim that it demonstrated probable cause to believe Backpage hosted illegal advertisements.

### B. Even if Seizure of Publishing-Related Assets or Proceeds Could be Justified, the Procedures Employed Here Were Constitutionally Deficient

Whenever the law authorizes the seizure of materials (or proceeds therefrom) that are even arguably protected by the First Amendment, the Supreme Court has long held that more rigorous procedural protections must be used. In circumstances such as these, the government must use "procedural safeguards designed to obviate the dangers of a censorship system." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559-560 (1975). Such safeguards include placing "the burden of instituting judicial proceedings, and of proving that the material is unprotected . . . on the censor, limiting any restraint to "a specified brief period" to preserve the status quo, and ensuring "a prompt final judicial determination." *Id.* at 560; *see Freedman v. Maryland,* 380 U.S. 51, 58 (1965). None of these constitutionally-required procedures were followed in this case, where the government seized vast amounts of publishing-related assets using *ex parte* seizure warrants and other means and scheduled no subsequent hearings of any kind. To make matters worse, the government continues to this day to seize additional assets on an *ex parte* basis.

These procedural requirements have been articulated in various contexts in which First Amendment rights were implicated. In *Blount v. Rizzi,* 400 U.S. 410 (1971), the Supreme Court invalidated provisions of federal law that authorize the Postmaster General to halt use of the mails and of postal money orders for commerce in allegedly obscene materials, or to obtain a court order to detain the defendant's incoming mail pending the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

1    outcome of administrative proceedings.  The Court observed that "the First Amendment

2    requires that procedures be incorporated that 'ensure against the curtailment of

3    constitutionally protected expression, which is often separated from obscenity only by a

4    dim and uncertain line.'"  *Id*. at 416 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58,

5    66 (1963)).

6           Among other things, this places the burden of initiating judicial review and of proving

7    that the material is unprotected expression on the censor and requires final judicial

8    determination on the merits within a specified, brief period to prevent the administrative

9    decision of the censor from achieving an effect of finality.  *Id*. at 417.  The Court stressed

10   that only a judicial determination in an adversary proceeding ensures the necessary

11   sensitivity to freedom of expression, and that a mere showing of probable cause cannot be

12   sufficient to justify the seizure.  *Id*. at 418-20.  It held that the procedures were

13   constitutionally deficient both because of the delay involved and because claimants were

14   not guaranteed a final judicial determination on the issue of obscenity.  *Id*. at 421-22; *see,

15   e.g., U.S. v. Treatman*, 408 F.Supp. 944, 954-56 (C.D. Cal. 1976) (applying *Blount* to

16   invalidate postal law authorizing injunctions barring the mailing of sexually-oriented

17   advertising because the provision "contains none of the required procedural safeguards").

18          Even where laws authorizing seizures are facially valid, the Supreme Court has held

19   that the First Amendment requires that they be interpreted to incorporate adequate

20   procedures.  Thus, in *U.S. v. Thirty-Seven Photographs*, 402 U.S. 363 (1971), the Supreme

21   Court interpreted the seizure provisions set forth in Section 1305(a) of the Tariff Act of

22   1930 as including strict procedural requirements when U.S. Customs agents seized books,

23   pamphlets, advertisements or other materials alleged to be obscene.  Applying *Freedman*,

24   the Court held that seizures could be upheld under the Tariff Act only if the government

25   initiated judicial proceedings "no more than 14 days from the seizure of the goods" and

26   received a final judicial ruling on the merits within "60 days from the filing of the action."

27   *Id*. at 373-74.

28

1    In this case, the seizure warrants must be vacated because the government

2 followed none of the constitutionally-required procedures. It obtained seizure warrants

3 based on nothing more than a flawed showing of probable cause; it failed to initiate

4 judicial proceedings of any kind to rule on the validity of the seizures (much less doing

5 so within a reasonable period); and it has no process for obtaining a final judicial ruling

6 on the merits of its claims that the publishing-related assets and proceeds are forfeitable.

7 The government's actions flout the constitutional procedures that exist to prevent the

8 possibility that "the censor's determination may in practice be final." *Blount*, 400 U.S. at

9 419 (quoting *Freedman*, 380 U.S. at 57-58).

10    **C.    The Government's Probable Cause Showing Was Defective and Any
11          Hearing on the Validity of the Seizures Will Require the Government to
12          Satisfy a Heightened Burden of Proof**

13    While no pre-conviction seizure of assets or proceeds of publishing activities should

14 have been permitted under the principles of *Fort Wayne Books*, the Court had no

15 opportunity to assess the legality of the Seizures because the government improperly

16 accomplished its objectives using *ex parte* procedures. In this case, the Versoza Affidavits

17 were deficient even to establish probable cause because they omitted any reference to

18 relevant legal authority and were riddled with false statements, distortions, and material

19 omissions. In this case, because First Amendment considerations are involved, the Court

20 should vacate the seizure warrants in their entirety. But if it is inclined to permit the

21 government to justify the Seizures after the fact, the government must support them with

22 more than a probable cause showing. Any hearing on the validity of the seizures must place

23 the burden on the government to demonstrate that the specific challenged advertisements

24 related to illegal activity, that Claimant/Defendants had actual knowledge of the specific

25 ads at issue, that Claimant/Defendants knew those specific ads related to illegal activity,

26 and that Claimant/Defendants acted with criminal intent with respect to those specific ads.

27 In meeting its burden, the government must provide specific evidence, and cannot reply on

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

the mere "judgment" or "belief" of the officer providing the affidavit nor on any presumption that ads related to unlawful activity.

### 1. The Versoza Affidavits Do Not Even Establish Probable Cause that Claimant/Defendants Committed Any Crimes

The Claimant/Defendants are entitled to a prompt hearing to challenge the sufficiency of warrants authorizing search or seizure under the Due Process Clause of the Fifth Amendment. *United States v. Crozier*, 777 F.2d 1376, 1383 (9th Cir. 1985); *United States v. $52,100 in U.S. Currency*, No. 17-CV-2002-BAS-JMA, 2018 WL 1782934, at *2 (S.D. Cal. Apr. 13, 2018). In this connection, a warrant obtained with an intentionally or recklessly false affidavit "must be voided and the fruits of the search excluded to the same extent as if probable cause were lacking."[27] Once it is shown that a statement in the affidavit is false, the Court must decide if there was probable cause for the warrant notwithstanding the false statement. *United States v. Christakis,* 238 F.3d 1164, 1167 n.1 (9th Cir. 2001). *Franks* also requires suppression when the search warrant was obtained with an affidavit that intentionally or recklessly omits material facts. *See Franks v. Delaware*, 438 U.S. at 156; *United States v. DeLeon,* 979 F.2d 761, 763 (9th Cir. 1992). In such a case, the Court must decide if there was probable cause for the warrant if the omitted information is included. *Id.* at 764.[28] These requirements apply any time the government seizes assets it alleges resulted from criminal activity. But here, as explained below, the government's burden is much higher.

---

[27] *United States v. Hall*, 113 F.3d 157, 159 (9th Cir. 1997) (quoting *Franks v. Delaware,* 438 U.S. 154, 156 (1978). *See United States v. One 1987 Mercedes Benz, 190E VIN: WDBDA28DXHF373152*, No. 90 C 3484, 1992 WL 198441, at *5–6 (N.D. Ill. Aug. 11, 1992) (finding of probable cause vacated where the court affidavit in support of a civil seizure warrant contained false statements that misled the judge signing the warrant).

[28] In this regard, "misstatements or omissions of government officials which are incorporated in an affidavit for a search warrant are grounds for [suppression], even if the official at fault is not the affiant." *DeLeon,* 979 F.2d at 764.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

### 2. The Versoza Affidavits Omit Reference to Controlling Case Law

The Versoza Affidavits contained both errors of omission and commission. The most serious omission was his failure to mention any of the cases finding the First Amendment protects online classified advertising sites generally, and Backpage.com in particular. This omission is critical, since *all* the forfeiture allegations hinge on allegations that most ads on Backpage.com violate California laws against prostitution and/or federal law against human trafficking. Without the underlying "specified unlawful activities," there is no predicate for Versoza's allegations that resulting financial transactions violated federal money laundering laws or that the Travel Act was implicated. Yet the Versoza Affidavits do not disclose that the government knew that the California courts had *twice* rejected the specific theory on which *these* seizures are based: the allegation that the operations of Backpage.com violated California law prohibiting prostitution.[29] The Versoza Affidavits also do not disclose that claims against Backpage.com premised on 18 U.S.C. § 1591 also have been dismissed.[30]

---

[29] Those failed California prosecutions are intertwined with this case, as the government and the California DOJ "partnered" in their efforts to take down Backpage, yet the Versoza Affidavits *do not mention the failed prosecutions or disclose that both courts dismissed charges* based on the theory that hosting (or editing) classified ads for adult services promote prostitution. *See People v. Ferrer*, 2016 WL 7237305 (Sup. Ct. Sacramento Cty. Dec. 9, 2016) ("*Ferrer I*"); *People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cty. Aug. 23, 2017) ("*Ferrer II*") (holding the First Amendment and Communications Decency Act ("CDA") foreclose suit "against an online publisher when that suit is based on speech provided by a third party"). The courts explained that "the relevant question in this case is whether, and to what extent, Defendants' activities entitle them to protection *of their First Amendment rights* through the immunity provision of the CDA" *Ferrer I*, 2016 WL 7237305, at *3 (emphasis added d). *See Ferrer II*, slip op. 11 ("[T]he protections afforded by the First Amendment were the motivating factors behind … the CDA.").

[30] *E.g.*, *Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016). Although *Doe No. 1* was decided based on statutory immunity under 47 U.S.C. § 230(c)(1), the court also found the factual averments in the complaint were inadequate: "Though a website conceivably might display a degree of involvement sufficient to render its operator both a publisher and a participant in a sex trafficking venture (say, that the website operator helped to procure the underaged youths who were being trafficked), the facts pleaded . . . do not appear to achieve this duality." *Id*. No such allegations were ever made against Backpage.com, and the Versoza Affidavits contain none.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

Inspector Versoza based his seizure analysis on his estimate that 90 percent of Backpage.com's revenues "are generated from 'adult' and 'escort' ads," Versoza Aff. 1 at ¶ 7.b. & n.1, but fails to disclose that numerous courts have rejected arguments seeking to equate ads in these categories on Backpage.com (or other websites) as synonymous with prostitution or trafficking. *Dart*, 807 F.3d at 234 ("[N]ot all advertisements for sex are advertisements for illegal sex.")[31]  Indeed, no court to address that question has ever reached a contrary conclusion, but the Versoza Affidavits omit any mention of any of these cases.  Under these circumstances, Inspector Versoza's claim that the evidence is sufficient to establish probable cause is demonstrably false.

More specifically, courts have also rejected the bases on which Inspector Versoza's broad-brush conclusions rest.  For example, he based his allegation that "most" Backpage revenue was derived from illegal activity on what he calls "publicly available materials," *id*. at ¶ 9.a., including a 2010 letter from state attorneys general asserting that ads for prostitution and sex trafficking are "rampant" on Backpage.com, *id*. at ¶ 29.a., a January 2017 Senate subcommittee report, *id*. at ¶ 29.c., an August 2011 letter from the mayor of Seattle that took Backpage.com to task for not adopting an in-person age verification procedure, *id*. at ¶ 29.d., a 2015 statement from a detective in the Seattle Police Department, *id*. at ¶ 32, and a 2015 statement from a detective in the Boston Police Department.  *Id*. at ¶ 32.  Contrary to Inspector Versoza's allegation, the court in *Cooper*, 939 F. Supp. 2d at 816, 831-35, rejected Tennessee's reliance on *the same letter* from state attorneys general that

---

[31] *Accord Doe v. Backpage.com LLC*, 104 S Supp. 3d 149, 156-57 (D. Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016) ("The existence of an escorts section in a classified ad service, whatever its social merits, is not illegal."); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 1262, 1282 (W.D. Wash. 2012) (escort ads have long been permitted and escort services are licensed and regulated in many states); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 805, 816, 833-34 (D. Tenn. 2013) (ads on Backpage.com are protected speech under the First Amendment); *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097, at *9-11 (D.N.J. 2013) (rejecting argument that escort ads on the website are unprotected speech); *M.A. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1049-50 (E.D. Mo. 2011)*; see also Dart v. Craigslist*, Inc., 665 F. Supp. 2d 961, 968 (N.D. Ill. 2009) ("We disagree … that the 'adult services' section is a special case. The phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content."); *Cohen v. Bd. of Supervisors*, 707 F.2d 840, 852 (Cal. 1985) ("An escort service may very well involve lawful activities relating to sex.") (internal quotation marks omitted).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

Versoza referenced (as well as a 2011 letter from the AGs to the same effect) and held that the state could not constitutionally presume that classified advertisements deemed "adult" or that were sexually-oriented relate to illegal activity (nor could it enact legislation to prohibit such ads). *Id*. at 834 (noting "numerous legal activities unrelated to child sex trafficking that could comprise a 'sexual act,' from 'phone sex services, nude dancing, online chat services, [and] adult-pay-for-view websites [to] other legal sexually oriented material").[32]  The court in *McKenna*, 881 F. Supp. 2d at 1282, likewise considered anecdotal evidence from police detectives but found such evidence could not support equating "adult" advertising with criminality. *Id*. at 1277-78. The courts in *McKenna* and *Cooper* likewise rejected Inspector Versoza's assumption that the absence of an age-verification mechanism is evidence of criminal behavior or intent. *Id*. at 1277; *Cooper*, 639 F. Supp. 2d at 830. Reliance on congressional reports is likewise insufficient to reach a conclusion about the legality of a website and is of doubtful admissibility in any event.[33]

Courts also have rejected the other bases on which Inspector Versoza asserted probable cause for a seizure, including his visit to Backpage.com to pose as a purchaser in the website's "dating" section, Versoza Aff. ¶ 25, his purported "review" of "several thousand" ads (out of millions) "in the various 'adult' categories of Backpage," and his conclusion that more than half of those ads used terms and phrases "consistent with sex trafficking and prostitution." *Id*. at ¶ 31. These are precisely the same "indicia" of prostitution the court rejected in *Dart v. Craigslist*.[34]

---

[32] *See also Backpage.com, LLC v. Dart*, 807 F.3d at 234 (listing additional examples of legal adult ads on Backpage.com, including ads relating to fetishism, phone sex, and striptease artists); *Craigslist, Inc.*, 665 F. Supp. 2d at 968 ("A woman advertising erotic dancing for male clients ('w4m') is offering an 'adult service,' yet this is not prostitution.").

[33] *E.g.*, *Pearce v. E.F. Hutton Grp., Inc.*, 653 F. Supp. 810, 813-16 (D.D.C. 1987) ("Given the obviously political nature …, it is questionable whether any report by a committee or subcommittee of [Congress] could be admitted … against a private party."); *Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 22-23 (6th Cir. 1984) (*per curium*) (excluding House subcommittee report as inadmissible).

[34] Phrases Inspector Versoza said were "indicative" of illegal activity include "roses," "in-call," "outcall," "GFE," and "PSE."  Other asserted indicia of criminality included "sexually provocative pictures" that in his "training and experience" are indicative of ads for prostitution, including

In *Dart,* the sheriff of Cook County, Illinois, alleged that Craigslist was aiding and abetting prostitution because most of the ads in its erotic services section "are veiled (sometimes very thinly) using code words," such as "'roses' mean dollars and 'greek' refers to anal sex."  Sheriff Dart relied on third party claims for his conclusion that "Craigslist is now the single largest source for prostitution, including child exploitation, in the country," and he also pointed to his own use of sting operations as "evidence" of the website's culpability.  665 F. Supp. 2d 961, 962-63 (N.D. Ill. 2009).  But the court concluded that Sheriff Dart "is simply wrong when he insists that these terms are all synonyms for illegal sexual services," and rejected his "conclusory allegations to support the contention that Craigslist induces users to post ads for illegal services."  *Id.* at 968-69.  The court held that providing a platform for the speech of someone who might commit illegal acts "does not satisfy the ordinary understanding of culpable assistance to a wrongdoer."  *Id.*  at 967;  *see also McKenna*, 881 F. Supp. 2d at 1279 ("where an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that").  Any hearing to assess the government's probable cause showing must consider these applicable decisions (as well as the government's failure to mention them).

### 3.    The Versoza Affidavits Contain False and Misleading Statements

The Versoza Affidavits also contain numerous false and misleading factual statements regarding Claimant/Defendants' level of knowledge of, and involvement with, illegal third-party ads on Backpage.com.  Such allegations start with a faulty premise that equates a general *awareness* of some illegal third-party speech with *criminal responsibility* for specific advertisements, and Inspector Versoza further distorts the meaning of the evidence he cites. For example, he describes a September 25, 2010, email Ferrer wrote after receiving a

---

"woman's cleavage," "buttocks presented in a sexual manner," and "women posing in sexual positions wearing lingerie and woman bending over revealing her naked buttocks."  Versoza Aff. at ¶ 31.

letter from several state attorneys general and mischaracterizes it as saying "Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would 'piss[] off a lot of users who will migrate elsewhere' and force Backpage to refund those customers' fees." Versoza Aff. at ¶ 29(b). Contrary to this claim, the document refers neither to prostitution nor ads that are "indicative of prostitution," but only to ads that violate Backpage's terms of use (violations that could be for any number of reasons, *e.g.*, excessive nudity). Contrary to the averments in Versoza's Affidavits, the Ferrer's notes do not say he was unwilling to delete ads, but rather discusses the pros and cons of deleting ads versus removing only the offensive content from ads.[35]

Inspector Versoza's claim that internal Backpage.com communications proved "Backpage has instituted policies and procedures designed to maintain its promotion of sex trafficking and prostitution" materially distorts the documents he references. Versoza claimed that Backpage internal communications showed its editorial practices sought to "'sanitize' some of the language Backpage customers use to advertise in order make the advertising of sex trafficking less overt," Versoza Aff. at ¶ 30, but Versoza supported this claim by cherry-picking isolated phrases from certain emails, while omitting adjacent text that changed the import of the quoted material, sometimes entirely reversing their meaning. For example:

| Versoza's Claims | What the Emails Actually Said |
| --- | --- |
| ¶ 30(a): Inspector Versoza swore that "[i]n April 2008, Ferrer wrote an email explaining that although he was 'under pressure to clean up phoenix's [sic] adult content,' he was unwilling to delete prostitution | The actual email does not mention "prostitution ads." It does say Ferrer is unwilling to delete entire ads that contain certain terms (none of which reference "prostitution" or sex for money) ***because*** "[d]eleting ads and dealing with chargebacks |

---

[35] Ferrer's notes say that if the ad is simply removed, the "[u]ser does not know what they did wrong." The document then states, "I would like to go back to having our moderators remove bad content in a post and then locking the post from being edited." Also, contrary to the false impression given by Versoza's Affidavit, there is no indication that the document was written in response to the law-enforcement letter from which Versoza quotes. Ex. 17.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

| | |
|---|---|
| ads because doing so 'would put us in a very uncompetitive position with craig[slist].'" | is messy. They will just re-post and I get no where [sic]." *See* Ex. 9 (emphasis added). Versoza distorted the email's meaning. |
| ¶30(b): Versoza swore that "[o]n October 8, 2010, a Backpage manager sent an email threatening to fire any Backpage employee who acknowledged, in writing that a customer was advertising prostitution: 'Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . . This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job." | Inspector Versoza used an ellipse and omitted the following from the middle of the email: "There was no mention of prostitution in the power point presentation. That was a presentation designed to create a standard for what images are allowed and not allowed on the site. If you need a definition of 'prostitution', get a dictionary. Backpage and you are no position to redefine it." *See* Ex. 10. Versoza's description of the email is misleading. |
| ¶30(d): Inspector Versoza swore that on October 16, 2010, a Backpage manager sent an internal email stating "'I'd like to still avoid Deleting ads when possible,' that 'we're still allowing phrases with nuance,' and that '[i]n the case of lesser violations, editing should be sufficient.'" | The email actually said in relevant part: <br><br> [W]e need to intensify our efforts in cleaning Escorts, Body Rubs, Male Escorts, TS Escorts and Dom & Fetish. <br><br> This intensification will come in the form of extra staff and overtime but most importantly in stricter standards for language and images in ads. <br><br> I'd still like to avoid Deleting ads when possible, but ***if an ad makes a clear reference to sex for money or an image displays a sex act, don't hesitate deleting it. Those are not the types of ads we want on our site at all.*** <br><br> In the case of lesser violations, editing should be sufficient. ***We're still allowing HBO type nudity but if an image makes you think twice, remove the image.*** There is zero tolerance for closeups of exposed |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

| | genitalia. |
| | |
| | . . . |
| | |
| | ***If you find yourself locking ads for any user more than twice, lock their entire account . . . .*** |
| | |
| | Ex. 11 (emphasis supplied). Versoza seriously misrepresented the content of this email. |
| ¶30(e): Inspector Versoza swore that an October 25, 2010 email stated "'[i]llegal content removed' through Backpage's moderation processes was 'usually money for sex act.' This email also explained that, after the 'sex act pics are removed,' the 'ad text may stay.'" Versoza's description suggests the email says that an advertisement for prostitution may remain after sex-act pictures are removed. | The email Inspector Versoza cited is actually a list of recommendations that deal with various types of problems. One involves advertisements of "money for sex act." The email actually says two times that such advertisements are not allowed and says three separate times that they are deleted. The email separately says that "sex act pics are a common problem," that the sex act pictures are removed and that after that the remaining text may remain. By combining the issues of ads for prostitution and sexually explicit pictures—issues that the email treats separately—Versoza falsely implies the email says ads for prostitution may remain after sexually explicit pictures are removed. *See* Ex. 12. |

On balance, the Versoza Affidavits were wholly deficient even under a standard *Franks* analysis. The affidavits asserted broad conclusions of law without disclosing the controlling cases that addressed the dispositive issues, including cases that undermined the specific allegations that Backpage.com was being operated in violation of California law prohibiting prostitution. The affidavits also are rife with affirmative misstatements of the evidence that further undermine any findings of probable case. Even if the affidavits were

not deficient, however, a finding of probable cause would be insufficient to justify the seizures, as explained below.

**D.  Any Hearing on the Validity of Seizures of Proceeds From Publishing Must Satisfy Both Fourth and First Amendment Requirements**

Because the orders in this case apply to seizures involving publishing assets and proceeds, the government must do more than satisfy a *Franks* analysis.  The Supreme Court has explained that "while the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances), *it is otherwise when materials are presumptively protected by the First Amendment*."  *Fort Wayne Books*, 489 U.S. at 65.  Publishing-related materials (and proceeds) cannot be equated with other criminal contraband and must satisfy not just the Fourth Amendment but the First Amendment as well.  *E.g.*, *A Quantity of Books v. Kansas*, 378 U.S. 205, 211-12 (1964) ("It is no answer to say that obscene books are contraband, and that consequently the standards governing searches and seizures of allegedly obscene books should not differ from those applied with respect to narcotics, gambling paraphernalia and other contraband.").[36]

As explained above, where the proceeds of publishing are involved, the government should have been barred from conducting a pre-conviction seizure and its actions should have been restrained by strict procedural safeguards.  However, the government already acted preemptively to seize the proceeds of a publishing venture, and the Court must decide how to evaluate its actions.  Claimant's/Defendants' position is that the seizure orders should be vacated immediately.  But, if the Court decides instead to hold a hearing on the validity of the seizures, certain guiding First Amendment requirements must govern:

---

[36] *See also  Stanford v. State of Texas*, 379 U.S. 476, 486 (1965) ("The point is that it was not any contraband of that kind which was ordered to be seized, but literary material."); *Marcus v. Search Warrant*, 376 U.S. 717, 730-31 (1961) ("The Missouri Supreme Court's assimilation of obscene literature to gambling paraphernalia or other contraband for purposes of search and seizure does not therefore answer appellants' constitutional claim, but merely restates the issue whether obscenity may be treated in the same way.").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

- ***First***, the burden of proof rests firmly on the government, and it cannot justify a seizure with a mere showing of probable cause.[37]

- ***Second***, the government's burden includes proving that the *specific* advertisements for which it seeks to seize proceeds related to unlawful conduct, that Claimant/Defendants knew those *specific* advertisements related to unlawful conduct, and also proving scienter – that Claimant/Defendants had the required guilty state of mind with respect to those *specific* advertisements. *Smith v. California*, 361 U.S. 147 (1959).

- ***Third***, the government cannot justify a seizure simply because it is convinced the material at issue "looks like" unprotected speech, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244, 255 (2002), and this is true notwithstanding a police officer's sworn belief the expressive materials he reviewed promote illegality. *Roaden*, 413 U.S. at 506 (seizure of expressive materials cannot be based "solely on a police officer's conclusions.").

### 1. The Government Must Link Any Seized Assets to Specific Evidence of Illegal Activity on the Part of Claimant/Defendants

For Claimant/Defendant to be considered culpable for advertisements published on Backpage (and thus to justify any seizure of proceeds), it is not enough for the government to allege that ads for prostitution sometimes (or even often) appeared on Backpage, or even to claim that Claimant/Defendants were aware of the possibility (or even the likelihood) of such postings. The Supreme Court has long held that under the First Amendment the government cannot impose liability for distributing expressive materials without proof of scienter. In *Smith v. California*, 361 U.S. at 153-54, for example, the Supreme Court struck down a Los Angeles ordinance making it a crime for booksellers to possess obscene books. Even though the First Amendment does not protect obscene speech, the Court concluded that a bookseller could not be held liable without proof of

---

[37] *See United States v. Playboy Entm't. Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 818 ("When First Amendment compliance is the point to be proved, the risk of nonpersuasion … must rest with the Government, not with the citizen."); *Bd. of Trustees v. State Univ. of N.J. v. Fox*, 492 U.S. 469, 480 (1989) ("the State bears the burden of justifying its restrictions"); *Fort Wayne Books*, 489 U.S. at 63 (seizure cannot be based on probable cause).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

knowledge concerning the contents of a given book because in the absence of scienter, there is "the hazard of self-censorship of constitutionally protected material ....". *Mishkin v. New York*, 383 U.S. 502, 511 (1966)*; see also Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) ("[W]rongdoing must be conscious to be criminal.").  Where a website publishes millions of advertisements, the government cannot justify a wholesale seizure of assets based on allegations that the website's former owners had some general level of awareness that third-parties posted ads for prostitution.  This is particularly true under the offenses alleged in the Versoza affidavits.  Versoza's legal theory supporting the seizure warrants was that most ads on Backpage.com related to prostitution in violation of California law, and sex trafficking in violation of 18 U.S.C. § 1591, both of which require a showing of specific intent.  In the case of Section 1591, the Justice Department has argued "[e]ven if an advertisement for illegal sex trafficking appeared on [its] website, an operator could not be convicted under [the law] *without proving that* [*it*] *knew* that the advertisement at issue related to illegal sex trafficking of a minor or of a victim of force, fraud, or coercion." DOJ's Reply in Support of Motion to Dismiss at 7-8, *Backpage.com, LLC v. Lynch*, No. 1:15-2155 (RBW), ECF No. 13 (emphasis added).  The district court accepted this interpretation of the statute.  *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96, 107 (D.D.C. 2016).  Likewise, prostitution under California law is a specific intent crime.  *See* Cal. Penal Code § 647(b)(1) ("An individual agrees to engage in an act of prostitution when, with specific intent to so engage . . . .).  If the government cannot obtain a conviction without such evidence, it cannot preemptively seize the proceeds of publishing without such proof.

Further, this month, in response to challenges to Allow States and Victims to Fight Online Sex Trafficking Act of 2017 ("FOSTA"), 18 U.S.C. § 2421(A), the U.S. Department of Justice stated:

> •"Only actions taken with the intent to promote or facilitate the prostitution of another person in a jurisdiction where prostitution is illegal, per Section 2421A and Section 4(a) of FOSTA, or knowing sex trafficking under Section 1591, fall with the specifications of the Act."  Ex. 15 at 10 of 29.

•"Case law concerning 18 USC § 1956, the federal money laundering statute . . . [e]ssentially [require] the government [to] show the transaction at issue was conducted with the intent to promote the carrying on of a specified unlawful activity. . . . [T]here must be evidence of *intentional* promotion. In other words, the evidence must show that the defendant's conduct not only promoted a specified unlawful activity but that he engaged in it *with the intent* to further the progress of that activity." *Id.* at 13-14 of 29 (emphasis in original).

•[H]ere, plaintiffs fail to show a credible threat of prosecution because they do not allege that they have the intent to ***further specific acts*** of prostitution." *Id.* at 16 (emphasis added).

•[A]ll FOSTA did with respect to criminal law was create a new federal offense that mirrors one that already exists." *Id.*

•The criminal act prohibited in Section 2421A(b)(2) is . . . the intentional promotion or facilitation of prostitution. Critically proof of intent is a higher *mens rea* than knowledge." *Id.* at 22 of 29.

Thus, under the applicable and widely-recognized legal standard, the government has the burden to prove that Claimant/Defendants had the requisite knowledge and intent *with respect to the particular advertisements for which the government claims authority to forfeit proceeds*. The generalized averments in the Versoza Affidavits at most attempt to establish that certain bank accounts or assets can be traced to earnings from Backpage.com. However, such a showing paints with much too broad a brush. The government has the burden to trace assets it seeks to seize to (i) particular ads relating to unlawful conduct, (ii) *about which Claimant/Defendants had the requisite knowledge*, and (iii) *as to which Claimant/Defendants had the intent to promote the illegal conduct being advertised*. Absent such proof, the government will be unable to show any offense was committed by the publication of an ad for which Claimant/Defendants could be culpable, and the government will have no basis on which to support a seizure of assets.

1    Such a requirement flows not just from the need to prove scienter, but also from

2    bedrock law that a special showing of particularity is required when "the things to be seized"

3    implicate the First Amendment. *Roaden*, 413 U.S. at 504. For example, the government

4    could not constitutionally seize the entire contents of a bookstore or its assets based on an

5    allegation that some books (or even many of the books) sold were unlawful or promoted

6    illegality. *See*, *e.g.*, *United States v. California Publishers Liquidating Corp.*, 778 F. Supp.

7    1377, 1388-89 (N.D. Texas 1991) (forfeiture limited to materials found to be obscene).

8    Here, however, virtually all assets asserted to be proceeds from Backpage.com were seized

9    based on Inspector Versoza's averments that he saw ads on Backpage.com that he believed

10   were "indicative of" prostitution and his estimates as to the proportion of legal versus illegal

11   content on the website.

12    Seizures based on such general allegations overlook the fact that profiting from the

13   sale of advertisements for adult services is a legal activity protected by the First

14   Amendment, even if some (or even many) of the advertisements ultimately are found to

15   promote illegal services.[38] Indiscriminately seizing the proceeds from the sale of all ads

16   on a website based on an allegation that some proportion of them (in the government's

17   estimation) promoted illegal services has the feel of a general warrant, which the

18   Supreme Court has long held to be "constitutionally intolerable." *Stanford v. Texas*, 379

19   U.S. at 486. In *Stanford*, the Court voided a warrant and ordered the return of property

20   seized from a mail order book business that prosecutors alleged violated a state law

21   prohibiting communist activity. Even though the Court assumed the warrant was duly

22

23   _____

[38] *McKenna*, 881 F. Supp. 2d at 1281 ("The third-party publication of offers to engage in illegal

24   transactions does not fall within 'well-defined and narrowly-limited classes of speech' that fall outside

      First Amendment protection."); *Cooper*, 939 F. Supp. 2d at 830 ("While prostitution may be illegal in

25   Tennessee, the statute at issue here does not criminalize prostitution – it criminalizes the sale or

      potential sale of advertisements."); *Dart v. Craigslist*, 665 F. Supp. 2d at 967 (providing a platform for

26   the speech of someone who might commit illegal acts "does not satisfy the ordinary understanding of

      culpable assistance to a wrongdoer"); *Ferrer II*, No. 16FE024013, slip op. 13 ("Here, there is no dispute

27   that Backpage charged money for the placement of advertisements. Providing a forum for online publishing

      is a recognized legal purpose").

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY
SEIZURE WARRANTS

issued upon a showing of probable case, it held it was the kind of warrant "which it was the purpose of the Fourth Amendment to forbid – a general warrant." 379 U.S. at 480. The seizure warrants here suffer from the same overbreadth.

The seizures here are even more egregious, however, because they also ignore the requirement of proving scienter. Accordingly, in any hearing on the validity of the seizures, the government must prove not just that any assets it has seized are proceeds derived from the sale of particular ads it has shown were for illegal activity, but that Claimant/Defendants knew those particular ads promoted illegal activity and that Claimant/Defendants intended to promote the illegal activity in those particular ads.

## 2. The Government Must Support Any Seizure With More Than the "Judgment" of a Law Enforcement Officer

In any hearing on the seizures, the government's burden of proof cannot be met by statements from Inspector Versoza (or second-hand statements of other law enforcement officials or political figures) that they believed Backpage.com hosted advertisements for prostitution. The mere judgment of a police officer has never been held to be sufficient to seize material affected with a First Amendment interest. Inspector Versoza's statements that he believed most ads on the website (and proceeds therefrom) related to illegal activity based on his visiting the website and reviewing ads, his "conversations with law enforcement officers around the country," and conclusions drawn from his "training and experience" ignore the basic rule that the government cannot justify restricting speech by relying upon "the conclusory assertions of the police officer." *Lee Art Theatre, Inc.*, 392 U.S. at 637.

The Supreme Court has described "leaving the protection of [First and Fourth Amendment] freedoms to the whim of the officers charged with executing the warrant" as a "constitutional impossibility." *Stanford*, 379 U.S. at 485; *see Marcus*, 367 U.S. at 724-29; *Pappert*, 337 F. Supp. 2d at 658. Nor can Inspector Versoza's references to his "training and experience," his "conversations with law enforcement officers around the country," or his "review of law enforcement officers' statements and reports regarding

34

Backpage" distinguish the allegations in the Affidavits from prior cases. Such statements are insufficient to support allegations "that the majority of Backpage ads that appear in the traditional 'adult' categories (such as 'escort,' 'massage,' or 'body rubs') are actually advertisements promoting sex trafficking or prostitution," Versoza Aff. at ¶¶ 31.i, ¶ 32, under bedrock law that expressive materials (and related assets) cannot be seized based simply on "a police officer's conclusions." *Roaden*, 413 U.S. at 506; *see Lee Art Theatre, Inc.*, 392 U.S. 636 (seizure of film as allegedly obscene cannot be justified based on the affidavit of a police officer). It does not matter whether the affidavits are based on Inspector Versoza's individual judgment or on the collective judgment of various officers through second and third-hand accounts.[39]

In this context, seizing wholesale the proceeds derived from publishing based on a law enforcement officer's statement that he looked at some advertisements and believed they related to prostitution, or that he thought the ads used language or images that he believed were "indicative" of wrongdoing, cannot be justified. The Seventh Circuit enjoined a sheriff's efforts to impose an economic boycott on Backpage.com based on the same type of claim – that he believed most ads were for prostitution – observing "a majority is not all, and not all advertisements for sex are for illegal sex." *Dart*, 807 F.3d at 203. The court observed that governmental efforts to choke off financial resources violates the First Amendment "unless there is *no* constitutionally protected speech in the ads on Backpage's website – and no one is claiming that." *Id*. at 231 (emphasis in original). The Affidavits supporting the asset seizures in this case certainly make no

---

[39] In addition to claiming he reviewed and personally evaluated content on Backpage.com, Inspector Versoza claimed to review and rely on documents from various governmental agencies and authorities, including a 2010 letter from state attorney's general, a Senate subcommittee report, and a letter from the mayor of Seattle. Inspector Versoza's claims must be subjected to constitutional scrutiny. The same type of claims by "governmental agencies and authorities" (including, specifically, the 2010 letter from state attorneys general) have been cited by state legislators to justify laws seeking to ban sex-oriented online classified advertisements. *E.g.*, *Cooper*, 939 F. Supp. 2d at 815-16. But courts have uniformly rejected restrictions on speech based on such "evidence" or on assumptions that all classified ads for adult services are by definition illegal. *Id*. at 831-32; *see also McKenna*, 881 F. Supp. 2d at 1280-83.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

such claim.  And even if they did, the First Amendment would bar the government from imposing penalties (financial or otherwise) based on such allegations without a judicial ruling to that effect, finding the requisite knowledge and intent.

In any hearing on the validity of the seizures of Claimant's/Defendants' assets, the government must present competent evidence, beyond Inspector Versoza's beliefs or similar claims by other law enforcement officials whose second-hand accounts he quoted in his affidavits.  Any such evidence must be sufficient to satisfy the heightened scrutiny required where First Amendment interests are implicated.

### E. Assuming, Arguendo, any Pre-trial Seizure Is Appropriate, these Seizures Are Overinclusive and Must Be Vacated

The Versoza Affidavits attempt to trace a handful of transactions from Backpage to various accounts and then justify the seizure of *those entire accounts*.  But, as explained above, the Versoza affidavits do not even allege an intent to promote a specific instance of prostitution through a specific advertisement.  Because the government has not even tried to show Claimant/Defendants' "intent to further specific acts of prostitution," they have not alleged an actual crime.  Without such a showing, there are no criminal proceeds. Nonetheless, the seizure warrants are overinclusive for at least two additional reasons.

First, the Versoza Affidavits led to the seizure of some assets that were simply unrelated to Backpage.  Such seizures are improper under any standard.  Second, by seizing all Backpage assets, the government's net included assets that the government does not even argue could be criminal proceeds, including Backpage money from overseas operations, Backpage money that is not derived from adult advertising, and adult advertising revenues that were not related (even in the government's overly-expansive view) to prostitution or human trafficking.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

**1. By Seizing Virtually All of Claimants/Defendants' Assets, the Government Improperly Reached Assets That Have Nothing To Do With Backpage**

Beginning in the late 1970s, Michael Lacey and James Larkin acquired *Phoenix New Times* and over the next three decades built a small newspaper empire. By 2001, their company, New Times, Inc. ("New Times"), had grown to 13 weekly newspapers in major cities across the United States. In 2006, with the acquisition of the Village Voice group of publications, the company operated 17 weekly papers through Village Voice Media Holdings ("VVM"). Declaration of John Brunst ("Brunst Decl.") at ¶3. VVM sold its interests in the newspapers in 2013 to a group of long-time company executives. *Id.* at ¶¶ 4, 14. After the sale, New Times was renamed Medalist Holdings, Inc. ("Medalist"). *Id.* None of the assets of these publishing ventures, or the proceeds of the sale, are tied to any of the allegations in the Indictments. In 2004, as the Internet (and, more particularly, Craigslist) was eroding newspaper classified advertising, New Times, Inc. launched Backpage.com as an online classified advertising service. VVM sold its interests in Backpage.com, LLC to Carl Ferrer in April 2015.

The assets derived from these publishing ventures generally fall into two categories: pre-Backpage funds and non-Backpage funds. First, as to the pre-Backpage funds, New Times issued approximately ███████ in distributions to the Shareholder Defendants from 2000 to 2006. *Id.* at ¶¶ 6, 12. These distributions were made in connection with a private equity firm's investment in New Times in 2000, and debt recapitalizations of New Times. *Id.* at ¶¶ 7-12.

Second, the Shareholder Defendants received non-Backpage distributions in connection with the sale of the print publication business in January 2013. Most of the newspapers, including the Village Voice, were sold to Voice Media Group, Inc. ("VMG") in a seller-financed deal. From January 2013 to March 2018, VMG made loan and rent payments to Cereus Properties. Of these payments, about ███████ were distributed to the Shareholder Defendants. *Id.* at ¶14.

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

Collectively, about ████████ in distributions unconnected to Backpage's operations were made to the Shareholder Defendants. *Id* at ¶¶ 13-14. Inspector Versoza's Affidavits do not disclose these distributions, let alone make any effort to trace such distributions back to Backpage. As such, there is no viable theory under which the government could seize such funds. Nevertheless, the government has done so anyways. For example, the government seized ████████ from account xxxx1938 at ████████ ████████a. That money is proceeds from the sale of print-media companies and unrelated to Backpage. The Versoza Affidavit does not even try to justify this seizure. *See* at ___.[40] This seizure must be vacated under any standard. The government also recently seized an additional account of Cereus Properties, LLC.

### 2. Non-Backpage Assets Cannot Be Seized Merely Because They Were Commingled With Backpage Assets

The government has informed counsel for Claimant/Defendants that it intends to seek civil forfeiture of the entire balances of their bank and brokerage accounts on the basis that these accounts contain commingled funds, and untainted funds were purportedly used to "facilitate" the laundering of Backpage-related funds. The seizure affidavits, however, do not establish probable cause that any such facilitation occurred and, as explained below, there is no viable theory under which the government could ultimately forfeit such funds.

Under the civil forfeiture statute, specifically section 18 U.S.C. § 981(a)(1)(A), "property involved" in an alleged money laundering offense "includes property used to facilitate" that offense. *U.S. v. All Monies ($477,048.62) In Account No. 90-3617-3, Israel Disc. Bank, New York, N.Y.*, 754 F. Supp. 1467, 1473 (D. Haw. 1991). Facilitation takes place "when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *U.S. v. Approximately Six Hundred & Twenty Thousand Three Hundred & Forty-Nine Dollars & Eighty-Five Cents*, No. 13 CV 3966 RJD SMG,

---

[40] In addition, the government withdrew its sworn explanation for the seizure of over ████████ of certificates of deposit through a "Notice of Errata," leaving no explanation of the basis for the seizure. *Compare* 18-mj-00996, Versoza Aff. at ¶63(e) with 18-mj-00996 at Doc. No. 5 (notice of errata).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

2015 WL 3604044, at *3 (E.D.N.Y. June 5, 2015) (citations omitted).  "To prove that property 'facilitated' money laundering, the government must establish more than a mere showing that tainted and untainted funds were pooled together." *Id*. (citations omitted).

*United States v. Contents in Account No. 059-644190-69*, 253 F. Supp. 2d 789 (D. Vt. 2003), is instructive as to the limitations of the facilitation theory of forfeiture here. There, the government seized and sought civil forfeiture of the entire balances of five commingled accounts owned by the claimant under a facilitation theory. *Id.* at 790-91.  The claimant was alleged to have illegally transferred funds from the Law Centers for Consumer Protection ("LCCP") into her own accounts for her personal use. *Id.*  The court noted that, because the alleged money laundering occurred through the transfer of funds from LCCP to the claimant, "the money laundering would have been equally as effective if it had not involved any untainted funds but merely the transfer of LCCP funds to accounts in [claimant's] personal control." *Id*. at 800.  The court therefore ultimately held that, because the claimant's commingling of funds in her accounts amounted to the mere "pooling of tainted and untainted funds," the government lacked probable cause to seize the accounts in their entirety. *Id*.  Instead, the court held that the government was required to satisfy the tracing requirement of section 981(a)(1)(A), which would have resulted in the return of over $1 million of the approximately $2.7 million in funds seized from the claimant. *Id*.

The facilitation theory of forfeiture fails here for the same reasons.  First, the seizure Affidavits merely set forth that Claimant/Defendants' bank and brokerage accounts contain some funds derived from Backpage, but altogether ignore the funds contained in these accounts that are unrelated to Backpage.   In other words, the affidavits allege that Claimants/Defendants' accounts contain pooled tainted and untainted assets, but go no further, which is plainly insufficient to establish probable cause to seize all such assets. *Id.*; *Approximately Six Hundred & Twenty Thousand Three Hundred & Forty-Nine Dollars & Eighty-Five Cents*, 2015 WL at *3. Second, the alleged money laundering here would have been "equally as effective" had it involved only funds derived from Backpage.  Indeed, the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS

funds the Shareholder Defendants received in connection with debt recapitalizations of New Times and the sale of the newspaper business cannot be traced back to Backpage. *Contents in Account No. 059-644190-69*, 253 F. Supp. 2d at 800 ("If 'facilitation' means nothing more than the commingling of funds in a complicated series of transactions, the tracing requirement would be a dead letter.").[41]

### 3. The Government Has Improperly Seized Backpage Proceeds that are Clearly Not Criminal Proceeds

Numerous courts have established that at least *some* of Backpage's adult content is legal in the United States. *See, e.g., Backpage.com LLC v. Dart,* 807 F.3d 229, 231 (7th Cir. 2015). So (at a minimum) proceeds of that content does not violate the Travel Act. Likewise, the Travel Act does not reach overseas activities.[42] The government must admit that a significant portion of Backpage's adult-content revenue came from overseas. Therefore, proceeds from those ads cannot be criminal proceeds. And the government does not even allege that proceeds from Backpage's non-adult sections are criminal. Therefore, the government's seizures are patently overinclusive.

## IV. THE SEIZURES VIOLATE CLAIMANT/DEFENDANTS' SIXTH AMENDMENT RIGHT TO COUNSEL

The government's seizure of Claimant/Defendants' "legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment." *Luis v. United States*, 136 S. Ct. 1083, 1088 (2016). In *Luis*, the government sought the pretrial restraint of defendants' untainted funds. *Id*. The Supreme Court held that "insofar as innocent (*i.e.,* untainted) funds are needed to obtain counsel of choice, we believe that the Sixth

---

[41] This District has questioned the viability of the facilitation theory. *See U.S. v. $3,148,884.40 U.S. Currency (Seized From Accounts of Bital)*, 76 F. Supp. 2d 1063, 1067 (C.D. Cal. 1999) (rejecting the facilitation theory as "incompatible" with 18 U.S.C. § 984, which allows for the substitution of fungible property, and provides for a one-year statute of limitations to seek forfeiture of such property).

[42] Domestic laws should not be applied extraterritorially unless Congress clearly denotes foreign application. *See Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S. 247, 255 (2010). But the Travel Act's text plainly demonstrates its domestic focus. *See* 18 U.S.C. § 1952(b)(2) ("unlawful conduct" means "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.").

Amendment prohibits the court order that the Government seeks." *Id*. at 1093. The Court also distinguished prior cases in which it had upheld the pretrial restraint of assets traceable to the alleged crime, noting that "the law has tracing rules that help courts implement the kind of distinction we require in this case." *Id*. at 1095.

Here, those tracing rules make clear that the government has engaged in a massive overreach in its seizure of Claimant/Defendants' undeniably innocent funds that are wholly unconnected to Backpage. Likewise, the government's seizure of Backpage proceeds, but without connecting them to specific illegal ads of which Claimant/Defendants had knowledge and intended to promote, is a further violation of Claimant/Defendants' Sixth Amendment rights. Under *Luis*, the government's seizure of the entire balances of Claimant/Defendants' bank and brokerage accounts therefore plainly deprives Claimant/Defendants of their Sixth Amendment right to obtain counsel of choice.

## V. CONCLUSION

For the foregoing reasons, this Court should vacate the Seizures. Alternatively, this Court should order an evidentiary hearing and require the government to justify any seizures with sufficiently reliable evidence to meet First Amendment standards that any seized assets are proceeds from specific illegal advertisements for illegal prostitution or human trafficking of which Claimant/Defendants had knowledge and specifically intended to promote, or are funds used to facilitate the laundering of such proceeds. At a minimum, this Court must vacate the seizure of all funds unrelated to Backpage and all Backpage funds that are the proceeds of Backpage's legal activities.

Dated: July 31, 2018             BIENERT, MILLER & KATZMAN, PLC

                                 By: /s/ Thomas H. Bienert
                                   Thomas H. Bienert
                                   Kenneth M. Miller
                                   Anthony R. Bisconti
                                   Attorneys for James Larkin

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO VACATE OR MODIFY SEIZURE WARRANTS