# Exhibit "B"

PART 2

Exhibit 8

| Number | A. Case | B. Magistrate Judge | C. Affidavit-Warrant Date Signed | D. Entity/Person (Owner) | E. Bank | F. Account | G. Estimated Balance at Seizure | H. Seizure Method(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | 18-MJ-00716 | Honorable Patrick J. Walsh | 3/28/2018 | ■ | ■ | XXXX 3620 / (6) | unknown | Criminal Civil CACD |
| 2 | | | 3/28/2018 | ■ | ■ | XXXXXX 3873 / (2A) | $■ | Criminal Civil CACD |
| | | | | | | | $■ | |
| 3 | 18-MJ-00723 | Honorable Patrick J. Walsh | 3/28/2018 | ■ | ■ | XXXX 2523/ (9) XXXX 44S10 (9) | $■ | Criminal Civil CACD Postal |
| | | | | | | | $■ | |
| 4 | 18-MJ-00996 | Honorable John E. McDermott | 4/26/2018 | ■ | ■ | XXXX 2485 / (16A) (approx) | $■ | Civil CACD |
| 5 | 18-MJ-00996 | Honorable John E. McDermott | 4/26/2018 | ■ | ■ | XXXX 3126 / (16C) (approx) | $■ | Civil CACD |
| 6 | 18-MJ-00996 | Honorable John E. McDermott | 4/26/2018 | ■ | ■ | XXXXX 8316 / (16D) | $■ | Civil CACD |
| 7 | 18-MJ-00996 | Honorable John E. McDermott | 4/26/2018 | ■ | ■ | XXXXX 8324 / (16E) | $■ | Civil CACD |
| 8 | 18-MJ-00996 | Honorable John E. McDermott | 4/26/2018 | ■ | ■ | XXXXX 8332 / (16F) | $■ | Civil CACD |
| 9 | 18-MJ-00997 | Honorable John E. McDermott | 4/26/2018 | ■ | ■ | XXXXXXXX 1210 / (17) | $■ | Civil CACD |
| | | | | | | | $■ | |
| 10 | 18-MJ-00996 | Honorable John E. McDermott | 4/26/2018 | ■ | ■ | XXXX 1897 / (16B) | $■ | Civil CACD Postal |
| | | | | | | | $■ | |
| 11 | | | 3/28/2018 | Lacey | SAN FRANCISCO, CA 94109-2019 | | $■ | Criminal |
| 12 | | | 3/28/2018 | Lacey | SEBASTOPOL, CA 95472-4947 | | $■ | Criminal |
| 13 | | | 3/28/2018 | Lacey | SAN FRANCISCO, CA 94115 | | $■ | Criminal |
| 14 | | | 3/28/2018 | Lacey | SAN FRANCISCO, CA 94123 | Lis Pendens | $■ | Criminal |
| 15 | | | 3/28/2018 | Lacey | PARADISE VALLEY, AZ 85253 | Lis Pendens | $■ | Criminal |
| 16 | | | 3/28/2018 | Lacey | SEDONA, AZ | Lis Pendens | $■ | Criminal |
| 17 | | | 7/25/2018 | Lacey | Paradise Valley, AZ 85253 | | $■ | Criminal (S) |
| 18 | | | 7/25/2018 | Lacey | Paradise Valley, AZ 85253 | | $■ | Criminal (S) |
| 19 | | | 7/25/2018 | Lacey | Paradise Valley, AZ 85253 | | $■ | Criminal (S) |
| 20 | | | 7/25/2018 | Lacey | Paradise Valley, AZ 85253 | | $■ | Criminal (S) |
| 21 | | | 7/25/2018 | Lacey | Paradise Valley, AZ 85253 | | $■ | Criminal (S) |
| | | | | | | | $■ | |
| | | | | | | Lacey Total | $■ | |

Lacey Seizures

Case 2:18-cv-06742-RGK-PJW   Document 6-2   Filed 08/01/18   Page 5 of 86   Page ID #:287

LARKIN SEIZURES

| Number | A.<br>Case | B.<br>Magistrate Judge | C.<br>Affidavit-Warrant<br>Date Signed | D.<br>Entity/Person<br>(Owner) | E.<br>Bank | F.<br>Account | G.<br>Estimated Balance at<br>Seizure | H.<br>Seizure Method(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | | | 3/28/2018 | ██████ | ██████ | XXXXXX 3873 / (2A) | $████ | Criminal<br>Civil CACD |
| | | | | | | | $██████ | |
| 2 | 18-MJ-00713 | Honorable Patrick J. Walsh | 3/28/2018 | ████ | ████ | XXXXXXXXXXX 8225 / (8A) | $███ | Criminal<br>Civil CACD<br>Postal |
| 3 | 18-MJ-00713 | Honorable Patrick J. Walsh | 3/28/2018 | ████ | ████ | XXXXXXXXXXX 7054 / (8B) | $████ | Criminal<br>Civil CACD<br>Postal |
| 4 | 18-MJ-00722 | Honorable Patrick J. Walsh | 3/28/2018 | ██ | ████ | XXXX 2592 / (7B) | $████ | Criminal<br>Civil CACD<br>Postal |
| 5 | 18-MJ-00722 | Honorable Patrick J. Walsh | 3/28/2018 | ███ | ████ | XXXX 1938 / (7E) | $████ | Criminal<br>Civil CACD<br>Postal |
| 6 | 18-MJ-00722 | Honorable Patrick J. Walsh | 3/28/2018 | ██ | ████ | XXXX 1889 / (7A) | $████ | Criminal<br>Civil CACD<br>Postal |
| | | | | | | | $██████ | |
| 7 | 18-MJ-00797 | Honorable Patrick J. Walsh | 4/9/2018 | ████ | ████ | XXXXXX 70012 / (14) | $████ | Criminal (S)<br>Civil CACD<br>Postal |
| | | | | | | | $██████ | |
| 8 | 18-MJ-00996 | Honorable John E. McDermott | 4/26/2018 | ███ | ██████ | XXXXXX 8103 / (16G) | $████ | Criminal (S)<br>Civil CACD |
| 9 | 18-MJ-00996 | Honorable John E. McDermott | 4/26/2018 | ███ | ██████ | XXXXX 8162 / (16H) | $████ | Criminal (S)<br>Civil CACD |
| 10 | 18-MJ-00996 | Honorable John E. McDermott | 4/26/2018 | ███ | ██████ | XXXXX 8189 / (16I) | $████ | Criminal (S)<br>Civil CACD |
| | | | | | | | $██████ | |
| 11 | 18-MJ-01427 | Honorable Jean P. Rosenbluth | 6/4/2018 | ██████ | ██████ | XX-XX2020 | $██████ | Criminal (S)<br>Civil CACD |
| | | | | | | | $█████ | |
| 12 | | | | ████ | ██████ | XXXXXX 0012 | $█████ | Criminal (S)<br>Postal |
| | | | | | | | $█████ | |
| 13 | | | | ██ | ST HELENA, CA 94574 | Lis Pendens | $███ | Criminal |
| 14 | | | | ██ | PARADISE VALLEY, AZ 85253 | Lis Pendens | $███ | Criminal |
| 15 | | | | ██ | CHICAGO, IL 60637 | Lis Pendens | $███ | Criminal |
| 16 | | | | ██ | Paris, France 75007 | ████████ | | Criminal (S) |
| | | | | | | | $██████ | |

8-003

LARKIN SEIZURES

| 17 | | | | ■ | ■■■■■■ | XXXXXX 0114<br>$■■■■ (4-5-18)<br>$■■■ (4-6-18)<br>$■■■ (5-10-18) | $3■■■ | unknown |
| | | | | | | | $■■■■ | |

| LARKIN TOTAL | $■■■■■ |
| | |

8-004

| Number | A. Case | B. Magistrate Judge | C. Affidavit-Warrant Date Signed | D. Entity/Person (Owner) | E. Bank | F. Account | G. Estimated Balance at Seizure | H. Seizure Method(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | 18-MJ-00715 | Honorable Patrick J. Walsh | 3/28/2018 | ▮ | ▮ | XXXXXX 3825 / (2B) | $▮ | Criminal Civil CACD Postal |
| | | | | | | | $▮ | |
| 2 | | | 3/28/2018 | ▮ | ▮ | XXXXXX 3873 / (2A) | $▮ | Criminal Civil CACD |
| | | | | | | | $▮ | |
| 3 | 18-MJ-00798 | Honorable Patrick J. Walsh | 4/4/2018 | ▮ | ▮ | XXXXX 6878 / (15A) | $▮ | Civil CACD |
| 4 | 18-MJ-00798 | Honorable Patrick J. Walsh | 4/4/2018 | | | XXXXX 4954 / (15B) | $▮ | Civil CACD |
| 5 | 18-MJ-00798 | Honorable Patrick J. Walsh | 4/4/2018 | | | XXXXX 7892 / (15D) | $▮ | Civil CACD |
| 6 | 18-MJ-00798 | Honorable Patrick J. Walsh | 4/4/2018 | | | XXXXX 7889 / (15E) | $▮ | Civil CACD |
| 7 | 18-MJ-00798 | Honorable Patrick J. Walsh | 4/4/2018 | | | XXXXX 7888 / (15F) | $▮ | Civil CACD |
| 8 | 18-MJ-00798 | Honorable Patrick J. Walsh | 4/4/2018 | | | XXXXX 6485 / (15G) | $▮ | Civil CACD |
| 9 | 18-MJ-00798 | Honorable Patrick J. Walsh | 4/4/2018 | | | XXXXX 0582 / (15C) | $▮ | Civil CACD |
| | | | | | | | $▮ | |
| 10 | | | 7/25/2018 | ▮ | Pinetop, AZ 85935 | | $▮ | Criminal (S) |
| 11 | | | 7/25/2018 | ▮ | Phoenix, AZ 85018 | | $▮ | Criminal (S) |
| 12 | | | 7/25/2018 | ▮ | Phoenix, AZ 85018 | | $▮ | Criminal (S) |
| | | | | | | | $▮ | |
| | | | | | | Brunst Total | $▮ | |

8-005

| Number | A. Case | B. Magistrate Judge | C. Affidavit-Warrant Date Signed | D. Entity/Person (Owner) | E. Bank | F. Account | G. Estimated Balance at Seizure | H. Seizure Method(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | 18-MJ-00719 | Honorable Patrick J. Walsh | 3/28/2018 | ▅ | ▅▅▅▅ (Safety Deposit Box) | XXXXX 7224 | $▅ | Civil CACD |
| | | | | | | | $▅ Unknown | |
| 2 | 18-MJ-00719 | Honorable Patrick J. Walsh | 3/28/2018 | ▅ | Money Market Account | XXXX 3645 / (3C) | $▅ | Criminal Civil CACD |
| 3 | 18-MJ-00724 | | 3/28/2018 | ▅ | ▅▅ | XXXXXX 6292 / (10) | $▅ | Criminal Civil CACD |
| 4 | | | 3/28/2018 | ▅▅▅▅ | ▅▅ | XXXXXX 3873 / (2A) | $▅ | Criminal Civil CACD |
| | | | | | | | $▅ | |
| 5 | 18-MJ-00712 | Honorable Patrick J. Walsh | 3/28/2018 | ▅▅ | ▅▅▅▅ ▅▅ | XXXXX 6943-01 / (5A) | $▅ | Criminal Civil CACD Postal |
| 6 | 18-MJ-00712 | Honorable Patrick J. Walsh | 3/28/2018 | ▅▅ | ▅▅▅▅ ▅▅ | XXXXX 5280-01 / (5B) | $▅ | Criminal Civil CACD Postal |
| 7 | 18-MJ-00719 | Honorable Patrick J. Walsh | 3/28/2018 | ▅ | ▅▅▅ ▅▅ | XXXX 0178 / (3A) | $▅ | Criminal Civil CACD Postal |
| 8 | 18-MJ-00719 | Honorable Patrick J. Walsh | 3/28/2018 | ▅ | ▅▅▅ Checking Account | XXXX 0151 / (3B) | $▅ | Criminal Civil CACD Postal |
| | | | | | | | $▅ | |
| 9 | 18-MJ-00718 | Honorable Patrick J. Walsh | 4/9/2018 | ▅▅▅▅ | ▅▅ | XXX 6910 (4) | $▅ | Criminal Civil CACD Postal |
| | | | | | | | $▅ | |
| | | | | | | SPEAR TOTAL | $▅ | |

Ferrer Seizures

| Number | A. Case | B. Magistrate Judge | C. Affidavit-Warrant Date Signed | D. Entity/Person (Owner) | E. Bank | F. Account | G. Estimated Balance at Seizure | H. Seizure Method(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | 18-MJ-00722 | Honorable Patrick J. Walsh | 3/28/2018 | ███ | ███ | XXXX 2912 / (7C) | $███ | Civil<br>Criminal (US v. Ferrer) |
| 2 | 18-MJ-00722 | Honorable Patrick J. Walsh | 3/28/2018 | ███ | ███ | XXXX 2500 / (7D) | $███ | Criminal<br>Civil CACD<br>Criminal (US v. Ferrer) |
| 3 | 18-MJ-00752 | Honorable Patrick Walsh | 3/28/2018 | ███ | ███ | XXX 4832 / (12A) | ███ | Criminal<br>Civil CACD<br>Criminal (US v. Ferrer) |
| 4 | | | 5/16/2018 | ███ | ███ | x4155 | $███ | Criminal (US v. Ferrer)<br>Criminal (US v. Backpage) |
| 5 | | | 5/16/2018 | Unknown | ███ | XXXXX - 6180 | unknown | Criminal(US v. Ferrer)<br>Criminal (US v. Backpage) |
| 6 | | | 5/16/2018 | Unknown | ███ | XXXXX - 6255 | unknown | Criminal (US v. Ferrer)<br>Criminal (US v. Backpage) |
| 7 | | | 5/16/2018 | Unknown | ███ | XXXXX - 5978 | unknown | Criminal (US v. Ferrer)<br>Criminal (US v. Backpage) |
| 8 | | | 5/16/2018 | Unknown | ███ | XXXXX - 7091 | unknown | Criminal (US v. Ferrer)<br>Criminal (US v. Backpage) |
| 9 | | | 5/16/2018 | bitcoin cash wallet containing 55 bch transferred from address ███ | | bitcoin cash wallet address ~t8v7e | $███ | Criminal (US v. Ferrer) |
| 11 | 18-MJ-00720 | Patrick J. Walsh | 3/28/2018 | ███ | ███ | XXXXX 1098 / (13) | unknown | Civil CACD |
| 10 | | | 3/28/16<br>5/16/2018 | ███ | The Colony, Texas | | $███ | Criminal (S)<br>Criminal (US v. Ferrer) |
| | | | | | | **Total Ferrer** | $███ | |

| Number | A. Case | B. Magistrate Judge | C. Affidavit-Warrant Date Signed | D. Entity/Person (Owner) | E. Bank | F. Account | G. Estimated Balance at Seizure | H. Seizure Method(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | 18-MI-00721 | Honorable Patrick J. Walsh | 3/28/2018 | | | XXXXX 7188 / (1) | | Criminal Civil CACD Criminal (US v. Backpage) |
| 2 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 5803 / (18A) | | Civil CACD Criminal (US v. Backpage) |
| 3 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 5801 / (18B) | | Civil CACD Criminal (US v. Backpage) |
| 4 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 5805 / (18C) | | Civil CACD Criminal (US v. Backpage) |
| 5 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 2226 / (18D) | | Civil CACD Criminal (US v. Backpage) |
| 6 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 2231 / (18E) | | Civil CACD Criminal (US v. Backpage) |
| 7 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 2230 / (18F) | | Civil CACD (US v. Backpage) |
| 8 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 4194 / (18G) | | Civil CACD Criminal (US v. Backpage) |
| 9 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 4196 / (18H) | | Civil CACD (US v. Backpage) |
| 10 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 4198 / (18I) | | Civil CACD Criminal (US v. Backpage) |
| 11 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 8083 / (18J) | | Civil CACD Criminal (US v. Backpage) |
| 12 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 8086 / (18K) | | Civil CACD Criminal (US v. Backpage) |
| 13 | 18-MI-00998 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 8080 / (18L) | | Civil CACD Criminal (US v. Backpage) |
| 14 | 18-MI-01001 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXXXXXX 2452 / (21A) | | Civil CACD Criminal (US v. Backpage) |
| 15 | 18-MI-01001 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXXXXXX 4721 / (21B) | | Civil CACD Criminal (US v. Backpage) |
| 16 | 18-MI-01000 | Honorable John E. McDermott | 4/26/2018 | | | XXXXXXXXX 7664 / (20) | | Civil CACD Criminal (US v. Backpage) |
| 17 | | | 5/16/2018 | | | x4155 | | Criminal (US v. Ferrer) Criminal (US v. Backpage) |
| 18 | | | 5/16/2018 | | | x4155 | | Criminal (US v. Backpage) |
| 19 | | | 5/16/2018 | | | x4155 | | Criminal (US v. Backpage) |
| 20 | | | 5/16/2018 | | | x4155 | | Criminal (US v. Backpage) |
| 21 | | | 5/16/2018 | | | x4155 | | Criminal (US v. Backpage) |
| 22 | | | 5/16/2018 | | | x4155 | | Criminal (US v. Backpage) |
| 23 | | | 5/16/2018 | unknown | | XXXXX -6Lix5 | | Criminal (US v. Backpage) |
| 24 | | | 5/16/2018 | unknown | | XXXXX -6Lix5 | | Criminal (US v. Backpage) |

Backpage Seizures

| 25 | | | 5/16/2018 | unknown | | XXXXXX -6Lix5 | | Criminal (US v. Backpage) |
|---|---|---|---|---|---|---|---|---|
| 26 | | | 5/16/2018 | unknown | | XXXXXX -6Lix5 | | Criminal (US v. Backpage) |
| 27 | | | 5/16/2018 | unknown | | XXXXXX -6Lix5 | | Criminal (US v. Backpage) |
| 28 | | | 5/16/2018 | unknown | | XXXXXX -goaeV | | Criminal (US v. Backpage) |
| 29 | | | 5/16/2018 | unknown | | XXXXXX -t8v7e | | Criminal (US v. Backpage) |
| 30 | | | 5/16/2018 | unknown | | XXXXXX - 6180 | | Criminal(US v. Ferrer) Criminal (US v. Backpage) |
| 31 | | | 5/16/2018 | unknown | | XXXXXX - 6255 | | Criminal (US v. Ferrer) Criminal (US v. Backpage) |
| 32 | | | 5/16/2018 | unknown | | XXXXXX - 5978 | | Criminal (US v. Ferrer) Criminal (US v. Backpage) |
| 33 | | | 5/16/2018 | unknown | | XXXXXX - 7091 | | Criminal (US v. Ferrer) Criminal (US v. Backpage) |
| 34 | | | 5/16/2018 | | | XXXXXX - 6886 | | Criminal (US v. Backpage) |
| 35 | | | 5/16/2018 | | | XXXXXX - 1124 | | Criminal (US v. Backpage) |
| 36 | | | 5/16/2018 | | | XXXXXX - 1933 | | Criminal (US v. Backpage) |
| 37 | | | 5/16/2018 | | | ??? | | Criminal (US v. Backpage) |
| 38 | | | 5/16/2018 | | | LI090x | | Criminal (US v. Backpage) |
| 39 | | | 5/16/2018 | | | LI090x /(19A) | | Criminal (US v. Backpage) |
| 40 | | | 5/16/2018 | | | LI300x /(19B) | | Criminal (US v. Backpage) |
| 41 | | | 5/16/2018 | | | LI740x /(19C) | | Criminal (US v. Backpage) |
| 42 | | | 5/16/2018 | | | LI900x /(19D) | | Criminal (US v. Backpage) |

Backpage Seizures



Backpage Seizures



| 50 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 51 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 52 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |

Backpage Seizures



| 53 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 54 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 55 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 56 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 57 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 58 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 59 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 60 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 61 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |

Backpage Seizures

| 62 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
|---|---|---|---|---|---|---|---|---|
| 63 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 64 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 65 | | | 5/16/2018 | | | | | Criminal (US v. Backpage) |
| 66 | | | 5/16/2018 | | N/A | N/A | | Criminal (US v. Backpage) |
| 67 | | | 5/16/2018 | | N/A | N/A | | Criminal (US v. Backpage) |
| 68 | | | 5/16/2018 | | N/A | N/A | | Criminal (US v. Backpage) |
| 69 | | | 5/16/2018 | | N/A | N/A | | Criminal (US v. Backpage) |
| 70 | | | 5/16/2018 | | N/A | N/A | | Criminal (US v. Backpage) |
| 71 | | | 5/16/2018 | | N/A | N/A | | Criminal (US v. Backpage) |

| 72 | | | 5/16/2018 | ███████ | N/A | N/A | ████ | Criminal (US v. Backpage) |
| 73 | | | 5/16/2018 | ████████ | N/A | N/A | $████ | Criminal (US v. Backpage) |
| | | | | | | BACKPAGE TOTAL | $███████ | |

8-015

Unknown Owner/Entity

| Number | A. Asset ID | B. Asset Description | C. Account Number | D. Balance |
|---|---|---|---|---|
| 1 | 18-USP-001426 | Funds in Account XXXX 2207 in the name of ▉ | XXX-2207 | $ ▉ |
| 2 | 18-USP-001427 | Funds in Account #XXXX 00239 in the name of ▉ | XXX-0239 | $ ▉ |
| 3 | 18-USP-001434 | Funds in Account #XX 2177 in the name of ▉ | XX-2177 | $ ▉ |
| 4 | 18-CR-00465 / 18-USP-001542 / 18-CR-00422 | ▉ on Behalf of ▉ | XX-0457 | $ ▉ |
| 5 | 18-USP-001116 / 18-CR-00422 | 6 Bitcoins Valued at $39,576.94 | Bitcoin Wallet -6Lix5 | $ ▉ |
| 6 | 18-USP-001532 / 18-CR-00422 | 55.5 BCH | Bitcoin Cash Wallet-t8V7e | $ ▉ |
| 7 | 18-USP-001706 / 18-CR-00422 | 2,0006933 BTC | Bitcoin Wallet - 6Lix5 | $ ▉ |
| 8 | 18-CR-00422 | ▉ | xxx7177 | unknown |
| 9 | 18-CR-00422 | ▉ | x1262 | unknown |
| 10 | 18-CR-00422 | | x4139 | unknown |
| 11 | 18-CR-00422 | 136.654469S BTC | Bitcoin Wallet-6Lix5 | $ ▉ |
| 12 | 18-CR-00422 | 73.6252224J BCH | Bitcoin Cash Wallet-t8V7e | $ ▉ |
| 13 | 18-CR-00422 | 783.9735116 | Litecoin Wallet-goaeV | $ ▉ |
| 14 | 18-CR-00422 | 509.81904619 BTC | Bitcoin Gold Wallet-kklml | $ ▉ |
| | | Total Unknown Owner/Entity | | $ ▉ |

Case 2:18-cr-00423-DJH Document 287-1 Filed 08/29/18 Page 18 of 119

Exhibit 9

| From: | mantisbot@villagevoicemedia.com |
|---|---|
| Sent: | Thursday, April 03, 2008 7:55 PM |
| To: | carl.ferrer@backpage.com |
| Subject: | [Backpage.com 0004618]: Global filter: Could we make terms very city specific |

A NOTE has been added to this issue.
=====================================================================
http://tasks.vvmedia.com/view.php?id=4618
=====================================================================
Reported By:            ferrerc
Assigned To:            ▮▮▮▮▮▮▮▮
=====================================================================
Project:                Backpage.com
Issue ID:               4618
Category:               backpage.com
Reproducibility:        always
Severity:               minor
Priority:               normal
Status:                 assigned
Task Type:              support
Task Activity:          Open
Task Scope:             Small
Source:
Exp. Start Date:
Exp. Comp. Date:
Fiscal Quarter:
=====================================================================
Date Submitted:         04-03-2008 11:51 MDT
Last Modified:          04-03-2008 12:54 MDT
=====================================================================
Summary:                Global filter: Could we make terms very city
specific
Description:
I am under pressure to clean up phoenix's adult content. Deleting ads and dealing with
chargebacks is messy. They will just re-post and I get no where.

It is better to block terms (although, we will play whack-a-mole but this is better than
deleting ads, chargebacks, refunds and support inquiries from deletion)

Our terms are global. Is it possible to default block all cities and custom block selected
cities?

In phoenix only, I would add terms:
Erotic Languages
Nympho
Pop
Cum
Oral
Back-door
FS
Blow

i

CONFIDENTIAL                                                           BP-PSI-2_00009541

I do not want to do this globally since it would put us in a very uncompetitive position with craig, lead to lots of support inquiries, lost pageviews and revenue.

====================================================================

--------------------------------------------------------------------
████████ - 04-03-08 12:03
--------------------------------------------------------------------
Would this be for both banning and the LSL or just banning?

--------------------------------------------------------------------
 ferrerc - 04-03-08 12:09
--------------------------------------------------------------------
Tamara said having it for the LSL would also be useful. But it should be this option should be at the very bottom of the form.

By the way...I'm going thru content in phoenix via admim (server group b admin server's speed is like bad dial up...glad we are upgrading it)

--------------------------------------------------------------------
████████ - 04-03-08 12:54
--------------------------------------------------------------------
At this point we think it would be easier to achieve this solely with the LSL which runs approximately every 15 minutes. We may be able to do it with the bans as well but that will be more involved so I'd recommend we do this in two phases.

I also want to mention that in order to achieve this in the best way, we will need to move the filters out of the master database and into the central database where the site/city data is located. We've been wanting to do this for a while since there isn't a need of both databases but it does require some systems changes, merging of two database, and configuration tuning making this a larger task.

If this is urgent, we can do it in the master database but our preference would be to take the time and do it right, minimizing future upkeep and maintenance when new sites launch.

Please let us know.

Thanks.

Issue History
| Date Modified | Username | Field | Change |
|---|---|---|---|
| 04-03-08 11:51 | ferrerc | New Issue | |
| 04-03-08 11:51 | ferrerc | Task Type | => support |
| 04-03-08 11:51 | ferrerc | Task Activity | => Open |
| 04-03-08 11:51 | ferrerc | Task Scope | => Small |
| 04-03-08 11:51 | ferrerc | Status | new => assigned |
| 04-03-08 11:51 | ferrerc | Assigned To | => ████████ |
| 04-03-08 11:51 | ferrerc | Status | assigned => feedback |
| 04-03-08 12:03 | ████████ | Note Added: 0011800 | |
| 04-03-08 12:04 | ████████ | Assigned To | ████████ => ferrerc |
| 04-03-08 12:09 | ferrerc | Note Added: 0011801 | |
| 04-03-08 12:09 | ferrerc | Status | feedback => assigned |
| 04-03-08 12:09 | ferrerc | Assigned To | ferrerc => ████████ |
| 04-03-08 12:54 | ████████ | Note Added: 0011802 | |

2

CONFIDENTIAL

BP-PSI-2_00009542

# Exhibit 10

**From:** Andrew Padilla
**To:** ▮ Jeff
**CC:** ▮, Tamara; Vaught, Joye
**Date:** 10/8/2010 10:28 AM
**Subject:** Re: Amy ▮

Jeff,

Until further notice, DO NOT LEAVE NOTES IN USER ACCOUNTS.

Backpage, and you in particular, cannot determine if any user on the site in involved with prostitution. Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over.

There was not one mention of prostitution in the power point presentation. That was a presentation designed to create a standard for what images are allowed and not allowed on the site. If you need a definition of "prostitution", get a dictionary. Backpage and you are in no position to re-define it.

This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job.

Andrew Padilla
Operations Manager
Backpage.com | Village Voice Media

[black redaction box]

>>> On 10/7/2010 at 9:35 PM, Jeff ▮ wrote:
Hi Joye,

The client Redacted for Privacy in Minnesota has been a long time TOU violator. Her account Redacted for Privacy Redacted for Privacy has been on FM & ELO. I denied a lot of requests in the queue because of posting violations. Then she sent a clean ad which I approved but opened the account to check on it later because I was suspicious. A few moments later I discovered this was a different account with the same ad, Redacted for Privacy I monitored it and a couple of minutes later she changed her ad putting in TOU Violations. I deleted the ad and put that account on FM & ELO since she had another approved ad on it. I also included a note as to why.

I found a third account for this client under Redacted for Privacy It also had violations so I did the same thing.

Thanks,

Jeff

https://ra1.vvmsecure.com/classifieds/central/,DanaInfo=admin.www.backpage.com+ManageAds?
user= Redacted for Privacy

BP-PSI-025590

https://ra1.vvmsecure.com/classifieds/central/.DanaInfo=admin.www.backpage.com+ManageAds?
user=**Redacted for Privacy**

https://ra1.vvmsecure.com/classifieds/central/.DanaInfo=admin.www.backpage.com+ManageAds?
user=**Redacted for Privacy**

HIGHLY CONFIDENTIAL

BP-PSI-025591

# Exhibit 11

**From:** Andrew Padilla [andrew.padilla@backpage.com] on behalf of Andrew Padilla
**Sent:** Saturday, October 16, 2010 9:05 PM
**To:**

**Cc:** Carl Ferrer; Dan Hyer
**Subject:** New Moderation Standards

All:

Perhaps indefinitely, and certainly over the next four days, we need to intensify our efforts in cleaning Escorts, Body Rubs, Male Escorts, TS Escorts and Dom & Fetish.

This intensification will come in the form of extra staff and overtime but most importantly in stricter standards for language and images in ads.

I'd like to still avoid Deleting ads when possible, but if an ad makes a clear reference to sex for money or an image displays a sex act,, don't hesitate deleting it. These are not the types of ads we want on our site at all.

In the case of lesser violations, editing should be sufficient. We're still allowing phrases with nuance but if something strikes you as crude or obvious, remove the phrase. We're still allowing HBO type nudity but if an image makes you think twice, remove the image. There is zero tolerance for closeups of exposed genitalia.

To make your efforts count, you'll want to lock any ad you have to edit. You can do this by Editing the Ad in Object Editor. In the Ad Object, scroll down to the Violation Flag field and check the Violated Terms of Use box. Then update the ad object. This prevents a user from making any future edits to that specific ad.

If you find yourself locking ads for any user more than twice, lock their entire account. To do this, first View their account.

i

BP-PSI-022177

Exhibit 12

| | |
|---|---|
| **From:** | carl ferrer |
| **Sent:** | Monday, October 25, 2010 8:34 PM |
| **To:** | Scott Spear |
| **Subject:** | Update |
| **Attachments:** | winmail.dat |

Begin forwarded message:

> From: Carl Ferrer <carl.ferrer@backpage.com>
> Date: October 25, 2010 12:22:12 PM MST
> To: Dan Hyer <Dan.Hyer@backpage.com>
> Subject: Fwd: Update I am giving Scott (i'll call you)
>
> fyi
>
> Begin forwarded message:
>
>> From: Carl Ferrer <carl.ferrer@backpage.com>
>> Date: October 25, 2010 12:19:42 PM MST
>> To: Andrew Padilla <andrew.padilla@backpage.com>
>> Subject: Update I am giving Scott (i'll call you)
>>
>> UPDATE:
>> 1. Hired 13 Indians
>> 2. Adult jobs and personals under beta moderaiton 3. Added multiple
>> efficiencies to queue.
>> 4. Created "Edited ad" queue is built with 15 minute window.
>> 5. We get a lot of complaints about false positives (staff training
issue)
>> 6. Staff requests:
>> - a check box to delete pics easier (scheduled)
>> - Show counter with number of ads pending for review in each queue
>> - Tool to highlight ads in red over 20 minute queue goal and provide
reporting.
>> - Reports
>> * number of ads in each queue within selectable time.
>> * number of ads moderated within a specified time window
>>
>>
>> Recommendations:
>> 1. Adult jobs:
>> a. Comments:
>> - no plan on bringing photo's back.
>> - illegal content removed is usually money for sex act
>> - The content is pretty clean after removing pics.
>>
>> b. Category Standards:
>> - Keep out escorts
>> - no sex act for money
>> - We do NOT delete: porn jobs. They  are legal. Example: Wanted

1

BP-PSI-023761

```
>> Female
for oral sex porn video for $1000. It's legal cause the camera makes it an art form.
>>
>> c. Actions:
>> Sex act for money ads are deleted.
>> Hourly rate escort or body rub ads may be moved to the right category.
>>
>> 2. Personals
>> a. Comments:
>> - heavy graphic content in men seeking men
>> - illegal content is usually money for sex act
>> - sex act pics are common problem.
>> - Are we going to allow nudity displaying any genitalia?
>>
>> b. Standards:
>> - no sex act pics
>> - no hourly rate for service (we are keeping out escorts)
>> - Do NOT delete ads about companion or massages ads if they do NOT
>> include a price.
>> - Sugar daddy and generous gentlemen type ads are OK.
>>
>> c. Actions:
>> Sex act pics are removed.
>> Sex act for money ads are deleted.
>> Hourly rate escort or body rub ads may be moved to the right category.
>>
>> 3. Adult (escorts, body rubs, etc.)
>> a. Comments:
>> - Ads are under review too long
>> - illegal content is usually money for sex act
>> - sex act pics are common.
>> - Are we going to allow nudity displaying any genitalia?
>>
>> b. Standards:
>> - no sex act pics.
>> - no sex act for money text.
>>
>> c. Actions:
>> Sex act pics are removed and ad text may stay.
>> Sex act for money ads are deleted and user is notified.
>>
>>
>>
```

CONFIDENTIAL                                                          BP-PSI-023762

Case 2:18-cr-00423-DJH Document 287-1 Filed 08/29/18 Page 29 of 119

Exhibit 13



# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SACRAMENTO

| | | | |
|---|---|---|---|
| **DATE:** | December 9, 2016 | **DEPARTMENT:** | 61 |
| **JUDGE:** | Michael Bowman | **CLERK:** | D. Rios Sr. |
| **REPORTER:** | N/A | **BAILIFF:** | N/A |

People of the State of California

**CASE NO.** 16FE019224

**Vs.**

Carl Ferrer et al,
Defendants



**Nature of Proceedings:** **COURT'S FINAL RULING ON DEMURRER**

## Introduction

Defendants face charges for their respective roles in owning and operating an online classified advertisement website. Allegedly, through third party use of this website, women and young girls were sexually exploited. The Attorney General seeks to hold the Defendants criminally liable for the victimization of these women. The People of the State of California have a strong and legitimate interest in combating human trafficking by all available legal means. Moreover, any rational mind would concur that the selling of minors for the purpose of sex is particularly horrifying and the government has a right and a duty to protect these most vulnerable victims.

The State's legitimate interest is not absolute, however, and must be constrained by the interests and protections of the First Amendment to the U.S. Constitution. In that vein, the United States Congress has created the Communications Decency Act under 47 USC section 230 ("herein CDA"). The CDA forecloses suit against an online publisher when that suit is based on speech provided by a third party. (47 USC §230 (c) (1) and (e) (3).) By enacting the CDA, Congress struck a balance in favor of free speech by providing for both a foreclosure from prosecution and an affirmative defense at trial for those who are deemed an internet service provider.

In fact, this Court garners strength for its ruling from the legislative history (or lack thereof). The CDA was created in direct response to a legal decision holding an online publisher strictly liable for defamatory statements posted by third parties. (*See Stratton Oakmont v. Prodigy Servs. Co.*, 1995 N.Y. Misc. LEXIS 229.) Since the creation of the CDA, several courts have construed the CDA's immunity provision broadly, such that close cases are resolved in favor of immunity. (*Fair Housing Council of San*

1

*Fernando Valley v. Roommates.com LLC* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.) Congress has had ample opportunity to statutorily modify the immunity provision if it disagrees with prevailing judicial application of this provision. Congress has not done so, and the current legal framework binds this Court.

The key question in this case is not whether speech in furtherance with human trafficking is protected free speech: clearly it is not. The issue to resolve is whether the Defendants should be entitled to immunity under the CDA for providing a forum for third party speech, or whether the defendants have crossed the line of merely providing a forum for speech to become actual creators of speech, and thus not entitled to immunity under the CDA.

## Background

Backpage.com is one of the largest on-line classified advertisement services, through which users may post advertisements in a variety of categories. Posting an advertisement in the "Adult Services" category requires a fee. Through various levels of involvement with Backpage.com, Defendants find themselves facing criminal charges regarding certain advertisements placed in the "Adult Services" category. Carl Ferrer, Michael Lacey and James Larkin currently face a charge of conspiracy to pimp, and Ferrer faces multiple additional charges of pimping and pimping of a minor.

The allegations are that Defendants conspired to create and organize a website that allows sex trafficking to take place. The People assert that Defendants created such a site, knowing that prostitutes and/or pimps use the site to advertise prostitution, and Defendants did so with the intent to derive support and maintenance from the prostitution resulting from the advertisements. The People allege that Defendants' plan has come to fruition and that they have derived financial support and maintenance from the prostitution resulting from the advertisements third parties pay Backpage.com to place. Allegedly, Defendants have also derived support from prostitution resulting from content "created" by Defendants themselves when they took content from the third party advertisements originally placed on Backpage.com and posted new advertisements on EvilEmpire.com and BigCity.com – sites also created and maintained by Defendant Ferrer.

On October 19, 2016, Defendants filed a demurrer to the felony complaint against them. Against the backdrop of unsuccessful attempts by the California and other state Attorneys General to shut down adult online advertising, the Defendants argue that the instant prosecution cannot go forward.

Defendants claim that the complaint and prosecution are: barred by the First Amendment, legally deficient under Section 230 of the Communications Decency Act ("CDA"), and devoid of any facts that constitute public offenses under the criminal statutes.

On November 16, 2016, this Court issued a tentative ruling on the matter, but allowed additional briefing. Both parties have filed additional arguments in response to the tentative ruling.

## Court's legal analysis and ruling

### 1.  Complaint states facts that constitute public offenses

The Defendants argue that the court should grant the demurrer because the Complaint fails to allege any public offense. Rather, Defendants maintain, the People are pursuing a theory of prosecution based on allegations that third parties posted content allegedly relating to unlawful conduct. Defendant Ferrer also claims that the pimping charges against him are deficient because there is nothing to connect Ferrer to any of the advertisements associated with the nine victims. (Def. 24-25) All the defendants allege that the complaint's conspiracy charge is deficient because it does not address several elements of conspiracy. (Def. 25-26) The People claim that the complaint expressly alleges that Defendant Ferrer "knowingly and repeatedly took the earnings of victims engaged in prostitution because his livelihood depended on it." (Opp. 18) As to the conspiracy between all the defendants, the People assert that the complaint expressly alleges they conspired together to commit pimping for the purpose of further enriching themselves. (Opp. 19) The People maintain that level of specificity is all that is required to provide notice under Penal Code section 952. (Opp. 18-20) The People argue that Defendants' assertion that the complaint does not adequately state facts that constitute public offenses belies confusion between civil and criminal pleading requirements. (Opp. 20) As stated below, the key issue here is whether Defendants are able to claim immunity under the CDA. Such ability to claim liability would not necessarily render the complaint deficient. The charging instrument however, is sufficient in this case.

### 2.  Defendants Challenge is Appropriately Raised in a Demurrer

The People claim that a demurrer is not the appropriate vehicle in which to raise a defense of immunity under the CDA. Rather, the People contend that such immunity may only be raised as an affirmative defense. This Court disagrees.

A demurrer to a criminal complaint lies only to challenge the sufficiency of the pleading and raises only issues of law. (Pen. Code, § 1004; *People v. McConnell* (1890) 82 Cal. 620; *People v. Biane* (2013) 58 Cal.4th 381, 388.) A defendant may demur only on delineated statutory grounds. (Pen. Code, § 1004; *People v. Saffell* (1946) 74 Cal.App.2d supp. 967, 972.) These include the ability to challenge the accusatory pleading on the ground that the pleading includes information that would be a bar to

prosecution. (Pen. Code, § 1004(5). *See also People v. Goodman* (2014) 225 Cal.App.4th 950, 956.) The language of the CDA itself states, "No cause of action may be brought and no liability will may be imposed under any State or local law that is inconsistent with this section." (47 U.S.C. §230 (e) (3) (emphasis added).) This statutory language clearly demonstrates a legislative intent to provide both a bar to prosecution and an affirmative defense at trial

Stated more succinctly "...close cases, we believe, must be resolved in favor of immunity, lest we cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged--or at least tacitly assented to--the illegality of third parties." Fair Housing. Council v. Roommates.com, LLC, 521 F.3d 1157, 1174, 2008 U.S. App. LEXIS 7066, *45, 36 Media L. Rep. 1545 (9th Cir. Cal. 2008 (emphasis added).

### 3. The First Amendment is implicated

Defendants contend that the First Amendment bars prosecution, as the People are seeking to prosecute individuals for the act of publishing third party content. However, the instant charges are not based on an overt attempt to criminalize the act of publication, and traditional First Amendment analysis is not required here. That is not to say that the First Amendment is not implicated. As noted, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA. Congress expressly intended to relieve online publishers from liability for publishing third-party speech. (47 U.S.C. § 230) Thus, the relevant question in this case is whether, and to what extent, Defendants' activities entitle them to protection of their First Amendment rights through the immunity provision of the CDA.

### a. Immunity Under the Communications Decency Act

The CDA provides immunity for online publishers and distributors of content generated by third parties. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.) Protection from the CDA is broken down into three parts. Conduct is shielded if the defendant (1) is a provider or user of an interactive computer service; (2) that the plaintiff seeks to treat as a publisher or speaker; (3) of information provided by another information content provider. (*Fields v. Twitter, Inc.* (2016 U.S. Dist. LEXIS 105768, *8; *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 19; 47 U.S.C. §230.) "There has been near-universal agreement that section 230 should not be construed grudgingly." (*Doe, supra*, 817 F.3d at 118 [citations omitted].)

The second component is the instant source of dispute. Defendants assert that Backpage.com is an internet service provider that merely allows third parties to publish their content, and the instant prosecution seeks to impermissibly treat them as the speaker. The People respond that the CDA does not

protect those who knowingly commit their own crimes on the internet. The People assert that Defendants should be viewed as content providers, and not entitled to immunity under the CDA.

### b. Content provision versus editorial functions

To determine whether defendant faces a claim that seeks to treat the defendant as a publisher or speaker of information provided by a third party, "'courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker'." (*Fields, supra*, 2016 U.S. Dist. LEXIS 105768, \*10, *quoting Barnes v. Yahoo!, Inc.* 570 F.3d 1096, 1101-02.) Moreover, because distributors are included in the publisher category, distributors are also entitled to protection under the CDA. After all, publication includes every repetition and distribution of material. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45.) Under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune." (*Fair Housing Council of San Fernando Valley v. Rommates.com, LLC,* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.) The Ninth Circuit has recognized that although "there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality...Such close cases must be resolved in favor of immunity..." (*Id* at 1174.)

Although the People acknowledge that third parties provided the content for the original advertisements placed on Backpage.com, the prosecution asserts that Defendants developed the content on BigCity.com and EvilEmpire.com by deliberately manipulating that original content to generate the advertisements placed on BigCity and EvilEmpire. The People assert that Defendants created "fake profiles" when "Backpage staff took images and information from Backpage escort ads and used them to create dating profiles on BigCity.com." (Ex 1, p2) In support of this claim, the People refer to an internal Backpage email that states "The content will be pre-populated with millions of images from backpage where we hope to extract two words of the title, the phone number, and age of the person. The images will need to be processed to where we crop an area most likely to give us a wholesome image." (Ex A) Backpage also added new information, "in line with the alleged purpose of the profile." This information was not taken from the original Backpage ad, and required staff to choose one of the following: "Interested in Men," "Interested in Women," or "Interested in Everyone." (Ex 1, p4) There were no links to the original Backpage ad and Defendants hoped to pitch BigCity as a dating site to Backpage.com escort users.

The People also allege that "Defendants took images and information from Backpage escort ads and used them to create a phone directory for female escorts on EvilEmpire.com." (Ex 1, p3) Customers could contact the escort directly from the number listed on EvilEmpire or through a link to original Backpage ad. The People acknowledge that the escort phone directory used "much of the same data that was selected to create a BigCity profile that was generated for that Backage escort user." (Ex 1, p5) However, EvilEmpire provides no opportunity for users to sign up, modify or contribute to entries. (Ex 1, p5)

In support of its claim that these actions constituted content creation, the People rely on *People v. Bollaert* (2016) 248 Cal.App.4th 699. In *Bollaert*, the defendant was convicted of extortion and unlawful use of personal identifying information. He set up two websites: a revenge porn site and a site which victims of the former could utilize to have their information removed, for a fee. To use the revenge porn site, defendant designed "required fields" that required a user seeking to post a photo of another person to input that other person's full name, age, location and Facebook link. Bollaert had the only user account; he looked at every single post and decided what would get posted, placed watermarks on each photographs to discourage re-posting by third parties, and kept a spreadsheet recording every post. Bollaert would not post pictures that he considered "garbage" which included those that did <u>not</u> include nude persons. (*Id* at 706) At trial, the jury rejected defendant's assertion that he was immunized as a service provider under the CDA.

On appeal, the Fourth District affirmed the conviction. The court noted that the immunity under the CDA was limited to interactive computer services that do not retain or acquire personal information with the intent to defraud, or that do not act as content providers. (*Id*. at 709-710.) In Bollaert's case, the evidence showed that he designed the revenge porn site specifically for the purpose of eliciting nude photos and private information of others. Bollaert then used that personal information for his own purposes, *i.e.*, for display on his website, to gain advertising income and to obtain payments from his removal website. The court found there was sufficient evidence that Bollaert retained the personal information with the intent to defraud the victims.

The court also rejected defendant's claim that he was entitled to immunity under the CDA because the evidence demonstrated he was a content provider. The court determined that Bollaert's affirmative acts in designing the website to <u>require</u> users to provide content that violated other persons' privacy did not entitle him to immunity under the CDA. The court based its conclusion and reasoning on the Ninth Circuit's *Roommates* decision, which also involved a website that was "designed to solicit" content that was unlawful. These acts were not neutral, but rather "materially contributed to the illegality of the content" such that the defendant became a content provider. (*Bollaert, supra*, 248 Cal.App. 4th at 721.)

Defendants here contend that *Bollaert* is distinguishable from the instant case because in that case, the defendant Bollaert *required* the entry of unlawful information by the user, which fell into the narrow exception to immunity recognized by *Roommates*. (Def. Supp. 3) In contrast, Defendants argue, Backpage.com does not require users to enter unlawful information. This Court agrees with the Defendants.

In *Fair Housing v. Roommates.com* (9th Cir. 2008) 521 F.3d 1157, the defendant ran a website for the purposes of matching potential roommates together. In order to utilize the website, participants

were required to answer a series of questions regarding a user's sex, sexual orientation and whether they will bring children to the household. Paid subscriptions provided access to detailed preferences from potential roommates. (*Id* at 1161-1162) The Fair Housing Councils of two cities sued Roommates, and alleged a violation of the Fair Housing Act and California housing discrimination laws. The Councils alleged that the website was acting as a housing broker in ways that it could not lawfully do off-line. (*Id* at 162.) The district court granted Roommate's motion to dismiss based on immunity provided by the CDA. The Ninth Circuit reversed.

The Ninth Circuit found that by creating the questions and choice of answers that a real estate broker was legally prohibited from asking and then requiring subscribers to answer them, Roommate became an information content provider and not immune under the CDA. (*Id* at 1164.) The court contrasted Roommate's impermissible behavior, where it both elicited the allegedly illegal content and made aggressive use of it in conducting its business, with permissible utilization of a neutral classification tool or search engine that does nothing to enhance the illegality of the content. (*Id* at 1172.)

Here, there are no allegations that Backpage required a third-party user to provide any protected information when the original ad is placed. As the information posted on EvilEmpire and BigCity is mostly taken from the original ad, Defendants did not "design to solicit" protected content as a condition to placing the ad. In fact, according to the exhibits attached by the People, Backpage moderators were instructed to look for offending material and remove it. (AG Supp. 6, Ex 9)

The People argue that Defendants actively "manipulated" the content provided by third parties so that they could profit from activity resulting from the ad placement. In light of the People's acknowledgement that the substance of the ads came from the original ad placed on Backpage, the only "manipulation" would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site. This is not prohibited activity. Indeed, it generally falls within the scope of protected editorial functions. (*See Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12, 20-21 [service providers' decisions on website structure, rules for posting and reposting are protected publisher functions] and *Fields v. Twitter, Inc.* (N.D. Cal 2016), 2016 U.S. Dist. Lexis 105768, *21 [protected publishing activity included decisions about what third party content may be posted or reposted online].) (*See also Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398-408-409 [Sixth Circuit adopting the "material contribution test" and determining that within the context of web hosting, a service provider must require third-parties to enter unlawful or actionable content to be deemed a content provider].

Undeterred, the People assert that content was created when one piece of information was added to BigCity profiles. In generating a BigCity ad, Backpage staff was required to choose "Interested in Men," "Interested in Women," and "Interested in Everyone." This information was not taken from the original Backpage ad. Yet, as Defendants note, the People acknowledge that these headings were "in line" with

the purpose of each profile. (Def. Supp. 4, fn3)  This creation of a headline "in line" with the content of the ad was not a material contribution to the offensive nature of the material.  (*See Phan v. Pham* (2010) 182 Cal.App.4th 323 [holding when Defendant's own acts material contribute to the illegality of the material, immunity under the CDA will be lost]. *See also Kimzey v. Yelp! Inc* (9th Cir 2016) 836 F.3d 1263, 1270 (Court found the service provider's creation and addition of a star rating system was best characterized as the kind of "neutral tool" operating on "voluntary inputs" determined to be permissible in *Roommates*.)

The People also accuse Defendants of creating "fake profiles" for BigCity postings, similar to *Anthony v. Yahoo! Inc* (N.D. Cal. 2006) 421 F.Supp.2d 1257.  In that case, Plaintiffs belonged to an online dating service through Yahoo.  Plaintiffs alleged that Yahoo created false profiles and sent those false and expired profiles to them as enticement to renew their dating service subscription.  The court refused Yahoo's claim of immunity under the CDA at the dismissal stage.  The court stated that the allegations that Yahoo created false profiles were sufficient to allow the case to go forward.

Here, the People have acknowledged that the content posted on EvilEmpire and BigCity were taken directly from the original Backpage ad.  This is different than the allegation in *Anthony* that Yahoo created a profile for a person who did not exist and represented to others that the fictitious person in the profile was available to date.

The People maintain Backpage created content similar to in *J.S. v. Vill. Voice Media Holdings, LLC* (2015) 184 Wn.2d 95J.S.  In that case, advertisements featuring three minor girls were posted online on a site owned by Backpage.  These girls became victims of sex trafficking and brought suit against Backpage.  Backpage moved to dismiss the case on the basis of immunity provided by the CDA.  The Washington Supreme Court refused to grant the motion to dismiss.  (*Id* at 98-99.)  The *J.S.* court stated that the case turned on whether Backpage merely hosted the advertisements or helped develop the content of those advertisements.  (*Id* at 101)

Applying the applicable state standard for a motion to dismiss, the *J.S.* court found that the plaintiffs alleged facts that, if proved true, would show that Backpage did more than simply maintain neutral policies prohibiting or limiting certain content.  Specifically, those allegations included that Backpage intentionally developed its website to require information that allows and encourages illegal trafficking of underage girls, developed content requirements that it knows will allow solicitors to evade law enforcement and that Backpage knows that the foregoing content requirements are a fraud and ruse actually aimed at helping pimps and prostitutes.  (*Id* at 102.)  The *J.S.* court found that it did not appear beyond a reasonable doubt that no facts existed that would justify relief, and denied Backpage's motion to dismiss.  (*Id* at 103.)

Here, the People allege that Defendants "created" content and are not entitled to immunity. However, on the face of the allegations, Defendants have, at most, republished material that was created by a third party. The People allege that the content was taken from ads placed by Backpage Escort users and posted onto EvilEmpire.com. The declaration in support of Defendants' arrest warrant states that the ads placed in EvilEmpire.com were "essentially identical" to the ads placed by the third party on Backpage.com and that EvilEmpire was an "additional platform for Backpage Escort ads." This demonstrates republication, not content creation. Republication is entitled to immunity under the CDA. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 63.)

Finally, the People assert that the Defendants' acts of pulling information from the original Backpage ad "constituted more than the mere reposting of information with 'slight' modifications." (AG Supp. 5) The People assert that when posting on BigCity, Backpage staff deleted all text, and converted the ad into a dating profile, contrary to the intent of the original ad poster. Yet, reposting content created by a third party is immune from liability for the offensive content under the CDA. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 63.) The act of reformatting original content to be placed on another site is also a traditionally protected editorial function. (*See Fair Housing Council of San Fernando Valley v. Roommates.com LLC* (9th Cir. 2008) 521 F.3d 1157, 1170-1171 [under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune."].) Finally, assuming that the People's assertion is true; that the ad went from expressing intent to advertise prostitution to express a desire to "date," the People are essentially complaining that Backpage staff scrubbed[1] the original ad, removing any hint of illegality. (AG Supp. 5-6) If this was the alleged content "manipulation," the content was modified from being illegal to legal. Surely the AG is not seeking to hold Defendants liable for posting a legal ad; this behavior is exactly the type of "good Samaritan" behavior that the CDA encourages through the grant of immunity.

The People's overall theory is that Backpage knew prostitution ads were placed on its main site and, in response, created two additional websites with the goal of encouraging that prostitution through increased ad placement. There are at least two problems with this theory. First, online publishers are not subject to notice liability. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45-46; *See also Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 407-408 [explaining that immunity under the CDA bars notice liability in an effort to maintain the robust nature of the internet and encourage self-regulation].) Next, both the People's "encouragement theory" and suggestion that by reposting the ads, Defendants are ratifying the content of the original ad, thereby becoming a content provider themselves, have been rejected by the courts. (*Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398,

---

[1] The internal Backpage email attached by the AG states, "The content [of BigCity] will be pre-populated with millions of images from backpage where we hope to extract two words of the title, the phone number, and age of the person. The images will need to b processed to where we crop an area most likely to give us a wholesome image." (Ex A)

413-414 [under the encouragement or ratification theory, service providers would be liable for inviting and commenting on illegal or actionable content, which impermissibly inflates the meaning of "development" to the point of eclipsing immunity from publisher-liability established by Congress]; *Ascentive LLC v. Opinion Corp.* (EDNY 2011) 842 F. Supp.2d 450, 476 [inviting postings then altering the way postings are displayed is not content development]; *Roommates, supra*, 521 F.3d at 1174 [encouragement, enhancement by implication or development by inference is protected conduct under the CDA]; *Black v. Google Inc* (N.D. Cal 2010) 2010 U.S. Dist. LEXIS 82905, *8 [even if defendants "sponsored or endorsed" an allegedly defamatory comment posted by a user, "the fact remains that Plaintiffs seek to hold it liable for content generated by a third-party" and defendants are entitled to immunity under the CDA].)

This Court finds *Kimzey v. Yelp! Inc* (9th Cir 2016) 836 F.3d 1263 helpful. Plaintiff Kimzey complained about offensive content in a negative business review posted on Yelp! and sought to hold Yelp! liable. Kimzey alleged that Yelp! Found the review on another website, reposted the offensive review on Yelp! and then republished the review as an advertisement or promotion on Google, all in an effort to increase online traffic to Yelp!. Kimzey's theory was that by repeatedly reposting the "found" review for Yelp!'s own use, Yelp! developed the content. (*Id* at 1267) The Ninth Circuit rejected Kimzey's "artful skirting of the CDA's safe harbor provision." (*Id* at 1266.)

The Ninth Circuit noted that Kimzey never specifically alleged that Yelp! authored the content of the statements posted. Instead, the allegations were that Yelp! adopted the statements from another website and transformed them into its own stylized promotions. The court determined that the allegations were insufficient to avoid immunity under the CDA. (*Id* at 1268) The court also rejected Kimzey's "convoluted" theory that Yelp! transformed the review into its own advertisement with the creation and addition of a star rating system that accompanied the promotion. Although this characterization had "superficial appeal" for the court, the court found that accepting the theory would extend the concept of "content provider" too far and would render the CDA's immunity provision meaningless. (*Id* at 1269.) The court stated that "Nothing in the text of the CDA indicates that immunity turns on how many times an interactive computer service publishes 'information provided by another information content provider.'" (*Ibid.*)

In short, courts have repeatedly held that an online service provider is protected whether he publishes third-party content for the first time, or republishes it for the nth time. To find the source of the liability for the unlawful or actionable content, one must trace the pedigree of the statement. (*Kimzey, supra*, 836 F.3d at 1268-1269; *Jones, supra*, 755 F.3d at 408-409; *Doe v. Friendfinder Network, Inc*, 540 F.Supp.2d 288, 295-296.)

4. **Removal from Protection under the CDA**

   a. **Victims' Intellectual Property Rights**

   The People assert that the CDA does not apply because Defendants violated the victims' rights of publicity when Defendants used the victims' likenesses posted in Backpage ads and used them either on BigCity or EvilEmpire sites without the victim's knowledge. In support, the People cite to *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12. (AG Supp. 9) In that case, plaintiffs brought claims against Backpage alleging an unauthorized use of a person's picture. Plaintiffs alleged that by garnering advertising revenues from advertisements placed by their traffickers, Backpage profited from the unauthorized use of the plaintiffs' photographs. The plaintiffs alleged that Backpage's use of their images cannot be written off as incidental because their pictures were "the centerpieces of commercial advertisements." (*Id* at 27.) The court found that although Backpage profited from the sale of advertisements, "it is not the entity that benefits from the misappropriation." Rather, the party who benefits from the misappropriation is the person who placed the original ad. The court stated "Matters might be different if Backpage had used the pictures to advertise its own services..." (*Ibid.*)

   The People assert that the "matters [that] might be different" are present here, when Defendants used pictures and text from Backpage ads to generate new ads on two additional websites. In response, Defendants call attention to the fact that users posting on Backpage.com accept the website's Terms of Use, in which they assign all intellectual property rights and agree that their photos and content may be reposted. (Def. Supp. 10)

   The right of publicity derives from the right of privacy. Generally, the right of privacy protects an individual's peace and quiet. The right of publicity, in turn, protects an economic interest a person has in the value of his identity. These privacy rights are personal. (*Hill v. National Collegiate Athletic Assn* (1994) 7 Cal.4th 1, 24.) Thus, the prosecutor does not have standing to assert this right on behalf of the victims. It is on that crucial fact that sets this case apart from *Doe v. Friendfinder Network Inc* (2008) 540 F.Supp. 2d 288, 304. (See AG Supp. 9) *Friendfinder* involved a civil plaintiff seeking damages for the violation of her right to publicity after an unknown person created a profile on her behalf, without her knowledge or consent, and *Friendfinder* used portions of that profile as advertisements to increase the profitability of their business. The court found the allegations sufficient to survive a motion to dismiss. (*Ibid.*)

   The People lack standing to assert this right. Moreover, existing case law indicates that these additional advertisements are permissible attempts at search engine optimization in an effort to increase the visibility of the information provided by the third party. (*See Asia Econ. Inst. V. Xcentric Ventures LLC* (C.D. Cal. 2011) 2011 U.S. Dist. LEXIS 145380, *19 [increasing the prominence of a page in internet searches do not amount to "creation or development of information"].) Indeed, the very purpose behind

the third party's placing the ad on Backpage was to provide accessibility to the public on a large scale. (*Cf Ibid* [the purpose of consumer reports is to provide accessibility to the public on a grand scale and "increasing the visibility of a statement is not tantamount to altering its message"].)

### b. Prosecution for pimping under Penal Code section 266H

The People maintain that Defendants' actions were not neutral, and they instead took an active role to further prostitution and seek to hold Defendants responsible for their own misconduct, not for the speech of others. "This is not a case against Backpage, a website; it is a case against three individual defendants who used multiple platforms to commercially sexually exploit vulnerable women and children." (AG, Supp 2)

This Court finds it difficult to see any illegal behavior outside of the reliance upon the content of speech created by others. The whiff of illegality is detected only when considering the alleged content of the statements contained in the ads. Indeed, the theory of prosecution requires the presumption that illegal content was contained in the ads, *i.e.*, that the ads were explicitly for prostitution. Under the prosecution's theory, Defendants would become liable at the point where information provided from third parties was transferred to the additional two websites because, according to the People, Defendants transferred the information intentionally to help to facilitate prostitution. (When prostitution transactions took place as a result of the ads, more ads would be placed.) Yet, the general actions required (absent consideration of speech content) to repost the ads would not be illegal. Thus, the prosecution depends on consideration of speech provided by a third party.

#### i. Theory that Defendant's derived financial support from prostitution

The People maintain that Defendants may be prosecuted under the theory is that defendants derived support from the earnings of another's act of prostitution. (*See McNulty, supra,* 202 Cal.App.3d at 630 [stating the two theories of prosecution for pimping].) The People assert that the allegations are that the Defendants "knowingly derived support from prostitution earnings, *i.e.*, profited from prostitution" when they created EvilEmpire to improve Backpage's search results (search engine optimization) and created BigCity to expand Backpage's share of "online commercial sex market" and profits. The People maintain that pimping will be shown when the People demonstrate that Defendants acquired income from prostitution resulting from advertisements placed in Backpage.com. The People assert that Defendants agreed upon a business model to maximize the receipt of prostitution earnings and committed many overt acts in furtherance of this objective. (Opp. 3)

In support, the People cite to *People v. Grant* (2011) 195 Cal.App.4th 107. *Grant* discusses a distinction between financial support received by the prostitute (illegal) and funds paid by the prostitute for services rendered or other purposes (legal). The appellate court made clear that "the statutory prohibition does not preclude a person from accepting a known prostitute's funds gained from the

prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Id* at 116. *See also Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn 7 [a natural reading of the pimping statute does not apply to an individual who provides a legitimate professional service to a prostitute even if paid with proceeds earned from prostitution, the service provider derives support from his own services]; *People v. Reitzke* (1913) 21 Cal.App.740, 742 [a legitimate defense to pimping is that a prostitute loaned the defendant money for the purpose of going into the saloon business, or for any other purpose except the purpose of being supported or maintained by the prostitute].)

Here, there is no dispute that Backpage charged money for the placement of advertisements. Does this qualify as services rendered for legal purposes? Given the services provided by the online publisher, the answer to that question is yes. Providing a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA. This immunity has been extended by the courts to apply to functions traditionally associated with publishing decisions, such as accepting payment for services and editing. (*See e.g., Fields, supra*, 2016 U.S. Dist. LEXIS 105768, *11-12 [Twitter immune against claims that it provided ISIS material support through use of its services because protected publishing activity included decisions about: what third party content may be posted online; monitoring, screening, and deletion of content; and whether to prevent posting].) In fact, the People acknowledge that the mere act of accepting money for postings is permissible. (Opp. 9) The case law is clear that, as discussed above, immunity is removed when the service provider affirmatively acts to create the offensive content.

This Court draws support for its conclusion from cases in other jurisdictions. In *Doe*, for example, the plaintiffs alleged that, beginning at age 15, they were trafficked through advertisements on Backpage.com and Backpage profited from their victimization. The plaintiffs filed suit against Backpage.com for violating the Trafficking Victims Protection Reauthorization Act ("TVPRA") which prohibits knowingly benefitting financially from sex trafficking. (*Doe, supra*, 817 F.3d at 15.) Plaintiffs' theory was that Backpage engaged in a course of conduct designed to facilitate sex traffickers' efforts to advertise their victims on the website by only charging for posts made in the "Adult Entertainment" section, and allowing users to pay an additional fee for "Sponsored Ads," which increased the number of times the advertisement appeared. (*Id*. at 17.) Plaintiffs also alleged that Backpage tailored its posting requirements to make trafficking easier by not blocking repeated attempts to post and by allowing users to pay anonymously through prepaid credit cards or digital currencies. (*Id* at 16.)

Backpage moved to dismiss the suit under Federal Rule of Civil Procedure 12(b) (6). The district court granted the motion and found that the CDA provided immunity from the claims. On review, the First Circuit Court of Appeals affirmed the district court's ruling. The First Circuit rejected the plaintiffs' assertion that Backpage participated in an affirmative course of conduct and actual participation in sex trafficking. The court noted that the challenged were traditional publisher functions, and thus immune from suit under the CDA. (*Id*. at 20) The court also noted that the plaintiffs were harmed when they were

trafficked through the advertisements. Without the content of those advertisements – which was created by a third party - there would be no harm. (*Id*. at 20.) The court dismissed the plaintiffs' assertion that Backpage's decisions about what measures to implement demonstrate a deliberate attempt to make sex trafficking easier. The court stated, "Whatever Backpage's motivations, those motivations do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content." (*Id* at 21.) The court went on to state "even if we assume, for argument's sake, that Backpage's conduct amounts to 'participation in a [sex trafficking] venture' – a phrase that no published opinion has yet interpreted – the TVPRA claims as pleaded premise that participation on Backpage's actions as a publisher or speaker of third-party content. The strictures of section 230(c) foreclose such suits." (*Ibid*.) The First Circuit specifically held that "claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)." (*Id*. at 22.)

Similarly, in *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041, the plaintiff sought to hold Backpage responsible for her victimization through sex trafficking that took place as a result of advertisements placed on Backpage.com. The plaintiff alleged that Backpage accepted a fee for such advertisements, knew that advertisements were for prostitution and "created information" by hosting a search engine, providing instructions for increased visibility of advertisements and allowed for anonymous payment. (*M.A.*, *supra*, 809 F.Supp.2d at 1044.) The court granted the Defendant's motion to dismiss on the basis that the CDA provided immunity. The court reasoned that there was no allegation that Backpage was responsible for the actual development of any portion of the content of the advertisements or specifically encouraged the development of the offensive nature. (*Id* at 1052.) (See also Opp. 21; Def. 21-22)

Even in viewing the offer of proof of the evidence most favorable to the Attorney Generals office, this case is very similar to the above cases. As alleged here, the prostitution took place as a result of an advertisement placed by a third party. Backpage's decision to charge money to allow a third party to post content, as well as any decisions regarding posting rules, search engines and information on how a user can increase ad visibility are all traditional publishing decisions and are generally immunized under the CDA. In short, the victimization resulted from the third party's placement of the ad, not because Backpage profiting from the ad placement.

## **Conclusion**

The First Amendment "makes the individual, not government, the keeper of his tastes, beliefs, and ideas." *Paris Adult Theater I v. Slaton* (1973) 413 US 49, 73 (Douglas, J., dissenting). At the same time, the Court understands the importance and urgency in waging war against sexual exploitation. Regardless of

the grave potential for harm that may result in the exercise of this article of faith, Congress has precluded liability for online publishers for the action of publishing third party speech and thus provided for both a foreclosure from prosecution and an affirmative defense at trial. **Congress has spoken on this matter and it is for Congress, not this Court, to revisit.**

**Court's ruling:**

Defendants' demurrer is GRANTED.

Defendants' request for judicial notice is DENIED.

Further court dates are vacated.

Bond is exonerated for each Defendant.

Dated: 12/9/16

**Honorable Michael G. Bowman**
**Judge of the Superior Court of California**
**County of Sacramento**

Case 2:18-cv-00423-DJH   Document 287-1   Filed 08/29/18   Page 45 of 119

Exhibit 14

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SACRAMENTO

**DATE**:                                    **DEPARTMENT**:      8
**JUDGE**:      Lawrence G. Brown            **CLERK**:
**REPORTER**:                                **BAILIFF**:

---

People of the State of California            **CASE NO**. 16FE024013

vs.

Carl Ferrer, Michael Lacey, and
James Larkin,

Defendants

---

**Nature of Proceedings: Ruling on Defendants' Motion to Dismiss under Penal Code Section 1004**

### Introduction

  Backpage.com is one of the largest on-line classified advertisement services, through which users may post advertisements in a variety of categories.  Posting an advertisement in the "Adult Services" category requires a fee.  Through various levels of involvement with Backpage.com, Defendants have twice found themselves facing criminal charges in Sacramento County relating to certain advertisements placed in the "Adult Services" category.

  The prosecution's theory is that Defendants conspired to create and organize a website that facilitates sex trafficking.  The People assert that Defendants created such a site through Backpage.com, knowing that prostitutes and/or pimps use the site to advertise prostitution, and with the intent to maximize their own profits from the illegal sex trade.   According to the People, this plan also included tricking credit payment processors into processing Backpage transactions, through the use of shell companies and fraudulent billing descriptors.  Allegedly, the credit processors would not have processed the payments had they known they were doing business with Backpage.com.  The People assert that Defendants' plan has come to fruition and they have derived massive financial support and maintenance from the prostitution.

### Background

  In 2016, Defendants faced various charges of pimping and conspiracy to pimp.  The Honorable Michael G. Bowman SUSTAINED the Defendants' demurrer and dismissed the complaint.  Judge Bowman found that it was apparent from the accusatory pleadings that the prosecution hinged on treating Defendants as the speakers

of the offensive conduct, when they were merely the publisher. Prosecution under this theory could not go forward, as the Communications Decency Act ("CDA") provides immunity for online publishers and distributors of content generated by third parties. (*See* 47 U.S.C. §230; *Barrett v. Rosenthal* (2006) 40 Cal.4[th] 33, 39.)

That same month, the Office of the Attorney General filed a new complaint, charging the same Defendants with conspiracy to commit money laundering (count 1), money laundering (counts 2-27), and conspiracy to commit pimping (count 28). The People also allege three sentencing enhancements based on the amount of money involved in the financial transactions. Defendant Ferrer also faces charges of pimping a minor under 16 years old (counts 29-31, 40), pimping a minor (count 32), pimping (counts 33-36, 39), and pimping a minor 16 years old (37-38).

On January 19, 2017, Defendants filed a Motion to Enforce the Court's Order of Dismissal; Alternative Demurrer; and Request to Transfer to Judge Bowman and Further Relief. On January 23, 2017, the People filed an Opposition. On March 6, 2017, Defendant filed a brief in further support for the above named Demurrer under Penal Code section 1004, and the People responded in further Opposition on March 8, 2017. The People also filed a Motion to Strike the declaration of defense counsel and Defendants' Exhibits A-J, attached to the Motion of January 19, 2017. On March 10, 2017, the parties addressed in open court Defendants' concerns of whether the complaint was sufficiently pled such that Defendants have been adequately apprised of the charges. Of particular concern was the money laundering charges, which charged Defendants with money laundering under the transactional prong but did not specify the underlying criminal activity. (See Penal Code §186.10(a)(2).) The Court invited the People to consider amending the complaint.

The People submitted the First Amended Criminal Complaint to the Court on March 24, 2017. This was deemed filed on April 28, 2017. The First Amended Complaint added several allegations and overt acts that explained the theory of prosecution. In particular, the People provided clarification that the money laundering charges are based on bank fraud, wire fraud and prostitution. On May 26, 2017, Defendants addressed the amended charges in their Continued Demurrer to Dismiss the State's Complaint. The People filed an Opposition on June 9th, and Defendants filed a Reply on June 23, 2017.

### Court's Legal Analysis and Ruling

The parties have briefed multiple issues that may be grouped into three categories. Defendants argue that the prosecution constitutes harassment and should be curtailed. Defendants also make several challenges to the pleadings and argue that procedural and facial defects prohibit the instant prosecution from going forward. Finally, Defendants argue that the First Amendment bars the instant prosecution because it is based on impermissible interference with publisher functions.

I.     **Nature of the Prosecution**

    A.     <u>Basis for the prosecution</u>

Since at least 2010, public officials and state prosecutors have been pressuring Backpage to remove the "Adult Services" category from the website in an endeavor to combat sex trafficking. With Backpage's refusal to comply, a philosophical disagreement between public officials and Backpage as to how best to combat sex trafficking is clearly present. (See *Backpage.com, LLC v. Lynch*, 216 F.Supp.3d 96, 100, fn. 2.) Defendants note the instant prosecution is one of a recent rash of attempts to assign liability for affiliation with Backpage. Defendants claim that in each case, including the previous prosecution dismissed by Judge Bowman, Backpage successfully argued that it was entitled to immunity under the CDA. Defendants argue that in light of this clear immunity, the instant charges are brought in bad faith and the prosecution is vindictive. Defendants argue that this is not the first time a government official has used coercive techniques to attempt to shut them down. (See e.g., *Backpage.com, LLC v. Dart* (7th Cir. 2015) 807 F.3d 229 [in his professional capacity, Cook County Sheriff threatened Backpage.com business partners in an attempt to dry out Backpage business].)

Yet, perhaps another possible perspective is that there is a growing desire to hold online media accountable for their role in disseminating information leading to condemnable acts by third parties. (See e.g., *Cohen v. Facebook, Inc.* E.D.N.Y. May 18, 2017) 2017 U.S. Dist. LEXIS 76701, *28-31 [seeking to hold Facebook liable for allowing Hamas to use its platform to encourage terrorist attacks]; and *Fields v. Twitter, Inc* (N.D. Cal. 2016) 217 F.Supp.3d 1116 [seeking to hold Twitter liable for providing ISIS an account to use for spreading extremist propaganda]. )

This Court need not decide whether this prosecution is brought in bad faith, nor is there a sufficient factual basis to do so, at this juncture. As discussed below, whether this case proceeds depends, in part, on whether Defendants enjoy immunity against these new charges under the CDA. This immunity was provided by Congress, and regardless of where Backpage floats on the tide of public opinion, the immunity must be modified by Congress.

B. The People's Investigation May Continue

Defendants also request this Court to enjoin further investigation by the People and to return the materials already seized as part of the investigation. This argument is largely based on Defendants claim that this prosecution is brought in bad faith. At this stage, there is insufficient justification for interference with the prosecutor's functions. (Compare *Dart, supra,* 807 F.3d at 233 [Court finding letter sent by Sheriff "containing legal threats and demands" to sever contractual ties with Backpage was clear evidence of bad acts by government official].) Thus, Defendants' request to enjoin the People from further investigation and to return the materials seized is denied.

II. **Procedural and Facial Challenges to the Charges**

A. Authority to File New Charges.

The parties dispute whether the instant prosecution may be initiated against Defendants. Defendants argue the People are prohibited from re-filing charges after the original demurrer was SUSTAINED and maintain that the First Amended Complaint constitutes an improper attempt to reinstate that original complaint. Defendants argue that the People forfeited this opportunity by failing to follow the proper procedure to cure the defects in the previous complaint, as outlined in Penal Code sections 1007-1009. Defendants also argue that re-

filing of charges is barred because the previous complaint was dismissed on constitutional grounds. (See *People v. Pinedo* (2005) 128 Cal.App.4th 968, 972 [state and federal due process clauses limit the People's discretion to re-file charges].)

The People's position is that the granting of a demurrer does not bar the prosecution from filing a new complaint, even where the charges are the same. "Even a dismissal in the superior court following an order setting aside an information or indictment is no bar to a future prosecution for the same offense." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 666, *citing People v. Van Eyk* (1961) 56 Cal.2d 471, 477; Pen. Code, § 999; see also Pen. Code § 1387.) Nevertheless, the People represent that the instant charges are "substantially different" than those contained in the prior complaint and because the prior complaint was not dismissed with prejudice, the new charges are appropriate.

The Court finds the People may file the instant charges. Judge Bowman dismissed the first complaint after finding the Defendants were entitled to immunity from prosecution under the Communications Decency Act. While the CDA was established to protect the constitutional right to free speech, the immunity provision providing online publishers immunity from liability for third-party speech is statutory. Thus, the dismissal was based on statutory legal grounds. Generally, when charges are dismissed based on legal grounds, the prosecution may file a new complaint or seek a grand jury indictment. (*Uhlemann, supra,* 9 Cal. 3d at 666.) Moreover, Judge Bowman's ruling signaled that a prosecution based on treating publishers as the speaker was prohibited under the CDA. This ruling would not prevent a prosecution under theories not subject to the immunity provision. The People assert that the instant charges do not fall under the purview of the CDA.

B.    Jurisdiction

Defendants question whether California has jurisdiction over this prosecution. Defendants argue that the allegation that they conducted transactions "throughout California," is insufficient because the People have not identified a single act actually committed in California. Defendants argue that territorial jurisdiction may be raised in a demurrer and is subjected to pre-trial determination. (See Penal Code §1004(1).)

A state is not prohibited from exercising jurisdiction over criminal acts that take place outside of its borders, if the results of the crime are intended to (and do) cause harm within the state. (*People v Fortner* (2013) 217 Cal.App.4th 1360, 1363.) California claims jurisdiction for offenses that fall under specific types of interstate situations. (*Ibid*, citing *People v. Betts* (2005) 34 Cal.4th 1039, 1047.) For example, under Penal Code section 27, a defendant may be punished under California law for any crime committed "in whole or in part" of the state. Similarly, under Penal Code section 788, California has jurisdiction for offenses commenced out of state then consummated in California. Finally, under Penal Code section 778a, California has territorial jurisdiction if the defendant does a preparatory act in California that is more than a *de minimis* act toward the completion of the offense. (*Fortner, supra,* 217 Cal.App.4th at 1363-1365.) In other words, California has territorial jurisdiction when "with intent to commit a crime" a person "does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state." (*People v. Renteria* (2008) 165 Cal.App.4th 1108, 1116.)

Here, the People contend that Defendants concocted a scheme to trick credit payment processors into processing payments for Backpage transactions when the processors would have otherwise declined. The People contend that this misrepresentation influenced banks to release money to Defendants. For jurisdictional purposes, the People contend that the acts of hosting a website and accepting credit payments for advertisement placement were non-*de minimis* parts of the overall scheme to defraud the banks. In this way, Defendants arguably committed more preparatory acts in California than what was deemed sufficient in *People v. Betts* (2005) 34 Cal.4th 1039, 1047, where there was sufficient evidence that the defendant's intent to molest his step-granddaughters formed in California when he suggested they go with him on a long haul truck drive. (*Id* at 1054-1056.)

This Court finds that California has jurisdiction over the instant charges. Assuming, without deciding, that Defendants intended to conduct, and participated in, the scheme alleged by the People, hosting the website through which payments were processed under fraudulent conditions was more than a *de minimis* act toward the bank fraud. The scheme would not have been as successful had it not been able to process payments for Backpage advertisements placed in California. For purposes of establishing jurisdiction, these allegations are sufficient.

C.     Case Assignment

Defendants request that this Court transfer the case back to Judge Bowman for the sake of "efficiency and to prevent forum-shopping." Defendants rely upon Penal Code section 1387, which provides exceptions to that general rule that the prosecution has an opportunity to re-file charges after one dismissal. (Pen. Code § 1387(a).) While section 1387 also serves to curtail prosecutorial harassment by placing limits on the number of times charges may be re-filed, these limitations do not dictate judicial assignment. This Court can find no justification for assignment through a method other than through the normal procedure governed by local rules 10.32 and 10.50. Defendants' request to have the case assigned to Judge Bowman is denied.

D.     Judicial Notice

Defendants have also requested this Court to take judicial notice of several documents attached as Exhibits A-J to their Motion filed on January 19, 2017. The People request this Court to strike these exhibits and the accompanying declaration from defense counsel.

This Court has been expressly called upon to review the propriety of the re-filed charges in light of the previous dismissal. Therefore, this Court takes judicial notice of the procedural history of the prior prosecution including the prior complaint and the Order granting Defendants' Demurrer. (See *People v. Putney* (2016) 1 Cal.App.5th 1058, 1063, fn. 4 [taking judicial notice of the prior case's procedural history but not the truth of any facts involving the underlying charge]; *People v. Hill* (1998) 17 Cal.4th 800, 847 [taking judicial notice of unpublished decision in separate case].)

While the previously filed complaint and dismissal order is helpful to the resolution of the matters before this Court at this juncture, Defendants' other documents do not have the same utility. (See *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564 [a court may take judicial notice of the truth of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments].) The Defendants' request to take

5

judicial notice for all exhibits attached to the January 19th motion, other than the previous complaint and dismissal order, is denied. The People's motion to strike these documents is SUSTAINED.

E.     <u>Challenges under Penal Code section 1004.</u>

A defendant may demur on delineated statutory grounds. (Pen. Code, § 1004; *People v. Saffell* (1946) 74 Cal.App.2d supp. 967, 972.) These include the ability to challenge: whether the facts stated constitute a public offense; defects on the face of the accusatory pleading; or on the grounds that the pleading includes information that would be a bar to prosecution. (Pen. Code, § 1004. *See also People v. Goodman* (2014) 225 Cal.App.4th 950, 956.) Literal compliance with pleading requirements under Penal Code section 952 is insufficient if the accusation fails to give constitutionally adequate notice of what the accused must defend against. (*People v. Jordan* (1971) 19 Cal.App.3d 362, 369.) California's system of criminal pleading under section 952 relies in part upon the transcript of the grand jury hearing or preliminary examination which must be furnished to the defendant to inform him of particular circumstances of his offense not shown by the accusatory pleading. (*People v. Anderson* (1961) 55 Cal.2d 655, 657; *People v. Johnson* (1964) 230 Cal.App.2d 80, 86; *People v. Jordan* (1971) 19 Cal. App. 3d 362, 369-371.)

However, compliance with section 952 does not necessarily overcome a due process attack and may be challenged in a demurrer prior to preliminary hearing. (*Lamadrid v. Municipal Court* (1981) 118 Cal.App.3d 786, 790; *Choung v. People of State of California* (1970) 320 F.Supp. 625, 629.) (*See also Lott v. United States* (1962) 309 F.2d 115, 117 [offenses must be accurately described in an indictment; and if necessary to do so, the allegations must be expanded beyond the words of the statute in order to embrace all the ingredients necessary to the offense]; *United States v. Cruikshank* (1875) 92 U.S. 542, 558 [the object of the indictment is to furnish the accused with such a description of the charge against him as will enable him to make his defense and to inform him of the facts alleged; a crime is made up of acts and intent and these must be set forth in the indictment].) The complaint must be given a reasonable interpretation and read as a whole with its parts considered in their context. (*People v. Biane* (2013) 58 Cal.4th 381, 388.)

*1. Money laundering premised on federal offenses.*

Defendants argue that the charges do not constitute a public offense because the People have no authority to base their state prosecution for money laundering upon violations of federal bank or wire fraud laws. The People respond that California law allows the state to incorporate federal offenses by reference, and the California money laundering statute specifically contains such a reference. This Court agrees with the People.

Penal Code section 186.10, subdivision (a), provides in pertinent part: "Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($ 5,000), or a total value exceeding twenty-five thousand dollars ($ 25,000) within a 30-day period, through one or more financial institutions (1) with the specific intent to promote, manage, establish, carry on, or facilitate the promotion, management,

establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime of money laundering."

Penal Code section 186.9 defines "criminal activity" as a criminal offense punishable under the laws of the state by imprisonment in the state prison or from a criminal offense committed in another jurisdiction punishable under the laws of that jurisdiction by death or imprisonment for a term exceeding one year. (Pen. Code §186.9(e).) Federal bank fraud, in turn, is punishable by imprisonment for a term of not more than 30 years. (18 U.S.C. §1344.) Similarly, federal wire fraud is punishable by not more than 20 years, absent special circumstances. (18 U.S.C. §1343.) Thus, it appears that federal bank and/or wire fraud may serve as the criminal activity underlying a charge of California money laundering.

### 2. The First Amended Complaint is Sufficiently Pled.

Defendants also argue that even if a state money laundering prosecution may be predicated on a federal offense, the charges are uncertain and fail to adequately apprise them of the actions against which they must defend. Despite the amendments to the charges, Defendants continue to assert a lack of specificity as to the transactions and monetary instruments allegedly involved in the money laundering. Defendants assert that the People may not rely on a simplistic pleading under Penal Code section 952, but must satisfy constitutional due process requirements as well. The People respond that they have complied with their pleading requirements and the case should be advanced to the preliminary hearing, where the full nature of the charges will become clear.

This Court agrees the complaint is not a model of clarity. However, the nature of the charges and theories of prosecution are ascertainable from the amended charging instrument. Specifically, the People now allege that Defendants conspired to orchestrate a bank fraud by misrepresenting to credit payment processors that they were not processing transactions from Backpage, and this misrepresentation would trigger a release of funds from banks. The overt acts alleged clarify that Defendants created multiple classified websites, and when applying for (at least one) merchant account, Defendant Ferrer omitted any reference to Backpage, despite intending to process Backpage transactions through the account. The People allege that credit payment processors, along with American Express, would not have knowingly processed the payments for Backpage and the banks would not have released funds absent Defendants' trickery.

These allegations provide sufficient notice for Defendants to understand the nature of the charges and prepare a defense. Essentially, either Defendants did - or did not - materially represent to credit payment processors in a scheme to fraudulently obtain money from banks. If Defendants did so, this may form the basis for a money laundering charge. (Cf. *United States v. Mason* (9th Cir. 1990) 902 F.2d 1434, 1443[1] [federal money laundering conviction supported by evidence that bank would not have opened a merchant account had it known it was laundering credit charges for prostitution; the false representation to the credit processor influenced the bank's release of funds].) The factual resolution to that question, however, is not at issue here.

---

[1] Overruled, on other grounds in part by *United States v. Doe* (9th Cir. 2013) 705 F.3d 1134, which was later withdrawn. See also *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266.

What is at issue is whether the First Amended Complaint has been sufficiently pled to meet statutory and due process requirements.

This Court finds the First Amended Complaint provides Defendants notice of the offenses of which they are accused, and Defendants are adequately apprised of the conduct against which they must defend. (Penal Code §952; *Lamadrid, supra,* 118 Cal.App.3d at 791.) In fact, Defendants' knowledge of the nature of the charges and theory of prosecution has been demonstrated throughout the briefing process and during argument to the Court. Therefore, the First Amended Complaint meets statutory and due process requirements and is sufficiently pled to go forward.

### F.    Purported Defects in the Money Laundering Charges

To prove that the defendant is guilty of money laundering, the People must ultimately show the act of conducting financial transaction(s) of a minimum amount, within a certain time frame, and that when the defendant did so, he either intended to promote criminal activity or he knew that the money represented the proceeds of criminal activity or was derived directly or indirectly from the proceeds of criminal activity. (CALCRIM 2997)

#### 1.    One Act, One Crime Concerns

Defendants argue that even if charges are sufficiently pled, the money laundering charges are fatally flawed because they are premised on the same acts as those allegedly constituting bank or wire fraud. Defendants argue that under the People's theory, the credit payments impermissibly constitute both the bank fraud and the money laundering.

Notably, the federal bank fraud statute punishes the fraudulent scheme, not necessarily the completion of the scheme. The offender must acquire (or attempt to acquire) bank property by means of the material misrepresentation. (*Loughrin v. United States* (2014) 134 S.Ct. 2384, 2393-2394.) Because bank fraud may be completed upon attempting to effectuate the scheme, there exists a range of punishable behavior that is subject to factual determinations by the trier of fact. That is separate and apart from the question at bar; *i.e* whether the charges are adequately pled.

Nevertheless, the parties draw attention to a problem identified by the federal courts that may arise when federal money laundering is based on federal bank or wire fraud, and suggest the same problem is present here. When the activity required to commit the fraud encompasses activity required to commit money laundering, the two offenses should merge into one offense under federal law. (See e.g., *United States v. Wilkes* (9th Cir. 2011) 662 F.3d 524, 545-546 [if a successful bank fraud requires concealment of financial transactions, the defendants cannot be charged with that same act of concealment a second time, as relating to the commission of money laundering].) Perhaps the most common "merger" problem arises when the court must parse out (or trace) the money involved in the underlying crime and money involved in the laundering. As a result, there are a plethora of federal cases that discuss tracing the proceeds of the criminal activity in order to determine when the bank or wire fraud ends, and money laundering begins. Indeed, the parties spend much time debating this issue.

Included in this discussion is the appropriate federal definition of "proceeds" for tracing purposes. (Compare *United States v. Santos* (2008) 553 US 507 [plurality decision defining "proceeds" as profits rather than gross receipts] with *United States v. Grasso* (9th Cir. 2013) 724 F.3d 1077, 1091 [recognizing subsequent legislative amendment defining "proceeds" as including gross receipts of criminal activity].)

Despite the parties' request to weigh in on this vexing problem faced by federal courts, the difficulty in defining and tracing proceeds does not appear to so plague the California money laundering statute. The bench notes in CALCRIM 2997 governing Money Laundering instruct, "If the definition of proceeds is an issue, see *United States v. Santos* – which holds that 'proceeds' in the federal money laundering statute means 'profits.'" There is no recognition of the legislative definition of "proceeds" enacted after *Santos*. This signals an intentional divergence from federal law and provides us with a clear definition of the *type of money to be traced*.

Additionally, *People v. Mays* (2007) 148 Cal.App.4[th] 13, the lead case involving money laundering, provides guidance on *how to trace the money* from the underlying criminal activity on its path to be laundered. The *Mays* court determined that our "promotional" money laundering prong under subsection (a)(1) of Penal Code section 186.10 requires monetary transactions to be made with a specific intent to keep the criminal activity alive. (*Id* at 29.) Under this section, there is no need to trace any funds, since there is no requirement that the money to be derived from an illegal source in order to promote criminal activity. (*Id* at 30)

However, under the "transactional" prong of subsection (a)(2), the requisite mens rea is knowledge that a monetary instrument represents criminal proceeds. Under this subsection, tracing the source(s) of transactions is required. Monetary instruments must be composed of the minimum statutory amount solely from criminal proceeds; it is insufficient merely to show the transaction was the right amount and from an account with comingled funds. This requires the government to show: the defendant's entire business was illegal, there were deposits of the minimum statutory amount or more in criminally derived funds, or there was a transfer of all funds out of the account. (*Mays, supra*, 148 Cal.App.4[th] at 32.)

Here, Defendants have been charged under both prongs of the money laundering statute. This means Defendants are being charged with, essentially, either investing money into the underlying criminal scheme, or conducting transaction with profits from the scheme and the People must show that the profits came solely from that underlying criminal activity. Regardless of whether the People will succeed in meeting their burden of proof, the theory and the charges under which they are proceeding appear to be valid under California law and adequately pled such that any defect does not bar prosecution.

2.     *Bank Fraud May be Premised on Intent to Defraud a Third Party*

Defendants argue that even if the "criminal activity" underlying a money laundering charge may be based on a federal bank charge, the instant allegations of bank fraud are facially deficient because Defendants had no relationship with the banks named in the First Amended Complaint and therefore could not have been victims of bank fraud.

The federal bank fraud statute states: "Whoever knowingly executes, or attempts to execute, a scheme or artifice (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of

false or fraudulent pretenses, representations, or promises; shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both."  (18 USC §1344.)

Subsection (1) requires intent to defraud a financial institution.  To act with the "intent to defraud" means to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself.  (*United States v. Brandon* (1st Cir. 1994) 17 F.3d 409, 425.)  Subsection (2) requires that a defendant "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice" and has two elements. First, the clause requires that the defendant intend "to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution." Second, the clause requires that the envisioned result—i.e., the obtaining of bank property—occur "by means of false or fraudulent pretenses, representations, or promises."  (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2388-2389.)  There must be a "relational" connection between the alleged false statements or representations and the obtaining of bank property, such that the misrepresentation is material. (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2393.)

A material misrepresentation made to a third party may qualify if it induces the bank to depart with its property.  (See *United States v. Nguyen* 2017 U.S.Dist. LEXIS 32549, *18-19 and *Loughrin v. United States* (2014) 134 S.Ct. 2384, 2389 [both stating that bank fraud can cover deception of a non-bank custodian with a goal to obtain a bank's property].)  This theory of bank fraud has been pursued in other jurisdictions.  For example, in *United States v. McNeil* (9th Cir. 2003) 320 F.3d 1034, 1039, the defendant used fake identification to open an account for the purposes of receiving a false tax refund, with the ultimate goal of transferring money from the fake account to his own.  The 9th Circuit rejected the argument that the conviction was invalid because the true victim was the IRS and not the bank.  The court determined that the plan was two-fold; fraudulently obtain money from the IRS, then (after the bank becomes a holder-in-due-course) misrepresent to the bank that Defendant was ultimately entitled to the money.  (See also *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266, 309-310 [jury could find that misrepresentation made to deceive payment processor to continue to process payments when they would otherwise decline constitutes bank fraud];  *United States v. Johnson* (C.D. Ut. 2015) 2015 U.S.Dist. LEXIS 145102, *6 [submitting a fraudulent merchant account applications to a bank so that online sales could be processed can constitute bank fraud].)

By extrapolation, the instant allegations of bank fraud based on the theory that Defendants made a material misrepresentation to a credit payment processor, which induced a bank to depart with its property, may be proper and may serve as the predicate "criminal activity" for a state money laundering charge.

### 3.  *Money Laundering Based on Wire Fraud*

Defendants are also charged with both prongs of money laundering after violating the federal wire fraud statute under 18 USC section 1343.  Wire fraud is committed when: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for

the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both…."  (18 USCS § 1343.)

Wire fraud does not require proof that the defendant's conduct violated a separate law or regulation. Rather, wire fraud has only three elements: "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud." (*United States v. Green* (2010) 592 F.3d 1057, 1064, *quoting United States v. Shipsey* (9th Cir. 2004) 363 F.3d 962, 971.)  The scheme to defraud must only include an "affirmative, material misrepresentation." (*Green, supra*, 592 F.3d at 1064).

Here, Defendants are faced with two counts of money laundering based on wire fraud, listing American Express as the victim and describing the fraudulent behavior as "using interstate wires by using various payment entities to disguise the true nature of the transactions."  Factually, the People have alleged that American Express signaled its intent to discontinue processing Backpage's credit payments after May 1, 2015, but Defendants continued to process American Express transactions from Backpage.   The People also allege that Defendants created shell companies and engaged in factoring in order to obscure the nature and/or source of the credit payments.

In light of the general money laundering discussion above, this Court finds no reason to prevent prosecution for money laundering based on wire fraud.


III.    **Application of The First Amendment**

In addition to the above facial attacks on the complaint, Defendants contend that the First Amendment bars prosecution for all charges, as the People are seeking to prosecute them for publishing functions.  However, the instant charges are not based on an overt attempt to criminalize the act of publication, and traditional First Amendment analysis is not required here. Indeed, the money laundering charges based on bank and wire fraud, on their face, are not based on publication of third party speech at all.  Rather, they are based on the purported illegality of Defendants financial operations.  This Court finds that the immunity provision of the CDA is not triggered by the money laundering charges based on bank or wire fraud.  Thus, the following discussion is directed at the pimping charges faced by Defendant Ferrer and the money laundering charges based on prostitution.

That is not to say that the First Amendment is not implicated at all.  Indeed, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA. Congress expressly intended to relieve online publishers from liability for publishing third-party speech.  (47 U.S.C. § 230)

As noted above, Penal Code section 1004 allows for a demurrer on the basis that the complaint contains matter which, if true would legally bar the prosecution.  (Penal Code §1004.)  The language of the CDA itself states, "No cause of action may be brought and no liability will may be imposed under any State or local law that is inconsistent with this section."  (47 U.S.C. §230 (e) (3) (emphasis added).)  This statutory language clearly demonstrates a legislative intent to provide both a bar to prosecution and an affirmative defense at trial. Thus, the relevant question in this case is whether, and to what extent, Defendants' activity entitles them to protection of their First Amendment rights through the immunity provision of the CDA.


A.    Immunity Under the Communications Decency Act

The CDA provides immunity for online publishers and distributors of content generated by third parties. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.) Protection from the CDA is broken down into three parts. Conduct is shielded if the defendant (1) is a provider or user of an interactive computer service; (2) that the plaintiff seeks to treat as a publisher or speaker; (3) of information provided by another information content provider. (*Fields v. Twitter, Inc.* (N.D. Cal. 2016) 217 F.Supp.3d 1116, *1121; *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 19; 47 U.S.C. §230.) "There has been near-universal agreement that section 230 should not be construed grudgingly." (*Doe, supra*, 817 F.3d at 118 [citations omitted].)

To determine whether defendant faces a claim that seeks to treat the defendant as a publisher or speaker of information provided by a third party, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker." (*Barnes v. Yahoo!, Inc.* 570 F.3d 1096, 1101-02.) Moreover, because distributors are included in the publisher category, distributors are also entitled to protection under the CDA. After all, publication includes every repetition and distribution of material. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45.) Under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune." (*Fair Housing Council of San Fernando Valley v. Rommates.com, LLC,* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.) The Ninth Circuit has recognized that although "there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality…Such close cases must be resolved in favor of immunity…" (*Id* at 1174.)

As applied to the instant case, there are two possible theories of prosecuting Defendants for pimping. A defendant can be convicted of pimping under a theory that involves actual solicitation of prostitution. Alternatively, defendants may be prosecuted under the theory that defendants derived support from the earnings of another's act of prostitution. (*See People v. McNulty* (1988) 202 Cal.App.3d 624, 630 [stating the two theories of prosecution for pimping].) The People rely on the second theory in asserting that Defendant Ferrer knowingly lived and derived support from prostitution earnings.

### 1. Theory that Defendant's derived financial support from prostitution

The People maintain that pimping will be shown when the People demonstrate that Defendants acquired income from prostitution resulting from advertisements placed in Backpage.com. Defendants maintain they merely accepted payment for a legitimate publishing function.

This Court finds *People v. Grant* (2011) 195 Cal.App.4th 107 helpful. *Grant* discusses a distinction between financial support received by the prostitute (illegal) and funds paid by the prostitute for services rendered or other purposes (legal). The appellate court emphasized that "the statutory prohibition does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Id* at 116. *See also Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn 7 [a natural reading of the pimping statute does not apply to an individual who provides a legitimate professional service to a prostitute even if paid with proceeds earned from prostitution, the service provider derives support from his own services]; *People v. Reitzke* (1913) 21

12

Cal.App.740, 742 [a legitimate defense to pimping is that a prostitute supplied defendant money for any purpose other than being supported or maintained by the prostitution].)

Here, there is no dispute that Backpage charged money for the placement of advertisements.  Providing a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA. This immunity has been extended by the courts to apply to functions traditionally associated with publishing decisions, such as accepting payment for services and editing.  (*See e.g.,Doe v. Backpage.com, LLC* (817 F.3d 12, 15, *petition for certiorari denied* January 9, 2017[decisions regarding posting standards and requirements, including accepting payments for posting, are not distinguishable from publisher functions].)

However, the People dispute the "services" at issue.  The People argue that the Backpage website generated income through its "Escort" section, which invariably contained prostitution advertisements.  Because these advertisements are not for legal services and Defendants were well aware of the nature of the advertisements, the People argue that any claim of immunity under the CDA is defeated.  (Pre-trial proceedings, July 14, 2017)  The People would have this Court determine that the services provided are based on the content of the advertisement rather than the forum on which the advertisement is posted.  Yet, to hold Defendant responsible for the content of the advertisement would require holding a publisher liable as if he was the speaker of the content.  Contrary to the People's claim, doing so directly triggers, not defeats, the immunity provision of the CDA.

However, that does not end our inquiry.  Immunity may be removed if Defendants' conduct went beyond those of a publisher and constituted content creation.  This may happen when a provider crosses the line from providing a neutral interactive service that simply replicates offending third party matter and instead takes active control of the content of a web posting.  (*Doe v. Backpage.com LLC* (D.C. Mass 2015) 104 F. Sup.3d 149, 156.) In short, if a provider's acts "materially contribute" to the illegality of the material, immunity will be lost.  (See *Fair Hous. Council v. Rommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1166 [defendant became a content provider by requiring an answer to discriminatory questions, defendant's unlawful questions sought unlawful answers as a condition to doing business]; *Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398-408-409 [a service provider must require third-parties to enter unlawful or actionable content to be deemed a content provider]; *FTC v. LeadClick Media* (2nd Cir. 2016) 838 F.3d 158, 175 [encouraging and managing another site to post fake news in order to boost web traffic and sales for client results in content creation]; and (*FTC v. Accusearch Inc.* (10th Cir. 2009) 370 F.3d 1187 [no immunity for company that created offensive content by paying researchers to illegally obtain phone numbers, then resold the numbers online].)

The People claim that Defendant Ferrer has gone a step beyond merely accepting payments for advertisements placed online.  Allegedly, Defendant Ferrer created content, connected pimps and traffickers with purchasers, and helped them avoid law enforcement.  The People allege that, through Backpage's posting guidelines, Defendant Ferrer encouraged, maintained and assisted illegal prostitution for purposes of his own financial gain.

     a.     Editing

The People allege Defendants created a moderation system where terms would be deleted or blocked by Backpage but the user would still be allowed to post the advertisement and compensate Defendants.  The People

allege that "such edits would not change the users' intent….but merely create a disguise." (Amend. Comp. 26) The People allege that these actions resulted in blocking certain prostitution terminology, but coded or obscured language and pictures were allowed to be posted. The People allege that Defendant Ferrer directed staff to delete or block words that were code for underage girls, but allowed the advertisement to be posted for a fee. (Amend. Comp. 26) The People contend that this constitutes "material contribution" to the offensive material. (Pre-trial proceedings, July 14, 2017, p 26)

In light of the People's acknowledgement that Backpage's edits would not change the user's intent, there can be no material contribution to the offensive content. Indeed, such actions generally fall within the scope of protected editorial functions. (See *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12, 20-21 [service providers' decisions on website structure, rules for posting and reposting - even when previously blocked - are protected publisher functions] and *Fields v. Twitter, Inc.* (N.D. Cal. 2016) 217 F.Supp.3d 1116, 1122 [protected publishing activity included decisions about what third party content may be posted or reposted online].)

Even if the edits or posting rules allow advertisers to use coded language, this is insufficient to render the website operator a content provider. The crucial distinction is between engaging in actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content, and responsibility for what makes the displayed content illegal or actionable. (*Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 414 [].) Here, it is the third-party who is responsible for the illegal content of the advertisement.

The People also allege that Defendants knew that the ads placed were for prostitution and Defendants purposefully crafted their posting procedures to maximize their profits from this prostitution. Yet courts have refrained from presuming to know a publisher's motivations for editorial decisions. First, "it is well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." (*Universal Commun. Sys. v. Lycos, Inc.* (1st Cir. 2007) 478 F.3d 413, 420, citing *Barrett v. Rosenthal* (2006) 40 Cal. 4th 33). Thus, even if Backpage knew of the unlawfulness of the content of the ads, knowledge is insufficient to render Defendants liable. This is true regardless of whether Backpage even exercised its editorial discretion and deleted or blocked certain terms from ads. (See *Doe II v. MySpace Inc,* (2009) 175 Cal.App.4th 561, 571 [immunity under section 230 applies even when self-regulation is unsuccessful or unattempted]; *Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21 [rejecting claim that website operators should be liable for failing to provide sufficient protections to users from harmful content created by others].)

Additionally, in *Backpage.com v. McKenna* (Wash. W.D.C. 2012) 881 F.Supp.2d 1262, the court recognized the difficulty in assigning knowledge of a third-party's intent to a publisher when that third party places an ad with Backpage. The court acknowledged that the pimp who publishes the advertisement certainly knows whether his offer is implicitly for sex, but expressed serious doubt that one could assign such knowledge to a publisher as to whether an advertisement "implicitly" offered sex. If an online service provider publishes advertisements that employ coded language, a reasonable person could be misled to believe that facts exist when they do not: an advertisement for escort services may be just that. Moreover, if the offer is "implicit," a third

party cannot ascertain that which is being offered before the transaction is actually consummated – a fact not likely to be known by a publisher.  (*Id* at 1279.)

Finally, courts have stated that the motivation behind editorial decisions "do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content."  (*Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21.)  Immunity depends on the source of the information in the injurious statement, not the source of the statement itself.  (*Universal Commun. Sys. v. Lycos, Inc.,* (1st. Cir. 2007) 478 F.3d 413, 419-420 [immunity only applies when the information that forms the basis for the state law claim has been provided by "another information content provider"]; 47 U.S.C. §230 (c)(1).)

Here, the People acknowledge that advertisements are placed by third parties and Backpage's edits "would not change the users' intent."  Nor is there an allegation that Defendant(s) set up the website to require offensive content to be supplied, as in *Roommates, Bollaert* or *Dirty World*.  As such, there is no material contribution to the offensive content in the advertisements, and the allegations reference traditional publisher functions.

b.   Use of Profile Information

The People also specifically allege that "Defendants created profiles for the victims named in [several] counts [ ] without their knowledge."  (Amend. Comp. 20, overt act 18)  These false or nonexistent profiles were "created from Backpage data and [then] used on other websites."  Allegedly, sometimes content that was edited out on Backpage was displayed on the affiliated websites of BigCity.com or EvilEmpire.com.  In doing so, Defendants unlawfully used another's image "for the Defendants' own commercial gain," and to advertise their own product.  (Amend. Comp. 25)  The People claim that this "misappropriation" of the likeness of Backpage users resulted in content creation.  (Amend. Comp. 25)

Similar allegations were considered in *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 and *Anthony v. Yahoo! Inc* (N.D. Cal. 2006) 421 F.Supp.2d 1257.  The People cite *Anthony* as instructive.  (Opp. 12)  In *Anthony*, Plaintiffs belonged to an online dating service through Yahoo!.  Plaintiffs alleged that Yahoo! created false profiles and sent those false profiles to users as enticement to renew their dating subscription.  The court refused Yahoo!'s claim of immunity under the CDA at the dismissal stage.  The court stated that the allegations that Yahoo! actively created false profiles, not merely that Yahoo! failed to delete the expired profiles, were sufficient to allow the case to go forward.

In *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 , plaintiffs brought claims against Backpage alleging unauthorized use of a person's picture.  Plaintiffs alleged that Backpage used their photos to garner advertising revenues from their traffickers.  (*Id* at 27.)  The court found that although Backpage profited from the sale of advertisements, it was "not the entity that benefitted from the misappropriation."  Rather, the party who benefitted from the misappropriation was the original advertiser.  The court stated, "Matters might be different if Backpage had used the pictures to advertise its own services…"  (*Ibid.*)  (See also *Perkins v. LinkedIn Corp* (N.D. Cal. 2014) 53 F.Supp.3d 1222, 1247 [defendant was a content provider when defendant, in an effort to increase its own business, unilaterally crafted and sent membership invitation emails to users' contacts].)

The People assert that Defendant Ferrer falls under the above exceptions when he created and then used profile information to increase Backpage revenue. Yet the People acknowledge that the information used was "created from Backpage data." Thus, it is clear that Defendants did not fabricate the data, as in *Anthony*. There is no allegation that in taking the data from the Backpage ads, Defendants created the injurious nature of the material. (See *Doe v. Friendfinder Network, Inc.* (D.C. N.H. 2008) 540 F.Supp.2d 288, 295 [website operator is not a content provider when there is no indication it contributed to the injurious character of the content].) Moreover, the People's allegation that the purpose of these "new" posts was to direct web traffic back to Backpage demonstrates that if a person was interested in the reposted profile, the person was redirected to the ad on Backpage. While additional advertisement revenue may have been a byproduct of this redirection, the original poster gained increased visibility of his ad. Increased visibility to the classified ads posted by third parties permissibly leads to search engine optimization in an effort to increase the visibility of the information provided by the third party. (See *Asia Econ. Inst. V. Xcentric Ventures LLC* (C.D. Cal. 2011) 2011 U.S. Dist. LEXIS 145380, *19 [increasing the prominence of a page in internet searches do not amount to "creation or development of information"].) Indeed, the very purpose of the online advertising accessed by the third party in placing an ad in Backpage was to provide accessibility to the public on a large scale. (See *Ibid* [the purpose of consumer reports is to provide accessibility to the public on a grand scale and "increasing the visibility of a statement is not tantamount to altering its message"]; See also *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041 ["Whatever [Backpage] did to increase their profitability ad visibility, did not create the content of the offensive posted information."].)

  c.  Overall Course of Conduct

The People attempt to establish a pattern of an overall course of conduct to indicate Defendants sought to structure their business to obtain maximum profits from the illegal sex trade. The People allege that Defendants "manipulated" advertisements to evade law enforcement detection. The People state, "In this way, rather than prevent a child from being sold for sex, the Defendants would knowingly profit from the child's commercial sexual exploitation and assist the trafficker to evade law enforcement." (Amend. Comp. 26)

The People maintain Backpage's conduct is similar to *J.S. v. Vill. Voice Media Holdings, LLC* (2015) 184 Wn.2d 95. In that case, advertisements featuring three minor girls were posted online on a site owned by Backpage. These girls became victims of sex trafficking and later brought suit against Backpage. Backpage moved to dismiss the case on the basis of immunity provided by the CDA. The Washington Supreme Court refused to grant the motion to dismiss. (*Id* at 98-99.) The *J.S.* court stated that the case turned on whether Backpage merely hosted the advertisements or helped develop the content of those advertisements. (*Id* at 101)

Applying the applicable state standard for a motion to dismiss, the *J.S.* court found that the plaintiffs alleged facts that, if proved true, would show that Backpage did more than simply maintain neutral policies prohibiting or limiting certain content. Specifically, those allegations included that Backpage intentionally developed its website to "require" information that allows and encourages illegal trafficking of underage girls, developed content requirements that it knows will allow solicitors to evade law enforcement and that Backpage

knows that the foregoing content requirements are a fraud and ruse actually aimed at helping pimps and prostitutes.  (*Id* at 102.)

Here, however, the factual allegations fall short of those alleged in *J.S.*.  There is no allegation that Defendants required information essential to the illegal trafficking of underage girls.  Instead, the People's allegations attempt to assign criminal liability to Defendants who offered an online forum, on which other people posted advertisements that led to prostitution, and that Defendants realized profits instead of "actively preventing" the sale of sex.  These allegations confuse moral obligations with legal ones and have been rejected in other jurisdictions.  For example, in *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041, Defendants were SUSTAINED immunity under the CDA for allegations that Backpage knowingly accepted a fee for advertisements leading to prostitution, and "created information" by hosting a search engine, providing instructions for increased visibility of advertisements and allowed for anonymous payment.  (*Id* at 1044.)  (See also *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 22 [rejecting the plaintiffs' assertion that Backpage participated in an affirmative course of conduct and actual participation in sex trafficking by charging for advertisements and allowing users to pay an additional fee for increased advertisement visibility and holding that "claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)."].)

As alleged here, the prostitution took place as a result of an advertisement placed by a third party.  Thus, the only "manipulation" would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site.  Backpage's decision to charge money to allow a third party to post content, as well as any decisions regarding posting rules, search engines and information on how a user can increase ad visibility, are all traditional publishing decisions and are generally immunized under the CDA. In short, the victimization resulted from the third party's placement of the ad, not because Backpage profited from the ad placement.  (See *Doe, supra*, 817 F.3d at 20 [noting that the plaintiffs were harmed when they were trafficked through the advertisements whose content was created by a third party]; *Cohen v. Facebook, Inc.* (E.D.N.Y. May 18, 2017) 2017 U.S.Dist.LEXIS 76701, at *28-31 [Facebook immune from liability for allowing Hamas to use its platform to post offensive content that incited or encouraged terrorist attacks in Israel because although Facebook's role in publishing that content was an essential causal element of the claims, allowing liability to be imposed on that basis would inherently require the court to treat the defendant as the publisher or speaker of content provided by Hamas, and was impermissible under the CDA].)

B.     Money Laundering Based on Prostitution

The People charge Defendants with both prongs of money laundering based on a specific intent to promote prostitution in violation of 18 USC 1952, pimping in violation of Penal Code section 266h, or knowing the monetary instruments represented the proceeds of the prostitution.  (See counts 15-16)

Referred to as the "Travel Act," section 1952 prohibits travel in interstate commerce or use of interstate facilities with intent to promote unlawful activity.   (*United States v Villano* (10th Cir. 1976) 529 F2d 1046.) The Travel Act defines an "unlawful activity" as any crime of prostitution under state law.  (See *United States v.*

*Campione* (7th Cir. 1991) 942 F.2d 429, 434.). Section 1952 refers to state law only to identify the defendant's unlawful activity; it does not require that the state crime ever be completed or proved. (*Ibid.*)

Although the parties do not discuss these specific charges at length, the previous discussion of the CDA's immunity provision as it relates to the pimping charges informs the Court's analysis with respect to these charges. As discussed above, the People are attempting to prosecute Defendants as if they were the speaker of the offensive content leading to prostitution, which is prohibited under the immunity provision of the CDA. This Court rejected the People's claim that Defendants actually created the content that led to their ability to live and derive support and maintenance from prostitution proceeds, when the face of the complaint demonstrated that Defendants engaged in protected publisher functions. Because this Court has rejected the prosecution based on the theory that Defendants engaged in pimping, their purported use of proceeds from prostitution cannot now serve as the basis for money laundering charges. As this Court has already determined, Defendants provide an online forum for third-party speech, and their decision to charge money for such postings constitutes activity protected under the CDA.

<u>Conclusion</u>

As amply briefed by the parties, federal law provides broad immunity for internet service providers from both federal and state prosecutions. Indeed, the 9th Circuit federal appellate court has instructed such immunity be applied liberally. The underlying public policy is to permit, and promote, the robust growth of the internet by shielding internet providers from facing suit over the content created by those posting on their sites. If and until Congress sees fit to amend the immunity law, the broad reach of section 230 of the Communications Decency Act even applies to those alleged to support the exploitation of others by human trafficking.

However, immunity afforded to internet service providers is not without limit. Even the most ardent defenders of a vigorous world wide web would have to concede that if a provider engaged in their own criminal acts, versus those of their customers, immunity must fail. And so it is in this case. While the charges relating to pimping will not be allowed to proceed, the offenses pertaining to allegations that the Defendants themselves engaged in financial crimes, to include bank fraud and money laundering to disguise their business dealings, will survive the demurrer stage.

**Court's ruling:**

Defendants' request to enjoin further prosecutorial investigation and return of the materials seized is OVERRULED.

Defendants' request for judicial notice is OVERRULED, except as to the prior charges and orders granting the demurrer and dismissal. Within that context, the People's motion to strike the remaining exhibits is SUSTAINED.

Defendants' request to assign the case to the Honorable Michael G. Bowman is OVERRULED.

Defendants' demurrer is SUSTAINED for counts 15-16, 28-40, OVERRULED as to the remainder of the charges.

**Dated:**

_____

**Honorable Lawrence G. Brown**
**Judge of the Superior Court of California**
**County of Sacramento**

Case 2:16-cr-00421-DJH   Document 287-1   Filed 08/29/18   Page 65 of 119

Exhibit 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

WOODHULL FREEDOM FOUNDATION,     )
et al.,                          )
                                 )
        Plaintiffs,              )
                                 )
    vs.                          )    Civil Action No. 18-01552 (RJL)
                                 )
UNITED STATES OF AMERICA and     )
JEFFERSON B. SESSIONS, in his official )
capacity as ATTORNEY GENERAL OF THE )
UNITED STATES,                   )
                                 )
        Defendants.              )
_____ )

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Defendants, by and through undersigned counsel, respectfully oppose Plaintiffs' Motion

for Preliminary Injunction (ECF No. 5) and move to dismiss Plaintiffs' Complaint (ECF No. 1)

pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for the reasons

set forth in the accompanying Memorandum of Points and Authorities.

Dated: July 12, 2018                    Respectfully submitted,

                                        JESSIE K. LIU, D.C. Bar #472845
                                        United States Attorney

                                        DANIEL F. VAN HORN, D.C. Bar #924092
                                        Chief, Civil Division

                        By:     */s/ Jason T. Cohen*
                                        JASON T. COHEN, ME Bar #004465
                                        Assistant United States Attorney
                                        Civil Division
                                        555 Fourth St., N.W.
                                        Washington, D.C. 20530
                                        Phone: (202) 252-2523
                                        Fax: (202) 252-2599
                                        Email: jason.cohen@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WOODHULL FREEDOM FOUNDATION, )
et al., )
 )
         Plaintiffs, )
 )
         vs. )          Civil Action No. 18-01552 (RJL)
 )
UNITED STATES OF AMERICA and )
JEFFERSON B. SESSIONS, in his official )
capacity as ATTORNEY GENERAL OF THE )
UNITED STATES, )
 )
         Defendants. )
_____ )

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**I.    Introduction**

In this case, Plaintiffs Woodhull Freedom Foundation, Human Rights Watch, Eric

Koszyk, Jesse Maley a/k/a Alex Andrews, and The Internet Archive bring a pre-enforcement

challenge to the Allow States and Victims to Fight Online Sex Trafficking Act of 2017

("FOSTA" or "Act"), seeking to have the Act declared unconstitutional facially and as applied

under the First and Fifth Amendments of the United States Constitution. Concurrent with the

filing of the Complaint (ECF No. 1), Plaintiffs moved for a Preliminary Injunction (ECF No. 5).

The extraordinary remedy of a preliminary injunction is unwarranted here because this

Court lacks jurisdiction. All five named Plaintiffs lack standing to bring this pre-enforcement

challenge because the assertions in Plaintiffs' Complaint fail to establish a credible threat of

prosecution based on constitutionally protected activity. Simply put, the case or controversy

requirement of Article III is not met. Further, even if Plaintiffs could establish standing, they

cannot demonstrate a substantial likelihood of success because they have failed to set forth any

claims upon which relief can be granted. Therefore, this is not a case that allows the Court to

award the equitable remedy Plaintiffs demand and dismissal is appropriate.

## II.     **Statutory Background**

The Allow States and Victims to Fight Online Sex Trafficking Act of 2017 ("FOSTA"),

Pub. L. No. 115-164, 132 Stat. 1253 (Apr. 11, 2018), primarily effected three changes in the law.

First, Section 3 of the Act amended Chapter 117 of title 18, United States Code, to add

§ 2421A, a new crime prohibiting individuals from owning, managing, or operating a website or

other technology platform with the intent to promote or facilitate the prostitution of another

person, punishable by up to 10 years in prison.[1] 18 U.S.C. § 2421A(a). Section 2421A includes

an aggravated felony if five or more individuals were prostituted or if the defendant recklessly

disregarded that his or her conduct contributed to sex trafficking, punishable by up to 25 years in

prison. 18 U.S.C. § 2421A(b). Section 2421A also criminalizes conspiring or attempting to

commit the offense, and provides for mandatory restitution for any sex trafficking victims. And it

specifies that it shall be an affirmative defense where the defendant proves by a preponderance

of the evidence that promoting or facilitating the prostitution is legal in the jurisdiction where the

conduct was targeted. 18 U.S.C. § 2421A(e). Section 2421A permits any person injured by an

aggravated violation of the statute to recover civilly. 18 U.S.C. § 2421A(c).

Second, FOSTA allows state and local authorities to bring criminal actions against

websites and other tech platforms for conduct that would constitute a violation of 18 U.S.C.

---

[1] 18 U.S.C. § 2421A is substantially similar to 18 U.S.C. § 1952 ("Interstate and foreign travel or transportation in aid of racketeering enterprises"), which makes it illegal to use any facility in interstate commerce with intent to "otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952(a)(3). "Unlawful activity" under Section 1952 includes prostitution offenses in violation of the laws of the State in which they are committed or of the United States. *Id.* § 1952(b).

§ 1591 or 18 U.S.C. § 2421 if the "promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted." *See* Section 4 of the Act. Section 1591 criminalizes sex trafficking, specifically, recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting by any means a person, knowing or recklessly disregarding that they would be caused to engage in a commercial sex act. 18 U.S.C. § 1591(a). For adult victims, the government must also prove that the defendant knew or recklessly disregarded that force, fraud, or coercion would be used to cause the victim to engage in a commercial sex act. *Id.* § 1591(a)(2). For child victims, the government must prove that the defendant knew or recklessly disregarded that the victim was under the age of 18, or that the defendant had a reasonable opportunity to observe the victim. *Id.* § 1591(c).[2]  A commercial sex act is any sex act, on account of which anything of value is given to or received by any person. 18 U.S.C. § 1591(e)(3). Section 1591 also criminalizes participation in a venture that engages in the conduct described above, as well as obstructing or attempting to obstruct enforcement of the provision.

Third, FOSTA permits sex trafficking victims to bring civil suits against websites and other tech platforms pursuant to 18 U.S.C. § 1595. *See* Section 4 of the Act. State Attorneys General may also bring such civil suits as *parens patriae*. *See* Section 6 of the Act.

## III.    Standard of Review

### A.    Dismissal Pursuant to Rule 12(b)(1) for Lack of Jurisdiction

Pursuant to Rule 12(b)(1), a court must dismiss a claim when it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A motion to dismiss under Rule 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine

---

[2] For advertising only, prosecutors must prove the defendant knew the victim was a minor or that force, fraud, or coercion was used against an adult. 18 U.S.C. § 1591(a).

whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted). "[I]t is presumed that a cause lies outside [the federal courts'] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction. *See, e.g.*, *U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011); *Peter B. v. United States*, 579 F. Supp. 2d 78, 80 (D.D.C. 2008) (plaintiff bears the burden of establishing that the court has subject matter jurisdiction). When reviewing a Rule 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inference in the plaintiff's favor." *Id.* At the same time, "[t]he court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), *aff'd*, 346 F.3d 192 (D.C. Cir. 2003); *see also Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (noting that the "plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim"). "[T]he District Court may in appropriate cases dispose of a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) on the complaint standing alone." *Herbert v. Nat'l Acad. of Sciences,* 974 F.2d 192, 197 (D.C. Cir. 1992). The Court also, however, may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting

4

evidence. *Id.*; *see also Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

**B.**     **Dismissal Pursuant to Rule 12(b)(6) for Failure to State a Claim**

Under Rule 12(b)(6), dismissal is appropriate if the plaintiff fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). In order to survive a Rule 12(b)(6) motions, the plaintiff's allegations, when read in a light most favorable to the plaintiff, must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Natl. Ins. Co. v. Fed. Deposit Ins. Corp.,* 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks omitted). But a court need not accept "factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint," nor must a court give credence to "plaintiff's legal conclusions." *Disner v. United States,* 888 F. Supp. 2d 83, 87 (D.D.C. 2012) (internal quotation marks omitted).

**C.**     **Standard of Review for Preliminary Injunction**

A party seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits, (2) that it will suffer irreparable injury if the injunction is not granted, (3) that the balance of equities tips in the movant's favor; and (4) that the public interest would be furthered by the injunction. *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). The third and fourth factors "merge when the Government is the opposing party." *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220–21 (D.D.C. 2015) (internal quotation marks omitted). Because the relief plaintiffs seek is "an extraordinary remedy," a preliminary injunction "should be granted only [if they carry] the burden of persuasion." *Chaplaincy of Full Gospel Churches v.*

*England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997);

*see also Dorfmann v. Boozer,* 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a

preliminary injunction, especially a mandatory one, should be sparingly exercised." (internal

quotation marks omitted)).

 The D.C. Circuit has traditionally applied a "sliding scale" approach to these four factors,

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009), under which "a

strong showing on one factor could make up for a weaker showing on another." *Sherley v.

Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Following the Supreme Court's decision in *Winter

v. NRDC, Inc.*, 555 U.S. 7 (2008), however, the D.C. Circuit Court "has suggested, without

deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more

demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of

success on the merits and irreparable harm." *Smith v. Henderson*, 944 F. Supp. 2d 89, 95–96

(D.D.C. 2013) (citing *Sherley*, 644 F.3d at 392).

## IV. Argument

### A. Plaintiffs Lack Standing

 "The first component of the likelihood of success on the merits prong usually examines

whether the plaintiffs have standing in a given case." *Kingman Park Civic Ass'n v. Gray*, 956 F.

Supp. 2d 230, 241 (D.D.C. 2013). Here, Plaintiffs fail to establish their standing to assert the

claims alleged in their Complaint, and this case should accordingly be dismissed for lack of

subject matter jurisdiction.

 "The judicial power of the United States" is limited by Article III of the Constitution "to

the resolution of 'cases' and 'controversies,'" *Valley Forge Christian Coll. v. Americans United

for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982), and the demonstration of a

6

plaintiff's standing to sue "is an essential and unchanging part of the case-or-controversy requirement," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The standing inquiry must be "especially rigorous" when reaching the merits of a claim would force a court to decide the constitutionality of actions taken by a coordinate Branch of the Federal Government. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). A plaintiff "'must demonstrate standing for each claim he seeks to press.'" *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 10 (D.C. Cir. 2015), *as amended* (July 21, 2015) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). Thus, to establish standing for its claims here, for which Plaintiffs seek only injunctive and declaratory relief, Plaintiffs must identify for each Plaintiff an injury in fact, fairly traceable to the statutory language at issue in the specific claim, and redressable by a favorable ruling, that is "concrete, particularized, and actual or imminent." *See id.*

The injury-in-fact requirement "helps to ensure that the plaintiff has a 'personal stake in the outcome of the controversy.'" *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical. An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id.* (citations and quotations omitted). Where a plaintiff brings a pre-enforcement First Amendment challenge to a statute, "[s]ubjective chill alone will not suffice to confer standing." *Johnson v. Dist. of Columbia.*, 71 F. Supp. 3d 155, 159 (D.D.C. 2014) (quoting *Act Now to Stop War & End Racism Coal. v. Dist. of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009)) (internal quotations omitted). Rather, in order to establish that threatened enforcement is "sufficiently imminent," a plaintiff must "allege[] an intention to engage in a course of conduct arguably affected with a constitutional interest, but

7

proscribed by a statute, and there [must] exist[] a credible threat of prosecution thereunder." *Susan B. Anthony List*, 134 S. Ct. at 2342 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)); *see also Clapper*, 568 U.S. at 409 (the threatened injury cited by the pre-enforcement plaintiff must be "certainly impending"); *Blum v. Holder*, 744 F.3d 790, 798 (1st Cir.), *cert. denied*, 135 S. Ct. 477 (2014) (applying *Clapper* to a pre-enforcement First Amendment challenge); *Johnson*, 71 F. Supp. 3d at 160 ("Where there is no expectation of enforcement, there is unlikely to be a 'credible threat' of prosecution."). A credible threat of prosecution exists when "the [challenged] law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (citations omitted).

The Supreme Court's analysis in *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334 (2014), is instructive. In *Susan B. Anthony*, the Court held that the plaintiffs had standing to challenge an Ohio statute that prohibited dissemination of false statements about candidates, knowing that, or with reckless disregard of whether, the statements were false. *Susan B. Anthony List*, 134 S. Ct. at 2338, 2343. The Court reasoned that the plaintiffs had sufficiently alleged an intent to engage in a course of conduct arguably affected with a constitutional interest because they had "pleaded specific statements they intend to make in future election cycles." *Susan B. Anthony List*, 134 S. Ct. at 2343. These statements qualified as "political speech" and thus were "certainly 'affected with a constitutional interest.'" *Id.* at 2344 (quoting *Babbitt*, 442 U.S. at 298). The Court also concluded that these statements were "arguably . . . proscribed by" the Ohio law. *Id.* at 2344. The Court rejected the notion that one plaintiff's fear of enforcement was "misplaced" because it had not alleged an intent to lie or recklessly disregard the veracity of its

8

speech. *Id.* at 2345. However, in doing so, the Court pointed out that this plaintiff had already
been the subject of complaints in past election cycles, and that complaints could be submitted by
"any person" with knowledge of the purported violation. *Id.*

This case presents quite a different situation. The courses of conduct alleged to be
planned by the Plaintiffs are not "'proscribed by [the] statute' they wish to challenge." *Susan B.
Anthony List*, 134 S.Ct. at 2344 (quoting *Babbitt*, 442 U.S. at 298). Plaintiff Woodhull Freedom
Foundation ("Woodhull") is a nonprofit organization "working full time toward affirming and
protecting the fundamental human right to sexual freedom." Compl. ¶ 15. Woodhull intends to
hold its ninth-annual Sexual Freedom Summit in August, 2018, "to protect the members of its
diverse communities and their right to information, health, and pleasure," and part of the
conference "involve[s] workshops devoted to issues affecting sex workers, such as harm
reductions, disability, age, health and personal safety." *Id.* ¶¶ 66-67. By its own admission,
Woodhull is proceeding with its Summit, including online advertising.  *Id.* ¶¶ 80.  As described
by Plaintiffs, none of these activities would subject someone to liability under 18 U.S.C.
§ 2421A, or any provision of FOSTA. Only actions taken with the intent to promote or facilitate
the prostitution of another person in a jurisdiction where prostitution is illegal, per Section
2421A and Section 4(a) of FOSTA, or knowing sex trafficking under Section 1591, fall within
the specifications of the ActSimilarly, while Plaintiff Human Rights Watch ("HRW") "produces
and publishes . . . research and advocacy on behalf of the rights of sex workers," it has an
established policy that "'[f]orced prostitution and trafficking in human beings are among the
most serious violations of human rights' and that '[a]ll states have an obligation to take
necessary measures to prevent and combat such criminal activities." Compl. ¶¶ 88, 90. While
HRW states that it is "concerned" that its human rights advocacy work, in particular its advocacy

for the decriminalization of sex work, could be seen by "US litigants" as "in some way assisting

sex trafficking," such concerns have no realistic basis and are not sufficient to confer standing.

Compl. ¶ 91. Likewise, Plaintiff The Internet Archive ("Archive"), which indiscriminately

captures and preserves internet content, including 80 million web pages per day, also does not

allege an intention to engage in a course of conduct proscribed by the statute at issue or for

which there exists a credible threat of prosecution. Compl. ¶ 124. Plaintiff Eric Koszyk is a

massage therapist who claims that Craigslist has blocked his advertisements in its "Therapeutic

Services" section, despite the fact that Koszyk is a licensed professional providing massage

therapy that is professional and therapeutic. Compl. ¶¶ 93-98. As alleged, there can be no

question that Koszyk's actions do not fall within those proscribed by the Act (nor does

Craigslist.org have a credible fear of prosecution if they ran his ad). Plaintiff Jesse Maley a/k/a

Alex Andrews' claims focus on a website called Rate That Rescue that allows members of the

sex worker community to rate rescue or service provider organizations on a scale and to post

comments describing their experiences. Compl. ¶ 105-109. She is also currently affiliated with

Sex Workers Outreach Project USA ("SWOP USA"), which is "dedicated to the fundamental

human rights of people involved in the sex trade and their communities, focusing on ending

violence and stigma through education and advocacy." *Id.* ¶ 102. Again, nothing in the

Complaint sets forth any intention by Andrews to engage in conduct proscribed by the Act for

which there exists any credible threat of prosecution.

Plaintiffs' argument that the terms "promote" and "facilitate" are overbroad and likely to

encompass their advocacy for the legalization of prostitution or the health and safety of sex

workers is unavailing and contrary to the enforcement history of substantially similar crimes. In

particular, a violation of 18 U.S.C. § 1952, often called the "Travel Act," consists of: (1) use of

the mails or interstate facilities; (2) with the intent to promote or facilitate the promotion of; (3) any unlawful activity; and (4) thereafter performs or attempts to perform an act to facilitate the unlawful activity. *See* 18 U.S.C. § 1952; *United States v. Bennett*, No. 95-30252, 1996 WL 477048, at *5-6 (9th Cir. Aug. 21, 1996)). "Any unlawful activity" is defined in relevant part as "any business enterprise involving . . . prostitution offenses in violation of the laws of the State in which they are committed." 18 U.S.C. § 1952(b).

As used in the Travel Act, the term "promote" or "facilitate the promotion" of any illegal activity means to do any act that would cause the unlawful activity to be accomplished or to assist in the unlawful activity in any way. *Bennett*, 1996 WL 477048 at *5; *see also, e.g., United States v. Reiner*, 500 F.3d 10, 12-19 (1st Cir. 2007) (defendant convicted of Travel Act violation was responsible for all personnel decisions concerning the massage parlor that served as a front for prostitution and the content of the advertisements posted in newspapers' adult sections, and handled the financial aspects of the business). Several recent prosecutions underscore this point. In *United States v. Seals*, 5:10–CR–50127, 2014 WL 3847916, at *10 (W.D. Ark. Aug. 5, 2014), the defendant was convicted of a Travel Act violation after admitting in plea agreement to opening bank and credit card accounts for the prostitution enterprise, hiring sex workers, answering telephone lines, and placing advertisements for the prostitution enterprise. In *United States v. Omuro*, N.D. Cal. No. CR 14-CR-336, the owner and operator of a website pleaded guilty to a Travel Act violation and admitted in his plea agreement that "[t]he website hosted advertisements, the vast majority of which were posted by prostitutes containing their picture[s], and in most instances, the sexual services they offered, and their rates. . . . The website also allowed site users to submit, search, and read reviews of the services offered by particular prostitutes. . . . As such, the website promoted and facilitated the carrying on of prostitution

11

throughout California, elsewhere in the United States, and Canada." Similarly, in *United States v. Hurant*, E.D.N.Y No. CR 16-45, a website operator pleaded guilty to a Travel Act violation and admitted in court pleadings that he "was well aware . . . that the escort ads he posted . . . were thinly-veiled proposals of sexual services in exchange for money"). Finally, in *United States vs. Lacey, et al.*, 18-cr-422 (D. Ariz.), Docket 3 ¶¶ 31-114, the indictment alleges that backpage.com and its officers and employees earned in excess of $500 million over several years by hosting ads that backpage.com employees edited to conceal that they were actually for prostitution. *Cf. Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) (skeptically posing as rhetorical question in dicta, "Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity?") (emphasis added). Section 1952 was first enacted in 1961. Pub.L. 87-228 § 1(a), Sept. 13, 1961, 75 Stat. 498. The fact that none of the Plaintiffs (nor anyone like them) has ever been prosecuted under Section 1952, and the substantial similarity between Section 1952 and 2421A, shows that the Plaintiffs do not have a credible fear of prosecution.

Case law concerning 18 USC § 1956, the federal money laundering statute, similarly demonstrates that the term "promote" does not apply to Plaintiffs' professed activities. The "specific intent to promote requirement" has been called the "gravamen" of a § 1956(a)(1)(A)(i) violation. *United States v. Carcione,* 272 F.3d 1297, 1303 (11th Cir. 2001). To prove it, the government must satisfy a stringent *mens rea* requirement. *United States v. Brown,* 186 F.3d 661, 670 (5th Cir. 1999). Essentially, the government must show the transaction at issue was conducted with the intent to promote the carrying on of a specified unlawful activity. *Id.* It is not enough to show that a money launderer's actions *resulted* in promoting the carrying on of

12

specified unlawful activity. *Id.* Nor may the government rest on proof that the defendant engaged in "knowing promotion" of the unlawful activity. *Id.* Instead, there must be evidence of *intentional* promotion. *Id.* In other words, the evidence must show that the defendant's conduct not only promoted a specified unlawful activity but that he engaged in it *with the intent* to further the progress of that activity. *Brown,* 186 F.3d at 670.

These examples illustrate the inapplicability of FOSTA to these Plaintiffs. Advocating for the legalization of sex work, for example, is the opposite of the intentional facilitation of illegal prostitution. Helping sex workers find appropriate service providers no more facilitates prostitution than rehabilitation services facilitate drug trafficking. Discussing "harm reductions, disability, age, health and personal safety" is not promoting or facilitating prostitution.

The facts of this case are more aligned with those in *American Library Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992) and *Backpage.com, LLC v. Lynch*, 216 F. Supp. 3d 96 (D.D.C. 2016). In *Barr*, the plaintiffs "sought an injunction and a judgment declaring [the Child Protection and Obscenity Act of 1988's] recordkeeping and forfeiture provisions to be unconstitutional, in violation of the First Amendment." 956 F.2d at 1181. Because the plaintiffs represented that "they [would] not knowingly . . . produce child pornography or obscenity," and even if they did, "they could not contend that their speech would be 'arguably affected with a constitutional interest,'" *id.* at 1193 (citations omitted), the D.C. Circuit held that "a litigant must demonstrate a credible threat of prosecution under a statute that appears to render the litigant's arguably protected speech illegal [and the p]laintiffs in th[at] case ha[d] not met that essential requirement and therefore ha[d] failed to assert an injury in fact with respect to their challenge,"' *id.* at 1194 ("Here, as [the] plaintiffs admit, the forfeiture provisions are not 'aimed' at them. They are aimed instead at those who [knowingly] produce and distribute child pornography and obscene

13

material."). Like the plaintiffs in *Barr*, none of the Plaintiffs here argue that they will operate a computer service with the intent to promote or facilitate the prostitution of another person or knowingly engage in sex trafficking.

Even if they did, they could not argue that such speech to facilitate illegal acts is entitled to First Amendment protection. *See United States v. Williams*, 553 U.S. 285, 297 (2008) (recognizing that "offers to engage in illegal transactions are categorically excluded from First Amendment protection"); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388-89 (1973) ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes."). Importantly, FOSTA only applies to knowing sex trafficking, which is prohibited under federal law and most state laws, and to the illegal promotion or facilitation of prostitution.[3] Thus, to the extent plaintiffs were engaging in conduct proscribed by FOSTA, they would not be engaging in constitutionally protected speech.

Moreover, in *Backpage.com*, the district court considered a First Amendment challenge to the Stop Advertising Victims of Exploitation Act of 2015 ("SAVE Act"), which amended 18 U.S.C. § 1591. The plaintiff, an online classified advertising service, asserted a pre-enforcement challenge to the SAVE Act, alleging, as Plaintiffs do here, that the provisions of the Act are unconstitutionally vague, overbroad, and infringe its First Amendment rights. *Backpage.com*, 216 F. Supp. 3d at 100. In dismissing the action for lack of standing, the Court held that although Backpage.com alleged an intention to continue to host third party advertisements that are adult-

---

[3] As noted above, Section 2421A includes an affirmative defense where the defendant proves by a preponderance of the evidence that promoting or facilitating the prostitution is legal in the jurisdiction where the conduct was targeted. 18 U.S.C. § 2421A(e). State criminal actions permitted by FOSTA can only occur in jurisdictions which criminalize the promotion or facilitation of prostitution. A summary of state child sex trafficking laws is available at https://sharedhope.org/wp-content/uploads/2017/11/2017-PIC-Toolkit.pdf.

oriented and concern escort services, such activities are not proscribed by the SAVE Act, and advertisements that actually promoted sex trafficking would not be afforded First Amendment protection. *Id.* at 103. And like the Plaintiffs here, Backpage.com could not show a credible threat of prosecution because it did not allege the requisite *mens rea* to subject itself to the statute's reach. *Id.* at 108-109. Similarly, here, plaintiffs fail to show a credible threat of prosecution because they do not allege that they have the intent to further specific acts of prostitution. (Even more, as discussed in more detail below, plaintiffs mischaracterize the scienter requirements set forth in FOSTA.)

### B.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims

In addition to their lack of standing, Plaintiffs are also unlikely to prevail on merits of their claims and have failed to state any claims on which relief can be granted. As discussed above, Plaintiffs' claims all rely on an incorrect interpretation of FOSTA that is not supported by the text of the law.

#### 1.   Plaintiffs Are Unlikely to Succeed on Their First Amendment Claims

As an initial matter, Plaintiffs' First Amendment claims are unlikely to succeed because FOSTA does not criminalize protected speech. For First Amendment protections to trigger, a challenged statute must infringe on protected speech. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985) (holding that if the allegedly restricted conduct is not protected speech activity, "[the court] need go no further"). As explained, however, FOSTA only applies to promotion or facilitation of illegal conduct. As such, no speech subject to FOSTA qualifies as protected by the First Amendment. *Williams*, 553 U.S. at 297; *Pittsburgh Press Co.*, 413 U.S. at 388-89; *Backpage.com*, 216 F. Supp. 3d at 103. Plaintiffs' overbreadth, strict scrutiny, and mens rea challenges accordingly fail on that basis alone.

Plaintiffs' overbreadth claim is also particularly unlikely to succeed because even if FOSTA reached some protected speech, its plainly legitimate sweep is vast, and it therefore could not be deemed substantially overbroad. Under the overbreadth doctrine "[a] defendant being prosecuted for speech or expressive conduct may challenge the law on its face if it reaches protected expression, even when that person's activities are not protected by the First Amendment." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 411–12 (1992). The doctrine is grounded in the idea that "the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). The Supreme Court has admonished, however, that the overbreadth doctrine is "strong medicine" that should be administered "only as a last resort." *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999). "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

To assert a facial overbreadth claim, Plaintiffs must demonstrate that the challenged provision of FOSTA (1) "could never be applied in a valid manner," or (2) that even though it may be validly applied to some, "it nevertheless is so broad that it 'may inhibit constitutionally protected speech of third parties.'"[4] *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988). "[T]he first kind of facial challenge will not succeed unless the court finds that every application of the statute created an impermissible risk of suppression of ideas." *Id.* "[T]he second kind of facial challenge will not succeed unless the statute is 'substantially'

_____

[4] The Supreme Court has noted that this latter kind of facial challenge is properly thought of as "an exception to ordinary standing requirements." *New York State Club Ass'n, Inc.*, 487 U.S. at 11.

16

overbroad, which requires the court to find a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* The overbreadth claimant bears the burden of demonstrating, from the text of [the law] and from actual fact, that substantial overbreadth exists." *Virginia,* 539 U.S. at 122.

Plaintiffs cannot prevail in either type of overbreadth challenge, and in their Complaint they make no claim whatsoever that FOSTA reaches more protected speech than unprotected speech. Certainly, FOSTA can be validly applied to a broad sweep of conduct involving knowing sex trafficking or where there is intent to promote or facilitate illegal prostitution, and the First Amendment would not be implicated at all. It cannot be said, therefore, that there are no valid applications, nor that there is substantial overbreadth sufficient to require facial invalidation. "The 'mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *Williams*, 553 U.S. at 303 (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984)). Rather, FOSTA is not "susceptible to an overbreadth challenge," *Williams*, 553 U.S. at 303, and any First Amendment deficiencies that may spring from the breadth of the statute must be cured not by facial invalidation, but "through case-by-case analysis." *Broadrick*, 413 U.S. at 622.

With respect to Plaintiffs' claims that FOSTA fails to meet strict scrutiny, they again fail to state a claim on which relief can be granted. Plaintiffs argue that "FOSTA fails strict scrutiny because the law does not directly advance the government's objective," and "has made it more difficult for law enforcement to investigate trafficking, and hindered operations of antitrafficking organizations." Compl. ¶ 142. In support of this, they cite to a single article written prior to the passage of FOSTA. Contrary to Plaintiffs' allegations, FOSTA advances an important

government interest. According to the Human Trafficking Institute, almost 85% of federal sex trafficking prosecutions in FY 2016 and 2017 involved online advertising. *See* https://www.traffickingmatters.com/wp-content/uploads/2018/05/2017-Federal-Human-Trafficking-Report-WEB-Low-Res.pdf, page 3. And the allegations in the prosecution of the officers and employees of backpage.com illustrate the extensive criminal conduct that can take place when websites intentionally facilitate prostitution. *United States v. Lacey, et al.*, 18-cr-422 (D. Ariz.), Docket 3 (Indictment). In short, FOSTA addresses a clearly established criminal problem.

Plaintiffs' claims that FOSTA is not narrowly tailored also are baseless. For example, Plaintiffs state that FOSTA "prohibits both commercial and non-commercial speech about sex work that does not involve sex trafficking." Compl. ¶ 143. But sex work, by definition, is a commercial activity, and for the most part in the United States, is an illegal activity. As discussed above, the First Amendment does not protect speech promoting illegal acts. For the reasons discussed above, Plaintiffs are also wrong that FOSTA "criminalizes speech that furthers public health and welfare goals such as provision of health and educational resources to consensual, adult sex workers, as well as advocacy for the decriminalization of sex work." *Id.* Finally, Plaintiffs' complaints about the criminal provisions in FOSTA are circular. According to them, the criminal provisions are not narrowly tailored because federal law already prohibits sex trafficking. *Id.* at ¶ 145. Plaintiffs fail to state a claim when they argue that FOSTA's criminal laws are infirm because there are already criminal laws in place.

It is worth underscoring that FOSTA does very little to broaden the scope of possible criminal liability. As discussed above, all FOSTA did with respect to criminal law was create a new federal offense that mirrors one that already exists, and defined a term used in a statute that

18

has been on the books for almost 18 years, and it allows the states to bring comparable actions. Thus, Plaintiffs are simply wrong when they characterize FOSTA as "expand[ing] the scope of the law." Compl. ¶ 145. What FOSTA does is broaden the scope of who may initiate criminal activity. The key innovation in FOSTA is to allow states to bring prosecutions for two types of crimes: sex trafficking, as prohibited by 18 USC § 1591, and intentional facilitation or promotion of illegal prostitution. But before FOSTA was enacted, websites could have been prosecuted in federal court for those same or substantially similar crimes (albeit under 18 USC § 1952), as websites never were immune from federal prosecution. To the extent FOSTA permits civil suits to proceed, it is only for conduct related to sex trafficking, where children are sold for sex, and adults are compelled to engage in commercial sex through force, fraud, or coercion. Contrary to Plaintiffs' contentions, FOSTA uses a scalpel, not a butcher's knife.

Plaintiffs also fail to state a claim that FOSTA is a content-based regulation of protected speech that fails strict scrutiny. The various provisions of FOSTA are a far cry from the content-based signage regulation at issue in *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (2015), or the posted notice requirement at issue in *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S.Ct. 2361, 2371 (2018)). Again, to the extent FOSTA regulates speech at all, it does so only with respect to illegal activity that is entitled to no First Amendment protection at all.

Count V, asserting a First Amendment claim based on an allegedly defective scienter requirement, also necessarily fails because Plaintiffs misstate the law. *See* Compl. ¶¶ 164-167. FOSTA changed nothing about Section 1591's scienter standard. All it did was define a term in the statute, while repeating the scienter element. Pre-FOSTA, Section 1591 referred to the scienter standard twice (and in all instances, it required the defendant acted knowingly if the conduct was advertising). *See Backpage.com*, 216 F. Supp. 3d at 109 (noting that the statute

contains two separate *mens rea* elements).[5] After FOSTA, Section 1591 adds to the existing

scienter elements by defining "participation in a venture" as "*knowingly* assisting, supporting, or

facilitating a violation of subsection (a)(1)." (emphasis added).  *See* Section 5 of the Act.

Contrary to Plaintiffs' assertions, FOSTA does not "seek[] to evade constitutional requirements

for scienter." Compl. ¶ 165. Plaintiffs' concerns about criminal "liability based on mere

generalized knowledge of another's conduct," *id.*, is not based on any fair reading of the statutes.

Plaintiffs also misstate the law when they say "FOSTA's 'aggravated' offense under 18

U.S.C. § 2421A(b)(2) further dispenses with scienter by imposing liability based on 'reckless

disregard' of the fact that conduct 'contributed to sex trafficking.'" Compl. ¶ 167. To the

contrary, the "reckless disregard" language is relevant only to the defendant's maximum

---

[5] 18 U.S.C. § 1591 provides (emphasis added):

(a) Whoever <u>knowingly</u>—
> (1) in or affecting interstate or foreign commerce, or within the special maritime
> and territorial jurisdiction of the United States, recruits, entices, harbors,
> transports, provides, obtains, advertises, maintains, patronizes, or solicits by any
> means a person; or
> (2) benefits, financially or by receiving anything of value, from participation in
> a venture which has engaged in an act described in violation of paragraph (1),
> <u>knowing, or, except where the act constituting the violation of paragraph (1) is
> advertising, in reckless disregard of the fact</u>, that means of force, threats of force,
> fraud, coercion described in subsection (e)(2), or any combination of such means
> will be used to cause the person to engage in a commercial sex act, or that the
> person has not attained the age of 18 years and will be caused to engage in
> a commercial sex act, shall be punished as provided in subsection (b).

\*\*\*

(c) In a prosecution under subsection (a)(1) in which the defendant had a reasonable
opportunity to observe the person so recruited, enticed, harbored, transported, provided,
obtained, maintained, patronized, or solicited, the Government need not prove that the
defendant knew, or recklessly disregarded the fact, that the person had not attained the
age of 18 years.

Notably, "advertising" is not included in Section 1591(c).

sentence, not to his underlying criminal liability. The criminal act prohibited in Section 2421A(b)(2) is the same as that in Section 2421A(a), namely, the intentional promotion or facilitation of prostitution. Critically, proof of intent is a higher *mens rea* than knowledge. *United States v. Bailey*, 444 U.S. 394, 403-08 (1980). Plaintiffs are unlikely to succeed in any First Amendment claim based on their misreading of these provisions.

Nor can Plaintiffs demonstrate injury-in-fact with respect to Count VI of the Complaint, which argues that FOSTA contains a constitutionally infirm *ex post facto* provision. *See* Compl. ¶¶ 168-174. "The Ex Post Facto Clause of the United States Constitution prohibits retroactive increases in punishment for a crime after its commission." *Sellmon v. Reilly,* 551 F. Supp. 2d 66, 84 (D.D.C. 2008) (citing U.S. Const. art. I, § 9, cl. 3; *Collins v. Youngblood,* 497 U.S. 37, 42–43 (1990)). When evaluating an *ex post facto* claim, "[t]he controlling inquiry is one of practical effect," rather than facial difference. *Fletcher v. Reilly*, 433 F.3d 867, 879 (D.C. Cir.2006). Here, as the Department of Justice noted in its March 23, 2018, letter to the Office of Management and Budget, prosecutors can avoid any *ex post facto* problems by pursuing only newly prosecutable criminal conduct that takes place after the bill was enacted. *See* March 23, 2018, letter, attached. Plaintiffs have not alleged that FOSTA has been applied retroactively to them or shown that they engaged in conduct prior to April 11, 2018, that was proscribed by 18 U.S.C. § 1951 or 2421A and for which they now face a credible threat of prosecution.

### 2. Plaintiffs Are Unlikely to Succeed in Their Vagueness Challenge

Plaintiffs are similarly unlikely to succeed in their vagueness challenge. "Vagueness doctrine is an outgrowth of the Due Process Clause of the Fifth Amendment, not the First Amendment." *United States v. Bronstein*, 151 F. Supp. 3d 31, 37  (D.D.C. 2015) (citing *Williams*, 553 U.S. at 304). "A criminal law is unconstitutionally vague if it is written so

imprecisely 'that it fails to give ordinary people fair notice of the conduct it prohibits,' or is 'so standardless that it invites arbitrary enforcement' by police, prosecutors, and juries." *Id.* (quoting *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015)); *see also Hodge v. Talkin*, 799 F.3d 1145, 1171-72 (D.C. Cir. 2015). These concerns "are heightened in the First Amendment context." *Bronstein*, 2015 WL 9412106, at *3. Here, of course, as explained above, heightened scrutiny is not warranted because any activities that could lead to prosecution under § 1591 or 2421A relate to the illegal activity of prostitution or sex trafficking. Such activities are afforded no First Amendment protection. *Williams*, 553 U.S. at 297; *Cent. Hudson Gas & Elec. Corp.*, 447 U.S.at 561-62. However, even if Plaintiff's vagueness challenge were related to First Amendment interests, "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Bronstein*, 151 F. Supp. 3d at 37 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). Moreover, while "'[c]lose cases can be imagined under virtually any statute,'" it is "a 'mistake' to 'belie[ve]' that the mere fact that close cases can be envisioned renders a statute vague.'" *Hodge*, 799 F.3d at 1173 (quoting *Williams*, 553 U.S. at 305-06).

A vagueness challenge may be made on either an as-applied or a facial basis. An as-applied challenge does not claim that statutory terms are vague "'in all their applications,'" but that the law is invalid "insofar as [it] prohibits 'engaging in certain specified activities.'" *Id.* (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 14 (2010)). When considering an as-applied vagueness claim, a court must determine whether the challenged law is vague as applied to the plaintiff's own conduct. *See id.* (citing *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 495 (1982)). In contrast, a facial challenge alleges that a law is "vague in all its applications.'" *Id.* (quoting *Johnson*, 135 S. Ct. at 2561). Under either analysis, before striking

22

down a statute as unconstitutionally vague, a court "must consider whether [it] is fairly 'amenable to a limiting construction'" that would remove any constitutional infirmity. *Id.* at *5 (quoting *Skilling v. United States*, 561 U.S. 358, 405 (2010)).

Here, Plaintiffs do not specify in their Complaint whether their vagueness challenge to FOSTA is facial or as applied. Given that Plaintiffs raise this claim in a pre-enforcement context, it is appropriate to construe their claim solely as a facial challenge.[6] *See, e.g., N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265-66 (2d Cir. 2015) ("Because plaintiffs pursue this 'pre-enforcement' appeal before they have been charged with any violation of law, it constitutes a 'facial,' rather than "as-applied," challenge."). In either case, however, Plaintiff's claim fails.

As noted above, Plaintiff's vagueness challenge focuses on the alleged ambiguity of the terms "facilitate" and "promote" in FOSTA. While the statute does not define "facilitate" or "promote," the absence of a definition does not render these terms vague when they have a readily understood ordinary meaning. As the Supreme Court has confirmed, "criminal statutes, like other statutes, [must be interpreted] in a manner consistent with ordinary English usage."

---

[6] It is well established that "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Flytenow, Inc. v. FAA*, 808 F.3d 882, 895 (D.C. Cir. 2015) (quoting *Humanitarian Law Project*, 561 U.S. at 18–19); *Hodge*, 799 F.3d at 1172 (recognizing that this limitation applies even where a statute implicates First Amendment interests). Here, that question itself is somewhat abstract since, as discussed above, Plaintiffs have not alleged intended actions in their Complaint that pose a credible threat of prosecution under FOSTA. However, to the extent Plaintiffs assert that their conduct is subject to prosecution, their vagueness challenge is premature. *See United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."); *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 589 (1972) (declining to consider vagueness challenge to oath requirement because "the law's future effect [on the plaintiff] remains wholly speculative"); *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546-47 (5th Cir. 2008) (considering a facial vagueness challenge only because there was a factual record of charges against the plaintiffs); *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 292 (6th Cir. 1997) (citing *Mazurie* in holding a facial vagueness challenge premature). In any event, however, as discussed herein, Plaintiffs' vagueness claim fails on the merits.

*Nichols v. United States*, 136 S.Ct. 1113, 1119 (U.S. 2016). Indeed, as discussed in Section A above, similar wording and use of the terms promote and facilitate have been present in the Travel Act and money laundering statutes for decades, and those terms have not been held unconstitutionally vague on those contexts. To the contrary, "[t]he likelihood that anyone would not understand any of those common words seems quite remote." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Section 2421A is limited to those who own, manage, or operate an interactive computer service "with the intent to promote or facilitate the prostitution of another person," thus giving ordinary people "fair notice of the conduct it prohibits," and it is not "so standardless that it invites arbitrary enforcement by police, prosecutors, and juries." *See Bronstein*, 151 F. Supp. 3d at 37 (quoting *Johnson*, 135 S. Ct. at 2556). These term bear no resemblance to words and phrases—like "in a manner annoying to persons walking by"—that courts have found result in facial vagueness because of their "fundamental subjectivity." *See id.* at 38; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010) (identifying terms "annoying," "indecent," "vagrants" as terms that the Supreme Court has held vague because they require "untethered, subjective judgments").

### 3. Plaintiffs Are Unlikely to Succeed on Their Statutory Immunity Argument

Count IV of Plaintiffs' Complaint, alleging that FOSTA's "selective removal of statutory immunity" violates the First Amendment, fails to state a claim upon which relief can be granted.

In essence, Plaintiffs argue that the First Amendment requires Section 230 of the Communications Act of 1934 to exist in full, without exceptions. This is obviously incorrect, as the First Amendment is self-executing, and does not need Congress to enact a statute in order to offer protections. Further, this is contrary to the wording of Section 230 prior to the enactment of

FOSTA, which already set forth several exceptions to Section 230's applicability.[7] Section 230 is a policy choice made by Congress to provide more protections than that offered in the First Amendment, *see, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1355-56 (D.C.C. 2014), and Congress can amend that policy. In other words, Plaintiffs have no relief if Congress decides that websites should no longer have more protections than the First Amendment already provides. And, as previously set forth above, nothing in FOSTA actually restricts rights protected by the First Amendment.

In sum, Plaintiffs have not alleged an intention to engage in a course of conduct arguably affected with a constitutional interest but proscribed by FOSTA, and have not demonstrated that a credible threat of prosecution under the Act actually exists. *See Susan B. Anthony List*, 134 S.Ct. at 2334. Furthermore, they are unlikely to prevail on the merits given that they have

---

[7] Prior to the enactment of FOSTA, Section 230(e) provided for the following exceptions:

(e) Effect on other laws
     (1) No effect on criminal law
     Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.
     (2) No effect on intellectual property law
     Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.
     (3) State law
     Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.
     (4) No effect on communications privacy law
     Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

47 U.S.C. § 230(e).

misstated the law and failed to allege claims upon which relief can be granted. Accordingly,

denial of Plaintiffs' Motion for Preliminary Injunction and dismissal of this action is appropriate.

**C.**   **The Other Preliminary Injunction Factors Weigh Against Emergency Relief**

Plaintiffs also fail to establish that the other three preliminary injunction factors support

their motion for emergency relief. First, Plaintiffs fail to demonstrate, as they are required to do,

"that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. As the

Supreme Court emphasized in *Winter*, "[i]ssuing a preliminary injunction based only on a

possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an

extraordinary remedy that may only be awarded upon a clear showing that plaintiff is entitled to

such relief." *Id.* (citation omitted).

The D.C. Circuit "has set a high standard for irreparable injury." *In re Navy Chaplaincy*,

534 F.3d 756, 766 (D.C. Cir. 2008) (citing *Chaplaincy of Full Gospel Churches v. England*, 454

F.3d 290, 297 (D.C. Cir. 2006)). To qualify as irreparable, in injury must be "certain and great,

actual and not theoretical, beyond remediation, and also of such imminence that there is a clear

and present need for equitable relief to prevent irreparable harm." *Id.* (quotation omitted).

Petitioner's speculative fears, therefore, cannot constitute an irreparable injury sufficient to

obtain injunctive relief. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per

curiam) (It is a "well known and indisputable principle[]" that "[i]njunctive relief will not be

granted against something merely feared as liable to occur at some indefinite time." (quotation

omitted)). "The movant must provide proof . . . indicating that the harm *is certain to occur in the

near future* . . . [and] that the alleged *harm will directly result from* the action which the movant

seeks to enjoin." *Id.* (emphasis added).

Here, in claiming entitlement to emergency relief, Plaintiffs primarily rely on the oft-quoted statement, by a three-Justice plurality in *Elrod v. Burns*, 427 U.S. 347, 353 (1976), that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." However, as the D.C. Circuit has recognized, "there is no *per se* rule that a violation of freedom of expression *automatically* constitutes irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006). This is not a case where FOSTA, by its own terms, prohibits Plaintiffs' constitutionally-protected speech. To the contrary, as explained above, Plaintiffs misconstrue the statutory provisions at issue and, in fact, the promotion or facilitation of illegal prostitution would not qualify as protected speech. Plaintiffs' claims that their present activities are chilled thus are nothing more than self-inflicted injury and fail to establish irreparable harm for the same reasons they are insufficient to establish an injury-in-fact.

A party seeking a preliminary injunction also must demonstrate "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. Fed. Elec. Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (balance of harms and public interest merge "because the government's interest *is* the public interest" (emphasis in original)). Here, they weigh decidedly against a preliminary injunction, particularly given that Plaintiffs seek to enjoin an Act of Congress that was "intended to serve the public interest." *Newdow*, 355 F. Supp. 2d at 293 (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312–13 (1982)).

## V. **Conclusion**

For all of the various reasons discussed above, Defendants respectfully submit that Plaintiffs' Motion should be denied and this case should be dismissed.

Dated: July 12, 2018

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:     */s/ Jason T. Cohen*
JASON T. COHEN, ME Bar #004465
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C. 20530
Phone: (202) 252-2523
Fax: (202) 252-2599
Email: jason.cohen@usdoj.gov

Exhibit 16

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

District of Arizona

SEALED

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. 18 - 9126 MB |
| _____ Paradise Valley, Arizona | ) |
| 85253 | ) |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ District of _____ Arizona _____
*(identify the person or describe the property to be searched and give its location)*:

        As described in Attachment A.

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

        As described in Attachment B.

        **YOU ARE COMMANDED** to execute this warrant on or before ___04-19-2018___ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to _any magistrate judge on criminal_
_duty in the District of Arizona._ *(United States Magistrate Judge)*

        ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
        ☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____

Date and time issued:     __4/5/2018 5:05 pm__     __[signature]__
                                                                  *Judge's signature*

City and state:     Phoenix, Arizona _____     U.S. Magistrate Judge Eileen S. Willett
                                                                  *Printed name and title*

DOJ-BP-0004425788

Attachment A-3



███████████████████████, Paradise Valley, Arizona 85253

A residence owned by Ocotillo Family Trust, in care of James and Margaret Larkin, Trustees.

The location to be searched is described as a multi structure, single family residence located in Paradise Valley, Arizona. The address is ██████████████████████ Paradise Valley, Arizona 85253. The residence is located on the south side of the road and the number ████ is located on the mailbox located in front of the residence, near the road. The front of the residence is white in color, has a U shaped driveway made of rock and pavers and is covered in desert foilage.

DOJ-BP-0004425789

Attachment B

Items To Be Seized

For the time period of January 1, 2010 through the present:

1. Evidence of wealth, assets, and real estate obtained from the illicit activity to include; notes, correspondence, and news articles related to prostitution, sex trafficking and/or Backpage and related entities.
2. Documentation of any funds received from Backpage or other related companies and disposition of those funds.
3. Records of assets held domestically and outside the United States.
4. Records of international travel to include U.S. or Foreign Passports.
5. Records of domestic travel expenditures to include travel tickets, hotel bills, copies of receipts, credit card statements, comprising evidence of expenditures during the money laundering scheme.
6. Records and correspondence regarding assets, including insurance policies, loan documents, and personal financial statements.
7. Records reflecting the acquisition or disposition of any residence, real property, vehicle, or other valuable asset.
8. Documents reflecting tangible personal expenditures and personal investments, real estate transactions, and property purchases.
9. Safe deposit box keys, storage locker keys and documents indicating the rental or ownership of such units.
10. United States or Foreign currency over $5,000 USD.
11. Documents containing identification or association with any trusts, trust agreements, bank accounts, deeds, or any documents associated with trusts, trustee information, transfer of trusts, or any assets associated with trusts (including transfer of those assets) and email correspondence.
12. Any property or proceed resulting from money laundering or international money laundering scheme to include computers, currencies, coins, precious metals, artwork, jewelry, home furnishings and vehicles.
13. Documents containing identification or association with the acquisition or disposition of cryptocurrencies (digital currencies), to include currency exchange information, digital wallet information (access codes), private address information (private key information), and digital currency statement or account ledgers. Digital currency is generally stored in digital "wallets," which essentially store the access codes that allows individuals to conduct digital currency transactions. To access digital currency, an individual must use a public address (or "public key") and a private address (or "private key"). The public address can be analogized to a bank account number, while the private key is like a password used to access an online account.

Electronic Data

The above described records may be stored on magnetic or electronic media including hard drive, portable devices such as thumb drives or any other media capable of storing information in a form readable by a computer. These records may also be stored on removable media digitally archived on external hard drives, CDs, DVDs, digital tape, and other forms of backup media.

DOJ-BP-0004425790

Exhibit 17

View Issue Details

| ID: | Category: | Severity: | Reproducibility: | Date Submitted: | Last Update: |
|---|---|---|---|---|---|
| 12328 | [Backpage.com] backpage.com | minor | always | 2010-09-08 10:14 | 2010-09-25 17:54 |

| | | | |
|---|---|---|---|
| Reporter: | ferrerc | Platform: | |
| Assigned To: | ferrerc | OS: | |
| Priority: | urgent | OS Version: | |
| Status: | closed | Product Version: | |
| Product Build: | | Resolution: | fixed |
| Projection: | none | | |
| ETA: | none | Fixed in Version: | |
| | | Target Version: | |
| Task Type: | support | | |
| Task Activity: | Open | | |
| Task Scope: | Small | | |
| Source: | | | |
| Exp. Start Date: | | | |
| Exp. Comp. Date: | | | |
| Fiscal Quarter: | | | |

| | |
|---|---|
| Summary: | Violated Terms of Use |
| | We have two approached for moderating content: |
| | 1. Remove bad content in the post. |
| | - Pro: Consumer friendly, more work for our admin, allows our staff to be subjective and not cause too much damage. |
| | - Con: User often adds back bad content |
| | |
| | 2. Remove the post |
| | - Pro: Hurts user financially, teaches user lesson and easiest for our admion staff to do. |
| Description: | - Con: User does not know what they did wrong, very consumer unfriendly, results in chargeback. |
| | |
| | We are in the process of removing ads and pissing off a lot of users who will migrate elsewhere. I would like to go back to having our moderators remove bad content in a post and then locking the post from being edited. |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Add to ad object:
Lock user from editing ad [ ] yes

- User will not be able to edit ad while ad is live.
- We can also prevent the ad from being edited when the ad is expired and renewed.

- the error message for the the user trying to edit the ad:
"Oops! You can not edit the post at this time since this post had previously violated our terms of use"

Steps To Reproduce:
Additional Information:
Attached Files:

| Notes | |
|---|---|
| (0036875) ▮▮▮▮ 2010-09-09 14:23 | Our preference from the database perspective is to add a value to the ViolationFlag for this. Perhaps: "Edit Lock Out" or something like that.<br><br>Will this work? If so, please let us know the language you would like.<br><br>Thanks! |
| (0036877) ferrerc 2010-09-09 14:31 | Works for me. |
| (0037070) ▮▮▮▮ 2010-09-17 19:29 | We'd like to review a number of User.Settings and Ad.ViolationFlag. values.<br><br>Can you take a look at the following to confirm that it all sounds good? If possible, please reply to this asap.<br><br>Thanks!<br><br>-------------<br>User.Settings<br>-------------<br><br>* Bypass Captcha - The user can bypass captcha. |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

* Bypass Filters - The user can bypass filters.

* Bypass Fraud Alerts - The user can bypass fraud alerts.

* Bypass Moderation - The user can bypass moderation.

* Whitelist Ad - The users ad is whitelisted and won't be a candidate for violations, aka no ghosting, spam, etc.

New Values:

* No HTML - Prohibits the user from using HTML in any of their ads.

* Forced Moderation - Forces the Moderation of all ads by this user.

* Edit Lock Out - Locks the user out of being able to edit any ads.


----------------
Ad.ViloationFlag
----------------

Existing values:

* Inappropriate Content - Set by report ad and leads to potential removal. No information on this is displayed to the user.

* Wrong Category - Set by report ad and leads to potential removal. No information on this is displayed to the user.

* Over Posted - Set by either: 1) report ad and leads to potential removal, or 2) backend analysis that also changes the Status to Ghosted. No information on this is displayed to the user.

* Spam - Set by backend analysis which also changes the Status to Community Removed. The user will see that there add has been Community Removed.

* Ghosted - Set by backend analysis which also removes this add from search results. No information on this is displayed to the user.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

New values:

* Strip Term From Ad - We're going to add this so we can set this whenever the backend analysis strips out a term. It's just for internal statistics. No information on this is displayed to the user.

* Violated Terms of Use - We belive this is the value for this task. If so, staff would flasg this and the user would see the "Oops! You can not edit the post at this time since this post had previously violated our terms of use"

* Edit Lock Out - This would be inherited from a user setting, manually set, or automatically set based on the age of the user's account. The user would see a message that they can not edit the ad.

* No HTML - This would be inherited from a user setting or manually set on a single ad. The user would see a message that they can not edit the ad.

| | |
|---|---|
| (0037074)<br>ferrerc<br>2010-09-17 21:20 | Looks good. |
| (0037084)<br>▮▮▮▮▮▮▮▮<br>2010-09-18 20:01 | Renaming this task for clarity. |
| (0037087)<br>▮▮▮▮▮▮▮<br>2010-09-18 20:21 | This feature is in place and ready for previewing on devel.<br><br>Here's a tour from a user perspective:<br><br>* Please go to the ad management page and click to edit the ad:<br><br>http://admin.devel.backpage.com/online/classifieds/VerifyAd?oid=2414458&id=3b7ac3e73e5d2b49e8085d634ee07bd6-1278625613 [^]<br><br>* You should see the message stating that the ad has violated the terms of use and that the ad can't be edited.<br><br>--- |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

To flag an ad in this way, set the Ad's ViolationFlag field to "Violated Terms of Use" as seen here:

http://admin.devel.backpage.com/tools/object-editor?oid=2414458 [^]

Please let us know how it looks. Once the schema changes are wrapped, we can push this out.

Also, please send us the Spanish Translation.

Thanks!

---

(0037094)
ferrerc
2010-09-19 21:43

Looks good.

I have sent out a request for the translation below:
Sorry! You can not edit the post at this time since this post had previously violated our terms of use"

---

(0037099)

2010-09-20 12:37

Sounds good thanks.

---

(0037101)
ferrerc
2010-09-20 12:51

ENGLISH
"Sorry! You can not edit the post at this time since this post had previously violated our terms of use"

SPANISH
"Lo siento! En este momento usted no puede editar su anuncio desde que el anuncio violo nuestras condiciones de uso."

---

(0037103)

2010-09-20 13:01

Thanks. This change is in place.

http://admin.espanol.devel.backpage.com/online/classifieds/EditAd?oid=2414458&id=3b7ac3e73e5d2b49e8085d634ee07bd6-1278625613 [^]

http://admin.devel.backpage.com/online/classifieds/EditAd?oid=2414458&id=3b7ac3e73e5d2b49e8085d634ee07bd6-1278625613 [^]

Note: we changed the English to "We're sorry" as the other two similar messages said "We're sorry" If this is not ok, please let us know.

BACKPAGE0001303

---

If this looks good, we'll roll it out with the final schema changes tonight.

| | |
|---|---|
| (0037116)<br>ferrerc<br>2010-09-20 13:53<br>(edited on: 2010-09-20 13:53) | We are good. You can launch tonight. |
| (0037133)<br><br>2010-09-20 17:06 | Question: how would you like to handle this for renewal ads?<br><br>Should these ads not renew?<br><br>Should we clear the slate on renew since it will be going back into the moderation queue as new?<br><br>Thanks! |
| (0037137)<br>ferrerc<br>2010-09-20 17:27 | Should these ads not renew?<br>ANSWER: no<br><br>Should we clear the slate on renew since it will be going back into the moderation queue as new?<br>ANSWER: Yes<br><br>We will let them renew their ad. It means we can let them change their copy.<br>More than likely, if we set a user or ad on edit lock out, we will have also set the user to forced moderation. The edit lock out is to prevent someone from changing their ad or ads after they passes moderation. |
| (0037152)<br><br>2010-09-20 19:41 | Should we re-set the Violation Flag to remove that the ad violated the Terms of Service when they renew it?<br><br>If so, they will be able to edit the ad again, including after it passes moderation.<br><br>If not, then after it passes moderation, it will remain locked down (no editing) and will display the violation message.<br><br>Please let us know. |
| (0037154)<br>ferrerc<br>2010-09-20 21:16 | My gut tells me to be less draconian:<br><br>So, we can re-set the Violation Flag to remove that the ad violated the Terms of Service when they renew it. They will be able to |

| | |
|---|---|
| (edited on: 2010-09-20 21:41) | edit the ad again, including after it passes moderation. |
| | If a user becomes a frequent problem, then we will lock out of edit from the user object. |
| (0037155) <br> ▮▮▮▮▮▮ <br> 2010-09-20 21:40 | This sounds good. Thanks! |
| (0037197) <br> ▮▮▮▮▮▮ <br> 2010-09-21 14:41 | This change has been released. <br><br> If you can run a few tests by setting an ad or two as "Violated Terms of Use", that would be great. <br><br> Thanks! |
| (0037204) <br> HyerD <br> 2010-09-21 14:51 | Tested this one too - it worked perfectly. |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# **DECLARATION OF JOHN BRUNST**

I, John Brunst, declare as follows:

1.  I am an individual over the age of eighteen.  I submit this declaration based upon my own personal knowledge and, if called as a witness, could and would competently testify thereto under oath.

2.  I submit this declaration in support of the *Notice of Motion and Motion to Vacate or Modify Seizure Warrants* (the "Motion") with which this declaration is being concurrently filed.

3.  I am a legal and/or beneficial owner of, or hold a direct or indirect interest in, the following assets and their contents (collectively, the "Subject Assets"):

    a.          Bank account number ending in xx3825;

    b.          account number ending in xx6878;

    c.          account number ending in xx4954;

    d.          account number ending in xx7892;

    e.          account number ending in xx7889;

    f.          account number ending in xx7888;

    g.          account number ending in xx6485;

    h.          account number ending in xx0582;

    i.          account number ending in xx3873; and

    j.          account number ending in xx4862.

4.  I did not give permission or otherwise consent to the government's seizure of the Subject Assets.

5.  I join in and consent to the request in the Motion to consolidate the related cases identified in the caption of the Motion and in the separately filed Notice of Related Cases.

1

3512

1    I swear under penalty of perjury of the laws of the United States of America that the

2    foregoing is true and correct.  Executed this 30 day of July, 2018 in Phoenix, Arizona.

3

4    _____

                                John Brunst

5

     435617-1

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# DECLARATION OF JOHN BRUNST

I, John Brunst, declare as follows:

1.  I am a defendant in the above-entitled action.  Based on my review of historical financial records, including audit reports prepared by independent auditors, and my personal knowledge, the facts set forth herein are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.

2.  From 1992 to January 2013, I served as the Chief Financial Officer of New Times, Inc. ("New Times").

3.  In January 2006, New Times purchased the *Village Voice*.  Village Voice Media Holdings, LLC ("VVMH") was created as a holding company for the *Village Voice* and New Times' publications.

4.  In January 2013, New Times sold VVMH's newspaper holdings to Voice Media Group ("VMG").  Following that transaction, New Times was renamed Medalist Holdings, Inc. ("Medalist").  From January 2013 onwards, I served as the Chief Financial Officer of Medalist.

5.  From December 2012 to the present, I have also served as the Treasurer of Cereus Properties, LLC ("Cereus Properties"), an indirect subsidiary of Medalist.

6.  From 1993 onwards, the shareholders of New Times, and later Medalist, were Michael Lacey, James Larkin, Scott Spear, myself, and trusts for the benefit of Troy Larkin and Ramon Larkin (Larkin's sons).

7.  In Fiscal Year Ending ("FYE") June 2000, Alta Communications, a private equity firm, made an investment in New Times.  In connection with that investment, New Times issued a shareholder distribution of ▮▮▮▮▮▮▮▮.  Of that amount, ▮▮▮▮▮▮▮▮ was distributed to the individual shareholders of New Times.  The remaining amount was used to pay the expenses of the transaction.

8.  In FYE June 2003, as a result of the sale of New Times' Los Angeles publication, New Times issued shareholder distributions, including tax payments on behalf of the shareholders, in the amount of ▮▮▮▮▮▮▮.  Of that amount ▮▮▮▮▮▮▮ was

1   distributed to the individual shareholders of New Times.  The remaining amount of

2   $595,789 was distributed to Alta Communications.

3          9.      In FYE June 2004, New Times issued shareholder distributions from excess

4   cash, including tax payments on behalf of the shareholders, in the amount of ███████.

5   Of that amount ███████ was distributed to the individual shareholders of New Times.

6   The remaining amount of ███████ was distributed to Alta Communications.

7          10.     In FYE June 2005, as a result of a debt recapitalization and excess cash, New

8   Times issued shareholder distributions, including tax payments made on behalf of the

9   shareholders, in the amount of ███████.  Of that amount, ███████ was distributed to

10  the individual shareholders of New Times.  The remaining amount of ███████ was

11  distributed to Alta Communications.

12         11.     In FYE ending December 2006, New Times acquired the *Village Voice*.  In

13  connection with the acquisition, City Press Publishing, Inc. ("City Press Publishing"), a

14  consortium of private equity firms, received a minority ownership interest in VVMH.  As a

15  result of a debt recapitalization in connection with the acquisition, New Times issued

16  shareholder distributions, including tax payments made on behalf of the shareholders, in

17  the amount of ███████.  Of that amount, ███████ was distributed to the individual

18  shareholders of New Times.  Of the remaining amount, Alta Communications received

19  ███████ and City Press Publishing received ███████.

20         12.     In total, from 2000 to 2006, New Times issued ███████ in shareholder

21  distributions, including tax payments made on behalf of the shareholders.  Of that amount

22  ███████ was distributed to the individual shareholder of New Times. The remaining

23  amount was distributed to outside investors, including Alta Communications and City

24  Press Publishing, and to pay the expenses of the Alta transaction.

25         13.     Backpage was formed in 2004.  From 2004 to 2006, Backpage generated

26  ███████ in EBITDA (earnings before interest, tax, depreciation, and amortization).

27  During that same time period, New Times generated ███████ in operating income.  In

28

3511329.1                                          2

other words, from 2004 to 2006, Backpage accounted for $1.9% of New Times' operating income.

14.     In January 2013, New Times sold its newspaper business to VMG in a seller-financed transaction.  From January 2013 to March 2018, VMG made loan and rent payments to Cereus Properties totaling ███████.  Of these payments ███████ was distributed to the individual shareholders of Medalist.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed July 30, 2018, at Phoenix, Arizona.

_____
John Brunst

## DECLARATION OF JAMES LARKIN

I, James Larkin, declare as follows:

1.     I am an individual over the age of eighteen.  I submit this declaration based upon my own personal knowledge and, if called as a witness, could and would competently testify thereto under oath.

2.     I submit this declaration in support of the *Notice of Motion and Motion to Vacate or Modify Seizure Warrants* (the "Motion") with which this declaration is being concurrently filed.

3.     I am a legal and/or beneficial owner of, or hold a direct or indirect interest in, the following assets and their contents (collectively, the "Subject Assets"):

     a.     ████████████ account number ending in xx1889;

     b.     ████████████ account number ending in xx2592;

     c.     ████████████ ccount number ending in xx1938;

     d.     ████████ Certificate of Deposit Account Registry Service ("CDARS") account number ending in xx8103;

     e.     ████████████ CDARS account number ending in xx8162;

     f.     ████████████ CIDARS account number ending in xx8189;

     g.     ████████ account number ending in xx3873; and

     h.     ████████ account number ending in xx4862.

4.     I did not give permission or otherwise consent to the government's seizure of the Subject Assets.

I swear under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.  Executed this 20 day of July, 2018 in Paradise Valley, Arizona.

_____
James Larkin

435617-1

1

1    **DECLARATION OF MARGARET LARKIN**

2    I, Margaret Larkin, declare as follows:

3    1.    I am an individual over the age of eighteen. I submit this declaration based
4    upon my own personal knowledge and, if called as a witness, could and would competently
5    testify thereto under oath.

6    2.    I submit this declaration in support of the *Notice of Motion and Motion to*
7    *Vacate or Modify Seizure Warrants* (the "Motion") with which this declaration is being
8    concurrently filed.

9    3.    I am a legal and/or beneficial owner of, or hold a direct or indirect interest in,
10   the following assets and their contents (collectively, the "Subject Assets"):

11          a.    ████████████████████ ccount number ending in xx0012;

12          b.    A████████████████████ account number ending in xx2020.

13   4.    I did not give permission or otherwise consent to the government's seizure of
14   the Subject Assets.

15   5.    I join in and consent to the request in the Motion to consolidate the related
16   cases identified in the caption of the Motion and in the separately filed Notice of Related
17   Cases.

18

19   I swear under penalty of perjury of the laws of the United States of America that the
20   foregoing is true and correct. Executed this _30_ day of July, 2018 in Paradise Valley,
21   Arizona.

22

23                                             Margaret Larkin

24

25

26

27

435617-1

1

## DECLARATION OF MICHAEL LACEY

I, Michael Lacey, declare as follows:

1.     I am an individual over the age of eighteen.  I submit this declaration based upon my own personal knowledge and, if called as a witness, could and would competently testify thereto under oath.

2.     I submit this declaration in support of the *Notice of Motion and Motion to Vacate or Modify Seizure Warrants* (the "Motion") with which this declaration is being concurrently filed.

3.     I am a legal and/or beneficial owner of, or hold a direct or indirect interest in, the following assets and their contents (the "Subject Assets"):

      a.     ▮▮▮▮▮▮▮▮▮▮▮▮▮ account number ending in xx3620;

      b.     ▮▮▮▮▮▮▮▮▮ account number ending in xx2523, which the government may also have designated as account number ending in xx44S10 in the civil seizure bearing case number 2:18-mj-00723;

      c.     ▮▮▮▮▮▮▮ account number ending in xx2485;

      d.     ▮▮▮▮▮▮▮ account number ending in xx3126;

      e.     ▮▮▮▮▮▮ Certificate of Deposit Account Registry Service ("CDARS") account number ending in xx8316;

      f.     ▮▮▮▮▮▮▮▮ CDARS account number ending in xx8324;

      g.     ▮▮▮▮▮▮▮ CDARS account number ending in xx8332;

      h.     ▮▮▮▮▮▮ account number ending in xx1897;

      i.     ▮▮▮▮▮▮▮▮▮ account number ending in xx1210;

      j.     ▮▮▮▮▮▮ account number ending in xx3873; and

      k.▮▮▮▮▮▮ account number ending in xx4862.

4.     I did not give permission or otherwise consent to the government's seizure of the Subject Assets.

5.     I join in and consent to the request in the Motion to consolidate the related cases identified in the caption of the Motion and in the separately filed Notice of Related Cases.

I swear under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed this 31 day of July, 2018 in San Francisco Calif.

Michael Lacey

435617-1

2

Scanned with CamScanner

## DECLARATION OF RAMON LARKIN

I, Ramon Larkin, declare as follows:

1.     I am an individual over the age of eighteen.  I submit this declaration based upon my own personal knowledge and, if called as a witness, could and would competently testify thereto under oath.

2.     I submit this declaration in support of the *Notice of Motion and Motion to Vacate or Modify Seizure Warrants* (the "Motion") with which this declaration is being concurrently filed.

3.     I am a legal and/or beneficial owner of, or hold a direct or indirect interest in, the following asset and its contents (the "Subject Asset"):

      a.     ███████████████ account number ending in xx7054.

4.     I did not give permission or otherwise consent to the government's seizure of the Subject Asset.

5.     I join in and consent to the request in the Motion to consolidate the related cases identified in the caption of the Motion and in the separately filed Notice of Related Cases.


I swear under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.  Executed this 30th day of July, 2018 in Kansas City, Missouri.

                                  _____

                                    Ramon Larkin

435617-1

# **DECLARATION OF TROY LARKIN**

I, Troy Larkin, declare as follows:

1. I am an individual over the age of eighteen. I submit this declaration based upon my own personal knowledge and, if called as a witness, could and would competently testify thereto under oath.

2. I submit this declaration in support of the *Notice of Motion and Motion to Vacate or Modify Seizure Warrants* (the "Motion") with which this declaration is being concurrently filed.

3. I am a legal and/or beneficial owner of, or hold a direct or indirect interest in, the following asset and its contents (the "Subject Asset"):

    a. ███████████████. account number ending in xx8225.

4. I did not give permission or otherwise consent to the government's seizure of the Subject Asset.

5. I join in and consent to the request in the Motion to consolidate the related cases identified in the caption of the Motion and in the separately filed Notice of Related Cases.

I swear under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed this  30  day of July, 2018 in Brooklyn, New York.

*Troy Larkin*
_____
Troy Larkin

435617-1

1

**DECLARATION OF SCOTT SPEAR**

I, Scott Spear, declare as follows:

1. I am an individual over the age of eighteen. I submit this declaration based upon my own personal knowledge and, if called as a witness, could and would competently testify thereto under oath.

2. I submit this declaration in support of the *Notice of Motion and Motion to Vacate or Modify Seizure Warrants* (the "Motion") with which this declaration is being concurrently filed.

3. I am a legal and/or beneficial owner of, or hold a direct or indirect interest in, the following assets and their contents (the "Subject Assets"):

    a. ███████████ safety deposit box number ending in xx7224;

    b. ███████ account number ending in xx6292;[1]

    c. ███████████ account number ending in xx3645;

    d. ███████████ account number ending in xx0178;

    e. ███████████ account number ending in xx0151;

    f. ███████ account number ending in x6910;

    g. ███████████ Services account number ending in xx6943-01;

    h. ███████████ Services account number ending in xx5280-01;

    i. ███████ account number ending in xx3873; and

    j. ███████ account number ending in xx4862.

4. I did not give permission or otherwise consent to the government's seizure of the Subject Assets.

5. I join in and consent to the request in the Motion to consolidate the related cases identified in the caption of the Motion and in the separately filed Notice of Related Cases.

---

[1] I will note that the government seized the ███████████ account number ending in xx7224 and the ███████ account number ending in xx6292 in the related civil seizure case numbers 18-mj-00719 and 18-mj-00724, respectively, but has since returned those accounts. However, it appears those seizure cases remain pending, and so I am including these accounts in this declaration.

1

1      I swear under penalty of perjury of the laws of the United States of America that the

2  foregoing is true and correct. Executed this **31** day of July, 2018 in Scottsdale, Arizona.

3

4                                     Scott Spear

5

6

7  435617-1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27