INDEX OF EXHIBITS

Exhibit A          November 16, 2018 Letter to Mike Piccarreta from U.S. Attorney

Exhibit B          Order Dismissing *Backpage v. Dart* Litigation as Moot

Exhibit C          Sheriff's Motion for Sanctions Against Backpage and Its Attorneys in *Backpage v. Dart*

Exhibit D          February 22, 2017 Transcript Excerpts re Grand Jury 16-4 Motion to Compel and Cross-Motion to Quash Grand Jury Subpoena

Exhibit E          National Center of Missing and Exploited Children PowerPoint entitled "Backpage Advertisements and The Erotic Review"

Exhibit F          January 1, 2008 Invoice from Elms Web Services, Inc.

Exhibit G          February 17, 2009 Phoenix New Times Article *"TheEroticReview.com" Founder David Elms Arrested in Phoenix, Suspected of Trying to Hire Killer*

Exhibit H          May 11, 2009 Email to Scott Spear from Jim Larkin

Exhibit I          February 18, 2011 Email from Andrew Padilla

Exhibit J          March 1, 2011 Email from Ernie Allen to Brad Myles

Exhibit K          November 7, 2018 Email from Amanda Wick to Mike Piccareta

# Exhibit A



**U.S. Department of Justice**

United States Attorney
District of Arizona

---

| | |
|---|---|
| Two Renaissance Square<br>40 N. Central Ave., Suite 1800<br>Phoenix, AZ 85004-4408 | Main:   (602) 514-7500<br>Main Fax:   (602) 514-7693<br>Direct Fax:   (602) 514-7450 |

<u>VIA EMAIL</u>                                       November 16, 2018

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ 85701

   Re: *Your Letter of October 26, 2018*

Dear Mike:

   We wish to respond to your October 26, 2018 letter. The letter requests disclosure of *Brady* material and appears to be a standard letter that you send prosecutors in other cases with a few categories specific to this case. A *Brady* determination in this case, however, is particularly difficult based on the defense theories that the joint defense has advanced in pleadings (in this case and others), correspondence, and meetings with the prosecution team.

   As you well know, you and other defense counsel have repeatedly asserted that the activities on the Backpage.com website, including the conduct detailed in the Superseding Indictment, was somehow immunized by the First Amendment and/or Section 230 of the Communications Decency Act ("CDA"). We disagree. First, Section 230 of the CDA does not apply, on its face, to a federal prosecution. 47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of … [any] Federal criminal statute."). The defense has not provided any counter-arguments to this position. Second, the evidence demonstrates considerable content creation on the part of the principals and employees of Backpage. The following three activities constitute, at a minimum, content creation by Backpage:

   **Moderation**: Backpage engaged in the practice of sanitizing ads by editing them—specifically, removing terms and pictures that are indicative of prostitution and then publishing a revised version of the ad. Unfortunately, this also included child sex trafficking victims.

   **Aggregation**: This was accomplished by identifying prostitutes advertising on other similar prostitution websites. Backpage would then post a free ad and contact the pimp or prostitute and solicit them to Backpage with the incentive of a free ad for six weeks or with similar financial incentives.

November 16, 2018
Page 2 of 5

**Reciprocal Link and Affiliate Program**: This refers to Backpage's business arrangement with a website known as The Erotic Review (TER). Backpage and TER posted reciprocal ads on each other's websites. As you know, TER is a website that allows clients of prostitutes to provide written reviews of the prostitutes' various attributes. By inserting TER link in particular ads, Backpage was manipulating or creating content. In addition, Backpage entered into a financial arrangement with a person known as "Dollar Bill" who earned fees in return for arranging for numerous prostitutes and pimps to post ads on Backpage.

In light of the above, we do not share your view that there "is abundant information in the government's possession and/or generated by the government that is favorable and exculpatory to the defendants." Quite the opposite. It is noteworthy that neither you nor any of the other defense attorneys, in any of the pleadings and correspondence filed to date, have made any effort to address the above areas of content creation – all of which are described in detail in the Superseding Indictment. Nevertheless, we will attempt to address your *Brady* requests.

*First*, as set forth in the October 29, 2018 response to your letter ("USA response") requesting the inadvertently disclosed material, again we do not agree with your general assessment that there is an abundance of *Brady* material. As a reminder, we met in December 2017 and explained our legal theory, provided incriminating emails exchanged by your client, and identified witnesses that will be testifying against your client in a pending prosecution. ■

Instead, you took the position that your client maintains he had a First Amendment right to his activities at Backpage and alternatively, did not have the *mens rea* to commit the specific offenses contained in the indictment. Again, you have neither provided us any authority in support of that legal theory nor any counter evidence. And, that exchange occurred before both Backpage CEO Carl Ferrer and Backpage Sales and Marketing Director Dan Hyer agreed to cooperate and testify against your client and the remaining defendants.

*Second*, your request involving 2010 statements from Francey Hakes regarding whether Craigslist could be held criminally liable for content in their adult section eight years ago is not relevant to the Superseding Indictment in this case for several reasons. First, it is important to appreciate the distinctions between Craigslist and Backpage and what has occurred since 2010. Craigslist voluntarily shut down its adult section, presumably recognizing that it faced exposure to both criminal and civil liability for facilitating prostitution. Second, and more importantly, we are unaware of Craigslist engaging in the same business practices that Backpage employed to increase revenue from prostitution ads. For example, Craigslist did not have similar moderation practices employed by Backpage (*e.g.*, stripping out words or terms indicative of prostitution and then posting the ads (including ads indicative of child sex trafficking), etc.). We also have no evidence that Craigslist engaged in the solicitation and "aggregation" of prostitution ads from a competing prostitution websites. Furthermore, we

November 16, 2018
Page 3 of 5

know of no financial relationship between Craigslist and "Dollar Bill" or someone similarly situated. As you know, in an email exchange between your client and another Backpage employee, "Dollar Bill" was characterized as a "super affiliate" who received considerable fees for arranging for prostitutes and pimps to post ads on Backpage. (*See* Superseding Indictment, ¶¶ 60-62.) In a related email, your client directed that 4200 [prostitution] ads posted by Dollar Bill be reinstated. (*Id.*) Finally, Craigslist did not have a financial relationship with the website TER or a similar site.

*Third,* we are also unaware of Craigslist engaging in activities designed to circumvent conventional banking and credit card processing to disguise the true nature of their adult services category. In contrast, Backpage was conspiring with others (e.g., "Dollar Bill", TER, and numerous other obvious pimps to facilitate prostitution. In short, whatever position a DOJ representative might have taken 10 years ago regarding the *mens rea* required by a website operator has little relevance to this prosecution. Lastly, the statement that you attribute to Ms. Hakes also predated the successful prosecutions of myRedBook.com, Rentboy.com, escorts.com and Ross William Ulbricht (the "Silk Road" prosecution). It is noteworthy that the defense, here, has made no meaningful attempt to distinguish the successful prosecutions of these websites from the activities engaged in by Backpage.

Next, you cite to a statement in the Congressional record that is relevant to concerns about legislation proposed to combat sex trafficking on prostitution websites similar to Backpage *by State and local prosecutors.* This is in the context of the application of the CDA. Yet this federal prosecution is exempted from the restrictions of the CDA. That was the point of the legislation referenced in the Congressional record—to allow states to prosecute websites like Backpage in the same manner a federal prosecution can be achieved. But again, the Backpage employees that are cooperating acknowledge that the Backpage defendants knew for years that they were facilitating prostitution, and the internal emails and public statements of Lacey and Larkin bear this out. Even James C. Grant, representing Backpage in the Arizona federal grand jury litigation, conceded that if the website knew "through participation in a venture, you're conspiring with somebody, you know they posted an ad, you know the person involved is underage [of course, the illegality of prostitution is not limited to underage sex trafficking victims] that's a prosecutable crime..." (GJ RT 2/22/17, p. 38 ) Here, because of the aggregation, affiliation and reciprocal link ventures and other conduct summarized above, Backpage knew that *every* ad had the potential for facilitating prostitution services, including child sex trafficking.[1]

*Fourth*, you cite a nearly forty-year old, out-of-circuit civil case,that stands for the proposition that a federal court can enjoin a *state court prosecution* if it was brought for

---

[1] As with our prior correspondence, the discussion in this letter is not meant to be an exhaustive statement of the reasons why the apparent defenses referenced by the joint defense defense team to date lack merit, particularly in view of the limited amount of information known so far about Defendants' theories and defenses.

November 16, 2018
Page 4 of 5

improper purposes. *Fitzgerald v. Peek,* 636 F.2d 943, 945 (5th Cir.1981) ("conduct allegedly retaliated against or sought to be deterred is constitutionally protected and that the state's bringing of the criminal prosecution is motivated at least in part by a purpose to retaliate against or deter that conduct, and the state fails to show that it would have decided to prosecute even had the impermissible purpose not been considered."). This case has no relevance to the facts here and it does not even stand for the proposition that you are apparently citing it for, namely a discovery requirement. Although your request is based on mere speculation you are—in a manner of speaking—barking up the wrong tree. Categorically no such evidence exists. We are aware that Larkin and Lacey have publicly decried the late Senator John McCain and his wife Cindy as the architects of the federal Backpage prosecution, arguing that this case is politically motivated. The decision to investigate Backpage that resulted in the Superseding Indictment was made by the United States Attorney's Office in the District of Arizona, the DOJ Criminal Division, and no one else.    The same analysis applies to your overly-broad request contained in paragraph 5.

*Fifth,* you are requesting all documents and commendations from law enforcement to Backpage relating to Backpage's cooperation in any criminal investigation. (Your October 26 letter, ¶¶ 6,7,11.) This request is unclear for several reasons. If you are asking for all subpoenas issued to Backpage in the course of state and federal investigations where Backpage complied with subpoenas, we do not share the view (nor is there any legal support) that this would be *Brady* material. Backpage was merely complying with a court order. Moreover, any documents or testimony at a trial or a hearing provided by Backpage in response to a subpoena would be in furtherance of court-ordered compliance. This isn't exculpatory—it's just avoiding contempt.

You also seek commendations Backpage received from law enforcement. These aren't *Brady* material either. Backpage was engaged in a veneer of cooperation with law enforcement. They hid their true business model that included moderation, aggregation, and affiliated programs. Moreover, after banks no longer would do business with Backpage they concealed payments from pimps posting prostitution ads and concealed Backpage as the payee, etc. We expect that at trial former Backpage employees (including but not limited to Ferrer and Hyer) will testify that Backpage's business model was concealed from law enforcement in variety of ways. We also expect at trial that law enforcement, including those that provided commendations to Backpage, will testify that had they known of Backpage's actual business practices (*e.g.*, stripping out words and posting the ads, inserting the link to TER, etc.) and financial relationships (*e.g.*, affiliated relationships with "Dollar Bill" and others, etc.) they would not have provided the commendations. In sum, we do not view commendations from law enforcement as *Brady* material.

*Sixth,* without providing any authority, you demand various communications between the prosecution team and attorneys representing cooperators, various law enforcement agencies, civil attorneys representing victims, NCMEC etc. (Your October 26 letter, ¶¶ 6-11) Without more, it is difficult to respond to such a request. Although you have provided some

November 16, 2018
Page 5 of 5

authority for other requests (which we do not concede are necessarily on point), you provide no authority for this overbroad request. In short, this appears to be a wish list, based on speculation, in an effort to engage in a fishing expedition.

*Seventh*, you request all documents to and from Backpage and NCMEC relating to possible unlawful activity involving underage individuals. (Your October 26 letter, ¶ 10.) )It is unclear what you mean by "documents" nor do you articulate why you believe these are exculpatory. In any event, if you are asking for emails between Backpage and NCMEC, those are readily available based on emails we received via search warrants and subpoenas. They are also contained in the PSI Appendix, which is available on the U.S. Senate website. Any other documents we received from NCMEC has been provided or will be provided based on the scheduling order.

*Eight*, paragraph 12 of your October 26 letter requests internal Justice Department memoranda "relating the understanding of the applicable law government Backpage." Again, you provide no authority for this request. And, case law makes clear that material encompassing only an attorney's mental impressions or legal theories does not constitute *Brady*. *See, e.g., Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006). "Extending the *Brady* rule to opinion work product would greatly impair the government's ability to prepare for trials." *Id.* Indeed, "if opinion work product were accessible by opposing counsel 'much of what is now put down in writing would remain unwritten.'" *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

*Ninth and last*, paragraphs 4-31 make various general *Brady* requests, non-specific to this case, citing some authority (mainly from the 1980s). We will examine your specific requests and, to the extent we have information covered by the requests and supported by the cases you cite, we will make it available. Finally, in the event you are unsatisfied with our responses to your October 23 and 26 letters and file a discovery motion, please include our responses to both letters as attachments so the court has an understanding of our efforts to be responsive to your various requests.

Sincerely,

ELIZABETH A. STRANGE
First Assistant U.S. Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

# Exhibit B

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BACKPAGE.COM, LLC,

               Plaintiff,

    v.

THOMAS J. DART, Sheriff of Cook County,
Illinois,

               Defendant.

Civil No. 1:15-cv-06340

Judge John J. Tharp, Jr.

## ORDER

The defendant's motions to dismiss the case [222] and to dissolve the preliminary injunction entered on December 23, 2015 [223] are granted. Accordingly, the case will be terminated on the docket. The defendant's motion for sanctions [226] remains pending, however, with briefing to be completed on the schedule previously entered by the Court.

## STATEMENT

In the wake of guilty pleas entered by the plaintiff in this case, Backpage.com LLC, and its CEO, Carl Ferrer, to federal charges of money laundering conspiracy and conspiracy, respectively, Sheriff Dart has moved to dismiss this case as moot and to dissolve the preliminary injunction entered by this Court on December 23, 2015. At a hearing conducted on April 26, 2018, a briefing schedule was set; Backpage's response to the Sheriff's motions was due on May 17, 2018, with the Sheriff's reply due on May 31, 2018. Backpage filed neither a response nor a motion to extend the time to respond and has therefore forfeited its claim. *Boogaard v. National Hockey League*, --- F.3d ---, 2018 WL 2377803 (7th Cir. May 25, 2018).

In any event, the Court agrees with the Sheriff that this case is moot in light of the guilty pleas entered by Backpage and Ferrer, and the plea agreements they entered into with the United States.[1] In its guilty plea, Backpage admitted, among other things, that Backpage executives conspired to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers and to launder the hundreds of millions Backpage earned by facilitating the unlawful publishing of ads for prostitution offenses. Backpage Plea Agreement at ¶ 10.a., ECF No. 8-1, Case. No. 18-cr-465 (D. Ariz.). Ferrer, in his plea agreement, acknowledged that he had participated in the Backpage conspiracy. Ferrer Plea Agreement at

---

[1] "Courts may take judicial notice of court filings and other matters of public record when the accuracy of those documents reasonably cannot be questioned." *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017).

¶ 10.a, ECF No. 7-1, Case. No. 18-cr-465 (D. Ariz.). Ferrer agreed, among other things, "to immediately shut down the website www.backpage.com ('Backpage') in the United States and all other countries in which the website operates" and to the "surrendering to the United States the registration account, including login and password information, for the www.backpage.com domain name necessary to operate the various Backpage websites and providing technical assistance to the United States to effectuate the shutdown." *Id.* at ¶ 3.a. Backpage, for its part, agreed that it would "cease to exist or operate." Backpage Plea Agreement at ¶ 3.d. Ferrer and Backpage each agreed to forfeit any interest in the website (or any of dozens of related websites) as well as various bank accounts and other assets of the company. In short, the plea agreements effectively ended the operational existence of Backpage.[2]

Backpage's shutdown renders this case moot. Backpage's claim in this case is that Sheriff Dart violated Backpage's First Amendment speech rights by attempting to coerce third parties—specifically, credit card companies—not to process payments for advertising on the web site. Backpage characterized the Sheriff's actions as a prior restraint on speech, but with its shutdown there is nothing left to restrain. Backpage's shutdown would not necessarily moot its claim if it were seeking damages, of course, but in an effort to narrow discovery in the case, Backpage previously disavowed any claim for damages and filed an amended complaint seeking only injunctive relief. *See* Backpage Motion for Leave to Amend, ECF No. 167, at ¶ 4; Tr. 8/9/16, ECF No. 174, at 4:4-13; Amended Compl., ECF No. 173, at 20-21 ("Prayer for Relief," seeking no damages).[3] But the injunction that Backpage seeks can no longer do it any good. Now that it is operationally defunct, no one—not credit card companies or anyone else—can do business with Backpage and Backpage is of course out of the business of providing advertising for prostitution services. An injunction would therefore change nothing. Injunction or no, there will be no more advertising—licit or illicit—on Backpage.com.

As the Sheriff correctly notes, because an injunction can no longer provide any benefit to Backpage, its claim for injunctive relief is moot. "A court's power to grant injunctive relief only survives if such relief is actually needed." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009). "In an action seeking only injunctive relief, this requirement ordinarily means that, once the threat of the act sought to be enjoined dissipates, the suit must be dismissed as moot." *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596 (7th Cir. 2006). Where a company seeking injunctive relief has ceased to operate, its claims are ordinarily deemed to be moot. *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 285 (2001) ("a live controversy is not maintained by speculation that City News might be temporarily disabled from reentering a business that City News has left and currently asserts no plan to reenter"); *Bd. of License Comm'rs of Town of Tiverton v. Pastore*, 469 U.S. 238, 239-40 (1985). And while the criminal prosecutions of Backpage and its executives, and the forfeiture of Backpage's assets, are not final, there is no realistic possibility that Backpage will ever resume operations; it follows as well that there is no realistic possibility that the Sheriff will resume his exhortations to (or, in

---

[2] And, indeed, visitors to backpage.com are greeted with a notice advising that backpage.com and affiliated websites have been seized by the government.

[3] Backpage also sought attorney's fees, but "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim"). *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990).

Backpage's view, his coercion of) third parties not to facilitate Backpage's crimes. There is, in short, "no reasonable expectation that the [alleged] wrong will be repeated." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000). Accordingly, Backpage's claim is moot.

Because Backpage's claim is moot, there is no case or controversy and this Court therefore lacks subject matter jurisdiction. *Home Care Providers, Inc. v. Hemmelgarn*, 861 F.3d 615, 620 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1000, 200 L. Ed. 2d 252 (2018) ("cases that do not involve 'actual, ongoing controversies' are moot and must be dismissed for lack of jurisdiction"). And because the case is being dismissed for lack of jurisdiction, the Court has no basis to continue in force the preliminary injunction previously entered. Nor could the preliminary injunction survive the dismissal of the case in any event. Accordingly, the preliminary injunction is dissolved.

Date: May 31, 2018

John J. Tharp, Jr.
United States District Judge

3

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| BACKPAGE.COM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-06340 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| THOMAS J. DART, Sheriff of Cook | ) | Magistrate Judge Young B. Kim |
| County, Illinois, | ) | |
| | ) | |
| Defendant. | ) | |

## SHERIFF'S MOTION FOR SANCTIONS
## AGAINST BACKPAGE AND ITS ATTORNEYS

Thomas J. Dart, Sheriff of Cook County, Illinois, by his undersigned Special Assistant State's Attorneys, requests that this Court enter an order based on its inherent authority and pursuant to Federal Rule of Civil Procedure 26(g)(3) and 28 U.S.C. § 1927 requiring Backpage and its attorneys, jointly and severally, to pay Cook County, Illinois all of its attorneys' fees and costs incurred in this litigation, including on appeal and in petitioning for *certiorari*, on the grounds that Backpage admitted on April 5, 2018 that its entire first amendment civil rights case was based on untrue facts from the beginning, and thus a hoax, a fraud on this Court, a fraud on the Seventh Circuit Court of Appeals and a fraud on the United States Supreme Court. Backpage and its attorneys also have squandered resources of the Cook County State's Attorney Office, the Office of the Sheriff of Cook County and the taxpayers of Cook County under the guise of a civil rights plaintiff in its phony lawsuit, simultaneously fighting off the advances of law enforcement so that it could continue to make hundreds of millions of dollars from its enterprise that admittedly facilitated and promoted prostitution and child trafficking. In support of his motion, the Sheriff states:

## I.      THE SIGNED PLEA AGREEMENT OF CARL FERRER, <u>CEO AND OWNER OF BACKPAGE, PROVES FALSITY</u>

On April 5, 2018 Carl Ferrer, CEO and owner of Backpage, entered into a plea agreement with the United States on behalf of himself and Backpage.  *See* Exhibits A and B.  In those plea agreements, Ferrer attested to facts demonstrating that the entirety of Backpage's complaint against the Sheriff was a fraud from the beginning—something the Sheriff has been arguing since the inception of this case.

In the signed plea agreements, Ferrer admits the following facts regarding Backpage being a content provider for illegal prostitution advertisements on its website:

> I have long been aware that the great majority of these advertisements [on Backpage] are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and much of Nevada).  (Ex. B, ¶ 10(a).)
>
> Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L., J.L., S.S., D.H., A.P., and J.V.) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers.  *Id.*
>
> For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and publish a revised version of the ad.  *Id.*
>
> These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads."  *Id.*

In addition to acknowledging that Backpage was a content provider for illegal advertisements for prostitution, Ferrer admitted that the reason credit cards companies stopped doing business with Backpage was due to the illegal nature of Backpage's business, and not the Sheriff's letters to the credit card companies:

2

> Since 2004, Backpage has earned hundreds of millions of dollars
> in revenue from publishing "escort" and "adult" ads. Over time,
> many banks, credit card companies, and other financial institutions
> refused to do business with Backpage due to the illegal nature of
> its business. *Id.*

And on top of Backpage wrongfully accusing the Sheriff of first amendment violations,

Backpage and its attorneys lied to this Court when stating that due to the Sheriff's actions,

Backpage had not been able to accept credit card payments for advertisements and was being

crippled by the loss of income. (ECF No. 5 at p. 17.) On the contrary, Ferrer now admits:

> In response [to the credit card companies refusing to do business with
> Backpage], I worked with my co-conspirators to find ways to fool credit
> card companies into believing that Backpage-associated charges were
> being incurred on different websites, to route Backpage-related payments
> and proceeds through bank accounts held in the name of seemingly
> unconnected entities (including, but not limited to Posting Solutions,
> Website Technologies, Website Technologies, and Cereus Properties) . . .
> (Ex. B, ¶ 10(a).)

## II. THE ENDLESS LIES OF BACKPAGE AND ITS ATTORNEYS ARE WIDESPREAD, BEGINNING WITH THE COMPLAINT AND TAINTING THE ENTIRETY OF ITS CONDUCT THROUGHOUT THIS LITIGATION

### A. Backpage's complaint was a fraud when filed

On August 21, 2015, two weeks after the United States Senate Permanent

Subcommittee on Investigations had issued a subpoena to Backpage requesting information

regarding its business practices, Backpage filed suit against the Sheriff. From day one,

Backpage's complaint against the Sheriff was a fraud, neither grounded in fact nor law. From

the opening salvo through the prayer for relief, Backpage painted a false picture of a first

amendment-crusading Backpage versus a Sheriff that was trying take away the constitutional

rights of an information platform and its posters:

> Sheriff Dart's actions to cripple Backpage.com and all speech through the
> site are an especially pernicious form of prior restraint. He has achieved
> his purpose through false accusations, innuendo, and coercion . . .

3

Moreover, Sheriff Dart's actions have not only infringed Backpage.com's right to publish and distribute speech, but the rights of millions of the website's users to post and receive protected speech.  (ECF No. 1, ¶ 6.)

As shown in the Ferrer and Backpage plea agreements, the above factual assertions have always been lies; the speech at issue was never protected by the first amendment, and Backpage was a content provider and distributor of illegal, non-protected speech.

The lies in Backpage's complaint range from Backpage stating it prohibited and prevented illegal content on its platform:

> Backpage.com prohibits illegal content and activity on its website and takes extensive steps to prevent such misuse, especially to guard against any form of human trafficking or child exploitation (ECF No. 1, ¶ 23)

to Backpage stating it was only a third-party content provider, not an author of the illegal advertisements for prostitution:

> Sheriff Dart's actions also violate Section 230 of the CDA, 47 U.S.C. § 230, as he has no right or authority to preclude or seek to prosecute Backpage.com under state law for publishing third-party content (ECF No. 1, ¶ 56)

to Backpage stating that it was the Sheriff's actions that caused the credit card companies to stop doing business with Backpage:

> Thus, because of Sheriff Dart's actions, Backpage.com is barred from credit card services of any of the three largest card companies [American Express, Visa, Master Card] or any acquiring banks or credit processing companies. (ECF No. 1, ¶ 43.)

**B.      Backpage follows up its fraudulent complaint with
a request for a TRO and a Preliminary Injunction**

Not satisfied with its fraudulent request for money damages and declaratory relief in its Complaint, Backpage also filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction.   (ECF No. 5.)  In support of the same, Backpage attached the sworn declaration of Carl Ferrer (ECF No. 6), which was replete with lies:

- Backpage.com does not dictate or require users to post any content. Instead, users provide all the content for ads they post using an automated interface. Ferrer Declaration, ¶ 4.

- Backpage.com also employs extensive, voluntary monitoring measures to prevent and remove improper user postings. Ferrer Declaration, ¶ 14.

- The practical effect of Sheriff Dart's and the credit card companies' actions has been to cut off nearly all revenue to Backpage.com. This affects not only adult ads but also other ads for dating, housing, services, trades, and sales of goods, among others. Although Backpage.com allows payment by bitcoin, this has accounted for a very small percentage of purchase on Backpage.com. Ferrer Declaration, ¶ 27.

- Sheriff Dart's actions and the termination of credit card services have also harmed Backpage.com's efforts to police and preclude improper ads. Ferrer Declaration, ¶ 29.

And those lies created the basis for this Court to enter a Temporary Restraining Order against the Sheriff on July 24, 2015. (ECF No. 29.)

After the TRO was entered by this Court, based on the misrepresentations of Backpage, the parties began to engage in limited discovery to determine whether a preliminary injunction was appropriate. In this limited discovery period, during which Backpage was withholding valuable information from the Sheriff, Backpage was completely stonewalling the United States Senate. On August 6, 2015 Backpage informed the Senate that it was refusing to provide any information regarding its business practices. *See Backpage Answer to Subpoena,* August 6, 2015; ECF No. 197-1 at 14. And Backpage's attorneys in this case were aware of Backpage's obstructionist conduct before the Senate as they served as Backpage's attorneys in the Senate proceedings. U.S. District Court for the District of Colombia, Case No. 16-mc-00621 at ECF No. 6 (Appearance of Robert Corn-Revere).

During this limited discovery period, Backpage's lies continued. In answers to interrogatories, Backpage referenced the above-cited affidavit from Carl Ferrer, thereby perpetuating those falsehoods. Additionally, in its written response to the Sheriff's interrogatory

number four, Backpage stated that after July 6, 2015 Backpage.com could no longer charge for ads because of the Sheriff's actions to pressure Visa and MasterCard. We now know for certain that this is false as Backpage and Ferrer have admitted to setting up straw companies to circumvent the credit card companies' ban. (Ex. A, ▌10(a) and Ex. B, ▌10(a).)

In preparation for the subsequent preliminary injunction hearing, Backpage's lies continued. In the deposition of Carl Ferrer, he perpetuated the lie that Backpage did not know that many ads on its site were for child prostitution, for example:

> Q.    You are aware that each month hundreds of postings in Backpage's adult
>        services site likely involve minors?
>
> A.    No.

August 18, 2015 deposition of Carl Ferrer. But despite the lies and deceit of Backpage, this Court correctly denied its request for a preliminary injunction. Backpage moved to stay the case pending an appeal of the denial of its request for a preliminary injunction, and therein lied again. Backpage told the Court that VISA and Mastercard had "cut off nearly all revenue to Backpage.com." As set forth above, we now know this to not be true, and to this day, neither Backpage nor its attorneys have corrected the record.

**C.    Backpage continued its lies on appeal**

In its opening and reply briefs on appeal, the parade of lies continued. Here are two of the most egregious:

- Backpage.com had a multi-tiered system to screen, block and remove posts that may be improper. (October 2, 2015 Opening Brief at 5, n.1.)

- [Sheriff] Dart cannot pursue legal claims against Backpage.com under state criminal or nuisance laws for allegedly aiding and abetting individuals who misuse the site, because the website does not cause this in any sense. (November 5, 2015 Reply Brief at 5.)

The assertion Backpage made to the Seventh Circuit that it was doing everything it could to block prostitution ads when in fact it was helping to write them is as material of a lie as Backpage could have made. And that its lawyers then used this lie to make an argument that Backpage could never be liable under state criminal laws for aiding and abetting prostitution—an argument that was clearly wrong—is exactly the type of argument that Backpage's lawyers should have refused to make. Their participation makes them complicit in their client's lies.

### D.     <u>Backpage's lies continued throughout the litigation</u>

At points that Backpage and its attorneys could and should have come clean about Backpage's lies to this Court, they instead prolonged them. In its Motion for Partial Summary Judgment, Backpage made the following false statements:

- Backpage.com also employs extensive voluntary monitoring measures to prevent and remove improper user postings. (ECF No. 124-1, ¶ 14.)

- Through its review process, Backpage.com . . . immediately reports any that may concern child exploitation to NCMEC (approximately 300 per month.) (ECF No. 124-1, ¶ 15.)

Backpage went to great lengths to fight the Sheriff's Motion for Leave to Amend Affirmative Defenses and spent a great deal of effort trying to undercut the importance of the Red Beauty ad placed by a member of Sheriff's Office. As this Court recalls, the Sheriff sought to plead the affirmative defense of illegality, and in support provided evidence regarding Backpage sanitizing the Red Beauty ad of references indicating the subject was a child. Backpage filed briefs and affidavits trying to show that the Sheriff's claims about the Red Beauty ad were false. *See, e.g.,* Backpage's May 17, 2016 Opposition to Dart's Motion for Leave to Amend Affirmative Defenses. (ECF No. 160.) In fact, the "evidence" provided by Backpage in support of that argument was false, but focusing on that misrepresentation misses the larger point. The larger point is that Backpage knew that it routinely did exactly what the Red Beauty evidence showed:

sanitize ads of references to the subject of the ads being children, and its tremendous efforts to

attack the Red Beauty evidence was designed to divert the Court's attention.  What Backpage

and its lawyers should have done, in fact were required to do, was come clean to the Court and

admit that it engaged in sanitization of ads, for example, by amending their false complaint.

## III.    SANCTIONS AGAINST BACKPAGE AND ITS COUNSEL SHOULD BE AWARDED PURSUANT TO THIS COURT'S INHERENT AUTHORITY

As this Court is aware, it has power to sanction parties and their attorneys under

several rules and statutes.  *See, e.g.,* Federal Rule of Civil Procedure 11, 26, 37 & 56 and 28

U.S.C. § 1927.  In addition to these specific rule and statutory bases, the Court has inherent

authority to enter sanctions.  "[I]f a court finds that fraud has been practiced upon it, or that the

very temple of justice has been defiled, it may assess attorney's fees against the responsible

party, as it may when a party shows bad faith by delaying or disrupting the litigation." *Chambers*

*v. NASCO, Inc.*, 501 U.S. 32, 46 (1991).  "A court has inherent power, which is to say a common

law power, to punish by an award of reasonable attorneys' fees or other monetary sanction . . .

misconduct by lawyers appearing before it."  *Carr v. Tillery,* 591 F.3d 909, 919 (7th Cir. 2010)

(*citing Chambers,* 501 U.S. at 43-46).  The Supreme Court has made clear that "the inherent

power of a court can be invoked even if procedural rules exist which sanction the same conduct."

*Chambers,* 501 U.S. at 49.  This Court should use its inherent power to sanction both Backpage

and its counsel for the lies which Backpage told and which its counsel must have known were

lies when stated.

In *Chambers*, the Court explained that "the District Court could have employed

Rule 11 to sanction [the plaintiff] for filing 'false and frivolous pleadings,' and that some of the

other conduct might have been reached through other Rules.  Much of the bad-faith conduct by

[plaintiff], however, was beyond the reach of the Rules; his entire course of conduct throughout

the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address. In circumstances such as these in which all of a litigant's conduct is deemed sanctionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." *Id.* at 50–51 (citations omitted).

In *Reichmann v. Neumann*, 553 F. Supp. 2d 307, 327–28 (S.D.N.Y. 2008), the court entered a sanction pursuant to the court's inherent authority requiring plaintiff and his attorneys to pay the defendant's costs and attorneys' fees where plaintiff's attorneys "did not reasonably question [plaintiff] or investigate the support for his claims, even as the facts he alleged grew more and more implausible."

In *In re Narragansett Clothing Co*., 143 B.R. 582 (Bankr. D.R.I. 1992), the court granted a motion for sanctions against the bankruptcy trustee and his attorney. The court reasoned that "at no time during the pleading and pre-trial stage, nor at the hearing on the merits, has there been any discernable or justifiable reason for the Trustee to litigate this matter. While [the court did] not, with the benefit of hindsight, like to second guess the litigants in such matters, here, with or without hindsight, there was never any reasonable basis upon which the Trustee should have incurred legal expense to the estate in litigating this matter. Because of the total absence of any merit in the Trustee's position, [the] motion for sanctions is granted, and the full amount of its necessary and reasonable attorneys' fees herein are awarded against the Trustee and his attorneys, and payment of said sanctions, of course, should not come from estate funds." *Id.* at 583–84.

In *In re Evergreen Sec., Ltd.*, 384 B.R. 882, 937 (Bankr. M.D. Fla.), *aff'd,* 391
B.R. 184 (M.D. Fla. 2008), *aff'd,* 570 F.3d 1257 (11th Cir. 2009), the court awarded as sanctions
"the amount of $371,517.69, representing approximately fifty-five percent of Evergreen's fees
and costs incurred in the recusal litigation" to be paid by the party who filed the motion to recuse
and his law firm, jointly and severally.   The court explained that in filing motion for recusal of
judge, disqualification of Chapter 11 debtor's counsel and his law firm, and revocation of all
orders entered in main case and proceedings involving their clients, attorneys and law firms
engaged in "bad faith," as warranted imposition of sanctions pursuant to court's inherent powers,
section of Bankruptcy Code authorizing court to issue any order necessary or appropriate to carry
out provisions of title 11, and Bankruptcy Rule 9011.  *Id.*  Attorneys and firm "conducted no
reasonably thorough and objective investigation of the actual facts" instead constructing their
motion from "gossip, hearsay, untruths, and assumptions," so that every allegation in the motion
was objectively frivolous, they relied on inapposite and inflammatory case law to support the
motion, namely, case law involving criminal investigations of judges, and they filed the motion
for improper purposes of delaying matters in debtor's case, harassing the court, debtor and
debtor's attorneys and punishing the court for unfavorable rulings. *Id.* at 932.

As seen in the above-cited cases, when a party and its counsel perpetuate a
meritless case based upon bald-faced lies, the Court should impose sanctions against the party
and its lawyers for engaging in such egregious conduct.  As seen in the fact section above and in
the sections immediately below, Backpage lied to this Court and its attorneys perpetuated those
lies when they should have instead brought those lies to the Court's attention so that it could
properly and timely address them.

**A.**     __The Court should use its inherent authority to sanction Backpage__

Here, Backpage repeatedly lied to this Court about numerous issues, the most mendacious of which are Backpage's statements that: (1) it did not "sanitize" or "moderate" the ads on its website that were, prior to sanitization or moderation, clearly for adult prostitution or child prostitution; (2) that VISA and Mastercard ceased doing business with it because of the letters sent by the Sheriff; and (3) that it was unable to process credit card transaction or otherwise be paid for ads placed on its website. These lies caused the Seventh Circuit to order that this Court enter a preliminary injunction, the Supreme Court to deny a *certiorari* petition, and caused this Court to rule against the Sheriff on several motions and allow this case to go on for more than another year. This Court should find that Backpage perpetrated a fraud on the Court, and that under its inherent authority, sanctions should be awarded to the Sheriff in the amount of the reasonable attorneys' fees for his entire representation in this matter. *See Reichman*, 553 F. Supp. 2d at 319 (plaintiff in breach of contract case sanctioned where he brought claim knowing that the dispute had been settled and only dismissed case when documents showed up that completely foreclosed his claim).

**B.**     __The Court should sanction Backpage's counsel__

Backpage's counsel may well have known all along about their client's lies, but even if not, they were presented with an abundance of opportunities from very early on in this case to know that their client was lying to the Court about the critical issues. They then either learned of these lies but did nothing or stuck their heads in the sand. "Sticking one's head in the sand is more than undignified. It is sanctionable. In this case appellees' attorneys' fees are an appropriate sanction; these are costs that would not have been incurred but for a doomed appeal, and the expense should be borne by the side that created them." *Khalil v.*

*Town of Cicero*, 916 F.2d 715 (7th Cir. 1990) (imposing sanctions under Rule 37). *See also City of Livonia Employees' Retirement System v. Boeing Co.*, 306 F.R.D. 175, 181 (N.D. Ill. 2014) (Rule 11); *Paniagua v. Max 18, Inc.*, No. 11 C 03320, 2013 WL 5907893, *8 (N.D. Ill. Nov. 4, 2013) (Rule 11). The following chronology paints the picture of why and when Backpage's counsel knew or should have known that their client was lying to the Court:

In April 2015, the United States Senate, through the Permanent Subcommittee on Investigations (the "Subcommittee"), requested an interview to discuss Backpage's business practices. ECF No. 197-1 at 14. On June 19, 2015, after two months of negotiations with Backpage's counsel over specific topics the Subcommittee wished to discuss, the Subcommittee interviewed Elizabeth McDougall, Backpage's general counsel. *Id.* During that interview, McDougall would not answer critical questions regarding Backpage's procedures for screening for illegal content. *Id.* This was the first red flag that gave an indication that Backpage's procedures may be less than legal.

On July 7, 2015, two weeks before Backpage filed its complaint against the Sheriff, the Subcommittee issued a subpoena to Backpage, seeking, among other things, documentation regarding its screening process and data retention policies. *Id.* On August 6, 2015, a few weeks prior to the preliminary injunction hearing in this case, Backpage sent the Subcommittee a letter stating it was refusing to answer its subpoena. *Id.* Red Flag Number Two.

On August 13, 2015 the Subcommittee subpoenaed two Backpage employees, Andrew Padilla—the head of Backpage's moderation department—and Joye Vaught—the supervisor in charge of training Backpage's moderators (not coincidentally, on information and belief, two of the people that Carl Ferrer alleges he conspired with, *see* Plea Agreement at Ex. B at ¶ 10(a))—to discuss their job duties. ECF No. 192-1 at 14—15. Instead of answering the

12

Subcommittee's questions, both individuals hired an attorney and refused to answer, invoking their fifth amendment privilege, stating their answers might tend to incriminate them. *Id.* at 15. Red Flag Number Three.

On October 1, 2015 the Subcommittee issued a new, more targeted subpoena, focusing on Backpage's moderation efforts, including information related to editing or modifying of ads prior to publication—the very information that would have destroyed Backpage's argument of immunity under the Communications Decency Act. *Id.* Backpage answered by providing twenty-one pages of publicly available documents and writing a letter stating it refused to provide any relevant documents, citing first amendment objections. *Id.* Red Flag Number Four.

The Subcommittee informed Backpage that its objection was without merit and ordered Backpage to comply by November 12, 2015. *Id.* at 16. Additionally, the Subcommittee subpoenaed Carl Ferrer to testify before the Subcommittee on November 19, 2015. *Id.* Not surprisingly, Backpage refused to answer the subpoena and Carl Ferrer did not show up at the Subcommittee's hearing as he had fled the country. *Id.*; ECF No. 126. Red Flag Number Five.

On November 30, 2015 the Seventh Circuit reversed this Court's decision regarding the preliminary injunction, finding that "it is *unclear* that Backpage is engaged in illegal activity." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 233 (7th Cir. 2015) (emphasis added). Given that Backpage was refusing to answer subpoenas regarding its moderation processes, and its employees were invoking their fifth amendment privileges against self-incrimination with regard to those processes, it was becoming clear that "illegal activity" may be at the heart of Backpage's functions.

13

On March 11, 2016 Backpage filed a Motion for Partial Summary Judgment, stating that there was no need for the parties to engage in further discovery. ECF No. 124. Again, Backpage was pushing to cover up its "illegal activity," as it did not want the Court to allow the Sheriff to see discovery which would demonstrate that the entire case against the Sheriff was a farce.

On March 29, 2016 the Subcommittee filed its Application to Enforce Subpoena Duces Tecum with the U.S. District Court for the District of Columbia, and Backpage through its counsel (*the same counsel that is representing Backpage in this case*) filed its opposition to the same. ECF No. 197-1 at 16—17; U.S. District Court for the District of Colombia, Case No. 16-mc-00621 at ECF No. 6 (Appearance of Robert Corn-Revere). Red Flag Number Six.

On March 30, 2016, the Court denied Backpage's Motion for Summary Judgment without prejudice and ordered the parties to brief any disputed discovery issues. ECF No. 137. On April 6, 2016 the Sheriff filed a Bench Memorandum, arguing he was entitled to discovery on, among other things: (1) Backpage's purported damages, specifically requesting information on lost profits and any illegal contracts for prostitution, as Backpage should not be compensated for the same; and (2) Backpage's moderation practices to show the illegality of Backpage's business. ECF No. 143.

On April 20, 2016 Backpage filed a response to the Sheriff's Bench Memorandum, arguing Backpage should not have to turn over moderation discovery as the Communication Decency Act provides immunity for Backpage as a platform provider. ECF No. 153. This argument by Backpage's attorneys was disingenuous at best, as by now they had to know that Backpage was a part author in a great majority of the prostitution ads on the website, thereby losing any possible immunity under the CDA. As of this date, at the very latest,

Backpage's attorneys were at best practicing willful indifference to Backpage's actions, because if its attorneys did not know that Backpage was authoring ads for prostitution, that is due to their intentionally turning a blind eye to all of the evidence in front of them.

On April 21, 2016, as part of the Sheriff's Motion for Leave to Amend Affirmative Defenses, the Sheriff informed the Court about the Red Beauty Investigation, during which the Sheriff gained first-hand knowledge of Backpage's sanitization process, proving that Backpage was not just an information platform provider but an author of ads purporting to prostitute children. ECF No. 155. Rather than acknowledging Backpage's conduct, Backpage's attorneys accused the Sheriff of creating fake ads that failed to demonstrate any sanitization. ECF No. 160. This was obviously false and provides further evidence that Backpage's attorneys were either covering up their clients' illegal actions or purposefully sticking their heads in the sand.

On May 17, 2016 Backpage's attorneys filed an opposition brief with the Court, arguing that the Sheriff should not be allowed to amend his affirmative defenses as the Sherriff's defense on illegality was "futile" because the Sheriff's "proposed illegal conduct defense directly violates [the CDA]." *Id.* Again, by now, Backpage's attorneys should have known that this was untrue.

On August 2, 2016 Backpage sought leave to file a first amended complaint, abandoning its request for monetary damages. ECF No. 167. Backpage and its attorneys knew that it needed to drop the claim for money damages, otherwise the Court would allow discovery into Backpage's purported lost profits, and its moderation practices for purposes of determining which "contracts" were illegal (*i.e.*, payments for ads for prostitution). ECF No. 141 (Transcript from March 30, 2016). Backpage knew that if it allowed the Sheriff to dig into its lost profits

claim, the Sheriff would learn (1) that Backpage never stopped making money through Visa and MasterCard, and therefore the entire basis for its requested injunctive relief—that Backpage was stopped from doing business with Visa and Master Card—was a sham; (2) that Backpage was a content provider and could never have any protections under the CDA; and (3) that Backpage was laundering money through straw entities.

On August 5, 2016 the district court in the Senate Action granted enforcement of the Subcommittee's subpoena, rejecting Backpage's first amendment argument.  *Senate Permanent Subcomm. v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016*), vacated as moot sub nom. Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080 (D.C. Cir. 2017).  Over the course of the next three months, Backpage engaged in legal theatrics, requesting appeals and stays from the district court's enforcement order.  ECF No. 197-1 at 17—18.  Finally, after all appeals and stays were exhausted, Backpage started turning over documents.  *Id.* at 18.  By the end of 2016, Backpage had turned over more than five hundred thousand pages of documents in response to the Subcommittee's subpoena.  *Id.* at 20.

On August 9, 2016 Backpage again requested that this Court proceed with summary judgment proceedings, stating the "Court should reject the Sheriff's arguments [regarding needing additional discovery] again and move this case forward to consideration and briefing of summary judgment on liability and declaratory relief."

On September 26, 2016 and December 23, 2016, Carl Ferrer was indicted in the State of California for taking part in a pimping conspiracy and money-laundering conspiracy.  Ex. C.  The December indictment detailed efforts that Backpage had undertaken to set up sham companies to bypass detection by American Express.  *Id.*  According to the indictment, in May of 2015, in only the State of California, Backpage was able to conduct $48,288.25 worth of

16

transactions, even though American Express had ceased processing Backpage transactions on May 1, 2015.  *Id.*  Attorneys for Backpage in this case also represented Carl Ferrer in the indictment proceedings.  Ex. D.

At this point there is direct evidence, known to Backpage's attorneys, that Backpage and its CEO, Carl Ferrer, had lied to this Court.  Specifically, in paragraph 4 of both the complaint and the amended complaint, which was filed just prior to the indictments, Backpage stated that due to the Sheriff's letters, American Express, Visa and Master Card all blocked use of their cards for any and all purchases on the website.  ECF No. 1; ECF No. 173.  If Backpage was circumventing the blocks being administered by the credit card companies, and still using American Express, Visa and Master Card to accept payment, this directly affects Backpage's theory of causation and its requests for relief.  Specifically, if Backpage was still running transactions through the credit card companies, albeit illegally, Backpage was never suffering the harm it alleged in its complaint.

Instead of bringing the above to this Court's attention, as they were obligated to do, Backpage's attorneys chose to do nothing, except press forward with Backpage's request for summary judgment.  In fact, since learning that Backpage had lied in the amended complaint pending before this Court, Backpage sought summary judgment or a summary judgment hearing on four separate occasions.  *See* Opposition to Defendant's Motion for Leave to File Sur-Response Opposing Backpage's Motion to Renew Summary Judgment Proceedings (November 23, 2016) (ECF No. 191) (stating "the Court should set a hearing on the Plaintiff's motion for summary judgment at the earliest possible date"); Opposition to Suggestion of Mootness (February 21, 2017) (ECF No. 196) (stating the Court should "hold this case is moot and expeditiously proceed to Plaintiff's motion for summary judgment"); Plaintiff's Motion for

Sanctions Based on Sheriff Dart's Fraud on the Court (December 15, 2017) (ECF No. 205) (stating that Backpage seeks an order requiring that "[a] schedule be set for briefing and argument on Plaintiff's motion for summary judgment," even though it was completely unrelated to the motion it filed); Plaintiff's Reply to Sheriff Dart's Opposition to Motion for Sanctions Based on Sheriff Dart's Fraud on the Court (February 2, 2018) (ECF No. 214) ("Backpage filed its Motion for Sanctions and asked this Court to order … a briefing schedule for resolution of the case on summary judgment"). Once Backpage's attorneys learned that the factual basis for the entire amended complaint was false, namely that Backpage was still actively using credit cards to pay for services on its website, they had a duty and an obligation to inform the Court and the Sheriff's attorneys of the same, at a minimum, by amending their errant pleading. Instead, they ran from that obligation, and pushed this Court for an entry of summary judgment in their client's favor, even though such a judgment would have been based on a fraud.

On January 19, 2017 after reviewing documentation provided and testimony regarding Backpage's business practices, the Subcommittee issued a report from its investigation titled Backpage.com's Knowing Facilitation of Online Sex Trafficking. ECF No. 197-1. In the report the Subcommittee found that Backpage had knowingly concealed evidence of criminality by systematically editing its adult ads, and that it knowingly facilitated prostitution and child trafficking. *Id.*

On September 15, 2017, the Sheriff sought leave to issue subpoenas to discover evidence proving that Backpage has been and is engaged in criminal activities, including the solicitation of prostitutes and creation of advertisements for prostitution. ECF No. 201. The evidence was discovered in the Philippines in a non-related case. *Id.* The Sheriff explained in his motion that based on the date range of a few of the incriminating documents that were

available from the docket in Backpage's case against Missouri Attorney General Hawley, it

appeared that Backpage was sanitizing ads of their criminal content in 2015 and 2016, the same

time it was telling this Court that it was not.  *Id.*

       In response to the Sheriff's request, Backpage's attorneys did not tell this Court

about any of the evidence that they had discovered over the course of the last eighteen months,

but rather, pushed forward and continued to argue that the Court should reject the issue raised in

the Sheriff's motion as those issues already had been considered by the Court.  ECF No.  204.

       Counsel for Backpage, throughout the course of this litigation, their representation

of Backpage in the Subcommittee proceedings, and their representation of Carl Ferrer in his

California criminal proceedings, learned of information disproving the facts alleged by Backpage

in its amended complaint.  At the very least, counsel for Backpage, in this case, learned that (1)

Backpage, even after the attempted ban by the credit card companies, was still able to use credit

cards to process payments for services provided through Backpage.com; and (2) Backpage was

sanitizing its ads such that it was an information content provider, and not afforded protections

by the Communications Decency Act.   Even with such knowledge, they performed no

investigation into the same, and failed to inform the Court of evidence discovered.   Such

"ostrichism" is shocking and sanctionable.

## IV.    BACKPAGE'S COUNSEL SHOULD BE SANCTIONED UNDER 28 U.S.C. § 1927

       Sanctions under § 1927 should be awarded when counsel acts in an objectively

unreasonable and vexatious manner.  *Grochocinski v. Mayer Brown Rowe & Maw LLP*, 452 B.R.

676, 685 (N.D. Ill. 2011), *aff'd*, 719 F.3d 785 (7th Cir. 2013).  "Objective bad faith does not

require a finding of malice or ill will; reckless indifference to the law will qualify. If a lawyer

pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to

be unsound, the conduct is objectively unreasonable and vexatious." *Id.* When determining whether an attorney's actions were objectively reasonable, the court "may infer intent from a total lack of factual or legal basis for a suit." *Id. See also Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184–85 (7th Cir.1992) (counsel sanctioned under § 1927 when "counsel acted recklessly, counsel raised baseless claims despite notice of the frivolous nature of these claims, or counsel otherwise showed indifference to statutes, rules, or court orders").

Now that the criminal indictment and guilty pleas from Backpage and Carl Ferrer have come to light, it is clear that almost every paper filed and proceeding conducted was tainted by false representations, omissions and outright lies. It is obvious that counsel knew or should have known that Backpage was engaged in a criminal conspiracy, and yet its attorneys continued to make false assertions and fight all attempts by the Sheriff to uncover the truth. By repeatedly filing false declarations and motions intended to thwart attempts to reveal the illegitimacy of their client's business, Backpage's counsel have shown utter disrespect for the judicial process and the rule of law. Similar actions have resulted in the imposition of harsh sanctions against the attorneys. *See Kapco Mfg. Co., Inc. v. C & O Enterprises, Inc.*, 886 F.2d 1485, 1490 (7th Cir. 1989) (imposing sanctions against attorney for the cost incurred by the defendants in defending the litigation where the actions of the plaintiff's attorney "evidenced a disregard for an orderly and truthful resolution of the dispute"). Here, the Court needs to simply look at the indictment and plea filed in the criminal case and the misrepresentations and deceit on the Court that Backpage's attorneys have engaged in throughout the proceedings becomes clear.

Considering Backpage's admission in the plea agreement that it fraudulently implemented methods of continuing to receive payment after credit card companies ceased doing business with them, it appears the damages initially claimed in this case were non-existent. "An

20

award of sanctions is proper if the attorney 'has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice or where a claim is without a plausible legal or factual basis and lacking in justification." *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir.2014) (*quoting Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988)).  Similarly, Backpage's claim that it did not sanitize or moderate ads to remove the appearance of adult and child prostitution is equally sanctionable as there has been ample evidence in other courts to prove otherwise, and Backpage's attorneys were part of these proceedings too.

Even if counsel for Backpage try to claim ignorance as to the false nature of the claims when they were initially filed, the Seventh Circuit has interpreted 28 U.S.C. § 1927 as the appropriate source of authority "to impose a continuing duty upon attorneys to dismiss claims that are no longer viable." *Intellect Wireless, Inc. v. Sharp Corp*., 87 F. Supp. 3d 817, 848–49 (N.D. Ill. 2015).  Its attorneys also cannot claim that they could not act because of their duty to Backpage to keep confidential Backpage's illegal conduct.  *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063 (7th Cir. 2000) (concluding that the district court did not abuse its discretion in sanctioning an attorney for providing false information and failing to disclose relevant information when awarding attorneys' fees and costs incurred as a result of bad conduct, in which the Court cited to a comment to Rule of Professional Conduct 3.3 which states the "duty to protect client confidentiality does not come before the duty to be honest with the court").

There is too much evidence of illegality for counsel not to have been cognizant of the false pleadings and deceit.  The Sheriff requests, if not already sufficient by this written motion and attached evidence, limited discovery to prove that Backpage's counsel knew the

pleadings, discovery responses, filings and statements in open Court were false when made, followed by an evidentiary hearing, supplemental briefing and an award to promote justice.

WHEREFORE, for the foregoing reasons, the Sheriff requests that this Court enter an order:

1.  permitting limited discovery;

2.  holding an evidentiary hearing on sanctions;

3.  permitting supplemental briefing on the appropriateness and amount of sanctions; and

4.  for any other relief the Court deems appropriate.

Respectfully submitted,

THOMAS J. DART,
SHERIFF OF COOK COUNTY, ILLINOIS

By: Paul J. Kozacky
One of his attorneys

Paul J. Kozacky
Alastar S. McGrath
Jerome R. Weitzel
KOZACKY WEITZEL MCGRATH, P.C.
55 West Monroe Street, 24th Floor
Chicago, Illinois 60603
(312) 696-0900

# **Exhibit D**

1                    UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3                   _____

4

5   In Re Grand Jury 16-4,         ) Phoenix, Arizona
                              )

6                            ) February 22, 2017
   _____)

7

8

9

10

11        BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

12          REPORTER'S TRANSCRIPT OF PROCEEDINGS

13  Motion to Compel and Cross-Motion to Quash Grand Jury Subpoena

14

15                        SEALED

16

17

18

19

20

21  Official Court Reporter:
    Patricia Lyons, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Ste. 312
    401 West Washington Street, SPC 41
23  Phoenix, Arizona  85003-2150
    (602) 322-7257
24

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared with Computer-Aided Transcription

```
14:56:11   1   Western District of Washington is instructive and I recommend;
           2   the Court's attention to that --
           3          THE COURT:  I've read both of Judge Jones' orders.
           4          MR. GRANT:  Thank you.
14:56:21   5          But -- and I say that because what he did was he
           6   looked very closely at the actual request the government was
           7   making.  He said I'm not going to redraft your subpoenas for
           8   you, but you can't do this; this is too broad.  There may be
           9   some permissible request, there may not be, but come back to
14:56:43  10   me with something else.  That was the first of the subpoenas
          11   he eliminated.
          12          Then afterward, when the government did come back
          13   with further subpoenas and had no better connection for their
          14   cause of their investigation, he said, in effect, enough's
14:57:00  15   enough.
          16          So I think his sort of measured approach as to how to
          17   address the subpoenas and to recognize the real flaw was this
          18   vast overbreadth of the subpoena in the first place, that it
          19   recommends itself and Rule 17 suggests that is exactly the way
14:57:19  20   the analysis should go.
          21          Are there other questions?
          22          THE COURT:  Yeah.  Hold on just a minute.
          23          MR. GRANT:  Sure.
          24          THE COURT:  If a website operator republishes an
14:58:05  25   advertisement knowing, completely knowing and understanding
```

14:58:09  1   that the advertisement is for underage prostitution, meeting

2   the scienter requirement that was addressed in the briefing,

3   is it Backpage's position that that -- either that that is not

4   a crime or, if it could be characterized as a crime, it can't

14:58:34  5   be prosecuted because it's committed in a First Amendment

6   context?

7       MR. GRANT:  To take the Court's question, I'm

8   assuming they have knowledge not simply because somebody

9   submitted an ad, but they know something?

14:58:47  10      THE COURT:  Yeah, they know something more --

11      MR. GRANT:  Actual mens rea, actual knowledge?

12      THE COURT:  Right.  That's my hypothetical.

13      MR. GRANT:  So the situation of the hypothetical is

14   if there is actual knowledge, say through participation in a

14:58:58  15   venture, you're conspiring with somebody, you know they posted

16   an ad, you know the person involved is underaged, that's a

17   prosecutable crime, Your Honor.

18      THE COURT:  Let's assume, then, hypothetically, that

19   the government has reason to believe that a website operator

14:59:16  20   is doing that.  Is knowingly engaging in illegal activity by

21   publishing these advertisements, and let's say that the

22   government serves a grand jury subpoena on the website

23   operator to obtain information from the operator as to how the

24   ads are received and processed and revised and what

14:59:45  25   communications occur with the advertisers to try to figure out

# **Exhibit E**

# Backpage Advertisements and the Erotic Review



# EXAMPLE #1 – HOW IT WORKS

**backpage.com**

backpage.com > las vegas adult entertainment > las vegas escorts

Post an Ad

las vegas, nv, free classifieds

## One Of A Kind*34C-23-38 Caramel Vixen~25

posted July 29, 2010  08:47 PM

inappropriate content    wrong category    over posted

**Reply:** click here

*I'm like that exquisite, luxurious getaway, with never forgetting memories well after the retreat.*
*Make it a priority to call on ME!*
*Veronica (503) 891-1565*

**Poster's age:** 25

• **Location:** Outcalls Preferred
• **Post ID:** 3117490

Email this ad to a friend



Enlarge Picture



Enlarge Picture



Enlarge Picture



New Reviews    Search Reviews    Chat with a Provider    Search ▾    Top 100 ▾    TER Plug-In    Submit a Review

Home    Reviews    Mail    Discussion Boards    Site Reviews    Chat

**Veronica White's Profile**
TER ID: 144149

ᛤ ONLINE NOW

Send Private Mail To Provider    Add To Favorites    Report A Problem    Link To This Review

↑                    **Same name**

## Erotic Review for Backpage Ad

↑ **Same Number**

### general information

| | |
|---|---|
| ad website | http://la.backpage.com/Fem... |
| personal website | http://mswhite.cuties-lasvegas.com |
| agency name | Unknown |
| agency | Independent |
| city | Orange County |
| phone 1 | (503) 691-1565 |
| phone 2 | None |
| incall/outcall | incall/outcall |
| services delivered as promised | Yes |
| on time | Yes |
| porn star | No |

| | |
|---|---|
| service | Escort/Massage |
| other city serviced | Los Angeles |
| phone type | She picks up |
| phone type | None |
| email | veronica.white-i-9@gmail.com |
| smokes | No |
| availability | daytime/nighttime |

### appearance

| | |
|---|---|
| real photo | Yes |
| build | Thin |
| ethnicity | African american |
| age | 21 - 25 |
| hair color | Black |
| hair type | Straight |
| hair length | Shoulder length |
| piercings | None |
| pussy | Shaved |

| | |
|---|---|
| photo accurate | Yes |
| height | 5'6" - 5'8" |
| Transsexual | No |
| breast size | 34-35 |
| breast cup | B |
| breast implants | No |
| breast appearance | Perky |
| tattoos | A few |

### services offered

| | |
|---|---|
| massage | VIP only |
| sex | VIP only |
| blow job | VIP only |
| touch pussy | VIP only |
| kiss | VIP only |
| two girl action | VIP only |
| more than one guy at a time | VIP only |
| multiple pops allowed | VIP only |

| | |
|---|---|
| massage quality | VIP only |
| s&m | VIP only |
| cum in mouth | VIP only |
| lick pussy | VIP only |
| anal | VIP only |
| will bring second provider | VIP only |
| full, no-rush session | VIP only |
| rimming | VIP only |

**cost of service**

| SERVICE | LENGTH | PRICE |
|---|---|---|
| VIP only | VIP only | VIP only |

Check out our VIP Section section for info on becoming a supporter of The Erotic Review. Being a supporter of this site gains you access to the Explicit part of search form, plus alot of other nice stuff. If you would like to sign-up, click here. If you are already a VIP member please click here.

## Reviews (25)

| DATE | | REVIEWER | ONLINE STATUS | APPEARANCE / PERFORMANCE |
|---|---|---|---|---|
| view | Nov-2010 | thekingpin | | VIP only |
| view | Oct-2010 | | | |
| view | Sep-2010 | | | |
| view | Aug-2010 | | | |
| view | Aug-2010 | | | |
| view | Aug-2010 | | | |
| view | Jun-2010 | | | |
| view | Jun-2010 | | | |
| view | Jun-2010 | | | |
| view | Jun-2010 | | | |

### Review: VERONICA WHITE

**THEKINGPIN'S REVIEW OF VERONICA WHITE**

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| VIP only | VIP only | VIP only | VIP only |

**general details**

| Report A Problem | See Provider's Profile | Send Mail |
|---|---|---|

I haven't written a review in a while, mainly because the providers I've seen have requested me not to. However, Veronica asked me to post a review after our session. Let me tell you, the session was great and Veronica is a sweetheart, so I would do anything she asked. I contacted her initially through email. After a few exchanges and her checking my references, we set up a time for her to come to my hotel near LAX. At the appointed time, I received a knock at my door. When I went to open the door, she was nowhere to be found. Then, she appeared from the side of the hall. Apparently, she tries to be low-key in public, so she didn't have her heels on when she came to the hotel. She quickly made the switch after she knocked on my door. I can appreciate that. Let me say that her pictures don't do her justice because she was drop-dead gorgeous in person. I invited her in and then the fun began. Non-vips, you gotta see her.

**The Juicy Details   *In-depth reviews for VIP Erotic Review Members**

This feature is for VIP Members Only.

# Example #2 - Missing Child

Child went missing from Phoenix, AZ in 2007 and was recovered after nine months in 2008. This was her posting while she was missing – at age 15

This child is 18 years old today, but has reviews on the Erotic Review dating back to 2006 when she was just 14 years old.

The child continues to be advertised on-line as of Dec 2010.

salt lake city, ut free classifieds

http://saltlakecity.backpage.com/FemaleEscorts/melanie_is_ready_t...

Melanie Is Ready To Please you › salt lake city escorts - backpage.com

backpage.com › salt lake city adult entertainment › salt lake city escorts

## Melanie Is Ready To Please you - 20

posted: March 29, 2008, 03:47 PM

report: [inappropriate content] | [spam/category] | [wrong category] | [over posted]

Reply: click here

I CAN GIVE YOU A GREAT EROTIC MASSAGE & TERRIFIC GFE
TER REVIEWED AND I DEFINITELY AIM TO PLEASE!

INCALL-200 PER HOUR
150

NO RESTRICTED CALLS
NO TEXTING
PLEASE BE DISCREET
602-434-3016
MELANIE

Location: MID-VALLEY
Poster's age: 20

Email this ad to a friend



Enlarge Picture



Enlarge Picture

No other company or person should contact this advertiser for solicitation for any product or service.

Account Login | Help · Popular Adult Searches | Terms of Use | Privacy Policy © Copyright 2008

saltlakecity.backpage.com is an interactive computer service that enables access by multiple users and should not be treated as the publisher or speaker of any information provided by another information content provider.

http://www.theeroticreview.com/reviews/show.asp?ID=8758&page=9#Review

View   Favorites   Tools   Help

The Erotic Review Melanie Sweets from Phoenix | Pho...

Home | Reviews | Mail | Discussion Boards | Site Reviews | Chat

**Melanie Sweets's Profile**

Send Private Mail To Provider | Add To Favorites | Report A Problem | Link To This Review

# Erotic Review for Backpage and other Advertisements

**Same Number**

**Same name**

## general information

| | |
|---|---|
| ad website | |
| personal website | Unknown |
| agency website | |
| agency name | Independent |
| agency | Independent |
| city | Phoenix |
| phone 1 | |
| phone 2 | |
| incall/outcall | Incall/Outcall |
| services delivered as promised | Yes |
| on time | Yes |
| porn star | No |

## appearance

| | |
|---|---|
| real photo | Yes |
| build | Baby Fat |
| ethnicity | White |
| age | 18-25 |
| hair color | Blond |
| hair type | Some Curls |
| hair length | Shoulder length |
| piercings | None |
| pussy | Shaved |

| | |
|---|---|
| photo accurate | Yes |
| height | 5'0"-5'5" |
| Transsexual | No |
| breast size | 36-37 |
| breast cup | D |
| breast implants | No |
| breast appearance | Perky |
| tattoos | None |

## services offered

| | |
|---|---|
| massage | |
| sex | |
| blow job | |
| touch pussy | |
| kiss | |
| two girl action | |
| more than one guy at a time | |
| multiple pops allowed | |

| | |
|---|---|
| message quality | |
| S&m | |
| cum in mouth | |
| lick pussy | |
| anal | |
| will bring second provider | |
| full, no-rush session | |
| rimming | |

| | |
|---|---|
| service | Escort, Massage, S&m |
| other city serviced | New England |
| phone type | She picks up |
| phone type | She picks up |
| phone type | She picks up |
| email | |
| smokes | |
| availability | Full-time |

The E Review

**Home**  **Reviews**  **Mail**  **Discussion Boards**  **Chat with a Provider**  **Search ▼**  **Top 100 ▼**  **TER Plug-In**  **Chat**

New Reviews   Search Reviews   Chat with a Provider   Search ▼   Top 100 ▼   TER Plug-In   Submit a Review

**Review: MELAINE**

Report A Problem | See Provider's Profile | Send Mail

**JOHNDOE007'S REVIEW OF MELAINE**

**general details**

| | | | |
|---|---|---|---|
| **appearance** | **performance** | **attitude** | **atmosphere** |
| VIP only | VIP only | VIP only | VIP only |

Many people on CL have been expressing a desire to see Melanie, but have been reluctant since no hobbiest has posted a review yet in any forum. I took the plunge and gave Melanie a call since I was craving some attention from a cute young thing. Melanie was easy to reach on the phone and was quite pleasant. I asked if she was a GFE provider and she stated she was. Set an appointment with her and used the standard two call system. Called again when I was approaching the incall location and she provided specific directions and room number at the motel.

She was waiting at the door of her room when I pulled up in my car. She looked even a bit better than her pictures. Took care of business, and I was told to get comfortable. Melanie jumped out of her clothes and asked me what I like. Things steadily went downhill from there....

**The Juicy Details**

This feature is for VIP Members Only

# A "hobbyist's" review of the child in 2006 - at age 14

# Example #3- confirmed victim of child trafficking

Child has advertisements going back to at least age 17

**backpage.com**

backpage.com > north bay > adult entertainment > north bay > escorts

Post an Ad

northbay free classifieds by

inappropriate content | wrong category | over posted

## l/SE Capreece Starling|real 34 Ds! NorthBay Outcalls! - 19

Posted October 2 2016 06:57 A.M.

Reply click here

- Incalls & Outcalls.. !~* Hey guys,
This is Capreece.
Hopefully can become Much More than your average encounter. Being that I'm only 19. I have A LOT of curious energy. So combining my
curiosity with my New found Maturity, you are sure to have a very unique experience. Very Laidback to enjoy yourself and Take a bit more
Always speak louder than words.. So I would probably work better if I could show you, rather than tell you. So give me a call and we'll have a
good time.... I promise. See ya!.

Please No Blocked Calls and No txt Messages .
P.S. If you want to know a little more about me see my awesome reviews on TER (search user ID 139538)...! ←

~Capreece~* (707) 536-7441

Donation exchanged for legal adult personal services such as modeling, escorting or massages are simply for time, companionship, and
related stated service. Anything else that may or may not occur is a matter of personal choice and personal preferences between two or more
consenting adults of legal age and is not contracted for, nor is it requested to be contracted for in any manner. This is NOT an offer of or for
prostitution. Fees charged are for the time spent only. I do reserve the right to decline appointments and individuals as I deem necessary. By
contacting me either through phone or email you agree to this contract and these terms and hereby acknowledge that you are not part of any
law enforcement agency using this advertisement for entrapment or for arrest.

Poster's age: 19

- Location: Northbay outcalls

- Post ID: 6284409 northbay

- Other ads by this user:
Want to play?! I'm only a call away! Capreece Starling. OUTCALLS. - 19 (OUTCALLS!) adult entertainment escorts
Want to play?! I'm only a call away! Capreece Starling. - 19 (EastBay. incall.) adult entertainment escorts
Want to play?! I'm only a call away! Outcalls!!!!~ - 19 (Outcalls!) adult entertainment escorts
Come and Play on My Last Day! - 19 (San Jose/Santa Clara/Sunnyvale.) adult entertainment escorts
Come and play on my last day! I'm only a call away! MAJOR SPECIALS! - 19 (no-ano) adult entertainment escorts

Email this ad to a friend




Enlarge Picture



Enlarge Picture



Home   Reviews   Mail   Discussion Boards   Chat

New Reviews   Search Reviews   Chat with a Provider   Search ▾   Top 100 ▾   TER Plug-In   Submit a Review

**Review: CAPREECE**

**STROKER312'S REVIEW OF CAPREECE**

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| VIP only | VIP only | VIP only | VIP only |

**general details**

I came across Capreece's ad last night. I was in the mood for something young and light. She seemed to fit the bill and I saw that she would be in my area the following day. I contacted and she was nice and easy going. Sort of on the phone. Decided to have her give me a call when she got to her incall the following day and go from there. She called the following day, early afternoon and we set up an appointment for later in that day. Got to her incall and called. She came down from her room and met me in the parking lot. Asked me to kiss her on the lips I assume this was to prove I was not LE. Nice ass tits too, she has some very sweet lips. Checked out her body while I followed her into her house and back to her room. She is thick but athletic with beautiful big breasts. Got to room and set out donation. We got comfortable on the bed and...

**The Juicy Details**

This feature is for VIP Members Only.

The johns know that the activity is illegal and occasionally reference law enforcement in their reviews.

This child was identified through the Innocence Lost National Initiative.

# Example #4 – CyberTipline Report


**backpage.com**

washington dc  free classifieds

backpage.com > washington, DC adult entertainment > washington, DC escorts

(report) | inappropriate content | wrong category | over posted

posted  September 1, 2010  01:33 PM

♥ __ S w E e T __ B u S t Y __ ♥ __
P_L_A_t_i_N_u_M__B_l_O_n_D_e__♥ - 20

**Reply: click here**

♥♥Friendly & Fun To Be Around♥_____



(310)
3
0
3 ◄
8
8
3
8

*Alice,*

*I'm sweet, open minded and all my pictures are real!*
*Hello Gentlemen, When I was the last time you were able to*
*just let loose, be worry free, and indulge a bit?*
*Well, right now is your chance!*
*I am absolutely what you have been looking for. Safe,*
*relaxing, and sexy! My sweetness and fun-loving attitude will*
*make your day great. If you're looking for an exceptional*
*experience, LOOK NO FURTHER, I'm here!*
*$140/$240 INCALLS....*
*::A::V::A::I::L::A::B::L::E:::24/7::*
*Go call me now~I always pick up my phone!*

**Poster's age: 20**

• **Location:** Hwy 495+ Alexandria [incalls]/Outcalls]

• **Post ID:** 3657140 washingtondc

**Email this ad to a friend**


Enlarge Picture


Enlarge Picture


Enlarge Picture

Traffickers try to
hide phone numbers
from law
enforcement
searches by using
different ways to
spell out or display
the phone number.

However, the PRICE
of services is not
hidden and is clear
to readers.

# The Johns recognize that they are engaging in sex with a "young" girl

**Alica's Profile**
TER ID: 155328

Add To Favorites     Report A Problem     Link To This Review

**general information**

| | |
|---|---|
| **ad website** | https://washingtondc.backpage.com/FemaleEscorts/a_v_a_i_a_b_l_e_... |
| **personal website** | n/a |
| **agency name** | Unknown |
| **agency** | Independent |
| **city** | Washington D.C. |

other city serviced   None

service   Escort/Massage/S&M

New Reviews     Search Reviews     Chat with a Provider     Search     Top 100     TER Plug-In     Submit a Review

**Review: ALICA**

| | |
|---|---|
| **phone 1** | (310) 303-9836 |
| **phone 2** | None |
| **incall/outcall** | incall/outcall |
| **services delivered as promised** | Yes |
| **on time** | Yes |
| **porn star** | No |

Report A Problem     See Provider's Profile     Send Mail

**appearance**

| | |
|---|---|
| **real photo** | Yes |
| **build** | Average |
| **ethnicity** | White |
| **age** | 18 - 20 |
| **hair color** | Blonde |
| **hair type** | Straight |
| **hair length** | Below sh |
| **piercings** | None |
| **pussy** | Shaved |

**GUITARMAN69'S REVIEW OF ALICA**

| appearance | performance | attitude |
|---|---|---|
| VIP only | VIP only | VIP only |

| | atmosphere |
|---|---|
| | VIP only |

**general details**

I was browsing and saw Alica and decided to give it a shot. I used a call system applied. She was available at a nice hotel. She met me at a side entrance and led me up to the room. She is young and sexy as I expected. I left the donation on the table and we got comfortable.

**services offered**

| | |
|---|---|
| **massage** | VIP only |
| **sex** | VIP only |
| **blow job** | VIP only |
| **touch pussy** | VIP only |
| **kiss** | VIP only |
| **two girl action** | VIP only |
| **more than one guy at a time** | VIP only |
| **multiple pops allowed** | VIP only |

**The Juicy Details**

This feature is for VIP Members Only

| | |
|---|---|
| **will bring second provider** | VIP only |
| **full, no-rush session** | VIP only |
| **rimming** | VIP only |

# Example #5 – CyberTipline Report

Children are routinely moved by their traffickers from city to city to keep them away from familiar surroundings and to avoid detection by law enforcement.



backpage.com

fargo, nd free classifieds

backpage.com > fargo adult entertainment > fargo escorts

report:   inappropriate content   |   wrong category   |   over posted

**-->Layla Marx <--- Sexy Petite Asian Playmate**
Posted: November 18, 2010, 02:47 PM

Reply: click here

heyy fellas!
my name is layla marx nd i am here for yur enjoyment!
beautiful, charming, nd so much fun!
i am here for tha week so come have some fun with me!
it's getting cold out... maybe i can warm yu up?
looking good nd smelling pretty just for yu!
5'1
108lbs
34b
714-788-1860

yu can also check out my reviews on TER, nd other review sites!
hope to hear from yu soon!

serious callers only!
no blocked calls, txts, or emails!
by calling yu are agreeing that yu are not affiliated with any form of
law enforcement!
all donations are for time nd companionship only!

wanna double tha fun?!
ask about my two girl!

• Location: incall 24/7

• Poster's age: 20




Enlarge Picture


Enlarge Picture

## Reviews (4)

### general information

**Layla Marx's Profile**
TER ID: 154486

| | | | | | |
| New Reviews | Search Reviews | Cha | | Home | Reviews |

ad website http://stlouis.backpage.com/FemaleEscorts/exotic-tiny-lili-asia-...
personal website n/a
agency name Unknown
agency Independent
city St. Louis
phone 1 (612) 390-2597

| | DATE | REVIEWER | ONLINE STATUS | APPEARANCE / PERFORMANCE |
|---|---|---|---|---|
| view | Oct-2010 | MusicCityScene | OFFLINE | VIP only |
| view | Sep-2010 | CrazLuvin | OFFLINE | VIP only |
| view | Aug-2010 | atomos319 | OFFLINE | VIP only |
| view | Jul-2010 | lgpaladin | OFFLINE | VIP only |

service Escort/Massage
other city serviced Minnesota
phone type She picks up

Report A Problem    See Provider's Profile    Send Mail

## Review: LAYLA MARX

### CRAZLUVIN'S REVIEW OF LAYLA MARX

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| | | | |

### appearance
VIP only

### general details

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| VIP only | VIP only | VIP only | VIP only |

### services offered

### services delivered

I had been watching this girl for awhile and finally decided to give her a go. Called from my hotel, she picked up right away and was able to see me just about an hour later. She came alone to the room, but her girlfriend drove her to the hotel and apparently stayed in the car. She made one phone call after getting to the room, I guess to say things were cool. She did not kiss but was willing to hug. She was super cute and tiny. The original agreement was for less than I paid her because I decided if she was going to be a bit detached, then I wanted a little something extra. Non-VIP you should know this girl is something special and worth every penny - VIP read on to see just how far this girl will go....

more tha
m
**The Juicy Details**

# Example # 6

## Another CyberTipline Report to NCMEC

## The ads leave little to the imagination...

**backpage.com**

backpage.com > phoenix adult entertainment > phoenix escorts

phoenix, az free classifieds

report: inappropriate content | wrong category | cross posted

## TaStEy CARAMEL honey... uMmm m F33L Me :::

### SqIURt ::: - 20

posted: March 9, 2010, 06:57 PM

Reply: click here

EBONY CARAMEL HONEY AVAILABLE FOR YOUR PLEASURE.

::: & TASTE MY SWEET HONEY UMMMM...:::

HEY MY NAME IS CANDY & IM FEELING REALLY NAUGHTY!
I HAVE A COUPLE OF TOYS BY MY BED & IM READY TO
PLAY... HOW DO YOU WANT TO GIVE IT TO ME???

FAST!...SLOW!...CAN I RIDE YOU??...OR DO YOU WANT IT
FROM THE BACK??...HOWEVER YOU LIKE IT...M & LET ME
SHOW YOU MY SPECIAL TECHNIQUES.

MY HONEY DRIPS...MY BOOTY CLAPS UMM & LET ME
SHOW YOU MY NAUGHTY SIDE!

BOOTY CLAPING!!!

SPECIALS!!!

UMMM I CANT WAIT TO HEAR FROM YOU!

TASTE MY CANDY...48(0)31(8)11(0)7

TER: http://www.theeroticreview.com/reviews
/show.asp?id=148604

Poster's age: 20

• Location: Anywhere you need me.



# ...and the reviews corroborate the illegal activity

New Reviews    Search Reviews    Chat with a Provider    Search    Top 100    TER Plug-In    Submit a Review

## Review: CANDY

Report A Problem    See Provider's Profile    Send Mail

### BIGGEEP'S REVIEW OF CANDY

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| VIP only | VIP only | VIP only | VIP only |

**general details**

Saw her pics and I always wanted a squirter. Typical two call system, you guided me to her rental apartment. She is nice looking, not beautiful but will do. I got the 15 min session, she only squirts for 1/2 hr or hour. Would see again.

**The Juicy Details**

This feature is for VIP Members Only

---

New Reviews    Search Reviews    Chat with a Provider    Search    Top 100    TER Plug-In    Submit a Review

## Review: CANDY

Report A Problem    See Provider's Profile    Send Mail

### FROM 85003'S REVIEW OF CANDY

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| VIP only | VIP only | VIP only | VIP only |

**general details**

I had seen Candy's ads on BP for while and send her an PM. She replied and sounded like fun. I was getting ready to leave the office on Fridy when I saw her ad on BP that she was having a special so I called her and she was available not to far from me. So I booked a date and stopped by her incall in 30 mins. Non VIPs she's okay for the price but not FS.

**The Juicy Details**

This feature is for VIP Members Only

# Example #7

## Can certain keywords suggest a child victim?

## "fresh" "young" "new in town"





**backpage.com**

phoenix, az free classifieds

backpage.com > phoenix adult entertainment > phoenix escorts

report:   inappropriate content   |   wrong category   |   over posted

*-*-* YOUNG SOUTHERN THING !!! ::: New To Phoenix :
: : Sweet & Sexy : : Call Me Anytime !!! *-*-* - 20

posted: August 11, 2010, 06:42 PM



Enlarge Picture



Enlarge Picture

Hi:

I'm PARIS !!! I am fresh from Alabama and here to please you
with my Southern Charm. I am very sweet, sexy, and
seductive!!!

I have long blonde hair, deep green eyes, and a very petite and
toned body!!

So, call me now or anytime you are ready – Paris:
☎ 928-310-7213

I am your fantasy dream girl, your perfect playmate! Experience
the ultimate pleasure with me!

I only cater to upscale men who know what they want, are
very generous, well mannered, and possess impeccable
hygiene.

I will make all of your fantasies come true! Think of me as a
memorable break in the middle of a tiring day or a sweet
retreat any time of day.

I am very open minded and have an uninhibited wild side!

I am a 100% natural. I have WILD gorgeous hair, soft tanned skin,
seductive green bedroom eyes, and a petite tight toned body. I
am very bright, funny, sensual, honest, discreet, and just love the
company of men.

New Reviews   Search Reviews   Chat with a Provider   Search   Top 100   TER Plug-In   Submit a Review

**Jaymie / Paris's Profile**
TER ID: 158771

Add To Favorites      Report A Problem      Link To This Review

"*...a new provider who still needs to learn a few things about the business...*"

This review lends credibility to the fact that the girl is young and

## general information

| | |
|---|---|
| ad website | http://eroticservices.cityvibe.com/escorts.php?dc=av&dp=194823... |
| personal website | http://phoenix.backpage.com/FemaleEscorts/10564293 |

### agency information

| | |
|---|---|
| agency name | unknown |
| agency | independent |
| city | Atlanta |
| phone 1 | (678) 565-8346 |
| phone 2 | (928) 310-7213 |

service      Escort
other city serviced   None
phone type   She picks up
phone type   Voice mail

incall/outcall
services delivered as promised : **JAYMIE**

on time
pom sta

## appearance

re

**MASONDIXON  JAYMIE**

## services offered

| | |
|---|---|
| sex | VIP only |
| blow job | VIP only |
| touch pussy | VIP only |
| kiss | VIP only |
| two girl action | VIP only |
| more than one guy at a time | VIP only |
| multiple pops allowed | VIP only |

| | |
|---|---|
| skin | VIP only |
| cum in mouth | VIP only |
| lick pussy | VIP only |
| anal | VIP only |
| will bring second provider | VIP only |
| full, no-rush session | VIP only |
| rimming | VIP only |

Paris and I had a hard time hooking up due to some phone problems she was having. I had initially scheduled an appointment with her, but when I showed up to the motel, she didn't answer. We finally reconnected a bit later, and she explained the phone problems, so we rescheduled for later that day. When I arrived, she gave me her room number, and I went up. I was very pleased when she opened the door, as she was definitely the girl in the photos, cute, petite, and with a great ... incredible tight little **[obscured]**. She gave me a nice hug, and I left the donation on the table, which she promptly scooped up, counted, and put aw...

Paris is a fairly new provider, who still needs to learn a few things about the business, but, on the whole, a very sweet girl with

**[obscured]** body, and I would see her again.

# How Do we know that children are being advertised on Backpage?

- Since 2006 NCMEC has identified 17 missing children in advertisements on Backpage

- 10 of those children were identified in 2010 alone .

- The children range in age from 13-17 years old

# Example #8 - Confirmed Missing Child Victim

Child reported missing multiple times, starting at age 12. She was last recovered during Operation Cross Country in Nov 2010.

In this ad she is 16 years old. Traffickers will often place the child in sexual poses while hiding the face child to conceal identity and youth

**ONGOING INVESTIGATION

---

**backpage.com**

baton rouge, la free classifieds

backpage.com > baton rouge adult entertainment > baton rouge escorts

**ExTrEmLY hOT & WILD... EXoTiC BARbiE ! - 18**

posted October 7, 2010, 12:30 PM

report:

**Reply: click here**

I can assure you that our time spent together will never be rushed, of the highest quality, and a time you will always remember.
After BEING with me all of your EXPIRENCES will have been satisfied. Let me fullfill your ULTIMATE FANTASY.

207 458 4130

50 Roses 15 Minute Incall
100 Roses 30 Minute incall
150 Roses 60 Minute Incall
I WILL NOT TALK ABOUT DONATIONS OVER THE PHONE !?

Poster's age: 18

• Location: Airline ( l12 )

• Post ID: 4045874



Email this ad to a friend

# Example #9 – Confirmed Missing Child Victim

This Child is a repeat runaway and has been reported missing to NCMEC multiple times. Traffickers pray on vulnerable children in state care.

The child was 15 years old at the time of this advertisement.

**backpage.com**

backpage.com > chicago adult entertainment > chicago escorts

chicago, il  free classifieds

NEW!!!!º⁰ **·Exotic·· #1 Choice·**º⁰**** ☆º³₀¢ ☆ A WILD 1 ☆ º³₀¢ º³₀¢º°**** · 21

posted  June 16, 201C  04:00 PM

report:  inappropriate content          wrong category          save posted

Reply: click here

Beautiful toned figure and an amazing personality that will keep you entertained and feeling warm and relaxed for hours...

G..F...E




100 HH
160 HR
PARIS
203 302 8122

Enlarge Picture

Do not post obscene images, e.g. explicit genitalia, sex acts, erect penises, etc.

Do not post content which advertises an illegal service.

Postings not complying with the terms of use are subject to removal.

# Example #10

north carolina free classii

**backpage.com**

backpage.com > north carolina adult entertainment > north carolina escorts

report:   inappropriate content   |   wrong category   |   over posted

## 100 QUICKiE *~* ☆ ★ B*E*A*U* T*I*F*U*L

posted: June 21, 2010, 09:46 AM

Looking for a satisfying time gentlemen?
Meet the beautiful BROOKLYN......... I am an open-minded,
easygoing, sexy, and seductive Goddess ready for
companionship!
Take the perfect break out of a long and busy week you won't
regret!  *_-Don't you think its time to treat yourself?
*  - *100% Real Photos* - *
LET ME FULLFILL YOUR FANTASY!!!!!!!! Dont miss out on my
HOUR special. TONIGHT!!! ;) :) :)
CALL NOW!!!! ****310-595-4061****

- • Location: Raleigh / Durham

- • Post ID: 3983657

Email this ad to a friend



New Reviews    Search Reviews    Chat with a Provider    Search    Top 100    TER Plug-In    Submit a Review

# Review: BROOKLYN

Report A Problem    See Provider's Profile    Send Mail

## FOURLITTLE'S REVIEW OF BROOKLYN

### general details

| appearance | performance | attitude | atmosphere |
|---|---|---|---|
| VIP only | VIP only | VIP only | VIP only |

It was tough to get her on the phone initially, but finally around 4:00 she picked-up. She initially seemed like I woke her up, but when I said I wanted to see her that night, she said absolutely. She said she would call me 30 minutes before to make sure I was still coming since she was sharing a room with someone and needed to know in case I didn't show up so something else could be scheduled. At 30 minutes before, she did not call, so I waited until about 15 minutes before and called her. Again, she seemed out of it, like I woke her up again. I asked if she wanted to do another time and she said absolutely not. She said to give her 20 minutes and call back to get the room number. Finally, I called back, got the room number and was on my way.

### The Juicy Details

This feature is for VIP Members Only

This reviewers comments suggest the girl was "out of it". Pimps often use drugs to control the girls or to keep them working. Drug abuse and/or exhaustion are common for victims of trafficking.

# Exhibit F

# Elms Web Services, Inc.

# Invoice

**David Elms**

**Bill To:**

Backpage.com, LLC
1201 E Jefferson
Phoenix, AZ 85034

**Invoice No:** 1313

**Date:** Jan 1, 2008

**Referrals that convert!**

My team and I specialize in placing banner ads and one way in bound links with high conversions and SEO.

| Description | Estimated new referrals per mo | Cost per visit | Amount |
|---|---|---|---|
| Feb Banner ad placement | 450,000 | .00888 | $4,000 |

| | |
|---|---|
| Subtotal | $4,000 |
| Sales Tax | na |
| Total | $4,000 |

**Remit Payment to:**

Elms Web Services, Inc.

5228 W 124th St
Hawthorne, CA 90250
T 310.491.1451 F 310.491.1452
Email: david@elmsweb.com

# Exhibit G

# "TheEroticReview.com" Founder David Elms Arrested in Phoenix, Suspected of Trying to Hire Killer

Ray Stern | February 17, 2009 | 9:49am

- 
- 
- 
- 
- 

ᴀᴀ

The founder of theeroticreview.com, a Web site the *New York Times* calls the Amazon.com of prostitution, has been arrested in Phoenix on suspicion of trying to kill one person and seriously injure another, selling drugs and misconduct with weapons.

David Elms, 38, was booked into the Maricopa County jail early this morning after he arrived in Phoenix from California, following information about him that police gleaned from the "Desert Divas" escort service investigation. Here's the straight poop from Sergeant Andy Hill's news release:

*Suspect: Elms, David; A/M; DOB 4/09/71; booked into Maricopa County Jail for one count of conspiracy to commit murder; one count of conspiracy to commit aggravated assault; one count of conspiracy to possess narcotic drugs for sale; one count of conspiracy to commit misconduct involving weapons; one count of possession of drug paraphernalia*

Continue Reading

*Victim 1: 32 year old female*

*Victim 2: 62 year old male*

*Phoenix Police Department investigators recently received information that Mr. Elms wanted to hire someone to kill the listed female victim. Investigators met with Mr. Elms after he arrived in Phoenix from California just after midnight on February 15, 2009.*

*Mr. Elms was arrested about 30 minutes later after probable cause was developed to arrest him for the listed charges. Investigators state that Mr. Elms contracted to have the woman killed and the listed adult male victim seriously injured. Mr. Elms was arrested without incident by officers from the Phoenix Police Department's Special Assignments Unit.*

*Some of you have asked if the information received is related to the recent "Desert Divas" case. Investigators said it is related because information in this conspiracy to commit murder case came from a suspect in the "Desert Divas" case. Investigators are looking into whether there is any other connection.*

*This investigation is continuing.*

The above-referenced *New York Times* story says Elm's popular Web site rates high-end escort services and makes it easier for customers to hook up with prostitutes in the same area. Elm has supposedly made a comfortable living from the site -- and there are plenty of perqs.

From the article:

*"He is the most influential man in the prostitution business in America," said Jason Itzler, the former head of NY Confidential, an escort ring. Mr. Itzler was released from prison last year after serving 30 months for the attempted promotion of prostitution.*

*...*

*Mr. Elms usually does not say much publicly about his Web site, asserting that reporters twist his words. But in an interview with MSNBC.com in 2006, Mr. Elms said that he started The Erotic Review in 1999 because he wanted to empower the customers of prostitutes.*

*"I was getting ripped off," he said. "There was no way to hold people accountable for their actions."*

**If you like this story, consider signing up for our email newsletters.**
**SHOW ME HOW**
X


**Newsletters**

- ☑ Film
- ☑ Promotions
- ☑ Events
- ☐ Daily ☑ Weekly

All-access pass to the top stories, events and offers around town.



- <span style="color:maroon">No Thanks</span>
- <span style="color:maroon">Sign Up</span>

And here's a sample from his site:

Clicking on one of the "providers" gets you contact and personal info. As in, *really* personal:

Elms is in the middle of a federal <span style="color:maroon">copyright infringement lawsuit</span> and was fighting drug and weapons charges back in June (we're not sure how that turned out). The

latest charges are his most serious yet -- and he'll be stuck with the "plead to the lead" policy of Maricopa County Attorney Andrew Thomas.

Will Elms' next Internet venture have something to do with prison sex?

**Ray Stern** has worked as a newspaper reporter in Arizona for more than two decades. He's won many awards for his reporting, including the Arizona Press Club's Don Bolles Award for Investigative Journalism.

# **Exhibit H**

**To:**      Scott Spear[scott.spear@villagevoicemedia.com]; Carl Ferrer[carl.ferrer@backpage.com]
**From:**    Jim Larkin
**Sent:**    Mon 5/11/2009 7:27:57 PM
**Subject:** johns accused of favorably rating escorts on Erotic Review in exchange for discounts

Authorities: 43 more indicted in Desert Divas prostitution bust

Arizona Republic, May 9, 2009


Authorities on Friday announced that 43 more people have been indicted
on charges of having roles in a prostitution syndicate that earned an
estimated $18 million over six years.

Those arrested as part of the latest phase of the Desert Divas
prostitution scandal included four "VIP customers" accused of
favorably rating escorts online in exchange for reduced rates for sex.

Others answered phones or photographed the women for advertisements,
according to investigators.

Most of those included in the April 23 indictment are accused of being
prostitutes, including Jillian Lybarger, a Maricopa County sheriff's
detention officer.

Friday's announcement came less than one month after Desert Divas
founder Paul Nichta and others pleaded guilty to a variety of felony
charges.

Maricopa County Attorney Andrew Thomas and Phoenix detectives said the
latest waves of arrests stretched from Phoenix to Colorado, Florida
and Washington.

More than 20 people have yet to be arrested as part of the latest
indictment, officials said.

Phoenix police Lt. John Collins said the VIP customers indicted this
spring rated Desert Divas escorts on the California-based Erotic
Review prostitution Web site - an action that authorities said they
would prosecute as a felony for supporting a criminal enterprise.


Reach the reporter at michael.ferraresi@arizonarepublic.com.


Content-Type: text/plain; charset=US-ASCII
Content-Transfer-Encoding: 7bit
Content-Disposition: inline

Authorities: 43 more indicted in Desert Divas prostitution bust

Arizona Republic, May 9, 2009

Authorities on Friday announced that 43 more people have been indicted on charges of having roles in a prostitution syndicate that earned an estimated $18 million over six years.

Those arrested as part of the latest phase of the Desert Divas prostitution scandal included four "VIP customers" accused of favorably rating escorts online in exchange for reduced rates for sex.

Others answered phones or photographed the women for advertisements, according to investigators.

Most of those included in the April 23 indictment are accused of being prostitutes, including Jillian Lybarger, a Maricopa County sheriff's detention officer.

Friday's announcement came less than one month after Desert Divas founder Paul Nichta and others pleaded guilty to a variety of felony charges.

Maricopa County Attorney Andrew Thomas and Phoenix detectives said the latest waves of arrests stretched from Phoenix to Colorado, Florida and Washington.

More than 20 people have yet to be arrested as part of the latest indictment, officials said.

Phoenix police Lt. John Collins said the VIP customers indicted this spring rated Desert Divas escorts on the California-based Erotic Review prostitution Web site - an action that authorities said they would prosecute as a felony for supporting a criminal enterprise.

Reach the reporter at michael.ferraresi@arizonarepublic.com.

# **Exhibit I**

| From: | Andrew Padilla ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on behalf of Andrew Padilla |
|---|---|
| Sent: | Friday, February 18, 2011 10:16 PM |
| To: | Adam ▮ Allen ▮ Amanda ▮ Andrew ▮ Angel ▮ Angela ▮ Beverlie ▮ Billie ▮ Brian ▮ Bryan ▮ Cathleen ▮ Cody ▮ Dawn ▮ Devyn ▮ Donavon ▮ Ian ▮ James ▮ Jana ▮ Jason ▮ Jeff ▮ Jennifer ▮ Jessica ▮ John ▮ Justin ▮ Kolter ▮ LaTamara ▮ Levi ▮ Maria ▮ Martina ▮ Matt ▮ Michael ▮ Michael ▮ Misty ▮ Monica ▮ Nathan ▮ Nick ▮ Ray ▮ Roger ▮ Sara ▮ Sean ▮ Stefano ▮ Tara ▮ Tranica ▮ Zeke ▮ |
| Cc: | Joye ▮ |
| Subject: | another term bites the dust |
| Attachments: | good.jpg; bad.jpg; bad (1).jpg; bad (2).jpg; bad (3).jpg |

All:

We've been filtering out the terms "TER" and "The Erotic Review" along with links to theeroticreview.com since January of this year but our internet safety experts have suggested we take a more aggressive approach.

Effective immediately, any variation of, or reference to, TER is banned.  If you find it in an ad, remove the phrase and update the ad but do not lock the ad from editing for this violation alone.  If the review ID number is attached to the reference (TER #8675309), remove the ID number along with the TER reference.

If you find a string of numbers without a direct reference to TER, it's allowed.
Examples:

"#123456"

"Well Reviewed #666666"

"Google my reviews #12011201"

An easy way to weed out a good chunk of these references is to do a search for "TER" on the city page.  You'll get some false positives but it should point you in the right direction.  Non-adult spammers will sometimes use hidden keywords like "block bus ter video" and the search will see the tail-end of "bus ter".  To avoid this, you can start your search after you've navigated to the Adult section of the city.

I'm attaching 4 example screenshots of what is not allowed (circled in red) and 1 example screenshot of what is okay (circled in green).

If you have any questions, please ask me or Joye.  Thanks.

Andrew Padilla
Operations Manager
Backpage.com | Village Voice Media
▮▮▮▮▮▮▮▮▮

App.000260

CONFIDENTIAL

BP-PSI-029717

# **Exhibit J**

| | |
|---|---|
| **From:** | Ernie Allen |
| **To:** | Brad Myles |
| **Subject:** | FW: |
| **Date:** | Tuesday, March 01, 2011 4:51:00 PM |

This is the first e-mail.

-----Original Message-----
From: Ernie Allen
Sent: Tuesday, March 01, 2011 12:07 PM
To: Anderson, Harold
Cc: Anderson, Kayrita
Subject: RE:

Harold, Kayrita:

I promised a report after my meeting this morning with Backpage executives.  Kayrita, I am including you in this update because you were brought up during the meeting, and not in a positive way.  I am going to give you a full unvarnished report, so we need to treat it as confidential.  Most of these things, I cannot say to others.  They were honest and candid, and so was I.  I can tame it down a little, but felt that you should hear it all.

To say that the meeting did not go well is an understatement.  I had a very important 10 am phone call and had told them that I only had one hour to give them.  However, at 10 am we were screaming at each other and I simply could not leave.  So, we did battle for another half hour.

The attendees were Jim Larkin, Chairman and CEO of Village Voice Media; Scott Spear, Executive Vice President; Mike Lacey, co-owner (with Larkin) and Editor-in-Chief (I googled him and in several reports, he refers to himself as "asshole in charge"), which speaks volumes about him; Carl Ferrer, Vice President of Sales & Marketing and pointman for Backpage; plus Hemu and his staffperson, Simrin Hooper.

Carl did a presentation on all they have done, and the steps they are taking.  Larkin said that they were changing all of their ads to conform with a "print standard."  Ferrer said that they have implemented two levels of moderation and now have 90 people reviewing and moderating ads.  Larkin said that their primary source of guidance is "user moderation," and that they are getting lots of reports from their users.

They have banned hundreds of terms and are continually monitoring to keep illegal content from appearing.  They talked about the problems they are having with "phishing," people hacking into their site and stealing their customers identity, financial information, etc.

I responded with several basic points:

(1) That we appreciated the steps they were taking, but they aren't working.  I mentioned Erotic Review, and said that all you have to do is to look at the Erotic Review site to determine that the ads they are running are clearly prostitution ads involving both kids and adults.  (Larkin said, "we have nothing to do with Erotic Review.")  I asked, "have you registered with Erotic Review so you can read the ads about the woman and children being advertised for sex on your site?"  They haven't.

(2) I pointed out that while they had made 158 reports to NCMEC, virtually all of them came as a result of user-generated complaints.  I said that if 90% of the reports came from your users, that means that Backpage's 90 "screeners" and "moderators" and their two-tiered review system effectively had only found 9 or 10 ads that they deemed worthy of reporting.  While they quibbled a little about the numbers, Larkin said that "user-generated" reports are the best way to identify inappropriate content and activity.  Ferrer committed that he would enhance their review system and generate more proactive reports.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

# Exhibit K

**From:** Wick, Amanda (CRM) <Amanda.Wick@CRM.USDOJ.GOV>
**Sent:** Wednesday, November 7, 2018 6:17 PM
**To:** mlp@pd-law.com
**Cc:** Reid, Patrick (CRM) <Patrick.Reid@CRM.USDOJ.GOV>
**Subject:** RE: Andrew Padilla: seizure warrants issued for IOLTA funds to defend Mr. Padilla / request for seizure affidavit

Mike,

Kevin forwarded me your email so that I could address your concerns. First, it might help for me to clarify a few things as some of the information in your email isn't quite accurate. We actually obtained two seizure warrants for funds contained within two different IOLTA accounts, both held in the name of Piccarreta Davis Keenan Fidel PC. One (attached hereto as "36A 37 38 40 JPMC") is for $10,000 from a JP Morgan Chase bank account ending in -9285. The second (attached hereto as "36B Grand Point") is for $740,000 from a Grand Point bank account ending in -3985.

I'm not sure who the "they" is that you reference in your email below, but my supervisor at DOJ has told any counsel that inquired that this case is being prosecuted out of the District of Arizona and MLARS is assisting on asset recovery issues only. As a result, we would have to consult with the prosecutors in Arizona to confirm what the status of the criminal case was, whether discovery had been provided, whether the warrant was under seal and, if not, whether we could provide it upon request. Given that the warrant affidavit would likely be produced at some point during discovery, we didn't think the prosecutors in Arizona would object, but we needed to check with them before sending out the warrant affidavit. I anticipate having an answer on that tomorrow.

Finally, the warrant needs to be executed within 14 days, the deadline for which is Wednesday, November 14th. We give law firms the opportunity to wire funds to the United States, in lieu of serving the warrants on the banks, because we are trying to minimize any disruption the warrant could have on your IOLTA accounts. I'm sure Patrick told you that, often when we serve a seizure warrant on a bank to seize funds from an IOLTA account, the bank freezes the accounts entirely and sometimes more accounts than the ones listed in the warrant. Because of the adverse effects that can cause, we work very hard to coordinate with law firms to effectuate the turnover of the funds with as little impact on the firms as possible. However, some firms do decline to wire funds in lieu, and in that situation, we serve the warrants on the bank, as authorized by the court, prior to the 14th day.

To the extent a law firm has earned fees that have not been moved from the IOLTA to an operating account, we request that substantiating bills (redacted for attorney-client privilege) be submitted to us for due diligence review, and once reviewed, we subtract that amount from the seizure amount, as we are not seeking to seize earned fees.

Should you wish to make a <u>Monsanto</u> claim, we offer every defendant the opportunity to show that they are financially unable to pay for their defense without the funds we are seizing. Because of the timeliness of the warrant, we will be seizing the funds before the 14th, but if you can make a showing that your client has no other funds with which to pay for his defense, we are happy to review those materials and consider releasing some amount back to pay legal fees.

I hope that answers your questions, but if not, please do not hesitate to call me at my direct line below. Thank you for your time and assistance with this matter.

Sincerely,

**Amanda Schlager Wick**
Trial Attorney, Asset Forfeiture & Money Laundering Unit
Money Laundering & Asset Recovery Section (MLARS)
1400 New York Ave. NW, 10th Floor
U.S. Dept. of Justice, Washington, D.C. 20004
(202) 514-2842
(202) 597-0435 (cell)
(202) 514-5522 (fax)

*CONFIDENTIALITY NOTICE*:  This communication with its contents and attachments, if any, may contain confidential, law enforcement sensitive, privileged attorney/client communications or work products, and is not subject to disclosure.  It is solely for the use of the intended recipient(s).  Unauthorized interception, review, use, or disclosure is prohibited.  If you believe that you have received this communication in error, please notify the sender immediately and permanently delete the email, any attachments, and all copies from your computer.