# EXHIBIT 3

PICCARRETA DAVIS KEENAN FIDEL PC
LAWYERS

MICHAEL L. PICCARRETA
JEFFERSON KEENAN
LOUIS S. FIDEL

BARRY M. DAVIS
(1948-2016)

2 EAST CONGRESS STREET, SUITE 1000
TUCSON, ARIZONA 85701
(520) 622-6900
FAX (520) 622-0521
WWW.PD-LAW.COM

June 13, 2018

VIA EMAIL: Kevin.Rapp@usdoj.gov

Kevin Rapp, Esq.
United States Attorney's Office
Two Renaissance Square
40 N. Central Avenue, Ste. 1200
Phoenix, AZ 85004-4408

     Re:    United States v. Lacey, et al.: Letter dated May 18, 2018

Dear Kevin:

     I am writing in response to your letter of May 18, 2018, in which you express your "concerns" about funds wired to my law firm to pay defense costs for Andrew Padilla. As with many matters in this case, we see things differently, and I have a few concerns of my own. My firm has represented Andrew Padilla since early February 2017. We have invested considerable time and effort on the case, we have developed a strong relationship with Mr. Padilla, and we have obtained quite a bit of knowledge about the case and its deficiencies during this time. Mr. Padilla is presumed innocent and is entitled to his Fifth and Sixth Amendment rights to his day in court with counsel of his choice. The government's conduct, even in these discussions, is seriously impacting these rights. Kevin, I do not expect you to agree with my analysis. However, I am glad we can have a professional, civil relationship to discuss all of the potential issues from differing perspectives.

     To begin with, Mr. Padilla and I do not believe that one penny of the assets of Backpage.com, LLC ("Backpage") is tainted[1]. Rather, we agree with the numerous courts that have found, time and time again, that there is no crime here. United States District Court Judge Richard A. Jones was correct five years ago when he noted "the novel vicarious liability theory the Government espouses" and "[t]he court is aware of no entity that has ever faced criminal liability in a case like this one." Order, January 17, 2013. In noting the difficulty of finding "a

---

[1] The discussion set forth here is by no means a complete or comprehensive analysis of the law and the facts in this case. It is just a partial view of these matters supporting our firm belief that the funds wired to my law firm are not subject to seizure or forfeiture.

PICCARRETA DAVIS KEENAN FIDEL PC

viable criminal case," *id.* at 17, Judge Jones made it clear that "[t]he Government's insistence that solicitation for prostitution and other unlawful acts do not merit First Amendment protection ignores the lawful solicitations that Backpage users make, even within the 'adult' category....Whatever unlawful services might be for sale on Backpage.com, the Government does the grand jury no favors by ignoring the lawful 'adult' ads on the site." *Id.* at 19-20.[2]

Of course, the Seventh Circuit Court of Appeals has also specifically recognized Backpage.com as "an avenue of expression of ideas and opinions" protected by the First Amendment, including its "classified ads for 'adult' services." *Backpage.com LLC v. Dart,* 807 F.3d 229, 230-31 (7th Cir. 2015). The court held that the county sheriff was "using the power of his office to threaten legal sanctions against the credit-card companies for facilitating future speech, and by doing so he is violating the First Amendment unless there is *no* constitutionally protected speech in the ads on Backpage's website -- and no one is claiming that." *Id.* at 231. In recognizing the First Amendment's protection for Backpage.com's adult section, the court used as an example the similar protections for print publications featuring such ads. "Even entities that know the information's content do not become liable for the sponsors' deeds. Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity?" *Id.* at 234 [quoting *Doe v. GTE Corp.,* 347 F.3d 655, 659 (7th Cir. 2003)]. *Backpage.com v. Dart* cannot be dismissed as being decided on 47 U.S.C. § 230 grounds, a statute that you believe does not apply to a federal criminal prosecution. The opinion only mentions 47 U.S.C. § 230 briefly twice in passing and was decided on straight-forward First Amendment grounds. I am sure that the government is aware of the numerous other cases reaching the same or similar conclusions. These courts have reached these conclusions despite being fully aware of the authorities you have mentioned, holding that there's no First Amendment protection for "speech integral to criminal conduct." *See, e.g., United States v. Stevens,* 559 U.S. 460, 468 (2010) and *Pittsburgh Press Co. v.*

---

[2] It appears that, rather than confront this issue, the government simply moved the grand jury investigation and continued on in a different district which would involve a different United States District Court Judge.

PICCARRETA DAVIS KEENAN FIDEL PC

*Human Relations Commission*, 413 U.S. 376, 388 (1973).[3] These courts were also no doubt well aware of the Travel Act[4] and money laundering statutes.

I am mentioning the weight of this authority here not to change your mind, but to show exactly why Mr. Padilla and I do not believe that the funds wired to my law firm are tainted in any manner or subject to pretrial seizure or forfeiture. Based on the weight of this authority, Mr. Padilla and I believe that Backpage's revenues were legitimate. Nothing we have seen or heard in the reverse proffer, the Senate Permanent Subcommittee on Investigations Report,[5] or the 61-page speaking indictment has caused us to question those beliefs. Mr. Padilla and I both believe that he was engaged in lawful activity at a lawful business. Backpage had been involved in this activity for over a decade, withstanding all of these challenges to the legality of its operations. Backpage was, in fact, a spin off from the same sort of print ads that ran in the back of the Village Voice *for decades*. I have been unable to discover any state or federal criminal prosecution of a publisher of this type of "adult themed" print ads. There do not appear to be any such cases in which criminal charges were pursued in the state of Arizona. There is one decision discussing "an adult-oriented weekly publication" described as a "tabloid-style newspaper contain[ing] news, editorials, and photographs, but primarily consist[ing] of sexually oriented advertisements for adult bookstores, numerous 'escort' and 'model' services, and the like. Dozens of these ads contain photographs of partially nude and completely nude women posing in a variety of positions" and also contain "'strictly personal' classified ads for persons seeking various sexual encounters with others." *State v. Evenson*, 201 Ariz. 209, 211 (App. 2001). Despite noting that these ads were used by police in prostitution investigations, *id.* at n. 1, there was not even the slightest hint that the publisher could be criminally liable for anything, and there was no question that the publication was constitutionally protected by the First Amendment and Article 2, § 6 of the Arizona

---

[3] The government has also referred to: (a) two federal cases in which defendants (on vastly different facts) accepted guilty pleas and therefore, by definition, did not challenge the government's theory of prosecution meaning that there was no ruling in the government's favor on this issue by those courts; (b) a state supreme court ruling on an issue of federal law that has already been denounced as incorrect as a matter of federal law by a federal court of appeals; and (c) a partial denial of a motion for summary judgment in which one plaintiff was deemed to raise an issue of material fact by incorrectly describing Backpage's conduct. *United States v. Omuro*, N. D. Cal. No. 3:14-cr-336; *United States v. Hurant*, E. D. N. Y. No. 16-cr-45; *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 n. 5 (1st Cir. 2016) [rejecting the analysis set forth in *J.S. v. Village Voice Media Holdings, LLC*, 359 P.3d 714, 718-24 (Wash. 2015)]; *Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL 1542056 (D. Mass. 2018). Thus, the clear weight of authority regarding the legality of Backpage's activities still favors Backpage's position.

[4] *Dart v. Craigslist, Inc.*, 665 F.Supp.2d 961, 963 (N. D. Ill. 2009) [dismissing lawsuit claiming that "Craigslist makes it easier for prostitutes, pimps, and patrons to conduct business" in violation of state laws and the Travel Act].

[5] A key flaw (among many) in the PSI is the fact that it is a political document, not a legal analysis. It is the direct result of political involvement by Congress using snippets of emails, conversations, and unrelated events, while ignoring any exculpatory information. In the end, it is simply an exercise in confirmation bias.

PICCARRETA DAVIS KEENAN FIDEL PC

Constitution. Backpage was simply a spin-off of the type of lawful advertising that had been repeatedly recognized as constitutionally protected for decades.

A consenting adult has the constitutional right to advertise that he or she wants to have sex (including very specific types of sex) with other consenting adults. He or she cannot advertise that he or she wants to do so for money. Conversely, 'models' and 'escorts' have the constitutional right to advertise the services for which they charge money, but they cannot advertise that their services include sex. As with many other constitutionally protected First Amendment activities, protected and unprotected activities are "often separated…only by a dim and uncertain line." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963). Mr. Padilla always firmly believed that Backpage was on the protected side of that line. Because of the dangers of encroaching on constitutionally protected activity, it is the government that must steer clear of that line and "freedoms of expression must be ringed about with adequate bulwarks." *Id.* These protections explain why there have been no prior criminal prosecutions of publishers of these types of ads.

Through his employment as a salaried employee working in what he firmly believed to be lawful activities at a lawful business, Mr. Padilla earned the right to be indemnified against actions such as the present criminal prosecution. *See United States v. Stein*, 541 F.3d 130, 155 (2d Cir. 2008) [recognizing the Sixth Amendment right to counsel of choice for "an employee who reasonably expects to receive attorneys' fees as a benefit or perquisite of employment, whether or not the expectation arises from a legal entitlement"]. The funds that were wired to my law firm were not a gift. Backpage and its affiliates are obligated to indemnify Mr. Padilla, and Mr. Padilla is entitled to those funds in connection with his employment with Backpage (and, later, its ultimate parent, Amstel River Holdings, LLC[6]), in accordance with applicable state law, *e.g.*, 6 Del. C. § 18-108. Regardless of the existence of written agreements, everyone understood that employees and others associated with Backpage would be indemnified against legal claims arising from their employment with Backpage. Because Mr. Padilla earned the right to receive indemnification through his employment, and because he does not believe that any of the conduct was unlawful or any of the assets tainted, he is, in essence, a bona fide purchaser for value of the funds for these services. *See Luis v. United States*, 136 S.Ct. 1083,

---

[6] When the United States seized Backpage.com, Mr. Padilla was employed by Amstel River Holdings, LLC. Mr. Padilla's title was Chief Operating Officer (COO) on the business' organizational chart. Under its Limited Liability Company Agreement, Amstel is obligated to indemnify Mr. Padilla as a "Company officer[]." Amended and Restated Limited Liability Company Agreement, Article XI, sec. 11.01(a). Moreover, various subsidiaries of Amstel are obligated to indemnify Mr. Padilla, as Amstel is an affiliate of the members of the subsidiaries and Mr. Padilla is an employee of Amstel. *See, e.g.*, Dartmoor Holdings, LLC Third Amended and Restated Limited Liability Company Agreement, Article 8, sec. 8.2: "The Company shall indemnify, defend and hold harmless each Member [*i.e.*, Atlantische],…the affiliates of each Member [*i.e.*, Amstel], and their respective managers, members, directors, officers, employees, or agents [*i.e.*, Mr. Padilla]…to the fullest extent permitted by law…."

PICCARRETA DAVIS KEENAN FIDEL PC

1091 (2016). I certainly do not believe that the funds I received (before there was an indictment in this matter) are the proceeds of any unlawful activity or are tainted in any manner.

The fact that the government was successful in pressuring Mr. Ferrer to cooperate with the government in exchange for favorable treatment does nothing to change our beliefs that Backpage's conduct was lawful. Mr. Padilla is well aware that Mr. Ferrer is now contradicting most everything he has said and done regarding Backpage for more than a decade, and nothing Mr. Ferrer is saying now has changed Mr. Padilla's view that Mr. Padilla and Backpage were, at all times, engaged in lawful activity. I am well aware of the pressure the government can place upon any individual and the decision to provide inconsistent statements to support the government's position for a wide variety of reasons.

Nor does the fact that a federal judge in California approved a government seizure warrant targeting the account used to transfer funds to our trust account change our beliefs that the funds are legitimate. I have strong reasons to question the validity of the *ex parte* proceeding that produced that seizure warrant. In that *ex parte* proceeding, the federal prosecutor had the duty to make sure the judge was fully apprised of "all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse." LRCiv 83.3(e); Rule 42, ER 3.3(d), Rules of the Arizona Supreme Court.

We have reason to believe that the judge was not advised that numerous courts have specifically rejected the government's theory of prosecution, that high-ranking Department of Justice officials have informed Congress that similar activities by the website Craigslist could not be prosecuted under federal criminal law,[7] or that key legislators very recently admitted that "current federal criminal law...lacks proper prosecutorial tools to combat these websites,"[8] all facts of which Mr. Padilla and Backpage were aware. Thus, in addition to the judiciary, the executive and legislative branches (which are also presumably well aware of the Travel Act and money laundering statutes) have also acknowledged that Backpage's activities could not

---

[7] "I am not aware of any laws that would make them [criminally] liable [for third-party postings], unless there was evidence that Craigslist was a participant...conspiring with those who were misusing their site, that is, knowingly conspiring to violate laws....I am not aware of anything that shows us that Craigslist might be criminally liable...." Testimony of DOJ's National Coordinator for Child Exploitation, Prevention, and Interdiction, Francie Hakes, Domestic Minor Sex Trafficking: Hearing Before Subcommittee on Crime, Terrorism, & Homeland Security of the House Committee on the Judiciary, 111th Cong. 215-16 (2010).
[8] House of Representatives Report 115-572 Part 1, p. 5, February 20, 2018.

PICCARRETA DAVIS KEENAN FIDEL PC

be prosecuted under then current federal law.[9] Mr. Padilla and others associated with Backpage took these courts, prosecutors, and legislators at their words. In sum, Mr. Padilla and others at Backpage have confirmation from all three branches of the United States Government that their conduct was lawful and constitutionally protected. When it comes to specific intent crimes like Travel Act violations and money laundering,[10] evidence negating the required *mens rea* cannot get any stronger than this. The search warrant affidavit failed to present any of this information to the judge -- evidence that would have been necessary for the judge to make "an informed decision, whether or not the facts are adverse." There has never been a determination after an adversarial hearing that any of these funds are tainted. I am pretty sure that, in an adversarial proceeding, the government would not receive a determination that they are, especially so pretrial.

In addition, the seizure warrant is also invalid due to the nature of the information that was (and more significantly was not) presented to the judge. The affidavit for the seizure warrant never mentions the litigation history in which Backpage has been successful in refuting the theories upon which the seizure warrant is based. The affidavit is premised, in part, on violations of California's prostitution laws, but the affidavit does not mention that Mr. Lacey and Mr. Larkin were criminally charged with violating those laws and the California courts dismissed those charges as unfounded. The affidavit prepared by Postal Inspector Versoza quotes several emails, but omits critical text, omits email chains, and omits critical

---

[9] Again, this does not purport to be a complete analysis of these matters. These are just examples of the type of supporting authority of which Mr. Padilla and Backpage were aware. Additional examples are cases analyzing Backpage's conduct and finding that it does not constitute facilitation or aiding and abetting of criminal acts of prostitution or sex trafficking by third-party users of the website. *Dart v. Craigslist*, 665 F.Supp.2d at 963; *M.A. v. Village Voice Media Holdings, LLC*, 809 F.Supp.2d 1041, 1054 (E. D. Mo. 2011) [recognizing that *Dart* "held that Craigslist could not be liable for facilitating prostitution and child exploitation under an 'aiding and abetting' theory based on the misuse of its services by customers" and "allegations of Backpage aiding and abetting (defendant convicted of violating the Travel Act) do not describe the specific intent required for aiding and abetting" under 18 U.S.C. § 2]. Other authorities have specifically held that Backpage's treatment of ads posted by third parties such as "rules about which terms are permitted or not permitted in a posting" and "the website's reaction after a forbidden term is entered into an advertisement" are features "which reflect choices about what content can appear on the website and in what form, [and] are editorial choices that fall within the purview of traditional publisher functions." *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 20-21 (1st Cir. 2016). There are, of course, additional problems with the government premising a Travel Act prosecution on violations of underlying state criminal laws when 47 U.S.C. § 230 provides a complete defense to those state law violations. *See, e.g., Gourlay v. Barrett*, 2017 WL 1329434, *4 (E. D. Mich. 2017) ["Congress intended that no liability may be imposed under a state criminal law that is inconsistent with § 230"].
[10] *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974); *United States v. Gurolla*, 333 F.3d 944, 957 (9th Cir. 2003).

PICCARRETA DAVIS KEENAN FIDEL PC

context to the emails, resulting in a highly inaccurate and highly misleading depiction of what the emails actually say.[11] For example, paragraph 30(d) of his affidavit states:

> On October 16, 2010, the same Backpage manager [Mr. Padilla] sent this separate internal email explaining, "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

The actual text of this email was:

> I'd like to still avoid Deleting ads when possible *but if an ad makes a clear reference to sex for money or an image displays a sex act, don't hesitate deleting it. These are not the types of ads we want on our site at all.*

> In the case of lesser violations, editing should be sufficient. We're still allowing phrases with nuance, but if something strikes you as crude or obvious, remove the phrase.

[Emphasis added]. Inspector Versoza's selective editing of the email dramatically changed the message it actually conveyed, keeping critical evidence from the judge. Again, this is not meant to be a comprehensive analysis of the deficiencies in the affidavit, it is just an example of the kind of misleading selective editing and numerous other insufficiencies in the affidavit which, of course, will be brought to the court's attention. To the extent that the indictment was based on the presentation of the same sort of incomplete, inaccurate, and misleading information to the grand jury, it is, of course, also subject to challenge.

Obviously related to these concerns is the fact that the seizure warrant is invalid because Backpage's publishing proceeds cannot be seized until the government proves, at an adversarial pretrial hearing, that the proceeds are from activity that is *not* protected by the First Amendment. *See, e.g., Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989) ["while the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause…, it is otherwise when materials presumptively protected by the First Amendment are involved"]. Under these circumstances, none of Backpage's assets can properly be determined to be tainted and subject to forfeiture until *all* matters relating to Backpage's activities have been fully litigated in the adversarial process. In fact, *Luis v. United States*, 136 S.Ct. 1083, 1093 (2016), makes it clear that the fact that funds may *at some point* be determined to be forfeitable to the government does not outweigh a criminal defendant's present constitutional right to use assets to which he is entitled to fund his counsel of choice.

---

[11] In this regard, it should be noted that Mr. Padilla offered, pre-indictment, to answer all questions truthfully about these emails and the operations of Backpage (if he were immunized) to clear up any misconceptions about these actions and events. That offer was declined.

PICCARRETA DAVIS KEENAN FIDEL PC

I have additional concerns about whether the government is pursuing legitimate financial interests in seeking to forfeit these funds in light of the fact that the government will likely have to expend the same amount, or more, if Mr. Padilla is deprived of the funds for my services and panel counsel is appointed to represent him. In fact, *Luis* specifically noted that, under these circumstances, "[t]hese defendants, rendered indigent, would fall back upon publicly paid counsel, including overworked and underpaid public defenders....The upshot is a substantial risk that accepting the Government's views would -- by increasing the government-paid-defender workload -- render less effective the basic right the Sixth Amendment seeks to protect." 136 S.Ct. at 1095. The government's position here seems to be at odds with the fact that "it is in the government's interest that every defendant receives the best possible representation he or she can obtain." *United States v. Stein,* 541 F.3d 130, 157 (2d Cir. 2008). Under these circumstances, it appears that the government has no real financial interest and is, instead, expressing its preference on who will represent Andrew Padilla.

Apart from these concerns, I am concerned with the fact that the government is contemplating a tactic -- pretrial seizure of attorneys' fees -- that I have not previously observed in this district (except in some drug cases where there is no real dispute as to the unlawful origin of the funds). Your theory of forfeiture of fees could be applied to any typical financial case in which the proceeds of a challenged financial transaction were placed into an account with other funds (which is exactly what people do when they are operating a business). The government's theory could render indigent virtually any defendant in any financial case simply on an *ex parte* allegation of an illegal financial transaction. However, I have not seen the government go after attorneys' fees in this manner previously. I have certainly never seen this when the government is pursuing a novel theory of criminal liability and certainly not in a case with First Amendment implications. The government is the party that is attempting to plow new ground here. The government is the party that is defying courts, prosecutors, and legislators that have repeatedly asserted that then existing federal criminal laws simply did not address Backpage's activities. That is the very reason FOSTA/SESTA was passed, after several failed attempts by the government to pass such laws directed at websites like Backpage, and it remains to be seen whether that law, itself, will be found constitutional. Given the fact that the government does not typically go after attorneys' fees, pretrial, in even ordinary financial cases, it is especially unusual in my experience for the government to go after attorneys' fees on a previously untested theory, especially prior to obtaining a conviction.

Finally, I am concerned that my office appears to be the only one targeted in this manner, although I suspect this may change now that I have raised these issues. Government counsel advised previous counsel for Mr. Larkin and current counsel for Mr. Hyer that they were not seeking to forfeit or seize attorneys' fees. Is it a coincidence that I am being targeted while I am the one who has been a bit more assertive raising issues relative to Mr. Padilla's legal and constitutional rights?

PICCARRETA DAVIS KEENAN FIDEL PC

The fact that counsel for Mr. Ferrer, Nanci Clarence, is permitted to keep funds from the same source that you claim is tainted[12] also naturally raises questions about why I am being singled out for special treatment by the government. There appears to be a different standard for counsel for defendants who plead guilty and cooperate with the government as opposed to those who are presumed innocent and stand on their constitutional rights. This, again, appears to be an attack on Mr. Padilla's Sixth Amendment right to counsel of his choice.[13]

I am also detecting what may be an emerging pattern of government overreaching in this case that includes ignoring applicable case law, overaggressive seizures, attempts to remove defendants' counsel of choice from the case, and attempts to deny defendants assets necessary to fund counsel of choice.[14] All of these actions obviously will gain the government tactical advantage. It is my belief that, if Mr. Padilla is properly represented, there will be no conviction based upon the government's theories and the facts as they currently stand. Under these circumstances, "the government's interference in the [] [d]efendants' ability to mount a defense 'creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general.'" *United States v. Stein*, 435 F.Supp.2d 330, 372 (S.D.N.Y. 2006) [quoting *Young v. United States ex rel Vuitton et Fils S.A.*, 481 U.S. 787, 811 (1987)]. The government's efforts in these areas appear to be raising huge issues with serious constitutional implications that are completely collateral to the defendants' guilt or innocence of the charges in the indictment. It does not seem wise to me for the government to be going down these roads.

In sum, Mr. Padilla is a gentleman with no significant criminal history who worked very hard as a salaried, tax-paying employee for a company that operated without any judicial

---

[12] *See* Preliminary Order of Forfeiture, No. CR-18-00464-001-PHX-DJH (Doc. 23), pp. 12-13, filed May 16, 2018.

[13] I understand that "[a]greements may be entered into to exempt from forfeiture an asset transferred to an attorney as fees for legal services, but...only if: (1) there are reasonable grounds to believe that the particular asset is not subject to forfeiture; and (2) the asset is transferred in payment of legitimate fees for legal services actually rendered or to be rendered." *United States Attorneys' Manual* § 9-120.116. If the government has "reasonable grounds to believe that the particular asset is not subject to forfeiture" and therefore can be used to pay Ms. Clarence's legal fees, then why not mine? In fact, I am willing to accept the same arrangement the government has made with Ms. Clarence and give to the government any unused funds in my account that remain at the end of the case if the case ends with a conviction.

[14] There are other issues that we will need to discuss in the future that also raise concerns, such as over-aggressive behavior in execution of search warrants (including removing one defendant's 77-year-old mother-in-law naked from the shower at gunpoint), service of early morning arrest warrants after receiving offers to voluntary surrender, needlessly restrictive release conditions despite pretrial services' recommendations, interference with access to funds for ordinary living expenses, possible collusion with civil plaintiffs' counsel to impact defendants, issuing a speaking indictment as opposed to a traditional indictment, and the document dump of the initial disclosure (which we will discuss at a later date). I want to make clear that I am not accusing you (or anyone else) of any misconduct here, I am just listing our concerns.

9

PICCARRETA DAVIS KEENAN FIDEL PC

determinations of criminal activity for many, many years. The company operated in various lawful structures with all the obvious earmarks of a lawful business. There were numerous statements from the executive, judicial, and legislative branches as to the legality of the business. This individual is also entitled to indemnification for attorneys' fees and the payment of attorneys' fees to represent him in this very matter. He vigorously asserts his innocence and is presumed innocent and has asserted his right to be represented by counsel familiar with the case. The government made representations that it was not seeking to forfeit attorneys' fees and, indeed, has entered into an agreement with one defendant not to forfeit any attorneys' fees and permit company funds to be used to fund his representation throughout the proceedings. All of this in a case that raises many defensible legal, constitutional, and factual issues that are a long way from being resolved in the government's favor, if ever. It would seem to me that to strip Mr. Padilla of counsel by denying him the funds for representation and rendering him indigent would deny him his Fifth and Sixth Amendment rights and also raise issues about the fundamental fairness of this prosecution and the appropriate remedy for these violations.

Sincerely,

Michael L. Piccarreta

MLP:bp

10