# EXHIBIT 6



U.S. Department of Justice

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main: (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax: (602) 514-7693 |
| Phoenix, AZ 85004-4408 | Direct Fax: (602) 514-7450 |

October 29, 2018

VIA EMAIL

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ 85701

Re:   *Your Letter of October 23, 2018*

Dear Mike:

      We wish to respond to your October 23, 2018 letter. The letter requests the disclosure of *Brady* material. Specifically, you claim that two internal memoranda prepared several years ago by the United States Attorney's Office for the Western District of Washington ("WDWA") (which we are now seeking to clawback for inadvertent disclosure) constitute *Brady* material because they are "clearly exculpatory." For an array of reasons, we don't share this view. These internal work product memoranda were authored by WDWA in 2012 and 2013. As you are well aware, when these memoranda were drafted, WDWA lacked significant evidence that the Phoenix Team has since obtained that clearly demonstrates that Defendants had the knowledge and intent to facilitate prostitution. This letter provides some of the reasons why the internal memoranda are not *Brady* or *Giglio*.[1]

      As an initial matter, case law makes clear that material encompassing only an attorney's mental impressions or legal theories does not constitute *Brady*. *See Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006). "Extending the *Brady* rule to opinion work product would greatly impair the government's ability to prepare for trials." *Id.* Indeed, "if opinion work product were accessible by opposing counsel 'much of what is now put down in writing would remain unwritten.'" *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)). In general, a prosecutor's opinions and mental impressions are not discoverable unless they contain underlying exculpatory facts. *Morris*, 447 F.3d at 742. Here, WDWA internal memoranda in 2012 and 2013 have no evidentiary value in 2018 given the huge amount of evidence that has come to light in the past five years.

---

[1] The government's clawback motion (Doc. 343) articulates why these memoranda are also not discoverable.

October 29, 2018
Page 2 of 4

A non-exhaustive list of such evidence is outlined below.

For example, the memoranda predated the prosecutions in *United States v. Omuro*, N.D. Cal. No. CR 14-CR-336 and *United States v. Hurant*, E.D.N.Y No. CR 16-45, where the founders of the websites www.myRedBook.com and www.Rentboy.com were convicted of violating 18 U.S.C. § 1952—the very crimes charged in this case.

In addition, WDWA did not have the benefit of the U.S. Senate's Subcommittee on Permanent Investigations Report issued in January 2017 ("PSI Report"), four years after the memoranda were prepared.[2] The PSI Report found, among other things, that Backpage knew it facilitated prostitution and child sex trafficking. The PSI also released an 840-page Appendix containing incriminating Backpage.com materials, including several emails directly inculpating your client, Andrew Padilla.[3] Many of these documents did not come to light until after the U.S. Senate successfully pursued legal action to enforce its subpoena for internal Backpage records in 2016. *See Senate Permanent Subcommittee on Investigations v. Ferrer*, 199 F. Supp. 3d 125 (D.D.C. 2016).

At the time the WDWA memoranda were prepared in 2012 and 2013, Backpage was ostensibly working with the National Center for Missing and Exploited Children ("NCMEC") in an effort to combat prostitution on its website. However, as you know, in 2014 NCMEC publicly denounced Backpage and repudiated any suggestion that Backpage was somehow an ally in the fight against child sex trafficking. NCMEC joined several other non-profit groups and the Office of the Washington Attorney General's Office in support of the child victims by filing amicus briefs urging the court to allow the Washington State case to proceed. Documents subsequently obtained by the U.S. Senate indicate that Backpage artificially limited the number of ads it reported to NCMEC each month. (PSI Report at 42.)

The WDWA memoranda were also drafted long before the Washington Supreme Court ruled against Backpage and in favor of three minor girls who had been "bought and sold for sexual services online on Backpage.com." *J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715 (Wash. 2015). The Court—in ruling that Backpage's motion to dismiss should be denied—found that discovery should be conducted "to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking." *Id.* at 718. As you are aware, Backpage settled this case for a substantial sum to avoid discovery.

Next, the WDWA memoranda predated compliance with a variety of subpoenas (including Arizona Grand Jury Subpoenas 108 and 359) that produced additional incriminating

---

[2] BACKPAGE.COM'S KNOWING FACILITATION OF ONLINE SEX TRAFFICKING, https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FIN AL.pdf.

[3] https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf

October 29, 2018
Page 3 of 4

emails demonstrating Backpage's knowing facilitation of prostitution on its website. We shared some of those emails with you in our two-hour meeting in December 2017.

WDWA also did not have the benefit of numerous moderators who have confirmed that Backpage was engaging in the facilitation of prostitution. Some of those moderators are concealed as Backpage Employees A-C in the PSI Report. These moderators have separately been interviewed by the Phoenix Team and are expected to testify at trial. Other moderators, not referenced in the PSI Report, have also met with the Phoenix Team and are expected to testify at trial. They provide damning information about Backpage's moderation practices, and against your client in particular.

WDWA also did not have access to what is referred to as the Costar material, which demonstrates that Backpage engaged in content creation by trolling competing prostitution websites overseas and then copying and reposting those websites' ads on Backpage. This included soliciting pimps and prostitutes to determine if they were willing to continue posting (and importantly would pay for the co-opted ads). Although this primarily occurred in the Philippines, Defendants were aware of this conduct and even assigned American staff to make contact with prostitutes.

Lastly and importantly, the WDWA did not have the benefit of two critical cooperators—Carl Ferrer and Daniel Hyer. As evidenced by their plea agreements, Backpage was facilitating prostitution and engaging in considerable content creation that included, among other things, domestically aggregating ads from competing websites, forming affiliated relationships with individuals such as "Dollar Bill" who packaged thousands of prostitution ads for sale to Backpage, and forming a business relationship with the website The Erotic Review ("TER"). TER allowed Backpage to insert links to TER, allowing purveyors of Backpage to read "customer" reviews of advertised prostitutes—including underage victims.[4]

Based on the forgoing, we are struggling with how Defendants can possibly argue that they have a First Amendment defense in light of the considerable content creation detailed above. As you know, the Communications Decency Act ("CDA") has no application to this federal prosecution. See 47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of…[any] Federal criminal statute."). Indeed, the successful prosecutions mentioned above in the myRedBook.com, Rentboy.com and escorts.com cases demonstrate that federal criminal liability may be imposed under these circumstances. And given the evidence of content creation referenced above, it's unclear how the CDA would apply even if this prosecution had been initiated by a state.

---

[4] This letter does not detail the significant evidence of money laundering that has also emerged in the years since the WDWA prepared the two internal memoranda in 2012 and 2013, including steps that some of Defendants took following the decision of the major credit card companies to stop doing business with Backpage.com in 2015.

October 29, 2018
Page 4 of 4

    In the final analysis, the primary defense you have proffered is that as a mere host of content created by others, Defendants shouldn't be held responsible for any illegal activity by its users. As evidenced above, Backpage was not a neutral platform hosting third party content. Rather, it was engaged in a sophisticated business model to facilitate, and indeed, increase the volume of prostitution postings to maximize revenue. In light of the above, we are unable to determine what evidence could possibly lend itself to a First Amendment claim. Moreover, the court has affirmed in this case that the Government has no general obligation to identify *Brady* or *Giglio* material. But, again, if we come across such evidence, we will certainly bring it to your attention. And, if you are aware of any such material we ask you to bring it to our attention so that we may give it its due consideration.

    Lastly, in the alternative, you have alluded to a secondary defense, namely that Mr. Padilla did not have the *mens rea* to engage in the substantive Travel Act charges. Although you have not provided any supporting authority, we do not share the view that this rises to a cognizable defense. Mr. Padilla was involved in a conspiracy with the named Defendants and others to specifically and intentionally manage a website that was designed to facilitate unlawful activity, namely prostitution. *See United States v. Ulbricht*, 31 F.Supp.3d 540 *556 (S.D.N.Y. 2014) ("The Indictment does not allege that Ulbricht is criminally liable simply because he is alleged to have launched a website that was—unknown to and unplanned by him—used for illicit transactions. If that were ultimately the case, he would lack the *mens rea* for criminal liability. Rather, Ulbricht is alleged to have knowingly and intentionally constructed and operated an expansive black market for selling and purchasing narcotics and malicious software and for laundering money. This separates Ulbricht's alleged conduct from the mass of others whose websites may—without their planning or expectation—be used for unlawful purposes.") Like the First Amendment claim, we are unaware of any exculpatory evidence that would support a lack of *mens rea* defense.[5]

                                                                         Sincerely,

                                                                         BRIAN BENCZKOWSKI
                                                                         Assistant Attorney General
                                                                         Criminal Division
                                                                         U.S. Department of Justice

                                                                         */s Reginald E. Jones*
                                                                         REGINALD E. JONES
                                                                         Senior Trial Attorney, CEOS
                                                                         Criminal Division
                                                                         U.S. Department of Justice

---

[5] This is not meant to be an exhaustive statement of the reasons why the apparent defenses discussed above lack merit, particularly in view of the limited amount of information known so far about Defendants' theories and defenses."