PICCARRETA DAVIS KEENAN FIDEL PC
2 East Congress Street, Suite 1000
Tucson, Arizona 85701-1782
(520) 622-6900
Michael L. Piccarreta
State Bar No. 003962
Email:  mlp@pd-law.com
Attorney for Defendant Andrew Padilla
            -and-
KARP & WEISS, P.C.
3060 N Swan Road
Tucson, AZ 85712
(520) 325-4200
Stephen M. Weiss
State Bar No. 002261
Email: sweiss@karpweiss.com
Attorney for Defendant Joye Vaught

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>v.<br><br>6. Andrew Padilla,<br>   (Counts 1-51)<br>7. Joye Vaught,<br>   (Counts 1-51)<br><br>                    Defendants. | NO. CR-18-00422-06-PHX-DLR<br><br>JOINT REPLY TO RESPONSE (DOC. 476) TO MOTION TO DISMISS DUE TO GOVERNMENT INTERFERENCE WITH RIGHT TO COUNSEL AND REQUEST FOR DISCLOSURE OR, IN THE ALTERNATIVE, MOTION TO WITHDRAW (DOC. 456) |

## I.   BACKGROUND

In their motion to dismiss, defendants Padilla and Vaught note that Judge Logan[1] made it clear that issues relating to the seizure of attorney trust accounts for the defendants in this case should be addressed in the Central District of California (*see* Doc. 447 p. 3), and defendants further noted that issues relating to the government's unlawful seizures of defendants' assets are currently pending on appeal from the Central District of California to the Ninth Circuit Court of Appeals. (Doc. 456 p. 9). The defendants repeated their strong belief that the government's actions were unlawful and unconstitutional, but stated that they "will not reiterate those arguments here," (Doc. 456 p. 9), given the fact that those matters are being currently litigated and await decision elsewhere. The defendants added: "However, even if, contrary to law and fact, the government's seizures of attorney trust accounts were lawful, the government's conduct nevertheless constitutes improper interference with Padilla's and Vaught's right to counsel of choice." (*Id*.). Defendants' motion then sets forth a number of grounds showing that the government's improper interference with funds earmarked for indemnification and advancement of legal costs and fees denied them their right to counsel of choice under the Fifth and Sixth Amendments to the United States Constitution. (Doc. 456 pp. 9-16). In its response, the government addresses ***none*** of these grounds for dismissal, injects many factual and legal matters beyond the scope of defendants' motion, and re-argues the seizure issues while ignoring the actual arguments in defendants' motion.

## II.   ARGUMENT

**A.   The Government's Interference With Assets Earmarked To Fund The Defense Of The Present Case Has Denied Defendants Their Right To Assistance Of**

---

[1] Judge Logan recused himself from this case and related cases on March 1, 2019. (Doc. 485).

**Counsel Of Choice In Violation Of The Fifth And Sixth Amendments To The United States Constitution.**

Defendants Padilla and Vaught have requested this Court to dismiss the indictment against them due to the government's violation of their Fifth Amendment right to due process and Sixth Amendment right to counsel of choice, based on the principles set forth in *United States v. Stein*, 435 F.Supp.2d 330 (S.D.N.Y. 2006), *aff'd* 541 F.3d 130 (2d Cir. 2008), and this Court's supervisory powers. Defendants submit that the government's actions in the present case constitute the same type of improper interference with assets earmarked to fund counsel of choice that led the court to dismiss the indictment in *Stein*.

The government contends that *Stein* is inapposite because there was no question that the funds of the accounting firm, KPMG, were "untainted." (Doc. 476 p. 9). The government's response ignores several key factors. First, the government has never established that the funds at issue in this case are "tainted" as it is obligated to do. Thus, assets earmarked for funding counsel of choice must be made available to fund the defense. Second, *Stein* involved both tainted and untainted assets of the accounting firm, KPMG, inasmuch as "KPMG admitted extensive wrongdoing, paid a $456 million fine, and committed itself to cooperation in any future government investigation or prosecution." 541 F.3d at 139. It is not likely that the distinguished trial judge, Judge Lewis Kaplan, would have permitted the government to achieve the same result of denying the defendants their right to counsel of choice simply by alleging that KPMG's "extensive wrongdoing" tainted all of KPMG's assets.

In fact, *Stein* is precisely on point in its analysis of the effect of the government's conduct in denying the defendants' constitutional right to counsel of choice. As in the present

case, the defendants, by virtue of their employment with Backpage.com ("Backpage"), were entitled to use the assets earmarked for defense of the case.[2] The government's conduct regarding these assets "unjustifiably interfered with [the defendants'] relationship with counsel and their ability to mount the best defense they could muster." *Id*. at 155.

The court's analysis of the impact of the government's interference with the defendants' right to counsel is directly on point in the present case:

> Defendants were indicted based on a fairly novel theory of criminal liability; they faced substantial penalties; the relevant facts are scattered throughout over 22 million documents regarding the doings of scores of people…; the subject matter is "extremely complex"…; technical expertise is needed to figure out and explain what happened…. As Judge Kaplan found, these defendants "have been forced to limit their defenses…for economic reasons and…they would not have been so constrained if KPMG paid their expenses"…. We therefore hold that these defendants were also deprived of their right to counsel under the Sixth Amendment.

*Id*. at 157 (quoting district court).

In the instant case, defendants face a novel theory of criminal prosecution -- indeed, unprecedented and contrary to nine different courts that have addressed Backpage and its status of publisher. Defendants face substantial penalties given the government's larding up dozens of alleged misdemeanor prostitution acts into federal five-year statutes by coupling them with the Travel Act. The relevant facts are scattered through tens of millions of pages of documents, most of which have not even been produced by the government despite a scheduling order that called for their production by December 3, 2018. The subject matter is extremely complex,

---

[2] "Because defendants reasonably expected to receive legal fees from KPMG, the fees 'were, in every material sense, their property.'" 541 F.3d at 151 (quoting district court).

involving what rivals a law school exam question designed to see how many issues can be implicated -- First Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment, in addition to the potential need for expert assistance in areas of internet postings, publishing, electronic document tracing, age determination, and sex trafficking in order to address what happened and the government's intended issues. And defendants already "have been forced to limit" their defense preparation "for economic reasons." For example, due to expense, the defendants have been unable to hire a vendor needed to image, rectify, sort, organize, code, and search the in excess of ten million documents produced by the government thus far. And they "would not [be] so constrained" if they had the funds promised to them to defend the allegations. It is as though Judge Kaplan were writing his opinion in our case. Because defendants Padilla and Vaught have also been denied access to assets earmarked to fund their counsel of choice, the indictment against them must also be dismissed.

Here, the law is clear that the government cannot by fiat declare the proceeds from Backpage are "tainted" any more than it can presume all adult advertising is illegal and unprotected by the First Amendment. However, even if -- as the government has asserted -- this case is no different from any run-of-the-mill prosecution that does not involve constitutionally-protected interests, the government has engaged in improper actions in the present case that simply are not present in any of the cases upon which the government relies. The government's response does not address these arguments or attempt to defend the government's conduct.

**1.** **Permitting Cooperating Defendants To Keep Funds Earmarked For Attorneys' Fees While Denying Those Funds To Defendants Who Are**

**Contesting The Charges Is Unseemly And Undermines The Workings Of The Adversary System.**

The government does not even attempt to defend its conduct in allowing cooperating defendants to use allegedly "tainted" money to fund their defense, while denying funds from the very same source to those who will make it harder for the government to win its case through vigorous representation and assertion of the defendants' rights, except to contend, in a footnote, that the government is permitted to provide benefits in exchange for cooperation. (Doc. 476 p. 16 n. 23).

The problem in this case is the government's disparate treatment of defendants in an ongoing criminal prosecution. The defendants who have the temerity to assert their innocence and vigorously assert their rights are suddenly deprived of the assets necessary to continue to fund counsel of choice and thereby deprived of counsel. On the other hand, the defendants who curry favor with the government, give up their rights, and cooperate with the government can continue to utilize assets derived from the same allegedly "tainted" source in their attorneys' trust fund accounts and continue to be represented by their counsel of choice. The result is to clearly undermine the contemplated workings of the adversary system and is precisely the type of "ends justify the means" conduct that has been rightly condemned. *United States v. Helmandollar*, 852 F.2d 498, 501 (9th Cir. 1988).

In short, if the government believes it can use "tainted" funds to further the government's interest in securing cooperation from a co-defendant, then the government can surely use the same funds to further "the government's interest that every defendant receives the best possible representation he or she can obtain." *Stein*, 541 F.3d at 157. The fact that the

government has not done so here shows its true motivation and improper interference with right to counsel of choice.

### 2. The Timing Of The Government's Seizure Of Attorney Trust Funds To Severely Disrupt Criminal Proceedings After Defendants Exercise Their Protected Constitutional And Statutory Rights Also Warrants Dismissal Of The Indictment.

The government's response makes *no* effort to justify its conduct in seizing attorney trust accounts some 18 months after undersigned counsel began representing Mr. Padilla and seven months after Mr. Weiss began representing Ms. Vaught at the time of the initial indictment. It was only after months of vigorous litigation in the case and approximately two weeks after receiving rulings on litigated pretrial motions,[3] that the government obtained its attorney trust account *ex parte* seizure warrants for defendants Padilla and Vaught. Again, this highly unusual and selective use of mid-case seizure of attorney trust accounts has not occurred in any of the cases the government attempts to rely upon. This is a seemingly intentional strategy which has severely impaired the ability of Padilla and Vaught to defend this case.

The government's actions have completely disrupted the defense, creating uncertainty and limiting the ability for undersigned counsel to proceed in complex and time-consuming criminal litigation. This type of seizure of attorney trust accounts in the middle of highly disputed criminal litigation, with critical First Amendment implications, has not occurred previously in this district in undersigned counsel's experience. This is especially troubling and there has not been a contested adversary hearing demonstrating that *any* of the publishing

---

[3] These included adverse rulings on the government's motion to disqualify counsel and violate attorney-client privileges. (Docs. 338, 345).

assets are tainted. This case does not involve *per se* contraband,[4] but rather legitimately earned publishing proceeds of a business that had been operating openly for years collecting revenue and paying its bills. Again, the government's actions are undermining the workings of the adversary system.

The government's conduct must be viewed in light of its pattern to deprive defendants of their Sixth Amendment rights. The government sought *ex parte* seizure warrants outside of this district thus necessitating the expenditure of additional resources outside of this jurisdiction. The government adopted a course of conduct seeking to avoid judicial review of its actions. The government unsuccessfully attempted to conflict out First Amendment counsel of choice, which also took considerable time and resources to resolve. The government provided disclosure in a manner that is useless to the defendants without expensive technical assistance. After discussions with counsel for the defendants, the government elected not to seize trust accounts which contain the funds to defend the case. However, after defendants asserted their constitutional rights, the government changed course and seized the trust accounts of First Amendment counsel in yet another unsuccessful attempt to remove them from the case. Counsel for Padilla and Vaught vigorously asserted their clients' rights and the government responded, in part, by seizing their attorneys' trust accounts. The government then asserts that, even without the benefit of a valid seizure warrant, any attorneys accessing funds in the trust accounts may be investigated with no assurances that they will not be criminally

---

[4] *See Luis v. United States*, 578 U.S. __, __, 136 S.Ct. 1083, 1090 (2016) (describing contraband subject to seizure as "a robber's loot, a drug seller's cocaine, a burglar's tools, or other property associated with the planning, implementing or concealing of a crime").

prosecuted. As a result, counsel for Padilla and Vaught have not received any compensation for any services rendered after November 30, 2018, over three months ago. These actions cannot be viewed in a vacuum, but as an overall pattern which has significantly and adversely impacted defendants' due process and Sixth Amendment rights, severely undermining the workings of the criminal adversary system.

The government's response does not even attempt to excuse or justify the timing of these seizures of attorney trust accounts. Defendants submit that the chronology speaks for itself and demonstrates the government's improper purpose in severely disrupting these criminal proceedings mid-stream, after the defendants have vigorously asserted their rights. *See United States v. DeMarco*, 550 F.2d 1224, 1227-28 (9th Cir. 1977).

### 3. *Monsanto.*

Finally, the government's repeated emphasis on *United States v. Monsanto*, 491 U.S. 600 (1989) is misplaced. As the defendants have repeatedly pointed out, *Monsanto* comes into play only *after* a lawful seizure of assets that could be used to fund counsel of choice, and that matter, as noted, has yet to be determined. Second, the government's seemingly generous offer to counsel for Padilla and Vaught is not at all what it seems. The government states that it "specifically invited [counsel for Padilla and Vaught] to submit financial records evidencing financial need, and the Government would consider releasing attorneys' fees, without requiring them to request a formal *Monsanto* hearing from this Court." (Doc. 476 p. 17 n. 24). When counsel for Mr. Padilla pursued the government's apparent offer to "consider releasing attorneys' fees," counsel learned that the government was actually stating only that "CJA panel funds" may be available "to supplement attorney fees." (*See* email correspondence between

counsel for Mr. Padilla and counsel for the government, January 23, 2019, attached hereto as Exhibit 1).

In other words, the government simply referred counsel to the "overworked and underpaid public defenders" that the Supreme Court found to be no substitute for a defendant's retained counsel of choice. *Luis v. United States*, 578 U.S. __, __, 136 S.Ct. 1083, 1095 (2016). Indeed, *Luis* recognized "a substantial risk that accepting the Government's views would -- by increasing the government-paid-defender workload -- render less effective the basic right the Sixth Amendment seeks to protect." *Id*. This, of course, would also directly contravene "the government's interest that every defendant receives the best possible representation he or she can obtain." *Stein*, 541 F.3d at 157. Thus, in addition to the fact that *Monsanto* is the improper vehicle for addressing access to funds for counsel of choice in this case, the government's representations about relief under *Monsanto* ring particularly hollow.[5]

In any event, prior to any *Monsanto* hearing, the government would be required to identify the specific ads that it claims were for prostitution, identify the proceeds from those specific ads, and then trace those specific proceeds to the assets it has seized, none of which the government has done to date.

**B.      Defendants Are Entitled To Disclosure Of All Communications Relating To The Government's Belated Decision To Seize Attorney Trust Accounts And**

---

[5] Indeed, Justice Kagan's dissent in *Luis*, 136 S.Ct. at 1112, indicates that the controversial 5-4 *Monsanto* decision permitting pretrial seizure of attorneys' fees was incorrectly decided and is ripe for reconsideration. *See also Sixth Amendment – Right to Counsel – Scope of Pretrial Asset Freezes -- Luis v. United States*, 130 Harv.L.Rev. 357, 365 n. 76 (2016) ("interpreting Justice Kagan's opinion as 'openly invit[ing] future petitioners to make broader arguments and to challenge all pretrial orders freezing assets needed to retain counsel,'" citation omitted).

**Disclosure Of Any Other Cases In The District Of Arizona Where There Have Been Post-Indictment Pretrial Seizures Of Defendants' Attorneys' Fees.**

The government's response does not address or oppose defendants' request for disclosure of communications surrounding the seizures of publishing assets and attorneys' fees post-indictment and pre-trial. (Doc. 456 pp. 16-17). Because the government does not oppose this request, the government should be ordered to turn over these communications to the defendants. At a minimum, these communications should be produced and reviewed by the Court *in camera* and any records not disclosed kept under seal for potential appellate review.

**C.    The Government Response Misstates The Law Regarding Protected First Amendment Activities.**

Although the motion did not address the First Amendment issues underlying this case, the government devotes five pages of its response to a discussion of these issues in an effort to justify its actions, primarily those involving the seizure of assets and proceeds attributable to Backpage. (Doc. 476 pp. 9-14). This puts the cart before the horse, with the government merely assuming the truth of its allegations that all postings on Backpage related to illegal activity, that the defendants are culpable for third-party speech, and that the government's asset seizures are entirely legitimate. By trying to divert the Court's attention from the arguments actually made in the motion and in an effort to reframe the question, the government is asking this Court to get out in front of the Ninth Circuit, which currently is considering the constitutional validity of the pretrial seizure of publishing proceeds. *See In the Matter of Seizure of: Any and all funds held in Republic Bank of Arizona Accounts xxxx1889, xxxx2592, xxxx1938, xxxx2912, and xxxx2500, No. 18-56455*, Doc. No. 27 (9th Cir.), (setting case for expedited briefing and argument). *See also* Appellant's Opening Brief ("AOB"), attached as Exhibit 2. The

government's response also appears to anticipate a motion not yet filed or briefed -- that the Superseding Indictment is patently defective because it fails to allege under proper standards of *mens rea* any criminal activity by the defendants for actions and speech of third parties.

In any event, the government's arguments on this point expose a frail understanding of the law that underlies both this misguided prosecution and the government's abusive tactics. It fundamentally distorts the issues by asserting the defendants are claiming First Amendment rights "to commit or facilitate criminal activity" and to receive "proceeds of a crime." (Doc. 476 pp. 10, 13). Both propositions fundamentally misstate the constitutional issues in this case, and are irrelevant to the motion, which is focused on the government's efforts to hobble the defense in violation of defendants' Sixth Amendment rights. However, the government's discussion of these issues is addressed below so that it does not mislead the Court with half-baked notions of how the First Amendment works.

### 1.    The Government Misleadingly Conflates The Speaker With The Advertising Platform.

The government's statement that the First Amendment does not protect "speech proposing an illegal transaction," (Doc. 476 p. 10), ignores the fact that Backpage was not the "advertiser," but instead provided a platform for ads posted by others. *Backpage.com, LLC v. Cooper*, 939 F.Supp.2d 805, 830 (M.D.Tenn. 2013) ("[T]he statute at issue here does not criminalize prostitution—it criminalizes the sale or potential sale of advertisements"). "Providing a forum for online publishing is a recognized legal purpose." *People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cty. Aug. 23, 2017) ("*Ferrer II*"), slip op. at 13. *See also Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015) (specifically recognizing

1   Backpage as "an avenue of expression of ideas and opinions" protected by the First

2   Amendment, including its "classified ads for 'adult' services").[6]

3        The question of what legal standards apply when the government seeks to hold a

4   publisher criminally liable for speech posted by third parties is addressed more fully below,

5   but the government's reliance on *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human*

6   *Rights*, 413 U.S. 376 (1973) is misplaced. (Doc. 476 p. 10). As with the rest of the

7   government's argument, it begins with the *assumption* that all ads on Backpage proposed

8   illegal transactions and that the defendants knew about particular ads in advance and intended

9   to promote illegal transactions. But the Ninth Circuit had held that *Pittsburgh Press* cannot be

10  read to presume that only illegal speech is involved where the government targets commercial

11  speakers. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 822 (9th Cir. 2013) ("Nothing in

12  *Pittsburgh Press*…suggests that we should expand our inquiry beyond whether the affected

13  speech proposes a lawful transaction to whether the affected speech is conducted in a lawful

14  manner"). *Pittsburgh Press* involved a newspaper advertising category that *on its face* violated

15  a municipal anti-discrimination ordinance. It would apply to this case only if Backpage had

16  maintained a "prostitution" category and accepted ads that had explicit money-for-sex offers,

17  which was never the case. Instead, the government merely presumes all ads in the adult

18  categories were for prostitution and that it may impute the undisclosed intentions of the

---

[6] *See also* Order, January 17, 2013, pp. 19-20, *In re Grand Jury Subpoenas*, Case No. GJ12-172RAJ (W.D.Wash.), submitted as Exhibit 4 hereto under seal.

advertisers to the defendants who ran the platform. There is no authority to support this proposition, and many cases conclude the opposite.[7]

Contrary to the government's reading of *Pittsburgh Press*, courts have held that the First Amendment bars the government from criminalizing Internet advertising based on the assumption that some of the ads may propose illegal transactions. As a consequence, courts invalidated criminal laws targeting Backpage in Washington, Tennessee, and New Jersey, affirming that constitutional protection extended to Backpage's role as a *platform for speech*. *Backpage.com, LLC v. McKenna*, 881 F.Supp.2d 1262, 1281-82 (W.D.Wash. 2012); *Cooper*, 939 F.Supp.2d at 833; *Backpage.com, LLC v. Hoffman*, 2013 WL 4502097 *9 (D.N.J. Aug. 20, 2013).

The government's citation of *United States v. Ulbricht*, 31 F.Supp.3d 540 (S.D.N.Y. 2014), *United States v. Omuro*, No. 14-CR-336-WHO (N.D.Cal.), and *United States v. Hurant*, No. CR 16-45 (E.D.N.Y.) for the proposition that a website operator "may be prosecuted under federal law for knowingly facilitating prostitution" hardly proves its point. (Doc. 476 p. 10). This is just an example of a credulous prosecutor who is convinced by his

---

[7] Also, *Pittsburgh Press* predates both the commercial speech doctrine and the Internet, and subsequent decisions illustrate the shallowness of the government's analysis. Two years after *Pittsburgh Press*, the Supreme Court held the First Amendment protected a publisher in Virginia that ran an advertisement for an abortion clinic in New York even though abortions were illegal in Virginia at that time. *Bigelow v. Virginia*, 421 U.S. 809 (1975). The Court held that if the publisher were held responsible for the potentially illegal conduct, "[t]he burdens thereby imposed on publications would impair, perhaps severely, their proper functioning." *Id.* at 829.

own pleadings and press releases, as none of those cases resulted in rulings relevant to the First Amendment issues here.

Two of the government's citations are to nothing more than plea agreements,[8] and the third actually undermines the government's position in this case. In *Ulbricht*, the court denied a motion to dismiss an indictment against Ross Ulbricht, the creator of Silk Road, for participating in conspiracies for narcotics trafficking, computer hacking and other crimes. 31 F.Supp.3d at 546. The case concerned the purchase and sale of "thousands of kilograms of heroin and cocaine" and "malicious software designed for computer hacking." *Id.* at 549-50. According to the government's Complaint, the defendant "pursued violent means, including the murder-for-hire of several individuals he believed posed a threat to [his] enterprise." *Id.* at 550. The court specifically noted that the indictment did not allege Ulbricht was criminally liable for launching a website that others misused for illicit transactions, because "[i]f that were ultimately the case, *he would lack the mens rea for criminal liability*." *Id.* at 556 (emphasis

---

[8] In *Omuro*, No. 14-CR-336-WHO (N.D.Cal.), for example, the defendants pled guilty to charges of promoting prostitution for *their own speech* that included reviews of prostitutes and providing advice on avoiding law enforcement stings. *See* Gov't Sentencing Mem. at 4, Supporting Declaration ¶ 3 (Dkt. 70, 70-1). No First Amendment issue was raised or decided. *United States v. Hurant*, No. CR 16-45 (E.D.N.Y.) also involved a plea agreement in which the defendant pled guilty to structuring a website with categories for users to list what sex acts they were willing to perform. Again, no First Amendment defense was raised and no ruling issued.

added).[9] The fact is, the government can cite no decisions to support its novel vicarious liability theory seeking to hold Backpage liable for third-party content.[10]

### 2. The Government Erroneously Conflates Allegations With Judicial Findings.

The government's claim that this case raises no First Amendment issues (based on allegations that Backpage hosted *only* speech relating to unlawful activities) is wrong for multiple reasons, not the least of which is that it assumes what the government has the burden to prove. While certain narrowly-framed and specifically-defined categories of speech are considered outside the First Amendment's protection, *United States v. Sineneng-Smith*, 910 F.3d 461, 470 (9th Cir. 2018), speech is presumed to be protected and must be treated as such but until the government has proved its case. *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). The burden of proof is on the government and these limits are strictly enforced.[11] "The government

---

[9] Unlike Backpage: the Silk Road website had categories that, on their face, invited ads for unlawful activity (*e.g.*, categories for the sale of "cannabis" and "opioids"); users posted thousands of ads that, on their face, proposed unlawful transactions (*e.g.*, the sale of "HIGH QUALITY #4 HEROIN ALL ROCK" and "5gr UNCUT Crystal Cocaine!!"), with such ads being immediately and prominently visible on the site's homepage; Silk Road did not sell classified ads for a small fee, but rather collected a commission of 8% to 15% from every sale; and Silk road was involved in each sale by escrowing payments pending the completion of each transaction. *United States v. Ulbricht*, 13-mj-02328 (S.D.N.Y.), Sealed Complaint, Dkt. 1 (attached as Exhibit 3).

[10] Indeed, in previous proceedings in this district before Judge Campbell (that the government had unsealed, Doc. 197 p. 11 n. 3), the government conceded that these "cases where website operators have been recently criminally prosecuted successfully…aren't on all fours…." TR, February 22, 2017, p. 10.

[11] This is true for every category of "unprotected" speech. *E.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964) (public officials must prove falsity of speech and actual malice to recover damages for defamation); *Miller v. California*, 413 U.S. 15, 23-25 (1973) (government must show that work, taken as a whole, meets three-part test to be considered obscene); *Brandenburg v. Ohio*, 395 U.S. 444, 447-49 (1969) (government must prove that

may not suppress lawful speech as a means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002).[12] The government's assumption that adult oriented ads can be equated with or assumed to be ads for illegal transactions also betrays a profound ignorance of First Amendment principles.

Of particular relevance here, the First Amendment prohibits the government from declaring that online classified ads for adult services or escorts are unprotected simply because a government investigator (or a prosecutor) believes they "look like" ads for illegal prostitution.[13] *Backpage.com, LLC v. Dart,* 807 F.3d 229, 234 (7th Cir. 2015). Yet that is the mistaken premise of the government's case, despite the fact that every court to address this question has held that it cannot presume such ads are unprotected.[14] The government tries to

---

speaker intended to provoke commission of crime and that speech was likely to produce imminent crime to be considered incitement).

[12] *See United States v. Playboy Entm't. Group, Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 818 ("When First Amendment compliance is the point to be proved, the risk of nonpersuasion…must rest with the Government, not with the citizen."); *Bd. of Trustees v. State Univ. of N.J. v. Fox*, 492 U.S. 469, 480 (1989) ("the State bears the burden of justifying its restrictions").

[13] The government doubles down on this error by also claiming that Backpage violated the law by publishing ads copied from "other prostitution websites" (the government does not identify any such sites in its response, but has identified Craigslist.org as one such website) and by paying a fee to advertise on *The Erotic Review* -- presuming in both cases that the content on those other websites was also unlawful.

[14] *See, e.g., Doe v. Backpage.com LLC*, 104 F.Supp.3d 149, 156-157 (D.Mass. 2015), *aff'd*, 817 F.3d 12 (1st Cir. 2016) ("The existence of an escorts section in a classified ad service, whatever its social merits, is not illegal"); *McKenna*, 881 F.Supp. at 1282 (escort ads have long been permitted and escort services are licensed and regulated in many states); *Cooper,* 939 F.Supp. at 816, 833-34 (ads on Backpage are protected speech under the First Amendment); *Hoffman*, 2013 WL 4502097, at *9-11 (rejecting argument that escort ads on the website are

explain away these cases with a blanket assertion (without citation or explanation) that the holdings only related to state civil cases that addressed the question of statutory immunity under Section 230 of the Communications Decency Act. (Doc. 476 p. 11). This is wrong both as a matter of fact and law for several reasons:

- First, cases holding that the First Amendment prohibits equating escort or other adult-oriented ads with prostitution have included state criminal laws, threats of law enforcement action, and actual prosecutions. *E.g.*, *McKenna*, 881 F.Supp. at 1282; *Cooper,* 939 F.Supp. at 816, 833-34; *Hoffman*, 2013 WL 4502097 at *9-11; *Dart,* 807 F.3d at 234; *Ferrer II*, slip op. at 13.

- Second, even where this issue was addressed in civil cases, courts were addressing the *constitutional* issue that prohibits the government (or a private litigant) from assuming that adult or escort ads are unprotected by the First Amendment. *E.g.*, *Doe v. Backpage.com LLC*, 104 F.Supp.3d at 156-157; *M.A. v. Village Voice Media Holdings,* 809 F.Supp.2d at 1049-50; *Dart v. Craigslist*, Inc., 665 F.Supp.2d at 968.

- Third, this is nothing but a strawman argument -- the government is responding to a point that was not made. The defendants cited these cases because of their First Amendment holdings and analysis, not because of any conclusions regarding Section 230.

The government also seeks to distinguish the First Amendment cases by asserting that "nearly all" of the case law cited was from a time before the release of the U.S. Senate's Permanent Subcommittee on Investigations report on Backpage ("*PSI Report*"). (Doc. 476 p. 11). Apart from the fact that a congressional report cannot trump judicial holdings based on constitutional principles, it overlooks the decision in *Ferrer II*, issued August 23, 2017 -- months after the *PSI Report* -- in which the court dismissed claims that defendants "conspired

---

unprotected speech); *M.A. v. Village Voice Media Holdings, LLC*, 809 F.Supp.2d at 1049-50. *See also Dart v. Craigslist*, Inc., 665 F.Supp.2d at 968 ("We disagree…that the 'adult services' section is a special case. The phrase 'adult,' even in conjunction with 'services,' is not unlawful in itself nor does it necessarily call for unlawful content").

to create and organize a website that facilitates sex trafficking." *Ferrer II*, slip op. 1. The court rejected charges based on Backpage's alleged "editing" of ads on the site through "a moderation system where terms would be deleted or blocked…but the user would still be allowed to post [to]…and compensate" the site, holding that "such actions generally fall within the scope of protected editorial functions." *Id*. 13-14. Although the court applied Section 230 to dismiss the indictment, it explained that this "broad" immunity derives directly from Congress' intent to protect the First Amendment rights of online publishers, to relieve them of liability for publishing third-party speech. *Id*. 11.[15]

Without getting into any specifics, the government claims that the *PSI Report* supports its conclusions, and that "incriminating Backpage documents" were produced in the report's Appendix. (Doc. 476 p. 11). However, as shown in the pending Ninth Circuit appeal, the documents the government cites are more exculpatory than "incriminating."[16] All of this is beside the point in any event, because a congressional report cannot be used as a proxy for a judicial finding of guilt.[17] Moreover, congressional "findings" can hardly establish whether a

---

[15] The *Ferrer II* court also held that deleting terms to "sanitize" ads is not a "material contribution to the offensive content." *Id*. 14 ("[D]elet[ing] or block[ing] words that were code of underage girls, but allow[ing] the ad[] to be posted for a fee" does not "constitute[] 'material contribution' to [] offensive material"). Additionally, it held Section 230 immunity could not be lost based on "overall course of conduct," especially where Backpage did nothing to "require" offensive content, or based on allegations that the site "'manipulated' advertisements to evade law enforcement detection." *Id*. 16-17.

[16] *See* AOB, pp. 12-13, 42 n. 29. The government misrepresented the contents of the documents and deleted references that showed Backpage's policy was to delete ads that included clear references to prostitution.

[17] The government also cites the now vacated district court ruling to enforce the PSI subpoena, (Doc. 476 p. 11), but that case dealt only with congressional authority to conduct an

publishing venture is constitutionally protected, particularly where, as here, there has been no adversary proceeding and no judicial findings. *See*, *e.g.*, *Blount v. Rizzi*, 400 U.S. 410, 416-22 (1971) (burden is on the government to initiate prompt adversarial proceeding and prove material at issue is unprotected expression).

The question for congressional materials like the *PSI Report* is not whether they could ever be sufficient to establish guilt or determine the First Amendment status of a publisher, but whether they are even relevant or admissible in a judicial proceeding. Such reports are commonly excluded from judicial consideration, as they represent "heated conclusions of a politically motivated hearing." *Baker v. Firestone Tire & Rubber Co*., 793 F.2d 1196, 1199 (11th Cir. 1986). Courts generally do not consider whether such a congressional document can be incorporated into pleadings—they examine whether it should be considered *at all*, and when they are not trustworthy, they are rejected. *E.g.*, *Pearce v. E.F. Hutton Grp., Inc.*, 653 F.Supp. 810, 813-16 (D.D.C. 1987) ("Given the obviously political nature …, it is questionable whether any report by a committee or subcommittee of [Congress] could be admitted…against a private party"); *Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 22-23 (6th Cir. 1984) (*per curiam*) (excluding House subcommittee report as inadmissible). The recent "hearings" relating to Justice Kavanaugh is another most recent example as to the political nature of congressional investigations.

---

investigation and reached no findings on the ultimate question of Backpage's First Amendment status (as the government misleadingly suggests).

The same goes for the government's attempt to rely on Carl Ferrer's plea agreement to support its assumption that it has proven its case. (Doc. 476 pp. 2-3, 13). As a matter of black letter law, the guilty plea or conviction of a codefendant "may not be used by the government and received over objection as substantive evidence of the guilt of those on trial." *U.S. v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981). While the government may try to rely on Ferrer's statements if there is ever an adversary hearing on the constitutional status of Backpage as a publishing platform, the fact that no such hearing has been held is fatal to the government's First Amendment argument. *E.g.*, *Blount*, 400 U.S. at 416-22. Even if such a hearing had been convened, the government would be unable to overcome the presumption of constitutional protection merely by pointing to Ferrer's plea deal, because such statements are "presumptively unreliable," "presumptively suspect," and "less credible than ordinary hearsay." *Lee v. Illinois*, 476 U.S. 530. 541 (1986). This is because "plea agreement[s] may adopt facts the government wants to hear in exchange for some benefit." *United States v. Vera*, 893 F.3d 689, 692-93 (9th Cir. 2018). *Cf. Bruton v. United States*, 391 U.S. 123 (1968) (admission of co-defendant's confession inculpating defendant constitutes reversible error, despite limiting jury instruction).

### 3.      Mens Rea

The government's attempt to rely on plea agreements underscores another basic flaw both in its indictment of these defendants but also in its approach to the First Amendment issues raised by this prosecution -- it fails to allege the *mens rea* necessary to establish a criminal act. The government alleges the defendants knew that Backpage was used by third parties for purposes of prostitution, (Doc. 476 p. 12), but this hardly suffices. *Doe v. GTE Corp.*, 347 F.3d

655, 659 (7th Cir. 2003) ("Even entities that know the information's content do not become liable for the sponsor's deeds. Does a newspaper that carries an advertisement for "escort services" or "massage parlors" aid and abet…prostitution, if it turns out that some (or many) of the advertisers make money from that activity? How about Verizon, which furnishes pagers and cell phones to drug dealers…?"); *In re Aimster Copyright Litig.*, 334 F.3d 643, 651 (7th Cir. 2003) ("A retailer of slinky dresses is not guilty of aiding and abetting prostitution even if he knows that some of his customers are prostitutes…."); *Dart v. Craigslist*, 665 F.Supp.2d at 967 (providing a platform for the speech of someone who might commit illegal acts "does not satisfy the ordinary understanding of culpable assistance to a wrongdoer").

The essential premise of the indictment is that Backpage "facilitated" prostitution generally through its overall editorial policies, but it fails even to allege the necessary *mens rea* as to any specific acts. As the government has argued in other cases, it has the obligation to prove not just that the *defendants* knew that *particular ads* were for prostitution, but that they had the *specific intent to facilitate those particular acts* of prostitution. In *Woodhull Freedom Foundation v. United States*, the government argued that for prosecutions under the Travel Act, the prosecutor must prove "not simply that the defendant was aware of a potential result of the criminal offense, but instead that the defendant intended to 'explicitly further[]' a specified unlawful act." *Woodhull Freedom Foundation v. United States*, 334 F.Supp.3d 185, 199-201 (D.D.C. 2018). The court agreed with the government and held that the law applies

only to "specific unlawful acts with respect to a particular individual, not the broad subject-matter of prostitution." *Id.*[18]

This issue of *mens rea* goes to the heart of the government's erroneous First Amendment assumptions. Not only is specific intent an essential element of a criminal prosecution in any Travel Act prosecution, it is particularly important where the government is seeking to prosecute a publisher for hosting third party speech. In this case, however, the government has argued that it may prosecute based on a theory of generalized knowledge. *See*, *e.g.*, Statement of AUSA Andrew Stone, Oct. 5, 2108 Tr. 102:9-14 ("[W]hat's at issue in this case [is] [d]id they know that the vast majority of these advertisements that went up on this Web site were for prostitution?"). *See also* Doc. 456, Ex 7. AUSA Kevin Rapp letter to Michael Piccarreta, 11/29/18, p. 3 ("Here, because of the aggregation, affiliation, and reciprocal link ventures and other conduct summarized above, Backpage knew that *every* ad had the potential for facilitating prostitution services, including child sex trafficking"). This does not come close even to alleging the necessary *mens rea*, particularly in this First Amendment context.

---

[18] Likewise, in *Backpage.com, LLC v. Lynch*, 216 F.Supp.3d 96 (D.D.C. 2106), the Justice Department argued that for a conviction under 18 U.S.C. § 1591, "[e]ven if an advertisement for illegal sex trafficking appeared on [its] website, an operator could not be convicted under [the law] *without proving that* [*it*] *knew* that the advertisement at issue related to illegal sex trafficking of a minor or of a victim of force, fraud, or coercion." DOJ's Reply in Support of Motion to Dismiss at 7-8, *Backpage.com, LLC v. Lynch*, No. 1:15-2155 (RBW), ECF No. 13 (emphasis added). Once again, the district court accepted the government's interpretation of the statute. 216 F.Supp.3d at 107.

The government's theory is equivalent to asserting it may assume the guilt of a bookstore owner under obscenity law because the store stocks adult publications. But such an assumption is *never* permissible. It is a basic proposition of First Amendment law that the government cannot criminally punish publishers or distributors of speech without sufficient proof of *scienter*, *i.e.*, that a defendant knew the *specific* speech that is the basis for criminal charges was unlawful and had specific *intent* to violate the law. *Smith v. California* 361 U.S. 147, 153-154 (1959) (striking down ordinance imposing criminal sanctions on the sale of obscene books without any required scienter, because absent proof that a seller had knowledge, "he will tend to restrict the books he sells" and the law would "impose a severe limitation on the public's access to constitutionally protected matter").[19] Astonishingly, the government fails even to allege a single instance involving any advertisement where the standard for *mens rea* would be satisfied.

**4.     The First Amendment And "Proceeds Of Crime."**

The government's argument that defendants have no right to the "proceeds of crime" begins with the same false assumption that it may assume in advance that all of the postings on Backpage were for illegal transactions. Not only does this assumption lack any legal basis,

_____

[19] *See also Mishkin v. New York* 383 U.S. 502, 511 (1966) ("[t]he Constitution requires proof of scienter to avoid the hazard of self-censorship of constitutionally protected material and to compensate for the ambiguities inherent in the definition of obscenity"); *United States v. X-Citement Video, Inc.* 513 U.S. 64, 78 (1994) (Court interpreted a federal statute prohibiting interstate transfer of child pornography to require that the government prove a defendant had knowledge of "both…the sexually explicit nature of the material and…the age of the performers," because a lack of such scienter requirements "would raise serious constitutional doubts").

23

but the government is asking this Court to prejudge the very issue currently pending in the Ninth Circuit. *See* AOB at 28-40. As set forth in the defendants' brief on appeal, mere probable cause is insufficient to justify pretrial seizures of publishing assets or proceeds. *See*, *e.g.*, *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 63 (1989); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Board,* 502 U.S. 105 (1991); *American Library Ass'n v. Thornburgh*, 713 F.Supp. 469, 484 n.19 (D.D.C. 1989) ("pre-trial seizure of non-expressive material [including printing presses, bank accounts, etc.] *ex parte* from a business engaged in expressive material also is unconstitutional"), *rev'd on standing grounds sub nom. American Library Ass'n v. Barr*, 956 F.2d 1178, 1194-96 (D.C. Cir. 1992).

The government asserts that these cases do not apply because they relate only to seizures of expressive materials or to assets of "an ongoing business," and that "Backpage has effectively ceased operations and is no longer in the publishing business." (Doc. 476 p. 13). Not only is this wrong on the law, as the cases make clear that seizing the proceeds of publishing is independently unconstitutional, it blunders into conceding the government has engaged in prior restraint by closing down the second largest classified ad website on the Internet. The government argues that Backpage had "already" closed down, (Doc. 476 p. 13 n. 19),[20] but it did so *only because the government seized all its assets*.[21] Its claim that

---

[20] This assertion is belied by the first paragraph of the indictment which states that Backpage was "shut down by federal law enforcement authorities in April 2018…." (Doc. 230 ¶ 1).

[21] Disposition of the website and related assets remains a live issue because defendants' corporate entities hold a lien on all the assets of Backpage and its affiliates. The First Amendment issue is not moot where resumption of a closed business is possible once the cloud over the assets is lifted. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000).

defendants have not identified cases holding it is improper to "seize the proceeds of a business that constituted a criminal enterprise," (Doc. 476 p. 13 n. 19), is false. *See*, *e.g.*, *Vance v. Universal Amusement Co.*, 445 U.S. 308, 315-16 (1980) (invalidating nuisance abatement law authorizing business closure prior to final adjudication); *Spokane Arcades, Inc. v. Brockett*, 631 F.2d 135, 138-39 (9th Cir. 1980), *aff'd mem.*, 454 U.S. 1022 (1981) (same). Once again, the government tries to justify its actions by assuming the very thing it must prove at trial.

**III.  If This Court Does Not Dismiss The Indictment Against These Defendants, Counsel For Defendants Request This Court To Issue Its Order Permitting Them To Withdraw.**

The government's conduct in seizing attorney IOLTA trust accounts has rendered defendants Padilla and Vaught indigent and unable to continue to fund their counsel. The government's conduct is the direct cause of defendants being without funds to continue to retain counsel, and constitutes changed circumstances in the case necessitating counsel's withdrawal. If the Court denies the present motion, undersigned counsel respectfully request this Court to its issue its order allowing them to withdraw from the case and appointment of the Federal Public Defender or experienced counsel from the Criminal Justice Act panel for the District Court in Phoenix.[22]

**IV.  CONCLUSION**

The government has engaged in a very successful litigation strategy, the results of which have impacted and violated defendants' Sixth Amendment right to counsel and Fifth

---

[22] Defendants Padilla and Vaught will submit evidence of their indigency to the Court under seal, signed consents to withdraw as attorney of record, and applications and proposed orders in compliance with LRCrim 57.14 and LRCiv 83.3.

Amendment due process of law. The strategy includes: 1) seizing company First Amendment proceed assets without holding an adversary hearing or tracing of the assets at the initiation of the case; 2) permitting defendants who would give up their constitutional rights to maintain company assets to pay their counsel of choice while seizing the same assets from presumed-innocent defendants who decline to resolve the case and choose to exercise their constitutional rights; 3) the unsuccessful filing of conflict motions to remove First Amendment counsel and then seizing of their trust accounts in the midst of litigation; and 4) the seizure seven months post-indictment of attorney trust account funds that were advanced to defendants Vaught and Padilla to defend this case, leaving them without the necessary funds to defend themselves.

This is a complicated matter that requires the assistance of multiple attorneys, a legal assistant, and technical support to effectively defend the case. The government's actions and avowal that attorneys may be investigated and risk criminal charges if advanced fees are used to defend the case have severely impacted the attorney-client relationship and left counsel unable to be paid for all work performed since December 1, 2018, unable to retain experts, and unable to obtain technical assistance to review the millions of documents that were provided in disclosure. This is not a routine forfeiture matter but a strategic series of actions by the government to impact the defendants' ability to defend themselves. Accordingly, the indictment must be dismissed.

RESPECTFULLY SUBMITTED this 8th day of March, 2019.

PICCARRETA DAVIS KEENAN FIDEL PC

By:    /s/        Michael L. Piccarreta
                Michael L. Piccarreta
                Attorney for Defendant Andrew Padilla

KARP & WEISS, P.C.

By:    /s/        Stephen M. Weiss
                Stephen M. Weiss
                Attorney for Defendant Joye Vaught

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 8th day of March, 2019, I electronically transmitted the foregoing to the Clerk of the Court via the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Reginald Jones:  Reginald.Jones@usdoj.gov
Peter S. Kozinets:  Peter.Kozinets@usdoj.gov
John Kucera:  John.Kucera@usdoj.gov
Margaret Perlmeter:  Margaret.Perlmeter@usdoj.gov
Kevin Rapp:  Kevin.Rapp@usdoj.gov
Andrew Stone:  Andrew.Stone@usdoj.gov
Thomas Bienert:  tbienert@bmkattorneys.com
Paul Cambria:  pcambira@lglaw.com
Robert Corn-Revere:  bobcornrevere@dwt.com
Bruce Feder: bfeder@federlaw.com
James Grant:  jimgrant@dwt.com
Michael D. Kimerer, mdk@kimerer.com
Gary Lincenberg: glincenberg@birdmarella.com