Paul J. Cambria, Jr. (NY 15873, admitted *pro hac vice*)
Erin E. McCampbell (NY 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com

Janey Henze Cook (AZ 022496)
HENZE COOK MURPHY PLLC
722 E. Osborn Road, Suite 120
Phoenix, Arizona 85014
Telephone: (602) 956-1730
Facsimile: (602) 956-1220
janey@henzecookmurphy.com

*Attorneys for Defendant Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                   Plaintiff,<br><br>vs.<br><br>Michael Lacey, *et al*.,<br><br>                   Defendants. | NO. CR-18-00422-PHX-SMB<br><br>**DEFENDANT MICHAEL LACEY'S MOTION TO AMEND HIS CONDITIONS OF PRETRIAL RELEASE AND MOTION FOR EXPEDITED RELIEF**<br><br>(Expedited oral argument requested) |

Defendant Michael Lacey, by and through his undersigned attorneys, hereby moves under 18 U.S.C. § 3142(c)(1)(B) & (3) for an order amending his conditions of pretrial release as set forth in the Court's April 13, 2018 Order (Doc. 67).  As discussed in greater detail below, the condition of release requiring continued electronic monitoring is not the least restrictive

condition that will reasonably ensure his presence at trial and the safety of the community. Further, electronic monitoring prevents Mr. Lacey from engaging in the form of exercise that he has relied upon his entire life—swimming—to ameliorate the effects of a heart condition, maintain physical fitness, and alleviate stress.  In light of the fact that Mr. Lacey will be taking a trip on March 27, 2019 with his wife, which was approved by pretrial services, and during which he would greatly appreciate the ability to swim and step on the beach, Mr. Lacey requests that this Court hear this Motion on an expedited basis.

This Motion is based on the attached Memorandum of Points and Authorities, the Court's file, and any evidence or argument presented at the hearing on this matter.  This is Mr. Lacey's first motion to amend his conditions of pretrial release.

U.S. Pretrial Services has no objection to the removal of Mr. Lacey's electronic monitoring anklet; however, counsel for defendant and counsel for the government have been unable to resolve this issue without bringing the instant Motion.

Excludable delay under 18 U.S.C. § 3161(h)(1) may occur as a result of this Motion or of an order based thereon.

Dated:    March 19, 2019              LIPSITZ GREEN SCIME CAMBRIA LLP

*/s/ Paul J. Cambria, Jr.*
Paul J. Cambria, Jr.
Erin McCampbell Paris
*Attorneys for Defendant Michael Lacey*

HENZE COOK MURPHY PLLC

*/s/ Janey Henze Cook*
Janey Henze Cook
*Attorneys for Defendant Michael Lacey*

2

## MEMORANDUM OF POINTS AND AUTHORITIES

As set forth in greater detail below, defendant Michael Lacey moves to amend the order setting his conditions of supervised release (Doc. 67) to strike the condition requiring electronic monitoring. Further, he seeks an order allowing substitution of one of the assets pledged as part of his conditions of pretrial release.

## BACKGROUND

### I. Mr. Lacey is a 70-year-old, long-term resident of Arizona, with deep ties to this District.

Mr. Lacey is an honored journalist who has been an active member of the Arizona community for fifty-three years. In 1966, Mr. Lacey moved to Arizona to attend Arizona State University. In 1970, Mr. Lacey co-founded an alternative newspaper originally called the *Arizona Times* and subsequently renamed the *Phoenix New Times*. The newspaper became and has remained a prominent voice for free speech and journalism in Arizona for forty-nine years. In addition to founding the *Phoenix New Times*, Mr. Lacey and his partners acquired sixteen other newspapers, forming a nationwide conglomerate which they operated under Village Voice Media Holdings, LLC ("VVMH"). Collectively, the newspapers, which provided their publications free of charge, had more than 1.8 million readers. Because the newspapers did not require subscriptions, the publication of classified advertisements evolved as a key part of the revenue supporting the newspapers.

Mr. Lacey, who served as the editor-in-chief of the newspapers, oversaw investigative journalism covering a broad array of topics. During his tenure, the newspapers won hundreds of awards, including the Pulitzer Prize. Indeed, Mr. Lacey has been honored numerous times for his excellence in journalism.[1]

---

[1] Mr. Lacey won the 2011 Clarion Award from the Association for Women in Communications for his story about a diabetic woman who died in jail custody. *See* Michael Lacey, *What's Mom Worth?: When a Woman Became Deathly Ill in Sheriff Joe Arpaio's Jail, Guards and Nurse Ignored Her Agony,* PHOENIX NEW TIMES (Dec. 9, 2010), http://www.phoenixnewtimes.com/news/whats-mom-worth-when-a-woman-

In addition to his commitment to providing free access to trail-blazing journalism, Mr. Lacey has been very generous to the Arizona community. For example, from 2014-2017, Mr. Lacey and his co-defendant James Larkin donated $3.75 million dollars to various non-profit organizations that assist immigrants and refugees.[2] Mr. Lacey has also donated to various non-profit organizations including those focused on encouraging minorities to vote. Further, Mr. Lacey (through VVMH), created paid digital fellowships for minority journalists in conjunction with the Walter Cronkite School of Journalism and Mass Communication at Arizona State University (and the Medill School of Journalism at Northwestern University). These programs were instrumental in providing aspiring minority journalists with a jump start on their careers. These are just examples of the many philanthropic activities in which Mr. Lacey has participated.

---

became-deathly-ill-in-sheriff-joe-arpaios-jail-guards-and-nurses-ignored-her-agony-6446744. Mr. Lacey was awarded the 2010 Best in the West journalism competition award for Immigration and Minority Affairs Reporting (along with Stephen Lemons and Paul Rubins of the *New Times*) for a series concerning immigration enforcement tactics of the Maricopa County Sheriffs County sheriff's office. *See* Michael Lacey, *Are Your Papers In Order?,* Phoenix New Times (March. 12, 2009), http://www.phoenixnewtimes.com/news/are-your-papers-in-order-6426683. He led a VVM series called *Amongst Us*, deploying reporters across the country to report stories of the travails and contributions of Latinos, which won the 2011 James Aronson Award for Social Justice Journalism. *See* http://brie.hunter.cuny.edu/aronson/?page_id=1169. Mr. Lacey has also received the Valley of the Sun Society of Professional Journalists' President's Award, and has been honored by the Arizona chapters of the American Civil Liberties Union and the NAACP.

[2] These funds represent the settlement that Mr. Lacey and Mr. Larkin obtained after filing a successful Civil Rights Act suit against former Maricopa County Sheriff Joe Arpaio for their wrongful arrests. The events that led to this lawsuit are indicative of Mr. Lacey's commitment to vindication of his constitutional rights and defending himself against bogus criminal charges. Beginning in 2004, the *Phoenix New Times* published a series of articles critical of Sheriff Arpaio. These articles led to the arrests of Mr. Lacey and Mr. Larkin in the dead of night, *see* David Carr, *A Knock in the Night in Phoenix*, New York Times (May 12, 2008), http://nytimes.com/2008/05/12/business/media/12carr.html; however, all of the charges against them were promptly dismissed. Subsequently, they filed the civil action, and prevailed with an *en banc* victory in the Ninth Circuit, in which the Court recognized that "[i]t is hard to conceive of a more direct assault on the First Amendment than public officials ordering the immediate arrests of their critics." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (*en banc*).

Mr. Lacey has significant personal ties to Arizona and the United States. Mr. Lacey is newly married to a long-term resident of Arizona and he and his wife reside in Arizona. He owns numerous properties in Arizona, including his primary residence, where he has resided since 2005. Additionally, he owns several properties in the State of California.[3] He has two sons who live in California, a brother who lives in Kansas, and a sister who lives in New York. He has always and continues to maintain strong relationships with his children and siblings.

**II.     The charges pending against Mr. Lacey.**

On March 28, 2018, a grand jury sitting in this District indicted Mr. Lacey and his co-defendants for allegedly conspiring to violate the Travel Act (18 U.S.C. §§ 371, 1952), as well as violations of the Travel Act (18 U.S.C. §1952), and the money laundering statutes (18 U.S.C. §§ 1956, 1957). (*See* Indict., Doc. 3.) On July 25, 2018, the government obtained a superseding indictment, which is the operative indictment in this case. (*See* Super. Indict., Doc. 230.) The superseding indictment included the original charges, as well as additional charges under the Travel Act and money laundering statutes. (*See id.*)

The charges stem from defendants' former ownership of the website www.backpage.com, which provided an online platform for third-party users to post classified advertisements ("Backpage"). In 2004, VVMH launched its online classified advertisement platform, Backpage, which allowed third-parties to create and post advertisements under a variety of topics, including, but not limited to, real estate, jobs, rentals, as well as adult topics such as dating, massage, domination, and escorts. In 2015, defendants sold their interests in Backpage to its long-time chief executive officer, Carl Ferrer, through a seller-financed loan. Entities controlled by Mr. Ferrer operated Backpage until it was seized and shut down by the government on April 6, 2018 as part of its seizures in the related cases *United States v. Ferrer*, 18-CR-464, and *United States v. Backpage*, 18-CR-465. The government's novel theory for

---

[3]     As discussed in greater detail below, due to the government's pretrial seizures, Mr. Lacey is in the process of stipulating to the interlocutory sale of two properties in San Francisco, California.

prosecuting Backpage, Mr. Ferrer, and the defendants in this action is that, by providing a platform for third-parties to create and post advertisements for adult services, defendants are criminally liable for *any* conduct of those third parties. As set forth in greater detail in other filings before this Court incorporated herein by reference (*see* Joint Repl. to Resp. to Mot. to Dismiss, Doc. 494 at 10-24), the government's theory is deeply flawed and fails to take into account the myriad judicial opinions recognizing Backpage as "an avenue of expression of ideas and opinions" protected by the First Amendment, including its "classified ads for 'adult' services." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015).[4]

Additionally, prior to issuance of the indictment in this case, the Attorney General of the State of California filed a criminal complaint against Messrs. Lacey, Larkin, and Ferrer, charging

---

[4] This is just one example of very clear judicial recognition that Backpage's activities relating to "adult" advertisements are constitutionally protected. There are many others, and no cases to the contrary. For example, in *Doe v. GTE Corp.*, 347 F.3d 665 (7th Cir. 2003), the Seventh Circuit wrote:

> A web host, like a delivery service or phone company, is an intermediary and normally is indifferent to the content of what it transmits. Even entities that know the information's content do not become liable for the sponsor's deeds. Does a newspaper that carries an advertisement for "escort services" or "massage parlors" aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity? How about Verizon, which furnishes pagers and cell phones to drug dealers and thus facilitates their business?

*Id.* at 669; *see Backpage.com LLC v. McKenna*, 881 F. Supp. 2d 1262, 1282 (W.D. Wash. 2012) ("The Court finds it unlikely that Defendants would be able to prove that *all* online advertisements for escort services are ads for prostitution. Thus, a website that contains a section for postings for escort services that chooses to either shut down that section or require age verification will likely chill protected speech in the course of doing so" (emphasis in original)); *see also Backpage.com LLC v. Hoffman*, 2013 WL 4502097 at *8 (D.N.J. 2013) (enjoining statute and rejecting the argument "that the Act does not regulate speech protected by the First Amendment because it only prohibits the advertisement of an illegal transaction"); *Backpage.com LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013) (enjoining statute).

6

them with one count of conspiracy and nine counts of pimping. Much like this case, the State sought to hold defendants liable for the conduct of third parties based on their ownership interests in Backpage. Mr. Lacey self-surrendered in California upon the filing of the criminal charges against him. Critically, on December 9, 2016, the court granted defendants' demurrer, dismissing all counts and recognizing that "providing a forum for online publishing is a recognized legal purpose." *People v. Ferrer*, No. 16FE019224 (Sup. Ct. Sacramento Cnty. Dec. 9, 2016), slip op. at 13. On December 23, 2016, the Attorney General filed a new criminal complaint against Messrs. Lacey, Larkin, and Ferrer, re-charging them with the same pimping counts in addition to money laundering counts. On August 23, 2017, the court granted defendants' demurrer and dismissed all counts relating to pimping and all money laundering counts involving funds allegedly derived from payments by users to post advertisements on Backpage. *See People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cnty. Aug. 23, 2017). The only counts that survived demurrer were the money laundering counts based on allegations that Backpage committed bank fraud or wire fraud for use of descriptors on users' credit card bills that the state alleged were deceptive. On March 5, 2018, defendants moved to dismiss the remaining charges for gross governmental misconduct and/or to suppress evidence. The court is scheduled to hear argument on that motion on June 7, 2019.

       Throughout the California proceedings, Mr. Lacey has been released on bail without the requirement of use of an electronic monitoring anklet or other forms of monitoring. Notably, while on release, and long after he was aware of the grand jury investigation in this District that ultimately led to the instant charges, the court in California returned his passport to allow him to travel to Mexico for a vacation with his wife. Mr. Lacey was in Mexico for eighteen days and returned as planned.

### III. The current conditions of pretrial release were more restrictive than necessary and should be revisited.

More than one year prior to Mr. Lacey's arrest, his attorneys had been in contact with the prosecutors on this case. In the event of the issuance of an indictment, Mr. Lacey offered to self-surrender, as he had been allowed to do in a case pending in the State of California.[5]

On April 6, 2018, the day before Mr. Lacey and his wife had planned to host family and friends at their home for their wedding reception, the government executed a warrant for his arrest. Pretrial services indicated that, based on its extensive investigation of Mr. Lacey's personal history, familial and community ties, and finances, as well as a thorough assessment of the crimes charged, release on his own recognizance with certain specified conditions was merited. The government took a different position, and the parties appeared for a detention hearing. At the detention hearing, the parties indicated that they had reached an agreement which included certain conditions of release and the posting of a $1,000,000 surety bond and two property bonds. (*See* Am. Min. Entry, Doc. 62.) Mr. Lacey was detained until April 13, 2018, when he was able to secure his property bonds with certain properties. (*See* Min. Entry, Doc. 65.) In addition to posting the bonds, the Order Setting Conditions of Release ("Order") specified that Mr. Lacey must: (1) not travel outside of Maricopa County without express prior Court or Pretrial Services permission; (2) avoid all direct or indirect contact with co-defendants about Backpage-related matters outside the presence of counsel; (3) report as directed to Pretrial Services; (4) refrain from use and possession of controlled substances; (5) submit to random urine drug testing; (6) surrender all travel documents; and (7) maintain weekly contact with defense counsel. (Order, Doc. 67.)

Mr. Lacey has been monitored by Pretrial Services for almost one year, during which he fully complied with his pretrial release conditions. At this time, his Pretrial Services officer, the

---

[5] Notably, during the time between commencement of the grand jury investigation and issuance of the indictment in this case, Mr. Lacey frequently traveled outside the District, including to international destinations, for weeks at a time, returning after each trip.

8

person in the best position to opine on his risk of flight and danger to public safety, has indicated that he does not oppose the removal of Mr. Lacey's electronic monitoring anklet.

**IV.   The condition requiring use of an electronic monitoring anklet prohibits Mr. Lacey from swimming, which he relies upon to maintain health and alleviate stress.**

Mr. Lacey is 70 years old. Prior to his arrest, he regularly swam to maintain his health, manage his weight, and alleviate stress. This discipline is the one form of exercise to which he has been able to successfully commit. He has been unable to swim since his arrest because he is required to wear an electronic monitoring anklet. The instant motion is based primarily on his desire to regain the ability to swim, which is very important given his personal and family history of a heart condition, as recognized by his physician. (*See* Mar. 8, 2019 Ltr. from Dr. Fred S. Markham, M.D., attached hereto as Ex. A.)

Additionally, Mr. Lacey will be taking a trip to Hawaii on March 27, 2019, which was approved by Pretrial Services. Mr. Lacey was able to purchase this trip using previously accumulated airline miles which would expire if he did not use them. Because this trip is imminent, Mr. Lacey respectfully requests an expedited determination on the instant Motion. Critically, Mr. Lacey would avoid pools and the ocean if wearing his anklet; however, if exposure to sand or a splash from a swimmer made contact with the anklet, or if the anklet simply malfunctioned, he would need to immediately return to this District to report to Pretrial Services. Recognizing that the technology of the anklet is not perfect, counsel fears that, if Mr. Lacey has a problem, he will need to purchase an expensive airline ticket with funds not miles, which he cannot afford.

**ARGUMENT**

Based on all of the above and the opinion of Mr. Lacey's Pretrial Services officer, electronic monitoring is not a necessary condition to ensure his presence at trial or public safety. For that reason, Mr. Lacey respectfully requests that this Court amend the Order to strike the condition requiring the continued use of an electronic monitoring anklet. This Court is

empowered to "at any time[,] amend the order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3). Further, conditions of release must be the "least restrictive" conditions necessary to "reasonably assure" the defendant's appearance and the community's safety." 18 U.S.C. § 3142(c)(1)(B). The requirement that the conditions "reasonably assure" appearance and safety do not require a guarantee of safety or non-flight. *See United States v. Hir*, 517 F.3d 1081, 1086, 1092 n.2 (9th Cir. 2008); *United States v. Gentry*, 455 F. Supp. 2d 1018, 1032 (D. Ariz. 2006). In making a determination on the appropriateness of the conditions of release, courts must consider: the defendant's history and characteristics; danger to the community; and nature of the offense and weight of the evidence. *See* 18 U.S.C. § 3142(g).

**I.     Mr. Lacey's history and characteristics weigh in favor of amending the Order to omit the condition requiring continued use of an electronic monitoring anklet.**

Mr. Lacey's history and characteristics weigh in favor of removal of the anklet because he presents no risk of flight. He is 70 years old and has resided in this District since 1966. He has strong familial ties to this District and owns numerous properties in this District, in addition to properties in California.

Mr. Lacey has not hid his whereabouts from the prosecutors in this case. Mr. Lacey's attorneys were in contact with the prosecutors in this case prior to his arrest and offered to self-surrender, just as he had in the case pending in California. After learning of the grand jury investigation in this District, but prior to his arrest, he regularly traveled outside this District, including to international destinations for weeks at a time. Indeed, the court in California returned his passport to allow him to take an eighteen-day trip to Mexico while charges were pending against him in that State. Because he was not required to wear an electronic monitoring anklet as part of his conditions of release in that case, he traveled to Mexico without one and he returned as planned. Then, after his arrest in this case, he has fully complied with his conditions of release.

The most important factor for this Court's analysis is the position of Mr. Lacey's Pretrial Services officer, who has monitored Mr. Lacey for nearly a year. ***His officer does not oppose removal of the anklet***. This factor, along, weighs heavily in favor of removal of the anklet.

Further, Mr. Lacey is not someone to shy away from a legal battle. He has a well-documented history of bringing affirmative litigation to vindicate his constitutional rights. *See, e.g.*, *McKenna*, 881 F. Supp. 2d at 1282. He has fought and beat vindictive criminal charges. *See Lacey*, 693 F.3d at 917. Further, he has mounted a vigorous and successful defense to the case pending in California, which involves similar theories of culpability. *See People v. Ferrer*, No. 16FE019224 (Sup. Ct. Sacramento Cnty. Dec. 9, 2016); *People v. Ferrer*, No. 16FE024013 (Sup. Ct. Sacramento Cnty. Aug. 23, 2017). This background demonstrates that he is someone who fully litigates cases to their conclusion, not someone who runs or backs down or is pressured into relenting. He will appear for his trial to mount a vigorous defense.

The government does not necessarily disagree with the assessment of Pretrial Services; however, the government has pointed to a foreign trust with assets of approximately $16.5 million that purportedly renders Mr. Lacey a risk of flight. The government's concern is unfounded. Mr. Lacey has surrendered his passport. Further, the trust was formed for the benefit of his sons in accordance with all federal tax laws, including the filing of a Report of Foreign Bank and Financial Accounts fully disclosing this trust to the Internal Revenue Service. Additionally, the trust has been subjected to the government's pretrial seizures. Indeed, this asset is subject to four different forms of pretrial restraint. The government named it in both forfeiture counts in the superseding indictment. (*See* Doc. 230 at 65, 80.) In the Central District of California, the government sought a pretrial seizure warrant under docket 18-MJ-997, which remains subject to sealing, and then filed a civil forfeiture action under docket 18-CV-8565. Finally, the government has pursued administrative forfeiture of the asset through the United States Postal Inspection Service and has assigned the trust Asset I.D. Number 19-USP-000268.

## II. The removal of Mr. Lacey's anklet does not increase the risk of danger to the community.

This factor is a non-issue for this Court. Mr. Lacey presents no risk of danger to public safety. In the past, the government claimed that Mr. Lacey presented a threat to public safety to the extent that he exerted any continued control over Backpage, notwithstanding the fact that Backpage was sold to Mr. Ferrer in 2015. The government's characterization of Mr. Lacey's control over Backpage after the sale to Mr. Ferrer is unfounded; and the website is no longer operational. Mr. Lacey cannot exert control over a website that (a) was seized by the government on April 6, 2018, and has been in the government's control since then and (b) has not operated since April 6, 2018. *See* www.backpage.com. For this reason, removal of Mr. Lacey's anklet presents no risk of danger to the community. Again, the person in the best position to make a determination about risk to public safety, Mr. Lacey's Pretrial Services officer, does not oppose the removal of his anklet.

## III. The government's case is infirm.

The government's theory is flawed at every step. As set forth in greater detail in the Joint Reply to Response to Motion to Dismiss (Doc. 494 at 10-24), and incorporated herein by reference, the government's case fails to take into consideration the law regarding protected First Amendment activities, and fails to plead the requisite heightened mens rea, among other errors. Due to these critical shortcomings, the strength of the government's case does not weigh in favor of continue use of the anklet. Indeed, Mr. Lacey maintains that this case is highly defensible and will litigate his defenses in future submissions to this Court.

## IV. Mr. Lacey requests modification of the property pledged as part of his conditions of pretrial release.

Additionally, due to the pretrial seizures in this case, Mr. Lacey is unable to maintain each of his properties and pay the requisite taxes. As a result, Mr. Lacey is currently working with the Government to stipulate for the interlocutory sale of two residences, one located at 2755 Fillmore Street San Francisco, CA 94123, and the other located at 1100

Union #700 San Francisco, CA 94109. The property located on Union Street is currently pledged as security for Mr. Lacey's release in this matter. (*See* Doc. 67.)

Mr. Lacey hereby moves to modify his release conditions in this case to allow for the interlocutory sale of the Union property. Per an agreement with the government, the net proceeds from the sale would be wired to the United States Marshall's Service. Because the property serves as collateral for his release in the instant matter, Mr. Lacey hereby moves for a modification of his release conditions to allow for the net proceeds from that sale to serve as substitute collateral securing his release. The Government does not oppose modification of the release condition to allow for the interlocutory sale and replacement of the security with the net proceeds from the sale. The parties contemplate filing stipulations for interlocutory sales in the Central District of California shortly.

## CONCLUSION

In light of the foregoing, Mr. Lacey respectfully requests that this Court amend the Order to remove the condition requiring use of an electronic monitoring anklet. Further, Mr. Lacey requests that this Court allow him to substitute one of the properties pledged as part of the conditions of his pretrial release to be replaced with funds to be held by the United States Marshals Service upon interlocutory sale of that property, which is not opposed by the government.

RESPECTFULLY SUBMITTED this 19th day of March, 2019,

*/s/*   *Paul J. Cambria, Jr.*
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

*/s/*   *Janey Henze Cook*
HENZE COOK MURPHY PLLC
Attorneys for Defendant Michael Lacey

On March 19, 2019, a PDF version of this document was filed with Clerk of the Court using the CM/ECF System for filing and for Transmittal Of a Notice of Electronic Filing to the Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Reginald Jones, reginald.jones4@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
John Kucera, john.kucera@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Patrick Reid, Patrick.Reid@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Amanda Wick, Amanda.Wick@usdoj.gov