ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Michael Lacey,<br><br>　　　　　Defendant. | CR-18-422-PHX-SPL (BSB)<br><br>**UNITED STATES' RESPONSE TO MOTION TO AMEND THE RELEASE CONDITIONS OF LACEY'S PRETRIAL RELEASE (Doc. 503)** |

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The United States responds to defendant Michael Lacey's motion to amend his conditions of release (Doc. 503). The United States argued at the early stage of these

proceedings that Lacey is a risk of flight in light of the serious charges against him, the weight of the evidence, his financial status and ties abroad, and his recent movement of $16.5 million of dollars to an offshore account in anticipation of his indictment. The United States argued he should be released only on conditions or a combination of conditions sufficient to reasonably assure his appearances as required by law. For a variety of reasons, Lacey's recent request to remove electronic monitoring is unavailing and the government is not prepared to consent to, and indeed, opposes a change in the current conditions of release.

*First,* Lacey has not articulated any change of circumstances to warrant amending his release conditions. He claims he would like to swim and the electronic monitoring prevents him from doing so (and may otherwise interfere with a Hawaiian vacation). These reasons were previously known and are insufficient to support his motion.

*Second*, Lacey has been sanctioned by a court in Washington State—and his former company, Backpage.com, LLC, was recently sanctioned by an Illinois federal court—for making false claims in Backpage-related litigation. As discussed below, this raises concerns about whether Lacey would be candid with the Court (including Pretrial Services) when responding to questions about travel, finances, etc.

*Third*, Lacey has a history of moving money offshore ($16.5 million transferred to an undisclosed account in Hungary) to prevent the government from seizing tainted money generated from illegal Backpage revenue. These funds have not been located abroad and could presumably be used by Lacey if he chooses to flee.

*Fourth*, since his arrest, the weight of the evidence against Lacey has increased—and so has his exposure to a lengthy sentence if convicted. As detailed below, Lacey, in his capacity as a Backpage owner, employed several business strategies to increase revenue by expanding Backpage's volume of prostitution ads. These acts rebut his claim that Backpage was simply a neutral platform for the posting of advertisements created by third parties. Lacey has also acknowledged that Backpage's advertisements included child sex trafficking. The motion should be denied.

# ARGUMENT

## A. Lacey Fails to Articulate Changed Circumstances to Warrant a Modification of His Conditions

Lacey has recycled his original opposition to pretrial detention (Doc. 23) and is now attempting to re-litigate his release conditions after having agreed to certain terms in exchange for his release. (Doc. 67.) Lacey had the opportunity to have a detention hearing but instead opted to be released on certain conditions. Indeed, his co-defendant—James Larkin—made the same request (to remove electronic monitoring) after agreeing to release on certain conditions, and that request was denied by this Court. (*See* Docs. 197, 224.) The Court found Larkin failed (as Lacey does here) to identify circumstances not known when he agreed to the release conditions. For this reason alone, Lacey's motion should be denied.

Under the Bail Reform Act of 1984, the "judicial officer may at any time amend the [release] order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3). The legislative history of this provision is clear that Congress intended to require **a showing of changed circumstances to justify a modification of conditions**: "[t]his authorization is based on the possibility that a changed situation or new information may warrant altered release conditions." S. Rep. 98-225, *available at* 1983 WL 25404, at *16 (Aug. 3, 1983); *see also United States v. Lafrance*, 2016 WL 3882845, at *1 (D. Mass. July 13, 2016) ("Defendant has failed to show a substantial change in circumstances that warrants such a significant change in the conditions of his release, and the developments in this case, as described in the summary of the docket (set out above) similarly shows no qualifying change in circumstances for the modification sought. To the contrary, Defendant's case has progressed closer to trial: he has been indicted, discovery has been provided, and a superseding indictment broadens the scope of potential liability and increases the potential penalties.").

Courts reviewing requests to amend bond conditions under Section 3142(c)(3) read the provision "in conjunction with §3142(f)." *United States v. Merola*, 2008 WL 4449624, at *2 (D.N.J. Sept. 30, 2008) ("Under § 3142(f) of the Bail Reform Act of 1984, the Court

is expressly authorized to reopen the detention hearing of a defendant when material information **'that was not known to the movant at the time of the hearing'** comes to light. Courts have interpreted this provision strictly, holding that hearings should not be reopened if the evidence was available at the time of the hearing. Thus, the definition of 'changed circumstances.'"); *see also United States v. Wei Seng Phua*, 2015 WL 127715, at *1-2 (D. Nev. Jan. 8, 2015) ("Contrary to defendants' assertions, the government's factual support and reliance on 18 U.S.C. § 3142(f) are justified because this Court must consider whether new information exists that was not previously known or presented at the detention hearing to determine whether to modify the pretrial release condition at issue."). As the statute provides, a defendant awaiting trial may reopen a detention hearing "if the judicial officer finds that information exists *that was not known* to the movant at the time of the hearing and that has a material bearing on the issue" of whether he will flee or is a danger. 18 U.S.C. §3142(f)(2) (emphasis added).

Here, there was no detention hearing. Instead, the parties negotiated over several days and settled on mutually acceptable terms for release. One important term insisted upon by the United States was active Global Positioning System (GPS) electronic monitoring. Defendant agreed to this term. Lacey is now reneging on that agreement by urging facts that were known at the time of his arrest (*e.g.*, he has been a swimmer for "his entire life" and occasionally takes beach vacations) to change his release conditions. (Doc. 503 at 2.) In short, Lacey is asking for a "do over" by asserting that electronic monitoring is an inconvenience. This is not a materially changed circumstance justifying modification under the Bail Reform Act.

Co-defendant Larkin previously made the same request to remove the electronic monitoring, albeit for different reasons. After agreeing to certain release conditions in exchange for his release, Larkin argued that he needed to travel unencumbered by the ankle bracelet because of a need to visit his wife and daughter residing in California. The Court found that the circumstances that precipitated his request were known at the time he reached the agreement on his release conditions. Magistrate Judge Bridget S. Bade's

analysis of the lack of changed circumstances that applied to Larkin's request applies with equal force to Lacey:

> So on April 16, 2018, when the order was entered with those conditions of release, he knew all of that information. He knew those facts. So what you've described or what it appears to me that you've described is that he's having second thoughts, that he, after having entered into this agreement, realizes that he doesn't like it. *That to me is not a changed circumstance.*

(Doc. 237 at 7) (emphasis added.)

Magistrate Judge Bade denied Larkin's request to remove the ankle bracelet and observed:

> [W]hat you're arguing for are serial detention hearings. Same circumstances, let's just present them over and over again and see what the Court will do this time. Let's judge shop. Let's get a different judge. Let's appeal to the district judge. You want to go back and revisit all the issues of flight and danger and the things that would be decided at a detention hearing.

(*Id.* at 33.) Because Lacey likewise presents no changed circumstances, this request should be denied.

### B. **Lacey's Recent Court Sanctions**

On March 25, 2019, a district court in the Northern District of Illinois imposed a $250,000 sanction against Backpage for "its fraudulent representations during the course of this litigation." (*See* Order dated March 25, 2019, in *Backpage.com, LLC v. Dart*, CV-15-06340, attached as Ex. A; *see also* 446-1 at 14-35.) This is the same case that resulted in a Seventh Circuit decision in 2015 that Lacey cited in his motion for the proposition that courts have recognized Backpage as "an avenue of expression of ideas and opinions." (Doc. 503 at 6 (citing *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015).) We now know that the Seventh Circuit's decision was premised on Backpage's fraudulent representations. The district court's recent order recognized that "Backpage.com knowingly took positions that were factually unsupported and made numerous false statements to advance its claim against Sheriff Dart." (Ex. A at 5.) "Indeed, it is difficult to imagine how Backpage.com could have advanced its claim if, in lieu of the false allegations identified above, it had included the admissions it made in the plea agreement."

(*Id.*)  The district court rewrote Backpage's complaint to demonstrate how it would have read if Backpage hadn't made false representations to the court:

> The Sheriff has infringed Backpage's First Amendment rights by accurately advising credit card companies (two of them, anyway) that the great majority of ads on Backpage's adult services web site are for prostitution and that Backpage routinely doctors those ads to conceal their unlawful nature.  When told about these facts by Sheriff Dart, those credit card providers decided that they did not want to be publicly linked to a company like Backpage and stopped accepting payments for ads placed on Backpage.com.  Or at least they thought they had stopped accepting such payments.  In reality, however, Backpage.com devised ways to deceive the card companies about its continued used of their cards as payment for access to its adult services advertising.  It also devised additional means to collect payments for those ads and continued to receive substantial revenues from such advertising.

(Ex. A at 5.)

In addition, on May 23, 2018, in the Superior Court of the State of Washington, a judge imposed sanctions of two $100,000 awards against Lacey, co-defendant James Larkin and others for, among other things, making claims [to the court] that were untruthful:

> Another one that the Court can consider in regards to bad faith is procedural bad faith and that is vexatious conduct during the course of litigation, wasting private and judicial resources, **making claims that, months later, were found to be untruthful.**

(*See R.O. v. Medalist Holdings, Inc.*, No. 17-2-04897, Superior Court State of Washington, May 23, 2018, Tr. attached as Ex. B, p. 64-65.)  (Lacey has appealed that order.)

Given this recent history, Lacey does not inspire confidence that he would be candid to the Court (and his assigned Pretrial Services Officer).  The precaution of electronic monitoring is warranted for this further reason.  *See, e.g., United States v. Hir*, 517 F.3d 1081, 1092 (9th Cir. 2008) (for release orders to be effective, "they depend on [the defendant's] good faith compliance") (quoting *United States v. Tortora*, 922 F.2d 880, 886 (1st Cir. 1990) (concluding that similar release conditions contained "an Achilles' heel . . . virtually all of them hinge on the defendant's good faith compliance" and "the

conditions as a whole are flawed in that their success depends largely on the defendant's good faith—or lack of it. They can be too easily circumvented or manipulated.")).

### C. Lacey Moved $16.5 Million Off-Shore to Avoid Government Seizure

As detailed in the superseding indictment, Lacey has obstructed the government's interest in seizing tainted funds by using his attorney's IOLTA to move money offshore in anticipation of being indicted. (*See* Doc. 230, Counts 99, 100 and ¶ 16; *see also* Email dated July 29, 2016, from Lacey to John Becker, attached as Ex. C.) Lacey did this *after* he was charged by the State of California with various offenses related to his ownership of Backpage and learning Backpage's CEO, Carl Ferrer, had received an Arizona federal grand jury subpoena. Lacey sought advice not only from his attorney in placing funds ($16.5 million) offshore, but also requested advice from his bank on how to avoid a government seizure. (*Id.*) Lacey did this well before he was facing arrest, an 86-count superseding indictment, and, now, considerable evidence implicating him in a 14-year criminal enterprise that facilitated prostitution, including child sex trafficking. These funds have not been located abroad and presumably may be available to Lacey if he chooses to flee.

### D. Nature of the Offense and Strength of the Evidence

Lacey's rehash of the nature of the offense and the strength of the evidence is inaccurate and should be rejected. (*See* Doc. 503 at 5-7, 12.) The United States argued in its original detention motion that the strength-of-the-evidence factor supported a flight-risk determination because the grand jury had already returned a 93-count indictment that summarized incriminating evidence against Lacey (Doc. 3), and the United States Senate had separately issued a 50-page report recognizing the criminal nature of Lacey's contributions to Backpage.[1] (*See* Doc. 13 at 4-5.) The Senate reported Backpage's internal documents revealed that nearly all of Backpage's "adult" advertisements were solicitations for prostitution, Backpage was fully aware of the true nature of these ads, and Backpage

---

[1] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf.

- 7 -

had taken an array of affirmative steps to help its customers (pimps and traffickers) "sanitize" and conceal the ads' illegality.

Since Lacey's release on conditions in April 2018, the strength of the evidence has increased, as supported by the July 2018 Superseding Indictment (Doc. 230, which contains a detailed account of additional incriminating evidence). Much of this evidence is summarized in Doc. 446 at 9-14, which is incorporated by this reference. As these filings explain, Defendants, including Lacey, pursued numerous business practices to increase Backpage's volume of prostitution ads and conceal its activities from law enforcement. These practices included "moderation" (redrafting prostitution ads to make them less obvious to law enforcement, and posting the revised ads without altering the true nature of the illegal transactions they promoted), reciprocal-link programs (cross-referral business arrangements with websites like The Erotic Review, which contained "reviews" of adult and child prostitutes advertised on Backpage), aggregation/pre-boarding (trolling the web for prostitution ads, copying and posting the ads on Backpage, and then contacting the pimps or prostitutes involved and offering them free trial periods of advertising), financial relationships with "super pimps" (business deals with individuals who placed large volumes of prostitution ads on Backpage), and concealment money laundering. (Doc. 446 at 9-14; *see also* Doc. 446-1 at 1-76.) Lacey's motion not only ignores this evidence, but is also silent regarding the fact that Backpage's CEO, Carl Ferrer, and Backpage's Sales and Marketing Director, Dan Hyer, have both pleaded guilty to conspiring to promote prostitution in violation of 18 U.S.C. § 1952 (Travel Act). *See* D. Ariz. No 18-CR-464, Doc. 7-2 (Ferrer plea agreement); Doc. 271 (Hyer plea agreement). Lacey's motion also ignores that Backpage.com, LLC and four related entities have pleaded guilty to money laundering conspiracy. *See, e.g.*, D. Ariz. No. 18-CR-465, Doc. 8 and attachments.

In response to the United States' detention motion and, again, in the instant motion to amend conditions, Lacey cursorily argues that the strength-of-the-evidence factor favors him because the indictment "fails to take into consideration the law regarding protected First Amendment activities, and fails to plead the requisite heightened *mens rea*, among

other errors." (Doc. 503 at 12.) The United States has repeatedly pointed out that these assertions are incorrect and have been consistently rejected in recent years. *First*, Lacey does not (and cannot) take the position that Backpage was not knowingly promoting prostitution on its website, including child sex trafficking. The evidence of Lacey's involvement in the operation and management of Backpage was considerable such that he cannot plausibly claim he had no knowledge of the true purpose of Backpage's business model: to derive revenue from prostitution, including child sex trafficking. Lacey certainly cannot claim he was unaware of Backpage's facilitation of prostitution especially in light of Ferrer's, Hyer's, and Backpage's recent guilty pleas.

*Second*, Lacey's argument that he did not have the *mens rea* is belied by the substantial evidence the United States will present at trial. Below are illustrative instances where Lacey was intimately involved and had knowledge of Backpage's facilitation of prostitution, including child sex trafficking:

### i. The Detroit Backpage Murders

In December 2011, four woman were murdered as a result of advertising on Backpage for prostitution. (*See Murdered Women in Detroit Linked to Backpage.com, Cops Say*, published Dec. 27, 2011, attached as Ex. D.) In response to law enforcement inquiries into the business practices of Backpage, Lacey (and Larkin and Ferrer) engaged the services of a public relations company (Sitrick) to handle the fallout from the negative publicity surrounding the quadruple murder.[2] Lacey exchanged emails with the public relations firm to formulate a response that included deflecting the blame on other prostitution websites. This is evidenced by an email to Lacey and others, where an attorney (Ed McNally) stated "were better off just muddying the waters out there today with the news of the 22 websites." (Email dated Dec. 29, 2011, from McNally to Lacey, among

---

[2] In response to a grand jury subpoena seeking email exchanges between Lacey (and other Backpage owners) and the public relation companies, Backpage attorneys took the position that these communications were protected by the attorney client privilege. Senior Judge David C. Campbell found that many of these emails were not afforded these protections and ordered the emails disclosed.

others, attached as Ex. E.) At trial, the United States expects to introduce testimony that these websites aggregated or copied their content from Backpage. Moreover, one of the 22 websites, The Erotic Review, had a longstanding financial and business relationship with Backpage. The Erotic Review was a website where "Johns" provided reviews of the services of prostitutes, including underage trafficking victims. (*See* Doc. 446 at 11-12; Doc. 446-1 at 40-76.) Against this background, Lacey knew that the Backpage website was used for prostitution (resulting in a quadruple murder), and wasn't just a "neutral content platform." In 2015, four years after Lacey attempted to deflect blame for the Detroit quadruple murder, another victim was murdered in the Detroit area by a customer who responded to her ad on Backpage. (*See* Doc. 230 (Victim 16) ¶ 175.) This evidence, and similar emails and witnesses presented at trial, likely will increase Lacey's prison exposure—giving him further incentive to flee. The witnesses include Backpage CEO Carl Ferrer, among others.[3]

### ii. Lacey Knew He Was Facilitating Prostitution and Child Sex Trafficking

Lacey's argument that Backpage was merely a neutral content platform is at odds with additional evidence. Evidence that Lacey knew of Backpage's promotion of prostitution advertising is summarized throughout the Indictment and Superseding Indictment. (*See generally* Docs. 3 and 230.) Moreover, from his emails and numerous witnesses, Lacey knew Backpage was used to facilitate prostitution, including child sex

---

[3] That Carl Ferrer will be testifying about Lacey's knowledge of Backpage's efforts to facilitate prostitution (including child sex trafficking) underscores the government's rationale for seeking disqualification of Ferrer's former attorneys at the firm of Henze, Cook and Murphy (HCM). (Doc. 118.) HCM co-authored the instant motion, which includes arguments contrary to the factual basis of the plea agreement of HCM's former client, Ferrer. In connection with the United States' Motion to Disqualify HCM, the Court ordered that HCM will "only participate in the limited capacity set forth in the pleadings." (Doc. 338.) Counsel representing HCM in responding to the Motion to Disqualify represented that HCM would participate in *compliance* with Lacey's conditions of release. (Doc. 176 at 10.) There was no mention of trying to modify the conditions of release by undermining the government's case, which is at odds with their former client's cooperation against Lacey and the other Backpage owners. HCM further represented "in this narrow role, HCM will not be acting in a manner that is materially adverse to Mr. Ferrer's interests." (Doc. 176 at 10.) HCM's involvement in this filing appears to be contrary to the Court's ruling.

trafficking. For example, in May 2011 he employed a different public relations media company (Culloton) to address a CNN news story critical of Backpage. In an email exchange, Lacey referred to the FBI's "arrest numbers for all hookers" that the reporter used. (Email dated May 1, 2011, from Lacey to Larkin and McNally, attached as Ex. F.) Lacey also acknowledged that child sex trafficking occurred on Backpage, but equated underage sex trafficking victims to "drug dealers us[ing] cell phones, fed-x, underage people using phony I.D. to get into bars. Thousands of people patronize local bar [sic] legally. You don't close it when someone underage deceives the owner of the bar." (Email dated January 31, 2012, attached as Ex. G.) Moreover, Backpage's principals were well aware that the moderation practices stripped out coded terms indicative of child sex trafficking (*e.g.*, Lolita, new in town, sweet young thing, amber alert, among others) and continued to post the ad and receive revenue from the posting. (*See* Doc. 230 at 16-37.)

There's more. Lacey responded to a column by *New York Times* reporter Nicholas Kristoff entitled "*Where Pimps Peddle Their Goods*" that detailed a Backpage child sex trafficking victim's story.[4] Lacey acknowledged in a January 23, 2012 email that Backpage ran ads that involved child sex trafficking, stating, "of course there are kids who get through the system, as there are in bars." (Email dated January 23, 2012, from Lacey to Suskin, attached as Ex. H) Again, Lacey seemed to equate Backpage child sex trafficking victims (several of whom were murdered) to underage individuals who sneak into bars.

### iii. Lacey Through His Attorneys Misled Courts About Backpage's Business Practices

Lacey, of course, is wrong in his claim that no court has ever accepted the theory that a website or website operator may be criminally prosecuted under federal law for knowingly facilitating prostitution. (Doc. 503 at 6 n.4.) In *United States v. Omuro*, the

---

[4]https://www.nytimes.com/2012/03/18/opinion/sunday/kristof-where-pimps-peddle-their-goods.html

- 11 -

founder of the website www.myRedBook.com was convicted of the same crime charged in this case—18 U.S.C. § 1952. Omuro's website hosted thousands of ads posted by prostitutes, and Omuro generated $5 million from fees paid by escorts to post their ads more prominently on the website. *See United States v. Omuro*, N.D. Cal. No. 14-CR-336, Doc. 70 at 1-3. Similarly, in *United States v. Hurant*, the founder of the website www.Rentboy.com was convicted of violating 18 U.S.C. § 1952. In his sentencing memo, Hurant admitted he "was well aware . . . that the escort ads he posted . . . were thinly-veiled proposals of sexual services in exchange for money." *United States v. Hurant*, E.D.N.Y No. 16-CR-45, Doc. 117 at 6, Doc. 107 at 39.[5] And again, in 2012, the Department of Justice obtained the forfeiture of the website www.escorts.com based on similar conduct. *See* https://archives.fbi.gov/archives/philadelphia/press-releases/2012/internet-escort-services-firms-charged-with-money-laundering-sentenced-in-federal-court. (*See also* Doc. 42 at 2-5; Doc. 476 at 10-12.)

The results in these cases are hardly surprising and easy to harmonize with the First Amendment. Long ago, the Supreme Court recognized that "[w]e have no doubt that a newspaper constitutionally could be forbidden to publish a want ad . . . soliciting prostitutes." *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973). Put simply, the First Amendment does not protect speech promoting criminal conduct. *See, e.g., United States v. Stevens*, 559 U.S. 460, 468-69 (2010) ("From 1791 to the present, . . . the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never include[d] a freedom to disregard these traditional limitations. These historic and traditional categories long familiar to the bar—including obscenity, defamation, fraud, incitement, and *speech integral to criminal conduct*—are well-defined and narrowly limited classes of speech, the prevention and punishment of which have never

---

[5] *Hurant* has other parallels to this case. In its *Hurant* sentencing memo, the government stated that although the Rentboy.com website "had disclaimers that claimed that the advertisements on the site were for companionship only and not for prostitution," the company's employees would often reject ads containing explicit offers of sex for money "but allow the ad to be resubmitted with different language. In many cases, Rentboy.com employees would just edit the advertisement's language and approve it."

been thought to raise any Constitutional problem.") (citations omitted); *United States v. Meredith*, 685 F.3d 814, 819-20 (9th Cir. 2012) (applying "the First Amendment exception that allows the government to regulate speech that is integral to criminal conduct"); *United States v. Rahman*, 189 F.3d 88, 116-17 (2d Cir. 1999) ("[F]reedom of speech . . . do[es] not extend so far as to bar prosecution of one who uses a public speech . . . to commit crimes."). *See also Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980) ("[T]here can be no constitutional objection [under the First Amendment] to the suppression of . . . commercial speech related to illegal activity.").

Moreover, numerous recent cases against Backpage and Lacey show that Backpage wasn't merely a passive conduit for third-party content, but actively facilitated prostitution. In 2015, the Washington Supreme Court denied Backpage's and Lacey's motion to dismiss a civil lawsuit brought by three minor girls who had been "bought and sold for sexual services online on Backpage.com." *See J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015). This was the same court that later (in a different case) sanctioned Lacey and the other Backpage defendants. The court held that, because the plaintiffs had plausibly alleged that Backpage does "more than just provide a forum for illegal content" and affirmatively shapes the content of users' ads through "posting rules [that are] 'designed to help pimps develop advertisements that can evade the unwanted attention of law enforcement, while still conveying the illegal message,'" the plaintiffs should be permitted to conduct discovery "to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking." *Id.* at 718. In 2017, following extensive discovery, the trial judge in the *J.S.* case denied Backpage's motion for summary judgment. Afterward, Backpage entered a confidential settlement with the plaintiffs.[6] In light of these

---

[6] The October 2017 settlement in *J.S. v. Village Voice Media Holdings et. al* was sealed. Nevertheless, it apparently was substantial enough to prompt Travelers Property Casualty Co. to seek to deny Backpage's related insurance claim; Travelers argued it had no duty to indemnify Backpage, citing exclusions that bar coverage for *intentional acts*, among other things. (*See Traveler Property Casualty Company of America v. Village Voice Media Holdings LLC, et al*, D. Ariz. No. 2:17-CV-03994.)

various courts denying Backpage's arguments, it is difficult to understand how Lacey can argue that the government's case is travelling under a "novel theory." (CR 503 at 5.)

A recent decision from the District of Massachusetts further undermines Lacey's representation that he has prevailed in all previous Backpage-related cases. Last year—on March 29, 2018—the Hon. Leo Sorokin issued a five-page order denying in part a motion to dismiss that Lacey had filed in a civil case brought by a different underage victim who had been trafficked via Backpage. *See Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL 1542056 (D. Mass. 2018). The ruling explained that, because the plaintiff had made a plausible allegation that Backpage had "redrafted [her] advertisement . . . to suggest she was an adult," the alleged conduct was not covered by the CDA's grant of immunity. *Id.* at *1. Here, similarly, the indictment and further investigation *after* indictment demonstrate that Backpage helped edit and redraft prostitution advertisements.

Although it is true that Lacey and Backpage have prevailed in a number of prior cases that sought civil remedies or that turned on whether Backpage could be prosecuted under state criminal law, those cases are easily distinguishable. (*See* Doc. 503 at 6-7 at n.4.) First, those cases differ for the obvious reason that Section 230 of the Communication Decency Act of 1996 ("CDA") provides a broad grant of immunity in such contexts. This, however, is a case brought under federal criminal law—a context in which the CDA has no application. *See* 47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of . . . [any] Federal criminal statute."). Indeed, the successful prosecutions in the myRedBook.com, Rentboy.com, and escorts.com cases demonstrate that federal criminal liability may be imposed under these circumstances.

Second, those cases are also distinguishable because, with one exception (*People v. Ferrer*), they were decided prior to the release of the Senate Report in 2017. That report resulted from the review of hundreds of thousands of internal Backpage documents and other evidence that were not available when the cited cases were decided.

Third, those cases were decided before the District of Arizona grand jury litigation that preceded the indictment in this case—litigation in which Senior Judge David C.

- 14 -

Campbell and a unanimous three-judge panel of the Ninth Circuit rejected Backpage's First Amendment-based challenges to the government's investigation and theory of the case. (*See* Doc. 194 at 7-8, incorporated by this reference.)[7]  The Arizona grand jury investigation resulted in the production of still more previously undisclosed Backpage documents shedding additional light on the company's internal operations.

Fourth, Lacey's cases were all decided before Backpage.com, LLC and its CEO pleaded guilty and admitted that the "great majority" of Backpage's "adult" ads were for prostitution services. As Ferrer admitted, during its 14-year existence, Backpage "derived the great majority of its revenue from fees charged in return for publishing advertisements for 'adult' and 'escort' services." (D. Ariz. No. 18-CR-464, Doc. 7-2 at 12-13.) Ferrer further admitted:

> I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., D.H., A.P, and J.V.) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage.

(D. Ariz. No. 18-CR-464, Doc. 7-2 at 13.) In the factual basis of its plea agreement, Backpage.com, LLC confirmed it "derived the great majority of its revenue" from fees charged for "adult" and "escort ads," and "the great majority of these advertisements [were] for prostitution services. . . ." (D. Ariz. No. 18-CR-465, Doc. 8-2 at 11.)

Backpage Sales and Marketing Director Hyer similarly corroborated Ferrer's account and described the moderation process as follows:

> Over time, I also became involved (along with Ferrer, Andrew Padilla, and Joye Vaught) in Backpage's efforts to "moderate" the content of the website's escort and adult ads. Once again, I knew that the great majority of the ads being "moderated" were actually offering illegal prostitution services—our removal of explicit words and pictures did nothing to change

---

[7]  On May 17, 2018, Judge Campbell issued an order authorizing the United States to disclose the Grand Jury proceedings in this case.

> the services being offered. In fact, Padilla and I agreed that I and other Backpage sales and marketing employees use the term "models" in intra-company emails when referring to persons in Backpage ads who appeared to be underage. The use of this term was to avoid looking bad in a lawsuit.

(CR 271, Hyer plea agreement at 10.) In short, "moderation" involved the deliberate and knowing publication of prostitution ads. As discussed above, these developments have undercut the basis for decisions such as *Backpage.com, LLC. v. Dart*, upon which Lacey heavily relies. (*Compare* Doc. 503 at 6 *with* Ex. A hereto.)

Lacey (through his numerous civil and criminal attorneys) misled courts across the United States about Backpage business practices that were well known to him. Lacey and other Backpage owners failed to disclose Backpage's financial relationship with The Erotic Review, its affiliate relationship with a "super pimp" known as Dollar Bill, and moderation practices that included stripping out terms indicative of prostitution (including child sex trafficking) and posting millions of ads. (*See* Doc. 230 at 9-37; Doc. 446 at 9-14.) Lacey further concealed Backpage efforts at circumventing conventional banking and payment processors by concealing Backpage as the recipient of revenue from postings of millions of prostitution ads. (*See* Doc. 230 at 44-49; Doc. 446 at 13-14.) It is noteworthy that the Backpage defendants have never attempted to address these business practices in their various pleadings and correspondence. As noted above, both the Northern District of Illinois and the Superior Court in the State of Washington imposed sanctions for Backpage's misleading statements and obstructive litigation behavior.

In sum, if convicted of all (or even a portion of) these charges, Lacey—who is 70 years old—faces the very real possibility of spending the rest of his life in prison. Such exposure creates a powerful incentive to flee. *See, e.g., United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."); *United States v. Anderson*, 384 F. Supp. 2d 32, 35 (D.D.C. 2005) (ordering pretrial detention in white collar case, even though the defendant had no prior felony convictions and "no history of violent criminal activity," in part because "[t]he

combined statutory maximum penalties for the federal crimes with which Mr. Anderson is charged is 23 years. . . . At 51 years old, Mr. Anderson potentially could spend most of the remainder of his life in prison if convicted."). In addition to the instant federal prosecution, Lacey is facing charges in the State of California, is under investigation by the Attorney General in the State of Texas, and is defending numerous civil cases across the country. This onslaught of criminal and civil cases provides ample motive to flee.

Lacey's motion to revisit his release conditions raises facts that were well known at the time the parties negotiated his release conditions. The only changed circumstances is that the evidence is now stronger against Lacey than it was in April 2018. Lacey's motion to amend release conditions by removing electronic monitoring should be denied.

Respectfully submitted this 2nd day of April, 2019.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*/s Kevin Rapp*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

### Certificate of Service

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: James Grant, Paul Cambria, Robert Corn-Revere, Janey Henze Cook.

*s/Angela Schuetta*
U.S. Attorney's Office