# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

BACKPAGE.COM, LLC,

                Plaintiff,

    v.

THOMAS J. DART,
Sheriff of Cook County, Illinois,

                Defendant.

Civil No. 1:15-cv-06340

Judge John J. Tharp, Jr.

## <u>ORDER</u>

The Sheriff's motion for sanctions against Backpage.com and its attorneys [226] is granted in part and denied in part. Based on its fraudulent representations during the course of this litigation, the Court imposes a sanction of $250,000 against Backpage as a partial offset of fees and costs incurred by the Sheriff in responding to Backpage's misrepresentations. The motion for sanctions against Backpage's counsel, however, is denied. See Statement for details.

## <u>STATEMENT</u>

This motion represents the last installment in this case, which concerns the efforts of Thomas Dart, the Sheriff of Cook County, to end advertising for prostitution and human trafficking in the adult services section of Backpage.com ("Backpage") by seeking to convince credit card companies not to do business with Backpage as long as it accepted such ads. While claiming that it engaged in efforts to cooperate with law enforcement and to identify problematic ads, Backpage sued Sheriff Dart, alleging that the Sheriff' was threatening official action against the credit card companies and thereby imposing a prior restraint on Backpage's free speech rights.

Backpage sought and obtained a temporary restraining order from this Court, but after an evidentiary hearing, this Court denied a preliminary injunction.[1] *Backpage.com, LLC v. Dart,*

---

[1] Backpage's complaint included a Due Process claim as well as a First Amendment claim, but the sole focus of its motion for preliminary injunctive relief was the First Amendment claim. In *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841 (7th Cir. 2016), the Seventh Circuit expressed significant doubt as to whether the conduct alleged in this case would give rise to a violation of the Due Process clause. "The First Amendment," it noted, "forbids a public official to attempt to suppress the protected speech of private persons by threatening that

127 F. Supp. 3d 919 (N.D. Ill. 2015). This Court found that "Backpage.com's adult services section overwhelmingly contains advertisements for prostitution, including the prostitution of minors," *id.* at 922; that Backpage had not adequately demonstrated that the Sheriff's threat to cause the credit card companies to be investigated for facilitating Backpage's conduct actually caused the companies' decision to sever their ties with Backpage, *id.* at 930-33; and that Backpage had not adduced evidence that it would be irreparably harmed by the Sheriff's conduct, because it was speculative as to whether the company would fail if customers could not pay for adult services ads with credit cards, *id.* at 934-35.

The Seventh Circuit reversed the denial of the requested preliminary injunction. *Backpage.com, LLC v. Dart,* 807 F.3d 229 (7th Cir. 2015). The Court of Appeals, finding instead that "it is unclear that Backpage is engaged in illegal activity, *id.* at 233;"[2] that the credit card companies had capitulated to the Sheriff's threat, *id*., that Backpage was merely an intermediary between advertisers of adult services and their customers, *id*. at 234, and that the Sheriff's actions "would be bound to cause irreparable injury" to Backpage, *id*. at 238. The Court of Appeals directed the entry of a preliminary injunction that required, *inter alia*, the Sheriff to notify the credit card companies that no action would be taken against them. Despite the opportunity to do so, however, none of the credit card companies resumed processing transactions for ads on Backpage.

When discovery in this case subsequently continued after entry of the preliminary injunction, the Sheriff sought, among other things, information relating to Backpage's finances (as relevant to the question of the monetary damages Backpage was seeking). In response, Backpage amended its complaint to eliminate any claim for damages and pressed forward seeking only permanent injunctive relief. First Amended Complaint, ECF No. 173.

Contemporaneously, Backpage was embroiled in litigation and controversy elsewhere, including a Congressional investigation. Two weeks before it filed this suit, Backpage had been subpoenaed by the United States Senate Permanent Subcommittee on Investigations for information regarding advertising on its adult services section. After the Senate subcommittee issued its report, titled "Backpage.com's Knowing Facilitation of Sex Trafficking," on January 9, 2017, Backpage shut down its adult services section the next day.

---

legal sanctions will at his urging be imposed unless there is compliance with his demands." [citing *Backpage.com LLC v. Dart,* 807 F.3d 229, 231 (7th Cir. 2015)]. It is less clear that the Due Process Clause does so. The First Amendment is concerned with the chilling effect government action may have on speech; procedural due process is not."

[2] The Seventh Circuit has since recognized that Backpage's web site "contained an adult section advertising different categories of sex work." *United States v. Jackson*, 865 F.3d 946, 949 (7th Cir. 2017), *cert. granted, judgment vacated on other grounds,* 138 S. Ct. 1983 (2018).

Subsequently, both Backpage and its CEO, Carl Ferrer, were charged with, and pled guilty to, federal conspiracy charges relating to money laundering and the Travel Act, respectively. In his plea agreement, Ferrer admitted that he had known that "the great majority" of ads placed on Backpage's adult services section were ads for prostitution, and that he conspired with other Backpage principals "to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. Ferrer admitted that one of the ways that the conspirators facilitated advertising for prostitution was to create so-called "moderation" processes by which Backpage would edit ads submitted to remove terms and pictures that were particularly indicative of prostitution. Ferrer also admitted that credit card companies stopped doing business with Backpage based on the illegal nature of its business (not, then, because of any official action threatened by the Cook County Sheriff or others). In response to the actions of the credit card companies, Ferrer admitted that Backpage devised means to deceive the credit card companies as to the source of credit card charges submitted in payment for Backpage.com services and to continue receiving payments for those ads.

As part of its plea agreement, Backpage agreed, among other things, to cease operations and its web site was shut down. Because Backpage is no longer an extant entity, and given the crippling restitution owed by the company and its principals, which effectively eliminates any possibility that the company could arise from the ashes, the Court dismissed the suit against the Sheriff as moot.

In the wake of Backpage's demise, Sheriff Dart filed this motion seeking sanctions against Backpage and its attorneys. The premise of the Sheriff's motion is that throughout the litigation, Backpage and its attorneys falsely claimed that Backpage "prohibits illegal content and activity on its website and takes extensive steps to prevent such misuse" and that the credit card companies stopped doing business with Backpage because of the Sheriff's actions rather than the unlawful nature of Backpage's business. The Sheriff seeks reimbursement of its attorneys' fees and costs incurred in this litigation, including on appeal and in petitioning for certiorari. In response to the motion, Backpage's counsel, Davis Wright Tremaine LLP ("DWT") and Schiff Hardin LLP,[3] moved to withdraw from their representation of Backpage.com; that motion was granted. Backpage was given additional time to respond to the motion but has not done so; DWT, however, has responded.

Based on the guilty pleas entered by Backpage and Ferrer, its CEO, there is no question that Backpage has, from the filing of its complaint, knowingly presented false information to this Court in support of its claim against Sheriff Dart. A brief comparison of some of the principal claims asserted by Backpage in this litigation and admissions by Backpage and Ferrer in their plea agreements suffices to make the point incontrovertible:

---

[3] Backpage.com's lead counsel in this case has been Richard Corn-Revere and James Grant of DWT. Charles H.R. Peters of Schiff Hardin LLP has served as local counsel. Other lawyers also filed appearances on behalf of Backpage.com, but did not play a substantial role in this case. The Court understands that, with respect to Backpage's counsel, the Sheriff's motion is directed at DWT, and only DWT responded to the motion.

| *Backpage's Original Complaint* | *Backpage/Ferrer Plea Admissions (¶ 10)* |
|---|---|
| ¶ 23: "Backpage.com prohibits illegal content and activity on its website and takes extensive steps to prevent such misuse . . . ." | "The great majority of these advertisements [for 'adult' and 'escort' services] are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada)." |
| ¶ 25: "Backpage.com also takes extensive measures to police user posts." | Backpage worked "to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers." |
| ¶¶ 19, 34: "Users provide all the content for ads they post on Backpage.com"; Sheriff's actions violate Section 230 of the Communications Decency Act because Backpage is merely a publisher of content provided by others. | Backpage "utilized 'moderation' processes through which [it] would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage." |
| ¶ 44: "[B]ecause of Sheriff Dart's actions, Backpage.com is barred from credit card services of any of the three largest card companies . . . ." | "Over time, many banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business." |
| ¶ 45: "Sheriff Dart's actions . . . have cut off nearly all revenue to Backpage.com (leaving only Bitcoin as a means of payment, which accounts for a small percentage of purchases on the website)." | Backpage "found ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments sand proceeds through bank accounts held in the name of seemingly unconnected entities" |

These false statements are plainly material to issues implicated by Backpage.com's complaint and motions for preliminary injunctive relief—that is why Backpage made them. Its complaint put at issue whether speech on the site was protected, whether Backpage.com policed, rather than promoted, unlawful solicitations, and otherwise merely published, rather than authored, content in the ads (a claim critical to Backpage's assertion that the Communications Decency Act shielded its actions from liability). The question of whether Dart's actions caused the credit card companies to stop accepting payments from Backpage.com was a central question on which the viability of Backpage's claim against Dart rested; Backpage's admission that it was the unlawful nature of Backpage's adult advertising that prompted the card companies to stop accepting payments (rather than a threat of investigation by Dart) was utterly at odds with its contentions in this Court and the Court of Appeals; that even Backpage acknowledged that there

was no causality between threat and the actions of the card companies may have prompted the Court of Appeals to reconsider its view that "[t]he causality is obvious." 807 F.3d at 233. And, of course, Backpage's claim that its inability to accept credit card payments threatened its very existence was central to the issue of irreparable harm; that it found ways to work around that limitation would have further confirmed this Court's view that it had not established that irreparable harm was likely, and certainly would have challenged the Court of Appeals' conclusion that Backpage "was bound" to suffer irreparable harm.

The Court therefore has no difficulty in concluding that in conducting this litigation, Backpage.com knowingly took positions that were factually unsupported and made numerous false statements to advance its claim against Sheriff Dart. Indeed, it is difficult to imagine how Backpage.com could have advanced its claim if, in lieu of the false allegations identified above, it had included the admissions it made in its plea agreement. The complaint would then have read something like this:

> The Sheriff has infringed Backpage's First Amendment rights by accurately advising credit card companies (two of them, anyway) that the great majority of ads on Backpage's adult services web site are for prostitution and that Backpage routinely doctors those ads to conceal their unlawful nature. When told about these facts by Sheriff Dart, those credit card providers decided that they did not want to be publicly linked to a company like Backpage and stopped accepting payments for ads placed on Backpage.com. Or at least they thought they had stopped accepting such payments. In reality, however, Backpage.com devised ways to deceive the card companies about its continued use of their cards as payment for access to its adult services advertising. It also devised additional means to collect payments for those ads and continued to receive substantial revenues from such advertising.

*That* complaint would have made the prospect of obtaining injunctive relief substantially more difficult.

To be clear, however, the Court's ruling does not rest on a determination that Backpage's misrepresentations render its claim frivolous; the point is merely that the misrepresentations involved facts that were, or would have been, material to the evaluation of Backpage's claim for preliminary injunctive relief in this Court and in the Court of Appeals. Even if Backpage could have prevailed absent its misrepresentations, it nevertheless made false statements that were material, even if not dispositive, and in doing so defrauded this Court. Sanctions against Backpage are unquestionably warranted.

That Backpage and its principals acted in bad faith, however, does not compel the conclusion that its attorneys did so as well. Although his briefs frequently employ the formulation that "Backpage and its attorneys" lied to the court, elsewhere the Sheriff stops short of definitively claiming that Backpage's attorneys actually knew that Backpage was lying about its conduct and the effects of Dart's conduct. *See, e.g.*, Motion at 11 ("Backpage's counsel may

well have known all along about their client's lies"). Whether or not its counsel had actual knowledge of the company's fraud, however, Backpage contends that Backpage's lawyers actively avoided the truth by sticking their heads in the sand.

For its part, DWT maintains that there is no basis to impose sanctions on attorneys who successfully advanced constitutional claims on behalf of Backpage. The Sheriff, they argue, is merely reasserting his discredited "illegality" defense. They further deny that the Sheriff has demonstrated that they knew that Carl Ferrer "would change and contradict averments he made not just in this case but in a half dozen others."

The first argument can be dispatched essentially for the reasons already set forth. If the Sheriff's motion focused only on Backpage's admission that "the great majority" of ads on its adult services site were for prostitution, DWT might have a point, because the Seventh Circuit's opinion seems to hold that the presence of even a single lawful ad on Backpage's adult services site would have made the site a protected "avenue of expression of ideas and opinions entitled to First Amendment protection." 807 F.3d at 231-32. But the misrepresentations by Backpage go not only to the extent to which the Backpage adult services site served as a medium for unlawful solicitation of criminal conduct but also to elements such as causation and irreparable harm, which the court of appeals considered and resolved in Backpage.com's favor. Knowing that Backpage had successfully devised work arounds to compensate for the loss of credit card transactions, for example, would plainly be material to the question of irreparable harm. So, too, Backpage's admission that Dart's "threats" had not caused the card companies to disassociate themselves from Backpage. *Id.* at 233. There is, in short, more to Backpage's misrepresentations than the viability of the Sheriff's "illegality defense." And even if there weren't, that would not give Backpage, or its counsel, the green light to make false statements in an effort to cast the company in a better light generally.

DWT's second argument, however, is more substantial. Pointing out that the Sheriff relies entirely on the admissions of Backpage and Ferrer in their plea agreements to establish the falsity of the positions taken in this litigation, DWT essentially asks why it was not entitled to rely on the prior version of the facts that their client supplied to them. They point not only to fact that Ferrer supplied a declaration in support of Backpage's motion for preliminary injunctive relief but also to the other, consistent, declarations he made in other cases in which similar issues were being litigated.

In answer, Backpage points to what it calls the "red flags" that also surfaced before and during the litigation that should have put DWT on notice that facts alleged in the complaint were not accurate. Most of these warning signals relate to the congressional investigation that was going forward during the pendency of this case, but the fact that Backpage's attorneys knew about ongoing investigations does not demonstrate that Backpage's attorneys knew that the claims of Backpage's executives about its practices were false. Plainly, there was a lot of smoke, and Backpage's attorneys should have been looking closely to see if there was a fire, but as the most prominent incident on which the Sheriff focuses—the "Red Beauty"—posting—suggests, DWT appears to have looked closely at the purportedly revealing information.

The "Red Beauty" incident involved an undercover posting to Backpage's adult services site. An investigator in the Sheriff's office reported that he had created an online post advertising the services of a girl between 14 and 18 years old who had just graduated from grade school. According to the investigator's report, he paid for and submitted the ad but when it posted, the references to grade school and the age range of 14-18 had been deleted. The Sheriff cites this incident as a smoking gun that revealed the "moderation" practices Backpage employed to conceal the fact that ads were for child prostitution. When the incident was revealed in discovery, however, DWT pointed out that the dates on the documents appeared to suggest that the version that had purportedly been edited was dated a day before the version that had purportedly been the original posting. DWT also pointed out that the investigator's report further muddied the waters because it documented that the investigator had gone back online and was, in fact, able to post the ad with the original language. Given the ambiguities, if this incident demonstrates anything, it is that the Sheriff has not come up with the smoking gun showing that DWT knew, or was deliberately avoiding, the truth about Backpage's practices.

The premise of the Sheriff's motion for sanctions against Backpage's counsel is essentially that counsel failed to discover the transgressions that Backpage and Ferrer admitted to when they pled guilty. Even accepting arguendo that there was reason to doubt representations that Ferrer and other Backpage officials made to them, the Sheriff's motion falls short in documenting any instance in which counsel (as distinguished from Backpage) made or facilitated a specific representation of fact that was known to be untrue when it was made. And when Backpage and Ferrer acknowledged under oath that their prior representations about Backpage's operation and content of its "adult" classified section were false, DWT promptly moved to withdraw as counsel. Based on the record presented, the Court does not find a sufficient basis to conclude that DWT's conduct warrants the imposition of sanctions or the conduct of an evidentiary hearing.

* * * * *

For the reasons set forth above, the Court concludes that during this litigation, Backpage knowingly and repeatedly made false representations of fact concerning relevant aspects of its operations. This fraudulent conduct has been pervasive throughout this law suit. Federal courts have the inherent power "to punish by an award of reasonable attorneys' fees or other monetary sanction" misconduct by parties and attorneys appearing before it. *Carr v. Tillery*, 591 F.3d 909, 919 (7th Cir. 2010) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991)). In *Chambers* the Supreme Court recognized that where a party's "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court, and the conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," it is appropriate to rely principally on the court's inherent power to address the conduct in its entirety rather than first applying Rules and statutes containing sanctioning provisions to discrete occurrences. *Chambers*, 501 U.S. at 50-51.

The Court recognizes, however, that the efficacy of a sanctions award at this juncture is compromised by the termination of Backpage's operations and the criminal sanctions that will

likely be imposed as a result of its conviction for money laundering conspiracy.[4] Backpage faces significant fines and, pursuant to its plea agreement, potential restitution payments up to $500 million. It appears, in short, unlikely that a payment of sanctions will ever be collectible from Backpage. There is little reason, therefore, to engage in protracted proceedings to determine the appropriate monetary sanction to impose. Given the centrality of Backpage's fraudulent conduct in this litigation, the Court has no difficulty concluding that Backpage's conduct has resulted in substantial attorneys' fees and litigation costs to the Sheriff measured in the hundreds of thousands of dollars that would not have been required absent Backpage's fraudulent representations. The Court therefore orders Backpage to pay to the Sheriff of Cook County a sanction in the amount of $250,000. This award is, however, subordinate to all criminal fines and restitution awards imposed as part of Backpage's sentence. Accordingly, the Sheriff may not attempt to collect the award until Backpage's sentence is final.

Date: March 25, 2018

John J. Tharp, Jr.
United States District Judge

---

[4] Sentencing is presently scheduled for July 9, 2019.