Paul J. Cambria, Jr. (NY 15873, admitted *pro hac vice*)
Erin E. McCampbell (NY 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com

*Attorneys for Defendant Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>vs.<br><br>Michael Lacey, *et al.*,<br><br>                    Defendants. | NO. CR-18-00422-PHX-SMB<br><br>**DEFENDANT MICHAEL LACEY'S REPLY IN FURTHER SUPPPORT OF HIS MOTION TO AMEND HIS CONDITIONS OF PRETRIAL RELEASE AND MOTION FOR EXPEDITED RELIEF**<br><br>(Expedited oral argument requested) |

Defendant Michael Lacey, by and through his undersigned attorneys, hereby submits the instant reply in further support of his Motion to Amend his Conditions of Pretrial Release ("Motion") (Doc. 503) in which Mr. Lacey seeks an order from this Court vacating the requirement that he wear an electronic monitoring anklet.  Mr. Lacey's Pretrial Services officer, who has monitored him for one year, does not oppose the Motion.

The government opposes the Motion (*see* Doc. 516), claiming it was not properly brought before this Court because Mr. Lacey to failed allege changed circumstances.  The government is wrong on the law and the facts.  Pretrial Services has monitored Mr. Lacey for a year and does not oppose his Motion.  Observation and supervision for over a year is new factual information and,

combined with other changed circumstances, demonstrates that this Motion is properly before this Court, even under the government's interpretation of the law.

The remainder of the government's opposition focused on one issue—its belief that its case against Mr. Lacey is strong and its suggestion that this factor, alone, supports denial of the Motion. The government wants this Court to ignore Mr. Lacey's career, contributions to this District, and his strong personal and professional ties to this District. Further, it appears that the government wants this Court to ignore the most salient factor in ruling on the Motion—the fact that Mr. Lacey's Pretrial Services officer, who has monitored him for a year, does not oppose the Motion. The government's invitation to ignore the full range of statutory factors should be rejected. The relevant statute directs courts to consider: the defendant's history and characteristics; danger to the community; and nature of the offense and weight of the evidence, *see* 18 U.S.C. § 3142(g), each of which weigh in favor of granting the Motion.

**I.      Mr. Lacey's Motion is properly before this Court.**[1]

There is no binding authority that restricts this Court's ability to amend Mr. Lacey's conditions of release absent changed circumstances.[2] Indeed, the plain language of the relevant statute indicates that a "judicial officer may at any time amend the order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3). "[L]egislative history—no matter how clear—can't override statutory text." *Hearn v. Western Conf. of Teamsters Pension Trust Fund*, 68 F.3d

---

[1] Ms. Henze Cook took no part in drafting the merits of the Motion. She signed the pleading because she drafted the paragraph about the interlocutory sales and contacted Mr. Lacey's Pretrial Services officer about his position on the Motion.

[2] Additionally, this Motion is not a request for a second detention hearing. Previously, when the parties appeared for the detention hearing, the parties informed the Court that they had reached an agreement on conditions of release. Instead of holding a hearing, taking evidence, and issuing an opinion addressing the § 3142(g) factors, the Court accepted the parties' agreement. (*See* Am. Min. Entry, Doc. 62.) That proceeding does not qualify as a detention hearing under § 3142(f). *See United States v. Gourley*, 936 F. Supp. 412, 415 (S.D. Tex. 1996) (concluding that a preliminary hearing in which there was no evidence presented or issuance of a ruling on the § 3142(g) factors did not qualify as a hearing under § 3142(f) and pursuit of a hearing afterwards did not require presentation of changed circumstances). Consequently, Mr. Lacey's instant Motion does not constitute a request to "reopen[]" a detention hearing under § 3142(f), meaning that Mr. Lacey was under no obligation to show changed circumstances.

301, 304 (9th Cir. 1995). Nor should this Court abandon the plain language of this statute based on unpublished decisions from other courts. (*See* Gov't's Opp'n at 3-4.) Instead, the plain text of this statute vests this Court with the authority to amend conditions of release "at any time." 18 U.S.C. § 3142(c)(3).

That said, even if this Court determines that Mr. Lacey must present changed circumstances, he has done so. First, there has been a material development in this case—one that the government completely ignores: **Mr. Lacey's Pretrial Services officer does not believe that continued use of an electronic monitoring anklet is necessary**. This recommendation is based on one year of monitoring Mr. Lacey, which was not available at the time Mr. Lacey agreed to the government's proposed conditions of pretrial release. Second, Mr. Lacey's health has been impacted as this case has progressed. He has gained weight; he experiences significantly more stress on a day-to-day basis than he did prior to his arrest; he was briefly hospitalized, and now takes a blood pressure medication, all of which was a wake-up call on the importance of maintaining good health. To do so, he seeks ability to swim, which his doctor recommends. (*See* Mot. Ex. A.) These health-related developments, too, were not known at the time the original conditions of release were set. Further, at the time these conditions were set, Mr. Lacey understood that he would be able to shower while wearing the anklet and, based on that fact, did not understand the anklet to preclude swimming. In any event, at this time, regaining the ability to swim is critical to his overall health.

II.   **This Court should grant the Motion.**

   A.   **Mr. Lacey's personal characteristics and history (which the government ignored) weigh in favor of removal of the anklet.**

The government has ignored (and wants this Court to ignore) Mr. Lacey's character, professional accomplishments, charitable contributions, and his strong familial ties to this District and the United States. As set forth in greater detail in the Motion and incorporated herein by reference, Mr. Lacey is seventy years old and has resided in Arizona for fifty-three years. He owns

property in this District and lives in this District with his wife, also a long-term Arizona resident.[3] Many decades ago, Mr. Lacey began his career as a journalist in this District. He achieved great success, culminating in co-ownership of a nationwide newspaper conglomerate that received numerous awards including the Pulitzer Prize. He generously invested in this District, donating funds to various non-profit organizations and creating paid digital fellowships for minority journalists, among other philanthropic endeavors. The government has not disputed these facts. Nor has the government disputed Mr. Lacey's well-documented history of litigating cases to their conclusion. As is consistent with his litigation history (*see* Mot. at 4 n.2, 7, 11), Mr. Lacey has mounted and will continue to mount a vigorous defense to the instant charges.

Most importantly, the government was silent as to the fact that Mr. Lacey's Pretrial Services officer does not oppose this Motion based on monitoring Mr. Lacey for one year.

Instead of addressing these factors, the government attempts, unconvincingly, to cast Mr. Lacey as a liar. In an effort to cast aspersions on Mr. Lacey, the government points to sanctions imposed against the corporation Backpage.com, LLC in the case captioned *Backpage.com, LLC v. Dart*, CV-15-06340 after remand from the Seventh Circuit. (*See* Gov't's Opp'n at 5-6.) According to the government, because the corporate entity Backpage.com, LLC pleaded guilty in a criminal case in this District (*United States v. Backpage.com, LLC*, 18-CR-465, Doc. 8-001), and because the court in *Backpage.com, LLC v. Dart*, CV-15-06340 sanctioned the corporation for making statements in that earlier litigation that, at first blush, appear to be at odds with the guilty plea the corporation took in this Court, Mr. Lacey, who was not a party to that litigation, is a liar. (*See id.*) Notably, the government's claim fails to take into account that the civil litigation in *Backpage.com, LLC v. Dart*, CV-15-06340, was commenced months after Backpage.com, LLC was sold to Carl Ferrer, its long-time Chief Executive Officer (now the government's chief witness), that the sanctions motion was unopposed by Ferrer, and was based on an affidavit Ferrer had submitted to the court. Therefore, at the time this action began (and at the time of Backpage's guilty plea), Mr. Lacey no longer had any

---

[3] During the briefing on this Motion, Mr. Lacey and his wife completed a trip outside the continental United States, traveling to Hawaii on March 27, 2019 and returning as planned.

interest in the company and made no submissions to the court. The imposition of sanctions in a case to which Mr. Lacey was a stranger does nothing to impugn his character, much less his honesty and integrity, and to claim otherwise is misleading.

In the government's second attempt to cast Mr. Lacey as a liar, the government points to sanctions that were imposed in a civil action litigated in the State of Washington in the case captioned *R.O. v. Medalist Holdings, Inc.*, No. 17-2-04897-1. Again, the details of this litigation and the sanctions imposed do not impugn Mr. Lacey's honesty or integrity. In that case, the plaintiff sued several corporations and individuals, including Mr. Lacey. On May 18, 2018, a few weeks after Ferrer pleaded guilty in a criminal action in this Court (*United States v. Ferrer*, 18-CR-464, Doc. 7-2), the plaintiffs in the *R.O.* civil action brought a motion for sanctions. In the motion, they assail the deposition testimony of the general counsel for Backpage.com, LLC as well as the discovery responses of the corporation for being at odds with Ferrer's guilty plea. (*See* Pls.' Mot. for Sanctions, *R.O. v. Medalist Holdings, Inc.*, attached hereto as Ex. A, at 5-9.) Critically, the motion indicates that Mr. Lacey made no substantive statements in response to the complaint or discovery demands, instead asserting his Fifth Amendment rights. (*See id.* at 8.) Consequently, Mr. Lacey's submissions played no role in the court's determination to impose sanctions based on false statements. (*See* Jun. 28, 2018 Order, *R.O. v. Medalist Holdings, Inc.* at 7-11.) Instead, the court's ruling was based on Mr. Ferrer's guilty plea and the substantive discovery responses of the corporation. Again, this claim is baseless and misleading.

Additionally, the government claims that Mr. Lacey's creation of a foreign trust renders him a risk of flight. Mr. Lacey created the trust with the assistance of counsel for the benefit of his sons at a time when the California prosecution had been dismissed and there were no charges pending against him in this District. The creation of foreign trusts does not violate any law. Further, the government's complaint that it has been unable to "locate[]" the trust is disingenuous. (Gov't's Opp'n at 7.) Shortly after forming the trust, Mr. Lacey declared it in a filing with the Internal Revenue Service ("IRS"). Subsequently, he filed a Report of Foreign Bank and Financial Accounts (commonly referred to as an FBAR); which identified the bank, trustee, and other information on

the trust, and included a copy of the trust. The government (through the IRS), has had documents declaring the existence and location of the trust since March 7, 2018. The government obtained documents related to the trust a second time by subpoenaing them from the attorney who assisted Mr. Lacey with its formation, and a third time as part of reciprocal discovery in this case. Consequently, it is unclear why the government is claiming to be unable to "locate[]" the trust, particularly because the government has subjected the trust to four different forms of pretrial forfeiture. (*See* Mot. at 11.) Mr. Lacey has not been deceptive about his formation of a lawful trust for his sons, formed when there were no charges pending against him, and which has been reported to the government several times.

In sum, Mr. Lacey has strong familial and professional ties to this District and does not present a risk of flight. His pretrial services officer does not oppose the Motion. The government has said nothing to dispute these facts and they weigh heavily in favor of granting the Motion.

### B. Risk of danger to the public (which the government failed to address) weighs in favor of removal of the anklet.

Although vocal in the past, the government was silent as to how discontinuation of use of the anklet presented a risk of danger to the public. In light of this concession, and because the purported harm that Mr. Lacey is alleged to have caused was related solely to operation of the Backpage website, which has not operated for over a year, this factor is a non-issue.

### C. Nature of the offense and weight of the evidence (the sole focus of the government's opposition) does not outweigh the other factors.

The government's brief suggests that the only factor this Court should consider is the nature of the offenses and purported weight of the evidence against Mr. Lacey. (*See* Gov't's Opp'n at 7-17.) The government's exclusive reliance on this factor is misplaced because the law requires consideration of this factor *in addition to* Mr. Lacey's personal characteristics and history, and the risk of danger to the public, and the Ninth Circuit has repeatedly explained that the nature of offenses and weight of the evidence is "the *least important* of the various factors." *E.g.*, *United States v. Motamedi*,

767 F.2d 1403, 1407 (9th Cir. 1986) (reversing denial of pretrial release) (emphasis added).  More importantly, the government has overstated the weight of its purported case against Mr. Lacey.[4]

As set forth in greater detail in other submissions and incorporated herein by reference, the government's case—which seeks to punish publishers not for their own speech but for providing a platform that publishes the speech of third parties—presents significant First Amendment issues. (*See, e.g.*, Defs.' Joint Reply to Resp. to Mot. to Dismiss, Doc. 507, at 8-21.)  Numerous courts have held that the First Amendment bars the government from criminalizing Internet advertising based on the assumption that some of the ads may propose illegal transactions.  *See, e.g.*, *Backpage v. McKenna*, 881 F. Supp. 2d 1262, 1281-82 (W.D. Wash. 2012) (invalidating criminal statute targeting internet ads and recognizing Backpage as a platform for speech).  Indeed, "[t]he government may not suppress lawful speech as a means to suppress unlawful speech.  Protected speech does not become unprotected merely because it resembles the latter.  The Constitution requires the reverse." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2000).  Thus, speech is *presumed to be protected* and must be treated as such *until* the government has proved its case. *See Ashcroft v. A.C.L.U.*, 535 U.S. 564, 573 (2002).  Under these well-settled principles, the central theme of the indictment—the assumption that ads for lawful adult services can be equated with ads for illegal transactions—is impermissible.

Moreover, when the government seeks to hold a publisher criminally liable for the speech of third parties, the government must prove that the defendant-publisher knew that the *specific speech* that is the basis for criminal charges was unlawful and that the defendant-publisher had the *specific intent* to violate the law. *See, e.g.*, *Smith v. California*, 361 U.S. 147, 153-54 (1959) (striking law imposing criminal sanctions on the sale of obscene books without any required scienter, because absent proof that a seller had knowledge, "he will tend to restrict the books he sells" and the law would "impose a severe limitation on the public's access to constitutionally protected matter").  The indictment

---

[4] Although the government's case will be challenged in greater detail and on more extensive grounds in other submissions to this Court, a brief discussion of the shortcomings of the government's case is provided herein.

contains no allegations that satisfy the scienter requirement for prosecution of publishers for publishing third-party speech.  (*See* Joint Repl. at 17-20.)

Further, there is no indication in *any* public filing that the government can establish the specific intent required to obtain a conviction under the Travel Act, 18 U.S.C. § 1952, for facilitating prostitution.[5]  To establish a Travel Act violation, the government must establish that the "accused formed a specific intent to . . . facilitate" a violation of state law.  *United States v. Gibson Specialty Co.*, 507 F.2d 446, 449 (9th Cir. 1974).  In *Gibson Specialty*, a punchboard/pulltab manufacturer sold and shipped its products to buyers located in Montana, where it was unlawful to possess punchboards and pulltabs.  The manufacturers were charged with facilitating the commission of games of chance in Montana in violation of Montana law under the Travel Act.  The Court explained that, to establish that a manufacturer violated the Travel Act through sale of products to Montanans, "the prosecutor must show that the manufacturer in some significant manner associated himself with the purchaser's criminal venture for the purpose of its advancement."  *Id.*  In affirming dismissal of the Travel Act charges, the Court "assumed" that the defendants were aware of the Montana law and that the prosecutors' construction of it was correct; however, even with those assumptions, the Court could not "find that the defendants by selling to Montanans intended, within the meaning of the [T]ravel [A]ct, to facilitate a violation of state law."  *Id.* at 450; *accord United States v. Prince*, 529 F.2d 1108, 1112 (6th 1976) ("[T]he Travel Act only reaches those who engage in interstate activities with intent to perform other illegal acts.  Thus there is a requirement of a separate intent related to the use of interstate facilities which is different from the intent required to commit the underlying State offense.").

---

[5]  Defendants are charged under 18 U.S.C. § 1952(a)(3)(A), which states:  "Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to . . . (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform-- (A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both . . . ."

Under *Gibson Specialty*, it is not enough for the government to show that defendants knew that prostitution was a state crime or that defendants learned, after publication, that some of the website's users had placed ads that appeared to be for lawful adult services such as escorting, massage, or erotic dance, but were, instead, ads for prostitutes. *Gibson Specialty* mandates that the government must prove that the defendants (1) knew that a particular ad was an ad for prostitution; (2) published the ad with the specific intent to use the internet to facilitate prostitution; and (3) intended to facilitate prostitution in "significant" association with the ad's author (the website user).

There is not a single allegation in the indictment that meets this standard. Instead, the indictment alleges that defendants were aware that:

- the "vast" or "overwhelming" majority of the ads posted to the website were for prostitution (Indict. at ¶¶ 9, 34);
- government agencies and non-profits believed that ads had been posted to the website by prostitutes (*id.* at ¶¶ 74, 86, 97, 141, 144); and,
- prosecutions for pimping or other crimes had occurred which involved ads that had been posted to the website (although indictment does not allege that the ads at issue offered sex acts in exchange for money) (*id.* at ¶¶ 71, 76, 92).

In its opposition, the government points to Mr. Lacey's correspondence with public-relations consultants after learning that murder victims had placed ads on Backpage (among other sites) or in anticipation of media coverage of Backpage as "proof" he knew that Backpage facilitated prostitution. (Gov't's Opp'n at 10-11.) None of these allegations tie a specific defendant (Mr. Lacey or otherwise) to a specific ad pre-publication or allege that a defendant authorized publication of an ad for illegal conduct with the specific intent to facilitate illegal conduct via the internet or show that any of the defendants worked in "significant" association with the ad author (let alone that they knew any of the users who posted ads on the website). Instead, these allegations purport to establish insufficient general intent.[6]

---

[6] *See Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) ("Even entities that know the information's content do not become liable for the sponsor's deeds. Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet . . . prostitution,

9

Indeed, the government has repeatedly conceded that it is proceeding on a theory of general intent.[7]

Against this backdrop, the government has trotted out arguments that have already been refuted in other pleadings. For example, the government criticizes Mr. Lacey for omitting discussion of the pleas of Carl Ferrer and Dan Hyer; however, those pleas do nothing to advance the government's case. Carl Ferrer stated that he had "long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services." (*United States v. Ferrer*, 18-CR-464, Doc. 7-2 at 13.) Dan Hyer stated that he knew "that the great majority of the ads . . . were actually offering illegal prostitution services." (*United States v. Lacey*, 18-CR-422, Doc. 271 at 10.) These statements suggest, at best, general knowledge and not the requisite specific intent. Moreover, this Court should reject the government's invitation to accept these pleas, which have never been tested, as substantive evidence against Mr. Lacey.[8]

The government points to two prosecutions related to the website www.redbook.com to claim that website operators can be held liable for third-party speech. (Govt's' Opp'n at 11-12.) As previously noted, those cases have no bearing on the First Amendment issues in this case because those defendants pleaded guilty, raised no First Amendment defenses, and were accused of conduct

---

if it turns out that some (or many) of the advertisers make money from that activity? How about Verizon, which furnishes pagers and cell phones to drug dealers?").

[7] *See* Nov. 29, 2018 Ltr. from R. Jones to M. Piccarreta, attached hereto as Ex. B at 3 ("Backpage knew that *every* ad had the potential for facilitating prostitution services . . . ."); *see also* Excerpts from Oct. 5, 2018 Transcript, attached hereto as Ex. C at 102 ("[W]hat's at issue in this case . . . Did [defendants] know that the vast majority of these advertisements that went up on this Web site were for prostitution."). *Gibson Specialty* makes it clear that a defendant cannot be convicted because an ad for legal adult services had the "potential" to be an ad for prostitution or because the government or its witnesses claim that "the vast majority" of the ads were for prostitution.

[8] A guilty plea of a codefendant "may not be used by the government and received over objection as substantive evidence of the guilt of those on trial." *United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981). Further, courts should be skeptical of plea agreements because "plea agreement[s] may adopt facts the government wants to hear in exchange for some benefit." *United States v. Vera*, 893 F.3d 689, 692-93 (9th Cir. 2018); *see also Lee v. Illinois*, 476 U.S. 530, 541 (1986) (explaining that accomplices' confessions and arrest statements are "presumptively unreliable," "presumptively suspect," and "less credible than ordinary hearsay").

vastly different from what is alleged in this case. (Joint Reply at 11-12.) Similarly, the government's reliance on the U.S. Senate's Permanent Subcommittee on Investigations report on Backpage as substantive proof against Mr. Lacey is misplaced. A report of a political body cannot be used as a proxy for a judicial finding of guilt and does not trump judicial opinions based on constitutional principles, particularly when the report if patently flawed. (*Id.* at 14-16.)

Further, the government points to content aggregation, reciprocal link programs, and moderation to argue that defendants must have known that the true purpose of Backpage's business model was to derive revenue from prostitution. (*See* Gov't's Opp'n at 8-9.) Setting aside that the government cannot assume knowledge and that this argument, too, alleges insufficient generalized knowledge, the government is wrong about these practices as will be discussed in greater detail in future submissions. Content aggregation and reciprocal links are standard marketing tools that publishers of classified ads have used for decades. Moderation falls under "traditional editorial functions," even when terms or images are deleted and the remaining portion of the ad is published. (*See People v. Ferrer*, Case No. 16FE024013 (Sup. Ct. Sacramento Cnty. Aug. 23, 2015), slip op., attached hereto as Ex. D at 13-14 ("[E]ven if Backpage knew of the unlawfulness of the content of the ads, knowledge is insufficient to render Defendants liable. This is true regardless of whether Backpage even exercised its editorial discretion and deleted or blocked certain terms from ads.").)

## CONCLUSION

Because each of the Section 3142(g) factors weighs in favor of removal of the anklet, and the Pretrial Services officer who has monitored Mr. Lacey for more than one year does not oppose the Motion, Mr. Lacey respectfully requests that this Court grant the Motion.

RESPECTFULLY SUBMITTED this 16th day of April, 2019,

/s/   *Paul J. Cambria, Jr.*
LIPSITZ GREEN SCIME CAMBRIA LLP
Attorneys for Defendant Michael Lacey

| | |
|---|---|
| 1 | On April 16, 2019, a PDF version |
| 2 | of this document was filed with |
| 3 | Clerk of the Court using the CM/ECF |
|   | System for filing and for Transmittal |
| 4 | Of a Notice of Electronic Filing to the |
| 5 | Following CM/ECF registrants: |
| 6 | Kevin Rapp, kevin.rapp@usdoj.gov |
| 7 | Reginald Jones, reginald.jones4@usdoj.gov |
| 8 | Peter Kozinets, peter.kozinets@usdoj.gov |
|   | John Kucera, john.kucera@usdoj.gov |
| 9 | Margaret Perlmeter, margaret.perlmeter@usdoj.gov |
| 10 | Patrick Reid, Patrick.Reid@usdoj.gov |
|    | Andrew Stone, andrew.stone@usdoj.gov |
| 11 | Amanda Wick, Amanda.Wick@usdoj.gov |