*L Ast Decision*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF SACRAMENTO

| | |
|---|---|
| **DATE:** | **DEPARTMENT:**   8 |
| **JUDGE:**   Lawrence G. Brown | **CLERK:** |
| **REPORTER:** | **BAILIFF:** |

---

People of the State of California

vs.

Carl Ferrer, Michael Lacey, and
James Larkin,

Defendants

**CASE NO.** 16FE024013

---

**Nature of Proceedings: Ruling on Defendants' Motion to Dismiss under Penal Code Section 1004**

### Introduction

Backpage.com is one of the largest on-line classified advertisement services, through which users may post advertisements in a variety of categories. Posting an advertisement in the "Adult Services" category requires a fee. Through various levels of involvement with Backpage.com, Defendants have twice found themselves facing criminal charges in Sacramento County relating to certain advertisements placed in the "Adult Services" category.

The prosecution's theory is that Defendants conspired to create and organize a website that facilitates sex trafficking. The People assert that Defendants created such a site through Backpage.com, knowing that prostitutes and/or pimps use the site to advertise prostitution, and with the intent to maximize their own profits from the illegal sex trade. According to the People, this plan also included tricking credit payment processors into processing Backpage transactions, through the use of shell companies and fraudulent billing descriptors. Allegedly, the credit processors would not have processed the payments had they known they were doing business with Backpage.com. The People assert that Defendants' plan has come to fruition and they have derived massive financial support and maintenance from the prostitution.

### Background

In 2016, Defendants faced various charges of pimping and conspiracy to pimp. The Honorable Michael G. Bowman SUSTAINED the Defendants' demurrer and dismissed the complaint. Judge Bowman found that it was apparent from the accusatory pleadings that the prosecution hinged on treating Defendants as the speakers

the offensive conduct, when they were merely the publisher. Prosecution under this theory could not go forward, as the Communications Decency Act ("CDA") provides immunity for online publishers and distributors of content generated by third parties. (*See* 47 U.S.C. §230; *Barrett v. Rosenthal* (2006) 40 Cal.4[th] 33, 39.)

That same month, the Office of the Attorney General filed a new complaint, charging the same Defendants with conspiracy to commit money laundering (count 1), money laundering (counts 2-27), and conspiracy to commit pimping (count 28). The People also allege three sentencing enhancements based on the amount of money involved in the financial transactions. Defendant Ferrer also faces charges of pimping a minor under 16 years old (counts 29-31, 40), pimping a minor (count 32), pimping (counts 33-36, 39), and pimping a minor 16 years old (37-38).

On January 19, 2017, Defendants filed a Motion to Enforce the Court's Order of Dismissal; Alternative Demurrer; and Request to Transfer to Judge Bowman and Further Relief. On January 23, 2017, the People filed an Opposition. On March 6, 2017, Defendant filed a brief in further support for the above named Demurrer under Penal Code section 1004, and the People responded in further Opposition on March 8, 2017. The People also filed a Motion to Strike the declaration of defense counsel and Defendants' Exhibits A-J, attached to the Motion of January 19, 2017. On March 10, 2017, the parties addressed in open court Defendants' concerns of whether the complaint was sufficiently pled such that Defendants have been adequately apprised of the charges. Of particular concern was the money laundering charges, which charged Defendants with money laundering under the transactional prong but did not specify the underlying criminal activity. (See Penal Code 86.10(a)(2).) The Court invited the People to consider amending the complaint.

The People submitted the First Amended Criminal Complaint to the Court on March 24, 2017. This was deemed filed on April 28, 2017. The First Amended Complaint added several allegations and overt acts that explained the theory of prosecution. In particular, the People provided clarification that the money laundering charges are based on bank fraud, wire fraud and prostitution. On May 26, 2017, Defendants addressed the amended charges in their Continued Demurrer to Dismiss the State's Complaint. The People filed an Opposition on June 9th, and Defendants filed a Reply on June 23, 2017.

## Court's Legal Analysis and Ruling

The parties have briefed multiple issues that may be grouped into three categories. Defendants argue that the prosecution constitutes harassment and should be curtailed. Defendants also make several challenges to the pleadings and argue that procedural and facial defects prohibit the instant prosecution from going forward. Finally, Defendants argue that the First Amendment bars the instant prosecution because it is based on impermissible interference with publisher functions.

I.      **Nature of the Prosecution**

    A.      <u>Basis for the prosecution</u>

Since at least 2010, public officials and state prosecutors have been pressuring Backpage to remove the "Adult Services" category from the website in an endeavor to combat sex trafficking. With Backpage's refusal comply, a philosophical disagreement between public officials and Backpage as to how best to combat sex trafficking is clearly present. (See *Backpage.com, LLC v. Lynch*, 216 F.Supp.3d 96, 100, fn. 2.) Defendants note the instant prosecution is one of a recent rash of attempts to assign liability for affiliation with Backpage. Defendants claim that in each case, including the previous prosecution dismissed by Judge Bowman, Backpage successfully argued that it was entitled to immunity under the CDA. Defendants argue that in light of this clear immunity, the instant charges are brought in bad faith and the prosecution is vindictive. Defendants argue that this is not the first time a government official has used coercive techniques to attempt to shut them down. (See e.g., *Backpage.com, LLC v. Dart* (7th Cir. 2015) 807 F.3d 229 [in his professional capacity, Cook County Sheriff threatened Backpage.com business partners in an attempt to dry out Backpage business].)

Yet, perhaps another possible perspective is that there is a growing desire to hold online media accountable for their role in disseminating information leading to condemnable acts by third parties. (See e.g., *Cohen v. Facebook, Inc.* E.D.N.Y. May 18, 2017) 2017 U.S. Dist. LEXIS 76701, *28-31 [seeking to hold Facebook liable for allowing Hamas to use its platform to encourage terrorist attacks]; and *Fields v. Twitter, Inc* (N.D. Cal. 2016) 217 F.Supp.3d 1116 [seeking to hold Twitter liable for providing ISIS an account to use for spreading extremist propaganda]. )

This Court need not decide whether this prosecution is brought in bad faith, nor is there a sufficient factual basis to do so, at this juncture. As discussed below, whether this case proceeds depends, in part, on whether Defendants enjoy immunity against these new charges under the CDA. This immunity was provided by Congress, and regardless of where Backpage floats on the tide of public opinion, the immunity must be modified by Congress.

   B.   The People's Investigation May Continue

Defendants also request this Court to enjoin further investigation by the People and to return the materials already seized as part of the investigation. This argument is largely based on Defendants claim that this prosecution is brought in bad faith. At this stage, there is insufficient justification for interference with the prosecutor's functions. (Compare *Dart, supra*, 807 F.3d at 233 [Court finding letter sent by Sheriff "containing legal threats and demands" to sever contractual ties with Backpage was clear evidence of bad acts by government official].) Thus, Defendants' request to enjoin the People from further investigation and to return the materials seized is denied.

## II.   Procedural and Facial Challenges to the Charges

   A.   Authority to File New Charges.

The parties dispute whether the instant prosecution may be initiated against Defendants. Defendants argue the People are prohibited from re-filing charges after the original demurrer was SUSTAINED and maintain that the First Amended Complaint constitutes an improper attempt to reinstate that original complaint. Defendants argue that the People forfeited this opportunity by failing to follow the proper procedure to cure the defects in the previous complaint, as outlined in Penal Code sections 1007-1009. Defendants also argue that re-

ing of charges is barred because the previous complaint was dismissed on constitutional grounds. (See *People Pinedo* (2005) 128 Cal.App.4th 968, 972 [state and federal due process clauses limit the People's discretion to re-file charges].)

The People's position is that the granting of a demurrer does not bar the prosecution from filing a new complaint, even where the charges are the same. "Even a dismissal in the superior court following an order setting aside an information or indictment is no bar to a future prosecution for the same offense." (*People v. Uhlemann* (1973) 9 Cal.3d 662, 666, *citing People v. Van Eyk* (1961) 56 Cal.2d 471, 477; Pen. Code, § 999; see also Pen. Code § 1387.)   Nevertheless, the People represent that the instant charges are "substantially different" than those contained in the prior complaint and because the prior complaint was not dismissed with prejudice, the new charges are appropriate.

The Court finds the People may file the instant charges.  Judge Bowman dismissed the first complaint after finding the Defendants were entitled to immunity from prosecution under the Communications Decency Act.  While the CDA was established to protect the constitutional right to free speech, the immunity provision providing online publishers immunity from liability for third-party speech is statutory.  Thus, the dismissal was based on statutory legal grounds.  Generally, when charges are dismissed based on legal grounds, the prosecution may file a new complaint or seek a grand jury indictment. (*Uhlemann, supra,* 9 Cal. 3d at 666.) Moreover, Judge Bowman's ruling signaled that a prosecution based on treating publishers as the speaker was prohibited under the CDA.  This ruling would not prevent a prosecution under theories not subject to the immunity provision.  The People assert that the instant charges do not fall under the purview of the CDA.

B.    Jurisdiction

Defendants question whether California has jurisdiction over this prosecution.  Defendants argue that the allegation that they conducted transactions "throughout California," is insufficient because the People have not identified a single act actually committed in California.  Defendants argue that territorial jurisdiction may be raised in a demurrer and is subjected to pre-trial determination. (See Penal Code §1004(1).)

A state is not prohibited from exercising jurisdiction over criminal acts that take place outside of its borders, if the results of the crime are intended to (and do) cause harm within the state. (*People v Fortner* (2013) 217 Cal.App.4th 1360, 1363.)  California claims jurisdiction for offenses that fall under specific types of interstate situations. (*Ibid*, citing *People v. Betts* (2005) 34 Cal.4th 1039, 1047.)  For example, under Penal Code section 27, a defendant may be punished under California law for any crime committed "in whole or in part" of the state.  Similarly, under Penal Code section 788, California has jurisdiction for offenses commenced out of state then consummated in California.  Finally, under Penal Code section 778a, California has territorial jurisdiction if the defendant does a preparatory act in California that is more than a *de minimis* act toward the completion of the offense. (*Fortner, supra,* 217 Cal.App.4th at 1363-1365.)   In other words, California has territorial jurisdiction when "with intent to commit a crime" a person "does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state." (*People v. Renteria* (2008) 165 Cal.App.4th 1108, 1116.)

4

Here, the People contend that Defendants concocted a scheme to trick credit payment processors into processing payments for Backpage transactions when the processors would have otherwise declined. The People contend that this misrepresentation influenced banks to release money to Defendants. For jurisdictional purposes, the People contend that the acts of hosting a website and accepting credit payments for advertisement placement were non-*de minimis* parts of the overall scheme to defraud the banks. In this way, Defendants arguably committed more preparatory acts in California than what was deemed sufficient in *People v. Betts* (2005) 34 Cal.4th 1039, 1047, where there was sufficient evidence that the defendant's intent to molest his step-granddaughters formed in California when he suggested they go with him on a long haul truck drive. (*Id* at 1054-1056.)

This Court finds that California has jurisdiction over the instant charges. Assuming, without deciding, that Defendants intended to conduct, and participated in, the scheme alleged by the People, hosting the website through which payments were processed under fraudulent conditions was more than a *de minimis* act toward the bank fraud. The scheme would not have been as successful had it not been able to process payments for Backpage advertisements placed in California. For purposes of establishing jurisdiction, these allegations are sufficient.

C.    Case Assignment

Defendants request that this Court transfer the case back to Judge Bowman for the sake of "efficiency and to prevent forum-shopping." Defendants rely upon Penal Code section 1387, which provides exceptions to that general rule that the prosecution has an opportunity to re-file charges after one dismissal. (Pen. Code § 1387(a).) While section 1387 also serves to curtail prosecutorial harassment by placing limits on the number of times charges may be re-filed, these limitations do not dictate judicial assignment. This Court can find no justification for assignment through a method other than through the normal procedure governed by local rules 10.32 and 10.50. Defendants' request to have the case assigned to Judge Bowman is denied.

D.    Judicial Notice

Defendants have also requested this Court to take judicial notice of several documents attached as Exhibits A-J to their Motion filed on January 19, 2017. The People request this Court to strike these exhibits and the accompanying declaration from defense counsel.

This Court has been expressly called upon to review the propriety of the re-filed charges in light of the previous dismissal. Therefore, this Court takes judicial notice of the procedural history of the prior prosecution including the prior complaint and the Order granting Defendants' Demurrer. (See *People v. Putney* (2016) 1 Cal.App.5th 1058, 1063, fn. 4 [taking judicial notice of the prior case's procedural history but not the truth of any facts involving the underlying charge]; *People v. Hill* (1998) 17 Cal.4th 800, 847 [taking judicial notice of unpublished decision in separate case].)

While the previously filed complaint and dismissal order is helpful to the resolution of the matters before this Court at this juncture, Defendants' other documents do not have the same utility. (See *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564 [a court may take judicial notice of the truth of facts asserted in documents such as orders, findings of fact and conclusions of law, and judgments].) The Defendants' request to take

icial notice for all exhibits attached to the January 19th motion, other than the previous complaint and dismissal order, is denied.  The People's motion to strike these documents is SUSTAINED.

E.     Challenges under Penal Code section 1004.

A defendant may demur on delineated statutory grounds.  (Pen. Code, § 1004; *People v. Saffell* (1946) 74 Cal.App.2d supp. 967, 972.)  These include the ability to challenge: whether the facts stated constitute a public offense; defects on the face of the accusatory pleading; or on the grounds that the pleading includes information that would be a bar to prosecution.  (Pen. Code, § 1004.  *See also People v. Goodman* (2014) 225 Cal.App.4th 950, 956.)  Literal compliance with pleading requirements under Penal Code section 952 is insufficient if the accusation fails to give constitutionally adequate notice of what the accused must defend against.  (*People v. Jordan* (1971) 19 Cal.App.3d 362, 369.)  California's system of criminal pleading under section 952 relies in part upon the transcript of the grand jury hearing or preliminary examination which must be furnished to the defendant to inform him of particular circumstances of his offense not shown by the accusatory pleading.  (*People v. Anderson* (1961) 55 Cal.2d 655, 657; *People v. Johnson* (1964) 230 Cal.App.2d 80, 86; *People v. Jordan* (1971) 19 Cal. App. 3d 362, 369-371.)

However, compliance with section 952 does not necessarily overcome a due process attack and may be challenged in a demurrer prior to preliminary hearing. (*Lamadrid v. Municipal Court* (1981) 118 Cal.App.3d 786, 790; *Choung v. People of State of California* (1970) 320 F.Supp. 625, 629.) (*See also Lott v. United States* (1962) 309 F.2d 115, 117 [offenses must be accurately described in an indictment; and if necessary to do so, the allegations must be expanded beyond the words of the statute in order to embrace all the ingredients necessary the offense]; *United States v. Cruikshank* (1875) 92 U.S. 542, 558 [the object of the indictment is to furnish the accused with such a description of the charge against him as will enable him to make his defense and to inform him of the facts alleged; a crime is made up of acts and intent and these must be set forth in the indictment].)  The complaint must be given a reasonable interpretation and read as a whole with its parts considered in their context.  (*People v. Biane* (2013) 58 Cal.4th 381, 388.)

*1.  Money laundering premised on federal offenses.*

Defendants argue that the charges do not constitute a public offense because the People have no authority to base their state prosecution for money laundering upon violations of federal bank or wire fraud laws.  The People respond that California law allows the state to incorporate federal offenses by reference, and the California money laundering statute specifically contains such a reference.  This Court agrees with the People.

Penal Code section 186.10, subdivision (a), provides in pertinent part: "Any person who conducts or attempts to conduct a transaction or more than one transaction within a seven-day period involving a monetary instrument or instruments of a total value exceeding five thousand dollars ($ 5,000), or a total value exceeding twenty-five thousand dollars ($ 25,000) within a 30-day period, through one or more financial institutions (1) with the specific intent  to promote, manage, establish, carry on, or facilitate the promotion, management,

establishment, or carrying on of any criminal activity, or (2) knowing that the monetary instrument represents the proceeds of, or is derived directly or indirectly from the proceeds of, criminal activity, is guilty of the crime money laundering."

Penal Code section 186.9 defines "criminal activity" as a criminal offense punishable under the laws of the state by imprisonment in the state prison or from a criminal offense committed in another jurisdiction punishable under the laws of that jurisdiction by death or imprisonment for a term exceeding one year. (Pen. Code §186.9(e).) Federal bank fraud, in turn, is punishable by imprisonment for a term of not more than 30 years. (18 U.S.C. §1344.) Similarly, federal wire fraud is punishable by not more than 20 years, absent special circumstances. (18 U.S.C. §1343.) Thus, it appears that federal bank and/or wire fraud may serve as the criminal activity underlying a charge of California money laundering.

### 2. The First Amended Complaint is Sufficiently Pled.

Defendants also argue that even if a state money laundering prosecution may be predicated on a federal offense, the charges are uncertain and fail to adequately apprise them of the actions against which they must defend. Despite the amendments to the charges, Defendants continue to assert a lack of specificity as to the transactions and monetary instruments allegedly involved in the money laundering. Defendants assert that the People may not rely on a simplistic pleading under Penal Code section 952, but must satisfy constitutional due process requirements as well. The People respond that they have complied with their pleading requirements and the case should be advanced to the preliminary hearing, where the full nature of the charges will become clear.

This Court agrees the complaint is not a model of clarity. However, the nature of the charges and theories of prosecution are ascertainable from the amended charging instrument. Specifically, the People now allege that Defendants conspired to orchestrate a bank fraud by misrepresenting to credit payment processors that they were not processing transactions from Backpage, and this misrepresentation would trigger a release of funds from banks. The overt acts alleged clarify that Defendants created multiple classified websites, and when applying for (at least one) merchant account, Defendant Ferrer omitted any reference to Backpage, despite intending to process Backpage transactions through the account. The People allege that credit payment processors, along with American Express, would not have knowingly processed the payments for Backpage and the banks would not have released funds absent Defendants' trickery.

These allegations provide sufficient notice for Defendants to understand the nature of the charges and prepare a defense. Essentially, either Defendants did - or did not - materially represent to credit payment processors in a scheme to fraudulently obtain money from banks. If Defendants did so, this may form the basis for a money laundering charge. (Cf. *United States v. Mason* (9th Cir. 1990) 902 F.2d 1434, 1443[1] [federal money laundering conviction supported by evidence that bank would not have opened a merchant account had it known it was laundering credit charges for prostitution; the false representation to the credit processor influenced the bank's release of funds].) The factual resolution to that question, however, is not at issue here.

---

[1] Overruled, on other grounds in part by *United States v. Doe* (9th Cir. 2013) 705 F.3d 1134, which was later withdrawn. See also *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266.

That is at issue is whether the First Amended Complaint has been sufficiently pled to meet statutory and due process requirements.

This Court finds the First Amended Complaint provides Defendants notice of the offenses of which they are accused, and Defendants are adequately apprised of the conduct against which they must defend. (Penal Code §952; *Lamadrid, supra,* 118 Cal.App.3d at 791.) In fact, Defendants' knowledge of the nature of the charges and theory of prosecution has been demonstrated throughout the briefing process and during argument to the Court. Therefore, the First Amended Complaint meets statutory and due process requirements and is sufficiently pled to go forward.

F.    Purported Defects in the Money Laundering Charges

To prove that the defendant is guilty of money laundering, the People must ultimately show the act of conducting financial transaction(s) of a minimum amount, within a certain time frame, and that when the defendant did so, he either intended to promote criminal activity or he knew that the money represented the proceeds of criminal activity or was derived directly or indirectly from the proceeds of criminal activity. (CALCRIM 2997)

1.    *One Act, One Crime Concerns*

Defendants argue that even if charges are sufficiently pled, the money laundering charges are fatally flawed because they are premised on the same acts as those allegedly constituting bank or wire fraud. Defendants argue that under the People's theory, the credit payments impermissibly constitute both the bank fraud and the money laundering.

Notably, the federal bank fraud statute punishes the fraudulent scheme, not necessarily the completion of the scheme. The offender must acquire (or attempt to acquire) bank property by means of the material misrepresentation. (*Loughrin v. United States* (2014) 134 S.Ct. 2384, 2393-2394.) Because bank fraud may be completed upon attempting to effectuate the scheme, there exists a range of punishable behavior that is subject to factual determinations by the trier of fact. That is separate and apart from the question at bar; *i.e* whether the charges are adequately pled.

Nevertheless, the parties draw attention to a problem identified by the federal courts that may arise when federal money laundering is based on federal bank or wire fraud, and suggest the same problem is present here. When the activity required to commit the fraud encompasses activity required to commit money laundering, the two offenses should merge into one offense under federal law. (See e.g., *United States v. Wilkes* (9th Cir. 2011) 662 F.3d 524, 545-546 [if a successful bank fraud requires concealment of financial transactions, the defendants cannot be charged with that same act of concealment a second time, as relating to the commission of money laundering].) Perhaps the most common "merger" problem arises when the court must parse out (or trace) the money involved in the underlying crime and money involved in the laundering. As a result, there are a plethora of federal cases that discuss tracing the proceeds of the criminal activity in order to determine when the bank or wire fraud ends, and money laundering begins. Indeed, the parties spend much time debating this issue.

Included in this discussion is the appropriate federal definition of "proceeds" for tracing purposes.  (Compare *United States v. Santos* (2008) 553 US 507 [plurality decision defining "proceeds" as profits rather than gross receipts] with *United States v. Grasso* (9th Cir. 2013) 724 F.3d 1077, 1091 [recognizing subsequent legislative amendment defining "proceeds" as including gross receipts of criminal activity].)

Despite the parties' request to weigh in on this vexing problem faced by federal courts, the difficulty in defining and tracing proceeds does not appear to so plague the California money laundering statute.  The bench notes in CALCRIM 2997 governing Money Laundering instruct, "If the definition of proceeds is an issue, see *United States v. Santos* – which holds that 'proceeds' in the federal money laundering statute means 'profits.'"  There is no recognition of the legislative definition of "proceeds" enacted after *Santos*.  This signals an intentional divergence from federal law and provides us with a clear definition of the *type of money to be traced*.

Additionally, *People v. Mays* (2007) 148 Cal.App.4[th] 13, the lead case involving money laundering, provides guidance on *how to trace the money* from the underlying criminal activity on its path to be laundered.  The *Mays* court determined that our "promotional" money laundering prong under subsection (a)(1) of Penal Code section 186.10 requires monetary transactions to be made with a specific intent to keep the criminal activity alive.  (*Id* at 29.)  Under this section, there is no need to trace any funds, since there is no requirement that the money to be derived from an illegal source in order to promote criminal activity.  (*Id* at 30)

However, under the "transactional" prong of subsection (a)(2), the requisite mens rea is knowledge that a monetary instrument represents criminal proceeds.  Under this subsection, tracing the source(s) of transactions is required.  Monetary instruments must be composed of the minimum statutory amount solely from criminal proceeds; it is insufficient merely to show the transaction was the right amount and from an account with comingled funds.  This requires the government to show: the defendant's entire business was illegal, there were deposits of the minimum statutory amount or more in criminally derived funds, or there was a transfer of all funds out of the account.  (*Mays, supra*, 148 Cal.App.4[th] at 32.)

Here, Defendants have been charged under both prongs of the money laundering statute.  This means Defendants are being charged with, essentially, either investing money into the underlying criminal scheme, or conducting transaction with profits from the scheme and the People must show that the profits came solely from that underlying criminal activity.  Regardless of whether the People will succeed in meeting their burden of proof, the theory and the charges under which they are proceeding appear to be valid under California law and adequately pled such that any defect does not bar prosecution.

## 2. *Bank Fraud May be Premised on Intent to Defraud a Third Party*

Defendants argue that even if the "criminal activity" underlying a money laundering charge may be based on a federal bank charge, the instant allegations of bank fraud are facially deficient because Defendants had no relationship with the banks named in the First Amended Complaint and therefore could not have been victims of bank fraud.

The federal bank fraud statute states:  "Whoever knowingly executes, or attempts to execute, a scheme or artifice (1)  to defraud a financial institution; or (2)  to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of

false or fraudulent pretenses, representations, or promises; shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both." (18 USC §1344.)

Subsection (1) requires intent to defraud a financial institution. To act with the "intent to defraud" means to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself. (*United States v. Brandon* (1ˢᵗ Cir. 1994) 17 F.3d 409, 425.) Subsection (2) requires that a defendant "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice" and has two elements. First, the clause requires that the defendant intend "to obtain any of the moneys . . . or other property owned by, or under the custody or control of, a financial institution." Second, the clause requires that the envisioned result—i.e., the obtaining of bank property—occur "by means of false or fraudulent pretenses, representations, or promises." (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2388-2389.) There must be a "relational" connection between the alleged false statements or representations and the obtaining of bank property, such that the misrepresentation is material. (*Loughrin v. United States* (2014) 134 S. Ct. 2384, 2393.)

A material misrepresentation made to a third party may qualify if it induces the bank to depart with its property. (See *United States v. Nguyen* 2017 U.S.Dist. LEXIS 32549, *18-19 and *Loughrin v. United States* (2014) 134 S.Ct. 2384, 2389 [both stating that bank fraud can cover deception of a non-bank custodian with a goal to obtain a bank's property].) This theory of bank fraud has been pursued in other jurisdictions. For example, in *United States v. McNeil* (9ᵗʰ Cir. 2003) 320 F.3d 1034, 1039, the defendant used fake identification to open an account for the purposes of receiving a false tax refund, with the ultimate goal of transferring money from the fake account to his own. The 9ᵗʰ Circuit rejected the argument that the conviction was invalid because true victim was the IRS and not the bank. The court determined that the plan was two-fold; fraudulently obtain money from the IRS, then (after the bank becomes a holder-in-due-course) misrepresent to the bank that Defendant was ultimately entitled to the money. (See also *United States v. Warshak* (6ᵗʰ Cir. 2010) 631 F.3d 266, 309-310 [jury could find that misrepresentation made to deceive payment processor to continue to process payments when they would otherwise decline constitutes bank fraud]; *United States v. Johnson* (C.D. Ut. 2015) 2015 U.S.Dist. LEXIS 145102, *6 [submitting a fraudulent merchant account applications to a bank so that online sales could be processed can constitute bank fraud].)

By extrapolation, the instant allegations of bank fraud based on the theory that Defendants made a material misrepresentation to a credit payment processor, which induced a bank to depart with its property, may be proper and may serve as the predicate "criminal activity" for a state money laundering charge.

### 3. *Money Laundering Based on Wire Fraud*

Defendants are also charged with both prongs of money laundering after violating the federal wire fraud statute under 18 USC section 1343. Wire fraud is committed when: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for

the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both…." (18 USCS § 1343.)

Wire fraud does not require proof that the defendant's conduct violated a separate law or regulation. Rather, wire fraud has only three elements: "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud." (*United States v. Green* (2010) 592 F.3d 1057, 1064, quoting *United States v. Shipsey* (9th Cir. 2004) 363 F.3d 962, 971.)  The scheme to defraud must only include an "affirmative, material misrepresentation." (*Green, supra,* 592 F.3d at 1064).

Here, Defendants are faced with two counts of money laundering based on wire fraud, listing American Express as the victim and describing the fraudulent behavior as "using interstate wires by using various payment entities to disguise the true nature of the transactions." Factually, the People have alleged that American Express signaled its intent to discontinue processing Backpage's credit payments after May 1, 2015, but Defendants continued to process American Express transactions from Backpage.   The People also allege that Defendants created shell companies and engaged in factoring in order to obscure the nature and/or source of the credit payments.

In light of the general money laundering discussion above, this Court finds no reason to prevent prosecution for money laundering based on wire fraud.

## III.    Application of The First Amendment

In addition to the above facial attacks on the complaint, Defendants contend that the First Amendment bars prosecution for all charges, as the People are seeking to prosecute them for publishing functions.  However, the instant charges are not based on an overt attempt to criminalize the act of publication, and traditional First Amendment analysis is not required here. Indeed, the money laundering charges based on bank and wire fraud, on their face, are not based on publication of third party speech at all.  Rather, they are based on the purported illegality of Defendants financial operations.  This Court finds that the immunity provision of the CDA is not triggered by the money laundering charges based on bank or wire fraud.  Thus, the following discussion is directed at the pimping charges faced by Defendant Ferrer and the money laundering charges based on prostitution.

That is not to say that the First Amendment is not implicated at all.  Indeed, the protections afforded by the First Amendment were the motivating factors behind the enactment of the CDA. Congress expressly intended to relieve online publishers from liability for publishing third-party speech.  (47 U.S.C. § 230)

As noted above, Penal Code section 1004 allows for a demurrer on the basis that the complaint contains matter which, if true would legally bar the prosecution.  (Penal Code §1004.)  The language of the CDA itself states, "No cause of action may be brought and no liability will may be imposed under any State or local law that is inconsistent with this section." (47 U.S.C. §230 (e) (3) (emphasis added).)  This statutory language clearly demonstrates a legislative intent to provide both a bar to prosecution and an affirmative defense at trial. Thus, the relevant question in this case is whether, and to what extent, Defendants' activity entitles them to protection of their First Amendment rights through the immunity provision of the CDA.

A.    Immunity Under the Communications Decency Act

11

The CDA provides immunity for online publishers and distributors of content generated by third parties. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39.)  Protection from the CDA is broken down into three parts. Conduct is shielded if the defendant (1) is a provider or user of an interactive computer service; (2) that the plaintiff seeks to treat as a publisher or speaker; (3) of information provided by another information content provider. (*Fields v. Twitter, Inc.* (N.D. Cal. 2016) 217 F.Supp.3d 1116, *1121; *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 19; 47 U.S.C. §230.)  "There has been near-universal agreement that section 230 should not be construed grudgingly." (*Doe, supra*, 817 F.3d at 118 [citations omitted].)

To determine whether defendant faces a claim that seeks to treat the defendant as a publisher or speaker of information provided by a third party, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a publisher or speaker." (*Barnes v. Yahoo!, Inc.* 570 F.3d 1096, 1101-02.)  Moreover, because distributors are included in the publisher category, distributors are also entitled to protection under the CDA.  After all, publication includes every repetition and distribution of material. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 45.)  Under the CDA, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune." (*Fair Housing Council of San Fernando Valley v. Rommates.com, LLC,* (9th Cir. 2008) 521 F.3d 1157, 1170-1171.)  The Ninth Circuit has recognized that although "there will always be close cases where a clever lawyer could argue that something the website operator did encouraged the illegality…Such close cases must be resolved in favor of immunity…" (*Id* at 1174.)

As applied to the instant case, there are two possible theories of prosecuting Defendants for pimping.  A defendant can be convicted of pimping under a theory that involves actual solicitation of prostitution. Alternatively, defendants may be prosecuted under the theory that defendants derived support from the earnings of another's act of prostitution. (*See People v. McNulty* (1988) 202 Cal.App.3d 624, 630 [stating the two theories of prosecution for pimping].)  The People rely on the second theory in asserting that Defendant Ferrer knowingly lived and derived support from prostitution earnings.

### 1.    Theory that Defendant's derived financial support from prostitution

The People maintain that pimping will be shown when the People demonstrate that Defendants acquired income from prostitution resulting from advertisements placed in Backpage.com.  Defendants maintain they merely accepted payment for a legitimate publishing function.

This Court finds *People v. Grant* (2011) 195 Cal.App.4th 107 helpful.  *Grant* discusses a distinction between financial support received by the prostitute (illegal) and funds paid by the prostitute for services rendered or other purposes (legal).   The appellate court emphasized that "the statutory prohibition does not preclude a person from accepting a known prostitute's funds gained from the prostitute's lawful activities or for purposes other than the person's support and maintenance." (*Id* at 116.  *See also Allen v. Stratton* (C.D.Cal. 2006) 428 F.Supp.2d 1064, 1072, fn 7 [a natural reading of the pimping statute does not apply to an individual who provides a legitimate professional service to a prostitute even if paid with proceeds earned from prostitution, the service provider derives support from his own services]; *People v. Reitzke* (1913) 21

Cal.App.740, 742 [a legitimate defense to pimping is that a prostitute supplied defendant money for any purpose other than being supported or maintained by the prostitution].)

Here, there is no dispute that Backpage charged money for the placement of advertisements. Providing a forum for online publishing is a recognized legal purpose that is generally provided immunity under the CDA. This immunity has been extended by the courts to apply to functions traditionally associated with publishing decisions, such as accepting payment for services and editing. (*See e.g.,Doe v. Backpage.com, LLC* (817 F.3d 12, 15, *petition for certiorari denied* January 9, 2017[decisions regarding posting standards and requirements, including accepting payments for posting, are not distinguishable from publisher functions].)

However, the People dispute the "services" at issue. The People argue that the Backpage website generated income through its "Escort" section, which invariably contained prostitution advertisements. Because these advertisements are not for legal services and Defendants were well aware of the nature of the advertisements, the People argue that any claim of immunity under the CDA is defeated. (Pre-trial proceedings, July 14, 2017) The People would have this Court determine that the services provided are based on the content of the advertisement rather than the forum on which the advertisement is posted. Yet, to hold Defendant responsible for the content of the advertisement would require holding a publisher liable as if he was the speaker of the content. Contrary to the People's claim, doing so directly triggers, not defeats, the immunity provision of the CDA.

However, that does not end our inquiry. Immunity may be removed if Defendants' conduct went beyond those of a publisher and constituted content creation. This may happen when a provider crosses the line from providing a neutral interactive service that simply replicates offending third party matter and instead takes active control of the content of a web posting. (*Doe v. Backpage.com LLC* (D.C. Mass 2015) 104 F. Sup.3d 149, 156.) In short, if a provider's acts "materially contribute" to the illegality of the material, immunity will be lost. (See *Fair Hous. Council v. Rommates.com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1166 [defendant became a content provider by requiring an answer to discriminatory questions, defendant's unlawful questions sought unlawful answers as a condition to doing business]; *Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398-408-409 [a service provider must require third-parties to enter unlawful or actionable content to be deemed a content provider]; *FTC v. LeadClick Media* (2nd Cir. 2016) 838 F.3d 158, 175 [encouraging and managing another site to post fake news in order to boost web traffic and sales for client results in content creation]; and (*FTC v. Accusearch Inc.* (10th Cir. 2009) 370 F.3d 1187 [no immunity for company that created offensive content by paying researchers to illegally obtain phone numbers, then resold the numbers online].)

The People claim that Defendant Ferrer has gone a step beyond merely accepting payments for advertisements placed online. Allegedly, Defendant Ferrer created content, connected pimps and traffickers with purchasers, and helped them avoid law enforcement. The People allege that, through Backpage's posting guidelines, Defendant Ferrer encouraged, maintained and assisted illegal prostitution for purposes of his own financial gain.

a.    Editing

The People allege Defendants created a moderation system where terms would be deleted or blocked by Backpage but the user would still be allowed to post the advertisement and compensate Defendants. The People

-llege that "such edits would not change the users' intent....but merely create a disguise." (Amend. Comp. 26) The People allege that these actions resulted in blocking certain prostitution terminology, but coded or obscured language and pictures were allowed to be posted. The People allege that Defendant Ferrer directed staff to delete or block words that were code for underage girls, but allowed the advertisement to be posted for a fee. (Amend. Comp. 26)  The People contend that this constitutes "material contribution" to the offensive material. (Pre-trial proceedings, July 14, 2017, p 26)

In light of the People's acknowledgement that Backpage's edits would not change the user's intent, there can be no material contribution to the offensive content.  Indeed, such actions generally fall within the scope of protected editorial functions.  (See *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12, 20-21 [service providers' decisions on website structure, rules for posting and reposting - even when previously blocked - are protected publisher functions] and *Fields v. Twitter, Inc.* (N.D. Cal. 2016) 217 F.Supp.3d 1116, 1122 [protected publishing activity included decisions about what third party content may be posted or reposted online].)

Even if the edits or posting rules allow advertisers to use coded language, this is insufficient to render the website operator a content provider.  The crucial distinction is between engaging in actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content, and responsibility for what makes the displayed content illegal or actionable.  (*Jones v. Dirty World Entmt Recordings LLC* (6th Cir. 2014) 755 F.3d 398, 414 [].)  Here, it is the third-party who is responsible for the illegal content of the advertisement.

The People also allege that Defendants knew that the ads placed were for prostitution and Defendants purposefully crafted their posting procedures to maximize their profits from this prostitution.  Yet courts have refrained from presuming to know a publisher's motivations for editorial decisions.  First, "it is well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech."  (*Universal Commun. Sys. v. Lycos, Inc.* (1st Cir. 2007) 478 F.3d 413, 420, citing *Barrett v. Rosenthal* (2006) 40 Cal. 4th 33).  Thus, even if Backpage knew of the unlawfulness of the content of the ads, knowledge is insufficient to render Defendants liable.  This is true regardless of whether Backpage even exercised its editorial discretion and deleted or blocked certain terms from ads.  (See *Doe II v. MySpace Inc,* (2009) 175 Cal.App.4th 561, 571 [immunity under section 230 applies even when self-regulation is unsuccessful or unattempted]; *Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21 [rejecting claim that website operators should be liable for failing to provide sufficient protections to users from harmful content created by others].)

Additionally, in *Backpage.com v. McKenna* (Wash. W.D.C. 2012) 881 F.Supp.2d 1262, the court recognized the difficulty in assigning knowledge of a third-party's intent to a publisher when that third party places an ad with Backpage.  The court acknowledged that the pimp who publishes the advertisement certainly knows whether his offer is implicitly for sex, but expressed serious doubt that one could assign such knowledge to a publisher as to whether an advertisement "implicitly" offered sex.  If an online service provider publishes advertisements that employ coded language, a reasonable person could be misled to believe that facts exist when they do not: an advertisement for escort services may be just that. Moreover, if the offer is "implicit," a third

party cannot ascertain that which is being offered before the transaction is actually consummated – a fact not likely to be known by a publisher. (*Id* at 1279.)

Finally, courts have stated that the motivation behind editorial decisions "do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content." (*Doe v. Backpage.com, LLC* (1st Dist. 2016) 817 F.3d 12, 21.) Immunity depends on the source of the information in the injurious statement, not the source of the statement itself. (*Universal Commun. Sys. v. Lycos, Inc.,* (1st. Cir. 2007) 478 F.3d 413, 419-420 [immunity only applies when the information that forms the basis for the state law claim has been provided by "another information content provider"]; 47 U.S.C. §230 (c)(1).)

Here, the People acknowledge that advertisements are placed by third parties and Backpage's edits "would not change the users' intent." Nor is there an allegation that Defendant(s) set up the website to require offensive content to be supplied, as in *Roommates, Bollaert* or *Dirty World*. As such, there is no material contribution to the offensive content in the advertisements, and the allegations reference traditional publisher functions.

      b.    Use of Profile Information

The People also specifically allege that "Defendants created profiles for the victims named in [several] counts [ ] without their knowledge." (Amend. Comp. 20, overt act 18) These false or nonexistent profiles were "created from Backpage data and [then] used on other websites." Allegedly, sometimes content that was edited out on Backpage was displayed on the affiliated websites of BigCity.com or EvilEmpire.com. In doing so, Defendants unlawfully used another's image "for the Defendants' own commercial gain," and to advertise their own product. (Amend. Comp. 25) The People claim that this "misappropriation" of the likeness of Backpage users resulted in content creation. (Amend. Comp. 25)

Similar allegations were considered in *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 and *Anthony v. Yahoo! Inc* (N.D. Cal. 2006) 421 F.Supp.2d 1257. The People cite *Anthony* as instructive. (Opp. 12) In *Anthony*, Plaintiffs belonged to an online dating service through Yahoo!. Plaintiffs alleged that Yahoo! created false profiles and sent those false profiles to users as enticement to renew their dating subscription. The court refused Yahoo!'s claim of immunity under the CDA at the dismissal stage. The court stated that the allegations that Yahoo! actively created false profiles, not merely that Yahoo! failed to delete the expired profiles, were sufficient to allow the case to go forward.

In *Doe v. Backpage.com LLC* (1st Cir. 2016) 817 F.3d 12 , plaintiffs brought claims against Backpage alleging unauthorized use of a person's picture. Plaintiffs alleged that Backpage used their photos to garner advertising revenues from their traffickers. (*Id* at 27.) The court found that although Backpage profited from the sale of advertisements, it was "not the entity that benefitted from the misappropriation." Rather, the party who benefitted from the misappropriation was the original advertiser. The court stated, "Matters might be different if Backpage had used the pictures to advertise its own services…" (*Ibid.*) (See also *Perkins v. LinkedIn Corp* (N.D. Cal. 2014) 53 F.Supp.3d 1222, 1247 [defendant was a content provider when defendant, in an effort to increase its own business, unilaterally crafted and sent membership invitation emails to users' contacts].)

The People assert that Defendant Ferrer falls under the above exceptions when he created and then used profile information to increase Backpage revenue. Yet the People acknowledge that the information used was "created from Backpage data." Thus, it is clear that Defendants did not fabricate the data, as in *Anthony*. There is no allegation that in taking the data from the Backpage ads, Defendants created the injurious nature of the material. (See *Doe v. Friendfinder Network, Inc.* (D.C. N.H. 2008) 540 F.Supp.2d 288, 295 [website operator is not a content provider when there is no indication it contributed to the injurious character of the content].) Moreover, the People's allegation that the purpose of these "new" posts was to direct web traffic back to Backpage demonstrates that if a person was interested in the reposted profile, the person was redirected to the ad on Backpage. While additional advertisement revenue may have been a byproduct of this redirection, the original poster gained increased visibility of his ad. Increased visibility to the classified ads posted by third parties permissibly leads to search engine optimization in an effort to increase the visibility of the information provided by the third party. (See *Asia Econ. Inst. V. Xcentric Ventures LLC* (C.D. Cal. 2011) 2011 U.S. Dist. LEXIS 145380, *19 [increasing the prominence of a page in internet searches do not amount to "creation or development of information"].) Indeed, the very purpose of the online advertising accessed by the third party in placing an ad in Backpage was to provide accessibility to the public on a large scale. (See *Ibid* [the purpose of consumer reports is to provide accessibility to the public on a grand scale and "increasing the visibility of a statement is not tantamount to altering its message"]; See also *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041 ["Whatever [Backpage] did to increase their profitability ad visibility, did not create the content of the offensive posted information."].)

        c.        Overall Course of Conduct

The People attempt to establish a pattern of an overall course of conduct to indicate Defendants sought to structure their business to obtain maximum profits from the illegal sex trade. The People allege that Defendants "manipulated" advertisements to evade law enforcement detection. The People state, "In this way, rather than prevent a child from being sold for sex, the Defendants would knowingly profit from the child's commercial sexual exploitation and assist the trafficker to evade law enforcement." (Amend. Comp. 26)

The People maintain Backpage's conduct is similar to *J.S. v. Vill. Voice Media Holdings, LLC* (2015) 184 Wn.2d 95. In that case, advertisements featuring three minor girls were posted online on a site owned by Backpage. These girls became victims of sex trafficking and later brought suit against Backpage. Backpage moved to dismiss the case on the basis of immunity provided by the CDA. The Washington Supreme Court refused to grant the motion to dismiss. (*Id* at 98-99.) The *J.S.* court stated that the case turned on whether Backpage merely hosted the advertisements or helped develop the content of those advertisements. (*Id* at 101)

Applying the applicable state standard for a motion to dismiss, the *J.S.* court found that the plaintiffs alleged facts that, if proved true, would show that Backpage did more than simply maintain neutral policies prohibiting or limiting certain content. Specifically, those allegations included that Backpage intentionally developed its website to "require" information that allows and encourages illegal trafficking of underage girls, developed content requirements that it knows will allow solicitors to evade law enforcement and that Backpage

16

knows that the foregoing content requirements are a fraud and ruse actually aimed at helping pimps and prostitutes.  (*Id* at 102.)

Here, however, the factual allegations fall short of those alleged in *J.S.*.  There is no allegation that Defendants required information essential to the illegal trafficking of underage girls.  Instead, the People's allegations attempt to assign criminal liability to Defendants who offered an online forum, on which other people posted advertisements that led to prostitution, and that Defendants realized profits instead of "actively preventing" the sale of sex.  These allegations confuse moral obligations with legal ones and have been rejected in other jurisdictions.  For example, in *M.A. ex rel. P.D. v. Village Voice Media Holdings, LLC* (E.D. Mo. 2011) 809 F.Supp.2d 1041, Defendants were SUSTAINED immunity under the CDA for allegations that Backpage knowingly accepted a fee for advertisements leading to prostitution, and "created information" by hosting a search engine, providing instructions for increased visibility of advertisements and allowed for anonymous payment.  (*Id* at 1044.)  (See also *Doe v. Backpage.com LLC* (2016) 817 F.3d 12, 22 [rejecting the plaintiffs' assertion that Backpage participated in an affirmative course of conduct and actual participation in sex trafficking by charging for advertisements and allowing users to pay an additional fee for increased advertisement visibility and holding that "claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1)."].)

As alleged here, the prostitution took place as a result of an advertisement placed by a third party.  Thus, the only "manipulation" would be in the act of extracting the content from the original ad and/or from the act of physically posting the extracted content on a new site.  Backpage's decision to charge money to allow a third party to post content, as well as any decisions regarding posting rules, search engines and information on how a user can increase ad visibility, are all traditional publishing decisions and are generally immunized under the CDA. In short, the victimization resulted from the third party's placement of the ad, not because Backpage profited from the ad placement.  (See *Doe, supra*, 817 F.3d at 20 [noting that the plaintiffs were harmed when they were trafficked through the advertisements whose content was created by a third party]; *Cohen v. Facebook, Inc.* (E.D.N.Y. May 18, 2017) 2017 U.S.Dist.LEXIS 76701, at *28-31 [Facebook immune from liability for allowing Hamas to use its platform to post offensive content that incited or encouraged terrorist attacks in Israel because although Facebook's role in publishing that content was an essential causal element of the claims, allowing liability to be imposed on that basis would inherently require the court to treat the defendant as the publisher or speaker of content provided by Hamas, and was impermissible under the CDA].)

B.    Money Laundering Based on Prostitution

The People charge Defendants with both prongs of money laundering based on a specific intent to promote prostitution in violation of 18 USC 1952, pimping in violation of Penal Code section 266h, or knowing the monetary instruments represented the proceeds of the prostitution.  (See counts 15-16)

Referred to as the "Travel Act," section 1952 prohibits travel in interstate commerce or use of interstate facilities with intent to promote unlawful activity.  (*United States v Villano* (10th Cir. 1976) 529 F2d 1046.) The Travel Act defines an "unlawful activity" as any crime of prostitution under state law.  (See *United States v.*

*mpione* (7th Cir. 1991) 942 F.2d 429, 434.). Section 1952 refers to state law only to identify the defendant's unlawful activity; it does not require that the state crime ever be completed or proved. (*Ibid.*)

Although the parties do not discuss these specific charges at length, the previous discussion of the CDA's immunity provision as it relates to the pimping charges informs the Court's analysis with respect to these charges. As discussed above, the People are attempting to prosecute Defendants as if they were the speaker of the offensive content leading to prostitution, which is prohibited under the immunity provision of the CDA. This Court rejected the People's claim that Defendants actually created the content that led to their ability to live and derive support and maintenance from prostitution proceeds, when the face of the complaint demonstrated that Defendants engaged in protected publisher functions. Because this Court has rejected the prosecution based on the theory that Defendants engaged in pimping, their purported use of proceeds from prostitution cannot now serve as the basis for money laundering charges. As this Court has already determined, Defendants provide an online forum for third-party speech, and their decision to charge money for such postings constitutes activity protected under the CDA.

### Conclusion

As amply briefed by the parties, federal law provides broad immunity for internet service providers from both federal and state prosecutions. Indeed, the 9th Circuit federal appellate court has instructed such immunity be applied liberally. The underlying public policy is to permit, and promote, the robust growth of the internet by shielding internet providers from facing suit over the content created by those posting on their sites. If and until Congress sees fit to amend the immunity law, the broad reach of section 230 of the Communications Decency Act even applies to those alleged to support the exploitation of others by human trafficking.

However, immunity afforded to internet service providers is not without limit. Even the most ardent defenders of a vigorous world wide web would have to concede that if a provider engaged in their own criminal acts, versus those of their customers, immunity must fail. And so it is in this case. While the charges relating to pimping will not be allowed to proceed, the offenses pertaining to allegations that the Defendants themselves engaged in financial crimes, to include bank fraud and money laundering to disguise their business dealings, will survive the demurrer stage.

**Court's ruling:**

Defendants' request to enjoin further prosecutorial investigation and return of the materials seized is OVERRULED.

Defendants' request for judicial notice is OVERRULED, except as to the prior charges and orders granting the demurrer and dismissal. Within that context, the People's motion to strike the remaining exhibits is SUSTAINED.

Defendants' request to assign the case to the Honorable Michael G. Bowman is OVERRULED.

Defendants' demurrer is SUSTAINED for counts 15-16, 28-40, OVERRULED as to the remainder of the charges.

**Dated:**

_____

**Honorable Lawrence G. Brown**
**Judge of the Superior Court of California**
**County of Sacramento**