Exhibit 8

**From:** carl ferrer
**Sent:** Monday, October 25, 2010 8:34 PM
**To:** Scott Spear
**Subject:** Update
**Attachments:** winmail.dat


Begin forwarded message:

> From: Carl Ferrer <carl.ferrer@backpage.com>
> Date: October 25, 2010 12:22:12 PM MST
> To: Dan Hyer <Dan.Hyer@backpage.com>
> Subject: Fwd: Update I am giving Scott (i'll call you)
>
> fyi
>
> Begin forwarded message:
>
>> From: Carl Ferrer <carl.ferrer@backpage.com>
>> Date: October 25, 2010 12:19:42 PM MST
>> To: Andrew Padilla <andrew.padilla@backpage.com>
>> Subject: Update I am giving Scott (i'll call you)
>>
>> UPDATE:
>> 1. Hired 13 Indians
>> 2. Adult jobs and personals under beta moderaiton 3. Added multiple
>> efficiencies to queue.
>> 4. Created "Edited ad" queue is built with 15 minute window.
>> 5. We get a lot of complaints about false positives (staff training
>> issue)
>> 6. Staff requests:
>> - a check box to delete pics easier (scheduled)
>> - Show counter with number of ads pending for review in each queue
>> - Tool to highlight ads in red over 20 minute queue goal and provide
>> reporting.
>> - Reports
>> * number of ads in each queue within selectable time.
>> * number of ads moderated within a specified time window
>>
>>
>> Recommendations:
>> 1. Adult jobs:
>> a. Comments:
>> - no plan on bringing photo's back.
>> - illegal content removed is usually money for sex act
>> - The content is pretty clean after removing pics.
>>
>> b. Category Standards:
>> - Keep out escorts
>> - no sex act for money
>> - We do NOT delete: porn jobs. They  are legal. Example: Wanted

1

>> Female
for oral sex porn video for $1000. It's legal cause the camera makes it an art form.
>>
>> c. Actions:
>> Sex act for money ads are deleted.
>> Hourly rate escort or body rub ads may be moved to the right category.
>>
>> 2. Personals
>> a. Comments:
>> - heavy graphic content in men seeking men
>> - illegal content is usually money for sex act
>> - sex act pics are common problem.
>> - Are we going to allow nudity displaying any genitalia?
>>
>> b. Standards:
>> - no sex act pics
>> - no hourly rate for service (we are keeping out escorts)
>> - Do NOT delete ads about companion or massages ads if they do NOT
>> include a price.
>> - Sugar daddy and generous gentlemen type ads are OK.
>>
>> c. Actions:
>> Sex act pics are removed.
>> Sex act for money ads are deleted.
>> Hourly rate escort or body rub ads may be moved to the right category.

>>
>> 3. Adult (escorts, body rubs, etc.)
>> a. Comments:
>> - Ads are under review too long
>> - illegal content is usually money for sex act
>> - sex act pics are common.
>> - Are we going to allow nudity displaying any genitalia?
>>
>> b. Standards:
>> - no sex act pics.
>> - no sex act for money text.
>>
>> c. Actions:
>> Sex act pics are removed and ad text may stay.
>> Sex act for money ads are deleted and user is notified.
>>
>>
>>

2

CONFIDENTIAL

BP-PSI-023762

DOJ-BP-0000006905

Exhibit 9

  All of **us** serving you™

April 2, 2014

Backpage.com

Attn:  Jed Brunst, CFO
8776 E. Shea Blvd., Suite 106-617
Scottsdale, AZ  85260-6629

Via UPS Return Receipt (or Federal Express)

Re: Account – 1-535-9507-1165

Closure Effective:  May 1, 2014

Dear Jed:

In accordance with your Deposit Account Terms and Conditions, please be advised that we have elected to close your Account with us.

The effective date of closure will not take place until the close of business 30 days from the date of this letter, on May 1, 2014.  Accordingly, unless you choose to close the Account prior to that time, effective at the close of business on May 1, 2014, the Account will automatically close and be terminated.  Once the Account is closed, you will no longer be able to conduct any banking business using the Account, including making deposits or initiating wire transfers.  Any/all outstanding items presented against the Account will be returned as unpaid.

Effective immediately, any check, withdrawal, or other item presented for payment on the Account against insufficient collected or available funds will be returned.  Therefore, deposits or transfers must be made prior to items being presented for payment.  If deposit items consist of checks, please ensure that these deposits are made will in advance of any debit transaction to allow sufficient time for checks to be collected, per the assigned availability/float schedules related to the Account.

Unless the Company chooses to close the Account before the closure date, the Account will automatically close and be terminated on May 1, 2014.

The Company may close the Account before May 1, 2104.  The collected balance in the Account, after satisfying any outstanding service charges / costs or other outstanding obligations, if any, will be available as provided in your Deposit Accounts Agreement (the "DDA").  Alternatively, if we do not hear from you before May 1, 2014, U.S. Bank will automatically close the Account and mail any remaining balances to the Company in accordance with the DDA.

<u>U.S. Bank reserves all rights and remedies available to it under the Deposit and Account Terms, U.S. Bank Services Terms and Conditions or otherwise.</u>

If you have any questions concerning this letter, I can be contacted at the address or phone number below:

Sincerely,

*John T. Pearson*

John T. Pearson, CFA
V.P., Media & Communications
U.S. Bank National Association
1420 Fifth Avenue, 7th Floor
Seattle, WA 98101
w. 206-344-4453; f. 206-344-3646

**usbank.com**

CA DOJ AGO 0000600265
DOJ-BP-0002712519

# Exhibit 10
# (Intentionally Left Blank)

Exhibit 11

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-18-0422-PHX-SPL |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | October 5, 2018 |
| Michael Lacey, | ) | 10:50 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE STEVEN P. LOGAN, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

HEARING ON PENDING MOTIONS - VOLUME II

(Pages 61 through 136, inclusive.)

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1    received awards from various law enforcement officials.  There

2    was some communications and some relationships with Backpage

3    and various other organizations in terms of the National Child

4    Exploitation Center, NCMEC.  They responded to subpoenas when

5    subpoenas were provided and things like that.  That's all -- I

6    don't think they need us to show them those documents.  I mean,

7    that's something they're very familiar with.  They cite them

8    back to us in a lot of the various pleadings.

9             Now, what's at issue in this case -- and let's set

10   aside this First Amendment issue that they have raised because

11   that's a legal issue that the Court will rule on at some

12   point -- is a factual issue.  Did they know that the vast

13   majority of these advertisements that went up on this Web site

14   were for prostitution.

15            So that is what is clearly articulated in the

16   90-plus-page superseding indictment.  And there's lots of

17   material that's given as support for that.  And I think as

18   Mr. Piccarreta is going to get to, some of those documents have

19   already been turned over with respect to the superseding

20   indictment.  And there are others that we were turning over,

21   and I think today there's a disclosure.

22            So there's a continuing disclosure from the government

23   to defense on all these particular issues.  But with respect to

24   Brady or exculpatory, we're unsure what that would look like,

25   Your Honor.

Exhibit 12



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | |
|---|---|
| Two Renaissance Square | Main:    (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Fax:  (602) 514-7693 |
| Phoenix, AZ  85004-4408 | Direct Fax:  (602) 514-7450 |

<u>VIA EMAIL</u>                                        January 10, 2019

Mike Piccarreta, Esq.
Piccarreta Davis Keenan Fidel PC
2 East Congress Street, Suite 1000
Tucson, AZ  85701

     Re:    *Your Letter of October 26, 2018*

Dear Mike:

     We wish to respond to your October 26, 2018 letter.  The letter requests disclosure of *Brady* material and appears to be a standard letter that you send prosecutors in other cases with a few categories specific to this case.  A *Brady* determination in this case, however, is particularly difficult based on the defense theories that the joint defense has advanced in pleadings (in this case and others), correspondence, and meetings with the prosecution team.

     As you well know, you and other defense counsel have repeatedly asserted that the activities on the Backpage.com website, including the conduct detailed in the Superseding Indictment, was somehow immunized by the First Amendment and/or Section 230 of the Communications Decency Act ("CDA").  We disagree.  First, Section 230 of the CDA does not apply, on its face, to a federal prosecution.  47 U.S.C. § 230(e)(1) ("Nothing in this section shall be construed to impair the enforcement of … [any] Federal criminal statute.").  The defense has not provided any counter-arguments to this position.  Second, the evidence demonstrates considerable content creation on the part of the principals and employees of Backpage.  The following three activities constitute, at a minimum, content creation by Backpage:

     **Moderation**: Backpage engaged in the practice of sanitizing ads by editing them—specifically, removing terms and pictures that are indicative of prostitution and then publishing a revised version of the ad.  Unfortunately, this also included child sex trafficking victims.

     **Aggregation**: This was accomplished by identifying prostitutes advertising on other similar prostitution websites.  Backpage would then post a free ad and contact the pimp or prostitute and solicit them to Backpage with the incentive of a free ad for six weeks or with similar financial incentives.

**Reciprocal Link and Affiliate Program**: This refers to Backpage's business arrangement with a website known as The Erotic Review (TER).  Backpage and TER posted reciprocal ads on each other's websites.  As you know, TER is a website that allows clients of prostitutes to provide written reviews of the prostitutes' various attributes.  By inserting TER link in particular ads, Backpage was manipulating or creating content.  In addition, Backpage entered into a financial arrangement with a person known as "Dollar Bill" who earned fees in return for arranging for numerous prostitutes and pimps to post ads on Backpage.

In light of the above, we do not share your view that there "is abundant information in the government's possession and/or generated by the government that is favorable and exculpatory to the defendants."  Quite the opposite.  It is noteworthy that neither you nor any of the other defense attorneys, in any of the pleadings and correspondence filed to date, have made any effort to address the above areas of content creation – all of which are described in detail in the Superseding Indictment.  Nevertheless, we will attempt to address your *Brady* requests.

*First*, as set forth in the October 29, 2018 response to your letter ("USA response") requesting the inadvertently disclosed material, again we do not agree with your general assessment that there is an abundance of *Brady* material.  As a reminder, we met in December 2017 and explained our legal theory, provided incriminating emails exchanged by your client, and identified witnesses that will be testifying against your client in a pending prosecution.  In response, you asked that your client be provided immunity (this suggests that you recognized he had criminal exposure) but never provided any evidence that contradicts the emails and the witnesses expected to testify against your client.  Instead, you took the position that your client maintains he had a First Amendment right to his activities at Backpage and alternatively, did not have the *mens rea* to commit the specific offenses contained in the indictment.  Again, you have neither provided us any authority in support of that legal theory nor any counter evidence.  And, that exchange occurred before both Backpage CEO Carl Ferrer and Backpage Sales and Marketing Director Dan Hyer agreed to cooperate and testify against your client and the remaining defendants.

*Second*, your request involving 2010 statements from Francey Hakes regarding whether Craigslist could be held criminally liable for content in their adult section eight years ago is not relevant to the Superseding Indictment in this case for several reasons.  First, it is important to appreciate the distinctions between Craigslist and Backpage and what has occurred since 2010.  Craigslist voluntarily shut down its adult section, presumably recognizing that it faced exposure to both criminal and civil liability for facilitating prostitution.  Second, and more importantly, we are unaware of Craigslist engaging in the same business practices that Backpage employed to increase revenue from prostitution ads. For example, Craigslist did not have similar moderation practices employed by Backpage (*e.g*., stripping out words or terms indicative of prostitution and then posting the ads (including ads indicative of child sex trafficking), etc.).  We also have no evidence that Craigslist engaged in the solicitation and "aggregation" of prostitution ads from a competing prostitution websites.  Furthermore, we

January 10, 2019
Page 3 of 5

know of no financial relationship between Craigslist and "Dollar Bill" or someone similarly situated.  As you know, in an email exchange between your client and another Backpage employee, "Dollar Bill" was characterized as a "super affiliate" who received considerable fees for arranging for prostitutes and pimps to post ads on Backpage. (*See* Superseding Indictment, ¶¶ 60-62.)  In a related email, your client directed that 4200 [prostitution] ads posted by Dollar Bill be reinstated. (*Id*.)  Finally, Craigslist did not have a financial relationship with the website TER or a similar site.

*Third,* we are also unaware of Craigslist engaging in activities designed to circumvent conventional banking and credit card processing to disguise the true nature of their adult services category.  In contrast, Backpage was conspiring with others (e.g., "Dollar Bill", TER, and numerous other obvious pimps to facilitate prostitution.  In short, whatever position a DOJ representative might have taken 10 years ago regarding the *mens rea* required by a website operator has little relevance to this prosecution.  Lastly, the statement that you attribute to Ms. Hakes also predated the successful prosecutions of myRedBook.com, Rentboy.com, escorts.com and Ross William Ulbricht (the "Silk Road" prosecution).  It is noteworthy that the defense, here, has made no meaningful attempt to distinguish the successful prosecutions of these websites from the activities engaged in by Backpage.

Next, you cite to a statement in the Congressional record that is relevant to concerns about legislation proposed to combat sex trafficking on prostitution websites similar to Backpage *by State and local prosecutors*.  This is in the context of the application of the CDA.  Yet this federal prosecution is exempted from the restrictions of the CDA.  That was the point of the legislation referenced in the Congressional record—to allow states to prosecute websites like Backpage in the same manner a federal prosecution can be achieved.  But again, the Backpage employees that are cooperating acknowledge that the Backpage defendants knew for years that they were facilitating prostitution, and the internal emails and public statements of Lacey and Larkin bear this out.  Even James C. Grant, representing Backpage in the Arizona federal grand jury litigation, conceded that if the website knew "through participation in a venture, you're conspiring with somebody, you know they posted an ad, you know the person involved is underage [of course, the illegality of prostitution is not limited to underage sex trafficking victims] that's a prosecutable crime…" (GJ RT 2/22/17, p. 38)  Here, because of the aggregation, affiliation and reciprocal link ventures and other conduct summarized above, Backpage knew that *every* ad had the potential for facilitating prostitution services, including child sex trafficking.[1]

*Fourth*, you cite a nearly forty-year old, out-of-circuit civil case, that stands for the proposition that a federal court can enjoin a *state court prosecution* if it was brought for

---

[1] As with our prior correspondence, the discussion in this letter is not meant to be an exhaustive statement of the reasons why the apparent defenses referenced by the joint defense team to date lack merit, particularly in view of the limited amount of information known so far about Defendants' theories and defenses.

January 10, 2019
Page 4 of 5

improper purposes. *Fitzgerald v. Peek,* 636 F.2d 943, 945 (5th Cir.1981) ("conduct allegedly retaliated against or sought to be deterred is constitutionally protected and that the state's bringing of the criminal prosecution is motivated at least in part by a purpose to retaliate against or deter that conduct, and the state fails to show that it would have decided to prosecute even had the impermissible purpose not been considered."). This case has no relevance to the facts here and it does not even stand for the proposition that you are apparently citing it for, namely a discovery requirement. Although your request is based on mere speculation you are—in a manner of speaking—barking up the wrong tree. Categorically no such evidence exists. We are aware that Larkin and Lacey have publicly decried the late Senator John McCain and his wife Cindy as the architects of the federal Backpage prosecution, arguing that this case is politically motivated. The decision to investigate Backpage that resulted in the Superseding Indictment was made by the United States Attorney's Office in the District of Arizona, the DOJ Criminal Division, and no one else. The same analysis applies to your overly-broad request contained in paragraph 5.

*Fifth*, you are requesting all documents and commendations from law enforcement to Backpage relating to Backpage's cooperation in any criminal investigation. (Your October 26 letter, ¶¶ 6,7,11.) This request is unclear for several reasons. If you are asking for all subpoenas issued to Backpage in the course of state and federal investigations where Backpage complied with subpoenas, we do not share the view (nor is there any legal support) that this would be *Brady* material. Backpage was merely complying with a court order. Moreover, any documents or testimony at a trial or a hearing provided by Backpage in response to a subpoena would be in furtherance of court-ordered compliance. This isn't exculpatory—it's just avoiding contempt.

You also seek commendations Backpage received from law enforcement. These aren't *Brady* material either. Backpage was engaged in a veneer of cooperation with law enforcement. They hid their true business model that included moderation, aggregation, and affiliated programs. Moreover, after banks no longer would do business with Backpage they concealed payments from pimps posting prostitution ads and concealed Backpage as the payee, etc. We expect that at trial former Backpage employees (including but not limited to Ferrer and Hyer) will testify that Backpage's business model was concealed from law enforcement in variety of ways. We also expect at trial that law enforcement, including those that provided commendations to Backpage, will testify that had they known of Backpage's actual business practices (*e.g.*, stripping out words and posting the ads, inserting the link to TER, etc.) and financial relationships (*e.g.*, affiliated relationships with "Dollar Bill" and others, etc.) they would not have provided the commendations. In sum, we do not view commendations from law enforcement as *Brady* material.

*Sixth*, without providing any authority, you demand various communications between the prosecution team and attorneys representing cooperators, various law enforcement agencies, civil attorneys representing victims, NCMEC etc. (Your October 26 letter, ¶¶ 6-11) Without more, it is difficult to respond to such a request. Although you have provided some

January 10, 2019
Page 5 of 5

authority for other requests (which we do not concede are necessarily on point), you provide no authority for this overbroad request.  In short, this appears to be a wish list, based on speculation, in an effort to engage in a fishing expedition.

*Seventh*, you request all documents to and from Backpage and NCMEC relating to possible unlawful activity involving underage individuals.  (Your October 26 letter, ¶ 10.)  )It is unclear what you mean by "documents" nor do you articulate why you believe these are exculpatory.  In any event, if you are asking for emails between Backpage and NCMEC, those are readily available based on emails we received via search warrants and subpoenas.  They are also contained in the PSI Appendix, which is available on the U.S. Senate website.  Any other documents we received from NCMEC has been provided or will be provided based on the scheduling order.

*Eight*, paragraph 12 of your October 26 letter requests internal Justice Department memoranda "relating the understanding of the applicable law government Backpage."  Again, you provide no authority for this request.   And, case law makes clear that material encompassing only an attorney's mental impressions or legal theories does not constitute *Brady*. *See, e.g., Morris v. Ylst*, 447 F.3d 735, 742 (9th Cir. 2006).  "Extending the *Brady* rule to opinion work product would greatly impair the government's ability to prepare for trials." *Id.*  Indeed, "if opinion work product were accessible by opposing counsel 'much of what is now put down in writing would remain unwritten.'"  *Williamson v. Moore*, 221 F.3d 1177, 1182 (11th Cir. 2000) (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

*Ninth and last*, paragraphs 4-31 make various general *Brady* requests, non-specific to this case, citing some authority (mainly from the 1980s).  We will examine your specific requests and, to the extent we have information covered by the requests and supported by the cases you cite, we will make it available.  Finally, in the event you are unsatisfied with our responses to your October 23 and 26 letters and file a discovery motion, please include our responses to both letters as attachments so the court has an understanding of our efforts to be responsive to your various requests.

Sincerely,

ELIZABETH A. STRANGE
First Assistant U.S. Attorney
District of Arizona

*s/ Kevin Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

Exhibit 13
(Filed Under Seal)

# Exhibit 14
# (Filed Under Seal)

Exhibit 15

| | |
|---|---|
| **From:** | Stone, Andrew (USAAZ) |
| **To:** | Ariel A. Neuman; Rapp, Kevin (USAAZ); Kozinets, Peter (USAAZ); Perlmeter, Margaret (USAAZ); Kucera, John (USACAC); Jones, Reginald (CRM) |
| **Cc:** | Tom Bienert; Toni Thomas; Paul Cambria; Erin McCampbell Paris; Grant, James; Corn-Revere, Bob; Bruce Feder; Feder Law; Gary S. Lincenberg; Gopi K. Panchapakesan; David Eisenberg; Joy Bertrand; Whitney Bernstein |
| **Subject:** | RE: US v. Lacey et al., Grand Jury Material |
| **Date:** | Monday, September 9, 2019 4:50:15 PM |

Ariel,

The government is not inclined to file such a motion.

Thanks,
Andy


Andrew C. Stone
Assistant U.S. Attorney
District of Arizona
(602) 514-7635
andrew.stone@usdoj.gov

---

**From:** Ariel A. Neuman <aneuman@birdmarella.com>
**Sent:** Thursday, September 05, 2019 3:51 PM
**To:** Rapp, Kevin (USAAZ) <KRapp@usa.doj.gov>; Kozinets, Peter (USAAZ) <PKozinets@usa.doj.gov>; Perlmeter, Margaret (USAAZ) <MPerlmeter@usa.doj.gov>; Stone, Andrew (USAAZ) <AStone1@usa.doj.gov>; Kucera, John (USACAC) <jkucera@usa.doj.gov>; Jones, Reginald (CRM) <Reginald.Jones@CRM.USDOJ.GOV>
**Cc:** Tom Bienert <tbienert@bienertkatzman.com>; Toni Thomas <tthomas@bienertkatzman.com>; Paul Cambria <pcambria@lglaw.com>; Erin McCampbell Paris <emccampbell@lglaw.com>; Grant, James <jimgrant@dwt.com>; Corn-Revere, Bob <bobcornrevere@dwt.com>; Bruce Feder <bf@federlawpa.com>; Feder Law <fl@federlawpa.com>; Gary S. Lincenberg <glincenberg@birdmarella.com>; Gopi K. Panchapakesan <gpanchapakesan@birdmarella.com>; David Eisenberg <david@deisenbergplc.com>; Joy Bertrand <joy.bertrand@gmail.com>; Whitney Bernstein <wbernstein@bienertkatzman.com>
**Subject:** US v. Lacey et al., Grand Jury Material

Kevin/Peter/Andy/Reggie:

I write to request that the government produce the grand jury transcripts underlying the indictment and superseding indictment in this case.  I am requesting the transcript of both the government's instructions to the grand jury, as well as the testimony of all witnesses who appeared before the grand jury.  Now that the case has been charged, Jencks Act material and preliminary witness and exhibit lists have been disclosed, and the case is set for trial, the need for grand jury secrecy has passed.  Cf. *In re Special Grand Jury (for Anchorage, Alaska)*, 674 F.2d 778, 781–82 (9th Cir. 1982) (listing the factors which justify grand jury secrecy, none of which apply in this matter at this time) (citing *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979)).  On the other hand, the

defendants in this case must examine the grand jury transcript with sufficient time to bring substantive motions by the Court deadline of October 18, 2019.  Specifically, the government's statements in court and in its briefs suggest that the grand jury may not have been properly instructed as to the standard necessary to indict the defendants on the Travel Act counts, and the related conspiracy count.  Further, the recently-disclosed Jencks Act material for Carl Ferrer, when compared to certain allegations in the indictment, together with a careful review of underlying documents as compared to the summaries of those documents contained in the indictment, suggest that the grand jury may have been misled as to the nature of certain evidence.  Each of these constitutes a particularized need for the requested grand jury material, as contemplated by numerous Supreme Court and 9th Circuit decisions.  If either is correct, it may warrant dismissal of the indictment.

Counsel for another defendant in this case previously requested the grand jury instructions, and you refused.  Please advise whether you will reconsider your position given the current posture of the case, and will also produce the transcripts of testimony before the grand jury.

I recognize that a motion to the Court by the government would be required for such disclosure, and request that the government confirm via return email by no later than September 9, 2019, that it will file such a motion (indicating that defendants do not oppose) by no later than September 13, 2019.  If I do not hear from you or you do not agree, I will raise this issue with the Court.

If you would like to discuss this request, please contact me.

Thank you for your prompt attention to this matter.


**Ariel A. Neuman**
*Principal*
O: 310.201.2100
F: 310.201.2110
E: aneuman@birdmarella.com
**vCard | Bio | LinkedIn**
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

Exhibit 16

**From:** Andrew Padilla [andrew.padilla@backpage.com] on behalf of Andrew Padilla
**Sent:** Saturday, October 16, 2010 9:05 PM
**To:** Adam Padilla; Allen Romero; Amanda Thatcher; Angel Lampi; Angela Boyd; Anna Fraser; Billie Miles; Cathleen Wingfield; Cody Gautier; Dawn Lee; Devyn Braga; Donavon Stewart; Ian Leal; James Hammer; Jana Scifers; Jason Statom; Jeff Lyons; Jennifer Phipps; Jessica Shelton; Joye Vaught; Justin Dew; Kolter Whelan; Levi Yockey; Luis Garcia; Maria Rhoad; Martina Gutierrez; Matthew Watson; Michael Enriquez; Michael Sanchez; Nathan Yockey; Nick Vann; Ray Ronan; Roger Williams; Sara Colombo; Sean Meyer; Stefano Ciaravella; Tara Kibbey; Tranica Reilly; Zeke Finlay
**Cc:** Carl Ferrer; Dan Hyer
**Subject:** New Moderation Standards

All:

Perhaps indefinitely, and certainly over the next four days, we need to intensify our efforts in cleaning Escorts, Body Rubs, Male Escorts, TS Escorts and Dom & Fetish.

This intensification will come in the form of extra staff and overtime but most importantly in stricter standards for language and images in ads.

I'd like to still avoid Deleting ads when possible, but if an ad makes a clear reference to sex for money or an image displays a sex act,, don't hesitate deleting it.  These are not the types of ads we want on our site at all.

In the case of lesser violations, editing should be sufficient.  We're still allowing phrases with nuance but if something strikes you as crude or obvious, remove the phrase.  We're still allowing HBO type nudity but if an image makes you think twice, remove the image.  There is zero tolerance for closeups of exposed genitalia.

To make your efforts count, you'll want to lock any ad you have to edit.  You can do this by Editing the Ad in Object Editor.  In the Ad Object, scroll down to the Violation Flag field and check the Violated Terms of Use box.  Then update the ad object.  This prevents a user from making any future edits to that specific ad.

If you find yourself locking ads for any user more than twice, lock their entire account.  To do this, first View their account.

1

Exhibit 17

**From:** John Shehan
**Sent:** Monday, July 11, 2011 5:30 PM
**To:** Ernie Allen
**Cc:** Michelle Collins; Staca Urie; Meghan Perkins; Kristen D. Anderson; John Rabun; Linda Krieg; Lindsey Olson
**Subject:** Today's meeting with Don Moon/Backpage

Ernie,

Don Moon from Backpage met with Staca Urie, Kristen Anderson, Meghan Perkins and I this morning as a followup to his June 3rd meeting. Carl Ferrer, Backpage Abuse, joined us via conference call.

The meeting today lasted about an hour and was completely focused on Carl providing us with an update from their end. There was no mention of the recent Villiage Voice/Ashton Kutcher media attention. At this meeting there was little to no interaction with Don Moon. His only comments were that he has previously met with WA Attorney General Rob McKenna and as a result now the Seattle Mayor and Chief of Police have requested a meeting. He will be meeting with them soon.

Don and Carl are presenting two blocks at the Dallas Crimes Against Children Conference. Carl will stay at the conference the entire week and Don will leave after the presentations.

Below are the updates provided by Carl:

In the month of June, Backpage submitted 280 reports to the NCMEC CyberTipline. Carl indicated 1/3 of those reports are from users and the other 2/3 from their moderators.

Backpage has been tracking the subpoena requests. In June they received 92 total subpoenas, of which 19 were related to child sexual exploitation. 5 were a direct result of follow-up from CyberTipline leads send to law enforcement.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000670**

Carl met with Sgt. Byron Fasset last week.  Bryon brought "9 or 10" people from his team to meet with Carl. They met for two hours and Backpage was given the following feedback:

1)  Too many ads are being submitted to the CyberTipline involving people over 18 years of age
2) Backpage needs to articulate in the CyberTipline reports as to why they think the person in the ad is under 18
3) Moderator names should be identified in the CyberTipline report
4)  Time and date (with timezone) should be included in the report
5)  Backpage should run PSA's on their site that warn about the penalties for statutory rape and/or that encourage reporting of child victims
6) Deploy an image hashing tool for the images posted in the ads
7) Develop a phone # lookup tool for LEA (similar to what craigslist had built)
8) Backpage legal compliance needs to be available 24/7

Carl indicated that they are reviewing all of the suggestions that were provided by Byron (above).  Backpage had a converstation with Microsoft regarding PhotoDNA but Carl indicated they are planning to build their own hashing tool and are not going to use PhotoDNA.  Backpage has created a law enforcement compliance guide and will be giving it to NCMEC later this week after making some final edits.  They are also planning to release a safety section that will appear as a link at the bottom of each page later this month.  The content was prepared by SSP Blue and will include references to NCMEC and Polaris Project.

Carl also provided some feedback related to the questions posed at the last meeting about some of the CyberTipline reports they have submitted.  At this time Backpage is not proactively doing any data mining of their system after they receive a report directly from a user or the public indicating the posting is for a child or their own child.  They are not searching for additional postings made with the poster's email address, phone, or IP to supplement their reporting to CyberTipline.  They are only reporting the individual ad that was reported to them as being related to a minor.  Carl also clarified the process Backpage uses after reporting an ad to CyberTipline to determine whether the ad should still be posted on Backpage or ghosted instead.  If the Backpage receives a report from the public or one of their users about an ad involving a minor and the moderator feels it is valid, they ghost the ad and remove it from the list of ads available in that area.  They then report it to CyberTipline and archive all of the data waiting for a subpoena from law enforcement.  If they are not confident the ad really involves a minor they allow it to be posted on the list. It is the same moderator judgment call for ads located by the moderators during their review.  If the picture appears to be someone under the age of 25 they ghost the ad, do not post it, and report it to CyberTipline.  If they aren't sure the picture is for someone

DOJ-BP-0004570685

under the age of 25 they allow it to be posted and report it to CyberTipline.

Since the Dallas conference is in August we discussed holding off on having another meeting until September

Please let me know if you have any questions.

John

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000672

Exhibit 18

**From:** Staca Urie
**Sent:** Friday, September 09, 2011 5:03 PM
**To:** Ernie Allen
**Cc:** Michelle Collins; John Shehan; Meghan Perkins; Kristen D. Anderson; John Rabun; Linda Krieg; Lindsey Olson
**Subject:** Meeting with Don Moon/Backpage

Ernie,

Don Moon from Backpage met with Michelle Collins, John Shehan, Meghan Perkins and I yesterday as a follow up to the July 11th meeting. We did not meet in August due to the Dallas Conference. Carl Ferrer, Backpage Abuse, joined us via conference call.

The meeting lasted just over an hour and as in the past the focus was primarily on updates provided by Carl related to reporting to CyberTipline and other efforts they are making. Don did provide a short update regarding the letter received from the Attorney Generals. He let us know they have hired Jeff Modisett, previous Indiana Attorney General, who has represented Yahoo and other companies who have faced similar issues. He also explained it is likely they will respond to the letter by the end of the month. Don indicated at this point Backpage/Village Voice does not intend to provide a point-by-point response to all of the questions that appeared in the letter. Given our previous meetings with Backpage over the past couple months, I feel it is unlikely their system is able to provide the numbers requested by the Attorney Generals going back to September 2010. Don mentioned multiple times he feels the end result of all of this would be standards and that is what they will be recommending in their response, likely highlighting that NCMEC is in the best position to provide those standards.

Carl then provided his operational update over the phone. They are summarized below.

In August, there were 265 reports made to CyberTipline which was a slight decrease from the 280 reported in July. He indicated they are receiving more reports directly from users/public regarding content and he feels it is as a result of the increase in awareness. He feels the volume of reports made to the CyberTipline is going to continue to increase. Carl was happy to report the problem they were having with the time zones that appeared in CyberTipline reports has been fixed. This was a very large problem for law enforcement because it effected the information located as a result of a subpoena because the time zones were not accurately reported.

In terms of feedback, Carl feels that about 1Ž2 of the law enforcement they speak with love the reports they are receiving from Backpage through the CyberTipline and the other 1Ž2 feel they are getting too many reports. When asked how many subpoenas they receive were a result of a CyberTipline report and how many were a result of an independently initiated investigations, Carl was unsure. He felt he would be able to get that information but didn't

DOJ-BP-0004570682

know it off hand.  He felt that off the top of his head that they receive more subpoenas from the FBI than local/state law enforcement.  The "public awareness" also seems to be increasing the number of subpoenas Backpage is receiving.  Carl said there was an increase from July to August but he didn't have the exact numbers handy.  Backpage has incorporated the feedback provided by NCMEC and created an updated guide for law enforcement.  Carl emailed the guide after the meeting so that it can be distributed to law enforcement with CyberTipline reports or when we receive questions.  The guide is attached.

The user safety section has launched on Backpage after receiving feedback from NCMEC and Polaris.  Even though it is now "live" Carl encouraged any input or suggestions we might have for continued improvement.  Carl is still unsure how they are going to address the need for 24 hour response to emergent requests.  They are considering an answering service that will call someone when those requests come in after-hours.  Carl felt the Dallas Conference was very helpful.  Not only from the perspective of being able to give a presentation and provide information to law enforcement, but through his attending other sessions.  He specifically mentioned the value he found in attending sessions presented by Facebook and another about undercover investigations on CraigsList.  He noticed how law enforcement uses Craigslist for undercover stings because Craigslist will leave the ads posted, whereas Backpage removes them.  Carl has had several instances where an ad was posted and removed several times due to a violation of their terms of service (specifically inappropriate text implying a child was involved) and then found out they were law enforcement sting ads.  They have been reminding law enforcement of the need to comply with terms of service even when posting ads in an undercover capacity.

According to Carl, although Facebook is very excited about the potential uses for PhotoDNA they are not sure whether it will work for Backpage's purposes.  They are working on creating a system in-house Carl referred to as end gram analysis.  This would look at portions of an image, store information and then be capable of looking for similar images.  They have purchased new servers to assist with this more data intensive analysis.  We provided feedback about a series of CyberTipline reports that were made that appeared unrelated however the reports included references by the moderator that the multiple ads were posted using the same credit card.  Carl was very happy this proved helpful and indicated they are continuing to look at additional ways to data mine and link ads for reporting purposes.

Backpage has continued their work with the DNA Foundation.  Carl  has asked them to create a PR campaign which the adult industry would accept and use, that warns individuals of the consequences of engaging in sex with children.  The DNA Foundation has sent Carl a rough copy of their suggestions for this campaign.  Carl and Don disagreed over who should create this campaign.  Carl feels it should be outsourced to a 3rd party like the DNA Foundation and Don felt it should be created in-house as a model program to demonstrate actions taken by Backpage.  Regardless, both Don and Carl felt this campaign needs to be in place by the end of this year.

Finally, Carl discussed the fact that they are looking into systems that would verify users with driver's license information to determine identity.  It is a product of LexisNexis and Carl indicated it would be very expensive for them to implement.  At this point they are exploring other possibilities and also considering using registered sex offender data as a source.

We asked Carl about the criteria being used to escalate certain reports they make to an urgent status.  He explained that their focus with urgent reports was whether they were "rescue

oriented", imminent threats, or situations in which a user provided information that appeared authentic. Meghan provided a few examples of reports made that met this criteria but were not escalated, for example a user reported a child was being held hostage. Carl was very interested in reviewing these examples and happy to use them as training tools for improved reporting.

We did not set a date for the next meeting at this time.

Please let me know if you have any questions.

Staca Urie
Director, Case Analysis Division
National Center for Missing & Exploited Children
(703) 837-6446
surie@ncmec.org

Exhibit 19

| | |
|---|---|
| **From:** | Staca Urie |
| **To:** | Ernie Allen |
| **Cc:** | Michelle Collins; John Shehan; Meghan Perkins; John Rabun; Linda Krieg; Lindsey Olson |
| **Subject:** | Meeting with Don Moon/Backpage |
| **Date:** | Thursday, October 13, 2011 1:13:27 PM |

Ernie,

Yesterday Don Moon from Backpage met with Michelle Collins, John Shehan and I as a follow up to the September 8th meeting.  Carl Ferrer, Backpage Abuse, joined us via conference call.

The meeting lasted about an hour with the majority of the information being shared by Carl over the phone.  Don shared that Jim Larkin was in town as well because later in the day they were meeting with Goddard Claussen Public Affairs who specialize in issue/advocacy advertising to discuss an ad/PSA campaign.  Don feels it would be very helpful to advertise the type and length of sentences people receive for prostituting children.

The operational update from Carl is summarized below:
Carl shared they are hoping to have PSA ads running within Backpage by the end of this year.  The intent is to make users aware of the consequences for victimizing children through prostitution and to encourage reporting to CyberTipline.  The ads may appear organically as users are searching, they could be hard linked in specific locations within the adult and personals areas, or they may appear within the ads themselves.  Carl indicated traffic to the site and postings have seen a slight drop in September.  As a result the number of reports made to CyberTipline dropped slightly as well.  In September Carl indicated 187 CyberTipline reports were made and 17 were escalated as urgent.  He expects the overall number of reports to go back to the 200 level in October.  He has asked the moderators to focus on WA State and shared that they have finally received their first subpoena from King County, WA and they turned it around in an hour.

In September, Backpage received 136 subpoenas which is an all time monthly high but 47 of them were from one officer.  Of the 136 subpoenas, 16 specifically mentioned the case involved a possible minor and 1 specifically mentioned it was in response to a CyberTipline report.  We discussed ways to improve the communication received via subpoenas to better track which are connected to CyberTipline reports.  Backpage is considering adding language to their guide for Law Enforcement asking them to include the CyberTipline report number in the subpoena.  Carl asked for any other Law Enforcement guides that include this type of language and John indicated he would share the Yahoo Guide with him.  We also indicated we could review the template language appearing in Backpage CyberTipline reports to see if it could be adapted to include a reference to including CyberTipline report numbers with subpoenas.  Carl also shared they have had to appear as witnesses in 2 recent court cases.  One was a grand jury hearing in NY for a case involving a minor victim.  The second was a criminal trial in GA in which the defendant was convicted of 3 counts of prostitution of a minor.

The Backpage User Safety section has been released on their site.  It is located at: http://washingtondc.backpage.com/online/classifieds/UserSafety  Carl asked for any feedback or input for improvement to this section.  The User Safety section covers a multitude of topics to

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

NCMEC 000666

include safety concerns and tips for placing and responding to ads, various scams and frauds being perpetrated on classified sites, and finally human trafficking/child exploitation. Users are referred to the CyberTipline and National Human Trafficking Resource Center to report any suspected human trafficking or child exploitation. There are also links to Missingkids.com and Polarisproject.org. Brad Myles at Polaris has been in communication with Backpage and reviewed the User Safety section. At his request they will be adding a pop up that appears as you are searching adult content areas to make reports of possible child exploitation. Carl indicated Brad will be providing content for this pop up.

Backpage is still working on developing their own image matching tool based on end gram analysis. At this point they are not using PhotoDNA but they will continue discussions with Microsoft and will keep it as an option for the future. They have spent over $100,000 to increase their storage capacity so they are able to main the images for a longer period of time. The goal is to make sure they can provide the images to law enforcement in response to a subpoena. Carl shared they are currently testing an age verification solution they have purchased from Aristotle. It is 99 cents for each query. As a test they are using it to verify new users attempting to make a posting in WA. They turned it on Friday and had 40 new users over the weekend. 36 failed the verification process and 4 passed. Carl believes the high failure rate is because of the personal information (name, date of birth, and zip code) that is requested in order to be verified. He does not feel the users are comfortable providing this information and fear it is a scam. As a result, they are not providing their real information. In the future the goal is to prevent anyone that fails from being able to make postings. Backpage will be maintaining the submitted information for the verification process to provide it to law enforcement with a subpoena. However, they will not be saving the ad the individual was attempting to post but failed to do so as a result of failing the verification process.

Carl asked how the CyberTipline handles reports involving an international jurisdiction and was very happy to hear there are 49 International VPNs with law enforcement abroad. Carl also wanted to know whether CyberTipline would be interested in reaching out to other classified sites in an attempt to register them and encourage reporting. Carl and Don felt there are many other sites out there that are allowing pornographic images, nudity, and descriptive text that is now no longer permitted on Backpage. Don indicated they would like to share the company's contact information with CyberTipline but **absolutely did not** want anyone knowing the contact information came from Backpage. Michelle and John said that would not be a problem and explained the work of the ESP team proactively reaching out to electronic service providers. Already since the meeting Carl shared information regarding the site Reddit. Coincidentally, Reddit reached out to the CyberTipline at the same time yesterday to setup access to report.

Lastly, we shared the information about the creation of the Child Sex Trafficking Team at NCMEC. While there would be no change from their perspective we wanted them to know how their reports would be handled internally by this new hybrid team.

We did not set a date for the next meeting at this time.

Please let me know if you have any questions.

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*

**NCMEC 000667**

Staca Urie
Director, Case Analysis Division
National Center for Missing & Exploited Children
(703) 837-6446
surie@ncmec.org

*CONFIDENTIAL MATERIALS PRODUCED PURSUANT*
*TO 05-16-17 LETTER REQUEST FROM U.S. DOJ*                         **NCMEC 000668**