Exhibit B

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANT

I, Amy L. Fryberger, being duly sworn, hereby depose and state as follows:

I.    Training and Experience

     1.   I am currently assigned to the Federal Bureau of Investigation's (FBI) Phoenix, Arizona Field Office. I have been employed by the FBI as a Special Agent for ten years. As part of my responsibilities, I am charged with investigating violations of statutes applying to human trafficking. Prior to working human trafficking cases, I was assigned to work national security, gang, and drug investigations. During the course of my career as a Special Agent with the FBI, I have participated in the execution of numerous search warrants, seizure warrants, and arrests of individuals for violation of federal law.

     2.   I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly, but does not purport to set forth my complete knowledge or understanding of the facts related to this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

II.    The Federal Indictment

     1.   On March 28, 2018, a Federal Grand Jury in Arizona returned a 93 count indictment charging Michael Lacey ("LACEY"), James Larkin ("LARKIN"), Scott Spear ("SPEAR"), and other current and former employees and principals of Backpage.com with violations of Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Sections 1952(a)(3)(A) (Travel Act – Facilitating Prostitution); and Title 18 U.S.C. §§ 1956 and 1957, Concealment, International and Transactional Money Laundering and Conspiracy to Commit Money Laundering. A copy of the indictment is attached as Exhibit A.

     2.   The indictment alleges that LACEY, LARKIN, SPEAR and others conspired to use the internet to commit violations of the Travel Act, specifically, that they knowingly facilitated the commission of prostitution related offenses that are in violation of state or local laws thought the internet by operating Backpage.com. The next 50 counts allege individual violations of the Travel Act. Each count relates to a specific advertisement that was posted on

Backpage where LACEY, LARKIN, SPEAR, and others are alleged to have knowingly attempted to facilitate prostitution crimes by permitting the ads to be posted and/or by affirmatively editing the ads.  The remaining counts in the indictment allege several types of money laundering as well as a conspiracy to commit money laundering.  Since its creation in 2004, Backpage has earned approximately $500 million in prostitution-related revenue and it is alleged that LACEY, LARKIN, SPEAR, and others took various steps to launder the money, including routing the proceeds of Backpage's business account through seemingly-unrelated entities, wiring money into and out of foreign bank accounts, and converting proceeds into and out of bitcoin and other forms of cryptocurrency.

III.    Purpose of Application for Seizure Warrant

1.    This affidavit is made in support of an application for a search warrant based on probable cause to search the following locations for records and materials that are relevant to the above mentioned crimes and for proceeds of the above referenced crimes.

i.    Subject Location 1: A residence owned by LACEY, located at 3300 East Stella Lane, Paradise Valley, Arizona 85253 (further described in Attachment A-1);

ii.    Subject Location 2: A residence owned by Creek Hideaway LLC, located at 10647 North State Route 89A, Sedona, Arizona (further described in Attachment A-2);

iii.    Subject Location 3: A residence owned by LARKIN, located at 5555 North Casa Blanca Drive, Paradise Valley, Arizona 85253 (further described in Attachment A-3);

iv.    Subject Location 4: A safe deposit box utilized by SPEAR, located at Gainey Ranch Branch (Br 05)/NBA (Phoenix Metro Market-NE), 7375 East Doubletree Ranch Road, Scottsdale, Arizona 85258 (further described in Attachment A-4).

IV.    Facts in Support of Probable Cause

1.    A federal grand jury found LACEY, LARKIN, SPEAR, and others were involved in a conspiracy to commit several different forms of money laundering.  From my training and experience, I know that individuals who engage in money laundering try to conceal their assets by maintaining multiple bank accounts, domestically and overseas, as well as in assets such as

cryptocurrency that are not as readily discoverable by law enforcement officers.   From my involvement in this investigation, I am aware of the following:

        a.   <u>International Travel and Banking Transactions</u>

      i.      On November 7, 2016, LACEY met with two bank employees, Lin Howard and Abran Villegas of Arizona Bank & Trust, in Phoenix, Arizona.  Both employees were subsequently interviewed by law enforcement agents concerning their November 7th meeting with LACEY.

      ii.     Howard stated LACEY asked her how assets get seized and how asserts can be protected from seizure.  LACEY informed Howard that he had just been released from jail in California and that one of his attorneys had put their house up for his [LACEY's] bond.  Howard did not provide LACEY with any advice, in fact, she was shocked that LACEY would ask her such a question.  LACEY proceeded to tell Howard that his attorney told him [LACEY] about the Cook Islands and places around the world such as Nevis, were good places to protect his assets.  LACEY told Howard that he was not looking to avoid paying taxes; he was trying to put a percentage of his assets offshore to protect them from government seizure.  After the meeting with LACEY, Howard started doing research on LACEY, his transactions, and also reached out to Arizona Bank & Trust's Anti-Money Laundering Group.  Based on this, Howard learned that LACEY was not following the bank's procedures for wire transfers and the wires being transferred in and out of LACEY's accounts appeared to be money laundering.  Howard also told the interviewing agents that she has worked in banking in Arizona for the past 10-11 years and prior to her conversation with LACEY, she has never had a conversation with anyone about moving their money offshore.  Howard said she was in disbelief that LACEY attempted to seek her advice in moving money offshore or ask the bank's opinion on moving assets.

      iii.    Villegas recalled LACEY asking him and Howard for recommendations as to where he could put his money to protect it from being seized.  Villegas did not remember where specifically LACEY said he was going to take his money, but reiterated that LACEY was asking for recommendations for someone to help him shield his assets.  Similar to Howard, Villegas did not provide LACEY with any recommendations.  LACEY informed Villegas that his [LACEY] attorney is the trustee on LACEY's accounts and the attorney told LACEY about ways to shield his money and accounts.  Villegas said LACEY mentioned that he sold Village Voice Media and Backpage and told Villegas that he was living off the proceeds of those sales.

Villegas said that, in addition to the conversation about hiding his assets, LACEY talked to Villegas about his accounts and asked him to perform some wire transfers. When asked about a $12 million wire transfer [note: this should be $16.5 million wire transfer] that was wired out of LACEY's account in December 2016, Villegas said he was on vacation at the time of the wire transfer and said the wire was a "surprise" to him. Villegas said Arizona Bank & Trust later decided to sever its relationship with LACEY. Villegas said LACEY called Villegas and asked him why he was being pressured by the bank to close LACEY's accounts. LACEY further told Villegas that he had not yet been convicted and that he was being treated as if he was "guilty until proven innocent." LACEY also said that the money in his account was from legitimate cash flow. Villegas said he explained to LACEY that he was not being pressured and that Arizona Bank & Trust's reputation was at risk. Villegas said he has been in banking since 1999 and has never had anyone ask him how to hide assets or move money offshore.

iv. On December 29, 2016, five wire transfers of $3.3 million USD each (*i.e.,* a total of $16.5 million USD) were sent from LACEY's trust/bank accounts at Arizona Bank & Trust (also known as Dubuque Bank and Trust), to a different American bank account. The recipient account, Johnson Bank in Arizona, is a trust account held by Becker & House, PLLC. One day later, on December 30, 2016, the attorney submitted a request to transfer the entire $16.5 million to an account at K&H Bank in Budapest, Hungary held by an entity called Primus Trust Co. The request was approved and the $16.5 million wire transfer to K&H Bank in Hungary occurred on January 3, 2017.

v. On May 15, 2017, SPEAR opened a safe deposit box at National Bank of Arizona. On April 3, 2018, a bank employee stated that SPEAR opened the safe deposit box at approximately the same time as $750,000 in cashier's checks were purchased. The cashier's checks were paid for by a National Bank of Arizona account belonging to SPEAR. The same employee stated that there is a possibility that the cashier's checks could be located in the safe deposit box.

vi. As discussed in the indictment, Backpage and its principals have utilized crypto currency as a means to facilitate prostitution and money laundering. For example, between September 4, 2015, and November 23, 2015, Backpage customers bought about one million "adult" ads with bitcoin, which Backpage then sold to a third-party for approximately

$8.6 million.  These funds were sent from international bank accounts into Backpage-controlled domestic accounts.  Some of the funds were then sent to Backpage principals such as LACEY and LARKIN.

       vii.      The investigation has also revealed other evidence that LARKIN and other Backpage principals have utilized bitcoin and other crypto currency in furtherance of money laundering efforts.  Members of the investigative team have reviewed record of the following accounts:  Branch Banking & Trust account number ending in -2008, belonging to Website Technologies (which, as discussed in the indictment, is a Backpage-related entity), held in Arizona ("BBT Account"); Arizona Bank & Trust account number ending in -6211 belonging to Cereus Properties (which, as discussed in the indictment, is another Backpage-related entity), held in Arizona ("AZBT Account"); and Charles Schwab account number ending in -4693 in the name of LARKIN ("Schwab Account").  Additionally, investigators have reviewed GoCoin transactions related to certain ads posted on Backpage, specifically including ads that related to victims A.C., S.F., T.S., S.L., K.O., and R.W, several of whom were minors when they were trafficked.  Finally, investigators have reviewed emails associated with the email addresses used to post some of the ads promoting the trafficking of A.C., S.F., T.S., S.L., K.O., and R.W.  From this review, investigators have observed the following:

    1.   On September 6, 2015, a bitcoin account associated with the owner of the email address who trafficked A.C. and S.F. paid Backpage about $4 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Palm Springs, California.

    2.   On September 15, 2015, an email from the same email address owner indicated a payment to Backpage of about $8 worth of bitcoin in order to "Fund Account" for palmsprings.backpage.com.  Based on information learned through this investigation, it is believed that to "Fund Account" means that the email address owner provided bitcoin to Backpage as payment for credit to be used at a later time to pay for Backpage ads.

3. On October 6, 2015, the same email address owner paid Backpage about $1 worth of bitcoin to "Fund Account" on palmsprings.backpage.com.

4. On October 30, 2015, a bitcoin account associated with the owner of the email address who trafficked T.S., S.L., K.O., and R.W. paid Backpage about $1 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Columbus, Ohio.

5. On November 2, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads.

6. On November 21, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to Backpage for credit for that email owner's Backpage ad account.

7. Between September 4, 2015, and November 23, 2015, Backpage customers bought about one million "adult" ads from Backpage with bitcoin; which Backpage then sold to GoCoin for approximately $8.6 million.  Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution.

8. Between December 14, 2015, and December 29, 2015, a GoCoin account held in Slovakia wired over $1.25 million to the BBT Account in the United States.  Based on a review of GoCoin's financial records and GoCoin's pattern of payments to Backpage for bitcoin sales, it is believed that this $1.25 million represented GoCoin's partial payment to Backpage for the bitcoin Backpage sold to GoCoin during the period of September 4, 2015, through November 23, 2015.

9. On December 31, 2015, the BBT Account wired $811,424 to the AZBT Account.

10. On January 11, 2016, the AZBT Account wired approximately $1.3 million to LARKIN's Schwab Account.

11. From LARKIN's Schwab Account, over the period of March 2016 through January 2017, almost $1,100,000 was sent to pay for services and for a property LARKIN owns in France.

12. These transactions show that LARKIN has benefited from millions of dollars of revenue derived from illicit prostitution ads. Additionally, these transactions show that LARKIN has moved funds between accounts before eventually sending these funds to pay for properties he holds abroad. This layering suggests that LARKIN strategically moves funds to evade seizure by law enforcement. The complexity of the transactions also suggests that LARKIN is actively engaged in concealment of illicit funds.

viii.     Based on my review of records in this investigation and my discussions with other law enforcement personnel in this investigation, I also know that the Backpage Operators have also used various other financial vehicles to conducting their money laundering to include: wire transfers, checks, direct deposits, cash, and gift cards.

ix.     Both LACEY and LARKIN engage in international travel. The investigation shows LACEY recently traveled to Mexico. When LACEY returned to Phoenix, Arizona from Mexico on February 28, 2018, he was in possession of $3,000.00 in U.S. Currency. LACEY is scheduled to depart Phoenix, Arizona on April 9, 2018, for a three week trip to Spain and Portugal.

x.     LARKIN purchased an apartment home in Paris, France in 2016 and has spent approximately $100,000 remodeling the apartment. LARKIN holds bank account in Australia, France, and Switzerland. From February 16, 2018 – February 24, 2018, LARKIN traveled from San Francisco, California to Paris, France. LARKIN also departed San Francisco, California on March 30, 2018, for Dublin, Ireland. He is expected to return to Phoenix, Arizona on April 6, 2018.

xi.     Both LACEY and LARKIN own properties domestically as well.  These properties were acquired after 2010 in Arizona, California, and Illinois.  They are valued at over $25,000,000.

a.        Probable Cause for each Subject Location

i.      The property located at 3300 East Stella Lane, Paradise Valley, Arizona 85253 was purchased by LACEY on November 18, 2005.  A loan secured by the property was obtained by LACEY on June 23, 2010 and a house was built in 2011.  A utility check was conducted on March 29, 2018, and records reveal the utilities are being paid by LACEY. LACEY was seen by surveillance units turning into this residence on March 29, 2018.  On April 3, 2018, LACEY's wife was observed leaving the home and their cars were observed parked on the property as well.  A search of the Arizona Department of Motor Vehicles database on March 27, 2018, revealed Arizona Driver's License Number D01375492 was issued to Michael Gerard LACEY at 3300 E. Stella Lane, Paradise Valley, Arizona 85253 was issued on January 22, 2017. Additionally, the following vehicles are registered to LACEY at 3300 E. Stella Lane, Paradise Valley, Arizona 85253: (1) a 2014 Jaguar, VIN SAJWA4HA1EMB52384, Arizona License Plate number BKA4866 and (2) a 2010 Dodge, VIN 1D7RV1CT2AS158579, Arizona License Plate number CA35324.

ii.     The property located at 10647 North State Route 89A, Sedona, Arizona 86336 was purchased by LACEY on September 5, 2013.  The property is located on over an acre of land with a house located on the property overlooking a creek, typical of a Sedona, Arizona vacation property.  A special warranty deed was filed by LACEY on March 29, 2017, where LACEY granted the property to Creek Hideway LLC, a Delaware limited liability company for $0. The address associated with Creek Hideway LLC is 3300 East Stella Lane, Paradise Valley, Arizona.  A utility check was conducted on March 29, 2018, that revealed utilities are currently being paid by Michael LACEY.  Per open source internet searches, the property is not currently for rent or sale.

iii.    The property located at 5555 North Casa Blanca Drive, Paradise Valley, Arizona 85253 was purchased by LARKIN on October 21, 2005.  The property was conveyed to the Ocotillo Family Trust, in care of James and Margaret LARKIN, Trustees, on March 12, 2015.  LARKIN deeded the property to Margaret LARKIN on March 9, 2017, as sole and

separate property.  A search of the Arizona Department of Motor Vehicles database on March 27, 2018, revealed that on May 16, 2016, James Anthony LARKIN was issued Arizona Driver's License Number D05996617, listing his address as 5555 North Casa Blanca Drive, Paradise Valley, Arizona 85253.  Additionally, the following vehicles are registered to James and Margaret LARKIN at 5555 North Casa Blanca Drive, Paradise Drive, Arizona 85253: (1) a 2014 Porshe, VIN WP0AB2A92ES121390, Arizona License Plate number BA6385, (2) a 1972 BMW, VIN 2240110, Arizona License Plate number BKM5166, (3) a 2016 Mercedes, VIN 4JGDF7EE5GA675517, Arizona License Plate number BA6381, and (4) a 2016 BMW, VIN WBXHT3C30G5F65711, Arizona License Plate number BVS4831.  A utility check was conducted on March 27, 2018 that revealed the utilities were paid in March 2018 by LARKIN.

4.      Safe deposit box number ending in -7224 located at National Bank of Arizona, 7275 East Doubletree Ranch Road, Scottsdale, Arizona 85258 is held in the name of Scott and Elona SPEAR.  On or about May 15, 2017, the safe deposit box was opened by SPEAR using $98 of funds from a Branch Banking & Trust account number ending in - 2008.  This bank account belongs to Website Technologies, a Backpage-related entity that is held in Arizona. From 2015 – 2016, bank accounts belonging to Website Technologies received wire transfers from foreign accounts totaling over $100 million dollars.  Wire transfers and checks drawn off of these bank accounts were used to facilitate and promote prostitution and also funneled money into other accounts directly benefiting LACEY, LARKIN, and SPEAR.  This safe deposit has only been accessed by SPEAR and was last accessed on December 8, 2017.

5.      I know from my training and experience that individuals will keep documents relating to their own illegal profits from fraudulent schemes and the laundering of those profits in their homes.  This is because the documents concern their own personal finances and assets as opposed to the finances of the business and they wish to keep documents relating to such private matters in a place to which other individuals have limited access.

6.      I know from my training and experience that individuals who gain proceeds from illegal activities will need to launder those proceeds in order to conceal the source of their funds and often do so by purchasing assets in other individuals' names or depositing them in bank accounts in the names of other individuals, and transferring assets into the names of other

individuals. Individuals who want to hide illicitly gained proceeds will also use cash to eliminate a paper trail.

7.      I know from my training and experience that individuals who keep large amounts of currency at their residence, in a safety deposit box, or on their person take extra measures to secure and protect that currency. Given that the main source of income for LACEY, LARKIN and SPEAR, since at least 2008, has been from Backpage proceeds, and because a majority of those proceeds are traceable to prostitution and sex trafficking ads, I believe that the safe deposit box will contain valuables, cash and/or other monetary instruments.

8.      Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime(s), and/or (2) the objects may have been used to collect and store information about crimes in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about a crime.

V.      Search Methodology to be Employed

1.      It would be extremely difficult, if not impossible to conduct a thorough on-site review of all of the potential evidence in this case. Given these constraints, the search methodology to be employed is as follows:

2.      All computers, computer hardware and any form of electronic storage that could contain evidence described in this warrant will be seized for an off-site search for evidence/assets as described in the attachments of this warrant. It is anticipated that mirror copies or images of such evidence will be made if the failure to do so could otherwise potentially alter the original evidence.

3.      Consistent with the information provided within

this affidavit, contextual information necessary to understand the evidence and to establish admissibility of the evidence in subsequent legal proceedings will also be sought by investigative agents.

      4.  Additional techniques to be employed in analyzing the seized items will include (1) surveying various file directories and the individual files they contain, (2) opening files to determine their contents, (3) scanning storage areas, (4) performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in this affidavit and attachments, and (5) performing any other data analysis techniques that may be necessary to locate and retrieve the evidence/assets described in this affidavit and it attachments.

VI.    Conclusion

      1.    Based on the facts and circumstances stated above, there is probable cause to believe that items of evidence as well as assets derived from illicit activity are located in the aforementioned locations.

 

Amy L. Fryberger
FBI Special Agent

Subscribed to and sworn to me
this 5 day of April, 2018

Honorable Eileen S. Willett
United States Magistrate Judge