Exhibit E

# AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Richard Robinson, being duly sworn, hereby depose and state as follows:

I. Training and Experience

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices described in Attachments A1 & A2, which are currently in law enforcement possession — and the extraction from that property of electronically stored evidence described in Attachment B.

2. I am a Special Agent-Computer Information Specialist (SA-CIS) in the Internal Revenue Service-Criminal Investigation (IRS-CI) E-Crimes Program for the South Pacific Area and stationed in Glendale, Arizona. I have been employed by IRS-CI as a Special Agent for 14 years. I underwent a six-week training program in 2017 to become an SA-CIS and studied computer systems and electronic storage. Prior to joining the E-Crimes Program, I spent 13 years as a Special Agent investigating violations of criminal statutes including money laundering offenses, tax evasion and other financial crimes. During the course of my career as a Special Agent and SA-CIS with IRS-CI, I have participated in the execution of numerous search warrants, seizure warrants, and arrests of individuals for violations of federal law.

3. I am familiar with the facts and circumstances described herein. This affidavit is based upon my personal involvement in this investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses, including information that has been reported to me either directly or indirectly, but does not purport to set forth my complete knowledge or understanding of the facts related to this investigation. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

II. Purpose of Application for Seizure Warrant

1. This affidavit is made in support of an application for a search warrant based on probable cause to search the following devices for records and materials believed to have been used to support violations the federal crimes that will be further addressed below.

        i.        Subject digital devices: digital devices[1] seized on April 6, 2018 (further described in Attachments A1 & A2).

III.    The Federal Superseding Indictment

        1. On July 25, 2018, a Federal Grand Jury in Arizona returned a 100 count superseding indictment charging seven individuals, including the co-founders and former owners of the website Backpage.com, MICHAEL LACEY and JAMES LARKIN, with violations of Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Sections 1952(a)(3)(A) (Travel Act – Facilitating Prostitution); and Title 18 U.S.C. Sections 1956 and 1957, Concealment, International Promotional, Transactional, and International Concealment Money Laundering and Conspiracy to Commit Money Laundering. *USA v. Michael Lacey, et al.*, CR18-422-PHX-SPL.

        2. The superseding indictment, which is enclosed as Exhibit A and whose contents and allegations are incorporated by reference, alleges that LACEY, LARKIN, and others conspired to use the internet to commit violations of the Travel Act, specifically, that they knowingly facilitated the commission of prostitution related offenses that are in violation of state or local laws though the internet by operating Backpage.com. Counts 2 – 51 of the superseding indictment allege individual violations of the Travel Act. Each count relates to a specific advertisement that was posted on Backpage where LACEY, LARKIN, and others are alleged to have knowingly attempted to facilitate prostitution crimes. The remaining counts in the indictment allege several types of money laundering as well as a conspiracy to commit money laundering.

IV.    Facts in Support of Probable Cause

        1. In approximately May 2016, the U.S. Postal Inspection Service, the Federal Bureau of Investigation, and the Internal Revenue Service – Criminal Investigation began an investigation of Backpage.com. The focus of the investigation has been on violations by Backpage, its associated entities, and its principals, of Title 18, United States Code, Sections 1952 (Travel Act – Facilitating Prostitution) and Title 18, United States Code Sections 1956 and 1957 (Money Laundering). During the course of the investigation, investigators learned that Backpage, during

---

[1] Item #5 from 3300 Stella Lane included on Attachment A1 is a disc containing stored data extracted from Michael Lacey's iPhone during the execution of the search warrant. Lacey provided the passcode for the phone to allow for the extraction of the data and the device itself was not seized. For simplicity, the disc storing that data is included in the collective term "devices" used throughout this search warrant application.

certain years, was realizing tens of millions of dollars in profit from adult advertisements. Through victim and witness interviews, and data gathered from warrants and subpoenas, investigators have determined that Backpage.com and its principals were knowingly involved in the facilitation of prostitution and were engaged in money laundering activities.

2. On April 5, 2018, Carl Ferrer (FERRER), Chief Executive Officer (CEO) of Backpage, pleaded guilty to Title 18, United States Code 371, Conspiracy. In the factual basis of his plea agreement, Ferrer admitted:

> In 2004, I co-founded the website www.Backpage.com ("Backpage"), along with M.L. and J.L. Backpage eventually became the second-largest classified advertising website in the world and, during its 14 years of existence, has derived the great majority of its revenue from fees charged in return for publishing advertisements for "adult" and "escort" services.
>
> I have long been aware that the great majority of these advertisements are, in fact, advertisements for prostitution services (which are not protected by the First Amendment and which are illegal in 49 states and in much of Nevada). Acting with this knowledge, I conspired with other Backpage principals (including but not limited to M.L. [Michael Lacey], J.L.[James Larkin], S.S. [Scott Spear], D.H. [Daniel Hyer], A.P. [Andrew Padilla], and J.V. [Joye Vaught]) to find ways to knowingly facilitate the state-law prostitution crimes being committed by Backpage's customers. For example, I worked with my co-conspirators to create "moderation" processes through which Backpage would remove terms and pictures that were particularly indicative of prostitution and then publish a revised version of the ad. Such editing did not, of course, change the essential nature of the illegal service being offered in the ad—it was merely intended to create a veneer of deniability for Backpage. These editing practices were only one component of an overall, company-wide culture and policy of concealing and refusing to officially acknowledge the true nature of the services being offered in Backpage's "escort" and "adult" ads.
>
> In addition to conspiring to knowingly facilitate the state-law prostitution offenses being committed by Backpage's customers, I also conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., J.B. [John "Jed" Brunst], and D.H.) to engage in various money laundering offenses. Since 2004, Backpage has earned hundreds of millions of dollars in revenue from publishing "escort" and "adult" ads. Over time, many

banks, credit card companies, and other financial institutions refused to do business with Backpage due to the illegal nature of its business. In response, I worked with my co-conspirators to find ways to fool credit card companies into believing that Backpage-associated charges were being incurred on different websites, to route Backpage-related payments and proceeds through bank accounts held in the name of seemingly unconnected entities (including but not limited to Posting Solutions, Website Technologies, and Cereus Properties), and to use cryptocurrency-processing companies (including but not limited to CoinBase, GoCoin, Paxful, Kraken, and Crypto Capital) for similar purposes.

3. On August 17, 2018, DANIEL HYER (HYER), the Sales and Marketing Director for Backpage, pleaded guilty to Title 18, United States Code 371, Conspiracy. In the factual basis of his plea agreement, Hyer admitted:

> In 1998, I started working at the Dallas Observer, an alternative newspaper that later became part of the Village Voice Media Holdings ("VVMH") chain. During my early years at the Dallas Observer, I was an account executive responsible for selling print ads.
>
> In 2006 or 2007, I was asked to help grow Backpage.com ("Backpage"), which was VVMH's attempt to create a classified advertising website to compete with Craigslist. During my first few years in this position, my primary responsibility was to increase the number of ads being posted on Backpage. To do so, I helped develop a process called "preboarding" or "aggregation." In general, this process consisted of identifying so-called "escort" and "adult" ads on other websites and creating ads on Backpage for the individuals depicted in those ads in the hope of securing their future business. These aggregation efforts, which I discussed with my bosses Carl Ferrer and Scott Spear, resulted in large revenue and traffic growth for Backpage. As a result, Ferrer and Spear authorized the expansion of the aggregation team I was supervising and authorized me to repeat the aggregation process (which was initially concentrated in Dallas) in other major U.S. markets.
>
> I knew that the majority of the ads that I and others at Backpage were creating through the aggregation process were actually offering illegal prostitution services. Among other things, the true nature of the ads was obvious and we sometimes used ads containing links

to The Erotic Review (a website where customers would post "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts) as the source of the content for the new Backpage ads we were creating. In addition, I and other Backpage employees were deluged with near-constant reminders—in the form of news articles discussing prostitution busts on Backpage, warning letters from Attorneys General, and other sources—of the reality of what was being offered. For a period of time, I even received daily "Google alerts" that summarized the new prostitution-related stories about Backpage that kept appearing in the news. Nevertheless, I kept working for Backpage, and kept facilitating these prostitution offenses, because I was afraid of losing my job and because VVMH and Backpage operated in a culture of denial. I also participated in later efforts to expand Backpage's aggregation efforts to overseas markets, where we often did not even bother with taking out code words to conceal the fact that prostitution services were being offered.

Over time, I also became involved (along with Ferrer, Andrew Padilla, and Joye Vaught) in Backpage's efforts to "moderate" the content of the website's escort and adult ads. Once again, I knew that the majority of the ads being "moderated" were actually offering illegal prostitution services—our removal of explicit words and pictures did nothing to change the underlying nature of the services being offered. In fact, Padilla and I agreed that I and other Backpage sales and marketing employees use the term "models" in intra-company emails when referring to persons in Backpage ads who appeared to be underage. The use of this term was to avoid looking bad in a lawsuit.

4. On April 5, 2018, the Hon. Eileen Willett issued a search warrant (18-9126B) authorizing law enforcement agents to search several properties owned by LACEY and LARKIN for evidence of the crimes specified in the indictment.

5. On April 6, 2018, law enforcement agents executed the aforementioned search warrant. During the resulting search, agents seized several of the electronic devices identified in Attachments A1 & A2.

6. Also on April 6, 2018, law enforcement agents arrested LARKIN at Sky Harbor Airport in Phoenix, Arizona. During the arrest process (which occurred pursuant to an arrest warrant), agents seized the remaining electronic devices identified in Attachments A1 & A2.

7. As noted, a federal grand jury found LACEY, LARKIN, and others were involved in a conspiracy to use the Internet to facilitate prostitution. From my involvement in this investigation, I believe the digital devices that are the subject of this search warrant application will likely contain evidence that LACEY and/or LARKIN violated Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Sections 1952(a)(3)(A) (Travel Act – Facilitating Prostitution); and Title 18 U.S.C. §§ 1956 and 1957, Concealment, International Promotional, Transactional, and International Concealment Money Laundering and Conspiracy to Commit Money Laundering).

8. A review of interviews and documents, including e-mail correspondence, conducted both prior to and since issuance of the superseding indictment lead me to believe the digital devices will contain evidence of the crimes discussed above. For example:

   a. Beginning in or around 2007, to increase its user base, Backpage developed a plan, which became known within Backpage as "aggregation" or the "Dallas plan," to create free ads for prostitutes in an attempt to secure future advertising revenues from them. Specifically, Backpage classified ad sales representatives would search competing websites, call the numbers listed on the postings for erotic or adult services, offer the users free ads on Backpage, and create the resulting ads. This plan was developed to draw users to Backpage in an attempt to increase its ad revenue; the thought was that the recipients of free ads would eventually become paying users. The "Dallas plan" was successful and contributed greatly to Backpage's early growth and success.

   b. Also beginning around 2007 or 2008, Backpage paid referral fees to its own sales staff and to users for referring new customers and ads through what were called "affiliate programs." This was another marketing technique used to develop Backpage's user base. Backpage was making referral payments of this sort of about $500,000 per year at one point.

   c. Backpage also employed other business strategies that were specifically intended to promote and facilitate prostitution. For example, for several years, Backpage had a reciprocal link agreement with The Erotic Review ("TER"), a website that permitted customers to post explicit "reviews" of their encounters with prostitutes, including descriptions of prices charged for particular sex acts. Backpage paid tens of thousands of dollars to TER in return for assistance in getting TER's customer base to start using Backpage.

   d. In December 2014, LACEY emailed a letter, at LARKIN'S request, to engage BDO Consulting to complete an appraisal of Backpage and related entities. BDO

Consulting analyzed Backpage's operations, revenue streams, and future value in anticipation of the 2015 sale of Backpage from companies controlled primarily by LACEY and LARKIN to companies legally controlled by FERRER. BDO Consulting communicated the results of its analysis to LACEY and LARKIN'S company, Medalist Holdings, LLC. Even after the sale, LARKIN continued to exercise substantial control and oversight over Backpage and FERRER. LARKIN and LACEY continued to have substantially all of their income come from Backpage. They also continued to have company meetings regarding the monitoring and oversight of Backpage post-sale, which LACEY did not always attend, but was briefed, either before or after the meetings.

  e. In addition to Backpage.com and other business entities directly controlled by LACEY, LARKIN and FERRER, Backpage.com used partner sites such as MobilePosting.com or Easypost.com to allow its customers to post ads and pay for the ads in a way that kept financial institutions from knowing that the transaction was a purchase of a Backpage ad. Backpage customers would purchase and post ads on the partner sites knowing that the ad would also appear on Backpage. Backpage would receive the majority of the revenue derived from the sale of these ads, with the partner sites keeping a small percentage for its services.

  f. Former owners of Backpage, including LARKIN, met with FERRER prior to the anticipated release of the U.S. Senate Permanent Subcommittee on Investigations report on January 9, 2017, to determine how Backpage would respond.

  9. Between 2014 and 2016, several American banks closed various bank accounts held by Backpage and its principals due to suspicion that the accounts were being used for illegal purposes. As a result, Backpage went overseas and opened a web of bank accounts across Europe, Asia, and Central America to launder and conceal its illegal proceeds. Further, Backpage regularly converted the proceeds of its business into and out of bitcoin, routed the funds through the international bank accounts, and disbursed the currency to its principals, including LACEY and LARKIN (as compensation and profits prior to the sale and as their share of loan payments received from Backpage after the sale).

  10. Computer hardware, software, documentation, passwords and data security devices may be important to a criminal investigation in two distinct important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime(s), and/or (2) the objects may have been used to collect and store information about crimes in the form of electronic data. Rule

41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about a crime.

V. Additional Facts in Support of Probable Cause - LACEY

1. I have reviewed income tax returns for LACEY from 2012 through 2015 and determined that Backpage profits distributed to LACEY as an owner, together with a salary funded by Backpage proceeds, make up the vast majority of LACEY'S income, and that his income from 2013 through 2015 was about six times what his income had been in 2012. For that reason, purchases, payments, and transactions LACEY made from 2012 on constitute potential money laundering violations.

2. On July 29, 2016, LACEY emailed a lawyer with Becker & House, PLLC seeking a recommendation for a lawyer with expertise in off-shore accounts. He stated he was "not interested in any tax avoidance, I want to put some assets in place where litigious parties, including government parties, cannot access my accounts."

3. On or about November 7, 2016, LACEY met with the Senior Vice President, Senior Operations Officer and Senior Vice President, Commercial Relationship Manager at Arizona Bank & Trust. LACEY notified them that he had just been released from jail in California and inquired about how assets get seized and how assets get protected from seizure. LACEY proceeded to tell them that his attorney had given him advice about places around the world that were good places to protect his assets from seizure. As he did with the lawyer with Becker & House, PLLC, LACEY informed the bank he was not trying to avoid paying taxes, but was trying to put a percentage of his assets offshore to protect them from government seizure.

4. On December 29, 2016, five wire transfers of $3.3 million USD each (a total of $16.5 million USD) were sent from LACEY-related accounts with Arizona Bank & Trust. Each of the sending accounts contained "Michael G Lacey" and "Retained Annuity Trust" and named John R. Becker as Trustee. John R. Becker is an attorney with Becker & House, PLLC. The recipient account for all five wires was a trust account held at Becker & House, PLLC, a law firm that has represented LACEY in various matters.

5. On December 30, 2016, a lawyer for Becker & House, PLLC submitted a request to transfer the entire $16.5 million USD to an account in Budapest, Hungary. This transmission to Hungary was completed in January 2017.

6. In January 2018, a deed of trust in the amount of $247,734.30 was recorded in Maricopa County secured by a house in Phoenix and naming LACEY as the lender. Thus, it appears that LACEY has laundered money into loans to others in addition to other transactions.

7. I know from my training and experience that individuals who derive proceeds from illegal activity need to launder those proceeds in order to conceal the source of the funds and often do so by purchasing assets in other names as well as maintain bank accounts, both domestically and internationally, in the names of other individuals and entities. Additionally, I know from my training that individuals involved in illegal activity use cryptocurrency to conceal and launder proceeds.

VI. Additional Facts in Support of Probable Cause - LARKIN

1. I have reviewed income tax returns for LARKIN from 2012 through 2015 and determined that Backpage profits distributed to LARKIN as an owner, together with a salary funded by Backpage proceeds, made up the vast majority of LARKIN'S income, and that his income from 2013 through 2015 was at least six times what his income had been in 2012. For that reason, purchases, payments, and transactions LARKIN made from 2012 on constitute potential money laundering investigations.

2. I have reviewed bank records for LARKIN and observed that between 2011 and 2015, well over one hundred computer initiated transfers were conducted in accounts belonging to LARKIN and his wife. I also know from a review of those records that LARKIN used an account funded with Backpage proceeds to purchase a house in Chicago in October 2015. Additionally, LARKIN transferred €300,000 (Euros) from an account funded with Backpage proceeds to an account in France in November 2015. LARKIN and his wife purchased a property in Paris, France in 2016.

3. I further have cause to believe that LARKIN used one or more of the devices to be searched in order to conduct overseas banking transactions because during his detention hearing in federal court in April 2018, he stated (through counsel) that he would need to access his laptop

computer in order to transfer funds from an account in France to his attorney's trust account within the U.S. Exhibit B (RT 4/16/18 at 10-12.)

4. Around June of 2008, LARKIN established the "Ocotillo Family Trust dated June 2, 2008" (Ocotillo Family Trust), and deeded his Paradise Valley residence purchased in 2005 to that trust. LARKIN also holds investment and bank accounts in the name of Ocotillo Family Trust. Funds from Backpage have been traced to bank and investment accounts in the name of Ocotillo Family Trust.

5. LARKIN also established other trusts that name his children as beneficiaries, including Oaxaca Trust UTA 3/11/2015, Chiapas Trust UTA 3/11/2015, Cuernavaca Trust UTA 3/11/2015, and Puebla Trust UTA 3/11/2015. These accounts received intermittent wires consisting of Backpage funds throughout 2016. Accounts set up in 2017 with Arizona Bank & Trust name LACEY as one of two authorized signers on the accounts. LACEY listed an e-mail address of mgl@qamer.net on the account information.

VII.   Seizure and Custody of Devices to Be Searched

1. The devices listed in the respective Attachments A1 & A2, which are devices previously seized from LARKIN'S and LACEY'S properties pursuant to a search warrant and devices that were on LARKIN'S person upon arrest, were transported to the FBI evidence control room, located at 21711 N. 7th Street, Phoenix, Arizona 85024, and have remained there since that time.

VIII.  Search Methodology to be Employed

1. The search methodology to be employed is as follows:

   i. The devices to be searched are already in FBI's possession. It is anticipated that mirror copies or images of such evidence will be made if the failure to do so could otherwise potentially alter the original evidence.

   ii. Consistent with the information provided within this affidavit, contextual information necessary to understand the evidence and to establish admissibility of the evidence in subsequent legal proceedings will also be sought by investigative agents.

iii. Additional techniques to be employed in analyzing the seized items will include (1) surveying various file directories and the individual files they contain; (2) opening files to determine their contents; (3) scanning storage areas, (4) performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in this affidavit and its attachments, and (5) performing any other data analysis techniques that may be necessary to locate and retrieve the evidence described in this affidavit and its attachments.

2. Some (but not all) of the materials contained with the devices to be searched may be covered by the attorney-client privilege or otherwise protected from disclosure. The United States has been utilizing a Filter Team throughout the course of its investigation of Backpage and plans to continue utilizing the Filter Team to review materials and documents that may result from a search of the items described in Attachments A1 & A2. (It should be noted that the defendants in *United States v. Lacey*, CR 18-422-SPL, have recently sent letters to the prosecution and filed pleadings with the Court objecting to the use of filter teams.) The Filter Team will review the documents for privilege or protection only and will disseminate non-privileged and non-protected documents to the Investigative Team. The Investigative Team will determine which documents constitute evidence of unlawful activity. Because the Filter Team will be properly walled off from the Investigative Team, it may review emails and communications between or involving attorneys, to determine if they properly qualify for privilege or protections, in accordance with procedures set forth above. This will eliminate the risk that protected information will reach the Investigative Team. The separation between the Investigative Team from the Filter Team serves two purposes: (1) it allows the Filter Team to review documents for privilege and protection only and insulates the Filter Team from the substantive investigation and prosecution of Backpage and its principals and (2) it allows the Investigative Team, which is more familiar with the details and specifics of the investigation, to determine which documents constitute evidence of unlawful activity.

3. Once the Filter Team has identified any potential privileged or protected material, and before the Filter Team submits any materials to the Court *in camera* and moves for their

disclosure to the Investigative Team, the Filter Team will confer with counsel for LACEY and/or LARKIN, as appropriate, and counsel will have the ability to file objections with the Court.

4. A similar procedure for the Filter Team was approved by Magistrate Judge Willett in October 2016 in 16-mb-305-MHB. Exhibit C.

5. Finally, because investigators cannot anticipate all potential defenses to the offenses in this affidavit, and as such, cannot anticipate the significance of the evidence to be obtained pursuant to this warrant, it is requested that all seized evidence be retained by law enforcement until the conclusion of legal proceedings or until other order of the court.

IX. Conclusion

Based on the facts and circumstances stated above, there is probable cause to believe that items of evidence derived from illicit activity is located in the aforementioned electronic devices.

Richard Robinson
Special Agent-CIS, IRS-CI

Subscribed to and sworn to me this 31st day of August, 2018

Honorable John Z. Boyle
United States Magistrate Judge