**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CR-18-0422-PHX-SMB |
|         Plaintiff, | ) | |
| | ) | |
|         vs. | ) | Phoenix, Arizona |
| | ) | October 3, 2019 |
| Michael Lacey, | ) | 9:21 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
|         Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**EVIDENTIARY HEARING ON MOTION TO COMPEL**

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    <u>**A P P E A R A N C E S**</u>

2    FOR THE GOVERNMENT

3            U.S. ATTORNEY'S OFFICE
             By:  **Mr. Kevin M. Rapp**
4                 **Mr. Andrew C. Stone**
                  **Ms. Margaret Wu Perlmeter**
5                 **Mr. Peter Kozinets**
             40 North Central Avenue, Suite 1200
6            Phoenix, Arizona 85004

7            U.S. ATTORNEY'S OFFICE
             By:  **Mr. Reginald E. Jones**
8            1400 New York Avenue, NW, Suite 600
             Washington, D.C. 20530

9

10   FOR THE DEFENDANT LACEY:

11           LIPSITZ GREEN SCIME CAMBRIA
             By:  **Mr. Paul John Cambria, Jr.**
12           42 Delaware Avenue, Suite 120
             Buffalo, New York 14202

13
             HENZE COOK MURPHY, PLLC
14           By:  **Ms. Janey Henze-Cook**
                  **Mr. Tom Henze**
15           722 East Osborn Road - Suite 120
             Phoenix, Arizona 85014

16
     FOR THE DEFENDANT LARKIN:

17
             BIENERT MILLER & KATZMAN, PLC
18           By:  **Mr. Thomas Henry Bienert, Jr.**
                  **Ms. Whitney Z. Bernstein**
19           903 Calle Amanecer, Suite 350
             San Clemente, California 92673

20
     FOR THE DEFENDANT SPEAR:

21
             FEDER LAW OFFICE, PA
22           By:  **Mr. Bruce S. Feder**
             2930 East Camelback Road, Suite 160
23           Phoenix, Arizona 85016

24

25

```
 1    FOR THE DEFENDANT BRUNST:

 2              BIRD MARELLA BOXER WOLPERT NESSIM
                DROOKS LINCENBERG & RHOW, PC
 3              By:  Mr. Ariel Neuman
                     Mr. Gary Lincenberg
 4              1875 Century Park E Suite 2300
                Los Angeles, CA 90067
 5
      FOR THE DEFENDANT PADILLA:
 6
                DAVID EISENBERG, PLC
 7              By:  Mr. David S. Eisenberg
                3550 North Central Avenue, Suite 1155
 8              Phoenix, Arizona 85012

 9    FOR THE DEFENDANT VAUGHT:

10              JOY BERTRAND, ESQ., LLC
                By:  Ms. Joy M. Bertrand
11              P.O. Box 2734
                Scottsdale, Arizona 85252
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

WITNESS                                              PAGE

J. PATRICK CULLEN
        Direct Examination by Mr. Stone            14
        Cross-Examination by Mr. Cambria           32
        Cross-Examination by Mr. Newman            45
        Redirect Examination by Mr. Stone          53

WILLIAM GERKEN
        Direct Examination by Mr. Stone            56
        Cross-Examination by Mr. Bienert           88
        Cross-Examination by Mr. Newman            125
        Redirect Examination by Mr. Stone          141

MATTHEW FROST
        Direct Examination by Ms. Perlmeter        150
        Cross-Examination by Ms. Bernstein         202, 209
        Voir Dire Examination by Ms. Perlmeter     208

<u>**P R O C E E D I N G S**</u>

COURTROOM DEPUTY:  Criminal case 2018-422, United States of America versus Michael Lacey and others.

Will the parties please announce.

MR. STONE:  Good morning, Your Honor.  Andy Stone, Peggy Perlmeter, Kevin Rapp, Peter Kozinets, Reginald Jones, and Special Agent Richard Robinson with the IRS for the government.

THE COURT:  Okay.

MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria on behalf of Michael Lacey who is present.

MS. BERNSTEIN:  Good morning, Your Honor.  Whitney Bernstein and Tom Bienert on behalf of Mr. Larkin who is present.

Also seated next to me at counsel table is Tami Loehrs, our expert.  And behind me is Tony Thomas, our paralegal.

MR. NEUMAN:  Good morning, Your Honor.  Ariel Neuman and Gary Lincenberg on behalf of John Brunst who is present.

MR. EISENBERG:  Good morning, Your Honor.  David Eisenberg on behalf of Andrew Padilla who is not present.  We would waive his appearance.

MR. FEDER:  Bruce Feder for Scott Spear who is present.

MS. BERTRAND:  Good morning, Your Honor.  Joy Bertrand

1   for Joye Vaught.  I would ask that her appearance be waived as

2   well today.

3            THE COURT:  And does the government have any objection

4   to the appearance of Andrew Padilla and Joye Vaught being

5   waived?

6            MR. STONE:  No objection.

7            THE COURT:  Okay.  Their appearance is waived.

8            Okay.  We're set for an evidentiary hearing on the

9   motion to compel.

10           Just so we're clear, I guess the issue for me is the

11   technical description of what the defense is requesting or what

12   the government has.  There wasn't an issue regarding the

13   context in which this computer system plays in this case.  I

14   was a little concerned that the scope of the hearing might be

15   misunderstood because there was an issue with the subpoena sent

16   to Carl Ferrer, which I guess was withdrawn before I had to

17   rule on the motion to quash.  So I just wanted to, I guess,

18   state that so that it was clear that I don't really want any

19   evidence surrounding anything other than the servers, how they

20   work, what information is there, and how to produce usable data

21   or how it's not available.

22           So it's the defense motion, so I was going to have

23   them go first.

24           MR. BIENERT:  Your Honor, Thomas Bienert for Defendant

25   Larkin.  If I can address just so at least Your Honor

1 understands, because I totally hear what you're saying, but I

2 think it gets a little muddled, depending on what Your Honor's

3 concern is.

4        As I see it, and obviously government counsel can tell

5 me if they disagree, there is sort of three, I would think,

6 components that we would need -- or at least I assumed we would

7 be addressing.  One is what was the capability of the system,

8 I'll call it, before it was shut down; then it would be what

9 was done or not done in terms of how it was retrieved; and then

10 what is the status of it since it's been taken, both in terms

11 of technically, does it work, and ancillary to that, whatever

12 the government says it works to do, what can you see or not

13 see, and how different or not different is that from what it

14 used to be able to show before it was seized.  That's how I was

15 sort of envisioning it.

16        So, obviously, we agree -- we, obviously, the

17 technical part is a big part of this, but I also assumed,

18 although if Your Honor doesn't think we need to address it, we

19 won't, that part of it is sort of, I'll call it the factual

20 evidence of what procedurally the system allowed you to do, and

21 that's different, potentially, than the technical folks.  That

22 tends to be people who were familiar with the system because

23 they worked on it at Backpage.  And so those are the two things

24 that we at least thought would be relevant.

25        And just so Your Honor will know, because it raises an

1    issue, there has been a lot that's happened in the last few

2    days.  We designated Carl Ferrer, because from what we knew and

3    understood, and still believe, he is the one person who has the

4    biggest wealth of information about the system, what it was

5    designed to do, how it worked, and how it was used at Backpage,

6    and what, if anything, you can do with it now.

7         We also believe, as an aside, that he, because of his

8    extensive cooperation with the government on it, he was

9    available to testify, and should be.

10        We then subpoenaed a couple of other people that we

11   didn't know if we would be available to get them or not, two

12   people who we understand would have at least some information

13   about the system, how it worked before, and at least one

14   witness, Ms. Martin, who I think may be in court today, but I'm

15   not sure, apparently is still working with the government and

16   the system, so she might be able to tell us what it was like

17   before and what it's like now.

18        And, finally, we subpoenaed Tamara Nickels who could

19   tell us what it was like before.

20        Once we had information that Ms. Nickels was going to

21   testify, which was all the way through, we got the word she

22   would last week, we talked to her on the phone, or others did,

23   and then we had a two-hour meeting with her yesterday, we

24   withdrew the subpoena to Carl Ferrer because we don't need to

25   bring him if we can otherwise get it, and we can avoid that

1   whole issue about whether he's waived and we can force him on

2   the stand, et cetera.

3          But there is a wrinkle.  Since our two-hour meeting

4   with Ms. Nickels yesterday, we got an e-mail about ten o'clock

5   last night that she's now invoking the Fifth Amendment.  I will

6   tell Your Honor that while we were in our meeting, which was

7   about fifteen minutes after our witness list went to the

8   government with her name on it, while we were in the meeting

9   with her and her counsel, her counsel said, oh, the

10  government's calling me.  Did you send her a witness list?  We

11  said, yeah.  She said, I'll talk to them later.  We don't know

12  what happened from there, but I do think that the circumstances

13  are such that the government somehow conveyed that it might be

14  problematic if she testified.

15         So that was -- of the three witnesses, the one that we

16  thought we had, she's apparently not going to be here, although

17  we are going to want to address whether she should be allowed

18  to testify or ordered to testify.

19         Number two, Ms. Martin, we were told through an

20  investigator that indicated that she now works for the

21  government.  She used to work for Backpage.  She now works for

22  the government and she would not -- she was subpoenaed but she

23  would not be appearing.  And that was that.  She wouldn't talk

24  to us.  I don't know if she's here or not, but we do not have

25  her available, potentially, because apparently she is now

1    working for the government as a former Backpage employee

2    helping them with something to do with Backpage documents.  We

3    don't know what that is.

4         So with all that as one circumstance, we may need to

5    revisit with you, Your Honor, the whole Carl Ferrer issue,

6    because if we can no longer call the witness who as of last

7    night was going to testify on these procedural issues, then we

8    would believe that we should be able to call Mr. Ferrer.  So

9    with that as one big link in several things that have happened

10   in the last few days, we certainly think we should go forward

11   today with whatever we can, but we are potentially going to

12   want to ask to do supplemental submissions to Your Honor or

13   information depending on what happens today.

14        THE COURT:  Okay.  Well, the reason that I think that

15   first part is not -- obviously, it's relevant to the case but

16   not relevant to this hearing, is that there is no question that

17   before the Web site was seized, it was a fully operational Web

18   site.  You've already discussed all the things it could do, all

19   the things it helped you with in defending other cases, it's

20   been briefed ad nauseam in other pleadings, so I have a wealth

21   of information about that.

22        The question is whether the government has an

23   obligation to disclose it as is, or I guess as it was, whether

24   the government has an obligation to preserve it as it was, and

25   now that it hasn't been preserved as it was, what their

1    obligation is now and if they've met that.  So that's why I

2    don't think that first part is particularly important for this

3    hearing.

4           MR. BIENERT:  Well, understood.  Then I will take it

5    we'll focus on the technical components, and we'll obviously --

6    no pun intended, by the way -- we'll obviously address it as we

7    go after that what our thoughts are and get feedback from Your

8    Honor on the others.

9           THE COURT:  All right.

10          MR. BIENERT:  And then, finally, I thought we had an

11   agreement.  The government had sent us an e-mail saying they

12   thought it made sense for them to put on their witnesses first

13   and we were okay with that, and we told them we were okay with

14   that.

15          THE COURT:  Well, I'm okay with that if you guys have

16   decided that's the most efficient way to do that.

17          MR. STONE:  We do think it's most efficient, Your

18   Honor.  And the government's prepared to call our first

19   witness.  And as we stated in our prehearing memorandum, we do

20   anticipate on calling three witnesses that will address what

21   Your Honor's concerns were with respect to the technical

22   aspects of the Web site.

23          MR. NEUMAN:  Your Honor, before we call the witnesses,

24   just one issue.  We've been getting disclosures, Jencks

25   disclosures from the government for the past few days.  This

1    morning I was handed five CDs.  I don't have the capability of

2    opening them.  Apparently, there is more Jencks material on

3    them.  Just another issue that we're going to have to address

4    once we see what's here.  Apparently, it's e-mails related to

5    some of the witnesses that they intend to call.  Not suggesting

6    we don't go forward right now, but it adds to the things that

7    may require further supplemental briefing or submissions to the

8    Court, so I wanted to make the Court aware of that.

9            THE COURT:  Okay.

10           MR. STONE:  Your Honor, may I just be heard for

11   30 seconds on that issue?

12           THE COURT:  It's not an issue for today.

13           MR. STONE:  Okay.

14           THE COURT:  So, no.

15           MR. STONE:  The government will call, as its first,

16   FBI Special Agent Forensic Examiner J. Patrick Cullen.

17           THE COURT:  Okay.

18           MR. FEDER:  I'd like to invoke the witness rule, Your

19   Honor.

20           THE COURT:  Okay.  The rule has been invoked, so if

21   you have other witnesses in the courtroom, can you exclude

22   them.

23           MR. STONE:  Does that include experts?

24           THE COURT:  No.

25           MR. STONE:  Okay.  Then I don't think we need anyone

1    -- we have one other witness, Mr. Gerken, who is going to speak

2    about the servers.  He ran the company that managed the

3    servers.  He's a fact witness.  Do you have issues with him

4    leaving or staying in?

5            MR. CAMBRIA:  I would request that he leave, Your

6    Honor.

7            THE COURT:  Okay.

8            MR. STONE:  That's fine.  Your Honor, just for --

9            MR. BIENERT:  I don't know if Ms. Martin is here, if

10   she is, she's a potential witness and shouldn't be in the room.

11           THE COURT:  Is Ms. Martin here?

12           (No response.)

13           MR. BIENERT:  Okay.

14           MR. STONE:  Finally, Your Honor, our final witness is

15   Matt Frost who has been designated as an expert, so we would

16   ask that he remain.

17           THE COURT:  That's fine.

18                     J. PATRICK CULLEN,

19   called as a witness herein, having been first duly sworn, was

20   examined and testified as follows:

21           THE COURT:  And the exhibits that have been submitted,

22   are you guys stipulating to those for the purposes of today's

23   hearing or not?

24           MR. STONE:  We haven't spoken about any stipulations.

25   We've exchanged exhibits just this morning.  I anticipate with

1    this witness just some photos of -- I don't anticipate they'll

2    be an objection because defense counsel has provided me the

3    same photos so...

4          THE COURT:  Okay.

5          MR. STONE:  Or at least some of the same photos.

6                    DIRECT EXAMINATION

7    BY MR. STONE:

8    Q.  Sir, could you please introduce yourself.

9    A.  My name is J. Patrick Cullen.

10   Q.  Where do you work, Mr. Cullen?

11   A.  With the Federal Bureau of Investigation.

12   Q.  How long have you worked with the FBI?

13   A.  Fifteen years.

14   Q.  And what is your current title?

15   A.  I am a special agent forensic examiner.

16   Q.  Did you have to be certified to become a forensic examiner?

17   A.  Yes, I did.

18   Q.  When did that certification occur?

19   A.  I was certified in 2015.

20   Q.  Before you were a forensic examiner, what were -- what was

21   your job title with the FBI?

22   A.  So I was a special agent working computer hacking crimes.

23   Q.  What type of -- what type of crimes did you work when you

24   were a special agent?

25   A.  So computer hacking, computer intrusion type crimes.

```
 1   Q.   Currently what are some of your duties with the FBI?
 2   A.   So as a forensic examiner, I'm involved in the imaging of
 3   media, cell phones, computers, GPSs, you name it, the
 4   processing of those items, the analysis of those items, and
 5   then the review and recording of those items.
 6   Q.   Do you have an approximation of how many electronic media
 7   items you have imaged over the years?
 8   A.   So I checked yesterday.  I had about 520 items.
 9   Q.   And you've been involved in numerous seizures of electronic
10   media as well?
11   A.   Yes, I have.
12   Q.   Do you have an estimate or an approximation of how many
13   seizures you've been involved in?
14   A.   So total search warrants is about 95 as of last month.
15   Q.   Many of those had electronic media?
16   A.   Actually, all of those would have had some electronic
17   media.
18   Q.   Are you familiar with this matter?
19   A.   Yes, I am.
20   Q.   How are you familiar with it?
21   A.   So I was asked to travel from Phoenix to Tucson to
22   participate in a search warrant at a business called Login,
23   L.L.C.
24   Q.   Do you remember the date of that search warrant?
25   A.   April 6th or 8th.
```

1    Q.   April 6, 2018?

2    A.   Yes.

3    Q.   Did you have any role in the investigation leading up to

4    April 6, 2018?

5    A.   I did not.

6    Q.   Why were you asked to go to Login data center on that day?

7    A.   So they were expecting to -- to seize and return to Phoenix

8    a number of computers, so they asked for someone from our

9    office to have computer forensic knowledge to come down and

10   assist with that.

11   Q.   That's within your role and duties with the FBI?

12   A.   Yes.

13   Q.   Okay.  On April 6, 2018, why don't you walk us through what

14   you did that day.

15   A.   So we -- we being the search team -- went to a business

16   called Login, L.L.C., in Tucson.  It's a hosting company where

17   you can have your servers co-located in.  We made contact with

18   someone at the front desk and told them that we were there to

19   execute a search warrant.  They put us in contact with Login

20   CTO, a guy named Ehud Gavron.  So Mr. Gavron eventually showed

21   up.  We showed him the search warrant and told him what we were

22   there to do.

23        He told us he needed to make contact with a company

24   called DesertNet.  And it's my understanding that DesertNet was

25   the creator and the keeper of that system that we were looking

1   to seize, so we waited for representatives to show up.  Mr. Wil

2   Gerken showed up, along with one of his system administrators.

3   Q.   Who is Wil Gerken?

4   A.   Wil Gerken was the chief technology officer for DesertNet.

5   Q.   What did you understand him -- or how did you understand

6   his knowledge to be with respect to the servers that you were

7   there to seize?

8   A.   Well, so I understood that his company was the one that

9   maintained those servers and he had intimate knowledge of how

10  they were put together and how they worked.

11  Q.   Did you speak with Mr. Gerken at that time?

12  A.   Yes, I did.

13  Q.   And do you remember what was -- what that conversation

14  entailed?

15  A.   So we, again, we showed him the search warrant.  We told

16  him that we were there to power down the servers and to take

17  them back to Phoenix.  I can't remember if he made a call at

18  that point or he had already called someone and he was told to

19  cooperate.

20        So they walked us into the server facility.  So you

21  have to understand it's a row of servers that belong to

22  Backpage, as well as other companies.  They pointed out which

23  servers belonged to Backpage.  We asked him what type of

24  operating system they were running.  He told us it was a

25  version of FreeBSD, which is a Linux/Unix operating system.

1   Q.  You asked him what type of operating system they were

2   using?

3   A.  Yes.

4   Q.  And you said FreeBSD?

5   A.  FreeBSD.

6   Q.  Does BSD stand for anything?

7   A.  It probably does but I'm not aware of what that is.

8   Q.  Okay.  And what did that mean to you when you learned about

9   the operating system?

10  A.  So it meant that it's a Linux operating system, which is

11  specialty in the FBI, and that it would be beneficial for us to

12  have someone with knowledge of that system to help us power it

13  down.

14  Q.  Do you have specialized knowledge about Linux systems?

15  A.  I have knowledge of Linux but I do not have a certification

16  in analyzing Linux systems.

17  Q.  Okay.  You mention that when you were there, there were

18  racks of servers at Login data center?

19  A.  Yes.

20  Q.  And did Mr. Gerken show you the servers that belonged to

21  Backpage?

22  A.  Yes, he did.

23  Q.  Were there other servers at the data center that belonged

24  to other companies?

25  A.  Yes, there were.

1   Q.  So I'd like to show the witness what has been marked as

2   Plaintiff's Exhibit Number 1.  And it's on the screen as well.

3           Do you recognize this image, sir?

4   A.  Yes, I do.

5   Q.  What is it?

6   A.  So it was a picture of the first row of servers at Login,

7   L.L.C.

8   Q.  And there are a number of other pictures in the exhibit

9   folder in front of you, Exhibit Number 1.  Have you looked at

10  all those photos previously?

11  A.  Yes.

12  Q.  Do you recognize those photos?

13  A.  Yes, I do.

14  Q.  What are those photos of?

15  A.  Those are photos taken during the search warrant of the

16  servers in the racks at Login, L.L.C.

17  Q.  And you recognize that because you were there that day?

18  A.  Yes.

19          MR. STONE:  Your Honor, move to admit Exhibit 1 and

20  move to publish.

21          MR. CAMBRIA:  No objection.

22          THE COURT:  And I don't hear any objection, so

23  Exhibit 1 will be admitted.

24          Yes, you can publish.

25          MR. STONE:  Thank you.

1    BY MR. STONE:

2    Q.  So we're looking at the first page of this.  Could you just

3    describe this photo briefly?

4    A.  So that would be servers racks.  And it was the first row

5    of servers that we encountered that belonged to Backpage.

6    Q.  Page number two of this exhibit, what -- what are we

7    looking at?

8    A.  So you're looking at a couple of things.  One, you're

9    looking at the individual cabinets.  There are four of them.

10   The servers that are inside the cabinets, the back of them.

11   And at the top, it's kind of blown out, but you see an A and

12   you can see a D, it's A, B, C, and D, that's the way we label

13   each of those individual cabinets with a letter.

14   Q.  When you say we, you mean the FBI?

15   A.  The search team of the FBI.

16   Q.  Next photo?

17   A.  Again, that's the front of the servers in the cabinet.

18   Q.  And there is -- within the server it almost looks like

19   disks or hard drives.  Is that what we're looking at?

20   A.  That's correct.

21   Q.  Can you kind of point at it?

22   A.  So where the red circle is there, that's an example.  Those

23   are all individual hard drives that make up that server.

24   Q.  The next photo.

25   A.  Again, the front of some servers, and actually the rear of

1   a couple servers at the top.

2   Q.  Is this another picture of the servers?

3   A.  Yes.

4   Q.  What are the numbers there for?

5   A.  So when we seize items from a search warrant, each item

6   gets a number, an item number, so that's what the number one,

7   number two, and so on represent.

8   Q.  A closer picture of servers one and two?

9   A.  Yes.

10  Q.  Other equipment that was Backpage's that was set to be

11  seized?

12  A.  Yes.

13  Q.  And now we're on page 8 of Exhibit 1.  And there is other

14  placards that represent additional servers; is that right?

15  A.  That's correct.

16  Q.  What are we looking at on page number 9 of the exhibit?

17  A.  So that is -- that is a picture that was taken after one of

18  the servers had been powered down and pulled from the rack or

19  the cage that it was -- it was installed in.

20  Q.  Additional servers up to 23?

21  A.  Yes.

22  Q.  Up to 28 on page 11?

23  A.  Yes.

24  Q.  Page 12 has the placard 29?

25  A.  Yes.

1   Q.   A closer photo of it?

2   A.   Yes.

3   Q.   And then 30 and 31?

4   A.   Yes.

5   Q.   Okay.  Do you have a recollection of how many servers were

6   powered off and seized that day?

7   A.   Well, there were 31 total servers seized, most of them were

8   running.  There were some of those small ones that you saw

9   sitting there, they were just sitting there, so I think it was

10  like six to eight of those were not powered on.

11  Q.   Okay.  In all your years and experience of shutting down

12  electronic media, is there an optimal way to shut down a

13  computer or a server so that you best maintain the integrity of

14  the data that's located on the electronic media?

15  A.   Yes, there is.

16  Q.   Could you describe that method?

17  A.   So in some instances it's called a soft shutdown or it's

18  called a regular shutdown.  If you think of your Windows

19  computer where you go to the start menu, power, and shutdown,

20  you notice when you do that it takes anywhere from 15 seconds,

21  upwards of a minute to actually turn off.  What's happening in

22  the background is programs that are running, files that are

23  being written at that time, they finish, and then it gracefully

24  shuts down those processes as it's shutting down the computer

25  system.  It does that as the best way to preserve the file

1   system from being corrupted.

2   Q.  And that's opposed to, I suppose, just yanking a power cord

3   out; is that right?

4   A.  That's correct.

5   Q.  Is that referred to a hard shutdown?

6   A.  That's a hard shutdown.

7   Q.  And what is the danger of conducting a hard shutdown?

8   A.  So the danger is always -- well, one of the dangers is that

9   you may have corruption in the file system, you may have

10  corruption in individual files.  The only time that we actually

11  consider a hard shutdown anymore -- well, one of the only times

12  is if there is a risk of data being erased at that time, then

13  you would pull the plug, but due to the risk of corrupting

14  files and the file system structure, we prefer to do the soft

15  shutdown if possible.

16  Q.  Okay.  Now, how did you shut down the servers at Login data

17  center on April 6, 2018?

18  A.  So as we spoke to Mr. Gerken and he told us that he was

19  told to cooperate, and he had an individual with him, a system

20  administrator, we asked him if they would actually conduct the

21  orderly shutdown of the servers, and they agreed to do that for

22  us.

23  Q.  Would you have been able to do a soft shutdown or an

24  orderly shutdown without Mr. Gerken's assistance?

25  A.  It would have been very difficult, if not impossible for

1    us.

2    Q.   Why?

3    A.   We didn't have the password at that time.

4    Q.   Mr. Gerken was the individual with the password because

5    DesertNet was managing those servers; is that right?

6    A.   Yes.

7    Q.   How long did it take to -- for the servers to shut down in

8    this soft shutdown manner?

9    A.   That process took probably 20 to 40 minutes.

10   Q.   And you were there and observed it?

11   A.   Yes.

12   Q.   Did you have an understanding of whether these servers in

13   Tucson were the universe of servers that ran Backpage.com?

14   A.   So I understood, um, at the time that I arrived and was

15   speaking to representatives of DesertNet, that there was a

16   backup set of servers or a mirrored set of servers in

17   Amsterdam.

18   Q.   Were those servers that were also managed by DesertNet?

19   A.   Yes.

20   Q.   Did DesertNet also conduct a soft shutdown of the servers

21   in Amsterdam?

22   A.   Yes, they did.

23   Q.   Were you able to observe the soft shutdown of the servers

24   in Amsterdam?

25   A.   Yes.

1    Q.   Okay.  After the servers were shut down in an orderly

2    manner, what did you do next?

3    A.   So after they were shut down and representatives from

4    DesertNet disconnected all the connections that you saw in that

5    first photo, they would slide it out of the rack partway, and

6    then our people, our searchers would come and retrieve it, take

7    it over, take photos of it, package it up for transportation

8    and stage them for moving to Phoenix.

9    Q.   When they unplugged the cords, did that harm or affect the

10   integrity of the data that was on the servers?

11   A.   No, because the computers were already shut down at that

12   point.

13   Q.   Why did the government take the servers that day?  Why not

14   just leave the servers up and running and leave the Web site

15   going?

16   A.   So I don't know the reason for that.  In my capacity, I am

17   given a service request, in this case it was to go to Tucson,

18   shut down servers and bring them back to Phoenix, so the why

19   behind that, I don't know.

20   Q.   You have testified that you said that you have been a part

21   of something like 95 seizures of electronic media; is that

22   right?

23   A.   Yes.

24   Q.   And you have forensically imaged or copied electronic

25   media, is it 500 times or so?

1    A.   Yes.

2    Q.   What is the reason in those cases that the FBI seizes

3    electronic media and then makes a forensic image?

4              MR. CAMBRIA:   Object to the relevance here, Your

5    Honor.   He indicated he didn't know why in this particular

6    case.

7              THE COURT:   The objection is overruled.   The question

8    was not related to this case.

9              THE WITNESS:   So could you repeat the question,

10   please?

11             MR. STONE:   Yes.

12   BY MR. STONE:

13   Q.   In all your experience, why is it that the government

14   seizes electronic media and makes a forensic image of the

15   media?

16   A.   So the -- the thing as an examiner that you're most

17   concerned about is preservation of the data, preservation of

18   the digital evidence.   Digital evidence is very fragile, in

19   that if it continues to run, if people continue to access it,

20   things can change on there.   So our preferred method is to

21   power down the servers or the computers, like was done in this

22   case, because we know at that point in time it -- it is in a

23   state that it was on the day we seized it.   And so the next

24   thing that we do, eventually sometime down the road, is when we

25   begin the imaging process, we actually take steps to ensure

1  that we don't do anything to write data to those servers so

2  they're still in the same condition they were when we received

3  them.

4  Q.  When you say write data, what does that mean?  Is that

5  W-R-I-T-E?

6  A.  Yes.

7  Q.  What does that mean?

8  A.  So the way computers interact with hard drives is they

9  write data in and they read data, read and write.  So any time

10  you write something to a computer hard drive, you change it.

11  So we wanted to make sure we're not making those changes,

12  that's what I mean by, it's called write protection.

13  Q.  When it -- the servers are orderly shut down and unplugged,

14  that ensures that that evidence is frozen, essentially; is that

15  right?

16  A.  That's a good analogy.

17  Q.  But you would agree with me that, let's say -- let's take

18  an example of a computer, the FBI seizes a computer and it's

19  part of a criminal case and that information needs to be

20  disclosed to defendants.  It would be much easier for defense

21  or anyone else to actually receive a computer so that they can

22  look around and understand what data was contained on the

23  computer?

24          MR. CAMBRIA:  Object to the leading, Your Honor.

25          THE COURT:  The objection is overruled.

1    BY MR. STONE:

2    Q.  How come the FBI doesn't do that?

3    A.  So to answer your first part of the question, it would be

4    much easier to just browse the desktop or browse the Windows

5    Explorer to look for evidence, that's correct.

6          But every time you do that, every time you open a

7    folder, every time you open a picture, you're changing the

8    evidence.  And so if the objective is to say, this evidence

9    that we seized is in the same state, you know, every time we

10   look at it, we verify it, we make sure it hasn't changed, it's

11   kind of like a continuum of maximum evidence preservation on

12   this side versus, in your example, convenience on this side.

13   They really are at odds with each other and you have to try to

14   balance the needs of everyone involved in preserving the

15   evidence and getting the evidence out of those systems.

16   Q.  Have you received forensic images and forensic copies of

17   electronic media before?

18   A.  Yes, I have.

19   Q.  Are you able to analyze those forensic images?

20   A.  Yes, I am.

21   Q.  How are you able to analyze those?

22   A.  So it depends on, well, a couple things, one, the size.

23   Sometimes an image will fit on one hard drive.  So if that's

24   the case, I'm able to just connect that hard drive to a write

25   protection device, connected it to my exam computer and use

1    software, forensic software to review it.

2              Sometimes you receive multiple hard drives because

3    it's such a large dataset, you know, I mean, a four terabyte

4    hard drive, if you have a dataset that's 40 terabytes, it's not

5    going to fit on one.  And in that case I have -- the FBI has a

6    forensic network, we have like 360 terabytes of storage raw, so

7    obviously not that open, but I'm able to copy those files to

8    that file system in the folder and then tell my evidence -- my

9    software to say, those are the ones you want to look at, and it

10   mounts those virtually, if you will, and I'm able to analyze

11   them from putting them on my server.

12   Q.  Are there -- well, I'll come back to that.

13             So I guess the short answer to the question is when

14   you receive a forensic image of electronic media, you're able

15   to analyze the data that's on that image?

16   A.  Yes, I am.

17   Q.  Beyond your role of helping shut down the servers in the

18   Tucson data center, have you had any other activities or have

19   you been involved at all in this matter?

20   A.  Yes, I have.

21   Q.  In what capacity?

22   A.  Um, there were some servers that were seized by the FBI in

23   Dallas, there were five of those, I believe, and they were

24   turned, they were sent to Phoenix.  Um, I was asked to image

25   those servers, and then I also did some personal devices,

1    laptop computers, desktop computers.

2    Q.  You imaged those servers which means you made a copy of

3    those servers; is that right?

4    A.  A forensic copy, yes.

5    Q.  How did you make the copies?

6    A.  So in this particular case, we have a tool developed by the

7    FBI that's called a Linux boot CD, because with a server one of

8    the things is you have all those hard drives that you saw

9    earlier, um, they can actually be in what's called a RAID, its

10   a redundant array of disks.  So you can have ten drives that

11   make up one volume, so those ten drives, you know, ten two

12   terabyte drives make up one 20 terabyte volume.  And the

13   software does two things.  It allows me to boot forensically,

14   so it boots off of the drive not off of the suspect computer,

15   and all those hard drives that are in that particular device,

16   it mounts them in a read only capacity.  And we talked about

17   read/write, I don't want to write anything to them, so it's a

18   forensic tool allowing me to see the data that exists, if you

19   will, in the pool of data.

20   Q.  And what's the -- what's the copy called?  Is it an E01?

21   What does E01 stand for?

22   A.  So an E01 is a format called the EnCase format and so it's

23   a forensic standard copy that we use.

24   Q.  Is that what you used in this case --

25   A.  Yes.

1    Q.  -- with respect to the Dallas servers?

2         Now, are you familiar with something called an FTK

3    Imager, an FTK Imager software?

4    A.  Yes, I am.

5    Q.  What is that?

6    A.  So FTK Imager is a software that we use to do a couple of

7    things.  One, you can open these E01 image files and browse the

8    corresponding file tree.  Um, the other thing that we do is we

9    use FTK to sometimes image drives.

10   Q.  Does FTK work with all operating systems?

11   A.  It -- it does not.

12   Q.  Which operating system does it work with and which does it

13   not work with?

14   A.  So I am certified to work on Windows and Mac computers.  It

15   definitely works with those, except for the newer Macs, it

16   doesn't work with the brand new Macs.  It will work with some

17   Linux operating systems like EXT3, that's a file system, and

18   EXT4, but there is a host of other ones it won't know what to

19   do with it when you point it at it.

20   Q.  What about the servers that you imaged from Dallas, would

21   an FTK -- FTK Imager software work with those servers?

22   A.  It did not.  It could not read the file.

23   Q.  Why is that?

24   A.  It must have been in a format probably like -- a lot of

25   these servers are in the Z file servers, ZFS file server, and

1    it doesn't work with them.

2    Q.  So with respect to the data that was seized on this -- on

3    the servers both in Tucson and Amsterdam, is it your

4    understanding that the integrity of the data was maintained

5    throughout this seizure?

6    A.  Yes.

7    Q.  Why is that?

8    A.  Due to the way it was shut down, the soft shutdown that we

9    talked about earlier.

10   Q.  And do you have an understanding of -- if someone had the

11   appropriate tools and the appropriate know-how, would they be

12   able to then access the data that is produced off the copies of

13   those servers?

14   A.  Yes.

15           MR. STONE:  Just a moment, Your Honor.

16           That's all I have, Your Honor.

17           THE COURT:  Okay.

18           Who is going first?

19           Mr. Cambria, cross.

20           MR. CAMBRIA:  Yes.  Good morning.

21                          CROSS-EXAMINATION

22   BY MR. CAMBRIA:

23   Q.  Good morning, agent.

24   A.  Good morning.

25   Q.  Before you, you should have Defendant's Exhibit 101.  Do

1    you have that there?

2            It's on its way.

3    A.  Yes.

4    Q.  Yes.  Do you recognize that?

5    A.  Yes, I do.

6    Q.  Have you seen that before?

7    A.  Yes, I have.

8    Q.  And the whole exhibit, if you just review it and tell me

9    whether you're familiar with that?

10   A.  Yes, I am.

11           MR. STONE:  I don't believe we have a copy of this

12   exhibit.

13           MR. CAMBRIA:  They were here.

14   BY MR. CAMBRIA:

15   Q.  Yes, sir?

16   A.  Yes, I am.

17   Q.  All right.

18           MR. CAMBRIA:  And I would offer this in evidence, Your

19   Honor.

20           MR. STONE:  Take a second to look at it.

21           I'm not sure what the foundation or the relevance is

22   of this.  It appears to be a search warrant that's sworn out by

23   another agent.

24           THE COURT:  Is this the search warrant that you were

25   participating in?

1          THE WITNESS:  Yes.

2          THE COURT:  Are there any other search warrants in

3   here?

4          MR. CAMBRIA:  No.

5          MR. STONE:  No objection.  I see that.  Thank you.

6          THE COURT:  Exhibit 101 will be admitted.

7   BY MR. CAMBRIA:

8   Q.  Now, were you familiar, at least generally, with the

9   indictment in this case?

10  A.  I was not.

11  Q.  Were you told of the nature of the charges in this case?

12  A.  I was not.

13  Q.  Did you work with Agent Fryberger?

14  A.  When.

15  Q.  Well, in connection with this search.

16  A.  So the first time I actually spoke to Agent Fryberger was

17  after the briefing which took place right before the search was

18  executed.

19  Q.  All right.  And did she conduct the briefing?

20  A.  Yes, she and Agent Tolhurst.

21  Q.  All right.  Was there a discussion there about the goal of

22  the search being to access these servers, and, more

23  particularly, the information that they contained?

24  A.  So the discussion I had with Agent Fryberger after this was

25  -- after the briefing was, so your request to the computer

1    response team that I'm part of is to seize these servers; is

2    that correct?  And the answer was yes.

3    Q.  All right.  And you had, for example, this search warrant

4    with you at the time that you executed it, did you not?

5    A.  Yes.

6    Q.  Including attachment B, is that true?

7    A.  Yes.

8    Q.  All right.  And attachment B describes basically the nature

9    of what's the object of the seizure, does it not?

10   A.  Yes, it does.

11   Q.  And, for example, under A, evidence of who used, owned,

12   controlled the computer at the time the things described in the

13   warrant were created, edited or deleted, such as logs, registry

14   entries, configuration files, browsing history, et cetera,

15   true?

16   A.  Yes.

17   Q.  All right.  And that was the goal, to seize this -- to

18   seize these servers to ultimately capture that information,

19   true?

20   A.  Yes.

21   Q.  All right.  And, in addition to that, you were told that

22   the focus was also to capture evidence of who accessed the

23   computer, you who used it, chronologically who used it, et

24   cetera, true?

25   A.  Yes.

1   Q.  All right.  So you knew of a discrete category, if you

2   will, of information that supposedly was on this computer, on

3   these computers?

4   A.  Say that again, please.

5   Q.  Well, you understood the focus was to gather information

6   concerning the historical use of the data in the computers,

7   true?

8   A.  Yes.

9   Q.  All right.  And, as a matter of fact, in this warrant, if

10  we turn to the affidavit of Fryberger, there is a

11  representation in there -- and this would be on the third page

12  of the affidavit, if you will, they're not numbered but it's

13  the third page of the affidavit, Roman numeral four.

14  A.  Where it says facts in support of probable cause?

15  Q.  No.  It says -- under four it says, the server -- servers

16  contain current and historical content of the ads that were

17  posted on Backpage.  Servers contain all versions of an

18  advertisement that a user attempts to post on Backpage.  If an

19  ad is stripped of certain words or if a photograph is removed,

20  the server will maintain the original form of the ad.  The

21  server also maintains user payment information.

22          Did you see that?

23  A.  Yes, I do.

24  Q.  And that was a representation, according to this document,

25  made to the court at the time they obtained the warrant, was it

1   not?

2   A.  Presumably, yes.

3   Q.  And, in addition, was there not a representation made that

4   steps would be taken to preserve the evidence in its original

5   form?  If you look at page 4, it says there, three to four

6   anticipated mirror copies or images of such evidence will be

7   made, if the failure to do so could otherwise alter the

8   original evidence, correct?

9   A.  Yes.

10   Q.  All right.  So you knew that steps had to be taken so as

11   not to alter the form of the original evidence; is that

12   correct?

13   A.  Yes.

14   Q.  All right.  And you weren't certified in Linux, were you?

15   A.  I was not.

16   Q.  Not.  So Mr. Gerken is called and he is the individual who,

17   as far as you knew, had knowledge of the working of this

18   system, correct?

19   A.  Yes.

20   Q.  And, at that time, did you have a particular protocol that

21   you informed Mr. Gerken you wanted him to follow in order to

22   preserve the evidence in its original form?

23   A.  So the protocol that I had --

24   Q.  The question was a yes or no question.

25   A.  Then the answer to that was -- okay.  Yes.

1  Q.  All right.  And did you say to him, sir, it is important

2  that we handle these computers such that we do not alter the

3  original form of the information they contain?

4  A.  I don't recall saying those words to him.

5  Q.  Well, did you ask him to explain a -- I'm sorry.  Strike

6  that.

7       Did you inform him of any particular kind of

8  information that was the focus of the warrant?

9  A.  We provided him a copy of the search warrant.

10  Q.  All right.  Well, the search warrant has a list there that

11  we went through of what is hoped will be found, correct?

12  A.  Yes.

13  Q.  Do you know whether or not he read it?

14  A.  He did take the time to look through it.

15  Q.  And did you discuss with him, do you understand,

16  Mr. Gerken, for example, that we need to do this in such a way

17  that we're going to preserve all of this?

18  A.  Yes.

19  Q.  All right.  And did -- at that point in time, what did you

20  say to him?

21  A.  So I asked him, I said, we need your assistance in powering

22  these servers down to preserve the integrity of the servers.

23  Q.  The integrity of the servers.  Okay.  But you didn't call

24  any particular kind of information to his attention?

25  A.  I did not.

1   Q.  All right.  And did you inquire of him as to whether or not

2   he actually had the expertise necessary to do this?

3   A.  Yes.

4   Q.  Did you ask him whether or not he had ever done it before?

5   A.  Whether he had powered down servers before?

6   Q.  No, whether or not he had ever had a massive number of

7   servers like this where he had to power them down and preserve

8   the evidence inside of them?

9   A.  I don't recall him speaking of that.

10  Q.  Now, did you ask him at that time if he could do a

11  schematic of the servers and their configuration so that they

12  could be reconfigured and operate in their normal functional

13  way?

14  A.  I did not.

15  Q.  Was there anything preventing you from doing that?

16  A.  From having a schematic or from asking or --

17  Q.  From asking or doing one?

18  A.  No, there was not.

19  Q.  You could have made on the spot a mirror image of these and

20  left them there, could you not?

21  A.  Um, I could not have in this case.

22  Q.  And why is that?

23  A.  Because I was dictated by the case agents telling me they

24  were to be seized and brought back to Phoenix.

25  Q.  All right.  But it was certainly possible for you to have

1  made a mirror image of these and left them there intact, was it

2  not?

3  A.  It could have been possible for that to happen, yes.

4  Q.  And if that would have happened, then the evidence would

5  have still been preserved in its original form, would it not

6  have?

7  A.  The copies that we would have made would have been the

8  original form, yes.

9  Q.  Well, and the servers that you would leave behind, because

10  you made mirror images of them, would still be available to be

11  functional as originally configured, true?

12  A.  Yes, but they would be changing.

13  Q.  Well, you say they'd be changing because they'd be

14  evolving, true?

15  A.  They would be changing because they were running, yes.

16  Q.  All right.  But you would have already made a mirror image,

17  would you not?

18  A.  Yes.

19  Q.  So you would have been able to freeze in time, as of the

20  time of your mirrored image, as to what was happening in the

21  computers, true?

22  A.  That is possible, yes.

23  Q.  And then you would know the difference if anything changed

24  after that, correct?

25  A.  Yes.

1   Q.  But if you would have mirrored them on the spot, you would

2   have also preserved in the original functioning manner the

3   servers, correct?

4   A.  I'm not sure I understand what you're asking there.

5   Q.  If you mirrored the servers --

6   A.  Okay.

7   Q.  -- and then left the servers configured, the servers that

8   are left configured would have been in their original

9   evidentiary form, would they not?

10  A.  Yes, with the exception they would not have had

11  connectively to the internet or the domain servers.

12  Q.  Okay.  But as far as operating them, if they were

13  reconnected to the internet, they would be operational, would

14  they not?

15  A.  Yes, assuming the domain servers were operational as well.

16  Q.  All right.  And you could have conferred with Mr. Gerken to

17  make sure that that happened, could you not have?

18  A.  Yes.

19  Q.  And you know in the past the FBI has, in fact, gone into

20  establishments and made mirror images and left behind with a

21  read only format, if you will, the computers as they found

22  them, true?

23  A.  Um, I have never done that before, but I assume that's been

24  done in some cases, yes.

25  Q.  Well, you know that that's been done, have you not?

1    A.  I do not.  I don't have knowledge of that.

2    Q.  All right.  But you say you assume so because it's clearly

3    doable, is it not?

4    A.  Yes, it's possible.

5    Q.  All right.  So in order to fulfill the representation to

6    the magistrate who originally issued this warrant, you were to

7    take steps to allow these computers to have an original

8    evidence form, were you not?

9    A.  Yes.

10   Q.  Now, as we sit here today, the application for the warrant,

11   if you look at the bottom of the page 4, double I, that, sir,

12   says, further, because investigators cannot anticipate all

13   potential defenses to the offenses in this affidavit, and as

14   such cannot anticipate the significance of the evidence that

15   has been lawfully seized pursuant to the warrant, it's

16   requested that -- and here you say that you take custody of

17   the -- you say here retain by law enforcement until the

18   conclusion.

19          Do you recall -- do you see that statement?

20   A.  I do see that statement.

21   Q.  So there was a realization, was there not, that the

22   information in these servers was absolutely important to the

23   defense of the case as well, correct?

24   A.  Yes.

25   Q.  Now, so no mirror image taken and no schematic done.  Any

1    other steps that you asked Gerken to take so that he could

2    readily reassemble these, if necessary, so that they could be

3    in their original evidentiary form?

4    A.   There were none.

5    Q.   Now, I want to ask you an additional question as follows.

6    Yesterday, I believe it was yesterday, the government made a

7    submission to the Court.  And I want to read to you the

8    representation they made to the court, and I want to ask you

9    whether or not you agree with this or disagree with it.

10          On page 7 of the United States prehearing memo for

11   this hearing, the government says, beginning at line -- or

12   folio 21, reassembling a fully functioning version of the Web

13   site that operates just like the live version would be a

14   difficult, technologically challenging task, because links and

15   references to files and data within the servers were referenced

16   based on the way that the servers were networked when the Web

17   site was operational.  Restoring the Web site to functional

18   state is not as simple as connecting any three servers of the

19   appropriate types.  Rather, the IP internet protocol address of

20   the different servers as they were configured at the time would

21   need to be rediscovered and the organization and

22   interrelationship of the various system components would need

23   to be reconstructed.  There would be a need to programmatically

24   merge various system components and have them work together in

25   concert to pull data from the right places at the right times

1    to make the Web site look exactly as it would have appeared to

2    outside users and internal administrators when the Web site was

3    operational.  This is a technologically complex task that would

4    likely involve considerable time and cost to accomplish.

5            Do you agree with that?

6    A.  Yes.

7    Q.  So that which I just read characterizes the current state

8    of the computer constellation, if you will, that has been

9    seized in this case, true?

10   A.  Yes.

11   Q.  And that clearly is not the original form that the evidence

12   that you seized was in, correct?

13   A.  I'm not sure I would agree with that.

14   Q.  Well, okay.  Well, you couldn't just go in and start

15   searching on the various -- on the -- on the items you seized,

16   could you?

17   A.  As far as searching how, with Web browser?

18   Q.  Searching -- searching -- just reasonably searching?

19   A.  You could with -- they have -- it's a database, so you can

20   search through a database.

21   Q.  Well, I'm talking about fully functional, reasonably and

22   fully functional.  It's no longer reasonably or fully

23   functional, is it?

24   A.  So is -- is it running as a Web site right now?  The answer

25   is no.

1   Q.  Okay.  And you took no steps with Gerken to try to fill in

2   all of the things that the government pointed out in their

3   submission that would be necessary to reassemble this server in

4   its original evidentiary form, correct?

5   A.  Yes.

6            MR. CAMBRIA:  That's all.

7                         CROSS-EXAMINATION

8   BY MR. NEUMAN:

9   Q.  Good morning, Agent Cullen.

10  A.  Good morning.

11  Q.  Just want to go back.  I think you said that you have been

12  involved in 95 search warrants and imaged approximately 520

13  devices, right?

14  A.  That's correct.

15  Q.  And a device is a hard drive, for instance?

16  A.  Hard drive, cellular phone, GPS.

17  Q.  Ever been involved in the seizure of a Web site before?

18  A.  The seizure, no.

19  Q.  Okay.  Are you familiar with the seizure of the Silk Road

20  Web site?

21  A.  I am not, other than what I've read on -- on the internet.

22  Q.  Okay.  Are you aware that in that case the FBI seized the

23  servers but left a read only version of the Web site running

24  for the prosecution, defense, and court to have access to?

25  A.  I am not aware they did that.

1   Q.   Do you know what a read only version of a Web site is?

2   A.   Is it would be nothing that could be written to.

3   Q.   Okay.  And is that something that is possible to create if

4   you have the right information?

5   A.   I would assume so if it's been done before.  I have never

6   done that before.

7   Q.   You don't have the expertise --

8   A.   No.

9   Q.   -- to do that?

10  A.   That's correct.

11  Q.   Okay.  And, in this case, there was no discussion, it

12  sounds like, about maintaining the servers or the hard drives

13  in such a way that a read only version could be created after

14  the seizure, right?

15  A.   That's correct.  There was no discussion.

16  Q.   When you talked to Agent Fryberger, the affiant at the

17  briefing, it sounds like the instructions were, seize the

18  servers -- or power them down and seize the servers, right?

19  A.   That's correct.

20  Q.   So pointing you back to the affidavit in front of you, and

21  this is a bit of what Mr. Cambria was asking you, but I don't

22  think he asked you about this in particular.  I'm looking at

23  paragraph VIii.  I think it's on page 5 of the affidavit.  It

24  says -- and I can read it to you in case you can't find it.

25  A.   Please do.

1   Q.  Contextual information necessary to understand the evidence

2   will -- and I'm going to skip -- and I'll try to establish

3   admissibility will also be sought by investigative agents.

4           Now, contextual information in the case of a Web site,

5   would that include the internet protocol addresses of the

6   different servers as they were configured at the time?

7   A.  The servers talking to each other or --

8   Q.  Yes.

9   A.  Yes.  And we actually had a list of that.  Someone had

10  gotten that from Backpage.

11  Q.  Okay.  So you, the government, have a list of the IP

12  addresses of the different servers as they were configured at

13  that time?

14  A.  They had a list of all the internal IP, the non routable IP

15  addresses.

16  Q.  I just want to make sure we're --

17  A.  Yes.

18  Q.  I'm not a tech guy.  I want to make sure we're talking the

19  same language.  I'm actually reading from the government's

20  submission yesterday that Mr. Cambria read to you as well, it's

21  page 8, line 2.  They say, one of the things they would need to

22  give the defense what they're asking -- what we're asking for

23  is the IP addresses of the different servers as they were

24  configured at that time.

25  A.  Okay.

1    Q.  Is that what you're telling the Court --

2    A.  So --

3    Q.  -- the government has?

4    A.  -- the night before, or a couple days after we had a list

5    on Excel of IP addresses.  I don't know if it was server

6    specific or which servers they belong to, but we did have

7    something.

8    Q.  So, to be clear, it sounds like you don't actually know --

9    A.  That's correct.

10   Q.  -- whether this information was obtained, right?

11   A.  That's correct.

12   Q.  And on the day of the search, you didn't do anything to

13   obtain the IP addresses of the different servers as they were

14   configured at that time, right?

15   A.  That's correct.

16   Q.  And, to your knowledge, neither did anybody else who was at

17   the search site on that day, correct?

18   A.  They did not.

19   Q.  I'm sorry?

20   A.  They did not.

21   Q.  And it would have been easy enough to ask Mr. Gerken for

22   that information on that day, correct?

23   A.  Yes.

24   Q.  You chose not to?

25   A.  Yes.

1   Q.  Okay.  What about information about the -- in terms of the

2   Web site again -- we're not talking about a computer.  I want

3   to -- let's differentiate for a moment, because you talked with

4   the prosecutor about a computer and how you, you know, you take

5   one hard drive, you plug it in somewhere, you can look at that

6   data pretty easily, an image of that data.  We're talking

7   about, you said 31 servers, how many hard drives?

8   A.  Oh, hundreds.

9   Q.  Okay.  So not something you just plug into a computer?

10  A.  Right.

11  Q.  Okay.  So different, sort of apples and oranges when we're

12  talking about seizing a cell phone or a computer and talking

13  about servers with hundreds of hard drives that have

14  interrelationships, right?

15  A.  I don't know if I would answer yes to that, because it's

16  still the same process of acquiring the image and analyzing the

17  image.

18  Q.  Sure in terms of actually getting the image of the data --

19  A.  Uh-huh.

20  Q.  -- but in terms of viewing that and how those

21  interrelationships work, if you're talking about a hard drive

22  on a computer and hundreds of hard drives, that's going to be

23  different, right?

24  A.  It could be different, yes.

25  Q.  Okay.  And, in this case, again, going back to what the

1    government says, they would need to give the defense what it

2    needs to do -- to defend this case, again, page 8, line 3 of

3    their submission, Document Number 759, they said they would, in

4    addition to the IP addresses of the different servers as they

5    were configured at that time, they would also need the

6    organization and interrelationship of the various system

7    components.

8              Now, do you know what that means?

9    A.  I have not seen that.  I do not know what they're referring

10   to there.

11   Q.  Okay.  Did -- well, let me ask you.  Does it mean how the

12   servers might be connected, which server plays what role, for

13   instance, one is the database server, one is an image server,

14   one is a Web site server, that would potentially --

15   A.  Yes.  I would say yes to that.

16   Q.  Okay.  Let me finish my question just so we have a clear

17   understanding of what we're talking about.

18   A.  Okay.

19   Q.  Those different roles of the servers and how they interact

20   with each other, that would be this interrelationship of the

21   various system components, right?

22   A.  Yes.

23   Q.  So we're in agreement.

24             And on the day -- and that would also be, going back

25   to the affidavit, the contextual information necessary to

1  understand how this system works, right?

2  A.  That could be part of it, yes.

3  Q.  Okay.  And, again, the Agent Fryberger told the magistrate

4  that that information would be sought.  It sounds, from what

5  you're saying, that there was no effort made that day by you or

6  any other agents to obtain information about the

7  interrelationship of the various system components?

8  A.  As far as the IP addresses and the connections, that's

9  correct.

10  Q.  We already talked about the IP addresses.

11  A.  Uh-huh.

12  Q.  We already said nobody made any effort to find that that

13  day.  Now I'm talking about the roles of the servers, right?

14  So there is a Web site server, there is an image -- I don't

15  know if you even know this about this case, do you know that,

16  that there is different roles -- there is different roles?

17  A.  Yes, I know that.

18  Q.  So you know that there is different roles for different

19  servers, and those different roles are necessary to work

20  together to create the Web site, right?

21  A.  Yes.

22  Q.  Okay.  And on the day of the search, my question is, it

23  sounds to me like there was no effort made to identify those

24  different roles of the servers, right?

25  A.  Yes.

1    Q.   Okay.  There was no effort, correct?

2    A.   There was no, yes.

3    Q.   And there was no effort made to identify the

4    interrelationship of the different servers, right?

5    A.   Yes.

6    Q.   Okay.  And, again, presumably, and we'll talk to him in a

7    minute, but, presumably, you could have asked Mr. Gerken about

8    that, right?

9    A.   Yes.

10   Q.   He would have been the one with the most knowledge about

11   that, right?

12   A.   That's correct.

13   Q.   Okay.  So when we see those pictures -- and I don't want to

14   touch the government's computer here -- but when we see those

15   pictures of the servers with the different numbers on them and

16   such, that's not noting, for instance, number 25 is the

17   database server, and number 32 is the image server?  All that

18   is, is saying this is the picture of number 25.  This server

19   we're designating as number 25 going forward.  When I make an

20   image of number 25, that's the one I'm talking about, right?

21   A.   That's correct.

22   Q.   Okay.  We're not talking about how these servers are

23   connected, what the IP address is, what the relationship is,

24   what the interrelationship is, none of that, right?

25   A.   That's correct.

1    Q.  And none of that information was sought that day, correct?

2    A.  It was not.

3    Q.  Okay.

4          MR. NEUMAN:  That's all I have for now.  Thank you,

5    Your Honor.

6          THE COURT:  Is there anyone else?

7          Okay.  Redirect.

8          MR. STONE:  Briefly, Your Honor.

9                      REDIRECT EXAMINATION

10   BY MR. STONE:

11   Q.  Special Agent Cullen, there was discussion from Mr. Cambria

12   about imaging the servers at Login data center.  Do you

13   remember that?

14   A.  Yes.

15   Q.  Did you have any sense of how much data was contained

16   within the servers on that day?

17   A.  As far as having a number, no, but looking at the number of

18   hard drives that were in those servers, it was immense.

19   Q.  Walk us through what it would take to image a server.

20   You've imaged two servers from Dallas in this case, right?

21   A.  Yes.

22   Q.  How long did it take to image those servers?

23   A.  A week for each server.

24   Q.  Here there was 31 servers, correct?

25   A.  Right.  And it would have been slower doing an on-scene

1    image.

2    Q.  What would you have needed to have done?

3    A.  I would haven, one, needed a lot of storage, which we

4    didn't have.  I would have also needed Linux experts to be

5    there to image on scene, because it's a very specialized way,

6    and time.  That -- that large of population we would have been

7    there for months, potentially.  It would have been a long time.

8    Q.  Multiple months to image the servers on site?

9    A.  Yes.

10   Q.  You discussed the process of making a forensic image or a

11   copy of certain electronic media, including two servers in this

12   case.  Let me ask you.  If information wasn't contained on the

13   original electronic media, wasn't on that computer, would the

14   information be on the copy?

15   A.  It would be -- no, it would not be.

16   Q.  If it's not on the original, it's not going to be on the

17   copy?

18   A.  That's correct.

19   Q.  Fairly simple.

20            Mr. Neuman asked you a number of questions about

21   interrelationships and IP addresses and conducting additional

22   work to ensure that everything remained networked and together,

23   correct?

24   A.  Yes.

25   Q.  Do you know if you need all of that connectivity to access

1    information that was contained on the Web site?

2    A.   The -- no, you do not.

3    Q.   Why not?

4    A.   Because it's contained in a database.   That's how the

5    server maintains all of its data is inside of a database.

6    Q.   So if information was contained on the Web site, assuming

7    you have the know-how, would you be able to see that

8    information that's on a copy of the database?

9    A.   Yes, you would.

10   Q.   If you had the appropriate know-how and you had the

11   appropriate servers; is that correct?

12   A.   If you had the appropriate know-how and the images.   The

13   servers are irrelevant at that point if you have the images.

14   Q.   If you had copies of the servers which we're calling

15   images?

16   A.   Yes.

17   Q.   Did your actions that day help preserve the integrity of

18   the data that was on Backpage.com?

19           MR. CAMBRIA:   Object to that.

20           THE COURT:   The objection is overruled.

21           THE WITNESS:   Yes.

22           MR. STONE:   No further questions.

23           THE COURT:   All right.   You may step down.

24           MR. CAMBRIA:   May I please, Your Honor?   I have a

25   follow-up on what he asked.

```
1              THE COURT:  No.  You may step down.

2              THE WITNESS:  Thank you.

3              THE COURT:  Your next witness.

4              MR. STONE:  Next witness the government calls is

5  William Gerken.

6                        WILLIAM GERKEN,

7  called as a witness herein, having been first duly sworn, was

8  examined and testified as follows:

9                        DIRECT EXAMINATION

10 BY MR. STONE:

11 Q.  Good morning, sir.  Could you please introduce yourself.

12 A.  William Gerken.

13 Q.  Where do you work, Mr. Gerken?

14 A.  DesertNet.

15 Q.  What is DesertNet?

16 A.  We're a software and hosting providing company.

17 Q.  Is that a company that you founded?

18 A.  Yes.

19 Q.  When did you start DesertNet?

20 A.  DesertNet, L.L.C., started in '96.  We started a little bit

21 earlier at Tucson Weekly before we were a company in '94/'95.

22 Q.  Did you start working after you took some college classes

23 and studied in computer programming?

24 A.  Yes.

25 Q.  So if you could talk briefly about how you got your start
```

1    and how DesertNet came to be.

2    A.  Sure.  I was hired by Tucson Weekly to help put their

3    newspaper on line.  This is pretty early on.  There wasn't

4    really software that could really help a newspaper go on line,

5    so wrote some software to do that.

6    Q.  What year or years did you do that?

7    A.  This is -- this is probably '95.

8         So they were -- they were fairly early on being on the

9    internet at the time.  And we -- I was getting them on line

10   probably in a couple of hours, not really having anything else

11   to do, so we got a little entrepreneurial and decided we could

12   do this for other newspapers so developed the software more and

13   started helping other newspapers get on line and host them as

14   well and then spun off to a company.

15   Q.  So you started working with different newspapers and

16   weeklies and then you started DesertNet?

17   A.  Precisely.

18   Q.  Was one of the newspapers or publications that you worked

19   with the New Times?

20   A.  Yes.

21   Q.  When did you start working with the New Times?

22   A.  Um, I am having to guess, but I think around '98, '99,

23   somewhere around there.

24   Q.  What was your role in working with the New Times?

25   A.  Similar to what I have just described.  We had some

1   software that could help with getting their newspapers to put

2   together their Web sites.  They saw some efficiencies with that

3   and wanted to use it and we wanted to work together and started

4   to.

5   Q.  Is that still a publication you work with today?

6   A.  It is, yes.

7   Q.  I'm sorry, do you have a title at DesertNet currently?

8   A.  Chief Technology Officer.

9   Q.  Is there a president or CEO or someone who is above you

10  within the organization?

11  A.  There is not.

12  Q.  Part of your work at DesertNet, do you host servers for

13  other companies?

14  A.  Yes.

15  Q.  Where do you host the servers?

16  A.  Currently at Login in Tucson, which is a data center in

17  Tucson.

18  Q.  Do you know roughly about how many servers you're currently

19  hosting at Login data center?

20  A.  Yeah, in the ballpark of 50, you know, possibly a few more.

21  Q.  Are you familiar with a Web site Backpage.com?

22  A.  Yes.

23  Q.  How are you familiar with the Web site?

24  A.  We provided some hosting and software services for

25  Backpage.

1   Q.  Did that relationship that you had with Backpage, did that

2   stem from your original relationship working with the New

3   Times?

4   A.  Yes.

5   Q.  How did that come to be?

6   A.  We had been working with New Times for quite some time.

7   And at one point they approached us and asked if we could help

8   them put together a classifieds site.  And we had done some

9   classified work with some other publications and we saw some

10  ways we could help each other.  And they gave us specifications

11  for the classified site they wanted to put together and we

12  helped build that and then ultimately host it.

13  Q.  So short answer maybe is you helped build the site and

14  hosted the site?

15  A.  Yeah, that would have been a shorter answer, yeah.

16  Q.  Did you host the site throughout the time that Backpage.com

17  was on line?

18  A.  Yes.  The portion of the site that we're involved with,

19  yes.

20  Q.  Now, I think you said there was some software involved in

21  the work that you did for Backpage.  Who helped -- who from

22  DesertNet worked on that software, developed it?

23  A.  I was the primary lead developer on that, some other

24  coworkers as well.

25  Q.  So safe to say you're intimately familiar with the workings

1    of that Web site, Backpage.com?

2    A.  The software, yes.

3    Q.  But it's also true that you -- your company, DesertNet, was

4    hosting the servers for Backpage at Login data center; is that

5    right?

6    A.  That's true.

7    Q.  Were you hosting servers anywhere else?

8    A.  Yes.

9    Q.  Where?

10   A.  Switch data centers in Amsterdam.

11   Q.  So given your experience with the Web site, is there

12   anyone, in your mind, who would be better equipped to answer

13   questions about how the Web site was managed than you?

14   A.  No.  I think I'm the person for that.

15   Q.  How about how data was retained on -- on the Web site?

16   A.  How the data was stored in the database?

17   Q.  Correct.

18   A.  Yes.

19   Q.  Are you also able to speak to how the servers were set up

20   that ran the Web site?

21   A.  Yes, their roles, yes.

22   Q.  As compared to anyone who actually worked at Backpage, is

23   it your understanding that you would have more knowledge about

24   how the servers were set up than any employee of Backpage?

25   A.  Yes.  For that question, yes.

1    Q.  And that's because DesertNet was managing these servers?

2    A.  Correct.

3    Q.  Both in Tucson and in Amsterdam?

4    A.  Correct.

5    Q.  Let's talk about the configuration of the servers that

6    helped run the Web site.

7             I know it's been a number of months, but do you have

8    an approximation of how many servers were in Desert Net's

9    control in the Tucson data center?

10   A.  Yes.

11   Q.  With respect to Backpage?

12   A.  Yes.  You're asking for the quantity?

13   Q.  What's the approximation?

14   A.  Forty.

15   Q.  Do you have an understanding, again, an approximation, of

16   how many servers were in the data center in Amsterdam?

17   A.  Again, an approximation, 20.

18   Q.  Okay.  Let's talk about the roles of the various servers in

19   Tucson.

20             Were there -- was there a server called a database

21   server, database servers that were within the Tucson data

22   center?

23   A.  Yes.

24   Q.  Okay.  Do you have a recollection of how many database

25   servers?

1  A.  My memory is approximately four.

2  Q.  And what was the setup of those four servers?  Did all four

3  servers have unique information saved on them?

4  A.  No.

5  Q.  How was that set up?

6  A.  All four servers would have the same information on them.

7  The nuance is that one would be what we would call the master

8  server, it's where data would get written to, where the others

9  would replicate that information and reads would happen from

10  there.

11          To give you an example, if somebody is posting an ad,

12  the ad that -- the data that they're posting gets saved to that

13  master server.  If somebody is viewing an ad, the data that is

14  being retrieved to view that ad comes from the replicated slave

15  servers.

16  Q.  So what's the purpose of having the three replicated or

17  slave servers?

18  A.  Efficiency and performance, performance.  Yeah.

19  Q.  Helps run the Web site faster?

20  A.  Exactly.  It's -- by splitting it up that way, you'll get

21  maximum performance on the Web site.

22  Q.  But in terms of actual data, as long as you had the master

23  database server, you wouldn't need the replicated servers

24  because it's all the same information that's contained it on?

25  A.  That's correct.  They're redundant.

1    Q.  All right.  What about image servers?  Were there image

2    servers hosted by DesertNet?

3    A.  Yes.

4    Q.  Now, explain the function of an image server.

5    A.  Images are not -- they're large files.  They are not as

6    efficient to store them in a database.  It increases the size

7    too much.  It's better to have a very simple system where you

8    can save images on disk and then just simply retrieve them with

9    pointers.  The image servers facilitated that.

10   Q.  How many image servers, to the best of your recollection,

11   were under Desert Net's control that were related to Backpage?

12   A.  In Tucson?

13   Q.  In Tucson.

14   A.  Approximately three.

15   Q.  Was there any redundancy among those three?

16   A.  Yes.  They're completely redundant to each other.

17   Q.  Each one contained the same images?

18   A.  Yes.

19   Q.  All right.  So you've talked about four database servers

20   and three image servers, but there certainly were quite a few

21   additional servers.  What were those other servers?

22   A.  Yes.  The majority of them would be Web servers.

23   Q.  What's a Web server?

24   A.  A Web server on its simplest of forms is you have a URL,

25   the page that you're requesting, and the Web server facilitates

1    getting that page and delivering it to you.

2              In their case, the same type of thing.  If a reader

3    wanted to see a bicycle ad on Backpage, there would be a URL to

4    that bicycle ad.  Let's say it's Phoenix, and the ad's number

5    5, 523, we'll say, the Web server would receive that URL.  They

6    would run a little program that would know which database to go

7    to, Phoenix; which image it is, which ad to go to; whatever

8    number I just said.  It would fetch that information, it would

9    grab the images.  It would marry it with a display template and

10   serve it back to the user.

11   Q.  Was there any unique information that would be stored on

12   the Web servers with respect to ad data, let's say?

13   A.  For ad data, no.

14   Q.  So, seemingly, they were workhorses that married up

15   information from the ad along with the image and then displayed

16   it for the user or whoever is looking at the Web page?

17   A.  Yeah, that's succinctly correct.

18   Q.  Are there other machines, maybe something called the load

19   balancer?

20   A.  Yes.

21   Q.  What's that?

22   A.  There are servers that we would call helper servers.  The

23   load balancer is the primary one.  Load balancer, basically,

24   happens right before that Web server, so when two the URL is

25   being accessed, the system can say, go to one of these

 1  particular servers, this one doesn't have as much usage on it

 2  right now.  It's to spread the usage over multiple servers.

 3  Q.  Also for efficiency?

 4  A.  Entirely for efficiency.  Efficiency and redundancy, I'll

 5  add, so.

 6  Q.  Okay.  What about the servers in Amsterdam?  I think we

 7  talked about the universe of the servers in Tucson.  Anything

 8  we left out of Tucson before we go to Amsterdam, actually?

 9  A.  No, that covers it.

10  Q.  Okay.  Now, looking at Amsterdam, was there any redundancy

11  between Tucson and Amsterdam?

12  A.  Yes.  Yes.  It was designed to be a fail over site that

13  both of them -- at the backhoe or a fire took out Login, for

14  example, it could fail over to Amsterdam and vice versa.

15  Q.  So they were the same?

16  A.  They were the same.

17  Q.  If one -- if there was a natural disaster in Tucson, then

18  the Web site could shift to Amsterdam and that could continue

19  to run the site without any interruptions?

20  A.  Correct.

21  Q.  So within the data center in Amsterdam, did you have the

22  same types of servers that we just went over, the database

23  server, the image servers and Web servers?

24  A.  Yes, exactly.

25  Q.  Were they similar in that there was a master database

1    server and then three replicated or slave servers?

2    A.  Yeah.  I'm not positive on the quantity, but similar in the

3    design.  There would be a master and some replicated.

4    Q.  Setting aside the quantity, it would be a similar setup?

5    A.  Yes.

6    Q.  And the master database server, just so we're clear, in

7    Tucson and the one in Amsterdam, were those similar?

8    A.  They were.  They're designed to be identical.

9    Q.  They were identical?

10   A.  Yeah.

11   Q.  How about image servers in Amsterdam and image servers in

12   Tucson?

13   A.  They were designed to be identical.

14   Q.  Were you aware of any servers that were stored in Amsterdam

15   that were not under Desert Net's control?

16   A.  Pertaining to Backpage?

17   Q.  Pertaining to Backpage.

18   A.  Yes.  I believe, I hear that their credit card transaction

19   system was in Amsterdam as well.

20   Q.  Does that have a name?

21   A.  They were -- they refer to it as PPI.

22   Q.  Payment processing island?

23   A.  Yes.

24   Q.  And those were not under Desert Net's control?

25   A.  That's correct.

1    Q.  But with respect to the ad data, those were contained on

2    the servers within Desert Net's control; is that correct?

3    A.  Correct.

4    Q.  If you would, maybe you could walk us through what happens

5    when a Backpage user uploads an ad and how that information

6    moves through the system and to the servers.

7    A.  Sure.  The user would -- I'll stick with my bicycle ad.  A

8    user would run a post on a bicycle ad for a bicycle they're

9    selling.  They would fill out a form in their browser.  It

10   would have the title, ad body, other information about the

11   bicycle, images.  Once they finished filling that out, seeing a

12   preview of it, they would click to save it, to post it.  When

13   they go to post it, that information would get written to the

14   master database server for that market to create an ad record

15   for it.  Images would go out to the image servers.  There would

16   also be a record of those images in the master database server.

17   That's predominantly what would happen.

18          If there was a transaction to occur, some money to

19   exchange hands, there would be, prior to that save, after the

20   user previewed and decided to push through, it would hand off

21   to PPI to do a credit card transaction, for example.  I

22   couldn't speak to that, but I know that we would get back a

23   success or a failure out of that which would then let

24   everything save the ad, save the images and such.

25   Q.  And all that information then would be saved, most of the

1    ad data information would be on the database server and the

2    images on the image server; is that right?

3    A.   That's correct.  I wouldn't say most, I would say all.

4    Q.   All, all of the ad data goes to -- and is saved on the

5    database server and then the image is moved to the image

6    server?

7    A.   Correct.

8    Q.   You mention that it -- if there was a payment involved, it

9    would go to PPI and then information would come back to the

10   server's controlled by DesertNet; is that right?

11   A.   Correct.

12   Q.   And there is information, though, that was stored with

13   respect to some of the payment, like the ad price or date and

14   timestamps or transactional approval data, would that all be

15   stored on the databases controlled by DesertNet?

16   A.   That type of information really would be on PPI.  There

17   would be some very basic rudimentary information, such as a

18   real generic invoice just for statistic purposes that would be

19   on the DesertNet managed Backpage database, but the accounting

20   information would be on the PPI.

21   Q.   But some of the basic functions would be saved on the Web

22   site controlled by DesertNet?  I'm sorry, on the servers

23   controlled by DesertNet?

24   A.   Correct.

25   Q.   Okay.  How many servers would be needed to access the

1    universe of the information with respect to the ad data that

2    was contained on Backpage.com?

3    A.  Just the information, just --

4    Q.  Just the information?

5    A.  A master database server or a database server.  The

6    database is specifically on that server, the image server.  All

7    of the content related to the ad, the ad title, headline, user

8    who posted it, are on those too.

9    Q.  Two servers and you're able to access all the ad

10   information?

11   A.  Yes.

12   Q.  So let me ask you.  If you had a forensic copy of the

13   master database server and a forensic copy of an image server,

14   setting aside convenience and know-how, would you be able to

15   access the information that was on the Web site before it was

16   seized?

17   A.  I'm not familiar with the term forensic copy.  Is it just a

18   copy?

19   Q.  I'll represent to you that it's just a copy --

20   A.  Okay.

21   Q.  -- of the two servers.

22   A.  Then, yes.

23   Q.  You mentioned the -- I think you mentioned there were

24   multiple databases located on the database server, the master

25   database server; is that right?

1    A.   That's correct.

2    Q.   Would you talk a little bit about what types of databases

3    were on that particular server?

4    A.   Yes.   Primarily two types, one that the majority of

5    databases, or what I would call a market database, there would

6    be a unique database for the UK, a unique database for

7    Australia, a unique database for Arizona, that type of thing.

8    So they would be geographically divided up into unique

9    databases.   That's one type.

10          The other types, internally we refer to it as central.

11   That stores some different information.   It's trying to -- it

12   stores a subset of the ad across all of those market databases.

13   So it's a mechanism for an advertiser or somebody to see ads

14   across all of them.

15   Q.   So if you were accessing information saved in the central

16   database, let's say for a particular user, what would you be

17   able to access?

18   A.   You would have pointers to ads they posted.   You would have

19   some information about the user itself, like their e-mails,

20   some IPs, things like that, but the -- it -- it -- I'm using

21   the word pointers because the market databases are really where

22   you want to get the ad content from.   It's just a convenience

23   that the central one is telling you where they all are.

24   Q.   Markets database, I believe you just testified were split

25   off into maybe geographical locations.   A Phoenix, for example,

1    may have had its separate market database?

2    A.  It did.

3    Q.  New York; Washington, D.C., other examples?

4    A.  Both correct, yes.

5    Q.  And if you looked in the central database, you could find a

6    subset of ads or you could find where a user had posted

7    different ads among the different geographical regions; is that

8    correct?

9    A.  That's correct.

10   Q.  And then you could go to the market databases for the

11   particular region and find all the information about the ads

12   posted?

13   A.  Correct.

14   Q.  Have you ever heard the term versioning?

15   A.  Yes.

16   Q.  What does versioning mean to you?

17            What does versioning mean to you?

18   A.  To me, um, preserving earlier copies of -- let me give

19   you -- let's go to an example to me.  If a writer is writing a

20   story and they create a headline and a story, they save it,

21   that version is saved.  The next day they open it, they tweak

22   the headline a little, maybe change some ad copy, they save it.

23   There is now two versions.  They can make some more

24   modifications and it's keeping that history of the versions

25   that they've made before.

1  Q.  Let's then focus on Backpage.com.  Would versioning mean

2  different versions of an ad that was posted, what you just

3  described?

4  A.  There weren't.

5  Q.  Okay.  When you say there weren't, what does that mean?

6  A.  Backpage didn't use versioning.  You'd have to take

7  effort -- it takes effort and steps to set up a versioning

8  system.  It's not just something that natively happens with the

9  software they were using.

10  Q.  Those efforts and steps were not taken for Backpage.com?

11  A.  No.

12  Q.  So if I am a user and I posted an ad on Monday and I

13  changed it the next day, what's saved on the Web site?

14  A.  The version that you changed the next day.  It's the latest

15  one.  You might tweak that headline a dozen times to help sell

16  your bicycle, the last one saved is the one that's saved.

17  Q.  Was that always the case throughout the lifespan of the Web

18  site?

19  A.  Yes.

20  Q.  So let's go back in time to 2015, would you be able to

21  search on the Web site and find different versions for the same

22  ad?

23  A.  No.

24  Q.  How about with images, is that the same situation for

25  images?

1    A.   Images are a little different.  The images are stored

2    separately so they don't necessarily get overwritten.  An image

3    could be removed by a user.  They don't like the picture of

4    their bicycle any longer, they remove it.  It would still have

5    an existence on the image server, it would be detached but

6    there would be a marker, a trace to it.  They could add more

7    images, same thing.  So the images do have a little bit of an

8    independent lifestyle.  I wouldn't go as far as calling it

9    versioning, it's just that previous copies -- or different

10   images, really, you know, as you're uploading new images,

11   you're not really replacing.  They're new images.

12   Q.   All right.  I want to focus your attention on the day that

13   the Web site was shut down.  Do you remember that day?

14   A.   I do.

15   Q.   Where were you?

16   A.   I was at home at the start.

17   Q.   You receive a phone call?

18   A.   I did.

19   Q.   From?

20   A.   From Ehud Gavron who is -- I think his title is president.

21   He runs Login data centers.

22   Q.   And what did you learn from Mr. Gavron?

23   A.   He let me know that the FBI was there with a warrant to

24   seize the Backpage servers.

25   Q.   At some point did you make your way down to the data

1    center?

2    A.  Yes.  Yes.  And I should get down there, which I did,

3    within a half hour, probably.

4    Q.  Who did you meet with at the data center once you arrived?

5    A.  I don't remember all of the agents that were there, but I

6    think there were about six of them.

7    Q.  Generally, you met with some law enforcement agents?

8    A.  I met with law enforcement agents, yes, and also the two

9    principal owners of Login data centers were there as well.

10   Q.  Were you shown any documentation?

11   A.  I was shown the warrant.

12   Q.  Did you take a look at the warrant?

13   A.  I did.

14   Q.  Read through it?

15   A.  I did.

16   Q.  What happened next?  And I can ask a more direct question.

17         Did you speak with anyone at Backpage during that

18   morning?

19   A.  Yes, I did.  I called them when I heard about the warrant

20   was there.  I wanted to let -- inform them as well.  I believe

21   I spoke to Carl Ferrer, but I'm not 100 percent sure it was

22   Carl.  It was a while ago and it was a little nerve racking.

23   Q.  What you did learn from the call, whether it was with

24   Mr. Ferrer or someone else?

25   A.  It was a very short and simple call.  Cooperate was really

1    the one word that I was told.

2    Q.  Did you?

3    A.  Yes.

4    Q.  What or how did you cooperate?

5    A.  Oh, went down there, read the warrant.  The agents knew

6    that we hosted many newspapers and they were considerate of

7    that, and they wanted us to be there -- us being primarily

8    myself -- to be there to identify the servers, help them

9    remove -- point to what the servers were so that they could

10   remove them.

11   Q.  There were other servers in that data center that didn't

12   belong to Backpage?

13   A.  Correct.

14   Q.  So you showed law enforcement where the Backpage servers

15   were?

16   A.  We did.

17   Q.  What did you do next?

18   A.  We properly logged into them, shut them down so that they

19   would come to a resting state, a soft shutdown, essentially,

20   let them know it was ready to be removed.

21   Q.  What does a soft shutdown mean, in your eyes?

22   A.  It's mainly -- it's -- probably the easiest way of thinking

23   about it is the opposite of a hard shutdown is where you just

24   pull the power cable off of a server and it just stops.  That

25   could be damaging.

1    Q.   How can that be damaging?

2    A.   If there are rotational hard drives, they could be in the

3    middle of writing data, that loss of power could cause data

4    corruption, it could even damage the disks.

5    Q.   Soft shutdown, on the other hand, does what?

6    A.   Soft shutdown avoids that.  It makes sure all the writes

7    are finished.  It also -- there is other information that could

8    be in RAM, it's all dealing with the writes.  It lets

9    everything come to a resting state and then you power it down.

10   Q.   So soft shutdown helps prevent the possibility of damaging

11   the integrity of the data?

12   A.   Exactly.

13   Q.   What about the servers in Amsterdam?  Did you do anything

14   with those servers that day?

15   A.   Yes.

16   Q.   What did you do?

17   A.   It was later in the day.  We were asked to shut those down

18   as well, and remotely logged in to them and did the same soft

19   shutdown on them.

20   Q.   Any issues that you encountered with either the soft

21   shutdown in Tucson or Amsterdam?

22   A.   Any issues?

23   Q.   Any issues out of the ordinary or anything that would lead

24   you to believe that the integrity had been somehow damaged?

25   A.   No.

1    Q.  So I want to talk a little bit about recreating the Web

2    site as it looked before the seizure.

3    A.  Okay.

4            THE COURT:  Counsel, before you start a new area,

5    let's take a short recess.  It's 11 o'clock.  Ten minutes.

6            MR. STONE:  That's fine, Your Honor.  Thank you.

7            THE WITNESS:  Thank you.

8            (Recess taken, 11:00 a.m. - 11:11 a.m.)

9                    CONTINUED DIRECT EXAMINATION

10   BY MR. STONE:

11   Q.  I think we just we finished talking about the shutdown of

12   the servers both in Tucson and Amsterdam.

13   A.  I believe so.

14   Q.  Okay.  All right.  I want to talk about now what it might

15   take to recreate the Web site as it was constituted before the

16   seizure.  That's where we were.

17           Already you've already testified that the information

18   that one would need is contained on one database server and one

19   image server, correct?

20   A.  Correct.

21   Q.  And you also talked about that there were a lot of Web

22   servers and some helper servers that help make the Web site

23   look the way it did before the seizure?

24   A.  Correct.

25   Q.  Now, if we were to give you a database server, an image

1   server, and a Web server, could we just plug them all in and

2   make the Web site run the way it did pre-seizure?

3   A.  I wish it was that simple.  No.

4   Q.  Why not?

5   A.  There is a lot that goes into the full site, domains is a

6   key thing, Phoenix.Backpage.com means something to those

7   servers.  It knows to use the Phoenix database so it has to

8   respond to that URL.  There are other nuances about the --

9   posting ads would be quite difficult with just those three

10  servers to actually distribute everything back through it.

11  Reading would be easier.

12  Q.  Okay.  I want to save what you -- the last part of what you

13  said, but originally you were one of the people, if not the

14  lead developer, tasked with getting Backpage.com off and

15  running; is that correct?

16  A.  That's correct.

17  Q.  And for you right now reconstituting the Web site as it was

18  before would be a difficult task; is that true?

19  A.  It would be.

20  Q.  Now, you mentioned -- I think you mentioned that something

21  would be easier at the end of your previous answer.  Was that

22  -- did I hear that correctly?

23  A.  You did, yes.

24  Q.  What does that mean?

25  A.  It's really the scope of your question of getting Backpage

1    functioning again is -- does that mean taking ads from users,

2    reading everything?  Does it only mean displaying the ads and

3    some tools that were used, or does it mean simply just fetching

4    specific ads based on IDs?  There is kind of a couple tiers

5    there.

6    Q.  Why don't you go through the tiers as you just testified

7    to.

8    A.  Yes.  I'll start on the bottom.  With just the database

9    server and an image server, all of the data for an ad is there.

10   So it is possible to query those databases, to pull up the

11   information you need for an ad and to also retrieve the images

12   that you need for that ad.  What you get is all of the data in

13   a raw format, you know, no -- it wouldn't look like a Web page,

14   it would just be the text.

15   Q.  And if someone was given a copy of the database server and

16   a copy of the image server, would they have the capabilities to

17   run these manual queries that you just talked about?

18   A.  They could.  I'll add a little bit more to that, that there

19   are other nuances about the file system that I think are

20   worthwhile of pointing out.

21   Q.  Okay.  Let's leave aside the other nuances, but we'll get

22   back to them.

23          But assuming that you had the know-how, would you be

24   able to access the data that was contained on the Web site?

25   A.  Yes.  Yes.

1   Q.  And as you move up the tiers, presumably, the top tier

2   would be reconstituting the entire Web site?

3   A.  Yes, precisely.

4   Q.  Is there any difference between this top tier of the Web

5   site and this bottom tier of manual queries in terms of

6   accessing and analyzing the information?

7   A.  Conveniences.

8   Q.  In term --

9   A.  It's the same data.

10  Q.  It's the same data?

11  A.  The same.

12  Q.  So setting aside convenience, is there any difference

13  between the bottom and the top?

14  A.  It's the same data, so no.

15  Q.  So if you got the Web site totally backed up and running,

16  had all the interconnectivity, IP addresses, the domain name

17  service, everything up and running, it might be more convenient

18  to look at the data, but there wouldn't be any additional data

19  than just what you could obtain from the manual queries?

20  A.  Yeah, if we're defining data as the ad --

21  Q.  Yes.

22  A.  -- then --

23  Q.  Ad data.

24  A.  Then I agree with that statement.

25  Q.  Okay.  Now, let's talk about the nuances in terms of

1    accessing the manual queries.  What are those?

2    A.   Nuances are the person accessing it would need to be

3    skilled minimally with SQL, so that's structured query language

4    of how they would query the database to find things.  They

5    would need to have a familiarity with the schemas themselves to

6    know where everything is.

7         The other nuance I was getting into was the file

8    system, you know, it -- your question sounded like there would

9    be copies of the database, and if that's the case, then the

10   file system is not relevant, but if it's actually the servers

11   themselves, then navigating and getting around the file system

12   of finding things has relevance.

13   Q.   I think that's important to ask you a couple follow-ups.

14   If someone is given just a copy of the server, then you

15   testified that the file systems would be important?

16   A.   Yeah.  They would need to have -- the person would need to

17   have knowledge of how to find their way around the file system,

18   find where the databases are, be familiar with the operating

19   system and some partitioning that it used to find everything.

20   Q.   Just so we have names, what is the file system that is

21   important in the data that we're talking about here?

22   A.   The file system is known as Z, like in zebra, FS, Z file

23   system.

24   Q.   So if someone just had a copy of the server, they would

25   need to be conversant in ZFS?

1    A.  They would need to be conversant in it.  There is another

2    thing that they would need to be a little bit more conversant

3    in.

4    Q.  What is the other thing?

5    A.  The operating system is FreeBSD, you know, it's the word

6    free, and boy, Sam, dog, BSD.  And it's a Unix-based operating

7    system similar to Linux, but it's not Linux.  And that skill

8    set would need to be there and then one more.  On FreeBSD.  We

9    employed something called jails.  They're essentially -- you

10   can think of them as virtual machines.  They're kind of virtual

11   partitions.  So that we could have a group of databases in one

12   jail, another group of database in another jail and be able to

13   move them from server to server if we needed to.  It's a

14   convenience but necessary to understand.

15   Q.  So if I'm understanding you correctly, someone who just has

16   a copy of the server would need to have knowledge about ZFS,

17   FreeBSD, and the jail system that you just talked about?

18   A.  Yes, correct.

19   Q.  And that's just to access the database?

20   A.  That is just to get to the data.

21   Q.  Once you have access to the database, what would you need

22   to -- what knowledge would you need to know?

23   A.  That's a good question.  Once you're there, then it's SQL

24   and understanding the schema.

25   Q.  What if it was -- the initial part of getting to the

1   database was eliminated, meaning if all the databases were

2   copied and sent over to someone, would that eliminate some of

3   these steps that you've just discussed?

4   A.  Yes, it would get rid of that whole first layer of

5   FreeBSD --

6   Q.  I'm sorry.  I interrupted.

7   A.  -- FreeBSD, ZFS, jails, that would be eliminated.  There

8   would just be the data.

9   Q.  And you're talking about SQL, or S-Q-L, at that point?

10  A.  Exactly.

11  Q.  And that's a type of database?

12  A.  It's one of the most common ways to query a database.

13  Q.  So, again, if someone is given just the databases, if they

14  were proficient in working with SQL, they would be able to

15  access the information that was contained on the Web site

16  before it was seized?

17  A.  Yes.

18  Q.  And information, we're talking about the ad data.

19          All right.  I think I interrupted you.  You, I

20  believe, were talking about certain levels, one being the

21  manual query, the top one being creating the whole Web site

22  again.  What are these two -- one or two that are hanging out

23  in the middle?

24  A.  You kind of split that first one into two by getting rid of

25  that, the ZFS and getting rid of that hurdle, so that was one.

1    We'll give that one one.  Just the copy of the databases and

2    the images now, so get rid of all that Unix stuff, that becomes

3    an easier one.  So that one should really be here.

4            The other two that I was alluding to before is one is

5    the site's fully working, it's taking ads again, it's doing

6    everything it did.  The other one is more that I would call the

7    site in a read only mode, and that's specifically being able to

8    see the ads as they were before, in the same presentation as

9    they were before, and using similar tools as were used before

10   by administrators.  The big difference is that there -- the

11   data is not changing, and that's easier than having the writes

12   working again.

13   Q.  What would it take to put the site into a read only that

14   you just described?  What actions would be needed?

15   A.  There are challenges.  There -- another name that their

16   system used is something called GYRO Base.  It's just,

17   essentially, a programming language, application language that

18   helped marry the design of the site with the data, smoosh the

19   two together and give the user what they want.  GYRO Base is

20   what fulfilled that.  So getting GYRO Base up and running again

21   so that those same design templates can function as they did

22   before and query the database as it did before is that read

23   only layer, and it's some specialized skill.

24   Q.  The only benefit to that method of viewing the data would

25   be that it looks prettier; is that right?

1    A.   I would say looks the same but looks prettier, yes.  Yeah.

2    Q.   The data doesn't change, how you are digesting the data

3    changes, in terms the form?

4    A.   That's absolutely correct, yes.

5    Q.   Were you aware of any retention policy for the data on

6    Backpage.com?

7    A.   I'm aware there was one.  I don't know the specifics of it

8    though.  I don't recall it.

9    Q.   Don't know the specifics, but when you say there was one,

10   what is your understanding of what the policy did to the data

11   on the Web site?

12   A.   All right.

13            MR. BIENERT:  Objection, Your Honor.  Calls for

14   hearsay.

15            THE WITNESS:  Pardon?

16            THE COURT:  The objection is overruled.

17            MR. STONE:  You may answer.

18            THE COURT:  As the question was phrased.

19            THE WITNESS:  Can you repeat the question?

20            MR. STONE:  I'll try.

21   BY MR. STONE:

22   Q.   I believe you testified that you were aware of a retention

23   policy --

24   A.   Yes.

25   Q.   -- for the data?

```
 1              MR. BIENERT:  Object on foundation, or at least ask
 2    that he lay one before we get into the details.
 3              THE COURT:  Can you finish the question?
 4              MR. STONE:  Okay.  That was one question.  I was going
 5    to go to the next one.
 6              THE COURT:  Okay.  The objection is overruled for
 7    whether or not he is aware of.
 8              THE WITNESS:  Okay.
 9    BY MR. STONE:
10    Q.  In your awareness of that policy, what did that mean for
11    the data that was on the Web site?
12    A.  As ads would expire, with my bicycle ad, it eventually
13    expires and has little to no value, so it would -- it would be
14    removed after a certain period of time.  And, you know, they
15    had policies of removing ads based on time that the ad was
16    expired.  It keeps the database lean.
17    Q.  So if a Web site continued to run, your understanding is
18    certain ads would be deleted?
19    A.  That's -- expired ads, generally.
20    Q.  Expired?
21    A.  Yeah.
22    Q.  Removed from the database?
23    A.  Yes.
24    Q.  What about a schematic of how the servers were set up in
25    the Tucson data center, were you aware if one existed?
```

A.  No, we didn't really have one like that.  Each role -- we had processes that could create each role of a server.  It had been around for quite some time and was evolving, so we didn't have a drawing.

Q.  Now, I want to ask just a few questions.  And for these questions I want you to assume that the databases have been copied and given to a forensic examiner of the Web site, along with a copy of an image server.  Okay?

A.  Okay.

Q.  Would you be able to, once you had copies of the databases and a copy of the image server, search the data for ads that were posted on the Web site?

A.  Yes.

Q.  Would you be able to search the data to determine how many ads were posted in each category?

A.  Yes.

Q.  Could you determine within those categories how many non-adult ads were posted?

A.  Yes.

        You know, I'm going to pause you for a second.  The -- you're not talking about over the lifetime of the entire system?

Q.  No.  Good question and good clarification.  I'm talking about as the Web site existed the day it was seized.

A.  The ads that were in the database, then my answers are

1    still all yes.

2    Q.  So with a copy of the databases and a copy of the image

3    server, are you able to access all ad data that existed on the

4    Web site the day it was seized?

5    A.  Yes.

6           MR. STONE:  Just a moment, Your Honor.

7           No further questions, Your Honor.

8           THE COURT:  Okay.  Cross.

9           MR. BIENERT:  Thank you, Your Honor.

10                      CROSS-EXAMINATION

11   BY MR. BIENERT:

12   Q.  Hi, Mr. Gerken.  My name is Tom Bienert and I represent

13   James Larkin.

14          Let me just do a bit of an overview.  The reality is

15   at the time that you showed up on, I think it was April 6,

16   2018, when you got called down to the location and the search

17   warrant was occurring --

18   A.  I can't confirm that date, but it was in early April.  It

19   might have been the 5th.

20   Q.  Okay.  On the day that you showed up --

21   A.  Yeah.

22   Q.  -- the system was working and functioning when you got

23   there, right?

24   A.  Correct.

25   Q.  And there are about 40 different components or servers.  Is

1    that the right term?

2    A.  Yes.

3    Q.  And is it true that separate and apart from whether one

4    server would contain, for example, text data and another server

5    would contain image data and another server might have

6    administrative data, the configuration of how all this was put

7    together was integral to the operation of the Web site?

8    A.  The site that was live, yes.

9    Q.  Yes.

10   A.  Yes.

11   Q.  And there were a lot of features that one who worked at

12   Backpage, for example, could find or look for on the site by

13   using the system when it was operating and configured, correct?

14   A.  Correct.

15   Q.  Now, obviously, we'll get to a little more detail in a few

16   minutes, but on that day the servers were shut down and the

17   components were taken away by federal authorities, right?

18   A.  Yes.

19   Q.  And that was about a year-and-a-half ago, ish, a year ago

20   last April?

21   A.  Correct.

22   Q.  And you've had a lot of correspondence with people from the

23   government about questions and other issues related to those

24   servers and the way it all worked over the last year and five

25   months or so, right?

1    A.   Yes.

2    Q.   Has the government ever taken you to the location where

3    they have the components?

4    A.   No.

5    Q.   And -- well, you answered it, but let me finish so we have

6    a good record.

7         Has the government ever taken you to any location

8    where they actually have the gizmos, the components, and asked

9    you to take a look at them?

10   A.   Still no.

11   Q.   Okay.  And so, obviously, the government has never asked

12   you to come and hook it up for them, has it?

13   A.   Correct, they have not.

14   Q.   And I am assuming the government has never taken you

15   anywhere and asked you to look at some imaged or different

16   system that they set up that they indicated they think contain

17   the same capability as the original system, right?

18   A.   Could -- could you ask that again?

19   Q.   Right.  I mean, if I'm following the government's

20   questioning, a lot of the questions were about what the system

21   that you had put together and were operating or hosting for

22   Backpage, what it was like and how it worked, right?

23   A.   Correct.

24   Q.   But then towards the end they asked you questions about,

25   well, what if we were going to set up a different system, not

1   that one, but just do something different to try to get the

2   same information?  Do you remember the latter part of the

3   question?

4   A.  Yeah.

5   Q.  The government has never taken you anywhere and asked you

6   to look at another variant of the system with some of the

7   components but set up differently than you had it to see how it

8   operates, right?

9   A.  A variant of the system, no.

10  Q.  So as you sit here now, you have no idea whether the

11  government has or doesn't have any put together system that

12  allows it to take out any of the information that had been on

13  the system the day it was seized?

14  A.  Do I know if they do?

15  Q.  Right.

16  A.  I can only assume.

17  Q.  And why do you assume?

18  A.  They have had the data for a year-and-a-half.

19  Q.  You would think that by this time they would be able to

20  show you things that came from the system in working order,

21  right?

22  A.  We're tell --

23  Q.  I'll move on.

24  A.  I just need some clarity sometimes on if you're talking

25  about the actual data or the Web site, because they are

1    different things.

2    Q.  Okay.  So just to be clear, I am not a techie, so I will

3    try to refer to what the overall operating system, or the IT

4    system, I'll refer to as the system.

5    A.  Okay.

6    Q.  And then I guess different components or things like data

7    or images or subcomponents, I'll try to be more precise with

8    them.  Okay.

9         So right now I'm just talking about a working system.

10   So, to be clear, as you sit here now, the government has never

11   showed you or showed you anything that they claim came from a

12   currently operating version of the system under their control?

13   A.  No.

14   Q.  So on the particular day of the search -- and I'll

15   represent to you it was April 6th.  That sounds about right,

16   time wise?

17   A.  Yes.

18   Q.  You got called.  About how long do you think it was from

19   the time you got first called that they needed you to go down

20   to Login, to the facility, and when you think you would have

21   gotten there?

22   A.  I would say it was within the hour, probably close to the

23   hour.

24   Q.  So it was about an hour by the time you got there.  And at

25   the time you got there, did it appear that the agents were

1    waiting for you and it had not yet started doing anything to

2    retrieve the items?

3    A.  I can't say what they did before I met them, but they were

4    in a conference room when I met them.

5    Q.  But once you got there and you looked at them, everything

6    was intact?

7    A.  Right.

8    Q.  It didn't look to you like any of the Backpage servers had

9    been removed or unplugged or the like, right?

10   A.  Correct.

11   Q.  So they were waiting for you, right?

12   A.  Correct.

13   Q.  And is it -- based on your discussions with them, did you

14   indicate that you were knowledgeable about the system and had

15   some understanding of how it was put together and worked?

16   A.  I may have.

17   Q.  You were knowledgeable about the system and how it was put

18   together, at least from a technical standpoint, right?

19   A.  Correct.

20   Q.  You were able to, if you had been asked, to help them

21   understand the connectivity aspects of the IT system, if they

22   had asked, right?

23   A.  Yes.

24   Q.  Did they ask you to explain any of the connectivity issues?

25   A.  I don't recall that question.

1  Q.  You don't recall ever giving them that information, right?

2  A.  On that day, no, I don't recall.

3  Q.  Had they asked you, would you have given them the

4  information?

5  A.  Yes.

6  Q.  Because you were being cooperative, right?

7  A.  Correct.

8  Q.  Did anyone indicate to you, from the government when they

9  were doing the search, that it was important to them to try to

10  take apart the system in a way that they could put it back

11  together and get it operating with the same functionality that

12  it had when they got there?

13  A.  No.

14  Q.  From your experience, would it be possible to take the

15  Backpage system that was at Login hosted by DesertNet on that

16  day and shut it down and move it to a different location and do

17  it in a way so that when you got to the different location, you

18  could make it all work the same way?

19  A.  Is the question is it possible?

20  Q.  Yes.

21  A.  Yes.

22  Q.  And is it true that you had experienced not long before the

23  day of the search of moving a system, taking it down and

24  setting one up?

25  A.  Yes.

1    Q.   Did it involve Backpage?

2    A.   Oh, yes, it did.

3    Q.   So not only did you know how to do it, but as of the date

4    of the search, you had done it before for the Backpage system,

5    right?

6    A.   Correct.

7    Q.   And you were able to get it back together and make it all

8    work properly, right?

9    A.   Correct.

10   Q.   If the goal of the agents was to disassemble the system in

11   a way that it could then be reassembled in functioning working

12   order like it was when they got there, what steps, from your

13   perspective, do you believe you would have wanted taken?

14   A.   From my perspective, I'm a type of person that documents,

15   so I would have documented.

16   Q.   I'm sorry.  Say that again.

17   A.   I'm the type of person that documents things, so I would

18   have documented what each server's role was and how it was

19   connected.

20   Q.   How it was what?

21   A.   How it was connected.

22   Q.   Connected to the other components?

23   A.   Uh-huh.

24   Q.   And other than documenting things, what, if anything else,

25   would you have recommended or could you have done to make it

1    likely it could be reconnected?

2    A.   When I said -- it's a pretty broad question there.  If we

3    were to do it ourselves, if we were asked to do it, we would

4    have worked with setting it up in another facility and kind of

5    leapfrogged it across, so to speak, brought over certain

6    pieces, got it functioning, brought over the rest.

7    Q.   So it would have been a step-by-step process?

8    A.   It would have been a step-by-step process is the short

9    answer.

10   Q.   And is it true on the day of the search it would have been

11   possible to take the system off line so it was no longer

12   visible to the public as a Web site but the system was still

13   intact and it could still be used, for example, by Backpage or

14   federal authorities, or you?

15   A.   Yeah, possible, yes.

16   Q.   But you weren't asked to do that, right?

17   A.   I was not.

18   Q.   Now let's talk a little bit about the Login facility where

19   the servers were.  Was it a secured facility?

20   A.   Depends on your definition of security, but I consider it

21   secured.

22   Q.   Well, was it a locked building?

23   A.   Yes.

24   Q.   Was it a building that people from the public like me or

25   others who didn't have authority to be there couldn't just walk

1   into?

2   A.   To the actual data center?

3   Q.   Right.

4   A.   No.

5   Q.   Was the area where the servers and other components were

6   contained, did that room or area also have the ability to be

7   locked?

8   A.   Yes.

9   Q.   Could the servers themselves be locked in place where they

10   were?

11   A.   Yes.

12   Q.   Is it true that the room and the facility at Login had

13   video cameras to monitor what was going on in the room?

14   A.   They do have security cameras.   I couldn't answer beyond

15   that.

16   Q.   But there are cameras there?

17   A.   There are cameras there, yeah.

18   Q.   From your perspective, would it have been at least feasible

19   to take the Backpage system off line, secure it, lock it up in

20   the place where it was and work on it and use it in a read only

21   capacity for some period of time as of April 6th going forward?

22   A.   The question is:   Is it feasible?

23   Q.   Yeah.

24   A.   Yes.

25   Q.   Did anybody from the government at the time of the search

1  ever ask you about how feasible or difficult or easy that would

2  be?

3  A.  No.

4  Q.  Now, you were asked questions by government counsel about

5  the types of searches or things that you potentially could do

6  if someone with the right experience and information could

7  reconnect the components of a data server, an image server, and

8  I forget if there was something else necessary?

9  A.  We mentioned a Web server as well, but we could stick with

10  yours, yeah.

11  Q.  And you talked about some of those things.  But let me just

12  talk a little bit about what the system could do and ask you

13  how difficult or hard it would be to start anew and make a new

14  system do those same things.

15  A.  Okay.

16  Q.  You already went over the fact that with the right

17  equipment, the right expertise, and the right components, data

18  server, image server, one could pull up images of an ad that

19  was on the server as of that date, right?

20  A.  Correct.

21  Q.  To the degree that one wanted to do searches for what would

22  be, I guess, sometimes referred to as administrative data,

23  about the ad, the user, similarities or patterns, things like

24  that, would one be able to readily obtain that type of

25  information simply by having the data server and the image

1  server?

2  A.  You said a lot in that question, but all of the data is in

3  the database, so, ultimately, yes.

4  Q.  Would there be a need for other equipment and/or components

5  to help do searching features to allow the different components

6  to work together to do searches, for example?

7  A.  Can you rephrase it?

8  Q.  Right.  I mean, is it as simple as someone turns on the

9  data computer and the image computer and they're plugged in

10  together and someone can just immediately, without any other

11  components, software or hardware, do all these different type

12  of searches I mentioned, or might you need other components and

13  software?

14  A.  Well, if you have a specific -- I'm not referring to you --

15  but if you have a specific question, like you need to fetch

16  this specific ad, then you have all of the pieces to get you

17  that ad.  I'm not sure if I answered your question though.

18  Q.  Well, I think you did generally.  I'm going to try to make

19  it a little more specific.

20         MR. BIENERT:  Your Honor, I have a couple of exhibits

21  and I -- since we haven't done it before, is your preference

22  that I just give the official one and one for the Court to the

23  clerk and then the other parties?

24         THE COURT:  Yes.

25         MR. BIENERT:  Is that how you want me to do it?

1          I'm going to hand madam clerk the Defense Exhibit 103.

2     And I've got two copies there, one for the clerk and one for

3     Your Honor.

4          Do we want a third copy for the witness or is the

5     official one for the witness?

6          THE COURT:  Well, if you have another copy, then she

7     can mark it while the witness is --

8          Oh, she's already marked it.  The tag is already on it

9     so she can just give it to the witness.

10    BY MR. BIENERT:

11    Q.  Okay.  When it gets placed in front of you, sir, I'm going

12    to ask you to take a look at Exhibit 103.

13    A.  Okay.

14    Q.  Just look at each page and then I'm going to ask you some

15    questions about it.

16    A.  Okay.

17    Q.  Do you recognize what this document is, not necessarily the

18    particular document, what type of document it is?

19    A.  Yes, I do, not the particular.

20    Q.  What do you recognize it to be?

21    A.  I recognize the first half to be an ad, an advertisement in

22    an administrative mode, so an administrator is looking at the

23    ad.  The second half I recognize as a page in an interface

24    called the object editor.

25    Q.  And just so I'm clear --

1      THE COURT:  I'm sorry, what was it called?

2      THE WITNESS:  The object editor.

3      THE COURT:  Okay.  Thank you.

4  BY MR. BIENERT:

5  Q.  And, just for the record, am I accurate, sir, that the

6  first part you're referring to as an ad is the first three

7  pages of Exhibit 103?

8  A.  That is correct.

9  Q.  And the, quote, object editor is the last two pages which

10  has sort of a blue background and field?

11  A.  That is correct.

12  Q.  Is this information that one could retrieve from the

13  Backpage system when it was operational and hosted by

14  DesertNet, this type of information?

15  A.  Yes.

16  Q.  And if we can focus first on the first three pages, which

17  is what you were calling an ad, if we turn to the second page,

18  and if you can just tell me, first of all, do you recognize

19  what the information in the yellow box in the middle where it

20  says administrative data, do you recognize that format and what

21  that is relative to these documents?

22  A.  Yes.

23  Q.  What would that be?

24  A.  Data that is not shown to the public.

25  Q.  I'm sorry?

1   A.   Sorry.   Data that is not shown to the public.   It's

2   information associated with this ad but not shown to the

3   public.

4   Q.   Okay.   So in order to retrieve this type of information, it

5   has to be a search that is able to yield things that are more

6   than just the publically available photo or text content on the

7   Web site, right?

8   A.   That the search has to request for information to display

9   this, yes.

10  Q.   Right.   And this is something that you configured as part

11  of the capabilities of the Backpage system to be able to do

12  this type of search feature, right?

13  A.   Correct.

14  Q.   And this is something that, at least as you understood it,

15  folks that worked at Backpage, at least in certain departments,

16  would regularly do from their own workspace to access this type

17  of information, right?

18  A.   I can say the information existed, you know, you could get

19  to it.   I don't know how they used it, yeah.

20  Q.   So you know the technical side, but you don't know the day

21  in, day out, how it's really done at Backpage side at the

22  business, right?

23          Okay.   So if we look at the administrative data box,

24  and if we just look at some of the entries there, it indicates

25  that this -- about three or four lines down you see it says,

1  paid ad and it says yes?

2  A.  Yes.

3  Q.  And is it accurate, obviously, that this is information one

4  could get by doing a search on the system when it was operating

5  to find out if an ad was paid and how much it cost?

6  A.  Correct.

7  Q.  And then if you look right below that, it says, view all

8  ads by this user on this site.

9       Do you see that?

10 A.  Yes.

11 Q.  What does that template do or access if one were to hit it

12 when it was operating?

13 A.  When it was operating, if you would click on that, it would

14 essentially do a search for this particular user on this

15 particular site, which appears to be Portland.

16 Q.  Okay.  So let's break that down.  First of all, when you

17 say this site appears to be Portland, you made a reference

18 before to there is the master servers, and I forget what you

19 called them, you said there were other servers that relate to

20 different locations?

21 A.  It's -- actually, I was referring to market databases, I

22 think, what you might be referring to.

23 Q.  Yes.

24 A.  So, in this case, this market database, I'm going by

25 memory, it's probably Maine and Portland would be -- had been

1   in there.

2   Q.   So within a bigger database there are sub databases within

3   the servers that are different regions of the country or areas

4   of the country where Backpage ads are posted?

5   A.   Yeah.   I wouldn't use the term sub database, but, yes,

6   there are separate.

7   Q.   Okay.   So when it says, this template, view all ads by the

8   user on this site would allow you to see other ads by this

9   person, so the system had the ability to go back and look for

10  other things relative to this same exact user, right?

11  A.   Yes.

12  Q.   And I see, on this one at least, there is a number three

13  next to that.   Do you know what that means?

14  A.   Its intention is that there are three other ads by that

15  user in this site.

16  Q.   And is it your understanding that one -- by hitting that

17  template, one could see the three other ads?

18  A.   Yes.

19  Q.   And see similar information that we're seeing here about

20  those three ads, right?

21  A.   Correct, if they then viewed those three ads.

22  Q.   In other words, the system had the -- I'm sorry?

23  A.   This would probably be one of the three so.

24  Q.   Right.   Okay.

25          And then if we go down, there is a template about four

1  or five lines below that, it says, report this ad to the NCMEC,

2  N-C-M-E-C.

3         Do you see that?

4  A.  I do.

5  Q.  Do you know what that references?

6  A.  Yes.  It was a -- I believe it pulled up a form that let

7  them report this particular ad to the NCMEC.

8  Q.  What did you understand that entity to be?

9  A.  Oh, the -- I don't recall what the acronym is, but it's the

10 National Center, I think, for Missing and Exploited Children.

11 Q.  So it was a template to see if someone had reported this ad

12 as, potentially, involving an underage person?

13 A.  Yes.

14 Q.  And then if we go down to the bottom, there is information

15 about invoices, the bottom of that administrative data box,

16 right?

17 A.  Yes.

18 Q.  And I note that there are two different references, one for

19 $7 on the 29th and one for $7 on the 28th of 2014.

20        Do you see that?

21 A.  Yes, I do.

22 Q.  And so is it accurate that the system, when it was

23 functioning, when you had it hosted, would allow one to see

24 data involving payment history for more than one payment and

25 over more than one static time frame, in other words, over

1  time?

2  A.  Yes.  You know, I did want to clarify, as I did when I was

3  asked the question before, it wasn't an accounting system, but

4  it did have some basic invoicing.

5  Q.  And was it your understanding that somehow the system could

6  configure to other servers which you weren't hosting here in

7  Arizona that could involve, I think it was PPI or other types

8  of payment information?

9  A.  I didn't quite follow the question in there.  Sorry.

10 Q.  Was I accurate that when you were explaining earlier when

11 government counsel was questioning you, you said that there was

12 also contained somewhere in Backpage's server systems

13 information about payment, PPI or different types of payments

14 for ads?

15 A.  Yes.  I mean, we didn't administer those servers so I can't

16 really tell you what it had, but there is that other system,

17 yes.

18 Q.  But was it your understanding that the way the system was

19 configured at least, wherever that server was, it would allow

20 someone working at Backpage to access, not just ad, photo, and

21 text information, but payment information?

22 A.  That's my understanding.

23 Q.  All right.  And if we look at the right-hand side of this

24 box, it gives a name, this one says DGGFF, and a phone number

25 and an e-mail.

1         Do you see that?

2    A.  Yes, I do.

3    Q.  Was the system searchable by all of those items?  You could

4    search the name, the phone number, and the e-mail as well?

5    A.  Technically, this is a search that you're seeing.  It's a

6    query that's displaying those, so the answer is yes.

7    Q.  Well, I guess the question I have is if we're looking at

8    one ad, was it your understanding that the system, when it

9    operated, if someone wanted to see if the same person with the

10   same designated name had other information in the system from

11   ads at different times, could they search that as well?

12   A.  Yes.

13   Q.  Now, if we go to the bottom, the bottom half of the page

14   where it says deleted images, administrators only, right above

15   two photographs, do you see that?

16   A.  Yes, I do.

17   Q.  What is your understanding of what that is?

18   A.  My understanding is that there are two images that were

19   once associated with this ad and were removed for whatever

20   reasons identified here.

21   Q.  Okay.  And if we look above the ad on the left, which

22   appears to be -- it's the photo of the lady from behind, right

23   above it, it says, deleted by system.

24         Do you see that?

25   A.  Uh-huh.

1    Q.  What does that mean?

2    A.  I would actually need to look at the code again to answer

3    it completely accurately, but what it seems like to me is some

4    type of an automated deletion.

5    Q.  Was it your understanding that there were filters and

6    things on the system that would automatically delete certain

7    types of material from ads?

8    A.  Was it my understanding that?

9    Q.  The IT system had filters or other types of automated

10   mechanisms to delete certain types of things from ads?

11   A.  Yes.

12   Q.  And then if we look to the next picture to the right of

13   that, which is the photograph looking at the lady from the

14   front, it says, deleted by BP 48.

15          Do you see that?

16   A.  I do.

17   Q.  What did you understand that to mean?

18   A.  I understood it to mean a user account, a staff user

19   account.

20   Q.  So BP 48, that designation would be some employee of

21   Backpage?

22   A.  Yes.  I answered that with slight hesitancy because I don't

23   know for sure it would be a singular person.

24   Q.  Okay.  So at least this ad, exhibit -- or this

25   administrative data in Exhibit 103 does have a memorization of

1   images that were deleted from the ad?

2   A.   That's correct.

3   Q.   And that's something that the system, when operating, could

4   do, right?

5   A.   That's correct.

6   Q.   So if there were ever a question, if anyone was raising

7   concerns about whether Backpage was or wasn't callously or

8   recklessly posting a picture that was inappropriate because it

9   may have involved someone who was under age or doing something

10  illegal, the system had the ability to do searches about

11  particular people, I should say users, ads and the like, to

12  basically investigate different data points to get an

13  understanding of what happened?

14  A.   Did the -- was the system capable of doing that is the

15  essence of your question?

16  Q.   Yeah.

17  A.   Yes.

18  Q.   And, in fact, that was a feature that you put in -- well,

19  strike that.

20          That was a feature that you understood was used on a

21  daily basis at Backpage, right?

22  A.   I believe it was.

23  Q.   Now, when we go to the last two pages of Exhibit 103, which

24  is the object editor, if I'm saying it right?

25  A.   Correct.  You're saying it correct.

1   Q.  And you if could just explain to us, in essence, what this

2   is and how the information on here is different, if at all,

3   from the photos, to the degree that -- well, that's a bad

4   question.  Just explain to us, if you can, what the object

5   editor information is in general.

6   A.  Yeah.  The object editor, essentially, is -- these are

7   queries into the database that are pulling up the field and

8   values that are already in the database.  It's an

9   administrative interface so that an administrator can see the

10  values in a clean way, and in some cases, you know, review

11  them.  That's pretty much it.

12  Q.  Is it accurate that it is a fairly challenging, I think is

13  the word you used earlier, enterprise to get a system like

14  Backpage's up and running so that one could, among other

15  things, be able to do the types of searches for the types of

16  administrative data that we are looking at in this exhibit?

17  A.  Is the question did I say it was challenging, yes.

18  Q.  And it's something that requires expertise, right?

19  A.  Yes.

20  Q.  And not just general expertise in the field, but actual

21  knowledge and understanding of a lot of particular information

22  of that business or that system, in other words, their domain

23  names, what they're doing, what they're trying to achieve, how

24  they want to configure, that sort of stuff, right?

25  A.  Correct.

1    Q.  And as government counsel said, no one knew that

2    information, at least on the technical side, better than you,

3    because you put it together, right?

4    A.  For -- well, these are ultimately queries, you know, these

5    are ultimately questions and searches.  They're pre-prepared

6    searches.  And I do have some knowledge of the requests of what

7    these pre-prepared searches were.

8    Q.  Now, so on the day of the search itself, no one from the

9    government asked you to help them take down the system in a way

10   that would ensure or make more likely that the system could be

11   put back together in the same functionality it had before,

12   right?

13           MR. STONE:  Objection.  Asked and answered.

14           MR. BIENERT:  I'm segueing.  I'll move on.

15           THE COURT:  Your objection is overruled.

16   BY MR. BIENERT:

17   Q.  But let's talk about since that time.  Is it true that in

18   the four or five months after the search and the items were

19   taken, you received a lot of inquiries from government

20   investigators, FBI or IRS agents who were in the techie side,

21   trying to understand the system they had seized from Backpage?

22   A.  The data, yes.

23   Q.  And is it fair to say there are dozens, if not hundreds, of

24   pages of exchanges between you and them when you're trying to

25   answer their questions?

1  A.  I can't tell you a page count.  I don't know that, but,

2  yes, there were multiple questions.

3  Q.  And these exchanges -- here's what I'm going to do.

4       MR. BIENERT:  Your Honor, may I approach?

5       THE COURT:  Yes.

6       MR. BIENERT:  I'm not offering to admit, but this is

7  the Jencks materials that were sent to us, I think, two days

8  ago.

9       MR. STONE:  They were sent a week ago, but, yes, they

10  would be the Jencks material.

11       MR. BIENERT:  They were sent by mail on Friday night,

12  Your Honor.  We got them just recently.

13  BY MR. BIENERT:

14  Q.  I'm going to direct you to a couple of e-mails.

15       So to make it a little easier for you, I'll just

16  represent those are various things, many of which involve you,

17  some don't, but at the bottom facing you there should be some

18  little tabs.

19  A.  There are.

20  Q.  So I'm going to direct your attention to a -- should have a

21  blue tab on it at the bottom -- and I'm going to direct your

22  attention to a May 9 dated document.  This is just to refresh

23  your memory.  I'm going to ask you questions from it, and if

24  you can do it without looking, fine.

25       MR. STONE:  Counsel, could you give a Bates number,

1    please?

2              MR. BIENERT:  It's Bates 00457.

3              MR. STONE:  Thank you.

4              MR. BIENERT:  And it's May 9th.

5              THE WITNESS:  Okay.  I have that page.

6    BY MR. BIENERT:

7    Q.  So is it true, sir, that as of May 9th of this year, so a

8    year and a month after the items were taken, you started

9    hearing from and getting correspondence from an IRS special

10   agent named Richard Robinson asking you to clarify various

11   things about how the Backpage server system works?

12   A.  Yes.

13   Q.  And is it true that on or around May 9th, you basically got

14   an e-mail from Mr. Robinson, or Agent Robinson, that basically

15   said, hey, you and I met last year at Login data center, and

16   he's reminding you of when you all met at the search.  And then

17   he goes on to say, hey, I have a bunch of questions about the

18   Backpage server.

19             MR. STONE:  Your Honor, are we refreshing recollection

20   here, are we impeaching?  I'm not sure what the purpose of the

21   document --

22             MR. BIENERT:  I'm asking him if that's what happened,

23   if he remembers or not.

24             THE COURT:  The objection is overruled.

25             You can answer the question.

1          THE WITNESS:  Yes.

2     BY MR. BIENERT:

3     Q.  And did he then, as of May 9th, start asking you a bunch of

4     questions about the server, starting then and lasting until the

5     end of May?

6     A.  I can't confirm the dates, but, yes, we did have

7     conversations.

8     Q.  If we go to the next tab, which would be green, and I'll

9     just --

10         MR. BIENERT:  Government, it's Bates 000403.

11    BY MR. BIENERT:

12    Q.  Is it true, sir, that Agent Robinson, on May 14th of this

13    year, e-mailed you back after another exchange, and indicated

14    that he appreciated you trying to answer things, even if it was

15    just from memory, because your memory was far more reliable on

16    these high-level concepts than the guesses that he and other

17    lay people had on how this system worked?

18    A.  Is it true that I was asked that question?

19    Q.  That he said that to you in an e-mail.

20    A.  It's written here, yes.

21    Q.  Is the reality, sir, that what you realized in May of this

22    year when you were getting these e-mail exchanges from Agent

23    Robinson, is he didn't understand how the Backpage server

24    system worked?

25    A.  Did I have that conclusion?

1   Q.  Yeah.

2   A.  I don't think I had that conclusion.  I had the conclusion

3   that he had questions.

4   Q.  Did you appreciate at the time that it was clear that he

5   didn't have the system up and running?

6           MR. STONE:  Objection.  Calls for speculation.

7           THE WITNESS:  Yeah, it doesn't feel --

8           THE COURT:  The objection is overruled.

9           THE WITNESS:  I'm sorry.  Did you say overruled?  I'm

10  sorry.

11          THE COURT:  Yes.  So you can answer it if you

12  understood.

13          THE WITNESS:  Yeah, I didn't understand what they

14  actually had, I really didn't.

15  BY MR. BIENERT:

16  Q.  Well, you certainly had no understanding as of May 9th of

17  this year that they had a system that was operating and could

18  deliver the information that the Backpage server used to be

19  able to provide when it was operating in your facility, right?

20  A.  I hadn't been told that they had that.

21  Q.  I'm sorry?

22  A.  I hadn't been told that they had such a system.

23  Q.  And is it true that in the May -- in around May 14th he

24  asked you questions about central backup servers and how things

25  worked, and basically once you explained it to him, he

1  indicated that you had cleared up a key misconception that he

2  had about how the system operated?

3  A.  It does say that here, so I'm just going to say yes.

4  Q.  Well, does that sound right, the gist of what I'm saying?

5  In other words, as you sit here now, June, July, August,

6  September, it was four months ago, is it an accurate -- strike

7  that.

8          Do you have a recollection that as of four months ago

9  in May you were getting a series of e-mails from Agent Robinson

10 basically saying, I have a lot of concerns and confusion about

11 how the system works and you were trying to help him?

12 A.  Yeah, I would express it differently, that I had questions

13 about the system, yeah.

14 Q.  And if we go to the yellow tab.

15          MR. BIENERT:  Government counsel, May 21, Bates

16 000401.

17 BY MR. BIENERT:

18 Q.  Is it true that as late as May 21, 2019, among the

19 questions that Agent Robinson was trying to understand and have

20 you explain to him were how many of each type of server they

21 even had seized from the Tucson center and the Amsterdam

22 center?

23 A.  Yes, I believe that was questions.  Yes.

24 Q.  And is it fair to say that what you were telling him during

25 all of these exchanges was to the effect of, I'll tell you the

1  best I can, but given that it's been so long, I don't really

2  have good recall of a lot of this?

3  A.  That's true.

4  Q.  Now, there is no doubt, sir, that on April 6th of 2018 when

5  they waited for you for an hour to start taking down the

6  servers, you could have told them then how things were

7  configured and answered any questions about how this stuff

8  needed to be understood and put together to function, right?

9  A.  Correct.

10 Q.  But by being asked the questions 13 months later, you're

11 not sure about a lot of it, are you?

12 A.  Yeah.  I have to take some assumptions, yes.

13 Q.  Is it true, sir, if you go to the red tab, Exhibit 000380,

14 or Bates 380, sorry, that on May 29, 2019, you had a final

15 correspondence with Agent Robinson where he had asked you to

16 actually look at his description and roles of Backpage Web site

17 servers to use in the declaration to file in court, and he was

18 having you look at copies of it to tell him if what he had was

19 right?

20 A.  Yes.  I think it was more that he was asking me to correct

21 if it was wrong.

22 Q.  And you went through several drafts with him of the

23 document, right?

24 A.  I don't remember several.  I think maybe one.

25 Q.  Okay.  At least one then?

1   A.  I think.  You know what, I'm not 100 percent sure, but,

2   yeah.

3   Q.  Okay.  And if you go to the draft that he had you review,

4   is it true that as part of the draft he had you review, part of

5   the language that he had you look at -- and this is on the --

6   A.  The second right there.

7   Q.  -- the fourth page in.  It ends in 383 at the bottom right.

8   There is a paragraph, third paragraph down where he asks you to

9   review language that said, because links and references to

10  files and data within the servers were referenced based on the

11  way that the servers were networked when the Web site was

12  operational, restoring the Web site to a functional state would

13  not necessarily be as simple as connecting any three servers of

14  the appropriate types.

15          Do you see that?

16  A.  Yes.

17  Q.  Now, he ran that language by you, correct?

18  A.  Yes.

19  Q.  And you agreed that that was accurate, right?

20  A.  Yes.

21  Q.  So, just to be clear, when counsel basically says, so if

22  you got the boxes, if you got the data box and the image box,

23  you could basically get what you need, it's a lot more

24  complicated than that, isn't it?

25  A.  It -- it's complicated, certainly.  The distinction is

1    definitely Web site versus data.  It's an important

2    distinction.

3    Q.  Is it true that Agent Robinson asked you to confirm, and

4    you did, additional language that said, even though any one of

5    the database servers and image servers contain data for all

6    Backpage.com ads at the time the site was taken down,

7    simulating the function of the Web site would require extensive

8    time and expertise, if possible at all?

9    A.  Is the question do I agree with that statement?

10   Q.  Yeah.

11   A.  Yes.

12   Q.  I mean, you told them back in May that you agreed with that

13   statement, right?

14   A.  Yeah.

15   Q.  And you still agree with it now, right?

16   A.  I do.  We're talking about the site not the data, but yes.

17   Q.  Well, we're talking about the function of the system even

18   in a read only capacity, right?

19   A.  The write is what gives me the most amount of hesitance,

20   writing the data.  Reading is less than impossible, it's a

21   lower level, but, yes, the essence is it's complex.

22   Q.  Now, as you sit here right now, you have no knowledge at

23   all as to whether all of these things that I just went over

24   with you that the system could do back when it was functioning,

25   including the things in Exhibit 103, you have no knowledge

1    right now as to whether the government has any capability to

2    replicate those things, do you?

3    A.  I don't -- I don't know.  Yeah.

4         MR. BIENERT:  And I'm just conscious of time.  I've

5    got a little more, Your Honor.  I'm going to keep going.  I

6    just didn't know if you wanted a breaking time or have one?

7         THE COURT:  I was going to break at 12:15.

8         MR. BIENERT:  Perfect.

9         THE COURT:  Okay.

10   BY MR. BIENERT:

11   Q.  There has been a lot of talk about how difficult or not

12   difficult, or challenging or not challenging it would be.  You

13   have been talking to the government or for a while, you've been

14   dealing with this issue in the last several weeks, what do you

15   believe would be the time and cost involved in going to

16   wherever they keep the gizmos that were the system, the

17   Backpage system, and getting it all up and running the way it

18   did as of April 6, 2018?

19   A.  Everything running?  I mean, everything?

20   Q.  Not so it could be public, everything running so it was in

21   the condition it was when they took it and would have all the

22   features it had then, but not a feature that allows people to

23   post new ads.  We're not trying to make a live Web site, I'm

24   just talking about -- so do you remember there was a question

25   asked of you whether -- well, strike that.

1          The question would be what do you think would be the

2     time and money for all of us in this room that are relevant to

3     this case to have the ability to go on the Web site and search

4     for things that we think are relevant to this case of the

5     nature that we went over with you?

6     A.   Being -- trying to be very specific, as I am, I would want

7     to get clarity of the scope, and I just want to give you some

8     clarity.  Having this page working is clarity of scope.  Having

9     this page working and all of these elements is clarity of

10    scope.  So if that's the question, I could be able to get you

11    an estimate on that.  If it's open ended, it's harder to be

12    able to --

13    Q.   Well, let me take those two and add just a couple more.

14    A.   Okay.

15    Q.   What if someone wanted to check and run a search or

16    configure things to see how many referrals to NCMEC, the child

17    abuse entity, did Backpage make in a certain time frame?  So

18    that was something that was capable when the system was

19    running, right?

20    A.   I don't remember that specific query.  I do remember ads

21    being flagged with NCMEC, but not that specific data query.  I

22    just don't remember that one.

23    Q.   Okay.  Well, one way or the other, would one, when it was

24    operating, be able to take a time frame and either run a report

25    or do a survey to find the number of referrals to NCMEC based

1   on the data?

2   A.   If it previously did that, it could do it again.  If that

3   answers your question.

4   Q.   Okay.  Similarly, what about a system that would be able to

5   show what moderation terms were in play and on how many ads was

6   moderation utilized?  That was a feature that could be done --

7   A.   Yeah.

8   Q.   -- back when it was running, right?

9   A.   The first part, yes.  The second one of how many ads were

10  moderated, period, I believe there were counts for those too.

11  Q.   Okay.  So just to kind of, I guess for ease of where we are

12  now -- and I'm certainly not saying this is exhaustive -- but

13  if we just take those four components, the ability to do the

14  two things that I've gone over with you and you highlighted,

15  and those two other features that I just mentioned, how much

16  time and how much money would you estimate it would take,

17  assuming that the government gave you access to the components?

18  A.   In my head, I'm just walking through how we'd have it --

19  you're saying access to the actual servers by the components?

20  Q.   There is an assumption there, but, yes, sir.

21  A.   You know, I -- I wouldn't want to estimate anything other

22  than a few months of time, you know.  For simple questions, I

23  could estimate something in days or hours, but you're asking --

24  a lot of the items that you're asking for are reports, full

25  functionality of the object editor I heard in there, the pages

1    that these go to when you click on, it's pretty much getting

2    the site up to a read only level.

3    Q.  Right.  And that's really what I'm looking for, a read only

4    level.

5    A.  Yeah.  You know, and I -- I wouldn't want to estimate less

6    than a couple of months and at least a couple of people during

7    that time.

8    Q.  And how much money, both in terms of time and components,

9    do you believe that project ballpark would be?

10   A.  I would say somewhere between 30 and $50,000.

11   Q.  Okay.  Is this a good --

12   A.  That's a really -- that's -- that scope was really loose.

13   I would want to -- you know, if you had a full scope written

14   out.

15   Q.  I guess the challenge would be to come up with what was the

16   system capable of when it was operating if it were then just

17   placed off line but in a read only, and that's the thing we

18   would be seeking to be able to accomplish?

19   A.  Right.

20   Q.  And would you be somebody who, assuming you could find your

21   notes and look at things to kind of remind yourself of what you

22   had designed and functioning back in April of last year, is

23   that something that you would have information that you think

24   you could sketch out as to what all those things were to help

25   us arrive at what the scope was?

1  A.  Yeah, I think I'm probably the most appropriate for that.

2          MR. BIENERT:  I see it's 12:15, Your Honor.  Is this a

3  good breaking point?  I thought you said you wanted to break at

4  12 --

5          THE COURT:  I did.  Mr. Stone looks like he's --

6          MR. STONE:  I would just say, if he's done, I only

7  have about five minutes, we can be done with the witness.

8          MR. NEUMAN:  I have some questions.

9          THE COURT:  Okay.  We're going to recess for lunch, so

10  you're going to have to come back.  Sorry.

11          So we'll break for an hour and we'll get started at

12  about 1:20.  Thank you.

13          (Lunch recess, 12:15 p.m. - 1:21 p.m.)

14          THE COURT:  We're back on the record with counsel and

15  the parties present.

16          MR. BIENERT:  The one thing I was going to do, I would

17  move at this time into evidence Exhibit 103.

18          MR. STONE:  No objection.

19          THE COURT:  Okay.  103 will be admitted.

20          MR. BIENERT:  Thank you.

21          MR. NEUMAN:  May I proceed, Your Honor?

22          THE COURT:  Yes.

23          MR. NEUMAN:  Thank you.

24

25                          CROSS-EXAMINATION

1    BY MR. NEUMAN:

2    Q.   Good afternoon, Mr. Gerken.

3    A.   Good afternoon.

4    Q.   I want to focus on a different area, but before I get to

5    it, you were asked by the prosecutor about the document

6    retention or data retention policies, you said you were aware

7    that there is some policy but you didn't know the details of

8    it, right?

9    A.   That's correct.

10   Q.   Are you also aware -- so you don't know, for instance,

11   excuse me, you don't know how long data was kept on the

12   Backpage servers, correct?

13   A.   No.

14   Q.   And are you aware that during the course of Backpage's

15   existence in the years leading up to this seizure in April of

16   2018, that there was -- Backpage was involved in significant

17   amounts of litigation?

18   A.   Yes, I believe so.

19   Q.   And are you aware that, as to all of that litigation, or

20   most of it, litigation holds were put in place, such that data

21   was retained for much longer than what might be otherwise a

22   data retention policy?

23   A.   Yes.

24   Q.   Okay.  And do you know how long that data was retained or

25   do you not know that either?

1    A.   No, I wouldn't know the specifics.

2    Q.   But you're generally aware?

3    A.   Yeah.

4    Q.   Thank you.  So what I'd like to focus on is what we've been

5    talking about this read only version, versus the two server

6    version, I'll call it.  Okay?

7    A.   Okay.  That works.

8    Q.   Because that's really what this hearing, in some ways, is

9    about.

10   A.   Okay.

11   Q.   And just starting with the read only version, you said you

12   testified that now it would take you potentially a couple of

13   months and some tens of thousands of dollars to create a read

14   only version at this point, right?

15   A.   Correct, a similar system.

16   Q.   A similar system.

17        Now, first of all, that is assuming that all of the

18   data was imaged correctly, right?

19   A.   True.

20   Q.   So if some of the images that the government has or has

21   provided to the defense are not imaged correctly, makes it even

22   harder, right?

23   A.   Yes.

24   Q.   Same thing when we're talking about these two server

25   versions, right, if some of that data -- and we'll get into

1    specifics -- was not imaged correctly, what we were talking

2    about, accessibility to data and such, sort of goes out the

3    window, right?

4    A.  Yes.

5    Q.  Okay.  Now, on the day of the search the government had

6    told the judge that they were going to seek contextual

7    information necessary to understand the evidence.  It sounds

8    like you were not asked for any contextual information such as

9    IP addresses of the various servers and the like, right?

10   A.  Um, I don't recall being asked that, no.

11   Q.  Okay.  And you were not asked about the interrelationship

12   of the various system components, correct?

13   A.  At the time of the seizure, no, I don't recall that.

14   Q.  Okay.  And at the time of the seizure, it sounds like you

15   had that information readily in hand, correct?

16   A.  True, yes.

17   Q.  Could have provided it upon request, essentially?

18   A.  Yes.

19   Q.  Now, assuming that the data is all intact, it would take

20   you several months to create a read only version.  If you had

21   been asked on April 6, 2018, to create a read only version,

22   before anything was taken apart, how long would it have taken

23   you, approximately?

24   A.  Before anything was taken apart?

25   Q.  Before -- when they walked in the door, disconnected it

1 from the internet, right, because we don't want the public

2 accessing it, posting to it, we don't want it changing, right,

3 but it's -- everything -- the servers are still in, nobody from

4 the government has touched it, how long would it take you --

5 have taken you at that point to create a read only version,

6 approximately?

7 A.  The main thing that wouldn't function would be domains, so

8 a day or two.

9 Q.  A day or two?

10 A.  Yeah.

11 Q.  And if you were asked to create two versions at that point,

12 one for the prosecution and one for the defense, essentially,

13 double that time, maybe four days?

14 A.  Two versions, like split it off into two?

15 Q.  Two read only copies.

16 A.  Two read only copies.  Um, I probably feel more comfortable

17 saying a couple weeks in that case.

18 Q.  Okay.  Couple meaning about two weeks?

19 A.  Yes.

20 Q.  Okay.  And what would the cost have been at that point

21 having in hand all of the interrelationship data and IP

22 addresses and stuff, significantly less than your estimate now?

23 A.  Yes.

24 Q.  Would have been a pretty different story, essentially,

25 right?

1    A.   It would have been.

2    Q.   Okay.  And, again, at that point there wouldn't have been

3    any question about the integrity of the data, meaning whether

4    these images contained all the data accurately, because it

5    would have still been housed at DesertNet at that point, right?

6    A.   Correct.  Your --

7    Q.   I'm sorry.

8    A.   Your scenario is assuming nothing was shut down, correct,

9    just disconnected from the internet?

10   Q.   Disconnected from the internet so that the public no longer

11   has access.  You go to Backpage.com and you get some sort of

12   error, right?

13   A.   Yes.

14   Q.   That's easy to do, right?  Maybe -- in fact, it might be

15   worth just explaining -- I keep hitting these -- that it would

16   be relatively easy to disconnect the Web site from the internet

17   such that the public could no longer access it but still

18   maintain the various functionality as we've talked about on the

19   back end, right?

20   A.   Yes, that's correct.

21   Q.   That's very, very easy?

22   A.   Very easy.

23   Q.   That's, in fact, how you build a Web site, you build it up

24   without it being connected to the internet, and the very last

25   thing you do is hit the switch so the public can access it?

1   A.  Could be.  In my case probably not, but, yes.  Yeah.

2   Q.  Okay.  I'm no expert.

3   A.  It works.  Your definition works.

4   Q.  All right.  Fair enough.

5           Now, we talked a little bit about the difference --

6   the difference between the read only version and the two server

7   version when we were looking at Exhibit 103, which was this ad

8   and the back end -- what I'll call the back end, or

9   administrative data, I think you called it the object editor?

10  A.  Yes.

11  Q.  Okay.  That would all be accessible in this same format in

12  a read only version, right?

13  A.  In the scenario you painted, yes.

14  Q.  I'm asking even if -- even if today you were able to

15  recreate a read only version --

16  A.  Yes.

17  Q.  -- you would have access to that?

18  A.  Yes.

19  Q.  Okay.  And in the two server version, this format, at

20  least, is not available, correct?

21  A.  The data is available?

22  Q.  This format.

23  A.  Correct.

24  Q.  All right.  Because I want to talk about format, because

25  while the government has asked you about putting aside

1    convenience, I want to focus on convenience for a little bit,

2    actually.  Okay?

3    A.  Okay.

4    Q.  So this, as we said, this object editor would be available

5    in a read only version.  This object editor doesn't take any

6    expertise to read, does it, in your opinion?

7    A.  Expertise to read, I'm not sure I --

8    Q.  If I look at this object editor, I don't need to know MySQL

9    language, do I?

10   A.  Correct.

11   Q.  I don't need to be familiar with the jail system, right?

12   A.  Correct.

13   Q.  I don't need to know ZFS, right?

14   A.  Correct.

15   Q.  I can probably do it as a lawyer, right?

16   A.  Correct.

17   Q.  Okay.  If I want to get at this data on this two server

18   system, I got to have at least some of that expertise, you said

19   at least the MySQL stuff, right?

20   A.  That's true.

21   Q.  And, potentially, depending on how things are arranged,

22   ZFS, FreeBSD, jail, all of that expertise, potentially, as

23   well, right?

24   A.  I agree.

25   Q.  And, again, all of that is assuming that the data is imaged

1    accurately?

2    A.  Correct.

3    Q.  The two server version --

4         MR. NEUMAN:  Your Honor, I would like to show the

5    witness --

6    BY MR. NEUMAN:

7    Q.  Well, in fact, before I do that, and just to make the point

8    a little clearer, Mr. Gerken, the back end administrative data

9    that we were talking about, the object editor and such, to your

10   knowledge, Carl Ferrer didn't have any expertise in MySQL and

11   such, right?

12   A.  To my knowledge?

13   Q.  Yeah.

14   A.  No.

15   Q.  And, to your knowledge, the other folks who were accessing

16   this data while they worked at Backpage and actually using it

17   in real time, they were using this object editor version not

18   some other version, right?

19   A.  Correct.

20   Q.  Okay.  Now, it's not as simple to say that you just need

21   two servers, right, because each server is made up of how many

22   hard drives, potentially?

23   A.  That's -- that's a hard one to remember.  Many.  We'll say

24   often more than 10.

25   Q.  Often more than 10.  Sometimes more than 20?

1    A.   Potentially, yes.

2    Q.   Okay.  And each one of those has several thousand paths

3    that connects those hard drives to make the server work, right?

4    A.   Could you rephrase that?

5    Q.   Well, those hard drives, those 10 or 20 hard drives, or

6    more, potentially, that make up a server, they have to be

7    connected in a certain way for that data to be accessible,

8    correct?

9    A.   Yes.

10   Q.   So if the government, when they took those servers, pulled

11   out the individual hard drives, didn't necessarily keep track

12   of what went where, and then said, okay, here's all the hard

13   drives from that server, it's not the same thing as what they

14   took from DesertNet, is it?

15   A.   They were intact when they were removed.

16   Q.   And it would make a difference if some of those hard drives

17   were pulled out, the order wasn't notated anywhere of what --

18   how they were pulled out, and then during the course of the

19   imaging process, some of -- at least some of those images were

20   corrupted, that would be a very different scenario, correct?

21   A.   Yes.

22   Q.   So if you were to understand, if somebody was to testify

23   that images of hard drives taken from a database server are, in

24   fact, corrupted and not accessible, even having all of the

25   expertise that you described, all those questions that the

1    prosecutor asked you about access to the data being the same

2    and so on and so forth, again, out the window, right?

3    A.  If the data is corrupt, it's not accessible.

4    Q.  Okay.  Now, you talked about the difference between the two

5    server version and the read only version, and one of the things

6    you said is that the two server version, theoretically, has all

7    the data there, assuming it was imaged correctly, but it's in

8    raw form.  And by raw form do you mean CSV form?

9    A.  No.  It would be in the database.

10   Q.  Okay.

11   A.  So it would be the text or whatever integer decimal,

12   whatever type of data it was, it would be in that native state,

13   and that would be --

14   Q.  What does the native state look like to some of us who

15   don't have computer expertise?

16   A.  Like an Excel spreadsheet.

17          MR. NEUMAN:  Your Honor, I have Exhibit J.  It was

18   already filed.  It's Document 64311.  I don't know if you want

19   me to mark it as an exhibit or we can just -- I'm fine using it

20   as -- however the Court wants me to.

21          THE COURT:  No, but, I'm sorry, can you repeat the

22   number?

23          MR. NEUMAN:  It's Exhibit J to the -- well, Document

24   Number 64311.

25          THE COURT:  643.

1        MR. NEUMAN:  I have a copy for the Court.

2        COURTROOM DEPUTY:  We can make it Defendant's Exhibit

3   104.

4        THE COURT:  Do you want to make it an exhibit?

5        MR. NEUMAN:  May be easier.

6        THE COURT:  So it will be 104.

7        MR. NEUMAN:  May I proceed, Your Honor?

8        THE COURT:  Yes.

9        MR. NEUMAN:  Okay.

10  BY MR. NEUMAN:

11  Q.  Mr. Gerken, do you have that in front of you?

12  A.  I don't believe I do.

13  Q.  I'm sorry.  I wasn't sure where we were in the process.

14  A.  Yes.

15  Q.  Do you have that now?

16        So looking at what is, I guess, 104, is this what you

17  mean by the raw form in an Excel spreadsheet for a particular

18  ad?  Does this look like what that would be?

19  A.  Yes.

20  Q.  So doesn't look like the Web site, what we think of as a

21  Web site, Exhibit 103, they don't necessarily go together, but,

22  effectively, am I right, that 103 is what it would look like in

23  a read only version, if that existed, and 104 is what that same

24  ad or a similar ad looks like now in the two server version?

25  A.  Yes, 104, Exhibit J --

1    Q.   Yes.

2    A.   -- the two server is the raw format and that's how it would

3    look like.  The read only, which would be getting the system

4    working again, would look like the exhibit in your right hand.

5    Q.   And let me ask you, if you even had this 104 data for every

6    ad and you were able to pull it out, how long might that take,

7    or how long -- do you know how long it takes to pull this for a

8    particular ad or no?

9    A.   If you had this database and you wanted to just pull out

10   one ad?

11   Q.   Yeah.

12   A.   Once you knew the schema, that's just a single query.

13   Q.   There is no way, is there, to turn Exhibit 104 and make it

14   look like Exhibit 103, correct?

15   A.   No way?

16   Q.   Well, no way unless we start recreating the read only

17   version at least, right?

18   A.   Or an equivalent, I would say.

19   Q.   Or an equivalent.  Fair enough.  But as -- if I represent

20   to you that as things stand we only have the two server

21   version, I can't turn this into this, 104 into 103, right?

22   A.   Not without doing more work.

23   Q.   Okay.  And that work would be extensive?

24   A.   Yes, it would range what a developer would charge to do

25   that.

1   Q.  I didn't mean -- I didn't say expensive, I said extensive.

2   A.  Oh, I thought you said --

3   Q.  Either way?

4   A.  Yeah, it would be extensive.

5   Q.  Okay.  And in terms of the queries that were available --

6   I've lost my exhibits -- in Exhibit 103 with the object editor,

7   to run those queries would potentially take much more time and

8   expertise, right?

9   A.  Yes, more time.

10  Q.  Well, let me ask you this.  You agreed with me before that

11  even I, or any other lawyer, could probably run the queries

12  through the 103 object editor, right?

13  A.  Technically, you wouldn't be running a -- a query is what's

14  producing this, but if you were reading this in the

15  application, you wouldn't be using SQL.

16  Q.  Fair enough.  But if I want to go see the other three ads

17  by the user on this site, I could just click a button on the

18  read only version, right?

19  A.  That's correct.

20  Q.  Whereas in the two server version, I've got to have an

21  expert familiar with all these other computer languages run

22  whatever they have to run to go find those other ads, right?

23  A.  Yes.  They would need to execute that specific instruction,

24  which is what that would be.

25  Q.  And it still won't look like this or the other ads --

1    A.   No.

2    Q.   -- that come up from that user won't show up in this format

3    either, right?

4    A.   No.

5    Q.   Okay.  So when we talk about setting aside convenience,

6    would you agree with me that if -- comparing the two server

7    version to the read only version, that the read only version is

8    more easily searchable and manipulable, would you agree with

9    that, for a non expert?

10   A.   Yes.

11   Q.   Okay.  And would you agree with me that the -- given the

12   ease with which a read only version can be searched, converting

13   the Web site into this two server version has, at least to some

14   degree, degraded the searchability?

15   A.   By a non expert.

16   Q.   Yes.

17   A.   Yes.

18   Q.   Okay.  Well, and it's not just that, right, because before

19   somebody could pull up these ads in the format that they looked

20   like, and now, at least assuming we have this two server

21   version, they can't, right?

22   A.   They would not look like that, correct.

23   Q.   So it's not just the utility, in terms of searching, but

24   also the utility in terms of displaying that has changed,

25   correct?

1   A.  Correct.

2   Q.  So, for instance, if -- let's just say somebody says that

3   they took a picture of an ad on the Web site with a phone,

4   right --

5   A.  Uh-huh.

6   Q.  -- and I want to, as the lawyer in this case, show what

7   that ad actually looked like, let's say it was, had been

8   changed at some point after that picture was taken, in the read

9   only version I could do that, correct?

10  A.  Correct.

11  Q.  Now, in the two server version I can't do that, right?

12  A.  You would have the same data.  It would not look the same.

13  Q.  I want to be able to show a judge or a jury what the Web

14  site looked like.  Okay.  That's what I'm trying to do.

15  A.  Yep.

16  Q.  I can't do that with the two server version, right?

17  A.  Two server version by itself, no.

18  Q.  Okay.  And so if they have -- if the government has an

19  expert who says, I looked at all these ads and they were all

20  obviously for prostitution, and I want to challenge that expert

21  by showing her ads from the actual Web site, I can't do that

22  anymore with the two server version, right?

23  A.  You can't show this.

24  Q.  That's right.

25  A.  The ad.

1   Q.  Okay.  The convenience that we talk about, right, we

2   said -- the prosecutor said, setting aside convenience, the

3   convenience that we're talking about is, one, the ability of a

4   non expert to access this data, correct?

5   A.  Correct.

6   Q.  So if I'm sitting in the middle of a trial and I need to

7   access a Web page or a witness is on the stand, in the read

8   only version I could do that, in the two server version, I

9   can't do that, right?

10  A.  Again, I'd qualify saying, you would still have the same

11  data but it would not look the same.

12  Q.  Okay.

13          MR. NEUMAN:  Just one second, Your Honor.

14          THE COURT:  All right.

15  BY MR. NEUMAN:

16  Q.  And, Mr. Gerken, I think just to make sure we're all on the

17  same page here, everything we're talking about assumes that the

18  data was imaged correctly, right?  If the -- if the data is not

19  imaged correctly at this point, meaning for whatever reason it

20  was corrupted after the government took it, we don't know what

21  is, potentially, accessible and what's not accessible at this

22  point, right?

23  A.  Correct.

24  Q.  Okay.

25          MR. NEUMAN:  I have nothing further.  Thank you, Your

1    Honor.

2              THE COURT:  Is there anyone else?

3              (No audible response.)

4              THE COURT:  Redirect.

5              MR. STONE:  Thank you, Your Honor.

6                         REDIRECT EXAMINATION

7    BY MR. STONE:

8    Q.   Exhibit 103, Exhibit 104, those are the two exhibits

9    Mr. Neuman was just asking you questions about, assuming

10   they're for the same ad, what data is different in 103 than

11   104?

12   A.   No data should be different.

13   Q.   It's the exact same?

14   A.   It should be, yes.

15   Q.   There were a lot of questions about, hey, why couldn't the

16   government have just taken the servers off line and left the

17   servers in place at the data center in Tucson.  Do you remember

18   those questions?

19   A.   I do.

20   Q.   Is it true that even if the servers are off line, if they

21   continue to run, scripts continue to run?

22   A.   That's true.

23   Q.   Does the data then change if it continues to run?

24   A.   Yes.

25   Q.   So even if it were off line, if the servers continued to

1  run, it would be difficult to determine what evidence existed

2  on April 6, 2018, and anything after that date, because the

3  machines would still be active?

4  A.  Yes, if the machines were allowed to be active, yes.

5  Q.  Any idea what it costs per month to house the Backpage

6  servers at the data center?

7  A.  Oh, I don't recall the number.  It was a lot.  Um, you

8  know, upwards of 30,000.

9  Q.  Mr. Bienert went through Exhibit 103 in detail with you.

10  And if you turn to the back pages, then there were a number

11  of -- there is a number of information boxes in what was

12  referred to as an object editor; is that correct?

13  A.  Correct.

14  Q.  And I think you mentioned that the information here are

15  simply queries; is that right?

16  A.  That's true.

17  Q.  So what do you mean when you say that?

18  A.  This is a representation of all of the invoice data on this

19  particular page.  This invoice data may be stored in different

20  tables in the database, potentially even in different

21  databases.  This is pulling together all of those pieces to

22  provide a representation of all of the invoice data for their

23  users, staff.

24  Q.  And if you had the databases right now, would you be able

25  to obtain the same information?

1   A.  Yes.

2   Q.  If defendants sent you a list, sent you, Mr. Gerken, a list

3   of categories of information that they would want to see in

4   terms of queries to run in the database, would you be able,

5   just off a database server, to run those queries and provide

6   that information?

7   A.  Yes.  If the database server had these particular databases

8   and we could see the schema again, or I could see the schema

9   again, yes.

10  Q.  Again, assuming that nothing is corrupted and that the

11  master database server was provided in full?

12  A.  Yes.

13  Q.  Mr. Bienert asked a lot of questions about the read -- sort

14  of setting up a read only site; is that right?

15  A.  Yes, correct.

16  Q.  And you answered it would take some time and it would cost

17  some money, 30 to $50,000 maybe is about the estimate you gave?

18  A.  Right.

19  Q.  And I just want to be clear.  When you're answering those

20  questions, that was just related to how the data would be

21  presented; is that right?

22  A.  Well, both, actually.  Yes, the majority of that was how

23  the data would be presented, but we'd also need to get the

24  databases set up, get the images, you know, all of your basics

25  that you would need just for the two server version.

1   Q.  All right.  Let's assume you have the two servers in place

2   and you have the databases and you have all that information.

3   When he was asking you questions about it would take two to

4   three months and it would cost this amount of money, that was

5   to write whatever code you would need to make the presentation

6   of the data prettier, basically?

7   A.  In this similar format to Exhibit 103.

8   Q.  And would it -- strike that.

9          But if someone just asked you for the information, not

10  how it looked, but just the information, would you be able to

11  provide it if you had the --

12  A.  Yes.

13  Q.  -- database servers?

14  A.  Yes.

15  Q.  And that's not just someone like you who could provide it,

16  I think you testified that somebody who was familiar with SQL

17  and SQL databases would be able to access that information; is

18  that right?

19  A.  That's correct.

20  Q.  There is also the image server and there are pointers, I

21  believe you testified, that would show what image goes to which

22  ad; is that right?

23  A.  Correct.

24  Q.  So if somebody had that information, they'd be able to

25  recreate at least what data was on the ad and what pictures

1    were on the ad, correct?

2    A.  Yes.

3    Q.  And, again, I think Mr. Bienert was talking about

4    connecting components and -- and putting things together before

5    you would even be able to access the database.  That's not

6    quite right, is it?

7    A.  Um, it's one way to do it.

8    Q.  But if you're just running the manual queries, you don't

9    need to attach anything, you just need the database?

10   A.  Correct.

11   Q.  And there was some questions about IP addresses to

12   reconnect the servers to access the data.  Same question.  If

13   you had the database, you wouldn't need any IP addresses or

14   anything to access the data?

15   A.  That's also correct.

16   Q.  Sir, has anyone from the defense contacted you to ask for

17   assistance in accessing the data?

18   A.  To actually ask for assistance?

19   Q.  Asking for your assistance to access it?

20   A.  Um, there was one conversation, yes.

21   Q.  Was that recent?

22   A.  Recent.

23   Q.  Within the last week?

24   A.  Yes.  Assistance is a strong word, though, you know, it was

25   a conversation.

```
 1   Q.  A general conversation about --

 2   A.  Yes.

 3   Q.  -- maybe what you knew?

 4   A.  Yes.

 5   Q.  As it related to this hearing.

 6           MR. STONE:  No further questions.

 7           THE COURT:  Okay.  I have one, maybe two questions for

 8   you.

 9           Because you talked about an image server.

10           THE WITNESS:  Yes.

11           THE COURT:  And in the image server, if you wanted to

12   get an image off of it, an actual picture, do you get the

13   picture or do you get just the data that says it's a picture?

14           THE WITNESS:  It's a good question.  You would get the

15   picture.  You would get the file, or the JPEG.

16           THE COURT:  So you would get --

17           THE WITNESS:  You get the file of --

18           THE COURT:  -- where you see an actual image?

19           THE WITNESS:  Yes, you would.

20           THE COURT:  Okay.  Because Exhibit 104 doesn't have

21   any --

22           THE WITNESS:  No it doesn't.

23           THE COURT:  -- pictures.  So this is just data from

24   the data portion?

25           THE WITNESS:  It is.  I didn't look through every page
```

1  here, but in here will be what they referenced as pointers to

2  the image, which might be just a URL, direct URL to the image.

3  It could be a numeric value to the image, so there is some --

4  there is something in here that tells you that's the image.

5          THE COURT:  And it tells you where to go in the image

6  server to find it?

7          THE WITNESS:  That's correct.

8          THE COURT:  Okay.  Then in the --

9          THE WITNESS:  Yeah.  And they are URLs.

10         THE COURT:  Okay.

11         THE WITNESS:  I'm seeing them.

12         THE COURT:  Thank you.

13         I think in cross-examination there was a scenario

14  where you would be asked to move the whole database off line.

15         THE WITNESS:  Uh-huh.

16         THE COURT:  And you said that could be done.

17         THE WITNESS:  When he was asking to move it to another

18  facility, was that the question?

19         THE COURT:  Right.

20         THE WITNESS:  Yes.

21         THE COURT:  And it's off line.  Once you reconnect it

22  and it's running, is it affecting the data?

23         THE WITNESS:  It's a good question.  The clarity on

24  it, um, I don't recall who mentioned fronds or scheduled

25  events, and there was some discussion of retention --

1          THE COURT:  Right.

2          THE WITNESS:  -- as time goes by, ads expire,

3    retention policies kick in, so old ads might get deleted.  Some

4    ads may actually have the opposite, they may come live.  They

5    might have been scheduled.  There is a way to avoid that

6    though, which I think is the heart of the question you might

7    have.

8          THE COURT:  And what's that?

9          THE WITNESS:  To put the file system also in a read

10   only mode, have the databases in a read only mode, disable

11   those processes as well, find them and disable them.  But the

12   read only mode should take care of it.  It really means you

13   can't write, can't change.

14         THE COURT:  So if you're in read only and you're

15   running all these searches and pulling up things, that doesn't

16   affect the data.

17         THE WITNESS:  No, it doesn't.  It can't.  It's read,

18   it's literally collecting information, not allowed to -- to

19   change it or edit it, delete it, add to it, all those are

20   writes, so you can't do that.

21         THE COURT:  And so if it's in read only, then the

22   retention process, if it existed, whatever it was, would stop?

23         THE WITNESS:  It would error.  It would fail, correct.

24   Yeah.

25         THE COURT:  Okay.

1          THE WITNESS:  It couldn't -- the answer is, yes, it

2     would stop.

3          THE COURT:  But then if it errors, isn't that

4     affecting the data?

5          THE WITNESS:  It's not.  It's just the, um, pointing

6     out that it tried to run and it couldn't run.

7          THE COURT:  Okay.  Does anybody have any follow-up

8     questions based on what I asked?

9          MS. BERNSTEIN:  Just one, Your Honor.

10                    FOLLOW-UP QUESTIONS

11    BY MS. BERNSTEIN:

12    Q.  So, Mr. Gerken, if I'm understanding the read only

13    description that you just gave to the judge correctly, it

14    freezes the data in time exactly as it existed the moment you

15    put it into read only mode?

16    A.  That is correct.

17         MS. BERNSTEIN:  Thank you.

18         THE COURT:  Okay.  I don't see any other questions.

19    You may step down.

20         THE WITNESS:  Thank you.

21         THE COURT:  Thank you.

22         Your next witness.

23         MS. PERLMETER:  Thank you Your Honor.  The government

24    calls Matthew Frost.

25                    MATTHEW FROST,

1   called as a witness herein, having been first duly sworn, was

2   examined and testified as follows:

3                          DIRECT EXAMINATION

4   BY MS. PERLMETER:

5   Q.   Good afternoon.   Please introduce yourself.

6   A.   My name is Matthew Frost.

7   Q.   And what do you do and where do you work?

8   A.   I work for the FBI as a computer -- sorry, information

9   technology specialist, forensic examiner, in Pocatello, Idaho.

10   Q.   And how long have you had the job -- job duties of an

11   information technology specialist, forensic examiner?

12   A.   Just over ten years.

13   Q.   And have you been working in that capacity the entire time

14   you've been with the FBI?

15   A.   As a full-time employee, yes.   I had a -- I was a -- I had

16   an internship with the FBI that was unpaid, and then I was a

17   temporary part-time employee as a transcriptionist while I was

18   in -- at ISD.

19   Q.   What is your educational background?

20   A.   I have a bachelor's in economics, with a master's degree in

21   -- an MBA, master's in business administration, with an

22   emphasis in information assurance.

23   Q.   And what do you do currently for the FBI as a forensic

24   examiner?

25   A.   I conduct forensic examinations.   So we take digital media,

1    when the request comes in, a case agent asks for a piece of

2    media, a server, cell phone, hard drive, a server to be

3    examined, and then with valid legal authority I conduct the

4    examination, create images, extract data, and then present

5    reports and findings back to the requestor.

6    Q.   Have you taken any Linux specific courses that help you

7    perform your job duties?

8    A.   Yes, I have.  I have taken a couple Unix forensics courses

9    within the FBI, and then I have taken outside vendor Linux

10   training.

11   Q.   Do you have any certifications?

12   A.   Yes.  I am a certified Linux forensics practitioner.

13   Q.   Do you hold other certifications as well?

14   A.   Yes, sorry.

15   Q.   That's okay, but you do have some certifications that are

16   specific to Linux?

17   A.   Yes.

18   Q.   Do you have any teaching experience in the Linux/Unix area?

19   A.   Yes, I have conducted several training -- trainings within

20   the FBI.  I have traveled and taught new examiners the tools

21   and techniques of Linux examinations, as well as web-based

22   training where I create training on a specific topic, um, like

23   RAID or ZFS or image mounting, and I presented that to a web-

24   based audience within the FBI.

25   Q.   And have you testified in court regarding your work done as

1  a forensics examiner for the FBI?

2  A.  Yes, I have.

3          MS. PERLMETER:  And, Your Honor, Mr. Frost's resume is

4  on the docket under 4222 if the Court wants to review his other

5  work history.

6          THE COURT:  All right.

7  BY MS. PERLMETER:

8  Q.  Mr. Frost, this afternoon I want to break down your

9  testimony into, basically, four main areas.  First I'd like to

10  talk about your work and the FBI's work in retrieving the

11  Backpage related servers from Amsterdam; second, I wanted to

12  talk to you about the forensic images that you made of the

13  servers that were later disclosed, the servers that came from

14  both Tucson, as well as Amsterdam; third, I would like to ask

15  you some questions about computer hardware and software that is

16  related to the Backpage servers; and then, lastly, I would like

17  for you to demonstrate for the Court how a person can access

18  the data that has been extracted from the Backpage servers.

19  Okay?

20  A.  Yes.

21  Q.  So let's start with the investigation.  When were you, when

22  did you become involved in the Backpage investigation?

23  A.  I received a request in April or early May of 2018 to come

24  to Phoenix, Arizona, to look at some servers that had been

25  seized.

1  Q.  And so when you were asked to assist in this case, were the

2  Backpage servers already shut down?

3  A.  Yes, they were.

4  Q.  All right.  Did you have any involvement in this case when

5  the Web site was live and running?

6  A.  I did not.

7  Q.  So what did you do to familiarize yourself with this case?

8  A.  I came to Phoenix and I met with the case agents.  They

9  briefed me on the background of the case and the servers they

10  had seized.  And that's the familiarization I received.

11  Q.  Do you know why you were asked to help with the

12  investigation of this case?

13  A.  Yes.  A call -- a request came out for a Linux/Unix

14  forensic examiner to come look at the servers.  They were

15  identified as being in the category of Linux/Unix.

16  Q.  And during that first visit to Phoenix to meet with the

17  case agents, were you able to preview any of the servers that

18  had been seized from the Tucson facility?

19  A.  Yes, I had.

20  Q.  And what were you able to learn from that preview?

21  A.  I learned that there was lots and lots of data, many, many

22  servers.  And I, not knowing the architecture of the network or

23  what the roles of each of the servers, we just picked servers

24  based on, this server looks like it will hold a lot of data, so

25  I will pull this out and preview it in a forensic manner in a

1    read only mode so that the data integrity would be preserved.

2    And I looked at the systems with an initial tool to see if I

3    could see the data.

4    Q.  And with that initial tool that you used, were you able to

5    see the data?

6    A.  I was not.  I could see the physical drives but I couldn't

7    see the logical data inside those drives.

8    Q.  And so what is the difference between a physical drive and

9    the logical data that you were unable to see?

10   A.  Physical drive is the hardware that once it's connected to

11   a computer it's presented as a physical drive, and then

12   depending on what operating system, how it interacts with the

13   physical drive, if it can mount or look at the data inside the

14   drive, the logical drive, the file system, the data.

15   Q.  Did you then use other tools to help you to see the logical

16   data in these servers?

17   A.  Yes.  Having looked at the physical drives, I looked at the

18   hex value of the data inside the physical drive, so not the

19   file system, but the hex value or the -- the raw, raw data, and

20   it was determined that it was a ZFS file system.  I saw

21   indicators that it was a Z pool and a ZFS file system, so then

22   I got ZFS specific tools to look at it.

23   Q.  All right.  So I will come back to ZFS and Z pools later

24   on, but at this point in this first meeting with the case

25   agents, during your preview were you able to identify the

1   master base server as well as the server that contained the

2   images?

3   A.  I was able to identify a database server and image -- or

4   servers that were image servers.

5   Q.  And, at this point in time, the servers in Amsterdam were

6   still in Amsterdam?

7   A.  Correct, powered down but in Amsterdam.

8   Q.  So then fast forward to June of 2018.  Were plans made for

9   the FBI to travel to Amsterdam in an attempt to retrieve those

10  servers?

11  A.  Plans were made to travel to Amsterdam, not to initially

12  retrieve them, but to verify what was there on those servers.

13  Q.  Was this June 8, 2018, the first time the FBI was able to

14  travel to Amsterdam to view the information and equipment that

15  was being housed out there?

16  A.  Yes.

17  Q.  Okay.  Prior to going out, what was the plan, what was the

18  plan for this trip?

19  A.  Because I had traveled to Phoenix and I saw all the servers

20  and I was quite overwhelmed with the number of servers, it was

21  just voluminous in nature, planning to go to Amsterdam I had

22  been informed that there were two -- two copies of the data, so

23  one was in Tucson and one was in Amsterdam, so knowing we had

24  two copies, I had made plans and had consulted other forensic

25  experts with the plan to go to Amsterdam and verify what was on

1    those servers, verify we could match up database servers, image

2    servers, and then isolate those servers from the internet so

3    they could be left exactly how they were intact in an

4    enterprise environment that we could then, through technology,

5    access through encrypted channels so that no one else could

6    access the data but us.

7    Q.  So before going out to Amsterdam, it was the plan of the

8    FBI to potentially isolate the servers so that they could be

9    remotely accessed by the FBI from the United States?

10   A.  Yes.

11   Q.  Okay.  Did that happen?

12   A.  It did not.

13   Q.  Okay.  So what happened?

14   A.  We -- when we flew to Amsterdam, we met with the Dutch

15   national police, the high techs crimes unit.  We met with them

16   and presented the legal authority to MLAT for us to request

17   information from their government as the United States, it's

18   us, not me.  We presented with them the legal authority and

19   then our plan for how we wanted to -- what we wanted to do with

20   the data.  When we presented that plan to the high tech crimes

21   unit, the lead investigator, or lead examiner, he had to

22   consult with the prosecutor to see what would be allowed under

23   Dutch law.

24   Q.  So when you arrived in Amsterdam, did you have a meeting

25   with members of the Dutch police?

1    A.   Yes.

2    Q.   Okay.  And when I say you, I mean you and members of the

3    FBI?

4    A.   Yes.

5    Q.   Did you have any meetings with the Dutch prosecutor?

6    A.   We did not.

7    Q.   So after meeting with the Dutch police, were you able to

8    move forward with your plan as you guys had discussed?

9    A.   No, we were informed, again, by the Dutch national police

10   that the -- that they -- he didn't see a way, after consulting

11   the prosecutor, that they could allow the servers to stay in

12   Amsterdam live knowing what the servers contained.  They wanted

13   the servers down and out of the racks.

14   Q.   So what did -- what did FBI -- what did the FBI do to

15   adjust to that?

16   A.   Well, I should further note that we were -- we were guests

17   in the country, in the Netherlands.  We -- I can't just walk in

18   the data center and say, we're the FBI, give us those servers.

19   We have to request the Dutch to do it and then they have to

20   follow their legal proceedings and rules and laws.

21           So since we couldn't keep them in a running or live

22   state, disconnect from the outside world, they said they had to

23   seize them.  So with their assistance, they seized the servers,

24   some of the servers, and took them into Dutch custody.

25   Q.   Did the FBI explore the possibility of imaging all of the

1   servers in the data center on site at the switch center?

2   A.  Again, when the Dutch national police -- we told them the

3   Tucson servers were very large, there was many, many terabytes

4   of data, maybe even a petabyte of data, they said there is no

5   way we can image that on scene, so we'll just seize the servers

6   and then you can image them when you get them.

7   Q.  So, after hearing that, did you identify nine servers for

8   the Dutch to seize?

9   A.  Yes, we did.

10  Q.  And then did you get to walk out with them that day or did

11  they have to go through the Dutch legal process?

12  A.  Yes, the nine servers identified, the database servers,

13  image servers, and a backup appliance were retained in Dutch

14  national police, and they took control of them and we had to

15  wait for them to turn them over to us.  The process took

16  several months to work through their legal system before they

17  got turned over to the U.S. government and then shipped to my

18  office.

19  Q.  What did those nine -- what types of servers were those

20  nine servers?

21  A.  Um, types of them, they were Dell servers or their

22  functionality?

23  Q.  Functionality.

24  A.  They were database servers, servers containing the image

25  sets from the ads on Backpage and a backup appliance.

1  Q.  Okay.  All right.  So after traveling to Amsterdam, you

2  returned back to the United States.  Do you continue working

3  with the servers that were taken from Tucson while you await

4  the return of the servers from Amsterdam?

5  A.  Yes.  Two of the servers from Tucson were shipped to my

6  office, a database server and an image server.

7  Q.  And then did you -- did you make mirror image copies,

8  forensic copies, we've heard several terms today, so that you

9  could see what was contained within those servers?

10 A.  Yes.  I made a hash -- or image copies and then hash

11 verified, verifying the image matched the original drive.

12 Q.  And then were you communicating with anyone at DesertNet at

13 this time to get some information about how these -- what may

14 be on these servers?

15 A.  Yes.  I reached out to Wil Gerken at DesertNet, made a few

16 telephone calls and many e-mails back and forth where I asked

17 questions and he provided additional information.

18 Q.  Okay.  So, ultimately, you were able to make image copies

19 of two servers, the master database server, as well as an image

20 server that were seized from the Tucson facility?

21 A.  Yes.

22 Q.  And how long did that take you?

23 A.  That process took several weeks, maybe even a month to

24 image all the drives and verify them.

25 Q.  And then when the servers from Amsterdam came to you, did

1    you also image a copy or create a forensic image of the master

2    database server as well as the images server?

3    A.  Yes, I did.

4    Q.  And then did you provide -- were those copies eventually

5    provided to the defense?

6    A.  Yes.  I made discovery copies that I shipped to Phoenix.

7    Q.  Okay.  In addition to that, did you do anything else that

8    would assist defense in accessing and understanding the data?

9    A.  Um, with the -- the image copies I created, I had, during

10   this time frame, I had also extracted the database files in a

11   SQL dump format, as they were MySQL SQL databases, I conducted

12   a SQL dump or extracted databases from the servers, copied them

13   to separate hard drives and then provided those to Phoenix that

14   were intended for discovery purposes.

15   Q.  Did you participate in a conference call in February of

16   2019 with members of the prosecution, with other FBI agents, as

17   well as defense representatives?

18   A.  Yes, I did.

19   Q.  And what was the topic of that phone call?

20   A.  They -- I was requested to help on a conference call based

21   on my knowledge of the servers and what we would be providing

22   to the defense for discovery.  During that time, I explained

23   that there were Linux slash Unix servers and that I was

24   providing hard drives that would be in EXT4 format, because I

25   was working in Linux environment.

1            I also explained the -- the structure of the servers,

2      that there was the physical server, the physical drives, then

3      there was a Z pool, then there was the operating system,

4      FreeBSD, and there were jails on top of that.  I remember

5      specifically the -- someone from the defense side asked, so can

6      I just plug these hard drives into my laptop?  And I said, no,

7      it takes numerous hard drives to recreate one server and your

8      laptop wouldn't be able to read the hard drives in the native

9      form.  And, um, during that call -- so it was recommended the

10     expert be brought on to assist the defense in recreating, but I

11     said you can go through that lengthy process and quite complex

12     process to reconstruct the servers, or I've also already

13     extracted the databases and you can work off the databases I've

14     provided also.

15     Q.  So you provided image copies of the Backpage servers, but

16     in addition to that did you put on a single standalone hard

17     drive the master database of the Backpage servers?

18     A.  Master database and all the other databases.

19     Q.  And did you put in it a SQL format so that they could

20     access it more quickly, as opposed to going through the

21     original imaged copy?

22     A.  Yes.

23     Q.  Other than the question from the defense representative

24     about whether they could just plug that hard drive into their

25     laptop, were there any other questions asked of you that day

1  about the discovery process?

2  A.  I don't think so.  They may have asked how many or how

3  much, and I said it was upwards of 50 drives, 50 terabytes of

4  raw data.

5  Q.  Did anyone from the defense side of this phone call appear

6  to understand or at least be familiar with SQL databases and

7  ZFS files?

8  A.  As I was talking about it, there was a male voice on the

9  line that resonated that he heard of EXT4 or these other

10 components and that he said, I at least heard of it, yes.

11 Q.  After that phone call, a month or two later, did members of

12 the defense team travel to you or travel to your facility in

13 Idaho to physically inspect the servers?

14 A.  Yes, they did.

15 Q.  And during that visit, did anyone -- when was that visit?

16 A.  I believe it was April 2018.

17 Q.  During that visit were there any additional questions

18 about --

19 A.  Maybe March.

20 Q.  Maybe March or April of 2018?

21 A.  Yes.

22 Q.  Spring of 2018?

23 A.  Yes.

24 Q.  During that visit, were there any additional questions

25 about how to use the database, maybe what types of software or

1   forensic tools could be used to help them understand the data

2   in the databases?

3   A.  I wasn't, um, specifically asked any questions about that.

4   One question that was asked was if they could take pictures,

5   and we said, no, we're an FBI facility, and we could provide

6   pictures.

7   Q.  I want to show you what's been marked as Exhibit Number 6.

8       Mr. Frost, do you know what this is?

9   A.  The document, yes.

10  Q.  Okay.  What does this document describe?

11  A.  It describes a process I went through with pictures of

12  copying forensic disk images, E01 or expert witness format,

13  EnCase formatted image copies, to standalone hard drives.  In

14  some cases multiple images fit on a single hard drive and

15  sometimes it didn't.  It also explains there is an E01 text

16  file which states information about the tool I used to create

17  the image, when I did it, the hash verification log files

18  included in that.  So it shows the picture 23 is a database

19  server from Tucson that I had received, and it just goes

20  through pictures showing that the image copies were created,

21  put in the hard drive, EXT4 file system, and then also there

22  was a database extraction done, database exported files in the

23  SQL format, they were also provided on the hard drive.

24  Q.  So can you walk us through, when you're making a forensic

25  image of the servers, what do you do and then in what format do

1  they come out in?

2  A.  The -- in this particular case, I powered on the server to

3  a boot disk, which is an operating system contained only in RAM

4  on the system, so no data on the actual server is changed.  And

5  then I can query information about the disks, it was a Linux

6  based tool, so it gave me drive letters from SDA, SCSI device

7  A, SDB, SDA, or SDC, et cetera, all the way through the 24th

8  letter in the alphabet, V, maybe, whatever 24 is.  There were

9  24 drives in the server.  So I selected a drive with an imaging

10  tool, FTK Imager Command Line, so it's a Linux based tool.  I

11  selected the device SDA to be imaged with a forensic tool hash

12  verification, and told it to copy that to our network that I

13  attached a network attached storage device to the back of the

14  server so I could write all these images to one location.  Then

15  later after the images have been created and verified, I copied

16  them to the individual hard drives for discovery.

17  Q.  Okay.  So when you image data, do you do it in accordance

18  to FBI protocol?

19  A.  Yes.  We use industry standard tools, everything is hash

20  verified with matching hash values.

21  Q.  So when you produced the forensic disk in E01, expert

22  witness format, is that industry standards?

23  A.  Yes, it is.

24  Q.  Okay.  And then explain how we get from that to the EXT4

25  file system.

1    A.  Yes.  So, like I said, I created the image files, and once

2    they were created and verified, they were sitting on our

3    network storage, so then I attached another computer by a

4    forensic work station with a standalone hard drive and a doc.

5    I put the hard drive in.  I connected to my Linux system.  I

6    then formatted the hard drive EXT4 so my Linux system could

7    write to the disk.  Then I copied the image files off the

8    server onto the disk, once again, verifying the device once it

9    was on the standalone hard drive.  I do another hash

10   verification.  So the E01.txt file would then be --

11          When I put it on the standalone drive, the EO1 text

12   file would then be updated with the new verification and the

13   hash would be, again, printed in the text file and the date

14   timestamp would be associated with that also.

15   Q.  Okay.  And then what is the interplay between the EXT4 file

16   system and the ZFS file system?

17   A.  In this case, nothing.  EXT4 was how the hard drive was

18   formatted, that's the file system that stores it.  ZFS is how

19   the servers were formatted.

20   Q.  Uh-huh.

21   A.  And their file system.

22   Q.  And so would this blue area over here, the database

23   exported files in SQL format, is this piece of what you -- is

24   this what you extracted onto a single standalone hard drive?

25   A.  Yes, the database extractions and the SQL format --

1    Q.  Okay.

2    A.  -- were copied out.

3    Q.  Is this single standalone hard drive, is the information

4    that you placed on there also available in the 56 hard drives

5    that were also provided to the defense?

6    A.  Yes.  The images -- the image copies, the forensic copies

7    of the server that was used to extract the database were also

8    provided, so I had the forensic images on the hard drives, then

9    I had the database that were separate.

10   Q.  So why -- since the information is here in the 56 hard

11   drives, why did you also export it into a separate standalone

12   hard drive in SQL format?

13   A.  Just because the difficulty in accessing the database

14   files, once I had access to them, I extracted them and then I

15   provided them so that they could more easily review the data,

16   as I mentioned in the phone call.

17   Q.  Okay.  And that's the February 2019 phone call when you

18   explained to them what they would be receiving and the format

19   in which they would be receiving it?

20   A.  Yes.

21            MS. PERLMETER:  Okay.  The government moves Exhibit

22   Number 6 into evidence.

23            THE COURT:  Any objection?

24            MS. BERNSTEIN:  No objection.

25            THE COURT:  Exhibit 6 will be admitted.

1    BY MS. PERLMETER:

2    Q.  Now, as you became aware, were you provided copies of

3    victim ads as they correlated to the superseding indictment

4    that were obtained by -- that were obtained before the Web site

5    was shut down?

6    A.  Yes, I had.

7    Q.  Okay.  Did you use the information on those ads to kind --

8    and then go back into the database as it is available now to

9    see if the corresponding data is there?

10   A.  Yes, I did.

11   Q.  And then -- so what did you do?

12   A.  I connected to the database files and then ran SQL queries

13   based on information from the ads, specifically it was the

14   posting ID.  I did a search for the posting ID and located the

15   ad that contained that posting ID from Backpage, and then I

16   extracted or copied those files off in an Excel spreadsheet

17   type format, CSV.

18   Q.  So with that information, with both sets of information,

19   the way the ads looked while the Web site was still running and

20   with the information in the Excel spreadsheet type format, are

21   you able to compare that the -- the information as it exists in

22   both formats to verify that it's the same information?

23   A.  Yes.  One distinction I would make is the requested ads,

24   some of the ads had the exact same posting ID but they were

25   dated differently.  There may have been slightly different

1   versions of the text in the ad, but with the database I had

2   access to for Backpage, I only had the last version of the ad,

3   so with the object ID, whatever the final one was the date the

4   servers were taken down, that is the one I was able to extract.

5   I couldn't extract every single version that they provided and

6   some cases there were multiple.

7   Q.  But you were able to confirm both images or both sets of

8   pictures were the same?

9   A.  Yes.

10  Q.  And e-mails on both ends were the same?

11  A.  I don't believe the requested ads had e-mail information in

12  them, but the posting IDs and the data matched.

13  Q.  Okay.  And the pending aspects of the sets of information

14  that was provided when the ad was originally posted, if it was

15  available, it was also consistent?

16  A.  Yes.

17  Q.  So after you make a forensic image, I think you mentioned

18  it, but do you take any steps to verify that the image is

19  complete and not a corrupted file and is actually an exact copy

20  of the original?

21  A.  Yes.  Again, the industry standard forensic tools do hash

22  verifications, so at any time I could pull up the image files

23  and re-verify that they're the exact same as when I originally

24  created them and matching the hash of the original device they

25  were taken from.

1   Q.  And have you also worked off of the imaged files to verify

2   that they are not corrupted?

3   A.  Yes.  When I created the image files and copied them over,

4   I verified -- or hash verified them once again.

5   Q.  Okay.  Now, I want to start asking you some questions about

6   the different types of hardware and software that are involved

7   and that have been kind of mentioned today, and I want to start

8   with just the basics.

9         What is a server?

10  A.  A server is -- it can be any computer system.  A server is

11  more a role in functionality, as in it serves out information

12  so that multiple people can access it at a time or people can

13  view or put data onto that server.

14  Q.  And is a hard drive a piece of storage media where data --

15  that stores data on a computer?

16  A.  Yes.

17  Q.  And then can a server have multiple hard drives?

18  A.  Yes.

19  Q.  So -- and we've already mentioned briefly somewhat that

20  there are different operating systems in existence; is that

21  right?

22  A.  Yes.

23  Q.  Microsoft Windows being one popular operating system.

24        What is the operating system that the Backpage servers

25  were using?

1    A.   They were running FreeBSD.

2    Q.   Okay.  What is that?

3    A.   FreeBSD is an open source or free operating system,

4    FreeBSD.  BSD is -- it used to stand for Berkeley -- Berkeley

5    something distribution, I can't remember, but it's changed a

6    little bit since it was originally introduced in the mid '90s

7    to -- it's a Unix file system, so different from the Linux.

8    Q.   So if you have Windows-based forensic tools or forensic

9    tools that are meant to be used with a Windows operating

10   system, will they also work with a FreeBSD operating system?

11   A.   Windows tools cannot read the FreeBSD information, no.

12   Q.   So if you're trying to gather information from an operating

13   -- from the FreeBSD operating system, what kind of tools do you

14   have to use?

15   A.   You have to use Unix slash Linux forensic tools that can

16   read and interact with the FreeBSD operating system.

17   Q.   Is one analogy possibly you can't play an MP3 file through

18   Microsoft Word?

19   A.   Yes.

20   Q.   What is a database?

21   A.   Database is a storage container for data.  There are

22   different types of databases, but it's just a large container

23   to store data that can be easily retrieved and queried.

24   Q.   What is a relational database?

25   A.   Relational database is one type of database.  Often SQL

1  databases are relational databases.  And a relational database

2  is made up of tables with columns and rows inside the table, so

3  one database, one relational database might have multiple

4  tables.

5           A good analogy is if you had a university where they

6  have professors, students, classes and times those classes are

7  stored, each table would include information about the

8  students, another table would include information about the

9  professor, another table would include information about the

10 classes, and then, you know, what times they are, those classes

11 are offered.  So as you populate this table, one student might

12 have a class from one professor at a certain time and you could

13 -- these tables are interrelated, so they're relational

14 database, because the information can all be grouped together

15 to form different queries about which student takes which class

16 at what time.

17 Q.  So, for example, if the student table, it might possibly

18 contain information like name of the student, phone number,

19 e-mail address, birthday, social security number, things like

20 that?

21 A.  Correct.

22 Q.  And there would be a separate table, perhaps, for the

23 different professors, and then maybe a separate table for the

24 different courses that the university offered?

25 A.  Yes.

1   Q.  And then could you relate the tables with amongst --

2   against each other to compare and contrast the information that

3   you would like?

4   A.  Yes.

5   Q.  How is that -- is that being used -- is that being seen

6   here in relation to the Backpage Web site?

7   A.  Yes.  So the database is the MySQL, the SQL database used

8   by Backpage was a relational database.  So you have one

9   database with different tables inside that database, and each

10  table had columns and rows with different information.

11  Q.  So what is MySQL?

12  A.  MySQL is -- it's a program.  It's the application that runs

13  the database, the database software, so this software can be

14  run on, you know, different computers, servers, but it is one

15  type of database.

16  Q.  A database management system?

17  A.  Yes.

18  Q.  And is it publically available?

19  A.  Yes, MySQL is free to download.

20  Q.  And what is SQL, S-Q-L?

21  A.  SQL is the structured query language, that's how you

22  interact with the database or request information, put

23  information, move information.

24  Q.  Okay.  So is it the -- is it a database management

25  language?

1   A.  Yes, it could be seen like that.

2   Q.  Okay.  And what is Heidi S -- HeidiSQL, Heidi S-Q-L?

3   A.  HeidiSQL is another piece of free software that can be

4   downloaded from the internet that is used to look at database

5   data and interact with it in a more user-friendly format than

6   what resides in SQL itself.

7   Q.  And have you used MySQL and HeidiSQL to look at the data

8   that comes from the database servers?

9   A.  Yes.

10  Q.  What are file systems?

11  A.  File system is -- so the operating system is what runs the

12  computer.  The file system is how the operating system

13  interacts with the data on the computer.

14  Q.  Okay.  So it is the interface between the computer and the

15  storage device?

16  A.  Yes.

17  Q.  And what was Backpage using?

18  A.  For the file system?

19  Q.  Yes.

20  A.  It was ZFS.

21  Q.  Okay.

22  A.  Or the Z file system.

23  Q.  And is this a system that Windows-based forensics tools can

24  be used to extract information?

25  A.  No.  Windows-based tools can't read ZFS, Z pool, or any of

1   the data.

2   Q.   Okay.   What is -- a couple more things here.   What is a

3   RAID?

4   A.   RAID is a -- it's a redundant array of either independent

5   disks or inexpensive disks.   It's a -- it's often employed in

6   servers where you have multiple drives, but the storage based

7   on, if you want quick access, you can create two copies and

8   read from and write from them independently, or you can do it

9   for security so that your data doesn't get corrupted.   You have

10   spares and extra drives.   And the data is striped or it's put

11   across all the drives, so if you lose one drive, you could

12   replace it and the data will rebuild itself and it won't lose

13   any data if a drive fails.

14   Q.   What is a Z pool?

15   A.   A Z pool is how the ZFS file system handles -- so the ZFS

16   file system, unlike normal operating systems, the file system

17   and the volume manager are integrated.   So when I talked

18   earlier about the hardware, that's the hard drive.   So when you

19   connect a hard drive to an operating system, it needs a volume

20   manager to tell it, you just connected a hard drive, what do

21   you want to do with it?   With ZFS, the volume manager and the

22   operating system are all one and the same.   So you -- where you

23   can have RAID with ZFS, there is actually Z RAID built in, the

24   ZFS operating system is built with security and integrity built

25   into the Z pool, so you can add disks, remove disks in any

1    order.  The Z pool are the pool of drives.  You could have one

2    pool, two pools, multiple pools that can grow exponentially

3    based on how much data you need.  You can do file system

4    snapshotting, you can do all sorts of functionality with the

5    file system in relation to the hard disks and the drives stored

6    on it.

7    Q.  And was Backpage using the Z pool?

8    A.  Yes, they were.

9    Q.  And so, in doing so, does it matter -- does it -- is there

10   any particular significance in which hard drive may have been

11   loaded first or turned on first and which ones came

12   subsequently after?

13   A.  No.  With the Z pool, when you interact with the Z pool, it

14   -- you can query -- well, you put all -- if all the drives are

15   there, it will power up, if it's not there, it may say, I'm

16   missing this drive.  I'm operating in a degraded capacity.  But

17   it would tell you which drives they're missing, which drives

18   you have.  If you have the whole pool, half pool, it would give

19   you that information about the pool.  Doesn't matter if I

20   connect drive one over here or drive one over here first or

21   last, if I've got all the drives, the pool just builds itself.

22   Q.  And are you familiar with EnCase?

23   A.  Yes, I am.

24   Q.  What is that?

25   A.  EnCase is an industry standard forensic suite tool to do

1    forensic examinations.

2    Q.  Is it applicable towards which operating system?

3    A.  EnCase runs on Windows.

4    Q.  Would it be able to work on Linux based systems?

5    A.  Yes.  EnCase has some functionality to read some Linux file

6    systems.

7    Q.  And then how about, what is FTK?

8    A.  FTK is a forensic toolkit provided by AccessData.  It's

9    another forensic suite.

10   Q.  And is it -- which operating system is it used for?

11   A.  FTK, the forensic toolkit runs on Windows also.

12   Q.  Can it be used to look at data running under the Linux

13   operating system?

14   A.  Again, it has some functionality with some Linux operating

15   systems, but not all of them.

16   Q.  And so when you say some functionality, what does that

17   mean?  Does it mean you can see part of it and not all of it or

18   what does that mean?

19   A.  It depends on the file system.  If it's an EXT2 file

20   system, yes, it can read it; if it's an EXT3, yes; EXT4 you

21   have partial interactivity, as in it may tell you there is some

22   folders there, but it might give you weird counts on file size

23   because it can't quite interpret the data correctly.  The --

24          I'm sorry.  Did that answer your question?

25   Q.  To be able to ensure that you are properly reading and

1   interpreting data that comes off of a Linux operating server,

2   would you -- would EnCase or FTK be your tools of choice?

3   A.  No, they would not.

4   Q.  What would you use?

5   A.  I would use native operating system tools or forensic tools

6   specifically designed for Linux and Unix forensics.

7   Q.  And are these tools publically available?

8   A.  Yes, they're all free.  Any of the Linux open source tools

9   are free to download.

10  Q.  Let's move forward and talk about how you search for

11  information with the data servers that you have now.  Okay?

12        As part of your responsibilities in this case, are you

13  asked to search for certain pieces of data?  Do you get

14  requests from other law enforcement agencies, state

15  prosecutors, federal prosecutors to search for ads that may

16  have been on Backpage before the takedown?

17  A.  Yes, I do.

18  Q.  And what do you do in those cases?

19  A.  When a request comes in, I look at the request and see what

20  information they're requesting, then I take the information,

21  like an e-mail address or a phone number or a posting ID, and I

22  then query the database for information related to that request

23  specifically, and I search the database they have specified, or

24  marketplace.

25        Sometimes they request all databases to be searched,

1    and I can conduct that search, or a specific market like

2    Phoenix, and I conduct the search just on the Phoenix server.

3    Then once the ads are located or any ad data related to the ad,

4    I extract the ad and any related user data, the images,

5    information about the images, if there is invoices, anything

6    related to the ad in that aspect, I extract that and then

7    provide it back to them on optical media.

8    Q.  And have you done that for the ads that are related to this

9    case like we discussed earlier?

10   A.  Yes.

11   Q.  Okay.  Have you created a PowerPoint presentation to

12   explain to other people how the database works?

13   A.  Yes, I did.

14           MS. PERLMETER:  Okay.  And can you pull up Exhibit

15   Number 9?

16           May I approach the witness, Your Honor?

17           THE COURT:  Yes.

18   BY MS. PERLMETER:

19   Q.  Mr. Frost, I'm going to hand you Exhibit Number 9.

20           Is Exhibit Number 9 a copy of the PowerPoint

21   presentation that you created to help explain the data as it

22   exists on the server?

23   A.  Yes.  It's a disk that contains the PowerPoint.

24   Q.  And then did you review it this morning to make sure it

25   actually is a copy?

1  A.  Yes.  I initialled the disk.

2         MS. PERLMETER:  Move to admit Exhibit Number 9 into

3  evidence.

4         THE COURT:  Any objection?

5         MS. BERNSTEIN:  I'm sorry, what is Exhibit Number 9?

6         MS. PERLMETER:  It's a PowerPoint presentation that he

7  created that shows the informational data.

8         MS. BERNSTEIN:  I think -- I don't know anything about

9  this.  I don't know if the foundation or the authentication is

10  laid for it.

11         MS. PERLMETER:  So it is also marked as a PDF file in

12  Exhibit Number 5 which has the Bates stamps.

13         MS. BERNSTEIN:  I'm not sure that that either lays the

14  foundation or authenticates it.

15         THE COURT:  Well, he did lay the foundation that he

16  looked at it, and it's the PowerPoint that he created, he

17  checked it this morning and initialled the disk, so foundation

18  is laid.

19         But, I'm sorry, what you followed up with was

20  Exhibit 5?

21         MS. PERLMETER:  Yes.  So Exhibit 9 is -- that is the

22  PDF version of the PowerPoint and it is Bates stamped for the

23  defense to cross reference.  The actual file and PowerPoint

24  format is Exhibit Number 9.

25         THE COURT:  Okay.  The objection is overruled.

1        MS. PERLMETER:  And, Your Honor, would it be okay if,

2   at this point, the witness stepped down to access the

3   PowerPoint off his computer?  And, at this point, he's going to

4   be testifying off files that he has on his computer.

5        THE COURT:  Yes.

6        THE WITNESS:  So I just noticed it's HDMI here.  I

7   could actually bring it up here, if you guys prefer.

8        MS. PERLMETER:  Okay.  Do you want me to do that?

9        THE COURT:  If it's just as easy, then bring it up

10  here.

11       THE WITNESS:  Yes.

12  BY MS. PERLMETER:

13  Q.  Okay.  So is this an excerpt of some of the data that you

14  have reviewed, specifically, is it as to the Phoenix

15  marketplace?

16  A.  Yes, it is.

17  Q.  Okay.  And when you -- what was your purpose in creating

18  this PowerPoint?  What were you trying to explain to others?

19  A.  I was trying to explain to my supervisor the process I went

20  through to reconstruct an ad.

21  Q.  Okay.  So why don't we go to the next slide and --

22  A.  Yes.

23  Q.  And, tell us, what are we looking at here under name, and

24  it seems like it's going down now in alphabetical order.

25  A.  Yes.  So we see on the left-hand side there is a PHX

1   underscore Backpage, on the -- that's the database I've

2   connected to.  On the right-hand side we have the tables that

3   are associated with that database.

4   Q.  So ad is an example of a table?

5   A.  Yes.

6   Q.  And ad count is another table?

7   A.  Yes, it is.  Each of these are tables with -- contained

8   within the PHX underscore Backpage database.

9   Q.  And through the next few slides are you just showing all of

10  the tables that were available in the Phoenix Backpage

11  marketplace?

12  A.  Yes.  Would you like me to click through those?

13  Q.  And so are you familiar with what information some of these

14  tables contain?

15  A.  Yes, I am.

16  Q.  Can you give us some examples?

17  A.  Yes.  If I skip back.  So the first one you mentioned is

18  ad, the ad table, that's the table that contains all of the ads

19  that are currently in the PHX underscore Backpage database.

20  Another one would be category at the bottom, that's one of the

21  fields within the ad database.  This is where they started to

22  relate to each other.

23        Image, image would be another one.  That's the

24  information about the images that were uploaded to the ads, and

25  those tables are correlated or related and they have pointers

1   back to each other.

2   Q.  And so do you take the information from one table to help

3   you get to other information that may be contained on other

4   tables?

5   A.  Yes.

6   Q.  And are there also tables related to invoices?

7   A.  Yes, invoice tables right there also.

8   Q.  Okay.  And is this an example of the way the relational

9   database works?

10  A.  Yes, it is.

11  Q.  And as you -- as you go through these slides, how would you

12  explain to someone how to make sense and analyze and understand

13  the data as it was available back on April 6, 2018?

14  A.  Yes.  Would you like me to just go through the

15  presentation?

16  Q.  Uh-huh.  Yes.

17  A.  Okay.  So if you select the ad database for Phoenix, this

18  is what a shortened version database looks like.  These are the

19  -- going this way are the rows.  Each one of these rows

20  signifies a new ad in the database.

21          As we go across this way, these are all columns that

22  have different pieces of the ad and different data about the

23  ad.  This is shortened.  There is 91 total fields, but that

24  wouldn't fit across the screen.  I just took a screen shot of

25  the first portion.

```
 1   Q.  And is this a capture in time at the moment the Web site
 2   was powered down?
 3   A.  Yes.  So any ads in the system are ads that would have been
 4   on the day it was shut down.
 5   Q.  So the status column second from the right, where it says,
 6   expired live, expired live, is that -- would that signify which
 7   ads might have been live at the moment of the shutdown and
 8   which ads might have expired?
 9   A.  Yes.
10   Q.  Okay.  Let's go to the next slide.
11           So can you explain to us how you relate the tables and
12   the information together?
13   A.  Yes.  So right here the, object ID, objid here that's
14   circled in the green box, is the -- what Backpage would refer
15   to as the posting ID.  On the far right-hand side you see a
16   column marked user, that signifies the user or the unique
17   identifier for the user that posted this specific ad.
18           So on this one -- so if we're looking at ad with
19   object ID, objid 3723546, we see there on the lower left-hand
20   corner, we see it was posted by a user with unique ID 30414033.
21           Here I point to the user table.  The user table,
22   because now we've identified a user ID, and now I'm going to go
23   to the user table to find out more information about that user
24   ID.
25           So here is the user table from the PHX underscore
```

1    Backpage database, and we see information here as we go across,

2    again, the objid.  So each -- each row in the relational

3    database has to have a unique number identifier.  These can't

4    be duplicated within the database itself or it would be a

5    broken pointer.  So objid carries over for multiple fields.

6    We'll see that is the unique identifier for this piece of

7    information.  As we saw before, the objid for the ad table was

8    the unique identifier for the ad specifically.  Now the objid

9    up here is the unique ID --

10            Sorry about that.

11            The -- sorry.  Back to user database.  The objid here

12   is the unique identifier for the user.  So in this case you see

13   a user with e-mail address, Wil at DesertNet.  So if I want to

14   get information about Wil, I can search for his e-mail address

15   and find out what his user ID was.  I can use that information

16   to find ads he had posted, which we'll see in just a minute.

17            So here I'm searching for user database for user

18   30414033.  That was the user identified that posted that ad in

19   the first ad table in the lower left-hand corner.  So I do that

20   as MySQL query right there.  So I select star from user where

21   objid equals 30414033, the database then returns that

22   information associated with that unique number, if it's there.

23   In this case, we find that the objid is, again, listed there,

24   and it was -- has an e-mail associated with

25   Scottsdalegirlz@gmail.com.

1    Q.  So when you get a request from law enforcement to pull all

2    ads that could be associated with, for example,

3    Scottsdalegirlz@gmail.com, this is the process you would go

4    through?

5    A.  Yes.  I would a run a query similar to this instead of

6    objid, because if I didn't know the objid, I would search for

7    select star from user where e-mail equals

8    Scottsdalegirlz@gmail.com.

9    Q.  So there are different ways to search depending on the

10   information that you have?

11   A.  Yes.

12   Q.  All right.  I'm sorry.  Keep going.

13   A.  So now we go back to the ad database and we're searching

14   for user 30414033, again, that's the e-mail or the address the

15   Scottsdale girls that we just located based on the objid of the

16   first ad.  So we had one ad that sent us to a user.  Now from

17   the user I did a query to select star from ad to give me

18   everything from the ad table where user, the user column in the

19   database in the table equals 30414033.

20          So now we see right here there is 72 ads.  So, again,

21   91, that's how many columns there are going across, and the 72

22   represents how many unique ads were posted by that specific

23   user.

24   Q.  Okay.

25   A.  So that was the original ad we searched for was the

1  3723546.  And from here now we've located the user and the ad,

2  so the next step would be go to the images associated with this

3  ad, and to do that we go to image table in the PHX underscore

4  database.

5  Q.  So, at this point, you've been working with information

6  from the master database, or like at least the Phoenix Backpage

7  database?

8  A.  Yes.

9  Q.  And the images are on a separate server?

10  A.  The images themselves are but we're still piecing together

11  an ad, so now we're going to the image table in the PHX

12  underscore database to find out information about the images

13  associated with that ad specifically.

14  Q.  Okay.  So you're basically going step-by-step to get the

15  information you need relating back and forth between the

16  tables?

17  A.  Yes.

18  Q.  Okay.

19  A.  Up here we see the SQL query I ran, select star from image,

20  image table where at equals 3723546.  So this would give us all

21  of the images that were uploaded to that one specific ad.  In

22  this case, we see there are five of them.

23  Q.  And from here does that -- is that the pointer directing

24  you where to go to find the actual pictures themselves?

25  A.  Yes.  So there is a couple more steps still.  So this is

1   just a zoomed in version of the large path.  The large path is

2   one of the columns in the image table for this specific ad, and

3   it gives us this piece of information here, which is another

4   unique identifier for the image itself.  It also gives us the

5   image file names, so there is the name of the image file that

6   was uploaded.

7        So from here I would use this unique ID, that's just

8   telling us you go to that slash and that's the unique

9   identifier.  That's the number.  There they are.

10       Okay.  So now I go to the images database, which is a

11  separate database from the PHX underscore Backpage database.

12  And here I do a select star from uploaded image.  Uploaded

13  image is the table inside the images underscore Backpage

14  database.  And I search for the objid 6889523.  Again, so there

15  we search for one specific object ID, or one specific image.

16  And this can be done at bulk.  I don't have to do a single

17  query, I could do hundreds, or if not thousands of queries all

18  at once.

19       So we search that database.  There is the information

20  we search for again.  So now we locate the path name you see

21  I've highlighted in red over there.

22       So now this is zoomed in just on the column of path

23  name.  So here we see the entire path, so from here I see it's

24  image 12009082009.  Here's the file structure for -- that

25  points me to the exact location of the image file that ends in,

1    dash, dash, large dot JPG, that I could go to and then I would

2    copy out that image file to put with the other ad data I have

3    extracted along the way.

4    Q.  So you just said you have to look in different places, but

5    all of the information is the same and it's there, you just

6    kind of have to know where to look for it?

7    A.  Yes.  This is just a simplified step-by-step walking

8    through the process of putting all the information together.

9    Q.  Okay.  And what information do you have to know to be able

10   to run these queries?  Do you have to be familiar with SQL?

11   A.  Yes.  You would have to have familiarity with the SQL

12   language to run the queries to find the information you want,

13   and familiar with the databases and how it stores the data to

14   piece it all back together.

15   Q.  Can you -- is there anything else you would like to tell us

16   about this PowerPoint you prepared?

17   A.  I think that's it.

18            Yes.  Questions?

19   Q.  Can you also now show us, or give us a live demo on how you

20   can query for searching things off the Backpage servers or off

21   the databases?

22   A.  Yes, I can.

23   Q.  So you didn't bring all of the databases with you.  Did you

24   extract a small portion of it onto a virtual machine to be able

25   to make this presentation in court today?

1   A.  Yes, I did.

2          So I extracted a -- from the database I extracted, I

3   copied one of them to my laptop.  On my laptop that's running

4   Windows 10, I have VMware Workstation, which is a

5   virtualization software that allows me to run virtual machines.

6   Inside my host operating system of Windows, I could run Linux

7   operating systems.

8          So --

9   Q.  So for purposes of your demo today, are we going to be

10  talking about information that is contained within the

11  Washington, D.C., database?

12  A.  Yes.  I have extracted -- if you see right here, the HUP

13  001982-IDA underscore Backpage dot SQL, um, that tells me that

14  the evidence item that I've labeled in my lab HQP 001982, I

15  extracted IAD underscore Backpage, which is the Washington,

16  D.C., marketplace.

17  Q.  And which programs or tools are you using to be able to run

18  this demo?

19  A.  So the operating system here is Mint, which is a Linux

20  distribution, again, free to download that I downloaded the

21  MySQL application, and I'm running the service to host the

22  server on the system.  I then took this file, the dot SQL

23  format, if you see that, and I imported it into the MySQL

24  server running on this virtual machine.

25          Over here in this window, you see that that is the --

1    that is the dot SQL file that I've opened up in a text editor,

2    because a SQL file in the SQL database, it's all just text.  So

3    as we saw before, everything is text.  This information tells

4    me the host, the server version, the OS version.  As you see,

5    all this information here --

6              Is there a way to zoom in on this thing?

7              COURTROOM DEPUTY:  No.

8              THE WITNESS:  Okay.  This information here matches up

9    with FreeBSD.  It tells us information about the server.  It

10   tells us right here the table is IAD underscore Backpage, and

11   then here's the table of information, you'll see LBID create

12   date, again, all of those categories we saw all the table

13   information is stored in this single text file it's about SQL.

14   BY MS. PERLMETER:

15   Q.  And are you able to ingest it or import it into another

16   tool so it becomes a little bit more user friendly?

17   A.  Yes.  So I -- if we step back out of my virtual machine and

18   go to my host operating system of Windows, I have the program

19   HeidiSQL, that's another free program I downloaded from the

20   internet that interacts or it's a database for SQL servers.

21   Q.  So here are we able to see the same tables that may be

22   available and different types of information?

23   A.  Yes.

24   Q.  Okay.  So what -- if I were to ask you if you could run a

25   query to see how many ads -- how many automobile ads may have

1    been posted on the Washington, D.C., database?

2    A.  Yes, but my laptop sat idle, so I just have to reconnect to

3    the database if you can give me just one second.

4         Here you can see I'm connecting to host IP

5    19216843128, that's the IP address of the virtual machine

6    running on my computer.

7         Okay.  So now I've connected.  We see HON underscore

8    Backpage, I connected two different databases.  But there is

9    the IAD we spoke of before.

10        And your request was for automobiles?

11   Q.  Yes.  So if you wanted to know how many automobile ads may

12   have existed in Washington, D.C., on April 6, 2018, how would

13   you do that?

14   A.  So I would go down to the section table to get information.

15   I double click on it.  It brings it up here.  I click data.

16   This gives me the object ID or the unique identifiers

17   associated with the different fields.

18        Your request was for --

19   Q.  You know what -- yes, it's for automobiles, but before we

20   go there, yes, can you tell us about the different -- what does

21   this ID column tell us?

22   A.  Yes.  The ID columns tells us which category the ads were

23   loaded to, whether it was employment services, real estate

24   rentals, buy/sell, musician, adult, community, dating,

25   automotive places.  And then the far right-hand side, that's

1  the unique identifier I would use to search for a specific ID.

2  Q.  Okay.  So we're doing a search for automobiles, but one

3  could also do a search for jobs, things for sale, things for

4  trade, dating, and perhaps even adult ads?

5  A.  Yes.

6  Q.  Okay.  All right.  So how do we go about finding the

7  automobile ads?

8  A.  So for automobile, the objid that's -- I'm going copy it

9  here.  I'm going to go to my query field.  Select star from ad

10  where section equals.  Paste that number in.  So there is our

11  unique -- the unique ID for our automobile based on the section

12  table.

13         Now we run the query.  And there it gives us 2,883

14  unique ads under the section automobile.

15  Q.  Okay.  So at the time the Web site was shut down, there

16  were roughly 2,800 automobile related ads on the Washington,

17  D.C., database?

18  A.  Yes.

19  Q.  Okay.  And if you could just walk us through here.  What

20  are these other fields and what kind of information does it

21  provide?

22  A.  Yes.  So here -- before where we saw the shortened version

23  from my PowerPoint, now we're able to look at every single

24  category.  And I could query -- I could ask for specific

25  information, instead of the star which is giving me everything,

1    I could change that and ask for a specific field, like give me

2    the users or the ad.

3         Let me scroll across here.  We see there is a category

4    and section right here by section.  Again, we search for the

5    section, so you noticed all the section references are the

6    exact same we searched for based on relational database model.

7         Going across, we see the user field right here, so

8    this gives us all the users that posted each -- each ad.  And,

9    again, each row is a unique ad.

10        Going across from here, contact phone numbers, white

11   list, header, title, ad, so now -- if I was interested in this

12   ad, the second ad, I can double click and it gives me all of

13   the text that would have been in the body of the ad itself.

14   Q.  So you can find not only the title of the ad, but all of

15   the text that is within the body of the ad, such as how many

16   miles may have been on the car, what year the car is, how much

17   the seller is asking for, anything that the user may have

18   provided?

19   A.  Yes, any information they put in their advertisement would

20   be in the ad field.

21        The next ad -- or the next column would be has image.

22   And so if we went to an ad, where we see on this one it is,

23   yes, that it has images, so then I would know to go look at the

24   images table and look for the images associated with that ad.

25        I was going to continue going across, if you'd like me

1  to.  Region, age, price, salary, here's IP address.  Again,

2  more -- more of the 91 fields.  Search, the tier, the online

3  price, ad price, pay type, approval code.  Here we get some of

4  the invoice information.

5  Q.  So when -- when the defense was asking Mr. Gerken about the

6  administrative data that wouldn't be made available to the

7  public -- are you familiar with what I'm talking about?

8  A.  Yes.

9  Q.  The stuff in the yellow box?  Is that information available

10  here in this database?

11  A.  Yes.  So all this information wouldn't have been displayed

12  if you clicked on the ad.  This is everything about the ad in

13  the ad table.

14       Do you want me to continue explaining, talking?

15       There is a violation field with information about said

16  violations.  There is a moderation tab with moderation log.

17  Q.  And then there is a central server update?

18  A.  Yes.  Yes, where we can see not all ads are uploaded to

19  central.

20       And that's the end of the ad table.

21  Q.  Okay.  And then, I guess, slightly differently, if you were

22  approached and said, hey, I am investigating a case.  I'm

23  looking for some information from a particular e-mail.  I'd

24  like to know if this particular e-mail address has posted any

25  ads.  Would you able to see, just with the e-mail alone, if

1  that e-mail address has ads associated to it in any other

2  categories:  Buy, sell, trade, employment, adult, et cetera?

3  A.  Yes.  With an e-mail address, I could do a query for that

4  e-mail address, and then from the user look at all ads they

5  posted.

6  Q.  Okay.  So why don't we try sexy young girl at live dot com,

7  so it's sexy, underscore young, underscore girl, at live dot

8  com, and see if there are any ads in the Washington, D.C.,

9  database?

10  A.  Underscore girl?

11  Q.  Underscore girl.

12  A.  At Gmail dot com?

13  Q.  Live dot com.

14  A.  Sorry about that.

15      So now I'm going search star from user where e-mail

16  equals that e-mail address.

17      Yes.  So we see there is the e-mail.  There is a

18  unique ID.  And this -- so this is a user table.  This would be

19  the information about the user on the PHX underscore back IED

20  database.

21  Q.  Now you're free to go forward from here if you wanted to

22  get more information about what ad was posted, or perhaps how

23  many ads or where in which categories, what would you do?

24  A.  So then I would take the object ID here, copy it and do a

25  select star from ad where user equals that user.

1          So now we see the user ID was 890121.  So if we go

2    over to the user column, which is right here, we see the same

3    user and we see there were 42 unique ads on the IED databases

4    at the time of seizure.

5    Q.  And then could you go -- could you then go a step further

6    and see what category this person's ads were posted in?

7    A.  Yes.  So, again, those columns are here somewhere.  Where

8    is column?

9          Category and section are here, so we can search the

10   category or the section.  So section is 4381, category is 4443,

11   if we can remember those, 4381.  So then I would go to the

12   section table and look at the data, and it was 4381 was the

13   section, which is adult.  Adult is the ID for the section.

14   Q.  Okay.  So we know that this particular ad from sexy young

15   girl at live dot com was in the adult section?

16   A.  Yes.

17          THE COURT:  Counsel, I'm going to stop you there so we

18   can take a break.  We'll break for about ten minutes.

19          (Recess 3:12 p.m. - 3:23 p.m.)

20          THE COURT:  And before you get started, I know that

21   some of you are worried about the time, so at 4:30, 4:45, then

22   we'll talk about that.

23          Go ahead.

24

25          CONTINUED DIRECT EXAMINATION

1    BY MS. PERLMETER:

2    Q.  Mr. Frost, after you're done researching the database and

3    pulling the information that you need, how do you then transmit

4    that to the requester?

5    A.  For -- if we're talking this specific one with this user

6    ad, I'll grab the ads and then the images, and from this thing

7    we just right click, export rows, and then I export them in the

8    Excel CSV format.  In this case I'm just exporting to --

9            MS. BERNSTEIN:  I'm sorry, Your Honor, I can't hear

10    the witness.  If he could --

11            THE WITNESS:  Yes.  So I right click, click export

12    grid rows, brings up this dialogue box, including column names.

13    And this is including everything, like a minimizer, I could get

14    select information if I wanted to, ads.  And then I click okay.

15    And it saves it out to that Excel file.  Then I would take that

16    Excel file right here, again, we see it contains the same

17    information, they're just scrunched down from Excel, but we

18    still see the user information, that same user we searched for.

19    I would take this information, the CSV and the images, copy

20    them to an optical disk and then ship it to the requester.

21    BY MS. PERLMETER:

22    Q.  So the person who requested the information would be able

23    to review the information without having -- without needing to

24    know SQL or being able to run queries?

25    A.  Correct.

1    Q.  I want to move on.

2            Did you have an opportunity to review a declaration

3    that was prepared by a Tami Loehrs which is on the docket as

4    7171?

5    A.  Yes, I did.

6    Q.  And in part of that declaration did she say that the

7    government did not meet industry -- or minimum industry

8    standards for the electronic data seized and that the data is

9    completely unusable in its current form?

10   A.  Do I remember reading that?  Yes.

11   Q.  Yes.  Do you agree with that statement?

12   A.  I do not.

13   Q.  Why not?

14   A.  I used our industry standard forensic tools for Unix

15   forensics, I copied them out, hash verified them and provided

16   them on media that was related to Unix/Linux and the exam was

17   in that realm.

18   Q.  And did you just provide a demonstration today about how

19   one would use the data?

20   A.  Yes.

21   Q.  Did you also read Ms. Loehrs's opinion that most of the

22   data acquired by the government was not produced in an industry

23   standard format and is not forensically sound because it was

24   created with an unknown program and then the person wasn't

25   informed what program was used?  I'm summarizing, but did you

1    read that?

2    A.  Yes, I did.

3    Q.  So do you agree with that statement or disagrees?

4    A.  I disagree.

5           MS. BERNSTEIN:  Objection, Your Honor.  I think that

6    misstates the declaration.

7           MS. PERLMETER:  Yeah.  And I said I summarized.

8           THE COURT:  Objection overruled.

9           MS. BERNSTEIN:  I wouldn't agree that's a summary.

10           THE COURT:  Well, the objection is overruled.

11           THE WITNESS:  I disagree.

12   BY MS. PERLMETER:

13   Q.  I'm sorry?

14   A.  Yes, I disagree with that statement.

15   Q.  And why do you disagree?

16   A.  Could you read the -- could we rephrase the statement?

17   Q.  Okay.  Well, was the information created with unknown

18   programs?

19   A.  Oh, um, no, it was not.

20   Q.  Okay.  What programs did you use to access this

21   information?

22   A.  The standard Unix/Linux forensics imaging tools with hash

23   verification, industry standard for a Unix/Linux examination.

24   Q.  And were the programs that you used and the programs that

25   the defense might need to also conduct their examinations, was

1   that information conveyed to them in the conference call that

2   occurred in February of 2019?

3   A.  Yes.  I informed them the architecture of the servers, the

4   differing levels, then I provided a separate, more easily

5   accessible SQL format that they could just ingest into a SQL

6   format as I demonstrated today on my laptop.

7   Q.  And the tools they might want to consider using, are they

8   publically available?

9   A.  All of them are publically available, free to use open

10  source tools.

11  Q.  Are the image files you have created forensically for

12  forensic purposes, are they corrupt?

13  A.  All of them were hash verified to -- as in they match the

14  exact copy when I created them.  And when I moved them to the

15  hard drive, then I verified it after I copied them to the

16  standalone hard drives.

17  Q.  Do you also recall reading that the integrity of the data

18  has been destroyed in a number of ways?

19  A.  I do.

20  Q.  Do you agree with that?

21  A.  I do not.

22  Q.  How come?

23  A.  Again, the data and the integrity thereof was preserved in

24  industry standard expert witness file format E01 image files,

25  and, again, hash verified to match the original.

1    Q.  And then I just kind of want to clarify the timeline a

2    little bit.  The conference call that you participated in with

3    the defense team, members of the government and the case

4    agents, was that in February of 2019?

5    A.  Yes, it was.

6    Q.  Okay.  And then at some point was it some point after when

7    the defense came and did a physical inspection of the servers

8    that were located in Idaho?

9    A.  Yes.

10   Q.  Okay.  So the phone conversation happened first, and then

11   the inspection in Idaho happened second?

12   A.  Yes.

13   Q.  Okay.  Has there also, or have you provided testimony

14   related to your work on the Backpage databases in court?

15   A.  Yes.  Yes.

16   Q.  Explain -- I mean, have you explained in court or have you

17   testified about the databases, about how they relate to each

18   other and how the data is extracted?

19   A.  Yes.  In this court today and also in federal court in New

20   York and in Maryland.

21   Q.  And then did one of your colleagues also provide similar

22   testimony?

23   A.  Yes, in New York federal court again.

24   Q.  This was testimony that was provided within the last year?

25   A.  Yes.

1    Q.  Now, you have also heard discussions about -- today about

2    reconstituting the Web site to the exact same way that it was

3    on April 6th, perhaps a closed version where it would not be

4    accessible to the outside world, and you've also heard about

5    using two servers to pull the world of information related to

6    the ads to be able to see the information that may have been on

7    any particular ad.

8           No matter how you look at it, is the information

9    different depending on the platform in which the viewer looks

10   at it?

11   A.  No.  Again, the data is the data.

12   Q.  Okay.  Is it in -- is the data that you have -- that has

13   been provided in this case, is it functional?

14   A.  Yes.  As I demonstrated, it's easily accessible,

15   functional, and readable.

16   Q.  And it is usable by someone who is able to understand how

17   the data should be used and which tools and programs may be

18   needed to be able to use it?

19   A.  Absolutely.

20          MS. PERLMETER:  I have no more questions.

21          THE COURT:  Cross.

22          THE WITNESS:  Did you want this back?

23          THE COURT:  You can just leave it right there.

24          THE WITNESS:  Okay.

25                      CROSS-EXAMINATION

1   BY MS. BERNSTEIN:

2   Q.   Good afternoon, Mr. Frost.

3   A.   Good afternoon.

4   Q.   Do you have Exhibit 103 up there?

5   A.   Is that this?

6           THE COURT:   No.

7   BY MS. BERNSTEIN:

8   Q.   I don't believe so.

9           THE COURT:   Traci is going to get it for you.

10          THE WITNESS:   I do now.

11  BY MS. BERNSTEIN:

12  Q.   And I'm going to put this on the ELMO, if that can be

13  displayed, please.

14          Let me know once you've had an opportunity to flip

15  through all the pages that make up that exhibit.

16  A.   I have.

17  Q.   Now, I think one of the last things you just testified to

18  was that no matter what format you're viewing this data in, the

19  information is all the same; is that correct?

20  A.   The data is the same, yes.

21  Q.   The data is all the same.   So what changes is the ability

22  to use the data, the ability to understand it?

23  A.   Is that a question?

24  Q.   I can rephrase.

25          In your own words, what would be the difference

1    between the multiple screens that you just walked us through in

2    various programs and what we're looking at right here on

3    Exhibit 103?

4    A.  Um, I would call this a user friendly format.

5    Q.  Okay.  And I have to admit, I didn't understand a lot of

6    the MySQL, HeidiSQL, FreeBSD things that you were saying, but I

7    can understand this.  Does this -- is it a fair

8    characterization that this is also an attorney friendly format?

9    A.  I would say if an attorney can read a spreadsheet, the data

10   in this is the same, so I would think you could read both of

11   them and get the same information out of them.

12   Q.  Okay.  Well, let's talk about that for a second.

13           We referenced -- she referenced the February call that

14   we had earlier this year, correct?

15   A.  Yes.

16   Q.  And in that call I had asked if you would send us samples

17   of the ads, correct?

18   A.  Yes, I believe so.

19   Q.  And you provided us with samples of the exported CSV file

20   that you created, correct?

21   A.  Yes, I did.

22   Q.  Did you actually create the CD that was sent to us?

23   A.  I don't know which one you received.  I created copies and

24   sent them to my Phoenix FBI division.

25   Q.  There is some notation on here.

1          MS. BERNSTEIN:  May I approach the witness and see if

2    this is his initials?

3          THE COURT:  Yes.

4          THE WITNESS:  Nope.

5    BY MS. BERNSTEIN:

6    Q.  Okay.  Okay.  So you -- I just want to recap that.  You

7    sent us a -- you created the samples -- you create samples of

8    the CSV file of ads that were in the indictment, correct?

9    A.  Yes, I did.

10   Q.  And you provided that to the government?

11   A.  Yes.

12   Q.  And the government provided that to us, presumably, as far

13   as you know?

14   A.  Yes.

15   Q.  I want to show the witness what I'm marking as Defense

16   Exhibit 120.

17          If you can unbind that and take a look at that for me.

18          MS. PERLMETER:  Your Honor, just for organization, can

19   we have a list of the exhibits that the defense intends to use

20   for this witness right now and then for any other witness later

21   on?

22          THE COURT:  Do you have a list?

23          MS. BERNSTEIN:  I don't, unfortunately, but we can

24   endeavor to do that in the future.

25          THE COURT:  Okay.  At the end of the day I'll ask you

1    to get them a list.

2    BY MS. BERNSTEIN:

3    Q.  Did you get a chance to flip through that?

4    A.  Yes, I flipped through some of the pages.

5    Q.  And do you recognize this?

6    A.  Yes.  It appears to be a printout of the Excel spreadsheets

7    that I produced.

8    Q.  And the Excel spreadsheets that you produced is the export

9    that you made of your recreated database of the ads; is that

10   correct?

11   A.  Not a recreated database, but an extraction of the data

12   contained in the database that I put on optical media.

13   Q.  So the data -- well, I'm sorry.  Is this a fair and

14   accurate depiction of the spreadsheet that you made, printout

15   of it?

16   A.  I mean, it's a printout, it's spread over multiple pages.

17   I mean, on the -- when you look at it digitally, it's much more

18   concise and consolidated and easily viewed.

19   Q.  Is there anything different between the digital

20   representation and this representation, as far as you know?

21   A.  Just how you space and format.  You could change box sizes,

22   shrink them, expand them.

23   Q.  But the information contained therein is an accurate and

24   fair depiction of your chart?

25   A.  Yes, if you printed off what I produced, then yes.

1          MS. BERNSTEIN:  So I would move Exhibit 120 into

2     evidence at this time.

3          THE COURT:  Any objection?

4          MS. PERLMETER:  Well, I just have some questions,

5     because there is page numbers, and some of the pages they're

6     not numbered in order.  It goes up to -- I'm skimming through,

7     since it was just provided moments ago -- looks like it goes up

8     to 400 and then it drops back down to the single digits, then

9     there is some pages that don't have any page numbers.  There

10    is -- there is some pictures, there is Excel spreadsheets.  I'm

11    not sure what this exhibit represents.

12         THE COURT:  Who prepared this?

13         MS. BERNSTEIN:  This was a printout of the

14    spreadsheets that were given to us by the government.

15         That's what the witness just identified it as as well.

16         THE COURT:  Well, you asked him if it appears to be.

17         When you printed it off, did it come with these

18    numbers?

19         MS. BERNSTEIN:  Yes, Your Honor.

20         THE COURT:  So do you want to ask the witness some

21    voir dire?

22         MS. BERNSTEIN:  I'm sorry?

23         THE COURT:  I'm asking if they want to voir dire the

24    witness.

25         MS. PERLMETER:  Sure.  Yes, Your Honor.

1    VOIR DIRE EXAMINATION

2    BY MS. PERLMETER:

3    Q.  Mr. Frost, regarding Defense Exhibit 120, while it may

4    generally look like a printout of the spreadsheet data, can you

5    say at this point in time whether it came from the same source,

6    if it's a combination of different Excel spreadsheets, or if

7    it's a combination of pieces of paper printed from different

8    sources?

9    A.  The optical media I produced that had the extractions from

10   the ads would have had multiple spreadsheets, so if they

11   printed out each of the individual spreadsheets, then the

12   numbering might be different, so it's -- I mean, I can only

13   assume it's everything.  I didn't look through all the pages,

14   but, again, I produced an optical media with digital content

15   and this is a printout.

16   Q.  Do you think this is the information that you provided to

17   the defense in that CD she showed you?

18   A.  I could assume so.  Without looking at the CD I created and

19   comparing every ad, then I am willing to assume it is based on

20   what it looks like.

21   Q.  If you had more time to, perhaps, take the actual CD and

22   then compare it with the printed versions of the information,

23   would you be able to state with more certainty whether or not

24   it was the same?

25   A.  Yes.  On the CD I have each of the spreadsheets labeled,

1   images, ads, user information organized so I can go to the user

2   table and find out what user posted which ads, or I can go to

3   the ads table or the invoices and they're organized that way.

4   This way I would have to search through and figure out which

5   table is what.

6          THE COURT:  Let me interrupt.  Let me ask you this.

7   As a generality, if you took something from the CD you produced

8   and printed it out, would it generally have this format?

9          THE WITNESS:  Yes.  Based on, you know, if -- in Excel

10  you can spread a column way out or scrunch it way down, but it

11  would have rows and columns then look similar to this.

12         THE COURT:  Okay.  So here's my problem.  He obviously

13  hasn't looked at the exhibit before.  But I think Exhibit 120

14  could be admitted for demonstrative purposes but not for the

15  truth of what the actual data is that is contained within here.

16         MS. BERNSTEIN:  That's fine.  Thank you, Your Honor.

17         THE COURT:  Do you have any objection you want to

18  state on the record?

19         MS. PERLMETER:  No, Your Honor.

20         THE COURT:  All right.  Exhibit 120 will be admitted

21  for that purpose.

22                    CONTINUED CROSS-EXAMINATION

23  BY MS. BERNSTEIN:

24  Q.  So I want to draw your attention back to what I have on the

25  screen, which is Exhibit 103.

1    A.  Yes.

2    Q.  Are you able to see -- is that on your screen?

3    A.  Yes, it is.

4    Q.  Okay.  And so we've heard a lot of testimony today about

5    how the information is all the same, no matter the format in

6    which it's produced, correct?

7    A.  The data is the same?

8    Q.  That the data and the information is the same no matter the

9    format in which it's produced?

10   A.  Correct.

11   Q.  And you've heard that testimony because you've been sitting

12   in this courtroom this entire day as well?

13   A.  Yes.

14   Q.  Okay.  In Exhibit 103, which is up on the screen, I can

15   see -- I'm going to move it up a little bit.  Do you have the

16   physical paper there as well so you can look at whatever you

17   want?

18   A.  I do.

19   Q.  Okay.  So I'm going to scroll this up a little bit.  And do

20   you see where, down here, where it says deleted images,

21   administrators only?

22   A.  I do.

23   Q.  And then underneath it says, click to restore or fully

24   remove the deleted image?

25   A.  Yes, I see that.

1   Q.  And then down below there is also the option to keep

2   deleted, restore, or remove?

3   A.  Yes.

4   Q.  Can you show me where I could find that information in

5   Exhibit 120?

6   A.  In here?

7   Q.  Yes, please.

8   A.  Yes, so we could go and pull up the images table, or images

9   database -- is this ad from this information?

10  Q.  Can you tell me how I could even tell that?

11  A.  Yes.  So in the images table --

12  Q.  Well, I'm sorry to cut you off, but can you do that for me?

13  Can you see if the ad that I'm showing you is in this -- is in

14  Exhibit 120?

15  A.  If I look through all of them, I could look for the posting

16  ID and then find it, yeah.

17  Q.  And can you show me how I would do that?  Is there a

18  specific page you would start at or what would you do?

19  A.  I would open the spreadsheet in my computer and search for

20  the posting ID in Excel.

21  Q.  Okay.  And where is the posting -- well, let me -- your

22  Excel spreadsheet, it has 91 columns, if I remember correctly?

23  A.  Yes, it does.

24  Q.  So that's 91 separate pieces of information, correct?

25  A.  Ninety-one columns, yes.

1    Q.   What does each column represent?

2    A.   It's a field that could contain information.

3    Q.   And what else could it convey, if not information?

4    A.   It could be blank or empty.

5    Q.   What would that signify if it were blank or empty?

6    A.   That there was no information in that field.

7    Q.   So each of the 91 columns on your spreadsheet pertain to

8    different pieces of information, correct?

9    A.   Yes.  Some of them have data, some of them may have been

10   blank or zero.

11   Q.   And all 91 pieces -- all 91 separate columns of information

12   is contained succinctly in Exhibit 103; is that correct?

13   A.   From the 91 columns?

14   Q.   Yes.

15   A.   No.  Again, there was additional tables with additional

16   information.  So you have a lot more information than is

17   displayed here.

18   Q.   I'm sorry, which one has more information?

19   A.   The database has more information than is just displayed

20   here.

21   Q.   Such as?

22   A.   It doesn't have the hash of the images, whereas you have

23   the hash of the images uploaded in the database.  I don't see

24   many date timestamps.  I see a posted date, but there is a

25   modified date, create date.  Again, there is much more

1    information in the database than the smaller version here.  So

2    if you wanted all the information, the database would have it,

3    here, again, is a subset of what all the information is.

4    Q.  So if I'm understanding what you're saying, there is

5    information in the database that is different than the

6    information that is in the administrative report that existed

7    when the Web site was live?

8    A.  It appears the administrative report is a smaller set of

9    all the data about a particular ad.

10   Q.  And you indicated that one of the distinctions is the hash

11   values for the images?

12   A.  You asked for differences.  I don't see anything where it

13   says hash value in the image and the name, whereas -- and the

14   database we can find what the hash of the image is, so when I

15   pull out a hash or pull out the image, I can then hash it and

16   verify and say, yep, the database says this number, that's the

17   number I got.  This image is the exact image that I extracted

18   that was uploaded that is in the table.  And I don't see that

19   information in the admin view that we're viewing now.

20   Q.  Can you tell me which column of your 91 correlates to the

21   hash value of the images that you're talking about?

22   A.  So the, again, so the 91 columns, that's just the ad

23   information.  There are additional tables that I showed before.

24   There is the image table.  There is the uploaded image table.

25   And these are additional tables, additional information from

1    the relational database I discussed earlier that convey

2    information about the ad.

3    Q.  Okay.  Then let me limit our conversation to just the table

4    that we just looked at, for what felt like hours, with 91

5    columns on the top.  Is there -- and that represents 91

6    different pieces of information.  Am I understanding your

7    testimony that those 91 pieces of information are not what is

8    contained in the object editor and administrative data of the

9    ad when it was live?

10   A.  Some of this data is from the ad table, some of it, like

11   the -- like the e-mail is from the user table, which is

12   separate from the ad table.  So the administrative view is

13   pulling from additional tables that I referenced earlier, but

14   not all of them are in the ad table with the 91 columns we

15   looked at specifically.

16   Q.  I'm not sure I understand that.  I'm going to leave it

17   alone for a moment and I'm going to show you what I'm marking

18   right now as Defense Exhibit 121.  And this is Exhibit K of the

19   motion to compel.  It's already in the record at docket 623-12.

20   A.  I've reviewed the data, or the document.

21   Q.  I'm sorry?

22   A.  I've reviewed the document.

23   Q.  I'm sorry.  I've been having trouble hearing you, so I

24   apologize.  Maybe if you could -- yeah.  Thank you.

25          Do you see what I have up on the screen?

1    A.  Yes.

2    Q.  And does this appear to you to be a list of multiple

3    changes and modifications with different dates and times by

4    different users that was made to an ad?

5    A.  I could see it says last modified Wednesday, earlier change

6    Monday, Monday, Monday, June, Sunday, yes.

7    Q.  Now, is it your testimony that this information is

8    available in Exhibit 120 or Exhibit 104 or -- is it available

9    in Exhibit 120 or 104?

10   A.  I would have to look up this specific ad information and

11   look through all the tables to see which table -- or what date

12   timestamp.  Since I didn't create this, I don't know what

13   earlier change is referencing what column, what cell.  I mean,

14   there is -- there is many timestamps, so where these are

15   pulling from, I don't know.

16   Q.  Me neither.

17        I'm going to show you Exhibit 104.  Do you have that

18   in front of you as well?

19   A.  I do.

20   Q.  Okay.  On Exhibit 104, what I have just put up on the

21   screen, do you see where it has a creation date?

22   A.  Yes.

23   Q.  It has a last modified date?

24   A.  Yes.

25   Q.  And it has a last edit user column?

1    A.   Yes.

2    Q.   It doesn't appear to have iterations of moderations or

3    edits to the ad, does it?

4    A.   In this particular field, no.

5    Q.   Are you aware of all 91 fields in your chart?

6    A.   Ninety-one fields, yes, but the databases are massive and I

7    haven't looked through every single one of them and every date

8    timestamp.

9    Q.   Well, I'm not asking you if you have looked at every one

10   and the date and timestamp.  I'm asking you if the charts

11   you've created contained the information that was available

12   when the Web site was live, which included all iterations of an

13   edit to an ad, date, time, and user.  Are you familiar with

14   whether your chart contains that information?

15   A.   My information that I produced contains the information of

16   the ad in the database where I pulled the data from.

17   Q.   Yes.  I've heard you say that.  But what I'm asking you is

18   if your database -- if your charts, excuse me, contains all

19   versions and edits to an ad by date, time, and user?

20   A.   The information I extracted does not.

21   Q.   Okay.  Thank you.

22        MS. PERLMETER:  Your Honor, just maybe to clarify

23   things.  I don't know if the defense is trying to suggest that

24   the ad data in Exhibit 121 is the same ad as in Exhibit 120 or

25   if she is just asking questions generally, because -- but if

1   she wants to make the link that 120 and 121 are from the same

2   ad, then I think that foundation should be laid before the

3   witness is asked if it's the same ad.

4           THE COURT:  I understood it to be a general question,

5   not specific to any one ad.

6           MS. BERNSTEIN:  It was, Your Honor.  And I don't think

7   the witness had confusion when answering the questions.

8           THE COURT:  Is that your understanding as well?

9           THE WITNESS:  That just in general this ad -- or we're

10  talking -- she asked if the ad tables -- only the ad table, 91

11  rows, contained this information.  And my ad table does not

12  contain this information.

13          MS. BERNSTEIN:  Yeah, that's all.  Thank you.

14  BY MS. BERNSTEIN:

15  Q.  Mr. Frost, you never worked at Backpage.com, correct?

16  A.  Correct.

17  Q.  You never saw the Web site while it was live, correct?

18  A.  Correct.

19  Q.  You never worked at DesertNet?

20  A.  I did not.

21  Q.  You were never otherwise involved in the creation of the

22  Backpage IT system?

23  A.  Correct.

24  Q.  You were never involved in the maintenance of those

25  systems?

1    A.  I was not.

2    Q.  You have corresponded and spoken extensively with

3    Mr. Gerken who was the -- is the CEO of DesertNet; is that

4    correct?

5    A.  Yes, I have.

6    Q.  You have also corresponded and spoken extensively with

7    Chris Kempel who is the former CTO of Backpage?

8    A.  Yes, I have spoken to Chris Kempel also.

9    Q.  Mr. Gerken and Mr. Kempel have told you most of you what

10   know about the functioning Backpage.com systems?

11   A.  They gave me an overall picture, yes.

12   Q.  And that overall picture emerged when?

13   A.  Once I had received the servers and started to analyze the

14   data is -- I was asking questions to enhance the speed of my

15   review of the data to get access to the ads and images.

16   Q.  In April of 2019 you provided Special Agent Robinson with

17   189 pages of e-mails between you and Wil Gerken; is that

18   correct?

19   A.  Yes, I did.

20   Q.  I'm sorry?

21   A.  Yes, that is correct.

22   Q.  And those e-mails spanned five months?

23   A.  I don't remember time frames, but I provided the e-mails to

24   Special Agent Robinson.

25   Q.  Okay.  You seized these servers in April of -- or not you

1    personally, but the government seized these servers in April of

2    2018, correct?

3    A.   Yes.

4    Q.   You began communicating with Mr. Gerken when?

5    A.   Maybe when I was in Phoenix the first time in late April,

6    early May, maybe when I was in Pocatello, I don't remember the

7    exact time frame, but it was spring-ish before -- summer before

8    I went, or in that time frame.

9    Q.   And that's 2018, April, May of 2018?

10   A.   Yes.

11   Q.   Okay.  And you provided Special Agent Robinson with these

12   e-mails in April of 2019, correct?

13   A.   Correct.

14   Q.   And had you communicated with Mr. Gerken continuously

15   throughout that time?

16   A.   Off and on.

17   Q.   Okay.  Have you reviewed those e-mails?

18   A.   I have not.

19   Q.   Okay.  Did you ever write a report or a summary of what you

20   learned from Mr. Gerken?

21   A.   No.

22   Q.   You never provided the information you learned from

23   Mr. Gerken to the defense, did you?

24   A.   Everything I received from Mr. Gerken was in my e-mail and

25   I forward that on with -- knowing they would go to defense.

1    Q.  Do you know when it arrived to the defense?

2    A.  I do not.

3    Q.  Would it surprise you to learn it was Monday last night and

4    we have a disk of some I haven't had a chance to review yet?

5    A.  If that's the date it happened, then --

6    Q.  And, again, these are your communications from April of

7    2018 --

8         MS. PERLMETER:   Objection.  Calls for speculation as

9    the date of disclosure.

10        THE COURT:   The objection is overruled.

11   BY MS. BERNSTEIN:

12   Q.  These are your communications from April of 2018

13   continuously through April of 2019 when you provided them to

14   Special Agent Robinson?

15   A.  Yes.   It would have been an e-mail I sent or received from

16   Mr. Gerken during that time frame.

17   Q.  Okay.   I want to talk about the information that you got,

18   the demonstrative that you gave us of your systems and how you

19   got this data.

20        What tool did you use to extract the information from

21   the servers that you had?

22   A.  The HeidiSQL was the tool I used to extract the databases

23   and the ads, if that's what you're asking.

24   Q.  Let me back up all the way up.

25        You fly out to Phoenix, and at some point what arrives

1  in Pocatello are servers and hard drives, correct?

2  A.  Yes.

3  Q.  What did you do with the servers and hard drives?

4  A.  I imaged the hard drives contained on the servers.

5  Q.  How did you do that?

6  A.  With Linux forensic software.

7  Q.  What program?

8  A.  FTK Imager Command Line.

9  Q.  You used FTK Imager for them?

10 A.  It was one of them.  I could have used another imaging

11 tool, but primarily it was FTK Imager Command Line.

12 Q.  Okay.  And when you image a drive, the acquisition data

13 actually denotes the tool that you use to image it; is that

14 correct?

15 A.  If you're talking FTK Imager, when used Imager, it creates

16 that text file that includes that information, yes.

17 Q.  And what is ADIS?

18 A.  If I could see it in context?

19 Q.  Yes.  Just one moment.

20         Do you see where it says acquired using?

21         MS. PERLMETER:  Can we get this marked as an exhibit?

22         MS. BERNSTEIN:  Sure.  This will be Defense

23 Exhibit 122.

24         MS. PERLMETER:  Can I have a copy, please?

25         THE COURT:  Isn't this -- we've seen this before.

1    MS. BERNSTEIN:  It's a screen shot of the presentation

2    we've just watched.

3    THE COURT:  Yeah.

4    MS. BERNSTEIN:  But, sure.

5    BY MS. BERNSTEIN:

6    Q.  Do you see where I'm pointing?

7    A.  Yes, I'm sorry.  A screen shot of which presentation?

8    Q.  Of the information that -- when you go into a drive, what

9    you see when you go into that drive?

10   A.  Oh, okay.

11   Q.  And all I'm trying to establish, you indicated that you

12   weren't sure what -- I think I said it wrong -- but you

13   indicated you weren't sure what ADI3 was, so I'm just trying to

14   establish what program that is that you used to image the

15   drive?

16   A.  That's AccessData Imager 3, version 3-ish.

17   Q.  And is that FTK, AccessData Imager?

18   A.  Yeah, FTK Imager.

19   Q.  So FTK Imager is the tool that you used to get into the

20   servers and the hard drives that you received?

21   A.  To create the images?

22   Q.  Correct.

23   A.  Yes.  I used AccessData Command Line Imager tool to create

24   images of the physical drives from the servers.

25   Q.  Did you use any other tools?

1    A.   Yes.

2    Q.   What other tools?

3    A.   I used additional Linux boot CDs, um --

4    Q.   Linux boot CDs?

5    A.   Linux boot CDs, yes, a bootable CD that runs Linux tools.

6    Q.   Is there a specific program name associated with that?

7    A.   Um, the CD is a compilation, so the FBI has one that the

8    FBI program is produced, it's a cart boot media.  That is one

9    tool I use.  The primary tool I use for imaging would be the

10   FBI's forensic boot or Linux boot media.

11   Q.   The primary tool that you used for imaging is the FBI's

12   forensic Linux boot media?

13   A.   Yes.

14   Q.   Okay.  Is that a proprietary FBI program?

15   A.   The CD is a compilation of the tools that are available on

16   Linux that the FBI has packaged together on one distribution.

17   Q.   Can I go get that FBI Linux boot CD?

18   A.   It's law enforcement only but you could get all the tools

19   on there.  They're open source and free.

20   Q.   And were there any other programs that you used to image

21   the drives and the servers that you received into 2018?

22   A.   Without reviewing all of the dozens of log files that have

23   been associated with those images, I can't say exactly, but

24   that was the primary tool I used to image them.

25   Q.   The primary tool you used was the FBI compilation CD, you

1    also used FTK; is that correct?

2    A.   So FTK Imager is a software package on the boot CD.

3    Q.   So the tool you used is the FBI CD?

4    A.   Um, if you're talking tools specifically to do the imaging,

5    that would be the software package, AccessData Imager, which

6    was running off of a CD from the cart boot media.

7    Q.   Well, I am.  I'm trying to understand exactly what it is

8    that you did with the drives because I can't view them, and so

9    I want to understand what programs you used to be able to view

10   them.  And it sounds to me like the program you're saying you

11   used is an FBI compilation of Linux tools that's on an FBI law

12   enforcement only disk?

13   A.   The tool specifically is AccessData Command Line Imager,

14   which can be downloaded from AccessData for free.  It's a free

15   tool.

16   Q.   That's also known as FTK?

17   A.   FTK is a forensic toolkit.  Again, the company, AccessData,

18   has lots of forensic tools.  One of them is FTK, one of them is

19   FTK Imager, Windows -- the Windows version, there is Access --

20   FTK Imager Command Line.

21   Q.   Do you have your forensic tools with you today?

22   A.   I certainly don't.

23   Q.   Okay.  And what would you do after you imaged a drive?

24   A.   Once a drive was imaged, I do hash verification of that

25   drive.

1  Q.  And can you explain -- is a hash verification, is it fair

2  to say that a hash verification is sort of like a digital

3  fingerprint?

4  A.  Yes.

5  Q.  It confirms that the data is identical, what you have

6  extracted or what you've imaged off a drive is identical to

7  what exists on the drive?

8  A.  From the original, yes.

9  Q.  And when did you begin imaging these drives?

10  A.  After they arrived.  The drives I started with would have

11  been the two servers I received from Phoenix.  And that would

12  have been a time frame after I was in Phoenix and once they

13  were shipped to me some time early summer of 2018.

14  Q.  Is a record of this kept anywhere?

15  A.  Yes.  So every single image I created has a file that is

16  saved within the image file.  So if you pull up the image

17  itself, and the FTK Imager we had a screen shot of, the data is

18  encapsulated inside the image itself, as well as in a text

19  file.  So if you had the image, you could pull up the metadata

20  associated about the image file that was created, you also have

21  the text file that will tell you all the information, when it

22  was imaged, how long it was imaged, when it was verified, how

23  long it took to verify.

24  Q.  Okay.  So I'm putting back up Defense 122.  Does this

25  indicate the date when you imaged this hard drive, for example?

1    A.  Yes.  So I see image information acquisition started.  And

2    this is based on the date of the system I was extracting from,

3    so assuming the clock is set correctly, that is the information

4    you would pull from.

5    Q.  Is that something you check when you're doing a forensic

6    image that you know is going to be used for evidence in a

7    criminal matter?

8    A.  Yes.  So we look at the date and timestamp -- or, sorry, we

9    look at the information in the system to see the BIOS

10   information of what time the computer thinks it is.

11   Q.  So do you have any reason to believe that that date is

12   incorrect?

13   A.  So I don't know where this one -- which server this came

14   from, if it was an Amsterdam, then it should have been set to

15   Amsterdam time.  So if I imaged it in America, we're nine or

16   ten hours different, so the time I actually started it might be

17   different than this actual time, but it should be fairly close.

18   Q.  Let's talk about Amsterdam for a second.  You mention that

19   you had desired to leave the servers in Amsterdam running; is

20   that right?

21   A.  Absolutely.

22   Q.  And at what point did the servers in Amsterdam come down

23   from usability, that a potential advertiser could no longer go

24   onto the Amsterdam Web site and post and publish an

25   advertisement to Backpage.com?

1  A.  They were shut down before I was brought into the case, so

2  I don't know the exact date that happened.

3  Q.  You were brought into the case April 2018?

4  A.  Late April, early May, that time frame.

5  Q.  Do you have a record somewhere what date you were brought

6  into this case?

7  A.  I would have to check my travel logs and see when I flew to

8  Phoenix or check my e-mail and see when I was requested to go

9  to Phoenix.

10  Q.  Okay.  You prepared your testimony today with the

11  government, correct?

12  A.  Yes.

13  Q.  Okay.  Now, when you were testifying, you said that what

14  you wanted to do in Amsterdam was take it off line and then

15  access it through encrypted channels, correct?

16  A.  Yes.

17  Q.  Your hope was to keep it on line and remotely access it,

18  correct?

19  A.  Yes, it was.

20  Q.  Why did you want to do this?

21  A.  Because I had already been to Phoenix and saw all the

22  servers sitting there, and this time I realized it would be

23  much easier to be able to access the servers live and just look

24  at everything up and running.  It would have been much easier

25  than dead box forensics.

1   Q.  Is there any reason that the Arizona Tucson servers could

2   not have been taken off line and accessed through encrypted

3   channels remotely?

4   A.  Technologically, no, that's possible.

5   Q.  Do you recall Agent Cullen's testimony earlier this morning

6   when he said that FTK Imagers would not work on FreeBSD

7   programs?

8   A.  Yes.  I think he made some reference to that.

9   Q.  I'm sorry.  Can you say that again?

10  A.  Yes.  I remember him talking about that.

11  Q.  And, yet, FTK is the program you successfully used,

12  correct?

13  A.  So if we're talking FTK Imager, the tool to image drives,

14  then the FTK Imager can see a physical drive and create an

15  exact copy of it, no matter what file system is on there.  If

16  the drive is encrypted, it will copy an encrypted drive, if

17  it's FreeBSD, it will copy a FreeBSD drive.

18          Now, if you want to use FTK Imager to review the data

19  on that drive, when you look at it, it won't be able to see the

20  data that's inside that drive, because it's a Windows forensic

21  tool primarily, and it's just not the correct tool to view the

22  data.

23  Q.  So what tool do you use to view the data?

24  A.  Are we talking FreeBSD?

25  Q.  You have imaged how many servers in this case?

1  A.  Several.

2  Q.  How many hard drives?

3  A.  Dozens.

4  Q.  Dozens, hundreds?

5  A.  Maybe.  There is a lot of hard drives, yes.

6  Q.  And what program do you use to view those?

7  A.  So I use a Linux based tool that --

8  Q.  What is the name of it?  I'm sorry to cut you off, but I'm

9  just curious about the name of the program.

10  A.  So the program I use is different than the software used to

11  read the data.  So the software is an application that runs

12  inside the operating system, so the software has to be able to

13  talk to the file system.  So, in this case, I used a Z pool

14  tool, or Z -- ZFS views, something to that nature, that would

15  then reconstruct the data to -- so I could view the Z pools, as

16  I said.

17  Q.  When you forensically imaged the servers and the hard

18  drives in this case, did you take photographs of anything?

19  A.  When I imaged them to take photographs?

20  Q.  Yes.

21  A.  There was probably some administrative photographs I took,

22  yes.

23  Q.  And you produced those to the government?

24  A.  The photographs I took I sent via e-mail, I believe, or I

25  can't remember I -- a request was asked to get images -- or the

1   pictures and I sent them out.

2   Q.  Who made that request?

3   A.  The defense -- the request came from defense and I created

4   that, so I responded with the images to the FBI office.

5   Q.  And you -- and what were these images of?

6   A.  They were images of the servers themselves.

7   Q.  My question is when you went into the servers and you

8   imaged an individual hard drive, did you take a photograph of

9   the BIOS screen, for example?

10  A.  I do not believe so.

11  Q.  Do you usually take photographs of the BIOS screen?

12  A.  Not usually, no.

13  Q.  Is that -- have you ever been taught to take photographs of

14  the BIOS screen?

15  A.  I know some examiners take photographs of the BIOS screen.

16  Q.  But it's optional, in your view?

17  A.  The information is captured in other places.  Again, the

18  tools I use capture the date, timestamp, so I don't always take

19  pictures of the BIOS.

20  Q.  And you've been a member of the FBI computer analysis and

21  response team for ten years?

22  A.  Yes.

23  Q.  You follow the agency policies and the rules of evidence?

24  A.  Yes.

25  Q.  You regularly collect digital evidence for forensic

1   examinations?

2   A.  Yes.

3   Q.  You regularly create forensic images of hard drives and

4   other digital storage devices?

5   A.  That is correct.

6   Q.  And you don't take BIOS screen photographs?

7   A.  Not always.

8   Q.  Sometimes?

9   A.  Yes, sometimes.

10  Q.  And what is it, in your view, that determines whether or

11  not a piece of evidence is significant enough to be associated

12  with a BIOS screen photograph as you're accessing it?

13  A.  Um, if I was loading BIOS and there was something

14  significant, like the date was way off, then I would probably

15  note that.

16  Q.  Could you explain the information that's captured in a BIOS

17  screen?

18  A.  It depends on the BIOS.  Depends on the server.

19  Q.  Could you give some examples?

20  A.  Inside the BIOS there is information about the hard drives,

21  the boot order, other information like that.

22  Q.  Is there information about the configuration of the server?

23  A.  Yes, configuration of the server and some aspects of the

24  server are in the BIOS.

25  Q.  Is there information about how the server, for example, if

1   it's a RAID?

2   A.   That's probably in the -- there is a separate RAID

3   configuration tool that sits on boot up.   There is separate --

4   depends on if it's hard RAID or soft RAID.   There is many

5   different levels.   And if you're speaking BIOS in general, it

6   may contain RAID information, it may not.   They may be stored

7   somewhere else.

8   Q.   And, again, RAID information is when multiple servers are

9   -- information is spread across multiple servers; is that

10  correct?

11  A.   Multiple drives.

12  Q.   Multiple drives.   Excuse me.   Okay.

13         After you take a forensic image, I think you indicated

14  that you hash verify it?

15  A.   Yes.

16  Q.   Okay.   And that process is significant to verify that it's

17  identical to the original data, correct?

18  A.   That is correct.

19  Q.   Exhibit 120 and Exhibit 104 are the spreadsheets you've

20  created of the data you say existed in the database, correct?

21  A.   Yes.

22  Q.   Are you able to hash verify that?

23  A.   Yes.   So when I extract the databases, I hash the file I've

24  extracted, but since I'm generating that information, there is

25  nothing to compare it back to.

1   Q.   Because you actually created these spreadsheets, right?

2   A.   Yes, I did.

3   Q.   They never existed on Backpage.com?

4   A.   Correct.

5   Q.   So the information that is on there is stuff you pulled out

6   and that you created?

7   A.   Yes.

8   Q.   And it can't -- I think you just said you can't hash that

9   massive document that's in front of you because there is

10  nothing to hash it against.  It didn't -- you created it.  It

11  didn't exist previously, correct?

12  A.   That is correct.

13  Q.   So we can't verify the accuracy of the information that's

14  in these tables?

15  A.   The only piece we can accurately say and hash verify would

16  be the image files, because it stores the hash of the image

17  when it's uploaded, and then I can compare the images are the

18  exact same.

19  Q.   I want to talk about your attempt to recreate the

20  functionality of the Backpage.com systems.  Can you please

21  explain what it means to virtualize the Backpage environment?

22  A.   Yes.  So to virtualize the environment would be to take a

23  piece of software, in this case it would be a Linux based

24  software distribution that could read the file formats

25  associated that I had created.

1          I will then take all those images and I would do a

2    process called mounting the image, which is to use a piece of

3    software to take the image file and present it to the operating

4    system so that I can see the file system data.

5    Q.   Okay.  Does virtualizing an environment sort of stimulate

6    the Web site operation in a controlled environment?

7    A.   If you're talking virtualization of Backpage.com, if you

8    virtualized everything, then, yes, that's what it would mean.

9    Q.   You attempted to do this?

10   A.   I attempted to virtualize aspects of the Web site.

11   Q.   And you were unsuccessful?

12   A.   Because of the size, the number of drives and the system I

13   was using, I ran into issues where I believe I ran out of RAM.

14   I didn't have enough computer hardware capacity to keep all of

15   the pieces in a virtual state.

16   Q.   And you were here for Mr. Gerken's testimony when he

17   indicated that he would be able to create a read only version

18   of the system; is that correct?

19   A.   Yes, I heard that.

20   Q.   Okay.  You've been testifying for a while this afternoon,

21   correct?

22   A.   Yes.

23   Q.   At no point in time in any of your direct or

24   cross-examination thus far have I heard you describe

25   de-crypting any of the Backpage servers or drives.  Did you

1    de-crypt any of the Backpage servers or drives?

2    A.   Um, nothing -- the servers and drives were not encrypted

3    no.

4    Q.   They were not encrypted?

5    A.   Correct.

6    Q.   Okay.  And when you provided -- I just want to actually

7    clear up a couple of confusing terms that have gone on today.

8         We talked -- I want to talk about databases first.

9    Okay.  You've described a marketplace database, right?

10   A.   Yes.

11   Q.   And that's what existed on Backpage.com that contained

12   various advertisements, right?

13   A.   Yes.  So when I refer to a marketplace, that would be a

14   specific database for a geographic region that had been

15   designated by Backpage to store ads for a certain region.

16   Q.   Okay.  And you've also talked about an image database which

17   contains all of the images that were on Backpage.com, right?

18   A.   Yes.

19   Q.   And you've also talked about this MySQL database?

20   A.   Yes.

21   Q.   But that is a -- that's different than the servers and the

22   information that existed on Backpage.com, correct?

23   A.   MySQL is different than -- what was the question?

24   Q.   You've talked about a MySQL database, right?

25   A.   Yes.

1   Q.   Okay.  And that's a database that you created?

2   A.   Yes.  It was on my laptop.

3   Q.   You ran code?

4   A.   Um, ran a code, so I installed the program, yes.

5   Q.   And I watched you run codes to do queries, correct?

6   A.   Yes, I ran queries.

7   Q.   Okay.  And that database, as you've been using the term, is

8   a very distinct and separate thing from the marketplace

9   database or the image database as they existed on Backpage.com,

10  correct?

11  A.   So the database is the extracted version from the database.

12  It was not sitting in a dot SQL format.  I extracted that so

13  that it could be used and reviewed and accessed.

14  Q.   You created it?

15  A.   Yes, I did.

16  Q.   It didn't exist on Backpage.com?

17  A.   The SQL file I created did not.

18  Q.   Okay.  Are we able to bring up the program again?  Could

19  you bring that up for me, the program that you were searching

20  with the prosecutor?

21  A.   Yes.

22       I have to reconnect.

23  Q.   I'm sorry?

24  A.   I have to reconnect.  It's timed out.

25       I've got it.

1    Q.   Okay.  So how do I, as an attorney defending my client

2    against a 100-count indictment, run a search for all ads

3    reported to NCMEC?

4    A.   We first had to find out which table contained that ad, if

5    it contains it at all.

6    Q.   Okay.  And the tables contain all of the information that

7    accompanied an ad.  That's been your testimony, correct?

8    A.   Yes.  So if we're talking the ad table, that will contain

9    all the tables associated with the ad data.

10   Q.   So how do I run a search for all ads that were reported to

11   NCMEC?

12   A.   Again, I would look through that and see is this data

13   stored anywhere.  I don't know if Backpage retained that

14   information.

15   Q.   Well, I'm showing you again what's been marked as Exhibit

16   K, which is already in the record, and I believe we marked it

17   today as Exhibit 121.

18           MS. BERNSTEIN:  Can we switch to the Elmo real quick,

19   please?

20           COURTROOM DEPUTY:  Yes.

21   BY MS. BERNSTEIN:

22   Q.   Do you see this section that's called violations?

23   A.   Yes, I do.

24   Q.   And do you see where it says, violation flag?

25   A.   Yep.

1    Q.  And you see where it says reported to NCMEC?

2    A.  I do see that.

3    Q.  So it appears that information was maintained?

4    A.  So then I would go to the violation column of the table.

5    If you like me to go there, I can --

6    Q.  Please.

7    A.  -- look at that and see, again, what information is there.

8         MS. BERNSTEIN:  Can we switch back to the witness's

9    computer so we can observe the search?

10        THE WITNESS:  Here's violations, and then I would

11   search this column for that information.

12   BY MS. BERNSTEIN:

13   Q.  And, I'm sorry, I wasn't table to view your screen while

14   you were creating that search.  I mean, my concern is as an

15   attorney just being able to do this to defend my client.

16        Could you show me again how you created the search?

17   A.  So I haven't done a search yet.  This is just the ad table.

18   So if we look up here --

19        Can we get the circle power?

20        COURTROOM DEPUTY:  You should have.  It's on.

21        Try again.

22        THE WITNESS:  No.

23   BY MS. BERNSTEIN:

24   Q.  I don't have access to this database that we have up,

25   correct?

1    A.  The IED underscore Backpage database was provided in

2    discovery on, again, a standalone hard drive.  All the SQL dump

3    files were provided.

4    Q.  So if that were read, your testimony, is that would be an

5    interactive Web site exactly like we're looking at now in Mint?

6    A.  So you would have to take the database and ingest it into a

7    SQL server and then access it from a tool like HeidiSQL like I

8    have here.

9    Q.  And HeidiSQL was not a program that ever ran on

10   Backpage.com, as far as you know?

11   A.  Correct.

12   Q.  And Mint was not a program that ever ran on Backpage.com,

13   as far as you know?

14   A.  Correct.  That is software I am using to aid myself.

15   Q.  So this is -- this is different than what was on the

16   Backpage.com Web site again?

17   A.  Yes.  So if I -- if I took, let's say Backpage had a Word

18   document and I copied the Word document off, I could look at it

19   in Microsoft Word, I could look at it in WordPad, I could look

20   at it in a Linux manner, so I could look at the program in, you

21   know, different programs, but, yes, just because my Microsoft

22   Word program wasn't on the server, it doesn't mean I can't look

23   at the data.

24   Q.  Exhibit K, Exhibit 121 is what it looked like when

25   Backpage.com was live, correct?

1    A.   Which one is K?  Is that this?

2    Q.   It's the black and white five page object editor.

3    A.   So -- no, not necessarily.  So this information -- Backpage

4    doesn't have a bunch of ads sitting out there displaying with

5    full pictures.  All the data is stored in a database, and then

6    if a specific ad is requested, then the servers go out, grab

7    the data, put it in ad format and then that's what is

8    displayed.  But sitting there right now or in the servers when

9    they are running was a database full of columns and rows

10   containing information.

11   Q.   So Exhibit K is what this information looked like when

12   Backpage.com was up and running and this data was pulled?

13   A.   You could retrieve it in this format, but this is not how

14   it was saved at Backpage.  It wasn't saved like this.  You

15   could generate a report that made it look like this or generate

16   an ad, but the data at rest at Backpage was in the SQL database

17   format, all text as we saw before.

18   Q.   And there was a button to generate this ad?

19   A.   Yes.  You could click and make the ad be generated, yes.

20   Q.   And I can't do that anymore?

21   A.   Correct, neither can I.

22   Q.   Okay.  So, I'm sorry, back to this Mint HeidiSQL program.

23   Can you please show me how to search for all ads that were

24   reported to NCMEC?

25             THE COURT:  You're going to have to use words.

1    THE WITNESS:  Okay.  Yes.  So if you look at the --

2  this is the ad table for IED again, so Washington, D.C.,

3  database.

4  BY MS. BERNSTEIN:

5  Q.  And do I have the ability to search across the Web site as

6  opposed to going into the 176 separate marketplaces?

7  A.  On a standalone, no, you would have to search each market

8  individually or create a program that would do the search for

9  all of those.

10  Q.  Okay.  Please continue.

11  A.  So I have selected the ad table, and looking at the data

12  from the ad, what you see on your screen.  Then if you scroll

13  over to the violation column, which would have been in -- it's

14  one of the 91 columns as violation.

15    Now, if you're asking for the specific SQL query to

16  search for that, I haven't done that yet, so I don't know the

17  exact syntax, because it's not a number or something I could

18  search for standard.  I would have to see what formatting it

19  is, but I could visually inspect and just search through here

20  and look and see is there a NCMEC flag in the violation.

21  Q.  Well, if you could scroll up for a bit -- sorry, if we can

22  go up to the first -- the top of this chart.

23  A.  Yep, we're there.

24  Q.  So I see -- on the screen we're looking at right now there

25  is two violations listed, correct?

1    A.   Violation count and violation.

2    Q.   No.   I'm actually just looking in the violation column,

3    that column of the 91 column.

4    A.   Oh, yes.

5    Q.   And I see two responses.   If that's a fair characterization

6    of that?

7    A.   Yes.

8    Q.   Okay.   And the first one says proxy score, 1.80?

9    A.   Yes.

10   Q.   What violation is that?

11   A.   I don't know.   All I can say is that's what the cell says

12   is that number you have referenced.

13   Q.   Okay.   And then a little bit lower it says, hits, one,

14   hits, back -- filter object ID 2827914, backslash filter object

15   ID, action, flag as spam, action match, dot relaxation, dot --

16   oh.

17   A.   Oh, sorry.

18        Let me bring that up.   There you go.

19   Q.   And do you know what that means?

20   A.   No, I didn't program these servers.   All I know is that's

21   the information contained in that column.

22   Q.   So let's keep going, because I'm still trying to figure out

23   how to find an ad that was reported to NCMEC.

24   A.   Assuming there is one for IED, we could scroll through and

25   look through all of them, if you would like.

1  Q.  Well, how about this?  The ad that we've been looking at in

2  Exhibit K slash Defendant's Exhibit 121 for purposes of this

3  hearing, appears to have been posted in Tacoma.  So we know for

4  a fact, right, that there is at least one ad that was posted in

5  the Tacoma marketplace that was reported to NCMEC.  Please show

6  me how we find that ad in this system.

7  A.  So I only brought a small subset.  I only have the

8  Washington, D.C., database.  I did not bring the entire

9  universe of Backpage databases with me for the download that I

10  prepared.

11  Q.  Can you click back out, because I did think that I saw

12  additional databases when you logged in and described that

13  being Washington.

14  A.  Right here.

15  Q.  So what are these other -- what are these other

16  spreadsheets you've created?

17  A.  The information here -- so information schema is just,

18  that's something in SQL.  So these -- all this information is

19  in the SQL server I created, so some are there by default, like

20  my PHD admin, cyst, new schema is one I created, MySQL is one I

21  created.  These are databases I created to populate the MySQL

22  server.  So the marketplace that I have uploaded are HON

23  underscore Backpage and IED.  HON, I believe, is Honduras.

24  Q.  Why did you bring the Honduras marketplace?

25  A.  It was just small and I just grabbed them at random.

1    Q.  How many marketplaces were there total, as far as you know?

2    A.  There are over a hundred, hundred and plus.

3    Q.  Does 176 sound correct?

4    A.  I haven't counted them, but it's possible.

5    Q.  Okay.  So we're not able -- and stop me if I'm wrong.  If

6    you have the ability to work with this data for a little bit

7    longer and show me if an ad was reported to NCMEC, that's what

8    I'm trying to understand, but it sounds to me like you can't do

9    that; is that correct?

10   A.  Sitting here right now without looking and looking up

11   syntax to see how you search for fields with quotes and things

12   like that, since I have never done that search before, then I

13   can't do it here, no.

14   Q.  And so if I, as an attorney defending my client against a

15   100-count indictment, want to find out whether or not an ad was

16   reported to NCMEC, I have to look up fields of syntax and run

17   code and create a Mint HeidiSQL database to do that?

18   A.  You could do that if you like to or you could hire an

19   expert to do that.

20   Q.  But I have no ability to look at a report with a check box

21   that tells me whether or not it was reported to NCMEC, right,

22   that's gone?

23   A.  Correct.

24   Q.  Okay.  Let's try another piece of data I'm interested in.

25        If we can go back to the ELMO, I'm on Exhibit 121 on

1   the first page.  And we can see that there are various

2   modifications that were made to an ad.

3          How many do you see listed there?

4   A.  Ten.

5   Q.  Okay.  And it indicates the date that the modification was

6   made, correct?

7   A.  Yes, it does.

8   Q.  The time the modification was made?

9   A.  Correct.

10  Q.  And the user who made the modification, correct?

11  A.  Yes.

12  Q.  And so I'm looking at the third entry, where there was a

13  change on Monday, June 10th of 2013, at 8:05 a.m. by user BP

14  85.

15  A.  Yes.

16  Q.  Okay.  So I want to know what ads BP 85 modified.  Can you

17  show me how to figure that out?

18  A.  Again, so that would be in the moderator log, or moderator

19  log file there is a column.

20         MS. BERNSTEIN:  Can we please switch back to the

21  witness's computer?

22         THE WITNESS:  Yes.  So I would go to moderator log.

23  It's maybe over here.

24  BY MS. BERNSTEIN:

25  Q.  I'm sorry, actually, can you --

1    A.   There it is.

2    Q.   I'm sorry?

3    A.   Here's the moderation log, moderator, moderation log.

4    Q.   Okay.  So the very first entry you have here, just on the

5    top that I can see, says, edited B.  If you drag that column

6    out, is it going to tell me more or does it just say edited B?

7    Edited B.  Okay.

8         And then next it appears to be a blank field; is that

9    right?

10   A.   For the moderation log?

11   Q.   For the moderation log that correlates to edited by.

12   A.   Yes.

13   Q.   So it doesn't tell me what user edited an ad?

14   A.   That field is empty.

15   Q.   But we just looked at it where there is a lot of

16   information about this specific user.  None of those were

17   blank, right?

18        Let's scroll down again.

19   A.   Which user are we talking about when you say none of them

20   are blank?  Back on the ad you had up here?

21   Q.   Yeah.

22   A.   I saw -- yeah, so I saw one where it was -- had the -- the

23   moderator, we're assuming a moderator user edit of that.

24   Q.   I'm sorry.  Let's put this back up on the screen because I

25   don't want there to be any confusion.

1          There is ten modifications that are viewable from the

2    object editor, which was the administrative tool we had when

3    Backpage.com was live.  Those ten modifications, every single

4    one of them has a user -- has the name of a user who made the

5    modification, correct?

6    A.  Yes.

7    Q.  Okay.  Now, let's go back -- and please just leave the

8    screen that you had up, because I had a couple more questions

9    about that one.

10          When I look at this screen I see, edited by on the

11   very top of the screen, edited B, excuse me.  I scroll down a

12   couple -- I skip of five -- four lines, and then I see edited

13   A, edited B, edited A.  And every time the moderation action

14   indicates that it was edited, the moderation log is blank as to

15   the user that did that, correct?

16   A.  It appears that on this example, yes.

17   Q.  Okay.

18          THE COURT:  Counsel, I'm going to stop you.

19          MS. BERNSTEIN:  Okay.

20          THE COURT:  You can step down.  Or disconnect,

21   whatever.

22          THE WITNESS:  Okay.

23          THE COURT:  So, Traci, what were the times again?

24          COURTROOM DEPUTY:  October 18, 9:00 to 12:00 or

25   October 23rd, 9:00 to 12:00.

```
 1              THE COURT:  Okay.  So we have two time periods
 2    available -- I'm starting trial next week -- but on the 18th
 3    from 9:00 to 12:00 or the 23rd from 9:00 to 12:00.
 4              MR. RAPP:  The United States prefers the 23rd.
 5              MR. CAMBRIA:  I can't be here the 23rd.
 6              THE COURT:  I'm sorry, I couldn't hear you.
 7              MR. CAMBRIA:  I said that I couldn't be here the 23rd,
 8    Your Honor.  I have a conflict.  I have a trip.  But I think if
 9    it's just to complete this hearing, that Ms. Bernstein could
10    stand in for me.  And my client's here and would not have an
11    objection to that.
12              THE COURT:  Okay.
13              MR. FEDER:  I can't do it on the 23rd.  I can do it on
14    the 18th.
15              THE COURT:  You cannot do it on the 23rd?
16              MR. FEDER:  Right.
17              MS. BERNSTEIN:  I'm in a deposition on the 18th and my
18    expert is also unavailable on the 18th, so that won't work for
19    us, unfortunately.
20              THE COURT:  The 24th?
21              MS. BERNSTEIN:  I'm sorry?
22              THE COURT:  The 24th?
23              MS. PERLMETER:  24th, 9:00 to noon?
24              MR. FEDER:  What time?
25              THE COURT:  Nine to noon.
```

1          MS. BERTRAND:  Judge, I'm not available on the 24th

2     but I can ask counsel to step in.  I'm not taking witnesses on

3     this.

4          MR. CAMBRIA:  Same here.

5          THE COURT:  Okay.

6          MS. BERNSTEIN:  Myself, Mr. Lincenberg, and

7     Mr. Bienert, are in a hearing in the Southern District of

8     California on the 24th at 1:00 o'clock in the afternoon.

9          THE COURT:  The 25th from 1:00 to 4:00.

10          MR. RAPP:  We can do the 25th, Your Honor.

11          MS. BERNSTEIN:  I think we're just conferring.  I'm

12     personally available on the 25th, as is my expert.

13          THE COURT:  Everybody thumbs up.

14          Okay.  I'm not hearing anybody can't make it.

15          MR. CAMBRIA:  I can't make it.

16          MS. BERTRAND:  I can't either, but the same.

17          MR. CAMBRIA:  Ms. Bernstein can stand in for me on

18     that date, Your Honor.

19          THE COURT:  Okay.  So let's continue this on

20     October 25th at 1:00 p.m.  Okay.

21          MS. BERNSTEIN:  Thank you, Your Honor.

22          MR. EISENBERG:  Your Honor, may I address the Court?

23          THE COURT:  Yes.

24          MR. EISENBERG:  Your Honor, I want to address the

25     Court on a matter of a witness that was subpoenaed for

1    appearance today.  I'll give the Court some background, and it

2    won't take me long, but I think this is of importance to the

3    system and to the defendants and the parties.

4          The person that was subpoenaed by the defendants

5    through an affidavit of indigency which Your Honor signed,

6    being a CJA attorney, that is a matter of requirement, the

7    subpoena was directed to Issa Martin in Grand Prairie, Texas.

8    The subpoena was served.  And I have a return of service on the

9    subpoena by a marshal whose name I cannot read, but obviously

10   in that district that serves Texas.  And it was served on

11   October the 1st, 2019.  I have a copy of the subpoena and its

12   return of service if the Court would like to see it.

13         That witness was not here this morning, and as far as

14   I could tell, she is not here this afternoon.  My investigator

15   received a telephone call from this witness on the 1st of

16   October, and it essentially goes like this:  Ms. Martin

17   responded forcefully that she had received a subpoena in

18   reference to a trial.  She stated she was not going to testify

19   in any trial on behalf of Andrew Padilla.  I, meaning my

20   investigator who is in court today, corrected Ms. Martin and

21   told her that the 10-3, meaning October 3rd, proceeding was a

22   hearing not a trial.  She responded that she didn't care.  She

23   was not appearing.  I, meaning the investigator, informed her

24   that the subpoena was an order from the court.  Ms. Martin

25   again stated that she did not care, she would not be appearing.

1    She further stated that she would not appear unless you

2    subpoena everyone from the company.  And I assume that means

3    Backpage.  That's my assumption.

4         She said she had heard that she was the only one being

5    subpoenaed.  I, meaning the investigator, asked her who told

6    her that, and she responded, I'm not saying.  The investigator

7    asked Ms. Martin if she had been in contact with the

8    government.  She stated she left a message with Reginald Jones.

9    I asked for his number.  Ms. Martin responded to the effect,

10   he's with the prosecution.  You have his number.

11        Ms. Martin told the investigator she would call

12   Mr. Eisenberg, the attorney who had issued the subpoena as

13   well.  And my name is on the subpoena down in the lower left-

14   hand corner.

15        As described by the investigator, Ms. Martin's

16   telephone demeanor could be described as forceful, firm, and

17   agitated.  A few minutes later -- I believe a few minutes later

18   I received a call as well.  And in this discussion I was told

19   by Ms. Martin that she had just got a subpoena and she wasn't

20   going to appear at a hearing on Friday.  I told her that the

21   hearing was on Thursday.  She said she wasn't going to get on

22   an airplane and come to any hearing.  She had personal things

23   to attend to.  She also said she was not going to be a witness

24   for Mr. Padilla.

25        I stated the subpoena was a directive from the Court

1    to appear and her presence was required.  Then she stated she

2    would contact an attorney.  She said that she had called Reggie

3    Jones about the subpoena and that she had also called

4    Mr. Ferrer's attorney.  I asked her if Mr. Ferrer's attorney

5    represented her, but she simply said she would contact an

6    attorney about the subpoena.  I told her such contact was her

7    prerogative, but repeated that it was a direction from the

8    Court requiring her appearance.  And I stated if she did

9    contact an attorney, to have him or her give me a call.

10          At some point in the call I also suggested to her that

11   she make herself available for a meeting when she came into

12   Phoenix, but she was quite clear there would be no meeting.

13   And I would describe her demeanor to me, essentially, as the

14   same it was to the investigator, very forceful, if not hostile.

15          In my point of it is this, Your Honor.  We, as the

16   defense, don't know whether we're going to have Ms. Martin

17   appear again now that there is an -- there is a new time Your

18   Honor has set, but I think we'd all be concerned about the fact

19   that a witness has disregarded an order of this Court.  And I

20   am not sure what it is that Your Honor wants to do about it,

21   but I want to present this to the Court at this time because

22   she is in contempt of court, in my belief.  I haven't heard

23   from her and I did not think it appropriate for me to try to

24   call her back again, but she's not here today.

25          THE COURT:  Okay.  So what are you asking?

1          MR. EISENBERG:  I will talk with my colleagues, Your

2     Honor, with respect to how we want to proceed about this, but I

3     will be back with another subpoena to Your Honor requesting her

4     appearance if we do want her to appear again at this -- at the

5     continuation of this hearing.

6          As far as requesting her to be held in contempt of

7     court, Your Honor, I don't think that's necessarily up to me.

8     It could be up to the Court.  But, in any event, I am going to

9     consider it and I'll talk to my colleagues about that, how to

10    proceed.

11          THE COURT:  So you knew on October 1st that she was

12    telling you she's not coming?

13          MR. EISENBERG:  Yes.

14          THE COURT:  So I guess if I know in advance, I can

15    handle it better than after the fact, because she may have had

16    -- part of the things you mentioned is personal things.  She's

17    subpoenaed from out of state on October 1st to appear in

18    Arizona on October 3rd.

19          MR. EISENBERG:  Right.

20          THE COURT:  There may have been a legitimate reason

21    why she's not here.

22          MR. EISENBERG:  With respect, Your Honor, she gave me

23    none, nor was there any further contact on the next day.

24          THE COURT:  I understand, but my experience with

25    civilians who are unrepresented is that they may not trust the

1  lawyers that are calling them, whether it's from the government

2  or the defense, that sometimes if I am able to get them on the

3  phone ahead of time, I can calm them down and get them to

4  comply, which is a suggestion if you need to call her next

5  time.

6        MR. EISENBERG:  You mean you, the Court?

7        THE COURT:  Yes.

8        MR. EISENBERG:  Oh.

9        THE COURT:  I mean, in open court.  I wouldn't do it

10 without somebody else on the phone.

11       MR. EISENBERG:  Well, that's a little difficult, Your

12 Honor, at this point because she didn't appear, and I did not

13 think it was incumbent upon myself to give her a call again

14 because I think she was just done with the process.  I can't

15 characterize what was going on in her mind, but I do think it's

16 an effrontery to the Court not to appear.  It's not my order,

17 it's Your Honor's order, and that is in the format of the

18 subpoena directing her appearance.  If she had a problem with

19 appearing, then perhaps she could have found a lawyer, could

20 have called me, and perhaps something else would have been

21 done, but none of that was done.

22       THE COURT:  To put this in context, who is she?

23       MR. EISENBERG:  Issa Martin was a Backpage employee

24 who was at one time a custodian of records for Backpage.  And

25 when Backpage received subpoenas, my understanding is that she

1    appeared, perhaps at grand juries, perhaps at trials, and she

2    was the person who I envision as a custodian of records, in

3    other words, someone who can identify records.

4           THE COURT:  So just for future reference, part of my

5    consideration in what to do in these situations, because it's

6    not like it hasn't happened before, is, obviously, the

7    importance of the witness, and I guess I don't understand that

8    at this point, but --

9           MR. EISENBERG:  Well --

10          THE COURT:  So I -- if you think she's a critical

11   witness and you want me to have an order to show cause hearing

12   for her, I will certainly do that.  If you are planning to call

13   her next time and you have the same hesitation, I think there

14   is a way to handle it.

15          MR. EISENBERG:  Your Honor, my only further request is

16   to determine whether, if there was a call made to the

17   government, because she told me and my investigator that she

18   was going to call Mr. Jones, I don't know if that call was made

19   and I have no idea what was said.  I just would like to get

20   confirmation whether a call was received.

21          THE COURT:  Mr. Jones.

22          MR. JONES:  I haven't spoken with Ms. Martin, Your

23   Honor.  She did send me an e-mail, but as far as telephone

24   contact, I have not had any telephonic contact with her, nor

25   e-mail contact with her.  She did send the government an e-mail

1    alerting us of the subpoena by defense and she did send us a --

2    with an attachment, I think, of the subpoena, which was

3    yesterday.  I was in flight on my way to Arizona when I

4    received that e-mail.

5            THE COURT:  And did you respond to her?

6            MR. JONES:  No.  My only response to her is when we

7    received the subpoena asking her -- we asked her to send the

8    subpoena to us.  She sent us the subpoena.  We have had no

9    contact with her regarding whether or not she will attend or

10   not, none of that, Your Honor, any contact with her whatsoever.

11           THE COURT:  And did she leave you a phone message?

12           MR. JONES:  Not to my knowledge.  I have not been in

13   the office this week, but I have not received a voice mail from

14   her.

15           THE COURT:  Okay.

16           MR. JONES:  I'll check when I get back next week, but

17   I have not received a voice mail from her today.

18           MR. FEDER:  Judge, could I add something?

19           I did have contact with Ms. Martin last week with my

20   investigator.  She indicated to me she was, I think her word

21   was, working for the government and being flown around the

22   country as a custodian of records on behalf of the government,

23   and mentioned Mr. Jones name as her contact.  And it was a very

24   short conversation because she cut it short indicating that she

25   wasn't going to talk to the defense.  So it would appear there

1    is -- there is, at least, more than the contact that the

2    defense has had with Ms. Martin with the government.  And I

3    would just like a representation that nobody in the government

4    has had any contact with her, made no representations, et

5    cetera, to her, and would like to get, since they would appear

6    to have an ability to contact her, to find out why she didn't

7    appear.

8              THE COURT:  Well, no.  The question was whether they

9    had contact with her about her appearance at this hearing.  I

10   wasn't asking about in general throughout the history of this

11   case whether they've had contact with her.  My concern was

12   whether they somehow impeded or interfered with her desire to

13   appear today.

14             MR. FEDER:  Well, we've heard from Mr. Jones.

15             MR. JONES:  We did not, Your Honor.

16             MR. FEDER:  My assumption is that means nobody in the

17   government agent or lawyer has had contact with Ms. Martin in

18   regard to her presence at this hearing?

19             THE COURT:  As far as the lawyers that are here, is

20   that an accurate representation?

21             MR. JONES:  Yes, Your Honor.  We stated she did e-mail

22   us alerting us of the subpoena.  She sent us the subpoena that

23   was sent her.  We did not inform her whether or not to attend.

24   We have no contact in that regard, Your Honor.

25             MR. BIENERT:  Again, I'm just hearing all this.  First

1    of all, one other piece of evidence which is why this is sort

2    of a strange situation.  Either the middle of the night last

3    night or the night before in reading some of the Jencks that we

4    got from the government, as of, I think, Monday, there is a

5    transcript from a case where one of the forensic technicians

6    from the FBI testified, one of the ones alluded to from the

7    stand, either it was this witness or his colleague.  In the

8    transcript there was a reference to Ms. Martin's testimony, so

9    back -- it was a case where they are going after someone and

10   there was a piece of evidence that tied into whether that was

11   the person -- that defendant was somebody who advertised on

12   Backpage.

13          The bottom line is it appeared from that transcript

14   that Ms. Martin testified this calendar year as a government

15   witness in conjunction with the FBI witness as to something

16   related to Backpage.  I may be wrong, but it seems like

17   Ms. Martin's relationship with the FBI, taking that coupled

18   with her statement to my co-counsel that she, quote, works with

19   the FBI, it seems like her relationship is more than just a

20   normal, I'll call it, third-party witness.  And if that is

21   true, then when she says, I'm not testifying for you, defense,

22   and if I heard government counsel right, if she writes him and

23   says, they sent me this subpoena -- I think he said I wrote

24   back or said something like, I'm not going to tell you whether

25   to appear or not --

1          THE COURT:  No, that's not what he said.

2          MR. JONES:  No, that's not.

3          MR. BIENERT:  That's -- I just want to make sure, you

4    know, this is the second witness in a day now, in two days,

5    that seems to be saying we're not testifying, when they're, at

6    least facially, with some likely interaction with the

7    government.  I spent two hours with a witness yesterday who was

8    all ready to go, and while I was there her lawyer said, oh,

9    there is Mr. Rapp calling us.  I said, yeah, because she's on

10   the witness list.  And then last night we get an e-mail she's

11   not testifying, she's taking the Fifth.

12          And so I am concerned, not intently -- not

13   intentionally, perhaps, but I am concerned that there are

14   witnesses that when they either reach out to the government or

15   the government learns they may testify for us, something is

16   said or done that makes them think they shouldn't do that.  And

17   that would be an interference with our ability, as defendants,

18   to put on our case.

19          And we relied on -- to be honest with you, Your Honor,

20   that's why I withdraw the subpoena to Mr. Ferrer, because I

21   thought, why get into a battle over his rights when we got two

22   other witnesses who I think can give me the same thing.  So I

23   don't know what to do about it except it's very strange.  And I

24   would certainly hope that there is -- I mean, I would like to

25   think that if the government hears from any witness that we

1   have subpoenaed through a court-issued subpoena, that whatever

2   they say otherwise, it would be, well, if you have a subpoena,

3   you should be there.

4          THE COURT:  Okay.  I understand your concern.  I don't

5   have any information that the government interfered with the

6   witness.  Other than to make a record of your concerns, is

7   there a purpose to this?  Do you want me to ensure that the

8   witness is available next hearing?

9          MR. BIENERT:  First of all, we appreciate that.  And I

10  think it certainly makes sense what you're saying.  The reason

11  I'm hesitating is in light of what you had said earlier today

12  and where we are, there was definitely a purpose where we feel

13  like we need a witness like this, because, for example,

14  Ms. Martin, I think, would be familiar with the old Backpage

15  when it was running, and seems to have some familiarity with

16  something to do with what they pull off of Backpage now.

17         At the same time, I'm taking to heart Your Honor's

18  statement earlier today in where we are.  So I think that where

19  we best leave it is we caucus, and if we believe that we need

20  her here -- I don't want to bring her here and then at the end

21  of it you're like, well, gee, that really didn't add much more.

22  So I think we need to caucus, but we may be submitting

23  something, Your Honor, asking for you to issue an order to show

24  cause or the like if we need her.  But, frankly, if it doesn't

25  add anything that we really need, then I'm not going to do that

1    just for the show.

2            THE COURT:  Okay.  Mr. Eisenberg.

3            MR. EISENBERG:  Well, Your Honor, I would simply add I

4    think we're obligated to tell the Court if someone is abusing

5    the Court's authority, so I look at this in a little bit of a

6    broader picture.

7            THE COURT:  I appreciate that.  Thank you.

8            MR. EISENBERG:  Thank you, Your Honor.

9            THE COURT:  Was there something else?

10           MR. EISENBERG:  Not from me, Your Honor.

11           THE COURT:  It looked like Mr. Stone was going to

12   stand up.

13           MR. STONE:  Just anticipating that we'd be in recess

14   soon.

15           THE COURT:  Okay.  We're in recess.

16           Oh, counsel, before the -- when are we coming back,

17   the 25th -- by 5:00 p.m. the next day can you please give my

18   courtroom deputy your exhibits and exhibit list so that she

19   does not have to do this piecemeal at the next hearing.

20           MS. BERNSTEIN:  Yes, Your Honor.

21           MR. BIENERT:  I have one -- I apologize, one thing, a

22   clarification.  I don't know if Your Honor would have even

23   noticed, but as part of pleadings for this hearing, some of the

24   exhibits that we submitted or may be using were some of the

25   blurbs from the various Jencks materials that the government

1    gave us of Mr. Ferrer.  And I just want to make sure, in an

2    abundance of caution, we filed them under seal.  And that's

3    part of the document under seal.  But I guess I wanted to

4    clarify Your Honor's earlier order, you issued a protective

5    order where only counsel can maintain it, and obviously we're

6    not letting anyone else have it and our clients have to look at

7    it in our office, I understand that, but to the degree that we

8    are submitting a pleading where there is some aspect of that

9    that is relevant to the pleading, not wholesale putting the

10   reports in, it seems extremely cumbersome for us to have to do

11   separate under seal filings simply because there is something

12   in the many, many, many pages of debris of Mr. Ferrer that is

13   relevant to a motion or hearing.  And so I was seeking a

14   clarification of whether while the protective order is in

15   place, if we are, nonetheless, allowed, if it's part of a

16   pleading in front of Your Honor in court, can we submit it like

17   we normally do or do we have to go through an under seal

18   process simply because it involves one of his many statements?

19            MS. BERNSTEIN:  And, Your Honor, to further clarify an

20   issue that created earlier this week, though it wasn't an issue

21   at this hearing, our response to the motion to quash was over

22   200 pages and so we were asked to provide, per your chamber

23   rules, a hard copy of it, and there was some confusion about

24   how that would interface with the directive that we also not

25   make copies of that information.

1          THE COURT:  Okay.  Does the government want to be

2    heard?

3          MR. RAPP:  Well, if they're filing -- so you can't

4    just circumvent the protective order by filing the reports on

5    the public docket, I don't know if that's what they're

6    referring to, but if they want to use the reports as some type

7    of a pleading, they have to file them under seal.

8          THE COURT:  That's your request?

9          MR. RAPP:  That's our request.

10          THE COURT:  Okay.

11          MR. BIENERT:  And maybe the best way I could ask Your

12    Honor to consider it, and a reasoned way, to be specific, what

13    we submitted them to you as part of was the issue -- our

14    opposition to the motion to quash filed by Mr. Ferrer and his

15    attorney.  And so obviously it was extremely relevant to say,

16    look at all the things he's talking about that we think are

17    relevant to this hearing.

18          And I would encourage Your Honor, if it helps you make

19    the decision, to look at what those under seal blurbs and

20    statements are.  They are just garden variety important factual

21    evidence about the case.  It's like any other witness, it's

22    just not the kind of thing I've ever seen placed under seal.

23    He's not a witness that needs to be protected.  He's out in the

24    open as to who he is.  It's not stuff where we're talking about

25    a whole bunch of other people where they need to be protected.

1    And this is just simply another of the many slogs through mud

2    -- my term -- that I feel like this case is just to do the

3    normal things we do.  And there is just no reason for us to

4    have to go through under seal filings because we referenced

5    something that Mr. Ferrer, their main witness, said in, like,

6    200 pages of interviews.

7              THE COURT:  Okay.  And I agree with you.  I am

8    distressed by the number of documents filed under seal and

9    would like to minimize that.  So I will go take a look at that

10   response and look at my order and see if that can be changed

11   somehow.  Okay.

12             MR. BIENERT:  Thank you, Your Honor.

13             (Proceedings concluded at 5:05 p.m.)

14                     *          *          *

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 5th day of October,

13   2019.

14

15

16
                    /s/ Christine M. Coaly_____
17                  Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25