MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Michael Lacey, et al.,<br><br>Defendants. | No. CR-18-422-PHX-SMB<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' MOTION TO DISMISS INDICTMENT BASED ON SECTION 230 OF THE COMMUNICATIONS DECENCY ACT OR, ALTERNATIVELY, AS VOID FOR VAGUENESS (Doc. 783)** |

**Preliminary Statement**

Congress has commanded that "*Nothing* in this section [47 U.S.C. § 230 (the Communications Decency Act or CDA)] shall be construed to impair the enforcement of . . . any . . . Federal criminal statute."  47 U.S.C. § 230(e)(1) (emphasis added).  Despite this unequivocal language, Defendants assert that other subsections of the CDA somehow bar this federal prosecution.  (Doc. 783, Mot. at 3.)  Entirely absent from Defendants' motion is the plain text of § 230(e)(1), which dooms the motion from the outset.  The first rule of statutory interpretation is that the plain language of a legislative enactment controls if unambiguous.  *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009).  The word "Nothing" is clear as day—it means that *not one thing* in the CDA can be construed to block this federal criminal prosecution.  Defendants' motion should be denied for this bedrock reason.

Even if § 230(e)(1) didn't exist, Defendants' motion fails a second reason: the Superseding Indictment (Doc. 230 or SI) puts at issue whether Defendants' former website, Backpage.com (Backpage), was a creator of content and therefore ineligible for CDA immunity.  The detailed SI, based on thousands of internal documents not available when most of cases Defendants cite were decided, demonstrates that Backpage deliberately created and/or acquired prostitution ads through its: (a) aggregation/Dallas Plan efforts to create prostitution ads in several American cities and solicit the featured prostitutes for future business; (b) "affiliate" agreements with ad buyers like Dollar Bill, through which Backpage paid to acquire illegal content; and (c) "reciprocal link" deals with prostitution websites like The Erotic Review, a leading source of referrals.  Backpage also used "moderation" to facilitate ads selling adults and children for sex (by stripping out only the most egregious terms or images while still publishing the ads), and employed further practices to cement its place as the nation's predominant prostitution website.  These facts belie any notion that Backpage was merely a passive host of ads covered by the CDA.

Defendants' motion should be denied for a third independent reason: 18 U.S.C. § 1952 (the Travel Act) does not require that Defendants committed a state law offense. The gravamen of a Travel Act claim is the violation of federal law—the use of a facility of

interstate commerce to promote or facilitate unlawful activity.   The SI more than adequately states an offense under the Act.

Defendants' "vague-as-applied" argument is a repeat of the same argument from Doc. 561.  (*Compare* Doc. 561, Mot. at 39-41, *with* Doc. 783, Mot. at 11-13.)  The Court has already rejected it.  (Doc. 793, Order at 20-22.)  The motion should be denied.

**Factual Background**

The SI's factual allegations must be taken as true at this stage.   *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).   These allegations are summarized in the government's responses to Defendants' prior motions to dismiss, and the United States incorporates those summaries here.  (*See* Doc. 649, Resp. at 4-12; Doc. 776, Resp. at 2-7.)

**Argument**

**I.   SECTION 230(e)(1) MEANS WHAT IT SAYS: NOTHING IN THE CDA CAN IMPAIR THIS FEDERAL CRIMINAL PROSECUTION.**

The cardinal rule of statutory construction is simple: "[W]e begin by analyzing the statutory language, assuming that the ordinary meaning of that language accurately expresses the legislative purpose.  We must enforce plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Stand. Life Ins. Co.*, 560 U.S. 242, 251 (2010) (quotations and citation omitted; alteration omitted).  *See also Carcieri*, 555 U.S. at 387 ("plain and unambiguous" text "must [be] appl[ied] according to its terms").

In a subsection entitled "Protection for 'Good Samaritan' blocking and screening of offensive material," the CDA provides:

> (1) Treatment of publisher or speaker
>
> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
>
> (2) Civil liability
>
> No provider or user of an interactive computer service shall be held liable on account of--
>
> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene,

lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable . . . .[1]

47 U.S.C. § 230(c).  A different subsection states "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

However, in 47 U.S.C. § 230(e)(1), Congress states that *nothing* in any of these subsections shall be construed to impair the enforcement of any federal criminal statute:

> (e) Effect on other laws
>
> > (1) No effect on criminal law
> >
> > Nothing in this section shall be construed to impair the enforcement of . . . any . . . Federal criminal statute.

47 U.S.C. § 230(e)(1).  Congress could not have been clearer: "nothing"— not one thing— in § 230 "shall be construed to impair the enforcement" of any federal criminal law, period.  While Congress limited the ability of other parties—particularly civil litigants—to hold websites like Backpage to account, it deliberately did not seek to render the internet a law-free zone.  Rather, it explicitly preserved the ability of federal authorities to enforce federal criminal statutes regardless of anything else in the CDA.  As this Court recently recognized: "This case, however, does not concern civil liability, and the CDA has 'no effect' on 'any other Federal criminal statute.'"  (Doc. 793, Order at 13 (quoting 47 U.S.C. § 230(e)(1)).)

The Travel Act is one such federal criminal statute.  It provides:

> (a)  Whoever . . . uses . . . any facility in interstate . . . commerce, with intent to – . . .
>
> > (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishing, or carrying on, of any unlawful activity,

---

[1] The CDA defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet . . . ."  47 U.S.C. § 230(f)(2).  It defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).

and thereafter performs or attempts to perform—

> (A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both . . . .

18 U.S.C. 1952(a).  The Travel Act defines "unlawful activity" as, *inter alia*:

> (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances . . ., or prostitution offenses in violation of the laws of the State in which they are committed or of the United States,

> (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, or

> (3) any act which is indictable under subchapter II of chapter 53 of title 31, United States Code, or under section 1956 or 1957 of this title . . . .

18 U.S.C. § 1952(b).  Simply put, the Travel Act criminalizes the use of the internet (a facility in interstate commerce) with intent to promote or facilitate "any unlawful activity," coupled with performing or attempting to perform an act of promotion or facilitation.[2]

Section 230(e)(1) does not state that statutes like the Travel Act that involve promoting or facilitating state law offenses are excluded from § 230(e)(1); the text contains no such exclusion, and this Court may not engraft one onto Congress's chosen language. *See Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016) ("We are interpreting and applying not a judge-made doctrine but a statutory requirement, and therefore must honor Congress's choice.") (internal quotations and citation omitted).  Even if other CDA provisions could be used to block enforcement of civil or state criminal laws against an "interactive computer service," *see* 47 U.S.C. § 230(c)(1), enforcement of federal criminal statutes involving the same conduct may not be "impaired" by the CDA.  47 U.S.C. § 230(e)(1).

Other courts have recognized that Congress deliberately excluded federal criminal prosecutions from CDA immunity.  As the First Circuit has explained:

> Congress made pellucid that it sought "to ensure vigorous enforcement of Federal criminal laws to deter and punish" illicit activities online, 47 U.S.C. § 230(b)(5); and this policy coexists comfortably with Congress's choice "not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties'

---

[2] The SI identifies numerous prostitution ventures Defendants and/or their co-conspirators promoted or facilitated.  (*See* Doc. 776, Resp. to Brunst's Mot. to Dismiss at 1-5, 7-9.)

1
2
3

potentially injurious messages," *Lycos,* 478 F.3d at 418 (omission in original) (quoting *Zeran,* 129 F.3d at 330-31). Seen in this light, the distinctions between civil and criminal actions—including the disparities in the standard of proof and the availability of prosecutorial discretion—reflect a legislative judgment that it is best to avoid the potential chilling effects that private civil actions might have on internet free speech.

4    *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 23 (1st Cir. 2016). *See also United*

5    *States v. Ulbricht*, 31 F. Supp. 3d 540, 568 (S.D.N.Y. 2014) (Silk Road website

6    prosecution; "Even a quick reading of [the CDA] makes it clear that it is not intended to

7    apply to the type of intentional and criminal acts alleged to have occurred here."); *Obado*

8    *v. Magedson*, 2014 WL 3778261, at *8 (D.N.J. July 31, 2014) ("the CDA exception for

9    federal criminal statutes applies to government prosecutions, not to civil private rights of

10   action under [statutes] with criminal aspects").

11        Backpage and its prior counsel (who now represent Defendants Lacey and Larkin

12   here) have acknowledged in court filings that the CDA does not reach federal criminal

13   prosecutions. In its Supreme Court filing in *Jane Doe No. 1*, for example, Backpage wrote:

14   "The First Circuit correctly held that the exception in Section 230(e)(1) for criminal

15   enforcement applies only to federal criminal prosecutions; it does not permit private

16   plaintiffs' civil actions based on alleged violations of criminal statutes. . . . In this regard,

17   too, the First Circuit's decision is consistent with every other federal court that has

18   considered the issue." (Br. in Opp. to Pet. for Writ of Cert. at 18 & n.11, available at

19   http://www.scotusblog.com/wp-content/uploads/2016/12/16-276-BIO.pdf.)

20        Defendants' attempt to construe the CDA as rendering this federal prosecution

21   under the Travel Act for promoting or facilitating prostitution "a legal impossibility" meets

22   the textbook definition of "impair."[3] (Doc. 783, Mot. at 8-9.) The plain text of 47 U.S.C.

23   § 230(e)(1) forecloses using any part of the CDA to "impair" enforcement of any federal

24   criminal statute. Defendants' motion must be denied on this basis alone.

25
26
27   ───────────────
28   [3] *E.g.,* https://www.merriam-webster.com/dictionary/impair (defining "impair" as "to diminish in function, ability or quality: to weaken or make worse") (last visited Nov. 15, 2019).

- 5 -

## II.   THE CDA DOES NOT APPLY TO DEFENDANTS.

Even if 47 U.S.C. § 230(e)(1) didn't exist, the detailed allegations in the SI—which much be accepted as true at this stage—demonstrate that Backpage and its operators were not merely passive intermediaries for third-party content, but rather pursued an array of business practices calculated to develop prostitution-advertising content for Backpage.  In other words, Backpage and its operators were not merely "interactive computer service" providers, but were also "information content providers" within the meaning of 47 U.S.C. § 230(f)(3)—and hence were not entitled to CDA immunity under § 230(c).

A large portion of Defendants' motion is devoted to discussing CDA immunity generally and past decisions in which Backpage prevailed by asserting CDA-based arguments.  (Doc. 783, Mot. at 4-8.)  Defendants assert that lawsuits seeking to hold website operators liable for the "exercise of a publisher's traditional editorial functions," including whether to allow or block content, are barred under the CDA.  (Doc. 783, Mot. at 5.)  Defendants have made these arguments before (*see, e.g.*, Doc. 561, Mot. at 21) ("In fact, 23 years ago, Congress set out not only to protect but to encourage online providers to engage in such editorial practices. . . ."), and this Court has roundly rejected them.

In its October 24, 2019 Order, the Court wrote: "The SI does not attack protected editorial functions" or practices.  (Doc. 793, Order at 12.)  The Court explained:

> The SI alleges Defendants participated in moderation not merely to edit, but to "conceal the true nature of the ads being posted on its website." (SI ¶ 11). When a post advertised child prostitution, their "official policy" was to delete particular words in the ad that indicated the child's age and publish the revised version.  (SI ¶ 13).  This "only created a veneer of deniability and helped Backpage's customers (*i.e.*, pimps trafficking children) evade detection." (SI ¶¶ 13, 78).  Backpage permitted users to include TER [Erotic Review] ID numbers, "just no live links." (SI ¶ 85).  [*See also* SI ¶ 95] . . . . .  The SI also alleges the "non-adult sections" were simply intended to provide "plausible deniability" and to make the website "defensible" and more palatable to law enforcement.  (SI ¶ 112).  A Backpage training document specifically instructed Backpage moderators not to remove photographs of a person who looks like a minor, unless the ad also contained a banned term.  (SI ¶ 143).  The training manual instructed moderators to allow phrases like "99% CUM BACK FOR MORE," "car service," and "lollipop special." (SI ¶ 143).  Backpage also taught customers how to word their ads to avoid moderator restrictions.  (SI ¶ 59–67).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**The cases Defendants rely on do not persuade the Court that the above practices alleged in the SI were merely traditional, editorial functions.** First, many of the cases were decided under the Communications Decency Act ("CDA"), which grants immunity from civil liability to "interactive computer service" providers when information on its service originates from "another information content provider." 47 U.S.C. § 230(c); *see Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1105 (9th Cir. 2009) ("To summarize, we hold that section 230(c)(1) bars Barnes' claim, under Oregon law, for negligent provision of services that Yahoo undertook to provide"); *Green v. Am. Online (AOL)*, 318 F.3d 465, 469–71 (3d Cir. 2003); *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) ("By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service."); *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014); *Batzel v. Smith*, 333 F.3d 1018, 1026–30 (9th Cir. 2003) *superseded by statute on other ground as recognized in Breazeale v. Victim Serv., Inc.*, 878 F.3d 759 (9th Cir. 2017); *Doe v. Backpage.com, LLC*, 104 F. Supp. 3d 149 (D. Mass. 2015); *M.A. ex rel P.K. v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011). This case, however, does not concern civil liability, and the CDA has "no effect" on "any other Federal criminal statute." 47 U.S.C. § 230(e)(1).

Second, the facts alleged in the SI are qualitatively different than the protected activities in those cases. In *Batzel*, for example, the Ninth Circuit held that an individual's minor edits of another's email before forwarding the email to a listserv did not make that individual responsible for the "development" of the content (and thus subject to civil liability). 333 F.3d at 1031; *see also Jones*, 755 F.3d at 415–16 (holding defendant website and operator were not liable under the CDA because they did not "materially contribute[] to the defamatory content"). In *Barnes*, 570 F.3d at 1098–99, and *Zeran*, 129 F.3d at 330, websites failed to remove information at the request of victims of hoaxes and harassment perpetrated by third parties, but the websites took no affirmative steps to conceal or facilitate its users' illegal conduct. In *Green*, the Third Circuit held that § 230(c)(2) immunized AOL for its "good faith efforts to restrict effort to restrict access to material they consider to be objectionable." 318 F.3d at 472.

. . . .

The SI does not allege Defendants are criminally liable because they unknowingly and unintentionally operated a website used by third parties to post prostitution ads. Rather, it alleges Defendants purposely sought out opportunities to increase prostitution advertising on Backpage. The SI alleges the Defendants intentionally identified prostitutes, created free Backpage ads for them, and used those ads to try to secure future business. (SI ¶¶ 9, 36). Hyer directed the project, and Spear, Hyer, C.F., and Larkin participated in meetings where the project was on the agenda. (SI ¶¶ 36, 38, 40). The plan was also described in a document C.F. gave to Larkin, Spear, and Brunst. (SI ¶42). Defendants also sought to expand their traffic through TER, a "prostitution website" where "johns" could rate and review escorts including the "prices charged for particular sex acts." (SI ¶¶ 10, 54). As alleged, Backpages' efforts to promote its website facilitated prostitution and were not protected business practices.

(Doc. 793, Order at 12-15 (emphasis added).)

- 7 -

1    Defendants now rehash the same arguments and caselaw. (*Compare* Doc. 561, Mot.

2    at 21-24 (citing, *e.g.*, *Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997),

3    *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012), *M.A. ex rel.*

4    *P.K v. Village Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041 (E.D. Mo. 2011), *People*

5    *v. Ferrer*, 2016 WL 7237305 (Cal. Super. Ct. Dec. 9, 2016); *People v. Ferrer,* No.

6    16FE024013 (Cal. Super. Ct. Aug. 23, 2017)), *with* Doc. 783, Mot. at 5-7 (citing the same

7    cases).)  For the reasons discussed in the United States' Response to Doc. 561 and the

8    Court's October 24, 2019 Order, these arguments and cases are unavailing. (*See* Doc. 649,

9    Resp. at 2-3, 21-29 (incorporated by this reference); Doc. 793, Order at 11-14 & n.3.)

10    Moreover, *Dart v. Craigslist*, 665 F. Supp. 2d 961 (N.D. Ill. 2009), provides an

11   instructive counterexample to Defendants' cases.  The court found Craigslist protected by

12   the CDA because it operated merely as a host for ads created and posted by third parties,

13   and did not create, solicit or cause or induce anyone to create or post illegal ads.  665 F.

14   Supp. at 969 and n.9.  The SI's allegations, in contrast, demonstrate that Backpage created

15   prostitution ads by copying them from other prostitution websites and soliciting pimps and

16   prostitutes with free trial offers; solicited business from and included cross-references to

17   prostitution websites like The Erotic Review; solicited bulk prostitution advertising from

18   super-affiliates like "Dollar Bill"; and helped edit and redraft, or "doctored," its customers'

19   ads to conceal their unlawful nature.  (*See, e.g.*, SI¶¶9-11, 33-152; *see also* Doc. 516-1 at

20   6.)  These facts far surpass anything considered in *Craigslist.*

21    To the extent Defendants dispute these allegations, the proper forum for resolving

22   any such disputes is trial on the merits—not a motion to dismiss the indictment.  *See United*

23   *States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) (a motion to dismiss cannot be used as a

24   vehicle for challenging the government's proof); *Boren*, 278 F.3d at 914; *United States v.*

25   *Nukida*, 8 F.3d 665, 670 (9th Cir. 1993).

26

27

28

**III.    THIS CASE IS NOT A "LEGAL IMPOSSIBILITY."**

>   **A.    Defendants May Be Prosecuted Under the Travel Act for Using a Facility of Interstate Commerce to Promote Unlawful Activity.**

Defendants' "legal impossibility" cases are inapposite.  (*Cf*. Doc. 783, Mot. at 8-9.) Defendants do not contest that state law prostitution offenses were committed as a result of the sale of the victims identified throughout the SI, or that solicitation offenses were committed when the victims were offered for sale.  (*Cf*. SI¶¶160-176.)  Nor do they claim that any underlying state laws that criminalize prostitution or solicitation have been repealed. *Cf. Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 603-04 (9th Cir. 2010) (advertising the sale of adults for sex is illegal throughout the U.S. except parts of Nevada); *Erotic Service Provider Legal Ed. and Research Project v. Gascon*, 880 F.3d 450, 459-60 (9th Cir. 2018) (soliciting is illegal).  Rather (and ignoring 47 U.S.C. § 230(e)(1)), Defendants seem to argue that *they* cannot be prosecuted for violating state prostitution laws under the CDA.  Yet the SI charges Defendants under the Travel Act, a federal criminal statute.  18 US.C. § 1952; (SI¶201.)  By no stretch has the CDA rendered "a legal impossibility" Defendants' federal criminal liability under that statute.

The Ninth Circuit recognizes that "[a]n indictment under the Travel Act requires allegations of each of the three elements of the crime: (1) interstate commerce or use of an interstate facility (2) with intent to promote an unlawful activity and (3) a subsequent overt act in furtherance of that unlawful activity."  *United States v. Tavelman*, 650 F.2d 1133, 1138 (9th Cir. 1981).  Defendants assert that the United States must also allege and prove that Defendants themselves committed or could have committed the state law prostitution offenses referenced in the SI.  (Doc. 783, Mot. at 3-4.)  This assertion is based on a misreading of the SI and two Ninth Circuit cases Defendants cite in support.

First, the SI alleges *inter alia* that Defendants, with an intent to *promote* or *facilitate* state law prostitution offenses, performed one or more overt acts in furtherance of that unlawful activity.  (*See generally* SI ¶¶1-201.)  That is all that the government need allege. *Tavelman*, 650 F.2d at 1138; *see also United States v. Welch*, 327 F.3d 1081, 1092 (10th Cir. 2003) ("The Travel Act proscribes not the unlawful activity per se, but the use of

- 9 -

interstate facilities with the requisite intent to promote such unlawful activity. An actual violation of [the Utah Commercial Bribery Statute] is not an element of the alleged Travel Act violations in this case and need not have occurred to support the Government's § 1952 prosecution."); *United States v. Montague*, 29 F.3d 317, 322 (7th Cir. 1994) ("[T]he federal crime to be proved in Section 1952 is use of the interstate facilitates in furtherance of the unlawful activity . . . Section 1952 does not require that the state crime ever be completed."); *United States v. Campione*, 942 F.2d 429, 433–34 (7th Cir. 1991) (same); *United States v. Palfrey*, 499 F. Supp. 2d 34, 43 (D.D.C. 2007) ("To the extent Defendant is arguing that the Government must prove each element of the predicate state offenses, it is well-settled that the Government bears no such burden in Travel Act cases. . . . The statute requires only that a defendant 'inten[ded] to . . . promote . . .any unlawful activity,' not that the defendant have completed such unlawful activity.").

The first Ninth Circuit case Defendants cite, *United States v. Bertman*, 686 F.2d 772 (9th Cir. 1982), does not support the notion that the Travel Act requires that Defendants committed state law prostitution offenses themselves. *Bertman* involved a claim under 18 U.S.C. § 1952(b)(2) that the defendant violated the Travel Act by bribing a public official in Hawaii in direct violation of the Hawaii Penal Code. 686 F.2d at 772-74. The court held that "[w]hen the unlawful activity charged in the indictment is *the violation* of state law, the commission of or the intent to commit such a violation is an element of the federal offense," the government "must prove . . . that the defendant has or could have violated the underlying state law, and the defendant may assert any relevant substantive state law defense." *Id*. at 774 (emphasis added). Here, the unlawful activity at issue is not Defendants' direct *violation* of a state "extortion, bribery, or arson" statute under 18 U.S.C. § 1952(b)(2) (as in *Bertman*), but rather Defendants' *promotion* or *facilitation* of unlawful activity under 18 U.S.C. § 1952(a)(3) and (b)(1). (*See, e.g.*, SI¶¶9-11, 34.) In these circumstances, it would make no sense to require that the government prove Defendants did or could have directly committed the underlying state law offenses. "Promotion" or "facilitation," not commission, is all that is required. *See* 18 U.S.C. § 1952(a)(3).

Defendants' contrary reading would render superfluous the terms "promote" and "facilitate" in 18 U.S.C. § 1952(a)(3)—"a result we typically try to avoid." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 941 (2017).  *See also Williams v. Taylor,* 529 U.S. 362, 404 (2000) ("[W]e must give effect, if possible, to every clause and word of a statute.").  For that very reason, the Ninth Circuit has recognized that the Travel Act does not require proof that defendants intended to violate state law themselves; proof that defendants intended to *promote* or *facilitate* violation of state law suffices.  *United States v. Polizzi*, 500 F.2d 856, 876-77 (9th Cir. 1974) ("[T]o the extent that [a Sixth Circuit case] requires proof that an accused under § 1952 intended to violate state law himself, we find that it conflicts with the clear meaning of the language used in § 1952.").  (*See also* Doc. 793, Order at 15 (quoting *Polizzi* and describing *mens rea* required by Travel Act).)

Defendants' second case, *United States v. Hiatt*, 527 F.2d 1048 (9th Cir. 1975), lends even less support.  The court rejected Hiatt's assertion that his Travel Act prosecution was invalid because Alaska's prostitution statute violated the equal protection clause.  527 F.2d at 1051.  Here, Defendants do not challenge the constitutionality of any underlying state prostitution laws.  Nor do they contest that prostitution offenses were committed as described throughout the SI.  (*See, e.g.,* SI¶¶160-176.)  Under the Travel Act, Defendants may be prosecuted for *promoting* or *facilitating* such offenses—as the plain language of 18 U.S.C. § 1952(a)(3) makes clear.

**B.  Defendants' Resort to Extrinsic Evidence Should Be Rejected.**

Defendants' out-of-context discussion of a single extrinsic email dating from mid-2013 is unavailing.  (*Cf.* Doc. 783, Mot. at 10; Doc. 783-1.)  On a motion to dismiss, the SI's allegations are taken as true and the sufficiency of the allegations are judged by the four corners of the SI.  *E.g.*, *Boren*, 278 F.3d at 914.  Accordingly, Defendants' attempt to widen the inquiry to extrinsic evidence should be rejected.

Even if considered, the email isn't all that great for Defendants.  It documents that one of Backpage's owners (Lacey) told the then-president of the National Center for Missing and Exploited Children (NCMEC), Ernie Allen, that "adult prostitution is none of

your business," to which Mr. Allen responded "well, at least you know what business you are in." (Doc. 783-1 at 2; *see* SI¶89.)  Mr. Allen estimated that "Backpage alone is making $5 million per month on these ads, and ha[s] become the information infrastructure for the prostitution and sex trafficking industry in this county . . . ."  (Doc. 783-1 at 2-3.)  Mr. Allen recounted being told federal prosecutors "agreed to investigate" "some of the smaller, sexually oriented, more blatant" prostitution advertising websites.  (Doc. 783-1 at 2.)  At the time, Backpage represented that it was ostensibly pursuing "good faith effort[s] to screen, monitor and report" (Doc. 783-1 at 2)—efforts that have since been exposed as a fiction.  (*See, e.g.*, SI¶151; Doc. 516-1 at 2-9.)  A year later, NCMEC filed a brief excoriating the sincerity of Backpage's efforts to prevent child sex trafficking.  (SI¶140.)

Moreover, the email was written years before Backpage was compelled to disclose more than 500,000 internal documents to the U.S. Senate Permanent Subcommittee on Investigations in 2016 and the grand jury in 2017. (*See* Doc. 696, Resp. to Mot. Compel at 4-5 and n.1; Doc. 444-1.)   Several of these documents are discussed in the Senate Subcommittee's 50-page report Backpage.com's Knowing Facilitation of Online Sex Trafficking[4] and its 840-page appendix.[5]  The report concluded that virtually all of Backpage's "adult" ads were solicitations for prostitution and "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking. . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted content others had created." (SI¶151.)[6]

---

[4] https://www.hsgac.senate.gov/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf (SR).

[5] https://www.hsgac.senate.gov/imo/media/doc/Final%20Appendix%202017.01.09.pdf.

[6] The Subcommittee also obtained testimony from Backpage moderators, one of whom testified that all of the employee-moderators knew that the ads they reviewed offered sex for money; another testified "everyone" knew that Backpage's adult advertisements were for prostitution, and "[a]nyone who says [they] w[ere]n't, that's bullshit." (SR 36-37.)

Subsequently, Backpage and its CEO, Carl Ferrer, pleaded guilty in April 2018 and admitted the "great majority" of Backpage's revenue-generating ads were "for prostitution services." (18-CR-464, Doc. 7-2 at 12-13; 18-CR-465, Doc. 8-2 at 11.)  Ferrer further admitted that he "conspired with other Backpage principals (including but not limited to M.L, J.L, S.S., D.H., A.P, and J.V.)" "to create 'moderation' processes" that did not change the essential nature of the illegal services being offered in the ad, but that merely "create[d] a veneer of deniability for Backpage." (18-CR-464, Doc. 7-2 at 13.)  Ferrer also admitted to conspiring with Defendants to engage in money laundering, including "fool[ing] credit card companies into believing that Backpage-associated charges were being incurred on different websites…." (18-CR-464, Doc. 7-2 at 13-14.)  Sales and Marketing Director Daniel Hyer later pleaded guilty to Count 1 of the SI and corroborated Ferrer's account of Backpage's "moderation" practices.  (Doc. 271 at 10.)

Following these developments, an Illinois federal court dismissed *Backpage.com LLC v. Dart* and imposed $250,000 in sanctions against Backpage.   The court held Backpage and Ferrer's admissions provide "incontrovertible" proof that Backpage misled the Seventh Circuit about whether "speech on the site was protected, whether Backpage.com policed, rather than promoted, unlawful solicitations, and otherwise merely published, rather than authored, content on its site."  (Doc. 516-1 at 4-5.)[7]

But at this stage, reference to extrinsic materials is unnecessary to reject Defendants' misguided effort to sidestep the plain language of 47 U.S.C. § 230(e)(1).

## IV.     DEFENDANTS' AS-APPLIED VAGUENESS CLAIM LACKS MERIT.

The vast majority of Defendants' cited "vagueness" cases resulted in affirmed criminal convictions.  (Doc. 783, Mot. at 11-12.)  In *United States v. Williams*, 553 U.S. 285, 304 (2008), for example, the Supreme Court upheld the defendant's convictions for promotion and possession of child pornography and rejected his claim that a statute

---

[7] *See also* Doc. 207-1, attaching *R.O. and K.M. v. Medalist Holdings, Inc., et al*, Wash. Super. Ct., Pierce County, No. 17-2-04897-1, June 28, 2018 Order at 7-12 (imposing $200,000 sanction on Lacey, Larkin and others for perpetuating a fraud on the court).

criminalizing the pandering or solicitation of child pornography was impermissibly vague. The Court recognized that "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" 553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). A common theme in these cases is that, even where free-speech considerations are involved, "due process does not require impossible standard of clarity." *Information Providers' Coalition for Defense of the First Amendment v. FCC*, 928 F.2d 866, 874 (9th Cir. 1991) (quotation and citation omitted). *See also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("we can never expect mathematical certainty from our language"); *Turf Center v. United States*, 325 F.2d 793, 795 (9th Cir. 1963) (rejecting vagueness challenge in Travel Act prosecution; "The fact that in some cases it may be difficult to determine the side of the line on which a particular fact situation falls is not sufficient reason to hold the language too ambiguous to define a criminal offense."); *United States v. Kilbride*, 584 F.3d 1240, 1247 (9th Cir. 2009) ("[w]e conclude Defendants' as-applied vagueness challenge fails even applying a heightened standard of clarity"; affirming convictions for fraud in connection with electronic mail).

Here, Defendants assert that because they were never before prosecuted under the Travel Act, they didn't have fair notice that they could be prosecuted under the Travel Act. (*Cf.* Doc. 783, Mot. at 12-13.) This argument is circular and unavailing. First, the CDA has always contained a carve-out for federal criminal prosecutions, 47 U.S.C. § 230(e)(1)—an exception of which Backpage and counsel for Lacey and Larkin were well aware. *See* Part I, *supra*. Second, the government successfully pursued Travel Act prosecutions against similar prostitution website operators before charging Defendants. *See United States v. Omuro*, N.D. Cal. No. 14-CR-336, Doc. 70 at 1-3; *United States v. Hurant*, E.D.N.Y. No. 16-CR-45, Doc. 117 at 1, 6, 13-14, and Doc. 125 at 2.[8]

Third, Defendants received a decade-long drumbeat of notice concerning the

---

[8] Commentators also recognized Backpage could be prosecuted under federal statutes. Monica J. DeLateur, *From Craigslist to Backpage.com: Conspiracy as a Strategy to Prosecute Third-Party Websites for Sex Trafficking*, 56 Santa Clara L. Rev. 531 (2016).

illegality of the services they promoted and facilitated.  Law enforcement officers across the country presented Backpage with evidence that the overwhelming portion of its "adult" ads were for prostitution.  (SI¶¶74, 105, 109, 111, 141, 144.)  NCMEC, news organizations, the U.S. Senate, and others repeatedly notified Backpage of the prevalence of prostitution ads on its site.  (SI¶¶86, 89, 97, 127, 131, 134, 140, 151.)[9]  Backpage's executives received similar notices from an array of financial institutions that cut ties with the company due to illegal activity concerns.  (SI¶¶135, 147, 181, 182, 187.)

Fourth, Backpage's executives repeatedly admitted in internal company documents and private meetings that the overwhelming majority of the website's "adult" ads involved illegal prostitution.  (*See, e.g.*, SI¶¶9, 34, 69, 77, 85, 98, 104, 107-08, 112, 114, 118-19, 128, 138, 143, 148-49, 150.)  Defendants also received Google Alerts with news reports discussing instances in which prostitutes who had been advertised on Backpage were kidnapped, raped or murdered.  (SI¶150; Doc. 271 at 9.)  Backpage officials testified in numerous criminal trials regarding many such victims.  (SI¶¶71, 76, 92.)  As this Court has recognized, the SI amply alleges Defendants and their co-conspirators had notice of the illegal nature of the activities they promoted or facilitated.  (Doc. 793, Order at 6.)

Fifth, courts did not "uniformly" find that Backpage was immune from state civil liability under the CDA.  (*Cf.* Doc. 783, Mot. at 6.)  *See, e.g., J.S. v. Village Voice Media Holdings, Inc.*, 359 P.3d 714, 715-16 (Wash. 2015) (denying motion to dismiss claim by three minor girls who had been "bought and sold for sexual services" on Backpage); *Jane Doe No. 1 v. Backpage.com, LLC*, 2018 WL 1542056, at *1 (D. Mass. 2018) (allowing claim where victim plausibly alleged Backpage "redrafted [her] advertisement…to suggest she was an adult").  As more evidence about Backpage came to light, courts imposed sanctions in the *Dart* and *R.O.* cases described above.  *See* Part III.B, *supra*.

Against this backdrop, a person of ordinary intelligence would fairly conclude that

---

[9] The documentary *I Am Jane Doe* (2017) (available on Netflix) likened the ease of using Backpage to buy children for sex to "shopping on Amazon."  See https://www.iamjanedoefilm.com/.

he or she was at risk of prosecution for engaging in the conduct described in the SI. (*Cf.* Doc. 783, Mot. at 13.) Apparently for that very reason, several Defendants engaged in financial transactions designed to conceal their misconduct and evade law enforcement. (SI¶ 16.) In July 2016, one of them, Lacey—while aware of the grand jury investigation in this matter—sought assistance in moving his assets to places where "government parties . . . cannot access my accounts"; soon thereafter, $16.5 million in Backpage-derived cash was wired from his bank accounts in the U.S. to an overseas account in Hungary. (SI¶ 16.)

If this were not enough, the Court rejected Defendants' as-applied vagueness argument in its October 24, 2019 Order:

> As applied in the SI, the Travel Act does limit its application to unprotected speech. The statute requires use of an interstate facility, with the intent to facilitate an unlawful activity, and a subsequent act in furtherance of that unlawful activity. Here, the SI alleges Defendants used a website with the intent to facilitate prostitution (a criminal activity) and executed strategies to further and increase that activity. The Court cannot conclude that such a standard or the allegations in the SI do not give fair warning that facilitating a criminal act is itself a crime. As applied in the SI, the Travel Act is not unconstitutionally vague.

(Doc. 793, Order at 22.) Defendants offer nothing to alter this analysis. Rather, they assert they were "engaged in conduct that Congress, through the [CDA], sought to incent." (Doc. 783, Mot. at 13.) As in the Silk Road case, even a quick read of the SI demonstrates Congress did not seek "to incent" the creation of a massive online marketplace for illicit prostitution. *See Ulbricht*, 31 F. Supp. 3d at 568.

## V.     DEFENDANTS' REMAINING ARGUMENTS LACK MERIT.

Even if Defendants could avoid liability on the Travel Act counts, they may still be prosecuted for money laundering-relating crimes as alleged in the SI. (*Cf.* Doc. 783, Mot. at 13-14.) *See, e.g.*, *United States v. Thompson*, 286 F.3d 950, 972 (7th Cir. 2002) (defendant properly convicted of money laundering, even though acquitted of substantive drug offense, where evidence was sufficient for jury to conclude defendant knew funds were illegally derived); *United States v. Lalley*, 257 F.3d 751, 755-56 (8th Cir. 2001) (knowledge sufficient to support money laundering convictions can be show by evidence that defendant was deliberately ignorant of the unlawful source of funds). Both Backpage

and its former CEO Carl Ferrer have "pleaded guilty to numerous charges" concerning Backpage's operations.  (Doc. 768, Order at 2.)  Defendants' co-defendant, Daniel Hyer, has pleaded guilty to Count 1 of the SI.  (Doc. 271.)  The remaining Defendants can be convicted for money laundering without being criminally liable for the activity that generated the laundered money. (*See* Doc. 649, Resp. at 14-16, incorporated by reference.)

### Conclusion

For all of the foregoing reasons, Defendants' Motion to Dismiss Indictment Based on Section 230 of the Communications Decency Act or, Alternatively, as Void for Vagueness (Doc. 783), should be denied.


Respectfully submitted this 27th day of November, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Peter S. Kozinets*

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

1

## CERTIFICATE OF SERVICE

2

3

I hereby certify that on November 27, 2019, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance

5

as counsel of record.

6

7

*s/ Angela Schuetta*
Angela Schuetta
U.S. Attorney's Office

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28