# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | December 2, 2019 |
| Michael Lacey, | ) | 8:36 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| Defendants. | ) | |
| _____ | ) | |

### BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

### CONTINUED EVIDENTIARY HEARING ON MOTION TO COMPEL

**(Pages 445 - 516)**

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

FOR THE GOVERNMENT

        U.S. ATTORNEY'S OFFICE
        By:  **Mr. Kevin M. Rapp**
             **Mr. Andrew C. Stone**
             **Ms. Margaret Wu Perlmeter**
             **Mr. Peter Kozinets**
        40 North Central Avenue, Suite 1200
        Phoenix, Arizona 85004

        U.S. ATTORNEY'S OFFICE.
        By:  **Mr. John Jacob Kucera**
        312 North Spring Street, Suite 1200
        Los Angeles, California 90012


FOR THE DEFENDANT LACEY:

        LIPSITZ GREEN SCIME CAMBRIA
        By:  **Mr. Paul John Cambria, Jr.**
        42 Delaware Avenue, Suite 120
        Buffalo, New York 14202

FOR THE DEFENDANT LARKIN:

        BIENERT MILLER & KATZMAN, PLC
        By:  **Mr. Thomas Henry Bienert, Jr.**
             **Ms. Whitney Z. Bernstein**
        903 Calle Amanecer, Suite 350
        San Clemente, California 92673

FOR THE DEFENDANT SPEAR:

        FEDER LAW OFFICE, PA
        By:  **Mr. Bruce S. Feder**
        2930 East Camelback Road, Suite 160
        Phoenix, Arizona 85016

FOR THE DEFENDANT BRUNST:

        BIRD MARELLA BOXER WOLPERT NESSIM
        DROOKS LINCENBERG & RHOW, PC
        By:  **Mr. Ariel Neuman**
        1875 Century Park E Suite 2300
        Los Angeles, CA 90067

```
1    FOR THE DEFENDANT PADILLA:

2            DAVID EISENBERG, PLC
             By:  Mr. David S. Eisenberg
3            3550 North Central Avenue, Suite 1155
             Phoenix, Arizona 85012
4
     FOR THE DEFENDANT VAUGHT:
5
             JOY BERTRAND, ESQ., LLC
6            By:  Ms. Joy M. Bertrand
             P.O. Box 2734
7            Scottsdale, Arizona 85252

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         I N D E X

 2    WITNESS                                      PAGE

 3    TAMI LOEHRS
              Continued Cross-Examination
 4                  by Mr. Rapp                    450
              Redirect Examination by Ms. Bernstein   486
 5

 6                       E X H I B I T S

 7    Number                Description           Admitted

 8    123         Tami Loehrs' Hard Drive Review
                  Spreadsheet                       505
 9    197         12-11-2012 US v Certantes-Perez
                  USDC WD TX                         492
10    199         12-19-2019 Doc. 51 Order re
                  Motion to Compel US v. Gonzales
11                17-CR-01311 District Arizona &
                  US v Ordonez 18-CR-00539 District
12                Arizona                            489

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **P R O C E E D I N G S**

2          COURTROOM DEPUTY:  Criminal case 2018-422, criminal

3  case 18-464 and 465, United States of America versus Michael

4  Lacey, on for continued evidentiary hearing.

5          MR. RAPP:  Good morning, Kevin Rapp on behalf of the

6  United States.

7          Also appearing is Andrew Stone, John Kucera, Peg

8  Perlmeter, and Peter Kozinets, all on behalf of the United

9  States.

10         MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria

11  on behalf of Mr. Lacey who is present.

12         MS. BERNSTEIN:  Good morning, Your Honor.  Whitney

13  Bernstein and Tom Bienert on behalf of James Larkin who is also

14  present.

15         MR. NEUMAN:  Good morning, Your Honor.  Ariel Neuman

16  on behalf of John Brunst who is present in court.

17         MR. FEDER:  Bruce Feder for Scott Spear who is also

18  present.

19         MR. EISENBERG:  Good morning, Your Honor.  David

20  Eisenberg on behalf of Andrew Padilla.  We would waive his

21  appearance.

22         MS. BERTRAND:  Good morning, Your Honor.  Joy Bertrand

23  appears for Joye Vaught.  We also waive her appearance this

24  morning.  Thank you.

25         THE COURT:  Okay.  So let's finish with the

1   evidentiary hearing and we can talk about the 464 and 465

2   status conference.

3          Mr. Rapp.

4                  CONTINUED CROSS-EXAMINATION

5   BY MR. RAPP:

6   Q.  Good morning, Ms. Loehrs.

7   A.  Good morning.

8   Q.  Other than the meeting with Matt Frost, what have you

9   reviewed in preparation for the continuation of your

10  cross-examination today?  What have you reviewed?

11  A.  Mr. Frost's declaration that I received, I think,

12  Wednesday.

13  Q.  All right.  Did you review any of the cases that we

14  discussed the last time?

15  A.  No, I haven't.

16  Q.  Did you review the transcript of your testimony?

17  A.  I looked at it, yes.

18  Q.  Did you review it in some detail?

19  A.  Not in detail, no.

20  Q.  Is there a reason why you didn't?

21  A.  I know what I testified about.

22  Q.  All right.  Okay.  You met with Matt Frost who was -- is

23  the government's expert, on November 19th, correct?

24  A.  Correct.

25  Q.  You know that the government reached out to the defense and

UNITED STATES DISTRICT COURT

1  offered to have Mr. Frost assist your firm in accessing the

2  data that the government provided, right?

3  A.  Correct.

4  Q.  And Mr. Frost flew down from Pocatello, Idaho, to meet with

5  you at your office, right?

6  A.  Correct.

7  Q.  This meeting was video recorded by the defense attorneys in

8  this case?

9  A.  Correct.

10  Q.  This -- the video, specifically, the video was set up to

11  capture the computer screen to document what Mr. Frost was

12  doing, right?

13  A.  Correct.

14  Q.  And in preparation for your testimony, you watched that

15  video, right?

16  A.  I have not seen the video, no.  I was there in person.  I

17  haven't watched the video.

18  Q.  All right.  The defense -- did the defense provide you the

19  video to review?

20  A.  I have not been provided with the video.

21  Q.  Now, prior to the visit, you laid out 11 hard drives on

22  which you were unable to access the data, right?

23  A.  Correct.

24  Q.  And these are the 11 hard drives that gave you trouble,

25  right?

1    A.  They were a sampling of the drives, correct.

2    Q.  Did you discuss the three steps to evaluating whether there

3    was data on the drives?

4    A.  I'm not sure I understand that question.

5    Q.  All right.  Did you discuss the three steps with Mr. Frost

6    to evaluating the data on the drives?

7    A.  I'm not sure what you're referring to by three steps.

8    Q.  All right.  Well, let me take it one by one.

9            Step one was whether or not the drive was readable,

10   correct?

11   A.  That was one of the issues with --

12   Q.  Okay.

13   A.  -- a couple of the drives, yes.

14   Q.  And step two was whether the E01 forensic files could be

15   pulled into forensic software.  Would you agree with me there?

16   A.  Yes.

17   Q.  And step three was being able to access the data contained

18   on the Backpage servers, right?

19   A.  That would be part of bringing it into the forensic

20   software.

21   Q.  Right, but bringing this data into one forensic software so

22   you could review the data, right?

23   A.  Correct.

24   Q.  When he, Mr. Frost, was in your office, was he using your

25   equipment?

1    A.  Yes.

2    Q.  Prior to the meeting, were you asked to download a Linux

3    distribution software such as Fedora?  Were you asked to do

4    that?

5    A.  Yes.

6    Q.  And did you do that?

7    A.  Yes, we did.

8    Q.  Was the computer you provided the government running a

9    Linux distribution system?

10   A.  No.  It was a Windows computer.

11   Q.  Did you give the government permission to install the Linux

12   Mint onto your computer?

13   A.  Yes.

14   Q.  Are you aware that the Linux Mint, as well as Fedora, are

15   freely available online?

16   A.  Yes.

17   Q.  After Mr. Frost installed the Linux Mint on your computer,

18   did he try to access the 11 drives that you laid out for him in

19   the lobby of your office?

20   A.  Yes.

21   Q.  You provided him with your disk mounter to use for this

22   step, correct?

23   A.  I did not provide him with a disk mounter.

24   Q.  Well, let's -- was he able to access 11 -- 8 of the 11

25   drives?

1    A.  He was able to access 8 of the 11 drives, yes.

2    Q.  And is it your understanding that these 8 drives contained

3    E01 files accompanied by a log describing the time and the

4    details of the data acquisition?

5    A.  I did not see the logs, but, yes, that's my understanding.

6    Q.  For those drives that he was able to access, once your

7    computer was booted to a Linux operating system, did you

8    observe what Mr. Frost had to do in order to access each of the

9    disks?

10   A.  Yes, I did.

11   Q.  He only had to connect to the computer, correct?

12   A.  I'm not sure I understand that question.

13   Q.  He only had to connect the drive to the computer to access

14   the data; is that right?

15   A.  No.  He had to go through numerous steps to access the

16   data.  Connecting the drive was the first step.

17   Q.  At the point the drive auto mounted, were you able to see

18   the files on the disk?

19   A.  Again, I don't believe it auto mounted.  I think he was

20   running command language through there.  And, yes, I did

21   eventually see the data.

22   Q.  Okay.  Did you observe what Mr. Frost did?  Were you there

23   observing?

24   A.  Yes, I was.

25   Q.  Did you think to maybe go back and look at the video that

1   the defense set up to actually review what he did?

2   A.  I didn't need to.  I was there.  I saw everything he did.

3   Q.  Are you aware whether or not the defense had other experts

4   review this videotape?

5   A.  Yes.

6   Q.  Who are those experts?

7   A.  Oh, wait, the videotape?  No, I have no idea who reviewed

8   the videotape.

9   Q.  So, just to be clear, because you just said yes, to be

10  clear, you don't know if the defense had other experts,

11  computer experts, review the videotape?

12  A.  No, I have -- I do not know who reviewed the videotape.  I

13  haven't seen it.

14  Q.  Okay.  Do you know whether or not the defense has retained

15  other experts since the last time we met and prior to this

16  meeting?

17  A.  Yes.

18  Q.  Yes.  Who are those experts?

19  A.  Um, Mr. Englander.

20  Q.  And who is he?

21  A.  He is an expert that I suggested that they send some disks

22  to.

23  Q.  All right.  Why did you suggest that they send it to a

24  Mr. Englander?

25  A.  To prove that these disks were not in industry standard

1    formats that could be accessed.

2    Q.  All right.  And how do you know Mr. Englander?

3    A.  We actually worked on opposite sides of a case together.

4    He worked for the insurance company and I was hired by the

5    plaintiffs to get into the insurance company computers, so he

6    had to come to my lab and sort of oversee everything I was

7    doing getting into the insurance company computers.

8    Q.  All right.  Did you -- since the last hearing, did you and

9    Mr. Englander communicate?

10   A.  I haven't spoken to him at all.  I simply offered his name

11   to the attorneys.

12   Q.  You haven't exchanged any e-mails with him or anything like

13   that?

14   A.  No.  I have had no communications with him whatsoever.

15   Q.  During this meeting with Mr. Frost, did you ask if the

16   folder name such as SDA, or SD me -- SDB, rather, meant

17   something?

18   A.  I don't believe I asked if they meant something.  I asked

19   why he chose to put some of the images inside those folders on

20   some images where he didn't do it on others.

21   Q.  What do you recall his answer to you?

22   A.  That's just what he felt like doing.

23   Q.  Is this a question that you would pose to the government

24   prior to this meeting, either directly or indirectly?

25   A.  I don't think I have specifically asked about the SDA

1   folders, no.

2   Q.  Now, in fairness, were there three drives that Mr. Frost

3   was not able to access in this meeting?

4   A.  Yes.

5   Q.  And do you have reason to believe that any of those drives

6   were functional when you first received them from the

7   government?

8   A.  I believe one of them we had trouble with but we were able

9   to get into it and now it's not working at all.

10  Q.  Okay.  And you don't know -- I mean, you don't know how

11  these, um, hard drives were maintained prior to you receiving

12  them from Mr. Feder?

13  A.  They were sealed in a box.

14  Q.  But you don't know how he -- he maintained them?

15  A.  I have no idea.

16  Q.  Is it possible they were not maintained correctly?

17  A.  I suppose it's possible.  I mean, they were all sealed in a

18  box in protective sleeves and in protective outer, you know,

19  like Styrofoam and stuff, so I don't see how they were taken

20  care of.

21  Q.  But they're electronic and sometimes electronics fail,

22  right?

23  A.  Electronics fail for no reason at all, yes.

24  Q.  Yes.  In fact, you've testified to that in previous cases,

25  right?

1    A.   Absolutely.

2    Q.   State versus Polowitz:  I've had hard drives fail the week

3    after purchasing them.  I've had hard drives last for ten

4    years.  There is no way to predict the failure of a hard drive,

5    whether it's degraded or something mis-functioned on it.  It's

6    electronic, right?

7            MS. BERNSTEIN:  Objection, Your Honor.  Relevance.

8    The witness conceded that she agrees electronics fails all the

9    time.

10           THE COURT:  The objection is sustained.

11   BY MR. RAPP:

12   Q.   And you don't really know who had access to these drives,

13   do you?

14   A.   I do not.

15   Q.   Did you prepare a spreadsheet documenting your initial

16   assessment of these hard drives?

17   A.   Yes.

18   Q.   And for hard drive HQP002141, did you make a notation that

19   this drive contained forensic images titled SDE-1B211?

20   A.   I don't have it in front of me, but I'm assuming if you're

21   reading from my chart, then, yes.

22   Q.   Now, did the government offer to replace these three hard

23   drives that weren't functioning?

24   A.   Yes.

25   Q.   Now, during the meeting, did Mr. Frost attempt to view the

1    contents of one of the disks, HQP002145, using the FTK Imager

2    in Windows?  Do you recall that?

3    A.  I don't recall specifically.

4    Q.  Did he restart -- how about this?  Did he restart your HP

5    computer and allow it to boot back into Windows?

6    A.  Yes.  Several times, I believe.

7    Q.  Once in Windows, is FTK Imager able to view the content of

8    the physical disk?

9    A.  FTK Imager was able to view content on the disks, yes.

10   Q.  Did FTK Imager display some segments of an E01 file with a

11   file size of zero?

12   A.  Yes.

13   Q.  Did the government then ask if you had any Linux-based boot

14   disk in your lab, such as Kali, DEFT, or Paladin?

15   A.  I don't remember the specific names, but I believe they

16   asked.

17   Q.  And you didn't have any?

18   A.  No, sir.

19   Q.  The government had a bootable drive containing a Linux-

20   based set of tools called Sumuri Paladin 7.  Did you give

21   Mr. Frost permission to install Paladin 7 on your computer?

22   A.  Yes.

23   Q.  And you are aware that Paladin 7 is freely downloadable

24   online?

25   A.  I was not until that day, but apparently it is a free tool

1    online.

2    Q.  Do you agree the step was so Mr. Frost could show you how

3    to mount the EXT45 so he could view the E01 image file?

4    A.  Yes.

5    Q.  Did the segments of the E01 file on the disk appear to have

6    uniform file sizes of 8 gigabytes each except for the last

7    file?

8    A.  Yes.

9    Q.  Ms. Loehrs, do you agree 8 of the 11 hard drives that you

10   set out for the FBI were successfully mounted and contained

11   valid forensic images?  Do you agree with that?

12   A.  I wasn't able to validate all of them, but, yes, he was

13   able to mount the drives and showed me that the images were

14   there.

15   Q.  And afterwards you recall telling Mr. Frost, quote, I

16   totally understand that Windows doesn't interpret these

17   correctly.  Do you recall saying that?

18   A.  Yes.

19   Q.  Were you able to view the hex data from that E01 file?

20   A.  Again, I was looking at data on the screen.

21   Q.  Did that data appear to be encrypted?

22   A.  There is no way you could tell.  You would have to bring it

23   in.

24   Q.  Did Mr. Frost point out text in that view that indicated

25   the presence of a Z pool?

1    A.  He did.

2    Q.  Do you agree as a result of this meeting the government was

3    able to show you to get through the step one that at the outset

4    of the testimony I described?

5    A.  Yes.

6    Q.  And whether the images were readable?

7    A.  Yes.

8    Q.  And 8 of the 11 images were readable, valid forensic

9    images.  Would you agree with that?

10   A.  Again, I don't know that they're valid because I wasn't

11   able to bring them all in.  I could just see -- I saw the steps

12   he took and that there was data there.  I haven't been able to

13   validate all of them.

14   Q.  Did you ask Mr. Frost whether all the disk images from a

15   server would need to be present to reassemble a Z pool?

16   A.  I did not ask him that.

17   Q.  Do you have any prior experience, ma'am, working with Z

18   pools or Z file system?

19   A.  No, I don't.

20   Q.  Now, in light of the fact that you don't have experience

21   with this, with the Z pools or the Z file, would you look to

22   hire another expert who had experience with Z pools?

23   A.  Well, at my point you shouldn't need another expert just to

24   get into forensic images, but to rebuilt the broken data that's

25   been provided, yes, you would need an expert to rebuild that

1    particular system.

2    Q.  When you say broken data, what do you mean by that?

3    A.  I can see from the drives that a cohesive system with a

4    bunch of usable data was, essentially, broken into a million

5    separate pieces and provided on drives in a nonindustry

6    standard format, so that would have to be completely rebuilt,

7    if at all possible, by somebody who understood the original

8    system.

9    Q.  But if you had an expert who had experience with Z pools,

10   couldn't they view this -- this data?

11   A.  They could view -- they could see that it's Z pool data,

12   that's not the issue.  I don't know that any expert could

13   rebuild the system other than the person who put it together

14   originally.

15   Q.  Well, you would agree that an expert in Z pool or Z file

16   could look at this video of Mr. -- Mr. Frost walking you

17   through these steps, right?

18   A.  Sure.  Anyone can watch that, yes.

19   Q.  At the conclusion of the meeting, were you asked whether

20   you had further questions, do you recall saying, this

21   absolutely clears up everything on my end, and you had no

22   further question, right?  You said that?

23   A.  Yes, I did.

24   Q.  Now, I think you've already answered this, but just to be

25   clear, you haven't reviewed the testimony of Wil Gerken and

1   Mr. Frost from the previous hearing, have you?

2   A.  Again, I was here for that, so I heard it, but I haven't

3   specifically reviewed it in detail.

4   Q.  Okay.  Did the defense ever provide you the transcript --

5   I'll withdraw the question.

6           You were not given the transcript of your -- you were

7   given the transcript of your testimony, right?

8   A.  I believe so.

9   Q.  But you were not given the transcript of Mr. Gerken's and

10  Mr. Frost's testimony; is that right?

11  A.  I don't know.  I honestly don't remember.  I was here for

12  the hearing.  I don't know if I got their transcript or not.  I

13  may have.

14  Q.  Well, you don't know if you did or not?

15  A.  No.  I get hundreds of e-mails every day.  I've gotten tons

16  of e-mails on this case.  There was no reason for me to review

17  it, so I don't know if I have it or not, because, again, I was

18  here so I heard the testimony and took notes.

19  Q.  Okay.  Did you review your notes?

20  A.  Yes.

21  Q.  Okay.  But you didn't -- you didn't request, just to --

22  just to be on the safe side, to look at Mr. Gerken's -- the

23  transcript of Mr. Gerken's testimony or Mr. Frost?

24  A.  I did --

25          MS. BERNSTEIN:  Your Honor, objection.  Asked and

1    answered.

2            THE COURT:  The objection is sustained.

3    BY MR. RAPP:

4    Q.  Do you recall testifying at the previous hearing:  As I

5    look through the E01s, they were all the same size for a while,

6    and then they were size zero, size zero, size zero, then a huge

7    file, then a size zero, size zero.  That right there is a red

8    flag that this is not a valid -- something happened.  That is

9    not a valid file.  EnCase will not open that.  No forensic tool

10   will open that no matter how hard you try.

11           Do you remember testifying to that?

12   A.  Yes.

13   Q.  And during the meeting with Mr. Frost, you said that you

14   understood then that the files on the disk provided by the

15   government display incorrectly in Windows, right?

16   A.  Yes.

17   Q.  And, based on that, is it possible that the files you were

18   describing during your October 25th testimony were valid files

19   that were not being displayed correctly?

20   A.  Yes.

21   Q.  And have you examined any of the -- since the meeting with

22   Mr. Frost, have you gone back and examined any of the drives

23   you received from the government?

24   A.  No.

25   Q.  Do you recall testifying in the last hearing to the

1   following:

2          I'm just trying to open these forensic images.  And,

3   again, not all of them show as forensic images.  Some of them

4   do.  Some of them show as E01s but the others just show as

5   garbage, so I was just trying to find something to read this

6   data.

7          Do you recall testifying to that?

8   A.  Yes.

9   Q.  Is it now apparent that what you believe to be, in your

10  words, garbage before is likely data that was being incorrectly

11  displayed in Windows?

12  A.  Yes.  Because of the way it was formatted, yes.

13  Q.  In the last hearing you testified to having a chat with

14  someone from AccessData where they told you that the FTK Imager

15  could not image FreeBSD.

16  A.  Yes.

17  Q.  Wasn't it that they actually told you that the FTK Imager

18  would not run on a FreeBSD system?

19  A.  I don't believe that's what the chat says, but the chat's

20  been printed.

21  Q.  Isn't it your understanding that the FTK Imager could take

22  an accurate image of a physical disk regardless of what file

23  system was on the disk?

24  A.  I don't believe that's true.

25  Q.  But have you learned that the FTK Imager has data viewing

1    data stored in some file systems?  Have you learned that?

2    A.  I'm not sure I understand what you just asked.

3    Q.  Okay.  You testified in the last hearing that the drives in

4    the Backpage servers were self-encrypting drives that would be

5    unreadable if they were taken out of their chassis.

6         Do you recall that?

7    A.  That is what was provided to me by the government, yes.

8    Q.  If the drives were imaged within the chassis, the self-

9    encrypting drives would not be an issue, correct?

10   A.  Possibly.

11   Q.  Is it your understanding now that using external boot media

12   an examiner could produce a valid and verifiable hard drive

13   image using a program such as AccessData Command Line Imager?

14   A.  Again, as a general sense, yes, FTK Imager works on a

15   number of different systems.

16   Q.  So you recall -- you've read the motion, the two motions,

17   the initial June motion and the reply motion filed by the

18   defense in this case, have you not?

19   A.  I believe so.

20   Q.  And you know in the reply, this is the document that had

21   your declaration?

22   A.  Yes.

23   Q.  And they -- in the defendant's motion they note, among

24   other things, that they submitted a declaration of you, an

25   expert in forensic computer evidence, who confirms that the

1    information and data the government has produced to date is not

2    forensically sound and useless, right?

3    A.   Yes.

4    Q.   That's not accurate?

5    A.   Actually, I believe it still is.

6    Q.   You still believe that's accurate?

7    A.   I do.

8    Q.   Also in your declaration:  The issues with the data

9    produced by the government includes, but is not limited to, the

10   way in which the data was acquired and preserved, the integrity

11   the data produced, and the ability, or lack thereof, to access,

12   review, and analyze the data.

13          Do you still believe that to be correct?

14   A.   I do still believe that to be correct, yes.

15   Q.   Most of the data acquired by the government was not

16   produced in an industry standard format and is not forensically

17   sound.

18          Do you still view that as a correct statement?

19   A.   Absolutely.

20   Q.   You claim that you lack the ability to access, review, and

21   analyze the data, right?

22   A.   I am not sure I agree with that completely.

23   Q.   Okay.  But that's from your declaration, right?

24   A.   You would have to read me exactly, because I think you're

25   taking it out of context.  I am capable of reviewing industry

1    standard forensic data.  I am not capable of rebuilding a Z

2    pool system.  That's two completely different things, so I'd

3    just like you to clarify which one you're talking about.

4    Q.  Don't you need to be able to see something, ma'am, before

5    you come to the conclusion that it's faulty, don't you need to

6    be able to see the image?

7    A.  Not always.

8    Q.  This is also from your declaration:  The majority of the

9    electronic data seen does not meet minimum industry standards

10   and is completely unusable in its current form.  The issues

11   include the way the data was acquired and preserved, the

12   integrity of the data produced, and the ability, or lack

13   thereof, to access, review, and analyze the data.  That's the

14   complete quote.

15           Again, how are you able to conclude this without

16   actually seeing the images?

17   A.  Well, I have now seen what's on those disks and I still

18   agree with that.  It is not industry standard.  It was not

19   produced in a readable format.  And I don't think anyone will

20   ever be able to put that data back into a usable form again.

21   Q.  Well, you would agree that Mr. Frost, with his expertise,

22   was able to access the data, correct?

23   A.  I would agree he could access it.  He was not able to

24   access the way the servers were.  He built his own database

25   that I can't verify.  That's not the same -- just accessing

1   data is not the same as receiving a server in a usable format.

2   We need forensically sound data that can be validated so that I

3   know that the data he's looking at is the data I'm looking at,

4   which is exactly the same as the data that was on the original

5   server, and we cannot do that.

6   Q.  And you don't believe what you observed Mr. Frost do in

7   court does that.  Is that your opinion?

8   A.  I -- absolutely, that is my opinion.  He made his own

9   database that cannot be validated.

10  Q.  But -- but Mr. Frost is not the only person that has this

11  expertise.  Would you agree with me there?

12  A.  Sure.  He is not the only person with Linux expertise, yes.

13  Q.  There is enumerable experts out there that has the same

14  expertise that Mr. Frost has.

15  A.  Yes.

16  Q.  You just don't have that expertise, right?

17  A.  Well, again, I don't have the expertise rebuilding a Z file

18  system.

19  Q.  You provided analogy in your declaration:  This is like

20  sending someone a document that cannot be opened in Word or

21  Adobe, industry standards, because the document was created

22  with an unknown program, right?

23  A.  Yes.

24  Q.  And do you still agree with that?

25  A.  I do still agree with that.

```
1    Q.  And you provide an analogy in your declaration that this is
2    like buying a large piece of unassembled furniture but
3    realizing you don't have all the parts or the instructions on
4    how to build it, right?
5    A.  Yes.
6    Q.  And you still stand by that analogy?
7    A.  Absolutely.
8    Q.  But if there are experts out there that are readily
9    available, they would be just the people you want, just to
10   follow your analogy, to be able to assemble the furniture,
11   right?
12   A.  Again, it doesn't matter how good you are at assembling
13   furniture, if you don't have all the parts, you can't do it.
14   Q.  But all the parts are there, right?
15   A.  But I disagree.
16   Q.  Oh, you disagree?
17   A.  That's where we disagree.
18   Q.  All right.  Ma'am, let's talk about your educational
19   background.
20           MS. BERNSTEIN:  Objection, Your Honor.  Relevance.
21           THE COURT:  Objection is overruled.
22   BY MR. RAPP:
23   Q.  By your own admission, you're a high school dropout, right?
24   A.  Yes, I am.
25   Q.  Got your GED?
```

UNITED STATES DISTRICT COURT

1   A.  Yes, I did.

2   Q.  You have a paralegal degree from a community college,

3   right?

4   A.  No, I don't.

5   Q.  You don't?

6   A.  No, sir.

7   Q.  You went to Pima Community College?

8   A.  Sure did.

9   Q.  Did you get some type of degree there?

10  A.  No, I did not.

11  Q.  All right.  You attended University of Arizona, right?

12  A.  Yes, I did.

13  Q.  You don't have a degree from University of Arizona, right?

14  A.  That is correct.

15  Q.  In fact, to be -- just to cut to the chase here, there is

16  nothing that you studied at the University of Arizona that is

17  really relevant for what you do now; is that right?

18  A.  I disagree.

19  Q.  Well, you took a bunch of classes in fashion merchandising,

20  correct?

21  A.  That was what I started in, correct.

22  Q.  What computer science type courses did you take at the U of

23  A?

24  A.  That was in, like, 1987, I think.  I have no idea.

25  Q.  All right.  And then you get a Bachelor's of Science from

1    the University of Phoenix, right?

2    A.  Correct.

3    Q.  And how many years did you attend that school?

4    A.  Two.

5    Q.  And was that actually where you went to the campus or --

6    A.  Actually, I think two, two or three.  Yes, I went to school

7    every Tuesday night as a single mom.

8    Q.  All right.  And, now, you've been -- you've been cross

9    examined a lot on, not only your educational background, but

10   your work history, right?

11   A.  Yes.

12   Q.  And, as a matter of fact, you were fired from your first

13   job, right?

14   A.  Um, not my first job, but I was fired from a job.

15   Q.  Okay.  And, in fact, you've been cross examined on that

16   issue before previously?

17   A.  I have.

18   Q.  And the Ninth Circuit has ruled that that was an

19   appropriate area of cross-examination in the U.S. versus Fuller

20   case?

21          MS. BERNSTEIN:  Objection, Your Honor.  Foundation.

22          THE COURT:  The objection is overruled.

23   BY MR. RAPP:

24   Q.  Well --

25   A.  I have no idea.

1    Q.  Well, you, no doubt, remember testifying in United States

2    versus Fuller?

3    A.  I don't know what the Ninth Circuit, what their opinion was

4    on asking me those questions.  I have no idea.

5    Q.  Well, the District Court did not abuse its discretion when

6    it refused to grant Fuller a mistrial on the ground of

7    prosecutorial misconduct.  The prosecutor asked Fuller's expert

8    computer witness, Tami Loehrs, whether she had been fired from

9    an earlier job, right?

10          MS. BERNSTEIN:  Objection, Your Honor.  I am not

11   following the relevance of any of this.

12          THE COURT:  The objection is overruled.

13   BY MR. RAPP:

14   Q.  That was relevant to her qualifications as an expert

15   computer witness, right?  You've read that decision?

16   A.  No, I have not read that decision in -- I mean, again, what

17   was that, early 2000?  I do not recall that.  I have worked on

18   over a thousand cases.

19   Q.  Well, actually, that was December 18, 2009.  Does that

20   refresh your recollection?

21   A.  Sure.  I don't remember it.

22   Q.  Ma'am, you've never published any articles, right?

23   A.  No, I have not.

24   Q.  And your testimony has been, look, I wasn't -- I wasn't

25   retained to actually review the material on the Web site and

1    find certain things that the defense was asking me to find on

2    the Web site, right?

3    A.  Well, that's not entirely true.  We didn't know where it

4    was going to go.  We never made it that far.  If it had been a

5    logical image and an industry standard tool, I probably would

6    have been able to run searches for them, but that's now how it

7    turned out to be, so that would not then be my job moving

8    forward.

9    Q.  All right.  But, fair to say, you don't have any training

10   in trying to, for example, identify an image that might be

11   child pornography, right?

12   A.  Do I have -- I'm sorry, repeat that.

13   Q.  Okay.  If you were to review the Web site, the Backpage Web

14   site, you wouldn't have been asked to try to locate images of,

15   perhaps, underage trafficking victims, right?

16   A.  I --

17             MS. BERNSTEIN:  Objection.  Speculation.

18             THE COURT:  The objection is overruled.

19             THE WITNESS:  I have no idea what they were going to

20   ask me to do.  Again, we haven't gotten that far.  Step one was

21   to find out what type of data we had been given.  I have no

22   idea how it would have moved forward.

23   BY MR. RAPP:

24   Q.  Now, in your previous testimony you testified on direct

25   that you have had three negative decisions in your career; is

1    that right?

2    A.  I believe so.

3    Q.  Okay.  Well, so I note -- did you meet with the defense to

4    prepare for your -- the continuation of your cross-examination?

5    A.  I had a phone call.

6    Q.  With who?

7    A.  Ms. Bernstein.

8    Q.  And did you go over some -- some of these cases that have,

9    to put it mildly, given negative opinions about your

10   credibility?

11   A.  Yes.

12   Q.  And what cases did you go over?

13   A.  We reviewed Cervantes.

14   Q.  Okay.  Can I just stop you there?  And this is a small

15   point, but you and I got into a little debate the last time

16   about whether it was Cervantes or Certantes.  Do you remember

17   that?

18   A.  Yes.  And I see the order appears to be misspelled.

19   Q.  Well, did you look at the whole docket?

20   A.  I -- all I know is I -- we were hired by the client and he

21   said his name was Cervantes, so I have all of that.

22   Q.  Okay.  But if you looked at the whole docket, you would

23   find out that on every single document it's spelled Certantes?

24   A.  Okay.  Well, I have no idea how to explain that other than

25   his family hired us and told us his name was Cervantes so...

1   Q.  All right.  But that -- that was not a -- that was

2   something of a negative opinion for you, correct?

3   A.  Actually, no, I don't think that case was a negative

4   opinion at all.  I think you took it completely out of context.

5   Q.  Well, Moran was a negative opinion, right?

6           MS. BERNSTEIN:  Objection, Your Honor.  Asked and

7   answered.  We did this at the last hearing.

8           THE COURT:  The objection is sustained.

9   BY MR. RAPP:

10  Q.  Well, why don't you tell me which cases that are -- that,

11  in your view, are negative, the three cases that are negative

12  opinions.  Why don't you tell me.

13          MS. BERNSTEIN:  Objection, Your Honor.  Same

14  objection.

15          THE COURT:  The objection is overruled.

16          THE WITNESS:  The Thomas, Leikert, Neale opinion was

17  negative.  Moran was negative.  And a judge wrote a negative

18  opinion about paying me on Solon.

19  BY MR. RAPP:

20  Q.  And those are the three?

21  A.  Correct.

22  Q.  But -- but you're certainly familiar with this case,

23  Gonzales, that there was a published decision in February of

24  this year, right?

25  A.  Yes.

1   Q.  And this is -- this is by Senior Judge David Campbell,

2   correct?

3   A.  Yes.

4   Q.  But -- and you read that decision?

5   A.  Yes, I have read everything.  I'm still actively involved

6   on that case.

7   Q.  All right.  But you know that decision actually cites to a

8   case, Pirosko?  Do you know that?

9   A.  That I have never worked on.

10  Q.  Okay.  But you've -- we brought that up at the last

11  hearing.  Do you recall that?

12  A.  Yes.

13  Q.  And you said, I never -- I never worked on that case?

14  A.  Correct.

15  Q.  Right.  But you know that the Pirosko case actually cites a

16  lot of your work from the Thomas and the Moran case, right?

17  A.  Okay.  Again, I haven't read Pirosko.  I have never been

18  hired on Pirosko.  I have no idea why they're using anything

19  about me in Pirosko.  It's not one of my cases.

20  Q.  Now, you cite the Solon case as one of those negative.

21  What was negative about that?

22  A.  The judge approved me for $10,000 -- it was a CJA case.

23  And when I submitted my $9,000 bill, he was very angry that I

24  had submitted such a large bill for doing my work.

25  Q.  This was to this federal district court judge?

1    A.  Correct, in Wyoming.

2    Q.  And, in fact, in that opinion -- you've read the entire

3    opinion?

4    A.  I read the opinion, and then, actually, they wrote -- and I

5    don't know what you call it --

6    Q.  Again, I'm just asking you.  Did you read the opinion?

7    A.  I did.

8    Q.  Did you read the published opinion?

9    A.  I did.

10   Q.  And you know that the district court judge on the record

11   said, this woman -- referring to you -- has pretty exalted

12   ideas of her worth, right?

13   A.  Yes.

14   Q.  It's going to be a cold day in hell before I ever authorize

15   payment to Loehrs of $15,000?

16   A.  Yes.

17   Q.  Have you read the United States versus Mckinion case?

18   That's a 2014 case.

19   A.  No.

20   Q.  Do you know that in that case they actually, in the

21   footnote in that case, they cite the Thomas case which we now

22   agree questioned your credibility, right?

23   A.  Yes.

24   Q.  How about the United States versus Shipton?  Have you read

25   that published decision?

1    A.   That just came out.

2    Q.   Well, it didn't just come out.   It came out September of

3    2019, right?

4    A.   I just received it.

5    Q.   And in that case, though, the Court need not belabor the

6    point, the evidence received from Ms. Loehrs was largely

7    irrelevant to the issues before the Court at this stage, and

8    where it did bear upon the question of expectation of privacy,

9    her testimony was not entirely credible, right?

10   A.   Yes.

11   Q.   Okay.   And they also cite the Thomas case in that one?

12   A.   I believe Thomas gets cited a lot.

13   Q.   How about United States versus Clark, this is United States

14   District Court of Maine, January 2011, 762 Fed Supp. 2003.   Do

15   you remember that case?

16   A.   That's another one where I have been attributed as

17   testifying and I never testified.   I worked on the case but I

18   never testified in the case.

19   Q.   To the extent the defense -- they state in that case, to

20   the extent the defendant's computer forensic expert, Tami

21   Loehrs, attempted to rebut some of this testimony, the Court

22   finds Detective Bradeen's testimony on this subject to be more

23   credible, right?

24   A.   I didn't testify, so I --

25   Q.   Well, did you -- well, did you submit a declaration?

1    A.  I don't believe so.  I submitted a report to the attorney.

2    I don't know what the attorney did on that case.  I submitted a

3    report and all of the sudden I'm hearing that I have an opinion

4    about my testimony.  I never testified.

5    Q.  All right.  But you worked on the case?

6    A.  Uh-huh.

7    Q.  And --

8    A.  Yes, I did.

9    Q.  -- are you -- are you familiar with Madlis versus United

10   States, Madlis?  This is a Florida court.  This is federal

11   Supp. 2010 Westlaw 7141531.  Do you remember that, Madlis,

12   M-A-D-L-I-S?

13   A.  I remember them very well, yes.

14   Q.  Okay.  In her order, Judge Lenard rejected Madlis'

15   arguments and found that Ms. Loehrs' affidavits were vague and

16   unhelpful, right?

17   A.  Again, if that's what it says.

18   Q.  Well, you read it?

19   A.  I don't read every opinion.  I don't even know half of the

20   opinions that come out because I am not always involved in the

21   case all the way through.  I do a job, I submit a report, and

22   then I'm done, so sometimes I don't even know.

23   Q.  Well --

24   A.  But, yes, this has been brought up previously, but I

25   haven't specifically read what she wrote.  I don't have her

1    opinion.

2    Q.  We talked about this at the last hearing that at least one

3    court found it not credible that you hadn't read decisions that

4    reflected upon your testimony at hearings, right?

5    A.  I do recall that, yes.

6    Q.  And Judge Lenard further noted that Ms. Loehrs' statements

7    that she only found one video on the computer's hard drive was

8    undermined by her earlier admission that she was only able to

9    conduct a preliminary examination of the computer, right?

10   A.  I guess.  I don't even know what that means.

11   Q.  However, Ms. Loehrs' affidavits offer only speculation and

12   unsupported conclusions of law, right?

13   A.  Again, if that's what's on there.

14   Q.  Would you agree with me that there is more than just three

15   cases?

16   A.  Again, I am only aware of three that attacked my

17   credibility.  A lot of these things that you're reading are

18   taken out of context.  Um, I know the Madlis case, and the

19   issue was not the number of video, the issue was --

20   Q.  Ma'am, let me stop you.

21   A.  It's taken out of context.

22   Q.  Yes or no?  Do you agree with me?

23         MS. BERNSTEIN:  Objection, Your Honor.  I ask that the

24   witness be able to answer the question he posed.

25         THE COURT:  Well, she was answering a different

UNITED STATES DISTRICT COURT

1    question.

2          The objection is overruled.

3    BY MR. RAPP:

4    Q.  This is just a yes or no.

5          Yes or no, do you agree that there is more than three

6    cases?

7    A.  I disagree that those are --

8    Q.  Yes or no?

9    A.  -- opinions -- no, I don't agree.

10   Q.  Okay.  But, at any rate, it's important, as an expert

11   witness, to be objective in your work, right?

12   A.  Absolutely.

13   Q.  And, in fact, your declaration -- you say in your

14   declaration you were retained to either refute or prove the

15   allegations in the indictment of the Backpage defendants,

16   right?

17   A.  That would be accurate.

18   Q.  Okay.  And in order to be objective, it's important what

19   your public statements are, right?

20   A.  I don't know that my public statements have any bearing in

21   my objectivity as a forensic expert.

22   Q.  Well, you've been cross examined on this before, on your

23   interview with the Arizona Daily Star, right?

24   A.  Yes.

25   Q.  You have been -- a couple of times you've been cross

1   examined?

2   A.   Correct.

3   Q.   And in that article you have been cross examined on the

4   fact that you said to the reporter in that -- who was writing

5   that article, that you try to come up with defense scenarios,

6   right?

7        Yes or no?  Did you say that?

8   A.   Incorrect.

9   Q.   Yes or --

10  A.   No, I did not.

11  Q.   You did not say that?

12  A.   I have explained this previously when I testified, that

13  reporter wrote that in the article, and what I had said was I

14  find all the scenarios that occur on a computer not just the

15  one the government wants you to see.

16  Q.   Okay.  So that --

17  A.   That's my job.

18  Q.   That reporter got it wrong.  Is that what you're saying?

19  A.   That reporter quoted me incorrectly, that is correct.  And

20  I have said that previously.

21  Q.   But you have previously been cross examined on your

22  Facebook site, right?

23  A.   Yes, I have.

24  Q.   Several times?

25  A.   Yes, I have.

1    Q.  And, particularly, your statement on the Facebook site

2    which says, the most dangerous threat facing our nation is the

3    FBI?

4    A.  Well, that's not the whole quote.

5    Q.  Well, FBI:  Our mission is to protect you from the most

6    dangerous threats facing our nation.  FBI is the most dangerous

7    threat facing our nation.  Is that the exact quote?

8    A.  That's the exact quote --

9    Q.  Okay.

10   A.  -- joke that I put.

11   Q.  There is no question before you.

12        Is that the quote?

13   A.  That is the quote.

14   Q.  And in your cross-examination of this, you have, in one

15   instance -- first of all, you have testified previously that

16   your Facebook site was private, right?

17   A.  Absolutely.

18   Q.  And you have even intimated that an FBI agent hacked into

19   your Facebook site to be able to discover this derogatory quote

20   to the FBI, right?

21   A.  That agent actually testified that he was alerted to my

22   account, so yes.

23   Q.  All right.  And -- and you and I both agree that that would

24   be illegal to hack into a Facebook site?

25   A.  No, it's not.

1    Q.  Right?

2    A.  Not by the FBI it's not.

3    Q.  Well, wouldn't the FBI have to get a warrant to do that?

4           MS. BERNSTEIN:  Objection, Your Honor.  Foundation.

5           THE COURT:  The objection is overruled.

6           THE WITNESS:  You would think.

7    BY MR. RAPP:

8    Q.  Okay.  Well, did you make any complaint to the Inspector

9    General of the FBI for this illegal activity?

10   A.  I have never complained or filed anything with all the

11   stuff that's thrown at me, no.

12   Q.  But, in any event, the FBI is the agency you have been

13   dealing with in this case, right?

14   A.  Yes, it is.

15   Q.  Okay.  You flew up to Pocatello, right?

16   A.  Yes, I did.

17   Q.  Mr. Frost clearly works for the FBI, right?

18   A.  Yes.

19   Q.  And -- and FBI agents were involved in seizing the servers,

20   right?

21   A.  Yes.

22          MR. RAPP:  Can I just have a moment?

23   BY MR. RAPP:

24   Q.  Ma'am, did you receive the FBI property receipt for the

25   drives signed by Mr. Feder?

1    A.  I have no idea.  We have tons of property receipts.  Not

2    that I am aware of specifically.

3    Q.  Do you know if those property receipts identify which

4    server's specific disk the images came from?

5    A.  That was mentioned in our meeting.

6    Q.  The disk images were provided in an E01 format, right?

7    A.  Some of them.

8    Q.  But that's an industry standard format, right?

9    A.  E01 is an industry standard format, yes.

10   Q.  So when you say in your declaration, the declaration that

11   you filed in this case, not unlike the declaration that you

12   filed in all these other cases, when you say that it wasn't

13   presented to you in industry standard format, that's not

14   accurate, is it?

15   A.  It actually is.  The E01 itself is an industry standard

16   format, but the way it was formatted with Linux is not industry

17   standard.

18   Q.  But you just had difficulty accessing the disks formatted

19   in the EXT4, right?

20   A.  I did have difficulty following all the steps to get into

21   the E01s, yes.

22   Q.  Ma'am, is it just possible that the defense retained the

23   wrong expert in this case?  Is that possible?

24   A.  I disagree.  No.

25            MR. RAPP:  I have nothing further.

1           THE COURT:  Redirect.

2                   REDIRECT EXAMINATION

3    BY MS. BERNSTEIN:

4    Q.  Ms. Loehrs, how many cases have you worked on in your

5    career?

6    A.  Over a thousand.

7    Q.  Many where you go against Mr. Rapp's office?

8    A.  Hundreds.

9    Q.  Does it seem as though Mr. Rapp's office is particularly

10   invested in trying to discredit you?

11          MR. RAPP:  Objection.  Leading.

12          THE COURT:  The objection is sustained.  Well, yeah,

13   the objection is sustained.

14   BY MS. BERNSTEIN:

15   Q.  Is Mr. Rapp's office familiar with all of your cases?

16   A.  Very.

17   Q.  Did you review the impeachment material that the government

18   provided?

19   A.  Yes.

20   Q.  Was some of that a chart of all of your cases?

21   A.  Um, yes, that's one of the things that was in there.

22   Q.  Are there 125 pages of academic records from the 1980s and

23   '90s that were subpoenaed in 2007?

24   A.  I don't know how many pages there were, but, yes, the file

25   that I received from the government on this case, I have

1  received that file many, many times over the years, so it's the
2  same -- it's the same stuff.
3  Q.  And you've been asked many of the same questions?
4  A.  All the time, yes.
5  Q.  Mr. Rapp brought up five cases at our last hearing,
6  correct?
7  A.  Yes.
8  Q.  Did you work on all five of those cases?  I think you said
9  you did not.
10 A.  No, I did not.
11 Q.  The other four cases, do you recall what the subject matter
12 of those -- or the charges in those cases were?
13 A.  They're all child pornography cases.
14 Q.  And what was the issue in all of those cases?
15 A.  I think all of them but Cervantes involved law
16 enforcement's proprietary software, identifying people on file
17 sharing networks.
18 Q.  Did any of those opinions find you to be unqualified?
19 A.  No.
20 Q.  Did any of those opinions take issue with your forensic
21 methods?
22 A.  No.
23 Q.  In addition to what Mr. Rapp has asked you about, are there
24 many other opinions that have been published about cases you've
25 worked on?

1    A.  Yes, there are.

2    Q.  Did one of those occur earlier this year?  I think he asked

3    you about the Gonzales case.

4    A.  Yes.

5    Q.  And that's case number 17-CR-01311, that was before Judge

6    Campbell in this courthouse?

7    A.  That's correct.

8    Q.  I'm showing you what's been marked as Defense Exhibit 199.

9         Do you recognize this?

10   A.  Yes, that's the order in Gonzales.  I think that's the

11   first one.  There has been two.

12        MS. BERNSTEIN:  I would move defense Exhibit 199 into

13   evidence.

14        THE COURT:  Any objection?

15        MR. RAPP:  Well, so I did not ask about this case, but

16   I -- if I get an opportunity to re-cross on this, I don't have

17   an objection to it.

18        THE COURT:  You did ask about Gonzales.

19        MR. RAPP:  Well, I asked about the case Pirosko that

20   was cited in the published decision, but if there is specific

21   areas that she wants to go over, I would like the opportunity

22   to cross examine.

23        THE COURT:  Okay.  But there is no objection to the

24   exhibit?

25        MR. RAPP:  No.

1           THE COURT:  Exhibit 199 will be admitted.

2    BY MS. BERNSTEIN:

3    Q.  And here Judge Campbell's order -- well, let me ask you.

4           In that case, Mr. Rapp's office did substantively the

5    exact same cross-examination of you in terms of trying to

6    attack your credibility?

7    A.  Yes, they did.

8           MR. RAPP:  Objection.  Leading and foundation.

9           THE COURT:  The objection is overruled.

10   BY MS. BERNSTEIN:

11   Q.  And Judge Campbell's published order at footnote one

12   specifically states, the government contends that Loehrs'

13   affidavit is unreadable, unreliable, citing several cases

14   rejecting or limiting the scope of her testimony.  Again, these

15   are the same cases that Mr. Rapp brought up?

16   A.  Yes.

17          MR. RAPP:  Objection.  Foundation.

18          THE COURT:  What foundation?  She was the expert.

19          MR. RAPP:  Are you asking me?

20          THE COURT:  That you cross -- yes.  What foundation do

21   you think is missing?

22          MR. RAPP:  Well, I would like to know which cases -- I

23   find it interesting she's read this case and not the other

24   cases, but did she say what cases --

25          MR. FEDER:  Move to strike.

1              THE COURT:  Okay.  Let him finish.

2              So your objection is really that her question is not

3       specific enough?

4              MR. RAPP:  Yes.

5              THE COURT:  Okay.  The objection is sustained.

6       BY MS. BERNSTEIN:

7       Q.  The order continues, the Court found Loehrs' credible at

8       the evidentiary hearing and has no basis at this point for

9       excluding her opinions under Federal Rule of Evidence 702,

10      correct?

11      A.  Yes.

12      Q.  And this order was issued in February of 2019?

13      A.  Correct.

14      Q.  Since that time, has the Court found any basis for

15      excluding your opinions under Federal Rule of Evidence 702?

16      A.  No.

17             MR. RAPP:  Objection.  Foundation.

18             THE COURT:  The objection is overruled.

19      BY MS. BERNSTEIN:

20      Q.  There is also at least one favorable law review article

21      that's been published about you?

22      A.  Yes.

23      Q.  And, for the record, that's Arizona State Law Review 45

24      Arizona State LJ 891.

25             And that read, Tami Loehrs, for example, is perhaps

1    one of the most highly respected computer forensic experts in

2    computer crime prosecutions in the southwest.  She's testified

3    in --

4              MR. RAPP:  I object.  First of all, she's leading.

5    She should --

6              MS. BERNSTEIN:  Can I finish my question?  I allowed

7    Mr. Rapp to finish his questions before I made objections.

8              THE COURT:  The objection is sustained.  This is

9    improper impeachment.

10   BY MS. BERNSTEIN:

11   Q.  All right.  Ms. Loehrs, I don't want to belabor these

12   points, but I do want to ask you just about one case that

13   Mr. Rapp quoted from pretty extensively at our last hearing.

14   He asked you about Certantes, correct?

15   A.  Yes.

16   Q.  I'm going to show you what's been marked as Defense

17   Exhibit 197.  Can you look at that, please?

18   A.  Yes.

19   Q.  And do you recognize this?

20   A.  Yes, I do.

21   Q.  And what do you recognize it as?

22   A.  This is the, again, I call it the Cervantes case.  I have

23   seen this order many times.

24             MS. BERNSTEIN:  Your Honor, I would ask the Court to

25   just take judicial notice of this opinion, or I, alternatively,

```
1    move it into evidence at this point in time.
2              THE COURT:  Any objection to the admission of 197?
3              MR. RAPP:  I have no objection.
4              THE COURT:  197 will be admitted.
5    BY MS. BERNSTEIN:
6    Q.  So I just have a few questions about this.
7              In Certantes the Court was not at all critical of your
8    skills as an expert, correct?
9    A.  Correct.
10   Q.  Can you please go to the --
11             MR. RAPP:  Judge, I'm going to object, continuing
12   objection to leading the witness.  You have -- this is not --
13   this is her witness, not mine.
14             THE COURT:  Okay.
15   BY MS. BERNSTEIN:
16   Q.  Can you please go to the second page of this opinion, of
17   this exhibit?
18   A.  Yes.
19   Q.  Where there is -- under subheading B.
20   A.  Yes.
21   Q.  Can you please read me that first sentence that's
22   highlighted in the second paragraph under subheading B.
23   A.  The Court finds no fault with Ms. Loehrs' credentials or
24   qualifications as an expert, and recalls that the government's
25   motion made no attempt to contest them.
```

1    Q.  Did the Court hold a Daubert hearing in that case?

2              MR. RAPP:  Judge, she should have to read the

3    remaining part of that.

4              THE COURT:  Was that not complete?

5              THE WITNESS:  That's that sentence.  That's not the

6    entire page or paragraph, but that was --

7              MS. BERNSTEIN:  Your Honor, there is many points of --

8              THE COURT:  Well, the exhibit is admitted.  I will

9    read the opinion.

10   BY MS. BERNSTEIN:

11   Q.  And the Court -- did the Court hold a Daubert hearing?

12   A.  Yes, they did.

13   Q.  Were you admitted?

14   A.  Yes, I was.

15   Q.  The government in Certantes challenged you on what basis,

16   do you recall?

17   A.  I believe it was because I was trying to show, with the

18   evidence, knowledge of child pornography being on

19   Mr. Cervantes's computer, and they -- our exam was limited

20   because we were only given two days.  And the computer was

21   networked and we knew other people had access to it, and I

22   couldn't put him at the keyboard.  So they didn't want me to

23   testify about it because the exam wasn't complete, and they

24   thought it would be misleading to the jury to say that we

25   didn't find any evidence that he was the one at the keyboard.

1    Q.  Did the Court actually agree with that opinion and

2    methodology, though?

3    A.  They did.  They just, again, our exam was limited by the

4    government, and since we couldn't complete it, they didn't want

5    me to testify about it, but she agreed with that methodology,

6    yes.

7    Q.  And do you remember Mr. Rapp asking you about this

8    background or context when he questioned you?

9    A.  No, he did not put it in context.  Most of these are out of

10   context.

11   Q.  Can you please go to page 4 of the opinion.

12   A.  Yes.

13   Q.  The very bottom of the first column.

14   A.  Yes.

15   Q.  Could you read that highlighted sentence.

16   A.  Ms. Loehrs believes she can confidently render an expert

17   opinion that the user associated with these activities was also

18   the individual who accessed the prohibited images.  In the

19   Court's view, this appears to be a sound and useful forensic

20   method.  There is also every reason to believe that Ms. Loehrs

21   possesses the expertise to apply this forensic method

22   adequately.

23   Q.  Do you recall Mr. Rapp asking you about that either?

24   A.  No, he did not.

25   Q.  Mr. Rapp brought up a couple of other cases today, correct?

1    A.  Yes.

2    Q.  And do you recall if those were provided in the defense

3    impeachment materials?

4    A.  I don't.  I'm not -- there is so much material in there, I

5    don't know if they're all included or not.

6    Q.  Do you think his quotes today were, likewise, out of

7    context?

8            MR. RAPP:  I'm going to object to that as leading.

9            THE COURT:  The objection is sustained.

10   BY MS. BERNSTEIN:

11   Q.  Did you agree with the quotes he asked you about today?

12   A.  I do not.

13           MR. RAPP:  Objection.  Relevance.

14           THE COURT:  The objection is overruled.

15           THE WITNESS:  Again, I believe that much of what is

16   being pulled out is being taken out of context.

17   BY MS. BERNSTEIN:

18   Q.  Ms. Loehrs, are you confident that this judge can make her

19   own assessment of your credibility?

20           MR. RAPP:  I'm going to object, Judge, to that.

21           THE COURT:  The objection is sustained.

22   BY MS. BERNSTEIN:

23   Q.  Do you know what happened ultimately in the Robert Dean

24   Moran case?

25   A.  It was dismissed.

1          MR. RAPP:  Objection.  Relevance.

2          THE COURT:  The objection is sustained.

3  BY MS. BERNSTEIN:

4  Q.  I want to talk about this meeting on November 19th in your

5  office.

6  A.  Yes.

7  Q.  What was the purpose of that meeting?

8  A.  So that Mr. Frost could show me what he did with the

9  evidence, because some of the drives, again, weren't accessible

10 and other drives weren't being recognized properly, so he was

11 going to come and show me what -- what he did to access them,

12 because he created them.

13 Q.  And what -- what was the issue with the drives that didn't

14 work?

15 A.  They don't work.  They're either physically -- they're

16 probably physically damaged because they -- one of them was

17 actually clicking and the other two just wouldn't show up.

18          THE COURT:  Are you talking about the three?

19          THE WITNESS:  Correct, right, three of the drives.

20 One was actually clicking, making a damage noise, the other two

21 just wouldn't show up.

22 BY MS. BERNSTEIN:

23 Q.  How many drives did you all review?

24 A.  Eleven.

25 Q.  And were those the entirety of what didn't work in your

1   review?

2   A.  No, this was just a sampling of the ones that I had

3   problems with.

4   Q.  Excluding those three that were physically defective, what

5   did you learn about the other nine drives?

6   A.  Well, everything was done in a Linux format.  So he had to

7   download Linux software and use commands to mount the drive and

8   then use what I would call nonindustry standard forensic tools

9   that you can just download for free, which we don't typically

10  use in our industry, to actually open the drives and see the

11  data that was on them, or open the E01s.

12  Q.  What is the industry standard format for drives containing

13  forensic images?

14  A.  The -- we have to use forensic tools that have been

15  validated and tested, and those tools are well-known:  EnCase,

16  FTK, X-Ways.  There is a number of them.  They read all file

17  systems, they also read Linux file systems, if you don't format

18  everything in a Linux format.  You're supposed to take a

19  logical image of the system, whatever it is, whether it's

20  Windows, or Mac, or Linux, or Android, you take a logical

21  forensic image and you put it into an industry standard E01

22  that can be read by all of our industry standard tools.  That

23  is what we're taught, that's the standard, and that's what I

24  have received on, again, thousands of evidence items over the

25  last 20 years.

1    Q.  And why is it important to transmit forensic evidence in an

2    industry standard format?

3    A.  It would be like if I sent you computer code that only I

4    knew.  If I sent you code that you can look up and you can see

5    exactly what that code does, that's industry standard.  If I

6    write my own code and I just send it to you without any

7    explanation of what I wrote, you'll have no idea what it means.

8    It's basically sending you another language that you have no

9    interpreter for.

10        So when you provide forensic images in an industry

11   standard format, you take whatever your unique system is and

12   you have to provide it so that every forensic expert who is

13   trained in these methodologies and tools can open it and read

14   it.

15   Q.  Is there any reason why the drives were formatted the way

16   they were?

17   A.  Mr. Frost just chose to do it that way.  I believe because

18   he's a Linux expert, he just -- he's not a forensic guy, I

19   think he just chose to do everything his way with his tools

20   with free things that he downloaded.

21   Q.  And this is not usual?

22   A.  This is not standard.  I've received forensic images from

23   the FBI on Linux systems many times in the past, they've never

24   ever been provided this way.

25   Q.  What is a log file?

1    A.   Just a text file that describes some activity.

2    Q.   Should that be on each drive?

3    A.   Yes, it should.

4    Q.   Was it?

5    A.   Well, again, the log file was inside all this proprietary

6    formatting, so my understanding is they were on there but I --

7    I couldn't get to them in the beginning to read the information

8    because they were buried under this formatting.

9    Q.   And Mr. Rapp asked you, I believe he asked you about

10   downloading Fedora?

11   A.   Yes.

12   Q.   Did you use the Fedora program that you downloaded at their

13   request?

14   A.   No.  We downloaded what they -- they gave us the URL, we

15   downloaded it and put it on our computer, but it wasn't what

16   Mr. Frost wanted, so he used Mint instead.

17   Q.   Were there any other programs that the government brought

18   to use to this meeting?

19   A.   Yes.  Mr. Robinson handed Mr. Frost the forensic program

20   that he used to open the E01s.

21   Q.   And I think you said Mr. -- excuse me, Mr. Frost ran

22   command language?

23   A.   Correct.

24   Q.   What is command language?

25   A.   So, again, in Linux, you have to know commands, like the

1   old DOS system where you had to go in and actually type

2   instructions.  In normal industry standard formatting stuff, we

3   have -- it's a graphical user interface, so you have programs

4   that show you what to do.  Just like Windows, you have little

5   folders you can open and menu items.

6           For Linux you have to know all the commands to type in

7   to make it do what it has to do, and not everybody knows what

8   those commands are.  I don't know all of the Linux commands,

9   that's why you put it into an industry standard format where

10  you don't need to type in all those commands.

11  Q.  It's not industry -- is it industry format -- is it

12  industry standard format to have to use Linux command language?

13  A.  It is not.

14  Q.  And I think either Mr. Rapp or you testified that the

15  government brought a bootable drive?

16  A.  Yeah, I -- I don't know that they brought one.  Mr. Frost

17  asked me for a CD to burn, and we suggested that he put it on a

18  thumb drive, but he wanted a CD.  And we couldn't come up with

19  one because we haven't used CDs in years, so he ended up, I

20  think, making a bootable thumb drive with the thumb drive.

21  Q.  Did they indicate that any of those programs on that drive

22  or any of the other programs Mr. Rapp asked you about were

23  necessary?

24  A.  Did they indicate if they were necessary?

25  Q.  Prior to your review --

1  A.  Oh.

2  Q.  -- did they indicate that you needed those programs?

3  A.  No.

4  Q.  Or, excuse me, prior to the meeting?

5  A.  No, I had no idea.

6  Q.  And can you just explain again what Z pool and ZFS does?

7  Is that about viewing the data?

8  A.  No, it's --

9          MR. RAPP:  Objection.  Asked and answered.

10          THE COURT:  The objection is overruled.

11          THE WITNESS:  The Z file system is a type of file

12  system.  Macintosh has a type of file system.  Windows has a

13  type of file system.  This is a specific type of file system

14  for Linux.  It's not a very well known file system and I think

15  it's used for very high-end specialty type things.  So it is an

16  -- it is an unusual file system that ran these servers.

17  BY MS. BERNSTEIN:

18  Q.  Does that file system need to be used to access the data?

19  A.  No.  Again, if -- if you have a server that's running any

20  file system, Mac, Windows, Linux, anything, if you take a

21  logical image of that with forensic tools and you create E01s

22  that forensic tools will open, you will be able to see that

23  data, but what happened was they pulled all the drives

24  separately and just copied it in a Linux format so nothing can

25  read it.

1    Q.  Did your meeting with Matt Frost on November 19th solve all

2    of the problems?

3    A.  It didn't solve anything, in my view.  Now I know how he

4    did it.  Now I understand what tools I would need to get into

5    it, but, again, it's still my opinion that it's completely

6    unusable in its format because it was broken into too many

7    pieces.

8    Q.  Would you have imaged the systems this way?

9    A.  No.

10   Q.  How would you have imaged them?

11   A.  Again, like I've explained.  You take a running server, you

12   take a logical image.  When it's up and running, that is to see

13   the system as it is when it's running as a whole cohesive unit,

14   you take a logical image of that, put it onto industry standard

15   E01s that can be opened with any industry standard tools that

16   everyone in the industry is using and understands, and that

17   would open, again, your server.

18   Q.  And why would you have done it this way?

19   A.  Because I still believe right now that system is

20   irretrievably broken the way it was produced because the hard

21   drives were ripped out separately.  And you can't take a system

22   that depends on all these other hard drives and all these other

23   servers as a whole, you can't just split those up, break them

24   into all these different pieces, put them in some format and

25   then say, here you go.  It's like shattering it into a million

1   pieces and then asking you to rebuild it somehow.

2   Q.  I want to turn to Exhibit 123, if you have that in front of

3   you.  This was marked at the last hearing.

4           COURTROOM DEPUTY:  She does not have that in front of

5   her.

6           THE WITNESS:  I do.

7           COURTROOM DEPUTY:  You do have 123?

8           THE WITNESS:  I do.

9           COURTROOM DEPUTY:  Okay.  Good.

10  BY MS. BERNSTEIN:

11  Q.  And is this the spreadsheet of your hard drive review?

12  A.  Yes.

13  Q.  Thus far?

14  A.  Correct.

15  Q.  To your knowledge, are these all of the drives that existed

16  to create the Backpage systems?

17  A.  No, this is only five of them, is my understanding.

18  Q.  Does this include the payment processing island?

19  A.  No, it does not.

20  Q.  Do you have the payment processing island?

21  A.  Um, I believe so.

22  Q.  And do you recall how big that is?

23  A.  I don't.

24          MS. BERNSTEIN:  Your Honor, I would move Exhibit 123

25  into evidence.

1          THE COURT:  Any objection?

2          MR. RAPP:  Isn't it already in evidence?

3          MS. BERNSTEIN:  It was marked, it wasn't admitted.

4          MR. RAPP:  Well, I still don't know the foundation for

5     this document.  It's not Bates stamped.  I don't know where it

6     came from.

7          THE COURT:  Can I see that?

8          THE WITNESS:  Yes.

9          THE COURT:  And she went over this, I believe, on

10    direct, right?

11         MS. BERNSTEIN:  Yes, Your Honor.  I just neglected to

12    move it into evidence.

13         THE COURT:  So that objection is overruled.

14         123 will be admitted.

15    BY MS. BERNSTEIN:

16    Q.  Ms. Loehrs, what do you need to be able to review the data

17    contained on the hard drives that you've received so far?

18    A.  Well, I could -- I could now review the data on there, but

19    the data is unusable.  So if I used these Linux tools the way

20    Mr. Frost showed me, I could go in and see that there is Z

21    pools, there is -- it has to be completely rebuilt.

22    Q.  To rebuild it, do you need information about the systems?

23    A.  Yeah.  In my opinion, I think the only person who could

24    actually rebuild this is the person who originally put it

25    together, they would -- to know what all of this data is and

1    where it goes and how it works together.

2    Q.  And why, in your opinion, is that person the only one who

3    could put it back together?

4    A.  Because there is no other way to know how this was working.

5    We don't have any documentation.  We don't have any pictures.

6    We don't have any schematics.  We have no information about how

7    all of this -- all of these pieces made a whole picture.  So

8    you can't put that back unless you know what the whole picture

9    is.  And, at this point, the only person who knows that whole

10   picture, I believe, is Mr. Gerken.

11   Q.  Can you estimate how much time it would take you to review

12   the drives that you have and validate the images that are

13   there?

14           MR. RAPP:  Objection.  Foundation.

15           THE COURT:  The objection is overruled.

16           THE WITNESS:  I mean, again, just to go into the

17   drives now using these Linux tools pulling the data out would

18   take, I don't know, 100 or more hours just to pull the data

19   out.  That's not to have readable data and understandable data,

20   just to get it out of the forensic format it's in.

21   BY MS. BERNSTEIN:

22   Q.  Do you know how much time it's going to take the government

23   to re-image the physically defective drives?

24           MR. RAPP:  Objection.  Foundation.

25

1    BY MS. BERNSTEIN:

2    Q.  If you know?

3              THE COURT:  The objection is overruled.

4              THE WITNESS:  Typically, imaging a drive, these are

5    fairly small drives, couple of gigs, a few hours, not long.

6    BY MS. BERNSTEIN:

7    Q.  And the time estimate that you just gave us, that was to --

8    to preview it or to do a forensic analysis?  Can you explain

9    what that would entail?

10   A.  So you can't -- here's the problem.  You can't do a

11   forensic analysis on these using forensics tools because it

12   wasn't created in a logical image.  It's a physical image that

13   has to be rebuilt.  So once you get the data off of these hard

14   drives, I can't open them in a forensic tool and just start

15   running searches and see data the way I would normally do on

16   any other case we work on.

17             If we opened a Windows system or a Mac system or even

18   a Linux system that was done logically, we'd be able to see the

19   file system, the folders, all the data, and we could run

20   searches.  This data has been split up and broken up so it has

21   to be rebuilt before we can even go in and try to analyze it or

22   run searches on it.  And I can't even guess how long it would

23   take to try to rebuild something like that.  From this data,

24   from the actual drives that I got would probably take somebody

25   six months or more to try to rebuild that, if they could.

```
1    Q.  Would you also need the rest of the data that's out there

2    from the Backpage systems to restore functionality?

3    A.  Absolutely, because we don't -- we don't know what's

4    missing.  We don't know how it all works together.  You can't

5    just say, well, I don't need that sever, if you don't even know

6    what that sever did or how it interacted with this.

7    Q.  If you could pull all of the data out and if someone could

8    reassemble everything, in your opinion, would that create kind

9    of a user friendly search like what we saw in Exhibit 121,

10   which I have put on the screen?

11   A.  Only if you could put the servers back into their original

12   state.  You're not going to get something like that out of just

13   pulling the data out.  You're going to get what Mr. Frost

14   created, which is he pulled a bunch of data, put it into a SQL

15   database, but we have no way to tell if it's all of it, if it's

16   part of it, if it's accurate.  We can't validate it and it

17   won't look like that.

18        MS. BERNSTEIN:  Thank you.  One moment.

19   BY MS. BERNSTEIN:

20   Q.  Ms. Loehrs, I believe on cross-examination you said that

21   you do not have all of the parts, something to that effect.  Do

22   you recall that?

23   A.  Correct.

24   Q.  Can you explain what you meant by that?

25   A.  Well, we only have five servers, for one, out of the entire
```

1    pool of servers, which we know was at least, I think, 40 just

2    running in Tucson.  So not -- taking out the duplicate servers,

3    I believe there were 40-some servers that ran the Web site, and

4    you can't just rebuild that with five of them because you -- we

5    don't know how they all worked together.  So you're missing

6    servers.

7           And I also believe it's broken because we have

8    encryption, we have -- we don't know how the drives were

9    configured.  There is so many different pieces that just aren't

10   included in what we've received.

11          MS. BERNSTEIN:  Thank you.  No further questions.

12          THE COURT:  All right.  You may step down.

13          THE WITNESS:  Thank you.

14          THE COURT:  Anything further from the defense?

15          MS. BERNSTEIN:  No, Your Honor.  We have no further

16   witnesses.

17          THE COURT:  Okay.

18          MS. BERNSTEIN:  Your Honor, I would just note Docket

19   815, I believe it was 815, was filed -- no, I'm sorry, that's

20   Mr. Frost's declaration -- 805 the defense filed on

21   November 26th, and it was the response to the government's

22   pretrial memo.  I would just note that for the Court.  And I

23   have a printed copy if the Court would like.

24          THE COURT:  Sure, if you have it printed, that would

25   be helpful.  Thank you.

1          All right.  Is there anything further from the

2    government?

3          MR. RAPP:  Judge, are you in receipt of Mr. Frost's

4    declaration that details the meeting?

5          THE COURT:  Well, she indicated that it was filed.

6          MS. BERNSTEIN:  It's at Docket 815.  I have a copy of

7    that, too, if the Court would like.

8          MR. RAPP:  815.

9          THE COURT:  So, yes, I have a copy.  I haven't read

10   it.

11         MR. RAPP:  Nothing.

12         THE COURT:  Okay.  All right.  With respect to, let's

13   see, 465 and 464, Mr. Whalen filed a motion to continue the

14   status conference because he's in a federal jury trial in

15   another state and requests 60 to 90 days for that continuance.

16   It looked like he contacted some counsel who indicated they

17   didn't have any objection.

18         MS. BERNSTEIN:  And, Your Honor, Mr. Kucera and the

19   defense have met and conferred, there is no objection from

20   anyone on the defense side of that continuance.  Our request of

21   the Court is a 60-day continuance of the status conference.

22         THE COURT:  Okay.

23         MR. KUCERA:  That's fine, Your Honor.  John Kucera on

24   behalf of the United States.

25         Just to preview for the Court, the government intends

1    at some point to move to stay the ancillary proceedings, but

2    given that we're, at this point, amenable to moving everything

3    out, we'll pick and choose that time.

4              MS. BERNSTEIN:  To clarify, Your Honor, 60 to 90 days,

5    whatever works for Mr. Whalen.  There is no objection.

6              THE COURT:  He seemed to indicate 60 days would be

7    fine.

8              So, Traci, can you get a new date?

9              COURTROOM DEPUTY:  Yes.

10             THE COURT:  That is Doc. 88, the motion to continue.

11             February 3rd at 10:30.

12             MR. KUCERA:  That's fine for the government, Your

13   Honor.

14             MR. CAMBRIA:  I can't do the 3rd.  I can do the 4th.

15             THE COURT:  That date's not good?

16             MR. BIENERT:  I'm in the same boat.  I think both

17   Mr. Cambria and I are unavailable on the 3rd.  I'm available

18   the rest of that week.

19             MR. CAMBRIA:  So am I.

20             MR. BIENERT:  Or the next week.

21             THE COURT:  Okay.  February 10th at 1:00.

22             MR. KUCERA:  That's also fine for the government, Your

23   Honor.

24             THE COURT:  No?

25             MR. CAMBRIA:  I have a trial starting that day on the

1    10th.

2         MS. BERNSTEIN:  Your Honor, if this is being set for a

3    status conference at that time --

4         MR. CAMBRIA:  Yeah, status conference, Your Honor, she

5    can appear for me.

6         THE COURT:  Okay.  Everybody else okay with that date,

7    February 10th at 1:00 o'clock?

8         And nobody has really asked to move it, but Traci just

9    reminded me that on the -- December 13th is actually scheduled

10   for the forfeiture hearing, so I'm assuming everybody agrees

11   that that should be vacated?

12        MR. KUCERA:  Yes, Your Honor.

13        MS. BERNSTEIN:  Yes, Your Honor.

14        MR. KUCERA:  With the hope that we can, at the

15   February 10th status, address any potential need for an actual

16   hearing.

17        THE COURT:  Correct.

18        MR. KUCERA:  Thank you.

19        THE COURT:  So we'll vacate December 13th, and time is

20   excluded between now and then, February 10th.

21        Okay.

22        MR. NEUMAN:  Your Honor, two other matters, just

23   housekeeping, in terms of timing.  One is there is a fully

24   briefed motion on behalf of my client that's been joined,

25   Docket 746, it was fully briefed as of October 30th, motion to

1   dismiss for failure to plead a necessary element of the travel

2   act.  I don't know if we can schedule a date for that, or just

3   I want to bring it to the Court's attention.

4        THE COURT:  We're working on it.  There were a number

5   of motions filed in that one-week period.

6        MR. NEUMAN:  No, Your Honor, this one was actually

7   filed several months prior and is fully briefed as of

8   October 30th, so I just wanted to raise that.  Like I said,

9   it's Docket Number 746.

10        But the Court's point leads me directly into my second

11   housekeeping issue, which is the numerous motions that were

12   filed within one day.  Our replies are all due December 23rd at

13   this point.  The current motion in limine deadline is

14   January 10th.  We're realistically not going to have rulings on

15   all of these substantive motions by then.  I think we need to

16   move out that date, Your Honor, for the motion in limine

17   deadline.  It's, obviously, several months before trial.  I

18   think we can move it much closer to trial and deal with it, so

19   I just wanted to raise that with the Court.  Don't need to deal

20   with it today, but I think we do need to know at least that

21   they're not going to be due that day so we're not all preparing

22   things that are a waste of everybody's time.

23        THE COURT:  I agree that the motion in limine deadline

24   can be moved.  Let me just pull up the calendar.

25        COURTROOM DEPUTY:  The final pretrial conference is

1    March 6th currently so...

2            THE COURT:  So March 6th is the final pretrial

3    conference, which means we'd have to have it before then.  We

4    can move it to February 7th.

5            Does the government have any objection to that?

6            MR. RAPP:  No.  No, we do not, Your Honor.

7            THE COURT:  Okay.

8            MR. NEUMAN:  Yeah.  I just think it depends on how we

9    deal with all these other motions, but maybe for now that makes

10   sense and we can raise it as needed going forward.

11           THE COURT:  All right.

12           MR. NEUMAN:  So February 7th, Your Honor?

13           THE COURT:  Yes.

14           And anything else?

15           MR. NEUMAN:  That's it for me.

16           THE COURT:  Okay.

17           MR. EISENBERG:  There is one other case, Your Honor,

18   that has a status conference on the 13th of December, that's

19   465, and I assume the Court will also move that.

20           THE COURT:  Yes.  If I wasn't clear, that was -- yes.

21   I was talking about both of them, but thank you.

22           Anything else?

23           MS. BERNSTEIN:  No, Your Honor.

24           THE COURT:  Okay.  I'll get you a ruling as soon as I

25   can.

1          MR. NEUMAN:  Thank you, Your Honor.

2          (Proceedings concluded at 10:03 a.m.)

3                    *          *          *

```
 1                     C E R T I F I C A T E

 2

 3          I, CHRISTINE M. COALY, do hereby certify that I am

 4   duly appointed and qualified to act as Official Court Reporter

 5   for the United States District Court for the District of

 6   Arizona.

 7          I FURTHER CERTIFY that the foregoing pages constitute

 8   a full, true, and accurate transcript of all of that portion of

 9   the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 17th day of December,

13   2019.

14

15

16              /s/ Christine M. Coaly_____
                Christine M. Coaly, RMR, CRR
17

18

19

20

21

22

23

24

25
```