
MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>           Plaintiff,<br><br>    v.<br><br>Michael Lacey, et al.,<br><br>           Defendants. | No. CR-18-422-PHX-SMB<br><br>**MOTION TO ADMIT EVIDENCE OF MURDERS IMPLICATING BACKPAGE** |

## SUMMARY OF ARGUMENT

Defendants' knowledge that prostitution proliferated on Backpage.com is a central issue in this prosecution. At trial, the government will demonstrate that Backpage facilitated prostitution through an array of business practices. These practice included,

among others, a financial relationship with The Erotic Review, aggregating content from competing prostitution websites, and moderation practices that sanitized prostitution ads.

The Court has held that, as alleged in the Superseding Indictment, the First Amendment is not a viable defense for Defendants. (Doc. 793.) Accordingly, Defendants' primary defense at trial likely will focus on whether they possessed specific intent to violate the Travel Act. To support their defense, Defendants likely will argue that they did not know that Backpage.com was used almost exclusively for prostitution, let alone intend to promote or facilitate that unlawful activity. The evidence, however, belies this argument.

As discussed below, Defendants knew that a number of prostitutes who advertised on Backpage were murdered. Defendants knew about these murders through a variety of mediums, including their own internal tracking of news stories, search warrants and subpoenas from law enforcement, high-profile news programs and newspaper articles, and civil lawsuits. The publicity generated by these violent crimes led Defendants to strategize about the company's response and attempt to minimize the negative impact of these stories. This evidence is highly probative in supporting the government's theory that Defendants knew about the website's true nature, and helps demonstrate how the company's business practices facilitated the criminal activities of the prostitutes and pimps who used the website. The evidence shows that despite receiving repeated news stories and other notice of these violent crimes, Defendants persisted in their efforts to expand Backpage's volume of prostitution advertising and related revenue growth. The probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. The evidence should be admitted.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### **I.      Defendants' Knowledge About Relevant Murders**

Defendants knew about the violent crimes that occurred to women advertised on its website. The best evidence of their knowledge is that they maintained their own internal spreadsheet that catalogued news articles that referenced Backpage. In 2014, Defendant Scott Spear directed internal Backpage staff to track stories that implicated the company.

The result was a spreadsheet that categorized the stories as negative, neutral, or positive. (Spreadsheet attached as Exhibit B.) Various public relations firms retained by Backpage utilized this list. Backpage general counsel Elizabeth McDougall and others attempted to identify stories that cast Backpage in a positive light. This list contained numerous articles of prostitution stings, arrests of pimps for child sex trafficking, and murders implicating Backpage. Some of the more high profile cases (many referenced in the Superseding Indictment) are detailed below. Beyond cataloguing these stories internally, many of the Defendants were made aware of these violent crimes in other ways as well, including press accounts, law enforcement inquiries, and subpoenas—both for documents and to testify at a murder trial.

### A. The Detroit Backpage Murders

In December 2011, four woman were murdered after being advertised on Backpage for prostitution. (*Murdered Women in Detroit Linked to Backpage.com, Cops Say*, published Dec. 27, 2011, attached as Ex. C.)   Defendants knew about these murders as evidenced through their work with public relations firms, receipt of Google Alerts, internal email exchanges, and a brand analysis report prepared by an outside firm.

i.  Defendants' Coordination with Public Relations Firms

To handle the fallout from the negative publicity that resulted from this quadruple murder, Defendants Lacey and Larkin engaged the services of Sitrick—a public relations firm.[1] Lacey exchanged emails with Sitrick to formulate a response that included deflecting the blame to other prostitution websites. This is evidenced by an email to Lacey and others, where an attorney (Ed McNally) stated "were [sic] better off just muddying the waters out there today with the news of the 22 websites." (Email dated December 29, 2011, from McNally to Lacey and others, attached as Ex. E.)

At trial, the government believes the evidence will show that the content on these

---

[1] In response to a grand jury subpoena seeking email exchanges between Lacey (and other Backpage owners) and the public relation companies, Backpage took the position that these communications were protected by the attorney-client privilege. Senior Judge David C. Campbell found that many of these emails were not afforded these protections and ordered the emails disclosed. (*See* April 2, 2018 Order, attached as Exhibit D.)

22 websites often originated from Backpage. This fact was also well known to Defendants Lacey, Larkin and Spear. Further, The Erotic Review was also one of these 22 websites, which had a longstanding financial and business relationship with Backpage. The Erotic Review was a website where "Johns" provided reviews of the services of prostitutes, including underage trafficking victims. (*See* Doc. 446 at 11-12; Doc. 446-1 at 40-76.) Backpage made monthly payments to The Erotic Review in accordance with invoices that referred to the company as "Elms Web Services, Inc." (Ex. F). When the owner of The Erotic Review (David Elms) was arrested in a prostitution sting, Larkin emailed Spear and Ferrer alerting them to Elms's arrest. (Ex. G.) Simply put, the effort to deflect blame on other websites including The Erotic Review is, at a minimum, highly misleading, but nevertheless, relevant to knowledge of prostitution occurring on Backpage.com.

In addition to the email exchanges between Lacey and Larkin shortly after the murders, Lacey and Larkin's apparent personal attorney Don Bennett Moon ("Moon") and McDougall had email exchanges with another public relations firm. In these emails, they discussed contacting the Detroit Free Press in an effort to discourage the newspaper from referring to the quadruple murders as the "Backpage murders." (Email dated June 9, 2012 attached as Ex. H.) They apparently decided not to approach the newspaper with this request.

ii. Google Alerts

At trial, the government will present evidence that many of the Defendants set up Google Alerts to keep informed of any news stories about Backpage.[2] Defendants received an average of three to four articles per day detailing arrests of pimps and prostitutes, rescues of child sex trafficking victims, murders, and many other news stories about Backpage. Several alerts featured articles that chronicled the arrest, trial, and appeal in the Detroit Backpage murder case. (*See* Exs. I and J; Google alerts for Spear dated January 2, 2012 and Larkin dated May 5, 2012.)

---

[2] Google Alerts is a service that sends emails to the user when it finds new results—such as web pages, newspaper articles, blogs, or scientific research—that match the user's search term(s).

### iii. Internal Emails Between Lacey and Larkin

Lacey and Larkin, as Backpage's majority owners, had the most to lose financially from bad publicity. They would often ruminate about various strategies to counter negative publicity. In one such exchange, Larkin asks Lacey "why can't we admit these are prostitutes" and concludes by wondering, "how long before cops catch someone in Detroit." (Email attached as Ex. K.)

### iv. Brand Analysis Report

In 2011, Defendants hired public relations firm Goddard Global to help devise a public relations strategy for Backpage. Goddard recommended that Backpage retain Greenberg Quinlan Rosner ("GQR"), a strategic advice consulting firm, to conduct a "brand analysis" of Backpage. Larkin agreed and entered into a contract with GQR. (Contract attached as Ex. L.) In June 2012, Greenberg issued a report entitled "Backpage.com Media and Digital Brand Analysis." (Report attached as Ex. M.) In the report, GQR finds that media coverage about Backpage breaks down into five major categories. (*Id.* at 2.) One of those categories is "Police Blotter," which is described as "stories about someone getting busted for using Backpage.com," including news stories about police stings, prostitution arrests, and murders. (*Id.*) The report further notes that "the very end of 2011 saw a huge news spike related to the Detroit murders. This spike related to the Detroit murders also appears in Twitter, but is only nominally apparent in the blogs and other social media." (*Id.* at 7-8.) In short, the brand analysis report further demonstrates Defendants' knowledge about the Detroit Backpage murders.

### B. Murder of Victim 6, C.M.

On June 22, 2012, a "john" stabbed Victim 6, C.M., to death at an apartment complex in Scottsdale, Arizona. This murder is alleged in the Superseding Indictment. (Doc. 230 ¶ 165; *see also* Ex. N.) On the same day, law enforcement contacted Backpage's CEO Carl Ferrer, and requested that Backpage "freeze" C.M's ads. (Email dated June 22, 2012, attached as Ex. O; Victim 6's Backpage ads are attached as Ex. P.) On July 4, 2012, the Scottsdale Police Department served a search warrant on Backpage seeking all the ads

associated with C.M. (Search Warrant attached as Ex. Q.)

### C. Strangulation and Murder of A.H.

On October 14, 2014, A.H. was murdered at a Motel 6 in Hammond, Indiana. (Ex. R.) The murderer, Darren Vann, had arranged to meet A.H. through an advertisement posted on Backpage.com. (*Id.*) Vann's case received extensive national coverage because Vann admitted to killing *six* other woman. Backpage catalogued this murder on an internal spreadsheet it maintained to track press stories. (Ex. B at 92, 134, 139, 141, 150, 160, 167, 171, 173, 177, 179.) In addition, Backpage's general counsel—McDougall—was asked to comment on Backpage's connection to the murder, but she declined. (*See* Ex. S.)

### D. Murder of Victim 15, J.W.

On June 10, 2015, Victim 15, J.W., was murdered after she fled from her assailant's vehicle and was struck by oncoming traffic. (*See* Ex. T; Doc. 230 at ¶ 174.) J.W. was working as prostitute and her assailant was her pimp. She was posted on Backpage shortly before her murder. (*See* Ex. U.) In addition to publicity surrounding this murder Defendants were on notice of this murder because the investigating Detective subpoenaed J.W.'s ads and a Backpage custodian was subpoenaed to appear at trial and authenticate the ads. The New Orleans Deputy District attorney made efforts to locate a witness at Backpage that could authenticate the Backpage postings at trial. First, she contacted attorney Steve Ross from Akin Gump.[3] (Ex. V.) Ultimately, she filed a motion to secure the attendance of an out-of-state witness from Backpage and advised the company that a witness was required. She also exchanged emails with a Backpage employee regarding the need for a records custodian to authenticate the victim's postings on Backpage. (Ex. W.) A Backpage employee provided a declaration certifying the authenticity of the postings. (*Id.*)

### E. Murder of Victim 14

On June 20, 2015, Victim 14's body was found inside a car in northwest Dallas

---

[3] Akin Gump represented Defendants Lacey, Larkin and Ferrer in litigation related to the U.S. Senate investigation of Backpage.

about ten miles from Backpage's corporate headquarters. (*See* Doc. 230 ¶ 173.) The Dallas Morning News publicized the murder. (Ex. X.) At trial, the investigating detective will testify about the crime's connection to Backpage. The victim's father is expected to testify that he contacted Backpage by email following the murder and requested that they remove his daughter's postings from the website. (Doc. 230 ¶ 173; Ex. Y.) Despite his efforts, Backpage did not immediately comply.

### F. Murder of Victim 16, C.W.

On August 17, 2015, the body of Victim 16, C.W., was found in an alley on Detroit's west side, four years after the Detroit quadruple murder. (Ex. Z; Doc. 230, ¶ 175.) It was later determined that the assailant was Jerome Moore and he met Victim 16 on Backpage.com. (*Id.*) Investigating detectives subpoenaed Backpage for the victim's ads and a custodian testified at trial. (*See* Ex. AA.)

### G. Murder of D.R.

On Christmas Eve 2016, in a Chicago suburb, the body of 16-year-old D.R. was found in a garage. She was beaten to death. (*Slain Teen's Mom Seeks Answers About Alleged Sex Trafficking*, attached as Ex. BB.) D.R. was advertised on Backpage. (Ex. CC.) A highly-publicized investigation and subsequent prosecution determined that she was trafficked by a pimp on Backpage. D.R.'s family sued Backpage. An article detailing the lawsuit asked Backpage for a comment and none was forthcoming. (*See* Ex. DD.) On May 17, 2017, the victim's mother, Y.A., sued Backpage in state court and held a press conference. (*See* Complaint, attached as Ex. EE.)

On July 11, 2017, the Washington Post published a front-page article detailing newly-discovered documents concerning Backpage and including statements from Y.A. (Article attached as Ex. FF.) Y.A. discussed the facts of her lawsuit against Backpage. The article noted that Y.A.'s lawsuit was just one of eight civil cases filed by sex trafficking victims filed against Backpage in 2017. (*Id.*) On September 19, 2017, Y.A. testified before the Senate Subcommittee overseeing the investigation of Backpage. McDougall was asked for comment but declined.

## II. **Federal Rules of Evidence and Applicable Law Support Admission**

The Federal Rules of Evidence and applicable case law support the admission of this evidence at trial. Clearly, the evidence discussed above is relevant, so the question before the Court will be, under Rule 403, is the evidence unfairly prejudicial. In making evidentiary determinations, a trial court is "accorded a wide discretion in determining the admissibility of evidence under the Federal Rules." *United States v. Abel*, 469 U.S. 45, 54 (1984). Under Rule 403, however, "the balance in close cases is struck in favor of admission" of the evidence. *Id.*

Unfair prejudice is "prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law to the facts as found." *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009). "[U]nfair prejudice does not simply mean damage to the opponent's cause. If it did, most relevant evidence would be deemed [unfairly] prejudicial." *Id.*

Consequently, courts have admitted extremely prejudicial evidence when its probative value is significant. *See United States v. LeMay*, 260 F.3d 1018, 1027-29 (9th Cir. 2001) (evidence that the defendant had previously molested other young relatives under similar circumstances properly admitted under Rule 403); *United States v. Cardena*, 842 F.3d 959, 992 (7th Cir. 2016) (offer to cooperate); *United States v. Moore*, 641 F.3d 812, 827 (7th Cir. 2011) (dogfighting evidence to show control of premises); *United States v. Green*, 617 F.3d 233, 251-52 (3d Cir. 2010) (attempted murder properly admitted in drug trial to prove motive and bias); *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) (evidence that the defendant inserted gun into girlfriend's vagina properly admitted under Rule 403 to prove the defendant's intent and role in scheme).

While Rule 403 recognizes that relevant evidence may, on occasion, impede the search for truth, it requires a careful assessment of probative value and its countervailing concerns—and tips the scales decidedly in favor of admitting relevant evidence. The Rule also provides the judge with discretion to remedy potential prejudice by instruction. The Rule embodies a respect for jury resolution of fact disputes that is grounded in long history

and experience. Here, in light of the defense that Defendants had no knowledge of the true nature of the postings, evidence of these highly-publicized murders should be admitted, leaving to the jury the task of assessing the relative weight of evidence as it resolves fact issues about Defendants' knowledge and makes a fully-informed decision about guilt.

### III. Conclusion

Evidence of the murders detailed above is relevant and probative with respect to the question of Defendants' guilt and should be admitted at trial.

Respectfully submitted this 17th day of April, 2020.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Kevin M. Rapp*

KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

JOHN J. KUCERA
Special Assistant U.S. Attorney

BRIAN BENCZKOWSKI
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/Zachry Stoebe*
U.S. Attorney's Office