MICHAEL BAILEY
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

JOHN J. KUCERA (Cal. Bar No. 274184, john.kucera@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1200
Los Angeles, CA 90012
Telephone (213) 894-3391

BRIAN BENCZKOWSKI
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (Miss. Bar No. 102806, reginald.jones4@usdoj.gov)
Senior Trial Attorney, U.S. Department of Justice
Child Exploitation and Obscenity Section
950 Pennsylvania Ave N.W., Room 2116
Washington, D.C. 20530
Telephone (202) 616-2807
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-18-00422-PHX-SMB |
| Plaintiff, | |
| v. | **UNITED STATES' MOTION *IN LIMINE* TO DETERMINE ADMISSIBILITY OF EVIDENCE** |
| Michael Lacey, et al., | |
| Defendants. | |

## INTRODUCTION

The United States files this Motion *in Limine* to provide the Court with notice of evidence the government seeks to introduce in its case-in-chief and to respectfully request that the Court make a pretrial ruling that each category of evidence is admissible (or will

be admissible once the United States lays the anticipated foundation that is discussed below). The United States has divided the evidence into five categories: (1) emails sent or received by Defendants, (2) other intra-Backpage documents produced in discovery, (3) certified domestic business records pursuant to Fed.R.Evid. 803(6) and 902(11), (4) documents produced by counsel for Michael Lacey, and (5) summary exhibits.[1]   The United States believes a pretrial ruling on the admissibility of these five categories of evidence are in the interests of judicial economy because it will allow trial to proceed more smoothly and result in a more efficient and effective use of the jury's time.[2][3]

Pretrial consideration of evidentiary matters is permissible under the rules and will greatly streamline the presentation of the evidence at trial.[4]  *Palmerin v. City of Riverside*, 794 F.2d 1409, 1403 (9th Cir. 1986) ("Pretrial motions are useful tools to resolve issues which would otherwise 'clutter up' the trial.  Such motions reduce the need for sidebar conferences and argument outside the hearing of the jury, thereby saving jurors' time and eliminating distractions."); *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006) (granting government's motion in limine to make pre-trial ruling "regarding admissibility of approximately 260 emails that the government seeks to admit in its case against the defendant"); *id.* at 43 ("At the Court's request, the government helpfully provided a chart

---

[1]      These five categories contains a large part of the evidence the United States seeks to introduce at trial but does not encompass all of the evidence the United States will seek to admit.

[2]      A digital media device containing this evidence is being provided to the Court and Defendants separately.  A chart listing these documents by exhibit number and indicating which theory or theories the government offers for admission of each exhibit is attached as Exhibit A.  Exhibits D-G are being submitted under seal in accordance with the Court's Protective Order. (*See* CR 730.)

[3]      This motion contains both lettered and numbered exhibits.   Exhibits pertaining to the motion itself are identified by letter.  Exhibits pertaining to the evidence the government seeks to admit at trial are identified by number.

[4]      *Donnelly Corp. v. Gentex Corp.*, 918 F. Supp. 1126, 1130 (W.D.Mich. 1996) ("[T]he Court . . . has authority under Federal Rules of Evidence 103, 104, 402 and 403 (as well as the Court's inherent authority to manage trials) to make rulings concerning preliminary questions as to the admissibility of evidence.").

listing each email by exhibit number and indicating which theory or theories the government offers for admission of each exhibit"); *United States v. Davis*, 826 F. Supp. 617, 620 (D.R.I. 1993) ("Defendants suggest that a motion *in limine* may not be used to admit evidence prior to trial, rather, it may only be used to exclude evidence.  This argument cannot be sustained. . . . Ruling on these issues now will avoid a needless, time-consuming dispute in the middle of what is expected to be a very long trial.  Therefore, this Court will exercise its discretion to rule on the motion now.").

## I.      Emails Sent or Received By The Defendants[5]

The discovery in this case contain a large number of emails sent and received by the Defendants, Defendants' co-conspirators and other Backpage.com personnel and independent contractors (*e.g.*, El Camino Technologies, DesertNet, Goddard Gunster, and a number of public relations firms).  The United States intends to introduce many such emails into evidence at trial.  In some cases, this evidence will be introduced through a trial witness who personally sent or received the email in question.  No foundational questions should arise in those circumstances.  *See* Fed.R.Evid. 901(b)(1) (one acceptable method of authentication is testimony by a "witness with knowledge" that "an item is what it is claimed to be").

In other cases, however, the United States does not anticipate calling the sender (or any recipients) of the email as a trial witness.  For the reasons set forth below, the United States respectfully requests the Court make a pre-trial finding that all emails sent or received by Defendants (or between the Defendants and Backpage employees and independent contractors) are admissible.

---

[5]      When this motion refers to "email," it is referring to an email and any attachments associated with the email.  A "message unit" is "[a]n email and any attachments that are associated with the email." Sedona Conference Glossary: Commonly Used Terms for E-Discovery and Digital Information Management (2d ed. Dec. 2007).  The Ninth Circuit has relied upon the Sedona Glossary to assist in the understanding of electronic discovery.  *See Resnick v. Netflix, Inc.* (*In re Online DVD-Rental Antitrust Litig.*), 779 F.3d 914, 929 n.8 (9th Cir. 2015); *see also Morgan Hill Concerned Parents Association v. California Department of Education*, 2017 WL 445722 n.3 (E.D.CA February 2, 2017).

### a.    Authenticity

As a threshold matter, the Court should find that these emails satisfy the authentication requirements of Rule 901.  Rule 901(a) simply requires that a proponent of evidence makes a prima facie showing of authenticity so that a reasonable juror could find "that the item is what the proponent claims it is."  This requirement "does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what is purports to be."  *United States v. Dhinsa*, 243 F.3d 635, 658-59 (2nd Cir. 2001) (citations omitted).  Once this threshold showing has been made, any questions concerning the genuineness of the item normally go to the weight of the evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 n.6 (9th Cir. 2002) ("Once the trial judge determines that there is prima facie evidence of genuineness, the evidence is admitted, and the trier of fact makes its own determination of the evidence's authenticity and weight.").  Here, there are two independent reasons why the Court should find that Rule 901's low threshold for admission has been satisfied.

### i.    Distinctive Characteristics.

First, the emails can be authenticated under Rule 901(b)(4) because their "appearance, contents, substance, internal patterns, [and] other distinctive characteristics" show that they are what they purport to be—emails sent to and from defendants.  Specifically, the "to" and "from" lines located in the header at the top of each email identify—by name—the sender and recipients (*e.g.*, "FROM: Scott Spear").   In addition, many of the emails include a signature and/or signature block at the end that repeats the name of the sender.  Finally, the contents of the emails clearly concern the business operations of Backpage and related entities. (*e.g.*, Website Technologies, Cereus Properties, and Posting Solutions).

In *United States v. Safavian*, 435 F. Supp. 2d 36 (D.D.C. 2006), the court authorized the admission of a cache of emails based on the presence of similar "distinctive" identifiers.  *Safavian* involved a prosecution arising from the Jack Abrahamoff lobbying scandal.

Before the trial, the government announced that it intended to admit approximately 260 emails that had been extracted from the server of Abrahamoff's law firm, under the theory that the emails constituted "e-mail exchanges between Mr. Safavian, Mr. Abrahamoff, and other individuals."  435 F. Supp. 2d at 38-39.  The government filed a lengthy motion in limine seeking a determination that the emails would be authentic and admissible despite the absence of a witness with personal knowledge of the emails.  The court granted the motion in relevant part, holding that the government could introduce the majority of the emails through its case agent or another summary witness.  *Id*.

As relevant here, the *Safavian* court concluded the government had made a sufficient showing as to authenticity because "these e-mails contain the name of the sender or recipient in the bodies of the email, in the signature blocks at the end of the e-mail, in the 'To:' and 'From:' headings, and by signature of the sender.  The contents of the emails also authenticate them as being from the purported sender and to the purported recipient, containing as they do discussions of various identifiable matters." *Id*. at 40.

Likewise, in *United States v. Siddiqui*, 235 F.3d 1318 (11th Cir. 2000), the Eleventh Circuit rejected an authenticity challenge to an email that had been admitted as proof of communications made and received by the defendant.  *Id*. at 1322-23.  Relying on Rule 901(b)(4), the court found that the government had properly authenticated the email showed familiarity with the underlying scheme, and because the email contained references to the defendant's nickname.  *Id.*

### ii.    Emails Produced To The Government By Backpage and Carl Ferrer

Additionally, the Court may also conclude that the requisite showing of authenticity has been met for the emails the government is seeking to admit because a large number of these emails were produced to the government by Backpage and Carl Ferrer in response to a subpoena.

On October 17, 2016, the Arizona grand jury issued a subpoena ("Subpoena 108") directing Backpage and Ferrer to produce documents related to their "reviewing, blocking,

deleting, editing, or modifying advertisements in Adult Sections" of Backpage.com. Following months of litigation, on September 15, 2017, Davis Wright Tremaine LLP (DWT) and Henze Cook Murphy, PLLC, who represented Backpage and Ferrer in the aforementioned proceedings (and are counsel for Defendants Lacey and Larkin in this case), produced approximately 550,000 documents to the government in compliance with Subpoena 108. (*See* Docs 444, 524, 643-3, and 696-1.)  As part of discovery in this case, the government has re-produced these records to Defendants and intends to introduce a large number of them at trial. *Id.*

Courts (and secondary authorities) have found production in response to a document request may serve in itself to authenticate the document.[6]  *AT Engine Controls Ltd. V. Goodrich Pump & Engine Control Sys., Inc.*, 637 Fed. App'x 645, 649 n.7 (2d Cir. 2016) ("ATEC asserts this document is not properly considered both because it is unauthenticated and hearsay.  We discern no manifest error in the district court's consideration of the document.  The bar for authentication is not high, and… the fact that it was produced by ATEC itself… made it 'reasonable likely' that it is [authentic]."); *John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F. Supp. 2d 462, 472 (S.D.N.Y.2000) ("[T]he Court admits the documents produced by CDM's corporate custodian in response to JPMS's subpoena.  The Court finds that these documents are authentic based upon two factors: the act of production by CDM's corporate representative and the documents themselves. Testimony is not the sine qua non of authentication; circumstantial evidence may serve to demonstrate a document's authenticity…. [T]he act of production implicitly authenticated the documents.").

---

[6]    *See* Grimm et al., Best Practices for Authenticating Digital Evidence 8 (2016) ("If a document request is sufficiently descriptive, a response to that request may serve in itself to authenticate the email, as the act of production may be a concession that the document is what the party asked for—and thus is what the party says it is."); *see also* Mark D. Robins, Evidence at the Electronic Frontier: Introducing E-mail at Trial in Commercial Litigation, 29 RUTGERS COMPUTER & TECH. L.J. 219, 226-29 (2003) ("Other factors that courts frequently consider in authenticating writings and other items will similarly apply to e-mail.  These factors include…whether a party produced the document in discovery….").

In *United States v. Brown*, 688 F.2d 1112, 1115-16 (7th Cir. 1982), Brown was convicted of conspiracy to embezzle and misapply property belonging to an employment training program following a trial at which the government introduced business records produced by Brown as President of Cataract Corporation.  On appeal, Brown raised an authenticity challenge to Cataract's business records, arguing the "records were inadmissible at trial because a proper foundation had not been laid," but the Seventh Circuit rejected this argument and affirmed Brown's conviction.  As relevant here, the Seventh Circuit concluded that Brown's argument was "totally without merit," explaining:

> Brown produced the documents voluntarily and, as an officer of the corporation, he was in a position to vouch for their authenticity.  Just as he could have identified the records by oral testimony, his very act of production was implicit authentication.  Moreover, Brown's counsel, who was clearly acting as an agent of Cataract's president when he produced the documents, concedes that the documents "originate(d) somewhere in some connection with the corporation." Tr. at 48.  There is ample evidence that the documents were Cataract's records.

Here, like in *Brown*, Backpage and Ferrer produced approximately 550,000 documents to the government and, as Chief Executive Officer of Backpage, Ferrer was in a position to vouch for their authenticity.  While Ferrer could authenticate each of these records orally at trial, his very act of producing the records was implicit authentication.  Likewise, DWT conceded that the documents originated with Backpage.  (Exhibit B.)

In sum, the Court should find that the requisite showing of authenticity has been met for emails the government is seeking to admit because of the emails' distinctive characteristics and because Backpage and Ferrer produced a large portion of these emails to the government.

### b.    The Emails Are Admissible Because Exceptions to The Hearsay Rules Apply

Any objection from the defense to the admission of the intra-Backpage emails on hearsay grounds should be rejected.  As discussed below, each email falls outside the definition of hearsay for one or more reasons.  Additionally, some of the emails are being

offered for non-hearsay purposes.

### i.    Party-Opponent Admission

First, any email sent by one of the Defendants falls outside the definition of hearsay because it qualifies as a party-opponent admission under Rule (801)(d)(2)(A).  *In re Homestore.com Inc. Securities Litigation*, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004) ("Emails written by a party are admissions of a party opponent and admissible as non-hearsay under Fed.R.Evid. 801(d)(2)(A)."); *Safavian*, 435 F. Supp. 2d at 43 ("The statements attributed directly to Mr. Safavian come in as admissions by a party opponent under Rule 801(d)(2)(A)…."); *Siddiqui*, 235 F.3d at 1323 ("Those [emails] sent by Mr. Siddiqui constitute admissions of a party….").

### ii.    Co-Conspirator Statement

Second, every email sent by Defendants or by one of the Defendants' co-conspirators (*e.g.*, Ferrer or Dan Hyer), fall outside the definition of hearsay because they qualify as co-conspirator statements under Rule 801(d)(2)(E).  This is because each statement was made by an identified co-conspirator, was made during the course of the charged conspiracy (*i.e.*, between 2004 and April 2018), and was intended to further the conspiracy.  *See generally Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("Before admitting a co-conspirator's statement…There must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made "during the course and in furtherance of the conspiracy.").

### iii.    Statement of Party's Agent

Third, all of the emails sent by Backpage personnel and independent contractors (such as Monita Mohan, DesertNet, and representatives of public relations firms) are statements of a party's agent under Rule 801(d)(2)(D) and are therefore admissible against each Defendant as if it were his or her own statement.  *See* Fed.R.Evid. 801(d)(2)(D) (excluding from the definition of hearsay any "statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship").

To invoke Rule 801(d)(2)(D), the proffering party bears the burden of establishing that (1) the statement was made by an "agent" of the opposing party and (2) the statement concerned a matter within the agent's scope of employment. *Sea-Land Serv., Inc. v. Lozen Int'l, LLC*, 285 F.3d 808, 821 (9th Cir. 2002). Both elements are clearly satisfied here. First, all Backpage employees qualify as an "agent" because they were employed by Backpage at the time of the communications. Similarly, Monita Mohan (owner of the India-based company Backpage hired to moderate "adult" ads) also qualifies as an "agent" because emails sent by Mohan concerned matters within the scope of her employment (*i.e.*, Backpage's moderation activities).

Moreover, representatives of the public relations firms (Culloton Strategies, Sitrick & Company, SSP Blue, and JMS Public Relations) retained by Backpage to assist in handling responses to complaints it often received about sex trafficking activity on the website also qualify as "agents." (Exhibit C at 3 ("Backpage presents evidence that government executives, law enforcement agencies, and the media began to pressure Backpage in 2010 to improve its efforts to combat sex trafficking activity on its website... Backpage's outside counsel therefore hired the PR firms to provide that service.").)[7]

*Metro-Goldwyn-Mayer Studios, Inc, v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 970-974 (C.D. Cal. 2006), powerfully supports the conclusion that the public relations firm emails qualify for admission under Rule 801(d)(2)(D) under these circumstances. In *Groskster*, a group of record companies, movie studios, and music publishers sued *Groskter* claiming his file-sharing software contributed to massive infringement of copyrighted works owned by the companies. *Id*. at 970. In support of their claim, the

---

[7]    DWT (counsel for Backpage and Ferrer at the time) produced a number of public relation firm-related emails to the government in compliance with Subpoena 108, but argued that others were protected by the attorney-client privilege. Senior District Judge David Campbell largely rejected this argument, finding that Backpage's communications with the aforementioned public relations firms (except SSP Blue) were not subject to the attorney-client privilege and ordering Backpage to produce these records to the government. (Exhibit C at 14.) The public relation firm emails the government is seeking to admit at trial were produced to the government by Backpage and Ferrer either prior to, or in accordance with, Judge Campbell's Order.

companies moved to admit a number of emails from a graphic design professional who performed work for *Groskter*.  *Id*. at 973.  *Groskter* admitted that the graphic designer performed work for it during the relevant time period, but argued that the designer's emails do not fall within the ambit of Rule 801(d)(2)(D) because she was an independent contractor rather than an employee.  *Id*.

The court overruled *Groskter's* objection, finding that "a statement is admissible under Rule 801(d)(2)(D) so long as it is made by an agent within the scope of agency, regardless of the precise contractual relationship between the agent and the party against whom the evidence is offered."  *Id*. at 973-974.  The court went on to note that defendants sent a number of emails that indicated that the graphic designer was its agent, and that, regardless of her precise contractual status, her responsibilities were comparable to that of an in-house graphic designer.  *Id*. at 974. The court concluded that all of the graphic designer's statements were admissible non-hearsay under Rule 801(d)(2)(D).  *Id*.  Here, as in *Groskter*, email exchanges between Defendants and representatives of public relations firms clearly indicate that the public relations firms were Defendants' "agents" acting within the scope of their employment.

### iv.    Adoptive Admission

The three preceding subsections demonstrate why the intra-Backpage emails are admissible based on the identity and role of the sender.  In addition, the circumstances under which these emails were received provides an independent basis for their admission.

Specifically, many of the emails are admissible against the recipients as adoptive admissions under Rule 801(d)(2)(B).  Under that rule, a statement is not hearsay if it is offered against a party and is "a statement of which the party has manifested an adoption or belief in its truth."  Notably, such an "adoption" can be manifested by silence:  "The general rule concerning admissions by silence or acquiescence is well established.  When an accusatory statement is made in the defendant's presence and hearing, and he understands and has an opportunity to deny it, the statement and his failure to deny are admissible against him." *United States v. Moore*, 522 F.2d 1068, 1075 (9th Cir. 1975); *see*

1   *also United States v. Gil*, 58 F.2d 1414, 1420 (9th Cir.1995), ("[I]t's not a question of the

2   court weighing the evidence at this time and deciding whether the showing [that a statement

3   is adopted by silence] is strong or weak.  The court merely needs to decide that there is a

4   substantial enough showing to present the issue to the jury for them to perform that

5   weighing function.").

6          The intra-Backpage emails contain numerous examples of adoptive admissions.  For

7   instance, one of the intra-Backpage emails that is admissible as an adoptive admission is

8   Exhibit 176: a November 6, 2013 email from Ferrer to Defendants James Larkin

9   ("Larkin"), Jed Brunst ("Brunst"), and Scott Spear ("Spear") that included as an attachment

10  a PowerPoint presentation entitled *Executive Meeting Items*.  This PowerPoint presentation

11  discussed strategies for fooling credit card companies into believing that Backpage-

12  associated charges were being incurred on different websites, including a proposal to set

13  up shell companies without any apparent connection to Backpage ("**create new companies**

14  **with new principals**") and use their bank accounts to accept payment.  Another "solution"

15  was to "**allow users to fund an account thru several other sites**" that **"have no adult or**

16  **images**."  Neither Larkin, Brunst, nor Spear ever emailed back to disagree with Ferrer's

17  ideas and assertions.

18         Another email that is admissible as an adoptive admission is Exhibit 177: a March

19  10, 2014 email exchange between Defendants Brunst, Spear and others with the subject

20  line "**Website Technologies vs Backpage (Vendors, audits, risk assessments, email.**)"

21  During this exchange, one person stated, "Carl Ferrer and I were just discussing company

22  names and the possibility of updating our email addresses to websitetechnologies.com."  In

23  response, Brunst cautioned: "**We need to think this thru or all the work to separate it**

24  **from BP will be lost.**"  Spear never emailed back to disagree with Brunst's assertion about

25  their work to make it appear that Backpage and Website Technologies were independent

26  entities.  This email is a textbook example of an email that is admissible against defendants

27  as an adoptive admission.

28

Further, another example of an adoptive admission is Exhibit 58: an October 16, 2010 email from Defendant Padilla to a large group of Backpage employees, including Defendant Vaught as well as Ferrer and Hyer. The email had two attachments that provided guidance on how to "moderate" ads. The first was a PowerPoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts. Next to each picture was an instruction as to whether it should be approved or disapproved by a Backpage moderator. These instructions included: "**Approve. Nude rear shots are okay as long as the model is not exposing her anus or genitalia.**" And "**Approve. Rear shot okay. Transparent wet panties okay.**" The second was an Excel spreadsheet identifying 50 terms indicative of prostitution that should be "**stripped**" from ads before publication. Padilla concluded the email by stating: "**[I]t's the language in ads that really killing us with the Attorneys General. Images are almost an afterthought to them.**" Vaught did not email back to disagree with Padilla's guidance on how to "moderate" ads. This email is yet another example of an email that is admissible against Defendants as an adoptive admission.[8]

Courts have not hesitated to admit evidence of admissions-through-silence under analogous circumstances. For example, in *United States v. King*, 560 F.2d 122 (2nd Cir. 1977), Boucher was charged with engaging in fraudulent real estate transactions involving mispriced land. *Id*. at 124-25. At trial, the government sought to introduce evidence that, during a meeting that occurred after one transaction, Boucher's co-worker admitted the pricing was "ridiculous" and Boucher "heard that remark and said nothing in response." *Id*. at 134-35. The district court admitted the evidence over Boucher's hearsay objection and the Second Circuit affirmed, explaining that under the "circumstances…it was more reasonably probable than not that a man would answer the charge made against him than that he would not." *Id*. *See also United States v. Wiseman*, 814 F.2d 826, 828-29 (1st Cir.

---

[8] These three emails are also admissible against all of the Defendants because they qualify as party-opponent admissions and as co-conspirator statements.

1987) (admitting the defendant's silence after he was introduced as "Mac," who was brought up to put "junk" on the streets, and failed to respond to or correct the introduction); *United States v. Hoosier*, 542 F.2d 687, 687 (6th Cir. 1976) (admitting the defendant's silence where his girlfriend, in his presence, stated that they had a significant amount of money in their hotel room after robbing a bank).

### v.   Not Offered for Truth

Finally, many of the intra-Backpage emails also are admissible to show the Defendants' notice, knowledge, state of mind, intent, and pattern of communication.  For example, many of the emails discuss complaints from customers that text and images indicative of prostitution were being removed from their ads by Backpage staff prior to the ad being posted on Backpage.  Other emails discuss inquiries from customers about their inability to pay for "adult" ads using credit cards because companies had stopped processing payments for Backpage out of concern these transactions were being used for illegal purposes (*i.e.,* prostitution and sex trafficking).  And others simply detail the sheer volume of prostitution and sex trafficking (including the sex trafficking of children) facilitated through Backpage.  Courts have repeatedly recognized that email evidence may be admitted for these legitimate non-hearsay purposes.  *Safavian*, 435 F.Supp. 2d at 44-45 ("[A] number of the e-mails are admissible under Rule 803(3) to show Mr. Safavian's state of mind at the time he received them. . . .  Other e-mails provide context for the defendant's statements. . . .  Still others are non-hearsay because the truth of the emails' contents. . .are unimportant.  It is the fact of these discussions rather than their contents . . .that is being offered by the government.");  *United States v. Tamura*, 694 F.2d 591, 598 (9th Cir. 1982) (holding that telexes received by defendant were admissible "for the nonhearsay purpose of showing [Tamura's] knowledge of the scheme").

## II.   The Admissibility Of Other Intra-Backpage Documents Produced In Discovery

The discovery in this case also contain additional documents that were not attached to emails produced to the government by Backpage and Ferrer in response to Subpoena

108.   These documents include (1) internal PowerPoint presentations bearing Backpage's name; (2) documents prepared for Backpage by consulting firms concerning Backpage's business plans; (3) performance appraisals (*i.e.*, audits) for Backpage moderators; (4) letter correspondence from the public, regulators, and law enforcement urging Backpage to shutdown the "adult" section of the website; and (5) a purported 2014 Letter of Intent for Sale of Membership Interest in Backpage and related entities and a 2015 Purchase and Sale Agreement signed by Defendants.   The United States intends to introduce many of these documents into evidence at trial.   In some cases, this evidence will be introduced through a trial witness who personally sent or received the document in question.   As in the case of emails, no foundational questions should arise in those circumstances.   *See* Fed. R. Evid. 901(b)(1).

In other cases, however, the United States does not anticipate calling the sender or recipients of these documents as a trial witness and respectfully requests the Court make a pretrial ruling that all documents falling into this category are admissible.   To start, these documents satisfy the authentication requirements of Rule 901(a) because they were produced to the government by Backpage and Ferrer or they contain other distinctive characteristics that show that they are what they purport to be.   (*See* Part I, *supra*.)   Further, each document falls outside the definition of hearsay for one or more reasons. Additionally, some of these documents are being offered for non-hearsay purposes.

### a.   Intra-Backpage PowerPoint Presentations

The intra-Backpage PowerPoint presentations bear Backpage's name and/or logo and therefore are admissible as co-conspirator statements under Rule 801(d)(2)(E) because Backpage (an identified coconspirator) has pleaded guilty to conspiring to commit money laundering.   *See United States v. Backpage.com*, LLC, CR-18-PHX-SMB, Docs. 8 and 8-2.   Alternatively, the PowerPoint presentations are admissible as non-hearsay to show Backpage's state of mind.   *Grokster*, 454 F. Supp.2d at 974 ("Plaintiffs have proffered numerous documents, produced by [defendant] StreamCast, that appear to be business plans and PowerPoint presentations.   These documents are not attached to emails.

StreamCast objects to them on hearsay grounds.  Documents that bear StreamCast's trade names, logos, and trademarks are statements by StreamCast itself, and are admissible as admissions by a party-opponent under Rule 801(d)(2), or alternatively as non-hearsay to show StreamCast's state of mind.  These include but are not limited to PowerPoint presentations.")

### b.   Performance Appraisals

Between 2011 and 2012, a number of Backpage moderators (who were supervised by Padilla and Vaught) underwent performance appraisals (*i.e.*, audits).  These performance appraisals are admissible as an admission by a party opponent or as coconspirator statements.  Defendants Padilla and Vaught were Backpage employees at the time they completed the performance evaluations.  And the task of evaluating employees was certainly within the scope of their employment.

Relatedly, to the extent the performance appraisals were completed by other Backpage employees, these appraisals are admissible as statements of Backpage's agent under 801(d)(2)(D).[9]  (*See* Part I, *supra*.)

### c.   Consulting Firm Documents

Additionally, documents prepared for Backpage and related entities by consulting firms (*e.g.*, BDO Consulting, and Duff and Phelps) constitute statements of Backpage's "agent" under 801(d)(2)(D) and are therefore admissible against Defendants as if it were their own statement. (*See* Part I, *supra*.)  First, BDO Consulting and Duff and Phelps qualify as an "agent" because the firms were hired by Backpage to perform work related to its business operations.  Further, the documents these firms prepared for Backpage concerned matters within their respective scopes of employment.  For instance, the first

---

[9]     Alternatively, the PowerPoint presentations and performance appraisals produced by Backpage and Ferrer not attached to emails are also admissible as business records under Rule 803(6).  It is anticipated that Ferrer will testify that he is: (1) familiar with the contents and preparation of these categories of records; (2) that these records were made at or near the time of the occurrence of the matters; (3) that these records were kept in the regular course of Backpage's regularly conducted activity; and (4) were made in the course of the regularly conducted activity as a regular business practice.

1    sentence of Exhibit 7 (a document prepared by BDO Consulting entitled *Fair Market Value*
2    *of the Common Equity of Medalist Holdings, Inc.*) states "Dear Mr. Brunst:  At your
3    request, BDO Consulting was retained to assist with estimating the fair market value of the
4    common stock of Medalist Holdings, Inc. . . ."  Similarly, the first sentence of Exhibit 498
5    (a document prepared by Duff and Phelps entitled *Backpage.com, LLC Confidential*
6    *Information Memorandum June 2011*) reads "Duff and Phelps Securities has been retained
7    by Backpage.com LLC to serve as its exclusive financial advisor in connection with the
8    potential sale."

9             **d.    Letter Correspondence Sent to Backpage and Defendants**

10           A number of letters sent to Backpage and Defendants from the public, regulators,
11   and law enforcement are admissible under 803(3) to show the Defendants' notice,
12   knowledge, state of mind, intent, and pattern of communication.  For example, these letters
13   discuss that the vast majority of the "adult" and "escort" ads appearing on Backpage were
14   actually ads for prostitution (including the prostitution of children) and urged Backpage to
15   shutter the "adult" section of its website.  *See* Exhibit 52 at 1, September 21, 2010 letter
16   from the National Association of Attorneys General (NAAG) to Backpage's public
17   relations representative Sam Fifer "**ads for prostitution—including ads trafficking**
18   **children—are rampant on the site**" and argued "**we to[o], call on Backpage to listen,**
19   **to care, and respond now by shutting down the adult services section of its website**";
20   *see also* Exhibit 140 at 1-2, January 5, 2011 letter from Auburn Seminary to Defendants
21   Lacey and Larkin, among others, "**a cursory glance at Backpage.com reveals that**
22   **paying customers are regularly posting ads that sell sex**," . . . "**we think the immediate**
23   **action of permanently shutting down Backpage's Adult Section is required**"; *see also*
24   Exhibit 116 at 1, August 5, 2011 letter from the Mayor of Seattle, Washington, to Carl
25   Ferrer and Backpage "**Your company is in the business of selling sex ads.**"

26           Letters to Backpage also discussed the prevalence of women and children being sold
27   for sex through the promotion of their ads on Backpage.  *See* Exhibit 52 at 1, "**It is time**
28   **for the company . . . [to] take immediate action to end the misery of the women and**

**children who may be exploited and victimized by these ads**"; *see also* Exhibit 119 at 1, August 31, 2011 letter from NAAG to Backpage's public relations representative Sam Fifer, "**we are increasingly concerned about human trafficking, especially the trafficking of minors.  Backpage is a hub for such activity**"; *see also* Exhibit 140 at 2; "**Minors continue to be sold for sex by others posting advertisements on Backpage.**"

Lastly, Exhibit 8, December 2014 Letter of Intent for (purportedly) Sale of Membership Interest in Dartmoor Holding and Exhibit 9, purported April 2015 Purchase and Sale Agreement were signed by Defendants; thus, these documents are admissible as party-opponent admissions and as coconspirator statements.

### e.  Summary

In sum, the United States respectfully requests the Court hold that exhibits 2-13, 15-20, 22-24, 26-28, 31-75, 79-84, 86-87, 89-98, 102-106, 108-110, 112-120, 122-126, 128-131, 133-151, 153-159, 161-173, 175-181, 183, 185, 187-190, 193-210, 231-259, 261-310, 315-457, 471, 480, 486-487, and 498-503  (*See* Exhibit A attached hereto and submitted to the court separately) are admissible.  It is also requested that the Court further clarify that these documents may be introduced at trial through a government agent or other summary witness.  *Safavian*, 435 F. Supp.2d at 42 ("The jury may draw whatever reasonable conclusions and inferences it chooses to from these e-mails and how to consider them, but the Court will not permit any testimony beyond the bare fact of what words appear on a particular e-mail by a case agent or summary witness who neither composed nor received these emails.").

## III.  Business Records Pursuant to Fed.R.Evid. 902(11) Certification

### a.  Bank Records

The United States intends to introduce several categories of bank records at trial including (a) records from Backpage-related bank accounts; and (b) records from Defendants' personal bank accounts.  The statements for these accounts are too voluminous to provide as attachments to this motion but have been provided to defense counsel.  (*See* CR 889-1.)

1     The Court should hold that these exhibits are business records admissible under Fed.

2     R. Evid. 803(6).  Fed. R. Evid. 902(11) provides that certified domestic records of regularly

3     conducted activities can be self-authenticating and therefore admissible under Rule 803(6)

4     if accompanied by written declaration from a records custodian or other qualified person

5     certifying that the records: (a) were made at or near the time of the occurrence of the matters

6     set forth by, or from, information transmitted by a person with knowledge of those matters;

7     (b) were kept in the course of the regularly conducted activity; and (c) were made in the

8     course of the regularly conducted activity as a regular business practice.  With respect to

9     these records, the United States has obtained certificates of authenticity from the respective

10    issuing banks and provided these certifications to defense.

11            **b.      Backpage-related Meeting Agendas**

12            Throughout the course of the conspiracy, Defendants held meetings to discuss

13    Backpage-related developments.   Agenda items for these meetings discussed certain

14    topics—including (a) Backpage's intention to "Trade with TER [The Erotic Review]" in

15    order to increase traffic in its "adult" section; (b) updates on previous efforts to create a

16    business partnership with The Erotic Review; (c) Backpage's consideration of a "move

17    offshore" to "minimize restrictions" and "allow more skin"; and (d) various "aggregation"

18    updates. *See* Exhibits 14, 21, 23, 30, and 101.

19            At trial, it is anticipated that Ferrer will testify that he provided the meeting agendas

20    to the government and is familiar with their contents and their preparation.  Ferrer will also

21    testify that it was regular practice for meeting agendas to be created at or near the time of

22    the meetings, and, as CEO of Backpage, his typical practice was to keep these agendas in

23    the course of Backpage's regularly conducted business.   Based on this foundational

24    testimony, the United States will seek to admit a number of meeting agendas into evidence.

25            The United States anticipates Defendants may oppose the admission of these

26    meeting agendas by raising a hearsay objection.  The Court should reject any such objection

27    and find that the agendas are admissible as business records under Rule 803(6) of the

28    Federal Rules of Evidence.  As noted above, the necessary foundation exists for admission

under Rule 803(6) because (1) the agendas were made by a person with knowledge (*i.e.* Ferrer) at or near the time of the meetings; and (2) the agendas were created and maintained in the course of Backpage's regularly-conducted business activity.  *United States v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985) ("A writing is admissible under Fed.R.Evid. 803(6) if two foundational facts are proved: (1) the writing is made or transmitted by a person with knowledge at or near the time of the incident recorded, and (2) the record is kept in the course of regularly conducted business activity.").  A witness does not have to be the custodian of documents offered into evidence to establish Rule 803(6)'s foundational requirements. *United States v. Ray,* 930 F.2d 1368, 1370 (9th Cir. 1991); *see also Bergen v. F/V St. Patrick,* 816 F.2d 1345, 1353 (9th Cir. 1987), *modified on other grounds,* 866 F.2d 318 (9th Cir.), *cert. denied,* 493 U.S. 871 (1989). "The phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-keeping system."  *Ray,* 930 F.2d at 1370 ("A review of the record indicates that the former employees were familiar with the contents and preparation of the exhibits in question.  It was not an abuse of discretion to allow the former employees to lay the foundation for these exhibits.").

### c.    Google Analytics Reports

Throughout the course of the conspiracy, Defendants were routinely briefed about Google Analytics reports, which provided snapshots of which other websites were referring users to Backpage.  These Google Analytics reports confirmed that The Erotic Review (TER) was playing a crucial role in driving traffic to Backpage.  For example, the monthly report for January 2009 stated that TER was the #1 outside source of referrals and was responsible for over half a million visits that month.  The daily report for March 22, 2010 showed that TER was responsible for referring more than 40,000 daily visits to Backpage—more than six times as many as the next-biggest referral source.

At trial, it is anticipated that Carl Ferrer and/or Dan Hyer will testify that as CEO and Sales and Marketing Director, respectively, it was regular practice for Backpage to create "Google Analytics" Reports and that these reports were kept in the course of

Backpage's regularly conducted activities.  Ferrer and/or Hyer will also testify that it was regular practice for Backpage to create these "Google Analytics" reports on a daily, weekly, and monthly basis.  Based on this foundational testimony, the United States will seek to introduce a number of "Google Analytics" reports at trial.  *See* Exhibits 311, 312, 313, and 314.

### d.   Backpage Stories

Beginning in at least 2010, Defendants created, maintained, and periodically updated a spreadsheet that included a compilation of news articles discussing Backpage. *See* Exhibit 260.  This spreadsheet comprised more than 5,600 news articles and included sections entitled "good articles" and "big pieces and articles." This spreadsheet also contained contact information for various members of the media.  At trial, it is anticipated that Carl Ferrer and/or Dan Hyer will testify that as CEO and Sales and Marketing Director, respectively, Backpage created this spreadsheet as a normal course of business, that these spreadsheets were kept in the course of Backpage's regularly conducted activities, and that it was regular practice for Backpage to periodically update this spreadsheet.  Based on this foundational testimony, the United States will seek to introduce this "Backpage Stories" spreadsheet at trial.

### i.   Ads Obtained From Wayback Machine, Unchartered Inc., and Backpage.com; Video of Backpage.com Recorded by Special Agent Brian Fichtner

#### 1.  Wayback Machine

The United States intends to introduce historical ads from Backpage.com obtained from the Wayback Machine.  (*See* Exhibit D, filed under seal.)  The Wayback Machine is a service created by the Internet Archive, a website that provides access to a digital library of Internet sites and other cultural artifacts in digital form.  *Id.*  Wayback Machine makes it possible to surf more than 450 billion pages stored in the Internet Archive's web archive.  *Id.*  The chronological records are compiled by routinely taking screenshots of websites as they exist on various days, which then become searchable through the Wayback Machine.  *Id.*

To start, the Court should take judicial notice of the ads obtained from the Wayback Machine under Fed. R. Evid. 201, as other courts commonly have done. *See Orozco v. Fresh Direct, LLC*, No 15-CV-8226, 2016 WL 5416510, n. 8, 9 (S.D.N.Y. Sept. 27, 2016) (the court relied upon the Wayback Machine to view screenshots of the defendant's website). In *Under A Foot Plant Co. v. Exterior Design, Inc.*, No. 6:14-cv-01371-AA, 2015 WL 1401697, at *2 (D. Or. Mar. 24, 2015), the Court noted that "District Courts have routinely taken judicial notice of content from" the Wayback Machine. *See, e.g., Pond Guy, Inc. v. Aquascape Designs, Inc.*, 2014 WL 2863871, *4 (E.D. Mich. June 24, 2014); *Martins v. 3PD, Inc.*, 2013 WL 1320454, *16 (D. Mass. Mar. 28, 2013) (the court took judicial notice of various historical versions of the defendant's website obtained from the Wayback Machine); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 2013 WL 6869410, *4 (S.D.N.Y. Dec. 30, 2013) (noting that "courts have taken judicial notice of the contents of internet archives.").

In *Marten Transport, Ltc. V. Platform Advertising, Inc.,* No. 2:14-cv-02464, Dkt. 180, 2016 WL 1718862, *1-2 (D. Kan. Apr. 29, 2016), plaintiff filed a motion *in limine* prior to trial seeking the court's admission of screenshots of the defendant's websites obtained from the Wayback Machine. *Id*. at 5. The plaintiff argued the screenshots were authenticated under Fed R. Evid. 901 through the declaration of an employee of the Wayback Machine, who gave testimony that the screenshots were true and accurate electronic copies of webpages archived by the Wayback Machine. *Id*. The plaintiff also argued the court should take judicial notice of the webpage screenshots under Fed. R. Evid. 201. *Id*. The court ruled that the employee's testimony was sufficient to lay a proper foundation under Rule 901. *Id*. Significantly, however, the court went on to hold that authentication was not necessary and that it not only could, but must take judicial notice of the screenshots. *Id.* at 6-8. In deciding the question of judicial notice, the court noted that the defendant offered no reason to believe that the Wayback Machine adds information to the screenshots at the time those screenshots were captured, therefore, the accuracy of those screenshots could not reasonably be questioned. *Id*.

Additionally, courts have concluded that authentication of screenshots obtained from the Wayback Machine may be accomplished by affidavits from Internet Archive employees.  *See, e.g., Bacon v. Avis Budget Group Inc.*, 357 F. Supp. 3d 401 (D.N.J. 2018) (suggesting that materials obtained from the Wayback Machine may be admissible if properly authenticated with an affidavit from Internet Archive employees); *U.S. v. Bansal*, 663 F.3d 634, 667-68 (3d Cir. 2011) (finding that screenshots obtained from the Wayback Machine were admissible if authenticated by an Internet Archive employee).

Here, the United States has obtained a written affidavit from a Wayback employee for all ads it is seeking to introduce obtained from the Wayback Machine.  Therefore, these records are admissible as business records under Fed. R. Evid. 803(6).  (*See* Part III, *supra*.)

### 2.  Uncharted Inc., and Backpage.com Ads

In addition to ads from WayBack Machine, the United States intends to introduce ads obtained from Uncharted Software, Inc.,[10] and from Backpage.com prior to its shutdown.  The United States has obtained business record certifications for these ads from a records custodian or other qualified witness.  (*See* Exhibits E and F, filed under seal.)  Thus, like the Wayback Machine ads, the Court should also find these exhibits admissible as business records under Fed. R. Evid. 803(6).

### 3.  Video of Backpage.com Recorded by SA Fichtner

In March 2015, California Department of Justice (CalDOJ) Special Agents Brian Fichtner and Tera Mackey conducted an undercover operation on Backpage.com (Backpage).  (Exhibit G, May 23, 2019 Declaration of Brian Fichtner ¶ 4.)[11]  To learn about the Backpage user experience, the operation involved reviewing the Sacramento section of

---

[10]   Uncharted Software, Inc., is an Internet Technology services and computer software company that developed TellFinder, a tool designed to explore domain-specific web crawls using graph analysis and multi-modal visualization.  Similar to the Wayback Machine, archived data made viewable by TellFinder is compiled using software known as web-crawlers.  *See* https://uncharted.software/

[11]   Exhibit G (along with the attached DVD) is being separately provided to the Court under seal.

Backpage and comparing posting an ad in Backpage's fee-based "adult" section versus Backpage's free non-adult section. (Fichtner Decl. ¶ 4.) As part of the operation, on March 6, 2015, SA Fichtner posted two fictional undercover advertisements: One offered adult companionship for money in the "escort" category of the adult section, and the other listed a sofa for sale in the "buy, sell, trade" section.   (Fichtner Decl. ¶ 5.) SA Fichtner recorded his review of the Sacramento section of Backpage and posting of both ads on March 6, 2015 using FastStone, a video capture tool that created a file entitled "Video_ 20 1 5-03-06-091756.wmv" (the video). (Fichtner Decl. ¶ 6.) He saved the video on a compact disc and booked it into evidence as part of his investigation. (Fichtner Decl. ¶ 6.) The video contains a fair and accurate depiction of the Backpage webpages that SA Fichtner visited on March 6, 2015. (Fichtner Decl. ¶ 6.)

The United States intends to call SA Fichtner to testify regarding the foregoing CalDOJ operation and the video, and to lay appropriate foundation for admission of the video. The video memorializes SA Fichtner's review of the website and the placement of undercover ads in the adult-escort and buy-sell-trade sections.  It also shows how a user browsing through the Sacramento adult-escort section of Backpage on March 6, 2015 would have encountered pages and pages of adult ads that overwhelmingly consisted of express or readily-implied prostitution ads.  When assessed under Fed. R. Evid. 401, the video is highly relevant to demonstrating how the Sacramento adult-escort and buy-sell-trade sections of Backpage looked and operated at the time of the recording.  The probative value of the video is not substantially outweighed by any considerations in Fed. R. Evid. 403. The video is not cumulative of the other evidence (such as individual ads the government intends to offer at trial) and the video is not unfairly prejudicial.  Rather, the video truthfully shows how the Sacramento adult-escort and buy-sell-trade sections of Backpage appeared at the time of the recording and the jury is entitled to see this well-preserved example of how the website appeared to users.

IV.    **Documents Produced by Counsel for Michael Lacey**

On April 18, 2018, the Arizona District Court granted the government's Motion to Compel Compliance with Grand Jury Subpoena based on Crime-Fraud Exception ordering Defendant Lacey's then counsel to produce to the grand jury, among other things, all bank records concerning the receipt of $16.5 million in wire transfers from Defendant Lacey and transmission of a $16.5 million wire to Hungary.  In compliance with this order, Lacey's counsel produced a six-page document to the government.  (*See* Exhibit 1.)  This document contains a July 2016 email from Lacey to his counsel seeking assistance in "put[ting] some of his assets in place[s] where…government parties…can not access [my] accounts." Exhibit 1, at 4-5.  A few months later, Lacey asked employees of an Arizona-based bank for advice on how to move his assets "offshore" to protect them from seizure by the government.  (SSI ¶ 16).  Soon afterward, $16.5 million in Backpage-derived cash was wired from Lacey's bank accounts in the United States to an overseas bank account in Hungary.  (SSI ¶ 16).  At the time of the Hungarian transfer, Lacey was facing criminal charges in California state court and was aware of the federal grand jury investigation in this matter.  (SSI ¶ 16).

The Court should find that the requisite showing of authenticity has been met for these documents because Lacey's counsel produced these documents to the government. Further, the July 2016 email is admissible as admissions by a party opponent.

V.    **Summary Exhibits**

The United States intends to present records of summary exhibits at trial. These exhibits include the following: (1) "Compensation" charts, which summarizes Defendant's Backpage-derived compensation; (2) "Revenue" charts, which summarizes Backpage's annual earnings, and specifically, earnings from "adult" advertisements; and (3) flowcharts outlining how Backpage-generated proceeds flowed through various entities (*e.g.*, Website Technologies, Camarillo, Cereus Properties, etc.).  Many of these summary exhibits were provided to Defendants on January 24, 2020 and April 9, 2020, respectively.  The government will produce any remaining summary exhibits to Defendants within a

1    reasonable time prior to trial.

2           The United States respectfully requests the Court find that these exhibits are

3    admissible under Rule 1006, which provides that evidence may be admitted "in the form

4    of a chart, summary, or calculation" where "[t]he contents of voluminous writings,

5    recordings, or photographs . . . cannot conveniently be examined in court."  For a summary

6    chart to be admissible under Rule 1006, "[a] proponent … must establish that the

7    underlying materials upon which the summary is based (1) are admissible in evidence and

8    (2) were made available to the opposing party for inspection.  These materials must be

9    admissible, but need not themselves be admitted into evidence."  *United States v. Rizk*, 660

10   F.3d 1125, 1130 (9th Cir. 2011).  Here, both of these requirements are satisfied.

11          First, the documents on which the exhibits are based—intra-Backpage records, the

12   records from Backpage's many bank accounts, and the records from Defendants' bank

13   accounts—are themselves admissible.  In fact, the United States intends to offer those

14   documents into evidence at trial in addition to offering the summary exhibits.  *United States*

15   *v. Milkiewicz*, 470 F.3d 390, 397 (1st Cir. 2006) ("the summary may be admitted in addition

16   to the underlying documents to provide the jury with easier access to the relevant

17   information").  Second, the underlying documents have been produced in discovery.

18          For these reasons, the Court should issue a ruling that the government's summary

19   exhibits are admissible under Rule 1006.  The documents they summarize are voluminous

20   and encompass thousands and thousands of pages.  Courts have recognized that summary

21   exhibits are particularly appropriate under these circumstances.  *United States v. Kelley*,

22   105 F.2d 912, 918 (2d Cir. 1939) ("The prosecution's accountants were allowed to present

23   their calculations from the books and returns in evidence.  This kind of evidence when

24   based upon documents themselves competent and accessible, is always admissible, a jury

25   without such guidance would be totally unable to cope with complicated accounts.").

26   **VI.    Conclusion**

27          Based on the foregoing, the United States respectfully requests the Court make a

28   pretrial determination that the evidence contained within the five aforementioned

1   categories are admissible at trial.

2        Respectfully submitted this 17th day of April, 2020.

3                                    BRIAN BENCZKOWSKI
                                     Assistant Attorney General
4                                    Criminal Division, U.S. Department of Justice

5                                    s/Reginald E. Jones
                                     REGINALD E. JONES
6                                    Senior Trial Attorney
                                     U.S. Department of Justice, Criminal Division
7                                    Child Exploitation and Obscenity Section

8                                    MICHAEL BAILEY
                                     United States Attorney
9                                    District of Arizona

10                                   KEVIN M. RAPP
                                     MARGARET PERLMETER
11                                   PETER S. KOZINETS
                                     ANDREW C. STONE
12                                   Assistant U.S. Attorneys

13                                   JOHN J. KUCERA
                                     Special Assistant U.S. Attorney
14

15

16

17
                            **CERTIFICATE OF SERVICE**
18

19        I hereby certify that on this same date, I electronically transmitted the attached

20   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

21   Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance

22   as counsel of record.

23

24   s/ Marjorie Dieckman
     Marjorie Dieckman
25   U.S. Attorney's Office

26

27

28