# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| *In re* Grand Jury Subpoena No. 16-04-108 | **ORDER**<br>**(SEALED)** |

    The government has filed a motion to compel Backpage.com, LLC and its CEO, Carl Ferrer (collectively, "Backpage"), to produce certain documents that have been withheld in response to a grand jury subpoena. Backpage has withheld the documents on the basis of the attorney-client privilege. Backpage responded to the motion, the government filed a reply, and the Court held a hearing on February 9, 2018. As a result of the hearing, the Court required Backpage to produce evidence to support factual assertions made in its response to the motion and at the hearing. Backpage provided five declarations and two documents for *in camera* review. The parties dispute whether this evidence is sufficient to establish the attorney-client privilege.

    Three categories of documents are at issue. Backpage has withheld documents reflecting communications between its attorneys and three public relations ("PR") firms: Culloton Strategies, Sitrick & Company, and JMS Public Relations. Backpage has also withheld communications with SSP Blue, a company established and operated by Hemanshu Nigam, a former federal prosecutor. Finally, Backpage has withheld one

email between outside counsel and Duff & Phelps, an investment bank. For the reasons that follow, the court will grant the motion in part.

**I.      Legal Standard.**

The attorney-client privilege protects confidential communications that reflect or facilitate legal advice from an attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). The Supreme Court has explained the privilege's purpose:

> Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Id.* at 389. "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Id.* at 390.

Application of the privilege requires case-by-case analysis, *id.* at 396-97, and the party asserting the privilege "has the burden of establishing the existence of an attorney-client relationship *and* the privileged nature of the communication," *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (emphasis in original) (internal quotation marks omitted). Privilege issues generally are resolved under federal common law, with exceptions not applicable here. Fed. R. Evid. 501. In the Ninth Circuit, an eight-part test determines whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Graf*, 610 F.3d at 1156. Disclosure of attorney-client communications to third parties generally waives the privilege. *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1126-27 (9th Cir. 2012).

**II.     PR Firms.**

Backpage has withheld communications among the PR firms, Backpage employees, and Backpage attorneys.  U.S. Mot. Compel at 9-10.  Backpage contends that it did not waive the privilege by communicating with these firms because they are the functional equivalents of Backpage employees.  Backpage Opp'n Mot. Compel at 8-13.  Backpage alternatively relies on a district court holding that such communications are protected where the PR and litigation strategies are inextricably intertwined.  Court's Livenote Tr. (Feb. 9, 2018); Backpage Reply Evid. Sub. at 2, 13-17.  Backpage does not argue that the firms acted as agents of outside counsel.  Court's Livenote Tr. (Feb. 9, 2018); Backpage Opp'n Mot. Compel at 8-13.

**A.     Background.**

Backpage presents evidence that government executives, law enforcement agencies, and the media began to pressure Backpage in 2010 to improve its efforts to combat sex trafficking activity on its website.  McNally Decl. ¶ 2; Suskin Decl. ¶ 6; Bugaighis Decl. Exs. C-I.  At that time, Backpage lacked an in-house PR department to handle its response.  McNally Decl. ¶ 3; Suskin Decl. ¶ 5.

Backpage's outside counsel therefore hired the PR firms to provide that service.  Outside counsel retained Culloton in March 2011 and Sitrick in November 2011 as "expert consultants" who provided "confidential consulting advice and PR services to facilitate legal advice" to Backpage.  McNally Decl. ¶ 2; *see also* Suskin Decl. ¶ 8.  Outside counsel supervised their work.  Suskin Decl. ¶ 8.  Culloton and Sitrick worked directly with outside counsel and Backpage principals "to plan and implement strategies addressing legal issues and public communications . . . and to ensure that public statements and responses to inquiries, demands and criticisms from public officials, law enforcement, the media and others were as accurate and as effective as possible and consistent with the law and [Backpage's] legal positions and strategies."  McNally Decl. ¶ 3; *see also* Suskin Decl. ¶ 8.  Outside counsel rendered confidential advice to Culloton and Sitrick "concerning draft communications, public statements and press releases, and

meetings with public officials, NGOs and others as regarded legal issues, [Backpage's] legal positions, and related issues." McNally Decl. ¶ 4. Culloton and Sitrick "provided confidential advice, including regarding [Backpage's] legal media strategy and how to best implement it." McNally Decl. ¶ 4. "Both firms were a significant part of [Backpage's] legal teams, addressing certain risks to and opportunities for [Backpage], and the possibility of litigation or other government actions or proceedings." McNally Decl. ¶ 4.

Outside counsel SSP Blue "sub-contracted . . . JMS Public Relations to vet, under [SSP Blue's] direct supervision, any media inquiries. Along with other internal and external legal counsel, Backpage and [SSP Blue] determined what response, if any, was provided and what statements, if any, would be made." Nigam Decl. ¶ 12. JMS "worked at [SSP Blue's] direction and at the direction of other legal counsel representing Backpage specifically to vet only those media inquiries that were related to matters for which [SSP Blue] was retained to provide legal advice and counsel." Nigam Supp. Decl. ¶ 2. JMS "had no independent authority and discretion to make business decisions on Backpage's behalf." Nigam Supp. Decl. ¶ 2.

### B. Functional Equivalence Doctrine.

In *Graf*, the Ninth Circuit held that a third party can be the "functional equivalent" of a corporate employee and therefore entitled to communicate with corporate legal counsel under the attorney-client privilege. 610 F.3d at 1159. The outside consultant in *Graf* was an individual who helped form the company, "regularly communicated with [customers] and others on behalf of [the company], marketed the company's insurance plans, managed its employees, and was the company's voice in its communications with counsel." *Id.* at 1152-53, 1157. *Graf* noted that the outside consultant was "the company's primary agent in its communications with corporate counsel" and was "empowered to act on behalf of the corporation." *Id.* at 1159 (internal quotation marks omitted). The Ninth Circuit found the consultant to be "a functional employee" of the company, and that his communications with outside counsel were therefore entitled to the

- 4 -

same privilege protection as communications by regular employees. *Id.* In so holding, the Ninth Circuit followed the Eighth Circuit's decision in *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994). *Id.* at 1158-59. *Bieter* had also found that the individual before it "was in all relevant respects the functional equivalent of an employee." *Bieter*, 16 F.3d at 938.

### 1. Legal Standard.

The government asks the Court to interpret the functional equivalence doctrine narrowly, identifying multiple elements that must be present for functional equivalence. U.S. Resp. Evid. Sub. at 3-9. Backpage counters that the government's argument is inconsistent with the way in which courts have applied the doctrine. Backpage Reply Evid. Sub. at 7-12.

Neither *Graf* nor *Bieter* identified the relevant factors to consider in applying the functional equivalence doctrine. And many district courts simply consider the unique circumstances of each case, without adopting any particular standard, in determining whether the third party is the functional equivalent of an employee. *See, e.g.*, *Sierra Dev. Co. v. Chartwell Advisory Grp., Ltd.*, No. 3:13-CV-0602-RTB (VPC), 2016 WL 4107680, at *4-5 (D. Nev. Aug. 1, 2016) (proponent failed to make the detailed factual showing necessary to establish functional equivalence); *United States v. Ormat Indus., Ltd.*, No. 3:14-cv-00325-RCJ-VPC, 2016 WL 4107682, at *7 (D. Nev. Aug. 1, 2016) (proponent failed to provide a detailed factual showing of similarity of duties or possession of relevant information about the client); *United States v. Lonich*, No. 14-cr-00139-SI-1, 2016 WL 1733633, at *6-7 (N.D. Cal. May 2, 2016) (party failed to provide sufficient evidence to justify functional equivalence); *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, No. 15-cv-0595-BAS-MDD, 2016 WL 931077, at *3 (S.D. Cal. Mar. 11, 2016) (raw material supplier was not a functional employee of a company that purchased from him); *W. Sugar Coop. v. Archer-Daniels-Midland Co.*, No. CV 11-3473-CBM (PJWx), 2015 WL 12696192, at *2 (C.D. Cal. Nov. 4, 2015) (PR firm was a functional equivalent because it provided the same services an in-house PR department would); *Medversant Techs., L.L.C. v. Morrisey Assocs., Inc.*, No.

1 CV 09-05031 MMM (FFMx), 2011 WL 13124128, at *4-5 (C.D. Cal. July 20, 2011) (PR firm was a functional equivalent because it acted as the client's "public relations department").

The District of Nevada appears to have adopted a broad approach: "the pivotal question is 'whether the consultant performs duties similar to those performed by an employee and whether by virtue of that relationship, he or she possesses information about the company that would assist the company's attorneys in rendering legal advice.'" *See Sierra Dev. Co.*, 2016 WL 4107680, at *3 (quoting *Fosbre v. Las Vegas Sands Corp.*, Nos. 2:10-cv-00765-APG-GWF, 2:10-cv-01210-APG-GWF, 2016 WL 183476, at *5 (D. Nev. Jan. 14, 2016)); *see also United States ex. rel. Strom v. Scios, Inc.*, No. C05-3004 CRB (JSC), 2011 WL 4831193, at *4 (N.D. Cal. Oct. 12, 2011) (the "dispositive question is the consultant's relationship to the company and whether by virtue of that relationship he possesses information about the company that would assist the company's attorneys in rendering legal advice").

Other courts have identified limiting factors. Most notably, the court in *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103 (S.D.N.Y. 2005), explained:

> To determine whether a consultant should be considered the functional equivalent of an employee, courts look to whether the consultant had primary responsibility for a key corporate job, whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation, and whether the consultant is likely to possess information possessed by no one else at the company.

*Id.* at 113 (internal citations omitted).

In *Upjohn*, the Supreme Court extended the attorney-client privilege to a low-level employee outside the "control group" at the highest levels of management. 449 U.S. at 394-95. Finding no reason to distinguish between corporate executives and lower-level corporate employees, the *Upjohn* Court emphasized that the employees (1) spoke on

- 6 -

1 behalf of the company to counsel, (2) at the direction of superiors, and (3) possessed
2 helpful information about the corporation. *Id.* at 394.

3 Looking to *Upjohn*, the *Bieter* court saw no reason to distinguish between an
4 employee and a third party consultant who (1) had daily interaction with corporate
5 employees, (2) was involved in the principal mission of the business, (3) was authorized
6 to represent the company, (4) possessed unique information about the company, and
7 (5) acted at the direction of corporate superiors. 16 F.3d at 938, 940. "It is only natural
8 that, just as middle-level – and indeed lower-level – employees would have the relevant
9 information needed by corporate counsel if he is adequately to advise the client with
10 respect to actual or potential difficulties, so too would nonemployees who possess a
11 significant relationship to the client and the client's involvement in the transaction that is
12 the subject of legal services." *Id.* at 938 (internal quotation marks omitted).

13 The Ninth Circuit also looked to *Upjohn* in adopting *Bieter*'s reasoning and the
14 functional equivalence doctrine. *Graf*, 610 F.3d at 1158-59. "The *Bieter* court reasoned
15 that 'too narrow a definition of 'representative of the client' will lead to attorneys not
16 being able to confer confidentially with nonemployees who, due to their relationship to
17 the client, possess the very sort of information that the privilege envisions flowing most
18 freely.'" *Id.* at 1158 (quoting *Bieter*, 16 F.3d at 937-38). *Graf* found no reason to
19 distinguish between a corporate employee and an independent contractor who (1) had
20 authority to represent the company, (2) managed corporate employees, and
21 (3) communicated with corporate counsel on behalf of the company. *Id.* at 1159.

22 These cases suggest that a third party is the functional equivalent of a corporate
23 employee when he or she (1) has authority to speak on behalf of the corporation to
24 counsel, (2) performs duties associated with the corporation's ordinary course of
25 business, (3) works under the supervision of the corporation, and (4) possesses helpful
26 information about the corporation due to his or her relationship with it. These factors
27 strike an appropriate balance between the traditionally narrow attorney-client privilege
28 and the reality of today's corporate workplace. *Compare Graf*, 610 F.3d at 1156

("Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." (internal quotation marks omitted)) *with Fosbre*, 2016 WL 183476, at *4 ("corporations increasingly conduct their business not merely through regular employees but also through a variety of independent contractors retained for specific purposes" (internal quotation marks omitted)).

### 2. Analysis.

Looking to these factors, the Court concludes that Backpage has failed to establish the functional equivalence of the three PR firms.

First, Backpage has not established that the firms had authority to speak on behalf of the corporation to counsel. The evidence shows that the PR firms participated in discussions with Backpage principals and counsel regarding appropriate public communications strategy, but Backpage has presented no evidence that the firms were empowered to represent Backpage or make decisions on its behalf in communications with counsel. *See Graf*, 610 F.3d at 1159 ("[A]s fictitious entities, corporations can seek and receive legal advice and communicate with counsel only through individuals *empowered to act on behalf of* the corporation[.]" (emphasis added) (internal quotation marks omitted)).

Second, Backpage has not shown that the PR firms performed duties associated with the corporation's ordinary course of business. Backpage's evidence instead makes clear that the firms were retained for a narrow set of litigation-related PR tasks. The evidence does not demonstrate that Backpage hired these firms to act as its PR department in the regular course of business.

Third, Backpage has not shown that the PR firms worked under the supervision of the corporation. The declarations clearly state that outside counsel supervised each PR firm.

Finally, Backpage has not shown that the PR firms possessed helpful information about the corporation due to their relationship with it. The evidence shows that the firms

provided consulting advice regarding PR strategy, but there is no indication that they provided information *about* Backpage.

For these reasons, the Court finds that Culloton, Sitrick, and JMS were not the functional equivalents of Backpage employees.[1]

### C. *In re Grand Jury Subpoenas*.

Backpage alternatively relies on *In re Grand Jury Subpoenas*, 265 F. Supp. 2d 321 (S.D.N.Y. 2003), for the proposition that communications with PR firms are subject to the attorney-client privilege. Court's Livenote Tr. (Feb. 9, 2018). That case concerned the target of a grand jury investigation whose counsel retained a PR firm to assist in crafting a strategy to influence publicity about a criminal investigation. 265 F. Supp. 2d at 323. The target's counsel was concerned that negative publicity would pressure prosecutors to seek a significant indictment. *Id.* The target produced evidence that the PR firm's assignment differed from standard PR work: "its target audience was not the public at large. Rather, [the PR firm] was focused on affecting the media-conveyed message that reached the prosecutors and regulators responsible for charging decisions in the investigations concerning" the target. *Id.* at 323-24. The district court concluded:

> the ability of lawyers to perform some of their most fundamental client functions – such as (a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, (b) seeking to avoid or narrow charges brought against the client, and (c) zealously seeking acquittal or vindication – would be undermined seriously if lawyers were not able to engage in frank discussions of facts and strategies with the lawyers' public relations consultants.

*Id.* at 330. The court accordingly held that "(1) confidential communications (2) between lawyers and public relations consultants (3) hired by the lawyers to assist them in dealing

---

[1] This conclusion is buttressed by several additional considerations identified in the cases cited above: (1) whether the third-party relationship existed before the litigation, (2) whether the third party has primary responsibility for a key corporate function, (3) whether the third party manages corporate employees, (4) whether the third party performs duties already performed by the corporation, (5) whether the third party works at the corporation's office, and (6) whether the third party has daily interaction with corporate employees. Backpage has not satisfied any of these considerations.

- 9 -

with the media in cases *such as this* (4) that are made for the purpose of giving or receiving advice (5) directed at the handling of the client's problems are protected by the attorney-client privilege." *Id*. at 331 (emphasis added). Backpage cites no Ninth Circuit decision that has adopted this holding.

The Court need not decide whether the holding in *In re Grand Jury Subpoenas* is good law because the Court concludes that the holding is narrow and Backpage has not shown it would apply here. The case marked only a narrow expansion of the attorney-client privilege, specifically emphasizing that it applied to PR firms "hired by the lawyers to assist them in dealing with the media in cases *such as this*." *Id*. (emphasis added). The precise challenge faced by the lawyers in that case was to prevent media pressure from causing or expanding their client's indictment. 265 F. Supp. 2d at 323. Backpage, which has the burden of establishing the existence of the privilege, *Graf*, 610 F.3d at 1156, has not shown that a similar situation existed in this case.

Backpage's declarations speak only in general terms about its repeated criticism in the media. McNally Decl. ¶ 2 (Backpage was "facing an increasing number of public and other criticisms and challenges from government officials and others"); Suskin Decl. ¶ 6 ("Backpage faced an increasing number of public and other criticisms and challenges from public officials and others"). Of the news articles provided by Backpage, three were negative and one was positive. Bugaighis Decl. Exs. E (July 2011 article describing local government efforts to persuade Backpage to strengthen its policies to prevent illegal advertising), F (May 2012 article describing Backpage as "the foremost classified advertising website for adult services – even if the ages and circumstances of some of the people selling those services remain questionable"), G (June 2012 article arguing that criticism of Backpage is misplaced), H (January 2012 article describing pimp's use of Backpage to prostitute a minor). And letters from state attorneys general requested that Backpage improve policies and mechanisms to combat sex trafficking. Bugaighis Decl. Exs. C (September 2010 request that Backpage take additional steps to prevent or screen illegal advertisements), D (August 2011 request for information – in lieu of a subpoena – to substantiate Backpage's assertions regarding efforts to prevent illegal advertisements).

To be sure, Backpage faced public scrutiny and calls to improve its efforts to combat sex trafficking. But Backpage does not show that an indictment was imminent as in *In re Grand Jury Subpoenas*, or that the public scrutiny affected its legal position in any way. The evidence instead suggests that the public scrutiny affected Backpage's business interests. *See* Bugaighis Decl. Exs. F ("Major brands such as H&M, IKEA and Barnes & Noble recently pulled ads from publications owned by Backpage.com parent company Village Voice Media."), G (quoting calls for American Apparel, Best Buy, Disney, Dominos, H&M, IKEA, REI, and T-Mobile to stop advertising on Backpage), G (Goldman Sachs sold its stake in Backpage after receiving negative publicity for its association with the website).

More importantly, the evidence does not substantiate Backpage's assertion that the public scrutiny affected its criminal liability. Court's Livenote Tr. (Feb. 9, 2018). Backpage relies on the enactment of three state laws that would expose Backpage to criminal liability. *See* Backpage Opp'n Mot. Compel at 5-6. But Backpage concedes that enforcement of each law was enjoined on *legal* grounds as a likely violation of the First Amendment and as preempted by the federal law granting it immunity. *Id.* (citing *Backpage.com, LLC v. Hoffman*, No. 13-cv-03952 (DMC)(JAD), 2013 WL 4502097, at *5-11 (D.N.J. Aug. 20, 2013) (granting preliminary injunction against enforcement of New Jersey law that prohibited sale of advertisements for commercial sex abuse of minors); *Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 828, 840 (M.D. Tenn. 2013) (granting preliminary injunction against enforcement of Tennessee law that prohibited the sale of sex-related advertisements); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1278, 1284 (W.D. Wash. 2012) (same with respect to a Washington law)). Backpage also appears to rely on a July 2013 letter from state attorneys general to U.S. congressmen requesting an amendment to a federal law that immunizes Backpage from state criminal liability for the actions of its users. Bugaighis Decl. Ex. I. But this evidence from July 2013 could not have motivated Backpage's 2010, 2011, and 2012 communications with the PR firms. U.S. Mot. Compel Exs. I, J, K.

In short, Backpage has presented insufficient evidence to show that it would fall within the narrow holding of *In re Grand Jury Subpoenas* – that it faced the same kind of imminent criminal prosecution as the target in that case. Thus, even if that case is good law, the Court cannot conclude that its narrow holding would apply here.

Companies often face public scrutiny and potential criminal and civil liability. The Court cannot conclude that *In re Grand Jury Subpoenas* extends the attorney-client privilege to PR firms whenever serious public challenges arise. Courts, including the Ninth Circuit, construe the attorney-client privilege narrowly. Backpage has not shown that *In re Grand Jury Subpoenas* would extend it to the communications with the PR firms in this case.

**III.  SSP Blue.**

Backpage withheld approximately 350 emails reflecting communications with SSP Blue. U.S. Mot. Compel at 13. The government does not dispute that SSP Blue was founded and is operated by Hemanshu Nigam, an attorney who formerly worked as a federal prosecutor. U.S. Mot. Compel at 13. The government argues, however, that SSP Blue "does not hold itself out as a law firm and states in its marketing materials that it specializes in the provision of security, privacy, and crisis management services – amorphous terms that often connote business (as opposed to legal) advice." U.S. Reply at 10; *see also* U.S. Mot. Compel at 13-14. The Court agreed at the February 9 hearing that this evidence shifted the burden to Backpage to "come forward with some evidence that he was functioning as a lawyer in the work that he did with respect to these 350 emails." Court's Livenote Tr. (Feb. 9, 2018).

Backpage has provided the Court with a declaration from Mr. Nigam which states that he provided legal advice and services to Backpage. Nigam Decl. ¶¶ 9-11. The government contests this assertion and offers evidence that at least part of Mr. Nigam's role was to facilitate introductions. U.S. Resp. Evid. Sub. at 11-12. In light of this mixed role, the government asserts, Mr. Nigam must attest that each of the 350 emails reflects

1 legal advice. U.S. Resp. Evid. Sub. at 11-12. The government asks the Court to conduct
2 an *in camera* review of the emails. U.S. Resp. Evid. Sub. at 12.

3 The Ninth Circuit has stated that a privilege log and supporting affidavits can be sufficient to establish the existence of the attorney-client privilege. *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992). Backpage has satisfied this standard. Mr. Nigam clearly is an attorney, and his declaration establishes that he provided legal advice to Backpage. The government does not dispute that the privilege log characterizes the 350 emails as legal advice. The Court will not require further production of communications with SSP Blue.

## IV. Duff & Phelps.

Backpage relied on the attorney-client privilege to withhold an email between its outside counsel and Duff & Phelps. U.S. Mot. Compel at 8-9. The government contests this assertion of privilege, arguing that Duff & Phelps is an investment bank that helped Backpage secure corporate financing. U.S. Mot. Compel at 8-9. Backpage counters that its outside counsel "required the assistance of a corporate financial advisor, Duff & Phelps," to advise Backpage concerning corporate restructuring and ensure "compliance with statutory and regulatory requirements." Backpage Opp'n Mot. Compel at 14-15 (internal quotation marks omitted).

Although disclosure of attorney-client communications to third parties generally waives the privilege, *In re Pac. Pictures Corp.*, 679 F.3d at 1126-27, an exception applies to third parties "engaged to assist the attorney in providing legal advice," *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). "If the advice sought is not legal advice, but, for example, accounting advice from an accountant, then the privilege does not exist." *Id.* The Court therefore directed Backpage to substantiate its argument "with some evidence that Duff & Phelps was acting in a way that was necessary to the rendering of the legal advice" from an attorney. Court's Livenote Tr. (Feb. 9, 2018).

Backpage has submitted the two privilege log entries and the two associated documents for *in camera* review. It contends that the 14 days allowed by the Court made

it impossible for Backpage to procure other evidence to support its assertion of privilege. Backpage Supp. Mem. at 2-3. But when the Court asked if Backpage would like more time to assemble its evidence, Backpage's counsel responded: "I think we can do it" by the Court's deadline. Court's Livenote Tr. (Feb. 9, 2018).

Having reviewed the document in camera, the Court cannot accept the privilege log's characterization of the email and attachment as "information to facilitate legal advice from outside counsel . . . regarding regulatory issues." U.S. Mot. Compel Ex. H. Duff & Phelps does not appear to be providing any information at all. Outside counsel simply forwards to Duff & Phelps and certain Backpage employees a list of questions and answers that appear to include both legal and business advice. The email does not indicate who prepared the questions and answers. Backpage has supplied no evidence from which the Court can find that Duff & Phelps was anything other than a third party whose receipt of an alleged attorney-client communication waived the privilege.

**IT IS ORDERED:** The government's motion to compel is **granted in part** and **denied in part**. Backpage shall produce the Culloton Strategies, Sitrick & Company, JMS Public Relations, and Duff & Phelps documents to the government by **April 16, 2018**.

Dated this 2nd day of April, 2018.

_David G. Campbell_
David G. Campbell
United States District Judge

cc: All counsel by cd on 4/2/2018