1   Thomas H. Bienert, Jr. *(admitted pro hac vice)*
        tbienert@bmkattorneys.com
2   Whitney Z. Bernstein *(admitted pro hac vice)*
        wbernstein@bmkattorneys.com
3   BIENERT KATZMAN, PLC
    903 Calle Amanecer, Suite 350
4   San Clemente, CA 92673
    Telephone: (949) 369-3700
5   Facsimile: (949) 369-3701

6   Attorneys for James Larkin

7   Paul J. Cambria, Jr. *(admitted pro hac vice)*
        pcambria@lglaw.com
8   Erin McCampbell *(admitted pro hac vice)*
        emccampbell@lglaw.com
9   LIPSITZ GREEN SCIME CAMBRIA LLP
    42 Delaware Avenue, Suite 120
10  Buffalo, New York 14202
    Telephone: (716) 849-1333
11  Facsimile: (716) 855-1580

12  Attorneys for Michael Lacey

13  *[Additional counsel listed on next page]*

14
                **IN THE UNITED STATES DISTRICT COURT**
15
                **FOR THE DISTRICT OF ARIZONA**
16

17  United States of America,                CASE NO. 2:18-cr-00422-PHX-SMB

18          Plaintiff,                        **DEFENDANTS LACEY, LARKIN,
                                              BRUNST, AND SPEAR'S MOTION
19      vs.                                   TO DISMISS BASED ON
                                              OUTRAGEOUS GOVERNMENT
20  Michael Lacey, *et al.*,                  MISCONDUCT INVADING
                                              ATTORNEY-CLIENT PRIVILEGE
21          Defendants.

22                                            **UNDER SEAL**

23
                                              **Oral Argument Requested**
24

25                                            Assigned to Hon. Susan M. Brnovich,
                                              Courtroom 506
26

27

28

---

Gary S. Lincenberg *(admitted pro hac vice)*
  glincenberg@birdmarella.com
Ariel A. Neuman *(admitted pro hac vice)*
  aneuman@birdmarella.com
Gopi K. Panchapakesan *(admitted pro hac vice)*
  gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for John Brunst

Bruce Feder (AZ Bar No. 004832)
  bf@federlawpa.com
FEDER LAW OFFICE, P.A.
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135

Attorney for Scott Spear

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   FACTUAL BACKGROUND ............................................................................ 2

      A.    The Government Knew of the Joint Attorney-Client Relationships and
            Joint Defense of Backpage and Related Parties From the Outset. ................. 2

      B.    Judge Logan Rejected the Government's Motion to Override Privileges and
            Obtain Information About Attorney-Client Communications. ......................... 4

      C.    The Government Repeatedly Interrogated Ferrer About Defendants'
            Privileged Communications and Advice from the Outset and Even After
            Judge Logan's Rulings. ................................................................................... 5

III.  ARGUMENT ..................................................................................................... 7

      A.    The Government Elicited Attorney-Client Privileged Information. ................. 8

      B.    The Government's Outrageous Misconduct Violated Defendants' Fifth and
            Sixth Amendment Rights. ............................................................................... 9

      C.    The Government Has the "Heavy Burden" Of Proving No Prejudice. ........... 10

      D.    Dismissal is the Appropriate Remedy For the Government's Gross
            Misconduct. ..................................................................................................... 12

            1.    Dismissal is the Appropriate Remedy for the Government's
                  Constitutional Violations. ....................................................................... 14

            2.    Dismissal is the Appropriate Remedy for the Government's
                  Misconduct Even Absent A Constitutional Violation. ........................... 15

            3.    Preclusion Of Witnesses And Evidence and Disqualification of
                  Prosecutors and Agents Also Are Available as Alternative Remedies. .. 16

IV.   CONCLUSION .................................................................................................. 17

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Donnelly v. DeChristoforo*
    416 U.S. 637 (1974)....................................................................................13

*Kastigar v. United States*
    406 U.S. 441 (1972)............................................................................... 11, 17

*Segura v. United States*
    468 U.S. 796 (1984)....................................................................................13

*United States v. Aguilar*
    831 F. Supp. 2d 1180 (C.D. Cal. 2011)....................................................14

*United States v. Chapman*
    524 F.3d 1073 (9th Cir. 2008)............................................................ 14, 15

*United States v. Chen*
    99 F.3d 1495 (9th Cir. 1996)........................................................................8

*United States v. Danielson,*
    325 F.3d 1054, 1071 (9th Cir. 2003) ......................................... 10, 12, 17

*United States v. Fernandez*
    388 F.3d 1199 (9th Cir. 2004)....................................................................15

*United States v. Haynes*
    216 F.3d 789 (9th Cir. 2000)........................................................................9

*United States v. Horn,*
    811 F. Supp. 739 (D.N.H. 1992)................................................................16

*United States v. Irwin*
    612 F.2d 1182 (9th Cir. 1980)......................................................................9

*United States v. Jicarilla Apache Nation*
    564 U.S. 162 (2011)......................................................................................8

*United States v. Kojayan*
    8 F.3d 1315 (9th Cir. 1993)................................................................. 13, 14

*United States v. Lopez*
    4 F.3d 1455 (9th Cir. 1993)................................................................. 12, 15

ii

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

*United States v. Marshank*
    777 F. Supp. 1507 (N.D. Cal. 1991) ................................................... 14, 15, 16

*United States v. Mett*
    65 F.3d 1531 (9th Cir. 1995) ...................................................................... 17

*United States v. Morrison*
    449 U.S. 361 (1981) .............................................................................. 14, 16

*United States v. Pederson,*
    2014 WL 3871197 (D. Or. Aug. 6, 2014) ................................................ 13

*United States v. Ross*
    372 F.3d 1097 (9th Cir. 2004) ................................................................. 15

*United States v. Ruehle*
    583 F.3d 600 (9th Cir. 2009) ..................................................................... 7

*United States v. Sabri*
    973 F. Supp. 134 (W.D.N.Y. 1996) ......................................................... 14

*United States v. Schell*
    775 F.2d 559 (4th Cir. 1985) ................................................................... 14

*United States v. Simpson*
    927 F.2d 1088 (9th Cir. 1991) ................................................................. 12

*United States v. Stringer*
    535 F.3d 929 (9th Cir. 2008) ................................................................. 9, 15

*United States v. Sullivan*
    2020 WL 1815220 (D. Haw. Apr. 9, 2020) ............................................ 16

*United States v. W.R. Grace*
    526 F.3d 499 (9th Cir. 2008) ................................................................... 12

*Upjohn Co. v. United States*
    449 U.S. 383 (1981) ................................................................................... 8

*Williams v. Woodford*
    384 F.3d 567 (9th Cir. 2004) ..................................................................... 9

**Other Authorities**

Fed. Rule Evid. 501 ....................................................................................... 7

## I.    INTRODUCTION

Defendants Michael Lacey, James Larkin, Scott Spear, and John Brunst move to dismiss the indictment based on the government's brazen and outrageous invasions of the attorney-client privileges jointly held by them, entities they own and control, Backpage, and Carl Ferrer. Commencing near the time of indictment and when the government reached a cooperation agreement with Ferrer, the government repeatedly, knowingly, and intentionally interrogated Ferrer about privileged communications and advice given by Defendants' counsel relating to the core of the issues in this case. The invasions occurred during each and every one of the government's interviews of Ferrer.

The government elicited from Ferrer privileged information about advice from lawyers related ███████████████████████████████. Despite knowing from the outset that certain lawyers represented Defendants and/or their entities and were part of joint representation and/or common interest arrangements with Ferrer and Backpage, and that Ferrer thus could not unilaterally waive the privilege, the government plowed ahead with detailed questions about privileged communications. The government's conduct took place over 13 months and incredibly, continued even after Judge Logan rejected the validity of the "waivers" on which the government purported to rely.

The invasions began no later than April 2018, even though the government already knew the identities of Defendants' counsel and knew of joint representation and common interest arrangements. Indeed, on April 25, 2018, it filed a motion to disqualify certain counsel *based* on those arrangements. Dkt. 118. The invasions continued in May 2018, even after Defendants' counsel warned that Ferrer could not waive the privileges. The invasions continued in July 2018, while the government's motion to access Defendants' privileged communications based on Ferrer's purported unilateral "waiver" was pending before Judge Logan (Dkt. 195), and after the government received Defendants' opposition, setting out the pertinent facts and controlling law in detail (Dkt. 226). During an October 5, 2018 hearing over whether the Court would give the government permission to delve into privileged communications based on waiver, the defense pressed the government to disclose whether it had already done so without court permission.

The government deflected the question and failed to disclose it had already repeatedly done just what it then was asking for permission to do. Dkt. 348, pp. 91-92.

Even after Judge Logan denied the government's motion in October 2018, and despite his explicit rejection of the very theories on which the government was purportedly relying to justify its invasions of Defendants' privileges, the government's invasions continued. Not only did the government continue invading Defendants' privileges for another seven months, but it used the time to go back and revisit with Ferrer all of its prior privilege invasions from 2018. Indeed, when the February 2019 deadline came for the government to disclose the interview memoranda that documented its invasion of Defendants' privileges, the government filed an *ex parte*, *in camera* motion to significantly extend the time to disclose those materials. Defendants learned of the secret motion only after a clerical error led to them being mailed a copy of the order granting the extension. *See* Dkt. 447. The government then used the extension not only to *delay disclosing* its misconduct, but also to *facilitate continued misconduct*.

The government cannot reasonably dispute that it repeatedly invaded Defendants' privileged communications—its own memos document that fact. The government also cannot plausibly deny that it did so intentionally, despite knowing of joint representations and common interest arrangements, without seeking advance Court permission, and even after Judge Logan refused to grant such permission. The privileged information that the government learned from the Ferrer interviews has infected its prosecution of this case, including through its issuance of a superseding indictment, its interviews of other witnesses, and its preparation for trial. The government's conduct was outrageous unconstitutional, and Defendants are severely and irreparably prejudiced. The indictment must be dismissed.

## II.   FACTUAL BACKGROUND

### A.   The Government Knew of the Joint Attorney-Client Relationships and Joint Defense of Backpage and Related Parties From the Outset.

For several years before bringing this case, the government investigated Backpage, Defendants, and the entities that owned or were affiliated with the website (such as Village Voice Media Holdings, LLC. ("VVMH")). These parties had been involved in a number of cases across the country, successfully defeating charges that the website and its owners could be liable for ads

posted by third-party users.[1] A number of law firms had jointly represented Backpage, VVMH, Carl Ferrer, and Defendants in these cases and otherwise.[2]

From the investigation, and well before, the government knew that VVMH, Backpage, and Defendants had worked extensively with counsel for more than a decade. For example, Backpage produced 2.1 million pages of documents in response to a grand jury subpoena that preceded the indictment in this case (No. 16-04-108), which were accompanied by a privilege log listing 7,000 withheld documents and identifying over 75 attorneys that had represented VVMH, Backpage, and related parties. The government also sought to compel production of 350 emails with an attorney (Hemanshu Nigam, a former federal prosecutor) who had advised about practices for review and moderation of user-submitted ads, but Judge Campbell ruled that these communications were privileged and properly withheld. Dkt. 195-8 at 11-13.

At the outset of the prosecution, Defendants cautioned the government not to review or elicit information about attorney-client communications. *See* Declaration of Ariel A. Neuman ("Neuman Decl."), Ex. 1 & 2. More specifically, Defendants explained that counsel had represented Backpage and other entities and individuals jointly, and therefore Ferrer could not waive privileges unilaterally. *Id.,* Ex. 1 at 1. Defendants also requested that the government promptly disclose all communications with Ferrer or from his personal attorney, Nanci Clarence, about other counsel's prior representation of Backpage or related parties, including specifically memoranda of interviews or FBI Form 302s. *Id.,* Ex. 3.

In response, the government acknowledged that Ferrer could not waive jointly held privileges, but claimed it had "taken steps to avoid disclosure of any JDA-protected material." *Id.*, Ex. 4. The government later expanded on this claim, asserting it had "taken extensive efforts"

---

[1]   Defendants have addressed these cases in prior briefing on the government's Motion to Resolve Privilege Issues. *See* Dkt. 235 at 4-9, *see, e.g.*, *In re Grand Jury Subpoenas to Backpage.com, LLC and Village Voice Media Holdings, LLC*, No. GJ12-172RAJ (W.D. Wash. Jan. 17, 2013); *People v. Ferrer*, No. 16FE019224, 2016 WL 7237505 (Cal. Super. Ct. Dec. 9, 2016).

[2]   *E.g.*, SNR Dentons, Paul Hastings, Akin Gump, Perkins Coie, Davis Wright Tremaine, and several others. *See* Dkt. 235 at 4-9.

"to prevent the receipt of any JDA-protected information" in interviews of Mr. Ferrer, and citing case law for the proposition that Defendants had no grounds to object because they had "failed to allege specific facts that indicate communication of privileged information to the Government." *Id.,* Ex. 5 at 3.[3] At the same time, however, the government refused to provide records of its interviews with Ferrer, saying that its reports had not been finalized and would not be produced until February 29, 2019 as part of *Jencks* Act disclosures. *Id.,* Ex. 6 at 2 (later postponed by four months based on an *in camera, ex parte* government motion that Defendants only learned about through clerical error (*see* Dkt. 471, 535)).

While purporting to avoid Ferrer disclosing any privileged information, the government proposed filing a motion with the Court to "address[] potential privilege issues posed by this case," specifically whether Ferrer could waive privileges for Backpage or other parties and whether use of a taint team was permissible. *Id.,* Ex. 5 at 2. The government filed its Motion to Resolve Attorney-Client Privilege Issues on June 14, 2018. Dkt. 195. Unbeknownst to Defendants, and contrary to the assurances the government had given, it had *already* invaded privileges—repeatedly—in interviewing Ferrer. *See, infra* Section II.C.

**B.   Judge Logan Rejected the Government's Motion to Override Privileges and Obtain Information About Attorney-Client Communications.**

The government's Motion to Resolve Privilege Issues sought a broad ruling that Ferrer could unilaterally waive privilege protections relating to Backpage and dealings with attorneys because he had acquired the website in 2015. Defendants responded that Ferrer did not and could not control privileges because Backpage had been jointly represented with other parties (including VVMH and Defendants), and the parties had longstanding agreements that joint representation/joint defense privileges could not be waived without the other parties' consent. *See* Dkts. 226, 235, 324. Judge Logan rejected the government's motion; he held that the parties'

---

[3]   As Defendants later learned when the government finally turned over the 302s from Ferrer's interviews, the government's "extensive efforts" consisted solely of discussing with Ferrer's criminal defense counsel staying away from joint defense privileged information during his proffers, but the government thereafter repeatedly questioned Ferrer, and elicited information from him, about communications with and advice of counsel. *See* Neuman Decl., Exs 9-16.

agreements were clear and precluded Ferrer from unilaterally waiving privileges or disclosing privileged information. Dkt. 345 ("Logan Order II") at 4 (holding disclosure is barred unless a party first obtains written consent from other JDA parties, "[i]t is undisputed that Ferrer did not obtain the written consent," and therefore "the Government's argument for access to the privileged communication fails"); *see also* Dkt. 338 ("Logan Order I") at 8 (order denying government's motion to disqualify counsel and finding that the joint representation and defense agreements are "valid and enforceable").[4]

At the same time, Judge Logan denied Defendants' concomitant motions that sought discovery of the government's communications with Ferrer to assess whether privileges had been invaded. Logan Order II at 8. The Court accepted the government's assurances that it had protected against disclosure because its taint team had screened and segregated communications for 265 attorney names, and these materials had not been provided to the attorneys prosecuting this case. *See id.* (citing government's reply, Dkt. 169 at 16). Based on the government's representations, and given his ruling that the government was barred from accessing privileged communications, Judge Logan found that "Defendants' concerns about fairness are unfounded at this point." *Id.*

### C. The Government Repeatedly Interrogated Ferrer About Defendants' Privileged Communications and Advice from the Outset and Even After Judge Logan's Rulings.

Because of the government's misrepresentations—and the Court's acceptance of them in determining there was no need to inquire into whether the government had improperly accessed any privileged communications—Defendants had no means to assess whether the government *had* infringed privileges. However, when the government finally provided its Memoranda of Interviews (MOIs) from the Ferrer interviews, the government's repeated invasions of Defendants' privileged communications became clear. The following are just a few examples (of many dozen):[5]

---

4   The Orders are attached as Neuman Decl., Exs. 7 and 8.

5   All of the MOIs, as revised and adopted by Ferrer in 2019 (after Judge Logan's rulings), are

5

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

- Ex. 9: Memorandum of April 5, 2018 Interview (as adopted and revised by Ferrer on February 5, 2019), ¶¶ 81(a), 88, 95:

  - ████████████████████████████████████████████████████████
  - ████████████████████████████████████████████████████████

- Ex. 10: Memorandum of April 17, 2018 Interview (as adopted and revised by Ferrer on February 5, 2019), ¶¶ 7(c), 45, 76(b), 145, 167(a):

  - ████████████████████████████████████████████████████████
  - ████████████████████████████████████████████████████████
  - ████████████████████████████████████████████████████████

- Ex. 11: Memorandum of May 10, 2018 Interview (as adopted and revised by Ferrer on February 5, 2019), ¶¶ 133, 143:

  - ████████████████████████████████████████████████████████
  - ████████████████████████████████████████████████████████

- Ex. 13: Memorandum of July 26, 2018 Interview (as adopted and revised by Ferrer on May 13, 2019) ¶¶ 81, 85:

  - ████████████████████████████████████████████████████████
  - ████████████████████████████████████████████████████████

- Ex. 14: Memorandum of December 14, 2018 Interview (as adopted and revised by Ferrer on May 13, 2019), ¶¶ passim, 14 and passim, 23, 24, 101, 111:

  - ████████████████████████████████████████████████████████

---

attached as Neuman Decl., Ex. 9 (April 5, 2018 MOI); Ex. 10 (April 17, 2018 MOI); Ex. 11 (May 10, 2018 MOI); Ex. 12 (July 23, 2018 MOI); Ex. 13 (July 26, 2018 MOI); Ex. 14 (Dec. 14, 2018 MOI); Ex. 15 (Feb. 5, 2019 MOI); and Ex. 16 (May 13, 2019 MOI).



- Ex. 15: Memorandum of February 5, 2019 Interview, ¶¶ 80(a) and (b):

As the MOIs demonstrate, the government invaded Defendants' privileges from its first interview of Ferrer (on April 5, 2018), and continued to do the same in seven successive interviews spanning more than thirteen months, despite Defendants' cautions voiced in April and May 2018, about joint representation and privilege rights; continued after assuring Defendants and the Court that they were taking "extensive efforts" to avoid privilege disclosures; and continued even after Judge Logan's rulings that the government *could not* access privileged communications or claim that Ferrer could effect a waiver. The government went so far as to use interviews on February 5 and May 13, 2019 to revisit *all* the prior interviews and have Ferrer correct and adopt all of the interview memos, thus having Ferrer reconfirm or discuss further all the privileged information covered in the prior interviews.[6] And, throughout this time, the government avoided and delayed producing the MOIs, ensuring Defendants would not have specific grounds to complain until well after the fact.

## III.   ARGUMENT

The government's blatant disregard for Defendants' attorney-client privileges, *even after the Court rejected its waiver theories*, violated Defendants' Fifth and Sixth Amendment rights, caused substantial prejudice, and constituted outrageous misconduct for which the most drastic remedy – dismissal of the indictment – is appropriate.

---

[6]   The February and May 2019 sessions resulted in each of the prior MOIs having two versions – an original and then a "revised" version that was reviewed and adopted by Ferrer.

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

### A.     The Government Elicited Attorney-Client Privileged Information.

In federal court, "[i]ssues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law," not state law. *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009) (citations omitted); *see also* Fed. Rule Evid. 501. "The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law.'" *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). The "privilege applies to communications between lawyers and their clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation." *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996) (privilege covers "advice regarding the client's business affairs.") Its aim is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Jicarilla*, 564 U.S. at 169. "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389. It protects both the advice given by the attorney and the "giving of information to the lawyer to enable [the lawyer] to give sound and informed advice." *Id.* at 390; *see also Chen*, 99 F.3d at 1499–500 ("People need lawyers to guide them through thickets of complex government requirements, and [. . .] have to be able to talk to their lawyers candidly without fear that what they say to their own lawyers will be transmitted to the government.").

Here, the lawyers were not only being consulted with reference to their knowledge in the law, they were also helping to navigate the "thickets of complex government requirements" in a new and developing area of the law – civil and criminal liability for owning and operating a website hosting content posted by third parties. The government elicited from Ferrer communications to and from the lawyers relating ███████████████████████████████████████ ███████████████████████████████████. The government elicited those privileged communications even after Judge Logan ruled that Ferrer could not disclose the communications. As Judge Logan found, Ferrer could not unilaterally waive the applicable privileges without the consent of the other parties to the various joint representation and joint

defense agreements, which he did not have. *See* Logan Order I at 10; *see also* Logan Order II.

**B.    The Government's Outrageous Misconduct Violated Defendants' Fifth and Sixth Amendment Rights.**

Government interference with a defendant's attorney-client relationships may violate the defendant's "Fifth Amendment right to due process of law." *United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980). "A claim of outrageous government conduct premised upon deliberate intrusion into the attorney-client relationship will be cognizable where the defendant can point to actual and substantial prejudice." *United States v. Haynes*, 216 F.3d 789, 797 (9th Cir. 2000) (citation and internal punctuation omitted). "A claim of government interference with the attorney-client relationship has three elements: (1) the government was objectively aware of an ongoing, personal attorney-client relationship; (2) the government deliberately intruded into that relationship; and (3), as a result, the defendant suffered actual and substantial prejudice." *United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008).

Similarly, deliberate interference to "the confidential relationship between a criminal defendant and defense counsel" also violates the Sixth Amendment right to counsel "if it substantially prejudices the criminal defendant." *Williams v. Woodford*, 384 F.3d 567, 584–85 (9th Cir. 2004). "Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *Id.*

Here, the government interrogated Ferrer five times between April 5 and July 26, 2018—each time probing Ferrer about communications with Defendants' counsel. Ferrer purported to waive the privilege as to communications with Backpage's lawyers, but the government *knew* that the lawyers about whom it was questioning Ferrer either were Defendants' lawyers who were in a joint defense arrangement with Ferrer/Backpage or were both Defendants' counsel and Backpage's counsel (i.e. there was a joint representation). The government also knew that Defendants had not waived privilege and had warned that Ferrer could not waive their privileges or any jointly held privileges. In response, the government said it would respect the jointly held privileges (*knowing* that was untrue, as it already was invading them), while also making the very

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

same arguments regarding waiver that Judge Logan later rejected. *Compare* Neuman Decl., Exs. 2 & 3; Dkt. 269; Logan Order I; Logan Order II.

The MOIs show that the government made no attempt to probe Ferrer about counsel that only represented Ferrer or Backpage. There were such lawyers, but their names do not come up anywhere in the MOIs. Instead, the government just interrogated Ferrer about privileged communications with Defendants' counsel, and Ferrer provided the requested information. The government's "warnings" to Ferrer were nothing but window dressing—and the government appears to have dispensed with even the window dressing at the July 23, 2018 interview. *See* Neuman Decl., Ex. 12.

The clearest evidence that the government *willfully* invaded Defendants' privileges is that the government continued to interrogate Ferrer about Defendants' privileged communications after Judge Logan rejected the government's arguments regarding waiver on October 18, 2018, ruling that the government had no basis to access Defendants' privileged communications. Logan Orders I and II. The government nonetheless interviewed Ferrer on December 14, 2018, and repeatedly inquired about Defendants' privileged communications. From the MOI, it appears the government did not even acknowledge Judge Logan's rejection of the government's position regarding waiver. Neuman Decl., Ex. 14. Then, on February 5 and May 13, 2019, the government had Ferrer review notes or memoranda of the 2018 interviews all over again, and asked Ferrer to reconfirm or further comment on the information therein, *including all the privileged information they had previously elicited. Id.*, Exs. 15 & 16. Thus, the government's intent to invade Defendants' privileges is demonstrated by the fact that the government inquired into Defendants' attorney-client communications without court permission commencing with its very first interview of Ferrer, and continued to invade Defendants' privileges long after Judge Logan rejected the government's waiver argument.

### C.     The Government Has the "Heavy Burden" Of Proving No Prejudice.

To determine whether the government's review of privileged material results in a violation of Defendants' Constitutional rights, courts apply a burden-shifting analysis. First, a defendant must make a *prima facie* showing that the government intentionally—*i.e.* affirmatively, rather than

passively—reviewed privileged material. *United States v. Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003), as amended (May 19, 2003). Here, there is no question that the violation was intentional rather than passive. The prosecutors asked Ferrer questions which elicited the privileged information, including discussing at length conversations with and among attorneys, even after they had been warned by defense counsel. The government then doubled down, continuing its inquiries into privileged information even after Judge Logan rejected its theories of waiver. And during the hearing that led to that rejection, it stood silent when pressed as to whether its rejected theories might implicate the ongoing interviews of Ferrer. This is not a case where the prosecutors passively received privileged information, such as through a document production. The prosecutors here knew that invasion of the privilege was a serious concern, yet went ahead and elicited privileged information again and again, in interview after interview.

"Once the prima facie case has been established, 'the burden shifts to the government to show that there has been . . . no prejudice to the defendant[] as a result of these communications.'" *Id.* This is a "heavy burden," and "the mere assertion by the government of the integrity and good faith of the prosecuting authorities is not enough." *Id.* at 1072 (internal quotation marks omitted). Indeed, just as with immunized testimony, the *Kastigar* analysis applies to both "direct and indirect use" of wrongly obtained privileged information. *Id.* at 1072. As a result, the government "must show . . . that all of its pre-trial and trial strategy was based on independent sources." *Id.* at 1074. Further, "strategy in this context is a broad term that includes, but is not limited to, such things as decisions about the scope and nature of the investigation, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and what to save for possible rebuttal." *Id.* The government's "burden of proof . . . is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.'" *Id.* at 1071 (quoting *Kastigar v. United States*, 406 U.S. 441, 460 (1972)). "In the absence of such an evidentiary showing by the government, the defendant has suffered prejudice." *Id.* at 1072. Thus, "[u]nder the second step of the analysis, the government must

1  introduce evidence and show by a preponderance of evidence that it did not use th[e] privileged

2  information." *Id.* at 1074.

3         Here, the defendants have made a *prima facie* showing that the government "acted

4  affirmatively to intrude into the attorney-client relationship." The prejudice Defendants suffered

5  is manifest. The prosecutors who will try this case, and the agents who investigated it (some of

6  whom will testify at trial), have had privileged information since not later than April 2018. Since

7  that time, they have interviewed numerous additional witnesses, returned a superseding

8  indictment with new and additional allegations, filed several substantive motions, including a

9  motion to disqualify counsel in 2018 and another motion to disqualify filed just recently,

10 repeatedly changed their proposed witnesses and exhibits, and, most importantly, prepared for a

11 trial at which they hope to convict Defendants of serious offenses. Their entire strategy has been

12 centered around the testimony of Ferrer, whose interviews they sought to shield from

13 Defendants for as long as possible. They have repeatedly referred to his statements and his

14 explanation of certain evidence when alleging Defendants' guilt. Indeed, the information they

15 obtained from Ferrer suffuses their entire prosecution of this case. With the privileged

16 information in hand, they can prepare him for cross-examination on why he took certain actions.

17 Further, the government now has deep insights into the defense's strategy and thinking, which it

18 can use to guide its prosecution of this matter and to evaluate and prepare for any defense

19 Defendants may put on.

20        The prejudice from the government's misconduct pervades the case to such an extent that

21 no hearing is required. But if the government can somehow show on the papers that its entire

22 prosecution of this case is not tainted by its violations of Defendants' constitutional rights, then

23 at a minimum, the Court should order an evidentiary hearing where the government is put to its

24 "heavy burden" of proof on that point. *See Danielson*, 325 F.3d at 1074 (remanding to "hold an

25 evidentiary hearing at which this standard can be applied").

26        **D.    Dismissal is the Appropriate Remedy For the Government's Gross
               Misconduct.**

27        "There are three legitimate grounds for a court's exercise of supervisory power: 'to

28 implement a remedy for the violation of a recognized statutory or constitutional right; to

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

1  preserve judicial integrity by ensuring that a conviction rests on appropriate considerations

2  validly before a jury; and to deter future illegal conduct.'" *United States v. Lopez,* 4 F.3d 1455, 1463

3  (9th Cir. 1993) (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir.1991)); *see also United*

4  *States v. W.R. Grace,* 526 F.3d 499, 511 n.9 (9th Cir. 2008).

5      "Prosecutors are subject to constraints and responsibilities that don't apply to other

6  lawyers." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). "The prosecutor's job isn't

7  just to win, but to win fairly, staying well within the rules." *Id.* As Justice Douglas once warned,

8  "[t]he function of the prosecutor under the Federal Constitution is not to tack as many skins of

9  victims as possible to the wall. His function is to vindicate the right of people as expressed in the

10 laws and give those accused of crime a fair trial." *Donnelly v. DeChristoforo,* 416 U.S. 637, 648–49

11 (1974) (Douglas, J., dissenting). Indeed, the Ninth Circuit has observed that "hard-bitten

12 litigation tactics are unbecoming a prosecutor." *Kojayan*, 8 F.3d at 1323.

13      What could be a more "hard-bitten litigation tactic" than prosecutors knowingly invading

14 privileges, misleading Defendants and the Court about its conduct, sloughing off Defendants'

15 concerns that their privileges were being invaded, and then doubling-down on that invasion after

16 the prosecutors' theory of waiver is explicitly rejected by the Court? What could be a more

17 "hard-bitten litigation tactic" than to repeatedly, knowingly, and intentionally invade Defendants'

18 privileges to gain a tactical advantage in this case?[7] "[T]he Government cannot be permitted to

19 benefit from its violations of the Constitution." *Segura v. United States*, 468 U.S. 796, 839 (1984)

20 (Stevens, J., dissenting). And, even if the conduct does not violate the Constitution, the

21 Government should not be permitted to escape the consequences of its misconduct.

22

23 [7]   Such conduct by a prosecutor is so problematic that in *United States v. Pederson*, 2014 WL

24 3871197 (D. Or. Aug. 6, 2014), following guilty pleas sparing defendants the death penalty, and
   with no motion pending, the Court *sua sponte* issued a Supervisory Opinion to criticize the

25 government's privilege invasions and discovery misconduct. The court found government
   misconduct in (1) never requesting permission from the court prior to reviewing the privileged

26 communications, (2) failing to notify defense counsel for some time after it learned of the
   invasions, (3) trying to use the privileged communications to support a crime-fraud argument,

27 and (4) "most troubling…in large part, the government, which was aware of the problems to a

28 substantial degree, did not alert the court of these problems of its own volition."

### 1.    Dismissal is the Appropriate Remedy for the Government's Constitutional Violations.

Dismissal of the indictment here is an appropriate exercise of the Court's supervisory powers in light of the government's Constitutional violations and the ongoing prejudice to Defendants. Indeed, dismissal of the indictment is appropriate "where there is continuing prejudice from a constitutional violation that cannot be remedied by suppression of the evidence." *United States v. Marshank*, 777 F. Supp. 1507, 1525 (N.D. Cal. 1991) (citing *United States v. Morrison*, 449 U.S. 361, 365-66 n.2 (1981)). Here, the government's invasions of Defendants' privileges so pervasively infect the prosecution of this case that suppression does not remedy the problem. The bell of information obtained from Ferrer cannot be "unrung," and the ways in which the prosecution team has used and will use it cannot be disentangled.

In these instances of outrageous government misconduct, dismissal is the appropriate remedy. *See, e.g. United States v. Chapman*, 524 F.3d 1073, 1088 (9th Cir. 2008) (affirming dismissal of indictment, where district court was "concerned that any lesser sanction would be like endorsing the AUSA's conduct" (internal alterations omitted)); *Kojayan*, 8 F.3d at 1324-25 (dismissing indictment pursuant to court's "supervisory power" where "prosecutorial misconduct [. . .] deprived the defendants of due process of law" "to make it clear that [*inter alia,*] the misconduct was serious [. . . and] steps must be taken to avoid a recurrence of this chain of events."); *United States v. Schell*, 775 F.2d 559, 562-66 (4th Cir. 1985) (reversing conviction and ordering that the indictment be dismissed under the Fifth Amendment, based on the government's intrusion into defendants' attorney client relationship); *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1206-10 (C.D. Cal. 2011) (dismissing indictment under the court's supervisory powers, based on government misconduct including, *inter alia*, "improperly obtaining attorney-client privileged communications," and so as not to allow the government "to benefit from a 'do over,' [and in the] hopes that this ruling will have a valuable prophylactic effect"); *United States v. Sabri*, 973 F. Supp. 134, 147 (W.D.N.Y. 1996) (dismissing charged offense based on holding that "government's manipulation of the attorney-client relationship [was] offensive to the principles which underlie our criminal justice system," and concluding "that the government's conduct as to [the dismissed charge] was outrageous and violative of the defendant's Fifth Amendment due

process rights"); *Marshank*, 777 F. Supp. at 1523 (dismissing indictment under both the Fifth and Sixth Amendment, where "the taint of the government's constitutional transgression infected every part of the investigation and prosecution of the defendant").

### 2. Dismissal is the Appropriate Remedy for the Government's Misconduct Even Absent A Constitutional Violation.

Even if the Court finds that the government's misconduct does not rise to the level of a Constitutional violation, it "may [also] exercise its supervisory powers to dismiss an indictment in response to outrageous government conduct that falls short of a due process violation." *United States v. Fernandez*, 388 F.3d 1199, 1239 (9th Cir. 2004) (quoting *United States v. Ross*, 372 F.3d 1097, 1109 (9th Cir. 2004)). "[E]xercise of [the Court's] supervisory powers is an appropriate means of policing ethical misconduct by prosecutors." *Lopez*, 4 F.3d at 1463 (it is "within the discretion of the district court to act in an appropriate manner to discipline [the prosecutor] if he subverted the attorney-client relationship"). To warrant dismissal under these circumstances, the government's conduct must (1) be flagrant and (2) cause substantial prejudice to the defendant. *Id.*; *see also Stringer*, 535 F.3d at 941. While "accidental or merely negligent governmental conduct is insufficient to establish flagrant misbehavior," a finding of "willfulness" is not required. *Chapman*, 524 F.3d at 1085. Rather, government action in "reckless disregard" of the defendant's rights satisfies the standard. *Id.*

Here, the government did not act accidentally or negligently. It knowingly and repeatedly invaded Defendants' privileges, and purposefully elicited and then reconfirmed its elicitation of privileged information, even after its theories regarding waiver were rejected by the Court, all while affirmatively misrepresenting to Defendants what it was doing. It also stood silent when pressed as to whether those theories might infect its interviews of Ferrer, and then went back and asked him all the same questions all over again, re-violating the privilege over and over. While no finding of "willfulness" is required, here it would be difficult to reach any other conclusion. And as discussed above, Defendants have suffered "substantial prejudice" warranting dismissal.

15

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

### 3. Preclusion Of Witnesses And Evidence and Disqualification of Prosecutors and Agents Also Are Available as Alternative Remedies.

Where courts find the government's conduct is not sufficiently outrageous to warrant dismissal, but nonetheless is violative of constitutional rights and ethical norms, they impose remedies short of dismissal "tailored to the injury suffered." *Morrison*, 449 U.S. at 364. For example, in *United States v. Horn*, the government obtained access to certain confidential attorney work product materials. 811 F. Supp. 739, 745-48 (D.N.H. 1992), *rev'd in part on other grounds*, 29 F.3d 754 (1st Cir. 1994). The court held that the government's conduct was not sufficiently "outrageous" to warrant dismissal, but it nonetheless imposed a series of remedies to address the resulting prejudice suffered by the defendants, including: (1) disqualifying the lead prosecutor (who had reviewed the materials) from any participation in the case; (2) ordering the government to provide defendants with a written summary of each government witness' testimony, and a list of exhibits to be introduced through or testified to by each witness; (3) making certain witnesses available to the defendants for deposition prior to trial; and (4) prohibiting the government from introducing any of the documents at issue, or eliciting any testimony concerning their substance. *Id.* at 752.

Although this case does not involve discrete and limited violations of Defendants' privileges, in such cases preclusion of the particular evidence (or testimony) at issue is "the remedy characteristically imposed." *Morrison*, 449 U.S. at 365; *see also Marshank*, 777 F. Supp. 1521-22 ("Suppression is an appropriate remedy where the court can identify and isolate the evidence obtained in violation of the defendant's Fifth Amendment due process rights. The prosecution is thus denied 'the fruits of its transgression' and the due process right to a fair trial is preserved.") (citation omitted). Suppression of evidence beyond just the privileged materials themselves is likewise appropriate under the court's supervisory powers. *See, e.g., United States v. Sullivan*, 2020 WL 1815220, at *9-10 (D. Haw. Apr. 9, 2020) (suppressing 473 files obtained by the government, only 4 of which were privileged, in light of the government's conduct, despite finding that the defendant had not suffered any prejudice).

Here, if the Court does not dismiss the indictment entirely, the Court should order the exclusion of all privileged information obtained by the government, and all documentary and

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

testimonial evidence, legal theories, or other government work product derived directly or indirectly therefrom. *See Danielson*, 325 F.3d at 1072 ("[W]e have interpreted *Kastigar's* prohibition on use to include both direct and indirect use. For example, information derived from compelled testimony may not be used in providing 'assistance in focusing the investigation, deciding to initiate the prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy.'" (citation omitted)). That not only means excluding Ferrer as a witness, but also all other evidence the government developed based on the breaches of Defendants' privileges.

Defendants further submit it is impossible to separate the taint of the government's privilege invasions from the entirety of the prosecution.[8] Should the Court choose not to dismiss the indictment, removing those prosecutors and agents who have been exposed to the privileged information – here, the entire prosecution team – would be a less effective remedy, but nevertheless would send the strong message that such intentional privilege invasions cannot be countenanced, would provide some deterrence of similar misconduct, and would at least remove those individuals who participated in and directly benefited from the invasions of Defendants' privileges.

## IV.   CONCLUSION

The government has violated Defendants' Constitutional rights, with brazen and outrageous conduct that continued even after Judge Logan's rulings. While Defendants submit that the indictment must be dismissed now, at a minimum, the Court should hold a *Kastigar*/*Danielson* hearing to put the government to its burden of proof, and then determine the remedy the Court will impose.

---

[8]   The Ninth Circuit has recognized that attorneys may be disqualified for violation of applicable ethical rules, even absent a Constitutional violation. *See United States v. Mett*, 65 F.3d 1531, 1537 (9th Cir. 1995). The government's conduct has not conformed to the requirements of the Arizona Rules of Professional Conduct, providing an independent basis under the Court's supervisory powers for the relief Defendants seek. *See* 28 U.S.C. § 530B.

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

1

Respectfully submitted,

2   DATED:  May 1, 2020

Thomas H. Bienert, Jr.

3

Whitney Z. Bernstein
BIENERT KATZMAN PC

4

5

By:   _s/Thomas H. Bienert, Jr._

6

Thomas H. Bienert, Jr.
Attorneys for James Larkin

7   *Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Jan. 2020) § II*

8   *(C) (3), Thomas H. Bienert, Jr. hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized its filing.*

9

10  DATED:  May 1, 2020

Paul J. Cambria, Jr.
Erin McCampbell

11

LIPSITZ GREEN SCIME CAMBRIA LLP

12

13  By:   _s/ Paul J. Cambria, Jr._

Paul J. Cambria, Jr.

14

Attorneys for Michael Lacey

15

16  DATED:  May 1, 2020

Gary S. Lincenberg
Ariel A. Neuman

17

Gopi K. Panchapakesan
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,

18

DROOKS, LINCENBERG & RHOW, P.C.

19

20  By:   _s/Gary S. Lincenberg_

21

Gary S. Lincenberg
Attorneys for John Brunst

22

23  DATED:  May 1, 2020

FEDER LAW OFFICE, P.A.

24

25  By:   _s/ Bruce Feder_

Bruce Feder

26

Attorneys for Scott Spear

27

28

18

DEFENDANTS LACEY, LARKIN, BRUNST, AND SPEAR'S MOTION TO DISMISS BASED ON OUTRAGEOUS
GOVERNMENT MISCONDUCT INVADING ATTORNEY-CLIENT PRIVILEGE

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on May 1, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*/s/ Toni Thomas*
Toni Thomas
