**Joy Bertrand, Esq.**
PO Box 2734
Scottsdale, Arizona 85252-2734
Telephone:  602-374-5321
Fax:  480-361-4694
joyous@mailbag.com
www.joybertrandlaw.com
Arizona State Bar No. 024181

**ATTORNEY FOR:  DEFENDANT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

United States,

      Plaintiff,

      v.

Joye Vaught,

      Defendant.

Case No. CR-18-422-SMB

**DEFENDANTS' MOTION TO ENFORCE THE COURT'S MAY 7, 2021 ORDERS**

NOW COME the Defendants, by their attorneys of record, to ask the Court to enforce its May 7, 2021 Orders precluding evidence of crimes committed by third-parties.[1]  The Defendants further submit the following:

---

[1] ECF Docs. 1555 and 1556.

## INTRODUCTION

Today's *Arizona Republic* contains an article about the trial starting tomorrow.  Much of the article, which appears to have been fed to the reporter by a representative/s of the Government, focusses on the June 2012 murder of Crystal MacMartin.[2]

This fundamental questions in this prosecution is, "Did the Defendants specifically intend to facilitate business enterprises involved in prostitution in violation of state law through the publishing of fifty third-party advertisements?" Nearly four months ago, this Court ruled:

> Generally, the Court agrees that the crimes of third parties are only relevant to the extent that they gave Defendants' notice that prostitutes were advertising on Backpage.com.  However, the specific details of crimes committed by third parties are irrelevant to whether Defendants violated the Travel Act, and in most instances, evidence of such third-party crimes is likely improper.  But without reference to specific contexts where the Government intends to introduce such evidence, the Court will not categorically conclude that all evidence of crimes committed by third parties is inadmissible.  If the Government attempts to introduce such evidence at trial, it will only be admitted to the extent that it gave Defendants notice that prostitutes were utilizing Backpage.com, and the Government will not be allowed to introduce evidence showing the details of the crimes.  As to the evidence of third-party murders, as the Court mentioned above, the Court will address those arguments in a separate order.[3]

---

[2]  Richard Ruelas, "Backpage Trial Set to Begin: Former New Times Execs Charged with Aiding Prostitution," Arizona Republic, August 30, 2021.  A PDF copy of the article accompanies this Motion as Exhibit 1.

[3]  ECF Doc. 1156 at 5.

With regard to murders committed by third parties, this Court ruled:

. . . While evidence showing notice to Defendants that prostitutes were using its website is relevant and the evidence has some probative value, the potential prejudice against Defendants from the introduction of the evidence regarding the murders is quite high.  If evidence of the details of the murders were introduced, it is likely to inflame the passions of the jurors against the Defendants or create confusion that Defendants are responsible for the murders.  Where the probative value of evidence is low and the potential prejudicial effect of evidence is high, courts should typically exclude evidence . . . Thus, clearly facts and details regarding the murders themselves should not be admitted.

Further, as Defendants correctly point out, the Government has failed to explain how or through whom it seeks to introduce the evidence or the intended scope of the evidence it seeks admitted.  For example, will the Government call the next of kin of the victims to testify regarding their prostitution, use of Backpage.com, and murder?  Is the Government simply seeking to admit the internal spreadsheet used by Backpage to track news stories?  Without further information concerning what specific evidence the Government intends to introduce and how it intends to introduce it, the Court cannot find that the Government's intended evidence is admissible.  Thus, the Court will not make a specific finding on the admissibility or exclusion of the evidence at this time and will wait until trial to rule on specific objections or motions in limine.  However, the Court can rule now that the Government will not be allowed to introduce evidence regarding the specific details of the murders themselves.[4]

Despite the Court's rulings, in its latest witness list, the Government's still appears to insist on calling witnesses to testify about the exact material this Court precluded.  Because the Government may plan to discuss one or both of these

---

[4]  ECF Doc. 1155 at 5-6 (internal cite omitted).

murder prosecutions in its opening statement, the Defendants bring their motion to preclude evidence of either murder prosecution before the trial begins.

The Defendants present two instances of third party crimes that the Government appears to intend to call, despite the Court's clear rulings.  These two cases encompass seven of the 83 witnesses on the Government's list.  As discussed below, a total of **44 witnesses** – more than half of the Government's 83 witnesses, appear to pertain to third party crimes.  By precluding this wholly irrelevant evidence, the Court stands to shorten this trial by two to three weeks.

A.    *Victim 6 Witnesses Remaining on the Government's Witness List.*

With regards to the 2012 Scottsdale murder of Crystal McMartin (named by the Government as "Victim 6"), the Government keeps on its witness list:

Lynn Nelson (McMartin) – Crystal McMartin's mother (listed twice as Gvt. Witness 51 and 57);

Hugh Lockerby – Scottsdale Police Department (Gvt. Witness 46);

Scott Carpenter – Scottsdale Police Department (Gvt. Witness 12);  and

Brittany McMartin – Crystal McMartin's sister (Gvt. Witness 50)

Joseph Matthews' murder of Crystal McMartin does not form the basis of any count of the Indictment.

B.    *Victim 15 Witnesses Remaining on the Governnment's Witness list.*

With regards to the 2012 death of Jasilias Wright (named by the Government as "Victim 15" in the Superseding Indictment), the Government keeps on its witness list:

Justin Berry – Louisiana State Police (Gvt. Witness 9);

Gustave Bethea – Louisiana State Police (Gvt. Witness 10);  and

Chad Gremillion – Louisiana State Police (Gvt. Witness 34)

The Government uses the prosecution of Adam Littleton as the basis for Counts Nineteen and Twenty.[5]  The Government also gives detail about Ms. Wright's death in another portion of the Superseding Indictment:

> In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana. These ads contained words and phrases such as  "Thick Glass of Chocolate Milk Looking for a GoodTime! ! ! " and "sexy certified freak" and contained pictures showing Victim 15 's legs, shoulders and buttocks.

> On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will. In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.[6]

These two women's tragic deaths are in no way relevant to any element of any crime charged in the Superseding Indictment.  Even if the Government could show these murders had a scintilla of relevance to the Superseding Indictment,

---

[5]  ECF Doc. 230 at 52.

[6]  ECF Doc. 230 at 43.

these facts would be far too incendiary to be admissible.  To allow the Government to present facts surrounding these third-party crimes at this already complex trial also will create unnecessary distraction and use an inordinate amount of precious trial time.

## APPLICABLE LAW

Federal Rule of Evidence 402 prohibits the admission of evidence that is not relevant.  Evidence is relevant, if:

(**a**) it has any tendency to make a fact more or less probable than it would be without the evidence;  and

**(b)** the fact is of consequence in determining the action.

Even if evidence is relevant, it must be precluded if, "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[7]  If there exists any alternative evidence with same or greater probative value, but with lesser threat of unfairly prejudicing defendant, as proffered evidence, court must discount probative value of originally proffered evidence and exclude it if its now-lesser probative value is substantially outweighed by unfair prejudice to defendant.[8]

---

[7]  Fed. R. Evid. 403.

[8] *U.S. v. Ozsusamlar*, 428 F.Supp.2d 161, 170 (S.D.N.Y. 2006), citing *Old Chief v. United States*, 519 U.S. 172, 182-83 (1997).

### THE EXPECTED TESTIMONY REGARDING THIRD-PARTY ACTS

**I.     James Michael Matthews' Murder of Crystal MacMartin.**

*A.     This 2012 Incident is Outside the Statute of Limitations and Does Not Pertain to a Single Count of the Indictment.*

James Michael Matthews murdered Crystal MacMartin on June 12, 2012. The Government brought its first indictment in this case on March 28, 2018.[9] Despite this event falling outside of the statute of limitations, the Government included details of Matthews' crime in the superseding indictment:

> In or around June 2012, Victim 6 was sold for sex, through the use of Backpage ads in Arizona.  Her traffickers utilized Backpage ads that did not offer a specific person but instead generally offered a woman with a particularly type of hair color and build.  On June 22, 2012, Victim 6 was dispatched to a customer who had responded to a Backpage ad featuring "Nadia," who was described as a slender brunette woman.  Upon arrival at the location, Victim 6 was stabbed to death.[10]

The Superseding Indictment's description leaves out several critical details:

1.     Escort Services are legal in Scottsdale.  The city even licenses them.[11]

---

[9] ECF Doc. 1 at 1.

[10] ECF Doc. 230 at 41.

[11] Scottsdale Muni. Code 16-452 et. seq.

2.      Ms. MacMartin filled out an employment application to work at the escort service.[12]  In that application, she noted she had worked as an escort in Las Vegas, before moving to Arizona.[13]

3.      The Government can point to no evidence that shows she was forced into working as an escort or "trafficked."

4.      Ms. MacMartin's significant other drove her to the appointment with Matthews – further underscoring that Ms. MacMartin worked as an escort voluntarily and did not hide what she did for a living.[14]  Ms. MacMartin's significant other insisted that Ms. MacMartin did not have sex for money.[15]

5.      The escort service did not use Ms. MacMartin in an ad.  Rather, the service used generic ads that described different kinds of women (e.g., slender brunette, busty blonde).[16]

6.      The Government offers no evidence to show that Ms. MacMartin intended to anything other than provide escort services to Matthews.[17]

B.      *Ms. MacMartin was an Escort, not a Prostitute.*

---

[12]  The police reports for this case were turned over by the Government, but not Bates-numbered.  The relevant, redacted excerpts of the reports are included as Exhibit 2 to this Motion.  Ex. 2 at 1-2.

[13]  *Id.*

[14]  *Id.* at 3

[15]  *Id.*

[16]  *Id.* at 4-5.

[17]  Scottsdale defines an escort as, "any person who is hired, or offered to hire, to accompany one or more other persons to social, business or entertainment gatherings, public or private, for compensation of any kind.  A person is an escort even if other services are provided to the patron, if such services are merely incidental to the escort services."  Scottsdale Muni. Code 16-453.

It is not clear what evidence the Government intends to present to show that Ms. MacMartin arrived at Matthews' apartment to do anything illegal. She was dressed when she was found. There does not appear any evidence, such as text messages, to show that she and Matthews had made arrangements to do anything illegal.

C.      *Investigators Found No Information Regarding Backpage Searches for Escorts or Prostitution-Related Activity was on Matthews' Devices.*

A review of the Government's disclosures shows no evidence tying Backpage to Ms. MacMartin's death. In fact, it is not clear how Matthews came across the escort service's ad for "Nadia." Matthews could have found a "Nadia" ad through a simple Google search for the escort agency.

D.      *James Michael Matthews' Guilty Plea and Sentence.*

Matthews' case was hardly a "whodunit." Matthews opened the door of his apartment, covered in blood. As he stood in the entryway of this apartment, police could see evidence of a violent alteration. Near Matthews, police saw a butcher knife covered in blood. The State, led by prosecutor Juan Martinez, pursed the death penalty. [18]

---

[18] A copy of the docket in *State v. Matthews* is attached to this Motion as Exhibit 3.

Matthews pled guilty to first degree murder on or about September 4, 2015.[19]  On November 4, 2015, Matthews was sentenced to life in prison.[20]

The Government can offer no evidence that Backpage was in any way involved with Matthews' conduct.  While the Government can point to generic Backpage ads that depicted a woman who had similar physical traits to Ms. MacMartin's, the evidence is not clear that Matthews even contacted the escort agency *via* Backpage.

## II.     The Death of Jasilas Wright.

The facts of Littleton's case can be summarized as:

On June 10, 2015, at 4:57 a.m., emergency operators were alerted to an object, possibly a human body, lying in the center lane of westbound Interstate 10. Louisiana State Police and the Jefferson Parish Sheriff's Office (JPSO) found a trail of blood, body parts, sandals, a cellular phone, clothing, a hair piece, and a watch from the Veterans on-ramp to the Power exit.  After analyzing the victim's fingerprints and cellular phone, the police identified the body as nineteen-year-old Jasilas Wright.  After speaking to the victim's friends and family members and searching the home of the victim's mother, Nedra Wright, defendant, Adam Littleton, was identified as a suspect.

[Ms. Wright] had known defendant for less than a month.  Defendant had traveled to New Orleans from Texas on May 14, 2015, with Quinicsha Johnson, a prostitute.  While staying at the Monteleone Hotel, defendant met the victim through her work as a dancer at Stiletto's, a Bourbon  Street strip club.  Within a few days, the victim left New Orleans with defendant, telling family members that she was going to dance in Texas with some

---

[19] *Id*.

[20] *Id*.

girls from her work. Defendant and the victim thereafter stayed in hotels in Ft. Worth, Dallas, Austin, and Grand Prairie, Texas. In the beginning of June, the victim and defendant drove back to New Orleans in a gray Camry belonging to defendant's brother, Michael Adams.

Upon their return to New Orleans, the victim and defendant stayed with the victim's mother, Ms. Wright, at her home . . . The victim's family believed defendant was the victim's boyfriend. According to her family, when she returned home, the victim appeared to have lost weight; she told her grandmother, Carole Bernard, that she was not going to leave New Orleans or her nine-month-old son again. After returning to New Orleans, the victim resumed working at Stiletto's. Defendant drove the victim to and from work, and spent time with Ms. Wright while the victim worked.

On the night of June 6, 2015, the victim went out with her friend from high school, Demonyan Cooper, and spent the night with another man. Two days later on June 8, 2015, the victim and defendant went to Walmart's Woodforest bank where defendant opened a bank account and deposited ten dollars. On the evening of June 9, 2015, the victim went to work. While she worked, defendant met Journae King, a former dancer, on Bourbon Street, and they exchanged text messages until 2:40 a.m. the following morning of June 10, 2015. Defendant's cell phone records revealed that he was in downtown New Orleans at 4:20 a.m., thereafter near Loyola Drive in Kenner from 5:00 a.m. to 5:05 a.m.

On June 10, 2015, Ms. Wright realized that her daughter had not come home from work, although both her and defendant's bags were still in the house. At approximately 11:00 a.m., Journae King called Ms. Wright asking if she had seen her daughter. After speaking with Ms. King, Ms. Wright called Ms. Bernard, her mother and the victim's grandmother. Meanwhile, defendant made phone calls to Ms. Johnson, Ms. Cooper, Ms. King, as well as his brother and sister, crying and telling them that the victim had jumped out of his car on the highway. Ms. Cooper went to Ms. Bernard's house and put all phone calls from defendant on speakerphone in the presence of Ms. Bernard and officers from New Orleans Police Department (NOPD).

Cell phone records show defendant continued to drive west to Dallas, Texas arriving there between 9:45 and 10:15 p.m. at the apartment of Stephanie Walker, his brother, Michael Adams' girlfriend. After hearing

defendant's story, Ms. Walker confirmed the details on the internet and called the Louisiana State Police from her workplace.  On June 12, 2015, Ms. Walker spoke with Trooper First Class Gus Bethea at which point she reported to the trooper that she had overheard defendant telling Mr. Adams that he could not call the police because he was scared that he was responsible.  According to Ms. Walker, defendant said he had forced the victim into the car and told her the only way she was going to get out was if she jumped.  Ms. Walker also overheard defendant say that he saw, in his rearview mirror, two cars run over the victim and that he stopped at the next exit to throw her belongings out of the car.  Louisiana State Police and JPSO deputies arrived in Dallas, searched the Camry, and interviewed Mr. Adams and Ms. Walker.  The search of the vehicle revealed defendant's bank statements from Bank of America and paperwork from victim's visit to Texas Health Resources center on May 23, 2015 at 2:00 a.m. for a cervical sprain.

The coroner, Dr. Marianne Eserman, determined that the cause of the victim's death was multiple blunt force injuries, and based on law enforcement reports, the manner of death was homicide.  Louisiana State Police obtained two arrest warrants for defendant: one for second degree kidnapping in Orleans Parish and another for second degree murder in Jefferson Parish. Defendant turned himself in to the police in Shreveport, and he was escorted to Orleans Parish.[21]

*A.    Because Adam Littleton's Murder Conviction Was Not a Unanimous Verdict, the Louisiana Court of Appeals Vacated and Remanded It.*[22]

In April 2020, the United States Supreme Court ruled that state criminal jury verdicts for serious offenses must be unanimous.[23]  In light of that decision,

---

[21]  *State v. Littleton*, 285 So.3d 1181, 1188-89 (LA Ct. App. 2019) (conviction reversed by *State v. Littleton*, 306 So.3d 558 (LA Ct. App. 5 Cir. 2020).

[22]  *State v. Littleton*, 306 So.3d 558 (LA Ct. App. 5 Cir. 2020).

[23]  *Ramos v. Louisiana*, ___ U.S. ____, 140 S.Ct. 1390 (2020).

the Louisiana Court of Appeals remanded Littleton's conviction in October 2020. The case currently awaits a new trial date before a Louisiana trial court.[24]

B.     *Conflicting Facts Regarding the Relationship Between Adam Littleton and Jasilas Wright.*

At his trial, the State of Louisiana alleged that Littleton was Ms. Wright's pimp.[25]  From that allegation, the State of Louisiana also alleged that Littleton kidnapped Ms. Wright and was taking her back to Texas to work further as a prostitute.[26]  The Orleans Parish District Attorney, however, declined to charge Littleton with kidnapping.[27]  According to the State of Louisiana, Ms. Wright jumped out of the car, while they travelled westbound on Interstate 10, rather than continue to Texas with Littleton.[28]

---

[24]  The current docket from the Littleton prosecution is attached to this Motion as Exhibit 4.

[25]  *Littleton*, 285 So.3d at 1190.

[26]  *Id.* at 1195.

[27]  Ken Daley, "Orleans Prosecutor Refuses Kidnapping Case in Jasilas Wright's I-10 Death," NOLA.com (online version of New Orleans Times Picayune), August 12, 2015, available at https://www.nola.com/news/crime_police/article_ecf45df9-eb36-5ed5-9eb2-18db329ca388.html (last visited August 29, 2021).

[28]  *Id.*

On information and belief, Littleton's defense was that he and Ms. Wright were dating and he was neither trafficking her nor kidnapping her.  Without that kidnapping felony, Littleton cannot be guilty of felony murder.

The spit verdict at trial shows that the State of Louisiana's case was not a slam dunk.

*C.      It is not Clear What Evidence the Government Will Use to Show that Backpage Was in Any Way Involved in Ms. Wright's Death.*

At some point Littleton likely will be retried.  A second jury will have to determine what happened in Littleton's car that night.

What is clear is that Backpage was in no way involved in Ms. Wright's death.  Backpage did not introduce Littleton to Ms. Wright.  Backpage did not encourage their relationship, whatever that may have been.  Backpage did not make it in any way easier for Littleton and Ms. Wright to travel from New Orleans to Dallas.  Backpage did not force Ms. Wright into Littleton's car.  Backpage did not get into an argument with Ms. Wright.  Backpage did not either stop on I-10 to let her out of the car or prompt her to jump out of the car.

**III.      Other Third Party Crimes Witnesses on the Government's Witness List.**

The MacMartin and Wright cases are not isolated instances that could be chalked up to the Government overlooking them on its current witness list.  The Defendants point to the following witnesses, with brief summaries:

Yvonne Ambrose (Government Witness 4) is the mother of Desiree Robinson. Desiree Robinson was murdered by a prostitution john in 2016. Carrie Landau (Government Witness 43) investigated Ms. Robinson's murder. The Defendants can find no link in the Superseding Indictment or the Government's disclosure that connects any Backpage ad to Ms. Robinson's murder.

Destinee Ortiz (Government Witness 58 and "Victim 5" in the Superseding Indictment) is associated with the ad listed in Count 2 of the Superseding Indictment. The Government lists Brian Griffen (Government Witness 35) on its witness list, but he did not investigate the posting of the ad in Count 2. Rather, according to the Government's disclosures, Griffen only would testify about his investigation of a cab driver, who was charged with statutory rape of Ms. Ortiz and another girl, who was staying in a hotel with the cab driver. Griffen even stated in his correspondence to the Government's case agents, "the case really didn't have a ton to do with Backpage. In fact next to the motel where they were staying is an adult video store." While the Government may be able to call Ortiz to testify about the ad in Count 2 in the indictment attributed to her, the rest of this evidence is wholly unrelated to the Defendants' conduct.

Andrea Benson (Government Witness 8) is expected to testify about the abuse she sustained from her pimp. None of her testimony relates to any ad posted on Backpage.

Megan Lundstrom (Government Witness 47) is expected to testify about the abuse she sustained from her pimp. The Government also may seek testimony from her regarding a friend of hers, who also was a prostitute, who was killed by a pimp in Wyoming. None of this testimony relates to any ad posted on Backpage.

Jordan Thurman (Government Witness 76) is expected to testify about her work as a prostitute starting when she was sixteen-years-old. She may testify about being robbed at gunpoint and/or about being one of four people working for a pimp. None of this testimony relates to any ad posted on Backpage.

Chris Garcia (Government Witness 29) is the father of decedent Alexus Garcia.  Colleen Shinn (Government Witness 71), retired Dallas PD who investigated murder case in 2015.

Christina Harrison (Government Witness 38), is the mother of decedent Cynthia Worthy.  Arshana Sanders (Government Witness 67), is the half-sister of Ms. Worthy.   Detrick Mott (Government Witness 54), works for the Detroit Police Department who investigated the Ms. Worthy's murder in August 2015.

In addition to the MacMartin and Wright prosecutions, these eight examples bring us to nineteen witnesses on the Government's list who either should be entirely precluded from testimony or severely curtailed in their testimony to focus only on the specific facts set forth in the counts of the Superseding Indictment.

The following witnesses also appear related only to instances of third-party crimes that do not involve advertising on Backpage:

Government Witness 5   Beck, Anya
Government Witness 6   Beck, Sara
Government Witness 13  Cervantes, Astrid
Government Witness 14  Cervantes, Savannah
Government Witness 19  Fasset, Byron
Government Witness 22  Figueroa, Naomi
Government Witness 23  Frazier, Shaniqua
Government Witness 24  Fritzke, Derek
Government Witness 26  Gallagher, Mike
Government Witness 27  Gallegos, Penelope
Government Witness 28  Gaughan, Daniel
Government Witness 30  Gavin, Donna
Government Witness 32  Gotjen, Deidre
Government Witness 36  Guyer, William
Government Witness 43  Landau, Carrie
Government Witness 45  Leary, Brehanna

Government Witness 55  Murray, Eric
Government Witness 63   Pride, Kubiiki
Government Witness 65   Rosseland, Jamie
Government Witness 66  Russo, Michael
Government Witness 72  Smillie, Ella
Government Witness 73  Svendgard, Jessika
Government Witness 74   Svendgard, Nacole
Government Witness 77  Toleston, Chanel
Government Witness 78  Umperowicz, Thomas

**ARGUMENT**

This Court properly found in its prior orders that evidence surrounding homicides such as these are wholly inappropriate in this trial.

Only the most pedestrian view of the MacMartin and Wright homicides could prompt even speculation that they are relevant to any of the charges in this case.  Both of these cases are textbook examples of irrelevant evidence. Superseding Indictment charges the Defendants with promoting prostitution and money laundering.  None of the Defendants, individually, are implicated in either of these homicides.

Evidence surrounding any third party crime creates considerable confusing diversions for the jury.  Will they be asked to determine if any of the Defendants contributed to either of these women's deaths?  As to just the Mac Martin and Wright homicides, the seven witnesses pertaining to both of these homicides will take three to four days of trial testimony – to what end?

As to the two Backpage advertisements pertaining to Ms. Wright that comprise Counts Nineteen and Twenty of the Superseding Indictment, the Government can attempt to prove-up those Counts without delving into the facts of Ms. Wright's death.  Any mention of her death and the following prosecution of Adam Littleton, however, will cause a mistrial.

**More than half** of the Government's listed witnesses have nothing to do with the posting of the ads at issue in the indictment.  Yet, the Government demands of this Court, our jurors, the Defendants, and legion other interested people twelve weeks to put on irrelevant, cumulative, and incendiary evidence.

If the Court is uncomfortable precluding the testimony of all of the above witnesses before the trial begins, then the Defense would ask the Court to do two things.  First, preclude the Government from mentioning any of these third party crimes in its opening statement.  Second, require to Government to proffer, outside of the presence of the jury, what, exactly, it intends to elicit with each witness' testimony.

## CONCLUSION

For the foregoing reasons, the Defendants ask this Court to preclude evidence of the deaths of Crystal MacMartin and Jasilas Wright.

RESPECTFULLY SUBMITTED this 31st day of August, 2021.

_s/Joy Bertrand_
_Joy Bertrand_

Attorney for Defendant Vaught

DATED:  August 31, 2021          Respectfully submitted,

                                 Thomas H. Bienert Jr.
                                 Whitney Z. Bernstein
                                 Bienert | Katzman PC

                                 By:     /s/ Thomas H. Bienert, Jr.
                                 _____
                                         Thomas H. Bienert Jr.
                                 Attorneys for Defendant James Larkin


DATED:  August 31, 2021          Gary S. Lincenberg
                                 Ariel A. Neuman
                                 Gopi K. Panchapakesan
                                 Bird, Marella, Boxer, Wolpert, Nessim,
                                 Drooks, Lincenberg & Rhow, P.C.

                                 By:     /s/ Gary S. Lincenberg
                                 _____
                                         Gary S. Lincenberg
                                 Attorneys for Defendant John Brunst


DATED:  August 31, 2021          Paul J. Cambria
                                 Erin McCampbell
                                 Lipsitz Green Scime Cambria LLP

                                 By:     /s/ Paul J. Cambria
                                 _____
                                         Paul J. Cambria
                                 Attorneys for Defendant Michael Lacey


DATED:  August 31, 2021          Feder Law Office, P.A.

                                 By:     /s/ Bruce S. Feder
                                 _____
                                         Bruce S. Feder
                                 Attorney for Defendant Scott Spear

DATED:  August 31, 2021          The Law Office of David Eisenberg, PLC

                                 By:    /s/ David Eisenberg
                                         David Eisenberg
                                Attorney for Defendant Andrew Padilla

## CERTIFICATE OF SERVICE

On August 31, 2021, I, Joy Bertrand, attorney for the Defendant, filed the foregoing with the Arizona District Court's electronic filing system.  Based on my training and experience with electronic filing in the federal courts, it is my understanding that a copy of this pleading will be electronically served upon opposing counsel and co-defendants' counsel, upon its submission to the Court.

Respectfully submitted this 31st day of August, 2021.


s/Joy Bertrand
Joy Bertrand
Attorney for Defendant