UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

———————————————

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-18-0422-PHX-SMB |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 3, 2021 |
| Michael Lacey, | ) | 9:10 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |

———————————————————————

BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - DAY 3 - A.M. SESSION

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                      A P P E A R A N C E S

 2    For the Government:

 3                 U.S. Attorney's Office
                   By: PETER SHAWN KOZINETS, ESQ.
 4                     KEVIN M. RAPP, ESQ.
                       MARGARET WU PERLMETER, ESQ.
 5                     ANDREW C. STONE, ESQ.
                   40 North Central Avenue, Suite 1200
 6                 Phoenix, AZ  85004

 7                 U.S. Department of Justice
                   By: REGINALD E. JONES
 8                 1400 New York Avenue NW, Suite 600
                   Washington, DC  20530

 9

10    For the Defendant Lacey:

11                 Lipsitz Green Scime Cambria
                   By: PAUL JOHN CAMBRIA, JR., ESQ.
12                     ERIN E. MCCAMPBELL PARIS, ESQ.
                   42 Delaware Avenue, Suite 120
13                 Buffalo, NY  14202

14    For the Defendant Larkin:

15                 Bienert Katzman
                   By: THOMAS HENRY BIENERT, JR., ESQ.
16                     WHITNEY Z. BERNSTEIN, ESQ.
                   903 Calle Amanecer, Suite 350
17                 San Clemente, CA  92673

18    For the Defendant Spear:

19                 Feder Law Office
                   By: BRUCE S. FEDER, ESQ.
20                 2930 East Camelback Road, Suite 160
                   Phoenix, AZ  85016
21
      For the Defendant Brunst:
22
                   Bird Marella Boxer Wolpert Nessim Drooks
23                 Lincenberg & Rhow
                   By: GOPI K. PANCHAPAKESAN, ESQ.
24                     GARY S. LINCENBERG, ESQ.
                   1875 Century Park E, Suite 2300
25                 Los Angeles, CA  90067
```

UNITED STATES DISTRICT COURT

For the Defendant Padilla:

                DAVID EISENBERG, PLC
                By: DAVID S. EISENBERG, ESQ.
                3550 North Central Avenue, Suite 1155
                Phoenix, AZ  85012

For the Defendant Vaught:

                JOY BERTRAND ESQ, LLC
                By: JOY MALBY BERTRAND, ESQ.
                P.O. Box 2734
                Scottsdale, AZ  85252

1

INDEX

2

SUMMARY OF COURT PROCEEDINGS                                    PAGE:

3        Proceedings Outside Presence of Prospective Jury Panel    5
         Proceedings Outside the Presence of the Jury            25
4        Preliminary Jury Instructions                           46

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1          (Proceedings outside presence of prospective jury panel:)

2              THE COURT:  We are on the record outside the presence

3     of the jury panel.

4              So I was told that juror 18 wants to talk to us, and

5     juror 33 is downstairs crying because he or she doesn't want to

6     be here.

7              So I'm going to call juror 33 up here and find out

8     what the issue is.  We haven't sworn in the jury, so we have

9     some options that would otherwise not be available.

10             And 33 would be on the jury if she can explain why she

11    can't be here.  So if juror 33 has to be excused, I can think

12    of two ways to solve the problem.  One, she becomes our first

13    alternate, or, two, we redo the strikes with less strikes

14    because we don't have as many jurors.  So think about the

15    options while we talk to her.

16             MS. PERLMETER:  Your Honor, if I may, Peggy Perlmeter

17    for the United States.

18             At some point, if we get to that point, the government

19    would like to make a record about something that happened this

20    morning that we think the Court should know about before we

21    make a decision, how we need to redo strikes, if we need to,

22    unless you would like me to do it now.

23             THE COURT:  What is the issue?

24             MS. PERLMETER:  Well, this morning the United States

25    handed its final list of peremptories to the court reporter or

1     to --

2            MR. LINCENBERG:  Would you please speak into the

3     microphone.

4            MS. PERLMETER:  This morning, prior to the start of

5     court, the United States handed its final list of peremptory

6     strikes to your courtroom deputy.  She added it to her master

7     list.  Then the master list inadvertently was passed over to

8     the defense, and Ms. Bernstein did take it over to the side of

9     the defense courtroom near the pocket doors on the far side

10    from the government's table.  We observed her going over there

11    to meet with her jury consultant.  Mr. Lincenberg went over

12    there at one point.

13           Shortly after, it was discovered that the master list

14    did have the government's strikes on there, so it was removed

15    from the defense.  But just to be safe, we would just like to

16    make sure and have the defendants avow, one, they did not see

17    any of the government's strikes, and, two, if they did, that

18    they did not rely on any of that information to exercise their

19    strikes, because what happened and what gives the government

20    concern is that the defense spent about ten minutes going --

21    putting together their final list before turning it into the

22    courtroom deputy at about 8:40 this morning.

23           THE COURT:  And there are no overlaps.  Ms. Bernstein?

24           MS. BERNSTEIN:  I'm, first of all, happy to complete

25    the record, because Ms. Perlmeter left out quite a bit.  When

1    it was handed to me by the courtroom deputy, we asked when we

2    came in -- and the government knows this because we were all in

3    the courtroom -- we said:  Do we get a clean list?  Is there a

4    clean list?  May we have a clean list?

5            When we were given the master list, the government

6    said:  Our strikes are on there.

7            I said:  Shouldn't we have a clean list?

8            We were told to use this.

9            And I looked at them, and I said okay.  So they know

10   that I knew that I wasn't supposed to have that list, and we

11   were trying to work that out.

12           I can avow that we did not change anything.  I mean, I

13   don't think I have an obligation to show the Court, but I can

14   show the Court what our strike list was coming into today, and

15   they match what our strike list is on the sheet.

16           THE COURT:  Okay.  Well, I needed you to avow to that.

17   Do you have any other questions?

18           MS. PERLMETER:  No.  That's all.  We just want to make

19   sure the process is fair and if they're going to avow, all of

20   the defense attorneys, that they did not see the government

21   strikes, and if they did, they did not rely on that information

22   before submitting their final list to the courtroom deputy.

23           MS. BERNSTEIN:  Your Honor, again I'm the only person

24   who had the list.  I just avowed to that.  I can show you our

25   list from before, though I don't believe that calls for that.

1    And I would just ask that if the government's making a record,

2    that it be complete, because it was noticeably absent of some

3    facts I think Your Honor should have known.

4            THE COURT:  Elaine, can you get juror 33.

5            MR. BIENERT:  Your Honor, I have a short matter

6    involving family members.

7            THE CLERK:  Can you get to a microphone.

8            THE COURT:  Can you -- Yeah.

9            MR. BIENERT:  Just very quickly, my client has six

10   children.  They're all adults.  They're flying in.  They're

11   coming over just for his opening.  I know there's tight space

12   upstairs, and they're worried about spacing.  They're all of

13   course a family and vaccinated.

14           We have four people over here that are coming down --

15   certainly I am and my paralegal -- for opening.  I was hoping

16   they could come to this side and stand there for the opening

17   and see it.  But I know you all have a -- and these guys are

18   doing a good job of making sure we follow the rules -- there's

19   a limit of 20 people.  And given that they're a family in a

20   clump, I'm hoping that it would be okay if his family members

21   for opening were standing up there where we would normally be.

22           THE COURT:  Oh, because you're saying there's only

23   four dots?

24           MR. BIENERT:  Yes.  And also they're only letting 20

25   people up for distancing.  And if we have 20 people and they're

1    on their way here, if 20 people show up -- I think there are

2    about 12 or 13 now -- there's no room in the inn type of thing.

3    And I was hoping that for the family members they can just be

4    up in sort of our section.

5            THE COURT:  Well, they can be up there.  It looks like

6    there's a couple extra spots.  So you just need to get a body

7    up there to save a spot.

8            MR. BIENERT:  Can they lay out, you know, and take

9    more space just like my kids would do?  I guess the big

10   question is is it okay if they're not all on dots since they're

11   a family, and maybe they occupy three dots for six people

12   instead of three people?

13           THE COURT:  Well, actually I'm uncomfortable with

14   that.  I know what you said.  I get it.  But I'm making

15   everybody sit in spots even though you all work together every

16   day.  And they can still be next to each other.  I mean, we can

17   ask people to move so they can all six be in a row.

18           MR. BIENERT:  Okay.  All right, Your Honor.  That's

19   all I have.  Thank you.

20           THE COURT:  Thank you.

21      (Panelist 33 entered the courtroom.)

22           THE CLERK:  Come in and stand right here for me, and

23   I'll grab you a microphone.

24           THE COURT:  For the record, you're juror 33?

25           PANELIST 33:  Yes.

1          THE COURT:  Okay.  And I understand there's something

2     you wanted to tell us?

3          PANELIST 33:  Yes.  When we were in the court, the

4     prosecutor mentioned some things that I don't think I could be

5     impartial.

6          THE COURT:  Okay.

7          PANELIST 33:  And I do not want to be here.

8          THE COURT:  Well, so what happened between when you

9     were in here and now?

10          PANELIST 33:  Because she said that there was probably

11     going to people coming to testify that I could not be impartial

12     with.

13          THE COURT:  Okay.  I need --

14          PANELIST 33:  Particularly people that are on drugs.

15          THE COURT:  Okay.  And do you have some family history

16     with that?

17          PANELIST 33:  Yes.

18          THE COURT:  Okay.  Does the government have any

19     follow-up questions?

20          MS. PERLMETER:  No, Your Honor.  Thank you.

21          THE COURT:  Ms. Bernstein?

22          MS. BERNSTEIN:  No, Your Honor.  Thank you.

23          THE COURT:  Anyone else?  Mr. Lincenberg?

24          MR. LINCENBERG:  (Shakes head side to side.)

25          THE COURT:  If you just go back down to the jury room,

1    we'll let you know.

2        (Panelist 33 exited the courtroom.  The Court and clerk

3    confer off the record.)

4            MR. LINCENBERG:  Is 18 coming up?

5            THE COURT:  Yes.  Sorry.

6        (Panelist 18 entered the courtroom.)

7            THE COURT:  Okay.  And just state your juror number.

8            PANELIST 18:  Juror 18.

9            THE COURT:  Okay.  And I heard you had wanted -- made

10   a request that you wanted to speak to us.

11           PANELIST 18:  I really don't think --

12       (Reporter interrupts for clarification.)

13           PANELIST 18:  I'm very anxious for the last several

14   days, and last night it was even worse.

15       (Reporter interrupts for clarification.)

16           PANELIST 18:  Last night I couldn't sleep.  I've been

17   up since 2:30.  It's not a matter of wanting, like the

18   questions that were asked of me.  I know a lot of people don't

19   want to be here.  It's not that.  I just feel incredibly

20   anxious about this whole situation.  And I don't know if I

21   would be able to do this every day for 50 days.

22           THE COURT:  And have you had anxiety issues before, or

23   this is something new?

24           PANELIST 18:  Normally, no.  The only time I felt this

25   anxious was when I battled cancer.  And I'm feeling bad again,

```
 1   and I don't know why.  I don't know if it's the content or just

 2   the situation.  But normally, no, I'm not an anxious person,

 3   and I'm very a very professional person.  But for some reason

 4   this is really getting to me.

 5            THE COURT:  Okay.  Does the government have any

 6   questions?

 7            MS. PERLMETER:  No, Your Honor.  Thank you.

 8            THE COURT:  Any of the defense?

 9            MS. BERNSTEIN:  No, Your Honor.

10            MR. LINCENBERG:  Well, can we have a side bar?

11            THE COURT:  Sure.  You can have a seat.

12       (Bench conference on the record as follows:)

13            MR. LINCENBERG:  Is it the Court's position that this

14   juror should be dismissed for cause -- for hardship?

15            THE COURT:  Yes.

16            MR. LINCENBERG:  I don't disagree.

17            THE COURT:  She can't --

18            MR. LINCENBERG:  I don't disagree.  I just wanted to

19   check, because we do think that because this juror's being

20   dismissed for cause, we should have another strike.  We used a

21   strike, your peremptory, which were --

22            THE COURT:  Okay.  Well, we can talk about that on the

23   record without her.

24            MR. LINCENBERG:  Okay.  I just wanted to make sure.

25   Thank you, Your Honor.
```

```
 1              THE COURT:  Okay.

 2         (End of bench conference.)

 3              THE COURT:  Okay.  Juror 18, if you'd just go back

 4    downstairs, we'll let you know.

 5         (Panelist 18 exited the courtroom.)

 6              THE COURT:  Okay.  So we are outside the presence of

 7    the jurors.  Juror 33, for the record, she was visibly upset.

 8    I couldn't tell whether she was actually crying, but she was --

 9    her voice was shaky and was visibly upset.  So I believe she

10    needs to be struck for cause.  Is there any objection from the

11    government?

12              MS. PERLMETER:  No, Your Honor.

13              THE COURT:  From the defense?

14              MR. LINCENBERG:  No, Your Honor.

15              MS. BERNSTEIN:  No, Your Honor.

16              THE COURT:  And the same goes for juror 18.  She

17    wasn't quite as emotional, but she was -- her voice was shaky.

18    She was clearly distraught.  So I don't believe she was faking

19    it.  So I would strike her for cause as well.

20              Any objection from the government?

21              MS. PERLMETER:  No.

22              MR. LINCENBERG:  No, Your Honor.

23              THE COURT:  Okay.  So that means we're two down.  And

24    we do have to, because one of those was still on the list, we

25    would have to reshuffle the list.  So I guess we do have to
```

1    start over, because I don't know any other -- Well, unless we

2    just go to 16 jurors.  So, Mr. Lincenberg.

3            MR. LINCENBERG:  Well, I think we do need to restart

4    the process.

5            THE COURT:  Let's see.  And what's the government's

6    position?

7            MS. PERLMETER:  Your Honor, could the members of the

8    government confer for a couple of minutes?

9            THE COURT:  Sure.  And for both sides, I just sort of

10   did the math.  So if we restart, there's going to be 17 strikes

11   on the defense, 9 on the government.  If we just lose her, we

12   have 16.

13           MR. LINCENBERG:  Right.  And so our request is that we

14   get the 18 strikes.  I would also note for the record, as the

15   Court's considering these numbers -- and this is just my

16   memory, although I conferred with defense counsel, so forgive

17   me if I'm incorrect -- but when the Court ruled on the request

18   for additional strikes, our memory was that the Court made it

19   18 and 9.  When we came into court the other day, the Court

20   said it was going to be 18 and 10.

21           And I double checked with folks to see if I was wrong,

22   and they recall it being 18 and 9.  Now, the Court makes its

23   ruling, so if the Court changed it to 18 and 10 --

24           THE COURT:  Well, it was 15 and 9.  When I decided to

25   give you guys three extra, I decided to give them one.  So if I

1    misspoke, it was simply a misstatement.

2        MR. LINCENBERG:  And the Court has the discretion to

3    make it 18 and 10.  We're not -- I'm just raising it because

4    we're getting into these numbers.  And when we talk about the

5    number of alternates, obviously we don't know how this is going

6    to play out, who sort of had the level of anxiety or courage to

7    speak up now, or how this is going to play out.  But I just

8    concluded a six-week trial.

9        THE COURT:  Where?

10       MR. LINCENBERG:  In Santa Monica state court.  It was

11   estimated at four weeks.  We literally did closings Monday.

12   Mr. Neuman gave the closing because I had to start coming out

13   here.  And we had a pretty good jury.  I think we ended up --

14   The judge had seven alternates for this what was estimated at a

15   four- to five-week trial.  We ended up, I think, losing three,

16   three or four in this -- in what was a shortened time frame.

17       And obviously we have a lengthier time frame.  None of

18   us know, you know, where things are going with COVID one way or

19   the other and the anxiety level.  But I do think it hearkens in

20   favor of having a greater number of alternates here.

21       Now, I don't want to argue away, you know, having 18

22   strikes.  We exercised our strikes before there was sort of a

23   final cause determination, and we would like to get that strike

24   back.

25       THE COURT:  Okay.  I understand.  I'd like to give it

1    to you, but we don't even have that many jurors.

2              MR. LINCENBERG:  Well, but it's in part why I just

3    raised in terms of the number of government strikes.  It may

4    have -- Obviously it may have been a miscommunication.  I can

5    understand how the Court would have given the government an

6    additional one.  It's just what we remembered from it.

7              THE COURT:  Has the government finished conferring?

8              MS. PERLMETER:  Your Honor, we would prefer to keep

9    the number of alternates high at five instead of losing an

10   alternate, and we would propose that we proceed with one less

11   juror on each side.  So 9 for the government, 10 for the -- 17

12   for the defense.

13             THE COURT:  Okay.

14             MR. LINCENBERG:  Well, I mean, if there's an

15   alternative between four or five alternates, I think, I mean,

16   versus losing a strike, we'd like the strike.  So I think we

17   need five alternates, but I don't think the solution to that

18   should be to take away one of our strikes.

19             THE COURT:  Well, you can't -- we don't have enough

20   jurors.

21             MR. LINCENBERG:  Well, the solution in that regard

22   would be to redo it with the government having nine

23   peremptories instead of ten.

24             THE COURT:  Okay.  Yeah.  I understand that.  But both

25   sides are entitled to peremptories.  Both sides are entitled to

| | |
|---|---|
| 1 | a fair trial.  And the fairest resolution is that you both lose |
| 2 | one. |
| 3 | I understand you want 18, but we either lose an |
| 4 | alternate, or both sides lose a strike.  And the numbers work |
| 5 | out that way. |
| 6 | MS. BERNSTEIN:  Your Honor, I would just note that, |
| 7 | you know, though we have been trying to be cohesive to |
| 8 | accelerate this process, we are six very differently situated |
| 9 | defendants.  And the Court recognized that in giving each |
| 10 | defendant three strikes, because we do have different voices, |
| 11 | we do have different concerns.  So I don't know who gets short |
| 12 | changed one of the strikes if we're only down to 17, and I |
| 13 | certainly don't want it to be my client. |
| 14 | THE COURT:  Well, I could take it down to 12 and give |
| 15 | the government -- Well, actually 13 is under the rules.  So I |
| 16 | could take it back down to 13, but you're still then one person |
| 17 | gets an extra one if you're trying to divide them evenly.  So |
| 18 | even under the rules, you guys don't get an even number. |
| 19 | MS. BERNSTEIN:  I think the situation we're in is we |
| 20 | need to figure out how to make this work with the numbers that |
| 21 | we have, just noting that everything we've done over the past |
| 22 | couple of days has been with each defendant understanding that |
| 23 | they have three strikes to exercise.  So I don't know how we |
| 24 | decide who loses one. |
| 25 | MR. LINCENBERG:  I mean, obviously the Court has a lot |

| | |
|---|---|
| 1 | of discretion here.  We don't have a big legal leg to stand on |
| 2 | in this regard.  I just think that, you know, if it's 18 and 9, |
| 3 | it's two to one versus two to one and one-ninth.  And I do |
| 4 | think that's a fair solution.  We exercised our strikes.  I |
| 5 | mean, your know, where the Court is at, is the Court saying, |
| 6 | well, I don't want to lose the extra alternate; we have nobody |
| 7 | else available; so it just ends up being tough luck for you |
| 8 | guys on the defense the way it has worked out.  And so we're |
| 9 | arguing that -- |
| 10 | THE COURT:  Well, they're getting one less strike too. |
| 11 | MR. LINCENBERG:  Well, but the government can make a |
| 12 | record on that, but it seems to me that the fair solution, |
| 13 | since the Court gave us 18 strikes on the defense, is to still |
| 14 | give us 18 strikes after the -- |
| 15 | (Reporter interrupts for clarification.) |
| 16 | MR. LINCENBERG:  -- after the hardships. |
| 17 | THE COURT:  Doesn't that mean they get 8, so they lose |
| 18 | two strikes, and you don't lose any? |
| 19 | MR. LINCENBERG:  I'm confused.  They right now had ten |
| 20 | strikes, and all ten of their strikes were strikes that were |
| 21 | exercised, and those folks are now not being on the jury, |
| 22 | right? |
| 23 | THE COURT:  We're going back to a clean slate of 43. |
| 24 | Now there's only 43 jurors on the list.  So 43 minus the 17 |
| 25 | that we need is 26.  If I give you 18, they get 8, so they lose |

```
1    2 strikes.  You don't lose any.  And on balance the --

2              MR. LINCENBERG:  So it's down to 43, not 44?

3              THE COURT:  Yes, 43.  So, Elaine, do you have a clean

4    list?

5              THE CLERK:  Yes.  I need to make a copy.  I need to

6    make a copy.

7              THE COURT:  Let me ask you this.  For the record, do

8    you want me to have this list filed, the one that was before

9    these people got struck?

10             MR. LINCENBERG:  Yes.

11             MS. BERNSTEIN:  Sure, Your Honor.  Thank you.  And if

12   the master list, the clean master list that the sides receive

13   right now, if that can indicate who's left, because I just have

14   a number discrepancy.  So it would be helpful if we could just

15   get the list from you guys so we know who is left.

16             THE COURT:  I'm not sure what you mean.

17             MS. BERNSTEIN:  I don't see 43 remaining jurors, so I

18   must have miscounted somewhere.  But we were previously given

19   the entire venire.  So when it can be provided to us, if

20   everyone who is no longer available can be taken out, that

21   would just help to reconcile these lists.

22        (The Court and clerk confer off the record.)

23             THE COURT:  We're on recess.

24        (Proceedings recessed from 9:34 a.m. until 9:56 a.m.)

25             THE COURT:  So sorry that took so long.  I wanted to
```

1    make sure everything got transferred correctly.  And in doing

2    that, we were coming up with a different number because I was

3    working off a list that didn't include a no-show, so that's why

4    your list is different.

5             So there is 44, but I'm still keeping the numbers the

6    way they are at 17 and 9.  But I just wanted to let you know

7    that I figured out why your number is different than mine.

8             MR. LINCENBERG:  Your Honor, just for the record, it

9    ended up being 17 and 10, correct?

10            THE COURT:  17 and 9.

11            MR. LINCENBERG:  Well, didn't the government exercise

12   10 peremptories?

13            THE COURT:  Their first time around, yes.

14            MR. LINCENBERG:  Oh, so now I see we're going to redo

15   it at 17 and 9?

16            THE COURT:  Correct.

17            MR. LINCENBERG:  Okay.  Thank you, Your Honor.

18      (Proceedings recessed from 9:58 a.m. until 10:28 a.m.)

19            THE CLERK:  Can I turn the sound on now?

20            THE COURT:  Yeah.  Well, no.  I'm sorry.  Don't.

21   Because I need to ask them.  So it's muted?

22            THE CLERK:  For the jurors, yes.

23            THE COURT:  Okay.  Are there any Batson challenges

24   from the prosecution?

25            MS. PERLMETER:  We don't know who's left.

1          MR. RAPP:  Don't know.

2          THE COURT:  Elaine, can you give the prosecution the

3     defense list and the defense the prosecution list?

4          THE CLERK:  Give the defense the prosecution's list?

5          THE COURT:  Yeah, so they can see what the prosecution

6     struck, and the government can see what the defense struck.

7          Can I have the master list?

8          THE CLERK:  Yes.

9       (The Court and clerk confer off the record.)

10         THE COURT:  Okay.  Everybody seems to have settled

11    down.  Does the government have any motions?

12         MS. PERLMETER:  No, Your Honor.

13         THE COURT:  No?

14         MS. PERLMETER:  We have no Batson challenges either.

15         THE COURT:  Okay.  Then we'll seat the jury, swear

16    them in, and then we'll take a break.

17         MR. LINCENBERG:  I was looking to confirm with the

18    government -- they needed a minute -- just so that we have an

19    agreement.

20         MS. BERNSTEIN:  I confirmed with Agent Tolhurst.

21         MS. PERLMETER:  But our lists don't match up, so let

22    me confirm.

23         MR. LINCENBERG:  The government is trying to reach a

24    settlement agreement with itself.

25       (The Court and clerk confer off the record.)

1          MR. LINCENBERG:  Would it be helpful for us to state

2   publicly so we're all in agreement?  I think that --

3          THE COURT:  What's the issue?

4          MR. LINCENBERG:  Just to make sure we know the

5   jurors -- I think we've agreed who the jurors are, just so

6   there's no confusion.

7          THE COURT:  Okay.  I'll read who we have.

8          MR. LINCENBERG:  That would be great.

9          THE COURT:  And if you have a disagreement, we have a

10  problem.

11          Juror one.

12          MR. LINCENBERG:  Yes.

13          THE COURT:  10, 12, 19, 21, 22, 32, 49, 55, 62, 65,

14  67, 68, 84, 88, 93, and 97.

15          MR. LINCENBERG:  Correct.

16          MS. PERLMETER:  That's correct.

17          MR. LINCENBERG:  See, that was all easy.

18          THE COURT:  Good.  Okay.  So instead of having 45

19  people squish in some corner, we're leaving them downstairs,

20  and they're going to come up as we call them.

21          Do you understand?

22          THE CLERK:  Hold on.  Let me turn on the volume out

23  there.

24          THE COURT:  Okay.  We are back on the record with the

25  jury present by video conference.

1        So for the jurors in the jury room, I'm going to call

2    the numbers of the jurors selected to try this case.  If your

3    number is called, please come forward, and Elaine will tell you

4    where to come take a seat in the courtroom.  So come up to the

5    courtroom, and Elaine will direct you to your seat.

6        Juror number one.

7        Juror number 10.

8        Juror number 12.

9        Juror number 19.

10       21.

11       Juror 22.

12       Juror 32.

13       Juror 49.

14       Juror 55.

15       Juror 62.

16       Juror 65.

17       67.

18       68.

19       Juror 84.

20       Juror 88.

21       Juror 93.

22       And juror 97.

23       I'd ask the remaining jurors to wait in the jury

24    room to make sure that we have everybody we need, and then I'll

25    release you but not yet.

1          Elaine, do you want to go to the door.

2          THE CLERK:  After 68, who was -- Who was after 68?

3    I'm sorry.

4          That way I can seat them in the right order.

5      (The Court and clerk confer off the record.  Jurors entered

6    the courtroom.)

7          THE COURT:  For the jurors in the jury room, I want to

8    thank you for your time during this jury selection process, but

9    you're now excused.  Thank you.

10          Okay.  You 17 are our trial jurors, so in a minute I'm

11    going to have Elaine show you the jury room is where you'll go

12    on breaks.  We also have a different room for you for lunch

13    where you could be more spaced out.

14          And she'll talk to you about some of them, and then

15    we're going to take a break, because we've all been working.

16    And then we'll come back in to do preliminary instructions and

17    get started with the case.

18          But before we do that, if you could all stand and

19    raise your right hand to be sworn in as trial jurors.

20      (Trial jurors sworn.)

21          THE COURT:  All right.  And one other little

22    admonishment.  I'm going to read a whole instruction on what

23    you can and cannot do as jurors, but until I read that to you,

24    just remember you can't have any contact with the lawyers or

25    the parties, and they all know that, so if -- even me.  So if

1    any of them pass you in the hallway and just ignore you,

2    they're instructed to.  So they're not being rude.

3            And you also can't talk to any press or even your

4    family about what the case is about.  You can tell your family

5    and employer that you're on a trial and how long it's supposed

6    to last, but that's all you can tell them.  All right.

7            Elaine, can you show them to the back in that little

8    area we have in the back.

9        (The jury exited the courtroom at 10:54 a.m.)

10           THE COURT:  Okay.  The door closed.  So I had e-mailed

11   you guys a corrected draft of the preliminary instructions.  It

12   on purpose doesn't include a First Amendment instruction.  I

13   did receive, Mr. Cambria, your additional filing for specific

14   instructions for preliminary.  I have done the research,

15   considered the arguments that were previously presented, the

16   new information you presented, and have declined to include

17   that in the preliminary jury instructions.

18           So other than that, does the government have any

19   typos, corrections, additions?

20           MS. PERLMETER:  No, Your Honor, no.

21           THE COURT:  Okay.  Ms. Bernstein.

22           MS. BERNSTEIN:  Your Honor, I don't believe that we do

23   either, although my computer just dropped that document.  But I

24   don't believe that we do either.  I don't know if Mr. Cambria

25   was intending to make a record about the First Amendment.

1          THE COURT:  The record has been made.

2          Does anybody else -- Mr. Eisenberg?

3          MR. EISENBERG:  No, Your Honor.

4          THE COURT:  Mr. Feder?

5          MR. FEDER:  I'm sorry --

6      (Reporter interrupts for clarification.)

7          THE COURT:  I can't hear you.

8          MR. FEDER:  I don't know that I received it.  When was

9   it sent?

10          THE COURT:  So it was after the 20th.

11          MR. FEDER:  I'm sorry.  Last month?

12          THE COURT:  In August.

13          MR. FEDER:  Yeah.

14          THE COURT:  So it was after we talked about the jury

15   instructions.  Then I made the corrections we talked about,

16   researched the First Amendment issue, and then sent a corrected

17   draft.

18          MR. FEDER:  Okay.  Thank you.

19          THE COURT:  So let me just pull it up so that I can

20   make sure you got it.

21          MR. FEDER:  I thought you meant something more recent.

22          THE COURT:  No.  It was at least a week ago, I think.

23          MR. FEDER:  Okay.  All right.  No.  I saw that.

24          THE COURT:  Mr. Lincenberg.

25          MR. LINCENBERG:  Nothing further, Your Honor.

1          THE COURT:  Ms. Vaught.

2          MS. BERTRAND:  No.

3          THE COURT:  Okay.

4          MS. BERNSTEIN:  Your Honor, if you can just indulge me

5   for one minute so that I can complete the record on behalf of

6   my client --

7          THE COURT:  Okay.

8          MS. BERNSTEIN:  -- as to the First Amendment.  I just

9   want to note that the First -- the presumption of protection

10  under the First Amendment applies --

11         THE COURT:  Ms. Bernstein, we had this argument on the

12  20th, and there's been additional briefing which the Court has

13  considered.

14         MS. BERNSTEIN:  I was just going to say two more

15  sentences, if that's okay.

16         THE COURT:  Okay.

17         MS. BERNSTEIN:  That the presumption of protection

18  under the First Amendment is akin to the presumption of

19  innocence.  It cloaks these proceedings unless the government

20  removes it.  So we do think that to not provide it is error.

21  To not provide it assumes the conclusion that the government

22  has been trying to establish and that we are here to litigate.

23  Thank you.

24         THE COURT:  Okay.  And if you could -- Yes.

25         MR. BIENERT:  I had something I wanted to raise before

1    openings.  I don't know if you want to do that now or later.

2         THE COURT:  Well, so you -- I need to get copies of

3    these because I didn't make copies until I know there's

4    objections.  So we're going to have a break.  Does the

5    government know how long your opening is going to be?

6         MR. JONES:  Approximately 100 minutes, Your Honor.

7         THE COURT:  Okay.  So we may take lunch early so that

8    I don't have to interrupt them.  But I do want to read the

9    instructions before lunch so the jurors have the admonitions.

10   So, yes, why don't you tell me what you want to say before the

11   openings.

12        MR. BIENERT:  Mr. Jones and I two days ago exchanged

13   our slides and stuff, so we, I think, we both did a good job of

14   that in talking back and forth.  My concern is that, looking at

15   his slides -- and I conveyed this to him yesterday morning --

16   as well as seeing who the first witness that the government is

17   calling or I think the second or third, but a lady who is a

18   child trafficking expert, the first slide that the government

19   looks like they're using is a purported underage victim's mom,

20   and the last slide they're using in opening is an underage

21   victim's mom.  I don't know what he's going to say.  Those are

22   just the slides.

23        When I coupled that with their early witness, who is a

24   child trafficking expert, it appears to me that the government

25   really is going to try to just say repeatedly that this is a

1    child trafficking case.  Now, as Your Honor knows, there's a
2    federal charge for child trafficking.  It has not been made in
3    this case.
4           And the other thing that I think is abundantly clear
5    now that we've spent two-plus days with jurors is, by my count,
6    probably 60 percent of the time we spent on jurors who might
7    have a substantive issue with this case, it was this issue of
8    trafficking in underage people.
9           And many jurors flat out said, you know, if this is a
10   consenting adult, you know, I can follow the rules, but if
11   we're talking about children or victims who are trafficked, I
12   don't know about that.
13          That's not what's charged here.
14          Obviously if the government has competent evidence to
15   come in and show that our clients, you know, we're doing all
16   the elements of facilitating a prostitution business
17   enterprise, while we're going to challenge that, based on Your
18   Honor's rulings, et cetera, they have a right to do that.  But
19   they don't have a right to turn this into a purported child
20   trafficking case, which is solely based on getting raw emotion,
21   getting the jurors to be blindly or blinded by the concern
22   about children, when that's not what's charged.
23          And I think that it would be so -- I think it's so
24   incendiary.  You know, we always in law school, right, they
25   tell us yelling fire in a crowded theater.  I think yelling

1    children are being trafficked and abused, I think that's as bad

2    as that, if not worst.

3          Your Honor recognized that murders, without some real

4    extreme reason, shouldn't be talked about.  I think abusing

5    children in most people's minds is at the same level.

6          So I wanted to make -- to say I don't believe the

7    government should be able to argue child trafficking.  I don't

8    believe the government should be able to put on a witness who's

9    just going to be some sort of an expert about what trafficking

10   does to children.  If the witness has percipient evidence on

11   this case, sure.  So that's what I wanted to say.  And I wanted

12   to say it before opening because I don't want to be jumping up

13   in his opening if that's what he does.  Thank you, Your Honor.

14         THE COURT:  Okay.  Counsel.

15         MR. JONES:  Reggie Jones on behalf of the

16   United States, Your Honor.  The defendants are again

17   relitigating issues that the Court has already decided in

18   motions in limine.  The Court has already instructed the

19   government on the four areas that its expert can testify to.

20   We're aware of that and intend to abide by the Court's order.

21         As pertains to the child sex trafficking, as Your

22   Honor has indicated, in criminal record 1156, these defendants

23   are charged with -- the government has to prove that the

24   defendants intended to facilitate prostitution.  As the Court

25   noted, the fact that individuals are trafficked on Backpage,

1    both children and adults, and defendant knew it is extremely

2    probative to show notice that they knew the site was being used

3    for illegal activity.

4            So, again, Your Honor, we just want to reiterate that

5    you have already -- we've litigated these issues, and the Court

6    has already issued orders on both of those issues Mr. Bienert

7    just brought up, and the government intends to abide by the

8    orders the Court has issued.

9            THE COURT:  Okay.  These photographs, is it the same

10   person in the first slide and last slide?

11           MR. JONES:  No, Your Honor.  They're two separate

12   individuals.

13           THE COURT:  Okay.  And do these individual have

14   anything to do with this case?

15           MR. JONES:  Yes.  They are both testifying, Your

16   Honor, in the case, so they are relevant.

17           THE COURT:  Okay.  So I understand the defense

18   concern.  We did litigate this in motions in limine with the

19   expert motion and I believe another one.

20           So they aren't prohibited from using the word

21   trafficking, but you do need to be careful that your whole

22   opening is not focused on this idea that that's all that

23   Backpage was about.

24           MR. JONES:  Understood, Your Honor.

25           THE COURT:  Okay.  So I'm aware of the issue.

1          MR. BIENERT:  I'm assuming -- Sorry.

2          So the question is during opening, obviously I'm not

3   going to object if he's referencing it.  Is my objection noted

4   no matter what he says, or if I feel like he's layering on too

5   thick, am I allowed to object during opening?

6          I don't want to stand up in his opening if I don't

7   have to if Your Honor has said I've ruled; move on.

8          THE COURT:  But if you think he's crossing the line, I

9   know maybe you disagree about where the line should be, but,

10  yes, you can object.

11         MR. BIENERT:  Okay.

12         THE COURT:  And I'll be paying attention for that

13  issue.  And if I think he's gone too far, I'll subtly let you

14  know.

15         MR. BIENERT:  All right.  Thank you, Your Honor.

16         THE COURT:  One other thing.  I know who's doing the

17  government's.  Who's starting for the defense?

18         MR. BIENERT:  (Hand raised.)

19         THE COURT:  You.  Also, I've reconsidered your request

20  about the family, so when we, if you can have them together --

21         MR. BIENERT:  It worked out, Your Honor.

22         THE COURT:  Well, so they've done it anyway.

23         MR. BIENERT:  I laid across the floor like Superman.

24         THE COURT:  Okay.  But they're squashed together

25  anyway.

1        MR. BIENERT:  We can spread them out.

2        THE COURT:  No, no, no.  That's okay.  I reconsidered.

3   We've just got to keep it to 20 people up there, so --

4        Also -- I'm sorry -- I keep thinking of logistical

5   things.  How many people are you going to have down here?  Do

6   you guys know?  Like first -- paralegals and things like that?

7        MR. BIENERT:  I'll speak for my --

8        THE COURT:  Because the government's attorneys and

9   your staff get priority down here before other public members,

10  and I want to make sure we save enough seats.

11       MR. BIENERT:  For Mr. Larkin, it will be myself,

12  Ms. Bernstein, obviously our client, and our paralegal,

13  Ms. Thomas, who is up top.

14       THE COURT:  So you need two extra seats?

15       MR. BIENERT:  Right.  And just so Your Honor knows

16  what we did discuss with your staff -- and I didn't know if

17  this -- was that once the jurors and all are set, we discussed

18  that because my paralegal will be handling a lot of exhibits

19  sometimes for other people, if we were to sit at that end where

20  Mr. Feder is, the client and either Ms. Bernstein or I, and

21  then if Ms. Thomas could put a chair right next to that on the

22  outside.

23       THE COURT:  Well, one of those chairs is fine.

24       MR. BIENERT:  Yes, Your Honor, that's what I meant.

25       MR. FEDER:  Similarly, Judge, we had also discussed my

1    having my paralegal sitting at the end in the second row for

2    the same purpose.

3            THE COURT:  Okay.

4            MR. EISENBERG:  Your Honor, I'll have one court

5    person.  She's sitting there now.

6            THE COURT:  Okay.

7            MR. LINCENBERG:  Your Honor, for most of the trial

8    we'll have two attorneys.  There may be occasions with a

9    paralegal, a few occasions with a third attorney.  But

10   generally two.  And we'd also like to be sitting on the end

11   because Mr. Panchapakesan is going to be here with me during

12   the bulk, for almost the entire trial.

13           THE COURT:  Okay.  So really, for today, do you have

14   anyone here?

15           MR. LINCENBERG:  No.

16           THE COURT:  Okay.  That's, I guess, what I needed to

17   know mostly.

18           MS. BERNSTEIN:  Your Honor, there's a total of four

19   people, I believe, for the defense team today that would need

20   to sit on the floor.

21           THE COURT:  Okay.  And for the government, do you have

22   anyone that needs to come down, sit on the floor, for openings?

23           MR. RAPP:  Yes, three.

24           THE COURT:  Three.  Okay.  So I believe there's --

25   There's nine seats in the back and four over here.  So there's

1    four empty spots that we'll leave in the back for public, I

2    guess.  Okay.

3              MR. EISENBERG:  Your Honor, excuse me.  I do have a

4    matter that pertains to the opening statements.

5              THE COURT:  Okay.

6              MR. EISENBERG:  Your Honor, there are three slides

7    that I have -- there may be more -- but three that have the

8    picture of my client that's contained in the slide itself.  The

9    slides are e-mails.

10             The originals of these e-mails don't have my client's

11   picture on them.  It's the same picture that, as far as I can

12   tell, that was used when my client was sworn in at the senate

13   permanent subcommittee on investigations.  I think this is

14   prejudicial to my client.  His picture doesn't appear on the

15   original e-mail.  Everybody sitting in the jury box knows who

16   my client is.  They certainly know who it is by now.

17             There's no need to photograph him and stick him on an

18   e-mail such as the one I'm holding, Your Honor.  I know you

19   perhaps can't see it from there.  I'd be happy to hand them up

20   to you.  And there are three similarly situated.

21             I don't think that's fair at all, and I think it

22   underscores the fact that it's he that sent them.  But his name

23   is on the e-mails from or to Andrew Padilla.

24             So I think it's highly prejudicial, and I think if

25   they want to do the e-mail, that's fine.  I'm not objecting to

1    the e-mail.  I'm just objecting to the fact that his picture is

2    on the e-mail.

3              THE COURT:  Okay.

4              MR. LINCENBERG:  Your Honor, while it's relevant, I

5    have a similar objection to the one that Mr. Eisenberg just

6    raised with regard to Exhibits 173, 178, and 185.  These are

7    e-mails that I would have no objection to them using, but I

8    have objections to them using with the photos.  I don't know if

9    these are license shots or mugshots or whatever that are

10   superimposed on them.

11             We also have objections -- We've met and conferred by

12   e-mail, so the government doesn't agree with our objections.

13             We also have objections to the certain bar charts

14   which are at Exhibit 1481 as well as pie charts at 1480.  These

15   are sort of revenue type bar charts that are completely

16   misleading in the sense of going into things that have nothing

17   to do with the 50 ads charged in the indictment.  They're meant

18   to inflame the jury, so-and-so earned so much money and so

19   forth and so on with regard to overall business and has nothing

20   to do with the 50 ads that are -- or 50 counts charged in this

21   case.

22             THE COURT:  And just to be clear, when you guys are

23   using exhibit numbers, these are exhibits that they are using

24   in their opening.  They're not the actual exhibit.  So the

25   actual exhibit is the e-mail, and they for the opening have

1     added the picture?  Is that --

2           MR. JONES:  No.  Your Honor, we gave them a copy of

3     our PowerPoint slide for opening, and we just included for

4     their reference the exhibit that references the PowerPoint

5     slide that we seek to admit at trial.  It's to help them out in

6     that regard.

7           THE COURT:  And for the PowerPoint you added their

8     picture to the exhibit?

9           MR. JONES:  Correct.  Just to the e-mails and to

10    some of the documents, Your Honor.  As Your Honor is aware,

11    this is a ten-week trial with six defendants.  The government

12    is seeking to admit a hundred -- hundreds of exhibits.  We have

13    the burden to prove each of these defendants guilty beyond a

14    reasonable doubt.  And the government believes that it's very

15    helpful at the outset for the jury to be able to associate

16    various e-mails and documents with respect to defendants.  We

17    don't believe it's prejudicial.

18          In fact, Your Honor, when the defendants, specifically

19    defense counsel for defendant Spear, sent us his original

20    PowerPoint, they included photos of the defendants.  He has

21    since sent us a revised PowerPoint that didn't include those

22    photos.  But it just goes to the point that it's not

23    prejudicial, and it is -- including the photos in e-mails and

24    including photographs of the defendants in opening and closing

25    statements is a practice that has been used in the District of

1    Arizona in several cases, including cases that included

2    Mr. Feder as well as Mr. Eisenberg.

3          MR. LINCENBERG:  Well, we put on the Elmo -- I'm not

4    sure how that gets triggered to the screen -- just an example

5    of one of these.  It's -- They have an exhibit.  It says

6    Exhibit 185, and it's not Exhibit 185 because it has a

7    photograph superimposed on it of my client.

8          MR. JONES:  Well, we won't be showing the exhibit --

9    The jury is not going to see the exhibit numbers.  They added

10   the exhibit numbers to help you be able to associate it with a

11   PowerPoint slide that we're referencing in their opening

12   statement.

13         MR. LINCENBERG:  Great.  I appreciate that.  But that

14   doesn't change the point.

15         THE COURT:  Okay.  Well, your objection is noted, but

16   I don't see any prejudice.  I do think it's helpful to the jury

17   to associate someone with an e-mail, a particular person.

18         MR. JONES:  Thank you, Your Honor.

19         MR. LINCENBERG:  And then we had the objection with

20   regard to the bar charts.

21         THE COURT:  Yeah.  What are the bar charts?

22         Actually, Elaine, do you have that up on the Elmo, or

23   can you put it up?

24         MR. LINCENBERG:  I can put one up.

25         THE COURT:  Can you show me the Elmo.

1          MR. JONES:  Your Honor, the bar charts are the

2   defendants' income from --

3          THE CLERK:  Can you see it?

4          MR. JONES:  -- from Medalist --

5          THE COURT:  Yeah, I see it.

6          MR. JONES:  Oh, sorry.  From Medalist Holding, a

7   parent company of Backpage, for 2013, '14 to '15, which is

8   highly relevant, Your Honor.  Again, the government has to

9   prove that these defendants intended to facilitate

10  prostitution.  And, you know, the argument is the motivation

11  for them continuing to run this business for 14 years was the

12  tens of millions of dollars that they were making based on fees

13  they were charging customers to post on their website.

14         So the fact -- the -- how much income they were

15  generating from Backpage is highly relevant in this case.  And

16  so we disagree wholeheartedly with the defendant's argument

17  that they're irrelevant and misleading.  I mean, they're

18  evidence, and we have also given them the summary charts that

19  will come in that reference --

20         MR. LINCENBERG:  Well, I don't know if they'll come in

21  or not.  The Court obviously has a 403 duty in this case, and

22  the Court has to decide where it's going to go.

23         The Court made clear long ago that this case involves

24  50 ads, and they have to prove a specific intent with regard to

25  those ads.

1          And to then inflame the jury that these are rich guys,

2    made a lot of money, and when 99.9 percent has nothing to do

3    with those 50 ads is just prejudicial, and the prejudice is

4    extreme.  And we certainly got a feel of it through the

5    voir dire process.  And we think the Court should exercise the

6    Court's discretion to keep this trial tighter relating to

7    what's been charged.  This is the problem that Mr. Bienert

8    raised with the child trafficking, which is of enormous

9    prejudice.  It's coming in here.

10          This case can quickly get out of control, having

11   nothing to do with the charges, if the government is just

12   allowed to start throwing things out that are inflammatory.

13          And it's clear that they have a reason for doing so.

14   It's not hard to understand that this stuff is inflammatory.

15          THE COURT:  Mr. Feder, did you want to say something?

16          MR. FEDER:  Number one, I'm assuming when an objection

17   is made, that it's made on behalf of everyone unless they

18   disavow?

19          THE COURT:  Is that the rule you want to apply

20   throughout the trial?

21          MR. LINCENBERG:  We would like to.  Otherwise we'll

22   all be bobbing heads jumping up and down.

23          MR. FEDER:  Secondly, Mr. Spear, his looks to be a

24   booking photo is superimposed onto a statement that we believe

25   is not even made by him.  So it's completely misrepresented.

1    And I'm sorry.  It's Exhibit 10A in the presentation that the

2    government apparently intends to make.

3                THE COURT:  Do you have that page?

4                MR. FEDER:  I do.

5                THE COURT:  Can you put it on the Elmo for me?

6                MR. FEDER:  Sure.  Can you see it?

7                THE COURT:  Yes.  Okay.  Who wants to respond why this

8    is tied to Mr. Spear?

9                MR. JONES:  Again, Your Honor, we indicated Mr. Spear

10   is aware that Exhibit 10A is an e-mail that included an

11   attachment his client sent to Mr. Ferrer and Mr. Hyer.  And so

12   that's why his picture is indicated -- is included on the

13   Exhibit 10A.  It's an e-mail his client sent.

14               MR. FEDER:  We believe this is from a presentation

15   created by Mr. Ferrer, which was sent to Mr. Spear, but they're

16   putting Mr. Spear's picture as if it's something that he

17   created.  There's a distinction, and it's prejudicial, and it

18   completely is out of context to the entire document.

19               THE COURT:  Well, if the government has a good faith

20   basis to believe something's coming in, they can use it.  It's

21   opening statement.  They obviously can't go into every detail

22   of every conversation of every exhibit that's coming in at this

23   trial or they'd be talking longer than the trial is going to

24   last.

25               MR. FEDER:  But they can't or at least shouldn't be

| | |
|---|---|
| 1 | able to put a mugshot, what appears to be a mugshot, on a |
| 2 | document that's misrepresentative as being the author. |
| 3 | THE COURT:  Well, you don't know what context he's |
| 4 | going to use it in, right? |
| 5 | MR. FEDER:  No.  He's got these -- |
| 6 | THE COURT:  So he's saying he has a basis to connect |
| 7 | the two?  I'm relying on his -- |
| 8 | MR. JONES:  Correct, Your Honor. |
| 9 | THE COURT:  -- good faith that he knows the rules, |
| 10 | that if he doesn't, you can object during opening. |
| 11 | MR. FEDER:  Thank you. |
| 12 | THE COURT:  He's told me he has a basis for including |
| 13 | that. |
| 14 | MR. FEDER:  Thank you. |
| 15 | MR. LINCENBERG:  And, Your Honor, what about the |
| 16 | inflammatory bar charts? |
| 17 | THE COURT:  Well, I was getting to that, but everybody |
| 18 | keeps standing up.  So Mr. Cambria. |
| 19 | MR. CAMBRIA:  Yeah.  I just -- The bar chart that's |
| 20 | relevant to us is Exhibit 1693, which, again, is just raw |
| 21 | figures of supposed income.  We're putting it on the Elmo now. |
| 22 | And again I join specifically in the comments of |
| 23 | Mr. Lincenberg that, you know, it's way beyond what the charges |
| 24 | are here.  It's obvious that the game plan on the government is |
| 25 | to put in kids trafficking and lots of money.  And it seems to |

1     me that those prejudicial things should not be allowed,

2     especially the kids' part.

3              THE COURT:  Does anybody else want to say anything

4     about the money issue?

5              MS. BERNSTEIN:  Just that we would join those

6     objections on behalf of Mr. Larkin as well.

7              THE COURT:  How many charts do you have about the

8     money?

9              MR. JONES:  As far as the individual defendants, Your

10    Honor, I believe there are only three or four, for 2013, '14,

11    '15, and then the chart Mr. Cambria showed.

12             So out of all of our hundred slides, there are only,

13    you know, four or five that mention the individuals' -- the

14    defendants' income that they made from Backpage.

15             THE COURT:  Well, as far as evidence, it's relevant as

16    to motive.  Four slides out of how many?

17             MR. JONES:  Like a hundred, Your Honor, so roughly ten

18    percent -- I want to make sure.  Yeah.  There are four slides

19    that mention the -- that talk about the income the defendants

20    made from Backpage.  Any other revenue charts are just revenue

21    that Backpage generated during its years of operation.  But as

22    to the specific defendants, only four slides out of close to a

23    hundred, Your Honor, mentioned their income from 2013, 2014,

24    '15, '16, and '17, all time periods of the charged conspiracy

25    in this case, and they're highly relevant.

1       MR. CAMBRIA:  May I?

2       THE COURT:  Okay.  So throughout this trial we're

3   going to have a lot of objections and conversations.  And I

4   will hear the -- whatever position you want to put forward.  I

5   will hear from the government.  But we can't continue this back

6   and forth just whenever you want to respond to something.

7   That's just not the way it works.

8       So you've already placed your objection on the record.

9   They've responded.  I find that four charts out of a hundred

10  that talk about these specific defendants is relevant and not

11  overly prejudicial.  So I'm not going to order the government

12  to remove them.

13      Is there any other objection not related to those pie

14  charts?

15      MR. CAMBRIA:  Just a different issue with regard to

16  those charts.

17      THE COURT:  What's that?

18      MR. CAMBRIA:  That the government cannot and has not

19  taken the position that all the money represented in those

20  charts was as a result of criminal conduct as opposed to

21  conduct presumptively protected by the First Amendment.

22      So now we're back into presumptively protected

23  conduct.  No instruction to the jury.  And now they're going to

24  be putting up a chart, which is for everything.  They even

25  admit that there's all kinds of things that have nothing to do

1   with sex.  And now they're going to be making that

2   representation to the jury.  And we have no presumption of

3   First Amendment protection that the jury is going to be able to

4   analyze so we could say it's not -- it's just not so.  Thank

5   you.

6           THE COURT:  Thank you.

7           MR. LINCENBERG:  Your Honor, this is Mr. Lincenberg.

8   I'm not seeking to continue this, but there's 13 charts, not

9   four, when you count the pie and the bar.  And we've made our

10  record.  I'm not going to further it, but -- And I'm assuming

11  that when they get to bar chart number five, I don't need to

12  object on the record?

13          THE COURT:  No.  But do those additional charts

14  specify any individual defendant?

15          MR. LINCENBERG:  Some of them are individual

16  defendants.  I think that's what counsel was saying that there

17  were four --

18          MR. JONES:  No.  There are four that reference the

19  individual defendants.

20          MR. LINCENBERG:  Excuse me.  Excuse me.  Let me

21  answer.  I was just saying that, counsel, that there are four

22  that talk about income of the individual defendants, and then

23  there's charts that talk about revenues of the company, things

24  like that.  Each one is -- Some are different years.  Some of

25  them are adult versus non-adult, things like that.  There's 13

1     of those.

2          THE COURT:  Okay.  I'm going to go make copies of the

3     jury instructions, and I'll be back in to read the preliminary

4     jury instructions.

5          (Proceedings recessed from 11:24 a.m. until 11:46 a.m.

6     Proceedings in the presence of the jury:)

7          THE COURT:  We're back on the record with the jury

8     present.  So Elaine is handing out a copy of the preliminary

9     jury instructions.  I'm going to read these to you.  You can

10    either read along or just listen, however you prefer.

11         All right.  Jurors:  You are now the jury in this

12    case, and I want to take a few minutes to tell you something

13    about your duties as jurors and give you some preliminary

14    instructions.  At the end of the trial, I will give you more

15    detailed instructions, and those instructions will control your

16    deliberations.  When you deliberate, it will be your duty to

17    weigh and to evaluate all the evidence received in this case

18    and in that process to decide the facts.  To the facts as you

19    find them you will apply the law as I give it to you, whether

20    you agree with it or not.

21         You must decide the case solely on the evidence and

22    the law before you.  Perform these duties fairly and

23    impartially.  Do not allow personal likes or dislikes,

24    sympathy, prejudice, fear, or public opinion to influence you.

25    You should also not be influenced by any person's race, color,

1    religion, national ancestry, or gender, sexual orientation,

2    profession, occupation, celebrity, economic circumstances, or

3    position in life or in the community.  Unconscious biases are

4    stereotypes, attitudes, or preferences that people may

5    consciously reject but may be expressed without conscious

6    awareness, control, or intention.  Like conscious bias,

7    unconscious bias can affect how we evaluate information and

8    make decisions.

9           This is a criminal case brought by the United States

10   Government.  The United States charges defendants with

11   conspiracy, violations of the Travel Act, and money laundering.

12   The charges against the defendants are contained in the

13   indictment.  The indictment simply describes the charges the

14   government brings against each defendant.  The indictment is

15   not evidence and does not prove anything.

16          Each defendant has pleaded not guilty to all the

17   charges and is presumed innocent unless the government proves

18   the defendant guilty beyond a reasonable doubt.  In addition,

19   each defendant has the right to remain silent and never has to

20   prove innocence or present any evidence.

21          To help you follow the evidence, I will give you a

22   brief summary of the elements of the crimes which the

23   government must prove to make its case:

24          Count 1 is conspiracy.  The three elements of

25   conspiracy are as follows:

1          First, beginning in or around 2004 and ending on or

2     about April, 2018, there was an agreement between two or more

3     persons to commit at least one Travel Act offense as charged in

4     the indictment.

5          Second, the defendant became a member of the

6     conspiracy knowing of at least one of its objects and intending

7     to help accomplish it; and

8          Third, on or after March 28th, 2013, one of the

9     members of the conspiracy performed at least one overt act for

10    the purpose of carrying out the conspiracy.

11         Counts 2 through 51 are Travel Act counts.  The two

12    elements to support a Travel Act conviction are as follows:

13         First, the defendant used the mail or any facility in

14    interstate commerce with the intent to promote, manage,

15    establish, carry on, or facilitate the promotion, management,

16    establishment, or carrying on of any business enterprise

17    involved in prostitution offenses in violation of the laws of

18    the state in which they are committed; and

19         Second, after doing so, the defendant performed or

20    attempted to perform an act that did promote, manage,

21    establish, carry on, or facilitate the promotion, management,

22    establishment, or carrying on of any business enterprise

23    involving prostitution offenses in violation of the laws of the

24    state in which they are committed.

25         Further, you may find a defendant guilty of the Travel

Act as charged in Counts 2 through 51 of the indictment if the United States has proved each of the following elements beyond a reasonable doubt:

First, a member of the conspiracy committed the Travel Act offense as alleged in that count;

Second, the person was a member of the conspiracy charged in Count 1 of the indictment;

Third, the person committed the Travel Act offense alleged in furtherance of the conspiracy;

Fourth, the defendant was a member of the same conspiracy at the time the offense charged in Counts 2 through 51 was committed; and

Fifth, the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.

Count 52 is conspiracy to commit money laundering. The two elements of money laundering conspiracy are as follows:

First, beginning in or around 2004 and ending on or around April, 2018, there was an agreement between two or more persons to commit at least one crime alleged in the money laundering conspiracy; and

Second, that the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

1    Counts 53 through 62 are concealment money laundering.

2    The three elements of concealment money laundering are as

3    follows:

4    First, the defendant conducted a financial transaction

5    involving property that represented the proceeds of promoting,

6    managing, establishing, carrying on, or facilitating the

7    promotion, management, establishment, or carrying on of any

8    business enterprise involving prostitution offenses in

9    violation of the laws of the State in which they are committed.

10    Second, the defendant knew that the property

11    represented the proceeds of some form of unlawful activity; and

12    Third, the defendant knew that the transaction was

13    designed in whole or in part to conceal and disguise the

14    nature, the location, the source, the ownership, or the control

15    of the proceeds of the specified unlawful activity.

16    Counts 63 through 68 are international promotional

17    money laundering.  The two elements of international

18    promotional money laundering are as follows:

19    First, the defendant transported money from a place in

20    the United States to or through a place outside the

21    United States or to a place in the United States from or

22    through a place outside the United States; and

23    Second, the defendant acted with the intent to promote

24    the carrying on of the specified criminal activity in the

25    indictment.

1       Counts 66 through 99 are transactional money

2    laundering.  The five elements of transactional money

3    laundering are as follows:

4       First, the defendant knowingly engaged or attempted to

5    engage in a monetary transaction;

6       Second, the defendant knew the transaction involved

7    criminally derived property;

8       Third, the property had a value greater than $10,000;

9       Fourth, the property was in fact derived from

10   specified unlawful activity, that is, promoting or facilitating

11   the promotion of any business enterprise involved in

12   prostitution offenses in violation of the laws of the state in

13   which they are committed; and

14      Fifth, the transaction occurred in the United States.

15      Count 1 is international concealment money laundering.

16   The three elements of international concealment money

17   laundering are as follows:

18      First, the defendant transported money from a place in

19   the United States to or through a place outside the

20   United States;

21      Second, the defendant knew that the money represented

22   the proceeds of promoting or facilitating the promotion of any

23   business enterprise involving prostitution offenses; and

24      Third, the defendant knew the transportation was

25   designed in whole or in part to conceal or disguise the nature,

location, source, ownership, or control of the proceeds of promoting or facilitating the promotion of any business enterprise involving prostitution offenses.

The Travel Act is a specific intent crime, and that means for each defendant to be found guilty, the government needs to prove that each defendant specifically intended to facilitate an activity which the defendant knew to be unlawful under state law, specifically, promoting or facilitating the promotion of any business enterprise involved in prostitution.

The evidence you are to consider in deciding what the facts are consists of:

1.   The sworn testimony of any witness;

2.   The exhibits which are received in evidence; and

3.   Any facts to which the parties agree.

The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case:

1.   Statements and arguments of the attorneys;

2.   Questions and objections of the attorneys. Questions can be used only to give meaning to the witness's answer;

3.   Testimony that I instruct you to disregard; and

4.   Anything you may see or hear when the Court is not in session even if what you see or hear is done or said by one of the parties or one of the witnesses.

1          Evidence may be direct or circumstantial.  Direct

2     evidence is a physical exhibit or the testimony of a witness

3     who saw, heard, touched, smelled, or otherwise actually

4     perceived an event.  Circumstantial evidence is proof of a fact

5     or facts from which the existence of another fact may be

6     determined.

7          You are to consider both direct and circumstantial

8     evidence.  Either can be used to prove any fact.  The law makes

9     no distinction between the weight to be given to either direct

10    or circumstantial evidence.  It is for you to decide how much

11    weight to give to any evidence.

12         Admission of evidence in court is governed by rules of

13    law.  I will apply those rules and resolve any issues that

14    arise during the trial concerning the admission of evidence.

15         If an objection to a question is sustained, you must

16    disregard the question, and you must not guess what the answer

17    to the question might have been.  If an exhibit is offered into

18    evidence and an objection to it is sustained, you must not

19    consider that exhibit as evidence.  If testimony is ordered

20    stricken from the record, you must not consider that testimony

21    for any purpose.

22         Do not concern yourselves with the reasons for my

23    rulings on the admission of evidence.  Do not regard those

24    rulings as any indication from me of the credibility of the

25    witnesses or the weight you should give to any evidence that

has been admitted.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account:

1.   The witness's opportunity and ability to see or hear or know the things testified to;

2.   The witness's memory;

3.   The witness's manner while testifying;

4.   The witness's interest in the outcome of the case, if any;

5.   The witness's bias or prejudice, if any;

6.   Whether other evidence contradicted the witness's testimony;

7.   The reasonableness of the witness's testimony in light of all the evidence; and

8.   Any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are and how much weight you think their testimony deserves.

I will now say a few words about your conduct as jurors, which I will call the admonition.

1          First, always wear your jury badge in and around the

2     courthouse so that everyone will know you're on a jury.

3          Second, keep an open mind throughout the trial, and do

4     not decide what the verdict should be until you and your fellow

5     jurors have completed your deliberations at the end of the

6     case.

7          Third, because you must decide this case based only on

8     the evidence received in the case and on my instructions as to

9     the law that applies, you must not be exposed to any other

10    information about this case or to the issues it involves during

11    the course of your jury duty.  Thus, until the end of the case

12    or unless I tell you otherwise:

13          Do not communicate with anyone in any way and do not

14    let anyone else communicate with you in any way about the

15    merits of the case or anything to do with it.  This includes

16    discussing the case in person, in writing, by phone or

17    electronic means, via e-mail, via text messaging, or any

18    Internet chat room, blog, website or application, including but

19    not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn,

20    Snapchat, or any other forms of social media.  This applies to

21    communicating with your fellow jurors until I give you the case

22    for deliberation, and it applies to communicating with everyone

23    else, including your family members, your employer, the media

24    or press, and the people involved in the trial -- excuse me --

25    although you may notify your family and your employer that you

1    have been seated as a juror in the case and how long you expect

2    the trial to last.  But if you are asked or approached in any

3    way about your jury service or anything about the case, you

4    must respond that you have been ordered not to discuss the

5    matter and to report the contact to the Court.

6         Because you will receive all the evidence and legal

7    instruction you properly may consider to return a verdict, do

8    not read, watch, or listen to any news or media accounts or

9    commentary about the case or anything to do with it -- although

10   I do not have information that there will be news reports about

11   the case -- do not do any research such as consulting

12   dictionaries, searching the Internet, or using other reference

13   materials, and do not make any investigation or in any other

14   way try to learn about the case on your own.  Do not visit or

15   view any place discussed in the case, and do not use Internet

16   programs or other devices to search for or view any place

17   discussed during the trial.  Also, do not do any research about

18   this case, the law or the people involved, including the

19   parties, the witnesses, or the lawyers, until you have been

20   excused as jurors.  If you happen to read or hear anything

21   touching on this case in the media, turn away and report it to

22   me as soon as possible.

23        The lawyers and the parties have been given the same

24   instruction about not speaking with you jurors, so do not think

25   they're being unfriendly to you.  When you go home tonight and

1  family and friends ask what the case is about, remember you

2  cannot speak with them about the case.  All you can tell them

3  is that you're on a jury, the estimated schedule for the trial,

4  and that you can't talk about the case until it's over.

5      These rules protect each party's right to have this

6  case decided only on the evidence that has been presented here

7  in court.  Witnesses here in court take an oath to tell the

8  truth, and the accuracy of their testimony is tested through

9  the trial process.  If you do any research or investigation

10  outside the courtroom or gain any information through improper

11  communications, then your verdict may be influenced by

12  inaccurate, incomplete, or misleading information that has not

13  been tested by the trial process.  Each of the parties is

14  entitled to a fair trial by an impartial jury, and if you

15  decide the case based on information not presented in court,

16  you will have denied the parties a fair trial.  Remember you

17  have taken an oath to follow the rules, and it is very

18  important that you follow these rules.

19      A juror who violates these restrictions jeopardizes

20  the fairness of these proceedings, and a mistrial could result

21  that would require the entire trial process to start over.  If

22  any juror is exposed to any outside information, please notify

23  the Court immediately.

24      At each break I will not repeat this entire

25  admonition.  I will probably refer to it by saying please

1    remember the admonition or something like that.  However, even

2    if I forget to make reference to it, remember the admonition

3    applies at all times during the trial.

4         At the end of trial, you will have to make your

5    decision based on what you recall of the evidence.  You will

6    not be given a written transcript of any testimony.  You should

7    pay close attention to the testimony as it is given.

8         If you wish, you may take notes to help you remember

9    the evidence.  If you do take notes, please keep them to

10   yourself until the end of the trial when you and your fellow

11   jurors go to the jury room to decide the case.  Do not let

12   note-taking distract you from being attentive.  When you leave

13   the courtroom for recesses, your notes should be left in the

14   jury room.  No one will read your notes.  After you have

15   rendered your verdict, Elaine will collect your notes and

16   destroy them.

17        Whether or not you take notes, you should rely on your

18   own memory of what was said and the evidence.  Notes are only

19   to assist your memory.  You should not be overly influenced by

20   your notes or those of your fellow jurors.

21        Although the defendants are being tried together, you

22   must give separate consideration to each defendant.  In doing

23   so, you must determine which evidence in the case applies to

24   each defendant, disregarding any evidence admitted solely

25   against some other defendants.  The fact that you may find one

1    of the defendants guilty or not guilty should not control your

2    verdict as to any other defendants.

3            If at any time during the trial you have difficulty

4    hearing or seeing something that you should be hearing or

5    seeing or if you get into personal distress for any reason,

6    raise your hand and let me know.

7            If you have any questions about parking, restaurants,

8    or other matters related to jury service, feel free to ask one

9    of the staff.  But remember that the admonition applies to

10   court staff as it does to everyone else.  So do not try to

11   discuss the case with court staff.

12           If you have a question about the case for a witness or

13   for me, write it down, but do not sign it.  When the lawyers

14   are done examining the witness, I will collect any jury

15   questions.

16           If there is a question, the lawyers and I will discuss

17   the question.  The rules of evidence or other rules of law may

18   prevent some questions from being asked.  If the rules permit

19   the question and the answer is available, an answer will be

20   given at the earliest opportunity.  When we do not ask a

21   question, it is no reflection on the person submitting it.  You

22   should attach no significance to the failure to ask a question.

23   I will apply the same legal standards to your questions as I do

24   to questions asked by the lawyers.  If a particular question is

25   not asked, please do not guess why or what the answer might

1    have been.

2           From time to time during the trial, it may become

3    necessary for me to take up legal matters with the attorneys

4    privately, either by having a conference at the bench when the

5    jury is present in the courtroom or by calling a recess.

6           Please understand that while you are waiting, we are

7    working.  The purpose of these conferences is not to keep

8    relevant information from you but to decide how certain

9    evidence is to be treated under the rules of evidence and to

10   avoid confusion or error.

11          Of course we will do what we can to keep the number

12   and length of these conferences to a minimum.  I may not always

13   grant an attorney's request for a conference.  Do not consider

14   my granting or denying a request for a conference as any

15   indication of my opinion of the case or what your verdict

16   should be.

17          The next phase of the trial will now begin.  First,

18   each side may make an opening statement.  An opening statement

19   is not evidence.  It is simply an outline to help you

20   understand what the party expects the evidence will show.  A

21   party is not required to make an opening statement.

22          The government will then present evidence, and counsel

23   for defendants may cross-examine.  Then if the defendants

24   choose to offer evidence, counsel for the government may

25   cross-examine.

1          After the evidence has been presented, I will instruct

2     you on the law that applies to the case, and the attorneys will

3     make closing arguments.

4          After that you will go to the jury room to deliberate

5     on your verdict.

6          All right.  So we're going to recess for one hour for

7     lunch.  Please remember the admonition.  And when you come back

8     from lunch, you will return to either the waiting room out back

9     or the jury room, and we'll bring you in when we're ready.  All

10    right.  You're free to go.

11        (Proceedings recessed at 12:08 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            <u>C E R T I F I C A T E</u>

2

3            I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6            I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11           DATED at Phoenix, Arizona, this 27th day of September,

12   2021.

13

14

15                              s/Linda Schroeder
                             Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT