Exhibit A

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 1, 2021 |
| Michael Lacey, | ) | 9:03 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE SUSAN M. BRNOVICH, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**TRIAL - DAY 1**

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:


    U.S. ATTORNEY'S OFFICE
    By:  **Mr. Peter S. Kozinets**
         **Mr. Kevin M. Rapp**
         **Ms. Margaret Wu Perlmeter**
         **Mr. Andrew C. Stone**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004


    U.S. DEPARTMENT OF JUSTICE
    By:  **Mr. Reginald E. Jones**
    1400 New York Avenue, NW, Suite 600
    Washington, DC 20530


For the Defendant Lacey:

    LIPSITZ GREEN SCIME CAMBRIA
    By:  **Mr. Paul J. Cambria, Jr.**
         **Ms. Erin E. McCampbell-Paris**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202


For the Defendant Larkin:

    BIENERT KATZMAN
    By:  **Mr. Thomas H. Bienert, Jr.**
         **Ms. Whitney Z. Bernstein**
    903 Calle Amanecer, Suite 350
    San Clemente, CA 92673

UNITED  STATES  DISTRICT  COURT

```
 1   For the Defendant Spear:

 2       FEDER LAW OFFICE
         By:  Mr. Bruce S. Feder
 3       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
 4

 5   For the Defendant Brunst:

 6       BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
         LINCENBERG & RHOW
 7       By:  Mr. Gopi K. Panchapakesan
              Mr. Gary S. Lincenberg
 8       1875 Century Park E, Suite 2300
         Los Angeles, CA 90067
 9

10   For the Defendant Padilla:

11       DAVID EISENBERG, PLC
         By:  Mr. David S. Eisenberg
12       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
13

14   For the Defendant Vaught:

15       JOY BERTRAND, LLC
         By:  Ms. Joy M. Bertrand
16       P.O. Box 2734
         Scottsdale, AZ 85252
17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1

**I N D E X**

2                                                                    PAGE

3   JURY VOIR DIRE                                                  11

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1          **P R O C E E D I N G S**

2          COURTROOM DEPUTY:  We are on the record in CR 18-422,

3    United States of America versus Michael Lacey and others,

4    before the Court for a jury trial.

5          MS. PERLMETER:  Good morning, Your Honor.  Peggy

6    Perlmeter and Kevin Rapp on the first level, Reginald Jones,

7    Special Agent Tolhurst, on behalf of the United States.

8          On the upper level, Your Honor, Richard Robinson with

9    the IRS, Peter Kozinets, Andrew Stone, Daniel Boyle, and Lindon

10   Versoza.

11         MR. CAMBRIA:  Good morning, Your Honor.  Paul Cambria

12   and Michael Lacey present.

13         MS. BERNSTEIN:  Good morning, Your Honor.  Whitney

14   Bernstein with James Larkin at counsel table.

15         Upstairs is Toni Thomas and Tom Bienert.

16         MR. FEDER:  Good morning, Your Honor.  Bruce Feder

17   with Scott Spear.

18         MR. LINCENBERG:  Good morning, Your Honor.  Gary

19   Lincenberg with John Brunst.

20         And I wanted to raise an issue with regard to our jury

21   consultant.

22         MS. BERTRAND:  Good morning.  Joy Bertrand appears

23   with Joye Vaught.

24         MR. EISENBERG:  And good morning, Your Honor.  David

25   Eisenberg and Andrew Padilla, who is present.

1           Upstairs is Andy Murphy, an investigator with the

2     case.

3           THE COURT:  Okay.

4           MR. LINCENBERG:  May I raise this issue, Your Honor?

5           THE COURT:  You may.

6           MR. LINCENBERG:  Thank you, Your Honor.

7           Your Honor, we were advised that the Court had

8     indicated that we would not be permitted to have our jury

9     consultant -- her name is Lee Meihls, she's in the courtroom

10    with us right now -- present here.  And we feel that -- we'd

11    ask the Court to reconsider, for a couple reasons.

12          First, this is obviously a very important part of the

13    trial.  Ms. Meihls is a specialist in assisting.  I've done

14    numerous trials with her.  I've never seen a trial where a jury

15    consultant wasn't permitted on the floor.  My guess is in

16    non-COVID times, the Court probably permits it, and the Court

17    is dealing with this difficult situation of how to keep people

18    spaced and so forth.

19          You know, we feel that there could be a spot up here

20    if Ms. Meihls could sit down, and would be distanced, and be

21    able to assist us.  We're going to be very restricted if she's

22    not able to be here.  Part of her job is also, as with the

23    attorneys, to be able to look at the jurors and see their

24    reactions and the like.

25          Ms. Meihls also has a medical condition.  If the Court

UNITED STATES DISTRICT COURT

1    needs, she could explain it further, but she had brain surgery

2    not too long ago.  She does have some -- she can climb stairs,

3    but has difficulty with the stairs, and certainly would have a

4    great amount of difficulty standing in order to try to be able

5    to look down.  And, of course, wherever she might be able to

6    stand, she wouldn't be able to see all the jurors like counsel

7    would.

8            So we would really ask if the Court would allow us to

9    have a seat, you know, perhaps here, so that Ms. Meihls could

10   be down here and we could be able to consult with her.

11           THE COURT:  Mr. Lincenberg, you -- well, not you,

12   because you weren't here, but on August 20th your co-counsel

13   raised this issue.  Do you remember that?

14           MR. LINCENBERG:  I don't recall it because I was cross

15   examining a witness in a trial that literally ended yesterday.

16           THE COURT:  And he didn't advise you of the issue?

17           MR. LINCENBERG:  I don't recall.  I know we made an

18   appeal to the Court before, and I know the Court has indicated,

19   I'm aware of that, Your Honor, that's why I'm asking for

20   reconsideration.  I understand what the Court has indicated.  I

21   just would ask the Court's indulgence to reconsider.

22           I know the Court is trying to manage this in very

23   difficult circumstances.  And I appreciate everything the

24   Court's doing to try to keep everybody safe and moving it

25   forward, but I think we could have a socially distanced space

1 over here that Ms. Meihls could sit and I don't think it would

2 impact anything.

3          THE COURT:  Okay.

4          MR. EISENBERG:  Your Honor, I have a suggestion.

5          THE COURT:  Okay.  The problem is, is we discussed

6 this on August 20th.  Nobody advised me of any special

7 circumstances, so we haven't had an opportunity to make any

8 adjustments, and our jury is sitting downstairs.

9          MR. LINCENBERG:  In terms of the special circumstances

10 with regard to Ms. Meihls's health issues, Ms. Meihls just

11 advised me of that.  And if the Court orders Ms. Meihls to have

12 to stand up there, she'll do the best she can.  It's -- it just

13 -- it's a difficulty for her and it's a disadvantage for us in

14 terms of being able to effectively employ her services.  I

15 apologize.

16          THE COURT:  We talked about the fact that your jury

17 consultant could consult with you in between panels, and,

18 obviously, at the time that comes for making strikes.

19          The issue was that I made it very clear that there was

20 only room for attorneys and parties for jury selection.  These

21 seats here.

22          MR. LINCENBERG:  I'm aware of that.

23          THE COURT:  Mr. Eisenberg.

24          MR. EISENBERG:  Yes, Your Honor.

25          My suggestion is given, Ms. Meihls's health issue and

1  her importance to this proceeding, I can move over there with

2  my client.  Those seats over there --

3           THE COURT:  No, those are jury seats.

4           MR. EISENBERG:  All around us.

5           THE COURT:  Every seat in here is taken.

6           MR. EISENBERG:  And would that include the back -- the

7  first back bench, Your Honor?

8           THE COURT:  Those are not -- yes, those have blue dots

9  for jurors.

10          MR. EISENBERG:  This bench here does not appear --

11          MR. LINCENBERG:  Yes, it does.  It does.

12          MR. EISENBERG:  It does.  All right.

13          MR. LINCENBERG:  I was just thinking a seat here

14  distanced from everybody in front of the counsel table here, if

15  we could put a seat.

16          I understand that the upstairs is not ADA compliant.

17          THE COURT:  Elaine.

18          (An off-the-record discussion was held between the

19  Court and the courtroom deputy.)

20          THE COURT:  All right.  We found one chair.  It's in

21  the back, though.

22          MR. LINCENBERG:  Appreciate it.

23          THE COURT:  Elaine will show her.

24          MR. LINCENBERG:  Thank you, Your Honor.

25          Your Honor, could I just ask a logistical question?

1   With regard to these screens, which I believe we don't need

2   here, can we put them on the floor to make room?

3          THE COURT:  I'm sorry, with respect to what?

4          MR. LINCENBERG:  The screens that are on counsel

5   table, I see -- I see here you must have -- I'm wondering, can

6   we put it on the floor for right now?  No?

7          THE COURT:  The cords are all -- I mean, I guess,

8   technically, you could try, but if you mess up the cords,

9   you're going to lose your screen.

10         MR. LINCENBERG:  Okay.

11         THE COURT:  All right.  And so I think --

12         MS. BERNSTEIN:  This is Whitney Bernstein.

13         And, Ms. Garcia, as you're printing extras, we want to

14   provide some to the rest of our team upstairs.  If we can get

15   two or three extra ones.  Thank you.

16         (Court stands in recess, 9:14 a.m. - 9:23 a.m.)

17         THE COURT:  So, counsel, just -- I don't know if it

18   copied onto your sheet, Juror 29 was a no show.

19         MS. BERNSTEIN:  And, Your Honor, that's -- so when you

20   say 29, that's going down the random number 29?

21         THE COURT:  Yes.

22         MS. BERNSTEIN:  Okay.

23         MS. PERLMETER:  Your Honor, if I may?  This is Peggy

24   Perlmeter.

25         The government has gone over the list of jurors that

1    was just provided, and we cross referenced it to the Excel

2    spreadsheet that the Court provided, and the number of people

3    on both lists do not match.  So if, at some point, when the

4    Court has time, if we could discuss that.

5              THE COURT:  Don't match at all?

6              MS. PERLMETER:  The number of people don't match.

7              THE COURT:  Like they're missing or they don't match?

8              MS. PERLMETER:  It looks like they're missing.  We

9    have five extra people on the --

10             THE COURT:  There were five excused.  They sent

11   excuses in.  I think you got them.  I can tell you which ones

12   they were.

13             MS. PERLMETER:  Okay.

14             THE COURT:  Juror 258, Juror 77, Juror 436, 248, and

15   1871.

16             MS. PERLMETER:  Thank you.

17             (9:33 a.m., the first group of prospective jurors

18   entered the courtroom.)

19             THE COURT:  Good morning, everybody.  Thank you for

20   your patience this morning.

21             The logistics of doing trial during COVID are a little

22   bit more difficult, so sometimes it takes a little longer to

23   get everybody in here.

24             This is the time set for trial in criminal case number

25   18-CR-422, United States of America versus Michael Lacey, James

1    Larkin, Scott Spear, John Brunst, Andrew Padilla, and Joye

2    Vaught.

3              Would all prospective jurors please stand and raise

4    your right hand to be sworn.

5              (The prospective jurors were duly sworn.)

6              THE COURT:  All right.  Please be seated.

7              And if at any time during this process you can't hear

8    me or one of the attorneys, please raise your hand and let us

9    know and we'll get closer to the microphone.

10             You have all started this jury selection process case

11   -- of this case when you filled out the jury questionnaires,

12   and I want to thank you for the time that you took to do that.

13   That process will enable us to do this much quicker.

14             We've asked most of the questions we wanted to ask in

15   that jury questionnaire with the purpose of trying to minimize

16   the amount of time we're all sitting here together.

17             The questions that we have already asked, or that we

18   might ask today, are not intended to pry unnecessarily into

19   your private lives and affairs, however, we do need to ask some

20   questions to find out if you have any knowledge about this

21   particular case or about any of the persons who might be

22   involved in it, to find out if you have any preconceived

23   opinions about the case which you might find difficult to lay

24   aside, and to find out if you've had any personal or family

25   experiences that might cause you to identify yourselves with

1     any of the parties.

2              In other words, we ask these questions to assure all

3     the parties in this case that the jurors selected to try this

4     case can be fair and impartial.

5              During this in-person process -- well, actually, I

6     don't have any -- well, I think I have one general question for

7     you, so when I ask that, if you have a yes answer, just raise

8     your hand.  If there is only one or two of you, that's easy.

9     If a lot of you raise your hand, what I'll do is I'll just go

10    around and write down everybody's number so you can put your

11    hand down, and then I'll follow up as necessary.

12             When I call on you, or if one of the attorneys has a

13    question for you, please stand up, it helps us all to hear, and

14    state your number before you answer.

15             And, on a side note, I will refer to you by your juror

16    number.  I'm instructing the attorneys to refer to you by your

17    juror number.  And that's because everything said here in open

18    court is taken down word-for-word by the court reporter.  So we

19    don't want your name in the record.

20             Obviously, there is a record of who you are, but we

21    don't want it here in the open record.  So that's why

22    everybody's using a number.  I know it's kind of impersonal,

23    but it's not meant to be, it's just to keep your privacy

24    secure.

25             If I ask you a question or one of the attorneys asks

1    you a question that, for whatever reason, you prefer to answer

2    privately, please raise your hand and tell us that you do have

3    an answer but you prefer to answer privately.  I'll make a note

4    of that, and at an appropriate time, we'll discuss it outside

5    the presence of the other jurors.

6            All right.  With all that being said, after you

7    submitted your questionnaire, is there anything that's changed

8    in the last few weeks that would affect your ability to sit as

9    a juror in this case?

10            Let me just write down the numbers.  Juror 5, 9, 13,

11   17, 8, 24, 26, 28, and 31.

12            Okay.  Juror 5.

13            PROSPECTIVE JUROR:  Juror 5.  I am a college

14   professor --

15            THE COURT:  Okay.  One second.

16            PROSPECTIVE JUROR:  Juror 5.  I'm a college professor

17   here in Arizona, and since the --

18            (Reporter interrupts for clarification.)

19            PROSPECTIVE JUROR:  How about now?

20            THE COURT:  That's better.

21            PROSPECTIVE JUROR:  I'm a college professor in

22   Arizona.  And since the trial was postponed two weeks, my

23   semester has already started.  I teach eight-week classes.

24   75 percent of my students are 40 percent in grade-wise.  And I

25   am the only, now after retirement, full-time faculty member, so

```
1    I -- my semester is in process here.  I don't know what else to
2    tell you.  I'm the only one.  I am on our honor's committee.
3    I've run our online program, and also an instructional council
4    member and the only one from my campus.
5              THE COURT:  Okay.  Thank you.
6              Juror Number 8.
7              PROSPECTIVE JUROR:  I'm Juror Number 8.  I guess since
8    that time I finished the questionnaire, I have become very
9    concerned with the Delta variant of the coronavirus, and I'm
10   just very preoccupied with it.  And I don't really -- I can't
11   really honestly say that my mind is a hundred percent on things
12   when I feel like I'm being exposed.
13             THE COURT:  So you feel that that would overwhelm your
14   ability to concentrate?
15             PROSPECTIVE JUROR:  I don't think I could be -- yeah,
16   basically.  It's on the top of my mind.  Just being, you know,
17   in the courtroom with a lot of people, you know, I just feel it
18   occupies my mind quite a bit.
19             THE COURT:  Okay.  All right.  On a side note, at
20   least for this process, I don't know if it makes anybody feel
21   better, all of those -- the attorneys and parties and myself
22   have all tested negative within the last 48 hours, at least for
23   what it's worth.
24             Okay.  Juror 9.
25             PROSPECTIVE JUROR:  I'm Juror 9.  Since the
```

1    questionnaire -- during the questionnaire I was unemployed, on

2    unemployment.  That has since ended.

3          I've gotten a job last week.  And this is -- these are

4    the first weeks, you know, of training this new job, so that

5    would affect, you know, my employment status, possibly.  I

6    don't know the hours of the trial, things like that to work

7    around, it's a possibility depending on the hours, but those

8    are my concerns.

9          That's what's changed since the questionnaire for me.

10         THE COURT:  Okay.  Well, congratulations.  Where did

11   you get a job?

12         PROSPECTIVE JUROR:  With Solar Nation is the name of

13   the company.

14         THE COURT:  And is that -- do you know how big of a

15   company that is?

16         PROSPECTIVE JUROR:  From my understanding, they're

17   kind of a small company right now, in the process of expanding.

18         THE COURT:  All right.  And are you being paid a

19   salary?  Is it hourly?  Is it commissioned?

20         PROSPECTIVE JUROR:  I'm commissioned based.

21         THE COURT:  Okay.  Thank you.

22         Juror 13.

23         PROSPECTIVE JUROR:  As you can see, I've had surgery

24   on my shoulder.  They rebuilt my rotator cuff.  I have no

25   problem with anything except the 21st of September when I go

1  back to see the doctor again.

2         THE COURT:  And do you know what time your appointment

3  is?

4         PROSPECTIVE JUROR:  10:00 a.m.

5         THE COURT:  And so if we could work around that, there

6  is no other conflict?

7         PROSPECTIVE JUROR:  No.

8         THE COURT:  Okay.  Thank you.

9         Juror 17.

10        PROSPECTIVE JUROR:  Number 17.  My grandfather passed

11 away this morning and I'll have a funeral next week, so I don't

12 know when the trial starts, but that would be my only conflict.

13 It's out of state.

14        THE COURT:  Okay.  I'm sorry.  Thank you for coming in

15 today.  What -- do you know when it's going to be?

16        PROSPECTIVE JUROR:  He just passed away today, so

17 I'm --

18        THE COURT:  And you said it's out of state?

19        PROSPECTIVE JUROR:  It's in Wisconsin, yes.

20        THE COURT:  All right.  Thank you.

21        Juror 24.

22        PROSPECTIVE JUROR:  Hello.  So I submitted -- with the

23 questionnaire, I submitted a document from my work saying that,

24 basically, I'm -- so I'm a Ph.D. chemist.  I work at a company

25 that makes equipment for circuit boards.  And, basically, I am

1    the only chemist at my company that can keep this project

2    going, where, basically, I have to travel for work.

3           So I submitted -- I submitted last night an additional

4    document from my work saying that there is a very strong chance

5    that I will need to travel for work in the next three months.

6    And, basically, there is no one else in my company that can

7    travel in my stead because of my expertise so...

8           THE COURT:  Okay.  Thank you.

9           Juror 26.

10          PROSPECTIVE JUROR:  Juror Number 26.

11          THE COURT:  I'm going to ask you to grab the

12   microphone.

13          PROSPECTIVE JUROR:  Okay.  Juror Number 26.  After I

14   filled out the questionnaire, my company told me they would

15   only pay for ten days of jury duty.  It would be a financial

16   hardship for me to go beyond that.

17          THE COURT:  Okay.  You faded out there at the end.

18   You said it would be a financial hardship for you?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  And where do you work?

21          PROSPECTIVE JUROR:  I work for Viasat, V-I-A-S-A-T.  I

22   am a salaried employee.

23          THE COURT:  Okay.  Thank you.

24          Juror 28.

25          PROSPECTIVE JUROR:  Juror 28.  I just realized that

1   after I submitted my questionnaire, I had made an omission with

2   my personal associations.  I do have a friend who is training

3   to be a DEA agent.  I don't know if that has any bearing on --

4   I think federal employees was a question on that survey.

5           THE COURT:  So you just forgot to include that?

6           PROSPECTIVE JUROR:  That's correct.  I just wanted to

7   make sure that that was --

8           THE COURT:  And is that friend currently training or

9   had trained?

10          PROSPECTIVE JUROR:  Yes.  She's currently in Quantico.

11          THE COURT:  Okay.  Thank you.

12          PROSPECTIVE JUROR:  Thank you.

13          THE COURT:  Juror 31.

14          PROSPECTIVE JUROR:  Good morning.  I'm Number 31.

15  Sorry.  My grandpa came home out of hospice on Monday and he is

16  no longer responsive.  And his oxygen this morning dropped, and

17  he's currently in the Cheyne-Stokes, and so we're expecting him

18  to pass this week and then we will have a funeral out of state.

19          THE COURT:  Okay.  Thank you.

20          Okay.  So that is -- because we asked all the general

21  questions in the questionnaire, that's all I have.  So the

22  attorneys are allowed to ask you some follow up if they want to

23  clarify anything in the questionnaire, so I am going to hand it

24  over to the government first.

25          Ms. Perlmeter.  And if you come to the podium, you can

1    take off your mask, otherwise you have to keep it on.

2           MS. PERLMETER:  If it's okay with everyone, I'll try

3    this with the mask on.  And if you all have -- if anyone has

4    trouble hearing me, please raise your hand and I'll move myself

5    over to the podium.

6           Thank you.  My name is Peggy Perlmeter.  I'm one of

7    the prosecutors and I'll be handling this case on behalf of the

8    government.  Thank you all for being here today.

9           A few follow-up questions here.

10          THE COURT:  Ms. Perlmeter, we're going to have you put

11   on this microphone.  I want to make sure the court reporter can

12   hear you.  If you're not facing her, it becomes difficult.

13          Okay.  Go ahead.

14          MS. PERLMETER:  All right.  Juror Number 3.  Good

15   morning, sir.  In your questionnaire you had written that in

16   2017 you were a victim of a car theft; is that right?

17          PROSPECTIVE JUROR:  (No audible response.)

18          MS. PERLMETER:  Okay.  I just want to make sure that I

19   have the right name to the right juror.

20          Did you indicate on your questionnaire that you were

21   the victim of a car theft in 2017?

22          PROSPECTIVE JUROR:  Juror 3.  Not to my recollection.

23          MS. PERLMETER:  Okay.  Thank you.

24          May I have a minute, Your Honor?

25          PROSPECTIVE JUROR:  Property was stolen from a car,

1    not the car itself stolen.

2           MS. PERLMETER:  Okay.  Thank you for the

3    clarification.  So I just want to make sure that I'm

4    associating the right questionnaire to the right person.

5           PROSPECTIVE JUROR:  Yes.

6           MS. PERLMETER:  Okay.  And then did you also further

7    indicate that you felt that the police investigation was

8    lackluster?

9           PROSPECTIVE JUROR:  Absolutely.

10          MS. PERLMETER:  Okay.  What agency investigated that

11   case?

12          PROSPECTIVE JUROR:  The Phoenix Police Department.

13          MS. PERLMETER:  Phoenix Police Department.  And then

14   you indicated that you felt like you may not be able to be fair

15   and impartial in this case based on your experience with law

16   enforcement in that matter?

17          PROSPECTIVE JUROR:  I did probably indicate that, yes.

18          MS. PERLMETER:  So my question for you is, if you are

19   selected as a member of the jury in this case, there will be

20   members of law enforcement coming in to testify to present

21   evidence and information.

22          Would your experience back in 2007 impact your ability

23   to fairly and impartially consider the testimony of the law

24   enforcement officers that may come to testify in this case?

25          PROSPECTIVE JUROR:  Quick correction, 2017, right?

1          MS. PERLMETER:  Yes.

2          PROSPECTIVE JUROR:  No, that shouldn't be a problem.

3          MS. PERLMETER:  Okay.  If the witness was a member of

4    the Phoenix Police Department, do you feel that you would have

5    difficulty being fair and impartial because of your experience

6    with the Phoenix Police Department?

7          PROSPECTIVE JUROR:  No, probably not.

8          MS. PERLMETER:  All right.  Juror Number 24.  Sir, you

9    had indicated on your questionnaire that you had a trip to New

10   York City planned from October 29th until November 2nd.  Is

11   that trip still planned?

12         PROSPECTIVE JUROR:  Yes.

13         MS. PERLMETER:  Do you have tickets purchased for

14   airline and lodging?

15         PROSPECTIVE JUROR:  Yes, airline, no lodging, but I

16   also have tickets for other attractions in New York already

17   bought.

18         MS. PERLMETER:  Okay.  Thank you very much, sir.

19         Juror Number 8.  Yes, sir.  We got your request for

20   needing to use the restroom.  If the Court was able to give you

21   accommodations to use the restroom, would that impact your

22   ability to sit and listen to the evidence in this case?

23         PROSPECTIVE JUROR:  No, as long as I could -- you

24   know, as long as that could be accommodated.

25         MS. PERLMETER:  Thank you.  Also, if you're selected

1    as a member of this jury, you will hear some evidence of a

2    sexual nature.  It was mentioned in the jury questionnaire,

3    there will be discussion about sexual acts, body parts,

4    genitalia, things like breast, sexual intercourse, oral sexual

5    contact, phrases like those may come up.  And then if you're

6    selected as a juror, you will have to use -- to deliberate on

7    the evidence and use those words when discussing the facts with

8    your fellow jurors.

9            So you had expressed some discomfort in having to do

10   that, and I just wanted to clarify with you today.  A lot of us

11   have some discomfort discussing those private topics with

12   people that we don't know, but when brought together for a

13   purpose such as court, would you be able to set aside that

14   discomfort and discuss the evidence with members of your --

15   with fellow members of the jury?

16           PROSPECTIVE JUROR:  You know, I think I would still be

17   very uncomfortable doing that.

18           MS. PERLMETER:  I understand that you would be

19   uncomfortable and it's not something that you would want to do,

20   but if required to do it, would you be able to?

21           PROSPECTIVE JUROR:  Yes, I would.

22           MS. PERLMETER:  All right.  Thank you.

23           Juror Number 6.  Thank you.  Sir, you had indicated in

24   your questionnaire that you work at a place called Senior Time.

25           PROSPECTIVE JUROR:  No.

```
 1            MS. PERLMETER:  No.  Okay.  Sorry.  Do you live in a
 2    house with several roommates?
 3            PROSPECTIVE JUROR:  Juror Number 6, yes.
 4            MS. PERLMETER:  Okay.  What is your occupation?
 5            PROSPECTIVE JUROR:  I'm a time and expense associate.
 6            MS. PERLMETER:  And what does that mean?
 7            PROSPECTIVE JUROR:  I do payroll, basically.
 8            MS. PERLMETER:  Did you indicate on your questionnaire
 9    that you had a roommate that was an attorney?
10            PROSPECTIVE JUROR:  Yeah.
11            MS. PERLMETER:  And what is that person's name?
12            PROSPECTIVE JUROR:  Tyler Schwenke.
13            MS. PERLMETER:  And what type of law does Tyler
14    practice?
15            PROSPECTIVE JUROR:  He practices defense for the State
16    of Arizona.
17            MS. PERLMETER:  Is it criminal defense?
18            PROSPECTIVE JUROR:  Yeah, criminal defense.  Sorry.
19            MS. PERLMETER:  Do you talk with Tyler about his
20    cases?
21            PROSPECTIVE JUROR:  Yeah.  Obviously, he can't share
22    everything, but we do ask him about cases and just like general
23    law stuff.
24            MS. PERLMETER:  Is there anything about what you and
25    he have discussed that would make you unable to sit as a fair
```

1   and impartial juror in this case?

2          PROSPECTIVE JUROR:  I don't -- like, in regards to,

3   like, this case happening, or just, like, in just, like,

4   general law procedure?

5          MS. PERLMETER:  In general.

6          PROSPECTIVE JUROR:  No, I don't think so.

7          MS. PERLMETER:  Okay.  Thank you.

8          PROSPECTIVE JUROR:  Yeah.

9          MS. PERLMETER:  Juror Number 18.

10         Juror Number 18, I had the similar question that I

11  posed to Juror Number 8 for you, based on the answer that you

12  gave in the questionnaire that you might have trouble

13  deliberating in this case.

14         PROSPECTIVE JUROR:  If I'm required, I'll -- if I'm

15  required, I'll do what's necessary.

16         MS. PERLMETER:  I understand.  Thank you.

17         Juror Number 20.  Juror Number 20, thank you.  What

18  year did you serve as a juror in Missouri in the land real

19  estate case?  Do you recall?

20         PROSPECTIVE JUROR:  It had to be in -- during the

21  1980s, as close as I can get it.

22         MS. PERLMETER:  All right.  Thank you very much.

23         Juror Number 27.  Sir, you indicated that you have a

24  friend who is a member of the FBI.

25         PROSPECTIVE JUROR:  Yes.

1          MS. PERLMETER:  Is that a friend here locally?

2          PROSPECTIVE JUROR:  No.

3          MS. PERLMETER:  In what state?

4          PROSPECTIVE JUROR:  Alaska.

5          MS. PERLMETER:  And is he or she a special agent?

6          PROSPECTIVE JUROR:  Yes, she is.

7          MS. PERLMETER:  Does she investigate cases involving

8   financial crimes or sexually related offenses?

9          PROSPECTIVE JUROR:  I know she does some with

10  financial crimes.  She doesn't give me all the details on the

11  stuff that she investigates.

12          MS. PERLMETER:  Do you and her discuss the nature of

13  her work?

14          PROSPECTIVE JUROR:  We have some, and that's the

15  financial.  I'm not aware of any investigations into sexual

16  crimes.

17          MS. PERLMETER:  Is there anything about your

18  relationship with her that would impact your ability to sit

19  here, receive information, and then treat -- and then serve as

20  a fair and impartial juror?

21          PROSPECTIVE JUROR:  No.

22          MS. PERLMETER:  Thank you.

23          Juror Number 30.  Juror Number 30, thank you.  You had

24  indicated on your questionnaire that some members of your

25  family may have been part of the criminal justice system

1   themselves.  Did you indicate it was your son and your

2   granddaughter?  I just want to make sure I have it correct.

3                 PROSPECTIVE JUROR:  Brother-in-law.

4                 MS. PERLMETER:  Brother-in-law.  Okay.  Was your

5   brother-in-law arrested or charged with some sort of criminal

6   offense?

7                 PROSPECTIVE JUROR:  State the question again.  I'm

8   sorry.

9                 MS. PERLMETER:  Was your brother-in-law arrested or

10  charged with some type of criminal offense?

11                PROSPECTIVE JUROR:  No, the question before that.

12                MS. PERLMETER:  I think on your questionnaire you had

13  indicated that some members of your family had been involved

14  with the criminal justice system, either arrested, charged

15  with, or convicted of a crime.

16                PROSPECTIVE JUROR:  Yes.  That was my son-in-law.

17                MS. PERLMETER:  Your son-in-law.  Okay.  And what was

18  that for?

19                PROSPECTIVE JUROR:  Armed robbery.

20                MS. PERLMETER:  When was that?

21                PROSPECTIVE JUROR:  2001.

22                MS. PERLMETER:  Was that here locally or out of state?

23                PROSPECTIVE JUROR:  Local.

24                MS. PERLMETER:  Was he prosecuted and convicted of the

25  offense?

1          PROSPECTIVE JUROR:  Oh, yeah.  He got 187 years.

2          MS. PERLMETER:  And then how do you feel, do you have

3     any thoughts or opinions on his journey through the criminal

4     justice system?  Do you feel he was treated fairly, unfairly,

5     or something else?

6          PROSPECTIVE JUROR:  187 years, we don't even live that

7     long, so he was definitely treated unfairly.

8          MS. PERLMETER:  So is there anything from that case

9     that you bring with you to this court that would make you

10    unable to sit fairly, impartially -- fairly and impartially and

11    judge these particular defendants on the evidence that you will

12    hear in this case?

13         PROSPECTIVE JUROR:  Yes.

14         MS. PERLMETER:  Can you --

15         PROSPECTIVE JUROR:  Yes.

16         MS. PERLMETER:  Okay.  Can you explain in a little bit

17    more detail?

18         PROSPECTIVE JUROR:  Just unfairness.  That's all.

19         MS. PERLMETER:  You had also indicated -- so there

20    were a series of questions on -- on different aspects of the

21    law as it applies in a criminal case.  And the Court will tell

22    you, if you're selected, that a criminal defendant has the

23    right to remain silent, and that you may not use that person's

24    silence against him in court when evaluating the evidence.

25         So would you be willing to follow that law if selected

1    as a juror?

2              PROSPECTIVE JUROR:  Sure.  Certainly.

3              MS. PERLMETER:  Do you believe -- because I think on

4    your questionnaire there was like a yes or a no about whether

5    or not you think a criminal defendant should be required to

6    prove his or her own innocence.  So do you believe that or do

7    you -- what do you think about that now?

8              PROSPECTIVE JUROR:  I do believe that.

9              MS. PERLMETER:  You do think that a criminal defendant

10   should have to do something to prove their innocence?

11             PROSPECTIVE JUROR:  I do.

12             MS. PERLMETER:  Okay.  Thank you.

13             Juror Number 34.

14             COURTROOM DEPUTY:  We don't have a 34 in here yet.

15             MS. PERLMETER:  No 34.

16             I have no more questions, Your Honor.

17             THE COURT:  Okay.  And for the defense.

18             Mr. Cambria.

19             MR. CAMBRIA:  Thank you.  Good morning.  My name is

20   Paul Cambria and I represent Mr. Lacey.

21             Juror Number 6, you indicated that you Googled

22   Mr. Lacey.  Is that true?

23             PROSPECTIVE JUROR:  (No audible response.)

24             MR. CAMBRIA:  All right.  We'll get you some sound

25   here.

1          PROSPECTIVE JUROR:  Juror Number 6.  There we go.  I

2     did Google him.

3          MR. CAMBRIA:  Okay.  As a result of that, have you

4     formed any preconceived notions or theories about him?

5          PROSPECTIVE JUROR:  No.  Honestly, it was one of those

6     things where I thought it was, like, a name that just, like,

7     wasn't going to show anything up.  And then, of course, like,

8     Wikipedia shows, like, what the trial is kind of going to be

9     about.  So other than that, no, I didn't do any other research,

10    have no other idea about any other people in the case or any

11    other details.

12          MR. CAMBRIA:  All right.  And is it fair to say that

13    whatever you read in Google or Wikipedia, wherever, you can put

14    that aside and be fair to my client?

15          PROSPECTIVE JUROR:  Yeah.  It wasn't -- it wasn't

16    determinative or anything like that.  It was straight up, like,

17    just, like, what is happening, so the fact that, like, trial is

18    going to happen, but nothing determinative or anything like

19    that.

20          MR. CAMBRIA:  Thank you, sir.

21          PROSPECTIVE JUROR:  You're welcome.

22          THE COURT:  Ms. Bernstein.

23          MS. BERNSTEIN:  I can come grab the microphone, Your

24    Honor.

25          COURTROOM DEPUTY:  I'll give you a different one.

1          MS. BERNSTEIN:  Thank you.  Can everyone hear me?  Is

2     that on?

3          Okay.  Thank you.  My name is Whitney Bernstein, and

4     with some of my co-counsel who are not seated at the table,

5     it's my honor to represent James Larkin.

6          So we know that you've all filled out various

7     questionnaires.  They were extensive.  They have a lot of

8     specific questions in them.  And we're not here to change your

9     mind or change your beliefs about anything.  We are just here

10    to have a candid conversation, to talk about what those beliefs

11    are and what your feelings are, so that we have the ability to

12    impanel an impartial jury for our client.

13         So I want to just follow up with a couple of you on

14    those questions.

15         I think, Juror Number 14 -- and I want to make sure I

16    have the right person -- did you indicate that you are a beauty

17    advisor?

18         PROSPECTIVE JUROR:  Yes.

19         MS. BERNSTEIN:  Okay.  Thank you.  And I think you

20    also indicated that your sister is having a baby?

21         PROSPECTIVE JUROR:  Yes.

22         MS. BERNSTEIN:  When is her baby due?

23         PROSPECTIVE JUROR:  October.

24         MS. BERNSTEIN:  Are you planning on assisting with the

25    baby?

1            PROSPECTIVE JUROR:  No.

2            MS. BERNSTEIN:  Okay.  I think you also indicated that

3     you had very strong feelings about pornography?

4            PROSPECTIVE JUROR:  Yes.

5            MS. BERNSTEIN:  And that was a pretty specific

6     question.  That's something you've given a lot of thought to

7     before?

8            PROSPECTIVE JUROR:  (No audible response.)

9            MS. BERNSTEIN:  And you had that belief when you

10    answered the questionnaire well before you came in here today?

11           PROSPECTIVE JUROR:  Yes.

12           MS. BERNSTEIN:  And it sounds like it could be hard

13    for you to put that aside?

14           PROSPECTIVE JUROR:  As far as, like, making a decision

15    in terms of something that happened, I don't think that would

16    affect the way I would decide, necessarily.  I think that's

17    more of a personal belief on my part.

18           MS. BERNSTEIN:  Right, but so -- and, again, when

19    people walk through the courtroom, you don't lose your personal

20    beliefs.  We all retain them.  So, for example, if this was a

21    case about, you know, where someone had -- if this was a case

22    where someone had a gun, and you don't like guns, even though

23    people have the right to carry a gun, this probably wouldn't be

24    the trial for you, because I'm not here to change your beliefs

25    about guns, but it probably wouldn't make sense for you to sit

 1   on a trial like that.

 2           Does that make sense?

 3           PROSPECTIVE JUROR:  I guess so.

 4           MS. BERNSTEIN:  Well, I just want to find out just if

 5   this is the case for you, if you're able to be impartial for

 6   this case.  And so it sounded like you had very strong beliefs

 7   about pornography.  And I think you said that, right?

 8           PROSPECTIVE JUROR:  Yes.

 9           MS. BERNSTEIN:  It sounds like it might be hard for

10   you to put those aside.  You said you could try to leave that

11   in the back of your mind, but it's in your mind.  You would

12   agree?

13           PROSPECTIVE JUROR:  I wouldn't say that I would be,

14   like, pro pornography all the sudden, but I wouldn't say

15   immediately I would think somebody is a horrible person for

16   whatever dealings that they had with it.  I mean, if it's

17   something consensual, or, you know, whatever it is, I don't

18   necessarily know what it's all about, but for me, personally, I

19   don't agree with pornography.  I don't think it's, you know, a

20   positive industry that affects people positively, so that's

21   pretty much just how I feel about that.

22           MS. BERNSTEIN:  And that is a belief that you hold

23   pretty strongly?

24           PROSPECTIVE JUROR:  Uh-huh.

25           MS. BERNSTEIN:  Okay.  Thank you.  So even if you're

1    told to disregard that belief, that's a belief you've had for a

2    while?

3            PROSPECTIVE JUROR:  Yeah, I would say that's probably

4    a belief I've had my whole life.

5            MS. BERNSTEIN:  Thank you.

6            And, Juror 30, when Ms. Perlmeter was questioning you,

7    you indicated that you think a criminal defendant would have to

8    prove their innocence at a criminal trial; is that right?

9            PROSPECTIVE JUROR:  Yes, that's what I said.

10           MS. BERNSTEIN:  Do you understand the constitutional

11   presumption of innocence, that everyone is presumed innocent

12   unless the government proves with competent evidence beyond a

13   reasonable doubt that they are no longer innocent?

14           PROSPECTIVE JUROR:  Yes, I understand.

15           MS. BERNSTEIN:  And if the judge instructed you to

16   follow that principle, you, nonetheless, believe that a

17   defendant should have to prove their innocence?

18           PROSPECTIVE JUROR:  I believe that's -- I believe

19   that.

20           MS. BERNSTEIN:  Okay.  Thank you.

21           I apologize that it's taking so long.  The numbers

22   were all randomized, so that's why we're all trying to figure

23   this out today.

24           Just a moment, please.

25           Thank you, jurors, and thank you, Your Honor.  That's

1    all I have for now.

2              THE COURT:  Okay.  Mr. Feder.

3              MR. FEDER:  Juror Number 30, can I pick on you again?

4              PROSPECTIVE JUROR:  Certainly.

5              MR. FEDER:  As you might imagine, a belief that a

6    defendant is not presumed innocent and that they have to prove

7    something is a little upsetting to criminal defense lawyers.

8              Do you understand that?

9              PROSPECTIVE JUROR:  I do now.

10             MR. FEDER:  Because our constitution talks about the

11   presumption of innocence, and that the government has this

12   heavy burden of proving guilt beyond a reasonable doubt.

13             Do you understand that?

14             PROSPECTIVE JUROR:  Yes.

15             MR. FEDER:  If the judge -- and let me ask you a

16   question.  Who is the person that you trust the most in the

17   world?

18             PROSPECTIVE JUROR:  Who is the person I trust, the

19   person?

20             MR. FEDER:  Yes, brother, sister, father.

21             PROSPECTIVE JUROR:  I trust my wife.

22             MR. FEDER:  Good answer.  If your wife was charged

23   with some type of crime, and you think that she is the most

24   trusted person in the world, what would it take for you to

25   believe that the government has proven her case against her?

1              PROSPECTIVE JUROR:  What would it take?

2              MR. FEDER:  Yes.

3              PROSPECTIVE JUROR:  I'm not sure if I understand the

4    question.

5              MR. FEDER:  In other words, if she's the most trusted

6    person in your world, you would never suspect her of committing

7    a crime, right?

8              PROSPECTIVE JUROR:  Absolutely.

9              MR. FEDER:  That would be completely foreign to you.

10             PROSPECTIVE JUROR:  I would not believe that she did

11   it.

12             MR. FEDER:  And in order for you to be -- to have your

13   opinion about your wife's honesty and law-abiding nature

14   changed, how much evidence would it take to change your mind,

15   or would you still adhere to what you're saying, which is that

16   she would have to prove her innocence?

17             PROSPECTIVE JUROR:  It would -- I would absolutely

18   have to really see that she did that crime.

19             MR. FEDER:  That's what we call the presumption of

20   innocence and reasonable doubt.  Do you get kind of a flavor

21   for that as we talk about it?

22             PROSPECTIVE JUROR:  Absolutely.

23             MR. FEDER:  And if you were chosen for this jury,

24   could you see each of these accused people at these tables as,

25   essentially, in the position of your wife, and that you would

1   not let -- you would not vote for guilt unless, one, the

2   government were able to get past the presumption of innocence;

3   and, two, to prove every element of every crime beyond what's

4   called a reasonable doubt?

5           PROSPECTIVE JUROR:  Yes.

6           MR. FEDER:  Is there anybody else in the panel -- I'm

7   sorry, but the numbers are a little screwed up -- that answered

8   in their questionnaire that they believe -- it was question 43

9   -- that they believe that a defendant should have to prove

10  their innocence, number one; that they should have to testify,

11  number two; and/or that the prosecution has too heavy a burden

12  of proving somebody guilty?  Could you please raise your hand.

13          I know there is some of you because I read it in your

14  questionnaires.

15          Number 8.

16          PROSPECTIVE JUROR:  Number 8.  You know, I may have

17  said that, I'm not sure.  I'm not sure.  But when I think about

18  it, I understand the concept, but at the same time, I would

19  think that if someone was completely innocent, that they would

20  actively advocate their innocence, and that if they didn't do

21  that, that would be an indicator that, perhaps, they were not.

22          MR. FEDER:  Well, wouldn't that be the job of the

23  criminal defense lawyers who represent them, in order to do

24  what you're asking to be done?

25          PROSPECTIVE JUROR:  I think both have to do the job

1    right.

2             MR. FEDER:  But let's talk about this concept that,

3    again, is engrained in our criminal justice system for hundreds

4    of years.

5             Who is your most trusted person?

6             PROSPECTIVE JUROR:  I guess I'll go with wife too.

7             MR. FEDER:  That's a great answer.  And if your wife

8    was accused by people like these folks to my right for some

9    kind of crime, wouldn't it -- how much evidence would it take

10   for you to be convinced that she is -- that she committed some

11   kind of crime?

12            PROSPECTIVE JUROR:  Well, so in that specific case, I

13   know for a fact that my wife would be able to prove her

14   innocence and advocate for that in a positive way, right.  And

15   so, at that point, it would be her word versus what the

16   government's word was and then the jury would decide.  But she

17   would -- I know for a fact that if my wife was ever accused of

18   anything, that she would be able to give a positive defense on

19   her own behalf.

20            MR. FEDER:  But we're talking about, number one, what

21   the law is, and, number two, what is fair.  Do you think it's

22   fair that if your wife, your most trusted person in the world,

23   is accused, rightly or wrongly, that she should have to prove

24   her innocence versus the government of our country having to

25   prove that she is guilty beyond a reasonable doubt?

1        PROSPECTIVE JUROR:  There is two different parts.  I

2    think the government definitely has to do that, but I think, at

3    the same time, an innocent person has a responsibility to

4    advocate on their behalf.

5        MR. FEDER:  Which is what her lawyers, hopefully,

6    would do, right?

7        PROSPECTIVE JUROR:  Again, at the end of the day, I

8    hope she would do that, and I know that she would do that.

9        MR. FEDER:  But let's say, again, that you are picked

10   as a juror, and the order of the trial is that the government

11   has to go first because they carry the, what's called the heavy

12   burden of getting past this presumption of innocence, right?

13       PROSPECTIVE JUROR:  Right.

14       MR. FEDER:  Do you think your wife would have to do

15   anything at all if the government could not get past that

16   presumption of innocence?

17       PROSPECTIVE JUROR:  If it was any serious nature at

18   all, I would hope that she would.

19       MR. FEDER:  But she -- do you understand that, under

20   our system, she wouldn't have any responsibility to do that?

21       PROSPECTIVE JUROR:  I certainly understand that.

22       MR. FEDER:  And then it is only upon the defense to

23   think about whether or not they want to put on evidence or not

24   after, and only after, the prosecutors have been able to

25   present the amount of evidence it takes to get past, one, the

1    presumption of innocence, and then, second, to prove their case

2    and each element in it beyond a reasonable doubt.

3              Do you understand that?

4              PROSPECTIVE JUROR:  Yeah.

5              MR. FEDER:  Do you have any quarrel with that?

6              PROSPECTIVE JUROR:  No.  But if you're asking me as a

7    juror if I would sit -- in my mind, if I would ask myself, wow,

8    why didn't he testify on his own behalf, I would probably ask

9    myself that question.

10             MR. FEDER:  Even though --

11             PROSPECTIVE JUROR:  In all honesty.

12             MR. FEDER:  Even though the law doesn't require it?

13   Even though the law indicates that you cannot do that because

14   there is a presumption of innocence?

15             PROSPECTIVE JUROR:  But if you're asking me what I

16   think in my head, you know, I can't say that I wouldn't be able

17   to just turn that off.

18             MR. FEDER:  Let me try to summarize it here.  It

19   sounds like you would not be able to apply a presumption of

20   innocence and that the government has to prove guilt beyond a

21   reasonable doubt, because you would expect these folks to do

22   something on their own behalf, whether or not the government

23   had proven their case?

24             PROSPECTIVE JUROR:  If those are the -- those are two

25   different choices, right?  I think my first choice was the

1    government does have to prove something, right?  But I would

2    also hope that the other side, the defendant I guess would be

3    the right word, would also, you know, advocate on their own

4    behalf.

5              MR. FEDER:  What if the prosecutors didn't put on much

6    of a case?  Do you think the person that is accused, fairly or

7    unfairly, still has to defend himself?

8              PROSPECTIVE JUROR:  I guess if the prosecution didn't

9    put on, like, any case at all, then I guess, yeah, it would be

10   true.

11             So, I mean, if the prosecution came up and didn't

12   prove anything at all, then, you know, the choice would be

13   nothing at all and nothing on this side, then there is nothing

14   there, I would think.  But if the prosecution came out and

15   proved, okay, this is what happened, and the other side didn't

16   even counter that at all, I would have to wonder, well, maybe

17   that it's true.

18             MR. FEDER:  As you stand here right now, and you -- if

19   you were asked to vote guilty or not guilty, how would you

20   vote?

21             PROSPECTIVE JUROR:  On what?

22             MR. FEDER:  Based on what the case is about.

23             PROSPECTIVE JUROR:  I have no idea.

24             MR. FEDER:  Under our system of laws, you have to --

25   you would have to vote not guilty, because the presumption of

1    innocence and the burden of proof on the government is beyond a

2    reasonable doubt, so you have to vote not guilty right now

3    because there is no evidence.

4              PROSPECTIVE JUROR:  I guess I'm kind of lost on where

5    we are right now, so...

6              MR. FEDER:  Juror Number 8, you've indicated -- well,

7    let's finish this up.  Can you apply the presumption of

8    innocence and proof beyond a reasonable doubt or not, without

9    requiring or thinking in the back of your head that these folks

10   have to put on some kind of evidence to prove that they're not

11   guilty?

12             PROSPECTIVE JUROR:  I don't know.

13             MR. FEDER:  You've indicated that you are concerned

14   about the Delta -- you've indicated that you're concerned about

15   the Delta virus, right?

16             PROSPECTIVE JUROR:  I'm --

17             MR. FEDER:  Like everybody.

18             PROSPECTIVE JUROR:  I'm very preoccupied with, for

19   instance, you know, being in a courthouse for an extended

20   period of time, you know, with a lot of people in and out.  I

21   think that increases --

22             MR. FEDER:  Is that going to keep you from being able

23   to be a good juror, an attentive juror and focused juror?

24             PROSPECTIVE JUROR:  I cannot guarantee that I would be

25   able to put a hundred percent of my attention on the trial.

1          MR. FEDER:  Thank you.

2          Is there anybody else who would like to have me pick

3     on them and wants to raise their hand about these issues about

4     presumption of innocence, reasonable doubt, and the burden of

5     proof of the government?  Come on, somebody.

6          Okay.

7          PROSPECTIVE JUROR:  I sure don't want to after

8     watching that.

9          MR. FEDER:  Well, I'll try to be a lot gentler than I

10    was with Number 8.

11         PROSPECTIVE JUROR:  All I will say is that I have

12    similar feelings, in that anytime I watch something and someone

13    doesn't stand up to -- to speak on their own behalf, I wonder

14    why.

15         THE COURT:  And could you state your number for the

16    record?

17         PROSPECTIVE JUROR:  Oh, sorry, 16.

18         THE COURT:  Thank you.

19         MR. FEDER:  If the judge were to instruct you, if you

20    were a juror, that you are not to put any importance whatsoever

21    on an accused person if they don't testify, is that going to

22    affect your ability to be a juror and fairly judge this case?

23         PROSPECTIVE JUROR:  I don't think so.  It's very

24    difficult to -- to make that statement and to answer questions

25    that are what ifs when you haven't heard any of the case at all

1   yet, but I don't think that it would affect my ability to -- to

2   be a fair juror.

3           MR. FEDER:  If you had to vote right now, knowing what

4   you know about this case, which is that little blurb in the

5   questionnaire, what would your vote be?

6           PROSPECTIVE JUROR:  Well, you've told me I would have

7   to vote not guilty.

8           MR. FEDER:  Don't listen to me.  I'm just a criminal

9   defense lawyer.

10          PROSPECTIVE JUROR:  I know.

11          MR. FEDER:  Do you understand that that's the --

12          PROSPECTIVE JUROR:  Yes.

13          MR. FEDER:  -- that's our legal system?

14          PROSPECTIVE JUROR:  I do understand that.

15          MR. FEDER:  And that our constitution has been around

16  a long time, and those are the types of rules that are

17  required --

18          PROSPECTIVE JUROR:  Absolutely.

19          MR. FEDER:  -- in these types of cases?

20          PROSPECTIVE JUROR:  And I understand human nature as

21  well, and that it's really difficult to not draw conclusions in

22  your own head about things based on the things that you've

23  heard if left with no trial, no arguments, nothing, and just

24  having to say what -- so I think being instructed based on the

25  law and based on what our country says is the case, I -- I

 1    would be able to do that.

 2            MR. FEDER:  Thank you very much.

 3            Anybody else want to be victimized?

 4            I can see you're smiling, Number 23.

 5            PROSPECTIVE JUROR:  Sorry.  Number 23.  No, I don't

 6    have an opinion on it.  I believe in our justice system.  I

 7    believe that the rules are set in place for both sides to

 8    follow and adhere to and that's the way it goes, and that our

 9    job is to be -- to make sure that those rules are followed.

10    So, no, it's -- I don't have any problem with your -- your line

11    of thinking.

12            MR. FEDER:  Thank you.

13            Is there anybody else in this room that does not agree

14    with Juror Number 23?  Please raise your hand or forever hold

15    your peace.

16            (No audible response.)

17            MR. FEDER:  Thank you.

18            THE COURT:  Mr. Lincenberg.

19            MR. LINCENBERG:  Thank you, Your Honor.

20            THE COURT:  Mr. Lincenberg, do you have any questions

21    for Juror Number 4?  I'm going to let her leave to take a

22    restroom break, or you can ask them when she gets back.

23            MR. LINCENBERG:  Let me just take a look.

24            THE COURT:  Sure.

25            MR. LINCENBERG:  I can certainly -- I think Juror

1    Number 4 should take a restroom break, and if the Court wants

2    to proceed, we can proceed.

3            THE COURT:  Okay.

4            MR. LINCENBERG:  So I -- can everybody hear me if I

5    speak loudly and don't use the microphone here?  Thank you.

6            I'd like to follow up on Mr. Feder's questions with

7    regard to presumption of innocence.

8            My name is Gary Lincenberg.  I represent Mr. John

9    Brunst in this case.

10           And there were a couple of responses of people who

11   weren't sure whether or not a defendant should be required to

12   testify in their minds and the like.  And, honestly, I greatly

13   appreciate your honesty in responding of things that go through

14   your mind.

15           You know, what we really want as jurors is for you to

16   be brutally honest with us.  If you have opinions, we all have

17   opinions, we come into here -- into the courtroom with our

18   opinions.  We're not expected to wipe our mind clean and our

19   history of our lives clean with regard to our opinions.  The

20   idea of being brutally honest is so that we, as lawyers, can

21   help evaluate whether or not you, as jurors, can fairly

22   evaluate the evidence in this case.

23           And this question is particularly important to me,

24   because you'll see that when the trial starts -- and the first

25   thing that happens in a trial, the government is going to give

opening statements and some of the defense lawyers are going to give opening statements.  I plan to do what's called reserve my opening statement, meaning not give an opening statement before the government presents its case, because I want to see what the evidence is going to be.  They indicate some people may testify, and then sometimes they change who is going to testify and the like.

Now, what that means is that you're going to hear the prosecutors lay out a whole story of what they believe the evidence will show.  And it may be weeks, if not months, before you actually hear from me in my opening statement.  So you can imagine that my concern is do we have people on the jury who will follow the judge's instructions that my client is presumed innocent and that I'm not to form an opinion until we get to the defense case.

That's a very difficult thing to do.  We're human beings.  We react.  We're in this artificial environment of a courtroom where we can only consider what is stated in the courtroom when it comes in as evidence.  And I will, of course, be getting up to question witnesses.  You won't hear from me for a long time.

And so what I'm really looking for, first of all, is a general show of hands, is there anybody who just believes they would have difficulty reserving your views, reserving judgment until all of the evidence is in in the case and the judge has

1   fully instructed you on the evidence?  And there may be some

2   who the answer is yes, they -- they might have that type of

3   concern, that you might hear what the government has to say and

4   say that I would expect -- that you might be of the view that I

5   would expect I will form opinions.  They're going to call lots

6   of witnesses, people who were prostitutes, people who were

7   advertising on Backpage's websites.

8           THE COURT:  Counsel, what is your question?

9           MR. LINCENBERG:  The question is whether or not you

10  will be able to fairly reserve judgment or you think that

11  you'll start to form an opinion or hold it against Mr. Brunst

12  because I'm reserving my opening?  Please raise your hands if

13  you think you might fall into that category.

14          (No response.)

15          MR. LINCENBERG:  All right.  Let me go back to Juror

16  16, if I may.  Because you had indicated in your jury

17  questionnaire, and you were honest enough to also raise your

18  hand in court to indicate that you expect that a defendant

19  should have to testify.  So, as you sit here today -- and

20  that's your opinion, you're entitled to hold it -- do you

21  believe that if somebody did not testify, that that will send a

22  signal to you that they're therefore guilty?

23          PROSPECTIVE JUROR:  No, I don't think it would send a

24  signal that they are therefore guilty.  Again, he was talking

25  about what kind of plays in your head.  As I watch TV, as I

1   watch those shows, if someone doesn't testify, I wonder why.

2          MR. LINCENBERG:  Okay.  And if the judge were to

3   instruct you that the prosecution has the burden to prove the

4   case beyond a reasonable doubt, that the defense doesn't have

5   to put on any evidence whatsoever, would you be able to fairly

6   and fully follow that instruction, or would it leave questions

7   in your mind?  That's my question.  Would it leave questions in

8   your mind?

9          PROSPECTIVE JUROR:  I think it would leave questions

10  in my mind.

11         MR. LINCENBERG:  I appreciate -- I appreciate your

12  honesty.

13         Anybody else that would say, you know what, I have

14  questions in my mind if the defendant didn't put on certain

15  evidence or did not testify in the case, and it might impact my

16  ability to be a fair and impartial juror?  Please be brutally

17  honest with me.  There is no right or wrong answer.

18         Yes.  Sir, we heard you.  Anything -- unless there is

19  something further to add, you were honest and --

20         PROSPECTIVE JUROR:  No.  I think -- Number 8.  I think

21  16 basically stated it the same way that I probably wish I had

22  said.

23         MR. LINCENBERG:  Okay.  Thank you very much.

24         Juror Number 9, I believe, sir, that you indicated

25  that you have a new job.  When did you start?

1          PROSPECTIVE JUROR:  Juror 9.  I started officially

2    Monday last week.

3          MR. LINCENBERG:  Okay.  And are you working from home

4    or the office?

5          PROSPECTIVE JUROR:  It's door-to-door.

6          MR. LINCENBERG:  Door-to-door?

7          PROSPECTIVE JUROR:  Yeah.

8          MR. LINCENBERG:  Okay.  And did you indicate that

9    you -- did you indicate that you were paid commission?

10         PROSPECTIVE JUROR:  Commission, yes, sir.

11         MR. LINCENBERG:  All right.  And how long had you been

12   unemployed before going to that job?

13         PROSPECTIVE JUROR:  Since, I believe, May of last

14   year.

15         MR. LINCENBERG:  Okay.  May of 2020?

16         PROSPECTIVE JUROR:  May of -- I'm sorry, May of --

17   when the pandemic started.

18         MR. LINCENBERG:  May of 2019?

19         PROSPECTIVE JUROR:  Yes.

20         MR. LINCENBERG:  Okay.  So would serving on -- this

21   jury is going to be four or five days a week at times.  Would

22   it bother you that that would be interfering with your ability

23   to earn a living?

24         PROSPECTIVE JUROR:  Yes, depending on the hours of

25   trial compared to -- so the -- the hours that I go knocking

1   door-to-door, typically, are three to eight in the evening.  So

2   if it's a morning thing for the courts, I might be able to make

3   that work.

4          MR. LINCENBERG:  All right.  And as the days shorten,

5   as we have shorter days, is that still going to -- you still go

6   door-to-door during the dark or do you try to do it before it

7   gets dark?

8          PROSPECTIVE JUROR:  Personally, I try to do it before

9   dark.  It's more of a rule -- it's not a necessity to go those

10  hours.  It's more of a rule of thumb to have the most chances

11  of success.

12         MR. LINCENBERG:  Right.  So would it -- do you think

13  it might be a burden to you, that you might be concerned about

14  not performing enough to keep your job or earn a sufficient

15  income if we were in trial from 9:00 to 4:00 or so?

16         PROSPECTIVE JUROR:  It's a possibility, yes, that

17  would be a concern.

18         MR. LINCENBERG:  Okay.  And do you believe that that

19  also might cause you some anxiety about the length of the

20  trial, given that this may be lasting for several months and

21  might implicate your employment over a lengthy period of time?

22         PROSPECTIVE JUROR:  I'd say there would be some level,

23  yes.  I would have some concern if it, indeed, you know,

24  started to affect the hours that I was able to go out and try

25  and earn a living.

1        MR. LINCENBERG:  Okay.  Now, you also asked an --

2   answered a question in the questionnaire -- it was question

3   68 -- you said -- on the question of whether you believe

4   prostitution should be legalized, you said, yes, legalizing

5   prostitution but -- would help curve a lot of the stigma around

6   it, but the issue is with human trafficking.

7        PROSPECTIVE JUROR:  Yes.

8        MR. LINCENBERG:  Do you recall that?  Okay.

9        Now, this is a case which involves statutes involving

10  prostitution not human trafficking.  If the prosecution puts on

11  evidence, however, that somebody says they were trafficked,

12  would that be something that would be of a particular concern

13  to you in being able to fairly look at this -- this case

14  otherwise?

15       PROSPECTIVE JUROR:  I don't believe I would be -- be

16  able to be unbiased in that situation.

17       MR. LINCENBERG:  Okay.  Let me ask, by a show of

18  hands, if there is anybody else in connection with the question

19  -- because there were a few people who had various questions,

20  either you believed prostitution should be legal or not, but

21  your real concern was where there were children involved or

22  child trafficking.  This case involves people advertising on a

23  Backpage site, and some of those people are going to come into

24  the courtroom.  I anticipate they'll say, I was trafficked, or

25  something to that effect.

```
 1              With a show of hands, would that indication be
 2   something that you think might make it more difficult for you
 3   to be fair and impartial in a case in which our clients are
 4   charged with promoting prostitution?  Please give me a show of
 5   hands.  Please be brutally honest with me.  There is no right
 6   or wrong answer.
 7              THE COURT:  Juror 9, you can sit down.  Thank you.
 8              MR. LINCENBERG:  Thank you, Juror 9.
 9              (No response.)
10              MR. LINCENBERG:  Juror 10.  Juror 10, good morning.
11              PROSPECTIVE JUROR:  Good morning.
12              MR. LINCENBERG:  In the questionnaire relate --
13   somewhat related to this topic, the question was asked:  Should
14   the government investigate or prosecute purchasers of sex?  And
15   you said yes, and you had in there, was it consensual?
16              PROSPECTIVE JUROR:  Yeah.
17              MR. LINCENBERG:  Can you explain what you mean by
18   that.
19              PROSPECTIVE JUROR:  I think that one of the questions
20   in there was if prostitution should be legal, and I think under
21   certain guidelines, yes.  And the same way how, like, alcohol,
22   or, like, now weed is being used as, like, a form of tax, to
23   like -- the same way, like, how the college is with schools and
24   everything, I think prostitution could be used in the same
25   sense, but as of right now it's still illegal.  And that's
```

 1    where my thought process is on it.

 2            MR. LINCENBERG:  I'm trying to understand.  When you

 3    say, you know, was it consensual, was that getting at, well, if

 4    there was somebody who wanted to sell their body to somebody

 5    through prostitution, somebody wanted to buy it, it was

 6    consensual, then you have no problem, but otherwise you would?

 7    Is that what you're getting at?

 8            PROSPECTIVE JUROR:  Yeah.  Force is never okay.

 9            MR. LINCENBERG:  Right.

10            PROSPECTIVE JUROR:  That's -- yeah.

11            MR. LINCENBERG:  Okay.  And when asked a question

12    about your feelings regarding laws affecting the internet,

13    publishing content, you indicated -- you said something to the

14    effect, don't incriminate yourself on social media.  What did

15    you mean by that?

16            PROSPECTIVE JUROR:  Don't post that you're selling

17    shit or -- sorry -- or that you're, like, doing something that

18    you're not supposed to.  Like, if you're selling yourself

19    online, don't -- don't promote it on your Instagram or

20    whatever.

21            MR. LINCENBERG:  Okay.  Thank you very much for

22    your -- your candid answers.

23            Juror Number 15.  Okay.  Hello, sir.  There was one

24    question dealing with crypto currency in which you indicated

25    that you and your brother did some small crypto trading.  You

UNITED STATES DISTRICT COURT

1    may hear some evidence in this case that at a time payment was

2    permitted for ads on Backpage using crypto currency.  Do you

3    have any problem with that idea that the business would accept

4    crypto currency as a form of payment?

5              PROSPECTIVE JUROR:  No.

6              MR. LINCENBERG:  Does anybody in the courtroom have

7    any concerns, negative feelings about bitcoin or Dogecoin, or

8    whatever the different crypto currencies, being used as a

9    source of payment?  Does anybody think that that suggests that

10   there must have been something, perhaps, underhanded about the

11   business?  Raise your hands, please, if you have any of those

12   negative feelings.

13             (No response.)

14             MR. LINCENBERG:  Okay.  Thank you, sir.

15             Juror Number 20.  Good morning.  You indicated that

16   your -- that you were -- you had a BS in accounting and you

17   were a retired CPA, CFO, and controller.  My client,

18   Mr. Brunst, was a chief financial officer on a holding company

19   that had a loan with Backpage and has an accounting degree.

20   And I was wondering if, because of that, I wanted to ask if you

21   could just expound a little bit on your background work, your

22   experience.

23             PROSPECTIVE JUROR:  Juror Number 20.  I first was in

24   the military and then got my CPA degree, accounting degree and

25   my CPA certificate, and practiced for about five years, and

1    then went into the private industry as a CFO, several different

2    companies.  I changed companies about every three or four

3    years.  And then I retired.

4              MR. LINCENBERG:  Okay.  Thank you.  I appreciate that.

5    Now, you indicated in the questionnaire -- there was a question

6    that dealt with adult escort services.  And you'll hear

7    evidence that adult escort services are lawful, sometimes

8    regulated, and that this case deals with prostitution separate

9    from that.

10             When the question was asked are you bothered that

11   adult escort services are legal and/or can legally advertise

12   their services, you said, yes, I believe this is directly

13   contradictory to what God has intended for our world.  And when

14   I saw your answer, it raised a question that I had for you as

15   to whether you thought you could be fair and impartial in this

16   case since you gave us your honest view that even lawful

17   activity like that should not be permitted.

18             Is this a case you believe you could be fair and

19   impartial to these defendants who are charged in this criminal

20   case?

21             PROSPECTIVE JUROR:  Yes, I believe that I can.

22             MR. LINCENBERG:  You believe you could be?

23             PROSPECTIVE JUROR:  Yes.

24             MR. LINCENBERG:  That your religious views on these

25   issues would not interfere, would not cause you to be at all

1    biased against them in this case?

2            PROSPECTIVE JUROR:  No, they would not.

3            MR. LINCENBERG:  Okay.  And when asked a question

4    whether you had strong feelings about prostitution or

5    commercial sex, you gave the same answer.

6            There is going to be evidence in this case of

7    prostitution, and the question will be whether our clients are

8    liable by running their site and promoting them.  Would you be

9    at all more inclined towards the prosecution side because

10   prostitution is at issue here?

11           PROSPECTIVE JUROR:  I don't believe that I would be.

12           MR. LINCENBERG:  Okay.  Thank you.  And you were asked

13   a question whether the government should investigate or

14   prosecute providers of platforms that promote or facilitate

15   prostitution, and you said yes.  Apologize for that.

16           And you said yes, and let me ask you why.

17           PROSPECTIVE JUROR:  Can you rewind and --

18           MR. LINCENBERG:  Yes.  Let me start over.  We were

19   interrupted.

20           The question had been asked about whether the

21   government should investigate platforms that the government

22   contends are promoting prostitution, whether -- and this could

23   apply, in this case it's Backpage, you know, we all have --

24   there is a lot of platforms out there.  Twitter in which -- you

25   know, we see in the paper that the Taliban are using Twitter,

1    for example, or Facebook, or Google, different platforms

2    sometimes are criticized.

3         Is it your view that when something that is illegal,

4    whether it's terrorism or unlawful sales of products or

5    prostitution, makes its way onto those platforms, is it your

6    view that those who -- who own those platforms should be

7    prosecuted for that?

8         PROSPECTIVE JUROR:  I would say yes.

9         MR. LINCENBERG:  Okay.  And, given that view,

10   regardless of whether Twitter was intending to promote the

11   Taliban, or Backpage folks were intending to promote

12   prostitution, fair to say that you'd have a bias against them

13   because their platform was being used for that?

14        PROSPECTIVE JUROR:  I would have to agree with that,

15   yeah.

16        MR. LINCENBERG:  Okay.  And I greatly appreciate your

17   honesty.  Thank you very much.

18        Juror Number 26.

19        PROSPECTIVE JUROR:  Juror Number 26.

20        MR. LINCENBERG:  Sir, you indicated this morning that

21   you were concerned that your employer would only pay you for

22   ten days of leave.  Do I -- I think you were the gentleman.

23        PROSPECTIVE JUROR:  Correct.

24        MR. LINCENBERG:  Okay.  Can you expand on that, what

25   do you do, how important your job is to you, and the like?

1          PROSPECTIVE JUROR:  I'm a production planner for a

2     satellite company.

3          MR. LINCENBERG:  We can't hear you very well.

4          There we go.

5          PROSPECTIVE JUROR:  Is that better?

6          MR. LINCENBERG:  Yeah.  What does a production planner

7     do?

8          PROSPECTIVE JUROR:  I plan the materials that are

9     needed to build the actual satellite.

10          MR. LINCENBERG:  Okay.  And how long have you been in

11     that position?

12          PROSPECTIVE JUROR:  Three years.  I've been doing that

13     work for more than that.

14          MR. LINCENBERG:  Okay.  And what would happen if you

15     were to serve -- if you were forced to serve, you would just go

16     without pay?

17          PROSPECTIVE JUROR:  After the ten days I either have

18     to use my paid time off or leave without pay.

19          MR. LINCENBERG:  Okay.  And if this case went several

20     months, and then at the end of the several months, would you be

21     kind of in a hurry to get back as you're in deliberations?

22     Might it impact how much time you would want to spend in

23     deliberations, for example?

24          PROSPECTIVE JUROR:  Obviously, yeah -- yes, because I

25     would be curious of what's going on at work and --

1                    (Reporter interrupts for clarification.)

2            THE COURT:  Can you just repeat your last answer and

3     we'll see if we can hear better.

4            PROSPECTIVE JUROR:  Yes.  I would be concerned with

5     what's going back on at work.

6                    (Reporter interrupts for clarification.)

7            PROSPECTIVE JUROR:  Better?  Okay.

8            Yes.  I would be concerned with what's going on at

9     work, because I have somebody covering for me for all my work.

10           MR. LINCENBERG:  Okay.  Now, let me ask you about some

11    of your earlier work.  You, I believe, indicated that earlier

12    in your career you were a cost accountant and a general ledger

13    accountant for tech firms.  I'm following up on this because

14    Mr. Brunst is an accountant.  Can you explain for me a little

15    bit about what the nature of the work was that you did there.

16           PROSPECTIVE JUROR:  I was responsible on the general

17    ledger side, when I was doing that, for posting the debits and

18    credits and the monthly cycle.

19           MR. LINCENBERG:  Now, let me ask you on that, if I can

20    interrupt.  On the general ledger side, when you're looking at

21    debits and credits, did you get documentation and then just

22    sort of put them in the proper place in the ledgers and prepare

23    the accounting forms that needed to be done?

24           PROSPECTIVE JUROR:  It was all electronic.

25           MR. LINCENBERG:  Electronic.  Okay.  Did you do any

1   particular due diligence into what those underlying debits and

2   credits were, as to, for example, whether they were for lawful

3   or unlawful activity, or whether customers had complaints or

4   anything like that?

5            PROSPECTIVE JUROR:  Only when we were out of balance,

6   we'd have to go and investigate why we were out of balance or

7   what particular transaction that was.

8            MR. LINCENBERG:  Okay.  And then you would investigate

9   why you were out of balance.  When you investigated why you

10  were out of balance, would that get into an investigation as to

11  whether, for example, a particular customer was doing something

12  wrong?

13           PROSPECTIVE JUROR:  Not at my level.

14           MR. LINCENBERG:  Right.  Okay.  All right.

15           And you indicated in your questionnaire that websites

16  -- platforms should be responsible when the content leads to

17  criminal activity.

18           Can you expand on your answer there?

19           PROSPECTIVE JUROR:  Well, if the website is, in my

20  opinion, doing something illegal, I believe that they would be

21  responsible for those actions that they're taking.

22           MR. LINCENBERG:  Okay.  So if somebody posted

23  something that was illegal on the website, in your view, the

24  website should also have responsibility?

25           PROSPECTIVE JUROR:  Yes.  As the content provider,

```
 1   yes.
 2           MR. LINCENBERG:  Okay.  I appreciate your answers.
 3   Thank you.
 4           Juror Number 29.
 5           No, there is no 29.  I'm sorry.  Okay.
 6           Then maybe if we could go to Juror Number 31.
 7           PROSPECTIVE JUROR:  Juror Number 31.
 8           MR. LINCENBERG:  Hi.  Good morning.  My heart goes out
 9   to you for your losses, and I know it's difficult to share that
10   in a public place, so forgive me for following up on it.
11           It sounds like, first of all, your mind is elsewhere
12   right now.  Is that fair?  And you're going to need to take
13   some time off.  It sounds like you were close to your
14   grandmother.
15           PROSPECTIVE JUROR:  It's my grandfather.  I'm very
16   close with him, I would say just about as close as I am with my
17   own parents.
18           MR. LINCENBERG:  Okay.  And so how much -- how much
19   time do you -- there is going to -- how much time do you think
20   you would need off for that?
21           PROSPECTIVE JUROR:  Honestly, it's hard to say.  When
22   I lost my dad two-and-a-half years ago, I'm still grieving over
23   that.  So to lose his dad this soon, I, honestly, I can't give
24   a time frame.
25           MR. LINCENBERG:  All right.  And would your grief
```

1   also, even if you were in the courtroom as you are today, is

2   your mind a little bit elsewhere?

3          PROSPECTIVE JUROR:  Absolutely.

4          MR. LINCENBERG:  Okay.  Would that make it a little

5   more difficult to stay focused on the witnesses and the

6   testimony?

7          PROSPECTIVE JUROR:  Absolutely.

8          MR. LINCENBERG:  Thank you very much.  And, again, my

9   sympathies.

10          Nothing further.  Thank you, Your Honor.

11          THE COURT:  Okay.  There might be a few more

12   questions.  How many people need a break?  It's been

13   90 minutes.  Okay.

14          So we're going to take a break, I say ten minutes, but

15   there are a lot of you.  So just come back outside the

16   courtroom as soon as you're ready, but don't come back into the

17   courtroom.  We'll bring everybody in at the same time.

18          Try to remember where you're seated because we'll seat

19   you in the same place.

20          And we're at recess.

21          (Recess taken, 11:07 a.m. - 11:28 a.m.)

22          THE COURT:  Thank you.  Please be seated.

23          We are back on the record with the jury present.  You

24   were all so very efficient getting back in here.  Thank you.

25          All right.  Mr. Eisenberg.

1          MR. EISENBERG:  Thank you, Your Honor.

2          Well, we're decreasing in height, we went from my

3    colleague Mr. Lincenberg to me.  I hope you all can see me.  I

4    can see you.  Okay.

5          Question for Juror Number 13.  Where are you, Number

6    13?

7          Yes, sir.  I noticed from -- are you from Iowa?

8          PROSPECTIVE JUROR:  No.

9          MR. EISENBERG:  Got the Hawkeyes.

10         PROSPECTIVE JUROR:  Yeah.  I'm from Texas but I went

11   to Iowa to play football.

12         MR. EISENBERG:  Good.  I noticed in your answers to

13   the juror questionnaire that you have a connection to law

14   enforcement.

15         PROSPECTIVE JUROR:  Not that I can think of.

16         MR. EISENBERG:  St. Paul Minnesota Police Department.

17         PROSPECTIVE JUROR:  Oh, I applied for there, yes.

18         MR. EISENBERG:  You did.  Okay.  Is there anyone in

19   your family who has a connection to law enforcement?

20         PROSPECTIVE JUROR:  No.

21         MR. EISENBERG:  And so you also stated that -- okay.

22         Website responsibility was part of the questionnaire

23   that we had here.  And when you answered that question, what

24   did you think it was getting at?

25         Let me give you a --

1              PROSPECTIVE JUROR:  Actually, it was a long time ago.

2     I don't remember.

3              MR. EISENBERG:  I'll try to refresh your recollection.

4     That's a lawyer's term.

5              Feelings about website responsibility for content

6     posted by users.  That was the question.  And then the answer

7     was:  User platforms should be responsible to keep their sites,

8     and so forth.

9              PROSPECTIVE JUROR:  Any -- any web-based communication

10    device should be policed by whoever owns the device.

11             MR. EISENBERG:  So that can take -- well, we're

12    talking in the abstract here, and I know we're going to have to

13    wait until the trial unfolds -- but that can include many

14    different efforts on behalf of the website.

15             PROSPECTIVE JUROR:  As long as the website is -- is

16    going in good faith --

17             MR. EISENBERG:  In good faith.

18             PROSPECTIVE JUROR:  -- there shouldn't be a problem.

19             MR. EISENBERG:  Right.

20             PROSPECTIVE JUROR:  The thing is right now there has

21    been no litigation nor any action by Congress or anyone else

22    that makes the platforms responsible.  They can -- they can

23    tell you that, yeah, we -- we did something here or did

24    something there, but it's -- there has been no concrete law.

25             MR. EISENBERG:  So it's a pretty undefined area?

1              PROSPECTIVE JUROR:  Correct.

2              MR. EISENBERG:  Right.  And so it's left to the

3      platform provider to do the best they can.  Would you agree

4      with that?

5              PROSPECTIVE JUROR:  Yes, I would.

6              MR. EISENBERG:  Okay.  Thank you, sir.

7              Juror Number 20.  Ma'am, I noticed from the responses

8      on your juror questionnaire you had strong feelings about a lot

9      of things, and I won't go into them specifically, but -- well,

10     one of those was about escort services and legal adult

11     entertainment.  And you were pretty clear that you just weren't

12     in favor of those; am I correct?

13             PROSPECTIVE JUROR:  Juror Number 20.  Yes.

14             MR. EISENBERG:  Yes, ma'am.

15             PROSPECTIVE JUROR:  Correct.

16             MR. EISENBERG:  So is it going to be difficult for you

17     to sit in this case and hear testimony that's going to relate

18     to, for example, escort services?

19             PROSPECTIVE JUROR:  I don't believe it will be.

20             MR. EISENBERG:  And would it be difficult for you to

21     talk about or hear evidence that has to do with massages?

22             PROSPECTIVE JUROR:  No, it won't.

23             MR. EISENBERG:  In spite of the fact that in your --

24     it seems to me like you have a pretty strong reaction to those

25     activities, and, in fact, it may come from your own moral

1   situation, your own moral position.

2           PROSPECTIVE JUROR:  I feel I can be objective.

3           MR. EISENBERG:  You can?

4           PROSPECTIVE JUROR:  Yes.

5           MR. EISENBERG:  Okay.  So, well, that's -- so what

6   that's going to entail in this case is you'll have to sit and

7   hear things that you may not like, and they may have issues

8   with respect to things that you just simply don't agree with,

9   but you would have to set that aside and try to relate it to

10  the people who are actually here as defendants.

11          PROSPECTIVE JUROR:  Yes.

12          MR. EISENBERG:  Okay.

13          PROSPECTIVE JUROR:  You're right.

14          MR. EISENBERG:  So, in other words, if somebody comes

15  in and says that they were a -- I'll just make it up, I don't

16  want to get too far away from this -- a victim of someone who

17  was a pimp, but it has nothing to do with these gentlemen and

18  lady here, would you be able to set aside the fact that they're

19  talking about the -- the testimony is about something that

20  happened to them in that situation but it doesn't relate to any

21  of the defendants here?  Would you hold that against the

22  defendants?

23          PROSPECTIVE JUROR:  No, I would not.

24          MR. EISENBERG:  All right.  I appreciate that, ma'am.

25          Your Honor, that's all I have.  Thank you.

1              THE COURT:  Okay.  Ms. Bertrand.

2              MS. BERTRAND:  Good morning.  We're still in the

3    morning.  My name is Joy Bertrand.  And it's really easy to

4    keep track of who my client is because her name is Joye Vaught.

5    I don't know how that happened, but that's who I am and who my

6    client is.

7              And before we talk about specific issues today, and we

8    are going to focus on issues, I want to -- I think sometimes we

9    start jury selection and it feels like we've been shot out of a

10   cannon and we don't -- we don't have clear indications about

11   what happens in jury selection.

12             And there is a perception, I think, from television,

13   that the lawyers are here trying to figure out who to get rid

14   of, who to strike, and who to keep.  And I want to suggest to

15   you that the other thing we're doing today is finding out who

16   wants to be here and who does not.

17             And Ms. Vaught and I are only one-seventh of what's

18   going on here today, but I encourage you to be honest, and I

19   encourage you to be straightforward with us and the Court if

20   you do not want to be in this case.  It's too important to say,

21   well, I guess, if I must, if you make me.  So please be candid

22   with us.  And if you don't want to be here, I'll do everything

23   in my power, it's a little limited, it to make sure you're not

24   here when we're done.  Okay.

25             So, with that, can we agree that we're going to be

1    straight with each other?

2         (No audible responses.)

3         MS. BERTRAND:  And my colleagues have talked a little

4    bit about reasonable doubt.

5         And, Juror 16, I am not going to pick on you or ask

6    you to give a right answer, but would you mind talking with me

7    for a moment?

8         PROSPECTIVE JUROR:  Hi.

9         MS. BERTRAND:  Hi.  Reasonable doubt is thrown around

10   a lot, lawyers, and judges, and jurors.  What does reasonable

11   doubt mean to you?  When you hear the government, the

12   prosecution has to prove a case beyond a reasonable doubt, how

13   would you define that personally?

14        PROSPECTIVE JUROR:  Well, I think it just means that I

15   still don't -- haven't heard enough to be fully convinced that

16   that is correct, that there is still a part of me that thinks

17   that they might be wrong.

18        MS. BERTRAND:  Okay.  Thank you.

19        PROSPECTIVE JUROR:  Can I just -- I want to go back to

20   the question that I answered last time.  He asked me if there

21   would still be a question, if all I heard was the government's

22   case --

23        MS. BERTRAND:  Sure.

24        PROSPECTIVE JUROR:  -- then would you still -- I have

25   a hard time imagining that if all you hear is everything that

1  has been -- that they have to prove that this is -- person is

2  guilty, and that's all you hear, that anybody would not still

3  have questions.  There is two sides here, there is two parts of

4  it, and you always want to hear both.

5          MS. BERTRAND:  Sure.

6          PROSPECTIVE JUROR:  So that was my response was, of

7  course, if all I heard was one side of the case, I would be

8  left wanting in that situation.

9          MS. BERTRAND:  Thank you.  I think that's -- I think

10  that's a natural feeling to have.  And what gets hard, in a

11  complex case like this where there is so many counts and so

12  many moving pieces, is staying on task and keeping the

13  prosecution on task.  They meet reasonable doubt or they don't.

14  And reasonable doubt can be, and should be, I can't rule out

15  other reasonable options.  Using reason, or using logic, I

16  can't rule out other things may have happened.  There are --

17  there are alternative concepts that do not lead to guilt.

18          Does that make sense?

19          PROSPECTIVE JUROR:  Yeah, it does.  It's a much better

20  answer than I gave.

21          MS. BERTRAND:  I try.  Thank you, Juror 16.

22          Who agrees with Juror 16 about that comfort level with

23  reasonable doubt, or who disagrees?

24          How about Juror 5, in listening to this?

25          PROSPECTIVE JUROR:  I'm Juror 5.  Yeah, I think

1    reasonable --

2              MS. BERTRAND:  You just have to project through your

3    mask.

4              PROSPECTIVE JUROR:  Reasonable doubt, yeah, I believe

5    that there is reasonable doubt.  I would think I have to give

6    -- everything that's been asked here, I have to hear the

7    evidence.  You can't make me tell you what I'm going to do in a

8    situation until I hear that.

9              MS. BERTRAND:  Oh, yes.

10             PROSPECTIVE JUROR:  But you also asked -- and I do

11   want to respond to this -- who doesn't want to be here?  To be

12   honest with you, I don't want to be.  The whole time I've been

13   here --

14             (Reporter interrupts for clarification.)

15             PROSPECTIVE JUROR:  I'm sorry.  You know, I'm very

16   interested in what this case is because of what I do for a

17   living, but I have a hundred students right now.  As I'm

18   sitting here and go outside, I have got 15 calls right now from

19   students that have papers due tomorrow, that have exams on

20   Friday.  I just -- I don't know what to tell you, they're

21   40 percent through with their grade.

22             (Reporter interrupts for clarification.)

23             PROSPECTIVE JUROR:  40 percent of my students have --

24   or 75 percent of my students have 40 percent of their grades

25   calculated.  We know the effects of COVID-19 educationally.

1   Students are being left behind.  I've been a college professor

2   for 23 years and it's killing me not to take their phone calls

3   for the paper that's due tomorrow.

4           I take pride in what I do.  Just like you care about

5   your clients, I care about my students.  I don't know.  I think

6   it's asking a lot for me to do that.  You know, my college --

7   what are my students going to do, ask for a tuition refund?

8   We're already down, you know, ten percent enrollment.  That's

9   just my personal feelings.  I answered, yes, I don't want to be

10  here.

11          MS. BERTRAND:  Thank you.

12          Anyone have feelings like Juror 5 that they would like

13  to get out of themselves, not get out?  Any other strong

14  feelings that they want to share?

15          (No response.)

16          MS. BERTRAND:  If you change your mind, let us know.

17  It's important that you let us know.

18          Juror 2, hi.  I noticed in your written responses you

19  were quite candid with us about your discomfort in serving.

20  And I think lawyers sometimes forget that not everybody is

21  comfortable with public speaking.

22          THE COURT:  Ms. Bertrand, can you move closer to the

23  microphone?

24          MS. BERTRAND:  Sure.

25          PROSPECTIVE JUROR:  I'm extremely uncomfortable

1    speaking.

2              MS. BERTRAND:  I'm sorry.  We can't hear you.  Talk

3    like you're at a football game into the microphone and then

4    we'll hear you.

5              PROSPECTIVE JUROR:  I never speak loud.  I'm extremely

6    uncomfortable speaking.

7              MS. BERTRAND:  Yeah.

8              PROSPECTIVE JUROR:  Being here is, like, one of my

9    nightmares that I've had my entire adult life.  I don't drive,

10   so my husband brings me and drops me off and then he goes home.

11   And that -- leaving me in a public place alone is terrifying.

12             MS. BERTRAND:  A place you've never been?

13             PROSPECTIVE JUROR:  Yes.  I will get better as time --

14   right now I am a wreck.

15             MS. BERTRAND:  I hear you.  I'm so glad you were

16   candid with us, because one aspect of jury service is the

17   listening and processing of the information you receive.  But,

18   as jurors, the other job is to speak your voice when it comes

19   time to deliberate.  And by just their nature, some people are

20   -- want -- seek compromise and want to make things nice, make

21   people comfortable.  And some people say, no, I stick to my

22   guns.  I don't care who I make uncomfortable.

23             Where would you put yourself in that spectrum?

24             PROSPECTIVE JUROR:  I tend to make people comfortable.

25   I don't always speak my own mind.  I kind of let other people

1    have their way.

2             MS. BERTRAND:  Make people comfortable?

3             PROSPECTIVE JUROR:  Yes.

4             MS. BERTRAND:  Another thing, and I won't go into

5    detail, is that you noted that some of the sexual content in

6    this evidence would make -- would be really uncomfortable to

7    take in?

8             PROSPECTIVE JUROR:  Yes.

9             MS. BERTRAND:  Do you think it's something that would

10   be -- distract you from paying attention?

11            PROSPECTIVE JUROR:  Probably.  I have trouble paying

12   attention anyway.

13            MS. BERTRAND:  Okay.

14            PROSPECTIVE JUROR:  My mind wanders sometimes, yeah.

15            MS. BERTRAND:  Some people -- and this information

16   that you'll -- some of the stuff you'll see is graphic.  It's

17   not -- what is that?

18            It's graphic.  It's people doing things I didn't know

19   they did until I joined this case, and it includes photos of

20   people doing the things I didn't know happened until I took

21   this case.

22            How do you feel you would be able to process that, or

23   would you be able to process that?

24            PROSPECTIVE JUROR:  I am not certain.  I haven't

25   really been exposed to this sort of thing.  I don't even know a

1    lot about the internet at all.  I don't use a computer.  So all

2    the stuff about bitcoin, I have no idea what that is.

3                MS. BERTRAND:  Sure.

4                PROSPECTIVE JUROR:  Yeah.  I'm a little sheltered.  I

5    don't leave my house much, so that's why.

6                MS. BERTRAND:  That's okay.

7                PROSPECTIVE JUROR:  It is for me.

8                MS. BERTRAND:  Yeah, and I'm sure it's for your family

9    too.  Do you have a concern that this imagery and descriptions

10   might be overwhelming?

11               PROSPECTIVE JUROR:  Yes.

12               MS. BERTRAND:  Thank you.  Thank you so much for

13   sharing with us.

14               Who, in listening to Juror 2, has similar concerns

15   about, let's start with, being able to speak their voice?

16               So, Juror 4, where would you put yourself on that

17   spectrum from, I'm here to make things nice, I'm here to make

18   people comfortable, to I'm going to stick to my guns?

19               THE COURT:  Ms. Bertrand, you need to stay close to

20   the microphone.

21               PROSPECTIVE JUROR:  My husband would say I always

22   speak my voice, so I don't really have a problem doing that.  I

23   try to do it respectfully and kindly and listen to other

24   people, but I usually pretty much stick to my guns.  And I will

25   -- I don't want to use the word fight, I know that's not the

right word -- but I will get my point across and be probably

too -- trying too hard to make myself understood until I think

that everybody understands my point of view and then I'll stop.

MS. BERTRAND:  So you'll speak until you're heard?

PROSPECTIVE JUROR:  Pardon me?

MS. BERTRAND:  You'll speak until you feel heard?

PROSPECTIVE JUROR:  Correct.

MS. BERTRAND:  What about the issue of the graphic

content of this case?

PROSPECTIVE JUROR:  While I'm not a person who enjoys

that type of thing or I participate in that, I think that I

could -- it would be -- I could watch it.  I could do what I

needed to do.  I'm a person who does what's required of me even

if it's difficult.

So it would be -- you know, I would -- yeah, I

would -- it's not something that is a part of my life, so I

wouldn't particularly -- you know, I could do -- I could look

at the evidence and determine the evidence to the best of my

abilities.  I can't say that I wouldn't be, like, shocked

maybe, because it's not something I normally -- I don't even

know what it is, but, you know, it's not something I would

normally do, so I might be shocked, but I think I could

deliberate.  Is that the right word?

MS. BERTRAND:  It is if it's the right word for you.

PROSPECTIVE JUROR:  Okay.

1           MS. BERTRAND:  I noticed in your response -- your

2    written responses that you have a -- one of your children is a

3    child trauma therapist.  Is that accurate?

4           PROSPECTIVE JUROR:  Yes, my daughter.  She's 42.  But

5    she -- she has, in her education -- in her education, in her

6    internships she worked as a high-needs case manager for

7    children as a social worker, then she also worked in the

8    domestic violence area -- it keeps going out -- as an intern.

9    And then now she's a professional therapist and she does have

10   some children as clients.

11          MS. BERTRAND:  Does she have adult clients too?

12          PROSPECTIVE JUROR:  Yes, whole -- the whole, what do

13   you call?

14          MS. BERTRAND:  Trauma clients?

15          PROSPECTIVE JUROR:  She has trauma, but she's also

16   doing marital and family therapy.  She does all kinds.

17          MS. BERTRAND:  I'm so sorry about that microphone.

18          PROSPECTIVE JUROR:  The battery is probably going

19   dead.

20          MS. BERTRAND:  Yeah, good guess.

21          You mentioned in your written answers a distinction

22   about being trafficked or being forced into this work, what --

23   what does that -- versus just prostitution.  What's that

24   distinction to you?

25          PROSPECTIVE JUROR:  Well, I'm not an expert in the

1    field.

2             MS. BERTRAND:  Sure.

3             PROSPECTIVE JUROR:  So I would say someone who has

4    been vulnerable in some way, maybe they're very young, maybe

5    they're, you know, a young woman, or I suppose a boy too, it

6    could be a boy who is vulnerable, and somebody befriends them

7    and does things for them that benefits them, and then they end

8    up in a lifestyle that may not be beneficial to them.  And, you

9    know, and then they're stuck in that lifestyle and maybe abused

10   in that lifestyle to have to be continuing it to make money for

11   that person.

12            MS. BERTRAND:  Sure.

13            PROSPECTIVE JUROR:  Versus someone who chooses to do

14   that, as maybe an older person, you know, that decides that

15   that's a good way to make money because -- for whatever reason.

16            MS. BERTRAND:  Thank you, Juror 4.  I appreciate it.

17            Who has feelings like Juror 4, that there are

18   distinctions between prostitution and someone choosing that

19   versus trafficking and being taken for granted, trapped?

20            Juror -- where is Juror 10?

21            What's your feelings about that distinction?

22            PROSPECTIVE JUROR:  Being trafficked versus willingly

23   being --

24            MS. BERTRAND:  Yes.

25            PROSPECTIVE JUROR:  I don't really have a clear point

1   on one or the other.  I think one of them is you're mature and

2   make the choice to do it, as opposed to other which is, I

3   guess, for popularity of the word, being groomed at an early

4   age.

5           MS. BERTRAND:  Yes.

6           PROSPECTIVE JUROR:  That's pretty much it.  To where

7   you don't know any better.

8           MS. BERTRAND:  That's the distinction to you, being

9   able to make a real knowing choice versus being kind of pulled

10  and manipulated into it.  Is that fair?

11          PROSPECTIVE JUROR:  Yeah.

12          MS. BERTRAND:  I noticed in your discussions with my

13  colleagues and in your written responses you said, you know,

14  don't -- don't go posting your business on, you said Instagram.

15          PROSPECTIVE JUROR:  Yeah.

16          MS. BERTRAND:  But we could use any social media

17  platforms, OnlyFans, Pinterest, you would be surprised to

18  learn.  In your mind, coming into this case, what's your

19  feeling about the responsibility of those -- those platforms,

20  those providers?

21          PROSPECTIVE JUROR:  I think that they should try their

22  hardest to not have illegal things happen.

23          MS. BERTRAND:  Uh-huh.

24          PROSPECTIVE JUROR:  I don't really have any concrete

25  idea of what should -- if it is on their hands or if it's on

```
 1    the people -- the people posting its hands.  Yeah, I don't -- I
 2    never really put thought into it, to be honest.
 3              MS. BERTRAND:  I don't think most people have.
 4              PROSPECTIVE JUROR:  Yeah.
 5              MS. BERTRAND:  But there might be a distinction.
 6              Thank you.  Thank you, Juror 10.
 7              Juror 27.  Hello.  You had to know one of us was going
 8    to talk to you.
 9              PROSPECTIVE JUROR:  I might be able to speak loud
10    enough.
11              MS. BERTRAND:  Okay.  Counsel, what areas do you
12    practice in?
13              PROSPECTIVE JUROR:  Bankruptcy, creditor's rights,
14    commercial litigation, business litigation.
15              MS. BERTRAND:  You try cases?
16              PROSPECTIVE JUROR:  I've tried a few cases.
17              MS. BERTRAND:  To juries?
18              PROSPECTIVE JUROR:  Never to a jury.
19              MS. BERTRAND:  Bankruptcy doesn't have juries.
20              PROSPECTIVE JUROR:  No, not typically.  I mean, it
21    could, arguably, have one in an adversary proceeding, but not
22    general bankruptcy.
23              MS. BERTRAND:  Sure.  Especially with litigators, and
24    I've been on panels too, and I sit there, like, on my hands
25    trying not to talk.
```

1          What's your expectation of the lawyers in this room,

2     as a litigator?

3          PROSPECTIVE JUROR:  What's my?

4          MS. BERTRAND:  Expectation of the lawyers.

5          PROSPECTIVE JUROR:  Oh, expectation.  I don't know if

6     I have any specific expectation.  I mean, I've sat in on voir

7     dire before.  And I've never tried to jury, but in my early

8     practice I did insurance defense litigation and participated

9     in, as an associate, through the voir dire process.  I know

10    there is a lot that you all are doing and things that, through

11    this process, trying to get information from jurors to make

12    decisions on who is to sit on the jury and who to potentially

13    strike.

14         MS. BERTRAND:  What else?

15         PROSPECTIVE JUROR:  I mean, I understand each side has

16    a position.  The state's looking for who might be more

17    receptive to their position, and possibly the same on the

18    defense.  I'm not sure what else you're looking for at this

19    stage.

20         MS. BERTRAND:  That might be all you have.

21         All right.  Do you have any -- because litigators tend

22    to be kind of black and white, because they're forced to take

23    positions on things, any firm positions you've developed in

24    listening to this case and answering the questionnaire so far?

25         PROSPECTIVE JUROR:  I -- I do have positions on

```
 1    Backpage, just on my personal background and thoughts on it
 2    that -- my understanding of it.
 3              MS. BERTRAND:  What are those?
 4              PROSPECTIVE JUROR:  I -- I -- typically, are -- my
 5    understanding was it's used for improper and nefarious
 6    purposes.  I'm not aware of what all it's used for, but my
 7    general understanding is that it's typically a site that, if
 8    you're looking for something illegal, that's where people go
 9    to.
10              MS. BERTRAND:  Any other thoughts about Backpage?
11              PROSPECTIVE JUROR:  No, other than that.  I do
12    remember seeing, I feel like back when -- I think it was in the
13    news.  I remember reading articles about when the arrests, or
14    whatever, were made in regards -- I assume it was this case
15    but --
16              MS. BERTRAND:  Let me ask you this, and you're going
17    to know the law school answer, but your friends here won't.
18    You knew about the arrest.  You knew people had been indicted,
19    right?
20              PROSPECTIVE JUROR:  Yes.
21              MS. BERTRAND:  The human nature is to say, well, they
22    must have done something or they wouldn't be here.  The
23    government wouldn't have gone to all of this trouble if they
24    didn't have a case.  How do you feel about that?  Was that your
25    first opinion?
```

1          PROSPECTIVE JUROR:  No.  I mean, I understand the

2     presumption of innocence and that -- look, there is likely and

3     clearly some evidence that led to the arrests, and there is

4     something that was put out there that, obviously, there is a

5     case to be made, but I certainly understand the concept of the

6     presumption of innocence, and that just because you're arrested

7     does not mean that you're guilty.

8          MS. BERTRAND:  Thank you.  Thank you, counsel.  Thank

9     you, Juror 27.  Thank you.

10          Who disagrees with Juror 27?  Well, they must have

11     done something or we wouldn't all be here.  It's okay.  It's

12     human nature to say it.

13          There is a string of bank robberies and they finally

14     make an arrest, and I'll tell you the first thing, if criminal

15     defense lawyers have been following it, is they're like, oh,

16     good, they caught them.

17          So Juror 18.  Hello.  You're going to have to talk

18     through the mask.

19          PROSPECTIVE JUROR:  Hi.  Hello.

20          MS. BERTRAND:  What's your feelings about, well, they

21     must have done something?  Do you agree with that?

22          PROSPECTIVE JUROR:  Not necessarily.  I think people

23     sometimes do get in a position that they --

24          THE COURT:  I need you to speak up a little.

25          PROSPECTIVE JUROR:  I think sometimes people end up in

1  a position that didn't warrant them to be there.

2          MS. BERTRAND:  Sure.

3          PROSPECTIVE JUROR:  There could be a mistaken

4  identity.  There could be a situation where a friend of a

5  friend or something, not every person is -- that is arrested

6  should be arrested.

7          MS. BERTRAND:  You, in talking with one of my

8  colleagues, and I -- and I notice that you are very poised and

9  very soft spoken.  You were, I believe, one of the folks that

10  said, well, I'll deliberate if I have to.

11          PROSPECTIVE JUROR:  I've been a juror before on a

12  trial.

13          MS. BERTRAND:  What kind of trial was that?

14          PROSPECTIVE JUROR:  It was a gang trial.

15          MS. BERTRAND:  A gang trial?

16          PROSPECTIVE JUROR:  Yes, ma'am.

17          MS. BERTRAND:  And without going into the details of

18  the deliberations, did you feel like you could speak your

19  voice?

20          PROSPECTIVE JUROR:  Absolutely.

21          MS. BERTRAND:  Do you feel like you're the kind of

22  person who would be seeking compromise?

23          PROSPECTIVE JUROR:  I would seek to try to get the

24  truth and make the right decision based on the evidence.

25          MS. BERTRAND:  What if people disagree with you?  How

1   do you handle that?

2          PROSPECTIVE JUROR:  I would continue to try to push my

3   point and also hear others as well.

4          MS. BERTRAND:  Thank you, Juror 18.

5          Just a moment, please.

6          Juror 18, I'm going to ask one other series of

7   questions to you.  I apologize.  It's hard to cross back and

8   forth with the different lists here.

9          You noted, and much like Juror 2, that talking about

10  sexual things makes you uncomfortable.

11         PROSPECTIVE JUROR:  Yes, very much.

12         MS. BERTRAND:  We have weeks of evidence coming in

13  that involve graphic sexual content.  Some people might say

14  that it would flood me, it would be too much for me to process,

15  and some say, bring it on.  What is your feeling, knowing that

16  we're going to have to sit here with images projected on these

17  big screens and go through this evidence, how do you think you

18  would handle that?

19         PROSPECTIVE JUROR:  I would be uncomfortable.  As I

20  said before, if I'm required to do something, I am able to set

21  aside the uncomfortableness of it and handle it appropriately.

22         MS. BERTRAND:  Can you say more about handling it

23  appropriately?

24         PROSPECTIVE JUROR:  Just listen to the evidence and

25  view the evidence and do what's needed to make a final

1    decision.

2          MS. BERTRAND:  All right.  Thank you.  Thank you,

3    Juror 18.

4          Just a moment, please, Judge.

5          Juror 22.  Hi.

6          PROSPECTIVE JUROR:  22.

7          MS. BERTRAND:  Yes, sir.  Hello.  Nice to meet you.

8          You listed yourself as a consultant.  What kind of

9    consulting do you do?  And I apologize if I didn't hear it when

10   I was writing.

11         PROSPECTIVE JUROR:  No, you're fine.  I do branding

12   and marketing.  So I do a lot of logos and renames and social

13   media newsletters, things like that.

14         MS. BERTRAND:  Social media branding?

15         PROSPECTIVE JUROR:  All types of -- all types of

16   branding.

17         MS. BERTRAND:  For companies?

18         PROSPECTIVE JUROR:  Yeah, companies and nonprofits, a

19   couple of political campaigns.

20         MS. BERTRAND:  Did you say political campaigns?

21         PROSPECTIVE JUROR:  Mainly nonprofits.

22         MS. BERTRAND:  Okay.  Can you give an example?  I

23   don't know if you're bound to some confidentiality agreement.

24   I understand that.  What are an example of some of the

25   nonprofits that you've helped?

1          PROSPECTIVE JUROR:  Right now one is called -- sorry,

2     so a big one for me is called New Pathways for Youths.  They do

3     mentorship for kids that live in poverty in Garfield, so that's

4     a big one I spend a lot of time on.  I'm doing a youth

5     engagement nonprofit in Colorado right now.  So all types of

6     stuff really.  There is not a specific issue area that I focus

7     on.

8          MS. BERTRAND:  You noted that your, was it your dad --

9          PROSPECTIVE JUROR:  Yeah.

10          MS. BERTRAND:  -- volunteered or volunteers for,

11     sounds like a safe house?

12          PROSPECTIVE JUROR:  Yeah, volunteered, I think

13     probably five-ish years ago.

14          MS. BERTRAND:  Okay.

15          PROSPECTIVE JUROR:  I don't remember where, when.  I

16     think what he did was he, like, walked around and played faux

17     security guard, but I don't know any details beyond that.

18          MS. BERTRAND:  Did his work with the safe house,

19     halfway house kind of place --

20          PROSPECTIVE JUROR:  Yeah.

21          MS. BERTRAND:  -- impact how you see prostitution?

22          PROSPECTIVE JUROR:  No.  He didn't talk about it very

23     much.  He would just kind of go away on Saturday mornings, come

24     back aground noon, and that was it.  There wasn't a lot of

25     conversation about it.

1          MS. BERTRAND:  In your questionnaire answers, you talk

2    about your position about the legalization of prostitution and

3    concern that sex workers themselves -- and I thought this was a

4    great distinction -- don't punish the people in the industry,

5    publish -- or punish whom?  Who do you think would be

6    responsible or should be pursued?

7          PROSPECTIVE JUROR:  Yeah.  I think -- I mean,

8    obviously, we're in a legal system, so whoever is, I guess,

9    breaking laws.  But, you know, I think -- someone at some point

10   was talking about violent actors and coercion and things like

11   that, and I think that probably makes sense to be a priority

12   for any kind of prosecution.

13         At the same time, it's complicated, there is a lot of

14   different factors, so it's hard to say any specific wide range

15   in judgment, because every case, I assume, is different.

16         MS. BERTRAND:  Well, you have experience with social

17   media platforms?

18         PROSPECTIVE JUROR:  Yeah.

19         MS. BERTRAND:  And they run the gamut from OnlyFans to

20   -- I really thought Pinterest was the most, like, low key of

21   them but --

22         THE COURT:  Ms. Bertrand, you need to move back.

23         MS. BERTRAND:  -- but, apparently, not.  It's for more

24   than recipes.

25         PROSPECTIVE JUROR:  Yeah.

1          MS. BERTRAND:   Instagram.  Since you work with these

2    platforms and you have some technical expertise with them,

3    what's your feeling about what burdens these platforms have?

4          PROSPECTIVE JUROR:  Yeah.  I mean, I think -- someone

5    made the point there is not currently a legal obligation, and I

6    don't know the facts on that.  But, as far as I know, there is

7    no legal obligation to, like, seek out, hunt down illegal

8    content.

9          You know, I think something a lot of folks have said

10   is that the platforms should do their best, you know, and

11   that's hard to define, but I think that's a pretty fair

12   guideline.  Again, though, I think it's case by case and --

13   yeah.

14         MS. BERTRAND:  All right.  Did you have any

15   familiarity, given the industry you work in, about this

16   prosecution of these Backpage employees and owners?

17         PROSPECTIVE JUROR:  No, not this specifically.  I know

18   there was a controversy, but my preexisting knowledge was,

19   like, I think Backpage was like Craigslist.  That was about the

20   extent of what I know.

21         MS. BERTRAND:  All right.  Thank you.

22         With what we discussed so far, and I told you at the

23   beginning of this, tell me, tell us, if you have anything else

24   to share with us from what you've heard so far that we need to

25   know.

1          Juror 11, you've been quiet.  We'd love to hear from

2     you.

3          PROSPECTIVE JUROR:  Juror 11.

4          MS. BERTRAND:  Yes.

5          THE COURT:  What is your question?

6          MS. BERTRAND:  Do you want to be here?

7          PROSPECTIVE JUROR:  Yeah, I do.

8          MS. BERTRAND:  Why?

9          PROSPECTIVE JUROR:  I believe it's a civic duty.

10          MS. BERTRAND:  It's going to be -- it's going to be a

11     big ask for the people that serve on this jury.  We're talking

12     about months.

13          PROSPECTIVE JUROR:  Well, I work as a postman, and I

14     walk about 12 or 13 miles every day, so it doesn't seem that

15     big of an ask to me really.

16          MS. BERTRAND:  Okay.  Thank you.  And your employer is

17     okay with you -- with a long jury service?

18          PROSPECTIVE JUROR:  USPS, yep.

19          MS. BERTRAND:  Okay.  Thank you.

20          Anyone else have anything to share before I sit down?

21          Anything else?

22          Yes.  Juror 19.

23          PROSPECTIVE JUROR:  I'll just share that -- I mean,

24     just putting it out there -- my employer has no problem with me

25     doing a long jury.  I am not uncomfortable speaking my mind.

1    Sometimes my husband would say I should shut up.  But -- I'm

2    sure most husbands would say that about their wives -- but I

3    also too am not uncomfortable with seeing images, photographs,

4    videos.  I'm able to disconnect with that.  So, as far as, I

5    know it's -- I know it's real, but I'm also able to -- I don't

6    think that it would affect, like, my mental health or capacity.

7            I also -- like, things don't -- obviously, I get

8    bothered by things, but I wouldn't -- it wouldn't be disruptive

9    to myself to share or talk or use language with others that I

10   just met, you know.

11           MS. BERTRAND:  Sure.

12           PROSPECTIVE JUROR:  So I just wanted to put that out

13   there, because I know many of these people do feel

14   uncomfortable, so I just wanted to let you know I don't.

15           MS. BERTRAND:  Okay.  Thank you.  Anyone else?

16           See, now look what you've done.  You've empowered

17   others.

18           Juror 7.

19           PROSPECTIVE JUROR:  I share Juror 11's feeling about

20   it being a civic duty, but I actually don't want to be here.

21   And the reason is -- and I didn't speak up earlier because it's

22   happening in realtime -- my son has a panic disorder.  And he's

23   a sophomore in college.  He's had it since he was in seventh

24   grade.  It's triggered at the onset of each school year.  And

25   he's struggling a lot.  I was just down in Tucson, he's at

1   University of Arizona, so I was down there this morning, got up

2   early to drive up here.  Got a call from him during our --

3   during our break, sobbing.  I'm sort of his -- he's -- he's

4   seeing a psychiatrist there and a counselor, but I'm kind of

5   his go-to person when he's upset.  And so not being available

6   to him, you know, is -- is problematic for me and for him.

7   And, for that reason, I don't want to be here.

8           MS. BERTRAND:  Thank you.  Thank you.  It sounds like

9   you would not be able to be fully present.

10          PROSPECTIVE JUROR:  That's right.

11          MS. BERTRAND:  Thank you.

12          Juror 6.

13          PROSPECTIVE JUROR:  I don't know if, like, we're

14  supposed to -- like, because I know it was in the questionnaire

15  to talk about financial hardships and everything.  I don't know

16  if we can now but --

17          MS. BERTRAND:  Go ahead.

18          PROSPECTIVE JUROR:  My work does offer jury duty pay,

19  but they only offer up to ten days' worth.  And so just, like,

20  financially, I support myself.  I'm on my own and everything.

21  I just, like, would absolutely not be -- the case is

22  interesting and I, like, absolutely agree with the civic duty

23  and everything like that, so it's not that it's not important

24  to me on that scale.  It's just, like, not being able to pay

25  rent is, obviously, a little bit more important than, you know,

1   being able to serve so -- but that -- that's really my only

2   issue with being here.

3           Other than that, obviously, I have a friend that's a

4   lawyer, and I love hearing about law, I love this, like, kind

5   of environment and all of that kind of stuff, it's more of

6   just, like, financially it's not going to be possible, for me,

7   at least.

8           MS. BERTRAND:  Okay.  Thank you.  Thank you.

9           Your Honor, I'm just going to check my notes one last

10  time.

11          Juror 25.  You've been quiet.

12          PROSPECTIVE JUROR:  Yes.

13          MS. BERTRAND:  You're going to have to push through

14  the mask to talk.

15          PROSPECTIVE JUROR:  Yeah, I know I've been quiet.

16          MS. BERTRAND:  What's your take on what you've heard

17  so far?

18          MS. PERLMETER:  Your Honor, we object.  We ask that

19  the --

20          THE COURT:  Yes.

21          MS. PERLMETER:  -- specific --

22          THE COURT:  Hold on.  Hold on.  I'm sorry.

23          Go ahead.

24          MS. PERLMETER:  We just ask that counsel pose a

25  specific follow-up question for each juror.

1          THE COURT:  Yes.

2          Counsel, you need to ask a specific question and it's

3    supposed to be followup.

4          MS. BERTRAND:  Juror 25, you noted you're a server?

5          PROSPECTIVE JUROR:  What was that?  I'm sorry.

6          MS. BERTRAND:  In your questionnaire you said you were

7    a server?

8          PROSPECTIVE JUROR:  Yes.

9          MS. BERTRAND:  Like, at a restaurant?

10         PROSPECTIVE JUROR:  Yes.

11         MS. BERTRAND:  What would you do if you had to sit on

12   a 12-week jury trial?

13         PROSPECTIVE JUROR:  It's not that big of a deal to me

14   financially.  I'm okay stable -- stable financially, so I'm not

15   worried about that.  My work, as long as I let them know when

16   the jury service is, then they don't mind.

17         MS. BERTRAND:  Just a moment, Your Honor.

18         You said in your questionnaire that you don't believe

19   prostitution should be legal.  Yes?  Can you elaborate on that,

20   please?

21         PROSPECTIVE JUROR:  Well, it's already illegal, so I

22   kind of believe that it should be illegal, but, I don't know, I

23   think that a lot of the times what is involved with

24   prostitution is also negative and illegal, so -- I mean, I

25   think the two kind of go hand-in-hand.  And I haven't really

1   done much research behind it, but it's already illegal, so I

2   would follow the law on that.

3           MS. BERTRAND:  What other things?  Can you elaborate

4   on that?  Say more about what other things go hand-in-hand with

5   prostitution to you?

6           PROSPECTIVE JUROR:  Typically, sex trafficking, or

7   drugs, or anything of that nature.  Yeah, other things that are

8   negative in the world that contribute to that.

9           MS. BERTRAND:  And you believe that prostitution is

10  something the police should do their best to stop?

11          PROSPECTIVE JUROR:  Yes.

12          MS. BERTRAND:  Okay.  Have you heard of Backpage

13  before being brought into this case?

14          PROSPECTIVE JUROR:  No.

15          MS. BERTRAND:  Thank you.

16          Unless anyone else has anything else, I have nothing

17  further.  Thank you.

18          THE COURT:  Okay.  Elaine, are the jurors downstairs

19  listening still?  I know they were.

20          COURTROOM DEPUTY:  Yeah, they should be.

21          THE COURT:  Okay.  The jurors are going to be excused

22  for an hour.

23          For this group, if you can just wait outside for a few

24  minutes, I'm going to release a couple of you, I anticipate,

25  and I'd like to do that before you go to lunch, but I need to

1    discuss it with the attorneys before I do that.

2            So if you all could just wait outside until Elaine

3    comes out to tell you to go to lunch, I'd appreciate that, and

4    then we'll need you back in an hour.

5            (12:20 p.m., the prospective jury panel left the

6    courtroom, save Juror Number 16.)

7            THE COURT:  Counsel, you can have a seat.

8            We're on the record.  And, Juror 16, if you could just

9    come forward.

10           PROSPECTIVE JUROR:  I will.  I'm sorry.  I just -- I

11   felt like I should have said at the very beginning, I am

12   concerned about being here because my -- I work at an

13   elementary school office.  And COVID has just kind of made a

14   mess of things down there.  And for me to be gone for the

15   length of time that I would be gone, I'm concerned about that.

16           My mother is also unhealthy, and I'm also the medical

17   power of attorney for another elderly woman who has taken two

18   falls.  I got another call while I was out there after the

19   first meeting, she fell again today after yesterday.  And I'm

20   just concerned about not being available for them.  That juror

21   reminded me when he talked about his son, so I just felt like I

22   should have mentioned that when you asked us to stand up in the

23   beginning and I was too nervous to stand up.

24           THE COURT:  What's the school you work for?

25           PROSPECTIVE JUROR:  It's called Sunburst Elementary

1    School in the Washington Elementary School District.

2              THE COURT:  It's a public school?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Okay.  And does your mother live with you

5    or --

6              PROSPECTIVE JUROR:  No, she lives in Tucson, actually.

7    And the other elderly woman lives in -- and she lives in

8    Phoenix, but in an independent living place.

9              THE COURT:  Okay.  And does your mother live on her

10   own or with someone?

11             PROSPECTIVE JUROR:  She lives with her husband.

12             THE COURT:  Okay.  Does the government have any

13   follow-up questions before I let Juror 16 go?

14             MS. PERLMETER:  No, Your Honor.

15             THE COURT:  Any defense counsel?

16             MS. BERNSTEIN:  No, Your Honor.

17             MR. CAMBRIA:  No, Your Honor.

18             THE COURT:  All right.  Thank you.

19             PROSPECTIVE JUROR:  Thank you.

20             (Prospective Juror 16 left the courtroom.)

21             THE COURT:  Counsel, before you go, is there any

22   objection to excusing for hardship Juror 5?

23             MS. PERLMETER:  No objection.

24             MR. LINCENBERG:  Can I have just a moment?

25             THE COURT:  It's the college professor.

1          MR. LINCENBERG:  I'm sorry, Your Honor, we just

2  haven't had a chance to talk and --

3          THE COURT:  Okay.  These are hardship questions, but

4  you can bring her up.

5          MR. LINCENBERG:  I know.

6          Your Honor, did the Court just excuse Juror 16?

7          THE COURT:  No.

8          MR. LINCENBERG:  No?

9          MR. CAMBRIA:  16.

10         THE COURT:  No, 16 is not excused.  I just asked her

11  to step out.

12         MR. LINCENBERG:  Oh, I'm sorry.  So I'm just -- I'm

13  just trying to -- 5 and 16 seem to be in the same boat,

14  generally, different reasons.

15         THE COURT:  Okay.  I will get to 16.

16         MR. LINCENBERG:  Okay.

17         THE COURT:  But do you have any objection to Juror 5?

18         MR. LINCENBERG:  Not if 16 is also going to be

19  excused.  I think they're in the same boat.  So if the Court --

20  we have an objection -- I'll rephrase it.

21         We have an objection unless -- I just don't get a

22  sense yet of, you know, what the Court's view is on folks who

23  it's difficult because of work-related items to --

24         THE COURT:  Well, because it's different, each person

25  individually.

1          So, over objection, Juror 5 will be struck.

2          Juror 8.  Is there an objection to excusing Juror 8

3    for his concerns about the coronavirus, as well as his -- well,

4    that's the hardship.

5          MS. PERLMETER:  No objection.

6          MS. BERNSTEIN:  No, Your Honor.  I share his concerns.

7          THE COURT:  Anybody -- Mr. Lincenberg?

8          MR. LINCENBERG:  No objection.

9          MR. FEDER:  No objection.

10         THE COURT:  Eight will be struck.

11         Juror 9 for financial hardship.  He's the one that

12   just got a job after being unemployed for a year.

13         MS. PERLMETER:  No objection.

14         MS. BERNSTEIN:  No objection, Your Honor.

15         MR. LINCENBERG:  No objection.

16         THE COURT:  Juror 17 whose grandfather just passed

17   away this morning.  Any objection?

18         MS. PERLMETER:  No objection.

19         MS. BERNSTEIN:  No, Your Honor.

20         THE COURT:  Juror 26 said it's a financial hardship

21   because after filling out the questionnaire he found out his

22   company will only pay ten days.  Any objection?

23         MS. PERLMETER:  No objection.

24         MR. LINCENBERG:  No objection.

25         MR. EISENBERG:  None.

1          THE COURT:  Juror 31, whose grandpa is in hospice and

2     is expected to pass soon.

3          MS. PERLMETER:  No objection.

4          MS. BERNSTEIN:  No objection, Your Honor.

5          THE COURT:  Juror Number -- I'm sorry, my notes aren't

6     exactly in order.  Juror Number 6 is the one who spoke up at

7     the very end who said it would be a financial hardship because

8     his employer will only pay ten days.

9          MS. PERLMETER:  No objection.

10         MR. LINCENBERG:  If I could just have a moment.

11         MR. FEDER:  Is that Juror Number 6, Judge?

12         THE COURT:  Six.

13         MS. BERNSTEIN:  And, Your Honor, we do object to

14    dismissing Juror Number 6 on a hardship.

15         THE COURT:  Okay.  Over objection, Juror 6 will be

16    struck.  He clearly indicated he was concerned about paying his

17    rent.

18         Let's see, those are the ones I've considered for

19    hardship.

20         Juror 16, her job is not the same situation.  She

21    works in the office.  She's not a teacher.  It's a public

22    school.  So I am not going to excuse her for that reason.

23         I'm going to ask that you guys come back at 1:15.  I

24    will ask you to be prepared to ask me for any other strikes for

25    cause on this panel.

1           When we come back for -- when we continue, a couple of

2    thoughts about jury selection so far.

3           Ms. Perlmeter, I expect you to be a little more

4    efficient with your time.

5           For the defense, there was a lot of repeat.  Some of

6    you asked the same question of three people.  I'm probably

7    going to speak up more.  I don't like to interrupt attorneys,

8    but that's my concern is that there is a lot of repetition.

9           And be careful on getting too close to making an

10   opening statement, Mr. Lincenberg, and anybody else.

11          All right.  We'll see you at 1:15.

12          MS. BERNSTEIN:  Your Honor, will the courtroom be

13   locked?  Can we leave things in here?

14          COURTROOM DEPUTY:  I am locking and everyone will have

15   to leave.

16          MS. BERNSTEIN:  Thank you.

17          (Lunch recess, 12:29 p.m. - 1:19 p.m.)

18          THE COURT:  We're on the record outside the presence

19   of the jury panel.  The sound is not on downstairs.  We have

20   counsel and defendants present.

21          In the first 31, does the government have any motions

22   for cause?

23          MS. PERLMETER:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MS. PERLMETER:  The first we'll start with Juror

1    Number 2.

2              THE COURT:  We can't hear you.  Maybe just sit so

3    you're closer to the microphone.

4              MS. PERLMETER:  We would move to excuse Juror Number 2

5    based on cause.  She indicated that she has trouble paying

6    attention and her mind wanders.

7              MS. BERTRAND:  No objection.

8              MS. BERNSTEIN:  No objection, Your Honor.

9              THE COURT:  And that was Ms. Vaught that said it the

10   first time, right?

11             MS. BERNSTEIN:  Ms. Bertrand who said it first,

12   Ms. Bernstein saying it second.

13             MS. BERTRAND:  No objection.

14             THE COURT:  Thank you.  All right.  I don't hear any

15   other objection.  I do have a note about that.

16             Juror 2 will be struck.

17             MS. PERLMETER:  Next we would move to strike Juror

18   Number 30.  He stated that he feels that defendants need to

19   prove their innocence.

20             THE COURT:  Any objection?

21             MS. BERNSTEIN:  No, Your Honor.

22             MR. FEDER:  We object.  I think he was rehabilitated

23   to being able to say he would follow the law.

24             THE COURT:  Okay.  Mr. Feder, I'm sorry, when you

25   respond, can you just remain seated so you're close to the

1    microphone.  So you object.

2              Anybody else?

3              MR. LINCENBERG:  We would join in Mr. Feder's

4    objection.

5              MR. CAMBRIA:  We would also, Your Honor, Mr. Lacey.

6              THE COURT:  And that was Mr. Cambria.

7              MR. CAMBRIA:  Yes.  I'm sorry, Your Honor.

8              MR. EISENBERG:  As well as Mr. Padilla.

9              MS. BERNSTEIN:  Your Honor, I misspoke.  I didn't

10   understand we were doing for cause challenges, so we do also

11   object to Number 30.

12             MS. BERTRAND:  As does Ms. Vaught.

13             THE COURT:  Mr. Feder, can you explain how you think

14   he was rehabilitated?  Because after you questioned him,

15   someone else did, and he repeated endlessly that he believes a

16   criminal defendant should prove innocence.

17             MR. FEDER:  I don't recall that happening, Judge.  I

18   think after I talked to him he maintained that he would be able

19   to -- he said he would be able to treat all the defendants as

20   though it was his wife, and he trusted her the most, and would

21   therefore apply the presumption.

22             THE COURT:  Okay.  Anything further from the

23   government?

24             MS. PERLMETER:  No, Your Honor.

25             THE COURT:  I will look at the transcript at the next

1    break before I make my decision, because I don't remember it

2    that same way.  My notes don't reflect that.  I remember that

3    conversation, but I don't remember him ever backing off from

4    the general belief, strongly held belief that a criminal

5    defendant should prove innocence.

6              So are there any other motions from the government?

7              MS. PERLMETER:  Yes.  But as to Number 30, he also

8    stated that he felt that he couldn't be fair based on his

9    son-in-law's conviction for the 187 years.

10             MS. BERNSTEIN:  Your Honor, that's not my memory of

11   what that juror had said.  He had said that he thought that was

12   an unfair sentence, as that's longer than anyone's natural

13   life.  I don't think anyone disagrees with that.  I don't

14   recall him saying that he would, therefore, not be able to be

15   fair for this trial.

16             THE COURT:  Okay.  Thank you.

17             MR. FEDER:  In addition, Judge, in his questionnaire I

18   believe he said that the conviction was fair, if I recall

19   correctly.

20             THE COURT:  Okay.  So no other motions from the

21   government?

22             MS. PERLMETER:  I have more.

23             THE COURT:  Okay.

24             MS. PERLMETER:  Juror Number 24.  This juror indicated

25   that he has preplanned travel from October 29th where he's

1    already purchased plane tickets and tickets for attractions in

2    New York City.  He also has work-related travel requirements

3    that he's expecting this quarter.  And he indicated that he's

4    the only chemist for his company, and that without him they

5    would not -- he would not -- they would not be able to move

6    forward with their projects.

7            THE COURT:  What's the defense position?

8            Ms. Bernstein.

9            MS. BERNSTEIN:  Your Honor, there was numerous

10   opportunities to sort of speak up.  There were some times where

11   jurors were asked if there were any other concerns, there were

12   times where they were asked about financial burden, financial

13   hardship, and a number of people did stand up at that point who

14   hadn't previously spoken.  We even had a juror who remained

15   after everyone was dismissed to share her hardships with us.

16           This individual did not emphasize his hardships.  He

17   didn't volunteer his New York City trip, it was only when

18   Ms. Perlmeter asked him.  And I don't think he emphasized at

19   all that he had -- that he won't be able to go on that trip.

20   That was all.  He has no lodging.  It doesn't seem very planned

21   either.  So we would object.

22           THE COURT:  Did you get his additional excuse that he

23   e-mailed in?

24           MS. BERNSTEIN:  We did not.

25           THE COURT:  Okay.  Let me see if I can find it.

1          Anybody else from the defense want to make a statement

2  about that?

3          MR. LINCENBERG:  Nothing further.  We agree.  I did

4  want to just note he did disclose in his questionnaire that he

5  had a paid vacation from 10-29 through November 2nd, just to

6  correct that point.  But I think that, given the length of the

7  trial, I don't think that that amounts to cause.

8          THE COURT:  Okay.  I don't have it here, but it was a

9  list of dates.  I'm assuming it related to his business travel.

10         So the motion -- hold on.

11         MR. FEDER:  Judge, my client points out that if he

12 left on the 29th, depending on what time his flight was, we're

13 off for the next two weeks.

14         THE COURT:  Yes, I know.

15         MR. FEDER:  Okay.

16         THE COURT:  Thank you.

17         The motion is denied.  If I can find -- maybe I have

18 the wrong number of the person that sent in the late excuse.

19 If we find it, I'll let you know what it says and we can

20 re-discuss.  So let me put that on my --

21         Okay.  Next.

22         MS. PERLMETER:  Juror Number 7, Your Honor.  This is

23 the one that --

24         THE COURT:  Juror 7.

25         MS. PERLMETER:  Juror Number 7.  This is the

1    individual this morning that disclosed that his son has panic

2    attacks and that he wants to spend time with him is how I took

3    it.

4              MR. LINCENBERG:  Your Honor, I'll speak up.  We would

5    oppose that one.  I think that it's a sad situation, but if

6    this gentleman is at work, he's also distant from his son at

7    school, he'll just be in jury duty.  The idea that he has to be

8    on call during the day any differently than if he was at work,

9    I don't think makes a lot of sense.  So while it's a

10   sympathetic situation, I don't believe it comes close to cause

11   or hardship.

12             THE COURT:  Ms. Bernstein, did you have something to

13   add?

14             MS. BERNSTEIN:  No, I don't have anything to add.  We

15   would join the objection.

16             THE COURT:  Okay.  Does everybody join the objection?

17             MR. CAMBRIA:  Yes.

18             MR. LINCENBERG:  We do.

19             THE COURT:  Okay.  Over objection, Juror 7 will be

20   excused.  He drove all the way to Tucson this morning before

21   coming in to service today, which indicates to me that this is

22   more than just comforting his child who is seeing a

23   psychiatrist, and he brought it up.  It was significant enough

24   to him to bring it up, so Juror 7 will be struck.

25             Anything else?

1          MS. PERLMETER:  No, Your Honor.

2          THE COURT:  And from the defense.  Let's start with

3    Mr. Cambria.

4          Do you have any motions for cause?

5          MR. CAMBRIA:  I do, Your Honor, 18.  The problem with

6    that particular potential juror is that she has a problem with

7    the materials.  And this is a case where we already know, from

8    looking at the government's exhibit list and the history of

9    this case, that there are going to be a number of graphic ads,

10   if you will.  There are 50 charged in the indictment.  And it's

11   going to be important for her to observe those.  Especially the

12   nuances of the ads, I think that's very important.  And here we

13   have a person who was pretty strong in her distaste, if you

14   will.

15         And so the threat there is that she's not going to

16   give them the consideration that they deserve, and if that

17   happens, that's really unfair to the defense, may be unfair to

18   the prosecution, but it certainly is to the defense.

19         THE COURT:  What's the government's position?

20         MS. PERLMETER:  Your Honor, this juror maintained that

21   she will deliberate if she has to.  While she did indicate that

22   this would not be her topic of choice, because she has been a

23   prior juror before, she did indicate that she understands her

24   responsibilities and her duties as a juror and that she would

25   perform them.

1          She also indicated that, while she is soft spoken, she

2     felt that her voice -- her views were heard and considered in

3     her past jury case.  And she also indicated that -- to address

4     defendants' concerns, she also stated that she is aware that

5     not every person who is arrested should be.  So we think she

6     can be fair, we think she can deliberate and be fair and

7     impartial with this jury.

8          THE COURT:  And does anybody else from the defense

9     want to be heard?

10          MR. FEDER:  Do we need to join?

11          MR. LINCENBERG:  I think we all join.  We discussed

12     these at lunch, Your Honor, so we're all joining in -- we're

13     going to be proposing four, and we all join in them.

14          THE COURT:  Okay.  So the motion to strike Juror 18 is

15     denied.  Although questioned about it, she adamantly stuck to

16     the fact that she would seek the truth, that it wouldn't affect

17     her ability to deliberate, so that motion is denied.

18          Mr. Cambria, your next one.

19          MR. CAMBRIA:  That's the only one I have.  We split

20     these up, Your Honor.

21          THE COURT:  Okay.  Who is next?

22          Ms. Bernstein.

23          MS. BERNSTEIN:  Sure, Your Honor.

24          We would move for cause on Juror Number 14.  And Juror

25     Number 14, when I questioned her extensively, shared candidly

1    that she has very strong beliefs about pornography and related

2    topics, that's also what she put into her questionnaire.

3          She explained that she has had these beliefs her

4    entire life, and that she will bring them into the courtroom,

5    so we move for cause on her.  I think it will be difficult for

6    her to deliberate about the images in this case, which are

7    pornographic at best.

8          THE COURT:  And the government's position?

9          MS. PERLMETER:  Your Honor, Juror Number 14 in

10   response to that stated, and made very clear, that it was a

11   personal belief and that she would not immediately find or say

12   that someone was a bad person just because they were involved

13   in it.  She is able to separate her personal beliefs to serve

14   as a juror in this case.

15         MS. BERNSTEIN:  And she did say that, that's right,

16   and that's an admirable statement.  But when asked if she would

17   bring this into the courtroom and how long she's had this

18   belief, she indicated that it was a lifelong belief, and that

19   she couldn't put it out of her mind, that she would bring it

20   into the courtroom.  And we move for cause on that because we

21   deserve a juror who can be impartial and put that out of their

22   mind.

23         THE COURT:  Well, she also said that it wouldn't

24   affect her ability to be fair and impartial.  And we all come

25   into -- the jurors all come in with beliefs, the question is

1   whether they can still be fair and impartial.

2          MS. BERNSTEIN:  But, Your Honor, when asked if she

3   would bring these beliefs into the courtroom with her, she did

4   say yes.  Asked if she could put them out of her mind and do

5   this, she did say they'd be in her mind.

6          So I think when a question is posed that says, can you

7   be fair and impartial, we'd all like to think that we're fair.

8   And I think everyone understands that they need to be impartial

9   to sit on the jury.  When asked if she could put this out of

10  her mind or if she would bring it with her, she indicated that

11  she would.  And that would prejudice us to have a juror on the

12  jury in this case who has very strong beliefs about

13  pornographic images, has had them her entire life, and has

14  admitted she can't put them out of her head.

15         THE COURT:  Well, they're not required to -- to

16  suddenly like pornography.

17         MS. BERNSTEIN:  There are many jurors, Your Honor, who

18  did not indicate that they have that leaning, that they have

19  that mindset, that they have those beliefs.  And so for this

20  juror to say that this will be in her mind, that she will not

21  -- that she will bring these beliefs with her into the

22  courtroom, you know, it just -- this is not the case for her.

23         Given the nature of this case and the charges of this

24  case and the, you know, infinite boxes of government exhibits

25  that I see right here, most of which I think are all like the

1   most pornographic images they could possibly find on the

2   internet, this is not the case for that juror.  If she's going

3   to be sitting there with this in her mind, it would prejudice

4   us from having a fair and impartial jury.

5          THE COURT:  Okay.  I'll take it under advisement,

6   because if I decide right now, it would be to deny it, but I'm

7   going to look at her answers.

8          Do you have another one or someone else?

9          MR. FEDER:  Number 16.

10         THE COURT:  Mr. Feder.

11         MR. FEDER:  We also move to strike her for cause.

12  She, in addition to her hardship questions, she's the one that

13  has a mother and a friend down in Tucson that are in difficult

14  medical situations.  She really, I mean, notwithstanding the

15  number of questions I asked her, she couldn't get around that

16  she expects defendants to testify.  She agreed with, I think

17  it's Juror Number 8, that any innocent person would put on --

18  essentially, present a defense, and thought that they have to

19  testify in order to, essentially, prove innocence.

20         So if you look at her questionnaire, it's kind of full

21  of sort of moralistic -- I have a moral problem with

22  prostitution.  It's harmed one of her friend's -- best friend's

23  marriage.  It caused STDs to be introduced into the -- to the

24  family relationship, affected pregnancies.  I mean, she's very

25  prejudiced against, essentially, the mention of prostitution,

1    but she's going to make the defendants improperly not -- not

2    have the presumption of innocence in their favor, number one,

3    and be required to testify in their own defense, number two, in

4    order for her to think about them.

5           THE COURT:  Okay.

6           MS. PERLMETER:  Juror 16 was pushed by many of defense

7    counsel, and she maintained steadfast throughout that, while

8    she does have her beliefs, that she understands the law and

9    that she could fairly and impartially do her duty as a juror.

10   She maintained that over and over again.

11          As to her mother's condition, she did indicate that

12   she resides with her husband, so -- which I understood as the

13   mother's husband.

14          THE COURT:  Okay.  Over the government's objection,

15   Juror 16 will be struck.

16          And the last one.

17          MR. LINCENBERG:  Mr. Lincenberg.  Your Honor, the last

18   one is Juror Number 20.  And I think this one is pretty

19   straightforward.

20          So in the questionnaire Juror Number 20 on question

21   64, strong feelings affected by escort services or legal adult

22   entertainment industry.  Yes, I believe this type of lifestyle

23   entertainment is not in alignment with the type of world or

24   humans that God made us to be.

25          65.  Bothered -- are you bothered that adult escort

1    services are legal and/or can legally advertise services?  Yes.

2    Again, I believe that this is directly contrary to what God has

3    intended for our world.

4            66.  Do you have strong feelings, have you been

5    affected by prostitution or commercial sex, quote/unquote?

6    Yes.  Again, I believe that this is directly contradictory to

7    what God has intended for our world.

8            So I questioned Juror Number 20 in that arena.  And

9    Juror Number 20, I believe, was fairly candid, particularly as

10   we went along, in saying I could not leave these biases aside,

11   and that this is -- this is not a case where she would able to

12   -- would be able to be fair and impartial to defendants in this

13   type of prosecution.

14           THE COURT:  Okay.

15           MS. PERLMETER:  Juror Number 20 was also questioned by

16   multiple counsel on behalf of the defendants, and I agree she

17   was very candid, she was very vocal where she did confidently

18   state her answers, including her answer that she could be fair

19   and impartial despite her views.  She did maintain that.

20           MR. LINCENBERG:  The interesting thing was she had

21   answered that -- it was really before I got up and questioned

22   her -- and I followed up on that and explored it, and that's

23   when she was candid that she could not be fair and impartial in

24   a case like this.  Her words were that I would be biased in a

25   case like this.

1          THE COURT:  I do have a note that she indicated -- I

2    agree that she tried to resist a little bit the pressure -- but

3    I do have a note that she indicated she had a bias against

4    platforms that allow this type of material, and I think that

5    was at the point where I felt she would properly be struck for

6    cause, so the motion is granted.

7          MR. LINCENBERG:  Thank you.

8          THE COURT:  Is that it from the defense?

9          MR. LINCENBERG:  Yes, it is, Your Honor.  Thank you.

10         THE COURT:  Okay.  So just so we're all on the same

11   page, 30 and 14 are taken under advisement.

12         And we'll bring in the next panel.

13         MS. PERLMETER:  Will this be Jurors 34 through 70?

14         COURTROOM DEPUTY:  No, 32 through 62.  Page 2 of your

15   printouts that I gave you of the seating chart.

16         MS. PERLMETER:  Okay.

17         (1:47 p.m., the next panel of prospective jurors were

18   brought into the courtroom.)

19         THE COURT:  And thank you, everybody, for your

20   patience.

21         Due to the restrictions and the changes we've made

22   because of COVID, we have to bring you up in smaller groups

23   than we normally would.  Normally we would cram you all in

24   here.  So thank you for that.

25         While you were down there, I gave some introductory

1    remarks and explanation about the jury selection process.  I'm

2    not sure if the audio was working at that point or not.

3              Juror Number 32, do you know?  Were you able to hear?

4              PROSPECTIVE JUROR:  Yeah, I think at the beginning it

5    wasn't too loud.

6              THE COURT:  Okay.  So let me just say a couple things

7    about the jury selection process.

8              We have utilized a questionnaire in this case, which

9    thank you for taking the time to do that.  We did that so that

10   we could try to minimize the amount of time we had to spend in

11   court with everybody questioning them.  So that should make

12   this process a little less painful.

13             So today what I need you to do is, if I ask you a

14   question or if one of the attorneys asks you a follow-up

15   question, if you could please stand -- we're going to hand you

16   a microphone to make sure that the court reporter can hear

17   everything -- and state your number.

18             Throughout this process, I will refer to you by your

19   juror number, the attorneys will refer to you by your juror

20   number.  And that is just so that we keep your name out of the

21   record, because everything said here in court is taken down

22   word-for-word by the court reporter.  So it is not meant to be

23   impersonal.  I just wanted to let you know why we're utilizing

24   your juror number instead of your name.

25             So if you could please stand, state your name, and

1    then answer the question.  We need the court reporter to hear

2    the number of the person answering.

3         Also, if you're asked a question, but for whatever

4    reason you prefer not to answer in front of the entire panel,

5    just tell us that you have an answer but you prefer to answer

6    privately, and I'll make a note of that and at a later time

7    we'll discuss it outside the presence of the jury panel.  The

8    attorneys will be present but not the entire jury panel.

9         And, by way of explanation, we've asked you a lot of

10   questions, some people might have felt that they were

11   intrusive, and it's not meant to be intrusive.  The reason we

12   ask these questions is to find out if there is any reason you

13   should not be a juror on this particular case.  Sometimes there

14   is one case that's not good for some jurors and may be better

15   suited for another juror.

16        So we ask questions to see if you know any of the

17   parties, if you know anything about the subject matter of the

18   trial, to find out if you have any preconceived opinions about

19   the case that you might find difficult to lay aside.  So our

20   goal is to find jurors that can be fair and impartial and give

21   both parties a fair trial.  So that's why we ask these

22   questions.  They are not intended to be intrusive.

23        With that being said, I only have one question before

24   I turn you over to the attorneys, and that is that after you --

25        Before I ask you any questions, we need to have you

UNITED STATES DISTRICT COURT

1    sworn in.  So if you could all stand and raise your right hand

2    to be sworn.

3              (The prospective jury panel was duly sworn.)

4              THE COURT:  Okay.  Thank you.  You can have a seat.

5              So you filled out these questions -- the

6    questionnaires a number of weeks ago.  So my question is is

7    there anything that's changed in the last few weeks that you

8    think would affect your ability to sit as a juror in this case?

9              Okay.  Since there is a number of you, I'm going to

10   just list everybody's number, you can put your hand down after

11   that.

12             Juror 36, Juror 42, 47, 48, 50, 51, 52, 56, and 59,

13   60, 61.

14             COURTROOM DEPUTY:  And 49.

15             THE COURT:  And 49.  Okay.

16             Juror 36, what's changed?

17             PROSPECTIVE JUROR:  I'm Juror 36.  I started a new job

18   at Carvana on the 30th, on Monday, so it's the third day today.

19   And I just don't think I could financially sustain on 200 bucks

20   a week for a couple of months, to be honest with you.

21             THE COURT:  And have you checked, since it's a new job

22   -- well, my first question would be are you on like a

23   probationary status or anything?

24             PROSPECTIVE JUROR:  Yeah.  I'm not even a hundred

25   percent sure how it works, to be honest with you, but I know I

UNITED STATES DISTRICT COURT

1    don't have any benefits or PTO for like the first 30 days at

2    least, so I would assume this -- I mean, I told them I'm coming

3    here and they said it's covered, but it's not like I'm getting

4    paid.

5             THE COURT:  Okay.  So they do not have paid jury duty?

6             PROSPECTIVE JUROR:  No.

7             THE COURT:  Okay.

8             PROSPECTIVE JUROR:  Not for me at least, a new hire.

9             THE COURT:  Okay.  And were you unemployed for some

10   period of time before starting your new job?

11            PROSPECTIVE JUROR:  Correct.  Yeah.

12            THE COURT:  Okay.  All right.  Thank you.

13            Juror 42.

14            PROSPECTIVE JUROR:  Hi, I'm Juror 42.  My health has

15   declined quite a bit since filling out the survey.  I'm under

16   the care of a pain specialist and she wrote me a letter for an

17   excuse.

18            THE COURT:  Okay.  Did you submit that earlier or did

19   you --

20            PROSPECTIVE JUROR:  I did, but they said it was too

21   late, that I needed to come in still.

22            THE COURT:  Okay.  All right.  I'll pull up that

23   letter while we --

24            PROSPECTIVE JUROR:  Okay.  Thank you.

25            THE COURT:  -- continue.  Thank you.

1          Juror 47.

2          PROSPECTIVE JUROR:  Juror 47.  Since I filled out the

3    questionnaire, I have since become a single mother.  I have a

4    child that has no adequate child care for the time of me being

5    down here, and I live up in Payson, Arizona.  So for me to come

6    down for the next two-and-a-half, almost three months, and

7    leave my child with absolutely nobody is not feasible for me.

8          THE COURT:  And how old is your child?

9          PROSPECTIVE JUROR:  My child is going to be 16 in a

10   week.

11         THE COURT:  And I think I -- because you sent in after

12   you finished the questionnaire, and I think I had a question

13   about that, because in your questionnaire you were not single.

14         PROSPECTIVE JUROR:  Correct, yes.  No.  I'm -- I'm

15   actually in the middle of a separation so --

16         THE COURT:  Okay.

17         PROSPECTIVE JUROR:  -- within the last three weeks to

18   a month that's occurred as well.

19         THE COURT:  Okay.  Thank you.

20         PROSPECTIVE JUROR:  Thank you.

21         THE COURT:  Juror 48.

22         PROSPECTIVE JUROR:  Hello.  I am Juror Number 48.

23   What changed since the questionnaire, when I brought it up to

24   my boss that I had jury duty, he did let me know that it is ten

25   paid days.  After that I have to try to figure out how to

1    remain financial stability.

2              I am at an at-will position.  I'm a manager for AT&T.

3    And we are salaried, so I'm not, like, under any union contract

4    or anything like that.  I could be let go at any time so.

5              THE COURT:  All right.  Two questions with that.

6    One -- well, maybe three.  How long have you worked there?

7              PROSPECTIVE JUROR:  I have been at AT&T since 2017.

8              THE COURT:  Okay.  And based on how long you've worked

9    there, do you have a real concern that if you served as a

10   juror, you would be penalized?

11             PROSPECTIVE JUROR:  I do.

12             THE COURT:  And after the ten paid days, is it a

13   financial hardship for you to serve as a juror?

14             PROSPECTIVE JUROR:  It is.  My job actually moved me

15   here in 2019, so all of my family is in Chicago.  I have no

16   family in Arizona, just me and my boys.

17             THE COURT:  Okay.  Thank you.

18             Juror 49.

19             PROSPECTIVE JUROR:  Good afternoon.  Recently we just

20   lost a few employees in our department so we have to take on a

21   bit more responsibility.  It would be unclear whether or not I

22   would be able to do the entire 10 to 12 weeks if that did

23   happen.  And if it's something more than two weeks, it's

24   unclear whether or not -- whether the policy would be able to

25   take care of anymore payment after that.

1          THE COURT:  Whore do you work?

2          PROSPECTIVE JUROR:  Banner Health.

3          THE COURT:  Banner Health?

4          PROSPECTIVE JUROR:  Yep.

5          THE COURT:  And what do you do there?

6          PROSPECTIVE JUROR:  I'm a research analyst.  We deal

7     with compliance for clinical trials.

8          THE COURT:  And other than the, I guess, strain it

9     puts on your department, based on your description, you're not

10    clear on their policy regarding jury duty?

11         PROSPECTIVE JUROR:  As far as the exact days, no, so

12    I'd have to go and find out how many days they'd be willing to

13    cover.

14         THE COURT:  Okay.  Thank you.

15         PROSPECTIVE JUROR:  Thank you.

16         THE COURT:  Juror 50.

17         PROSPECTIVE JUROR:  I'm Juror 50.  Since the

18    questionnaire, I asked my employer, and my employer says that

19    we have a difficulty for hire the engineers for my department.

20    My department is responsible to develop new technology to

21    launch the products.  And I have three projects that in my

22    hands now that responsible to finish the project by the end of

23    this year.

24         THE COURT:  I'm sorry.  Can you repeat that last part?

25    You're responsible for three projects.

1          PROSPECTIVE JUROR:  Three projects, three new

2    technology that is supposed to help develop before the end of

3    this year to meet the company revenue goal, otherwise there

4    will be a big impact with the company.

5          THE COURT:  Who do you work for?

6          PROSPECTIVE JUROR:  Footprint.

7          THE COURT:  Footprint?

8          PROSPECTIVE JUROR:  Footprint.

9          THE COURT:  Okay.  And so is your concern that it

10   would be a hardship on your employer?

11         PROSPECTIVE JUROR:  Correct.

12         THE COURT:  Okay.  Thank you.

13         PROSPECTIVE JUROR:  Thank you.

14         THE COURT:  Juror 51.

15         PROSPECTIVE JUROR:  Hi, Juror Number 51.  I recently

16   got my daughter tested for a psyche eval, and we have a meeting

17   tomorrow to follow up on the report that they did.  And she's

18   going to need testing and additional meetings to go through to

19   get resources to help her.

20         And then I have two younger daughters that have --

21   that go to in-home daycare, and I know of at least two days

22   that she's going to be closed, so I'm going to have to be home

23   to take care of them.

24         THE COURT:  Okay.  And do you have any other adults

25   living with you?

1           PROSPECTIVE JUROR:  My husband does, but he is the

2    only person in his position at work, so he's not able to take

3    time off.

4           THE COURT:  And how old is your daughter, the one that

5    you're looking at treatment for?

6           PROSPECTIVE JUROR:  Nine.

7           THE COURT:  Nine?

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  Okay.  And you said the other two are

10   younger?

11          PROSPECTIVE JUROR:  Correct.

12          THE COURT:  Okay.  Thank you.

13          PROSPECTIVE JUROR:  Thank you.

14          THE COURT:  Juror 52.

15          PROSPECTIVE JUROR:  Hi, Juror 52.  Can you hear me?

16          THE COURT:  Yes.

17          PROSPECTIVE JUROR:  Okay.  So I have a real problem

18   with highway driving.  I actually have a real fear of it.  And

19   I thought -- because normally I don't do so much -- come this

20   far.  And doing that this morning caused me a lot of anxiety

21   and I kind of had a small panic attack over it.  And so I don't

22   know how I'm going to do that every day, because it really does

23   give me a lot of fear.  And it's a long ways to drive.

24          So that's really my only thing right now is that it's

25   going to be difficult going -- coming here and back every day,

1    all the way down to Riggs and 10, because the 10 is just -- you

2    know, there is a lot of construction and things going on right

3    now.  So it just gave me a lot of anxiety this morning.  I

4    thought I would be fine with it, and then, you know, by the

5    time I got to my exit, I was a complete disaster.

6            THE COURT:  That's what I was going to ask you.  So

7    you live around Riggs and the I-10.  That's, like, in Chandler?

8            PROSPECTIVE JUROR:  Yes.  Sun Lakes is actually where

9    I'm at.

10           THE COURT:  And how long did it take you to get here?

11           PROSPECTIVE JUROR:  I'd say probably about 45,

12   50 minutes.

13           THE COURT:  Okay.  Thank you.

14           PROSPECTIVE JUROR:  Maybe closer to an hour, I'm not

15   exactly sure, but somewhere around an hour.

16           THE COURT:  Okay.  Thank you.

17           Juror 56.

18           PROSPECTIVE JUROR:  Juror 56.  I am on the board of a

19   small manufacturing company in California.  I presumed I could

20   -- I should add, we're in a very contentious situation with our

21   largest shareholder.  I presumed that I could simply give my

22   proxy to another board member that's of like mind and solve the

23   problem that way, but company counsel informs me that because

24   we're a California corporation, that is prohibited for me to

25   do.  It's actually a breach of my fiduciary responsibility to

1    do so.  It's going to make it very difficult for me.

2              THE COURT:  And I think I remember reading about this

3    a little bit.  When is the vote?

4              PROSPECTIVE JUROR:  There'll be a whole series of

5    board meetings.  They'll be at kind of odd intervals because

6    we're trying to arrange an emergency financing.  There is also

7    the possibility of an acquisition underway, so it's difficult

8    to predict the exact time it will happen.

9              THE COURT:  Okay.  Thank you.

10             Juror 59.

11             PROSPECTIVE JUROR:  I'm Juror 59.  And I have a heart

12   condition.  And I was -- I had a-fib and I was -- we were

13   controlling it with medication.  And on Friday my cardiologist

14   called and said -- I also have a pacemaker that monitors my

15   heart -- that they had gotten an alert that I had gone back

16   into a-fib, and he wants to do an ablation as soon as possible.

17   And, you know, if the three months is realistic, it would be

18   putting it off until next year maybe.

19             THE COURT:  Okay.

20             PROSPECTIVE JUROR:  Another thing that I'd like to

21   clarify.  On my questionnaire where it asked if I had children,

22   I believe I put no, because it was right after a question if

23   there was anybody at home that needed your care, so I was

24   thinking the question was in regard to children at home.  I

25   actually have four children, three daughters and a son, that

1    are on their own.  So I just wanted to clarify that for you.

2         THE COURT:  Okay.  I think you're moving the

3    microphone a little bit far away, but I did hear you have four

4    kids.

5         PROSPECTIVE JUROR:  Yes, three girls and a boy.

6         THE COURT:  Okay.  All right.  Thank you.

7         Juror 60.

8         PROSPECTIVE JUROR:  Juror 60.  Is that coming through?

9         Juror 60.  Luckily I am not that bashful, but I have

10   ulcerative colitis, so if I could be accommodated when it gets

11   bad -- it doesn't always happen -- I'm fine.

12        My second problem is January of 2020 I had a stroke.

13   Physically I look good, but sometimes I don't retain and

14   remember stuff.  How much that is, I don't know, I just keep

15   getting told.  And I haven't had it with that yet, but that's

16   where I can go from there.

17        THE COURT:  Okay.  Thank you.  If at any time during

18   this process you need a break, raise your hand and let me know.

19        Okay.  Let's see, Juror 61.

20        PROSPECTIVE JUROR:  Judge, so there are two things.

21   First and foremost, on the questionnaire it said if I had any

22   upcoming travel that had been planned, purchased, et cetera.

23   At the time I had been planning but had not yet purchased

24   tickets and whatnot for a trip to New York from November 9th

25   through the 14th.  I had scheduled that per using the calendar

1    that was given to me with the questionnaire.  My concern with

2    that would be if the dates were to change, then that could

3    cause issues with those travels.

4           And the second thing is I suffer from anxiety,

5    depression, PTSD, and whatnot, and I see a therapist biweekly

6    for that.  And my therapist and I have agreed that it would not

7    be in the best -- in my best interest for my mental health to

8    be without her services for that long of a period of time.  As

9    it is, like right now, I'm already, like, kind of having

10   anxiety, as you can hear.

11          THE COURT:  Okay.

12          PROSPECTIVE JUROR:  I thought that I would -- that I

13   was strong enough to be able to -- to deal with it, but I'm not

14   sure at this point if I am so.

15          THE COURT:  Okay.  All right.  Thank you for telling

16   us.

17          Is there anyone else that I missed?

18          (No response.)

19          THE COURT:  Okay.  I don't see any hands.

20          Okay.  So that is the only general question I had for

21   the whole panel.  Counsel may have some follow-up questions

22   based on your questionnaires.

23          So, Ms. Perlmeter.

24          MS. PERLMETER:  Thank you.  All right.  Good

25   afternoon, everyone.  Thank you for being here this afternoon.

1          My name is Peggy Perlmeter.  I am one of the assistant

2   United States attorneys that will be working on this case if

3   you are chosen to be with us over the next few months.

4          We have a few follow-up questions for some of you this

5   afternoon, as the judge said, based on some of the answers you

6   gave in the questionnaire.

7          Juror Number 47, in your questionnaire there was a

8   series of questions about general principles of law, such as a

9   criminal defendant has a right to remain silent and does not

10  need to testify on his behalf.  Do you remember seeing those

11  questions?

12         PROSPECTIVE JUROR:  Yes, ma'am.  Juror Number 47.

13  Yes, ma'am.

14         MS. PERLMETER:  Okay.  One of them was also that, in a

15  criminal trial, the burden of proof resides on the government.

16  It's up to the government to present evidence to prove the

17  charges for which it has alleged.

18         PROSPECTIVE JUROR:  Right.

19         MS. PERLMETER:  A defendant need not prove innocence,

20  need not produce any evidence.

21         In your questionnaire, I think you checked the box, or

22  marked that you think a defendant should prove that he's

23  innocent, so I just wanted to make sure that I had the right

24  answer from you.

25         PROSPECTIVE JUROR:  Not so much the defendant, but the

1    defendant's lawyers.  And, you know, I think beyond a

2    reasonable doubt, you know, they have to prove, you know,

3    either way, you know, the defendant, you know, as far as his

4    lawyers and his counsel, have to provide some kind of evidence,

5    I would think, as to why they are not guilty, not necessarily

6    the defendant themselves.

7              MS. PERLMETER:  Okay.  So if you're chosen to sit as a

8    member of this jury, you will be instructed that the burden of

9    proof lies on the government, and that in a criminal case it's

10   a burden of proof beyond a reasonable doubt.  So that's the

11   burden on the government.  And you'll be told that a defendant

12   need not prove innocence.

13             Will you be able to follow that concept of law if

14   you're chosen as a member?

15             PROSPECTIVE JUROR:  Yes, ma'am.

16             MS. PERLMETER:  Okay.  Thank you.

17             Also, if you're chosen, or selected to be a member of

18   this jury, you will hear some evidence about sexually explicit

19   topics.  People will be discussing private sexual matters, such

20   as, you know, sexual intercourse, oral sexual conduct.  You

21   will hear words in testimony like penis, vagina, breasts, so

22   they will be present in the courtroom throughout trial.  And

23   then one of your duties as jurors is at the end of the case to

24   go back in the jury room and deliberate on the evidence.  So if

25   you are a juror in this case, you will have to be able to

1    deliberate on the evidence, which will also require that you be

2    able to discuss these topics with each other.

3           So, Juror -- and I know it is a topic that is not one

4    that is -- that you normally discuss with strangers, but for

5    the purposes of this court case, I'd like to talk about how

6    some of you may feel about potentially having to be -- having

7    -- potentially being required to do that.

8           So let's start with Juror Number 52.  Okay.  So you

9    had indicated that you don't like this at all in your

10   questionnaire.  So my question to you this afternoon is if you

11   are selected, I understand you don't like it, you would prefer

12   to do other things, perhaps, but would you be able to

13   deliberate?

14          PROSPECTIVE JUROR:  I think so, yes.

15          MS. PERLMETER:  Thank you very much, ma'am.

16          Also in the questionnaire there were questions about

17   having to decide whether or not a witness is credible.  Who do

18   you want to believe?  Do you want to believe their testimony in

19   part, in all, or perhaps not at all?

20          One of the questions was would you find someone to

21   be -- well, first of all, you'll be instructed that you should

22   treat witnesses on an even slate, take their testimony as it

23   is, and then consider it, you know, in whole and in

24   consideration with all the other evidence at trial when you go

25   and decide what you want to believe and what you don't want to

1    believe.

2              So there was a question about whether or not a person

3    with a substance abuse problem, or a person who suffers from

4    issues like homelessness, does that substance abuse problem or

5    does that homelessness make them less credible or more credible

6    as a witness simply because they happen to have that particular

7    status.

8              So, Juror Number 50, sir, you had indicated in your

9    questionnaire that drug users tend to be less credible.  If you

10   hear -- if you're selected and you're sitting listening to the

11   evidence and you hear some evidence or some testimony about

12   drug usage, would you automatically find that witness to be

13   less credible or more credible simply because they have used

14   drugs in the past?

15             PROSPECTIVE JUROR:  I believe they would be less

16   credible.

17             MS. PERLMETER:  Why do you think that, sir?

18             PROSPECTIVE JUROR:  Because, well, based on the movies

19   or news, people with drug abuse or drug influence, they tend to

20   -- their integrity has been compromised, so their credibility

21   has been -- will be reduced.

22             MS. PERLMETER:  What if the drug use or the substance

23   abuse or the alcohol abuse was something that happened in the

24   past and the witness was discussing it as a part of their past,

25   would that have an impact on your opinion?

1          PROSPECTIVE JUROR:  It will be.

2          MS. PERLMETER:  Do you think you would be able to

3    fairly and impartially evaluate a witness that has had

4    substance abuse in their history --

5          PROSPECTIVE JUROR:  Yes.

6          MS. PERLMETER:  -- or would you automatically place

7    them below the credibility line simply because they have that

8    issue in their history?

9          PROSPECTIVE JUROR:  Well, if -- if the -- the people

10   who I'm talking with have evidence that they've rebuilt their

11   credibility, then I might reconsider their status.

12         MS. PERLMETER:  I'm sorry, could you repeat yourself?

13   I didn't quite hear you.

14         PROSPECTIVE JUROR:  If they tell me what have been

15   done, so in the past that rebuilt their drug abuse or drug

16   problems, then I might be -- change my opinions.

17         MS. PERLMETER:  Okay.  All right.  Thank you.

18         Juror Number 60.

19         PROSPECTIVE JUROR:  Juror 60.

20         MS. PERLMETER:  Hi, Juror Number 60.  Thank you.  My

21   question for you is similar to the other juror.  Are you able

22   to deliberate knowing that this case will involve evidence of a

23   sexual nature?

24         PROSPECTIVE JUROR:  Yes, I believe so.

25         MS. PERLMETER:  I'm sorry.  I didn't hear you.

1          PROSPECTIVE JUROR:  Of a sexual nature, yes, I believe

2     so.

3          MS. PERLMETER:  Thank you.

4          Juror Number 51.

5          PROSPECTIVE JUROR:  Juror Number 51.

6          MS. PERLMETER:  Hi, Juror Number 51.  I had a few

7     questions for you.  The first one is similar to what I just

8     asked Juror Number 50 about the drug use.

9          I think you had indicated that drug addicts tend to

10    lie, so my question to you is the same as I posed to Juror

11    Number 50.  Would you be -- fairly and impartially be able to

12    -- or would you be able to evaluate a witness's testimony on a

13    clean slate and consider all of it, knowing that they have

14    substance abuse history in the past, or would having that

15    history automatically place them either higher or lower on the

16    credibility scale?

17         PROSPECTIVE JUROR:  No.  I think if the drug abuse is

18    in the past and they're sober now, that they could be just as

19    credible as anybody else.

20         MS. PERLMETER:  And why do you think that?

21         PROSPECTIVE JUROR:  Because they've already taken the

22    steps to get over that problem and get their lives back on

23    track, basically.

24         MS. PERLMETER:  All right.  Thank you.

25         And then my other question for you was that I think

1    you indicated you had a couple of people in your life that had

2    been involved in or had been arrested or convicted of a sex

3    crime.

4           PROSPECTIVE JUROR:  Correct.

5           MS. PERLMETER:  Okay.  So I think one person was your

6    stepsister's stepfather.

7           PROSPECTIVE JUROR:  Correct.

8           MS. PERLMETER:  Okay.  And then the second person was?

9           PROSPECTIVE JUROR:  A friend.

10          MS. PERLMETER:  A friend's husband?

11          PROSPECTIVE JUROR:  Yes.

12          MS. PERLMETER:  Okay.  Were those -- well, let's go

13    step-by-step.

14          With your stepsister's stepfather, was that -- where

15    in -- where in the country was it, about what time frame did it

16    happen?

17          PROSPECTIVE JUROR:  It was in Arizona and it was, I

18    believe it was about 20 years ago, but it had been happening

19    since she was a little girl.

20          MS. PERLMETER:  So was your stepsister the victim?

21          PROSPECTIVE JUROR:  Correct.

22          MS. PERLMETER:  Okay.  Did you -- did she share much

23    of her experiences with you?

24          PROSPECTIVE JUROR:  No, because she had to keep them

25    secret at the time.

1        MS. PERLMETER:  Have you since -- has she since shared

2    them with you?

3        PROSPECTIVE JUROR:  No.

4        MS. PERLMETER:  No.  Okay.  So where -- where do you

5    gather your information from?

6        PROSPECTIVE JUROR:  I was around when he was caught

7    and during the trial.

8        MS. PERLMETER:  Okay.  Do you feel like your

9    stepsister's stepfather -- do you have any opinion or do you

10   have any knowledge whatsoever about whether he was treated

11   fairly or unfairly as he progressed through the criminal

12   justice process?

13       PROSPECTIVE JUROR:  I believe he was treated fairly

14   and got what he deserved.

15       MS. PERLMETER:  And what do you base that opinion on?

16       PROSPECTIVE JUROR:  Just the way he treated her.

17   There was pictures involved.  As I said, it was a secret.  She

18   was -- feared for her life.  She had to do whatever he said,

19   basically, until he was caught.

20       MS. PERLMETER:  Okay.  Would that -- would your

21   knowledge of that event have any impact on your ability to sit

22   in this trial, to receive all the evidence, and to remain fair

23   and impartial?

24       PROSPECTIVE JUROR:  No, I don't think so, because

25   every situation has its own differences.

MS. PERLMETER:  Okay.  Now, how about the other one,
your friend's husband?  Can you similarly tell me where that
happened and the time frame.

PROSPECTIVE JUROR:  It was in Arizona again, and it
was within the last, like, five years.

MS. PERLMETER:  And within the last?

PROSPECTIVE JUROR:  Five years.

MS. PERLMETER:  Five years.  Did that also resolve in
a trial or --

PROSPECTIVE JUROR:  It did resolve in a trial.  And
that trial I just know of from hearsay, which from what I
heard, it was unfairly done.

MS. PERLMETER:  Okay.  Is that your opinion after
hearing the information or is that the opinion expressed to you
by your friend or other people?

PROSPECTIVE JUROR:  Expressed to me by friends and
other people.

MS. PERLMETER:  Unfair on behalf -- so was your friend
the victim?

PROSPECTIVE JUROR:  No.  My friend's husband was the
defendant.

MS. PERLMETER:  Okay.  But your friend was not
involved, was not a victim or --

PROSPECTIVE JUROR:  No.

MS. PERLMETER:  Okay.  What was the -- do you know

1    what the charge was?

2            PROSPECTIVE JUROR:  I believe it was molestation of a

3    minor and I don't remember what else.

4            MS. PERLMETER:  As far as you're aware, was the minor

5    a child that your friend and her husband had in common?

6            PROSPECTIVE JUROR:  Yeah.  She was over at their house

7    for a party.

8            MS. PERLMETER:  Okay.  So is there anything about that

9    event that would lead you to be unable to sit and give this

10   case a fair review?

11           PROSPECTIVE JUROR:  No, because, once again, I think

12   each scenario has its own differences.

13           MS. PERLMETER:  All right.  Thank you so much.

14           PROSPECTIVE JUROR:  Thank you.

15           MS. PERLMETER:  Juror Number 45.

16           PROSPECTIVE JUROR:  Juror Number 45.

17           MS. PERLMETER:  Hello.  Repeat question here.  Also in

18   your questionnaire you had indicated that you may have some

19   difficulty deliberating, or that you weren't sure.  Now that

20   you have sat in the courtroom for a little bit and heard some

21   of the information and some of the responses, knowing that it's

22   going to be a sexually related trial with some kind of sex

23   information coming through, do you think you'll be able to

24   deliberate?

25           PROSPECTIVE JUROR:  Hard question to answer.  It

1    really is.

2         MS. PERLMETER:  I'm sorry.  I'm having trouble

3    hearing.

4         PROSPECTIVE JUROR:  In my questionnaire it also said

5    that we had done work for the county sheriff's department back

6    in South Carolina in reviewing the case files, and those case

7    files, attached case files, obviously.  And there were child

8    pornography files, people, you know, I'm sure you've seen all

9    the case files with photos, and it's really hard, really hard.

10   If that answers your question.

11        MS. PERLMETER:  Yes, it does.  I understand.  And I

12   agree that it's hard, but is it something that you will be able

13   to do?  It may be something that you don't want to do, and

14   there are some things that people just can't do, but if you

15   look at yourself and you think about it, is it something that

16   you would be able to do?

17        PROSPECTIVE JUROR:  I'd have to say no.

18        MS. PERLMETER:  Okay.  Thank you.

19        Juror Number 44.

20        PROSPECTIVE JUROR:  Juror 44.

21        MS. PERLMETER:  Hello, Juror Number 44.  I think you

22   indicated in your questionnaire that your son and your

23   ex-husband have been convicted of crimes.

24        PROSPECTIVE JUROR:  Yes.

25        MS. PERLMETER:  Can you tell me what they are, when

1  they happened, and where they happened.

2          PROSPECTIVE JUROR:  Okay.  Husband was 2006 for theft,

3  theft of means of transportation, and he spent three years in

4  prison, from 2006 to 2009.

5          Son --

6          MS. PERLMETER:  Was that here in Arizona?

7          PROSPECTIVE JUROR:  In Arizona, yes.

8          MS. PERLMETER:  Okay.

9          PROSPECTIVE JUROR:  Son was also in Arizona.  His --

10  he had various charges.  I think they were some drug charges,

11  some fraud, maybe like use of credit cards.  And he spent 2006

12  until 2010 in prison in Arizona.

13          MS. PERLMETER:  Okay.  So they were separate offenses?

14  They did not commit a crime together?

15          PROSPECTIVE JUROR:  Correct.

16          MS. PERLMETER:  Okay.  Thank you.  Is there -- do you

17  have an opinion on whether your son and your ex-husband were

18  treated fairly or unfairly as they moved through the criminal

19  justice process?

20          PROSPECTIVE JUROR:  I believe they were treated

21  fairly.

22          MS. PERLMETER:  Is there anything about your son and

23  your ex-husband's experience that would make you unable to sit

24  as a fair and impartial juror in this case?

25          PROSPECTIVE JUROR:  No.

1          MS. PERLMETER:  Okay.  Thanks.  And then I think you

2     had also mentioned in your questionnaire that it might be

3     difficult to deliberate on some of the topics that are

4     anticipated to be presented.

5          PROSPECTIVE JUROR:  Well, the questions basically

6     were -- you know, I put some of them are a sin, but I wouldn't

7     really be judging as a sin.  I would be deliberating on, you

8     know, testimony, so I -- I would be able to do that.

9          MS. PERLMETER:  Okay.  And -- thank you.  Thank you.

10          Can I have one moment, Your Honor?

11          So next is Juror Number 43.  Hi, Juror Number 43.  So,

12     Juror Number 43, I received the -- I didn't receive answers on

13     all the questions in the questionnaire for you.  Did you fill

14     it out in part, because I didn't get responses to the back end

15     of it, so I thought I would just ask you a few of those now.

16          PROSPECTIVE JUROR:  I -- I filled all the questions.

17          MS. PERLMETER:  You did answer all the questions?

18          (Reporter interrupts for clarification.)

19          THE COURT:  Can you just start your answer over.  We

20     couldn't hear you.

21          PROSPECTIVE JUROR:  I had problems submitting the

22     answers.  I think the system stopped in the middle.  I

23     resubmitted and they went through the whole thing.

24          MS. PERLMETER:  So you had some difficulty submitting,

25     and then you tried again and it did go through?

```
 1              PROSPECTIVE JUROR:  Yes.

 2              MS. PERLMETER:  My version has a few holes, so do you

 3      mind if I ask you the questions?

 4              So, sir, do you have strong feelings about pornography

 5      on the internet or have you or someone close to you ever been

 6      affected by pornography?

 7              PROSPECTIVE JUROR:  Yes, very strong feelings.

 8              MS. PERLMETER:  I'm sorry?

 9              PROSPECTIVE JUROR:  Yes, very strong feelings.

10              MS. PERLMETER:  Okay.  What are your feelings?

11              PROSPECTIVE JUROR:  The environment that sometimes

12      take advantage of people that don't have -- they are in need

13      and they need support, and they take advantage of that,

14      especially children, I mean, teenagers.  That was the only

15      problem.

16              MS. PERLMETER:  Do you have strong feelings about

17      escort services or people working in the legal adult

18      entertainment industry, or have you or someone close to you

19      ever been affected by this type of service?

20              PROSPECTIVE JUROR:  Not -- not really, no.  No strong

21      feelings.  But as long as it's legal, it's fine, especially if

22      they are adults and they -- they agreed to work in that

23      environment.

24              MS. PERLMETER:  Does it bother you that adult escort

25      services are legal and/or that people working in this industry
```

UNITED STATES DISTRICT COURT

1   can legally advertise their services?

2           PROSPECTIVE JUROR:  No.  No.

3           MS. PERLMETER:  Do you have strong feelings about

4   prostitution or have you or someone close to you ever been

5   affected by prostitution or the purchase or sale of a sex act

6   for money, also referred to as commercial sex?

7           PROSPECTIVE JUROR:  No, no.  No knowledge and no -- no

8   close ties, no.

9           MS. PERLMETER:  Do you think law enforcement, either

10  local, state, or federal, and the government, either local,

11  state, or federal, should expend resources investigating and

12  prosecuting individuals who are purchasers of commercial sex?

13          PROSPECTIVE JUROR:  If they're violating the law,

14  absolutely.

15          MS. PERLMETER:  Do you think that prostitution should

16  be legalized?

17          PROSPECTIVE JUROR:  No.  For the same reasons I

18  mentioned, that the environment has propensity to take

19  advantage of certain people.

20          MS. PERLMETER:  Have you, any members of your family

21  or close friends, ever engaged in, been accused of engaging in,

22  or been convicted of prostitution, soliciting prostitution, or

23  any act related to the purchase of commercial sex?

24          PROSPECTIVE JUROR:  No.

25          MS. PERLMETER:  If you're selected to sit as a member

1    of this jury, would -- you're going to hear testimony about

2    prostitution.  Would that -- would you be able to receive that

3    information and fairly and impartially go through it?

4              PROSPECTIVE JUROR:  Absolutely.

5              MS. PERLMETER:  Prior to coming to court today, or

6    prior to filling out this questionnaire at home, had you ever

7    heard of the website www.Backpage.com?

8              PROSPECTIVE JUROR:  Barely.  There was some

9    connections.  I use Craigslist so was some connections to that,

10   but that's the only thing I know about it.

11             MS. PERLMETER:  Okay.  Do you know if any members of

12   your family or close friends, have they ever used the website?

13             PROSPECTIVE JUROR:  I'm not aware.

14             MS. PERLMETER:  How about other online classified

15   websites like Craigslist, eBay, Google, or other online

16   classified websites?

17             PROSPECTIVE JUROR:  The only one I'm familiar with is

18   Craigslist.

19             MS. PERLMETER:  In general, what are your feelings

20   about the laws and regulations affecting the internet,

21   including the publishing of content posted by users of the

22   websites?

23             PROSPECTIVE JUROR:  That's a very difficult question

24   because the environment we are with the social media and all

25   that, and with no -- lack of regulations, it's very difficult.

1   But I still believe if you are the owner of one of those

2   websites, I think you need to do your best to protect society.

3          MS. PERLMETER:  Okay.  What are your feelings about

4   whether websites such as You Tube, Facebook, Twitter, Google,

5   and Instagram, among others, should be responsible for the

6   content posted by users of the website?

7          PROSPECTIVE JUROR:  Again, the same answer before.

8   The -- I think they should try to do the best to regulate

9   themselves, but eventually I think they need to be accountable

10  for some of the impact they do to society.

11         MS. PERLMETER:  Some questions about the different

12  victims and witnesses that you may hear from if you're selected

13  to sit as a juror, and whether or not -- and how you may or may

14  not evaluate their credibility as a witness.

15         Would you find a witness's testimony to be more or

16  less credible simply based on race, nationality, ethnicity, or

17  religion?

18         PROSPECTIVE JUROR:  I think it's the same for

19  everyone.

20         MS. PERLMETER:  The same for everyone?

21         PROSPECTIVE JUROR:  Yeah.

22         MS. PERLMETER:  Okay.  Some of the witnesses in this

23  case are ethnic minorities and of a low socioeconomic status.

24  Would you find a witness's testimony to be more or less

25  credible simply based on their socioeconomic status?

1           PROSPECTIVE JUROR:  No.

2           MS. PERLMETER:  Some of the witnesses in this case

3     have experienced challenges with substance abuse and

4     homelessness.  Would you find a witness's testimony to be less

5     credible simply based on their experiences with substance

6     abuse, either drug or alcohol abuse, and homelessness?

7           PROSPECTIVE JUROR:  Again, if it is in the past,

8     that's a different situation and the impact should be as a

9     normal person.

10          MS. PERLMETER:  Do you have any religious, moral,

11    spiritual, or philosophical beliefs that would make it

12    difficult for you to sit in judgment of another person?

13          PROSPECTIVE JUROR:  No.

14          MS. PERLMETER:  Thank you very much, Juror Number 43.

15    That was a lot.

16          PROSPECTIVE JUROR:  Yeah.

17          MS. PERLMETER:  Thank you.  I don't have anymore

18    questions, Your Honor.

19          THE COURT:  Okay.  Mr. Cambria.

20          MR. CAMBRIA:  My name is Paul Cambria and I have the

21    pleasure of representing Michael Lacey.  And I'm going to ask

22    you a few questions.  And I appreciate your candid answers.

23          As you probably heard, if you were listening

24    downstairs, you know, there are no right or wrong answers,

25    they're just your answers.  And you're not going to be graded

1    on this or anything like that, we're just going to go through

2    and try to get some information.

3              Juror Number 43, you indicated --

4              PROSPECTIVE JUROR:  Juror Number 43.

5              MR. CAMBRIA:  Yes, sir.  You indicated that you felt

6    that there should be some responsibility on the part of a

7    website or something like Craigslist.  Is that true?

8              PROSPECTIVE JUROR:  Yes.

9              MR. CAMBRIA:  And would you mind speaking right into

10   the --

11             PROSPECTIVE JUROR:  Yes.

12             MR. CAMBRIA:  Thank you.  She has to take it down over

13   there.

14             And you said that you used Craigslist at certain

15   times; is that correct?

16             PROSPECTIVE JUROR:  Yes.

17             MR. CAMBRIA:  When you were using Craigslist, did you

18   notice any adult advertisements on Craigslist?

19             PROSPECTIVE JUROR:  I was very specific.  I was in and

20   out.  I was just selling something, so I put it in, do the

21   transaction and remove.  So, again, didn't spend time searching

22   the -- the website.

23             MR. CAMBRIA:  You didn't just kind of come across

24   something as you were searching?

25             PROSPECTIVE JUROR:  No.

1          MR. CAMBRIA:  All right.  If -- and so you feel that

2     there should be -- if a third-party places something on

3     Craigslist and what they place on the list is all their words,

4     words they compose, and if for some reason it turns out that

5     their conduct is not appropriate, you feel the website should

6     have some responsibility for that?

7          PROSPECTIVE JUROR:  Like I said before, it's a very

8     difficult question.  And with no regulation and with no laws to

9     try to enforce the content of the website to be managed, it's

10    very difficult to do that work.  But I still believe that the

11    owner of the website needs to do the best they can to clean up.

12    And it's obvious sometimes when just scan things, you can see

13    something is not right.

14         MR. CAMBRIA:  Okay.

15         PROSPECTIVE JUROR:  You need to take action.

16         MR. CAMBRIA:  All right.  So you feel they should do

17    the best they can.

18         Is it fair to say that people use telephones to commit

19    crimes?

20         PROSPECTIVE JUROR:  Yes.

21         MR. CAMBRIA:  All right.  And you feel that the phone

22    company should in some way be responsible if somebody uses

23    their phone to commit a crime?

24         PROSPECTIVE JUROR:  I think the comparison is not

25    right.

1          MR. CAMBRIA:  I'm sorry?

2          PROSPECTIVE JUROR:  I don't think the comparison is

3     correct.

4          MR. CAMBRIA:  Okay.

5          PROSPECTIVE JUROR:  One is private and another one is

6     open to everybody.

7          MR. CAMBRIA:  Well, you say the phone company is --

8          PROSPECTIVE JUROR:  No, no.  I'm saying, I'm making

9     the phone call and I'm committing a crime, so I am -- I am the

10    only one that knows, and the other person, but nobody is -- you

11    know that.

12         MR. CAMBRIA:  I see.  Okay.  And, however, if the

13    phone company finds out that somebody committed a crime using

14    their phone, should they shut their phone service off?

15         PROSPECTIVE JUROR:  They need to follow the law.  If

16    the law says they need to do that, they should do that.

17         MR. CAMBRIA:  Okay.  So you think they should shut

18    their phone off so they couldn't do it again?

19         PROSPECTIVE JUROR:  Is that what the -- you're the

20    expert.  I'm not an expert on the law.  Is that what the law

21    says?

22         MR. CAMBRIA:  Well, I think that's another, as you

23    pose it, a difficult, complicated question.

24         PROSPECTIVE JUROR:  Okay.

25         MR. CAMBRIA:  And it's just a matter of me asking if

1    you think that somebody has a service that's used by millions

2    and millions of people, and generally people know that people

3    use the mail and phones and things like that to commit crimes,

4    how much responsibility should be on the platform, in other

5    words, the phone company or the U.S. mail or FedEx or one of

6    those?  That was the question.

7              PROSPECTIVE JUROR:  It's a difficult question.

8              MR. CAMBRIA:  It's an open question.

9              PROSPECTIVE JUROR:  Yeah, it is.  But I think at the

10   end, society has to be protected in one way or another.

11             MR. CAMBRIA:  All right.  Thank you, sir.

12             Juror Number 50.

13             PROSPECTIVE JUROR:  Juror 50.

14             MR. CAMBRIA:  Get you a microphone.

15             PROSPECTIVE JUROR:  Juror 50.

16             MR. CAMBRIA:  You -- I'm reading your questionnaire

17   here.  You indicated -- there were talked -- we had a COVID

18   question.  Obviously, all of us are here, Her Honor has allowed

19   me to take this off while I talk, otherwise we all have to wear

20   these things, be distanced and so on.

21             Now, you indicated you have a daughter who,

22   apparently, works, what, in an emergency room?

23             PROSPECTIVE JUROR:  Yes.  She's a scribe.

24             MR. CAMBRIA:  All right.  And you put this down.  Is

25   there some feeling that maybe she would be exposed and you

1    might get exposed?

2              PROSPECTIVE JUROR:  Correct.

3              MR. CAMBRIA:  Is that a fear on your part that would

4    cause you to think maybe you shouldn't be here?

5              PROSPECTIVE JUROR:  I don't have fear for that.  I

6    just want to put an announcement.  That's it.

7              MR. CAMBRIA:  Okay.  So you're just putting us on

8    notice actually?

9              PROSPECTIVE JUROR:  Yes.

10             MR. CAMBRIA:  All right.  You said -- they were asking

11   you questions about people taking drugs and whether or not you

12   would believe them or not believe them because they had a drug

13   history.  Would it be relevant to know if during the event

14   they're talking about they were in some way influenced by

15   drugs?

16             PROSPECTIVE JUROR:  Yeah, that could change the

17   answer, yes.

18             MR. CAMBRIA:  That would be relevant, wouldn't it?

19             PROSPECTIVE JUROR:  Correct.

20             MR. CAMBRIA:  And it would be okay, as far as you're

21   concerned, to consider that?

22             PROSPECTIVE JUROR:  Yes.

23             MR. CAMBRIA:  Let's see.  You indicated that you

24   got -- your job situation is such that you have some three

25   projects that you're responsible for?

1          PROSPECTIVE JUROR:  Correct.

2          MR. CAMBRIA:  Will they be compromised in some way if

3     you're here for the next three or four months?

4          PROSPECTIVE JUROR:  They'll be compromised for sure.

5          MR. CAMBRIA:  And are these -- will that have an

6     affect, in other words, will you be thinking about them or

7     trying to deal with them maybe late at night or something like

8     that?

9          PROSPECTIVE JUROR:  That will be the plan, yeah.  I

10    will have to stay late night and try to finish the job.

11         MR. CAMBRIA:  Do you think there is any chance that,

12    as a result of that, we may lose some of your attention or

13    maybe you'll be up late and not be rested, or any of those

14    things?

15         PROSPECTIVE JUROR:  Potentially.

16         MR. CAMBRIA:  That's a potential?

17         PROSPECTIVE JUROR:  Correct.

18         MR. CAMBRIA:  All right.  All right.  Thank you, sir.

19    I appreciate it.

20         PROSPECTIVE JUROR:  Thank you.

21         MR. CAMBRIA:  Number 51.

22         PROSPECTIVE JUROR:  Juror 51.

23         MR. CAMBRIA:  I think they asked you the same

24    questions about drugs.

25         PROSPECTIVE JUROR:  Correct.

1          MR. CAMBRIA:  And if they were taking drugs at a time

2     they're talking about something, that would be relevant,

3     wouldn't it?

4          PROSPECTIVE JUROR:  It would be relevant.

5          MR. CAMBRIA:  All right.  So you indicate you have a

6     connection to law enforcement.  What's that connection?

7          PROSPECTIVE JUROR:  Did I say that I have a connection

8     to law enforcement?  I don't have a connection to law

9     enforcement right now.

10          MR. CAMBRIA:  Okay.  I just had -- the answer was yes,

11     self.  Explain.  I worked as a contract for USCIS.

12          PROSPECTIVE JUROR:  Oh, yes.  That is correct.

13          MR. CAMBRIA:  Do you have any other connection to law

14     enforcement?

15          PROSPECTIVE JUROR:  No, that would be it.

16          MR. CAMBRIA:  Okay.  Have you used online classified

17     websites like Craigslist?

18          PROSPECTIVE JUROR:  Yes.

19          MR. CAMBRIA:  Some of those?  And fair to say that

20     there are literally millions of ads on these?

21          PROSPECTIVE JUROR:  Correct.

22          MR. CAMBRIA:  All right.  And during the course of

23     skimming through any of that on Craigslist, have you seen

24     anything that appeared to be adult in some nature?

25          PROSPECTIVE JUROR:  Yes.

1          MR. CAMBRIA:  All right.  And you, obviously,

2     exercised your right to skip over it and go on to something

3     else?

4          PROSPECTIVE JUROR:  Correct.

5          MR. CAMBRIA:  All right.  Did you feel at that time

6     that you had to report it to somebody or something like that?

7          PROSPECTIVE JUROR:  No.

8          MR. CAMBRIA:  No.  Okay.  Do you have any problem with

9     the proposition that the -- this is America, and we have a

10    judicial system and we all love it and we're proud of it, true?

11         PROSPECTIVE JUROR:  (No audible response.)

12         MR. CAMBRIA:  And the system says that if a citizen is

13    accused of a crime by the government, the government has to

14    prove that crime beyond a reasonable doubt.  The ordinary

15    citizen doesn't have to go against the government and prove

16    their innocence.  Is that fair to say?

17         PROSPECTIVE JUROR:  Correct.

18         MR. CAMBRIA:  And you're okay with that?

19         PROSPECTIVE JUROR:  Yes.

20         MR. CAMBRIA:  And if they -- and the law also says

21    that -- it doesn't mean it happens in every case -- but the law

22    says that a citizen can simply remain silent, not testify,

23    nobody can draw any negative inference from that.  Are you okay

24    with that?

25         PROSPECTIVE JUROR:  Yes.

1          MR. CAMBRIA:  And if, for example, the government may

2     go through, call 100 witnesses, and at the end the jurors say,

3     you know what, they didn't prove the crime that was charged and

4     -- would you have any problem with that situation?

5          PROSPECTIVE JUROR:  No.

6          MR. CAMBRIA:  So you don't have an uneasy feeling if

7     somebody doesn't get up and testify, if their lawyers attempt

8     to succeed by questioning witnesses and so on and presenting

9     witnesses?

10         PROSPECTIVE JUROR:  No.

11         MR. CAMBRIA:  All right.  Thank you.

12         PROSPECTIVE JUROR:  Thank you.

13         MR. CAMBRIA:  Juror 52.

14         PROSPECTIVE JUROR:  Juror 52.

15         MR. CAMBRIA:  Good afternoon.

16         PROSPECTIVE JUROR:  Good afternoon.

17         MR. CAMBRIA:  And you answered the question which I

18    had just asked her, about do you feel that a defendant should

19    prove their innocence, and you said you agreed with that.  Is

20    that fair to say?

21         PROSPECTIVE JUROR:  I -- I feel differently about that

22    now.

23         MR. CAMBRIA:  And what changed your mind?

24         PROSPECTIVE JUROR:  Rethinking and listening to some

25    of the other earlier opinions on that, and realizing that that

1    doesn't really make sense, because they need to be proven

2    guilty and not prove themselves innocent, because the burden is

3    on proving their guilt.

4            MR. CAMBRIA:  Our system is set up so that, you know,

5    the government, big powerful thing, that the citizen has the

6    right to protections of the law --

7            PROSPECTIVE JUROR:  Correct.  Right.

8            MR. CAMBRIA:  -- that we all enjoy.

9            PROSPECTIVE JUROR:  And that makes sense to me.

10           MR. CAMBRIA:  So even though you answered this

11   question, defendants should prove innocence, agree, now you're

12   saying that you would not hold that -- should any of these

13   people decide not to testify, you would not hold that against

14   them?

15           PROSPECTIVE JUROR:  Correct.  I believe I

16   misunderstood the question when I read it --

17           MR. CAMBRIA:  I'm sorry?

18           PROSPECTIVE JUROR:  I believe I misunderstood the

19   question reading it the first time.

20           MR. CAMBRIA:  That's fine.  See, that's why we ask

21   questions, so we get the truth.  Thank you so much.

22           Now, you also indicated that the government should

23   prosecute platforms to root out and rescue trafficked

24   individuals.

25           Do you recall that?

1          PROSPECTIVE JUROR:  Yes.

2          MR. CAMBRIA:  Nobody here is charged with trafficking.

3  Did you think they were?

4          PROSPECTIVE JUROR:  I didn't really know what to

5  expect.

6          MR. CAMBRIA:  All right.  And so, obviously, you have

7  a strong feeling if somebody is forced, in other words,

8  trafficked, they're forced by somebody to do something?

9          PROSPECTIVE JUROR:  Correct.

10          MR. CAMBRIA:  Here -- here we have a bunch of people

11  who placed ads on this platform.  That's what happened.  Okay.

12          The other thing is that you said that -- you were

13  asked about whether you would be able to discuss sexual topics.

14          PROSPECTIVE JUROR:  Uh-huh.

15          MR. CAMBRIA:  There'll be a number of ads here that

16  people will have to review, some deal with sexual topics.

17  Would that be an issue with you?  Could you do that or not?

18          PROSPECTIVE JUROR:  I could, yeah, I -- I think that I

19  could do that.  Is it something that I would want to do, of

20  course not.  It's not in my nature to sit and talk about that

21  type of thing, which it wouldn't be for most people here.  But,

22  yeah, I definitely could.  I think I would probably end up,

23  like, do more listening than --

24          MR. CAMBRIA:  What we're interested in, at least I am,

25  is if you could have open and frank conversations with your

1  fellow jurors about ads and --

2          PROSPECTIVE JUROR:  About ads?

3          MR. CAMBRIA:  About ads that may include some form of

4  sexual topic.  Could you do that?

5          PROSPECTIVE JUROR:  Sure.  Yes.

6          MR. CAMBRIA:  See, because if there is any reluctance

7  to do that, you don't participate in that, we've lost a juror,

8  because we need all 12 jurors to be part of this.

9          PROSPECTIVE JUROR:  Uh-huh.

10          MR. CAMBRIA:  You think you could do it?

11          PROSPECTIVE JUROR:  I believe so, yes.  I would have

12  to be in the situation.

13          MR. CAMBRIA:  Now, there was another answer you gave

14  here:  Do you think you could determine if a person is credible

15  or not?  Is there some problem with that?  Do you think that

16  people could fool you or mislead you?

17          PROSPECTIVE JUROR:  What is the question?

18          MR. CAMBRIA:  I'm sorry?

19          PROSPECTIVE JUROR:  What is the question?

20          MR. CAMBRIA:  Yeah.  The question in this was do you

21  believe you could determine whether a person is credible?  And

22  you said, no.  I don't know how I would assume to know this.

23  There isn't any magic formula.  I'm just asking you do you

24  think you could do that sort of thing?

25          PROSPECTIVE JUROR:  With enough information, I think I

UNITED STATES DISTRICT COURT

probably could, to the best of my knowledge, to -- to determine

if I thought that they were credible or not.  Whether they are

or not, I can't say that I would know that for sure.

     MR. CAMBRIA:  Okay.  Very good.  Fair enough.  That's

all I have.  Thank you.

     PROSPECTIVE JUROR:  Thank you.

     MR. CAMBRIA:  Number 53.

     PROSPECTIVE JUROR:  Juror 53.

     MR. CAMBRIA:  Good afternoon, sir.  Get by the

microphone here.

     You indicated earlier you had a medical condition

that, obviously, was an issue for you.  Do you think that will

prevent you from being an attentive juror, or will there be a

need for a number of interruptions?

     PROSPECTIVE JUROR:  I'm not aware of a medical

condition.

     MR. CAMBRIA:  I'm sorry?

     PROSPECTIVE JUROR:  I'm not aware of a medical

condition.

     MR. CAMBRIA:  Oh, I'm sorry.  I'm reading this.

You're 53.  Mixed my numbers up.  I'm sorry.  I need Juror --

     PROSPECTIVE JUROR:  60.

     MR. CAMBRIA:  60.  All right.  Well, they've got you

here as 53.  Sorry, sir.

     You heard my question?

1            PROSPECTIVE JUROR:  I did.

2            MR. CAMBRIA:  And what's the answer?

3            PROSPECTIVE JUROR:  I'm Juror 60.

4            MR. CAMBRIA:  60, yes, sir.

5            PROSPECTIVE JUROR:  Like I said earlier to the judge,

6    I had a stroke, a brain bleed, actually.  And I feel pretty

7    good, but I don't always remember everything in great content,

8    at least I'm getting told that a lot by my wife.  But I appear

9    to be able to answer questions at the moment.  Now, how long I

10   can retain things or -- I'm not going to tell you, because I've

11   never gone in and had the doctor do this yet.

12           MR. CAMBRIA:  Just a little closer.  Thank you.

13           PROSPECTIVE JUROR:  There we go.  So where did I stop?

14           So I have not been evaluated by anybody credible, but

15   I -- some of these questions you're asking about the form I

16   actually filled out, some of them I don't quite remember now,

17   but I'm sure I did that.

18           MR. CAMBRIA:  I'm sorry.  I didn't catch the last

19   part.

20           PROSPECTIVE JUROR:  I'm sure I did that.  I mean, some

21   of those questions I don't remember.  You're asking questions

22   around what's coming off the sheets.

23           MR. CAMBRIA:  Uh-huh.

24           PROSPECTIVE JUROR:  I mean, I understand what they

25   are, but I'm not remembering the answers that I gave to them.

1          MR. CAMBRIA:  That's okay.  You can answer just the

2     questions I ask you here today.  How's that?

3          PROSPECTIVE JUROR:  Yes.  Thank you.

4          MR. CAMBRIA:  All right.  So -- so do you feel that

5     your medical situation would interrupt your ability to give us

6     your undivided attention, would require a number of

7     interruptions, anything like that?

8          PROSPECTIVE JUROR:  I'm feeling unsure.  How is that?

9     I mean, I can't tell you exactly.  I'm just feeling unsure that

10    I could keep all of it in a reasonable line of thought long

11    enough.  I mean, I -- I don't know how to answer that question.

12    I think I can do it, but I'm not sure I can do it.

13         MR. CAMBRIA:  Okay.  Let me try to put it this way.

14    I'm not trying to put words in your mouth.

15         PROSPECTIVE JUROR:  No.  I'm trying to answer it

16    honestly.

17         MR. CAMBRIA:  You're unsure as to whether or not you

18    could give us your undivided attention in order to be a juror.

19    Is that fair?

20         PROSPECTIVE JUROR:  I think I can do that.

21         MR. CAMBRIA:  You think you can do that?

22         PROSPECTIVE JUROR:  I think I can do that.

23         MR. CAMBRIA:  All right.  Any reluctance at all on

24    that?

25         PROSPECTIVE JUROR:  On a day-by-day basis for the long

1     term, I can't -- I can't answer that one fairly.  On a

2     day-to-day, what we're doing here, I can -- I can do this.  I'm

3     not sure that in 10 weeks or 12 weeks, or whatever you guys are

4     talking about, I can keep all of that together without having a

5     way to -- I'm assuming that we can't write things down and we

6     can't control that stuff.  I'm not sure I can do that.  But I'm

7     also telling you I have not been evaluated, you just have to

8     take me by my word on how I'm feeling about that.

9                MR. CAMBRIA:  Okay.  Well, that's an honest answer.

10    We appreciate that.  Thank you, sir.

11               Number 54.

12               PROSPECTIVE JUROR:  Juror 54.

13               MR. CAMBRIA:  Good afternoon.

14               PROSPECTIVE JUROR:  Good afternoon.

15               MR. CAMBRIA:  You heard my questions up here about --

16    and I notice you answered the same way about credibility and

17    drug abuse.  Can you explain to us -- well, no, strike that.

18               My question is if it -- if there is an event that

19    someone is talking about and they may have been influenced by

20    drugs during that event, would you agree that would be a

21    relevant issue for you to consider?

22               PROSPECTIVE JUROR:  Yes.

23               MR. CAMBRIA:  All right.  And, indeed, it may very

24    well be that -- that you may disregard what that person has to

25    say because of their situation, drug situation?

1          PROSPECTIVE JUROR:  Possibly, if they're under the

2     influence.

3          MR. CAMBRIA:  Okay.  You also answered a question you

4     were asked about escorts, and you said you're bothered that

5     escorts are legal.  And what's the issue with that?  The

6     question is -- it's number 65 -- question says, bothered that

7     escorts are legal?  Yes.  Explain.  And you said, I'm opposed

8     to any advertisement of these services that children or

9     teenagers may see.  Is that -- is that the limit?  In other

10    words, if adults see it, it's okay?

11         PROSPECTIVE JUROR:  If it's a legal escort --

12         MR. CAMBRIA:  Okay.

13         PROSPECTIVE JUROR:  -- situation, yes.

14         MR. CAMBRIA:  So you appreciate the fact that there

15    are legal licensed escorts?

16         PROSPECTIVE JUROR:  Yes.

17         MR. CAMBRIA:  Okay.  So that -- so that was the

18    concern there.

19         Now, there is another question here about pornography.

20    And pornography can be any -- you know, any explicit picture,

21    whatever, a loose definition of it, if you will.  You said I'm

22    opposed to any form of it on the internet or in a publication.

23         Will that -- because there will be some pictures here

24    that may have some semi-nudity or what have you -- will that

25    prejudice your opinion in the sense of being fair and impartial

1    just because of that, of something you feel strongly about?

2              PROSPECTIVE JUROR:  No.  I was on a jury in 2017 for

3    Maricopa County.

4              MR. CAMBRIA:  I'm sorry.  Go ahead.

5              PROSPECTIVE JUROR:  And it was a sex abuse against

6    minors, and that same incident came up, and I was able to

7    fairly judge that.

8              MR. CAMBRIA:  Okay.  There are no charges here about

9    minors.  Do you understand that?

10             PROSPECTIVE JUROR:  Yes.

11             MR. CAMBRIA:  But you indicated you were bothered by

12   the fact that escorts are legal.  What's that -- what are you

13   bothered by that?  If they're legal, they're licensed by the

14   city and things like that --

15             PROSPECTIVE JUROR:  Honestly, I don't remember that

16   with the legal.  I -- unless I was thinking it said illegal.

17             MR. CAMBRIA:  Okay.  Let's see here.

18             What about this idea that a -- there is no burden of

19   proof on the defense, that the prosecution has to establish

20   their charges?  Do you believe that?  You could apply that?

21             PROSPECTIVE JUROR:  Yes.

22             MR. CAMBRIA:  And with regard to the pornography kind

23   of thing, could you discuss those sort of subjects with other

24   jurors?

25             PROSPECTIVE JUROR:  Yes.

1          MR. CAMBRIA:  You could.  Okay.

2          Have you looked at websites like Facebook, or Twitter,

3     Craigslist, things like that?

4          PROSPECTIVE JUROR:  Yes.

5          MR. CAMBRIA:  And have you noticed on any of those

6     websites adult subjects, if you will?  Let's take Facebook, for

7     example.

8          PROSPECTIVE JUROR:  No, not on Facebook.

9          MR. CAMBRIA:  Not on Facebook.  Okay.  How about

10    Craigslist?

11         PROSPECTIVE JUROR:  Craigslist.  I've never looked at

12    it.  When I was looking for something else on Craigslist, I

13    noticed that was listed.

14         MR. CAMBRIA:  Okay.  All right.  Thank you.

15         55.

16         There is an initial COVID situation here.  Is there

17    any -- do you have any issues about being exposed to a lot of

18    people for a long time?

19         PROSPECTIVE JUROR:  No, I don't.

20         MR. CAMBRIA:  Okay.  And any issues as far as the

21    burden being on the government and --

22         PROSPECTIVE JUROR:  No.

23         MR. CAMBRIA:  -- defense not have to prove innocence,

24    that kind of thing?

25         And because -- are you familiar with websites,

UNITED STATES DISTRICT COURT

1    Craigslist --

2              PROSPECTIVE JUROR:  Yes.

3              MR. CAMBRIA:  -- Facebook, all that?

4              PROSPECTIVE JUROR:  Yes.

5              MR. CAMBRIA:  And have you seen adult subjects on

6    those --

7              PROSPECTIVE JUROR:  Yes.

8              MR. CAMBRIA:  -- in the past?  Pardon?

9              PROSPECTIVE JUROR:  Yes.

10             MR. CAMBRIA:  Frequently?

11             PROSPECTIVE JUROR:  Not frequently, but yes.

12             MR. CAMBRIA:  And Facebook, for example?

13             PROSPECTIVE JUROR:  Twitter.

14             MR. CAMBRIA:  Twitter.  Uh-huh.  And was there any

15   indication in any of these ads that people were trying to meet

16   other people?

17             PROSPECTIVE JUROR:  No, not really.

18             MR. CAMBRIA:  Okay.  Were there any other websites

19   that you reviewed where it appeared people were trying to meet

20   other people, maybe for sexual activity?

21             PROSPECTIVE JUROR:  Yes.

22             MR. CAMBRIA:  And like Tinder.

23             PROSPECTIVE JUROR:  I don't know what Tinder is.

24             MR. CAMBRIA:  What website?

25             PROSPECTIVE JUROR:  Something called Adam.

1          MR. CAMBRIA:  I'm sorry?

2          PROSPECTIVE JUROR:  Adam, for Adam.

3          MR. CAMBRIA:  Adam.  Okay.  And people were there,

4   apparently, trying to meet other people for sexual activity?

5          PROSPECTIVE JUROR:  That was their goal.

6          MR. CAMBRIA:  Okay.  So would it be fair to say it's

7   not unusual to find this stuff on the internet?

8          PROSPECTIVE JUROR:  It's not unusual.

9          MR. CAMBRIA:  Okay.  Can you -- if -- if a police

10   officer testified in this case, would you automatically give

11   the police officer more credibility because they're police

12   officers?

13          PROSPECTIVE JUROR:  No, not necessarily.

14          MR. CAMBRIA:  Okay.  And I ask that to anybody here, a

15   show of hands, anybody here feels that a police officer would

16   be entitled to greater credibility as a witness than someone

17   who is not a police officer?  Anybody?

18          Yes, sir.  I mean, would you stand, please.  What's

19   your number?

20          PROSPECTIVE JUROR:  Juror 34.

21          MR. CAMBRIA:  34, yes, sir.

22          PROSPECTIVE JUROR:  Juror 34.  You asked if I would

23   give them more credibility, and my answer is yes.

24          MR. CAMBRIA:  Just simply because they're police

25   officers?

1          PROSPECTIVE JUROR:  Well, as a retired police officer,

2    I know what goes into that.  It's a very big question in my

3    mind, or issue.

4          MR. CAMBRIA:  So, basically, you're telling us because

5    you're a retired police officer and so on, that if a police

6    officer is a witness, they're going to start off a little bit

7    ahead of somebody who is not a police officer, as far as truth

8    goes?

9          PROSPECTIVE JUROR:  Yes, sir.

10          MR. CAMBRIA:  Thank you.

11          Number 36.

12          Yes, sir.  You indicated earlier that you had a

13    financial hardship if you were to be in this trial, something

14    about you couldn't live on 200 a week.

15          PROSPECTIVE JUROR:  That's correct.  Correct.

16          MR. CAMBRIA:  Okay.  And are you the sole -- sole

17    supporter?

18          PROSPECTIVE JUROR:  Yeah, I am.

19          MR. CAMBRIA:  All right.  Thank you, sir.  That's all

20    I have.

21          Number 52.  I missed the part about I -- only because

22    I have these two little batteries behind my ears here, meaning

23    I wear hearing aids.  I did not hear -- you said something

24    about driving was an issue with big trucks and things like

25    that.  Is that what it was?

1          PROSPECTIVE JUROR:  Highway driving.

2          MR. CAMBRIA:  Oh, I see.

3          PROSPECTIVE JUROR:  Yeah, I have -- I'm fearful on the

4    highway.  So I typically avoid highways, but I can't do that in

5    this situation, so I just -- I don't normally drive this far

6    along the highway.  And so I was on the 10 for an hour this

7    morning and it -- yeah, I was very shook up by the time I got

8    to my exit.

9          And then I got into downtown and I didn't know where I

10   was going, and I had to pull over and ask a security guard and

11   I -- tears started falling.  So I just -- I just lost control.

12   I -- I -- and I just thought if I have to do this every day,

13   that it's going to be really difficult for me, because I don't

14   want to have an accident.  I don't want to cause an accident.

15   I was going 60 miles an hour with people just zooming all

16   around me, so it was very -- I was sweating and very nervous.

17          MR. CAMBRIA:  So you're afraid for your safety?

18          PROSPECTIVE JUROR:  Mine and anyone else's that is

19   around me.

20          MR. CAMBRIA:  And also you indicated you became very

21   anxious.  Would that -- would that anxiety, if you will, make

22   it difficult for you to concentrate on what's happening here?

23          PROSPECTIVE JUROR:  No.  I think that once I was here,

24   that I would be just fine.  It's just a matter of getting here.

25   And even if I had somebody that I could carpool with or

1    something, then maybe that would work better for me.

2          MR. CAMBRIA:  Until later in the afternoon when you

3    thought about having to drive home?

4          PROSPECTIVE JUROR:  Then I have to drive home.

5          MR. CAMBRIA:  Well, that's the thing.  We have to be

6    careful that there is nothing that's going to interfere with

7    clearheaded thinking.

8          PROSPECTIVE JUROR:  Yeah.  I'm actually -- I've been

9    kind of shook up today, and I know it's because I -- because of

10   the way the day started for me.  Because I honestly thought

11   that I would be able to just -- you know, because I don't

12   typically drive that far along the highway.  And I don't know

13   if things have changed lately, but everybody is going very,

14   very fast, in my opinion, so it was -- it's -- and there is a

15   lot of construction along the 10, and just everybody is just --

16   so, yeah, it was -- it was a little bit stressful for me.

17         MR. CAMBRIA:  So it could get -- could get worse,

18   could get better?

19         PROSPECTIVE JUROR:  Right.

20         MR. CAMBRIA:  All right.  Thank you.

21         PROSPECTIVE JUROR:  You're welcome.

22         THE COURT:  Before you continue, Mr. Cambria, we're

23   going to take a short break.

24         So if I could have everybody go out.  If you need to

25   use the restroom, please do.  And be back outside ready to come

1       in in 15 minutes.

2                   And, counsel, I need you back in ten.

3                   (Recess taken, 3:06 p.m. - 3:17 p.m.)

4                   THE COURT:  We're on the record but outside the

5       presence of the jury panel.

6                   I wanted to release some people for hardship, so

7       that's why I took the break.

8                   The first one is Juror 36 who is the one who said he

9       started his new job and claimed it will be a financial

10      hardship.

11                  Is there any objection?

12                  MS. PERLMETER:  No objection.

13                  MS. BERNSTEIN:  No objection, Your Honor.

14                  THE COURT:  Does anybody have an objection they want

15      to put on the record?

16                  (No response.)

17                  THE COURT:  Okay.  I don't hear any.

18                  Juror 36 will be struck.

19                  Juror 42 has the health -- her health is a problem.

20      And she had a letter sent in from her doctor, from her pain

21      specialist.

22                  Is there any objection?

23                  MS. PERLMETER:  No, Your Honor.

24                  MR. LINCENBERG:  Is that the driving?

25                  THE COURT:  No.  42 is over here in the front row in

```
1   the corner.  She said it at the very beginning, that her health

2   is declining and she is under treatment.

3            MR. LINCENBERG:  No objection.

4            THE COURT:  Juror 47 is the one who lives in Payson,

5   is separated now since after she filled out her questionnaire,

6   and can't leave her 15-year-old alone.

7            MS. PERLMETER:  No objection.

8            MS. BERNSTEIN:  No objection, Your Honor.

9            THE COURT:  Any objection?

10           MR. LINCENBERG:  No objection.

11           THE COURT:  Juror -- oh, Juror 48 also said since he

12   or she filled out the questionnaire, they talked to their

13   employer about jury pay, and it would be a financial hardship

14   because they only pay 10 days.  She's also worried about

15   getting fired.

16           MS. PERLMETER:  No objection.

17           MR. LINCENBERG:  No objection.

18           MS. BERTRAND:  Your Honor, no objection, but I do have

19   a concern with her saying that she fears being fired.  That's

20   illegal if her company were to do that.  And if we do let her

21   go, I would just ask the Court maybe to advise the jurors that

22   employers cannot fire people for serving on a jury.  That --

23   that really wrangled me to hear her say that.  That's all.

24           THE COURT:  Yeah.  Okay.  Juror 48 will be struck.

25           Juror 50, so when I asked him about his employer, or
```

1    about changes, he indicated it was a hardship on his employer.

2    When Mr. Cambria followed up, he indicated that it would be

3    distracting and he would be working on off hours.  So, at that

4    point, I think it rose to the level where Juror 50 should be

5    struck, but I'm willing to be convinced otherwise, I suppose.

6              MS. PERLMETER:  We have no objection.

7              MS. BERNSTEIN:  No objection, Your Honor.

8              MR. FEDER:  We have no objection, Your Honor.

9              THE COURT:  Juror 51 has the nine-year-old who

10   recently had a psyche eval and she has a bunch of followups.

11             Any objection?

12             MS. PERLMETER:  No objection.

13             MR. LINCENBERG:  No objection.

14             MR. EISENBERG:  Please note it for me too.

15             THE COURT:  I'm sorry, what did you want noted,

16   Mr. Eisenberg?

17             MR. EISENBERG:  That I have joined in all of the

18   objections that have been made so far by the defense, each one

19   of the last five, I think.

20             THE COURT:  Well, there haven't been any objections.

21             MR. EISENBERG:  Well, they say no objection, so I'm

22   joining in.  It's a double negative.  Double negative.

23             THE COURT:  I just want to make sure I'm on the same

24   page, so that the record is clear.  All right.

25             Juror 52, Mr. Lincenberg, is the next one, and she's

1    the one that has anxiety, which I do think clearly would impact

2    her ability to focus during trial.

3              Is there any objection from the government?

4              MS. PERLMETER:  No.

5              MR. LINCENBERG:  No, Your Honor.

6              MR. EISENBERG:  No, Your Honor.

7              MS. BERNSTEIN:  No.

8              MR. FEDER:  No, Your Honor.

9              THE COURT:  Okay.  And this is just so that it's

10   easier for Christine.  Mr. Lincenberg seems to be responding

11   mostly, so I'm going to ask you to respond first, and then if

12   nobody says anything else, I'm assuming you're all joining, and

13   if you disagree, speak up.  Okay.

14             MR. FEDER:  Judge, did you pass by 49?

15             THE COURT:  I did.  Yeah.

16             Juror -- oh, no, no, no.  Juror 59, he's the one with

17   the heart condition and needs an ablation procedure.

18             MS. PERLMETER:  No objection.

19             MR. LINCENBERG:  No objection.

20             THE COURT:  Juror 59 will be struck.

21             Juror 60.  He's the one that had a stroke last year,

22   believes it affects his memory.

23             Any objection?

24             MS. PERLMETER:  No objection.

25             MR. LINCENBERG:  No objection.

1          THE COURT:  Okay.  Juror 60 will be struck.

2          Juror 61 has anxiety, depression, PTSD, and was having

3     trouble just answering that one question.

4          Is there any objection from the government?

5          MS. PERLMETER:  I remember, but what number was she

6     again?

7          THE COURT:  61.

8          MS. PERLMETER:  No objection.

9          MR. LINCENBERG:  No objection.

10          THE COURT:  Okay.  Hearing no other objections, Juror

11     61 is struck.

12          So I skipped over 49 and 56.  Mr. Feder, did you want

13     to ask me about 49?  I did specifically.

14          MR. FEDER:  No.  56, I mean, he has some concerns.

15          THE COURT:  Well, and you can ask him about that.  He

16     may get struck, I suppose, but I just didn't feel it rose to

17     the level of hardship.  I don't know.

18          MR. FEDER:  Okay.

19          THE COURT:  Some of these are judgment calls.

20          Okay.  So we'll bring the jury back in.  I'm going to

21     excuse those jurors and then --

22          Mr. Cambria, were you done or no?

23          MR. CAMBRIA:  Yes, I -- yes, I am, Your Honor.

24          I was wondering about cause on the ex-police officer.

25     He made it pretty clear that he would be giving the police a

1   leg up, and that's usually a fairly obvious disqualification.

2          MR. LINCENBERG:  And, Your Honor, his -- his

3   questionnaire says he, basically, at some point, I think, was a

4   sex crimes police officer and so forth.

5          THE COURT:  All right.  So I will take that as a

6   defense motion to strike Juror --

7          MR. LINCENBERG:  34.

8          THE COURT:  No -- oh, 34.  Sorry.  I thought you said

9   44.

10          What's the government's position?

11          MS. PERLMETER:  Your Honor, I would ask for the

12   opportunity to attempt to rehabilitate Juror Number 34, because

13   he was just given a, you know, would you tend to side with

14   people of the same group that you have associated with.  If you

15   were instructed that -- he would be told you need to consider

16   everybody equally, then, I mean, that would be the law, and

17   he's expected to follow the law, then he could be

18   rehabilitated.

19          THE COURT:  Okay.  I'll allow the --

20          MR. EISENBERG:  Your Honor, my impression of what he

21   was saying was stronger than that.

22          THE COURT:  I'm not saying he won't be struck, but I'm

23   going to give them an opportunity to question him, as well as

24   anybody else that wants to, because we're a little early.  I

25   wouldn't usually do for cause, Mr. Cambria just brought it up,

1    so we'll finish up with that juror later.

2          Okay.  So, Elaine, you can bring the jurors in.

3          MS. BERTRAND:  Your Honor, how long are we going

4    today?

5          THE COURT:  I don't know.  We're going to finish this

6    group.

7          MS. BERTRAND:  Judge, when the jurors are excused, do

8    their chairs stay --

9          THE COURT:  Empty.

10         MS. BERTRAND:  -- open?

11         THE COURT:  I'm not going to bring people in to fill

12   them at this point, yes.

13         (3:29 p.m., the prospective jurors entered the

14   courtroom.)

15         THE COURT:  Okay.  Thank you.  Please be seated.

16         And we're back on the record with the jury present.

17         Before we finish with some questions, I'm going to

18   release some jurors.  So if your number is called, you're

19   excused and you're free to go.

20         Juror 36, Juror 42, Juror 47, Juror 48, Juror 50,

21   Juror 51, Juror 52, Juror 59, Juror 60, and 61.

22         Mr. Cambria, did you have anymore questions?

23         MR. CAMBRIA:  No, I did not.  Thank you.

24         THE COURT:  Okay.  Ms. Bernstein.

25         MS. BERNSTEIN:  Your Honor, I believe Mr. Feder is

1    going to go first.

2              THE COURT:  Oh, Mr. Feder.

3              MS. BERNSTEIN:  Thank you.

4              MR. FEDER:  Good afternoon.  My name is Bruce Feder.

5    I represent Scott Spear on the far end down there.  I'm going

6    to ask a couple questions.

7              First off, can I talk to Juror 37?

8              Juror 37, you indicated that you are bothered by

9    escorts being legal.  Do you remember that answer?

10             PROSPECTIVE JUROR:  Correct.  Correct.

11             MR. FEDER:  Could you tell us a little bit about -- I

12   mean, your answer, if I have it right, you said, I don't

13   believe it's healthy for people to work in this field mentally

14   and sometimes physically.  Can you --

15             PROSPECTIVE JUROR:  Correct.

16             MR. FEDER:  -- elaborate anymore on that?

17             PROSPECTIVE JUROR:  Not really.  I don't think it's

18   healthy mentally or physically a lot of the time.

19             MR. FEDER:  But the fact that you don't think it's

20   mentally or physically good for people to do that, is that

21   going to affect your ability to recognize that it is legal to

22   be an escort?

23             PROSPECTIVE JUROR:  I mean, I don't know the

24   definition of what legal escort is.

25             MR. FEDER:  Well, for instance, there will probably be

1    evidence in this case where there are Scottsdale, and some of

2    the various cities in the Phoenix metro area, give out licenses

3    for escorts.  Do you understand that?

4              PROSPECTIVE JUROR:  I understand that.

5              MR. FEDER:  So the fact that they -- it is legal to be

6    an escort, that one can get a license to be an escort, is that

7    going to -- are you still going to have a problem with the fact

8    that people are escorts, number one, and that they may want to

9    advertise it in a periodical or a website?

10             PROSPECTIVE JUROR:  Yes.

11             MR. FEDER:  And is that going to keep you from being

12   able to be a fair and impartial juror if that kind of evidence

13   comes up, which I think it will?

14             PROSPECTIVE JUROR:  I would hope not.

15             MR. FEDER:  You would hope that it will not?

16             PROSPECTIVE JUROR:  I would hope that it would not

17   affect me to be impartial.

18             MR. FEDER:  But you have doubt?

19             PROSPECTIVE JUROR:  Yes.

20             MR. FEDER:  And you have doubt because of the belief

21   that you've expressed in your questionnaire and what you're now

22   doing, correct?

23             PROSPECTIVE JUROR:  Correct.

24             MR. FEDER:  So the people that are over to my --

25   behind me are -- they are not going to have your ability to

1  presume them innocent and to make the government prove their

2  guilt beyond a reasonable doubt because they're going to be a

3  little -- you're going to have a little bit of a problem with

4  the subject?

5          PROSPECTIVE JUROR:  It's a moral question for me.

6          MR. FEDER:  And, you know, let's be brutally honest,

7  as I think we have discussed being.  Morals sometimes take over

8  logic and legalities and things like that, correct?

9          PROSPECTIVE JUROR:  Correct.

10         MR. FEDER:  And your morality, you believe, would --

11 would keep you from being a fair and impartial juror based on

12 that subject?

13         PROSPECTIVE JUROR:  Sacrificing what I believe morally

14 for monetary gain would be a problem.

15         MR. FEDER:  You also indicated that you could -- there

16 was a question that said, would you have an ability to discuss

17 or deliberate regarding topics of a sexual nature?  And your

18 answer, I think, was you're not sure.  And then you went off

19 and started talking about that you don't like pornography.

20         You understand that this case is not about

21 pornography, right?

22         PROSPECTIVE JUROR:  I don't even know what the case is

23 about.  It was very brief what was told to us.

24         MR. FEDER:  All right.  That's all I have.  Thanks.

25         And, Number 38, can we talk a little bit?

UNITED STATES DISTRICT COURT

1              PROSPECTIVE JUROR:  Number 38.

2              MR. FEDER:  Thanks.  I'm not going to repeat what

3     you've said in your questionnaire, but it sounds like you've

4     had some traumatic things happen to your children; is that

5     right?

6              PROSPECTIVE JUROR:  That's correct.

7              MR. FEDER:  And what happened to your children, of

8     course, had a deep effect on you and continues to this day,

9     right?

10             PROSPECTIVE JUROR:  That's correct.

11             MR. FEDER:  And you indicated that, in the

12    questionnaire, that you were not sure if you could be fair and

13    impartial, right?

14             PROSPECTIVE JUROR:  That was correct, yes.

15             MR. FEDER:  Trials are places where it's sort of the

16    right place and the right time for somebody, and sometimes it's

17    not the right place and the right time for certain jurors.

18             Me, I would have trouble in an environmental crime,

19    and crimes against children, and crimes against pets, and

20    things like that.  I just wouldn't be the right person, no

21    matter how logical I might be, no matter how much I might try,

22    it just wouldn't be fair to either side to have me.  That's why

23    nobody ever picks me as a juror.

24             And using that as an analogy, do you think that you

25    could be a fair and impartial juror, given the circumstances?

1          PROSPECTIVE JUROR:  I would like to say yes, because

2     I've heard already that this isn't about children, that this

3     trial -- there is no children involved, so I --

4          MR. FEDER:  Well, there could be assertions that there

5     are children involved.

6          PROSPECTIVE JUROR:  Pardon?

7          MR. FEDER:  There may be assertions like that.

8          PROSPECTIVE JUROR:  Okay.  Then if there are no

9     children involved, then, yes, if not, no.

10          MR. FEDER:  That you could not be fair and impartial

11     if the -- if there is an allegation by the government, the

12     prosecutors, that children advertised on Backpage?

13          PROSPECTIVE JUROR:  Possibly, yes.

14          MR. FEDER:  That would be a, basically --

15          PROSPECTIVE JUROR:  Right.

16          MR. FEDER:  -- be an, I can't do it, situation?

17          PROSPECTIVE JUROR:  Sure.  Yes.

18          MR. FEDER:  Okay.  Thank you.

19          Next in line, 39.

20          PROSPECTIVE JUROR:  39.

21          MR. FEDER:  Juror 39, you answered one of the

22     questions:  Will you be able to deliberate or discuss topics of

23     a sexual nature?  And you said that you were not sure, right?

24          PROSPECTIVE JUROR:  Yeah.

25          MR. FEDER:  You understand that there is going to be a

1    fair amount of discussion about things of a sexual nature in

2    this trial, correct?

3              PROSPECTIVE JUROR:  Yeah.

4              MR. FEDER:  And given that alone, is that going to

5    adversely affect your ability to be a fair and impartial juror?

6              PROSPECTIVE JUROR:  I don't know.

7              MR. FEDER:  Well, again, if you put yourself in my

8    shoes, defending somebody like my client --

9              PROSPECTIVE JUROR:  Uh-huh.

10             MR. FEDER:  -- would you want somebody like you to be

11   on that jury who is not sure?

12             PROSPECTIVE JUROR:  Probably not.

13             MR. FEDER:  You've also indicated -- were you able to

14   hear the first group's questioning from downstairs?

15             PROSPECTIVE JUROR:  Yes.

16             MR. FEDER:  So you probably heard some of this, but

17   I'll repeat it anyhow.

18             You also answered some questions about whether or not

19   you believe people that are accused of crimes should have to

20   prove their innocence, and whether or not they should have to

21   testify, and whether or not it's too hard for prosecutors to

22   convict citizens of this country.

23             Do you recall those questions and answers?

24             PROSPECTIVE JUROR:  Yes.

25             MR. FEDER:  Is that still your belief?

1          PROSPECTIVE JUROR:  I mean, yeah.  I feel someone, if

2    they're going to be -- say that they're innocent, they should

3    probably have a reason to believe they're innocent.  And you're

4    going to go with who do I trust most.  It would be my mom.  And

5    if my mom told me that she didn't commit a crime, but all of

6    the evidence pointed to that she committed a crime, I'd

7    probably believe the fact that she committed the crime, and

8    would like to hear her side of the story to prove that she's

9    innocent.

10         MR. FEDER:  You, obviously, did hear our discussion.

11         PROSPECTIVE JUROR:  Yeah.

12         MR. FEDER:  If your mother is your most trusted person

13   in your life --

14         PROSPECTIVE JUROR:  Uh-huh.

15         MR. FEDER:  -- and some prosecutors came along and

16   charged her with a crime, you understand that -- that she is

17   presumed innocent, right?

18         PROSPECTIVE JUROR:  Uh-huh.

19         MR. FEDER:  And do you have a problem with that

20   presumption of innocence?

21         PROSPECTIVE JUROR:  I mean, I'd like to -- I'd like to

22   hear her story as to why she's innocent, yeah.

23         MR. FEDER:  So you would, basically, put my client and

24   everybody else over here that's charged in the position that,

25   as opposed to the burden being on the government, that they

UNITED STATES DISTRICT COURT

1   have -- that they would have to prove something to you in order

2   for you to prove them -- to acquit them, right?

3            PROSPECTIVE JUROR:  Yeah, because otherwise it seems a

4   little sus, like.

5            MR. FEDER:  So is it fair to say that you don't think,

6   given your beliefs, that you could be a fair and impartial

7   juror?

8            PROSPECTIVE JUROR:  I mean, I could try, but I don't

9   think it would be, like, what you want.

10           MR. FEDER:  You have got to be, not only verbally

11  honest with us --

12           PROSPECTIVE JUROR:  Okay.  Then no.

13           MR. FEDER:  -- but brutally -- thanks a lot.

14           PROSPECTIVE JUROR:  Thank you.

15           MR. FEDER:  Number 40.  You knew I was going to call

16  on you, didn't you?

17           PROSPECTIVE JUROR:  Number 40.

18           MR. FEDER:  Thank you.  First let's talk about the

19  hardship that you put in your -- in your questionnaire.  I'm

20  not exactly sure if I understand it, so why don't you give it

21  your best shot as to why this is -- I mean, not that a

22  three-month trial is not going to be a hardship on almost

23  anybody, but why is it specifically a hardship for you?

24           PROSPECTIVE JUROR:  Similar to the gentleman that's an

25  engineer, I'm a project lead for -- our company does software

1    conversions.  It's a bigger company.  So I've got three of

2    those currently going on.  They would come to a halt if I was

3    on this jury.

4              MR. FEDER:  You are --

5              MR. LINCENBERG:  I'm sorry, I wasn't able to hear you,

6    sir.  If you could just pull the mic closer.

7              Thank you very much.

8              MR. FEDER:  Why don't you repeat your answer, if you

9    could.

10             PROSPECTIVE JUROR:  My work -- my job is a software

11   consultant converting company ERP systems, basically,

12   accounting, manufacturing.  And I'm the project lead, the sole

13   lead on three of those projects currently.

14             MR. FEDER:  Three of those projects that are currently

15   ongoing?

16             PROSPECTIVE JUROR:  Correct.

17             MR. FEDER:  And you're the only person in that job?

18             PROSPECTIVE JUROR:  I usually manage that on my own,

19   my own clients.

20             MR. FEDER:  All right.  I mean, if you're not there

21   for three months, tell us some of the consequences.

22             PROSPECTIVE JUROR:  Projects would be pushed back

23   until next year, so implication would be on those clients.

24             MR. FEDER:  How would that affect your --

25             PROSPECTIVE JUROR:  I don't know my company's policy

UNITED STATES DISTRICT COURT

on payment, so I don't -- I'm not worried about my job being

gone.  I don't know what they would pay me during that time.

The projects themselves would be delayed until next year.

          MR. FEDER:  There is a good possibility you could lose

the job because of the delay?

          PROSPECTIVE JUROR:  Not likely.

          MR. FEDER:  In your questionnaire answers you said

that the -- you're bothered by the fact that escorts are legal,

that you're against that kind of service.  Realizing the

questions and answers that we've already had, the fact that one

can get a license in some of these cities around the Phoenix

metro area for escorting, does that change your opinion at all?

          PROSPECTIVE JUROR:  It doesn't change my opinion that

I don't like them.  I understand that they're legal and that

wouldn't affect my ability --

          MR. FEDER:  Well, again, using the same questions that

I've been asking others.  If you were in my shoes, or, more

importantly, my client, Mr. Spear's, shoes, would you want

somebody with your mindset and your thought processes to judge

you?

          PROSPECTIVE JUROR:  Not knowing anything about the

court, I mean, I assume the case isn't whether or not being an

escort is good or bad, it's did they break the law, is it legal

or not?  So, yeah, I would be okay with having somebody like me

on the jury.

1          MR. FEDER:  So you think, notwithstanding what you've

2     said in this questionnaire, you could be a fair and impartial

3     juror?

4          PROSPECTIVE JUROR:  Yes.

5          MR. FEDER:  Would the fact that there are alleged --

6     that -- that escorts, persons considering themselves escorts,

7     advertised in Backpage, would that be a strike against the

8     defendants?

9          PROSPECTIVE JUROR:  No, not if escorts is legal.  I

10    don't see that as an issue.

11         MR. FEDER:  If it were suggested that that escort ad

12    isn't an escort ad, but a prostitution ad, would that be a

13    strike against the defendants?

14         PROSPECTIVE JUROR:  I would assume, like we've talked

15    about earlier, that websites should do what they can to limit

16    that illegal behavior.

17         MR. FEDER:  So do you have any thoughts on how

18    websites can do something like that, that it's possible?

19         PROSPECTIVE JUROR:  I know that every time somebody

20    posts about the virus, I see a flag on it, so obviously there

21    is ways to do something, but I'm sure you could tag buzzwords

22    and flag different ads.

23         MR. FEDER:  But if something got through, would that

24    still be a strike against the defendants?

25         PROSPECTIVE JUROR:  I'm sure people would try to find

1    ways to get around that, so I don't know how they could be a

2    hundred percent accountable, but they should do something.

3           MR. FEDER:  And if things got through, are you going

4    to blame the people that -- that owned and operated Backpage or

5    are you going to blame the people that did things to get

6    through?

7           PROSPECTIVE JUROR:  Obviously, the people that did

8    things to get through.

9           MR. FEDER:  Excuse my ignorance, but what is Operation

10   Underground Railroad?

11          PROSPECTIVE JUROR:  It's a -- I don't know much about

12   it other than my wife.  I think it's an organization that tries

13   to rescue trafficked children, is my understanding.

14          MR. FEDER:  Is it something that you think if you went

15   home and said, hey, I'm going to be on the Backpage jury, that

16   that's going to cause some problems at home?

17          PROSPECTIVE JUROR:  No.  My wife or I don't know

18   anything about Backpage, so, no, I do not think that's a

19   problem.

20          MR. FEDER:  Are you going to be able to not talk to

21   your wife about what's going on if you were a juror?

22          PROSPECTIVE JUROR:  Yes, I will be able to not talk to

23   my wife.

24          MR. FEDER:  Your questionnaire also indicates that

25   you're -- you have two brothers that are in -- on the police

1  force in Canada.  You're Canadian?

2          PROSPECTIVE JUROR:  Two brother-in-laws.  My wife is

3  Canadian, was Canadian.

4          MR. FEDER:  Do you ever talk to them about their work?

5          PROSPECTIVE JUROR:  Not very often.  Occasionally.

6          MR. FEDER:  Are they in good graces with you or bad

7  graces with you?

8          PROSPECTIVE JUROR:  Good.

9          MR. FEDER:  Given the fact that there is going to be

10  some law enforcement people in this case, are you going to give

11  them, a law enforcement person, more credence than regular

12  people?

13          PROSPECTIVE JUROR:  I don't think so.  I mean, I

14  think -- that's hard to say.  I mean, I don't -- I'm accustomed

15  to respecting law enforcement, but I understand the question.

16          MR. FEDER:  It may be a matter of -- a manner of

17  speak, people do it all the time, I think and I may, but it's

18  really important in this setting that you think really hard

19  about whether or not you think it might affect you or whether

20  it will affect you or whether it won't affect you.  Better if

21  you can be as black and white as you can.

22          PROSPECTIVE JUROR:  Yeah, I understand.  You know,

23  it's not really related to having family members in law

24  enforcement, as much as I just naturally respect those that are

25  in law enforcement, but I'll do my best to not give any

1    credence to that.

2         MR. FEDER:  Again, asking you the same question I hope

3    I'm not repeating too often, and that is, is your belief in law

4    enforcement people going to be a problem for defendants who are

5    depending on jurors to be neutral, to obey the presumption of

6    innocence, to obey requiring the prosecutors to prove guilt

7    beyond a reasonable doubt, to give all witnesses the same

8    credence, depending on what they say and how they say it, are

9    those all things that you believe, given your beliefs, and

10   given the fact that doesn't matter if you're on this trial or

11   not, are you -- do you believe you can do that?

12        PROSPECTIVE JUROR:  Yes.

13        MR. FEDER:  And you're not -- it's not I think, you're

14   now more sure?

15        PROSPECTIVE JUROR:  Yes.

16        MR. FEDER:  In answer to a question that says, the

17   government should investigate and prosecute a provider of a

18   platform that promotes and facilitates prostitution, you said

19   yes, you believe minimizing these individuals in organizations

20   would have the best effect on reducing prostitution.  What does

21   minimizing mean or what did you mean by minimizing?

22        PROSPECTIVE JUROR:  I don't remember.  It's been a

23   long time since I filled that out.

24        MR. FEDER:  Am I allowed to go show him the

25   questionnaire?

1        PROSPECTIVE JUROR:  I'm just trying to remember what

2   my thinking would have been.

3        MR. FEDER:  Okay.

4        PROSPECTIVE JUROR:  I think what I was trying to say

5   would be, making it as difficult as possible for individuals to

6   illegally use those websites would be a good thing.

7        MR. FEDER:  What does that mean?

8        PROSPECTIVE JUROR:  Like, maybe one thing would be

9   putting flags on suspect postings.

10        MR. FEDER:  Okay.  Would it mean trying to get rid of

11   words, trying to get rid of --

12        THE COURT:  Mr. Feder.  Mr. Feder.

13        MR. FEDER:  Yes.

14        THE COURT:  You're becoming really quiet, so can you

15   repeat that last question and speak up.

16        MR. FEDER:  I thought this thing magnified me, but I

17   guess not.

18        What would that mean, flagging?

19        PROSPECTIVE JUROR:  I haven't thought about it.  My

20   only experience really is, you know, with what you see with

21   COVID.  Anybody that posts anything about the virus or vaccine,

22   you'll see a flag on that posting.  And so there is ways to do

23   it, technology, so they could be notified if there were words

24   used or things that were questionable, and then those could be

25   reviewed.

1          MR. FEDER:  Well, I mean, you understand -- given what

2     you're saying, it sounds like you've read articles about some

3     of the websites, Facebook, and Google, and those people

4     flagging false information about COVID, right?

5          PROSPECTIVE JUROR:  I haven't read articles, I've just

6     seen -- seen it.

7          MR. FEDER:  But you also know that there is a lot of

8     controversy and articles saying that they're not stopping it,

9     that they should stop it, but they're not able to or they're

10    not willing to, right?

11         PROSPECTIVE JUROR:  I assume that's correct.

12         MR. FEDER:  So you understand that it's not easy?

13         PROSPECTIVE JUROR:  Right.  I agree with that.

14         MR. FEDER:  Thank you very much.

15         THE COURT:  Mr. Lincenberg.

16         MR. LINCENBERG:  Juror Number 40, I just wanted to

17    follow up on one or two more questions.

18         It sounded like you were trying to reason through, and

19    understanding the question I think you were asked, you were

20    saying it would depend on whether things were illegal that were

21    being posted or something.  I wanted to follow up on that.

22         One of the things you are going to hear in this case

23    is that attorneys had advised the defendants that their ads

24    that were being run were lawful.  Is that something that you

25    would consider in evaluating the evidence?

1          MS. PERLMETER:  Objection.

2          THE COURT:  Counsel, can I see you at side bar.

3          (The following proceedings were held at side bar.)

4          MR. LINCENBERG:  Is that the Court's noise or --

5     that's not from me, is it?

6          THE COURT:  No, no.  We turned that on on purpose so

7     they couldn't hear.

8          MR. LINCENBERG:  Good.

9          THE COURT:  And anything else you want to say about

10    your objection?  I know what you're --

11         MS. PERLMETER:  It just seems like Mr. Lincenberg is

12    pre-trying his case.  He's posing hypotheticals when there has

13    been no evidence set forth in the record so far.  We have no

14    objection to specific follow-up questions to statements he has

15    made in his questionnaire, or specific follow-up based on

16    statements that he has made today, but we object to the defense

17    pre-trying their case and basically making opening statements.

18         MR. LINCENBERG:  Well, I'm not pre-trying the case.  I

19    was following up on the question.  The Court's familiar with

20    Mr. Ferrer's testimony and the like about attorneys advising.

21    The Court ruled that that's not privileged and it is coming in.

22    And I was -- all I asked is if the -- if the juror -- potential

23    juror would even consider that.  I didn't ask him how he would

24    look at it.  Because he was answering Mr. Feder's question that

25    it -- it depends whether it's legal or illegal, and so I want

1    to get a sense of whether he's just going to be open to that

2    evidence.  That's all.

3             THE COURT:  Okay.  But you're asking them to prejudge.

4             MR. LINCENBERG:  My question was just would you

5    consider that testimony.

6             THE COURT:  Okay.  You can ask that question, but you

7    are coming really close to the line.

8             MR. LINCENBERG:  I know.  I won't go beyond that.

9             THE COURT:  Okay.

10            (The following proceedings were held in open court.)

11            THE COURT:  You can ask the question.

12            MR. LINCENBERG:  Did you remember the question?

13            The question was there is going to be evidence about

14   attorneys advising the defendants that the ads and the policies

15   were lawful.  And my question is not to judge that evidence,

16   but would you consider that in terms of evaluating the

17   defendants' state of mind?

18            PROSPECTIVE JUROR:  I -- yeah, I would guess I would

19   have to hear it.  An attorney could give wrong advice, but

20   would that make it legal?  If an attorney gives me bad advice,

21   I'm still breaking the law, I guess that's my question, but --

22            MR. LINCENBERG:  Well, let me ask.  If the attorney

23   gave you bad advice -- let's -- I'm not -- I think the advice

24   was good, but let's say the advice was bad, and you followed

25   that advice in good faith, would you just consider that in

1   terms of evaluating whether our clients acted lawfully?  I'm

2   not asking you to make a decision.

3           PROSPECTIVE JUROR:  I would say yes.

4           MR. LINCENBERG:  Okay.  Thank you, sir.

5           Ladies and gentlemen, you may have heard this morning

6   that I'm going to be reserving my opening statement.  I asked

7   the jury panel this morning if anybody would hold that against

8   us?  I'm looking to make sure that, since the government's

9   going to put on their case first and I am not going to give an

10  opening until afterwards, that even though it may be a long

11  time, that you'll keep an open mind.  Some of us make snap

12  judgments, we go along and we -- we dig in, that's where we

13  are.  That's the way some human beings behave.

14          Is there anybody here who sort of fits in that

15  category that, you hear it at the beginning, you kind of come

16  to a judgment and you usually stick to it after that?  Just

17  raise your hand if you think that fits you.

18          (No response.)

19          MR. LINCENBERG:  Can everybody -- is there anybody who

20  would not keep an open and impartial mind as the evidence comes

21  in until the end of it, knowing that there is going to be weeks

22  full of witnesses called by the government first, that's just

23  the way cases are presented?  Would anybody have a problem with

24  that, holding it against my client?

25          (No response.)

1          MR. LINCENBERG:  I'd like to ask a question of Juror

2     Number 33, if I might.

3          PROSPECTIVE JUROR:  33.

4          MR. LINCENBERG:  Ma'am, in your questionnaire you

5     indicated you were the sole provider of income for your

6     household.  Can you please just review what you do for a living

7     and, you know, what impact the case might have on you.

8          PROSPECTIVE JUROR:  I'm a scheduler at Mayo Clinic,

9     22 years.

10         MR. LINCENBERG:  Okay.  So I assume that the Mayo

11    Clinic would pay you for your -- during your jury service.

12         PROSPECTIVE JUROR:  To be honest, I have no idea.

13         MR. LINCENBERG:  You're not sure.  Okay.  Do you know

14    if there is somebody there who you could check with?

15         PROSPECTIVE JUROR:  Yes.

16         MR. LINCENBERG:  Okay.

17         PROSPECTIVE JUROR:  I could call our human resources.

18         MR. LINCENBERG:  Your Honor, I don't want to overstep

19    my bounds, but would it be appropriate for me to ask if that's

20    something that could be done by tomorrow?

21         THE COURT:  Yes, and -- yes.  And there is another

22    juror that I'm going to ask to do the same thing.

23         MR. LINCENBERG:  Okay.  Would that be -- would that be

24    okay, ma'am?

25         PROSPECTIVE JUROR:  Yes.

1          MR. LINCENBERG:  All right.  Thank you very much.

2          Juror Number 34, first of all, let me thank you for

3   your service, and thank you for your honesty in noting that, as

4   a police officer, you tend to lend greater credibility to the

5   testimony of police officers.  And I just wanted to follow up a

6   little bit with -- with that.

7          I believe that as part of your views, looking at your

8   questionnaire, you also expect a defendant to testify?

9          PROSPECTIVE JUROR:  I don't recall writing that.  I

10  understand that for many reasons they have a right to not

11  testify and it's not held against them.  I'm not sure how that

12  question was worded.

13         MR. LINCENBERG:  I think the question was -- it was 43

14  C, I think -- let me just grab your questionnaire real quickly.

15         Let's make sure I get it right.

16         43.  I would expect a person charged with a crime to

17  testify in their own defense.  You indicated that you agree,

18  that if somebody is looking to be acquitted in a case, it's

19  your expectation in that situation that they would testify.

20         PROSPECTIVE JUROR:  Let me fine tune that for a moment

21  and say that in my experience as a criminal investigator, I was

22  always expected, and expected of myself, to get some kind of

23  statement from a person who had become a defendant, because

24  there are often cross-accusations, there are many reasons to

25  that.  And then in taking a case forward, if that person would

1    not talk or provide information, then that became, okay, they

2    had their chance.

3            In a trial setting, I wouldn't consider it in the same

4    way, because I know that there are reasons that people might

5    choose not to testify.

6            MR. LINCENBERG:  So when you interviewed people, they

7    had their chance, and you did not view it favorably if they

8    chose not to answer your questions.  Is that fair?

9            PROSPECTIVE JUROR:  I would state it as they left me

10   with no other recourse if the evidence built probable cause in

11   a case to file charges.

12           MR. LINCENBERG:  Okay.  And I believe you also

13   indicated that during the course of your work, your work also

14   involved issues involving prostitution; is that correct?

15           PROSPECTIVE JUROR:  Yes.

16           MR. LINCENBERG:  Okay.  All right.  And fair to say

17   that there is going to be police officers who come into court,

18   their credibility may be challenged on cross-examination, and

19   if you were in the defense seat looking for a juror who was

20   going to treat that witness no different from any other

21   witness, that you would put yourself in the category of not

22   necessarily being a juror who could satisfy that from the

23   defense point of view?

24           PROSPECTIVE JUROR:  It became a somewhat complicated

25   question.  Let me answer the question:  If I were a defendant,

1    would I want Juror 34 on the panel?  I would say no.

2            MR. LINCENBERG:  Okay.  All right.  Okay.

3            Juror 35 -- thank you very much.

4            Juror 35.

5            PROSPECTIVE JUROR:  35.

6            MR. LINCENBERG:  Good afternoon, sir.  Just a couple

7    of questions for you.  You -- I have a note that either -- I

8    think it was somebody in your family was involved in banking;

9    is that right?

10           PROSPECTIVE JUROR:  Um --

11           MR. LINCENBERG:  I don't think it was you, but

12   somebody else.

13           PROSPECTIVE JUROR:  Loan officer.

14           MR. LINCENBERG:  Loan officer.  Who was that?  What

15   kind of relative?

16           PROSPECTIVE JUROR:  That's my wife.

17           MR. LINCENBERG:  Your wife.

18           PROSPECTIVE JUROR:  And -- and her -- her sister was

19   in escrow.

20           MR. LINCENBERG:  Okay.  And as a loan officer at a

21   bank, is part of your wife's job to do due diligence on the

22   borrower to determine whether or not this is a person who is

23   fit to provide a loan to then?

24           PROSPECTIVE JUROR:  Yes, but the information goes out

25   to the lender that then has the underwriters that determines

1   what the person's information that she receives is qualifying

2   for the loan.

3           MR. LINCENBERG:  Okay.  And is it your experience

4   through the years of, perhaps, discussing things with your

5   wife, that banks tend to do due diligence before extending

6   money?  They want to sort of know their customer before they're

7   going to lend them money.

8           PROSPECTIVE JUROR:  That's their money, so they're

9   going to do what they have to to protect their behalf, yes.

10          MR. LINCENBERG:  Okay.  Thank you, sir.  That's really

11  all I have of you.  I appreciate it.  Thanks.

12          I'm sorry.  There was another question.

13          No, nothing further.  Thank you.

14          Juror Number 56.

15          PROSPECTIVE JUROR:  Juror 56.

16          MR. LINCENBERG:  Sir, I believe that one of the other

17  attorneys is going to ask you a few questions, but there were

18  one or two things I wanted to touch upon, if I may.

19          Your job involves selling technology to banks; is that

20  correct?

21          PROSPECTIVE JUROR:  I retired from that.  I'm doing

22  some consulting now, but yes.

23          MR. LINCENBERG:  Can you describe the nature of your

24  work?

25          PROSPECTIVE JUROR:  Yes.  I worked for two companies

UNITED STATES DISTRICT COURT

1    that built internet banking and mobile banking products.  And

2    so, in effect, we built the internet banking or mobile banking

3    that you saw branded to your bank is running on our servers,

4    millions of people, large scale businesses.

5           MR. LINCENBERG:  Okay.  And -- and what do you do now

6    as a consultant?

7           PROSPECTIVE JUROR:  I do some consulting for

8    technology companies, generally around sales and marketing

9    partnerships.

10          MR. LINCENBERG:  In the work that you did over the

11   years with banks, did you or your company ever have disputes

12   with the banks?

13          Let me -- let me make it a little more clear.  First,

14   did you ever have legal disputes, contract disputes?

15          PROSPECTIVE JUROR:  Typically, the disputes would be

16   over functionality.  If something wasn't working the way they

17   thought it should, they might have withheld payment, things of

18   that nature.

19          MR. LINCENBERG:  Did you ever have to testify?

20          PROSPECTIVE JUROR:  I did not.

21          MR. LINCENBERG:  Deposition or anything like that?

22          PROSPECTIVE JUROR:  No.  Never reached that stage.

23          MR. LINCENBERG:  Okay.  And I had just asked Juror

24   Number 35 this question, I'm going to ask you as well.  Was it

25   your sense that the banks -- I know you were only dealing with

1   people who were dealing with purchase of technology -- but that

2   they tried to do their due diligence before deciding to enter

3   into a contract?

4           PROSPECTIVE JUROR:  There was actually a legal

5   requirement for them to do that.

6           MR. LINCENBERG:  All right.  Thank you very much.

7           Your Honor, that's all I have.

8           THE COURT:  Okay.

9           MS. BERNSTEIN:  Can you hear me?  Is the mic on?

10          Hi.  Thank you for being here today and for sticking

11  with us in the afternoon.  My name is Whitney Bernstein, and it

12  is my pleasure to represent James Larkin.

13          I just want to go over some of the follow-up questions

14  that some of my colleagues and the government have covered with

15  you as well.

16          I'm going to start with Juror Number 49.

17          PROSPECTIVE JUROR:  Good afternoon.

18          MS. BERNSTEIN:  Hi.  On the questionnaire there was a

19  question asking about your feelings about website

20  responsibility for content posted by users.

21          PROSPECTIVE JUROR:  Sure.

22          MS. BERNSTEIN:  And you answered, I think it is their

23  responsibility to provide a platform but not interfere, as long

24  as it is not putting people in danger.

25          PROSPECTIVE JUROR:  Correct.

1          MS. BERNSTEIN:  What do you mean by that?

2          PROSPECTIVE JUROR:  So if you have a social media

3   website, I think it's -- it's up to you how you want to police

4   that.  You should have a way of dealing with complaints and a

5   way of maybe flagging for things that could put people in

6   danger.  But you're probably not going to be able to get to all

7   that because there is just so much content, depending on what

8   website and how much traffic you have.

9          So when it comes to policing yourself, those are

10   mostly going to be by your guidelines and any applicable

11   regulatory that goes along with it.

12          MS. BERNSTEIN:  Thank you.  Thank you.

13          PROSPECTIVE JUROR:  Sure.

14          MS. BERNSTEIN:  And, Juror 56, some additional

15   questions for you, please.

16          PROSPECTIVE JUROR:  Juror 56.

17          MS. BERNSTEIN:  I know particularly, if you were all

18   listening to us while you were sitting downstairs, that we've

19   gone over the legal principles of the presumption of innocence,

20   that our clients are presumed innocent unless the government

21   proves with confident evidence beyond a reasonable doubt that

22   they are no longer innocent.

23          On your questionnaire, you were asked if you

24   understood and agreed with these principles of law and you

25   answered no.  Can you explain that?

1          PROSPECTIVE JUROR:  I should not have answered no.

2          MS. BERNSTEIN:  Was it just a typo?  Okay.

3          Well, another question said that -- it was something

4     along the lines of, we make it too hard -- the criminal justice

5     system makes it too difficult for the government to convict,

6     and you answered that you agree with that.

7          PROSPECTIVE JUROR:  I think there are times when that

8     is true, when you will find a situation where the guilt is

9     intuitively obvious but can't be legally demonstrated, and --

10    and my -- actually, if I may, use an illustrative point.

11         There were several comments that the site, apparently,

12    was carrying ads for legal escorts, and it -- for me, it

13    beggar's belief that you could advertise escorts and not

14    understand that you were facilitating prostitution.

15         MS. BERNSTEIN:  I'm sorry, I didn't hear that part.

16         PROSPECTIVE JUROR:  Beggar's belief that you could run

17    escort ads and not understand that you were facilitating

18    prostitution.

19         MS. BERNSTEIN:  Those are synonymous in your mind?

20         PROSPECTIVE JUROR:  Yes.

21         MS. BERNSTEIN:  You do understand that there is a

22    factual, and legal, and moral, and ethical, and religious

23    distinction between the two?

24         PROSPECTIVE JUROR:  Yes, I understand that.

25         MS. BERNSTEIN:  But, in your mind, you wouldn't be

1    able to distinguish?

2         PROSPECTIVE JUROR:  I find it very difficult to

3    believe that there are legal prostitute -- or, excuse me, I

4    made a Freudian slip -- legal escorts that do not engage in

5    sexual services.

6         MS. BERNSTEIN:  Thank you for your honesty with that.

7         Are you familiar with -- how do you feel about strip

8    joints?

9         PROSPECTIVE JUROR:  I don't personally enjoy them but

10   I --

11        MS. BERNSTEIN:  Do you think that a striptease is

12   necessarily leading to sexual activity?

13        PROSPECTIVE JUROR:  Not as certainly as an escort

14   service.

15        MS. BERNSTEIN:  What about bondage?

16        PROSPECTIVE JUROR:  I don't have any knowledge -- I

17   know it exists, but I don't have any knowledge.

18        MS. BERNSTEIN:  BDSM?

19        PROSPECTIVE JUROR:  It's the same thing, is it not?

20        MS. BERNSTEIN:  I'm not entirely sure.  I'm just going

21   to give you some terms.

22        PROSPECTIVE JUROR:  I would presume if you were paying

23   someone to entertain you in that manner, highly likely it would

24   lead to a sexual encounter.

25        MS. BERNSTEIN:  And that's very -- I appreciate your

1    honesty, and that's very important for this case, because I

2    think we've discussed in some -- there has been some emphasis

3    about the fact that we're going to look at really graphic

4    pictures, there is going to be a lot of conversation about sex

5    and sexual activities, and there will also be a lot of

6    conversation about legal adult entertainment activities.  And

7    it's really important to be able to distinguish between the

8    two.

9           So it sounds to me like you are very firm in your

10   belief that they're sort of synonymous?

11          PROSPECTIVE JUROR:  In the area of escorts

12   specifically, yes.

13          MS. BERNSTEIN:  Thank you.

14          Does anyone else agree with Juror Number 56?  This is

15   a really crucial point for this case, so if you can please let

16   us know.

17          Thank you.  I'll talk to 34 first and then 37.

18          Is there anyone else?

19          PROSPECTIVE JUROR:  34.

20          MS. BERNSTEIN:  Thank you.  So you agree with what

21   Juror 56 was saying?

22          PROSPECTIVE JUROR:  Yes, to the extent that I see

23   escorts as synonymous with prostitution.

24          MS. BERNSTEIN:  You see escorts as synonymous with

25   prostitution?

1          PROSPECTIVE JUROR:  Yes.

2          MS. BERNSTEIN:  You do understand there is a factual,

3    legal, et cetera, difference?

4          PROSPECTIVE JUROR:  I would call that a theoretical

5    difference.

6          MS. BERNSTEIN:  It's theoretical to you?

7          PROSPECTIVE JUROR:  The city I worked in did not issue

8    those licenses.  I didn't delve into the criteria that they

9    based on that on, but in my work life and experience they were

10   synonymous.

11         MS. BERNSTEIN:  And what city was that?

12         PROSPECTIVE JUROR:  Tempe.

13         MS. BERNSTEIN:  Tempe.  Thank you.  We appreciate your

14   candor.

15         And for everyone, there are certain juries you should

16   sit on and certain juries you shouldn't.  And so if you hold

17   the beliefs like Juror Number 34, it's important for our system

18   to work and for our clients to have a fair chance, that you let

19   us know that.  So I really appreciate it.

20         Juror Number 37.

21         PROSPECTIVE JUROR:  Question.

22         MS. BERNSTEIN:  Do you share the belief that escort

23   services and prostitution are synonymous, or do you understand

24   that there is a legal, factual, ethical, moral, religious

25   difference between the two?

1           PROSPECTIVE JUROR:  I consider them synonymous.

2           MS. BERNSTEIN:  You do as well?

3           PROSPECTIVE JUROR:  I do.

4           MS. BERNSTEIN:  And that's a firmly held belief that

5    you have?

6           PROSPECTIVE JUROR:  It's always been my belief, yes.

7           MS. BERNSTEIN:  And you held that belief far before

8    coming into this courtroom today?

9           PROSPECTIVE JUROR:  Ever since escorts have been in

10   movies, yes.

11          MS. BERNSTEIN:  And even if you were instructed that

12   legally there is a distinction, that's not going to override

13   your firmly held belief?

14          PROSPECTIVE JUROR:  No, because you can call it

15   whatever you want to call it, but then -- that's all I can say.

16   I consider them synonymous.

17          MS. BERNSTEIN:  Thank you.  I appreciate that.

18          Does anyone else have anything to share along those

19   same lines, or agree or disagree with what they've said?

20   Please don't be shy, because this is very important for our

21   clients to get a fair trial.

22          (No response.)

23          MS. BERNSTEIN:  Okay.  Juror Number 43.

24          PROSPECTIVE JUROR:  Number 43.

25          MS. BERNSTEIN:  I apologize, we didn't have your

1    answers, which is why the prosecutor asked you those questions,

2    so I just want to follow up.  I think you had said that -- that

3    websites should be held accountable for the content that's

4    posted by their users.

5              PROSPECTIVE JUROR:  Okay.

6              MS. BERNSTEIN:  So --

7              THE COURT:  I'm sorry.  Wait, wait, wait.  We didn't

8    hear your answer.

9              PROSPECTIVE JUROR:  Okay.

10             MS. BERNSTEIN:  I'm not trying to put words in your

11   mouth.

12        Do you believe that websites should be held

13   responsible for content posted by users?

14             MS. PERLMETER:  Objection.

15             THE COURT:  The objection is overruled.

16        Go ahead.

17             MS. BERNSTEIN:  The question was if you believe that

18   websites should be held accountable for content posted by

19   users?

20             PROSPECTIVE JUROR:  They should have some

21   responsibility.  It's very difficult to do.  I think we

22   discussed that before.  There is no regulations in place, so

23   they have to find the guidelines by themselves to execute in

24   trying to prevent doing damage to society.

25             MS. BERNSTEIN:  They need to implement guidelines to

1    prevent damage to society, is that what you had said?  The mic

2    was cutting out.

3              PROSPECTIVE JUROR:  Yes.  Yes.

4              MS. BERNSTEIN:  Thank you.  And lately I think we're

5    all familiar with what's going on in Afghanistan and the

6    troops' withdrawal.  Are you familiar with the Taliban using

7    Twitter?

8              PROSPECTIVE JUROR:  Yes.

9              MS. BERNSTEIN:  And it's your -- it's your view that

10   Twitter should be held accountable for those acts of terrorism?

11             PROSPECTIVE JUROR:  Some accountability, yes.

12             MS. BERNSTEIN:  Okay.  And even if that wasn't the

13   law, that's the belief that you hold, correct?

14             PROSPECTIVE JUROR:  Responsibilities, not violating

15   the law, then it's a moral -- it's something personal,

16   something that has to be good for the society, so it's

17   something that has to be good.

18             THE COURT:  I'm sorry.  Can you repeat your answer?

19   We're really having a little -- sometimes the masks make it

20   more difficult.

21             PROSPECTIVE JUROR:  Start the question, please.

22             MS. BERNSTEIN:  I think you had said -- I -- I had

23   asked you even if the law doesn't require, for example, Twitter

24   to be criminally liable for acts of terrorism that the Taliban

25   has committed using that platform, I believe your answer was --

1          THE COURT:  Okay.  I'm going to interrupt, because the

2     question might be a problem, so let me rephrase it.

3          If you're selected to try this case, the Court will

4     instruct the jury on the law that applies to figure out whether

5     somebody's guilty or not guilty.  If you disagreed with that

6     law, would you still follow it?

7          PROSPECTIVE JUROR:  Actually, I would follow it.

8     That's a very good way to put in the question.  Actually, I

9     like that.  Yes, absolutely.

10          THE COURT:  And if you felt someone should be

11     responsible but the law says they're not, would you acquit

12     them, find them not guilty?

13          PROSPECTIVE JUROR:  If you give instructions, and the

14     instructions has to be followed the way you state it and it's

15     according to the law, then I will follow it.  It should not be

16     a problem.

17          THE COURT:  Okay.  Ms. Bernstein.

18          MS. BERNSTEIN:  Thank you.

19          Thank you, sir.

20          I want to go back to Juror 39 for a moment.

21          Hi.  I appreciated your candor and honesty earlier

22     that you would not be able to deliberate and discuss topics of

23     a graphic sexual nature.  That's correct?

24          PROSPECTIVE JUROR:  Yes.

25          MS. BERNSTEIN:  And can you explain that for a moment?

1          PROSPECTIVE JUROR:  I'm 19.  I'm basically a child.

2    So all of this is just like -- I'm still in the -- like, I get

3    that I am an adult, but it's, like, hard to talk about adult

4    things because of my brain, like, I'm still just a kid.  Like,

5    I live at home with my parents and it just -- it just makes me

6    uncomfortable, because I'm literally a child.

7          MS. BERNSTEIN:  I appreciate that.  We're not here to

8    change anyone's beliefs, just to understand.  And it's not only

9    that it's difficult for you to talk about these things

10   yourself, but it would be very difficult to deliberate with

11   strangers about this as well?

12         PROSPECTIVE JUROR:  Yeah, because I'm 19, so I just

13   feel like that doesn't really mean anything, because my opinion

14   doesn't matter.  I can't be here responsible for people's

15   beliefs when they've had more of a life to live than me, so I

16   would literally let everyone else decide before I would put my

17   opinion in.

18         MS. BERNSTEIN:  Thank you.

19         And does anyone agree with Juror 39 that it would be

20   difficult for them to deliberate with other strangers if the

21   topics are about, as the prosecutor said, anal sex, or

22   stripping, or bondage, very graphic sexual activity, would that

23   be difficult for anyone else?

24         Juror Number 54, can you please explain?

25         PROSPECTIVE JUROR:  Juror 54.

1      MS. BERNSTEIN:  Can you please -- you raised your hand

2  that it would be difficult for you.

3      PROSPECTIVE JUROR:  I think it would be.  For me it

4  would be more of the photographs.  I think once I see a

5  photograph, in my memory, it stays there forever.  And as I

6  mentioned, I have been on a sexual abuse case before, and I

7  still remember those pictures very graphically.  And I'm a very

8  sympathetic, compassionate person, and if I see any kind of

9  abuse of a person, then that mentally, for me, is very

10  difficult to --

11      MS. BERNSTEIN:  I understand that.

12      PROSPECTIVE JUROR:  -- accept and to understand, you

13  know, how this can happen.

14      MS. BERNSTEIN:  And I think what's going on here is

15  actually two issues.  It's, one, what you're touching on, the

16  ability --

17      PROSPECTIVE JUROR:  I'm sorry.  I'm having a hard time

18  hearing you.

19      MS. BERNSTEIN:  I think there is two issues going on.

20  It's, one, what you're touching on, the ability for you

21  personally to remain impartial when you look at images that

22  inflame your passions, that inflame deeply held passions that

23  you've had.  I think you indicated your prior trial was in

24  2017?

25      PROSPECTIVE JUROR:  Correct.

UNITED STATES DISTRICT COURT

1          MS. BERNSTEIN:  So you've held onto that for many

2     years.  You firmly believe this.

3          I think the second issue is whether you're able to

4     speak with strangers, with whomever is chosen to be on the

5     jury, to discuss and dissect graphic sexual pictures with

6     people you don't know.  Would that be hard for you as well?

7          PROSPECTIVE JUROR:  I would be very uncomfortable with

8     that.

9          MS. BERNSTEIN:  And that's fine, that's just an

10    important thing for this case, so I appreciate you explaining

11    that.

12         And is there anyone else that feels the same way, that

13    this would be difficult for them?

14         (No response.)

15         MS. BERNSTEIN:  Please let us know if there is.  If it

16    comes up later, please let us know, because we're just here to

17    have the system work and to give our clients a fair chance.

18    And if it's difficult for you to touch on the subject matter,

19    there are many other trials that you would be a better juror

20    for.

21         Thank you.

22         MR. EISENBERG:  I'll go next, Your Honor.

23         THE COURT:  All right.

24         MR. EISENBERG:  Number 43, I see that --

25         PROSPECTIVE JUROR:  Number 43.

1          MR. EISENBERG:  Thank you, sir.  And I don't mean to

2     impinge on you the way you may feel we're doing, but it is

3     important.  And I want to go back to something Her Honor said

4     to you, which has to do with the legal principle of the law

5     comes from the judge in our system.  So if the law is as Her

6     Honor says it is, you said you would abide by the law as a

7     juror?

8          PROSPECTIVE JUROR:  Absolutely.

9          MR. EISENBERG:  Okay.  And that's the way it should

10    be.  But earlier in your responses to Ms. Bernstein you were

11    talking about moral principles, which I think are things you

12    feel morally inside, so -- am I right?

13         PROSPECTIVE JUROR:  Okay.  Yes.

14         MR. EISENBERG:  Okay.  And if -- if the Court says,

15    this is the law and you must abide by it, but your moral

16    compass says, I don't think so, or I don't like it, or I don't

17    like what's going on here, are you still going to be able to --

18         PROSPECTIVE JUROR:  It's a tough life, isn't it?

19         MR. EISENBERG:  Yes, it is.  Yeah, I know.  And

20    everybody has these issues in their lives, but what we're

21    dealing with in here is an organized system of trying to bring

22    the law and justice to every person who comes before the court.

23    So it's asking people to say, deep down inside I may not like

24    this charge -- we call them charge, the legal principle -- but

25    some would say, I'm sorry, I just can't follow it.  In my heart

1    of hearts, I'm not going to do it.

2            PROSPECTIVE JUROR:  You have to be pragmatic in every

3    decision you make, and then you have to follow the rules,

4    otherwise then you get in trouble.

5            MR. EISENBERG:  Okay.

6            PROSPECTIVE JUROR:  That's what we're trying to

7    prevent here, right?

8            MR. EISENBERG:  Well, I'm trying to get at the idea

9    will your moral feelings about something overcome the Court's

10   rule on this is what the law is?

11           PROSPECTIVE JUROR:  I think the question was more to

12   make somebody accountable when their actions or no actions have

13   an impact to -- to society or to the way we live.  I think that

14   was the context I put more in that, nothing more than that.

15           MR. EISENBERG:  Then I'll turn it around.  You would

16   disregard any moral concern that you have and you would follow

17   the law.  Is that what you're saying?

18           PROSPECTIVE JUROR:  I would follow the law always.

19           MR. EISENBERG:  Regardless of what your internal

20   feelings were about something?

21           PROSPECTIVE JUROR:  First, the law.

22           MR. EISENBERG:  I'm sorry?

23           PROSPECTIVE JUROR:  First, the law.

24           MR. EISENBERG:  First, the law, but then something

25   else, or always the law?

1          THE COURT:  Counsel.

2          PROSPECTIVE JUROR:  In this situation here that we're

3     discussing, the law is the one that has the priority.

4          MR. EISENBERG:  Thank you, sir.

5          Well, ladies and gentlemen, about ten minutes have

6     passed since Ms. Bernstein asked this question, but I really do

7     want to make sure that we are all on the same page with the

8     question.

9          And the question is:  Are escort services in you all's

10    minds synonymous with prostitution?  And at one point a few of

11    you did answer that question, and now some time has gone by,

12    and I know it's getting late, but I think this is something we

13    don't really want to let pass until everybody has had the

14    opportunity to respond.

15         MS. PERLMETER:  Objection.

16         THE COURT:  Counsel, can I see you at side bar?

17         (The following proceedings were held at side bar.)

18         THE COURT:  Okay.  You guys keep repeating the same

19    things.  I'm not going to let it go anymore.

20         MR. EISENBERG:  Your Honor, it's just that this is

21    probably one of the most important --

22         THE COURT:  Well, you're lecturing.  You guys are

23    lecturing the jury on it.  If you want to ask the question, ask

24    the question and then move on, but I'm not going to let you

25    keep going:  Are you sure?  Are you sure?  Are you sure?

1          MR. EISENBERG:  May I ask the question this last time?

2          THE COURT:  Since you've already asked it, yes.

3          MR. EISENBERG:  All right.

4          THE COURT:  But if no one raises their hand, you need

5     to move on.

6          MR. EISENBERG:  I will.

7          THE COURT:  And nobody else needs to ask it again,

8     because you're the last one.

9          MS. PERLMETER:  Your Honor, I'd like to ask for

10    permission to follow up with Juror Number 40 based on some of

11    the questions Mr. Lincenberg asked subject to what we talked

12    about at the last bench conference.

13         THE COURT:  Okay.  I'll look at my notes.

14         MR. FEDER:  Judge, do you think it's going to be this

15    hot tomorrow?

16         THE COURT:  I'll check after.  We just need to get

17    through.

18         (The following proceedings were held in open court.)

19         MR. EISENBERG:  So I don't see any hands to my

20    question.

21         Gentleman.

22         PROSPECTIVE JUROR:  So just so that we're all on the

23    same page, what is the legal definition of an escort versus a

24    prostitute?

25         MR. EISENBERG:  I don't think I should be giving that.

1   I can just tell you that it's legal in many jurisdictions,

2   including this.  Okay?

3           PROSPECTIVE JUROR:  Okay.

4           MR. EISENBERG:  Okay.

5           Juror 44.

6           PROSPECTIVE JUROR:  Juror 44.

7           MR. EISENBERG:  Ma'am, good afternoon.  Ma'am, there

8   was a question about discussion among fellow jurors about

9   sexually explicit topics.  I don't think you've been asked this

10  before, have you, not by us?

11          PROSPECTIVE JUROR:  Just sort of by the --

12          MR. EISENBERG:  Ma'am?

13          PROSPECTIVE JUROR:  -- prosecution, not by you, not by

14  defense.

15          MR. EISENBERG:  Okay.  And I think your answer to it,

16  as I have it here in writing, is, no, it would be difficult for

17  you to discuss sexually explicit topics with fellow jurors; is

18  that correct?

19          PROSPECTIVE JUROR:  It is a little difficult, but I

20  think I could do it, like they're saying, set aside your morals

21  and go by the law.  I would agree with that.

22          MR. EISENBERG:  This is a little different, though.

23  Would you be able to discuss the topic?

24          PROSPECTIVE JUROR:  Oh, yeah.  Yes.

25          MR. EISENBERG:  You think you would or you couldn't?

1          PROSPECTIVE JUROR:  I was exposed to pornography for

2    about 40 years, so I do believe that I could discuss it.

3          MR. EISENBERG:  Okay.  That would impact your ability

4    to be a fair juror?

5          PROSPECTIVE JUROR:  I don't think so.  I think we're

6    looking at the law and whether somebody has committed a crime

7    or not, and not, you know, my experience.

8          MR. EISENBERG:  Well, you were talking about you had

9    been exposed to pornography for some 40 years.  And I got the

10   impression from that that what you're saying is, having had

11   that around you for so long, you wouldn't be able to discuss

12   the topic of a sexually explicit topic?

13         PROSPECTIVE JUROR:  I'm saying I have been around it,

14   so I wouldn't feel uncomfortable talking about it.  I wouldn't

15   be shocked or surprised.

16         MR. EISENBERG:  Would it affect your ability to sit in

17   judgment of somebody else?

18         PROSPECTIVE JUROR:  I don't believe that -- how do I

19   say that?  I think that, you know, the same discussion about

20   the law, that I would be looking at the law not looking at the

21   person or the -- you know, not my opinion, but the law.

22         MR. EISENBERG:  So you're saying you would be able to

23   set it aside, your experience with pornography?

24         PROSPECTIVE JUROR:  Correct.

25         MR. EISENBERG:  The fact that I believe there was a

UNITED STATES DISTRICT COURT

conviction in your family involving pornography, that wouldn't

affect your ability to sit in judgment of somebody else?

PROSPECTIVE JUROR:  I just had exposure to it, so it

wouldn't shock me.

MR. EISENBERG:  Well, that's a little bit different

than whether you could be fair when you're sitting in judgment

of somebody else, not whether seeing explicit photographs or

non explicit photographs, for that matter, it's really a

question of whether your prior experience says, I just can't be

fair here.

PROSPECTIVE JUROR:  No, I wouldn't say that.

MR. EISENBERG:  You don't think it would impact you at

all?

PROSPECTIVE JUROR:  No.

MR. EISENBERG:  You also said that you were bothered

that escorts are legal.  You were bothered by the fact that

they were legal.  Now, this is specific --

THE COURT:  Mr. Eisenberg, can you please move the

microphone closer.

MR. EISENBERG:  Yes.

You said you were bothered by the fact that escorts

are legal.  That was in your response to the questionnaire.  So

does that persist even now, even today it bothers you?

PROSPECTIVE JUROR:  I don't think it would bother me

to --

1        THE COURT:  I need you to speak up, please.

2        PROSPECTIVE JUROR:  I think I put on there that it was

3   a sin, but I do not think that -- I think that I could, you

4   know, listen to a case and not judge -- judge morally but judge

5   by the law.

6        MR. EISENBERG:  Well, if, in your mind, it is a sin,

7   and I'm not -- certainly not arguing that one way or another,

8   doesn't that already foreclose the -- the issue as to whether

9   the person is guilty or not?

10        PROSPECTIVE JUROR:  I don't think so.

11        MR. EISENBERG:  Even though you see it as a sin, it's

12   okay.

13        PROSPECTIVE JUROR:  Well, I'm going to be looking at

14   testimony and figuring out testimony and witnesses.  It's not

15   my place to -- everybody sins.  It's not my place to call it

16   sin really.

17        MR. EISENBERG:  Okay.

18        PROSPECTIVE JUROR:  It's, you know --

19        MR. EISENBERG:  So you're saying you would set aside

20   the actual act that you see as a sin and be guided by the

21   evidence and the law --

22        PROSPECTIVE JUROR:  Correct.

23        MR. EISENBERG:  -- as applied to the evidence or vice

24   versa?

25        PROSPECTIVE JUROR:  Correct.

1          MR. EISENBERG:  Okay.  Thank you, ma'am.  I appreciate

2    it.

3          PROSPECTIVE JUROR:  You're welcome.

4          MR. EISENBERG:  And, Juror 45.

5          PROSPECTIVE JUROR:  45.

6          MR. EISENBERG:  Let's see.  Is it on?

7          PROSPECTIVE JUROR:  Can you hear me?

8          MR. EISENBERG:  Yes, I can hear you.

9          All right.  Now, sir, you responded in your

10   questionnaire that you heard about the defendants through the

11   media and --

12         PROSPECTIVE JUROR:  Correct.

13         MR. EISENBERG:  All right.  Now, there have been

14   recent publications which were in the media, including some

15   even today --

16         PROSPECTIVE JUROR:  This morning on the news.

17         MR. EISENBERG:  -- about this case.  Yes.  And you saw

18   it in the paper?

19         PROSPECTIVE JUROR:  I don't get the paper.

20         MR. EISENBERG:  Okay.  See it on TV or see it on the

21   internet?

22         PROSPECTIVE JUROR:  (No audible response.)

23         MR. EISENBERG:  And I don't want you to go into it,

24   but there was an article or a publication with respect to what

25   this case is about; is that correct?

1          PROSPECTIVE JUROR:  If there was, it was years ago,

2     because this was on --

3          MR. EISENBERG:  Then let's talk about publications

4     years ago and publications right now, as of today, yesterday.

5     Have you seen anything today about this case or yesterday about

6     this case?

7          PROSPECTIVE JUROR:  Just on the news this morning.

8          MR. EISENBERG:  And on the news, on the radio, I take

9     it, is what you're saying?

10         PROSPECTIVE JUROR:  TV.

11         MR. EISENBERG:  TV.  Okay.  Now, there is a -- has

12    that affected you in any way in terms of coming in here and

13    determining what's going on with this case?

14         PROSPECTIVE JUROR:  Watching the news this morning?

15         MR. EISENBERG:  Yes.

16         PROSPECTIVE JUROR:  No.

17         MR. EISENBERG:  And are you saying that you disregard

18    what the news says?

19         PROSPECTIVE JUROR:  Yeah.

20         MR. EISENBERG:  You're kind of laughing.  Why is that?

21         PROSPECTIVE JUROR:  Just these days and times, I

22    pretty much just disregard all the news.

23         MR. EISENBERG:  Okay.  So is that the same way as

24    saying, and I think it is, that you wouldn't be guided by

25    whatever you read or heard or saw with respect to the news

1    concerning this case?

2              PROSPECTIVE JUROR:  No.

3              MR. EISENBERG:  If you're selected as a juror, the

4    Court tells the jurors, do not read anything about the case, do

5    not talk to anybody about the case, that sort of thing, because

6    the idea is what you get in the courtroom, that's where the

7    evidence is.

8              PROSPECTIVE JUROR:  And that's where it says too.

9              MR. EISENBERG:  I'm sorry?

10             PROSPECTIVE JUROR:  And that's where it says.

11             MR. EISENBERG:  Yes.  So anything that is written --

12   go ahead.

13             PROSPECTIVE JUROR:  So what are you saying, if I am

14   selected for the jury, that you don't watch the news, you don't

15   watch TV, you don't watch --

16             MR. EISENBERG:  You can do that, but you can't with

17   respect to this case.  Is that hard to do?

18             PROSPECTIVE JUROR:  You have to ask the media that

19   one.

20             MR. EISENBERG:  I'm sorry?

21             PROSPECTIVE JUROR:  You'd have to ask the media.

22             MR. EISENBERG:  Well, certainly the media can publish

23   what it wants to publish.  The point is is whether you and any

24   other juror are going to be watching it or listening to it.

25             PROSPECTIVE JUROR:  Would that influence my call on

1    this?

2           MR. EISENBERG:  Well, that's one question.  The first

3    is more fundamental.  If you're told not to do that by the

4    Court, would you follow that?

5           PROSPECTIVE JUROR:  I wouldn't talk with anybody about

6    it, but am I going to watch the news?  Yes.

7           THE COURT:  So let me just interrupt.

8           Juror 45, it doesn't mean you can't watch TV, you

9    can't read, you can't listen to the radio.  The instruction is

10   if you come across something, turn it off, don't watch that

11   particular segment.  If you hear something, turn it off.  If

12   you see something in the newspaper, don't read it.  And then

13   you have to inform the Court and then we deal with it, whatever

14   it is.  Could you do that?

15          PROSPECTIVE JUROR:  Yeah, because, first of all, I

16   don't read the newspaper.  I don't get it.  And, to be honest,

17   if I turn the news on, it's pretty much to get the weather and

18   that's it.  I go out to the other TV.  I just can't watch news

19   anymore.  But if it is, would I turn it, yeah, sure, if I was

20   sitting on the jury.

21          THE COURT:  Okay.

22          PROSPECTIVE JUROR:  Does that answer that question?

23          MR. EISENBERG:  I'm going to go one step further.  If

24   you're sitting on the jury and that happens, would you turn it

25   off?

1              PROSPECTIVE JUROR:  I think I just answered it, didn't

2    I?

3              MR. EISENBERG:  Did you say that?  Then I missed it.

4    Okay.

5              I guess the same is true for everybody else here, with

6    respect to the news and publications, have people seen or heard

7    recently, with respect to this case, anything about it?

8              (No response.)

9              MR. EISENBERG:  All right.  And I'm sure the

10   admonition from Her Honor would be the same, if you're a member

11   of the jury, you would be told to disregard anything that you

12   hear or see.

13             You also said, sir, that the defendant should prove

14   his innocence.  That's in response to question 43 in your

15   questionnaire.

16             PROSPECTIVE JUROR:  Yes.

17             MR. EISENBERG:  Okay.  So what you're saying is it's

18   the obligation of the defendant to prove that he is not guilty;

19   is that correct?

20             PROSPECTIVE JUROR:  I don't know how to describe this.

21   I think it's both sides that need -- I mean, obviously, the

22   prosecution has to prove beyond a reasonable doubt.

23             MR. EISENBERG:  Right.

24             PROSPECTIVE JUROR:  And do I think -- do I think that

25   the defendant or defendants should --

1              (Reporter interrupts for clarification.)

2              PROSPECTIVE JUROR:  And I think the attorneys for the

3    defendant have to prove innocence.

4              THE COURT:  Defendants have to prove they're innocent.

5    Is that what you said?

6              PROSPECTIVE JUROR:  Yeah.

7              THE COURT:  Okay.

8              MR. EISENBERG:  So it's an obligation on the part of

9    the defendant to prove that he or she is not guilty?

10             PROSPECTIVE JUROR:  Yes.

11             MR. EISENBERG:  Okay.  And my last question for you,

12   sir, is -- actually, no.  I'm sorry.  I think you've answered

13   it.  I think you have answered it satisfactory.

14             I don't have anymore questions for this jury, Your

15   Honor, and I'm done.

16             THE COURT:  Okay.

17             Counsel.

18             MS. BERTRAND:  Okay.  Can you hear me?

19             That's good.  This will be easier because it's hard to

20   talk to everybody when you're spread out.

21             Understanding that you heard the discussion with the

22   first group that we had about reasonable doubt and about what

23   it means to be a juror on this case, and I'm going to tell you

24   as well, we're not going to belabor the point, but that this is

25   really important.  And if there is some reason -- and I can

1    think of several -- that you don't want to be on this jury or

2    you can't serve on this jury, tell us.  And I only represent

3    Joye Vaught, that's one-seventh of this whole production, but

4    I'll do what I can.  I'll do everything I can to make sure that

5    you don't serve.  Because what we don't want is people here

6    that, A, don't want to be here, can't pay attention, and can't

7    fulfill this when it gets long and it gets hard.  So please

8    don't worry about telling us that.  It's okay.

9            Juror 55, hi.  I can't see with these and I can't see

10   without them.  It's the most frustrating thing.

11           You mentioned in your questionnaire answers that

12   websites like You Tube, Facebook, and the like should be

13   responsible for the content posted by users on their websites

14   up to a limit, and harmful posts and totally fake news should

15   be scrutinized on a daily basis.

16           First, what's your definition of what that

17   responsibility looks like?

18           PROSPECTIVE JUROR:  Well, that's a good question.

19   Maybe not -- how do I say this?  Those platforms have a debt to

20   society to do things as decently as they can.  It's hard to do

21   things right all the time, but -- and it might be hard to do

22   it, but you've got to start somewhere.  They should look at

23   people who are trying to purposely put disingenuous content

24   into the population.  I think a lot of people do that.  They

25   don't know why they do it, but they do it anyway.

1          And platforms can't really be held -- well, they can

2     be held -- not responsible -- but it's hard for them as well

3     because they can't go through each -- each content and say,

4     okay, this is good, this is bad.  They don't know why people

5     are saying these things, but they have to start somewhere.  I

6     think if they start small and work up.

7          MS. BERTRAND:  Start small and work up.

8          PROSPECTIVE JUROR:  Yeah, you know, get rid of all the

9     crazies, and there is a lot of them online, but then, you know,

10    work their way to the really hard stuff, which is -- is part of

11    a mishmash of the government regulations, and people looking at

12    things and saying, this is not right.  That's the -- it's up to

13    the -- to the content displayers as well.  I mean, platforms

14    can't do everything.  They don't even know half the problems

15    that exist or they're not paying attention to it.  So if they

16    start paying attention, they might get somewhere.

17         MS. BERTRAND:  So what do we do with sex work?

18         PROSPECTIVE JUROR:  Can it be regulated, yes and no.

19         MS. BERTRAND:  What do we do with it on these

20    platforms?

21         PROSPECTIVE JUROR:  Monitor, I don't know -- it's like

22    an apartment complex, you have one person that goes around and

23    looks at all the patios and says, okay, this patio is decent,

24    this patio is bad.  So what do you do?  You go back to the --

25    to the office and you say, this place is a mess.  Can you do

1    something about that?  Okay.  We'll do something about it.

2    They won't say what, but they'll do something about it.

3            And that's like Facebook.  Facebook is totally

4    different from when it started.  2008 it was child's play

5    almost.  Now it's not -- it's not like that anymore.  It's a

6    bunch of people that all push their own ideas and values on

7    other people, and people suck it up and love it.

8            MS. BERTRAND:  Not a lot of policing.

9            PROSPECTIVE JUROR:  There is some but it's not enough.

10   It's -- it's weird.

11           MS. BERTRAND:  It is weird.

12           PROSPECTIVE JUROR:  I remember when it was -- when it

13   was first started, it was nothing like it is now.  It was -- it

14   was crazy but it was just people trying to work their way

15   through the minutia.

16           MS. BERTRAND:  It's kind of taken a life of its own.

17           PROSPECTIVE JUROR:  Yes.

18           MS. BERTRAND:  Thank you.  Thank you, Juror 55.

19           Who agrees with Juror 55 that social media and these

20   platforms have taken on a life of their own?

21           Juror 62.  Yes, you.  I'll get you a microphone.

22           PROSPECTIVE JUROR:  Number 62.

23           MS. BERTRAND:  Yes.

24           THE COURT:  What is the question?

25           PROSPECTIVE JUROR:  Do you have a question?

1          MS. BERTRAND:  What do you -- in response to what

2     Juror 55 said, that these platforms have taken on a life of

3     their own and it's hard to regulate them, what is your take on

4     that?

5          PROSPECTIVE JUROR:  Life is hard.  Find a way.

6          MS. BERTRAND:  Can you say more about that?

7          PROSPECTIVE JUROR:  You don't like the way something

8     operates, there is processes to go through to fix that and

9     change it.  If you don't change it, then you have to abide by

10    the way it exists.

11         MS. BERTRAND:  Now, I believe in your questionnaire

12    you said that you refer -- the answer to 69, the question was

13    government should investigate or prosecute the provider of a

14    platform that promotes or facilitates prostitution.  And there

15    was no response.  But then in the explanation, if the perp is

16    violating an existing statute, law enforcement should pursue.

17         Who is the perp that you're referring to in that

18    response, the poster, the platform?

19         PROSPECTIVE JUROR:  It goes back to what I just said.

20    If it violates the law, then it should be pursued.  If it

21    doesn't violate a law, then why are we following it?

22         MS. BERTRAND:  And you noted in response to question

23    76 that there is a responsibility to these platforms to protect

24    the innocent.

25         Who is the innocent in your eyes in that answer?

UNITED STATES DISTRICT COURT

1    PROSPECTIVE JUROR:  Well, in the case that I've been

2    listening today, it appears that the innocent may be the

3    underage child.

4        MS. BERTRAND:  Can you say more about that?  It

5    appears it's the underage child.  So what should the platform

6    do to protect underage children?

7        PROSPECTIVE JUROR:  It goes back to working with law

8    enforcement, providing the information, giving them the

9    necessary tools they have to pursue that if it violates the

10   law.  If it doesn't violate the law, then I'm not sure what

11   we're after.

12       MS. BERTRAND:  Thank you.

13       Juror 39, I'm not going to necessarily -- you're

14   welcome to say something, but I was really touched by what you

15   said when you said I don't -- in essence, I'm going to

16   paraphrase you -- I don't have a voice.  I'm only 19.  And what

17   touches me is everyone has an equal voice on a jury.

18       Do you think that you would be uncomfortable asserting

19   -- taking your stand, placing yourself in a position because of

20   your age or any other reason?

21       PROSPECTIVE JUROR:  Yeah.  I don't know.  I just -- I

22   don't have very strong opinions on the world yet.  I haven't

23   even lived on my own in the world yet.  So I don't -- I don't

24   -- my social media is like Snapchat where I have streaks with

25   my high school friends, like -- like, I don't -- I don't know,

1    basically, anything we're talking about, every time you guys

2    ask a question, I have no clue what you're saying because you

3    guys use such big words.  So, like, I wouldn't be very helpful

4    as a juror.

5              MS. BERTRAND:  Okay.  I'm hearing you.

6              PROSPECTIVE JUROR:  Okay.

7              MS. BERTRAND:  And I will try not to use big words.

8              PROSPECTIVE JUROR:  Thank you.

9              MS. BERTRAND:  Who feels like Juror 39, like, look,

10   man, this is a big deal and no one wants to hear from me, for

11   whatever reason, I don't -- I'm not qualified to talk about

12   this stuff and judge this stuff?

13             How about Juror 46?  We haven't heard from you that

14   much.

15             PROSPECTIVE JUROR:  No, I don't think I'm -- I don't

16   feel that way.

17             MS. BERTRAND:  Okay.

18             PROSPECTIVE JUROR:  I am fine to give my opinion and

19   listen objectively and do what I have to do.

20             MS. BERTRAND:  All right.  This morning we talked with

21   the first batch of jurors who were in here about some people

22   are just, by their nature, that they're about finding common

23   ground and conciliation and agreement, and there are some who

24   say, no, I stand my ground and I hold my ground and I will

25   throw down.

1          Where would you put yourself in that spectrum?

2          PROSPECTIVE JUROR:  Probably a little in the middle.

3    I mean, I definitely make a judgment early on, but then I'm

4    open to hear facts and sway my decision if it -- you know, if

5    the information goes that way so...

6          MS. BERTRAND:  And do you feel comfortable holding

7    your ground if you feel strongly about something?

8          PROSPECTIVE JUROR:  Definitely.

9          MS. BERTRAND:  Thank you.

10          Juror 56, hi.  And there might be a couple people who

11    agree with you on this one.  I'll just put that out there.  I

12    believe one of your answers was that -- and it's late and it's

13    hot in here, so if I missed it, you can just say, Joy, I

14    already said that -- that the system makes it too hard to

15    convict people.  Do you remember talking about that?

16          PROSPECTIVE JUROR:  Yes, I do.

17          MS. BERTRAND:  Can you say more about that, that the

18    system makes it too hard to convict folks.

19          PROSPECTIVE JUROR:  I think there are times, from

20    things that I've read in the paper, that people who are

21    obviously guilty get off on a technicality.  And so the law was

22    interpreted correctly, and yet the criminal as was allowed to

23    go free based on what I would regard as a technicality as

24    opposed to facts.

25          MS. BERTRAND:  Sure.  And sometimes -- sometimes that

1     technicality is a constitutional rule, but what I hear maybe --

2     and please correct me if I'm wrong -- is that it's frustrating?

3               PROSPECTIVE JUROR:  That's exactly right, it is.

4               MS. BERTRAND:  Disappointing?

5               PROSPECTIVE JUROR:  It is frustrating and it is a

6     difficult thing, because I do believe in the constitution and

7     you have to uphold it, but I think sometimes it leads to

8     injustice.

9               MS. BERTRAND:  So what do we do when there is a

10    tension between the two, between justice and the constitution?

11              PROSPECTIVE JUROR:  I'm sorry.  What was the question?

12              MS. BERTRAND:  What do we do when there is tension

13    between the two?

14              PROSPECTIVE JUROR:  You follow the law.

15              MS. BERTRAND:  Okay.  Thank you.  Thank you, Juror 56.

16              Who agrees with Juror 56, that even when it's hard, we

17    have to follow the constitution?

18              Juror 49, yes.  Who else?  Did I see a -- 38, 34, 44,

19    41.

20              41, you wanted to say something when you raised your

21    hand.  What did you want to say about that?

22              PROSPECTIVE JUROR:  I'm just going to say that even

23    with -- when there is tensions, you know, just the supreme law

24    of the land is the Constitution of the United States, so for me

25    it would be the constitution.

1        THE COURT:  Wait.  Can you -- I'm sorry.  You need to

2   speak up a little.

3        PROSPECTIVE JUROR:  Oh, I said for me that the supreme

4   law of the land is the Constitution of the United States.  So

5   if there is tension, I would definitely go with the

6   constitution.

7        MS. BERTRAND:  All right.  Thank you.

8        Juror 34, I won't -- I won't keep you on your feet

9   long, because you've talked quite a bit, but you said you would

10  follow the constitution, but you've also said this is not the

11  case you want me on, folks, correct?

12       PROSPECTIVE JUROR:  Well, yes.  And I don't think it's

13  for reasons of not following the constitution, but, obviously,

14  a court proceeding is very complicated, involves the jury

15  determining the credibility of witnesses, and that is where

16  that original question, I think, came from as to how much

17  credibility I would give upfront to various types of witnesses.

18       MS. BERTRAND:  I gotcha.  Thank you.

19       Number 40, you were talking about your wife's

20  involvement in, was it Operation Underground Railroad?

21       PROSPECTIVE JUROR:  Yes.

22       MS. BERTRAND:  And that's an organization that assists

23  people who have been trafficked and are trying to leave that

24  world, right?

25       PROSPECTIVE JUROR:  That's my understanding, yeah.

1          MS. BERTRAND:  And he's not here so I'll tell you.  My

2   beloved would not come home and tell me he did something that

3   would upset me.  So my question for you is, if we're in a case

4   like this where it's going to be obvious, even if you don't

5   talk about the case, what case you're going to be on a jury

6   for, what kind of pressure are you going to have at home?  On

7   one hand you've got your -- your wife, your beloved, very

8   involved, very concerned, according to your answers, about

9   human trafficking and sex trafficking, and your own community

10  involvement involving people who have been involved in the sex

11  industry, how are you going to square that with a not guilty

12  verdict, or could you?

13          MS. PERLMETER:  Objection.  Juror Number 40 already

14  stated that, if selected, he would abide by the Court's orders

15  and not discuss the matters discussed at trial with his wife at

16  home.

17          THE COURT:  Okay.  The objection is noted, but this

18  question is a little different.

19          So to simplify the question.  If you were selected as

20  a juror in this case, you get to the end of trial, you're in

21  jury deliberations and the jury decides to return a not guilty

22  verdict because the government didn't meet their burden of

23  proof, would you have any difficulty voting that way because

24  you would have to go back and tell your wife that you voted not

25  guilty?

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Any other questions?

3           MS. BERTRAND:  Not for Juror 40.

4           THE COURT:  Okay.

5           MS. BERTRAND:  Juror 58, hi.  We haven't talked a lot.

6           PROSPECTIVE JUROR:  Juror 58.

7           MS. BERTRAND:  Hi.  In your questionnaire answers you

8   mention that you follow the Me Too, prostitution, and sex and

9   human trafficking reports.  Do you remember?

10          PROSPECTIVE JUROR:  Could you repeat that?

11          MS. BERTRAND:  Sure.  It was in answer to -- and I

12  hope I -- I think so.  You reside in Gilbert?

13          PROSPECTIVE JUROR:  Excuse me?

14          MS. BERTRAND:  You reside in Gilbert?  I'm trying to

15  make sure I have the right questionnaire for you.

16          PROSPECTIVE JUROR:  Yes.

17          MS. BERTRAND:  Okay.  You noted, in terms of keeping

18  up with current events, that you follow the Me Too movement,

19  and sex trafficking, human trafficking reports.  Do you

20  remember talking about that in your questionnaire?

21          PROSPECTIVE JUROR:  Yes.

22          MS. BERTRAND:  And you also stated that our laws --

23  and you said this a couple times -- our laws need to be updated

24  to deal with changes in our society.

25          Do you recall talking about that?

UNITED STATES DISTRICT COURT

1          PROSPECTIVE JUROR:  Yes.

2          MS. BERTRAND:  First of all, in terms of what you

3    followed in the Me Too and the sex trafficking documentaries

4    and news reports, how does that affect your feelings about

5    sitting on a jury about this case and the issues in this case?

6          PROSPECTIVE JUROR:  Well, I have to listen to the

7    facts on this case, right?  I mean, we might be -- I mean, I'm

8    not going to be expressing an opinion on a case that I had read

9    or I had once seen, it's about the specifics on this case.

10         MS. BERTRAND:  Got it.  And there might be some of my

11   colleagues who want to say something about this, so what -- how

12   do you define trafficking in your mind, because you

13   specifically used that word in your responses?  What is

14   trafficking to you, whether it's sex trafficking or human

15   trafficking?

16         PROSPECTIVE JUROR:  Well, there is a financial gain

17   for some -- I mean, using a person or persons that might be

18   underage or might be under duress, that's only for financial

19   gain, but somebody that is -- it's a -- is breaking the law.

20         MS. BERTRAND:  So, in your mind, I just want to make

21   sure everyone is clear, if someone is engaged in, for example,

22   sex work for financial gain, that, to you, is trafficking.  Am

23   I understanding you correctly?

24         PROSPECTIVE JUROR:  They're closely related, I mean.

25         MS. BERTRAND:  Closely related?

1              PROSPECTIVE JUROR:  Yes.

2              MS. BERTRAND:  How so?  Can you say more about that?

3              PROSPECTIVE JUROR:  Well, I mean -- I mean, I used to

4    live in California, right.  And -- and there was very obvious

5    areas of the city, especially in Los Angeles, where there were

6    that kind of transactions.

7              MS. BERTRAND:  Sure.

8              PROSPECTIVE JUROR:  Okay.  So it was always very

9    obvious that somebody was waiting for the ladies or the

10   youngsters, and it was directing them -- I mean, I used to do

11   construction, so I was building right along some of those

12   streets, so it was something that I was watching there every

13   day, so that's what it -- it really made my mind that it's

14   closely related.

15             MS. BERTRAND:  Sure.  Sure.  And do you think that

16   your mind, with that experience, seeing it day-to-day, and I'm

17   imagining some pretty sad, some pretty pathetic things you saw

18   with people who are pretty desperate, would that impact your

19   ability to be clearheaded in this case when we're talking about

20   sex work and prostitution and all kinds of stuff?

21             PROSPECTIVE JUROR:  Well, I mean, like I say before, I

22   have to know the specifics.  I have to know what the evidence

23   is on this case.  Because, I mean, you have -- I mean, we are

24   -- we have -- right now we have our own mind, say it, what we

25   think they did.  Also we're open to hear an evidence from a

1    case, and based on that, reach to a verdict.

2           MS. BERTRAND:  Okay.  Thank you, Juror 58.

3           Who else finds prostitution and trafficking very

4    closely related?

5           Juror 33.

6           Juror 40, I saw you raise your hand.  Let me just see

7    what Juror 33 wants to say.

8           PROSPECTIVE JUROR:  33.

9           MS. BERTRAND:  Yes.

10          PROSPECTIVE JUROR:  Can you repeat that question?

11          MS. BERTRAND:  Sure.  Do you believe that, in

12   listening to Juror 58, are trafficking, sex trafficking, human

13   trafficking, and prostitution interrelated, in your mind?

14          PROSPECTIVE JUROR:  I'm pretty naive to all this.

15          MS. BERTRAND:  Sure.

16          PROSPECTIVE JUROR:  I really don't -- I mean, I pretty

17   much would have to -- someone would have to tell me the

18   definitions of each one of these because I'm pretty sheltered

19   when it comes to all this stuff.

20          MS. BERTRAND:  Okay.

21          PROSPECTIVE JUROR:  I know I'm a lot older than her

22   and I'm uncomfortable with it, so I can imagine how she feels.

23          MS. BERTRAND:  Do you feel comfortable participating

24   in a discussion in terms of having your own voice?

25          PROSPECTIVE JUROR:  Oh, yeah.

1          MS. BERTRAND:  All right.  Thank you.

2          Juror 40, what did you want to say?  You did raise

3     your hand.

4          Thank you, Juror 33.

5          PROSPECTIVE JUROR:  Number 40.  I just -- in my mind,

6     they're related.  Seems like the purpose of trafficking in

7     general is to get more prostitutes.

8          MS. BERTRAND:  Okay.  You're soft spoken, so I just

9     want to make sure we heard.  Trafficking means to get more

10    prostitutes.  So what is the difference --

11         PROSPECTIVE JUROR:  I would say, typically, the

12    purpose of trafficking, in my mind, is to get more individuals

13    to serve as prostitutes or to work as prostitutes.  I'd say

14    they're related, not necessarily the same, but related.

15         MS. BERTRAND:  Are all prostitutes, in your mind,

16    trafficked?

17         PROSPECTIVE JUROR:  No.

18         MS. BERTRAND:  Okay.  Thank you.  Let me just check my

19    notes, Judge.  I'm finishing up.

20         Nothing further, ma'am.  Thank you.

21         THE COURT:  Okay.  And, counsel, you can have about

22    two minutes for 34 and 40.

23         Just use the microphone.

24         MS. PERLMETER:  Hi, Juror Number 40.  So you've been

25    asked a lot of questions today by pretty much everybody.  One

UNITED STATES DISTRICT COURT

1    follow-up question for you.  This is related to the question,

2    or the hypothetical that you were posed, where one of the

3    defense attorneys asked you, well, if a person relied on advice

4    from their attorney and then behaved in accordance with it.

5    Okay.

6           So I will take it one step further.  If your attorney

7    gives you advice based on information that you share with your

8    attorney so that they can give you advice, do you think it

9    would be problematic if you fail to provide your attorney with

10   all of the relevant information?

11          PROSPECTIVE JUROR:  Yes.

12          MS. PERLMETER:  All right.  So we've had a lot of

13   discussion today, and it's good because we need to be able to

14   find jurors who will be fair for the defense, and we also need

15   to find jurors that will be fair for the government.

16          And we've had some discussion about different types of

17   witnesses --

18          Oh, I'm sorry, Juror 40, please sit down.  I

19   apologize.  I just had that one question for you.

20          We've had discussions about whether or not certain

21   life experiences can make you biased towards one group of

22   people or another.  If you are selected to serve as a member of

23   this jury, you will be given an instruction about how you are

24   to evaluate the credibility of a witness.  And, basically, it

25   tells you that it is up to you to decide what you want to

1    believe and what you don't want to believe, and that you can

2    accept a witness's testimony in whole or in part or not at all.

3          And the factors that you may take into account are

4    things such as the witness's ability to hear --

5          MR. LINCENBERG:  Your Honor, is this the follow up

6    that the Court was anticipating?

7          THE COURT:  No.  Do you have a question for Juror 34?

8          MS. PERLMETER:  Yes.

9          Juror 34, you are a retired law enforcement officer,

10   and you told us that if you were a defendant, you would

11   probably not want someone like yourself on the jury.

12         PROSPECTIVE JUROR:  Yes.

13         MS. PERLMETER:  And you also said that you tend to

14   believe law enforcement witnesses.

15         PROSPECTIVE JUROR:  Yes.

16         MS. PERLMETER:  Now, as a law enforcement officer, are

17   you also -- do you also understand that you are required to

18   follow the law as the judge instructs it of you?

19         PROSPECTIVE JUROR:  Yes.

20         MS. PERLMETER:  Okay.  Do you agree to follow the law

21   even if you disagree with it?

22         PROSPECTIVE JUROR:  Yes, but I've never said I

23   disagreed with any of the laws that were discussed today.

24         MS. PERLMETER:  If you are instructed to treat all

25   witnesses equally, meaning not to elevate someone based on

1    status, or diminish someone based on status, would you be

2    willing to do that -- not willing, are you able to do that?

3              PROSPECTIVE JUROR:  I don't think so, no.

4              MS. PERLMETER:  Okay.  So based on your work as a law

5    enforcement officer, you're just unable to set aside that

6    feeling of favoring law enforcement witnesses?

7              PROSPECTIVE JUROR:  Correct, I cannot.

8              MS. PERLMETER:  Okay.  Thank you.  That's -- I'm

9    sorry.  What did you say?

10             PROSPECTIVE JUROR:  Correct.

11             MS. PERLMETER:  Okay.

12             PROSPECTIVE JUROR:  Sometimes the questions become

13   should you say yes to the no or no to the yes.  So I'm trying

14   to say, correct, I cannot take that out of my mind.

15             MS. PERLMETER:  Okay.  And that's what we're trying to

16   figure out, just like the questions we started off earlier

17   today about people who may have had substance abuse issues or

18   homelessness in their life, so it's law enforcement in family,

19   friends, self, is another category.  Okay?

20             PROSPECTIVE JUROR:  Yes.

21             MS. PERLMETER:  Thank you very much for your time.

22             THE COURT:  Okay.  So that finishes the questions of

23   this group.  We still have some more jurors that we have to

24   finish, which we're going to have to do tomorrow.

25             So that means if you have not been excused, I need you

1    to come back tomorrow at 9:00 a.m. and we'll finish up

2    tomorrow.  All right.

3            And for everybody downstairs --

4            Are they still listening?

5            Everyone downstairs is excused to come back tomorrow

6    at 9:00 a.m.

7            All right.  We're at recess.

8            MR. LINCENBERG:  Your Honor, one of the jurors has a

9    question for you.

10           THE COURT:  Okay.

11           PROSPECTIVE JUROR:  Do we keep numbers?

12           THE COURT:  Yes, that would be helpful, but if you

13   lose it tonight, just let us know in the morning and we'll get

14   you a new one, because you will keep the same number, but I

15   realize they're just stickers.

16           (The prospective jurors left the courtroom.)

17           THE COURT:  Counsel, I wanted to go over hardship, but

18   I accept that you may want to discuss -- or not hardship,

19   sorry -- for cause, so I'm not going to make you do it right

20   now, but I want you back at 8:30 so we can do it before the

21   next panel.

22           Also tomorrow I think a couple attorneys were straying

23   from this area and getting too close to the jurors.  You can't

24   do that.  I'll take away the microphone and make you stand at

25   the podium.  All right.  Let me see if there is anything else.

1          Nope, that's it.  We'll see you tomorrow at 8:30.

2     Thank you.

3          MR. JONES:  Your Honor, just briefly.  The government

4     -- Reggie Jones on behalf of the United States.  We just wanted

5     to make you aware that we did comply with your court order from

6     record 12-11 and gave each defense counsel a copy of our

7     PowerPoint that we plan to use for opening statement.  Defense

8     counsel for defendant Larkin has also reciprocated and given us

9     his anticipated opening statement exhibits.

10          The other four defense counsels who are giving opening

11     statements indicated to the government that they were not

12     intending to use exhibits or PowerPoints, so we just wanted to

13     make you aware of that.

14          MS. BERTRAND:  Judge, I did e-mail them the one

15     exhibit I might be using.

16          MR. FEDER:  I actually told Mr. Jones I would send it

17     to him tonight.

18          MR. EISENBERG:  And, Your Honor, excuse me, I'll give

19     Mr. Jones -- I'll give Mr. Jones the exhibit that I intend to

20     use as soon as we're done.

21          THE COURT:  Okay.  Did I not say 48 hours in advance

22     for everybody?  Was there an issue with sending an e-mail in

23     time?

24          MR. JONES:  You indicated 24 hours in advance, Your

25     Honor, of opening statements, which the government did -- did

1    comply with.

2           MR. EISENBERG:  Well, I got this today, Your Honor, at

3    the first break.  And I'm prepared to tell counsel right now

4    what I'm going to use.

5           THE COURT:  I can't hear you.  I'm sorry.

6           Mr. Jones, I thought you gave it to them yesterday?

7           MR. JONES:  No, we gave it to them this afternoon,

8    Your Honor, at the break.  We did it when we were anticipating

9    the 24-hour period to start, when opening statements were to

10   begin, so we gave it to them after the lunch break.

11          THE COURT:  Okay.  So send them your --

12          MR. EISENBERG:  I will, Your Honor.  Thank you.

13          (Proceedings concluded at 5:16 p.m.)

14                        *          *          *

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8   a full, true, and accurate transcript of all of that portion of

9   the proceedings contained herein, had in the above-entitled

10  cause on the date specified therein, and that said transcript

11  was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 25th day of

13  September, 2021.

14

15

16

                        /s/ Christine M. Coaly_____
17                      Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25