Exhibit G

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) CR-18-00422-PHX-SMB |
| Plaintiff, | ) |
| | ) Phoenix, Arizona |
| vs. | ) September 8, 2021 |
| | ) 1:19 P.M. |
| Michael Lacey, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - AFTERNOON SESSION

Official Court Reporter:
Barbara H. Stockford, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 39
Phoenix, Arizona  85003-2151
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                    A P P E A R A N C E S

 2      For the Government:

 3                  U.S. Attorney's Office
                    By: PETER S. KOZINETS, ESQ.
 4                      KEVIN M. RAPP, ESQ.
                        MARGARET WU PERLMETER, ESQ.
 5                      ANDREW C. STONE, ESQ.
                    Two Renaissance Square
 6                  40 North Central Avenue, Suite 1200
                    Phoenix, AZ  85004
 7
                    U.S. Department of Justice
 8                  Child Exploitation & Obscenity Section
                    By:  REGINALD E. JONES, ESQ.
 9                  1400 New York Avenue, NW, Suite 600
                    Washington, DC  20530
10

11      For the Defendant Michael Lacey:

12                  Lipsitz Green Scime Cambria LLP
                    By: PAUL J. CAMBRIA, JR., ESQ.
13                      ERIN McCAMPBELL PARIS, ESQ.
                    42 Delaware Avenue, Suite 120
14                  Buffalo, NY  14202

15

16      For the Defendant James Larkin:

17                  Bienert Katzman PC
                    By: THOMAS H. BIENERT, JR., ESQ.
18                      WHITNEY Z. BERNSTEIN, ESQ.
                    903 Calle Amanecer, Suite 350
19                  San Clemente, CA  92673

20      For the Defendant John Brunst:

21                  Bird, Marella, Boxer, Wolpert, Nessim, Drooks,
                    Lincenberg & Rhow PC
22                  By: GARY S. LINCENBERG, ESQ.
                        GOPI K. PANCHAPAKESAN, ESQ.
23                  1875 Century Park East, 23rd Floor
                    Los Angeles, CA  90067
24

25
```

UNITED  STATES  DISTRICT  COURT

```
 1                    A P P E A R A N C E S (Continued)

 2     For the Defendant Scott Spear:

 3                  Feder Law Office PA
                    By: BRUCE FEDER, ESQ.
 4                  2930 East Camelback Road, Suite 160
                    Phoenix, AZ  85016
 5

 6     For the Defendant Anthony Padilla:

 7                  David Eisenberg PLC
                    By: DAVID EISENBERG, ESQ.
 8                  3550 North Central Avenue, Suite 1155
                    Phoenix, AZ  85012
 9

10     For the Defendant Joye Vaught:

11                  Joy Bertrand Esq. LLC
                    By: JOY MALBY BERTRAND, ESQ.
12                  P. O. Box 2734
                    Scottsdale, AZ  85252
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2                                                    PAGE

3    OPENING STATEMENT BY MR. EISENBERG                 5

4    OPENING STATEMENT BY MS. BERTRAND                 19

5    OPENING STATEMENT BY MR. CAMBRIA                   27

6

7

8                    PLAINTIFF'S WITNESSES

9    NAME                 DIRECT  CROSS REDIRECT RECROSS VOIR DIRE

10   BRIAN FICHTNER          48

11

12

13                    INDEX OF EXHIBITS

14   NO.        DESCRIPTION                        RECEIVED

15   489A       Video recorded by Brian Fichtner on     61
                3-6-2015

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1              (In open court; jury not present.)
 2              THE COURT:  Mr. Eisenberg, are you going next?
 3              MR. EISENBERG:  Yes, I am.  Your Honor.
 4              THE COURT:  Okay.
 5              MR. EISENBERG:  Your Honor, I've added a prop.
 6              THE COURT:  Okay.
 7              (In open court; jury present.)
 8              THE COURT:  Be seated.  We are back on the record with
 9    the jury present.
10              Mr. Eisenberg?
11              MR. EISENBERG:  Thank you, Your Honor.
12                    OPENING STATEMENT BY MR. EISENBERG
13              MR. EISENBERG:  Colleagues, Mr. Padilla, Your Honor,
14    government counsel, jurors:  The government has the burden
15    here.  The burden is to prove beyond a reasonable doubt that my
16    client or any of the other clients intended to commit a certain
17    crime in this case:  facilitation of prostitution.  It was not
18    Mr. Padilla's intention to do that.  His intention was to
19    screen ads, as the head of the moderators, in order to allow
20    them to be published for legal services.  His intention was not
21    and, in fact, he made an active effort to prevent the
22    publication of ads that were illegal; that is, sex for money.
23              Mr. Padilla, would you stand, please?
24              Ladies and gentlemen, this is Andrew Padilla.  I am
25    David Eisenberg.
```

1            Thank you, sir.

2            I represent Mr. Padilla.  Mr. Padilla's job at

3    Backpage was operational.  He started in screening

4    advertisements.  The working environment of Backpage at that

5    time was over there on Jefferson Street, in a building that all

6    can see from the public walk, in the desk in an office.

7    Nothing hidden.  He worked at a desk with his fellow

8    moderators.  When the operation moved from Phoenix to Dallas,

9    he worked in the Dallas Observer building, not hidden, in a

10   building, not in a cave, not in a tent, not hidden.

11           His sources for guidance in terms of moderation -- and

12   I'll talk a little bit about this more, but I think it's

13   important to get it out right now.  He, Mr. Padilla, was not

14   the source or the idea for how moderation would work.  That

15   belonged principally to Carl Ferrer who was the chief executive

16   officer and the cofounder of Backpage.

17           You will hear throughout this case that any idea with

18   respect to how moderation was going to work did not come from

19   Andrew Padilla.  It came basically from Mr. Ferrer, and

20   Andrew Padilla followed Mr. Ferrer's guidance.  It also came

21   from the lawyers who -- about whom you have heard, and I'll

22   tell you a little bit more.

23           The attorneys by name:  There were at least three of

24   them before Liz McDougall came.  Some were in private practice.

25   Others actually had work space, work space at Backpage.  So

1    they were physically there in order to give advice with respect

2    to moderation.  So, if Mr. Padilla needed advice, he didn't

3    rely on himself.  He relied on the attorneys and he relied on

4    Mr. Ferrer.

5              His background is interesting in that he didn't get

6    past the 11th grade.  Went to high school in Maryvale.  When he

7    left, he worked in a warehouse from 1991 to 2004 as a

8    blue collar worker.  He was a forklift operator.

9              Eventually, after he worked there with his brother and

10   his father, he found a job at Backpage.  This job was to

11   moderate ads.  Nothing else.  He did nothing else at Backpage

12   except to moderate ads.  He started at $11 an hour in 2006.

13   Eventually, he worked his way up to being a salaried employee.

14   He did get a bonus, but it wasn't related to the volume of ads.

15   It wasn't related to the number of ads that he could publish or

16   that his teams could publish.  There was no penalty taken out

17   of his salary for rejecting an ad or taking an ad off the

18   Backpage website.  His income, therefore, was not dependent at

19   all on the number of ads that came through.

20             The evolution of these ads:  Starting about the first

21   three years, his main focus wasn't on moderation with respect

22   to adult; it was more on attending to cleaning up the spam that

23   had come in for publication.  And he assisted his clients with

24   ads.  He oversaw the edits of ads that were posted to the

25   various sections.  At that point in time, he did not focus on

1    adult moderation.  There was no need to do that.

2          Then along came the access to the postings that

3    were -- at some point, had been on Craigslist.  These allow,

4    according to the rules that he was supposed to follow, for the

5    publication of legal ads in the Adult Services section.  Not

6    pornography, not sex for money, but legal ads predicated upon

7    standard that he learned, not that he developed, but that he

8    learned.  And so, as a worker, as an operational person, his

9    goal was to follow the standard that had been set for him

10   principally by Mr. Ferrer and by the attorneys.

11         As volume increased, the moderation staff itself

12   increased so that, by 2008 and 2009, starting then until

13   moderation ended, there were at least 100 people doing this

14   work connected with Backpage.  The initial -- initial steps of

15   moderation hadn't been developed very much at the beginning

16   where it was simply get rid of nudity.  Anything that was nude

17   was gone.  That was the standard that my client followed

18   because that's the standard he was told to follow.  They

19   focused on language as well, but this was sort of an

20   indeterminate, indiscriminate, undefined standard.  What do the

21   words mean?  For guidance, they looked to Mr. Ferrer who was

22   the person in charge, not my client.

23         Mr. Ferrer became very busy.  The Backpage business

24   expanded.  It went global.  Work became more intense.  Some of

25   the moderators worked at home.  Some of the moderators came

1    into the office.  However, as moderation needs increased, so

2    did the need for direction.  This is where Mr. Ferrer really

3    came in with respect to how you moderate an ad that appears to

4    have something in it that may be problematic.  Take out words

5    or take out pictures.  The decisions continued to come from the

6    lawyers.  You will see and the government will show you many,

7    many printouts, many PowerPoints, many attachments to emails

8    that list descriptions of words.  You saw them during

9    Mr. Jones' opening statement.  This word is out; that word is

10   out; that word is out; that word is out; can't do that word;

11   can't do these words in conjunction with other words.  All of

12   that got developed by Mr. Ferrer and the lawyers.

13          Now, you know, lawyers -- I'm not going to apologize

14   for lawyers.  I'm one of them, but the fact of the matter is,

15   when you are not a lawyer and you are working in the context of

16   something that involves legal reference, legal statements,

17   legal help, you tend to follow that which is exactly what my

18   client did throughout the time that he worked for Backpage --

19   go to the lawyers or go to the boss.

20          So here's the development.  Moderation, please

21   understand, constantly developed and I'm not going to go into

22   the actual of bits and pieces of it, but I'm going to divide

23   this into two steps.  First, as it began to develop, there were

24   meetings with Mr. Ferrer and the lawyers.  The attachments that

25   Mr. Ferrer sent out were discussed with the lawyers.  There

1    were seminars.  People would gather in a room.  They would show

2    these words up on a board:  These are good; these are not.

3    Now, they consisted of banned words or phrases, some of the

4    ones that were very obvious.  The goal here was to take out

5    that which could be problematic and leave in that that which

6    passed muster.  This was hard to apply many times, but there

7    were banned portions not only of words, but parts of bodies.

8           Then, at times, even Mr. Ferrer himself directed the

9    removal of an ad.  Next came Ms. McDougall.  Now we've got

10   something more structured.  And, remember, my client is not the

11   developer of the structure.  He's the implementer.  He is the

12   manager.  He's the person who is supposed to bring it about.

13   That's his job.

14          And Ms. McDougall came in, I think it was 2012.  She

15   remained at Backpage for six years.  Her theory was, and it was

16   put into operation, if an ad had bad language, sex for money,

17   it was out.  The whole ad, gone.  Don't even bother to fool

18   with it.  Just don't let it pass.  If the image was bad, too

19   much was exposed, take the image out.  Let the rest of the ad

20   go.  That's what my client followed.  The ad in that case would

21   run.

22          In the whole context of this, in the thousands,

23   millions of ads that were posted, my client did not know the

24   posters.  He didn't know their backgrounds.  He didn't know

25   their locations, for the most part, except to tell from an ad,

1   and he didn't know their associations.  To him, this was a job

2   that required someone to have some oversight and try to put it

3   into practice.  Not the standards; the job.

4           Now, you've heard talk from my colleagues about the

5   commitment that Backpage had to law enforcement.  This was

6   designed to prevent underage exploitation.  And it was part of

7   Mr. Padilla's job and also part of his assistant, Ms. Vaught,

8   to determine whether there was a reason to refer an ad to

9   NCMEC, and this is how it worked.  There was no prohibition on

10  the moderator looking at an ad and deciding it's got to go to

11  NCMEC.  This is even before the ad got into the newspaper.

12  Send it to NCMEC.  They understood that.  That was part of

13  their prerogative and they had the right to do that.  Nobody

14  ever stopped a moderator from sending an ad to NCMEC.

15          If a moderator could not determine or felt insecure

16  about the issue -- is this for child exploitation? -- they were

17  free to come to Mr. Padilla and Ms. Vaught and, indeed, they

18  did.  And then, they, Mr. Padilla, would refer the ad to NCMEC

19  or tell the moderator "Go ahead and do it, it's okay."

20          There were also complaints from third parties about

21  child exploitation.  These too got referred to NCMEC.  The

22  standards to refer a potentially child-exploitive advertisement

23  were set by the lawyers and, to some extent, by Mr. Ferrer.

24  The elements were was the photo evocative?  Did it look like

25  somebody was underage?  Pretty hard to tell.  Pretty hard to

1    tell.  Was there an age indicator in the advertisement?

2    Something like "17" or "near 17" or "just got out of high

3    school" or something like that, that would be a criteria.  The

4    degree of nudity was another criteria and the context of the

5    advertisement itself, whether it was clear that an underage

6    person was offering themselves for sex for money.  You know,

7    sex for money wouldn't have mattered whether it was an adult or

8    an underage person; that ad was gone.  This is how it worked.

9            I told you a little bit about how the referral was

10   made.  Backpage had a link set up to NCMEC.  If you were going

11   to refer an ad, as a moderator, up it went into the link and

12   over it went to NCMEC just as soon as you could post it.  There

13   were 24-hour-a-day access, seven days a week.

14           So if a moderator working at home doing the night

15   shift, which they did, saw an ad, they wouldn't bother to call

16   Mr. Padilla.  They didn't have to.  They would send it over

17   then, that evening, and NCMEC was theoretically going to act on

18   the ad.  NCMEC was only open five days a week from

19   approximately 8:00 to 5:00.  Sometimes those ads didn't get

20   over to the next stage until later on.

21           Here's the next stage.  NCMEC might refer that

22   advertisement to law enforcement.  Law enforcement, as

23   Mr. Bienert showed you, would then, in effect, either ask or

24   subpoena Backpage for the information with respect to the ad

25   because they wanted to investigate the potential of the

1    referral from NCMEC to a child who had been in danger.

2            Every single time, every single time they sent in a

3    subpoena or a request, it was fulfilled by Mr. Padilla's

4    section.  They had a standing custodian of records whose job it

5    was to go find the ad and the history of the ad and they would

6    send it to law enforcement.

7            In turn, law enforcement did what we've been calling

8    "attaboys":  "Great job, great job.  Thank you so much.  Best

9    compliance I've ever seen."  And, indeed, there were times when

10   Backpage would refer more than the ad to that particular law

11   enforcement person.  They might even give other indicia of that

12   ad or other background with respect to it.  This compliance was

13   within 24 hours typically.

14           Through all of this, through all of these attaboys,

15   Mr. Padilla was never told by law enforcement, not by the

16   Denver police, not by the Boston police, not by whatever police

17   department you cared to look at, "You're committing

18   prostitution."  He never heard that.  Through all of these

19   emails and all of these contacts, there was never one thing

20   that was said to him and not one thing, I venture to guess,

21   said to anybody over at that moderation unit anything about

22   committing facilitation of prostitution.  Indeed, whether it

23   was said in any other form besides an email, it just isn't

24   there.  Just isn't there.  So, as far as he is concerned, he's

25   operating apparently within the law.

1          Now, part of this case has been, during the opening,

2     contained a few items of emails that I think I need to set

3     straight.  First one is this email.  This was shown to you

4     during the government's opening.  Okay.  Here's the

5     advertisement or, sorry, the email.  It's Exhibit No. 56 in the

6     government's opening.  Just as they did with the other

7     defendants, they will put the picture of defendant on the ad.

8     It bears no longer saying this, it's repetitious, Mr. Padilla's

9     picture did not appear along with the email.

10         Here's an email dated October the 8th, 2010, and,

11    according to the government, it reads like this:  "Leaving

12    notes on our site that imply that we're aware of prostitution

13    or in any position to define it enough to" -- should be "is

14    enough to lose your job over."  This, as you can tell, has been

15    cropped.  The actual email is complete and I'll show it to you

16    in a minute.  "If you don't agree with what I'm saying

17    completely, you need to find another job."

18         There was not one mention of prostitution in the

19    PowerPoint presentation.  This was a presentation designed to

20    create a standard -- and this is important because they left

21    this in -- a standard of what images are allowed -- a standard,

22    a standard that you moderate, you could follow, and not allow

23    on the site.  That got left in.  Thank you.  If you need the

24    definition of "prostitution," get a dictionary.  Backpage and

25    you are in no position to redefine it, because we are dealing

with advertisements that are in the adult sector and what we
are doing is preventing an advertisement coming out for
prostitution.  The only way we can do that, according to what
we have been told, is if it's sex for money or something like
that, that type of thing.

        Let's look at the real email or -- in it -- in its
entirety.  Here's the first sentence under "Until further
notice, do not leave notes in users' accounts."  And, as you
can tell from this particular email, what the government showed
you was cropped.

        Next:  "Backpage and you, in particular, cannot
determine if any user on the site" -- should be "is" -- "is
involved with prostitution," and the reason is -- is that
unless, under the guidelines they have, the guidelines they
have, this is an ad for prostitution.  Otherwise, it's not our
business to define it.  Our business is to moderate it.  That's
the first email.

        The second email had to do with nudity.  Here we go.
This is an email, January 14th, 2011.  Again, Mr. Padilla's
picture appears.  What this says is "Nudity violations will
always be a part of this business and we shouldn't treat our
users unfairly because the company standard for propriety is
constantly changing."

        Here's the rest of the email.  First of all, let me
stop at the top of the email.  It's not just an email to one

1    person.  If you count the names on this email, it's from

2    Mr. Padilla, courtesy copy to Ms. Vaught.  There are some 40

3    names in this particular email.  They are all moderators and

4    here is what he is saying in its entirety.

5         First, down to the part that starts "Andrew Padilla

6    wrote":  "Backpage will be increasing the restrictions on

7    images in adult categories effective immediately. It will be

8    increasing the restrictions on images."

9         Second, "The latest changes apply specifically" -- and

10   then you can read what it applies to -- "bare breasts, butt

11   cleavage and sheer clothing."  He is now giving as much

12   guidance as he can to the changing evolution of the nudity

13   guidelines.  That's his job.  Not to develop the standards, but

14   to put them out.  Thongs are still acceptable for bottoms, but

15   they must be worn, so on and so forth.

16        The old rule supersedes this.  If genitalia is

17   otherwise exposed, out.  That is, if a thong is being worn

18   properly, but anything is visible or bulging out of the crotch,

19   it is still a violation.

20        This may not be a standard that's particularly

21   appealable in the sense of looking at things and being

22   judgmental about them.  That's not his job.  Nor was it the job

23   of Backpage because, as you have heard, these attorneys who had

24   preceded me have made a great point about what it means to be

25   able to publish in accordance with First Amendment and

1    Section 230 of the statute that was quoted quite thoroughly by

2    counsel.  They had the right to do this.  What they're trying

3    to do is do it in such a way that this all will pass muster and

4    there will be no worry about facilitation of prostitution.

5         Then it goes on to talk about sheer clothing is still

6    allowed and so forth.  And then at the bottom -- at the bottom,

7    it says:  As always, you should only be redacting content and

8    not deleting the entire ad when you find these violations.

9    These violations are completely different from ads for illegal

10   services.  This is a different type of advertisement.  Adult

11   content.  Nudity violations will always be a part of this

12   business and we shouldn't treat our users unfairly because the

13   company's standard -- not his, but the company's standard,

14   according to what has been properly set by the lawyers, is

15   constantly changing.  If, however, you run into ads that

16   endanger a minor in any way, Community Remove the ad and send

17   the ad URL to Joye.

18        "Community" may be a misnomer, but the idea is there.

19   Remove the ad, send it to Joye Vaught.

20        You didn't get any of that when the government opened

21   its case.

22        So what about Mr. Padilla's intent?  I think I've

23   captured it.  I've tried to capture it for you as best I could.

24   His intent was to accomplish his job.  For him, this was a good

25   job.  He had a job that he enjoyed doing because he was

1    responsible for putting out the newspaper.  His job was to

2    screen ads to comply with known but evolving standards by

3    conforming those standards which would be acceptable to the

4    escort business, the massage business and other forms of legal

5    adult entertainment.  These are standards not that he

6    developed.  He didn't set them.  They were set by Mr. Ferrer

7    and by the lawyers.  His intent was not to post ads or to cover

8    up for prostitution.

9            That, ladies and gentlemen, is my client in a

10   nutshell.  You know, if you really wanted to pedal prostitution

11   and facilitate it, he wouldn't have banned anything.  Let the

12   ad go in.  Let the money for sex go in.  Let it ride.  He

13   didn't need to ask for pay based upon the volumes of ads that

14   he could have put out.  He never did that.  Or he could have

15   gone off in some hut someplace in a remote area and done his

16   thing.  Didn't do that.  Worked in an office building

17   surrounded by several other people who were in that moderation

18   group.

19           So, ladies and gentlemen, as you go along and you

20   listen to all of this, keep in mind that, from his perspective,

21   what he was doing was to try to make the system work just like

22   every one of these other defendants was trying to do:  Make it

23   work so that it could properly publish in accordance with the

24   rules and regulations and the ideas that he and others were

25   operating under.

1          Thank you.

2          THE COURT:  Ms. Bertrand?

3          MR. BERTRAND:  Your Honor, I'll be using the Elmo

4  during the presentation.

5          THE COURT:  Okay.

6              **OPENING STATEMENT BY MS. BERTRAND**

7          MR. BERTRAND:  Good afternoon.  My name is Joy

8  Bertrand.  And it's easy to keep us straight, as I said in voir

9  dire, because my client's name is Joye, Joye Vaught.  And

10 Ms. Vaught was Andrew Padilla's subordinate at Backpage.  We'll

11 talk about that in detail this afternoon.

12         Let's start with reasonable doubt.  And lawyers use

13 these words a lot, hear them on TV.  They have weight; they

14 have power.  And I'm going to leave this up here and refer to

15 it while we're talking.

16         What we don't talk about well is what is a reasonable

17 doubt.  And it's a juror, using reason or logic, could believe

18 that a doubt may be there, that there is a possibility of a --

19 of another version of the facts and other interpretation of the

20 facts than the prosecution asserts.  And it's their job in this

21 prosecution to rule out doubt.  And this may be doubt that the

22 lawyers suggest to you.  It might be doubt that you raise in

23 your own thoughts as you listen to the evidence.  But they have

24 to rule it out.  If they don't, there is only one verdict and

25 that's a "not guilty" verdict.

1          We talked in voir dire about some people -- some

2     people feel the system makes it too hard to convict.  It's

3     supposed to be hard.  Our Founding Fathers wanted it to be

4     hard.  So don't -- don't feel bad about holding them to the

5     high standard.

6          A doubt is any possibility that, if true, defeats any

7     element of the crimes that they have to prove.  And here

8     Ms. Vaught is in a little bit different situation.  Mr. Padilla

9     -- here Mr. Padilla are different in this case in that they

10    face none of the money laundering charges.  They only face the

11    conspiracy charge and the counts of specific facilitation of

12    prostitutions.  I'm not going to address the money laundering.

13    That's not anything we can respond to.  But I will talk about

14    the two crimes and what the government, the prosecution, has to

15    prove here -- every element beyond a reasonable doubt.

16          So, first, conspiracy.  Conspiracy is a fancy name for

17    an agreement, an understanding.  And a criminal conspiracy has

18    an intention behind the agreement to do something illegal.  You

19    can be -- you can conspire to commit arson.  You can conspire

20    to commit homicide.  You can conspire to do any crime, but you

21    have to have more than one person and everyone has to know

22    they're in this agreement.

23          The next thing that the government must show is that

24    this agreement was to do something illegal and everyone was

25    on -- had some understanding that this had an illegal intent to

1    it.

2         So I can conspire to throw a surprise birthday party

3    for somebody.  That's legal and there's nothing wrong with

4    doing that.  The word "conspiracy, the word "agreement" here

5    does not have any sinister meaning.

6         And then, lastly, someone has to do something in

7    furtherance of the agreement.  And that's what each of these

8    elements, the prosecution is going to show up wanting here.

9         So, first off, the government is going to have to

10   prove beyond a reasonable doubt that Ms. Vaught knew there was

11   an agreement to do anything and that there was an agreement.

12   An agreement to do what?  She's low on the totem pole here.

13   We've got powerful, powerful people running a huge

14   organization.  And, like many employees in huge organizations

15   at the bottom of the totem pole, they're not going to be

16   brought in to all of the understandings that the other people

17   have.  Here there's not even an agreement to break the law.

18        What we have is a newspaper going out of its way to

19   comply with the law and to make sure it's following the law.

20   And you're going to hear evidence in this case that Backpage

21   spent millions of dollars on moderation.  And, when Craigslist

22   shut down, it was a tsunami to Backpage, and Backpage answered

23   that by hiring more moderators, people working 24 hours a day,

24   working at home, working in other countries, just to process

25   these ads.

1        And, like Mr. Eisenberg said, they could have said

2    "Hey, you know what, let it roll.  Free speech.  Have at it."

3    They didn't.  They saw the responsibility with having this

4    forum and they accepted the responsibility and went out of

5    their way to make sure they were compliant.  And Ms. Vaught is

6    on the ground floor of this organization working with the

7    moderators and trying to keep all of this moving and trying to

8    make sure that they're each being careful.  So you're not going

9    to hear evidence that Ms. Vaught intentionally joined anything.

10   She was policing the ads and policing the moderators.

11        The evidence also will show that Ms. Vaught took her

12   job very seriously.  Some of the emails mentioned yesterday,

13   taken a little out of context, but there's two here, for

14   example.  Both -- these are within three months of each other.

15   Ms. Vaught was the supervisor for Colleen and she cc's Andrew,

16   her boss, on this.  She is warning Colleen to get her act

17   straight in moderating.  And she says, on February 27,

18   "Colleen, I am going through your work from last night and

19   finding some pretty bad violations in the ads you approved.

20   Please slow down and read carefully.  There isn't much room for

21   mistakes."  And then she gives the examples of the ads that

22   should not have been let through.

23        Colleen continues to miss and, in April 2014,

24   Ms. Vaught again writes to her.  She's putting this in writing.

25   She's putting her on notice, cc's Mr. Padilla:  "Hi, Colleen.

1    The number of ads you viewed last night was a lot higher than

2    normal and there was no action taken on any of them.  I found a

3    bunch of violations that were missed.  Here are a few examples.

4    This is a warning, Colleen.  Slow down and pay attention to the

5    ads closely.  This is the kind of thing that can get someone

6    fired."

7            And the way that -- you'll hear that the way

8    Ms. Vaught was able to kind of initially tell who is doing

9    their job and who isn't was by how many ads they went through

10   in a shift and, if they went through too many, if they let too

11   many through, Ms. Vaught knew they weren't paying attention or

12   they were just scrolling through.  So when she saw someone

13   whose numbers were off, she went in and checked herself and

14   told employees "Knock it off.  Take this job seriously."

15           The other way that we know Ms. Vaught took her job

16   seriously is that she interfaced with law enforcement.  She saw

17   her job at Backpage as being an arm of law enforcement.  And,

18   like you've seen, they had a reason to trust the police.  They

19   had a reason to trust these law enforcement officers that were

20   saying "Thanks, we couldn't have done it without you.  Great

21   turnaround.  Thanks for helping us find a really bad guy."

22           Ms. Vaught and her colleagues were invited by law

23   enforcement to speak at conferences.  That's someone who takes

24   her job helping law enforcement seriously.  That's not someone

25   joining a conspiracy to violate the same laws she's going to

1    work every day to make sure are not violated.

2         We also have Ms. Vaught's interaction with the

3    National Center for Missing and Exploited Children.  So she was

4    the person who had to cull through all of these materials that

5    would be sent to the Abuse at Backpage.com email.  Third

6    parties could be people perusing the site, saying "Hey,

7    something looks wrong with that.  Send that to Abuse."  Other

8    customers of Backpage could send reports of potential abuse.

9    And that created a lot of extra work for Ms. Vaught to sort

10   through.

11        And then there were the people that the moderators

12   observed in these ads that looked like they were underage.  And

13   you're going to hear in this trial that Ms. Vaught played it

14   safe.  She erred on the side of caution and she said anyone

15   that looks under 21, not under 18, goes to NCMEC.  And you're

16   going to hear testimony NCMEC at one time finally said "You

17   guys are flooding us with so many reports."  That's not someone

18   joining a criminal conspiracy to perpetuate the same crimes

19   she's going to work every day to stop.

20        You're also going to hear -- because this is a

21   specific intent crime, we do get to talk about people's

22   character, and you're going to hear Ms. Vaught had many reasons

23   to make sure that she was doing her job well, that she was

24   following the law.  She had demanding family obligations and

25   this job helped her take care of her family.  She was not going

1    to do something to jeopardize this.

2          Much like Mr. Padilla, she grew up on the west side.

3    She's got a high school diploma.  She's super-bright, and she

4    works.  She works really hard.  And this job, with that level

5    of education and this level of responsibility and status, made

6    her proud.  She was proud of working for Backpage and working

7    in the moderation section and helping law enforcement.

8          So that's the conspiracy.

9          Ms. Vaught and the other defendants are also charged

10   with distinct acts of allowing ads to go through and, by

11   allowing those ads to go through, to facilitate prostitution.

12   And here's where the government is going to really have

13   difficulty ruling out alternative options.  First, they've got

14   to show this is a specific intent crime.  So the prosecution

15   has to show that each one of these defendants looked at each

16   one of these ads.  You saw a couple of them posted:  "It's the

17   journey, not the destination" lady who is 44 in the nightie.

18   Each one of them saw the ad, said "That is prostitution and

19   I am going to assist."

20          MR. JONES:  Objection, Your Honor.  Argumentative and

21   misstates the law.

22          THE COURT:  The objection is sustained.

23          MR. BERTRAND:  They have to show they knew those ads

24   were for prostitution and that it was prostitution in the

25   jurisdiction where the ad was running.  So on top of it all,

1    they've also got to know how many dozens and dozens of local

2    laws to make sure that this one in Sacramento fits the

3    Sacramento definition versus the Seattle versus Wichita Falls.

4    And they had to know they were breaking the law when they

5    allowed the ad to run.  They can't.

6            The government, the evidence will show, will not be

7    able to rule out that they never saw these ads of the millions

8    that ran every day.  And, if they did, as Mr. Bienert pointed

9    out, they're all for legal conduct.

10           When we talked about, in voir dire, reasonable doubt,

11   which is the standard they must meet, it's high.  And in this

12   chart, you see there's all different gradations of belief and

13   acceptance of facts from "I believe they didn't do it

14   completely" to, in the middle, "it's possible, more likely than

15   not."  Okay.  Then you get into "I think it happened.  I have a

16   strong belief that it happened."  But it is not until we get to

17   reasonable doubt that you can convict.  Anything short of

18   reasonable doubt requires acquittal.

19           And here is the example I will leave with you:  We

20   measure risk.  All of us measure risk all the time.  And recall

21   the Tylenol incident in the eighties where cyanide was found in

22   maybe three bottles in all the United States.  That's why we

23   have to have those foil caps and all that stuff on our jars

24   now.  It's a couple years after that, and you or one of your

25   family members has a raging headache and you go to that

1   medicine cabinet and you say "Hmm, I don't know how long this
2   Tylenol's been sitting here."  Do you take it?  That's
3   reasonable doubt.  I ask you to keep that in mind throughout
4   this trial and hold them to their burden.  It never shifts.
5   The job always remains with them.  And if they cannot meet
6   reasonable doubt, the only option is to acquit these
7   defendants.
8           Thank you.
9              OPENING STATEMENT BY MR. CAMBRIA
10          MR. CAMBRIA:  May it please the Court, fellow counsel,
11   ladies and gentlemen of the jury:  My name is Paul Cambria.
12   I represent Michael Lacey.
13          Michael, please stand.
14          Michael's wife, Jill, is here.  Michael's sons, Colin
15   and Roarke, stand please.  They're here for support.  And --
16   thank you.
17          And I'm here to talk about what I believe the proof
18   will show and will fail to show.  And Her Honor is here, of
19   course, to tell you what the law is at the end of this case.
20          This case is about knowledge.  It's about intent.
21   They have to prove that each of these defendants intended to
22   further a prostitution business, advertise through these ads
23   that they have listed in this indictment.
24          Let's put some things into perspective.  The proof
25   will show that there are millions and millions of ads during

1    the years that are covered in this indictment.  They have found

2    50 out of millions and millions that they claim demonstrate a

3    violation of the law and are part of their case.  Millions and

4    millions.  Just think about that for a second.

5            The other thing is this:  You heard from Mr. Bienert

6    about some of the history of our clients, of Mr. Lacey and

7    Mr. Larkin.  You know, some people hide behind the First

8    Amendment and some people believe in the First Amendment.  And

9    they believe in the First Amendment and the proof will show

10   that they're the real deal.  You heard Mr. Bienert refer to the

11   fact that there was a time, as you know, they formed these

12   various newspapers in the seventies when they were Arizona

13   State students.  They eventually had several newspapers, 17

14   around the country, and they specialized in being different in

15   the sense that they wrote about things that traditional

16   newspapers tried to avoid, things that were controversial,

17   things that criticized public officials.  And, indeed, they

18   criticized a local police enforcement official and he decided

19   to retaliate against them by arresting them the middle of the

20   night, putting them in jail, and these gentlemen began their

21   First Amendment voyage, if you will.  They fought back.  They

22   sued.  They won approximately three and a half million dollars.

23           The prosecution would have you believe here that money

24   is their driving force, that that's why they're doing all this,

25   and all this helping of the police and so on is just a cover.

1    Well, they took the three and a half million dollars that they

2    earned in that lawsuit, they donated it to local Hispanic

3    community groups of all political stripes and academic

4    institutions that were opposed to racist and discriminatory

5    political tactics.

6         They also spent millions of dollars, if you will,

7    helping an organization called Children of the Night.  It's a

8    nonprofit.  It helps women and girls who have been trafficked,

9    and they spent millions of dollars on that.  They saved a

10   historical building here at a cost of several million dollars.

11   This was the Booker T. Washington School at the time.  They

12   saved that.  So the proof will show that money doesn't drive

13   them.  They are the real deal.

14        And the reason why they have not buckled and said "Oh,

15   yeah, we'll close the adult section" -- because that's what

16   Craigslist did.  Craigslist was threatened and they closed the

17   adult section of Craigslist.  Didn't do any good.  The proof

18   will show without a doubt that the wrongdoers, the abusers,

19   simply moved to another section of Craigslist or moved to

20   Facebook or moved to TikTok or moved to one of the others.

21   You'll see.  But these gentlemen said, no, wait a minute, there

22   are millions of people who are posting ads on Backpage that

23   have nothing to do with criminal activity, whether it be a job

24   or a couch or a car or what have you or a striptease or

25   something like that in the adult sector that's legal.

1          When the federal government in 2018 came in and closed
2    Backpage.com and seized it, all those millions of people who
3    posted ads that had nothing to do with adult in any way had
4    their voice silenced.  And so these men feel and believe with
5    their hearts and their soul that the answer is not to ban the
6    website.  The answer is to use the website as a tool to fight
7    the wrongdoers.  The wrongdoers are the pimps, the people who
8    prey on others, the ones who violate the law.

9          There are wrongdoers in everything and every aspect of
10   life.  Think about it.  There are people who abuse telephones
11   to commit crimes.  They're wrongdoers and they use telephones
12   to commit crimes.  There are people who use the mail to commit
13   crimes, use the U.S. government's own function, the mail, to
14   commit crimes.  There will always be those people.

15         So the question then becomes do you eliminate the
16   websites, the phones, the mail because there are abusers or do
17   you join with the authorities and identify these people and
18   prosecute these people?  And that's the program that they
19   adopted.  And they were advised by their attorneys and others
20   that, if you shut down the adult section, like Craigslist,
21   they're just going to move to something else.  And Craigslist
22   they moved over to the dating sections.  You're going to see,
23   the proof is going to show, that even Facebook now is being
24   used to market people, if you will.  TikTok is, Tinder,
25   Twitter, a number of others -- they're all being used by the

1    abusers.

2              These people who sit here today never met one single

3    person who ever posted an ad on Backpage.  They never forced

4    them to write an ad.  They didn't force them to engage in any

5    kind of conduct that would violate the law.  They didn't share

6    in any funds that they may have made as a result of charging

7    people for their services.  They didn't do any of those things.

8    They sold an ad.

9              Now you're going to learn from some of the witnesses

10   here that, you know, this whole internet thing at the time that

11   Backpage was created was in its infancy.  Everybody was

12   learning what to do with it.  I mean -- and you can draw on

13   your own experience.  You know, you start off and you have a

14   Facebook page and you're lucky that you were able to put it on

15   your phone.  And then one of your kids, like one of my six

16   daughters, comes up and goes, "Oh, hey, Dad, do this, push

17   that," and you find out all these great applications that are

18   on it, right?

19             Well, when they form this -- and understand there's

20   only one person who came up with Backpage, and that was

21   Carl Ferrer.  It was his baby, okay.  Carl was an ad man.

22   That's what he did.  He sold ads.  He learned how to, you know,

23   create more ads.  This was his thing.  That's what he did.  And

24   so it was in its infancy at that time.  And that means that,

25   you know, everybody got some experience as to how they would

1   start to abuse it, what would they do.  If you banned a phone

2   number in numbers, they'd write it out -- t-w-o, t-h-r-e-e --

3   that sort of thing.  Okay.  And these things kept happening.  A

4   lot of the websites did nothing to help the authorities

5   identify and prosecute the actual abusers.

6        Now, there'll be one thing that is beyond dispute:

7   Mike Lacey is a newspaper man.  He's identified all over this

8   case as an editor and a writer.  That's what he did.  He wasn't

9   a Backpage guy in the sense that he is no computer guy.  Yes,

10  he was co-owner of the parent company that owned Backpage, but

11  Backpage was created by Carl Ferrer.

12       Mike never took any ads.  Mike didn't do anything with

13  moderation or anything else, all these other things.  He didn't

14  develop any of the day-to-day protocols or any of that other

15  stuff.  He was the newspaper man.  Remember, they still had the

16  newspapers up until a certain period of time.  And you will see

17  from time to time through this case that he -- he appears, if

18  you will, when somebody says something that's an exaggeration

19  or is not true or whatever, Mike weighs in and writes an

20  article or contributes to an article or something.  That was

21  his thing.  He's a newspaper man.  Never changed from being a

22  newspaper man.  Backpage was the creation of Carl Ferrer, and

23  Carl was the hands-on person, and it will be obvious.

24       Their first witness they're going to call is somebody

25  who is going to tell you that he called Backpage to say that a

1   certain ad was to be removed because it was for prostitution.

2   Now he's a police officer who happened to post that ad.  And

3   who answers?  Carl Ferrer.  And, as he's talking to this

4   witness, he can hear the keys typing.  Carl is that hands-on

5   with Backpage.  That's what he does.  And he finds the ad and

6   so on and so forth.  This was Carl's baby.

7           The newspapers -- and again, to show you the

8   genuineness of these gentlemen as newspaper people, they won

9   over 3,800 awards including the xxx Pulitzer Prize for a

10  critical article.  That's the real deal.  These are real

11  newspaper people, and that's where Mike lives.  He's a

12  newspaper man.

13          He -- the first time he ever saw these 50 ads was when

14  these charges were filed and he was shown the ads and the

15  indictment.  He just didn't have anything to do with the

16  day-to-day operation of Backpage.  However, he was told

17  repeatedly by Carl Ferrer and a number of attorneys that Carl

18  and others had hired to advise them as to how to -- how do you

19  preserve the First Amendment for all the people that have now

20  been deprived of that when the government shut them down?  How

21  do you preserve that and, at the same time, not promote the

22  abuser's activity?

23          And a number of attorneys advised them.  A number of

24  court decisions.  You saw today Mr. Bienert referenced a number

25  of court decisions that you'll hear about where the courts

1    agreed that the First Amendment applies and that certain things

2    who maybe to the untrained appear to be something questionable,

3    it turns out that they're not and they're fully protected.

4            Example:  You'll hear testimony that these so-called

5    abusers, the pimps, they would post a picture of a total

6    stranger that they didn't even know, that they would just lift

7    off of the Web and they would post that picture and that would

8    be of a younger-looking person, and it was only done by them to

9    try to get people to acquire the ad, if you will.  And then

10   when the person who answered the ad went to the door, the old

11   maid card was there.  I mean, it was a whole different deal.

12   And so now you know that you can't rely on the pictures.

13           In fact, some of the witnesses will testify that

14   Backpage was very, very, very proactive in reporting anybody

15   they thought was under 25 years of age, and they would report

16   them to NCMEC.  And NCMEC is National Exploit -- National --

17   I'm sorry -- National Exploitation of Children.  And what it

18   meant, it was an organization that would report to the police.

19   So, for example, if somebody at Backpage thought that an

20   individual looked like they were under 25, they would report

21   them to NCMEC and then it would be up to the NCMEC

22   organization, or NCMEC, to follow through and to send that to

23   the appropriate legal authority, to the appropriate police, if

24   you will.  National Exploitation of Missing Children --

25   Exploitation and Missing Children.  NCMEC.

1          And, indeed, you'll find out that, at one point in

2     time, Mr. Lacey and others happened to have a meeting with the

3     NCMEC people and Mr. Lacey was upset because he felt that they

4     were not spending 100 percent of their time trying to take care

5     of children as opposed to veering off into some other area, if

6     you will.

7          So now we look at Backpage and say to yourself, all

8     right, they have to prove beyond a reasonable doubt that they

9     were facilitating this illegal conduct, this prostitution, in

10    violation of state law, whatever state it was in, this

11    prostitution business.  They'd have to, number one, know about

12    it and, number two, specifically intend to advance it.

13         Well, think about this for a second.  If you're

14    Mike Lacey and you're being told by the person who runs it day

15    in and day out we are spending millions of dollars collecting

16    information for the authorities, we are providing paper trails

17    to the authorities so they can prosecute the actual wrongdoers,

18    the pimps and so on, we are spending money to send our

19    employees to court to testify in prosecutions and to convict

20    people who are abusing your website -- and, indeed, the proof

21    will show that they did, indeed, send those people.  They did,

22    in fact, testify and those individuals were, in fact,

23    convicted.  And if you were a reasonable person of reasonable

24    intelligence -- and I submit that Mike Lacey is -- and you were

25    told we have a number of lawyers who are skilled in the

```
 1    First Amendment area and in the criminal area, some former
 2    prosecutors and so on, and they have advised us that we --
 3              MR. JONES:  Objection, Your Honor.
 4              THE COURT:  What's your objection?
 5              THE COURT REPORTER:  I'm sorry.  Mr. Jones, I didn't
 6    hear you.
 7              THE COURT:  Mr. Jones, the court reporter couldn't
 8    hear you.
 9              MR. JONES:  Sorry.  He's misstating the law,
10    Your Honor.
11              MR. CAMBRIA:  I didn't state the law, Your Honor.
12              THE COURT:  The objection is overruled.
13              MR. CAMBRIA:  Thank you.
14              -- and that you have hired lawyers who specialize in
15    this area and they have advised you how to do these things
16    lawfully and not be somebody who is advancing or promoting.  So
17    think about the website and ask yourself, as we go through this
18    case, if this is promotion or if this is prosecution.
19              Number one, they had a warning section on their
20    website that said, if you are underage or you have something to
21    do with someone underage, you are subject to being punished or
22    prosecuted.  They have on their website, on Backpage, a place
23    where you can report if you think somebody is abusing Backpage.
24    Just anybody now.  If you think, when you read their ads,
25    somebody is abusing someone, you can hit that and report them.
```

1    They have public service announcements on Backpage indicating
2    that there's severe criminal penalties for violating the law.
3    They have a specific manual, if you will, that they developed
4    for the police to tell the police how they can get information
5    from Backpage quicker so that they can use it to prosecute the
6    wrongdoers.  They have a manual that they put together and they
7    show the police how they can have a quick turnaround for
8    information.  Not only that, but they, on their own, develop a
9    program where they -- if the police say "We're interested in
10   this ad," they then, through their program, are in a position
11   to show that ad is connected with several other ads and they
12   then give all those to the police.

13           They also, the proof will show, have advised the
14   police, listen, there are abusers on other websites out there.
15   There are abusers on Craigslist and all these other places and
16   here's where they are.

17           And then the police have used Backpage to create
18   so-called sting ads where they would make up an ad, make it
19   appear to be an ad for prostitution.  Backpage, as it turned
20   out, the proof will show, took it right down and they had to
21   call Backpage and say "No, no, put that back up.  That's our
22   ad.  That's a police add.  We're using you to catch the
23   wrongdoers."  And Backpage put the ad back up.

24           So, now, if you're a normal, ordinary, regular person
25   and you're being told by Carl Ferrer and those running the

1    day-to-day business that all these things are being done,

2    including people being convicted and sent to jail as a result

3    of witnesses that you paid for to go to court, would you

4    believe that you are promoting criminal activity or you are

5    helping to identify the perpetrator, identify the bad people

6    who are abusing the system?

7           The internet is not going away.  You can say to

8    yourself all day long that, no matter what system you have,

9    there will always be somebody who will figure out how to go

10   around it.  It's just the nature of the beast, the nature of

11   the beast.  But if you do the best you can to help the

12   authorities to not promote it, but to detect and punish those

13   who are abusing it, you aren't promoting prostitution.

14          There are a couple of schools of thought here.  You're

15   going to hear from some groups that say, ah, well, we told

16   Backpage that there were prostitution ads on their site and

17   that they should close it down.  And that's one school.  Okay.

18   They like to talk about it.  They're the desk people.  Okay.

19   They make speeches.  They write articles and they tell you

20   what's good for you, okay.

21          Then there's a second camp, and those are the police

22   authorities who are in the trench actually making a difference.

23   Actually making a difference.  And they say we want you.  We

24   want to use you.  We want to use the internet to fight the

25   people abusing the internet.

1          You'll find out that the FBI didn't want Backpage

2   taken down.  You'll find out that, once Backpage was taken down

3   and closed, not only did those millions of people who said

4   nothing that was against the law get silenced, but what

5   happened is the bad people, if you will, went to other

6   websites, some overseas outside the jurisdiction of the U.S.

7   What does that mean?  That means that, when police authorities

8   issue a subpoena to them, they're like, "Hi we're not in

9   America, sorry. (Imitates sound.) Here's your subpoena."

10          Mr. Bienert read some attaboys today, so to speak,

11   where police agencies said, "Wow, we can't believe how you

12   responded to us so quickly."  We had some police agencies that

13   said, "You are our partners."  "Our partners."  So I ask you,

14   you have to have the intent to commit the crime.  You have to

15   intend to make it go forward.  If you had Mueller, the head of

16   the FBI, thanking you for what you're doing -- and that's the

17   proof that will be in this case -- and you have over a hundred

18   police agencies thanking you, calling you their partner and "we

19   couldn't do it without you," would you for one second, as a

20   reasonable person, think that you were promoting crime as

21   opposed to fighting crime?

22          And, of course, they want to dismiss all this.  You

23   heard the comments:  "Oh, this is just a facade.  This is a

24   facade.  They're waving the First Amendment and they're telling

25   you all this stuff that they did just so they can keep the

1   money rolling.  That's their thing."  Well, you know what?

2   You're going to find out.  Millions of dollars.  And not just

3   one or two things, but, like, 10 different things.

4           Oh, and then there's the -- you heard in the opening

5   comments, well, if you have a so-called possible prostitution

6   ad and it has a word in it or words that indicate or may

7   indicate prostitution, and you take the words out and you post

8   the ad, it's still prostitution.  No.  Think about it.  If

9   those words are words that somebody who wants to commit a crime

10  are looking for and they're gone, that person isn't going to

11  commit a crime because the word that would have enticed them to

12  answer the ad is gone.  It's gone.  And so what you've done is

13  you've taken what's potentially an illegal ad and now you've

14  made it -- you've neutralized it.  You've made it something

15  that that person out there who may have tried to commit a crime

16  isn't going to respond to it.

17          Think about it.  If you had an ad that said handgun,

18  shotgun, rifle, machine gun for sale, well, we know machine gun

19  would be illegal, right?  So that would be an illegal ad.  Now

20  you take out the word "machine gun," what's left?  It's a legal

21  ad at that point because the very thing that might have

22  triggered some wrongdoer is gone.  It's gone.

23          So this case is about a number of people and whether

24  or not, based on what they were told -- and what was actually

25  happening, okay, so this wasn't just something where Carl said

| | |
|---|---|
| 1 | all the lawyers are telling us this and we're putting these |
| 2 | things on a website and we're sending people out to testify and |
| 3 | we're letting the police know all these other things.  No, that |
| 4 | was actually happening.  That was happening.  That wasn't just |
| 5 | talk. |
| 6 | And people like Mike who aren't involved in the |
| 7 | day-to-day Backpage, why not rely?  Is that unreasonable to |
| 8 | rely on?  And you saw Mr. Bienert showed you some excerpts from |
| 9 | a number of different statements from police authorities. |
| 10 | You're going to find out that those actually happened. |
| 11 | So, now, if you're a regular, ordinary individual, |
| 12 | reasonable intelligence, and you're told that all these police |
| 13 | agencies are thanking you, do you think you're intending to |
| 14 | further illegal activity or are you helping to detect it? |
| 15 | So the First Amendment's preserved so that all those |
| 16 | people that I talked about when they shut Backpage down and all |
| 17 | the people that were posting for jobs and all the rest of it, |
| 18 | they all got silenced, well, Backpage and those people and all |
| 19 | of us are protected by allowing a website, but using the |
| 20 | website to detect and to punish the violators because, if |
| 21 | that's -- if that's the way it goes, everything has some |
| 22 | violator someplace.  We're going to get rid of everything? |
| 23 | So here's the situation.  I have -- there's one |
| 24 | particular count here that's different, that's -- that only |
| 25 | involves Mike Lacey, and this is a so-called concealment money |

1    laundering count.  And I'm going to tell you what the evidence

2    is here and, in the end, say this is ridiculous, okay.  And

3    here's what it is.  Concealment money laundering, the one thing

4    that it requires -- and Her Honor gave you this in the initial

5    instructions that we had -- it requires that money be moved or

6    whatever and concealed.  Very important: concealed.  Okay.

7    Very critical element: concealed.

8           Mr. Lacey established a trust for his two sons.

9    Several million dollars.  And because every time some

10   government investigator -- you heard Mr. Bienert talked about

11   Dart and how he tried to shut down Master and Visa and all

12   that, and that the minute that these authorities show up, the

13   bankers run for the hills because they just don't want to be

14   part of that, okay.

15          So Mr. Lacey wanted to put his money in a trust for

16   his sons in a place where, if some agent walked into a bank,

17   the bank wouldn't say "Oh, get out of here, take your stuff

18   back."  All right.  So at the time that he did it until this

19   very day, there's been no finding that that money is unlawful.

20   There is no order saying that he has to, in some way -- at the

21   time that he established his trust, there was no order that

22   said that he couldn't touch the money or do what he wanted with

23   it and so on.

24          So he hired lawyers.  They put a trust together.  They

25   sent the money to an investment group in Hungary.  You might

1    say, wait a minute, that's international.  But the crime is

2    concealment international money laundering.  And he never

3    concealed it because the evidence will show as follows:  He had

4    his lawyers and his accountants, in writing, notify the

5    United States government, through the IRS, exactly where the

6    money was, how much there was, who the beneficiaries were, who

7    the creator was, where the money came from, in writing.  Notice

8    to the U.S. government of all the details.  Concealment?

9    Revelation.  Not concealment.  Anybody can have money offshore

10   as long as they report that, and that's what he did.

11          And you will get to see the so-called FBAR which is

12   the form that you file that totally gives all the details of

13   the money transaction.  And that's going to be the proof as to

14   that count; that it was in no way concealed.

15          So now we get to sort of the situation where I told

16   you Mike is a writer.  He's an editor.  And, after the one

17   point in time, he said that Backpage actually made prostitution

18   transparent.  And what he meant by that, which is pretty

19   obvious, is that they kept records now of anything that they

20   suspected violated the law.  They turned those records over to

21   the police.  They -- oh, and here's another thing.  They talk

22   about charging for the ads, okay.  Guess where charging for the

23   ads came from?  The Attorney Generals met with Craigslist and

24   said to Craigslist "We want you to charge for these adult ads

25   because it will create a paper trail that we can find and, if

1    you follow the money, you find the people involved."  Okay.

2    And I can just hear them in their summation saying "Yes, follow

3    the money and it comes over here to these guys."  No.  Follow

4    the money for the people who abuse the website.

5            And so they asked -- the Attorneys General asked that

6    the ads be charged for, and so that's what Craigslist did.  And

7    the lawyers at Backpage said they want people to charge for the

8    ads so they have a trail, and that's what they did, and they

9    provided that trail to the authorities.

10           And you're going to find out that Carl Ferrer, the guy

11   with the keyboard running it day-to-day, they were responsive.

12   If, for example, any police agency called up -- and if they

13   called, by the way, they could get Carl directly because he was

14   the hands-on guy -- they either got Carl or they got

15   Liz McDougall who was the attorney for Backpage, the company.

16   And they would call, Carl would answer the phone, and the

17   police officer could say "This ad is prostitution.  Will you

18   take it down?"

19           And, in fact, we're going to find out that one police

20   officer tested whether or not they actually took it down, and

21   so he posted a fake ad and -- he posted two fake ads

22   actually -- one was for an old green couch and the other one

23   was supposedly a possible prostitution ad -- and then called

24   Carl and said -- well, first he called McDougall and got her

25   answering service.  Then he called Carl, got Carl and told

1    Carl, "Here's the ad.  Here's what it is.  I'm a police

2    officer, and it's prostitution."

3            And at one point, he was asked, "Well how do you know

4    it's prostitution?" because, when you see the ad, you see that

5    it in no way looks like that clearly.  All right.  And that's

6    one thing.  One thing for sure:  The only two people who know

7    for sure whether or not a prostitution act occurred are going

8    to be the two people who are in the room who -- somebody who

9    responded to the ad and met up with someone.  And a lot of

10   times, you're going to find out that the ad is totally legal,

11   but when the person gets to the room, they are then

12   propositioned in the room.  Well, that's not on them because

13   the ad was legal.

14           Anyway, so you're going to see where the police tested

15   out the system.  And so they said, "This ad's illegal."

16           And McDougall asks, "Well, what's illegal about it?"

17   Because when you see it, it doesn't look -- you know, it

18   clearly doesn't show sex for money.

19           And instead of saying, "Ah," (makes sound), he goes,

20   "Oh, well, that's secret.  I can't tell you that right now."

21   Yeah, because it was a legitimate question by the lawyer which

22   is "Wait a minute, I'm looking at this ad and it doesn't look

23   like it's illegal to me."  Okay.

24           So, anyway, he calls and gets Carl.  And Carl goes

25   "Just a second."  Hears a click-click-click.  Carl goes, "Oh,

1    yeah, I found the ad and you also posted a couch ad."  So, you

2    see, what they put in their system to link things, he found the

3    other ad.

4              And he goes, "Oh, yeah, yeah, yeah, you're right."  He

5    goes, "But we know, but I can't tell you how we know, but

6    that's prostitution ad."  Of course, it wasn't at all.  He made

7    it up.

8              And so Carl said, "Okay, we're taking it right down."

9              So now this police officer decided, well, we're going

10   to test the system here and see whether or not he just paid me

11   lip service or whether he really took it down.  And he goes

12   online and it's gone.

13             So he said, "Well, I'm going to try to repost it, only

14   I'm going to change a few things."  Changes it.  Guess what?

15   No ad.  Well, I'm going to either use a different address or

16   use a different city.  He tries three or four things.  The ad

17   never gets reposted.

18             So, if you were somebody all about money, take it

19   down.  As soon as it came up someplace else, hey, why not.

20   Didn't happen that way.  They took it down.  Took it down.  In

21   place, in place.  Guard, guardian things in place, if you will.

22             So now we get to this.  And by the way, when Carl is

23   in Dallas running this whole thing, Mike never left Arizona.

24   Mike is an Arizona guy, family's here, and never had a reason

25   to be going with Carl because, obviously, he wasn't the guy

1    that ran the website.

2           So now ask yourself this:  You're going to have proof

3    absolutely that, when Craigslist closed "Adult," the abusers

4    moved to "Women Looking for Men," "Dating," all this stuff.

5    And you're going to find out also that others moved overseas

6    and you're going to find out that others moved to Facebook and

7    they moved to Twitter and they moved to TikTok.

8           Well, right now what happened is, when they said --

9    the government -- "The abusers are on Backpage.  We're closing

10   Backpage," when the abusers moved to Facebook, are they going

11   to come in and close Facebook?  When the abusers moved to

12   Twitter, are they going to close Twitter?  When they moved to

13   TikTok, are they going to close TikTok?  When will it end?  Or

14   are these guys the real deal who say we can help you get the

15   ones responsible, the ones who are preying upon the young

16   women, who are forcing -- whatever they're doing, taking their

17   money.  And a lot of people are, you know, consenting people

18   who are doing this stuff for a living and so on.  Backpage

19   isn't trying to make them succeed.  Backpage is doing

20   everything that they were doing, everything they could, to help

21   the police.

22          So the very last thing:  If you're sitting here and

23   you have all these police agencies -- the FBI, the FBI's head

24   and everything else -- tell you what a great job you're doing,

25   do you have the knowledge and intent to commit a crime?

```
1   I think the answer is clear.  And I look forward to the
2   opportunity to share that again with you when we are done and
3   we've heard all the proof.
4           Please keep an open mind and understand that we will,
5   in fact, prove things in this case, even though we have no such
6   burden, because we're going to ask questions, bring things out
7   that we think you should know.  And we'll rely on you all to
8   come up with the appropriate verdict after you've heard
9   everything in this case.  These people are part of the
10  solution, the practical realistic solution, as opposed to
11  people who are trying to make crimes happen.
12          Thank you, ladies and gentlemen.  Thank you.
13          THE COURT:  Mr. Lincenberg, are you deferring?
14          MR. LINCENBERG:  Yes, thank you, Your Honor.  We're
15  going to reserve.
16          THE COURT:  Thank you.  We're going to take our
17  afternoon recess.  We'll come get you in about 20 minutes.
18          (Recess taken from 2:52 p.m. to 3:14 p.m.)
19          THE COURT:  We are back on the record with the jury
20  present.
21          Your first witness?
22          MR. KOZINETS:  Yes, sir, Your Honor.  Our first
23  witness is California Department of Justice Special Agent
24  Brian Fichtner.
25          (The witness, BRIAN FICHTNER, was duly sworn.)
```

UNITED STATES DISTRICT COURT

Fichtner - Direct                              49

| | |
|---|---|
| 1 | THE COURT:  Yes, you can take off your mask. |
| 2 | THE WITNESS:  Thank you. |
| 3 | DIRECT EXAMINATION |
| 4 | BY MR. KOZINETS: |
| 5 | Q.  Special Agent Supervisor Brian Fichtner, can you please |
| 6 | introduce yourself to the jury. |
| 7 | A.  Yes.  My name is Brian Fichtner.  I'm Special Agent |
| 8 | supervisor with the California Department of Justice.  I have |
| 9 | been employed with the California Department of Justice since |
| 10 | 1998. |
| 11 | THE COURT:  Special Agent, can you pull the microphone |
| 12 | closer to you?  We can't hear you. |
| 13 | THE WITNESS:  I apologize. |
| 14 | THE COURTROOM DEPUTY:  Do you want me to move it to |
| 15 | the other side since he's facing that way, if it reaches? |
| 16 | THE COURT:  I don't know if it will reach. |
| 17 | Just pull it closer to you. |
| 18 | THE WITNESS:  Okay.  Do you want me to repeat that? |
| 19 | MR. KOZINETS:  Sure. |
| 20 | THE COURT:  Okay, thank you. |
| 21 | THE WITNESS:  Yes.  My name is Brian Fichtner.  I'm a |
| 22 | Special Agent Supervisor with the California Department of |
| 23 | Justice.  I've been employed with the California Department of |
| 24 | Justice since 1998. |
| 25 | |

UNITED STATES DISTRICT COURT

1    BY MR. KOZINETS:

2    Q.   In 2015, did you work on a California Department of Justice

3    investigation involving Backpage.com?

4    A.   Yes, I did.

5    Q.   And when I refer to "Backpage," can I do that as a

6    shorthand for "Backpage.com"?

7    A.   Yes.

8    Q.   Are you familiar with how Backpage looked to the general

9    public in 2015?

10   A.   Yes, I am.

11   Q.   Did you create video recordings of how the website appeared

12   at that time?

13   A.   Yes, I did.

14   Q.   Before we talk about that further, I want to learn a little

15   bit more about you.  Can you tell us about your educational

16   background?

17   A.   Yes.  I attended college at the California State University

18   Sacramento.  I received a bachelor of science degree in

19   criminal justice.

20   Q.   And then you came to work for the California Department of

21   Justice.  What did you do initially there?  Did you attend some

22   sort of training academy?

23   A.   Yes.  Upon my appointment with California DOJ, I attended a

24   464-hour basic specialized investigators academy.

25   Q.   And upon completing that academy, did your position change?

1    A.   I was a Special Agent Training to begin with.   And then

2    eventually, after a year, I was appointed to a Special Agent.

3    Q.   What did you thereafter do, just very briefly, during your

4    time with California DOJ?

5    A.   My first assignment was with our Bureau of Narcotic

6    Enforcement.   I was with that bureau for several years until

7    I moved over to our Bureau of Investigation.   I was with the

8    Bureau of Investigation for five years and then moved to our

9    Bureau of Gambling Control.   From there, I was promoted into

10   the position I currently hold which is the department's

11   training coordinator for advanced training center.

12   Q.   Now, I understand that, at a certain point, you were

13   assigned to something called the eCrime unit?

14   A.   Yes, I was.

15   Q.   And when was that?

16   A.   I was assigned there when I moved to the Bureau of

17   Investigation in 2012.

18   Q.   And what year did you -- for how long did you work there?

19   A.   For five years until 2017.

20   Q.   What was the eCrime unit?

21   A.   The eCrime unit was the unit that was designed to -- or

22   focused on investigating multi-jurisdictional organizations

23   that utilized digital or electronic equipment or networks to

24   facilitate the crime.

25   Q.   What were your responsibilities when you were working at

1    the eCrime unit?

2    A.   I was an investigator for various investigations to include

3    Backpage.com.

4    Q.   And when you were assigned to the eCrime unit, did you

5    receive any specialized training on the collection of evidence

6    from websites?

7    A.   I did. I attended a few training courses.  One was a

8    40-hour investigative course of internet investigation of

9    crimes.  I attended a 24-hour course involving online social

10   networking where they also covered gathering of evidence.

11   I attended 32 hours of basic network investigations and also

12   digital evidence seminar with the California District

13   Attorney's Association.

14   Q.   And in the course of this training, were you trained on

15   tools to -- that you could use to record screenshots or

16   screen-captured videos from websites?

17   A.   Yes.  In the online social networking course, they provided

18   a tool.  It's called a FastStone capture tool that allows you

19   to record or capture screenshots or record video of the

20   screens.

21   Q.   Thank you.  Now, turning to Backpage for a moment, how did

22   you first become familiar with Backpage?

23   A.   Initially in 2014, I assisted with an undercover operation

24   that another agent conducted in our office.  I just assisted in

25   that investigation, but they did a sting operation where they

Fichtner - Direct                                   53

```
 1    contacted a number of people in the advertisements to set up
 2    dates and, basically, it's a prostitution sting.
 3    Q.  So when you say they contacted a number of people, were
 4    they contacting -- who were they contacting?
 5              MR. BIENERT:  Objection, Your Honor.  This is all
 6    hearsay.
 7              THE COURT:  The objection is overruled as to this
 8    question.
 9              MR. KOZINETS:  Thank you, Your Honor.
10    BY MR. KOZINETS:
11    Q.  When you assisted with this sting operation, what -- what
12    did you do?
13    A.  In the operation, the case agent and the undercover agents
14    would contact people in the advertisements in the Adult Escort
15    section of Backpage.com.
16              MR. BIENERT:  Objection.  Hearsay.  No foundation for
17    how he knows it.
18              THE COURT:  The objection is overruled.
19    BY MR. KOZINETS:
20    Q.  You may continue.
21    A.  Yes.  And once they contacted those people and those
22    advertisements, they would arrange to meet those individuals at
23    a hotel room.
24    Q.  And what happened when those meetings were arranged?
25              MR. BIENERT:  Objection.  Foundation, Your Honor.
```

UNITED STATES DISTRICT COURT

Fichtner - Direct

1          THE COURT:  The objection is sustained.

2     BY MR. KOZINETS:

3     Q.  Special Agent Supervisor Fichtner, when these meetings were

4     arranged, what role do you play in the investigation?

5     A.  Just a team member on the team.  Surveillance mainly which

6     included following, protecting, assisting in the overall

7     investigation.

8     Q.  Were you -- as part of your role in the investigation, do

9     you review the evidence that was developed in these meetings?

10    A.  Yes.

11    Q.  And what did the evidence show?

12          MR. BIENERT:  Objection.  Calls for hearsay.

13          MR. CAMBRIA:  I object to that.

14          THE COURT:  The objection is sustained.

15    BY MR. KOZINETS:

16    Q.  Or what did you -- sorry.  In the course of your work in

17    this investigation, what did you -- what did you observe from

18    your involvement in the investigation?

19          MR. LINCENBERG:  Objection.  Vague and calls for

20    hearsay.

21          THE COURT:  The objection is overruled.

22          THE WITNESS:  I saw them arrange dates by going on the

23    Backpage website, calling those -- the phone numbers in the

24    advertisements and negotiating with people on the other end.

25

Fichtner - Direct                                                    55

```
 1    BY MR. KOZINETS:

 2    Q.  What did the negotiations -- what did you observe about the

 3    negotiations?

 4    A.  The negotiations were exchanging money for sex.

 5            MR. BIENERT:  Your Honor, objection as to what he

 6    heard.  There's hearsay involved.  There's also a 404 issue

 7    with what he's describing.

 8            THE COURT:  The objection is sustained as to hearsay,

 9    but overruled as to 404.

10    BY MR. KOZINETS:

11    Q.  At a certain point after your participation in the sting

12    operation, did you come to be assigned to be the case agent for

13    the Backpage investigation?

14    A.  Yes, I did.

15    Q.  And when was that?

16    A.  That was in February 2015.

17    Q.  What is a case agent?

18    A.  A case manager, team leader, oversees the general

19    day-to-day stuff with the investigation.

20    Q.  And as the -- you know, once -- once you became assigned to

21    work on this Backpage investigation, did you take any steps to

22    learn about the nature of the investigation?

23    A.  I did.

24    Q.  What did you do?

25    A.  I wanted to do a little research.  So, obviously, I Googled
```

UNITED STATES DISTRICT COURT

Fichtner - Direct

56

```
 1   everything to learn about the website.  I logged on to the

 2   website to understand what it is as well as talked to prior

 3   case agents and other attorneys in the office that were

 4   assisting in the investigation.

 5   Q.  From this kind of initial work that you performed, did you

 6   come to form an understanding as to why the California

 7   Department of Justice was investigating Backpage?

 8            MR. BIENERT:  Objection.  Calls for a conclusion,

 9   Your Honor.

10            THE COURT:  The objection is overruled.  The question

11   is yes or no.

12            THE WITNESS:  Yes.

13   BY MR. KOZINETS:

14   Q.  What understanding did you have?

15            MR. BIENERT:  That's objected to.

16            THE COURT:  The objection is overruled.

17            THE WITNESS:  That the advertisements in the Adult

18   Escort section appeared to be blatant prostitution ads.

19            MR. LINCENBERG:  Move to strike as opinion testimony.

20            THE COURT:  Objection is overruled as that forms the

21   basis for why he proceeded.

22   BY MR. KOZINETS:

23   Q.  Did you -- after becoming the case agent, did you

24   periodically review the Backpage website?

25   A.  I did.
```

UNITED STATES DISTRICT COURT

Fichtner - Direct

1   Q.   And did you review it throughout 2015?

2   A.   I did.

3   Q.   Approximately how often would you review it?

4   A.   At least weekly if not, you know, very often during the

5   week.

6   Q.   Did these reviews include reviewing the Adult Escort

7   section of Backpage?

8   A.   Yes.

9   Q.   After you became the case agent, did you conduct an

10  undercover investigation of Backpage?

11  A.   I did.

12  Q.   And what were the purposes of the -- well, can you briefly

13  describe what this undercover investigation was?

14  A.   Sure.   I wanted to better understand the website itself.

15  So I decided to create two fictional undercover advertisements

16  to better understand how the Web page worked, kind of get a

17  user's experience of the Web page and also to get an idea of

18  what the responses would be like to these advertisements and

19  eventually see how Backpage themselves would respond if I were

20  to call and ask for help regarding these advertisements.

21  Q.   Did you work with another agent on this undercover

22  operation?

23  A.   I did. I worked with Special Agent Tera Mackey.

24  Q.   Who is she?

25  A.   She's another agent that was assigned to the crime unit

1    with me.

2    Q.   Now, in conducting this operation, you created two

3    undercover ads?

4    A.   I did.

5    Q.   And, very briefly, what were they?

6    A.   One was an adult ad in the Adult Escort section and one was

7    a sofa for sale.

8    Q.   Did you want these ads to resemble actual ads on Backpage?

9    A.   I did.   After reviewing a number of different

10   advertisements, I wanted something that would fit in with all

11   the others that were created in those sections.

12   Q.   So in coming up with, you know, ideas on how to craft these

13   two ads, did you review particular parts of the website?

14   A.   I did.   I reviewed several areas throughout the website to

15   include thoroughly reviewing the Adult Escort section.

16   Q.   And that helped you -- that helped inform how you put these

17   ads together?

18   A.   It did.   I just got a very good idea of what the

19   advertisement should be.

20   Q.   In the course of reviewing the Adult Escort section ads,

21   did you observe any types of similarities or common

22   characteristics of the ads that you saw there that gave you --

23   that helped inform how you designed your undercover escort ad?

24   A.   I did.   It always had kind of a catchy title, a lot of

25   times sexual in nature.   And then there was a detail section

Fichtner - Direct

1    that started out with almost like a proposition, you know,

2    offering different things, you know, like making your dreams

3    come true or fulfilling your fantasies, but it also had other

4    verbiage and consistent terminology like "in call," "out call,"

5    "100 percent," you know, "real pics."  And then it would have,

6    a lot of times, pricing to go along with time increments.

7    Q.  So did you observe any other types of common

8    characteristics regarding the images that were associated with

9    the adult escort ads on Backpage?

10   A.  Yes, they all had photographs, sometimes videos attached

11   them, and they were all -- a lot of times, scantily clad

12   dressed women in lingerie or full nudity.

13   Q.  When you were working on the undercover operation, were you

14   aware of any differences in prices, just even -- you know, have

15   one of these escort ads published versus a non-escort -- or

16   non-adult ad?

17   A.  The Adult Escort section had a minimum fee.  If I were to

18   post an advertisement in the Adult Escort, there was a minimum

19   fee of $10 when I posted mine.  In the Furniture for Sale

20   section, there was no minimum fee.

21   Q.  When you were posting these two undercover ads, were they

22   tied to an undercover or fictitious user?

23   A.  Yes.  In completing the advertisements, utilized the same

24   email address to tie them together, but also I posted the same

25   phone number that you can call to -- call for the ad.  It was

Fichtner - Direct

1    the same undercover phone number for both ads.

2    Q.  To the extent any fees were associated with these ads, did

3    you use the same form of payment?

4    A.  Yes.

5    Q.  And which was what?

6    A.  Oh, a MasterCard is what I used to pay for the ads.

7    Q.  And when you -- when did you conduct this undercover

8    operation involving posting these two ads?

9    A.  March 6th, 2015.

10   Q.  Did you make a recording of your review of the website,

11   your posting of those two ads, on that date?

12   A.  Yes, I did.

13   Q.  And how did you make that recording?

14   A.  I used the FastStone capture tool that was provided to me

15   in one of the courses that I took.

16   Q.  And where were you when you made the recording?

17   A.  At our field office in Sacramento.

18   Q.  How long of a recording did you make?

19   A.  This one was a little over half hour, I think.

20   Q.  I'm showing you what's been marked as Exhibit 489A.  I'm

21   just going to get right to the very beginning of it.

22          MR. BIENERT:  What's the number?

23          MR. KOZINETS:  489A.

24   BY MR. KOZINETS:

25   Q.  Special Agent Supervisor Fichtner, do you recognize this

Fichtner - Direct                                    61

```
 1    exhibit?

 2    A.  Yes, I do.

 3    Q.  How do you recognize it?

 4    A.  This is the video that I recorded for posting the

 5    undercover advertisements.

 6    Q.  This is the same video that you recorded on March 6, 2015?

 7    A.  Yes, it is.

 8              MR. KOZINETS:  Your Honor, I move to admit this into

 9    evidence.

10              THE COURT:  Any objection?

11              MR. CAMBRIA:  Your Honor, I see a 404(b) objection

12    here.

13              THE COURT:  Okay, that objection is overruled.

14    Anything else?

15              MR. LINCENBERG:  Also relevance.

16              MR. BERTRAND:  Hearsay.

17              THE COURT:  The objections are overruled.  489A will

18    be admitted.

19              MR. KOZINETS:  Thank you.  I request that it be

20    published.

21              THE COURT:  Go ahead.

22              (Exhibit No. 489A admitted into evidence.)

23    BY MR. KOZINETS:

24    Q.  I'm adding a little time counter at the bottom right here.

25    Special Agent Fichtner, can you describe what we're looking at
```

UNITED STATES DISTRICT COURT

Fichtner - Direct                                      62

```
 1   right now?
 2   A.   This is the home page of the desktop computer that I was
 3   working with.
 4   Q.   I'm going to start playing the video.
 5              (Video played.)
 6   Q.   Can you describe what you just did?
 7   A.   I typed in "Backpage.com" into the search bar and clicked
 8   on the Backpage.com website for the Sacramento region.
 9   Q.   And were you looking at the Sacramento region as you were
10   sitting in Sacramento?  Is that where you're based?
11   A.   Correct.
12   Q.   I'm going to highlight just the -- these sort of categories
13   here.  What is it that we're looking at here on this Web page?
14   A.   These are the 11 categories that Backpage lists for
15   advertisements.
16   Q.   Do you see how there's sort of a yellow number next to 10
17   of the 11 categories?
18   A.   Yes.
19   Q.   Is there a similar number next to the adult category?
20   A.   There is not.
21   Q.   Just highlighting the adult category itself, do you see
22   that there?
23   A.   Yes, I do.
24   Q.   And what is this that we're looking at?
25   A.   Those are the sub-categories under the adult section.
```

UNITED STATES DISTRICT COURT

Fichtner - Direct

1    Q.   Are they in alphabetical order?

2    A.   They are not.

3    Q.   I want to direct your attention to the right-hand side of

4    the screen.   There's sort of a different section over here that

5    I'm highlighting.   What is this that I've highlighted?

6    A.   This is where you can change the state and cities that you

7    would like to view.   Right now in the Sacramento region; so

8    it's under California.

9    Q.   And what is sort of listed under California here?

10   A.   Those would be the various cities or areas that Backpage

11   was doing business of advertising in California.

12   Q.   What would happen if you clicked on one of these other

13   cities or regional areas?

14   A.   It would bring you to advertisements for that area.

15   Q.   One of the regions listed here is the Inland Empire.   What

16   is the Inland Empire?

17   A.   The Inland Empire is the area east of Los Angeles.   San

18   Bernardino County, Riverside County area.

19   Q.   And just again, looking at the top of this geographic

20   section here, is this a sort of a drop-down type menu here?

21   A.   Yes, it is.

22   Q.   So would this enable you to search other states as well?

23   A.   Yes.   It would give you the other options for the states.

24   Q.   I'm going to keep playing the video.   And can you tell us

25   what you just did?

Fichtner - Direct

1    A.   So I clicked on the Adult Escort section and the next page

2    is a disclaimer that you have to go through to proceed.

3    Q.   I've just highlighted the disclaimer.  Can you please read

4    it?

5    A.   Yes.  It states "This section contains sexual content

6    including pictorial nudity and adult language.  It is to be

7    accessed only by persons who are 18 years of age or older and

8    is not considered to be a minor in his, her state of residence

9    and who live in a community or local jurisdiction where nude

10   pictures and explicit adult materials are not prohibited by

11   law.  By accessing this website, you are representing to us

12   that you meet the above qualifications.  False representation

13   may be a criminal offense."

14           "I confirm and represent that I am 18 years of age or

15   older and am not considered to be a minor in my state of

16   residence and that I am not located in a community or local

17   jurisdiction where nude pictures or explicit adult materials

18   are prohibited by any law.  I agree to report any illegal

19   services or activities which violate the terms of use.  I also

20   agree to report suspected exploitation of minors and/or human

21   trafficking to the appropriate authorities.  I have read and

22   agree to this disclaimer as well as the terms of use."

23   Q.   Thank you.  Now, do you need to -- there are two buttons

24   down here.  What are these two buttons that you can click on?

25   A.   It gives you two options to agree with the disclaimer or

UNITED STATES DISTRICT COURT

1    disagree.

2    Q.  Can you click on those buttons without having to read the

3    terms of use?

4    A.  Yes.

5    Q.  Special Agent Fichtner, I have played another few seconds

6    of the video.  We're now on 33 seconds into it.  Can you

7    describe what it is we're seeing here?

8    A.  Yes, this is the list of advertisements in the Sacramento

9    escort -- Adult Escort section.

10   Q.  And directing your attention to the upper left side of this

11   Web Page, there are two buttons here.  Can you describe what

12   these are?

13   A.  Yes.  When it's in the "brief" view, you'll see it as it

14   appears right there, which is a list.  If you click on the

15   "gallery" view, a picture would also populate with the title of

16   the advertisement.

17   Q.  And I just want to highlight some of the first few items

18   seen in the left-hand side of the page.  Can you describe what

19   it is that's displayed here under the date Friday, March 6th?

20   A.  Under Friday, March 6, it's a list of titles of the

21   advertisement.  Each title there is a hyperlink to the

22   advertisement.

23   Q.  What does that mean?  What is a hyperlink?

24   A.  If you click on that line, it will take you to the actual

25   advertisement.

Fichtner - Direct                                          66

```
 1   Q.  And directing your attention to the right-hand side of the

 2   screen here, what ads are there that are here on the right?

 3           MR. BERTRAND:  Objection.  Hearsay.

 4   BY MR. KOZINETS:

 5   Q.  Okay.  But just can you describe what you see on the

 6   right-hand side of the screen?

 7   A.  On the right-hand side there --

 8           THE COURT:  The objection -- well, there's no

 9   objection to the new question.  Do you have an objection to the

10   rephrased question?

11           MR. BERTRAND:  Yes.  Yes.  Same objection.  Hearsay.

12           THE COURT:  Okay.  The objection is overruled.

13   BY MR. KOZINETS:

14   Q.  What is it that we're looking at on the right-hand side of

15   the screen?

16   A.  These are advertisements that are called sponsored ads or

17   thumbnails.  You can pay extra to have your advertisement that

18   may be listed on the left, but also placed on the right for

19   better visibility.

20   Q.  What is the second advertisement down from the top here?

21   A.  That one is an advertisement for Children of the Night

22   which is a nonprofit organization to help people that are in

23   the business to get out of the business of prostitution.

24   Q.  And can you just read the first couple phrases here in the

25   ad?
```

UNITED STATES DISTRICT COURT

1    A.   It says "Tired of turning tricks?   Pimps don't care.   We

2    do!   Call..."

3    Q.   And are these -- what are tricks?

4    A.   It's terminology associated with prostitution.

5    Q.   What are pimps?

6    A.   And pimps.   Tricks and pimps.

7    Q.   What is your understanding of a pimp?

8    A.   My understanding of pimp is one that derives support from

9    somebody that is prostituting for money.

10   Q.   I'm going to continue to run the video.   Can you describe

11   what you've just done?

12   A.   So I clicked on the first advertisement on the list and

13   this is the actual ad.

14   Q.   Okay.   I'm just going to highlight the text here.   Are

15   these the -- kind of the types of ads that you reviewed when

16   you were crafting the undercover escort ad that you posted

17   later this day?

18   A.   Yes.

19   Q.   Can you read the title of this ad?

20   A.   Yes.   It says "Young, sexy, still in town.   Enjoy some

21   TyTee Time," dash, "19."

22   Q.   Is there information about when the ad was posted?

23   A.   It was posted on Friday, March 6, 2015, at 8:37 A.M.

24   Q.   And there is a little button that -- right at the top here.

25   Do you see this button here?

1   A.  Yes.

2   Q.  What is that button?

3   A.  If you would like to reply to this advertisement, you can

4   click on that button to do so.

5   Q.  Can you read the text of the ad, please?

6   A.  Yes.  It says "Hi, guys.  I'm TyTee.  I'm a petite blonde,

7   blonde hair, green-eyed girl.  You will enjoy my sweet and

8   friendly attitude.  I am goofy and fun to laugh and play with.

9   Never feel awkward with me.  I never rush, but allow you to

10   relax.  Please be a gentleman to me because I'm always a lady.

11   I'm super-cool and easygoing.  No games.  100 percent

12   independent.  I'm currently doing outcalls until 3:00 p.m.

13   Fetish friendly," with a phone number.  And then "TyTee.  Call

14   me.  Business inquiries.  No blocked calls.  No AA men, please.

15   Pics are 100 percent me."

16   Q.  Are there certain features of this ad that are things that

17   you've seen in other Backpage ads as well, common

18   characteristics?

19   A.  Yes.  Obviously, the opening description.  Kind of a

20   proposition, but also the 100 percent independent.  "Outcalls"

21   is a common verbiage.  No blocked calls.  Pics are 100 percent

22   me.

23   Q.  Thank you.  I'm going to keep running the video here.

24   Actually there's another -- there is one more button down here.

25   Do you see this one?

69

1    A.   Yes.

2    Q.   What is that for?

3    A.   It allows you to email this ad to somebody.

4    Q.   Can you describe what just happened in the last few seconds

5    of the video that we just watched?

6    A.   Yes.  I clicked on the next advertisement and it brought up

7    another advertisement.

8    Q.   I've just highlighted the title in the text of the ad.  Can

9    you read the title as best as you're able to?

10   A.   Yes.  It says "Best lips in the city.  The baddest exotic

11   freak.  Supa.  Gone in hours.  60 QK special," dash "23."

12   Q.   I'd like to direct your attention to the "60 QK special."

13   Is "QK" something that you've seen in other Backpage escort

14   ads?

15   A.   Yes.  I've seen a number of different ads.  It's basically

16   an abbreviation for "quick" or "quickie."

17   Q.   Have you seen it spelled or presented in different ways?

18   A.   Yes.  QQ, QKI, KK.

19   Q.   Or other words maybe used to express the same?

20   A.   Quick session.

21   Q.   Can you read the text of the ad, please?

22   A.   Yes.  It says "I'm your exotic Ebony.  You'll love spending

23   some quality time with me.  I love to take my time pleasing

24   you.  I never rush.  With curves in all the right places,

25   you'll love my mouth-watering skills and friendly demeanor.

Fichtner - Direct

```
1    Just one call away from pure bliss of ecstasy.  420 friendly.

2    I am always eager to please you, baby," with the phone number,

3    "Ebony, out and in calls."

4    Q.  And does this sentence that you just read here contain some

5    of the common language that you've seen in other ads?

6    A.  Yes, it does.  Again, with the proposition, some offering,

7    but also the out and in calls along with the 60 QK which is

8    money and time increment.

9    Q.  I want to direct your attention to some of the imagery

10   associated with this ad which I'm just going to highlight here.

11   Directing your ad to kind of the bottom center of what I've

12   just highlighted, can you describe this image?

13   A.  At the bottom there, it looks -- appears to be a naked

14   woman in front of a bed.

15   Q.  Can you describe the images to the right?

16   A.  It looks like a woman's hand holding a sex toy or a dildo.

17   Q.  I'm going to keep running the video.  Can you describe what

18   you've just done?

19   A.  I went back to the main list of advertisements and clicked

20   on next advertisement in line.

21   Q.  So this was the third advertisement in line, I believe?

22   A.  The third one.

23   Q.  And just highlighting the text here, can you read the

24   title?

25   A.  Yes.  It says "Gorgeous nubian princess playmate available
```

UNITED STATES DISTRICT COURT

Fichtner - Direct

1    now," dash, "25."

2    Q.  Can you read the text?

3    A.  It says "Hey, I'm Giselle.  I'm an upscale companion love

4    catering to upscale gentlemen.  Come spend time with a sensual

5    and sexy sweet beauty.  Seeking reviews.  In call, out call

6    available.  See you soon," and the phone number.

7    Q.  In the course of your investigation, did you encounter

8    other websites that contained reviews of individuals who

9    advertised on the Adult Escort section in Backpage?

10   A.  Yes.  There was a website called The Erotic Review.

11   Q.  And what is The Erotic Review?

12   A.  That's a website basically where users or customers of

13   these advertisements can review who they met with and had

14   sexual experiences with.

15   Q.  Can you describe what you've just done in the next few

16   seconds of the video?

17   A.  I clicked on another advertisement.

18   Q.  Is this the fourth advertisement down, just listed?

19   A.  Yes.

20   Q.  And, again, just focusing on the title of the ad, can you

21   read the title, please?

22   A.  Yes.  It says "$60, $100, $180 hot Friday special.  Sweet

23   sexy green-eyed beauty.  Ask about my two-girl shows," dash,

24   "19."

25   Q.  And the dollar amounts here, they're in differing

Fichtner - Direct

1    increments?

2    A.   Correct.

3    Q.   Are those -- and the ads that you reviewed on the Adult

4    Escort section that had pricing in increments, were those

5    associated with other types of information?

6    A.   Yeah.  Many of the other advertisements had pricing in

7    increments of everything from 15 minutes to half hour to an

8    hour.  Sometimes they called it a quick session, half hour or

9    hour.  That would be a similar price range.

10   Q.   Can you read the text of this ad -- or sorry, did you just

11   read the text?

12   A.   Yes.  It says "Hey, I'm Jessica.  I am the hottie you will

13   be hooking up with tonight.  New and updated pictures.  So

14   please don't ask.  I take pride in my appearance.  I have a

15   slim tight body along with a cute baby face and an awesome

16   laid-back attitude.  My ultimate goal is to give you the best

17   experience you deserve.  I as well love to be pleased."  And

18   then you have the phone number.  "Ask about my two-girl shows.

19   Sorry, I do not cater" -- or "carter" -- "to African-American

20   men under 45.  Generous and respectful gentlemen only."

21   Q.   This sentence here -- "I as well love to be pleased." --

22   has a couple of emojis at the end of it.  Do you know what

23   those emojis just descriptively are?

24   A.   The first one is a tongue.  The second one is a splash

25   emoji.

1    Q.   That's about one minute 29 seconds into the video.  I'm

2    going to just keep playing.

3              Can you describe what you've just done to get to this

4    Web page?

5    A.   I went back to the main list and clicked on another

6    advertisement.

7    Q.   And can you read the title of this advertisement?

8    A.   Yes.  It says "New in town.  Hot Latina sexy Lexi" -- with

9    different emojis:  open mouth, a rose, a happy face, two splash

10   emojis -- dash "19."

11   Q.   Can you read the text of the ad please?

12   A.   It says "Tell me how you want it.  I'm on it.  Come for a

13   fun comfortable visit with me, sexy Lexi.  Very, very sweet and

14   very discreet.  Long hair, don't care.  Long beautiful legs

15   standing at five-seven.  Available now.  In calls only."

16   Q.   And directing your attention to the photograph on the

17   bottom right-hand side of the ad, can you describe this

18   photograph?

19   A.   Yeah, it looks like a topless woman with just wearing

20   panties, laying on a bed.

21   Q.   Can you describe what you've just done to get us to this

22   part of the website?

23   A.   Yes.  I went back to the main list and clicked on another

24   advertisement.

25   Q.   And can you read this title also, please?

1   A.  It says "Beautiful exotic bootylicious blonde Barbie, Shyla

2   James.  So beautiful," dash, "27"

3   Q.  Can you read the text as well?

4   A.  It says "Hello.  My name is Shyla James.  I cater to

5   professionals who are mature, adventurous and discreet.  I have

6   a bronzed kissed complexion, beautiful blonde-brown hair and

7   sultry green eyes.  I pride myself on my desire to please and

8   you can expect the very best.  Serious inquiries only.

9   Pictures are 100 percent accurate," with the phone number and

10  it says 300 hour; 200 half hour; 125 15 minutes.

11  Q.  Thank you.  And what did you do to get us to this ad?

12  A.  I returned to the main list of advertisements and clicked

13  on another advertisement.

14  Q.  And can you read the title of this one?

15  A.  It says "Running specials.  Sweet juicy," dash "23."

16  Q.  And can you just tell us about the symbols or emojis that

17  you see here?

18  A.  There's also a cherry emoji, a sucker emoji.  I don't know

19  what the "Y" is.  And then a splash emoji.

20  Q.  Can you read the text in the ad please?

21  A.  It says "My name is Caitlin and I can be very addicting.

22  I'm the perfect companion.  Sweet, sexy and most importantly

23  discreet.  I can be your best kept secret."  Emoji with a

24  partial phone number.  "Don't take a chance at disappointment.

25  Come to me private.  In call available.  Pics are 1,000 percent

```
 1   real and I have an amazing personality to match.  Call me to

 2   experience the thrill of a lifetime."  Then emojis with the

 3   remainder of the phone number, and it says "No trades, blocked

 4   calls or black men.  Sorry."

 5   Q.  And just showing you some of the images on the right-hand

 6   side here, can you describe these images?

 7   A.  Yes.  It's a woman posing in the top right with no top on

 8   and the other pictures are in lingerie, kind of a sexual

 9   position.

10   Q.  It says -- there's a little button here, some sort of link

11   here that says "Enlarge picture."  Do you see that?

12   A.  Yes.

13   Q.  What is that?

14   A.  If you click on that, it does just that; it enlarges that

15   picture on your screen.

16   Q.  Okay.  In the interests of time, I'm going to fast-forward

17   a little bit.  And can you tell me what screen we're looking at

18   here?

19   A.  We're back to the disclaimer screen.

20   Q.  This is the disclaimer screen that one has to agree with

21   when entering the escort section?

22   A.  Correct.

23   Q.  And I know you've read this language to us already.  But

24   I'm showing you or highlighted the first sentence.  Can you

25   read this one again?
```

UNITED STATES DISTRICT COURT

1   A.   Yes.   It says "This section contains sexual content

2   including pictorial nudity and adult language."

3   Q.   Thank you.   I'm going to just play the video from here.

4   Can you describe what you're doing here?

5   A.   Here I'm agreeing with the disclaimer.   Took me to the main

6   list.   Now I'm clicking on the "Post an Ad" button as I'm

7   entering the Adult Escort section to post an ad.

8   Q.   And once you did that, we landed on this, what page?   What

9   is this Web page?

10  A.   This is stating the posting rules before you're allowed to

11  enter the next step to post an ad.

12  Q.   Can you read the posting rules, please?

13  A.   Yes.   It says "You agree to the following when posting in

14  this category."   And it states "I will not post obscene or lewd

15  and lascivious graphics or photographs which depict genitalia,

16  actual or simulated sexual acts or naked images.   I will not

17  post any solicitation directly or in 'coded' fashion for any

18  illegal service including exchanging sexual favors for money or

19  other valuable consideration.   I will not post any material on

20  the site that exploits minors in any way.   I will not post any

21  material on the site that, in any way, constitutes or assists

22  in human trafficking.   I am at least 18 years or older and not

23  considered to be a minor in my state of residence.   Any post

24  exploiting a minor in any way will be subject to criminal

25  prosecution and will be reported to the cyber-tip line for law

```
1    enforcement.  Postings violating these rules and our terms of
2    use are subject to removal without refund."
3    Q.  So I'm going to restart the video here.
4              THE COURT:  Counsel, are you going to go into the
5    posting of the ad?
6              MR. KOZINETS:  Yes.
7              THE COURT:  Okay.  Then why don't we break as we
8    discussed earlier.
9              MR. KOZINETS:  Okay.
10             THE COURT:  We're going to break a little early today.
11   We have something to discuss.  So, rather than have you sit
12   around while we do that, we're just going to do it at the end
13   of the day.  So we'll see you tomorrow morning at 9:00 A.M.,
14   and please remember the admonition.
15             (In open court; jury not present.)
16             THE COURT:  Okay.  I was just waiting to hear the door
17   shut.  So we are outside the presence of the jury.
18             Before we get into the legal issues, I've been advised
19   that -- I don't know -- on breaks or lunch, someone was taking
20   chairs and tables from jury area, but you can't do that.
21   There's the area that's marked off for jurors and that's
22   because they need social distancing space.  So you can't remove
23   anything from that area ever.  You're not supposed to be going
24   into that area.
25             MR. LINCENBERG:  This is Mr. Lincenberg.  I'm guilty
```

| | |
|---|---|
| 1 | of that.  We haven't seen anybody sit in that area.  Is it |
| 2 | possible for the Court to figure out someplace we can gather |
| 3 | and eat?  There's a couple of tables on the side that we've |
| 4 | been using, but there's only a few chairs there and so we |
| 5 | really have no place to gather and eat lunch or anything and... |
| 6 | THE COURT:  Well, the note I have is that they are |
| 7 | planning to add more tables and chairs, but it may take a |
| 8 | couple days for them to get it.  Okay.  That's all I can tell |
| 9 | you.  They're aware of it and they're working on it. |
| 10 | Okay.  Let me start with, Mr. Lincenberg, at the |
| 11 | beginning of the day, you brought up something with respect to |
| 12 | Nicole Svendgard. |
| 13 | MR. LINCENBERG:  Yes.  With regard to Ms. Svendgard, |
| 14 | as I understood it, government counsel this morning stated |
| 15 | that -- is there an echo?  Should I come up to the -- |
| 16 | THE COURT:  There is a little echo.  It doesn't bother |
| 17 | me, but... |
| 18 | MR. LINCENBERG:  With regard -- with regard to |
| 19 | Ms. Svendgard, government counsel's argument was essentially |
| 20 | "I know the 302s don't match what we said, but don't worry.  We |
| 21 | know that that's what the witness is going to testify to," |
| 22 | which, of course, triggered in my mind that they didn't produce |
| 23 | any witness statements for what they apparently have discussed |
| 24 | with the witness that they now know the witness is going to |
| 25 | testify to. |

1          THE COURT:  Okay.  Does someone from the government

2    want to respond to their allegation that you haven't disclosed

3    something?

4          MR. RAPP:  We've disclosed the reports related to

5    Nicole Svendgard.

6          THE COURT:  And are you suggesting that, once they

7    learn of a difference, they should create a report to provide?

8          MR. LINCENBERG:  Well, if they have notes of something

9    that was stated that's different than in the reports, they

10    should provide those.

11          THE COURT:  Do you have anything?

12          MR. RAPP:  I don't have any.  I don't -- I will have

13    to confer with my agents, but I don't believe they have any

14    either.

15          THE COURT:  Okay.  I suggest you do that.

16          MR. LINCENBERG:  It's, obviously, a problem related to

17    this morning.  The other thing that I had raised this

18    morning -- I don't want to preempt the Court's order of

19    items -- was dealing with the 48 hours protocol and us getting

20    an email that I see as I'm walking into the court that, after a

21    four-day weekend of defense counsel scrambling to prepare for

22    one of the three witnesses they had identified, all of a sudden

23    they're saying this witness is not coming.  They said there's a

24    travel issue.

25          I think the Court should actually inquire about a

1    travel issue.  I don't know why this witness couldn't travel

2    here.  But, beyond that, it just raises the broader concern of

3    us learning last-minute; so government counsel not only

4    changing this, but then they added a witness which, I guess, is

5    to comply with the 48-hour notice because this person might be

6    called on Friday.

7            It really would be quite helpful if there was just a

8    Friday afternoon notice of who they plan to call the next week.

9    And we understand that things can come up and things may change

10   and they can keep us advised if there's some change in the

11   order of things, but this way we can -- we can properly

12   prepare.

13           So there's two issues there that I was mentioning.

14   One was after we spend all weekend and then letting us know

15   when we get into court that this witness isn't going to be

16   here.  And the second one is asking if the Court would modify

17   that protocol for a little more advance notice.

18           MR. STONE:  Your Honor, I sent the email on the

19   48-hour to make defense counsel aware of an issue with travel,

20   and it sounds like defense counsel does have an issue with it.

21   It turns out that that particular witness was able to get on a

22   flight, we learned, and was able to travel.  There was some

23   issues this morning.  They seem to have been resolved.  And so

24   I don't think our witness schedule is going to change.  This

25   witness is Tera Mackey and she will likely be the second

```
 1   witness called tomorrow, as we indicated last week.
 2           MR. LINCENBERG:  When did counsel learn that she had
 3   travel issues?
 4           MR. STONE:  Just now -- we emailed earlier when we
 5   learned that she had travel issues.  I just learned right now
 6   that she was able to get on the flight.
 7           MR. LINCENBERG:  Was this coming from Sacramento?
 8           THE COURT:  Okay.
 9           MR. LINCENBERG:  I know the Court doesn't want a
10   dialogue.
11           THE COURT:  No.
12           MR. LINCENBERG:  I'm just highlighting for the Court
13   some of the issues, and the bigger issue is the 48-hour notice.
14           THE COURT:  I think it's good that the government was
15   trying to keep you updated.
16           MR. LINCENBERG:  Well, on Tuesday morning that, all of
17   a sudden, they first --
18           THE COURT:  Okay.
19           MR. LINCENBERG:  -- you know.
20           THE COURT:  So they've asked me to change the
21   protocol.  What's the government's position?
22           MR. STONE:  Your Honor, when we -- we give a week in
23   advance, there would be more issues potentially with the travel
24   and us moving things around, and I'm sure there would be
25   additional complaints.  We believe 48 hours is sufficient.  We
```

1    plan on complying with that rule.  We give the witnesses and

2    the exhibits we intend to admit through those witnesses 48

3    hours in advance.

4            THE COURT:  Okay.  So we have talked about this

5    before.  You've asked me to change the protocol before.  I'm

6    denying your request to change the protocol.  If it becomes a

7    repeated problem, we'll have to talk about it.  But as

8    I indicated -- well, maybe I didn't indicate earlier.  But

9    clearly, you all have had this case for a very long time.

10   You've done a lot of pretrial preparation and I am quite

11   confident that you are not looking at these witnesses for the

12   first time 48 hours in advance.

13           MR. LINCENBERG:  Well, some we are.  But, Your Honor,

14   we -- I mean, we just got a ton of new discovery last week and,

15   when you balance what you're trying to do, whether to go

16   through them -- you know, what counsel says, it's going to

17   create more issues, we recognize we're representing right here,

18   if they give us the witnesses who they may call next week and

19   then if they find out, "hey, you know what, we're not going to

20   call somebody next week," we can live with that, but at least

21   it allows us to prepare over the weekend for what's coming up

22   during the week.

23           THE COURT:  Okay.  I understand your request.

24           The second issue was brought by Ms. Bernstein.

25   I don't know if -- oh, there she is.  And it's with respect

1    to -- I guess your request is disclosure of something which

2    I didn't quite understand.  Some internal memos of the

3    government or --

4           MS. BERNSTEIN:  Yes.  Thank you.  And I apologize for

5    bringing this up this morning because it probably does

6    necessitate a lengthier conversation.

7           DOJ investigated Backpage and these defendants --

8    again, Your Honor, this is all vague because I have never read

9    the letters that are abundant in the press, the memos that are

10   everywhere that Judge Logan ordered us not to read.  So this is

11   my best recitation of it.

12          DOJ investigated Backpage and these defendants 2010,

13   2011, and produced two lengthy memos in 2012.  My understanding

14   of those two lengthy memos is that DOJ -- the agents -- I think

15   it was the FBI and IRS agents as well as the AUSAs in the

16   Western District of Washington had been essentially charged by

17   DOJ to go indict Backpage.  And they did lengthy

18   investigations.  They interviewed dozens of witnesses.  I don't

19   know how many.  They subpoenaed thousands of documents.

20   I don't know how many.  They took depositions from some of the

21   defendants sitting right here.  And the conclusion of this

22   lengthy years-long investigation by DOJ, I believe FBI and

23   I believe IRS -- the same parties that are sitting here -- is

24   that there was no evidence of any criminality.

25          Mr. Stone and his colleagues have ad nauseam responded

1    to us that, well, things have changed since then.  We found
2    other things that you were apparently doing back then that
3    allegedly we didn't know you were doing back then; so that
4    changes everything.  And, Your Honor, this is extremely
5    problematic and it's problematic because Mr. Jones' very
6    inflammatory, very effective opening was all about this parade
7    of horribles that Backpage has been doing and imputing that
8    knowledge to these defendants, and much of it focused on that
9    timeframe.
10           So, number one, DOJ's own investigations, FBI's
11   investigations, IRS's investigation from that timeframe are
12   party admissions.  The issue before Judge Logan had been the
13   government disclosed these memos and some underlying documents
14   to us probably sometime summer of 2018.  When -- my
15   understanding is when defense counsel began to make use of this
16   very clear *Brady* material, the government clawed it back.
17   There is litigation about the clawback.  And before
18   Judge Logan -- he ruled, and I don't know the docket numbers,
19   but I can find them for Your Honor.  But Judge Logan
20   essentially ruled that these were protected by work product,
21   that the memos were protected by work product.
22           I think that -- you know, we've never appreciated that
23   order, but have abided by it and respected it.  And I think it
24   might be all well and good until Mr. Jones opens emphatically
25   on activities that Backpage and these defendants were allegedly

```
1    doing in 2010, 2011 and 2012, a timeframe and activities that
2    his very Department of Justice and these agents' very own
3    agencies investigated in detail for years and found, again, no
4    evidence of criminality.
5            For the government to say that we are not entitled to
6    the underlying facts -- the work -- the memos might be work
7    product, but facts are not work product.  And so for the
8    government to say that we are not entitled to the underlying
9    facts, the depositions of all the people that they deposed
10   then -- we have a handful of depositions they produced, but not
11   the rest, and we know people -- far more were deposed.  We know
12   the IRS questioned at least four moderators and took notes --
13           THE COURT:  Wait.  I'm sorry.  I just want to ask you
14   a question before you move on because you're going through a
15   lot of information.
16           So you said you have a handful of depositions.  I'm
17   guessing that's depositions of some of the defendants?
18           MS. BERNSTEIN:  I believe, Your Honor, we have
19   depositions of one of the defendants and I believe we have
20   depositions from perhaps two to three of the witnesses on the
21   government's 80-plus-person witness list.  I know and we've
22   asked for if and, if your Honor would like, I can find my
23   letters from the past three years begging for it.  We've asked
24   for the depositions and the notes and the interviews of many of
25   these other people.
```

1        Off the top of my head, I can think of four moderators

2   who were deposed and their IRS notes.  They were definitely

3   investigated by the IRS.  Those notes, I don't know what they

4   say.  I know the conclusion was that there was no criminality.

5   I know that the allegations of aggregation and content

6   moderation and all of these perfectly legal activities that are

7   being used to say somehow this whole operation was criminal,

8   that was in place back then, Your Honor.  And the moderators

9   told them that that was in place back then.  So the fact that

10  they've interviewed at least four moderators that I know of,

11  determined there was no evidence of criminality, and want to

12  stand here today and say, "Well, we got other evidence," that

13  doesn't change what they learned back then when all of this was

14  allegedly still going on.

15        Those four moderators that we've requested ad nauseam

16  they simply took off their witness list.  That might comply

17  with *Jencks*, but that doesn't comply with *Brady*.  And this has

18  been an issue from the beginning of this case.

19        The government's view is that these ads are illegal

20  and so the First Amendment doesn't apply because the ads are

21  illegal.  Never mind that's what they have to prove.  That's

22  their view.  We're not entitled to these documents because,

23  well, they think those people didn't tell them everything they

24  know now.  That's not how *Brady* works.

25        And so for the government to open and say this in

1    2010, this in 2011, this in 2012 when their own department and
2    their own agencies know that they investigated this thoroughly
3    and there were no evidence of criminality -- and they are
4    lengthy memos.  I'd like the memos.  I'd like all the
5    underlying facts.  If your Honor finds that work product
6    pertains to the memos, it doesn't pertain to the underlying
7    facts.  They are *Brady*.  It's clear as day.  And, at a minimum,
8    I would request that Your Honor review the memos and review the
9    facts in camera, and I think we'd be having a different
10   conversation if you saw what they are withholding from all of
11   us.
12           THE COURT:  And other than the memos, did you ask for
13   the underlying facts from Judge Logan?
14           MS. BERNSTEIN:  No, no we did not.
15           THE COURT:  So that issue has never been litigated?
16           MS. BERNSTEIN:  Correct.
17           THE COURT:  Okay.  Anything else?
18           MS. BERNSTEIN:  Not on this topic, but on others.
19           THE COURT:  Okay.  So let me hear from the government.
20           So one -- first, is it correct that the issue of the
21   memos has been litigated, but not the issue of the underlying
22   depositions and facts?
23           MR. STONE:  The order -- just so that we're all on the
24   same page, Judge Logan issued a nine-page -- seven-page order
25   in 2019, Document 449.  I have it as 449-1.  And it was a hotly

1  contested issue, Your Honor with several motions from the

2  defense on that issue and that was just to claw back the memos,

3  and so that issue has been litigated.  I haven't looked at this

4  in a while.  So I'm just glancing through it, Your Honor.

5          In this memo -- or I'm sorry -- in this order from

6  Judge Logan, Page 3, first, the Court must address the

7  defendant's argument that the disclosed memos contain *Brady* and

8  *Giglio* materials.  So that issue was litigated and Judge Logan

9  ruled on it.

10         MS. BERNSTEIN:  Your Honor, Judge --

11         MR. STONE:  Please.

12         THE COURT:  Yeah.

13         MR. STONE:  The defendants argue that the disclosed

14  memos discuss exculpatory material that contain witness

15  statements favorable to the defense, investigative leads and

16  evidence relevant to defendants' upcoming challenges to the

17  grand jury proceedings, to the searches and seizures in this

18  prosecution -- that was a quote from a defendant's motion --

19  and also impacts other proceedings in the case before the

20  Court.  The Court finds that the defendants' argument is

21  misguided.  It is clear to the Court that the --

22         THE COURT:  Okay, I'm sorry.  I have it in front of

23  me; so you don't have to read it to me.

24         MR. STONE:  Sorry.  That's been litigated, Your Honor.

25  These are the same arguments that were made before Judge Logan,

1    unless I'm misunderstanding that there's now a different *Brady*
2    argument.
3            THE COURT:  Well, that's the issue of the memos which
4    I -- at least Ms. Bernstein is arguing is separate from
5    depositions and/or notes of interviews of moderators that could
6    contain *Brady* material.
7            MR. STONE:  Well, I wish we had an opportunity to
8    review what we've disclosed because I don't want to say
9    something that is not accurate as we sit here, Your Honor, when
10   we didn't know this was going to be an issue that we were going
11   to take up today.  But my understanding is that we have gone
12   through the materials and produced notes that related to
13   witnesses that are on our witness list, including IRS notes
14   from witnesses who had been interviewed then by IRS agents and
15   who now are on the government's witness list.  We reviewed the
16   file and disclosed those notes.
17           THE COURT:  Right, but her argument is separate from
18   that.  Obviously, that's required under *Jencks*, right?
19           MR. STONE:  Yes, Your Honor.
20           THE COURT:  So she's arguing that there's additional
21   disclosures that you are obligated to provide under *Brady*.
22           MR. STONE:  Which are?
23           THE COURT:  Notes of other moderators -- of interviews
24   of other moderators from which the government concluded there
25   was no wrongdoing.

UNITED STATES DISTRICT COURT

1          MR. STONE:  Well, I think the issue is a little more

2     nuanced, Your Honor.  And, again, doing this on the fly --

3     obviously, there's a lot of documents that have been disclosed

4     and I would feel comfortable if we had an opportunity to review

5     and respond.  I mean, of course, this is an issue that has been

6     known for a long time and now we're on Day 4 of trial and we're

7     just raising it.  There have been lots of motions that have

8     been filed in this case, Your Honor.

9          THE COURT:  Okay.  We can talk about it tomorrow.

10         MR. STONE:  I appreciate it, Your Honor.

11         THE COURT:  We will take it up again tomorrow.

12         MS. BERNSTEIN:  To aid the Court, I can file just a

13    sample of my dozens of letters over the past three years where

14    I identified these moderators that I know they interviewed by

15    name.  As I'm sure the Court can appreciate, the concern is

16    that we don't have what we know we don't have.  We also don't

17    know what we don't know is out there.  And it's just very

18    concerning that the government has been gatekeeping *Brady* and

19    there are items that we know exist that we haven't received.

20         So I can give you an another example.

21         THE COURT:  That's the way the system works, right?

22         MS. BERNSTEIN:  I'm sorry?

23         THE COURT:  That's the way the system works.

24         MS. BERNSTEIN:  That the government withholds *Brady*?

25    That's not the way the system works.

```
1              THE COURT:  No, no, that they gatekeep it.  I mean --
2              MS. BERNSTEIN:  And it leads to a lot of withholdings.
3    That -- that -- I mean, this morning I was reading about the
4    Bundy case, the people in Oregon.  I mean, I don't want to make
5    this a bigger deal than it is.  I don't want to lob misconduct
6    allegations at the government.
7              There are interviews of moderators that I know they
8    did that I don't have, that I have asked for, and their
9    response to my asking for them was initially they haven't
10   adopted it; it's not Jencks.  Okay.  Then their response was
11   "They're not our witness list anymore."  That does not obviate
12   Brady.  And that's what we're concerned about.
13             I would also note that the author of these memos from
14   2012 is on the government's witness list.  So we are hamstrung
15   to have an individual up here testifying who is going to say --
16   I don't know what he's going to say -- when we know that that
17   is in stark contrast to what that individual said in 2012.
18             THE COURT:  Okay.  So why don't you file those
19   letters.
20             MS. BERNSTEIN:  Okay.
21             THE COURT:  And then the government will be more
22   focused on what you're talking about as well and we can discuss
23   it tomorrow.
24             MR. RAPP:  Can we just ask -- get one clarification?
25   Who is the witness that they're referring to that's on our
```

1    witness list that is the person who took the notes?

2            MS. BERNSTEIN:  Vienneau.  Vienneau.  Special Agent

3    Vienneau of the IRS.

4            MR. RAPP:  Yeah, no.  We have disclosed that.

5            MS. BERNSTEIN:  We do have a fraction of the

6    disclosures and I do not believe that we have what this

7    individual did for three years, but if that's Mr. Rapp's

8    contention, then I would just ask that we note that for the

9    record because I think that this case will prove that that is

10   not true.

11           THE COURT:  Okay.  And you said there was something

12   else.

13           MS. BERNSTEIN:  Yes, Your Honor. I think we also

14   wanted to discuss the fact that last night, for example, the

15   government produced 80-some-odd pages of discovery.  You know,

16   we understand that things might be changing as we progress.

17   I haven't had an opportunity to review these 80-plus pages of

18   discovery.  Nor do I fully appreciate how the government's case

19   is shifting and changing especially when they get away with

20   their opening argument.  I don't know what more they're trying

21   to add in.  And I would just ask, if this is going to be

22   ongoing because, paired with the late disclosures of witnesses,

23   it's really putting us in a position to review.  I mean, we are

24   very busy doing a lot of other things besides deciphering USAfx

25   links and downloading new discovery.

1          THE COURT:  You said they produced 80 documents or 80
2  new pages?
3          MS. BERNSTEIN:  I am going just on the Bates numbers,
4  which don't always track how long the pages are, because often
5  what happens -- which I think has been the issue of
6  confusion -- is that there will be -- one document will have a
7  Bates number on it, but that will end up being like an 800-page
8  document.  So it might be one file, but it's a large file.
9          I have not reviewed anything they sent last night.
10  I just saw the cover letter from their paralegal, and that
11  indicates that there's around 80 Bates-range pages that were
12  disclosed last night.
13          MR. STONE:  It's 80 pages, Your Honor.
14          THE COURT:  And why was it just disclosed last night?
15          MR. STONE:  It's *Jencks*, primarily *Jencks* for witness
16  emails between -- emails from that witness as I understand it.
17          MS. BERNSTEIN:  Your Honor, email witnesses --
18          THE COURT:  Okay.
19          MS. BERNSTEIN:  Sorry.
20          THE COURT:  I understand normally that that's how the
21  *Jencks* disclosure proceeds, but, in this particular case, you
22  guys had agreed on earlier disclosure of *Jencks* material.
23          MR. STONE:  This particular witness is Matt Frost.  He
24  was a witness during the evidentiary hearing and we turned over
25  hundreds of pages of *Jencks* at that evidentiary hearing.  These

1     are additional emails between Mr. Frost and agents that pertain

2     to ads that he is able to access from the Backpage website, as

3     I understand it.

4             MS. BERNSTEIN:  And, Your Honor, I would just say that

5     the government has -- oftentimes, when I've requested *Jencks*,

6     they said, "Well, the witness hasn't adopted it yet.  The

7     witness hasn't adopted it yet."  They've taken a very narrow

8     view of when that disclosure is due.  I have not had an

9     opportunity to look at what they disclosed last night, but

10    unless they are emails from Matt Frost from last night, I don't

11    know why that *Jencks* was not produced sooner because emails --

12    emails authored by their witness is not *Jencks* their witness

13    has to adopt.

14            THE COURT:  Okay.  So just in the interest of time,

15    I would ask -- you can tell me that you got new disclosure, but

16    these are sort of theoretical arguments when you don't know

17    what it is and I can't really do anything about it.  So we're

18    wasting a lot of time.

19            MS. BERNSTEIN:  Well, just want to explain we'll be in

20    a position tomorrow, perhaps, to tell you what substantively

21    was there, but want the Court to be aware that we are getting

22    disclosure on -- we got some on Friday night.  We got some last

23    night.  So I just want the Court to know that.

24            THE COURT:  Okay.

25            MS. BERNSTEIN:  The other thing I would add is that

1   we've had an issue with the government's exhibits.  There's

2   something like -- I think it totals over 20,000 pages.  What

3   was going on throughout the course of this case is the

4   government was giving us their exhibit lists and said "Go find

5   it yourself."  This is something we've talked to Your Honor

6   about before.

7           Last Monday, I believe -- and I might be wrong on the

8   date, but I believe it was Monday, we had given the government

9   a four-terabyte hard drive that they loaded up and gave us

10  their exhibits.  Of those exhibits, at least 50 of them are

11  locked, require password.  We don't have a password for those.

12  So that has also hampered our ability to prepare for trial.  We

13  don't know what those are.

14          THE COURT:  So who is responding?

15          MR. STONE:  Your Honor --

16          THE COURT:  Mr. Stone.

17          MR. STONE:  I really wish that they would have told us

18  that.  They gave us -- they gave us the hard drive.  We did our

19  best to put the exhibits on.  This is our first time hearing of

20  it.  We would have done our best to absolutely fix what was

21  going on.  There's a lot of exhibits and I'm sorry that 50 of

22  them seem to have issues, but there may be an easy fix.  I'm

23  not sure.  I'd have to talk with our paralegal who did the

24  download.  But that was not our intention to have 50 exhibits

25  that didn't work.

```
 1              THE COURT:  Okay.  Can you have your paralegal
 2   communicate which 50 exhibits they are?
 3              MS. BERNSTEIN:  Yes, of course, Your Honor.
 4              MR. STONE:  I really wish that had been brought up
 5   outside your presence, Your Honor.  That is certainly something
 6   we could have worked through.
 7              MS. BERNSTEIN:  This is not the first time that we
 8   have brought up a multitude of issues with the way the
 9   government produces documents to us.  So I appreciate
10   Mr. Stone's position, but I don't appreciate the
11   characterization that we are wasting the Court's time with
12   issues that are hamstringing our ability to prepare for this
13   trial.
14              THE COURT:  Anything else?
15              MS. BERNSTEIN:  Yes, Your Honor.  The Svendgards are
16   testifying.
17              MR. LINCENBERG:  Your Honor, before we go off that
18   topic -- this is Mr. Lincenberg.  And I don't want to beat a
19   dead horse, but this is part of the problem with the 48 hours
20   as well, because we have all these documents that are flooding
21   in.  We don't know what witnesses they relate to.  This is a
22   monumental task to play catch-up and we need some time to be
23   able to properly prepare.
24              THE COURT:  Okay.  Ms. Bernstein?
25              MS. BERNSTEIN:  About the Svendgards, Your Honor,
```

1    because Officer Mackey was apparently experiencing travel

2    issues that have since been resolved, the government did

3    indicate that the Svendgards are going to testify.  That

4    includes Jessika Svendgard and Nicole Svendgard who Your Honor

5    is familiar with as the subject of the misrepresented statement

6    in the opening.

7            The -- as to Jessika Svendgard -- and this is as to

8    also government witness number 3 which is Christina Decoufle --

9    I might be mispronouncing that name.  But as to both of those

10   witnesses, we believe that they are entirely irrelevant.  I can

11   go into more detail on each of them, but the general ask as to

12   both Jessika Svendgard and Officer Decoufle is that the

13   government proffers what these people are going to say and how

14   it has any bearing whatsoever on any of the charges in this

15   indictment.

16           THE COURT:  I remember the name Christina Decoufle.

17           MS. BERNSTEIN:  She's a child sex trafficking expert,

18   Your Honor.  We don't know what she's here to provide.  The

19   government has proffered her as a child sex trafficking expert.

20   So I believe Your Honor would have seen her name in the

21   litigation on the experts in the motion in limine.

22           THE COURT:  The motion in limine, right?

23           MS. BERNSTEIN:  I believe so.

24           THE COURT:  Where you covered what the government told

25   you she was going to testify about.  Because there was a

1    paragraph listed for each expert or a paragraph and a half or

2    two paragraphs, and then you guys essentially did the same type

3    of disclosure.  The government objected.  They said it's the

4    same disclosure for both parties.  So I remember there being

5    some disclosure about what she would testify about.

6            MS. BERNSTEIN:  I have the Court's ruling.  Oh, no,

7    I'm sorry.  That's the Court's ruling as to a different

8    witness.  The Court actually did not address what Ms. Decoufle

9    would be bounded by.  We presume it tracks with the rest of the

10   Court's order on that motion in limine which is at Docket --

11   well, my computer froze.  It's at Docket 1081.

12           THE COURT:  Okay.

13           MS. BERNSTEIN:  Your Honor, as I read the

14   government's -- as I read the way your order copied the

15   government's expert notice, I actually don't see that they

16   indicate that Ms. Decoufle will testify about children.  So

17   I apologize for that.  I think I had some bad information.  But

18   on Pages 2 to 3, the way the government describes Ms. Decoufle

19   does not involve children.

20           THE COURT:  Well, let me just confirm with the

21   government because sometimes they will discuss sex trafficking

22   when, really, it means child sex trafficking.

23           Is Ms. Perlmeter handling that witness?

24           MR. STONE:  She is, Your Honor.

25           THE COURT:  Okay.  So she's on her way down.

1          While we're waiting for her, Jessika Svendgard -- she

2   is not one of the 50 ads?

3          MS. BERNSTEIN:  Correct.

4          MR. RAPP:  She is Victim 4 in the superseding

5   indictment.

6          MS. BERNSTEIN:  She is not one of the 50 ads.

7          MR. RAPP:  She's Victim -- can I answer?

8          MS. BERNSTEIN:  I was answering the question.  Of

9   course, you can answer.

10          MR. RAPP:  Well, I was answering her.

11          She is Victim 4 in the superseding indictment.  She

12   was trafficked in 2010 from September to -- from June to

13   September.  Her pimp went to trial in 2011 and was convicted.

14   She also participated in the prosecution of a john that got

15   some media exposure certainly in the Seattle area, but also

16   is -- was featured in the CNN exposé "Selling the Girl Next

17   Door."  But I think, importantly, she filed suit against

18   Village Voice Media, Backpage and her pimp, and the case was

19   filed in 2012.  There was a lot of litigation involving the

20   case.  It went up to the Supreme Court of the State of

21   Washington and it was argued in 2014.  It was decided in

22   September of 2015.  I might add this was a decision that the

23   defense did not mention in none of their opening statements.

24   In that case, the Court held that minors in this case -- and

25   she was joined in this case with two other trafficking victims.

1    They were 13 at the time they were trafficked.  She was 15.

2           The Supreme Court held that the minor sufficiently

3    alleged that the website operators helped develop content of

4    advertisement for sexual services of minors.  And so they

5    denied Backpage's motion to dismiss and it paved the way for

6    discovery in the case.

7           So both Jessika Svendgard and her mother Nicole were

8    deposed relative to the case of J.S. versus Village Voice Media

9    and Backpage, and they were deposed by attorneys paid for by

10   Backpage in July of 2017.

11          I think it's also significant, though, Jessika did not

12   appear at the senate subcommittee on the day that the

13   defendants appeared -- defendants Lacey, Larkin and Padilla.

14   Her mother appeared and provided a statement to the senate

15   subcommittee based on Jessika's being trafficked on Backpage.

16          Lastly, this is a case, I think the Court might

17   remember, Backpage settled for quite a bit of money, I think.

18   And I say that because there was an action filed in district

19   court here by Travelers denying the indemnification from the

20   Backpage defendants and that was filed before Judge Logan.

21          So she is squarely in the superseding indictment which

22   charges a 14-year conspiracy.  She falls within that 14-year

23   conspiracy.

24          THE COURT:  Okay.  So I'm trying to find the

25   superseding indictment.  But I think you're saying she's listed

| | |
|---|---|
| 1 | in the superseding indictment, but she's not one of the 50 ads? |
| 2 | MR. RAPP:  Yes, but she's -- she is a victim.  It's a |
| 3 | conspiracy, as the Court knows, and there's a five-year statute |
| 4 | of limitation on substantive counts, but the -- there was acts |
| 5 | certainly in furtherance of the conspiracy that predated that |
| 6 | five years as of the filing of the indictment in July of 2018. |
| 7 | So she certainly is relevant to the case.  And she is very |
| 8 | relevant on knowledge and notice given the fact that these |
| 9 | defendants watched closely -- it's even more relevant now, |
| 10 | given their opening statements, because they've now opened the |
| 11 | door to these legal decisions.  And this legal decision by |
| 12 | Washington State Supreme Court based on Jessika's case places |
| 13 | them on notice not only that three underaged trafficking |
| 14 | victims sued them, but also that a court found that they |
| 15 | actually did assist in the creation of the postings. |
| 16 | THE COURT:  Okay. |
| 17 | MS. BERNSTEIN:  This case, as Mr. Rapp loves to bandy |
| 18 | about, settled.  There was no ruling on the merits of the case. |
| 19 | A motion to dismiss in the civil case in the pretrial stages |
| 20 | was denied which, as your Honor knows, has absolutely no |
| 21 | bearing to the facts.  It was simply what had been alleged at |
| 22 | the time was not sufficient to dismiss the indictment. |
| 23 | If Ms. Svendgard is here to re-litigate that case, |
| 24 | we're happy to do that.  But I think, as Mr. Rapp just said, |
| 25 | we're going to end up talking about three other purportedly |

1    underaged women at the time.  This relates to the CNN exposé;

2    so I think we need to get some new subpoenas out for all the

3    CNN producers that were a part of that.  And I am particularly

4    concerned that Mr. Rapp is going to argue to the jury that a

5    settlement -- a sealed settlement with confidentiality and

6    nondisclosure agreements in a civil case is going to be some

7    admission of guilt.

8         MR. RAPP:  I'm not going near settlement at all.  I'm

9    just adding that as background for the Court to understand what

10   happened.

11        THE COURT:  Okay.  So her testimony is relevant.  It's

12   within the scope of a conspiracy, but I think you are concerned

13   more with the limits of her testimony.

14        MS. BERNSTEIN:  I think it's twofold.  Yes, with the

15   limits of her testimony, but if her testimony is within the

16   scope of the conspiracy, because Mr. Rapp is alleging that it

17   occurred for all 14 years, is that -- is that the contention?

18        THE COURT:  Well, that's what the superseding

19   indictment alleges.

20        MS. BERNSTEIN:  I'm sorry?

21        MR. RAPP:  It's what a grand jury found.

22        MS. BERNSTEIN:  Well, we'd love to talk about what the

23   grand jury found.

24        But, Your Honor --

25        THE COURT:  It doesn't help.

 1        MS. BERNSTEIN:  Yes.  Concerned about the limits of

 2  her testimony.

 3        THE COURT:  Okay.  We also probably, at some point,

 4  have to have some discussion about the admissibility of all

 5  these other cases.

 6        MR. RAPP:  If I could just be heard on that.  They

 7  have squarely opened the door to these legal decisions

 8  including this case which I intend to go over with

 9  Ms. Nicole Svendgard because she was more -- as the mother, she

10  was more active, but you can't stand in front of the jury --

11  it's what's good for the goose is good for the gander.  You

12  can't stand in front of the jury and talk about dated favorable

13  cases to them when you have a case that squarely fits in with

14  the theory of the government in this case; namely, that they

15  were engaging in internal prostitution marketing strategies to

16  facilitate prostitution including the moderation that was

17  designed not to deter prostitution, but to promote it.

18        And so I don't know what the defense is -- you know,

19  the defense has shifting sands on their defense.  That's fine.

20  They don't have to put on a defense.  But you can't stand in

21  front of the jury and trot out a bunch of legal cases that they

22  view as favorable and not talk about this one that is

23  particularly disfavorable to them.

24        MS. BERNSTEIN:  I would just say two --

25        THE COURT:  I have issues with the way some of those

1    rulings were portrayed as well.

2          MR. RAPP:  We do too, but that's for another day.

3          MS. BERNSTEIN:  In response to the J.S. litigation,

4    I would just add two things which is, number one, if

5    I understood Mr. Rapp correctly, the relevance -- the main

6    relevance for him of that litigation is I think he said that a

7    court found that there were these internal marketing strategies

8    and these things that were creating prostitution.  That is

9    directly at odds with the way they are trying to not provide

10   the memos from the 2012 DOJ investigation where they say the

11   reason those aren't relevant and the reason everything

12   underlying them isn't relevant is because they didn't know then

13   what they purport to know now.  I think, if I understood

14   Mr. Rapp, he's saying that the relevance of J.S. is actually

15   that they did know that in 2010.

16         THE COURT:  In 2015.

17         MR. RAPP:  No.  She's -- she's wrong.

18         THE COURT:  Okay, okay, hold on.  I need to get some

19   clarification from her.

20         The ruling from the Washington court was in 2015.

21         MS. BERNSTEIN:  I don't have the case in front of me.

22   I don't actually know the date.

23         MR. RAPP:  I can give you the cite right now.

24         THE COURT:  Mr. Rapp, she's talking to me.

25         All right.  So, obviously -- well, maybe not -- I know

1   you guys don't agree with me, but I've already ruled that --

2   that other acts within the scope of the conspiracy are

3   admissible and things that provided notice to the defendants

4   that this was going on is relevant.  Mr. Rapp has indicated he

5   is not going into the settlement.  And I'm assuming Mr. Rapp

6   remembers that I've ruled you can't go into the life of her

7   while she was being trafficked.

8          Mr. Rapp?

9          MR. RAPP:  Right.  I mean she's just going to say,

10  "Look, I had a pimp.  The pimp posted me on Backpage.  He took

11  pictures of me.  He crafted the text.  On some occasions,

12  I crafted the text.  He posted me.  The phone rang.  I did

13  three to four tricks a night."

14         She will -- because it's -- obviously, it's relevant,

15  she will talk in limited terms about the sexual activities she

16  had with these men who kept the money, but the reality is she

17  was very much involved in the -- she testified in a criminal

18  case in Seattle regarding the prosecution of the pimp.

19         Obviously, there are certain preliminary questions

20  I have to ask her to set up the story, but I don't intend to

21  dwell on, you know, her -- her life during that time period,

22  the day-to-day life as being pimped out and trafficked.

23         THE COURT:  And so this is one of those examples where

24  the government has one of the parties to the ad who is one of

25  the only two people that can tell you what the ad was about.

1    So...

2            MS. BERNSTEIN:  And it's also not one of the travel

3    count ads.  I appreciate the purported limits you just set of

4    her testimony, but that's really quite a day in the life of a

5    trafficked child, and that's really problematic -- of the

6    sexual acts she engaged in.  If this is being offered to show

7    that the defendants were on notice that she purportedly won,

8    which she did not do, but that she purportedly won some state

9    case, why -- why are the details of a minor's sexual acts and

10   who kept that and the tricks she turned so we can hear about

11   it, how is that relevant?  How is that relevant to our notice?

12           MR. RAPP:  Well, it's --

13           THE COURT:  You've alleged this isn't prostitution.

14   They are providing evidence that it is prostitution.  And I'm

15   assuming -- well, I'm assuming you're going to tell us what the

16   ad looked like or the language used.

17           MR. RAPP:  Which they have the ad -- well, now, wait a

18   minute.  They've had the ad because they got the ad in the

19   civil suit that they --

20           MS. BERNSTEIN:  Again, Your Honor, we are not the

21   Backpage attorneys, and Mr. Rapp's intentional conflation of

22   this is getting tired.

23           We have not been party to any civil litigation.

24   Mr. Rapp knows that.  Mr. Rapp's intentional conflating of the

25   defense attorneys for six individuals in this criminal case

| | |
|---|---|
| 1 | with the, quote, unquote, "Backpage attorneys" is a very tired |
| 2 | refrain. |
| 3 | MR. RAPP:  Well, let me be clear.  The Supreme Court |
| 4 | case was argued by James Grant who has been shoulder to |
| 5 | shoulder with these attorneys for the last three years except |
| 6 | in the last month.  And so the notion that they somehow don't |
| 7 | know about this civil case that they settled -- and agreed to |
| 8 | in a settlement on the eve of trial, I might add.  So, look, |
| 9 | there -- they might have some grievances over some of the |
| 10 | victims, but this victim is particularly relevant on knowledge. |
| 11 | THE COURT:  Okay.  So I've already said she's |
| 12 | relevant. |
| 13 | MS. BERNSTEIN:  And, Your Honor, as to James Grant, he |
| 14 | -- |
| 15 | THE COURT:  Okay.  There doesn't need to be -- let's |
| 16 | be clear.  I'm asking the questions so that I can make a |
| 17 | ruling, and you two need to stop talking to each other through |
| 18 | me. |
| 19 | So the victim can testify as to most of what you said. |
| 20 | If she attempts to go into some detailed description of the |
| 21 | sexual acts, that might be an issue unless -- but then I might |
| 22 | preclude the defense from arguing "Well, it wasn't really |
| 23 | sexual intercourse" because she wasn't allowed to describe it. |
| 24 | So, based on the opening, I may allow more than I would have |
| 25 | because you're challenging -- if she says it's sexual acts and |

```
1    you've challenged whether some sexual acts are actually

2    prostitution, she may have to go into what those acts are.

3             MS. BERNSTEIN:  We appreciate that, Your Honor, but

4    there's still a way to say sexual penetration without going

5    into graphic details about a child who was trafficked and

6    forced to perform sex against her will.

7             THE COURT:  I agree.

8             MR. LINCENBERG:  Your Honor, this is Mr. Lincenberg.

9    If I may just join in briefly, I think that what the openings

10   talked about was the ads, not what -- not what people were

11   actually doing.  I have no doubt that -- that people may have

12   advertised for things and then, at the end of the day, there

13   may have been prostitution that took place.  This has to do

14   with what was advertised.

15            MR. BIENERT:  This is Mr. Bienert.

16            THE COURT:  Part of the way to prove what was

17   advertised is to have the person testify about what happened.

18   So --

19            MR. BIENERT:  Your Honor -- this is Mr. Bienert.

20   That's the big disconnect here.  And you're going to make

21   whatever ruling you'd make, but I will say I believe that's

22   erroneous and the reason is, first of all, you now know a lot

23   more about the case than you did months ago because you've

24   heard each of our positions in opening, and I got to think

25   you're a lot more educated because you've heard things normally
```

1  you don't hear until now.  There is no dispute that Backpage's

2  window into whatever was going on here are the ads.  And the

3  ads predate the activity, whatever happens or doesn't happen.

4  And so I believe that it is erroneous and extremely prejudicial

5  because it is either irrelevant, or so minimally irrelevant it

6  doesn't pass 403, for the government to be focusing on what did

7  or didn't happen after the ad in graphic terms.  They can

8  certainly say generally whether they were doing certain types

9  of sex, but getting into the details -- because doesn't further

10 the ball of what Backpage knew or didn't know based on the ad.

11        The problem with all of this is that the government is

12 trying to put in evidence of things that involve privity and

13 whatever goes on between the pimps and the johns and the

14 prostitutes as being one and the same of what Backpage knew or

15 could know when it posts an ad earlier, and that's the

16 disconnect.  The focus should be on the ads and whether the ads

17 represent one thing or the other, and they can talk about what

18 they say the ads represent all they want, but that's a

19 different issue than what they did or didn't do later and it

20 certainly ratchets it up even more to talk about "and here's,

21 for example, how my pimp treated me" which is what a lot of the

22 evidence, at least anticipated, was.

23        And by the way, I'm blending things, but I noticed

24 Ms. Decoufle, back on that issue, one of the things she was

25 going to talk about, at least according to the government's

1  submission a while ago --

2          THE COURT:  Okay, we'll talk about her later.

3  Anything else you want to say about the victim?

4          MR. BIENERT:  No, except that the victim shouldn't be

5  able to gild the lily on what happened after the ad in great

6  detail.

7          THE COURT:  Okay.  Mr. Cambria, you're standing?

8          MR. CAMBRIA:  Yeah, please, could I just add this:

9  Unless they can show that any of these defendants were aware of

10  what, if anything, happened after the ad was posted, it's not

11  relevant because whether or not somebody negotiated something

12  post-ad is not relevant to our situation.  In fact, the

13  language this Court used in its decision with us said "through

14  these 50 ads,"  And that's our window on this case.  So, if

15  somebody then did something outside the ad, for whatever reason

16  subsequently, that's not admissible against us.  How are they

17  going to show that -- unless they can show that one of our

18  clients was there when it happened or was there when a

19  conversation occurred or was there when circumstances other

20  than in the ad changed.  And so I don't think they can testify

21  at all about what happened subsequent to the ad.  Our entire

22  window in this case is the ad.  And your Honor said so in your

23  decision.  You said "through these 50 ads."

24          THE COURT:  Okay.  All right.  I do -- I do have a

25  better understanding now that I've heard both sides, but I also

1    understand both positions.  And the government's position is

2    that the evidence will show circumstantially that this all

3    provided the information from which the defendants developed

4    their strategy to intentionally promote this business so that

5    they could continue their business.  Probably not an eloquent

6    statement of how I understand the government's case.

7              Is there anything the government wants to add?

8              MR. RAPP:  Only that we now intend to admit --

9              THE COURT:  Wait, I can't hear you.

10             MR. RAPP:  Just on notice, given the opening

11   statement, we now intend to go over this case.  It is JS, SL

12   and LC versus Village Voice Media Holdings, Backpage.com,

13   Backpage.com LLC, and Baruti Hopson and New Times Media.  It's

14   at 184 Wn.2d 95.  We intend to admit that through Nicole

15   Svendgard on notice and knowledge.

16             THE COURT:  Okay.  Well, I'll look at the case

17   tonight.  Can we talk about the expert?

18             There you are, Ms. Perlmeter.  Is the expert going to

19   testify as to -- or do you intend to offer any evidence

20   regarding child sex trafficking?

21             MS. PERLMETER:  So, not specifically.  However, she

22   was a vice detective with the Phoenix Police Department from

23   2005 to 2018.  So I understand the Court's ruling and I don't

24   intend to focus on child sex trafficking at all.  However, in

25   her work as a vice detective, one of the goals was to recover

1   as many victims as possible and they did focus on recovering

2   children.  She also has -- in recent years, is now serving as a

3   consultant to NCMEC.  So it's parts of her bio.  It is what she

4   does.  But I think I can phrase her testimony in a way that

5   does not highlight children and she can talk about sex

6   trafficking, human trafficking and prostitution as a whole.

7           She -- because her timeframe within the unit was 2005

8   to 2018, she basically gives overlay on what the Court had

9   deemed admissible.  She can talk about how law enforcement

10  investigated sex trafficking and human trafficking crimes from

11  2005 until 2018.  I can do that in a way that does not

12  highlight child sex trafficking.  However, that was part of her

13  responsibilities to try to recover children that were being

14  trafficked.  So to answer --

15          THE COURT:  Okay.  You can talk about investigation

16  without talking about child sex trafficking.

17          MS. PERLMETER:  Yeah, I can talk about it in terms --

18  because I think the biggest -- the greater umbrella is

19  prostitution.  And the fact that some of the people that she

20  encountered, some of the victims that she interviewed happened

21  to be children, I think I could do it in a way that will permit

22  her to testify truthfully and also not highlighting the fact

23  that she interacted with children.

24          THE COURT:  Well, and you should direct her to do so.

25          MS. PERLMETER:  Yeah.

1        MR. BIENERT:  The second hurdle, Your Honor, and I've

2   got the motion and order in front of me.  At least as written

3   before, it talks about things she'll do related to looking at

4   things online.  I understand that.  That we're not contesting

5   at this point after Your Honor's ruling.  But the last two

6   sentences -- "Lastly, Detective Decoufle will discuss the

7   relationship between sex traffickers and pimps and their

8   victims.  She will describe the methods and process traffickers

9   and pimps utilized to entice, coerce or control their

10  victims." -- I would submit that, in this case, which is not

11  against a pimp or a trafficker -- it's against a platform that

12  ads went on and, again, the window has to do with the ads --

13  that having an expert talk about the relationships between

14  pimps and their victims and methods they use to entice, coerce

15  or control victims is not relevant and certainly, at most,

16  minimally relevant to ads being screened and would be overly

17  prejudicial and they certainly should not be talking about

18  that.

19        THE COURT:  Can you give me the docket number of my

20  order again?  Do you remember?

21        MS. BERNSTEIN:  It's 1,081.

22        THE COURT:  81?

23        MS. BERNSTEIN:  1,081.

24        MR. PANCHAPAKESAN:  Your Honor, this is

25  Mr. Panchapakesan.

1      Just to piggyback off Mr. Bienert's point, in that

2  order, I believe the Court delineated four areas of expert

3  testimony to be appropriate.  I agree that No. 4 is not an

4  appropriate topic, but the government at least ought to have to

5  proffer, as to Ms. Decoufle, which specific topic she'll be

6  offering expert testimony on.  Otherwise, we are not in a

7  position to prepare.

8      THE COURT:  I'm looking at the four areas.  And

9  I would say at this point, since I know more since I ruled,

10 I do think that the information in No. 4 about the relationship

11 between traffickers and pimps and their victims including the

12 common methods a sex trafficker uses to maintain control over a

13 victim is not relevant.

14      Does the government wish to be heard?

15      MS. PERLMETER:  Not at this juncture.  However, we

16 would like to reserve the opportunity to revisit this issue

17 depending on how the defense shifts.  If the defense starts

18 going down the line that a victim could not have been

19 trafficked or could not have been prostituted because of a

20 certain behavior or because she behaved one way with a pimp

21 versus someone else acting differently with a pimp -- if they

22 bring the relationship between the pimp and the victim into

23 play, then the government would like an opportunity to be

24 reheard on this issue.

25      THE COURT:  Well, that's fine.  So, for purposes of

1    when this expert testifies either tomorrow or the next day,

2    you're not to go into that area.

3            MS. PERLMETER:  Sure.

4            THE COURT:  Okay.

5            MS. BERNSTEIN:  I think that's it, Your Honor.  We

6    appreciate going through all this.  And I just want to confirm

7    that we understand the order of the witnesses since Mr. Stone's

8    morning email.  We can confirm that with them.

9            THE COURT:  So it's -- well, continuation of this

10   witness, and then who's next?

11           MS. PERLMETER:  So Agent Fichtner will continue.  Then

12   the government's intention is for Tera Mackey to testify and

13   the Svendgards to testify.  However, we also make our witness

14   list and our trial testimony plan, and sometimes our plan is

15   derailed because court takes longer than we expect.  Sometimes

16   the Court taking longer than we expect, certain witnesses

17   taking longer or shorter than we expect, we have to move people

18   around to accommodate their lives as well and we have to fly

19   many people.  So while we intend to -- the intent is not to

20   hide from the defense who our witnesses are going to be.

21   They've had our witness list for quite some time.

22           THE COURT:  It certainly seems like it.  So,

23   apparently, this Tera Mackner -- is that her name?

24           MS. PERLMETER:  Mackey.

25           THE COURT:  Mackey.  Sorry.  -- has managed to make

```
 1   her flight, and I'm assuming you would want to get her on since
 2   she's coming from out of state.
 3           MS. PERLMETER:  Yes.
 4           THE COURT:  So your intent is to call her after
 5   Agent Fichtner?
 6           MS. PERLMETER:  Yes.  But, in the future, you know, if
 7   we plan to have a witness testify on Tuesday, and Tuesday comes
 8   and goes and then they're not available the rest of the week,
 9   then we have to kind of shuffle around and scramble to fill all
10   of the court time.  So it's not intended to mislead or -- you
11   know, sometimes we just have to make adjustments based on the
12   time that we have.
13           THE COURT:  Okay.
14           MS. BERNSTEIN:  We understand that.  It was just
15   getting an email this morning at 8:15 when they know well and
16   good what they were doing today seemed a little late
17   disclosure.
18           MR. BIENERT:  I'm a little confused about
19   Ms. Decoufle.  I thought she was going to be the third witness.
20   I didn't hear her.  So my understanding is that the order is
21   Fichtner, Mackey, Svendgard, and no Decoufle.
22           MS. PERLMETER:  We would like to call
23   Detective Decoufle fifth because she is local and we have the
24   Svendgards coming from out of state.  So we have their flight
25   arrangements made.
```

UNITED STATES DISTRICT COURT

```
 1              MR. BIENERT:  Fair enough.

 2              MR. LINCENBERG:  Well, it's not fair enough.  We just

 3    heard about the Svendgards this morning.  So even under this

 4    restrictive 48-hour rule, they can't call them tomorrow.

 5              THE COURT:  Well, they can.  You just object to it.

 6              MR. LINCENBERG:  Okay.  Fair enough.

 7              THE COURT:  Well, we'll see where we are after the

 8    agent is.  I don't know how long this is going to take.

 9              MR. LINCENBERG:  Your Honor, a couple quick points.

10    First, we would request permission for Mr. Panchapakesan to

11    pull his seat up over here next to the table at the end so that

12    we can talk more easily during the trial.

13              THE COURT:  No.  Sorry.

14              MR. LINCENBERG:  Okay.  And then we did have -- the

15    Court doesn't have to take it up now, but we did have a filing

16    about limiting instructions.

17              THE COURT:  Oh, okay.  Well, I actually also need --

18    we're not going to do it right now, but we also need to talk

19    about the motion that was filed about the advice-of-attorney

20    defense.  And I do remember that pleading, but I read it a

21    couple days ago.  So I will take a look at it tonight.

22              Did it affect -- I don't remember off the top of my

23    head.  Does it affect one of the witnesses testifying tomorrow,

24    potentially?

25              MR. LINCENBERG:  I don't believe so.
```

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.

2          MR. STONE:  Your Honor, just quickly on that, we

3    haven't responded to that motion yet, the motion that

4    Mr. Lincenberg just brought up.  I think our deadline to

5    respond to that is on Monday.

6          MR. LINCENBERG:  For the limiting instruction.

7          MR. STONE:  Right.  So we will respond prior to

8    Monday.

9          THE COURT:  Well, as long as it doesn't become

10   relevant.  I don't remember --

11         MR. LINCENBERG:  Right.  It's a general rule that --

12   that, under Rule 105, that, as they bring in evidence of

13   supposed notice from a NCMEC meeting or this or that, as to how

14   the Court is going to handle that with regard to limiting

15   instructions.

16         THE COURT:  Okay, all right.

17         MS. BERNSTEIN:  And, Your Honor, I'm sorry.  Just one

18   final thing is that the government had filed a couple of

19   motions to admit business records.  We haven't responded to all

20   those.  We don't agree with all those and don't want the Court

21   to take our silence as any acquiescence.  We plan to address

22   those as they come up with the witnesses.

23         THE COURT:  You mean their notice -- so you guys filed

24   a notice about using -- about 902, I believe, and then the

25   government filed essentially the same pleading, but as a

1     motion.  Is that what you're talking about?

2               MS. BERNSTEIN:  Yeah.  Mr. Panchapakesan is going to

3     handle this, Your Honor.  Thank you.

4               MR. PANCHAPAKESAN:  Good afternoon, Your Honor.

5               So there's -- on the government side, there's,

6     I believe, two motions to admit certain records.  One is Docket

7     1223 that deals with bank records and summary exhibits.  We

8     oppose that.  That's fully papered.

9               The other -- excuse me -- the other motion is

10    Docket 1235.  We have not responded to that.  That deals with

11    the pre-admission of certain advertisements that are

12    purportedly certified by Carl Ferrer.  We object to that.  I'm

13    happy to address the issues today.

14              THE COURT:  No, but thank you for putting me on notice

15    and I'll take a look at it.  Let's see.  Okay.  I see, the

16    certification by Carl Ferrer.  Okay.  Well, he's not testifying

17    in the next two days.  So...

18              MR. PANCHAPAKESAN:  Right.  And on that, Your Honor,

19    as I understand it, I'm sure the government can explain, but

20    I think they're using him or trying to use him essentially to

21    admit scores of advertisements.  So I assume it's possible the

22    government may try to admit those advertisements before he

23    testifies.  In short, we don't think it's proper because, you

24    know, it's akin to the CFO of a Facebook or a Twitter

25    certifying tweets or wall posts, right?  These are a handful of

1   ads out of millions of ads.  There is no foundation, really, as

2   to how he is able to certify these ads.

3           In looking at them sort of briefly, they are

4   screenshots.  Some are pulled from archive.org.  Some are sort

5   of shoddily printed.  It's really a hodgepodge of material and

6   there is no indication that Mr. Ferrer was the one who pulled

7   the ads.  We don't know how they were pulled.  We don't know

8   when they were pulled.  We don't know if they were pulled from

9   Backpage.  This is, you know, really key evidence in this case

10  because, as I understand it, some of these advertisements

11  pertain to the women who are the subject of the counts in the

12  indictment.

13          THE COURT:  Okay.  So let me just stop you because

14  I guess I wasn't clear that I'm not taking it up right now, but

15  I appreciate you bringing it to my attention that that still

16  needs to be handled.

17          So I have a list of things.  Tomorrow, these are --

18  these are the things that are pending, a little complicated to

19  take care of at 8:30, but I anticipate that you'll have

20  something out.  So I still want you here at 8:30.  And then you

21  can let Elaine know if there's anything that we have to talk

22  about before the agent gets back on the stand and I can come

23  down and we can talk about it.  All right.  We'll see you will

24  the morning.  Thank you.

25          (Proceedings adjourned at 5:08 p.m.)

UNITED STATES DISTRICT COURT

1        C E R T I F I C A T E

2

3         I, BARBARA H. STOCKFORD, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7         I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 24th day of September

13   2021.

14

15

16              _____/s/ Barbara H. Stockford_____
                Barbara H. Stockford, RMR, CRR, CRC
17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT