Exhibit I

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

———————————

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | CR-18-0422-PHX-SMB |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 10, 2021 |
| Michael Lacey, | ) | 8:46 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————— | ) | |

BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - DAY 6 - A.M. SESSION


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    A P P E A R A N C E S

2    For the Government:

3                  U.S. Attorney's Office
                   By: PETER SHAWN KOZINETS, ESQ.
4                      KEVIN M. RAPP, ESQ.
                       MARGARET WU PERLMETER, ESQ.
5                      ANDREW C. STONE, ESQ.
                   40 North Central Avenue, Suite 1200
6                  Phoenix, AZ  85004

7                  U.S. Department of Justice
                   By: REGINALD E. JONES
8                  1400 New York Avenue NW, Suite 600
                   Washington, DC  20530

9

10   For the Defendant Lacey:

11                 Lipsitz Green Scime Cambria
                   By: PAUL JOHN CAMBRIA, JR., ESQ.
12                     ERIN E. MCCAMPBELL PARIS, ESQ.
                   42 Delaware Avenue, Suite 120
13                 Buffalo, NY  14202

14   For the Defendant Larkin:

15                 Bienert Katzman
                   By: THOMAS HENRY BIENERT, JR., ESQ.
16                     WHITNEY Z. BERNSTEIN, ESQ.
                   903 Calle Amanecer, Suite 350
17                 San Clemente, CA  92673

18   For the Defendant Spear:

19                 Feder Law Office
                   By: BRUCE S. FEDER, ESQ.
20                 2930 East Camelback Road, Suite 160
                   Phoenix, AZ  85016

21

22   For the Defendant Brunst:

                   Bird Marella Boxer Wolpert Nessim Drooks
23                 Lincenberg & Rhow
                   By: GOPI K. PANCHAPAKESAN, ESQ.
24                     GARY S. LINCENBERG, ESQ.
                   1875 Century Park E, Suite 2300
25                 Los Angeles, CA  90067

3

1    For the Defendant Padilla:

2            DAVID EISENBERG, PLC
             By: DAVID S. EISENBERG, ESQ.
3            3550 North Central Avenue, Suite 1155
             Phoenix, AZ  85012
4
     For the Defendant Vaught:
5
             JOY BERTRAND ESQ, LLC
6            By: JOY MALBY BERTRAND, ESQ.
             P.O. Box 2734
7            Scottsdale, AZ  85252

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

4

1 **INDEX**

2 SUMMARY OF COURT PROCEEDINGS                              PAGE:

3 Proceedings Outside the Presence of the Jury              5
  Proceedings Outside the Presence of the Jury             60

4

5

6

7 **INDEX OF WITNESSES**

8 WITNESSES FOR THE          Direct      Cross      Redirect
  GOVERNMENT:

9

  FICHTNER, Brian              18
10 SVENDGARD, Jessika           67

11

12

13 **INDEX OF EXHIBITS**

14 EXHIBIT NO.:        DESCRIPTION:                     RECEIVED:

15   489B     Screenshot Auto Repost Prices from
               Fichtner Video                               38
16   489C     Screenshot Sponsor Ad Prices from Fichtner
               Video                                        39
17   490A     Email from Sacramento.backpage.com to
               katiecatt19@gmail.com, x re Edit/Delete
18             line.  Sweet dreams do come true! Call me!
               3/6/15                                       40
19   490B     Email from Sacramento.backpage.com to
               katiecatt19@gmail.com, x re Edit/Delete
20             line.  Sofa for Sale! 3/6/15                 41
     490D     Screenshot of ad Sweet dreams do come true!
21             Call me! - 24                                41
     490E     Screenshot of ad $150, sofa for sale!         42
22  1636A     Clip from 1636, 00:00-01:20
               (including Ny'La ad)                         53

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1        (Proceedings outside the presence of the jury:)
 2             THE COURT:  I understand we're still missing someone?
 3             So we'll wait.
 4             MR. LINCENBERG:  One thing, if we can go off the
 5   record?
 6             THE COURT:  Yes, we're off the record.
 7        (Proceedings off the record.)
 8        (Mr. Feder entered the courtroom at 8:48 a.m.)
 9             THE COURT:  We're going to go on the record outside
10   the presence of the jury.
11             Mr. Feder, where were you?
12             MR. FEDER:  I looked at the minute entry.  It said
13   9:00.  So I apologize, Judge.
14             THE COURT:  Well, I specifically told everybody to be
15   here at 8:30 every day specifically because we're going to go
16   through this every morning, and I don't want the jury waiting.
17             MR. FEDER:  My apologies.  I also told Mr. Spear 9:00,
18   so I apologize.
19             THE COURT:  Okay.  Well, even if the minute entry says
20   9:00, 8:30.
21             Also, one other thing.
22             Someone from the defense team called the clerk's
23   office, well, through facilities about some issues.  I'm pretty
24   sure it was August 20th but maybe it was the day before I had
25   this discussion with you about not contacting the clerk's
```

1      office about issues related to the trial.

2              It is not their job to manage this trial.  They manage

3      the District of Arizona.  They don't need to mini manage this

4      trial.

5              So don't call the clerk's office again.  They just

6      call me.  And if you do, we'll have a hearing about contempt.

7              You've got to stop calling the clerk's office.  Just

8      bring the issue to me.

9              MS. BERNSTEIN:  Your Honor, I think that might be -- I

10     don't know what the issue was.  I think it might have been

11     referring to one of the support staff was trying to assist with

12     getting a refrigerator in the room, so just --

13             THE COURT:  And tables and a separate area for you.

14     There was a list of things.

15             MS. BERNSTEIN:  Okay.  Can we -- Once we have that

16     list, can we bring that to Your Honor's attention?

17             THE COURT:  Yes.  And the clerk's office did attempt

18     to call back, but there was no answer.  So I don't think you

19     ever got an answer.

20             MS. BERNSTEIN:  Okay.

21             THE COURT:  But I know at least Mr. Eisenberg -- I'm

22     sure he shared with you that they're working on an attorney

23     lounge.  It's just not ready yet.  But they hope to have it --

24     I hate to tell you when they hope to have it done, because then

25     if it's not done, but I was told a week or ten days, so --

1          Mr. Lincenberg.

2          MR. LINCENBERG:  Is there anyplace in the meantime?  I

3    mean, you know, at lunchtime we sort of go around the corner,

4    you know.  I'm concerned about people getting dehydration, and

5    it's a hot area.  The government goes to their air conditioned

6    places.  And then we saw that chairs were not being used in the

7    jury area, and we took one.  We were scolded for that.  We

8    don't really have places to even sit in the heat.

9          If there's an area in the courthouse that is unused

10   that's air conditioned over the lunch hour, until this happens,

11   we would request that the Court see if the Court can help us

12   out there.

13         THE COURT:  Okay.

14         MR. LINCENBERG:  Okay.  In terms of other issues, I

15   know if the Court has something on the Court's agenda, I'll

16   defer to the Court.  We have this issue where the parties both

17   briefed for the Court some of the Svendgard testimony, which --

18         THE COURT:  I saw the government's memo.  Did the

19   defense file something?

20         MR. LINCENBERG:  We filed an opposition, and the

21   government filed a reply.  And we don't need to get to that

22   probably right now.

23         THE COURT:  Well, except that that will cause a delay

24   when we switch, so we should discuss it now.  But let me pull

25   up the file.

1        MR. LINCENBERG:  We filed something yesterday late in

2   the day, and the government filed something.  We just got it

3   while we're in the courtroom, a short reply.

4        THE COURT:  Okay.  One second.  Okay.  I read the

5   response and the reply.

6        So the first issue is -- So we'll just go through all

7   five.  It's summarized by the government as a topic of

8   recovering her daughter JS after running away from home, her

9   involvement in the prosecution of JS's pimp, and that her

10  daughter was posted on Backpage.

11       So, Mr. Rapp, are you responding?

12       MR. RAPP:  Yes.

13       THE COURT:  Okay.  So the fact that her daughter was

14  posted on Backpage I see as relevant.  I'm not sure how the

15  prosecution of the pimp is relevant.

16       MR. RAPP:  Well that's how she learns that she was

17  posted on Backpage.  So she doesn't learn that until after --

18  during the course of the prosecution of Baruti Hopson.  She

19  then learns that there is this website Backpage.  And once she

20  discovers that, she then begins to meet with a series of

21  elected officials.  Meanwhile, the defense -- the defendants

22  are also interfacing with those same elected officials.  And so

23  that's why it's relevant.

24       But, more importantly, all of that leads to the filing

25  of the 2012 lawsuit where she is on behalf of her daughter,

1    who's 15, and two other plaintiffs that are 13 that were

2    trafficked on Backpage.  That of course ends up in the

3    Washington State Supreme Court, which is now open, fair game,

4    given the opening of the door by the defense.

5         It then results in a confron -- Then she speaks -- All

6    of this leads to her speaking in front of the United States

7    Senate and telling her story.  And it just happens to be on the

8    same day that the defendants are there.

9         And then of course that's where you get the

10   confrontation.  So if you take that confrontation in a vacuum,

11   she is very well known to these defendants at this point

12   because of the lawsuit in 2012 and their concern about that

13   lawsuit going forward in discovery.

14        And so given their opening statement, they're the

15   defenders of the First Amendment, and they want to press their

16   claims.  They settle like a cheap suit on that case and when

17   it's on the eve of trial.  So all of this is relevant because

18   it leads to that lawsuit.  And it just happens to be the case

19   that she meets with the mayor of Seattle.  The defendants are

20   then meeting face to face.  Carl Ferrer and an agent of the

21   defendants meet with the mayor of Seattle.  There's internal

22   e-mails about the mayor of Seattle's decision to deny

23   advertising in the Seattle Weekly, which is an alternative

24   newspaper owned and operated by Lacey and Larkin.  And so

25   that's a concern to them.  There's a lot of e-mails between the

1    publisher and the editor of the Seattle Weekly and Mr. Lacey

2    and Larkin.  So that's relevant.

3            And then of course she meets with Robert McKenna, who

4    at the time was the Attorney General for the State of

5    Washington.  She tells him her story about being trafficked and

6    her daughter's -- the prosecutions arising out of that

7    trafficking with the pimp Baruti Hopson and also a John, Julian

8    Tarver.  That results in legislation that she also speaks

9    publicly about two bills.  Robert McKenna's office defends

10   those two bills, and it's passed into law.  And the Backpage --

11   the defendants file a, you know, an enjoinder of that.  And so

12   that is Backpage versus McKenna.  So that's relevant.

13           And so all of this under the rubric of notice is

14   relevant, particularly in light of the defense opening.

15           THE COURT:  Okay.  So, Mr. Lincenberg.

16           MR. LINCENBERG:  Yes.  Briefly, as to subpoint one

17   first, Mr. Rapp has just outlined an additional reason why the

18   testimony of these witnesses is not relevant, which is that

19   he's proffering that this witness will say, both the daughter

20   and the mother, that they didn't even have anything to do with

21   the posting of the ad or even know that the ad was out there.

22   So that's an additional reason why this -- much of that

23   testimony is irrelevant.

24           Second, Mr. Rapp ignores the objection with regard to

25   number one, which is evidence of a mother recovering her

1    underaged runaway daughter is not relevant in this trial.

2    Never responds to that.  It's obviously all part of a sympathy

3    gathering story that they're trying to use to inflame the jury

4    that he doesn't even respond to.  It's really simply designed

5    to garner sympathy.

6           With regard to the -- That's subpoint one.  Mr. Rapp

7    merged it into a discussion of the JS lawsuit, which was what

8    was initially led to this dispute.

9           And as we lay out in our opposition, Your Honor, the

10   JS lawsuit was -- there was a motion to dismiss.  And in

11   Washington law a complaint may be dismissed only if it appears

12   beyond a reasonable doubt that no facts exist that would

13   justify recovery.

14          So what the Court said is that they basically allege

15   that Backpage created these ads, and so therefore on this very

16   liberal pleading standard it moves forward.  It has nothing to

17   do with notice of anything.

18          The decisions that the defense is proffering are

19   decisions which say based upon the First Amendment, based upon

20   the Communications Decency Act, which deals with state criminal

21   offenses like prostitution, which are at issue here, that

22   that's notice that courts find that Backpage's conduct was

23   lawful and permitted.

24          THE COURT:  No.  It says that they were protected.

25          MR. LINCENBERG:  Protected, right, protected.

1        So to suggest that an opinion on a procedural issue

2   like whether something is pled in a manner puts somebody on

3   notice that what your platform is doing is illegal is just --

4   it's wrong, and it's confusing, and it's misleading to the

5   jury.

6        THE COURT:  Okay.  Anything final, Mr. Rapp?

7        MR. RAPP:  Well, just that he doesn't address the fact

8   that these were state court actions.  He doesn't address the

9   fact of the carve-out for the federal criminal prosecution.

10       And so that's the distinction between the cases.  The

11  one thing I will add is what will be now -- which was going to

12  be hotly contested before their opening statement -- was

13  Mr. Ferrer is expected to testify that for each one of these

14  courts, they never disclosed the internal prostitution

15  marketing strategies, which the defense, I might add, in three

16  years of litigation has never addressed.

17       And so given the fact that they have highlighted this

18  advice of counsel defense, it is going to be the testimony that

19  they misled these courts on every single occasion.

20       MR. LINCENBERG:  That argument's for another day.

21  That argument's for another day.  This is simply, on the point

22  of the opinion, whether a decision on a procedural ground says

23  anything.  And it doesn't, and it's misleading and confusing

24  and should not be in.

25       THE COURT:  Well, all of those cases are misleading.

1    So if this doesn't come in, all the other ones don't come in.

2           MR. LINCENBERG:  The other cases are completely

3    leading -- they're completely relevant because they're dealing

4    with protection --

5           THE COURT:  They're dealing with state cases, the

6    Section 230, which I've already found doesn't apply in this

7    case.  So I've reread them yesterday.  I'm probably going to

8    reread them again a couple of other times.

9           But those cases are not applicable to this situation.

10          MR. LINCENBERG:  Well, those cases are completely

11   applicable because that is what the lawyers are looking to and

12   then advising the clients that this is lawful conduct.  And

13   it's lawful conduct for a number of reasons.

14          THE COURT:  Well, okay.  I understand that.  But then

15   this ruling is also applicable for the notice that if you're

16   creating content, it's not lawful.

17          MR. LINCENBERG:  This court didn't say that.  This

18   court --

19          THE COURT:  I disagree.  I read it.

20          MR. LINCENBERG:  This court simply said that there was

21   a pleading, and you can't dismiss it on the face of the

22   pleading.

23          THE COURT:  Because the pleading says that they're

24   creating content which would be illegal.

25          MR. LINCENBERG:  Well, that's part of the advice.  It

1    has to do with the fact that you cannot create content.

2              THE COURT:  Okay.

3              MR. LINCENBERG:  Right.  That you can moderate it.

4    And that's what Backpage's moderation policies were for.  But a

5    decision on a procedural ground like this is irrelevant.  Now,

6    there's a number of other points that we object to here.  And I

7    know the Court wants to move forward, and the Court had to

8    review this in a rushed manner because counsel just filed them.

9    It's a lot on the Court's plate.  But these objections are

10   important.  The idea of, by way of context and background,

11   quote-unquote, getting into mothers saving their runaway

12   daughters --

13             THE COURT:  Okay.  Let me just save you some time.  So

14   for the government, Ms. Svendgard's testimony, as I see it,

15   much of it would be irrelevant and hearsay.  The fact that her

16   daughter was trafficked on Backpage is relevant, but that's it.

17   Not the prosecution of her pimp.  The meetings, you can go into

18   the fact that she had meetings and why she had a meeting in

19   general but not what they talked about at the meeting other

20   than the purpose of the meeting was this, because that's just

21   background to what I understand follows from reviewing the

22   exhibits.

23             You can talk about the fact that she testified before

24   the senate at this hearing but not the substance of her

25   testimony.  And of course you can talk about her confrontation

1    with Mr. Lacey.

2            The documentaries, the government wrote "The

3    United States believes the evidence will show the defendants

4    were aware of and had notice of these two documentaries."

5    What's your good faith basis for saying that?

6            MR. RAPP:  Carl Ferrer.  We expect him to testify that

7    they were very much aware of that documentary because, I mean,

8    of course they were.  The documentary chronicles the civil

9    litigation against Backpage.  It has all -- It has the

10   defendants in it.  It has arguments before the Washington and

11   State Supreme Court.  Carl Ferrer will testify that, yeah, when

12   this documentary came out -- I just want to say that the

13   defendants were very concerned about articles and broadcasts.

14   As evidence, one of the exhibits in this case is an enormous

15   spreadsheet of every single article that was ever written about

16   Backpage, 99 percent of them negative.

17           So, yes, they were concerned about those documentaries

18   coming out.  And, yes, we expect him to testify that they were

19   aware of it.

20           MR. LINCENBERG:  Of course there's reputational

21   concern, but the documentaries and this whole story is really

22   being put in just to make this into a star-studded thing that

23   there's people who have devoted their lives -- And the

24   documentaries are about child trafficking.  It just -- All of

25   this is really intended not on any notice.  I mean, if we get

1    back to the core, the people speaking in the documentaries say

2    nothing about whether any of these defendants had any knowledge

3    that any of their particular ads involved people who actually

4    were engaged in prostitution.

5            It's moving farther and farther afield and farther and

6    farther into this inflammatory child-trafficking world.

7            THE COURT:  Okay.  I'm going to preclude this

8    witness's testimony about the participation in the documentary.

9    I don't know how that's relevant.  Carl Ferrer's testimony may

10   be relevant.  Okay.

11           MR. LINCENBERG:  Thank you, Your Honor.

12           THE COURT:  All right.  Let's bring the jury in.

13           Did you -- Mr. Eisenberg.

14           MR. EISENBERG:  Yes, Your Honor.  Thank you.  Earlier

15   the Court spoke about information concerning the accommodations

16   that the defense team has.  My information comes from Denise

17   Aguilera, who is our CJA representative -- our CJA

18   representative, and then I have passed that on to my

19   colleagues.

20           Secondly, I've informed chambers that my client tested

21   negative for the coronavirus and that of course, as Your Honor

22   can see, he's present here in court, and I think he's fine.

23   He's ready to go.

24           THE COURT:  Okay.  Thank you.

25           MR. EISENBERG:  Thank you.

1      MS. BERNSTEIN:  Your Honor, I would also note that I'm

2  going to be doing the cross-examination of Ms. Svendgard, the

3  younger Svendgard, so I'll just need to accommodate timing when

4  I need to be out of the room to pump.

5      THE COURT:  Okay.  Is the mother or the daughter going

6  first?

7      MR. RAPP:  This morning?  No.  We're continuing on

8  with Agent Fichtner, and after the break we will proceed with

9  the Svendgards, after the morning break.

10      THE COURT:  I know, but is the mother or daughter

11  going first?

12      MR. RAPP:  Oh, I'm sorry.  The daughter is going

13  first.

14      THE COURT:  Okay.

15      MS. BERNSTEIN:  I'll just need at least a half hour

16  break.  It takes me, like, seven minutes to get down to that

17  room.  I have to clean my pump parts.  I have to pump.  I have

18  to put it in the fridge.  I have to walk back up here.  So

19  that's why it takes so long.  So I apologize for that delay.

20      THE COURT:  All right.

21      MR. STONE:  Your Honor, should we grab the witness?

22      THE COURT:  Yes.

23      (The Court and clerk confer off the record.  The jury

24  returned to the courtroom at 9:14 a.m.)

25      THE COURT:  We are back on the record with the jury

1    present.  So you all didn't get a call last night, so I'm

2    assuming you guessed, but Mr. Padilla tested negative for

3    COVID, so I didn't have any concerns about proceeding with

4    trial again.  So we're back.  And, Special Agent, you're still

5    under oath from Wednesday.  Do you understand that?

6              THE WITNESS:  Yes, I do.

7              THE COURT:  All right.

8        BRIAN FICHTNER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

9                    CONTINUED DIRECT EXAMINATION

10   BY MR. KOZINETS:

11   Q.  Good morning, Special Agent Supervisor Fichtner.

12   A.  Good morning.

13   Q.  I'm Assistant United States Attorney Peter Kozinets.  And I

14   neglected to ask you to spell your name for the record on

15   Wednesday.  Can you do that please.

16   A.  Yes.  My first name is spelled B-r-i-a-n, last name

17   Fichtner spelled with an F, as in Frank, i-c-h-t-n-e-r.

18   Q.  Thank you.  I'd like to pick up where we left off, and I'd

19   like to ask if we could publish Exhibit 489A at the 50 -- I'm

20   sorry -- the 5-minute-29-second mark.  Thank you.

21              Special Agent Supervisor Fichtner, I'd like to direct

22   your attention to the video screen.

23              Can you please explain what it is that we're looking

24   at in this portion of your video.  Can you not see it?

25   A.  I'm sorry.  It's not up on my screen.  Okay.  Thank you.

FICHTNER - DIRECT

1  Q.   So I'm showing you what had been marked and admitted as

2  Exhibit 489A.   Do you see that on your screen?

3  A.   Yes, I do.

4  Q.   And I have fast forwarded it to the point where we left off

5  on Wednesday, the 5-minute-29-second mark   Do you see that

6  there?

7  A.   Yes, I do.

8  Q.   Can you explain to us what it is that we are looking at

9  here.

10  A.   This is the first step in the process of posting an

11  advertisement on the Backpage website in the adult escort

12  section.

13  Q.   I'm starting to play the video from here.   Can you describe

14  what it is that you're doing.

15  A.   Here I've just typed in the title that I wanted for my

16  fictitious undercover advertisement, and now I'm typing in the

17  description for the advertisement.

18  Q.   I'm highlighting part of the video screen that you're

19  typing on right now.   Do you see the highlighted portion?

20  A.   Yes, I do.

21  Q.   What does it say?

22  A.   It says postings in this category are $10.

23  Q.   Was that some sort of minimum price?

24  A.   Yes.   Minimum fee of $10.

25  Q.   Did that minimum fee apply to other categories on Backpage?

UNITED STATES DISTRICT COURT

1   A.   I did not see minimum fees in the other categories.

2   Q.   I'm highlighting the portion of the video screen showing

3   you actually typing the content of the ad.  Do you see that

4   there?

5   A.   Yes, I do.

6   Q.   I'd like to focus on this first paragraph that you've typed

7   here.  When you were coming up with language for this ad, were

8   you trying to make the ad similar to other ads you had seen in

9   the escort section?

10  A.   Yes.   I wanted this advertisement to fit in with all the

11  other advertisements in the escort section that I had been

12  viewing, so I used similar verbiage, wording, similar content.

13  Q.   We talked about some of the common characteristics of these

14  ads that you had observed in your review of the escort section.

15  Did you incorporate some of those common characteristics here?

16  A.   I did.   They commonly had, like, a proposition here and say

17  would like to make your dreams come true.   They had similar

18  terminology, you know, like I'm clean, safe.   100 percent

19  independent was very common and, you know, available 24/7.

20  Q.   I'm going to pause the video here.   Can you go ahead and

21  just read the title and the text of your ad.

22  A.   The title says, "Sweet dreams do come true.  Call me."  The

23  description states "Hi.  I'm Terra.  I'm in town for a short

24  time and would like to make your dreams come true.  I'm clean,

25  safe, and 100 percent independent.  I'm available 24/7.  Let's

UNITED STATES DISTRICT COURT

1   party together.  You'll leave with a smile."  Then it says,

2   "Real pic.  No fakes.  Please be clean and polite.  No blocked

3   calls.  No drama.  Minimum 30 minutes, $100.  $175 for an

4   hour."

5   Q.  And so this additional language that you've typed since we

6   went over the first paragraph, does this also incorporate some

7   of those common characteristics that you had observed?

8   A.  Yes.  I put in additional verbiage, words, that I saw in a

9   lot of the other ads, along with pricing with time increments.

10  Q.  And can you describe what information you're providing

11  here?

12  A.  There, just below the timing cost, I'm typing in the

13  undercover cell phone number that will be used for this

14  advertisement and to say call or text me at that number.

15  Q.  Focusing in on the next category of information here, do

16  you see that category there?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  That's where you can list your age.

20  Q.  Was there any requirement to verify your age?

21  A.  There was not.

22  Q.  Could you have put in any age you wanted to?

23  A.  Yes.

24  Q.  Do you see this portion of the webpage that I've just

25  highlighted?

1    A.   Yes.

2    Q.   What is this part of the webpage?

3    A.   This gives you the option to receive e-mails or not.  I

4    chose I did not want to.  I just wanted to receive the calls

5    and texts.

6    Q.   Was this a feature that Backpage provided?

7    A.   Yes.

8    Q.   And if you had selected forward e-mail responses to me, was

9    that a -- what would that feature do?

10   A.   That would allow you to reply to this advertisement through

11   e-mail.

12   Q.   Do you see this next feature?

13   A.   Yes.

14   Q.   What is this?

15   A.   It says -- It offers the option of displaying other

16   postings you may have and link them to this advertisement.

17   Q.   How about this next feature?  What is this?

18   A.   This allows you to upload a video with the maximum length

19   of 30 seconds or 15 megabytes.

20   Q.   So this would be a video that you could upload and add to

21   your advertisement?

22   A.   Correct.

23   Q.   And what is this next feature that we're looking at?

24   A.   This allows you to upload pictures to your advertisement up

25   to it looks like 12.

FICHTNER - DIRECT

1   Q.   So using this feature, one could add 12 photos -- up to 12

2   photos to their advertisement?

3   A.   Yes.

4   Q.   Can you describe what it is that you are doing here.

5   A.   Here I am looking for a picture to upload in one of my

6   files, locating an undercover picture to add to the

7   advertisement.

8   Q.   I want to focus your attention now to the next portion of

9   the webpage here which I've highlighted on the video screen.

10  Can you describe what this is?

11  A.   Yes.   This section allows you to upgrade your advertisement

12  for additional money.   You can auto repost the ad, which will

13  bring it to the top of the list every so often for additional

14  cost.

15  Q.   Now, is this dropdown menu here associated with that auto

16  repost feature?

17  A.   Yes.   It tells you the number of times and the cost

18  associated.   The one that's highlighted, it would bring it up

19  four times for 40 additional dollars.

20  Q.   And can you go through the additional pricing that is

21  featured here?

22  A.   Yes.   You can do eight times for $80, 12 times for $120, 26

23  times for $240, 52 times for $480, up to 104 times for $960.

24  Q.   I'm just going to go back slightly here.   I've just

25  highlighted a separate part of the upgrades section.   Do you

1    see that part here?

2    A.   Yes.   That's for a sponsored ad that -- for the

3    advertisements we saw on the right side of the list of

4    advertisements previously in this video.

5    Q.   Were those those thumbnail, kind of those boxes that had

6    kind of larger displays of ads on the right-hand side of the

7    search screen when you were looking for ads?

8    A.   Correct.

9    Q.   Those are the sponsor ads?

10   A.   Those are the sponsored ads or thumbnails.

11   Q.   And what is this pricing sort of menu that we're looking at

12   here?

13   A.   Here from that dropdown screen, if you wanted to run that

14   sponsored ad for a week, it would be $10.60 all the way down to

15   where it says 20 weeks for $212, but it looks like the dropdown

16   screen can even roll farther.

17   Q.   Thank you.   And did you select a sponsorship for this ad?

18   A.   I did.   I selected the two-week sponsorship for $21.20.

19   Q.   And did you select an auto repost number as well?

20   A.   Yes.   I selected the auto repost for the ad for eight times

21   for $80.

22   Q.   Can you describe what's happening now.

23   A.   I clicked on the continue button, and it's going to the

24   next step to preview the ad.

25   Q.   So we're looking at the ad preview screen at this point?

FICHTNER - DIRECT

1    A.   Yes.

2    Q.   And I'd like to direct your attention to the information

3    over here where it says section, category, location, ad price.

4    Do you see that there?

5    A.   Yes, I do.

6    Q.   What does that information say?

7    A.   The section is for adult entertainment.   The category is

8    for the escorts, location in Sacramento, with the ad price of

9    $111.20.

10   Q.   And does the remainder of screen show you a preview of the

11   ad that you had crafted as we were discussing previously?

12   A.   Yes.   And in this preview you can also see the picture that

13   I uploaded.

14   Q.   Can you describe where we are now?

15   A.   Yes.   I clicked on the place ad button, and it's taken us

16   to the payment screen.

17   Q.   And does the payment screen offer various forms of payment?

18   A.   Yes, it does.   You can pay by either credit card with a

19   MasterCard or Visa or with bitcoin.

20   Q.   And what is your understanding of bitcoin just very

21   generally?

22   A.   It's a digital currency.

23   Q.   Do you see any other credit card logos down here at the

24   bottom?

25   A.   Just MasterCard and Visa.

FICHTNER - DIRECT

1  Q.  I want to go back a little bit here.  Do you see where it

2  says the charge will appear on your statement?

3  A.  Yes.

4  Q.  What entity does it identify there?

5  A.  It says this charge will appear on my statement as BP

6  National.

7  Q.  And what does it say on the next line?

8  A.  Payment Solutions BV in the Netherlands.

9  Q.  You're entering credit card information now?

10 A.  Yes.  This is an undercover credit card that I used.

11 Q.  I'd like to direct your attention to the middle of the

12 screen here.  Did the payment entity just change?

13 A.  Yes, it did.

14 Q.  What did it change to?

15 A.  Now it states that the charge will appear on my statement

16 as BP Classified under Classified Solutions in the United

17 Kingdom.

18 Q.  Thank you.  And this reflects the price of your ad?

19 A.  The price of my ad is $111.20.

20 Q.  What screen are we looking at here?

21 A.  This is the fourth step.  It's just stating that we're all

22 done; thank you.  It's stating thank you for posting the ads,

23 and don't hit the browser back button as it may result in

24 multiple charges.

25 Q.  Now, at this point did you receive an e-mail in connection

1   with this ad?

2   A.   I did.   I received an e-mail to the undercover e-mail

3   address that was input into the advertisement, and it stated

4   that thank you for the ad, and your advertisement is now

5   pending.

6   Q.   Was the e-mail from --

7   A.   The e-mail was from Backpage.com.

8   Q.   Did it reflect the price of the ad?

9   A.   Yes, it did.   It was basically a receipt for the

10  advertisement.

11  Q.   I'm going to fast forward just a little bit.   Can you

12  describe now what it is you're doing on your video?

13  A.   We're back to the home page.   I clicked on the

14  buy/sell/trade section for furniture, and these are the list of

15  advertisements for furnitures for sale on Backpage in the

16  furniture for sale section.

17  Q.   And I just want to highlight the list of ads on the left

18  here.   What does this list reflect?

19  A.   A list of advertisements for furniture for sale.

20  Q.   And how many advertisements for furniture for sale had been

21  posted in the last -- well, so far on March 6th?   Let's start

22  with that.

23  A.   There were no postings on March 6 according to this list.

24  Q.   How about on March 5th?

25  A.   Two.

1    Q.  And how about just within the last three weeks or so

2    reflected on this list?

3    A.  Nine or ten.

4    Q.  How many sponsor ads are in this section?

5    A.  There is one.

6    Q.  Can you describe generally what you're doing here.

7    A.  Yes.  I just clicked on the first advertisement to get an

8    idea what they look like.

9    Q.  And was there a minimum price for these ads, for purchasing

10   these ads?

11   A.  No.

12   Q.  What are you doing here?

13   A.  Here I'm looking to post my own advertisement, so I'm going

14   to the furniture for sale category to begin the first step of

15   posting my undercover advertisement.

16   Q.  And I'm just going to fast forward through your typing of

17   the ad.  So I've now fast forwarded to the 16-minute-55-seconds

18   mark approximately.  Can you just generally describe what we're

19   seeing here.

20   A.  Here again I'm typing in the title, the description of the

21   sofa that I wanted to sell, the price, trying to figure out

22   exactly how much I wanted to list it for, settled on $150.

23   It's located in Sacramento.  And I used the same e-mail address

24   as the undercover escort ad.  I also selected the same option

25   to not receive any e-mail responses.  And now I'm uploading a

1    picture.

2    Q.   You used the same undercover e-mail address for this ad?

3    A.   Yes, I did.

4    Q.   The same one that you used for the escort ad?

5    A.   Yes.

6    Q.   And here again we're seeing you select the couch photo?

7    A.   Correct.

8    Q.   I want to direct your attention to the upgrade section

9    here.

10   A.   Okay.

11   Q.   What section are we looking at here?

12   A.   Again, this is the upgrade section that you can purchase

13   additional options to upgrade your advertisement.

14   Q.   And is this first feature we see on the number of times, is

15   that sort of kind of a baseline or minimum option you could

16   select here?

17   A.   Yes.  This is a similar option as in the adult escort

18   section, except for here the number of times, 26 times, it only

19   cost me $1.02.

20   Q.   And looking now down at the sponsor part of this payment

21   section, do you see that here?

22   A.   Yes.

23   Q.   Is this the dropdown menu for the prices for sponsoring

24   this non-adult, couch-for-sale ad?

25   A.   Correct.   This is the additional fee to sponsor the ad or

1   place a thumbnail ad starting at one week for ten cents

2   dropping down to where it says 20 weeks for $2, but then the

3   roll bar can go farther.

4   Q.   Thank you.   And what is it that we're looking at here?

5   A.   So this is the second step to preview the ad for the sofa

6   for sale that I placed.

7   Q.   Is this the price of your ad here?

8   A.   Yes.   The total price for the ad is $1.22.

9   Q.   What is it that we're looking at here?

10  A.   This is the payment screen for that advertisement.

11  Q.   And I'd like to direct your attention again to the payment

12  entity information here.   Do you see that there?

13  A.   Yes.

14  Q.   Was there the same change that we had observed previously?

15  A.   Yes.

16  Q.   And what screen are we looking at here?

17  A.   This is the final step saying we're all done and stating

18  thank you for the ad.

19  Q.   Did you receive a similar sort of e-mail from Backpage kind

20  of confirming your purchase of that ad?

21  A.   Yes, I did.   I received another e-mail for this ad from

22  Backpage.com basically stating the price and thanking me for

23  posting the ad.   It was a receipt.

24  Q.   Now, what is it that you're doing now?

25  A.   Now I'm going back to get into the main page.   And it's

1   taking me to the disclaimer screen, which I click agree.  And

2   now we're back at the main list of advertisements in the

3   Sacramento adult escort section.

4   Q.  Now, focusing on the list here on the left, do you see this

5   list here?

6   A.  Yes.

7   Q.  Do you recall the last ad or -- I should say -- the ad that

8   was at the top of the list before you went and posted the two

9   undercover ads was this TyTee Time ad?

10  A.  Correct.

11  Q.  So what do these ads on -- that appear above TyTee Time

12  represent?

13  A.  Those are the advertisements that have been posted since

14  the last time we were in this screen.

15  Q.  And how many advertisements were posted in that time?

16  A.  I count eight.

17  Q.  And this was within about how many minutes?

18  A.  15 minutes, 10, 15 minutes.

19  Q.  So within the 15 minutes or so that it took you to put up

20  these undercover ads, eight new adult escort ads posted in the

21  Sacramento section of Backpage.com's escort section?

22  A.  Yes, yes.

23  Q.  Can you tell us what it is that we're looking at now?

24  A.  Yes.  This is a different view option of the advertisements

25  we were just looking at.  Instead of listing them in a list

1    form, which would have been the brief view, I clicked on the

2    gallery view.  And this now gives you the list of

3    advertisements along with a photo.

4    Q.  Just highlighting the very top row here, do you see how

5    there are posting dates and times associated with each of these

6    ads?

7    A.  Yes.

8    Q.  Are these the eight new ads that posted while, you know,

9    within the last 15 minutes or so of your making this recording?

10   A.  Yes.

11   Q.  Can you just read the titles of the first three ads here

12   that we see.

13   A.  Yes.  The first one says smoking, hot, skilled, juicy,

14   available, best in the -- It's cut off.

15          The second one says 100 percent real, upscale blond

16   bombshell, elite.

17          Third one, magical lips, nice booty, cute face, spank.

18          The fourth one, the right choice, guaranteed, 100.

19   Q.  Okay.  You can --

20   A.  Okay.

21   Q.  -- stop there.

22          So there are eight ads in this first row?

23   A.  Yes.

24   Q.  And eight ads in the second row?

25   A.  Yes.

1   Q.   Eight ads in the third row?

2   A.   Yes.

3   Q.   Looking at the bottom row, how many ads are there?

4   A.   Six.

5   Q.   So how many ads total do we see on this one page?

6   A.   On this page, 30.

7   Q.   And what is this bar here at the bottom of the screen with

8   all these numbers?

9   A.   That allows you to go to the next page and line.

10  Q.   How many pages does it give you the option of scrolling

11  through here?

12  A.   They're up to ten, but it can go beyond that.

13  Q.   And just directing your attention to the last ad here, what

14  is the posting date and time of this one?

15  A.   The date and time on that is Friday, March 6, 6:46 a.m.

16  Q.   6:46 a.m.  And you were recording this video at right now

17  approximately 9:00 that morning?

18  A.   Yes.

19  Q.   So this reflected 30 ads that had been posted since, you

20  know, between 6:46 a.m. and 9:00 a.m.?

21  A.   Yes.

22  Q.   30 ads just in the Sacramento section of Backpage's adult

23  escort's category?

24  A.   Just in the Sacramento area, yes.

25  Q.   What are we looking at here?

FICHTNER - DIRECT

1   A.  We're looking at the second page with an additional 30

2   advertisements.

3   Q.  And just looking at this last line of advertisements here,

4   I want to direct your attention to the posting times.  Is the

5   very last -- What is the very last posting time that we see

6   here?

7   A.  That was March 6, 3:32 a.m.

8   Q.  So we've now seen 60 ads that have been published here --

9   A.  Correct.

10  Q.  -- preceding the time you were creating the video?

11  A.  Correct.

12  Q.  And what page are we on now?

13  A.  This is the third page with an additional 30

14  advertisements.

15  Q.  What page are we on now?

16  A.  This is the fourth page.

17  Q.  So this fourth page has another 30 ads on it?

18  A.  Correct.

19  Q.  We're now on the next page?

20  A.  Yes.  This is the fifth page with an additional 30

21  advertisements.

22  Q.  And just highlighting that last line of these ads here, can

23  you just read the titles of these ads.

24  A.  The first ad says, "Thursday Outcall Special-24."

25          Second one, "Charlie Roxxx, Certified World Class

UNITED STATES DISTRICT COURT

1    Pleasure Girl."  It looks cut off.

2           The third one is "Beautiful bombshell ready to play.

3    Don't keep me."

4           Fourth one is "Good Girl $100."

5           And then "Italian Princess waiting to come see you,"

6    several emojis.

7           Last one, "I'm back.  Sweet college student looking

8    for a great", and then it's cut off.

9    Q.  So this is Page 5?

10   A.  Yes.

11   Q.  30 ads per page?

12   A.  Yes.

13   Q.  So we've now seen 150 of these ads?

14   A.  Correct.

15   Q.  And this last one here was put up March 5th, 8:03 p.m.  Do

16   you see that?

17   A.  Yes, Thursday March 5th, 8:03 p.m.

18   Q.  So that would have been within the last 12 hours or so

19   of -- or 13 hours of when you created this recording?

20   A.  Correct.

21   Q.  150 ads?

22   A.  Yes.

23   Q.  We're now on the sixth page?

24   A.  Yes.

25   Q.  When you hovered your mouse over one of these ads, can you

1    see the various images associated with them?

2    A.   Yes.   This is a feature that was provided.   If you place

3    your cursor over the gallery view, it would scroll through the

4    pictures that were attached to the advertisement.

5    Q.   So we're now on Page 7 of the gallery view?

6    A.   Yes.

7    Q.   Another 30 ads?

8    A.   Correct.

9    Q.   Is this Page 8?

10   A.   Yes.

11   Q.   Another 30 ads?

12   A.   Yes.

13   Q.   Page 9?

14   A.   Yes.

15   Q.   Which also had 30 ads on it?

16   A.   Yes.

17   Q.   And now we're on Page 10?

18   A.   Yes.

19   Q.   Just focusing on the last ad on Page 10 here, what is the

20   date and posting time here?

21   A.   It is Thursday, March 5th, 6:22 a.m.

22   Q.   So from approximately 9:00 a.m. March 6 to 6:22 a.m. the

23   prior day, in between that period of time, 300 ads were sold

24   here?

25   A.   Yes.   300 advertisements were posted in that 27-hour

1    period.

2    Q.   And, again, this is just for Sacramento?

3    A.   Just for Sacramento.

4    Q.   Just for the Sacramento portion of Backpage's adult escort

5    section?

6    A.   Yes, which was -- excuse me -- one of, what, 30 areas in

7    the State of California.

8    Q.   Right.   When we started looking at your video recording,

9    recall that geographic sort of dropdown menu which reflected

10   different areas within California?

11   A.   Correct.   And Sacramento was just one of those roughly 30

12   areas.   And this is a depiction of a 27-hour period of time

13   with 300 advertisements just in the Sacramento area.

14   Q.   Before we move on, I just want to show you a few more

15   documents relating to your undercover operation.

16   A.   Okay.

17   Q.   And so this would just need to be submitted for now.

18          Special Agent Supervisor Fichtner, do you see what is

19   displayed on your screen?

20   A.   Yes, I do.

21   Q.   And do you recognize this document?

22   A.   Yes, I do.

23   Q.   I want to mention that it is marked Exhibit 489B.   What is

24   this document?

25   A.   This is a screenshot of the process and the posting the

FICHTNER - DIRECT                                    38

1   undercover advertisement that's depicting the auto repost ad

2   pricing.

3   Q.  Is it a fair and accurate screenshot from the video you

4   created?

5   A.  Yes, it is.

6          MR. KOZINETS:  I'd like to move this into evidence.

7          THE COURT:  Which exhibit is this?

8          MR. KOZINETS:  It's Exhibit 489B.

9          THE COURT:  Any objection?

10          MR. BIENERT:  No, Your Honor.

11          THE COURT:  489B will be admitted and can be

12   published.

13   Q.  (BY MR. KOZINETS)  So what does this exhibit show?

14   A.  This shows the pricing for the upgrade on the advertisement

15   that I post.

16   Q.  This was for the escort advertisement?

17   A.  Correct.  This is for the escort advertisement.

18   Q.  I have one more exhibit to offer.  Special

19   Agent Supervisor Fichtner, I'm showing you what has been marked

20   as Exhibit 489C.  Do you see that on your screen in front of

21   you?

22   A.  Yes.

23   Q.  Do you recognize this document?

24   A.  Yes.

25   Q.  What is the document?

1   A.   This is a screenshot of part of the video we just watched.

2          MR. KOZINETS:  Move to admit Exhibit 489C.

3          THE COURT:  Any objection?

4          MR. BIENERT:  No, Your Honor.

5          THE COURT:  489C will be admitted and can be

6   published.

7   Q.   (BY MR. KOZINETS)  Special Agent Supervisor Fichtner, the

8   last exhibit we were looking at, did that have the price ranges

9   for the auto repost ad upgrade for your -- for the escort

10  section?

11  A.   Yes.

12  Q.   And what pricing list are we looking at here?

13  A.   This is the pricing list for the sponsored ads.

14  Q.   I have another exhibit to proffer.

15         Special Agent Supervisor Fichtner, I'm showing you

16  what has been marked as Exhibit 490A.  Do you see that exhibit?

17  A.   Yes.

18  Q.   Do you recognize it?

19  A.   Yes, I do.

20  Q.   How do you recognize it?

21  A.   This is an e-mail that I received from Backpage.com after I

22  posted the adult escort ad thanking me for posting the ad, and

23  it also shows the date, time, and price of the ad.

24         MR. KOZINETS:  I'd like to move Exhibit 490A into

25  evidence.

```
 1            THE COURT:  Any objection?

 2            MR. BIENERT:  No, Your Honor.

 3            THE COURT:  490A will be admitted and can be

 4    published.

 5            MR. KOZINETS:  Thank you.

 6    Q.  (BY MR. KOZINETS)  Special Agent Supervisor Fichtner, I'm

 7    just highlighting part of the e-mail.  Does this information

 8    confirm the information that you had selected regarding the

 9    upgrades that you purchased for the escort ad?

10    A.  Yes.

11    Q.  And so that was to have a sponsorship?

12    A.  Yes.  For the location of Sacramento, it shows that I chose

13    a sponsor and auto repost for eight times.

14    Q.  And what is the total price of the ad here?

15    A.  The total price is $111.20.

16    Q.  I have another exhibit I'd like to proffer.

17            Special Agent Supervisor Fichtner, I'm showing you

18    what has been marked as Exhibit 490D.  Do you see that?

19    A.  Yes.

20    Q.  Do you recognize it?

21    A.  Yes.

22    Q.  What do you recognize it as?

23    A.  This is a screenshot of the advertisement, the undercover

24    advertisement that I posted in the escort section of Backpage.

25            MR. KOZINETS:  We move for the exhibit to be admitted.
```

FICHTNER - DIRECT

| | |
|---|---|
| 1 | THE COURT:  And this is 490D or B? |
| 2 | MR. KOZINETS:  I'm sorry.  It is 490D. |
| 3 | THE COURT:  Okay.  Any objection? |
| 4 | MR. BIENERT:  No, Your Honor. |
| 5 | THE COURT:  490D will be admitted. |
| 6 | MR. KOZINETS:  May it be published please? |
| 7 | THE COURT:  Yes. |
| 8 | Q.  (BY MR. KOZINETS)  So, Special Agent Supervisor Fichtner, |
| 9 | is this how the escort ad that you purchased appeared when it |
| 10 | was live? |
| 11 | A.  Yes. |
| 12 | Q.  I have another exhibit to proffer. |
| 13 | Special Agent Supervisor Fichtner, I'm showing you |
| 14 | what's been marked as Exhibit 490B.  Do you recognize that? |
| 15 | A.  Yes.  This is a copy of the e-mail I received from |
| 16 | Backpage.com related to the sofa advertisement that I posted. |
| 17 | MR. KOZINETS:  This is a -- Pardon me. |
| 18 | Your Honor, I'd move to admit Exhibit 490B into |
| 19 | evidence. |
| 20 | THE COURT:  Any objection? |
| 21 | MR. BIENERT:  No, Your Honor. |
| 22 | THE COURT:  490B will be admitted and can be |
| 23 | published. |
| 24 | Q.  (BY MR. KOZINETS)  Special Agent Supervisor Fichtner, I'm |
| 25 | just directing your attention to the information regarding the |

1    upgrades that you selected for this ad.  Do you see that there?

2    A.  Yes, I do.

3    Q.  Did you select a sponsorship for the ad?

4    A.  Yes.  I selected a sponsor, and I selected the auto repost

5    for 26 times.

6    Q.  And what was the total price of your sofa for sale ad?

7    A.  The total price for this ad was $1.22.

8    Q.  Finally, I just have one more document here to proffer.

9    Special Agent Supervisor Fichtner, I'm showing you what's been

10   marked as Exhibit 490E.  Do you recognize that?

11   A.  Yes.

12   Q.  How do you recognize it?

13   A.  This is a screenshot of the advertisement I posted for the

14   sofa for sale.

15           MR. KOZINETS:  Move to admit Exhibit 490E.

16           THE COURT:  Any objection?.

17           MR. BIENERT:  No, Your Honor.

18           THE COURT:  490E will be admitted and can be

19   published.

20   Q.  (BY MR. KOZINETS)  Special Agent Supervisor Fichtner, is

21   this a copy of a printout of the ad that you published?

22   A.  Yes.  Not a very good copy but a copy.

23   Q.  So this is the couch for sale ad that you purchased during

24   your undercover investigation?

25   A.  Correct.

FICHTNER - DIRECT

1  Q.  So just before we move on, I just want to ask you:  So did

2  you select similar upgrade features for the couch ad and for

3  the escort ad?

4  A.  Yes.  I tried to keep it as consistent and similar as

5  possible.

6  Q.  The escort ad price, do you recall what it was?

7  A.  Yes.  $111.21, I think.

8  Q.  Do you recall the price for the couch for sale ad?

9  A.  $1.22.

10 Q.  So the adult escort ad was about a hundred times more

11 expensive than the furniture ad?

12 A.  Yes, it was.

13 Q.  Thank you.  What happened in your undercover investigation

14 after the escort ad and the couch ad went live on Backpage?

15 A.  Immediately after the escort ad went live, within minutes,

16 we started receiving calls and text messages for the escort ad.

17 Q.  What was the nature of the responses that came in or the

18 volume?

19 A.  They were directed towards soliciting sex for money.

20 Q.  How many responses were received?

21 A.  I think there were close to 200 text messages from

22 different phone numbers and over 130 phone calls from different

23 phone numbers.

24 Q.  Now, those were the responses to the escort ad?

25 A.  Those were responses to the escort ad.

1   Q.  And that was over an approximately how many day period?

2   A.  We actually let it run for about ten days.

3   Q.  So about 300 or I think you said more than 300 total --

4   pardon me -- responses to that escort ad?

5   A.  Correct.

6   Q.  How many responses did you get to the sofa for sale ad?

7   A.  We received one.

8   Q.  One over that ten-day period?

9   A.  That same ten-day period.

10  Q.  Now, you talked about a ten-day period.  What happened

11  after the ads were live for ten days?

12  A.  We let them run for ten days, and then I decided to reach

13  out to Backpage.  I wanted to find out what the response would

14  be to us reporting an advertisement that we believed to be an

15  ad for prostitution in the escort section and see what the

16  response would be.  So I placed a --

17  Q.  Before you -- Before you continue, I just want to ask you:

18  Before you reached out about these ads, were you aware of

19  whether there had been any effort to moderate or remove your

20  escort ad from Backpage?

21  A.  I was unaware of any moderation of the ads.

22  Q.  Were you aware of any effort to take down any of the other

23  ads, the 300 or so other ads, for instance, that we looked at

24  just previously that had been posted within 27 hours of the ad

25  that you purchased?

```
 1    A.  I do not know.

 2              MS. BERTRAND:  Objection.  Calls for speculation.

 3    Move to strike.

 4              THE COURT:  The objection's sustained.  The answer

 5    will be stricken.

 6    Q.  (BY MR. KOZINETS)  Do you know if any of the other ads that

 7    posted within that 24-hour period were taken down?

 8    A.  I do not.

 9    Q.  So you mentioned that you reached out.  What was the first

10    thing that you did?

11    A.  First I placed a phone call to Elizabeth McDougall.  It's

12    my understanding she was legal counsel for Backpage at the

13    time.

14    Q.  How did you reach that understanding?

15    A.  Just through being briefed on the investigation before I

16    took it on but also through, you know, my own investigation of

17    looking into Backpage and finding information out there on the

18    Internet along with an interview that she gave with Anderson

19    Cooper on CNN that listed her as legal counsel for Backpage.

20    And she was speaking on behalf of them in that interview.

21    Q.  And what happened when you -- What happened next?

22    A.  I attempted to call her but received a voice mail.  So I

23    just left a message identifying that I was a special agent with

24    the California Department of Justice, that I had identified an

25    advertisement in the adult escort section that was for
```

1    prostitution, and to have her return my call.

2    Q.   And what did you do next?

3    A.   Then I placed a phone call to Carl Ferrer, who was the CEO

4    of Backpage at that time, and he actually answered the phone.

5    He answered it, said, hi, this is Carl.  I identified myself as

6    a special agent with the California Department of Justice and

7    told him that I had identified an advertisement in the escort

8    section that was for prostitution.

9    Q.   And what, you know, what happened after that?

10   A.   He asked me how I knew that.  I told him I couldn't get

11   into details of my investigation.  But I basically was trying

12   to find out how do I go about reporting this ad.  And he began

13   to tell me that I can send an e-mail to Backpage.  But as he

14   was telling me how to do that through the e-mail, he just asked

15   for the name of the ad, description of the ad.  So I provided

16   him with the actual post ID number of the ad to identify it

17   that way.

18        It sounded like he was looking it up on the computer,

19   because he eventually said that he would take care of it for

20   me.  And he said he also identified another advertisement that

21   was linked to that escort ad, but it didn't appear to be

22   illegal because it was a sofa for sale.

23        I asked him if I should still report this through the

24   e-mail, and he said no, he would take care of it.  I asked him

25   how, you know, when that would be taken down.  He said it

FICHTNER - DIRECT                                    47

1    should be taken down by the end of the day.

2           He also stated that that was their claim to fame, was

3    to -- was their response to law enforcement, how efficient they

4    were.  And he also offered to preserve any records that I may

5    want in the future if I were to choose to subpoena those

6    records.

7    Q.  Now, until you called and spoke with the CEO of Backpage,

8    your ad remained live on the escort section?

9    A.  Correct.

10   Q.  Ten days later, though, when you called the CEO and asked

11   that it be taken down, it was taken down?

12   A.  It was.  After our phone call, I logged back onto the

13   website, and both advertisements had been removed.

14   Q.  Did you try to repost the escort ad?

15   A.  I did.

16   Q.  Were you able to?

17   A.  I was not.

18   Q.  So what happened next?

19   A.  The following day I received a call from Elizabeth

20   McDougall.  She called me.  I -- She said she was returning my

21   call from the day before.  I identified myself as an agent with

22   the California Department of Justice.  I told her that I had

23   identified an escort ad that was for prostitution in their

24   escort section.  However, I had already reached out to

25   Mr. Ferrer, and he had removed the ad for me.

1           Again, she asked how I knew it was a prostitution ad.

2    I explained I couldn't get into the details of the

3    investigation.  But I did ask her that I saw a number of other

4    advertisements that were on there and why those weren't being

5    restricted.  And she pointed to the First Amendment.  She said

6    Backpage believes in the First Amendment and doesn't want to

7    restrict people from posting advertisements.

8           She said there was a filtering process in place to

9    prevent illegal ads being posted, and she described it as a

10   four-step screening process.  The first step was a computer

11   program that would filter out certain words that she said was

12   associated with illegal activity, prostitution, sex

13   trafficking.  And then she said the advertisement would be

14   screened twice by a human moderator.  And then finally the

15   general public had the option to report the advertisement.

16   Q.  What was your response to all of this?

17   A.  I was surprised at some of the ads and the filtering

18   process.  I asked her about a few of the ads that had full

19   nudity that showed bare breasts, genitalia, and if that was

20   allowed.  And she said, you know, pictures like that should not

21   be allowed and that they would have to address it with the

22   moderator to correct the problem.

23   Q.  Did you again raise the issue of prostitution ads with her

24   during your call?

25   A.  I did.  I pointed out that, you know, a number of, gosh,

1    almost all these advertisements just looked like blatant

2    prostitution ads.  And each time I raised that, you know, she

3    never dissuaded me from that.  She basically said the Internet

4    and prostitution is not going away.  And if Backpage were to

5    restrict people from posting in the adult services section,

6    that it would only drive the industry underground and make it

7    more difficult for law enforcement to investigate, which

8    surprised me because --

9             MR. BIENERT:  Objection to the conclusions and his

10   personal opinions, Your Honor.

11            THE COURT:  The objection's sustained.

12   Q.  (BY MR. KOZINETS)  Did Ms. McDougall ever call you to alert

13   you to any prostitution ads on Backpage?

14   A.  She did not.

15   Q.  Did Mr. Ferrer?

16   A.  He did not.

17   Q.  Did anybody from Backpage ever call you to alert you to any

18   prostitution ads on Backpage?

19   A.  No.

20   Q.  Did you continue to periodically review the Backpage

21   website in 2015?

22   A.  Yes, I did.

23   Q.  I'd like to direct your attention to a review you conducted

24   in September of 2015.  Do you recall doing that?

25   A.  Yes.

1   Q.  And what type of review -- or was there a particular date

2   in September when you conducted a review and created another

3   recording?

4   A.  Yes.  September 8, 2015.

5   Q.  And what type of review were you conducting?

6   A.  This one I just wanted to browse the website and just

7   record what was being posted at that date and time.

8   Q.  Were you -- Was there any sort of, you know, randomness

9   associated with your review, or how did you kind of decide how

10  to review it?

11  A.  It was just that.  It was just a random view but also to

12  kind of test out and, you know, increase my user experience and

13  see how the website may have changed during that time, if

14  it's -- if it was the same or it is improved or just to see how

15  it was at that date and time.

16  Q.  Did you notice any changes in the website that you saw in

17  September of 2015 compared to March, 2015?

18  A.  Yes.  They had added a couple additional features to make

19  it easier to browse.

20  Q.  What features did they add?

21  A.  In the previous video, we saw that you could see it in a

22  list.  You could also see it in a gallery view with pictures.

23  They added a feature where you can, you know, browse it by date

24  but also by video.  You had the option to, I guess, search

25  through videos for the advertisements.

1    Q.  Was there now any sort of difference in how you could pay

2    for the ads?

3    A.  Yes.  There was also the option of creating a customer

4    account and purchasing credits to pay for advertisements.

5    Q.  Can you just describe that a little bit further?  What, you

6    know, what did that entail?

7    A.  Just that.  You would log on, create an account, user name,

8    password.  You can buy credits so you would actually have kind

9    of like a Backpage credit line.  So when you would go to post

10   an advertisement, you wouldn't have to input your

11   Visa/MasterCard at that time.  You can just pull from the

12   credits that you had already purchased prior.

13   Q.  Okay.  Did you create a video of your random browsing

14   through the escort section of Backpage on September 8th, 2015?

15   A.  Yes, I did.

16   Q.  Do you remember approximately how long that video was?

17   A.  Maybe 15 minutes.

18   Q.  And can you describe what you saw on the video.

19   A.  Yes.  A lot of explicit material.  A lot of the videos

20   depicted full nudity, genitalia, masturbation.

21   Q.  Before testifying today, did you review any clips or

22   excerpts from that approximately 15-minute video that you

23   recorded?

24   A.  Yes, I did.

25   Q.  And did you review any screenshots from that video?

1    A.  Yes, I did.

2    Q.  I'd like to proffer Exhibit 1636A.  I'm just going to put

3    that up here on the screen.

4            MR. BIENERT:  I'm sorry.  What's the number, sir?

5            MR. KOZINETS:  1636A.

6            MR. BIENERT:  Thank you.

7    Q.  (BY MR. KOZINETS)  Special Agent Supervisor Fichtner, do

8    you recognize Exhibit 1636A?

9    A.  Yes, I do.

10   Q.  What do you recognize it as?

11   A.  This is the beginning of the video that I created on

12   September 8, 2015.

13   Q.  Do you recognize this as an excerpt of the video that you

14   created?

15   A.  Yes.

16   Q.  And you viewed this video before?

17   A.  Yes, I have.

18   Q.  You viewed this excerpt before?

19   A.  Yes, I have.

20   Q.  And you've confirmed that it is an excerpt of the video you

21   created on September 8th, 2015?

22   A.  Yes, it is.

23           MR. KOZINETS:  Move to have Exhibit 1636A admitted.

24           THE COURT:  Any objection?

25           MR. BIENERT:  No objection.

1        THE COURT:  1636A will be admitted and can be

2   published.

3   Q.  (BY MR. KOZINETS)  Special Agent Supervisor Fichtner, I'm

4   showing you just the very beginning of this exhibit.  Can you

5   describe what it is that we're seeing on the screen?

6   A.  This is the front home page for Backpage.com at this date

7   and time.  Here it lists the states and the cities underneath

8   them where previously we were just viewing the Sacramento

9   region.  This showed you the states as well as international

10  countries that you can view.

11  Q.  And do you have a general familiarity with California law

12  regarding prostitution?

13  A.  Yes.

14  Q.  And just in general terms, not giving a specific legal

15  definition, but in very general terms, what is your

16  understanding of California prostitution law?

17  A.  That you can't solicit, engage in, or arrange to have sex

18  for money.

19  Q.  And solicit means offering?

20  A.  Correct.

21  Q.  In the course of your work with law enforcement agents --

22  Well, let me put it this way.  In the course of your work on

23  the Backpage investigation, did you come to work with law

24  enforcement agents from other parts of the country?

25  A.  Yes.

FICHTNER - DIRECT                                    54

1    Q.   From your work on the investigation, did you come to an

2    understanding as to the legality of prostitution in the rest of

3    the country?

4              MR. CAMBRIA:   Object to this.

5              THE COURT:   What's your objection?

6              MR. CAMBRIA:   The objection at this point is, Your

7    Honor, no relevance.

8              MR. BIENERT:   And no foundation as to this witness.

9    It's Mr. Bienert.   It sounds like --

10             THE COURT:   The objection as to foundation is

11   sustained.

12   Q.   (BY MR. KOZINETS)   From your work on the investigation and

13   your dealings with other law enforcement agents from around the

14   country, did you learn from your work and from other agents

15   about prostitution occurring elsewhere in the country?

16             MR. BIENERT:   Objection.   All hearsay.

17             MR. EISENBERG:   Irrelevance, Your Honor.

18             THE COURT:   The objection's overruled but just answer

19   yes or no.

20             THE WITNESS:   Yes.

21   Q.   (BY MR. KOZINETS)   From that, did you learn whether

22   prostitution is illegal in other parts of the country?

23             MR. BIENERT:   Same objection.

24             THE COURT:   The objection is overruled.

25             MR. LINCENBERG:   Objection.   Calls for a legal

UNITED STATES DISTRICT COURT

1    conclusion and vague.

2              MR. BIENERT:  No foundation that this witness is an

3    expert on other than California prostitution laws.

4              THE COURT:  Okay.  The question is "Did you learn

5    whether prostitution is illegal in other parts of the country?"

6    You can answer yes or no.  The objection's overruled.

7              THE WITNESS:  It's a tough yes or no.

8    Q.  (BY MR. KOZINETS)  Did you learn whether prostitution is

9    illegal in other parts of the country?

10   A.  In just one part of the country, yes.  I'm sorry.  It's

11   only legal in one part of the country.

12             MR. BIENERT:  Objection to the substantive answer for

13   lack of foundation, and it's all based on hearsay.

14             MR. KOZINETS:  This is just --

15             THE COURT:  The objection's overruled.  The answer

16   will stand.

17   Q.  (BY MR. KOZINETS)  Okay.  All right.  So this sort of

18   geographic list of places that is just visible on this part of

19   the screen that we're looking at now, those are other places

20   where Backpage was available?

21   A.  Yes.

22   Q.  And I realize this is sort of cut off.  It doesn't show the

23   full scope of, you know, the United States here.  But this is

24   sort of just a rough reflection?

25   A.  Yes.

1  Q.  Okay.  Special Agent Supervisor Fichtner, directing your

2  attention to the upper left-hand part of the screen here, what

3  is it that we're looking at here?

4  A.  These are the options that are now in place for you to sort

5  or view through the advertisements.

6  Q.  And so what is the top section?

7  A.  The top is where it shows the list of advertisements that

8  used to be called brief, and then you have the gallery, which

9  is -- has a picture along with the list of advertisements.  And

10  then they've added video where you can sort through the

11  advertisements for those that have a video attached as well as

12  sort through by date.

13  Q.  So by this point in September of 2015, Backpage had

14  increased the ability of the user to search through these

15  escort ads?

16  A.  Correct.  They had added additional features to make the

17  user experience better.

18  Q.  And is this kind of a gallery view that we're looking at

19  here?

20  A.  Yes.  This is the gallery view.

21  Q.  And, again, this is from September of 2015?

22  A.  Correct.

23       MR. LINCENBERG:  Your Honor, can we have a standing

24  objection -- this is Mr. Lincenberg -- that everything

25  post-sale is completely irrelevant?

1          THE COURT:  Yes.  Yes.

2     Q.  (BY MR. KOZINETS)  Special Agent Fichtner, I'm directing

3     your attention to three ads from the second row of this gallery

4     view.  It's the second, third, and fourth ad.  Can you just

5     read the titles of these ads please.

6     A.  Yes.  The first one says, "Last day in town.  100 percent

7     real and independent," and then "Beautiful --" looks like it's

8     cut off.

9          Second one is "100 percent real mixed with caramel and

10    honey-20."

11         The third one is "Gorgeous mixed babe in town" with

12    an emoji.  "Call for Camilla-2."

13    Q.  Do you notice how the second or -- I'm sorry -- the first

14    and the third of these escort ads include references to the

15    word town or in town?

16    A.  Yes.

17    Q.  For instance, that first ad says last day in town?

18    A.  Yes.

19    Q.  Are these phrases that you commonly saw on the escort

20    section of Backpage?

21         MR. BIENERT:  Objection as to time, Your Honor, or

22    just could he give a time frame?

23    Q.  (BY MR. KOZINETS)  Sure.  When you were

24    conducting your investigation in the year 2015, were these

25    phrases that you commonly saw?

1    A.   Yes.

2    Q.   This may have skipped ahead.   I'm just going to go back a

3    little bit.   I'm sorry.   There was a skip.   I'm showing you

4    three additional escort ads that are on the third row of the

5    gallery view that we were just looking at.   Do you see these

6    here?

7    A.   Yes.

8    Q.   And I realize that the title of the first ad is somewhat

9    obscured, but can you read the titles of the second and third

10   ads?

11   A.   Yes.   The second one says, "Only in town for a few days.

12   Specials-25."

13           The last one says, "Hot and ready" with splash emojis,

14   "incalls, outcalls," has a vehicle emoji "play".

15   Q.   Is that like a car?

16   A.   A car.

17   Q.   So hot and ready, splash, splash, splash, three splash

18   emojis?

19   A.   Correct.

20   Q.   And then incalls --

21   A.   Incalls, outcalls.

22   Q.   -- outcalls.

23   A.   Sorry.

24   Q.   And then car play?

25   A.   And car play.

FICHTNER - DIRECT

1    Q.   And -- I'm sorry -- are we in the video search section now?

2    A.   Yes.  So now we are searching through the video view of the

3    advertisements.

4    Q.   And I'm just showing you the ad appearing at the end of

5    this clip.  Do you see this ad here?

6    A.   Yes, I do.

7    Q.   Can you just read the title of the ad please.

8    A.   The title says, "Exotic, Passionate, Korean, Indian, and

9    Ebony Five Star.  Available now.  Highly reviewed.  Outcall

10   specials now-21."

11   Q.   And can you read the text of the ad please.

12   A.   The text states "Hey, fellas, I'm Nyla.  I am in town

13   hosting incalls and outcalls throughout Sacramento and

14   surrounding cities.  I'm very open-minded, and I love to

15   please.  You will love and never forget the time we spend

16   together.  Every second will be passionate and real.  So please

17   call so we can get started playing."

18   Q.   Okay.  You can stop there.  Does this ad have, again, those

19   sort of similar common characteristics that you had observed

20   from your review of the escort section back in March of 2015?

21   A.   Yes.  It has similar statements like incalls, outcalls,

22   proposition.  Yes, it has similar content.

23   Q.   And we're not going to show this --

24           THE COURT:  Counsel.  I'm sorry.  I'm going to

25   interrupt so we can take our morning recess.  So we'll come get

UNITED STATES DISTRICT COURT

60

```
1    you in about 20, 25 minutes.  Please remember the admonition.
2    We'll see you then.
3         (Proceedings recessed from 10:39 a.m. until 11:20 a.m.
4    Proceedings outside the presence of the jury:)
5              THE COURT:  You can get the jury.
6              MR. RAPP:  And I presume you're going to give the jury
7    some explanation as well?
8              THE COURT:  Yes.
9              MS. BERNSTEIN:  And, Your Honor, we just filed a
10   motion at 1295, and I can orally tell you -- I'm sorry; I just
11   ran upstairs -- I can tell you orally what it says, but it's
12   about limiting Ms. Svendgard's testimony.  I don't know if
13   Ms. Svendgard is in the room, but I would ask that she leave
14   the room.
15             I'm sorry?
16             THE COURT:  Finish.
17             MS. BERNSTEIN:  And just would like if the Court can
18   address that before she testifies.
19             THE COURT:  Have you seen it?
20             MR. RAPP:  No.  She's been on our witness list for
21   over a year.
22             MS. BERNSTEIN:  We don't object to her testifying.
23   Just to limit her testimony.
24             MR. RAPP:  Your Honor, what -- how would the Court
25   like to proceed on this?
```

```
 1              THE COURT:  Give me just two more minutes.
 2              MR. RAPP:  Sure.  I didn't know if you were waiting
 3    for me.
 4              THE COURT:  You can have a seat since -- Okay.
 5              First, I don't know why this wasn't filed earlier
 6    instead of after a 40-minute break and not prior to trial when
 7    you knew this witness was going to be called to testify.
 8              MS. BERNSTEIN:  Because it wasn't until --
 9              THE COURT:  Because now our break is turning into over
10    an hour.
11              MS. BERNSTEIN:  Your Honor, it wasn't until the
12    expounding on Ms. Svendgard's testimony that we were concerned
13    that the government is going to attempt to do the same thing
14    with the younger Svendgard.  And this was not worked on over
15    the break.  It was just filed, and everyone agreed to consent
16    to it.
17              THE COURT:  Mr. Rapp.
18              MR. RAPP:  Judge, that's absurd.  That's absurd.
19    They've had -- They deposed this witness in 2017.  They've had
20    all her statements from the criminal case.  The gov -- This is
21    a retread of motions that have been relitigated again and
22    again.  This is a victim who was posted on Backpage in 2010.
23    They were given notice of it in 2012 when they were sued.  They
24    have been engaging in a conspiracy that included internal
25    prostitution marketing strategies, which makes the 50
```

1    substantive counts within the statute of limitations reasonably

2    foreseeable to these defendants.  They got notice in 2012.

3    They deposed her in 2017.  So how is it that they are filing

4    this right now?

5              THE COURT:  Well, I understand that, but now they've

6    raised the objection, so I have to --

7              MR. RAPP:  I understand.

8              THE COURT:  -- deal with it.

9              Do you have anything you want to say about the

10   substance of -- I guess it looks like a general relevance

11   objection and 403.

12             MS. BERNSTEIN:  It is, Your Honor, 401 and 403.  And I

13   do want to correct, again, we are not Backpage.  We are not the

14   Backpage attorneys.  We had no part in 2012 litigation, 2017

15   litigation, and we have to stop conflating the two.

16             THE COURT:  Okay.  But you've had her statements,

17   correct?

18             MS. BERNSTEIN:  Correct.  But we were not a part of

19   the litigation as was alleged.

20             MR. RAPP:  Again --

21             THE COURT:  You don't have to retread that issue.  So

22   as to her relevance, what's your response?

23             MR. RAPP:  Well, it's very relevant.  It's that she

24   was trafficked in 2010.  They filed suit against them, her, a

25   15-year-old trafficking victim, and two 13-year-old trafficking

1    victims, therefore putting these defendants on notice that

2    their website was facilitating prostitution, including child

3    sex trafficking, which would make all substantive 50 counts

4    reasonably foreseeable to them under an aid and abet theory and

5    Pinkerton theory of liability.

6              THE COURT:  Okay.

7              MS. BERNSTEIN:  Your Honor, I think that's the

8    problem, is that the conspiracy is not a general conspiracy

9    that Backpage was bad and Backpage created prostitution.  The

10   government is limited by what they charged in this case.  And

11   the government charged a conspiracy to violate the Travel Act

12   and listed some overt acts in furtherance of that conspiracy.

13             Obviously an agreement hasn't been established, and

14   that's for the jury and for later at the conclusion of trial.

15   But at this point for the government to say that Ms. Svendgard

16   can come talk about being trafficked when she was 15 because

17   she filed a suit in 2010, it doesn't track the elements.

18             Is she the business enterprise?  Is any of her three

19   pimps the business enterprise?

20             MR. RAPP:  Yes.

21             MS. BERNSTEIN:  Because it's not Backpage.  I'm not

22   sure how this witness then is able to establish that what her

23   pimps did or did not agree with Backpage.  If Mr. Rapp just

24   said that her pimps are the business enterprise, okay, that's

25   clarity we haven't had before.  How is this witness going to

1   talk about pimps' agreements with these defendants?

2           If Mr. Rapp wants to bring in the pimp, we can

3   litigate that.  But this is hearsay.  It's irrelevant.  It's

4   confusing.  It's inflammatory.  And it really muddles the

5   elements of conspiracy.

6           Ms. Svendgard is not a subject of any of the

7   substantive Travel Act counts.  The government did not indict

8   a prosec -- a conspiracy that Backpage was bad and prostitution

9   occurred, because that's not an indictable offense under their

10  theory.

11          The government indicted a conspiracy to violate the

12  Travel Act by these six defendants conspiring and agreeing with

13  business -- particular business enterprises to promote or

14  facilitate those business enterprises' promotion of

15  prostitution.

16          THE COURT:  Okay.

17          MS. BERNSTEIN:  And Ms. Svendgard doesn't fit into

18  that.

19          THE COURT:  Okay.  Before I rule, does anybody else

20  want to say anything?  Because I don't want any adding

21  additional arguments after I've ruled.

22          MR. LINCENBERG:  No, Your Honor.

23          THE COURT:  Mr. Feder?

24          MR. FEDER:  No.

25          THE COURT:  Mr. Eisenberg?

1          MR. EISENBERG:  No, Your Honor.

2          THE COURT:  Ms. Bertrand?

3          MS. BERTRAND:  No, ma'am.

4          THE COURT:  Mr. Cambria?

5          MR. CAMBRIA:  No, Your Honor.  No, Your Honor.

6          THE COURT:  Okay.  So I'm going to allow her

7     testimony, but it's going be really limited.  I mean, she's

8     allowed to testify that she was trafficked by her pimp through

9     Backpage and that she filed suit, but I don't know what else

10    you anticipate getting into.

11          MR. RAPP:  I anticipate -- I anticipate her to testify

12    that she was trafficked by being posted on Backpage, yes, and

13    that people paid money to post her ad, that --

14          THE CLERK:  I think the two mics are too close

15    together.

16          MR. RAPP:  Yeah.  I mean, various people posted her on

17    Backpage.  They used Visa cards to post her.  They paid for the

18    ads.  All of those things that are relevant to a business

19    enterprise.  They paid for the hotels that she was at.  They

20    paid for her clothes.  Those are relevant to the business

21    enterprise.  They reposted her ad, kind of like what we saw

22    this morning, again and again.  And then of course she filed

23    suit against them and was deposed by Backpage attorneys,

24    including Liz McDougall was present there during the testimony,

25    who was an agent of theirs.

1          MS. BERNSTEIN:  Your Honor, this is extremely

2    problematic.  The idea -- My understanding, from having read

3    the deposition and the -- Ms. Svendgard was deposed as a part

4    of her 2017 lawsuit, and she also testified in the criminal

5    trial of one of her pimps.  So I've reviewed her deposition

6    transcript and her testimony at her pimp's trial.  And my

7    understanding is that she does not know.  She thinks her pimp

8    paid money.  She never saw her pimp pay money.

9          MR. RAPP:  That's not true.  That's not true.

10          THE COURT:  Mr. Rapp --

11          MS. BERNSTEIN:  Your Honor, you have the documents.

12    So to try and connect Ms. Svendgard to a conspiracy to violate

13    the Travel Act through a specific business enterprise of her

14    pimp, it is hearsay.  It is inflammatory for Ms. Svendgard to

15    say my pimp did X, Y, and Z.

16          THE COURT:  You're right.  It may be.  It sounds like

17    she may not have the foundation for it.  So you can make the

18    objection.

19          MS. BERNSTEIN:  I'm just concerned with the way he's

20    going to go into her testimony, because if I don't get to

21    cross-examine her until the end to say, "In fact, you never

22    actually posted your ad or saw any of this.  This is all what

23    someone told you," we can't unring that bell.  And I think all

24    of this is real intellectual gymnastics to try to get this to

25    connect to a business enterprise through the Travel Act.  I

J. SVENDGARD - DIRECT                                    67

```
 1    understand the government --
 2              THE COURT:  Okay.  Ms. Bernstein, I've ruled.
 3    She's going to be allowed to testify.  If she doesn't have the
 4    foundation, she's not going to be allowed to answer those
 5    questions.
 6              MS. BERNSTEIN:  Thank you.
 7              THE COURT:  Okay.  Do you have your witness ready?
 8              MR. RAPP:  I do.
 9              THE COURT:  Can you bring in the jury.
10         (The jury returned to the courtroom at 11:33 a.m.)
11              THE COURT:  We are back on the record with the jury
12    present.
13              For the jury's information, to accommodate witness
14    schedules, we're interrupting the special agent's testimony to
15    take this witness out of order.
16              And could you introduce your witness, who you're
17    calling.
18              MR. RAPP:  Yes.  The United States calls Jessika
19    Svendgard.
20         JESSIKA SVENDGARD, GOVERNMENT'S WITNESS, SWORN
21                      DIRECT EXAMINATION
22    BY MR. RAPP:
23    Q.  Ma'am, can you spell your last name for the record.
24    A.  Jessika Svendgard, and my last name is S-v-e-n-d-g-a-r-d.
25    Q.  Ms. Svendgard, you know that your mother's also testifying
```

1   in this trial?

2   A.  Yes, I do.

3   Q.  So to keep the record clear, I'm going to refer to you as

4   Jessika.

5   A.  Okay.

6   Q.  Where are you from?

7   A.  I am from the southeast.

8   Q.  How long have you lived there?

9   A.  About five years.

10  Q.  What do you do there?

11  A.  I am a mother, and I own a tree service.

12  Q.  Do you do that by yourself?

13  A.  With my partner.

14  Q.  All right.  Brothers, sisters?

15  A.  Yes.  I have two siblings, an older brother and an older

16  sister.

17  Q.  Did you grow up in the southeast of the United States?

18  A.  No.  I grew up in a suburb of Seattle, Washington.

19  Q.  And when did you leave Seattle, Washington?

20  A.  When I was approximately 17.

21  Q.  I want to take you back to March of 2010.  How old were

22  you?

23  A.  I was 15 at the time.

24  Q.  And when did you turn 16?

25  A.  December of that year, December 21st.

J. SVENDGARD - DIRECT                                      69

```
1    Q.  What year in -- Were you in school?

2    A.  Yes, I was.

3    Q.  High school?

4    A.  Correct.

5    Q.  During 2010, did you run away from home?

6    A.  Yes, I did.

7    Q.  How many times did you run away from home?

8    A.  Twice.

9    Q.  Did you run away from home in March of 2010?

10   A.  Yes, I did.

11   Q.  What caused you to run away from home?

12   A.  I was getting bullied at school.

13   Q.  Why were you getting bullied at school?

14   A.  Because I was a female wrestler.

15   Q.  You were on the wrestling team?

16   A.  Correct.

17   Q.  All right.

18   A.  I'm sorry.

19           THE CLERK:  Your Honor, I'm sorry.  Excuse me.

20       (Clerk provides tissue box to witness.)

21           THE WITNESS:  Thank you.  I'm okay.

22   Q.  (BY MR. RAPP)  Okay.  So let's talk about the first time --

23   A.  Okay.

24   Q.  -- you ran away from home.

25           How long were you gone?
```

UNITED STATES DISTRICT COURT

J. SVENDGARD - DIRECT

1    A.   I was missing for ten days.

2    Q.   While you ran away, did you meet somebody?

3    A.   Yes, I did.

4    Q.   Who did you meet?

5    A.   Her name was Candace.

6    Q.   And where did you meet her?

7    A.   I met her at a youth homeless center in downtown Seattle.

8    Q.   How long did you spend with her?

9    A.   Approximately seven of the ten days that I was missing.

10   Q.   All right.   Now I'm going to jump ahead slightly.   You ran

11   away a second time?

12   A.   Yes, I did.

13   Q.   Did you meet up with Candace the second time?

14   A.   Yes, I did.

15   Q.   And during that time that you met up with her, did she post

16   you on a website?

17   A.   Yes.   She posted me on Backpage.com.

18   Q.   Now, let's go back to the first time you met her for the

19   ten days.

20   A.   Okay.

21   Q.   During that time period, did you observe what Candace did

22   for a living?

23   A.   Yes, I did.

24   Q.   What did she do for a living?

25   A.   She was a prostitute.

J. SVENDGARD - DIRECT

1  Q.  How old was Candace?

2  A.  I was under the impression that she was 17.  I later found

3  out she was 23.

4  Q.  And during that ten days where you had an opportunity to

5  observe her and you say she was a prostitute, what did you

6  observe that led you to believe that she was engaged in

7  prostitution?

8  A.  Besides her telling me that she was, I witnessed her engage

9  in sexual acts with people in exchange for money.

10  Q.  And where did you see her do that?

11  A.  In a vehicle, multiple vehicles.

12  Q.  At some point were you rescued?

13  A.  Yes.

14  Q.  How did that come about?

15  A.  I was able to get away from the -- where I was at, and I

16  found a police officer and asked him to call my mother.

17  Q.  And did he?

18  A.  Yes.

19  Q.  Did your mother come and take you home?

20  A.  She did.

21  Q.  When you went home -- And is that in the latter part of

22  March of 2010?

23  A.  I believe so, yes.

24  Q.  Now, did Candace, during that time period, did Candace give

25  you something?

1    A.  Yes.  She gave me a cell phone.

2    Q.  And did you keep that cell phone?

3    A.  I did.

4    Q.  And when you went home in the latter part of March of 2010,

5    did you still have that cell phone?

6    A.  Yes, I did.

7    Q.  Did you have contact with Candace over the next couple

8    months?

9            MS. BERNSTEIN:  Objection.  Leading.

10            THE COURT:  The objection's overruled.

11            THE WITNESS:  Yes.  I talked to her for several months

12    after that.

13    Q.  (BY MR. RAPP)  What did you and Candace talk about doing?

14    A.  We had talked about going to California together, and that

15    was pretty much it.

16    Q.  All right.  Did you want to go to California?

17    A.  Yes.

18    Q.  And did you talk about that during the seven of the ten

19    days that you were with her in March?

20    A.  Yes, I did.

21    Q.  And at some point in 2010, did you run away for the second

22    time?

23    A.  Yes, I did.

24    Q.  Can you explain to the jury, Jessika, how you went about

25    doing that.

J. SVENDGARD - DIRECT

1   A.  I packed a small bag of clothes, and I snuck out the front

2   door when a train went by so my parents wouldn't hear me.

3   Q.  And did you meet up with Candace?

4   A.  Yes, I did.

5   Q.  Was Candace with anybody else?

6   A.  Yeah.  She was with two females and another male.

7   Q.  And did you go somewhere?

8   A.  Yeah.  We went to one hotel and then separated from some of

9   the people and ended up at the Knights Inn.

10  Q.  Is that a hotel in the Seattle area?

11  A.  Yeah.  It's -- I can't remember where it was at though.

12  Q.  Okay.  So just to be clear, what month in 2010 are we in,

13  if you remember?

14  A.  Late June.

15  Q.  Late June.  And when you met up with Candace, did she --

16  did she talk to you -- continue to talk to you about going to

17  California?

18  A.  Yes, she did.

19  Q.  Did she have money and perhaps a car to go to California?

20  A.  No, she did not.

21  Q.  During the time period before you ran away the second time,

22  did you and Candace talk about going to California?

23  A.  Yeah.  She had promised that she had Greyhound tickets to

24  get to California with me.

25  Q.  And then when you ran away with her in 2010, you found that

1    she didn't have that?

2    A.   That's correct.

3    Q.   Did she discuss with you in June of 2010 how you could make

4    money so that you could afford tickets to go to California?

5    A.   She said if I worked with her, that we could make money

6    faster in order to be able to pay for the Greyhound tickets.

7    Q.   And when she said "work with her," what did you learn that

8    meant?

9    A.   To prostitute.

10   Q.   And where did she make that statement?  Was it at the hotel

11   or where?

12   A.   Yes.  It was at the Knights Inn Motel.

13   Q.   Did she talk to you about how you would go about

14   prostituting yourself?

15   A.   She said she needed --

16          MS. BERNSTEIN:  Objection.  Hearsay.

17          THE COURT:  The objection's sustained.

18          MR. RAPP:  May I be heard?  Effect on the listener.

19          THE COURT:  Counsel, can I see you at side bar?

20      (Bench conference on the record as follows:)

21          THE COURT:  How is this effect on not hearsay?

22          MR. RAPP:  I don't even know if it's offered for the

23   truth.  She's just telling her you can make money to go to

24   California.  We don't even know if it's true.  As a result,

25   it's effect on the listener.  She allows herself to be posted

1    on Backpage, numerous times meets with men, has sex, and gets

2    money.  So it obviously is effect on the listener.  We don't

3    even know if -- I'm not even offering it for the truth.  I'm

4    offering it for what it caused her to do.

5              MS. BERNSTEIN:  It is being offered for the truth

6    because it's being offered to show that Candace said do X, Y,

7    Z, and JS did X, Y, Z.  She cannot testify to what someone told

8    her.  It's not effect on the listener.  Effect on the listener

9    is this catchall that I think the government invokes at every

10   turn, but it is not effect on the listener.  He's asking her

11   what did Candace say to you, not how did you feel after you

12   talked to Candace.

13             THE COURT:  Okay.  The objection is sustained.  You

14   can say what happened after she talked to Candace but not what

15   Candace said.

16       (End of bench conference.)

17   Q.  (BY MR. RAPP)  Did you have some conversations with

18   Candace?

19   A.  I did, yes.

20   Q.  Did Candace do anything with you to post you on

21   Backpage.com?

22   A.  Yes.  She took pictures of me.

23   Q.  And did you observe what she did with those pictures?

24   A.  She proceeded to make a Backpage ad and posted it.

25   Q.  All right.  And did she do that on a phone or a computer,

1  or what did she do this on?

2  A.  I don't recall.

3  Q.  After she -- So can you describe the pictures that she

4  took?

5  A.  Little clothing and provocative.

6  Q.  And did you actually observe her posting you on this

7  website?

8  A.  I was in the same vicinity as her.  I don't remember if I

9  watched every click that she made.

10  Q.  After she posted you on Backpage.com, what happened?

11  A.  The phone started to ring that she had given me.

12  Q.  And who was -- Did you answer the phone, or did she answer

13  the phone?

14  A.  I did.

15  Q.  And who was on the other end of the phone?

16  A.  Somebody who wanted to pay for sex.

17  Q.  All right.  And was there any arrangements made with this

18  person for you to meet with them?

19  A.  Yes.  They were supposed to come pick me up, and I was to

20  have oral sex or intercourse with them in exchange for money.

21  Q.  And did that happen while you were with Candace?

22  A.  Yes, it did.

23  Q.  And how many times, Jessika, did that happen?

24  A.  Like three or four.

25  Q.  And did you go -- I'm going to ask you some tough

1    questions.  Did you go with these men?

2    A.  Yes, I did.

3    Q.  And did you have sex with them?

4    A.  I was 15, and I was not the age of consent.  I was raped.

5              MS. BERNSTEIN:  Objection, Your Honor.  That's not the

6    question that was asked.

7              THE COURT:  The objection's sustained.

8    Q.  (BY MR. RAPP)  Did they pay you?

9    A.  Yes, they did.

10   Q.  At some point -- Did you keep the money?

11   A.  No, I did not.

12   Q.  Did you give it to somebody?

13   A.  Candace, we got in an altercation, and she took it from me.

14   Q.  Did you leave Candace?

15   A.  Yes, I did.

16   Q.  All right.  Did you -- Where did you go?

17   A.  I hid in the back of the motel under a mattress.

18             MS. BERNSTEIN:  Your Honor, objection, and I would

19   request a side bar.

20             THE COURT:  The objection's sustained.  Counsel.

21      (Bench conference on the record as follows:)

22             THE COURT:  Counsel, I told you not to go into the

23   life of a victim, and this is getting into beyond being posted.

24             MR. RAPP:  Well, I have to tell the story.

25             THE COURT:  Well --

1          MR. RAPP:  No.  Let me -- Let me just finish.  She

2    calls a pimp, a pimp that she had met through Candace.  The

3    pimp picks her up, takes her to his apartment.  They're there

4    for a couple days.  He then starts posting her on Backpage.com,

5    and she starts engaging in the same activity.  I mean, I can't

6    just have her parachute into -- She's got to give some type of

7    a story here how she ends up with --

8          THE COURT:  Actually she doesn't.  You can jump to the

9    next one.  I'm not going to allow this.  So --

10         MR. RAPP:  Okay.

11         THE COURT:  -- you need to be very careful.

12         MR. EISENBERG:  Your Honor, can you strike the

13   testimony that was given just now with respect to what happened

14   when she ran off and hid under a mattress or something like

15   that?  That's highly prejudicial to us.  So was her answer I

16   was only 15.  But this part about how she got away is just

17   incredibly prejudicial.

18         MR. FEDER:  On top of Candace took my money, she

19   assaulted me or something; we had an altercation.  This is --

20   This is the end result of allowing --

21         THE COURT:  You need to say your name.

22         MR. FEDER:  I'm sorry.  Bruce Feder.

23         MS. BERNSTEIN:  I would just --

24         THE COURT:  Are you done?

25         MR. FEDER:  Yeah.

J. SVENDGARD - DIRECT                    79

```
 1          THE COURT:  I can't have three of you talking at one
 2   time without saying your name.
 3          Mr. Rapp, do you want to respond to the request to
 4   strike that from the record?
 5          MR. RAPP:  It's part of the story.  She leaves the
 6   hotel and meets another pimp.
 7          THE COURT:  Okay.  But these details are violating my
 8   order that you not go into the sort of details of her life as a
 9   prostitute.
10          MR. RAPP:  Well, there's actually a lot more to this
11   than what I'm going into.  I'm just telling the story.  She has
12   to be able to tell a story that makes sense where she ends up
13   with another pimp, and then she's going to end up with yet
14   another pimp, so -- and all through Backpage.com.
15          THE COURT:  Well, it's the Backpage.com that matters,
16   not how she gets from one to the next.  So the objection --
17   I'll strike that last answer.
18          MS. BERNSTEIN:  Can we just note -- This is Whitney
19   Bernstein.  And I would just note for the record -- because I
20   don't think it will come across -- that she has cried multiple
21   times during Mr. Rapp's testimony, and it is prejudicial and
22   inflammatory.
23       (End of bench conference.)
24          THE COURT:  That last question and answer will be
25   stricken.
```

1   Q.  (BY MR. RAPP)  Okay.  Jessika, did you meet somebody else

2   that evening?

3   A.  Yes, I did.

4   Q.  Who was that?

5   A.  Baruti Hopson.

6   Q.  Did you go somewhere with Baruti Hopson?

7   A.  Yes.  I went to his apartment.

8   Q.  How long were you with Baruti Hopson?

9   A.  The next 105 days, give or take a few.

10  Q.  While you were at -- with Baruti Hopson, did you have an

11  opportunity to observe what he did for a living?

12  A.  Yes.

13  Q.  Well, what did you observe that -- how he made his money?

14  A.  He -- He was -- He made his money off of me.

15  Q.  What, based on your experience over that 105 days, what

16  would you characterize his job as?

17          MS. BERNSTEIN:  Objection, Your Honor.

18          MR. FEDER:  Object as to relevance.  And may it be a

19  continuing objection?

20          THE COURT:  Okay.  The objection is overruled but

21  noted.

22  Q.  (BY MR. RAPP)  All right.  Did he -- Can you explain to

23  this jury how he made money off of you?

24  A.  He would sell me on Backpage.com, and I would --

25          MS. BERNSTEIN:  Objection.  Lack of foundation.

1          THE COURT:  The objection is sustained.

2   Q.  (BY MR. RAPP)  All right.  Did you observe -- Did he take

3   any pictures of you?

4   A.  Yes, he did.

5   Q.  How many times over the 105 days did he take pictures of

6   you?

7   A.  There was only one specific time he took pictures that he

8   just reused every time.

9   Q.  And did you see, Jessika, what he did with those pictures?

10  A.  Yes.  He would post them on Backpage and make ads.

11  Q.  Were you present when he made these ads?

12  A.  Yes, I was.

13  Q.  And what did you see him actually doing to make these ads?

14  A.  Giving, like, a description of me and sometimes, you know,

15  how long I could see somebody for and posting pictures to go

16  with them.

17  Q.  And when he would do this, what would happen?

18  A.  People would call.

19  Q.  And would you answer the phone, or would Mr. Hopson answer

20  the phone?

21  A.  I would.

22  Q.  And who would you talk to?

23  A.  Purchasers or Johns.

24          MS. BERNSTEIN:  Objection, Your Honor.

25          THE COURT:  What's the objection?

```
 1              MS. BERNSTEIN:  Lack of foundation.

 2              THE COURT:  The objection's overruled.

 3    Q.  (BY MR. RAPP)  When you say Johns, what are Johns?

 4    A.  People paying for sex.

 5    Q.  And were these the people who were calling you?

 6    A.  I'm sorry.  What?

 7    Q.  Were these, when you said that you would receive these

 8    calls after Mr. Hopson would post you on Backpage.com, were

 9    these Johns that were calling you to arrange for sex?

10    A.  Yes, they were.

11    Q.  And did you actually meet with these individuals?

12    A.  Yes.  I would either be driven to where they are or they

13    would come to me to a hotel.

14    Q.  And when you went with them, Jessika, what would happen?

15    A.  I would be raped for money.

16    Q.  In the 105 days that you were with Mr. Hopson, how many

17    times would that happen, Jessika?

18    A.  Three to --

19              MS. BERNSTEIN:  Objection, Your Honor, relevance.

20              THE COURT:  The objection's sustained.

21    Q.  (BY MR. RAPP)  When you got -- Did you get paid?

22    A.  I did not get to keep any of the money, no, so no.

23    Q.  What did you do with the money?

24    A.  I had to give it to Baruti.

25    Q.  All right.  So let's go back to Backpage.com.  Did you
```

J. SVENDGARD - DIRECT

1   observe how Mr. Hopson would pay for your ad on Backpage.com?

2   A.  He would put money on a prepaid --

3           MS. BERNSTEIN:  Objection, Your Honor.  This was not

4   the question.

5           THE COURT:  The objection's sustained.  Can you repeat

6   the question for her.

7   Q.  (BY MR. RAPP)  Sure.  Did you actually see how Mr. Hopson

8   was able to pay for your ad on Backpage.com?

9   A.  Yes.

10  Q.  How did he go about paying for the ad?

11  A.  With a debit card.

12  Q.  And what would he do with that debit card?

13  A.  He would -- It would just ask for the payment information,

14  and he would type in the information and --

15          MR. FEDER:  Objection.  Calls for hearsay and

16  foundation.  Move to strike.

17          THE COURT:  The objection's overruled.

18  Q.  (BY MR. RAPP)  And did you ever use a credit card to post

19  an ad of yourself?

20  A.  I did.

21  Q.  And where did you get that credit card?

22  A.  Baruti Hopson.

23  Q.  And do you know where these credit cards came from?

24  A.  No.

25  Q.  Were these credit cards that were in Mr. Hopson's name

J. SVENDGARD - DIRECT

1    based on what you could observe?

2            MS. BERNSTEIN:  Objection, Your Honor.

3            THE COURT:  What's your objection?

4            MS. BERNSTEIN:  I withdraw.

5            THE COURT:  Okay.

6            THE WITNESS:  I'm sorry.  Can you repeat the question?

7    Q.  (BY MR. RAPP)  Of course I can.  Were you in a position to

8    observe whether these credit cards had Mr. Hopson's name on

9    them?

10   A.  From my observations, they did not.  They were just

11   pre-loaded debit cards that you could load at pretty much any

12   cash, like, place.

13   Q.  Did you ever see him purchase these credit cards?

14   A.  Yes.

15   Q.  How many times?

16           MS. BERNSTEIN:  Objection, Your Honor.  Relevance.

17           THE COURT:  The objection's sustained.

18   Q.  (BY MR. RAPP)  Now, at some point did you have an

19   arrangement with a man for sex that wasn't a John?

20   A.  Yes, I did.

21   Q.  And did this person, did you learn, based on your

22   observations, that this person was a pimp?

23   A.  Yes, I did.

24           MS. BERNSTEIN:  Objection, Your Honor.  Lack of

25   foundation.

J. SVENDGARD - DIRECT                          85

```
1              THE COURT:  The objection's sustained.
2              MS. BERNSTEIN:  Move to strike.  Sorry, Mr. Rapp.
3              THE COURT:  That is -- Well, it's denied right now
4    unless -- if you're going to lay some more foundation.
5    Q.  (BY MR. RAPP)  Can you tell the jury about this person I'm
6    referring to.
7    A.  He -- This person posed to be a John.  And when he showed
8    up, he was a pimp, and he showed me how much better my life
9    could be if I went with him.  And I ended up leaving with him.
10   Q.  When you say he was posing as a John but in fact was a
11   pimp, did he meet you through one of the postings on
12   Backpage.com?
13   A.  Yes, he did.
14             MS. BERNSTEIN:  Objection.  Foundation.
15             THE COURT:  The objection's sustained.
16             MS. BERNSTEIN:  Move to strike.
17             THE COURT:  That last answer will be stricken.
18   Q.  (BY MR. RAPP)  Did you -- Did you meet him through
19   Backpage.com?  Did he answer one of your postings?
20   A.  Yes, he did.
21             MS. BERNSTEIN:  Objection.  Lack of foundation.  Move
22   to strike.
23             THE COURT:  The objection's sustained.
24   Q.  (BY MR. RAPP)  How do you know that?
25             THE COURT:  The answer will be stricken.
```

UNITED STATES DISTRICT COURT

J. SVENDGARD - DIRECT                                    86

1    Q.  (BY MR. RAPP)  How do you know that he met you through a

2    posting on Backpage.com?

3              MS. BERNSTEIN:  Object to the question, Your Honor.

4              THE COURT:  The objection's overruled.

5    Q.  (BY MR. RAPP)  How do you know?

6    A.  He called the number that was on my Backpage listings.

7    Q.  And then he showed up?

8    A.  To the address that I gave him.

9    Q.  And did you spend some time with him?

10   A.  Yes.

11   Q.  And was there anybody else with him?

12   A.  There was a woman by the name of Thee (phonetic).

13   Q.  And was she engaging in acts of prostitution as well?

14             MS. BERNSTEIN:  Objection, Your Honor, relevance.

15             THE COURT:  The objection's sustained.

16             THE WITNESS:  Not that I witnessed.

17             THE COURT:  You can't answer.

18             THE WITNESS:  Oh, I'm sorry.

19             THE COURT:  That's okay.

20   Q.  (BY MR. RAPP)  Did you -- Eventually did you end up back

21   with Baruti Hopson?

22   A.  I did.

23   Q.  And did you continue to engage in acts of prostitution at

24   his direction?

25             MS. BERNSTEIN:  Objection, Your Honor, to the form of

UNITED STATES DISTRICT COURT

1    the question.  Calls for an answer and lack of foundation.

2              THE COURT:  The objection's overruled.

3              THE WITNESS:  Can you repeat the question?

4    Q.  (BY MR. RAPP)  Yes.  Well, let's take a step back.  Did you

5    end up back with Mr. Hopson?

6    A.  I did.

7    Q.  Did you continue to be posted on Backpage.com?

8    A.  Yes.

9    Q.  And did you continue to meet with men for the purposes of

10   having sex for money?

11   A.  Yes, I did.

12   Q.  Eventually did you -- Eventually did you arrange to have

13   sex with somebody, and they turned out not to be a John?

14   A.  When I was recovered, yes.

15   Q.  Can you tell us about that.

16   A.  I went to meet somebody who --

17             MS. BERNSTEIN:  Objection, Your Honor, relevance.

18             THE COURT:  The objection's sustained.

19   Q.  (BY MR. RAPP)  Well, did you -- did you -- did you respond

20   to -- Did somebody respond to a posting on Backpage.com?

21   A.  Yes.  I got a phone call from one of the postings, and I

22   went to meet with the John, and it was a police officer.

23   Q.  And is this, when you say you were recovered, were you

24   arrested?

25   A.  Yes.

1    Q.  Now, going back to the time you were with Baruti Hopson,

2    did you stay in the same city?

3    A.  We -- He would -- We would travel.

4    Q.  When you say you would travel, where would you go?

5    A.  To other suburbs around Seattle.

6    Q.  All right.  And do you recall some of those suburbs, the

7    names of those suburbs?

8    A.  Belleview and I believe Bothell, and I can't recall the

9    names, all of them.

10   Q.  Jessika, do you know why you would go to other cities?

11   A.  Because he --

12           MS. BERTRAND:  Objection.  Relevance.

13           THE COURT:  The objection's sustained.

14   Q.  (BY MR. RAPP)  But, in any event, did you go to other

15   cities and have these same meetings with men, sex for money?

16           MS. BERTRAND:  Objection.  Relevance.

17           THE COURT:  The objection's overruled.

18           You can answer that one.

19           THE WITNESS:  Could you repeat the question.

20   Q.  (BY MR. RAPP)  Yes.

21   A.  I'm sorry.

22   Q.  Did you go -- When you went to these other cities, did you

23   also have arrangements with men through your Backpage postings

24   and have sex for money?

25           MS. BERNSTEIN:  Objection.  Lack of --

```
 1              MR. EISENBERG:  Objection.  Foundation.
 2              THE COURT:  I'm sorry.  I didn't hear the objection.
 3              MR. EISENBERG:  Foundation, Your Honor.
 4              MS. BERNSTEIN:  And relevance, Your Honor.
 5              THE COURT:  The objection's overruled.
 6              THE WITNESS:  Yes.  I would travel to and post
 7     different listings on Backpage.com for different cities in
 8     order to make money for Baruti Hopson.
 9     Q.  (BY MR. RAPP)  All right.  Now, after you were arrested,
10     did you return home?
11     A.  Yes, I did.
12     Q.  And did you participate in the prosecution of Baruti
13     Hopson?
14     A.  Yes, I did.
15     Q.  And did you testify at his trial?
16     A.  Yes.
17     Q.  And during that trial, did they show you, during your
18     preparation and in that trial, did they show you the postings
19     on Backpage.com?
20     A.  Yes.
21     Q.  And I want to jump ahead a little bit.  At some point were
22     you deposed as part of a civil case?
23     A.  I was.
24     Q.  And during that process, were you showed your postings on
25     Backpage.com?
```

J. SVENDGARD - DIRECT

```
1    A.  I believe so, yes.

2    Q.  All right.  I'm showing you what has been marked as

3    Government's 211C.

4         And this is for the witness's eyes only, madam clerk.

5         Now, Jessika, have you, in preparation for your --

6    You've already testified for your preparation for your

7    testimony in the criminal case of Baruti Hopson you looked at

8    your postings?

9    A.  Yes.

10   Q.  And in preparation for your testimony here, you've looked

11   at your postings, correct?

12   A.  Correct.

13   Q.  And can you -- Do you have it on the screen there?

14   A.  I do.

15   Q.  And are these the postings during the time -- the 105-day

16   time period that were on Backpage.com?

17   A.  Yes, they are.

18   Q.  How do you know that?

19   A.  The pictures are of me, and I recognize the text and the

20   e-mail, and the -- and it has Baruti Hopson's name it.

21   Q.  Let me ask you about the e-mail.  How do you recognize the

22   e-mail?

23   A.  We would use that to make the postings.

24   Q.  All right.  And in terms of the dates, do the dates of

25   these postings, do they correspond to the time -- the 105-day
```

1   time period you were with Mr. Hopson?

2   A.  Yes.

3   Q.  And indeed the first one, the first posting, do you see

4   what date it was in?  Did you see the --

5   A.  Do you want me to say the date?

6   Q.  Yeah.  What was the date?

7   A.  June 27th, I believe.

8   Q.  And then the last posting as part of 211C, let's see if we

9   can show you the date there.

10  A.  August.

11  Q.  Do you see that?

12  A.  Do you want me to say the date?

13  Q.  Yes.  What was the date?

14  A.  August 14, 2010.

15  Q.  And that is within the time period that you were being

16  posted on Backpage.com by Baruti Hopson?

17  A.  Yes, sir.

18          MR. RAPP:  Move to admit 211C.

19          THE COURT:  Any objection?

20          MS. BERNSTEIN:  Your Honor, I do have an objection.

21  I would like to do a brief voir dire of the witness.

22          THE COURT:  Okay.  Let's do it after our lunch break.

23  All right.  We're going to recess for an hour for lunch.

24  Please remember the admonition.  We'll see you after lunch.

25      (The jury exited the courtroom at 12:10 p.m.)

J. SVENDGARD - DIRECT                                   92

1          MS. BERNSTEIN:  Your Honor, I would just remind the

2    government and witness there should be no communication during

3    the break while she's on the stand.

4          THE COURT:  No communication with who?

5          MS. BERNSTEIN:  The government should not be speaking

6    to the witness about her testimony while she's in the middle of

7    it under oath.

8          MR. RAPP:  It wasn't my intention to, but I've never

9    heard of that as a rule.

10          THE COURT:  I haven't either but -- Okay.  Oh, I

11    wanted to let defense know that you can use my jury room, which

12    is up on the fifth floor at the very end.  So if you're up

13    there, the left side, you have to go all the way to the end

14    hall and press the button, and Yvonne or one of my law clerks

15    will let you in.

16          Socially distanced, it's only enough for eight people,

17    but it's something for right now.

18          MR. FEDER:  Thank you, Your Honor.

19          THE COURT:  But I told her that she only had to wait

20    around for 15 minutes after we recess each day for lunch, so

21    somebody needs to go up there.

22          MS. BERNSTEIN:  We will, Your Honor.  And what time

23    are we to be back?

24          THE COURT:  1:15.

25          MR. LINCENBERG:  Your Honor, this is Mr. Lincenberg.

1    Very quick point.  With regard to the side bars, if the

2    background noise is preventing the jury from hearing, then I

3    would ask that everybody not whisper.  We have a big group.

4    We're all sticking our heads in real close.  I still can't hear

5    when people are whispering.  And it seems to me that people can

6    speak in a normal voice, and the jurors won't be able to hear.

7            THE COURT:  Well, we can try it.  But generally I

8    don't want people talking in their full voice.  I know the

9    noise is supposed to minimize the amount people can hear, but

10   some -- some people tend to talk louder than others, but --

11           MR. LINCENBERG:  Well, I understand the quandary.  My

12   sense is that with that background noise, if we talk in a

13   normal voice, there's no speakers for the jurors.  They won't

14   hear us.  And I can't hear half of what's being said.

15           THE COURT:  Okay.

16           MS. BERNSTEIN:  And I'm sorry --

17           MR. BIENERT:  Your Honor, since we're doing one

18   attorney rule --

19      (Reporter interrupts for clarification.)

20           MR. BIENERT:  -- if you do a side bar, if I ever hear

21   anything audibly, I will stand up and raise my hand, and maybe

22   you can appoint someone from the government to do the same.

23           MS. BERNSTEIN:  Your Honor, I apologize, but for

24   scheduling purposes, I'm going to need a break at about 2:00.

25   I can go until 2:00.

1              THE COURT:  All right.

2         (Proceedings recessed at 12:13 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        <u>C E R T I F I C A T E</u>

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 14th day of September,

12   2021.

13

14

15                              s/Linda Schroeder
                          Linda Schroeder, RDR, CRR
16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**