Exhibit J

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 10, 2021 |
| Michael Lacey, | ) | 1:15 p.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:   THE HONORABLE SUSAN M. BRNOVICH, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - DAY 6 - P.M. SESSION

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2     For the Government:

3

4         U.S. ATTORNEY'S OFFICE
          By:  **Mr. Peter S. Kozinets**
                **Mr. Kevin M. Rapp**
5               **Ms. Margaret Wu Perlmeter**
                **Mr. Andrew C. Stone**
6         40 North Central Avenue, Suite 1200
          Phoenix, Arizona 85004

7

8         U.S. DEPARTMENT OF JUSTICE
          By:  **Mr. Reginald E. Jones**
9         1400 New York Avenue, NW, Suite 600
          Washington, DC 20530

10

11

12    For the Defendant Lacey:

          LIPSITZ GREEN SCIME CAMBRIA
13        By:  **Mr. Paul J. Cambria, Jr.**
                **Ms. Erin E. McCampbell-Paris**
14        42 Delaware Avenue, Suite 120
          Buffalo, NY 14202

15

16    For the Defendant Larkin:

17        BIENERT KATZMAN
          By:  **Mr. Thomas H. Bienert, Jr.**
18              **Ms. Whitney Z. Bernstein**
          903 Calle Amanecer, Suite 350
19        San Clemente, CA 92673

20

21

22

23

24

25

1    For the Defendant Spear:

2        FEDER LAW OFFICE
         By:  **Mr. Bruce S. Feder**
3        2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016

4

5    For the Defendant Brunst:

6        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
         LINCENBERG & RHOW
7        By:  **Mr. Gopi K. Panchapakesan**
              **Mr. Gary S. Lincenberg**
8        1875 Century Park E, Suite 2300
         Los Angeles, CA 90067

9

10   For the Defendant Padilla:

11       DAVID EISENBERG, PLC
         By:  **Mr. David S. Eisenberg**
12       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012

13

14   For the Defendant Vaught:

15       JOY BERTRAND, LLC
         By:  **Ms. Joy M. Bertrand**
16       P.O. Box 2734
         Scottsdale, AZ 85252

17

18

19

20

21

22

23

24

25

```
 1                         I N D E X

 2    WITNESS                                      PAGE

 3    JESSIKA SVENDGARD
               Voir Dire by Ms. Bernstein          9
 4             Continued Direct Examination
                  By Mr. Rapp                      11
 5             Cross-Examination by Ms. Bernstein  19
               Cross-Examination by Mr. Cambria    47
 6             Redirect Examination by Mr. Rapp    50

 7
      NACOLE SVENDGARD
 8             Direct Examination by Mr. Rapp      54
               Cross-Examination by Ms. Bernstein  69
 9             Cross-Examination by Mr. Cambria    74
               Redirect Examination by Mr. Rapp    76
10

11    SPECIAL AGENT SUPERVISOR BRIAN FICHTNER
               Continued Direct Examination
12                By Mr. Kozinets                  78
               Cross-Examination by Mr. Cambria    101
13
                         E X H I B I T S
14

15    Number              Description           Admitted

16    211 C          Victim #4 Additional Backpage Ads
                     USAO-BP-0033004 - USAO-BP-0033019    10
17

18    1636 B         Clip From 1636, 04:23-04:50
                     (Tiffany Ad)                     80
19
      1636 C         Clip From 1636, 06:53-07:10
20                   (Diana Bedroom Pleaser Ad)       82

21    1636 D         Screen Shot From 1636, 8:51
                     (Sarah Bella Ad)                 85
22
      1636 E         Screen Shot From 1636, 10:27
23                   (Veronica Ad)                    87

24    1636 F         Clip From 1636, 12:30-13:05
                     (Sponsor Ads)                    88
25
```

**P R O C E E D I N G S**

1

2          THE COURT:  And we are outside the presence of the

3    jury.

4          Mr. Rapp.

5          MR. RAPP:  I have two issues.  One is, we're sort of

6    creeping along here.  We've got two witnesses who are out of

7    state.  We'd very much like to get them back on a plane.

8          We fully appreciate Ms. Bernstein's situation, but

9    Mr. Larkin has two attorneys, Mr. Bienert, and so we'd like to

10   move this along a little bit faster.  That's our one --

11          You know, already we had yesterday as a day off,

12   occasioned by the defense.  We have Mr. Feder showing up here

13   at 9:00 o'clock, when it was abundantly clear to everybody else

14   that we were supposed to be here at 8:30.

15          We have out-of-state witnesses.  90 percent of our

16   witnesses are out of state that we're flying in, so that's our

17   -- my first issue.

18          Second, I want to address the government's 211 C.  We

19   made a prima facie case.  This is a posting that has been

20   certified by Carl Ferrer, which the Court has already ruled he

21   is a custodian of records, that's 1235, Exhibit B.

22          If they want to cross examine this witness on the

23   weight, they get their opportunity, so we would like to finish

24   up this witness and let the --

25          THE COURT:  So you're objecting to her doing a voir

UNITED STATES DISTRICT COURT

1    dire?

2              MR. RAPP:  Yes.  Yes.

3              THE COURT:  Okay.

4              MS. BERNSTEIN:  I guess I'll take them in reverse

5    order, Your Honor.

6              I don't believe that the Court has ruled that Carl

7    Ferrer is a custodian of records, and, therefore, those records

8    are admissible.  In fact, until the records are admitted, the

9    foundation does need to be laid.

10             These ads that we're looking at are not, in fact, what

11   they looked like when they were on the website, and so I just

12   want an opportunity to ask the witness about that.  I can do

13   that during cross-examination, but we do object to the

14   admission of the ads.

15             I can also respond to this suggestion that because

16   there was a day off yesterday, in an abundance of caution, as

17   someone was exhibiting symptoms of a pandemic while we're all

18   here for trial, and because Mr. Feder arrived at 8:45 this

19   morning, which he explained was a misunderstanding, it doesn't

20   actually impact the way my body produces milk for my infant,

21   and the suggestion that I don't get to breastfeed when I'm

22   doing this witness.

23             Your Honor has asked us to try to be efficient.  I am

24   the one who is doing this witness.  We're going to be

25   efficient.  So someone else cannot sit in.  I need to see what

1   she's doing.  I need to hear what she's doing.  And the

2   suggestion that I don't need to is wrong, and the suggestion

3   that I should have breastfed yesterday or this morning is also

4   wrong.

5           And I would add, Your Honor, I have not been asking

6   the Court for breaks every time I leave.  I have left -- I

7   leave four times during the course of a day.  I have not asked

8   for any breaks other than when it directly affects something I

9   am doing.

10          THE COURT:  I know, but this morning we were on break

11  for 40 minutes.  And I purposely actually ran past 10:40,

12  because you weren't the lawyer at the table, so that you could

13  leave and we would not be on break for 40 minutes.  And I'm not

14  sure exactly what happened.

15          MS. BERNSTEIN:  I'm sorry, I don't understand.  I

16  needed to pump at 10:45, so I went and pumped and then I came

17  back in.

18          My body produces milk in three-hour intervals.  I

19  mean, it's not like -- this is very inconvenient for me as

20  well.  I wish this trial had gone sooner, but this is where we

21  are, and I have an absolute right to feed my daughter.

22          THE COURT:  Okay.  You didn't tell me 10:45, you said

23  at a break, at the break.

24          MS. BERNSTEIN:  I apologize.  I had communicated that

25  to your courtroom deputy.

1          THE COURT:  Okay.  Well, we need to have better

2    clarity so that I can efficiently run the courtroom, because

3    we're now going to have less than 45 minutes before we have to

4    take a break, which I am accommodating.  I'm not saying I'm not

5    going to.  But we need to have a better discussion about this.

6    And we'll do it later, because we don't have time right now

7    because we're running out of time.

8          So we will put the witness on.  You can do your voir

9    dire, as long as it is true voir dire, and then we'll proceed.

10          MS. BERNSTEIN:  Thank you, Your Honor.

11          THE COURT:  Could you bring the witness in so she's --

12          (1:21 p.m. the jury entered the courtroom.)

13          THE COURT:  Thank you.  Please be seated.

14          And we are back on the record with the jury present.

15          Okay.  Before we left, Ms. Bernstein asked to voir

16    dire the witness.  I'm going to allow her to do that.

17          MS. BERNSTEIN:  Ms. Garcia, could the exhibit be put

18    up on my screen, please.

19          COURTROOM DEPUTY:  I'm sorry?

20          MS. BERNSTEIN:  The exhibit that we're dealing with

21    with this witness, I don't see it on the screen.

22          THE COURT:  Mr. Rapp, could you put that exhibit up?

23          MS. BERNSTEIN:  It's on Mr. Rapp's computer.

24          COURTROOM DEPUTY:  There you go.

25          MS. BERNSTEIN:  Thank you.

VOIR DIRE EXAMINATION

BY MS. BERNSTEIN:

Q.  Hi, Ms. Svendgard.  I'm going talk to you over here, if
that's okay?

A.  Okay.

Q.  This is a multi-page document, right?

A.  I don't know.

MS. BERNSTEIN:  Can we click through the document for
Ms. Svendgard?

THE COURT:  Mr. Rapp, could you help us with that?

BY MS. BERNSTEIN:

Q.  Do you now see that it's a multi-page document?

A.  I do.

Q.  And this is in black and white, as well?

A.  Correct.

Q.  Did you print these and provide them to the government?

A.  No, I did not.

Q.  Have you seen these before today?

A.  Yes, I have.

Q.  And the government reviewed these with you when it was
preparing your testimony?

A.  Yes, they have.

Q.  This is not what it looked like when it was on the website;
is that correct?

A.  I don't know what you mean by that question.

1    Q.  Have you ever seen your ad on the website?

2    A.  Yes.

3    Q.  Did it look like what's represented in these pages?

4    A.  It was not in black and white.

5    Q.  Did the government ever ask you to identify your ads off of

6    the website?

7    A.  I -- can you rephrase?

8    Q.  Yeah.

9    A.  I'm sorry.  I don't understand.

10   Q.  It's okay.

11        Did the government ever show you the website and ask

12   you to pull your ad from the website?

13   A.  No, they did not.

14   Q.  They just showed you these black and white pages?

15   A.  Yes.

16   Q.  Thank you.

17        MS. BERNSTEIN:  So, Your Honor, we would object to the

18   admission of these ads through this witness.

19        THE COURT:  Okay.  Over objection, Exhibit 211 C will

20   be admitted.

21        MR. RAPP:  Can I publish to the jury, Your Honor?

22        THE COURT:  Yes.

23        MR. RAPP:  Thank you.

24

25

1                    CONTINUED DIRECT EXAMINATION

2    BY MR. RAPP:

3    Q.   Now, Jessika, you see on your screen there?

4    A.   Yes.

5    Q.   Okay.  I'm just -- I'm going to go through some of these

6    postings.

7    A.   Okay.

8    Q.   And you have seen these before you testified today?

9    A.   Yes.

10   Q.   And you have seen these when you testified a number of

11   years ago --

12             MS. BERNSTEIN:  Objection, Your Honor.

13             THE COURT:  What's your objection?

14             MS. BERNSTEIN:  Reference to facts not in evidence,

15   violating the Court's order.

16             THE COURT:  The objection is overruled.

17   BY MR. RAPP:

18   Q.   At the trial of Baruti Hopson, you saw these postings?

19   A.   Correct.

20   Q.   All right.  So let's look at a number of them.

21             In terms of the text at the top, what does it say?

22   A.   No discounts, well worth it, no discounts, 18.

23   Q.   Did you prepare the text of this posting?

24   A.   Either I or Baruti Hopson did.

25   Q.   And with regard to the age, why 18?

1    A.  You have to be 18 years or older to post an ad on Backpage.

2    Q.  Now, with respect to the text there, do you see that where

3    it starts, Hi, my name is Joy?

4    A.  Yes.

5    Q.  So, Jessika, that's not your name?

6    A.  No, it is not.

7    Q.  How is it that you were settled on the name of Joy?

8    A.  I believe Candace gave that name to me and it kind of just

9    rolled over to when I was with Baruti as well.

10   Q.  Now, in this text it doesn't say anything about sex for

11   money, does it?

12   A.  No.  We would try to clean the ad up a little bit to make

13   it less obvious to law enforcement that we were committing a

14   crime.

15   Q.  Why were you concerned about law enforcement?

16   A.  Because prostitution is illegal.

17   Q.  Well, what about being concerned about Backpage?

18   A.  My understanding is that's what Backpage is used for, so

19   that -- that was never a concern.

20   Q.  And, regarding the telephone number, your phone number or

21   Candace's phone number?

22   A.  I can't recall.

23   Q.  All right.  Fair enough.

24           But there is these hashes in between the numbers.  Why

25   was that the case?

1  A.  Again, just to make the numbers less, just, obvious to law

2  enforcement trying to do stings and things of that nature.

3  Q.  All right.  And, again, your age is 18, correct?

4  A.  On the ad, yes.

5  Q.  But at the time you were how old?

6  A.  I was 15 years old.

7  Q.  And you have the location as Seattle, SEA-TAC?

8  A.  Correct.

9  Q.  And that's in the area of the airport?

10 A.  Yes, correct.

11 Q.  How about in call/out call, what does that mean?

12 A.  In call means that people can come to your location, and

13 out call means you can go to them.

14 Q.  Now, we'll look at these images quickly.

15      Were these -- were these the images Candace took or

16 Baruti took?

17 A.  Candace took these of myself.

18 Q.  All right.  Another -- another ad.  This is July 9th of

19 2010, correct?

20 A.  Yes.

21 Q.  This time you're 19.  Why?

22 A.  Baruti thought it would evade the police to make me not

23 look so young.

24 Q.  And regarding Baruti, you see the e-mail there?

25 A.  Yes.

1    Q.   Do you recognize it?  Do you need it magnified?

2    A.   No.  It's meenymak@hotmail.com.

3    Q.   And what is that?  What's the significance of that?

4    A.   That was Baruti Hopson's e-mail and you need that in order

5    to post an ad.

6    Q.   Why?  Do you know why?

7    A.   So people have a way to respond to it if you don't have a

8    phone number, to my knowledge.

9    Q.   Did anybody respond to you by e-mail that you recalled in

10   the 105 days you were with Baruti Hopson?

11   A.   None that I met with.

12   Q.   Why is that?

13   A.   It seemed like too much of a paper trail and like it could

14   be the police.  Baruti would not allow it.

15   Q.   And were the vast -- so what was the majority of the

16   arrangements you had with these men?  How did they get in touch

17   with you?

18   A.   By the telephone number on the ad.

19   Q.   And, again, the phone number, do you see that there?

20   A.   Yes.

21   Q.   Now, this is different.  You actually write it out.  Why is

22   that the case?

23   A.   Just trying to make it not so obvious of how to contact us,

24   in order to make it seem more difficult for a police officer to

25   try to find the number on the ad.

1    Q.  I'm now showing you page 5 of Government's 211 C.

2           Do you see that there on your screen?

3    A.  Yes.

4    Q.  And same thing, Joy, no reference to sex in the text, sex

5    for the exchange of money, right?

6    A.  Yes, you are correct.

7    Q.  Different pictures.  We'll look at them quickly.  These --

8    are these pictures of you?

9    A.  Yes, they are.

10   Q.  Are these pictures Candace took --

11   A.  No.

12   Q.  -- or --

13   A.  No, sir.

14   Q.  -- or Baruti?

15   A.  Baruti Hopson took those.

16   Q.  And how did he take them?

17   A.  With a digital camera.

18   Q.  Another one, July 12th, 2010.  See the phone number down

19   there?

20   A.  Yes, I do.

21   Q.  This time with number signs in between them.  Why was that

22   done?

23   A.  To avoid -- to avoid police officers noticing the phone

24   number in the ad.

25   Q.  Jessika, were your ads ever reposted, that you know of?

1    A.  Yes, multiple times.

2    Q.  What do you mean by that?  Can you explain that?

3    A.  In order to make the ad most recent when somebody is coming

4    to look on the Backpage, you would repost it and it would be at

5    the top of the list.

6    Q.  And why would you do that?

7    A.  In order to get more people to call.

8    Q.  And how many times a day do you recall either you or Baruti

9    Hopson doing that, reposting your ad?

10   A.  Multiple.

11   Q.  Now, I'm showing you page 9 of 211 C.

12          Do you see that on your screen, Jessika?

13   A.  Yes.

14   Q.  And this is August 8th of 2010, right?

15   A.  Yes, sir.

16   Q.  Can you read the top line there of the text?

17   A.  120 HH, Joy, Joy, 120 HR, 19.

18   Q.  And what does the 120 HH mean?

19   A.  It's $120 for a half an hour and $150 for an hour.

20   Q.  Hour of what?

21   A.  Time with me.

22   Q.  Whose idea, Jessika, was it to put in these time ranges?

23          MS. BERNSTEIN:  Objection.  Calls for hearsay and lack

24   of foundation.

25          THE COURT:  The objection is sustained.

1    BY MR. RAPP:

2    Q.  Did you put that in there?

3    A.  If I was told to.

4    Q.  Were there times where you were asked to write your own

5    text?

6    A.  No, I was only told to.

7    Q.  You were only told to?

8    A.  Yes, sir.

9    Q.  By who were you directed to do that?

10   A.  Baruti Hopson.

11   Q.  Were there occasions, Jessika, where you -- where you

12   posted, you -- you prepared a posting, not unlike one of these

13   that we've looked at?

14   A.  Yes.

15   Q.  And posted it on Backpage.  And when you -- did you have

16   occasion to look at it when it was, for lack of a better word,

17   live on the website?

18   A.  Yes.

19   Q.  Were there occasions where what you prepared and posted had

20   changed?

21   A.  Yes.

22   Q.  What can you tell us about that?

23   A.  I recall seeing my ad with dollar signs when I posted it,

24   and they were gone when I saw it live on the ad, for lack of a

25   better term.

1    Q.  Now, during the time that you -- you were with Baruti

2    Hopson for the 105 days -- and I think I might have asked you

3    these questions and you'll remind me -- but did you meet a John

4    that -- during that time period that you also participated in

5    the prosecution of?

6    A.  Yes, I did.

7    Q.  Do you recall his name?

8    A.  Julian Tarver.

9    Q.  Now, Jessika, after -- after the trials of Baruti Hopson

10   and Julian Tarver, did there come a time where you filed a

11   lawsuit, or your mother, on behalf of you, filed a lawsuit

12   against Backpage?

13   A.  Yes, there was.

14   Q.  Do you recall what year that was?

15   A.  I believe it was in 2012.

16   Q.  Did there come a time where you were deposed by --

17          Do you know what a deposition is?

18   A.  Yes, sir.

19   Q.  What is a deposition?

20   A.  Where I make a statement about what happened in front of

21   attorneys.

22   Q.  All right.  And is there a court reporter there, not unlike

23   a court reporter is here?

24   A.  Yes, there is.

25   Q.  And during that deposition, did you tell those lawyers

1   about the experience you had for 105 days?

2   A.  Yes, I did.

3   Q.  And do you recall a particular attorney from Backpage being

4   present during your deposition?

5   A.  Yes, I do.

6   Q.  Who was that?

7   A.  Liz McDougall.

8   Q.  And did she identify herself as an attorney for Backpage?

9   A.  I -- I do not recall.

10          MR. RAPP:  If I could just have a minute, Your Honor?

11          Your Honor, I'll pass the witness.

12          THE COURT:  Okay.

13                    CROSS-EXAMINATION

14  BY MS. BERNSTEIN:

15  Q.  Hi, Ms. Svendgard.

16  A.  Hello.

17  Q.  I'm really sorry for what you've gone through, as a woman

18  and as a mother.

19          MR. RAPP:  Objection, Your Honor.  This is not a

20  question.

21          THE COURT:  The objection is sustained.

22  BY MS. BERNSTEIN:

23  Q.  Ms. Svendgard, have you ever spoken to James Larkin?

24  A.  No.

25  Q.  Have you ever communicated with him in writing?

```
1    A.   No.

2    Q.   Have you ever met him?

3    A.   No.

4    Q.   And I'm going to do the same questions for all of the

5    people sitting over here.

6            Have you ever spoken to Michael Lacey?

7    A.   No.

8    Q.   Have you ever met him?

9    A.   No.

10   Q.   And have you ever communicated with him in writing?

11   A.   No.

12   Q.   Have you ever spoken to Andrew Padilla?

13   A.   No.

14   Q.   Communicated with him in writing?

15   A.   No.

16   Q.   Or met him?

17   A.   No.

18   Q.   Have you ever spoken to Scott Spear?

19   A.   No, I have not.

20   Q.   Communicated with him in writing?

21   A.   No, I have not.

22   Q.   Or met him?

23   A.   No.

24   Q.   How about Joye Vaught?

25   A.   No.
```

```
1   Q.  Never met her?

2   A.  No, I have not.

3   Q.  Never communicated with her in writing?

4   A.  No, I have not.

5   Q.  And never spoken to her?

6   A.  No.

7   Q.  Is Baruti Hopson in prison?

8   A.  To my knowledge, yes.

9   Q.  What about Candace?

10  A.  I have no idea where she is.

11  Q.  You never participated in a prosecution of her?

12  A.  They could not find her.

13  Q.  And this was in 2010; is that correct?

14  A.  Correct.

15  Q.  So they have never found her since 2010?

16  A.  Correct.

17  Q.  To your knowledge?

18  A.  Yes.

19  Q.  I don't want to rehash everything that you covered with

20  Mr. Rapp.  I'm just going to try to talk to you about a couple

21  of areas.  Okay?

22  A.  Okay.

23  Q.  So you talked about how you had run away from home twice in

24  2010; is that right?

25  A.  Yes.
```

1    Q.  And that had nothing to do with any website; is that

2    correct?

3    A.  Correct.

4    Q.  Neither Backpage nor any other website?

5    A.  Correct.

6    Q.  And when you first ran away, you met Candace; is that

7    right?

8    A.  Yes, ma'am.

9    Q.  And she was 23, you said?

10   A.  Yes, to my knowledge.

11   Q.  And Candace is the one who introduced you to -- to this

12   lifestyle; is that correct?

13   A.  Yes.

14   Q.  And just to be abundantly clear, you did not meet Candace

15   through Backpage.com?

16   A.  No, I did not.

17   Q.  And when Mr. Rapp talked to you about Mr. Hopson's trial --

18            You testified in that, correct?

19   A.  Yes, I did.

20   Q.  And he just talked to you about your deposition in your

21   mother's lawsuit; is that correct?

22   A.  It wasn't just my mother's lawsuit, but yes.

23   Q.  That you had given a deposition under oath?

24   A.  Yes.

25   Q.  Okay.  And in -- do you recall saying in those that you --

1   the ads that were posted on your behalf never had nude photos?

2   A.  Yes.

3   Q.  And do you recall also saying that you had never posted

4   your face?

5   A.  I would have to see it.

6        MS. BERNSTEIN:  Your Honor, can we please bring up

7   Exhibit 28 at page 43, line 8.

8        THE COURT:  Where is it connected?

9        COURTROOM DEPUTY:  Is your staff getting it?

10        MS. BERNSTEIN:  I'm sorry, yeah.

11        I'll move on for the time being.

12        Can we please pull up Government Exhibit 211 C,

13   Ms. Garcia.

14        COURTROOM DEPUTY:  I don't have control over the -- it

15   would have to be your --

16        MS. BERNSTEIN:  I'm sorry, then let's just pull up the

17   government's exhibit.

18        I'm sorry.  There are all these fancy computers.

19   BY MS. BERNSTEIN:

20   Q.  So I want to zoom in on the top of this.

21        MS. BERNSTEIN:  Is this published to the jury?

22        THE COURT:  Now it is, yeah.

23   BY MS. BERNSTEIN:

24   Q.  I'm going to zoom in at the top of this.

25        A little bit higher up, actually.

1          Do you see where it says -- oh, I can actually mark --

2    do you see where it says what I just underlined?

3    A.  Yes, ma'am, I do.

4    Q.  So it says that it was -- this post was removed; is that

5    correct?

6    A.  Yes.

7    Q.  And it says by me?

8    A.  That is what it says.

9    Q.  Did you remove the post?

10   A.  No, I did not.

11   Q.  Do you know who removed the post?

12   A.  I have my speculations, but, no, I do not.

13   Q.  Are you familiar with the person who posted this at -- let

14   me underline here -- I think you said that that was

15   Mr. Hopson's e-mail?

16   A.  Yes, ma'am.

17   Q.  So was it Mr. Hopson who removed this post?

18   A.  Considering he's in prison, I would think not.

19   Q.  Do you know when this post was removed?

20   A.  I do not.

21   Q.  Do you know whether the Backpage.com website is still live?

22          MR. RAPP:  Objection.  Relevance.

23          THE COURT:  The objection is overruled.

24          THE WITNESS:  Can you reask the question?

25

1    BY MS. BERNSTEIN:

2    Q.  Do you know whether the Backpage.com website is live?

3    A.  I do not believe it is.

4    Q.  Do you know that the government seized it?

5    A.  Yes, I do.

6    Q.  And the government took it down, to your knowledge?

7    A.  Yes, ma'am.

8    Q.  And before when we were talking about these ads, you

9    indicated that the government never took you to the website to

10   show you the ads; is that right?

11   A.  Not that I remember.

12   Q.  Okay.  So do you know when the website was removed?

13   A.  Like when the federal government took it down?

14   Q.  Correct.

15   A.  I believe in 2018.

16   Q.  So do you understand that whenever this was obtained, this

17   ad, which we don't know, that it says the ad was not live and

18   the status was removed by me?

19   A.  I do not know that.

20   Q.  Have you seen this before?

21   A.  Yes.

22   Q.  Had you ever noticed that portion of this before?

23   A.  No, I did not.

24   Q.  Okay.  I want to scroll down to the bottom of this.

25           MS. BERNSTEIN:  I apologize, but I don't know how to

1    use this stuff.  I don't know how to clear the screen either.

2              THE COURT:  Upper right-hand corner, I believe.

3              MS. BERNSTEIN:  If we can zoom in on this portion down

4    here, please.

5              I'm sorry, we might need to zoom back out.

6    BY MS. BERNSTEIN:

7    Q.  But, Ms. Svendgard, are you familiar with this area right

8    here that's called administrative data?

9    A.  I have seen it before.  I have seen it before.  I'm not

10   super familiar.

11   Q.  You testified that you posted some ads on Backpage; is that

12   right?

13   A.  Yes, ma'am.

14   Q.  And that you saw Mr. Hopson post ads on Backpage?

15   A.  Correct.

16   Q.  Did you also see Candace post ads on Backpage?

17   A.  Yes.

18   Q.  When they posted these ads on Backpage, did you ever

19   observe this section of the ad that's called administrative

20   data?

21   A.  No.

22   Q.  Okay.  To your knowledge, was this section of the ad

23   visible to the general person viewing an ad on Backpage.com?

24   A.  No.

25   Q.  So this section of the ad might have just been the back end

1   only?

2   A.  Correct.

3          MS. BERNSTEIN:  If we can go to the next page, please.

4   BY MS. BERNSTEIN:

5   Q.  Every single one of the ads that the government showed you

6   just now was posted by this e-mail address; is that right?

7   A.  To my knowledge, yes.

8   Q.  And do you know whether it was, in fact, you or Mr. Hopson

9   who actually posted these ads?

10  A.  It was either him or I.

11  Q.  You don't have a memory as to any of these specific

12  advertisements?

13  A.  It was either him or I.

14  Q.  So either him or you who posted these ads lied; is that

15  right?

16  A.  Correct.

17  Q.  And there is a number of lies.  I think you testified that

18  the number indicated your age?

19  A.  Correct.

20  Q.  But that was, in fact, a lie?

21  A.  Yes.

22  Q.  Because I think you said minors were not allowed on

23  Backpage.com?

24  A.  Correct.

25          MS. BERNSTEIN:  Can we go to the next ad, please.

1    BY MS. BERNSTEIN:

2    Q.  And that is also a lie?

3    A.  Yes.

4          MS. BERNSTEIN:  Can we go to the next one, please.

5    BY MS. BERNSTEIN:

6    Q.  Also a lie?

7    A.  Yes.

8          MS. BERNSTEIN:  Next one, please.

9    BY MS. BERNSTEIN:

10   Q.  Also a lie?

11   A.  Yes.

12   Q.  And while we're here, this one is another example of an ad

13   that was removed.  Do you know what that means?

14   A.  I'm guessing it means it was taken off the website.

15   Q.  You don't know whether it was or was not taken off the

16   website, right?

17   A.  I do not know.

18          MS. BERNSTEIN:  Can we go to the next ad, please.

19   BY MS. BERNSTEIN:

20   Q.  This is also untrue?

21   A.  Yes.

22          MS. BERNSTEIN:  Next ad, please.

23   BY MS. BERNSTEIN:

24   Q.  This is, likewise, untrue?

25   A.  Yes.

```
 1              MS. BERNSTEIN:  Next ad, please.

 2              Oh, I'm sorry, can we blow that one up again.

 3   BY MS. BERNSTEIN:

 4   Q.  And, again, here's yet another ad that was removed,

 5   correct?

 6   A.  Yes, to what it's saying.  It says removed.

 7              MS. BERNSTEIN:  Can we go to the next ad, please.

 8   BY MS. BERNSTEIN:

 9   Q.  Also untrue?

10   A.  Yes.

11   Q.  And this is, I believe, the last ad.

12              MS. BERNSTEIN:  If there is another, can we go to the

13   next screen.

14   BY MS. BERNSTEIN:

15   Q.  And, again, that's also incorrect?

16   A.  Correct.

17   Q.  You posted your advertisements, or observed Mr. Hopson post

18   advertisements of you in 2010?

19   A.  Yes, ma'am.

20   Q.  Throughout which months again?

21   A.  I believe late June to early to mid September.

22              MS. BERNSTEIN:  Can we please put up Number 59.

23              And this should not -- I don't know -- I don't know if

24   this should be published or not.  I don't know how these

25   screens are controlled.  I'm sorry.
```

```
 1              COURTROOM DEPUTY:  If you see the seal, no one can see

 2    it.  None of the jurors can see it.

 3              MS. BERNSTEIN:  Thank you.

 4              Can we put up Number 59.

 5    BY MS. BERNSTEIN:

 6    Q.  Do you recall seeing this, Ms. Svendgard?

 7    A.  Yes, I do.

 8    Q.  And when you saw it, it wasn't highlighted; is that right?

 9    A.  I do not believe so.

10    Q.  This is what you saw in 2010 when either you or Mr. Hopson

11    posted ads?

12    A.  I do not remember the any posts exploit, that part.  The

13    part in red, I do not remember.

14    Q.  And I think you can mark your screen too, if you'd like.

15    A.  Yeah, I don't remember this.

16    Q.  Do you recall seeing this one?

17    A.  Yes, I do.

18              MR. RAPP:  Judge, I would object.  We're talking about

19    the contents of an exhibit that's not been admitted.

20              THE COURT:  Okay.  The objection is overruled.  She

21    hasn't read anything from it yet.

22    BY MS. BERNSTEIN:

23    Q.  Ms. Svendgard, do you remember the -- what I'm just marking

24    right here -- seeing that?

25    A.  No.  I only specifically remember the last one.
```

1   Q.  Can you mark it on your screen, please?

2   A.  This.  This one.

3   Q.  And you remember these as what you saw in 2010 when you or

4   Mr. Hopson posted your ads?

5   A.  I remember this, this, and the third, and what is on the

6   bottom.

7   Q.  And when you say what is on the bottom, is that what I just

8   highlighted?

9   A.  Correct.

10          MS. BERNSTEIN:  Can we please --

11          Move to admit this, Your Honor.

12          THE COURT:  And which exhibit is this, I'm sorry, 59?

13          Mr. Rapp is handling the witness.

14          MS. BERNSTEIN:  I apologize.  Someone is going to let

15   me know what exhibit number it is.

16          MR. RAPP:  I have an objection, because she -- I don't

17   know what year this exhibit is.  I don't -- it's not even from

18   where she was trafficked.  I mean, it's not even -- it's a

19   different city, so I don't know any -- I don't know anything

20   about this exhibit.

21          THE COURT:  The objection is sustained.

22   BY MS. BERNSTEIN:

23   Q.  All right.  Ms. Svendgard, I'm going to read to you what

24   you indicated you recall from back in 2010.

25          MR. RAPP:  I'm going to object to that.  You can't

UNITED STATES DISTRICT COURT

1   read from an exhibit that's not in.

2          THE COURT:  Well, the objection is overruled.

3   BY MS. BERNSTEIN:

4   Q.  When you -- when you would post an ad, or when Mr. Hopson

5   would post an ad, you recall that before that ad went live, for

6   lack of a better word, there were terms of use that the poster

7   had to agree to, right?

8   A.  Yes.

9   Q.  And those were called -- when they came up on your screen,

10  they were called the posting rules; is that right?

11  A.  I believe so.

12  Q.  One of the things that those rules said is that you agree

13  to the following when posting in this category.  And that

14  category is adult category; is that correct?

15  A.  Correct.

16  Q.  That's where your ads were posted?

17  A.  The escort category.

18  Q.  Is that the only category you ever posted in?

19  A.  That I remember, yes.

20  Q.  And this would come up when posting in the adult escort ad

21  category?

22  A.  Not this specifically, but something along the lines of it.

23  Q.  Yes, I'm sorry, posting rules?

24  A.  Yes.

25  Q.  And one of the things it said was, you agree to the

1    following when posting in this category:  I will not post

2    obscene or lewd and lascivious graphics or photographs which

3    depict genitalia or actual simulated sex acts.

4            Do you remember that?

5    A.  Yes, I do.

6    Q.  And, in fact, your advertisements do not appear to have any

7    photographs depicting genitalia or actual simulated sex acts;

8    is that right?

9    A.  I -- I feel like me bent over on a pool table in a thong is

10   a sex act, or showing one to be done to me.

11   Q.  So that violated the rules --

12   A.  Yes.

13   Q.  -- of the website?

14   A.  Yes.

15   Q.  So another lie that either you or Mr. Hopson did is, when

16   you posted these ads, you -- you said you would abide by the

17   rules, and you did not?

18   A.  Yeah.  I was -- I was forced to do those things, so, yes,

19   we did break those rules.

20   Q.  There is another rule, right, it says, I will not post any

21   solicitation directly or in any coded fashion for any illegal

22   services exchanging sexual favors for money or other valuable

23   consideration.

24            Do you recall that?

25   A.  Yes, to a certain extent.

1    Q.  It also said, I will not post any material on the site that

2    exploits minors in any way.

3              Do you recall that?

4    A.  No, I do not.

5    Q.  And you recall that it says, I am at least 18 years of age

6    or older and not considered to be a minor in my state of

7    residence?

8              MR. RAPP:  I'm going to object.  She's reading from a

9    document that's not in evidence.

10             THE COURT:  Well, she's asking her if she remembers.

11             The objection is overruled.

12             THE WITNESS:  I do not remember that, the last phrase

13   that you just read.

14   BY MS. BERNSTEIN:

15   Q.  You do recall that it said, any posts -- excuse me,

16   postings that violate these rules or our terms of use are

17   subject to removal without refund?

18   A.  Yes.

19   Q.  And then before you would post an ad, you or Mr. Hopson

20   would post the ad, you had actually to click the line that

21   said, I will abide by these rules and the site's terms of use;

22   is that right?

23   A.  I -- I do not remember.

24   Q.  You don't remember having to agree to these rules before an

25   ad was posted?

1    A.  Yeah.  I don't remember if we just had to read them.  I

2    don't remember if we had to actually click an agree button or

3    not to those rules.

4    Q.  And about how many times would you say you, yourself,

5    posted an advertisement?

6    A.  I'm sorry.  Could you like --

7    Q.  Do you recall how many ads you posted yourself?

8    A.  When I was told to post them, I posted.  I -- I couldn't

9    recall.  As many times as I was told to.

10   Q.  And the ads that -- the ads that we've looked at today are

11   the only ones we're talking about; is that correct?

12   A.  No, I believe there was more.

13   Q.  Have you provided that to the government?

14   A.  No, I have not.

15   Q.  Have you told them that?

16   A.  Yes, I have.

17   Q.  Have they ever showed you other ads?

18   A.  No.

19   Q.  So it's your memory that there were more ads than what

20   we're looking at right now?

21   A.  Yes, I believe so.

22   Q.  How many more?

23   A.  I couldn't say.  Depends how -- you want to know how many

24   times a certain ad was reposted?  Because, I mean, there could

25   have been, you know, five ads that were not in this that were

posted 70 times, I mean.

Q.  Did you -- did you or Mr. Hopson do the reposting or was

that something automated?

A.  Me or Mr. Hopson would do that.

Q.  Would physically hit, what, a repost button?

A.  Yeah, or something along those lines.

Q.  So what did you tell the government, that there were

additional advertisements?

A.  Yes.

Q.  And when did you tell them this?

A.  At some point between me being recovered and now.

Q.  And you were recovered in 2010 as well?

A.  Yes.

Q.  So, in the past 11 years, you've told the people sitting

here that there were more advertisements?

A.  Yes.

Q.  Okay.  The advertisements that we have seen, as we just

went through -- and I'm not going to do that again with you --

but those advertisements contained a lie as to the age,

correct?

A.  Yes.

Q.  And those advertisements violated the rules that you recall

having to abide by when those ads were posted; is that correct?

A.  Yes.

Q.  And I think you said that you test -- that the ads said you

1    were of legal age, over 18, and I think you said that was to

2    avoid trouble with the police?

3    A.  Yes.

4    Q.  And why would that create trouble with the police?

5    A.  Because prostitution is illegal.

6    Q.  So only at a certain age or always?

7    A.  I would think that it's always illegal.

8    Q.  So why -- why was your age modified?

9    A.  In order to be put on the website.

10   Q.  Because the website did not allow anything by an underage

11   person?

12   A.  They also said they don't allow graphic photographs, but --

13   yes.

14   Q.  Yes, what?  I'm -- yes -- I phrased a bad question.

15   A.  You can ask that question again, if you want.

16   Q.  You changed -- you or Mr. Hopson changed your age on the

17   ads because the website would not allow anyone under 18 to post

18   anything; is that right?

19   A.  I never tried to put my real age in there, so I'm not sure

20   if the ad would have gone through or not, so I cannot say yes

21   or no to that.

22   Q.  Okay.  Thank you.

23         So why -- what is your understanding of why it was

24   changed?  Why not be honest?

25   A.  Because I was being trafficked and a 32-year-old man

1    decided what I did for those 108 days.

2    Q.  I appreciate that.  And I think what you've gone through is

3    a horrific experience.

4                MR. RAPP:  Objection.  I object to that.

5                THE COURT:  The objection is overruled.

6                What's your question?

7    BY MS. BERNSTEIN:

8    Q.  I -- I don't want to re -- I don't want you to have to

9    relive what you went through.

10               MR. RAPP:  Objection.  Is there a question?

11               THE COURT:  The objection is overruled.

12               Go ahead.

13   BY MS. BERNSTEIN:

14   Q.  It's very important to understand why the age says what it

15   says.  So I'm asking you why it said 18 or 19 if that was not,

16   in fact, your age?  Do you know?

17   A.  Because the man who had me was committing a crime by having

18   me.

19   Q.  I'm sorry, that wasn't my question.

20               Do you know why your age was not truthful?

21   A.  You would have to ask Baruti Hopson for that answer.

22   Q.  What about the ads that you posted?

23   A.  I was doing what I was told, and that is the age I was told

24   to put.

25   Q.  Okay.  I want to talk about when you said you were

1    recovered by -- through Backpage.com.

2           Do you remember saying that?

3    A.  I was recovered from an ad on that, yes.

4    Q.  And when you were arrested, presumably, an ad had been

5    posted on the website; is that right?

6    A.  Correct.

7    Q.  Is that one of the ads that we looked at today?

8    A.  Possibly.  I was never shown the -- what ad they found me

9    on.

10   Q.  How do you know that it was an ad that they found you

11   through?

12   A.  They told me.

13   Q.  And they found you in a hotel room; is that right?

14   A.  Correct.

15   Q.  And you had been told that someone was coming to have sex

16   with you?

17   A.  I was actually going to an out call, so I was going to have

18   sex with somebody.

19   Q.  At a hotel?

20   A.  Correct.

21   Q.  So you were in the hotel room or you were approaching the

22   hotel room when you were arrested?

23   A.  I went up to the -- the person posing as a John's hotel

24   room.

25   Q.  And what happened?

1    A.  I was then arrested.

2    Q.  And I think you said police had aimed guns at you, in fact;

3    is that right?

4    A.  I don't -- I don't recall.  They did have guns.  I don't

5    know if they were aimed at me.

6    Q.  They took you in for questioning after this?

7    A.  Yes.

8    Q.  About how long did they question you for?

9    A.  I -- I do not recall.

10   Q.  Do you recall previously saying that it was about six

11   hours?

12   A.  I do not recall saying that.

13   Q.  Okay.

14          MS. BERNSTEIN:  Could we please show the witness

15   exhibit --

16          Can I put something on the Elmo that will only display

17   to the witness?

18          THE COURT:  Yes.

19   BY MS. BERNSTEIN:

20   Q.  While I search for this to help refresh your memory, what

21   is your memory of how long you were there that night, at the

22   police station?

23   A.  I was -- I was at the police station and then I was booked

24   into juvenile hall, so -- I was in a holding cell also for

25   quite a while -- so it could have been the span of several

1   hours.

2   Q.  It's your testimony that the night that you were recovered,

3   you were questioned and booked into juvy?

4   A.  Correct.

5   Q.  What name did they give you -- did you give when you were

6   arrested?

7   A.  It depends on what time you're referring to.

8   Q.  I'm sorry.  I'm referring to the time that you're speaking

9   about now.

10  A.  Okay.  My -- my real name, Jessika Svendgard.

11  Q.  And what date was this, approximately?

12  A.  The end of September, around -- I don't know, sometime

13  around the end of September.

14  Q.  Of 2010?

15  A.  Correct.

16  Q.  You went to a room that was a police officer's, correct?

17  A.  Yes.

18  Q.  You were arrested?

19  A.  Correct.

20  Q.  This was the end of your time on Backpage.com?

21  A.  To my -- yes.

22  Q.  And you were booked into juvenile detention that night?

23  A.  Yes, I was, or early the next morning.

24  Q.  Were there other times that you were arrested while you

25  were working with Mr. Hopson?

1   A.  Is there a -- I was -- I was trafficked, but if the term

2   you want to use is working, then yes.

3   Q.  And when were those times that you were arrested while

4   being trafficked?

5   A.  I do not recall the dates.

6   Q.  Do you recall how many there were?

7   A.  I was only arrested one time.  I was held by police another

8   time but not arrested or charged.

9   Q.  When was the time you were held by police but not arrested

10  or charged?

11  A.  I believe I was in Bellevue.

12  Q.  Do you remember when it was?

13  A.  I -- I do not.

14  Q.  And when was the other time that you were arrested?

15  A.  It was sometime after that, and I believe it was for a

16  theft charge.

17  Q.  The first time that you were held by police and not

18  charged, what name did you give?

19  A.  Lisa Robinson.

20  Q.  Is that your name?

21  A.  No, ma'am.

22  Q.  What birth date did you give?

23  A.  I believe 11-21-91.

24  Q.  And that would have made you over 18?

25  A.  Correct.

1    Q.   That's not your birth date?

2    A.   No.

3    Q.   How old were you when you were questioned by the police

4    that time?

5    A.   I was 15.

6    Q.   Why did you not tell them that you were 15 years old?

7    A.   Because I was doing what I was told to do by the man who

8    was trafficking me.

9    Q.   And how many police officers were questioning you that

10   night?

11   A.   I cannot remember.

12   Q.   One, or more than one?

13   A.   At times, more than one.

14   Q.   And about how long were you there?

15   A.   As long as they could hold me without charging me.

16   Q.   Do you know how long that was?

17   A.   I would -- I would say approximately six -- six hours or

18   so.

19   Q.   So you're with police for approximately six hours, and you

20   give them an age that is, in fact, how many years older than

21   you were at the time?

22   A.   Three or -- three, I believe.

23   Q.   Did the police ever know that you lied to them about your

24   age?

25   A.   They were suspecting it, but could not prove it.

1    Q.  And they were looking at you in person; is that correct?

2    A.  Yes.

3    Q.  Not a washed out picture on the computer screen, but

4    physically in person?

5    A.  Yes.

6    Q.  And they could not tell that you were lying about your age?

7    A.  No, they could, they just couldn't prove it.

8    Q.  And how do you know that they could tell that you were

9    lying about your age?

10   A.  Because they looked for missing photos through -- missing

11   photos of kids and tried to identify me and could not.

12   Q.  And they could not, so they ended up letting you go, right?

13   A.  Correct.

14   Q.  And you said they didn't charge you?

15   A.  No.

16   Q.  And what had you been arrested for?

17   A.  I was arrested for -- held on suspicion of prostitution.

18   Q.  What were the circumstances giving rise to that?

19   A.  A police officer had responded to an ad and they did a

20   prostitution sting in the hotel that I was at.

21   Q.  And they take you and they suspect that you're under age

22   and suspect that you were acting as a prostitute, or being

23   trafficked, as we now know?

24   A.  Yes.

25   Q.  Why didn't they arrest you?

1   A.  Because they did -- it was only suspicion.  I don't know.

2   I did not ask them.

3   Q.  So your ad was not enough to arrest you?

4   A.  I -- I do not know.

5   Q.  You didn't get arrested based on your ad?

6   A.  I mean, no.  I don't know.

7        I didn't get arrested.  I don't know if it was based

8   on the ad or not.

9   Q.  They saw your advertisement, you said?

10  A.  I was in -- the time you're just talking about, another

11  pimp had me, and I don't know what ads they were responding to.

12  Q.  It's your understanding that they were responding to an ad;

13  is that right?

14  A.  Correct.

15  Q.  And that ad, that lied about your age, correct?

16  A.  Yes, I believe so.  I don't know.  I did not see the ad.

17  Q.  And you also testified that while you were there, you lied

18  about your age, correct?

19  A.  Correct.

20  Q.  And they did not arrest you or charge you with prostitution

21  based on your advertisement, as far as you know?

22  A.  Correct.

23  Q.  And they did not charge you with prostitution based on

24  coming and meeting you in person; is that right?

25  A.  Correct.

1   Q.  They did not charge you with prostitution based on finding

2   you in a hotel room during a prostitution sting; is that right?

3   A.  Correct.

4   Q.  And that's because none of this is actually proof

5   determinative of prostitution?

6   A.  I -- I guess so.  I don't know.

7           MS. BERNSTEIN:  I want to go back to 211, please, 211

8   C.

9           THE COURT:  Counsel, we had discussed the need for an

10  early break.  Is this --

11          MS. BERNSTEIN:  This is a good time.

12          THE COURT:  All right.  So we're going to break a

13  little early, and this break is going to be for a half an hour,

14  so we'll come get you in a half an hour.

15          (Recess taken, 2:12 p.m. - 2:50 p.m.)

16          THE COURT:  Thank you.  Please be seated.

17          And we are back on the record with the jury present.

18          Ms. Bernstein.

19                  CONTINUED CROSS-EXAMINATION

20  BY MS. BERNSTEIN:

21  Q.  Ms. Svendgard, you had also testified about a third time

22  that you were arrested.  I think you said it was for

23  shoplifting?

24  A.  Yes, ma'am.

25  Q.  Do you recall when that was?

```
1    A.  I do not.  Sometime during those months of June and
2    September.
3    Q.  Of 2010?
4    A.  Yes.
5    Q.  When you were 15 years old?
6    A.  Correct.
7    Q.  And when you were arrested for shoplifting, you told them
8    you were 18 years old?
9    A.  Correct.
10   Q.  And a person saw you, an officer in person?
11   A.  Yes.
12   Q.  And that person did not take you in as a juvenile; is that
13   right?
14   A.  No, they did not.
15   Q.  They also believed your lie about your age?
16   A.  Yes.
17   Q.  Thank you.  Thank you for your time.
18          MS. BERNSTEIN:  No further questions.
19          THE COURT:  Mr. Cambria.
20                      CROSS-EXAMINATION
21   BY MR. CAMBRIA:
22   Q.  Good afternoon.
23   A.  Hello.
24   Q.  You indicated in questioning from Mr. Rapp that you took a
25   number of steps in crafting your ad so as not to attract
```

1   attention by the police.  Is that fair to say?

2   A.  Yes, sir.

3   Q.  And that included, for example, making you look older in

4   your pictures.  Did you tell us that?

5   A.  I don't know if it was from my pictures, but more of the

6   wording in the postings.

7   Q.  Okay.  I thought you said something about making you look

8   older in the pictures.

9   A.  What I believe I said was make it appear older by my -- by

10   the age being older, from 18 to 19.

11   Q.  Oh, I see.

12          And so it appears also that in your ads, to try to --

13   try to not be detected by the police, that you didn't offer any

14   sex act for money in your ads; is that correct?

15   A.  Yes, sir.

16   Q.  And, for the most part, it appeared that the police were

17   not attracted to your ads.  Is that fair to say?

18   A.  Yes.

19   Q.  And so in trying -- in, basically, fooling them, I guess,

20   you were successful?

21   A.  For lack of -- yeah.  Yes.

22   Q.  All right.  However, were there times when there was no sex

23   offered for money in your ad, on the face of your ad, but you

24   would then have a telephone call with a prospective, as you

25   said, John, a customer, and at -- during that call, would you

1    have conversations about sex for money?

2    A.  Not usually, sir, no.

3    Q.  All right.  How about once they showed up, if they came to

4    you or you went to them?

5    A.  Yes.

6    Q.  And so at that time you would start a conversation which

7    had a proposition of sex for money?

8    A.  There -- there wasn't a lot of talking involved, sir.

9    Q.  Well, there was some agreement, was there not, when the

10   person showed up, as to a price and what you were going to do

11   and so on.  Is that fair to say?

12   A.  No.  It was more I -- the price was on the ad for how long

13   they were going to be with me, and it wasn't usually discussed

14   on what they wanted to do to me, it just would happen.

15   Q.  Well, but when you got there and met with the person,

16   that's when things actually became sex for money, correct?

17   A.  Yes.

18   Q.  And before that, as you've told us, you crafted your ad

19   such that the police, who might be interested in whether an

20   ad's for prostitution, would not be attracted to it.  Is that

21   fair to say?

22   A.  Yes.

23            MR. CAMBRIA:  That's all.  Thank you.

24            THE COURT:  Any other cross?

25            No.  All right.  Redirect.

REDIRECT EXAMINATION

BY MR. RAPP:

Q.  Jessika, did you post on any other websites?

A.  No.

Q.  Who introduced you to Backpage.com?

A.  Candace.

Q.  Now, Jessika, why did you lie about your age in all these postings?  Why did you lie?

A.  I -- I didn't really have a choice.

Q.  Why didn't you have a choice?

A.  Because I was being forced to do what I was doing by a 32-year-old pimp.

Q.  And, just so we're clear, is that Baruti Hopson?

A.  Correct.

Q.  Now, Ms. Bernstein asked you about another pimp.  Do you recall that?

A.  Yes.

Q.  Okay.  And what was his name?

A.  Count.

Q.  And how old was he?

A.  I -- I do not know.

Q.  Can you estimate?

A.  Mid twenties.

Q.  And when you were working for him, did the police respond to an ad?

1    A.  To my understanding, yes.

2    Q.  Now, when you posted -- you recall the questions

3    Ms. Bernstein had about the terms of use and your age and the

4    like.  Do you remember those questions?

5    A.  Yes.

6    Q.  Okay.  Did Backpage ever ask you at any time to submit

7    proof of your real age?

8    A.  No, it did not.

9    Q.  Did they ever require you to go down to some office and

10   provide a driver's license?

11   A.  No, it did not.

12   Q.  When you were arrested on these various occasions, did you

13   have an identification?

14   A.  No, I did not.

15   Q.  You didn't have a driver's license?

16   A.  No.

17   Q.  Why not?

18   A.  Because I was only 15.

19   Q.  Now, during these 105 days, did you -- was your appearance

20   changed?

21   A.  My -- my hair was cut very short.

22           MS. BERNSTEIN:  Objection, Your Honor.  Relevance.

23           THE COURT:  The objection is overruled.

24   BY MR. RAPP:

25   Q.  Why did you do that?

1    A.  I -- it was done to me.

2           MS. BERNSTEIN:  Objection, Your Honor.  Relevance.

3           THE COURT:  The objection is sustained.

4           MR. RAPP:  They opened the door.

5           THE COURT:  The objection to that question is

6    sustained.

7    BY MR. RAPP:

8    Q.  Well, why didn't you follow the posting rules, Jessika?

9    Why didn't you follow the posting rules?

10   A.  I was just doing what I was told.  And none of our ads were

11   ever taken down, so I didn't think that those rules were really

12   ever supposed to be taken seriously, honestly.

13   Q.  Just to follow up on some of the questions Mr. Cambria

14   asked you.  When -- did you craft your ad?

15   A.  Not without Baruti present guiding me into what to say.

16   Q.  All right.  And did he craft the ad to avoid the police?

17   A.  Yes.

18   Q.  Did he ever craft the ad to avoid -- to -- to make sure

19   that Backpage took your ad down?

20          MR. FEDER:  Speculation.

21          THE COURT:  The objection is sustained.

22          Who was that?

23          MR. FEDER:  Bruce Feder.  Sorry.

24   BY MR. RAPP:

25   Q.  Now, Ms. Bernstein asked you about your mother's lawsuit.

1                Do you remember those questions?

2  A.  Yes, I do.

3  Q.  Was it your mother's lawsuit?

4  A.  It was our -- my lawsuit with -- my mother helped me do

5  that because I was under age.

6  Q.  Were you the only one in that lawsuit?

7  A.  No, I was not.

8  Q.  Who else was in that lawsuit?

9          MS. BERNSTEIN:  Objection, Your Honor.  Relevance.

10          MR. FEDER:  Beyond the scope and relevance.

11          MR. RAPP:  It's not beyond the scope.

12          THE COURT:  So beyond the scope and relevance.

13          The objection is overruled.

14  BY MR. RAPP:

15  Q.  Who else was in that lawsuit with you, Jessika?

16  A.  Two other underaged people, girls.

17          MS. BERNSTEIN:  Objection, Your Honor.  Relevance.

18          THE COURT:  The objection is overruled.

19  BY MR. RAPP:

20  Q.  When you filed that lawsuit in 2012, did they take down the

21  website?

22  A.  No, they did not.

23  Q.  When you were deposed in 2017 with Backpage lawyers there,

24  did they take down the website?

25  A.  No, they did not.

1              MR. RAPP:  Nothing further.

2              THE COURT:  All right.  You may step down.

3              Your next witness.

4              MR. RAPP:  The United States calls Nacole Svendgard.

5                        NACOLE SVENDGARD,

6    called as a witness herein, having been first duly sworn, was

7    examined and testified as follows:

8                       DIRECT EXAMINATION

9    BY MR. RAPP:

10   Q.  Ma'am, will you state your full name and spell your last

11   name for the record, please.

12   A.  Nacole Svendgard, S-V-E-N-D-G-A-R-D.

13   Q.  And, ma'am, you know that your daughter testified in this

14   case?

15   A.  I do.

16   Q.  I'm going to call you Nacole to distinguish the two.  Is

17   that okay?

18   A.  Absolutely.

19   Q.  All right.  Nacole, what do you do?

20   A.  I am an assistant manager in retail.

21   Q.  And what part of the country is that in?

22   A.  The southeast.

23   Q.  Do you have any children?

24   A.  I do.

25   Q.  How many?

1   A.  Three.

2   Q.  And what are their ages?

3   A.  We're going to get into the tough questions right away,

4   huh?

5   Q.  Yes.

6   A.  30, 28, and 26.

7   Q.  And Jessika is your --

8   A.  Youngest.

9   Q.  Okay.  Married?

10  A.  Yes.

11  Q.  Have you always lived in the southeast United States?

12  A.  No, sir.  We raised our children in Seattle.

13  Q.  Now, I want to take you back to March 2010.

14          Do you remember that?

15  A.  I do.

16  Q.  How old was Jessika?

17  A.  She was 15, had just turned 15.

18  Q.  And did you -- did Jessika run away a couple times in 2010?

19  A.  She did, first in March and again in --

20          MR. CAMBRIA:  Your Honor, I object.  This is

21  cumulative.

22          THE COURT:  The objection is overruled.

23  BY MR. RAPP:

24  Q.  At some point in 2010 or into 2011, did you learn that your

25  daughter was posted on Backpage.com?

1    A.  I did.

2    Q.  How did you learn that?

3    A.  I learned it from reading an article in the Seattle Weekly

4    and also through the Baruti Hopson trial.

5    Q.  Now, the -- what do you know about the Seattle Weekly?

6    A.  I apologize, I said the wrong -- the Seattle Times.

7    Q.  Seattle Times.  Is Seattle Times a newspaper in Seattle?

8    A.  It is.  It's a bigger newspaper, regional newspaper.

9    Q.  All right.  And what did you learn from that article?

10        MS. BERTRAND:  Hearsay.

11        MR. CAMBRIA:  Objection.  Hearsay.

12        THE COURT:  The objection is sustained.

13   BY MR. RAPP:

14   Q.  At some point were you actually shown the postings?

15   A.  I was.

16   Q.  Where did that take place?

17   A.  I was testifying on Capitol Hill in the state of Washington

18   on some legislation that was being passed, and the

19   prosecutor --

20        MS. BERNSTEIN:  Objection, Your Honor.  This is beyond

21   the scope of Your Honor's earlier ruling.

22        THE COURT:  The objection is overruled as to this

23   question.

24   BY MR. RAPP:

25   Q.  You were saying, the prosecutor?

1    A.   The prosecutor had brought one of the ads that my daughter

2    was in and was going to show the legislators what we were

3    talking about and why this bill would be important.

4    Q.   And up to that point, had you ever seen the postings of

5    your daughter on Backpage?

6    A.   I had not.

7    Q.   And this was the prosecutor that handled the prosecution of

8    Baruti Hopson?

9    A.   Yes, it was.

10   Q.   Did you, at one point, meet with the mayor of Seattle?

11           MR. CAMBRIA:   Object to the relevance, Your Honor.

12           THE COURT:   The objection is overruled per the earlier

13   ruling.

14   BY MR. RAPP:

15   Q.   What was the purpose of your meeting?

16   A.   So, not long after the Baruti Hopson trial, the mayor of

17   Seattle, Mike McGinn, had pulled all Seattle public

18   advertising -- advertisements out of the Seattle Weekly.

19           MR. CAMBRIA:   This is objected to as hearsay and no

20   foundation.

21           MS. BERTRAND:   And relevance.

22           THE COURT:   The objection is sustained.

23           Maybe you can ask --

24           MR. RAPP:   Yes.

25           THE COURT:   -- the question a different way.

1   BY MR. RAPP:

2   Q.  What do you know about the Seattle Weekly?

3   A.  So the Seattle Weekly is a small weekly publication.  I

4   later learned that it was also ran by Village Voice Media, who

5   also owned Backpage.com, which is where my daughter was posted.

6   Q.  And then going back to the -- the mayor for Seattle.  Did

7   you have a meeting with the mayor of Seattle?

8   A.  I did, to thank him for pulling the advertisement and for

9   protecting --

10         MR. CAMBRIA:  This is objected to.  That was a yes or

11  no question, Your Honor.

12         THE COURT:  The objection is overruled.

13  BY MR. RAPP:

14  Q.  Do you remember my question?

15  A.  Yes.  So I did meet with the mayor.  And, once again, after

16  he had pulled the advertisements from the Seattle Weekly, I met

17  with him to thank him for that, and, as a parent, to tell him

18  why it was important to me.

19  Q.  All right.  Now, was -- in terms of the Seattle Weekly,

20  were you ever contacted by a reporter from the Seattle Weekly?

21  A.  I was.

22  Q.  When did that happen?

23  A.  During the Baruti Hopson trial.

24  Q.  Did you also meet with Washington state legislators?

25  A.  On several occasions.

1   Q.  And for what purpose?

2           MR. CAMBRIA:  Your Honor, I object to the relevance of

3   this.

4           THE COURT:  The objection is overruled per our

5   previous discussion.

6   BY MR. RAPP:

7   Q.  What was the purpose of it?

8   A.  So one of the bills that I was highly interested in in 2011

9   going into 2012 was 6251.  It was in-person identification if

10  you were going to be able to advertise on an internet website

11  such as Backpage.

12  Q.  Okay.

13  A.  The other one was, I want to say 2691, and it was

14  enhancement of fines for purchasers.

15  Q.  Purchasers of sex?

16  A.  Buyers, yes.  And there were several others.  We passed 12

17  that year.

18  Q.  And did you also meet with a person by the name of Robert

19  McKenna?

20  A.  I did.

21  Q.  Who is Robert McKenna?

22  A.  Robert McKenna, at the time, was the attorney general for

23  the state of Washington.

24  Q.  What was the purpose, Nacole, for you meeting with Robert

25  McKenna?

1          MR. CAMBRIA:  Objection.  Relevance.

2          THE COURT:  The objection is overruled.

3          THE WITNESS:  So as -- as the bills were moving

4    through the process on Capitol Hill, I felt like it was

5    important to meet with the top legal person for the state of

6    Washington and help build support for this legislation.  And so

7    I met with him and shared my experience and why I felt that

8    this legislation was -- was important to have in-person

9    identification.

10   BY MR. RAPP:

11   Q.  In-person identification for what?

12   A.  For posting on an internet website such as Backpage.

13   Q.  And did that bill pass?

14   A.  It did.

15   Q.  What happened to that bill?

16   A.  Unfortunately, there was a lawsuit brought by Backpage, and

17   the State of Washington and Rob McKenna ended up being sued for

18   that legislation and it never got implemented.

19   Q.  Now, at some point, did you file a lawsuit against

20   Backpage?

21   A.  So -- yes.  So, as I was moving through the process, like I

22   said, everything was happening very --

23          MR. CAMBRIA:  Object, Your Honor.  That's a yes or no

24   question.

25          THE WITNESS:  Yes.

```
 1              THE COURT:  Objection sustained.
 2   BY MR. RAPP:
 3   Q.  Did you file a lawsuit against Backpage?
 4   A.  I did.
 5   Q.  When did you do that?
 6   A.  The lawsuit was filed in December of 2012 -- or wait,
 7   sorry, July of 2012.
 8   Q.  All right.  And just to be clear, were you a plaintiff in
 9   the lawsuit?
10   A.  I was not.
11   Q.  Who was?
12   A.  My daughter and two other juvenile victims that had been
13   sold on Backpage.
14   Q.  And at some point did you -- did this case proceed to the
15   Washington Supreme Court?
16   A.  It did in, I believe that would have been October of 2014.
17   Q.  All right.  And before it ended up in the Washington State
18   Supreme Court, did -- did you seek out some assistance in terms
19   of filing a brief in that -- in that lawsuit?
20              MR. CAMBRIA:  Object to the relevance.
21              THE COURT:  The objection is sustained.
22              MR. RAPP:  Could we have a side bar on this?
23              THE COURT:  Sure.
24              (The following proceedings were held at side bar.)
25              MR. RAPP:  So this amicus brief is highly relevant in
```

1    this case, for a number of reasons.  One is that it is where

2    NCMEC and another anti -- another anti -- it is where NCMEC and

3    several other anti-trafficking organizations remediate

4    Backpage.com and tell the Court in Washington State that they

5    don't believe Backpage was ever sincere in its efforts to try

6    to rid child sex trafficking from the site.  That, in part,

7    leads to the Washington State Supreme Court to find in favor of

8    the plaintiffs and allow the case to go forward.

9            This amicus brief is -- was used in our opening

10   statement.  It's going to be discussed by Carl Ferrer, because

11   it becomes a big concern for Backpage and the defendants.  And

12   so how we get that amicus brief and how we end up in the

13   Washington State Supreme Court is relevant.

14           I only have a couple questions on this.

15           MR. CAMBRIA:  I don't see, Your Honor, how litigating

16   -- you know, talking about the details of litigation -- you

17   indicated to us that she could testify that she filed a suit

18   and that was it, and not anything about the rest of it.

19           And what's the difference about an amicus brief?  Why

20   would that be something that would be relevant to these

21   charges, because some legal organization had an opinion, an

22   opinion about the lawsuit?  Why -- why does that show any kind

23   of knowledge on the part of us?  We had an opinion that was

24   contrary to theirs and the judge made a decision.  I mean,

25   there is just no basis for that.

1          MR. RAPP:  I would only just end by saying it goes to

2    notice.

3          THE COURT:  And you may be able to talk about it with

4    Carl Ferrer who has information about whether they had notice.

5          MR. RAPP:  They had internal --

6          THE COURT:  But for this witness, I'm sustaining the

7    objection.

8          MS. BERTRAND:  Your Honor, I have another concern.

9    Jessika Svendgard is -- has -- I don't believe has been

10   released as a witness and she is watching this testimony.

11         MR. RAPP:  She's a victim.  She's victim 4 in the

12   superseding indictment.  She has a right to be here.

13         THE COURT:  That's my understanding.  If we need to

14   discuss it later, we can.

15         MS. BERTRAND:  Okay.

16         (The following proceedings were held in open court.)

17   BY MR. RAPP:

18   Q.  So I think when last we were discussing, we were at the

19   Washington State Supreme Court?

20   A.  Yes.

21   Q.  And this is in the state of Washington?

22   A.  Correct.

23   Q.  And did you go to the Washington State Supreme Court to

24   watch this argument?

25   A.  I did.

1    Q.   And were there attorneys from Backpage at this argument?

2    A.   There were.   There were attorneys representing Backpage --

3    Q.   All right.

4    A.   -- there.

5    Q.   And is there one attorney in particular that you recall?

6    A.   I believe Liz McDougall was there, although she didn't

7    argue the case.

8    Q.   All right.   Did the Washington State Supreme Court find in

9    favor of the plaintiffs?

10   A.   They did, 6 to 3.

11   Q.   And did your case proceed forward?

12   A.   That's what that meant, that our case was able to proceed

13   forward.

14   Q.   Now, Ms. Svendgard, as a result of that, did you give a

15   deposition to Backpage attorneys?

16   A.   Yes.   That would have happened, I believe, around July of

17   2017.

18   Q.   And did you -- did you tell them about your experience,

19   your family's experience with Backpage.com?

20   A.   Yes.

21   Q.   Now, talking about Liz McDougall, did you have occasion to

22   see her speak?

23   A.   I did.

24   Q.   Where?

25   A.   She was really the voice for Village Voice Media and

1    Backpage.com for -- for quite a long time.  So any time there
2    was articles written or TV interviews to be done, it was pretty
3    much Liz McDougall that would do those.
4    Q.  Okay.  Now, were you asked to give a statement to the
5    United States Senate?
6    A.  Yes.  That would have been around January of 2017.
7    Q.  And what was the purpose of your statement to the United
8    States Senate?
9              MR. CAMBRIA:  Object.  Relevance.
10             THE COURT:  The objection is overruled.
11   BY MR. RAPP:
12   Q.  What was the purpose of your statement?
13   A.  So they were doing an investigation into online child sex
14   trafficking, and Backpage in particular.  And I was asked to
15   come and testify as to my family's experience and what we had
16   done over the last several years in regards to Backpage and --
17   and tell our story.
18   Q.  And did that -- was this a Senate Commit -- not the full
19   Senate?
20   A.  Not the full Senate.  It was a subcommittee.
21   Q.  And do you know who the chairpersons were?
22             MS. BERNSTEIN:  Objection, Your Honor.  Relevance and
23   403.
24             THE COURT:  The objection is sustained.
25

1    BY MR. RAPP:

2    Q.  Did that subcommittee issue a report?

3    A.  They did.  Not long after the conclusion of -- of our

4    testimonies, with the evidence that they had gathered over the

5    years --

6              MS. BERNSTEIN:  Objection, Your Honor.  Hearsay.

7              MR. CAMBRIA:  I object to this.

8              THE WITNESS:  -- they issued a report.

9              MR. CAMBRIA:  This was a yes or no question, Your

10   Honor.

11             THE COURT:  The objection is sustained.

12             THE WITNESS:  Yes.

13   BY MR. RAPP:

14   Q.  Yes, they issued a report?

15             Yes, they issued a report --

16   A.  Yes.

17   Q.  -- based on their investigation?

18   A.  Yes.

19   Q.  And is that -- was that report, to your knowledge,

20   publically available?

21   A.  Yes.

22   Q.  Now, Ms. Svendgard -- or, Nacole, to be clear on the

23   record, can you remind us when you gave that testimony to this

24   Senate subcommittee?

25   A.  I believe the exact date would have been January 10th,

1    2017.

2    Q.  All right.  Was there any of the defendants that are in

3    this case, were they present at that Senate meeting?

4    A.  Yes, there were several.

5    Q.  Who do you recall being present?

6    A.  Carl Ferrer, Mr. Lacey, Mr. Larkin, Ms. McDougall, and

7    Mr. Padilla.

8    Q.  All right.  And at some point were you in a room watching

9    proceedings?

10   A.  Yes.

11   Q.  And did you -- did you go in and give your statement that

12   you've now testified to?

13   A.  I did.

14   Q.  But before you went into that meeting, did you travel

15   outside into the hallway of the Senate?

16   A.  Yes.  So we were held in one room and we were --

17           MS. RAMACHANDRAN:  Object, Your Honor.  It's a yes or

18   no question.  I object to the speeches.

19           THE COURT:  The objection is overruled.

20           You can finish your answer.

21           THE WITNESS:  We were moved from where we were being

22   held, because we were the second panel, into the Senate hearing

23   room to testify.

24   BY MR. RAPP:

25   Q.  Okay.  What happened when you left that room to go in to

1   give your statement about Backpage.com?  What happened?

2   A.  So, as we were being moved, there were several

3   representatives from Backpage lingering in the hall and we were

4   passing.  And as we were passing, one of the individuals looked

5   in our direction, Mr. Lacey to be exact, and said, if these

6   fucking yahoos would just keep their mouth shut.

7   Q.  All right.  How far were you from him when he made that

8   statement?

9   A.  At least as close as I am to you.

10  Q.  All right.  And, for the record, can you identify Mr. Lacey

11  today?

12  A.  Probably.

13  Q.  Take your time.

14  A.  In the back wearing a blue mask and a white shirt, bolo

15  tie.

16  Q.  Can you -- well, there is a lot of people wearing a blue

17  mask.

18  A.  Sorry.

19  Q.  Could you -- is he wearing anything --

20  A.  He has dark red glasses, graying hair, a black suit jacket.

21       MR. RAPP:  May the record reflect that this witness

22  has identified defendant Michael Lacey.

23       THE COURT:  Can you tell me which seat he's in.

24       THE WITNESS:  Two, if you're looking from my

25  direction.

1          THE COURT:  The front row or the back row?  Front row

2     or back row?

3          THE WITNESS:  Back.

4          THE COURT:  Okay.  The record will reflect the

5     identification.

6          MR. RAPP:  Can I just have a moment, Your Honor?

7          THE COURT:  Yes.

8          MR. RAPP:  I'll pass the witness.

9                    CROSS-EXAMINATION

10    BY MS. BERNSTEIN:

11    Q.  Good afternoon, Ms. Svendgard.

12    A.  Good afternoon.

13    Q.  I'll be brief.

14          You testified in response to Mr. Rapp's questions that

15    you had lobbied on behalf of legislation in Washington State;

16    is that right?

17    A.  Correct.

18    Q.  And that was legislation for -- to implement restrictions

19    on websites; is that right?

20    A.  It was in-person identification if you were going to post

21    on a website like Backpage.com.

22    Q.  Would -- those websites, did it also include porn websites?

23    A.  Included any website that we were going to post -- where --

24    it was a safety net for children.

25    Q.  On porn websites?

1    A.  Yes.

2    Q.  Google?

3    A.  No.

4    Q.  Not -- Google is not a website that --

5    A.  Google is a website.  Google was not hosting adult escort

6    service, so, no, Google -- I don't believe Google was a part of

7    it.  That's not the part I testified to anyhow.

8    Q.  It's your testimony that Google does not host adult website

9    -- adult website services or escorts?

10   A.  My testimony in front of the Washington State Committee --

11   Q.  I'm sorry, I mean today.  I mean today.  Is it your

12   testimony today that Google doesn't host adult content and

13   adult escorts and adult websites?

14           I don't want to misunderstand what you had just said.

15           MR. RAPP:  I'm going to object.  I'm going to object

16   as to the foundation.  When is she talking about, today or --

17           THE COURT:  If you can just clarify.

18   BY MS. BERNSTEIN:

19   Q.  Ms. Svendgard, when I was asking you about the legislation

20   in Washington, you said that it applied to websites, you said

21   porn websites.  I asked you about Google, and you said no,

22   because Google doesn't host adult escort ads or adult websites;

23   is that right?

24   A.  That's not what I was testifying -- that was not my

25   testimony in front of legislators then.  My testimony to

1    them --

2    Q.  I understand that.  I'm asking you about what you said

3    today.  Do you remember that exchange that we just had?

4    A.  Yes.

5    Q.  So it's your testimony today that Google does not host

6    adult content; is that right?

7    A.  No, they do.  But what I'm saying is my testimony then when

8    I was trying to pass legislation was about what happened to my

9    child when she was 15 years old and sold on the website

10   Backpage.com and how I thought a safety net would be in-person

11   identification.

12   Q.  I understand that.  And I appreciate that you were there to

13   talk about your experience.

14            I'm asking you about what websites that legislation

15   that you lobbied for would have applied to?

16   A.  My understanding would -- it would have applied to websites

17   hosting adult content for escort services.

18   Q.  Does Google host adult content for escort services?

19   A.  I don't know.

20   Q.  You don't know?

21   A.  I don't know.

22   Q.  Does Facebook host adult content?

23   A.  I don't know.

24   Q.  Does Instagram host adult content?

25   A.  I have no idea.

1   Q.   Does Craigslist host adult content?

2   A.   They did at one time.

3   Q.   Does TikTok host adult content?

4   A.   I have no idea.

5           MR. RAPP:  I'm going to object because I am not

6   getting the answers here.  I don't know if it's getting on the

7   record.

8           THE COURT:  Could you pull the microphone a little bit

9   closer.

10  BY MS. BERNSTEIN:

11  Q.   Does OnlyFans host adult content?

12  A.   Yes.

13          THE COURT:  I'm sorry.  I need you to speak up a

14  little bit.

15          THE WITNESS:  I believe they do, yes.

16  BY MS. BERNSTEIN:

17  Q.   And the website that you were -- the legislation that you

18  were lobbying for would have applied to all of these websites

19  that host adult content.  That's your testimony?

20  A.   My testimony is that in the state of Washington we were

21  trying to pass legislation that if you were going to post on

22  this website in the state of Washington, you needed to do an

23  in-person identification.

24  Q.   And, again, that is for any website that would host adult

25  content; is that right?

1    A.  I'm not exactly sure to all the minutia of the bill.  I

2    testified to what I knew and my experience in 2011 and 2012.

3    Q.  Okay.  Thank you.

4            And you indicated that you are -- in your experience,

5    you are aware that that -- the attorney general was sued and

6    that that legislation was never implemented; is that right?

7    A.  Correct.

8    Q.  And that's because that legislation is illegal and contrary

9    to the constitution?

10           MR. RAPP:  Objection.  She's not a lawyer.

11           THE COURT:  The objection is sustained.

12   BY MS. BERNSTEIN:

13   Q.  Do you know why that legislation was never implemented and

14   why that suit was brought?

15   A.  It was my belief that --

16   Q.  I'm just asking about your knowledge not your belief.  I'm

17   sorry.

18           THE COURT:  So yes or no.  Do you know why?

19           THE WITNESS:  No.

20   BY MS. BERNSTEIN:

21   Q.  You also testified about, I believe an attorney you said

22   whose name was Elizabeth McDougall; is that right?

23   A.  Yes.

24   Q.  And do you know what her role was?

25   A.  She was the counsel for Backpage, it was my understanding

1    of what she did.

2    Q.  Your understanding is that she was general counsel for

3    Backpage?

4    A.  Uh-huh.

5    Q.  And as -- do you know what general counsel means?

6    A.  She was an attorney for Backpage.

7    Q.  And that she was an in-house attorney for Backpage?

8    A.  She was the attorney for Backpage.  I don't know what in-

9    house or -- means.

10   Q.  Is it your understanding that she provided legal advice

11   to --

12   A.  Yes.

13   Q.  -- the operation over the years?

14   A.  She was the attorney for Backpage.

15          THE COURT:  Hold on.  You guys can't talk at the same

16   time.  So just wait a minute.

17          Could you repeat your question?

18   BY MS. BERNSTEIN:

19   Q.  Is it your understanding that she provided legal advice to

20   Backpage over the years?

21   A.  Yes.

22          MS. BERNSTEIN:  Thank you.

23                      CROSS-EXAMINATION

24   BY MR. CAMBRIA:

25   Q.  Good afternoon.

1    A.   Good afternoon.

2    Q.   This statement that you attribute to Mr. Lacey, originally

3    you said it was Mr. Larkin, didn't you?

4    A.   I did.

5    Q.   And the statement supposedly was made to the press?

6    A.   There was press in the hallway, correct.

7    Q.   Well, that's who he was talking to, wasn't it?

8    A.   He -- yes, he was -- he was speaking with press, but as we

9    passed in the hall, he directed the statement in our direction,

10   so I --

11   Q.   He turned your way when you walked by?

12   A.   Yes.

13   Q.   But he was talking to the press, was he not?

14   A.   Yes.

15   Q.   All right.  And what the whole conversation was to the

16   press you're not able to tell us, are you?

17   A.   No.

18   Q.   So you don't know what came before or came after what you

19   believe you heard, true?

20   A.   That is true.

21   Q.   So you don't know what context it was made in, correct?

22   A.   I can only go by what I felt --

23   Q.   Simple question.

24   A.   -- it was directed at us.

25   Q.   Do you know?  No speculation.  Do you know?

1   A.  No.  I don't know what was said before or after.

2   Q.  Thank you.

3   A.  You're welcome.

4   Q.  They -- they don't trust me, so I have to ask questions

5   when I get notes.

6         Did you ever read any press articles which quoted

7   anyone at that hearing, meaning either Mr. Lacey or someone

8   else from Backpage?

9         MR. RAPP:  Hold it.

10        MR. CAMBRIA:  Well, let me rephrase it.  Let me

11  rephrase it.

12  BY MR. CAMBRIA:

13  Q.  Did you ever read an article which repeated what you

14  believe you heard from Mr. Lacey in the press?

15        MR. RAPP:  I'm going to object and ask for a side bar

16  on that.

17        THE COURT:  Well, the objection is sustained.

18        MR. CAMBRIA:  Okay.  That's all.

19        THE COURT:  Any other questions from the defense?

20        (No response.)

21        THE COURT:  Okay.  Redirect.

22                    REDIRECT EXAMINATION

23  BY MR. RAPP:

24  Q.  With respect to these other websites that Ms. Bernstein was

25  asking you about, do you recall that series of questions?

1    A.  Yes.

2    Q.  She asked you questions about Facebook and Twitter and the

3    like?

4    A.  Uh-huh.

5    Q.  Do you know, based on your experience, whether those

6    websites hosted an escort category?

7    A.  I do not believe that in 2011 that they hosted an adult

8    escort section.

9    Q.  All right.  And what is your experience based on?

10   A.  My experience is based on what happened to my family and my

11   child when she was 15.

12   Q.  And have you had any other experience in this arena, so to

13   speak?

14   A.  I teach a parent's perspective on child trafficking and --

15          MS. BERNSTEIN:  Objection, Your Honor.  Relevance and

16   beyond the scope.

17          THE COURT:  The objection is sustained.

18          MR. RAPP:  All right.

19          MS. BERNSTEIN:  Move to strike.

20          THE COURT:  The last answer will be stricken.

21          Any other questions?

22          MR. RAPP:  Nothing further.

23          THE COURT:  All right.  You may step down.

24          THE WITNESS:  Thank you.

25          THE COURT:  And are you recalling the special agent?

1        MR. KOZINETS:  We will be, Your Honor.  We just need

2   to switch over something on the computer.

3        THE COURT:  Is someone going to get him though?

4        MR. KOZINETS:  Yeah.

5        THE COURT:  Okay.  While this is loading, if anybody

6   on the jury wants to stand up, feel free.

7        MR. KOZINETS:  We're ready.

8        THE COURT:  Okay.

9        MR. KOZINETS:  Thank you, Your Honor.

10                 CONTINUED DIRECT EXAMINATION

11   BY MR. KOZINETS:

12   Q.  Special Agent Supervisor Fichtner, I've put back on the

13   screen what had been previously admitted as Exhibit 1636 A,

14   which was an excerpt -- a video excerpt that we were looking at

15   when you were testifying this morning.  And we were almost at

16   the end of this clip.

17        MR. BIENERT:  I'm sorry, Your Honor, can I just have a

18   reminder of the exhibit number?

19        MR. KOZINETS:  This is 1636 A.

20        MR. BIENERT:  Thank you.

21   BY MR. KOZINETS:

22   Q.  And I think I -- I just wanted to highlight a couple of

23   things on this ad at the end of this clip.

24        Do you see it on your screen, sir?

25   A.  Yes, I do.

1    Q.   Okay.  I think we were looking at the video element here.

2             Do you recognize what this is?

3    A.   Yes, that's the -- well, this is an excerpt of the video

4    that I created, and that's the video attached to the

5    advertisement.

6    Q.   To this particular advertisement?

7    A.   Yes.

8    Q.   Can you tell how long this video embedded in the

9    advertisement is by looking at this sort of indicator at the

10   bottom of the embedded video?

11   A.   Yes.  The time bar says 6 seconds.

12   Q.   So this would be a 6-second, just, video --

13   A.   Correct.

14   Q.   -- embedded in this ad?

15   A.   Correct.  This would be a 6-second video.

16   Q.   And I want to direct your attention to another part of this

17   ad appearing underneath the text.

18            Do you see that there?

19   A.   I do.

20   Q.   Do you know what this is?

21   A.   I am not sure.

22   Q.   Can you just read what it is called?

23   A.   It says, see more videos, new.

24            MR. KOZINETS:  I'm going to proffer a new exhibit.

25   BY MR. KOZINETS:

1    Q.   Sir, I'm showing you another exhibit marked 1636 B.

2         Do you recognize this exhibit?

3    A.   Yes.  This is another excerpt of the video that I created.

4    Q.   The video that you created on September 8th, 2015?

5    A.   Correct.

6    Q.   And did you review this before testifying?

7    A.   Yes, I did.

8    Q.   And did you confirm this is an excerpt of the video that

9    you created on September 8th, 2015?

10   A.   Yes.

11        MR. BIENERT:  Clarification, Your Honor, was it '15 or

12   '16?

13        MR. KOZINETS:  The exhibit number?

14        MR. BIENERT:  They are both in 2015, but this one is

15   September and the other one is --

16        MR. KOZINETS:  Yeah.

17        MR. BIENERT:  The date?

18        MR. KOZINETS:  The date is September 8th, 2015.

19        MR. BIENERT:  Thank you.

20        MR. KOZINETS:  I would move to admit this exhibit,

21   Exhibit Number 1636 B.

22        THE COURT:  Any objection?

23        MR. BIENERT:  No, Your Honor.

24        THE COURT:  Okay.  1636 B will be admitted and can be

25   published.

1          MR. KOZINETS:  Thank you.

2     BY MR. KOZINETS:

3     Q.  Sir, I'm directing your attention to an ad that is part of

4     this exhibit.

5          Do you see that here?

6     A.  Yes, I do.

7     Q.  And does this ad also have an embedded video clip?

8     A.  Yes, it does.

9     Q.  Just directing your attention to the text of the ad here.

10    Could you read it, please.

11    A.  Yes.  It says, Tiffany here.  If you are a high-class

12    gentleman that enjoys the company of a woman that is as

13    intelligent as she is beautiful, accept my invitation and

14    prepare yourself.  I enjoy catering to respectful gentlemen who

15    enjoy relaxation.  I am always attentive to your wants/needs.

16    100 percent independent.  Everything is covered.  My time is

17    valuable, as well as yours.  Tiffany, with a phone number, out

18    call only, out call only.

19    Q.  And are these the images associated with that ad that we're

20    scrolling through?

21    A.  Yes.

22          (A video is being played.)

23    BY MR. KOZINETS:

24    Q.  This is just an excerpt of your overall video, but from

25    viewing this particular clip right here, can you describe what

1    was depicted in the video embedded in this ad?

2    A.  Yes.  It is a naked woman showering.

3            MR. KOZINETS:  I'd like to proffer another exhibit.

4    BY MR. KOZINETS:

5    Q.  Sir, I'm going to direct your attention to an exhibit

6    that's been marked 1636 C.

7            Do you recognize this exhibit?

8    A.  Yes.  This is another excerpt of the video that I recorded

9    on September 8, 2015.

10   Q.  And you reviewed this excerpt before testifying today?

11   A.  Yes, I did.

12           MS. BERTRAND:  Your Honor, objection.  Cumulative.

13           THE COURT:  The objection is overruled.

14   BY MR. KOZINETS:

15   Q.  Did you confirm that this is an excerpt of the video that

16   you had created on September 8, 2015?

17   A.  Yes, it is.

18           MR. KOZINETS:  Move to admit.

19           THE COURT:  Any objection?

20           MR. BIENERT:  No objection, Your Honor.

21           THE COURT:  Okay.  1636 -- did you say, C?

22           MR. KOZINETS:  Yes.

23           THE COURT:  -- will be admitted.

24   BY MR. KOZINETS:

25   Q.  I'm going to show the very first part of this clip, which

1    is, essentially, a still image.

2            Special Agent Supervisor Fichtner, do you see the very

3    first part of Exhibit 1636 C?

4    A.  Yes, I do.

5    Q.  And what do you recognize this to be?

6    A.  This is an excerpt of the video I recorded on September 8,

7    2015.

8    Q.  And does this particular part of the excerpt show another

9    adult escort ad posted on Backpage.com in the Sacramento

10   section?

11   A.  Yes.

12   Q.  And does it contain an embedded video clip?

13   A.  Yes, it does.

14   Q.  And can you tell just from looking at the bar underneath

15   the video clip, how long of a video it is?

16   A.  The video is 30 seconds.

17   Q.  And I'm not going to have you look at all of the text of

18   the video, but -- of the ad, but do you see the highlighted

19   portion of the text in front of you?

20   A.  Yes, I do.

21   Q.  And can you read that language, please?

22   A.  It says, out calls only, with the phone number,

23   (916)539-9182, QK 100, half hour 120, hour 200.

24   Q.  Now, this -- we're not going to show any part of this

25   embedded video, but can you just describe what it is that you

84

1    observed when you recorded this?

2    A.  It was 30 seconds of a woman masturbating herself.

3    Q.  Sir, I'm directing your attention to an ad appearing at the

4    end of this video clip.  Do you see this ad in front of you?

5    A.  Yes, I do.

6    Q.  Can you read the title of it, please?

7    A.  It says, Dianna, bedroom pleaser, dash 25.

8    Q.  And do you see an embedded video in the ad?

9    A.  Yes, I do.

10   Q.  Can you describe what is depicted in the video?

11   A.  It is a video of a woman, a naked woman showering.

12   Q.  And can you read the text of the ad for us, please.

13   A.  It says, hello.  How are you, love?  I'm your romantic

14   goddess Dianne.  I am here to please and excite you in every

15   way, from my lips to my hips, and I love to be pampered with

16   gifts.  I have a QQ 40, half hour 80, hour 160, out call come

17   with a fee.  I'm gifted and I am all a gentleman needs to relax

18   and receive all that he needs from a queen.  I can accommodate

19   most of your wishes.  Call me if interested, with her phone

20   number.

21   Q.  Thank you.  And does this ad have many of the

22   characteristics that we've been talking about that you had seen

23   in the adult escort ads that you had been reviewing on

24   Backpage?

25   A.  Yes.  It still has the proposition, it still has the time

1   increments with the price range, along with an out call, and
2   same -- same type of verbiage.
3   Q.  And same type of imagery except this time we now have the
4   video as well?
5   A.  Correct.
6          MR. KOZINETS:  I have a screen shot exhibit next to
7   offer.
8   BY MR. KOZINETS:
9   Q.  Special Agent Supervisor Fichtner, can you see the image on
10  your screen at the moment?
11  A.  Yes, I can.
12  Q.  And I'm showing you what's been marked as Exhibit 1636 D.
13  What do you recognize it as?
14  A.  This is a screen shot of a moment of time in the video that
15  I recorded on September 8, 2015.
16  Q.  Did you confirm this is an accurate screen shot of the
17  video that you had recorded on September 8, 2015?
18  A.  Yes.
19          MR. KOZINETS:  Move to admit Exhibit 1636 D.
20          THE COURT:  Any objection?
21          MR. BIENERT:  No, Your Honor.
22          THE COURT:  1636 D will be admitted and may be
23  published.
24  BY MR. KOZINETS:
25  Q.  Sir, we talked about how this -- this is a screen shot, so

1   this is just -- is this just like a -- like a still photograph

2   of your video?

3   A.  Yes, it is.

4   Q.  Now, do you see embedded in it a video that had been made

5   part of this ad?

6   A.  Yes.

7   Q.  And did you watch the full version of that embedded video?

8   A.  Yes, I did.

9   Q.  What does it depict?

10  A.  It depicts 15 seconds of a woman showering and

11  masturbating.

12  Q.  And, again, without having you read the entire text of the

13  call, I'm directing you to part of the text -- I mean, the

14  entire text of the ad -- I'm directing you to a portion of it.

15  Can you please read the portion that is displayed?

16  A.  Yes.  It says, in call, out call, half hour 140, half hour

17  160, hour 200, hour 240, two hours 400, two hours 480, with a

18  phone number.

19          MR. KOZINETS:  I have another screen shot to proffer.

20  BY MR. KOZINETS:

21  Q.  Sir, I'm showing you what's been marked as Exhibit 1636 E.

22          Do you see that?

23  A.  Yes, I do.

24  Q.  And do you recognize it?

25  A.  Yes, I do.

1    Q.  What do you recognize it to be?

2    A.  It is a screen shot of part of a video that I recorded on

3    September 8, 2015.

4    Q.  And have you confirmed that this is an accurate screen shot

5    taken from that video?

6    A.  Yes, I have.

7             MR. KOZINETS:  Move to admit Exhibit 1636 E.

8             THE COURT:  Any objection?

9             MR. BIENERT:  No, Your Honor.

10            MR. KOZINETS:  Request to publish.

11            THE COURT:  1636 E will be admitted and can be

12   published.

13   BY MR. KOZINETS:

14   Q.  Sir, what is this that we are looking at?

15   A.  This is another advertisement in the Sacramento escort

16   section.

17   Q.  And just directing your attention to the title of the ad.

18   Can you read the title, as best as you're able?

19   A.  Sure.  It says, new, lips emoji, mixed, splash emoji,

20   exotic, with a crown, queen, splash emoji, 100, with a rose,

21   dash 23.  Posted Saturday, August 29, 2015, 11:12 a.m.

22   Q.  And do you see how this also has an embedded video in the

23   ad?

24   A.  Yes, I do.

25   Q.  Did you review the video?

1   A.  Yes, I did.

2   Q.  What does it show?

3   A.  It shows a naked woman washing herself.

4        MR. KOZINETS:  I have another clip, last one.

5   BY MR. KOZINETS:

6   Q.  Sir, I'm showing you what's been marked as Exhibit 1636 F.

7        Do you see that on -- is that on your screen?

8   A.  Yes, I do.

9   Q.  And do you recognize this?

10  A.  Yes.

11  Q.  What do you recognize it as?

12  A.  It's an except of the video I recorded on September 8,

13  2015.

14  Q.  And you've viewed this before?

15  A.  Yes, I have.

16  Q.  And you've confirmed that it's an except of that video you

17  had created in September of 2015?

18  A.  Yes.

19        MR. KOZINETS:  Move to admit Exhibit 1636 F.

20        THE COURT:  Any objection?

21        MR. BIENERT:  No objection.

22        THE COURT:  1636 F will be admitted and can be

23  published.

24  BY MR. KOZINETS:

25  Q.  Sir, do you recognize this as the video appearing kind of

1    towards the end of your longer recording of September 8, 2015?

2    A.  Yes.

3    Q.  I want to pause right here at the 6 second mark.  What is

4    it that we're seeing at the bottom of the page here?

5    A.  From this video view shot, the sponsored ads, or

6    thumbnails, instead of being on the right side of the page,

7    they are listed down below.  So these are the sponsored ads.

8    Q.  So I'm highlighting for you just the first six sponsored

9    ads appearing on that page.

10            Do you see them?

11   A.  Yes, I do.

12   Q.  Do you recognize the second sponsored ad?

13   A.  Yes.  That ad looks like the one from Children of the

14   Night, the nonprofit group.

15   Q.  Does this ad reference turning tricks?

16   A.  Yes.  It says, tired of turning tricks?  Pimps don't care,

17   we do.  Call.

18   Q.  I'm pausing the video again at 12 seconds into it.

19            Just showing you a collection of four of the sponsored

20   ads.  Do you see them here?

21   A.  Yes, I do.

22   Q.  Can you read the title of the first one?

23   A.  It says, out calls, Juicy Jaye, with a splash emoji.  And

24   then I'm not sure what the other emojis are.  It says,

25   chocolate cutie, looks like a bikini pine tree -- or a palm

1   tree, cell phone specials, and then the tongue emoji, splash

2   emoji, best lips in town, with a splash emoji and a tongue

3   emoji.

4   Q.  Can you go ahead and read the part after the phone number?

5   A.  It says, specials, 100 for a quickie, 150 for a half hour,

6   250 for an hour, no negotiations, no out calls, Sacramento and

7   surrounding area.

8   Q.  And can you also just read the last ad that we see here,

9   the title down here.

10  A.  The last one says, 100, 150, 250, out calls only, then

11  emojis.  Booty lovers number one choice, more emojis,

12  100 percent real pics, curvy and delicious.

13  Q.  So were these all live ads on Backpage when you created the

14  recording of September 8, 2015?

15  A.  Yes, they were.

16  Q.  And they were all in the adult escort category of Backpage?

17  A.  Correct.

18  Q.  Just in the Sacramento section for adult escorts?

19  A.  Just in the Sacramento area.

20  Q.  Could any member of the general public who had been

21  browsing through Backpage have viewed all of these ads?

22  A.  Yes.

23  Q.  Are you generally familiar with California law involving

24  escorts?

25  A.  Yes.

1    Q.  Are escorts legal?

2    A.  Yes, they are.

3    Q.  Are they licensed?

4    A.  Yes.  To be an escort in California, every county or city,

5    you know, varies, but you need to apply for a business license

6    and have a special license to be an escort, yes, in California.

7    Q.  Is there a fingerprinting requirement?

8    A.  Yes.  The process, at least in Sacramento County that I

9    know of, apply for a business license, then a special license,

10   and then you submit, you know, your application to the

11   sheriff's department.  They do a fingerprinting and a

12   background check before the sheriff's department approves that

13   license.

14   Q.  And what are, generally speaking, lawful escort services?

15   A.  It's one person hiring another person to spend time

16   together that does not involve any illegal acts.

17   Q.  So offering to, or engaging in the exchange of sex for

18   money is not part of being a lawful escort?

19   A.  No, that would be an illegal act and that is not allowed.

20   Q.  In the course of doing your work on the Backpage

21   investigation, how many Backpage escort ads would you say you

22   had reviewed?

23   A.  Hundreds.

24   Q.  Did you ever see a Backpage escort ad that featured a

25   person indicating that they held an escort license?

1   A.   I did not see any ads indicating they had a license.

2   Q.   Or any ads with, say, like an escort license number?

3   A.   No.

4   Q.   Did you ever come across any lawful licensed escorts in any

5   of the undercover operations that you were involved in?

6            MR. BIENERT:   Objection, Your Honor.   Relevance.

7   Foundation.   Notice.

8            MR. FEDER:   Speculation.

9            THE COURT:   Was there somebody else?

10            MR. FEDER:   Bruce Feder.   Speculation too.

11            THE COURT:   The objection is sustained as to that

12   question.

13            MR. KOZINETS:   As to foundation?

14            THE COURT:   As to -- yes.

15   BY MR. KOZINETS:

16   Q.   Just limiting the question to -- to your personal knowledge

17   and involvement in investigations involving Backpage ads, did

18   you personally ever make contact with a person in one of these

19   advertisements who claimed to be a lawful, licensed escort?

20            MR. BIENERT:   Objection, Your Honor.   It's all

21   hearsay.   It's irrelevant.   Other acts.

22            THE COURT:   The objection is sustained as to hearsay.

23   BY MR. KOZINETS:

24   Q.   In the ads that you reviewed, in the Backpage escort ads

25   that you reviewed, did you encounter any ads that offered

1  companionship to attend a social event, like a high school

2  reunion?

3  A.  I did not.

4  Q.  Or a wedding, for instance?

5  A.  I did not.

6  Q.  An ad that offered to go out for a movie?

7  A.  I did not.

8  Q.  A dinner?

9  A.  No.

10 Q.  Coffee?

11 A.  No.

12 Q.  Did the Backpage escort ads that you reviewed, did any of

13 them appear to offer legitimate, lawful, licensed escort

14 services?

15         MR. CAMBRIA:  Objection.  Calls for a conclusion and

16 speculation.

17         THE COURT:  The objection is sustained.

18 BY MR. KOZINETS:

19 Q.  I'd like to circle back to your discussion with Elizabeth

20 McDougall in March of 2015.

21         Do you recall how she spoke about a filtering process?

22 A.  Yes.

23 Q.  Based on your multiple reviews of the Backpage escort

24 section in Sacramento, did the filtering process appear to be

25 working?

```
 1            MR. CAMBRIA:  Object to that.  Calls for a conclusion.
 2   Speculation.
 3            THE COURT:  The objection is sustained.
 4   BY MR. KOZINETS:
 5   Q.  I'm going to bring back up on the screen Exhibit 489 A,
 6   which had been admitted previously.  And I'm going to fast
 7   forward to a certain part of the exhibit.
 8            Sir, I have fast forwarded to the 5 minute 15 second
 9   mark on Exhibit 489 A.
10            Do you see that part of the exhibit?
11   A.  Yes, I do.
12   Q.  And what do you recognize this part of the exhibit to be?
13   A.  This is -- or these are the posting rules that come up
14   before you post an advertisement in the adult escort section.
15   Q.  I want to direct your attention to the first posting rule
16   here.  Could you read it again for us, please.
17   A.  It says, I will not post obscene or lewd and lascivious
18   graphics or photographs which depict genitalia, actual or
19   simulated sexual acts, or naked images.
20   Q.  Thank you.  Just stopping here for a second.
21            In your review of the Backpage escort section in
22   Sacramento, was this rule followed?
23            MR. CAMBRIA:  Objection.
24            MS. BERTRAND:  Objection.
25            MR. BIENERT:  Objection.  Can you note the time, Your
```

1   Honor, because we're looking at September, and I believe this

2   is back in March.  Can we specify the time he's talking about?

3   BY MR. KOZINETS:

4   Q.  I would specify the time that you worked on the Backpage

5   investigation, 2015, in the year 2015, was this rule followed?

6           MR. BIENERT:  Same objection, Your Honor.  He should

7   be limited to the document he's looking at, at the time of it,

8   which as I understand it was -- I think this is the March 2015

9   video.

10          THE COURT:  I'm sorry.  I don't understand the

11  objection.  Your objection to the question is a time frame?

12          MR. BIENERT:  I would ask him to give a time frame

13  that relates to this document for this question.  If he wants

14  to expound on it, he can, but the document is from a set time

15  which is different than the other video we just finished

16  looking at, which was many months later.

17          You know, Your Honor, I can clean it up in cross, so

18  I'm fine.

19          THE COURT:  Do you want to have a side bar?

20          MR. BIENERT:  I don't need it.  I withdraw.

21          THE COURT:  Okay.  So I'm going to overrule the

22  objection and he can cross on the issue.

23  BY MR. KOZINETS:

24  Q.  So focusing on this first posting rule regarding obscene,

25  lewd, lascivious graphics or photographs which depict

UNITED STATES DISTRICT COURT

```
 1   genitalia, actual or simulated sex acts, or naked images, in
 2   2015 when you conducted all of these reviews of Backpage's
 3   adult escorts advertisements, was this rule followed?
 4   A.  It was not.
 5   Q.  Did you observe violations of this rule?
 6   A.  On many occasions, yes.
 7   Q.  With respect to the second rule here, do you see that
 8   second rule?
 9   A.  Yes, I do.
10   Q.  Will you read that again, please.
11   A.  It says, I will not post any solicitation directly or in
12   coded fashion for any illegal service, including exchanging
13   sexual favors for money or other valuable considerations.
14   Q.  Did you see violations of this rule?
15           MR. CAMBRIA:  That's objected to.
16           MS. BERTRAND:  Objection.
17           THE COURT:  Okay.
18   BY MR. KOZINETS:
19   Q.  In 2015?
20           THE COURT:  What is the objection?
21           MR. CAMBRIA:  No foundation, Your Honor.
22           MS. BERTRAND:  Speculation.
23           THE COURT:  The objection is sustained.
24           MR. CAMBRIA:  And a time frame, please.
25           THE COURT:  Well, I sustained the objection so.
```

1    BY MR. KOZINETS:

2    Q.  I'd like to focus on the last part of this rule about

3    exchanging sexual favors for money or other valuable

4    consideration.

5              In 2015, did you see violations of this rule on the

6    Backpage escort section?

7              MS. BERTRAND:  Objection.  Speculation.

8              MR. CAMBRIA:  Objection, same reason, foundation.

9    Calls for hearsay also, and a conclusion.

10             THE COURT:  The objection is sustained.

11             MR. KOZINETS:  Can we have a side bar, Your Honor?

12             THE COURT:  Yes.

13             (The following proceedings were held at side bar.)

14             MR. KOZINETS:  May I be heard?

15             THE COURT:  Yes.

16             MR. KOZINETS:  Your Honor, Special Agent Fichtner has

17    testified that he spent, you know, more than a year routinely

18    reviewing these escort ads on Backpage.  He's testified that

19    they contained many common characteristics associated with

20    prostitution advertising.

21             When he initially testified, he called them

22    prostitution ads, and I'm just simply asking him now, with

23    reference to these posting rules, whether he observed

24    violations of the posting rules, including the second one

25    listed above.

1        THE COURT:  The coded fashion, is that the one?

2        MR. KOZINETS:  Yeah, directly or in coded fashion.

3        MR. CAMBRIA:  It says, for illegal service.  Your

4   Honor, it calls for -- Paul Cambria.  I'm sorry, Your Honor.

5        It calls for a conclusion on his part, a legal

6   conclusion, number one, for illegal service.  He hasn't been

7   qualified in any way in that and there is no foundation for it.

8   It's his opinion.  And he hasn't been qualified to give such an

9   opinion, nor have they laid the foundation necessary to make

10  that judgment, especially whether it's legal or not.

11       THE COURT:  That's where my issue is.  I think asking

12  him to opine on whether it's legal or not is part of the jury's

13  -- well --

14       MR. KOZINETS:  Okay.

15       THE COURT:  Well, really the question for the jury so.

16       MR. KOZINETS:  Okay.  Can -- can I ask him if -- if he

17  observed, you know, ads that -- well, he's already testified

18  that he thought these were prostitution ads.

19       Can I phrase it now, instead of in terms of illegal

20  services, can I say, ads that were offering sex for money, and

21  that it's not --

22       MS. BERTRAND:  I have an additional objection.

23       THE COURT:  No.

24       MS. BERTRAND:  I have an objection.  If the Court's

25  going to sustain the objection, we don't need to talk about it.

1          MR. BIENERT:  I don't think this guy testified that

2    any of these --

3          (Reporter asks for clarification.)

4          MR. BIENERT:  This is Mr. Bienert.

5          I don't believe this person has testified that these

6    are prostitution ads.  He's used the word escort.  He's tried

7    to characterize the ads with other words.  We have been

8    objecting to any ultimate characterization, so I just don't --

9    certainly don't want to have the record be that somehow this

10   guy has established they're prostitution ads or that that's

11   what the status of the record is.  That's the question, as Your

12   Honor says.

13         MR. KOZINETS:  This is Peter Kozinets.

14         What if I restrict the question just more broadly to,

15   you know, based on your, you know, experience reviewing all of

16   these ads and what you observed with respect to all of these

17   ads, were these posting rules being followed, which is similar

18   to a question I've already asked.

19         THE COURT:  Well, he already answered that and he said

20   no.

21         MR. KOZINETS:  Well, with respect to the first line,

22   but not with respect to the second line.  I can make it more

23   general with respect to all the posting rules, if that would

24   make it better.

25         MR. CAMBRIA:  Paul Cambria, Your Honor.

 1              Again, that calls for a conclusion on his part.  The

 2      foundation hasn't been laid for it and he just shouldn't be

 3      trying to give the ultimate -- an ultimate conclusion.

 4              THE COURT:  Yeah, that would encompass that, the

 5      ultimate question.

 6              MR. KOZINETS:  How about if -- how about this

 7      question?  This is Peter Kozinets.

 8              How about, did it appear to you that these rules were

 9      being taken seriously?

10              THE COURT:  No.

11              MR. CAMBRIA:  That's a state of mind.

12              THE COURT:  Yeah.  So maybe move on.

13              MR. KOZINETS:  Okay.

14              (The following proceedings were held in open court.)

15      BY MR. KOZINETS:

16      Q.  Special Agent Supervisor Fichtner, when you started

17      testifying, we looked at a video you had created in March of

18      2015.

19      A.  Yes.

20      Q.  Do you remember that?  And now we've just been looking at

21      excerpts from a video from September of 2015?

22      A.  Correct.

23      Q.  In the space between those two time periods, did you

24      observe any change in the volume of these types of ads that you

25      were seeing on Backpage?

1   A.  I just know that there continued to be page, after page,

2   after page of advertisements in the adult escort section.  To

3   the actual volume, I do not know.

4   Q.  And over time did it appear that Backpage had made -- had

5   added features to the site that made it easier for these

6   advertisers to advertise this type of advertisements?

7   A.  Yes, they did add features that kind of enhanced the user

8   experience that I was experiencing as I logged on and browsed

9   the website.

10  Q.  And just to summarize, some of those features included?

11  A.  The way to view, the way to sort, the -- as you can see, we

12  were able to view by video, to sort through to find the ones

13  that, you know, really were explicit, by date.  You could

14  create a customer account to pay with credits instead of credit

15  card.

16  Q.  Thank you.

17          MR. KOZINETS:  I pass the witness.

18          THE COURT:  Okay.

19                      CROSS-EXAMINATION

20  BY MR. CAMBRIA:

21  Q.  Good afternoon.

22          Good afternoon.  It's Fichtner, correct?

23  A.  Fichtner, yes.

24  Q.  All right.  I don't want to mispronounce your name.

25          Do you mind if I call you Agent Fichtner instead of

1    supervising special and all that?  I mean, I will if you want

2    me to.

3    A.  No, that's fine.

4    Q.  Thank you.

5           At one point in time under questioning you said that

6    you were asked a question and it was, did anyone at Backpage

7    ever report any suspected violations to you?

8           Do you remember that question?

9    A.  Yes.

10   Q.  All right.  And you answered it no, correct?

11   A.  Right, not to me directly, no.

12   Q.  All right.  Well, you never asked them to do that to you

13   specifically, did you?

14   A.  No.

15   Q.  All right.  And so the other thing is you're familiar with

16   NCMEC, the center for exploitation?

17   A.  Yes.

18   Q.  All right.  I get that right sometimes.

19           Is it not true that the procedure there is that if

20   someone suspects an individual who is a minor is being abused

21   or exploited, they would report that to the NCMEC organization,

22   correct?

23   A.  Procedure where?  I'm sorry.

24   Q.  I'm sorry?

25   A.  The procedure -- you said the procedure, what procedure?

```
 1   Q.  Yeah.  Procedure would be, if you had such a suspicion, you

 2   would report it to NCMEC?

 3   A.  If I did?

 4   Q.  No, anyone.  Could be you, could be me, could be any of us.

 5   A.  Yes, that's an option to report it to NCMEC.

 6   Q.  And then they channel it to the appropriate legal

 7   authority, do they not?

 8   A.  I don't know all the procedures of NCMEC.  I'm sorry.

 9   Q.  Oh, all right.  I'm sorry.

10        Okay.  Now, you were giving us some figures of the

11   number of ads that appeared to have an adult subject.

12        Do you recall those questions?

13   A.  Yes.

14   Q.  All right.  Did you calculate the number of ads that had

15   nothing to do whatsoever with adult subjects?

16   A.  No.

17   Q.  Well, you gave us some figures of ads and so on.  Were you

18   not interested in the figures, let's say, for cars for sale,

19   jobs, all these other things that are on the website?

20        MR. KOZINETS:  Objection.  Misstates prior testimony.

21        THE COURT:  The objection is overruled.

22   BY MR. CAMBRIA:

23   Q.  Do you understand my question?

24   A.  Yes.  Actually, I did compare vehicles for sale compared to

25   those that were in the adult escort ad section at the same time
```

1   and place during one of my browsings.  It was about -- there

2   was -- I checked a section in Sacramento, as well as San Jose,

3   and there is probably ten escort ads per every one vehicle for

4   sale.

5   Q.  All right.  How about non adult ads, there are millions,

6   are there not?

7   A.  I don't know how many.

8   Q.  Well, didn't you try to calculate that?

9   A.  I did not.

10  Q.  So you just wanted to say, well, there is all these adult

11  related ads, but not put them in the context of the whole

12  website by saying, non adult ads are X, correct?  Just gave us

13  one part of the picture, didn't you?

14  A.  I do not know how many other ads there were, no.

15  Q.  Because you didn't look, did you?

16  A.  I was not able to add them up.

17  Q.  And what would prevent you from adding them up, just the

18  desire, correct?

19  A.  Time, I guess, and -- well, you're right.  I guess I did

20  not add the other ones up.

21  Q.  And so to give a real picture of this website and how much

22  of it is not adult at all and would not be against the law at

23  all, compared to adult sections which you may be questioning,

24  you never did that, true?

25  A.  No.

1    Q.  It's true that you never did that, correct?

2    A.  That was a long question.  Can you repeat that one more

3    time?

4    Q.  Sure.  Let's put it this way.

5            You didn't give us a complete picture of the whole

6    website, including non adult versus adult, statistic-wise, did

7    you?

8    A.  Not in those videos, no.

9    Q.  No.  Yeah, and not -- not any -- not any numbers at all for

10   the whole site?

11   A.  No.

12   Q.  All right.  Now, you created an ad which we saw here today.

13   There was no nudity in that ad, correct?

14   A.  Correct.

15   Q.  And there was no offer of sex for money in that ad, true?

16   A.  True.

17   Q.  Okay.  And you said that at one point in time you desired

18   to contact Backpage and to see whether or not, if you told them

19   that you were a police officer and this was a prostitution ad,

20   if they would take it down, correct?

21   A.  Correct.

22   Q.  All right.  So now you first tried to contact McDougall who

23   had been identified to you as the attorney for Backpage?

24   A.  Correct.

25   Q.  And you got a voicemail?

A.  Yes.

Q.  Then you called Carl Ferrer.  And is it fair to say that you understood that Carl Ferrer was the chief executive officer of Backpage?

A.  Yes.

Q.  That he ran Backpage?

A.  He was the chief executive officer, yes.

Q.  Well, what does chief executive officer mean to you?

A.  Yeah.  Well, he's --

Q.  That he ran it, correct?

A.  Sure.

Q.  Okay.  Now, you called and you got Carl, right, and you talked to him?

A.  Yes.

Q.  And you told him that you were law enforcement?

A.  Yes.

Q.  And he said, okay, what can I do for you, right?

A.  Yes.

Q.  And you said, well, we had this ad, and this ad is an ad for prostitution.

        Do you recall making that representation?

A.  Yes.

Q.  And he said, well, how do you know?

        Do you remember that?

A.  Yes.

1   Q.  And instead of telling him, you said, oh, well, this is an

2   undercover investigation, or something like that, and I can't

3   tell you, true?

4   A.  Yes, I cannot explain the details of the investigation.

5   Q.  Right.  Because the ad itself had no offer of sex for

6   money, so he asked you, why is this a prostitution ad, correct?

7   A.  Right.  It had a proposition, I guess, pricing and time

8   increments.

9   Q.  He asked you why and you declined to tell him what the

10  reason was, true?

11  A.  Correct.

12  Q.  Okay.  And, as a matter of fact, this wasn't an ad for

13  prostitution at all, it was an ad that you put together and

14  there was no prostitute involved?

15  A.  It was an ad to be similar to the other advertisements in

16  the escort section.

17  Q.  Well, it was an ad that didn't have a prostitute connected

18  to it, correct?

19       MR. KOZINETS:  Just -- objection.  The witness should

20  be allowed to finish his answer.

21       THE COURT:  The objection is noted.

22       MR. CAMBRIA:  I'm sorry.  I thought you did.

23  BY MR. CAMBRIA:

24  Q.  Question:  It was an ad that did not have a prostitute

25  attached to it, correct?

1   A.  Correct.  It was an undercover advertisement.

2   Q.  All right.  So, now, when you talked to Carl, and you gave

3   him a number, correct, so he can look the ad up?

4   A.  Yes.

5   Q.  And what number was that, not the number itself, but where

6   did it -- where did it come from?

7   A.  That was a number that was generated from Backpage.

8   Q.  Okay.

9   A.  That was added to the advertisement.

10  Q.  And you actually heard Carl making typing sounds, did you

11  not, like he was on a computer?

12  A.  That's what it sounded like, yeah.

13  Q.  And he said, oh, I found it, true?

14  A.  Yes.

15  Q.  And said, well, we will take it down, correct?

16  A.  Correct.

17  Q.  But he also said to you that there was a Backpage abuse

18  feature on the website that you could access to report such an

19  ad, true?

20  A.  He said there was an e-mail abuse at Backpage that I could

21  e-mail the advertisement to.

22  Q.  And it was right on the website?

23  A.  I believe so, yes.

24  Q.  Okay.  And he told you that if you used that and put in

25  your credentials, that it could speed up the process, true?

1   A.  I don't think he said it would speed up the process.  He

2   was pretty quick.

3   Q.  Well, he was quick.  He did it immediately, didn't he?  He

4   took your ad down immediately?

5   A.  It appeared that -- it appeared that he did, yes.

6   Q.  And so he was totally responsive.  You were law

7   enforcement, you said it was prostitution, he didn't know why,

8   but he took it down, true?

9   A.  Yes.

10  Q.  Okay.  So now, anyway, there is this abuse feature that's

11  on the website and he told you about it, true?

12  A.  The abuse at Backpage.com e-mail, yes.

13  Q.  Okay.  And, also, he told you that Backpage had internally

14  developed a manual for law enforcement to follow, correct?

15  A.  Yes.  I asked him for a phone number, an actual phone

16  number to call, and he referenced you can send an e-mail to get

17  a law enforcement guide.

18  Q.  And he indicated to you that there was a guide that they

19  had created so that law enforcement could quickly obtain

20  information necessary to enforce the law?

21  A.  I don't know what the guide entailed or had in it, because

22  I did not actually request one from --

23  Q.  Well, you didn't ask for one, correct?

24  A.  I did not ask for one.

25  Q.  Right.  But he volunteered to you that they had one, and

1    indicated that it would expedite your investigation, didn't he?

2    A.  I don't know if he used that word.  I don't remember him

3    using -- saying --

4    Q.  Used words similar, same message?

5    A.  No.  I think he, if I remember, he just said you can e-mail

6    them to get the phone number, and they had a law enforcement

7    guide that's available.

8    Q.  Right.  But the guide was to assist the law enforcement

9    organizations, true?

10   A.  I would guess it does.

11   Q.  Well, that's what he told you it was for, did he not?

12   A.  I can't remember exactly what he said about it.

13   Q.  But he is the one that told you about the fact that there

14   was a law enforcement guide available?

15   A.  Yes.

16   Q.  All right.  Now, you say you also, at the same time, posted

17   a couch ad, correct?

18   A.  Correct.

19   Q.  And I suppose, from what you've told us here, you were

20   trying to say, well, I post an adult looking ad and got all

21   kinds of responses, and I post a couch ad and I only got a

22   couple responses.  Was that why you were doing that?

23   A.  I wanted to see the foot traffic for both sections, yes.

24   Q.  Well, you picked a green couch, correct?

25   A.  You didn't like the couch?

1  Q.  I don't think anybody would like a green couch, do you?

2  A.  That's why it was cheap.

3  Q.  But, I mean, wouldn't it be a little bit more fair if you

4  picked a black couch, or a dark brown couch, you know, like

5  something people might be interested in?

6  A.  I don't know, I've got two college kids.  They would love

7  that couch.

8  Q.  They'd take the green couch, right?  In any event, that's

9  what you picked, a green couch, right?

10  A.  Yes.

11  Q.  And Carl told you -- you didn't tell Carl about the couch,

12  Carl told you about the couch, didn't he?

13  A.  Correct.

14  Q.  So what happened is when he looked up your ad, which you

15  said was prostitution, apparently, they had a link to any other

16  ad that would have that same kind of information, correct?

17  A.  He was able to link those two, yes.

18  Q.  And he said to you, hey, by the way, there is a couch here,

19  correct?

20  A.  Yes, in a sense, yes.

21  Q.  Okay.  So, now, so far in your conversation he's asked you,

22  how did you know that it was prostitution; he's told you that

23  there is an abuse line that you can access; he's told you there

24  is a manual for the police; and he's indicated to you that they

25  have the ability to link ads, true?

UNITED STATES DISTRICT COURT

1  A.  Yes.

2  Q.  Okay.  So, now, when you went through the site, you were

3  shown a number of different things.  There were certain

4  questions asked and there were certain statements made on the

5  site in the terms of use, correct?

6  A.  Yes.

7  Q.  All right.  And, for example, there was one statement that

8  said that minors were not allowed on the site, true?

9  A.  Yes.

10  Q.  And that if there was any abuse or exploitation, whatever,

11  of minors, that that would be reported to the authorities,

12  reported to NCMEC, and so on, correct?

13  A.  Yes.  They were hoping it would get reported.

14  Q.  And that it was against the law and a criminal matter?

15  A.  Yes, I believe so.

16  Q.  Now, after you finished your call with Carl, you decided

17  that you'd kind of try to test the system, didn't you, in the

18  sense of whether you could repost it and it would go live or

19  whether they would continue to block it?

20  A.  Correct.

21  Q.  And how many different ways did you try to repost it?

22  A.  Oh, several.

23  Q.  Can you give us what they were?

24  A.  I used different e-mails I think, different -- I don't know

25  if I used different payment forms, but different photo, I

1  think.  I can't remember all the ways, but I tried different --

2  several ways to mix it up to see if it would get accepted.

3  Q.  Different cities?

4  A.  Different cities possibly, yes.

5  Q.  And every single way that you tried, you failed, correct?

6  A.  For that advertisement, yes.

7  Q.  Well, that's the only advertisement we're talking about,

8  isn't it?

9  A.  That's the one we're talking about.

10  Q.  All right.  And so for that ad, you tried everything you

11  could think of, apparently, to see if you could make it go live

12  again and it never went live?

13  A.  I could not get that one to go live again, no.

14  Q.  And then -- I'm sorry, you said no, right?

15  A.  No.

16  Q.  It did not.  Okay.

17      And then there was a time when you were told that

18  there was a process in place where there would be a computer

19  scan, if you will, of words, and then there would be human

20  beings involved and another layer of scan, and so on, to review

21  these ads.

22      Do you recall that?

23  A.  Correct, like the filtering process.

24  Q.  Right.  And you mentioned something, I think you said to

25  McDougall, who is the -- who was the lawyer for the company,

UNITED STATES DISTRICT COURT

1    and she said, well, we've got -- we'll do something about that.

2    We'll talk to the moderator, for example, and we'll correct

3    that.

4              Do you recall her saying that to you?  You told us

5    about that?

6    A.  Yes.  Along those lines, yes.

7    Q.  Okay.  Now, in your -- in your training, you've had

8    training on utilizing websites and the internet in law

9    enforcement, haven't you?

10   A.  Yes.

11   Q.  And, as a matter of fact, websites, the internet and so on,

12   can be extremely valuable to a law enforcement authority, can

13   it not?

14   A.  Sure, yes.

15   Q.  For example, if somebody entered into a financial

16   transaction, there could be a paper trail, if you will, of the

17   financial transaction, true?

18   A.  Yes.

19   Q.  And, in addition, every computer has kind of an address,

20   does it not?

21   A.  Yes.

22   Q.  And so if we took this computer here and dialed it into

23   Craigslist and in the adult section and so on, you would be

24   able to trace back to that computer, would you not?

25   A.  Yes.

1    Q.  And so if someone was committing some sort of crime using a

2    computer and they accessed a particular website, that website

3    could provide valuable information for law authorities to,

4    perhaps, detect and eventually punish crime?

5    A.  Yes, it can help law enforcement.

6    Q.  Okay.  Now, you -- what you've been telling us about here

7    about your activities and the various exhibits that we saw and

8    so on, you -- it appears that this was occurring in 2015.  Is

9    that true?

10   A.  Yes.

11   Q.  All right.  And March, April, May, June, July, I think you

12   went all the way to September, October, or later?

13   A.  Yes.

14   Q.  Okay.  Did you ever follow whether or not, after Craigslist

15   closed their adult section, that you could still find the same

16   types of ads in other places on Craigslist?

17   A.  I wasn't too familiar with Craigslist and their, I guess,

18   adult service section, at that time.

19   Q.  But you know that's true, though, don't you?

20           MR. KOZINETS:  Objection.  Foundation.

21           THE COURT:  Sustained.

22           MR. CAMBRIA:  I'm sorry, what was that?  I didn't hear

23   what the objection was.

24           MR. KOZINETS:  Foundation.

25           MR. CAMBRIA:  Oh, I got it.

BY MR. CAMBRIA:

Q.  So I'm asking you whether or not you became familiar with the fact that adult type ads were still on Craigslist after they closed the adult section down, and, if so, how?

MR. KOZINETS:  Vague as to time.

THE COURT:  The objection is overruled.

If you know.

BY MR. CAMBRIA:

Q.  If so, how?

A.  If so, how did I know that or --

Q.  Yeah.

A.  I do think I remember hearing that Craigslist was still a place that could be used to, you know, offer similar advertisements.

Q.  So people who were offering these advertisements, once the adult section closed, they just went to another section, that's what you heard?

MR. KOZINETS:  Objection.  Hearsay.

THE COURT:  The objection is sustained.

MR. CAMBRIA:  Okay.

BY MR. CAMBRIA:

Q.  Now, part of your -- well, no.  Strike that.

Have you ever arrested someone based solely upon an ad?

A.  No.

1    Q.  And all these ads that you were shown here this morning,

2    and this afternoon, do you know whether or not anyone in your

3    department, or you, yourself, arrested, or attempted to arrest

4    any of those people just on the ad?

5    A.  No.

6    Q.  Okay.  Now, if someone offered, let's say, massage, and

7    that's all it said in the ad is massage, there would be no way

8    for you to tell whether that was a real massage, a legitimate

9    massage, or some other massage that might go beyond just

10   massage, correct?

11             MR. KOZINETS:  Objection.  Vague.

12             MR. CAMBRIA:  Vague?

13             THE COURT:  The objection is sustained.

14             MR. CAMBRIA:  Okay.

15   BY MR. CAMBRIA:

16   Q.  How about if somebody advertised that they were a stripper,

17   would you say that's illegal?

18   A.  No.

19   Q.  All right.  And if they advertised that they gave massages,

20   would that be illegal, that ad just the way I stated it?

21             MR. KOZINETS:  Objection.  Vague.

22             THE COURT:  The objection is overruled.

23             THE WITNESS:  Just based on that, no.

24   BY MR. CAMBRIA:

25   Q.  No.

1          How about if somebody advertised that they were a

2    dominatrix?  You know what that is, right?

3    A.  I believe so.

4    Q.  Anyway, you know what that is, correct?

5    A.  I think so, yes.

6    Q.  Yeah.  All right.  That advertisement alone would not be

7    illegal, would it?

8    A.  I don't know.  I don't believe so.

9    Q.  All right.  And if someone -- and, of course, if someone

10   responded to such an ad, the only way that it would turn into

11   something that wouldn't be lawful is if then they got involved

12   in exchanging sex for money, right?

13   A.  Correct.  And we're talking California still, is that what

14   we're talking, where I'm from?  Yes.

15   Q.  Okay.  Now, it turns out that after you posted your ad, one

16   of your colleagues also posted an ad and also had it taken down

17   by reporting it to the abuse line; is that correct?

18   A.  Yes.  We --

19   Q.  And -- get my glasses out here.  Apparently -- see, the way

20   you had the ad taken down was by talking to Carl Ferrer,

21   correct?

22   A.  Correct.

23   Q.  Right.  And your colleague had the ad taken down by simply

24   accessing this abuse feature of the website, correct?

25   A.  Correct.

1    Q.  And the ad was taken down, correct?

2    A.  I think about 15 hours later it was finally taken down.

3    Q.  Yeah.  Okay.

4         And you told us about your conversation with

5    McDougall.  And you understood that she was the attorney for

6    the -- for Backpage, for the company, and et cetera, true?

7    A.  Yes.

8    Q.  Okay.  And she's the one that explained --

9         Well, first thing was, she said how do you know the ad

10   is prostitution?

11        Do you recall that?

12   A.  Yes.

13   Q.  And you told her the same thing you told Carl, which was I

14   can't tell you, correct?

15   A.  Correct.

16   Q.  All right.  Now, have you heard of situations where police

17   officers have posted sting ads on websites?

18   A.  Yes, I believe so.

19   Q.  So what they would do is they would create a fake, if you

20   will, ad, and they would put it up on the website, and then

21   they would wait for someone to access it, and then wait to see

22   if that someone engaged in some kind of criminal act, correct?

23        MR. KOZINETS:  Objection.  Counsel is testifying.

24        THE COURT:  The objection is sustained.

25

120

1    BY MR. CAMBRIA:

2    Q.  All right.  What's a sting ad?

3    A.  Basically, an undercover ad, like what we did was a

4    fictitious advertisement, to find out where it leads.

5    Q.  Okay.  And are you aware of the fact that there are certain

6    times when police officers had sting ads posted, they were

7    taken down by the website, and then the police would call and

8    say, hey, put that back up because it's one of our sting ads?

9    A.  I don't know.

10            MR. KOZINETS:  Objection.  Okay.

11            THE WITNESS:  I'm sorry.

12   BY MR. CAMBRIA:

13   Q.  I'm sorry.  What was the answer?

14   A.  I don't know.  I don't know of any personally.

15   Q.  Do you recall on the Backpage ad there was a statement

16   there that said as follows:  Any post exploiting a minor in any

17   way will be subject to criminal prosecution and will be

18   reported to the cyber tip line for law enforcement?

19   A.  Yes.

20            MR. CAMBRIA:  That's all.  Thank you.

21            THE COURT:  Mr. Bienert, not meaning to influence your

22   answer in any way, but do you have any idea how much cross you

23   have?

24            MR. BIENERT:  It's a ballpark, but it's certainly more

25   than 16 minutes.

UNITED STATES DISTRICT COURT

1          THE COURT:  Okay.  So let's just break now.

2          So we'll recess for the evening.  Please remember the

3     admonition.  And we'll see you Monday morning.  And have a nice

4     weekend.

5          (Proceedings concluded at 4:42 p.m.)

6                         *          *          *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 24th day of

13   September, 2021.

14

15

16                    /s/ Christine M. Coaly_____
17                    Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25