**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Michael Lacey, et al.,<br><br>Defendants. | No. CR-18-00422-001-PHX-DJH<br><br>**ORDER** |

Pending before the Court is the Defendants' Motion to Dismiss the Superseding Indictment (Doc. 1355). The Government has filed a Response in opposition (Doc. 1393) and the Defendants have filed their Reply (Doc. 1413).  The Defendants also filed a Supplement (Doc. 1437), to which the Government has filed a Response (Doc. 1439).  Also pending is the Defendants' Motion to Compel Government to Comply with its *Brady* and *Giglio* Obligations (Doc. 1281).  The Government has filed a Response (Doc. 1326) and the Defendants have filed a Reply (Doc. 1332).  The Court now issues its rulings.

**I.     Background**[1]

On July 25, 2018, a federal grand jury returned a 100-count superseding indictment ("SI") against moving Defendants and others.  (Doc. 230).  The SI outlined the history of Backpage.com ("Backpage") as being created in 2004 and shut down by federal law enforcement authorities in 2018.  (*Id*.)  The SI alleged that the Defendants engaged in criminal acts while operating Backpage including conspiracy, facilitating prostitution, and

---

[1] The record includes ample history of the case. The Court here provides only background that is relevant to the pending Motion.

money laundering. (*Id.*) The overt acts are alleged to have occurred beginning on or about September 10, 2013 and continuing through April 2018. (*Id.*).

This case has been assigned to three district court judges since its initiation, the last of whom oversaw eight days of trial before declaring a mistrial. During the case's pendency, the parties have filed numerous motions related to the Government's production of *Brady* and *Giglio* material and its alleged attorney-client privilege violations. They have also sought evidentiary rulings governing the production of the Government's evidence. Particularly pertinent to this Motion to Dismiss is a pre-trial evidentiary ruling made by the trial court on May 7, 2021 (Doc. 1156).

In that Order, the trial court granted in part and denied in part the Defendants' Motion to Preclude Presentation of Certain Evidence (Doc. 908). (Doc. 1156). In their Motion, the Defendants had sought to preclude evidence of 1) sex trafficking or child-sex trafficking, 2) third-party criminal conduct other than prostitution, 3) a third party's Travel Act conviction from 1987 and 4) purported prostitution ads from printed publications as irrelevant and prejudicial. (Doc. 908). The court found that "[s]ex trafficking and child sex trafficking are, by definition, both forms of prostitution. Both are simply a subset of the crime. Sex trafficking and child sex trafficking require victims to engage in sex in exchange for payment and the Government must prove that Defendants intended to facilitate prostitution through Backpage.com." (Doc. 1156 at 3). The court also ruled that third-party crimes "are only relevant to the extent that they gave Defendants' notice that prostitutes were advertising on Backpage.com. However, the specific details of crimes committed by third parties are irrelevant to whether the Defendants violated the Travel Act[.]" (*Id.* at 5). The court ruled that the Government could introduce testimony from former prostitutes about how ads were created, drafted, edited and paid for. The Court warned the Government, however, that the testimony could not include lifestyles or details of their time working as prostitutes. (*Id.*)

Trial began in this case on September 1, 2021, with jury selection. The Government made its opening statement on September 3, 2021. During the next four days, the

Government produced four witnesses.  The Government first called Brian Fichtner, who testified about how Backpage operated and appeared in 2015, and about how he crafted an ad for posting on Backpage.  It then called "Victim 4", who testified about how another prostitute posted her ad on Backpage and how through the ad, men would call to arrange for sex with her.  During Victim 4's testimony, and in responding to the Government's direct examination, she told the jury that she was 15 years old and that she was raped.  A third Government witness, Nacole Svendgard, testified about how her daughter was posted on Backpage, how she met with public officials about Backpage, and described a meeting she had with Defendant Lacey.  Finally, the Government's expert, Dr. Cooper, testified about how sex trafficking occurs on-line, and about coded prostitution terms.

The Defendants objected multiple times to Victim 4's, Ms. Svendgard, and Dr. Cooper's testimony as being prejudicial and beyond the trial court's evidentiary rulings.  After Dr. Cooper testified, the Defendants made an oral objection for a mistrial based on a wide array of conduct and the aforementioned testimony, which they asserted was highly prejudicial.  The Government responded that it believed it was adhering to the prior court rulings.  The trial court stated that it had "concerns that the government has crossed that [prejudice] line several times []."  The court then stated it need to evaluate the cumulative effect of the testimony and took the matter under advisement.

After these four days of testimony, on September 14, 2021, the trial court declared a mistrial. (Doc. 1347).  The court noted that although it gave the Government some leeway—"because child sex trafficking and sex trafficking are forms of prostitution"— "in the opening, and with every witness thereafter, it seems, the government has abused that leeway." (*Id*. at 4).  The court went on to discuss the cumulative effect on the jury of the Governments' witnesses testifying about child sex trafficking, about Victim 4's testimony of abuse and rape by her trafficker ("105 days"), and Dr. Cooper's references to an overwhelming number of victims being trafficked on Backpage without being "tethered to some communication with the Defendants." (*Id.* at 4-5).  The court also noted that testimony "about the reputation of Backpage [was] untethered from communications to the

defendants." (*Id.* at 5). Though the court did not find misconduct, it did find that the cumulative effect of the testimony as prejudicial to the defendants was cause for a mistrial. (*Id.*)

On October 5, 2021, the trial court held a status conference with the parties and set a new trial date of February 9, 2022. (Docs. 1336 and 1377). The trial judge then recused herself from the case, and the proceedings were assigned to this Court. (Doc. 1367). The Defendants filed this Motion on November 1, 2021. The Court held oral argument on the Motion on December 3, 2021, after which the Defendants filed a Supplement to their Motion. (Doc. 1437).

## II. Discussion

The Defendants argue three grounds for dismissal: "First, the Double Jeopardy Clause, triggered by the government's actions which caused the mistrial; Second, the Court's inherent supervisory powers, which give the Court discretion to fashion an appropriate remedy, including dismissal [and]; Third, the Due Process Clause, triggered by the misconduct underlying the government's trial actions, pre-trial privilege invasions, and discovery abuses." (Doc. 1355 at 7). The Government responds that the trial court's statement upon declaring a mistrial that "I don't see any of these [reasons for the Court's mistrial ruling] as intentional misconduct" is fatal to Defendants' Motion. (Doc. 1393 at 7). It also asserts that Defendants cannot show that the government acted intentionally to bring about a mistrial as required by *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982). (*Id.*) The Court will address these arguments in turn.

### A. The Double Jeopardy Clause

#### 1. Legal Standards

Generally, where a defendant moves for a mistrial, there is a narrow exception to the rule that the Double Jeopardy Clause is no bar to retrial. *Kennedy*, 456 U.S at 673. A defendant may raise the bar of double jeopardy in a second attempt to try him only if the conduct that gave rise to a successful motion for mistrial was prosecutorial conduct intended to provoke the defendant into moving for the mistrial. *Id.* at 679. Put differently,

1  if the prosecutor's action was intended to "goad the [defendant] into requesting a mistrial,"
2  then the Double Jeopardy Clause would protect a defendant from a subsequent prosecution.
3  *Id.* at 673.  To determine whether the government engaged in such goading, a court must
4  review the objective facts and circumstances of the case. *Id.* at 675.

**2. Analysis**

Defendants assert that on this record, the Court should find that the government goaded them into moving for a mistrial.  First, they state that the government was on notice that they would seek a mistrial "from the Defendants' pre-trial motions, the Court's pre-trial rulings, the defense's objections during trial and the Court's ruling and warning directed toward the government during trial." (Doc. 1355 at 21).  They next assert that the government "sought to infect the trial with nothing but 'irrelevant and highly prejudicial material' during its opening and with the testimony of *each* witness." (*Id.*)  Lastly, the Defendants state "the government's case was failing *on the merits*." (*Id.*)  Taken together, they urge this Court to find the Government's combined conduct was intended to goad the Defendants into moving for a mistrial.  A review of the record does not persuade this Court to so find.

First, the record of this proceeding spans over four years, with approximately 1400 docket entries.  It bears out that the Defendants and the Government have routinely filed pre-trial motions alleging discovery abuses, and asserted and re-asserted pre- and in-course of trial objections to evidence and testimony.  Indeed, currently pending before the Court is Defendants' reassertion that the government is withholding *Brady* and *Giglio* material. (Doc. 1281).  But for that pending Motion, a close examination of the record shows that the previously-assigned courts have issued rulings on many of the same assertions brought here.  The Court does not presume that strong advocacy, including the aforementioned motion practice, by parties in a case such as this carries with it some nefarious intent.  Thus, without substantial evidence of Government misconduct, the Defendants cannot find, as they invite the Court to do, that the Government deliberately presented its case in a way to bring about a mistrial.  Critically missing here is evidence of Government counsels'

"intent" to goad.

The Defendants' contention that the Government sought to infect the trial with irrelevant and prejudicial material is also not borne out by the record. Regarding the Government's opening argument, the Defendants state that the government "from the outset of trial, poisoned the jury during its opening by focusing on child sex trafficking, knowing the effect explosive, inadmissible, and prejudicial evidence involving sex trafficking would have on the jury." (Doc. 1355 at 9). In response, the Government argues that their understanding of the trial court's rulings about what areas could be covered and the court's rulings on Defendants' objections during the opening statement in fact shows the contrary. The Court agrees.

The Court need only review the record in light of the trial court's prior evidentiary ruling. Again, the trial court previously ruled that "[s]ex trafficking and child sex trafficking are, by definition, both forms of prostitution. Both are simply a subset of the crime. Sex trafficking and child sex trafficking require victims to engage in sex in exchange for payment and the Government must prove that the Defendant's intended to facilitate prostitution through Backpage.com." (Doc. 1156 at 3). The judge found that evidence that tends to prove the Defendants were aware Backpage.com was being used to facilitate sex trafficking and child sex trafficking are extremely probative to show notice to the Defendants that Backpage was being used for illegal purposes. (*Id.*) She cautioned the Government that they were not to linger on the details of the abuse sex trafficking victims suffered as a result of being trafficked but clarified that evidence of the fact that people were being trafficked on Backpage.com is admissible. (*Id.* at 5).

Before the Government proceeded to its opening statement, the trial court stated that the government "[isn't] prohibited from using the word trafficking" but she cautioned that "[you] do need to be careful that your whole opening is not focused on this idea that that is what Backpage was about." (Doc. 1340 at 31). During the opening the Defendants objected seven times. All but three of those objections were overruled—but on grounds

not asserted here.[2] (*See id.*; Doc. 1341 at 24, 56–57). Rather, the record shows that the Government adhered to the trial court's evidentiary ruling. The Court notes, as the Government asserted, that its opening statement tracked the events as alleged in the SI. Opening statements "should be limited to a statement of facts which the [party] intends or in good faith expects to prove." *Leonard v. United States*, 277 F.2d 834, 841 (9th Cir. 1960). The Government was entitled to provide the jury with a history of Backpage.com, which began in 2004, and an explanation of its case as outlined in the SI, which spanned through 2018. No error occurred here.

Regarding the claim that the prosecutors solicited prejudicial testimony from its witnesses such that it tainted the jury, the Court agrees. Indeed, the cumulative effect of this testimony is what prompted the trial court to declare a mistrial. The trial court found that the Government, despite agreeing not to focus its testimony on child sex trafficking, solicited testimony from Dr. Cooper solely on child sex trafficking. (Doc. 1347 at 4). The court further found that though it ordered the Government to stay away from the day in the life of a prostitute, they proceeded to solicit answers from a witness about abuse by her traffickers, and that she was raped more than once.[3] (*Id*. at 5). The trial court found that this testimony likely would raise "a whole new emotional response from people." (*Id*.) Despite the trial court's ruling, this Court is nevertheless hard-pressed to find that the government solicited this testimony with the intent to goad the Defendants into moving for a mistrial. This Court's ruling, in part, is supported by the trial court's finding that "I don't see any of these as intentional misconduct [but] the cumulative effect of all of that is something that I can't overlook and won't overlook." (*Id*.) Indeed, "it will be a rare trial

---

[2] After opining on the improper witness testimony, the trial court stated "well, that was error committed on top of the opening statement, which was close to causing a mistrial." This Court will not speculate on what was meant by "close to causing a mistrial." This Court's own review of the Government's opening statement does not show Government error.

[3] The Defendants' requested an evidentiary hearing, essentially seeking to place the Government's witnesses under oath to testify about how they were prepared. The Court declines to do so, noting that Government counsel avowed to the Court its methods of witness preparation as to the witnesses at issue. Counsel's avowal is sufficient.

of any complexity in which some proffered evidence by the prosecutor or by the defendant's attorney will not be found objectionable by the trial court[.]" *See Kennedy*, 456 U.S at 674-75.

The Defendants' last contention, that the Government resorted to goading the Defendants into seeking a mistrial because its case was failing on the merits, is not supported by the record. Indeed, the Defendants raised this same argument at trial. (Doc. 1346 at 68–69). Addressing the Defendants' oral motion for a mistrial because the Government had yet to produce evidence of their "specific intent on any of the counts or things charged in the indictment," the trial judge stated "it's way too early to make that argument because I can envision from the evidence that I've already seen where they're going to get to that . . .[i]t's way to early. We're barely, I don't know, ten percent in." (*Id.*)[4]

The Court adopts the trial court's finding. As previously noted, the SI charged 100 counts of alleged criminal acts including conspiracy, facilitating prostitution, and money laundering. The SI's allegations span the time frame of 2013 through 2018. The trial was expected to last approximately three months. The Government listed 76 witnesses, only four of whom actually testified. These facts, alone, reflect that the Government's case-in-chief was in its infancy. The posture of the case makes the Defendants' argument that the Government abandoned its case because it was failing on its merits highly improbable.

Finally, the Defendants fail to mention that the trial court actually proceeded in way which shows an intent to retry the case. Indeed, after declaring a mistrial, a status conference was held with all Parties to settle on the new trial procedures going forward. (Doc. 1336). Although the present Motion was not yet filed, the trial court had a fuller view of the entire case than this Court does, yet there was no apparent angst in the trial court's determination to retry the case and to do so in very short order. The objective facts here do not support a Double Jeopardy bar to the Government retrying its case.

The Court will now to Defendants' argument that the case should be dismissed

---

[4] The trial court then stated, "the only real argument that I am considering is the . . . prejudicial value of the testimony that's been given so far." (*Id.*)

under the Court's inherent supervisory powers.

### B. The Court's Inherent Supervisory Powers

#### 1. Legal Standards

"Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." *McNabb v. United States*, 318 U.S. 332, 340 (1943). Thus, courts may dismiss an indictment under their inherent supervisory powers "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct." *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010) (quoting *United States v. Hasting*, 461 U.S. 499, 505 (1983) (internal citations and quotation marks omitted). A defendant must demonstrate prejudice before the court may exercise its supervisory powers to dismiss an indictment. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 255 (1988). Nevertheless, a district court can dismiss an indictment under its supervisory powers even if "the conduct does not rise to the level of a due process violation." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).

A district court has various options in determining whether and how to use its supervisory authority. It may limit the witnesses or testimony offered by the government, or it may sanction the attorneys. *See Hasting*, 461 U.S. at 506 & n.5. The most drastic remedy is dismissal with prejudice because this prevents the government from retrying the defendants at all. *See United States v. Chapman*, 524 F.3d 1073 at 1085 (9th Cir. 2008) (explaining that improper dismissal of "an indictment with prejudice encroaches on the prosecutor's charging authority") (internal quotation marks omitted)); *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992) ("Dismissal of an indictment with prejudice necessarily implicates separation-of-powers principles . . . Such dismissal exercised under the guise of 'supervisory power' is impermissible absent 'a clear basis in fact and law for doing so.'"). Under its supervisory powers, a district court may dismiss an indictment with

prejudice for prosecutorial misconduct only if there is "(1) flagrant misbehavior and (2) substantial prejudice." *U.S. v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993). Further, the district court must "approach [the remedy] with some caution and a with a view toward balancing the interests involved." *Hasting*, 461 U.S. at 506–07 (citations and quotation marks omitted). A court must also have concluded that there is "no lesser remedial action" available to it. *Chapman*, 524 F.3d at 1087 (citations omitted).

### 2. Analysis

Defendants assert that the Court should exercise its supervisory powers to dismiss the case based on the government's "(1) misconduct . . . (2) concealment of discovery materials from the Western District of Washington investigation, and (3) privilege invasions in blatant violations of Judge Logan's court orders, coupled with its contemporaneous concealment from Judge Logan and the defense of these on-going invasions." (Doc. 1355 at 23–24). The Court's ruling above resolves the Defendants' first argument as to the Government's alleged misconduct. Accordingly, the Court will turn to the Defendants' assertion that the Government has concealed discovery materials from the Western District of Washington ("WDW") investigation that is relevant to this case.

#### i. Wrongful Concealment

The claims of wrongful concealment Defendants make in their Motion to Dismiss are also incorporated in their Motion to Compel Government to Comply with its *Brady* and *Giglio* Obligations (Doc. 1281) (and in various forms, have been repeatedly raised throughout the case). In their Motion to Compel, the Defendants assert that they "bring this motion to compel the government to produce ***all materials from its WDWA investigation that were relied upon when its attorneys concluded that there was no evidence of criminality.***" (*Id.* at 3–4) (emphasis in original). Defendants assert that they "have specifically requested all evidence from the WDWA investigation, noting that it is likely exculpatory." (*Id.* at 4). The Government responds that this Motion has been raised and resolved by the two previously-assigned courts. (Doc. 1326). A brief history of the courts' prior Orders is thus necessary.

**Order Denying Motion for Itemization of *Brady/Giglio* Material.[5]** On August 20, 2018, Defendant Padilla filed a Motion for Itemization of *Brady/Giglio* Material.[6] (Doc. 273). Padilla asserted that the Government began its investigation of Backpage approximately five years ago and that the Government disclosed two external hard drives of information with approximately 10.4 million documents. (*Id*.) The district court held that "the Government has met its burden of disclosure and should not have to take the additional steps of itemizing *Brady* materials for the Defendants." (Doc. 339 at 4). The Court found that the Government had provided Defendants with sufficient descriptions of categories of documents and provided them with access to Department of Justice discovery specialists to provide technical assistance. (*Id*.) The Motion was denied. (*Id.*)

**Order on Governments' Motion to Compel Destructions of Inadvertently Disclosed Documents.** On January 28, 2019, in a Sealed Order, the district court addressed the Governments' Motion to Compel Destruction of Inadvertently Disclosed Documents (Doc. 352). The Motion involved the inadvertent disclosure of documents, including attorney-generated memos, related to the Backpage.com investigation conducted by the U.S. Attorney's Office for the WDW. The Government asserted that 39 of the disclosed materials were privileged or non-discoverable.[7] (Doc. 352 at 4). The Defendants claimed that the disclosed memos contained *Brady* and *Giglio* material. (Doc. 407 at 11). They asserted that the disclosed material contained "witness statements favorable to the defense, investigative leads, and evidence relevant to Defendants' upcoming challenges to the grand jury proceedings, to the searches and seizures in this prosecution, to the filing of additional pretrial motions, to the cross-examination of government witnesses, and to other purposes relating to the present criminal proceedings." (*Id*. at 12). The district court granted the Governments' Motion, finding that the disclosed memos were "attorney work product

---

[5] This and the following Orders were issued by then-assigned District Court Judge Steven P. Logan.

[6] The co-defendants each filed a Joinder to the Motion. (*See* Docs. 275, 276, 277, and 278).

[7] The Defendants did not object to destroying 17 disclosed documents relating to a grand jury proceeding in the WDWA investigation, and the Government agreed that 79 of the disclosed documents were discoverable.

related to a separate investigation into Backpage.com that took place in the Western District of Washington." (Doc. 449 at 3). Explaining the decision, the court stated "[i]t is clear to the Court that the investigation that took place in the Western District of Washington is wholly separate from the criminal case before the Court. [citation omitted] The Defendants have failed to demonstrate how the mental impressions and legal analyses from attorneys that are not involved in this case could potentially be considered exculpatory evidence." (*Id*. at 4). The court further found that the attorney memos were irrelevant to the indictment and proceedings in this criminal case. (*Id*.)

**Order on Defendants' Motion to Compel Production of *Brady* Material.** Following this Order, on October 18, 2019, Defendants filed a Motion to Compel Production of *Brady* Material (Doc. 777). The Motion asserted that there were large categories of *Brady* material being withheld by the Government, including information on employees of Backpage[8] who took affirmative steps to keep ads related to sex trafficking or prostitution off the website and had information that users posted or attempted to post lawful adult activities in the adult categories. (*Id*. at 9). The Motion also asked the Court to compel, for example, the production of all witnesses and information related to statements made by high-ranking Department of Justice officials that opine on whether an internet provider is criminally liable for posting illegal ads without specific knowledge, and communications to and from any federal state, or local elected officials relating to the possible criminal prosecution of Backpage or its directors, officers, or employees, or legislators. (*Id*. at 10-11).

In its Order denying the Motion, the previously-assigned court, referencing the aforementioned Orders, noted that "[t]he instant dispute is far from fresh." (Doc. 1028 at 2). Citing governing law, the court explained again that "[i]t is the government, not the defendant or the trial court, that decides prospectively what information, if any, is material and must be disclosed under *Brady*." (*Id.* at 4) (citing *United States v. Lucas*, 841 F.3d

---

[8] The current Motion asserts that the Government interviewed Backpage personnel who moderated the content of ads during its WDW investigation but "yet has produced no summaries or notes or any other records of the evidence underlying the decision not to prosecute Backpage.com." (Doc. 1281 at 6).

- 12 -

796, 807 (9th Cir. 2016)). The court noted that the Government had already responded to the Defendants' requests by producing thirty-one categories of *Brady* materials. (*Id*. at 19). The court then opined that the Government is not compelled to produce information not within its custody. (*Id.*) It nonetheless reminded the Government of its ongoing *Brady* disclosure obligations. (*Id.*)

Now before the Court is Defendants' Motion to Compel Government to Comply with its *Brady* and *Giglio* Obligations (Doc. 1281). In renewing their requests, Defendants assert "that the case has evolved significantly in the past 32 months since Judge Logan issued his ruling," and thus, the issues are again ripe. (Doc. 1281 at 3). Specifically, Defendants assert that the "underlying facts . . . memorialized in the Memos are **directly at odds** with or otherwise undermine the governments' arguments at trial." (Doc. 1332 at 3) (emphasis in original). They assert that because the Government discussed Backpage.com's operation and the Defendants' conduct from 2004 through 2012 in its opening statement, the materials underlying the WDWA investigation is relevant. (Doc. 1332 at 5–6). They thus again request that this Court "compel the government to produce all materials from its WDWA investigation that were relied upon when its attorneys concluded that there was no evidence of criminality."[9] (Doc. 1281 at 8). They also request that this Court review "the DOJ's WDWA memos" *in camera*, to determine whether "any of the information in the memos themselves could undermine in any way the positions that the government has currently taken." (*Id.* at 4, 8).

The Government responds that its case is based on "exactly the same factual allegations and legal theories as its July 2018 Superseding Indictment." (Doc. 1326 at 2). The Government further explains that "materials from the WDWA Investigation are not *Brady* or *Giglio* for purposes of *this* case." (*Id.* at 10) (emphasis in original). They state that in the years after that investigation, "a tidal wave of evidence has emerged regarding Defendants' knowledge and intent to facilitate business enterprises involved in

---

[9] Defendants' reliance on *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011) is unpersuasive. There, the Government failed to disclose *Brady* and *Giglio* material from a testifying cooperating witness. The facts are thus not analogous.

prostitution." (*Id*. at 10–12). They assert that it is the new information upon which the Superseding Indictment is based.[10] (*Id.*) Put differently, the Government argues that the WDWA did not consider this "tidal wave of evidence" in determining to close its 2012—13 investigation, and thus the materials from the investigation "do not reveal exculpatory or impeaching information pertinent to this criminal case…" (*Id.* at 13).

Finding that the prior district court Orders (Docs. 352 and 1028) sufficiently address Defendants' request to compel the Government to produce the underlying WDWA materials, this Court declines to do so. The Court further notes that because the Government's case was only in its infancy when the statements regarding the WDWA proceedings were made, the Court declines to make a ruling as to the relevancy or materiality of the WDWA documents at this juncture. Upon review of the trial transcript, the Government's opening statement tracked the SI, and set forth the facts that the Government believed it could prove. Further, only four of the 76 listed witnesses testified. The materiality of these documents has not been established, and thus the Court disagrees that there has been such "significant evol[ution]" of the case to justify overruling the prior Orders on this issue. *See also East Bay Sanctuary Covenant v. Trump,* 950 F.3d 1242, 1262 (9th Cir. 2020) (noting that if an issue in a case has already been decided, then reconsideration of the order is generally only permitted if "the prior decision is 'clearly erroneous' and enforcing it would create 'manifest injustice'; [if] intervening, controlling authority encourages reconsideration; or [if] substantially different evidence is produced at a later merits trial").

Judge Logan's January 2019 Order also resolves Defendants' request that this Court undertake an *in camera* review of the WDWA memos to determine their materiality. Defendants acknowledge that they previously "have specifically requested all evidence from the WDWA investigation, noting that it is likely exculpatory." (Doc. 1281 at 6). They now assert that they "believe that the requested information will in fact prove that the

---

[10] The Government refers to incidents such as the 2017 U.S. Senate investigation report finding that Backpage knowingly facilitated prostitution and sex trafficking and supporting material. (Doc. 1326 at 11).

- 14 -

government did know much of what it now claims not to have known in 2012." (*Id*. at 7).[11]

The Court disagrees. The Court finds that the previously issued Orders (Docs. 339, 449 and 1028) sufficiently address the Defendants' current requests and that their slightly revised argument does not compel a different result. In sum, the Court declines to exercise its inherent supervisory powers and dismiss the case on the grounds that the Government has intentionally concealed or failed to produce exculpatory materials.

### i. Privilege Invasions

The Defendants next ask the Court to exercise its supervisory authority to dismiss the case based on the Governments' privilege invasions in blatant violations of Judge Logan's court orders, coupled with its contemporaneous concealment from Judge Logan and the defense of these on-going invasions. (Doc. 1355 at 23–24). The Court declines to do so. A close examination of the court record reflects that the trial court previously issued a Sealed Order addressing these very same allegations. (*See* Doc. 1168 (noting "[Defendants'] claim the Government elicited from Ferrer privileged information about advice from lawyers . . . they claim that the Government invaded Defendant's attorney-client privileges").[12] The trial court analyzed the previously-assigned court's Orders related to the joint defense agreement (Docs. 345 and 338) in finding that the Government has not invaded the Defendants' attorney-client privilege, and no outrageous government conduct. (*Id.*) The Court finds no basis in the Defendants' Motion to re-examine the same. *East Bay Sanctuary Covenant*, 950 F.3d at 1262 (noting that the law of the case doctrine "encourages the conservation of limited judicial resources and promotes consistency by

---

[11] Among the specific material Defendants contend show the Government knew then what it claims not to have known is an attorney memo "advising a potential buyer that there was no criminal or civil exposure should he decide to purchase Backpage.com." (*Id*. at 7). At oral argument, the Court questioned the memo's relevancy given (1) the district court's prior Order (Doc. 352), (2) that the potential buyer was not a named Defendant or on the Governments' witness list, (3) that there was no indication of whether the potential buyer shared the memo with the Defendants, and (4) that there was no information from which to glean what facts the attorney memo was based upon. Notwithstanding the Court's concerns, the Government agreed to seek the memo out to turn it over to the Defendants. The Defendants' request for the Court to review this particular memo is therefore moot.

[12] The trial court held oral argument prior to ruling. in which the Defendants reiterate their same allegations as to Ferrers' attorney-client privilege. (Doc.1395-1 at 9).

- 15 -

allowing court decisions to govern the same issues in subsequent stages of the same case").

### C. The Due Process Clause

The Defendants' last assertion is that the Court should dismiss the SI with prejudice under the Due Process Clause. (Doc. 1355 at 33). They argue that the Government's misconduct during trial demonstrates an "overreach, [an] abuse [of] this Court's leeway, and win at all costs" approach. (*Id*. at 34). They reassert that the Government "elicited statements from Carl Ferrer, which on their face were clearly privileged." (*Id.*)

Dismissing an indictment for outrageous government conduct, however, is "limited to extreme cases" in which the defendant can demonstrate that the government's conduct "violates fundamental fairness" and is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Black*, 733 F.3d 294, 302 (quoting *United States v. Stinson,* 647 F.3d 1196, 1209 (4th Cir. 1979). This is an "extremely high standard." *United States v. Garza–Juarez,* 992 F.2d 896, 904 (9th Cir. 1993) (citation omitted). In *Black*, the Court noted that there are only two reported decisions in which reviewing courts have reversed convictions under this doctrine. 733 F.3d at 302.

The trial court found no intentional misconduct by the Government. A review of the record likewise convinces this Court that the Government did not engage in misconduct, let alone conduct that is grossly shocking or outrageous. This Court could not find any instance where the Government intended to commit error during the trial proceeding. Thus, the Defendants' Due Process Clause argument also fails.

In accordance with the above,

**IT IS ORDERED denying** the Defendants' Motion to Dismiss with Prejudice (Doc. 1355).

/ / /

/ / /

/ / /

/ / /

/ / /

**IT IS FURTHER ORDERED denying** the Defendants' Motion to Compel Government to Comply with its *Brady* and *Giglio* Obligations (Doc. 1281).

Dated this 28th day of December, 2021.

Honorable Diane J. Humetewa
United States District Judge