**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. CR-18-0422-PHX-SMB |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 9, 2020 |
| Michael Lacey, | ) | 10:34 a.m. |
| James Larkin, | ) | |
| Scott Spear, | ) | |
| John Brunst, | ) | |
| Andrew Padilla, | ) | |
| Joye Vaught, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE SUSAN M. BRNOVICH, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TELEPHONIC HEARING

Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:


    U.S. ATTORNEY'S OFFICE
    By:  **Mr. Peter S. Kozinets**
         **Mr. Kevin M. Rapp**
         **Ms. Margaret Wu Perlmeter**
         **Mr. Andrew C. Stone**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004


For the Defendant Lacey:

    LIPSITZ GREEN SCIME CAMBRIA
    By:  **Ms. Erin E. McCampbell-Paris**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202


For the Defendant Larkin:

    BIENERT KATZMAN
    By:  **Ms. Whitney Z. Bernstein**
    903 Calle Amanecer, Suite 350
    San Clemente, CA 92673


For the Defendants Larkin and Lacey:

    DAVIS WRIGHT TREMAINE LLP - Seattle, WA
    By:  **Mr. James C. Grant**
    920 5th Ave., Ste. 3300
    Seattle, WA 98104-1610


 For the Defendant Spear:

    FEDER LAW OFFICE
    By:  **Mr. Bruce S. Feder**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016

1    For the Defendant Brunst:

2        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
         LINCENBERG & RHOW
3        By:  **Mr. Gopi K. Panchapakesan**
              **Mr. Ariel Neuman**
4        1875 Century Park E, Suite 2300
         Los Angeles, CA 90067

5

6        KIMERER & DERRICK PC
         By:  **Mr. Michael D. Kimerer**
7        1313 E Osborn Rd., Ste. 100
         Phoenix, AZ 85014

8

9    For the Defendant Padilla:

10       DAVID EISENBERG, PLC
         By:  **Mr. David S. Eisenberg**
11       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012

12

13   For the Defendant Vaught:

14       JOY BERTRAND, LLC
         By:  **Ms. Joy M. Bertrand**
15       P.O. Box 2734
         Scottsdale, AZ 85252

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

1

2          COURTROOM DEPUTY:  We are on the record in CR 18-422,

3    United States of America versus Michael Lacey, and United

4    States versus James Larkin, United States versus Scott Spear,

5    United States versus John Brunst, United States versus Andrew

6    Padilla, and United States of America versus Joy Vaught, before

7    the Court for a telephonic hearing.

8          THE COURT:  Mr. Rapp, or whoever is here from the

9    government, could you announce.

10          MR. RAPP:  Kevin Rapp on behalf of the United States.

11          MR. KOZINETS:  Peter Kozinets with the United States.

12          MR. STONE:  Andrew Stone with the United States.

13          MS. PERLMETER:  Peggy Perlmeter with the United

14    States.

15          THE COURT:  All right.  And I'm going to go through

16    defense counsel in some sort of order, only because we're on

17    the phone and it makes it difficult to have people talk over

18    one another.

19          So for defendant Lacey, who is appearing?

20          MS. MCCAMPBELL-PARIS:  Erin McCampbell-Paris.

21          THE COURT:  For defendant Larkin.

22          MS. BERNSTEIN:  Whitney Bernstein.  Good morning, Your

23    Honor.  And Mr. Larkin is on the line as well.

24          THE COURT:  Was there a second counsel for defendant

25    Lacey?

1          MS. MCCAMPBELL-PARIS:  No.  Paul Cambria will not be

2     on the phone today.  And Michael Lacey is exercising his right

3     to waive his appearance.

4          MR. GRANT:  Your Honor, this is Jim Grant on behalf of

5     Mr. Larkin and Mr. Lacey.

6          THE COURT:  All right.  Okay.  Let's see, for

7     defendant Spear.

8          MR. FEDER:  Bruce Feder for Mr. Spear, who is also on

9     the line.

10         THE COURT:  For defendant Brunst.

11         MR. NEUMAN:  Good morning, Your Honor.  It's Ariel

12    Neuman and Mr. Panchapakesan for Mr. Brunst, who is also on the

13    line.  And I believe I heard Michael Kimerer as well.

14         MR. KIMERER:  That is correct.  This is Michael

15    Kimerer on behalf of Brunst.

16         THE COURT:  All right.  And, let's see, for defendant

17    Padilla.

18         MR. EISENBERG:  Good morning, Your Honor.  This is

19    David Eisenberg representing him.  And we will waive his

20    appearance.

21         THE COURT:  All right.  Thank you.  And for defendant

22    Vaught.

23         MS. BERTRAND:  Good morning.  Joy Bertrand appears for

24    Ms. Vaught.  We waive her appearance.

25         THE COURT:  All right.  And we're set for a discovery

1   dispute.  I have read the e-mailed letter and the attachments

2   that included correspondence back and forth between the

3   government and defense counsel.

4        For this hearing, I'm going to ask that Mr. Feder

5   speak on behalf of the defense, because he contacted the Court

6   and prepared the documents, and then I'll hear from the

7   government.

8        So, Mr. Feder, anything you want to add?  I understand

9   that you're asking for Document 731, that order to be modified

10  to something more akin to Document 1047, which is the

11  protective order regarding the physical tax returns.

12        Go ahead.

13        MR. FEDER:  Correct.  So, as the Court knows from

14  reading the competing correspondence, the government, having

15  read this Court's order, which was different than how defense

16  counsel read the order, to allow a read-only sharing of --

17  digital read-only sharing of the Jencks with the clients.

18        At the very least, of course, we want that.  And I

19  think our position is that there has been a year that's gone by

20  where none of the alleged risks that the government asserted

21  that this Court, essentially, denied their motion for

22  sanctions, has occurred.  There was a suggestion in the

23  government's -- one of the government's correspondence that

24  said we could -- we, meaning that defense counsel, could read

25  some of the Jencks material to our clients if there wasn't very

1   much.

2           And I will tell the Court that on August 4th and

3   August 7th of this year, last month, we received about 310

4   pages of new memorandum of interviews, which, of course, would

5   be ridiculous to be in a position of having to read them to our

6   clients and have them absorb them, be able to use them, be able

7   to fashion questions out of them, et cetera.  And that the

8   original protective order was issued prior to the time of the

9   present pandemic.  And the Court is well versed as far as the

10  risk of the defendants, and some of their defense counsel, and,

11  for that matter, all of their defense counsel have in being

12  forced to be in the same room to have the clients come in and

13  read Jencks.

14          So, for those reasons, and the reason that we believe

15  the original protective order may not have been required, we

16  would ask the Court to modify the protective order to make it

17  the same as that order that, actually, all parties agree to, in

18  regard to the disclosure of the tax returns of Mr. Ferrer,

19  Mr. Hyer, and then the defendants and some of the corporate

20  defendants.

21          THE COURT:  And, Mr. Feder, you had some objection to

22  the proposal that it be disclosed in a read-only manner?

23          MR. FEDER:  I do, Judge.  And here's some of the

24  reasons.

25          Number one, when the -- when the documents are only

1   accessible by read only, one, that presupposes that all of the

2   defendants, and I can, I believe, speak for all of the

3   defendants, they are not all computer literate.  Meaning they

4   can't take the Jencks and write notes about them, at least on

5   the document itself, which they would be able to do if they

6   received a print.

7          In order to send read-only documents, the defense

8   counsel have to have a read-only program to do that.

9          And, third, is there is just -- it doesn't appear to

10  be any reason to do that.  If one of these defendants or

11  counsel or auxiliary people wanted to actually print these

12  documents, they could take a screen shot with their phone and

13  have it in that fashion.  So it just seems redundant, it seems

14  ridiculous to impose that kind of condition on defendants who

15  are approaching a trial date such that their counsel and them

16  can effectively and easily communicate and read and reread

17  these Jencks materials that involve their freedom.

18         So one is the present protective order is not

19  necessary; two, is it still could require the defendants to

20  actually have to go to a lawyer's office to read, and we just

21  don't believe that that's appropriate.

22         So, for all the reasons that are set out in the

23  letters, and for all of the reasons that the case law that was

24  cited states, which is there has never really been a valid

25  specific, page-by-page, document-by-document explanation as to

1    why a protective order is really necessary.  And proof of that

2    is we're now a year down the road when these documents were

3    first disclosed, and the government, I don't think, can say

4    anything that indicates that there has been any kind of risk

5    from having them been disclosed.

6                 THE COURT:  Okay.  Thank you.

7                 Mr. Rapp.

8                 MR. RAPP:  Well, if we just look at what the Jencks --

9    the Jencks Act never was implemented for preparation for trial.

10   The case law is pretty clear on that.  We cited a number of

11   cases in our previous pleadings, United States versus

12   Percevault, P-E-R-C-E-V-A-U-L-T, 490 F.2d 126, Second Circuit,

13   you know, the prosecution cannot be compelled to disclose

14   statements to the witness before he's testified on direct

15   examination.  This case stands for the proposition that the

16   Jencks Act is not meant for trial preparation.

17                But, in this case, the defense has had the Jencks Act

18   statements for over a year, the ones that are important to

19   them, which I presume is Carl Ferrer and Dan Hyer.  Sure, there

20   is Jencks Acts statements of trafficking victims that are, as

21   you go out and prepare for trial, they're being adopted and

22   they're being disclosed to the defense, but they've had it for

23   a year.  And the August trial date, I believe, was not even

24   continued until June of this year, so they were within two

25   months of trial.  And I suspect they were preparing for trial

1   vigorously and had reviewed those portions of the Jencks Act

2   statements that they felt implicated their client.

3          We realize this is a conspiracy, but the reality is

4   not every page, for example, of Carl Ferrer's statements will

5   you find statements implicating Mr. Spear, for example.  So

6   really the total amount of Jencks Act, given the volume of

7   discovery in this case, is pretty sparse.

8          They have the ability to review these documents.  I

9   mean, I find it ironic that it's Mr. Feder who has written a

10  correspondence.  He's the only defendant that I know of whose

11  client actually resides in Phoenix in the same place his office

12  is.  And his client, if he had not already reviewed the

13  statements that implicate him as of June of 2020, he had the

14  ability to go to his office and, as we said in our

15  correspondence, implement social distancing, wear a mask, read

16  those portions that implicate him.

17         With regard to the other defense attorneys, I believe,

18  and I'm -- you know, I'm not certain of this, but I know, for

19  example, Lacey and Larkin's attorneys reside either in

20  California or New York.  I presume they had been reviewing

21  those statements as of June of 2020 with their clients, knowing

22  that they would be in a trial in August of 2020.

23         And these are firms that I'm pretty sure have web-

24  based platforms available to them where they can share the

25  document, in other words, they could get on Zoom and, you know,

1   you share documents on Zoom.  They could look at those portions

2   of the statements.  I presume they've been doing that, but of

3   course they've been to a number of court appearances where

4   they've had the ability to do that.

5            So, for that reason, they've had the statements

6   available to them, they have the ability to review them.  Zoom

7   is a free web-based platform.  You can get it for an hour for

8   free, I believe, but -- so they've had the ability to do it.

9            With respect to the concerns of the witnesses, do the

10  witnesses still have concerns about their safety, absolutely.

11  Every single witness that we've interviewed, former employees,

12  and not just limited to Hyer and Ferrer, the other moderators

13  or employees all express concerns about testifying in this case

14  and how their identities will be disclosed and how their

15  statements will be disclosed.

16           If we go back to the rationale for the protective

17  order in the first instance, this was because of an article in

18  a publication called Wire where they disclosed the internal

19  memorandums that were subject to a court order to be disclosed.

20  But, in that same article, they impugn the integrity of Carl

21  Ferrer, they write about the fact that he has given the actual

22  quote from the Wire article.  It's unclear how effective Ferrer

23  will be.  Over the past decade, he has given numerous sworn

24  statements in Backpage litigation that contradict --

25           THE COURT:  Mr. Rapp.  Mr. Rapp.

1          MR. RAPP:  Yes.

2          THE COURT:  Sorry.  We lost you for one second.

3          So the last thing the court reporter got was:  It's

4     unclear how effective he will be.  Over the past decade, he's

5     given numerous sworn statements in Backpage litigation that

6     contradict, and that's --

7          MR. RAPP:  Yeah, contradict assertions in his plea.

8     This is a quote from the Wire article.  This is -- if the Court

9     recalls, this is sometime ago, but the author of that article

10    was an attorney who appears at court appearances with the

11    defendants in this case.  I mean, if I understand what

12    Mr. Feder was requesting, he was asking that these statements

13    should be made available to attorneys who are not of record in

14    this case, and investigators, and all that, and, obviously, we

15    oppose that for this very reason.

16         Look, Carl Ferrer, Dan Hyer, and the former employee

17    moderators that are testifying against these defendants, all of

18    these individuals are going to testify that there was a

19    criminal enterprise.  We have the same concerns about these

20    witnesses that you would have in prosecuting any criminal

21    enterprise.

22         Mr. Ferrer, in particular, is a devastating witness

23    for these defendants.  He is going to put into context nearly

24    thousands of e-mails that are incriminating that have

25    conversations that he's had with the defendants.  And so we

1    believe that they -- given an article like this, and some other

2    pleadings they filed where they trumpet these declarations,

3    that we believe that trial will show that they were written by

4    the attorneys for Mr. Ferrer.

5            And so we think that, given their track record, they

6    will do whatever they can to impugn the character of not only

7    Mr. Ferrer, but these other witnesses, and they use their

8    statements, and to disseminate those statements to these sort

9    of vague, unknown third parties, attorneys who are not of

10   record, investigators who we don't know.

11           So, for that reason, as we get closer to trial, we

12   think that those issues are even heightened.  There is a lot at

13   stake here.  I mean, the guidelines are life imprisonment.  The

14   money that has been seized is not inconsequential.  And so,

15   yeah, we think anybody who ran a criminal enterprise and has

16   been charged with that would not want these witnesses to

17   testify and will do what they can to impugn their character.

18   And, again, Jencks, by statute, is given after the witness

19   testifies for impeachment purposes.

20           And, by the way, that's the way some of these trials

21   have ran in this district.  It's mostly these statements are

22   given much closer to trial, not years before trial, not, as we

23   are now, 15 months prior to trial.

24           THE COURT:  Okay.

25           MR. RAPP:  So we don't think the pandemic has changed

1    the posture of these statements one bit, because many of these

2    defense attorneys and their clients were not even in the same

3    city to begin with and had to employ technology to review with

4    them in the first instance.

5         So, for that reason, we would oppose the request by

6    the defendants.

7         THE COURT:  Okay.  But, Mr. Rapp, I understand that

8    Jencks materials are not normally disclosed, however, the

9    government, along with the defense, submitted a proposed

10   scheduling order to Judge Logan that included a date for

11   disclosure of these materials, correct?

12        MR. RAPP:  Right.  No.  And no question.  I'm not --

13   I'm not saying that we didn't engage in a scheduling order in a

14   complex case.  But we could have, under the statute, said, hey,

15   we'll give you these Jencks a month before trial.  But, the

16   reality is, this is going to be a lengthy trial.  And despite

17   the fact that Jencks is not designed for trial preparation, you

18   know, it's going to be a lengthy trial, and we didn't want the

19   delays that are sometimes occasioned by the timely disclosure

20   of the Jencks under the statute, so that's why it's given in

21   advance.

22        But we did not give them these statements that are

23   produced and prepared for this federal criminal prosecution,

24   and they do not exist independent of this federal criminal

25   prosecution, for the defense to disseminate them to third

1   parties.  If the question is do we trust that these would be

2   maintained and not disseminated, no, we don't.  The track

3   record suggests that that cannot be trusted.

4        And so that's why we would, even as we get even closer

5   to trial, we are even more concerned about compliance with the

6   protective order.

7        THE COURT:  And, originally, when you submitted that

8   schedule order, there was no protective order.  So the normal

9   concerns with disclosure of Jencks material wasn't really an

10  issue until that Wire article came out, correct?

11       MR. RAPP:  Right.  And then we begin to see -- right.

12  And then we begin to see pleadings where they were, you know,

13  trying to impugn the character of Carl Ferrer.  The defense,

14  Lacey and Larkin in particular, have their own sort of digital

15  monthly magazine that sort of highlights the, you know, the

16  posture of this case, and, you know, they mention Carl Ferrer

17  in there, and so that's what gives us the concern, right.  I

18  mean, the reality is you had a court order out there ordering

19  them to destroy certain internal -- inadvertently disclose

20  internal memorandum, in our view, they didn't comply with that,

21  so that gives us concern about the Jencks statements of these

22  witnesses, particularly, as we get closer to trial.

23       THE COURT:  Okay.  Mr. Feder, so --

24       MR. FEDER:  I'll follow up on the Court's --

25       THE COURT:  Well, my -- what I'm asking -- what I want

1    to hear from you is why -- you've already been granted access

2    to Jencks material that you would not normally be entitled to

3    in a criminal case, and why should that be expanded further?

4         MR. FEDER:  Because, number one, the parties did agree

5    to the early disclosure of Jencks, as has been done, at least

6    in every, certainly, white collar case I've ever been involved

7    with in 40 years in front of this court.

8         And I am guessing Mr. Eisenberg and Ms. Bertrand will

9    say the same thing in regard to their experience here.  And I'm

10   guessing that counsel from New York for Mr. Lacey, and counsel

11   for Mr. Brunst and Mr. Larkin in California will tell you the

12   same thing.  There is probably not a court in the country that

13   would ever allow the government to serve a Jencks Act on the --

14   and they can't do that because the court has supervisory powers

15   under the United States versus Grace case, which is 526 F.3d

16   499, Ninth Circuit, 2008, for the orderly conduct of their

17   trials.

18        Think about a two-month trial, Judge, where the

19   government gives the Jencks materials out after each witness's

20   direct testimony and what -- how that trial would go.  It would

21   elongate it from a two-month trial to a 12, you know, a

22   12-month trial.  So what Mr. Rapp is saying is, candidly,

23   borders on the absurd, it just never happens by practice, and

24   the Court has supervisory powers to make it not happen in order

25   for the orderly supervision of trials.  That's number one.

1          Number two, the parties agreed to this.  And the

2     alleged reason for the government's claim now that there should

3     be restrictions on it is regarding a motion that this Court one

4     year ago, and actually more than one year ago, said was based

5     on speculation, at page 46 of the transcript.  So there was no

6     basis for it then, certainly with the changed conditions, those

7     changed conditions being, number one, the passage of time.

8     There is no specific allegations that the government can make

9     that there has been any kind of --

10          And, number two, because of the common problems, the

11     Court knows, based on sealed submissions, at least from

12     Mr. Spear, and I know from others, that there is real good

13     reason why I don't want Mr. Spear to have to come to my office,

14     and he doesn't want to have to come to my office in order to be

15     in a closed atmosphere, mask or no mask, touching documents one

16     by one to read them.  And, as we get close to trial, the need

17     for those inspections and reviews and discussions is going to

18     accelerate and expand.

19          So I'm not -- I resent very much the government's

20     assertion that somehow counsel was involved in making an unfair

21     allegation, but, you know, we went through that a year ago at

22     the hearing, Judge, and, again, this Court's order was to deny

23     the motion for sanctions, because the government's assertions

24     are speculation, and that's all they are.

25          So, realistically, in order to prepare for trial, the

1    defendants need to have access to these documents every day so

2    they can look at them, prepare, and help their client -- help

3    their counsel prepare, tell them what they -- you know, what

4    Mr. Ferrer, for instance, is seeing, and why they think that it

5    is, to look for impeachment, et cetera, et cetera.

6              Finally, one other thing.  I don't know where Mr. Rapp

7    is coming from on this, but the present protective order allows

8    the sharing of the Jencks Act with people who are authorized,

9    and that includes people who are retained to assist the

10   defense.  Those are the lawyers that we're referring to that we

11   want to be able to share the Jencks Act documents with.  That

12   is lawyers that are helping, or paralegals that are helping, et

13   cetera, to be able to look at that and give their two cents as

14   to what, you know, what they see and what ought to be done with

15   them.

16             There is nothing that's ever been asserted, and no

17   proof whatsoever, that anybody in the defense has shared any

18   document to anybody other than authorized persons, in light of

19   the protective order from last year.  And if Mr. Rapp has any

20   evidence to the contrary, let him put it on the record right

21   now:  Person, date, time, document, et cetera.

22             THE COURT:  I don't think he made the accusation that

23   anybody violated this protective order.  I think he, at least

24   what I heard, is he was referring to his concerns about what

25   happened before.  And, of course, my concern is, well, the

1    protective order did its job, in that nothing else has been out

2    in the public arena.

3            MR. NEUMAN:  Your Honor, this is Ariel Neuman for

4    Mr. Brunst.

5            I just want to point out, the Court's current

6    protective order, Document 730, at paragraph 4, does not allow

7    defense counsel to copy or reproduce the material.  So I'm not

8    sure how Mr. Rapp even makes the suggestion that somehow we are

9    reproducing it online.  It literally does not allow us to copy

10   the document that we get from them, so the restrictions here

11   are totally unwarranted.

12           From the beginning, and I remember I was looking back

13   at the transcript from last year, Mr. Rapp and the government

14   team conceded that there was no -- nothing to implicate

15   Mr. Brunst in their unsupported allegations.  They conceded

16   Mr. Brunst never did anything wrong and they had no evidence

17   that he did.  This has been collective punishment from day one,

18   which has been totally inappropriate.

19           Even today, what we've, essentially, heard Mr. Rapp

20   say is that they're not concerned for anybody's safety, there

21   is no basis for that, which would be a real reason to enter a

22   protective order.  They're concerned that people have said not

23   nice things about their witnesses.  That's not a basis to enter

24   a protective order.

25           In this case, all we're asking for is that the same

1   restrictions be imposed that were imposed in Document 1047,

2   which are that everyone abide by the restrictions the Court

3   ordered that the documents not be disseminated further.  There

4   is no basis for anything more restrictive than that at this

5   point, especially for Mr. Brunst, but, I would submit, for any

6   of the defendants.

7          THE COURT:  All right.  And didn't I say at the

8   beginning of this that Mr. Feder was going to speak for the

9   defense?

10         MR. NEUMAN:  You did, Your Honor, but I feel like I

11  have to make a record for my client, and any appearance where I

12  am here on behalf of my client.

13         THE COURT:  All right.  I'll take it under advisement

14  and issue an order by the end of the day.

15         Thank you.  We're at recess.

16         (Proceedings concluded at 11:03 a.m.)

17                    *          *          *

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 8th day of February,

13   2022.

14

15

16

                  /s/ Christine M. Coaly_____
17                Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25