2:18-cr-00422-DJH, September 12, 2023 (Ferrer excerpt)

1                    **UNITED STATES DISTRICT COURT**

2                    **FOR THE DISTRICT OF ARIZONA**

3                    _____

4
    **United States of America,**           )
5                                            )
                            Plaintiff,       )
6    vs.                                     )
                                             )  2:18-cr-00422-DJH
7    **Michael Lacey, et al.,**              )
                                             )
8                        Defendants.         )
                                             )  September 12, 2023
9   _____  )
10

11

12          **BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

13          <u>**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**</u>

14                  **(Testimony of CARL FERRER)**

15

16

17

18

19

20

21   Official Court Reporter:
     **Elaine Cropper, RDR, CRR, CCP**
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 35
23   Phoenix, Arizona  85003-2151
     elaine_cropper@azd.uscourts.gov
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

                    United States District Court

2:18-cr-00422-DJH, September 12, 2023 (Ferrer excerpt)

1                        <u>I N D E X</u>

2                          TESTIMONY

3    WITNESS                     Direct   Cross   Redirect   Recross

4    Government's Witnesses

5     CARL FERRER                   5

6

7                      <u>E X H I B I T S</u>

8    Number                                     Ident  Rec'd

9    1056   Email from Ferrer to Spear, "Backpage    86    87
             work plan", 11/21/2005
10
     1056a  Attachment, "Backpage Work Plan",        88    89
11
     1057   Emails form Spear and Ferrer, "adult     91    92
12           changes", 05/08/2006,

13   2030   Demonstrative Exhibit Illustrating       27    28
             Backpage Aggregation Process,
14
     2031   Demonstrative Exhibit Illustrating       33    34
15           Backpage Reciprocal Link Program
             Process,
16

17

18                        <u>RECESSES</u>

19                                           Page   Line

20   (Recess at 2:30; resumed at 2:51.)        37    16

21

22

23

24

25


                        United States District Court

1                              **A P P E A R A N C E S**

2

For the Government:

3                  **KEVIN M. RAPP, ESQ.**
                   **PETER S. KOZINETS, ESQ.**
4                  **ANDREW C. STONE, ESQ.**
                   **MARGARET WU PERLMETER, ESQ.**
5                  U.S. Attorney's Office
                   40 N, Central Ave., Ste. 1800
6                  Phoenix, AZ  85004-4408
                   kevin.rapp@usdoj.gov
7                  peter.kozinets@usdoj.gov
                   andrew.stone@usdoj.gov
8                  margaret.perlmeter@usdoj.gov

9                  **AUSTIN M. BERRY, ESQ.**
                   U.S. Department of Justice
10                 Child Exploitation and Obscenity Section
                   1301 New York Ave., NW, 11th Fl.
11                 Washington, D.C.  20005
                   austin.berry2@usdoj.gov

12

13   For the Defendant Michael Lacey:
                   **PAUL J. CAMBRIA, JR., ESQ.**
14                 Lipsitz Green Scime Cambria, L.L.P.
                   42 Delaware Ave., Ste. 120
15                 Buffdalo, NY  14202
                   pcambria@lglaw.com

16

17   For the Defendant Scott Spear:
                   **BRUCE S. FEDER, ESQ.**
18                 Feder Law Office, P.A.
                   2390 E. Camelback Road, Ste. 160
19                 Phoenix, AZ  85016
                   bf@federlawpa.com

20

                   **ERIC W. KESSLER, ESQ.**
21                 Kessler Law Office
                   6720 N. Scottsdale Rd., Ste. 210
22                 Scottsdale, AZ  85253
                   eric.kesslerlaw@gmail.com

23

24

25

2:18-cr-00422-DJH, September 12, 2023 (Ferrer excerpt)

1                    **A P P E A R A N C E S**   (Continued)

2

For the Defendant John Brunst:
3              **GOPI K.   PANCHAPAKESAN, ESQ.**
               Bird Marella Boxer Wolpert Nessim Drooks
4    Lincenberg & Rhow, P.C.
               1875 Century Park E. Ste. 2300
5              Los Angeles, CA  90067
               gpanchapakesan@birdmarella.com
6
For the Defendant Andrew Padilla:
7              **DAVID S. EISENBERG, ESQ.**
               David Eisenberg, P.C.
8              3550 N. Central Ave., Ste. 1155
               Phoenix, AZ  85012
9              david@deisenbergplc.com

10   For the Defendant Joye Vaught:
               **JOY MALBY BERTRAND, ESQ.**
11             Joy Bertrand, Esq., L.L.C.
               P.O. Box 2734
12             Scottsdale, AZ  85252-2734
               joy@joybertrandlaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25

                     United States District Court

CARL FERRER - Direct

# **P R O C E E D I N G**

| 1 | | |
| --- | --- | --- |
| 2 | (The following excerpt was separately transcribed.) | |
| 3 | MR. RAPP:  The United States calls Carl Ferrer. | |
| 4 | THE COURT:  Sir, please come forward here and be | |
| 5 | sworn. | 01:33:27 |
| 6 | COURTROOM DEPUTY:  Please raise your right hand. | |
| 7 | (CARL FERRER, a witness herein, was duly sworn or | |
| 8 | affirmed.) | |
| 9 | COURTROOM DEPUTY:  If you could please state and | |
| 10 | spell your last name for the record. | 01:33:45 |
| 11 | THE WITNESS:  I do.  And Ferrer -- oh, first and last | |
| 12 | name? | |
| 13 | COURTROOM DEPUTY:  Spell the last name. | |
| 14 | THE WITNESS:  Ferrer.  F-E-R-R-E-R. | |
| 15 | COURTROOM DEPUTY:  Please proceed to the witness | 01:33:58 |
| 16 | stand.  There's water there and please use the microphone. | |
| 17 | THE WITNESS:  Thank you. | |
| 18 | MR. RAPP:  Thank you, Your Honor. | |
| 19 | **DIRECT EXAMINATION** | |
| 20 | BY MR. RAPP: | 01:34:21 |
| 21 | Q.   Sir, could you state your full name and spell your last | |
| 22 | name for the record, please. | |
| 23 | A.   Carl Allen Ferrer.  My last name is F-E-R-R-E-R. | |
| 24 | Q.   Sir, what was your employment from 2004 to 2018? | |
| 25 | A.   From 2004 through 2018, I was the project manager at | 01:34:38 |

United States District Court

CARL FERRER - Direct

1    Backpage.com.                                                  01:34:44

2    Q.   When was the website Backpage.com created?

3    A.   We started building the site in 2003 and in 2004 we

4    launched in Phoenix, Arizona.

5    Q.   What type of website was Backpage.com?                    01:35:01

6    A.   Backpage.com was a clone of Craigslist.

7    Q.   What type of -- when you say it was a clone of Craigslist,

8    what did the website offer?

9    A.   So it had want ads, we called them classified ads, for a

10   variety of sections and categories but the category that -- the  01:35:33

11   section that seemed to do the best was Adult.

12   Q.   All right.  And did you charge to post ads on

13   Backpage.com?

14   A.   We did.  We always charged -- almost always charged for

15   ads in the Adult section.                                       01:35:54

16   Q.   Were there categories within the Adult section on

17   Backpage.com?

18   A.   There were.  Those categories are Female Escorts, Male

19   Escorts, Transsexual Escorts, Body Rubs, Adult Jobs, Phone and

20   Web.                                                            01:36:20

21   Q.   During your employment from Backpage.com from 2004 to

22   2018, did you come to learn which category within the Adult

23   section generated the most revenue?

24   A.   The vast majority of revenue is generated in Female

25   Escorts.                                                        01:36:42

United States District Court

CARL FERRER - Direct

| | |
|---|---|
| 1 | Q.   Was Backpage.com, did it have a site or a market here in | 01:36:47 |
| 2 | Phoenix, Arizona? |
| 3 | A.   Yes.  It was our first market. |
| 4 | Q.   How many markets was Backpage.com, how many markets did it |
| 5 | exist in by the time -- by 2018? | 01:37:04 |
| 6 | A.   It was in hundreds of markets. |
| 7 | Q.   In the Female Escort section of Backpage.com, can you |
| 8 | describe the ads from about 2004 to 2009? |
| 9 | A.   I'm sorry.  In 2004 through 2009? |
| 10 | Q.   Yes.  Can you describe the nature of the ads that were | 01:37:36 |
| 11 | posted in the Female Escort section between that time period? |
| 12 | A.   They are prostitution ads. |
| 13 | Q.   When you say they were prostitution ads, sir, what do you |
| 14 | base that on? |
| 15 | A.   A number of factors.  They were numerous sex act pics, | 01:37:58 |
| 16 | there were numerous sex act terms.  We had a relationship with |
| 17 | The Erotic Review and many of the ads had review IDs going to a |
| 18 | prostitution review site. |
| 19 | Q.   All right.  Let me just stop you there just so we |
| 20 | understand what The Erotic Review is.  We'll ask you some more | 01:38:23 |
| 21 | questions about this later.  Can you describe for the jury what |
| 22 | The Erotic Review was? |
| 23 | A.   The Erotic Review is a Yelp for prostitution.  Much in the |
| 24 | same way that clients in a restaurant will post reviews, Johns |
| 25 | who frequent prostitutes will post reviews in The Erotic Review | 01:38:51 |

CARL FERRER - Direct

| | |
|---|---|
| 1 | and it was the largest review site certainly in the U.S. if not | 01:38:56 |
| 2 | the world. |

Q.   Who was the user of the Female Escort category on
Backpage.com?  Who would -- who did you come to learn would
actually view the postings?                                01:39:15

A.   Johns, those people who frequented prostitutes.

Q.   Sir, do you know an individual by the name of Michael
Lacey?

A.   I do.

Q.   How is it that you know Michael Lacey?                01:39:30

A.   He was one of the company's owners.

Q.   When you say "the company," what company are we referring
to?

A.   It was New Times.  It later changed its name to Village
Voice Media.                                               01:39:50

Q.   And what, if any, was Mr. Lacey's role at the New Times/
Village Voice Media?

A.   Well, he was one of the owners and early on, he was --
well, I understood he was involved in the editorial side of the
company and his other partner, Jim Larkin, ran more of the    01:40:10
sales and marketing.

Q.   From 2004 to 2018 did you interact with Mr. Lacey?

A.   Yes, I did.

Q.   Did you exchange emails with him?

A.   Yes.                                                  01:40:26

CARL FERRER - Direct

| | | |
|--|--|--|
| 1 | Q.  Did you have meetings with him? | 01:40:27 |
| 2 | A.  Yes. | |
| 3 | Q.  Did you attend meetings outside of Backpage with him? | |
| 4 | A.  Yes. | |
| 5 | Q.  Do you know where Mr. Lacey resides, not his address but | 01:40:42 |
| 6 | city he resides in? | |
| 7 | A.  Phoenix, Arizona. | |
| 8 | Q.  And how do you know that, sir? | |
| 9 | A.  I saw all the owners sort of lived in Paradise Valley or | |
| 10 | somewhere near there. | 01:41:01 |
| 11 | Q.  Is that based on from 2004 to 2018 your interaction with | |
| 12 | some of these individuals? | |
| 13 | A.  Yes. | |
| 14 | Q.  Is Mr. Lacey seated in the courtroom today? | |
| 15 | A.  Yes, he is. | 01:41:15 |
| 16 | Q.  Could you please point to him and identify an article of | |
| 17 | clothing he's wearing? | |
| 18 | A.  Yeah.  He's directly behind you.  He has a gray suit, | |
| 19 | white shirt. | |
| 20 | Q.  Is he wearing a tie? | 01:41:27 |
| 21 | A.  Yes.  Cowboy tie. | |
| 22 | Q.  Is that sometimes known as a Bolo tie? | |
| 23 | A.  Bolo tie, yes. | |
| 24 | Q.  Is he wearing glasses? | |
| 25 | A.  Yes, black glasses. | 01:41:39 |

CARL FERRER - Direct

| 1 | MR. RAPP:  May the record reflect an identification | 01:41:41 |
| 2 | of the defendant Michael Lacey? | |
| 3 | THE COURT:  It may so reflect. | |
| 4 | BY MR. RAPP: | |
| 5 | Q.   Sir, do you know an individual by the name of Scott Spear? | 01:41:45 |
| 6 | A.   Yes, I do. | |
| 7 | Q.   How, sir, do you know Scott Spear? | |
| 8 | A.   Scott Spear was my supervisor for many years. | |
| 9 | Q.   Did you interact with Mr. Spear? | |
| 10 | A.   Mr. Spear and I, we worked on Backpage together very | 01:42:07 |
| 11 | closely and I -- we were joined at the hip. | |
| 12 | Q.   All right.  Is that to suggest that you met with him on a | |
| 13 | daily or weekly basis? | |
| 14 | A.   Often three times a day. | |
| 15 | Q.   Did you exchange emails with him? | 01:42:26 |
| 16 | A.   Yes, I did. | |
| 17 | Q.   And what was his role at Backpage.com? | |
| 18 | A.   He was my immediate supervisor so Scott set the budgets, | |
| 19 | worked on strategy, helped expand it into other markets and | |
| 20 | signed off of contracts with vendors. | 01:42:54 |
| 21 | Q.   All right.  Is Mr. Spear seated in the courtroom today? | |
| 22 | A.   Yes. | |
| 23 | Q.   Could you please point to him and describe an article of | |
| 24 | clothing he's wearing? | |
| 25 | MR. FEDER:  We'll stipulate that this is Mr. Spear. | 01:43:20 |

CARL FERRER - Direct

| | |
|---|---|
| 1 | THE COURT:  I'm sorry.  Mr. Feder, did you say | 01:43:22 |
| 2 | something? |
| 3 | MR. FEDER:  We'll stipulate that this is Mr. Spear. |
| 4 | BY MR. RAPP: |
| 5 | Q.   Is Mr. Spear wearing a mask? | 01:43:23 |
| 6 | A.   Yes, he is. |
| 7 | MR. RAPP:  May the record reflect an identification |
| 8 | of Mr. Spear? |
| 9 | THE COURT:  It may so reflect. |
| 10 | BY MR. RAPP: | 01:43:32 |
| 11 | Q.   Do you know an individual by the name of John Jed Brunst? |
| 12 | A.   Yes, I do. |
| 13 | Q.   How do you know him? |
| 14 | A.   Well, I knew him as Jed and Jed was the CFO of the |
| 15 | company. | 01:43:48 |
| 16 | Q.   All right.  And when you say he was the CFO of the |
| 17 | company, are we talking about Backpage.com? |
| 18 | A.   He was the CFO of the entire company but he approved and |
| 19 | helped with the budget for Backpage.com. |
| 20 | Q.   How do you know that? | 01:44:08 |
| 21 | A.   Because we had numerous budget meetings and budget |
| 22 | preparations with Jed present along with Jim Larkin. |
| 23 | Q.   All right.  Let me just back up to Mr. Spear just so the |
| 24 | record is clear here.  Did you come to learn at some point that |
| 25 | Mr. Spear had some type of an ownership interest in | 01:44:24 |

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Backpage.com? | 01:44:31 |
| 2 | A.   Yes. | |
| 3 | Q.   And similarly with Mr. Brunst, did he have an ownership | |
| 4 | interest that you knew of in Backpage.com? | |
| 5 | A.   Yes, I knew he was also an owner. | 01:44:41 |
| 6 | Q.   Is Mr. Brunst seated in the courtroom today? | |
| 7 | A.   Yes, he is. | |
| 8 | Q.   Could you please identify him and describe an article of | |
| 9 | clothing he's wearing? | |
| 10 | A.   He's in the far corner over there with a blue suit, blue | 01:44:58 |
| 11 | striped tie, light blue shirt. | |
| 12 | Q.   Is he wearing glasses, can you tell? | |
| 13 | A.   Yes.  He's also wearing glasses. | |
| 14 |         MR. RAPP:  May the record reflect an identification | |
| 15 | of defendant Jed Brunst? | 01:45:13 |
| 16 |         THE COURT:  It may. | |
| 17 | BY MR. RAPP: | |
| 18 | Q.   Do you know an individual by the name of Andrew Padilla? | |
| 19 | A.   Yes, I do. | |
| 20 | Q.   How is it that you know him? | 01:45:24 |
| 21 | A.   Andrew Padilla was the supervisor of the Moderation | |
| 22 | Department. | |
| 23 | Q.   All right.  Do you know approximately -- and this is at | |
| 24 | Backpage.com? | |
| 25 | A.   Yes. | 01:45:34 |

United States District Court

CARL FERRER - Direct

Q.   Do you know approximately when he started with the
company?

A.   I believe sometime 2006, 2007 he started.  I would say at
least 2006.

Q.   And when you say he was an operations manager of
moderation, what did that involve?

A.   Well, he started with the company as a moderator and then
he stood out as the manager, so he was able to hire additional
moderators and give them direction and supervision.

Q.   And who did he answer to?

A.   Well, he answered to me.

Q.   And during the time period that he worked at Backpage.com
did you exchange emails with him?

A.   Yes, we did, frequently.

Q.   Did you have meetings with him?

A.   Yes.

Q.   Is he seated in the courtroom today?

A.   Yes, he's in the front row, light blue shirt, dark suit,
also wearing glasses.

        MR. RAPP:  May the record reflect the identification
of the defendant Andrew Padilla?

        THE COURT:  It may.

BY MR. RAPP:

Q.   Do you know an individual by the name of Joye Vaught?

A.   Yes, I do.

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.    How is it that you know Ms. Vaught? | 01:46:54 |
| 2 | A.    Joye Vaught started with the company as a moderator and | |
| 3 | then was promoted to a supervisor and reported directly to | |
| 4 | Andrew Padilla. | |
| 5 | Q.    All right.  Did you have in-person meetings with | 01:47:12 |
| 6 | Ms. Vaught? | |
| 7 | A.    Not very often.  I mean, some, yes. | |
| 8 | Q.    All right.  Did you exchange emails with her? | |
| 9 | A.    Some, yes. | |
| 10 | Q.    All right.  Is she seated in the courtroom today? | 01:47:27 |
| 11 | A.    Yes, she is. | |
| 12 | Q.    Can you please point to her and identify an article of | |
| 13 | clothing she's wearing? | |
| 14 | A.    She's on the second row, blonde hair, also wearing glasses | |
| 15 | and a dark jacket. | 01:47:46 |
| 16 | Q.    Can you describe her shirt? | |
| 17 |        THE WITNESS:  Your Honor, may I did stand? | |
| 18 |        THE COURT:  You may. | |
| 19 |        THE WITNESS:  A black and white striped shirt. | |
| 20 |        MR. RAPP:  All right.  May the record reflect an | 01:48:00 |
| 21 | identification of defendant Joye Vaught? | |
| 22 |        THE COURT:  It may. | |
| 23 | BY MR. RAPP: | |
| 24 | Q.    I want to ask you about another individual.  Do you know | |
| 25 | an individual named Dan Hyer? | 01:48:07 |

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   Yes. | 01:48:10 |
| 2 | Q.   And how is it that you know Mr. Hyer? | |
| 3 | A.   Dan Hyer worked for Backpage.com as a sales and marketing | |
| 4 | director. | |
| 5 | Q.   How long have you known him? | 01:48:21 |
| 6 | A.   I've known Dan Hyer since I hired him when I was managing | |
| 7 | a print publication department, the Inside Sales Department.  I | |
| 8 | hired Dan Hyer then and later we promoted him to help market | |
| 9 | Backpage.com. | |
| 10 | Q.   And do you know an individual by the name of Jim Larkin? | 01:48:47 |
| 11 | A.   Yes, I do. | |
| 12 | Q.   Did you know him during the time period that you worked | |
| 13 | for Backpage.com? | |
| 14 | A.   Yes.  We worked closely together. | |
| 15 | Q.   All right.  And in what capacity did Mr. Larkin work in | 01:48:59 |
| 16 | Backpage.com? | |
| 17 | A.   Mr. Larkin was the CEO of the company.  He was Scott | |
| 18 | Spear's direct supervisor, but I often would work with both | |
| 19 | Spear and Larkin on numerous activities around Backpage.com. | |
| 20 | Q.   All right.  Now, I believe that you have testified that | 01:49:25 |
| 21 | your title at the inception of Backpage.com was that of a | |
| 22 | project manager.  Is that correct? | |
| 23 | A.   Yes.  It started as a project manager, yes. | |
| 24 | Q.   All right.  Did that title and your role change from 2004 | |
| 25 | to 2018? | 01:49:48 |

United States District Court

CARL FERRER - Direct

1  A.   The role didn't change.  The titles did change.                    01:49:51

2  Q.   All right.  Can you tell the jury what titles you held

3  with Backpage.com?

4  A.   I started as a project manager and then became sales and

5  marketing of Backpage and then went to VP of Backpage,            01:50:10

6  president of Backpage, and then CEO of Backpage.

7  Q.   All right.  And when you say your role, despite the change

8  in titles, didn't change, what basically was your role from

9  2004 to 2018?

10 A.   My role for 2004 to 2018 was to run the site and to hit      01:50:34

11 budget and the budgets came down from Scott Spear, Jim Larkin,

12 Jed Brunst.

13 Q.   All right.  Where was Backpage based?  Where was it

14 officed?

15 A.   So it started in Phoenix, Arizona, and then later we added   01:50:57

16 a Marketing Division in Dallas.

17 Q.   When you say it was based in Phoenix, Arizona, where in

18 the Phoenix metropolitan area was Backpage based?

19 A.   It was located at 1201 Jefferson.

20 Q.   All right.  And, sir, did you report there?  Is that where   01:51:22

21 you worked out of?

22 A.   Yes.  Yes.

23 Q.   And the individuals that you have identified in court,

24 where did they work?

25 A.   They worked in the -- well, they worked at the same          01:51:39

United States District Court

CARL FERRER - Direct

1   location.                                                                    01:51:42

2   Q.   All right.  Did there come a time where that location

3   changed?

4   A.   Yes.

5   Q.   When did that happen?                                                   01:51:48

6   A.   Around 2012 we vacated the -- that location on Jefferson

7   Street.  Phoenix employees started to work from home and more

8   of Backpage's operational control was in Dallas, Texas.

9   Q.   All right.  And did, for example, Mr. Lacey move to

10  Dallas?                                                                       01:52:18

11  A.   No.

12  Q.   Did Mr. Spear move to Dallas?

13  A.   No.

14  Q.   Did Mr. Brunst move to Dallas?

15  A.   No, they did not.                                                        01:52:28

16  Q.   Did those three individuals stay here to operate

17  Backpage.com?

18  A.   They did stay here.  I would have to come meet them here

19  often.

20  Q.   All right.  Did you relocate to Dallas?                                  01:52:42

21  A.   Yes.

22  Q.   How about Mr. Padilla, did he remain here?

23  A.   Mr. Padilla, he relocated to Dallas along with Joye

24  Vaught.

25  Q.   All right.  Now, as a website, did you have things known                 01:53:01

United States District Court

CARL FERRER - Direct

1   as servers?                                                                      01:53:10

2   A.   Yes.

3   Q.   And can you explain to the jury what a server is?

4   A.   A server is a computer storing data.  So we had numerous

5   computers because Backpage had a lot of data.                                    01:53:24

6   Q.   Can you explain -- when you say it had a lot of data, what

7   do you mean by that?

8   A.   It had the text of the ads and the images along with the

9   software to run the site.

10  Q.   And I believe a few moments ago in your testimony you said  01:53:46

11  that Backpage had a presence in other cities other than

12  Phoenix?

13  A.   Yes.

14  Q.   And would there be ads posted in each one of those markets

15  or cities?                                                                       01:54:01

16  A.   I'm not sure I understand the question.

17  Q.   Would people post ads in a given city?

18  A.   Yes, they would go online to post ads in a given city.

19  Q.   All right.  And approximately at Backpage, between 2004

20  and 2018, can you estimate how many postings there were on any  01:54:24

21  given day in certain city?

22  A.   Well, tens of thousands of postings in some markets but

23  certainly thousands of postings per day.

24  Q.   All right.  And is it those postings that would be

25  somewhere retained or would find themselves to these servers    01:54:48

United States District Court

CARL FERRER - Direct

1   that you just described?                                            01:54:54

2   A.   Yes.

3   Q.   And the post -- I believe your testimony was the postings

4   made up of images and texts?

5   A.   That's right, the texts of the ads and the images of the      01:55:05

6   ads, later video.

7   Q.   And where were the servers that maintained those -- that

8   data as you say, where were those servers located?

9   A.   So we had multiple server locations but the vast majority

10  of time they were in Tucson, Arizona at a data center called       01:55:30

11  Login.  That's also where our backups were stored.

12  Q.   And were those -- did you have servers anywhere else?

13  A.   We did.  We also had servers at a Phoenix location called

14  PNAP, and we had servers in Dallas, Texas, holding data.  And,

15  finally we had servers in Amsterdam, the Netherlands.              01:56:04

16  Q.   Okay.  Now, I believe your testimony was that in the

17  female escort category, people would pay to post an ad or at

18  least that was one of the few categories where you would

19  actually pay to post an ad.  Is that fair?

20  A.   Yes.                                                          01:56:33

21            MS. BERTRAND:  Objection.  Leading.

22            THE COURT:  Overruled.

23  BY MR. RAPP:

24  Q.   So when somebody would post an ad and pay for it, how

25  would Backpage get paid?  Can you explain that to the jury?        01:56:45

United States District Court

CARL FERRER - Direct

1    A.   Yes.   The process is someone is online.   They put in their      01:56:48

2    ad text, their images, some personally identifiable information

3    like an email address.   They hit "submit" and then a credit

4    card form would pop up onto the screen.   There they can enter

5    their credit card number, their address, their name, CVV, which    01:57:11

6    is like a security code.

7    Q.   That little three-digit code on the back of your credit

8    card?

9    A.   Yes.   Then they hit "submit" and if the credit card works,

10   then the ad will be stored on Backpage's server.                    01:57:29

11   Q.   All right.   And then how is it that them using the credit

12   card, how is it that ultimately the charge on the credit card

13   ends up back at Backpage.com?

14   A.   Yes.   So now that the transaction has been captured by

15   what we call a credit card processor, they will gather the          01:57:54

16   money and then periodically send it to -- to Backpage.com's

17   bank accounts, so it's usually once every two weeks or once a

18   month.

19   Q.   Okay.   So can you explain the difference to the jury

20   between a merchant bank and a treasury bank?                         01:58:24

21   A.   So when you secure credit card processing for any commerce

22   site, we call that merchant banking, trying to find a processor

23   who will use a bank in order for you to take MasterCard and

24   VISA.

25   Q.   All right.   Let me stop you there for the merchant            01:58:50

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | banking.  For a website like Backpage.com, is the merchant | 01:58:52 |
| 2 | banking, is that an important part of the business model? | |
| 3 | A.    Without merchant banking, you're dead.  I mean, just about | |
| 4 | everyone wants to pay with a credit card.  It's very difficult | |
| 5 | to conduct e-commerce without a merchant bank account. | 01:59:15 |
| 6 | Q.    And did you just say e-commerce? | |
| 7 | A.    Yes. | |
| 8 | Q.    And e-commerce, what does that mean? | |
| 9 | A.    It means buying stuff online. | |
| 10 | Q.    All right.  And then what is the import of treasury | 01:59:28 |
| 11 | banking for Backpage.com?  What's treasury banking? | |
| 12 | A.    A treasury bank is where you make your payroll, pay your | |
| 13 | bills.  It's also the bank where the merchant bank will deposit | |
| 14 | the funds that they have collected from Backpage users.  They | |
| 15 | will deposit it into a treasury bank. | 01:59:59 |
| 16 | Q.    All right.  Can you tell the jury what treasury banks, if | |
| 17 | any, Backpage had at its very start and going forward? | |
| 18 | A.    I recall -- well, for treasury banks, I know that they had | |
| 19 | BMO, the company had -- | |
| 20 | Q.    Is there a BMO branch that was used by Backpage here in | 02:00:24 |
| 21 | the Phoenix area? | |
| 22 | A.    Yes.  I believe they also had U.S. Bank.  They certainly | |
| 23 | had U.S. Bank for a merchant bank but I'm not sure if it was a | |
| 24 | treasury bank, too. | |
| 25 | Q.    All right.  But for the merchant bank, the processing part | 02:00:40 |

CARL FERRER - Direct

1  of it?                                                                    02:00:44

2  A.   We initially used U.S. Bank.

3  Q.   And was there a particular company that processed the

4  Backpage transactions?

5  A.   I became more deeply involved in the transactions when we   02:00:57

6  used Litle.   It's like little but only with one T, so

7  L-I-T-L-E.

8  Q.   And just so the jury understands, what was Litle?

9  A.   Litle a credit card processor who would help us secure

10 credit card processing.                                                   02:01:27

11 Q.   My last question on this banking part, when you would post

12 an ad in the Female Escort section of Backpage.com, how much

13 would it cost to support an ad?

14 A.   Generally $5, sometimes less.   Smaller markets, $1, $3.

15 Q.   Did that change over time?                                          02:01:55

16 A.   It did.   As Backpage became more of a monopoly in the

17 prostitution category, prices went up.

18 Q.   Just to be clear, did you have other categories on

19 Backpage.com?

20 A.   We did.                                                              02:02:14

21 Q.   For example, if you wanted to sell a couch, did you have a

22 category?

23 A.   We had the category Furniture for Sale.

24 Q.   If I wanted to post an ad in the furnishings or the

25 furniture category, how much would that cost?                            02:02:31

United States District Court

CARL FERRER - Direct

1   A.   It was free.  With the rare exception that somebody might          02:02:35
2   choose to buy a print ad in the newspaper, but that doesn't
3   happen much; and they could buy a sponsor ad, but it was always
4   little or no revenue coming from those categories.
5   Q.   All right.  Let's go back to the creation of Backpage.com.        02:02:52
6   Whose idea was it to create Backpage.com?
7   A.   I believe it was both Jim Larkin and myself, but I
8   definitely had a pretty strong lead in it.  Jim Larkin had sent
9   me to San Francisco.  And I ended up finding out in San
10  Francisco just how strong Craigslist was.  I then had meetings   02:03:26
11  with Larkin where we made the determination that I should take
12  that project on.
13  Q.   And just to be clear here, Mr. Larkin and Mr. Lacey, I
14  believe you testified they were involved in a newspaper here in
15  the Phoenix area called "The New Times"?                          02:03:49
16  A.   Can.
17  Q.   Can you tell the jury what "The New Times" is?
18  A.   The "Phoenix New Times" is an alternative weekly.  It has
19  long-form journalism, had a substantial classified section in
20  the back of the book with a lot of adult massage ads.            02:04:09
21  Q.   All right.  Is that the only newspaper that Mr. Lacey and
22  Mr. Larkin owned?
23  A.   No.  There's -- there were at least ten more.
24  Q.   And were they very similar to what you've just described,
25  "New Times"?                                                      02:04:33

CARL FERRER - Direct

1   A.   Yes.                                                              02:04:34

2   Q.   And were they in other cities?

3   A.   Yes.  In fact, those would be the cities that we would

4   later launch in Backpage.

5   Q.   Is there a reason why you launched Backpage in the cities       02:04:46

6   where Mr. Lacey and Mr. Larkin had a -- I think what you called

7   an alternative newspaper?  Is there a reason why that was done,

8   if you know?

9   A.   When we launched in these cities because we wanted to stop

10  the hemorrhaging of revenue, the loss of revenue from the           02:05:05

11  Internet and sites like Craigslist.

12  Q.   All right.  And then going back to 2004, which you've

13  testified was the year that Backpage was created, do you

14  know -- in your capacity as a classified salesperson in that

15  area, do you know how the alternatives were doing in terms of       02:05:27

16  generating revenue?

17            MR. FEDER:  Hearsay.

18            THE COURT:  Yes, he can answer if he knows.  He can

19  answer "Yes" or "No."

20            THE WITNESS:  Yes.  I'm very familiar with it.            02:05:47

21  BY MR. RAPP:

22  Q.   Why are you familiar with it?

23  A.   Well, I was -- I was -- I moved to Phoenix to be on the

24  corporate staff so I was aware that revenue generated by

25  Backpage.  And I understood how much the papers relied on the       02:06:04

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | profitability of the classified sections and it was getting | 02:06:10 |
| 2 | more and more difficult as sites like Craigslist became | |
| 3 | stronger.  So less of the papers -- the rest of the papers were | |
| 4 | getting smaller.  They were losing page count. | |
| 5 | Q.   All right.  And so when you say these were alternative | 02:06:26 |
| 6 | newspapers, are these newspapers that I would go -- somebody | |
| 7 | would deliver to my house and then I would pay them on a | |
| 8 | monthly basis or I would go to a machine and put in money, | |
| 9 | these things we used to use called coins, and get the | |
| 10 | newspaper?  How would they -- how would "The New Times," for | 02:06:49 |
| 11 | example, make money? | |
| 12 | A.   Entirely from advertising.  The papers are distributed | |
| 13 | free.  They are on racks at grocery stores, restaurants, and | |
| 14 | racks around the city. | |
| 15 | Q.   And so for them to make money, am I to understand your | 02:07:13 |
| 16 | testimony to be that they relied upon advertisements solely? | |
| 17 | A.   Yes.  Well, I should correct that testimony.  There was | |
| 18 | some event marketing going on that they would make money from, | |
| 19 | some sponsorships of events, but the vast majority of the money | |
| 20 | really depended on the number of pages in the newspaper and how | 02:07:37 |
| 21 | many ads were sold. | |
| 22 | Q.   So can you tell the jury what was the reason that | |
| 23 | Backpage.com was started? | |
| 24 | A.   It was started to directly compete with Craigslist that | |
| 25 | was eroding into the revenue of our newspapers. | 02:08:00 |

CARL FERRER - Direct

1   Q.   All right.  And when you started Backpage.com, did you          02:08:09

2   implement any strategies that would allow Backpage.com to be

3   competitive with Craigslist?

4   A.   Yes.

5   Q.   All right.  What was one of the strategies that you and          02:08:28

6   others implemented to try to compete with Craigslist?

7   A.   Well, the first strategy is we need to generate revenue

8   ourself, so we're going to charge for adult ads and go free

9   everywhere else.  And in some markets Craig was charging for

10  employment ads.  So we thought, well, we'll be free but we'll       02:08:58

11  always charge for categories like Female Escorts.

12  Q.   All right.  And did you find at the very inception of

13  Backpage that you were making any money from the Female Escort

14  category?

15  A.   Yes.  It was the only money, virtually.                         02:09:18

16  Q.   All right.  In addition to charging, did you implement any

17  other strategy that would allow you to grow the website?

18  A.   We did.  We started a process called content aggregation

19  which was internal code for stealing ads from Craigslist.

20  Q.   All right.  And so what types of ads did you steal from         02:09:48

21  Craigslist?

22  A.   We tried to take some job ads, rental ads.  But the ones

23  that really worked, the ones that stayed on the site, were the

24  ads that Craigslist had under their Erotic Services category.

25  Q.   And when you say "steal the ads," can you just sort of --       02:10:14

United States District Court

CARL FERRER - Direct

| 1 | in some detail explain how you went about actually stealing an | 02:10:19 |
| 2 | ad? |
| 3 | A.   We had staff hired to go to Craigslist, find an ad in |
| 4 | Phoenix, for example, and then take the ad from Craigslist and |
| 5 | just repost it on Backpage, take the images on Craigslist and | 02:10:35 |
| 6 | then just repost it on Backpage.  So we had to do this because |
| 7 | we had little or no content to start, so getting content online |
| 8 | was the first step. |
| 9 | Q.   All right.  But by stealing the ad, how would that wind up |
| 10 | generating revenue for you? | 02:11:01 |
| 11 | A.   Users or customers of those ads might respond to those ads |
| 12 | and then those users would then, in turn, or I should say |
| 13 | people would notice our ads on Backpage and maybe they will |
| 14 | start paying us. |
| 15 | MR. RAPP:  Madam Clerk, could I have the podium | 02:11:26 |
| 16 | please. |
| 17 | BY MR. RAPP: |
| 18 | Q.   So on your screen there, sir, is what's been marked as |
| 19 | United States 2030.  Do you see that there? |
| 20 | A.   Yes, I do. | 02:11:50 |
| 21 | Q.   And have you seen this demonstrative exhibit in |
| 22 | preparation for your testimony? |
| 23 | A.   I have. |
| 24 | Q.   And what does it basically demonstrate? |
| 25 | A.   This -- this slide as it is right now shows that users | 02:12:02 |

United States District Court

CARL FERRER - Direct

1    posting on Craigslist.                                              02:12:08

2    Q.   Let me just stop you for a minute.  Does this slide

3    demonstrate this process of aggregation?

4    A.   Yes.

5         MR. RAPP:  I would move to admit for demonstrative          02:12:18

6    purposes only United States 2030.

7         THE COURT:  It may be admitted.

8         (Exhibit Number 2030 was admitted into evidence.)

9    BY MR. RAPP:

10   Q.   All right.  And so you were about to explain -- before I    02:12:29

11   cut you off --

12        MR. RAPP:  Could that be published to the jury,

13   please?

14        THE COURT:  I'm sorry.  Mr. Rapp, what was that

15   exhibit number?                                                    02:12:40

16        MR. RAPP:  2030.

17        THE COURT:  Yes.  You may publish.

18   BY MR. RAPP:

19   Q.   And now we're talking about aggregation so can you explain

20   to the jury what they are seeing in this first slide?             02:12:57

21        THE COURT:  Let me just make sure all of the jurors,

22   your monitors are working and you can see the slide?

23        Okay.  Thank you.

24        MR. RAPP:  That is somewhat important.

25   \\\

United States District Court

CARL FERRER - Direct

BY MR. RAPP:                                                          02:13:10

Q.   So in this first slide, what does that show?

A.   It shows a consumer posting an ad on Craigslist.  That's

step one.

Q.   And then going to step two, what does that show?           02:13:27

A.   It shows a Backpage employee copying the ad content, which

is the text of the ad and the images, and posting it on

Backpage.

Q.   And then step three, what does that show?

A.   If we're able to find the email address of the user, we're  02:13:54

going to post the ad in their email address and then we're

going to send them another email with an ad repost offer.

Q.   All right.  And then showing you step four, what does that

demonstrate?

A.   If the user clicks a link in the email message that we've   02:14:18

sent them, we've now captured them as a user because now they

will be able to edit their ad through that link.

Q.   All right.  Once you did this, was at some point the

expectation that they would be a paying client or customer of

Backpage?                                                        02:14:48

A.   Yes.

Q.   And did you implement this strategy in just Phoenix or

only one city?

A.   No.  We implemented it in every major metro market in the

U.S.                                                             02:15:08

United States District Court

CARL FERRER - Direct

1  Q.   All right.  And who was basically in charge of this        02:15:14

2  strategy within Backpage?

3  A.   Well, of course me but Andrew Padilla supervised some of

4  our marketing activities in Phoenix and then Dan Hyer took it

5  over in Dallas and did it in an even larger scale.              02:15:36

6  Q.   All right.  Who directed you on the strategy, if anyone

7  did?

8  A.   So this strategy is something that we had management

9  meetings with Scott Spear.  Because we needed to hire staff, we

10 would have to get approval from Jed Brunst and put these kind   02:16:01

11 of things in the budget.  So we had a major marketing budget.

12 We spent more on marketing than we did moderation.

13 Q.   All right.  Did aggregation, the stealing of ads from

14 Craigslist -- was Craigslist the only classified website that

15 you stole ads from?                                             02:16:29

16 A.   No.  There were others.  We often would go through The

17 Erotic Review to find leaks.

18 Q.   Okay.  Let's come back to that.  Did aggregation remain as

19 a strategy from 2004 to 2018?

20 A.   Let me think about that.  From 2004 to 2018 we didn't need 02:16:56

21 to add content as much once Craigslist dropped the Adult

22 section, so we were sort of becoming the monopoly.  So I would

23 say that around 2010 it wasn't necessary.

24 Q.   All right.  Did you come to learn that some people were

25 stealing ads from Backpage?                                     02:17:23

United States District Court

CARL FERRER - Direct

A.   Yes.  And we weren't happy about it but, you know, we had      02:17:26
started our own business by stealing ads from Craigslist.

Q.   All right.  So at the outset of your testimony, and just a
few seconds ago, you referenced The Erotic Review.  How -- if
it did, how did The Erotic Review -- well, strike that.          02:17:47

        Was The Erotic Review also a strategy that was
implemented by Backpage to grow the site?

A.   It was.  It was the secret sauce.

Q.   All right.  When you say "secret sauce," what do you mean
by that?                                                         02:18:08

A.   You could steal content from Craigslist and put it on a
website; but if no one responds to those ads, you're not going
to turn them into paying customers.  So by having a
relationship with The Erotic Review, we could make those ads
that we stole from Craigslist, we could make their phone        02:18:27
numbers ring.

Q.   All right.  And who were you with -- this relationship
with The Erotic Review, who were you trying to attract to
Backpage.com as users or customers?

A.   We wanted those that would respond to prostitutes, the     02:18:51
Johns.

Q.   Okay.  And did you just come to learn about the existence
of The Erotic Review upon the creation of Backpage?

A.   No.  I was familiar with The Erotic Review.  They had run
ads in our Adult sections of our papers.                        02:19:17

United States District Court

CARL FERRER - Direct

| | |
|---|---|
| 1 | Q.   All right.  When you say it was a prostitution review | 02:19:21 |
| 2 | site, if you went to The Erotic Review, what would you expect | |
| 3 | to see on that site? | |
| 4 | A.   The price of the services and a description of the sexual | |
| 5 | services along with a description of the escort or, as they | 02:19:48 |
| 6 | called it on The Erotic Review, the provider. | |
| 7 | Q.   So did there come a point where you developed a | |
| 8 | relationship, a business relationship, with The Erotic Review? | |
| 9 | A.   Yes. | |
| 10 | Q.   And can you tell the jury how that relationship worked? | 02:20:17 |
| 11 | A.   The relationship worked in that The Erotic Review didn't | |
| 12 | have pictures on their site so they had a URL called an ad URL | |
| 13 | which is an ad website. | |
| 14 | Q.   All right.  Wait a minute. | |
| 15 | A.   The Web address. | 02:20:43 |
| 16 | Q.   Hang on.  What's a URL in layman's terms, plain English? | |
| 17 | A.   It's uniform resource locator, I believe, but it's really | |
| 18 | just a word for a long Web address that will take you to the | |
| 19 | specific page. | |
| 20 | Q.   All right.  And so you were telling the jury how this | 02:21:03 |
| 21 | relationship was established? | |
| 22 | A.   Essentially we're going to exchange links.  The Erotic | |
| 23 | Review is going to put a link for Backpage that's going to | |
| 24 | point exactly to a Backpage ad and female escorts so that Johns | |
| 25 | on The Erotic Review, when they click that link, will arrive on | 02:21:22 |

CARL FERRER - Direct

1  Backpage.                                                    02:21:26

2           And Backpage will do the exact same thing with the

3  ads that are on Backpage.  We will add a link to The Erotic

4  Review for that particular prostitute that when you click, you

5  will go directly to the review on The Erotic Review.  So in a   02:21:42

6  way, Backpage could have prostitution reviews by just having

7  links.

8  Q.   All right.  And similar to aggregation, in preparation for

9  your testimony today, have you reviewed an exhibit that

10 demonstrates visually this relationship between Backpage and    02:22:02

11 The Erotic Review?

12 A.   I have.

13 Q.   And I'm showing you United States 2031 for demonstrative

14 purposes only and so -- and I would request permission -- so is

15 this 2031, is this the demonstrative exhibit that you reviewed   02:22:26

16 that demonstrates how visually this relationship worked?

17 A.   Yes, it does.

18           MR. RAPP:  Move to publish United States 2031.

19           THE COURT:  It may be published.

20           You're not moving for admission?                    02:22:54

21           MR. RAPP:  I'm moving for --

22           THE COURT:  It may be admitted for demonstrative

23 purposes, yes.

24           MR. RAPP:  Thank you.

25           (Exhibit Number 2031 was admitted into evidence.)    02:23:01

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | BY MR. RAPP: | 02:23:04 |

Q.   All right.  Can you explain to the jury what this first page demonstrates or shows?

A.   So this -- so on this page, you'll see that The Erotic Review has a link that on The Erotic Review prostitution review page for a particular prostitutes they have a link to an ad that's on Craigslist.

Q.   All right.  And then looking at the next page, what does this show?

A.   This shows the step where Backpage steals the ad from Craigslist or aggregates it.  We have a little vacuum here. That's, essentially, what we would do on Craigslist, just a team of people taking the ads from Craigslist.

Q.   All right.  And then let's look at the next slide of 2031. Page three, what does this show?

A.   So in this slide, we are now sending that ad that we took, we're sending the Web address to The Erotic Review and we want them to put the Backpage web address on the prostitute's review page.

Q.   All right.  Then let's look at the next slide.  Does this slide demonstrate the link being placed on Backpage?

A.   It does.  What it shows is that the user, the John that's on The Erotic Review, will click that link and then they will arrive on Backpage.com and that's what we call in the business a referral.

02:23:22

02:23:47

02:24:11

02:24:42

02:25:10

CARL FERRER - Direct

1   Q.   All right.  And so in business is referral or what is            02:25:10

2   known as referral traffic, is that important in any respect to

3   the development of a website?

4   A.   It's really -- it's used by Google to identify what kind

5   of website you are based on who is linking to you.                    02:25:32

6   Q.   All right.  And did it become important within Backpage to

7   track this -- the referrals or referral traffic to Backpage?

8   A.   Extremely important.  We identified the traffic coming

9   from The Erotic Review.  We generated reports and shared those

10  reports with my superiors.                                            02:26:03

11  Q.   And your superiors being?

12  A.   Scott Spear, Jim Larkin, Jed Brunst.

13  Q.   A few more questions about The Erotic Review.  Is there

14  any point in time where money changed hands between The Erotic

15  Review and Backpage for this relationship?                            02:26:28

16  A.   Yes.

17  Q.   Tell us about that.

18  A.   This program was so successful and our budgets to increase

19  revenue were very aggressive.  We knew if we could double down

20  with a relationship with The Erotic Review that we would hit          02:26:52

21  our budgets in terms of revenue and ad count and page views.

22          So we offered the CEO of The Erotic Review $4,000 a

23  month and did a banner ad exchange program with them with the

24  hopes that he would send us a lot more referrals.

25  Q.   All right.  And when you say "banner ad exchange," can you       02:27:17

CARL FERRER - Direct

1   just explain that for the jury?                                              02:27:21

2   A.   A banner ads are, like, pictures, graphic ads, not text,

3   and we had a banner ad on The Erotic Review; and in exchange,

4   we gave The Erotic Review a sponsor ad on our page.  So

5   essentially we reciprocated the banner ads but we still paid    02:27:47

6   them $4,000 a month.

7   Q.   All right.  Let me see if I can ask some questions that

8   explain this.  Are you saying that if you went during this time

9   period -- can you give the jury, just so they have an

10  orientation, what is the time period that you started this      02:28:12

11  relationship with The Erotic Review?

12  A.   Early on.  We knew The Erotic Review was important as

13  early as 2006.  We wanted to keep the referral traffic growing

14  so we certainly -- in this time frame is 2007, 2008, 2009.

15  Q.   All right.  And so if you went on -- during that time       02:28:40

16  frame, if you went on The Erotic Review, is it your testimony

17  that you would see an ad for Backpage on The Erotic Review?

18  A.   You would.  You would see it on the home page of The

19  Erotic Review and you would see it on the individual reviews.

20  It would say "Sponsored By" and then a Backpage logo and then    02:29:05

21  Find Escorts Here.

22  Q.   All right.  So it would say Backpage.com, Find Escorts

23  Here?

24  A.   Yes.

25  Q.   And the hope was by seeing that ad, people looking at The    02:29:20

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Erotic Review would go to Backpage.com? | 02:29:25 |
| 2 | A.   That's what happened. | |
| 3 | Q.   All right. | |
| 4 |         THE COURT:  Mr. Rapp I'm going to suggest that we | |
| 5 | take our afternoon break at this time. | 02:29:35 |
| 6 |         MR. RAPP:  Certainly. | |
| 7 |         THE COURT:  Why don't we stand in a 20-minute recess. | |
| 8 |         And I'll just remind the jurors of an admonishment. | |
| 9 | When you're at recess, again, do not come to any conclusions, | |
| 10 | do not discuss the case amongst yourselves or anyone else. | 02:29:48 |
| 11 | Just simply try to enjoy your break and don't go far and we'll | |
| 12 | resume in 20 minutes. | |
| 13 |         Please all rise for the jury. | |
| 14 |         (Jury departs at 2:30.) | |
| 15 |         THE COURT:  All right.  Thank you. | 02:30:29 |
| 16 |         (Recess at 2:30; resumed at 2:51.) | |
| 17 |         (Court was called to order by the courtroom deputy.) | |
| 18 |         THE COURT:  All right.  Please be seated. | |
| 19 |         Let's bring in the jury. | |
| 20 |         (Jury enters at 2:53.) | 02:53:22 |
| 21 |         THE COURT:  All right.  Please be seated. | |
| 22 |         Mr. Rapp, you may continue. | |
| 23 |         MR. RAPP:  Thank you, Your Honor. | |
| 24 | BY MR. RAPP: | |
| 25 | Q.   Mr. Ferrer, when we left, when we left for break we were | 02:54:17 |

United States District Court

CARL FERRER - Direct

1  talking about ads that Backpage had put on The Erotic Review.     02:54:20

2  Do you remember that?

3  A.    Yes.   Links.   Links to ads.   Sorry.

4  Q.    Links to ads?

5  A.    Yes.   Oh.   No, I'm sorry.   The banner ads.     02:54:37

6  Q.    I was talking more about the banner ads.   In the same

7  respect, did you have advertisements for The Erotic Review on

8  Backpage?

9  A.    Yes, we did.

10 Q.    Just to distinguish that from the link -- I'm talking     02:54:58

11 about an ad that says something to the effect of we're The

12 Erotic Review.   Here's what we are.   That type an ad?

13 A.    Yes.   We had that.

14 Q.    And did you coordinate having those ads on Backpage.com

15 for The Erotic Review, did you coordinate that with some point     02:55:15

16 of contact at The Erotic Review?

17 A.    Yes, I did.   Mr. David Elms.

18 Q.    And was David Elms the person that you coordinated this

19 relationship with at The Erotic Review?

20 A.    Yes.   He was the CEO of The Erotic Review.     02:55:33

21 Q.    And as this relationship started with The Erotic Review,

22 did you have occasion to actually go on The Erotic Review and

23 look at reviews of prostitutes?

24 A.    Yes.

25 Q.    And what was the purpose of you doing that?     02:55:56

United States District Court

CARL FERRER - Direct

A.   I wanted to understand the market and I was tasked with    02:55:57

growing the Female Escorts category and they used The Erotic

Review, very valuable.

Q.   Did you ever see a review on The Erotic Review that was

for something other than a paid-for sexual encounter?    02:56:15

          MS. BERTRAND:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  No.

BY MR. RAPP:

Q.   How long did this relationship, in one form or another,    02:56:33

exist between Backpage and The Erotic Review?

A.   It certainly started as 2006, 2007 and then I believe

that -- it sort of -- we had a relationship with The Erotic

Review right up until the site's closing down in 2018 because

we continued to allow the review IDs on the ads.    02:57:05

Q.   All right.  So just to be clear, we looked at this

demonstrative exhibit which talked in terms of a link.  Did

there come a time where you no longer included the actual URL

links in a Backpage posting?

A.   Yes.    02:57:30

Q.   All right.  When did that occur?  Approximately?

A.   Approximately 2011 or 2012 I believe.  It's after we just

got so much pressure from outside groups to remove the link to

The Erotic Review.

Q.   I think you have talked in terms of a --    02:57:59

United States District Court

CARL FERRER - Direct

1        THE COURT:  Mr. Rapp, I'm going to ask you to move

2  closer to the microphone, please.                        02:58:02

3        MR. RAPP:  Yes, ma'am.

4  BY MR. RAPP:

5  Q.   I think you talked in terms of an identification number in   02:58:07

6  addition to the link.  Can you tell us about that?

7  A.   So we had links in the ads and then users would often just

8  cite the review ID.  They would say, "Check out my reviews,"

9  and then put in a number.  And Johns who used our site knew

10  that that is The Erotic Review ID number.                 02:58:37

11  Q.   All right.  And so did those ID numbers, even after you

12  removed the actual links being embedded in an ad or a posting,

13  did those ID numbers continue to remain in one form or another

14  in the postings until the site's closure in 2018?

15  A.   They remained on the site at least through 2017.  There   02:59:10

16  was a period of time, maybe a month or two before Backpage's

17  closure, that we just had phone numbers and photographs.  But

18  almost the entire life of the site, review IDs were in the

19  Female Escort ad pages, not all of them but a lot of them.

20  Q.   All right.  And I believe your testimony has been that the   02:59:38

21  referral traffic that was generated by The Erotic Review to

22  Backpage was important?

23  A.   It was the secret sauce.  It was one of the reasons why

24  Backpage became the default choice when Craigslist terminated

25  its Erotic Services and Adult Services section.           03:00:04

United States District Court

CARL FERRER - Direct

1  Q.   Was the importance of that referral traffic from The         03:00:07

2  Erotic Review, was it discussed with anybody above you in

3  management or ownership?

4  A.   Yes.

5  Q.   Who was that?                                                 03:00:25

6  A.   Scott Spear and then in budget meetings with Jed Brunst

7  and Jim Larkin.

8  Q.   Now, in addition to the aggregation and the reciprocal

9  link relationship, were there any other strategies that you

10 pursued early on in the development of Backpage that expanded   03:00:46

11 the site?

12 A.   Yes.  We started to cater to super posters, especially

13 since we were focused on growing the market in New York City.

14 Q.   And when you say "super poster," can you explain to the

15 jury what you consider to be a super poster?                    03:01:15

16 A.   So a super poster for Backpage would post thousands of ads

17 whereas your average user might just post one or two ads.

18 Super posters, they had thousands of prostitution ads that they

19 could bring to the site.

20 Q.   How did you first establish a relationship, a business     03:01:44

21 relationship, with a super poster?

22 A.   When the company purchased "The Village Voice", Jim Larkin

23 and Scott Spear sent me to New York City to develop a strategy

24 to make Backpage successful.  And early on we identified

25 reaching out to those posters who were already posting           03:02:07

United States District Court

CARL FERRER - Direct

| | |
|---|---|
| 1 | prostitution ads in the paper.  And so there were two of them | 03:02:12 |
| 2 | that come to mind that we immediately -- I went to see. |
| 3 | Q.   All right.  And so when you say you went to see, you |
| 4 | actually met with them in person? |
| 5 | MR. FEDER:  Objection.  404(b). | 03:02:31 |
| 6 | THE COURT:  Overruled. |
| 7 | THE WITNESS:  Yes. |
| 8 | BY MR. RAPP: |
| 9 | Q.   All right.  And when you -- where did you meet with them |
| 10 | in person? | 03:02:40 |
| 11 | A.   So there was a company called Somad and I was taken by the |
| 12 | classified director of "The Village Voice" to go meet with |
| 13 | Somad with the goal of having them post ads on Backpage. |
| 14 | Q.   And when you say you met with some other employee of "The |
| 15 | Village Voice," is this based in New York? | 03:03:10 |
| 16 | A.   Yes. |
| 17 | Q.   And who directed you, if anyone, to meet with this person |
| 18 | that ultimately introduced you to this super poster that you |
| 19 | have called Somad? |
| 20 | A.   So this strategy of growing New York to meet the | 03:03:33 |
| 21 | advertisers that are in print and get them to also post online, |
| 22 | that was a strategy from Larkin and Spear.  I should say Jim |
| 23 | Larkin and Scott Spear. |
| 24 | Q.   So who was the person that you met with from "The Village |
| 25 | Voice" and then ultimately met with Somad? | 03:03:57 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.    Her name is Angie Alexander. | 03:04:01 |

A.    Her name is Angie Alexander.

Q.    And did Ms. Alexander take you to someplace to meet with Somad?

A.    Yes.  We went to the Somad office during business hours when they had numerous customers.

Q.    Okay.  And what, if anything, did you observe at that office that -- with Ms. Alexander when you went to meet with Somad?  What did you observe?

A.    I observed that these customers were the perfect customers to post in the Female Escort section of Backpage.

Q.    And why do you say that, sir?

A.    They appeared to be in the prostitution industry.

            MR. EISENBERG:  Objection.  Foundation.

            THE COURT:  Sustained.

            MR. RAPP:  Okay.  Well, let's see if we can address those concerns.

BY MR. RAPP:

Q.    What did you observe?  What about them made you think that they were in the prostitution industry?

            MR. CAMBRIA:  Think?

            THE WITNESS:  Well, they were there to post ads in Craigslist Erotic Services.

BY MR. RAPP:

Q.    All right.

A.    They appeared to be dressed in a manner that was

03:04:12

03:04:31

03:04:45

03:04:54

03:05:05

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | provocative. | 03:05:09 |
| 2 | Q.   Were they dressed in a way that was consistent with -- | |
| 3 | MR. EISENBERG:  Objection.  Leading. | |
| 4 | MR. RAPP:  I haven't even finished the question. | |
| 5 | THE COURT:  Let him finish the question. | 03:05:20 |
| 6 | BY MR. RAPP: | |
| 7 | Q.   Were they dressed in a way that was consistent with | |
| 8 | postings on Backpage.com? | |
| 9 | MR. EISENBERG:  Objection -- | |
| 10 | MS. BERTRAND:  Join. | 03:05:30 |
| 11 | MR. EISENBERG:  -- foundation. | |
| 12 | THE COURT:  Overruled. | |
| 13 | He can answer the question. | |
| 14 | THE WITNESS:  Yes. | |
| 15 | BY MR. RAPP: | 03:05:37 |
| 16 | Q.   All right.  Now Somad was one super poster you've | |
| 17 | identified.  Can you identify other -- if there were others, | |
| 18 | super posters that were cultivated by Backpage.com? | |
| 19 | A.   Yes.  I later had a meeting with Dollar Bill, known -- | |
| 20 | that's how he's known but his real name, I believe, is William | 03:05:57 |
| 21 | Mersey. | |
| 22 | Q.   William Mersey.  Okay.  And what -- what role, if any, did | |
| 23 | this person you've identified as Dollar Bill, what role, if | |
| 24 | any, did he have as a super poster with Backpage.com? | |
| 25 | A.   Dollar Bill competed with Somad but he was more in the | 03:06:24 |

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Asian massage parlor niche.  And he posted thousands of ads on | 03:06:27 |
| 2 | Craigslist in Erotic Services, so we wanted him to begin | |
| 3 | posting on Backpage, "we" meaning -- well, I did. | |
| 4 | Q.   All right.  When you say Asian massage parlor, how do you | |
| 5 | know that that involves prostitution? | 03:06:46 |
| 6 | A.   Well, if you went to Dollar Bill's blog, the Psycho | |
| 7 | Roundup, he talks about his advertisers, provides reviews. | |
| 8 | MS. BERTRAND:  Objection, Your Honor.  Hearsay. | |
| 9 | THE COURT:  Overruled. | |
| 10 | THE WITNESS:  And we would even later let Dollar Bill | 03:07:12 |
| 11 | advertise that blog. | |
| 12 | BY MR. RAPP: | |
| 13 | Q.   On Backpage.com? | |
| 14 | A.   On Backpage.  And very descriptive of sexual services. | |
| 15 | Q.   Did you also exchange emails with Dollar Bill during the | 03:07:25 |
| 16 | life of his relationship with Backpage.com as a super poster? | |
| 17 | A.   Yes. | |
| 18 | Q.   And have you look at those emails in preparation for your | |
| 19 | testimony today -- | |
| 20 | A.   I have. | 03:07:42 |
| 21 | Q.   -- and tomorrow? | |
| 22 | So a super poster, I think your testimony was a super | |
| 23 | poster would post thousands of ads on Backpage.com? | |
| 24 | A.   That's correct. | |
| 25 | Q.   How would anybody make money off of this relationship? | 03:08:07 |

United States District Court

CARL FERRER - Direct

1    Can you explain that to the jury?                          03:08:11

2    A.   Somad and Dollar Bill would collect a fee for posting ads

3    on sites like Craigslist or Backpage and the goal is to keep

4    the ad near the top of the listings, so it requires some effort

5    on the part of Somad and Dollar Bill to continually move ads to   03:08:36

6    the top or repost or post new ads.  Because ads that are at the

7    top of the listings of Female Escorts, they generate the phone

8    calls whereas if ads go to page two or page three, the phone

9    calls fall off.

10   Q.   All right.  How do you know all of that?                03:09:01

11   A.   Well, just years -- I ran Backpage for many years and

12   competed with Craigslist for many, many years and we figured

13   out that move to the top was such a money-maker that we ran

14   reports and gave users the option to pay to move their ad to

15   the top and it was the vast majority of revenue.  People would   03:09:22

16   move their ad to the top sometimes twice a day.  We saw that in

17   users.

18          And I -- if they need to get phone calls, the

19   quickest way to do that is to move their ad to the top.

20   Q.   All right.  And did there come a time where -- did these   03:09:45

21   super posters receive, for lack of a better record, any type of

22   preferential treatment from Backpage.com?

23   A.   They had VIP treatment.  They were able to deal with

24   managers like myself or Dan Hyer.  We assigned personnel to

25   provide customer support to them and when incidents occurred   03:10:13

United States District Court

CARL FERRER - Direct

1    where ads were removed, they were given preferential treatment      03:10:18

2    in terms of advice on what's wrong with their postings and how

3    they need to change it or if we made a mistake, to restore all

4    of their ads.

5    Q.   All right.  Did there come a time in the life of            03:10:37

6    Backpage.com where the website began to face pressure to make

7    changes or even to close the website, to shutter the website?

8    A.   Yes.

9    Q.   When, approximately, did you learn that you were receiving

10   pressure from some outside entities to either change the          03:11:06

11   business model or to close the website?

12   A.   I believe in 2009 or 2010 we started to get letters from

13   the Attorneys General.

14   Q.   All right.  When you say letters from the Attorneys

15   General, what were they asking you to do?                         03:11:27

16            MR. CAMBRIA:  Object to the hearsay.

17            MS. BERTRAND:  Join.

18            THE COURT:  Sustained.

19   BY MR. RAPP:

20   Q.   Well, did you receive a letter from -- did you receive a      03:11:42

21   letter from an organization of Attorneys General?

22   A.   Yes.  We did.  In that letter they were calling for --

23            MS. BERTRAND:  Objection.

24            MR. CAMBRIA:  Not responsive.

25            MS. BERTRAND:  Move to strike.                           03:11:59

CARL FERRER - Direct

1        THE COURT:  Mr. Ferrer, when Mr. Rapp asks the                03:12:05

2   question, finish the question, don't offer anything more.  And

3   let him ask the question.

4            I'll sustain the objection.

5            Mr. Rapp, ask your next question.                          03:12:16

6   BY MR. RAPP:

7   Q.   Did they put you on notice that there were problems

8   with --

9            MR. KESSLER:  Object to the leading.

10           MS. BERTRAND:  Join.                                        03:12:23

11           MR. FEDER:  Judge, before we go on, I am assuming an

12   objection by one is an objection by all?

13           THE COURT:  Yes.

14           MR. FEDER:  Thank you.

15           THE COURT:  All right.  Restart your question, Mr.          03:12:36

16   Rapp.

17   BY MR. RAPP:

18   Q.   Did you receive a letter from the Attorneys General?

19   A.   Yes.

20   Q.   How did you receive that letter?                              03:12:43

21   A.   I believe it was sent to us by email, fax.  I certainly

22   received a copy of it.

23   Q.   All right.  Did you come to learn that other people within

24   Backpage.com also received a copy of it?

25   A.   Yes.  It was a huge development for the company.              03:12:59

CARL FERRER - Direct

```
 1  Q.   Okay.  Why do you say, in your words, it was a huge      03:13:03
 2  development?
 3             MR. KESSLER:  Objection, Judge.  It calls for
 4  hearsay.
 5             THE COURT:  Overruled.  As to his knowledge.        03:13:12
 6  BY MR. RAPP:
 7  Q.   What do you base your knowledge on that it was a huge
 8  development?
 9  A.   We watched Craigslist be attacked by the state Attorney
10  Generals and we were very concerned that we're next as a      03:13:30
11  company and that led to a lot of our moderation efforts in
12  terms of cleaning up some of the sex act pics.
13  Q.   So let's take a step back.  When you say "we," who are you
14  referring to as we?
15  A.   Jim Larkin, Scott Spear, certainly those two.            03:13:54
16  Q.   All right.  In addition to the Attorneys General, did you
17  also receive any direction from an organization by the name
18  that uses the acronym NCMEC?
19  A.   Yes.  We did.
20  Q.   And what, if any -- well, how did you receive notice by   03:14:14
21  NCMEC to make some changes to your --
22             MR. EISENBERG:  Objection.
23             THE COURT:  Sustained.
24             Rephrase the question.
25  \\\
```

United States District Court

CARL FERRER - Direct

BY MR. RAPP:                                                        03:14:30

Q.   Well, how did you receive notice?  Did you receive it by a

letter --

           MR. EISENBERG:  Objection as to the contents.

Notice.  I'm sorry, Your Honor.                                    03:14:38

           THE COURT:  How did you receive notice, Mr. Ferrer?

BY MR. RAPP:

Q.   How did you receive notice?

A.   Well, we hired an individual to represent the company in

its discussions with NCMEC, which is the National Center for      03:15:02

Missing and Exploited Children, and there were phone calls set

up between Jim Larkin and Ernie Allen of the National Center

for Missing and Exploited Children in which I was present on

those phone calls.

Q.   Okay.  And did you also meet in person with NCMEC?           03:15:20

A.   Yes, we did.

Q.   All right.  And during those meetings, did NCMEC notice

you of problems with your website?

           MR. KESSLER:  Objection.  Hearsay, and also

foundation.  Time.                                                 03:15:43

           THE COURT:  I think you can lay some foundation.

BY MR. RAPP:

Q.   Did you have a meeting with NCMEC?

A.   Yes, we did.

Q.   Did NCMEC ask to meet with you or did you ask to meet with   03:15:51

United States District Court

CARL FERRER - Direct

1   NCMEC?                                                                03:15:55

2   A.   I believe we asked to meet with NCMEC.

3   Q.   All right.  And during that meeting, did some

4   representative from NCMEC tell you that there were issues with

5   your website?                                                        03:16:13

6            MR. CAMBRIA:  Object to the hearsay.

7            MR. KESSLER:  As part of foundation, time.

8            MR. CAMBRIA:  And hearsay.

9            THE COURT:  And somebody is yelling, "Time."

10           MR. KESSLER:  This is Eric Kessler.                          03:16:32

11  BY MR. RAPP:

12  Q.   When was this meeting?

13  A.   I believe in 2010 or 2011.

14  Q.   All right.  And did a representative from the National

15  Center of Exploited and Missing Children, did they tell you          03:16:46

16  that there was prostitution on your website?

17           MS. BERTRAND:  Objection.

18           MR. KESSLER:  Objection, hearsay.

19           THE COURT:  Sustained.

20           MR. CAMBRIA:  Unbelievable.                                  03:16:56

21  BY MR. RAPP:

22  Q.   Did they notify you and give you notice that there was

23  prostitution --

24           MR. EISENBERG:  Objection.  Hearsay.

25           MS. BERTRAND:  Objection.                                    03:17:02

United States District Court

CARL FERRER - Direct

1      THE COURT:  Sustained.                                    03:17:04

2          MR. CAMBRIA:  And leading.

3  BY MR. RAPP:

4  Q.   Did you meet with an organization by the name of Polaris?

5  A.   Yes.                                                     03:17:11

6  Q.   Do you remember when that meeting took place?

7  A.   It was shortly after the meeting with National Center for

8  Missing and Exploited Children.

9  Q.   And do you know what type of organization Polaris is?

10 A.   Yes.  They are an anti-human trafficking organization.   03:17:27

11 Q.   And did you ask to meet with Polaris or did Polaris ask to

12 meet with you, if you know?

13 A.   I believe the company requested to meet with Polaris.

14 Q.   And during that meeting with Polaris, did they notice you

15 that there was prostitution --                                03:17:54

16         MR. EISENBERG:  Objection.

17         MS. BERTRAND:  Objection.

18 BY MR. RAPP:

19 Q.   -- on the website?

20         MR. EISENBERG:  Hearsay.                               03:18:00

21         MR. CAMBRIA:  And leading.

22         THE COURT:  Sustained.

23 BY MR. RAPP:

24 Q.   Well, let's go back to NCMEC.  Who was at the meeting at

25 NCMEC?                                                         03:18:20

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   At the meeting with NCMEC, I recall myself, Jim Larkin, | 03:18:21 |
| 2 | Michael Lacey and our user safety experts that we hired, a man | |
| 3 | that goes by the name Hemu Nigam and his assistant, Simrin | |
| 4 | Hooper I believe. | |
| 5 | Q.   And who from NCMEC was present, if you remember? | 03:18:49 |
| 6 | A.   There were half a dozen members from NCMEC present with | |
| 7 | their CEO, Ernie Allen. | |
| 8 | Q.   What did Ernie Allen tell you, the members that you've | |
| 9 | identified from Backpage -- | |
| 10 |        MS. BERTRAND:  Objection. | 03:19:18 |
| 11 |        MR. CAMBRIA:  Objection.  Hearsay. | |
| 12 | BY MR. RAPP: | |
| 13 | Q.   What did he tell you you should do with your website? | |
| 14 |        MS. BERTRAND:  Objection. | |
| 15 |        MR. CAMBRIA:  Objection.  Hearsay and leading. | 03:19:25 |
| 16 |        THE COURT:  Sustained. | |
| 17 | BY MR. RAPP: | |
| 18 | Q.   Did you meet with anybody else other than NCMEC and | |
| 19 | Polaris? | |
| 20 | A.   Yes. | 03:19:35 |
| 21 | Q.   All right.  And who else did you meet with? | |
| 22 | A.   We met with Mayor McGinn and the Chief of Police and his | |
| 23 | Chief of Staff. | |
| 24 | Q.   All right.  And did you receive correspondence from Mayor | |
| 25 | McGinn? | 03:20:01 |

CARL FERRER - Direct

1   A.    We did.   We received another letter.                           03:20:04

2   Q.    And in that letter did Mayor McGinn tell you --

3             MR. CAMBRIA:   Objection.   Hearsay.

4   BY MR. RAPP:

5   Q.    -- you should shut down your website?                           03:20:13

6             MS. BERTRAND:   Objection.

7             MR. CAMBRIA:   Objection.   Hearsay.   Rank hearsay.

8             MR. FEDER:   And leading.

9             MR. RAPP:   It's not offered for the truth.

10            MR. CAMBRIA:   Doesn't it?                                   03:20:24

11        Your Honor, that is disingenuous a statement by him.

12   That's rank hearsay.

13            THE COURT:   Mr. Cambria, let me rule.   I'm going to

14   sustain the objection.   Mr. Feder had an objection.   I heard

15   you say something.                                                   03:20:41

16            MR. RAPP:   Let me point out that there's two

17   attorneys.

18            MR. FEDER:   I want an objection for the entirety of

19   this line of questioning.   He is obviously trying to bring

20   out --                                                               03:20:58

21            THE COURT:   Mr. Feder, we're not going to have

22   sidebar conversation right now.   I can discuss your objection

23   when we end today.   You can put it on the record.

24        Let's continue forward, Mr. Rapp.

25   \\\

United States District Court

CARL FERRER - Direct

BY MR. RAPP:                                                       03:21:14

Q.   Did you -- did there come a time where certain media

outlets did stories on Backpage.com?

A.   Yes, quite often.

Q.   All right.  Can you identify the media outlets that did    03:21:30

stories on Backpage.com?

A.   Perhaps the one that was most impactful was --

          MR. CAMBRIA:  Your Honor, I object.  It's not

responsive.

          THE COURT:  Overruled.  I didn't hear his answer yet   03:21:45

so I don't know if it was nonresponsive, Mr. Cambria, because

you were speaking over him.

BY MR. RAPP:

Q.   I'll tell you what.  Why don't we break this down to

broadcast media versus print media?  Were there stories in      03:21:59

broadcast media, television, that was critical of Backpage?

A.   Yes.  There were.

Q.   And what broadcast medial outlets did exposés on Backpage?

          MR. EISENBERG:  Objection.  Leading.

          MS. BERTRAND:  Objection.  Misstates the testimony.   03:22:26

          THE COURT:  Overruled as to both.

          THE WITNESS:  CNN.

BY MR. RAPP:

Q.   All right.  And I believe you had actually answered this

but let's go back over it.  On the print media, who did stories 03:22:39

CARL FERRER - Direct

| | |
|---|---|
| 1 | on Backpage.com that were critical of the website? | 03:22:43 |
| 2 | MR. KESSLER:  Object to the form of the question. |
| 3 | THE COURT:  Sustained. |
| 4 | BY MR. RAPP: |
| 5 | Q.   Did anybody in print media write a story an Backpage.com? | 03:22:54 |
| 6 | A.   Yes.  The "New York Times". |
| 7 | Q.   Was there a particular writer at the "New York Times"? |
| 8 | A.   Nicholas Kristof, the columnist. |
| 9 | Q.   All right.  In addition, did you receive notice of stories |
| 10 | aside from just the "New York Times" but other stories, other | 03:23:21 |
| 11 | newspaper stories on Backpage.com, either hard print or |
| 12 | digital? |
| 13 | A.   Yes.  It was very frequent.  There were a loot of Google |
| 14 | alerts. |
| 15 | Q.   All right.  Can you explain to the jury what a Google | 03:23:37 |
| 16 | alert is? |
| 17 | A.   So Google alerts are something that you set up to alert |
| 18 | you -- well, what I did is I set up Backpage.com to send me an |
| 19 | alert whenever it was in the news and I know others in the |
| 20 | company did that, too. | 03:24:00 |
| 21 | Q.   Who else in the company do you know of that also had a |
| 22 | Google alert for Backpage.com? |
| 23 | MS. BERTRAND:  Objection.  Foundation. |
| 24 | THE COURT:  I think he can answer the question who |
| 25 | else does he know. | 03:24:14 |

United States District Court

CARL FERRER - Direct

 1             THE WITNESS:  Scott Spear.  I'm sorry.                    03:24:17

 2             THE COURT:  Overruled.

 3             Go ahead.  You may answer.

 4             THE WITNESS:  Sorry if I jumped the gun.

 5             Scott Spear.                                              03:24:25

 6    BY MR. RAPP:

 7    Q.    Anybody else?

 8    A.    I'm not sure.

 9    Q.    As a result of these meetings that you identified with

10    NCMEC and Polaris, and I believe you identified a Mayor for      03:24:43

11    Seattle, as a result of these meetings, did you make some

12    changes to what you would put on the website in terms of an ad

13    in the Female Escort section?

14    A.    Yes.  We sanitized the site.

15    Q.    When you say you sanitized the site, what do you mean by    03:25:09

16    that?

17    A.    It means we make it less obvious prostitution.

18    Q.    Do you know what the term "moderation" means?

19    A.    Yes.

20    Q.    All right.  What does moderation mean in the website       03:25:28

21    space?

22    A.    It means that the content is going to be reviewed by

23    either a human or a computer to conform to the terms of use.

24    Q.    All right.  And with respect to Backpage.com, what did you

25    implement -- did you implement some type of moderation?          03:25:56

                      United States District Court

CARL FERRER - Direct

1   A.   Yes, we did.                                                    03:26:00

2   Q.   Can you explain to the jury when you really started

3   implementing moderation?

4   A.   I believe it started as early as 2006 with Scott Spear's

5   PowerPoint to get rid of explicit nudity.                           03:26:21

6   Q.   All right.   And I think earlier on in your testimony you

7   described the postings from the inception up to approximately

8   2008, 2009 as having explicit nudity?

9   A.   Yes.   It was the wild, wild west in terms of content.

10  Just about anything was posted.   Full sex act pics.                03:26:53

11  Q.   All right.   And then in -- did you implement -- I think

12  your term was sanitizing the website.   Can you explain to the

13  jury -- let's just start with images.   What, if anything, did

14  you do to sanitize the site when it came to images?

15  A.   So a standard was set earlier on between *Hustler* and        03:27:24

16  *Playboy* standard.   This was a term that Scott Spear coined and

17  so we started the team in that area.   That meant sex act pics

18  needed to go and you could still have full nudity but you

19  couldn't have extreme closeups of genitalia.   And then the

20  standards would continually be modified to where eventually no     03:27:46

21  more pictures of genitalia is allowed but topless is okay and

22  then the standards would change once again as the pressure

23  mounted to then eliminate topless.

24  Q.   Okay.   Starting in 2006, your testimony is that this

25  started in 2006 and Mr. Spear came up with the *Hustler* versus    03:28:14

United States District Court

CARL FERRER - Direct

1   *Playboy* standard, going forward, how was that implemented to    03:28:18

2   remove those types of images?  How logistically was that done?

3   A.   So the images would just be removed.  Eventually, we would

4   put it into queues and people would remove the image.  But the

5   point to note here is the person who posted the ad, the whole    03:28:48

6   ad is not going to be removed, just the image.

7   Q.   Well, all right.  So I think your testimony was there were

8   ads that had full-on sex acts.  If you remove the sex acts, did

9   you continue to post the ad?

10         MR. KESSLER:  Object as to time.    03:29:16

11         MR. PANCHAPAKESAN:  It also misstates testimony.

12         THE COURT:  Overruled as to misstating the testimony.

13         I guess, Mr. Rapp, there should be more foundation as

14   to the time frame.

15         MR. RAPP:  Right.  Thank you.    03:29:29

16   BY MR. RAPP:

17   Q.   When did the removal of sex acts pics, when did that

18   start?

19   A.   2006 I believe, 2007.

20   Q.   All right.  And you had described, as time went on, that    03:29:43

21   certain images were even further removed based upon -- I

22   believe your testimony is based upon pressure that you

23   received?

24   A.   Yes.  And it was done in a graduated manner over a period

25   of years.    03:30:08

*United States District Court*

CARL FERRER - Direct

1   Q.   Did you ever -- did you ever just block the ad entirely?       03:30:10

2   A.   No.   We didn't block users for posting sex act pics.   We

3   blocked users if they have used a stolen credit card but not if

4   they posted a sex act pic.

5   Q.   All right.   And so if they weren't blocked, does that mean    03:30:35

6   that they could continue to post?

7   A.   Yes.   They could just post again if they are not blocked.

8   Q.   Now let's talk about text, words.   Did there come a time

9   where you started sanitizing the sites of certain words?

10  A.   Yes.                                                          03:31:06

11  Q.   Why did you do that?

12            MR. KESSLER:   Objection.   That's going to call for

13  hearsay.

14            THE COURT:   Overruled.

15            THE WITNESS:   The rules or some terms made the ads       03:31:22

16  more obvious prostitution, especially when they referred to a

17  sex act pic.   So we started removing those words from the ad

18  but not deleting the ad.   If they were a frequent violator, we

19  might delete the ad.

20  BY MR. RAPP:                                                       03:31:47

21  Q.   So we have talked about the volume that any given market

22  was receiving and I believe your testimony is that sometimes

23  you would receive, in any given market on a given day,

24  thousands of postings; is that correct?

25  A.   Correct.                                                      03:32:10

United States District Court

CARL FERRER - Direct

1   Q.   And I believe your testimony is, if it was a large market,          03:32:11
2   you could receive upwards of 10,000 ads on a given day?
3   A.   Maybe several thousand might be more --
4   Q.   More accurate?
5   A.   More accurate, yeah.                                                  03:32:29
6   Q.   But in any event, how -- what type of a staff did you have
7   to review these postings to sanitize them of these images and
8   terms?
9            THE COURT REPORTER:   I'm sorry.   Can you put your
10  hand up when you object?   I can't tell who is objecting.                  03:32:42
11           MR. FEDER:   Feder objecting.
12           THE COURT:   And what was the objection?
13           MR. FEDER:   Foundation.   Time.   This is a progressive
14  issue, Judge.   We need to know what, when.
15           THE COURT:   And I would agree, Mr. Rapp, when you're            03:33:07
16  talking in generalities, it's not really helpful.   If you could
17  narrow down the time frame that you are -- and it may be
18  redundant but I think it's important.
19  BY MR. RAPP:
20  Q.   All right.   You had to have a staff to review these                 03:33:22
21  postings to sanitize of images and texts?
22  A.   Yes.   Yes.   That's correct.
23  Q.   How were you able to -- how was the staff able to keep up
24  with the sanitation efforts given the volume of ads and let's
25  just start in, say, 2008?                                                 03:33:46

United States District Court

CARL FERRER - Direct

1    A.   We needed technology's help.                                          03:33:53

2    Q.   And what type of technology did you implement to assist in

3    this?

4    A.   We had filter blocking that could either block an ad from

5    being posted if it used a forbidden term or it would strip that    03:34:09

6    term out if it used that term.

7    Q.   All right.  But if it would strip the term out, can you

8    give us an example of a term that you would strip out of the ad

9    and allow it to continue to be posted?

10            MR. FEDER:  Again, foundation as to time.                  03:34:36

11            MR. RAPP:  2008.

12            THE COURT:  In 2008, yes.

13            THE WITNESS:  In 2008, if the term BBBJ appeared in

14   an ad, the user would -- may be able to type it in and the ad

15   would get submitted to our servers.  The ad would go live and      03:34:54

16   then a process would run that would just eliminate that term.

17   The ad would still go live but BBBJ would no longer be there in

18   the ad.

19   BY MR. RAPP:

20   Q.   Is that BBBJ, is that an acronym for a reference to a sex      03:35:09

21   act?

22   A.   Yes.

23   Q.   And then once the technology stripped that term out as of

24   2008 going forward, would the ad continue to be posted?

25   A.   Yes.                                                          03:35:31

United States District Court

CARL FERRER - Direct

1  Q.   And who within Backpage would implement this removal of          03:35:36

2  images and the stripping of terms on a daily basis?  Who was

3  responsible for that?

4              MS. BERTRAND:  Objection.

5              MR. KESSLER:  Objection.  Foundation.  Time.          03:35:55

6  BY MR. RAPP:

7  Q.   2008 going forward.

8              MR. KESSLER:  Well, "going forward" is a long time.

9              MR. RAPP:  There's two attorneys over there objecting

10 for one defendant.          03:36:05

11             THE COURT:  Yes.  I think --

12             MR. CAMBRIA:  What's wrong with that?

13             THE COURT:  Mr. Feder, you can make the objection.

14             Mr. Rapp, let's clarify.  We're in 2008.

15 BY MR. RAPP:          03:36:18

16 Q.   I'm talking about 2008 going forward and implementing

17 sanitation efforts.

18             MS. BERTRAND:  Same objection.

19             THE COURT:  I think that you're going to get the

20 foundation objection because 2008 could mean 2008 to 2010,          03:36:27

21 2015, 2018.  So maybe just narrow it down in terms of time

22 frame, Mr. Rapp.

23 BY MR. RAPP:

24 Q.   All right.  Let's just take 2008 to 2010.

25 A.   The supervisor of the Moderation Department, Andrew          03:36:45

United States District Court

CARL FERRER - Direct

1    Padilla.                                                          03:36:49

2    Q.   So when you had postings that had both images that

3    contained sex acts and a term that was indicative of a sex act,

4    why wouldn't you just block the entire ad?

5             MR. FEDER:  And we're talking about 2008.              03:37:16

6             MR. RAPP:  I'm talking 2008 to 2010.

7             THE COURT:  I think he's clarified 2008 to 2010.  So

8    unless he states a different year --

9             Mr. Rapp, and you will clarify that?

10            MR. RAPP:  I will.                                      03:37:31

11            THE COURT:  Reask the question.

12            MR. EISENBERG:  Your Honor, if I may.  We haven't had

13   a definition of an image of a sex act, so I'm not sure -- I'm

14   sorry.  I don't mean to go on about this but I don't think we

15   have a basis for that, Your Honor.                              03:37:48

16            THE COURT:  Well, I guess, Mr. Rapp, you can ask the

17   question.

18   BY MR. RAPP:

19   Q.   Can you -- so you've described at various times starting

20   in 2006 that there were images on the postings that were sex   03:38:00

21   acts?

22   A.   Yes.

23   Q.   Can you describe, to the best of your ability, during time

24   frame before you implemented moderation efforts, can you

25   describe what the sex act involved?                             03:38:25

United States District Court

CARL FERRER - Direct

1  A.   One example might be a woman giving a man oral sex.                    03:38:30
2  Q.   All right.   Is there other variations of sex acts similar
3  to that that would be images on postings that you would
4  receive?
5              MS. BERTRAND:   Objection.   Vague.                            03:38:49
6              THE COURT:   Overruled.
7              THE WITNESS:   Yes.
8  BY MR. RAPP:
9  Q.   Did the moderation efforts that you implemented, starting
10 in 2008 going forward, right up until the site was closed in    03:39:07
11 2018, did the moderation efforts in removing images or terms,
12 did they in any way impact the revenue for Backpage, if you
13 know?
14             MR. FEDER:   Objection.   Compound.   Over a 12-year
15 period?                                                          03:39:37
16             THE COURT:   Overruled.
17             THE WITNESS:   I was responsible for the revenue.   I
18 worked on setting the budgets and despite our moderation
19 improvements, the budgets were always aggressive in terms of
20 growth and revenue, and I never saw any impact to the revenue   03:39:56
21 from our moderation efforts.
22 BY MR. RAPP:
23 Q.   All right.   Can you explain to the jury what a charge-back
24 is?
25 A.   A charge-back would be when a user files a complaint that  03:40:21

United States District Court

CARL FERRER - Direct

1    their card was -- a card holder files a complaint that their          03:40:28
2    card was used unauthorized.
3    Q.   If you blocked a user -- let's just start in 2008 going
4    forward, to 2018.  If you blocked a user based on -- based upon
5    whatever image or term they included in a posting, would you          03:40:58
6    retain that poster as a customer going forward?
7    A.   We didn't block the user if they posted sex act pics or
8    put sex term language in their ads, but we would block them if
9    they used a stolen -- if they used a credit card unauthorized
10   and filed a charge-back.  That was a big deal.  Then we blocked       03:41:27
11   the credit card.  Then we blocked the email address, then we
12   blocked the phone number from appearing in the ad.  A lot of
13   efforts were given to prevent people from using credit cards
14   unauthorized.
15   Q.   All right.  And why was that the case?  Why, why was that        03:41:47
16   important, that credit card users who were using a fraudulent
17   credit card, why were they blocked?
18   A.   If you received too many charge-backs, like over half a
19   percent, for example, you might go on probation with MasterCard
20   and VISA; and the last thing the company wanted was any kind of       03:42:12
21   attention by MasterCard and VISA.
22   Q.   Okay.  Well, let's talk about that.  Why did you not want
23   to have this attention with these major credit card companies,
24   MasterCard and VISA?
25            MR. FEDER:  Calls for hearsay and speculation.              03:42:35

CARL FERRER - Direct

1    THE COURT:  He can give his understanding as to why.        03:42:37

2  The question was posed as why do you.  So overruled.

3    MR. FEDER:  But it implies what a credit card company

4  is doing, Judge.  Speculation, hearsay.

5    THE COURT:  The question was posed as to why it was        03:42:55

6  important to him.

7    Mr. Rapp, rephrase your question or reask it.

8  BY MR. RAPP:

9  Q.   Why was it important to you, working at Backpage.com, that

10 you didn't have a bunch of charge-backs?                      03:43:09

11 A.   Because if we lose our merchant account, our ability to

12 take credit cards, we could go out of business so very

13 important -- that's a very important metric in this business,

14 to keep the charge-back rate lower.

15 Q.   And how do you know that if you had a high rate of        03:43:33

16 charge-backs, how do you know that would pose a problem with

17 your merchant bank, your credit card processor?

18    MR. FEDER:  Hearsay.  Speculation.

19    THE COURT:  Overruled.

20    THE WITNESS:  We had regular meetings with --              03:43:50

21    MR. RAPP:  Hold on.

22    I think there was an objection.

23    THE COURT:  There was earlier.  I overruled it.

24    MR. RAPP:  I'm sorry.  My apologies.  I thought I

25 heard some other objection.                                   03:44:03

United States District Court

CARL FERRER - Direct

BY MR. RAPP:                                                      03:44:06

Q.   How would that create a problem with your merchant credit

card processing, a high rate of charge-backs?

          MR. FEDER:  Objection.  Speculation.

          THE COURT:  Sustained.                                 03:44:23

BY MR. RAPP:

Q.   How do you know this?  How do you know?  Did you deal with

your merchant credit card processing bank on some regular

basis?

A.   We did.  We had regular meetings with a company like       03:44:34

Litle, the credit card processor, who would inform us --

          MR. FEDER:  Objection.  Hearsay.  Move to strike.

This appears to be an intentional kind of issue to let --

          THE COURT:  Mr. Feder, let me rule on the objection.

          MR. FEDER:  Mr. Ferrer is not responding to the       03:44:58

question.

          THE COURT:  I'll sustain it and the portion as to

beginning that the credit card processor who would inform us,

that part is stricken.

          You may reask the question.                           03:45:20

BY MR. RAPP:

Q.   That relationship with your merchant bank, was that

important to the success of Backpage?

          MR. CAMBRIA:  Your Honor, he answered the question.

He said they would lose their credit card business.  He         03:45:38

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | answered the question. | 03:45:41 |
| 2 | THE COURT:  Reanswer the question. | |
| 3 | And let's move on, Mr. Rapp. | |
| 4 | THE WITNESS:  It's critical, yes. | |
| 5 | BY MR. RAPP: | 03:45:51 |
| 6 | Q.   Did there come a time where the credit card companies | |
| 7 | blocked the use of their cards for Backpage postings? | |
| 8 | A.   Yes. | |
| 9 | Q.   When did that happen? | |
| 10 | A.   That happened in July of 2015.  We lost MasterCard and | 03:46:14 |
| 11 | VISA. | |
| 12 | Q.   All right.  And when you lost those credit card companies, | |
| 13 | the ability for somebody to use the credit cards to post an ad, | |
| 14 | how -- how were you able to get paid for postings on | |
| 15 | Backpage.com? | 03:46:40 |
| 16 | A.   We initially just went free. | |
| 17 | Q.   All right.  Just taking a step back for just a minute.  We | |
| 18 | talked about the major credit card companies blocking the use | |
| 19 | of their cards in 2015 but was there -- and you've referred to | |
| 20 | this credit card processor by the name of Litle.  Did there | 03:47:07 |
| 21 | come a time where they stopped allowing you to process credit | |
| 22 | card transactions? | |
| 23 | A.   Yes.  Litle terminated us. | |
| 24 | Q.   All right.  And what year did they terminate you? | |
| 25 | A.   I believe around 2013, sometime in that year. | 03:47:33 |

United States District Court

CARL FERRER - Direct

1   Q.   All right.  And once you began to use -- lose this credit        03:47:39

2   card processing, let's start with the 2013, how did Backpage as

3   a company respond to that, the fact that Litle, that you've

4   identified as your merchant credit card processing bank, when

5   they discontinued allowing you to process, how did you -- how        03:48:02

6   did Backpage as a company respond to that?

7   A.   We engaged a consultant and then went looking for

8   processing in Europe.

9   Q.   All right.  And when you went to look for processing, as

10  you say, in Europe, who was involved in that within Backpage?        03:48:28

11  Was it you or who else?  Who in upper management, if any, was

12  involved in that?

13  A.   Certainly Scott Spear, who read the banking agreements,

14  myself, Jim Larkin, and Jed Brunst who had to open up companies

15  to secure European processing.                                       03:48:54

16  Q.   And when you say that you secured European processing, can

17  you explain to the jury why you had to go to Europe to obtain

18  this processing for the transactions here in the United States?

19  A.   Because U.S. banks did not want to do business with us.

20          MR. FEDER:  Calls for hearsay.  Speculation.                 03:49:23

21          THE COURT:  Overruled.

22          THE WITNESS:  Because U.S. banks did not want to do

23  business with Backpage.

24  BY MR. RAPP:

25  Q.   All right.  And when you went -- so can you explain to the      03:49:31

United States District Court

CARL FERRER - Direct

1   jury why -- were you able to secure processing in Europe?                    03:49:35

2   A.   Yes.  We were able to secure banks by using a company in

3   Bulgaria and finding a bank in Liechtenstein and the UK.

4   Q.   All right.  And those banks that you found -- and this is

5   in 2013.  This is before the July 2015, major credit card          03:49:57

6   companies like AMEX and MasterCard blocked the use, did the

7   European banks from 2013 to 2015, did they not have the same

8   problems with Backpage that the banks in the United States had?

9            MR. FEDER:  Hearsay and speculation.

10           THE COURT:  Sustained.                                             03:50:29

11           THE WITNESS:  They had --

12  BY MR. RAPP:

13  Q.   Let me ask you another question.

14  A.   Oh.  Sorry.

15  Q.   Did you do anything to try to conceal the fact that          03:50:38

16  Backpage was the ultimate recipient of the credit card

17  transactions, the revenue?

18           MR. FEDER:  Objection.  Speculation.

19           THE COURT:  Overruled.

20           THE WITNESS:  Yes.  We created holding companies.        03:50:59

21  BY MR. RAPP:

22  Q.   And can you explain to the jury first why did you create

23  holding companies?

24  A.   A European bank only wants to deal with a European company

25  so you have to set up a European company, even though it's just    03:51:14

United States District Court

CARL FERRER - Direct

1   a shell.                                                          03:51:18

2   Q.   All right.   And did that -- in so doing, did that allow

3   you to continue to receive credit card processing?

4   A.   It did.   Yes.

5   Q.   Now, you identified another point where the credit cards,    03:51:37

6   your credit cards were blocked from processing and you

7   identified that as July of 2015.   Your response in July -- in

8   2013 was to go overseas to Europe.   What did you do when the

9   major credit card companies blocked you in July of 2015?

10  A.   We attempted to secure processing that was even more high    03:52:17

11  risk in Asia.

12  Q.   All right.   And when you say "we," who -- was there

13  anybody who was either assisting you or giving you direction on

14  establishing these bank relationships in Asia?

15  A.   I had some assistance from Jed Brunst and representative      03:52:41

16  working for the sellers, Don Moon.

17  Q.   Okay.   And how is it that you were able to obtain this

18  processing?   This is now July -- post-July of 2015.   How were

19  you able to obtain this processing for credit cards?

20  A.   After 2015?                                                   03:53:15

21  Q.   Yes.

22  A.   Well, we -- I signed agreements with the shakiest

23  companies in the world and they turned out to be, you know,

24  really some of them just thieves.   They didn't send us our

25  funds.   It was very difficult.   But later we were able to set   03:53:31

United States District Court

CARL FERRER - Direct

1   up partner companies in Europe using five separate holding          03:53:37

2   companies in Europe with different Web domains.

3   Q.   All right.  And when you say using different Web domains,

4   why did you do that?

5   A.   To conceal the transactions so instead of Backpage.com, it    03:54:03

6   would be Ad Post 24.

7   Q.   All right.  And why were you trying to conceal the fact

8   that the transaction was being processed for a posting on

9   Backpage.com?

10  A.   So MasterCard and VISA wouldn't shut it down.  They would     03:54:23

11  have a hard time finding it.

12  Q.   After July of 2015, were there other ways that Backpage

13  implemented to get paid for an ad posted on the website?

14  A.   Yes.

15  Q.   What was that?                                                 03:54:52

16  A.   There were money orders, which was very successful.

17  Q.   Can you explain that to the jury, how money orders were

18  utilized instead of credit card transactions on how that was

19  successful?

20  A.   So we -- we had a line of credit for our customers.  If       03:55:14

21  they were good customers, they could get credit of -- I can't

22  recall the exact number, maybe $50, $100 worth of credit and

23  then they could mail us a money order, and they often did.

24  There were days that we had $70,000 worth of money orders come

25  in on a single day.                                                03:55:41

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   All right.  But when the major credit card companies | 03:55:43 |
| 2 | blocked their use of the cards for transactions and you had to | |
| 3 | find these other avenues to pay, did you lose substantial | |
| 4 | revenue? | |
| 5 | A.   Initially, especially when the site went free.  But then | 03:56:02 |
| 6 | it started to build back up because we had money orders and | |
| 7 | other alternative ways of payment. | |
| 8 | Q.   What were the other alternative ways of payment? | |
| 9 | A.   Gift cards like Starbucks gift cards. | |
| 10 | Q.   So explain that to the jury.  How would you use, for | 03:56:24 |
| 11 | example, a Starbucks gift card to post an ad on Backpage.com? | |
| 12 | A.   So you go to your user account and you buy credits and | |
| 13 | when you buy credits, you're given different payment choices. | |
| 14 | If you chose gift cards, there were select gift cards that we | |
| 15 | would accept and they just put in the number, the gift card | 03:56:54 |
| 16 | number, and then submit.  We would then give them credits and | |
| 17 | then take that gift card and then, through a third party, sell | |
| 18 | it on the resell market. | |
| 19 | Q.   All right.  And so can you give us an example of, say, | |
| 20 | based upon your experience, if you've got a $50 gift card, how | 03:57:20 |
| 21 | were you able to make any money selling that on some type of | |
| 22 | secondary market? | |
| 23 | A.   A $100 gift card is easier for me. | |
| 24 | Q.   All right.  You choose. | |
| 25 | A.   So $100 gift card is accepted by Backpage.  We send it to | 03:57:37 |

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | the secondary market.  They send us back -- they take a 35 | 03:57:42 |
| 2 | percent commission so then they send us back $65. | |
| 3 | Q.   Okay.  Do you know the term vanilla VISA? | |
| 4 | A.   Yes. | |
| 5 | Q.   And so can you explain to the jury what a vanilla VISA | 03:58:03 |
| 6 | card is? | |
| 7 | MR. FEDER:  Foundation as to time and then if this is | |
| 8 | after 2015, 401, 403. | |
| 9 | THE COURT:  Let him first answer the question of what | |
| 10 | a vanilla VISA is and then Mr. Rapp can ask the next question. | 03:58:22 |
| 11 | BY MR. RAPP: | |
| 12 | Q.   What is a vanilla VISA? | |
| 13 | A.   Vanilla VISA is sold in a store like 7-Eleven.  It's | |
| 14 | anonymous, you pay cash and get a card. | |
| 15 | Q.   Did there come a time in the life of Backpage.com where | 03:58:39 |
| 16 | you accepted vanilla VISAs to pay for postings? | |
| 17 | A.   Yes.  It was one of our top-producing cards. | |
| 18 | MR. FEDER:  Move to strike the final answer as | |
| 19 | nonresponsive. | |
| 20 | THE COURT:  Overruled. | 03:59:02 |
| 21 | Reask the question, Mr. Rapp. | |
| 22 | BY MR. RAPP: | |
| 23 | Q.   When did that start?  When did you start allowing posters | |
| 24 | to use vanilla VISA cards? | |
| 25 | A.   I think from the very beginning, but it was really brought | 03:59:15 |

United States District Court

CARL FERRER - Direct

1  to our attention with the relationship with Litle that vanilla          03:59:18

2  VISA was 70 percent of your credit card transactions.

3  Q.   So Litle informed you of this fact?

4  A.   They were shocked by it.

5  Q.   Now, did there come a time in the life of Backpage.com          03:59:38

6  that there were efforts to sell the website?

7  A.   Yes.

8  Q.   I want to take you to 2011.  Was there any effort to sell

9  the website in 2011?

10  A.   Yes, there was.                                                 04:00:03

11  Q.   And what, if anything, did you do in your capacity to

12  assist in selling the website?

13  A.   I worked with Jed Brunst to create the PowerPoint to sell

14  the site and then I went on numerous presentations with

15  investors, buyers.                                                   04:00:26

16  Q.   Do you recall how much you were trying to sell the website

17  for back in 2011?

18  A.   I thought it was $100 million.  I believe.

19  Q.   Okay.  And you've mentioned Mr. Brunst.  Can you explain

20  what role, if any, he had with you in trying to sell the             04:00:54

21  website?

22  A.   He worked closely with Duff Phipps in creating the

23  PowerPoint and setting up the meetings that we would go to and

24  we often would make presentations together.

25  Q.   All right.  And when you made these presentations to those      04:01:20

CARL FERRER - Direct

1  potential buyers, did you discuss with them the strategies that    04:01:30
2  we spoke about earlier, the aggregation and the reciprocal link
3  relationship and the super poster relationship?
4  A.   We did not share with them the prostitution ad marketing
5  activities.                                                        04:01:54
6  Q.   All right.  Did you have success selling the website in
7  2011?
8  A.   We came close but then there was some bad news that came
9  out in the media and the deal was canceled.
10 Q.   Okay.  Then going forward, was the site sold in 2015?        04:02:11
11 A.   Yes, on paper.
12 Q.   Who bought the website in 2015?
13 A.   I became the owner on paper.
14 Q.   All right.  When you say you became the owner on paper,
15 what do you mean by that, Mr. Ferrer?                              04:02:49
16 A.   My job description never really changed, only now I could
17 sign the bank agreements.
18 Q.   So how much -- how much did you pay for the website in
19 2015?
20 A.   Over $600 million with another kicker that was valued at     04:03:10
21 50 to 100 million if the site did well.  So it was over 600
22 million.
23 Q.   Can you explain that term "kicker" for the jury?
24 A.   Jim Larkin was concerned that he had sold the site too
25 cheap; and so if the site continued to grow in revenue, that he   04:03:32

United States District Court

CARL FERRER - Direct

1  wanted a kicker added to the agreement where they would get                    04:03:35

2  more money.

3  Q.   Did you have $600 million?  Did you pay -- did you write

4  them a check for the website?

5  A.   I did not write them a check.  I did not have the money.        04:03:52

6  They were going to do it on an earn-out and just sweep the

7  cash.

8  Q.   All right.  And so you have got to explain that to the

9  jury.  When you say they were going to do it as an earn-out and

10  sweep the cash, what are you talking about?                          04:04:06

11  A.   Well, the funds that would go to the Backpage accounts

12  they would take as payments for principal and interest so

13  whatever money came in, they would find a way to get swept to

14  their accounts, their bank accounts.

15  Q.   And so this was -- am -- are we to understand that you        04:04:28

16  would make a certain amount of money per month running the

17  website and then that money, if I understand your terminology,

18  would be swept out of the accounts and then go to the sellers?

19  A.   You know, for the first three months, it wasn't so much

20  swept out as we made payments.  But after losing credit cards,      04:04:53

21  it just was messy and so they just wanted to get all of the --

22  any cash that was coming in and so that was payments.

23  Q.   And so who were the sellers?  Who sold the website to you?

24  Who were the people that sold it?

25  A.   So that would be the owners:  Michael Lacey, Jim Larkin,       04:05:21

United States District Court

CARL FERRER - Direct

1  Jed Brunst, and Scott Spear.                                      04:05:25

2  Q.   So this sale, from your testimony, happened in 2015;

3  right?

4  A.   Yes.

5  Q.   And then I believe your testimony a few moments ago,         04:05:39

6  something else happened in 2015 as well?

7  A.   Right.  At three months after the purchase of the site,

8  MasterCard and VISA terminated and so we went from showing a

9  profit to losing money -- losing money in the fourth month.  It

10 was going to be impossible to make payments without MasterCard   04:06:02

11 or VISA.

12 Q.   The months preceding -- let's just call it the credit card

13 block, how much were you sweeping out to pay Mr. Lacey,

14 Mr. Larkin, Mr. Brunst, and Mr. Spear?

15 A.   I recall those three months I believe we were making        04:06:24

16 payments of 14 million per month.

17 Q.   All right.  And once the credit card's blocked, I believe

18 your testimony is -- did you have some difficulty making those

19 monthly payments?

20 A.   We couldn't make the monthly payments.  We were even        04:06:46

21 concerned with whether we could make payroll.

22 Q.   All right.  And as a result of that, what, if anything,

23 did you do regarding staffing in the wake of this credit card

24 block?

25 A.   We terminated 70-some employees in Phoenix and some in      04:07:13

United States District Court

CARL FERRER - Direct

1    Dallas.                                                                  04:07:17

2    Q.   And what type of -- what type of positions did you

3    terminate because of your inability to make payroll?

4    A.   It was mainly moderators.

5    Q.   All right.  And once you, in your words, mainly -- am I to   04:07:40

6    understand that you let go the moderators?

7    A.   Yes.

8    Q.   Did that include Mr. Padilla and Ms. Vaught?

9    A.   No.  They continued to remain with the company.

10   Q.   By 2015 when you bought the website for 600 million, what   04:08:10

11   do you approximate the website making on an annual basis during

12   that time frame.  Let's just say 2014 and then 2015?

13   A.   Annual revenue was annualizing 150 million to 160 million.

14   There were some days revenue was annualizing at 180,000 -- or

15   180 million.  What I mean by that is, you take the total          04:08:48

16   revenue and multiply it by 365 then would get your annual

17   potential revenue.

18   Q.   All right.  So when you -- you've discussed now, after the

19   credit card block, that you had to come up with ways to get

20   credit card processing?                                           04:09:09

21   A.   Yes.

22   Q.   And I believe that you identified a name of one of these

23   shell companies that I think your words were sort of concealed

24   that Backpage was the ultimate recipient of the revenue; is

25   that right?                                                       04:09:29

United States District Court

CARL FERRER - Direct

1    A.    Could you state that again?  I'm sorry.                04:09:31

2    Q.    I will.  So when the credit card companies blocked the use

3    of the credit card company's credit cards to do transactions to

4    post ads, I believe your testimony is you had to go elsewhere,

5    overseas?                                                   04:09:49

6    A.    Yes.

7    Q.    And who did you deal with from the sellers to assist in

8    trying to get credit card processing?

9            MR. PANCHAPAKESAN:  Objection.  Foundation.

10           THE COURT:  I'm going to overrule.  It's a confusing   04:10:15

11   question as well.

12           MR. RAPP:  I can make it easy.

13   BY MR. RAPP:

14   Q.    Is there somebody that you dealt with from the sellers on

15   the credit card processing -- on trying to establish banking?  04:10:23

16   A.    Yes.  Jed Brunst.

17   Q.    All right.  And what did you observe became Mr. Brunst's

18   role in that regard after the sale?  What was his role?

19   A.    Bill collector.

20   Q.    All right.  And when you say "bill collector," did he --   04:10:46

21   did he serve any role in trying to assist in getting banking so

22   that you could process transactions?

23   A.    Yes.  He was involved in the financial problems the

24   company was having and wanted to understand the revenue that

25   was coming in and what our options were for banking and when we   04:11:15

CARL FERRER - Direct

1   might, you know, get the reserves coming from these other          04:11:21

2   credit card processors that were -- that's what I mean by bill

3   collector.

4   Q.   All right.  And how frequently would you have contact with

5   him from July of 2015 going forward regarding bill collectors,     04:11:34

6   in your words?

7   A.   A minimum of a few times a week, either myself or the CFO

8   that we had we would have contact with him.

9   Q.   Now, in terms of the operation of the site from July of

10  2015 going forward, who was in control of the site?                04:12:04

11  A.   In terms of the operations of the site through what dates

12  again?

13  Q.   From July 5, 2015, through 2018.

14  A.   I am.  I guess I'm running the site but I'm having regular

15  meetings with the sellers.                                         04:12:29

16  Q.   All right.  And when you say you're having regular

17  meetings with the sellers, who from the sellers were you having

18  regular meetings with?

19  A.   Jim Larkin, Don Moon, Dan Quigley, another intermediary.

20  Q.   All right.  Now, Mr. Ferrer, let's talk about you.  Sir,      04:12:52

21  how old are you?

22  A.   62.

23  Q.   And are you married?

24  A.   I am.

25  Q.   Children?                                                     04:13:10

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.    Yes, three. | 04:13:11 |
| 2 | Q.    Did you go to college? | |
| 3 | A.    I did.  I went to the University of Wisconsin. | |
| 4 | Q.    And what did you study at the University of Wisconsin? | |
| 5 | A.    Communication, English, and business. | 04:13:25 |
| 6 | Q.    All right.  And when you got out of college, did you serve | |
| 7 | in the military at all? | |
| 8 | A.    I did.  I joined the National Guard to pay my student | |
| 9 | loans and eventually even reenlisted. | |
| 10 | Q.    All right.  And then as some point, as an adult, did you | 04:13:43 |
| 11 | get into the classified sales arena? | |
| 12 | A.    I did a few years after college.  I started working for a | |
| 13 | shop or a want ad paper, so that's why I have a lot of | |
| 14 | expertise in the classified ad business. | |
| 15 | Q.    And did you eventually go from -- and work at a couple of | 04:14:15 |
| 16 | newspapers? | |
| 17 | A.    I did.  I worked for "The Milwaukee Journal", a couple of | |
| 18 | their papers, and then decided to make a transition into the | |
| 19 | alternative weeklies. | |
| 20 | Q.    All right.  And what year was that approximately? | 04:14:30 |
| 21 | A.    1996 I met with Jim Larkin, had an interview. | |
| 22 | Q.    And did you start working for one of his alternative | |
| 23 | newspapers? | |
| 24 | A.    I did.  I worked for him in Dallas, Texas, so in 1996. | |
| 25 | And I was a classified director managing a staff of 15 to 20 | 04:14:50 |

United States District Court

CARL FERRER - Direct

1    people.
2    Q.   All right.  And how long did you do that before you were
3    involved in the creation of Backpage?
4    A.   So I did that and I joined the corporate staff after a
5    number of years, was sent around paper to paper to try to build
6    revenue.  So I was familiar with markets like San Francisco
7    where I became aware that Craigslist was just devastating the
8    company's revenue.
9            And then in 2003 is when I started to develop
10   Backpage with the company, hiring the developers.
11   Q.   Okay.  By the way, with respect to these alternative
12   newspapers, at the peak, based upon the time that you worked
13   there from 1996, let's just go to 2018, at the peak, how many
14   of these alternative newspapers did Mr. Larkin, Mr. Lacey,
15   Mr. Brunst and Mr. Spear have ownership over?
16   A.   I know it's over -- approximately 12.  11 to 12, maybe
17   more.
18   Q.   And then at some point did they buy what is known as "The
19   Village Voice"?
20   A.   Yes.  They bought "The Village Voice" but that included
21   other markets like Minneapolis.
22   Q.   All right.  And just for the jury's edification, where is
23   "The Village Voice" located?
24   A.   In New York City.
25   Q.   Now, you've now testified that Backpage was created in

04:14:56
04:15:13
04:15:37
04:16:16
04:16:38
04:16:57

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | 2004.  By the time you get to 2011, when we just talked a few | 04:17:00 |
| 2 | minutes ago that it was the first effort to sell Backpage.com, | |
| 3 | how were these alternative newspapers doing, if you know, in | |
| 4 | terms of revenue? | |
| 5 | A.    They are not doing well.  They are shrinking in page size. | 04:17:23 |
| 6 | They are cutting back in staff.  I'm familiar because, you | |
| 7 | know, I know many of the people at the different newspapers. | |
| 8 | They are not doing very well.  In fact, a year later they would | |
| 9 | be sold.  2012. | |
| 10 | Q.    Mr. Lacey, Mr. Larkin, Mr. Spear, and Brunst sold their | 04:17:46 |
| 11 | interests in these alternative newspapers? | |
| 12 | A.    They did. | |
| 13 | Q.    So if you know, was the only asset that they had, was it | |
| 14 | Backpage.com that was generated revenue? | |
| 15 | A.    I remember that -- well, it was the only asset -- I can't | 04:18:15 |
| 16 | really speak to that.  I can say it's one of the assets that | |
| 17 | was continuing to grow revenue dramatically, like double-digit | |
| 18 | growth. | |
| 19 |             MR. RAPP:  So Madam Clerk, if you could put so the | |
| 20 | witness can see the screen. | 04:18:43 |
| 21 | BY MR. RAPP: | |
| 22 | Q.    We talked earlier about content aggregation.  Do you | |
| 23 | remember that conversation we had earlier in your testimony? | |
| 24 | A.    Yes. | |
| 25 | Q.    So I'm showing you United States 1056.  Do you see on your | 04:19:02 |

1   screen?                                                                    04:19:08

2   A.   Yes, I do.

3   Q.   And is this an email from you to Scott Spear?

4   A.   Yes, it is.  It's the Backpage work plan.

5   Q.   Is that attached to the email?                                         04:19:29

6   A.   It is.

7   Q.   And did you starting in 2004 through approximately 2013,

8   did you exchange emails with Mr. Spear?

9   A.   We did a lot of email exchanges.

10  Q.   And is this the email address internal that you would have    04:19:53

11  Mr. Spear's name on it?

12  A.   Yes.

13  Q.   And in preparation for your testimony in this trial, have

14  you looked at a lot of email exchanges between you and

15  Mr. Spear?                                                                 04:20:08

16  A.   I have.

17  Q.   And are those emails that you either authored and sent to

18  him or he sent to you?

19  A.   Yes, both.

20        MR. RAPP:  All right.  Move to admit United States           04:20:23

21  1056.

22        MR. FEDER:  401.  403.

23        MR. CAMBRIA:  There are prior objections, please.

24        THE COURT:  Overruled.

25        It may be admitted.                                           04:20:32

United States District Court

CARL FERRER - Direct

1          (Exhibit Number 1056 was admitted into evidence.)          04:20:33

2          MR. RAPP:  And request permission to publish, Your

3     Honor.

4          THE COURT:  It might be published.

5     BY MR. RAPP:                                                     04:20:47

6     Q.   All right.  I think you were just testifying that this was

7     a work plan that you were sending to -- from you to Scott

8     Spear.  Why were you sending him this work plan?

9     A.   Scott Spear likes this level of detail.  I've organized

10    the things that we've discussed and I put it into, like, a      04:21:08

11    functional to-do list that we're going to be working on.  And

12    this is something that I would send to him regularly, these

13    kind of work plans and agendas.

14    Q.   All right.  And I think your testimony earlier was you

15    were joined at the hip with Mr. Spear?                          04:21:26

16    A.   I was in Mr. Spear's office all the time.

17    Q.   All right.  And just so the jury understands the layout of

18    the offices, was your office right next to Mr. Spear?

19    A.   No.  My office was in Building A but Building B had better

20    coffee so I would go over there first thing in the morning for  04:21:49

21    the good coffee and then say hello to Spear and Larkin and then

22    go over work plans with them and what we're going to be working

23    on.

24          And we were also together trying to sell licenses.

25    Q.   All right.  Can you explain that to the jury?  They are     04:22:11

United States District Court

CARL FERRER - Direct

1  selling licenses?                                                    04:22:14

2  A.   Scott Spear had a lot of connections with all weeklies all

3  over the country so he's well-known.

4  Q.   How do you know that?

5  A.   Well, because I saw him do it.  He knows the publishers of   04:22:27

6  all of these other papers that we're trying to sell licenses to

7  and I watched him -- he sold our first license.

8  Q.   All right.  But when you sell a license, what does that

9  mean?  What do you get out of selling a license?

10 A.   Well, early on we thought that we're going to make         04:22:45

11 Backpage a technology company and we're going to provide all

12 weeklies with this technology solution to compete with

13 Craigslist.  We learned fairly quick that this was a mistake

14 and we would stop doing that.  We didn't need newspapers to get

15 a website off the ground.                                           04:23:07

16         But at this time, in 2005, we're busy trying to sell

17 licenses.

18 Q.   All right.  And so this work plan, I'm now showing you

19 1056a, and is this the work plan that you were referencing

20 earlier a few minutes ago that you would frequently provide      04:23:33

21 him?

22 A.   Yes, it is.

23         MR. RAPP:  Move to admit 1056a as well.

24         MR. FEDER:  401.  403.  801.

25         THE COURT:  Overruled.  It maybe admitted.              04:23:49

United States District Court

CARL FERRER - Direct

1          (Exhibit Number 1056a was admitted into evidence.)        04:23:50

2  BY MR. RAPP:

3  Q.   All right.  And we had talked earlier in your testimony

4  about content aggregation.  Do you see that on your screen

5  there?                                                            04:24:05

6  A.   Yes, I do, in the middle of the page.

7  Q.   All right.  And in that you have a reference to adult.  Do

8  you see that there?

9  A.   Yes.

10          MR. RAPP:  Judge, I'm sorry.  I meant to ask that        04:24:21

11  this be published.

12          THE COURT:  Yes, it may be published -- I'm sorry.

13  Are you asking now?

14          MR. RAPP:  Yes.

15          THE COURT:  Yes, it may be published.                    04:24:34

16          MR. RAPP:  It wasn't published on the jurors' screen.

17  BY MR. RAPP:

18  Q.   Just go back a little bit.  Do you see the highlighted

19  portion there?

20  A.   Yes.  I do.                                                 04:24:44

21  Q.   Okay.  And is this reference content aggregation that we

22  were talking about before?

23  A.   Yes, it does.

24  Q.   And on that 2, can you read the second -- the number 2

25  under content aggregation?                                       04:25:03

United States District Court

CARL FERRER - Direct

1   A.   Yes.   It says, number two:   Adult, list every independent    04:25:05

2   escort.   Secure 200 ads in every market.

3   Q.   And can you explain to the jury what the goal was that you

4   were trying to do?   What were you trying to communicate with

5   Mr. Spear with this?    04:25:24

6   A.   That our intent is to seed the site, the Female Escorts

7   category, with 200 independent escorts.

8   Q.   Okay.   And what does 200 independent escorts mean?

9   A.   Meaning they should have different phone numbers and

10  different pictures so that it looks like it's a lot of content    04:25:42

11  that the consumer of those ads would enjoy going through.

12  Q.   All right.   You have testified that the Female Escort

13  section was the most profitable category in Adult?

14  A.   Yes.

15  Q.   Did you also have categories that were Personals?    04:26:06

16  A.   We did.   We sometimes called it Dating, same thing.

17  Personals, Dating.

18  Q.   Did you come to learn -- oh, wait a minute.   Did you

19  charge -- if somebody wants or wanted to put a posting in the

20  Dating section, did you charge for that posting?    04:26:29

21  A.   At what time timeline?

22  Q.   Well, let's start in 2005.

23  A.   In 2005 it was free to post in Personals.

24  Q.   All right.   Did you come to learn that the prostitutes

25  that posted in the Female Escort section, did you come to learn    04:26:57

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | that they were posting for free in the Personal section? | 04:27:01 |
| 2 | MR. FEDER:  Hearsay. | |
| 3 | THE COURT:  Overruled. | |
| 4 | THE WITNESS:  Yes, it was a problem. | |
| 5 | MR. RAPP:  Madam Clerk, if you could publish that | 04:27:16 |
| 6 | again.  Thank you. | |
| 7 | BY MR. RAPP: | |
| 8 | Q.   And so drawing your attention to this section Sponsor and | |
| 9 | Maintenance, do you see that there? | |
| 10 | A.   Yes, I do. | 04:27:34 |
| 11 | Q.   And do you see under c, there is a reference to personal | |
| 12 | ads.  Can you read that, what you tell Mr. Spear in that bullet | |
| 13 | point under c? | |
| 14 | A.   I write:  Personal ads are hooker-free and posted in the | |
| 15 | appropriate categories. | 04:27:57 |
| 16 | Q.   What are you communicating to Mr. Spear in that -- in that | |
| 17 | bullet point under c? | |
| 18 | A.   I'm telling Spear, Mr. Scott Spear, that one of our tasks | |
| 19 | that we will accomplish this quarter will be to take the hooker | |
| 20 | ads, which are prostitution ads that have a price, and we're | 04:28:22 |
| 21 | going to get those ads out of there and move them to the | |
| 22 | correct category which would be normally Female Escorts. | |
| 23 | Q.   All right.  Moving on to Exhibit 1057, do you see this | |
| 24 | email on your screen there, sir? | |
| 25 | A.   Yes, I do. | 04:28:58 |

United States District Court

CARL FERRER - Direct

1  Q.   And is this an email exchange between you and Mr. Spear in    04:28:59
2  2006?
3  A.    Yes, it is.
4            MR. RAPP:   Move to admit United States 1057 and
5  request permission to publish.                                    04:29:17
6            MR. FEDER:   401.   403, 801.
7            THE COURT:   Overrule.   It maybe admitted.
8            (Exhibit Number 1057 was admitted into evidence.)
9            MR. FEDER:   And, I'm sorry, 106.
10           MS. BERTRAND:   Also, I'm not sure if the Government's   04:29:35
11 moving in simply the excerpt from the document that is
12 highlighted for the lawyers to see or the entire document and I
13 can't see the entire document behind it.
14           THE COURT:   Yes.   The entire document is blurred.   I
15 mean it's in the background, Mr. Rapp, if you look at the        04:29:52
16 screen.   Okay, because you can't see it.
17           MR. RAPP:   It's an email exchange.
18           THE COURT:   Okay.   Now I see it.
19           MR. RAPP:   Thank you.
20           THE COURT:   Well, let me finish.   It may be admitted.  04:30:12
21 Did you move to publish?
22           MR. RAPP:   Yes.   I request permission to publish.
23 BY MR. RAPP:
24 Q.   And so directing you to this portion there, do you see
25 that there?                                                      04:30:30

United States District Court

CARL FERRER - Direct

1   A.   Yes.                                                         04:30:30

2   Q.   And drawing your attention to the middle part of this, is

3   this an email from Mr. Spear to you?

4   A.   It is.

5   Q.   And could you read the highlighted portion there?  And     04:30:42

6   I'll ask you some questions on the other side of it.

7   A.   Yes.  Scott Spear writes:  Massage and personal services

8   in the Services Category Forums, (sex, gay, lesbian -- we need

9   to do some work here) personals, specifically MSM, which is --

10  Q.   Can I stop you?  What does that stand for?                  04:31:11

11  A.   Men seeking men.

12       -- and WSM, women seeking men, as they are loaded

13  with lewd and lascivious pics as well as escorts.

14  Q.   What did you understand lewd and lascivious pics to mean?

15            MR. FEDER:  Hearsay.  Speculation.                     04:31:37

16            THE COURT:  Overruled.

17            MR. CAMBRIA:  Relevance.

18            MS. BERTRAND:  Relevance.

19            THE COURT:  Overruled.

20            THE WITNESS:  That is extreme graphic close-ups of     04:31:42

21  genitalia or sex act pics.

22  BY MR. RAPP:

23  Q.   And then he also says:  As well as escorts.

24       What did you take that to mean that?

25  A.   The prostitutes are posting free ads in Dating and this is  04:32:03

United States District Court

CARL FERRER - Direct

| | |
|---|---|
| 1 | going to be a lot of work to try to convert them into paid | 04:32:07 |
| 2 | customers in the Female Escorts category. |
| 3 | Q.   All right.  Was that something of a concern? |
| 4 | A.   It was a concern.  Scott Spear was invested in this |
| 5 | project to build -- | 04:32:25 |
| 6 |         MR. FEDER:  Move to strike.  Hearsay.  Speculation. |
| 7 |         THE COURT:  Sustained.  Sustained and I think we -- |
| 8 | are you done with this exhibit or are you going to move on? |
| 9 |         MR. RAPP:  I've got just a couple quick questions. |
| 10 |         THE COURT:  The only reason I ask is, if we can | 04:32:46 |
| 11 | finish quickly, we should because we're at about 4:33 now and |
| 12 | so I promised our jurors we would break around this time.  But |
| 13 | if you have one question left . . . |
| 14 |         MR. RAPP:  I'll tell you what.  How about we just |
| 15 | break and I'll -- we'll take it up tomorrow. | 04:33:03 |
| 16 |         THE COURT:  Okay. |
| 17 |         Members of the jury, we are now at our afternoon |
| 18 | recess.  And, again, it's vitally important that you not make |
| 19 | up your minds.  We're at the very beginning stages of the case, |
| 20 | as you know. | 04:33:18 |
| 21 |         We took a week off, essentially, to enable some of |
| 22 | our participants to get better and, hopefully, I'm on the mend |
| 23 | here, too.  But in any event, I just ask that you, again, not |
| 24 | do any research, not talk to any of your co-workers or your |
| 25 | family members or your friends about what has transpired in the | 04:33:37 |

United States District Court

CARL FERRER - Direct

1   court.  Doing so will then kind of lead you down the rabbit                   04:33:42

2   hole of trying to make up your mind about what's going on and

3   what's being said.

4          We still have a long way to go so simply just keep an

5   open mind.  Maybe do something more enjoyable tonight and get     04:33:54

6   out there.  I think it's under 100 degrees today, thankfully.

7          And so with that, we will stand in recess until

8   sharply nine a.m. tomorrow.

9          Please all rise for the jury.

10         (Jury departs at 4:34.)                                     04:34:09

11         THE COURT:  All right.  Please be seated and I ask

12  those who are in the courtroom to remain seated for a few

13  minutes to permit our jurors to leave uninterrupted.

14         Now, let me just clarify for the record, Mr. Rapp.  I

15  know that previously the prior Court and this Court did          04:34:54

16  indicate to you that the letters, the Attorney General letters

17  and so on were admissible; but the way in which you went about

18  seeking to admit, I thought that what you were going to do is

19  show Mr. Ferrer the letters.

20         MR. RAPP:  I am going to do that.                          04:35:26

21         THE COURT:  So in any event, I sustained the hearsay

22  objection because of the manner in which the testimony was

23  being elicited so I just wanted to clarify that so that you

24  understand.

25         MR. RAPP:  I do.                                           04:35:44

United States District Court

CARL FERRER - Direct

1    THE COURT:  And I will say that Mr. Feder's point is        04:35:45

2    a good one in terms of identifying the time frame in which

3    you're talking about because we've talked about a whole range

4    of time, from 2004 to 2018.

5        When you talk about so many activities occurring, it      04:36:03

6    would be very helpful for the jury to understand the time frame

7    because, as you know, some of the individuals here have claimed

8    that they weren't employed at the time at Backpage at the time

9    that certain things happened.

10       With that, we will resume --                              04:36:22

11       Oh, and I wanted to say, Mr. Cambria, although I

12   enjoy hearing from you and your objections, we need not

13   highlight the objection.  Hearsay objection is a hearsay

14   objection.  It doesn't necessarily have to be emphasized by

15   saying it's a rank hearsay objection, so just be mindful of     04:36:39

16   that.

17       MR. RAPP:  Can I just briefly, Judge.  You know, we

18   went through a huge process of going through these exhibits and

19   the defense made a very robust record on that.  I don't know if

20   we need to have them throw out all of the citations to the      04:36:57

21   Federal Rules of Evidence.  If they could just say "our

22   previous objections," I think that does it for the record.  I

23   only suggest this just in the interest of time.

24       The second part of this is a minor point is, once I

25   admit it, can we just automatically just publish it just so I    04:37:21

CARL FERRER - Direct

1    don't have to ask those additional, because I would have to do    04:37:25

2    that on 400 exhibits, so I'm just looking for ways to

3    streamline this.

4            THE COURT:  So you're asking for an automatic

5    publication after it's been admitted?    04:37:36

6            MR. RAPP:  Yes.

7            THE COURT:  Is there an objection?

8            MS. BERTRAND:  I don't know because I don't know how

9    it's going to come in.

10           THE COURT:  And I think that's the problem with    04:37:46

11   respect to some of the exhibits, because I think some of the

12   exhibits, depending on how you're going to show them, either

13   are going to be part of the email or not.  So let's just move

14   forward in terms of the publication.

15           And with regard to the other objections, I did tell    04:38:01

16   counsel that in order to preserve the record at the appropriate

17   time that the exhibit was being offered, that they were

18   entitled to place their actual objections on the record.  And

19   so we'll move forward in that way.  I think it's fine the way

20   it's going in terms of citing the rule and not arguing the    04:38:19

21   objection.

22           So with that, let's stand in recess.

23           MR. EISENBERG:  Your Honor, I'm sorry.  Dave

24   Eisenberg.  I do have a housekeeping question for you.  I

25   believe -- I heard that this witness may be on the witness    04:38:35

United States District Court

CARL FERRER - Direct

1   standard for several days, maybe weeks.  We have discussed          04:38:39

2   among ourselves when we should be letting the Government know

3   what exhibits we intend to use in cross-examination.  I'm not

4   sure, the way I read some of the trial orders, whether that --

5   is that a three-day?  So --                                          04:39:00

6          THE COURT:  Yes.  It is a three-day requirement.

7   So -- well, I think, you know, Mr. Rapp or part of his team can

8   kind of tell you or give you an idea how much further

9   Mr. Ferrer is going to go but you're talking about in

10  cross-examination?                                                   04:39:21

11         MR. EISENBERG:  Correct, Your Honor, yes.

12         THE COURT:  And I think they can alert you as to when

13  they are getting ready for him to finish his testimony.

14         And if you could be mindful of that, it would help

15  you in the long run in terms of receiving those exhibits that       04:39:33

16  will be used on cross-examination as well.

17         MR. EISENBERG:  It would be helpful.

18         THE COURT:  I mean it's unpredictable, we know, but

19  do the best that you can.

20         MR. RAPP:  Certainly.                                         04:39:46

21         THE COURT:  All right.  Have a good evening.

22         COURTROOM DEPUTY:  All rise.

23         (Whereupon, these proceedings recessed at 4:39 p.m.)

24                         * * * * *

25

United States District Court

1                    C E R T I F I C A T E                    04:39:52

2

3          I, ELAINE M. CROPPER, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of      04:39:52

6    Arizona.

7

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled    04:39:52

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15         DATED at Phoenix, Arizona, this 12th day of              04:39:52

16   September, 2023.

17

18

19

20                         s/Elaine M. Cropper                       04:39:52

21                         _____

22                         Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                  04:39:52

                    United States District Court