UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, ) | |
| ) | No. 2:18-cr-00422-DJH |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Phoenix, Arizona |
| Michael Lacey, et al., ) | September 14, 2023 |
| ) | 9:00 a.m. |
| Defendants. ) | |
| _____) | |

**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL – DAY 6**

**(A.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                      A P P E A R A N C E S

 2   For the Government:
         UNITED STATES ATTORNEY'S OFFICE
 3       By:  Mr. Kevin M. Rapp, Esq.
              Mr. Andrew C. Stone, Esq.
 4              Mr. Peter Shawn Kozinets, Esq.
              Ms. Margaret Wu Perlmeter, Esq.
 5       40 North Central Avenue, Suite 1800
         Phoenix, Arizona  85004-4408
 6       kevin.rapp@usdoj.gov
         peter.kozinets@usdoj.gov
 7       andrew.stone@usdoj.gov
         margaret.perlmeter@usdoj.gov
 8       - and -
         UNITED STATES DEPARTMENT OF JUSTICE
 9       By:  Mr. Austin Berry, Esq.
         1301 New York Avenue NW, 11th Floor
10       Washington, DC  20005
         austin.berry2@usdoj.gov
11

12   For the Defendant Michael Lacey:
         LIPTSITZ GREEN SCIME CAMBRIA, LLP
13       By:  Mr. Paul J. Cambria, Esq.
         42 Delaware Avenue, Suite 120
14       Buffalo, New York  14202
         pcambria@lglaw.com
15
     For the Defendant Scott Spear:
16       KESSLER LAW OFFICE
         By: Mr. Eric Walter Kessler, Esq.
17       6720 North Scottsdale Road, Suite 210
         Scottsdale, Arizona  85253
18       eric.kesslerlaw@gmail.com
         - and -
19       FEDER LAW OFFICE, PA
         By:  Mr. Bruce S. Feder, Esq.
20       2930 East Camelback Road, Suite 160
         Phoenix, Arizona  85016
21       bf@federlawpa.com

22

23

24

25
```

**A P P E A R A N C E S (Cont'd)**

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
          **Mr. Gary S. Lincenberg, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, California  90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com
    aneuman@birdmarella.com

For the Defendant Andrew Padilla:
    DAVID EISENBERG, PLC
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, Arizona  85012
    david@deisenbergplc.com

For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ, LLC
    By:  **Ms. Joy Malby Bertrand, Esq**
    P.O. Box 2734
    Scottsdale, Arizona  85252-2734
    Joy@joybertrandlaw.com

1                              **I N D E X**

2     **WITNESSES FOR THE GOVERNMENT:**                         **PAGE**

3     Carl Ferrer
                Direct Examination (Cont'd) by Mr. Rapp         8
4

5

6                               **EXHIBITS**

| **NO.** | **DESCRIPTION** | **REC'D** |
|---|---|---|
| 49 | Email from Padilla to Hyer and Ferrer, 09/01/2010 DOJ-BP-0000005736 | 19 |
| 52 | Attorneys General Letter to Backpage, 09/21/2010 DOJ-BP-0000006947-DOJ-BP-0000006949 | 54 |
| 57 | Emails between Padilla and Mohan, 10/11/2010 DOJ-BP-0000005372 - DOJ-BP-0000005373 | 99 |
| 58 | Email from Padilla to Hyer, Vaught, and Moderators (with attachments), 10/16/2010 DOJ-BP-0000012943 | 101 |
| 58a | Attachment. PowerPoint depicting a series of 38 with approval instructions DOJ-BP-0000012944-DOJ-BP-0000012981 | 105 |
| 106 | Emails between Ferrer, Larkin, and Spear, 04/19/2011 DOJ-BP-0000196949-DOJ-BP-0000196950 | 54 |
| 593a | Screenshot linked to posting, "Ev3Ry !!! M@N's!///!!% W3tt *** Dre@M__ CuM% TruE*** - 24", USAO-BP-0024586 | 12 |
| 593b | Screenshot linked to posting, "** I JuST TuRNeD 18 YeSTeRDaYY** FiNaLLY LeGaL -18", USAO-BP-0024587 | 12 |

24

25

1                          **EXHIBITS (Cont'd)**

2      **NO.**          **DESCRIPTION**                           **REC'D**

3      600      Emails between Ferrer, Padilla and Hyer,        88
               Review/Moderation Instructions for Indian
4              Moderators, 10/05/2010,
               DOJ-BP-0002124350 - DOJ-BP-0002124355
5
       804      Emails between Lacey and Spear, "Re: The        17
6              whole CNN Transcript", 04/28/2010,
               DOJ-BP-002131048
7
       907      Email from Ferrer regarding TER,                83
8              09/22/2010 DOJ-BP-0002124449 -
               DOJ-BP-0002124451
9
       918      Emails from Padilla, Ferrer, Spear,             30
10             "equipment and staff", 09/05/2010
               USAO-BP-0023403 – USAO-BP-0023404
11
       923      Email, "Fwd: Change.org petition against        40
12             VVM", 09/14/2010
               USAO-BP-0023412
13
       925      Emails from Spear, Larkin, "Ernie Allen         52
14             testimony", 09/15/2010
               USAO-BP-0023416
15
       932      Letter to Backpage from Montgomery County,      44
16             MD, faxed 09/21/2010
               USAO-BP-0023427 – USAO-BP-0023428
17
       933      Emails from Ferrer, Spear, "Response to         50
18             Maryland fax", 09/22/2010
               USAO-BP-0023429
19
       938      Emails from Spear to Lacey, Larkin, Ferrer      73
20             and others, 09/30/2010,
               USAO-BP-0023438 - USAO-BP-0023440
21
       1187     Filter term form noting Padilla banning        23
22             the term "cum", 09/01/2010,
               DOJ-BP-0000104362 – DOJ-BP-0000104363
23

24

25

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 1609a | Version of Exh 1609, page 1 only, USAO-BP-0015533 | 39 |
| 1610 | AIM Group Release, "Backpage replaces Craigslist as prostitution-ad leader", 10/19/2010, USAO-BP-0015506 – USAO-BP-0015508 | 35 |
| 1613 | Emails from Ferrer to Kim, "Re: Craigslist", 09/03/2010, DOJ-BP-0002124684 – DOJ-BP-0002124687 | 27 |

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (Defendants are present and out of custody.) |
| 3 | (Court was called to order by the courtroom deputy.) |
| 4 | (Proceedings commence at 9:00 a.m.) |
| 5 | (Jury not present at 9:00 a.m.) |

1  **P R O C E E D I N G S**

2  (Defendants are present and out of custody.)

3  (Court was called to order by the courtroom deputy.)

4  (Proceedings commence at 9:00 a.m.)

5  (Jury not present at 9:00 a.m.)                    09:00:35

6  THE COURT:  I think all of our jurors are present, and

7  so let's have the jury in.

8  MR. RAPP:  Your Honor, may I put the witness on the

9  stand?

10  THE COURT:  Yes, please.                          09:00:48

11  MR. RAPP:  Thank you.

12  THE COURT:  Let's do that before our jurors come.

13  All rise for the jury.

14  (Jury present at 9:01 a.m.)

15  THE COURT:  And good morning, members of the jury.   09:02:24

16  And I just wanted to say that I know I try to take breaks at an

17  even time in the morning, but if there's at any time that any

18  one of you need to take a break quicker than that, just simply

19  raise your hand, and we can try to accommodate the best we can.

20  I just know we're not always on the same clock oftentimes, so   09:02:47

21  don't be shy about letting me know if somebody needs to take a

22  break for any reason.

23  And so with that, the record will reflect the presence

24  of the jury, the presence of the parties, with the witness

25  present.                                          09:03:03

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          And, Mr. Rapp, you may continue.

2          MR. RAPP:  Thank you, Your Honor.

3               DIRECT EXAMINATION (Cont'd)

4    BY MR. RAPP:

5    Q.  Good morning, Mr. Ferrer.                              09:03:07

6    A.  Good morning.

7    Q.  When we broke last night, we were talking about Craigslist.

8          Do you recall that?

9    A.  Yes.

10   Q.  And did there come a time in April of 2010 where Craigslist   09:03:15

11   was critical on a blog of Backpage?

12   A.  Yes.  He threw us under the bus.

13   Q.  All right.  And when you say he threw you under the bus,

14   what are you referring to?

15   A.  He put links on his blog going to Backpage ads and cited   09:03:41

16   Backpage as being worse than Craigslist.

17   Q.  All right.  And was this a blog where Craigslist, in your

18   words, was throwing Backpage under the bus?  Was there any

19   discussion with the ownership or upper management regarding

20   this?                                                      09:04:09

21          MR. PANCHAPAKESAN:  Object to the term of "upper

22   management" as vague.

23          THE COURT:  Well, I guess sustained.

24   BY MR. RAPP:

25   Q.  Who did -- did you talk to anybody at Backpage about this   09:04:17

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    blog?

2    A.  Yes.  Scott Spear.

3    Q.  All right.  And what was the -- the subject of your

4    conversation with Mr. Spear regarding this blog?

5               MR. FEDER:  Hearsay.  Hearsay.                    09:04:30

6               THE COURT:  Sustained.

7               You can ask him what he said.

8               MR. RAPP:  What -- excuse me?  What who said?

9               THE COURT:  You can ask him what he said.

10   BY MR. RAPP:                                                 09:04:43

11   Q.  What did Mr. Spear say?

12              THE COURT:  No.  That's hearsay.

13              MR. RAPP:  That's admission.  It's a party opponent.

14              THE COURT:  Overruled.

15   BY MR. RAPP:                                                 09:04:53

16   Q.  What did he say?

17   A.  Let's write a response to Backpage.

18              MR. FEDER:  That's hearsay.  That's been sustained

19   twice.

20              THE COURT:  And I have now overruled.  I've changed my  09:05:00

21   ruling, Mr. Feder.

22              MR. FEDER:  Okay.

23              THE COURT:  You may reask the question.

24              I'm sorry.  Because we interrupted, reask the

25   question.  He can reanswer.                                  09:05:10

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          MR. RAPP:  Thank you.

2     BY MR. RAPP:

3     Q.  What did he say?

4     A.  He said:  Let's write a response to Craigslist and put it

5     up on the Backpage blog.                                    09:05:18

6     Q.  Right.

7     A.  And I agreed with him.

8     Q.  Okay.  And did you do anything else with respect to what

9     the -- what Craigslist had written in their blog about

10    Backpage?                                                   09:05:30

11    A.  Yes.  He pointed out an ad --

12          MR. FEDER:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  He pointed out an ad that was on

15    Backpage that was linked to an obvious prostitution ad that had  09:05:46

16    a sex act in the image.  So we needed to remove that ad.

17    BY MR. RAPP:

18    Q.  All right.  And have you -- have you looked at the ads that

19    were part of the link in the Craigslist blog in preparation for

20    your testimony?                                             09:06:06

21    A.  Yes.

22    Q.  I'm now showing you 593a on -- for the witness's eyes only.

23          THE COURT:  And could you get closer to the mic,

24    Mr. Rapp.

25          MR. RAPP:  Yes, ma'am.                                09:06:23

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          THE COURT:  Did you say -- what was the exhibit?

2          MR. RAPP:  593a.

3    BY MR. RAPP:

4    Q.  Sir, do you recognize this?

5    A.  Yes, I do.                                          09:06:38

6    Q.  How is it that you recognize this?

7    A.  This is one of the ads that Craigslist linked in his blog.

8    Q.  And how do you know that?

9    A.  Because the link appeared in the blog.

10   Q.  All right.  And how do you know this is a -- how do you     09:06:57

11   know this is a Backpage ad?

12   A.  Well, I'm familiar with the look and feel on how Backpage

13   looks, how the ads are organized.  It has certain features on

14   the document that -- or screenshot here of the ad, like other

15   ads by user, that's very unique with Backpage.             09:07:22

16   Q.  All right.  And is that the case with United States 593a?

17   A.  Yes.

18          MR. RAPP:  All right.  Move to admit 9- -- 593 --

19   BY MR. RAPP:

20   Q.  Actually, did you look at another one?  Let me put that up,  09:07:35

21   too, and we'll just do this all at the same time.

22          Did you look at 593b?

23   A.  Yes.

24   Q.  And, again, is that also one of the ads that was linked to

25   the blog?                                                 09:07:49

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    A.  Yes.

2    Q.  And did it have the same indicators that suggested to you

3    that this came from Backpage?

4    A.  Yes.  The exact -- it had -- yes, it had the -- those

5    indicators.                                                    09:08:04

6           MR. RAPP:  All right.  Move to admit 593a and b.

7           MS. BERTRAND:  Objection.  Hearsay.

8           THE COURT:  Overruled.

9           MR. CAMBRIA:  And 404(b) also.

10          THE COURT:  Overruled.                                  09:08:17

11          It may be admitted and published.

12          (Exhibits 593a-593b admitted into evidence.)

13          MR. RAPP:  And published.  Thank you, Your Honor.

14   BY MR. RAPP:

15   Q.  All right.  So this is -- is this one of the links that    09:08:23

16   Craigslist included on their blog?

17   A.  Yes.

18   Q.  And just do you see where the arrow is up there?

19   A.  Yes, I see the arrow.

20   Q.  Can you explain that, what that means.                     09:08:39

21   A.  That means that this document was captured from Way Back

22   Machine from the Craigslist blog.

23   Q.  All right.  And then with respect to the image -- the text,

24   rather, is -- is this a typical posting that you would see on

25   Backpage during this time frame, in April of 2010?            09:09:07

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          MS. BERTRAND: Objection to the term "typical."

2          And leading.

3          THE COURT:  Well, I'll sustain.

4          MR. RAPP:  All right.

5    BY MR. RAPP:                                                09:09:18

6    Q.  Let's go through some of it.

7          Is there anything in this posting that would suggest

8    to you that this was for prostitution?

9          MS. BERTRAND:  Objection.  Speculation and leading.

10         THE COURT:  Well, overruled.  I think there's been    09:09:31

11   sufficient foundation laid for his understanding of what his

12   understanding of what looks like prostitution ads, and so

13   overruled.

14         THE WITNESS:  Yes.  There's a number of terms.

15   BY MR. RAPP:                                                09:09:47

16   Q.  Can you -- can you tell the jury.  Give them some examples

17   of the terms.

18   A.  I think I'll circle them on the screen.

19         There's "just waiting to xxxplode.  I'm very horny."

20         I'm going to -- "juicy apple bottom booty up & down    09:10:07

21   ure big" -- and that's obviously cock.

22         "I'm experienced."

23         Toe curling and mind blowing are normally code words.

24   Q.  Did -- was there -- did you observe in this ad any effort

25   to misspell some of those terms?                            09:10:30

CARL FERRER - DIRECT EXAMINATION (Cont'd)

```
1   A.  Yes.  I -- I think that C-O-C-K is misspelled with a

2   C-*-C-K.

3   Q.  All right.  Anywhere else?

4   A.  Well, there's another sentence here.  "Let me cum help you

5   bust a fat load."                                               09:10:55

6   Q.  All right.  How about with respect to anything that

7   suggests a time limit and a price?

8         MS. BERTRAND:  Objection.  Leading.

9         THE COURT:  Overruled.

10        THE WITNESS:  So this ad has 80 roses for a quick          09:11:18

11  session.  And the quick session normally is oral sex.

12        Then you've got the $100 half hour and the full hour

13  for 200 roses, which is, obviously, 200 cash.

14  BY MR. RAPP:

15  Q.  All right.  And what about -- we talked earlier in your     09:11:42

16  testimony about incall/outcall.

17        Do you see anything like that in the text?

18  A.  Yes.  I missed that.  Outcall is right there.

19  Q.  All right.  And then in terms of the images -- look at just

20  quickly.  Were the images also suggestive of prostitution?      09:12:08

21  A.  The top image is full nudity, exposing genitalia.

22  Q.  All right.  And during this time frame, in April of 2010,

23  were you engaging -- was Backpage engaging in moderation

24  efforts?

25  A.  Yes.                                                        09:12:46
```

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   Q.  Any explanation as to how those terms and images got

2   through?

3          MR. EISENBERG:  Objection, Your Honor.  No foundation

4   for how that --

5          THE COURT:  All right.  Sustained.                    09:12:59

6   BY MR. RAPP:

7   Q.  Well, how many moderators did you have at this time?

8   A.  2010?  What month is this?

9   Q.  April of 2010.

10  A.  So I'm -- I'm going to say at least 20 moderators.  But we  09:13:13

11  had thousands of ads posted in many markets, and so we're just

12  not getting to them all.

13  Q.  All right.  And then looking quickly at the next link, this

14  is 593b.

15         MR. RAPP:  And request permission to publish it.  It    09:13:33

16  has been admitted.

17  BY MR. RAPP:

18  Q.  Again, is --

19         THE COURT:  Yes, you can publish.

20         MR. RAPP:  Thank you.                                  09:13:42

21  BY MR. RAPP:

22  Q.  And is this the other link in the Craigslist blog that --

23  that you -- you located?

24  A.  Yes.

25  Q.  All right.  And did you -- was there any discussion of      09:13:54

**CARL FERRER - DIRECT EXAMINATION (Cont'd)**

1  doing -- and I think you might have testified to this, that you

2  would do a response to the Craigslist blog?

3  A.  Yes.  I'm not sure if it was for these ads or some earlier

4  ads that Craig had linked to.  But, yes, we wrote a response,

5  and we put it on the Backpage blog.                          09:14:17

6  Q.  All right.  And was that response accurate in terms of --

7  of the -- the marketing strategies that Backpage had -- had

8  been engaging in?

9  A.  We didn't respond to Craigslist with any disclosure of our

10  marketing strategies, from stealing their ads to our          09:14:39

11  relationship with The Erotic Review.

12  Q.  All right.

13         MR. RAPP:  Now moving on to Exhibit 804.  This is for

14  the witness's eyes only.

15  BY MR. RAPP:                                                  09:15:10

16  Q.  Do you recognize this email?

17  A.  Yes.

18  Q.  And who is on this email?

19  A.  This is an email from Scott Spear to Carl Ferrer, Jim

20  Larkin, and Michael Lacey.  It's also copied Sam Fifer, Bill  09:15:29

21  Jensen, and Scott Tobias.

22  Q.  All right.  And -- and in terms of the subject matter of

23  this email, do you recall what that was?

24  A.  Yeah.  It's a -- there was a transcript that -- with

25  comments about Blumenthal, HE, in Connecticut regarding       09:16:02

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  Craigslist and Backpage.

2  Q.  All right.  And we had looked at at least one Attorneys

3  General letter.  And did that letter -- did that letter have

4  Mr. Blumenthal as the Attorney General of Connecticut?  Was he

5  one of the signatories on that letter?                           09:16:25

6  A.  Yes.

7  Q.  All right.  And -- and did -- was

8  Attorney-General-at-the-time Blumenthal, was he the subject of

9  discussion within Backpage?

10 A.  He was very much so.                                         09:16:38

11 Q.  And with whom in Backpage did they discuss Attorney General

12 Blumenthal?

13 A.  I recall Jim Larkin and Scott Spear and myself had

14 conversations regarding Attorneys General Blumenthal.

15 Q.  All right.  And was Attorney General Blumenthal publically   09:17:02

16 critical of Backpage?

17 A.  Yes.

18         MR. RAPP:  Move to admit Exhibit 804.

19         MR. FEDER:  Same.

20         THE COURT:  It may be admitted and published.           09:17:18

21         (Exhibit 804 admitted into evidence.)

22 BY MR. RAPP:

23 Q.  So this is -- the email starts up here, but just you're on

24 it.

25         Who else is on it?                                       09:17:41

18

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   A.  I'm on it.  It's from Scott Spear.  So it's going to Carl

2   Ferrer, Jim Larkin, Michael Lacey, Sam Fifer, Bill Jensen,

3   Scott Tobias.

4   Q.  And what does Mr. Lacey ask you gentlemen?

5   A.  I -- I think I forgot to mention Michael Lacey.          09:18:04

6           So in this email, Spear's responding to --

7           MR. CAMBRIA:  Objection, Your Honor.  Not responsive.

8           THE COURT:  Sustained.

9   BY MR. RAPP:

10  Q.  What does it say in this email?                          09:18:26

11  A.  "Is there any evidence of child trafficking anywhere?

12  Lacey."

13  Q.  And what does Mr. Spear tell Mr. Lacey?

14  A.  Mr. Spear writes, "We have had subpoenas that deal with

15  this exact issue.  More details and specifics later today.  We   09:18:42

16  get a ton of subpoenas that we comply with on a daily basis."

17  Q.  All right.  And at this point -- and I think you have

18  testified to the amount of subpoenas Backpage received over the

19  life of its existence.  But by 2- -- 2010, do you have any idea

20  how many subpoenas Backpage was receiving for                09:19:05

21  prostitution-related offenses?

22  A.  It's increasing.  I'm going to say probably 20 a month.  10

23  to 20 a month at this time.  Eventually it would go to 100 a

24  month.

25  Q.  All right.  I now want to show you Exhibit 49.            09:19:25

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1        And who is this an email from?

2   A.  The email's from Andrew Padilla.

3   Q.  And who is it to?

4   A.  Dan Hyer.  And I'm copied, Carl Ferrer.

5   Q.  All right.  And is this -- and when is this email sent?    `09:20:03`

6   A.  It's sent Wednesday, September 1st, 2010.

7   Q.  All right.

8        MR. RAPP:  Move to admit Exhibit 49.

9        THE COURT:  It may be admitted and published.

10       (Exhibit 49 admitted into evidence.)                      `09:20:26`

11       MR. RAPP:  Thank you.

12  BY MR. RAPP:

13  Q.  And what is Mr. -- if you could read Mr. -- what

14  Mr. Padilla is communicating to you and Mr. Hyre.  And I will

15  have some questions regarding what he's saying.                `09:20:33`

16  A.  Andrew Padilla writes, "Hey Dan, Scott had a meeting with

17  us today and he's pushing me hard to get the site as clean as

18  possible in the next 7 days."

19  Q.  Let me stop you there.

20       Do you know why -- and, first of all, does Scott --       `09:20:50`

21  who does that refer to?

22  A.  Scott Spear.

23  Q.  And do you know why in September of 2010 he is -- he had

24  this meeting with Mr. Padilla?

25       MR. FEDER:  Same.  And speculation.                       `09:21:05`

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

```
 1              THE COURT:  Sustained.
 2   BY MR. RAPP:
 3   Q.  Well, did you -- were you part of this meeting?
 4   A.  Yes.
 5   Q.  All right.  And what was Mr. Spear telling you during this    09:21:17
 6   meeting as to why he wanted to clean up the site?
 7   A.  We're under scrutiny from the Attorney Generals, and we
 8   need to clean up the sex act for money language and the blatant
 9   nudity and sex act pics.
10   Q.  And then -- and in this next -- in a -- the next full         09:21:41
11   paragraph, what does Mr. Padilla tell you -- tell you and
12   Mr. Hyer?
13   A.  Padilla writes, "I'm empowering the Phoenix staff to start
14   deleting ads when violations are extreme and repeat offenses.
15   When we delete ads, we're going to send an email from Sales."    09:22:02
16   Q.  Let me stop you there.
17              What is -- what did you take it to mean when he said
18   "when the violations are extreme and repeat offenses"?
19   A.  Well, the violations are extreme.  And repeat offenses
20   means that that it's very blatant sex for money, and they keep    09:22:26
21   reposting it over and over despite the ad being either edited
22   or removed.  So that becomes a repeat offense.
23              So we're just going to delete their ads instead of
24   editing their ads.  There's going to be no more -- no more
25   graces if you're a frequent violator.                            09:22:54
```

1   Q.   Okay.  But then when you go on where it says, "We're going

2   to send an email from Sales," what did you take that to mean?

3   A.   We want to avoid charge-backs.  So we're going to send an

4   email from Sales to let them know that, you know, their ad was

5   removed for violating the terms of use, and please post again        09:23:14

6   but follow the terms of use.

7   Q.   All right.  Then what does he say?

8   A.   "When we ban a user, we need to ban" -- "we need the ban to

9   stick for at least 30 days."

10  Q.   Do you know what is -- what was meant by that, by it needs      09:23:33

11  to stick for at least 30 days?

12  A.   So now if a user is a very -- if the violations are extreme

13  and repeat offenses, well, then Andrew Padilla's proposing to

14  ban the user, which means to block the email address from

15  posting for at least 30 days.                                        09:23:57

16  Q.   And then what else does he say?

17  A.   "When we Delete from the queue, we'll use Delete and

18  Notify."

19  Q.   All right.  And what does that mean?

20  A.   Delete and notify is a function where we alert the user         09:24:11

21  that posted the ad that was deleted that their ad is deleted,

22  please follow the terms of use.

23  Q.   All right.  And then what is the last thing that

24  Mr. Padilla tells you?

25  A.   "We'll do everything to notify the user so it's not a total     09:24:29

1    snub and we'll do everything we can to affect only the worst

2    apples."

3    Q.  What did you take that to mean?

4         Let me just be more specific?  What did you -- what

5    did you take it to mean when he said, "It's not a total snub"?    09:24:46

6    A.  We're very customer service friendly to those posting

7    prostitution ads in our adult section.  So we -- we have really

8    good customer service.  So it's not a total snub.  We're

9    letting them know that, look, you got to follow the posting

10   rules.                                                           09:25:11

11   Q.  All right.  Okay.  Let's look at Exhibit 1187.

12        Do you recognize this document?

13   A.  Yes.

14   Q.  How is it that you recognize this document?

15   A.  This is a in turn -- internal administrative document that   09:25:30

16   would come up on the screen whenever we enter terms for our

17   blocking term and stripout term technology.

18   Q.  And who -- who is responsible for that, the blocking terms

19   or the stripout -- stripping out of terms?  Who -- who at

20   Backpage would be responsible for that?                         09:26:04

21   A.  Andrew Padilla enters the terms most of the time.  Once in

22   a while I'll enter a few, and sometimes others will, but Andrew

23   Padilla enters the vast majority of them.

24   Q.  All right.  And -- and is he doing that with this

25   particular document?                                            09:26:19

1    A.  Yes.

2          MR. RAPP:  Move to admit 1187.

3          THE COURT:  Yes.  1187 may be admitted and published.

4          (Exhibit 1187 admitted into evidence.)

5    BY MR. RAPP:                                        09:26:35

6    Q.  Just to look, when was this -- when would -- when was this

7    stripping submitted?

8    A.  So this term was entered on Wednesday, September 1st --

9    1st, 2010.

10   Q.  All right.  And -- and in the term, what is the term that  09:26:54

11   he's stripping -- or banning, rather?

12          MR. EISENBERG:  Objection, Your Honor.  That misstates

13   what's in this document.  It's something other than stripping.

14          THE COURT:  Well, is the objection to the word

15   "strip"?                                            09:27:10

16          MR. EISENBERG:  It is, Your Honor.  It's not marked.

17   He's misstating evidence.

18          THE COURT:  All right.  Mr. -- Mr. Rapp?

19          MR. RAPP:  Okay.

20   BY MR. RAPP:                                        09:27:18

21   Q.  Why don't you -- why don't you explain this document.

22   What's going on?

23   A.  So the term is the word that we're going to put into the

24   filter.  So this term is C-U-M.  And then if you go below,

25   there's an action section, and we can program the filter to  09:27:34

**CARL FERRER - DIRECT EXAMINATION (Cont'd)**

1   either ban the term, flag it as spam, or strip the term from

2   the ad.

3            The two that's -- are most relevant is the ban and the

4   strip term from ad, because we would use either one quite a

5   lot.  Ban means that you won't be able to post the ad if the          09:27:56

6   term C-U-M is in the ad.

7            And there will be a message.  Sometimes that message

8   is just, oops, there's an error, and so then they know

9   something's wrong with my ad.

10           Let me change some of these words.  Okay.  Now it             09:28:20

11  works.

12           And then sometimes we put in a message that actually

13  said C-U-M is not allowed.  So that would save them a lot of

14  time.

15           So the next field that's really important is the             09:28:31

16  description, which I'll circle right there.  The description

17  was a requirement that whenever staff entered a term, that we

18  would have them put in the date and the initials and the

19  category that they entered the term for.

20  Q.  All right.                                                        09:28:58

21  A.  So --

22  Q.  And who are the initials here?

23  A.  This -- these are Andrew Padilla's initials.

24  Q.  All right.  And when -- while you were at Backpage and --

25  and these -- either a ban or a strip term was submitted to a          09:29:13

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  poster, did you come to learn that the poster would resubmit

2  their ad?

3  A.  When the term is banned, they just keep trying until they

4  figure out what's -- they just edit their ad.  That's what we

5  really liked about the filtered term technology, is that it          09:29:38

6  allowed users to self-sensor.  It coached them.  You could put

7  in terms that aren't allowed, like maybe BJ.  They get a

8  message.  They know they need to misspell the word if they want

9  to have that term in there or not use it.  And they're able to

10 get their ad posted.                                                 09:29:58

11 Q.  All right.  Let's look at the second page of 1187, too.

12 All right.

13       And then can you just tell us -- this section on down,

14 can you explain what's going on here.

15 A.  Yes.  Can we remove that little --                               09:30:17

16 Q.  Yes, I can.

17 A.  -- thing that I just -- so what -- what we have here is the

18 category that we're going to not allow the word cum to appear

19 in, C-U-M.  So we're not going to allow it in these categories:

20 Female escorts.  Body rubs.  Male escorts.  Transsexual              09:30:39

21 escorts.  Domination.  Adult jobs.  Strippers.

22       And then what's the most important part of this

23 technology is that the message to the poster you could

24 customize.  So this is the message that a user would see when

25 they hit submit to post their ad.  If they have C-U-M in the ad      09:31:02

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  text, it's going to tell them cum is a forbidden word in this

2  category.  That's enough.  They know.  All right.  I got to

3  take out that word.

4  Q.  All right.  Now, at this time -- so what happened, if

5  anything, to Craigslist during September of 2010?                    09:31:28

6  A.  I believe that he abandons his adult section, and Backpage

7  inherits the bulk of his business.

8  Q.  How did that impact Backpage in terms of the -- first in

9  terms of the volume of postings it might have received?

10 A.  It was a firehose of content coming in.  Our servers were       09:31:59

11 slowing down.  We needed to buy equipment.  It was a whole new

12 game.

13 Q.  And what about revenue?  Did it impact the revenue for

14 Backpage?

15 A.  Revenue increased significantly, and there was a lot of         09:32:19

16 excitement in the office.

17 Q.  All right.  When you say, "There was a lot of excitement in

18 the office," what do you mean by that?

19 A.  Spear and I knew that we were going to blow the budget out.

20 That revenue was going to be exploding through the remainder of      09:32:39

21 the quarter.

22 Q.  Now, with respect to -- during September of 2010, did you

23 still have any relationships with who you've described as super

24 posters?

25 A.  Yes.                                                             09:33:00

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    Q.  I'm showing you Exhibit 1613.

2         Do you see that on your screen?

3    A.  Yes, I do.

4    Q.  And how many is -- is this an email?

5    A.  Yes.                                                    09:33:15

6    Q.  And how many pages is the email?

7    A.  Four.

8    Q.  And who is this email -- who is this email exchange

9    between?

10   A.  It's an email exchange between myself and Sean Kim, a super   09:33:27

11   poster in New York.

12   Q.  All right.  And -- and what is basically the subject of

13   this email exchange?

14   A.  Craigslist.

15   Q.  All right.                                              09:33:46

16        MR. RAPP:  Move to admit 1613.

17        THE COURT:  It may be admitted and published.

18        (Exhibit 1613 admitted into evidence.)

19   BY MR. RAPP:

20   Q.  Going to page 3, what does Sean Kim tell you on August 31st   09:34:03

21   of 2010?

22   A.  Sean Kim writes:  Hey Carl.  How are you?  Are you guys

23   experiencing any big spike on your traffic or posting volume

24   today?  Not sure if you know but Craigslist made a big change

25   today.  Basically, they disabled reposting of all previous ad   09:34:32

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  that were posted before 5:30 p.m. today, and they are asking to

2  redo the ad at a reduced fee.  And each new ads are going to be

3  reviewed by their lawyers.  And ads getting approved, they are

4  just are getting more strict than before.  I know they were

5  under a great deal of pressure from Attorney Generals to shut          09:34:58

6  down the adult section, but they want to do everything they can

7  to keep it open, I guess.  Is there anything going to change on

8  Backpage?

9  Q.  And what do you tell Sean Kim regarding the Attorney

10 Generals?                                                             09:35:21

11 A.  "Hey Sean.  The Attorney Generals asked us to do a better

12 job moderating.  You could expect the following:  Tighter

13 standards on language forbidding sex for money code words, no

14 sex act pics, no pics showing pink vaginas.  Since we are

15 smaller with less financial resources than Craig, we'll do our       09:35:44

16 best by manually reviewing the content.  Yes, we seem to be

17 getting busier (I thought it might be since summer was over)."

18 Q.  And going to page 2, what did he tell you as of September

19 10th -- or September 2nd of 2010?

20 A.  Sean Kim writes, "Hi Carl.  One of my sponsor ad did not          09:36:14

21 show up all day today.  Their name is unicornnyc.  Can you let

22 me know what's going on?"

23 Q.  And then what do you say to him?

24 A.  I think --

25 Q.  Or does he tell you what the --                                   09:36:34

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    A.   -- he gives me more info.

2    Q.   Yeah.  And do you ask him for more info?

3    A.   Yes.  I write:  Can you send link to ad?  I did a search on

4    ads posted today with unicornnyc.  None were sponsor ads.  It's

5    quite chaotic in New York.  Sponsor ads are under heavy demand.      09:36:50

6    There's always the possibility of a problem, so I just need

7    help finding it.  Carl.

8    Q.   And then he gives you the information regarding the link?

9    A.   He does.  He sends me the title of the ad.  "Unicorn NYC.

10   Turn your fantasy into a Reality with these HOTTIES."               09:37:09

11   Q.   So this is -- do you recall how many postings Mr. Kim was

12   providing to Backpage during this time frame in 2010?

13   A.   Yeah.  He's providing thousands of ads.

14   Q.   Okay.  And -- okay.  And is that still the case with this

15   other individual that you've identified as Dollar Bill?            09:37:40

16   A.   Yes.  Yes.

17   Q.   Now, in terms of the additional resources that you've

18   referenced, who do you have to get approval for to handle this

19   increased volume of postings that you're receiving?

20   A.   I need to get approval from Scott Spear, who then gets         09:38:10

21   approval from Jed Brunst, because we're going to be making

22   purchases that are not in the budget.

23   Q.   All right.  And then showing you Exhibit 918, do you

24   recognize this email?

25   A.   Yes.                                                           09:38:32

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  Q.  And I'm just -- who is all on this email?

2  A.  Well, I see Andrew Padilla down at the bottom here.  It's

3  got a signature on it.

4  Q.  All right.  And then on the first page, what is basically

5  the subject of this email?                                    09:38:58

6  A.  Andrew Padilla's giving me his request for equipment and

7  staff to handle the additional workload.

8  Q.  All right.

9          MR. RAPP:  Move to admit --

10 BY MR. RAPP:                                                  09:39:15

11 Q.  And is Scott Spear also on this email?

12 A.  Yes, he is.

13          MR. RAPP:  Move to admit United States 918.

14          MR. FEDER:  Same.  Same.

15          THE COURT:  Overruled.                               09:39:22

16          It may be admitted and published.

17          (Exhibit 918 admitted into evidence.)

18 BY MR. RAPP:

19 Q.  So just down here, and also on the second page of this,

20 what is -- what is Andrew Padilla telling you here?           09:39:38

21 A.  "I'm getting the personnel now.  I might have them all

22 ready to go in" -- "in 3" -- I'll start over.

23          "I'm working on getting the personnel now.  I might

24 have them all ready to go in 3 weeks.  We can't have Brian

25 change any of the specs on our equipment again."             09:40:03

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1        And so he lists the equipment that we need.  These

2  are -- this is equipment for the computer stations for the

3  staff.

4  Q.  All right.

5  A.  And then he lists the staff that he needs.                    09:40:15

6  Q.  All right.  And then do you pass this along to anybody?

7  A.  Yes.  I send it as a cap request to Scott Spear.  That's

8  a -- anytime you're going to spend over $500, it's a -- kind of

9  a formal process for capital acquisition.  So that I'm asking

10  him to email me approval so I can begin to make the purchase.   09:40:45

11  Q.  And then what does Mr. Spear say to you regarding this

12  request for additional equipment and staff?

13  A.  Spear writes, "Approved.  Go get em."

14  Q.  And what did you take that to mean, "go get em"?

15  A.  I can order the equipment, and then I can tell Andrew       09:41:13

16  Padilla to hire the additional personnel.

17  Q.  All right.  In September of 2010, if you know, did -- did

18  Backpage come under any increased scrutiny as a result of

19  Craigslist shutting down its adult category?

20        MS. BERTRAND:  Objection.  Leading.  Calls for            09:41:40

21  speculation.

22        THE COURT:  Rephrase.  I'll sustain.

23  BY MR. RAPP:

24  Q.  What, if anything, happened to Backpage in September of

25  2010?                                                           09:41:53

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  A.  The Attorneys General continue to send us letters demanding

2  that we make changes.

3  Q.  All right.  Are you familiar with an organization called

4  the AIM Group?

5  A.  Yes.  Very much so.                                    `09:42:17`

6  Q.  And how is it that you are familiar with that organization?

7  A.  AIM Group reports on classified marketplaces like

8  Craigslist and Backpage and -- and others, and it's -- their --

9  their report's worth reading.

10  Q.  All right.  Why is the report worth reading?            `09:42:42`

11  A.  Because they do detailed analysis about -- about websites

12  and their composition and how they're performing, and even was

13  doing analysis on Backpage.  And that's when we really started

14  to pay attention to them.

15  Q.  All right.  But -- so let's just be clear, though.  Do you  `09:43:01`

16  know -- do you have any idea how long this AIM Group has been

17  writing this analysis on classified websites?

18       Do you know how long they've been in existence?

19  A.  Decades.  They were referred by some as the bible of the

20  classified industry.                                      `09:43:22`

21  Q.  And -- and did you -- did they -- did they publish some

22  type of a -- of a -- of a report or anything on a -- on a

23  monthly or annual basis?

24  A.  They did.  They had this report called the Classified

25  Intelligence Report.                                      `09:43:42`

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   Q.  All right.  And is that something that you found yourself

2   looking at?

3   A.  Yes.

4   Q.  Did -- did you have a subscription, or did somebody within

5   Backpage have a subscription to it?                                09:43:55

6   A.  Initially I tried to avoid having to pay the subscription,

7   but, you know, I found a way to get the reports.  And then

8   eventually we did become a subscriber.

9   Q.  All right.  Was the -- the contents of that AIMS Group

10  report, was it discussed internally within Backpage?              09:44:17

11          MR. PANCHAPAKESAN:  Objection.  Foundation.  It's

12  vague as to the report.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes, we described their reports.  And we

15  talked about it a lot.                                            09:44:32

16  BY MR. RAPP:

17  Q.  All right.  When you say "we," who are you referring to?

18  A.  Scott Spear.  Jim Larkin.

19  Q.  All right.  And did you come to learn that a -- did you

20  read this AIMS Group report in -- in September 2010?              09:44:45

21  A.  Yes.

22  Q.  And do you know if Mr. Spear or Mr. Larkin read the AIMS

23  Group report?

24  A.  Yes.

25  Q.  How do you know that?                                         09:45:04

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    A.   Because we discussed the report.

2    Q.   All right.  And -- and specifically -- specific as to

3    Mr. Spear, what did you discuss in the report?

4    A.   Often we discussed the reporting metrics that AIM Group was

5    using in their Classified Intelligence Reports, and we weren't     09:45:22

6    very happy about some of their reporting.

7    Q.   All right.  Let's look at Exhibit 1610.

8         All right.  And do you see this on the screen?

9    A.   Yes.

10   Q.   And is this the -- a AIMS report?                             09:45:51

11   A.   Yes, this is a report that appeared in their marketplaces

12   blog.

13   Q.   And is this a report that you discussed with Mr. Spear?

14   A.   Yes.

15   Q.   All right.  And I believe that you -- you said that -- that   09:46:10

16   you and -- and you'll correct me -- Mr. Spear were not happy

17   with the information that was contained in this?

18   A.   We were extremely unhappy how he would characterize the

19   revenue generated by Backpage --

20   Q.   All right.                                                    09:46:34

21   A.   -- correct.

22        MR. RAPP:  Move to admit Exhibit 1610.

23        MR. FEDER:  Objection.  Hearsay, foundation, and the

24   other 401/403.

25        MS. BERTRAND:  In addition to that, 901 and 1006.            09:46:46

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          THE COURT:  Overruled.

2          And I will admit it but with a note to the jury that

3     the exhibit is not offered for the truth of the content, as

4     the -- it only goes to as what this witness recalls about the

5     report.                                                          09:47:14

6          (Exhibit 1610 admitted into evidence.)

7          THE COURT:  You may go forward, Mr. -- and it may be

8     published, Mr. Rapp.

9          MR. RAPP:  Thank you.

10    BY MR. RAPP:                                                     09:47:21

11    Q.  So is this the AIMS Group report that was published in

12    October of 2010?

13    A.  Yes, it is.

14    Q.  Now, with respect to the accuracy of this report, was there

15    something that was inaccurate in it?                            09:47:49

16    A.  One moment.

17          Yes.  They inaccurately reported revenue for Backpage.

18    Q.  All right.  And so when you say "they inaccurately," how --

19    what estimation did they give about Backpage's revenue?

20    A.  You're asking -- you're asking -- can you help me find the  09:48:15

21    number on here?

22    Q.  Let's see if I can.

23    A.  Oh, I -- yeah, I see it.  That helps.

24          So they -- it probably helps for me to just read this.

25          "Backpage.com's revenue from online prostitution ads      09:48:46

CARL FERRER - DIRECT EXAMINATION (Cont'd)

```
 1   in 23 U.S. cities increased 15.3 percent to at least

 2   1,671,685."

 3            And so they computed that as an annual rate of

 4   20 million.

 5   Q.  Okay.  Was that accurate?                              09:49:03

 6   A.  No.  They had underreported it.  I think they only captured

 7   a third --

 8   Q.  Okay.

 9   A.  -- of the actual revenue.

10   Q.  All right.  Was the -- do you -- do you have any reason to  09:49:14

11   know why it is they did not capture the accurate revenue for

12   Backpage?

13            MS. BERTRAND:  Objection.  Calls for speculation.

14            THE COURT:  Sustained.

15   BY MR. RAPP:                                               09:49:31

16   Q.  Well, do you know what they based -- in reading their

17   articles, do you know what they based the -- the $20 million

18   annual revenue on?

19            MS. BERTRAND:  Same objection.  Calls for speculation.

20            THE COURT:  Overruled.                            09:49:48

21            THE WITNESS:  Yes.  They're counting the ads that

22   appear on a particular day.  But what AIM Group doesn't know is

23   that the ads are moved to the top sometimes three, four times a

24   day.

25            ///
```

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  BY MR. RAPP:

2  Q.  All right.

3  A.  So they see the same ad, but they are only counting it as

4  revenue once, when Backpage made revenue maybe three or four

5  times from that ad.                                                      09:50:11

6  Q.  All right.  In reading the AIM -- this article and -- and

7  the other AIMS Group's article on -- articles on Backpage, did

8  they -- were they aware of the strategies that you had with --

9  well, let me strike that.

10         Did they report on the strategies you had with The       09:50:33

11  Erotic Review and the super posters and your aggregation

12  strategy?

13         MR. EISENBERG:  Your Honor, I object to this line of

14  questioning because the way it's phrased, it's being offered

15  for the truth.  Your Honor made it -- a ruling it shouldn't      09:50:50

16  only be offered for that.

17         MR. FEDER:  Also relevance.  401/403.  Hearsay.

18         THE COURT:  Overruled.

19         The question is:  "Did they report on the strategies

20  you had with The Erotic Review and the super posters and your    09:51:09

21  aggregation strategy?"

22         And that relates to the reports that this witness

23  reviewed, so he may answer.

24         THE WITNESS:  No, they didn't report on the

25  prostitution marketing activities that Backpage was engaged in.  09:51:25

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   BY MR. RAPP:

2   Q.  Did you ever have occasion to meet with any representative

3   from the AIMS Group?

4   A.  Yes.

5   Q.  And during -- well, who -- and do you know what the time          09:51:37

6   frame of that meeting was?

7   A.  I've run into the CEO.  I do know the -- the time frame of

8   the meetings roughly by years.

9   Q.  All right.  And -- and can you estimate how many times you

10  had meetings with -- well, who is this person?                        09:52:03

11  A.  Well, initially there was a reporter that contacted us from

12  the AIM Group.  But later it was elevated to, I believe, the

13  CEO of AIM Group, and that would be Peter Zollman.  And Peter

14  would contact me frequently, and I would run into him in

15  conferences all the time.  And he would try to ask me            09:52:24

16  questions, and I would do my best to not give him any answers.

17  Q.  All right.  And -- but in those meetings, did you ever

18  disclose these -- these prostitution marketing strategies that

19  you've been discussing the last couple days?

20  A.  I did not.                                                        09:52:44

21  Q.  Let's look at 1609a.

22          Do you see that on your screen as well?

23  A.  Yes.

24  Q.  And is this also some type of a report from the AIM Group?

25  A.  Yes, it is.                                                       09:53:18

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   Q.  All right.  And is this one actually -- does it predate the

2   previous report that we looked at?

3   A.  Yes.  It's September 15th, 2010.

4   Q.  And did you have any discussions about this intelligence

5   report with Mr. Spear?                                              09:53:40

6   A.  I shared these reports with Mr. Spear, and we discussed

7   them.

8   Q.  All right.

9           MR. RAPP:  Move to admit 1609a.

10          MR. CAMBRIA:  Object to the hearsay.                        09:53:55

11          THE COURT:  Overruled.

12          MR. FEDER:  401/403.  Foundation.

13          THE COURT:  Overruled.  It may be admitted and

14   published.

15          (Exhibit 1609a admitted into evidence.)                     09:54:07

16   BY MR. RAPP:

17   Q.  And, again, was this report accurate in terms of the

18   revenue for Backpage?

19   A.  No.  Once again, it dramatically underreported the revenue,

20   but we still were not happy about it being reported.               09:54:25

21   Q.  All right.  I now want to look at Exhibit 923.

22          Do you see that on your screen, sir?

23   A.  Yes.

24   Q.  And do you recall being copied on this email in September

25   of 2010?                                                           09:55:03

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    A.  Yes, I do.

2    Q.  All right.  And is this an email that includes Mr. Lacey

3    and Mr. Spear?

4    A.  Yes, it does.

5    Q.  All right.                                                    09:55:17

6             MR. RAPP:  Move to admit Exhibit 923.

7             MR. CAMBRIA:  Same objections.

8             THE COURT:  I'm sorry.  What -- what was that?

9             MR. CAMBRIA:  I said the same objections we have

10   lodged, Your Honor.                                              09:55:32

11            THE COURT:  Overruled.

12            923 may be admitted.

13            MR. RAPP:  And request permission to publish.

14            THE COURT:  Yes, it may be published.

15            (Exhibit 923 admitted into evidence.)                   09:55:44

16   BY MR. RAPP:

17   Q.  Is this an email -- who is this an email from?

18   A.  So initially this email's from Bill Jensen.

19   Q.  All right.  And who's Bill Jensen?

20   A.  Bill Jensen is one of the managers of digital media for      09:55:58

21   Village Voice.

22   Q.  And what is he sending Mr. Lacey and Mr. Spear and you?

23   A.  He's sending us the change.org petition against VVM, which

24   is Village Voice Media.

25   Q.  And what was -- do you know what change.org is?  Did you      09:56:25

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    become --

2    A.  Yes.

3    Q.  -- aware of what that organization was?

4         What was it?

5    A.  It's an online site you can go to start up petitions and          09:56:34

6    have people sign up on those petitions in order to get things

7    to happen either politically or for organizations.

8    Q.  And -- and was there -- did change.org, did they have a

9    petition against Village Voice Media in September of 2010

10   that --                                                               09:56:58

11        MS. BERTRAND:  Objection.  Leading.

12   BY MR. RAPP:

13   Q.  -- you became aware of?

14        THE COURT:  Sustained.

15   BY MR. RAPP:                                                          09:57:04

16   Q.  Did you receive an email regarding a petition?

17        MS. BERTRAND:  Same objection.

18        THE COURT:  Overruled.

19        THE WITNESS:  Yes.  We received the email for the

20   petition entitled Tell Village Voice Media to Stop Child Sex          09:57:16

21   Trafficking on Backpage.

22        MR. FEDER:  Move to strike --

23        THE COURT:  Overruled.

24        MR. FEDER:  -- as relevant.  401/403.

25        ///

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    BY MR. RAPP:

2    Q.  And --

3          THE COURT:  Well, let me stop right there.

4          Overruled.

5          And, members of the jury, as I have previously told          09:57:33

6    you during the jury selection process, the defendants are not

7    charged with violating -- with violating the Travel Act by

8    facilitating misdemeanor -- excuse me.  The -- they are charged

9    with facilitating misdemeanor state law prostitution offenses

10   under the Travel Act, but, as I had previously instructed you          09:57:59

11   during the jury selection process, no defendant has been

12   charged with any sort of sex trafficking/child sex trafficking

13   violations.  So do bear that in mind.

14          Go forward, Mr. Rapp.

15          MR. RAPP:  Thank you.          09:58:18

16   BY MR. RAPP:

17   Q.  And was that -- did Mr. Spear forward you that -- that

18   email with the link regarding the change.org petition against

19   Village Voice Media above here?

20   A.  Yes, he did.          09:58:32

21   Q.  All right.  And, now, into 2010, in September of 2010 and

22   afterwards, did you -- did Backpage continue to receive notice

23   from law enforcement agencies regarding prostitution on the

24   website?

25          MS. BERTRAND:  Objection.  Leading and vague as to          09:58:55

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    "notice."

2              THE COURT:  Sustained.

3              MR. CAMBRIA:  And hearsay.

4    BY MR. RAPP:

5    Q.  All right.  Let me then show you Exhibit 932.          `09:59:04`

6              Do you recognize this document, sir?

7    A.  Yes, I do.

8    Q.  How do you recognize it?

9    A.  It was a document that was faxed to our corporate fax

10   number that's in Building B.                              `09:59:27`

11   Q.  Okay.  And I'm showing you the second page.

12             Is that the fax face sheet, as they like to call it?

13   A.  Yes.

14   Q.  And does this -- is Building B also the building where

15   subpoena requests would be -- be faxed?                   `09:59:46`

16   A.  Yes.  It's the same building that Brunst and -- Jed Brunst

17   and Scott Spear are in.

18   Q.  Did you -- did you share this fax with anyone else when it

19   was brought to your attention?

20   A.  Yes.                                                  `10:00:05`

21   Q.  Who?

22   A.  Scott Spear.  I believe Jess Adams brought it to my

23   attention.

24             MR. RAPP:  All right.  Move to admit 932.

25             MS. BERTRAND:  Objection.                       `10:00:17`

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          MR. CAMBRIA:  Objection.

2          MS. BERTRAND:  Hearsay.  Lack of foundation.

3          MR. CAMBRIA:  And 403.

4          MR. FEDER:  401/403.

5          THE COURT:  Overruled.                              10:00:25

6          MR. RAPP:  I request permission to publish.

7          THE COURT:  Yes, it may be published.

8          THE COURTROOM DEPUTY:  Is it admitted?

9          THE COURT:  It is admitted, and it may be published.

10         (Exhibit 932 admitted into evidence.)               10:00:39

11    BY MR. RAPP:

12    Q.  So this is page 2 of 932.  Is this the fax you were

13    referring to?

14    A.  Yes, it is.

15    Q.  All right.  And --                                   10:00:45

16         THE COURT:  And, again, hereto, let me just caution

17    the members of the jury.  This exhibit is also not offered for

18    the truth of the -- what the content of the letter is, only

19    that Mr. Ferrer received it and what his impressions were of

20    the -- the exhibit.                                      10:01:06

21         Go forward, Mr. Rapp.

22         MR. RAPP:  Thank you, Your Honor.

23    BY MR. RAPP:

24    Q.  And going to 932.  Is this a letter -- is this the letter

25    now that -- that we've been referring to?                10:01:20

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  A.  Yes, it is.

2  Q.  And who is the letter from?

3  A.  The letter is from the Montgomery County Maryland

4  Department of Police.

5  Q.  All right.  And I think -- I believe that you said that --          10:01:36

6  that somebody else received it and they brought it to your

7  attention.

8       Who was that?

9  A.  Jess Adams received it, our Backpage accountant who worked

10  in Building B.          10:01:51

11  Q.  All right.  And can you tell me what -- can you tell me

12  what the Montgomery -- can you read what the Montgomery County

13  Police Department is telling you.

14  A.  "The Montgomery County Department of Police, Vice Section,

15  in it's ongoing battle with those engaged in Prostitution/Human          10:02:12

16  Trafficking, has found countless advertisements on your

17  Internet site www.backpage.com in the adult section under the

18  escort and TS categories.  These categories on your site have

19  been found to cater to those engaged in Prostitution/Human

20  Trafficking.  With the demise of Craigslist.com adult section,          10:02:37

21  it has been noted that Backpage.com advertisements in these

22  categories has increased."

23  Q.  Let me just stop you there for a minute.

24       Is that true?  Had they increased?

25  A.  Yes.          10:02:53

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  Q.  And then what does he say in this next paragraph?

2  A.  "I have also reviewed Backpage's" -- ".com's Terms of Use

3  and have found several violations in the reference categories

4  set forth in the User Conduct.  Two items are flagrant

5  violations of the User Conduct, item 2 refers to 'unlawful,        10:03:12

6  vulgar, obscene, any kind or nature that encourages conduct

7  that could constitute a criminal offense'.  Item 4(c), Posting

8  any solicitation directly or in 'coded' fashion for any illegal

9  service exchanging sexual favors for money or other valuable

10 consideration.  The reference categories are advertising women   10:03:41

11 for the purpose of prostitution in violation of Maryland

12 Criminal Law, 11-303, Human Trafficking, and 11-304, Receiving

13 proceeds of Prostitution, and 11-306, soliciting for

14 prostitution.  In addition, some of the women travel across

15 state lines to engage in this activity which is in violation of   10:04:06

16 U.S.C. Title 18 Section 2421-Mann Act.  Additionally,

17 Backpage.com may be in violation of Maryland State Law by

18 accepting money for posting advertisements for prostitution.

19 I'm requesting the immediate removal of categories from your

20 Washington, D.C., area site, particularly Montgomery County,      10:04:29

21 Maryland, if you agree that the categories violate

22 Backpage.com's Terms of Use."

23 Q.  All right.  And then when you -- did you -- did you bring

24 this fax with this letter, did you -- did you bring it to the

25 attention of Mr. Spear?                                           10:04:53

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    A.  Yes.

2    Q.  And did you and Mr. Spear discuss its contents?

3    A.  Yes, we did.  It was one of the first contacts I can

4    remember where instead of --

5           MR. FEDER:  Objection.  Going beyond the scope of the         10:05:13

6    question --

7           THE COURT:  Sustained.

8           MR. FEDER:  -- again.

9           THE COURT:  And, again, Mr. Ferrer, just answer the

10   question, and then let Mr. Rapp ask you another one for         10:05:20

11   follow-up.  Thank you.

12          THE WITNESS:  Yes, Your Honor.

13   BY MR. RAPP:

14   Q.  Sir, had you received a -- a letter like this previously?

15   A.  No.         10:05:33

16   Q.  When you received this letter, did this -- first, did this

17   raise a concern with you?

18   A.  It did.  I -- I thought I might not be able to travel to

19   Washington, D.C.  I could be arrested.

20   Q.  When you discussed this with Mr. Spear, did he raise any         10:05:51

21   concerns about this letter?

22   A.  Yes.

23   Q.  What was his concerns?

24          MR. FEDER:  Hearsay.  401/403.

25          THE COURT:  Overruled.         10:06:04

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          THE WITNESS:  He had the same concerns, and we are

2   unclear what to do.  We're not going to remove the category.

3   Should we -- what should we do?

4          So we --

5   BY MR. RAPP:                                                    10:06:19

6   Q.  Let me stop you there.

7          Why wouldn't you remove the category?

8   A.  Why would we?

9   Q.  Why would you -- in light of this letter, why would you not

10  remove the category?                                           10:06:28

11          MR. FEDER:  Same.

12          THE WITNESS:  Because the revenue's good.

13          MR. RAPP:  All right.  And now let's look at 933 for

14  the witness's eyes only.

15  BY MR. RAPP:

16  Q.  So is this an email exchange between you and Mr. Spear?

17  A.  Yes.

18  Q.  And do you and Mr. Spear have any type of discussion about

19  giving a response to the Montgomery County Police Department?

20  A.  Yes.                                                        10:07:10

21  Q.  And do you -- do you prepare some type of a response to the

22  Montgomery Police Department?

23  A.  I did.  I drafted a response that we might send to the

24  Montgomery Police Department.

25  Q.  All right.  And is that down -- down here?                  10:07:31

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   A.   Yes.  It's at the bottom of the email.

2   Q.   And the email -- the proposed response, it's -- it's --

3   it's not signed by anybody.

4        Do you -- is there a reason why?

5   A.   I wasn't sure who was going to sign it.  I didn't want to      `10:07:52`

6   sign it.  I knew that.

7   Q.   Was it -- was the response accurate?

8        MS. BERTRAND:  Objection.  Calls for a legal

9   conclusion.

10       THE COURT:  Well, I think he just testified that he          `10:08:08`

11  wrote it, and so he can answer the question as to its accuracy

12  in his opinion as to what he wrote.

13       You may reask the question and --

14  BY MR. RAPP:

15  Q.   Was the -- was the proposed response accurate?              `10:08:23`

16  A.   No.  It was misleading.

17  Q.   All right.  And in what respect was it misleading?

18  A.   Well, we were asked if the majority of the postings that

19  we -- well, I'd rather -- when I -- when I wrote, "We believe

20  these postings do not represent the overwhelming majority of    `10:08:46`

21  the legal postings found on your site," well, that's some of

22  the company training that I --

23  Q.   All right.

24  A.   -- had learned to parrot back.

25  Q.   And then does Mr. -- does Mr. -- does -- well, let me just   `10:09:01`

CARL FERRER - DIRECT EXAMINATION (Cont'd)

 1  go back just for a second.  Let me just look at this.  Well,

 2  let's just go up here.

 3          What does Mr. Spear say to you?

 4          MR. FEDER:  Objection.  Hearsay.  Relevance.  And say

 5  when?  On what?  Foundation.                                10:09:38

 6          THE COURT:  Well, overruled.  Well --

 7          MR. RAPP:  Could I have this published?  Move to admit

 8  this, if I haven't already, and request to publish.

 9          THE COURT:  Yes, it could be admitted, and it may be

10  published.                                                  10:09:55

11          (Exhibit 933 admitted into evidence.)

12          THE COURT:  I thought it was published.  I'm sorry.

13          MR. RAPP:  That's my fault.

14          THE COURT:  Mr. Feder, I'm overruling the objection.

15  I think it relates to the letter that was drafted.  It's all  10:10:01

16  part of the same email.  That's my -- am I --

17          MR. RAPP:  It is, yes.

18          THE COURT:  Am I correct?

19          MR. RAPP:  You are correct.

20          THE COURT:  Okay.  Thank you.                       10:10:08

21  BY MR. RAPP:

22  Q.  And so what is Mr. Spear's response to you regarding the

23  proposed response that you prepared for the Montgomery Police

24  Department?

25  A.  Scott Spear writes, "Should we ask him to identify the   10:10:24

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   specific postings that violate the TOU?  Or does that just open

2   a huge can of worms?"

3   Q.  What's -- what's -- again, what's TOU mean?

4   A.  Terms of use.

5   Q.  And when Mr. Spear says, "Or does that just open a huge can     10:10:41

6   of worms," what did you take that to mean?

7   A.  I took it to mean that he might just send us a link to

8   every single ad that was posted in female escorts, Washington,

9   D.C.

10  Q.  All right.  Okay.  And so now let's look at Exhibit 52.         10:10:58

11  Let me just go back here for a minute.

12          Let me look at 925.  My apologies.

13          I'm showing you what is 925.  Do you recognize this

14  email?

15  A.  Yes, I do.                                                      10:11:49

16  Q.  And -- and how do you rec- -- why is it you recognize this

17  email?

18  A.  This email has to do with Ernie Allen's testimony.  He's

19  the CEO of NCMEC.

20  Q.  And does there -- there come a time when you actually meet      10:12:06

21  with Mr. Allen at some point in the future?

22  A.  Yes.

23  Q.  All right.  But is it after this email?

24  A.  Yes, it would be after this email.

25  Q.  And was there some type of a testimony that you were -- of      10:12:25

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   Mr. Allen that you were made aware of?

2   A.  Yes.

3   Q.  And does Mr. Spear alert you to that testimony?

4   A.  Yes.  He gives me a summary of the testimony.

5   Q.  Okay.                                                   10:12:50

6          MR. RAPP:  Move to admit 925.

7          MR. FEDER:  Same.

8          THE COURT:  Yes, it may be admitted.

9          (Exhibit 925 admitted into evidence.)

10          THE COURT:  And it may be published.               10:12:59

11   BY MR. RAPP:

12   Q.  All right.  And so what does Mr. Spear tell you in this

13   email below here?

14   A.  Scott Spear writes, "Just finished.  We got called out once

15   with CL.  Lots of history of the CL saga over the last two      10:13:19

16   years.  He strayed from script at times."

17   Q.  And what does Mr. Larkin say to Mr. Spear in response?

18   A.  Jim Larkin writes, "I've got the hearing up.  Do we know

19   anything about the underage example Ernie Allen cited from

20   Backpage?  Did they ever notify us of this?"                    10:13:46

21   Q.  All right.  And then does Mr. Spear copy you on this email?

22   A.  Yes, he does.

23   Q.  What does he say?

24   A.  Scott Spear writes, "Not to my knowledge (Maryland

25   example).  Copying Carl to see if he has any knowledge of       10:14:06

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   this."

2   Q.  And did you?

3   A.  I'm not sure.

4   Q.  Okay.  Fair enough.

5           I'm now showing you Exhibit 52 on your screen.          10:14:18

6           Do you recognize this exhibit?

7   A.  Yes, I do.

8   Q.  How is it that you -- well, what is it?

9   A.  So this exhibit is another letter from the State Attorneys

10  General group, and it's addressed to Backpage.com regarding the   10:14:47

11  site.

12  Q.  All right.  And how is it that you were made aware of this

13  letter?

14          MR. CAMBRIA:  Sorry, Your Honor.  Is -- I don't think

15  that that's correct that it's addressed to Backpage.  It's     10:15:03

16  addressed to a Samuel Fifer at a law firm.

17          THE COURT:  Well, yes.  Let's clarify, Mr. Rapp.

18          MR. RAPP:  All right.

19  BY MR. RAPP:

20  Q.  Did -- it actually goes to an individual, doesn't it?      10:15:18

21  A.  Yeah.  It's addressed to Sam Fifer, but it's regarding

22  Backpage.  Sam Fifer was -- the company hired Sam Fifer.

23  Q.  Right.  And you saw this letter at some point?

24  A.  Yes, I did.

25  Q.  Do you recall how it was that you saw this letter?         10:15:36

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    A.  The letter was given to me by Scott Spear, and it was the

2    subject of discussion and what our response might be.

3    Q.  Did you have a discussion with Mr. Spear in particular

4    about what the response was going to be?

5    A.  Mr. Spear and Mr. Larkin.                           10:15:55

6    Q.  All right.  And during that meeting, were you given any

7    direction as to how you would participate in providing a

8    response?

9    A.  I was tasked with kind of digging up details on the number

10   of ads, the number of ads removed, and that -- to get the     10:16:13

11   details for the response.

12   Q.  And who gave you that direction?

13   A.  Scott Spear.

14          MR. RAPP:  Move to admit United States 52.

15          MR. FEDER:  Same.                                10:16:28

16          THE COURT:  Yes, it may be admitted.

17          (Exhibit 52 admitted into evidence.)

18          MR. FEDER:  And 106.  I'm sorry.

19          THE COURT:  It may be admitted.

20          Overruled.                                       10:16:33

21          And published.

22          (Exhibit 106 admitted into evidence.)

23          MR. RAPP:  Thank you.

24   BY MR. RAPP:

25   Q.  So let's just start in -- at the top here.          10:16:41

**CARL FERRER - DIRECT EXAMINATION (Cont'd)**

1    What did they say to you -- say to Backpage, rather?

2 A. They write, "Thank you for your recent letter notifying us

3 of additional changes Backpage has implemented in order to

4 respond to our concerns that blatant prostitution ads are

5 rampant on the site.  Although we appreciate these efforts and  10:17:03

6 the cooperation the site has demonstrated since we began our

7 investigation in 2009, more needs to be done."

8 Q. When it says that -- when you notified them of additional

9 changes to Backpage that you had implemented, what changes had

10 you implemented that they're referring to?  10:17:25

11 A. I think we had added posting rules, reduced some of the

12 nudity, put up notices for users when they're posting.

13 Cosmetic changes on the site.

14 Q. When you say "cosmetic changes," what do you mean by that?

15 A. These are changes that are not going to impact revenue  10:17:49

16 growth negatively or disrupt the posters in the female escorts

17 category.

18 Q. All right.  And then what do they say to you?

19 A. "We are writing to request that you immediately take down

20 the adult services portion of Backpage."  10:18:15

21 Q. And then what's the next paragraph?  What do they say to

22 you?

23    MR. CAMBRIA:  Your Honor, I object.  This letter is

24 not to him.  And he keeps asking him, "What do they say to

25 you?"  10:18:39

56

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1           They're talking to an attorney.

2           MR. RAPP:  All right.

3           MS. BERTRAND:  Join.

4           THE COURT:  All right.  Mr. Rapp, just rephrase.

5           MR. RAPP:  Let me just clear this up.                    10:18:45

6    BY MR. RAPP:

7    Q.  Did -- did Mr. Fifer, did he work for Backpage?

8    A.  Yes.  He worked for Scott -- Scott Spear/Jim Larkin.

9    Q.  All right.  And then what did they -- what did they tell

10   Mr. Fifer in this letter?  What's the next paragraph?        10:19:01

11   A.  "We believe that ads" -- "We believe that ads for

12   prostitution, including ads trafficking children, are rampant

13   on the site and that the volume of these ads will grow in light

14   of Craigslist's recent decision to eliminate the adult services

15   section of its site.  In our view, it is time for the company  10:19:22

16   to follow Craigslist' lead and take immediate action to end the

17   misery of the women and children who may be exploited and

18   victimized by these ads.  Because Backpage cannot, or will not,

19   adequately screen these ads, it should stop accepting" --

20   "accepting them altogether."                                  10:19:43

21   Q.  All right.

22           MS. BERTRAND:  Your Honor, I'm going to object before

23   we go forward and renew an objection as to foundation regarding

24   this witness's ability to authenticate this document.

25           THE COURT:  Overruled.                                 10:19:59

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          And, again, members of the jury, this exhibit is not

2     offered for the truth of the content in it.  It's as to

3     Mr. Ferrer's understanding and what he did with respect to the

4     reaction to it.

5          So let's move forward, Mr. Rapp.                    10:20:19

6          MR. RAPP:  All right.

7     BY MR. RAPP:

8     Q.  Next paragraph.

9     A.  "As indicated in your recent letter to us, you found that

10    once you began charging for ads in the adult services section   10:20:28

11    of the site, prostitution began migrating into certain sections

12    of the personal section, so you began to charge to post ads in

13    that section as well.  We urge you to take additional efforts,

14    such as manual review of each ad in these sections of the

15    personals, and others if it becomes necessary, before ads are   10:20:53

16    posted."

17    Q.  And then the paragraph at the bottom.

18    A.  "We recognize that backpage may lose the considerable

19    revenue generated by the adult services ads.  Still, no amount

20    of money can justify the scourge of illegal prostitution, and   10:21:14

21    the" -- that's --

22    Q.  And going to the second page.

23    A.  -- "misery of the women and children who will continue to

24    be victimized in the marketplace provided by backpage."

25    Q.  And the last -- last paragraph.                       10:21:32

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   A.   "We sincerely hope backpage, like craigslist, will finally

2   hear the voices of the victims, women and children, who plead

3   with it to make this important change.  We, too, call on

4   backpage to listen, to care, and respond now by shutting down

5   the adult services section of its website.  It is the right          10:21:50

6   thing to do to protect innocent women and children."

7   Q.   And was this letter signed by a number of Attorney

8   Generals?

9   A.   Yes.

10  Q.   All right.  With respect to one of the -- wait a minute.        10:22:07

11          With respect to one of the claims that are -- that's

12  made in this letter, this part down here where it says that

13  prostitution began migrating into certain sections of the

14  personal sections, is -- was that accurate?

15  A.   Yes.  There had always been some posters that didn't want       10:22:57

16  to pay in female escorts, so they would post their escort

17  section in personals.  And that's why Scott Spear wanted me to

18  make those sections hooker free.  But it was those -- that was

19  the term I used at the time.  And it was hard to do, so

20  that's -- we implemented a fee.                                       10:23:23

21  Q.   All right.  And just -- and how long had that been going

22  on, if you know?

23  A.   I think we had just started this fee.  Not -- not too long.

24  Q.   Well, all right.  My -- right.  My question wasn't very

25  clear.                                                                10:23:39

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1        How long it had been going on that prostitution ads

2    had been migrating to the personal section?

3    A.   From fairly quick with -- I'd say around 2004 or '05.

4    Q.   All right.

5    A.   That early.                                              10:23:54

6    Q.   And just looking quickly at 1057.

7        MR. RAPP:   Madam clerk, this is already in evidence

8    and has been published.

9    BY MR. RAPP:

10   Q.   Is this section here of this email from Scott Spear in    10:24:03

11   2006, is this a reference to prostitution ads migrating to the

12   personal section?

13   A.   Yes, it is.

14   Q.   All right.   And then just going back to Exhibit 52 for a

15   minute, where the -- when they say that Backpage would lose     10:24:40

16   considerable revenue generated by the adult services ad by

17   shuttering that, is that accurate?

18   A.   Backpage would lose almost all of its revenue.   We didn't

19   have enough revenue coming from other categories for the site

20   to survive.                                                     10:25:34

21   Q.   And how about in -- in this time period, in late September

22   of 2010?   How was the ownership, Mr. Brunst and Mr. Lacey and

23   Mr. Spear, doing with the alternative newspapers?

24       MR. PANCHAPAKESAN:   Objection.   Compound.

25       MS. BERTRAND:   And speculative.                            10:25:55

CARL FERRER - DIRECT EXAMINATION (Cont'd)

```
 1              THE COURT:  Well, sustained.
 2    BY MR. RAPP:
 3    Q.  Do you know?  Do you know how they were doing?
 4    A.  I do know how the other papers were doing.
 5    Q.  How is it that you know?                              10:26:06
 6    A.  Because I worked in the office with the papers, and I saw
 7    the staff getting smaller and the papers getting smaller.
 8    Q.  All right.  And so how were they doing in terms of revenue?
 9    A.  Not very well.
10              MS. BERTRAND:  Same objection.                  10:26:20
11              THE COURT:  Well, overruled.
12              THE WITNESS:  They were not doing well, but Backpage
13    was doing fantastic.
14              MR. RAPP:  All right.  Your Honor, I'm about ready to
15    move into another area, but I can keep going.  Whatever your  10:26:35
16    preference is.
17              THE COURT:  Well, I think since you're ready to
18    transition, Mr. Rapp, this would be an appropriate time to take
19    our morning recess.  Why don't we let the jury have about
20    20 minutes.  And so by my count, I guess that would be about --  10:26:52
21    well, close to ten minutes to the hour.
22              And so if you would be ready in the jury room around
23    that time.  And in the meantime, again, just remember the
24    admonition not to come to any conclusions.  Just enjoy your
25    morning recess.                                           10:27:11
```

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          Please all rise for the jury.

2          (Jury not present at 10:27 a.m.)

3          THE COURT:  All right.  We will stand in recess.

4          MR. STONE:  Your Honor, I need a minute either now or

5   before the jury comes back on one small issue, if that's okay?      10:27:45

6          THE COURT:  Yes.

7          MR. FEDER:  Judge, I need to make a motion, too, but

8   Mr. Ferrer needs to be out of the courtroom.

9          THE COURT:  I didn't hear you, Mr. Feder.

10         MR. FEDER:  I said I would like to make a motion, but      10:27:55

11  I need Mr. Ferrer to leave the courtroom.  We can do that

12  now --

13         THE COURT:  Yes, he can --

14         MR. FEDER:  -- we can do that later.

15         THE COURT:  He can step down.      10:28:03

16         MR. STONE:  Your Honor, my -- my small issue is on the

17  limiting instruction that you read.

18         THE COURT:  Yes.

19         MR. STONE:  Two weeks ago, on the third day of trial,

20  we had a discussion about removing the word "misdemeanor" from      10:28:17

21  that limiting instruction, and I believe you agreed with the

22  government on that.

23         THE COURT:  Well, I -- I realized as I was reading it

24  that I had the previous instruction, and so I'll, of course,

25  correct on that.      10:28:29

**CARL FERRER - DIRECT EXAMINATION (Cont'd)**

1        MR. STONE:  Thank you, Your Honor.  That's it.

2        THE COURT:  Yes.

3        All right.  Mr. Feder?

4        MR. FEDER:  That kind of seeps into what I want to do,

5    Judge.  The last trial there was a mistrial for the repeated          10:28:37

6    use of child sex trafficking and adult sex trafficking.  The

7    jury in their questionnaires, as the Court knows, said they

8    could be fair unless it involved adult or child sex

9    trafficking.

10        The Court has now let in three or four straight          10:28:51

11    exhibits in about an hour of testimony, not for the truth

12    allegedly, but for -- in order to allow the Judge -- the

13    government to get in child sex trafficking over and over again.

14        So I move for a mistrial.  I know the Court's ruled on

15    that before, but, I mean, we had a mistrial last time for the          10:29:07

16    exact same issue.  The Court is allowing them to get away with

17    the basis of the mistrial last time.  It's improper, it's

18    prejudicial, and it shouldn't happen.

19        THE COURT:  Mr. Rapp?

20        MR. RAPP:  Judge, child sex trafficking is a subset of          10:29:21

21    prostitution.  Each exhibit that references that is tethered to

22    one or more of these defendants placing them on notice that

23    prostitution is on their website.

24        MR. FEDER:  That could have been settled by redaction

25    easily, which we also brought up earlier in this -- in this          10:29:44

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    case, but they didn't.  The only purpose, it would appear, of

2    putting on that testimony and these exhibits is to have that

3    phrase or phrases injected into this case to prejudice the

4    jurors.

5           THE COURT:  Well, I -- I'm going to adhere to the          `10:30:02`

6    prior ruling of the Court and my prior ruling.  And, as we

7    discussed ad nauseam again, Mr. Feder, and even going through

8    these proposed exhibits last week, I did indicate to you that

9    we have the limiting instruction and the purpose of the

10   exhibits and why they're coming in.                             `10:30:28`

11          And it is a mischaracterization to say that the

12   mistrial occurred just simply because a witness referenced

13   child sex trafficking.  That's not the entirety of the case for

14   the mistrial.

15          And so I'm going to adhere to the ruling of the Court.   `10:30:44`

16   And, again, I can admonish the jurors that none of the

17   defendants are charged with a trafficking offense, and I think

18   that should be sufficient.

19          I'm going to overrule the request for a mistrial.

20          MR. EISENBERG:  Your Honor --                            `10:31:05`

21          THE COURT:  We stand in recess.

22          MR. EISENBERG:  -- may I also be heard on this?

23          THE COURT:  Yes, Mr. Eisenberg, you may make a record.

24          MR. EISENBERG:  Thank you, Your Honor.

25          What really compounds the issue for us is the content    `10:31:12`

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    of a letter like this, which is broadly based.

2            THE COURT:  "A letter like this" meaning what?

3            MR. EISENBERG:  The one that -- 52, Your Honor, which

4    is, I think, the subject of what Mr. Feder was saying.

5            "Including ads trafficking children are rampant on the        10:31:29

6    site."

7            What does rampant mean?  What ads are they referring

8    to?  And it says, "The volume of these ads will grow in light

9    of Craigslist's recent decision."

10           This is all highly damaging to the defendants who         10:31:48

11   can't really defend against this kind of -- I wouldn't say

12   simply this statement that has no boundaries.

13           And I -- I appreciate Your Honor's giving notice to

14   the jury not to consider this for the fact, but, nonetheless,

15   this type of overstatement is -- goes on throughout this         10:32:09

16   letter, and we'll be mildly taxed trying to beat that down

17   under Rule 403.

18           MR. CAMBRIA:  May I add my --

19           THE COURT:  You may.

20           MR. CAMBRIA:  Your Honor, a letter, the part that was     10:32:26

21   just read here -- I don't know why that's happening.

22           The part that was just read here about the Attorneys

23   General characterizing the so-called -- the result of

24   activities which they're alleging on the part of the defendants

25   is a irreparably prejudicial statement, which we could not       10:32:47

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    confront, that is their opinion.  That is hearsay.

2         It's one thing to try to say that this is just being

3    offered as some kind of notice.  The problem with it is that

4    it's a conclusion drawn by a number of Attorneys General from

5    around the United States.  And it is about a subject which the        10:33:12

6    jurors in voir dire indicated that would be extremely

7    prejudicial and would prevent them from being fair and

8    impartial if it involved that.  And now we have a letter, which

9    we objected to, which draws conclusions by a number of top

10   legal individuals, if you will, from various states.        10:33:38

11        This is much more severe than the basis that was used

12   to grant the last mistrial, and no amount of instructions can

13   take away the stigma that has been developed here as a result

14   of the opinion of all of these individuals who we cannot

15   confront and basically damning us with their conclusions, which        10:34:04

16   are unfounded.

17        THE COURT:  Well, I'll simply reiterate the prior

18   ruling of the Court that found these letters to be relevant as

19   putting certain defendants on notice regarding the allegations

20   in the indictment.        10:34:23

21        And I will also reiterate that I've told this jury

22   that the content of the letter is not offered for the truth of

23   the matter, rather what Mr. Ferrer and others did as a

24   result -- as a -- in a response to that letter.

25        And so -- and, again, I think it is a        10:34:41

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   mischaracterization of the prior mistrial that it hinged on the

2   terminology that was used.  It was multiple witnesses that

3   formed the basis of -- of the mistrial and their statements on

4   the witness stand.

5          And so I will not reverse my ruling.  I'll deny the        10:35:03

6   motion for a mistrial.

7          And let's --

8          MR. CAMBRIA:  Could I add two other things?

9          Because there's so many Attorneys General, it's even

10  more people than testified the last time.  We had one person     10:35:17

11  who wound up having this result in a mistrial.  Here we have a

12  chorus of Attorneys General, who we could not confront, who

13  have rendered their conclusion.  And this jury has heard it.

14  And I also do not think the Court should tell the jury that

15  this serves as notice, because that's a question of fact as to   10:35:42

16  whether or not --

17         THE COURT:  I didn't tell them it was notice.  I don't

18  recall saying that at all.

19         MR. CAMBRIA:  I thought you just said that it was

20  being offered for notice.                                        10:35:52

21         THE COURT:  No.  It's being offered for the knowledge

22  of certain defendants as to what was going on on Backpage as

23  alleged in the indictment.  And that was what my prior ruling

24  was last week.  It remains my prior ruling.  And there has been

25  no testimony by an Attorney General with regard to what is in    10:36:08

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   the letter.  And so my ruling stands.

2          All right.  We'll stand in --

3          MR. CAMBRIA:  Well --

4          THE COURT:  -- recess.

5          MR. CAMBRIA:  Okay.                              10:36:20

6          (Recess from 10:36 a.m. to 10:52 a.m.)

7          (Jury not present at 10:52 a.m.)

8          THE COURT:  Let's go ahead and have the jury in.

9          All rise.

10          (Jury present at 10:53 a.m.)                    10:53:30

11          THE COURT:  Please be seated, and the record will

12   reflect the presence of the jury and counsel and the clients of

13   counsel.

14          And, Mr. Rapp, you may continue.

15          MR. RAPP:  Thank you, Your Honor.               10:54:00

16   BY MR. RAPP:

17   Q.  Mr. Ferrer, was there a point in 2010 when you were

18   contacted by CNN, the -- the broadcast media company?

19   A.  Yes, we were.

20   Q.  All right.  I'm showing you on your screen what is          10:54:23

21   premarked as United States 1185a.

22          Do you see that?

23   A.  I do.

24   Q.  And let's go through it.

25          Is this a multiple-page email?                  10:54:40

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   A.  Yes, it is.

2   Q.  All right.  And -- and it is a -- is it a email to you from

3   a reporter from CNN?

4           MS. BERTRAND:  Objection.  Leading and misstates the

5   character of this email string.                                  10:55:07

6           THE COURT:  Well, I think the question was, "Is this

7   an email to you from a reporter at CNN?"

8           He can answer if -- if -- you may answer, Mr. Ferrer.

9           THE WITNESS:  Yes.

10          MR. RAPP:  All right.  Move to admit 1185a.              10:55:27

11          MR. PANCHAPAKESAN:  Objection, Your Honor, under the

12   rule of completeness as the exhibit redacts Backpage's

13   response.

14          THE COURT:  Sustained.

15          MS. BERTRAND:  That's Sixth Amendment in *Crawford vs.*  10:55:37

16   *Washington*.

17          THE COURT:  Overruled.

18          I'll sustain Mr. Panchapakesan's objection.

19          MR. RAPP:  Well, the -- well, let me admit 1185.

20   Well, I'll move to admit 1185a and, Judge, request permission   10:56:26

21   to take up Mr. Panchapakesan's objection at a break.

22          THE COURT:  Yes.  You can -- we can revisit that

23   objection, but --

24          MR. PANCHAPAKESAN:  Your Honor, I --

25          THE COURT:  -- I guess --                                10:56:48

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1            MR. PANCHAPAKESAN:  Is he moving to admit the

2    redacted?

3            THE COURT:  Are you moving to admit 1185a or 1185?

4            MR. RAPP:  1185a.

5            MR. PANCHAPAKESAN:  And we object to that.          10:56:57

6            MS. BERTRAND:  Same objection.

7            THE COURT:  It is the same objection, and I've

8    sustained it.

9            MR. RAPP:  All right.

10   BY MR. RAPP:

11   Q.  Let's do it this way:  Did you -- did you receive an email

12   from a reporter from CNN?

13   A.  Yes, I did.

14   Q.  Who was the reporter from CNN?

15   A.  I received an email from Steve Turnham, and then I may have   10:57:15

16   also received an email from Amber Lyon.

17   Q.  All right.  And was Amber Lyon familiar to you?

18   A.  Yes.  She's the reporter who covered Craigslist.

19           MR. FEDER:  Objection.

20           THE COURT:  Overruled.                            10:57:35

21           MR. FEDER:  It's responding not to a question.  It's

22   the same old problem over and over again, Judge.  Please ask

23   the -- the government to stop it.

24           MR. RAPP:  Judge, this is a speaking objection.

25           THE COURT:  Well, the question was, "Are you familiar   10:57:45

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   with Amber Lyon?"

2           And you said, "Yes."

3           And then I think the issue Mr. Feder's having is

4   Mr. Ferrer then offers, without being asked, how are you

5   familiar?                                                           10:58:05

6           So --

7           MR. RAPP:  All right.  Let me ask that.

8           THE COURT:  I guess that's the mechanical way that you

9   should go about it, Mr. Rapp, unless you want to draw an

10  objection.                                                          10:58:13

11          MR. RAPP:  All right.

12  BY MR. RAPP:

13  Q.  How are you familiar with Amber Lyon?

14  A.  She was the reporter who covered Craigslist.

15  Q.  All right.  And did you -- was there an occasion where you      10:58:22

16  observed a broadcast or a -- a news report where you observed

17  Amber Lyon confronting Craig Newmark of Craigslist?

18          MS. BERTRAND:  Objection.  Hearsay within hearsay.

19          THE COURT:  Overruled.

20          He can answer the question if he saw something with         10:58:48

21  regard to Mr. Rapp's question.

22          MS. BERTRAND:  And another objection.  Leading.

23          THE COURT:  Well, sustained.

24          You can rephrase, Mr. Rapp.

25          ///

CARL FERRER - DIRECT EXAMINATION (Cont'd)

```
1    BY MR. RAPP:
2    Q.  Did you see Amber Lyon confront Craig Newmark?
3    A.  Yes, we did.
4    Q.  Okay.  When you say "we," who are you referring to?
5    A.  Scott Spear.  Myself.  Jim Larkin.  We watched the video.    10:59:14
6    It was very concerning.
7    Q.  All right.  Can you --
8            MS. BERTRAND:  Objection to the editorializing by the
9    witness.
10           THE COURT:  Sustained.                                   10:59:26
11           MS. BERTRAND:  Move to strike.
12           THE COURT:  And the jury will disregard the last
13   statement about it being concerning.
14   BY MR. RAPP:
15   Q.  Well, did this raise any type -- did that confrontation      10:59:36
16   raise any type of concern for you?
17   A.  It did raise a concern.  We thought we might be next and
18   Amber Lyon could jump out of the bushes at any time and
19   confront us.
20           MS. BERTRAND:  Your Honor, same objection.               10:59:55
21           THE COURT:  Overruled.
22   BY MR. RAPP:
23   Q.  In reaction to this -- this broadcast that you watched
24   involving Amber Lyon and Craig Newmark, did Backpage come up
25   with any strategy?                                               11:00:12
```

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   A.  We did.  We came up with talking points.

2   Q.  All right.  And what did you call those talking points?

3   A.  Ambush talking points.

4   Q.  Why did you refer to them as ambush talking points?

5   A.  Scott Spear, myself, and Jim Larkin did not want to appear          11:00:32

6   to be in a position like Craigslist, where he was not able to

7   respond to Amber Lyon's question about why the --

8   Q.  Let me -- let me just stop you there.

9        Let's forget about what Amber Lyon said.  But when you

10  watched the broadcast, did you observe Amber Lyon doing               11:00:53

11  anything?

12  A.  Yes, I did.

13  Q.  Okay.  What did she do?

14  A.  She handed Craig Newmark, the CEO of Craigslist, a print

15  copy of a prostitution ad and asked him why he wasn't doing          11:01:10

16  anything about it.

17  Q.  Okay.  And as a -- is that the reason that you developed

18  these ambush talking points?

19  A.  Yes.

20  Q.  Now, let me show you 938.                                        11:01:27

21        Do you see that on your screen there?

22  A.  Yes.

23  Q.  Let's start on page 3.

24        Is this a multiple-page email string?

25  A.  Yes, it is.                                                      11:01:55

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   Q.  And so can you tell me who is on this email string?

2   A.  Scott Spear, Jim Larkin, Michael Lacey, myself, and Steve

3   Suskin.  Also copied Hemu Nigam.

4   Q.  All right.  And what was -- what is the subject matter of

5   this email?                                                    11:02:27

6         I mean, it may not be in the subject line, but do you

7   remember the email?  Because are you also on it?

8   A.  Yes.

9   Q.  Okay.  And what was the subject matter?  What -- what was

10  the email exchange about?                                       11:02:41

11  A.  It's about the content that we're about to post on the

12  Backpage blog.

13  Q.  All right.  And then going to the second page, is there

14  also an email exchange talking about Amber Lyon?

15  A.  Yes.                                                        11:03:19

16         MR. RAPP:  Move to admit United States 938.

17         MR. FEDER:  Same.  Plus confrontation.

18         THE COURT:  Overruled.  It may be admitted, and it may

19  be published.

20         (Exhibit 938 admitted into evidence.)                    11:03:40

21  BY MR. RAPP:

22  Q.  All right.  Let's start down at the bottom of page 2.  And

23  who is -- who is copied on this email?

24  A.  So Scott Spear is sending to Jim Larkin, Carl Ferrer, Steve

25  Suskin, Michael Lacey, and Hemu Nigam.                          11:04:13

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  Q.  All right.  And what is Mr. Spear telling -- can you read

2  what Mr. Spear is telling you and Mr. Lacey.

3  A.  Yes.  "All:  See page 3A today's USA Today bottom of the

4  page with Ashton Kutcher and Demi Moore lining up with the NGOs

5  against child sex trafficking."                      11:04:42

6  Q.  Let me just stop you there.

7      What, if anything, do you know about Mr. Spear's

8  reference to Ashton Kutcher and Demi Moore?

9  A.  Ashton Kutcher and Demi Moore had a group called DNA that

10 was an anti-child sex trafficking group.  And --       11:05:01

11 Q.  How do you -- how do you know that?

12 A.  Because I -- I met -- the company sent me to meet with

13 Ashton Kutcher and Demi Moore after we had a --

14 Q.  When you say "the company," who's -- who at the company?

15 A.  Jim Larkin.  Scott Spear.                          11:05:20

16 Q.  All right.  And who had to approve your travel to -- was

17 your travel budgeted for this?

18 A.  Yes.  I've traveled all over the place.

19 Q.  All right.  And just so the jury -- let's not take it on

20 face value the jury knows who Ashton Kutcher and Demi Moore   11:05:40

21 are.  Who are they?

22 A.  Fairly famous actor and actress in Los Angeles.

23 Q.  All right.  And what was the purpose of you going to meet

24 with Ashton Kutcher and Demi Moore?

25 A.  To negotiate a peace treaty.                       11:05:59

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    Q.  To negotiate a peace treaty.

2         What does that mean?

3    A.  It meant that we --

4         MR. FEDER:  Same objections to this whole line of

5    questioning.                                                    11:06:11

6         THE COURT:  Overruled.

7         He may answer as to what he understands it means to

8    him.

9         THE WITNESS:  Ashton Kutcher had attacked the Village

10   Voice after the Village Voice Media company ran some stories     11:06:25

11   accusing Ashton Kutcher of exaggerating numbers in terms of --

12   BY MR. RAPP:

13   Q.  All right.

14   A.  -- the --

15   Q.  Let me just stop you there.                                  11:06:37

16        Who was -- who was taking the lead on this, the

17   Ashton -- from Backpage on the dispute with Ashton Kutcher and

18   Demi Moore?

19   A.  Michael Lacey.

20   Q.  All right.  Now, if you could read the next sentence.        11:06:50

21   Where it starts, "We."

22   A.  Where it starts where again?

23   Q.  So, "We."

24   A.  Right there?

25   Q.  After the Ashton Kutcher and Demi Moore sentence.            11:07:07

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  A.  "We come up multiple times in this story.  Its online" --

2  "Its online as well as USAtoday.com under nation and world.

3  Hemu has talked with Ernie Allen and we will try and defuse the

4  situation with the NGOs as best possible and get USA Today to

5  add our second statement (the one sent to Amber Lyon).  It will        11:07:29

6  be slightly edited and then we can put it up on our BP blog."

7  Q.  Let me just stop you there for a minute.

8        Is this BP blog, is this this blog that we talked

9  about earlier this morning that -- that you -- where you

10 responded to the Craigslist blog?  Is that the same blog?          11:07:47

11 A.  Yes.  The Backpage blog.

12 Q.  And then go on.

13 A.  "That should be coming within an hour.  Hemu also reports

14 that he has heard back that CNN is preparing a major story on

15 backpage.com."                                                     11:08:06

16 Q.  All right.  Let's just go up.

17       Then there is this -- there is this email here in

18 response.

19       Who is this from?

20 A.  This is from -- I knew him as Hemu Nigam.                      11:08:50

21 Q.  All right.

22 A.  Hemanshu.

23 Q.  Hemanshu.  But he had a short name that's Hemu?

24 A.  Yes.

25 Q.  All right.  And can you explain who Hemu -- Hemu -- Hemu       11:09:01

CARL FERRER - DIRECT EXAMINATION (Cont'd)

 1  Nigam is.

 2  A.  He was the user safety expert that Jim Larkin/Scott Spear

 3  hired.

 4  Q.  Okay.  And what does he say in this email?

 5  A.  "Thanks for providing the update, Scott.  Here are the two        11:09:22

 6  statements that Jamie would like to provide USA Today reporter

 7  so she can update the online story.  Reporters don't always

 8  agree to update their story, but we will certainly try.  We

 9  used the same statement as we sent to Amber Lyon."

10  Q.  All right.  And then this down in quotes, what does this         11:09:46

11  say?

12  A.  "The safety and security of our community is a top priority

13  for Backpage.com.  Backpage.com has just retained Internet

14  safety expert Hemanshu Nigam of SSP Blue to partner with us in

15  implementing a holistic plan centering around the criminal         11:10:08

16  activity on our site.  We also look forward to continuing our

17  productive dialogue with the Attorneys General and expect to

18  announce some significant changes to our site very soon."

19  Q.  All right.  Let me just stop you there.

20          We had looked at a -- we had looked at a -- a             11:10:25

21  PowerPoint earlier in your testimony.

22          MR. RAPP:  And, madam clerk, if you could take this

23  off the screen.  Thank you.

24  BY MR. RAPP:

25  Q.  We looked at a email presentation -- or PowerPoint            11:10:48

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  presentation earlier in your testimony, Exhibit 588, where you

2  had developed a strategy in dealing with the Attorney Generals.

3          Do you recall that?

4  A.  I do.

5  Q.  And what -- when they say in this, is it accurate that you          11:11:15

6  are engaging in a dialogue with the Attorney Generals?

7  A.  Yes.  That's a strategy by Scott Spear in this PowerPoint.

8  Q.  Right.  But I'm talking about the -- the email exchange

9  that we just saw from Hemu where it says that they're -- you're

10 engaging in a productive dialogue with the Attorney Generals,          11:11:43

11 the one we just saw.

12 A.  Yes.  That's an example of our slow dance.

13          MR. RAPP:  All right.  And could we publish 588, which

14 is already in -- already in evidence.

15          THE COURT:  Yes.          11:12:02

16 BY MR. RAPP:

17 Q.  And so is this what -- when they say that they're

18 engaging -- that -- that Backpage in this email is engaging in

19 a productive dialogue with the Attorney Generals, is that

20 accurate?          11:12:23

21          MS. BERTRAND:  Objection.  Calls for speculation as to

22 "productive."

23          THE COURT:  Well, sustained.

24          You can rephrase the question.

25          ///

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   BY MR. RAPP:

2   Q.  What kind of dialogue were you engaging in with the

3   Attorney Generals?

4   A.  A slow-them-down dialogue to move very, very slowly.  Do

5   very, very little, but to continue to send letters back and          11:12:44

6   forth.

7   Q.  All right.  Since we're on 588, let's look at -- let's look

8   at Exhibit 6 -- not Exhibit 6 -- slide 6 of Exhibit 8 -- 588.

9   It's in evidence.

10          Can you -- can you explain what this slide says as          11:13:12

11  part of this budget plan for 2010?

12  A.  Yes.  This is -- this slide is actually revenue by month

13  since the launch of the site.  And you can see it has what we

14  would call a hockey stick in terms of revenue growth.

15  Q.  What do you mean by "hockey stick growth" for those who          11:13:39

16  aren't hockey players?

17  A.  That's one revenue.  You know, it's sort of the bottom of

18  an L, or the bottom of the hockey stick, and then it shoots up.

19  And it shot up right around here.  That's where it begins to

20  increase.  And that's the same time that Craigslist shut down          11:13:57

21  adult services.

22  Q.  All right.

23          MR. RAPP:  Madam clerk, would you take it off.  Thank

24  you.

25          ///

CARL FERRER - DIRECT EXAMINATION (Cont'd)

BY MR. RAPP:

Q.   And so -- now, you've talked about Hemu Nigam.  What -- what role, if any, did he play, and when did he -- well, strike that.

When did he come aboard on Backpage with Backpage?     11:14:26

A.   Shortly after Craigslist shut down their adult services category.

Q.   And were you at all involved in the hiring of Hemu Nigam?

A.   I was not.

Q.   All right.  And who was involved in that?     11:14:49

A.   The owners.

Q.   All right.  And so in this email, is -- when -- when Mr. Nigam told you in the email that Amber Lyon was preparing a story, did you come to learn after that that she was preparing some type of a story on Backpage?     11:15:22

A.   Yes.

Q.   All right.  And what -- did you have any discussions within -- with anybody within Backpage regarding that story?

A.   Yes, we did.

Q.   All right.  Who did you discuss that with?     11:15:44

A.   The Amber Lyon coming story was discussed between Scott Spear, myself, Jim Larkin, and others.

Q.   All right.  And what, if any, strategy did you develop to -- to address the -- the coming story from Amber Lyon?

A.   Well, our standard operating procedure is when there was     11:16:14

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   media -- major media event or media exposure, we would

2   accelerate moderation efforts.

3   Q.  Okay.  And then going back to 938, which is in evidence.

4            THE COURT:  Mr. Rapp, it's a little bit of a issue

5   there.  Can you just clear that -- thank you.          11:16:50

6            MR. RAPP:  Sure.

7   BY MR. RAPP:

8   Q.  So we -- just so -- we've jumped around a little bit, but

9   let's -- we read this section here, where it talks about the

10  productive dialogue with the Attorney Generals.  And then it   11:17:05

11  says, "We expect to announce some significant changes very

12  soon."

13           What -- what changes were -- were -- were going to be

14  announced?

15  A.  We are going to shut down a few categories that don't   11:17:18

16  generate any revenue, those categories being personals and

17  dating, but we are not going to shut down escorts.

18  Q.  All right.  And let me just stop you.

19           In personals and dating, why didn't -- why didn't

20  those categories generate any revenue?                11:17:41

21  A.  Well, they did generate a little revenue, but I think it

22  was only a dollar to post, and there weren't very many postings

23  in there compared to female escorts.

24  Q.  Okay.  And then in the next paragraph, Mr. Nigam says --

25  what does he say here?                                11:18:02

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  A.  "We understand the very complex safety and security and

2  privacy challenges that Backpage.com faces and we look forward

3  to identifying ways to protect the vulnerable.  Immediately,

4  SSP Blue will take a thoughtful look at the site's

5  infrastructure to determine where necessary and impactful          11:18:21

6  changes can be made to provide a safer site.  Hemanshu Nigam,

7  founder, SSP Blue."

8  Q.  All right.  And going forward, what thoughtful look was

9  taken to determine where necessary and impactful changes could

10 be provided?                                                       11:18:41

11         What -- what -- going forward, what did -- what was he

12 referring to here?

13 A.  We were going to improve the cosmetic changes on the site

14 in terms of moderation standards, and then we're going to give

15 up a couple of categories and suspend them to create the           11:18:58

16 impression that we're doing something, but these categories

17 have little or no revenue.

18         MR. RAPP:  All right.  Let's look at 907 for the

19 witness's eyes only.

20 BY MR. RAPP:                                                       11:19:25

21 Q.  Meanwhile, did you -- while you were responding to -- while

22 Mr. Nigam was -- well, by the way, who was that response?

23 Those two paragraphs that we looked at, do you know where that

24 was going?  Who was going -- where was that going to -- to go

25 to?                                                                11:19:46

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  A.  I thought it was going to CNN.

2  Q.  Okay.  And, meanwhile, in September, did you still have

3  a -- a relationship with The Erotic Review?

4  A.  Yes, we did.

5  Q.  And I'm showing you 907.                                    11:20:06

6          Is that an email -- are you on this email?

7  A.  I am.

8  Q.  And who's this a email exchange with?

9  A.  The email exchange is between myself and the new manager of

10  The Erotic Review.                                             11:20:30

11          MR. RAPP:  All right.  Move to admit 907.

12          MR. FEDER:  Same.

13          THE COURT:  Yes, it may be admitted.

14          Overruled.

15          (Exhibit 907 admitted into evidence.)                 11:20:37

16          THE COURT:  And it may be published.

17          MR. RAPP:  Thank you, Your Honor.

18  BY MR. RAPP:

19  Q.  And so what -- so, just so we understand who we're talking

20  to, this person up here, do you recognize this person's name   11:20:49

21  and his email address?

22  A.  I do.  John Giorgio.

23  Q.  And I think you had -- you just testified that Mr. Giorgio

24  took over as your contact with The Erotic Review.

25  A.  Yes.                                                       11:21:06

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    Q.  All right.  And so did you find yourself emailing him from

2    time to time regarding this relationship?

3    A.  Yes.

4    Q.  And so down here, what are you telling Mr. Giorgio?

5    A.  "I received your voice mail this AM.  9 AM Amster time" --          11:21:24

6    "9 AM Amsterdam time works for me in the future (it's midnight

7    in Phoenix).  Here's con-" -- "a confidential items to be

8    discussed:  1, politics.  The AG's pressured Craig to shut down

9    adult and now" -- "and are now asking us to do the same.  We

10   declined."                                                            11:21:53

11        And then the -- then I provide the link to

12   blog.backpage.com.

13        "My options:  I could negotiate and make our content

14   lamer; I could move adult content overseas to a separate

15   company with new ownership; or, I could sell all or" --               11:22:08

16   "all" -- "all or the adult content on backpage to a" -- "to an

17   overseas company.  If you have any parties interested in b or

18   c, please let me know.  I'm comfortable with Option a, but the

19   other two options should be explored.

20        "Item 2:  Negotiate and make our content lamer.  We             11:22:31

21   are getting pressured to remove links to TER.  I have been

22   refusing their requests for the past year.  If I do remove

23   links, I would like to create a triangle for traffic.  The ter

24   link points to an ad on another site.  That site has a link to

25   TER and to backpage ad.  Backpage would link to the ad on the        11:22:53

CARL FERRER - DIRECT EXAMINATION (Cont'd)

```
 1   other site.  It's a triangle."
 2   Q.  Let me just stop you there.
 3        Can you sort of explain to the jury what it is you're
 4   proposing here regarding this triangle.
 5   A.  If -- if we have to get rid of The Erotic Review links and      11:23:10
 6   we still want to keep The Erotic Review traffic, we could just
 7   have a link to some other site and some other page that would
 8   appear in each ad, and then when you click that, you would go
 9   to another page that would provide the link to The Erotic
10   Review and a back link to Backpage.                                 11:23:32
11        So it's a way to sort of conceal the fact that you
12   still have prostitution reviews on Backpage ads.  You just have
13   to go to other pages.
14   Q.  And then what do you say in b to him?
15   A.  I sort of lost my --                                           11:23:49
16   Q.  Yeah.
17   A.  Lost track.
18   Q.  Let me see if I can help you here.
19   A.  Let me --
20   Q.  Right here.                                                    11:23:56
21   A.  "I also may want to switch my banner ad on TER to the other
22   escort site.  I know this seems a little complicated, but it's
23   politics and I can explain better on the phone."
24   Q.  All right.  Now -- so in terms of refusing this -- the line
25   here where you say, "I have been refusing the requests for the     11:24:27
```

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  past year regarding to removing the links to TER," are you

2  getting any direction on that?

3  A.  Yes.  We're getting direction from the Attorneys General.

4  Q.  All right.  And are you -- are you -- is there a -- is

5  there a reason that you're not following that recommendation?      11:24:53

6  A.  It would be bad for revenue and traffic, and that's

7  something that we discussed with Scott Spear.

8  Q.  All right.  When you say "we," who do you mean?  Who

9  discussed -- who do you mean by "we" when you say you discussed

10  it with Scott Spear?                                               11:25:14

11  A.  Myself.  Jim Larkin.  Scott Spear.

12  Q.  All right.  Now, in terms of moderation, in light of these,

13  CNN and the letters from the -- the Attorney Generals, what, if

14  anything, was going on with moderation?

15  A.  We're continuing to reduce the amount of nudity.            11:25:32

16  Q.  All right.  And what, if anything, is being done with the

17  moderation staff at Backpage?

18  A.  We are -- as revenue goes up, we're hiring more people.

19  Q.  All right.  Are you hiring more moderators in-house or

20  elsewhere?                                                        11:26:03

21  A.  At this time we'll take moderators from anywhere.  And we

22  end up finding a third-party solution called El Camino.

23  Q.  And where was El Camino based?

24  A.  Their company was in India.

25  Q.  Okay.  And -- and did you hire this company named          11:26:19

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    El Camino?

2    A.  We did.

3    Q.  And who made the decisions regarding the hiring and the

4    budgeting for El Camino?

5    A.  Scott Spear.                                              11:26:37

6    Q.  And did you provide -- who is it that would supervise this

7    El Camino, this moderation company?

8    A.  Andrew Padilla.

9    Q.  All right.  And would you -- how was it communicated to

10   El Camin- -- El Camino the standards for images and terms on    11:27:02

11   the postings?  How was that communicated?

12   A.  As changes came out of Building B, which was Scott Spear,

13   myself, Jim Larkin, and others, we would then hand those

14   changes to Andrew Padilla, and he would implement them.

15   Q.  All right.  Now I'm showing you Exhibit 600.              11:27:28

16          And do you see that on your screen?

17   A.  Yes.

18   Q.  Is this a multiple-page email string?

19   A.  Yes, it is.

20   Q.  And -- and who -- who is on this email string?           11:27:45

21   A.  This -- I see Monita Mohan, who's the -- one of the

22   manager/owners at El Camino; myself; Sukesh Mohan, another one

23   of the owners of El Camino.

24   Q.  Okay.  And anybody else from Backpage.com?

25   A.  And Andrew Padilla.  And Dan Hyer.                        11:28:17

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   Q.   Okay.

2               MR. RAPP:  Move to admit 600.

3               THE COURT:  It may be admitted and published.

4               (Exhibit 600 admitted into evidence.)

5   BY MR. RAPP:                                              11:28:33

6   Q.   So let's just go quickly to page 6 here.  And can you just

7   explain what this email exchange here is on page 6.

8   A.   Yes.

9   Q.   Yeah, what -- what's going on there?

10  A.   Su- -- Sukesh Mohan of El Camino contacts me.  I believe   11:29:02

11  he's replying back to my inquiry.  "Thanks for your interest.

12  Attached is a presentation with a company" -- "company

13  introduction, services offered, and pricing."

14  Q.   All right.  So it's fair to say this is sort of the

15  introduction to this company?                              11:29:29

16  A.   Yes.

17  Q.   All right.  And then at some point do you discuss in this

18  email what it is you want, what is -- what it is you want them

19  to do in terms of moderation?

20  A.   Yes, we do.                                           11:29:48

21  Q.   All right.  And -- and do you provide them sort of term --

22  definitions of terms and -- and images?

23  A.   I provide them the definition of the terms, what they're to

24  do with the images, and a log-in and a password to get into the

25  moderation database.                                       11:30:08

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   Q.  And so down here is -- is this a -- a reference to the --

2   to some type of standard for the images?

3   A.  Yes.  We allow full nudes for men and women; however, we do

4   not want to display any explicit images of genitalia, like the

5   inner vagina pics or an erect penis.  Our standard is Playboy          11:30:29

6   and not porn.

7   Q.  Okay.  And then does it go on to the next page what the

8   standards are for -- for images?

9   A.  Yes.  It gives very heavy detail.

10  Q.  All right.  But fair to say that -- that these bullet            11:30:52

11  points describe what it is that is allowed in terms of images?

12  A.  Yes.  This is the Scott Spear Playboy standard to, you

13  know, you could be nude but no close-ups of genitalia.

14  Q.  And then do you also tell them what the images that you --

15  should be failed, and is that detailed here in this -- this --      11:31:21

16  these bullet points?

17  A.  It is, yes.

18  Q.  All right.  And then do you discuss the text standards?

19          And we -- is it fair to say that we have seen in some

20  other emails the text that would be failed?                         11:31:45

21  A.  Yes.  This -- the sex act language.  It's what these terms

22  are.

23  Q.  All right.  And that goes on to the second page; right?

24  A.  Yes.

25  Q.  And then why is this all being forwarded up to Andrew           11:32:11

90

1    Padilla?

2    A.  Well, I'm going to send to Andrew what I've asked the

3    company in India to do, and he will be supervising them.

4    Q.  All right.  But, meanwhile, is Mr. Padilla also supervising

5    moderators in Phoenix?                                    11:32:44

6    A.  Yes.

7    Q.  And, again, where are those moderators located in -- in the

8    Backpage offices?

9    A.  They're working at 1201 East Jefferson office.  I believe

10   on the second floor of Building A.                        11:33:03

11   Q.  Okay.  Let's look at Exhibit 56 for your eyes only.

12        Now, this is a -- who is this an email exchange for?

13   A.  This is an email between Andrew Padilla, Jeff Lyons, Tamara

14   Nickel, Joye Vaught.

15   Q.  We've seen this Tamara Nickel on a couple emails           11:33:38

16   previously.  What was her role, if any, at -- at Backpage?

17   A.  She was one of the early managers of Backpage.  And then

18   she, instead of managing people, moved from -- out of credit

19   cards settlement and eventually into subpoenas.

20   Q.  All right.  And -- and does this also include Joye Vaught?  11:34:00

21   A.  Yes, it does.

22   Q.  And -- and why at this point, in 2010, is Joye Vaught

23   copied on this email, if you know?

24   A.  Joye is Andrew Padilla's assistant.

25   Q.  All right.  And --                                      11:34:25

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1        MR. RAPP:  So move to admit 56.

2        MR. EISENBERG:  Objection, Your Honor.  No foundation

3   for how he knows what this really is.

4        MS. BERTRAND:  Also, objection as to the lower half of

5   the page, as it's coming from -- as -- as hearsay.                11:34:41

6        THE COURT:  Sustained.

7   BY MR. RAPP:

8   Q.  Okay.  Well, do you know who the -- the person in the lower

9   part of this email is?

10  A.  Yes.  Jeff Lyons is a moderator.                               11:34:59

11  Q.  And how do you know who Jeff Lyons is?

12  A.  Because he would need to -- he was a problem moderator and

13  sometimes needed supervision.

14  Q.  Why do you say he was a problem moderator and sometimes

15  needed supervision?                                               11:35:19

16  A.  Well, I know that at one time he put notes in the --

17        MR. EISENBERG:  Objection, Your Honor.  Foundation.

18        THE COURT:  Well, I guess you can lay a little bit

19  more foundation how he knows with regard to Mr. Lyons.

20  BY MR. RAPP:                                                      11:35:41

21  Q.  Can you just give us the -- the time frame of -- of -- of

22  when you observed that he was a problem moderator.

23  A.  I told --

24        MS. BERTRAND:  Objection.  Vague as to form.

25        THE COURT:  What was the objection?                         11:35:58

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1        MS. BERTRAND:  It's vague.  The question is vague as

2    to "problem moderator."

3        THE COURT:  Sustained.

4    BY MR. RAPP:

5    Q.  Well, why do you -- why did you view him as a problem                    11:36:05

6    moderator?

7    A.  He was putting notes in the note field about the ads that

8    he was moderating.

9    Q.  All right.  And is -- have -- this email that's on your

10   screen, did you ever have any discussions regarding this --                  11:36:22

11   this email with either Mr. Padilla or Ms. Vaught?

12   A.  Yes.  Andrew Padilla brought it to my attention.

13   Q.  All right.  And is the -- what was the issue that

14   Mr. Padilla brought to your attention about Jeff Lyons?

15       MS. BERTRAND:  Objection.  This is still hearsay.                        11:36:46

16   Seeks hearsay.

17       THE COURT:  Sustained.

18       MR. RAPP:  Your Honor, that's an admission.

19       THE COURT:  Well, I think the question was, "What was

20   the issue?"                                                                  11:37:01

21   BY MR. RAPP:

22   Q.  Well, what -- what did Mr. Padilla tell you was the issue

23   with Jeff Lyons?

24       THE COURT:  Overruled as to --

25       THE WITNESS:  He stated Jeff Lyons was putting in the                    11:37:14

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   notes field that a particular user was engaged in prostitution.

2   BY MR. RAPP:

3   Q.  All right.  And why did Mr. Padilla bring that to your

4   attention?  What did he say was the -- what was the problem

5   with that?                                                    11:37:30

6   A.  He is not allowed to put notes field -- put that kind of

7   comment in the notes field --

8   Q.  Well, why?

9   A.  -- of any user.

10  Q.  Not to interrupt you.  Why -- why was he not allowed to do  11:37:43

11  that?

12  A.  Because Mr. Lyons is not able to determine whether someone

13  is involved in prostitution or not.

14  Q.  All right.  And does -- in this email, does Mr. Padilla

15  give Mr. Lyons a response?                                    11:38:04

16        MR. EISENBERG:  Objection, Your Honor.  It has -- I

17  don't believe it's been admitted.  And, moreover, we still

18  haven't laid a foundation for how he knows that this really is

19  an email.

20        THE COURT:  Sustained.                                  11:38:16

21  BY MR. RAPP:

22  Q.  Well, do you recognize the email addresses here?

23  A.  I do.

24  Q.  Do you exchange emails with Mr. Padilla and Ms. Vaught

25  during the time period they worked at Backpage.com?           11:38:26

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    A.  I do.

2    Q.  And do you even recognize Mr. Lyons' email?

3    A.  I do.

4         MR. RAPP:  All right.  Move to admit 56.

5         MS. BERTRAND:  Same objections as to hearsay.                    11:38:42

6         THE COURT:  Sustained.

7         MR. RAPP:  Sustained as to Mr. Padilla or Mr. Lyons or

8    both?

9         THE COURT:  Both.

10        MR. RAPP:  May I be heard on Mr. Padilla?                          11:38:58

11        THE COURT:  Yes.

12        MR. RAPP:  It's an admission of the party opponent.

13        THE COURT:  Well, I -- let me -- let me have you at

14   sidebar very briefly.

15        THE COURT:  Can you hear me?                                       11:39:22

16        THE COURT REPORTER:  Yes.

17        (Sidebar discussion begins on the record.)

18        THE COURT:  The way I look at this exhibit, Mr. Ferrer

19   is not on it.

20        MR. RAPP:  No.                                                     11:39:39

21        THE COURT:  So the foundation that has to be laid is,

22   how is he aware of this email?

23        You're going to try to introduce the content of the

24   email.  So I think that's the problem you're having, Mr. Rapp.

25        MR. RAPP:  Well, he could do that.                                11:39:49

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          THE COURT:  Well, you need to do that because --

2     because if -- there has to be some foundation laid for his

3     awareness of what the content of that particular email is

4     because he's nowhere on that chain.

5          MR. RAPP:  Right.  I believe the Court's order on the          11:40:05

6     emails was even though you're not a -- endorsed on the email,

7     if you can identify the internal email in between Backpage

8     employees, that would be admissible.

9          MR. KOZINETS:  If I may, I think that's about 1212.

10    About Backpage's on ten -- or right in there.  There's a whole     11:40:26

11    section on emails that we have Mr. Ferrer can lay foundation

12    for them if -- I believe if he's not copied on that.

13         THE COURT:  Well, I think the -- I think the

14    foundation on this particular email, though, is problematic

15    because there's no time frame.  And although he might be privy     11:40:44

16    to some of the discussions about the -- the flag problems with

17    this moderator, with regard to the specific content of this

18    email, there's not specific foundation laid as to his knowledge

19    about the content of it.

20         That's -- that's the problem that I have.  So it's not        11:41:04

21    like a blanket admission of any email that --

22         MR. EISENBERG:  And, Your Honor --

23         MR. RAPP:  Well --

24         THE COURT:  -- that includes a potential --

25         MR. RAPP:  Yeah.

UNITED STATES DISTRICT COURT

**CARL FERRER - DIRECT EXAMINATION (Cont'd)**

1          THE COURT:  -- co-conspirator statement.  He has to

2     have knowledge of it.  That's the problem.

3          MR. RAPP:  Actually, I don't think that's the ruling

4     of --

5          THE COURT:  Well, let's --

6          MR. RAPP:  -- 1212, Judge --

7          THE COURT:  Well, let me -- let me relook at it.  Can

8     you move on to a different --

9          MR. RAPP:  Sure.

10         THE COURT:  -- exhibit?                           11:41:29

11         MR. RAPP:  Yeah, absolutely.

12         THE COURT:  Let's do that and take it up later.

13         MR. EISENBERG:  Your Honor, before we close, I do want

14    to say that if it's identified before it was shown to him

15    preparing for the litigation and he says, oh, yes, I know what    11:41:37

16    that is, that's not sufficient.  He has to have known about it

17    before.

18         THE COURT:  So --

19         MR. KOZINETS:  So after the 1212, it's also read in

20    here --                                               11:41:51

21         THE COURT:  I'll look at this over the break --

22         MR. KOZINETS:  Okay.

23         THE COURT:  -- but let me just say that if there's

24    content in the email that you can bring out in his testimony

25    without introducing the email, that's another way to do it.      11:42:00

1    But --

2           MR. RAPP:  Well, he --

3           THE COURT:  -- unless he knows specifically what that

4    communication is about, it just can't come in.  But I'll look

5    at this and --                                              11:42:10

6           MR. RAPP:  Yeah.

7           THE COURT:  -- again, I'll try to --

8           MR. RAPP:  Understood.

9           THE COURT:  I'll get a better understanding what the

10   prior ruling was.                                           11:42:17

11          MR. KOZINETS:  Okay.

12          THE COURT:  And then is it -- can I take that?

13          MR. KOZINETS:  Let me make sure nobody's written on

14   it.

15          Yeah, okay.                                          11:42:23

16          THE COURT:  All right.  And then so let's move to

17   something else and then we can come back.

18          MR. RAPP:  Got it.  Thank you.

19          (End of sidebar discussion.)

20          MR. RAPP:  Got it.                                   11:42:40

21   BY MR. RAPP:

22   Q.  Okay.  Let's --

23          THE COURT:  One moment.  Before we start --

24          THE COURTROOM DEPUTY:  I don't know what that noise

25   is.  It's very hard to hear in here with what that is outside.  11:43:08

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1      THE COURT:  I don't know what's happening.  It might

2  be a -- perhaps a cleaner outside working on the floor or

3  something.  But we'll investigate, and let's try to move

4  forward.  And just speak into the microphone directly while we

5  investigate what is making that noise.                    11:43:28

6      MR. RAPP:  Okay.

7  BY MR. RAPP:

8  Q.  I'm -- I'm now showing you Exhibit 57.

9      Do you see that on your screen?

10 A.  Yes, I do.                                             11:43:41

11 Q.  And who is that -- who is on this email?

12 A.  Andrew Padilla, Monita Mohan, and myself, Carl Ferrer.

13     MR. RAPP:  Is the court reporter getting -- are you

14 getting this?

15     THE COURT:  I'm sorry.  Let's -- let me just let my   11:44:01

16 law clerk investigate, because I'm having a hard time hearing

17 as well.

18     MR. RAPP:  I just want to make sure she got it.

19     (Brief pause.)

20     THE COURT:  Well, let's hope that's not our           11:44:51

21 air-conditioning going off in here.

22     All right.  Let's continue.

23 BY MR. RAPP:

24 Q.  All right.  I'm showing you for the record what is marked

25 as United States 57.                                       11:45:00

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          Do you see that email on your screen, sir?

2    A.  Yes, I do.

3    Q.  Who is on this email?

4    A.  Monita Mohan, Andrew Padilla, Carl Ferrer.

5    Q.  All right.                                          11:45:12

6          MR. RAPP:  Move to admit 57.

7          THE COURT:  Yes, it may be admitted.

8          MR. RAPP:  And published.

9          THE COURT:  And published.

10         (Exhibit 57 admitted into evidence.)             11:45:24

11         MR. RAPP:  Thank you, Your Honor.

12   BY MR. RAPP:

13   Q.  What is Mr. Padilla telling Ms. Mohan?  Could you just read

14   the -- the bottom part of this email.

15   A.  Yes.  Andrew Padilla writes, "Hi Monita.  I've been        11:45:36

16   reviewing the ads Failed by at1 and I wanted to offer a few

17   pointers to hopefully streamline the work for you."

18   Q.  Let me stop you there.

19         At1.  Can you explain that to the jury.

20   A.  So that would be one of the moderators for El Camino.  We   11:45:54

21   would get them at1, at2, at3.

22   Q.  All right.  And then the next section?

23   A.  "We have a filter setup to automatically remove the word

24   "cum" so when you see it in an ad it's safe to ignore.  The

25   flip" -- "The filter will remove the term after the ad is       11:46:16

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   released.  And if you see the "come" -- C-O-M-E spelling --

2   "and it isn't a sexual reference, it's okay.  'Sexy' is okay.

3   If a banned term is used to describe what the escort is not

4   offering, it's okay to leave it.  For instance, 'no F/S' or 'I

5   do not offer full service.'"                                    11:46:42

6   Q.  Let me just stop you there.

7          What -- what did you take that to mean, the directions

8   that Mr. Padilla's giving Ms. Mohan?  What did you take that to

9   mean?

10         For instance, "no F/S" or "I do not offer full          11:46:56

11  service."

12  A.  Yes.  F/S means full service.  And if a poster says no full

13  service, that means no sexual intercourse.  Oral sex, yes.

14  Sexual intercourse, no.

15  Q.  All right.  And then what does he go on to say?            11:47:14

16  A.  "In slide 27 of the power point presentation, I think I was

17  too vague.  The rear shot was a thong or a g-string is okay

18  unless the fabric is off center and exposing the anus.  A

19  centered thong is okay and any discoloration around the anus

20  that is visible is okay.  The picture I choose" -- "The picture  11:47:39

21  I chose was a poor example.  I'll find a better example and

22  update the power point for you and our staff here.  Thanks."

23  Q.  And then what is she -- what does she respond to

24  Mr. Padilla with you copied?

25  A.  Monita replies, "Hi Andrew.  Thank you so much for your    11:48:01

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    feedback.  I will discuss with the team.  Best, Monita."

2    Q.  All right.  I'm going to show you 58a.

3           MR. RAPP:  This is just for the witness's eyes only.

4    58.

5    BY MR. RAPP:                                                    11:48:22

6    Q.  All right.  Now, do you recognize this email?

7    A.  Yes, I do.

8    Q.  And is this -- who is this email from?

9    A.  The email is from Andrew Padilla.

10   Q.  And are you and -- and somebody else copied on it?         11:48:46

11   A.  I am copied and Hyer is copied, and it's sent to the

12   moderation department that Andrew Padilla supervises.

13   Q.  All right.  And what's the subject of this email?

14   A.  The subject is image guideline PowerPoints and list of

15   banned terms.                                                  11:49:08

16           MR. RAPP:  All right.  Move to admit Exhibit 58.

17           MR. EISENBERG:  No objection, Your Honor.

18           THE COURT:  It may be admitted and published.

19           (Exhibit 58 admitted into evidence.)

20           MR. RAPP:  Thank you.                                  11:49:20

21   BY MR. RAPP:

22   Q.  Could you read what Mr. Padilla's telling -- well, first of

23   all, who is this email to?  Who is he sending it to?

24   A.  He's -- he's addressing it directly to the staff that's in

25   his moderation department in Phoenix, Arizona.                 11:49:42

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  Q.  All right.  And what does he tell them?

2  A.  He's telling them, "Some of you already received this

3  presentation by Gtalk, but I'm attaching it for those of you

4  that haven't."

5  Q.  What is -- can you tell the jury what Gtalk is.                11:50:00

6  A.  Gtalk was a type of messaging, and we -- the company

7  started to use it more instead of Gmail because it's quicker

8  and it didn't leave a record.

9  Q.  Then what else does he say?

10  A.  "For the slides that Fail, you shouldn't actually use the    11:50:21

11  Fail button in the queue.  Whether in the queue or in the

12  manual review, images that fit the Fail criteria should be

13  removed from ads."

14  Q.  What -- what did you take that to mean?

15  A.  We're going to edit the ads by removing images that are      11:50:40

16  failed, and then the ad's going to continue to be published.

17  Q.  All right.  Despite the fact that the image may violate

18  the -- the terms of use?

19       MR. EISENBERG:  Objection, Your Honor.

20       THE COURT:  Sustained.                                      11:51:02

21  BY MR. RAPP:

22  Q.  What does he next say?

23  A.  "For images described as Graphic Sex Acts, the entire ad

24  should be removed."

25  Q.  And then?                                                    11:51:19

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1  A.  "This is only a guideline.  Most of you already have a good

2  idea on how to handle most images.  If that's working for you,

3  stick to it.  You're not going to get in trouble for being too

4  clean right now."

5  Q.  What did you take that to mean?                          11:51:36

6  A.  Putting an extra emphasis to sanitize a site as we continue

7  to get more and more media exposure.

8  Q.  All right.  And then what does he say?

9  A.  "Images aside, it's the language in ads that's really

10  killing us with the Attorneys General.  Images are almost an   11:51:57

11  afterthought to them."

12  Q.  And what did you take that to mean?

13  A.  Sex act for money terms.  There's just too many of them

14  appearing in ads.

15  Q.  And when he says that's -- "that's really killing us with   11:52:13

16  the Attorney Generals," what did you take that to mean?

17  A.  The Attorneys General are sending us letters telling us

18  about specific terms.

19  Q.  All right.  And then -- and then what does he say at the

20  bottom here?                                                  11:52:33

21  A.  "I'm attaching a list of terms that are either banned or

22  being stripped out automatically by filters.  You should be

23  looking for the misspellings that the filters and the bans are

24  missing."

25  Q.  All right.  And does he attach to this email some type of a  11:52:49

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    slide show?  Slide show's the wrong term.

2         Does he -- does he attach some type of a deck of -- of

3    images that -- that provide the moderators examples of what

4    should be failed and what should be allowed?

5         MS. BERTRAND:  Objection.  Leading.  Compound          11:53:14

6    question.

7         THE COURT:  Sustained.

8         You can rephrase, Mr. Rapp.

9    BY MR. RAPP:

10   Q.  What does he attach to this email?                      11:53:22

11   A.  He attaches image guidelines 111 PowerPoint.

12        MR. RAPP:  All right.  All right.  So let me show this

13   witness 58a for his eyes only.

14   BY MR. RAPP:

15   Q.  All right.  Now -- so is this -- is 58a, is this the     11:53:40

16   PowerPoint slide -- or PowerPoint deck of -- of images that he

17   provides his moderators?

18        MS. BERTRAND:  Objection.  Foundation.

19        THE COURT:  Sustained.

20   BY MR. RAPP:                                                 11:54:05

21   Q.  Are you on this email with this attached Power --

22   PowerPoint deck?

23   A.  Yes.

24   Q.  All right.  So let's just talk about this.  We've been

25   talking about the female escort category during the last     11:54:17

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    couple days of your testimony.

2          What other escort categories are there?

3    A.  Oh, there's male escorts, transsexual escorts, and then

4    there's body rubs category.

5    Q.  Does this PowerPoint deck, does it include images that are        11:54:38

6    related to the male escort section?

7          MS. BERTRAND:  Objection.  Leading.  Same

8    authentication.

9          THE COURT:  As to leading, I'll sustain.

10          MR. RAPP:  All right.  Move to admit 58a.        11:54:56

11          MS. BERTRAND:  Objection.  Foundation.

12          THE COURT:  Overruled.

13          It may be admitted.

14          MR. RAPP:  All right.

15          THE COURT:  It may be published.        11:55:09

16          (Exhibit 58a admitted into evidence.)

17    BY MR. RAPP:

18    Q.  Okay.  And have you seen this -- did you see this at the

19    time?

20    A.  Yes.  I've reviewed this training document back then.        11:55:13

21    Q.  All right.  And -- and what would be the purpose of you

22    reviewing this training document?

23    A.  To become aware of Andrew Padilla's doing his job as his

24    supervisor and communicating the standards for moderation.

25    They're changing all the time.        11:55:30

**CARL FERRER - DIRECT EXAMINATION (Cont'd)**

1  Q.  And what type of images does this PowerPoint include?

2  A.  There's some nudity.

3  Q.  All right.  Are there any depictions of sex acts?

4  A.  I think so.  Yes.

5  Q.  All right.  So I'm going to -- you -- you received this        11:55:49

6  PowerPoint.  Did you receive it at the time that you -- you

7  were copied on this email?

8  A.  Yes.

9  Q.  And have you reviewed it in preparation for your testimony?

10  A.  Yes, I have.                                                   11:56:02

11  Q.  Is this the PowerPoint that Mr. Padilla sent to the

12  moderators?

13  A.  Yes, it is.

14  Q.  All right.  So I'm going to go through this quickly and

15  then come back to a number of the slides.                         11:56:13

16       All right.  So is that the image standards that

17  were -- was sent out by Mr. Padilla?

18  A.  Yes.

19  Q.  All right.  So in terms of the ad -- or the images that

20  were allowed, let me look -- let's look at a couple of those.     11:57:25

21       All right.  Let's look at 58a, page 9.

22       All right.  Is this one of the -- is this one of the

23  images that would be approved?

24  A.  Yes.

25  Q.  Looking at 58a/13, is this one of the images that would be    11:57:54

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   approved?

2   A.  Yes.

3          MS. BERTRAND:  Your Honor, objection as vague as to

4   time.  The -- the testimony's been that the moderation approach

5   has changed over time, so I'd ask that we be clear about when          11:58:21

6   this particular set of images or words were acceptable or not.

7          THE COURT:  All right.  I think she makes -- makes a

8   valid point, Mr. Rapp.  And why don't you lay some foundation,

9   and then we can have our lunch break.

10          MR. RAPP:  Okay.                                               11:58:42

11   BY MR. RAPP:

12   Q.  Well, when was this email sent to the moderation staff,

13   Mr. --

14   A.  The email was sent Sunday, October 17th, 2010.

15   Q.  Is the images that were contained in the PowerPoint, is          11:59:05

16   that the standard for images on October 17th of 2010?

17   A.  Yes, that is the image standard for October 17, 2010.

18          MR. RAPP:  Okay.

19          THE COURT:  All right.  I think that will bring us to

20   the point where we have our lunch break.  We will be at recess       11:59:30

21   for an hour for lunch.

22          And so, members of the jury, just remember the

23   admonition not to come to any conclusions or to discuss any of

24   the matters that have been presented so far amongst yourself or

25   anyone else.  Just simply enjoy your lunch break.  And be            11:59:48

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    prepared to come in at about 1:00, 1:05.

2            And please all rise for the jury.

3            (Jury not present at 11:59 a.m.)

4        THE COURT:  All right.  Please be seated and just

5    remain in the courtroom for a few minutes so that the jurors     12:00:25

6    can go off to lunch undisturbed.  And while they -- while they

7    make their way out, let me just address our sidebar.

8            I was looking at Document 1776 that the government

9    brought to my attention, and it is true that the prior ruling

10   of the Court really, as discussed in this particular order, was    12:00:51

11   as it relates to authentication by Mr. Ferrer.  And if I recall

12   correctly, early on -- well, there've been multiple emails.  I

13   think there's email addresses that use staff and then certain

14   emails have names attached to them.  And certainly there --

15   there is sufficient testimony with regard to authentication.       12:01:27

16           Now, that being said, so long as Mr. Ferrer can

17   identify the email address as being one that the company used

18   because of his multiple roles in the company, then the content

19   of the email, if it includes a co-conspirator statement, then

20   it is admissible under 801(d)(2)(D) and (2)(E).                    12:02:02

21           And so on that basis, the prior exhibit, which was at

22   issue, I think, is Exhibit 56.  And I think there has been

23   sufficient foundation laid for Mr. Ferrer's understanding of

24   what that conversation related to.  It is admissible.

25           And so --                                                  12:02:26

UNITED STATES DISTRICT COURT

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          MR. EISENBERG:  Your Honor, may I be heard?

2          THE COURT:  You may.

3          MR. EISENBERG:  I understand what the Court -- what

4    the Court is saying.  How- -- however, he would be able to

5    relate his understanding of that discussion, which is --          12:02:40

6          THE COURT:  When you say "he" --

7          MR. EISENBERG:  Mr. Ferrer.

8          THE COURT:  -- are you talking about Mr. Ferrer or

9    Mr. Padilla?

10         MR. EISENBERG:  Yeah, the witness.  The witness.          12:02:52

11         THE COURT:  Okay.

12         MR. EISENBERG:  If he is unable -- if he is simply

13   going to parrot what's in that email and not have any

14   recognition of his own that what was being said in that email

15   is something he recognizes, then I still have an a objection to          12:03:04

16   it.  All it is is an -- is an email between two people.

17         THE COURT:  Well, in terms of the ruling, I think

18   under 801(2)(D) -- oh, let me see if Mr. Rapp wants to respond

19   first before I --

20         MR. RAPP:  Well, so I disagree, particularly on this          12:03:28

21   56, because not only does he recognize the email addresses and

22   what was said, he actually had a separate conversation with

23   Mr. Padilla about Mr. Lyons about the particular subject matter

24   of the email.

25         So I understand counsel's objection.  It doesn't apply          12:03:49

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   with respect to this particular email.  It might on some other

2   email, but not this one.

3           THE COURT:  Well, I --

4           MR. EISENBERG:  Well -- sorry.

5           THE COURT:  Go ahead.                              12:04:03

6           MR. EISENBERG:  That conversation between Mr. Lyons

7   and -- as it pertains to Mr. Lyons that the witness had with

8   Mr. Padilla, I have no objection to that.  That's something he

9   knows.  He's going to testify about it.  This is just a --

10  hearsay, and he has no knowledge.                          12:04:20

11          I understand they're claiming that it advances the

12  conspiracy.  I'm not sure you could just get that far by

13  saying, oh, yeah, these words seem to advance the conspiracy,

14  because he -- he doesn't really have any knowledge as to what

15  was actually written, firsthand knowledge.  So --           12:04:37

16          MR. RAPP:  May I respond to that?

17          THE COURT:  Well, you may, and then I can --

18          MR. RAPP:  Yeah.

19          THE COURT:  -- let you know.

20          MR. RAPP:  It actually does further the conspiracy   12:04:47

21  when they're telling the moderators, don't put the word

22  prostitution in the notes.

23          That does further the objectives of the conspiracy,

24  because that would be incriminating evidence if ever found,

25  which it was.  So -- and he does know the context of that email  12:05:03

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    exchange.

2         THE COURT:  And having made the record, Mr. Eisenberg,

3    again my ruling stands, because under 801(d)(2)(D), it is

4    offered in the context of Mr. Padilla being an employee of

5    Backpage.  It was within the scope the relationship.          12:05:29

6         And so to the extent Mr. Ferrer can testify about his

7    knowledge of this problem that they had with this moderator, it

8    is relevant and admissible under that standard, and so it may

9    be revisited.

10        Let me go back to the prior exhibit from this morning.    12:05:54

11   When we -- and I can't recall what the number was.

12   Mr. Panchapakesan may recall.  But we had a discussion

13   previously about the redaction response from Backpage.  There's

14   a whole --

15        MR. RAPP:  Oh, yeah.                                      12:06:20

16        THE COURT:  -- page of redaction.

17        MR. RAPP:  Yes.  Yes.

18        THE COURT:  And I had asked the government to submit

19   to me what that response was because I think, if I remember

20   correctly, the response related to 230.                       12:06:31

21        MR. RAPP:  Yes.

22        THE COURT:  And so I need to see that, because -- and

23   I had not seen it, and I -- I want to see it before I revisit

24   that ruling.  But I knew that there was some concern that I had

25   about that the entirety of the -- the email being redacted --  12:06:51

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1          MR. RAPP:  Right.

2          THE COURT:  -- so --

3          MR. RAPP:  So just to direct the Court to 1185, the

4    exhibits that you have should be unredacted.  And it's 1185a

5    that redacts the references to the CDA.                          12:07:08

6          THE COURT:  So 1185 is unredacted?

7          MR. RAPP:  Unredacted.

8          THE COURT:  Okay.

9          MR. PANCHAPAKESAN:  Your Honor, may I be heard?

10         THE COURT:  Yes.                                           12:07:19

11         MR. PANCHAPAKESAN:  So, Your Honor, as to 1185, it's

12   like a five-page, six-page email between CNN and Backpage.

13   There are a number of responses on the part of Backpage that do

14   not reference the CDA.

15         For example, at the top of --                             12:07:38

16         THE COURT:  Can you just give me the page number --

17         MR. PANCHAPAKESAN:  Sure.

18         THE COURT:  -- so I can look at -- find it

19   immediately?

20         MR. PANCHAPAKESAN:  Top of page 3 of 1185, there's an      12:07:45

21   email from Steve Suskin to Amber Lyon that does not reference a

22   CDA.

23         The bottom of -- the middle of page 3, there's an

24   email from Steve Turnham at CNN.  Now, he references a

25   St. Louis case, which I assume is a state court case, which is   12:08:08

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   why he quotes Backpage as responding with a CDA, which is a

2   logical response to a state court case, but there are also

3   other references to, you know, non-CDA things in that response,

4   including assistance Backpage provided the FBI.

5           And then further at the bottom of page 5, and then          12:08:33

6   continuing to the end of the exhibit, there's a Backpage

7   response that does not reference the CDA.

8           THE COURT:  Okay.  I'll look at those exhibits, but

9   I'll tell you what my initial thought is, that the government

10  can redact those portions that refer to the CDA and remove the   12:08:52

11  redaction from those portions that do not specifically refer to

12  or cases that involve the CDA or allegations related to that.

13          MR. PANCHAPAKESAN:  Okay.

14          THE COURT:  Then I'll revisit the admissibility of

15  that.                                                            12:09:13

16          MR. RAPP:  May I just be heard on these other areas

17  that do not implicate the CDA but are -- so this is an agent of

18  Backpage that is giving self-serving statements to CNN.  The

19  door does not swing both ways.  The -- when they make a

20  statement, everybody makes a statement over here, it's an        12:09:30

21  admission of a party opponent.  When they make a self-serving

22  statement, it is self-serving hearsay.  They don't get that in.

23  They have to try to get that in themselves in their case, if

24  they choose to have a case.  They don't get it in here.

25          So that's why we would redact that.  There's no          12:09:47

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1   exception to that.

2        THE COURT:  Well, let me look at the exhibit again,

3   because I think -- and I can't remember exactly what the -- now

4   what the testimony is related to.  I'll have to look at that

5   again.  But it was in response to, I think, the CNN reporting      12:10:02

6   of Amber Lyons.  But I thought the -- the exhibit related to

7   what the strategy was in terms of the response to that.  And --

8        MR. RAPP:  The one that I introduced?

9        THE COURT:  Yes.

10       MR. RAPP:  Yeah, I can do that.                                12:10:21

11       THE COURT:  Yes.

12       MR. RAPP:  That's me doing it.  I can do that.  They

13   can't do that.

14       THE COURT:  Well --

15       MR. RAPP:  They can't do that.                                12:10:26

16       THE COURT:  Well, Mr. Ferrer, I think, was part of

17   that other conversation related to the response; right?

18       MR. RAPP:  Yes.

19       THE COURT:  And so let me take a look at it --

20       MR. RAPP:  Okay.                                              12:10:39

21       THE COURT:  -- and then I'll let you know.

22       MR. PANCHAPAKESAN:  Your Honor, my only comment on

23   this self-serving argument is that on this exhibit issue, 1185,

24   Ferrer receives all of this, and so it's not self-serving.

25   It -- he's on the stand.  It goes to his understanding, whether   12:10:53

CARL FERRER - DIRECT EXAMINATION (Cont'd)

1    he's on notice of it, the effect on him.

2         And there have been other exhibits where the

3    government's introduced the response, the reaction, and so I

4    think that's already all in essentially.

5         THE COURT:  All right.  So let's -- I'll take it under    12:11:05

6    consideration, and let's break for lunch.

7         (Recess taken at 12:11 p.m.)

8                    ---oOo---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                              **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 14th day of

16   September, 2023.

17

18

19                              /s/ Cathy J. Taylor
                                _____
20                              Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

UNITED STATES DISTRICT COURT