UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )
                Plaintiff,     )  NO. 2:18-cr-00422-DJH
v.                             )
                               )  Phoenix, Arizona
Michael Lacey, et al.,         )  September 14, 2023
                               )  1:03 p.m.
                Defendants.    )
_____)


BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EXCERPTED TESTIMONY OF CARL FERRER

JURY TRIAL DAY 6
P.M. SESSION


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                        A P P E A R A N C E S

 2   For the Plaintiff:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Kevin M. Rapp, Esq.
               Andrew C. Stone, Esq.
 4             Peter Shawn Kozinets, Esq.
               Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
          LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8        By:  Paul J. Cambria, Jr. Esq.
          42 Delaware Avenue, Suite 120
 9        Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
11        By:  David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
12        Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
          KESSLER LAW OFFICE
14        By:  Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
15        Scottsdale, Arizona 85253
          - and -
16        FEDER LAW OFFICE, PA
          By:  Bruce S. Feder, Esq.
17        2930 East Camelback Road, Suite 160
          Phoenix, Arizona 85016
18

19   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20        By: Gary S. Lincenberg, Esq.
               Gopi K. Panchapakesan, Esq.
21        1875 Century Park E, Suite 2300
          Los Angeles, California 90067
22

23   For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
24        By:  Joy Malby Bertrand, Esq.
          P.O. Box 2734
25        Scottsdale, Arizona 85252-2734
```

UNITED STATES DISTRICT COURT

1                               *I N D E X*

2

3    **GOVERNMENT WITNESS:**                                    **PAGE**

4    <u>CARL FERRER</u>
     Continued Direct Examination by Mr. Rapp....................18

5

6    Sidebar discussion.........................................83

7

8                          *INDEX OF EXHIBITS*

9    **EXHIBIT**                                            **RECEIVED**

10   <u>NO.</u>     <u>DESCRIPTION</u>

11   58c     PDF of Exhibit 58-b; Attachment.                20
             Spreadsheet with list of terms
12           DOJ-BP-0000012982

13   56      Emails from Padilla to Vaught and Moderators,   21
             10/08/2010 DOJ-BP-0000113676- DOJ-BP-0000113677
14
     65      Email from Padilla to Mohan, 10/27/2010         25
15           DOJ-BP-0000005003

16   604     Email from H Nigam to Spear and Ferrer and      26
             Reply from Padilla, "NYC Escorts Ads -
17           Prostitution", 10/18/2010, USAO-BP-0015411

18   1928    Emails from Ferrer and Padilla, "Strip out or   30
             ban GFE and PSE", 10/18/2010, DOJ-BP-0002124205
19
     201     Email from Ferrer to Spear, Hyer, Padilla       34
20           re GFE ads, 10/26/2010 DOJ-BP-0000003278

21   1586    Email from Padilla to Vaught and moderators     37
             "new guidelines in adult", 10/27/2010,
22           DOJ-BP-0000002827

23   610     Email from Padilla, "clarification on female    40
             nudity and pricing," 10/28/2010,
24           DOJ-BP-0002110558

25

1                          *INDEX OF EXHIBITS CONT'D*

2    <u>EXHIBITS</u>                                          <u>RECEIVED</u>

3    <u>NO.</u>      <u>DESCRIPTION</u>

4    612      Email from Padilla, "Upcoming development      42
              and more moderation changes", 11/08/2010,
5             DOJ-BP-0002110567 - DOJ-BP-0002110568

6    614      Email from Ferrer to Spear, "Call to discuss   44
              content", 11/10/2010, DOJ-BP-0002126357 -
7             DOJ-BP-0002126358

8    615      Email from TER Staff to Ferrer, Issues with    48
              Backpage rules, 11/12/2010,
9             DOJ-BP-0002123627 - DOJ-BP-0002123628

10   39a      Emails from Dollar Bill and Ferrer,            51
              10/25/2010, DOJ-BP-0004602790
11
     1766     Emails from Mersey and Ferrer, "flagged again", 52
12            10/26/2010, DOJ-BP-0000210637

13   1766a    Attachment.  Sophie (backpage ad)              52

14   1767     Email from Padilla to moderators and Ferrer,   54
              "flagged again:" 10/26/2010, DOJ-BP-0000005066
15
     1874     Email to Ferrer, "Adult escort ad", 11/12/2010, 59
16            DOJ-BP-0002135725

17   1874a    Attachment.  "DOC111210-003",                  59
              DOJ-BP-0002135726 - DOJ-BP-0002135729
18
     1185/1   Emails from Ferrer, "Hey Steve (I just         62
19            received your voice mail), 06/07/2010,
              DOJ-BP-0000338014 - DOJ-BP-000338019
20
     1185/2                                                  65
21   1185/3                                                  68
     1185/4                                                  70
22

23   940      Email from Lacey, "Kansas schedules Perp       73
              Walk'…", 10/12/2010,
24            USAO-BP-0023442 - USAO-BP-0023444

25

*INDEX OF EXHIBITS CONT'D*

| <u>EXHIBITS</u> | | <u>RECEIVED</u> |
|---|---|---|
| <u>NO.</u> | <u>DESCRIPTION</u> | |
| 162 | Emails between P.R. and Ferrer, 10/06/2010<br>DOJ-BP-0002130717-DOJ-BP-0002130721 | 81 |
| 162a | Attachment. Picture named Pams Body<br>DOJ-BP-0002130722 | 85 |
| 163 | Emails between P.R. and Ferrer, 11/15/2010<br>DOJ-BP-0004601120- DOJ-BP-0004601122 | 86 |
| 164 | Emails between P.R. and Ferrer, 06/06/2011<br>DOJ-BP-0000327966- DOJ-BP-0000327968 | 89 |
| 165 | Emails between P.R. and Ferrer, 07/14/2012<br>DOJ-BP-0000327964- DOJ-BP-0000327965 | 99 |
| 168 | Emails between P.R. and Ferrer, 09/17/2012<br>DOJ-BP-0000089030 | 100 |
| 504 | Ad involving P.R. entitled "50 Red R*O*S*E*S<br>S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!"<br>DOJ-0005070381-DOJ-BP-0005070393 (ad begins at<br>DOJ-BP-0005070384) | 106 |
| 505 | Ad involving P.R. entitled "75 Red R*O*S*E*S<br>S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!"<br>DOJ-0005070381-DOJ-BP-0005070393 (ad begins at<br>DOJ-BP-0005070385) | 106 |
| 506 | Ad involving P.R. entitled "50 Red R*O*S*E*S<br>S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!"<br>DOJ-0005070381-DOJ-BP-0005070393 (ad begins at<br>DOJ-BP-0005070386) | 106 |
| 507 | Ad involving P.R. entitled "50 Red R*O*S*E*S<br>S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!"<br>DOJ-0005070381-DOJ-BP-0005070393 (ad begins at<br> DOJ-BP-0005070387) | 106 |
| 508 | Ad involving P.R. entitled "50 Red R*O*S*E*S<br>S*P*E*C*I*A*L  -  DONT MISS OUT!!!!!"<br>DOJ-0005070381-DOJ-BP-0005070393 (ad begins at<br>DOJ-BP-0005070388) | 106 |

1        *INDEX OF EXHIBITS CONT'D*

2  **EXHIBITS**                                                    **RECEIVED**

3  <u>NO.</u>    <u>DESCRIPTION</u>

4  509    Ad involving P.R. entitled "50 Red R*O*S*E*S          106
          S*P*E*C*I*A*L   -   DONT MISS OUT!!!!!"
5         DOJ-0005070381-DOJ-BP-0005070393 (ad begins at
          DOJ-BP-0005070389)
6
          510    Ad involving P.R. entitled "50 Red R*O*S*E*S   106
7         S*P*E*C*I*A*L   -   DONT MISS OUT!!!!!"
          DOJ-0005070381-DOJ-BP-0005070393 (ad begins at
8         DOJ-BP-0005070390)

9  511    Ad involving P.R. entitled "50 Red R*O*S*E*S          106
          S*P*E*C*I*A*L   -   DONT MISS OUT!!!!!"
10        DOJ-0005070381-DOJ-BP-0005070393 (ad begins at
          DOJ-BP-0005070391)
11
          512    Ad involving P.R. entitled "50 Red R*O*S*E*S   106
12        S*P*E*C*I*A*L   -   DONT MISS OUT!!!!!"
          DOJ-0005070381-DOJ-BP-0005070393 (ad begins at
13        DOJ-BP-0005070392)

14 513    Ad involving P.R. entitled "50 Red R*O*S*E*S          106
          S*P*E*C*I*A*L   -   DONT MISS OUT!!!!!"
15        DOJ-0005070381-DOJ-BP-0005070393 (ad begins at
          DOJ-BP-0005070393)

16

17

18

19

20

21

22

23

24

25

1         *P R O C E E D I N G S*

2    (Whereupon the proceedings began at 1:03 p.m.)

3         COURTROOM DEPUTY:  All rise.

4         THE COURT:  Please be seated and let me -- let me

01:04p  5    just start by saying and then I'll let you say what you need

6    to, Ms. Bertrand.  And the record will reflect the presence of

7    counsel and defendants.  Mr. Ferrer is on the witness stand.

8         MR. RAPP:  Would you like him to leave?

9         THE COURT:  Yes, please, let's -- let's have

01:04p 10    Mr. Ferrer just briefly so we can discuss some matters.

11         (Mr. Ferrer exits courtroom and the following

12    discussion was held.)

13         And so, Mr. Rapp, I wanted to tell you that I looked

14    at 1185 and 1185a, and I do find that it is appropriate that

01:05p 15    the portion of the e-mail related to Steve Turnham's questions

16    that have been redacted out at, I believe, Page 3, that is an

17    appropriate redaction, as is the redaction on Page 4 that

18    begins "On November 8th, 2018, at 8:15."

19         And the only statement that I would make is with

01:06p 20    regard to this response to -- that starts "Hi Amber," and this

21    is at Page 3 at the very top of the page that's been redacted,

22    I mean, essentially, Mr. Ferrer has already testified to this.

23    So in many ways this is already in the record, and this

24    relates to the hiring of Mr. Nigam at SSP Blue and so it's --

01:06p 25    even though it is, as you say, a self-serving statement, it's

1    already part of the record in Mr. Ferrer's testimony.

2          So I don't at this point see any harm in permitting

3    that portion of the exhibit to be displayed and, as I

4    understood his testimony, it was a sort of communication

01:07p   5    conversation about how to respond to CNN; and I think this

6    portion has already been part of the record.

7          MR. RAPP:  I've just got to figure out logistically

8    so --

9          THE COURT:  I'm sorry -- yeah.  So I want to also

01:07p  10    say in the very end page as well, it's the same exact content

11    essentially, the hiring of Mr. Nigam.  It's the same

12    reiteration of the testimony Mr. Ferrer gave about so -- in

13    any event -- so I think if we move forward in that way with

14    that exhibit, that's fine; but I do find the portion that's

01:08p  15    redacted regarding Mr. Turnham is appropriate.

16          So Ms. -- was there anything further you wanted to

17    say about that, Mr. Rapp?

18          MR. RAPP:  No.  This just -- this just as a

19    logistical issue is I'm going so -- when I present this

01:08p  20    exhibit, I'm just going to redact on the screen the Turnham

21    and leave in the Suskin that relates to Nigam and then we will

22    exchange the hard copy and then also the copy for jurors,

23    right?

24          THE COURT:  Yes, yes.

01:09p  25          MR. RAPP:   All right.

1          THE COURT:  Ms. Bertrand, you wanted to say

2    something?

3          MS. BERTRAND:  Yes, your Honor.  This has arisen

4    over the lunch hour, and I will just start by saying I'm

01:09p 5    moving for a mistrial for the following reasons:  When we took

6    our break, I ran downstairs to move my car.  It was at a

7    meter.  As I was walking out of the building, I noticed a

8    display next to the coffee kiosk in the -- on the first floor,

9    a caption something to the effect of "Concerned for America's

01:09p 10   Children" or "Protecting America's Children" and presented by

11   the GSA.

12         It then featured, by my quick count, 18 to 20

13   missing children with a phone call -- or a phone number and a

14   message to contact the National Center for Missing and

01:09p 15   Exploited Children.

16         I also observed several of our jurors standing at

17   the kiosk waiting to purchase their lunch or coffee.  The

18   defense had no notice that such a display would be put up.  We

19   would have, of course, objected.  We now have several jurors

01:10p 20   exposed to this.  I cannot see where any probing of these

21   jurors or any instruction that we can give them will fix this

22   problem.

23         We now have downstairs an official courthouse

24   presentation essentially endorsing NCMEC and raising concerns

01:10p 25   about missing and exploited children at the same time the

1    Government has just started putting on evidence about NCMEC,

2    about child trafficking and sex trafficking which prompted

3    Mr. Cambria to raise a motion for a mistrial this morning.

4            I don't know who did it.  I would ask this Court to

01:11p   5    actually set an investigatory hearing about that, and in the

6    meantime I believe we have no choice but to grant a mistrial

7    based on the serious taint that this display would have had on

8    our jurors.

9            THE COURT:  Well, I think before I let the

01:11p  10    Government respond, Ms. Bertrand, to be clear, we are in a

11    federal courthouse but it's run by GSA.  So the GSA is the

12    branch of the government that runs the kiosks and so on and so

13    forth.

14            To be clear, let me ask you, the kiosk that you're

01:11p  15    referring to, is that -- I know there's a temporary kiosk

16    that's been set up due to the air conditioning issue.  Are you

17    talking about that one or the permanent station that's out

18    near the security guard shack?

19            MS. BERTRAND:  Near the security guard shack and the

01:12p  20    permanent station that has an espresso machine and salads and

21    the display is no less than fifteen feet from where the people

22    stand to order their coffee and snacks.

23            THE COURT:  When you say "display," are you talking

24    about a poster or are you talking about a billboard or what's

01:12p  25    the size of the display?

1    MS. BERTRAND:  Your Honor, I would estimate that

2  the -- four to five feet across, two and a half to three feet

3  high posed at eye level on a -- like a display board with the

4  pictures of each child, where they are missing from, an

01:12p  5  instruction to call NCMEC if they are seen and a phone number

6  and, again, a caption that says something to the effect of

7  "Concern about America's children" or "Protecting America's

8  children."

9    THE COURT:  Mr. Rapp, do you wish to respond?

01:13p  10    MR. RAPP:  Well, I have no idea what counsel's

11  talking about.  I can assure you that the US Attorney's Office

12  didn't have anything to do with it; but to put it mildly, it's

13  a little bit ridiculous.  You get amber alerts all the time

14  for missing children.  Are you to suggest that we put a stop

01:13p  15  to that?

16    I don't -- I'm non-dairy so I don't get milk cartons

17  anymore, but I know for a long time they used to have photos

18  of missing children on milk cartons.  I don't think anybody --

19  and sometimes they have billboards with missing children.  I

01:13p  20  don't get how that has anything to do with this case of

21  running a -- of being charged with Travel Act violations.

22    We didn't have anything to do with this.  I don't

23  know what she's talking about, but there's all sorts of

24  notifications this jury would receive and everybody would

01:14p  25  receive on TV, billboards, on their phone about missing

1    children; and I don't see the correlation, frankly, between

2    this case.

3         MS. BERTRAND:  Well, Your Honor, the difference is

4    we have it occurring in a courthouse with an essential

01:14p  5    endorsement of this organization and implying that the Court

6    is also -- I mean, not that anyone in here is not concerned

7    about children.  I'm not saying that, but we've got -- this is

8    a big deal and the fact that the Government hasn't seen it,

9    that's not my problem.  I've got several witnesses, including

01:14p  10   lay people, who saw it and observed jurors seeing it.

11        THE COURT:  Tamper down the tone, Ms. Bertrand.  I

12   understand you're passionate about your case --

13        MR. CAMBRIA:  It's a major witness.

14        THE COURT:  -- but let's just tamper down the tone.

01:14p  15        MS. BERTRAND:  Uh-huh.  I would also proffer to the

16   Court that I expect the Government is going to call the former

17   Executive Director, I believe was his title, of NCMEC, Ernie

18   Allen, and his testimony was mentioned this morning.

19        THE COURT:  Well, the motion for mistrial is denied

01:15p  20   and at the moment, not having myself viewed this placard or

21   poster, I would say this:  That it is true that every day

22   we're exposed to some advertisement by some agency warning

23   against human trafficking, child abuse, so on and so forth,

24   and here -- and it's my observation, though, NCMEC has come up

01:16p  25   a couple of times.

UNITED STATES DISTRICT COURT

 1           There hasn't been substantial evidence about it in

 2    particular.  The jury has been admonished many times,

 3    including today, that this case is not about child sex

 4    trafficking and so I think it's unreasonable to suggest that

 5    no person leaving this courthouse will not be exposed to some

 6    warning or public announcement relating to missing and

 7    exploited children; and short of sequestering this juror,

 8    which I don't -- jury, which I don't think is necessary at

 9    this juncture, I don't think that forms a sufficient basis for

10    a mistrial and a restart.

11           And so what I will do is I will -- I'll look at the

12    matter further, see if there's something that I can do with

13    respect to GSA.  This is a public building after all under the

14    GSA.  We pay rent, and so we don't have control over what is

15    displayed in the public areas.  While we may have some say, we

16    don't control that.  That's a GSA decision, and it's certainly

17    something that I wasn't aware of or none of my staff have

18    brought to my attention; and so at this time I'm not going to

19    declare a mistrial on those grounds.

20           MR. CAMBRIA:  May I -- may I say something, Your

21    Honor?

22           THE COURT:  You may make a record, Mr. Cambria.

23    We're keeping the jury waiting, just so you know.

24           MR. CAMBRIA:  Your Honor, this is a controlled

25    environment and --

1          THE COURT:  It's a secure environment, that's for

2    sure.

3          MR. CAMBRIA:  -- and this particular -- this is a --

4    the size of a -- like a blackboard and it has several pictures

01:18p 5    on it and it talks about child abuse and so on.

6          NCMEC is a very important part of this case.

7    Mr. Ernie Allen is going to be a witness.  There are other

8    people from that organization who are witnesses.  So now there

9    is a communication by a prosecution witness through this

01:18p 10   billboard.

11         THE COURT:  I don't understand that.

12         MR. CAMBRIA:  Well -- pardon me?

13         THE COURT:  I don't understand that.

14         MR. CAMBRIA:  Well, I can't imagine that this was

01:18p 15   just put up by some random individual.  Every single poster is

16   a NCMEC poster.

17         THE COURT:  Well, let me -- let me caution you

18   there, Mr. Cambria.  You're not accusing anyone on the

19   Government's side of purposely putting up this poster?

01:19p 20         MR. CAMBRIA:  Not at all.

21         THE COURT:  Okay.

22         MR. CAMBRIA:  What I'm saying is someone did it, and

23   what's happening is that someone is influencing or potentially

24   influencing the jury because the jurors were there.  I saw

01:19p 25   jurors there with placards on looking at it and so on and this

1    isn't -- I mean, you've given cautionary instructions because

2    it's such a volatile subject.

3           We had one mistrial because of discussions with

4    children.  We had voir dire of jurors telling us how they were

01:19p  5    concerned about that.  Now we have, basically, a

6    representative of one of the major witnesses in this case

7    putting up a display.

8           This is something outside the process and it's

9    extremely prejudicial, and I don't think you can make a

01:19p 10    determination until you see it yourself and you'll see what

11    we're talking about.  It's not something small.  It's like in

12    the old days in school when you see the blackboards.  It's

13    that size with pictures all over it and writing.

14           THE COURT:  Well, I think with that note we'll take

01:20p 15    a brief resource.  The Court will go out into the atrium and

16    look at the poster.

17           COURTROOM DEPUTY:  All rise.

18           (1:20 p.m recess.)

19           (1:25 Court resumes.)

01:25p 20           THE COURT:  All right, we are back on the record.

21           The Court has gone to the coffee kiosk and have -- I

22    have viewed the -- what is a bulletin board with a number of,

23    I'd say, eight-and-a-half-by-eleven single requests for

24    information on specific missing children and it is apparent to

01:26p 25    me that it is a GSA poster initiative, not something that the

District Court has responsibility for; but that being said,

again, it's a common type of advertisement or public

announcement, I would say, rather, that we see all the time,

that is commonplace in today's society, whether it be on those

01:27p  electronic billboards or whether it be in advertising; and I

don't know that the Court can direct any juror to turn off the

television if they hear something about a missing child, and

so I don't think at this point that's a basis to declare a

mistral and so I will not do that.

01:27p          MS. BERTRAND:  Thank you, Your Honor.

May I make a quick -- I'd just like to supplement

the record so the Court has a complete record, if I may?  It

will be very quick.

Some lay people in the gallery who heard our

01:28p  discussion about this pulled me aside while the Court stepped

out to look at the bulletin board and noted that the same

bulletin board was up yesterday directly behind what was,

apparently, like a buffet lunch that several jurors availed

themselves of.  I don't know if it was a fund-raiser or what

01:28p  the nature of the lunch was, but it has been up for two days,

and I did not notice it before but it has been in front of

jurors now for two days.

THE COURT:  Well, again, short of sequestering this

jury and telling them not to watch television or read the

01:28p  newspaper, they're going to be exposed to this kind of

|||
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |

information.  They're going to be exposed to fugitive posters

and so on and so forth, and I would also observe that, again,

though the National Center for Missing and Exploited Children

has come up, it's come up on both sides.

**01:29p** 5      My understanding is defense has put on information

6  -- or has put forward arguments in their opening statements

7  that you intend to elicit testimony that the defendants were

8  cooperative with law enforcement agencies, including NCMEC;

9  and so on that basis as well, I don't think there's sufficient

**01:29p** 10  evidence for me to find that this has so tainted the jury in

11  order to declare a mistrial.  So let's move forward.

12      Let's bring that jury in.

13      MR. FEDER:  Judge, one other thing.  I would request

14  that the GSA be -- we either have a hearing with the GSA

**01:29p** 15  person, find out if there was an application and who made the

16  application to put that in the atrium, because I assume none

17  of us can just plop a document like that in the middle of the

18  atrium without making some kind of written application to see

19  who put it there just coincidentally for the last two days

**01:30p** 20  during this trial that's been in the newspapers.

21      THE COURT:  Well --

22      MR. FEDER:  Secondarily, I would ask the Court to

23  poll the jury.

24      THE COURT:  Well, I'm not going to poll the jury,

**01:30p** 25  Mr. Feder, for all the reasons stated.

01:30p

01:30p

01:32p

01:32p

01:32p

```
 1              Secondly, I should add that I have inquired as to
 2   how this came about.  It was a national directive from the
 3   national headquarters of GSA.  Those posters are being put out
 4   throughout the nation in all GSA buildings at this time of the
 5   year, as they do multiple -- with multiple causes year-round.
 6              And so unless you can bring forth some other
 7   evidence of nefarious reasons why, then I'm not going to do
 8   that and so let's have the jury in.
 9              MR. RAPP:  Your Honor, may I reseat the witness?
10              THE COURT:  Oh, yes, Mr. Ferrer may come -- come in.
11              Just point of reference, our courtroom clerk
12   indicates that the notice has been up since February.
13              (Jury in at 1:32 p.m.)
14              THE COURT:  All right, please be seated.
15              Thank you, Members of the Jury, for your patience
16   with us.  As I indicated, from time to time we would have, you
17   know, some additional work that needs to be taken care of so
18   that we can continue to move forward in the case; and so we
19   did have some matters to address, and so I thank you for your
20   patience.  And, Mr. Rapp, you may continue.
21              MR. RAPP:  Thank you, your Honor.
22                  CONTINUED DIRECT EXAMINATION
23   BY MR. RAPP:
24   Q.  So, Mr. Ferrer, when last we broke for lunch we were
25   looking at United States 58a, which was the PowerPoint of
```

1  images, right?

2  A.   Yes.

3  Q.   All right.  And I believe that we looked at Image 9, and

4  let's just look at a couple more.

01:32p  5       So is this an image that was approved?

6  A.   Yes, this image was approved.

7  Q.   And then looking at Image 14 on Page 14, is this one that

8  was approved?

9  A.   Yes, this image was approved.

01:33p 10  Q.   And then looking at Image 15, is this one that was

11  approved?

12  A.   Yes.

13  Q.   And then -- all right.  Were there any images in this

14  PowerPoint that was provided by Mr. Padilla, were there any

01:33p 15  images that were consistent with images on the site from 2004

16  to 2009?

17  A.   Yes.

18  Q.   Which one of the images were consistent with images that

19  were found on Backpage during that time period?

01:34p 20  A.   Both the images that were failed and approved.

21  Q.   All right.  And did that include images that depicted sex

22  acts?

23  A.   Yes, images for sex acts were posted.

24  Q.   All right.  In looking at 58 -- 58c -- would you look at

01:34p 25  this on your screen -- was this an attachment to the e-mail

```
 1  sent by Mr. Padilla to the moderation staff?
 2  A.   Yes.
 3          MR. RAPP:  Move to admit 58c.
 4          MR. EISENBERG:  No objection.
 5          THE COURT:  It may be admitted.
 6          MR. RAPP:  And published.
 7          THE COURT:  Yes, it may be published.
 8          MR. RAPP:  Thank you.
 9          (Exhibit No. 58c admitted in to Evidence.)
10  BY MR. RAPP:
11  Q.   And so are these terms that would be blocked or stripped
12  in some fashion?
13  A.   Could I go back to that e-mail --
14  Q.   Of course.
15  A.   -- that Andrew sent?
16  Q.   Yes.  Yes, sir.
17  A.   To answer your question, the list of terms are either
18  gonna be banned or be stripped out using our filter
19  technology.
20  Q.   Just quickly going back to 58c, are all of these terms --
21  are you familiar with these terms?
22  A.   Yes.
23  Q.   And are all these terms -- what is -- what do they have
24  in common?
25  A.   Nearly all of these terms are descriptive of a sex act.
```

01:35p 5
01:35p 10
01:35p 15
01:36p 20
01:36p 25

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP

1   Q.   All right.  And now going back to Exhibit 56 for your

2   eyes only, we talked about this -- this exhibit previously and

3   I would now move for its admission.

4           THE COURT:  Yes, it may be admitted and published.

01:37p  5           (Exhibit No. 56 admitted in to Evidence.)

6   BY MR. RAPP:

7   Q.   And so do you recognize the name of this individual?  I

8   think you actually testified that you were familiar with this

9   person?

01:37p  10  A.   Yes, I'm familiar with Jeff Lyons, a moderator, in

11  Phoenix.

12  Q.   All right.  And what does Mr. Lyons -- what does he tell

13  this person?

14  A.   He writes to Joye, "The client in Minnesota has been a

01:37p  15  long time TOU violator.  Her account has been on FM & ELO.  I

16  denied a lot" --

17  Q.   Can I just stop you there for a minute?

18  A.   Yes.

19  Q.   Do you know, based upon your role there, what "FM & ELO"

01:37p  20  means?

21  A.   I used to remember.

22  Q.   All right.

23  A.   It's a moderation list.  I just can't recall -- oh,

24  filter -- I'm sorry.

01:38p  25  Q.   It's all right.

1   A.   I just can't recall.

2   Q.   And then can you read the remainder of this e-mail.

3   A.   "I denied a lot of requests in the queue because of

4   posting violations.  Then she sent a clean ad, which I

01:38p   5   approved but opened the account to check on it later because I

6   was suspicious.  A few moments later I discovered this was a

7   different account with the same ad.  I monitored it and a

8   couple of minutes later she changed her ad putting in TOU

9   violations.  I deleted the ad and put that account on FM & ELO

01:38p  10   since she had another approved ad on it.  I also included a

11   note as to why.

12       I found a third account for this client number.  It also

13   has violations so I did the same thing."

14   Q.   So my question on this is:  Was a poster -- did they have

01:39p  15   the ability to edit their ad?

16   A.   Yes, they could edit their ad realtime at any time.

17   Q.   All right.

18   A.   That includes changing text and adding images.

19   Q.   All right.  And why was that the case?  Why were they

01:39p  20   allowed to do that?

21   A.   Because it's very user friendly.  We found that ad

22   posters in the female escort categories like to continually

23   change their ad, ad emojis and different images and change the

24   text.  It's also something that Craigslist allowed their users

01:40p  25   so we're going to have the same functionality.

1    Q.   All right.  And if you stripped out a word -- one of the

2    offending words that we saw on the list and/or an image that

3    was one of the failed images, would that allow a poster to go

4    back into their ad and ad those terms or images?

01:40p  5    A.   It would later be stripped out again, but what would

6    happen is that an ad would get approved and then they would

7    add more coded terms.  Like instead of BBBJ, they would put

8    asterisks behind it or like I used an example "Greek" and then

9    they used 3's for the e's.  If that wasn't stripped out, then

01:41p 10    that ad would go live with those terms.

11    Q.   All right.  Now, looking at Mr. Padilla's response to

12    Mr. Lyons with Ms. Vaught copied, can you read what he -- what

13    Mr. Padilla tells Mr. Lyons?

14    A.   Mr. Padilla writes, "Jeff, until further notice, DO NOT

01:41p 15    LEAVE NOTES IN USER ACCOUNTS.  Backpage, and you in

16    particular, cannot determine if any user on the site in

17    involved with prostitution.  Leaving notes on our site that

18    imply that we're aware of prostitution, or in any position to

19    define it, is enough to lose your job over.

01:41p 20         There was not one mention of prostitution in the power

21    point presentation.  That was a presentation designed to

22    create a standard for what images are allowed and not allowed

23    on the site.  If you need a definition of 'prostitution,' get

24    a dictionary.  Backpage and you are in no position to

01:42p 25    re-define it.

1        This isn't open for discussion.  If you don't agree with

2   what I'm saying completely, you need to find another job."

3   Q.   You're not on this e-mail?

4   A.   Correct.

01:42p   5   Q.   But did you have a conversation with Mr. Padilla about

6   Mr. Lyons?

7            MS. BERTRAND:  Objection, leading.

8            THE COURT:  He can answer "yes" or "no" if he had a

9   conversation.

01:42p  10            THE WITNESS:  Yes.

11   BY MR. RAPP:

12   Q.   And what did Mr. Padilla say about Mr. Lyons with respect

13   to his work as a moderator?

14   A.   I recall a discussion about possibly terminating him, but

01:43p  15   we were really shorthanded.

16   Q.   All right.  Now, let's look at Exhibit 65.  You see that

17   exhibit on the screen?

18   A.   Yes.

19   Q.   And what is this?

01:43p  20   A.   It's an e-mail from Andrew Padilla to Monita Mohan of

21   El Camino.

22   Q.   All right.  Are you copied on it?

23   A.   Yes, I am.

24            MR. RAPP:  Move to admit United States 65.

01:43p  25            THE COURT:  It may be admitted and published.

1          *(Exhibit No. 65 admitted in to Evidence.)*

2    *BY* MR. RAPP:

3    Q.   Can you read the e-mail and I'll ask you some questions

4    on the other side?

01:44p  5    A.   "Hi Monita, We need as much direct help from your crew as

6    possible."  We should stop Failing ads and begin editing.  "We

7    understand if some mistakes are made.  As long as your crew is

8    editing and not removing the ad entirely, we shouldn't upset

9    too many users.

01:44p 10        Your crew has permission to edit out text violations and

11   images and then approve the ad."

12   Q.   All right.  With respect to the statement "as long as

13   your crew is editing and not removing the ad entirely, we

14   shouldn't upset too many users," what did that mean to you?

01:44p 15   A.   The company wants to not have too many users upset as we

16   implement these new and more rigid standards, and so instead

17   of removing the ad we're just gonna take out the offending

18   term and then approve the ad.  The ad will go live.  It's been

19   sanitized.

01:45p 20   Q.   And on this -- this strategy, who did -- who, if anyone

21   -- who, if any, did you receive direction on this strategy?

22   A.   We had numerous -- well, the most important meeting I

23   remember is with Jim Larkin and Scott Spear.

24   Q.   And what was the direction they gave you on this?

01:45p 25   A.   We were to not throw the baby out with the bath water.

```
        1    There was a directive to implement moderation in a gradual

        2    fashion to give users time to adjust to the standards -- the

        3    new standards coming out of the user safety meetings that we

        4    were having.

01:45p  5    Q.    Why did you want to do that?

        6    A.    If we implement the changes gradually, we won't lose

        7    revenue.  Users will learn to self censor.

        8    Q.    All right.  Let me go to Exhibit 604.

        9          You see that on your screen there?

01:47p 10    A.    Yes.

       11    Q.    All right.  And are you copied on this e-mail?

       12    A.    Yes, I am.

       13    Q.    And who else is on this e-mail?

       14    A.    This e-mail includes Andrew Padilla, Hemanshu Nigam,

01:47p 15    Scott Spear, Jamie Schumacher.

       16    Q.    All right.

       17          MR. RAPP:  Move to admit 604.

       18          MR. EISENBERG:  No objection.

       19          THE COURT:  604 is admitted.  It may be published.

01:47p 20          (Exhibit No. 604 admitted in to Evidence.)

       21          MR. FEDER:  The 604 I'm looking at -- I'm sorry,

       22    this is Bruce Feder -- oh, here we go, I'm sorry.  Nevermind.

       23    BY MR. RAPP:

       24    Q.    All right, let's start down here.  And so is this -- the

01:48p 25    bottom part, is this from Heman Nigam?
```

1    A.    Yes.

2    Q.    And you're on this?

3    A.    Yes, I am.

4    Q.    And Scott Spear?

01:48p  5    A.    Yes, we're both on the e-mail.

6    Q.    And can you tell the jury who Jamie Schumacher is, if you

7    know?

8    A.    She's a public relations person associated with Hemanshu

9    Nigam's company.

01:48p 10    Q.    All right.  And what does Mr. Nigam tell you and

11    Mr. Spear?

12    A.    He states, "I am finding way too quickly prostitution ads

13    at the top of the list - CT will look in nyc and will see this

14    too," and then he provides a link to an ad that has the title

01:49p 15    "filatio-only-hosting-in-midtown-2."

16    Q.    All right.  And the portion -- well, first of all, what

17    did you -- what did you take this to mean when he says, "I am

18    finding way too quickly prostitution ads at the top of the

19    list"?

01:49p 20    A.    Hemanshu was -- Nigam was browsing the Backpage site in

21    New York City and he was seeing numerous ads that were like

22    the ad that he shared in this e-mail below.  They had some

23    kind of sex for money.

24    Q.    All right.  And then this other portion that has capital

01:49p 25    "CT will look in nyc and will see this too," what did you take

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP    28

1  that to mean?

2  A.   CT is Connecticut and that would be Attorneys General

3  Blumenthal.

4  Q.   Okay.  Do you know what state Attorney General Blumenthal

01:50p  5  was the Attorney General of?

6  A.   Connecticut.

7  Q.   All right.  And was there some type of a concern about

8  Attorney General Blumenthal investigating or looking in to

9  Backpage?

01:50p  10  A.   Yes.

11  Q.   Okay.  And then do you forward this e-mail to Andrew

12  Padilla?

13  A.   Yes, I do.

14  Q.   All right.  And what does Andrew Padilla say about this

01:50p  15  ad?

16  A.   Andrew writes, "fuck.  I deleted the ad, purged the cache

17  and let the staff know not to allow this kind of shit."

18  Q.   All right.  Is this just in the New York market or is

19  this going on in other markets?

01:51p  20  A.   It's going on in all markets.

21  Q.   All right.  But was there a particular concern with the

22  New York market?

23  A.   The New York market had the most amount of content, the

24  most number of postings, and it was in close proximity to

01:51p  25  Connecticut and we're doing a lot of these moderation changes

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP      29

```
 1 │ to appease the Attorneys General.
 2 │ Q.   And in terms of the link that Mr. Nigam found
 3 │ problematic, what was -- so is it -- did you ever look at the
 4 │ actual posting connected to this link?
```
01:51p  5 │ A.   Yes.
```
 6 │ Q.   You did?
 7 │ A.   Yes, I would click it and I want to see how bad it is.
 8 │ Q.   All right.  Do you recall how -- what -- what was in that
 9 │ posting?
```
01:52p 10 │ A.   Well, the title was bad enough.
```
11 │ Q.   Why was the title bad enough?
12 │ A.   The title "filatio" is indicating oral sex and it's
13 │ hosting in, which is in call.
14 │ Q.   All right.  Is it spelled correctly?
```
01:52p 15 │ A.   No.
```
16 │ Q.   All right.  Is this an example of the misspelling of a
17 │ term?
18 │ A.   Yes, it's an example.
19 │ Q.   Would the correct spelling of this term, would have been
```
01:52p 20 │ -- would have been picked up by the strip filter at this time,
```
21 │ if you know?
22 │ A.   I don't know if we put in the correct spelling for
23 │ "filatio" in the strip and banned filter.
24 │ Q.   Would it be picked up by a human moderator during this
```
01:52p 25 │ time period, if you know?

 1   A.   It should be.

 2   Q.   All right.  but it wasn't?

 3   A.   This happens all the time.

 4   Q.   All right.  Now, moving on to Exhibit 1928, do you see

01:53p  5   this e-mail?  Is this an e-mail exchange between you and

 6   Mr. Padilla?

 7   A.   Yes, it is.

 8   Q.   And is this on October 18th of 2010?

 9   A.   Yes.

01:53p 10            MR. RAPP:  Move to admit 1928.

11            THE COURT:  Yes, it may be admitted and published.

12            *(Exhibit No. 1928 admitted in to Evidence.)*

13   *BY MR. RAPP:*

14   Q.   Do you know who you're writing this e-mail to?

01:53p 15   A.   Let me --

16   Q.   Yeah, take a look at it.

17   A.   So I am a -- yes, I've written this e-mail and I've sent

18   it to Andrew Padilla.

19   Q.   All right.  And can you -- can you tell what are you

01:54p 20   saying to Andrew Padilla in the lower part of this e-mail?

21   A.   I'm listing these terms right here that are coming out of

22   a meeting that I just had with Scott Spear and Heman Nigam,

23   and I'm indicating that we need to add these terms in to strip

24   out or ban per Scott Spear and Heman Nigam, and I'm doing it

01:54p 25   grudgingly because I know some of these terms appear in a lot

 1   of ads.

 2   Q.   All right.  Can you read what you actually tell him

 3   there.

 4   A.   (Reading):  Strip term out or ban per Scott and Hemu (and

01:55p  5   me grudgingly):

 6        "Girl friend experience.  Porn star experience

 7        Whole word:  GFE, PSE, G.F.E, P.S.E.

 8        Dan is concerned this will kill urls to bestfge.com.  I

 9   told him if you do --

01:55p  10   Q.   Wait, let's stop there for a minute.  What did you take

11   that to mean?  Is this Dan Hyer?

12   A.   Yes, Dan Hyer.

13   Q.   What did you take his concern to be?

14   A.   Well, if we strip out GFE and we don't make it a whole

01:55p  15   word term, then the URL bestgfe.com would end up just being

16   best.com, and so that's a problem.  So we had --

17   Q.   Why is that a problem?

18   A.   Well, because then that web address wouldn't work for

19   that advertiser that's posting on our site.  It's -- it's

01:56p  20   another escort site that we're allowing to post.

21   Q.   And I presume the -- well, the acronym down under whole

22   world -- whole word, rather, that says "PSE," does that relate

23   to the term above that -- where it's written out?

24   A.   Yes -- I'm not sure I understand the question.

01:56p  25   Q.   Yeah.  This term "porn star experience," is the acronym

 1   down there "PSE," does it stand for that?

 2   A.   Yes.

 3   Q.   And what did you come to learn porn star experience in a

 4   posting meant?

01:56p  5             MR. FEDER:  Hearsay.

 6             MR. CAMBRIA:  Foundation.

 7             THE COURT:  Overruled.

 8             THE WITNESS:  "Porn star experience" means that the

 9   prostitute you're hiring is gonna be crazy, wild, sex like a

01:57p 10   porn star.

11   BY MR. RAPP:

12   Q.   All right.  And then what is Mr. Padilla's response to

13   you?

14   A.   Mr. Padilla writes, "should I put the crew to look for

01:57p 15   misspellings of these or start to remove the stuff that

16   happened before I stripped the terms?"

17   Q.   What did you take that to mean?

18   A.   I took it to mean that we have GFE and PSE appearing in a

19   lot of ads.  So how are we gonna clean this up for all of the

01:57p 20   ads that are -- the older ads posted in the past?

21        We can put the strip out in to catch the new ads and the

22   bans to stop the new ads from having GFE and PSE, but what

23   about the old ads?

24   Q.   Okay.  Why didn't you just block the entire ad?

01:58p 25   A.   'Cuz that would be counter to the directive that I got

 1    from spear and Larkin, which is, do not throw the baby out

 2    with the bath water.  Make these changes in a gradual fashion.

 3    Q.   When you stripped out the offending term, did you somehow

 4    maintain the original ad anywhere?

**01:58p** 5    A.   We did not.

 6    Q.   And then what does -- what does he say below?  What's the

 7    last line that he says here, starting with "because"?

 8    A.   Andrew Padilla writes, "because that will mean that have

 9    to edit every ad on the site."

**01:59p** 10    Q.   And what did you take that to mean?

 11    A.   Every ad has GFE or PSE in it.

 12    Q.   All right.  Let's now look at Exhibit 201.

 13         Is this a e-mail from you to Andrew Padilla with Scott

 14    Spear copied?

**01:59p** 15    A.   Yes.

 16    Q.   All right.  And what is the subject matter of this

 17    e-mail?

 18    A.   "Moderation guidelines on the queues."

 19    Q.   All right.

**02:00p** 20              MR. RAPP:  Move to admit United States 201.

 21              MR. FEDER:  Same.

 22              THE COURT:  Overruled.  201 is admitted and it may

 23    be published.

 24              MR. RAPP:  Thank you.

**02:00p** 25              *(Exhibit No. 201 admitted in to Evidence.)*

BY MR. RAPP:

Q.   What are you telling Mr. Padilla and Mr. Hyer with Scott

Spear copied?  Can you read this?

A.   "We need to have the guidelines on the queue to help in

02:00p  training.  No doubt these standards will change.  We probably

should have an object we could edit.  We could even add a link

to pop up page for more detailed guidelines and examples."

And then I have this linked to a task that's scheduled.

"See attached mock."

02:01p  "Under adult jobs:  NOT ALLOWED:  No escort type price

menus (we are keeping out escorts).  No sex act for money.  A

user cannot say I'll pay $50 for oral sex."

Q.   All right.  Is this under -- this is under adult jobs?

A.   It's under adult jobs, which is adult employment

02:01p  category.

Q.   All right.  Did you find that people who were posting in

the female escort section were often posting in the adult job

category?

A.   They would, but we fixed that.

02:01p  Q.   All right.  Under the adult job act category not female

escorts, did you charge for ads in that category?

A.   I don't think we charged under adult jobs.

Q.   And so you're just trying to keep the escorts out of the

adult job category with this guideline?

02:02p  A.   Yes, we wouldn't allow them to have photographs in adult

1  jobs, just text.

2  Q.    And then jumping down to No. 2 "Under personals," can you

3  read that?

4  A.    "Under personals NOT ALLOWED:  No pics of a penis, labia,

02:02p  5  sphincter, actual or simulated sex act.  No text with hourly

6  rates for services like escorts or massage."

7  Q.    All right.  And then what -- what is allowed?

8  A.    What's allowed is pics of bare breast, bare butt,

9  g-string or thongs are okay.  Text referring to massages

02:02p  10  provided there are no rates.  Graphic sex act language

11  allowed.  Sugar daddy and generous gentlemen is allowed.

12  Q.    All right.  Did you also come to learn that -- was it

13  still the case in October of 2010 that female escorts were

14  also posting in the personal section?

02:03p  15  A.    Yes.

16  Q.    All right.  And then under "Adult" what was not allowed

17  under these new guidelines?

18  A.    So under "Adult (this is Escorts & Body rubs, etc.) NOT

19  ALLOWED:  No pics of a penis, labia, sphincter, actual or

02:03p  20  simulated sex act.  No sex act for money.  No coded sex act

21  for money:  GFE, PSE, BBBJ, DATY, etc."

22  Q.    Let me stop you.  Are all those references to sex acts?

23  A.    Yes.

24  Q.    And then what was allowed?

02:04p  25  A.    "ALLOWED:  Pics of bare breast, bare butt, g-string or

1   thongs are ok.  Hourly rates are OK."

2   Q.   What -- if you know, what is motivating this change in

3   the guideline?

4   A.   Well, there's been so many changes.  I've got Scott Spear

02:04p  5   copied in this e-mail.  I want some agreement that, okay, this

6   is what we're gonna have Andrew communicate to the moderators.

7   And because it's confusing and we're using a third-party

8   company, I wanted -- I want this information to appear on top

9   of the queue so when you're moderating personals, for example,

02:05p 10   you would see this message.  Here's the standard.  If you're

11   moderating female escorts, here's the standards.

12   Q.   Did -- did the moderation staff and you, as management,

13   did you develop some type of a mnemonic or mnemonics to -- so

14   that the moderation staff would know what type of images, for

02:05p 15   example, to ban or remove?

16        MS. BERTRAND:  Objection.  Leading, compound.

17        THE COURT:  Sustained.

18   BY MR. RAPP:

19   Q.   Did you develop any mnemonics?

02:05p 20   A.   Yes, we did.

21   Q.   Can you give us some examples of mnemonics that was

22   developed among the moderation staff?

23   A.   As a way to help kind of remember the changing standards:

24   If it's pink, it goes in the sink.  If it's a slit, you must

02:06p 25   omit.  If it's erect, you must eject.

1   Q.   All right.  And what was the purpose of those mnemonics?

2   A.   Just to put a little humor into a very difficult job.

3   Q.   All right.  Looking at 1586, is this -- is this an e-mail

4   from Andrew Padilla to the moderation staff?

02:06p   5   A.   Yes.

6   Q.   And is this on October 27th of 2010?

7   A.   Yes, it is.

8   Q.   And is the subject matter of this "new guidelines in

9   adult"?

02:07p   10   A.   Yes.

11            MR. RAPP:  Move to admit 1586.

12            THE COURT:  It may be admitted and published.

13            (Exhibit No. 1586 admitted in to Evidence.)

14   BY MR. RAPP:

02:07p   15   Q.   And can you -- can you read this e-mail and I'll ask you

16   some questions.

17   A.   Andrew writes, "We've been messing around with listing

18   guidelines in the queue since last night but the language

19   isn't finalized yet.  Regardless of what we specifically wind

02:07p   20   up saying there, here are some new rules:  no bear butts

21   (thongs okay), no penises, no breast sucking, no GFE, no PSE,

22   no pricing for services less than an hour."

23   Q.   Let me just ask you about that.  Were you involved in

24   some respect in the -- in these new guidelines?

02:08p   25   A.   Yes, I was.

1   Q.   Why was there no pricing for services less than an hour?

2   A.   The thought was anything less than an hour has to be a

3   non-companionship, and you've lost the plausibility for

4   companionship if it's a 15-minute or 30-minute paid

02:08p  5   experience.

6   Q.   What -- what do you mean by "you've lost the plausibility

7   for the companionship"?  What did you mean -- what do you mean

8   by that?

9   A.   That it's not prostitute -- could you ask that question

02:08p 10  again, what do I mean by?

11   Q.   Sure.  You said that you lost the plausibility for a

12   companionship argument.  I believe that was your testimony.

13   A.   Yes.

14   Q.   And how does -- what does that mean in relationship to no

02:09p 15  time less than an hour?

16   A.   Scott Spear and I were told by advisors that anything

17   under an hour was suggestive of a quickie, a blow job, and

18   there were ads like car dates and it just -- they were not

19   legitimate companion ads and a companion certainly would be at

02:09p 20  least one hour, and by being companion ads it's not so overt

21   prostitution.

22   Q.   All right.  And what else does Andrew say here?

23   A.   "You can move forward enforcing these changes

24   immediately.  I'll have more instructions later about how much

02:09p 25  female frontal nudity will be allowed."

1    Q.    And then what does he say?

2    A.    "We won't be removing ads for these violations.  These

3    ads should be edited and 'violated terms of use' should be

4    selected.

02:10p  5         We have to be fair to users and give them time to adapt.

6    Thanks."

7    Q.    Can you -- what did that mean to you, those last two

8    sentences?  You won't be removing the ads for these violations

9    and "we have to be fair to the users and give them time to

02:10p 10   adapt," what did that mean?

11   A.    We're following the same protocol of edit the ads, let

12   the users adjust, be fair to them.  We don't want a whole

13   bunch of chargebacks, and so many ads have GFE and PSE and so

14   many ads have 15 minutes and 30 minutes.

02:10p 15        So it's a highly disruptive set of changes and we're --

16   we're not going to just be deleting ads.  We'll edit them,

17   give users time to adapt.

18   Q.    Why wouldn't you just delete them?

19   A.    Because it's the directive coming from the owners of the

02:11p 20   company to not let Hemu kill the business with all these

21   changes.

22   Q.    All right.

23   A.    Hemu, the user safety expert.

24   Q.    Now, let's go to 610.

02:11p 25        All right.  Is this an e-mail from Andrew Padilla to

1   somebody named a200?

2   A.   Yes.

3   Q.   And you're not on this e-mail?

4   A.   Correct.

02:12p   5   Q.   But are you familiar with the change in guidelines?

6   A.   Very much so.

7            MR. RAPP:  Move to admit 610.

8            THE COURT:  Yes, it may be admitted.

9            *(Exhibit No. 610 admitted in to Evidence.)*

02:12p  10  *BY* MR. RAPP:

11  Q.   All right.  Can you read this e-mail -- and published

12  please, Your Honor, thank you.

13           THE COURT:  It may be published, yes.

14           THE WITNESS:  Andrew is e-mailing a200, which is, I

02:12p  15  believe, India -- El Camino.

16           MR. RAPP:  El Camino.

17           THE WITNESS:  "clarification on female nudity and

18  pricing."

19           "All:  No nudity below the waist.  That means butts,

02:12p  20  butt cracks, side butts, front butts, cigarette butts and

21  Butte, Montana," and he's got a Wikipedia to Butte, Montana,

22  link.

23           "No crotch shots.  Unless it's covered by fabric,

24  we're not allowing any female nudity below the waist.

02:13p  25           Panty shots, thongs and g-strings are okay.  Pubes

UNITED STATES DISTRICT COURT

1    popping out the sides are okay.  Butt holes popping out the

2    sides are not.

3              Boobs are okay.

4              A list of prices with no increments of time is okay:

02:13p 5        60, 80, 100, 120.

6              Fishnet tights are okay depending on the pose.  If

7    you can't see the butt crack or the hot pocket, it's okay.

8    So, side butt in mesh would be okay.

9              Scott's really pleased with the work we've been

02:13p 10   doing and he's giving us all movie passes, if not this week,

11   then next.  If you work from home, we'll mail yours.

12              Thanks, Andrew Padilla."

13   BY MR. RAPP:

14   Q.   And who's he referring to, the "Scott" that he's

02:14p 15   referring to here?

16   A.   Scott Spear.

17   Q.   All right.  And now moving to 612, is this another e-mail

18   from Andrew Padilla to a200?

19   A.   Yes, it is.

02:14p 20   Q.   And is -- are you copied on this e-mail?

21   A.   I am.

22   Q.   And can you read what instructions he's giving to his

23   moderators?

24              MR. RAPP:  Oh, move to admit 612 and publish.

02:14p 25              THE COURT:  Yes, it may be admitted and published.

1              *(Exhibit No. 612 admitted in to Evidence.)*

2              THE WITNESS:  Andrew writes, "upcoming development

3    and more moderation changes."

4              "We have two development projects right now that

02:15p   5    will hopefully streamline the moderation process for everyone.

6              In at least the queue, and possibly in admin view as

7    well, images will be tiled horizontally along the bottom of

8    the ad body instead of along the right side.  This should cut

9    down on the amount of scrolling within an ad."

02:15p  10   BY MR. RAPP:

11   Q.   Let me just stop you there.  Why was that important?

12   A.   We've got so many ads to moderate that Andrew's putting

13   in an efficiency improvement in terms of how the content will

14   be displayed.

02:15p  15   Q.   All right.  What else does he say?

16   A.   "Also, we're going to limit the amount of characters

17   available to users.  This might be done in stages, but the

18   eventual goal will be to limit users to 500 characters per ad.

19   We should see some progress on this before the end of the

02:16p  20   week."

21            "Moderation change:  The rule on price menus is changing

22   effective immediately.  Blank prices are no longer allowed."

23   Q.   Do you know why that's the case?

24   A.   I can't remember actually why.  It just seemed crazy, and

02:16p  25   I don't think that policy lasted for long; but the thought was

UNITED STATES DISTRICT COURT

1   users are getting around the posting rules again.  Of course

2   they are.

3   Q.   And then let's jump down to in this the one with the bold

4   below where it starts, "In this example..."

02:16p  5      Could you read that?

6   A.   Yes.  "In this example you would remove everything that's

7   in bold:  **60, 80**."

8      Then he has 100 hour and 120 that's not in bold.

9   Q.   All right.  Why -- why did the -- this change from

02:17p  10  removing the 60 to 80 and leaving the 100 and 120?

11  A.   The 60 or 80 is, once again, a date that's too quick, a

12  quickie, implying oral sex.

13  Q.   All right.  And then what else does he say?

14  A.   "Anything that comes before the Hour price is assumed to

02:17p  15  be for less than an hour and everything after the Hour price

16  is assumed to be for more than an hour.  In the first example,

17  we have to remove the whole thing because we don't have a

18  point of reference."

19  Q.   All right.  And then what else does he go on to say?

02:17p  20  A.   "As contradictory as this may sound, we're still allowing

21  pricing for 'specials' and 'meet and greet.'  So this example

22  would be okay:  60 Special, 80 Meet n Greet, 100 full hour,

23  200 90 minutes."

24  Q.   Do you know why -- what this meant to you that "we're

02:18p  25  still allowing pricing for 'specials' and 'meet and greet,'

1    why this was the case?

2    A.   The whole strategy just seemed crazy to me, but this is

3    what was -- what I was told to do and what Andrew was then

4    told to do.

02:18p  5        The implication is that 60 special -- well, that might be

6    an hour, but maybe there's -- maybe it's a discounted hour.

7    We don't know if it's 15 minutes or 30 minutes.  It's the same

8    thing with meet n greet.  That could be an hour.  Maybe

9    there's meeting and greeting that's occurring.  So it's --

02:19p 10    it's got enough ambiguity to possibly allow.

11    Q.   All right.  And when you say "ambiguity," what do you

12    mean by that?

13    A.   We really can't discern what's going on with these

14    labels, "special" and "meet n greet."  We don't -- we don't

02:19p 15    understand the time.

16    Q.   All right.  So let's look at 614.

17        Is this a e-mail between you and Mr. Spear?

18    A.   Yes.

19    Q.   And is this now in November of 2010?

02:20p 20    A.   Yes, it is.

21            MR. RAPP:  Move to admit 614.

22            MR. FEDER:  Same.

23            THE COURT:  Overruled.  614 may be admitted and it

24    may be published.

02:20p 25            *(Exhibit No. 614 admitted in to Evidence.)*

1    BY MR. RAPP:

2    Q.   So in 614 what are you telling Scott here?

3    A.   I'm saying to Scott Spear, "Litle wants to talk about

4    adult content issues.  I get the impression that he wants to

02:20p  5    share there suggestions and make sure that we have a plan in

6    place.  This is an important call.  I can handle it.  I just

7    want you and Gerard to be aware."

8    Q.   All right.  What do you mean by "Litle wants to talk

9    about adult content issues"?

02:21p 10    A.   Litle is our credit card processor allowing us to take

11   Mastercard and Visa, AmEx, and they want -- when they want to

12   talk about adult content issues, they're concerned about the

13   content that's running on Backpage.

14   Q.   Does that become a concern for you?

02:21p 15    A.   This is -- this is a -- this is a huge concern.  We --

16   it's a very -- I want to alert Scott Spear and Gerard Goroski

17   that we could lose our credit card processor.

18   Q.   When -- do you have meetings with representatives from

19   Litle?

02:21p 20    A.   Sorry, say again.

21   Q.   Do you have -- do you have meetings, either person or by

22   e-mail or phone, with representative from -- with Litle around

23   this time period?

24   A.   Yes, we have phone calls and then they come to our office

02:22p 25    periodically.

1    Q.   And this is the credit card processing company which all

2    postings that are posted on Backpage go through?

3    A.   Yes.

4    Q.   In those meetings do you ever disclose any of the

02:22p  5    strategies -- the prostitution marketing strategies that we've

6    been discussing the last couple days?

7    A.   We do not.

8    Q.   Do you tell them about moderation and not throwing the

9    baby out with the bath water?  Do you ever discuss that with

02:22p 10    them?

11   A.   We don't tell them our moderation is not removing

12   prostitution ads -- let me rephrase that.  It's not blocking

13   prostitution users posting ads.  It's simply editing ads,

14   occasionally deleting ads.

02:23p 15   Q.   All right.  And let's look at 615.

16        Did you still have a relationship with The Erotic Review

17   during this time period?

18   A.   Yes, we did.

19   Q.   And is this an e-mail exchange between you and The Erotic

02:23p 20   Review in November of 2010?

21   A.   Yes, it is.

22             MR. RAPP:  Move to admit 615.

23             MR. FEDER:  Same.

24             MS. BERTRAND:  Objection.  Foundation, hearsay.

02:23p 25             THE COURT:  Sustained, foundation.

BY MR. RAPP:

Q.   Is the -- is the person -- is the staff member at The Erotic Review, is this somebody that you've been exchanging e-mails with regarding your relationship with The Erotic Review?

02:24p        MS. BERTRAND:  Objection, leading.

        THE COURT:  Sustained.

BY MR. RAPP:

Q.   Who is -- who is the staff at The Erotic Review on behalf
02:24p  of staff?  Who is that?

        MS. BERTRAND:  Objection, calls for speculation.

        THE COURT:  Overruled.

        THE WITNESS:  I know it's John Georgio.

BY MR RAPP.

02:24p  Q.   How do you know it's John Georgio?

A.   Because we communicate through this e-mail address.

Q.   And just to remind the jury, who is John Georgio again?

A.   John Georgio is the CO of The Erotic Review.  So I know
by e-mailing staff at The Erotic Review John Georgio will read
02:24p  my e-mail.

Q.   Are these -- are your discussions in this e-mail and
otherwise with John Georgio, is it about the relationship
Backpage has with The Erotic Review?

A.   Yes, I -- I think we're still running the reciprocal
02:25p  links program.

1  Q.   All right.

2            MR. RAPP:  Move to admit 615.

3            THE COURT:  Yes, it may be admitted.

4            MR. FEDER:  Same.

02:25p  5            THE COURT:  Overruled.  It may be admitted and

6  published.

7            (Exhibit No. 615 admitted in to Evidence.)

8  BY MR. RAPP:

9  Q.   What are you telling -- what are you telling -- can you

02:25p 10  read what you're telling Mr. Georgio in this e-mail portion

11  below?

12  A.   "Thanks for the heads up.  I wish I could keep all users

13  happy.  If I could post in your threads anonymously, I would

14  say this:  Yes, back page has new moderation rules:

02:25p 15       -no naked butt or vagina pics.

16       -no code words.

17       -no rates less than one hour.

18       -no off site html images and limited text size."

19  Q.   Let me just stop you there for a minute.  What did you

02:26p 20  mean "if I could post in your threads anonymously"?

21  A.   The Erotic Review has forums and some of those forums are

22  used by prostitutes.

23  Q.   All right.  And how do you know that?

24  A.   Because I've seen them.  We had the VP -- we had a VIP

02:26p 25  access.

UNITED STATES DISTRICT COURT

1    Q.   All right.  And then this no offsite html images with

2    limited text size, this right here, what did you mean by that?

3    A.   An html image is actually a web address that you could

4    put into the ad text of an ad that would fetch the image from

02:26p  5    some other site, not Backpage, and then it would appear in the

6    ad.  Well, we were eliminating html images.

7    Q.   Why were you doing that?

8    A.   Because we had no control of the image being displayed.

9    Q.   Did you come to learn what those html images -- those

02:27p 10    offsite html images were?

11    A.   They would often go to -- they would bring in images that

12    were no longer allowed.  Now, we still allowed super posters

13    to use html images.

14    Q.   Why were the super posters allowed to use the html images

02:27p 15    as opposed to another type of poster?

16    A.   Because we could communicate the rules to them and they

17    would follow the rules.

18    Q.   All right.  And I -- I just want to be clear.  When you

19    say "no offsite html images," what type of images are we

02:28p 20    talking about?

21    A.   Nudity, sex act pics, graphic nudity.

22    Q.   And so can you explain -- if you had a posting of an ad,

23    can you explain what this means, "no offsite html images"?

24         How would somebody go from a posting to this separate

02:28p 25    website with these images?

1    A.   It wouldn't work that way.  The way it worked, I think I

2    recall one service called the ImageShack.  So you could post

3    images on ImageShack and they would give you a web address,

4    and then you could add that into your ad; and if you're

02:28p  5    familiar with html, what it would do is pull up an embedded

6    ad, an embedded image in your Backpage ad.

7    Q.   I see, okay.  Now, at this time period in the latter part

8    of 2010, November of 2010, were you still implementing

9    aggregation?

02:29p  10   A.   I don't think we need to do it in the US anymore.  I

11   think now that Craigslist has terminated the category we're

12   moving on to new territory.

13   Q.   Okay.  But in terms of the revenue in November of 2010,

14   since Craigslist shut down their adult category in September

02:29p  15   of 2010, what -- did you see any increase in revenue?

16   A.   We did.  The hockey stick continues to go up.  Once

17   again, just a straight line up in revenue.

18   Q.   And looking at Exhibit 39a, did you continue to have this

19   relationship with a super poster known as Dollar Bill?

02:30p  20   A.   Yes.

21   Q.   And is this e-mail in Exhibit 39a, is that a -- an

22   exchange between you and Dollar Bill regarding a posting?

23   A.   Yes, it is.

24           MR. RAPP:  Move to admit 39a.

02:30p  25           THE COURT:  Yes, 39a may be admitted and published.

1          MR. RAPP:  Thank you.

2          *(Exhibit No. 39a admitted in to Evidence.)*

3          THE COURT:  You just said 39a, right?

4          MR. RAPP:  Yes, 39a, thank you.

02:30p  5  BY MR. RAPP:

6  Q.   Can you read what Mr. Mersey, also known as Dollar Bill,

7  what he says to you?

8  A.   Dollar Bill writes, "It's clear to me that Sophie has

9  been flagged for the words 'rendezvous' and/or 'capitulate,'

02:31p 10  because without either of those two words, it's never been

11  flagged.  IT NEVER SAID GFE in the first place!

12     On the other hand, Porsche has never been flagged for

13  saying GFE in the display ad - which is why I didn't bother to

14  change it.  But don't worry bit it.  I have your mods figured

02:31p 15  out - because I deal with a lot of Asians...and that's who's

16  doing your mod job!"

17  Q.   Do you know what he means by "mods figured out" or "mod

18  job"?  What did you take that to mean?

19  A.   Moderators.

02:31p 20  Q.   All right.  Then looking at Exhibit 1766, is this an

21  e-mail between you and all Backpage -- Backpage moderators?

22  A.   Yes, it is.

23  Q.   And is this -- is this you responding to Dollar Bill's

24  issue?

02:32p 25  A.   Yes, this is one of the rare times that I communicate to

```
 1   all the moderators about an issue.
 2   Q.   All right.
 3              MR. RAPP:  Move to admit 1766.
 4              THE COURT:  Yes, it may be admitted and it may be
 5   published.
 6              MR. RAPP:  Thank you.
 7              (Exhibit No. 1766 admitted in to Evidence.)
 8   BY MR. RAPP:
 9   Q.   And so what are you -- what are you telling all the
10   moderators regarding William -- in response to William
11   Mersey's e-mail?
12   A.   "If you remove this ad, could you please contact Andrew
13   or me asap.  thanks."
14   Q.   And then 1766a.  And so what is 1766a?
15   A.   It's the screenshot of the ad in question.
16   Q.   All right.
17              MR. RAPP:  Move to admit 1766a.
18              THE COURT:  Yes, it may be admitted.
19              MR. RAPP:  And published.
20              THE COURT:  Yes, you may publish it.
21              MR. RAPP:  Thank you.
22              (Exhibit No. 1766a admitted in to Evidence.)
23   BY MR. RAPP:
24   Q.   So is -- so is this the ad that Dollar Bill's referring
25   to?
```

02:32p (line 5)
02:33p (line 10)
02:33p (line 15)
02:33p (line 20)
02:34p (line 25)

1   A.   Yes, it is.

2   Q.   Do you know what market this is in, what city?

3   A.   New York City.

4   Q.   And do you know what this refers to here, this link here?

02:34p  5   A.   Yes, I do.  It refers to the Dollar Bill's Psycho

6   Roundup.blogspot.

7   Q.   And earlier in your discussion you testified -- earlier

8   in your testimony, rather, you testified that one of the

9   reasons that you knew that Dollar Bill was providing you

02:34p 10   postings for prostitution was because of this link.

11        Is this an example of the link that you would go to to

12   have that understanding?

13   A.   Yes, he describes it right before the link, all sorts of

14   insider info on the biz.

02:35p 15   Q.   All right.  And why are you taking care of this

16   particular issue with Dollar Bill?  Why are you doing this?

17   A.   Because he's a VIP.  New York City revenue is extremely

18   important, and he has several thousand ads.

19   Q.   All right.  And moving on to 1767, is this an e-mail

02:35p 20   between Andrew Padilla and his moderation staff?

21   A.   Yes, it is.

22   Q.   And what's the subject of it?

23   A.   Subject is "flagged again."

24   Q.   All right.

02:35p 25           MR. RAPP:  Move to admit 1767.

 1              MR. EISENBERG:  No objection.

 2              THE COURT:  It may be admitted.

 3              MR. RAPP:  And published, please.

 4              THE COURT:  Yes, it may be published.

02:36p    5         (Exhibit No. 1767 admitted in to Evidence.)

 6   BY MR. RAPP:

 7   Q.    And is -- what does Mr. Padilla tell the entire

 8   moderation staff regarding this "flagged again"?

 9         What is he referring to?

02:36p   10   A.    Mr. Padilla writes, "mystery solved. staff:  for future

11   reference, escorts are allowed in body rubs and body rubs are

12   allowed in escorts."

13   Q.    Let me stop you there.  What did he mean by that -- or

14   what did you take that to mean?

02:36p   15   A.    I took it to mean that they will run in -- escorts might

16   run in body rubs, body rubs might run in escorts.  The reason

17   why body rubs was created was a place for Asian massage

18   parlors to go to so they wouldn't overwhelm or dominate the

19   escorts category.

02:37p   20   Q.    But did you come to learn what the body rubs -- we've

21   been talking about the female escort category, but did you

22   come to learn over time what the body rubs category was?

23   A.    Yes.  Yes, I did.  It's all the same category of

24   prostitution.

02:37p   25   Q.    All right.  And then -- then what does he follow that

1  with?

2  A.   "treat them as one category.  with the rush to get people

3  trained and up to speed on tou violations, I've neglected the

4  basics."

02:37p  5  Q.   All right.  And then going to 1874a.

6         MS. BERTRAND:  Your Honor, may we take our afternoon

7  break sometime soon?

8         THE COURT:  Yes.  I was purposely going a little bit

9  beyond because we didn't bring our jury in until half an hour,

02:38p  10  but it dawned on me that you all have been here since 1:00

11  o'clock.

12         So, Members of the Jury, we'll go ahead and take our

13  break now and, again, just remember the admonition.  We'll be

14  prepared to start promptly at 3:00 o'clock.

02:38p  15         Please all rise for the jury.

16         (Jury out at 2:38).

17         THE COURT:  All right, please be seated.

18         Mr. Ferrer, you may step down.

19         Let me just say, Mr. Rapp, some of these exhibits

02:39p  20  that you've brought forward, I don't recall that we reviewed

21  them; and so to the extent that they weren't in our previous

22  sessions, just lay that additional foundation, as the Court

23  required.

24         MR. RAPP:  Yes, you're right.

02:39p  25         THE COURT:  And so with that --

1        MR. RAPP:  You're right, we're now beyond that.

2        THE COURT:  With that, we will stand in recess.

3        COURTROOM DEPUTY:  All rise.

4        (Recess taken at 2:39 p.m.)

03:01p  5        (Back on the record at 3:01 p.m.)

6        COURTROOM DEPUTY:  All rise, court is now in

7   session.

8        THE COURT:  Please be seated.  And before we have

9   the jury in --

03:01p 10        MR. RAPP:  Judge, do you want the witness --

11        THE COURT:  Yes, you may step down for a minute,

12   Mr. Ferrer, if you don't mind.

13        (Mr. Ferrer exits the courtroom.)

14        THE COURT:  I just wanted to supplement the record

03:01p 15   with regard to the motion for mistrial related to the notices

16   for missing persons or children.

17        I bring to your attention that this is actually a

18   executive order issued by former President Bill Clinton back

19   on January 19th of 1996 in which he directs specifically that

03:02p 20   the GSA buildings will put up postings of missing persons or

21   children notices in federal facilities, and the practice was

22   reinitiated by the GSA here in February.

23        And so to the extent anyone wants to look at the

24   President's directive on issuing and posting those posters in

03:03p 25   federal buildings, they may do so.  I have it here and I'll

```
          1  give it to Liliana, but in any event what I will do is inquire

          2  -- I think it is at least appropriate to at least ask our GSA

          3  if they wouldn't mind for the duration of however long the

          4  period may be in which they run the campaign to at least move

03:03p    5  it from the high traffic public areas that the jurors may

          6  frequent and put it into an area that they wouldn't have any

          7  reason to be here in the building, and we'll at least make the

          8  request.

          9          All right, so we can have Mr. Ferrer back in and we

03:03p   10  can have our jurors prepared to come back in.

         11          (Jury in at 3:04 p.m.)

         12          THE COURT:  Please rise for the jury.

         13          All right, please be seated.  The record will

         14  reflect the presence of our jurors and the witness is on the

03:05p   15  stand.  Mr. Rapp, you may continue.

         16  BY MR. RAPP:

         17  Q.   All right.  I think when we broke we were about to look

         18  at United States 1874, and if you could just look at that

         19  e-mail.

03:05p   20          On November 12th of 2010 did you receive an e-mail

         21  with some postings attached?

         22  A.   Yes, I did.

         23  Q.   All right.  And I'm showing you the postings that are

         24  1874a.  Do you see that on your screen?

03:05p   25  A.   Yes, I do.
```

 1   Q.   And then the second page of 1874, do you see that?

 2   A.   Yes.

 3   Q.   When you -- so how do you know that this is a -- how do

 4   you know that this is a Backpage posting?

03:06p  5   A.   It's got the same fields.  The way the page is organized

 6   is like Backpage.  It also has the URL of the ad at the upper

 7   right-hand corner, and then it has the posted date and, most

 8   importantly, the posting ID is embedded at the bottom of the

 9   ad.

03:06p  10          MR. RAPP:  Move to admit 1874a, Pages 1 and 2.

11          MS. BERTRAND:  Objection.  Hearsay, lack of

12   foundation.

13          THE COURT:  Lay some more foundation, Mr. Rapp.

14          MR. RAPP:  All right.

03:06p  15   BY MR. RAPP:

16   Q.   Did you -- did you receive this -- did you receive these

17   postings from somebody within the Village Voice?

18   A.   Yes, I did.

19   Q.   All right.  And were they asking you to do something and

03:07p  20   that caused you to look at these postings?

21   A.   One moment.

22   Q.   Take your time.

23   A.   Yes, I'm -- he's bringing a user complaint to my

24   attention.

03:07p  25          MS. BERTRAND:  Objection.  It was a "yes" or "no"

1    answer.

2              THE COURT:  Sustained.

3    BY MR. RAPP:

4    Q.   Did it cause you to look at the postings and review it?

03:07p  5    A.   Yes, it did.

6    Q.   And then were those postings attached to the e-mail?

7    A.   Yes, they were.

8    Q.   Then going to 1874a, I believe you were testifying that

9    these were -- these two documents were a Backpage posting?

03:07p 10    A.   Yes, they are.

11    Q.   And for the reasons you previously testified to regarding

12    the posting ID and the URL at the very top?

13    A.   Yes.

14              MR. RAPP:  Move to admit 1874, Pages 1 and 2.

03:08p 15              MS. BERTRAND:  Same hearsay objection.

16              THE COURT:  Overruled.  1874 and 74a may be

17    admitted.

18              MR. RAPP:  And request permission to publish.

19              THE COURT:  Yes.

03:08p 20              (Exhibit No. 1874 and 1874a admitted in to

21    Evidence.)

22    BY MR. RAPP:

23    Q.   So what -- what did the e-mail cause you to look at in

24    this posting?

03:08p 25    A.   The e-mail is really focused on this area where a portion

1   of the text is being stripped out of this customer's ad.

2   Q.   All right.  And why -- do you know, based upon your

3   experience with the strip out, why that was the case?

4            MS. BERTRAND:  Objection, calls for speculation.

03:08p  5            THE COURT:  Sustained.

6   BY MR. RAPP:

7   Q.   Is it in your personal knowledge as to why that would be

8   stripped out based upon your involvement with the strip

9   filter?

03:08p 10            MS. BERTRAND:  Same objection as to the specific ad.

11            THE COURT:  Sustained.

12   BY MR. RAPP:

13   Q.   Did you come -- did you find postings that had -- did you

14   have complaints where posters would complain about terms being

03:09p 15   stripped out or URLs being stripped out?

16            MS. BERTRAND:  Objection, leading.

17            THE COURT:  Overruled.

18            THE WITNESS:  Yes, there were numerous complaints.

19   Strip out was very aggressive.

03:09p 20   BY MR. RAPP:

21   Q.   And is this an example of it?

22   A.   Yes, it is.

23   Q.   And did -- despite this -- the terms being stripped out,

24   did this get posted?

03:09p 25   A.   The ad will still be posted.  The term will be stripped

1   out.

2   Q.   All right.  And in this posting did it provide rates?

3   A.   Yes, it did.

4   Q.   All right.  And in the next page for 1874a, did it also

03:10p  5   have something that was stripped out?

6            MS. BERTRAND:  Objection, leading.

7            THE COURT:  Overruled.

8            THE WITNESS:  Could you remove that circle thing.

9            MR. RAPP:  Yes.

03:10p 10            THE WITNESS:  No.

11   BY MR. RAPP:

12   Q.   Do you know why it was stripped out on the first one and

13   not stripped out on this one?

14            MS. BERTRAND:  Objection, calls for speculation.

03:10p 15            MR. RAPP:  If you know.

16            THE WITNESS:  I do not know.

17            THE COURT:  I'm going to sustain the objection

18   first; and then, Mr. Rapp, you can rephrase or ask a new

19   question.

03:10p 20   BY MR. RAPP:

21   Q.   By looking at this can you tell why this wasn't stripped

22   out?

23   A.   I cannot.

24   Q.   All right.

03:11p 25            MR. RAPP:  So now let's go to 1185, and this is for

1   the witness' eyes only, madam clerk.

2   BY MR. RAPP:

3   Q.   So can you identify this e-mail?

4   A.   Yes, I can.

03:11p   5   Q.   And what is it?

6   A.   Steve Turnham from CNN contacts me asking to interview on

7   camera.

8   Q.   All right.

9          MR. RAPP:  And move to admit 1185, Page 1.

03:12p  10          THE REPORTER:  Mr. Feder, I can't hear you.

11          THE COURT:  Can you use the microphone, Mr. Feder.

12          MR. FEDER:  It was off.  401, 403, hearsay.

13          THE COURT:  Overruled.

14          MR. PANCHAPAKESAN:  I'm sorry, is this just the

03:12p  15   first page of the exhibit?  Is that what they're seeking to

16   admit?

17          MR. RAPP:  So I have to go page by page because I

18   have some redactions that I have to go page by page.

19          THE COURT:  Yes, he's going to use the version that

03:12p  20   we discussed.  Yes, it may be admitted.

21          MR. RAPP:   All right.

22          (Exhibit No. 1185, Page 1 admitted in to Evidence.)

23   BY MR. RAPP:

24   Q.   Does somebody from CNN contact you?

03:12p  25   A.   Yes.

1  Q.   And when you get notice of this, what, if anything, do

2  you do in response to getting a notice from CNN?

3  A.   Once I've notified Scott Spear, I'm instructed to send a

4  quick e-mail to CNN.  So I write, "I'm traveling today so

**03:13p**  5  email works best.  How can I help you?"

6  Q.   All right.  And what is it that Mr. Turnham has given you

7  notice of in this e-mail?

8            MR. RAPP:  May I publish this first page, please --

9            THE COURT:  Yes.

**03:13p**  10           MR. RAPP:  -- madam clerk, thank you.

11  BY MR. RAPP:

12  Q.   What is he -- what is he telling you that causes you to

13  contact somebody in upper management?

14  A.   He writes, "Hey thanks for getting back to me.

**03:13p**  15       A few questions.

16       Do you have any screening procedures to try to identify

17  underage girls on your escorts page?

18       Also do you have any reporting procedures to send sketchy

19  ads on to law enforcement?"

**03:13p**  20  Q.   And can you read the next one?

21  A.   "There's a girl who advertised on the dc escort page in

22  april who went by the name 'winter,' she's 12, and the police

23  are trying to find her now.

24       Any chance you can dig up her ads and send them my way.

**03:14p**  25       Do you charge for escort ads, of so, how much?  How much

1    are you expecting to earn from that category this year, and

2    what's that as a percentage of your total revenue?

3        Can we interview you on camera?

4        Thanks much, Steve Turnham."

03:14p  5   Q.   First, the ads that he's referencing in this e-mail

6    involving somebody by the name of Winter, does that cause you

7    to locate those postings?

8    A.   Yes.

9    Q.   And do you inform anybody in upper management or

03:14p 10   ownership about that?

11   A.   Yes, I sent it to Scott Spear and Jim Larkin.

12   Q.   And did you in any way communicate these other questions

13   by Mr. Turnham to anybody in upper management?

14   A.   I sent this entire e-mail to upper management.

03:15p 15   Q.   All right.  And upper management being?

16   A.   Scott Spear and Jim Larkin.

17   Q.   All right.

18        MR. RAPP:  Madam clerk, could you take that off the

19   screen.  Thank you.  And for the witness' eyes only, Page 2.

03:15p 20   BY MR. RAPP:

21   Q.   And is this also a continuation of an e-mail exchange

22   you're having with Steve Turnham?

23   A.   Yes.

24        MR. RAPP:  And request permission to admit 1185,

03:15p 25   Page 2 and publish.

1       THE COURT:  Yes, it may be admitted and published.

2           *(Exhibit No. 1185, Page 2 admitted in to Evidence.)*

3       THE COURT:  Are you -- let me just ask for

4   clarification.  Are you renumbering this as a2?  Did I hear

03:16p  5   you say that?  Or are you just referring it as 2 of a?

6       MR. RAPP:  I'm just going to keep it 1185a and make

7   the redactions that we discussed.

8       THE COURT:  Okay, thank you.

9   BY MR. RAPP:

03:16p 10   Q.   And so what do you tell Mr. Turnham in this -- in this

11  e-mail at the top?

12  A.   The reply is given to me and I send it to him.  That

13  reply is, "To our knowledge, Backpage has received no

14  inquiries from law enforcement regarding this matter, nor has

03:16p 15  any items such as you describe come to our attention prior to

16  your email.  Our internal search discloses two ads first

17  posted in April with the word 'Winter' and neither depicts a

18  minor.  Be advised that Backpage promptly responds to all

19  legitimate law enforcement inquiries in accordance with our

03:17p 20  Terms of Use and Privacy Policy.  Be further advised that a

21  review of backpage.com will disclose links designed to

22  facilitate reports to NCMEC's CYBERTIPLINE, as well as to

23  Backpage management in the event users identify abuse or

24  violations of our Terms of Use.

03:17p 25      Thanks for bringing this to your attention.  carl."

 1  Q.   All right.  When you -- I believe your testimony was that

 2  you actually located these postings of Winter; is that right?

 3  A.   I believe so, yes.

 4  Q.   And were those postings reported to NCMEC at all?

03:18p  5  A.   No.

 6  Q.   Down below there is an e-mail exchange from somebody else

 7  other than Steve Turnham.  Who is -- who is this person?

 8  A.   This is Amber Lyon of CNN.

 9  Q.   All right.  And her name has come up previously in your

03:18p  10  testimony?

 11  A.   Yes, she's the journalist that interviewed Craig Newmark

 12  of Craigslist.

 13  Q.   All right.  And you were aware of that interview?

 14  A.   Very much aware.  We wrote the ambush points to deal with

03:18p  15  Amber Lyon.

 16  Q.   And when you say "we wrote the ambush," are those the

 17  ambush talking points?

 18  A.   Yes, the ambush talking points that came from Scott Spear

 19  and Jim Larkin.

03:18p  20  Q.   All right.  And what is Amber Lyon looking to -- what

 21  does she ask you here?

 22  A.   Amber Lyon writes, "Hi Carl.  My name is Amber Lyon and I

 23  am a correspondent with CNN.  My producer, Steve Turnham, has

 24  been in touch with you in the past.  I am writing to request

03:19p  25  an in-person interview with you regarding the Escort page on

1   Backpage.com and to get your response to recent criticisms

2   from victims advocates that underaged girls are allegedly

3   being sex trafficked on the Escort page.

4       Thanks and look forward to meeting you.  Amber."

03:19p 5   Q.   Now, was there any discussion about you -- any discussion

6   with upper management -- let's just start with Scott Spear.

7       Was there any discussion with Mr. Spear about you

8   appearing on camera and submitting to an interview with

9   Ms. Lyon?

03:20p 10  A.   Briefly, but I said there's no way I'm doing it.

11  Q.   All right.  And why, sir, were you reluctant to submit to

12  the interview with Amber Lyon?

13  A.   It didn't go well for Craig Newmark, and I imagine it

14  would be not well for me.

03:20p 15  Q.   Okay.

16          MR. RAPP:  Let's go to Page 3.

17          Thank you, madam clerk.

18  BY MR. RAPP:

19  Q.   All right.  Does Mr. Suskin give Ms. Lyon a response?

03:21p 20  A.   Yes, he does.

21          MR. RAPP:  And so move to admit 1185, Page 3.

22          THE COURT:  Yes, it may be admitted.

23          MR. RAPP:  And published.

24          THE COURT:  And published.

03:21p 25          MR. RAPP:  Thank you.

| | |
|---|---|
| 1 | *(Exhibit No. 1185, Page 3 admitted in to Evidence.)* |
| 2 | *BY* MR. RAPP: |
| 3 | Q.   What does Mr. -- first of all, who is Steve Suskin? |
| 4 | A.   So Steve Suskin is a in-house counsel for the newspapers |
| 03:21p  5 | and Village Voice Media and seemed to be the only one that |
| 6 | would volunteer to have his name on responses to Amber Lyon. |
| 7 | Q.   All right.  So let's -- let's start with this top. |
| 8 |      What does he tell the individual from CNN, Steve Turnham? |
| 9 | A.   "We are not providing interviews at this time.  Below, |
| 03:22p 10 | however, is a statement from Backpage.com." |
| 11 | Q.   And what else does he say? |
| 12 | A.   The safety and security of our community is a top |
| 13 | priority for Backpage.com.  We have just retained Hemanshu |
| 14 | Nigam of SSP Blue to partner with us in implementing a |
| 03:22p 15 | holistic plan centered around preventing criminal activity on |
| 16 | our site." |
| 17 | Q.   Let me just stop you there.  What is this holistic plan, |
| 18 | if you know, that was centered around preventing criminal |
| 19 | activity on the site?  What was that? |
| 03:22p 20 | A.   This is the slow dance.  This is just making small, |
| 21 | incremental changes that wouldn't disrupt revenue growth. |
| 22 | Q.   And so when he says the security is a top priority for |
| 23 | backpage.com, did you come to know in the time you were at |
| 24 | Backpage what another top priority was for backpage.com? |
| 03:23p 25 | A.   The top priority was revenue.  Safety and security of our |

1   community was a sham.

2   Q.   It was a sham?  Why do you say, sir, it was a sham?

3   A.   Because our -- our purposes were growing revenue, were

4   sanitizing the site.  We just feel like we keep taking punches

03:23p  5   from the Attorneys Generals eventually they'll go away.  So

6   that's why we're gonna do this slow dance with them and not do

7   anything that's going to impact revenue.

8        There was never a budget where revenue was gonna go down

9   because of moderation.  Budgets were always double digit

03:23p 10   increases.

11   Q.   All right.  And then the last sentence, what does he say

12   in the last sentence to Mr. Turnham?

13   A.   Where did we end?

14   Q.   So I think you want to start with "we" there.

03:24p 15   A.   "We also look forward to continuing our productive

16   dialogue with the Attorneys General and expect to announce

17   some significant changes to our site very soon."

18   Q.   Well, we talked about this before, but this is very

19   similar, if not identical, to a previous message that was

03:24p 20   provided; is that right?

21   A.   This is a standard template we're going to use for years.

22   Q.   All right.  And what -- are you aware of any continuing

23   productive dialogue with the Attorneys Generals?

24   A.   We're getting ready to do a letter, a response.

03:25p 25   Q.   All right.

1    A.   And we're gonna take some steps that are, once again,

2    cosmetic and superficial.

3    Q.   All right.  And in the response to the Attorney Generals,

4    is this in the form of a letter?

03:25p  5    A.   Yes.

6    Q.   Did you disclose in that letter the strategies -- the

7    prostitution marketing strategies that we've been talking

8    about the last several days?

9         MR. FEDER:  Vague and ambiguous as to what letter,

03:25p 10    when, who.

11         THE COURT:  Sustained.

12         MR. RAPP:  I'll withdraw it.  We'll come to it.

13    BY MR. RAPP:

14    Q.   Moving on to Page 4, is this another page of that

03:26p 15    exchange?

16    A.   Yes, it's another response to Steve Turnham from Steve

17    Suskin.

18    Q.   So this is another response from Steve Suskin to

19    Mr. Turnham right here in the middle there?

03:27p 20    A.   Yes.

21         MR. RAPP:  Move to admit 1185, Page 4.

22         For the record, 1185a Page 4.

23         THE COURT:  Yes, it may be admitted and published.

24         (Exhibit No. 1185, Page 4 admitted in to Evidence.)

03:27p 25    BY MR. RAPP:

 1   Q.   Here, let's just start with the "we."  What does he --

 2   what does he tell in that -- what does Mr. Suskin tell

 3   Mr. Turnham starting with "we"?

 4   A.   "We cannot comment" --

03:27p  5   Q.   Well, I mean the next "we," the next sentence.

 6   A.   Oh.  "We have been working diligently to build a holistic

 7   safety and security program in partnership with Internet

 8   safety expert Hemanshu Nigam to better protect our community."

 9   Q.   All right.

03:28p 10   A.   "Backpage.com."

11   Q.   What do you know of -- what were you working diligently

12   on at this time to build a holistic safety and security

13   program in partnership with the Internet safety expert,

14   Mr. Nigam?  What were you working on?

03:28p 15   A.   Just minor cosmetic changes, negotiating on the terms

16   that would no longer be allowed.  Not much.

17   Q.   All right.  As time went on, did you come to learn that

18   Amber Lyon had actually produced a story on Backpage.com?  Did

19   you -- did you come to learn that?

03:29p 20           MS. BERTRAND:  Objection, leading.

21           THE COURT:  Overruled.

22           THE WITNESS:  Yes.

23           MR. RAPP:  Okay, we'll come back to that.

24           Now -- madam clerk, thank you.

03:29p 25           Let's go to Exhibit 940.  Bless you.

          1              THE COURT:  What was that again?

          2              MR. RAPP:  940, Your Honor.

          3              So I'm showing you what's been marked as 940.

          4              THE COURT:  Bless you.

03:29p    5   BY MR. RAPP:

          6   Q.   Do you see that on your screen?

          7   A.   Yes, I do.

          8   Q.   And this -- is this in October of 2010?

          9   A.   Yes, it is.

03:30p   10   Q.   And --

         11              THE COURT:  Bless you.

         12   BY MR. RAPP:

         13   Q.   Does this involve -- are you copied on this e-mail?

         14   A.   Yes, I am.

03:30p   15   Q.   And is Mr. Lacey copied on this e-mail?

         16   A.   Yes, he is.

         17   Q.   And is this e-mail approximately -- is it three pages

         18   long?

         19   A.   Yes.

03:30p   20   Q.   And what is the subject matter of this e-mail?

         21   A.   The subject is "Kansas Schedules 'Perp Walk' to Publicize

         22   Backpage.com Linked Arrests."

         23   Q.   All right.  And did you come to -- did somebody forward

         24   you an article regarding a -- an arrest connected to

03:31p   25   backpage.com from Kansas?

1   A.   Yes, I believe so, from Scott Spear's assistant.

2   Q.   All right.

3          MR. RAPP:  Move to admit United States 940.

4          MR. CAMBRIA:  Object, no foundation.

03:31p   5          THE COURT:  Overruled, 940 may be admitted.

6          *(Exhibit No. 940 admitted in to Evidence.)*

7          MR. RAPP:   All right.  Let's start on the -- and

8   request permission to publish.

9          THE COURT:  Yes.

03:31p  10   BY MR. RAPP:

11   Q.   And so on this -- this page, does this -- that's not what

12   I want to do.

13        Is this a article that's forwarded to these individuals,

14   including Michael Lacey and Scott Spear?

03:32p  15   A.   Yes.

16   Q.   And what did the article say?

17   A.   The article stated, "Anyone who's spent much time as a

18   reporter has experienced the 'perp walk,' the dramatic but

19   often unnecessary procedure in which criminal defendants are

03:32p  20   paraded before the cameras on their way to jail or court.

21   'Did you get 'em, boys?  Want me to run 'em by again?'  the

22   sheriff of Pima County asked a group of Tucson reporters

23   (including yours truly) a few decades ago.

24        Something similar is scheduled for tomorrow on the steps

03:33p  25   of the" -- what's that, Wyandotte?

1   Q.   Wyandotte.

2   A.   -- "Wyandotte County Courthouse in Kansas City, Kansas.

3   There, Kansas Attorney General Steve Six, Wyandotte County

4   Attorney General Jerry Gorman and assorted other brass hats

03:33p 5   will greet the ladies and gentlemen of the press to announce

6   two arrests 'tied to advertisements posted on Backpage.com,'

7   the AG's office announced in a press advisory late today.

8        Six says this little display is intended to 'reiterate

9   the message sent by 21 AGs on September 21 asking Backpage.com

03:33p 10   to immediately remove its Adult Services section and to

11   implement strict manual review policies for other ads.'

12       The 21 attorneys general earlier intimidated

13   Craigslist.org into removing its adult services section and

14   they have now moved on to Backpage.com, a free classifieds

03:34p 15   site operated by Village Voice Media, which publishers

16   'alternative' weeklies in major cities nationwide.

17       In a recent posting on its blog, the company said it has

18   hired a security expert to beef up its operations."

19   Q.   Let me just stop you there.  And so are the last two

03:34p 20   paragraphs, are they basically the message that Steve Suskin

21   gave to Steve Turnham in the previous e-mail, 1185a?

22       Is it basically the same message?

23           MS. BERTRAND:  Objection, the two documents speak

24   for themselves.

03:34p 25           THE COURT:  Sustained.

           1   BY MR. RAPP:

           2   Q.   Well, let's read it.  What do they say?

           3   A.   "'The safety and security of our community is a top

           4   priority for Backpage.com.  Backpage.com has just retained

03:35p     5   Internet safety expert Hemanshu Nigam of SSP Blue to partner

           6   with us in implementing a holistic plan centered around

           7   preventing criminal activity on our site,' the company said.

           8   Q.   Let's just stop there.  Do you have the same responses to

           9   this message quoted in this article that you gave with respect

03:35p    10   to the e-mail message that Mr. Suskin gave to Steve Turnham in

          11   1185a?

          12          MS. BERTRAND:  Same objection, the documents speak

          13   for themselves.

          14          THE COURT:  Sustained.

03:35p    15          MR. RAPP:  Well, this -- this will actually be the

          16   testimony.

          17   BY MR. RAPP:

          18   Q.   Okay.  Is this -- is this quote accurate down here?  In

          19   the quote that was given to this newspaper in Kansas City, is

03:35p    20   this an accurate quote of what you are doing within Backpage,

          21   starting with "The safety and security of our community is a

          22   top priority for Backpage.com'"?

          23          MR. FEDER:  Asked and answered.

          24          THE COURT:  I'm sorry, did you say something,

03:36p    25   Mr. Feder?

1      MR. FEDER:  I said asked and answered.  It's the

2  same thing he's just gone over with Mr. Ferrer two minutes

3  ago.  Same quote, same explanation.

4      THE COURT:  No, it's overruled.

03:36p  5      MR. RAPP:  Well, why don't you give the same answer,

6  if it is the same answer.

7      THE WITNESS:  It's the same sham reply that we send

8  out to medium.  It's been crafted by Hemanshu to give us time,

9  more time.

03:36p 10  BY MR. RAPP:

11  Q.   Give you more time for what?

12  A.   To slow dance, slow walk, make incremental changes, keep

13  the revenue train on the tracks.

14  Q.   All right, and let's go back.  And so on the first page

03:37p 15  of 940 what does Mr. Nigam -- what is he telling the other

16  individuals, including Mr. Lacey and Mr. Spear, who are

17  endorsed on this e-mail, what does he tell them?

18  A.   Hemanshu writes, "Hi all, I've discussed this with Scott.

19  Jamie and I have also discussed and she is going to circulate

03:37p 20  a responsive statement that she can put out tomorrow in case

21  any reporters call either before or after the perp walk.

22  Draft coming shortly.  Thanks, Hemu."

23  Q.   So this person, Jamie Schumacher, does she draft some

24  type of statement that ultimately ends up -- the same

03:38p 25  statement that we looked at that ended up in the article?

```
 1              MS. BERTRAND:  Objection, leading.  Repeats what's
 2   already in the document.
 3              THE COURT:  Sustained as to leading.
 4   BY MR. RAPP:
 5   Q.   Is the -- what is the -- what is the quote here by Steve
 6   Suskin?  Does this end up somewhere?
 7   A.   Yes, this is slightly different.
 8   Q.   Okay.  What is different about it?
 9   A.   Jamie's added a few touches in there.  I guess the -- I
10   guess to really capture the difference I need to read it all.
11   Q.   All right, if you would.
12   A.   "Backpage.com is committed to providing a safe place to
13   advertise in a criminal free environment.  As we recently
14   stated, we have been working diligently with Internet safety
15   expert Hemanshu Nigam of SSP Blue to identify key changes on
16   our site to prevent its misuse by criminals such as those
17   being prosecuted by Attorney General Six.  We expect to
18   announce these changes very soon and applaud General Six's
19   efforts to bring these criminals to justice.
20         Steve Suskin, Backpage.com."
21   Q.   And if you know, is there any difference between that
22   draft statement and what ends up in the article?
23   A.   Yeah, this one's really congratulating the Attorney
24   General for arresting criminals and that's -- I know that
25   Michael Lacey doesn't like it.
```

03:38p 5
03:38p 10
03:39p 15
03:39p 20
03:39p 25

1  Q.   All right.

2  A.   Jim Larkin doesn't like it.

3       MR. CAMBRIA:  Object to that, ask it be stricken.

4  Gratuitous.

03:39p  5       THE COURT:  Sustained, and the jury will disregard

6  that last statement as to what he believes Mr. Lacey believed.

7  BY MR. RAPP:

8  Q.   Why do you believe that Michael Lacey did not want to

9  congratulate the arrest of these individuals based upon the

03:40p  10  sting?

11       MR. CAMBRIA:  Objection to leading.

12  BY MR. RAPP:

13  Q.   All right.  Well, why don't you just read what Mr. Lacey

14  says here.

03:40p  15  A.   Michael -- Michael Lacey replies to all of us, "Do we

16  know anything about those arrested?  Charges?  What are we

17  applauding?  Are the perps different than rest of Backpage?

18  This is a sick stunt."

19  Q.   What did you take that to mean?

03:40p  20       MR. CAMBRIA:  Object.

21       THE COURT:  Overruled.

22       MR. CAMBRIA:  Your Honor, it speaks for itself.

23       What's the difference what he thinks?

24       THE WITNESS:  Are the perps --

03:41p  25       THE COURT:  Well, it is 401 so he may answer.

```
 1   BY MR. RAPP:
 2   Q.   What did you take Mr. Lacey's -- Mr. Lacey's statement to
 3   mean?  What did you take it to mean?
 4   A.   "Are the perps different than rest of Backpage" suggests
 5   that all of the users are Backpage potential perps.
 6   Q.   All right.  Now, let's switch to another area here.
 7        Do you know -- did you have e-mail exchanges with
 8   somebody by the name of Pamela Robinson?
 9   A.   Yes.
10   Q.   And how -- over what time period approximately did those
11   e-mail exchanges take place?
12   A.   Approximately 2010 to 2018.  There's a lot of e-mails.
13   Q.   All right.  And based on those e-mail exchanges -- well,
14   did you also come to learn that this person by the name -- who
15   identified themselves as Pamela Robinson was also putting
16   postings on Backpage.com?
17   A.   Yes.
18   Q.   And based upon the e-mail exchanges and the postings, did
19   you, based on your own personal knowledge, form an opinion as
20   to what business Ms. Robinson was in?
21             MS. BERTRAND:  Objection, calls for speculation.
22             THE COURT:  He can state his opinion, overruled.
23             MR. FEDER:  Also relevance and 403 and hearsay.
24             THE COURT:  He can state his opinion, overruled.
25             Reask -- I'm sorry.  Do you need Mr. Rapp to reask
```

03:41p  5
03:42p  10
03:42p  15
03:42p  20
03:43p  25

1      the question?

2                THE WITNESS:  No, I -- yes, I have an opinion.

3      BY MR. RAPP:

4      Q.    Okay.  What is your -- what is your opinion based upon

03:43p  5      the e-mail exchanges and postings?

6      A.    That Pamela Robinson was engaged in prostitution.

7      Q.    All right.  I'm showing you Exhibit 162 and 162's a

8      two-page.  Is this e-mail exchange in 162, is this with the

9      individual by the name of Pamela Robinson?

03:44p 10      A.    Yes.

11      Q.    And is this the person that -- based upon these e-mail

12      exchanges and her postings, that you had an opinion that she

13      was engaged in prostitution?

14      A.    Yes.

03:44p 15                MR. RAPP:  Move to admit 162.

16                MR. FEDER:  Same.

17                THE COURT:  Overruled.

18                MS. BERTRAND:  Same objections and hearsay.

19                THE COURT:  Overruled, it may be admitted.

03:44p 20                MR. RAPP:  And published, please.

21                THE COURT:  It may be published.

22                (Exhibit No. 162 admitted in to Evidence.)

23      BY MR. RAPP:

24      Q.    So looking at Page 2 of 162, what question is Pamela

03:44p 25      Robinson asking Carl at carl@backpage.com?

1   A.   She's asking, "can i use the promo code to get a discount

2   on my escort ads?"

3   Q.   And what do you respond?  What does carl@backpage.com

4   respond?

03:45p  5   A.   "Yes.  It will work in any category.  Carl."

6   Q.   And can you explain what a "promo code" is?

7   A.   A promo code will give the poster a discount, usually 10

8   percent, 15 percent, sometimes 20.

9   Q.   All right.  And you get -- at the top here can you -- can

03:45p  10  you say what -- can you read what she's asking you here?

11  A.   "My email address for your website is

12  clprovider4u@yahoo.com and the ad in question is:  50 Red

13  Roses special - Dont Miss out!!! and it i saying that it is

14  under review."

03:46p  15  Q.   All right.  Can you -- do you -- do you understand or

16  what did this exchange mean to you?

17  A.   It means her ad is pending.

18  Q.   All right.  And do you know why it's pending?

19  A.   She probably violated the posting rules.

03:46p  20  Q.   Let's go to Page 1.  What does she say to you here that

21  you saw the other portion of it?

22  A.   Pamela Robinson writes, "Carl:  I would like to know why

23  your website keeps removing my ad in the Escort section.

24  Other women have more explicit ads than me and they are up!  I

03:47p  25  have had that ad posted for a few years on your website and

1  now they are doing me this way?  I have even asked you to

2  repost for me for free several times in the past because I

3  didn't have the money to repost and I was broke and you did

4  that for me.  I can not afford to have this ad removed."

03:47p  5  Q.   And then it's a little bit broken up, but what does it

6  say there?

7  A.   "I will not be able to pay my bills."  She's gonna have

8  problems.

9  Q.   All right.  So what are you doing in response to Pamela

03:47p  10  Robinson's issues?  What are you trying to do to assist her in

11  any respect?

12  A.   Send her a promo code, to allow her to post again or we

13  -- you know, allow her ad to be edited again.

14  Q.   All right.  Let me show you the top part of this, of 162.

03:48p  15  What does she say to you here?

16  A.   Pamela Robinson writes, "Carl:  Who ever is in charge of

17  your classified dept removed my ad again and it has something

18  to do with a certain picture.  The picture is attached.  I am

19  going to file a complaint with the Better Business Bureau

03:48p  20  against Backpage.  I said before that I could not afford to

21  keep having my ad removed and then have to pay again to put it

22  back on.  If the person who is over that dept is such a prude

23  well maybe they should check out the other women's ads in that

24  section.  They are no better than me and I am sick and tired

03:49p  25  of being singled out for removal."

1  Q.   And does she -- down here does she indicate what her ad

2  says?

3  A.   "The ad says:  50 red roses special - don't miss out!!"

4  Q.   And have you seen similar ads to that?

03:49p  5  A.   That is her ad title she usually uses.

6  Q.   All right.

7           THE COURT:  Can I have counsel at sidebar.

8           (Following discussion held at sidebar.)

9           THE COURT:  Exhibit 162 has been admitted.

03:50p  10           MR. RAPP:  Yeah.

11           THE COURT:  You're redacting portions of an admitted

12  exhibit while the witness is testifying, and I don't know what

13  that's about.  You did that previously and you're doing it

14  now.

03:50p  15           MR. RAPP:  Yeah, let me explain.  We haven't gone

16  over this exhibit that I knew of.

17           THE COURT:  What do you mean we haven't gone over?

18           MR. RAPP:  We haven't -- I think we're beyond that

19  hundred now.

03:50p  20           THE COURT:  Okay.  I thought you meant in reference

21  to this witness, but you're talking about you haven't gone

22  over --

23           MR. RAPP:  Well, no, they have the -- they have the

24  exhibits in our exhibit list.  We haven't gone over it in

03:50p  25  court, and so I'm being very careful with it.  There is some

      1  language in there that could suggest a day in the life of a --

      2  of a escort.  I think it's -- I don't think it's that overt,

      3  but I'm just being very careful.  So I just thought I'd redact

      4  it out.  It's not that relevant in my question.

03:51p 5          THE COURT:  Well, at this stage when you've already

      6  admitted the exhibit --

      7          MR. RAPP:  Yes.

      8          THE COURT:  -- it's problematic when you start

      9  redacting while the witness is testifying about it.

03:51p 10          MR. RAPP:  Yeah.

     11          THE COURT:  And so I think you either move on and

     12  produce the redacted version of those elements that you're

     13  concerned about.

     14          MR. RAPP:  Yeah.

03:51p 15          THE COURT:  But it's inappropriate to do it

     16  midstream so --

     17          MR. RAPP:  Okay.

     18          THE COURT:  -- I'm going to ask you to move on from

     19  this exhibit.

03:51p 20          MR. RAPP:  All right.

     21          THE COURT:  All right.

     22          (End of sidebar discussion.)

     23  BY MR. RAPP:

     24  Q.  All right.  Let's look at -- so in this exchange with

03:51p 25  Pamela Robinson does she -- does she have a complaint about

          1  the removal of an image?

          2  A.   Yes.

          3  Q.   All right.  So looking at -- this is just for the

          4  witness' eyes only.

03:52p    5       Does she provide you as an attachment the image that got

          6  removed?

          7  A.   Yes, she does.

          8  Q.   All right.  And I'm showing you for the witness' eyes

          9  only 162a.  Is this the image that she's -- that she attaches

03:52p   10  that she complains that got removed?

         11  A.   Yes.

         12            MR. RAPP:  And move to admit 162a briefly.

         13            MS. BERTRAND:  Objection, 403.

         14            THE COURT:  Overruled.

03:53p   15            MR. RAPP:  And publish.

         16            THE COURT:  It may be been exhibited.

         17            COURTROOM DEPUTY:  And it's admitted?

         18            THE COURT:  I'm sorry?  It is admitted, yes.

         19            (Exhibit No. 162a admitted in to Evidence.)

03:53p   20  BY MR. RAPP:

         21  Q.   All right.  And so was the image that was attached to her

         22  e-mail, did it violate the terms of use?

         23  A.   Yes, it was a closeup of genitalia.

         24  Q.   All right.  So looking at Exhibit 163 for the witness'

03:53p   25  eyes only, do you continue to have e-mail exchanges with

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Pamela Robinson?                                             |
|       | 2  | A.   Yes.                                                     |
|       | 3  | Q.   And is 162 (sic) -- is this additional e-mail exchanges |
|       | 4  | where she's asking you questions?                            |
| 03:54p | 5 | A.   Yes.                                                     |
|       | 6  | MR. RAPP:  163, that's what I said.                           |
|       | 7  | My mistake, 163.                                              |
|       | 8  | THE COURT:  Yes, I just wanted to point out you said          |
|       | 9  | 162 and we're on 163.                                         |
| 03:54p | 10 | MR. RAPP:  Thank you, I appreciate it.                       |
|       | 11 | THE COURT:  Okay.                                             |
|       | 12 | BY MR. RAPP:                                                  |
|       | 13 | Q.   So 163, is this also an e-mail exchange between you and  |
|       | 14 | Pamela Robinson?                                             |
| 03:54p | 15 | A.   Yes, it is.                                             |
|       | 16 | Q.   All right.                                               |
|       | 17 | MR. RAPP:  Move to admit 163.                                 |
|       | 18 | MR. FEDER:  Same.                                             |
|       | 19 | THE COURT:  Overruled, it may be admitted.                   |
| 03:54p | 20 | (Exhibit No. 163 admitted in to Evidence.)                  |
|       | 21 | MR. RAPP:  All right, so let's go to Page 3.                  |
|       | 22 | BY MR. RAPP:                                                  |
|       | 23 | Q.   Is this just sort of a -- and request permission to     |
|       | 24 | publish.                                                      |
| 03:54p | 25 | THE COURT:  Yes.                                             |

BY MR. RAPP:

Q.   Is this a -- is this a portion of Pamela Robinson's posting?  It's a little bit chopped up, but is this a portion of it?

03:55p  A.   Yes, this is the ad text in her posting.

Q.   All right.  And then looking at 163, Page 2, is this in -- and request permission to publish this as well.

Is this also -- is it sort of a continuation?  What is this?

03:55p  A.   This is more for ad text.

Q.   All right, and then going to the first page of 163.

What does Pamela Robinson -- what is she saying to you down here below?

A.   Pamela Robinson writes, "Please let me edit my ad to this

03:56p  ad below and I will cancel my complaint with the Better Business Bureau.  companionship and massage services are NOT illegal.  Nothing sexual is implied here."

Q.   And then what does carl@backpage.com tell her?

A.   "Ok, please try editing the ad now.  Carl."

03:56p  Q.   What is this -- what is Backpage allowing her to do?

A.   We had the ability to lock users out from editing their ads after we moderated the ad.  For example, we removed her pic that violated her posting rules, and then we locked her out of her ad so she couldn't edit the ad.

03:56p  Q.   All right.  And then what does she say to you on November

1    15th of 2019?

2    A.    Pamela writes, "Carl:  Apparently who over in in charge

3    of your computer system for your ads is not taking me

4    seriously because every time i try to change my ad, it changes

03:57p  5    it back.  It is against the law for someone to tell someone

6    what can charge for a rate and this is causing me to lose

7    business BIG time.  I am sorry but I am so mad that I am

8    filing a complaint with the FBI tips line.  This is

9    ridiculous."

03:57p  10   Q.    And then what does carl@backpage tell her?

11   A.    "Read the posting rules.  One hour rates minimum at this

12   time."

13   Q.    And then what does she say in response?

14   A.    Pamela Robinson writes, "i hate to have to tell you this

03:58p  15   but no one is going to pay" more -- "pay anyone an hour for a

16   massage and you are going to have a lot of people going out of

17   business because alot of people can NOT afford to pay for an

18   hour."

19   Q.    All right.  Then let's go to Exhibit 164 for the witness'

03:58p  20   eyes only.  Now, Exhibit 164, is this also a continuation of

21   an exchange between you and Pam -- or carl@backpage and Pamela

22   Robinson?

23   A.    Yes.

24   Q.    All right.  Looking at page -- so move to admit 164.

03:58p  25            THE COURT:  Yes, it may be admitted.

```
 1              MR. FEDER:  Same.
 2              (Exhibit No. 164 admitted in to Evidence.)
 3    BY MR. RAPP:
 4    Q.   What is this?  Can you tell us what -- what is this in
 5    effort -- or what are you saying here to Pamela Robinson?
 6    A.   So Pamela Robinson, she received a marketing e-mail from
 7    carl@backpage.com and it had her last post on 2010 March 27th
 8    in the category of biz ops.
 9    Q.   All right.  And then -- so why is she receiving this --
10    this -- is this an automatic e-mail that she's receiving or
11    what is this?
12    A.   It's -- it's an e-mail that's sent to clients who --
13    who's e-mail address is inactive.  There's no active ad and
14    it's sent like bulk e-mail.
15    Q.   Okay.  And what's the point of the e-mail?
16    A.   Well, we send hundreds of thousands of e-mails, and the
17    point is to bring inactive clients back to the site to renew
18    their ads or post again.
19    Q.   All right.  And this now on your screen is 164, Page 2,
20    and I'd ask for that to be published as part of 164.
21              THE COURT:  It may be published.
22    BY MR. RAPP:
23    Q.   So this is the entire -- is this the entire e-mail that
24    is being sent out to her?
25    A.   This is the entire e-mail that I would write up and then
```

03:59p  5
03:59p 10
03:59p 15
04:00p 20
04:00p 25

1   have Scott Spear approve before I sent it out.

2   Q.   All right.  And why would you need Mr. Spear's -- why

3   would you need Mr. Spear's approval to send this out?

4   A.   I'd like to get a second pair of eyes on it and I'm --

04:01p   5   especially I'm talking about safety and security enhancements.

6   It's -- that's at his pay grade.

7   Q.   All right.  And then looking at the first page of 164,

8   what does -- what is she saying down here?

9   A.   Pamela Robinson writes, "I would really appreciate it if

04:01p   10   you would please take the block off my ad for editing my ad.

11   I have to change the phone number when the minutes run out of

12   my cell phone each month.  I wont post any more objectionable

13   pics, ok?  my ad is under theheading of 50 red roses special-

14   dont miss out.  and my e-mail address is."

04:01p   15   Q.   Now, what does carl@backpage.com tell her?

16   A.   "Hi, you should be able to edit now.  Please let us know

17   if you are still having trouble."

18   Q.   All right.  What is she -- what is she talking about here

19   in this e-mail exchange?  We're now -- we started in 2010.

04:02p   20   Now we're in 2012, right?

21   A.   Yes.

22   Q.   All right.  What is -- what is she saying here to you?

23   A.   She's concerned about an article that broke in Seattle

24   about the possible addition of --

04:02p   25              MR. FEDER:  Object as to hearsay on hearsay, what

 1    she is thinking.
 2              THE COURT:  Well, sustained as to that.
 3              MR. RAPP:  Well -- all right.  Well, let's put --
 4    let's put some context.
04:03p  5    BY MR. RAPP:
 6    Q.   Did you come to learn based upon this e-mail exchange
 7    with Pamela Robinson and also her postings what city she was
 8    working in?
 9    A.   Yes, Seattle/Tacoma.
04:03p 10    Q.   And did you -- at some point did Backpage.com receive
11    some scrutiny from the -- what happened in Seattle with
12    respect to backpage.com?
13    A.   Mayor McGinn was demanding we use IDs to check the age of
14    posters before they posted.
04:03p 15    Q.   And, indeed, did you receive -- did backpage.com receive
16    a letter from Mayor McGinn regarding the website?
17    A.   Yes.
18              MS. BERTRAND:  Objection, leading.  Objection,
19    hearsay.
04:03p 20              THE COURT:  Well, overruled as to whether or not
21    they received a letter but. . .
22    BY MR. RAPP:
23    Q.   Did you receive a letter?
24    A.   Yes, we did from Mayor McGinn.
04:04p 25    Q.   Was there also -- and did you have an exchange of letters

        1    with Mr. -- with Mayor McGinn in the same way that you had an

        2    exchange of letters with the Attorneys Generals?

        3    A.   Yes.

        4              MS. BERTRAND:  Objection, vague as to who is

04:04p  5    actually having the exchange of letters.

        6              THE COURT:  Sustained.

        7              MR. RAPP:   All right.

        8    BY MR. RAPP:

        9    Q.   Did you -- did you receive a letter from -- did you come

04:04p 10    to learn about a letter that you received from Mayor McGinn?

       11              MS. BERTRAND:  Objection, hearsay upon hearsay.

       12              THE COURT:  Sustained.

       13    BY MR. RAPP:

       14    Q.   Did you receive a letter from -- don't tell me what it

04:04p 15    says 'cuz we'll look at it later, but just did you receive a

       16    letter?

       17    A.   Yes, I received a letter.

       18    Q.   Okay.  Did you also come to learn that there was an

       19    article about Mayor McGinn's complaints about Backpage

04:05p 20    published in Seattle?

       21              MS. BERTRAND:  Objection, leading.

       22              MR. CAMBRIA:  And hearsay.

       23              THE COURT:  Sustained as to leading.

       24    BY MR. RAPP:

04:05p 25    Q.   Was there an article in the -- in Seattle about Backpage?

1      MS. BERTRAND:  Objection, leading.

2      THE COURT:  Sustained.

3      MR. RAPP:  Okay.  Does -- does Pamela Robinson

4  attach an article that was published in the Seattle times and

04:05p  5  does she send it to you and ask questions about it?

6      MS. BERTRAND:  Objection, leading.

7      THE COURT:  Overruled.

8      THE WITNESS:  Yes, she sends the attachment Backpage

9  article.

04:06p 10  BY MR. RAPP:

11  Q.   All right.  And then what does -- what does she ask you

12  about that article in her e-mail to carl@backpage?

13      MS. BERTRAND:  Same objection as to hearsay.

14      THE COURT:  Overruled as to what -- I'm sorry, as to

04:06p 15  what she asked him.

16      MR. RAPP:  Yes, what does she ask.

17      THE WITNESS:  I think I can just read this e-mail.

18      MR. RAPP:  Yeah, why don't you read it.

19      THE WITNESS:  "I would like to find out the real

04:06p 20  story behind this article.  Am I going to have to go somewhere

21  to place my ad in person?  I don't need to verify my age.  I

22  am 50 altho in my ad I say I am 38.  and what will happen if I

23  do?  get arrested on the spot?  This is ridiculous.

24      This is my only income and if it gets taken away I

04:06p 25  will end up living back on the street and I am not doing that

UNITED STATES DISTRICT COURT

 1    for anyone.  I don't do this because I WANT to, I do it

 2    because I HAVE to.

 3         No one will hire me between my bad credit score

 4    (below 500) and my past record.

04:07p  5         No one is making me do anything, I am making myself

 6    do it to pay my bills and keep a roof over my head.  I am in

 7    the Seattle/Tacoma area."

 8    BY MR. RAPP:

 9    Q.   All right.  Was there -- do you know if there was any

04:07p 10    effort in Seattle by either the mayor or law enforcement that

11    was asking for age verification by backpage.com?

12              MS. BERTRAND:  Objection, leading.

13              THE COURT:  Well, he can say "yes" or "no" if he

14    knows.

04:07p 15    BY MR. RAPP:

16    Q.   Do you know?

17    A.   Yes, I know.

18    Q.   Okay.  And was there some effort?

19    A.   Yes, Mayor McGinn.

04:08p 20    Q.   All right.  Let's look at 175 (sic).

21         Let's look at Page 2 of 165 and can you explain --

22              THE COURT:  Let me -- I think you said 175 and it's

23    165?

24              MR. RAPP:  I corrected it.  It's 165 for the record.

04:08p 25    BY MR. RAPP:

```
 1   Q.   This is Page 2.  Is this also an e-mail exchange between

 2   you and Pamela Robinson?

 3   A.   It's another marketing e-mail reaching out to Pamela

 4   Robinson.
```

04:08p   5
```
              MR. RAPP:  Move to admit 165.

 6            MS. BERTRAND:  Objection.  Hearsay, lack of

 7   foundation.

 8            THE COURT:  Let's say some more foundation,

 9   Mr. Rapp.
```

04:08p 10
```
              MR. RAPP:  All right.

11   BY MR. RAPP:

12   Q.   Let's look at the first page of 165.  Do you see the

13   e-mail and the date of the e-mail?

14   A.   Yes.
```

04:09p 15
```
     Q.   And is this -- do you know that this is an e-mail between

16   carl@backpage and Pamela Robinson?

17   A.   Yes, I wrote the e-mail and then had the ad text -- the

18   e-mail text approved by Scott Spear before sending out.

19   Q.   All right.  And then the above response, even though it
```

04:09p 20
```
     has it redacted out, do you know that this was a response from

21   Pamela Robinson?

22   A.   Yes.

23   Q.   All right.

24            MR. RAPP:  Move to admit 165.
```

04:09p 25
```
              MR. FEDER:  Object to this.  Look at this exhibit,
```

1    Your Honor.  One little blurb says July 14 of 2012.  Then the

2    next little blurb says July 14 of 2011, and on the other

3    page --

4            MR. RAPP:  Judge, there's no speaking objections.

04:10p  5    These are speaking objections.

6            THE COURT:  Wait, wait, let --

7            MR. FEDER:  So foundation, relevance, hearsay.

8            MS. BERTRAND:  I'll add 403.

9            THE COURT:  Mr. Rapp, can you make that a little

04:10p  10   larger for -- for my eyes?

11           MR. RAPP:  Sure, of course I can.

12           THE COURT:  Can you move down a page or is that the

13   entirety --

14           MR. RAPP:  Oh, I'm sorry.

04:10p  15           THE COURT:  I guess if you can lay some foundation,

16   Mr. Rapp, with regard to the time period of the e-mail --

17           MR. RAPP:  Okay.

18           THE COURT:  -- that would perhaps overcome the

19   objection.

04:11p  20           MR. RAPP:  All right.

21   BY MR. RAPP:

22   Q.   Mr. Ferrer, do you remember sending this -- this e-mail?

23   A.   Yes, I do.

24   Q.   How is it that you remember that, sir?

04:11p  25   A.   Because I wrote the e-mail and I programmed it to be sent

1   out with our e-mail service provider.

2   Q.   Why -- why were you sending this -- this e-mail out?

3   A.   Because I gathered e-mail addresses in the Backpage

4   database that did not have an active ad.

04:11p  5   Q.   All right.  And why were you doing that?  Why were you

6   doing that?

7   A.   Because it was one of our marketing initiatives to reach

8   out to users whose ads had expired but they had not renewed,

9   and this was something that we did on a regular basis, once a

04:11p  10   quarter.

11   Q.   Did you do this in all the categories on backpage.com?

12   A.   We did do it in all the categories, but the bulk was

13   adult.

14   Q.   Adult.  And within the adult what was the -- was there a

04:12p  15   particular category that you were focused on?

16   A.   Well, of course, the revenue makers in female escorts;

17   but this posting is under job wanted résumé posting.

18   Q.   All right.  But does this somehow make its way to Pamela

19   Robinson?

04:12p  20   A.   It does.  I sent it on July 14th, 2011, and then she

21   replies back.

22   Q.   All right.

23            MR. RAPP:  Before you read that, move to admit 165.

24            THE COURT:  It may be admitted.

04:12p  25            MR. FEDER:  Same objection.

1    THE COURT:  Our court reporter can't hear you,

2  Mr. Feder.  Is your microphone on?

3    MR. FEDER:  I'm sorry, I must have turned it on --

4  off.  There's a -- the names are not on this e-mail, Judge.

04:13p  5  So there's no way of knowing who it is.

6    THE COURT:  Well, let me -- let me verify.

7    Mr. Rapp, you've disclosed the e-mail to counsel.

8    MR. RAPP:  Yes.

9    THE COURT:  And in that e-mail was the address

04:13p  10  redacted or unredacted?

11    MR. RAPP:  I believe it was redacted, but I believe

12  I can clear this up with Mr. Ferrer.

13    THE COURT:  Yeah, and let me -- let me just say, I

14  think, Members of the Jury, the general practice often is to

04:13p  15  -- for example, black out a Social Security number,

16  identifying information generally and so -- but that is my

17  assumption; but, Mr. Rapp, you can clarify that.

18    MR. RAPP:  Sure.

19  BY MR. RAPP:

04:13p  20  Q.   How -- how is it that you know that this is from the

21  Pamela Robinson you've been e-mailing previously, having

22  e-mail exchanges?

23  A.   It includes the title of her ad, the exact same title of

24  the ad that she's been running for years.

04:14p  25  Q.   All right.  And is she -- is she also asking any of the

1    same questions that she had in the previous e-mails?

2    A.   It's the exact same problem that she's had.

3    Q.   All right.

4         MR. RAPP:  Move to admit 165 and publish it.

04:14p 5         THE COURT:  Yes, it may be admitted and published.

6         MR. RAPP:  Thank you.

7         (Exhibit No. 165 admitted in to Evidence.)

8    BY MR. RAPP:

9    Q.   So -- so the jury knows what we're talking about, is the

04:14p 10   bottom part of this, is this what you were referring to about

11   -- that was sent out as some type of a marketing program?

12   A.   Yes.

13   Q.   And then up here what does -- do you learn that Pamela

14   Robinson actually received this marketing e-mail?

04:15p 15   A.   Yes.

16   Q.   And what does she say to you -- at carl@backpage, what

17   does she say to you regarding her postings?

18   A.   "would you please take the edit block off my ad, I need

19   to change some info on it and update it.  I promise i won't

04:15p 20   put no more nude pics on it, you have my word.  Thank you."

21        "my e-mail address for the ad is...and my ad says:  50

22   red roses special- dont miss out" in the escorts section."

23   Q.   All right.  Now moving to 168.

24        Now, you receive -- is this yet another e-mail that you

04:16p 25   receive from Pamela Robinson in -- now in 2012?

```
 1  A.   Yes.

 2           MR. RAPP:  Move to admit 168.

 3           THE COURT:  Yes, 168 may be admitted.

 4           (Exhibit No. 168 admitted in to Evidence.)

04:16p  5  BY MR. RAPP:

 6  Q.   And then what does she say to you in 168?

 7  A.   Pamela Robinson writes, "Carl:  I would like to know why

 8  my ad in the escort section of backpage keeps getting messed

 9  with.  I am not posting any obscene pics and someone keeps

04:16p 10  erasing the link to my pics on my ad."

11  Q.   Let me just stop you there.  Do you know -- what did that

12  mean to you when she says about "erasing the link to my pics

13  in my ad"?

14           MS. BERTRAND:  Objection, calls for speculation.

04:16p 15  BY MR. RAPP:

16  Q.   What did you take that to mean?

17  A.   It's a --

18           THE COURT:  Let me sustain the objection.

19           You can rephrase, if you can.

04:17p 20  BY MR. RAPP:

21  Q.   What did you take -- is that something that you would

22  receive from other posters --

23           MS. BERTRAND:  Objection.

24           MR. RAPP:  -- that complaint?

04:17p 25           MS. BERTRAND:  Objection, leading.  Objection, seeks
```

1    hearsay.

2            THE COURT:  Overruled.  He can answer if that was

3    something he received from other posters.

4            THE WITNESS:  Yes, posters complained about links

04:17p   5    being removed in their ads.

6    BY MR. RAPP:

7    Q.   All right.  And what is the specific complaint Pamela

8    Robinson has with the removal of the link here in her posting?

9    A.   It was linked to a site so that she could include nude

04:17p  10    images.

11   Q.   All right.  And was -- was that removed from her posting?

12   A.   We removed the link -- we, the moderation team, removed

13   the link because if you click the link, you went to nude

14   images.

04:18p  15   Q.   All right.  And then what does she go on to say?

16   A.   I forget our place again.

17   Q.   It's right -- it's right -- right here.

18   A.   "that is so wrong.  I am being deprived of income that I

19   sorely need to make to keep me from being evicted out of my

04:18p  20   house and to pay my bills.  I want to know what the problem is

21   because i don't see one.  There are other women posting pics

22   on their ads that show more nudity than you allow and someone

23   keeps taking my link off of my ad?

24           (That link goes straight to my other ad where the pics

04:18p  25   are that you dont allow and thats the only way I can get

```
 1   people to see my pics.)
 2        This does not make any sense whatsoever and I want to
 3   know WHY it keeps happening.  I am not doing anything wrong at
 4   all.  My ad is currently under the phone number of
04:19p  5   253 581 2021 in the Tacoma, WA edition of backpage in the
 6   Escorts section.  The title of it is:  50 Red roses special -
 7   don't miss out!! and my account email is
 8   clprovider4you@yahoo.com.  Please advise.  thank you."
 9   Q.   All right.  Let's look at 169a.  Do you -- is 169 -- do
04:19p 10   you pass this along -- 169a, thank you.
11        Do you pass this along to anybody else within Backpage?
12   A.   Yes.
13   Q.   All right.  And who does this ultimately end up with?
14             MS. BERTRAND:  Objection, this seeks hearsay and
04:20p 15   he's not part of these e-mail streams that I see.
16             MR. RAPP:  Well --
17             THE COURT:  Yes, I'll sustain until you can lay some
18   foundation for -- I think he said he sent it along, but if it
19   relates to this chain that's the -- I think that's the
04:20p 20   question, Mr. Rapp.
21             MR. RAPP:  Right.
22   BY MR. RAPP:
23   Q.   Do you -- do you recognize the names in the -- the
24   e-mails on this -- on this e-mail?
04:20p 25   A.   Yes, I do and Shawn Rogers is the man handling Better
```

         1   Business Bureau reports that come in to the company.

         2   Q.   All right.  And how do you know that?

         3   A.   Because we've had quite a few of them, and so Shawn

         4   Rogers will send that complaint to -- to -- it used to come to

04:21p   5   me, now to Andrew.

         6   Q.   All right.  And then does it eventually -- is there

         7   another person who is endorsed on this e-mail chain?

         8            MS. BERTRAND:  Objection, leading in to the term

         9   "endorsed."

04:21p  10            THE COURT:  Yes.  What do you -- what do you mean by

        11   "endorsed," I guess?

        12   BY MR. RAPP:

        13   Q.   Is there another e-mail address on this that you

        14   recognize?  Is there another -- is there another e-mail

04:21p  15   address other than Shawn Rogers?

        16   A.   Yes, Ray Ronan.

        17   Q.   Okay.  And then anybody else?

        18   A.   And Andrew Padilla.

        19   Q.   Okay.  All right.

04:22p  20            MR. RAPP:  Move to admit 169a.

        21            MS. BERTRAND:  Objection, lack of foundation under

        22   801(d)(2)(E) as to Mr. Rogers and Mr. Ronan.

        23            THE COURT:  Yes, maybe lay some more foundation,

        24   Mr. Rapp.

04:22p  25   BY MR. RAPP:

```
 1    Q.   Does this cause Mr. Rogers to do something with this
 2    complaint that he gets from Pamela Robinson?  Does he -- does
 3    that cause him to do something, to send it to somebody else?
 4               MS. BERTRAND:  Objection, leading.  Calls for
 5    speculation as to what someone else did and their intent
 6    behind it.
 7               THE COURT:  Sustained, Mr. Rapp.
 8    BY MR. RAPP:
 9    Q.   All right, let me just ask this:  Does Mr. Padilla do
10    anything that you know of with respect to this Pamela Robinson
11    complaint?
12               MS. BERTRAND:  Same objection, leading.
13               THE COURT:  If he knows, he can answer.
14    BY MR. RAPP:
15    Q.   Do you know?
16    A.   Yes, I am aware that Andrew is handling this Better
17    Business Bureau complaint.
18    Q.   All right.  From Pamela Robinson?
19    A.   Yes.
20    Q.   Okay.  Now, have you -- have you in preparation for your
21    testimony today looked at the -- the postings for Pamela
22    Robinson?
23    A.   I have.
24    Q.   And do you know approximately how many there are?
25    A.   How many postings?
```

04:22p (line 5)
04:22p (line 10)
04:22p (line 15)
04:23p (line 20)
04:23p (line 25)

```
 1   Q.   How many postings?  Did she post frequently?

 2   A.   There are many, yes, many postings.

 3   Q.   And do they span a particular time frame?

 4   A.   Yes, over years.

 5   Q.   Okay.  And so how do you know those postings are from

 6   backpage.com -- that were posted on Backpage.com, how do you

 7   know that?

 8   A.   I know it by the look and feel of the screenshots of a

 9   Backpage posting, by the fields of data that are used, how

10   it's organized, how the footer looks, how the header looks.

11   Q.   All right.  And have you looked at Exhibits 504 through

12   513?

13   A.   Yes, I have.

14   Q.   And are all of those exhibits postings by Pamela

15   Robinson?

16   A.   Yes.

17            MS. BERTRAND:  Objection, calls for speculation as

18   to who posted it.

19   BY MR. RAPP:

20   Q.   Well, how do you know it comes from her?

21   A.   We reviewed these ads.  I've seen the ads, and they're

22   the Pamela Robinson ads.  I can identify by her ad title,

23   e-mail address used, if it's disclosed, and the pictures.

24   Q.   All right.

25            MR. RAPP:  Move to admit United States 504 through
```

04:24p (line 5)
04:24p (line 10)
04:25p (line 15)
04:25p (line 20)
04:25p (line 25)

 1   513.

 2              MS. BERTRAND:  Objection, hearsay.

 3              THE COURT:  Overruled.

 4              MS. BERTRAND:  403, lack of foundation.

04:25p  5       THE COURT:  Overruled.

 6              504 through 513 may be admitted.

 7              (Exhibit Nos. 504 - 513 admitted in to Evidence.)

 8              MR. RAPP:  All right, let's try to go quickly

 9   through this.  On your screen -- and request permission to

04:26p 10   publish 504 through 513.

11              THE COURT:  Yes, they may be published.

12   BY MR. RAPP:

13   Q.   All right.  And is this one of the Pamela Robinson

14   e-mails -- or postings rather, sorry?

04:26p 15   A.   Yes, it is.

16   Q.   And how do you identify it as a Backpage posting?

17   A.   Well, it's got -- how do I identify it as a Backpage

18   posting?  It's got the bread crumb up in the logo at the top.

19   We call it the header, and then below the header it's got the

04:26p 20   bread crumb, which is backpage.com, greater sign, washington

21   adult entertainment, greater sign, washington escorts.

22        It's got the title.  That click here is a feature to be

23   able to email the user.  It also has the posting ID at the

24   very bottom of the ad text underneath the location Tacoma.

04:27p 25   Q.   All right.  And so let's look at 505.  Is this also a

CARL FERRER - CONT'D DIRECT EXAMINATION BY MR. RAPP       107

1  Pamela Robinson posting on Backpage?

2  A.   Yes, it is.

3  Q.   And is this -- so just going -- just quickly back to 504

4  looking at the date, I don't believe I asked you about that,

04:27p  5  but is that -- what's the date of this posting?

6  A.   Posted Monday, January 27th, 2014.

7  Q.   And same with 505, what is the date of the posting?

8  A.   Thursday, February 6th, 2014.

9  Q.   And looking at 506, what is the date of the Pamela

04:28p 10  Robinson posting?

11  A.   Sunday, April 20th, 2014.

12  Q.   And 507, what's the date of the Pamela Robinson Backpage

13  posting?

14  A.   Wednesday, May 7th, 2014.

04:28p 15  Q.   And just by the way the e-mail exchange with her that --

16  about the link to her pictures, is that found anywhere on this

17  posting?

18  A.   Yes.

19  Q.   Is it where I've highlighted here?

04:28p 20  A.   Yes, it is.  She puts more pictures and info and then a

21  link to a third-party site.

22  Q.   All right.  And then 508, when was this posted?

23  A.   Saturday, May 31st, 2014.

24  Q.   509?

04:29p 25  A.   Tuesday, July 1st, 2014.

```
 1   Q.    510?

 2   A.    Tuesday, August 19th, 2014.

 3   Q.    511?

 4   A.    Thursday, February 26, 2015.

 5   Q.    512?

 6   A.    Sunday, September 13th, 2015.

 7   Q.    513?

 8   A.    Saturday, November 28th, 2015.

 9   Q.    All right.

10          MR. RAPP:  Your Honor, I'm about to go into a

11   completely different area -- well, it looks like we're at the

12   4:30 mark but...

13          THE COURT:  All right.  So, Members of the Jury, we

14   are at a natural breaking point.  I know from time to time I

15   told you I would ask about the Friday schedule, and so if you

16   would just think about it I might go a little longer to make

17   up for some of the time we lost today and last week.

18          If you could consult your schedules and in the

19   morning just let Liliana know.  If you could go beyond the

20   noon hour, we might just go about 12:30 or so just to make up

21   for some of that lost time; but, again, I remind you of the

22   admonishment and not to come to any conclusions or to discuss

23   the matter, do any research, but just simply have a good

24   evening break and we'll see you ready to come in sharply at

25   9:00.  Please all rise for the jury.
```

04:29p  (line 5)
04:29p  (line 10)
04:30p  (line 15)
04:30p  (line 20)
04:30p  (line 25)

UNITED STATES DISTRICT COURT

1          (Jury out at 4:30 p.m.)

2          THE COURT:  All right, we will stand in recess.

3          MR. PANCHAPAKESAN:  Your Honor, this is

4  Mr. Panchapakesan.

04:31p  5          THE COURT:  Yeah, can you speak into the microphone.

6          MR. PANCHAPAKESAN:  Sure, I'll come up.

7          I just want a quick clarification.  Maybe the

8  Government will clarify.  Exhibit 1185 or the CNN exchange, I

9  understood that the end of that e-mail -- I think it's bottom

04:31p  10  of Page 5 into 6 was supposed to come in.  I don't know if it

11  did.  I thought that we might have stopped at Page 4.  So I

12  just wanted to make sure that the record was accurate as to

13  the exhibit the Court said would come in.

14          THE COURT:  Let me look at what -- and I don't have

04:32p  15  it on the bench.  Let me look at what I recall that I told the

16  Government, and I'll clarify that in the morning because it is

17  an important point but I do recall there was -- at the top of

18  the page, I think in the very last page, I permitted the

19  exhibit to be unredacted because it was the mere testimony of

04:32p  20  what Mr. Ferrer had produced earlier on the stand.

21          The content that I recall redacting completely was

22  related to that inquiry about the St. Louis case or something

23  of that nature.

24          MR. BERRY:  Your Honor, if I could -- perhaps what

04:33p  25  the defense and I can do is I will -- I've already tried one

1   redaction of it and then I'm not sure I quite got it right.

2   So I want to double-check it, and I can work with

3   Mr. Panchapakesan this evening and go back and forth and make

4   sure that we are redacting it the way we think the Court

04:33p  5   suggested that we should do -- or ordered that we should do.

6           Then we can submit that in the morning for approval,

7   and if it needs to be redacted again I can do that again.

8   It's not that hard.  I just want to get it right.

9           THE COURT:  So let me just also clarify here.  It

04:33p 10   was a bit confusing because I wrote a hand note to myself.

11   Mr. Rapp introduced at first 1185a, and then he started

12   referencing Page 2, Page 3, Page 4.

13          So I have an 85a, an 85a2, a3 and a4 that I wrote

14   down in my notes, and so let's go ahead and verify the

04:34p 15   appropriate exhibit to go back to the jury.

16          This also begs the question that I had in the back

17   of my mind to raise with you.  Please at the end of the day

18   before you leave if you could meet with Liliana and confirm

19   with her your understanding of the exhibits that have been

04:34p 20   admitted on the day.

21          Let's do that on a day-by-day basis rather than

22   waiting to the end of the week or at the end of trial.  It

23   will make things much more manageable, and you'll be all on

24   the same page.  So if you could remember to do that and bring

04:34p 25   that to my attention in the morning to clarify.

1          MR. BERRY:  Absolutely, Your Honor.

2          And just to be clear, on 1185a when were you saying

3   the 1, 2, 3 after the 1185a, that was Mr. Rapp referring to

4   the page number of what's going to be 1185a.  So it's still

04:35p  5   going to be called 1185a.  We're just going to do with the

6   redactions the way you want them done.

7          THE COURT:  Okay, thank you.

8          Does that address your issue, Mr. Panchapakesan?

9          MR. PANCHAPAKESAN:  That's all, Your Honor, thank

04:35p 10   you.

11          THE COURT:  Okay, thank you.

12   *(Whereupon the proceedings concluded at 4:35 p.m.)*

13

14

0:0:0 15

16

17

18

19

0:0:0 20

21

22

23

24

0:0:0 25

UNITED STATES DISTRICT COURT

*REPORTER'S CERTIFICATION*

1

2

3         I, TERI VERES, do hereby certify that I am duly

4 appointed and qualified to act as Official Court Reporter for

5 the United States District Court for the District of Arizona.

6         I FURTHER CERTIFY that the foregoing pages

7 constitute a full, true, and accurate transcript of all of

8 that portion of the proceedings contained herein, had in the

9 above-entitled cause on the date specified therein, and that

10 said transcript was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 15th of

12 September, 2023.

13

14                         s/Teri Veres
                        TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT