1                    **UNITED STATES DISTRICT COURT**

2                    **FOR THE DISTRICT OF ARIZONA**

3                    _____

4
   **United States of America,**          )
5                                          )
                              Plaintiff,   )
6   vs.                                    )
                                           )  2:18-cr-00422-DJH
7   **Michael Lacey, et al.,**             )
                                           )
8                             Defendants.  )
                                           )  September 15, 2022
9   _____   )

10

11

12          **BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

13          <u>**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**</u>

14                    **(Testimony of CARL FERRER)**

15                         **JURY TRIAL DAY 7**

16

17

18

19

20

21  Official Court Reporter:
    **Elaine Cropper, RDR, CRR, CCP**
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, SPC 35
23  Phoenix, Arizona  85003-2151
    elaine_cropper@azd.uscourts.gov
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

                    United States District Court

2:18-cr-00422-DJH, September 15, 2022 (Ferrer excerpt)

**I N D E X**

**TESTIMONY**

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Government's Witnesses | | | | |
| CARL FERRER | 7 | | | |

**E X H I B I T S**

| Number | | Ident | Rec'd |
|---|---|---|---|
| 73 | Email from Ferrer to Hyer and Padilla, 11/17/2010 | 19 | 20 |
| 605 | Email from Spear to H Nigam, re Polaris Project feedback, 10/18/2010, | 30 | 30 |
| 616a | Redacted version of Exh 616 | 11 | 13 |
| 630 | Email from H Nigam, "Interview Request", 12/30/2010, | 36 | 37 |
| 633 | | | 45 |
| 637 | Emails between Spear, Lacey and Ferrer, on Lyon Ads and NCMEC Reporting, 01/22/2011, | 45 | 46 |
| 638 | Emails between Lacey and Ferrer on NCMEC Reporting, 01/22/2011, | 50 | 50 |
| 641 | Google Analytics report showing referral traffic for Backpage.com for the month ended 01/31/2011, | 66 | 66 |
| 643 | Issue log for "Deep cleaning strip out", 12/02/2010 to 02/07/2011, | 25 | 26 |
| 644 | Emails between H Nigam and Ferrer, "Backpage?", 02/14/2011, | 69 | 70 |
| 645 | Emails between Ferrer and Padilla, "delete whole ad terms (draft)", 02/16/2011, | 72 | 72 |

United States District Court

2:18-cr-00422-DJH, September 15, 2022 (Ferrer excerpt)

1        **E X H I B I T S** (Continued)

2    Number                                          Ident   Rec'd

3    646     Email from Vaught, "Edit Lock Out",      74      76
             02/18/2011,
4
     647     Email from Padilla "another term bites   78      84
5            the dust", 02/18/2011,

6    647a                                                     84

7    647b                                                     84

8    647c                                                     84

9    647d                                                     84

10   647e                                                     84

11   648     PowerPoint presentation, "Backpage.com   86
             and Litle & Co. Business Review",
12           02/24/2011,

13   684a                                                     97

14   1021    Emails from Spear and Larkin, "meeting    8       8
             tomorrow" 10/13/2010,
15
     1052b1  Clip from Exhibit 1052                    60      62
16
     1062    Email from Ferrer, "cnn demand           54      55
17           letter", 01/24/2011,

18   1062a   Attachment, Ad titled "New BooTy in      56      57
             ToWn",
19
     1611    Email from Myles to Spear, Ferrer,       34      35
20           "introduction", 12/08/2010,

21   1612b   Email from Ferrer to Spear, "Fwd:        88      88
             stricter guidelines for nudity –
22           January 2011", 01/17/2011,

23   2038    Email sent by Brunst, "response letter   64
             to cnn", 02/01/2011,
24

25

                    United States District Court

2:18-cr-00422-DJH, September 15, 2022 (Ferrer excerpt)

## MISCELLANEOUS NOTATIONS

| Item | Page |
|---|---|
| Motion for Mistrial | 107 |
| Judge's ruling | 108 |

## RECESSES

| | Page | Line |
|---|---|---|
| (Recess at 10:40; resume at 11:03.) | 53 | 13 |

United States District Court

2:18-cr-00422-DJH, September 15, 2022 (Ferrer excerpt)

1                          **A P P E A R A N C E S**

2

For the Government:
3                    **KEVIN M. RAPP, ESQ.**
                     **PETER S. KOZINETS, ESQ.**
4                    **ANDREW C. STONE, ESQ.**
                     **MARGARET WU PERLMETER, ESQ.**
5                    U.S. Attorney's Office
                     40 N, Central Ave., Ste. 1800
6                    Phoenix, AZ  85004-4408
                     kevin.rapp@usdoj.gov
7                    peter.kozinets@usdoj.gov
                     andrew.stone@usdoj.gov
8                    margaret.perlmeter@usdoj.gov

9                    **AUSTIN M. BERRY, ESQ.**
                     U.S. Department of Justice
10                   Child Exploitation and Obscenity Section
                     1301 New York Ave., NW, 11th Fl.
11                   Washington, D.C.  20005
                     austin.berry2@usdoj.gov

12

13   For the Defendant Michael Lacey:
                     **PAUL J. CAMBRIA, JR., ESQ.**
14                   Lipsitz Green Scime Cambria, L.L.P.
                     42 Delaware Ave., Ste. 120
15                   Buffdalo, NY  14202
                     pcambria@lglaw.com

16

17   For the Defendant Scott Spear:
                     **BRUCE S. FEDER, ESQ.**
18                   Feder Law Office, P.A.
                     2390 E. Camelback Road, Ste. 160
19                   Phoenix, AZ  85016
                     bf@federlawpa.com

20
                     **ERIC W. KESSLER, ESQ.**
21                   Kessler Law Office
                     6720 N. Scottsdale Rd., Ste. 210
22                   Scottsdale, AZ  85253
                     eric.kesslerlaw@gmail.com

23

24

25


                     United States District Court

2:18-cr-00422-DJH, September 15, 2022 (Ferrer excerpt)

1                **A P P E A R A N C E S** (Continued)

2     For the Defendant John Brunst:
                   **GARY S. LINCENBERG, ESQ.**
3                  Bird Marella Boxer Wolpert Nessim Drooks
      Lincenberg & Rhow, P.C.
4                  1875 Century Park E. Ste. 2300
                   Los Angeles, CA  90067
5                  glincenberg@birdmarella.com

6     For the Defendant Andrew Padilla:
                   **DAVID S. EISENBERG, ESQ.**
7                  David Eisenberg, P.C.
                   3550 N. Central Ave., Ste. 1155
8                  Phoenix, AZ  85012
                   david@deisenbergplc.com

9
      For the Defendant Joye Vaught:
10                 **JOY MALBY BERTRAND, ESQ.**
                   Joy Bertrand, Esq., L.L.C.
11                 P.O. Box 2734
                   Scottsdale, AZ  85252-2734
12                 joy@joybertrandlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

                  United States District Court

CARL FERRER - Direct

### **P R O C E E D I N G**

1          (The following excerpt was separately transcribed.)

2          (CARL FERRER, a witness herein, was previously duly

3  sworn or affirmed.)

4           **DIRECT EXAMINATION** (Continued)      09:18:36

5  BY MR. RAPP:

6  Q.   Good morning, Mr. Ferrer.

7  A.   Good morning, Mr. Rapp.

8  Q.   When we left last evening, we had gone through the

9  postings for this individual by the name of Pamela Robinson.  09:18:47

10  A.   Yes.

11  Q.   So just one last question.  In your exchanges with Pamela

12  Robinson, what was your intent?

13  A.   We wanted her to just follow the rules, try to post again

14  and then stop emailing us in support.  She was just relentless  09:19:11

15  over the years, just violating the rules, we would let her back

16  in, violate the rules again, block her from editing her ad.  So

17  the strategy was very much like we had done with all of the

18  other advertisers in Female Escort sections.  They would get a

19  pass.  They wouldn't be banned if they posted ads violating the  09:19:37

20  rules.  They would get to try again.

21  Q.   All right.  Now in the latter part of 2010 did you

22  continue to receive pressure from outside agencies regarding

23  Backpage.com?

24  A.   Yes.  09:20:06

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   I'm showing you for your eyes only United States 1021?   Do | 09:20:07 |
| 2 | you see that? | |
| 3 | A.   Yes, I do. | |
| 4 | Q.   And is this an email from Mr. Larkin to Mr. Spear? | |
| 5 | A.   Yes, it is. | 09:20:25 |
| 6 | Q.   And were you copied on it? | |
| 7 | A.   Yes, I am copied. | |
| 8 | MR. RAPP:  Move to admit 1021. | |
| 9 | MR. FEDER:  Same. | |
| 10 | THE COURT:  Overruled.  It may be admitted. | 09:20:38 |
| 11 | (Exhibit Number 1021 was admitted into evidence.) | |
| 12 | MR. RAPP:  And request permission to publish. | |
| 13 | THE COURT:  It may be published. | |
| 14 | MR. RAPP:  Thank you. | |
| 15 | BY MR. RAPP: | 09:20:51 |
| 16 | Q.   During this time period, were you meeting with Mr. Larkin | |
| 17 | and Mr. Spear? | |
| 18 | A.   Yes. | |
| 19 | Q.   What does Mr. Larkin tell Mr. Spear in this email?  Can | |
| 20 | you read that for the jury? | 09:21:04 |
| 21 | A.   Jim Larkin writes, "Scott:  As I mentioned this afternoon | |
| 22 | I would like to sit down with you and Carl when you guys | |
| 23 | coalesce your thoughts on how we are going to change up | |
| 24 | Backpage.com rules for posters to gain these hypocritical AG's | |
| 25 | 'blessing'." | 09:21:26 |

CARL FERRER - Direct

1  Q.   Let me just stop you there.  What did you take that to                      09:21:32

2  mean from Mr. Larkin?

3  A.   We're wondering what additional cosmetic changes we're

4  going to need to do in order to get the AGs to stop sending us

5  letters to take down the site -- take down the escort site.      09:21:51

6  Q.   And then what else does he say there?

7  A.   "We need to take a deep breath before we throw the baby

8  out with the bathwater and take our time to consider all of our

9  options.  Thanks Larkin."

10  Q.   So I believe you have testified previously to that          09:22:15

11  statement.  But what did you take that to mean, take a deep

12  breath before we throw the baby out with the bathwater?  What

13  did you take that to mean with Mr. Larkin?

14  A.   We had the meeting and it was communicated that we need to

15  push back with some of these recommendations and the changes    09:22:41

16  for the posting rules and the content.

17  Q.   Why did you want to push back?

18  A.   Because we don't want to kill the business.  Revenue is

19  exceeding expectations.  We're not going to keep putting in

20  these changes if it impacts the revenue, if it hurts our        09:23:02

21  advertisers in the Female Escort section.

22  Q.   All right.  Now, following this email did you and

23  Mr. Spear have occasion to meet regarding this directive from

24  Mr. Larkin?

25  A.   We did.                                                     09:23:31

United States District Court

10

CARL FERRER - Direct

1    Q.   And during those meetings, did you discuss any type of       09:23:32

2    strategy to implement Mr. Larkin, as the owner, his directive

3    in this email?

4    A.   Yes.   I discussed the tools and we came to an agreement on

5    some of the tools and how they would work and not throw the       09:23:47

6    baby out with the bathwater.

7    Q.   Can you give us an example of how you would go about doing

8    that to implement this objective of not throwing the baby out

9    with the bathwater?

10   A.   I explained the success we were having with the global       09:24:06

11   filter in terms of banning certain terms and that users being

12   alerted to the banned term and then making adjustments in their

13   postings and continuing to post.   I also communicated the use

14   of strip out, how we could just simply strip out the term

15   shortly after the posting goes live, and that we were not        09:24:28

16   blocking, banning ads that were posting prostitution ads.   We

17   weren't blocking the users.   We didn't block their email

18   address.   We didn't block their credit card.   We let them try

19   to post again following the posting rules giving users time to

20   adjust.                                                           09:24:54

21   Q.   Was there any discussion about just shutting down the

22   Adult section?

23   A.   No.

24   Q.   All right.   We looked at an email I believe yesterday and

25   I can pull it up if you need to but do you remember the email     09:25:10

United States District Court

CARL FERRER - Direct

1   from Litle?                                                      09:25:13

2   A.   Yes, I do.

3   Q.   And 2010, in the latter part of 2010 did you still have

4   concerns about your banking relationships?

5            MS. BERTRAND:   Objection.   Leading.                   09:25:36

6            THE COURT:   Sustained.

7   BY MR. RAPP:

8   Q.   Did you have any concerns about banking?

9            MS. BERTRAND:   Same objection.

10           THE COURT:   Sustained.                                 09:25:42

11  BY MR. RAPP:

12  Q.   What concerns, if any, did you have in the latter part of

13  2010?

14  A.   We were concerned that we could lose our merchant account

15  with Litle.                                                      09:25:49

16  Q.   Why was that a concern?

17  A.   Because there were numerous media events, negative

18  coverage on Backpage's -- there were numerous prostitution

19  arrests and stings.

20  Q.   Let's look at 616a.  Do you see that on your screen?       09:26:09

21  A.   Yes, I do.

22  Q.   Is this an email from Scott Spear?

23  A.   Yes, it is.

24  Q.   And who is the email to?

25  A.   He's emailing an employee at BMO, Bank of Montreal.        09:26:39

United States District Court

CARL FERRER - Direct

1    Q.   All right.  And who is copied on this email?                                09:26:48

2    A.   Jed Brunst.

3    Q.   And did you know whether or not Backpage had any type of a

4    banking relationship with BMO during this time period?

5    A.   Yes.                                                                         09:27:02

6    Q.   And what is BMO?

7    A.   BMO is the treasury bank for the company.  It's where the

8    checks from Litle would be deposited or the wire transfers.

9             MR. RAPP:  Move to admit 616a.

10            MR. LINCENBERG:  Objection.  No objection to 616 but        09:27:26

11   we certainly object to 616a which is an incomplete version of

12   the email correspondence.

13            MR. FEDER:  Also same objections.

14            THE COURT:  Is 616 the unredacted version, Mr. Rapp?

15            MR. RAPP:  It is.                                                         09:27:44

16            THE COURT:  And I guess let me inquire if you can

17   answer, is there a reason that you're not introducing 616 as

18   opposed to 616a?

19            MR. RAPP:  Because the redacted version is hearsay.

20            THE COURT:  Oh.  I see.  Okay.                                           09:28:04

21            MR. LINCENBERG:  616a, the redacted version, is

22   admissible because it's not hearsay.  It's not offered for the

23   truth.  616a is the response to the initial email.  It's out of

24   context without the initial email.

25            THE COURT:  Well, he's permitted to introduce and         09:28:22

United States District Court

CARL FERRER - Direct

1   bring that in and you can discuss it in your examination of the    09:28:25
2   witness.
3           All right.  Go forward.  Overruled.
4           MR. RAPP:  And so admitting 616a and request
5   permission to publish.    09:28:41
6           THE COURT:  Yes.  It may be published.
7           COURTROOM DEPUTY:  And it's admitted.
8           THE COURT:  Yes.
9           (Exhibit Number 616a was admitted into evidence.)
10  BY MR. RAPP:    09:29:01
11  Q.   All right.  What is Mr. Spear telling this individual from
12  BMO bank?  Can you read what he says?
13  A.   Scott Spear writes, "Mary Lee, No problem.  Here it is in
14  a nutshell:
15          "We suspended the following categories in personals:    09:29:25
16  Women seeking men, NSA, ("No Strings Attached") and Missed
17  Connections.  In addition we eliminated all images from the
18  Adult jobs category in the Adult Services Section."
19  Q.   Let me stop you there.  What do you take that to mean,
20  what Mr. Spear, with Mr. Brunst copied on this, is telling the    09:29:44
21  representatives from BMO?
22          MR. FEDER:  Same.
23          MS. BERTRAND:  Calls for speculation.
24          MR. LINCENBERG:  And I object.  It just highlights
25  all of the hearsay and now out of context without the preceding    09:30:02

United States District Court

CARL FERRER - Direct

1   email.                                                              09:30:05

2              MR. RAPP:  May I be heard on that?

3              THE COURT:  I'm going to overrule the objection.  He

4   can answer as to what he took that to mean.

5              THE WITNESS:  So we -- Scott Spear, Jim Larkin, and     09:30:25

6   myself, we had decided to shut down some categories, Women

7   Seeking Men, No Strings Attached, Missed Connections, because

8   we needed to appear like we were doing something in our user

9   safety PR campaign and so this is an example of it.  We're

10  communicating with the bank that we've shut down these           09:30:53

11  categories and we've created the impression that we're shutting

12  down Adult categories.  But in fact, there are no -- there's

13  very, very little revenue in these categories.  So the whole

14  thing is a sham.  Female Escort, Body Rubs, that's the bulk of

15  the revenue and the ad count and page views and we did not shut  09:31:15

16  down those categories.

17             MR. LINCENBERG:  Your Honor, I'm going to object to

18  the narrative and move to strike.  It's beyond what was asked

19  in the question.

20             THE COURT:  I'm going to overrule.                     09:31:30

21  BY MR. RAPP:

22  Q.   What does Mr. Spear tell the individual at BMO bank, with

23  Mr. Brunst copied on this email, what does he say in the next

24  paragraph?

25  A.   "We plan on bringing the Women Seeking Men category back    09:31:42

CARL FERRER - Direct

| | |
|---|---|
| 1 | by the first of the year.  At that time all posts in that | 09:31:47 |
| 2 | category will have a charge associated with them.  In addition |
| 3 | all posts in that category will be moderated (reviewed) by |
| 4 | staffers before they go live to ensure that they comply with |
| 5 | our Terms of Use." | 09:32:05 |
| 6 | Q.   Let me stop you there.  What did you take that to mean, |
| 7 | what Mr. Spear was communicating to her about the moderation |
| 8 | practice? |
| 9 |        MR. FEDER:  Same.  Relevance, 403. |
| 10 |        THE COURT:  Overruled. | 09:32:24 |
| 11 |        MR. FEDER:  I'm sorry.  106, too. |
| 12 |        THE COURT:  Overruled. |
| 13 |        You may answer. |
| 14 |        THE WITNESS:  We bring back the Women Seeking Men |
| 15 | category which has little or no content.  We're going to also | 09:32:35 |
| 16 | moderate those ads and we're going to charge a fee. |
| 17 | BY MR. RAPP: |
| 18 | Q.   Well, is it your testimony that there was little or no |
| 19 | content in that category? |
| 20 |        MR. FEDER:  Same. | 09:32:59 |
| 21 |        THE COURT:  Sustained. |
| 22 |        Mr. Rapp? |
| 23 | BY MR. RAPP: |
| 24 | Q.   If you know, why was there no content in that category or |
| 25 | little? | 09:33:08 |

CARL FERRER - Direct

```
 1            MS. BERTRAND:  Leading.  Objection.  Leading.        09:33:11

 2            THE COURT:  Sustained.

 3            You can ask him if he knows and then follow up.

 4   BY MR. RAPP:

 5   Q.   Do you know?                                             09:33:17

 6   A.   Yes, I know.

 7   Q.   Why?

 8   A.   Because I'm very much aware of the revenue by each

 9   category daily, weekly, monthly, and annually.

10   Q.   All right.  And did you -- knowing that, did you come to 09:33:34

11   some opinion as to why there was little to no content in those

12   categories?

13   A.   The page view traffic, Johns were looking mainly in Female

14   Escorts so that's where prostitutes would post their ads.  Now,

15   some wanted to save money and would post in the Personal        09:33:57

16   categories but not very many.  Not only that, we were trying to

17   keep prostitutes out of Personals, one of Scott Spear's

18   directives, so that no hourly rates should be charged in that

19   category.

20   Q.   All right.  And this last sentence of that second full     09:34:20

21   paragraph?

22   A.   "This is the same operating standard we have set for all

23   the categories in the Adult section."

24   Q.   What did you take that to mean?

25            MR. FEDER:  Same.                                      09:34:38
```

CARL FERRER - Direct

1      THE COURT:  Overruled.                                    09:34:39

2      THE WITNESS:  We're charging in all categories of the

3   Adult section and we are moderating by staffers.

4   BY MR. RAPP:

5   Q.  And can you read the next paragraph?                     09:34:56

6   A.  "We do not plan to bring back either NSA or Missed

7   Connections.  Both categories were full of inappropriate

8   content, spam, and scams and we feel its not in the site's best

9   interest or our users interests to keep these categories."

10  Q.  What did you take that statement to mean, that paragraph  09:35:17

11  to mean?

12      MR. FEDER:  Same.

13      THE COURT:  Overruled.

14      THE WITNESS:  Once again, it's a sham.  It gives the

15  impression that we're shutting down these problematic          09:35:28

16  categories.  But these categories have little or no content.

17  They are really -- they are just easy to just say, okay, we'll

18  shut down that category.  But they don't have any volume to

19  them.

20  BY MR. RAPP:                                                   09:35:48

21  Q.  And quickly, can you just explain, for the jury's

22  edification, what NSA or Missed Connections, what would that

23  category involve?

24  A.  So No Strings Attached was a category that Backpage had to

25  try to compete with Craigslist's Casual Encounters.  It's sort  09:36:02

CARL FERRER - Direct

1   of supposed to be dating where it's -- let's just say dating,          09:36:06

2   that -- it's the opposite of match.com.  And Missed

3   Connections, that's kind of an old-fashioned category that used

4   to appear in the newspapers that if you saw somebody in a

5   grocery store and you wanted to post again that "I saw you but      09:36:36

6   I forgot to get your number."  So in these categories, rarely

7   were there postings.

8   Q.   All right.  And even on the rare postings, did you charge

9   in those categories?

10  A.   I don't believe we charged in Missed Connections or NSA.      09:37:00

11  Q.   And then with the paragraph starting "All images," can you

12  read that paragraph?

13  A.   "All images have been or are being removed from Adult

14  jobs.  We will keep that standard in place going forward as we

15  finish our review of the category.  We found that many images     09:37:21

16  were inappropriate and unnecessary for this section and will

17  limit it to text only posting in the future.  This will be

18  complete in the next few weeks."

19  Q.   All right.  And what did you take that to mean?

20          MR. FEDER:  Same.                                           09:37:44

21          THE COURT:  Overruled.

22          THE WITNESS:  Once again, we're doing nothing.  It

23  sounds like we're doing something but we're just removing

24  images from a category that really shouldn't have images.  This

25  is a text-heavy category where you would say I have jobs at        09:37:57

United States District Court

CARL FERRER - Direct

| | |
|---|---|
| 1 | these strip clubs or that these, you know, come be at this -- | 09:38:02 |
| 2 | make porn videos.  But often prostitutes would post there.  So |
| 3 | by eliminating images, we will eliminate any kind of |
| 4 | prostitution ads appearing there. |
| 5 | BY MR. RAPP: | 09:38:23 |
| 6 | Q.   In 2010, did you tell your bank that you had this |
| 7 | relationship with The Erotic Review? |
| 8 | A.   We did not. |
| 9 | Q.   Why didn't you do that? |
| 10 | A.   Well, it would be a good way to lose a bank account. | 09:38:41 |

1   these strip clubs or that these, you know, come be at this --        09:38:02

2   make porn videos.  But often prostitutes would post there.  So

3   by eliminating images, we will eliminate any kind of

4   prostitution ads appearing there.

5   BY MR. RAPP:                                                          09:38:23

6   Q.   In 2010, did you tell your bank that you had this

7   relationship with The Erotic Review?

8   A.   We did not.

9   Q.   Why didn't you do that?

10  A.   Well, it would be a good way to lose a bank account.            09:38:41

11  Q.   Why do you believe it would be a good way to lose a bank

12  account?

13  A.   We wouldn't share our marketing activities with financial

14  institutions.  It's -- it's -- well, it's more than -- it just

15  wouldn't be self-serving.  It would be bad for business.            09:39:04

16  Q.   All right.  Did you believe that you would lose your

17  banking if you disclosed those strategies?

18  A.   Yes.

19            MR. RAPP:  All right.  Let's look at, for the

20  witness's eyes only, Exhibit 73.                                    09:39:28

21  BY MR. RAPP:

22  Q.   Is this an email from you to Andrew Padilla and Dan Hyer?

23  A.   Yes, it is.

24  Q.   All right.  And do you recall this email?

25  A.   Yes, I do.                                                      09:39:57

United States District Court

CARL FERRER - Direct

1   Q.   And is this in November of 2010?                              09:39:58

2   A.   Yes it is.

3            MR. RAPP:  Move to admit 73.

4            THE COURT:   73 is admitted.

5            MR. RAPP:  And publish.                                   09:40:10

6            THE COURT:  And publish.

7            (Exhibit Number 73 was admitted into evidence.)

8   BY MR. RAPP:

9   Q.   All right.  Can you just in general terms, can you tell

10  the jury what the subject of this email is?                        09:40:22

11  A.   I'm providing Andrew Padilla and Dan Hyer a summary of the

12  changes that we're going to implement in terms of content from

13  the meetings that I'm having with Scott Spear, Jim Larkin, in

14  Building B.

15  Q.   All right.  Can you read the message that you're giving to    09:40:48

16  Mr. Padilla here starting at the top?

17  A.   "The consensus is that we took a big step in the right

18  direction.  The content looks great.  Our goal is to tame the

19  content down even further while keeping good content users.

20  Police be ready to discuss tomorrow.                               09:41:10

21          "Items to I agree to implement.

22          "1, more banned terms.

23          "a. 'xxx' - strip it out as even a partial term b,

24  wet - strip out as a whole term c, Lolita - ban or strip out

25  (it is code for under aged girl d, pregnant - strip out term."     09:41:36

United States District Court

CARL FERRER - Direct

1          Number two, "Remove ads changes.  Pregnant ads.      09:41:44

2          "3, Pricing.  They agree 30 minutes can be in massage

3    ads (body rubs)."

4    Q.   Let me just stop you there.  Was this a new change?

5    A.   Yes.  This is backtracking.  We're going backwards on some   09:42:04

6    moderation standards.  We had been at an hour.  Now we're going

7    to go back to 30 minutes in body rubs.

8    Q.   And do you know what the reason is for that?

9    A.   Yes.  It just wasn't a practical solution for the body

10   rubs category especially.  Many, many users were putting in a   09:42:30

11   menu of pricing suggestive of one hour, 30 minutes, you know,

12   or 15 minutes.  They are doing it anyway.  So we might as well

13   let them use 30 minutes.

14   Q.   Okay.  And then go on?

15   A.   "I said we can not separate massage into separate queues   09:42:54

16   (but maybe I should)" -- excuse me I read that wrong.  "I said

17   we can not separate massage into separate queues (but maybe I

18   should).  But it is bad policy to have 30 minutes in escorts."

19   Q.   Let me stop you.  Why was it bad policy?

20   A.   It defeats that plausible deniability of companionship.   09:43:18

21   Q.   Can you explain that plausible deniability of

22   companionship, what does that mean?

23   A.   If time was less than one hour, then it sounded more like

24   a prostitution ad instead of escort companion ad.

25   Q.   All right.  And when you say a plausible deniability on   09:43:47

CARL FERRER - Direct

1   this companionship, was this companionship, was that a claim          09:43:51

2   that Backpage was trying to make to outside entities?

3            MS. BERTRAND:  Objection.  Leading and compound

4   question.

5            MR. LINCENBERG:  Objection.                                  09:44:09

6            THE COURT:  Sustained as to both.

7   BY MR. RAPP:

8   Q.   Let's go on.  Pick up where you left.

9   A.   "They think pricing numbers by themselves should be left

10  alone.  $80/$120/$240.   120/240.                                     09:44:24

11           "They just want quickees, 15 minutes, and 30 minutes.

12  I need a list of examples to get approved by scott."

13  Q.   Let me just stop you there.  Is this -- who is Scott?

14  A.   Scott Spear.

15  Q.   And at this time, any changes in terms of terms, did it          09:44:50

16  have to be approved by Mr. Spear?

17  A.   Yes.

18  Q.   And can you go on?

19  A.   "I should make the API a priority with Cybertipline.

20           "We can come up with a FAQ for users posting in              09:45:15

21  adult."

22  Q.   Let me stop you there.  FAQ means?

23  A.   Frequently asked questions.

24  Q.   Why would you come up with frequently asked questions or

25  posters in the Adult section, why would you do that?                  09:45:36

United States District Court

CARL FERRER - Direct

1  A.   The posting rules and the allowable content standards are          09:45:39

2  just continually changing.  It's chaotic for users and

3  unpredictable and many complaints in -- sent to support at

4  Backpage.com.

5  Q.   And so why would you try to answer their frequently asked          09:45:56

6  questions?

7  A.   So that users would -- posting in the Family Escorts

8  category would self-censor.

9  Q.   And what do you mean by self-censor?

10  A.   That they wouldn't have to contact Support; that they             09:46:13

11  could read and see these terms are allowed, these terms are not

12  allowed and then they could creates their ad accordingly.

13  Q.   All right.  And then the next.

14  A.   "We should include time date stamp on admin objects for

15  subpoenas."                                                            09:46:48

16  Q.   All right.  The next one?

17  A.   "Move to 500 characters max. (ASAP)".

18  Q.   Why did you have to do that ASAP?

19  A.   We really found that the longer the ad, the more likely a         09:47:05

20  prostitute might use terms that were not allowed in the Female

21  Escorts category and we had discussions about whether we should

22  even create a drop-down menu with choices on the posting form

23  but something Scott Spear wanted to do to help with the

24  plausible deniability.  But instead of doing that, we decided

25  to start with just not allowing the ads to be so long.                 09:47:29

United States District Court

CARL FERRER - Direct

1  Q.   All right.  And then number eight?                              09:47:34

2  A.   "Ban nipples (dec 1).

3            "Almost all ads have breasts covered."

4  Q.   All right.  And who was making that change?

5  A.   Big change, Scott Spear.                                        09:47:51

6  Q.   And then, finally, number nine?

7  A.   "Kill TER links in ads on Jan 1 - But allow users to put

8  is TER IDs (just no live links)."

9  Q.   Why were you doing that?

10 A.   We had a lot of pressure from the Attorneys General and        09:48:27

11 other NGOs to remove the links to the prostitution review site

12 The Erotic Review and we had just delayed it as long as we

13 possibly could.  And so on January 1 we'll kill those links,

14 meaning we'll just run a script through every single ad and

15 we'll just strip it out, but we're going to still allow users    09:48:57

16 to put in the six-digit number and some abbreviation to TER so

17 that it might say TER and then the "check out my reviews TER"

18 and then the ID.  That way we don't completely destroy the

19 relationship with The Erotic Review.

20 Q.   Do you know how somebody looking at a posting that if it       09:49:25

21 no longer had the link in it, do you know how they would be

22 able to find the person posted in that ad on The Erotic Review?

23            MR. CAMBRIA:  Calls for speculation.

24            THE REPORTER:  I'm sorry.  Who said speculation?

25            MS. BERTRAND:  Mr. Cambria did and I was going to        09:49:52

United States District Court

CARL FERRER - Direct

1   join.                                                              09:49:55

2           THE COURT:  I think just sustained because it's a

3   compound question.  You asked two separate questions.  So you

4   may reask one question, have the witness answer if he can.

5   BY MR. RAPP:                                                       09:50:10

6   Q.   How would somebody looking at an ad find a poster on The

7   Erotic Review just with the ID in the ad?

8           MS. BERTRAND:  Objection.  Calls for speculation.  In

9   fact I think it's the same question.

10          THE COURT:  Well, overruled based on the witness's        09:50:23

11  prior testimony about his knowledge.

12          THE WITNESS:  The ad says highly reviewed and then

13  the ID number.  Possibly it also has TER.  For Johns they know

14  that's The Erotic Review.  They take that ID number, they go to

15  The Erotic Review.  They search by ID number.  They find the     09:50:46

16  prostitution review.  So it's a little couple of extra steps

17  for the consumer of the prostitution ads; but they are very

18  much aware that when it says "highly reviewed" and then an ID

19  number that The Erotic Review is the place to go.

20          MR. RAPP:  All right.  Let's look at 643.                 09:51:08

21  BY MR. RAPP:

22  Q.   Can you identify this email?

23  A.   Yes.  This is a task that is scheduled in Mantis for the

24  developers.

25  Q.   And when did this -- when did -- are you giving direction    09:51:30

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | on this task? | 09:51:34 |
| 2 | A.   I reported the task and assigned the task. | |
| 3 | Q.   All right.  And did this take place in February of 2011? | |
| 4 | A.   Yes, it does. | |
| 5 | MR. RAPP:  Move to admit 643. | 09:51:47 |
| 6 | THE COURT:  It may be admitted and published. | |
| 7 | (Exhibit Number 643 was admitted into evidence.) | |
| 8 | BY MR. RAPP: | |
| 9 | Q.   And so just going down here, can you just read what you're | |
| 10 | asking them to do? | 09:52:06 |
| 11 | A.   "Deep cleaning strip out. | |
| 12 | "Description:  Remove the terms below from every old | |
| 13 | ad in the database. | |
| 14 | "Restrict removal of terms to these categories: | |
| 15 | FemaleEscorts, MaleEscorts, Bodyrubs, Domination, | 09:52:24 |
| 16 | TranssexualEscorts. | |
| 17 | "Deep clean tripped out terms:  1/2 hour, 1/2 hr, 15 | |
| 18 | min, 15 minute, 15/mins, 15min," with no space, "15minute," | |
| 19 | with no space, "30 min, 30/mins, 30," no space, "min, 3B-& 1J." | |
| 20 | Q.   And the last one? | 09:53:09 |
| 21 | A.   "@N@L".  It's code for anal. | |
| 22 | Q.   Oh.  All right.  Why are you doing this? | |
| 23 | A.   We are going to sanitize the site, especially the old ads. | |
| 24 | These terms are blocked but they are in old ads in the | |
| 25 | database.  And if they just move the ad at the top, it won't go | 09:53:35 |

United States District Court

27

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | through the moderation queue.  So we're constantly having ads | 09:53:38 |
| 2 | go live that violate the posting rules because the ad text was | |
| 3 | created months prior.  So this deep cleaning will sanitize the | |
| 4 | site and the content and otherwise we would have to do it | |
| 5 | manually and there's just a million ads that can't be done | 09:54:01 |
| 6 | manually. | |
| 7 | Q.   What's causing you to do this? | |
| 8 | A.   We're continuing to be under pressure from media, | |
| 9 | Government organizations, non-Government organizations and | |
| 10 | we're also prepping for I believe a meeting with NCMEC. | 09:54:28 |
| 11 | Q.   And what I've highlighted, what does that mean? | |
| 12 | A.   Yeah.  When I read it, I can't remember, it's code for | |
| 13 | something and we didn't like it.  I really can't remember what | |
| 14 | it is. | |
| 15 | Q.   Okay.  Fair enough.  Let's just go on to a couple of other | 09:54:52 |
| 16 | pages in 643 and is it fair to say that on 643, page two, is | |
| 17 | this a long list of terms? | |
| 18 | A.   Yes, it is. | |
| 19 | Q.   And in the interest of time, what are all of these terms | |
| 20 | indicative of? | 09:55:17 |
| 21 | A.   These terms, most of these terms are indicative of a sex | |
| 22 | act. | |
| 23 | Q.   All right.  And then going to 643-3, same? | |
| 24 | A.   Yes, the same. | |
| 25 | Q.   And indeed just to highlight a couple.  These three at the | 09:55:35 |

United States District Court

CARL FERRER - Direct

| 1 | top, can you tell us what those are? | 09:55:44 |

2  A.   "GFE, girl friend experience, girlfriend experience."

3  Q.   And then going to 643, page four, who else was involved in

4  this project?

5  A.   The developers and Andrew Padilla.                       09:56:08

6  Q.   And are you telling him who is giving you directions here

7  on this?

8            MR. EISENBERG:  Objection, Your Honor.  It's leading.

9            THE COURT:  Sustained.

10  BY MR. RAPP:                                                  09:56:28

11  Q.   Well, can you just read where I've highlighted?

12  A.   I write, "The reason why this is important is 'links to

13  other ads by this user' will often have bad content.  So, Scott

14  Spear wants me to kill links 'to other ads by this user' but

15  our users love it.                                            09:56:49

16        "So, best to do the deep cleaning and not kill a

17  valuable feature."

18  Q.   All right.  And down here, is this a statement by

19  Mr. Padilla?

20  A.   Yes.                                                     09:57:16

21  Q.   What is he saying?

22  A.   "I've attached an updated list of terms sets for strip

23  out."

24  Q.   And then what does he say down here?

25  A.   "Yes.  All of those terms are already set as Strip Term  09:57:26

CARL FERRER - Direct

1   From Ad filters."                                                          09:57:33

2   Q.   Now, I believe you just testified that you were doing this

3   in anticipation of some type of meeting.   Do you know what that

4   involved?

5   A.   Let me just one second.   You know, it's either a meeting     09:57:56

6   or we're cleaning it up for a major media event.

7   Q.   All right.   And at this time, are you aware of some type

8   of media event.

9   A.   This -- this may be where CNN is in touch with us and may

10  be publishing an investigation.                                     09:58:20

11        MR. EISENBERG:   Your Honor, I move to strike because

12  the witness does not have an actual knowledge to answer that

13  question.

14        MS. BERTRAND:   Join.   The witness is speculating per

15  his own words.                                                      09:58:40

16        MR. RAPP:   Maybe I can clear this up.

17        THE COURT:   Well, I'll overrule it because -- well,

18  let me just -- I'll overrule the objection but, Mr. Rapp, just

19  lay some foundation, please.

20  BY MR. RAPP:                                                        09:58:59

21  Q.   At this point, had you received emails from CNN?

22  A.   Yes, we have.

23  Q.   And was that a concern to you?

24  A.   Very much a concern.

25  Q.   How about to the ownership?                                    09:59:10

United States District Court

CARL FERRER - Direct

| 1 | A.   They were involved in the contact from CNN and in | 09:59:15 |

1    A.   They were involved in the contact from CNN and in

2    preparation to deal with it.

3    Q.   All right.  And so let me just show you 605.  Do you

4    recognize this email?  It's a two-page email -- well, there's

5    not much on page two, is there.  Do you recognize this email?

6    Are you copied on this email?

7    A.   Yes, I am.

8    Q.   Is this -- does this email also include Mr. Lacey?

9    A.   Yes, it does.

10   Q.   And Mr. Spear?

11   A.   Yes.

12   Q.   Is the subject matter of this meeting or the subject

13   matter rather of this email a meeting with Polaris?

14   A.   Yes, it is.

15           MR. RAPP:  And move to admit Exhibit 605.

16           MR. FEDER:  Same.

17           THE COURT:  Overruled.  It may be admitted.

18           (Exhibit Number 605 was admitted into evidence.)

19           MR. RAPP:  And publish.

20           THE COURT:  It may be published.

21           MR. RAPP:  Thank you.

22   BY MR. RAPP:

23   Q.   So, first of all, did you come to learn what Polaris was?

24   A.   Yes, I did.

25   Q.   What is Polaris?

09:59:15

09:59:44

10:00:10

10:00:30

10:00:41

10:00:50

United States District Court

CARL FERRER - Direct

A.   Polaris is an anti-human trafficking organization.

Q.   Was there some kind of a meeting with Polaris at some point in 2011?

A.   Yes, there was.

Q.   Was that meeting, do you know how that meeting was arranged?

A.   Yes, I do.

Q.   Can you tell the jury how that was arranged?

A.   Our user safety consultant Hemanshu Nigam set up meetings for us in Washington, D.C., with non-Government organizations. One of them was Polaris.

Q.   And in this email below, can you read what Mr. Nigam is telling you, Mr. Spear, and Mr. Lacey?

A.   "I received a call from Brad Myles, CEO of the Polaris Project.  You will recall that Polaris project is one of the NGOs that had harsh criticism for Craigslist.  Myles said that he thought BP was taking the right steps but didn't understand why the escort category was not placed under review especially since that was the place where most of the prostituting of women and children was taking place by violent pimps.  He said the NGO community was aligned on their belief about this and that they will be stating to the press their concern.  I explained what BP was doing in the escort area to clean out the illegal ads.  He said he looked in Washington, DC, where he is and easily found many illegal ads.  I stressed the need for a

32

CARL FERRER - Direct

1    national task force to which he agreed the NGO community would          10:02:57

2    like to participate in, so that the industry could better

3    understand how to spot the illegal activity and set best

4    practice standards.

5              "I don't know if they have spoken to any reporters           10:03:16

6    but it is something to be aware of -- the question of why other

7    sections were closed but not the escorts area will be publicly

8    raised by the NGO and AG community."

9    Q.   Let me just stop you there.  What is he referring to

10   there?                                                                 10:03:34

11   A.   Well, this is the sham where he shut down some Personal

12   categories but did not shut down where the -- the female

13   escorts categories and the other categories like Body Rubs,

14   Transsexuals, Escorts.

15   Q.   And then what does he say in the next paragraph.                   10:03:53

16   A.   "I know we are working quickly to clean up escorts, but we

17   may need a stronger response to media and NGOs if they call

18   than just that.  Perhaps we can reactively announce that you

19   are engaged in discussions with third party vendors who can

20   work 24/7 to make sure this area stays legit in addition to the        10:04:14

21   already triple resources you are putting on it."

22   Q.   That last sentence, what did you take that to mean?

23              MR. FEDER:  Same.

24              THE COURT:  I'm sorry.  Did somebody say something?

25              MR. FEDER:  Same.  Sorry.                                    10:04:41

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  Overruled. | 10:04:42 |
| 2 | THE WITNESS:  He wants -- Hemu Nigam wants the | |
| 3 | company to hire a vendor that he's recommending in Florida to | |
| 4 | do moderation in addition to the vendor that we already have, | |
| 5 | third-party vendor we already have doing moderation. | 10:04:59 |

BY MR. RAPP:

Q.   All right.  And how would that help rid the Female Escort section of prostitution, if you know?

A.   It would not.  It might remove some problematic words but it's not going to eliminate prostitution ads.

Q.   And is this what Mr. Nigam has in this paragraph, is this forwarded up to Mr. Lacey and Mr. Spear?

A.   Yes.

Q.   All right.  And then does Mr. Spear say anything in response?  What does he say in response to Mr. Nigam?

A.   "Hemu.  Absolutely and true.  We need to get your Florida-India connection hooked up with Carl as soon as possible.  The quicker the better to get that train moving."

Q.   Did that ever happen?

A.   Yes, it did.

Q.   You hired a Florida-based moderation vendor?

A.   My supervisor wanted me to hire them so we hired them, even though they didn't have equipment and they seemed to be pretty disorganized.  I went ahead and moved forward.

Q.   Do you remember what the name of that Florida-based vendor

CARL FERRER - Direct

1  is?

2  A.   I would have to see the email to recall the name.

3  Q.   That's fine.  Did they remain conducting moderation for

4  Backpage?

5  A.   For a little while but once Hemu was put on a back shelf,

6  we terminated our agreement with the Florida moderation

7  company.

8  Q.   What do you mean by Hemu put -- I heard shelf but I didn't

9  get the first part of that?

10  A.   It was put on a back shelf.

11  Q.   Put on a back shelf.  What do you mean by that?

12  A.   We no longer were going to take his advice.  That would

13  happen sometime after the NCMEC meetings that went so terribly.

14  Q.   Okay.  Looking at 1611 for your eyes only, do you recall

15  this email?

16  A.   I do.

17  Q.   And is this a -- let's see. it's a two-page email.  Is the

18  subject matter of this email a meeting with Polaris?

19        MS. BERTRAND:  Objection.  Leading.

20        THE COURT:  Sustained.

21  BY MR. RAPP:

22  Q.   What's the subject matter of this email?

23  A.   An introduction and conversation with Polaris.  We're

24  setting up meetings.

25  Q.   All right.  And is Mr. Spear on this email?

10:06:48

10:06:59

10:07:16

10:07:44

10:08:02

10:08:16

CARL FERRER - Direct

1    A.    Yes, he is.                                                          10:08:20

2              MR. RAPP:  Move to admit 1611.

3              MR. FEDER:  Same.  Same.

4              THE COURT:  Overruled.

5              It may be admitted.                                             10:08:26

6              (Exhibit Number 1611 was admitted into evidence.)

7    BY MR. RAPP:

8    Q.    All right.  And on your recollection, who within Backpage

9    is sort of taking the lead on, if there is somebody taking the

10   lead on, setting up this meeting with Polaris?                            10:08:38

11   A.    Scott Spear.

12   Q.    And what does Mr. Spear -- let's go to page two.  What

13   does Mr. Myles say to Mr. Spear on December 6, 2010?

14   A.    "Dear Scott, Thank you for your email, and for Carl's as

15   well.  Thanks also to Hemu for the introduction.  I'm sorry for          10:09:14

16   the delay in responding, as I've been out on a bit of travel

17   and am backed up on email correspondence.  If we were to try

18   and schedule a phone call first, the following are some times

19   on Wednesday, 12/8 when I'm available this week."

20   Q.    All right.  Let me just stop you there.  Do you recall if          10:09:37

21   there is a phone call with Mr. Myles relating to a meeting with

22   them?

23   A.    I don't recall the phone call.

24   Q.    But in any event, does Mr. Spear respond to Mr. Myles?

25   A.    Yes.                                                                10:10:08

CARL FERRER - Direct

Q.   Okay.  And then going to page one, is there ultimately a        10:10:09
meeting set up with Polaris in 2011?

A.   Yes, there is.

Q.   Okay.  And is there also a meeting set up with this
organization that we have been referring to called NCMEC?          10:10:40

A.   Yes.  The meeting for NCMEC in the morning, Polaris in the
afternoon.

Q.   All right.  And who -- with respect to NCMEC, did NCMEC
want to meet with Backpage or did Backpage want to meet with
NCMEC?  Who wanted to meet with whom?                              10:11:03

A.   I was the opinion Backpage wanted to meet with NCMEC
because we spent so much time preparing a PowerPoint to show
NCMEC.

Q.   All right.  And that PowerPoint, did you also, during the
meeting for Polaris, did you show Polaris that same PowerPoint     10:11:27
if you recall?

A.   Yes.

Q.   Okay.  Let's go on to another area here.  Let me show you
630 for the witness's eyes only.

        Do you recognize this email that has Mr. Spear and         10:12:07
Mr. Lacey on it?

A.   Yes, I do.

Q.   And do you recognize sort of the subject matter of this
email?

A.    It's an interview request.                                   10:12:22

United States District Court

CARL FERRER - Direct

Q.    Okay.  And let's go to page two.  Do you recognize this
Backpage posting that was provided to you?

A.    Yes, I do.

Q.    How is it that you recognize this Backpage posting?

A.    Because either I or my staff found this posting after we
were alerted to it with the CNN broadcast.

Q.    All right.

        MR. RAPP:  Move to admit 633.

        THE COURT:  I'm sorry?

        MS. BERTRAND:  Objection.

        THE COURT:  Was this 630 or 633?

        MR. RAPP:  I'm sorry, 630.

        MS. BERTRAND:  Objection.  Hearsay.

        MR. CAMBRIA:  I agree.  *Crawford*.

        THE COURT:  Overruled.

        630 may be admitted and published.

        (Exhibit Number 630 was admitted into evidence.)

BY MR. RAPP:

Q.    All right.  Let's just start -- all right.  Let's just
start up here.  Can you read what Mr. Nigam is telling
Mr. Spear and Mr. Lacey?

A.    "Hi, all.  After Carl and Simrin's review, and Jamie's and
my final editing to make it PR friendly, we have created the
final backgrounder document.  As we discussed on the call
today, please send the below email and attached PDF document to

United States District Court

10:12:24
10:12:48
10:13:07
10:13:22
10:13:55
10:14:23

38

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Amber Lyon at 12noon Phoenix/2 p.m." eastern time. | 10:14:26 |
| 2 | Q.   All right.  And this reference to the Backpage safety and | |
| 3 | security backgrounder, can you explain to the jury what that is | |
| 4 | a reference to? | |
| 5 | A.   That's a summary of our changes that we're making on the | 10:14:50 |
| 6 | site that we've already made or plan to make.  And it really is | |
| 7 | just a sham. | |
| 8 | Q.   Okay.  Why is the security backgrounder a sham in your | |
| 9 | view? | |
| 10 | A.   Because it's full of all of this general user safety | 10:15:14 |
| 11 | security information.  It's just a PR fluff piece and then | |
| 12 | we're shutting down categories that have little or no content. | |
| 13 | It's just meant to -- it's another example of a slow dance | |
| 14 | document.  We're doing something here.  We're getting better | |
| 15 | but we're really not doing anything. | 10:15:40 |
| 16 | Q.   All right.  And are there occasions where you provide this | |
| 17 | security backgrounder to various organizations. | |
| 18 | MS. BERTRAND:  Objection.  Leading. | |
| 19 | THE COURT:  Overruled. | |
| 20 | THE WITNESS:  We are going to -- I know that the | 10:16:00 |
| 21 | Backpage safety and security backgrounder, it's used with | |
| 22 | multiple organizations anytime there's a negative media event | |
| 23 | and it's used with banks and processors.  It really is an | |
| 24 | important document that we use in the company. | |
| 25 | \\\ | |

United States District Court

CARL FERRER - Direct

BY MR. RAPP:                                                    10:16:25

Q.    Okay.  Did the safety and security backgrounder, did it

contain any reference to the relationship you had with The

Erotic Review?

A.    No.                                                      10:16:38

Q.    Did it include any reference to the relationship you had

with super posters?

A.    It did not.

Q.    Did it detail your aggregation efforts early on in the

inception of Backpage?                                         10:16:58

A.    It did not.

Q.    Why didn't it?

A.    Would not be the narrative that we were striving for which

was kind of -- it would be too much of a disclosure.  It would

make it look like we had been very active in creating an        10:17:17

enterprise that would logically inherit the prostitution ads

from Craigslist.

            MR. RAPP:  All right.  Could I have that published

again?  This is 630.

BY MR. RAPP:                                                    10:17:44

Q.    And so what does Hemu -- Mr. Nigam, what does he tell

Mr. Lacey and Mr. Spear about Amber Lyon's efforts to speak

with somebody at Backpage?  What does he tell Mr. Lacey and

Mr. Spear here?  Can you read that?

            MR. CAMBRIA:  Your Honor, this is a                10:18:06

United States District Court

40

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | mischaracterization.  There's several people listed on this. | 10:18:07 |
| 2 | This isn't an exclusive to Lacey and Spear. | |
| 3 | THE COURT:  Well, I'll sustain, Mr. Rapp.  I guess | |
| 4 | you can read all or have Mr. Ferrer read all of the people who | |
| 5 | are on the email. | 10:18:21 |
| 6 | MR. RAPP:  All right. | |
| 7 | BY MR. RAPP: | |
| 8 | Q.   Who else is Mr. Nigam telling about this contact by Amber | |
| 9 | Lyon. | |
| 10 | A.   Jim Larkin, Steve Suskin, Scott Spear, Michael Lacey, and | 10:18:33 |
| 11 | Jamie Schumacher. | |
| 12 | Q.   And what is Mr. Larkin's role at the time with Backpage? | |
| 13 | A.   He's the CEO. | |
| 14 | Q.   And does he have an ownership interest? | |
| 15 | A.   Yes.  He's majority owner. | 10:18:54 |
| 16 | Q.   And Mr. Spear is -- what's his ownership interest in | |
| 17 | Backpage? | |
| 18 | A.   He's a minority owner. | |
| 19 | Q.   And how about Mr. Lacey? | |
| 20 | A.   He's the majority owner, too, I think he has the most | 10:19:12 |
| 21 | ownership. | |
| 22 | Q.   And we talk about Jamie Schumacher, I believe earlier in | |
| 23 | your testimony, but just to remind the jury, why is she copied | |
| 24 | on this? | |
| 25 | A.   She's a PR employee associated with Hemanshu Nigam. | 10:19:27 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   What does Hemu tell these individuals? | 10:19:39 |

2          MR. CAMBRIA:   Mr. Suskin?

3   BY MR. RAPP:

4   Q.   Okay.   Steve Suskin, who is that?

5   A.   Steve Suskin is in-house counsel, Village Voice Media.   10:19:46

6   Q.   So can you read what Mr. Nigam is telling them about Amber

7   Lyon's efforts to speak with somebody?

8   A.   "Hi all, this is actually the third time she has reached

9   out and each time we have declined the request through Steve.

10  In the last reach out related to the lawsuit and prosecution of   10:20:14

11  the pimp in St. Louis, we provided a basic statement which

12  resulted in minor coverage of the Backpage.com side of the

13  story and a major focus on the pimp getting a lean sentence in

14  a plea deal.

15          "It looks like she's planning to run another story.   10:20:34

16  This time, we think it is best to respond with our statement

17  below and also point the reporter to the backgrounder that we

18  have attached so that she can have more substance to utilize

19  that positions Backpage.com in the best light.

20          "Please review the backgrounder and let us know if   10:20:55

21  you have any questions so we can edit prior to Steve sending

22  it."

23  Q.   Did you come to learn that Amber Lyon wanted to interview

24  somebody at Backpage?   Did you receive any information on that?

25          MS. BERTRAND:   Objection.   Compound question.   10:21:21

CARL FERRER - Direct

1    THE COURT:  Sustained.  Just ask one question, Mr.                10:21:22
2  Rapp.
3  BY MR. RAPP:
4  Q.   Did you learn that Amber Lyon wanted to interview somebody
5  at Backpage?                                                        10:21:30
6  A.   Yes.  She emailed us with that request.
7  Q.   And did you agree to conduct an interview with her in your
8  capacity?
9  A.   It's way over my pay grade and I'm not going to do it.
10  Q.   Do you know who agreed to sit for an interview with          10:21:47
11  Ms. Lion in anticipation of this is story she was doing?
12  A.   No one agreed.
13  Q.   Mr. Lacey didn't agree?
14  A.   No, he did not.
15  Q.   Mr. Spear didn't agree?                                       10:22:06
16  A.   No, he did not.
17  Q.   Did the clear and convincing financial officer,
18  Mr. Brunst, did he agree?
19  A.   No, he did not.
20  Q.   Now, let me show you 633 for your eyes only.                  10:22:25
21       Do you recognize this posting?
22  A.   I do.
23  Q.   How is it, sir, that you recognize this posting?
24  A.   Because I either found this posting myself or I asked
25  staff to find it and they gave it to me.  It's a posting that      10:22:48

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | came out of the Backpage database of an ad that was posted by | 10:22:50 |
| 2 | CNN, Amber Lyon. | |
| 3 | Q.   All right.   And how do you know that?   How do you know | |
| 4 | that she posted this? | |
| 5 | A.   We could see the ad on screen and she mentioned the name | 10:23:04 |
| 6 | Winter and we did a search in the city that she had posted in | |
| 7 | and we were able to locate the ad. | |
| 8 | Q.   When you say you saw the posting on screen, what are you | |
| 9 | talking about? | |
| 10 | A.   I thought during the video she talked about where she was | 10:23:36 |
| 11 | posting the ad and what she was putting in her video. | |
| 12 | Q.   All right.   So did you -- did you do this at some point | |
| 13 | after -- well, did she broadcast a story on Backpage? | |
| 14 | A.   Yes.   She -- well, I'm sorry. | |
| 15 | Q.   Did CNN do a story on Backpage? | 10:23:55 |
| 16 | A.   Yes.   They broadcast a story.   I know I watched the story | |
| 17 | and others in the company. | |
| 18 | Q.   How do you know that others in the company watched it? | |
| 19 | A.   Because we were -- we, Scott Spear, myself, Jim Larkin, we | |
| 20 | were unhappy with the broadcast. | 10:24:14 |
| 21 | Q.   Did you have conversations with Mr. Spear and Mr. Larkin | |
| 22 | about the broadcast? | |
| 23 | A.   Yes. | |
| 24 | Q.   What was the nature of the discussion that you and | |
| 25 | Mr. Spear and Mr. Larkin had regarding the broadcast? | 10:24:35 |

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   Well, a couple -- | 10:24:42 |
| 2 | MR. FEDER:  Same. | |
| 3 | THE COURT:  Overruled. | |
| 4 | THE WITNESS:  Discussion one with Scott Spear is we | |
| 5 | discussed how much traffic went up when it was broadcast on | 10:24:53 |
| 6 | CNN.  We had record traffic.  The story on CNN was the | |
| 7 | equivalent to a Super Bowl commercial. | |
| 8 | BY MR. RAPP: | |
| 9 | Q.   All right.  You -- | |
| 10 | MR. FEDER:  Move to strike. | 10:25:10 |
| 11 | THE COURT:  Overruled. | |
| 12 | BY MR. RAPP: | |
| 13 | Q.   You and Mr. Spear had this conversation after the | |
| 14 | broadcast? | |
| 15 | A.   Yes. | 10:25:16 |
| 16 | Q.   How did you know that the traffic had increased after the | |
| 17 | broadcast of this CNN story on Backpage? | |
| 18 | A.   Google Analytics. | |
| 19 | Q.   All right.  Well, just getting back here before I get too | |
| 20 | far afield, 633 -- | 10:25:31 |
| 21 | MR. RAPP:  Move to admit 633. | |
| 22 | MR. FEDER:  Same. | |
| 23 | THE COURT:  Overruled. | |
| 24 | MS. BERTRAND:  Relevance and *Crawford v. Washington* | |
| 25 | confrontation. | 10:25:42 |

United States District Court

CARL FERRER - Direct

1          THE COURT:  Overruled as previously discussed, 401,    10:25:43

2   and it may be admitted and it may be published.

3          (Exhibit Number 633 was admitted into evidence.)

4   BY MR. RAPP:

5   Q.   We got a little bit far from this.  Can you just explain    10:26:04

6   to the jury what this posting is?

7   A.   This is an administrative view of a posting that appeared

8   on Backpage.com in the Memphis market.  It's the administrative

9   view because it has all of these other fields where we capture

10  user information like email address, what they paid -- how much    10:26:25

11  they paid, their name, phone number.

12  Q.   All right.  And so there's an email like -- what is the

13  email down here?

14  A.   The email address was courtneyamber44@gmail.com.

15  Q.   And let's just go to the second page.  And there's some    10:26:51

16  information here.  What type of information is this is here

17  (Indicating)?

18  A.   Well, what we see is the IP address.  We see some

19  moderation links and then there's the invoice where this ad

20  costs $5.    10:27:16

21  Q.   All right.

22          MR. RAPP:  Now let's go to 637.

23  BY MR. RAPP:

24  Q.   And do you recognize this email?  Let me go to the second

25  page.  Do you see that?    10:27:33

United States District Court

CARL FERRER - Direct

```
 1   A.   Yes.                                                    10:27:36
 2   Q.   Are you on this email?  Let me go to the first page so you
 3   know if you are or not.
 4            Do you see that?
 5   A.   Yes, I am.                                              10:27:44
 6   Q.   And is this related to -- is this related to the Amber
 7   Lyon story?
 8   A.   Yes, it is.
 9   Q.   And is Mr. Lacey on this?
10   A.   Yes, he is.                                             10:28:05
11   Q.   And is Mr. Spear on this?  Email?
12   A.   Yes.
13   Q.   All right.
14            MR. RAPP:  Move to admit 637.
15            THE COURT:  Yes, it may be admitted.                10:28:15
16            (Exhibit Number 637 was admitted into evidence.)
17            THE COURT:  And published.
18   BY MR. RAPP:
19   Q.   Let's just go to the second page.  Starting with this down
20   here in January, what is Mr. Lacey telling Scott Spear?       10:28:36
21   A.   "Will you send to Jensen Andy and me a few sentences that
22   describe how we forward to Ernie Allen questionable ads for his
23   review.  Lacey."
24   Q.   All right.  What did you take that to mean?  Can you
25   explain that?                                                10:28:56
```

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   He's asking Scott Spear to describe how we're sending | 10:28:57 |
| 2 | cybertip reports of ads we suspect being underage to the | |
| 3 | National Center for Missing and Exploited Children, NCMEC. | |
| 4 | Q.   All right.  And then let's go to the first page and do you | |
| 5 | join this conversation down here?  Did Scott Spear write | 10:29:28 |
| 6 | something to you down here? | |
| 7 | A.   Yes.  Scott Spear wants me to write the description | |
| 8 | without a lot of tech talk he tells me. | |
| 9 | Q.   All right.  And then do you respond to Mr. Spear?  What do | |
| 10 | you say to Mr. Spear about how that process works? | 10:29:57 |
| 11 | A.   "A senior BP staff member can click a link while in Admin | |
| 12 | View called report this ad to NCMEC.  A four-color PDF is | |
| 13 | automatically emailed to the posting of NCMEC.  It includes an | |
| 14 | IP, email address, comments from our staff, an FAQ explaining | |
| 15 | data and how to contact us.  NCMEC then emails us acknowledging | 10:30:25 |
| 16 | receipt of the report." | |
| 17 | Q.   All right.  And then do you send an email to Mr. Spear and | |
| 18 | Mr. Lacey regarding this explanation of the Amber Lyon posting | |
| 19 | that we just looked at in 633? | |
| 20 | A.   I do, I send an explanation answering Lacey's questions. | 10:31:08 |
| 21 | Q.   All right.  What do you tell Mr. Lacey and Mr. Spear? | |
| 22 | A.   "We would not have reported Amber's ads to NCMEC. we make | |
| 23 | reports when the following happens.  A user reports it, i.e., I | |
| 24 | saw this girl and she is not 18.  Or size this pic and I think | |
| 25 | she is too young.  We aggressively ask users to report child | 10:31:33 |

United States District Court

CARL FERRER - Direct

1    exploitation.  We get several reports a day.                           10:31:38

2              "Our moderators will see pics where the pic might be

3    too young or the text is suggestive of child exploitation.

4              "Once a report goes to NCMEC, they vet it and send it

5    to local law enforcement.  I think they look to make sure it is   10:31:57

6    possible exploitation:  Pic too young, text saying things like

7    "1st time" wrote United States Code, fresh, first timer, et

8    cetera.

9              The NCMEC people have been quite helpful."

10   Q.   Just asking you about this (Indicating), why would you not   10:32:18

11   have reported the posting that you found on Amber Lyon, why

12   would you not have reported that to NCMEC?

13   A.   Her ad doesn't feature any text suggestive of someone

14   underage and the image that's attached is a young person in a

15   swim suit but it's really impossible for a moderator to know      10:32:54

16   the age of the person.

17   Q.   How would a moderator, based on your experience, how would

18   they know the age?

19             MS. BERTRAND:  Objection.  He just stated they

20   wouldn't be able to.                                              10:33:10

21             THE COURT:  Sustained.

22   BY MR. RAPP:

23   Q.   All right.  What does Mr. Lacey, when you gave this

24   response to -- what did Mr. Lacey ask for you -- when you gave

25   this detailed response about what you would do with Amber         10:33:33

United States District Court

CARL FERRER - Direct

1    Lyon's ads?                                                    10:33:35

2          MR. CAMBRIA:  Your Honor, the exhibit speaks for

3    itself.

4          MR. RAPP:  Well, can you just read it?

5          MR. CAMBRIA:  I thought he did.                          10:33:42

6          MR. RAPP:  No, he did not read this part.

7          THE COURT:  Sustained.

8          Mr. Rapp, you may move forward.

9          MR. RAPP:  Do you mean overruled?

10         THE COURT:  Well --                                      10:33:52

11         MR. RAPP:  Can he read this?

12         THE COURT:  Yes.  He can read this.  I'm sustaining

13   the objection but you can move forward with the exhibit.

14         MR. RAPP:  I see.

15   BY MR. RAPP:                                                   10:34:00

16   Q.   Can you just read what Mr. Lacey -- I'm sorry for the

17   confusion.

18         Can you read what Mr. Lacey wrote you?

19   A.   "Michael Lacey wrote," Carl, why would we isolate this ad?

20   What would NCMEC do with this ad?  What do they look for, what  10:34:18

21   is being guarded against?  Lacey."

22         MS. BERTRAND:  Your Honor, I'm going to move to be

23   a -- I'm going to object and move to strike and ask that the

24   Court instruct the witness not to add his editorial comment

25   through this tone.                                             10:34:38

CARL FERRER - Direct

1    THE COURT:  I'm sorry.  I missed the last part.    10:34:41

2    MS. BERTRAND:  That the Court instruct the witness

3  not to editorialize what's being written here through this

4  tone.

5    THE COURT:  Overruled.  Let me just add the exhibit    10:34:52

6  is admitted and he may read from the exhibit when asked to do

7  so.

8    Mr. Rapp, continue.

9    MR. RAPP:  Thank you.

10  BY MR. RAPP:    10:35:09

11  Q.   Let's look at Exhibit 638 for the witness's eyes only.  Is

12  this an email exchange between you and Mr. Lacey?

13  A.   Yes.

14  Q.   And is Scott Spear also on it?

15  A.   Yes.    10:35:34

16  Q.   And is this sort of a continuation of the discussion that

17  you're having with him?

18  A.   It is.

19    MR. RAPP:  Move to admit 638.

20    THE COURT:  It may be admitted.    10:35:45

21    (Exhibit Number 638 was admitted into evidence.)

22    THE COURT:  And published.

23  BY MR. RAPP:

24  Q.   What does Mr. Lacey -- is he asking you some questions

25  here?    10:36:01

United States District Court

CARL FERRER - Direct

1    A.   Yes, he is.                                                    10:36:01

2    Q.   What questions is he asking?

3    A.   "Do you have guidelines our people use?

4           "Did you get guidelines from them about what theyd

5    like to see?                                                       10:36:12

6           "Do you have guidelines from them about what they do?

7           "What you've described is very vague.  Do they have a

8    database, for example, of runaways?  Lacey."

9    Q.   All right.  And what do you respond to Mr. Lacey and

10   Mr. Spear?                                                         10:36:39

11   A.   "Our guide lines are vague but at least easy to remember:

12          "if she looks under 18, report it.  If in doubt,

13   report it.  We get a couple of manager's opinions on pics we

14   are not clear about.

15          "Hemu gave us a dozen code words of under aged users.     10:37:04

16   Perhaps I'll learn more when at NCMEC."

17   Q.   Let me just stop you there.  Are you referring to some

18   type of a future meeting here that you had with NCMEC?

19   A.   Yes.

20   Q.   All right.  And if you could go on.                          10:37:20

21   A.   "Roughly, we reported 30 ads to NCMEC out of 300,000 adult

22   ads in the past 30 days."

23   Q.   Let me stop you there.  Where are the 300,000 adult ads

24   being posted?

25   A.   Predominantly in the U.S., in the Female Escorts category.   10:37:41

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   All right.  And then what else do you tell him about | 10:37:46 |
| 2 | regarding databases? | |
| 3 | A.   Regarding databases, "They have a hash list of porn pics | |
| 4 | and list of child porn URL sites to ban.  Nothing on | |
| 5 | runaways . . . yet." | 10:38:05 |
| 6 | Q.   Okay.  Now let's go on to 1062a. | |
| 7 | THE COURT:  Mr. Rapp, I think at this point we're at | |
| 8 | a good time to take our morning break.  And we'll take | |
| 9 | approximately 20 minutes, members of the jury.  Again, I ask | |
| 10 | for you to think about whether or not you would be able to | 10:38:38 |
| 11 | continue on this afternoon beyond the noon hour, roughly 12:30, | |
| 12 | 12:45.  If you would let Lilliana know that during your break. | |
| 13 | And, again, I remind you of the admonition not to discuss or | |
| 14 | come to any conclusions at this juncture in the trial.  Just | |
| 15 | simply enjoy your break. | 10:39:01 |
| 16 | Please all rise for the jury. | |
| 17 | (Jury departs at 10:39.) | |
| 18 | THE COURT:  All right.  Please be seated. | |
| 19 | Let me just inquire of the Government, did you have | |
| 20 | an opportunity to review that exhibit and whether its | 10:39:39 |
| 21 | operational?  It is working? | |
| 22 | MR. RAPP:  I'm sorry, judge, I didn't hear what you | |
| 23 | said. | |
| 24 | THE COURT:  The exhibit, is it operational? | |
| 25 | MR. RAPP:  The video? | 10:39:50 |

United States District Court

CARL FERRER - Direct

1          THE COURT:  Yes.                                              10:39:52

2          MR. RAPP:  Yes.

3          THE COURT:  Can you go ahead and run that now?

4          MR. BERRY:  I think the problem is we're waiting on

5    your IT folks.  My system is working but the sound system is    10:40:02

6    not working.

7          THE COURT:  All right.  IT is on the way.

8          MR. BERRY:  If you would like Your Honor, it's a

9    short clip.  I think it will go over email.  I'm not 100

10   percent but I could possibly email it to chambers.              10:40:16

11         MR. FEDER:  We would like to see it as well.

12         COURTROOM DEPUTY:  All rise.

13         (Recess at 10:40; resume at 11:03.)

14         (Court was called to order by the courtroom deputy.)

15         THE COURT:  All right.  Let's have the jury in and       11:03:53

16   jurors indicate that they can go only to 12:30 and so we will

17   not take a break.  We'll push forward until 12:30 and then

18   we'll recess for the weekend.

19         MR. RAPP:  What a shame.

20         THE COURT:  All rise for the jury.                        11:04:59

21         (Jury enters at 11:05.)

22         THE COURT:  All right.  Please be seated.

23         The record will reflect the presence of the jury, the

24   parties are present, and the witness is on the stand.

25         Mr. Rapp, you may continue.                               11:05:38

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | MR. RAPP:  Thank you, Your Honor. | 11:05:40 |
| 2 | Madam Clerk, I'm showing the witness Exhibit 1062. | |
| 3 | BY MR. RAPP: | |
| 4 | Q.   Do you see that, sir, on your screen? | |
| 5 | A.   Yes, I do. | 11:05:59 |
| 6 | Q.   Is that an email from you to Mr. Lacey and Mr. Spear? | |
| 7 | A.   Yes. | |
| 8 | Q.   And what's the subject of this? | |
| 9 | A.   Regarding CNN Demand Letter, privileged and confidential. | |
| 10 | Q.   All right. | 11:06:31 |
| 11 | MR. RAPP:  Move to admit Exhibit 1062 and publish. | |
| 12 | THE COURT:  Well, I think just clarify who it's to. | |
| 13 | My sense is you misstated that.  There's a to and a cc line. | |
| 14 | MR. RAPP:  Okay.  Fair enough. | |
| 15 | BY MR. RAPP: | 11:06:49 |
| 16 | Q.   Who is -- who is this -- the email from you to?  Who is it | |
| 17 | to? | |
| 18 | A.   The email is from me and it's to Bill Jensen and it's | |
| 19 | copied to Jim Larkin, Michael Lacey, Andy VanDeVoorde, Steve | |
| 20 | Suskin and Scott Spear. | 11:07:07 |
| 21 | Q.   All right.  And why are you copying Mr. Lacey and | |
| 22 | Mr. Spear? | |
| 23 | A.   Because you this has information to do with the CNN | |
| 24 | investigation's video that published. | |
| 25 | Q.   All right.  And is this email sent after the broadcast? | 11:07:24 |

United States District Court

55

CARL FERRER - Direct

1   A.   Yes.  It's sent after the broadcast.                      11:07:30

2              MR. RAPP:  Move to admit Exhibit 1062.

3              THE COURT:  Yes.  It may be admitted and published.

4              (Exhibit Number 1062 was admitted into evidence.)

5   BY MR. RAPP:                                                   11:07:44

6   Q.   Can you just read this for identification of the email?

7   A.   "When Amber posted her ad on backpage she held a copy of

8   the same ad text Selena had in her ad.  I attached the ad.  It

9   was a in DC.  Amber said Selena face was posted in Las Vegas a

10  couple of months ago.  Was Selena posted in one or two cities?  11:08:23

11  We are re-checking all subpoenas in Las Vegas and now

12  Washington DC for a match."

13  Q.   What do you mean by this?  What are you informing

14  Mr. Spear and Mr. Lacey of?

15  A.   The -- they have asked me to do research to try to find   11:08:46

16  the CNN details.

17  Q.   Who has asked you to do research?

18  A.   Scott Spear, Jim Larkin.  This is kind of the Seal Team 6.

19  Whenever there's a media event, we just start having what

20  events --                                                      11:09:06

21             MR. CAMBRIA:  Objection.  Not responsive.  Ask that

22  it be struck.

23             THE COURT:  Yes.  The jurors will disregard the

24  statement after the answer "Scott Spear, Jim Larkin."

25  \\\

United States District Court

CARL FERRER - Direct

1    BY MR. RAPP:                                                         11:09:27

2    Q.   And then you actually did say something about you made a

3    reference to Seal Team 6.  What did you mean by that?

4              MR. CAMBRIA:  Your Honor, that's what was struck.

5              MR. RAPP:  Now I'm asking him about it.                    11:09:38

6              THE COURT:  It was struck but Mr. Rapp is entitled to

7    ask the question if he can answer.

8    BY MR. RAPP:

9    Q.   Can you answer that?

10   A.   Yes, I can answer it.                                          11:09:47

11   Q.   All right.  What does the reference to Seal Team 6 mean?

12   A.   Seal Team 6 is how Jim Larkin would describe our staff's

13   ability to research where ads were posted and if they posted in

14   other places and then we would provide that kind of detail and

15   so Seal Team 6 is enabled here with the Selena ad posted in DC.     11:10:11

16   Q.   All right.  And then looking at 1062a, is this the

17   attachment and is this a two-page posting?

18   A.   Yes, it is.

19   Q.   And so is this the attachment that you were providing

20   Mr. Spear and Mr. Lacey?                                            11:10:43

21   A.   Yes.

22   Q.   All right.

23             MR. RAPP:  Move to admit 1062a.

24             THE COURT:  Yes, it may be admitted.

25             MS. BERTRAND:  The defense objects as to hearsay and      11:10:55

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | *Crawford.* | 11:10:58 |

THE COURT:  Overruled.  It may be admitted and published.

(Exhibit Number 1062a was admitted into evidence.)

BY MR. RAPP:                                                    11:11:02

Q.   Is this the posting that you found?

A.   Yes, it is.

Q.   And in some respect, does this match the posting that was provided by Amber Lyon?

A.   I believe so, yes.                                         11:11:28

Q.   So I now have on screen, which has been admitted for the record, 633.  This is the Amber Lyon posting and this is the one that you found.  And did they have the same -- basically the same terms in it?

MS. BERTRAND:  Objection, Your Honor.  One of them is   11:12:01
redacted so we can't tell if the terms are the same or not.

THE COURT:  I'm sorry.  What was the objection?

MS. BERTRAND:  One of the exhibits, the one on the left side of the screen, has redacted pieces from it, so we can't tell whether or not the two are equivalent.         11:12:19

THE COURT:  Well, I'll overrule -- I'll overrule the objection.  Mr. Rapp can probe into the areas that are unredacted with regard to this witness, if he can testify to them.

\\\

United States District Court

CARL FERRER - Direct

BY MR. RAPP:

Q.    Okay.  And so you recognize at all when comparing the
Amber Lyon posting and then the one that is -- that you
referenced as Selena in the email to Mr. Lacey and Mr. Spear,
did you see some similarities between the postings?

A.    Yes, the title New BooTy in ToWn is identical.  And the ad
text, including the phone number, "My name is Winter and I
would love to meet new people," is also identical.

Q.    All right.  And just so we're clear on this, the one on my
left, is this the posting that is identified as Selena in the
email to Mr. Spear and Mr. Lacey?

A.    Yes.

Q.    Was this posting also -- or the subject of this posting
also on the broadcast that you watched?

A.    Yes, it was.

Q.    So just to connect the dots, you had received an email
back sometime back in 2010 and let me show you 1185a, this is
the first page of 1185a and not subject to redactions and I
would ask that this be published.  This was previously
admitted.

      THE COURT:  Yes, it may be published.

BY MR. RAPP:

Q.    And the posting that we just looked at, was this the
posting that was referenced by this Steve Turnham in this email
that you received?

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   Yes. | 11:14:57 |
| 2 | Q.   Now, did you watch the Amber Lyon broadcast? | |
| 3 | A.   Yes. | |
| 4 | Q.   Do you recall more or less how long the broadcast was? | |
| 5 | A.   I am not sure.  Half an hour. | 11:15:16 |
| 6 | Q.   All right.  And during that broadcast, did she give an | |
| 7 | example of posting her ad and what would happen after posting | |
| 8 | her ad? | |
| 9 | MS. BERTRAND:  Objection.  Hearsay, *Crawford*.  Sixth | |
| 10 | Amendment. | 11:15:41 |
| 11 | THE COURT:  I'll sustain as to the form of the | |
| 12 | question. | |
| 13 | It is a leading question, Mr. Rapp.  Please ask | |
| 14 | non-leading questions. | |
| 15 | BY MR. RAPP: | 11:15:49 |
| 16 | Q.   What did Amber Lyon do with her posting that was presented | |
| 17 | in the broadcast? | |
| 18 | MS. BERTRAND:  Objection.  Hearsay. | |
| 19 | THE COURT:  Overruled. | |
| 20 | MS. BERTRAND:  *Crawford*. | 11:15:57 |
| 21 | THE WITNESS:  Amber Lyon, she posted an ad on | |
| 22 | Backpage and then she has her phone just start ringing off the | |
| 23 | hook. | |
| 24 | BY MR. RAPP: | |
| 25 | Q.   All right.  Did you watch the broadcast back when it was | 11:16:10 |

United States District Court

60

CARL FERRER - Direct

1  first broadcast?                                              11:16:22

2  A.   Yes.

3  Q.   Was it just broadcast one time?

4  A.   No.   It was rebroadcasted.

5  Q.   Was there any effort whatsoever by Backpage to prevent the   11:16:41

6  rebroadcast of the Amber Lyon story?

7           MS. BERTRAND:   Objection.   Leading.

8           THE COURT:   Sustained.

9  BY MR. RAPP:

10  Q.   What did Backpage do after it was broadcast the first    11:16:52

11  time?

12  A.   We sent CNN a tortious interference, some kind of -- a

13  cease and desist letter to stop the rebroadcast.

14  Q.   When you say "we," if you know, who do you mean by that?

15  A.   I said "we," I meant the company but what I mean is the   11:17:13

16  owners.   This is Michael Lacey, Scott Spear, Jed Brunst.

17  Q.   And you watched the broadcast but in preparation for your

18  testimony today, have you watched the broadcast in preparation

19  for your testimony?

20  A.   Yes, I have.                                             11:17:40

21  Q.   Have you watched the portion of that broadcast that

22  Ms. Lyon had posted her ad?

23  A.   Yes, I did.

24  Q.   All right.   And is that contained in 1052b1?

25           Have you watched this exhibit?                       11:18:10

United States District Court

CARL FERRER - Direct

1   A.   I didn't know what you mean by 1052b1.                          11:18:11

2          THE COURT:  Neither did I, Mr. Rapp.

3   BY MR. RAPP:

4   Q.   Is that in Exhibit 1052b1?

5   A.   Yes, I believe that's the video file.                          11:18:23

6   Q.   All right.

7          MR. RAPP:  Move to admit that and publish it for the

8   jury.

9          THE COURT:  Let me just ask, Mr. Rapp, I don't think

10  you asked this witness when this was -- you asked him if he saw    11:18:34

11  it.  When he saw it, the first time when he saw it the second

12  time.  I think there's a lack of foundation in terms of when

13  this actually occurred.

14  BY MR. RAPP:

15  Q.   When did you actually watch the broadcast?                    11:18:55

16  A.   I've watched the first broadcast, it was early January

17  2011 and then, despite our best efforts, CNN rebroadcast it and

18  I believe that would have been several weeks later.

19  Q.   All right.

20          MR. RAPP:  Move to Exhibit Number 1052b1.                   11:19:22

21          MS. BERTRAND:  Objection.  Relevance, 403, hearsay

22  and *Crawford v. Washington* and the Sixth Amendment.

23          THE COURT:  Overruled as to each of the objections as

24  previously noted.

25          It may be admitted.                                        11:19:38

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | (Exhibit Number 1052b1 was admitted into evidence.) | 11:19:39 |
| 2 | THE COURT:  And published.  I guess before you | |
| 3 | publish it, Mr. Rapp, why don't you ask a question if there is | |
| 4 | one. | |
| 5 | BY MR. RAPP: | 11:19:56 |
| 6 | Q.   Have you seen this? | |
| 7 | A.   Yes, I've seen the video. | |
| 8 | Q.   All right. | |
| 9 | (Video played.) | |
| 10 | BY MR. RAPP: | 11:21:30 |
| 11 | Q.   All right.  And does it go on like that?  Does she receive | |
| 12 | a number of calls? | |
| 13 | A.   Yes, a number of calls. | |
| 14 | Q.   All right.  And also on the site, also on this broadcast, | |
| 15 | is there any reference to the relationship Backpage had to The | 11:21:52 |
| 16 | Erotic Review? | |
| 17 | A.   No. | |
| 18 | Q.   Is there any reference to the relationship that Backpage | |
| 19 | has with super posters? | |
| 20 | A.   There is not. | 11:22:06 |
| 21 | Q.   Any comments about Backpage's aggregation efforts? | |
| 22 | MS. BERTRAND:  Objection.  Relevance as to what a | |
| 23 | company discloses to the press. | |
| 24 | THE COURT:  Overruled. | |
| 25 | THE WITNESS:  No, there's no disclosure of our | 11:22:24 |

United States District Court

63

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | aggregation activities or any of our prostitution marketing | 11:22:28 |
| 2 | activities. | |
| 3 | BY MR. RAPP: | |
| 4 | Q.   Just looping back to this video, when she receives these | |
| 5 | calls in the video, do you hear the other side of the call? | 11:22:43 |
| 6 | MS. BERTRAND:  Objection, hearsay. | |
| 7 | THE WITNESS:  I think so, yes. | |
| 8 | MS. BERTRAND:  Hearsay upon hearsay. | |
| 9 | THE COURT:  Overruled.  He can testify as to what he | |
| 10 | recalled seeing and hearing on the video. | 11:22:57 |
| 11 | THE WITNESS:  Yes, you can hear the Johns. | |
| 12 | BY MR. RAPP: | |
| 13 | Q.   What are they asking for, if anything? | |
| 14 | A.   They are talking about having sex with her. | |
| 15 | Q.   Now, I believe that you testified that a letter was sent | 11:23:20 |
| 16 | after the first broadcast. | |
| 17 | A.   Yes. | |
| 18 | Q.   And what was the purpose of the letter? | |
| 19 | A.   The purpose was to have CNN stop the rebroadcast.  That | |
| 20 | was the first purpose. | 11:23:38 |
| 21 | Q.   All right.  Did you see the letter? | |
| 22 | A.   Yes, I did. | |
| 23 | Q.   Did you have any involvement in its drafting? | |
| 24 | A.   Yes, I did. | |
| 25 | Q.   Was the letter that was sent to CNN, was it an accurate | 11:23:53 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | description of page's business model? | 11:23:57 |
| 2 | A.   No, it was not. | |
| 3 | Q.   Why wasn't it? | |
| 4 | A.   It didn't provide anything about your prostitution | |
| 5 | marketing activities and it also provided a number of | 11:24:16 |
| 6 | misleading deceptive statistics and it had that sham of user | |
| 7 | safety backgrounder document. | |
| 8 | Q.   The one we talked about previously? | |
| 9 | A.   Yes. | |
| 10 | Q.   Did it disclose the relationship with The Erotic Review? | 11:24:40 |
| 11 |           MS. BERTRAND:  Objection.  Relevance. | |
| 12 |           THE COURT:  Overruled. | |
| 13 |           THE WITNESS:  No. | |
| 14 | BY MR. RAPP: | |
| 15 | Q.   Did it disclose the relationship Backpage had with the | 11:24:49 |
| 16 | super posters? | |
| 17 |           MS. BERTRAND:  Same objection. | |
| 18 |           THE COURT:  Overruled. | |
| 19 |           THE WITNESS:  It did not. | |
| 20 | BY MR. RAPP: | 11:24:58 |
| 21 | Q.   Did it disclose aggregation? | |
| 22 | A.   No. | |
| 23 | Q.   I'm showing you Exhibit 2038 for your eyes only.  Do you | |
| 24 | see 2038 on your screen? | |
| 25 | A.   Yes, I do. | 11:25:24 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | Q.   Do you recognize the email in this email?  Do you | 11:25:37 |
| 2 | recognize who -- do you recognize the email down here | |
| 3 | (Indicating)? | |
| 4 | A.   Yes, I do. | |
| 5 |             MR. LINCENBERG:  Your Honor, I'm going to object. | 11:26:02 |
| 6 | Vague from reviewing it in preparation for trial with Mr. Rapp | |
| 7 | or back in 2011.  Vague as to time.  He's not on this email. | |
| 8 |             THE COURT:  Lay some foundation as to how -- if he | |
| 9 | provides the exhibit, how he recognizes it. | |
| 10 | BY MR. RAPP: | 11:26:22 |
| 11 | Q.   My question is, how do you recognize the email contained | |
| 12 | on this exhibit? | |
| 13 | A.   Because I'm very familiar with | |
| 14 | jedbrunst@villagevoicemedia.com email address. | |
| 15 | Q.   All right.  And in this email, is he forwarding something? | 11:26:33 |
| 16 |             MR. LINCENBERG:  Your Honor, I object.  That's not | |
| 17 | foundation, simply saying he recognizes an email address. | |
| 18 |             THE COURT:  Sustained. | |
| 19 | BY MR. RAPP: | |
| 20 | Q.   Is this an email that Mr. Brunst sent from his | 11:26:49 |
| 21 | villagevoicemedia.com email? | |
| 22 |             MR. LINCENBERG:  Same objection.  No foundation. | |
| 23 |             THE COURT:  Sustained. | |
| 24 |             MR. RAPP:  I'll come back to this but may I be heard | |
| 25 | on this? | 11:27:06 |

United States District Court

66

CARL FERRER - Direct

1          THE COURT:  You can be heard after 12:30.                    11:27:06

2          MR. RAPP:  Okay.

3   BY MR. RAPP:

4   Q.   Let's look at 641.  Do you see that on your screen?

5   A.   Yes, I do.                                                     11:27:26

6   Q.   And what is this?

7   A.   This is a referral traffic report once again from Google

8   Analytics.

9   Q.   And for what month is it?

10  A.   It's for the month of January 2011.                           11:27:40

11  Q.   Does it refer to the previous email traffic similar to the

12  previous Google Analytics reports we've seen?

13  A.   Yes, it does.

14          MR. RAPP:  Move to admit 641.

15          MS. BERTRAND:  Objection.  Hearsay, lack of                 11:28:05

16  foundation, lack of authentication.

17          THE COURT:  Overruled.

18          COURTROOM DEPUTY:  And it's admitted?

19          (Exhibit Number 641 was admitted into evidence.)

20          THE COURT:  It's admitted, yes, and it may be              11:28:16

21  published.

22  BY MR. RAPP:

23  Q.   So why is January of 2011, what happened in that month?

24  A.   This is the month the CNN investigation's video was

25  broadcast.                                                         11:28:41

United States District Court

CARL FERRER - Direct

1   Q.   All right.  And does this report detail the referral                    11:28:42

2   traffic from certain websites?

3                MS. BERTRAND:  Objection.  Leading.

4                THE COURT:  Sustained.

5   BY MR. RAPP:                                                                  11:28:52

6   Q.   What does the report say?

7   A.   It details the referral traffic coming from the top 17

8   sites.

9   Q.   All right.  Can you speak to the top three sites?

10  A.   Top three sites, TER.com had 722,087.  So that's the          11:29:07

11  number of users that came from The Erotic Review for the month

12  of January.  Followed by two other prostitution review sites,

13  eccie, and ussexguide.

14          So the top three referring sites are prostitution

15  review sites.                                                                 11:29:42

16                MS. BERTRAND:  Objection.  Lack of foundation.  Move

17  to strike.

18                THE COURT:  Overruled.

19  BY MR. RAPP:

20  Q.   How do you know these are prostitution review sites?          11:29:48

21  A.   Because I've been on the sites and I've seen the reviews.

22  Q.   And you've testified regarding The Erotic Review, which is

23  here, but what about the other two sites?

24  A.   What's the question?

25  Q.   Well, what about these other two sites?  How do you know       11:30:12

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | these are prostitution review sites? | 11:30:15 |
| 2 | A.   Eccae.net is a prostitution ad site and review site.  It | |
| 3 | was strongest in the Dallas, Houston area. | |
| 4 | Ussexguide.info, we've seen referrals coming from | |
| 5 | them and when you go online, it has ads and it has Johns | 11:30:36 |
| 6 | putting links to Backpage ads. | |
| 7 | Q.   Compared to the previous months, was there an increase in | |
| 8 | referral traffic around the time that there was the CNN | |
| 9 | broadcast? | |
| 10 | A.   Yes.  Traffic continues to increase significantly. | 11:31:03 |
| 11 | Q.   All right.  Looking at 643. | |
| 12 | Let me go back here to 2038.  This is for the | |
| 13 | witness's eyes only.  We just talked about this but I want to | |
| 14 | ask you some additional questions here.  How frequently did you | |
| 15 | email during the time period from 2004 to January or February | 11:31:51 |
| 16 | of 2011 with Jed Brunst? | |
| 17 | A.   I had emailed him a number of times. | |
| 18 | Q.   Can you give us an estimate? | |
| 19 | A.   Reports, questions, not as many times as Scott Spear, | |
| 20 | required a lot of maintenance.  But Jed Brunst, I would email | 11:32:21 |
| 21 | him.  I would also see him in office because I was over in | |
| 22 | Building B a lot. | |
| 23 | Q.   All right.  And do you recognize this email address for | |
| 24 | Mr. Brunst as the email address that you emailed him back and | |
| 25 | forth a number of times from 2004 to 2011? | 11:32:40 |

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | A.   Yes.  I recognize it. | 11:32:47 |
| 2 | Q.   This is his email address? | |
| 3 | A.   Yes, it is. | |
| 4 | MR. RAPP:  Move to admit 2038. | |
| 5 | MR. LINCENBERG:  Same objection.  We went through | 11:33:00 |
| 6 | this, Your Honor.  No foundation.  He's just saying what his | |
| 7 | email address is. | |
| 8 | THE COURT:  Sustained. | |
| 9 | MR. RAPP:  Judge, I would site doc -- | |
| 10 | MR. LINCENBERG:  Well, we're happy to argue this | 11:33:17 |
| 11 | after 12:30 as the Court had indicated. | |
| 12 | THE COURT:  We'll reserve that time to discuss it. | |
| 13 | BY MR. RAPP: | |
| 14 | Q.   Okay.  I now want to show you Exhibit 644.  Okay, do you | |
| 15 | see that on your screen, sir? | 11:34:16 |
| 16 | A.   Yes, I do. | |
| 17 | Q.   And would you agree that this is a two-page email? | |
| 18 | A.   Yes. | |
| 19 | Q.   And is this an email -- is the subject of this email some | |
| 20 | type of an article? | 11:34:36 |
| 21 | MS. BERTRAND:  Objection.  Leading. | |
| 22 | THE COURT:  Sustained.  Let him look at the email and | |
| 23 | he can tell you what he recognizes about the email, what it's | |
| 24 | about. | |
| 25 | \\\ | |

United States District Court

CARL FERRER - Direct

1 BY MR. RAPP:                                                          11:34:49

2 Q.   All right.  Do you see that?  Do you recognize it?

3 A.   Yes, I do.

4 Q.   And who is on this email at the top here?

5 A.   It's from Hemu, Hemanshu Nigam, and it's to myself, copied    11:35:03

6 is Jamie Schumacher, Scott Spear, Simrin Hooper, and Steve

7 Suskin.

8 Q.   All right.  And do you have, sir, an independent

9 recollection of this email?

10 A.   Yes.                                                          11:35:27

11          MR. RAPP:  All right.  Move to admit 644.

12          MR. FEDER:  Same.

13          THE COURT:  It may be admitted.

14          (Exhibit Number 644 was admitted into evidence.)

15          MR. RAPP:  And published.                                 11:35:37

16          THE COURT:  Yes, it may be published.

17 BY MR. RAPP:

18 Q.   And then starting here, can you read what this person,

19 Jamie Schumacher, says to Hemu Nigam?

20 A.   Jamie writes, "We should make sure this didn't happen via"   11:36:02

21 Backpage.  And then there's a link below to cnn.com article.

22 Q.   And what's the nature of the article?

23 A.   Arizona CEO child prostitution.

24 Q.   And what does Simrin -- what is Simrin saying in this

25 article above?                                                     11:36:38

United States District Court

CARL FERRER - Direct

1    A.    "Theres an article below related to a child prostitution          11:36:42

2    arrest in Phoenix.   We wanted to confirm the arrested man did

3    not find the minor via backpage.

4            "Can you please call the Phoenix Police Department

5    and ask to speak to Sgt. Steve Martos and let him know you saw      11:36:58

6    the article and if there's any Backpage involvement or use

7    involved in the case, and that y'all would like to help if

8    there was any involvement.   The number is:   Non-Emergency

9    602-262-6151.   It may have been conducted in a chat room or

10   something totally unrelated to BP, but we just want to check.       11:37:24

11           "Thanks, let me know what happens.   Simrin."

12   Q.    All right.   And let's go to the first page.   So was that

13   email that you just read, was that actually to you?

14   A.    It is, yes.

15   Q.    And then what does Mr. Nigam say to you?                       11:37:56

16   A.    Hemu Nigam writes, "Hi, Carl.   Just checking to see if you

17   found any connection.   Thanks, Hemu."

18   Q.    And then what do you tell Hemu with Mr. Spear copied on

19   the email?   What do you say.

20   A.    I write, "There's so much interest in this story I sent to     11:38:19

21   Spear and Suskin.   I think Lacey will want Steve to call."

22   Q.    And then what, finally, what does Mr. Nigam say to you?

23   A.    "Steve was reaching out to -- "reaching out to Sgt. Martos

24   and hopefully that will help."

25   Q.    All right.   You actually say something here because at the    11:38:50

United States District Court

CARL FERRER - Direct

1    time, are you even in Phoenix?                              11:38:53

2    A.   Yes.  And there's a delay.  I'm just not checking on my

3    email all the time because I'm busy.

4    Q.   All right.  Now, going forward, at some point do you --

5    this is just a yes-or-no question -- do you determine whether   11:39:14

6    or not this arrest had anything to do with Backpage down the

7    road?

8    A.   Yes.

9    Q.   All right.  We'll come back to that.

10            Now going to 645, this is for the witness's eyes      11:39:31

11   only.  Is this an email exchange between you and Mr. Padilla?

12   A.   Yes, it is.

13   Q.   Is this a two-page email exchange, with some information

14   on the next page?

15   A.   Yes, it is.                                              11:39:58

16   Q.   All right.  So -- and is this in February of 2011?

17   A.   Yes.

18            MR. RAPP:  Move to admit and publish 645.

19            THE COURT:  It may be admitted and published.

20            (Exhibit Number 645 was admitted into evidence.)     11:40:17

21   BY MR. RAPP:

22   Q.   Down here, what are you telling Mr. Padilla?

23   A.   I write, "Hey Andrew, I told Scott the list was coming

24   soon.  I add GFE and PSE at his request."

25   Q.   Let me stop you there.  What did you mean by that?       11:40:40

CARL FERRER - Direct

1  A.   The subject line is the "delete whole ad terms" so it's a

2  list of terms.                                                    11:40:42

3  Q.   All right.  But what did you mean by -- well, this added

4  GFE and PSE at his request, what did you mean by that?

5  A.   Scott Spear wanted GFE and PSEs in the list Delete Whole      11:40:56

6  Ad.

7  Q.   Do you know why?

8  A.   Because they are suggestive of prostitution.

9  Q.   And then what else do you say to Mr. Padilla?

10 A.   "Do you think we should remove the following because they    11:41:16

11 are not prostitution terms (they are really" just "bad taste ):

12 Daddy, lactating."

13 Q.   All right.  And does Mr. Padilla give you a response?

14 A.   Yes, he does.

15 Q.   Can you read his response?                                    11:41:35

16 A.   Andrew Padilla writes, "I think 'daddy' is about context.

17 It's another nail in the coffin of an ad that's probably

18 already got a lot wrong with it.  But if it's just someone

19 saying, "who's your daddy?", it's completely innocuous.  It's

20 safe to take it off this list and we can continue to strip it     11:41:55

21 and/or handle it on a per add basis.  The final solution for

22 this should be an alert sent to the global monitor and not a

23 strip out.

24       "'lactating' is a little trickier.  It implies some

25 exchange of bodily fluids which kills our 'companionship'         11:42:16

United States District Court

CARL FERRER - Direct

1   argument."                                                                          11:42:20

2   Q.   Let me stop you there.   What did you take that to mean?

3   A.   We know we're in the prostitution business and if we can

4   make things less obvious prostitution, then that is better.

5   And one way to do it is use the words "escort," companion,"       11:42:37

6   just these -- how do I describe this?   This is our defense to

7   continue to stay in the prostitution business.   These ads are

8   companionship ads.

9   Q.   Were they?

10  A.   No.                                                                             11:43:02

11  Q.   What else does he say?

12  A.   "but i don't think we've ever really gotten in trouble for

13  it.   We got in trouble for pregos and not all of the lactaters

14  are necessarily pregnant.   I can live with the bodily fluids

15  angle, it's fetishy and pushes the edge at a time when we're      11:43:20

16  losing our edge.   We should continue to strip it and only

17  delete the ad when it's clearly also a prego ad."

18  Q.   All right.   And now moving on to Exhibit 646 for your eyes

19  only.

20       Let me go back for a minute to 645 that's already            11:44:20

21  admitted.   What did you take him to mean if you could publish

22  it where it's highlighted there where it says "we're losing our

23  edge," what did you take that to mean?

24  A.   The site is becoming tamer, more sanitized and by losing

25  our edge, it's not that same wild, wild west experience it used   11:45:01

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | to be. | 11:45:06 |
| 2 | Q.   All right.   And was there any concern about losing our | |
| 3 | edge? | |
| 4 | A.   Yes. | |
| 5 | Q.   What's the concern? | 11:45:19 |
| 6 | A.   We are competing with other sites and we have aggressive | |
| 7 | budgets to grow this business and the best way to grow this | |
| 8 | business is to have edgy content in the Adult section. | |
| 9 | Q.   Now, I'm showing you United States 646.   Do you see that | |
| 10 | email? | 11:45:52 |
| 11 | A.   Yes, I do. | |
| 12 | Q.   Are you on this email? | |
| 13 | A.   I am not. | |
| 14 | Q.   Do you recognize the sender of the email? | |
| 15 | A.   Recognize the -- excuse me? | 11:46:03 |
| 16 | Q.   The person who the email is from? | |
| 17 | A.   Yes. | |
| 18 | Q.   And who is that? | |
| 19 | A.   Joye Vaught. | |
| 20 | Q.   And who is she sending the email to? | 11:46:13 |
| 21 | A.   She's sending the email to Adam Padilla, Allen Romero, | |
| 22 | Amanda Thatcher, Andrew Gilchrist, and Angel and there's a dot, | |
| 23 | dot, dot which means it's probably -- well, there's more email | |
| 24 | addresses.   Her just not being displayed. | |
| 25 | Q.   And who is copied on this? | 11:46:39 |

United States District Court

CARL FERRER - Direct

1    A.   Andrew Padilla.                                              11:46:41

2    Q.   And do you also recognize that as his internal email?

3    A.   Certainly his name.

4    Q.   All right.  And have you reviewed this email in

5    preparation for your testimony?                                  11:46:59

6    A.   I have.

7    Q.   Do you understand the context of this email?

8    A.   Yes, I do very much so.

9              MR. RAPP:  Move to admit Number 646.

10             MS. BERTRAND:  Objection.  Hearsay.  Relevance.         11:47:11

11             THE COURT:  Overruled.

12             It may be admitted.

13             (Exhibit Number 646 was admitted into evidence.)

14             MR. RAPP:  And published, please.  Thanks.

15             THE COURT:  Yes.                                        11:47:25

16   BY MR. RAPP:

17   Q.   So can you read this?

18   A.   Andrew writes --

19   Q.   No.  Not Andrew.

20   A.   Oh.  Yes.  Sorry.  Getting to be lunchtime.                  11:47:36

21             From Joye Vaught.  "Hi.  We are giving the users a

22   clean slate regarding editing rights.  Any ad that has

23   previously been locked out from editing, will have those rights

24   restored.

25             "This time around we should go easy on certain types   11:47:58

CARL FERRER - Direct

1    of violations.  We should reserve locking ads to instances                    11:48:02

2    where there is a clear offer of sex-for-money or graphic images

3    of sex acts/blatantly exposed genitalia.

4              "For instance:  Blank pricing, '69' in the age field,

5    breasts covered by hands or arms and thongs riding a little too    11:48:19

6    low should not be treated the same as offers for blowjobs, anal

7    and graphic images of sex acts.  In other words we should

8    research locking ads for the worst offenders.

9              "If you aren't sure what this means, please ask me or

10   Andrew."                                                                        11:48:40

11   Q.    Do you know why, in your capacity, in your role, that

12   she's telling the moderators to ask her or Andrew?

13   A.    I'm sorry?

14   Q.    In your capacity, in your position at Backpage, do you

15   know why she's asking the moderators to ask her or Andrew?         11:49:03

16            MR. EISENBERG:  Calls for a conclusion.  Speculative.

17            THE COURT:  Overruled.

18            MS. BERTRAND:  Join.

19            THE WITNESS:  Yes.  Because they are the supervisors.

20   BY MR. RAPP:                                                                    11:49:23

21   Q.    And apart from this email at this time period, are you

22   locking ads for users?

23   A.    We have been locking a lot of ads and that means to

24   prevent them from editing their texts after it was approved for

25   moderation, getting a lot of complaints in support to unlock      11:49:49

CARL FERRER - Direct

|    |                                                                       |          |
|----|-----------------------------------------------------------------------|----------|
| 1  | their ads, so we're just going to do kind of a fresh start for        | 11:49:52 |
| 2  | everyone.                                                             |          |

Q.   All right.  And when she says, "We should reserve locking

ads for the worst offenders," aside from this email, what do

you understand that to mean in your position?                    11:50:10

A.   Well, the worst offenders are those that just can't seem

to stop posting sex act pics and using extreme graphics sex for

money language in their ad texts.

Q.   All right.  Now, we had shown you an exhibit from 2010

where you were going to kill the links to The Erotic Review.     11:50:37

Do you recall that?

A.   Yes, I do.

Q.   I'm now showing you 647.  Do you see that, this email?

A.   Yes, I do.

Q.   Do you recognize this email?                                11:50:56

A.   Yes.

Q.   You're not on this email?

A.   I am not.

Q.   But do you recall this email being sent out?

A.   Yes.                                                         11:51:17

Q.   And does this email come from Andrew Padilla?

A.   Yes, it does.

Q.   And is it related to The Erotic Review links?

A.   Yes.

Q.   And is there -- do you see there where it says           11:51:33

United States District Court

CARL FERRER - Direct

| | | |
|---|---|---|
| 1 | attachments? | 11:51:41 |
| 2 | A.   Yes. | |
| 3 | Q.   And were you familiar at the time with the attachments | |
| 4 | that were sent out with this email? | |
| 5 | A.   I was. | 11:51:50 |
| 6 | Q.   And have you reviewed both the email and the attachments | |
| 7 | in preparation for your testimony? | |
| 8 | A.   I have. | |
| 9 | MR. RAPP:  Move to admit 647 and 647a through e. | |
| 10 | MR. EISENBERG:  Your Honor, excuse me.  No objection | 11:52:05 |
| 11 | to 647.  But he hasn't really identified a through e.  They | |
| 12 | haven't been brought up on the monitor. | |
| 13 | THE COURT:  Yes.  Let's lay some foundation for | |
| 14 | a through e. | |
| 15 | BY MR. RAPP: | 11:52:22 |
| 16 | Q.   All right.  Here is a.  Can you identify this? | |
| 17 | A.   Yes. | |
| 18 | Q.   You've seen it before? | |
| 19 | A.   I have. | |
| 20 | Q.   647b? | 11:52:31 |
| 21 | A.   Yes, I have. | |
| 22 | Q.   647c? | |
| 23 | A.   I have also seen this. | |
| 24 | Q.   647d? | |
| 25 | A.   Yes. | 11:52:43 |

United States District Court

CARL FERRER - Direct

1   Q.   And 647e?                                                        11:52:43

2   A.   Yes.

3   Q.   And the contents of both the email found in 647 and the

4   attachments, did you have some role at all in sort of the

5   changes that are being made with regard to The Erotic Review     11:53:04

6   that are contained within those exhibits?

7              MR. EISENBERG:  Objection, Your Honor.

8              MS. BERTRAND:  Objection.  Leading, compound

9   question.

10             THE COURT:  Wait, wait.  Mr. Eisenberg was speaking,    11:53:15

11  Ms. Bertrand.

12             MS. BERTRAND:  Sorry.

13             THE COURT:  Mr. Eisenberg?

14             MR. EISENBERG:  Yes, Your Honor.  Well, first of all,

15  it's unclear to me whether the witness said he recognizes back    11:53:23

16  when it came out or he recognizes it because it was shown to

17  him by the Government in preparation for this case.  In other

18  words, was that the first time he saw it?  And that's what I'm

19  concerned with, not only with the underlying 647 but a through,

20  I think, did or e.  That's number one.  Number two, it isn't     11:53:50

21  clear to me how he would recognize this 647.  He just says he

22  recognizes it.  There hasn't been any indication as to how he

23  does.

24             THE COURT:  Well, the jurors will rely on their own

25  memory about his testimony regarding the recollection of the     11:54:13

United States District Court

81

CARL FERRER - Direct

1    email and its content.  But with regard to a through e,                    11:54:16

2    Mr. Rapp, I think further foundation should be laid in a very

3    clear and concise manner with regard to how this witness knows

4    what these a through e items are.

5            One moment, please.                                               11:54:38

6            Ms. Bertrand you wanted to raise an objection.

7            MS. BERTRAND:  And I apologize, Your Honor.  I got

8    ahead of myself.  It was a leading question.  It was a compound

9    question.

10           THE COURT:  And so if you can -- I will sustain that              11:54:48

11   objection as well, Mr. Rapp.  So if you can lay some specific

12   further foundation as to each of the a through e exhibits, then

13   I think you won't run into those objections.

14           MR. RAPP:  Very well.

15   BY MR. RAPP:                                                              11:55:05

16   Q.   Sir, how do you recognize a through e?

17   A.   Andrew Padilla is implementing a change in policy

18   regarding the display of --

19           MR. EISENBERG:  Objection.  It's not responsive.

20           THE COURT:  Well, sustained.                                      11:55:18

21           MR. RAPP:  He's explaining how he knows about it.

22   BY MR. RAPP:

23   Q.   Well, how do you know about these attachments to 647?  How

24   do you know about them?

25   A.   There's a policy change and he's to implement it.                   11:55:31

United States District Court

CARL FERRER - Direct

1    Q.   Did you have discussions with Mr. Padilla about            11:55:34

2    implementing this policy change with respect to The Erotic

3    Review?

4    A.   Yes, I did.

5    Q.   How many times did you have discussions with him about it?  11:55:43

6    A.   A couple of times.

7    Q.   Did you discuss what you were going to allow and disallow

8    with regard to The Erotic Review?

9              MR. EISENBERG:   Objection.   Leading.

10             THE COURT:   Sustained.                                11:56:05

11             MR. RAPP:   It's not leading.

12   BY MR. RAPP:

13   Q.   Tell us what your discussions are with regard to this.

14   A.   It's a big change for us to -- first we remove the links

15   and now we're under pressure to just remove any mention to The  11:56:16

16   Erotic Review.   So we're trying to walk that line between not

17   making The Erotic Review mad at the site by completely

18   eliminating it and still have some kind of review ID available

19   to the user.

20             So Andrew Padilla and I discussed the best strategy   11:56:40

21   and I had it approved by Scott Spear that we will do this.   We

22   will still leave the number.   We'll get rid of the name The

23   Erotic Review.com and we may even get rid of TER but we're year

24   going to leave the ID number.

25             So this is, you know, one of the gradual steps that   11:57:02

United States District Court

CARL FERRER - Direct

1  we were taking.                                                11:57:07

2          MR. EISENBERG:  Objection, Your Honor.  The question

3  was how does he know.  Now he's going into a narrative.

4          THE COURT:  Sustained.

5  BY MR. RAPP:                                                   11:57:16

6  Q.  Did you have a discussion about how this change was going

7  to be communicated with the moderation staff?

8  A.  Yes.

9  Q.  What was that discussion with Mr. Padilla?

10 A.  That discussion is how we're going to allow IDs still to  11:57:25

11 appear without having The Erotic Review mentioned.

12          MS. BERTRAND:  Objection.  Nonresponsive.  Move to

13 strike.

14          THE COURT:  Overruled.

15 BY MR. RAPP:                                                   11:57:40

16 Q.  And as a result, was Mr. Padilla tasked with communicating

17 this change to the moderation staff gentleman?

18 A.  Yes.

19 Q.  And is that change contained within 647, a through e?

20 A.  Yes, it is.                                                11:57:54

21          MR. RAPP:  Move to admit and publish.

22          MS. BERTRAND:  Your Honor, objection as to the

23 exhibit.  Hearsay being offered for the truth of the matter

24 asserted.

25          THE COURT:  Overruled.                               11:58:05

United States District Court

CARL FERRER - Direct

1          A through e may be admitted along with 647.          11:58:09

2              (Exhibit Numbers 647 and 647a through 647e were

3     admitted into evidence.)

4     BY MR. RAPP:

5     Q.   All right.  Going back to 647 --          11:58:19

6              MR. RAPP:  And request permission?

7              THE COURT:  Yes.

8     BY MR. RAPP:

9     Q.   What does -- first of all, who are all of these people

10    here if you know?          11:58:36

11    A.   They are the moderators in Phoenix, Arizona.

12    Q.   All right.  And then who is copied on this email?

13    A.   Joye Vaught.

14    Q.   And do you know why Joye Vaught is copied on this email as

15    opposed to up here with the moderation staff?          11:58:58

16    A.   She's second in command of the department, Moderation

17    Department.

18    Q.   All right.  What does Mr.-- can you read the email that

19    Mr. Padilla sends to the moderation staff?

20    A.   "All:  We've been filtering out the terms 'TER' and 'The          11:59:19

21    Erotic Review' along with links to theeroticreview.com since

22    January of this year but our Internet safety experts have

23    suggested we take a more aggressive approach.

24          "Effective immediately, any variation of, or

25    reference to, TER is banned.  If you find it in an ad, remove          11:59:39

CARL FERRER - Direct

```
1   the phrase and update the ad but do not lock the ad from          11:59:43
2   editing for this violation alone.  If the review ID number is
3   attached to the reference (TER #8675309), remove the ID number
4   along with the TER reference.
5          "If you find a string of numbers without a direct          12:00:08
6   reference to TER, it's allowed.
7          "Examples:  #123456.
8          "Well Reviewed #666666.
9          "Google my reviews #12011201.
10         "An easy way to weed out a good chunk of these             12:00:32
11  references is to do a search for 'TER' on the city page.
12  You'll get some false positives but it should point you in the
13  right direction.  Non-adult spammers will sometimes use hidden
14  keywords like 'block bus ter video' and the search will see the
15  tail-end of 'bus ter'.  To avoid this" --                         12:00:54
16  Q.  Can we just stop for a minute?  Can you just explain what
17  that means?
18  A.  I hope I can.
19         MR. EISENBERG:  Objection, Your Honor.  The witness
20  just said that he may not have knowledge with respect to the      12:01:13
21  answer to this question.
22         THE COURT:  I'll sustain the objection with regard to
23  the question.
24         MR. RAPP:  Never mind.
25  \\\
```

United States District Court

CARL FERRER - Direct

1    BY MR. RAPP:                                                        12:01:34

2    Q.   Let's go on to the next sentence.  What does that say?

3    A.   "To avoid this, you can start your search after you've

4    navigated to the Adult section of the city.

5              "I'm attaching 4 example screenshots of what is not     12:01:51

6    allowed (circled in red) and 1 example screenshot of what is

7    okay (circled in green).

8              "If you have any questions, please ask me or Joye.

9    Thanks."

10   Q.   Okay.  And now looking at 647a, can you explain the          12:02:10

11   circled green, what is this in reference to?

12   A.   So this is an ID number, 117125, it's reviews.

13   Q.   All right.  And is this allowed or disallowed going

14   forward?

15   A.   What's this attachment name?                                 12:02:34

16   Q.   And this is attachment a.

17   A.   Did it have a name in the email address?

18   Q.   Let me see.

19   A.   I just want to make sure I'm accurate.

20             You can see the names, good, bad, bad, bad.             12:03:07

21   Q.   All right.  Is this what you're looking for?

22   A.   This helps right here.  "I'm attaching four example screen

23   shots of what is not allowed circled in red and one example

24   screenshot of what is okay circled in green."

25   Q.   And then looking at 648.                                     12:03:33

United States District Court

CARL FERRER - Direct

1    A.    So this is okay?

2    Q.    All right.  And then going forward, did you become aware       12:03:34

3    of postings that just had a six-digit ID number in them?

4    A.    Yes, many.

5    Q.    And this one actually has can you see what the site is       12:03:54

6    here?

7    A.    The ussexguide3.info.

8    Q.    Did you -- in addition to TER, did you allow other review

9    sites' IDs?

10   A.    We did.       12:04:19

11   Q.    And are you familiar with usasexguide3?

12   A.    It's one of the top referrers and this is probably a

13   redirect URL.

14   Q.    All right.  Going to 647b, allowed or disallowed?

15   A.    This is disallowed because it has TER.       12:04:46

16   Q.    All right.  And going forward, did you observe in postings

17   misspellings of TER?

18   A.    Yes.

19   Q.    And were they allowed?

20   A.    We wouldn't actively hunt them down.       12:05:07

21   Q.    All right.  And then going to -- well, so let me ask you,

22   when you found one of these ads that had this that you were

23   going to disallow, what would you do with the ad?

24   A.    We are taking outside TER ID and the review number, but

25   we're not removing the ad and we're not blocking the user from       12:05:45

CARL FERRER - Direct

1   any future postings.                                                    12:05:49

2   Q.   All right.  And then 647.  Allowed or disallowed?  647c?

3   A.   Disallowed?

4   Q.   647, did?

5   A.   Disallowed.                                                        12:06:13

6   Q.   And finally, 647e, disallowed or allowed?

7   A.   Disallowed.

8   Q.   All right.  Now let's look at, for the witness's eyes

9   only, 1612b.  And this is a two-page document.

10           Is this an email exchange involving Andrew Padilla?   12:07:06

11           MS. BERTRAND:  Objection.  Leading.

12           THE COURT:  Sustained.

13   BY MR. RAPP:

14   Q.   Who does this email exchange involve?

15   A.   Andrew Padilla and members of the Moderation Department   12:07:22

16   and I'm also receiving it and Scott Spear.

17   Q.   All right.  And does this -- do you know what the subject

18   of this email is?

19   A.   Stricter guidelines for nudity, January 2011.

20           MR. RAPP:  All right.  Move to admit 1612b.           12:07:45

21           THE COURT:  Yes.  It may be admitted.

22           (Exhibit Number 1612b was admitted into evidence.)

23           MR. RAPP:  And publish, please.

24   BY MR. RAPP:

25   Q.   So let's go to the second page.  So what does Mr. Padilla   12:07:57

United States District Court

CARL FERRER - Direct

1  tell the moderation staff here?                                    12:08:15

2  A.   "Backpage will be increasing the restrictions on images in

3  adult categories effective immediately.

4       "The latest changes apply specifically to bare

5  breasts, butt cleavage and sheer clothing.                         12:08:39

6       "Moving forward, breasts must be covered with

7  clothing.  Not hands, not articles, not glittery hearts, not

8  fuzzed out, not pixelized, not covered in soap suds or towels

9  or pillows or hair or pasties.  If it's an image of an escort

10 with her back completely to the camera, it's okay.  Otherwise,     12:09:00

11 clothes are the only acceptable form of cover up.

12      "Thongs are still acceptable for bottoms but they

13 must be worn as they were intended to be worn.  Not a little

14 bit below the crack, not half way down.  All the way up or it

15 gets removed.  The old rule supersedes this if genitalia is        12:09:20

16 otherwise exposed, (that is, if a thong is being worn properly

17 but anything is visible or bulging out of the crotch, it's

18 still a violation.)

19      "Sheer clothing is still allowed as long as the

20 coloration of the nipples, areola or genitalia is not visible.     12:09:39

21 Mesh or netting with visible nipples, areola or genitalia is a

22 violation.  If the coloration around the anus is visible

23 through sheer clothing or around the thong, it's a violation.

24 This will also apply to wet, transparent clothing.  For

25 example, a white t-shirt with visibly erect nipples is okay; a     12:09:59

CARL FERRER - Direct

1    wet white t-shirt with visible coloration of the nipples and          12:10:05

2    areola is not.  But a wet black t-shirt is okay because

3    coloration will not be apparent.

4              "As always, you should only be redacting content and

5    not deleting the entire ad when you find these violations.           12:10:20

6    These violations are completely" --

7    BY MR. RAPP:

8    Q.   Let me stop you there, Mr. Ferrer.  Why is that the case

9    that you redacting the content and not deleting the entire ad

10   when you find the violations that he details above?                  12:10:35

11   A.   We're not deleting the entire ad because --

12             THE COURT:  One second.  I want to make sure.

13             Are you okay back there?

14             PANEL MEMBER:  Oh, yes.

15             THE COURT:  All right.                                      12:10:52

16             You can move forward, Mr. Rapp.

17             MR. RAPP:  Thank you.

18   BY MR. RAPP:

19   Q.   Why were you not deleting the entire ad and you're just

20   redacting the content?                                               12:10:59

21   A.   The standards are continually changing.  This is a huge

22   change.  I mean, there's no way we're going to delete tens of

23   thousands of ads.  So we're very customer service friendly.

24   We're simply going to take out the images that don't meet the

25   new standard.  This will be good for revenue.                        12:11:22

United States District Court

CARL FERRER - Direct

1   Q.   All right.  And then what is the next sentence he says?   12:11:26

2   A.   "These violations are completely different from ads for

3   illegal services.  Nudity violations will always be a part of

4   this business and we shouldn't treat our users unfairly because

5   the company's standard for propriety is constantly changing."   12:11:43

6   Q.   Let me just stop you there.  What did you mean by those

7   last two.  These violations are completely different from ads

8   for illegal services and then the next sentence, what did you

9   take that to mean?

10  A.   Nudity, bare breasts, it's different than a sex act for a   12:12:02

11  particular dollar amount.  One is just way too obvious

12  prostitution and those are the ads that will be deleted.

13  Q.   All right.  And then the last two sentences?

14  A.   "If however you run into ads that endanger a minor in any

15  way, Community Remove the ad and send the ad url to Joye.   12:12:37

16          Thanks.  Andrew Padilla."

17  Q.   And then what does Andrew say in this above email to the

18  moderation staff?

19  A.   Andrew writes, "As an extra measure of customer service,

20  don't lock ads from editing if users are only violating the new   12:13:13

21  rules.  We'll give users a month or so to adjust.  Thanks."

22  Q.   And what did you take that to mean?

23  A.   Andrew is implementing the company mandate, the directive.

24  You know, don't throw the baby out with the bathwater.  Make

25  these changes in a graduated fashion.  We're not going to lose   12:13:38

United States District Court

CARL FERRER - Direct

| | |
|---|---|
| 1 | revenue over moderation changes. | 12:13:46 |
| 2 | Q.   And who does he copy on this email? |
| 3 | A.   He copies Joye Vaught and blind copies myself. |
| 4 | Q.   And why is he copying Joye Vaught? |
| 5 |         MS. BERTRAND:  Objection.  Calls for speculation. | 12:14:07 |
| 6 |         THE COURT:  Overruled.  If he knows. |
| 7 |         THE WITNESS:  She's second in command of the |
| 8 | Moderation Department. |
| 9 | BY MR. RAPP: |
| 10 | Q.   And then in this case do you send this Andrew's summary to | 12:14:16 |
| 11 | anybody? |
| 12 | A.   I do. |
| 13 | Q.   Who do you send it to? |
| 14 | A.   I send it to Scott Spear. |
| 15 | Q.   And then why do you send it to Scott Spear? | 12:14:36 |
| 16 | A.   Because he's the one originating the standard and I want |
| 17 | to make sure that we're not missing anything. |
| 18 | Q.   First of all, we are now into 2011; right? |
| 19 | A.   Yes. |
| 20 | Q.   If you know, how are the alternative newspapers doing in | 12:15:07 |
| 21 | 2011? |
| 22 | A.   They continue to struggle. |
| 23 | Q.   When you say "they continue to struggle," what do you mean |
| 24 | by that? |
| 25 | A.   Well, they are not exceeding revenue from the years prior. | 12:15:21 |

United States District Court

CARL FERRER - Direct

1    They are in a gradual decline.                                    12:15:24

2    Q.   Well, we looked at the Google Analytics for January for

3    Backpage but in terms of revenue, how is Backpage doing in

4    terms revenue?

5    A.   We're hitting record revenue, new highs month over month    12:15:41

6    with the exception of February because there's only 28 days in

7    February.   But once you get through February, each month we're

8    beating the month prior.

9    Q.   All right.   And do you observe the volume of postings

10   increasing?                                                       12:16:03

11   A.   Significant increase.

12   Q.   All right.   We talked about -- we looked at some emails

13   about exchanges with Mr. Spear and Mr. Myles about having a

14   meeting at this organization by the name of Polaris.   Do you

15   remember that?                                                    12:16:27

16   A.   Yes.

17   Q.   And I believe your testimony was that you also had a

18   meeting with NCMEC, the National Center of Exploited and

19   Missing Children?

20   A.   Yes, we did.                                                 12:16:41

21   Q.   And when did those meetings take place?   Do you know?

22   A.   Spring of 2011.

23   Q.   Were you asked to do anything in advance of those two

24   meetings?   In preparation of those two meetings, anything?

25   A.   I was asked to help create the PowerPoint for those two      12:16:57

United States District Court

CARL FERRER - Direct

1  meetings and then I would be going to Washington, D.C., to                    12:17:00
2  present -- to run the PowerPoint.
3  Q.   All right.  And who did you get direction on to put
4  together the PowerPoint?
5  A.   Scott Spear, Jim Larkin.                                                 12:17:14
6  Q.   All right.  And did you actually create some type of
7  PowerPoint?
8  A.   We did.  Our user safety experts were also involved,
9  Hemanshu Nigam.
10 Q.   And anybody else?                                                        12:17:27
11 A.   I think that's it.
12 Q.   Did the PowerPoint, before it was presented to NCMEC and
13 Polaris, did it have to be approved by anybody?
14 A.   Yes.
15 Q.   Who?                                                                     12:17:46
16 A.   This PowerPoint is going to be approved by the owners
17 before we present it.  This is an extremely important event.
18 Q.   Why is this an extremely important event?
19 A.   We set up this meeting with NCMEC to hopefully get their
20 buy-in that we could be almost a partner, that we could just                 12:18:03
21 send them NCMEC reports and show that we've made some changes
22 and get their buy-in.
23 Q.   All right.  Do you travel to Washington, D.C.?
24 A.   Yes.
25 Q.   Do you go to this office NCMEC?                                          12:18:24

United States District Court

CARL FERRER - Direct

1   A.   We do.  I do, along with others from the company.          12:18:27

2   Q.   And where is the office located?

3   A.   Somewhere in Washington, DC.  I took a taxi.

4   Q.   Okay.  You took a taxi.

5        When you get to NCMEC, where do you go?                    12:18:42

6   A.   We went to their conference room and set up for the

7   PowerPoint presentation.

8   Q.   And was that something you were focused on?

9   A.   Yes.

10  Q.   All right.  Who do you meet with from NCMEC?  Do you       12:19:02

11  remember who was there?

12  A.   Ernie Allen was there.  He's the CEO of NCMEC.  And John

13  Shehan I believe, also one of the more high-level employees at

14  NCMEC, and several other NCMEC employees.

15  Q.   And while you were there, were you given anything by       12:19:36

16  Mr. Allen?  Let me show you Government's 684a.  I'll put that

17  on your screen.  So just take a look at that.

18        THE COURT:  Mr. Rapp, can you ask the witness when

19  this happened?

20        MR. RAPP:  When what happened?                            12:20:09

21        THE COURT:  This meeting?

22  BY MR. RAPP:

23  Q.   Did you not testify it was in the spring of 2011?

24  A.   I said spring of 2011.  No snow on the ground.

25  Q.   Okay.  But would this email in 684a, can you take a look   12:20:21

United States District Court

96

CARL FERRER - Direct

1   at that?                                                      12:20:29

2   A.   Yes.

3   Q.   And does this email have anything to do with the meeting

4   that you had?

5   A.   Yes.  I believe this email was sent the day after the    12:20:43

6   NCMEC meeting.

7   Q.   All right.  Okay.  And were there some attachments -- let

8   me just show you some attachments to the email.  Do you

9   recognize the attachments to 684a?

10  A.   Yes.                                                      12:21:05

11  Q.   Okay.  And can you explain again what is contained in 684,

12  the attachments?  How did you come into possession of those?

13  A.   We received these attachments from NCMEC and they

14  demonstrated a -- the postings they had made on the site.

15  Q.   Okay.  And when you were given those, did you do anything   12:21:33

16  the next day with those in any respect?

17  A.   I did.  It was the Seal Team 6 effort again to figure out

18  what the posting was and what happened.

19  Q.   Okay.  And can you explain how you went about locating the

20  postings and then what you did afterwards?                     12:21:56

21  A.   We used NCMEC's copy and the information they provided on

22  the postings that they had made and then we did searches on the

23  database to try to find those postings and then we did a

24  step-by-step analysis to what happened to those postings.

25  Q.   All right.  And those postings are all contained in the    12:22:22

United States District Court

CARL FERRER - Direct

1   attachments to this email?                                          12:22:25

2   A.   Yes.

3           MR. RAPP:   Move to admit 684a and the attachments.

4           MS. BERTRAND:   Objection.   Hearsay, 401, 403.

5           MR. CAMBRIA:   And foundation.                              12:22:38

6           MS. BERTRAND:   And foundation.

7           THE COURT:   Overruled as previously noted 401.   It

8   may be admitted and published.

9           (Exhibit Number 684a was admitted into evidence.)

10  BY MR. RAPP:                                                         12:22:57

11  Q.   All right.   And so what are you telling Mr. Spear and some

12  others in this email?

13          MR. CAMBRIA:   What's the number?

14  A.   "NCMEC posted 8 under aged pics.   We have not found all of

15  them.                                                               12:23:20

16          "We did find the national ad.   Posted in all cities

17  for $2997.45 by" they included the phone number.

18          "The ad link is below.   It appears live but is

19  actually ghosted:"   There's a link to the ad in Phoenix

20  FemaleEscorts/ready-for-some-fun-18 with the ad ID 12833625.        12:23:41

21          "Ad history:   Original posting date, Friday, February

22  25, 2011 at 12:55 PM.

23          "Moderated (Tier 1) Approved by at47 at 2011-02-25

24  12:56:35.   A review of the post shows the moderator followed

25  our guidelines.   It is likely our Tier 2 moderators" -- "it is    12:24:15

United States District Court

CARL FERRER - Direct

1  likely our Tier 2 moderators would have also approved it.                      12:24:20

2          "A fraud alert email was triggered on the post at

3  February 25, 2011 at 12:56:46 PM.

4          "The ad was ghosted by staff as suspected fraud on

5  February 25, 2011 at 12:58 P.M.  The ad was live less than 2   12:24:38

6  minutes.  NCMEC reports 30 phone calls.  This is possible.

7          "The credit card was not settled and the invoice

8  marked as fraud by our accounting staff (bp1) on Friday,

9  February 25, 2011 at 1:04 P.M.

10          "Policy change recommendation" --                              12:25:06

11  BY MR. RAPP:

12  Q.   Let me just stop you.  Why are you giving a policy change

13  recommendation to Mr. Spear and also to Mr. Larkin?

14  A.   Because they approve the policies.

15  Q.   And what is the recommendation that you make?              12:25:20

16  A.   "It would be good to have also included a NCMEC report in

17  the process above.  We should report underaged pics whether

18  they are scammers or real ad posters.  In other words, report

19  to NCMEC much more aggressively (blurred or not blurred) pics

20  that could be underaged."                                          12:25:42

21          "I asked Andrew to move forward on this task."

22  Q.   And why are you asking Andrew to move forward on this

23  task?

24  A.   Because he and Joye managed the cybertip reports.  Those

25  NCMEC reports are done by the staff in his department.          12:26:01

United States District Court

CARL FERRER - Direct

1   Q.   All right.  And then looking at 684a, is this one of the          12:26:07

2   documents that Mr. Allen provided you?

3   A.    Yes.

4           MR. RAPP:  Move to admit 684a.

5           THE COURT:  It has been admitted.                              12:26:31

6           MR. RAPP:  Oh, I'm sorry.

7           The whole thing is 684a.

8   BY MR. RAPP:

9   Q.   So can you tell us, do you recall Mr. Allen providing you

10  these documents?                                                      12:26:48

11  A.   Yes.  He put them up on screen during the PowerPoint and

12  we received handouts.

13  Q.   All right.  And what if anything, did he tell you while

14  you were at NCMEC about these?

15          MR. CAMBRIA:  Object to hearsay.                              12:27:06

16          THE COURT:  Overruled.

17          THE WITNESS:  He said our image safeguards were

18  ineffective and, look, we have proof.

19  BY MR. RAPP:

20  Q.   All right.  And let's go on to the next page.  Did he say        12:27:16

21  that they had posted these ads?

22          MR. EISENBERG:  Objection.  Leading.

23          THE COURT:  Sustained.

24  BY MR. RAPP:

25  Q.   What did he say about how these ads ended up on Backpage,        12:27:32

United States District Court

CARL FERRER - Direct

1    if anything?                                              12:27:37

2    A.    He said he had posted those ads and that I wasn't able to

3    find the ads for the ones that were on the previous slide, but

4    I did find this ad or I should say Seal Team 6 and the company

5    found this ad.                                            12:27:49

6           MS. BERTRAND:  Objection.  Nonresponsive.  Move to

7    strike.

8           THE COURT:  I'll strike the last portion of the

9    testimony after -- well, where he said, "I did find this ad."

10   So that part of the testimony is stricken.                12:28:14

11          But, Mr. Rapp, you have about two minutes more.  I

12   promised the jury I would release them at 12:30.

13          MR. RAPP:  I understand and I won't stand in their

14   way.

15   BY MR. RAPP:                                              12:28:29

16   Q.    Can you just read what is on this the exhibit here?  What

17   did they tell you about this particular posting?

18   A.    "For $3,000, Backpage.com Allowed Us to Advertise.

19          "Ad took less than 5 minutes to post across hundreds

20   of cities.                                                12:28:52

21          "Ad image was posted online instantaneously.

22          "All personal information about the poster was

23   fabricated.

24          "All credit card information was anonymous.

25          "Ad received over 30 calls within 7 minutes of being  12:29:03

United States District Court

CARL FERRER - Direct

1    placed."                                                           12:29:07

2    Q.    And then going on to the next one, what does this -- what

3    did this, the information that Mr. Allen was conveying to you

4    about this ad?

5    A.    "One Ad, One City, One Day...40 Men Call to Pay for Sex     12:29:18

6    With Her.

7              "We received an average of 40 calls <u>per ad</u> in a

8    24-hour period for each of the ads we placed.

9              "Calls came in within minutes of posting; faster than

10   we could answer.                                                   12:29:36

11             "After explicitly and unambiguously informing the

12   caller that the female was underage, about half of the men

13   continued to express an interest in paying for sex with her."

14   Q.    And is this one, is this the actual posting?

15   A.    Well, this is one of them.  This is the national ad         12:30:01

16   posting that I found, the one posted in multiple cities.

17   Q.    And when Mr. Allen gave you this, was Mr. Lacey in the

18   room at NCMEC with you?

19   A.    Yes.

20   Q.    All right.                                                   12:30:18

21             MR. RAPP:  Judge, I would be going on to another

22   area.

23             THE COURT:  All right.

24             With that, members of the jury, we will conclude for

25   the week.  I do, again, ask you to remember the admonition       12:30:30

United States District Court

CARL FERRER - Direct

1    especially over the weekend.  Do not be tempted to research any        12:30:36
2    subject matter, anything that has been discussed, any of the
3    parties in the case, any of the information about the witness
4    who has been on the stand testifying.  Try to avoid any news
5    articles that may appear.  And it's helpful if you simply just        12:30:58
6    keep it out of your mind.  Don't come to any conclusions.
7    Again we are very early on in the case as you know.  Just
8    simply try to enjoy the weekend.  Hopefully we'll be under 100
9    degrees finally.
10          And so with that, please all rise for the jury.              12:31:15
11          (Jury departs at 12:31.)
12          THE COURT:  Mr. Ferrer, you may step down.  Again,
13   those who are present in courtroom I would ask to remain for a
14   few minutes so that the jurors can leave uninterrupted.
15          MS. BERTRAND:  Your Honor, before we break for the           12:31:58
16   day --
17          THE COURT:  Let me tell you what I need to address
18   with the parties and then I'll let you go, Ms. Bertrand.
19          I'm going to tell you, Mr. Rapp, that the issue that
20   I had with Exhibit -- I think the 2038, is the email, the           12:32:17
21   one -- I'm sorry, a couple-lined email document.  The email --
22   the question you asked was only as to the email address and the
23   email addresses are not indicative of Backpage.com employees.
24   I understand that the one email address to is to The Village
25   Voice.  But beyond that, I don't know how you can have             12:33:04

United States District Court

CARL FERRER - Direct

1    Mr. Ferrer say that he is familiar with this email, because          12:33:08

2    he's nowhere on the posting.  And, again, it doesn't appear to

3    me that he can actually authenticate it because it doesn't look

4    like those individuals are Backpage.com email users.

5           And so -- and I guess you need to explain to me, is        12:33:29

6    there a part two of this email that you are hoping to get in?

7    Because I think the testimony leading up to this was some sort

8    of responsive -- some sort of response to the CNN documentary.

9           And Mr. Ferrer did say that he participated in some

10   of that crafting of that response but I don't know how the two     12:33:58

11   interrelate.  So the objection by Mr. Lincenberg was well-taken

12   in my view.

13          MR. RAPP:  Okay.  I think I can connect this up and

14   I'll do it when we come back.  2037 is on screen.  This is from

15   Mr. Larkin to Jed Brunst.                                           12:34:22

16          THE COURT:  Wait, wait.  How does that relate to

17   2038?

18          MR. RAPP:  I'm explaining that.

19          THE COURT:  Okay.

20          MR. RAPP:  So Jim Larkin is sending to Jed Brunst and       12:34:30

21   then copying Carl Ferrer and Scott Spear this CNN letter from

22   David Vigilante and then in -- to David Vigilante and that is

23   the -- that's the letter that is sent to Vigilante that

24   Vigilante sends a response that is the subject of 85 that we're

25   going to provide redactions.  And then what I can do when we       12:35:03

United States District Court

CARL FERRER - Direct

1   come back is, I can put a little bit more context on this one          12:35:09

2   because now Mr. Brunst is sending the response letter to CNN to

3   some of the investors in "The Village Voice."

4           THE COURT:  Well, lay some foundation and just on

5   that point, you're going to have to go back to the old school       12:35:34

6   way of laying that foundation.  Otherwise, you're going to

7   continue to draw those objections.  I mean, I think it's just

8   quite simple, Mr. Rapp.  Just go back to the old ways that we

9   used to do thing.  Do you recognize the exhibit?  How do you

10  recognize it?  Do you remember the content of it, blah, blah,       12:35:55

11  blah, you know.  Otherwise, you're going to draw the objection

12  from Ms. Bertrand as she's entitled to do.

13          MR. RAPP:  Very well.

14          MR. LINCENBERG:  Your Honor, I was just going to

15  comment with regard to 2038.                                        12:36:11

16          THE COURT:  What was that?

17          MR. LINCENBERG:  You were asking Mr. Rapp about 2038.

18  And I think the point he's missing -- put 2037 aside.  That's a

19  different exhibit -- is 2038 is an email that Mr. Ferrer has

20  never seen.                                                         12:36:30

21          THE COURT:  I know and that's contactually the point

22  I made.

23          MR. LINCENBERG:  But what he's trying to do is lay a

24  foundation by pointing to recognition of an email but he can't

25  testify to something he's never seen.                              12:36:41

United States District Court

CARL FERRER - Direct

1      THE COURT:  And that's exactly the point I made.        12:36:44

2      MR. LINCENBERG:  It is and I'm speaking out because I

3  think it's also what's happening with other exhibits where --

4      THE COURT:  Give me a specific example.

5      MR. LINCENBERG:  Well, I think part of the example      12:36:59

6  was whatever the number was 847, a through 3, some of those, or

7  647 where -- what Mr. Ferrer is doing is, he's basically saying

8  I discussed -- I think in that case it was I discussed with

9  Mr. Padilla this general topic.  And then he comes back and a

10 through e relate to that topic.  But it's pretty clear that he  12:37:21

11 didn't see those ads at the time.  And I think it's an end run

12 that the Government is playing to try to get him as if he has

13 firsthand knowledge in his speaking to those ads.  And I think

14 that's where some of the others' objections lie, is that

15 there's an end run around foundation and his ability to testify  12:37:43

16 to these documents.

17     THE COURT:  Well, just lay the foundation as to each

18 exhibit and I'll point this out.  Mr. Ferrer, early on and they

19 did repeatedly because of objections, he has laid sufficient

20 foundation for his role in the company, multiple roles.  His    12:38:05

21 interaction, his knowledge of TER, the marketing research he

22 has to do and so I just make that observation that there is

23 sufficient information in the record, testimony and his

24 background and his knowledge in terms of his awareness.  So

25 just in a general sense.  I just make that observation.         12:38:31

CARL FERRER - Direct

1    So unless you want him to continue to testify about          12:38:35

2    this role in a day-to-day way, I think there's sufficient

3    foundation as to his experience and knowledge.  And I'm glad no

4    one is asking him about what do you mean by prostitution?  I

5    don't think we necessarily need to hear him again testify about    12:38:55

6    his knowledge of what prostitution is or what a sex act is.

7    But that's the observation I make.

8         And I do encourage you, Mr. Rapp, to just go back to

9    the way that you were all trained, we were all trained in trial

10   practice, go back to the old school way of laying foundation    12:39:16

11   for each exhibit, and I don't think we'll have all of those

12   objections related to foundation that we've had.

13        And so Ms. Bertrand?

14        MS. BERTRAND:  Thank you, Your Honor.  At this time I

15   renew the defense's motion for a mistrial based on this          12:39:35

16   morning's presentation which was the bulk of it about child sex

17   trafficking, child sex trafficking investigations, some stings,

18   like NCMEC ran a sting and Phoenix police ran a sting.  And I

19   am predicting this is going to be the bulk of this case and I

20   would estimate and I'm going to have my office work on this.  I    12:40:01

21   would estimate that fully 25 percent to 33 percent of the

22   exhibits that have come in so far relate not to just plain old

23   prostitution but something involving crimes against children.

24   And that is exactly what the defense has been saying is going

25   to be the danger with this case and the Government's approach      12:40:20

United States District Court

CARL FERRER - Direct

1   to it.  So I'm renewing our motion for mistrial at this time.        12:40:22

2            THE COURT:  And do you wish to respond, Mr. Rapp?

3            MR. RAPP:  Well, of course child sex trafficking and

4   child prostitution is a subset of prostitution and each exhibit

5   that is being demonstrated or being exhibited is tethered to       12:40:41

6   each one of these defendants in some fashion or another and so,

7   therefore, they are highly relevant and demonstrate that they

8   are put on notice that prostitution is on the website.  Yes, it

9   just happens to be child prostitution but the Court has already

10  ruled on that.                                                      12:41:01

11           MS. BERTRAND:  And the Court ruled in the last trial

12  that the Government overstepped the amount of license the Court

13  was giving the Government to prove up its case and it's not as

14  if this is the only way the Government can prove up a

15  prostitution case.  This is deliberate on the part of the          12:41:17

16  Government and it is out of bounds on 403 even if it is

17  relevant.

18           THE COURT:  Well, the Court has ruled exhaustively on

19  this issue and it is the Court's prior ruling that the evidence

20  has to be tethered to one of the defendants and the substantive    12:41:34

21  counts in the indictment.  But by my review, we're only in I

22  think day three and a half of this witness's testimony and by

23  my review of the exhibits that have come in so far, I think

24  today is the only day that I've seen any real photographs or

25  pictures of exhibits related to underaged individuals, not         12:42:02

United States District Court

CARL FERRER - Direct

1  children per se, teens and older.                                    12:42:07

2          And so at this juncture, I don't think there's

3  sufficient reason to declare a mistrial.  I don't think the

4  Government has pushed the envelope that far yet.

5          And, again, I will monitor it, ensure the Government   12:42:31

6  adheres to the Court's ruling in terms of tethering those

7  exhibits to the particular defendants and their awareness of it

8  and the substantive counts in the indictment.  But the motion

9  for a mistrial is -- I'm going to deny that motion.

10          All right.  With that we stand in recess and, again,   12:42:56

11  I think Lilliana has worked out a system where on a daily basis

12  she'll make sure that she and you are all on the same page with

13  regard to the exhibits that have been received into evidence.

14          And with that we will stand in recess --

15          MR. RAPP:  Judge, just one brief.  This kind of got   12:43:14

16  away from me as we were talking about the emails but the under

17  1212, as long as Mr. Ferrer can identify the email address, the

18  email is authentic.

19          THE COURT:  Well, I think the ruling really had to do   12:43:34

20  with his role in Backpage and the Backpage email addresses in

21  terms of authentication.  But there's an email that has a bunch

22  of people that are not Backpage employees and in the course of

23  his work -- I mean, I think that's the problem here.  And your

24  line of questioning, Mr. Rapp, really was, do you recognize the

25  address?  What is the address?  And that was it.  I mean, it's   12:44:04

United States District Court

CARL FERRER - Direct

1   not do you recognize the email and the content of the email?          12:44:06

2          MR. RAPP:  I just have to authenticate the email

3   under 1212 and this is the email he's exchanged with Mr. Brunst

4   frequently, The Village Voice email, it comes in.  He's now

5   authenticated it.  Now, can he give his opinion as to the          12:44:25

6   contents?  No.  But the email itself comes in and from there,

7   he can't -- he can't talk about it.  But 1212 is pretty clear

8   and Judge Brnovich's order is pretty clear on what we have to

9   do to authenticate an email.  I'll tell you, it would be very

10  difficult to do a white collar case if he had to identify all          12:44:50

11  of the other peoples' emails.  He just has to identify

12  Mr. Brunst's email.

13         THE COURT:  But it's this document in particular that

14  I'm concerned about because there's really no content there.

15  It's a one-page email.  So in any event, I'll look at the order          12:45:05

16  again; but I think the way that you draw drew out the

17  testimony, it's problematic.  I mean, you have to lay that

18  foundation, Mr. Rapp, and if you want to review the transcript.

19         Okay.  All right.  We'll stand in recess and you can

20  make a record -- I don't want a repeat of the same argument,          12:45:25

21  Mr. Lincenberg; okay?

22         MR. LINCENBERG:  It's not repeating anything.  That's

23  okay.

24         THE COURT:  Okay.  What's the new matter?

25         MR. LINCENBERG:  It's simply that part of the point          12:45:36

CARL FERRER - Direct

1   is that there's an email between two people at Goldman Sachs.          12:45:37

2   So he's pointing out an earlier email on the chain which is

3   essentially what he's trying to do with I think it's 1037.

4   1038 is emails between two different people at Goldman Sachs.

5            COURTROOM DEPUTY:  All rise.          12:46:10

6            (Whereupon, these proceedings recessed at 12:46 p.m.)

7                        * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

C E R T I F I C A T E

         I, ELAINE M. CROPPER, do hereby certify that I am
duly appointed and qualified to act as Official Court Reporter
for the United States District Court for the District of
Arizona.

         I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion of
the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control, and to the best of
my ability.

         DATED at Phoenix, Arizona, this 15th day of
September, 2023.



                              s/Elaine M. Cropper
                              _____
                               Elaine M. Cropper, RDR, CRR, CCP




              United States District Court