**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 19, 2023 |
| Michael Lacey, et al. | ) | 1:04 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - DAY 8 - P.M. SESSION

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
        **Mr. Peter S. Kozinets, Esq.**
        **Mr. Andrew C. Stone, Esq.**
        **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov

For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
    Washington, DC 20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
    bf@federlawpa.com
    - and -
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
    eric.kesslerlaw@gmail.com

```
 1   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 2       LINCENBERG & RHOW, P.C.
         By:  Mr. Gopi K. Panchapakesan, Esq.
 3            Mr. Gary S. Lincenberg, Esq.
         1875 Century Park E, Suite 2300
 4       Los Angeles, CA 90067
         gpanchapakesan@birdmarella.com
 5       glincenberg@birdmarella.com

 6
     For the Defendant Andrew Padilla:
 7       DAVID EISENBERG, P.L.C.
         By:  Mr. David S. Eisenberg, Esq.
 8       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
 9       david@deisenbergplc.com

10
     For the Defendant Joye Vaught:
11       JOY BERTRAND, ESQ., L.L.C.
         By:  Ms. Joy M. Bertrand, Esq.
12       P.O. Box 2734
         Scottsdale, AZ 85252
13       joy@joybertrandlaw.com

14                        I N D E X
15   EXHIBIT NO.                                    PAGE:
```

| EXHIBIT NO. | | PAGE: |
|---|---|---|
| 1698 | Email from McNally with attachment, 11/30/2011, DOJ-BP-0000054231 - DOJ-BP-0000054233 | 8 |
| 1698a | -0000054234 - DOJ-BP-0000054267 Attachment. "Notice to Auburn Board 11.30.11", DOJ-BP | 8 |
| 1130 | Email from Vaught, "weekend dec 10-11", 12/09/2011, DOJ-BP- Email 0000001235 Email | 9 |
| 42 | Email from Dollar Bill to Ferrer, 12/21/2011 DOJ-BP-0004602794 | 11 |
| 42a | Email to Hyer, Ferrer, Brunst, Spear, Larkin, Padilla, attaching page view And revenue reports, 10/16/2013 | 11 |

| 1 | **EXHIBIT NO. CONTINUED** | | **PAGE:** |
|---|---|---|---|
| 2 | | DOJ-BP-0004820697 | |
| 3 | 986 | Email from Spear, "Fwd: Analytics | 13 |
| 4 | | Backpage.com 20111227", 12/28/2011, USAO-BP-0024062 | |
| 5 | 986a | Attachment. "Analytics backpage.com | 13 |
| 6 | | 20111227", USAO-BP-0024063  USAO-BP-0024076 | |
| 7 | 120a | Email to Ferrer, Transmittal  Backpage Lender Pres V6 DOJ-BP-0000195806 | 18 |
| 8 | 120b | Attachments from Email to Ferrer | 20 |
| 9 | | Transmittal-Backpage lender Pres v6 | |
| 10 | 140a | Redacted version of Exh 140 DOJ-BP-0000052545  DOJ-BP-0000052551 | |
| 11 | 711 | Email from Ferrer to Larkin and Brunst, | 39 |
| 12 | | "Update agenda on Backpage", 01/18/2012, DOJ-BP-0004602467 - DOJ-BP-0004602468 | |
| 13 | 1714a | Email Michael Sitrick of PR firm, | 43 |
| 14 | | To Michael Lacey, Steve Suskin, Jim Larkin, Tony Knight and Carl Ferrer | |
| 15 | 1827a | Redacted version of Exh 1827 DOJ-BP- | 46 |
| 16 | | 0000349502 DOJ-BP-0000349504 | |
| 17 | 1200a | Redacted Exhibit 1200; Email to Lacey and Larkin | 49 |
| 18 | 1896 | Email from Lacey to Ortega, "Re: | 51 |
| 19 | | Update?", 03/19/2012, DOJ-BP-0004834481l | |
| 20 | 120 | Backpage PowerPoint, September 2011 DOJ-BP-0000195807-DOJ-BP-0000195849 | 62 |
| 21 | 1911b | Redacted version of Exh 1911 | 76 |
| 22 | | DOJ-BP-0004485960 | |
| 23 | 733a | Redacted version of Exh 733 | 80 |
| 24 | 1919 | Email to Spear "Analytics backpage.com 20120416" | 87 |
| 25 | | | |

UNITED STATES DISTRICT COURT

| 1 | **EXHIBIT NO. CONT.** | | **PAGE:** |
|---|---|---|---|
| 2 | 1919a | Attachment, Analytics Backpage.com_20120416" | 87 |
| 3 | 146 | Emails between Hyer, Ferrer, Mohan, Padilla, and Vaught, 03/02/2012 | 89 |
| 4 | | DOJ-BP-0000000573- DOJ-BP-0000000574 | |
| 5 | 532 | Email from Padilla to Moderators Dated 4-3-12 and Titled "Image Restoration | 91 |
| 6 | | Development is Done" with Attached DOJ-BP-0000000190 | |
| 7 | | | |
| 8 | 532a | Email from Padilla to Moderators Dated 4-3-12 and Titled "Image Restoration Development is Done" with Attached | 96 |
| 9 | | DOJ-BP-0000000190 | |
| 10 | 725 | Email from Padilla, "Moderation Reminder/ Update", 04/05/2012, DOJ-BP-0000032047 | 98 |
| 11 | | | |
| 12 | 725b | PDF of Exhibit 725-a; Attachment. Spreadsheet (native), "banned.xls", DOJ-BP-0000032048 | 98 |
| 13 | 724 | Email from Padilla to Moderators Dated 4-3-12 and Titled "Image Restoration | 102 |
| 14 | | Development is Done" with Attached DOJ-BP-0000000190 | |
| 15 | | | |
| 16 | 1829 | Email, "Important  Letter from Your acquirer", 07/04/2015 | 106 |
| 17 | | DOJ-BP-0004472080 - DOJ-BP-0004472083 | |
| 18 | 1829a | Attachment: FilterTerm42312.worked.xls DOJ-BP-0004434049 | 106 |
| 19 | 1830 | Email message from Padilla to Ferrer, "Re: Filtered term with false positives", | 108 |
| 20 | | 05/11/2012, DOJ-BP-0000020687 | |
| 21 | 1830b | PDF of 1830-a; Spreadsheet | 109 |
| 22 | 154 | Email from Padilla to Vaught and Staff (with attachment), 05/11/2012 | 111 |
| 23 | | DOJ-BP-0000025603 | |
| 24 | 154a | Attachment. Spreadsheet identifying over 600 code words/phrases DOJ-BP-0000025604 | 111 |
| 25 | | | |

6

```
 1                    P R O C E E D I N G S

 2

 3        (Proceedings commence at 1:04 p.m.)

 4            THE COURT:  Please be seated.  Mr. Rapp, considering

 5    your exhibit your CNN exhibit, it's heavily redacted.          13:04:11

 6            MR. RAPP:  Yes.

 7            THE COURT:  It's almost too heavily redacted for my

 8    preference, and so I don't know why it is you can't just offer

 9    it, offer whatever it was that's in that e-mail after proper

10    foundation with your witness.                                  13:04:29

11            MR. RAPP:  You mean the entirety unredacted?

12            THE COURT:  Whatever the unredacted parts of it are

13    that you are going to bring in.

14            MR. RAPP:  Okay.

15            THE COURT:  All right, and so let's have the jury in.  13:05:20

16                    (Jury is present)

17            THE COURT:  All right.  Welcome back, everyone.

18    Please be seated.  The record will reflect the presence of the

19    jury.  The witness is prepared.

20        And Mr. Rapp, you may continue.                            13:06:35

21            MR. RAPP:  Thank you, Your Honor.

22    CARL FERRER,

23    (Witness previously sworn.)

24

25
```

UNITED STATES DISTRICT COURT

```
 1                     CONTINUED DIRECT EXAMINATION
 2    BY MR. RAPP:
 3    Q.  Mr. Ferrer, I am showing on your screen 1698, do you see
 4    that?
 5    A.  Yes, I do.                                                13:06:45
 6    Q.  And what is that?
 7    A.  It's an e-mail from Andrew Padilla to Tamara Nickel.
 8    Q.  Is there another portion to this e-mail string?
 9    A.  Yes.  Below it is from Joyce or, excuse me, from Joy to the
10    Backpage moderation crew.                                     13:07:12
11    Q.  And when is this -- when is this e-mail sent?
12    A.  August 30th, 2011.
13    Q.  All right.
14          MR. RAPP:  Move to admit 1698.
15          THE COURT:  1698 may be admitted.                       13:07:26
16       (Exhibit No. 1698 was admitted.)
17          MR. RAPP:  And published.  Thank you.
18          THE COURT:  And publish.
19    BY MR. RAPP:
20    Q.  What is Joye Vaught telling the moderation crew?          13:07:40
21          MS. BERTRAND:  Objection; speaks for itself.
22          THE COURT:  Sustained.
23    BY MR. RAPP:
24    Q.  Can you read -- can you read what she tells you, tells the
25    moderation crew?                                              13:08:04
```

1   A.  Yes.  "Hi.  Abuse has been getting complaint e-mails from

2   this user, about her pictures being removed.  As far as I can

3   tell, they are all okay to leave.  Let me know if you have any

4   questions.  Thank you.  Joy."

5   Q.  Has -- at this point in August of 2011, has the number of                13:08:26

6   people moderating, has that increased or decreased?

7   A.  I believe it's increased.

8   Q.  Are you -- at this point in 2011 is Backpage expanding into

9   other markets within the United States?

10  A.  Yes.  We're adding cities and revenue and page count are                 13:08:53

11  growing.

12          MR. RAPP:  With respect to 1698a, to the extent I

13  didn't move that for admission as long as 1698 -- 1698, I would

14  move for 1698a in as well.

15          THE COURT:  Yes, it may be admitted.                                 13:09:18

16          (Exhibit No. 1698a is admitted.

17  BY MR. RAPP:

18  Q.  And so is this the -- is this the posting that Joye Vaught

19  is referring to in this in 1698?

20  A.  Yes, it is.                                                              13:09:46

21  Q.  And so in -- is the standards during -- is there any change

22  in the standards for nudity in August of 2011?

23  A.  I believe we were adding like boobs were coming back, like

24  some nudity was being allowed.

25  Q.  All right.  So looking at Exhibit 1130 on your screen, who              13:10:15

1   is this e-mail from?

2   A.  That e-mail is from Joye.

3   Q.  All right.  And who is she sending this e-mail to?

4   A.  Joye Vaught is sending the e-mail to Monica.

5           MR. RAPP:  Move to admit 1130.                    13:11:01

6           THE COURT:  Yes, it may be admitted.

7       (Exhibit No. 1130 was admitted.)

8           MR. RAPP:  Request permission to publish.

9           THE COURT:  It may be published.

10  BY MR. RAPP:                                              13:11:19

11  Q.  What is Joye Vaught telling Monica in this e-mail?

12          MS. BERTRAND:  Objection; document speaks for itself.

13          THE COURT:  Sustained.

14  BY MR. RAPP:

15  Q.  Can you read it?                                      13:11:28

16  A.  "Hi Monica,

17  You have our two most important cities now, Illinois and

18  Washington, on the weekends.  We think you are a strong

19  moderator so we trust you with them:)

20  Let me or Andrew know if you have any questions.  Send us any  13:11:41

21  ads where they look young, even if it seems like a lot.  We

22  have to be strict in those two places."

23  Q.  What is it about Illinois and Washington in December of

24  2011 that make them two important cities?

25  A.  In Washington we're dealing with Mayor McGinn and there's  13:12:06

1    some law mandating user I.D.s. in Illinois --

2    Q.  Are you receiving any, any scrutiny in Illinois?

3    A.  Yes, we are.

4    Q.  All right.  And but how many other cities at this point in

5    2011 does Backpage have a presence in?                          13:12:38

6    A.  Probably 400 markets at this time.

7    Q.  All right.  Now, during this time period, do you still have

8    some type of a relationship with super posters?

9              MS. BERTRAND:  Objection; leading.

10             THE COURT:  Overruled.                                 13:13:04

11             THE WITNESS:  Yes, we do.

12   BY MR. RAPP:

13   Q.  All right.  Showing you Exhibit 42, for your eyes only.  Is

14   this an e-mail exchange between you and Dollar Bill?

15   A.  Yes, it is, and Thomas is copied on it.  He works out of     13:13:30

16   Dallas.

17   Q.  And is this in December of 2011?

18   A.  Yes, it is.

19   Q.  And does this involve Mr. Dollar Bill's relationship with

20   Backpage as a super poster, is that the subject of this e-mail?  13:13:49

21             MS. BERTRAND:  Objection; leading.

22             THE COURT:  Sustained.

23   BY MR. RAPP:

24   Q.  What is the subject of this e-mail?

25   A.  It's "interesting feedback."  There's some -- it's           13:14:00

1    expressing some frustration.

2              MR. RAPP:  Move to admit 42.

3              MS. BERTRAND:  Objection; relevance; does not pertain

4    to any of the charged ads in the indictment.

5              THE COURT:  Overruled.                          13:14:23

6              MR. RAPP:  Move to admit and publish.

7              THE COURT:  Yes, may be admitted and published.

8              (Exhibit 42 and 42a are admitted)

9    BY MR. RAPP:

10   Q.  Can you read what Dollar Bill is asking or what Dollar Bill  13:14:39

11   is saying to you?

12   A.  "This girl, called me yesterday to book 15 Backpage ads in

13   the next few days with this image.  I told her I couldn't put

14   it in the middle but I'd try it on the side along with some of

15   her other pix - which are fine.  She wasn't happy!  Then when   13:14:58

16   the filter deleted her word 'naughty' (as in naughty and nice),

17   she called up to cancel all the ads and went into the Voice and

18   on my blog.  She's a pill who makes about 10 grand a week...

19   owns 4 apartments... and a store!  THIS is the girl who still

20   has the first dollar she ever made as an escort - a millionaire  13:15:24

21   several times over at age 28.  And all from being an escort!"

22   Q.  What do you say in response to Dollar Bill?

23   A.  "Yes, the pic is a little too nude for us.

24   As for naughty.  It is one of those words that get us into

25   trouble with user safety experts.  That said, I'll send my guy   13:15:50

```
 1    in charge of moderation.  Maybe we should let back in the word
 2    naughty -- Carl."
 3    Q.  42a, does that actually have the picture that he is writing
 4    you about?
 5              MS. BERTRAND:  Objection; leading.          13:16:07
 6              THE COURT:  Sustained.
 7    BY MR. RAPP:
 8    Q.  Is there a picture that he sends you?
 9    A.  Yes.
10              MR. RAPP:  Move to admit 42a.               13:16:14
11              MS. BERTRAND:  Same objection.
12              THE COURT:  Overruled.  It may be admitted.
13              MR. RAPP:  Request permission to publish.
14              THE COURT:  It may be published.
15    BY MR. RAPP:                                          13:16:30
16    Q.  All right.  In addition to the super posters, did you also
17    in the latter part of 2011 continue to have a relationship with
18    The Erotic Review?
19    A.  Yes, we did.
20    Q.  And was revenue for Backpage increasing or decreasing?  13:16:47
21    A.  Revenue is increasing.
22    Q.  I'm now showing you United States 986.  Do you see that on
23    your screen there?
24    A.  Yes, I do.
25    Q.  Is that a -- an e-mail from Mr. Spear to you?       13:17:17
```

UNITED STATES DISTRICT COURT

```
 1    A.  Yes.  It's from Scott Spear to me.

 2    Q.  All right.  And what is the subject of this e-mail?

 3    A.  It's a "Fwd:  Analytics backpage.com" for 2011 December

 4    27th.

 5    Q.  And I am showing you 986a, and what is that?              13:17:42

 6    A.  That's the actual report for December 27th, 2011.

 7    Q.  When you say "report," what kind of report is it?

 8    A.  It's a Google Analytics report showing the amount of

 9    traffic and the referring sites.

10        MR. RAPP:  Move to admit 986 and 986a and request       13:18:07

11    permission to publish.

12        MR. FEDER:  Same; no connection to ads.

13        THE COURT:  Overruled.  They may be admitted and

14    published.

15        (Exhibit Nos. 986 and 986a were admitted.)             13:18:29

16    BY MR. RAPP:

17    Q.  So the jury understands, so I just want to focus on this

18    pent up demand, this, what Mr. Spear says to you, what did you

19    take the pent up demand to mean?

20        MR. FEDER:  Relevance; speculation.                     13:18:49

21        THE COURT:  Sustained.

22    BY MR. RAPP:

23    Q.  Well, does demand, if you know, does demand increase in the

24    latter part of December?

25        MR. FEDER:  Relevance; leading; speculation.            13:19:11
```

```
 1              THE COURT:  I will sustain.
 2    BY MR. RAPP:
 3    Q.  Do you know from looking at Google Analytics reports over
 4    the years whether or not traffic to Backpage increases in
 5    December?                                            13:19:31
 6              MS. BERTRAND:  Objection; speculation, not noticed as
 7    an expert.
 8              THE COURT:  Overruled.  The question is, "Do you know"
 9    and so he may answer that question.  It calls for a yes or no
10    answer.                                              13:19:47
11              THE WITNESS:  Yes, I know.
12    BY MR. RAPP:
13    Q.  How do you know?
14    A.  Because I studied the traffic on Backpage.com daily and the
15    Google Analytics reports.                            13:19:56
16    Q.  And so let me just draw your attention to this down here,
17    can you explain what this is down here, this link?
18    A.  That link shows that -- that's the report.  It's coming
19    from Google Analytics for a particular day.
20    Q.  All right.  And then moving --                   13:20:18
21    A.  I need to correct myself.
22    Q.  Please do.
23    A.  That link, if you click it, you can opt out of the report
24    that you're receiving by e-mail.
25    Q.  And did you do that?                             13:20:32
```

```
1    A.  Did I opt out of the report?
2    Q.  Yes.
3    A.  No.
4    Q.  All right.  And then looking at 986a and drawing your
5    attention to, well, first, for what time period does this        13:20:48
6    report capture?
7    A.  It covers the day December 21st, 2011.
8    Q.  And then looking at the referring sites, can you interpret
9    the information that's on the referring sites?
10   A.  I can.  This is the visits coming from the referring sites   13:21:19
11   the top three sites are all prostitution review sites.
12   Q.  All right.  In terms of this information here, what does
13   this demonstrate for a single day?
14   A.  Well, for a single day you've got 3,134,202 visits, which
15   is a huge number at this time; 65,167,604 pageviews, and it's     13:21:53
16   another near record number.
17   Q.  All right.  Now, in 2011, did there come a time where
18   Backpage, the ownership of Backpage was contemplating selling
19   the website?
20          MS. BERTRAND:  Objection; leading.                         13:22:27
21          THE COURT:  Overruled.
22          THE WITNESS:  Yes.
23   BY MR. RAPP:
24   Q.  How do you know that?
25   A.  I was asked to find data and help make a presentation on     13:22:38
```

```
1    the sale of the site.
2    Q.  Who were you asked by?
3    A.  Jed Brunst.
4    Q.  And did you learn who was in charge of the effort to try to
5    sell Backpage?                                          13:23:02
6    A.  Jed Brunst.
7    Q.  All right.  And what, if anything, did you do at
8    Mr. Brunst's direction in this effort to sell Backpage, what
9    did you do at all?
10   A.  I was tasked with helping to create slides and look up    13:23:20
11   traffic and by category, by section, and put it in a format
12   that was usable.
13   Q.  All right.  And then at some point did you -- did you meet
14   with any perspective buyers of Backpage?
15   A.  Yes, we did.                                        13:23:49
16   Q.  And just so we understand the time period, do you know
17   approximately when this effort started?
18   A.  Help me to see an e-mail, but it was sometime 2011, 2012,
19   and we -- we had to see a number of people.
20   Q.  All right.  How many -- how many potential buyers do you    13:24:15
21   recall meeting with?
22   A.  I sat in on presentations for at least four or five buyers,
23   and then after which when we had a buyer I sat in another four
24   or five, well, at least four meetings, to secure additional
25   investors.                                              13:24:42
```

```
 1    Q.  All right.  And what, if anything, did you or Mr. Brunst

 2    provide the investors?  Well, first of all, was Mr. Brunst, did

 3    he attend any of these meetings with the investors?

 4    A.  Yes.

 5    Q.  And why is it that Mr. Brunst attended these meetings with      13:25:01

 6    the investors, if you know, as opposed to any of the other

 7    owners?

 8    A.  I don't know why except that he has -- he's responsible for

 9    finance and understanding the value of the company, but I don't

10    know why exactly.  Not certain.                                    13:25:24

11    Q.  Was there some type of a -- any type of a presentation you

12    would make to these investors?

13    A.  Yes, there was another PowerPoint.

14    Q.  All right.  And was this the same PowerPoint that you have

15    since testified about that was presented to, for example, NCMEC    13:25:55

16    and Polaris?

17            MS. BERTRAND:  Objection; leading.

18            THE COURT:  Overruled.

19            THE WITNESS:  No, this is a different PowerPoint.

20    This is more on a sale.                                            13:26:09

21    BY MR. RAPP:

22    Q.  All right.  And this PowerPoint, so fair to say that you

23    showed this PowerPoint to prospective buyers?

24    A.  Yes, we did.

25    Q.  And who created the PowerPoint?                                13:26:20
```

1  A.  I believe Jed Brunst did.  I did some edits, but created by

2  Jed Brunst or his staff.

3  Q.  Okay.  And can you explain how it is that you were provided

4  this PowerPoint and in your words did some edits?

5  A.  I get a number of e-mails and meetings in person with Jed          13:26:45

6  going over what should be included in the PowerPoint and how it

7  should be written, what additional things we should get.  We

8  were also working with a consultant called Duff Phelps.  They

9  participated in the creation of a PowerPoint.

10  Q.  All right.  So let's look at Exhibit 120a.  Do you see          13:27:08

11  that -- do you see that e-mail on the screen?

12  A.  I do.

13  Q.  And is this an e-mail exchange e-mail exchange between you

14  and somebody at Duff Phelps?

15  A.  Yes, it's from Jacob Rapp to myself.          13:27:37

16          MR. RAPP:  Move to admit 120a.

17          (Exhibit 120a is admitted.)

18          THE COURT:  Yes, it may be admitted and published.

19          MS. BERTRAND:  Objection as to hearsay; no link to any

20  of the defendants.          13:27:56

21          THE COURT:  Lay some foundation, Mr. Rapp.

22  BY MR. RAPP:

23  Q.  Well, so why are you having this e-mail exchange with this

24  person by the name of Jacob Rapp?

25  A.  I'm asking Jacob Rapp of Duff Phelps to send me the latest          13:28:18

```
1    version of the PowerPoint.  I need to send a slider of it to

2    our attorney, moderation slides in particular.

3    Q.  And as a result of you sending the e-mail, did something

4    happen?

5    A.  Yes.  He sends me back the attachment, the Backpage lender   13:28:44

6    presentation version six.

7              MR. RAPP:  Move to admit 120a.

8              MS. BERTRAND:  Same objection; lack of foundation as

9    to any connection to the defendants.

10             MR. LINCENBERG:  Your Honor, we have no objection so    13:29:05

11   long as the rule of completeness is complied with.  There is an

12   attachment here.  I imagine Mr. Rapp is going to get to it, but

13   right now it's an incomplete document.

14             THE COURT:  Is there an attachment?

15             MR. RAPP:  Yes, PowerPoint.                              13:29:22

16             THE COURT:  Overruled.  Overruled, Ms. Brunst --

17   sorry, Ms. Bertrand.

18   BY MR. RAPP:

19   Q.  I'm now showing you 120c, do you see that there?

20   A.  Yes.                                                          13:29:40

21   Q.  And is this a series of slides related to that PowerPoint?

22   A.  Yes, it is.

23   Q.  Okay.

24             MR. RAPP:  Move to admit 120c.

25             MR. LINCENBERG:  Object.  It's not -- 120c is not what  13:30:06
```

1   is attached.  It's just some slides.  It's not the complete

2   slide deck.

3            THE COURT:  I don't have a 120c on my exhibit list,

4   Mr. Rapp.  I have a and b.

5            MR. RAPP:  What is that?                        13:30:22

6            THE COURT:  I do not have a "c" on my exhibit list.  I

7   have a and b.

8            MR. RAPP:  On the exhibit list, the Court exhibit

9   list, the large exhibit list?

10            THE COURT:  The exhibit list that you gave me I have  13:30:36

11   no 120c, only a and b.

12            MR. LINCENBERG:  Your Honor should also have a 120.

13            THE COURT:  I do have a 120.

14            MR. RAPP:  I'm looking at --

15            COURTROOM DEPUTY:  Judge's copy does not have a "c."  13:31:12

16   Let's just look at 120.  So --

17            MR. RAPP:  120a, 120b?

18            THE COURT:  Yes.

19         (Exhibit Nos. 120a and 120b are admitted.)

20   BY MR. RAPP:                                            13:31:46

21   Q.  All right.  I am going to show you 120a in the interest of

22   time.  Okay.  All right.  Let me just ask you this, and we'll

23   come back.  We'll try to sort this out.  But was that

24   PowerPoint that you showed the investors, was it accurate?

25   A.  It was not accurate.  It was deceptive.            13:32:20

1   Q.  Why was it deceptive?

2   A.  The moderation was way oversold in terms of its

3   effectiveness when in fact it really was coaching users.

4   The -- there were many other parts that were just -- it was a

5   sales pitch.  They were trying to sell it.    13:32:51

6   Q.  Did you include the relationship that Backpage had with The

7   Erotic Review, did you include that in the presentation to the

8   investors?

9         MS. BERTRAND:  Objection; relevance.

10        THE COURT:  Overruled.    13:33:11

11        THE WITNESS:  We didn't include it because it would be

12   counter to the veneer of the general classified site.

13        MS. BERTRAND:  Objection; move to strike

14   nonresponsive.

15        THE COURT:  Sustained.  Witness will again be    13:33:23

16   instructed to answer on only the question asked.  Don't answer

17   anything further.  Mr. Rapp will --

18        THE WITNESS:  Yes, Your Honor.

19   BY MR. RAPP:

20   Q.  So when you say it was deceptive, and I believe the term    13:33:35

21   you used was a veneer, what did you mean by that in

22   relationship to this PowerPoint?

23   A.  In order to sell the site, we couldn't sell it as a

24   prostitution review site so we had to make it look and sound

25   like a general classified site.  It was a challenge.  We had to    13:33:57

1    put together numbers that would look like there was a lot of ad

2    count in other categories, but I know that that ad count is

3    kind of fake.  It's feeds; not real ads.

4    Q.  Can you explain that to the jury?  What do you mean in

5    terms of in this PowerPoint when they gave numbers for other     13:34:15

6    categories on the website?

7    A.  Sure.  Of course, almost all the transactions on Backpage

8    are in the adult section at this time.  It's in the 90 percent

9    range, but what we did was we would talk about the number of

10   ads in all the categories.  Well, we didn't have very many      13:34:39

11   automotive ads, but you could secure automotive feeds from

12   other businesses and import them and that would artificially

13   inflate the numbers.  We did that with automotive, we did it

14   with rentals, we did it with jobs, so we were importing

15   millions of ads to make the site look like a general           13:34:59

16   classifieds site in terms of ad count numbers.

17   Q.  Just so we're clear, when you have these feeds in these

18   other categories, is there any revenue generated from those

19   feeds?

20   A.  There's no revenue.                                        13:35:15

21   Q.  Does it cost you to pay for those feeds?

22   A.  Yes.  We have to -- we have to pay some development to

23   normalize the feeds to import them.

24   Q.  And when you say you had to pay to import these feeds, who

25   actually was ultimately responsible for those payments?        13:35:34

UNITED STATES DISTRICT COURT

```
1    A.  Those payments were part of the budget and the budget is

2    approved by Jim Larkin, Scott Spear and Jed Brunst.

3    Q.  All right.  Does the PowerPoint, does it tell the

4    prospective investor what the largest percentage of revenue is

5    coming from?                                                      13:36:05

6    A.  It does do that, yes.

7    Q.  What does it say in that respect?

8    A.  I believe it showed revenue being in the -- it shows it by

9    section and by category, and in the category of female escorts

10   it's the vast majority of revenue.  It's somewhere near          13:36:25

11   70 percent.

12   Q.  Does the PowerPoint tell the prospective investor the vast

13   majority of the revenue comes from the female escort section?

14   A.  It does, but I think we buried it.

15        MR. EISENBERG:  I object.  Yes, I -- I think counsel        13:36:44

16   is referring to something that isn't in, isn't -- hasn't been

17   admitted into evidence, and there's been no foundation for how

18   Mr. Ferrer knows the answer to these leading questions.

19        THE COURT:  Well, Mr. Eisenberg, the jury will rely on

20   their own recollection, but I think Mr. Ferrer just a few        13:37:09

21   moments ago stated that he assisted with the PowerPoint, and so

22   based on his testimony, based on his own recollection of what

23   he recalls of that document, he can answer a question.  So on

24   that basis I will overrule.

25   BY MR. RAPP:                                                     13:37:42
```

1    Q.  All right.  So how many investors or potential buyers did

2    you speak with using this PowerPoint with Mr. Brunst?

3    A.  At least half a dozen.

4    Q.  All right.  And now let me ask you about the Auburn

5    Theological Seminary, did you receive contact from an                13:38:18

6    organization known as the Auburn Theological Seminary?

7    A.  Yes, we did.

8    Q.  When did you receive contact from them?

9    A.  When they ran a half page ad in the New York Times

10   attacking Backpage, and they also followed up with a letter.         13:38:39

11   Q.  Okay.  Was there some meeting that was arranged to meet

12   with members of the Auburn Theological Seminary?

13   A.  Yes, there was a meeting scheduled.

14   Q.  Do you recall when that meeting was?

15   A.  Early 2012, I believe.  I attended that meeting and I ran        13:39:12

16   the PowerPoint.

17   Q.  Okay.  And so who, who asked for this meeting?

18   A.  I believe Jim Larkin.

19   Q.  How do you know that?

20   A.  Because we had discussions about the fact that Auburn           13:39:52

21   Theological Society had a page ad in the New York Times had

22   chased our one and only buyer of Backpage away.  They canceled.

23   Q.  So wait a minute.  During the time period this you received

24   word from the Auburn Theological Seminary, were you trying to

25   sell the website?                                                   13:40:26

UNITED STATES DISTRICT COURT

1   A.   Yes.   We had secured a buyer.   We were in the process of

2   trying to arrange additional financing.   I was joining that

3   potential buyer, going out and making presentations.

4          MS. BERTRAND:   Your Honor, objection; nonresponsive;

5   move to strike.                                                    13:40:45

6          THE COURT:   Overruled.

7   BY MR. RAPP:

8   Q.   All right.   And how do you know that the fact that the

9   Auburn Theological Seminary ran this half page article in the

10  New York Times, how does that have any connection to a            13:41:24

11  potential buyer not going forward with the purchase of

12  Backpage?   How do you know that?   What is your basis of

13  knowledge?

14          MS. BERTRAND:   Objection, calls for speculation.

15          MR. FEDER:   401, 403, hearsay.                           13:41:40

16          THE COURT:   Overruled.   He can testify about how he

17  came to learn.

18          MR. FEDER:   404(b)(2).

19          THE COURT:   So Mr. Ferrer can answer the question:

20  How do you know that the Auburn Theological Seminary ran this     13:42:06

21  half page article in the New York Times?

22          THE WITNESS:   I knew it before the meeting and I knew

23  it during the meeting when Jim Larkin said:   You took a half

24  page ad out to attack my company and you won't give me the

25  dignity of allowing me to defend myself.                          13:42:29

```
 1    BY MR. RAPP:
 2    Q.  Is that a statement Mr. Larkin makes in the meeting with
 3    the Auburn Theological Seminary?
 4    A.  Yes.
 5    Q.  And who else is present from Backpage at that meeting?        13:42:42
 6    A.  Michael Lacey, myself, and Ed McNally.
 7    Q.  All right.  Let me show you United States 140a, do you see
 8    that on your screen?
 9    A.  Not yet.  Yes, I do.
10    Q.  Can you recognize this?                                       13:43:18
11    A.  Yes, I can recognize it.
12    Q.  What is it?
13    A.  This is a letter from the Auburn Theological Seminary from
14    Reverend Dr. Katharine Henderson.
15    Q.  All right.  And how do you have knowledge of this letter?     13:43:48
16    A.  Because I received a copy of it.
17    Q.  How did you receive a copy of it?
18    A.  I received it either from Jim Larkin or Scott Spear.
19    Q.  All right.  And can you describe the circumstances under
20    which they provided you this letter?                             13:44:14
21    A.  I'm sent the -- I'm given the letter from Scott Spear or
22    Jim Larkin in order for me to look for any holes in their
23    argument and to contribute to what the response might be with
24    the Auburn Theological Seminary.
25    Q.  Was there a response that was prepared in response to the    13:44:34
```

1   letter they sent you?

2   A.  Yes.

3   Q.  All right.  And what, if anything, did you contribute to

4   that?

5   A.  Usually I'm the one looking up, you know, ad count, the          13:44:47

6   number of ads blocked, the number of subpoenas, reports, things

7   that are positive narrative for the company.

8   Q.  All right.  And was this letter sent to the Auburn

9   Theological Seminary, as far as you know?

10  A.  Yes, I believe we sent a response.                              13:45:15

11  Q.  And did you see that response?

12  A.  Yes.

13  Q.  And did that response reference the moderation as you have

14  described it in your testimony today and last week?

15         MR. EISENBERG:  Objection; leading.                         13:45:43

16         THE COURT:  Sustained.

17  BY MR. RAPP:

18  Q.  What did you tell them in the letter to the Auburn

19  Theological Seminary, rather, what did you tell them regarding

20  moderation?                                                        13:45:54

21         MS. BERTRAND:  Objection; hearsay.

22         THE COURT:  Overruled.  He can testify as to what he

23  said.

24         THE WITNESS:  We talked about the number of, I am sure

25  ad count in terms of the number of ads blocked and removed, but    13:46:09

```
 1    we didn't talk about the strip out or the coaching.

 2              MR. FEDER:  Objection; nonresponsive.

 3              MS. BERTRAND:  Join.

 4              THE COURT:  Sustained.

 5              MS. BERTRAND:  Move to strike.              13:46:24

 6              THE COURT:  The jury will disregard the witness' last

 7    statement.

 8    BY MR. RAPP:

 9    Q.  What did you not tell them about moderation?  What did you

10    not tell them in that letter that came from the owners,       13:46:35

11    Mr. Lacey and Mr. Spear and Mr. Brunst?

12    A.  We didn't tell them that we were --

13              MR. FEDER:  401, 403; hearsay; not linked to the

14    charged ads.

15              THE COURT:  Overruled.                     13:46:50

16              MR. FEDER:  Foundation, and 106.

17              THE COURT:  Overruled as to both.

18              THE WITNESS:  We did not tell them about editing of

19    ads, the fact that we weren't blocking prostitution ads.  We

20    were simply either editing the ads or coaching the users and  13:47:09

21    putting our main focus on driving revenue growth.

22    BY MR. RAPP:

23    Q.  All right.  In your response to the Auburn Theological

24    Seminary from the ownership from Mr. Lacey, Mr. Spear,

25    Mr. Brunst, did you tell them about The Erotic Review, the     13:47:31
```

UNITED STATES DISTRICT COURT

```
1    relationship that Backpage had with The Erotic Review?

2           MS. BERTRAND:  Objection; relevance.

3           THE COURT:  Overruled.

4           THE WITNESS:  We did not.

5           MR. LINCENBERG:  Your Honor, I'm also going to object.   13:47:47

6    Mr. Rapp's question keeps referencing Mr. Brunst to the witness

7    indicating he was not a part of this letter.

8           THE COURT:  Yes.  Please clarify, Mr. Rapp.

9    BY MR. RAPP:

10   Q.  Was Mr. Brunst an owner of Backpage?                      13:47:58

11          THE COURT:  I don't think that was the question that

12   you previously asked.

13   BY MR. RAPP:

14   Q.  Well, did Mr. -- were you trying -- at this time were you

15   trying to sell Backpage?                                      13:48:13

16   A.  Yes.

17   Q.  Was Mr. Brunst in any way involved in those efforts to sell

18   Backpage?

19   A.  He was leading the way.

20   Q.  All right.  Did there come a time where there was a        13:48:25

21   buyer that was -- did you learn if a buyer was interested in

22   buying Backpage?

23   A.  Yes.

24   Q.  Did that buyer change their mind?

25   A.  Yes.                                                       13:48:42
```

```
 1              MS. BERTRAND:  Objection; asked and answered.  This

 2   has been discussed.  Duplicative.

 3              THE COURT:  Overruled.  Go forward.

 4   BY MR. RAPP:

 5   Q.  Did you come to learn why that buyer changed their mind          13:48:53

 6   about buying Backpage?

 7              MS. BERTRAND:  Same objection.

 8              MR. CAMBRIA:  Hearsay.

 9              MS. BERTRAND:  And hearsay.

10              THE COURT:  He can answer yes or no.  Overruled.          13:49:02

11              THE WITNESS:  Yes.  Jim Larkin told me.

12   BY MR. RAPP:

13   Q.  All right.  Is that the comment that Mr. Larkin made?

14              MR. EISENBERG:  Objection; leading.

15              THE REPORTER:  Who is speaking?                          13:49:20

16              MR. EISENBERG:  I am.

17              THE COURT:  Overruled.

18   BY MR. RAPP:

19   Q.  All right.  When was that statement by Mr. Larkin made?

20   A.  The statement where he let me know that Craig Capital had       13:49:34

21   backed out as a buyer because of the half page Auburn

22   Theological Society ad.  He told me before the meeting, and

23   then at the meeting with the Auburn Theological Society, he

24   stated when we were arguing over time, and what he stated was

25   that:  You took a half page ad out to attack my company, to        13:49:57
```

1   attack my business, and you don't give me the dignity of having

2   enough time to defend myself.

3   Q.  All right.  In your words, when this Craig Capital pulled

4   out as a potential buyer, did that -- did that stop the efforts

5   of you and the Chief Financial Officer Mr. Brunst from pursuing          13:50:21

6   other buyers?

7           MS. BERTRAND:  Objection; leading.

8           THE COURT:  Overruled.

9           THE WITNESS:  I believe so.  There were no other

10  buyers.                                                                  13:50:37

11  BY MR. RAPP:

12  Q.  All right.  Now, let's look at Exhibit 140a, do you see

13  that on your screen?

14  A.  Yes.

15  Q.  Is this the letter that was sent by the Auburn Theological          13:50:57

16  Seminary?

17  A.  Yes.

18  Q.  And just to go to the signature page, do you recognize the

19  name of the signature?

20  A.  Yes, I do.                                                          13:51:18

21  Q.  How do you recognize the name of the signature?

22  A.  I recognize the name because I've been on the Auburn's

23  Theological Seminary website, we receive letters from this

24  person, and I met the -- I met her in person when we had a

25  meeting at Columbia University.                                         13:51:44

1    Q.  And who did she identify herself as?

2    A.  Reverend Dr. Katharine Henderson.

3    Q.  And just so we're clear here, you have been referring to a

4    meeting with the Auburn Theological Seminary, was she there?

5    A.  Yes.                                                    13:52:07

6    Q.  And in advance of that meeting, did you discuss the

7    contents of this letter with any of the ownership?

8    A.  Yes.

9    Q.  Who?

10   A.  Scott Spear, Jim Larkin, there were also some e-mails back   13:52:20

11   and forth I believe involving Michael Lacey.

12            MR. CAMBRIA:  Object to what he believes.

13            THE COURT:  Sorry.

14            MR. CAMBRIA:  I said object to what he believes.  It's

15   not based in recollection.                                  13:52:40

16            THE COURT:  Sustained.

17   BY MR. RAPP:

18   Q.  Was Mr. Lacey, was he also at the meeting with the Auburn

19   Theological Seminary?

20   A.  He was at the meeting, and there were e-mails between,    13:52:51

21   involving Michael Lacey and the Auburn Theological Seminary.  I

22   remember them.

23   Q.  All right.  Okay.  And during that meeting where Mr. Lacey

24   was present, you were present and Mr. Larkin was present, did

25   the letter that was sent to Backpage, did it come up in any    13:53:14

```
 1    respect?
 2    A.  Yes, it did.
 3    Q.  Okay.  And so, but did also the article in the New York
 4    Times come up?
 5    A.  Yes.                                                          13:53:38
 6    Q.  So can you explain to the jury this meeting that we've been
 7    referring to, how did it come about?
 8    A.  It was -- it was our standard formula to try to get a
 9    meeting and go through the PowerPoint.  We've done it in the
10    past many times, and so the ownership had decided that we       13:54:04
11    wanted to meet with Auburn Theological Seminary, and we even
12    offered to pay for their flights to the meeting.
13    Q.  When you say that, how do you know that?  How do you know
14    that the ownership offered to pay for their flights?
15    A.  Because it was in writing, I believe.  It was in writing in 13:54:25
16    one of our responses to the Auburn Theological Seminary.
17    Q.  All right.  And so where did the meeting take place?
18    A.  Columbia University.
19    Q.  And approximately when did this meeting take place?
20    A.  An e-mail would refresh me, but I'm thinking early 2012.    13:54:46
21    Q.  All right.  2012, early 2012, and did you travel out to New
22    York for the purpose of this meeting?
23    A.  Yes, I do.
24    Q.  And do you meet with -- do you meet with some of the
25    ownership before going into this meeting?                       13:55:14
```

A.  Yes, I meet with Michael Lacey, Jim Larkin.

Q.  And then do you proceed to the meeting?

A.  I leave early so I can find the conference room and hook up the PowerPoint so there will be no technical issues.

Q.  All right.  And where did -- what was the location of this meeting?                                                         13:55:33

A.  It was in Columbia University somewhere.  Very hard to find the conference room.

Q.  Columbia University is in?

A.  In New York City.                                                 13:55:45

Q.  In New York City.  And you get to the meeting before Mr. Lacey?

A.  About a half hour before.

Q.  And do you set up the PowerPoint?

A.  I do.                                                             13:56:01

Q.  And then at some point are you introduced to the members of the Auburn Theological Seminary?

A.  Yes, there were 20 some attendees.

Q.  All right.  And how -- how is the meeting, and then Mr. Lacey joins the meeting?                                           13:56:24

A.  Yes.  Mr. Larkin and Mr. Lacey came in together to join the meeting.

Q.  All right.  And how does the meeting start?

A.  It was a very rough start because there was an argument over the amount of time that would be allocated to each        13:56:43

```
 1    individual minister and time allocated to Backpage.
 2    Q.  All right.  And how is that argument resolved, if it is?
 3    A.  I felt it was very much resolved in the seminary's favor.
 4    Part of the reason why Larkin objected, but they -- the
 5    ministers were all given an opportunity to speak like five, ten    13:57:15
 6    minutes each, and then it would be Backpage's opportunity.
 7    Q.  Okay.  And without going individually with everybody, is
 8    there a common message among these ministers to Backpage
 9    regarding the website?
10    A.  There is.                                                      13:57:42
11    Q.  What's the common message that they give, if there is one?
12           MS. BERTRAND:  Objection; hearsay, and not tied to any
13    of the counts in the indictment.
14           THE COURT:  Overruled.  He may answer as to his
15    understanding of what the message was.                            13:58:00
16    BY MR. RAPP:
17    Q.  What was the understanding of the message that was given to
18    you?
19    A.  Prostitution on the sites leading to child prostitution,
20    and one child is too many.                                        13:58:10
21    Q.  All right.  Is there a specific minister that says the one
22    is too many?
23    A.  Yes, Reverend Dr. Katharine Henderson says it, yes.
24    Q.  What response, if any, does, does, if there is, does
25    Mr. Larkin and Mr. Lacey, do they respond to that statement?     13:58:35
```

1    A.  Well, after hearing that statement Mr. Lacey responds that

2    that's not realistic policy; that's a bumper sticker.

3    Q.  All right.  And then are you given the opportunity to

4    present your own PowerPoint?

5    A.  We are, but we have limited time and we are rushing through    13:59:07

6    it.

7    Q.  All right.  And same thing, is this the same PowerPoint

8    that was shown at the NCMEC and Polaris meeting?

9    A.  It is.  It's long.

10   Q.  And does it -- similar to other questions that I've asked    13:59:22

11   you in this meeting, is there any reference to what you have

12   described moderation to be on the website?

13          MS. BERTRAND:  Objection; relevance; hearsay.

14          THE COURT:  Overruled.

15          THE WITNESS:  No, we don't describe moderation as    13:59:48

16   being a sham.

17   BY MR. RAPP:

18   Q.  What about the relationship with The Erotic Review?

19   A.  We do not discuss a relationship with The Erotic Review or

20   any other prostitution ad marketing activities.    14:00:02

21   Q.  All right.  Now, this letter, 140a, is this a letter that

22   you receive, do you receive this before or after the meeting?

23   A.  This I -- this is before.

24   Q.  All right.  And -- and I already asked you the questions

25   about whether or not this was discussed with -- this was    14:00:34

1  discussed with the ownership.  What, if any, response did you

2  have to this letter, if you recall?

3  A.  I recall we wrote a letter in response.

4        MR. RAPP:  All right.  I want to move to admit 140a.

5        MS. BERTRAND:  Objection; hearsay; hearsay within          14:01:05

6  hearsay; lack of relevance as to any of the charged counts of

7  the indictment.

8        MR. FEDER:  403(2).

9        MS. BERTRAND:  And 404(b).

10        MR. CAMBRIA:  And 106.  There's blacked out parts of      14:01:22

11  this letter.  It's not a complete letter.

12        THE COURT:  Well, let me ask Mr. Rapp, has it been

13  redacted pursuant to Document 1643, the prior order of the

14  court?

15        MR. RAPP:  Yes.                                           14:01:37

16        THE COURT:  And did --

17        MR. RAPP:  I can come back.

18        THE COURT:  Did Mr. Ferrer testify that this is a

19  responsive letter to the Auburn society, or is this a letter

20  from the Auburn society?  I didn't quite catch that.           14:01:56

21  BY MR. RAPP:

22  Q.  Going to the last page, is this a letter from the Auburn

23  Theological Society?

24  A.  Yes, it's from the Auburn Theological Society.

25        MS. BERTRAND:  I renew my objections.                     14:02:16

1          THE COURT:  I'm going to sustain the objection as

2     tipping into 403, Mr. Rapp.

3     BY MR. RAPP:

4     Q.  Very well.  I'm now showing you, for the witness' eyes

5     only, Exhibit 711.  Do you recognize this exhibit?          14:02:32

6     A.  Yes, I do.

7     Q.  All right.  And who is this from?

8     A.  It's from myself.

9     Q.  All right.  And who are you sending it to?

10    A.  I'm sending it to Jim Larkin and Jed Brunst.           14:02:56

11    Q.  Okay.  Do you know what the purpose of this is?

12    A.  The purpose of this is to outline the major revenue

13    initiatives that the company is engaged in.

14    Q.  All right.  And is this sent around the time you're meeting

15    with the Auburn Theological Seminary?                      14:03:26

16    A.  Yes.

17    Q.  Are you also -- is this also after the efforts to sell

18    Backpage were not successful?

19          MS. BERTRAND:  Objection; leading.

20          THE COURT:  Sustained.                               14:03:45

21    BY MR. RAPP:

22    Q.  At the time you sent this to Mr. Brunst, do you know if

23    there were any efforts regarding the sale of Backpage?

24    A.  Those efforts had terminated.

25    Q.  Okay.                                                  14:04:04

```
 1            MR. RAPP:  Move to admit 711.

 2            THE COURT:  711 may be --

 3            MR. LINCENBERG:  No objection.

 4            THE COURT:  711 may be admitted.

 5       (Exhibit No. 711 was admitted.)                    14:04:16

 6            MR. RAPP:  Request permission to publish.

 7            THE COURT:  Yes, it may be published.

 8            MR. RAPP:  In terms of some of the bullet points here,

 9  let me just focus on some of these.

10  BY MR. RAPP:                                            14:04:34

11  Q.  What is -- what is this message that you're trying to

12  deliver to Mr. Brunst and Mr. Spear?

13            THE REPORTER:  I couldn't hear the objection.

14            THE COURT:  Please identify yourself when making the

15  objection, or stand so that the court reporter can see you, and  14:04:54

16  speak into the microphone.  What was the objection?

17            MR. FEDER:  Bruce Feder.  Misstates the document as

18  being involving Mr. Spear.  Mr. Rapp then corrected himself.

19            THE COURT:  Sustained.

20  BY MR. RAPP:                                            14:05:10

21  Q.  Well, let me just ask you, is Mr. Spear part of these

22  discussion as well?

23            MR. FEDER:  Objection; leading.

24            THE COURT:  Sustained.

25            THE WITNESS:  I don't know.                    14:05:21
```

UNITED STATES DISTRICT COURT

```
 1   BY MR. RAPP:
 2   Q.  All right.  So let's just look at number three, do you see
 3   that?
 4   A.  Yes.
 5   Q.  What does that bullet point refer to?                    14:05:31
 6   A.  Traffic and revenue diversification strategy.
 7   Q.  And what did that mean?
 8   A.  So --
 9   Q.  What did you mean?
10   A.  I'm laying out the ideas that we've had discussions with  14:05:49
11   about in terms of how we can have traffic appear under other
12   URLs.
13   Q.  All right.  And what does that mean for the jury?  It's a
14   bit techie.  What does that mean?
15   A.  Backpage.com is just getting a lot of negative media      14:06:08
16   exposure, so maybe we need to move some traffic to some other
17   domain, some other web address, and I refer to it here as the
18   lifeboat strategy just in case Backpage is shut down.
19   Q.  All right.  And just so we understand, is that lifeboat
20   strategy, is that what you meant by that reference?           14:06:38
21   A.  Yes.
22   Q.  And then going down to Google number nine, can you explain
23   that?
24   A.  Yes.  The -- there were some changes in Google Analytics,
25   so I'm alerting Jim Larkin and Jed Brunst that visits and     14:07:01
```

1    pageviews visits may appear to be lower; pageviews, the same,

2    and it's mainly because we're just getting rid of some -- we

3    are cleaning up the reporting.  There is some redundancy.

4    Q.  All right.  And then just jumping up here to six, what does

5    this refer to?                                                    14:07:29

6    A.  This is an idea to grow more pageviews and keep users on

7    the site longer.  So new views, we would have a gallery view

8    and a summary view, and the gallery view would be just a lot of

9    images, and you would, with a little bit of text under each

10   image, and then you click the image and the text and then you    14:07:52

11   go to the ad.  So it's a different experience from -- like a

12   Craigslist experience.  It's more of a dating ad experience

13   where you're looking at a lot of pictures.

14   Q.  Is this in the female escort section?

15   A.  Yes, it is.                                                   14:08:11

16   Q.  All right.  And what about the PR strategy, what strategy

17   does that reference?

18   A.  So I'm outlining the strategy that the company is working

19   on at this time, and strategy one is to get the Craig story

20   out, which means that Craigslist has some prostitution ads that   14:08:42

21   have moved to their therapeutic massage section, and so we want

22   to have Craigslist be in the news and get Backpage out of the

23   news.

24   Q.  Okay.

25   A.  The second bullet point is that AG McKenna has been           14:09:02

1   attacking Backpage in Washington state, and so we just are

2   going to try to attack him, attack him from getting campaign

3   donations from Bing, and then Bing is a search engine that

4   strikes content.

5   Q.  All right.  Now, going into 2012, you had now received a          14:09:27

6   letter from the Auburn Theological Seminary, you now have had a

7   meeting with them, did you have yet another person in the print

8   media begin to write articles about Backpage?

9   A.  Yes, we did.

10  Q.  And who was that?                                                 14:10:01

11  A.  Nicholas Kristof of the New York Times.  He's a columnist

12  there.

13  Q.  All right.  And did you learn at some point that

14  Mr. Kristof was doing an article on Backpage?

15  A.  We did.                                                           14:10:24

16  Q.  And how did you specifically learn about that?

17  A.  There was an e-mail that he had sent to us requesting

18  comments or information from Backpage and --

19  Q.  Let me show you 1714a [sic].  For the record, I am showing

20  you 714a, do you recognize that?                                     14:11:08

21  A.  Yes, I do.

22  Q.  What is that what is it?

23  A.  It's from Michael Sitrick, which is the PR firm that we had

24  engaged, to Michael Lacey, Steve Suskin, Jim Larkin,

25  Tony Knight and myself.                                              14:11:41

```
1    Q.  Is this related to this gentleman we have been talking
2    about by the name of Nicholas Kristof rather?
3    A.  Yes.
4    Q.  And is this an e-mail where he's asking questions?
5    A.  Yes.                                                        14:12:02
6    Q.  And is Mr. Lacey copied on this e-mail?
7    A.  Yes, he is.
8    Q.  And are you also copied on this e-mail?
9    A.  Yes, I am.
10            MR. RAPP:  Move to admit 1714a.                        14:12:21
11            MS. BERTRAND:  Objection; hearsay within hearsay;
12   relevance; not connected to any of the substantive ads in the
13   indictment.
14            THE COURT:  Overruled as to all.  It may be admitted
15   and published.                                                 14:12:35
16       (Exhibit No. 1714a was admitted.)
17   BY MR. RAPP:
18   Q.  Drawing your attention down to the bottom here, what is
19   Mr. Kristof asking you about, asking representative from
20   Village Voice Media about?                                     14:13:00
21   A.  "Okay, please try to get it to me early tomorrow if you
22   can.  One case in particular that I'll write about is one of a
23   who was marketed late last year on backpage before being
24   rescued by police in Brooklyn.  Kendall 'Ace' Judge has been
25   charged" -- need to reread that.  "Kendall 'Ace' Judge has been 14:13:23
```

1   charged in that case.  Anything you can say about that case?"

2   Q.  All right.  And does somebody -- does this Mr. Suskin, does

3   he ask you to do something or is he asking you questions, what

4   is he asking you here?

5   A.  Suskin writes, "See below note back from Kristof when I        14:13:49

6   told him the info would be to him tomorrow.

7   CARL:  any knowledge of the indicates to which he refers?"

8   Q.  And then what does Mr. Lacey say in response to these

9   e-mails?

10  A.  "We do how many million ads and he picks out one, tells us     14:14:12

11  at the end of the day and wants our total response by a.m.?  Of

12  course there are kids who get through system.  As there are in

13  bars.  This makes pursuit of solution, ie USC study, more

14  critical rather than scoring political points."

15  Q.  This reference to, "As there are in bars," what did you        14:14:37

16  take that to mean from Mr. Lacey?

17  A.  In bars you would have an I.D. to get into the bar to drink

18  alcohol.

19  Q.  All right.  And had you heard Mr. Lacey use this analogy

20  previously?                                                        14:15:06

21  A.  I wasn't sure if it was Mr. Lacey.

22          MR. CAMBRIA:  I object to it.

23          THE COURT:  Well, I will sustain the objection.

24  BY MR. RAPP:

25  Q.  All right.  With respect to his, the comparison to bars, at    14:15:22

```
1    this point was there any effort by Backpage to check I.D.s of
2    posters on the site?
3            MS. BERTRAND:  Objection, relevance, calls for
4    speculation.
5            THE COURT:  Overruled.                                14:15:50
6            THE WITNESS:  No, we are not checking I.D.s before
7    posting.
8    BY MR. RAPP:
9    Q.  All right.  And then now looking at 1 -- 1827a.
10           THE COURT:  118 27a?                                  14:16:10
11           MR. RAPP:  1827a.
12   BY MR. RAPP:
13   Q.  Do you recognize this e-mail?
14   A.  Yes.
15   Q.  All right.  And is Mr. Lacey on this e-mail?             14:16:33
16   A.  The e-mail is from Michael Lacey.
17   Q.  And are you on the e-mail?
18   A.  I am also -- I am -- he sent the e-mail to me and others.
19   Q.  Do you remember what the -- let me go to page 2, do you
20   remember what the subject matter of this e-mail is?         14:16:53
21   A.  I think it's an article in the Post.
22   Q.  All right.
23   A.  Yes, I see it.  It's an article in the Denver Post.  It's
24   the daily newspaper in Denver, Colorado.
25   Q.  Okay.                                                    14:17:14
```

1           MR. RAPP:  Move to admit 1827a.

2           MS. BERTRAND:  Objection; relevance; not connected to

3    any of the substantive ads in the indictment --

4           THE COURT:  Overruled.

5           MS. BERTRAND:  -- and hearsay.                          14:17:28

6           THE COURT:  Did somebody else --

7           MR. FEDER:  Sorry, my mic.  401, 403, hearsay.

8           THE COURT:  Overruled.  I will overrule Ms. Bertrand's

9    objection as well.  And it may be admitted and published.

10          MR. CAMBRIA:  106?                                      14:17:46

11          MR. RAPP:  Another objection, Judge.

12          THE COURT:  Is there a -- this is a 1827a, so is there

13   an 1827?

14          MR. RAPP:  This is a redacted.

15          THE COURT:  Overruled.                                  14:18:00

16      (Exhibit No. 1827a was admitted.)

17   BY MR. RAPP:

18   Q.  What does Mr. Lacey say in response to this Post article on

19   BP?

20   A.  "Guys couple of points:                                    14:18:15

21   Within the response we need to note that as deplorable as this

22   case is, and it is appalling, it is one bad case amongst how

23   many millions of ads that involve no one underage."

24   Q.  Let me stop you there.  What did you take that to mean,

25   particularly the "how many millions of ads"?                   14:18:37

1          MR. CAMBRIA:  Object to that.  What is the relevance

2     of his opinion?  We have an exhibit it speaks for itself.  It's

3     up to the jury to determine what it means, if anything.

4          THE COURT:  Sustained.

5     BY MR. RAPP:                                               14:18:53

6     Q.  Well, how many postings at this point in 2012 can you

7     estimate were on Backpage in any of the markets in the United

8     States?

9     A.  Millions of postings.

10    Q.  When you say "millions of postings," are those post, the   14:19:16

11    millions of postings in what category?

12    A.  The majority of the paid postings are in female escorts.

13    Q.  All right.  What does he say in number four?

14    A.  Number four, "drug dealers use cell phones, fed-x.  When

15    you bust them, you do not advocate shutting down phone service,  14:19:49

16    overnight deliveries, underage people use phony I.D. to get

17    into bars.  thousands of people patronize local bar legally,

18    you don't close it when someone underage deceives the owner of

19    the bar."

20    Q.  And number five?                                         14:20:11

21    A.  Number five, "in time period covered in this story, this is

22    only the second case developed by the attorney general.  the

23    case is awful, but with two cases it is not yet a tsunami of

24    underage trafficking.  prosecute this case, these individuals,

25    get care and treatment for the victims and stop pandering to    14:20:34

```
 1    yahoos."
 2    Q.  All right.  Let's look at Exhibit 1200a.  Do you recognize
 3    this exhibit?
 4    A.  Yes.
 5    Q.  What is it?                                                    14:21:04
 6    A.  This is e-mails discussing the New York Times column on
 7    January 26th "How Pimps Use the Web to Sell Girls."
 8    Q.  And is Mr. Lacey on this, on this e-mail?
 9    A.  Yes.
10    Q.  And who is the sending -- who is sending this e-mail?          14:21:30
11    A.  It's from Edward McNally.
12    Q.  All right.  Do you know why he is sending you -- sending
13    Mr. Lacey this e-mail, do you know why?
14            MR. CAMBRIA:  Your Honor, he is not just only sending
15    Mr. Lacey.  There is like nine people on this.                    14:22:01
16            THE COURT:  Sustained.
17    BY MR. RAPP:
18    Q.  Well, are you familiar with what's contained within this
19    e-mail?  Let me go to page 2.
20            MS. BERTRAND:  Objection, to the extent that it seeks      14:22:15
21    hearsay.
22            THE COURT:  Overruled.
23            THE WITNESS:  Yes, I am very familiar with this
24    column.
25    BY MR. RAPP:                                                      14:22:26
```

1   Q.  How are you familiar?

2   A.  Because we would discuss it in management meetings

3   afterwards.  It was a big deal to the company.

4   Q.  Why is this a big deal?

5   A.  The New York Times has a lot of reach and Nicholas Kristof          14:22:37

6   is syndicated, so this column is going to appear not just in

7   one newspaper; it's going to appear in virtually every daily

8   newspaper that has Nicholas Kristof syndicated, so it's bad PR,

9   very bad.

10  Q.  And just to be clear, this is Mr. Lacey's e-mail address?         14:22:57

11  A.  Yes.

12          MR. RAPP:  Move to admit Exhibit 1200a.

13           (Exhibit 1200a was admitted)

14          MS. BERTRAND:  Objection; hearsay; hearsay within

15  hearsay.                                                              14:23:15

16          MR. CAMBRIA:  And 106.

17          MS. BERTRAND:  106 and relevance; does not go to any

18  of the substantive counts of the indictment.

19          THE COURT:  Overruled.  Did you wish to make another

20  objection?                                                            14:23:31

21          MS. BERTRAND:  No.  I just was tired and kept talking

22  and I didn't mean to.  Sorry.

23          THE COURT:  Fair enough.  Overruled.

24          MR. RAPP:  Request permission to publish, Your Honor.

25          THE COURT:  Yes, it may be published.                         14:23:47

1   BY MR. RAPP:

2   Q.  All right.  And so is this an article written by

3   Nicholas Kristof?

4   A.  Yes, it is.

5   Q.  And is this the article that the previous e-mail with          14:23:59

6   Nicholas Kristof was e-mailing you and Mr. Lacey at least about

7   asking some questions?

8   A.  Yes.

9   Q.  All right.  And do you continue to have exchanges with

10  Mr. -- does Backpage, members of Backpage, do they continue to     14:24:33

11  have exchanges with Mr. Kristof about particular articles?

12  A.  Yes.

13  Q.  Does he -- is this the only article that Mr. Kristof writes

14  about Backpage?

15          MS. BERTRAND:  Objection; leading.                          14:24:56

16          THE COURT:  Sustained.

17  BY MR. RAPP:

18  Q.  Do you know if Mr. Backpage -- Mr. Backpage -- Mr. Kristof

19  wrote any other articles about Backpage?

20  A.  Yes, there were several more columns.                          14:25:06

21  Q.  Let's go on to -- let's look at -- let's look at 1896, do

22  you recognize, well, do you recognize the two individuals on

23  this e-mail?

24  A.  Yes, I do.

25  Q.  And who is -- who is one of the individuals on this e-mail?   14:25:52

1    A.   Tony Ortega.  He's the editor of Village Voice, the paper

2    in New York City.

3    Q.   And does -- does Mr. Ortega and, based on this e-mail, does

4    Mr. Ortega and Mr. Lacey have an exchange regarding, without

5    going into the substance of the e-mail at this point, regarding     14:26:22

6    the Nicholas Kristof articles?

7    A.   Yes, they do.

8    Q.   And is -- do you recognize Mr. Lacey's e-mail address?

9    A.   I do.

10   Q.   And is it -- does it have the     14:26:38

11   michael.lacey@villagevoicemedia?

12   A.   Yes, it does.

13   Q.   And do you also recognize Tony Ortega's e-mail address?

14   A.   Yes, I do.

15   Q.   All right.     14:26:53

16        MR. RAPP:  Move to admit 1896, 2, 1896, pages 1 and 2.

17        MS. BERTRAND:  Objection; hearsay within hearsay; not

18   linked to any of the substantive counts of the indictment; 403.

19        THE COURT:  Overruled as to those objections.

20   (Exhibit No. 1896 was admitted.)     14:27:13

21        MR. RAPP:  Request permission to publish.

22        THE COURT:  Yes, it may be admitted and it may be

23   published.

24   BY MR. RAPP:

25   Q.   Are you familiar with the subject matter of this e-mail?     14:27:30

1    A.  Yes, very much so.

2    Q.  How are you familiar with the subject matter of this?

3    A.  We were able to research and secure the ads for the victim

4    in the Nicholas Kristof column, and then we spent a lot of time

5    trying to test the veracity of Kristof's claims.                14:28:04

6    Q.  And why were you trying to test the veracity of Nicholas

7    Kristof's claims in his article?

8    A.  We just want to discredit Kristof we want to tell him he's

9    got the story wrong.

10   Q.  All right.  And what does Mr. Lacey tell Mr. Ortega         14:28:28

11   starting at the top here?

12   A.  "Tony,

13   here's the issue.

14   carl and jim have been on the dates since this came out as you

15   suggest, talking about being pimped out in nyc happened before  14:28:45

16   we arrived in nyc.

17   however, it is more complicated than that.

18   i will forward link for you to read articles that Carl

19   unearthed.

20   she was in high school in Boston when she started.              14:28:59

21   backpage goes into Boston October 11th, '05, reporting on

22   boston globe has her turning tricks in winter of '05.  she

23   meets her pimp, after she started sex work 'on a snowy winter

24   night' 2005.

25   so it is possible she was using backpage in Boston when under   14:29:20

UNITED STATES DISTRICT COURT

```
 1   pimps control.
 2   and it is possible that she was on the circuit traveling.
 3   Court testimony has her shuffled from boston to atlantic city,
 4   Florida.  Was she moved to nyc?  we don't know.
 5   carl is checking to see if police asked for our records.          14:29:38
 6   kristof says he isn't interested in prostitution, just pimps.
 7   Well, john jay study found pimps very small part of
 8   prostitution.
 9   and in any case, numerous studies sent to Kristof argue that
10   the Internet and technology, not abolition, is the solution to   14:29:55
11   rescuing kids.
12   this woman's story is horrific as you get into it.  there are
13   facts that Kristof was wrong, stories that are conflated, but
14   his woman is exactly who needs to be rescued, not driven into
15   the shadows.                                                      14:30:14
16   i suspect that we will end up with response, one page plenty,
17   while best to keep options open, suspect not cover."
18   Q.  I just have a question about Mr. Lacey's comment here where
19   he says, shuffled from Boston to Atlantic City and Florida, did
20   you ever observe a poster posting an ad that was posted in       14:30:49
21   different markets that Backpage had?
22   A.  Yes.
23   Q.  Can you explain that to the jury?
24   A.  It's not uncommon to see.
25            MR. FEDER:  Same.  Same.                                14:31:13
```

1          THE COURT:  Overruled.

2          THE WITNESS:  It's not uncommon to see those people

3     posting in female escorts category to move from city to city.

4     They will often put in their ad "New in town" and in this case

5     they will go up and down the east coast or go to other cities,          14:31:31

6     and we see that in the user account 'cause we see all the ads.

7     We know what city they are posting in.

8     BY MR. RAPP:

9     Q.  All right.  Now, in addition to articles written by

10    Nicholas Kristof, did you -- first, did you become aware of a          14:31:50

11    video broadcast of Nicholas Kristof and the subject of this --

12    the article, did you become aware of that?

13         MS. BERTRAND:  Objection.

14         THE WITNESS:  Yes.

15         THE COURT:  What was the objection?          14:32:14

16         MS. BERTRAND:  Well, it was leading, and this is about

17    to seek evidence that is a hearsay, hearsay within hearsay and

18    duplicative of what's already been addressed.

19         THE COURT:  I will sustain as to leading, and I

20    don't -- I don't at this point think Mr. Rapp has provided          14:32:34

21    enough foundation for me to know what exhibit he is going to

22    introduce, so let's give him a little leeway.

23    BY MR. RAPP:

24    Q.  Well, did you become aware of this video?

25    A.  Yes, Google news.          14:32:49

1    Q.  Didn't mean to interrupt you.  How did you become aware of
2    this video?
3    A.  Searching for Backpage in the news on Google.
4    Q.  All right.  Do you know if anybody else within Backpage was
5    aware of this video with Nicholas Kristof?                        14:33:07
6    A.  Yes, I know Andrew Padilla was.
7    Q.  All right.  And can you, without -- can you describe the
8    video without going into what, what was said on the video?  Can
9    you describe what it was?
10   A.  Nicholas Kristof is walking through Time Square with the      14:33:31
11   victim and she's pointing to places where she had been
12   prostituted.
13   Q.  All right.  And did you and Mr. Padilla have some type --
14   this is just a yes or no question, did you and Mr. Padilla have
15   a discussion about that video?                                    14:33:50
16   A.  Yes.
17   Q.  Now, I'm showing you 1911b, for your eyes only, do you see
18   that on the screen?
19   A.  Yes, I do.
20   Q.  Do you recognize the e-mail address that -- do you            14:34:21
21   recognize the e-mail address of who is sending this?
22   A.  Yes, I do.
23   Q.  How do you recognize it?
24   A.  Michael.lacey@villagevoicemedia.com.  That's the standard
25   format, first name, dot, last name, @, and the corporate e-mail  14:34:43

```
 1    address domain.
 2    Q.  All right.  And in terms of the context of this e-mail,
 3    does it reference Nicholas Kristof?
 4           MS. BERTRAND:  Objection; leading.
 5           THE COURT:  Sustained.                              14:35:01
 6    BY MR. RAPP:
 7    Q.  Do you recognize the context of this e-mail in also with
 8    the date when this e-mail was sent?
 9    A.  The e-mail was sent Sunday, April 6, 2012.
10    Q.  All right.  Is this the time period that Nicholas Kristof  14:35:20
11    was writing a series of articles?
12           MS. BERTRAND:  Objection; leading.
13           THE COURT:  He can answer it, if he knows.
14           THE WITNESS:  Yes, it's the same time period.
15           MR. RAPP:  Move to admit 1911b.                     14:35:39
16           MS. BERTRAND:  Objection, Your Honor.  First,
17    Mr. Ferrer isn't even included in this e-mail.  It isn't linked
18    to any of the substantive counts of the indictment.
19           THE COURT:  Sustain.
20           MS. BERTRAND:  106.                                 14:35:56
21           THE COURT:  I will sustain as to foundation.
22    BY MR. RAPP:
23    Q.  Well, let's talk about that.  Do you recognize these
24    numbers at the bottom?
25    A.  Yes.                                                   14:36:11
```

```
1    Q.  How do you recognize that?

2    A.  These are the numbers that are put on documents by various

3    investigative groups.

4    Q.  All right.  Do you recognize this one?

5    A.  Yes.                                                    14:36:29

6    Q.  How do you recognize it?

7    A.  That would be the Arizona Grand Jury.

8    Q.  Did you come to learn that in a Grand Jury out of Arizona

9    was seeking documents from Backpage?

10          MS. BERTRAND:  Objection; leading and --            14:36:46

11          THE COURT:  Sustained.

12   BY MR. RAPP:

13   Q.  Did you ever receive a subpoena from an Arizona Grand Jury?

14   A.  I did, and I had to go to court.

15   Q.  All right.  How about this number, do you recognize that? 14:36:57

16   A.  I do.

17   Q.  How do you recognize that?

18   A.  Because these are the documents that we were forced to turn

19   over to the --

20          MR. FEDER:  Hearsay; 401; 403; beyond the scope of the 14:37:21

21   question, isn't connected to anything.

22          THE COURT:  He can answer in the first person, but I

23   think the problem -- the problem -- let me finish.  The

24   problem, and the reason I'm sustaining the objection is he

25   tends to refer to the "we."  You need to be more specific,   14:37:41
```

```
 1   Mr. Rapp.
 2   BY MR. RAPP:
 3   Q.  Were you compelled to respond to a subpoena?
 4   A.  I was compelled to respond to a subpoena coming out of
 5   Washington D.C.                                               14:37:57
 6   Q.  All right.  Does this number have something to do with it?
 7   A.  Yes.
 8   Q.  Can you explain that?
 9           MR. FEDER:  Same objections.
10   BY MR. RAPP:                                                  14:38:08
11   Q.  Can you --
12           THE COURT:  If he knows.
13   BY MR. RAPP:
14   Q.  If you know, what is the significance of what is in front
15   of the number?                                                14:38:15
16   A.  Am I able to answer?  Permanent Subcommittee Investigation,
17   we referred to it as PSI, and it was a big deal.
18   Q.  It was a big deal because who was the entity requesting you
19   to provide these documents?
20   A.  The U.S. Senate.                                          14:38:37
21           MR. RAPP:  Move to admit 1911b.
22           MS. BERTRAND:  Objection; no foundation laid as to
23   these statements and the authentication of this document
24   through this witness.
25           THE COURT:  Sustained.                                14:38:55
```

UNITED STATES DISTRICT COURT

1   BY MR. RAPP:

2   Q.  Well, have you received e-mails from Mr. Lacey at this

3   e-mail address previously?

4   A.  I have, yes.

5   Q.  How many times?                                        14:39:08

6   A.  Several dozen times.

7   Q.  Indeed, haven't we looked at some today?

8   A.  We have.

9           MR. RAPP:  Move to admit 1911b.

10          MS. BERTRAND:  Same objection; lack of foundation.   14:39:28

11          THE COURT:  Sustained.

12  BY MR. RAPP:

13  Q.  Let's look at 1043.

14          MS. BERTRAND:  Your Honor, may we talk about when

15  we're going to take our afternoon break?                   14:39:58

16          THE COURT:  Well, I guess now is as good a time as

17  any.

18          Members of the jury, we'll be in a roughly 20-minute

19  break, but I ask that you be prepared to come in promptly on

20  the hour.  And just remember the admonition again not to come   14:40:14

21  to any conclusions or to discuss the case, and you may have

22  your break.  Please all rise for the jury.

23          All right.  We may stand at recess.

24          MR. RAPP:  Can we be heard before the jury comes back?

25          THE COURT:  Yes.                                    14:41:05

60

```
1              (Recess was taken at 2:43 p.m.)

2          (Proceedings reconvened at 3:01 p.m.)

3              THE COURT:  Mr. Rapp, you --

4              MR. RAPP:  I wanted to clear up this 120, so what we

5    were admitting was 120c, which was probably seven slides of a      15:01:09

6    43-slide PowerPoint.  We feel those slides are relevant.

7    That's what we intended to admit in the interest of time.  We

8    could admit the entire PowerPoint with the exception of one

9    slide, which is 13, and if Ms. Figueroa can put this on the

10   screen.  This is the one slide that we have a strong objection    15:01:44

11   to because it references the CDA, so I'm going to -- I would

12   admit 120 in with the exception of slide 13, but I'm only going

13   to discuss a few of the slides.

14             MR. LINCENBERG:  And --

15             THE COURT:  This is your newly added Exhibit 120c.       15:02:02

16             MR. RAPP:  120c was the redacted, which only had a

17   handful of slides.  It had seven slides and I was going to go

18   over with him.  I am not going --

19             THE COURT:  What is this?

20             MR. RAPP:  This is the entire -- I just wanted to show   15:02:21

21   you why we redacted it, but this --

22             THE COURT:  One slide is redacted.

23             MR. RAPP:  Well, we redacted 36 slides.  We just kept

24   seven in because those are the ones we want to discuss.  I

25   think the objection is a 106 objection.  I am not sure that       15:02:39
```

```
1    matters.  They can bring in the additional slides if they
2    wanted to, but if in the interest of time if we're going to
3    admit the entire exhibit, this particular slide should not come
4    in because it references the CDA.
5          MR. LINCENBERG:  And Your Honor, we strongly believe      15:02:57
6    that the entire slide deck should come in.  This is being
7    offered because the government wants to suggest there's
8    information in there that puts Mr. Brunst, speaking on behalf
9    of my client, Mr. Brunst on notice of what's being presented,
10   and page 13 is what puts him on notice that is exculpatory.    15:03:17
11   You can't just put in the part that's inculpatory.
12         The fact that page 13, one of the things that is
13   discussed is the Communications Decency Act is completely
14   relevant.  This is a presentation to investors.  They are
15   talking about the investment and legal risks to an investor of  15:03:39
16   purchasing Backpage, and part of the consideration that's being
17   discussed is whether the business is lawful or not, and this is
18   right on point.  It is basically saying we want to introduce
19   the parts that are, according to the government, inculpatory,
20   while excluding the parts that are exculpatory.  You can't      15:04:04
21   divide up what goes into my client's state of mind.
22         MR. CAMBRIA:  I agree with that, Your Honor, join in
23   that.
24         MR. FEDER:  Join.
25         MS. BERTRAND:  Join.                                      15:04:14
```

UNITED STATES DISTRICT COURT

```
 1              MR. EISENBERG:  As well.

 2              THE COURT:  All parties joined in the objection, but I

 3    will overrule the objection because as to slide 13 it does

 4    reference the CDA.  It makes statements purporting to be the

 5    law.  It is confusing and potentially misleading in terms of      15:04:31

 6    the statements about the CDA and how it applies to Backpage, so

 7    overruled.  So 120 is admitted with the redaction of 13.

 8              (Exhibit No. 120 is admitted.)

 9              MR. LINCENBERG:  Your Honor, we're not offering this

10    part as to whether or not what's in here is or is not an          15:04:51

11    accurate state of the law.

12              MR. CAMBRIA:  Correct.

13              MR. LINCENBERG:  We're not offering it as a defense.

14              THE COURT:  I understood the objection.

15              MR. LINCENBERG:  But -- but given that the prosecution   15:05:03

16    is constantly putting in Attorney General letters and the like,

17    this is what -- this is the most important part of what the

18    notice is that's being presented for a defendant's state of

19    mind.

20              THE COURT:  All right.  The record is made.             15:05:22

21              MR. RAPP:  The second issue is this 1911b.

22              This goes back to the Court's order at 1212, page 4,

23    and then Doc 1776 at page 2 through 3.  The witness has

24    identified the e-mail address.  We've already had evidence that

25    he's identified this e-mail address as an e-mail address he's     15:05:57
```

1  exchanged with Mr. Lacey.  It is an admission of a party

2  opponent.  "Jim and I believe in legalized prostitution" --

3          THE COURT:  Let me just say, in the first instance we

4  have Mr. Ferrer on the stand and he shouldn't be here for those

5  discussions.                                                    15:06:22

6          MR. RAPP:  I didn't see him sneak in actually.

7          THE COURT:  Counsel, there is sufficient number of you

8  here, so please be aware.

9          MR. RAPP:  So on top of that, in the event that the

10  Court -- so he's --                                            15:06:41

11          THE COURT:  Well, let me shortcut this because we have

12  our jury waiting.  This is the same issue that we confronted

13  last Friday.

14          MR. RAPP:  Uh-huh.

15          THE COURT:  Although the prior Court has a ruling that  15:06:51

16  with regard to Mr. Ferrer and some of these e-mails, he can

17  authenticate them in his position at Backpage and his knowledge

18  about what's being communicated.  This is different.  He --

19  this is an e-mail that I don't know that he has an independent

20  knowledge of, or if there's something in addition to that.     15:07:20

21          This is an e-mail exchange between one of the

22  individuals here in this case and somebody else.  And the very

23  fact that maybe he gathered information and documents to

24  produce to a Grand Jury doesn't further his knowledge of

25  whatever the substance of it is.                               15:07:41

1          And so, number one, you have to develop the proffer

2     that it is in furtherance of the conspiracy.  There has to be

3     some independent knowledge of this individual as to what is

4     being communicated here, and that to me is what is lacking in

5     terms of the foundation that you've laid so far.                    15:08:02

6          MR. RAPP:  It doesn't even matter who the individual

7     is.  It could be anybody.  It's coming from Mr. Lacey.  It

8     could be to any number of people.  It happens to be this

9     person --

10          THE COURT:  Well, I guess under that theory, Mr. Rapp,   15:08:17

11     why don't we have him bring in all of the e-mails from all of

12     the codefendants?

13          MR. RAPP:  But Judge, we have --

14          THE COURT:  There has to be independent foundation

15     laid as to each exhibit as being in the furtherance of the      15:08:31

16     conspiracy.

17          MR. RAPP:  So it there's two theories here, Judge.

18     One, I get it, it has to further the objects of the conspiracy,

19     and I don't know if this -- there is probably an argument that

20     it does, but it is a 100 percent admission of a party opponent.  15:08:48

21     "We believe in legalized prostitution," that's directly coming

22     from michael.lacey@villagevoicemedia.com.  That's it.

23          THE COURT:  But through this witness there has to be

24     some other foundation laid as to his knowledge of the e-mail;

25     not simply that he gathered up the documents and gave them to a  15:09:06

1    Grand Jury.

2          MR. RAPP:  We could never do a white collar case under

3    that theory.  The law is clear on this.  He can just

4    authenticate the e-mail.  I just went to this default in that

5    he knows because he's the CEO and he's getting these Grand Jury          15:09:23

6    subpoenas from here and he's getting it from the Senate, and

7    that had to be turned over.  I didn't know what the Court -- I

8    didn't know if the Court didn't know where the e-mail came

9    from, but this is from michael.lacey@villagevoicemedia.  It is

10   an admission of a party opponent.  There is no question as to          15:09:43

11   the authenticity of it.

12         THE COURT:  What is the admission to, and that's the

13   question?

14         MR. RAPP:  Well, it's, I mean, I guess people could

15   see things differently, but Kristof's first column on:  Former          15:09:54

16   hooker just flock wrong on facts.  She was a government witness

17   before Backpage even started.  Jim and I believe in legalized

18   prostitution and spend millions to try to keep underage off the

19   sight.  Not perfect by any means.

20         That is an admission of a party opponent.  He's          15:10:13

21   authenticated the e-mail address from which it came.  And if

22   the Court has any concern about the provenance of this e-mail,

23   he's one of the few witnesses I have had who is in the unique

24   position to say:  Yeah, I got a subpoena from the Arizona Grand

25   Jury, and we had to turn over these documents.          15:10:36

1        In addition, it has a second Bates number from the

2   Senate subcommittee and that one went all the way up to the

3   Supreme Court.  They found him -- Judge Campbell found him in

4   contempt here.  They found him in contempt in the DC circuit.

5   He ultimately had to provide these documents.  He's now                  15:10:55

6   exchanged this e-mail with Michael Lacey at that e-mail

7   address.

8        And by the way, up to this point we've gotten in a

9   number of e-mails with defendants on them that Mr. Ferrer was

10  not on them, and those came in with no problem.  So I am                   15:11:16

11  struggling to --

12       THE COURT:  No, they did not.  That may be my

13  recollection, but Mr. Ferrer was able to not only authenticate

14  those e-mails under 901, but he was also privy to the

15  communication because he had some reason to know in his                    15:11:33

16  capacity.  Here the question is, what's the reason to know that

17  this exchange is going forward?  I mean, does he have an

18  independent recollection of what Mr. Lacey, you know, opined

19  about this New York Times opinion?  That's the question.

20       MR. RAPP:  We do have this e-mail exchange where we                   15:11:54

21  just looked at the one with Tony Ortega where they are sort of

22  going back and forth --

23       THE COURT:  I thought that was this?

24       MR. RAPP:  No.  This is just a singular e-mail from

25  Mr. Lacey that he's sending on his Village Voice Media account            15:12:06

on behalf of Michael Lacey.  So that once Mr. Ferrer can say:
I know that e-mail address.  How do you know the e-mail
address?  'Cause I've exchanged e-mails with Mr. Lacey at that
e-mail address, and he's discussing Kristof.  So I mean, it's
not something out of the blue.  We just have some testimony          15:12:31
about this Kristof doing a series of articles, so obviously
he's just going to read this.  He is not even going to comment
on it because it's just an admission.  It's just an admission
of a party opponent, and it comes in like the Queen Mary.  It's
not -- there is no legal -- there is no evidentiary impediment       15:12:53
based upon what he's testified to thus far for this not coming
in.

          Again, if the Court thought there was authenticity
issue, he is able to testify to how Backpage turned it over to
various investigative bodies.                                        15:13:11

          THE COURT:  All right.  You can try to move to have it
admitted laying foundation.

          MR. CAMBRIA:  Your Honor, if I might be heard on that,
though.

          THE COURT:  Well, the time to make your objection is       15:13:41
before I rule, so go ahead.

          MR. CAMBRIA:  I didn't.  I thought you had.

          THE COURT:  It's 3:15.  We have a jury waiting.

          MR. CAMBRIA:  I thought I agreed with the first
language you said that the foundation wasn't there.  It was          15:13:54

1    that easy.  All you would have to do is identify an e-mail

2    address and everything would come in.

3            Secondly, I don't see it -- this, by the way, is

4    communication between Mr. Lacey and his wife.  But in addition,

5    it's not a -- it's not a party admission at all.  Somebody says          15:14:11

6    that they believe in something isn't the same as saying:  We

7    believe that it should be done on our website.  There's a

8    personal belief.  It doesn't turn into an admission in

9    connection with a business, but the foundation isn't there.

10           THE COURT:  All right.  You can try to move to get it           15:14:39

11   in laying the appropriate foundation.

12           Let me just clarify my ruling with regard to a number

13   of Ms. Bertrand's objections as not being tied to any count.

14   There of course is the allegation of an ongoing conspiracy

15   between 2004 to 2018, and the foundation is to be laid by the           15:15:03

16   government as to the existence of that conspiracy and the

17   individuals that are charged, their knowledge of the conspiracy

18   and what they did in furtherance of it, and so though she made

19   the objection in terms of not being tied to any one of the

20   counts that are alleged, it does go to the evidence of the --           15:15:30

21   the government's theory of the case.

22           All right.  Let's have the jury in.  All rise for the

23   jury.

24                       (Jury is present)

25           THE COURT:  All right.  Please be seated.  And thank            15:16:40

1    you for your patience, members of the jury.  We did have some

2    matters to discuss.  So we have been here since 3:00 o'clock.

3    But in any event, the record will show the presence of our jury

4    and the witness is on the stand.

5             Mr. Rapp, you may continue.                          15:16:54

6             MR. RAPP:  Thank you, Your Honor.

7    BY MR. RAPP:

8    Q.  Mr. Ferrer, I want to loop back to an exhibit that we

9    discussed earlier this afternoon, and that's Exhibit 120, do

10   you see that on your screen?                                  15:17:07

11   A.  Yes, I do.

12   Q.  And can you recognize this?

13   A.  I do recognize it.

14   Q.  And what is it?

15   A.  This is the sales management -- this is a presentation by  15:17:18

16   the management of Backpage.

17   Q.  All right.  And is this the PowerPoint that we were

18   discussing earlier today where you and Mr. Brunst presented

19   this PowerPoint to prospective buyers of the website?

20   A.  Yes.                                                      15:17:43

21   Q.  All right.  And would you agree with me that this is a

22   43-page -- 43-slide deck?

23   A.  Yes.

24             MR. RAPP:  I would move to admit Exhibit 120 with the

25   exception of slide 13.                                        15:18:06

1          THE COURT:  Yes, it may be.

2          MR. LINCENBERG:  Objection; rule of completeness, and

3  that makes it misleading.

4          THE COURT:  Overruled.  It may be admitted.

5          MR. LINCENBERG:  404(b(2).                              15:18:18

6      (Exhibit No. 120 was admitted.)

7          THE COURT:  Wait, wait.  It's a technical issue.  It

8  may need to be renumbered because you have a duplicated

9  exhibit.  You changed your exhibit list, so I just want to make

10  sure that it's appropriately identified.                        15:18:35

11          MR. RAPP:  I believe we can keep it for the record as

12  120 and just simply remove slide 13 if that's acceptable to the

13  Court.

14  BY MR. RAPP:

15  Q.  Let me just take a quick look here at slide five, do you    15:18:56

16  see that on your screen?

17  A.  Yes, I do.

18  Q.  All right.  Is this slide, can you just familiarize

19  yourself with it?  Is this slide accurate?

20  A.  It is deceptive.  No, not accurate.                         15:19:22

21  Q.  Why, sir, is it deceptive, in your words?

22  A.  The first bullet point is Backpage is the second largest

23  general classified Internet site in the world.  That is not

24  accurate.

25  Q.  Why isn't that accurate?                                    15:19:46

```
1    A.  Well, we are -- we're including feeds into creating a lot

2    of that impression of being a general veneer of a general

3    classifieds site.  And then the second largest classified

4    Internet site in the world, we were able to pull that off of

5    some site that ranks traffic like Alexa, but they listed it as        15:20:15

6    general classifieds, but they didn't understand that the

7    pageviews, the content and the revenue are almost entirely in

8    the adult section.

9    Q.  Okay.  Let's look at slide seven, and this slide, who does

10   it name as the CFO?                                                    15:20:51

11   A.  Jed Brunst.

12   Q.  And does it name Mr. Jed Brunst as not only the CFO of

13   Village Voice Media, but does it also name him the CFO of

14   Backpage.com?

15   A.  Yes, it does.                                                      15:21:13

16   Q.  Now, let's look at slide ten.  All right.  In reviewing

17   slide ten, is this slide accurate?

18   A.  One moment.  Some of this slide is inaccurate.

19   Q.  What is inaccurate about this slide?

20   A.  You know, I need to change my testimony.                          15:22:09

21   Q.  All right.

22   A.  What's in this slide is, it is accurate, but it's not --

23   it's deceptive in terms it's not disclosing where all those

24   pageviews and visits are coming from.

25   Q.  Why doesn't it disclose that?                                     15:22:41
```

1  A.  The main purpose of this PowerPoint is to have Backpage

2  appear like a genuine competitor to Craigslist and to be a

3  general classified site, which it is not.

4  Q.  All right.  Let's look at slide 12, can you interpret this

5  slide for the jury?                                               15:23:22

6  A.  This slide, this is probably the most interesting part is

7  right there.  Under Adult in the month of August, 1 billion

8  pageviews.  Pageview is when somebody looks at a page.  It's a

9  big number.  And then the Revenue, it's 94.2 percent is Adult,

10 so that's 4,923,784.  And then if you look down at Services     15:23:58

11 you'll see Services is the second category in terms of ranking.

12 Well, that's because it has a category Therapeutic Massage, and

13 that's kind of a quasi Adult category.  Often clients post in

14 both, female escorts and in Therapeutic Massage.  And then you

15 can see everything else is really in terms of pageviews, fairly  15:24:37

16 insignificant compared to the billion pageviews in Adults.

17 Same thing with Revenue, it's almost nonexistent, and Jobs

18 Rentals, Automotive.

19 Q.  All right.  And with respect to the 94 percent in Adult,

20 what percentage of that would be the female escort section?      15:25:03

21 A.  It's at least 70 percent.

22 Q.  And then looking at slide 15.  Oh, thank you.  What about

23 this slide, is this accurately communicating information to the

24 potential buyer?

25 A.  Yes, it is.                                                  15:25:48

1    Q.   And right here, this is accurate; correct?

2    A.   Yes.

3    Q.   What does it say?

4    A.   "Listings for female escorts represent the vast majority,

5    approximately 80 percent of the categories total traffic.  This          15:26:15

6    is a category within Adult."

7    Q.   All right.  Then looking at slide 17, I want to draw your

8    attention up here, and can you read this line, and I will ask

9    you questions on the other side?

10   A.   "Creates mainstream environment for site participants and           15:26:50

11   allows plausible deniability for exposure."

12   Q.   What did you take that to mean when it was included in this

13   PowerPoint that was presented to potential buyer?

14            MS. BERTRAND:  Objection; calls for speculation.

15            THE COURT:  Well, he can answer as to what he thought           15:27:14

16   it meant.

17            THE WITNESS:  What I thought it meant was the

18   69 percent of the total ads posted on Backpage in the nonadult

19   categories, which I already testified are mainly feeds and not

20   from users, that that creates that veneer of general classified         15:27:34

21   site.

22   BY MR. RAPP:

23   Q.   All right.  In terms of plausible deniability, what in

24   particular, that being in quotes, what in particular did that

25   mean in relationship to selling the website?                            15:27:56

UNITED STATES DISTRICT COURT

74

```
 1    A.   It means you're not running a prostitution website.

 2    Q.   Were you?

 3    A.   Yes.

 4    Q.   And then finally looking at page 18, what about -- can you

 5    read this bullet point?                                            15:28:29

 6    A.   "Industry-leading moderation process, 80 percent of staff

 7    are devoted to content moderation minimizes the occurrence of

 8    spam and inappropriate content and provides a superior user

 9    experience."

10    Q.   First, is that accurate?                                      15:28:54

11    A.   "Industry-leading moderation process" is not accurate.

12    Q.   Why is that not accurate?

13    A.   We weren't blocking users for violating the Terms of Use.

14    They could post again, and most of our technology was allowing

15    ads to get through.                                                15:29:21

16    Q.   All right.  And then the last part, "minimizes the

17    occurrence of spam and inappropriate content and provides user

18    experience," what did that mean to you?

19    A.   Being a free website where you could post free in a lot of

20    categories, most of the categories except in Adult, you got a     15:29:42

21    lot of spam, and so just getting rid of spam is important for

22    the user experience.

23    Q.   And then finally, what did this refer to the automated

24    filter?

25    A.   So we ran an automated filter across all ads before they     15:30:08
```

UNITED STATES DISTRICT COURT

1    got posted.

2    Q.  All right.  Is that accurate the way it's described here?

3    A.  Yes, I'd say it's accurate.

4    Q.  All right.  Now, let's go back to 1911b, we were discussing

5    this previously today, and this is for the witness' eyes only,      15:30:47

6    let me go through this e-mail again.  In April of 2012, was

7    this this time period that you were receiving articles by

8    Nicholas Kristof with the New York Times?

9    A.  Yes.

10   Q.  And did you exchange e-mails with Mr. Lacey about the          15:31:20

11   Nicholas Kristof articles?

12   A.  Yes, I did.

13   Q.  And indeed, did we not look at one before we broke where

14   he's exchanging an e-mail with an individual by the name of

15   Tony Ortega?                                                        15:31:54

16          MS. BERTRAND:  Objection; leading; argumentative.

17          THE COURT:  Overruled.  I think the question is:

18   Didn't we look at an e-mail earlier?  So overruled.  Well, he

19   can answer it, though.

20          THE WITNESS:  Yes.                                           15:32:10

21   BY MR. RAPP:

22   Q.  And again, Tony Ortega is who?

23   A.  Tony Ortega is the editor of the Village Voice and he works

24   for Michael Lacey.

25   Q.  All right.  Without going into the details of this e-mail,      15:32:22

```
 1    does it at least reference Nicholas Kristof?

 2              MS. BERTRAND:  Objection; hearsay; lack of foundation.

 3              THE COURT:  Sustained.

 4              MR. RAPP:  Move to admit 1911b.

 5              MS. BERTRAND:  Same objection as before the break,      15:32:50

 6    lack of foundation; hearsay; lack of authentication.

 7              THE COURT:  Overruled.

 8              MR. RAPP:  Request permission to publish.

 9              THE COURT:  Yes, it may be admitted and published.

10         (Exhibit No. 1911b was admitted.)                           15:33:22

11              MS. BERTRAND:  I'd ask that the Court instruct the

12    government to take the highlighting off the document.

13              THE COURT:  Yes.

14    BY MR. RAPP:

15    Q.  What does Mr. Lacey tell this recipient of the e-mail?       15:33:40

16              MR. CAMBRIA:  The document speaks for itself.

17              MS. BERTRAND:  Join.

18              THE COURT:  Well, I will sustain the objection.

19    BY MR. RAPP:

20    Q.  Can you read what he says?                                   15:33:51

21    A.  Yes.  "Kathleen, I knew events had jumped the shark when my

22    cleaning guy, a former priest, came that and gave me one of two

23    Nicholas Kristof columns in New York Times about our cavalier

24    trafficking of underage kids for sex.  He is in a talk group

25    and defended me saying, I know Michael, something isn't right.   15:34:10
```

1    Indeed.  I am sending you a letter we sent out to our staff,

2    many of whom have never seen Backpage, just heard all the

3    anguish.  Kristof's first column on former hooker just flat

4    wrong on facts.  She was a government witness before Backpage

5    even started.  Jim and I believe in legalized prostitution and          15:34:34

6    spend millions trying to keep underage off site, not perfect by

7    any means.  But for all the finger pointing, law enforcement

8    has a total of 50 trafficking cases over a three-year period.

9    We hand reviewed 32 million Backpage adult ads in that time

10   frame."                                                                  15:35:00

11   Q.  This reference to spending millions, what did you take that

12   to mean?

13          MS. BERTRAND:  Objection; calls for speculation.  He

14   is not included in this e-mail.

15          THE COURT:  Sustained.                                           15:35:15

16   BY MR. RAPP:

17   Q.  Let me move on to 1043 for the witness' eyes only.  And,

18   sir, do you recognize this article or this document?

19   A.  Yes, I do.

20   Q.  And what is the document, the article rather?                       15:35:36

21   A.  It's another column from Nicholas Kristof published

22   March 31, 2012, Financiers and Sex Trafficking.

23          MS. BERTRAND:  Objection, move to strike;

24   nonresponsive; commenting on the content of the article.

25          THE COURT:  Overruled.                                          15:36:06

```
 1    BY MR. RAPP:
 2    Q.  I'm not going to admit this article, Mr. Ferrer, but do you
 3    recall any discussions with upper management or ownership about
 4    this article in relationship to the investors in Backpage?
 5    A.  I do.                                                           15:36:29
 6    Q.  All right.  And who did you have conversations with?
 7    A.  Conversations were with Scott Spear, I believe.
 8    Q.  All right.  And did this article by Nicholas Kristof, did
 9    it raise any concerns with Mr. Spear?
10            THE REPORTER:  I didn't hear.                               15:37:04
11            MR. FEDER:  Speculation.  Sorry.
12            THE COURT:  Sustained.
13    BY MR. RAPP:
14    Q.  Did you come to learn that the Village Voice Media had
15    certain investors?                                                  15:37:24
16    A.  Yes.
17    Q.  How did you learn that?
18    A.  Through this column.
19    Q.  All right.  Was there any concern about those investors
20    pulling their investment as a result of this article?             15:37:38
21            MS. BERTRAND:  Objection; leading.
22            THE COURT:  Sustained.
23    BY MR. RAPP:
24    Q.  Did this article cause any concern?
25    A.  Yes, it caused concern.                                        15:37:50
```

```
1    Q.  All right.  And who specifically expressed concerns to you?
2    A.  Goldman Sachs was pulling their investment --
3            MR. CAMBRIA:  Objection, Your Honor.
4            MS. BERTRAND:  Nonresponsive.
5            MR. CAMBRIA:  Nonresponsive.                    15:38:06
6            THE COURT:  The part of pulling their investment will
7    be stricken and the jury will disregard.
8    BY MR. RAPP:
9    Q.  At this time was there still any effort to sell Backpage?
10   A.  I do not -- no, not that I know of.                 15:38:32
11   Q.  Let's look at 2040a.  Let's go to -- let's look at 723a.
12   Do you recognize this?
13   A.  Yes.
14   Q.  What is this?
15   A.  This is an e-mail that was originally sent through the   15:39:14
16   corporate media e-mail address.
17   Q.  All right.  And did you -- did you forward this e-mail to
18   Mr. Lacey?
19   A.  I forward -- I did forward an e-mail to Mr. Lacey regarding
20   the e-mail that was received at nobody at               15:39:41
21   villagevoicemedia.com.
22   Q.  All right.  And what was the subject matter of this e-mail?
23           MS. BERTRAND:  Objection; relevance; 403 and hearsay;
24   lack of foundation.
25           THE COURT:  Overruled.  Is this 723a?             15:40:10
```

```
 1              MR. RAPP:  Judge, this is 733a.

 2              THE COURT:  Okay.  I have -- on the transcript it also

 3    has 723.  You said 733?

 4              MR. RAPP:  733a.

 5              THE COURT:  Wait, let me look at the objection.          15:40:32

 6    Overruled.

 7              MR. RAPP:  Move to admit 733a.

 8              THE COURT:  Yes, it may be admitted and published.

 9        (Exhibit No. 733a was admitted.)

10    BY MR. RAPP:                                                       15:40:57

11    Q.  And so can you just summarize the subject of this e-mail

12    that you're forwarding to Mr. Lacey?

13              MR. CAMBRIA:  Your Honor, there is more than

14    Mr. Lacey on this e-mail.  He makes it sound like it's

15    something it's not.                                                15:41:14

16              THE COURT:  Sustained.

17    BY MR. RAPP:

18    Q.  Is there somebody else on this e-mail?

19    A.  Yes.  Michael Lacey and Jim Larkin.

20    Q.  And what was their role in Backpage?                           15:41:23

21    A.  Sorry, what was --

22    Q.  What was their role in Backpage?

23    A.  They were the majority owners.

24    Q.  And why is it that you sent this e-mail to Mr. Lacey and

25    Mr. Larkin?                                                        15:41:41
```

A.  Because the complainant who sent the e-mail, it ends up

going to michael.lacey@villagevoicemedia.com.

Q.  Okay.  And then how do you -- can you tell from this how

you're made aware of it?

A.  I received it, but I really can't tell who sent it to me.          15:42:08

Q.  Okay.  But do you -- what do you advise -- what do you

advise Mr. Lacey you're going to do in response to receiving

this e-mail?

A.  "Originally posted on Friday, April 20th, 2012 at

10:48 p.m.  Removed by user on Monday April 23, 2012 at          15:42:39

1:26 a.m.  To be safe, we will 404 all their ads."

Q.  Can you tell the jury what 404 their ads means?

A.  "404" means, just a term we use in the website business

that we're going to make sure that the ads don't appear online

anymore, and when we set it to 404 we can get it out of the          15:43:08

search engine Google.

Q.  Let's look at 1047.  Who is this an e-mail from?

A.  It's from Jim Larkin.

Q.  And who is it to?

A.  Jed Brunst.          15:43:40

Q.  And are there links in this e-mail?

A.  There are three links.

Q.  All right.

        MR. RAPP:  Move to admit 1047.

        MR. LINCENBERG:  Objection; foundation.          15:43:57

```
 1              THE COURT:  Sustained.
 2    BY MR. RAPP:
 3    Q.  Are you familiar with the internal e-mail exchanges of both
 4    Mr. Larkin and Mr. Brunst?
 5    A.  Yes.                                          15:44:10
 6    Q.  Did you often receive e-mails internally between them that
 7    had referenced their names?
 8    A.  Yes.
 9    Q.  And do you know, is the subject of this e-mail, the context
10    of this e-mail, does it have anything to do with the Nicholas   15:44:32
11    Kristof series of articles?
12              MR. LINCENBERG:  Objection; hearsay.  Those are not
13    foundational questions.
14              THE COURT:  Sustained.
15    BY MR. RAPP:                                      15:44:50
16    Q.  What -- did you come to learn what Mr. Brunst's role was
17    with respect to, first with respect to potential buyers of the
18    website, what was his role in dealing with them?
19              MR. LINCENBERG:  Objection; asked and answered.
20              THE COURT:  Sustained.                  15:45:16
21    BY MR. RAPP:
22    Q.  With respect to banks, what was -- what did you observe
23    Mr. Brunst's role was with respect to the banks that were
24    processing credit card transactions for Backpage, what was his
25    role?                                             15:45:40
```

```
 1              MR. LINCENBERG:  Objection; vague as to time.
 2              THE COURT:  I guess lay additional foundation as to
 3       the time period.
 4       BY MR. RAPP:
 5       Q.  Well, how about from 2004 to 2018?                          15:45:48
 6              MR. LINCENBERG:  Objection; vague.
 7              THE COURT:  If he can answer.
 8              THE WITNESS:  2004 to 2018 Jed Brunst dealt with banks
 9       and signed credit card processing agreements.
10       BY MR. RAPP:                                                   15:46:10
11       Q.  When -- when Backpage received criticism by the likes of
12       Nicholas Kristof, CNN, did you come to learn what Mr. Brunst's
13       role was with investors in Backpage?
14              MR. LINCENBERG:  Objection; vague; calls for
15       speculation.                                                   15:46:40
16              THE COURT:  Overruled.
17              THE WITNESS:  I knew he dealt with investors like CFOs
18       would normally do.
19       BY MR. RAPP:
20       Q.  All right.  Okay.                                          15:46:56
21              MR. RAPP:  Move to admit 1047.
22              MR. LINCENBERG:  Same objection.  No foundation.
23              THE COURT:  Sustained.
24       BY MR. RAPP:
25       Q.  I'm now going to show you --                              15:47:09
```

```
 1            MR. LINCENBERG:  Couldn't hear you, Mr. Rapp.

 2    BY MR. RAPP:

 3    Q.  2042, do you see that on your screen?

 4    A.  Yes, I do.

 5    Q.  Do you recognize Mr. Brunst's e-mail address?        15:47:26

 6            MR. LINCENBERG:  Your Honor, these are going to be the

 7    same foundational objections.

 8            THE COURT:  He can answer the last question.

 9    Overruled.

10            THE WITNESS:  Yes, I recognize Jed Brunst's e-mail     15:47:42

11    address.

12    BY MR. RAPP:

13    Q.  Does Mr. Brunst have the same e-mail address in terms of

14    the at as Mr. Lacey and Mr. Larkin?

15    A.  Yes, he did.                                          15:47:57

16    Q.  Did you exchange e-mails with Mr. Brunst at that e-mail

17    address on this e-mail?

18    A.  Many times.

19    Q.  How often do you think?

20    A.  I've been working with Jed Brunst since I joined the   15:48:18

21    company in 1996.  E-mail address domains would change as the

22    company would change, and this is the latest version of the

23    company at this time in 2012 is Village Voice Media.  Used to

24    be New Times, but we acquired the Village Voice and then we

25    took the e-mail domain villagevoicemedia.com.             15:48:42
```

1    Q.  And in fairness, sometime later on does he -- do you even

2    exchange e-mails with him at a different e-mail address?

3    A.  Yes.

4    Q.  All right.  And on this e-mail is there a signature line

5    with phone numbers?                                            15:49:00

6    A.  Yes, there is.

7    Q.  Do you recognize the phone numbers?

8    A.  I recognize the area code.  I am not specific about the

9    office number.  I probably have his mobile number in my

10   contacts, but I don't remember.                                15:49:24

11   Q.  Does this identify what his position is at Backpage?

12   A.  Yes, he's the CFO.  Let me correct that.  He's the CFO of

13   Village Voice Media Holdings, LLC.

14   Q.  We actually looked at the PowerPoint.  If you recall, we

15   looked at a slide on the PowerPoint, and did it also include   15:49:44

16   another entity that he was a CFO of?

17   A.  Yes, of Backpage.

18          MR. RAPP:  Move to admit 2042.

19          MR. LINCENBERG:  Objection.  No foundation.

20          THE COURT:  Sustained as to 401.                        15:50:00

21   BY MR. RAPP:

22   Q.  Did the ownership during this series of articles, did

23   the -- do you know, take them individually, do they have

24   concerns, reputational concerns, about the articles Mr. --

25   Mr. Kristof was printing regarding Backpage?                   15:50:28

```
 1              MS. BERTRAND:  Objection; leading.

 2              THE COURT:  Overruled.  He can ask if he knew.  He can

 3    answer if he knew.  I am sorry.

 4              THE WITNESS:  Yes, I am aware that investors are

 5    concerned and some are backing out like Goldman Sachs.         15:50:47

 6              MS. BERTRAND:  Objection; move to strike;

 7    nonresponsive.

 8              THE COURT:  Sustained as to all of his responses after

 9    "Yes, I'm aware that investors are concerned."

10              The jury will disregard the remainder of the          15:51:09

11    statement.

12    BY MR. RAPP:

13    Q.  How did you learn that investors were concerned?

14              MS. BERTRAND:  Objection; calls for hearsay.

15              THE COURT:  Overruled.  He can answer as to how he     15:51:17

16    learned.

17              THE WITNESS:  It was in the Nicholas Kristof column.

18              MS. BERTRAND:  Same objection; hearsay.

19              THE COURT:  Overruled.

20    BY MR. RAPP:                                                    15:51:34

21    Q.  With respect to the Nicholas Kristof column, how did you

22    learn from that column that Goldman Sachs had a concern, if

23    they did, in investing in Village Voice Media?

24              MS. BERTRAND:  Objection; leading.

25              THE COURT:  Sustained.                                 15:51:51
```

```
1    BY MR. RAPP:
2    Q.  Well, did you -- I'll withdraw that.  Let's look at 1919,
3    Exhibit 1919.  This is now in April of 2017, do you receive --
4    can you recognize this e-mail?
5    A.  Yes, I do.                                              15:52:34
6    Q.  How do you recognize that e-mail?
7    A.  This is a standard format of an e-mail coming from Google
8    Analytics to Scott Spear.
9    Q.  All right.  And do you also recognize 1919a?
10   A.  Yes.                                                    15:53:00
11   Q.  And what is 1919a?
12   A.  This is an exhibit showing traffic on the website on
13   April 16th, 2012.
14   Q.  Okay.
15          MR. RAPP:  Move to admit 1919 and 1919a.             15:53:17
16          MS. BERTRAND:  Objection; hearsay; foundation.
17          MR. FEDER:  Foundation.
18          THE COURT:  Overruled.  1919 and 1919a may be
19   admitted.
20       (Exhibit Nos. 1919 and 1919a are admitted.)            15:53:38
21   BY MR. RAPP:
22   Q.  Are you continuing -- let's look at 1919.  This is from,
23   who is receiving this?
24   A.  Scott.spear@villagevoicemedia.com.
25   Q.  And do you see this link below, you explained this before,  15:53:50
```

```
1    but what is that for the jury's edification?

2    A.  That link, if you clicked it, will give you the option to

3    no longer receive that report daily.

4    Q.  All right.  And then going to 1919a, this is for how, what

5    time period?                                                      15:54:19

6    A.  April 16th, 2012.

7    Q.  And what do we see in terms of the referring sites?

8    A.  We see that the top three referring sites are prostitution

9    review sites.

10   Q.  All right.  And they include what sites?                      15:54:40

11   A.  Theeroticreview.com, ussexguide.info, eccie.net.

12   Q.  Are they staying the same going down from previous months,

13   if you know, or going up?

14   A.  I think the visits from theeroticreview.com are starting to

15   go down, and it's -- it's mainly because we are not working on   15:55:02

16   getting the TR links as aggressively.

17        MS. BERTRAND:  Your Honor, Motion to Strike as

18   nonresponsive as to everything after:  Going down.

19        THE COURT:  Sustained.  Again, Mr. Ferrer, only try to

20   refrain your answers from providing a narrative.  Just simply    15:55:23

21   answer the direct question that Mr. Rapp asks you.

22        THE WITNESS:  I apologize, Your Honor.  It's getting

23   late in the day and it's kind of hard.

24        THE COURT:  No need to apologize.  I understand you're

25   trying to be helpful.  Pay attention to the question.            15:55:40
```

UNITED STATES DISTRICT COURT

```
1    BY MR. RAPP:

2    Q.  But at this point in 2012, how is the revenue for Backpage,

3    if you know?

4    A.  It's hitting all time record highs.

5    Q.  When you say, "hitting all time record highs," can you give      15:55:56

6    an estimate base upon what you know as to the amount of revenue

7    Backpage is generating in the middle of 2012?

8    A.  It's somewhere between 7 to 9 million a month in revenue.

9    Q.  All right.  Let's look at 146, do you recognize this

10   e-mail?                                                              15:56:35

11   A.  Yes, I do.

12   Q.  How do you recognize it?

13   A.  I -- I am one of the senders of the e-mail and then people

14   are responding to me.

15   Q.  Let's look at page 2, and do you see that part of it?           15:56:52

16   A.  Yes, I do.

17   Q.  All right.  Let's just go back here.  And who else is on

18   this e-mail?

19   A.  On this e-mail is Dan Hyer working out of Dallas,

20   Monita Mohan, Andrew Padilla and Joye Vaught.                       15:57:21

21           MR. RAPP:  All right.  So we will move to admit

22   Exhibit 146.

23           THE COURT:  Yes, it may be admitted and published.

24       (Exhibit No. 146 was admitted.)

25   BY MR. RAPP:                                                         15:57:48
```

1    Q.  Sometimes these are broken up, but this is the start, can

2    you tell us what who is this from and who is this going to?

3    A.  So this e-mail is from Dan Hyer working out of Dallas.

4    He's the sales and marketing director, and it's going to Andrew

5    Padilla and myself.                                              15:58:12

6    Q.  All right.  And what does -- what does Dan telling you and

7    Andrew about this ad, what does he say?

8    A.  "The ad below was edited unnecessarily yesterday.  We fixed

9    it.  Less than 12 hours later it got edited again-by the same

10   staff member AT19.                                               15:58:39

11         We already added time to the 2K buy to pacify this

12   client.  They spend a bunch with us."

13   Q.  What do you take the fact that the 2000, the reference to

14   2000 buy to pacify this client, what do you take that to mean?

15   A.  So this ad was run and they spent $2,000.                    15:59:00

16   Q.  All right.  And then what does Andrew here say to Monita?

17   A.  "Hi Monita,

18   Can you take AT19 off of moderation and have them retrained?

19   I'd rather see zero edits from a moderator than any edits that

20   were unnecessary.  Thanks.  Andrew."                            15:59:33

21   Q.  What did you take that to mean?

22   A.  That he's AT19, that's a specific moderator at El Camino,

23   and that they need to be retrained because they are making

24   unnecessary edits to an ad.

25   Q.  And do you know what is meant by "unnecessary edits"?       15:59:51

```
 1    A.  They are either taking out an image or changing text, one

 2    of the two.

 3    Q.  And finally, what does Monita Mohan, who does she send a

 4    response to regarding the retraining of this moderation staff

 5    member?                                                              16:00:14

 6    A.  She responds, "Hi, Carl we will make sure he's pulled off

 7    and retrained.  Best Monita."

 8    Q.  Who is copied on that?

 9    A.  Andrew Padilla and Joye Vaught.

10    Q.  Let's look at 532.  Do you recognize this e-mail?              16:00:32

11    A.  Yes, I do.

12    Q.  How do you recognize this e-mail?

13    A.  This e-mail, the subject line is "restoration of images"

14    and I am the one that helped work on that development.

15    Q.  And who is this e-mail from?                                   16:01:05

16    A.  It's from Andrew Padilla.

17    Q.  And who is he sending it -- who is also -- who is it being

18    sent to?

19    A.  He's sending it to the Phoenix moderation department.

20            MR. RAPP:  Move to admit Exhibit 532.                      16:01:20

21            MS. BERTRAND:  Objection; foundation.

22            THE COURT:  Overruled.  532 may be admitted and

23    published.

24        (Exhibit No. 532 was admitted.)

25    BY MR. RAPP:                                                       16:01:36
```

UNITED STATES DISTRICT COURT

```
1   Q.  What does Mr. Padilla tell the moderation staff, can you

2   read it?

3   A.  "You can start using the image restoration feature located

4   at the bottom of the ad page.  If you see an image there that

5   should not have been removed, select the Restore radio button    16:01:49

6   and update the ad.  (This can be done in conjunction with any

7   other edits on the Edit Ad form."

8   Q.  Let's stop there.  What does that mean or what did you take

9   that to mean in the context of moderation?

10         MS. BERTRAND:  Objection; calls for speculation.  He      16:02:08

11  is not included on this e-mail to be able to comment on it.

12         THE COURT:  Sustained.

13  BY MR. RAPP:

14  Q.  All right.  What's the next part of the this e-mail, what

15  is Mr. Padilla telling the moderation staff?                     16:02:24

16  A.  "The maximum number of images per ad is 8.  If there are 7

17  live images in the ad and 4 deleted images, you can only

18  restore 1 of them.  Don't bother restoring a deleted image if

19  it's the same as the one that's already live.

20  It's pretty straight forward but let me know if you have any     16:02:47

21  questions."

22         MR. EISENBERG:  Objection.  Sorry, Your Honor,

23  withdrawn.

24  BY MR. RAPP:

25  Q.  I think the objection was withdrawn.  Go ahead.  Continue.   16:02:56
```

A.   "I'm attaching a power point with 7 examples of images I
would and wouldn't restore.  It's by no means comprehensive but
it's a start.  Andrew."
Q.   Showing you 532a, for the witness' eyes only, are you
familiar with these, with this PowerPoint deck that's attached          16:03:22
to the e-mail?
A.   Yes.
Q.   How are you familiar with it?
A.   I'm familiar with it because it's got the radio buttons
that I developed when we scheduled this development on                  16:03:36
Backpage.  I didn't actually develop it.  I oversaw the
development.
Q.   All right.  And what is -- based upon your involvement in
this, why are -- why are you giving the moderators the
opportunity or the ability to restore certain images?                   16:03:58
A.   So that we can have more content online.
Q.   All right.
          MR. RAPP:  Move to admit 532a.
          MR. EISENBERG:  Objection, Your Honor, there is no
relationship given between 532a and 532.                                16:04:12
          THE COURT:  Yes.  Why don't you lay more foundation,
Mr. Rapp?
          MR. RAPP:  All right.  So may I have 532a published
again?
          MR. EISENBERG:  Not to the jury.                              16:04:34

UNITED STATES DISTRICT COURT

```
 1                 MR. RAPP:  532 isn't --

 2                 MR. EISENBERG:  532.  All right.

 3   BY MR. RAPP:

 4   Q.  So is there an attachment to this e-mail?

 5   A.  There is an attachment.                            16:04:44

 6   Q.  All right.  And what is the subject matter of the

 7   attachment?

 8   A.  "Image restoration development is done."

 9   Q.  Again, what, if anything, do you know about that?  Did you

10   have any involvement in it?                            16:05:01

11                 MR. EISENBERG:  Objection, Your Honor, asked and

12   answered.

13                 THE COURT:  Overruled.

14                 THE WITNESS:  I oversaw that development, and it

15   was -- I oversaw it.                                   16:05:11

16   BY MR. RAPP:

17   Q.  In looking at the attached PowerPoint deck, what message,

18   if any, is being communicated to the moderation staff?

19                 MS. BERTRAND:  Objection, calls for speculation as to

20   what someone else is trying to convey, and also hearsay, lack  16:05:28

21   of foundation.  This witness has said he is not familiar with

22   this specific PowerPoint.

23                 THE COURT:  He just testified that he oversaw the

24   PowerPoint development of it, so overruled.  You may answer the

25   question.                                              16:05:47
```

```
1    BY MR. RAPP:
2    Q.  Do you remember the question?
3    A.  No.
4           MR. RAPP:  I am going to ask the court reporter.  I
5    don't do this very frequently, but I will ask the court        16:05:55
6    reporter to read back my last question.
7           (Record read.)
8           MS. BERTRAND:  Objection.  Also the document speaks
9    for itself as to what it's trying to convey.
10          THE COURT:  Overruled.  You may answer the question.    16:06:22
11          THE WITNESS:  The attachment is guiding moderators how
12   to restore images and what the standard should be.
13          MR. EISENBERG:  Your Honor, excuse me, I move to
14   strike that answer.  It's not responsive with respect to what
15   is contained in this attachment.                               16:06:42
16          THE COURT:  Sorry, Hilda, I will do this one more
17   time.
18          (Record read.)
19          THE COURT:  The witness may answer.
20          THE WITNESS:  What's being communicated is how to      16:07:27
21   restore images and what the standards are.
22   BY MR. RAPP:
23   Q.  Okay.  Why would you want to have the moderators restore
24   certain images, why?
25   A.  Because we want more content.  We've got aggressive goals  16:07:42
```

```
1   in the budget, more pageviews, so the more images we have, the
2   more pageviews, the more revenue.
3   Q.  All right.
4           MR. RAPP:  Move to admit 532a.
5           MR. EISENBERG:  And renew my objection, Your Honor.      16:07:58
6   There is still no connection between the attachment and the
7   original e-mail can't relate.
8           THE COURT:  Lay more foundation, Mr. Rapp.
9   BY MR. RAPP:
10  Q.  Okay.  Absolutely.  Does this the e-mail in 532, does it     16:08:19
11  have a section that says "Attachments"?
12  A.  Yes.
13          MR. RAPP:  Can I have 532 published again?
14  BY MR. RAPP:
15  Q.  What does it say with respect to the attachment?             16:08:38
16  A.  It says:  Image restore PowerPoint.
17  Q.  Is 532a the image restore PowerPoint that Mr. Padilla is
18  sending to the moderation staff?
19  A.  Yes.
20          MR. RAPP:  Move to admit 532a.                           16:08:58
21          MR. EISENBERG:  I renew my objection.  There is no
22  connection between this attachment and what Mr. Padilla is
23  saying in the underlying e-mail.
24          THE COURT:  Overruled.
25      (Exhibit No. 532a was admitted.)                             16:09:16
```

```
 1              MR. RAPP:  Request permission to publish.
 2              THE COURT:  Yes, it may be published.
 3    BY MR. RAPP:
 4    Q.  And so can you just explain as I cycle through these, what
 5    we are seeing where it says, for example, what does this mean?    16:09:36
 6    A.  Restore.
 7    Q.  All right.  And this one?
 8    A.  Restore.
 9    Q.  And this one?
10    A.  Restore all three.                                            16:09:50
11    Q.  And this one?
12    A.  Restore.
13    Q.  And this one?
14    A.  Restore all three.
15    Q.  Okay.  All right.  Let's look at 725.  Do you recognize       16:10:03
16    this exhibit?  Let me ask you this:  Do you recognize who this
17    is from?
18    A.  Yes.
19    Q.  Who is this from?
20    A.  Andrew Padilla.                                               16:10:35
21    Q.  And how do you know that?
22    A.  Because andrew@backpage.com e-mail address.
23    Q.  And who is copied on it?
24    A.  Joye Vaught and Tamara Nickel.
25    Q.  And do you recognize the subject matter?                      16:10:52
```

```
 1    A.  Yes, "Moderation remainder/update."
 2    Q.  And is there -- let me just show you 725b, do you recognize
 3    725b?
 4    A.  Yes.
 5    Q.  And is that the attachment that Mr. Padilla was sending out        16:11:16
 6    to moderation?
 7    A.  Yes, it is.
 8    Q.  All right.  And independent of this, now you're not on this
 9    e-mail; right?
10    A.  I am not on the e-mail.                                           16:11:34
11    Q.  But are you familiar with the context of this e-mail?
12    A.  I am.
13    Q.  How are you?
14    A.  The attached list of the 120 adult terms was something that
15    the company had put together, meetings in Building B, kind of        16:11:53
16    like the final list.
17    Q.  When you say the meetings in Building B, who is part of
18    those meetings?
19    A.  That time it's Scott Spear, myself, maybe Liz McDougall.
20         MR. RAPP:  Move to admit 725 and 725b.                          16:12:16
21         MR. EISENBERG:  No objection.
22         THE COURT:  Yes, they may be admitted and published.
23      (Exhibit No. 725 and 725b are admitted.)
24    BY MR. RAPP:
25    Q.  What does Mr. Padilla tell the moderation staff?                 16:12:27
```

A.  "Attached is a list of 120 Adult terms that are banned on
this site.  These are terms that we consider egregious
violation of our Terms of Use.  These should not be confused
with terms that are merely suggestive or in poor taste.
The attached list is automatically filtered and a user                    16:12:49
attempting to post an ad with any of these terms receives an
error message during the posting process.  We don't want these
terms on our site.

        You'll see examples, in the list, where a term is
spelled several ways but we're only scratching the surface on            16:13:07
all the possible spelling variations.  If you see a misspelling
of any of these terms that gets around our filters, delete the
ad in its entirety.  Don't edit the text or remove any pics.
For term violation not on this list you can remove the term or
phrase and update the ad.                                                 16:13:29

        Make a" --

Q.  Let me stop you there.  What -- what do you take that to
mean?

A.  These 120 Adult terms are going to result in the ad being
deleted even if it's a misspelling, and it will be a                      16:13:42
misspelling because they are banned, so they are going to
attempt a misspelling.  These ads are going to be removed, but
we are not blocking the user from future postings.  They can
post again.

Q.  They can post again.  Do you come to learn that on the                16:14:03

1    occasion where they are blocked, do you come to learn that they

2    do post again?

3    A.   Yes.

4    Q.   And then what else does he say?

5          THE COURT:  Bless you.                                    16:14:19

6          THE WITNESS:  That terms that are not on the 120

7    egregious adult terms, those terms moderators can still edit

8    from an ad.

9    BY MR. RAPP:

10   Q.   All right.  And then down here, right here the, what else    16:14:37

11   does he say?

12   A.   "Make a list of the urls of any ads you delete and send

13   them to me at the end of your shift for review.  You can skip

14   this step if you're deleting from the queue.

15          If you have any questions, let me know.  Thanks."        16:14:55

16   Q.   With this moderation change, if, if the term is not

17   misspelled, do you know if the user will get some type of an

18   error message?

19   A.   They will, yes.

20   Q.   All right.                                                  16:15:18

21   A.   A custom message.

22   Q.   Okay.  And then what happens?

23   A.   The custom message says:  Don't use this forbidden term, it

24   names the term, and then the user has the ability to take that

25   term out, and then submit their ad.                             16:15:35

UNITED STATES DISTRICT COURT

1    Q.  All right.  And let's look at the terms on 725b, which is

2    in evidence, and these are the terms that -- explain this

3    spreadsheet, if you would?

4    A.  So these are the terms that are banned in the -- in the

5    female escorts and body rub, transsexual escorts, male escorts.      16:16:05

6    Those are the banned terms, but some of those terms are allowed

7    and you'll see that in Column C in phone web because that

8    category is usually promoting other websites.

9    Q.  And then looking at the next page, same, same thing, these

10   are banned terms?                                                    16:16:30

11   A.  Yes.

12   Q.  And just to highlight two of those banned terms it's 63 and

13   64, what are those?

14   A.  Girlfriend Experience.

15   Q.  And then 61, is that some kind of code for something?            16:16:46

16   A.  It's code for Girlfriend Experience.

17   Q.  All right.  And then page 3, additional terms?

18   A.  Yes.

19   Q.  And do these terms all have some type of either coded or

20   explicit, are they a reference to some type of sexual act?           16:17:07

21          MS. BERTRAND:  Objection; leading.

22          THE COURT:  Sustained.

23   BY MR. RAPP:

24   Q.  What are these terms?

25   A.  Most of these terms reference a sexual act.                      16:17:16

1    Q.  All right.  Let's go onto 724, do you recognize this

2    e-mail, or do you recognize who this e-mail is from, I should

3    say?

4    A.  Yes, I do.

5    Q.  Who is this e-mail from?                                    16:17:39

6    A.  It's from Andrew Padilla.

7    Q.  And who is copied on it?

8    A.  Joye Vaught and Tamara Nickel.

9    Q.  All right.  And at least to the context of this e-mail, do

10   you recognize the context?                                     16:17:56

11   A.  I do recognize the context.

12          MR. RAPP:  Move to admit 724.

13          THE COURT:  Yes.  724 may be admitted and published.

14      (Exhibit No. 724 was admitted.)

15   BY MR. RAPP:                                                    16:18:13

16   Q.  What is Mr. Padilla telling the moderation staff?

17   A.  "All:  Blank pricing and services for less than an hour are

18   now allowed in Adult.

19          15 minutes-$60 is okay.

20          30 minutes-$80 is okay.                                 16:18:34

21          $90 is okay.

22          15 min -$80 back rub is okay.

23          Anything time related is okay.

24          The only reason to check pricing now is for illegal

25   services.                                                      16:18:51

UNITED STATES DISTRICT COURT

1          $60-15-min blow and go is still a violation because of

2     the service.  The time is irrelevant in this case.

3          Let me know if you have any questions.  Thanks.

4     Andrew."

5     Q.  So is this a change in the time and the pricing from what          16:19:10

6     we've looked at previously?

7     A.  Yes, a big change.

8     Q.  Why make the change?

9     A.  You might recall that I testified about Hemu having us

10    remove the times, 15-minute, 30-minute, and it -- it just was          16:19:37

11    chaos thereafter because users would find a creative way to get

12    around that less than one word limitation, so we're giving up

13    and we're just going to allow them to put in the time and

14    minutes.

15    Q.  Let's look at 1829.  Do you recognize who this e-mail is          16:20:00

16    from?

17    A.  It's from Joye Vaught.

18    Q.  All right.  And who is she sending this to?

19    A.  She's sending it to Andrew.

20    Q.  And do you recognize the subject of this e-mail?          16:20:31

21    A.  Yes.

22              MR. RAPP:  Move to admit 1829.

23              MS. BERTRAND:  Objection; lack of foundation.

24              THE COURT:  Sustained.  Lay some more foundation.

25    BY MR. RAPP:          16:20:50

UNITED STATES DISTRICT COURT

```
1    Q.  Do you recognize who do you recognize the e-mail address?

2    A.  Joye@backpage.com, yes.

3    Q.  Did you frequently exchange e-mails with Joye Vaught at

4    joye@backpage.com?

5    A.  I didn't directly exchange e-mails with her, but she was          16:21:08

6    often copied.

7    Q.  All right.  And with respect to the Andrew, do you

8    recognize the recipient of this e-mail?

9    A.  Yes.

10   Q.  And with respect to the subject of it, which references          16:21:20

11   filters, does that mean anything to you in your position with

12   Backpage.com?

13   A.  It does.

14   Q.  What does that mean to you, caught up in filters?

15   A.  That she's completed her work on the terms to be entered         16:21:38

16   into the filters.

17        MS. BERTRAND:  Objection; calls for speculation.  He

18   is not included -- or speculating.  He is not included in this

19   e-mail.

20        THE COURT:  Overruled.  He can testify to his                   16:21:52

21   knowledge as to what filtered term.

22        MR. RAPP:  Move to admit 1829.

23        MS. BERTRAND:  Same objection as to foundation.

24        THE COURT:  Can you -- can you -- can you make it so

25   that I can see the entirety of the exhibit?                          16:22:09
```

UNITED STATES DISTRICT COURT

1          MR. RAPP:  So let me just ask a couple questions to

2   clarify.  Is there an attachment to this exhibit?

3          THE WITNESS:  There is an attachment.

4   BY MR. RAPP:

5   Q.  And is that attachment what is often known as an Excel          16:22:21

6   spreadsheet?

7   A.  Yes.

8          MS. BERTRAND:  Objection; leading.

9          THE COURT:  Sustained.

10  BY MR. RAPP:                                                        16:22:29

11  Q.  Well, can you tell what type of attachment it is?

12  A.  Yes, it's an Excel spreadsheet.

13  Q.  How is it that you recognize that it's an Excel

14  spreadsheet?

15         MS. BERTRAND:  Objection as to the government leading         16:22:48

16  Mr. Ferrer through his Trial Director queuing here.

17         THE COURT:  Well, sustained as to leading.  I don't

18  really understand what the remainder of your objection related

19  to.  But in any event, don't lead, Mr. Rapp.

20  BY MR. RAPP:                                                        16:23:12

21  Q.  Of course.  Have you looked at this in preparation for your

22  testimony?

23  A.  I have.

24  Q.  And is -- did you review an attachment that was attached to

25  this e-mail?                                                        16:23:25

1    A.  I did.

2    Q.  And in what format was that attachment?

3    A.  It's an Excel spreadsheet.

4           MR. RAPP:  Move to admit 1829 and 1829a.

5           MS. BERTRAND:  Same objection under 901.          16:23:40

6           THE COURT:  Overruled.  Excuse me, overruled.

7    BY MR. RAPP:

8    Q.  And so request permission to publish both 1829 and 1829a?

9           THE COURT:  Yes, it may be admitted and it may be

10   published.                                               16:24:02

11      (Exhibit No. 1829 and 1829a are admitted.)

12   BY MR. RAPP:

13   Q.  Is this the e-mail that we have been referring to?

14   A.  Yes, it is.

15   Q.  And what is Joye Vaught sending Andrew Padilla?        16:24:08

16   A.  Sending the filter term 42312.worked.xls.

17          MR. RAPP:  Madam clerk, can you take this off the

18   screen?  Thank you.

19   BY MR. RAPP:

20   Q.  And so showing you now 1829a.                         16:24:42

21          MR. RAPP:  And now I request permission to publish

22   1829a as well.

23          THE COURT:  Yes, it may be published.

24   BY MR. RAPP:

25   Q.  So I can't magnify this unfortunately.  Stand corrected.  16:25:10

UNITED STATES DISTRICT COURT

```
 1   Can you just -- can you explain what we are seeing here?
 2   A.  Yes.  It's helpful if we go to the top.  There might be
 3   headers on the spreadsheet.
 4   Q.  Okay.  I am sure there is a quicker way to do this.
 5   A.  Guess not.                                              16:25:45
 6   Q.  In any event, do you know what this is?
 7   A.  Yes.
 8   Q.  Can you explain this to the jury?
 9   A.  Column B is the terms.  Column C is where the terms is
10   going to be, where is it in the ad or is it the reply to ads?  16:25:58
11   Column D is the action.  Is it going to ban or is it going to
12   strip the term from the ad?  And then Column G is the person
13   who entered the term.  The most important column, H, is the
14   forbidden -- it's the message.  That's the custom message.
15   Q.  Okay.  So when do they get the custom message?          16:26:26
16   A.  When they attempt to submit an ad.
17   Q.  Okay.  And -- all right.  Can you sort of describe what
18   that custom message looks like?
19   A.  It states it right here in Column H.  You could have the
20   message, like "boink" is a forbidden word in this category.  16:26:50
21   Q.  All right.  And this is -- is each one of these terms, just
22   going over here, can you identify 229, 231 and 232, those are
23   the only ones -- and 235 and 236, those are the only ones I
24   will ask you out of all of these, what do those mean?
25   A.  What was the first one?                                 16:27:29
```

1    Q.  229, 231, 232, 235 and 236.

2    A.  So those are all variations of GFE, and they will all be

3    stripped from the ad when the ad is posted.

4    Q.  All right.

5            MR. RAPP:  Madam clerk, can you remove this from the          16:27:53

6    screen?  Thank you.

7    BY MR. RAPP:

8    Q.  All right.  Now let's look at 1830.  Okay.  Do you see that

9    on your screen?

10   A.  I do.                                                             16:28:45

11   Q.  And as a matter of fact, are you copied on this e-mail?

12   A.  It's sent to me.  Oh, are we talking about below or above?

13   Q.  How about both?

14   A.  So below it's sent to me and then above it's also sent to

15   me from Andrew Padilla.                                               16:29:07

16   Q.  All right.

17           MR. RAPP:  Move to admit 1830.

18           THE COURT:  Yes, it may be admitted and published.

19       (Exhibit No. 1830 was admitted.)

20   BY MR. RAPP:                                                          16:29:26

21   Q.  What message are you receiving down here from dan@backpage?

22   A.  "This one had 160 hits, all from massage parlors in the

23   context of an actual shower.  Big Shower, cleansing shower,

24   etc."

25   Q.  What did you take that to mean coming from Dan Hyer?             16:29:47

UNITED STATES DISTRICT COURT

A.  The subject line "Filtered term with false positives,"

some "shower" has been entered into the filter and it's being

stripped out or blocked from massage parlor ads.

Q.  All right.  And then what response do you give Dan Hyer?

A.  "This term did not give the user a message.  So, cleansing

shower resulted in the user getting an error message with no

help.

I would like to verify all the ban messages have errors that

say, Sorry this term 'xxxxxx' is a banned term."

Send me the list of terms that we recently modified from the

strip out to ban.

Carl."

Q.  And then is Andrew also part of this?

A.  Andrew is part of it, yes.

Q.  What does he say?  What is he going to do?

A.  Andrew states, "Everything with a B in the E column is

banned and now contains a forbidden text error."

Q.  Let's look at 1830b, is 1830b the attachment?

A.  Yes, it is.

        MR. RAPP:  Move to admit 1830b.

        THE COURT:  Yes, 1830b may be admitted.

     (Exhibit No. 1830b was admitted.)

        MR. RAPP:  Request permission to publish.

        THE COURT:  Yes, it may be published.

BY MR. RAPP:

16:30:17

16:30:37

16:30:51

16:31:15

16:31:31

110

```
1    Q.  Can you interpret this spreadsheet for the jury?

2    A.  Most of these terms are set up to ban if they are posted in

3    an ad in the adult section, and they will receive a custom

4    message.  So instead of saying, "Whoops, there is an error,"

5    they are going to receive a message that will allow them to        16:31:46

6    understand what's wrong with their post, how they need to

7    change it so that they won't e-mail us in support.

8    Q.  Okay.  I am now showing you 154.

9           THE COURT:  Is this going to be a long exhibit,

10   Mr. Rapp?  We are just after 4:30.                                  16:32:11

11          MR. RAPP:  Let me just take a quick look here see if

12   we can expedite it.  No, I don't believe so.  I think I could

13   do this pretty quick.

14   BY MR. RAPP:

15   Q.  Do you recognize this, who this e-mail is from?                 16:32:28

16   A.  Yes, Andrew Padilla.

17   Q.  Who is it going to?

18   A.  It's going to James Hammer, excuse me, James Hammer,

19   Robinson, Joye Vaught.

20   Q.  Do you recognize the subject matter of this exhibit?           16:32:43

21   A.  It states, "forbidden planet."

22   Q.  Does that mean anything to you?

23   A.  It's just humorous for forbidden words, I believe.

24   BY MR. RAPP:

25   Q.  Let me show you quickly 154a, is this the same type of         16:32:59
```

1    spreadsheet that we've been looking at that has the forbidden

2    terms?

3    A.  It is, yes.

4            MR. RAPP:  Move to admit 154 and 154a.

5            MR. EISENBERG:  No objection, Your Honor.                    16:33:15

6            THE COURT:  Yes, they made be admitted and published.

7        (Exhibit Nos. 154 and 154a are admitted.)

8    BY MR. RAPP:

9    Q.  Here's 154a, again, is this very similar to the other

10   spreadsheets with all these terms?                                  16:33:48

11   A.  Yes.

12   Q.  All right.

13           MR. RAPP:  I can --

14           THE COURT:  Can't hear you.

15           MR. RAPP:  I can stop now if that's acceptable.             16:34:00

16           THE COURT:  I think, yes, we would appreciate that,

17   Mr. Rapp.

18           All right.  Members of the jury, we are done for the

19   day.  And again, just remember the admonishment not to conduct

20   any research or come to any conclusions or to discuss any of       16:34:14

21   the matters that we heard about to any of your family friends

22   or coworkers, and so just do have a pleasant evening.  We will

23   begin promptly at 9:00 a.m. tomorrow.  Please all rise for the

24   jury.

25                   (Jury is not present.)                             16:34:36

1          THE COURT:  Mr. Ferrer, you may step down.

2          All right, counsel, please, in the future, if you're

3     going to update your exhibit list, add it to the end of your

4     exhibits, not insert it in the middle.  It disrupts the Court's

5     and the courtroom deputy's flow, so make sure you do that.  If          16:35:23

6     you're going to do the same with witnesses, and I don't expect

7     there to be added witnesses at this late day, add them to the

8     end.

9          We are adjourned.  Thank you.

10      (Proceedings concluded at 4:35 p.m.)          16:35:40

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **C E R T I F I C A T E**

4

5          I, HILDA E. LOPEZ, do hereby certify that I am duly

6   appointed and qualified to act as Official Court Reporter for

7   the United States District Court for the District of Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 20th day of

14  September, 2023.

15

16

17                              s/Hilda E. Lopez_____

18                              HILDA E. LOPEZ, RMR, FCRR

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT