1

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 26, 2023 |
| Michael Lacey, et al. | ) | 8:51 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

TRIAL - DAY 12 - A.M. SESSION

Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
         **Mr. Peter S. Kozinets, Esq.**
         **Mr. Andrew C. Stone, Esq.**
         **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov

For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
    Washington, DC 20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
    bf@federlawpa.com
    - and -
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
    eric.kesslerlaw@gmail.com

```
1   For the Defendant John Brunst:
        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
2       LINCENBERG & RHOW, P.C.
        By:  Mr. Gopi K. Panchapakesan, Esq.
3            Mr. Gary S. Lincenberg, Esq.
        1875 Century Park E, Suite 2300
4       Los Angeles, CA 90067
        gpanchapakesan@birdmarella.com
5       glincenberg@birdmarella.com

6
    For the Defendant Andrew Padilla:
7       DAVID EISENBERG, P.L.C.
        By:  Mr. David S. Eisenberg, Esq.
8       3550 North Central Avenue, Suite 1155
        Phoenix, AZ 85012
9       david@deisenbergplc.com

10
    For the Defendant Joye Vaught:
11      JOY BERTRAND, ESQ., L.L.C.
        By:  Ms. Joy M. Bertrand, Esq.
12      P.O. Box 2734
        Scottsdale, AZ 85252
13      joy@joybertrandlaw.com

14
```

15                          **I N D E X**

16  **PLAINTIFF WITNESS:**          **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**

17  CARL FERRER  (cont.)        6

18                      **E X H I B I T S**

19  **EXHIBIT NO**.                                          **PAGE:**

20
21  536      Email from Ferrer to Spear and Hyer,        85
             "Recommendation to grow sites more
22           Aggressively (draft)", 03/16/2007,
             USAO-BP-0002453  USAO-BP-0002454
23
24  6212     09.13.05 Email from C. Ferrer to S. Spear re:   98
             Sex for money ad strip-out DEFENSE 024805

25

**EXHIBIT CONT.**
**EXHIBIT NO.**                                           ADMITTED:

6063      08.01.10 Email from S. Spear to C. Ferrer       103
          and Andrew Padilla re: *ad in Minneapolis*
          and moderation not acceptable
          DEFENSE 023098

1        **P R O C E E D I N G S**

2

3        (Proceedings commence at 8:51 a.m.)

4        THE COURT:  All right.  Please be seated.  Let's go

5    ahead and have the jury in, and the witness.  Yeah, please      08:51:26

6    bring the witness in.

7        MR. RAPP:  Judge, can I make a couple brief points.

8    We've received about 40 additional exhibits very late last

9    night that the defense intends to introduce on

10   cross-examination.  Many of those exhibits fall into the same   08:51:50

11   categories that we discussed yesterday, and so for that reason

12   we would ask that we not go into those exhibits today until we

13   have a meaningful chance to put our objections on the record.

14       The other thing is, I don't know what's going on up

15   here, but I understood that we had to be at the podium.  I get   08:52:11

16   it if defense attorney wants to use the easel, but I'm not

17   seeing that.  So until that comes into play, I would ask,

18   because he's awfully close to this witness.

19       THE COURT:  Yes, I think that's appropriate.  I have

20   instructed all counsel to speak from the podium for purposes of  08:52:28

21   our court reporter, as well as the jury.  That's where the

22   microphones are.  I understand that you're using a lapel mic

23   often, but nevertheless do speak from the podium, and I can't

24   see that easel.

25       MR. FEDER:  Nothing on it.                                   08:52:56

1          THE COURT:  When you write on it there is going to be

2   something on it, presuming you do, I can't see it, so you'll

3   have to move it in front of Liliana.

4          And no exhibit will be introduced that the government

5   hasn't yet at least reviewed.                                  08:53:13

6          All right.  Let's bring the jury in.

7          MR. LINCENBERG:  The government --

8          THE COURT:  We don't know who is speaking.  My court

9   reporter doesn't.

10          MR. LINCENBERG:  This is Mr. Lincenberg.  With regard   08:53:30

11   to Mr. Rapp's objection, the government added many exhibits

12   during the course of the Ferrer examination that were not

13   provided to the defense several days in advance.  We didn't

14   object because we looked at them and we were able to deal with

15   them, so the Court should --                                  08:53:47

16          THE COURT:  We have our jury coming in.  Thank you.

17                    (Jury is present)

18          THE COURT:  All right.  Please be seated.  Welcome

19   back, members of the jury.  I hope you had a restful weekend

20   and ready to start anew.  Not quite quarter to the hour, but we 08:54:54

21   got five minutes on the clock.

22          And so I did want to mention to you, because I think

23   everyone is sort of monitoring, at least we are here in the

24   United States Courthouse, this potential for a Federal

25   government shutdown, and so we have been assured here in the   08:55:13

1   U.S. courts that we have sufficient funding to at least get us

2   through a couple of weeks regardless of whatever the

3   congressional action may be.  So that tells me that because

4   we're on -- we're not in trial next week, that if for some

5   reason there has been no agreement, we will have court the          08:55:33

6   following week unless you hear otherwise, and so do keep that

7   in mind.  We'll try to keep on our schedule at least for the

8   period that we have funding, and so just to ease your minds.

9            All right.  We have our witness on the stand.

10  Mr. Feder, you may continue your cross-examination.                 08:55:56

11  CARL FERRER,

12  (Witness was previously sworn.)

13            MR. FEDER:  Thank you.  Is this mic at the right

14  level?

15            THE COURT:  You can actually pull that closer to you      08:56:05

16  and it will be even better.

17                 CONTINUED CROSS-EXAMINATION

18  BY MR. FEDER:

19  Q.  Good morning.

20  A.  Good morning.                                                   08:56:15

21  Q.  Mr. Ferrer, have you ever responded to an ad from Backpage?

22  A.  I believe so.  I've sold a car.

23  Q.  Sorry, what?

24  A.  I believe I responded to ads.

25  Q.  In other words, went out and met one of the posters?            08:56:41

A.  Went out and met a poster?

Q.  Yes.

A.  No.  I really, you know, I sold a car on Backpage.

Q.  Well, why don't we make it exclusive to the adult section,
have you ever responded to an adult ad where you went out and
met the poster?

A.  No, I have not.

Q.  I assume that would mean that you've never had sexual
relations with any poster that advertised in the adult section
on Backpage; correct?

A.  That's correct.

Q.  Can you hear me okay?

A.  I can.

        THE REPORTER:  A little soft-spoken.

        COURTROOM DEPUTY:  I put it up.  I am putting it up.

        MR. FEDER:  Better?  Not better.  Better?  Can you
hear?  Can everybody hear me?

BY MR. FEDER:

Q.  You've been shown a lot of e-mails the last couple weeks;
right?

A.  Yes.

Q.  Would you say that was a primary or the primary way of
communicating among the people at Backpage, notwithstanding
that you were in the same office or not?

A.  Yes, we -- well, we used the e-mail a lot.

1   Q.  I mean, we've all gotten kind of lazy.  Sometimes when

2   we're in court, lawyers will talk to each other on their phones

3   instead of walking 5 feet and talking to them in person.  So

4   you, similarly at Backpage, everybody did the convenient thing

5   and talked on the -- talked on e-mail; right?                    08:58:53

6   A.  Yes, we used e-mail.

7   Q.  You've testified that you pled guilty April 6th of 2018,

8   true?

9   A.  Yes.

10  Q.  And had you talked to any prosecutor or any FBI agent about  08:59:14

11  pleading guilty before April 6, 2018?

12  A.  There was a proffer just before I went to do my plea.

13  Q.  Same day or a different day before?

14  A.  Same day.

15  Q.  But other than what you just said, before April 6, 2018,     08:59:49

16  you had never met or talked to any prosecutor or FBI agent

17  about pleading guilty to the crimes that you've pled guilty to;

18  correct?

19  A.  I did not.

20  Q.  Had your lawyers prior to that date been talking to the      09:00:10

21  prosecutors about some kind of plea?

22          MR. RAPP:  Objection, to the extent it calls for

23  privileged communications.

24          THE COURT:  Sustained.  He can answer yes or no.

25          THE WITNESS:  I wanted to shut down the site; do the     09:00:28

1    right thing.

2    BY MR. FEDER:

3    Q.  This is a yes or no answer, Mr. Ferrer, had your lawyers,

4    to your knowledge, been talking to the prosecutors about some

5    kind of plea before April 6th, 2018?                         09:00:45

6            MR. RAPP:  Same objection.

7            THE COURT:  He can answer yes or no.

8            THE WITNESS:  Yes.

9    BY MR. FEDER:

10   Q.  For how long?                                            09:00:56

11           MR. RAPP:  Same objection.

12           THE COURT:  Overruled, if he confines his answer.

13           THE WITNESS:  I don't know.

14   BY MR. FEDER:

15   Q.  Well, 2017.                                              09:01:08

16   A.  No.

17   Q.  When, if you remember, in 2018?

18           MR. RAPP:  Again, objection to the extent this is

19   based upon a conversation between his attorney as privileged.

20           THE COURT:  Mr. Ferrer can answer, if he knows, based  09:01:33

21   on his own personal knowledge.

22           THE WITNESS:  I believe it was in February when I had

23   decided to shut down the site that I have my lawyers begin

24   talking to the government.

25   BY MR. FEDER:                                                09:01:59

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | Q.  And your lawyers at that time were who? |
| 2 | MR. RAPP:  Objection; relevance. |
| 3 | THE COURT:  Sustained. |
| 4 | BY MR. FEDER: |
| 5 | Q.  Since your lawyers began talking to the prosecutors in |
| 6 | February of 2018, have you been paying your lawyers with your |
| 7 | own money or money that is the proceeds of money you made at |
| 8 | Backpage? |
| 9 | A.  It's from the Backpage proceeds. |
| 10 | Q.  And to your knowledge, as we sit here today, how much have |
| 11 | those lawyers been paid? |
| 12 | A.  I really don't -- I do not know. |
| 13 | Q.  Surely you have an estimate, don't you? |
| 14 | A.  I don't know. |
| 15 | Q.  You don't know if it's been millions of dollars, hundreds |
| 16 | of thousands of dollars, $5, no information whatsoever? |
| 17 | A.  Well, obviously I know it's not -- it's more than $5. |
| 18 | Q.  Okay.  Let's try this out, how about over $100,000? |
| 19 | A.  Yes. |
| 20 | Q.  How about over a million dollars? |
| 21 | A.  I don't think so. |
| 22 | Q.  Well, the lawyers that you had at least are San Francisco |
| 23 | based; right? |
| 24 | A.  Yes. |
| 25 | Q.  And are they still? |

09:02:16
09:02:42
09:03:02
09:03:30
09:03:48

```
 1              MR. RAPP:  Objection; relevance.

 2              THE COURT:  Sustained.

 3    BY MR. FEDER:

 4    Q.  Do you still have a lawyer named Nanci Clarence?

 5              MR. RAPP:  Objection; relevance.          09:04:01

 6              THE COURT:  Sustained.

 7    BY MR. FEDER:

 8    Q.  Is one of your lawyers present in court today?

 9    A.  Yes.

10    Q.  What's his name?                                09:04:08

11    A.  Jonathan Baum.

12    Q.  Is he a San Francisco-based lawyer?

13              MR. RAPP:  Objection; relevance.

14              THE COURT:  Sustained.

15    BY MR. FEDER:                                       09:04:17

16    Q.  Did you -- when you decided that you were going to look to

17    get some kind of deal with the government in February of 2018,

18    did you, you or your lawyers, notify the lawyers over to my

19    left?

20              MR. RAPP:  Objection; relevance.          09:04:47

21              THE COURT:  Sustained.

22    BY MR. FEDER:

23    Q.  When -- in April of 2018 you began talking to the

24    prosecutors; right?

25    A.  Yes.                                            09:05:02
```

```
 1    Q.  And you had many conversations with them; correct?

 2    A.  I did.  I had agreed to cooperate.

 3    Q.  Have you had any conversations with the prosecutors after

 4    April 24th of 2020?

 5    A.  Yes.                                                          09:05:25

 6    Q.  How many -- I know it might be difficult to give an exact

 7    number, I am talking about give me an estimate.

 8    A.  It's just many.

 9    Q.  A hundred?

10    A.  I don't think it was a hundred, but it was a lot.            09:05:38

11    Q.  About 50 to 100?

12    A.  Maybe 36 to maybe 30.

13    Q.  Well, 36 is a pretty exact number, is that a number that

14    sticks out for you?

15    A.  Well, I'm going to say -- "many" is the answer that is       09:06:00

16    best, but if you want a range, well, it's difficult for me.

17    Many is --

18    Q.  A range would be --

19    A.  A couple of dozen.

20          THE COURT:  Don't speak over one another, please.         09:06:18

21    BY MR. FEDER:

22    Q.  Sorry, Mr. Ferrer, continue.  Sorry, finish your answer.

23    A.  It's been -- this case has been going on since 2018.  There

24    was stops for Covid.  There are thousands and thousands of

25    exhibits, so there were several proffers and meetings to go      09:06:39
```

1    over the exhibits.

2    Q.  And therefore, since April 24th of 2020, how many, in your

3    estimate, how many more proffers, meetings, discussions about

4    your potential testimony have there been since that date?

5              MR. RAPP:  Objection; asked and answered.                    09:07:14

6              THE COURT:  Sustained.

7    BY MR. FEDER:

8    Q.  Is the range 30 to 50 more, is that a fair estimate?

9              MR. RAPP:  Objection; asked and answered.

10             THE COURT:  Sustained.                                       09:07:25

11   BY MR. FEDER:

12   Q.  And were -- where did these meetings take place?

13             MR. RAPP:  Objection; relevance.

14             THE COURT:  Sustained.

15   BY MR. FEDER:                                                          09:07:42

16   Q.  Were any of these meetings, any of these discussions

17   tape-recorded?

18   A.  I don't -- I do not know.

19   Q.  As far as you know not; correct?

20   A.  Correct.                                                           09:07:59

21   Q.  You've never listened to a tape-recorded meeting or

22   discussion that you had with the prosecutors or the agents,

23   true?

24   A.  Yes, that's true.

25   Q.  Have you ever made any tape-recordings of any meetings that        09:08:16

```
1    you had with the defendants?
2    A.  No, I have not.
3    Q.  Has anybody on your behalf done that in -- let me be
4    specific, in February of 2018?
5    A.  No, not to my knowledge.                                    09:08:45
6    Q.  These meetings that you've had, some of them took place in
7    Texas, some of them took place in California, some of them took
8    place here; right?
9           MR. RAPP:  Objection as to relevance, and there is no
10   question.                                                       09:09:08
11          THE COURT:  Sustained.  Rephrase, Mr. Feder.
12   BY MR. FEDER:
13   Q.  If you had a meeting -- sorry, strike that.
14          You have lawyers, you have lawyers in Texas, you have
15   lawyers in California; right?                                   09:09:28
16          MR. RAPP:  Objection; relevance.
17          THE COURT:  Sustained.
18   BY MR. FEDER:
19   Q.  Wherever these meetings were, either the prosecutors and
20   the agents or your lawyers and you were flying to have these    09:09:43
21   meetings?
22          MR. RAPP:  Objection; relevance.
23          THE COURT:  Sustained.
24   BY MR. FEDER:
25   Q.  Had there been a tape-recording we would have had an exact  09:09:55
```

rendition of what you said and what was said to you and how you

said everything; correct?

A.  Well, I had a chance to review the proffers to make sure

that they were accurate.

Q.  But an exact rendition of whatever you said and how you                  09:10:21

said it would have been much more accurate had there been

tape-recordings of these meetings and conversations?

          MR. RAPP:  Objection; asked and answered.

          THE COURT:  Sustained.

BY MR. FEDER:                                                               09:11:01

Q.  In preparing for your testimony last week, this week,

actually, how many weeks have you been testifying?  This is the

third week; right?

A.  Yes, I think so.

Q.  In preparing for your testimony the last two weeks, plus           09:11:12

this week, what have you reviewed to prepare yourself?

A.  I've reviewed the exhibits; I've reread the Jencks.

Q.  When you say "the Jencks," have you read anything, any

correspondence between e-mail written, whatever, between your

lawyers and the prosecutors or the agents?                              09:11:51

          MR. RAPP:  Objection; relevance.

          MR. FEDER:  Under Rule 612 it's very relevant, Judge.

          THE COURT:  Well, I would suggest a rephrasing of the

question because you ask about correspondence between e-mail

written, whatever, I think the whatever is a little bit broad,          09:12:18

1    so be more specific.

2    BY MR. FEDER:

3    Q.  In preparing for your testimony the last two weeks and this

4    week, have you reviewed any correspondence between the

5    prosecutors to my right and your lawyers?                    09:12:35

6             MR. RAPP:  Objection; relevance.

7             THE COURT:  He can answer yes or no.

8             THE WITNESS:  The -- I have correspondence with my

9    attorney.  I don't have e-mail correspondence with the

10   prosecutors.                                                 09:12:57

11   BY MR. FEDER:

12   Q.  Maybe you misunderstood my question.  Have you reviewed any

13   correspondence between your lawyers and the prosecutors?

14   A.  Regarding?

15   Q.  Regarding your desire to become a government witness in    09:13:16

16   exchange for the things, the benefits that you have received?

17   A.  The only e-mails that I can recall is where an agent might

18   be copied confirming a meeting time and place, and that's it

19   for e-mails.

20   Q.  So there have been no correspondence, at least to your      09:13:43

21   knowledge, between your lawyers and the government prior to

22   April 6th of 2018 discussing what you want to do and what

23   you're willing to give and what they are willing to give for

24   you in order for you to plead guilty April 6th, is that what

25   you're saying?                                                 09:14:07

UNITED STATES DISTRICT COURT

```
1    A.  I -- could you repeat that again?

2            MR. FEDER:  Could you read it back to him, please.

3    Thanks.

4            (Record read.)

5            THE WITNESS:  No, I'm not saying that.  My attorneys      09:14:41

6    are communicating with the government.

7    BY MR. FEDER:

8    Q.  Has there been any communications in writing that you

9    looked at in preparation for today's or the last couple of

10   weeks' testimony?                                                 09:14:59

11   A.  I haven't had any, no, I don't believe so.

12   Q.  You've never -- have you ever read any of those

13   correspondence --

14   A.  Correspondence?

15   Q.  -- between the prosecutors and your lawyers prior to         09:15:11

16   April 6th, 2018?

17           MR. RAPP:  Objection; asked and answered.

18           THE COURT:  Sustained.

19   BY MR. FEDER:

20   Q.  To your knowledge, is there any writings between your        09:15:28

21   lawyers and the prosecutors before April 6th, 2018, discussing

22   your plea, or to your knowledge was it all verbal?

23           MR. RAPP:  Objection to the extent it calls for him to

24   discuss privileged communications.

25   BY MR. FEDER:                                                    09:15:44
```

```
 1    Q.  It's a yes or no answer.
 2            THE COURT:  I think it's a compound question.
 3    BY MR. FEDER:
 4    Q.  Have you seen any written communications between your
 5    lawyers and the prosecutors?                                  09:16:02
 6            MR. RAPP:  Objection; foundation and relevance.
 7            THE COURT:  Sustained.
 8    BY MR. FEDER:
 9    Q.  So in your preparation for today's testimony and the last
10    couple of weeks, you reviewed what you characterize as Jencks 09:16:22
11    materials?
12    A.  Yes.
13    Q.  What is that?
14    A.  It's -- it's like the proffers.  It's the proffers.
15    Q.  What's a proffer?                                         09:16:40
16    A.  Well, I didn't really know until I started this process,
17    but that's when you agree to cooperate and then you talk about
18    the business.
19    Q.  Okay.  And the -- those proffers are all in writing; right?
20    A.  Yes.                                                      09:17:12
21    Q.  And you've had -- you've been given the opportunity to
22    review those proffers, right, and correct them?
23    A.  I did, yes, I was.
24    Q.  And have any of the 30 to 50 additional conversations that
25    you had with prosecutors or agents since April 24th of 2020   09:17:30
```

1    been reduced to writing?

2    A.   I -- I don't know, and first I want to correct that number

3    to be more like 30 or less because I'm really comfortable with

4    saying there's many meetings.

5    Q.   Okay.  So of those 30 or less meetings, have any of those          09:17:59

6    meetings been reduced to writing?

7    A.   I don't know.

8    Q.   Have you read any?

9    A.   No.

10   Q.   None; right?                                                        09:18:18

11   A.   Correct.

12   Q.   So you've had 30 or less meetings since December of, can't

13   remember this date, sorry, April of 2020, that you indicate are

14   not reduced to writing, and you just remember what was said

15   during those meetings?                                                   09:18:44

16   A.   These meetings are going over tens of thousands of e-mails.

17   This company was started in 2004 to 2018.  It's a company that

18   generated a half billion dollars.  There's a ton of e-mails,

19   there's a ton of exhibits, and so we went through it by year,

20   individual exhibits.                                                     09:19:16

21   Q.   But that's what you also discussed with the prosecutors and

22   the agents from April 6th, 2018, until April of 2020, and those

23   discussions were reduced to writing; right?

24   A.   What was the time frame?  What was that time frame again?

25   Q.   April '18 to April of '20.                                         09:19:38

```
 1    A.  April '18 to April '20, April '20, those conversations were
 2    in writing, yes.
 3    Q.  But none of the ones after that were in writing; right?
 4    A.  There may have been.  I'm not familiar with all the dates.
 5    Q.  Mr. Ferrer, all I'm trying to get at is what has been          09:20:01
 6    reduced to writing to see if we have everything of that nature.
 7    A.  I don't think -- I don't remember reviewing any Jencks
 8    material that was after, let's say, April 2020.  So I don't
 9    remember all of the dates.
10    Q.  So you had 30 or less meetings after April of 2020 that       09:20:26
11    have not been reduced to writing, true?
12    A.  Once again, there were many meetings to go over the
13    exhibits.
14    Q.  How much time would you say you spent with the prosecutors
15    or the agents since April of 2020 up until you started your      09:20:45
16    testimony a couple of weeks ago?
17    A.  Many hours.
18    Q.  100, 1000, 5000, 10,000?
19    A.  I didn't prepare for this by doing an analysis and trying
20    to calculate the exact number of hours.                          09:21:16
21    Q.  Please give me your best estimate.
22    A.  I'm not being uncooperative, but the best estimate I can
23    give you is many hours.
24    Q.  Does that mean more than 1000 hours?
25    A.  Definitely less than 1000 hours.                              09:21:34
```

1    Q.  And just to be clear, the money, the Backpage money that's

2    being used to pay your lawyers for the last five years, have

3    you been -- have you been paying those bills or has somebody

4    else been paying those bills?

5    A.  So the balance that's being used to pay my lawyers,                09:21:59

6    whatever is left over will be forfeited.

7    Q.  Have you been writing the checks, Mr. Ferrer, to your

8    lawyers or somebody else?

9    A.  I'm not writing the checks.

10   Q.  Who is?                                                            09:22:32

11   A.  It's like a prepaid account.  Like a -- I forget the --

12   Q.  A retainer?

13   A.  It's really not a retainer, but, yes.  You're the lawyer,

14   you know the terms better than I do.

15   Q.  Sometimes, yes.                                                    09:22:54

16   A.  There is a balance, and when this case is over, whatever is

17   left I have agreed to forfeit.

18   Q.  And that balance is in your lawyer's trust account, is that

19   what you're saying?

20   A.  Yes.                                                               09:23:13

21   Q.  And you don't know how much it is?

22   A.  I don't.

23   Q.  And you don't know how much has been charged; right?

24   A.  I haven't been paying very close attention to it, no.  That

25   said, I do get billings, but I just really don't look at them.        09:23:34

1    Q.  Okay.  Do you know what the hourly rate is?

2    A.  I don't.

3    Q.  Well, you've identify Mr. Baum who is sitting here today.

4    There was another person with you the last couple of weeks, was

5    that a lawyer for you too?                                    09:24:07

6    A.  Yes.

7    Q.  What's his name?

8    A.  First, Tahir, and then I can't recall his last name.

9    Q.  Also a San Francisco based?

10          MR. RAPP:  Objection; relevance.                       09:24:21

11          THE COURT:  Sustained.

12   BY MR. FEDER:

13   Q.  And do you know their hourly rate?

14   A.  I don't recall.

15   Q.  Mr. Baum was representing you before April of 2018, right  09:24:38

16   along with Nanci Clarence.

17          MR. RAPP:  Objection; asked and answered.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes.

20   BY MR. FEDER:                                                 09:24:51

21   Q.  And what was the hourly rate that they were being paid

22   prior to that time?

23   A.  I don't recall.

24   Q.  Has the hourly rate changed from before plea in April of

25   2018 to after?                                                09:25:06

| | |
|---|---|
| 1 | A.  I don't know. |
| 2 | Q.  I can give you a bunch of dates.  I can give you one at a |
| 3 | time, but in order to save time let me try to give you the |
| 4 | dates of the Jencks materials that we have and you tell me if |
| 5 | that sounds about right, okay? |
| 6 | A.  Okay. |
| 7 | Q.  April 5th of '18, April 7th -- 17 of '18, May 10th of '18, |
| 8 | July 23rd of '18, July 26th of '18, December of '18, February |
| 9 | of '19, May of '19, December of '19, April of '20. |
| 10 | A.  Did you say April is in 2020? |
| 11 | Q.  April 24, 2020. |
| 12 | A.  Okay. |
| 13 | Q.  All right. |
| 14 | A.  That sounds right.  So apparently there was one that was |
| 15 | transcribed for 2020, and I misspoke earlier.  I thought they |
| 16 | were all. |
| 17 | Q.  I don't think you did.  We have been talking about April of |
| 18 | 2020 and you said that was the last written one. |
| 19 | A.  Yep. |
| 20 | Q.  And when you reviewed those Jencks materials, you also |
| 21 | talked about documents and exhibits that have been used in this |
| 22 | trial; right? |
| 23 | A.  Yes. |
| 24 | Q.  They would show you things.  You would say:  Yeah, I |
| 25 | remember that; no, I don't remember that; yeah, that's what |

09:25:38

09:26:05

09:26:19

09:26:42

09:26:58

1    happened; that didn't happen.  All those things; right?

2    A.  We did go through the exhibits, and I am -- I was very

3    familiar with most of them because my name is on them.

4    Q.  Similarly, since April of 2020 when you had these 30 or

5    less meetings with the prosecutors and agents, you did about          09:27:23

6    the same thing.  You talked to them about what happened, what

7    these exhibits mean, what they don't mean, and things like

8    that, true?

9    A.  That's, you know, once again, if I said "30," I don't

10   believe that's accurate.  Many meetings.  And then what was          09:27:43

11   your question?

12   Q.  We talked about the same kinds of things that you had in

13   the meetings that were reduced to writing?

14   A.  That's correct.  We went through the exhibits.

15   Q.  Are you aware of any reason why those new meetings were not      09:28:01

16   reduced to writing so that you could review them before you

17   testify?

18   A.  I do not know.

19   Q.  Is it fair to say that in February of 2017, sorry, February

20   of 2018 your lawyers were already in communication with the          09:28:46

21   prosecutors in order for you to make a proffer and make some

22   kind of deal?

23          MR. RAPP:  Objection; asked and answered.

24          THE COURT:  Sustained.

25   BY MR. FEDER:                                                        09:29:02

Q.  You testified, Mr. Ferrer, that you attended a meeting in

February of 2018 with some of these defendants and their

lawyers telephonically, do you remember that testimony?

A.  You know, I do remember that testimony, and I can tell you,

I don't think we reached out to -- I didn't have my lawyers                    09:29:36

reach out to the government until after that meeting, after

February 18th meeting.

Q.  So it's not February as you just testified.  Now it's when,

March of --

A.  Well, it's still February, but that meeting was                            09:29:52

February 18th, and I have a distinct memory of that meeting and

it was at that meeting -- it was after that meeting I came to

the conclusion that I really, maybe the best thing for me to do

is to shut down the site.

Q.  So you weren't spying on the defendants and their lawyers                  09:30:23

in February of 2018?

          MR. RAPP:  Objection.  Objection; argumentative.

          THE COURT:  Overruled.  He can answer.

          THE WITNESS:  I definitely was not spying with them.

I just told them I couldn't do this anymore, and that they                     09:30:39

wanted to pay them in cash --

BY MR. FEDER:

Q.  Mr. Ferrer --

A.  Okay.

Q.  -- last week we had a nice conversation about what I hoped                  09:30:46

```
1    you could do for me, and that is if the answer can be a yes or
2    no, or I don't know, that you would do that, and you said okay;
3    right?
4    A.  Yes, but I'm going to still answer truthfully.
5    Q.  This is a yes or no answer.                              09:31:03
6         THE COURT:  And he answered the question, and so let's
7    move forward.
8         And Mr. Ferrer, just listen to the question.  And as I
9    instructed you with Mr. Rapp, just answer the question asked,
10   and I am sure Mr. Rapp will come back if there's anything that  09:31:18
11   needs to be clarified.
12        THE WITNESS:  Yes, Your Honor.
13        THE COURT:  All right.  Mr. Feder, please move
14   forward.
15   BY MR. FEDER:                                               09:31:28
16   Q.  You testified that, well, you testified that before you
17   went to work for the New Times in like the mid-1990s that you
18   had worked, sorry, you were working for the Dallas Observer, is
19   that what you said?
20   A.  Yes.                                                    09:32:21
21   Q.  And that was a New Times weekly newspaper?
22   A.  Yes, it was.
23   Q.  And before that what kind of work did you do?
24   A.  Ad salesman really selling ads.
25   Q.  For what kinds of companies?                            09:32:36
```

1    A.   I used to work for the Milwaukee Journal Group.

2    Q.   Sorry.

3    A.   Let me do it chronologically.  I started my career working

4    for the Milwaukee Journal Group.  It's a newspaper.

5    Q.   Spell it for me, if you could.  I don't know how --          09:32:56

6    A.   Milwaukee.

7    Q.   Milwaukee like Wisconsin?

8    A.   Journal Group.

9    Q.   And when was that, from when to when?

10   A.   19 -- hold on.                                               09:33:11

11   Q.   Just an estimate is good?

12   A.   I would say approximately in the '80s.

13   Q.   For roughly how long?

14   A.   Eight, eight to ten years.

15   Q.   And you were in -- you were selling ads?                     09:33:34

16   A.   Yes.

17   Q.   Okay.  Then what, or then where?

18   A.   So then I went to work for a free daily newspaper in Aspen,

19   Colorado.

20   Q.   That's a step up.  Aspen Colorado, a newspaper?              09:33:52

21   A.   It's a free daily paper.

22   Q.   Like the New Times except daily?

23   A.   Daily, yes.

24   Q.   And what did you do there?

25   A.   I was the general manager.                                   09:34:09

```
 1    Q.  Aspen is not a very big place.  I assume you were kind of

 2    the everything for everything?

 3              MR. RAPP:  Objection; relevance.

 4              THE COURT:  Sustained.

 5    BY MR. FEDER:                                                09:34:23

 6    Q.  Did you sell ads?

 7    A.  No, I managed salespeople.

 8    Q.  What kinds of ads did the Aspen paper have?

 9    A.  Out -- a lot of restaurant hospitality employment.

10    Q.  Any adult?                                               09:34:50

11    A.  No adult.

12    Q.  How about the Milwaukee Journal, any adult?

13    A.  No adult.

14    Q.  Okay.  Aspen, Colorado, when does that end?

15    A.  That ended in 1996.  I went to start with the Dallas     09:35:06

16    Observer.

17    Q.  And until 2004 you worked for an alternative newspaper or

18    weekly; right?

19    A.  No.

20    Q.  No?  Wasn't the Backpage newspapers considered alternative 09:35:38

21    newspapers, sorry, not Backpage, the New Times?

22    A.  Yeah, I just -- since 1996 I started working for

23    alternative newspapers; not 2004.

24    Q.  Sorry, I misspoke.  In 1996 to 2004 you worked for a New

25    Times alternative newspaper; right?                          09:36:11
```

```
 1   A.  Yes, I did.
 2   Q.  And with them you had a lot of experience with classified
 3   print ads; right?
 4   A.  I did.
 5   Q.  And with those there was a bright-line rule about          09:36:25
 6   everything goes except sex for money; right?
 7   A.  No.  The rule wasn't as, was not a bright line in the
 8   paper.
 9   Q.  Okay.  They had striptease ads, true?
10   A.  They had striptease ads, yes.                              09:36:49
11   Q.  Massage?
12   A.  Yes.
13   Q.  Escort?
14   A.  Yes, they did.
15   Q.  And those kinds of ads have always been part of the       09:37:03
16   alternative newspaper culture; right?
17   A.  Those types of ads been part of the culture.  Those ads in
18   escorts would sometimes have sex for money terms.
19   Q.  Like F-U-C-K for a hundred dollars, or are you talking
20   about the suggestive words that we've been talking about for  09:37:32
21   the last couple of weeks?
22   A.  I would say suggestive words like "Greek."
23   Q.  But you have to, I mean, in order to know what "Greek"
24   might mean, you got to know that language; right?
25   A.  Yeah, I'd agree you would have to know the language.  Some 09:37:50
```

UNITED STATES DISTRICT COURT

1  terms like BBBJ is another example of the language.

2  Q.  And as long as it wasn't F-U-C-K for a hundred dollars, it

3  was kind of an anything-goes atmosphere; right?

4  A.  Well, it would -- the rules would constantly change.

5  Q.  Can you answer that with a yes or no, Mr. Ferrer?          09:38:25

6  A.  It wasn't an anything-goes, so the answer is no.

7  Q.  When you began Backpage, and you were a founder of

8  Backpage; right?

9  A.  I was the project manager.  I often used the title

10  "founder" for marketing purposes, but I wasn't an owner.       09:39:21

11  Q.  I didn't ask you if you were an owner.  I asked you if you

12  were a founder.

13  A.  If you look up the definition of "founder" it implies

14  ownership, and I just want to make that clear.

15  Q.  Have you ever testified under oath, Mr. Ferrer, that you    09:39:36

16  were a founder?

17  A.  Could you ask that again?

18  Q.  Yes.  Have you ever testified under oath that you were a

19  founder?

20  A.  I don't know if I used that title.  I used a lot of        09:39:51

21  different titles.

22  Q.  Have you ever used the term "founder" in any regard that

23  you're aware of?

24  A.  For marketing e-mails, yes.  For PR purposes.

25  Q.  Are you saying that that's not true even though you did it? 09:40:06

```
 1   A.  I'm sorry.  I don't understand that question.
 2   Q.  I'm saying if you put it in marketing, if you put it in
 3   marketing materials, but it wasn't, it just wasn't true?
 4   A.  We put it in marketing materials because --
 5   Q.  Yes or no, Mr. Ferrer?                              09:40:33
 6   A.  Well, it depends on what your exact definition of "founder"
 7   is.
 8   Q.  Depends on what --
 9   A.  It can't be true -- exaggeration.
10   Q.  Define the difference between, in your mind, exaggeration  09:40:52
11   and untruth?
12          MR. RAPP:  Objection; relevance.
13          THE COURT:  Sustained.
14   BY MR. FEDER:
15   Q.  Does "exaggeration" mean a little but untrue, but not a lot  09:41:10
16   of untrue?
17          MR. RAPP:  Same objection.
18          THE COURT:  Sustained.
19   BY MR. FEDER:
20   Q.  When Backpage started and you were, sorry, what's your --  09:41:27
21   what's the title that you are using?
22   A.  So when Backpage started, my title -- the company -- the
23   title the company wanted me to use was sales and marketing
24   director of Backpage.
25   Q.  When Backpage started, I mean, this was your idea, wasn't  09:41:48
```

1    it?

2    A.   It was an idea that Jim Larkin and I came up with together

3    because he had sent me to San Francisco to figure out how to

4    compete with Craigslist.

5    Q.   And then when you came back you pitched Backpage; right?          09:42:06

6    A.   I said I pitched that we had to build a solution to compete

7    with Craigslist, and he had the name Backpage.com already

8    purchased that we could use.

9    Q.   Well, Backpage already belonged to New Times 'cause it was

10   the Backpage of all of the New Times weekly newspapers; right?        09:42:28

11   A.   It was, but they also had a domain Backpage.com.  They all

12   did.

13   Q.   And you wanted to complete with Craigslist because, like a

14   lot of newspapers around the country, New York Times,

15   Washington Post, everybody, they were getting pounded by              09:42:50

16   Internet sales and the advertising was going away for the

17   newspapers; right?

18   A.   That's, yes, I agree with that.

19   Q.   And Craigslist was, I don't know, were they the biggest in

20   that market?                                                          09:43:13

21   A.   Are you speaking in San Francisco?

22   Q.   No, in the country.

23        MR. RAPP:  Objection as to foundation.  What are we

24   talking about?

25        THE COURT:  Sustained.                                           09:43:24

1   BY MR. FEDER:

2   Q.  If you know?

3         MR. RAPP:  Same objection.

4         THE COURT:  Sustained.

5   BY MR. FEDER:                                          09:43:33

6   Q.  How would you characterize the market position of

7   Craigslist in 2004?

8   A.  Craigslist in 2004 was the rapidly growing general

9   classified site, and it was making -- having a financial impact

10  on newspapers.                                         09:43:57

11  Q.  Who had the most ads in or around 2004, if you know?

12        MR. RAPP:  Objection; foundation, and vague.

13        THE COURT:  Sustained.

14  BY MR. FEDER:

15  Q.  What kinds of things did Craigslist advertise?      09:44:21

16  A.  They had a job section, housing section, services, general

17  merchandise for sale.

18  Q.  How about adult?

19  A.  Adult personals.

20  Q.  Were they the only website in the country at that point in  09:44:46

21  time in 2004 who had an adult website --

22        MR. RAPP:  Objection.

23  BY MR. FEDER:

24  Q.  -- section of a website --

25        MR. RAPP:  Objection; foundation.              09:44:57

```
 1              THE COURT:  Sustained.
 2    BY MR. FEDER:
 3    Q.  -- to your knowledge?
 4              MR. RAPP:  Same objection.
 5              THE COURT:  Sustained.                      09:45:02
 6    BY MR. FEDER:
 7    Q.  When you went to San Francisco, what did you do there?
 8              MR. RAPP:  Objection; foundation; and relevance.
 9              THE COURT:  Sustained.  Lay a little foundation; time
10    frame.                                               09:45:24
11    BY MR. FEDER:
12    Q.  You testified about two minutes ago that the request of
13    Mr. Larkin you went to San Francisco to check out Craigslist to
14    see if Backpage should start something like that, true?
15    A.  True.                                            09:45:36
16    Q.  And then what did you do in San Francisco?
17              MR. RAPP:  Objection; vague.
18              THE COURT:  Sustained.
19              MR. FEDER:  Sorry, did you --
20              THE COURT:  I sustained it.                09:45:59
21              MR. FEDER:  Oh.
22    BY MR. FEDER:
23    Q.  What did you do in regard to learning about Craigslist and
24    how it might be applied to Backpage?
25    A.  Well, the sales staff was -- informed me how competitive   09:46:10
```

```
 1   Craigslist was, how Craig Newmark didn't like anyone
 2   prospecting from his site, but they had no other leads so they
 3   had to use Craigslist, and I helped create customer lists for
 4   the salespeople to be able to call prospects.
 5   BY MR. FEDER:                                              09:46:52
 6   Q.  Mr. Newmark didn't want people prospecting, what does that
 7   mean?
 8   A.  In his Terms of Use he didn't like people calling his
 9   clients and trying to convince them to run ads elsewhere.
10   Q.  Well --                                                09:47:14
11   A.  So he would personally --
12          THE COURT:  Don't speak over one another, please.  He
13   was still finishing his answer.
14   BY MR. FEDER:
15   Q.  I thought you were finished.                           09:47:23
16   A.  He would personally call.  He would call me.
17   Q.  What, sorry, what do you mean he would call you?
18   A.  He would call me and say, "Stop having your salespeople
19   call my ads and try to convince them to run with your paper."
20   Q.  And then at some point you started obtaining the Craigslist  09:47:41
21   ads that were on Google and reached out to those advertisers
22   that way; correct?
23   A.  Yes, that's correct.
24   Q.  And Google had all of the Craigslist ads on it?
25          MR. RAPP:  Objection; foundation.                   09:48:00
```

```
1            THE COURT:  Sustained.

2    BY MR. FEDER:

3    Q.  To your knowledge, Mr. Ferrer, did Google have all of the

4    Craigslist adult ads on it?

5            MR. RAPP:  Again, foundation as to when.            09:48:09

6            THE COURT:  Sustained.

7    BY MR. FEDER:

8    Q.  Starting in 2004.

9    A.  Not all, but some, yes.

10   Q.  Thousands, tens of thousands?                           09:48:24

11   A.  Lots of ads would be indexed by Google and you could find

12   them in the cache.

13   Q.  C-A-C-H-E, cache?

14   A.  In the Google cache, yes.

15   Q.  You could find pretty much all or many of the ads from any  09:48:42

16   website in that cache; right?

17   A.  Once again, "all" is an overstatement.  It depends on when

18   the search engine went to the site and crawled, so many.

19   Q.  In the cache at Google, is it fair to say that in 2004

20   there were billions of adult ads?                          09:49:08

21           MR. RAPP:  Objection; relevance.

22           THE COURT:  Sustained.

23   BY MR. FEDER:

24   Q.  If you wanted to find adult ads, Google was a good place to

25   go in 2004, true?                                          09:49:25
```

```
 1   A.  Google had a lot of adult ads indexed in their search

 2   engine, yes.

 3   Q.  And would they have like ads from Facebook there?

 4          MR. RAPP:  Objection; relevance.

 5          THE COURT:  Sustained.                        09:49:53

 6   BY MR. FEDER:

 7   Q.  Twitter?

 8          MR. RAPP:  Same objection.

 9          THE COURT:  Sustained.

10   BY MR. FEDER:                                        09:50:03

11   Q.  As soon as Backpage began, Backpage ads were also in the

12   Google cache; right?

13   A.  Yes.

14   Q.  Adult and every other category; correct?

15   A.  Yes.                                             09:50:20

16   Q.  Google is kind of like a vacuum cleaner that vacuums up

17   information so that people can go to that site and others like

18   Bing to search out what they want to search out?

19          MR. RAPP:  Objection; relevance and vague.

20          THE COURT:  Sustained.                        09:50:36

21   BY MR. FEDER:

22   Q.  When you started, sorry, when Backpage started before --

23   strike that.

24          What was the comparative size of Backpage to

25   Craigslist from say 2004 to 2008?                    09:51:13
```

1   A.  I always felt we were one-thirtieth the size because

2   Craigslist had so much traffic in other categories, like in all

3   categories.

4   Q.  In comparison to 2004 to 2010 in the adult section, what

5   was the distinction between Craigslist and Backpage?                09:51:48

6   A.  Well, that's a long range period of time.

7   Q.  Fair.  Let's bring it down.  It would be a two-year

8   increments, would that be good?

9   A.  Yes, that's more helpful.

10  Q.  '04 to '06.                                                     09:52:04

11  A.  Backpage's -- you're asking for the comparison to

12  Craigslist in just Adult; right?  In 2004 we're just getting

13  started, pretty insignificant, but now in 2006 we are making

14  inroads.  This is when we were taking ads from Craigslist, just

15  putting them on to Backpage.  What am I going to say,              09:52:36

16  one-thirtieth, well, worse than that, one-sixtieth of

17  Craigslist, but that's an estimate because I really don't know

18  the amount of billion, the billions of pageviews that

19  Craigslist gets by section or category.  I could understand if

20  by Backpage, but -- so what I'm giving you is just an estimate.    09:53:04

21  Q.  Wasn't that -- as part of your job, wasn't that kind of

22  something that you paid attention to to see where you kind of

23  fit in regard to Craigslist, your main competitor?

24  A.  Yeah.  So I am basing my comparison maybe on, well, I am on

25  ad count.  When Backpage started, didn't have much ad count, so    09:53:24

```
 1   we're really focused on, as I said, stealing the ads off
 2   Craigslist, putting that content into female escorts.  So 2004
 3   we're really insignificant, but we've been at it for two years
 4   in 2006, so we're starting to make inroads.
 5   Q.  And by '06 you're about one-sixtieth?                      09:53:51
 6   A.  That's a real general estimate, one-fiftieth.
 7   Q.  '06 to '08?
 8   A.  '08.
 9   Q.  Yeah, let's just say by '08, what fraction would you give?
10   A.  I'm very comfortable with saying that we're one-thirtieth  09:54:18
11   of Craigslist at that time.
12   Q.  And by the time Craigslist claims to shut down their Adult,
13   in 2010, what percentage are you of their adult ads?
14   A.  Well, now they don't have adult ads.
15   Q.  Immediately prior to them closing down?                    09:54:43
16   A.  Just prior?
17   Q.  Yeah.
18   A.  Well, we've been at it for many years, so we're doing
19   better than one-thirtieth.
20   Q.  Okay.  From -- in your capacity as the, whatever your      09:55:01
21   position was, did you look at other sites and language that
22   they used and the images that they used in their ads, the adult
23   ads, sorry?
24           MR. RAPP:  Objection as to foundation.  When?
25   BY MR. FEDER:                                                  09:56:25
```

```
 1   Q.  Starting in -- let's start with '06.

 2   A.  In '06 did I look at other websites?

 3   Q.  Sure.

 4   A.  Yes.

 5   Q.  Fair to say, I think you've already testified to this a        09:56:42

 6   little bit, but fair to say that it was pretty explicit; right?

 7            MR. RAPP:  Objection; vague; foundation.

 8            THE COURT:  Sustained.

 9   BY MR. FEDER:

10   Q.  How would you characterize it, Mr. Ferrer?                     09:56:56

11            MR. RAPP:  Same objection.

12            THE COURT:  I think the fairness comes to the other

13   websites.

14            MR. FEDER:  Okay.

15   BY MR. FEDER:                                                      09:57:04

16   Q.  Other than Craigslist, why don't you tell the Court what

17   other sites you would like to to see to give you an idea of

18   what your comparisons were?

19            MR. RAPP:  Objection; relevance.

20            THE COURT:  I'll sustain it only as to vagueness          09:57:20

21   again.

22   BY MR. FEDER:

23   Q.  As to the adult ads and how explicit they were, what other

24   sites did you look at in the 2006 time period?

25            MR. RAPP:  Objection; relevance.                          09:57:41
```

1              THE COURT:  Overruled.

2              THE WITNESS:  I can't recall other sites because I

3     think at that time frame we're just focused on Craigslist

4     adult.  I mean, we're going through his erotic services

5     category.                                                          09:58:02

6     BY MR. FEDER:

7     Q.  So you're not scraping ads off of Google for any other site

8     at that point in time?

9     A.  We are getting some other ads from some employment sites,

10    some general merchandise sites, but it's really just to put       09:58:25

11    some fluff in these other categories.  The real marketing

12    effort is coming through leads at Craigslist erotic services.

13    Q.  So fair to say the only adult ad that you are scraping off

14    of Google are from Craigslist and no other site even though

15    there's hundreds or thousands of them available?                  09:58:54

16             MR. RAPP:  Objection to counsel testifying.

17             THE COURT:  Sustained.

18    BY MR. FEDER:

19    Q.  How many other comparable sites in the '06 arena had adult

20    ads like Craigslist and Backpage that were available on Google?   09:59:10

21             MR. RAPP:  Objection; relevance; and vague.

22             THE COURT:  Overruled.

23             THE WITNESS:  So there are some other sites.  There

24    are sites like Erosguide, but it's kind of a different

25    demographic because those escorts were very, very expensive,      09:59:39

1   and the demographic that the Backpage marketing team focused on

2   was more like Craigslist, so we didn't use Eros as a lead

3   source.

4   BY MR. FEDER:

5   Q.  No other sources at that time frame?                    09:59:58

6   A.  Sometimes you could go to The Erotic Review and you could

7   find links to websites, other websites, but there were a number

8   of them, or the person in The Erotic Review might have their

9   own website so that -- that became also a lead.

10  Q.  That's all there was available to you on Google in the 2006   10:00:30

11  time frame, or the ones that you just named?

12  A.  No, there's other sites, but I was giving you sort of

13  the -- just telling you Craigslist erotic services is the

14  dominant, dominant lead site.  There are -- there are other

15  sites.  We competed against a site called CityVibe.  That site   10:00:54

16  had a number of prostitutes posting.

17  Q.  CityVibe still around?

18         MR. RAPP:  Objection; relevance.

19         THE COURT:  Sustained.

20  BY MR. FEDER:                                                10:01:23

21  Q.  Were the CityVibe ads available to Backpage on Google?

22         MR. RAPP:  Objection.

23  BY MR. FEDER:

24  Q.  In 2006.

25         MR. RAPP:  Okay.  Withdraw the objection.             10:01:33

```
 1              THE COURT:  You may answer, Mr. Ferrer.

 2              THE WITNESS:  I think so.  I mean, they would be

 3     indexed by the search engine.

 4     BY MR. FEDER:

 5     Q.  In the adult section of Backpage -- strike that.  Was the        10:02:15

 6     adult section of Backpage like Craigslist as far as the

 7     categories?

 8              MR. RAPP:  Objection; foundation.  When?

 9              THE COURT:  Sustained.

10     BY MR. FEDER:                                                        10:02:29

11     Q.  2006.

12     A.  Yes.

13     Q.  And there are a number of legal sex acts that were

14     available on that, on -- on both Craigslist and Backpage sites

15     in or around 2006?                                                   10:03:00

16              MR. RAPP:  Objection; foundation.

17              THE COURT:  Sustained.

18     BY MR. FEDER:

19     Q.  Massage is legal, true, during the 2006?

20     A.  Massage is legal.                                                10:03:14

21     Q.  Pole dancing?

22     A.  What was that?  Sorry.

23     Q.  Pole dancing?

24     A.  Pole dancing is legal.

25     Q.  Movies with individuals having sex legal?                        10:03:30
```

1    A.   Porn?

2    Q.   Yes.

3    A.   I believe so; most porn.

4    Q.   You could hire somebody to come clean your house in the

5    nude?                                                          10:03:51

6             MR. RAPP:   I'm going to object if he's asking this

7    witness for some type of legal conclusion on a particular act.

8             MR. FEDER:   Not asking him that.

9             MR. RAPP:   Well --

10            THE COURT:   Overruled.                               10:04:04

11            THE WITNESS:   The question was nude housekeeping?

12   BY MR. FEDER:

13   Q.   Sure.

14   A.   Well, I presume legal.

15            THE COURT:   Well, again, you weren't asked for a legal  10:04:19

16   conclusion, Mr. Ferrer.

17            THE WITNESS:   I guess -- Your Honor, I guess I don't

18   understand the question after the objection.

19   BY MR. FEDER:

20   Q.   As far as you know, I'm not asking you for a legal        10:04:34

21   conclusion, but as far as you know, if somebody wanted to

22   advertise on Backpage in 2006 to come pleasure themself, you

23   would hire somebody to do that in front of you; right?

24            MR. RAPP:   Objection; relevance; foundation and legal

25   conclusion.                                                    10:05:05

```
 1            THE COURT:  The witness may answer if he knows.
 2            THE WITNESS:  I know that we had some nude
 3  housecleaning ads, but I don't know about the pleasuring
 4  yourself part.
 5  BY MR. FEDER:                                              10:05:26
 6  Q.  What about hiring two people to come have sex with each
 7  other, is that something that could be advertised on Backpage?
 8            MR. RAPP:  Objection; foundation, and same legal
 9  conclusion objection.
10            THE COURT:  Overruled.                           10:05:48
11            THE WITNESS:  Could you ask the question again?  I
12  apologize, but it's --
13            MR. FEDER:  Read it back.
14            THE WITNESS:  -- complicated.
15            THE COURT:  I think it would be appropriate at this   10:06:06
16  point to lay some just foundation in terms of what your time
17  frame you're speaking about, if you're talking about Craigslist
18  or talking about Backpage, talking about other websites,
19  Mr. Feder.  I think that would be helpful.
20  BY MR. FEDER:                                              10:06:23
21  Q.  2006 Backpage, could somebody advertise on Backpage in the
22  adult section to have two people come and have sex with each
23  other?
24  A.  Would I -- I can tell you what we -- I'm not sure what
25  you're asking.  What about that, are you saying is it possible   10:06:51
```

1    to do that?

2    Q.  Sure.

3            MR. RAPP:  Object to speculation.

4            THE COURT:  Sustained.

5    BY MR. FEDER:                                          10:07:01

6    Q.  Unless the ad says, "F-U-C-K for a hundred dollars," you've

7    testified that your belief that, sorry, your belief that it's a

8    prostitute is the way the women dress?

9            MR. RAPP:  Objection; compound question.

10           THE COURT:  Sustained.                         10:07:58

11   BY MR. FEDER:

12   Q.  Have you -- strike that.

13           You have testified that the way you can tell the ad

14   advertises a prostitute is based on the way they dress;

15   correct?                                               10:08:16

16   A.  That could be one factor, but there are others.

17   Q.  I'm going to get to that.  And words that are suggestive;

18   correct?

19   A.  Correct, coded words.

20   Q.  Anything else?                                     10:08:38

21   A.  Yes.

22   Q.  What?

23   A.  Well, if they had links to The Erotic Review where you

24   could read reviews specifically about sex acts that they are

25   having with Johns for money.  You could also -- the fact that  10:08:54

UNITED STATES DISTRICT COURT

```
 1   they are posting on Backpage, and my knowledge of Backpage over

 2   this long period of time, and the fact that there were over

 3   20,000 prostitution investigations on the site in the category

 4   of female escorts can give you the assumption that they are

 5   prostitutes.                                                        10:09:31

 6   Q.  Every single one?

 7   A.  Well, I can't say every single one.

 8   Q.  Well, 20,000 investigation in relation to the amount of ads

 9   there were on the escort section of Backpage, sorry, strike

10   that.                                                               10:09:50

11           Are you talking about 20,000 from '04 to '18?

12   A.  Yes.

13   Q.  How many ads do you think there were from 2004 to 2018 on

14   Backpage in the female escort section in that time frame,

15   billions?                                                           10:10:11

16   A.  I'm comfortable with millions.

17   Q.  Eight figures, nine figure millions?

18   A.  There were millions of postings.

19           MR. FEDER:  Could you bring up Exhibit 19 and 19a?

20   That looks like the wrong one.  How about 311?  This is already     10:11:00

21   admitted.

22   BY MR. FEDER:

23   Q.  Mr. Ferrer, you see where it says -- sorry, this is for the

24   adult section; right?

25   A.  Yes, I see it on the screen.                                    10:11:28
```

```
1   Q.  On one day.

2   A.  What was your question?

3   Q.  Is this the adult section for one day, March 22, 2010 to

4   March 22, 2010; right?

5   A.  So this is for one day and it's breaking down the content      10:11:42

6   by the adult section.

7   Q.  Well, except that under search engines there is a number of

8   visits too, aren't there?

9   A.  Yes, there are.

10  Q.  And far eclipse the referring sites, which included The        10:12:03

11  Erotic Review; right?

12  A.  We did extremely well --

13  Q.  That's a yes or no.

14  A.  What was your question again?  I'm sorry.

15  Q.  The visits from search engines far eclipse the visits from     10:12:21

16  referring sites on Exhibit 311; correct?

17  A.  I believe search engines are about one-third of the

18  traffic, yes.

19        MR. FEDER:  Would you go back to the overall exhibit,

20  please?  Sorry, just show 311.  There we go.  Thanks.           10:12:38

21  BY MR. FEDER:

22  Q.  And on that single day there are a million seven; is this

23  right?

24  A.  On that day there were 1.7 million visits, yes.

25  Q.  And so over the course of 2004 to 2018 visits to the female   10:13:10
```

escorts, you're still going to say millions or are you going to
say billions?

A.  Well, this report is about pageviews looking at ads.  This
isn't about the ad count or the number of ads.  When I said
millions, you asked me how many ads were posted during that          10:13:42
period of time.  This would be when someone is looking at the
ads in the female.

Q.  By 2018, how many markets was Backpage where they have
female escort ads?

          MR. RAPP:  Objection; vague and foundation.  Where?        10:14:03

BY MR. FEDER:

Q.  For the United States.

          MR. RAPP:  Good.

          THE WITNESS:  You asked how many markets on Backpage
had the escort category?                                             10:14:21

BY MR. FEDER:

Q.  Yes.

A.  I believe we were in at least 400 cities and those cities
would have all had the escort category.

Q.  And they -- those markets included pretty much every big        10:14:35
city in the United States, plus a lot of small ones?

A.  Yes, a lot of small ones too.

Q.  And so 20,000 investigations next to millions, maybe tens
of millions of ads on the Backpage female escorts, it's a
pretty small percentage, wouldn't you say?                           10:15:10

1   A.  I think --

2   Q.  Yes or no?

3   A.  No, I think it's a lot of -- a lot of subpoenas.

4   Q.  You've brought up TER, your testimony quite frequently was

5   that TER was the secret sauce for ads on Backpage; right?          10:15:44

6   A.  See -- TER was the secret sauce to grow the adult section

7   on Backpage.

8   Q.  And you were asked on a number of occasions and answered on

9   a number of occasions how in various investigations and in

10  various newspaper articles, et cetera, that you didn't tell        10:16:18

11  them about TER, remember that testimony?

12  A.  Yes, we didn't.

13          MR. FEDER:  Could we bring up Exhibit 1835?

14  BY MR. FEDER:

15  Q.  Do you remember this exhibit that was admitted?               10:16:53

16  A.  Yes, I do remember this exhibit.

17  Q.  And this was a 2007 e-mail --

18  A.  Yes.

19  Q.  -- talking about The Erotic Review as being in, as of 2005,

20  in New York Magazine as the consumer reports of escorts?          10:17:16

21  A.  Yes.  This is the e-mail that has the ad text for the ad

22  that I created to run on Backpage.

23  Q.  These newspapers, these magazines, these television

24  stations had these headlines and articles and programs about

25  The Erotic Review in 2005, 2006, 2007.  Sorry.  Is this            10:17:45

```
1    published?
2              THE COURT:  I have it as admitted.  Am I wrong?
3              COURTROOM DEPUTY:  It is admitted.
4              THE COURT:  Yes, you may publish it.
5    BY MR. FEDER:                                          10:18:18
6    Q.  Is this e-mail in 2007, Mr. Ferrer, that lists all these
7    places where TER was being talked about in the 2005-2007 time
8    frame?
9    A.  Yes.
10   Q.  Is it really your testimony that nobody knew about TER or   10:18:36
11   that were TER on your site?
12             MR. RAPP:  I'm going to object to that.  It's vague
13   and confusing as to "nobody knew."
14             THE COURT:  Sustained.
15   BY MR. FEDER:                                          10:18:57
16   Q.  Well, you know what Playboy magazine is?
17   A.  Yes.
18   Q.  Was that a -- to your knowledge, did a lot of -- was that
19   published all over the country?
20   A.  Yes.                                               10:19:16
21             MR. RAPP:  Objection; foundation.
22             THE COURT:  Sustained.
23   BY MR. FEDER:
24   Q.  To your knowledge, was it available on newsstands in every
25   major city in the country in 2007?                     10:19:27
```

1          MR. RAPP:  Objection; foundation and relevance.

2          THE COURT:  Sustained.

3    BY MR. FEDER:

4    Q.  Is it your testimony that the police, the law enforcement

5    that did these 20,000 investigations over the course of          10:19:43

6    Backpage didn't know about TER?

7    A.  I really don't know what law enforcement was thinking or

8    what sites or tools they are using for their investigations.

9    Q.  Is it credible to you, Mr. Ferrer, that law enforcement

10   looking into prostitution wouldn't know about TER given all of   10:20:18

11   the available information that's contained in this e-mail?

12         MR. RAPP:  Objection; foundation and relevance.

13         THE COURT:  Sustained.

14   BY MR. FEDER:

15   Q.  Did any law enforcement person of these 20,000 ads or        10:20:34

16   20,000 subpoenas that you've talked about, did they ever

17   mention, hey, I didn't know about TER.  If I had known that,

18   that would have been different?

19   A.  When I said they didn't know, did TER?

20   Q.  Yes or no, Mr. Ferrer?                                        10:20:52

21         MR. RAPP:  I'll object to the extent it doesn't call

22   for a yes or no answer.

23         THE COURT:  Sustained.  It did not, Mr. Feder.  You

24   can rephrase.

25   BY MR. FEDER:                                                     10:21:11

1    Q.  Did any law enforcement officer during this, in any of

2    these 20,000 subpoenas that you received, did they ever mention

3    TER to you?

4    A.  I -- no, I don't think so.

5    Q.  Did they ever ask you about any information about TER?          10:21:30

6    A.  No.  Other sites, but not TER.

7    Q.  Did they ever ask you to give them any information about

8    your relationship with TER?

9    A.  No.

10   Q.  When you -- you testified around the country on behalf of       10:21:53

11   various United States Attorneys' Office and their cases, did

12   any of those prosecutors when they were preparing you ever ask

13   you about TER?

14   A.  They never asked.  We never disclosed.  I never disclosed.

15   Q.  Did they ever ask you about it?                                 10:22:12

16          MR. RAPP:  Objection; asked and answered.

17          THE COURT:  Sustained.

18   BY MR. FEDER:

19   Q.  Did you ever read any of these articles that are in this

20   e-mail, sorry, any of these articles?                              10:22:29

21   A.  I did not.

22   Q.  When you were communicating with TER, did Scott Spear or

23   anybody else to my left ever go and meet with Mr. Elms or

24   anybody else from TER?

25   A.  No.                                                            10:22:59

```
 1    Q.  To your knowledge, did they ever talk to Mr. Elms or

 2    anybody else at TER other than you and Mr. Hyer?

 3    A.  No, just --

 4    Q.  Just you?

 5    A.  -- just me.                                              10:23:11

 6    Q.  Were there ever -- was anybody else ever included on any of

 7    the e-mail communications that you had with TER other than

 8    Mr. Hyer?

 9    A.  I can't -- I can't recall any e-mail where they may have

10    been included.  Possibly Jess Adams who works for Scott Spear. 10:23:42

11    Q.  Jess Adams was only there for about a year or two; right?

12    A.  Maybe a little longer.

13    Q.  Okay.  And then in or around starting 2010, 2011 you were

14    told that TER ads needed to be banned from Backpage; right?

15    A.  TER ads?                                                 10:24:24

16    Q.  TER references in Backpage ads.

17    A.  We negotiated on that with individuals and settled on just

18    removing the links, but not the review I.D.s.

19    Q.  But without TER or some abbreviation of TER next to a link,

20    somebody would have to know about TER to even know what that   10:24:52

21    number was; right?

22    A.  Yes, that's true.

23    Q.  And you had numbers on your various ads about -- there was

24    an ad number that was administrative to Backpage, true?

25    A.  There are various numbers.  The only six digit number that 10:25:14
```

UNITED STATES DISTRICT COURT

```
 1    would be possible is a review I.D. in the female escorts
 2    category.
 3    Q.  How many digits was that?
 4    A.  The Erotic Review, review I.D.s were almost always, I
 5    believe, six digits.                                          10:25:40
 6    Q.  What about the administrative number that Backpage put on
 7    its ads?
 8    A.  Oh, the -- you're saying the post I.D. numbers?
 9    Q.  Yes.
10    A.  That's in a different section.  That's not --             10:25:51
11    Q.  How many digits, Mr. Ferrer?
12    A.  But it could be six digits.
13    Q.  So without the TER on the ad itself, there's a number of
14    numbers on your ads; right?
15    A.  Numbers like prices.                                      10:26:11
16    Q.  I'm sorry.
17    A.  You said -- the question was, how many -- are there numbers
18    in your ads?  There are, like prices --
19    Q.  Right.
20    A.  I am sorry?                                                10:26:22
21    Q.  Strike that.
22            MR. FEDER:  Could we see 73, and could this be
23    published?
24            THE COURT:  Yes.
25    BY MR. FEDER:                                                 10:27:16
```

1    Q.  See number nine on the screen, Mr. Ferrer?

2    A.  Yes, I do.

3    Q.  Now, it was your decision to wait until January, wasn't it?

4    A.  No, it was not.

5    Q.  But you were told by Mr. Spear and by Hemu and others to                    10:27:26

6    kill TER; right?

7    A.  We had an agreement after that meeting --

8    Q.  Yes or no?

9    A.  -- to do it January 1st.

10   Q.  You were told to kill TER, true?                                            10:27:42

11   A.  Yes, on January 1st.

12   Q.  So that was somebody else's decision?

13   A.  Yes, it is.

14   Q.  Is there an e-mail to that effect?

15   A.  I don't know.                                                               10:27:59

16          MR. FEDER:  Could I see BFCF, number 103, 1-0-3, BFCF

17   103?

18          THE COURT:  I'm sorry, what is -- what exhibit number

19   are you --

20          MR. FEDER:  Impeachment exhibit.                                         10:29:05

21          THE COURT:  Is this a government exhibit?

22          MR. FEDER:  It's my exhibit.

23          THE COURT:  Is it a marked exhibit?

24          MR. FEDER:  I'm sorry, it's my exhibit.

25   BY MR. FEDER:                                                                   10:29:36

```
 1   Q.  Could you scroll down?  Do you recognize this sworn

 2   declaration, Mr. Ferrer?

 3   A.  Yes, I do.

 4   Q.  Scroll up a little bit, please.  Paragraph six through

 5   eight.                                                        10:30:00

 6           THE COURT:  It's jumping around a bit.

 7           MR. FEDER:  I'm sorry.  Paragraph six through eight.

 8   BY MR. FEDER:

 9   Q.  Do you see this declaration is dated September of --

10           THE COURT:  Don't ask a question until the exhibit is 10:30:23

11   settled, okay, because it's been bouncing all over on my screen

12   at least.

13           MR. FEDER:  All right.

14           THE COURT:  Are you fixed on this page?

15   BY MR. FEDER:                                                 10:30:30

16   Q.  Let me know when you're ready.

17           THE COURT:  You may ask a question.

18   BY MR. FEDER:

19   Q.  Do you recall this declaration that you made in September

20   of 2016?                                                      10:31:39

21   A.  Yes, I do.

22   Q.  And you made this declaration under penalty of perjury?

23   A.  Yes.

24   Q.  And did you say in this declaration that Backpage stopped

25   advertising its services on TER in 2009?                      10:32:04
```

```
1    A.  Yes.

2    Q.  And that you -- Backpage terminated the referrals in 2010?

3    A.  Terminated the referrals in 2010?  I don't even really know

4    what that means.  Sorry.

5    Q.  Isn't that what it says, Mr. Ferrer?                          10:32:33

6         THE COURT:  Stop.  Don't talk over one another.  Let

7    him finish and then you can ask a question.

8    BY MR. FEDER:

9    Q.  Your testimony is that this sworn declaration that you

10   signed in 2016, that you don't understand what, quote,           10:32:44

11   terminated the referrals in 2010 means, end quote?

12   A.  This -- this is --

13   Q.  That's a yes or no answer, Mr. Ferrer.  You either

14   understand it or you don't.

15   A.  This is much more complicated.  You can't terminate a        10:32:59

16   referral.  Somebody can come to your site any time from any

17   other site.  What this is saying is that we terminated

18   referrals, and the only -- it's got to mean it's about the

19   banner ads.  That's why it's complicated.

20   Q.  But that's what it says; right?                              10:33:18

21   A.  That's what it says, yes.

22   Q.  Okay.  And you dispute what it says even though you signed

23   this sworn declaration in September of 2010?

24   A.  I'm saying it could have been more clear and it should have

25   been.                                                            10:33:33
```

1    Q.  And then it says in late -- did you say in late 2010 and

2    early 2011 Backpage.com banned TER numbers and links to TER

3    reviews from adult ads on Backpage.com and added TER and

4    related terms as banned terms to its automated filtering

5    system?                                                          10:33:58

6    A.  Once again, that's what it states, but it could have been

7    more clear.

8    Q.  Are you saying that it was untrue?

9    A.  What I'm saying is, is that the terms "TER" were filtered

10   out and banned, and the links were removed, but the numbers,    10:34:14

11   just a straight six digit number, they were still in the ads.

12   Q.  So this was untrue?

13   A.  I'm saying is, is that it could have been more clear.  It

14   is true that the terms "TER" are removed, so it doesn't say

15   "TER" and the number, so "TER" is gone, and the links are gone. 10:34:40

16   Q.  Mr. Ferrer, when you bought Backpage in April of 2015, did

17   you resume in any way doing business with TER?

18   A.  No.

19   Q.  Is TER still in existence as we sit here today?

20          MR. RAPP:  Objection; relevance.                         10:35:12

21          THE COURT:  Sustained.  And with that, Mr. Feder,

22   we'll go ahead and take our morning 20-minute break, and the

23   jury will, again, remember the admonition not to come to any

24   conclusions or discuss the case, but just to enjoy the

25   20 minutes that you have this morning for your recess.          10:35:32

```
 1              Please all rise for the jury.
 2                       (Jury is not present.)
 3              THE COURT:  All right.  We will stand in recess.
 4              MR. FEDER:  Have you issued any orders in regard to
 5    our hearing yesterday?                                          10:36:13
 6              THE COURT:  No, I have not.  I am still reviewing some
 7    things.
 8                   (Recess was taken at 10:36 a.m.)
 9              (Proceedings reconvened at 11:00 a.m.)
10              MR. RAPP:  Judge, Judge, I just have one small matter,  11:00:18
11    and I think Mr. Ferrer can be here for this.  I just noticed
12    when the defense is identifying an exhibit, he refers to it in
13    front of the jury as impeachment.  This last exhibit, it's on
14    our exhibit list.  So I mean, it's fine, but I think
15    impeachment in front of the jury is a little bit confusing, you  11:00:37
16    know.  It has different meanings to people.  If he wants to
17    have some kind of naming convention for it that suggests that
18    it's not on any of the exhibit lists and it should be
19    categorized as such, I think there's a way to do that without
20    referring to it as impeachment.                                 11:00:57
21              THE COURT:  Fair point.  You can rephrase.
22              MR. FEDER:  Fair enough.
23              THE COURT:  Please be seated.
24              MR. FEDER:  Judge, you've been sustaining relevance
25    objections to questions to Mr. Ferrer about other sites, and --  11:01:09
```

```
1    sorry.
2              (Mr. Ferrer leaves the courtroom.)
3              MR. FEDER:  It's relevant from a standpoint of good
4    faith for there to be testimony about what other sites were
5    doing as to their intent, and I am not sure what the basis of      11:01:51
6    the Court sustaining of those objections is, but that's the
7    relevance of it, and --
8              THE COURT:  It's the manner in which you ask the
9    question, Mr. Feder.  The questions are often vague.  They
10   don't specify a time frame.  You ask about essentially global     11:02:08
11   websites.  And so there's a substantial number of reasons why I
12   sustained the objection.
13             Pay attention to the question and the way you ask it.
14   And in some of these instances Mr. Ferrer can't conceivably
15   answer, I don't think anybody could, unless you lay some          11:02:28
16   foundation for the specifics of what you're talking about.
17             MR. FEDER:  Notwithstanding my mistakes, Judge, on
18   some of the questions that the Court has sustained the
19   objection to, the only objection has been relevance, and the
20   Court has sustained it.  That's what my record is for.            11:02:42
21             THE COURT:  I will look at it and I will revisit my
22   rulings on your areas of concern.
23             Since we're already delayed with our jury, I will say
24   upon reviewing, Mr. Panchapakesan, I think you posed what I
25   believe is, is this exhibit from Mr. Ferrer, it's got a stamp     11:03:07
```

1   on it, Exhibit 28, I can't recall now the precise exhibit

2   number that you were -- you made reference to.  It is the

3   e-mail on July 21st, Tuesday, to a Trent Voigt regarding the

4   Visa and Mastercard with the Dart reference in it forwarding

5   the complaint.                                             11:03:48

6           Do you recall what number that exhibit was?

7           MR. PANCHAPAKESAN:  Yes, Your Honor, one moment.

8           THE COURT:  I will permit you to show this to the

9   witness as a refreshing exhibit, but I'm not going to let you

10  admit this exhibit because of the multiple Dart references, the   11:04:10

11  Dart complaint, the other issues at this point.

12          Well, we'll see how it goes.  You can move for

13  admission at the appropriate time, and I will reserve my ruling

14  on that point.

15          And I think it's consistent with what the Court has   11:04:34

16  previously held in terms of the question before the jury as to

17  whether or not these are prostitution ads and, therefore, if

18  they are not, if they find that they are not, then possibly

19  having a First Amendment protection.

20          The only concern I have is perhaps there should be a   11:05:02

21  redaction regarding this Dart complaint, which is item number

22  one, but beyond that you can probe that area.

23          All right.  Let's have the jury in.

24          MR. PANCHAPAKESAN:  For the record, it's 6025.

25          THE COURT:  6025?                                  11:05:29

```
 1              MR. PANCHAPAKESAN:  That's right, Your Honor.

 2              THE COURT:  All right.  Let's go ahead and have the

 3    jury in.

 4              (Jury is present.)

 5              All right.  Please be seated.                        11:06:22

 6              Mr. Feder, you may continue.

 7              MR. FEDER:  Could we see Exhibit 907?  Wrong one.

 8    Sorry.  645.  Also wrong one.  Sorry about that.

 9    BY MR. FEDER:

10    Q.  Mr. Ferrer, on April 6th of 2018 you pled guilty to a    11:07:52

11    variety of things; right?

12              MR. RAPP:  Objection; asked and answered.

13              THE COURT:  Sustained.

14              MR. FEDER:  Judge I haven't asked him anything about

15    the plea; not one question.                                  11:08:08

16              THE COURT:  Well, the question is:  "you pled guilty

17    to a variety of things; right?"

18    BY MR. FEDER:

19    Q.  In prior testimony, Mr. Ferrer, do you recall repeatedly

20    calling the process of taking words out of escort and other  11:09:56

21    adult service ads as being sanitizing them?

22    A.  Yes.

23    Q.  "Sanitize," what does "sanitize" mean to you as far as a

24    definition is concerned?  Does it mean to clean?

25    A.  It does.                                                  11:10:23
```

```
 1  Q.  And under Section 230 of the Communications Decency Act --
 2          MR. RAPP:  Objection.
 3          MR. FEDER:  -- sanitizing --
 4          MR. RAPP:  Objection.  Move to strike.
 5          THE COURT:  Sustained per the Court's prior order,      11:10:38
 6  Mr. Feder.  The jury will disregard the question.
 7  BY MR. FEDER:
 8  Q.  Isn't the process of moderation the same sanitizing that
 9  you're talking about?
10  A.  Well, it depends --                                        11:10:54
11  Q.  Yes or no?
12  A.  -- what kind of moderation process you have.  The
13  moderation process we had wasn't to prevent, block, ban posters
14  violating our rules.  We would edit the text, or even in the
15  most egregious example, allow them to remove their ad, but then 11:11:16
16  we would allow them to post again.
17  Q.  We're back to our little problem, Mr. Ferrer.  I'm going to
18  try to ask you questions that hopefully will be a yes and no
19  answer for you, okay?
20  A.  Okay.                                                      11:11:35
21  Q.  And I don't want you to editorialize.  If you can answer it
22  with a yes or no.
23          MR. RAPP:  I'm going to object to that.  He was
24  answering the question, not editorializing.
25          MR. FEDER:  It was a yes or no question.               11:11:45
```

1           THE COURT:  Let's move forward.

2    BY MR. FEDER:

3    Q.  The process of moderation by definition is to edit ads;

4    right?

5    A.  No, there could be other purposes for moderation, like         11:12:00

6    remove ads or possibly even ban the user from ever posting

7    again.

8    Q.  Those are all possibilities, so there's the deletion of the

9    ad meaning the ad is deleted; right?

10   A.  Yes.  Yes.                                                      11:12:19

11   Q.  Backpage did that during the time that you were operating

12   it; correct?

13   A.  At times, yes.

14   Q.  They banned -- when you say "banned," what do you mean

15   "banned"?                                                          11:12:31

16   A.  Well, banned would be --

17   Q.  Ban a user?

18   A.  Can I explain what I mean by "ban"?

19   Q.  No.  You mean ban a user?

20           THE COURT:  Let me stop you there.  Mr. Feder, you         11:12:41

21   just asked him:  What do you mean by ban?  He was answering,

22   and then you cut him off.

23           MR. FEDER:  I'm following it up by, do you mean ban

24   the user?

25           THE COURT:  As part of the original question?              11:12:53

```
 1              MR. FEDER:  That's what I thought it was.

 2              THE COURT:  No, it was not.  So re-ask the question.

 3              MR. FEDER:  Sure.

 4              THE COURT:  Listen to the question and wait for it to

 5    be completely finished.                                    11:13:02

 6    BY MR. FEDER:

 7    Q.  Does the word "ban" mean to ban a user or ban a word or ad?

 8              MR. RAPP:  Objection as to foundation; vague.

 9              THE COURT:  Overruled.

10              THE WITNESS:  So you could do both.  You could ban a  11:13:13

11    word or you could ban a user, and you would ban that user by

12    their e-mail address or their credit card number or their phone

13    number that was in the ad text.

14    BY MR. FEDER:

15    Q.  And certain users were banned for repeated violations of   11:13:28

16    your Terms of Use; right?

17    A.  No.

18    Q.  Never?

19    A.  No.  Users would be banned primarily for charge-backs or

20    using credit cards unauthorized.  Rarely would they be banned  11:13:41

21    for violating the content rules.

22    Q.  When you say "rarely," let me ask it again.  Were users

23    ever banned permanently because of repeated violations of the

24    Terms of Use?

25    A.  There were --                                             11:14:05
```

```
1    Q.  Yes or no?
2    A.  Yes, there were some users banned for violating the Terms
3    of Use.
4    Q.  And in the context of an ad, does "ban" mean permanently
5    get rid of that one particular ad?                              11:14:18
6    A.  Yes, and let the others stay live.
7    Q.  And if there are other ads from the same poster advertising
8    whatever we want to call it, does "ban" mean getting rid of all
9    of their potential ads?
10   A.  Rarely.  Very rarely.  If they used stolen credit cards,    11:14:40
11   yes, they could lose all their ads.
12   Q.  But sometimes just for repeated violations of the Terms of
13   Use, true or not true?
14   A.  Sure, there are times, yes.
15   Q.  But moderation itself means essentially Backpage's rules    11:15:06
16   being followed and you controlling what is on the site, yes or
17   no?
18   A.  Yes, very much.  We were controlling what should be on the
19   site.
20   Q.  And that would include ads that were, in Backpage's         11:15:32
21   opinion, illegal on its face?
22           MR. RAPP:  Objection; foundation.
23           THE COURT:  Sustained.
24   BY MR. FEDER:
25   Q.  In 2004, Mr. Ferrer, could moderation mean banning an ad    11:15:53
```

1    because of its explicit sex terms?

2    A.   In 2004 there was no moderation for banning any ads that

3    had explicit sex terms.

4    Q.   Moderation in itself began 2006?

5    A.   I think, yes, mainly the images.                    11:16:26

6    Q.   And that was when Mr. Spear imposed his Playboy --

7    A.   Yes, the Playboy Hustler standard.

8    Q.   -- standard of images?

9    A.   Yes.

10   Q.   So in other words, Playboy centerfold, but not Hustler,   11:16:44

11   more egregious; right?

12   A.   Correct.

13   Q.   And is "sanitized" your word or is that something that you

14   were suggested you say?

15   A.   Well, it was a synonym that we would use.  We would use   11:17:05

16   "clean up" also, very common, "clean it up."

17   Q.   Edit?

18   A.   Yes, "edit" is one of the processes.

19   Q.   Moderate it?

20   A.   Edit it, moderate it, but don't ban it if it's a good user  11:17:23

21   that's paying the company money.

22   Q.   Mr. Ferrer, did I ask you --

23   A.   You asked --

24           THE COURT:  All right.

25           THE WITNESS:  So the definition of "moderation" can   11:17:36

1  mean banning, but it's truthful.  I want to be truthful that we

2  didn't ban paid users if they violated the Terms of Use.

3  BY MR. FEDER:

4  Q.  Is it fair to say, Mr. Ferrer, that since your plea in 2018

5  when you've met with the prosecutors, that you have been                 11:17:57

6  preparing your testimony?

7  A.  Since 2018 I, as part of my cooperation agreement, I knew I

8  was going to have to testify.

9  Q.  And you've been given the questions that would be asked and

10 your proposed answers?                                                   11:18:20

11 A.  Given the questions, no.

12 Q.  In other words, you discussed with the prosecutors what

13 questions you would be asked and what answers that you would

14 give; right?

15 A.  They would ask me questions and then I would give them the           11:18:35

16 answers, the truthful answers.

17 Q.  And those --

18 A.  They wouldn't give me the answer.

19 Q.  Those questions never changed; right?

20 A.  No.  Those questions changed all the time depending on the           11:18:48

21 exhibit.

22 Q.  And your answers have always been the same in the last five

23 years; right?

24 A.  Yes.

25 Q.  Nothing has ever been suggested like using the word                  11:19:04

1  "sanitize" or "steal," nothing like that?

2  A.  No.

3  Q.  When you pled guilty in April of 2018, do you have a

4  recollection of what you were facing if you did not plead

5  guilty?                                                          11:20:14

6          MR. RAPP:  Objection; to the extent it calls for

7  privileged communication.

8          THE COURT:  Sustained.  So long as it -- Mr. Ferrer

9  can answer as to his understanding.

10         THE WITNESS:  I'm sorry, what was the question again?    11:20:36

11         MR. FEDER:  Please read it back to him.

12         (Record read.)

13         THE WITNESS:  I do have a recollection that it was

14  substantial, but I don't recall exactly the details.

15  BY MR. FEDER:                                                   11:21:54

16  Q.  These defendants are charged with one count of conspiracy

17  regarding the Travel Act that has a mandatory --

18         MR. RAPP:  Objection.  He's testifying.

19         THE COURT:  Sustained.

20  BY MR. FEDER:                                                   11:22:03

21  Q.  Do you know what the maximum sentence is for a conspiracy

22  regarding the Travel Act?

23         MR. RAPP:  Objection; relevance and foundation.

24         THE COURT:  Sustained.

25  BY MR. FEDER:                                                   11:22:12

```
1    Q.  Were you facing five years maximum for a conspiracy to

2    violate the Travel Act?

3            MR. RAPP:  Objection; relevance, and also what is on

4    the -- what is on this paper?  I can't see it.

5            THE COURT:  Well, you can stand up and look at it,          11:22:26

6    Mr. Rapp, but sustained as to relevance.

7            MR. RAPP:  Well, to the extent that this is not in

8    evidence, I would object.  I can't see really what it is that

9    'cause he's standing in front of it, but if it's not in

10   evidence, it can't be shown to a jury.                           11:22:43

11           THE COURT:  Sustained.  Mr. Feder --

12           MR. FEDER:  Is the Court not going to allow me to talk

13   about his incentives?

14           THE COURT:  You may move forward.

15   BY MR. FEDER:                                                    11:22:56

16   Q.  Have you ever read the indictment?

17   A.  Yes.

18   Q.  There are roughly -- do you understand there is roughly 99

19   counts?

20   A.  Yes.                                                         11:23:20

21   Q.  And --

22   A.  Well, you know what, I might have misspoke.  I don't know

23   how many counts are there.

24   Q.  Do you understand that the maximum penalty for a violation

25   of conspiracy to violate the Travel Act has a maximum sentence   11:23:33
```

```
 1    of five years?
 2              MR. RAPP:  Objection to the relevance of this whole
 3    line of questioning, and also as to foundation with respect to
 4    the indictment.
 5              THE COURT:  Well, he can answer the question if he        11:23:48
 6    understands the what the maximum penalty is, but -- so he can
 7    answer the question if he knows.
 8              THE WITNESS:  I don't know.  I had my attorneys handle
 9    all of this.
10    BY MR. FEDER:                                                      11:24:12
11    Q.  So you have no idea as you sit here today what punishment
12    you could have faced if you had been indicted and convicted?
13    A.  I don't know the specifics.  I just, as I said earlier,
14    knew that --
15              MR. RAPP:  Objection.  If -- objection to the extent     11:24:37
16    this calls for some type of privileged communication as the
17    basis of his knowledge.
18              MR. FEDER:  It's -- there is no question about
19    privilege here.
20              THE COURT:  You may answer the question based on your    11:24:50
21    own knowledge, Mr. Ferrer.
22              THE WITNESS:  Well, my knowledge came from my attorney
23    who said it.
24              THE COURT:  All right.  Ask your next question.
25    BY MR. FEDER:                                                      11:25:08
```

```
 1    Q.  Your plea is to one count of conspiracy with a maximum
 2    penalty of five years in prison; correct?
 3    A.  Yes.
 4    Q.  And in exchange for the limitation of five years maximum,
 5    you have agreed to help the government as you have been doing      11:25:26
 6    the last couple of weeks; correct?
 7    A.  I have agreed to testify truthfully.
 8    Q.  And in exchange for your testimony, your understanding of
 9    your arrangement with the prosecutor is that they will bring
10    your cooperation to the attention of the sentencing judge;        11:25:49
11    right?
12    A.  Correct.
13    Q.  And your hope is that if you do well in their opinion they
14    will recommend no incarceration; right?
15    A.  I'm hopeful, correct, but there are no promises.              11:26:07
16    Q.  But if everything that you said on the stand was untrue,
17    but the government was satisfied with your testimony, you could
18    still get the sentence that you are hoping you get, which is
19    probation?
20          MR. RAPP:  Okay.  Well, that's -- objection; compound;      11:26:40
21    confusing and speculative.
22          THE COURT:  Sustained.  Sustained as to compound.
23    Sustained as to confusing.
24          MR. FEDER:  We'll try again.
25    BY MR. FEDER:                                                     11:26:56
```

1   Q.  So your understanding is the prosecutors are going to bring

2   their satisfaction with your testimony to the attention of the

3   sentencing judge; right?

4          MR. RAPP:  Objection; asked and answered.

5          THE COURT:  Sustained.                              11:27:12

6   BY MR. FEDER:

7   Q.  And if everything that you've said from the stand isn't

8   true, and they still bring that understanding to the sentencing

9   judge, you would get what you hope to get; right?

10         MR. RAPP:  Okay.  Objection.  That's confusing and    11:27:26

11  it's also speculative.

12         THE COURT:  Well, he can answer as to what he hopes to

13  get.

14         MR. FEDER:  Okay.

15         THE WITNESS:  So there were two questions there, I     11:27:36

16  believe.  Could I -- could you tell me again the question?

17  BY MR. FEDER:

18  Q.  If you don't tell the truth, but that's brought to the

19  attention of the sentencing judge, positively you'll still get

20  the benefit you hope for?                                    11:27:59

21  A.  No.  If I don't tell the truth I would not get that

22  benefit.

23  Q.  Whether or not you are telling the truth is completely up

24  to the prosecutor, isn't it?

25  A.  No, it's really up to me.  I mean, I --                  11:28:14

Q.  It's completely up to the prosecutor what they tell the

sentencing judge; right?

A.  I'm not really familiar with the process.  It's something

that my attorney handles.

Q.  And if they -- if the prosecutors are not satisfied with          11:28:40

your testimony, even if completely true, then they don't have

to bring your cooperation to the attention of the sentencing

judge?

        MR. RAPP:  Okay.  That's -- objection, confusing and,

again, just speculating on the hypothetical.                           11:28:59

        THE COURT:  Sustained as to confusing, Mr. Feder.

BY MR. FEDER:

Q.  It's completely up to the discretion of the prosecutors,

what, if anything, they bring to the attention of the

sentencing judge; right?                                               11:29:16

A.  I'm not familiar with the legal process, how it works.

Q.  Your understanding is they have complete discretion to

advocate for you with the sentencing judge or not; right?

A.  I -- it's my complete understanding, yes.  I'm hopeful

that, you know, that if I testify truthfully, that the                 11:29:51

prosecutors will make a recommendation.

Q.  But that's their decision, the prosecutor's decision

whether or not what you have done for them is worthy of a

recommendation to the sentencing judge or not; right?

A.  I suppose so.  I'm not exactly certain.                            11:30:12

```
1    Q.   Truthful or untruthful; correct?

2              MR. RAPP:  Objection; vague.

3              THE COURT:  Sustained.

4    BY MR. FEDER:

5    Q.   And as part, also part of your plea, your agreement with          11:30:32

6    the government, you have been allowed to keep certain assets;

7    is that right?

8    A.   Yes.

9    Q.   Assets that were purchased with money that you made from

10   Backpage?                                                              11:30:51

11   A.   No.

12   Q.   No.  So your testimony is that nothing that you have been

13   allowed to keep by the government was paid for in any way by

14   Backpage proceeds?

15   A.   No.  You had asked earlier a different question and I'm           11:31:07

16   saying that the house that I was allowed to keep was purchased

17   without Backpage money.

18   Q.   What about the house that was purchased for your now

19   ex-wife, wasn't Backpage money used for that?

20   A.   Well, I gave up any ownership in that house as part of this       11:31:30

21   plea deal.

22   Q.   But your wife has been able to keep it; right?

23   A.   Well, I think so.  Well, she was able to keep it, yes.

24   Q.   And that house was paid for with Backpage money that you

25   made; right?                                                          11:31:58
```

UNITED STATES DISTRICT COURT

1    A.  Some funds were commingled.  I would say that some funds

2    were Backpage funds.

3    Q.  How much is that house worth today, if you know?

4    A.  Well, I don't know.  She sold the house.

5    Q.  For how much, if you know?                                    11:32:20

6           MR. RAPP:  Objection; relevance and then foundation.

7           THE COURT:  Sustained.

8    BY MR. FEDER:

9    Q.  Did you purchase a Mercedes automobile right before you

10   entered into this plea?                                           11:32:33

11   A.  I did.  That's the Mercedes now with a hundred thousand

12   miles on it.

13   Q.  Five years ago how many miles on it did it have when you

14   bought it?

15   A.  I think it was like the year-old model, so a couple          11:32:48

16   thousand, maybe 1000 miles.

17   Q.  How much did you pay for that?

18   A.  I don't remember the number, the exact number.

19   Q.  Give us an approximation, if you can?

20   A.  I'm going to say something around 60,000 or less.           11:33:08

21   Q.  That was paid for with money that you made at Backpage?

22   A.  Yes.

23   Q.  Still have that car?

24   A.  I do.  It's the car with the 100,000 miles on it.

25   Q.  And have you been allowed, according to your agreement with  11:33:29

UNITED STATES DISTRICT COURT

1    the government, to keep any other assets?

2    A.  Yes.

3    Q.  What?

4    A.  The retirement account for those funds that were pre-2004.

5    Q.  How much is that?                                    11:33:54

6    A.  The pre-2004 funds would probably be -- I don't know the

7    exact number.

8    Q.  No idea?

9    A.  Well, you're asking for the pre-2004 numbers, and I would

10   have to run a report or --                              11:34:15

11   Q.  How much is it worth today, Mr. Ferrer?

12   A.  What's that?

13   Q.  How much is that retirement fund worth today?

14   A.  That probably, probably, well, somewhere under 600,000.

15   Q.  And is it the same retirement fund that you had before 2004  11:34:36

16   as the one that you had going forward to 2018?

17   A.  Is it the same fund?

18   Q.  Yes.

19   A.  Yeah, it's the 401(k).

20   Q.  That you made contributions to and Backpage and the New    11:34:55

21   Times made contribution to from 1996 to 2018?

22   A.  Yes.

23   Q.  And it's your testimony that only the monies that were in

24   the retirement fund before 2004 you are being allowed to

25   retain?                                                 11:35:20

1  A.  Yes.

2  Q.  And that's -- it was 600,000, or its present value is

3  600,000?

4  A.  Present, but that's total amount, and that account -- I

5  don't know how to -- I -- I don't know what the 2004 portion          11:35:37

6  value would be today.

7  Q.  Before April of 2018 you had a lot of contact with law

8  enforcement agents and officials; right?

9  A.  Yes, I did.

10  Q.  You testified on behalf of the government and three federal        11:36:08

11  trials around the country?

12  A.  No.  Four.

13  Q.  Four.  Minnesota, Florida, Tennessee, is there another one?

14  A.  No Tennessee.

15  Q.  Florida and Minnesota is right then; right?                        11:36:33

16  A.  Yes.

17  Q.  And then you talked to police officers, FBI agents, et

18  cetera, all the time during that period; right?

19  A.  Yes, I did.

20  Q.  Did you ever tell one of those people that you were doing          11:36:49

21  something wrong?

22  A.  No, I did not.

23  Q.  Did they ever tell you that you were doing something wrong

24  when they asked for your assistance?

25         MR. RAPP:  Objection as to foundation.                          11:37:08

1          THE COURT:  Yes, sustained.

2    BY MR. FEDER:

3    Q.  In the four instances where you went to testify for

4    Assistant United States Attorneys around the country in their

5    trials, did any of them ever tell you and those -- strike that.          11:37:25

6          In -- when you testified for the Assistant United

7    States Attorneys around the country, all four of the times was

8    in regard to an ad or ads that you gave them to support their

9    prosecution of a pimp or something like that; right?

10   A.  Yes.          11:37:50

11   Q.  And those ads, did any of those ads to your knowledge or

12   memory have TER on them?

13   A.  I don't recall the ads.

14   Q.  Did they go -- before you testified under oath for them,

15   did they go through what your, what their questions would be          11:38:07

16   and what they hoped your answers would be?

17   A.  They did -- they did tell me that these were the questions

18   they were going to ask about the exhibits.

19   Q.  They wanted to prepare you for your testimony, what to

20   expect; right?          11:38:27

21   A.  Yes.

22   Q.  Did any of those prosecutors ever say:  Hey, this is --

23   this is a prostitution ad.  You're doing something illegal?

24   A.  I didn't hear it from the prosecutors, but I did hear it

25   from some of the agents.          11:38:46

1    Q.  The agents that were connected to the U.S. attorneys or

2    somebody else?

3    A.  Yes, I remember a law enforcement officer in Jacksonville

4    telling me that he's not going to fault the site for making

5    money off of prostitution.  Anyway, it was an uncomfortable          11:39:07

6    conversation.

7    Q.  Did they -- because of that, when you were on the stand

8    under oath testifying against a citizen, didn't the prosecutor

9    bring up that you're violating the law?

10   A.  No.  They focused just on the content of the records.           11:39:32

11   Q.  So they just ignored what you claim this agent told you?

12          MR. RAPP:  Objection; foundation.  It's not clear that

13   the prosecutor knows about this conversation.

14          THE COURT:  Sustained.

15   BY MR. FEDER:                                                        11:39:49

16   Q.  Was the agent that you just talked about in with you and

17   the prosecutor when he or she was preparing you to testify?

18   A.  No.

19   Q.  Did that -- to your knowledge, did that agent testify in

20   that same trial?                                                     11:40:04

21          MR. RAPP:  Objection; relevance.

22          THE COURT:  Sustained.

23   BY MR. FEDER:

24   Q.  To your knowledge, did that agent testify that Backpage was

25   doing something illegal?                                             11:40:14

```
 1              MR. RAPP:  Objection; relevance.

 2              THE COURT:  Sustained.

 3   BY MR. FEDER:

 4   Q.  Okay.  We are talking about Jacksonville, anywhere else

 5   where somebody, either the prosecutor or the agent regarding      11:40:32

 6   that case said anything to you about illegality of Backpage?

 7   A.  No.

 8   Q.  And in those instances they -- you traditionally were

 9   asked:  Well, what's Backpage, right, when you testified?

10   A.  Yes, they would ask me that question.                         11:41:04

11   Q.  And you would describe it; right?

12   A.  I would.  I would describe the site like Craigslist.

13   Q.  As legal as a legal site, right, as legal ads?

14   A.  I wasn't commenting about the legality of the ads.

15   Q.  Well, but, I mean, you know, you've testified a number of     11:41:24

16   times here about what you didn't tell various law enforcement

17   people and journalists and that stuff, you could have said when

18   they gave you that oath to tell the truth, the whole truth and

19   nothing but the truth, and they asked you about Backpage, the

20   whole truth would have been that Backpage is illegal; right?      11:41:44

21   A.  It would have been more transparent for me to say that

22   Backpage has a lot of content that has sex for money.

23   Q.  But you didn't?

24   A.  I did not.

25              MR. FEDER:  Could I see Exhibit 536?                    11:42:59
```

```
 1   BY MR. FEDER:
 2   Q.  Are you familiar with this e-mail, Mr. Ferrer?
 3           THE COURT:  Is there a question, Mr. Feder?
 4           MR. FEDER:  I asked him if he was familiar, and he
 5   hasn't answered.                                              11:44:34
 6           THE WITNESS:  I am sorry.
 7   BY MR. FEDER:
 8   Q.  Maybe I didn't hear it.
 9   A.  I didn't hear it.  What did you ask me?
10   Q.  Are you familiar with this e-mail?                        11:44:41
11   A.  Oh, yes, I am, and I appreciate the time 'cause I reviewed
12   it.
13   Q.  Okay.  And is this an e-mail you recall sending to
14   Mr. Spear and Mr. Hyer in March of 2007?
15   A.  Yes.                                                      11:44:58
16   Q.  Is this accurate?
17   A.  Well, it's a long e-mail, and I'm -- I gave it a perusal.
18   I think it's mainly accurate.
19           MR. FEDER:  Can I see page 2?
20   BY MR. FEDER:                                                 11:45:37
21   Q.  What is spam?
22   A.  So spam is like business opportunities posted in the job
23   section, or that's the main type of spam.  Sometimes it's like
24   job sites trying to promote themselves and then posting lots of
25   ads.                                                          11:46:04
```

1  Q.  Is it people that have one type of business trying to put

2  that in to an inappropriate category?

3  A.  It's like -- it's not real jobs being posted in jobs.  It's

4  business opportunities, which usually are scams.

5          MR. FEDER:  Move for the admission of this                    11:46:26

6  Exhibit 536.

7          MR. RAPP:  No objection.

8          THE COURT:  Yes, it may be admitted.

9          MR. FEDER:  And published.

10          THE COURT:  Yes, it may be published.                        11:46:37

11          (Exhibit 536 was admitted.)

12  BY MR. FEDER:

13  Q.  Was this a plan or projection by you to Mr. Spear and

14  Mr. Hyer about how to grow Backpage?

15  A.  This is a summation of a plan with my conversations with         11:46:53

16  Scott and Dan that I crystalized it and put it into an

17  actionable plan.

18  Q.  Doesn't say anything about aggregation being illegal or

19  improper; right?

20  A.  I think we use another, so --                                    11:47:14

21  Q.  It's a yes or no.

22  A.  It doesn't use the word "aggregation" here, but what I was

23  saying is --

24  Q.  Go ahead.  Finish your answer.

25  A.  It uses another euphemism.  I consider an aggregation a          11:47:28

```
 1   euphemism.  Optimized.
 2   Q.  Okay.  Is there anything that's inaccurate in this?
 3   A.  Well, it does reflect what was going on at the time the
 4   transition from print to online.
 5   Q.  That was kind of a complex thing back then; right?        11:47:58
 6   A.  Complex what?
 7   Q.  It was a complex process to go from print, being a print
 8   person to being an Internet person?
 9   A.  It was a difficult transition many could not make.
10   Q.  Because the Internet was, at least even in 2007, is still  11:48:16
11   somewhat new and everybody was kind of trying to feel their
12   way, true?
13   A.  Yes, it was a transition for print to go online.
14   Q.  And when you were looking to help build Backpage, wasn't it
15   part of your job to go and look at other sites and look at what 11:48:43
16   other sites were doing to build their ad counts?
17   A.  Yes, I studied the competition.
18   Q.  And that included Craigslist, but was not exclusive to
19   Craigslist; right?
20   A.  Correct.                                                   11:49:01
21   Q.  And they were doing roughly the same thing that you hoped
22   to do at Backpage, true, insofar as growing their sites?
23   A.  I think we all shared the same goals of growing content and
24   revenue.
25   Q.  What is SEO?                                               11:49:20
```

```
 1   A.  So SEO is like the slide that you showed earlier, showed

 2   the number of searches coming in from Google, so we would

 3   optimize search engines so that keywords would bring up

 4   content.

 5            So for example, if you're searching for escorts in      11:49:45

 6   Phoenix, Phoenix Backpage would show up first.  That was the

 7   goal with SEO.

 8   Q.  SEO stands for search engine optimization?

 9   A.  Yes.

10   Q.  And in order to attract more viewers from Google, there's    11:50:02

11   all kinds of ways of trying to use SEO to optimize those views;

12   right?

13   A.  That's correct.

14   Q.  So, for instance, with some lawyers who advertise, they

15   have SEO experts helping them to try to bring people to their    11:50:24

16   legal site; right?

17            MR. RAPP:  Objection; relevance.

18            THE COURT:  Sustained.  Sustained.

19            MR. FEDER:  Oh, I'm sorry.

20   BY MR. FEDER:                                                    11:50:53

21   Q.  One of the primary goals of Backpage was to bring as many

22   eyeballs to your site; right?

23   A.  That's correct.

24   Q.  And if they came to eyeball one category, then the hope was

25   that they would also look what also was available and buy        11:51:09
```

UNITED STATES DISTRICT COURT

1    something there, true?

2    A.   That's true.

3    Q.   So the more content you could get on your site, the better

4    your, what is it called on Google, your value or your profile?

5    A.   Your ranking.                                              11:51:30

6    Q.   Your ranking.

7    A.   Yeah.   You would have better page rank with more content.

8    Q.   And that's the goal of most websites is to get more and

9    more people to come look at their site so that they could buy

10   whatever is being sold, true?                                   11:51:48

11   A.   Yes, it's true, and Google is very important.

12   Q.   And Google has what are called algorithms and that stuff on

13   how they rank your site?

14   A.   They do, and we knew how to or I knew how to help Backpage

15   do better in SEO.                                               11:52:13

16   Q.   And free ads, even though they are free, that's a way of

17   getting eyeballs to the site; right?

18   A.   Well, it's a way of getting content to the site so that it

19   would be indexed by the search engines.

20   Q.   Does Google aggregate?                                     11:52:47

21          MR. RAPP:   Objection; relevance and foundation.

22          THE COURT:   Sustained as to both.

23   BY MR. FEDER:

24   Q.   Every site aggregates, don't they, at the beginning?

25          MR. RAPP:   Same objection.                              11:53:02

 1           THE COURT:  He can answer, if he knows.

 2           THE WITNESS:  Well, I don't know about every site.  I

 3    can say that some sites do stuff their site with ads from

 4    competitors with the hope that it will be indexed by Google.

 5    BY MR. FEDER:                                                    11:53:47

 6    Q.  Was Backpage taking, in order to optimize the site, were

 7    they taking ads from the New Times?

 8           MR. RAPP:  Objection; relevance.

 9           THE COURT:  Overruled.

10           THE WITNESS:  Yes.  Backpage was originally designed     11:54:06

11    to help the print ads in the papers, so we would import them,

12    but we quickly learned the content is worthless for the most

13    part.  Doesn't come with pictures.

14    BY MR. FEDER:

15    Q.  Were you -- weren't you using the aggregation models that   11:54:40

16    you saw Craigslist and Google using?

17    A.  I don't know about Craigslist's aggregation, so I have no

18    idea, and Google's aggregation is in a separate category.  It's

19    a search engine.  It doesn't take the whole content of the

20    page.  It only shows a portion, and then you got to click it    11:55:12

21    and then you go to that website.  But for us you use the term

22    "aggregation," I refer to it as stealing ads.  We would take

23    the entire ad and put it on the site, so there would be no

24    reason to go to the other site where we got it from.

25    Q.  Mr. Ferrer, in a number of exhibits the names of some       11:56:53

1  people have come up that you have identified as agents or

2  representatives, do you remember that testimony?

3  A.  You know, I'm having difficulty hearing you.

4  Q.  Oh, okay.  Better?

5  A.  Oh, much better.                                          11:57:12

6  Q.  There have been a number of exhibits shown to you where

7  there was some names on there that you have identified as

8  agents or representatives of Backpage; right?

9  A.  Yes.

10  Q.  One of them is Steve Suskin.  Do you remember him?        11:57:33

11  A.  Yes, I do.

12  Q.  He's not an agent or representative of Backpage.  He was a

13  lawyer for Backpage; right?

14  A.  Yes.

15  Q.  He was in-house general counsel; right?                   11:57:45

16  A.  He was a lawyer for Village Voice Media who did some work

17  for Backpage.

18  Q.  And he had an office at least that he could use at 12th

19  Street and Jefferson; right?

20  A.  He did.                                                   11:58:01

21  Q.  And he did a number of things regarding both entities;

22  right?

23          MR. RAPP:  Objection; vague, and the Court's previous

24  ruling.

25          THE COURT:  Sustained as to vague, but Mr. Ferrer can  11:58:13

UNITED STATES DISTRICT COURT

```
 1   answer if he -- rephrase the question.
 2   BY MR. FEDER:
 3   Q.  Sure.  He was cc'd or e-mailed in regard to a number of
 4   actions Backpage was going to do or had done; right?
 5               MR. RAPP:  Objection; vague.                      11:58:37
 6               THE COURT:  Sustained.
 7   BY MR. FEDER:
 8   Q.  What was it that would make you send an e-mail to
 9   Mr. Suskin either directly or as a cc?
10               MR. RAPP:  Objection; relevance.                  11:58:56
11               THE COURT:  Sustained.
12   BY MR. FEDER:
13   Q.  Then there was another person that you've mentioned named
14   Sam Fifer; right?
15   A.  Yes.                                                      11:59:20
16   Q.  Is he an agent or representative or an outside lawyer?
17   A.  He is an outside lawyer.
18   Q.  With a large firm that has its main office in Chicago?
19               MR. RAPP:  Objection; counsel is testifying, and then
20   relevance.                                                    11:59:36
21               MR. FEDER:  I'm cross-examining him with direct
22   questions.
23               THE COURT:  Well, he can answer if he knows.
24               THE WITNESS:  Yes, he's with a large firm.
25   BY MR. FEDER:                                                 11:59:47
```

```
 1   Q.  It used to be Sonnenschein, et cetera, et cetera, and now

 2   it's a large national firm called Dentons; right?

 3            MR. RAPP:  Objection; relevance.

 4            THE COURT:  Sustained.

 5   BY MR. FEDER:                                              12:00:05

 6   Q.  And there was another agent and representative that's on

 7   some of the exhibits and that you've identified in your direct

 8   examination named Elizabeth McDougall; right?

 9   A.  Yes.

10   Q.  And she used to be the lawyer for Craigslist?          12:00:20

11            MR. RAPP:  Objection; relevance.

12            THE COURT:  Sustained.

13   BY MR. FEDER:

14   Q.  She started working at Backpage February of 2012?

15   A.  I believe that's correct, yes.                         12:00:39

16   Q.  And she was to take over the supervision of, among other

17   things, moderation; right?

18            MR. RAPP:  Objection; relevance.

19            THE COURT:  Overruled.  He can answer, if he knows.

20            THE WITNESS:  Well, she had other tasks, but       12:01:00

21   moderation, guiding us on moderation was one of those tasks.

22   BY MR. FEDER:

23   Q.  And she implemented a number of changes to moderation;

24   right?

25   A.  She did.                                               12:01:15
```

```
 1              MR. RAPP:  Objection; relevance.
 2              THE COURT:  Overruled.
 3    BY MR. FEDER:
 4    Q.  And she remained in the employ of Backpage until pretty
 5    much the termination; right?                              12:01:31
 6    A.  Yes.  Yes.
 7    Q.  After the sale in 2015 from some of the folks to my left to
 8    you; right?
 9    A.  Yes, she was still with Backpage.
10    Q.  What about somebody named Mark Sableman?               12:02:23
11              MR. RAPP:  Objection; foundation; vague; relevance.
12              THE COURT:  Sustained.
13    BY MR. FEDER:
14    Q.  Was he one of the agents or representatives that you've
15    referred to?                                              12:02:39
16              MR. RAPP:  Same objection.
17              THE COURT:  He can answer the question if he knows.
18              THE WITNESS:  I vaguely recall him.  I worked closer
19    with Liz McDougall.  I remember e-mails from Sam Fifer, but I
20    don't think I received an e-mail direct from Sableman.     12:03:08
21    BY MR. FEDER:
22    Q.  How about Don Moon, was he an agent and representative of
23    Backpage or a lawyer or both?
24    A.  What was the question again?  Sorry.
25    Q.  What about Don Moon, do you recognize that name?       12:03:26
```

UNITED STATES DISTRICT COURT

1    A.   Don Moon?

2    Q.   Don Moon.

3    A.   Yes.

4    Q.   Have you identified him as a representative of Backpage?

5    A.   He was a Board member of Village Voice Media.          12:03:36

6    Q.   Also a lawyer and former prosecutor in Arizona; right?

7              MR. RAPP:   Objection; relevance.

8              THE COURT:   Sustained.

9    BY MR. FEDER:

10   Q.   He was a lawyer?          12:03:50

11             MR. RAPP:   Same objection.

12             THE COURT:   Sustained.

13             MR. FEDER:   Judge, I'm about to move into another

14   area.

15             THE COURT:   We're going until 12:30.          12:04:17

16             MR. FEDER:   Thanks.

17   BY MR. FEDER:

18   Q.   Mr. Ferrer, how would you characterize your relationship

19   with Scott Spear while you were at Backpage?

20   A.   So while I was with Backpage he was my manager.  He had          12:05:10

21   certain strengths, like detail.  He could lay out the budgets,

22   and he also had some relationships with other alternative

23   newspapers that were very helpful in Backpage selling licenses.

24   Q.   Well, he was -- at one time he began and was the president

25   of the alternative newspaper organization in the United States;          12:05:43

1  right?

2          MR. RAPP:  Objection; relevance.

3          MR. FEDER:  It relates to what he just said.

4          THE WITNESS:  Did you ask me if he was president?

5  BY MR. FEDER:                                           12:05:59

6  Q.  Yes.

7  A.  I don't know that, but that seems plausible.

8  Q.  And you also described him as a micromanager; right?

9  A.  Scott required a lot of details and a plan.

10 Q.  But you knew that his employment was a variety of roles in  12:06:14

11 New Times until 2012 and a variety of roles in Backpage until

12 2015; right?

13 A.  Did he -- so what time frame are -- can we break that into

14 two questions?  I'm sorry.  You're asking about time frames.  I

15 know that his -- he had other tasks.                    12:06:41

16 Q.  Well, when you were at the, that paper in Texas in 1995,

17 '96 until 2004, did you know Mr. Spear?

18 A.  I knew of Mr. Spear.  He was the, like 900 personals expert

19 that we were running in the paper.

20 Q.  He was also all over the country doing various things for  12:07:08

21 all of the newspapers that New Times owned until 2012; right?

22 A.  Well, we were talking about 1996, and I would just say at

23 that time it was above my pay grade.  I don't know what he was

24 doing for the other papers.

25 Q.  Did he ever come to Dallas and did you ever meet him?  12:07:29

1    A.  He did.  He did come to Dallas and we did have meetings.

2    Q.  And somebody that has a lot of jobs has to be a

3    micromanager in order to be able to juggle everything; right?

4            MR. RAPP:  Objection; foundation; vague.

5            THE COURT:  He can answer if he can, in his opinion.          12:07:53

6            THE WITNESS:  Well, I'm familiar with the jobs that he

7    did that would involve me.  Like at that time when he came to

8    meet me in Dallas, he was really focused on trying to get money

9    for links that appeared on the web, and I guess that was a

10   little later.                                                         12:08:19

11   BY MR. FEDER:

12   Q.  That wasn't really my question, Mr. Ferrer.

13   A.  And I forgot.

14   Q.  The simple question about needing to be a micromanager when

15   you have a lot of jobs.  That's kind of a yes or no answer,          12:08:29

16   don't you think?

17   A.  Well, I think, no, if you have a lot of jobs, you don't

18   want to be a micromanager.  You like offload it.  I was

19   surprised.

20   Q.  Okay.  Did you get along with Mr. Spear?                         12:08:41

21   A.  I enjoyed working with Mr. Spear.  There were at times we

22   had some pretty big arguments.  At times I felt like we were a

23   married couple that had arguments.

24   Q.  Well, he was always trying to, not trying, he was always

25   demanding that the Backpage site be cleaned up and run right;       12:09:10

1    right?

2    A.  That's not true.

3    Q.  And he was always telling you, you got to do something, and

4    you thought he was unreasonable; right?

5    A.  What time frame and what context are we talking about?          12:09:26

6          MR. FEDER:  Can we see Exhibit 6212?

7    BY MR. FEDER:

8    Q.  Please take a look at that e-mail of September 13, 2005.

9          THE COURT:  Defense exhibit?

10         MR. FEDER:  It is.                                             12:10:00

11   BY MR. FEDER:

12   Q.  Tell me when you're done.

13         MS. BERTRAND:  Your Honor, what exhibit is this?

14         THE COURT:  I don't know.  Mr. Ferrer knows -- sorry,

15   Mr. Feder knows.                                                    12:10:27

16         MR. FEDER:  I'm sorry.  I didn't hear.

17         THE COURT:  She's asking you what exhibit it is.

18         MR. FEDER:  Oh, I'm sorry.  6212.

19         MS. BERTRAND:  Thank you.

20         THE WITNESS:  I'm sorry, are you waiting on me?               12:11:17

21         MR. FEDER:  I am.

22         THE WITNESS:  I read the document.

23   BY MR. FEDER:

24   Q.  Are you familiar with the ad?

25   A.  With the e-mail?                                                12:11:28

UNITED STATES DISTRICT COURT

```
1    Q.  Yeah.
2    A.  I am familiar with the e-mail, and humor doesn't --
3    Q.  That's a yes or no.
4    A.  I am familiar with it.
5    Q.  Is it from you to Mr. Spear?                          12:11:35
6    A.  Yes.  It's my reply to Mr. Spear trying to be funny.
7    Q.  Oh.
8            MR. FEDER:  Move to admit 6212.
9            MR. RAPP:  No objection.
10           THE COURT:  Yes, it may be admitted.              12:11:55
11           (Exhibit 6212 was admitted.)
12   BY MR. FEDER:
13   Q.  So at the bottom it's relating to this article about
14   Craigslist.  Mr. Spear is going --
15           JUROR 16:  Excuse me, I'm sorry, not hearing.  Sorry.  12:12:07
16           MR. FEDER:  Not hearing?
17           COURTROOM DEPUTY:  That was Juror 16.
18   BY MR. FEDER:
19   Q.  He's telling you to clean up the site this week; right?
20   A.  Yes, he is.                                           12:12:23
21   Q.  And you, comedian that you are, you are going, "It's
22   already clean.  We have no ads saying 'sex for money.'"
23   A.  No, that's not the part where I am trying to be funny.  The
24   part that I am trying to be funny on is about "Hal run the
25   sting for me?"  Hal used to be the president of the New Times,  12:12:40
```

```
1    and I told Spear about how he used to --

2           MR. FEDER:  Relevance; move to strike; beyond the

3    scope of the question.

4           MR. RAPP:  Wait a minute.

5           THE COURT:  Overruled.                              12:12:54

6           THE WITNESS:  Hal Smith used to use massage therapists

7    that gave happy endings that would place ads on Backpage, and

8    they would come to the counter and tell them to stop talking

9    about that, so that's what I'm joking about.  And it's

10   already --                                                 12:13:15

11          MR. FEDER:  Move to strike.

12          THE COURT:  All right.  Mr. Ferrer, you've finished

13   explaining.

14          Now you can ask your next question, Mr. Feder.

15          MR. FEDER:  Move to strike.                         12:13:23

16          MR. RAPP:  I would object to that.

17          THE COURT:  Overruled.  Ask your next question.

18   BY MR. FEDER:

19   Q.  So was your answer, "It's already clean.  We have no ads

20   saying 'sex for money'" true at that time?                 12:13:37

21   A.  At this time we have little or no content.  We're just

22   launching the site.  It's mainly print ads, and the ads are not

23   saying, blow job, $50.  That's what I'm telling him, and that

24   I'm not being funny on.  That I'm telling the truth.  But

25   remember, it's 2005.  We don't hardly have any ads in the site. 12:13:57
```

```
 1    We just launched.
 2    Q.  Your prior -- wasn't your prior testimony that this was a
 3    time when there was overt sex for money ads over the Internet,
 4    including Backpage?
 5    A.  That would pick up in 2006 and '7.  In 2004, we launched in   12:14:11
 6    2004, and then we're adding cities, adding licenses and we're
 7    importing mainly print ads.  So there's not a lot.  And we're
 8    talking about, you know, we're only in a handful of markets, a
 9    handful, not like Backpage today.
10    Q.  Backpage today?                                               12:14:41
11    A.  I mean, not -- I'm sorry.  It is getting close to lunch.
12    Backpage in April of 2000, or I should say March of 2018.
13    Q.  How about Exhibit 20?
14    A.  I'm familiar with this e-mail.
15    Q.  And when you say, "copy Spear so he knows I am being nice,"   12:15:45
16    what does that mean?
17    A.  What that means is that we had partnerships.  Well, we had
18    these -- Minneapolis, we own the paper, and there's an
19    administrator in Minneapolis who is not being helpful in the
20    growth of Backpage because I find out, you know, that he really   12:16:12
21    wanted to sabotage it.  So he only set the ads to expire, like
22    the ads would expire in seven days, but Backpage ads are
23    supposed to run 45 days or longer, and then stay expired.  He
24    would hard delete them.
25           So I'm being nice.  I'm copying Scott saying, you          12:16:33
```

```
 1   know, we should fire this guy, but I'm not -- I'll be nice.  We

 2   are not going to fire him.  Here's his problematic behavior.

 3            MR. FEDER:  Please bring up Exhibit 19.  Wrong one.

 4   Sorry.  551.

 5            THE WITNESS:  I see the e-mail and I am familiar with        12:17:36

 6   it.

 7   BY MR. FEDER:

 8   Q.  From you to Mr. Spear, cc Mr. Suskin --

 9   A.  Yes.

10   Q.  -- in February of '08?                                           12:18:01

11   A.  Yes.

12            MR. FEDER:  Move to admit.

13            THE COURT:  I thought it was already admitted.

14            MR. FEDER:  Sorry.  Okay.

15            THE COURT:  Am I right, Liliana?                             12:18:14

16   BY MR. FEDER:

17   Q.  Did you do these things, Mr. Ferrer, that you indicate in

18   this exhibit?

19   A.  Let's see.

20   Q.  Did you implement them?                                          12:18:23

21   A.  Yes.  Well, hold on a second.  Yes, we did these.

22   Q.  So you, in compliance with the posting rules, nothing that

23   suggested or implied an exchange of sexual favors for money?

24   A.  Yes.

25   Q.  You did that?                                                    12:19:02
```

1    A.  Well, we would do this later.  This is kind of a do-list.

2    Step three was done, but this is the to do-list and we would do

3    that.

4    Q.  Was step one done?

5    A.  Eventually step one was done.                                    12:19:16

6    Q.  Step two, you put some posting rules on there, Terms of Use

7    too, along with the Terms of Use?

8    A.  We did something like that in step two.

9    Q.  And fair to say that you were continually, you meaning

10   Backpage, modifying the posting rules in and Terms of Use to     12:19:42

11   get stricter and stricter over the years?

12   A.  There were modification in the Terms of Use, but I wouldn't

13   describe that as stricter.  That's my opinion, but Scott made

14   those changes.  And then the posting rules, we would eventually

15   remove those.                                                     12:20:15

16   Q.  When was that?

17   A.  Those would be the posting rules on top of the ad posting

18   form, and it's some time after 2012.

19   Q.  When Liz McDougall was in control of moderation?

20   A.  We had to -- we had to remove them because --                 12:20:41

21   Q.  That's just a yes or no answer.

22   A.  Yeah.  When, well, I'm guessing that it's around 2012 we

23   had to remove them because it turned out --

24   Q.  Mr. Ferrer, please just answer my question.

25   A.  Yes.                                                          12:21:00

1   Q.  Did it happen after Liz McDougall took over control of

2   moderation, yes or no?

3   A.  I think so.  I'm not certain around that time line.

4   Q.  She began her work in February of 2012; right?

5   A.  Correct, but I'm basing it on trying to figure out -- there    12:21:19

6   was an impetus that caused us to have to remove them, and I am

7   trying to remember the time to get to the right time, but if I,

8   I would say, I believe it's 2012.

9   Q.  All I asked you for was a yes or no, and you've given it to

10  me.  Okay.  Thank you.                                            12:21:45

11  A.  Okay.

12       MR. FEDER:  Would you bring up 6063?  6-0-6-3.  Let me

13  know when you're ready.

14       THE WITNESS:  Yeah, I am familiar with it.

15  BY MR. FEDER:                                                     12:22:48

16  Q.  This was another instance or an instance where Mr. Spear

17  was very unhappy with what was getting through on the Backpage

18  website; right?

19  A.  Yes.

20       MR. FEDER:  Sorry, move to admit and publish.               12:22:59

21       MR. RAPP:  No objection.

22       THE COURT:  Yes, it may be admitted and published.

23       (Exhibit No. 6063 was admitted.)

24  BY MR. FEDER:

25  Q.  First of all, at the bottom, that's what Mr. Spear wrote;    12:23:15

1  right?

2  A.  Yes.

3  Q.  And then the rest of the e-mail was between you and

4  Mr. Padilla talking about what Mr. Spear had been angry about;

5  right?                                                    12:23:35

6  A.  No, I replied to Mr. Spear; copied Andrew Padilla.

7  Q.  And you say there, "Answer:  This user should be banned for

8  90 days"; right?

9  A.  Yes.

10 Q.  Did you ban them for 90 days?                          12:24:02

11 A.  I can't recall, but that was -- that was the company policy

12 at the time to give them temporary bans.

13 Q.  Did one temporary ban and then another temporary ban turn

14 into a permanent ban, or no?

15 A.  For some egregious users, it could be.                 12:24:26

16 Q.  Or they would just get tired of getting banned on Backpage

17 and go to some other site?

18        MR. RAPP:  Objection; foundation; relevance.

19        THE COURT:  Sustained as to foundation.

20 BY MR. FEDER:                                              12:24:47

21 Q.  You've already testified that there were users, advertisers

22 that were currently banned; right?

23 A.  There were users that were banned.

24 Q.  Was 90 days for the first offense, was that common or was

25 that a policy?                                             12:25:05

1   A.  You know, I don't think it was a hard policy.  I'm

2   suggesting to Mr. Spear that this is what we should do.  This

3   would teach the user a lesson and then they can come back to

4   post.

5   Q.  Where is that in this e-mail?                        12:25:30

6   A.  Well, it's the e-mail sent to Spear, and then I'm writing,

7   "This user should be banned for 90 days the right to use html."

8   What that means is that --

9   Q.  Mr. Ferrer, where does it say you ban him for 90 days and

10  then he can come back?                                   12:25:50

11  A.  Well, that's what would happen on the 91st day.

12  Q.  So it doesn't say that?

13  A.  To me it was common sense.

14  Q.  And you're saying that you didn't make the policy about

15  90 days or whatever time period it was going to be for banning?  12:26:06

16  A.  I am suggesting -- I'll telling -- I'm suggesting this to

17  Mr. Spear.

18  Q.  Is there somewhere on this e-mail or elsewhere that you

19  recall where Mr. Spear had to okay you banning somebody for

20  90 days, or was that your authority?                     12:26:27

21  A.  Well, I am using the word, "This user should." It's a

22  suggestion to Spear on these are the things that we could do.

23  Q.  So your testimony is that Mr. Spear had to authorize that?

24  A.  I sought Mr. Spear's opinion and often he shared it with

25  me.                                                      12:26:56

Q.  And then you controlled it or he controlled it at least as

to banning for 90 days?

A.  Do I control it or does he control it?

Q.  Well, you had a lot of authority to operate Backpage;

right?                                                                    12:27:20

A.  Yes, I did.

Q.  Jim Larkin, Scott Spear and the rest of them, since they

had other things they were doing, they had you, since you knew

about advertising, operating this site; right?

A.  They were keenly interested in Backpage's success, numerous   12:27:34

management meetings, lots of e-mails, and like I said --

Q.  Did that not appear to be a yes or no answer?

A.  It didn't appear to be a yes or no answer.

        THE COURT:  Well, let's -- I think we are all getting

hungry or something at this point, so we'll take our afternoon   12:27:51

lunch recess for 45 minutes.

        Members of the jury, we are on a more expedited lunch,

I guess you would say, and so be prepared to come back in the

courtroom at 1:15 and we can resume, and just remember the

admonition and just enjoy your lunch.                            12:28:11

        Please all rise for the jury.

                    (Jury is not present.)

        THE COURT:  Please be seated.  Let me make one

clarification in case I did not make it clear.

Mr. Panchapakesan, regarding Exhibit 6025, you cannot introduce   12:29:01

1   the Dart case.  To the extent he can, the witness can answer

2   his understanding of what occurred if that comes to be, if he

3   has a recollection, but nothing regarding the case itself can

4   come in.

5          Now --                                              12:29:26

6          MR. LINCENBERG:  Your Honor, to clarify on that, if I

7   may, the Court is not saying we can't reference Sheriff Dart.

8          THE COURT:  Oh, no, and I clarified that yesterday.

9   It's part of the record yesterday.  Now, let me say this:  I'm

10  going to give you a warning regarding any mention of the CDA or  12:29:45

11  230, and if any counsel asks a question about definitions or

12  the meaning of CDA or 230 of this witness, I may begin to issue

13  an Order to Show Cause.

14         There have been two opinions issued by the Court

15  regarding the relevance of Section 230 to this case.  I have   12:30:11

16  admonished counsel numerous times, and I'm beyond the point now

17  of doing so, and so if any counsel blatantly violates the

18  Court's order, brings out the CDA, I may start issuing those

19  orders to show cause.

20         All right.  With that --                             12:30:42

21         MR. LINCENBERG:  Your Honor, can I please have one

22  minute for a point I was trying to raise earlier?  At the

23  beginning of the day Mr. Rapp objected to Mr. Feder using

24  exhibits that were on a list that he got yesterday.  The Court

25  should be aware that throughout the course of the direct       12:30:59

1   examination of Mr. Ferrer there were a number of exhibits that

2   were not on the list that had been earlier provided to the

3   defense.  We didn't raise it with the Court because it happens.

4   We rolled with it.

5   　　　　　And Mr. Rapp, I did mention it informally to Mr. Rapp,    12:31:18

6   and he said, well, they are on the exhibit list, and but I

7   just -- I think that what is sauce for the goose should be

8   sauce for the gander.  And we're working over the weekend.

9   There's always going to be exhibits that counsel are looking at

10  as they are looking over things and adding, and I don't think    12:31:36

11  Mr. Feder should be penalized in that regard if they are on the

12  exhibit list.

13  　　　　　THE COURT:  The difference there, as I understood it,

14  and I read what you said earlier, is you had an opportunity to

15  review those exhibits before they were introduced, and the    12:31:51

16  difference was that you stated on the record earlier that you

17  understood that they had not, and that's the difference.

18  　　　　　So to the extent that they have an opportunity to

19  review an exhibit that you're giving to them at the eleventh

20  hour, they have the opportunity to look at it.    12:32:10

21  　　　　　MR. LINCENBERG:  Who said that --

22  　　　　　THE COURT:  I'm talking, Mr. Lincenberg.  Again, the

23  problem is I don't want to have an argument in front of the

24  jury where we have sidebars.  We have to tiptoe around issues

25  before they are offered for introduction.  I don't want to get    12:32:26

1    into that.  That's not the method that this court employs.  I

2    maximize the use of this jury.

3            To the extent they have not seen the exhibit and they

4    were recently produced, I will give them an opportunity to do

5    that before they are introduced, as I have you.          12:32:44

6            So we're at lunch.

7            COURTROOM DEPUTY:  All rise.

8            (Recess was taken at 12:32 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                          **C E R T I F I C A T E**

4

5           I, HILDA E. LOPEZ, do hereby certify that I am duly

6    appointed and qualified to act as Official Court Reporter for

7    the United States District Court for the District of Arizona.

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 27th day of

14   September, 2023.

15

16

17                              s/Hilda E. Lopez_____
                                HILDA E. LOPEZ, RMR, FCRR
18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT