UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,        )
                                 )
                Plaintiff,       )   NO. 2:18-cr-00422-DJH
v.                               )
                                 )   Phoenix, Arizona
Michael Lacey, et al.,           )   September 27, 2023
                                 )   12:45 p.m.
                Defendants.      )
_____ )


BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL DAY 13
P.M. SESSION


Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                       A P P E A R A N C E S

 2   For the Plaintiff:
         UNITED STATES ATTORNEY'S OFFICE
 3       By:  Kevin M. Rapp, Esq.
              Andrew C. Stone, Esq.
 4            Peter Shawn Kozinets, Esq.
              Margaret Wu Perlmeter, Esq.
 5       40 North Central Avenue, Suite 1800
         Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
         LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8       By:  Paul J. Cambria, Jr. Esq.
         42 Delaware Avenue, Suite 120
 9       Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
         DAVID EISENBERG, PLC
11       By:  David S. Eisenberg, Esq.
         3550 North Central Avenue, Suite 1155
12       Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
         KESSLER LAW OFFICE
14       By:  Eric Walter Kessler, Esq.
         6720 North Scottsdale Road, Suite 210
15       Scottsdale, Arizona 85253
         - and -
16       FEDER LAW OFFICE, PA
         By:  Bruce S. Feder, Esq.
17       2930 East Camelback Road, Suite 160
         Phoenix, Arizona 85016
18

19   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20       By: Gary S. Lincenberg, Esq.
              Gopi K. Panchapakesan, Esq.
21       1875 Century Park E, Suite 2300
         Los Angeles, California 90067
22

23   For the Defendant Joye Vaught:
         JOY BERTRAND, ESQ, LLC
24       By:  Joy Malby Bertrand, Esq.
         P.O. Box 2734
25       Scottsdale, Arizona 85252-2734
```

UNITED STATES DISTRICT COURT

1                            **I N D E X**

2

3   **GOVERNMENT WITNESS:**                                        **PAGE**

4   <u>CARL FERRER</u>
    Continued Cross-Examination by Mr. Lincenberg..............

5

6   Sidebar discussion.......................................96

7

8                            **EXHIBITS**

9   **EXHIBIT**                                          **RECEIVED**

10   <u>NO.</u>     <u>DESCRIPTION</u>

11   6189    Classified Solutions Ltd. eMerchantPay         75
            Merchant Application Form
12            DEFENSE 024742-024749

13   6194    01.26.16 Email from M. Gage to          81
            C. Ferrer re: "PostFastr.com"
14            DOJ-BP-0002885636-0002885637

15   474     Email from Ferrer to Hansen re American    111
            Express, 07/22/2015, DOJ-BP-0005064739-
16            DOJ-BP-0005064740

17

18

19

20

21

22

23

24

25

1                    *P R O C E E D I N G S*

2    *(Whereupon the proceedings began at 12:34 p.m.)*

3              COURTROOM DEPUTY:  All rise, court is now in

4    session.

5              THE COURT:  All right, please be seated.  We can

6    have Mr. Ferrer back on the witness stand, and we'll retrieve

7    our jury.

8              All rise for the jury.

9              (Jury in at 12:48 p.m.)

10             THE COURT:  Please be seated.  The record will

11   reflect the presence of the jury.  Mr. Ferrer is on the

12   witness stand.  Mr. Lincenberg, you may continue.

13             MR. LINCENBERG:  Thank you, Your Honor.

14             We were in the middle of talking about Exhibit 6243.

15   If we could publish the organizational chart again.

16                    CONTINUED CROSS-EXAMINATION

17   BY MR. LINCENBERG:

18   Q.   Mr. Ferrer, we discussed the 2011 Village Voice Media

19   holding corporate structure.  We blew up the middle part,

20   which is where Backpage is located.

21        Let's move to the left-hand side.  If we can blow that

22   up, and does this appear to be where Mr. Lacey -- the

23   organizational chart involving Mr. Lacey on the left-hand

24   side?

25             MR. RAPP:  Objection as to foundation.

```
  1              THE COURT:  Sustained.
  2  BY MR. LINCENBERG:
  3  Q.  Well, sir, you -- do you recognize this as an
  4  organizational chart involving Village Voice Media holdings
  5  2011?
  6  A.  I do recognize it as an organizational chart for Village
  7  Voice.
  8  Q.  And let me ask you this:  Did you understand that
  9  Mr. Lacey supervised somebody named Christine Brennan, an
 10  Executive Managing Editor, involving the newspapers?
 11  A.  Yes, I do.
 12  Q.  And that he would also have editors in News Weekly,
 13  publishers reporting to him?  Was that your general
 14  understanding?
 15  A.  Yes, it is.
 16  Q.  Okay.  So now let's look at the right-hand side, if we
 17  can, of this.  And do you know who Mr. Mars was?
 18  A.  Yes.
 19  Q.  Okay.  And Mr. Goroski, Chief Information Officer?
 20  A.  Yes.
 21  Q.  And Diana Fraser?
 22  A.  Yes.
 23  Q.  And then business managers, did you understand that the
 24  seventeen newspapers that Village Voice holding company owned
 25  at the time had business managers?  Did you have that
```

 1  understanding?

 2  A.   Yes.

 3  Q.   And did you understand that these were the folks who

 4  reported up to Mr. Brunst at that time?

12:50p 5          MR. RAPP:  It's still unclear as to what the

 6  foundation is.

 7              THE COURT:  I think he asked in reference to 2011?

 8              MR. LINCENBERG:  Yes.

 9              MR. RAPP:  That's what he's saying.  He's just

12:51p 10 saying that.  There's no foundation.  He doesn't even

11  recognize this.  So what's the foundation?

12              THE COURT:  Yes, so lay some more foundation,

13  please.

14  BY MR. LINCENBERG:

12:51p 15 Q.   Well, Mr. Ferrer, I believe I'm focusing on the Village

16  Voice Media holdings organizational chart in 2011 and asking

17  you did you understand this to be the organizational chart in

18  Village Voice Media holdings in 2011?

19  A.   I don't believe I've seen this organizational chart.

12:51p 20 However, I understand the personnel.  I know the personnel and

21  I know some of their job descriptions.

22  Q.   Okay, thank you.

23              MR. LINCENBERG:  We can take 6243 down now.

24  BY MR. LINCENBERG:

12:51p 25 Q.   And just to give you a time period let's just stick with

CARL FERRER - CONT'D CROSS EXAM BY MR. LINCENBERG          7

```
 1   2011.  Did Backpage have ledgers -- let me back up.
 2        Do you know what an accounting ledger is?
 3   A.   You would use P & L statements, is that what you mean?
 4   Q.   Well, do you understand -- within Backpage -- did
12:52p 5   somebody in Backpage record transactions -- record financial
 6   transactions in the books?
 7   A.   Did somebody at Backpage record transactions in 2011?
 8   Q.   Yes.
 9   A.   Yes, the accountant.
12:52p 10  Q.   Okay.  And when you say "the accountant," you're not
11   referring to Mr. Brunst, are you?
12   A.   No.
13   Q.   Now, in 2013 Backpage hired somebody named Nathan
14   Kopecky, correct?
12:53p 15  A.   Correct.
16   Q.   And was Nathan Kopecky's title when he was hired Chief
17   Financial Officer of Backpage?
18   A.   Yes, it was.
19   Q.   All right.  And where did Mr. Kopecky come from, do you
12:53p 20  recall?
21   A.   He came from a recruiter that Jed Brunst knew.
22   Q.   Okay.  And then you interviewed him?
23   A.   Not exclusively.
24   Q.   Right.  Mr. Brunst also interviewed him, correct?
12:53p 25  A.   Yes.
```

1  Q.   My question is simply did you interview him?

2  A.   Yes.

3  Q.   All right.  And did he then serve as the Chief Financial

4  Officer of Backpage until Mr. Gage was -- later became CFO?

12:53p  5  A.   Yes, he did.

6  Q.   All right.  And did Mr. Gage become the CFO of Backpage

7  after you bought Backpage in 2015?

8  A.   Yes, he did.

9  Q.   All right.  And was Mr. Gage somebody who you had had --

12:54p  10  was referred to you by Trent Voigt?

11  A.   Yes.

12  Q.   And just to remind the jurors, I think we saw his name in

13  some e-mails, but was Trent Voigt somebody who worked for a

14  payment processor call Jetpay?

12:54p  15  A.   Yes.

16  Q.   All right.  And did you then hire Mr. Gage as the CFO of

17  Backpage post 2015 sale?

18  A.   It was a decision to hire between Jed Brunst and myself.

19  Q.   Okay.  By adding that Mr. Brunst was involved in the

12:54p  20  decision, are you saying that you did or did not hire him for

21  Backpage?

22  A.   I'm saying there's no way I could higher a CFO

23  independently without Jed Brunst's approval.

24  Q.   Okay.  So Mr. Brunst approved your hiring of Mr. Gage; is

12:55p  25  that correct?

1   A.   Yes.

2   Q.   All right.  So you hired Mr. Gage, correct?

3   A.   The company hired Mr. Gage.

4   Q.   Okay.  And Mr. Gage came out of the payment processing

12:55p   5   world; is that right?

6   A.   Yes.

7   Q.   He had some background, expertise in that area, correct,

8   your understanding?

9   A.   Yes.

12:55p   10   Q.   All right.  And that was something that was important to

11   you at the time, to have somebody who could help secure

12   payment processing for Backpage; is that right?

13   A.   It was important for the company, yes.

14   Q.   Okay.  Now, earlier I believe you confirmed that

12:55p   15   Mr. Brunst never had a Backpage e-mail address to your

16   knowledge; is that correct?

17   A.   No, he did not.

18   Q.   And was it your understanding that he also never had an

19   e-mail address for any of the other seventeen newspapers that

12:56p   20   were owned by the holding company?

21   A.   I think he did at one time.

22   Q.   At what time?

23   A.   Oh, let's say e-mail address -- what time?

24   Q.   Was it --

12:56p   25   A.   Probably 2000 -- before the Village Voice Media merge he

 1   used a New Times e-mail address.

 2   Q.   Well, that was a New Times holding company that he worked

 3   for, not the *Phoenix New Times* newspaper, correct?

 4   A.   Okay.

12:56p 5   Q.   Okay.  To your knowledge, did he ever have a e-mail

 6   address from the *San Francisco Weekly*, for example?

 7   A.   Not to my knowledge.

 8   Q.   All right.  Or the -- there was a Cleveland newspaper, I

 9   believe, that was owned by the holding company.  To your

12:56p 10   knowledge, did he have an e-mail address from the Cleveland

11   newspaper?

12   A.   No, he did not --

13   Q.   All right.

14   A.   -- to my knowledge.

12:57p 15   Q.   Let's talk about budgets, et cetera, budget meetings that

16   you testified to.  So, first of all, I believe your testimony

17   was that they would happen once a year; is that right?

18   A.   The main budget.

19   Q.   The annual budget?

12:57p 20   A.   The annual budget once a year.

21   Q.   Let's talk about the annual budget meeting.  That would

22   happen once a year; is that right?

23   A.   Yes.

24   Q.   And was that generally near the end of the year?

12:57p 25   A.   Correct.

```
 1    Q.   Okay.  And would those meetings -- they would take place
 2    -- was it a -- on one day, is that -- is that right?
 3    A.   Yes.
 4    Q.   Okay.  And I believe your testimony was that -- talking
12:57p  5    generally -- we'll focus on some particular years, but talking
 6    generally your general testimony is that Mr. Brunst
 7    participated in those annual budget meetings, correct?
 8    A.   Yes.
 9    Q.   Okay.  And was it your understanding that he also
12:58p 10    participated in annual budget meetings near the end of the
11    year for all eighteen companies that were owned by the holding
12    company?
13    A.   What year is this?
14    Q.   Well, let's pick the year 2008.  Is that your
12:58p 15    understanding?
16    A.   In 2008 that is my understanding.
17    Q.   Okay.  So in the month of December your understanding --
18    I understand you were not in those meetings, but your
19    understanding was that Mr. Brunst was participating in some
12:58p 20    eighteen different budget meetings for different businesses
21    owned by the holding company, fair?
22    A.   Well, I -- I don't know.
23    Q.   Okay.
24    A.   He might have offloaded some of that work to the
12:58p 25    controller.
```

1    Q.    Okay.  That would be speculation if that happened?

2    A.    That's right, so I don't know.

3    Q.    Just asking about your understanding.

4          Is that your understanding?

12:59p  5    A.    It's likely.

6    Q.    All right.  And let's focus on 2007 since that was the

7    subject of one of the exhibits.

8          So let's focus on 2007, and when I say 2007 I'm talking

9    about a meeting which ostensibly took place in December of

12:59p 10    2007 for a 2008 budget.  Fair enough?

11    A.    Yes.

12    Q.    And I believe your testimony was that you would prepare,

13    with the help of others, budgets and revenue projections in

14    anticipation of that meeting; is that right?

12:59p 15    A.    No, Scott Spear would prepare the budget.

16    Q.    Okay.  Wasn't your testimony that Mr. Spear would help

17    with that?

18    A.    He would lead it.

19    Q.    Okay.

01:00p 20    A.    I -- I would -- I would help.

21    Q.    All right.  So you helped Mr. Spear prepare budget and

22    revenue projections for the 2007 meeting as best you recall?

23    A.    Yes.

24    Q.    All right. And Mr. Larkin, I believe you said, would be

01:00p 25    present at budget meetings; is that right?

1   A.   Yes, he would.

2   Q.   All right.  And Mr. Larkin was the CEO of the holding

3   company for which we just looked at the organizational chart.

4        Backpage reported up to him, right?

01:00p  5   A.   Yes, he was the CEO of the holding company.

6   Q.   All right.  And as a general description of Mr. Larkin's

7   job duties, would it be fair to say that he oversaw overall

8   business operations as the CEO?

9   A.   It's my understanding.

01:01p 10   Q.   All right.  And, again, let's focus on 2007 with regard

11   to marketing.  Mr. Spear, as best you could recall, was

12   present at annual budget meetings?

13   A.   Yes, he was.

14   Q.   All right.  And he -- his job, I think you said, was

01:01p 15   overseeing marketing; is that right?

16   A.   I'm sorry, Mr. Spear?

17   Q.   Yes.  What was -- how would you describe his role there?

18   A.   He's the supervisor of -- of the entire Backpage

19   operation and I report to him.

01:01p 20   Q.   Okay.  And as far as you recall, Mr. Brunst was present

21   at this meeting that may have taken place sixteen years ago,

22   correct?

23   A.   Mr. Brunst was always in attendance for the budget

24   meetings.

01:02p 25   Q.   All right.  And so the answer's "yes" as far as you

1  recall?

2  A.   Yes.

3  Q.   All right.  And Mr. Brunst's role would be to look at the

4  overall projected expenses versus revenue that was projected;

01:02p  5  is that fair?

6  A.   What year are we?

7  Q.   2007.

8  A.   At that time looking at expenses and revenue, yes.

9  Q.   Okay.  And when I say looking at expenses and revenue --

01:02p 10  or when you say "looking at expenses and revenue," it really

11  was looking at the overall numbers, correct?

12  A.   It's looking at the overall numbers and how a sale

13  strategy will achieve those numbers.

14  Q.   And in terms of any line items, there were occasions when

01:02p 15  Mr. Brunst might raise a question about, let's say, executive

16  salaries, correct?

17  A.   That would be one item.

18  Q.   Okay.  Do you recall any instance in which Mr. Brunst

19  ever questioned any other budget line item?

01:03p 20      And I'm asking for a specific recall.  Do you

21  specifically recall any instance in which Mr. Brunst ever

22  questioned any budget line item other than persons' salaries?

23  A.   Other than persons' salaries?  So what line item would

24  there be without salaries?  Usually that's the main

01:03p 25  discussion.

 1   Q.   Okay.  And did -- in preparing for your testimony, did

 2   you review any e-mails in which you're asking Mr. Brunst to

 3   review any particular line item?

 4   A.   No, that's above my pay grade.  That would be Scott

01:04p 5   Spear.

 6   Q.   All right.  So since it's above your pay grade, I'm going

 7   to interpret your answer as being "no."

 8   A.   And the question was:  Did I e-mail Jed Brunst directly

 9   with concerns about the budget?

01:04p 10   Q.   No, no, no.  The question was:  Did you ever have an

11   e-mail with Mr. Brunst about any particular line item?  And

12   your answer was to talk about what Scott Spear may or may not

13   have done, and I'm asking if that answer means that your

14   answer is "no"?

01:04p 15   A.   Well, I -- I don't know.  I'm -- I just don't know.

16   Q.   Okay.  You don't know, but as we sit here today having

17   reviewed a lot of exhibits that the Government wanted to show

18   you in preparing, do you recall ever seeing anything like that

19   in any e-mail that the Government showed you, "yes" or "no"?

01:05p 20   A.   There are e-mails, but they're not focused on the budget.

21   They're different -- different items about the business --

22   Q.   Of course.

23   A.   -- like when we were selling the business --

24   Q.   And we'll -- we're gonna cover the sale.  Let's focus on

01:05p 25   the question, not veer off into some other topic.  Okay?

```
 1        All right.  Now, with regard to compliance department

 2   budgets or add moderation if that's easier for you -- if

 3   that's a term that's easier for you to focus on, did you ever

 4   seek advice from Mr. Brunst regarding the budget for the

 5   moderation department?  Did you ever seek his advice on that?

 6   A.   For the budget, specific to the budget, I can't recall.

 7   Q.   Fair enough.  Let me ask you a couple questions about

 8   Mr. Moon.  He came up in your testimony.

 9        Mr. Moon you described as a board member of the holding

10   company, correct?

11   A.   That was my understanding.

12   Q.   All right.  And just to put some time frame on this, was

13   this beginning around 2012 or so?

14   A.   When I first met Don Moon or --

15   Q.   When he got on the board.

16   A.   I don't -- I thought he'd been on the board much longer.

17   I don't know.

18   Q.   All right.  Over the years did you ever -- let me start

19   general and then we'll get specific.

20        Did you ever have discussions with Mr. Moon about the

21   business of Backpage?

22   A.   Generally?

23   Q.   I'm asking you generally.  We're gonna get more specific

24   in a minute.

25   A.   Yes.
```

01:05p  5
01:06p 10
01:06p 15
01:06p 20
01:07p 25

```
 1   Q.   All right.  And was that primarily in the 2012 onward

 2   time frame?

 3   A.   I believe so.

 4   Q.   All right.  And in those conversations with Mr. Moon do

 5   you recall talking to Mr. Moon about the fact that Mr. Brunst

 6   didn't really know or understand the business well?

 7            MR. RAPP:  Objection to the extent it calls for --

 8   the question itself calls for hearsay.

 9            MR. LINCENBERG:  This is not offered for the truth.

10            MR. RAPP:  Well, it can't be offered for any other

11   reason.

12            THE COURT:  Sustained.

13   BY MR. LINCENBERG:

14   Q.   Sir, did you -- did you have discussions with anybody

15   about the fact that when it came to business operations of

16   Backpage, that Mr. Brunst did not know or understand that

17   business very well?

18            MR. RAPP:  Objection, foundation and hearsay.

19            THE COURT:  Sustained.

20   BY MR. LINCENBERG:

21   Q.   Did Mr. Moon ever say to you that in his view, in

22   connection with these business discussions, that Mr. Brunst

23   didn't understand the business operations well?

24            MR. RAPP:  Objection, the question itself is

25   hearsay.  Move to strike it.
```

01:07p  5
01:07p 10
01:08p 20
01:08p 25

 1        MR. LINCENBERG:  This is not calling for the truth

 2   of the matter, Your Honor.

 3        THE COURT:  It's sustained.

 4        MR. RAPP:  To strike it, Judge?

01:08p  5        THE COURT:  Yes, the question will be stricken and

 6   the jury will disregard.

 7        MR. LINCENBERG:  All right.  Let's turn to Exhibit

 8   23 in evidence, and if we can start by -- we can just publish

 9   the first page for the moment.

01:09p 10   BY MR. LINCENBERG:

11   Q.   Okay.  So we're looking at a document entitled 2008

12   Budget and Business Plan For Backpage Overview.

13        Is that correct?

14   A.   Yes, it is.

01:09p 15   Q.   And when you were asked who authored it, I believe part

16   of your answer was that Mr. Spear was the main author; is that

17   right?

18   A.   I'm looking at Page 1 and I can tell you that Mr. Spear

19   wrote this.  I -- I -- I didn't write it.

01:09p 20   Q.   Well, did you contribute to it?

21   A.   It's possible.

22   Q.   Did you testify two weeks ago -- did my mic go off?

23        Did you testify two weeks ago that you contributed to

24   this document?

01:10p 25   A.   Yes, I would contribute reports and information --

UNITED STATES DISTRICT COURT

1    Q.    Okay.

2    A.    -- to go into the document.

3    Q.    And did you testify that Jess Adams contributed to this?

4    A.    Yeah, I'm not exactly sure what date Jess Adams is

01:10p  5    working, but the Backpage accountants are contributing.

6    Q.    All right.  Did you testify that you got some data for

7    this document from Mr. Hyer and Mr. Padilla?

8    A.    This is 2008?

9    Q.    Yes.

01:10p 10    A.    Yes, I assume so.

11    Q.    All right.  And as you testified, those are the people

12    you recall contributing to preparing this document; is that

13    fair?

14    A.    Yes.

01:10p 15    Q.    All right.  And was the -- this would have been used in

16    preparation for a meeting with some of the owners; is that

17    right?

18    A.    This is the annual budget meeting in which Jim Larkin and

19    Jed Brunst need to approve the budget for 2008.

01:11p 20    Q.    All right.  So the answer's "yes"?

21    A.    Yes.

22    Q.    Okay.  And Mr. Larkin was the CEO, correct?

23    A.    Yes, he was.

24    Q.    All right.  He was the person who you would have been --

01:11p 25    who would have been overseeing any discussion of the business

1  operations as the CEO; is that right?

2  A.   Yeah -- well, what was the question again?

3       I'm sorry, I was reading this document.

4  Q.   Yeah.  As the CEO -- fair to say that discussion about

01:11p  5  the business operations would have been directed to the CEO of

6  the holding company in connection with this meeting?

7  A.   I always thought we were directing it to both.

8  Q.   Okay.  With regard to issues like we talked about earlier

9  about expenses, projected revenues, that's something that you

01:12p 10  recall Mr. Brunst would be looking at, correct?

11  A.   Mr. Brunst would look at expenses, but I have to tell you

12  he also commented --

13  Q.   Well, you don't have to tell me.  You can just answer my

14  question and then volunteer whatever you want on redirect,

01:12p 15  okay?

16  A.   May I ask --

17  Q.   The question is:  Would he be reviewing expenses and

18  forecasts?

19  A.   May I answer the question?

01:12p 20  Q.   That question.

21           THE COURT:  Okay, stop.  Don't speak over one

22  another, please, for purposes of our court reporter.  It's

23  very difficult for her to do that when you're talking over one

24  another.  Simply pause, let him answer if he can.  Mr. Ferrer

01:12p 25  will do the same, let you ask the next question.  Just don't

 1    talk over one another.

 2            MR. LINCENBERG:  Okay.

 3            THE COURT:  You may proceed.

 4            MR. LINCENBERG:  All right.

01:13p  5    BY MR. LINCENBERG:

 6    Q.   Now, where did this 2000 -- with regard to this meeting

 7    in December 2007, do you recall anything particular -- look at

 8    me please, sir.  I'm not asking about the document for the

 9    moment.

01:13p 10    A.   Okay.

11    Q.   Do you recall -- do you recall any piece of conversation

12    that took place in this meeting that apparently took place

13    sixteen years ago?

14    A.   I cannot -- I remember conversations, but I can't tie

01:13p 15    them to specific years for this specific meeting.

16    Q.   Fair enough, and I'm not trying to test you here.

17          This is sixteen years ago, but just so the jury

18    understands, your testimony that you're giving in connection

19    with this is basically reviewing the document and then trying

01:14p 20    to reconstruct what might have taken place in a meeting; is

21    that fair?

22    A.   Well, no, it's not fair.

23    Q.   All right.  Well, let me ask you this:  Do you remember,

24    for example, where you were seated during this meeting in

01:14p 25    December of 2007?

1   A.   Well, this is -- this would have been December of 2007?

2   Q.   Yeah, do you remember where you were seated?

3   A.   No.

4   Q.   Do you remember if anybody was present by telephone?

01:14p  5        Do you remember if anybody was present by telephone in

6   this meeting in December of 2007?

7   A.   I don't believe there's -- I've ever had a budget meeting

8   where someone only attended by telephone.

9   Q.   Do you remember whether or not you handed Exhibit 23 to

01:14p  10  somebody at the meeting or perhaps e-mailed it to them ahead

11  of time?  Do you remember that?

12  A.   I believe that we did e-mail, but also handed it out at

13  the meeting.

14  Q.   And when you say you believe, fair to say you're just

01:15p  15  thinking about maybe what you generally did but really have no

16  specific memory about this meeting?

17  A.   No, it's protocol to, you know, e-mail it in advance and

18  then hand it out at the meeting.  I just wasn't sure if I

19  handed it out or Jess Adams did.

01:15p  20  Q.   Okay.  You're testifying now about what you remember the

21  protocol being, but not really what was done on December 20th

22  of 2007, correct?

23  A.   I -- I -- I don't understand that question because this

24  is -- we have a budget.  We print out the budget.  We hand it.

01:16p  25  We have Scott's -- or we have Scott Spear, myself, Jess Adams,

```
 1  Jim Larkin, Jed Brunst and we go through the budget and we try
 2  to get their approval.  That's -- that's the process.
 3  Q.   And I'm not debating with you what your protocol or
 4  process was.  I'm asking if you have any memory of this
 5  particular meeting.  That's all I'm asking you.
 6  A.   There's nothing eventful that I remember --
 7  Q.   Okay.
 8  A.   -- in this meeting.
 9  Q.   Now, when the prosecutor asked you about this meeting on
10  September 13th you testified, quote, "We were all excited."
11       Remember that testimony from two weeks ago?
12  A.   And what year?
13  Q.   This -- with regard to this 2007 meeting about the 2008
14  budget.  Do you recall that testimony, sir?
15  A.   And you're saying that I said I was excited about the
16  budget?
17  Q.   Your testimony was, quote, "We were all excited."
18       Do you recall -- first of all, if you can just look at me
19  for a moment.
20  A.   Yeah.
21  Q.   Do you recall testifying to that?
22  A.   I've testified a lot.  I -- I don't recall.
23  Q.   So then just say you don't recall.
24  A.   Okay.
25            THE COURT:  I'm sorry, was there an answer?
```

01:16p  5
01:16p 10
01:17p 15
01:17p 20
01:17p 25

1          MR. LINCENBERG:  I believe there was.

2          THE WITNESS:  I said, "I don't recall."

3          THE COURT:  Okay, thank you.

4  BY MR. LINCENBERG:

**01:17p**  5  Q.   So as you sit here today on September 27th, your best

6  testimony is you have no recollection about whether people at

7  this meeting were all excited, fair?

8     Just asking about.

9  A.   You know, it's not fair because, actually, the best thing

**01:18p** 10  the company had going for it was backpage.com.  So every year

11  was exciting because the company was growing --

12          MR. LINCENBERG:  Your Honor --

13          THE WITNESS:  -- substantially.

14          MR. LINCENBERG:  -- I move to strike the answer as

**01:18p** 15  non-responsive.

16          THE COURT:  And the answer will be stricken as

17  non-responsive.  I think you can reask your question and if

18  you can answer it "yes" or "no" or "I don't know" or however,

19  but listen to the question.  Answer the question if you can

**01:18p** 20  answer it.

21          THE WITNESS:  Okay.

22  BY MR. LINCENBERG:

23  Q.   Let me ask you this, sir:  Do you recall anything that

24  Mr. Brunst said in this December 2007 meeting as you sit here

**01:19p** 25  today?

1    A.   No, I cannot.

2    Q.   Okay.  Do you recall any reaction -- do you recall him,

3    for example, saying, "Yippy, I'm all excited," or jumping up

4    and down?  Any reaction -- do you recall any reaction of

01:19p 5    excitement from this meeting?

6    A.   I -- I cannot.

7    Q.   Okay.  And in -- you were -- in your 30 interviews with

8    the Government, did you ever make the statement to Mr. Rapp

9    that the people at this meeting were all excited?

01:19p 10   A.   I -- I may have.  I'm describing the mood because the

11   company was growing.

12   Q.   So your testimony is that you may have stated that to

13   Mr. Rapp?

14   A.   It's -- yes, it's very likely.

01:20p 15   Q.   Okay.  And if it's very likely, let me break it down.

16        After April of -- I believe it was established that the

17   last time that agents wrote down what you said in terms of

18   what was provided to the defense counsel, that that was April

19   of 2020.

01:20p 20        Is it your memory that you said this to Government

21   counsel after April of 2020?

22   A.   No, I don't recall saying that --

23   Q.   Okay.

24   A.   -- but. . .

01:20p 25   Q.   Let me ask you this:  In the past three-plus years since

1   April of 2020 I believe you indicated your best estimate was

2   that you maybe had 30 interviews?

3   A.   I -- that's what I had said.  It was many is what I'm

4   comfortable testifying to.

01:21p  5   Q.   And you reviewed a lot of documents with the Government

6   in those post April 2020 interviews; is that fair?

7   A.   Yes.

8   Q.   You provided them new information regarding your memory

9   of documents that you were reviewing, for example, fair?

01:21p 10   A.   New information?

11   Q.   Yeah, you'd give them answers.  They'd show you documents

12   they hadn't showed you in earlier meetings and you'd provide

13   answers, right?

14   A.   I would -- yes.

01:21p 15   Q.   Okay.

16   A.   That I would do.

17   Q.   And did Government counsel ever show you notes or

18   typewritten interviews from those 30 or so interviews that

19   took place after April 2020?

01:21p 20        MR. RAPP:  Objection, this is a compound question.

21        THE COURT:  Sustained.

22   BY MR. LINCENBERG:

23   Q.   Did you ever see any memorandum of interview for a

24   meeting that took place between you, Mr. Rapp and his

01:22p 25   colleagues after April of 2020 where it was recorded what you

1   told them?

2   A.   I -- I'm not sure about all the dates.

3   Q.   When you say "all the dates," any meeting after April

4   2020?

01:22p   5   A.   I might be mistaken, but I don't believe I saw any

6   written notes after April 2020.

7   Q.   Okay.  So if you would have said this to the Government

8   during an interview after April 2020, they would have never --

9   they never ran it by you to confirm whether you said that or

01:22p   10   not; is that right?

11   A.   What are we saying that I said?

12   Q.   Well, we were focusing for the moment on this testimony

13   that "we were all excited," whether that was ever said in any

14   interview; and right now I'm focusing to see if it was said in

01:23p   15   any interview that we never got a report of.

16   A.   Okay, what was the question?

17   Q.   Did you ever -- that you never -- you were never shown

18   any notes of statements by you for statements you made to the

19   prosecutors or statements you made after April of 2020,

01:23p   20   correct?

21   A.    I've answered that, yes.

22   Q.   All right.  Getting back to Exhibit 23, let's go to the

23   bottom of Page 1 and the top of Page 2.

24       Okay, so let's just focus for a moment in this document.

01:24p   25   It says, "In May in New York we launched a paid rentals

 1  section following Craigslists' entry into this paid arena a

 2  few months prior."  Do you see that?

 3  A.   I do.

 4  Q.   And then you see where it says, "While our actual revenue

01:24p  5  did not meet our original projections, the initiative has

 6  built significant revenue..."  Let's pause there.

 7       Now, was that statement accurate?

 8  A.   That's what it says, but in comparison to revenue in

 9  adult it was not that significant.

01:24p 10  Q.   Well, I believe your testimony on direct examination was

11  that none of the areas other than adult were ever significant

12  at all, correct?

13  A.   They were -- correct.

14  Q.   All right.  So fair to say that in your view, then, this

01:25p 15  is a false statement?

16  A.   It's -- I wouldn't call it false.  I would say that it's

17  hopeful, hopeful that maybe we could compete with Craigslist

18  in a non-adult category.

19  Q.   So when the statement says the initiative, quote, "...has

01:25p 20  built significant revenue..." your interpretation of that is

21  that this is hopeful as opposed to what has been done?

22  A.   It is and I can explain.

23  Q.   I'm just asking if that's your interpretation of what's

24  in this report that you presented to the audience of

01:25p 25  Mr. Larkin and Mr. Brunst?

```
        1  A.   Well, I -- I need to explain the context.

        2  Q.   No, you don't need to explain the context.  You can do

        3  that later.  I'm asking you the question of whether or not

        4  your interpretation of "has built" is hopeful?

01:26p  5  A.   Yes, I would describe it as hopeful.

        6  Q.   Okay, all right.  And so in presenting this to Mr. Larkin

        7  and Mr. Brunst you're saying you were not attempting to lie in

        8  this statement?

        9  A.   I didn't write this.

01:26p 10  Q.   Well, you presented it, right?  You helped prepare it?

       11  You reviewed it beforehand, right?

       12  A.   I've got Scott Spear as a co-presenter.

       13  Q.   Okay.  So in response to my question your answer is just

       14  "I didn't write this," fair?

01:26p 15  A.   I'm a -- state it --

       16  Q.   Is that your response?

       17  A.   What --

       18        MR. LINCENBERG:  I'll withdraw and move on, Your

       19  Honor.

01:27p 20  BY MR. LINCENBERG:

       21  Q.   Let's look at Page 11, analysis of expenses.  So maybe

       22  let's zoom in on this part here where it's "Total Proposed

       23  Expense Increase" year over year.  Do you see that?

       24  A.   I do.

01:27p 25  Q.   All right.  And to your understanding, is that sort of --
```

1  is that the type of number that would be the focus of the

2  ownership that is reviewing the budget?

3  A.    That would be one number.

4  Q.    Okay.

01:27p  5  A.    There are others.

6  Q.    All right.  Let's go to Page 15 and I'm gonna run through

7  seriatim Pages 15 through 21.  Maybe Page 16?  Okay, yeah,

8  let's go back to Page 15 for a moment.

9        So this is a section dealing with "Premium Position

01:28p  10  Sponsorship," and on the bottom it says examples of the

11  Premium Position Sponsorship.  Do you see that?

12  A.    I do.

13  Q.    And what did you understand Premium Position Sponsorship

14  to mean?

01:28p  15  A.    It was a product we were trying to build for the papers

16  so that they could sell a position.

17  Q.    Okay.  So then if we then move to Page 16, we're now

18  seeing some examples of Premium Position Sponsorship and these

19  are samples of -- relating to marketing work, for example,

01:28p  20  right?

21  A.    This is a real screenshot.  We did sell that ad as a

22  premium sponsor.

23  Q.    Okay.  And I know it's hard to read this but, for

24  example, this is dealing with cabinets and wood bedrooms and

01:29p  25  furniture and the like; is that right?

1  A.    Well, those are the two sponsor ads on top.

2  Q.    Okay.  And let's look to the next page and blow that up a

3  little bit.  This seems to also deal with furniture as

4  examples of the Premium Position Sponsorship program; is that

01:29p  5  right?

6  A.    No, it's not right.

7  Q.    Okay.  Let's go to the next page, and this is also a

8  sample page involving furniture, correct?

9  A.    This is the -- it's not a sample page.  It's a real ad

01:30p 10  that we -- that we created for this customer, and this is the

11  ad page that you would see when you click the sponsor ad.

12  Q.    Okay.  And this real ad is an example that is included in

13  the annual budget presentation that you're making to the CEO

14  and CFO of the holding company in talking about a Premium

01:30p 15  Position Sponsorship program that you're doing at Backpage,

16  right?

17  A.    Correct.

18  Q.    All right.  So let's look at the next one, maybe try to

19  blow this up.  You know, it's hard for me to read this at all,

01:30p 20  but I think that I can read "lingerie," for example.

21        Do you see that where I underlined?

22  A.    I do see that word.

23  Q.    Okay.  And is this another example of a program -- of a

24  ad that was run in your Premium Position Sponsorship program

01:31p 25  that does not involve escort services?

A.    Was this included in the budget?

Q.    Yeah, this was page -- I think we're up to Page 19.

A.    Yeah, it's -- it's kind a hard for me to read, but I
think it is another example.

01:31p  Q.    All right.  And let's just quickly run through the last
two.  The next one, "lingerie," do you see that?

A.    I do.

Q.    All right.  And let's just run to the last one, if we can
blow that up.  Boy, I have a hard time reading this, but you
01:32p  recall that these examples of ads that have been used as part
of the Premium Position Sponsorship that you were putting in
the proposal -- the 2008 budget proposal for Mr. Larkin did
not involve ads for prostitution?

A.    Agreed.

01:32p  Q.    All right.  And just to show you that's the last one,
let's go to the next page.  I think it moves on to the next
topic.

        All right.  Now, in this 2007 time period -- so just
before, let's focus on 2006.  Do you recall that that was when
01:33p  the New Times holding company bought the Village Voice?

A.    Yes.

Q.    Okay.  And I don't expect you to remember the exact
numbers, but do you recall that being approximately a 125
million dollar transaction?

01:33p  A.    I was not privy to those numbers.

```
 1  Q.   Okay.  And were you aware that in connection with that
 2  large transaction that Mr. Brunst was very busy working with
 3  the bankers and the lawyers in connection with the accountants
 4  in connection with that transaction?
```
01:33p 5  A.   I don't know.
```
 6  Q.   All right.  And do you recall, also, that not long after
 7  that there were transactions where New Times sold some of the
 8  newspapers -- four newspapers?
 9            MR. RAPP:  Objection, foundation.
```
01:34p 10           THE COURT:  Sustained.  Lay some foundation.
```
11            MR. LINCENBERG:  Will do, Your Honor.
12  BY MR. LINCENBERG:
13  Q.   Do you know whether or not New Times ever sold any of its
14  newspapers?
```
01:34p 15  A.   I think they did.
```
16  Q.   All right.  And do you know or recall -- we're going back
17  many years, but do you recall that one such transaction before
18  the rest of them were sold was a sale of about four
19  newspapers?
```
01:34p 20  A.   I -- I don't remember four.  I remember two.
```
21  Q.   Okay.  Was it your understanding that part of
22  Mr. Brunst's role was to be heavily engaged in transactions
23  involving the sales of newspapers?
24  A.   I don't know.  I really wasn't involved or I didn't sit
```
01:35p 25  in on any meetings.  I don't know.

```
 1   Q.   Okay.  But was it your understanding that that was

 2   consuming a lot of his time in that time period, if you know?

 3             MR. RAPP:  Objection, asked and answered.

 4             THE COURT:  Sustained.

 5   BY MR. LINCENBERG:

 6   Q.   And do you recall when the San Francisco Weekly paper had

 7   -- went bankrupt?

 8             MR. RAPP:  Objection, relevance.

 9             THE COURT:  Well, I'll overrule the objection and

10   we'll see.

11             THE WITNESS:  Do you have a time frame?

12             MR. LINCENBERG:  In the -- one moment.  2010.

13             THE WITNESS:  I guess I wasn't involved and I can't

14   recall it.

15   BY MR. LINCENBERG:

16   Q.   Forget about the date.  Do you recall at all Mr. Brunst

17   being consumed by involvement in the San Francisco Weekly

18   bankruptcy?

19             MR. RAPP:  Objection, foundation.

20             THE COURT:  Sustained.

21   BY MR. LINCENBERG:

22   Q.   Now, you testified to a couple of Google Analytics

23   reports.  Do you recall that?

24   A.   Yes.

25   Q.   Okay.  And I believe that some e-mails showed that one of
```

01:35p  5
01:35p  10
01:36p  15
01:36p  20
01:36p  25

1   the persons who received e-mails that contained Google

2   Analytics reports at least at some point was Mr. Brunst.

3        Do you recall that?

4   A.   You're asking if Mr. Brunst received any Google

01:37p  5   Analytics --

6   Q.   Right.

7   A.   -- reports by --

8   Q.   I can show you the e-mails, but I believe that was your

9   testimony.

01:37p 10   A.   Okay, yes.

11   Q.   And in connection with any Google Analytics reports that

12   you sent to Mr. Brunst, let me ask you the following:  Did you

13   ever receive an e-mail response from Mr. Brunst talking about

14   any of the content of those reports?

01:37p 15   A.   By e-mail only?

16   Q.   Starting with e-mail.

17   A.   I don't recall.

18   Q.   Okay.  Did you ever e-mail Mr. Brunst asking him to

19   analyze any of those reports?

01:37p 20   A.   No.

21   Q.   All right.  Did you ever receive any e-mail from

22   Mr. Brunst providing analysis to you regarding any Google

23   Analytics report?

24   A.   What time frame?

01:38p 25   Q.   At any time frame.  Did you ever receive any e-mail from

1  my client, Jed Brunst, providing you any analysis of any

2  portion of these Google Analytics reports?

3  A.   Well, there were some e-mails but I -- right around the

4  attempted first sale of Backpage that involved Google

01:38p  5  Analytics reports and traffic.

6  Q.   We know that you sent the reports at different times to

7  various people, including Mr. Brunst.  You can focus on my

8  question.  My question is:  Did you ever receive any e-mail

9  from Mr. Brunst providing an analysis of any of the Google

01:39p 10  Analytics reports?

11  A.   No, but he did request analysis.

12        MR. LINCENBERG:  Your Honor, I move to strike the

13  portion after "no."

14        THE COURT:  All right.  The portion after "no" will

01:39p 15  be stricken and the jury will disregard.

16  BY MR. LINCENBERG:

17  Q.   Now, these Google Analytics reports, I believe you

18  testified that for a large time frame they were provided for

19  free, correct?

01:39p 20  A.   Yes.

21  Q.   All right.  And by the way, do the reports say anything

22  about the content of a given ad?

23  A.   The Google Analytics reports?

24  Q.   Right.  Do they, for example -- do the reports say,

01:39p 25  "Here's an analysis of ads that you have where prostitutes are

       1   advertising their services," anything like that?

       2   A.   With the Google -- what are you saying that the Google

       3   Analytics reports would say?

       4   Q.   Repeat the question.  The question is:  Did the Google

01:40p 5   Analytics reports ever provide any breakdown, for example,

       6   which said, "Here's an analysis of prostitution -- prostitutes

       7   who are seeking to advertise on Backpage"?

       8   A.   That's not something that Google Analytics reports would

       9   do.

01:40p 10  Q.   Okay.  Did anyone at Google ever say to you in providing

      11   these reports that Google was facilitating prostitution?

      12          MR. RAPP:  Objection.  Relevance, foundation, and

      13   then the question itself is hearsay.

      14          MR. LINCENBERG:  I'm asking --

01:40p 15          THE COURT:  Sustained.

      16          MR. LINCENBERG:  Okay.  Let me ask if we could

      17   publish Exhibit 1925, which is in evidence.  It's a December

      18   4th, 2013, e-mail and there's an e-mail chain.

      19   BY MR. LINCENBERG:

01:41p 20  Q.   On the bottom we see there's an e-mail from you, which I

      21   think leaks onto the next page, and then there is an e-mail in

      22   the middle and then an e-mail from you and then an e-mail from

      23   Mr. Brunst and it relates to the subject line of "Google

      24   Analytics premium."  Do you see that?

01:41p 25  A.   Yes.

1    Q.   All right.  And I believe that within this chain -- and

2    maybe we can just focus in here -- there's a discussion about

3    a charge that Google wants to charge.  It talks about

4    different tiers which could run up to $330,000 a year.

01:42p  5         Do you see that?

6    A.   That's correct.

7    Q.   All right.  And because -- and you were considering

8    whether or not to spend that money, correct?

9    A.   I think I'm seeking approval --

01:42p 10   Q.   Okay.

11   A.   -- from Brunst to spend that money.

12   Q.   Right.  So you were -- did you want to spend that money?

13        MR. LINCENBERG:  We can go back to the full document

14   so Mr. Ferrer can see it.

01:42p 15        THE WITNESS:  I didn't think we would have any

16   choice.

17   BY MR. LINCENBERG:

18   Q.   Okay.  The -- and Mr. Brunst at some point on the top of

19   the e-mail chain responds by asking you what's the benefit.

01:43p 20        Do you see that?

21   A.   I -- I see what he wrote to me.

22   Q.   Okay.  And was there ever any discussion with Mr. Brunst

23   in your e-mails back and forth about ads for prostitution?

24   A.   In this e-mail?

01:43p 25   Q.   Right.

1    A.    No.

2    Q.    All right.  And I take it you didn't find it unusual that

3    somebody reviewing budgets would ask for a cost benefit

4    analysis on a potential $330,000 expenditure, did you?

01:43p  5    A.    I thought it was usual to ask how an expenditure would

6    increase revenue.

7    Q.    Okay.

8          MR. LINCENBERG:  And let's look at Exhibit 1151a,

9    which is in evidence, and I ask that that be published.  I

01:44p 10    think there's an e-mail -- let's go to 1151, which I think is

11    the e-mail that attaches 1151a.

12    BY MR. LINCENBERG:

13    Q.    Okay.  So this is an e-mail -- e-mail exchange between

14    you and Jess Adams; is that right?

01:44p 15    A.    Yes, it is.

16    Q.    All right.  And this is fourteen years ago, correct?

17    A.    Yes.

18    Q.    And it notes that there's a list of referring sites in

19    the Google Analytics report that was attached to it, right?

01:44p 20    A.    Yes.

21    Q.    And did you ever discuss with Mr. Brunst that list of

22    referring sites?

23    A.    Yes, I did.

24    Q.    When did you discuss with Mr. Brunst that list of

01:45p 25    referring sites?

     1    A.   I discussed this with Mr. Brunst in a meeting with Jim

     2    Larkin in a conference room where I pulled up these reports

     3    and I described the sites that were referring to Backpage.

     4    Q.   So that was what meeting?  What year did you do that?

01:45p  5    A.   Somewhere 2007, 2008, 2009.  It was right around that

     6    time.

     7    Q.   Okay.  So you don't recall what meeting that was?

     8    A.   No, I can -- I recall the meeting.  I just can't recall

     9    the exact time 'cuz we were in Building B --

01:45p 10    Q.   Okay.

    11    A.   -- conference room and I pulled it up on the screen and

    12    we're just amazed by how much traffic was being referred to us

    13    by The Erotic Review.

    14    Q.   So this testimony that you've just given today, in the

01:46p 15    ten or twelve interviews that you had with Mr. Rapp and his

    16    colleagues between April of 2018 and April of 2020, did you

    17    ever say that during those interviews?

    18         Seems like pretty significant testimony.  Did you ever

    19    say that during those interviews?

01:46p 20    A.   I -- I'm certain that I talked about The Erotic Review

    21    and my disclosure to my supervisors about The Erotic Review's

    22    success.

    23    Q.   Well, your supervisor was Mr. Spear, right?

    24    A.   I always felt I had three bosses.

01:46p 25    Q.   Oh, okay.  You told the Government that your supervisor

```
         1   was Mr. Spear?

         2   A.   Actually, I misspoke.  Four bosses.  The owners are the

         3   boss.

         4   Q.   So you told the Government that your supervisor was

01:46p   5   Mr. Spear, correct?  Correct?

         6   A.   Yeah, he's my direct supervisor.

         7   Q.   And we saw an organizational chart where Mr. Larkin is --

         8   was the supervisor over Mr. Spear, correct?

         9   A.   Correct.

01:47p  10   Q.   Okay.  But you're now telling the Members of the Jury

        11   that Mr. Brunst was always one of your supervisors or at least

        12   that's what you always felt; is that your testimony?

        13   A.   I never -- I didn't say that.

        14   Q.   Okay.  And this -- getting back to my question, whether

01:47p  15   in any interview with the Government, 30-plus interviews, did

        16   you ever tell the Government that you discussed the source of

        17   referrals with Mr. Brunst?

        18   A.   Yes.

        19   Q.   Okay.  And was that in one of the interviews that was

01:47p  20   typed up that you reviewed?

        21   A.   I don't know if it's there.

        22   Q.   Okay.

        23          MR. LINCENBERG:  Thanks, Christina.  We can take

        24   that down.

01:48p  25   BY MR. LINCENBERG:
```

```
 1  Q.   Let's talk a little bit more about The Erotic Review.   So
 2  I believe your testimony was that you met with Mr. Elms around
 3  2007 to negotiate a business deal.
 4       Was that the right time frame?
 5  A.   I think so.
 6  Q.   All right.  Mr. Brunst was not at that meeting, correct?
 7  A.   He was not.
 8  Q.   And I believe we already confirmed, I won't harp on it,
 9  that Mr. Brunst was not a part of any conversations or
10  meetings or e-mails Mr. Elms; is that correct?
11            MR. RAPP:  Objection, asked and answered.
12            THE COURT:  Sustained.
13  BY MR. LINCENBERG:
14  Q.   And the Government showed you several e-mails in their
15  direct examination and at least with regard to the e-mails
16  that the Government picked to show you, which were, I'll note
17  for the record, Exhibit 570, 837 and 1172, those were e-mails
18  between you and Mr. Elms.  Mr. Brunst was not copied on any of
19  those, correct?
20            MR. RAPP:  Same objection.
21            MR. LINCENBERG:  Specifically talking about e-mails.
22            THE COURT:  Well, I think the problem here,
23  Mr. Lincenberg, is you're asking about exhibits that are not
24  before this witness when you're asking the question and you're
25  noting for the record what those exhibits are.
```

01:48p  5
01:48p 10
01:48p 15
01:49p 20
01:49p 25

```
 1            So I'm going to strike the entirety of the question
 2   and you can start over.
 3            MR. LINCENBERG:   Okay, I was just trying to expedite
 4   it.  If we can put Government Exhibit 570 in evidence on the
01:49p  5  screen.
 6   BY MR. LINCENBERG:
 7   Q.   570 was a 2009 e-mail between you and Mr. Elms, correct?
 8   A.   Correct.
 9   Q.   Mr. Brunst is not a part of that e-mail exchange,
01:49p 10  correct?
11   A.   He is not.
12   Q.   We can go to Exhibit 837, and just go to the top.  It's
13   cut off a little bit but Mr. Elms -- Mr. Brunst is not part of
14   that e-mail exchange, correct?
01:50p 15  A.   Correct.
16   Q.   And Exhibit 1172.  Mr. Brunst is not part of this e-mail
17   exchange, correct?
18   A.   He's -- he's not copied on this e-mail.
19   Q.   All right.  Let's take a look at Exhibits 567 and 567a.
01:50p 20  So let's start with 567.
21            So this is an invoice -- it says from you to Jess Adams
22   and here is David's January invoice for TER banner.
23            Okay, and if we can now move to 567a, the attachment, and
24   it contains an invoice that was for $4,000.  Do you see that?
01:51p 25  A.   I do.
```

1   Q.   All right.  And the invoices, by the way, don't say

2   anything about adult or anything.  It's just "ad placement,"

3   correct?

4   A.   Correct.

01:51p  5   Q.   All right.  And in connection with this invoice you

6   testified in response to questions from Mr. Rapp that what you

7   then do, "I have to have this invoice and then do a request

8   for payment for Scott Spear and Jed Brunst to approve."

9        Did you review this document with the Government prior to

01:51p 10   your testimony?

11   A.   I believe so.

12   Q.   And was your testimony on September 13th the first time

13   that you ever told the Government that you went to Jed Brunst

14   for approval of this invoice?

01:52p 15   A.   I don't know.

16   Q.   Do you recall as you sit here today ever making that

17   statement to anybody prior to your testimony in this courtroom

18   that you went to Jed Brunst for approval of this invoice?

19   A.   It's -- it's likely that I did state that this invoice

01:52p 20   would have to be paid.  It has to get approved by Scott Spear

21   and Jed Brunst.

22   Q.   It's likely that you stated that to the Government?

23   A.   Yes.

24   Q.   So if you did state that to the Government, it's either

01:52p 25   in one of the written memorandum of interview received or it

 1   wasn't documented by the Government?  One of those two

 2   alternatives, correct?

 3   A.   Yes.

 4          MR. LINCENBERG:  Okay, we can take this down.

01:53p  5   BY MR. LINCENBERG:

 6   Q.   Now, you testified -- in connection with financial

 7   institutions you testified about -- I think you used the term

 8   "KYC" at one point, right?

 9   A.   Correct.

01:53p 10   Q.   And KYC, just to remind the jurors, stands for "know your

11   customer," correct?

12   A.   Yes.

13   Q.   And your understanding is that you can't get a bank

14   account without having to go through a KYC process, correct?

01:54p 15   A.   Correct.

16   Q.   And your understanding is that in going through that

17   process the banks might have reputational concerns.  I believe

18   you used the term "reputational" several times, correct?

19   A.   Correct.

01:54p 20   Q.   And, frankly, banks might also have anti-money laundering

21   obligations, right?

22   A.   Yes.

23   Q.   Right.  You understood that banks have AML departments,

24   correct?

01:54p 25   A.   I believe they do.

 1  Q.   And that they're required to under the Bank Secrecy Act;

 2  is that your understanding?

 3  A.   I've heard of the act.   I guess I don't have a full

 4  understanding of that act, though.

01:54p  5  Q.   Okay.   And when you fill out a contract -- let's focus

 6  for a moment on a contract for payment processing -- and spend

 7  months getting contracts vetted by the acquiring bank, by

 8  their attorneys, you're not disguising your transaction, are

 9  you?

01:55p 10  A.   What -- what time frame?

11  Q.   Well, did you ever, ever, disguise your transactions,

12  your applications for -- to acquiring banks or processors?

13  A.   Process --

14       MR. RAPP:  Objection, foundation.

01:55p 15       THE COURT:  Sustained.

16  BY MR. LINCENBERG:

17  Q.   Well, sir, you -- you yourself prepared some 30

18  applications over -- over the course of the years to different

19  payment processors, correct?

01:55p 20  A.   I believe that's correct.

21  Q.   And in preparing those applications you knew that they

22  were gonna -- you understood that they were going to be

23  vetted, correct?

24       MR. RAPP:  Same objection as to foundation.  When?

01:56p 25       MR. LINCENBERG:  At all times.

1        THE COURT:  With respect to the --

2        MR. LINCENBERG:  The 30.

3        THE COURT:  -- the 30?

4        MR. LINCENBERG:  Yes.

01:56p  5        THE COURT:  Well, maybe for clarity of the record

6   you can lay some foundation as to the time frame that you're

7   talking about.

8        MR. LINCENBERG:  Okay.

9   BY MR. LINCENBERG:

01:56p 10   Q.   Over what time period did you submit applications to --

11   for payment processing?

12   A.   So I submitted and signed applications for payment

13   processing after the transaction in April of 2015.

14   Q.   You're saying you never submitted them prior to April of

01:56p 15   2015?

16   A.   I didn't -- I couldn't sign them prior to 2015.

17   Q.   Didn't ask if you signed them, asked if you prepared --

18   asked if you were -- let's use the word "involved" in

19   preparing to submit them prior to April of 2015?

01:57p 20   A.   Yes, I was involved in preparing.

21   Q.   You couldn't sign them.  What you're getting at is that

22   the signature -- it needed a signature of -- I think you used

23   the term "UBO," ultimate business owner, correct?

24   A.   Correct.

01:57p 25   Q.   So even if you were preparing an application for payment

```
     1  processing, it would need a signature from Larkin, Lacey,

     2  Spear or Brunst, correct?

     3  A.   Correct.

     4  Q.   All right.  And there were times when Mr. Brunst signed

01:57p  5  those applications that you were submitting on the -- in the

     6  area that required a signature from a UBO, an ultimate

     7  business owner, correct?

     8  A.   At what time frame?

     9  Q.   Well, at any time frame whether prior to 2015 or after 20

01:57p 10  -- let's -- let's break it down.

    11  A.   He wouldn't sign them after 2015.

    12  Q.   So prior to 2015?

    13  A.   Yes.

    14  Q.   Okay.  And in preparing those applications you wanted to

01:58p 15  make sure you were telling the truth in those applications,

    16  correct?

    17  A.   We wanted to position us in the most favorable light, but

    18  I wouldn't describe those applications as being transparent.

    19          MR. LINCENBERG:  Your Honor, for the witness' eyes

01:58p 20  only I'd like to pull up on the screen -- not publish, but

    21  pull up on the screen Exhibit GL-CF-04, which is the May 10th,

    22  2018, "Memorandum of Interview" at Paragraph 132.

    23          THE COURT:  Okay.  You're going to have to wait for

    24  Liliana to distribute the exhibit.

01:59p 25          MR. LINCENBERG:  Yes.
```

```
 1              THE COURT:  Did you put that slash on the screen?
 2    There's a hash mark on the screen.
 3              MR. LINCENBERG:  I'm sorry, I didn't hear you, Your
 4    Honor.
```
01:59p  5              THE COURT:  There's a hash mark on the screen.
```
 6              MR. LINCENBERG:  Oh, got it, okay.
 7              MR. LINCENBERG:  Has Your Honor had a chance to
 8    review Exhibit 132?
 9              THE COURT:  As best I can.  It's a multiple-page
```
02:00p 10    document.
```
11              MR. LINCENBERG:  Is the Court focused on the part on
12    the screen, which is the part we're using, which is Paragraph
13    132?
14              THE COURT:  Yes, I've seen it.
```
02:00p 15              MR. LINCENBERG:  Your Honor, I'd like to read that
```
16    top portion, those three sentences in 132 for purposes of
17    impeachment.
18              THE COURT:  Was there a question before the witness?
19              MR. LINCENBERG:  Yes, the question was --
```
02:00p 20    Mr. Ferrer's testimony was that he was deceptive in these
```
21    applications.
22              MR. RAPP:  I don't think that's accurate.
23              Objection, improper impeachment.
24              MR. LINCENBERG:  It is accurate.
```
02:01p 25              THE COURT:  Well, I'm going to sustain because I

1    don't have that recollection.

2              MR. LINCENBERG:  Let me -- let me then go back to

3    it, your Honor.

4              THE COURT:  Should we go back into the record and

02:01p  5    ask the court reporter to state what his answer is?

6              MR. LINCENBERG:  We can do that, that'd be great.

7              THE COURT:  Is it the question immediately preceding

8    this introduction of the exhibit?

9              MR. LINCENBERG:  I think so.

02:02p 10              If the court reporter can read the question and

11    answer.

12              (Whereupon the question and answer were read back.)

13              THE COURT:  I think it's consistent for the

14    proffer --

02:02p 15              MR. LINCENBERG:  Okay.

16              THE COURT:  -- and I'm going to sustain the

17    objection.

18              MR. LINCENBERG:  Let me get back in to it.

19    BY MR. LINCENBERG:

02:02p 20    Q.   Sir, in preparing these applications is it true that you

21    knew that you could not lie on the applications?

22    A.   We could not have an obvious lie on the applications.

23    Q.   So your testimony is you could have a lie as long as it

24    wasn't obvious?

02:02p 25    A.   We did -- was that a question?

```
 1   Q.   So is your answer that you could lie on these
 2   applications as long as it wasn't obvious?
 3        Is that your testimony?
 4   A.   No.
 5              MR. RAPP:  Well, object.  That wasn't his testimony.
 6              MR. LINCENBERG:  Your Honor, that was his testimony;
 7   but I'd ask the Court to admonish Mr. Rapp he can make his
 8   objection without coaching.
 9              THE COURT:  Overruled as to that.  It wasn't
10   coaching, but let me look at the prior objection.
11              I think we can move on.  I'll overrule the
12   objection, but move on.
13              MR. LINCENBERG:  Do we have an answer?
14              THE REPORTER:  "No."
15              THE COURT:  He stated "no."
16   BY MR. LINCENBERG:
17   Q.   And, sir, is it true that you took care to not provide
18   information that was false?
19   A.   There's just a lot of applications, and I'm having to
20   think about them.  This is at what time frame?
21   Q.   It's in connection with what you told the Government
22   about merchant applications and agreements between 2010 and
23   2018 that you signed and submitted some 30 applications.
24   A.   And your question was?
25   Q.   Is it true that you took care not to provide information
```

02:02p   5
02:03p  10
02:03p  15
02:04p  20
02:04p  25

1    that was false?

2    A.   I'd have to look at each individual application.

3    Q.   Did you tell the Government that you'd have to look at

4    each individual application before telling them that you took

02:04p  5    care to not provide information that was false?

6         THE WITNESS:  I don't really understand that

7    question.

8         MR. LINCENBERG:  Your Honor, this is straightforward

9    impeachment.

02:05p 10         THE COURT:  Well, no.  You stated in your question

11   testimony that he did not give.

12        MR. LINCENBERG:  I stated exactly what he stated.

13        Sir, let me -- let me see if I can address the

14   Court's concern.

02:05p 15   BY MR. LINCENBERG:

16   Q.   In discussing merchant applications and agreements, you

17   were telling the Government in your interviews that Backpage

18   submitted some 30 applications for merchant accounts, correct?

19   A.   Correct.

02:05p 20   Q.   And you noted that many were turned down because of what

21   you called "death by Google search," correct?

22   A.   Correct.

23   Q.   And by that you meant that in performing their "know your

24   customer" functions, banks could easily go on Google and see

02:06p 25   all sorts of publicity involving Backpage that was negative,

1  correct?

2  A.    Correct.

3  Q.    And in discussing the applications, did you advise the

4  Government that they knew that they couldn't lie on the

02:06p  5  applications?

6  A.    I -- I may have said that.

7  Q.    Did you -- and was that a true statement?

8  A.    We couldn't lie, but that doesn't mean we didn't

9  misdirect.

02:06p  10  Q.    We're gonna get to the misdirection in a moment.  So I'm

11  not going to move to strike the part that's non-responsive.

12  We're going to get to that; but you knew you couldn't lie,

13  correct?

14  A.    We knew we couldn't lie.

02:07p  15  Q.    Right.

16  A.    We knew that you shouldn't lie on these bank

17  applications, correct.

18  Q.    And you knew that you -- you took care to provide -- to

19  not provide information that was false, correct?

02:07p  20  A.    "Took care," I wouldn't describe it as that.

21  Q.    Okay.

22         MR. LINCENBERG:  Well, Your Honor, I'd like to

23  impeach the witnesses with the statement -- the first phrase

24  of the second sentence of Paragraph 132.  We're gonna get to

02:07p  25  the third part of it.  Right now I'd like to impeach the

 1    witness while it's timely with this.

 2              THE COURT:  Show me the exhibit again.

 3              MR. LINCENBERG:  Can we put for Court's eyes, for

 4    counsels' eyes.

02:08p 5         THE COURT:  You may ask the question.

 6              MR. LINCENBERG:  What I'd like to do is read in the

 7    statement.  He's already --

 8              THE COURT:  You can ask it -- ask him a question.

 9    BY MR. LINCENBERG:

02:08p 10   Q.   Sir, you stated to the Government in this interview of

11    May 10th, 2018, first, that you knew you couldn't lie on the

12    applications, we covered that; and, second, you took care that

13    you were not providing information that was false.

14         I'm going to get to the next sentences.  Focus on what

02:08p 15   I'm asking you first, and then I'll get to the next sentence.

16         Is that true?

17   A.   What was the first question?

18   Q.   Did you tell the Government that you took care that you

19    were not providing information that was false?

02:08p 20   A.   Yes.

21   Q.   All right.  Now, let's get to -- you also told the

22    Government that you -- that you presented information in the

23    most favorable light to your application, correct?

24              MR. LINCENBERG:  We can take this down now.

02:09p 25              THE WITNESS:  Correct.

```
  1  BY MR. LINCENBERG:

  2  Q.   All right.  And so, for example, if I'm applying for a

  3  job and my résumé says that I have great grades, but I don't

  4  tell them that I got a "D" in accounting, but it's accurate

  5  that I had great grades, that's making sure I'm accurate but

  6  also not highlighting other aspects of my résumé.

  7       Fair analogy?

  8           MR. RAPP:  Objection, there's more to this

  9  paragraph.

 10           MR. LINCENBERG:  Oh, I'm gonna get to it all -- or

 11  you can get to it.

 12           THE COURT:  Well, is there an objection to the prior

 13  question?

 14           MR. RAPP:  Yes, improper impeachment is the

 15  objection.

 16           MR. LINCENBERG:  Right now we're not impeaching,

 17  we're asking a question.

 18           MR. RAPP:  Well, I don't know what we're doing by

 19  reading this.

 20           MR. LINCENBERG:  We're asking a question.

 21           THE COURT:  Well, his question starts out if I'm

 22  applying for a job and my résumé says X, Y and Z, that's the

 23  question before the witness.

 24           So perhaps the court reporter can re-read the

 25  question that was asked, and if Mr. Ferrer can answer he can
```

02:09p  5
02:09p 10
02:09p 15
02:09p 20
02:10p 25

```
 1  try to do that.

 2  BY MR. LINCENBERG:

 3  Q.   Fair analogy?

 4           THE COURT:  Well, I asked the court reporter to

 5  re-read --

 6           MR. LINCENBERG:  Oh, I'm sorry.

 7           THE COURT:  -- your question.

 8           MR. LINCENBERG:  Thank you.

 9           (Whereupon the question was read back.)

10           THE WITNESS:  It seems like you're presenting grades

11  in a favorable light, yes.

12           MR. LINCENBERG:  Okay.

13  BY MR. LINCENBERG:

14  Q.   Now, we've also previously stated that there was no

15  evidence of fraudulent merchant bank applications, correct?

16  A.   Is it possible to see this?

17  Q.   Yes.

18  A.   Because you seem --

19  Q.   I will show you that, but let me ask you if you remember

20  stating it?

21  A.   I don't know if I used those exact words.

22  Q.   Okay.  I'm going to show you the question -- the prior

23  statement in a moment, but let me ask:  Is it true as you sit

24  here today and the testimony to this jury under oath that you

25  stated in the past that there was no evidence of fraudulent
```

02:10p  5
02:10p 10
02:11p 15
02:11p 20
02:11p 25

1  merchant bank applications?

2  A.   What time frame?  Does it have a time frame?  Ever?

3  Q.   You made the statement in May of 2017.

4  A.   Well, I guess I need to see the context of it.  I'm --

02:12p  5  I'm -- I don't remember.

6  Q.   Okay.

7       MR. LINCENBERG:  Your Honor, I'd like to place for

8  the witness' eyes GL-CF-37.  There's an e-mail at 36 which

9  relates to 37, but I think we can focus on 37.

02:13p 10      MR. RAPP:  Could we have an identification of this

11  document?

12      MR. LINCENBERG:  These are Mr. Ferrer's comments in

13  response to allegations made against him by the California

14  Attorney General, and I'm looking for the comment -- let me --

02:13p 15  let's keep this document handy because I don't see it on this

16  page.  I may have the page wrong so let's come back to this in

17  a moment.

18      THE COURT:  You can ask one more question and we'll

19  take our afternoon break.

02:14p 20  BY MR. LINCENBERG:

21  Q.   Sir, did you also make the statement that a money

22  laundering charge is really an attempt to legislate by

23  prosecution via payment service providers which is the weak

24  link the Government pressures to cut off unpopular speech?

02:14p 25      MR. RAPP:  I'm going to object to this.  I have no

 1  idea what this document is, and he has to identify it.

 2          THE COURT:  That's sustained.

 3          MR. LINCENBERG:  We can go through that.  I don't

 4  think the Court wants me to go through it on the record, but

02:14p  5  we can or we can do it at the break.

 6          THE COURT:  Well, let's go ahead and take our

 7  afternoon break.  We've been at it for, by my count, an hour

 8  and a half.  We'll take our usual 20-minute break and aim to

 9  end at 4:30.

02:15p 10          Members of the jury, again, just remember the

11  admonishment and we will stand in recess.

12          Please all rise for the jury.

13          (Jury out 2:15 p.m.)

14          THE COURT:  Mr. Ferrer, you may step down.

02:15p 15          Please be seated.  I guess, Mr. Lincenberg, just a

16  note when you ask him whether he made a prior statement, it's

17  helpful if you give some context so this witness can try to

18  recall.  I think he's trying to do his best to do that, and

19  when you put forward a statement that he made that may not

02:16p 20  have to do with any testimony that he's given, I think it's

21  entirely helpful that you do that.  So just be cognizant.

22          All right, we'll stand in recess.

23          MR. LINCENBERG:  Your Honor, it might be helpful if

24  I can address the question Mr. Rapp asked.

02:16p 25          THE COURT:  You can discuss whatever it is you wish

```
 1    to discuss out of my presence.

 2              MR. LINCENBERG:  Okay.

 3              COURTROOM DEPUTY:  All rise.

 4              (Recess taken at 2:16 p.m.)

02:38p  5        COURTROOM DEPUTY:  All rise, court is now in

 6    session.

 7              (Back on the record at 2:38 p.m.)

 8              THE COURT:  Please be seated.

 9              We have the witness back on the stand.

02:38p 10        MR. RAPP:  Judge, can we just be heard on this last

11    effort to --

12              THE COURT:  Can you turn your microphone on?

13              MR. RAPP:  I'm sorry.  I think it's on, I just was

14    not standing close enough.

02:38p 15        So this -- the exhibit -- and I apologize, I don't

16    -- for the record, I don't know what the exhibit number is --

17              MR. LINCENBERG:  For the record, it's GL-CF-37 and

18    the attached e-mail is 36.

19              THE COURT:  There's an attached e-mail?

02:39p 20        MR. LINCENBERG:  36 is just an e-mail of 37.

21              MR. RAPP:  Yeah.  So here's -- here's our objections

22    to the use of this, Judge:  If you look at this document --

23    first of all, this is an unsigned document.  There's nowhere

24    anywhere on this document that Carl Ferrer has signed this

02:39p 25    document.  That's the least of the problems, though.
```

02:39p

 1          It is specific answers -- if you look the way this

 2    is laid out, this is specific answers, I guess, imputed to

 3    Carl Ferrer in response to the specific allegations in the

 4    California indictment, and so for that reason alone it is

 5    irrelevant.

 6          He is commenting on the specifics of the allegations

 7    in a state criminal proceeding involving different statutes

 8    and, more importantly, different elements and different

 9    specified unlawful acts as a predicate for money laundering.

02:40p  10    That's -- that should be enough to prevent the defense from

11    using these comments to attempt to impeach Mr. Ferrer.

12          The second problem with this is this is a document

13    that was prepared in conjunction with the attorneys for

14    Backpage and Mr. Ferrer will say that, and this is privileged

02:40p  15    information that we have not had access to.

16          As the Court might be aware from the history of

17    litigation in this case is they have a joint defense agreement

18    that they have used as a shield for a number of documents.

19    It's just now that Mr. Ferrer isn't part of that, they're now

02:40p  20    using it as a sword against him.  So that reason alone, this

21    has now invaded Mr. Ferrer's privilege with the attorney that

22    assisted him in creating these answers to these various

23    allegations.

24          MR. LINCENBERG:  A couple things.  First, the

02:41p  25    Government had as part of their cooperation effort that

1    Mr. Ferrer would plead guilty to money laundering charges in

2    California.  So, number one, they've put in issue his play --

3    they want to tag us with Pinkerton liability, and he's

4    claiming -- he went into court and said, "I've committed money

02:41p  5    laundering," when, in fact, he has made statements to the

6    opposite.  That's number one.

7            Number two, most important, is that these are prior

8    statements, not just in relation to a specific allegation.

9    These are statements by him that says when you fill out a

02:42p  10   contract.  It has nothing to do with the particular contract.

11           Spend months vetting contracts vetted by the

12   acquiring bank and processor.  You are not disguising your

13   transaction.  That's impeachment to his testimony.  He says

14   there was no evidence of fraudulent merchant bank

02:42p  15   applications.  That's impeachment to his testimony.

16           When he says a money laundering charge is really an

17   attempt to legislate by prosecution, that is impeachment

18   testimony and that it's done in order to cut off unpopular

19   speech.

02:42p  20           It doesn't matter the proceeding.  I'd be happy to

21   go into the proceeding.  I was purposely avoiding it because I

22   was trying to be mindful of the Court not wanting me to get

23   into that.

24           Now, let now address the last point about the

02:42p  25   privilege, and this is really set out at Docket 180-1.  There

 1  is a declaration there from Jim Grant.  So in connection with

 2  a motion to disqualify the Davis --

 3          THE COURT:  I don't know -- I don't know what docket

 4  you're referring to.  In -- in this proceeding?

02:43p  5          MR. LINCENBERG:  Yes, in this proceeding.

 6          THE COURT:  So what is it?

 7          MR. LINCENBERG:  180 -- I have down 180-1.

 8          So to give the Court some background, the Government

 9  moved to disqualify the Davis, Wright and Tremaine firm from

02:43p 10  further representation in this case.  Davis, Wright and

11  Tremaine represented Backpage.  I believe it represented, I

12  think, Mr. Ferrer as well; and that was opposed and the Court

13  ruled that they're not disqualified.

14          But in connection with that, Mr. Grant, who's a

02:43p 15  lawyer at Davis, Wright and Tremaine, submitted a declaration

16  and at Page 78 -- and, really, it's really what he attaches.

17          He attaches Mr. Ferrer's proffer agreement in which

18  he waives privileges with regard to, for example, this

19  document; and the proffer agreement at Paragraph 2 says

02:43p 20  Mr. Ferrer voluntarily waives all claims of attorney-client

21  privilege, whether in his personal or official capacity, as

22  the Chief Executive Officer of Backpage.com LLC, as whether in

23  his personal or official capacity, as the CEO of Backpage as

24  to communications with any attorney or law firm that

02:44p 25  represented Backpage or any related entity when such

 1   communications concern or related to backpage.com or any

 2   related entity.

 3          Now, I don't need to go into all that background.  I

 4   have a statement that he has lied under oath here directly

02:44p  5   contradicting prior statements that he's made.  I should be

 6   entitled to use that statement to impeach him, and it doesn't

 7   negate the impeachment value simply because, well, it was a

 8   California case.  There were, you know, other counts of money

 9   laundering that we didn't specifically name here.

02:44p 10          His testimony has been about deceiving banks and

11   he's -- he's running away from his prior statements.

12          THE COURT:  Let me -- let me just comment on that.

13   We can move on and have our jury in.

14          Number one, I think -- pay close attention to what

02:45p 15   this witness says in response to your answers.  There's

16   already been two or three times when you've proffered

17   impeachment exhibits when the testifying witness has not made

18   an inconsistent statement.  So that's number one, and I didn't

19   see that here.  That's -- that's why I sustained the

02:45p 20   objection, okay.

21          Number two, I look at this exhibit and it is

22   non-descript to me.  There are strikeout lines in here.  I

23   don't know what the authenticity of this document is or what's

24   -- you know, there's -- you know, Count 6, there's strikeout

02:45p 25   in red and -- so I don't know where this comes from.

 1          I don't know what it's in relation to, and if you're

 2   relying on Docket No. 180-1 I'd like to a moment to review

 3   that.

 4          MR. LINCENBERG:  That's fine.

02:46p   5          THE COURT:  And so you won't bring this in in the

 6   next round of questions --

 7          MR. LINCENBERG:  Fair enough.

 8          THE COURT:  -- and so you can move on --

 9          MR. LINCENBERG:  Fair enough.

02:46p  10          THE COURT:  -- to something else.

11          MR. LINCENBERG:  Can I just flash on the screen for

12   the Court to answer part of the questions which is CF --

13   GL-CF-36, which is the e-mail that that's attached to,

14   comment_transcript.

02:46p  15          MR. RAPP:  It says "attorney-client privileged" on

16   it.

17          MR. LINCENBERG:  Yeah, it was and he waived it.

18          THE COURT:  Well, that -- that's fine.  But, again,

19   the document itself, whatever it is, I don't know what this

02:46p  20   is.  It on the top of it says, "NOTE:  Many Blank Pages below.

21   You need to page thru them.  My comments in yellow highlight."

22          I don't know what this is --

23          MR. LINCENBERG:  Well, that's for --

24          THE COURT:  -- or where it comes from.

02:47p  25          MR. LINCENBERG:  That's for me to explore -- let him

1    answer where it is.

2           THE COURT:  Well, so at the moment we're not going

3    to go into it.  I'm going to look at Docket 180-1.  I'll see

4    whether or not the privilege was waived.  But, again, here I

02:47p  5    don't -- these are statements that are -- or comments that are

6    put in underneath a particular declaratory statement, and so

7    it's out of context.  So that's another problem.  So let's

8    move forward.  Let's have the jury in.

9           (Jury back in at 2:48 p.m.)

02:48p 10          THE COURT:  All rise for the jury.

11          All right, please be seated.  Thank you for your

12   patience.  We've had some matters to discuss out of your

13   presence, but I will note the presence of the witness; and,

14   Mr. Lincenberg, you may continue.

02:49p 15          MR. LINCENBERG:  Thank you, your Honor.

16   BY MR. LINCENBERG:

17   Q.   Sir, we were talking about payment processing

18   applications, and I'd like to return to that topic.

19          Now, there was some discussion in your testimony in

02:49p 20   response to Mr. Rapp's questions about establishing European

21   companies and did you under -- and, in fact, there was a

22   European company established, I believe, in the Netherlands,

23   for example, correct?

24   A.   Say again, I'm sorry.

02:49p 25   Q.   There was a company established in the Netherlands?

```
           1  A.    Yes.

           2  Q.    Okay.  Do you recall the name of that company?

           3  A.    I do.

           4  Q.    What was that?

02:49p     5  A.    Payment Solutions BV.

           6  Q.    And when Payment Solutions was established, were some of

           7  the requirements for establishing that that there be a Dutch

           8  director?

           9  A.    Yes.

02:50p    10  Q.    And did that director have to sign off on everything

          11  involving that company?

          12  A.    I think, yes, possibly a co-signature with Jed Brunst.

          13  Q.    Okay.  And did you understand that in order to establish

          14  certain banking relations in Europe, there were laws in Europe

02:50p    15  that required there to be a European entity?

          16        Do you recall that?

          17  A.    That's what I said, required?

          18  Q.    (Nodding of the head.)

          19  A.    Did I say "laws"?  I think it's a different word.

02:51p    20  Q.    What word did you use?

          21  A.    The banks -- European banks require a European company.

          22  Q.    Okay.  And in -- let's just say, for example, the --

          23  let's pick a time period, late 2015, Backpage was trying to

          24  build business in Europe, correct?

02:51p    25  A.    Correct.
```

1    Q.    Now, in connection with efforts to get payments

2    processed, did you state that you had endless discussions with

3    Don Moon?

4    A.    Probably.

02:51p  5    Q.    Did you describe Mr. Moon as your financial payment

6    method therapist?

7    A.    I don't recall that.  I guess I'd want to see it.

8    Q.    Okay.  And did -- well, let's show that to you.

9          Let's look at GL-CF-22, which is a July 10th, 2019,

02:52p 10    interview at Paragraph 21.

11          Take a look at Paragraph 21 from that interview, and does

12    that help refresh your memory that you described Mr. Moon as

13    your financial payment method therapist?

14    A.    That's what it states.

02:53p 15    Q.    And it states that -- that's an interview that you

16    reviewed and didn't change that statement, correct?

17    A.    Yes.

18    Q.    So when you say "that's what it states," just so the jury

19    understands, that's what the Government agent's memorandum of

02:53p 20    your interview states and then you reviewed it and made no

21    changes to that, correct?

22    A.    Well, I'm not sure the time frame.  Mr. Moon had a

23    variety of roles with the company.

24    Q.    And one of them was, as you described it, your financial

02:53p 25    payment method therapist?

 1  A.    Correct.

 2  Q.    And I believe you also indicated -- we can take this

 3  down, thank you.

 4        You also indicated that Mr. Moon at one point threatened

02:53p  5  Litle, L-i-t-l-e, Litle with litigation.  Do you recall that?

 6  A.    Litle with litigation?

 7  Q.    Let's put up the same document, GL-CF-24, Paragraph 21.

 8              THE COURT:  I think that was 22.

 9              MR. LINCENBERG:  21.

02:54p 10              THE COURT:  You said CF-24 --

11              MR. LINCENBERG:  Oh.

12              THE COURT:  -- and it's 22.

13              MR. LINCENBERG:  Got it, sorry.

14  BY MR. LINCENBERG:

02:54p 15  Q.    So did you have endless discussions with Mr. Moon over

16  the phone?

17  A.    We did --

18              MR. RAPP:  Objection, foundation.

19              THE COURT:  Sustained.

02:54p 20  BY MR. LINCENBERG:

21  Q.    Well, did you tell the Government that you had -- on July

22  10th of 2019 that you had endless discussions with Mr. Moon

23  over the phone throughout this process and described him as

24  your financial payment method therapist?

02:55p 25              MR. RAPP:  Objection, asked and answered.

        1              THE COURT:  Sustained.

        2   BY MR. LINCENBERG:

        3   Q.   Well, did you make statements to the Government on July

        4   10th, 2019, about your endless discussions with Mr. Moon?

02:55p  5   A.   Yes.

        6   Q.   Okay.  And were those discussions involving payment

        7   processing?

        8   A.   Yes, they were.

        9   Q.   Okay.

02:55p 10              MR. LINCENBERG:  We can take that down.

       11   BY MR. LINCENBERG:

       12   Q.   Now, you recall -- just to refresh the jury's memory, I

       13   think you mentioned a company named Litle.

       14        Can you just remind the jury who Litle was?

02:55p 15   A.   So Litle was a payment processor for Backpage for at

       16   least a couple of years.

       17   Q.   Did that end around 2013?

       18   A.   I believe so.

       19   Q.   And did Litle terminate that relationship?

02:56p 20   A.   Yes, they did.

       21   Q.   And did they -- did Litle advise you that they were

       22   terminating that relationship because of quote "reputational

       23   risk"?

       24   A.   Yes.

02:56p 25   Q.   And when you use the term "reputational risk," are you

```
      1   referring to sort of a phrase that captures the idea that

      2   we're gonna look bad if we continue dealing with you?

      3   A.   Yes.

      4   Q.   All right.  And after -- and Litle told you they didn't

02:56p 5   have any other complaints about doing business with Backpage,

      6   it was just that things were getting -- things were too hot

      7   and they didn't want to be associated with Backpage, right?

      8   A.   I don't think he used the expression "too hot."  Just

      9   simply saying, "What are you doing about reputational risk?"

02:57p 10  and I took that to mean how are we staying out of Google news

     11   with all of the arrests and how are we ensuring that we don't

     12   have illegal transactions.

     13   Q.   Okay.  And just to clarify for the jury, when you say

     14   "all of the arrests," you're not aware of Mr. Brunst ever

02:57p 15  being criminally charged in any case, are you?

     16          MR. RAPP:  Objection, relevance.

     17          MR. LINCENBERG:  I want to clarify what he means.

     18          THE COURT:  Well, I'll overrule the objection.

     19          THE WITNESS:  I'm talking about the arrest --

02:57p 20  BY MR. LINCENBERG:

     21   Q.   Answer my question, simple question.

     22        You're not referring to Mr. Brunst?

     23          MR. RAPP:  Objection --

     24   BY MR. LINCENBERG:

02:57p 25  Q.   You don't know of any arrest of Mr. Brunst?
```

```
 1              MR. RAPP:  Objection, foundation.

 2              THE COURT:  Sustained.

 3    BY MR. LINCENBERG:

 4    Q.   Do you -- when you said your conversation with Litle and

 5    all of the arrests out there, you don't know of Mr. Brunst

 6    ever being arrested, correct?

 7    A.   Correct.

 8    Q.   All right.  Now -- and reputational risk was the only

 9    problem that Litle had with Backpage, correct?

10    A.   That's what they told me.

11    Q.   Okay.  All right.  So after Litle ceased doing business

12    with Backpage, the company needed another payment processor,

13    correct?

14    A.   Correct.

15    Q.   All right.  And you worked somebody named Trent Voigt to

16    help in connection with payment processing by his company

17    Jetpay, correct?

18    A.   Correct.

19    Q.   And is it true that you were the primary contact from

20    Backpage with Mr. Voigt?

21    A.   With Mr. Voigt?

22    Q.   Yeah.

23    A.   Not initially.

24    Q.   Did you socialize with Mr. Voigt?

25    A.   I did have lunch with him.
```

02:58p 5
02:58p 10
02:58p 15
02:58p 20
02:59p 25

1    Q.   Did you go to baseball games with him?

2    A.   I think I did go to one baseball game.

3    Q.   All right.  And during this time frame when you're

4    dealing with Mr. Voigt, Michael Gage, who you hired as CFO for

02:59p  5  Backpage, had been Jetpay's CFO, correct?

6    A.   Yes, he had been.

7    Q.   All right.  And you openly disclosed to Jetpay that

8    Backpage was the primary business that you were involved with,

9    correct?

02:59p 10  A.   I --

11   Q.   Let me re -- let me shorten it.  Did you tell Mr. Voigt

12   that you were with Backpage?

13   A.   Yes.

14   Q.   Okay.  Now, during the 2010 to 2018 time frame, I believe

03:00p 15  your estimate was that you signed and submitted some 30

16   applications from merchant accounts with payment processors,

17   correct?

18           MR. RAPP:  Objection, asked and answered.

19           THE COURT:  Sustained.

03:00p 20          MR. LINCENBERG:  Okay.

21   BY MR. LINCENBERG:

22   Q.   Over these years there was lots of negative press

23   involving Backpage, correct?

24   A.   Correct.

03:00p 25  Q.   And Backpage also had faced different lawsuits during

```
         1   that time that were in the press, right?

         2               MR. RAPP:  Objection, relevance.

         3               THE COURT:  Sustained.

         4   BY MR. LINCENBERG:

03:00p   5   Q.  So when you say that many of the applications were turned

         6   down due to death by Google search, there's different things

         7   that people would have seen on Google search that might have

         8   said, "You know what, I just don't want to deal with these

         9   guys."  Reputational reasons, right?

03:01p  10   A.  Sorry, you kinda just cut in and out and I could barely

        11   hear you.

        12   Q.  I'm sorry.  The -- let's take a look at one exhibit in

        13   particular, one of the merchant pay applications.

        14               MR. LINCENBERG:  If we could place before the

03:01p  15   witness Exhibit 6189 for identification.

        16   BY MR. LINCENBERG:

        17   Q.  Sir, do you recognize 6189 for identification as a

        18   merchant application form for eMerchantPay?  And if you need

        19   to look at any pages of it, we can -- we can flip through

03:01p  20   them.

        21   A.  I'd like to see the page with the date --

        22   Q.  Sure.

        23   A.  -- on it.

        24               MR. LINCENBERG:  Maybe we can go to Page 2.  Let's

03:02p  25   see, I have a hard time here.
```

 1              I don't see a date in this exhibit.  I don't see it

 2    in the application.  Maybe we can show the witness --

 3              MR. RAPP:  Judge, I don't have an objection to this

 4    being admitted and published.

03:02p 5         MR. LINCENBERG:  -- some of the pages to see if you

 6    recognize it.

 7              THE COURT:  Wait.  Mr. Rapp said something and I

 8    didn't hear him.  Can you -- what is it that you said,

 9    Mr. Rapp?

03:02p 10        MR. RAPP:  I don't have an objection -- sorry for

 11   the delay.  I don't have an objection to this coming in and

 12   being published.

 13             MR. LINCENBERG:  We move to admit it.

 14             THE COURT:  Well, I think the witness asked to be

03:03p 15   shown a particular page.

 16             MR. LINCENBERG:  Well, I -- I think I offered to

 17   show him different pages.  He asked if there was a date on it,

 18   and on the pages I have in front of me I don't see a date.

 19             THE COURT:  So I do believe -- you can ask another

03:03p 20   question if he recognizes it and so on and so forth, but I

 21   think that was going to help him in that.

 22             MR. LINCENBERG:  Okay.

 23   BY MR. LINCENBERG:

 24   Q.  First of all, do you recall submitting an application for

03:03p 25   payment processing to eMerchantPay?

1    A.    Yes, I do.

2    Q.    Okay.  And in the application did you note -- I'm

3    directing you just to look at Page 1, for example -- that the

4    legal name of the company submitting it was Classified

03:04p  5    Solutions?

6    A.    That is the European company --

7    Q.    Okay.

8    A.    -- that is being used.

9    Q.    All right.  And you recall -- if we can go lower on that

03:04p  10   -- that Page 1.  Do you recall application that involved owner

11   of account Website Technologies, bank name BMO Harris Bank?

12   A.    Yes, this is the information Jed would have put in.

13          MR. LINCENBERG:  Your Honor, we'd move it in to

14   evidence.

03:04p  15          THE COURT:  Yes, it may be admitted.

16          (Exhibit No. 6189 admitted in to Evidence.)

17   BY MR. LINCENBERG:

18   Q.    Now, if we go to Page 2 under "Contact Information," is

19   the contact information Page 2 -- if we can highlight where it

03:05p  20   -- okay.

21       All right.  If we look at my lower circle, is the primary

22   contact person noted Carl Ferrer at backpage.com?

23   A.    Correct, I was to be the contact.

24   Q.    Okay.  And so in this application, which was for this

03:05p  25   Classified Solutions entity located in the UK, you weren't

```
 1    concealing that Backpage was connected with this application,
 2    were you?
 3    A.   No, there's a different kind of concealment.
 4    Q.   Were you concealing that Backpage was connected with this
```
03:06p  5    application?
```
 6    A.   No, 'cuz my e-mail address has backpage.com in it.
 7    Q.   All right.  And the idea that there was an overseas
 8    entity established in connection with this application had to
 9    do with a requirement, as you understood it, that there be an
```
03:06p 10    overseas entity, correct?
```
11    A.   Well, there's more to that than just that requirement --
12    Q.   I know --
13    A.   -- and I'd like to --
14    Q.   -- I'm asking about this particular requirement.
```
03:06p 15         Is that correct?
```
16    A.   This processor requires you to have a European company
17    doing European transactions, and we don't have many.
18    Q.   All right.  Did you ever make a prior statement where you
19    stated that you established non-US companies because you had
```
03:07p 20    non-US sites, non-US employees pay taxes to non-US governments
```
21    and take transactions in other currencies?
22              MR. RAPP:  Objection, relevance.
23              THE COURT:  Overruled, but it is compound.
24              THE WITNESS:  And the time frame of that statement?
```
03:07p 25              MR. LINCENBERG:  Well, I'm asking if you ever made

         1   such a statement, but the Court would like me to break it

         2   down.

         3   BY MR. LINCENBERG:

         4   Q.   Did you ever -- isn't it true that one of the reasons you

03:07p   5   established non-US companies is because, one, you had non-US

         6   employees, right?

         7   A.   That was by design to hire non-US employees.

         8   Q.   So the answer's "yes" you had non-US employees?

         9   A.   But not at this time.

03:08p  10   Q.   You had about twenty employees in 2017 working outside of

        11   the United States?

        12   A.   Yeah, but I think this application's 2013 or '14.

        13   Q.   Well, I'm just giving you a time frame to -- in 2017 did

        14   you have twenty employees working outside of the United

03:08p  15   States?

        16   A.   We did.

        17   Q.   All right.  Did you pay rent overseas?

        18   A.   We did.

        19   Q.   Okay.  And did you pay taxes to non-US governments?

03:08p  20   A.   Eventually, yes, but not at this time frame.

        21   Q.   All right.  And we can take this document down.

        22        I want to get back to -- we had talked earlier about this

        23   term "ultimate business owner verification."  Do you recall

        24   that, UBO verification, where one of the owners -- prior to

03:09p  25   2015 one of the owners of the holding company of Backpage had

1    to sign on applications.  Do you recall that?

2    A.   Yes, a UBO an owner needs to sign the application.

3    Q.   And in connection with any document that Mr. Brunst

4    signed as a UBO, was there -- do you recall there being

03:09p  5    anything in there that was factually false on those

6    applications?

7    A.   Once -- once again, I'd like to see the application.

8    Q.   Well, I'm asking you generally.

9    A.   Okay.  Well, I can tell you generally that when we're

03:10p 10    opening up accounts with European banks and using a European

11    company, we don't have European transactions, that that is a

12    deception to the banks.

13    Q.   So -- so in the applications you were submitting to banks

14    in Europe, you were deceiving them?

03:10p 15    A.   No, we described ourselves more as a work in progress.

16    We're gonna try to build up international, but the banks came

17    first, you know.  We had some, but not very many.

18    Q.   So "no" you were not deceiving them?

19    A.   Let's just say I don't think we were transparent.

03:10p 20    Q.   Well, just pick an answer.  Were you deceiving them or

21    not deceiving them?

22    A.   I think I just did pick an answer.

23    Q.   All right.  And so in your testimony over the prior two

24    weeks did you point to any false statement made by Mr. Brunst

03:11p 25    in connection with any payment processing application, do you

 1  recall?

 2  A.   I don't recall pointing to anything specific.

 3  Q.   Okay.  Now, let's talk about PostFastr.  PostFastr, as I

 4  understand it, was a company that Backpage dealt with,

03:11p  5  correct?

 6  A.   You mean created?  We created that company, PostFastr.

 7  Q.   Okay.  And PostFastr allowed users to post across the web

 8  at once; is that right?

 9  A.   It never did do that.

03:11p 10  Q.   All right.

11          MR. LINCENBERG:  I'd like to place before the

12  witness for his eyes only, not the jury's eyes, document

13  GL-CF-05.

14  BY MR. LINCENBERG:

03:12p 15  Q.   Sir, did you write an e-mail in June of 2014 to Scott

16  Spear, Jim Larkin and Jed Brunst about PostFastr?

17  A.   Yes, I do.

18  Q.   Did you state in it that e-mail that PostFastr allows

19  users to post across the web at once?  Did you state that?

03:12p 20  A.   That's what it says.

21  Q.   Well, let's explore your answer "that's what it says."

22       So when you say that's what it says, are you saying that

23  was a lie or was that the truth.

24  A.   I'm saying that I'm gonna need to explain what that

03:12p 25  means, because obviously you can't post across every web site.

1   Q.   So you're saying it was false?

2   A.   What I'm saying is this is an intent, you know.  I'm

3   writing the intent of PostFastr.  That's the description.  It

4   says here, "Scott, can you help me file an intent to use for

03:13p  5   PostFastr?" and then I'm providing a description.  So I'm

6   asking for help from my boss, Scott Spear.

7   Q.   Okay.  And --

8   A.   So it's not a lie.

9   Q.   It's not a lie, okay.

03:13p  10   And was the description also that it's ideal for

11   employees, property managers, buyers and sellers seeking

12   increased response and traffic to their posting?

13   A.   Yes, that's the family friendly description.

14   Q.   Okay.

03:13p  15   MR. LINCENBERG:  And if we can look at Exhibit 6194

16   for identification.  Let me just blow it up so Mr. Ferrer can

17   read it.

18   BY MR. LINCENBERG:

19   Q.   Mr. Ferrer, do you recognize Exhibit 6194 for

03:14p  20   identification as an e-mail from Michael Gage to you in

21   January of 2016?

22   A.   Yes, I do.

23   Q.   And was that an e-mail regarding PostFastr?

24   A.   Yes, that's the subject line.

03:14p  25   Q.   All right.

| | | |
|---|---|---|
| | 1 | MR. LINCENBERG:  Your Honor, I would move in to |
| | 2 | evidence 6194 for ID. |
| | 3 | MR. RAPP:  No objection. |
| | 4 | THE COURT:  6194 may be admitted and it may be |
| 03:14p | 5 | published. |
| | 6 | MR. LINCENBERG:  Thank you, Your Honor. |
| | 7 | (Exhibit No. 6194 admitted in to Evidence.) |
| | 8 | BY MR. LINCENBERG: |
| | 9 | Q.   Now, let's just focus in on the timing here.  This is |
| 03:14p | 10 | January 2016.  That was post sale, right? |
| | 11 | A.   Yes. |
| | 12 | Q.   And as part of this effort during that time is Mr. Gage |
| | 13 | helping to arrange payment processing? |
| | 14 | A.   He is. |
| 03:15p | 15 | Q.   All right.  And this e-mail, Mr. Brunst is not copied on |
| | 16 | this, correct? |
| | 17 | A.   I don't believe he is. |
| | 18 | Q.   Okay. |
| | 19 | MR. LINCENBERG:  We can take this down, thank you. |
| 03:15p | 20 | BY MR. LINCENBERG: |
| | 21 | Q.   Sir, are you familiar with the term "Operation |
| | 22 | Chokepoint"? |
| | 23 | MR. RAPP:  Objection, relevance. |
| | 24 | MR. LINCENBERG:  Well, the relevance, Your Honor, is |
| 03:15p | 25 | this deals with the whole credit card issue. |

1           THE COURT:  He can answer if he's familiar with the

2   term "yes" or "no."

3           THE WITNESS:  I am.

4   BY MR. LINCENBERG:

03:15p 5   Q.  And do you recall there being an initiative in 2012 --

6   federal initiative in 2012 that was attempting to ban

7   high-risk industries such as porn, firearms, dating and payday

8   loans from acquiring transactions?

9           MR. RAPP:  Objection as to the relevance of this.

03:16p 10          THE COURT:  Sustained.

11          MR. LINCENBERG:  Your Honor, the proffer of

12   relevance is that this is the -- this is what lays the

13   predicate for everything to come in the credit card part of

14   the testimony.

03:16p 15          THE COURT:  Well, rephrase the question.

16          MR. LINCENBERG:  Okay.

17   BY MR. LINCENBERG:

18   Q.  Do you recall that there was a federal initiative in 2012

19   in an attempt to ban high-risk industries?

03:16p 20          MR. RAPP:  Objection as to foundation as to his

21   basis of knowledge.

22          THE COURT:  Sustained.

23   BY MR. LINCENBERG:

24   Q.  Well, were you familiar with Operation Checkpoint?

03:16p 25   A.  No.

 1  Q.    It did not inform any of the work you were doing at

 2  Backpage?

 3  A.    Not Operation Checkpoint.

 4  Q.    Okay.  Oh, I'm sorry, I guess I misstated checkpoint.

03:17p  5        Operation Chokepoint?

 6  A.    Yes, I am.

 7  Q.    Okay.  And how did it inform your efforts at payment

 8  processing?

 9        MR. RAPP:  Objection to the extent it calls for

03:17p 10  hearsay for his basis of knowledge.

11        MR. LINCENBERG:  Not asking for the truth.

12        MR. RAPP:  Well --

13        THE COURT:  Overruled.  He can answer the question

14  if he can, how it informed his payment processing.

03:17p 15        THE WITNESS:  And I'm -- I'm gonna have to explain.

16        MR. LINCENBERG:  Please do.  I want you to explain

17  how you were informed.

18        THE WITNESS:  It's not a "yes" or "no" answer.

19        MR. LINCENBERG:  Yes.

03:17p 20        THE WITNESS:  So this comes back, once again, to

21  there's a lot of bad news in Google about different arrests

22  from the female escorts category of Backpage, which creates a

23  lot of risk for the banks and that the banks are held

24  accountable for the nature of the transactions, and so then

03:18p 25  they choose not to do business with those businesses.

1   BY MR. LINCENBERG:

2   Q.   And your statement about Operation Chokepoint at the time

3   was your understanding was that they were targeting businesses

4   simply for reputational reasons, correct?

03:18p  5   A.   Well, it's -- I know that they targeted Payday Loans --

6   Q.   Right.

7   A.   -- and I suppose that the reputation was the interest

8   rate.

9   Q.   And you know that they targeted firearms dealers, right?

03:19p  10  A.   Yes.

11  Q.   And porn, right?

12  A.   I'm speculating but. . .

13  Q.   You speculated in the past?

14  A.   It is a high-risk industry.

03:19p  15  Q.   And dating sites, correct?

16  A.   Some dating sites.

17  Q.   And your response to Operation Chokepoint was that

18  Backpage doesn't create porn, it actively deletes porn

19  pictures, doesn't sell guns, we sell advertising, correct?

03:19p  20  A.   Well, that's a very self-serving response on my part --

21  Q.   Okay.

22  A.   -- and not accurate.

23  Q.   All right.  So your response to it was inaccurate?

24  A.   Well, what am I responding -- what am I responding to?

03:20p  25          MR. LINCENBERG:  Now, let me show you Exhibit 792 in

1   evidence and ask that it be published, Your Honor.

2   BY MR. LINCENBERG:

3   Q.   Now, sir, this is an e-mail which the Government showed

4   you from April of 2015; and I believe the focus of their

03:20p   5   questioning was about the top part where Mr. Brunst writes,

6   "Didn't we go down the Mauritius path once and the banks had

7   the same issue with our content."  Do you recall that?

8   A.   Yes.

9   Q.   Okay.  Now, let's look further down the page at the

03:20p   10   preceding e-mail from you.  Okay.  So in the preceding e-mail

11   if we look towards the bottom of the page -- and maybe we can

12   just blow up -- let's try to -- well, let's blow up a bigger

13   portion for the witness to read.  Let's just blow up this

14   part.

03:21p   15       So in the preceding e-mail from you, you're raising that

16   certain banks may not process Mastercard transactions; is that

17   right?

18   A.   I'm -- it wouldn't be some banks.  Mastercard is

19   investigating Backpage and it could be we could lose

03:21p   20   Mastercard completely.

21   Q.   Okay.  So the -- and back -- and Mastercard was

22   investigating Backpage, in part, in response to threats from

23   Cook County Sheriff Dart, correct?

24   A.   I don't know that.

03:22p   25   Q.   You don't know that?

1   A.   It says April 1, 2015.

2   Q.   Right.

3   A.   I didn't really link it with Dart at the time.

4   Q.   Okay.  We'll get to -- we'll get to Dart.  Let's focus

03:22p  5   on -- on this.

6        So in the lower e-mail you suggest using a bank in

7   Mauritius to help advance credit card processing; is that

8   right?

9   A.   I'm sharing a recommendation from the consultant.

03:22p  10  Q.   Okay.  And there had been a previous attempt to get this

11  bank in Mauritius to do business with Backpage, correct?

12  A.   Correct.

13  Q.   And so what Mr. Brunst's response is, essentially, why

14  would you go to the same bank that already turned you down,

03:23p  15  correct?

16  A.   Essentially that's what he says.

17  Q.   And Backpage did not move forward with that bank,

18  correct?

19  A.   I don't remember.

03:23p  20  Q.   Okay.  And did Mr. Brunst -- we can take this exhibit

21  down.

22       Did Mr. Brunst suggest contacting counsel to help with

23  the banking and credit card processing issue?

24            MR. RAPP:  Objection, Judge.

03:23p  25            MR. LINCENBERG:  This is from a direct exam.  This

         1  was testimony that the Government brought out on September

         2  21st at Pages 80 and 81.

         3          MR. RAPP:  I'll have to look at it.  I've got to

         4  know the context.

03:24p   5          THE COURT:  He can answer "yes" or "no" if he knows.

         6          THE WITNESS:  Could I have a date, please?

         7          MR. LINCENBERG:  Well, you'll have to give me a

         8  date.  It involves Frick Bank.  You'll have to give me a date.

         9  It was your testimony.

03:24p  10          THE WITNESS:  Yeah, I remember.

        11          MR. LINCENBERG:  Okay.

        12          THE WITNESS:  What was the question?

        13  BY MR. LINCENBERG:

        14  Q.   The question was:  Mr. Brunst had suggested contacting

03:24p  15  counsel to help address issues you were having specifically

        16  with bank threat?

        17  A.   He wanted counsel to get them to pay us.

        18  Q.   Right.  And did you see something -- did you see

        19  something improper that Mr. Brunst was suggesting that if a

03:25p  20  bank is not paying you, that maybe you should have counsel get

        21  involved to assist in getting him paid?

        22      I understand you disagreed with the suggestion, but did

        23  you see that suggestion as something sinister, getting a bank

        24  involved to help dealing with potential legal dispute there --

03:25p  25  get counsel involved to help you deal with potential legal

1    dispute?

2    A.   Counterproductive but not sinister.

3    Q.   Okay.  Counterproductive, you just didn't -- you didn't

4    think it would work, correct?

03:25p  5    A.   We were having a hard time getting banks.  So threatening

6    them is not a good idea.

7    Q.   Okay.  And you're using the word "threatening them," but

8    you referenced DLA Piper.  DLA Piper was the law firm you're

9    referring to here, right?

03:25p 10    A.   Yes.

11    Q.   DLA Piper's got, like, 4,000 lawyers around the world,

12    right?

13           MR. RAPP:  Objection, foundation.

14           THE COURT:  Sustained.

03:26p 15    BY MR. LINCENBERG:

16    Q.   You understood them to be a reputable law firm, correct?

17    A.   I did.

18    Q.   Okay.  And so you're not suggesting there's something

19    sinister about saying, "Well, if we're having a dispute with a

03:26p 20    bank, let's see if counsel can help out," are you?

21           MR. RAPP:  Objection, asked and answered.

22           THE COURT:  Sustained, and I think it's a

23    misstatement of the testimony; but the jury will make that

24    ultimate decision.

03:26p 25           MR. LINCENBERG:  Well, if it's a misstatement, then

 1   it wasn't asked and answered.

 2           THE COURT:  Well, no, your including what he said is

 3   a misstatement of what he -- what Mr. Ferrer --

 4           MR. LINCENBERG:  I want this to be clarified.

03:26p  5        THE COURT:  Well, he testified it was not sinister.

 6           MR. LINCENBERG:  Right.

 7           THE COURT:  And you incorporated that in your

 8   question.

 9           MR. LINCENBERG:  Right.

03:26p 10        THE COURT:  So that's the part.

11           MR. LINCENBERG:  Okay, okay.

12   BY MR. LINCENBERG:

13   Q.   You also discussed banking issues with Mr. Moon, correct?

14   A.   Yes --

03:26p 15        MR. RAPP:  Objection, asked and answered.

16           MR. LINCENBERG:  No, I asked about payment --

17           THE COURT:  Overruled.

18           MR. LINCENBERG:  Sorry.

19   BY MR. LINCENBERG:

03:27p 20   Q.   Is that correct?

21   A.   Yes.

22   Q.   Okay.  And Mr. Moon also suggested seeking legal help to

23   address any issues that might be outstanding with financial

24   institutions, correct?

03:27p 25           MR. RAPP:  Objection, the question itself is

 1   hearsay.

 2            THE COURT:  Sustained.

 3   BY MR. LINCENBERG:

 4   Q.   Well, sir, you've testified on direct examination about

03:27p  5   this idea of having people involved in assisting with disputes

 6   with banks.

 7        I'm asking if, in part, that was also something that you

 8   had discussed with Mr. Moon?

 9            MR. RAPP:  Objection, asked and answered.

03:27p 10            THE COURT:  Sustained.

11   BY MR. LINCENBERG:

12   Q.   So let's focus on the major credit card companies, and

13   we'll break it down a little bit, but for starters AmEx, Visa

14   and Mastercard.

03:28p 15        From 2004 until around June of 2015 did all three of

16   those credit card companies allow their cards to be used to

17   buy ads on Backpage?

18   A.   Yes.

19   Q.   And after June of 2015 did that all change as a result of

03:28p 20   Sheriff Dart sending threatening letters to them?

21            MR. RAPP:  Objection, foundation.

22            THE COURT:  Sustained.

23   BY MR. LINCENBERG:

24   Q.   Was that your understanding?

03:28p 25            MR. RAPP:  Same objection.

1    THE COURT:  Sustained.

2    MR. LINCENBERG:  Well, sir, you -- Your Honor, I'm

3 trying to avoid getting into areas that the Court has had

4 orders on, which is part of the way of laying the foundation.

03:29p  5 So I'd ask the Court for some liberty here so that I don't get

6 into certain things.

7    THE COURT:  Well, you're not going to get into those

8 things that I ordered you not to get into.

9    MR. LINCENBERG:  Right, but --

03:29p 10    THE COURT:  Ask him a proper question.

11    MR. LINCENBERG:  That's why I'm asking the Court so

12 that I don't have to because that's part of foundation to give

13 me some leeway here.

14 BY MR. LINCENBERG:

03:29p 15 Q.  So, sir, in the summer of 2015 your understanding was

16 that Visa buckled to the reputational risk pressure from

17 Sheriff Dart, correct?

18    MR. RAPP:  Objection.  Foundation, relevance and

19 previous Court order.

03:30p 20    THE COURT:  Sustained.

21    MR. LINCENBERG:  I'd like to place before the

22 witness Exhibit GL-CF-08, and I'll just generally indicate

23 that this is an August 2015 deposition testimony in a

24 different proceeding.  I'd like to focus the witness on Page

03:30p 25 93, Line 6 through 11.

1          MR. RAPP:  This is the wrong -- sorry.

2          THE COURT:  As Liliana works on that, I'll just say

3     there's no -- there's no question before the witness.

4          MR. LINCENBERG:  I know.  I just wanted to place

03:31p  5     this before the witness and then ask the question.  Sir --

6          THE COURT:  Well, he doesn't have it yet.

7          MR. LINCENBERG:  Do you have it on your screen?

8          MR. RAPP:  He has it on the screen, we don't.

9     BY MR. LINCENBERG:

03:31p 10  Q.   So in sworn testimony in response to a question of your

11     understanding of the reputational risk that Visa was hung up

12     on was being associated with Backpage --

13          MR. RAPP:  Judge --

14          MR. LINCENBERG:  -- your answer was that --

03:31p 15          MR. RAPP:  -- I'm going to object.

16          MR. LINCENBERG:  I haven't asked the question yet.

17          THE COURT:  Wait.

18          MR. LINCENBERG:  -- the letters and the news that

19     broke from the result of those letters created a lot of bad

03:31p 20  news, which was reputational risk?

21          THE COURT:  Well, in the first instance, you're

22     reading from an exhibit that's not been admitted.

23          Number two, there was no question before this

24     witness prior to this exhibit being laid before him.

03:32p 25          MR. LINCENBERG:  Okay.

     1   BY MR. LINCENBERG:

     2   Q.   Sir, let's go back to the cover page of this exhibit.

     3        Did you testify in Los Angeles, California, on August

     4   18th, 2015, in a deposition?

03:32p  5   A.   Yes, I did.

     6   Q.   And was your testimony under oath?

     7   A.   Yes.

     8   Q.   Did you seek to tell the truth in that testimony?

     9   A.   I did.

03:32p 10   Q.   Okay.  And in that testimony did you testify that the

    11   letters and news from Sheriff Dart letter to credit card

    12   companies --

    13            MR. RAPP:  I'm going to --

    14            MR. LINCENBERG:  -- created a lot of bad news, which

03:32p 15   was reputational risk?

    16            MR. RAPP:  Objection, improper impeachment.

    17            MR. LINCENBERG:  I'm not impeaching right now.  I'm

    18   asking if he testified to that.

    19            THE COURT:  Well, he can answer the question if he

03:33p 20   recalls.

    21            MR. LINCENBERG:  We can go back and show the witness

    22   93, Lines 6 through 11.

    23            THE WITNESS:  And the question was?

    24   BY MR. LINCENBERG:

03:33p 25   Q.   The question was:  Did you testify as I indicated in my

```
 1   question to you from a moment ago?

 2   A.   I suddenly can't hear you.

 3   Q.   I'll repeat it.  In response to a question of your

 4   understanding of the reputational risk that Visa was hung up

 5   on being associated with Backpage, did you respond that the

 6   letters, the news that broke from the results of those letters

 7   created a lot of bad news, which was reputational risk?

 8   A.   That's what I stated.

 9             MR. LINCENBERG:  We can take this down now, thank

10   you.

11   BY MR. LINCENBERG:

12   Q.   And this is what you referred to when you used the term

13   "credit card apocalypse," correct?

14   A.   Yes.

15   Q.   That these credit card companies had been hit with a

16   letter from a Sheriff of Cook County, and just from that

17   letter they stopped doing business with Backpage for

18   reputational reasons, right?

19             MR. RAPP:  Objection.  Foundation, relevance,

20   previous Court order.

21             THE COURT:  Sustained.

22   BY MR. LINCENBERG:

23   Q.   And by the way, this was after you purchased Backpage,

24   correct?

25   A.   It was two and a half months after I became the nominal
```

Timestamps in left margin:
03:33p  (line 5)
03:34p  (line 10)
03:34p  (line 15)
03:34p  (line 20)
03:34p  (line 25)

1  owner.

2  Q.   The nominal owner who made the decision to shut down the

3  Backpage site, right?

4  A.   Correct.

03:35p  5  Q.   You didn't ask the non-nominal owners to do that, did

6  you?

7  A.   Well, I --

8  Q.   "Yes" or "no."

9  A.   To shut down the site or take down the category?

03:35p 10  Q.   To shut down the site.

11  A.   Not at that time.  I made the decision on my own.

12  Q.   All right.  And in this time period your view of what

13  Sheriff Dart was doing was starting a campaign against

14  Backpage, correct?

03:35p 15          MR. RAPP:  Okay, Judge, I'm going to object to this.

16  There's no foundation for it.  It's irrelevant.  There's

17  previous Court orders.  I'd ask that counsel be admonished.

18          MR. LINCENBERG:  This is -- I ask that counsel be

19  admonished --

03:35p 20          THE COURT:  Wait, wait, no.

21          MR. LINCENBERG:  -- for making that statement.

22          THE COURT:  I'm going to sustain the objection.

23          I'm going to sustain the objection.

24          MR. LINCENBERG:  Okay.

03:36p 25          THE COURT:  Move on to a different area,

```
 1   Mr. Lincenberg.

 2           MR. LINCENBERG:  All right.

 3   BY MR. LINCENBERG:

 4   Q.  Now, sir, did -- did you work with somebody named Tom

 5   Brown to respond to respond to the Sheriff Dart issues?

 6           MR. RAPP:  Okay, Judge --

 7           MR. LINCENBERG:  Can we have a sidebar, please.

 8           MR. RAPP:  Objection --

 9           THE COURT:  Yes, you may.

10           (Following discussion held at sidebar.)

11           THE COURT:  Mr. Rapp was in the middle of making an

12   objection.  What was the objection?

13           MR. RAPP:  My objection is he is trying to smuggle

14   in an advice of counsel defense.  This is a lawyer and this

15   lawyer -- of course, he hasn't complied with the requirement.

16   This lawyer has no idea what the internal prostitution

17   marketing strategies of Backpage are, and he's just simply

18   trying to smuggle in what we were concerned about in previous

19   hearings.

20           THE COURT:  Is this -- this is -- I assume you're

21   talking about the Dart litigation?

22           MR. RAPP:  Yes.

23           THE COURT:  And that's the way I see it at this

24   juncture.  Mr. Lincenberg, I told you yesterday you could

25   mention Dart --
```

03:36p (line 5)
03:36p (line 10)
03:37p (line 15)
03:37p (line 20)
03:37p (line 25)

1          MR. LINCENBERG:  Right.

2          THE COURT:  -- that Mr. Dart -- Sheriff Dart was

3    sending subpoenas or making inquiries, but you're getting very

4    close to the line of having this witness testify related to

03:37p  5    that litigation and so that is the reason I'm cutting you off.

6          MR. LINCENBERG:  Can I respond?

7          THE COURT:  Yes.

8          MR. LINCENBERG:  Thank you.

9          Your Honor, it's loud and clear to me --

03:38p 10          THE REPORTER:  Mr. Lincenberg, I can't hear you.

11          MR. LINCENBERG:  It is loud and clear to me that the

12    Court is not allowing us to get in any complaints that were

13    filed against the Sheriff, the Court opinion that was in

14    response to that.

03:38p 15          We are not -- for the umpteenth time, we are not

16    asserting an advice of counsel defense.  My client never spoke

17    to any lawyer --

18          THE COURT:  Which has nothing to do with advice of

19    counsel.  This is related to unrelated litigation.

03:38p 20          MR. LINCENBERG:  Well, I disagree that it's

21    unrelated, but I accept that that's the Court's order.

22          My client's state of mind is at issue before this

23    jury.  His good faith is at issue, and I want to get as close

24    to the line without crossing it as this Court will permit

03:38p 25    because the -- and in response, for example, in my opening

1    statement I was very clear not to get into litigation.

2            I stated in my opening statement that as a result of

3    the way the dispute with Mr. -- or Sheriff Dart ended,

4    whatever my words were, that my client took comfort in the

03:39p  5    further credit card processing and that work that was done.

6            Now, in our view, the opinion is the most relevant

7    thing to my client's state of mind.  The Court's not letting

8    me get there, but I'm trying to get in as much as I can.  I

9    have no intention of raising a legal complaint, a legal

03:39p 10    opinion; but this person, Mr. Ferrer, along with Larkin and

11    others, sent a letter to Sheriff Dart where they laid out

12    their response to his threats and include some things in it

13    like about the CDA that I'm not going to get into.  It also

14    includes some things about the First Amendment.

03:40p 15            THE COURT:  This is the lawyer letter?

16            MR. LINCENBERG:  This is the lawyer letter from Tom

17    Brown.

18            THE COURT:  With multiple redactions?

19            MR. LINCENBERG:  Right.

03:40p 20            THE COURT:  And I was going to say that the majority

21    of that letter speaks to other legal issues that were

22    confusing.  It's a voluminous letter laying out legal

23    analysis, and so that's not admissible for multiple reasons

24    and -- and I will say this:  That you've come to that line.

03:40p 25            MR. LINCENBERG:  Okay.  So is the Court's order that

```
 1    I cannot ask any further questions about Sheriff Dart?

 2              THE COURT:  About the Dart -- no, I did not say

 3    that --

 4              MR. LINCENBERG:  I'm asking.

 5              THE COURT:  -- about Sheriff Dart.

 6              MR. LINCENBERG:  Okay.

 7              THE COURT:  I'm talking about the line related to

 8    litigation and how the claims were brought; but you can say,

 9    "Did you meet with Sheriff Dart?"  You know, "What was your

10    understanding of Sheriff Dart's concerns?"  That's all

11    legitimate, but you're getting at the line where you're going

12    to start getting into this litigation and that's where we're

13    drawing it.

14              MR. LINCENBERG:  So the key point for me to

15    understand is:  Can I bring out that the response that was

16    sent to Sheriff Dart was that the First Amendment -- that the

17    business is operating lawfully because of the First Amendment?

18              THE COURT:  No.

19              MR. LINCENBERG:  Okay.

20              MR. CAMBRIA:  Can -- can we also be heard on that,

21    Judge?  I think what's happened here --

22              THE COURT:  On what?

23              MR. CAMBRIA:  On this issue -- the same issue.

24              I think what's happened is there's -- it's been sort

25    of suggested to the jury that the reason the credit card
```

03:40p (line 5)
03:40p (line 10)
03:41p (line 15)
03:41p (line 20)
03:41p (line 25)

CARL FERRER - CONT'D CROSS EXAM BY MR. LINCENBERG

```
 1   companies discontinued their service was because some --
 2   because Backpage people did something illegal when, as a
 3   matter of fact, the Court found that it was Sheriff Dart who
 4   did something illegal and so it seems to me that the problem
 5   here is --
 6           THE COURT:  Well, there's no -- I don't think there
 7   was a finding --
 8           MR. CAMBRIA:  A hundred percent.
 9           THE COURT:  -- as to illegality in terms of the
10   Court's opinion.  It was an order on the preliminary
11   injunction.  That's what I understood it to be, but in any
12   event --
13           MR. CAMBRIA:  Well, what's happening, though, is
14   there's this kind of suggestion out there, if you will, that
15   the reason that they shut down is because they were breaking
16   the law as opposed to they shut down because a -- an official
17   threatened them, which eventually the Court found was
18   inappropriate, but that somebody threatened them.
19           That was key here that the jury should know that it
20   wasn't because the credit card companies thought they were
21   doing something illegal.  It was because they got threatened
22   by a sheriff.  That's what happened.
23           THE COURT:  Well, but I've already made my ruling
24   with regard to that.  You've made your record, and so let's
25   not keep the jury waiting.
```

03:41p (line 5)
03:42p (line 10)
03:42p (line 15)
03:42p (line 20)
03:42p (line 25)

1        MR. LINCENBERG:  Your Honor, I'm going to need a

2   moment to look through my outline to see if there's any

3   questions I have in there that I don't think violate the

4   Court's order.  It's going to take me a minute to look at

03:43p   5   that.

6        THE COURT:  Yes, that's fine.

7        While I have you here, let me show you what I pulled

8   up.  I don't know, you need to go look back at the docket.

9   This is what you cited to me, and this is not related to your

03:43p  10   earlier argument.

11        MR. LINCENBERG:  180-1.

12        THE COURT:  180-1.  There is no dash one to this.

13   In other words, there's no exhibit --

14        MR. LINCENBERG:  We'll pull that.

03:43p  15        THE COURT:  Okay.

16        MR. LINCENBERG:  I won't get in to it today.

17        (End of sidebar discussion.)

18        THE COURT:  All right.  Thank you, Members of the

19   Jury.  I thought that was a pretty good stretch break as well.

03:43p  20   So let's give Mr. Lincenberg a moment, and then we can

21   continue forward.

22   BY MR. LINCENBERG:

23   Q.   Mr. Ferrer, in July of 2015 did you ever state that

24   Sheriff Dart's actions and termination of credit card services

03:44p  25   harmed Backpage's efforts to police and preclude improper ads?

```
 1   A.   That sounds like the company narrative.

 2   Q.   Did you make that statement under oath?

 3   A.   I'd like to see it.

 4   Q.   Sure.  That is --

 5           MR. LINCENBERG:  Can we show the witness GL-CF-07

 6   and first show him the front page, and then if we can go to

 7   Paragraph 29.

 8   BY MR. LINCENBERG:

 9   Q.   Have you had a chance to review that?

10   A.   I have.

11   Q.   Okay.  Is that a statement you made under oath?

12   A.   I did.

13   Q.   And when you volunteered that that was the company

14   narrative, did you do that to suggest that you could lie under

15   oath but it was somebody else's fault?

16   A.   No, it's not transparent.

17   Q.   Okay.

18           MR. LINCENBERG:  We can pull that down.

19   BY MR. LINCENBERG:

20   Q.   A couple years earlier had Sheriff Dart recommended that

21   Backpage use credit cards because it could assist in

22   identifying people posting on the site?

23           MR. RAPP:  Objection as to foundation.

24           THE COURT:  Sustained.

25   BY MR. LINCENBERG:
```

03:45p  5
03:45p 10
03:45p 15
03:46p 20
03:46p 25

1  Q.   In 2013 do you recall learning that Sheriff Dart had

2  advised Backpage -- requested from Backpage to impose charges

3  and require users to pay by credit cards in order to

4  discourage improper postings and provide information for law

03:47p  5  enforcement?

6  A.   I recall we received letters from Sheriff Dart.  I don't

7  recall specifically what was in those letters, and they seemed

8  to change from time to time.

9         MR. LINCENBERG:  I'd like to show you that same

03:47p 10  declaration, GL-CF-07, the July 2015 declaration that you

11  signed.  If we can put Paragraph 29 on the screen.

12      Let me ask you a question.

13  BY MR. LINCENBERG:

14  Q.   Did you state under oath that Sheriff Dart's actions and

03:48p 15  the termination of credit card services have harmed Backpage's

16  efforts to police and preclude improper ads?

17  A.   Yes.

18         MR. LINCENBERG:  You can take this down.

19  BY MR. LINCENBERG:

03:49p 20  Q.   And did you previously state that two years prior,

21  meaning 2013, that Sheriff Dart had sent Backpage a letter

22  demanding that it require reliance on credit cards for all

23  adult advertisements?

24  A.   I -- I don't recall that, but I do know we received

03:49p 25  letters from Sheriff Dart in 2013 asking us to do a number of

1   things, some of which we were already doing.

2   Q.   Let me direct your attention to Exhibit 6025 -- I'm

3   sorry.  Yeah, let me direct your attention to Exhibit 6025 for

4   identification, July 21st, 2015, e-mails between you and Trent

03:50p  5   Voigt regarding the Visa, AmEx, Dart issues.

6        Do you recognize this redacted exhibit?

7   A.   I do.

8   Q.   As an e-mail exchange between you and Mr. Voigt?

9   A.   Yes.

03:50p  10  Q.   And did it involve Mastercard and Visa and Dart?

11  A.   Yes, it did.

12       MR. LINCENBERG:  Your Honor, before we move it into

13  evidence, I would direct the Court's attention to the top

14  e-mail if the Court wishes to review that first sentence under

03:51p  15  -- regarding Mastercard and advise whether the Court will

16  admit this into evidence.

17       MR. RAPP:  Obviously we want to be heard.

18       THE COURT:  Well, is there an objection to the

19  exhibit coming in as is?

03:52p  20       MR. RAPP:  It's the Court's previous order.  It's

21  riddled throughout this.

22       THE COURT:  Yes, I think it should be redacted.  The

23  second --

24       MR. LINCENBERG:  Well, before -- before we -- I'm

03:52p  25  sorry.

          1              THE COURT:  The second sentence under "regarding

          2    Mastercard."

          3              MR. RAPP:  And also, Judge, even further down, the

          4    entirety of that.

03:52p    5              MR. LINCENBERG:  Before we get further down, Your

          6    Honor, by "the second sentence," are you referring to the "we

          7    think" or "we will know" sentence?

          8              THE COURT:  "If we..."

          9              MR. LINCENBERG:  Okay.  With those redactions, we're

03:52p   10    not going to move it into evidence.

         11              MR. RAPP:  I'm sorry, I didn't hear that.

         12              MR. LINCENBERG:  We're not -- we're not moving it in

         13    if that's redacted.

         14              MR. RAPP:  Oh.

03:52p   15              THE COURT:  I misspoke, Mr. Lincenberg.  It's the

         16    first portion of that sentence but it's --

         17              MR. LINCENBERG:  "We think..."?

         18              THE COURT:  It does then take it out of context

         19    somewhat but. . .

03:53p   20              MR. LINCENBERG:  When you say "the first portion" --

         21              THE COURT:  Up to the comma.

         22              MR. LINCENBERG:  Is it what's been blacked out now?

         23              THE COURT:  Yes.

         24              MR. LINCENBERG:  Okay, then we'll move that in.

03:53p   25              MR. RAPP:  Judge, there's -- there's a lot of --

```
 1   first of all, this is a three-page e-mail and there's quite a

 2   bit of information that is subject to the Court's order.

 3               MR. LINCENBERG:  Well, I don't -- I don't believe

 4   there's anything else subject to the Court's order on the

 5   other pages.  Can I have a moment to consult with Mr. Rapp?

 6               THE COURT:  Yes.

 7               (Counsel confer.)

 8               THE COURT:  Why don't -- why don't you take the

 9   evening to visit on the exhibit, and if you can come to some

10   agreement you can take it up in the morning.

11               MR. LINCENBERG:  Well, that's fine; but in light of

12   the Court's order I'm not disagreeing with the other two

13   parts.

14               THE COURT:  Yes.

15               MR. LINCENBERG:  So can I do my exam without

16   introducing it?

17               THE COURT:  Yes, yes.

18               MR. LINCENBERG:  Okay, thank you.

19   BY MR. LINCENBERG:

20   Q.   So, sir, on July 21st of 2015 did you advise Mr. Voigt

21   regarding Mastercard and Dart, "We think they will come back

22   once Visa is back..." and then after the redacted portion,

23   "then Visa has cover for protected speech"?

24        Did you advise that?

25   A.   I was told this information --
```

03:53p — line 5
03:54p — line 10
03:54p — line 15
03:54p — line 20
03:55p — line 25

```
 1  Q.   Did you advise him of that?

 2  A.   -- and I advised him.

 3  Q.   Okay.  You were told -- I don't think the Court's order

 4  permits you to get into who told you this.  I'm just asking if

 5  you advised him, "yes" or "no"?

 6  A.   I -- I gave him this advice.

 7  Q.   Okay.

 8          MR. LINCENBERG:  Can we go back to the document, the

 9  full document, Christina.  Thank you.

10          Can we go to the second page.

11          Can we go to the third page.

12  BY MR. LINCENBERG:

13  Q.   And on the third page, prior to your response to

14  Mr. Voigt, did Mr. Voigt write to you and ask --

15          MR. RAPP:  This would be hearsay.  So I'd object to

16  this on a hearsay ground.

17          MR. LINCENBERG:  Well, it goes to explain his

18  response.

19          MR. RAPP:  Well, no, it's still hearsay.  He's

20  offering it for the truth.

21          MR. LINCENBERG:  It's not offered for the truth.  It

22  gives context to his response.

23          THE COURT:  Well, in the context of the e-mail the

24  question was did he write to you and ask; and so he can answer

25  as to what's on the e-mail, yes.
```

 1          MR. LINCENBERG:  So do you understand the question,

 2    sir?

 3          THE WITNESS:  No.

 4          MR. LINCENBERG:  Do you want me to repeat it?

**03:56p**  5          THE WITNESS:  (Nodding of the head.)

 6    BY MR. LINCENBERG:

 7    Q.   So prior to your response to Mr. Voigt, had he asked you

 8    on July 21st, "When are you guys meeting with Visa?  Can you

 9    give me a status on what you are doing with MC?  Also what

**03:57p** 10    happened with AmEx?"  Do you see that?

11    A.   Correct, that's what I see.

12    Q.   So you're having conversations with Mr. Voigt openly

13    discussing the issues that Sheriff Dart is raising, correct?

14    A.   Yes.

**03:57p** 15    Q.   And you had discussions with Mickey Hansen of American

16    Express about these same issues, correct?

17    A.   I did.

18    Q.   And fast forwarding -- in your -- in your interviews with

19    the Government there were, as I counted, over 30 times when

**03:58p** 20    you broke things down into sort of pre-Dart and post-Dart

21    communications.  Do you recall that?

22    A.   Yes.

23    Q.   And so just "yes" or "no," post Dart did you gain any

24    comfort in the legality of the credit card processing in the

**03:58p** 25    post-Dart setting?  I can't state more in my question.

1        MR. RAPP:  Objection.  Relevance, foundation, and it

2    implicates the Court order.

3        MR. LINCENBERG:  Well, I'm trying to avoid the

4    Court's order.

03:59p  5        THE COURT:  I'll sustain the objection.

6    BY MR. LINCENBERG:

7    Q.   And, sir, in this post-Dart time period were -- was

8    Mr. Moon -- well, were you guided by Mr. Moon in your efforts

9    to get credit card processing?

04:00p 10        MR. RAPP:  Objection, it calls for hearsay.

11        MR. LINCENBERG:  Not offered for the truth.

12        THE COURT:  Well, he can say "yes" or "no" but --

13    and then we'll see what Mr. Lincenberg's next question is.

14        MR. LINCENBERG:  "Yes" or "no," sir.

04:00p 15        THE WITNESS:  He was one of multiple individuals.

16        MR. LINCENBERG:  And then let me show you Exhibit

17    474 for identification.  If we can just make it a little

18    bigger for Mr. Ferrer to see on the top.

19    BY MR. LINCENBERG:

04:01p 20    Q.   Did you have an e-mail exchange in July of 2015 with

21    Mickey Hansen of American Express?

22    A.   I do.

23    Q.   And had Mr. Hansen raised concerns that AmEx cards being

24    used to buy credits on Backpage?

04:01p 25    A.   He did.

```
 1   Q.   At this point, July 22, middle of Dart, did -- is it fair
 2   to say that AmEx did not want their credit cards used for
 3   adult ads?
 4   A.   Yes.
 5   Q.   And did you attempt to comply with that?
 6   A.   Well, we actually attempted to not comply.
 7   Q.   Okay.
 8           MR. LINCENBERG:  I'd like to place before this
 9   witness GL-CF-08, which is that August 2015 deposition
10   testimony, Page 109, Line 20 through 110/Line 7.
11   BY MR. LINCENBERG:
12   Q.   Sir, if you look -- you can read the question beforehand.
13   I'm going to focus you on Lines 5 through 7, which after a
14   lengthy statement did you testify under oath that you did your
15   best to comply with Mickey Hansen's request?
16   A.   Is that a question?
17   Q.   Yes.  Did you testify under oath that you did your best
18   to comply with Mickey Hansen's request?
19   A.   We did it incrementally and dragged it out to get as much
20   processing time as we could and then we complied.
21           MR. LINCENBERG:  Move to strike as non-responsive.
22           THE COURT:  All after "we did it incrementally" will
23   be stricken and the jury will disregard.
24           MR. LINCENBERG:  And just to go back to Exhibit 474
25   for identification, I'd move this in to evidence, Your Honor.
```

04:01p 5
04:02p 10
04:02p 15
04:03p 20
04:03p 25

1           It is a Government exhibit.

2           THE COURT:  It is, but let me make an observation.

3           It is also part of 6025 that we just looked at.

4           MR. RAPP:  How many pages is this?

04:04p  5           MR. LINCENBERG:  Which one was 6025?

6           Right, this is further -- I'm not sure if part of

7  the string is a part of this, but this is further parts of the

8  string.

9           THE COURT:  Well, in any event, does the Government

04:04p 10  have an objection to Government's 474?

11           MR. RAPP:  No objection.

12           THE COURT:  Yes, it may be admitted and it may be

13  published.

14           MR. LINCENBERG:  Thank you, your Honor.

04:05p 15           *(Exhibit No. 474 admitted in to Evidence.)*

16  BY MR. LINCENBERG:

17  Q.   One single question for Mr. Ferrer.  Was Mr. Brunst a

18  part of this e-mail exchange that you were having with Mickey

19  Hansen?

04:05p 20  A.   No, he's not.

21  Q.   Okay.

22           MR. LINCENBERG:  All right.  I'd like to place

23  before the witness Exhibit 177, which is in evidence and

24  publish it.  This is a March 10th, 2014, e-mail from

04:05p 25  Mr. Brunst to several folks.

BY MR. LINCENBERG:

Q.   So this came up on your direct examination, and this deals with Website Technologies.  Do you recall that?

A.   Yes, I do.

04:06p   Q.   All right.  And Joe -- Joe Backpage is Joe Kaiping, K-a-i-p-i-n-g?

A.   Yes, he is.

Q.   He was a Chief Technology Officer?

A.   Yes.

04:06p   Q.   And on the bottom he writes that Carl and I, I being Joe, were discussing company names and the possibility of updating our e-mail addresses to Website Technologies.com.

     Do you see that?

A.   I do.

04:06p   Q.   And Mr. Brunst responded, "We need to think this thru or all the work to separate it from Backpage will be lost."

     Do you see that?

A.   I do see it.

Q.   Now, Website Technologies was a company that you

04:06p   recommended forming, correct?

A.   I think I recommended the name, yes.

Q.   Okay.  You also spent money developing a Website Technologies business, correct?

A.   You know, Website Technologies was started before I took

04:07p   over the site so --

```
      1  Q.   Right, Jed --

      2  A.   -- so Jed spent money having content.

      3  Q.   Website Technologies was a company which provided

      4  services to -- or let's say potentially provided services to

04:07p 5  different web companies, correct?

      6  A.   No, it only provided services to Backpage.com and it was

      7  a -- sort of separate the reputational risk from Backpage.

      8  Q.   Now, do you recall going to a conference in the

      9  Netherlands for an AIM group?

04:08p 10  A.   For a what group?

      11  Q.   AIM?

      12  A.   No.

      13  Q.   Do you recall being in the Netherlands and part of the

      14  purpose for being there was to sell website services to

04:08p 15  companies?

      16  A.   I don't recall that at all.

      17  Q.   Did you recall that you marketed that Website

      18  Technologies was a company that could provide back room

      19  technical support for Internet companies?

04:08p 20         MR. RAPP:  I'm object to the foundation.

      21         THE COURT:  Sustained.

      22  BY MR. LINCENBERG:

      23  Q.   Did you recall marketing it as a company that had website

      24  development capabilities?

04:08p 25         MR. RAPP:  Same objection.
```

 1              THE COURT:  Well, is it -- you know, I'm going to
 2    say that I'm going to reverse my prior ruling.  The question
 3    was, "Did you recall that you marketed that Website
 4    Technologies was a company that could provide back room
04:09p 5    technical support for Internet companies?"
 6              He may answer if he recalls.
 7              THE WITNESS:  I think we may have used that
 8    description for something on Website Technologies; but,
 9    really, it was just for our own companies, never a third-party
04:09p 10   company.
11    BY MR. LINCENBERG:
12    Q.   So is it your testimony that Website Technologies had no
13    other businesses it did business with other than Backpage?
14    A.   No other -- well, I just want to be accurate.  What was
04:10p 15   that question again?
16    Q.   Yes.  Did Website Technologies sell services to any
17    company?
18    A.   Any company not owned by Backpage or affiliated to
19    Backpage?
04:10p 20   Q.   Right.
21    A.   Like an outside third company?
22    Q.   Right.
23    A.   Independent of Backpage, I can't recall any.
24    Q.   Did Website Technologies develop privacy controls?
04:10p 25        Privacy controls?

```
 1   A.   Privacy controls?

 2   Q.   Right.

 3   A.   I don't know what that is referring to.

 4   Q.   Did you advise any of the owners of the holding company

 5   that Website Technologies could create value apart from

 6   backpage.com?

 7            MR. RAPP:  Objection, foundation.

 8            THE COURT:  Overruled.

 9            THE WITNESS:  It's possible.  Perhaps we thought

10   about licensing the software, for example.

11   BY MR. LINCENBERG:

12   Q.   Now let's get back to this e-mail.  So under sub point 1,

13   the CTO, Joe, is talking about, "If we keep the PCI audit

14   company as Backpage.com LLC, then the assessments and PCI

15   audit would just apply to Backpage.com and its immediate

16   holdings."  Do you see that?

17   A.   Yes, I see it.

18   Q.   And then he writes, "Any PCI audits required for other

19   parent company holdings would then be performed separately."

20        Do you see that?

21   A.   Yes, I do.

22   Q.   Do you know what a "PCI audit" is?

23   A.   I do.

24   Q.   What is it?

25   A.   It's a -- it's something that you have to do annually to
```

04:10p  5
04:11p 10
04:11p 15
04:11p 20
04:12p 25

1    verify that you're securing the credit card data.

2    Q.   And was being PCI certified a good thing, in your view?

3    A.   We had to do it annually, and that's what Joe is

4    referring to here.

04:12p  5    Q.   Did you hear my question?

6    A.   I -- I'm sorry, I was reading this.

7    Q.   Okay.  I know it's late in the day, but try to focus on

8    my question.

9    A.   Go ahead, tell me the question again.

04:12p 10    Q.   Did you review it as a good thing to be PCI certified?

11    A.   It's not just a good thing, it's a requirement.

12    Q.   And at this time Website Technologies was not PCI

13    certified, correct?

14    A.   I'm not sure what all of this really means.  I mean --

04:12p 15    Q.   Well --

16    A.   Why would Website Technologies be PCI certified?  This is

17    the kind of thing that the CTO handled.  I'm not an expert in

18    PCI compliance.

19    Q.   "PCI" stands for payment card industry and it deals with

04:13p 20    data security standards as far as you understand, correct?

21    A.   Yes.

22    Q.   And your CTO is saying in this e-mail that Backpage is

23    PCI compliant but Website Technologies is not, right?

24    A.   I think that means that the audit's in Backpage's name and

04:13p 25    not Website Technologies' name.

1    Q.    And there's a concern being discussed here that if you

2    cross pollinate the companies, that Backpage could lose its

3    certification -- its PCI certification, correct?

4    A.    Once again, you lost me.  I don't really understand PCI

04:13p 5    audits.

6    Q.    All right.  Well, --

7    A.    I don't understand what the impact is on cross

8    pollinization.  It's way beyond my scope.

9    Q.    All right.  So this exhibit that you testified to on

04:14p 10   direct examination you're saying is an exhibit for which you

11   really don't understand what you were talking about?

12   A.    No, I'm saying that the specifics of PCI compliance in

13   regard to holding companies -- or cross pollinization, as you

14   say, that part I don't really understand.

04:14p 15   Q.    Okay.  And so you don't understand if when Mr. Brunst

16   writes back, "We need to think this thru or all the work to

17   separate it from BP will be lost," you have no idea whether

18   what he's referring to is be careful because if a company is

19   PCI certified and it combines with a company that's not, the

04:14p 20   company that's certified might lose its PCI certification,

21   right?

22   A.    That is not what Jed Brunst is referring to.  He's

23   talking about reputation.  He's talking about Backpage's bad

24   reputation bleeding over into Website Technologies; and then

04:15p 25   we lose the company that handles payroll, retirement accounts,

1   the leases.

2   Q.   Okay.  So when you say that Mr. Brunst in this e-mail is

3   talking about reputation, is there anything in the e-mail

4   below by Joe, the technology guy, that talks about

04:15p  5   reputational concerns?

6   A.   I don't see Joe referring to it, and that's why Jed is

7   referring to it.

8   Q.   And when you say "Jed is referring to it," does he refer

9   in this to reputation?  Does he talk about reputation here?

04:15p 10   A.   All the work to separate it from BP will be lost.

11   Q.   Right.

12   A.   Yes.

13   Q.   And this is in response to an e-mail about PCI audits,

14   right?

04:16p 15   A.   Yes, but I believe Jed's referring to something else.

16   Q.   Okay.

17         MR. LINCENBERG:  We can take this down.  Let's look

18   at Exhibit 178 in evidence.

19   BY MR. LINCENBERG:

04:16p 20   Q.   Now, one of the companies that you guys had been dealing

21   with -- one of the banks you had been dealing with is US Bank;

22   is that right?

23   A.   Yes.

24   Q.   And there came a point in time when US Bank cut off doing

04:16p 25   business with Backpage, right?

```
 1    A.    I believe so.

 2    Q.    And did you understand that New Times -- strike that.

 3          Did you understand that New Times and then Village Voice

 4    Media holding company between them had had a long relationship

 5    with US Bank?

 6              MR. RAPP:  Objection, foundation.

 7              MR. LINCENBERG:  I'm asking if he understood.

 8              THE COURT:  Sustained.

 9    BY MR. LINCENBERG:

10    Q.    And did you understand that with regard to Bank of

11    Montreal, that Bank of Montreal was also a bank that had done

12    business over the years with the holding company?

13    A.    What was that question again?

14    Q.    Yes.  Did you understand that there was a long-term

15    banking relationship with Bank of Montreal?

16    A.    I thought they might have invested money in the company.

17    Q.    They were a lender, right?

18    A.    They're a big bank.

19    Q.    And, for example, you understood that Bank of Montreal

20    was one of the major banks that had loaned money to New Times

21    on purchase the Village Voice newspaper in 2008, correct?

22    A.    Well, that I did not know until you just said it.

23    Q.    Okay.  And did you understand that revenue from Backpage

24    and various newspapers was being used to repay loans from the

25    banks that had helped finance the purchase of the Village
```

04:17p  5
04:17p 10
04:17p 15
04:18p 20
04:18p 25

    1   Voice newspaper?

    2   A.   Once again, way over my pay grade.  I don't know.

    3   Q.   Okay.  In 2014 you discussed with Mr. Brunst contacting

    4   Bank of Montreal to see if Bank of Montreal would bank

04:18p  5   Backpage, correct?

    6   A.   In what date?

    7   Q.   April of 2014.

    8   A.   No, this is -- I -- I'm not -- at this time I'm not

    9   leading any initiative to sign up bank accounts with BMO.

04:19p 10   Q.   Well, were you involved in providing know your customer,

   11   KYC, information to Bank of Montreal?

   12   A.   Well, the kind of information like the ultimate business

   13   owner of the company and the organization, that would have

   14   been handled by Jed Brunst entirely.

04:19p 15   Q.   Did you ever have any direct dealings yourself with

   16   anybody at Bank of Montreal?

   17   A.   I did years later after the transaction in April that

   18   would put my name on the banking accounts.

   19   Q.   And did you -- do you have any doubt in your mind as you

04:20p 20   sit here today that for many years Bank of Montreal was fully

   21   aware that Website Technologies' account was related to

   22   Backpage's work?

   23          MR. RAPP:  Objection, foundation.

   24          MR. LINCENBERG:  Let me restate it.

04:20p 25   BY MR. LINCENBERG:

1    Q.    Do you have any doubt that in April of 2014 that Bank of

2    Montreal was fully aware that Website Technologies was related

3    to Backpage?

4              MR. RAPP:  Same objection, plus speculation.

04:20p  5              THE COURT:  Well, yes, as to those; but it's also a

6    very confusing question and so I'll sustain the objection.

7              MR. LINCENBERG:  Let's move on to Exhibit 616a,

8    which is in evidence.  This is a redacted version of a

9    November 2010 e-mails from Spear and Larkin to Mary Latta of

04:21p 10    Bank of Montreal, right, if you look near the bottom.  Let's

11    show the whole two pages of the document.

12    BY MR. LINCENBERG:

13    Q.    So if we start on the bottom, we see that what's being

14    forwarded to Bank of Montreal is initially an e-mail from the

04:21p 15    Backpage CEO, Jim Larkin.  Do you see that?

16    A.    Yes, I do.

17    Q.    And he's copying -- he's sending that first to Tom

18    McGraw.  Who is Tom McGraw?

19    A.    I don't know.

04:21p 20    Q.    And Mary Latta, do you recall her being at Bank of

21    Montreal?

22    A.    I do.  She would -- yes, I recall her name in future

23    e-mails.

24    Q.    And Steve Suskin was a lawyer at Village Voice Media

04:22p 25    holdings?

CARL FERRER - CONT'D CROSS EXAM BY MR. LINCENBERG          122

1   A.   Yes.

2   Q.   And so the -- what preceded this e-mail exchange was the

3   part which is all blacked out, right?

4   A.   Correct.

04:22p  5   Q.   But as your testimony in introducing this was that this

6   was a record of Backpage and that the whole thing was

7   forwarded to the bank?

8   A.   Did I say the whole thing was forwarded to me?

9   Q.   Well, this was the exhibit that the Government placed

04:22p 10   before you and testified that this was your record of this

11   e-mail exchange.

12   A.   No, I believe I testified to the e-mail addresses, that

13   I'm familiar with the e-mail addresses of Jed Brunst and Scott

14   Spear, Jim Larkin.

04:22p 15   Q.   And with regard to Mary Latta's response to Jim Larkin

16   she writes, "Please just let me know what was suspended and

17   when it will be re-instated."  Is that correct?

18   A.   That is correct.

19   Q.   All right.  Her response doesn't question anything from

04:23p 20   the lengthy e-mail from the CEO, does it?

21   A.   I don't know what the CEO had sent so I -- I guess I

22   don't see a question here -- well, yes, I do see a question.

23   "Please let me know what was suspended."

24   Q.   All right.  And then Mr. Spear responds to Mary Latta on

04:23p 25   the top, right?

 1  A.    Correct.

 2  Q.    And I believe you noted in response to Mr. Rapp's

 3  question that the e-mail did not go into a dissertation about

 4  Backpage's marketing activities?

04:24p 5  A.    Not sure I used the word "dissertation," but it didn't

 6  disclose the prostitution marketing activities.

 7  Q.    And was there anything in the response from Mr. Spear to

 8  Ms. Latta that, in your opinion, was false?

 9  A.    It is very deceptive.

04:24p 10  Q.    So just to be clear, you've used this term "deceptive"

11  because he's not talking about everything that Backpage did in

12  its business that you believe was deceptive, right?

13  A.    Well, I can -- can I explain what's deceptive with this?

14  Q.    How about answering my question whether there's anything

04:25p 15  in this e-mail that you believe was false?

16  A.    Yes, I -- I think the e-mail in its entirety is a

17  falsehood.

18  Q.    Well, the e-mail in its entirety, we don't know what's

19  here because the Jim Larkin e-mail was blacked out, right?

04:25p 20          MR. RAPP:   All right, I'm going to object to that.

21          THE COURT:   Sustained.

22  BY MR. LINCENBERG:

23  Q.    And Mr. Brunst is copied on this e-mail, correct?

24  A.    Yes, he is.

04:25p 25  Q.    And you understood that he was a person who was a

```
 1  relationship contact with the bank, correct?
 2  A.   I would later come to understand that, yes.
 3  Q.   But in terms of the substance of whatever is being
 4  discussed about the operations of the business unit, questions
```
04:26p 5  and answers, they're being written by Larkin, Spear, back and
```
 6  forth with Latta, correct?
 7  A.   In this e-mail the reply to the bank is being written by
 8  Scott Spear.
 9  Q.   All right.  And it's also forwarding whatever Mr. Larkin
```
04:26p 10  said, correct?
```
11              MR. RAPP:  Objection, asked and answered.
12              THE COURT:  Sustained.
13              MR. LINCENBERG:  Well, let's take a look at Exhibit
14  616 for identification only, which is the unredacted November
```
04:26p 15  2010 e-mail, and I'm going to direct your attention to sub
```
16  point four from Mr. Larkin's e-mail; and don't state anything
17  out loud because we have some court orders here, but I'm going
18  to ask you a specific question.
19  BY MR. LINCENBERG:
```
04:27p 20  Q.   Did you ever hear Mr. Larkin say that the Attorney
```
21  General --
22              MR. RAPP:  Objection, hearsay.
23              MR. LINCENBERG:  Wait a second, I haven't asked my
24  question.
```
04:27p 25              MR. RAPP:  No, the question calls for hearsay.

1      THE COURT:  Let him finish -- there's an objection.

2  Let him finish.

3      MR. LINCENBERG:  I don't know what it's to because I

4  haven't finished my question.

04:27p  5      MR. RAPP:  Well, I got a good idea.

6      THE COURT:  Well, and that's what I was going to

7  say.

8      MR. LINCENBERG:  Okay.

9      THE COURT:  Let him finish the question, and if

04:27p 10  there's an objection you can object, Mr. Rapp.

11  BY MR. LINCENBERG:

12  Q.  Did you ever hear Mr. Larkin, your alleged -- one of your

13  alleged co-con conspirators in this matter, say that Attorney

14  General attacks on Backpage were a quote "political dance"?

04:27p 15      Did you ever hear him use that terminology?

16      MR. RAPP:  Objection.  Relevance, hearsay.

17      THE COURT:  Well, he can answer "yes" or "no" if

18  he's heard it.

19      THE WITNESS:  I hadn't heard "political dance."

04:28p 20  BY MR. LINCENBERG:

21  Q.  What did you hear?

22  A.  Well, I heard that we would engage with them in a slow

23  dance.

24  Q.  Okay.  And do you recall Mr. Larkin regularly being

04:28p 25  concerned that these letters from the Attorney Generals were

```
 1    being done by -- were being sent by political people who were
 2    seeking higher office?
 3              MR. RAPP:  All right, objection, hearsay, relevance.
 4              MR. LINCENBERG:  They introduced a lot of Attorney
04:28p 5    General letters.
 6              MR. RAPP:  It's still hearsay.
 7              THE COURT:  He can answer "yes" or "no" if he
 8    recalls.
 9              THE WITNESS:  What was that question again?
04:29p 10             MR. LINCENBERG:  Yes, can we have it read back.
11              (Whereupon the question was read back.)
12              THE WITNESS:  I had heard those words, but in a
13    different way, essentially the same meaning.
14              MR. LINCENBERG:  We can pull this off the screen,
04:29p 15    thank you.  Your Honor, how we doing time wise?
16              THE COURT:  We're at 4:29 and so good observation
17    there.
18              All right.  So Members of the Jury, we will end our
19    trial for today and, again, just remember the admonishment.
04:30p 20    We have one more 845 a.m. start tomorrow, which will be our
21    last day, and so do try to be here so that we can start on
22    time and then we'll continue.  Please all rise for the jury.
23              (Jury out at 4:30 p.m.)
24              THE COURT:  All right, please be seated.
04:31p 25              Let me -- let me clarify for the record prior to the
```

UNITED STATES DISTRICT COURT

1    jury coming in for the afternoon session Mr. Lincenberg

2    referenced documents from the Court and I provided you with

3    what you referred to as Document 180-1 and --

4                MR. LINCENBERG:  Not document, docket.

04:31p  5    THE COURT:  Docket, yes.  180-1, it does not have

6    exhibits attached to it.  So please review whatever it was

7    that your exhibit was attached to, and let my chambers know

8    precisely where that is so that I can review that to see if it

9    is as Mr. Rapp indicates regarding his -- his concern and

04:32p  10   objection.

11               Let me also say that with regard to this Exhibit

12   6025, I know we had a lengthy discussion about that exhibit

13   yesterday; and I'm going to go back and look at what I said

14   was permitted in this exhibit and, frankly, in looking at it

04:32p  15   and looking at the redacted version I -- frankly, I can't

16   recall my precise ruling as to whether or not you could elicit

17   testimony about the exhibit and just not admit it or if I said

18   it was to be a question that I would resolve at the time.

19               You've added particular redactions to this now.  So

04:33p  20   I'm going to review that record in the light of the

21   redactions.

22               MR. LINCENBERG:  Would it help the Court for

23   Mr. Rapp to note there were, I believe, two additional

24   redactions that I sidebarred with him that I was agreeing to.

04:33p  25   THE COURT:  And what would help me more is if you

UNITED STATES DISTRICT COURT

```
 1   provide to me the redacted version.

 2            MR. LINCENBERG:  Okay.

 3            THE COURT:  Now, I will say that when I was looking

 4   at Government's Exhibit 474 -- and maybe I'm wrong -- but I

 5   believe that this second page of 6025 from -- and it ends

 6   "Thanks, Mickey," is 474.  So double-check that.

 7            I want to make sure that I'm not misstating or

 8   confusing the record.  To me, it looked like the same precise

 9   verbiage and all of that.  So I want to make sure that the

10   record is clear.

11            Okay, so -- and tomorrow, apparently the jurors have

12   lost a little track and familiarity with all counsel.  So what

13   we're going to do -- we'll do it tomorrow, but we'll start

14   this as a regular practice at the beginning of the week of

15   trial is I'll have Government counsel introduce your

16   co-counsel and defense counsel may introduce themselves and

17   their clients in the morning session.  They just want to get

18   familiar with faces again, all right?

19            Okay.  All right, so we will stand in recess until

20   8:45 in the morning.

21   (Whereupon the proceedings concluded at 4:35 p.m.)

22

23

24

25
```

1          *REPORTER'S CERTIFICATION*

2

3                    I, TERI VERES, do hereby certify that I am duly

4     appointed and qualified to act as Official Court Reporter for

5     the United States District Court for the District of Arizona.

6                    I FURTHER CERTIFY that the foregoing pages

7     constitute a full, true, and accurate transcript of all of

8     that portion of the proceedings contained herein, had in the

9     above-entitled cause on the date specified therein, and that

10    said transcript was prepared under my direction and control.

11                   DATED at Phoenix, Arizona, this 28th of

12    September, 2023.

13
                                        _____s/Teri Veres_____
14                                      TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT