**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No.  2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 28, 2023 |
| Michael Lacey, et al., | ) | 8:49 a.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 14, A.M. SESSION

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2

For the Government:
3       UNITED STATES ATTORNEY'S OFFICE
        By:  **Kevin M. Rapp, Esq.**
4            **Andrew C. Stone, Esq.**
             **Peter S. Kozinets, Esq.**
5            **Margaret W. Perlmeter, Esq.**
        40 N. Central Avenue, Suite 1800
6       Phoenix, AZ 85004

7       UNITED STATES DEPARTMENT OF JUSTICE
        By:  **Austin Berry, Esq.**
8       1301 New York Avenue NW, 11th Floor
        Washington, DC 20005

9

For Defendant Lacey:
10      LIPTSITZ GREEN SCIME CAMBRIA, LLP
        By:  **Paul J. Cambria, Jr., Esq.**
11      42 Delaware Avenue, Suite 120
        Buffalo, NY 14202

12

For Defendant Spear:
13      KESSLER LAW OFFICE
        By:  **Eric W. Kessler, Esq.**
14      6720 N. Scottsdale Road, Suite 210
        Scottsdale, AZ 85253

15

        FEDER LAW OFFICE, PA
16      By:  **Bruce S. Feder, Esq.**
        2930 E. Camelback Road, Suite 160
17      Phoenix, AZ 85016

18  For Defendant Brunst:
        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
19      LINCENBERG & RHOW PC
        By:  **Gary S. Lincenberg, Esq.**
20           **Gopi K. Panchapakesan, Esq.**
        1875 Century Park E, Suite 2300
21      Los Angeles, CA 90067

22  For Defendant Padilla:
        DAVID EISENBERG, PLC
23      By:  **David S. Eisenberg, Esq.**
        3550 N. Central Avenue, Suite 1155
24      Phoenix, AZ 85012

25

                    UNITED STATES DISTRICT COURT

1                    **A P P E A R A N C E S (Continued)**

2    For Defendant Vaught:
          JOY BERTRAND, ESQ., LLC
3         By:  **Joy M. Bertrand, Esq.**
          P.O. Box 2734
4         Scottsdale, AZ 85252

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                            **I N D E X**

2

    **WITNESSES FOR THE**              **DIRECT**      **CROSS**      **REDIRECT**      **RECROSS**
3   **GOVERNMENT:**

4   **Carl Ferrer**
    By Mr. Lincenberg                        10
5

6

7                          **E X H I B I T S**

8
    **NO.**                        **DESCRIPTION**                      **REC'D**
9
    886-a    Attachment, Answer                                    23
10           DOJ-BP-0002711454

11  8        LOI re Sale of Membership Interest in                 76
             Dartmoor Holdings, 12/29/2014
12           DOJ-BP-0001862566 - DOJ-BP-0001862576

13  5364     04.16.15 Backpage - Restructuring and Sale           83
             of Business
14           DEFENSE 006132-006142

15  5427     04.22.15 Loan Agreement ($525,700,000.00)            87
             (Backpage US Operations)
16           (Vermillion/Shearwater/Atlantische)
             DEFENSE 015986-016050
17
    5459     04.22.15 Loan Agreement ($77,005,592.50)             89
18           (UGC Foreign Operations)
             (Vermillion/UGC)
19           DEFENSE 016869-016217

20  5443     04.22.15 Purchase and Sale Agreement                 89
             (Vermillion/UGC)
21           DEFENSE 016699-016829

22  5415     04.22.15 Membership Interest Purchase                89
             Agreement (U.S.)
23           (Vermillion/Dartmoor/Atlantische)
             DEFENSE 016469-016599
24

25

                     UNITED STATES DISTRICT COURT

1214-a    Attachment, First Loan Modification          93
          Agreement, USAO-BP-025442 - USAO-BP-025454

5474      12.29.15 Forbearance Agreement (Backpage US    95
          Operations) (Atlantische/Shearwater)
          DEFENSE 016371-016378

6196      06.09.16 Email from C. Ferrer to M. Gage re:   97
          *The note(s)*
          DOJ-BP-0002741887

UNITED STATES DISTRICT COURT

1              **P R O C E E D I N G S**

2              (Proceedings resumed at 8:49 a.m.)

3              (Jury not present.)

4         THE COURT:  Good morning, and please be seated.

5         I just wanted to say that -- and we do have all of our

6    jurors present.

7         I just wanted to say with regard to that Exhibit 6025,

8    I believe, I reviewed the prior record and what my statement

9    was in response to Mr. Panchapakesan raising it.  I did tell

10   you that you could ask questions about that exhibit but that it

11   wouldn't be admitted.  But, again, I point out that I do

12   believe that the second page of that is already admitted as

13   4 -- 474, I think.

14         So did you have an opportunity to look at that?

15         MR. LINCENBERG:  Is the Court referring to look at the

16   subsequent redactions that government counsel had requested and

17   agreed to?

18         THE COURT:  Well -- your microphone needs to be on.

19         I'm referring -- I'm referring to that exhibit and

20   I -- and I told you that you could ask questions about it but

21   that because of the references that are in there to the Dart

22   litigation, the complaint being filed and so on, that it would

23   likely not come in.

24         But you both together looked at redactions, and I

25   don't -- I didn't hear the government object to it, and again,

1    I say that I do believe the second page of that document is in

2    evidence at 474.

3              MR. LINCENBERG:  474 seems to be the lead-up --

4              THE COURT:  Yes.

5              MR. LINCENBERG:  -- to it.

6              THE COURT:  Yes.

7              MR. LINCENBERG:  Right.  And then so it -- we're

8    looking at --

9              THE COURT:  The first page, which has that big

10   redaction flag on it.

11             MR. LINCENBERG:  Right.  And we were seeking to admit

12   6025 because it contains the further email.

13             THE COURT:  Mr. Rapp?

14             MR. RAPP:  Okay.  Wait a minute.

15             THE COURT:  All right.  Mr. Rapp?

16             MR. RAPP:  Yeah.  So the only -- we got the

17   redactions, and the only issue we had with the redactions is

18   the protected speech portion of that because that is clearly a

19   veiled reference to the Dart litigation.

20             THE COURT:  Well, it is, in the context of the full

21   email, all related to the Dart litigation.  But I think, as

22   we've discussed before, it's a fair point with regard to if

23   Mr. Ferrer or the others who are charged here had a thought

24   that this was protected speech.

25                  Here, this relates to whether or not the credit card

1    companies were operating with that in mind or not.  But --

2           MR. RAPP:  Right.  So I think that's our problem, is

3    that what they're trying to suggest is that Visa is taking the

4    position that they have protected speech, and so that would --

5    and they'd be offering that for the truth.  And that is, you

6    know, how do they -- how does Mr. Ferrer know that Visa is

7    taking some type of position that allowing Backpage to use

8    Visas for processing somehow suggests that Visa believes that

9    this is protected speech?

10          I think that there's a lot of layers to that, and I

11   just think it's a very confusing statement, and it really is

12   Backpage who's trying to take the position that this is

13   protected speech because of the Dart litigation and perhaps

14   other litigation.  And so that's why we think it's confusing

15   and it's -- it's within the context of the Court's previous

16   orders.

17          THE COURT:  Well, again, it's -- there are different

18   points to this.  I think what I'll permit Mr. Lincenberg to do,

19   if he wishes to, he can refer to that first redacted page, but

20   it won't come in just because of the multiple redactions that

21   would need to be made to it.

22          But you certainly can ask about it, as I think you

23   have already.

24          MR. LINCENBERG:  Right.  We already covered that.

25          THE COURT:  But it won't come in.  So let's move

1    forward.

2              And let's bring up --

3              MR. LINCENBERG:  Your Honor --

4              THE COURT:  Can we have our witness --

5              MR. LINCENBERG:  We have another issue.

6              THE COURT:  Okay.  Let's take that up in the break.

7              All right.  Let's have our witness take the stand and

8    bring our jury in.

9              All rise for the jury.

10             (Jury present.)

11             THE COURT:  All right.  Please be seated.

12             And the record will reflect the presence of our jury.

13   The witness is on the stand.

14             And while it is on my mind, members of the jury, as I

15   told you earlier this week, we were looking like we were headed

16   towards a government shutdown.  We, of course, will not know

17   that until over the weekend.

18             But, again, we will be in court session -- if that

19   does occur when we have a break next week, assuming there

20   continues to be a shutdown, we'll still have trial the

21   following Tuesday.  There are going to be some impacts.  We are

22   in a government building, and so there will likely be light

23   government staff, although the court will be operating.

24             So all this to say there won't be likely a kiosk open

25   for coffee or lunch.  You may have to bring your own lunch.  Of

1   course, the restaurants outside will probably be open.  But do

2   be prepared for that in any event.

3            Certainly, if the Jury Administration Office calls you

4   and tells you not to come, then you should not come.  But

5   otherwise, we'll expect to be here.  We are all essential,

6   apparently.  You are the most essential to this process.

7            So let's move forward, Mr. Lincenberg.

8            MR. LINCENBERG:  And, Your Honor, we should probably

9   note there's not going to be air conditioning.

10           THE COURT:  No.  Please, let's dispel the rumor.  We

11   will be in an operational building.

12           MR. LINCENBERG:  I'd like to have placed before the

13   members of the jury and the witness Exhibit 885 which is in

14   evidence.  And to give everybody frame of reference, that was

15   an October 6th, 2015 --

16           THE COURT:  Can you -- let's --

17           MR. LINCENBERG:  Can you hear me?

18           Is that better?

19           THE COURT:  Yes.

20                        CARL FERRER,

21   called as a witness herein by the Government, having been

22   previously duly sworn or affirmed, testified as follows:

23                   CROSS-EXAMINATION (Continued)

24   BY MR. LINCENBERG:

25   Q.  Exhibit 885 relates to October 6th, 2015, and this deals

1   with Bank of Montreal requests for information about Website

2   Technologies' responses to AML request.  So I'd like to just

3   walk through this exhibit with you.

4            So, first of all, if we look at the top, at the top

5   there's an email from Mr. Brunst to you and your CFO, Nathan

6   Kopecky, saying:  This is what I sent to BMO a few months back

7   asking about WT business.

8            Do you see that?

9   A.  I do.

10  Q.  All right.  Then let's look lower.  And lower we're

11  referring to the August 2015 time frame with responses for BMO.

12           Do you see that?

13  A.  I do.

14  Q.  Okay.  And then if we look down, for example, on the page

15  where it's on the screen, Website Technologies, there was a

16  bullet:  Please explain their business.

17           And that was, as you understood it, part of the email

18  from BMO, correct?  BMO being Bank of Montreal.

19  A.  Yes.

20  Q.  Okay.  And then in capital letters was information that you

21  had supplied as an explanation of Web Technologies' business.

22  Is that right?

23  A.  Would you say that again?

24  Q.  Yes.  The capital part here, which is the response to the

25  explanation, had been information that you had forwarded to be

1    provided to Bank of Montreal providing an explanation of

2    Website Technologies' business.  Is that correct?

3    A.  No.  It's not correct.

4    Q.  What is not correct about that?

5    A.  Jed Brunst is writing this to BMO in August of 2015, so

6    those are his words.

7    Q.  So the words in capital are, you're saying, words that were

8    typed in by Mr. Brunst?

9    A.  Yes.

10   Q.  So where it says, for example, that Website Technologies is

11   a service company to Backpage.com, those are Mr. Brunst's

12   words?

13   A.  Well, it says more than that.

14   Q.  I'm going to get into the rest of it.  Let's pause with

15   that.

16   A.  You're --

17   Q.  Those are Mr. Brunst's words?

18   A.  That WT is a service company is there, and so is to

19   Backpage.com.

20   Q.  All right.  And then where it talks about also providing

21   services to Univision, what was Univision?

22   A.  Univision is a licensee that we set up a classified site to

23   run on their URL, but it's actually all of the -- just the

24   Backpage content that's repurposed in the Univision domain.

25   Q.  So --

1    A.  Any transactions -- I'm not done.

2           Any transactions that come through Univision, though,

3    will say Backpage.com on the credit card statement.

4    Q.  So did Website Technologies also provide services to

5    Univision?

6    A.  We did.

7    Q.  All right.  And did Website Technologies provide services

8    to other independent third-party licensees of Backpage?

9    A.  Well, actually, that's incorrect.  I misspoke.  I believe

10   the licenses are actually from Backpage.com to these companies

11   and not Website Technologies.

12   Q.  Okay.  So is it your testimony, then, that this information

13   here which you say Mr. Brunst drafted is false?  Or inaccurate?

14          Is that your testimony?

15   A.  Let me read it one more time.

16          What you had said was false that Website Technologies

17   was providing the software, when in fact Backpage.com had the

18   license agreement with Univision and other independent

19   third-party licenses, so in that aspect is not correct.

20   Q.  You said what I said is false.  I'm asking you if what is

21   written here in the large typed letters is accurate in terms of

22   what the company has set up for -- to handle IT development and

23   maintenance.

24   A.  It's inaccurate in that Website Technologies is just a

25   shell company that's -- Backpage.com is depositing funds into

14

1   the Website Technologies company.

2   Q.  So that's inaccurate?

3   A.  It's -- it's another case of it's not transparent.

4   Q.  Okay.  So I think the way you described it in your earlier

5   testimony is that it was accurate but that it's -- it's not,

6   we'll use your term today, transparent.  It's not providing

7   more information.

8   A.  Well, it's not -- it is -- there's parts of it here that

9   you might -- you could argue --

10  Q.  I'm not arguing.  I'm asking you, is there anything in this

11  statement that is inaccurate as stated?

12  A.  And I stated it is -- it is not transparent.

13  Q.  Okay.  Does "not transparent" mean that it is -- let's use

14  your term -- technically accurate but further information could

15  have been provided?

16  A.  Seems like a good description.

17  Q.  Okay.  Now, let's move to Exhibit -- let me just ask one

18  more question about that exhibit.

19          So if the bank had a concern about whether or not

20  Website Technologies was affiliated with Backpage, certainly

21  this email explanation noted that Website Technologies had an

22  affiliation with Backpage.  Right?

23  A.  This response that Jed Brunst wrote does suggest an

24  affiliation with Backpage.com.  It's listed there.

25  Q.  All right.  Let's explore further this testimony you've now

1    given that Jed Brunst drafted this language.

2            So, first of all, is that something that you ever told

3    the government in any of your interviews?

4    A.  What I am saying --

5    Q.  Yes or no?  I'm asking about what you told the government.

6            Is that something you ever told the government in any

7    of your 30 interviews?

8    A.  I think it's clear in the emails and the exhibits that we

9    went through the government.

10   Q.  Sir, please answer my question.

11   A.  So --

12   Q.  I'm asking what --

13   A.  I am answering you.

14   Q.  No, you're not.

15           MR. LINCENBERG:  Your Honor, I move to strike.

16           THE COURT:  All right.  Let's -- again, let's set the

17   rules.  Don't speak over one another.

18           And again, Mr. Ferrer, listen to the question, and if

19   you can answer it yes or no, do so, and then you can have an

20   opportunity to clarify later on.

21           THE WITNESS:  Yes, Your Honor.

22   BY MR. LINCENBERG:

23   Q.  Simple question:  Is that something that you told the

24   government in any of your 30 meetings with them, that Jed

25   Brunst wrote it?  Yes, no, I don't recall?  Love an answer.

1    A.  I didn't feel it was necessary because it's -- it's in the

2    email.

3    Q.  Okay.  It's in the email that Jed Brunst --

4    A.  Yes.  It's clear as day that he wrote this email.  This

5    isn't -- you know, I may have helped Jed Brunst, suggestions

6    and gave him a list of other licensees that Backpage had

7    licensed.  But I did not write this email to BMO.

8    Q.  Let's explore that point further.  Let's look at

9    Exhibit 886, which is in evidence, if we can publish that.

10            All right.  So, first of all, let's start from the

11   bottom of this email chain.  So first we have an email that

12   appears to be the first email in this chain being from Ilona

13   Nicholls of Bank of Montreal to Mr. Brunst on October 6th at

14   7:11 a.m.

15            Do we see that?

16   A.  Yes.

17   Q.  And the subject is:  Just need to update our files.

18            See that?

19   A.  Yes.

20   Q.  And then if we look down, we see one of -- that

21   Ms. Nicholls is saying:  We see that we are receiving a number

22   of wires from overseas.  We would like to know who are the

23   clients are that are paying through these two companies.

24            Do you see that?

25   A.  Yes.

CARL FERRER - CROSS-EXAMINATION                    17

1   Q.  And then there's an answer that is in blue below.

2       Do you see that?

3   A.  Yes.

4   Q.  And is that something that Mr. Brunst drafted?

5   A.  No.  He asked for suggestions.  I drafted it for him.

6   Q.  Okay.  So you drafted -- in there, for example, it says:

7   Borgun Bank is the acquirer for credit card transactions.

8       Do you see that?

9   A.  Yes, I do.

10  Q.  And then it talks about the sites include, and it lists a

11  whole bunch of different sites.  And if we can flip to the next

12  page, there's some more, including Cracker and Backpage and

13  Trucker Jobs and so forth.

14      Do you see that?

15  A.  I do.

16  Q.  Okay.  And then we see also it says:  We would like a more

17  detailed description of what Website Technologies does.

18      Do you see that?

19  A.  I do.

20  Q.  And then the answer is -- talks about that you own Website

21  Technologies.

22      Do you see that?

23  A.  Yes.

24  Q.  All right.  And then it talks about Website Technologies

25  provides the following services, and it goes through five

1    different services.

2          Do you see that?

3    A.  Yes.

4    Q.  And who drafted that?

5    A.  This would be -- I drafted it at the request of Jed Brunst.

6    Q.  Okay.  So this information about Website Technologies and

7    the URLs associated with them and what the services are was

8    drafted by you, correct?

9    A.  It was drafted by me to help Brunst in his reply.

10   Q.  Right.  And let's move up the page to the email in the

11   string above that, which is Mr. Brunst forwarding to you,

12   saying:  This is a question for the Bank of Montreal banker.

13   You should let her know that Website Technologies is owned by

14   you and not us.

15         Do you see that?

16   A.  I do.

17   Q.  Okay.  So this is when Mr. Brunst gets a request from

18   Website -- from Bank of Montreal.  He forwards it to you to

19   gather the information to answer the bank's questions.

20   Correct?

21   A.  Not correct.

22   Q.  All right.  Let's move up to the top email.

23         So we have here -- I'm sorry.

24         First, you reply, draft:  Here's a draft response to

25   BMO's request for information.  Please help me edit for

1    clarity.  Answers in blue.

2           And the answers in blue are the answers below.  Right?

3    A.  That's right.

4    Q.  The answers provided by you, correct?

5    A.  This is a draft of --

6    Q.  Were those the answers provided by you?

7    A.  No.

8    Q.  Okay.

9    A.  This is a draft of answers that I want Jed Brunst to help

10   me with, and he's asking me, Carl, you're going to have to

11   reply to the bank because now you're the owner.

12          I don't know what to write.  So I'm putting down ideas

13   to get help from Jed Brunst to say exactly what I need to say

14   to BMO so we don't lose this bank account.  Like, this is a

15   crisis.

16   Q.  All right.  So you're putting -- when you say you're

17   putting down ideas, what you're writing down, if we can go back

18   to the bottom again, are the answers to the bank's questions.

19   Correct?

20   A.  This is a draft.

21   Q.  Right.  It's a draft.

22          So let's go up to the top now, where you send this to

23   Mr. Brunst, and he says:  Here are my suggested revisions.

24   Please edit them however you see or ignore them altogether,

25   just my thoughts.

CARL FERRER - CROSS-EXAMINATION                    20

1           Do you see that?

2    A.  I do.

3           MR. LINCENBERG:  All right.  And if I could place for

4    the witness's eyes only Exhibit 886 for identification.  And

5    remember that there's an attachment -- 886-a?  What did I --

6    886-a for identification.

7    BY MR. LINCENBERG:

8    Q.  And I just pointed out, at 886 it says attached are some of

9    his suggestions to what you wrote.

10          Do you recall that?

11   A.  Correct.

12          THE COURT:  Let me confirm that -- I know 886 has been

13   admitted.  I don't know about 886-a so let me confirm.

14          MR. LINCENBERG:  It has not been.

15          THE COURT:  It has not, okay.  I just want to make

16   sure it's not on the screen then.

17          MR. LINCENBERG:  No.  That's why I indicated for

18   identification, for the witness's eyes only.

19   BY MR. LINCENBERG:

20   Q.  And does this appear to be the edits that Mr. Brunst

21   provides to the answer?

22   A.  I'm going to need some time to read this.

23   Q.  All right.  And if you'd like, by the way, we can put this

24   side by side to the answers that you drafted in 886 so that you

25   can compare them.

21

1    A.  You know, can you -- can you point out the differences?

2    Because it's going to take a long time.

3    Q.  I'm going to point to some of the differences.  I want to

4    first confirm -- the government introduced 886 without the

5    attachment, 886-a being the attachment.  I'm going to move that

6    into evidence.

7             MR. LINCENBERG:  Why don't I just move that into

8    evidence first and see if the government has an objection.

9             THE COURT:  Well, he said it's going to take him some

10   time to review it.  I don't know how many pages the document

11   is, so let him review it.

12            MR. LINCENBERG:  Sure.  And, Your Honor, it's -- and

13   for the jury, it's one page, basically.

14            THE COURT:  Let him take some time.

15            MR. LINCENBERG:  Okay.

16            THE WITNESS:  Is it possible you could pull up so I

17   could see the page where -- thank you.

18   BY MR. LINCENBERG:

19   Q.  There you go.  Yep.

20   A.  Thank you.

21            MR. LINCENBERG:  I'm going to assist the witness.  For

22   the witness's eyes only, I'm going to underline so he can see a

23   couple of the edits.

24            THE WITNESS:  There appears to be a number of

25   differences here.

22

```
 1    BY MR. LINCENBERG:

 2    Q.  So let's go through them.

 3    A.  Okay.  Yeah.  I'll just say it's got a number of

 4    differences.

 5    Q.  And I'd like to go through those.

 6               MR. LINCENBERG:  Your Honor, could we move --

 7               MR. RAPP:  But not until it's in evidence.

 8               THE COURT:  Yeah.  You can ask some questions about

 9    it, but --

10               MR. LINCENBERG:  Well, I'd like to move it into

11    evidence so that the jury can follow along as we compare the

12    edits to what was --

13               THE COURT:  Why don't you lay foundation a little bit

14    more for whatever this "a" is.

15               MR. LINCENBERG:  Sure.

16    BY MR. LINCENBERG:

17    Q.  Does this appear to be edits to the -- what you drafted?

18    A.  It's really impossible to know what the edits are because

19    it's not like a Word doc that shows, you know, his version

20    versus my version.  It's all just blended together.

21    Q.  Let me ask the question again:  Do these appear to be the

22    edits that Mr. Brunst provided which were attached to

23    Government Exhibit 886?

24    A.  I have seen differences between what I suggested and what

25    Mr. Brunst has indicated in this attached doc.
```

1    Q.  Right.  Those would be the edits, right?

2    A.  What's that?

3    Q.  Those would be the revisions, as you point out.

4    A.  Yes.  But they're impossible to determine --

5    Q.  Okay.

6    A.  -- without going word by word.

7    Q.  Right.  Well, we'll go through some of them.

8           MR. LINCENBERG:  Your Honor, we'd move 886-a into

9    evidence.

10          MR. RAPP:  Object on foundation.  I don't know -- I

11   don't know who wrote what in this.

12          MR. LINCENBERG:  The witness just --

13          THE COURT:  Why don't you ask him.

14   BY MR. LINCENBERG:

15   Q.  Well, your understanding is that 886-a were the edits that

16   were sent back to you by Mr. Brunst, correct?

17   A.  I believe that this is the attachment with the information

18   that he wants me to reply to the bank with.

19          MR. LINCENBERG:  Your Honor, we move 886-a into

20   evidence.

21          THE COURT:  It may be admitted.

22          (Exhibit No. 886-a admitted into evidence.)

23          MR. LINCENBERG:  If I can publish to the jury.

24          THE COURT:  It may be published.

25

 1   BY MR. LINCENBERG:

 2   Q.  Let me make it clear.

 3        Let's start -- I'm going to go through some of these.

 4   You can point out others if you want.  I'm not going to take

 5   the jury's time on every little "a" versus "the."  But let's

 6   just start with some of these and have the jury follow along.

 7        So, for example, on the right side of our screen here,

 8   we have what you had drafted where you said Bank Frick in

 9   Liechtenstein is the acquirer for credit card transactions.

10   And Mr. Brunst's edit as we see on the left side of the screen

11   is that Bank Frick in Liechtenstein is also an acquiring bank.

12        Do you see that?

13   A.  Yes.

14   Q.  So the edit there is that you had indicated that Bank Frick

15   was the acquirer.  Mr. Brunst edited so that the bank would

16   know that it was one of the acquirers.  Right?

17   A.  Correct.

18   Q.  Okay.  And in here, you had indicated that Borgun makes --

19   or that, if you look at -- where is Borgun?

20        There we go.  As we move back to -- good.  As we move

21   back to page 1 of 886, you had provided an answer that Borgun

22   Bank is the acquirer for credit card transactions, and

23   Mr. Brunst had edited to say Borgun Bank is one of the

24   acquiring banks.

25        Do you see that?

1    A.  I do see it.

2    Q.  Okay.  So these are edits which are basically wordsmithing

3    to indicate a little more clarity to what you're writing.  You

4    had written it's the acquiring bank and he said, well, we

5    should let them know there's more than one, so he said it's an

6    acquiring bank.  Right?

7              MR. RAPP:  Well, objection.  Objection.  Compound

8    question and confusing.

9              THE COURT:  Sustained.  Rephrase.

10   BY MR. LINCENBERG:

11   Q.  Would you agree that that's just wordsmithing to add a

12   little clarity?

13   A.  It's actually inaccurate.

14   Q.  Okay.

15   A.  And I can tell you --

16   Q.  How is it inaccurate?

17   A.  I can explain -- may I explain?

18   Q.  Yeah.  How is it inaccurate?

19   A.  It's inaccurate because we only had one acquiring bank in

20   Iceland:  Borgun.  We only had one acquiring bank in

21   Liechtenstein:  Bank Frick.

22              So I -- kind of like my version is more accurate.

23   Q.  So you like your version better, but his edit under

24   Iceland:  Just to note that Borgun Bank is one of the acquiring

25   banks used by Website Technologies.

1          Right?

2     A.  Borgun Bank is an acquiring bank used by Website

3     Technologies.

4     Q.  Right.  He doesn't say that it's -- that there's more than

5     one in Iceland.  He says it's one of them.  And then lower, for

6     example --

7     A.  Well, wait a second.  "One of them" implies multiple banks

8     in Iceland.  And that means more than one.

9     Q.  Where does it imply multiple banks in Iceland?  He says

10    Borgun Bank -- it's discussing Iceland, and he's noting that

11    Borgun Bank is one of the acquiring banks used by Website.  And

12    then under subpoint 2, for example, he says:  Bank Frick is

13    also an acquiring bank.

14          Correct?

15    A.  Okay.

16    Q.  All right.  Now, if we can put the matching descriptions

17    up -- I don't want to go through every "a" versus "the" in this

18    document.  But are there any others that you see that are

19    substantive edits which you believe are inaccurate?

20    A.  What are you referring to?

21    Q.  I don't know.  I don't see any substantive edits.

22    A.  Then I'm going to need --

23    Q.  I'm asking you if there's --

24    A.  I'm going to need more time.

25    Q.  All right.  Then why don't we do this:  If there's anything

1   you want to add, you can talk to Mr. Rapp, and during redirect

2   you'll have an opportunity to go back to that.  Okay?

3   A.  You're asking me to find the differences.  I'm certain I

4   can find the differences, but --

5   Q.  Right.

6   A.  -- to do that, I'm going to need more time.

7   Q.  And so that's why I'm saying you'll have time to talk with

8   Mr. Rapp about this, and he can come back to it on redirect.

9         Okay.  Let's move on.  We can take this down.

10        Oh, I'm sorry.  I wanted to go back to 886, at the

11  top -- we covered that.  Okay.  Let's move on.

12        Now, in the 2011 time period, you testified that there

13  were some attempts to sell Backpage.  Correct?

14  A.  Correct.

15  Q.  All right.  And at that time, the investment banking firm

16  of Duff and Phelps was retained to assist in that process.

17  Correct?

18  A.  Correct.

19  Q.  All right.  And at that time, the Village Voice Media

20  Holding Companies was owned 38 percent by another investment

21  banking firm called Goldman Sachs.  Correct?

22  A.  I don't know that.

23  Q.  You don't know the specific percentage?

24  A.  I -- once again, they didn't share that information with

25  me.  I'm not an owner.

1   Q.  So your testimony is that you did not know that Goldman

2   Sachs was a part owner of Village Voice Media Holding

3   Companies?  Is that your response?

4   A.  I learned it through the Nicholas Kristof column.

5   Q.  And what about Alta, another investment bank?  Were you

6   aware that they had owned 14 percent of the holding company at

7   that time?

8   A.  I'm familiar with Alta.  I guess, you know, the time frame,

9   when you say do I know these people, you got to ask what year

10  are we talking about.

11  Q.  2011.  Let's just use 2011.

12  A.  I think in 2011 I'm not aware of Alta.

13  Q.  Okay.  Now, the retention of Duff and Phelps, one of the

14  purposes was to help identify value for the company that was --

15  for Backpage, if it was going to be marketed to potential

16  buyers.  Right?

17  A.  I'm sorry.

18  Q.  Did Duff and Phelps help in establishing a price that

19  Backpage would be offered to potential buyers?

20  A.  I really can't answer that.  It's a conversation that would

21  have occurred between Brunst and Duff Phelps.  I mean, I'm not

22  aware who set the price.

23  Q.  I didn't ask who set the price.  I asked if Duff and Phelps

24  assisted in setting the price.

25          You testified to two PowerPoints --

1    A.  Well, that's -- that's a big difference.  I don't know who

2    set the price.  I don't know whether it was a number that

3    Brunst picked.  What I know --

4    Q.  You don't know if it's a number that anybody picked.

5    You're saying you don't know.  Right?

6    A.  I don't know.

7    Q.  My question is not whether you knew or not.  My question is

8    whether Duff and Phelps helped work in reviewing the financials

9    of Backpage to set a price.

10            You've testified to --

11            MR. RAPP:  Wait.  Objection.  Foundation and now

12   we're -- we've got two different questions going on here.

13            THE COURT:  Well, I think --

14            MR. LINCENBERG:  Withdraw it.

15            THE COURT:  Yes.  The foundation had been laid

16   previously.  Unless I'm hearing things differently, I thought

17   the witness testified he didn't know what was going on at that

18   time, so let's move forward.

19            MR. LINCENBERG:  But he testified differently.  He

20   testified that he didn't set the price.

21   BY MR. LINCENBERG:

22   Q.  Sir, you testified extensively on direct examination, for

23   example, about a Duff and Phelps presentation, which was

24   Exhibit 120 that the government moved into evidence.  Correct?

25   A.  We did work together on that presentation.

1    Q.  And then you testified later about a PowerPoint that Duff

2    and Phelps had prepared in, I believe it was September of 2011.

3    Correct?

4    A.  Yes, but none of that talks about price --

5              MR. LINCENBERG:  Move to strike after "Yes."

6              THE COURT:  Yes, it may be stricken and the jury will

7    disregard.

8    BY MR. LINCENBERG:

9    Q.  So let's look at Exhibit 655, which you testified about --

10   well, first, 655 is an email in March of 2011.  And it's an

11   email up top from Mr. Brunst to you and copy to Mr. Spear.

12   Correct?

13             And was this around the time that Duff was hired?

14   A.  I believe Duff Helps -- Duff Phelps was hired in 2011.

15   Q.  And let's look at Exhibit 120 in evidence.  Let's first

16   look at the table of contents.  If we go to the table of

17   contents.

18             So 120 is a September 2011 management presentation.

19   Correct?

20   A.  Correct.

21   Q.  And we look at -- go to the table of contents.  There we

22   go.

23             So this presentation, this was part of the materials

24   that Duff had prepared to assist in selling Backpage, correct?

25   A.  That's my understanding.

CARL FERRER - CROSS-EXAMINATION

1  Q.  Okay.  And the table shows some of the different categories

2  that are part of this presentation, correct?

3  A.  Correct.

4  Q.  And let's just look at a few of the slides.  Let's look at

5  the slide -- actually, let's keep this on the screen and get

6  back to it for a moment.

7        During that time period, were you providing

8  information about different, for example, vendors for Duff and

9  Phelps?

10  A.  At Jed Brunst's request, I sent them to Jed.

11  Q.  Right.  And were you also gathering five-year projections?

12  A.  I was requested to write a five-year projection, an

13  aggressive one, yes.

14  Q.  And did you provide information about expansion ideas in

15  Europe?

16  A.  I did.

17  Q.  And you testified -- you sort of snuck in the word

18  "aggressive" a moment ago.  And you testified on direct

19  examination that Jed Brunst and Mr. Spear were, quote,

20  extremely aggressive in the requests for higher projections.

21        Do you recall that?

22  A.  I do.

23  Q.  All right.  And was the trial the first time -- we can take

24  this down.

25        Was the trial the first time that you had ever told

1    that to the government?

2    A.  No.  I'm certain.

3    Q.  So you're certain that that was in some of the 30

4    interviews that you had with the government, that Mr. Brunst

5    was extremely aggressive in requests for higher projections?

6    A.  I'm certain that I described Mr. Brunst as -- and Scott

7    Spear as aggressive in projections, and with Mr. Brunst in

8    particular, collections of money.

9    Q.  We're going to get to collections.  All right.

10          So you're certain you described that he was extremely

11   aggressive in connection with these revenue projections.  Fair?

12   A.  Say that again one more time.  Sorry.

13   Q.  I'll move on.  It was asked and answered.

14          All right.  And let me just bring back up the email

15   that I had up on the screen, 655.

16          And we see here where it says in March of 2011, if you

17   could spend some time and start putting together -- oh, begin

18   putting five-year projections together, which include your

19   expansion ideas.  If you could spend some time and get your

20   thoughts together for a call.

21          Do you see that?

22   A.  Yes, I do see it.

23   Q.  And is this email the type of language that you referred to

24   as extremely aggressive?  Yes or no?

25   A.  The aggressiveness is not -- it occurs with the other

1   emails and meetings.

2   Q.  All right.

3   A.  They're not happy with the projections I give.

4   Q.  All right.  So then when you say others, you'd agree, this

5   email does not suggest some extreme aggression, correct?

6   A.  No.  There's -- the context would be in the future meetings

7   that occur after this email.

8           MR. LINCENBERG:  Okay.  Let's move to Government

9   Exhibit 498 for identification, and show the witness the cover

10  page.

11  BY MR. LINCENBERG:

12  Q.  So do you recall Duff preparing a lengthy memorandum in

13  detail to be used in connection with meetings with potential

14  purchasers of Backpage?

15  A.  Can I see more --

16  Q.  Sure.

17  A.  -- pages of this?

18  Q.  And I'll represent to you this is a 71-page document, but

19  maybe flip to the next page and blow this up a little bit,

20  so...

21  A.  Can I see some of the other pages, please?

22  Q.  Sure.

23           But before we move to the other pages, if we can go

24  back, you recall that the Confidential Information Memo is

25  based on information provided by Backpage.  You see that?  It's

1    being delivered on behalf of the company by Duff to a limited

2    number of parties who may be interested in pursuing a

3    transaction.

4             Does that help jog your memory?

5    A.  I have to tell you, I don't recall ever seeing this

6    document.  I think it just went to the owners.

7    Q.  Let's go to the next page.  Table of contents.  Summaries,

8    investment considerations, business overview, strategy, and so

9    forth.

10            Does that help refresh your memory?

11   A.  Can we see some actual pages?

12   Q.  Sure.  Let's keep going.

13            Executive summary.

14   A.  Can I see additional pages, please?

15   Q.  Sure.

16   A.  Okay.

17   Q.  You keep flipping some of the pages.

18   A.  Okay.  I recognize the content on these pages.

19   Q.  In fact, you provided a lot of content to Duff to --

20   because they were looking for information about Backpage in

21   connection with potential sale, correct?

22   A.  I thought that content went to Scott Spear and Jed Brunst.

23   They gave it to Duff Phelps.

24   Q.  Okay.  Fair enough.

25            And by the way, if we notice -- we're looking at one

1    of the pages, looks like it's the cover page.  You see there's

2    three different Bates numbers?

3    A.  Yes, I do.

4    Q.  And isn't it true that Backpage produced this document in

5    response to three different requests, one being the Arizona

6    grand jury?

7    A.  I believe so.

8           MR. LINCENBERG:  All right.  Your Honor, we would move

9    this document into evidence on the same basis, 901, that the

10   government moved documents into evidence with Mr. Ferrer

11   whether he recalls seeing them or not.

12          MR. RAPP:  Well, I don't -- I don't have an objection

13   to the authenticity.  I have an objection to the fact that it

14   is 50 pages of hearsay and it's got -- it has pages that are

15   violative of the Court's previous order.

16          MR. LINCENBERG:  So, Your Honor, if there's any pages

17   violative, it can be redacted.  This is a government's exhibit.

18   If they had anything needing to be redacted, they could have

19   redacted it.  And it relates to completeness because the

20   government put PowerPoints by Duff, and this is the lengthy

21   document --

22          Is this too loud?

23          THE COURTROOM DEPUTY:  It's coming in and out.

24          THE COURT:  You're going in and out.

25          MR. LINCENBERG:  Liliana's suggesting I switch this.

1    Sorry.

2            Testing.  You have to switch it.  There.

3            THE COURT:  I'm going to sustain the objection not

4    only on the grounds that the government said, but I just heard

5    the witness say he didn't recognize the document.  He

6    recognized some of the content in the pages he looked at.

7            MR. LINCENBERG:  I'd like --

8            THE COURT:  He did not recognize -- he's never seen

9    the document, so I'm going to sustain the objection.

10           MR. LINCENBERG:  Well, Your Honor, the government

11   introduced a lot of exhibits that he said he never saw, but

12   they were 901, and these were documents he produced.

13           THE COURT:  I sustained the objection.  And further,

14   if there's redactions to be made, then they should have been

15   made prior to any motion to admit.

16           So sustained.

17   BY MR. LINCENBERG:

18   Q.  All right.  Well, let me just, without publishing the

19   document, ask -- you said that there's some information you

20   recognize in here.  Let me go through some of the pages and see

21   if you recognize some of this information in Government

22   Exhibit 498 for identification.

23           So --

24           MR. RAPP:  Judge, I'll object to the extent he intends

25   on reading from this document that is not in evidence in an

```
 1    effort to see if he recognizes it.

 2              THE COURT:  Well, let's see what the questions are

 3    first.

 4    BY MR. LINCENBERG:

 5    Q.  All right.  Let's turn to page 17.  And if you can look at

 6    the section under Rigorous Quality Control and tell us if you

 7    recognize that.

 8              MR. RAPP:  Right.  So now he's just reading from the

 9    document.

10              THE COURT:  Well, Mr. Ferrer can read whatever that

11    content is, but not Mr. Lincenberg.

12              MR. RAPP:  Very well.

13              THE COURT:  And he can say if he recognizes it or not.

14              THE WITNESS:  So what was the question?

15    BY MR. LINCENBERG:

16    Q.  Do you recognize this content?

17    A.  I recognize the language is how we would later use to

18    describe moderation.

19    Q.  Okay.  And was this language accurate or inaccurate?

20              I'm not looking for --

21    A.  Well, I guess --

22    Q.  -- a narrative.  Just, was it accurate or inaccurate?

23              THE COURT:  Don't speak over one another, again,

24    please.

25              MR. LINCENBERG:  Your Honor, he hadn't spoken yet.
```

```
 1            THE COURT:  He was.

 2            THE WITNESS:  It's -- it's really talking about -- you

 3    asked me is it accurate or inaccurate, and I guess I really

 4    can't answer that.  It would be misleading for me to say yes or

 5    no.  So I -- I'd need to explain.

 6    BY MR. LINCENBERG:

 7    Q.  Let's look at page 18.

 8            Is the section -- take your time to read the section

 9    on Proactive Regulatory Philosophy, and tell us if -- first, if

10    you drafted it.

11    A.  I did not draft this.

12    Q.  Do you know who did?

13    A.  I did not write this.

14    Q.  Do you know who did?

15    A.  Oh, do I know who did?

16    Q.  Know.

17    A.  The date again is 2011?

18    Q.  Right.

19    A.  I'm not sure.

20    Q.  Okay.  And did you -- does this refresh your memory of

21    having read this Confidential Information Memorandum?

22    A.  You mean this slide?

23    Q.  Yeah.  Does it help refresh your memory of having reviewed

24    the document that Duff was using in connection with helping to

25    sell the company?
```

1    A.  It doesn't.

2    Q.  All right.  Let's look at page 20.  Company Overview.

3           Do you recognize that language?

4    A.  I -- I don't recognize this language.

5    Q.  Okay.  Let's look at page 25.

6           Do you recognize this Ad Volume and Revenue By

7    Category?

8    A.  I recognize this because we would use this in PowerPoints

9    when seeking buyers and investors.

10   Q.  And when you say you would use this language elsewhere, you

11   would use language, for example, disclosing that 93, 94 percent

12   of --

13          MR. RAPP:  I'm going to object.  He's reading from --

14   BY MR. LINCENBERG:

15   Q.  -- revenue was in the Adult category?

16          MR. RAPP:  He's reading from a document that's not in

17   evidence.

18          THE COURT:  Sustained.

19   BY MR. LINCENBERG:

20   Q.  Sir, in disclosures to potential buyers, did you -- and the

21   Duff documents that you did review, disclose that 93.40 percent

22   of revenue from Backpage was in Adult categories?

23   A.  Yes, we did.

24   Q.  That wasn't concealed from potential buyers, right?

25   A.  It's buried in the PowerPoints.

```
 1   Q.  Okay.  And when you say "buried in the PowerPoints," is the
 2   suggestion -- well, one of the potential buyers in that time
 3   period was a company called Craig Capital.  Correct?
 4   A.  Correct.
 5   Q.  Pretty sophisticated firm, as far as you understood?
 6   A.  I wasn't too familiar with firms and buyers, so I have a
 7   hard time knowing -- being able to answer that.
 8   Q.  Okay.  And is the suggestion about it being buried, is it
 9   your understanding that a potential buyer would not review all
10   of even a PowerPoint before spending hundreds of millions of
11   dollars on a purchase?
12   A.  No.  I believe they would review it, and we did disclose
13   it.  We even said plausible deniability.
14          MR. LINCENBERG:  Move to strike the other stuff that
15   Mr. Ferrer wants to add that he said and have him focus just on
16   the question that I asked.
17          THE COURT:  What is the part that you want stricken?
18          MR. LINCENBERG:  The plausible deniability part that
19   he's throwing in.
20          THE COURT:  All right.  The jury will disregard that
21   portion of his testimony.
22   BY MR. LINCENBERG:
23   Q.  Sir, isn't it true that where this phrase that you used,
24   plausible deniability, was used was because you understood that
25   a customer who might go on any adult site might not want it to
```

1   reflect on their credit card statement what that site is?

2   A.  I -- I don't understand that question.

3   Q.  Let me try to help you understand it.

4        Let's say somebody is -- Playboy's not published

5   anymore, but let's say somebody is subscribing to Playboy, but

6   they don't want on their credit card statement $36 to Playboy

7   or Hustler or Penthouse.  So the description is one that would

8   give them plausible deniability if their girlfriend or wife or

9   whoever might look at it.

10        Isn't that what plausible deniability referred to?

11  A.  Not in this case.  It's -- because the credit card

12  transactions at this time would have said Backpage.com.

13  Plausible deniability meant that we had the veneer of a general

14  classified site even though 93.4 percent of our revenue was in

15  adult.

16  Q.  When you say "the veneer," every one of these credit card

17  applications disclosed that they were related to Backpage.

18  Right?  Every one of these payment processing applications.

19  Right?

20  A.  Yes.

21  Q.  And it doesn't take a brain surgeon to know that Backpage

22  was all over Google as being in the adult category.  Correct?

23  A.  Well, I -- I don't know what you're asking.

24  Q.  I'll withdraw the question.

25        Let me direct your attention to Exhibit 120-a in

1     evidence and ask that that be published.

2              Now, 120-a was a government exhibit that you testified

3     to, and this is an email in September of 2011 from Jacob

4     Rapp -- I'm assuming no relationship to Mr. Rapp.

5              MR. RAPP:  Nope.

6     BY MR. LINCENBERG:

7     Q.  -- from Jacob Rapp at Duff and Phelps -- we'll take his

8     answer.  Even though it's not under oath, we'll accept it --

9     from Jacob Rapp at Duff and Phelps to Carl Ferrer.

10             Do you see that?

11    A.  I do.

12    Q.  And this was Duff and Phelps communicating to you asking

13    you to send to Duff and Phelps the latest version of the

14    PowerPoint.  Right?

15    A.  That's what it states.

16    Q.  Okay.  And we can take that down.

17             And Duff and Phelps is asking you for the latest

18    version because you were involved in editing, reviewing, and

19    providing information.  Correct?

20    A.  I am involved because I'm working for Mr. Brunst.

21    Q.  So -- okay.

22             So you're involved because you're working for

23    Mr. Brunst.  Is -- let me ask you the question that I asked you

24    again.

25             Is Duff and Phelps, to your understanding, emailing

1    you to send them -- well, let me ask you this:  Why do you

2    think Duff and Phelps was emailing you to ask you for the

3    latest version of the PowerPoint, Exhibit 120?

4    A.  I don't know.  They -- I mean, clearly Jed Brunst is the

5    boss.  Maybe he didn't respond promptly.

6    Q.  But your testimony was that Mr. Brunst created that

7    PowerPoint.  Right?

8    A.  Which PowerPoint are we referring to?

9    Q.  Exhibit 120.  If we can put Exhibit 120 on the screen.

10         You testified on direct examination that Mr. Brunst

11   created this PowerPoint.

12   A.  I'm saying that Mr. Brunst is responsible for the content

13   in this PowerPoint and I am working for him to help put it

14   together.  And we're on -- I believe that was Version 6, so

15   we've gone back and forth several times, several versions.

16   Q.  I see.  Okay.

17         So now it's not that Mr. Brunst created but he's

18   responsible for it.  Is that your latest and best testimony?

19         MR. RAPP:  I'm going to object to that.  I'm not sure

20   his testimony was how the defense counsel --

21         MR. LINCENBERG:  Move to strike the editorializing.

22   If he has an objection, he can state it.

23         THE COURT:  Well, I'm going to move to strike the

24   question as improper.  And let's move on.

25

1    BY MR. LINCENBERG:

2    Q.  Okay.  So if we go back to Exhibit 120-a, is your testimony

3    that Duff and Phelps is asking you to send the latest version

4    of the PowerPoint that Mr. Brunst is creating?

5             MR. RAPP:  Yeah, so this isn't 120.  This is 120-a.

6             MR. LINCENBERG:  This is 120-a, yeah.

7             THE COURT:  Is this in evidence?

8             MR. LINCENBERG:  Yes.

9             THE COURT:  Let's try to be precise in reciting the

10   exhibits.

11            MR. RAPP:  Yeah.  The objection is he's misstating the

12   contents of the email.

13            THE COURT:  Let's -- in the first instance, let's be

14   precise in citing to the exhibit number for the record.

15            Okay.  Let's move forward.  Go ahead.

16   BY MR. LINCENBERG:

17   Q.  Okay.  So 120-a, your testimony is that Mr. Rapp from Duff

18   and Phelps is emailing you for a PowerPoint that Mr. Brunst

19   created?  Is that your testimony?

20   A.  I think it might be the opposite.  Can I see the whole

21   email, please?

22   Q.  Sure.

23            The whole email talks about --

24   A.  Yeah.  I think it's the opposite.  I'm -- from Carl Ferrer

25   to Jacob Rapp.  "Can you send me the latest version of the

1   PowerPoint."

2            So Jacob has it.  I need to send a slide or two --

3   Q.  "To our attorneys"?

4   A.  -- to our attorneys.

5   Q.  So he's going back and forth with you about the PowerPoint.

6   A.  No, he's not.  What's going on here is that an attorney has

7   asked me to get a slide or two and so I'm asking for it.

8   Q.  And this is -- and as part of the process, you were

9   reviewing every word in that PowerPoint, right?

10  A.  What?

11  Q.  You were reviewing every word in that PowerPoint, right?

12  A.  I did -- well, review.  I don't have control of the content

13  in the PowerPoint, but I did read it.  The PowerPoint that we

14  used for the sales presentations.

15  Q.  Right.

16  A.  It's --

17  Q.  Okay.  So let's go back to Exhibit 120 and move to page 14.

18           So page 14 is discussing regulatory approach.  You see

19  that?

20  A.  I do see that.

21  Q.  And part of the PowerPoint is saying, quote/unquote, one of

22  the good guys.

23           Do you see that?

24  A.  I see it.

25  Q.  And it discusses cooperation, for example, with law

1    enforcement and gives some examples of thank yous from

2    different police departments.

3              Do you see that?

4    A.  I do.

5    Q.  And it discusses ongoing cooperation, correct?

6    A.  It has the words "ongoing cooperation."

7    Q.  Okay.  And it notes that Backpage has received hundreds of

8    appreciative emails, letters, and calls from law enforcement

9    officials around the country for its proactive assistance.

10             Do you see that?

11   A.  I see it.

12   Q.  And was that accurate?

13   A.  Yes.  We received a lot of emails saying thank you for

14   replying to the subpoena.

15   Q.  Well, you received a lot of emails above and beyond saying

16   thank you for replying to a subpoena, right?

17   A.  Yes.  We -- we deliberately sought public feedback so that

18   we could use it in PowerPoints like these.

19   Q.  I see.  Okay.

20             All right.  Let's look to slide page 15.  This is

21   talking about the Adult category, and the PowerPoint is noting

22   that listing for female escorts represents the vast majority of

23   the category's traffic.  Right?

24   A.  Correct.

25   Q.  Openly disclosing to any potential purchaser the nature of

1    Backpage's categories, that female escorts are some 80 percent

2    of the traffic.  Correct?

3    A.  I would agree.

4    Q.  Okay.  And Slide 12, Adult.

5           And noting for any potential purchasers that

6    93.4 percent of the total paid ads are in the Adult category,

7    openly disclosing that.  Correct?

8    A.  Correct.

9    Q.  And Slide 26.

10          Key considerations, noting that Backpage is simply an

11   intermediary and the subject matter being advertised on its

12   sites can be found in numerous newspapers, magazines,

13   et cetera, on Google, Microsoft, Yahoo, and so forth.

14          Do you see that?

15   A.  I see it.

16   Q.  And do you believe that to have been an accurate statement?

17   A.  Once again, it's difficult for me to answer yes or no

18   because it would be misleading.

19   Q.  Okay.  We can take that down.  Thank you.

20          All right.  I'd like to move to Exhibit 763 in

21   evidence and have that published.

22          So just to remind us where we're at with this, this is

23   a May 6th, 2014, email from Mr. Brunst to you, copying

24   Mr. Larkin.  Is that right?

25   A.  That's correct.

1    Q.  Okay.  And it has in here -- well, let's go down the email

2    so that you see it all.  If we can flip to the other pages.

3            So preceding this was an email from you on May 5th to

4    Mr. Brunst.  Correct?  And you provided certain information; is

5    that right?

6    A.  It's a long email.

7    Q.  Right.  Well, let me focus you on, under Long-Term Strategy

8    and Growth Plans, for example, you discussed monetizing the

9    consumer of content.

10           Do you see that?

11   A.  I do see that.

12   Q.  Okay.  And this was something that you had drafted as part

13   of your discussion of long-term strategy and growth plans.  Is

14   that accurate?

15   A.  Can I see the -- who this email went to?

16   Q.  Yes.  It looks like it's addressed to Jed.

17           Do you see that?

18   A.  Yeah.  I see it's addressed to Jed.

19           And what's above?  It says "Nathan would be helpful."

20   I wanted to see --

21   Q.  Sure.  That's, I believe, Mr. Brunst's reply, but we can go

22   back up to the first page.

23           Okay?  So there's two emails in this string.  The

24   first is information that you're providing to Mr. Brunst about

25   strategy and growth plans, and I just focused on one of the

```
 1    items; and then Mr. Brunst's reply.  Fair?
 2    A.  Where does Mr. Brunst reply?
 3    Q.  Mr. Brunst emailing you back.  "Carl."
 4    A.  Oh.  Got it.  All right.
 5    Q.  This was an exhibit that you reviewed with the government
 6    prior to your testimony, right?
 7    A.  Yep.  I got it.  I just needed to refresh my memory.
 8    Q.  All right.  And so just to have you confirm, this is
 9    information that you're providing on your -- the different
10    plans for the company and projections, including one that I'm
11    going to highlight just as an example, monetize the consumer of
12    content.  Is that right?
13    A.  This is an email where I was requested to come up with
14    every possible revenue-growing strategy --
15            MR. LINCENBERG:  Your Honor, I'm going to move to
16    strike.  It's nonresponsive.
17            THE COURT:  I'll have the answer stricken.
18            Maybe you can ask a clearer question, because it's --
19    it was fairly long and somewhat confusing.  So just go ahead
20    and ask a new question.
21    BY MR. LINCENBERG:
22    Q.  Sir, were you providing information to Mr. Brunst about the
23    strategy and growth plans of Backpage?
24    A.  I did send this email.
25    Q.  Okay.  And Mr. Brunst replied, right?
```

CARL FERRER - CROSS-EXAMINATION

1    A.  He did reply.

2    Q.  And if we can go up and just -- just to make it bigger,

3    let's just have page 1 here.

4         And Mr. Brunst's reply is:  Carl, these are all good

5    but need some reorganization -- some organization.  For each

6    revenue initiative, you should be explicit in describing the

7    revenue opportunity and why you believe it will be successful.

8         Right?

9    A.  That's what it states, correct.

10   Q.  So he's basically asking you, can you organize it a little

11   better and give it a little more detail.  Right?

12   A.  No.  He wants to know how much money.

13   Q.  Well --

14   A.  Describe the revenue opportunity.

15   Q.  Right.

16   A.  And he wants to know the sales strategy to accomplish it.

17   Q.  Okay.  Well, what he asks in the email is some organization

18   and be explicit in describing the opportunity and why you think

19   it's going to be successful.

20        Right?

21   A.  To -- that's what it states.  What he means is projections.

22   That's what revenue -- describing the revenue opportunity means

23   how much revenue.

24   Q.  Right.

25   A.  And when could it come in.

CARL FERRER - CROSS-EXAMINATION

51

1   Q.  So he's not coming up with this idea, if we go back to what

2   you wrote to him on page 2, of -- I'm just taking one as an

3   example.  He's not telling you monetize the consumer of

4   content.  He's just saying, if that's part of your strategy,

5   give us the projections and better organize your thoughts.  Is

6   that right?

7   A.  This strategy is something that Jim Larkin and I discussed,

8   so I'm listing -- this is one of the ideas that the company is

9   discussing.

10  Q.  Okay.  And he's responding by saying, spell it out in a

11  little more detail and better organization.  Right?

12  A.  And the sales strategy.

13  Q.  All right.  Let's look at Exhibit 500 in evidence.

14          Now, Exhibit 500, just to bring the jury back to where

15  we were at, was an exhibit you testified to on your direct

16  examination, and there's an email from BDO to Mr. Brunst on the

17  top.  There's a reply from Mr. Brunst to BDO with updated

18  forecast.

19          Do you see that?

20  A.  I see that.

21  Q.  And you're not on this email, right?

22  A.  Correct.

23  Q.  You never saw it until you discussed it with the prosecutor

24  in reviewing what documents he wanted to have admitted into

25  evidence through you; is that fair?

1   A.  Yes.

2   Q.  Okay.  And were you aware that BDO -- you recall BDO is the

3   accounting firm?

4   A.  Yes, it is.

5   Q.  And BDO had been an accounting firm that was doing a lot of

6   work in 2015 assisting in setting up corporate structures and

7   the sale of the company to you; is that right?

8   A.  Yes.

9   Q.  Okay.

10  A.  The sale's already occurred, and Jed's working with BDO.

11  Q.  Right.  And they also assisted with the sale, right?

12  A.  I think they did, yes.

13  Q.  And were you aware at the time that you testified about

14  this that BDO needed to understand the value of the loan to you

15  in order to properly value Mr. Larkin's estate?  Were you aware

16  of that?

17  A.  Could you state that again?

18  Q.  Yeah.

19          BDO at this time, in November of 2015, was making

20  inquiries because they needed to understand the value of the

21  loan, of the seller's loan to you, in order to properly value

22  Mr. Larkin's estate.

23          MR. RAPP:  Objection.  Foundation.

24          MR. LINCENBERG:  I'm asking if he's aware of it.

25          THE COURT:  Sustained.

```
 1    BY MR. LINCENBERG:

 2    Q.  Did you have any conversations about the purpose of BDO's

 3    inquiry that you testified about?

 4            MR. RAPP:  Same objection.

 5            THE COURT:  Sustained.  I think it's vague.

 6            MR. LINCENBERG:  I'm sorry?

 7            THE COURT:  It's vague.  The question you asked is

 8    vague.

 9    BY MR. LINCENBERG:

10    Q.  Looking at this email that you testified about, in

11    connection with this, did you ever have conversations with

12    Mr. Brunst about the purpose of BDO's inquiry to him?

13    A.  I don't recall any conversation regarding the purpose of

14    this email.

15    Q.  Okay.  And in the email, Mr. Brunst writes:  Per the

16    revised projection, the operating margin does increase over

17    time.  Expenses as a percentage of revenue decline.  But the

18    business needs to support a dramatically increased volume of

19    content and users as the result of ads becoming free to post.

20    And expenses over the projection period have been reduced, but

21    margins will never return to the previous levels unless a

22    highly automated global payment option like Visa is available,

23    allowing for free ads to become paid ads.

24            Do you see that?

25    A.  I do.
```

1    Q.  And you understand that to be Mr. Brunst advising the

2    accounting firm that because of the credit card problems, the

3    value of the entity is likely to be reduced?

4    A.  Are you asking me if that's my understanding now --

5    Q.  Yes.

6    A.  -- from --

7    Q.  Yes.

8    A.  -- having read this email?

9    Q.  Yes.

10   A.  Yeah, Backpage is a sinking boat.  And the loan isn't

11   worth, you know, 10 percent of the balance.

12   Q.  Okay.

13   A.  It's a half -- over a half a billion dollar loan.

14   Q.  Anything else?

15   A.  No.

16        MR. LINCENBERG:  Your Honor, I'd move to strike

17   everything after yes.

18        THE COURT:  All right.  It may be stricken, and the

19   jury will disregard.

20        MR. LINCENBERG:  Now, we can pull this off the screen.

21        THE COURT:  But in fairness, Mr. Lincenberg, you

22   prompted by saying, is there anything else?  So maybe next time

23   don't do that.

24        MR. LINCENBERG:  Okay.  Okay.

25

1   BY MR. LINCENBERG:

2   Q.  Now, sir, as of the time of the sale in April of 2015, I

3   think you testified the business was doing quite well.

4   Correct?

5   A.  Prior to the sale in 2015, yes.  All-time records.

6   Q.  All-time records.

7       You had a seven-figure income in 2014, correct?

8   A.  I don't know exactly, but I -- probably, yes.  Probably.

9   Q.  And did you see the purchase of Backpage at a time when it

10  was just coming off a year of all-time high sales as an

11  opportunity for you to increase your personal income even more?

12  A.  Yes.

13  Q.  And in connection with the decision of whether to purchase

14  Backpage, you consulted with professionals, correct?

15  A.  These are not my professionals.  These are -- so I did not

16  consult with my own professionals.

17  Q.  Did you have an attorney named Larry Shosid, who was

18  reviewing all of the documentation and counseling you in

19  connection with the purchase?

20  A.  Well, that was Jim Larkin's attorney, and he recommended I

21  use him.

22  Q.  Okay.  So the answer is yes, that you followed his

23  recommendation in a referral of an attorney?

24  A.  It's -- he was a company attorney.  He worked for the

25  Dallas Observer too.  And I was advised to use him.

1   Q.  Who owned the Dallas Observer in 2018 -- in 2015?

2   A.  Well, I'm speaking of his work Shosid maybe had done prior,

3   so in 2015, I believe it's an employee-led management group.

4   But Shosid worked for the Observer prior to the sale of the

5   papers.

6   Q.  Okay.  So you're not suggesting that in 2015, when you

7   retained Mr. Shosid, that he was representing Mr. Larkin at

8   that time, are you?

9   A.  I'm saying that this is the -- Larkin's former attorney

10  that he suggested that I use, strongly suggested, and I didn't

11  question it.

12  Q.  You could have hired any attorney you wanted to help you in

13  the sale, right?

14  A.  That's not my impression.

15  Q.  Your impression is that in your decision to make a purchase

16  for $600 million, that you were forced to use an attorney that

17  the seller was suggesting you might want to contact?

18  A.  That I was forced to use an attorney?  They always hired

19  all the attorneys.

20  Q.  Well, did --

21  A.  I didn't hire the attorneys.  They hired --

22  Q.  Is it your testimony that Mr. Larkin hired Larry Shosid to

23  represent you?

24  A.  No.  My testimony is, is that Larkin told me to use Larry

25  Shosid.

1    Q.  Did you ask Mr. Larkin for referrals?

2    A.  I don't recall whether I asked or he just told me.  I think

3    he just told me.

4    Q.  Just told you, you use this attorney?

5    A.  Yes.

6    Q.  Okay.  And because he told you to, that's who you hired to

7    represent you in a negotiation where he was the seller and you

8    were the buyer?  Is that your testimony?

9    A.  Yes.  And I was familiar with Shosid because we had him do

10   some other work for us in Dallas that involved Backpage.  So

11   I -- to really -- well, that's it.

12   Q.  And you viewed -- I believe your previous testimony was

13   that in 2014, Backpage's revenues were somewheres over a

14   hundred million.  The number that comes to mind is maybe

15   120 million for the year, 130 million.  Right?  Somewheres in

16   that neighborhood?

17   A.  Somewhere in that neighborhood.

18   Q.  All right.  And this was an opportunity of -- for you to be

19   the CEO and owner of a company with over a hundred million

20   dollars in annual revenue without putting down any money up

21   front.  Correct?

22   A.  Correct.

23   Q.  Okay.  You described it on your direct examination

24   testimony as, quote, a plan to put the company in your name.

25           Do you recall that?

1   A.  I do.

2   Q.  Okay.  Was that your plan?

3   A.  No.  It's a plan that the sellers put together so that we

4   could expand banking opportunities with a new UBO.  And I

5   viewed it as a good plan and that I'd be an employee,

6   essentially.

7   Q.  Well -- well, you'd be an owner.

8   A.  Well, I would be the public-facing owner, but I was assured

9   by the owners that they would set up layers of company --

10  companies to protect me from being the owner, that they would

11  make it look like a Dutch company owned it.

12  Q.  Well, there was a Dutch company that was established,

13  correct?

14  A.  Yes, there was.  Multiple Dutch companies.

15  Q.  And some 10, 15 percent of the revenue in that time period

16  was from international, outside of the U.S. sales, right?

17  A.  What year are you referring to?

18  Q.  Well --

19  A.  Because it wouldn't have been 15 percent in 2015.

20  Q.  Let me ask you this:  Of the $600 million price, about

21  500 million was for purchase of the U.S. company and somewheres

22  under -- a little bit under a hundred million was for purchase

23  of the overseas company.  Right?

24  A.  Correct.  It was two loans equaling $600 million.

25  Q.  Right.  Right.

1            And the structures of the company were structures that

2    were prepared by the corporate attorneys and BDO for a variety

3    of reasons, correct?

4    A.  The structure was created by Jed Brunst and his attorneys

5    and BDO.

6    Q.  So it's your testimony -- do you have firsthand knowledge

7    that Jed Brunst put together the corporate papers -- let me

8    strike that.

9            Is Mr. Brunst, to your knowledge, licensed, for

10   example, to practice law in the Netherlands?

11   A.  I'm not talking about law.  What I'm talking about is I --

12   Q.  I'm asking a question.

13   A.  -- didn't speak to BDO.  That's --

14           What's your question?

15   Q.  My question is, is it your understanding that Mr. Brunst is

16   a licensed lawyer in the Netherlands?

17   A.  He is not.

18   Q.  Okay.  And was it your understanding and desire that the

19   companies be created in a manner which would maximize your tax

20   benefits, for example?

21   A.  That would be one of the goals.

22   Q.  Okay.  Now, sir, if the earnings at the time -- let's just

23   call it about $125 million.  The company was then purchased at

24   about four times earnings.  Right?

25   A.  I think that's incorrect.

1    Q.  Four and a half -- more than four.  Between four and five

2    times earnings, correct?

3    A.  I thought the number was more like six, which is really

4    high for a site that has adult content.

5    Q.  So it's your testimony that a company which is purchased at

6    $600 million with a high margin and has $125 million of

7    revenue, that that multiple is high?

8    A.  It is extremely high because the content is female escorts,

9    and it's high reputational risk.  Very high.

10   Q.  And over the past few years, the company had made tens of

11   millions of dollars off that revenue.  The margins were high,

12   right?

13   A.  The margins were high, but the multiple should have been

14   three, but there was no negotiation on the price.  It was

15   600 million, sign it.  There -- I never was able to negotiate

16   ever on the price.

17   Q.  So you were handcuffed.  You had no ability to say, I'm

18   negotiating to buy this company.  I think the price should be

19   400 million.

20        You couldn't speak those words?

21   A.  I was handcuffed by my own greed because I wanted to keep

22   my salary because it was very good.

23   Q.  Okay.  Now, you had testified about an agent that you were

24   negotiating with in connection with this.  When you used this

25   term "agent," was that Don Moon?

1   A.  Yes.

2   Q.  Okay.  And when you were interviewed 30 times -- let's

3   confine it to the 10 or 12 interviews where there were reports

4   written up.

5        Did you ever, when you were talking about Don Moon,

6   just say, "I spoke to the agent"?  Or did you say, "I spoke to

7   Don Moon"?

8   A.  I don't remember.

9   Q.  Did you have discussions with the prosecutors in which you

10  discussed that when you testify on direct examination about Don

11  Moon, don't use his name, just call him agent?

12  A.  I'm not sure I recall.  I always referred to him as the --

13  representing the sellers.

14  Q.  Isn't it true, sir, that you intentionally came into court

15  and referred to him as an agent because you had discussions

16  about not advising that he was both a lawyer and a board member

17  of Village Voice Media Holdings?

18  A.  What's the question again?

19  Q.  My question is, isn't it true that you had discussions with

20  the prosecutors about intentionally referring to him as an

21  agent instead of by his name or as a board member or as a

22  lawyer helping the company because they asked you to avoid

23  those words?

24  A.  Yeah.  What I can say is, is that I referred to him as a

25  Village Voice Media board member.

1    Q.  Right.  In all of your interviews, you never once used this

2    term "agent" that you were using conveniently in your direct

3    examination, right?

4    A.  I think I called him Don Moon.

5    Q.  Okay.

6         MR. LINCENBERG:  All right.  I'd like to place before

7    Mr. Ferrer Exhibit 1049-b in evidence.  Ask that it be

8    published.

9         First show Mr. Ferrer the cover page in order to

10   orient himself, and then I'm going to ask that we turn to -- I

11   think it's Slide 6.

12   BY MR. LINCENBERG:

13   Q.  I want to focus you on -- focusing you in on 1049-b, this

14   is a June 24th -- June 2014 PowerPoint.

15        MR. LINCENBERG:  Let's just show Mr. Ferrer the next

16   page to help orient him.

17   BY MR. LINCENBERG:

18   Q.  It starts with Company History.  You recall testifying

19   about this document?

20        Let me -- let me move to page 6.  That was a pie chart

21   that the prosecutor had specifically asked you about.

22        Do you recall that?

23   A.  Yes, I do.

24   Q.  All right.  Now, on the left-hand side is a pie chart about

25   ads.  Do you recall that?  Focus in on Ads by Category

1   Breakdown.

2          And do you recall testifying that this pie chart is an

3   attempt to create that veneer of a general classified site when

4   it shows 47 percent of the ads posted as being in Jobs, but we

5   know the vast majority of these postings are feeds?

6          Do you recall that testimony?

7   A.  Yes.

8   Q.  And so you testified in that sense that this is rather

9   deceptive.  Right?

10  A.  Correct.

11  Q.  So this PowerPoint in 2014 that is going to be presented to

12  a potential buyer, your testimony is it was deceptive in the --

13  this pie chart.  Right?

14  A.  I'm not sure what the purpose of this PowerPoint was for.

15  Q.  We'll get to that.

16         Is it your testimony that this is deceptive?  That was

17  your testimony, right?

18  A.  Yes, and --

19  Q.  Okay.

20  A.  -- can I explain?

21  Q.  No.

22         Now, what -- are any of these figures inaccurate?

23  A.  They are.

24  Q.  Okay.  And point to one which is inaccurate.

25  A.  I can point to more than one.

1   Q.  Let's start with one of them.  Please point to one of them

2   that's inaccurate.

3   A.  Let's start with this one (indicating).

4   Q.  Okay.  So your testimony is that the pie chart which says

5   that 47 percent of the ads were in the Jobs category is

6   inaccurate.  That's your testimony?

7   A.  My testimony is, is that it includes feeds and is therefore

8   inaccurate.

9   Q.  And do you know who provided the information that led to

10  the creation of this pie chart?

11  A.  I ran a report that provided this information.

12  Q.  Okay.

13  A.  And that report included both feeds which are user

14  generated -- are the -- machine generated and user generated to

15  give the impression that we have a lot of job ads.

16  Q.  All right.  So you're saying it would have been more

17  accurate if you broke the Jobs category down by what's user

18  generated versus non-user generated.  Is that what your

19  testimony is?

20  A.  Correct.

21  Q.  All right.  And if we go to the other side of the pie

22  chart, this is noting that a high percentage, here it says

23  91 percent, are -- of transactions by category breakdown are

24  Adult Entertainment.  Right?

25  A.  Correct.

1   Q.  All right.  And so if we go back and look at the two pie

2   charts on the page next to each other, would it be fair to say

3   that nobody is concealing that adult entertainment makes up a

4   vast bulk of the company's transactions?

5   A.  Correct.

6   Q.  All right.  And the party that was -- that was

7   purchasing -- the party that entered into negotiations to

8   purchase the company was you, correct?

9   A.  There was no one else to take it over.

10  Q.  So you weren't deceived by this, were you?

11  A.  Oh, no.  I knew.

12          THE COURT:  Mr. Lincenberg, do you need more time on

13  this exhibit?

14          MR. LINCENBERG:  I can break right now, Your Honor.

15          THE COURT:  All right.  Members of the jury, we will

16  take our morning recess for 20 minutes, the standard time.  And

17  again, just remember the admonishment.  And we will start in 20

18  minutes and so just be prepared to come in at that time.

19          Please all rise for the jury.

20          (Jury not present.)

21          THE COURT:  All right.  You wanted to raise something

22  with me, Mr. Lincenberg?

23          MR. LINCENBERG:  Yes.  Yesterday we were using what's

24  been marked as GLCF 37, Mr. Ferrer's comments about money

25  laundering and those different issues.

1          And we supplied to the Court last night, I believe,

2     the proffer agreement.  I would also mention one other thing

3     that I think should be supplied to the Court.  Actually, two

4     points I wanted to make additionally.  I don't know if the

5     Court -- I mean, it came in late.  I don't know if the Court

6     had a chance to look at it.

7          THE COURT:  Oh, yes.  I'm looking at GLCF 37.

8          MR. LINCENBERG:  All right.  So the argument was that

9     the government had objected to our use of that because it was a

10    part of comments being sent to an attorney, Jim Grant.  And

11    they claimed it was privileged and that it was -- they also

12    argued it was in the context of something different.

13         And the Court had asked, first of all, to see the key

14    document that was part of that docket entry.  I don't remember

15    the number.  180-1.

16         THE COURT:  Can you speak up?  You're --

17         MR. LINCENBERG:  Yes.

18         THE COURT:  Thank you.

19         MR. LINCENBERG:  And I wanted also to note for the

20    Court a couple of more points.  First, the government doesn't

21    have standing to assert privilege.  Second, the government had

22    opposed our motion to dismiss for invasion of the privilege

23    with regard to a whole slew of different communications that

24    they had discussed with Mr. Ferrer.

25         THE COURT:  Well, let's get to the exhibit.

 1            MR. LINCENBERG:  Okay.

 2            THE COURT:  Focus on the exhibit.

 3            MR. LINCENBERG:  Second, the ruling in this court is

 4    that the privilege doesn't exist.

 5            And third is that Mr. Ferrer also was part of a joint

 6    defense agreement which had explicitly provided that any client

 7    signatory who enters into a cooperation agreement with the

 8    government or who testifies as a witness in any criminal

 9    proceeding arising from the case consents to any other

10    signatory, using for defense purposes any information or

11    material contributed by the client or by his attorney.  This

12    specifically permits use of contributed information or material

13    in cross-examining the witness and permits the presentation of

14    their information or material by the defense at any point of

15    the proceedings.

16            So this is a document.  It's his prior statements.  It

17    is directly contradictory to his testimony, and we would like

18    to be able to use that for impeachment of this witness.

19            THE COURT:  Well, I must be missing something,

20    Mr. Ferrer [sic].  You yesterday said that this was a part of a

21    filed docket, and that was not the case.  At least we explored

22    it, and it was an exhibit to that, so that's point 1.

23            MR. LINCENBERG:  It was a part of -- it was a part of

24    a document that was filed.

25            THE COURT:  Well, you gave me the wrong docket number

1    then.

2            MR. LINCENBERG:  Yeah.  I believe it was filed

3    ex parte.  I'm looking to Mr. Panchapakesan.  And I thought it

4    was -- 801 is the opposition.

5            Anyways, if I gave the Court the wrong information,

6    I -- then I was mistaken in terms of the docket entry.  I

7    understood it was a -- I think Docket 180-1.

8            THE COURT:  And that was wrong.

9            MR. LINCENBERG:  Okay.  And so then we provided to the

10   Court the key part of that filing, which was the proffer

11   agreement.  That filing was --

12           THE COURT:  What is the docket number of that filing?

13           MR. LINCENBERG:  180.

14           THE COURT:  180, as I recall, was a disqualifying

15   motion by the government.  So I'm not sure what you're looking

16   at.  I don't know.

17           But in any event, what I can tell you, looking at this

18   exhibit, looking at it last night, this looks like work

19   product, number one.  And it also, as I mentioned, doesn't have

20   any, to this point, that I can see -- there's an authenticity

21   issue here because there's strikeouts and there's really no

22   description as to who created the document and whose statements

23   are in there.  Although it does refer to Mr. Ferrer's comments,

24   I don't know who's putting those in.  I don't really know what

25   this document is about.

1              So that's -- that's --

2              MR. LINCENBERG:  Well, I can answer that.

3              THE COURT:  That's problematic.  So unless you can

4    give me whatever it is that this was filed with, then I'm not

5    going to be able to permit you to move to admit it or to use it

6    in that fashion, because as I said, I don't know who it is that

7    is putting these redlined comments in, and I don't know who it

8    is that is making these strikeout versions in, but it clearly

9    looks to me like a work in progress, not a statement under

10   oath.  So...

11             MR. LINCENBERG:  So a couple of responses.  First, we

12   noted that CF 36, GLCF 36, is -- and I'm going from memory --

13   an email from I think Ferrer to Jim Grant, which attached 37.

14             Second, Mr. Ferrer can authenticate that these are his

15   comments.  He's the one who made them.  If he wants to deny

16   that those are his comments or claim that they were out of

17   context, he can state that.

18             What we have is a document that is clearly statements

19   made by him, and if he wants to say, well, I was drafting and I

20   was revising and whatever excuses he wants, he can do that.

21   That's the weight and the give and take of impeachment

22   cross-examination.

23             THE COURT:  I'm waiting to hear from the government.

24             MR. RAPP:  Oh.  I'm happy to answer.

25             Well, first, the exhibit's just a mess.  I mean, it's,

1    as the Court has identified, it's all strikeouts.  It's not

2    even clear who wrote what in this thing, and then there's just

3    a lot of like legalese.  It even cites to Posner, legislate by

4    prosecution.  This all sounds like the Backpage attorneys'

5    line.

6            What really is of concern, though, is what

7    Mr. Lincenberg is not telling the Court, is where did he get

8    this?  How did he get this?  Because if he got it from Jim

9    Grant, Jim Grant was Mr. Ferrer's personal attorney.

10           And of course, we tried to -- I think the defense gave

11   the Court last night a proffer agreement where he waived the

12   privilege and the like.  And we tried to assert that in this

13   case, and Judge Logan, in Document -- Doc 345, said:  Ferrer is

14   bound by the JDA and he executed during his tenure with

15   Backpage, and based on the Court's in camera review this --

16   he's slightly right on the 180.  It's some kind of declaration

17   from Jim Grant, who filed it ex parte.  We've not even seen it.

18           But in any event, Judge Logan did find that Mr. Ferrer

19   was bound by this JDA in 345, so we can't even get these

20   documents.  And it's just like I said yesterday, they have used

21   this JDA as a shield, and then now they're going to try to use

22   it as a sword with just a mess of a -- an exhibit that they

23   won't even tell the Court how they got it, which would be

24   interesting.  And I note that Mr. Grant is on their exhibit

25   list -- or their witness list, so maybe he'll come in and tell

```
1    us how he provided this to them.

2              MR. LINCENBERG:  So in response, Your Honor, first of

3    all, this document --

4              THE COURT:  Reply.  You're replying, so this is the

5    last word, and then we can take our break, our 10-minute break

6    now.

7              MR. LINCENBERG:  Your Honor, first of all, the fact

8    that this exhibit is -- if you want to call it a mess, I mean,

9    Ferrer created it.  Whether it's messy or not, it has --

10             THE COURT:  I don't know that.

11             MR. LINCENBERG:  That's because you haven't allowed me

12   to impeach him with it and ask him about it.

13             THE COURT:  But I guess that's a minor point at

14   this -- I don't know where this came from.  So you have to tell

15   me where this came from, how it was produced, who created it.

16             And, again, it's -- it's actually -- it doesn't seem

17   like a final product to me because of all of the strikeouts,

18   and there's really no signature page.

19             So I don't know where this came from, who created it,

20   what it relates to, and so at this juncture, until you can give

21   me that, I'm not going to permit you to move it in or to ask

22   him about it.

23             All right.  With that, we'll be on our break.

24             (Recess taken, 10:42 a.m. to 10:57 a.m.)

25             THE COURT:  Please be seated.  And let's go ahead and
```

1    check on the jury.

2              (Jury present.)

3              THE COURT:  All right.  Please be seated.

4              The record will reflect the presence of our jury.  The

5    witness is on the witness stand.

6              Mr. Lincenberg, you may continue.

7              MR. LINCENBERG:  Thank you, Your Honor.

8    BY MR. LINCENBERG:

9    Q.  Mr. Ferrer, I want to go back to the testimony that you

10   gave this morning about Mr. Brunst setting up the corporate

11   structures in connection with the sale.

12             Now, you recall that on May 10th of 2018, you had told

13   the government in an interview that DLA Piper, BDO, and

14   CorpAcq -- that's C-O-R-P, capital A-C-Q -- worked with Brunst

15   in setting up the corporate structure when Ferrer purchased

16   Backpage.

17             Do you recall that?

18   A.  I don't recall it exactly, but that's accurate.

19   Q.  Okay.  Just so we're clear, let me place in front of you

20   Exhibit GLCF 4 for identification.  And first to orient you,

21   we'll show you the first page.

22             MR. LINCENBERG:  This is for the witness's eyes only.

23   GLCF 4.

24             And, Your Honor, may the court clerk put on the screen

25   for the witness's -- there we go.

1    BY MR. LINCENBERG:

2    Q.  So for your eyes only, you recall that -- does this help

3    refresh your memory and orient you to an interview you had on

4    May 10th, 2018, with various members of the government team,

5    including Mr. Rapp?

6    A.  Yep.  I see the date.

7    Q.  Okay.

8    A.  My name.

9    Q.  And that's an interview memo that you reviewed, right?

10   A.  I think I reviewed this.

11   Q.  Okay.  And the -- if we can now direct you to paragraph 138

12   of this memorandum, it's on page 18 of 20.

13        THE COURT:  Mr. Lincenberg, just in -- because of

14   Mr. Ferrer's response that he thinks he interviewed, give him a

15   little bit of time to review the exhibit before him.

16        MR. LINCENBERG:  Yeah.

17        THE WITNESS:  I've reviewed 138 and a few items

18   underneath, but not this entire memo.

19   BY MR. LINCENBERG:

20   Q.  Okay.  Paragraph 138, the notes from the agents are

21   consistent with what you testified to here today, that DLA

22   Piper, BDO, and CorpAcq worked with Brunst in setting up the

23   corporate structure when Ferrer purchased Backpage.  Right?

24   A.  I believe so.

25   Q.  Okay.  Now let's take a look at GLCF 18.  And if I can

1    direct your attention to the first page, just to orient

2    ourselves.

3           This is a meeting you had with Mr. Rapp and some of

4    his colleagues on February 5th, 2019.  This is the memorandum

5    of interview of that meeting.  Right?

6    A.  That's -- is correct.

7    Q.  And it notes that during the meeting, you went through

8    memoranda of interviews that had been prepared from earlier

9    interviews.

10          Do you see that?

11   A.  Yes, I do.

12   Q.  Including the May 10th, 2018, interview which we just

13   showed you at GLCF 4.  Right?

14   A.  That's what it states.

15   Q.  Okay.  And then in connection with what was in

16   paragraph 138 of GLCF 4, you made changes to that, didn't you?

17   Let me direct your attention to page 21 of 24, paragraph 192.

18          Let me actually help orient you.  If you look at

19   page 18, 18 -- sir, it may be easier for you to work with the

20   hard copy -- oh, it's on the screen, okay.

21          On page 18, we're now going through changes that you

22   made to the May 10th, 2018, memorandum of interview.  Right?

23   A.  It appears to be changes, yes.

24   Q.  Okay.  And it's going through different paragraphs.  On

25   page 19 you see we're still dealing with the same memorandum of

1    interview.  On page 20.  And then on to page 21.

2    A.  Yes.

3    Q.  Okay.  And did you tell the agents in February of 2019 that

4    when you stated earlier that DLA Piper, BDO, and CorpAcq worked

5    with Brunst to set up the corporate structure, that you said to

6    change that and delete "worked with Brunst"?

7           Do you see that?

8    A.  Yes.

9           MR. LINCENBERG:  We can take this down.

10          Now I'd like to bring to -- I'd like to have published

11   to the jury and placed -- no, this is for identification.  I'd

12   like to, for the witness's eyes, put up on the screen

13   Government Exhibit 8 for identification.

14   BY MR. LINCENBERG:

15   Q.  Now, sir, let me ask you, in December of 2014, did you

16   review a letter of intent in connection with a possible

17   purchase of Backpage?

18   A.  I did.

19   Q.  And if we go to page 11 of Exhibit 8 for identification,

20   did you sign this letter of intent as buyer?

21   A.  I did.

22   Q.  All right.  And do you recall there being a letter of

23   intent which laid out various provisions that the parties

24   intended to include in an eventual documented sale?

25   A.  I do recall this document.

1        MR. LINCENBERG:  Your Honor, we move for the admission

2   of Exhibit 8.

3        MR. RAPP:  No objection.

4        THE COURT:  It may be admitted and published.

5        (Exhibit No. 8 admitted into evidence.)

6        MR. LINCENBERG:  Thank you.

7   BY MR. LINCENBERG:

8   Q.  We can go back to the first page just to show the jury.

9        This is what's called a nonbinding letter of intent,

10  December of 2014.  And it identifies the various seller and

11  buyer contemplated parties.  Is that right?

12  A.  Correct.

13  Q.  All right.  And it was contemplated that it would be a

14  seller-financed sale, correct?

15  A.  Yes.

16  Q.  Meaning that the seller would lend you money to purchase

17  the company, correct?

18  A.  Well, I'd define it a little differently.  Because they

19  didn't give me the money, $600 million, and then I give it back

20  to them.  They -- I signed a loan to give them monthly

21  payments.

22  Q.  All right.  Part of the arrangement would be a

23  seller-financed or loan -- if we want to call it loan --

24  agreement, where you would then pay back principal and

25  interest.  Right?

1  A.  Correct.

2  Q.  All right.  And as part of loan agreements, is it your

3  experience, if there's loans from banks, that banks want

4  protections when there's loans?

5  A.  Well, there's protection and then there's protection.

6  Q.  Okay.  So let's talk about protection.

7         So, for example, if you are buying a home, one of the

8  things we're familiar with is the bank, if they're going to

9  give you a loan, might want the home as collateral in case you

10  don't pay, for example.  Right?

11  A.  Right.

12  Q.  And in business loans, sometimes the bank will want

13  additional protections such as, for example, a requirement of

14  reviewing financials as you're going through the period of the

15  loan.  Is that your experience?

16  A.  I've never experienced this before, personally, so this is

17  the first time.

18  Q.  All right.  And if we look at page 4, there's a provision

19  dealing with cash flow sweep.  I want to focus on that, because

20  you mentioned this term, "cash flow sweep."

21         And in the letter of intent, was this defined as being

22  that the cash flow -- free cash flow is defined as the buyer's

23  EBITDA -- let's pause.

24         Do you understand EBITDA to mean earnings before

25  interest, tax, and depreciation and amortization?

1    A.  Correct.

2    Q.  Defined as buyer's EBITDA for the previous four fiscal

3    quarters minus -- and it lists out four subpoints.  Correct?

4    A.  Correct.

5    Q.  All right.  And did you understand that this was a covenant

6    that was contemplated in this letter of intent, that after

7    Backpage paid different bills and so forth, that the lender was

8    entitled to receive monies towards whatever might be due in

9    that period of payment?

10   A.  That's what it indicates.

11   Q.  Okay.  And did you understand that one of the purposes, for

12   example -- let's use a hypothetical -- that a lender might want

13   to assure, for example, that a buyer of a company is not just

14   going to be sending money over to some other entity that the

15   buyer has to conceal it from a lender.  Right?

16   A.  What was the question?

17   Q.  Yeah.  Whether you understood that one of the purposes of

18   having covenants and protections for a lender such as a cash

19   flow sweep is to make sure that if there -- if it's a

20   seller-financed deal or if it's a loan from a bank, lender

21   wants to make sure that that person can't just use money that

22   comes into the company for whatever purpose they want.

23   A.  Well, you're asking me to have some expertise,

24   understanding this was the first transaction where I ever

25   bought a company that had covenants, so I'm not really familiar

1    with what the norms of covenants are.

2    Q.  Okay.  Let's move on to what we have marked as Exhibit 6188

3    for identification, if we can show that to the witness, please.

4           Sir, do you recall that in connection with your

5    purchase of Backpage, that a company named BDO, this accounting

6    firm, did a valuation of Backpage?

7    A.  Can I see more of the slides?

8    Q.  Sure.  We can give you a hard copy, too, but why don't we

9    try first --

10   A.  Yeah.

11   Q.  -- with going through some of the pages.

12          MR. LINCENBERG:  Madam Clerk, did you provide a hard

13   copy?  Thank you.

14   BY MR. LINCENBERG:

15   Q.  Let us know when you've seen enough, and you're free to

16   look at --

17   A.  How many pages are there?

18   Q.  You have the hard copy.

19   A.  Okay.  All right.

20          The question?

21   Q.  The question is, first of all, did you -- well, I think the

22   question was whether you recall that the accounting firm of BDO

23   prepared a Backpage valuation in March of 2015 in connection

24   with this sale transaction.

25   A.  I recall that BDO was engaged to calculate a valuation of

1    the IP so that you could value the IP between some transfer

2    between Curacao and the Netherlands.  But, you know, I don't

3    recall receiving this actual document.

4    Q.  Do you -- do you believe that -- I know it's eight years

5    later now, but do you believe that you received BDO's IP

6    valuation?

7    A.  I don't believe I received it, and I don't really

8    understand it.

9    Q.  Let me just ask you to look at Slide 7.

10         Did you have discussions with BDO to provide

11   information to use in connection with their preparing a

12   valuation report?

13   A.  It says in bullet point -- the third bullet point,

14   discussions with Backpage management.  And it is possible that

15   I did.

16        MR. LINCENBERG:  Your Honor, I would move into

17   evidence Exhibit 6188 for identification.

18        MR. RAPP:  Well, foundation as to the -- as to the

19   exhibit.  What -- what's the source of this information?  We

20   don't know anything about the source of the information.

21        THE COURT:  Well, and I think the witness testified

22   that he never received it and he doesn't really understand it.

23   So based on that, I'll sustain the objection.

24        MR. LINCENBERG:  I'd like to show the witness next

25   Exhibit 5364 for identification.

```
1    BY MR. LINCENBERG:
2    Q.  Sir, do you recognize 5364 as being a document prepared by
3    BDO involving the restructuring and sale of the business in
4    April of 2015?
5    A.  Could I see additional slides?
6    Q.  Yes.
7    A.  I do recall seeing this slide.
8            MR. LINCENBERG:  Your Honor, we would move 5364 into
9    evidence.
10           MR. RAPP:  Right, but I'd still object on foundation
11   as to where the information came -- just because he saw it
12   doesn't mean it's admissible.
13           THE COURT:  It's a multi-page document.
14           MR. LINCENBERG:  Yes.
15           THE COURT:  Let's lay some more foundation,
16   Mr. Lincenberg.
17   BY MR. LINCENBERG:
18   Q.  Okay.  So let's look at page 2.
19           Do you recall, for example, seeing charts which laid
20   out the current buyer structure?
21   A.  I do -- I do recall seeing this slide.
22   Q.  And was this slide prepared to document the buyer
23   structure?  We can look at -- there's other buyer structures,
24   if you would like, on page 3 and 4.  If we can go to page 3,
25   seller structure presale; page 4, seller structure presale;
```

```
 1   page 5, proposed structure.
 2            THE COURT:  Let him take some time to look at --
 3   there's a lot of content on the page, so let him take some
 4   time.
 5            THE WITNESS:  I -- I recall this document, especially
 6   Slide 5, because it's sort of this -- putting Dutch companies
 7   is sort of a way to conceal the ownership.
 8   BY MR. LINCENBERG:
 9   Q.  So you believe that this proposed structure on Slide 5, you
10   specifically recall it because it was a way to -- you thought
11   that the structure was a way to conceal the ownership?
12   A.  It was something that the sellers assured me could be done.
13   Q.  And which sellers told you that this would be structured in
14   a manner to conceal the ownership?
15   A.  Well, this was a Don Moon -- well, wait a second.
16            You know, we -- what I recall is running a press
17   release where we indicated it was the Dutch business that now
18   owned Backpage and that was -- I was requested to send that.
19   Q.  But now you're veering off.  I'm just asking you if you
20   recall who told you that this was intended to conceal the
21   ownership.  If you don't recall, just indicate you don't --
22   A.  I think it's just a collective understanding, and that's
23   why we're just adding so many companies here to this org chart.
24            MR. LINCENBERG:  Your Honor, we would move this
25   exhibit into evidence.
```

 1              THE COURT:  It may -- is there an objection?

 2              MR. RAPP:  No objection.

 3              THE COURT:  It may be admitted, and it may be

 4    published.

 5              (Exhibit No. 5364 admitted into evidence.)

 6              MR. LINCENBERG:  Thank you.

 7    BY MR. LINCENBERG:

 8    Q.  So just going back to page 1, this was a document prepared

 9    by the accounting firm BDO.  Is that right?

10    A.  Correct.

11    Q.  Dealing with -- laying out in various chart forms the

12    different ownership structures, correct?

13    A.  Correct.

14    Q.  All right.  So let's go back up to page 5, which you

15    testified was designed for deception.  Here it's "proposed"

16    because the sale closed six days later, right?

17    A.  What was the question again?

18    Q.  Well, the date of the document was April 16th, and this

19    says "proposed"; but is it your understanding that this was, in

20    fact, the corporate structure, this complex structure of

21    different entities, Backpage Canada, the Netherlands

22    corporation, and so forth?

23    A.  Yes.  The -- well, the sale would occur six days later.

24    Q.  Thank you.

25              Now, in the sale -- we can take this down.

1          In the sale, did the ultimate owner of Backpage after

2     the sale become the Vicky Ferrer Family -- the Vicky Ferrer

3     Trust?

4     A.  So it's my understanding that the trust holds Amstel, and

5     then Amstel has about 15 more companies below it, and that it

6     is -- so ultimately I think the Vicky Ferrer Family Trust holds

7     it.

8     Q.  And was that something that Jim Larkin or one of the

9     sellers forced -- shoved down your throat to put it in family

10    trust, put it in a trust?

11    A.  It was a suggestion that I do that, and Shosid agreed.

12    Q.  Okay.

13    A.  The attorney.

14    Q.  Isn't it true that the reason you put it in this trust was

15    for estate planning and tax purposes?

16    A.  For what?

17    Q.  For tax purposes.

18    A.  I -- I don't think it was tax purposes.

19    Q.  When you say it was suggested and Shosid agreed, are you

20    testifying that the sellers suggested that you buy it in a

21    certain trust that they had no control over, that you put it in

22    a trust in your mother's name?

23    A.  It -- I gave some options, and the recommend -- well, they

24    didn't really make a recommendation.  I gave some options, and

25    Shosid recommended the trust.

1          MR. RAPP:  I'm just going to object here to the extent

2     this is some privileged communication between an attorney and

3     Mr. Ferrer.

4          THE COURT:  Yes.  Sustained.

5     BY MR. LINCENBERG:

6     Q.  All right.  So whatever these options were, I don't want to

7     go into if they were discussed with your attorney.  Is that

8     what you were saying, these were options you discussed with

9     your attorney?

10    A.  Yes.

11    Q.  And so first, after the purchase, you became the owner.

12    You want to call it nominal owner, but you became the owner of

13    a $600 million company, right?

14    A.  Of a what?

15    Q.  $600 million company.

16    A.  I became the owner of a $600 million debt that included the

17    company.

18    Q.  Okay.  You became an owner of a company that you agreed to

19    pay $600 million to purchase, correct?

20    A.  Correct.

21    Q.  And Mr. Gage was hired as your CFO around that time,

22    correct?

23    A.  I think so.  It might have been Nathan Kopecky.  I'm not

24    sure at the time.

25    Q.  And you operated the business out of your offices in

1    Dallas.  You continued to operate out of your offices in

2    Dallas, correct?

3    A.  We operated it from the old newspaper office in Dallas.

4         MR. LINCENBERG:  I'd like to place before the witness

5    Exhibit 5427 for identification.

6         And if we can show the witness his signature on

7    page 53, and then go back to the first page.

8    BY MR. LINCENBERG:

9    Q.  So, sir, there were two loan agreements in connection with

10   the purchase, one involving the U.S. operations and a second

11   involving international operations, correct?

12   A.  Correct.

13   Q.  And you recognize your signature on 5427 for identification

14   as signing in connection with the loan agreement for the U.S.

15   operations?

16   A.  Did you say I recognize my signature --

17   Q.  Yeah.

18   A.  -- on this document?

19   Q.  Yeah.

20   A.  On the previous slide?

21   Q.  Yes.

22   A.  I do recognize my signature.

23   Q.  And this is an agreement that you entered into with the

24   sellers to purchase the U.S. operations, correct?

25   A.  I signed a lot of papers put in front of me.

1          MR. LINCENBERG:  Your Honor, we would move 5427 into

2   evidence.

3          THE COURT:  He hasn't answered the question.

4          MR. LINCENBERG:  I know.  But -- okay.

5          THE WITNESS:  I'm sorry.

6   BY MR. LINCENBERG:

7   Q.  Did you sign this document?  Let's go back to page --

8   A.  I did sign this document.

9          MR. LINCENBERG:  Your Honor, we'd move 5427 for

10  identification into evidence.

11         MR. RAPP:  Well, I'd object to the misstatement of the

12  evidence in terms of the sellers agreeing -- signing this

13  document.  There's no other -- there's only one seller on this

14  document.

15         MR. LINCENBERG:  Well, counsel can cross-examine on

16  that.

17         MR. RAPP:  I don't have an objection to its admission.

18         THE COURT:  It may be admitted.

19         (Exhibit No. 5427 admitted into evidence.)

20         THE COURT:  And published.

21         Why don't you identify what -- because it's a

22  multiple-page document, identify specifically what pages you're

23  going to be discussing so that we all, and the jury included,

24  can note that.

25         MR. LINCENBERG:  Right.  And, Your Honor, for the

1    moment we're just really looking to get the agreements in for

2    discussion later on.  I'm not going to spend a lot of time with

3    these agreements.

4             THE WITNESS:  Can I see the entire agreement?

5             MR. LINCENBERG:  Sure.  You want to -- could we give

6    the witness a hard copy?

7             Your Honor, while the witness is reviewing this,

8    advise the Court the next three --

9             THE WITNESS:  There's --

10            MR. LINCENBERG:  -- documents that we seek admission

11   of --

12            THE COURT:  The next what?

13            MR. LINCENBERG:  The next three documents that we will

14   seek admission of are 5459, the loan agreement for the foreign

15   operations; 5443, the purchase agreement for the foreign

16   assets; and 5415, purchase agreement for domestic assets.

17            I've advised Mr. Rapp that these are the next three

18   documents.  He's indicated he has no objection.  I can go

19   slowly through them or we can just seek their admission.

20            THE COURT:  However you wish.

21            MR. LINCENBERG:  We'd seek their admission.

22            THE COURT:  Is there an objection to 5459?

23            MR. RAPP:  No objection.

24            THE COURT:  5443?

25            MR. RAPP:  No objection.

```
1              THE COURT:  5415?

2              MR. RAPP:  No objection.

3              THE COURT:  All right.  Those exhibits may be

4    admitted.

5              (Exhibit Nos. 5459, 5443, and 5415 admitted into

6    evidence.)

7              MR. LINCENBERG:  Thank you, Your Honor.

8    BY MR. LINCENBERG:

9    Q.  Now, sir, with regard to the post-sale time period, I

10   believe at one point in your testimony you said that Mr. Brunst

11   was the, quote, bill collector.

12             Do you recall that terminology?

13   A.  I do.

14   Q.  And as the, quote, bill collector, is what you mean that if

15   there were outstanding amounts that Backpage owed to the

16   seller, that he would follow up with one of your CFOs to

17   collect?

18   A.  No.  It meant more than that.  And can I explain?

19   Q.  We're going to get into things.  You can explain later.

20   But for right now, just answer the question.

21             Did Mr. Brunst follow up with Mr. Gage at times, to

22   your knowledge, to -- with phone calls about collecting the

23   monies due?

24   A.  He did.  And he did more.

25   Q.  Great.
```

1          And did you understand that lenders generally monitor

2    loans to ensure that borrowers pay the amounts due?

3    A.  Well, that -- I don't have firsthand knowledge or

4    experience, but that seems like common sense.

5    Q.  And when you say common sense, it's also based on your

6    understanding of how people deal with banks.  If monies don't

7    get paid on a loan, you're usually going to hear from the bank.

8    Right?

9    A.  No, because, like, I don't hear from my bank about my

10   finances if I, you know, am late making a car payment.

11         So every loan is different and has a lot of -- more

12   covenants and requirements.  This one had many.

13   Q.  Yes.  And you do hear from the bank not about whether

14   you're making a car payment, but you'll hear from the bank if

15   you have a home mortgage and it's not paid.  You're going to

16   hear from the bank, right?

17   A.  Yeah, but the bank is not going to require the covenants

18   that were required.  I mean, it's like a mortgage and this loan

19   are like, there's no comparison.  This loan, I'm not even

20   allowed to get a job anywhere else on the internet.  There's so

21   many covenants.

22         MR. LINCENBERG:  Your Honor, I'd move to strike

23   everything after the word "Yeah."

24         THE COURT:  And the jury will disregard everything

25   after the answer "Yeah."

```
 1   BY MR. LINCENBERG:
 2   Q.  And during this late 2015 time period, I believe you
 3   testified that Backpage had challenges meeting its payment
 4   obligations.  Correct?
 5   A.  We had lost all of our credit card processing.  We went
 6   from showing a profit to losing millions of dollars per month.
 7   Q.  Is that your way of answering yes?
 8   A.  Yes.
 9   Q.  And because of these challenges, you had discussions with
10   Mr. Brunst in particular about whether you could have a
11   forbearance agreement.  Correct?
12   A.  I wouldn't -- I wouldn't describe it that way.
13   Q.  Okay.  Did you enter into forbearance agreements in
14   connection with the seller-financed transaction?  Did you enter
15   into forbearance agreements?
16   A.  I did enter into forbearance agreements, because we were in
17   default.
18   Q.  I didn't ask about because.  I asked if you entered into
19   forbearance agreements.
20   A.  We had to.  Yep.
21   Q.  Okay.  I'd like to show you Exhibit 1214 in evidence.
22          So this was a government exhibit that they showed you
23   on direct examination.  And does this appear to be an email
24   from Mr. Brunst to you in October of 2015 with the subject
25   matter:  Loan modification -- interest only for October?
```

1       Do you see that?

2   A.  I do.

3   Q.  And is the essence of the email that you had advised that

4   you couldn't pay the full amount due, and Mr. Brunst was

5   saying, all right, we'll agree to modify it.  You can only pay

6   interest for that time period?

7   A.  If you're asking me to agree to your summary, I'm going to

8   need to -- time to read this entire email.

9   Q.  All right.  Let me -- maybe it will be quicker if we just

10  go through the email.

11      So Mr. Brunst writes to you:  Carl, this modification

12  is temporary and get us through October with interest only.

13      Do you see that?

14  A.  I do.

15  Q.  And deleting any requirement for principal payments.  We

16  will have a revised note to you shortly.

17      Do you see that?

18  A.  I do see it.

19  Q.  All right.  And by a "revised note," did you, in fact,

20  enter into a loan modification agreement to ease the burden on

21  Backpage because your revenues were not as strong in late 2015

22  due to the credit card challenges?

23  A.  Yes.  We went to an interest-only loan.  Depends on the

24  loan, though.  I'm not sure which loan you're referring to, the

25  500 million -- $525 million U.S. loan or the loan that's for --

1    the other loan.

2    Q.  Well, let's look at what we've marked as 1214-a, which is

3    an attachment to this.

4           Do you recognize Exhibit 1214-a as the first loan

5    modification agreement made and entered into as of October 23,

6    2015?

7    A.  I do.

8    Q.  All right.  And let's go to the last page.  This what was

9    attached was being sent for your signature, correct?

10   A.  It appears so.

11          MR. LINCENBERG:  Your Honor, we would move

12   Exhibit 1214-a into evidence.

13          MR. RAPP:  No objection.

14          THE COURT:  1214-a may be admitted.

15          (Exhibit No. 1214-a admitted into evidence.)

16          THE COURT:  And it may be published.

17          MR. LINCENBERG:  Thank you.  I'll just briefly publish

18   it.  The first loan modification agreement.

19   BY MR. LINCENBERG:

20   Q.  Let's just take a look at one more.  Let's look at

21   Exhibit 5474 for identification.

22          Do you recall that in December of 2015, you signed a

23   forbearance agreement?

24          Let's maybe show him the last page of the exhibit.  Is

25   that your signature?

94

```
1    A.  It is.  Could you go back to the first page?  I just want

2    to know whether it's the U.S. loan or the overseas loan.

3    Q.  Do you see it says U.S. operations?

4    A.  Thank you.

5    Q.  Okay.  And in December of -- and let me withdraw that.

6              Just for the members of the jury, do you understand a

7    forbearance agreement meaning that there's a new agreement in

8    which the sellers will forbear or not enforce all of the

9    original terms of the loan agreement?

10   A.  Well, there's a little more detail than that, if I can

11   explain.

12   Q.  I'll tell you what.  I'm going to have you explain, but

13   maybe explain it in connection with this agreement.

14             MR. LINCENBERG:  Your Honor, I would move 5474 into

15   evidence.

16             THE COURT:  5474?

17             MR. LINCENBERG:  Yes.

18             MR. RAPP:  No objection.

19             THE COURT:  Okay.  I'm one exhibit behind.  I thought

20   we were still on 1214-a.  So somehow I missed that.

21             MR. LINCENBERG:  Your Honor, I believe you entered

22   into evidence 1214-a.

23             THE COURT:  It's likely?  Yes.  Okay, yes.  I thought

24   that we were still on the exhibit, I'm sorry.

25             So we are now on what?  5474?
```

1          MR. LINCENBERG:  5474.  We're moving forward to

2   December of 2015.

3          THE COURT:  Yes.  It may be admitted and it may be

4   published.

5          (Exhibit No. 5474 admitted into evidence.)

6   BY MR. LINCENBERG:

7   Q.  So let's look at the recitals.  So the recitals tend to

8   set -- in documents like these set forth sort of the background

9   of why you're entering into this agreement.  Right?

10          Sir?

11  A.  I'm sorry.

12  Q.  These recitals are -- sort of set forth the lay of the

13  land, right?  There's a loan agreement.  Due to unanticipated

14  business circumstances, the borrower's experiencing cash flow

15  issues, and so forth.  Right?

16  A.  Generally, that's what I see.

17  Q.  All right.  And 1.3 talks about how one or more events of

18  default presently exist.

19          Do you see that?

20  A.  Yes.  That we're currently in default.

21  Q.  And 1.4, borrower is asking lender to forbear from

22  exercising its rights.

23          Do you see that?

24  A.  I do see that.

25  Q.  And 1.5, lender, relying upon information provided by the

1    borrower, is willing to forbear.

2            Do you see that?

3    A.  I do see that.

4    Q.  Okay.  And then if we can go back to the agreement, the

5    agreement lays out the different provisions of it, forbearance

6    period and so forth.  Right?

7    A.  Correct.

8    Q.  All right.

9    A.  Can I -- can I explain now?  You said I could explain.

10   Q.  Well, I don't want just a narrative.  If you want to

11   explain anything in connection with these recitals, go ahead.

12   A.  Yeah, okay.

13           Can you blow up 1.1, this area?

14   Q.  Yes.

15   A.  You might remember the original note was $525 million, and

16   it's now 530 million, because principal and interest have been

17   accumulating.  And this loan, despite this period of -- long

18   period of time that's gone by, it's actually getting bigger.

19   Q.  Okay.

20   A.  And so when you asked me about forbearance agreements, you

21   know, they come in many forms.  And this one is not incredibly

22   helpful given that we don't have MasterCard and Visa.

23   Q.  Okay.  Thank you, sir.

24           Let's move on to 6196 for identification.

25           Sir, during June of 2016, that was a time period where

```
 1   Michael Gage was working as your CFO; is that right?
 2   A.  Correct.
 3   Q.  All right.  And do you recognize 6196 as an email from you
 4   to Mr. Gage where you're asking him for an accounting of the
 5   two loans?
 6   A.  Yes.
 7   Q.  And --
 8           MR. LINCENBERG:  Well, Your Honor, we'd move 6196 into
 9   evidence.
10           THE COURT:  Yes.
11           MR. LINCENBERG:  May we publish?
12           THE COURT:  It may be admitted and it may be
13   published.
14           (Exhibit No. 6196 admitted into evidence.)
15   BY MR. LINCENBERG:
16   Q.  So this is just a simple email.  Mr. Gage, as your CFO, is
17   keeping track of the accounting for payments made to Cereus
18   Properties as payments on the loan, right?
19   A.  You're asking me if Michael Gage is keeping track of the --
20   Q.  Yes.
21   A.  -- of the loans and the loan payments?  Yes, he is.
22   Q.  And do you recall that a lot of the communication about
23   loan payments and forbearance and so forth was between
24   Mr. Brunst and Mr. Gage?  Do you recall them having frequent
25   communications about that?
```

1   A.  Not all.  Some are direct with me.

2   Q.  Right.  So when you say "not all," is the answer yes, you

3   recall there being a lot of communications between Mr. Brunst

4   and Mr. Gage?

5   A.  Now you're fading out, or I'm losing my hearing.

6   Q.  I'll withdraw it.  And I'll try to pull the mic -- I'm not

7   sure where to hold it.  That's better.

8   A.  Yeah.

9   Q.  You can hear it okay?

10  A.  Yep.

11  Q.  All right.  I'm just going to hold it for the last 10

12  minutes this morning.

13         THE COURT:  Well, I was planning on going until the

14  quarter after the hour.

15         MR. LINCENBERG:  Okay.  For the next -- that's fine.

16  Then I'm going to try and clip it in the middle.  Maybe I

17  should clip it to my lip.

18  BY MR. LINCENBERG:

19  Q.  Now, sir, did you understand that Mr. Brunst, as part of

20  his duties, also dealt with auditors?

21  A.  Yes.

22  Q.  All right.  And, for example, through 2012, the accounting

23  firm Deloitte was the auditor who was reviewing Backpage's

24  books, right?

25  A.  That's correct.

1   Q.  Deloitte, for the members of the jury, one of the Big 4

2   independent accounting firms, right?

3   A.  I believe it is.

4   Q.  And did -- did you have any view at any time that Deloitte

5   was not performing their role properly?

6   A.  Did I ever --

7   Q.  Let me rephrase it.

8           Looking back, was it your view at the time that

9   Deloitte was performing their role properly?

10  A.  At the time --

11          MR. RAPP:  I'm going to object on foundation.

12          THE COURT:  Sustained.

13  BY MR. LINCENBERG:

14  Q.  You were the person in 2012 who was overseeing the

15  operations of Backpage, right?

16  A.  Correct.

17  Q.  And the -- you had some interaction yourself, limited, but

18  some interaction with Deloitte, correct?

19  A.  I did.

20  Q.  All right.  In fact, the -- and as we sit here today, you

21  don't recall any issues of concern between the auditor,

22  Deloitte, and Backpage, do you?

23  A.  My interaction was very limited to where it just focused on

24  sponsor ads.  So I'm not really aware if they understood

25  everything else about the business.

CARL FERRER - CROSS-EXAMINATION

1   Q.  So you're saying you don't really know, but you don't

2   recall any problems there?

3   A.  I don't recall any problems.

4   Q.  All right.  And after 2013, the accounting firm, BDO,

5   performed the audits; is that right?

6   A.  You know, I misspoke earlier.  Can I correct my testimony?

7   Q.  Sure.

8   A.  I became aware that Deloitte dropped the company.  I

9   thought it was reputational risk reasons.  And that's when we

10  started to work with BDO.

11  Q.  Right.  So you don't recall any problems with Deloitte, but

12  at some point they just, for reputational reasons, did not want

13  to continue as the auditor.  Is that a fair summary?

14  A.  Yeah, that was my understanding.

15  Q.  All right.  2013, BDO starts performing the audits, right?

16  A.  Yes.

17  Q.  And BDO is also a huge international accounting firm,

18  right?

19  A.  Correct.

20  Q.  All right.  Independent, correct?

21  A.  I'm not a CFO.  But I know they're a reputable firm.

22  Q.  Okay.  Let me show you 5487 for identification.  We're not

23  going to go through every year, but --

24       Let's actually -- let's skip it and go up to 2009.

25  Let's look at 5489 for identification.

1          Now, do you recall that one of the things that
2    Deloitte would prepare during the time period they were
3    auditors was a consolidated financial statement for both the
4    holding company and the subsidiaries?
5    A.  I do not.
6    Q.  Okay.  Then we'll skip 5489 and move forward.
7          Now, you testified that -- you testified to a
8    conversation that you had with Mr. Brunst in San Francisco.
9          Do you recall that?
10   A.  I do.
11   Q.  And I believe you placed it as having taken place in 2015.
12   Is that right?
13   A.  That -- that is inaccurate.  That was in 2012.
14   Q.  Okay.  So in 2012, I believe you said that the conversation
15   was one in which you were expressing a desire to remove the
16   adult sections like craigslist had and operate a business and
17   that that business might be a $20 million company at that
18   point.  Was that the gist of the discussion?
19   A.  Your summary's only partially true.  So can I explain?
20   Q.  Well, as to the part that I mentioned, that part of it was
21   your testimony?
22   A.  I'm -- you just --
23   Q.  You can add whatever else you want to talk about --
24   A.  No, I'm not trying to add.
25   Q.  -- on redirect.

CARL FERRER - CROSS-EXAMINATION

1    A.   Sorry.

2    Q.   Let me break it down.

3    A.   Yes.

4    Q.   So your memory now is in 2012 you had a conversation with

5    Mr. Brunst in San Francisco, right?

6    A.   I remember very well.

7    Q.   And one of the topics that you discussed was you were

8    saying that you had a desire to get out of the adult ad part of

9    the business, correct?

10   A.   So that is false.

11   Q.   Did you have a conversation in which you indicated that --

12   about, quote, getting rid of the escort section and still

13   having a $20 million business?

14        Were those the words that you used in your

15   September 21st testimony?

16   A.   I did, but that wasn't our desire.  We were forced to.

17   Q.   Okay.  So whether you were forced to or your desire, you

18   discussed in 2012 going to get rid of the adult section.

19   Correct?

20   A.   I was asked to --

21   Q.   Correct?  Was that part of the discussion?

22   A.   Yes.

23   Q.   All right.  And during that conversation, Mr. Brunst said:

24   If you want to close the adult section, go ahead.

25        Right?

CARL FERRER - CROSS-EXAMINATION

1   A.  Oh, absolutely not.

2   Q.  Okay.  And Mr. Brunst, in fact, never objected to your

3   closing the adult section if that's what you wanted to do.

4   Correct?

5          MR. RAPP:  I'm going to object to this.  It's -- the

6   question is hearsay so --

7          THE COURT:  Overruled.  He can answer if he recalls if

8   he never objected.

9   BY MR. LINCENBERG:

10  Q.  You can either indicate it's correct or you can deny it.

11  A.  That is incorrect characterization.

12  Q.  Okay.  Now, sir, when you pled guilty in this courthouse in

13  2018, you entered into an agreement with the government that

14  you hoped would provide greater leniency --

15          MR. RAPP:  Objection.

16  BY MR. LINCENBERG:

17  Q.  -- to you at the end of this matter, correct?

18          MR. RAPP:  These questions have been asked and

19  answered.

20          THE COURT:  I'll permit a little leeway for

21  Mr. Lincenberg.

22  BY MR. LINCENBERG:

23  Q.  Is that correct?

24  A.  I'm sorry, could you ask the question again?

25  Q.  Yes.  You entered into an agreement in 2018 with these

1    prosecutors in the hopes that if you worked with them, helped

2    them in a case against other people, that they would help you

3    get a lenient sentence.  Is that correct?

4            MR. RAPP:  Same objection.

5            THE COURT:  He can answer.  Overruled.

6            THE WITNESS:  It is not the only reason, but I was --

7    I am hopeful.

8    BY MR. LINCENBERG:

9    Q.  I'm going to go through a lot of your reasons.  Let's do

10   them one at a time.

11           Let me place before you Exhibit 5994-1 for

12   identification, which is entitled Cooperation Agreement -- or

13   Cooperation Addendum.

14           MR. LINCENBERG:  Madam Clerk, it might be helpful to

15   give him a hard copy.  I think we can work with the screen,

16   but...

17   BY MR. LINCENBERG:

18   Q.  So first, sir, if you look at page 6, is that your

19   signature on April 5th of 2018?

20   A.  Yes, it is.

21   Q.  All right.  And if we go back to page 2, is there a section

22   entitled Cooperation Required?

23   A.  Is there a question?

24   Q.  Yes.  Is there a section entitled Cooperation Required?

25   A.  There is a section.

CARL FERRER - CROSS-EXAMINATION                    105

1    Q.  All right.  And did that section require you to cooperate

2    with all attorneys or just the prosecutors?

3              MR. RAPP:  I'm going to object to that as vague.  All

4    attorneys?

5              MR. LINCENBERG:  Defense attorneys.

6              THE COURT:  How about you break it up in two

7    questions.

8              MR. LINCENBERG:  Sure.

9    BY MR. LINCENBERG:

10   Q.  Did that section require you to cooperate, quote/unquote,

11   with defense attorneys?

12   A.  I -- I don't see that.  Are we talking about my own defense

13   attorneys?

14   Q.  No.  With me and the attorneys at this table, the prior

15   attorney for Mr. Larkin.  Did this require you to cooperate

16   with us?

17   A.  It does not.

18   Q.  All right.  And, in fact, in paragraph a, it says:  If

19   requested by the United States --

20             You understand the United States to mean these

21   prosecutors, correct?

22   A.  Correct.

23   Q.  If requested by the United States, you shall meet with

24   representatives of the United States at any reasonable time and

25   place.

1               Correct?

2     A.  Correct.

3     Q.  And if we go down to page 3, paragraph 2, subpoint b, under

4     Additional Agreements, your agreement provides that if the

5     United States, meaning the prosecutors, move the Court for a

6     downward departure from the sentencing guidelines --

7               I'm going to pause for a moment.  Do you see where

8     I've read the first half of that sentence?

9     A.  Yes.

10    Q.  And this reference to sentencing guidelines, did you

11    understand that there's a law that sets forth guidelines to

12    guide a judge in sentencing an individual?  Did you understand

13    that?

14    A.  I don't really understand this.  I had my attorneys, my own

15    defense attorneys, work on this plea agreement.

16    Q.  Well, when you stood before the judge and pled guilty, the

17    judge specifically asked you if you understood all of the parts

18    of the agreement, correct?

19    A.  Well, I understand that that's what it says, but I'm not

20    really familiar with some of this language.

21    Q.  So, sir, as you sit here today, having been involved in a

22    federal criminal case for five years, is it your testimony

23    under oath that you don't know what the sentencing guidelines

24    are?

25    A.  I don't know what it means for a downward sentencing

CARL FERRER - CROSS-EXAMINATION

1    guideline.  I presume less.

2    Q.  And when the judge asked you if you understood the

3    agreement that you were entering into and you said yes, is it

4    your testimony now that you understood that the agreement said

5    this but you didn't understand what it meant?  Is that what

6    you're telling us here today?

7    A.  No.  What I'm saying is, is that you're asking me like a

8    question that I would want to consult with my attorney and I

9    did consult with my attorney, and I'm sure that he explained it

10   to me at the time; but as I sit on the stand today, you're

11   asking me questions that sound like I should -- I don't know.

12   You know, I'd rather have somebody like yourself very familiar

13   with sentencing guidelines.

14   Q.  And, in fact, the judge made sure that you consulted with

15   your attorney by asking you not only do you understand this,

16   but did you consult with your attorney to make sure you

17   understood it, right?

18   A.  I did.  Yes.

19   Q.  And this is a pretty important paragraph in your agreement,

20   correct?

21   A.  Yes.

22   Q.  And, in fact, what the paragraph provides is that if the

23   prosecutors decide that you have substantially assisted them,

24   that they will make a motion pursuant to Section 5K1.1 of the

25   sentencing guidelines.  Correct?

1   A.  I don't see the word "substantial," and so I'm just not

2   sure I understand your summary.  I'm looking for it.  I just

3   have to cooperate.

4   Q.  So it's your statement today that you had no understanding

5   that Section 5K1.1 is a provision which provides that if you

6   substantially assist the government, that they have discretion

7   to make a motion?  Is that your testimony today?

8   A.  That's really complicated, you know.  I don't understand.

9   Q.  So you just don't know?

10  A.  I don't know what you're asking --

11  Q.  Okay.

12  A.  -- of me.

13  Q.  And did the paragraph also provide that if the United

14  States, meaning the prosecutors, determine that you have

15  provided further cooperation within one year following

16  sentencing, the United States may also move for a further

17  reduction of your sentence?

18  A.  That's what it states.

19  Q.  Right.  And what it states allow you to understand that

20  you -- that the prosecutors, in their sole discretion, would

21  decide whether to recommend leniency or not.  Correct?

22  A.  No.  I -- oh, recommend, okay.

23  Q.  Yes.

24  A.  But ultimately it's the decision of the judge.

25  Q.  Yep.  Recommend.  Is that right?

CARL FERRER - CROSS-EXAMINATION

1   A.  Recommend, but there's no promises.

2   Q.  Right.

3        Right?  Is that your understanding?

4   A.  My understanding is recommend but there's no promises.

5   Q.  Got it.  You've got your lines down.  Recommend but no

6   promises.

7        Now, sir, further, you understood that the judge can

8   only consider this departure below the sentencing guidelines if

9   the United States, in its sole discretion, decides to make that

10  motion recommending leniency.  Correct?

11  A.  Can you show me where that is in this document?

12  Q.  I just read it.  Under Section 2b, twice it says:  The

13  United States shall in good faith consider moving the Court to

14  depart downward from the sentencing guidelines.  And below it

15  says:  If the United States determines that you've provided

16  cooperation.

17       Do you see that on the bottom of page 3?  It's on your

18  screen.

19  A.  Yeah, but you're not reading it completely.  You're

20  paraphrasing.

21  Q.  Let's read it all.  I'm going to read the entire paragraph.

22       Prior to the defendant's sentencing, the United States

23  shall in good faith consider moving the Court to depart

24  downward from the sentencing guidelines, and if applicable,

25  impose a sentence below the level established by law as the

```
 1    minimum sentence, pursuant to Section 5K1.1 of the sentencing

 2    guidelines and 18 USC 3553(e), respectively.

 3           If the United States determines that the defendant has

 4    provided further cooperation within one year following

 5    sentencing, the United States may also move for a further

 6    reduction of his sentence pursuant to Rule 35 of the Federal

 7    Rules of Criminal Procedure.

 8           Did I read that entire paragraph, sir?

 9    A.  You did.

10    Q.  Okay.  Let's move down to paragraph 3.

11           THE COURT:  Was there a question?  I thought there was

12    a question about it that you wanted --

13           MR. LINCENBERG:  There was a question, and he

14    answered, and then he said, "but you're not reading the entire

15    paragraph."

16           THE COURT:  Okay.

17           MR. RAPP:  Well, he misstated his -- what it said.

18           MR. LINCENBERG:  I did not misstate anything, and I

19    move --

20           MR. RAPP:  Yes, you did.

21           MR. LINCENBERG:  -- to strike the argument.

22           THE COURT:  Stop, stop, stop.  Don't talk over one

23    another.

24           I thought there was a prior question that prompted you

25    to read it.
```

1          MR. LINCENBERG:  Uh-huh.  And he said, "Yes, but

2     you're not reading the whole thing."

3          THE COURT:  All right.  So, all right.  Let's move

4     forward.  Ask your next question and let's move on.

5     BY MR. LINCENBERG:

6     Q.  Let's move down to paragraph 3.

7          Paragraph 3 sets forth what happens if you breach this

8     agreement to help the government.  And subpoint "a" provides

9     that if the defendant fails to comply with any of the

10    defendant's obligations or promises set forth in the plea

11    agreement or this addendum, the United States may -- let me

12    pause.

13         Sir, did I read that correctly?

14    A.  Yes.

15    Q.  And then let's look at number 1.

16         In its sole and absolute discretion, declare any

17    provision of the plea agreement and this addendum null and

18    void, without giving the defendant any right or option to

19    withdraw from the plea agreement, this addendum, or the plea of

20    guilty.

21         Is that an accurate reading of that?

22    A.  Yes, it is.

23    Q.  So you understand that if the prosecutors believe that you

24    go sideways on them, that they've got a lot of power to, say,

25    rip up your agreement?  You understand that?

UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAMINATION

1   A.  Yes.

2   Q.  If you don't even show up for a meeting when the

3   prosecutors demand that you show up, that could be, under the

4   earlier paragraph we read, a breach of the agreement.  Right?

5   A.  But I had to cancel meetings.

6   Q.  Okay.  So they decided not to -- so far they've decided not

7   to do that because you're continuing to substantially assist

8   them and you rescheduled the meetings you canceled.  Right?

9   A.  Correct.  I had a plumbing disaster in the house.

10  Q.  Okay.  And, in fact, if there's a breach of the agreement,

11  then the prosecutors can recommend any sentence up to and

12  including the statutory maximum sentence.  Correct?

13  A.  Correct.

14  Q.  And if they determine in their, quote, sole and absolute

15  discretion, close quote, that you have breached this assistance

16  agreement, then they can prosecute you or reinstate prosecution

17  of you for any and all crimes committed by you notwithstanding

18  the statute of limitations, the Speedy Trial Act, or any

19  constitutional restrictions in bringing later proceedings.

20          Correct?

21  A.  That's what it states.

22  Q.  And, in fact, if you go sideways on them, they can use in

23  any manner, in any proceeding, any evidence provided by you

24  before or after execution of this agreement.  Correct?

25  A.  I'm going to need a minute to reread this so that it

1    conforms to your summary.  Because what -- we're on item 3-3?

2    Q.  Uh-huh.

3              THE COURT:  Well, why don't we permit the witness to

4    do that while we take our lunch break.

5              So members of the jury, again, do not come to any

6    conclusions.  Do not research or discuss any of the matters

7    discussed so far in trial.  Just simply have a good 45-minute

8    break.  We'll return promptly at 1:00.

9              With that, all rise for the jury.

10             (Jury not present.)

11             THE COURT:  All right.  Mr. Ferrer, you may step down.

12             And we will be on our 45-minute lunch break.

13             (Lunch recess taken, 12:14 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 29th day of

13   September, 2023.

14

15

16                         s/Jennifer A. Pancratz
17                         Jennifer A. Pancratz, RMR, CRR, FCRR, CRC

18

19

20

21

22

23

24

25