UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF ARIZONA

                  _____


United States of America,     )
                              )
                Plaintiff,    )  NO. 2:18-cr-00422-DJH
v.                            )
                              )  Phoenix, Arizona
Michael Lacey, et al.,        )  September 28, 2023
                              )  1:01 p.m.
                Defendants.   )
_____)



        BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE

            REPORTER'S TRANSCRIPT OF PROCEEDINGS


                    JURY TRIAL DAY 14
                    P.M. SESSION




Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

                  UNITED STATES DISTRICT COURT

1                    *A P P E A R A N C E S*

2  For the Plaintiff:
        UNITED STATES ATTORNEY'S OFFICE
3        By:  **Kevin M. Rapp, Esq.**
              **Andrew C. Stone, Esq.**
4              **Peter Shawn Kozinets, Esq.**
              **Margaret Wu Perlmeter, Esq.**
5        40 North Central Avenue, Suite 1800
        Phoenix, Arizona 85004-4408

6

7  For the Defendant Michael Lacey:
        LIPTSUTZ GREEN SCIME CAMBRIA, LLP
8        By:  **Paul J. Cambria, Jr. Esq.**
        42 Delaware Avenue, Suite 120
9        Buffalo, New York  14202

10  For the Defendant Andrew Padilla:
        DAVID EISENBERG, PLC
11       By:  **David S. Eisenberg, Esq.**
        3550 North Central Avenue, Suite 1155
12       Phoenix, Arizona 85012

13  For the Defendant Scott Spear:
        KESSLER LAW OFFICE
14       By:  **Eric Walter Kessler, Esq.**
        6720 North Scottsdale Road, Suite 210
15       Scottsdale, Arizona 85253
        - and -
16       FEDER LAW OFFICE, PA
        By:  **Bruce S. Feder, Esq.**
17       2930 East Camelback Road, Suite 160
        Phoenix, Arizona 85016

18

19  For the Defendant John Brunst:
        BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20       By: **Gary S. Lincenberg, Esq.**
              **Gopi K. Panchapakesan, Esq.**
21       1875 Century Park E, Suite 2300
        Los Angeles, California 90067

22

23  For the Defendant Joye Vaught:
        JOY BERTRAND, ESQ, LLC
24       By:  **Joy Malby Bertrand, Esq.**
        P.O. Box 2734
25       Scottsdale, Arizona 85252-2734

UNITED STATES DISTRICT COURT

1                      *I N D E X*

2

**GOVERNMENT WITNESS:**                             **PAGE**

CARL FERRER
Continued Cross-Examination by Mr. Lincenberg...............4
Cross Examination by Mr. Eisenberg..........................20

*EXHIBITS*

**EXHIBIT**                                   **RECEIVED**

NO.     DESCRIPTION

581    Email from Spear to Ferrer, "Draft of         69
        adult abuse abatement", 05/26/2009,
        DOJ-BP-0002125279 - DOJ-BP-0002125280

51     Email from Ferrer to Hyer, Spear, and     91
        Padilla (with attachments), 09/05/2010,
        DOJ-BP-0000005681

51a    Attachment. Document listing banned terms   97
        DOJ-BP-0000005682-DOJ-BP-0000005683

59     Email from Padilla to Hyer, Vaught,     108
        and Moderators, 10/16/2010
        DOJ-BP-0000005332

61     Emails between Ferrer, Hyer, Spear,     119
        and Padilla, 10/25/2010
        DOJ-BP-0000005068- DOJ-BP-0000005069

|   |   |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | *(Whereupon the proceedings began at 1:01 p.m.)* |
| 3 | COURTROOM DEPUTY:  All rise, court is now in |
| 4 | session. |
| 01:01p 5 | THE COURT:  Please be seated.  We'll make sure our |
| 6 | jury's all gathered and bring them in. |
| 7 | All rise for the jury. |
| 8 | (Jury in 1:05 p.m.) |
| 9 | THE COURT:  All right, please be seated. |
| 01:05p 10 | The record will reflect the return of our jury. |
| 11 | Mr. Ferrer is on the witness stand. |
| 12 | Mr. Lincenberg, you may continue. |
| 13 | MR. LINCENBERG:  Is the mic okay? |
| 14 | THE REPORTER:  No. |
| 01:05p 15 | MR. LINCENBERG:  Let me turn it on. |
| 16 | THE COURT:  Yes, that will be helpful. |
| 17 | CONTINUED CROSS-EXAMINATION |
| 18 | BY MR. LINCENBERG: |
| 19 | Q.   Sir, do you recall a hearing in which you entered your |
| 01:06p 20 | guilty plea on April 5th of 2018? |
| 21 | A.   Yes, I do. |
| 22 | Q.   Okay.  And you recall that that hearing was before Her |
| 23 | Honor Judge Humetewa, correct? |
| 24 | I'm hearing a "no."  I have it in the transcript. |
| 01:06p 25 | THE COURT:  Well, it's -- the question wasn't to me, |

1    but I'm not recalling it.

2              MR. LINCENBERG:  Okay.  I'll point out where it's in

3    the transcript, but let's leave it alone.

4    BY MR. LINCENBERG:

01:06p  5    Q.   Do you recall standing before a Federal Judge?

6    A.   I do.

7    Q.   And do you recall in that hearing the Judge saying that

8    before sentencing your judge is going to use a guideline chart

9    to help you determine your sentence -- to help determine your

01:06p  10   sentence?

11   A.   Do I recall that --

12   Q.   Yes.

13   A.   -- him specifically saying that?

14   Q.   Yes, or generally?

01:06p  15   A.   Generally?  It's one of the worst days of my life, and

16   I'm having difficulty recalling everything that was said.

17   Q.   So my question is:  Do you recall, specifically or

18   generally, the Judge saying that before sentencing your judge

19   is going to use a guideline chart to help determine your

01:07p  20   sentence?

21   A.   I -- I recall other things.  I just don't recall that

22   specifically.

23   Q.   Do you recall the Judge telling you that a copy of the

24   chart is in front of you?

01:07p  25   A.   I'm sorry, I don't.

```
 1   Q.   Do you recall the Judge telling you that the Judge is
 2   going to go through it with you?
 3   A.   Well, he went through -- the Judge went through things
 4   with me.  It was fairly detailed.
```
01:07p  5   Q.   Do you recall the Judge asking if you understand how that
```
 6   guideline chart works and your answer was, "I do, Your Honor"?
 7        Do you recall that?
 8   A.   I recall saying "I do."
 9   Q.   And the Judge went through that chart because this was a
```
01:08p 10   very important decision you were making and the Judge wanted
```
11   to make sure that you fully understood your plea agreement,
12   correct?
13   A.   Well, I think --
14   Q.   Is that correct?
```
01:08p 15   A.   Yes, I think the Judge was -- went through --
```
16   Q.   Okay.
17   A.   -- with a lot of detail and thoroughness.
18   Q.   And, in fact, the Judge broke it down in further detail
19   and said on the left side of the chart are certain numbers and
```
01:08p 20   explained what they mean, correct?
```
21   A.   Once again, I can't recall the chart.
22   Q.   Do you recall --
23   A.   You're asking me to recall a chart from five years ago.
24   Q.   Do you recall the Judge then pointing out to you that on
```
01:09p 25   the right side of the chart are other documents?

1      Do you recall that?

2  A.   I can't recall that specifically at this time.

3  Q.   And the Judge asking if that makes sense to you and you

4  said, "It does, Your Honor."  Do you recall that?

01:09p  5  A.   I'm sure I said "I do."

6  Q.   Okay.  And do you recall the Judge explaining that what

7  happens at sentencing is your judge decides a category and

8  your offense level and then draws a line from both of those.

9  Wherever those lines meet in the middle of the chart, that's

01:09p 10  your guideline range.  Do you recall that?

11  A.   I remember some similar language to that effect.

12  Q.   Do you recall the Judge that's again asking you, do you

13  understand how the middle of the chart works and you said, "I

14  do, Your Honor."  Do you recall that?

01:10p 15  A.   I said "I do."

16  Q.   Okay.  And then do you recall having a separate hearing

17  in connection with this leniency agreement that you entered

18  into?

19         MR. RAPP:  Objection, misstates the agreement, title

01:10p 20  of the agreement.

21         THE COURT:  Sustained.

22  BY MR. LINCENBERG:

23  Q.   Well, the title of the agreement was "Cooperation

24  Addendum," right?

01:10p 25  A.   I don't have it in front of me.

8

Q.   But you recall the title of the agreement was a title
chosen by the prosecutors, correct?

A.   I -- I can answer your questions better if you have -- if
I have the Cooperation Agreement in front of me.

01:10p 5   Q.   And do you recall the Judge in that hearing explaining to
you what a 5K1.1 motion for a downward departure meant?

A.   Once again, my best answer is maybe.

Q.   And do you recall the Judge explaining that if the
Government chooses to make a motion, that the Court could

01:11p 10  consider that and give you a downward departure from your
guideline sentence; and your response was, "Yes, your Honor, I
understand that."  Do you recall that?

A.   I could recall it better if I had a transcript in front
of me.

01:11p 15  Q.   Sir, fair to say that this agreement that you entered
into to, quote, "cooperate" with the prosecution and plead
guilty was one of the most important agreements you've ever
entered into in your life?

A.   It is and it's the reason why I had an attorney really

01:12p 20  handle this matter for me --

Q.   Well --

A.   -- and explain it to me.

Q.   Sir, you were asked by the Judge to make sure you
understood it so that you couldn't come back later and just

01:12p 25  say, "My attorney was dealing with that," right?

A.   Yes, I agreed to it, but only after this was explained by

the attorney and then, I believe, the Judge went through it,

too.

Q.   And it was explained to you by the attorney, right?

01:12p   A.   Yes.

Q.   In fact, the Judge specifically made sure that you had

discussed it, that agreement, fully with your attorney, right?

A.   I'm not certain if -- if that was said.

Q.   How is it that you remember conversations vividly from

01:12p   2007 that the prosecutor asked you about, but you don't recall

these parts of your entering a guilty plea, an agreement,

which was one of the most important agreements that you ever

entered into?   How is it?

A.   Well, can I explain?

01:13p   Q.   You can -- yeah, you can explain.   Go ahead.

A.   It just helps if I have an exhibit or a transcript

because it's been so many years.

Q.   Because when you have an exhibit, then you can just read

off of the exhibit, right?

01:13p   A.   I'm not reading just off the exhibit.   It's helping me

recall.

Q.   So -- and, sir, was this agreement and the opportunity to

please the prosecutors and get this motion for a downward

departure one of your motivations for testifying here today?

01:13p   MR. RAPP:   Objection, argumentative and compound.

```
  1              THE COURT:  I'll overrule.
  2  BY MR. LINCENBERG:
  3  Q.   Was that one of your motivations?
  4  A.   I've agreed -- my motivation is I've agreed --
  5  Q.   Sir, I -- move to strike.  We're going to go through a
  6  lot of your motivations.  I want you to answer my question.
  7       Was that one of your motivations?
  8  A.   I will do so truthfully.
  9  Q.   Okay.  Now, sir, another one of your motivations was that
 10  you understood in April of 2018 that it was going to be
 11  difficult to continue operating Backpage because Congress had
 12  just passed a new law that was about to go into effect that
 13  would have targeted Backpage?
 14              MR. RAPP:  Objection.  Foundation, irrelevant.
 15              MR. LINCENBERG:  Your Honor, this goes to his
 16  motivation.
 17              THE COURT:  Sustained.
 18  BY MR. LINCENBERG:
 19  Q.   Sir, are you familiar with a law that was called FOSTA,
 20  F-O-S-T-A?
 21              MR. RAPP:  Objection.  Irrelevant, foundation.
 22              THE COURT:  Sustained.
 23  BY MR. LINCENBERG:
 24  Q.   Sir, isn't it true that one of your motives for pleading
 25  guilty was because there was going to be a new law coming into
```

01:14p  5
01:14p 10
01:14p 15
01:14p 20
01:15p 25

          1    effect that would make it harder for you to operate your

          2    business?

          3              MR. RAPP:  Same objection.

          4              MR. LINCENBERG:  I'm asking you if that's one of

01:15p    5    your motives?

          6              MR. RAPP:  Same objection.

          7              THE COURT:  Well, I'll permit the witness to answer

          8    "yes" or "no," but let's move on from the area,

          9    Mr. Lincenberg.

01:15p   10              MR. LINCENBERG:  "Yes" or "no"?

         11              THE WITNESS:  Absolutely no.

         12    BY MR. LINCENBERG:

         13    Q.   Was one of your motivations for entering into a leniency

         14    agreement that the US agreed not to seek to forfeit a property

01:15p   15    located at 2531 Tumbleweed Way?

         16              MR. RAPP:  I'm going to object on two things.

         17              One, this is -- I don't know what this address is,

         18    but it's personal information; and, secondly, this has been

         19    asked and answered.

01:16p   20              THE COURT:  Yes, it has been asked and answered.

         21              MR. LINCENBERG:  Your Honor, I have a client.  I

         22    should be able to cross-examine these witnesses about these

         23    points.  I'm going to run through these different points.

         24    Some of them were testified to in certain manners and some

01:16p   25    weren't.

1    THE COURT:  Let's refrain from publishing any

2    personal addresses --

3    MR. LINCENBERG:  Okay.

4    THE COURT:  -- or identifying information.

01:16p  5    You can rephrase the question.  I'll let you do so

6    in a limited way.

7    MR. LINCENBERG:  Thank you, Your Honor.

8    BY MR. LINCENBERG:

9    Q.   Sir, did the United States agree not to forfeit a

01:16p  10   property in Frisco?

11   A.   Yes, my primary residence.

12   Q.   Okay.  And was that primary residence a house or an

13   apartment?

14   A.   Excuse me?

01:16p  15   Q.   Was your primary residence a house or an apartment?

16   A.   It was a house that we had purchased only a year or two

17   after Backpage had launched.

18   Q.   Okay.  And so all of the mortgage payments and other

19   payments for the house were payments that were made from

01:17p  20   proceeds of Backpage?

21   A.   Nope, none of the payments were.

22   Q.   Okay.  And did the United States agree to not forfeit

23   your retirement account, which had been added to over the

24   years with proceeds from Backpage?

01:17p  25   A.   That is incorrect.

```
 1   Q.   Did the United States agree to let you keep two different
 2   Mercedes?
 3   A.   It let -- well, no, I think the car is also not excluded
 4   from forfeiture.
 5   Q.   Well, sir, you, I believe, first of all, testified that
 6   you had purchased a car in 2018, March of 2018, correct?
 7   A.   Correct.
 8   Q.   That was purchased for $65,000, correct?
 9   A.   I believe so.
10   Q.   And that was purchased with money you earned from
11   Backpage, right?
12   A.   Correct.
13   Q.   And that car was never forfeited, was it?
14   A.   But that doesn't mean it's not up for forfeiture.  It
15   could be forfeited.  I had a chance to review the agreement,
16   and I just want to be truthful.  It could be forfeited.
17   Q.   So five years later you're still driving that car, right?
18   A.   Yes.
19   Q.   And you also had a 2012 Mercedes that you purchased for
20   $55,000 that also wasn't forfeited, correct?
21   A.   2012?
22   Q.   Black utility Mercedes?
23   A.   Oh, that -- that car is -- I traded in for the new car.
24   Q.   Sir --
25   A.   So that wasn't possible to forfeit that car because the
```

01:17p  (line 5)
01:18p  (line 10)
01:18p  (line 15)
01:18p  (line 20)
01:19p  (line 25)

```
 1   car was -- the dealership had it.  I did a trade-in.

 2   Q.   And you filed for divorce in January of 2018; is that

 3   correct?

 4           MR. RAPP:  Objection, relevance.

 5           THE COURT:  Sustained.

 6   BY MR. LINCENBERG:

 7   Q.   Sir, in 2018 the United States did not seek forfeiture of

 8   all of the money that was sent over to your then wife as

 9   marital assets that you were placing in her name, correct?

10   A.   That's not correct at all.

11   Q.   That's not correct?

12   A.   No.

13   Q.   You ended up reaching a divorce agreement, correct?

14   A.   Let me make sure I have the time frame correct.

15       We reached an agreement on the divorce, but forfeited

16   funds were not part of any divorce settlement to her.

17   Q.   Right.  Nothing that was sent to your wife was forfeited,

18   correct?

19   A.   Nothing was sent to my wife on the list to be forfeited.

20   Q.   Well, let's go through a couple of examples.  So, for

21   example, you bought a speedboat, put it in your wife's name in

22   2017, correct?

23   A.   I didn't buy the speedboat and put it in my wife's name.

24   My wife bought the boat.  She likes boating, I don't.

25   Q.   And your wife bought it with Backpage proceeds, correct?
```

The timestamps in the left margin are:
01:19p (line 5), 01:19p (line 10), 01:19p (line 15), 01:20p (line 20), 01:20p (line 25)

1   A.   Yes.

2   Q.   Okay.  And there was a 2017 Mercedes, a third Mercedes,

3   black SUV, purchased for $77,000 that became part of the

4   marital assets of your wife, correct?

01:21p 5   A.   She had bought that car, correct.

6   Q.   All right.  And that car was purchased with proceeds from

7   Backpage, correct?

8   A.   Probably.

9   Q.   And to your knowledge, that $77,000 car was also not

01:21p 10   forfeited, correct?

11   A.   No.

12   Q.   And -- when you say "no," meaning, "yes," it was --

13   correct it was not forfeited, right?

14   A.   What was the question?

01:21p 15   Q.   Was it forfeited?

16   A.   No.

17   Q.   All right.  And without giving the address, the

18   Government did claim a residence in The Colony?  Let's not

19   give the address.  You know which residence I'm referring to?

01:21p 20   A.   I do.

21   Q.   You purchased it in September 2017 for cash?

22   A.   I did not purchase it.

23   Q.   Was that -- was it your -- was it your residence?

24   A.   It was not my residence.

01:22p 25   Q.   So what was that property?  Who owned it?

```
 1   A.   My wife.

 2   Q.   Okay.  And your wife purchased it with money from your

 3   work at Backpage?

 4   A.   Actually, that money came from some bitcoin that I had

 5   bought and then it, like, enormously went up in value so it --

 6   that's -- and then I liquidated it.

 7   Q.   And that bitcoin was bitcoin that you bought from money

 8   that you had earned in your work at Backpage, correct?

 9   A.   Well, it was actually expense reimbursement from Backpage

10   for expenses that I incurred.

11   Q.   Okay.  And that -- and the Government, in fact, released

12   any claim on that large home in March of 2022, correct?

13   A.   I gave up and forfeited all claims to that house, and

14   whatever arrangement that she had with her lawyer and the

15   Government was up to her.

16   Q.   Sir, are you aware that the Government released any claim

17   to that multi-million dollar house in March of 2022, "yes" or

18   "no"?

19   A.   Yes.

20   Q.   Okay.  And being able to retain these assets, some of the

21   examples I've gone through, was a part of your motivation for

22   entering into this agreement with the Government, right?

23   A.   A part of my motivation?  Very small part.  I have much

24   more important motivation.

25   Q.   All right.
```

01:22p (line 5)
01:22p (line 10)
01:23p (line 15)
01:23p (line 20)
01:23p (line 25)

```
 1   A.   Which is tell the truth.
 2   Q.   And another very small part of your motivation was that
 3   by cooperating you had very lenient bail conditions so that
 4   you can travel, for example, wherever you want?
01:24p  5   A.   That's absolutely not the case.  I wore an ankle bracelet
 6   and then my travel is restricted.
 7   Q.   Okay.  So you believe that your bail conditions would
 8   have been the same regardless?
 9   A.   Well, I can't speculate to that.
01:24p 10   Q.   Okay, fair enough.  And fair to say that avoiding the
11   life-changing stress of sitting through a trial as a criminal
12   defendant was part of your motivation for cutting this deal?
13   A.   What was that question again?
14   Q.   Yeah.  Was part of your motivation for cutting this deal,
01:25p 15   this leniency agreement, being able to avoid sitting through a
16   life-changing stressful federal criminal trial?
17   A.   Well, this is -- my main -- my main motive -- was it part
18   of my motivation?  I didn't really understand it.  I agreed --
19   Q.   The only question is:  Was it part of your motivation,
01:25p 20   "yes" or "no"?
21   A.   No, my main motivation was to cooperate.
22   Q.   Sir, you're going to have plenty of time to talk about
23   whatever other motivations you want to talk about.  Try to
24   confine yourself to the questions I'm asking you.
01:25p 25       Was part of your motivation being able to retain
```

 1   money that was from Backpage to pay the large attorneys'

 2   fees that you spoke about the other day during your

 3   examination?

 4          MR. RAPP:  Objection, asked and answered.

01:26p  5          THE COURT:  Overruled.

 6          THE WITNESS:  Did you say attorney fees?

 7          MR. LINCENBERG:  Yes.

 8   BY MR. LINCENBERG:

 9   Q.   Was that part of your motivation, being able to have that

01:26p 10  money to be able to pay -- I believe you said -- my memory is

11  upwards of a million dollars that was used -- that Backpage

12  money was used to pay for?

13  A.   It -- it is a benefit.

14  Q.   And was at the same time limiting how much money you

01:26p 15  would have to spend to defend yourself part of your motivation

16  for this agreement you entered into with the Government?

17  A.   Limiting the amount of money I would have to spend by

18  cooperating?  I think I really -- I don't think I considered

19  that.

01:26p 20  Q.   Was part of your motivation getting out from under the

21  loan obligations?

22  A.   Oh, absolutely not.  That loan's uncollectible.

23  Q.   Now, sir, you've testified for about ten days in this

24  matter.  We've heard at various times about prior testimony

01:27p 25  and declarations under oath that you've given over the years,

```
 1   and is it your testimony that you've never lied under oath

 2   during this testimony?

 3   A.   Yes.

 4            MR. LINCENBERG:  I have nothing further, your Honor,

 5   thank you.

 6            THE COURT:  Thank you, Mr. Lincenberg.

 7            Who is next?

 8            MR. EISENBERG:  (Indicating.)

 9            THE COURT:  Oh, Mr. Eisenberg.

10            Come forward, Mr. Eisenberg.

11            MR. EISENBERG:  I need to adjust the podium.

12            THE COURT:  Yes, and the microphone if you're not

13   using the lapel mic.

14            MR. LINCENBERG:  I'm taking this home with me, Your

15   Honor.

16            MR. EISENBERG:  I will go with this first, Your

17   Honor, but I have to change. . .

18            MS. BERTRAND:  And, Judge, if it's okay with the

19   Court, may I sit over here?  It's hard for me to see over the

20   podium.

21            THE COURT:  Yes.  Of course, yes.

22            MS. BERTRAND:  Thank you.

23            MR. EISENBERG:  Okay.  Can you hear me?  No?

24            THE COURT:  That microphone will need to be pretty

25   high up on your tie.
```

01:27p  (line 5)
01:27p  (line 10)
01:28p  (line 15)
01:28p  (line 20)
01:28p  (line 25)

```
 1                      CROSS-EXAMINATION
 2   BY MR. EISENBERG:
 3   Q.   Well, good afternoon, Mr. Ferrer.
 4   A.   Good afternoon.
```
01:28p  5   Q.   Mr. Ferrer, I'm Dave Eisenberg.  I represent Mr. Padilla;
```
 6   and this is the first time we've talked, correct?
 7   A.   Correct.
 8   Q.   Okay.  And so I want to just go through some preliminary
 9   matters, and then I'm going to tell you that we're going to go
```
01:29p 10   through many of the exhibits that you have seen and admitted
```
11   into evidence through your testimony before.  Okay?
12   A.   Okay.
13   Q.   And there'll be some new ones.  So if you need time to
14   look at the new ones, just let us know.  Okay?
```
01:29p 15   A.   Okay.
```
16   Q.   All right, good.  And the other request I have is please
17   try to answer my question.
18   A.   I'll do my best.
19   Q.   I know you will.  I hope you will.
```
01:29p 20        Now, sir, I think from your prior testimony we heard that
```
21   you were with Backpage as a project manager; is that correct?
22   A.   I had many titles, but essentially the project manager.
23   Q.   Okay.  I'm going with that one, project manager.
24        And you were with Backpage from 2000 -- started in 2004;
```
01:30p 25   is that correct?

1  A.   Correct.

2  Q.   And then you stayed with Backpage until it was closed,

3  correct?

4  A.   That is correct.

01:30p  5  Q.   And that was 2018, right?

6  A.   Correct.

7  Q.   And then you -- during that period of time you had other

8  titles, like vice president, right?

9  A.   Sales and marketing, director, and then vice president.

01:30p  10  Q.   Okay.  And then president?

11  A.   Then president.

12  Q.   And then CEO?

13  A.   Yeah, I think CEO kicked in in 2015.

14  Q.   Okay.  But that's before 2018?

01:30p  15  A.   Yes.

16  Q.   And during this period of time you came to know my

17  client, Andrew Padilla?

18  A.   Yes.

19  Q.   You didn't hire Mr. Padilla, though, did you?

01:31p  20  A.   That's a good question.

21  Q.   I know.  You wouldn't know we asked a good question.

22       Well, let me -- let me approach it this way:  Do you know

23  Micah Killough?

24  A.   Yes, I do.

01:31p  25  Q.   I may have mispronounced it, but that's the gentleman who

```
        1    hired Mr. Padilla; is that correct?

        2    A.    That is correct.

        3    Q.    And then when he started, if you know, if you know, he

        4    started in an area -- I'll call it spam relief for lack of a

01:31p  5    better term?

        6    A.    Yes.

        7    Q.    Okay.  And the spam relief was -- that was -- it wasn't

        8    moderation at that point, correct?

        9    A.    Well, it's a -- it's a type of moderation, but a

01:31p 10    different type of moderation.  It didn't have moderation

       11    queues.

       12    Q.    Well, it's different than the moderation that you've been

       13    testifying about for the last several days?

       14    A.    That's correct, sir.

01:32p 15    Q.    That's mod -- excuse me.  That's moderation with respect

       16    to advertisements being posted in, I think, adult content or

       17    adult and escorts and some of the other ones that you've

       18    mentioned, right?

       19    A.    I would agree with you.

01:32p 20    Q.    Good.  And so this moderation -- well, spam has to do

       21    with taking advertisements that appeared to be misleading with

       22    respect to jobs or business opportunities?

       23    A.    Exactly.

       24    Q.    Okay.  So that's what he was doing when he first started,

01:32p 25    if you know?
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1   A.   I believe he was, but he was under the supervision of

2   Micah Killough.

3   Q.   Okay.  Eventually he started doing moderation with

4   respect to what I've been calling just now the ads in escort

01:33p  5   and massage, et cetera?

6   A.   Correct.

7   Q.   And that started in approximately, I think, 2006, maybe

8   2007?

9   A.   I believe you're correct.

01:33p 10   Q.   And then there came a time when -- excuse me -- the

11   moderation section -- well, let me back up.

12      He became in charge of the moderators at some point,

13   correct?

14   A.   He did eventually.  For a while we had three managers in

01:33p 15   the department, and he was one of the managers and eventually

16   he would supervise the moderators.

17   Q.   So that would be in approximately 2009, is that about

18   right, 2008?

19   A.   Around that time, yes.

01:34p 20   Q.   Okay.  And remember, I'm only going to ask you to respond

21   if you have the knowledge, please respond.  If you don't know,

22   then you don't know.  Fair enough?

23   A.   Fair enough.

24   Q.   Good.  So starting at about that period of time, if you

01:34p 25   remember, how many moderators was he supervising when he

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1   became the head of the moderation process?
 2   A.   Well, I'm going to have to give you an estimate.
 3   Q.   That's okay, go ahead.
 4   A.   Well, I don't know the exact number.
 5   Q.   Well, all right.  Give us an estimate.
 6   A.   I'm going to say, maybe, eight or nine.
 7   Q.   And then it grew eventually?
 8   A.   It did.
 9   Q.   In fact, I think you've testified before that there came
10   a period of time when he was in charge of in Phoenix at least
11   20 moderators?
12   A.   There was a time when he had 20 moderators.
13   Q.   And then there came a time when the moderation effort
14   involved people not working at Backpage, but working at home?
15   A.   Yes.
16   Q.   And that practically doubled -- if not, it did double the
17   amount of moderators that he was supervising?
18   A.   It did.
19   Q.   And then there came a time when -- I think the company's
20   name is El Camino.  Do you remember that?
21   A.   I do.
22   Q.   That's Ms. Mohan, right?
23   A.   Correct.
24   Q.   And her husband?
25   A.   Sukesh.
```

01:34p 5
01:34p 10
01:35p 15
01:35p 20
01:35p 25

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    25

```
 1   Q.   Sukesh.  And her name is Monita?
 2   A.   Correct.
 3   Q.   And that is an off-shore moderating operation, correct?
 4   A.   Correct.
```
01:35p 5   Q.   And that was -- what date approximately did El Camino
```
 6   come into the picture?
 7   A.   Approximately, I'm gonna say, 2009 or 2010.
 8   Q.   Well, I think in your direct you associated the -- that
 9   company with what you called credit card Armageddon and that
```
01:36p 10  led to the hiring of moderators in India?
```
11   A.   No, I think your time frame is wrong there.  Credit card
12   Armageddon is July of 2015, like two and a half months after
13   my name as the owner of the site.
14   Q.   Okay.
```
01:36p 15  A.   So you're referring -- we had had Sukesh -- we had
```
16   El Camino with us years before.
17   Q.   Okay.  But that was due to the fact that the number of
18   ads in these categories were growing?
19   A.   Correct.
```
01:36p 20  Q.   And you had to have more moderators to moderate the ads,
```
21   right?
22   A.   The number of ads were growing, but also there were some
23   content rules.  So there was more work.
24   Q.   More work because people were going to be following the
```
01:37p 25  content rules, right?

1    A.   Well, people were gonna be following the rules?

2    Q.   Yeah, the moderators, I'm sorry.

3    A.   Oh.  The moderators were going to be enforcing the rules.

4    Q.   Right.  So because of the volume of ads that were

01:37p  5  increasing, you needed more moderators, right?

6    A.   I'm saying we needed more moderators because the volume

7    of ads and there were continually new rules added.

8    Q.   Those new rules that you're talking about meant rules

9    with respect to what could go into an ad and what couldn't?

01:37p 10  A.   That's correct.

11    Q.   Okay.  And so by the time the Indian -- moderators from

12    India came in were you up to something like -- well, how many

13    moderators were you up to at that point?

14    A.   Once again, it's helpful to have an exhibit or an e-mail

01:38p 15  at that time frame; but if you're gonna ask for an estimate,

16    I'm gonna say that, well, we had filled every desk in the

17    office.  So -- at what time -- what time frame are you talking

18    about?

19    Q.   Whenever you hired them.

01:38p 20  A.   Oh, whenever we hired El Camino?

21    Q.   Uh-huh.

22    A.   Well, 24 or more, I believe.

23    Q.   Well, there came a point in time -- and maybe it was

24    after you hired El Camino -- but weren't there up to 400

01:38p 25  moderators working at one time for Backpage?

```
 1   A.   At the peak?

 2   Q.   At the peak, okay, sure.

 3   A.   Well, those -- that's about -- about maybe 50 to 70 US

 4   moderators and the rest are moderators in the Philippines at

 5   the peak.

 6   Q.   Okay.  So the Philippine moderators, they came in after

 7   the moderators from India?

 8   A.   Correct.

 9   Q.   Okay.  So I guess we've established then -- excuse me,

10   Your Honor.

11           MR. EISENBERG:  Would you hand me the water.

12           We'll drink together.  Cheers.

13   BY MR. EISENBERG:

14   Q.   So at some point in time, okay, we're up to 400

15   moderators; and Mr. Padilla, he's in charge of 400 moderators?

16   A.   He is.

17   Q.   And he was assisted by Ms. Vaught?

18   A.   He was assisted by Ms. Vaught.

19   Q.   Okay.  So now I'm going to ask you if you know.  If you

20   know, how much did Mr. Padilla make, salary -- first of all,

21   was he salaried?

22   A.   Well, it varied by time frame.  So can you give me a time

23   that you would like to know?

24   Q.   Well, how was he paid throughout this whole period of

25   time?  Salary or was it by the hour or was it in assets?
```

01:39p lines: 5, 10, 15, 20; 01:40p line 25

1  A.   No, it -- I believe it was started by the hour, but then

2  it went to a salary.

3  Q.   Okay.

4  A.   A very reasonable salary.

01:40p  5  Q.   I'm sorry, I didn't hear.

6  A.   Reasonable.

7  Q.   A reasonable salary.  And I suggest to you that a

8  reasonable salary would have been about -- at least in 2012

9  $70,000 -- $74,000.  Does that sound right?

01:40p  10  A.   In 2012?

11  Q.   Yes, sir.

12  A.   Yes.

13  Q.   Okay.  And there was also a bonus that he would get.

14       Do you remember that?

01:41p  15  A.   There was a bonus plan again -- yes, there was.

16  Q.   Okay.  And in his case that bonus came to approximately,

17  in 2012, $10,000?

18  A.   Correct.

19  Q.   Okay.  Now, his salary wasn't predicated on the number of

01:41p  20  ads that went in to Backpage, was it?

21  A.   It was not.

22  Q.   And his bonus it was not predicated on that either, was

23  it?

24  A.   It was not.

01:41p  25  Q.   So if there were, I think, at one time a million ads over

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                29

```
         1  a certain period of time, that didn't increase his salary

         2  from, let's say, $800,000 -- ads?

         3  A.   I'm sorry, could you ask that again?

         4  Q.   Okay.  At some point in time I believe you've testified

01:42p   5  that there were a million postings like a day on Backpage?

         6  A.   I don't recall that number, but exactly.  There's a lot

         7  of postings.

         8  Q.   A lot, okay.

         9  A.   Okay.

01:42p  10  Q.   And those postings rose over time, correct?

        11  A.   Correct.

        12  Q.   But over time his bonus was not linked to that volume,

        13  was it?

        14  A.   Now I understand.  It wasn't linked to the volume, but he

01:42p  15  did get annual increases.

        16  Q.   He did, okay.

        17  A.   He did.

        18  Q.   But as far as I can tell, there was $74,000 in 2012.  I

        19  think we've established that.  We've agreed to that, "yes"?

01:42p  20  A.   Yes.

        21  Q.   Okay.  And there was a bonus of approximately 10,000,

        22  right?

        23  A.   Yes.

        24  Q.   Okay.  And in terms of hiring moderators, whose job was

01:43p  25  that?
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    30

    1   A.    What time frame?

    2   Q.    2012.

    3   A.    2012.  Well, that would be Andrew Padilla.

    4   Q.    Would be Mr. Padilla, right?

01:43p  5   A.    Yes.

    6   Q.    He had the authority to hire people, moderators?

    7   A.    That's right.

    8   Q.    And then Mr. Padilla was also in charge of training the

    9   moderators, right?

01:43p 10   A.    Yes, he was.

   11   Q.    And he was also in charge of -- well, let me ask this.

   12   Let me ask you this:  He was not in charge of setting the

   13   budget for Backpage, was he?

   14   A.    Not at all.

01:43p 15   Q.    Not at all, and I think what you're saying is he had

   16   nothing to do with the budget?

   17   A.    About the only thing he did with the budget is provide a

   18   list of moderators and negotiate on what their annual increase

   19   might be and compensation.

01:44p 20   Q.    Okay.  And was probably -- in fact, I believe he was also

   21   in charge of analyzing their performance over a period of

   22   time?

   23   A.    That is in his job description, yes.

   24   Q.    Well, okay.  The question is -- well, I think you've

01:44p 25   answered it, okay.

 1          So he was not in charge of -- well, let me ask it this

 2   way:  His job was moderation, correct?

 3   A.   Correct.

 4   Q.   Supervising moderators, right?

01:44p 5   A.   Correct.

 6   Q.   He was not in charge of -- and I think the phrase that

 7   you had used at some point in time early on in your direct was

 8   he wasn't -- I'll revise that.

 9          He did not get involved in stealing ads, did he?

01:44p 10  A.   I don't -- I had to speculate.  I don't know.

11   Q.   Well, we don't want you to speculate.  So if you don't

12   know, you don't know; but those ads that you say were stolen,

13   wasn't that through the marketing staff?

14          They were involved in -- I'll use a different word if you

01:45p 15   prefer -- taking ads that were on Craigslist and posting them

16   on Backpage?

17   A.   That's right, and there was a marketing staff in Phoenix

18   for a period of time.

19   Q.   Please, sir.  Okay.

01:45p 20  A.   I'm sorry.

21   Q.   Those are the people who were charged -- I'm sorry,

22   involved in taking ads from, say, Craigslist and posting them

23   in Backpage, not Mr. Padilla?

24   A.   I want to be truthful so I'm gonna need to explain.

01:45p 25   Q.   Here's the question:  As far as you know, Mr. Padilla was

```
         1   not involved in stealing ads?

         2   A.   It would have been tangential, meaning that there may

         3   have been some marketing people there that he was still

         4   supervising --

01:46p   5   Q.   Okay.

         6   A.   -- but eventually all of that would move to Dallas.

         7   Q.   And all of it would move to Mr. Hyer.  He would -- he was

         8   in charge of marketing, wasn't he?

         9   A.   Correct.

01:46p  10   Q.   Okay.  And when you say that my client was supervising

        11   somebody, I think you're referring to a man whose first name

        12   is Roger?

        13   A.   That's exactly who I'm referring to.

        14   Q.   And Roger -- that's just one person that you're referring

01:46p  15   to, correct?

        16   A.   Yeah, there might have been one more.

        17   Q.   Well, I heard you to say in testimony that Roger was

        18   assisting in this process.  That's the name I remember.

        19   A.   Is that a question --

01:46p  20   Q.   Yes.

        21   A.   -- I'm not sure.

        22        Could you ask it again?  I didn't quite follow.

        23   Q.   Sure.  The person that I heard you mention involved in

        24   stealing ads was Roger and last name is Williams, right?

01:47p  25   A.   Yes.
```

```
 1   Q.   Okay.  There may have been other people, but they weren't
 2   Mr. Padilla.  That's my point.
 3   A.   That's correct.
 4   Q.   Okay.  And when you say Mr. Padilla was supervising --
 5   I'll just use his first name, Roger.  It wasn't that he was
 6   instructing Roger how to go out and steal ads.  That's not
 7   what he was supervising, was he?
 8   A.   No, I think his supervision was show up to the office.
 9   Q.   Right.  Make sure that he timed in, checked in, that kind
10   of thing?
11   A.   Correct.
12   Q.   Now, Roger also did do some moderation work, didn't he?
13   A.   He did.
14   Q.   Okay.  So in that sense Mr. Padilla supervised Roger?
15   A.   That is correct.
16   Q.   Okay.  Now, I know you had a lot of testimony, sir, that
17   pertained to The Erotic Review and that there were situations
18   in which the references to The Erotic Review occurred in
19   Backpage postings, let me put it that way.  Okay?
20        Remember that?
21   A.   Yes.
22   Q.   Okay.  The effort in order to get those links, I think,
23   isn't that the term?  You'd see a link?
24   A.   Yes.
25   Q.   Okay.  He, Mr. Padilla, he wasn't in charge of putting
```

01:47p (line 5)
01:47p (line 10)
01:47p (line 15)
01:48p (line 20)
01:48p (line 25)

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1   those links into the ads, was he?

2   A.   No, Roger Williams was engaged in it the most.

3   Q.   And he was engaged in it under the supervision of

4   Mr. Hyer?

01:48p  5   A.   You know, it's just -- I'm just saying that there was a

6   little window where maybe Mr. Hyer wasn't as involved.

7   Q.   Okay.

8   A.   But for the most -- for the most part, Roger Williams

9   operated, when it came to The Erotic Review, independently.

01:49p 10   Q.   Okay.  I'm going to ask you the same type of question

11   with respect to super posters.  I remember your testimony was

12   that you went to the Somad offices in New York City?

13   A.   Yes, I did.

14   Q.   And that was in connection with the super posters idea?

01:49p 15   A.   Super posters ID?

16   Q.   No, idea.

17   A.   Oh, idea, I'm sorry.  Yes.

18   Q.   Okay.  Now, Mr. Padilla didn't go with you to New York

19   City to visit Somad, did he?

01:49p 20   A.   He did not.

21   Q.   Those super posters, I think you named them as Dollar --

22   Dollar Bill?  One of them was Dollar Bill?

23   A.   One of them was Dollar Bill.

24   Q.   Okay.  But then I think your testimony was -- had

01:50p 25   pertained to -- I'm going to call them letters.  See if you

1   recall this.

2        First of all, letters from the Attorneys General.  Do you

3   recall going through that in your testimony?

4   A.   Yes, I recall those letters.

01:50p  5   Q.   Okay.

6   A.   Lots of them.

7   Q.   And do you recall when you met -- I think you met with

8   Attorneys General?

9   A.   I met with a Assistant Attorneys -- Attorneys General.

01:50p  10  Q.   Assistant Attorney General.

11  A.   I didn't meet with her -- her boss.

12  Q.   Okay.  Mr. Padilla didn't go with you on that meeting,

13  did he?

14  A.   He did not.

01:50p  15  Q.   And I think your testimony was that in order to deal with

16  the Attorneys General, we -- and I think I have this right --

17  hired an individual to represent the company in its

18  discussions -- I'm sorry, that's not accurate.

19        Also with respect to NCMEC, let me revise.

01:51p  20       N-C-M-E-C, correct?

21  A.   Correct.

22  Q.   Okay.  And there were meetings with respect to NCMEC,

23  right?

24  A.   Correct, there were meetings.

01:51p  25  Q.   There were more than one, correct?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG          36

```
 1   A.    Yes.

 2   Q.    And you went to those meetings?

 3   A.    I went to one meeting.  The rest were telephonic for me.

 4   Q.    And the ones that were telephonic for you, were there

 5   other people there on the phone besides yourself?

 6   A.    The other people from the company were there at the NCMEC

 7   meeting.

 8   Q.    Mr. Padilla wasn't there at the NCMEC meeting, was he?

 9   A.    He was not.

10   Q.    Nor was Mr. Padilla on the telephone when there were

11   these telephonic conversations with NCMEC, right?

12   A.    He was not.

13   Q.    I think I might have this a little bit wrong.

14         The mayor of Seattle, is that McGinn?

15   A.    That is correct.

16   Q.    Mayor McGinn.  And there were meetings with Mayor McGinn

17   and his staff; is that correct?

18   A.    Correct.

19   Q.    And you were present at those meetings?

20   A.    I was.

21   Q.    Was there more than one, sir?

22   A.    There were two other people from the company present.

23   Q.    How many meetings were there?

24   A.    In person or telephonic?

25   Q.    Well, let's do in person first.  How many in person?
```

01:51p  (line 5)
01:52p  (line 10)
01:52p  (line 15)
01:52p  (line 20)
01:52p  (line 25)

```
 1   A.   One.

 2   Q.   And how many telephonic?

 3   A.   Well, if -- I guess we're including the mayor's staff at

 4   least -- and the president of the city council.  Maybe three

 5   -- two or three.

 6   Q.   These are telephone conversations, right?

 7   A.   Correct.

 8   Q.   Mr. Padilla wasn't at the meeting with Mayor McGinn or

 9   his staff, correct?

10   A.   He was not.

11   Q.   And he was not on the telephone any of those times, two

12   or three times?

13   A.   He was not.

14   Q.   So there was also a Polaris.  I think Polaris involved a

15   letter from Polaris?

16   A.   Did we get a letter from Polaris?

17   Q.   Only if you recall.

18   A.   Yeah, I don't know if we got a letter or just went to

19   meet him in person.

20   Q.   Okay.  The Polaris meeting, where was that?

21   A.   In Washington, D.C.

22   Q.   Was there just the one meeting?

23   A.   Yes.

24   Q.   Okay.  At the Polaris meeting Mr. Padilla was not

25   present, was he?
```

01:53p  5
01:53p 10
01:53p 15
01:53p 20
01:54p 25

```
 1   A.    He was not.

 2   Q.    With respect to aggregation, you know what I mean by that

 3   -- well, do you remember the term, "aggregation"?

 4   A.    Yeah, or the stealing ads, aggregation.

01:54p  5   Q.    Okay, that's the same thing.  All right, fine, thank you.

 6         So I want to show -- well, first of all, have you ever

 7   seen -- I think you have -- the job description for

 8   Mr. Padilla?

 9   A.    It's possible that I even wrote it.

01:54p 10   Q.    All right.

11         MR. EISENBERG:  Can we have the witness shown

12   Exhibit 899e and this is -- by the way, I'm sorry, Your Honor,

13   in evidence.  899e is in evidence.

14   BY MR. EISENBERG:

01:55p 15   Q.    Do you see it on your screen, sir?

16   A.    I do.

17   Q.    Now, at the top you've got Mr. Hyer, right?

18   A.    We do.

19   Q.    And then Ms. Nickel and then down at the bottom do you

01:55p 20   see Andrew Padilla?

21   A.    Correct.

22   Q.    Okay.  And you wrote this job description; is that

23   correct?

24   A.    I believe I did.

01:55p 25   Q.    And what you say in there is he was to manage the staff
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    assignments and training for spam abatement.

2        Let me just stop right there.

3    A.   Do you know what year this document is?

4    Q.   Well, sir, this document was produced by the Government

01:55p 5  so I do not know.  All I know is there is a job description

6    for Mr. Padilla.

7    A.   Okay.

8    Q.   And -- well, it is accurate, isn't it?

9    A.   I -- I recall writing it.  I was just trying to remember

01:56p 10 the time.

11   Q.   Okay, all right.  And I think your testimony was that he,

12   my client, managed the moderation department.  Then I told him

13   -- well, he managed the moderation department, and what you're

14   referring to here is staff assignments and training for spam

01:56p 15 abatement.  That has to do with what I've been calling

16   moderation, correct?

17   A.   Correct.

18   Q.   Okay.  Then you went on to say, "...this task is becoming

19   a 24/7 operation," and by that you meant that it's a

01:56p 20 full-time, around-the-clock, everyday effort, correct?

21   A.   Correct.

22   Q.   And Mr. Padilla was in charge of that, right?

23   A.   Right.

24   Q.   Is I'll go down to the next sentence where it says, "You

01:56p 25 also will suggest..."  Do you see that?

1   A.   Yes.

2   Q.   "You also will suggest improvement to and manage the use

3   of spam abatement tools..." correct?

4   A.   Correct.

01:57p  5   Q.   Okay.  "...including the global filter..."

6        Let me stop there.  Did I read that correct?

7   A.   Correct.

8   Q.   The global filter, what is that, sir?

9   A.   That's the list of words that can either be stripped out

01:57p 10  or alerted or banned, which would not allow a user to post an

11  ad with a particular word.

12  Q.   Okay.  And then it goes on to say, "...violation monitor,

13  global delete tools..." -- as a matter of fact, two phrases,

14  sorry.  "Violation monitor," that's kind of like what you were

01:57p 15  discussing before.  He would monitor to make sure that banned

16  words were taken out or stripped, correct?

17  A.   No, it's different.

18  Q.   What is it?

19  A.   It's -- it's when other users report an ad, they get

01:58p 20  thrown into a queue and then you have to monitor those

21  violations.  So it's user-reported potential violations in a

22  queue.

23  Q.   Okay.

24  A.   That's the violations monitor.

01:58p 25  Q.   All right.  And then "global delete tools," what's that?

1    A.   There were some tools that you could delete all the ads

2    or many ads at one time.

3    Q.   Right, okay.

4         Now, I'm going to start with some moderation practices,

01:58p   5    if you will.  I just want you to get into the right frame of

6    mind, and I've tried to organize these chronologically.  Okay?

7    A.   Okay.

8    Q.   Okay, very good.  So -- and I may have made a mistake on

9    a day or two, and if I did I apologize; but let's have 551 in

01:59p  10    evidence shown to the witness.

11        All right, sir.  Now, this is from you.  Would you agree?

12    We'll concentrate at the top.

13    A.   It is from me.

14    Q.   Okay.  The date is February 22, 2008, all right.  So

01:59p  15    that's -- at least we're into the time when monitoring escort

16    and adult ads has at least begun?

17    A.   Correct.

18    Q.   Okay.  And then there's a cc to Steve Suskin; is that

19    right?

01:59p  20    A.   Correct.

21    Q.   Okay.  And then the subject matter is "Terms of Use,"

22    correct?

23    A.   Correct.

24    Q.   Okay.  And this is a summary, as you can see from the

02:00p  25    first line, of various changes to be done.

1        Did I read that correctly?

2   A.   You did.

3   Q.   And that's something that you were putting in to

4   practice, that is, changes, right?

02:00p  5   A.   These are changes that Scott Spear wants that I'm

6   documenting so that I can pin him down to this is a final

7   version of changes that he wants to do.

8   Q.   Okay.  I don't see pinning down in this e-mail, and I've

9   read it pretty closely.  It's not there.

02:00p 10   A.   Well, it's --

11   Q.   It's not there, is it, sir?

12   A.   Oh, I'm sorry.

13   Q.   Okay.  It isn't there, is it?

14   A.   No.  The words to it, in effect, are there; but "pinning

02:00p 15   down" is not there.

16   Q.   Oh.  Well, I missed that, okay.

17        Now, if you go to "Step 1," "Add 'Posting Rules' on top

18   of the posting form for escorts and body rubs."

19        Let me just stop there.  What is the posting form that

02:01p 20   you're referring to there?

21   A.   So that's the form you would click when you are going to

22   write an ad, put in the title, the body copy, and then attach

23   some images.  That's -- that's the posting form.

24   Q.   Okay.  And that's what a user or an advertiser would do;

02:01p 25   is that correct?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1  A.    That would be a -- excuse me, I'm sorry?
 2  Q.    That would be the user, the poster, the person that
 3  posts?
 4  A.    Yeah, that would be a user posting versus --
```
02:01p
```
 5  Q.    Okay.  And so what's supposed to appear up there is where
 6  under this headline all in caps, "YOU MUST OBSERVE THE
 7  FOLLOWING POSTING RULES," right?
 8  A.    Correct.
 9  Q.    And then you list some four different rules, correct?
```
02:02p
```
10  A.    Yes.
11  Q.    Okay.  I'm referring to where it says "do not," and I see
12  it there four times.
13  A.    I was just counting.
14  Q.    Okay.  Did I get it right?
```
02:02p
```
15  A.    You did.
16  Q.    Okay.  Let's go to the first one.  No. 1, "Do not suggest
17  or imply an exchange of sexual favors for money," right?
18  A.    Correct.
19  Q.    And that's a -- that's a clear sign of prostitution,
```
02:02p
```
20  right?
21  A.    That would be very obvious prostitution.
22  Q.    And so what Mr. Spear is requesting that you do,
23  according to what you testified, is to make sure that there's
24  a posting at the top that says, "Do not suggest or imply an
```
02:02p
```
25  exchange of sexual favors for money"?
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                44

```
 1   A.   He wants this on top of the posting form, that's correct.
 2   Q.   Okay.  That's where -- well, withdrawn.
 3        Then the next request is, "Do not use code words..." and
 4   I'll just omit the code words.  We don't need to talk about
 5   them, but there are certain code words that he is saying do
 6   not use these code words; is that correct?
 7   A.   He also wants this on top of the posting form.
 8   Q.   Okay.  And he also wants on top of the posting form, "Do
 9   not include obscene images," right?
10   A.   Correct.
11   Q.   Okay.  And, "Do not post" -- I'm down to the last one --
12   "content which advertises an illegal service."
13        Do I have that right?
14   A.   Correct.
15   Q.   Goes to the top of the form?
16   A.   That's what's gonna be on top of the posting form.
17   Q.   Okay.  And then if you don't comply -- now I'm down to
18   the next sentence.  "Postings not complying with terms of use
19   are subject to removal."  Do I read that right?
20   A.   You do.
21   Q.   And "removal" means that ad gets taken out or --
22   A.   Correct.
23   Q.   I'm sorry, I didn't mean to interrupt you.  Did I say
24   that?  Is that correct?
25   A.   Well, that's what it says.
```

02:03p 5
02:03p 10
02:03p 15
02:03p 20
02:04p 25

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                45

1    Q.    Okay.  Well, that's what you wrote.

2    A.    That's what Scott Spear wanted at the top of the posting

3    form, and that's what I wrote in this e-mail.

4    Q.    Okay.  The part there, that's what you wrote, correct?

02:04p  5    A.    Correct.

6    Q.    Okay.  And by being subject to removal, that could mean

7    -- and maybe I don't have this right, but that ad would never

8    get posted in the first place if the moderator saw it?

9    A.    Say that again.

02:04p 10    Q.    Yeah.  If a -- well, I'll do it this way:  If a moderator

11    who was moderating this -- any particular ad saw sex for

12    money, the idea was -- not the idea, the instruction was,

13    "Don't approve that ad"?

14    A.    We're talking about this time line or are you talking

02:04p 15    2015?  We're talking 2008, right?

16    Q.    We're talking 2008, that's the date.

17    A.    These are the rules that are going on top of the posting

18    forms, and I'm not sure if the queues are even built yet.  So

19    I don't think the moderators are -- you know, I -- I just need

02:05p 20    to know when the moderation queues were built.

21    Q.    Okay.

22    A.    For now I can say with this e-mail this is what's on top

23    of the posting form.

24    Q.    All right.  Let's skip No. 2 and let's go all the way

02:05p 25    down to No. 4.  Do you see where -- 4(a)?

```
 1              MR. EISENBERG:  Ms. Ellig, could you highlight 4(a)
 2     for us, please.  Thank you.
 3     BY MR. EISENBERG:
 4     Q.   See in 4(a) -- I'll read this to you and I'm going to ask
02:05p 5     you what it means.  "Posting adult content or explicit adult
 6     material unless..." and I'm going to stop right there.
 7         What I think this meant to say is, "Do not post adult
 8     content or explicit adult material unless:"
 9     A.   Yeah, but that's not what it says.
02:06p 10    Q.   I know.  And when you read it, it doesn't make any sense,
11     does it?
12     A.   It doesn't.
13     Q.   But I think what you intended to say is just the
14     opposite, "Do not post adult content or explicit adult
02:06p 15    material unless:"  So far so good?
16     A.   Well, I can explain --
17     Q.   Well --
18     A.   -- if you'll permit me.
19     Q.   Okay.  This isn't -- no, go ahead.  What's that mean?
02:06p 20    A.   It will be helpful.
21     Q.   All right.
22     A.   I think this is a -- this is just can an excerpt of --
23     4(a), part of the Terms of Use, and above it it's saying like
24     don't -- these are things that -- don't do these things.
02:07p 25    Q.   Good, okay.  I understand.  And one of the don't do's is
```

```
 1    don't post unless the material is specifically permitted in

 2    the designated adult category.  If it is, then you can post.

 3         Did I -- do I have that right?

 4    A.   You have that right.

 5    Q.   Okay.  And don't post unless you are at least 18 years of

 6    age or older.  Did I read that right?

 7    A.   Correct.

 8    Q.   And that's called what -- I guess I can call that an age

 9    restriction, right?

10    A.   It's an age restriction in the Terms of Use --

11    Q.   Okay.

12    A.   -- for the adult category.

13    Q.   All right.  And then (b) --

14    A.   I might have misspoke, I'm sorry.

15    Q.   Oh, go ahead.

16    A.   No, that could be for all categories, too.

17    Q.   All right.  And then 4(b) is basically don't post

18    anywhere on the site obscene or lewd and lascivious graphics

19    or photographs; is that correct?

20    A.   That's correct.

21    Q.   Okay.  So this is a warning don't do these things, right?

22    A.   It's in the Terms of Use.

23    Q.   Okay.  And don't post graphics or photographs depicting

24    or simulating sexual acts; is that right?

25    A.   That's what it states, correct.
```

02:07p  5
02:07p 10
02:07p 15
02:08p 20
02:08p 25

1    Q.   And that's what you wrote?

2    A.   No, this is actually written by Scott Spear --

3    Q.   Okay.

4    A.   -- and then it's given to me because I don't write the

02:08p  5  language in the Terms of Use.  It's kind of lawyer-ish.

6    Q.   And you don't do lawyer-ish?

7    A.   You may have noticed I don't do it well.

8    Q.   Well, I've noticed a lot, sir, but that's -- nevermind,

9    gratuitous comment.

02:08p 10       Don't post any solicitation directly or in coded fashion

11   for any illegal service.

12        That's another thing that Mr. Spear wanted in there; is

13   that right?

14   A.   That's correct.

02:09p 15  Q.   Okay.  And then I should have completed it.

16   "...exchanging sexual favors for money or other valuable

17   consideration."  Is that right?

18   A.   That's correct.

19   Q.   Okay.  There came a point in time when these rules were

02:09p 20  changed to some extent.  I know that's broad and open.  That's

21   probably not fair.

22        Some of these rules did change, correct?

23   A.   I would tell you that the rules were continually

24   changing.

02:09p 25  Q.   Okay, all right.  And they were continually changing at

```
  1   -- not at Mr. Padilla's direction?
  2   A.   That is correct.
  3   Q.   In fact, Mr. Padilla didn't make up the rules, did he?
  4   A.   He did not.
02:09p 5  Q.   And neither did Ms. Vaught?
  6   A.   Correct.
  7   Q.   Their job and my client's job was to enforce the rules,
  8   right?  Why do you pause, sir?
  9   A.   Well, there's a difference in the rules that are stated
02:10p 10 here versus the rule -- the way content would be.  We -- we
 11   did our moderation increment --
 12   Q.   Here's my question --
 13   A.   You asked me to explain.
 14   Q.   No, then I'll rephrase.
02:10p 15 A.   Okay.
 16   Q.   But my question to you was:  His job was to enforce the
 17   rules?  If I can explain it a different way, he was in charge
 18   of moderating the ads so they would conform to the rules?
 19        That's his job?
02:10p 20 A.   Are we talking about these rules?
 21   Q.   We're talking about any rule at the time that he was in
 22   charge of the moderation effort.  His job was to enforce the
 23   rules no matter whether they changed at midnight, next year,
 24   four years later.  As long as he was there, that's his job?
02:11p 25 A.   His job is to --
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG          50

1   Q.   "Yes" or "no," sir -- I'm sorry.  Go ahead.

2   A.   His job is to enforce the rules as we deemed them to be

3   implemented, which was in a continual state of flux.

4   Q.   I understand that; but the answer is "yes" that's his

02:11p  5   job, enforce the rules?

6   A.   Yes.

7   Q.   Not hard to say, right?  It's accurate?

8   A.   Okay.

9   Q.   All right.  May the witness be shown exhibit -- well, let

02:11p 10   me do it this way:  In 2008 there was a budget and business

11   plan for Backpage's operation.  In fact, there probably was

12   for every year.  I know that's compound.

13        Do you remember seeing a budget plan in 2008 for

14   Backpage?

02:12p 15   A.   So there would be an annual budget, no doubt.  I think

16   that was one of the exhibits.

17   Q.   Yes, it was.  And I think it's Exhibit 23.  It's in

18   evidence.

19            MR. EISENBERG:  May we have 23, ma'am?

02:12p 20            Oh, it's there.  Okay, good.

21   BY MR. EISENBERG:

22   Q.   And this is -- my recollection, sir, this is what you

23   identified.  This is Exhibit 23.

24   A.   Correct.

02:12p 25   Q.   Okay.  So in Exhibit 23 if you go to Page 2 of that

```
  1  exhibit -- let me back up.  Who wrote the budget plan?
  2  A.   Scott Spear.
  3  Q.   And did you participate in helping Mr. Spear write this
  4  plan?
02:13p  5  A.   I did.
  6  Q.   And you gave Mr. Spear information that would go into the
  7  budget, right?
  8  A.   I did.
  9  Q.   So let's go now to Page 2, and you see down at the bottom
02:13p 10  the last paragraph?  I'm gonna ask you -- yeah, that's the
 11  one.  Read it to yourself just so we put this into context,
 12  and my question as you read is:  Did you write this section?
 13  A.   It is likely, but I'm not absolutely certain, but I'm
 14  familiar with all these tools.
02:14p 15  Q.   Okay, fine.  So what is -- what you're saying is -- I'm
 16  sorry.  What the budget plan is saying, "We also have spent a
 17  considerable amount of time..."  I'll just stop there.
 18       "We" is who?
 19  A.   So "we" is speaking -- so that would be Scott Spear and
02:14p 20  Backpage.  Backpage has spent a lot of time and resources --
 21  Q.   Well --
 22  A.   -- collectively.
 23  Q.   Okay, sorry.  Would you agree with this statement that
 24  Backpage has spent a considerable amount of time and resources
02:14p 25  in 2017 in improving content quality?
```

1    You agree with that, right?

2  A.   I do.

3  Q.   Okay.  And then the next sentence talks about the

4  "Automated spam routines removal bad postings..." I'll spot

02:15p  5  there -- actually, I should go a little bit further --

6  "...within 15 minutes at a pace of 180,000 removals per

7  month."  Did I read that correctly?

8  A.   That is correct.

9  Q.   And you would agree with that, too, in that routines have

02:15p  10  been instituted to remove bad postings within fifteen minutes?

11  A.   That's what it states, but there's some important

12  distinctions that I should point out to you.

13  Q.   Well, I'm not sure, sir, whether that actually answers

14  the question.  My question is:  Is that what it states?

02:15p  15  A.   That is what it states.

16  Q.   So any -- I'm sorry, I didn't mean to interrupt you; but

17  anybody reading this would look at it and say that the spam

18  routines would result in removal within fifteen minutes of a

19  bad posting, right?

02:16p  20  A.   Well, not if they work for Backpage.

21  Q.   Well, I'm sorry, sir, but -- all right.  This is an

22  internal document, isn't it?

23  A.   Yeah, but spam routines --

24  Q.   Uh-huh.

02:16p  25  A.   -- doesn't affect any adult postings.  It only is for

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    53

```
     1   free postings, and that's what I wanted to clarify.
     2   Q.   Oh, okay.  I'm sorry, all right.  Then it says, "The
     3   staff's global delete tools increased by ten fold the amount
     4   of spam manually removed."  Is that correct?
02:16p 5 A.   That's correct.
     6   Q.   Okay.  That relates just to spam; is that right?
     7   A.   That's correct.
     8   Q.   If you go to Page 7 of this plan you see under "Our Basic
     9   Strategic Plan is as Follows"?
02:17p 10 A.  I see it.
    11   Q.   Okay.  If you go down to point five -- see point five,
    12   "Put a staff in place..."
    13   A.   I do see it.
    14   Q.   And what that provides is, "Put a staff in place to
02:17p 15 handle the tasks above..." and then, "...including continued
    16   user improvements..." -- let me stop there.
    17        What's a "user improvement"?
    18   A.   Just making the site faster, easier, perhaps making the
    19   content better.
02:17p 20 Q.  Okay.  Then it says, "...abuse, spam, fraud prevention,"
    21   and then "user and user content creation," right?
    22        That would refer to postings in the adult section,
    23   wouldn't it?
    24   A.   What's -- 2008?
02:18p 25 Q.  Yes, sir.
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1   A.   And you're stating -- you're asking if the user and user

 2   content creation refers to the adult section?

 3   Q.   Yes.

 4   A.   Correct.

 5   Q.   Okay.  So that's 2008.  This is -- this is -- you don't

 6   -- I couldn't tell from this -- I'm sorry, I'm not the

 7   witness.

 8        You can't tell from this what date it came out in 2008?

 9   A.   What date this plan came out?

10   Q.   Yes, sir.

11   A.   I can give you a month.

12   Q.   Good.  What month?

13   A.   Almost always in December of 2007 would be the plan.

14   Q.   To cover the next year?

15   A.   The budget meetings were normally one month -- the

16   December prior to the new year.

17   Q.   Now, let's go to Exhibit 1164.  This is in evidence, and

18   I think you've testified to this one as well?

19   A.   Correct.

20   Q.   Now, if you look up -- jury's got it, okay.

21        You look up at the top and you see what it's referring to

22   is "backpage links," right?

23   A.   Correct.

24   Q.   And then there is a message about this.  It's from Roger

25   Williams in adult marketing, correct?
```

02:18p (line 5)
02:18p (line 10)
02:18p (line 15)
02:19p (line 20)
02:19p (line 25)

1    A.    Correct.

2    Q.    And he is talking about Backpage -- I'm sorry.  Yeah,

3    Backpage links; is that right?

4    A.    He is.

02:19p  5    Q.    And that's the same Roger Williams that you were talking

6    about a little bit before?

7    A.    It is.

8    Q.    Okay.  Now let's go to 580 -- I mean withdrawn.

9          Let's go to 588.  This is also in evidence.

02:20p 10          Okay.  This refers to a 2010 Budget Presentation

11   pertaining to Backpage, right?

12   A.    It does.

13   Q.    Okay.  And I think you testified about Slide 18.

14          MR. EISENBERG:  So if we could have slide -- I don't

02:20p 15   know how they're actually marked in the exhibit.  I think it

16   might be under "Special (sic) Initiatives for 2010 Plan."

17   That's really what I'm referring to.  So if we could find

18   that, Ms. Ellig.  It might be the second page.  There it is.

19   It's up on the monitor now.  This is in evidence, okay.

02:20p 20   BY MR. EISENBERG:

21   Q.    So one of the -- oh, I'm getting ahead of myself.

22          Who drew up this plan -- presentation, sorry?

23   A.    So this presentation is created by Scott Spear, whatever

24   accountant is on staff, and myself.

02:21p 25   Q.    Okay.  So you helped contribute to it, fair to say?

1    A.    I have.

2    Q.    Okay.  And with respect to what is now on your monitor

3    under "Specific Initiatives for 2010," did you contribute to

4    this -- I'll call it a slide for lack of a better way to put

02:21p  5    it?

6    A.    I am going to contribute to it and this portion, Scott

7    Spear has stated, I will be speaking about.

8    Q.    Okay.  And under this is to increase the monitoring staff

9    to full 24/7 operation, correct?

02:21p  10    A.    I believe so, yes.

11    Q.    And that pertains to Mr. Padilla's operation, right?

12    A.    It does.

13    Q.    So we're about the time in 2010 when moderation has to go

14    to a seven-day-a-week, 24-hour-a-day operation, correct?

02:22p  15    A.    That's correct.

16    Q.    Okay.  And that's due to the amount of ads that are going

17    through the moderation process in adult, escort, massage,

18    those types of categories, right?

19    A.    It is.

02:22p  20    Q.    Okay.  So if we turn to another slide -- and I think it's

21    18 but it says at the heading -- or the top "Specific

22    Initiatives for 2010 Plan.  Add Personnel."  There we go.

23    Thank you, ma'am.

24          Here under "Add Personnel" do you see Phoenix operations?

02:23p  25    Right down underneath -- it's right underneath "Add

```
        1    Personnel," sir.  There it is.  "Increase monitoring staff..."
        2    A.   Oh, I see, "Increase monitoring staff to a full 24/7
        3    operation."
        4    Q.   Let's see, no.
02:23p  5              MR. EISENBERG:  It would be the one that has to do
        6    with Phoenix operation, Ms. Ellig.
        7              I don't mean to mislead you but --
        8              THE WITNESS:  There we go.
        9              MR. EISENBERG:  Oh, thank you.
02:23p 10    BY MR. EISENBERG:
       11    Q.   So now you see what I'm talking about, right?
       12    A.   I do.
       13    Q.   And it says Mr. Padilla -- he's the operations and abuse
       14    manager, right?
02:23p 15    A.   Correct.
       16    Q.   And major projects are going to include -- we can skip
       17    the first four, but would you agree one of the major projects
       18    is to include "Adult Moderators: days, nights and weekend
       19    leads."  Is that correct?
02:24p 20    A.   Correct.
       21    Q.   And that is because we're going now -- or BP is going now
       22    to 24/7, right?
       23    A.   Correct.
       24    Q.   And we need more moderators to handle the workload,
02:24p 25    right?
```

1    A.   Craigslist shut down their adult section.  We need more

2    moderators.

3    Q.   Okay.  And then it says underneath that, "Moderation is

4    60% of Phoenix total personnel."

02:24p  5        So do I have this right, 60 percent of the people who are

6    working in the Phoenix area -- I'm sorry, at the Phoenix

7    location, they are doing monitoring work, right?

8    A.   Correct.

9    Q.   Okay.  And underneath you see how that breaks down.  What

02:24p 10   does "Q1" mean?

11   A.   First quarter.

12   Q.   Okay.  And then increase from 21 to 23.  And "FT," is

13   that full time?

14   A.   It is.

02:25p 15   Q.   All right.  So now we've got 23 moderators full time, and

16   then you've got some part timers, two to three?

17   A.   Correct.

18   Q.   So now we have -- or the request is to increase that many

19   people full time and part time, right?

02:25p 20   A.   The request is in Q1 to add --

21   Q.   Uh-huh, just Q1.

22   A.   -- two moderators full time and one moderator part time.

23   Q.   Well, Q1 increase -- am I reading this correct?  Yeah,

24   from 21 to 23, full-time moderators, right?

02:25p 25   A.   So that would be two additional full-time employees.

```
 1   Q.   Sure, okay, I see what you're getting at.  And then part
 2   time is two to three part time?
 3   A.   Correct.  I believe those are all additional employees.
 4   Q.   Oh, what you're saying is you go from two to three?
 5   A.   Oh, yes, you're correct this time, from two to three.  So
 6   it's one part-time employee.
 7   Q.   Okay.  Quarter 2 we've got a further increase, don't we?
 8   A.   We do.
 9   Q.   We go from 23 full time in Quarter 1 to 28 full time in
10   Quarter 2, right?
11   A.   Correct.
12   Q.   Okay.  And we go from three part-timers to five
13   part-timers?
14   A.   Correct.
15   Q.   Now, what we have underneath that is another -- well,
16   projected project, okay?  And that is "...to hold these
17   numbers as technology increases our efficiency."
18        Let me just stop there.  What does that mean?
19   A.   Well, you can tell in this budget that despite having the
20   increase in revenue from Craigslist that we're not really
21   adding that many moderators given that revenue is soaring.
22   Q.   I beg your pardon, sir, but I sure couldn't tell that
23   from this.
24   A.   Well, that's -- you asked my opinion and --
25   Q.   No, I asked you -- well, you're right.  I asked you what
```

1    does that mean.

2    A.   Yes.  I'm not done.  Can I finish?

3    Q.   No, I'm sorry.  What it means to the reader is to hold

4    these numbers -- you want to continue at 28 full time and five

02:27p   5    part time as technology increases our efficiency.

6    Maybe I shouldn't have left that out.

7         So what is happening here, if I've got this right, is

8    you're gonna have technology help these people do their job

9    and become more efficient at their job?

02:27p   10   A.   I would not interpret it that way.

11   Q.   Okay.  Well, let's go to the next part underneath.

12        It says, "Outsourcing experiment - the Philippines,"

13   okay?  Did I read that right?

14   A.   Correct.

02:28p   15   Q.   I'm curious as to whether does this mean you're going --

16   you intend to go -- or plan on going to hiring moderators in

17   the Philippines?

18   A.   That is correct.

19   Q.   Okay.  So that would have been in 2010 -- projected in

02:28p   20   2010; is that correct?

21   A.   That's correct.

22   Q.   Does that mean you would be replacing the India

23   moderators or this is in addition to the India moderators?

24   A.   The India moderators terminated their contract with us,

02:28p   25   and so we're gonna try the Philippine moderators with two

1    people to start.

2    Q.   Okay.  And that is because you need to have extra

3    moderators doing the moderating?

4    A.   We need more.

02:29p  5    Q.   We need more and that's because the volume is ever

6    continuing to rise, to rise, to rise, right?

7    A.   Correct.

8    Q.   And you're going to be dividing all those ads among

9    moderators -- no, I'm sorry, let me revise.

02:29p  10        The expectation is that a moderator will moderate every

11   ad?

12   A.   That is not the expectation.

13   Q.   Well, couldn't possibly be, is that what you're saying?

14   A.   It's a fire hose of content coming in and we can barely

02:29p  15   keep -- keep up and what I'm saying here is that this is not

16   enough moderators for what we really needed.

17   Q.   Okay.  And that has to do with planning, right -- I'm

18   sorry, revise.

19        That has to do with the fact that you want to have -- in

02:29p  20   your opinion, you need more money to hire more monitors --

21   moderators, I'm sorry, correct?

22   A.   We needed to put more moderators in the budget than we

23   did.

24   Q.   And the moderators that are there, they are moderating

02:30p  25   ads, the ones that they can get to, and I think we'll get to

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                62

```
        1   this in a while, maybe a thousand ads a day per moderator or
        2   more?
        3   A.   I don't recall the exact number but it's -- it's a lot.
        4   Q.   It's a lot and it's a lot to expect the manager of the
02:30p  5   moderating outfit to make sure that the ads are moderated in
        6   accordance with the standards of the day?
        7            MR. RAPP:  Is that a question?
        8            MR. EISENBERG:  Is that true?
        9            THE WITNESS:  Could you state it one more time?
02:30p 10   BY MR. EISENBERG:
       11   Q.   It's a hard job for the head of the moderators to have
       12   all of these ads moderated to the best of his ability?
       13   A.   It's a hard job and it's also hard because we're asking
       14   them to do a lot of things.
02:31p 15   Q.   Okay, all right.
       16            MR. EISENBERG:  And if you go to the -- I think it's
       17   the next page, Ms. Ellig.  Keep going.  All right, here we go.
       18   I don't know what slide this is, but we've got the right page
       19   up.
02:31p 20   BY MR. EISENBERG:
       21   Q.   This is again under "Specific Initiatives for 2010,"
       22   right?
       23   A.   Correct.
       24   Q.   And it has a headline "Continue as a good corporate
02:31p 25   citizen."  Mr. Spear wrote that?
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                 63

```
         1   A.    Yes, he did.

         2   Q.    Okay.  And underneath we have "Adult Moderation," and

         3   that has the following:  "Set and maintain our own standards."

         4         Did I read that right?

02:31p   5   A.    Correct.

         6   Q.    And then in parentheses in red -- it looks like to me red

         7   ink, or whatever it is, there's a reference to a standard

         8   called "the Playboy standard."  Is that right?

         9   A.    Yes.

02:32p  10   Q.    And the Playboy standard refers to the magazine Playboy,

        11   I guess, right?

        12   A.    It does.

        13   Q.    And in 2010 Playboy was being published?

        14   A.    I believe it was.  I just didn't buy a Playboy at that

02:32p  15   time.

        16   Q.    Well, did you buy one later on?  You can buy one.

        17   A.    I did not.

        18   Q.    You never did buy a Playboy?

        19   A.    (Shaking of the head.)

02:32p  20   Q.    Okay.  Did you ever look at one?  Nevermind.

        21         The Playboy standard, and that is what's written here.

        22   After the colon on the second line it says, "Sexy and erotic,

        23   not sex, lewd and lascivious," right?

        24   A.    Correct.

02:33p  25   Q.    Okay.  So the standard is according to the Playboy image,
```

```
         1   or whatever it is, sexy and erotic is okay if you want to

         2   publish an ad that looks like that.  So far so good?

         3   A.   Yes.

         4   Q.   And this is -- excuse me, sir.

02:33p   5        This is the standard as set by Mr. Spear, right?

         6   A.   It is.

         7   Q.   But we don't want sex, lewd and lascivious, right?

         8   A.   Correct, sex act pics gotta go.

         9   Q.   Okay.  What did you say, sex ad pics?

02:33p  10   A.   Sex acts.

        11   Q.   Acts, not pictures, okay.  So that's out, right?

        12   A.   Correct.

        13   Q.   That's inconsistent with this standard, right?

        14   A.   Correct.

02:33p  15   Q.   And then "lewd and lascivious," how would you define

        16   that?

        17   A.   Sex act pic.

        18   Q.   Okay, same thing.

        19   A.   Or extreme closeups of genitalia.

02:34p  20        MR. EISENBERG:  The next one, Ms. Ellig, if you

        21   could go down to the next slide.  Yeah, that's it.

        22   BY MR. EISENBERG:

        23   Q.   Underneath "Continue as a good corporate citizen" there's

        24   "Legal strategy."  You see that?

02:34p  25   A.   I do.
```

1   Q.   Okay.  And then underneath it's "Continue to engage

2   Attorney Generals"?

3   A.   Correct.

4   Q.   "Move slowly but deliberately," right?

02:34p  5   A.   Correct.

6   Q.   And then underneath is, "Continue to work closely with

7   law enforcement."  Am I correct?

8   A.   You are correct.

9   Q.   And I think you would agree with me, sir, that you did,

02:34p  10  you, personally, and Backpage did work closely with law

11  enforcement, didn't you?

12  A.   We did.  We had 20,000 some subpoenas.

13  Q.   I remember.

14  A.   A lot of work.

02:34p  15  Q.   20,000 subpoenas over -- what was that, about eight

16  years?

17  A.   Well, from 2004 to 2018, fourteen years.

18  Q.   Fourteen years.  And you had a separate -- well, part of

19  Mr. Padilla's supervision was over the gathering of

02:35p  20  information in response to a subpoena?

21  A.   Yes, it was.

22  Q.   So when a subpoena came in, if you know, the process

23  would be it would be given to somebody to do the research to

24  get what it is that law enforcement wanted, right?

02:35p  25  A.   Correct.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    66

```
         1   Q.    And that research would be -- oh, I'm sorry.  A subpoena

         2   is something that is issued in accordance with law enforcement

         3   investigation, right?

         4   A.    Correct.  Almost all were prostitution investigations.

02:36p   5   Q.    Well, they were investigations -- you ever keep any

         6   statistics on that?

         7   A.    On how many were not prostitution investigations?

         8   Q.    You said they're all prostitution investigations.

         9   A.    It was --

02:36p  10   Q.    Remember that, Mr. Ferrer?

        11   A.    I can tell you that I remember the few subpoenas that

        12   came along 'cuz they were just so exceptional.  It would,

        13   like, be a wife wanting to know the content of an ad to go

        14   after a husband during a divorce.

02:36p  15   Q.    Okay.  So --

        16   A.    Those jump out at you.

        17   Q.    Why?

        18   A.    Well, it's just so unusual.  I think there were others.

        19   Q.    I don't want to get into this personally so I'll just go

02:37p  20   on to something else, but that subpoena that you just talked

        21   about, that would not be law enforcement.  That would be a

        22   civil subpoena?

        23   A.    That's what I mean.  There was --

        24   Q.    Okay.

02:37p  25   A.    There was very, very few, but there were civil subpoenas.
```

1   Q.   All right.  We'll talk more later on about subpoenas.

2              MR. EISENBERG:  Can the witness be shown Exhibit

3   581?

4              THE COURT:  Mr. Eisenberg, are you going to be a

02:37p   5   while with the exhibit?

6              MR. EISENBERG:  I think I am, Your Honor.

7              THE COURT:  Okay.  So given that, Mr. Eisenberg, I

8   think we should go ahead and take our 20-minute afternoon

9   final break for the day; and so, again, just remember the

02:37p  10   admonishment, Members of the Jury, and just enjoy your break

11   and be prepared to come in -- well, we'll just give it 3:00

12   o'clock.

13              All right, please all rise for the jury.

14              (Jury out at 2:38 p.m.)

02:38p  15              All right, we will stand in recess.

16              (Recess taken at 2:38 p.m.)

17              (Back on the record at 3:00 p.m.)

18              COURTROOM DEPUTY:  All rise, court is now in

19   session.

03:00p  20              THE COURT:  All right, let's be seated and check on

21   the jury.

22              (Jury in at 3:02 p.m.)

23              THE COURT:  All rise for the jury.

24              All right, please be seated.  The record will

03:02p  25   reflect the presence of the jury.  Mr. Ferrer is back on the

1    witness stand and, Mr. Eisenberg, you may continue.

2              MR. EISENBERG:  Thank you, your Honor.

3              May the witness be shown 581, which is in evidence.

4              And may it be published, Your Honor?

03:03p 5        THE COURT:  Yes, it may.

6              COURTROOM DEPUTY:  I don't have 581.

7              THE COURT:  5-8-1.

8              COURTROOM DEPUTY:  When was that admitted?

9              MR. EISENBERG:  You can't see this, can you,

03:03p 10   Mr. Ferrer?  It's not on your screen?

11             THE WITNESS:  I can see it.  581?  I can see it.

12             MR. EISENBERG:  Oh, I can't see it up here.  I don't

13   know if the jurors can see it, Your Honor.

14             THE COURT:  Mr. Eisenberg, Mr. Rapp, I don't have

03:03p 15   this admitted as an exhibit.  It's marked 581.

16             MR. RAPP:  No objection to its admission.

17             MR. EISENBERG:  Okay.  I'm sorry, your Honor.

18             THE COURT:  Do you want to lay some foundation first

19   as to it?

03:04p 20             MR. EISENBERG:  Okay.  Counsel didn't object to it.

21             THE COURT:  I think just put it in some context.

22             MR. EISENBERG:  All right.

23   BY MR. EISENBERG:

24   Q.   Sir, is this an e-mail from Mr. Spear to you dated May

03:04p 25   25th, 2019, correct?

1    A.   Yes, it is.

2    Q.   And it talks about a draft of adult abuse abatement,

3    correct?

4    A.   Correct.

03:04p  5    Q.   And it has to do with moderation, what we've been talking

6    about?

7    A.   It does.

8    Q.   Okay.  And I think you are on this as well -- I'm sorry.

9         You responded to it; did you not?

03:04p 10    A.   I'm sorry, say again.

11    Q.   You responded to Mr. Spear's e-mail, if you look down at

12    the bottom or maybe even the second page?

13    A.   I think I sent this to Mr. Spear and then he responded.

14    Q.   Okay.

03:04p 15         MR. EISENBERG:  Your Honor, I move the admission of

16    581.

17         THE COURT:  Yes, it may be admitted and published.

18         (Exhibit No. 581 admitted in to Evidence.)

19         MR. EISENBERG:  Okay.  I'm sorry, Mr. Ferrer.

03:05p 20         Let's put this into better context.

21    BY MR. EISENBERG:

22    Q.   So you sent Mr. Spear adult content abuse abatement, a

23    draft of that, correct?

24    A.   Correct.

03:05p 25    Q.   And that's what we see under "Adult content abuse

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                70

1    abatement" about midway down, correct?

2    A.    Correct.

3    Q.    What you're saying here is, "We want to remove sex act

4    pics and coded terms."  I read that correctly?

03:05p  5    A.    You did.

6    Q.    So sex act pics, are those -- well, what you've been

7    talking about for the last several days.  These are pictures

8    of sex acts, right?

9    A.    Correct.

03:05p  10   Q.    And coded terms, I know you've talked about that as well,

11   right?

12   A.    Correct.

13   Q.    Okay.  And so what you're saying to Mr. Spear is, "There

14   is no technical solution that cannot be easily bypassed by a

03:06p  15   creative user."  Let me stop there.

16        What you're saying is if you want to get by whatever we

17   can do in terms of moderating, let's say coded words, and you

18   are a user, you would probably be able to figure out a way to

19   do it, right?

03:06p  20   A.    Correct, we saw that quite a lot.

21   Q.    Okay.  So that's followed by, "We can however build

22   technical solutions to improve efficiency."

23        Okay, let me stop there.  What does that mean?

24   A.    I believe -- this is 2009.  I believe we're looking at

03:06p  25   creating queues, moderation queues to make it easier to look

UNITED STATES DISTRICT COURT

1    at the new ads or the ads that were recently edited by the

2    user.

3    Q.   All right.  Let me break that down.  Would this be a

4    queue that is -- that a moderator would look at visually or is

03:07p   5   this the type of queue that would automatically strip a term?

6    We've heard that -- that type of expression or both?

7    A.   You know, I forgot about the strip-out filter and, yes,

8    you're correct, it would be both.

9    Q.   Is would be both kinds, okay.  Now, the next sentence

03:07p  10   reads, "Phoenix needs time to hire additional staff and the

11   equipment in order to take on this task so our approach will

12   need to be a series of phases."  Have I read that right?

13   A.   Correct.

14   Q.   Okay.  And what you're saying, in effect, is you need

03:07p  15   more people and more equipment in order to achieve adult

16   content abuse abatement?

17   A.   Correct.

18   Q.   Now, underneath there are some -- I don't know if they're

19   bullet points, but suggestions that you have and then the

03:08p  20   first one says, "First, a staff needs analysis:" okay?

21        Do you see that, sir?

22   A.   Correct.

23   Q.   And then now this is getting to the number of ads that

24   you estimate will come in in May of 2009, 5,000 per day,

03:08p  25   correct?

1   A.   Correct.

2   Q.   And so you got -- that's a pretty -- well, I don't want

3   -- that's a heavy volume, isn't it?

4   A.   It would end up being maybe one-tenth the volume that

03:08p  5   Backpage would eventually do.

6   Q.   Well, okay.  So if we stick with just 5,000 per day,

7   Backpage is open for posting seven days a week, isn't it?

8   A.   It is.

9   Q.   So -- and users -- well, is it fair to multiply this

03:09p 10   times seven to get what would go on in a week?  So seven times

11   five is 35,000?

12   A.   I believe that's correct.

13   Q.   And if we multiplied it times 50 weeks, is that a --

14   that's like a million ads or something like that?

03:09p 15   A.   It's too late in the day for me to --

16   Q.   I'm right there with you; but, anyway, if you do the

17   math, that's a lot of ads, right?

18   A.   It's a lot of ads.

19   Q.   All right.  Now, the tasks -- this starts on the next

03:09p 20   line.  One thing that the staff has to do is review the ad,

21   okay.  So that means somebody is going to be looking at that

22   ad, right?

23   A.   That's correct.

24   Q.   And then "remove abuse."  So if the ad has abuse in the

03:10p 25   form of either a picture or words, that moderator's got to

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                73

1   remove it?

2   A.   Correct.   They would remove the pic, let the other pics

3   stay on-line or remove the offending word.

4   Q.   Okay.   I'll skip the other part, "invoice as fraud" and

03:10p  5   all that.   Let's go down to the next one.

6        The bullet says, "Tag non-offending ads:"

7        See where I've read that?

8   A.   Yes.

9   Q.   What does it mean to tag a non-offending ad?

03:10p 10   A.   Well, we didn't do this, but the thought was if an ad is

11   past the review, that we don't want to look at it again; but

12   we didn't end up building this.

13   Q.   All right.   So that one didn't go through?

14        Then the next is -- this has to do with minutes.

03:11p 15   10,000 --

16   A.   I'm sorry, can I correct my testimony?

17   Q.   Sure, absolutely.

18   A.   We did end up building something like tag non-offending

19   ads.   We ended up -- that morphed into whitelisting.   So we

03:11p 20   did ad whitelisting.

21   Q.   And white -- I'm sorry, sir.   Whitelisting means that ad

22   -- if you know who the poster is, that ad's gonna be okay and

23   you can let it go?

24   A.   We don't have to moderate it.

03:11p 25   Q.   Okay.   The next bullet point there says 10,125 minutes/60

1    minutes is 169 hours per day.  What does that refer to?

2    A.   So that's the number of manhours needed based on the, you

3    know, minutes per ad.  So I'm just trying to do a manpower

4    calculation for Scott Spear.

03:12p  5    Q.   So you're trying to break something down as a

6    mathematical model to figure out, I suppose, how many -- well,

7    it says underneath "Staff required: 21 people"?

8    A.   Correct.

9    Q.   Okay.  So then underneath that there are phases, and I

03:12p 10    think if we just go to the next page.  You see at the top

11   where it says "Browse paid ads..."?  It's right at the top.

12   A.   Yep, I see it.

13   Q.   Okay.  "Browse paid ads in escorts and remove TOU

14   violation postings each day."

03:12p 15        So what you're saying is that you have to look at the ad

16   in escorts.  So you made a -- looks to me like a specific

17   approach to take with ads that are in escorts, right?

18   A.   Yeah, I think we're doing this incrementally, though, by

19   city, right?

03:13p 20   Q.   Oh, I see.  That was the reference to Phoenix and Dallas?

21   A.   Yes.

22   Q.   Okay.

23   A.   So we're doing it incrementally by market.  That's the

24   plan.

03:13p 25   Q.   Right.

1      MR. EISENBERG:  And then the part of the plan is in

2  Phase 2.  So if you go down a little bit further, Ms. Ellig.

3  I think it's around mid page, Page -- Phase 2 and Phase 2 says

4  -- I'll read it.  Okay, there we go.

03:13p  5  BY MR. EISENBERG:

6  Q.   "Phoenix hires 5 people and eventually 10 people."

7      So you're projecting that to do these tasks you would

8  have to hire -- is it five more people and then ten more

9  people?

03:14p 10  A.   I know that it's difficult to hire moderators to get that

11  into the budget.  So I believe I'm talking about only ten

12  people, but I could see how you could read it both ways.

13  Q.   Yeah.  I mean, it looks like you're hiring additional

14  people to the moderators you already have; is that correct?

03:14p 15  A.   Oh, we definitely are.

16  Q.   Oh.

17  A.   I'm just unclear -- like you read it, you're hiring five

18  people and then you're gonna hire another ten people, but I --

19  it's like hire five people and then add another five people so

03:14p 20  that we'd have ten people.

21  Q.   Yeah, that's the way I read it; but, anyway, you're the

22  -- you're the witness, sir; but, yes, I agree, okay.

23      And then Phase 3 it says, "Develop an escort ad queue for

24  5,000 ads per day."  What does that mean?

03:15p 25  A.   So that's the development to put any new ad or edited ad

1    into a specific queue and then you -- they would flash up on a

2    screen for a moderator to make a decision on --

3    Q.   Okay.

4    A.   -- and either edit or delete.

03:15p  5    Q.   And then if you go to the top of the first page, top of

6    the first page right at the very top where it says, "Is the 21

7    additional..." that's from Mr. Spear; is it not?

8    A.   Yes, Mr. Spear is -- wants some clarification if you want

9    21 additional or 10 additional.

03:15p  10   Q.   Something like what we just saw wasn't clear?

11   A.   Yes.

12   Q.   Okay.  Now, there was an attachment to this -- let's see.

13        MR. EISENBERG:  I'm sorry, okay.  May the witness be

14   shown 585, and I believe this one is in evidence.

03:16p  15   BY MR. EISENBERG:

16   Q.   Do you remember this, sir?

17   A.   I remember this e-mail.

18   Q.   Okay.  What you're looking at here appears to me to be a

19   cover page because it says "attached."  Something is attached

03:16p  20   to it?

21   A.   Correct.

22   Q.   Okay.  Now, we need to get the date.  This is November

23   19, 2009.  So we're still in 2009, correct?

24   A.   Correct.

03:16p  25   Q.   And what the attachment is is "Common terms and code

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
      1   words resulting in a post being removed," right?

      2   A.   Correct.

      3   Q.   Okay.  So if you look at 585a, which I believe is in

      4   evidence, then this is the attachment; am I correct?

03:17p 5   A.   That is the attachment.

      6   Q.   Okay.  And so -- excuse me.

      7        These are words -- and we don't need to go through them,

      8   but these are terms and code words that are referred to in 585

      9   as being -- as the words resulting in a post being removed,

03:17p 10  right?

      11  A.   Correct.

      12  Q.   So, in other words, if this word, whatever they are,

      13  appears in a post, that post, according to what's on 585, is

      14  -- is supposed to be removed?

03:18p 15  A.   That was the suggested policy at this time.

      16  Q.   Okay, I -- I understand.  So -- and what "removed" means

      17  is -- does that mean the word gets taken out or the ad is

      18  removed?

      19  A.   Well, we went back and forth; but this e-mail says the

03:18p 20  ad's removed, but I can tell you later the ad was edited.

      21  Q.   Okay, I know.  It comes -- goes back and forth and back

      22  and forth, right?

      23  A.   This is the very beginning of moderation.

      24  Q.   And so what I think you're saying, sir, is the standards

03:18p 25  changed frequently, didn't they?
```

UNITED STATES DISTRICT COURT

```
          1    A.    It is a very much work in progress.

          2    Q.    Okay.  And the changes go from up above you, like

          3    whomever, Mr. Spear or somebody else, to you, to Mr. Padilla?

          4    A.    That is correct.

03:19p    5    Q.    And then the expectation is he institutes that change?

          6    A.    Correct.

          7    Q.    And -- okay.  He doesn't do -- he doesn't create the

          8    changes.  Those come from somebody else?

          9    A.    What time frame?

03:19p   10    Q.    All right, let's just stick with 2009, okay, this time.

         11    A.    At 2009 it's definitely coming from Scott Spear.

         12    Q.    Okay.  Before we leave off with this attachment 585a, if

         13    you look down at the bottom where it says "note" --

         14    A.    Yes.

03:19p   15    Q.    -- and I think -- excuse me.  This pertains to a lot of

         16    what you have testified to before, but here we see it, if you

         17    agree with me, in writing.  "There are many creative spellings

         18    for the terms above which are too numerous to include in any

         19    list."  Did I read that correctly?

03:20p   20    A.    You did read it correctly.

         21    Q.    And -- I'm sorry.  Do you know who did -- is this list

         22    done up by you or is it done up by Mr. Spear or somebody else?

         23    A.    I think this is the negotiated list that Scott Spear and

         24    I agreed to, but I'm not sure who wrote it.

03:20p   25    Q.    Nonetheless, would you agree with me, sir, that somebody
```

         1   has made the observation that you could have a mis -- well,

         2   different spelling, like what we saw -- it's compound, sorry.

         3        You could have a different spelling for the word T-E-R,

         4   correct?

03:20p   5   A.   Correct.

         6   Q.   And instead of the "e" you'd have like a "3" in between T

         7   and R, right?

         8   A.   Correct.

         9   Q.   And at least in an automated way, unless you planned for

03:21p  10   that change, that ad with T3R might get through?

        11   A.   It often did.

        12   Q.   Okay.  And I think what you're saying and what this is

        13   saying, or maybe this is your experience, no matter how

        14   creative you can be in terms of moderating these ads and

03:21p  15   planning for them, it's just there are ways to get around it?

        16   A.   There are ways to get around it and they can edit their

        17   ads realtime.

        18   Q.   Okay.  Let's go to Exhibit 49, and I know this one is in

        19   evidence.  So on this one, sir -- okay, it's on the screen

03:22p  20   there, all right.

        21        This is from Mr. Padilla; is that correct?

        22   A.   That's correct.

        23   Q.   On September the 1st, 2010, correct?

        24   A.   Correct.

03:22p  25   Q.   So now we're in 2010 obviously, right?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1   A.   We are.

2   Q.   Okay.   The subject here is "new moderation rules"?

3   A.   That is correct.

4   Q.   Okay.   And if you just go to the second paragraph, "I'm

**03:22p** 5   empowering" -- oh, I'm sorry.   He's written this to Dan.

6        That's Dan Hyer, right?

7   A.   He has.

8   Q.   Okay.   And then he says, "I'm empowering the Phoenix

9   staff to start deleting ads when the violations are extreme

**03:22p** 10  and repeat offenses.   When we delete ads" -- I should preface

11  this if I'm reading it right -- "we're going to send an e-mail

12  from Sales," right?

13  A.   Correct.

14  Q.   What -- what does that mean, an e-mail from sales when an

**03:23p** 15  ad is deleted?

16  A.   So when a paid ad is deleted, it's gonna make that user

17  angry.   They could file a chargeback.   So what Andrew's doing

18  is sending to Sales, which is a separate e-mail address, an

19  alert that these ads have been deleted.

**03:23p** 20       What Sales will do then is send them a promo code and

21  remind them to follow the terms of use.

22  Q.   Okay.   The next sentence is, "When we ban a" -- "When we

23  ban a user, we need the ban to stick for at least 30 days."

24       And banning -- did I read that right?

**03:23p** 25  A.   You did.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    81

```
 1  Q.   And banning a user means whoever that is, that user is
 2  not gonna be able to post an ad for 30 days?
 3  A.   That user is almost always posting in female escorts
 4  and -- if they get banned, and then the ban's only for 30
 5  days, which means they can come back and post.  It's like a
 6  penalty.
 7  Q.   Okay.  "Don't do this" is basically what you're saying to
 8  the user, "Your ad's banned"?
 9  A.   Yes, and bans didn't work very well.
10  Q.   I understand that, sir, but the fact of the matter is at
11  this point in time the ad would be banned, right?
12  A.   The user would be banned.
13  Q.   I'm sorry.  You're right, okay.
14  A.   So they couldn't post any ads.
15  Q.   And the user knows this because there's going to be a
16  message sent to the user in some fashion; is that correct?
17  A.   Well -- and that's what Andrew is attempting to negotiate
18  with Sales saying, "Look, don't send them a promo code right
19  away.  We need the ban to stick for 30 days so that they learn
20  a lesson and then modify their content in the future."
21  Q.   Okay.  And maybe that's what's in the next sentence when
22  he says, "When we Delete from the queue, we'll use Delete and
23  Notify."  So what does that mean?
24  A.   I think there may have been an automated tool in the
25  moderation queues where you could hit "delete" or you could
```

03:24p  5
03:24p 10
03:24p 15
03:25p 20
03:25p 25

             1    hit "delete and notify," and the notify would send a link to

             2    the ad of the user that posted with, "Follow our Terms of

             3    Use."

             4    Q.   Okay.  In fact, I think on direct I think you testified

03:25p       5    pretty much this way, the way you just did.  I think your

             6    testimony was delete and notify is a function where we alert

             7    the user that posted the ad that was deleted that their ad is

             8    deleted.  Please follow the Terms of Use.

             9         Is that right?  Do you recall that testimony?

03:26p      10    A.   I do.

            11    Q.   Okay.  Let's go to Exhibit 1187.  All right.  So -- yeah.

            12         So this -- the heading here is "Class:  FilterTerm."

            13         The important part here is the date.  January 11th, 2012.

            14    Do I have that right?

03:26p      15    A.   You have it right but, really, that date is generated by

            16    a computer whenever the filters were sort of updated.

            17    Q.   Okay.

            18    A.   That's not the important date.  The date below is more

            19    important.

03:27p      20    Q.   September 1st --

            21    A.   Yes.

            22    Q.   -- 2010, right?

            23    A.   Correct.

            24    Q.   Okay.  And what this is saying -- well, there's a box

03:27p      25    there that says "Term," and that's the term that is going to

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1  be filtered; is that right?

2  A.   Correct.

3  Q.   And then we can skip down to "Action."  You see where it

4  says "Ban."  I think the testimony is that you put that word

03:27p  5  in, your ad's gonna be banned?

6  A.   I'm sorry, could you say that again.

7  Q.   Sure.  If you put the word that's listed in "Term" into

8  your ad and the moderator sees it, of course, or if it's

9  picked up, then that ad's gonna be banned, right?

03:27p 10  A.   It will give you an error message that says "whoops" or

11  it would later tell you, "Cum is a forbidden word."

12  Q.   Well, I see something here under "Action" with a black

13  dot in it before the word "Ban."  So the way this is to be

14  read is the action would result in a ban.

03:28p 15      Did I read that right?

16  A.   Yes, that is what it says; but the ban prevents the user

17  from going forward on the posting if that word appears

18  anywhere in the body copy or the title of the ad.

19  Q.   Okay, I get it.

03:28p 20      Under "Expiration" -- excuse me, it says "Expiration

21  Never Expire."  What does that refer to?

22  A.   There were sometimes we would expire a term that was

23  banned quickly because it might be like a spammer using some

24  website.  We also --

03:29p 25  Q.   Well, okay.  Let me focus, then, on the question.

1    The term -- under "Expiration" I see "Never Expire," and

2  I think your testimony was it's telling the poster that this

3  word is a forbidden word, right?

4  A.    Well, I can tell you what it actually says if you look

03:29p 5  further down.

6  Q.    I'll let you go but -- I mean, go ahead.  But my

7  recollection of your testimony is it's telling them that the

8  term that's in there is a forbidden word in this category.

9  That's enough.  They know.  All right.  I got to take out that

03:29p 10  word, okay.  That's what I heard your testimony to be?

11  A.    That's correct.

12  Q.    So the word -- okay.  That tells the person, "You can't

13  use that word."  I mean, that's what it's saying?

14  A.    It does.

03:30p 15  Q.    Okay.

16  A.    It's very customer friendly.

17  Q.    Whatever.  "Description," in here it says, "banned term

18  in escorts," and it gives a date and then initials, and I

19  think you testified that was put in there by Mr. Padilla; is

03:30p 20  that right?

21  A.    That is correct.

22  Q.    And the banned term is in -- I'm sorry, is in the

23  location of United States and Canada, right?

24  A.    It's in the United States and Canada, and I believe it's

03:30p 25  only in the category escorts.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1   Q.   Whatever, okay.  But two countries, total ban throughout
 2   Canada, throughout the USA, right?
 3   A.   Correct.
 4   Q.   Okay.  If you go over to "CategoryKey," I think that's on
 5   the next page.  I'd like to just concentrate on this.
 6        Okay.  Are we there, yeah.
 7        The way this is -- sorry.
 8        Under "CategoryKey" there are several categories.  Are
 9   these the categories in which that term is a forbidden word in
10   those categories?
11   A.   That's correct.
12   Q.   Okay.  So female escorts, right?  Can't do it there.
13   Can't put it in there?
14   A.   Was that a question?
15   Q.   Yes, sir.
16   A.   I'm sorry, I didn't --
17   Q.   Okay.
18   A.   You just kinda faded off there at the end.
19   Q.   So female escorts, that's a category in which this term
20   is banned, right?
21   A.   That is correct.
22   Q.   Okay.  I won't go through the rest of them, but it speaks
23   for itself.  All these other categories you can't use that
24   word.  It's forbidden, right?
25   A.   You are correct.
```

03:30p 5
03:31p 10
03:31p 15
03:31p 20
03:32p 25

CARL FERRER - CROSS-EXAM BY MR. EISENBERG          86

```
 1   Q.   Thank you, sir.
 2        Let's go to 918.  This, too -- yes, this is in evidence.
 3   So wait for it.
 4            MR. EISENBERG:  Okay.  So I think -- all right,
03:32p  5   let's go down to where it starts.  It would be "Begin
 6   forwarded message," Ms. Ellig.  It's about halfway down there.
 7            Yeah, okay.  I just want to make sure that we have
 8   this in the right context.
 9   BY MR. EISENBERG:
03:32p 10   Q.   This appears to be from Mr. Padilla, right?
11   A.   Yes.
12   Q.   On September the 5th, 2010?
13   A.   Yes.
14   Q.   And at 1:46 a.m., right?
03:33p 15   A.   Yes.
16   Q.   That's like a quarter to 2:00 in the morning?
17   A.   Well, this is central daylight time.  So he's working out
18   of Phoenix at this time.
19   Q.   Okay, whatever.
03:33p 20   A.   Midnight.
21   Q.   All right -- well, okay.  To you, correct?
22   A.   Correct.
23   Q.   Okay.  And what this is is, as he says here, this is
24   what, in effect, he's gonna need on expanding his operation?
03:33p 25   A.   That is correct.
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
 1   Q.   Okay.  So what he's saying here is, "I'm working on
 2   getting the personnel now."  Why don't we just stop there.
 3        Do you see that?
 4   A.   I do.
 5   Q.   If you look down underneath almost to the bottom you'll
 6   see "Personnel," and there -- okay.
 7        And there he talks about one overnight 10:00 p.m. to
 8   8:00 a.m., right?
 9   A.   He does.
10   Q.   So would you interpret that to mean he's looking for
11   somebody to work nights for ten hours?
12   A.   He is.
13   Q.   And then he wants two more personnel moderators, right?
14   These are moderators he's looking for?
15   A.   That's correct.
16   Q.   To start on at 4:00 in the morning and work to noon?
17   A.   Correct.
18   Q.   Now, if you turn that page over, he's asking for more
19   help, right?
20   A.   Where?
21   Q.   Turn the page.  I'm sorry, can we go to the next page.
22        There we go, okay.
23   A.   Is he asking for more help or --
24   Q.   It looks like he's asking for two late swing moderators?
25   A.   No, I -- can you scroll back up?  I mean, can you see the
```

03:34p (line 5)
03:34p (line 10)
03:34p (line 15)
03:35p (line 20)
03:35p (line 25)

1  other page?  I think that's, like, his total request of

2  personnel or what -- what he's gonna do with personnel.

3  That's better.

4  Q.   Well, the way I'm reading that, sir, under "late swing"

03:35p  5  -- thank you, ma'am -- is that this is from 4:00 p.m. to

6  midnight.

7       Would you agree with me that that's a different time

8  frame than what he's asking for?

9  A.   It is.  He's -- he's sort of allocating the new people on

03:36p 10  different shifts on a 24-hour-day or -- and the weekends.

11  Q.   Okay.  And then two weekend part-timers; is that correct?

12  A.   Correct.

13  Q.   Okay.  So are you saying -- it's a total of seven more

14  people?

03:36p 15  A.   It is.

16  Q.   Okay.  Then he's also -- if you go back to Page 1 where

17  it says, "I'm working on getting the personnel now," you will

18  see the next sentence is, "I might have them all ready to go

19  in 3 weeks," okay?

03:36p 20  A.   Correct.

21  Q.   Okay.  So the planning here is he's gonna go out -- he is

22  gonna go out and find -- what did we say -- seven people and

23  have them ready to work in three weeks, right?

24  A.   That is correct.

03:36p 25  Q.   Okay.  He also needs more equipment, and you can see the

```
 1    list there.  Keyboards, for example, monitors and so forth.
 2         Did I get that correct?
 3    A.   Correct.
 4    Q.   Okay.  So then to go above this see where it says
 5    September the 5th where Carl Ferrer wrote.  It starts, "Hey
 6    Scott"?
 7    A.   I'm sorry.  I do.
 8    Q.   Okay.  And what it appears to me is, if you will agree,
 9    that what you're saying is to Scott, please email me approval
10    for what Andrew wants to do in terms of what's listed below?
11    A.   Yes.
12    Q.   And then Mr. Padilla -- I'm sorry, Mr. Spear says up at
13    the top "go get em" -- "Approved.  go get em"?
14    A.   Correct.
15    Q.   So -- okay.  Mr. Spear is approving everything that it is
16    that Mr. Padilla wants?
17    A.   That's the process.
18    Q.   And then I think that what your testimony was, that you
19    were asking Mr. Spear to e-mail me approval so I can begin to
20    make the purchase.  Remember that's your testimony?
21    A.   Yes.
22    Q.   I took "go get em" to mean order the equipment and tell
23    Andrew he can hire the additional personnel, right?
24    A.   You mean on the Scott Spear's approval?
25    Q.   Yes, sir, uh-huh.
```

03:37p (5)
03:37p (10)
03:37p (15)
03:38p (20)
03:38p (25)

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    A.    That is correct.

2    Q.    Okay.  By the way, I meant to ask, sir, what building did

3    Mr. Padilla work in over there on Jefferson?

4    A.    So he's in the building separated from the corporate

03:38p  5    staff.  So Building B where -- which also houses the newspaper

6    *Phoenix New Times*.

7    Q.    Okay.  And where were you located, your office?

8    A.    I'm in Building B.  Sometimes I'm upstairs.  Sometimes

9    I'm downstairs.  I think at this time I'm upstairs.

03:39p 10    Q.    And the -- the moderators are working in what I call an

11    open area, like just basically a big ol' room?

12    A.    They are.

13    Q.    And they got a desk?

14    A.    Later it would just be tables.

03:39p 15    Q.    Because there were so many moderators?

16    A.    Correct.

17    Q.    And it's like a -- you don't have an office.  It's just,

18    like, totally open, right?

19    A.    Did you say me or, like, the staff?

03:39p 20    Q.    No, the moderators.

21    A.    Yeah, no, it's totally open.

22    Q.    Okay.

23          MR. EISENBERG:  So now I'd like to turn to Exhibit

24    51.  This is not in evidence, so just for the witness.

03:40p 25    BY MR. EISENBERG:

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

 1   Q.   Sir, if you look at this, this is another e-mail, is it

 2   not, from you -- I'm sorry, at least the top.  From

 3   Mr. Padilla to you?

 4   A.   It is.

03:40p  5   Q.   And it's during 2010; is that correct?

 6   A.   That is correct.

 7   Q.   And it relates to a Backpage list of escort service

 8   terms, right, down in the -- I'm sorry.

 9   A.   Yes, it does.

03:40p 10   Q.   And the subject matter is "terms and services," right?

11   A.   The subject matter is "terms and services," correct.

12   Q.   All right.

13        MR. EISENBERG:  Move the admission of Exhibit 51,

14   Your Honor.

03:41p 15        MR. RAPP:  No objection.

16        THE COURT:  It may be admitted and published.

17        (Exhibit No. 51 admitted in to Evidence.)

18   BY MR. EISENBERG:

19   Q.   So if you go down to the middle where it starts

03:41p 20   09/4/2010, would you agree with me, sir, that this is

21   something from you and is to, in part, Mr. Padilla?

22        See under "Tasks:  1. Andrew"?

23   A.   I believe it is.  I can't be absolutely certain, but I'm

24   listing -- oh, yeah, nevermind, I've read it.  Yes, it's going

03:42p 25   to Andrew.

1    Q.   Okay.  If you want to take a minute to read this, because

2    you may not have seen it in a while.  So go ahead and read it

3    and I'll get back to you.  Just tell me --

4    A.   I understand it.

03:42p  5    Q.   Okay, great.  So what you're saying to him is, "Could you

6    add to the banned list terms on the attached word doc and

7    sent" -- I think you meant "send to me Monday..." correct?

8    A.   Correct.

9    Q.   Okay.  Underneath there's another -- it looks like you

03:42p 10    contacted Dan and that would be Dan Hyer?

11    A.   Correct.

12    Q.   And you're telling Dan Hyer on Tuesday we'll pull all

13    staff off marketing and have them do moderation, right?

14    A.   Correct.

03:42p 15    Q.   Okay, let me just stop there.  What was the reason for

16    pulling people out of marketing in September of 2010 to do

17    moderation?

18    A.   I believe Craigslist was exiting adult services and that

19    we're just getting a fire hose of content.

03:43p 20    Q.   Okay.  So that happened -- Craigslist happened in

21    September of 2010 -- I shouldn't put it that way.

22         Craigslist closed sometime around that time and so now

23    you're getting more ads?

24    A.   I believe so.

03:43p 25    Q.   Okay.  And you need more people to help moderate the new

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    93

1    volume of ads?

2    A.    We are being overwhelmed.

3    Q.    Okay.  Now, let's stick with Dan because there -- I want

4    to ask you about this.  "I will be there to train."

03:43p   5        What did you mean by that?

6    A.    Well, I live in Dallas.  So I'm going back and forth

7    between Phoenix and Dallas and so I'm -- I'm probably working

8    out of Phoenix then when I write this so that I will be

9    heading to Dallas soon and that I will help guide the staff,

03:44p  10   train the staff Tuesday AM.

11   Q.    Now, that means you will -- it says you will be there to

12   train.  Were you in charge of the training, if you can recall?

13   A.    Well, this is really the early start of moderation and

14   we've got a crisis, an emergency situation --

03:44p  15   Q.    Right.

16   A.    -- and so this is just a stop gap measure to have

17   marketing staff --

18   Q.    Okay.

19   A.    -- help.

03:44p  20   Q.    They're new to this, marketing staff?  They're new to

21   moderation, right?

22   A.    Yeah, they don't do moderation.

23   Q.    Okay.  And you're taking those people who have never done

24   it -- I'm sorry, who haven't done it before and you -- the way

03:44p  25   I'm reading this, would you agree, you'll be there to do the

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                94

1  training?

2  A.   I am gonna be there to guide them on taking the sex act

3  pics out.

4  Q.   Okay.

03:45p  5  A.   That's the primary mission.

6  Q.   So we're going to be deleting pictures of sex acts; is

7  that right?

8  A.   I don't -- probably.

9  Q.   Okay.  Well, if you don't remember, that's --

03:45p 10  A.   Yeah, I don't remember.

11  Q.   Okay, that's fine.  So if you go to the top -- well,

12  above all that is something from Mr. Padilla to you.  Looks

13  like a response.  Am I right?

14  A.   Yes.

03:45p 15  Q.   Okay.  Now, if you go up above that we can confirm --

16  would you agree that it's from Mr. Padilla to you September

17  the 6th, 2010?

18  A.   That is correct.

19  Q.   And it's at 12:31 in the morning?

03:46p 20  A.   Another midnight shift.

21  Q.   Well, if he sends it at 12:31 in the morning, this is not

22  a robot sending it out.  This is Mr. Padilla?

23  A.   Yes.

24  Q.   Okay.

03:46p 25  A.   And it doesn't have a --

```
 1   Q.   Go ahead.

 2   A.   Well, it doesn't have a time date stamp so -- and it's

 3   e-mailed to me.  I think it is 12:31 a.m. Phoenix time.

 4   Q.   Okay, I see what you're getting at.  So would you agree

 5   with me, sir, he's a pretty hard worker, 12:31 in the morning?

 6   A.   I would agree.

 7   Q.   And -- okay.  And then he says, "My additions are at the

 8   end of your list."  Now, I'll get to that in a moment, but

 9   would you agree that I've read this right?

10        "These additional terms are currently filtered in their

11   common forms..." and I'll stop there.  What did that mean to

12   you?

13   A.   So common form -- I'll use Greek, for example, G-r-e-e-k.

14   And then a obfuscation or creative spelling might be

15   G-r-3-3-k.

16   Q.   Just like TER only the "E" is a "3"?

17   A.   e's are 3's.

18   Q.   Okay.  And then he says, "...and removed manually in

19   their variations."  So let me stop there.

20        "Removed manually," what does that mean?

21   A.   Well, that might mean editing the ad.  It might also mean

22   taking it down.

23   Q.   And manually --

24   A.   Could mean both ways.

25   Q.   I'm sorry.  "Manually" means it's gonna be done by hand,
```

03:46p (line 5)
03:47p (line 10)
03:47p (line 15)
03:47p (line 20)
03:48p (line 25)

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    96

1  right?

2  A.   That's right, not using any kind of filter technology.

3  Q.   So that means the moderator has to visually look at this

4  ad, and if it's gonna be removed a human is doing it?

03:48p  5  A.   That's correct.

6  Q.   And then to finish that off, "...manually in their

7  variations."  So I think this really goes to what you were

8  just saying.  That is, a word can have different spellings,

9  right?

03:48p  10  A.   Correct.

11  Q.   Okay.  So -- okay.  And just to make sure we're -- we're

12  on the -- in transition here, I read earlier "My additions are

13  at the end of your list."

14      So I want to go to 51a, which is not in evidence.  That

03:49p  15  will be on your monitor.  Can you see that, sir?

16  A.   Oh, I do see it, I'm sorry.

17  Q.   Oh, okay.  No, that's fine.  And it refers to terms, code

18  words and so forth.  This pertains to what Mr. Padilla has

19  written in 951, correct?

03:49p  20  A.   Yes.

21            MR. EISENBERG:  Move the admission of 51a, Your

22  Honor.

23            MR. RAPP:  No objection.

24            THE COURT:  It will be admitted and may be

03:49p  25  published.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1          *(Exhibit No. 51a admitted in to Evidence.)*

2          MR. EISENBERG:  So -- thank you, your Honor.

3    BY MR. EISENBERG:

4    Q.   And what this says is, "The following terms, service and

03:49p  5    code words are not allowed in the adult escort category on

6    backpage as they imply a sex for money transaction..." stop

7    there.  Did I read that right?

8    A.   That's correct.

9    Q.   And then -- I'm sorry?  Okay.  And then it says, "...or

03:50p  10   relationship which is a violation of Backpage.com's Terms of

11   Use."  Did I read that correct?

12   A.   That's correct.

13   Q.   And Terms of Use also is referred to as TOU; is that

14   correct?

03:50p  15   A.   It is.

16   Q.   Okay.  Then it says here, "Posts containing these terms

17   will be removed."  Did I read that correctly?

18   A.   You did.

19   Q.   And "removed," what does that mean to you?

03:50p  20   A.   Well, that means that the ad will be deleted but the user

21   will not be banned and they will be permitted to post again.

22   Q.   Well, you kind of anticipated the next sentence, but

23   okay.  In fact, what the next sentence is, "Continued use of

24   these terms by a poster will result in that person being

03:51p  25   banned from using the site."  What does that mean?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                98

```
 1  A.    Well, you're right, I didn't mean to steal your thunder.
 2        If they keep not following the rules, they're gonna get
 3  banned.
 4  Q.    You don't steal my thunder at all, sir.  That's fine.
 5        If you go down this list without having to go through it,
 6  there are several words; would you agree?
 7  A.    If I go down the list, there are what?
 8  Q.    Several words.
 9  A.    Several words?
10  Q.    Yes.  Several terms?
11  A.    Well, there's many terms here.
12  Q.    I counted them at 39.  I won't ask you to do it, but does
13  that seem about right to you if you just glance down or if you
14  want to count them, you can count them.
15  A.    At this time line?  I forget, what's the time here?  This
16  is right -- 2010?
17  Q.    Yeah, if you go back to 950 -- I'm sorry 51, the
18  transition -- or the e-mail that transitions this September
19  6th, 2010.
20  A.    That seems about right.
21  Q.    Okay.  If you turn the page, there's another note here.
22        Okay.  And that says -- would you agree this is kind of a
23  warning?  "There are many creative spellings for the terms
24  above which are too numerous to include in any list."
25        Did I read that correct?
```

03:51p 5
03:51p 10
03:52p 15
03:52p 20
03:52p 25

UNITED STATES DISTRICT COURT

1    A.    You did.

2    Q.    And then I think consistent with what you've been

3    testifying about, "...but these terms, however they may be

4    spelled, will be" -- well, let me revise that.

03:52p   5       "...but these terms, however they may be spelled, will be

6    considered 'off limits.'"

7       Okay.  What do you interpret "off limits" to be?

8    A.    "Off limits" would be not following the rules.

9    Q.    Can't use them, okay, all right.  So if you have a -- not

03:53p   10   an embroidered term, but a misspelling or a creative spelling,

11   then that can't be used?

12   A.    For some particular terms.  Kind of short list of terms,

13   any misspellings of those terms.

14   Q.    Okay.

03:53p   15   A.    At this time the list is pretty short.  It will grow

16   longer.

17   Q.    We're just getting started, aren't we, in terms of words,

18   terms?

19   A.    I believe we are.

03:53p   20   Q.    Okay.  And to anticipate what you were just saying, the

21   next sentence on the next -- on that page there says, "Also,

22   this list may be amended from time to time and is in no way

23   meant to be a limitation on what terms may be banned or

24   excluded by backpage.com."

03:54p   25      Did I read that correctly?

         1   A.    You did read it correct.

         2   Q.    So what I think that means is this list is gonna change

         3   and there may be variations on terms that we are also going to

         4   ban?

03:54p   5   A.    Correct.

         6   Q.    Sir, do you know who wrote that note?

         7   A.    I was asking myself while you were reading it.

         8   Q.    Did you write it?

         9   A.    I don't think I wrote it.

03:54p  10   Q.    Mr. Padilla write it, if you know?

        11   A.    I don't know for sure but --

        12   Q.    Okay.

        13   A.    -- likely.

        14   Q.    Okay.  Then we have another portion here.  "The following

03:55p  15   services and terms are examples of terms that have been deemed

        16   to be acceptable in the past in the adult escort section of

        17   backpage."

        18       So what is written underneath these terms are, in the

        19   past, been deemed okay.  Acceptable I should say, right?

03:55p  20   A.    Correct.

        21   Q.    And then it says, this list may be amended from time to

        22   time as other services and terms are acceptable under our TOU,

        23   correct?

        24   A.    Correct.

03:55p  25   Q.    Okay.  Then the last part is backpage.com -- sorry.

1    "At the same time, backpage.com reserves the right to

2  delete any term or terms seen on this list, as the same may be

3  amended from time to time."  Right?

4  A.    Right.

03:56p  5  Q.    And that means -- well, what does that mean to you?

6  A.    That moderation standards are in a continuous flux.

7  Q.    Okay.  Let's go to Exhibit 600.  This is in evidence.

8    Now, let me see.  This is a long exhibit.  I don't want

9  to belabor it, but if you go to -- looks like -- and correct

03:56p 10  me if I'm wrong about this -- the last page, Page 6, just to

11  try to cap this off, this is from Sukesh Mohan, correct?

12  A.    Correct.

13  Q.    Okay.  He is a part of the El Camino operation, right?

14  A.    He is -- he is.

03:57p 15  Q.    Okay.  And his wife is Monita, right?

16  A.    You know, I'm sorry, but I'm a little hard of hearing

17  myself and sometimes I just --

18  Q.    You know, what I think is happening I keep -- here, I'll

19  try to use this.  Okay, is that better?

03:57p 20  A.    Oh, much better, thank you.

21  Q.    Okay, thank you.  So I was asking that Monita Mohan is --

22  okay, she's part of El Camino, too; is that correct?

23  A.    She is.

24  Q.    Okay.  And what it's saying is on September 21, 2010,

03:57p 25  if I'm interpreting this correct, Mr. Mohan is responding

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                102

```
 1    to what appears to have been an inquiry by you interested in

 2    El Camino's services?

 3    A.   That is correct.

 4    Q.   Okay.  And you were the one making the inquiry of El

 5    Camino; is that correct?

 6    A.   I was.  We were looking for help.

 7    Q.   You were looking for help because the people working for

 8    Mr. Padilla, they're getting pretty overwhelmed, right?

 9    A.   Agreed.

10    Q.   And so this is a company that came to your attention?

11    A.   I think I found it on Google.

12    Q.   Okay.  There are a list of other events, but let's try to

13    just go to the next page, Page 5, where it says on Thursday,

14    September 23rd you sent out information to Sukesh.

15         "Ok, I'd like to test you out."  See that?

16    A.   That is -- I did send that e-mail.

17    Q.   Okay.  And then you're suggesting that, "To do this

18    right, we probably need to start with 6 staff."

19         Did I say that right?

20    A.   That is correct.

21    Q.   And what you're suggesting, I assume, is six employees of

22    his group are gonna be tried out?

23    A.   We're gonna try them out.

24    Q.   Okay.  And if you go -- let's try to just go to the first

25    page, and tell me if this is correct.  It looks to me like
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1   what you're doing is informing Mr. Padilla of how you're going

2   to have El Camino staff tried out on two queues below, and I'm

3   referring to Page 1.  It says "TASK."

4   A.   That is correct.

04:00p 5   Q.   Okay.  And I don't think it's -- well, so this is a test

6   run to see if these people are going to be able to moderate,

7   correct?

8   A.   That is correct.

9   Q.   And underneath what you've got here are what is going to

04:00p 10  be in these two queues, and one is content standard --

11  "CONTENT STANDARDS IMAGES and TEXT."  What does that mean?

12  A.   Well, I can -- I can only see the text -- thank you.

13  Q.   Well, maybe we can do it side to side.

14  A.   Yeah, that's better.  And your question was?

04:01p 15  Q.   What does it mean?

16  A.   What does it mean?

17  Q.   What is that referring to?  What is content standards --

18  well, let me ask it this way.

19  A.   You asked "TWO QUEUES," too.

04:01p 20  Q.   Okay.  And this is going to be -- well, you see under

21  "IMAGES" it says, "We allow full nudes for men and women"?

22  A.   Correct.

23  Q.   Okay.  That was the present standard at that time?

24  A.   It is.

04:01p 25  Q.   Okay.  Then it says in here, "However, we do not want to

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1  display any explicit images of genitalia..." et cetera, et

2  cetera, et cetera, right?

3  A.    Correct.

4  Q.    Okay.  The next sentence is, "Our standard is playboy and

04:02p  5  not porn"?

6  A.    Yes, it does say that that's the standard at that time.

7  Q.    At that time and the Playboy -- even though it's in lower

8  case, that refers to the *Playboy* magazine?

9  A.    It does.  It's the presentation that Scott Spear gave to

04:02p  10  the moderation team using Playboy cutouts in a PowerPoint.

11  Q.    Okay.  And then to just kinda cut to the chase here, you

12  send this to Andrew Padilla because you want him to determine

13  whether this is a good -- how to put it -- test for nude

14  people?

04:02p  15  A.    That's correct.  I want some feedback --

16  Q.    Okay.

17  A.    -- from the moderation supervisor.

18  Q.    And then he responds on October the 5th, 2010, at 6:08 in

19  the morning, correct?

04:03p  20  A.    Correct.

21  Q.    And he says "looks good to me," correct?

22  A.    That's right.

23  Q.    Okay.  Do you recall, sir, how this testing went of

24  El Camino?

04:03p  25  A.    It was a -- it was a pass, but they needed a lot of

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1   guidance from Andrew Padilla.

2   Q.   I think, sir, you have said before, not here in the trial

3   but -- that what proved to be the case with the Indian team is

4   that they have been kind of a nightmare to work with.

04:04p 5   Remember that, saying that?  They were very bureaucratic?

6   A.   This is after they've -- I think I said that after --

7   Q.   Right.

8   A.   -- they left us because I experienced a different

9   moderation team in the Philippines that was easier for both

04:04p 10   Andrew and I.

11   Q.   So fair to say that El Camino -- well, let me ask it this

12   way:  How long did they last?

13   A.   I don't know exactly without referring to exhibits or

14   e-mails, but I want to say maybe two years.

04:04p 15   Q.   Okay.  And then I think you've also said as an

16   observation about the culture in India also seemed to be that

17   all dating is matrimonial so they didn't get the adult

18   section.

19       I think what you're saying there -- or you tell us.  Do

04:05p 20   you remember saying that first?

21   A.   Yes, I remember saying it and I can explain.

22   Q.   Okay.  What did you mean by that?

23   A.   They just couldn't understand why a website would have

24   ads that appeared to be prostitution and that they wanted to

04:05p 25   get rid of all nudity, and it was kind of a difficult

1    adjustment with them.

2    Q.   So they weren't really moderating terms or images

3    correctly?

4    A.   They -- they would but you had to be very careful and

04:05p   5    specific.

6    Q.   And that led to a lot of back and forth between

7    Mr. Padilla and Ms. Mohan?

8    A.   That is correct.

9    Q.   And from her back to Mr. Padilla, correct?

04:06p  10    A.   Correct.

11    Q.   Okay.  Now, let's go to exhibit -- excuse me, Your Honor,

12    Exhibit 57.  This is in evidence.

13    A.    I see the exhibit.

14    Q.   Okay.  And you remember it?

04:06p  15    A.   Yeah, I'm only copied on it.

16    Q.   Okay.  But it was sent from Ms. Mohan to Mr. Padilla,

17    right?

18    A.   Correct.

19    Q.   On October the 12th?

04:07p  20    A.   Correct.

21    Q.   Okay.  And she's saying to Mr. Padilla, "Thank you so

22    much for your feedback.  I will discuss with the team."

23         Did I read that right?

24    A.   That is correct.

04:07p  25    Q.   And so, actually, what happens is I kinda got that out of

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    107

```
        1   context.  That follows on an e-mail from Mr. Padilla to Monita

        2   Mohan, correct?

        3   A.   Correct.

        4   Q.   Okay.  So he's saying, "I've been reviewing the ads

04:07p  5   Failed by at1..."  And "1" refers to a particular moderator?

        6   A.   It does.

        7   Q.   And they -- they're given numbers, right?

        8   A.   They are.

        9   Q.   Okay.  "...and I wanted to offer a few pointers to

04:07p 10   hopefully streamline the work for you."

       11        Did I read that right?

       12   A.   You did.

       13   Q.   Okay.  "We have a filter set up to automatically remove

       14   the word" -- and it's there -- "so when you see it in an ad

04:08p 15   it's" safer to ignore -- "it's safe to ignore."

       16        All right, do I have that?

       17   A.   You do have that correct.

       18   Q.   And then he's talking about how it would get removed.  It

       19   says, "The filter will remove the term after the ad is

04:08p 20   released."  So what is he saying there?

       21   A.   What he's saying is that when the ad is posted, shortly

       22   after it's posted that term will be removed.  So the user that

       23   posted it thinks that term's gonna be in their ad, but by the

       24   time the ad goes live it's been stripped out.

04:08p 25   Q.   Okay.
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1          MR. EISENBERG:  Let's go to 59, which is not in

2    evidence -- yeah, 59.  So you can be -- the witness can be

3    shown this on his monitor.

4    BY MR. EISENBERG:

04:09p  5    Q.   Okay.  Sir, you see your name as cc'd on this e-mail?

6    A.   I do.

7    Q.   And you see that it's from Mr. Padilla?

8    A.   It's from Mr. Padilla.

9    Q.   Okay.  And it refers to "New Moderation Standards,"

04:09p 10   correct?

11   A.   Correct.

12   Q.   And it's during the October 2010 time period, right?

13   A.   Correct.

14   Q.   Okay.

04:09p 15         MR. EISENBERG:  I move the admission of Exhibit 59,

16   Your Honor.

17         MR. RAPP:  No objections.

18         THE COURT:  It may be admitted and it may be

19   published.

04:09p 20         MR. EISENBERG:  Thank you, your Honor.

21         *(Exhibit No. 59 admitted in to Evidence.)*

22   BY MR. EISENBERG:

23   Q.   So this is from Mr. Padilla on Saturday, October 16th at

24   9:05 p.m., right?

04:09p 25   A.   That is correct.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    109

 1    Q.   Okay.  And it looks like it's to a lot -- I don't want to

 2    characterize it.  There are people that it's to, correct?

 3    A.   Correct.

 4    Q.   And that those people are moderators, aren't they?

04:10p  5    A.   They are.

 6    Q.   In fact, you probably recognize a few of the names there,

 7    right?

 8    A.   I do.

 9    Q.   Okay.  And the subject matter is -- I mentioned before

04:10p 10    his "New Moderation Standards," right?

11    A.   Correct.

12    Q.   So now we have yet another change -- projected change?

13    A.   Yes, we do.

14    Q.   And that is a change because somebody has told

04:10p 15    Mr. Padilla we now have new moderation standards?

16    A.   Is that a question?

17    Q.   Yes, it is.

18    A.   Yes.

19    Q.   Okay.  And down in the body of this it says, "Perhaps

04:10p 20    indefinitely, and certainly over the next four days, we need

21    to intensify our efforts in cleaning Escorts, Body Rubs..."

22    et cetera.  Did I read that?

23    A.   You did.

24    Q.   Now, this part, "This intensification will come in the

04:11p 25    form of extra staff and overtime..."  Let me just stop there.

                    UNITED STATES DISTRICT COURT

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                110

 1          Do you recall, sir, whether by October of 2018 the

 2   moderators had increased in numbers?

 3   A.    I -- I don't recall, but it's likely.

 4   Q.    Okay.  And overtime, do you know whether -- well, what

04:11p  5   does "overtime" mean?

 6   A.    It means overtime is authorized and that people want to

 7   work more than 40 hours a week, they'll get paid time and a

 8   half.

 9   Q.    And that authorization, that wouldn't be from

04:11p 10   Mr. Padilla.  That would be from Mr. Spear?

11   A.    Correct.

12   Q.    Okay.  But most -- I'm gonna read -- gonna continue on.

13          "...but most importantly in stricter standards for

14   language and images in ads."  Did I read that correctly?

04:12p 15   A.    You did.

16   Q.    Okay.  So the next part is, "I'd like to still avoid

17   Deleting ads when possible, but if an ad makes a clear

18   reference to sex for money or an image displays a sex act,

19   don't hesitate deleting it," right?

04:12p 20   A.    Correct, that's what it says.

21   Q.    Okay.  Well -- all right, next part.  "These are not the

22   types of ads we want on our site at all," right?

23   A.    Right.

24   Q.    And that is what he is saying to the people in the two

04:12p 25   block moderators.  "We don't want these ads"?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    111

```
 1  A.   He is stating that.
 2  Q.   Okay.  And then -- well, to go on, what he's also saying
 3  is, "In the case of lesser violations, editing should be
 4  sufficient.  We're still allowing phrases with nuance but if
 5  something strikes you as crude or obvious, remove the phrase."
 6  A.   That is correct.
 7  Q.   Okay.  And you, sir, are in agreement with this; are you
 8  not?
 9  A.   I am in agreement that we don't want to remove too many
10  ads at one time --
11  Q.   That's not what I -- okay, I'm sorry, go ahead.
12  A.   We don't want to remove too many ads at one time and then
13  get so many chargebacks that we lose our merchant accounts.
14  So these standards are getting progressively stricter --
15  Q.   I have a question for you, sir.  What you just said about
16  chargebacks or losing accounts --
17  A.   Yes.
18  Q.   -- that's not in this e-mail, is it?
19  A.   It's here about "avoid deleting ads when possible," and
20  it's also in there "in the case of lesser violations."
21  Q.   I don't see anything in there about chargebacks.
22  A.   Well, if you delete too many adds --
23  Q.   It's not there.  I'm sorry, sir.
24  A.   Can I explain?
25  Q.   No, I'm gonna ask you this question:  Chargebacks is not
```

04:13p (line 5)
04:13p (line 10)
04:13p (line 15)
04:14p (line 20)
04:14p (line 25)

1    mentioned in this e-mail, right?

2    A.   The word "chargebacks" is not mentioned in this e-mail.

3    Q.   Okay.  He starts to go -- I mean, continues on -- okay.

4    "We're still allowing HBO type nudity..." Let me stop you

04:14p  5    there.  What does "HBO" refer to?

6    A.   I think it's another word for Playboy, maybe --

7    Q.   How about Home Box Office, maybe?

8    A.   Yeah, that -- oh, that's what it means, yeah.  It's been

9    used as kind of a stricter standard than even Playboy.

04:15p 10    Q.   So what that is is a -- I think that was, like, cable?

11    Something like -- you could get Home Box Office on your

12    television and look at it, that kind of thing?

13    A.   So HBO is a premium movie channel, and it tended to have

14    some nudity --

04:15p 15    Q.   Okay.

16    A.   -- on some programs.

17    Q.   Okay.

18    A.   Very few programs and at night.

19    Q.   Okay.  But if an image makes you think twice -- to

04:15p 20    continue on, "...but if an image makes you think twice, remove

21    the image."  Did I read that right?

22    A.   You did.

23    Q.   "There is zero tolerance for closeups of exposed

24    genitalia."  What do you think -- or how would you interpret

04:15p 25    "zero tolerance"?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

1    A.    That image cannot appear on the site.

2    Q.    Okay.  It's out, right?

3    A.    What's that?

4    Q.    It's out, can't appear?

04:16p  5    A.    Either the image is out or the ad is out.

6    Q.    Maybe both -- well, the ad is out, the image is out?

7    A.    I'm sorry?

8    Q.    If the ad is out, the image is out?

9    A.    There were times we just removed the image and the ad was

04:16p 10    in.

11    Q.    If the ad is out, so is the image?

12    A.    But I'm telling you --

13    Q.    No, sir.  I'm sorry, I don't mean to be curt.

14    A.    Oh, I see what you're asking.

04:16p 15    Q.    Okay.

16    A.    If the ad was removed, then the images, of course, would

17    not be there because the ad is gone.

18    Q.    Okay.  So then he says here, "To make your efforts count,

19    you'll want to lock any ad you have to edit."

04:16p 20          What does it mean to "lock an ad"?

21    A.    So, like I said earlier, if you're gonna remove a sex act

22    pic, you can just remove the pic and then lock the user from

23    editing their ad again so they can't ad that pic back.

24    Q.    Okay.

04:17p 25    A.    So the ad thing goes live, stays live.

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    114

1    Q.   And then without going into it, would you agree with me

2    that the next sentence or so talks about how you actually

3    would do that?  You can do this by editing, et cetera?

4    A.   That next sentence says that, yes.

04:17p  5    Q.   Okay.  And then the last sentence in that paragraph, it

6    mentions what you just mentioned.  Would you agree, "This

7    prevents a user from making any future edits to that specific

8    ad"?

9    A.   That's correct.

04:17p 10    Q.   Okay.  The last part of this says, "If you find yourself

11   locking ads for any user more than twice, lock their entire

12   account."  What does that mean?

13   A.   Well, if they have two ads that they've had to be locked

14   out, well, then we're gonna lock them out.  Andrew is going to

04:18p 15   have the staff go through every single ad they might have.

16   They might have 12, 15, 20 ads and they're going to lock their

17   ability to edit any of those ads.

18   Q.   Okay.  Sounds like a lot of work.  Is it?

19   A.   It would be easier to delete the user, but we're trying

04:18p 20   to retain revenue.

21   Q.   Okay.  A lot of work?

22   A.   It is more work to lock users out of everything.

23   Q.   Could we go to Exhibit 58.  This is in evidence.

24        Okay.  Now, I think -- okay.  This is from Mr. Padilla;

04:19p 25   is it not?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                115

1   A.    It is.

2   Q.    And it's sent to, would you agree again, moderators?

3   A.    It is.

4   Q.    If you count the number of moderators there, would you --

04:19p   5   well, would you estimate it's at least 30, maybe 40?

6   A.    Yeah, somewhere between 30 and 40.

7   Q.    Okay.  You're cc'd on this, aren't you?

8   A.    I am.

9   Q.    And it's sent out on the 17th of October at 12:11 in the

04:19p  10   morning?

11   A.    It is.

12   Q.    Is another early bird, right?

13   A.    Or late.

14   Q.    Or late bird.  Somebody who's working pretty hard; would

04:19p  15   you say?

16   A.    I would say at this time the job is very challenging.

17   Q.    Okay.  And that says, "Some of you already received this

18   presentation by Gtalk, but I'm attaching it for those of you

19   that haven't," and I think you testified as to what Gtalk

04:20p  20   meant.  That's a form of display?

21   A.    It's a form of messaging that Google had that -- you get

22   a quicker notification that you received a message.

23   Q.    Okay.  And then he talks about slides, and this appears

24   to have been things that were attached to this e-mail.

04:20p  25       In other words, there are exhibits attached to this

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

```
     1  e-mail that you may have gone through some of them in your
     2  testimony; but he's attaching slides of things that are not
     3  acceptable and, in some cases, things that are acceptable?
     4  A.   He's attaching slides in a PowerPoint for banned or
04:21p 5  stripped-out terms.
     6  Q.   Okay.
     7  A.   Well, actually, that's two separate attachments.
     8  Q.   All right.  And then down -- if you go down further it
     9  says, "For images described as Graphic Sex Acts, the entire ad
04:21p 10 should be removed"?
     11 A.   That's correct.
     12 Q.   Okay.  Then he says, "This is only a guideline.  Most of
     13 you already have a good idea of how to handle most images.  If
     14 that's working for you, stick to it.  You're not going to get
04:21p 15 in trouble for being too clean right now," meaning that if you
     16 did delete more than you should be deleting, that's okay.
     17 This is -- we're in a learning mode; is that right?
     18 A.   That is correct.
     19 Q.   So if you look at 51a, if we could have that one on, this
04:22p 20 is one that got approved?
     21 A.   I see 51a.
     22 Q.   Okay.  And at some point in your testimony, I think that
     23 counsel asked you what would be the purpose of your reviewing
     24 this training document?  And your response is to become aware
04:22p 25 of Mr. Padilla doing his job as a supervisor and communicating
```

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                117

```
 1    the standards of moderation.
 2         Do you remember saying that in testimony?
 3    A.    Yes.
 4    Q.    And they're changing -- I'm sorry, "yes"?
 5    A.    I'm sorry, what was that last part?
 6    Q.    Do you remember saying that in your testimony?
 7    A.    I do.
 8    Q.    And that they're changing -- they are changing all the
 9    time, referring to standards of moderation, right?
10    A.    Correct.
11    Q.    So there were terms that were attached to this e-mail if
12    you go to -- I'm sorry.  Let's go to 58c.
13         And these are the terms, okay, and it says -- all right.
14    These terms are, I think you testified, descriptive of sex
15    acts, right?
16    A.    Most of them, not all of them.
17    Q.    Okay.  But these terms are terms that are -- if they're
18    in an ad, that ad doesn't go through?
19    A.    Can I see the name of this document again?
20    Q.    Well, you know what I have is 58c, and all that I had on
21    mine is "Sheet1," which you can see at the top.
22    A.    I guess my -- if I -- I'm not sure I understand your
23    question.  It's a little more complicated.  Some of these
24    terms are banned.  Some of them are stripped out, and that's
25    two different functions.
```

04:22p    5
04:23p   10
04:23p   15
04:23p   20
04:24p   25

1   Q.   Okay, I get it.  But I think your testimony was all of

2   these terms are descriptive of a sex act?

3   A.   Correct.

4   Q.   So --

04:24p  5   A.   I just noticed one that isn't, "young."

6   Q.   Well, somehow it snuck in there; but the idea is if this

7   term is in an ad, the ad is either -- the term is either

8   deleted or the ad itself is blocked?

9   A.   Yeah, the ad is blocked if they attempt to use that term.

04:24p 10   Then they get a message that says, "Don't use that term."

11   Q.   Okay.  Now, let's go to 61.  This is not in evidence so

12   if it can be put on the screen for Mr. Ferrer.

13   A.   I see it.

14   Q.   Okay, sir.  This is from Dan Hyer to you; is that

04:25p 15   correct?

16   A.   That is correct.

17   Q.   And it's in -- we're still in October of 2010; is that

18   correct?

19   A.   We are.

04:25p 20   Q.   And this pertains to updates in terms of things that are

21   happening with respect to staffing that pertains to

22   moderation?

23   A.   Correct.

24       MR. EISENBERG:  Move the admission of Exhibit 61.

04:25p 25       MR. RAPP:  No objection.

1            THE COURT:  Exhibit 61 may be admitted and

2    published.

3            MR. EISENBERG:  Thank you, your Honor.

4            *(Exhibit No. 61 admitted in to Evidence.)*

04:26p  5    BY MR. EISENBERG:

6    Q.    Okay.  Let's start with -- okay.  Is it -- is it the

7    case, sir, that you are writing to Mr. Padilla on an update

8    that you're going to be giving to Scott Spear?

9    A.    That's correct.

04:26p 10    Q.    Okay.  And then in parentheses it says "(i'll call you),"

11    right?

12    A.    Correct.

13    Q.    Did you call Mr. Padilla, if you recall?

14    A.    I -- I don't recall the call, but it's very likely.

04:26p 15    Q.    Well, then maybe you can't answer this; and if you can't,

16    that's fine.  Did you call him in an attempt to confirm these

17    things that you're recommending that are gonna go up to

18    Mr. Spear?

19    A.    I'm contacting Andrew Padilla to make sure that I've got

04:27p 20    everything.

21    Q.    Okay.  Now, as I see this, there are several blocks here

22    and I'm just -- I want to go down one by one.

23        The first block is "UPDATE" and it says "Hired 13

24    Indians."  Does that refer to that you did go through with

04:27p 25    El Camino and you hired 13 people there?

CARL FERRER - CROSS-EXAM BY MR. EISENBERG

120

1   A.   We hired 13 more people from El Camino.

2   Q.   Okay.  And then No. 2 is "Adult jobs and personals under

3   beta moderation."

4        What is "beta moderation"?

04:27p 5   A.   We banned more things to the queues, adult jobs and

6   personals.  It's only under beta meaning can't really get to

7   it right now.  We're testing it.

8   Q.   Testing it, okay.  But it was a -- it was a way -- I

9   assume what you're saying, it was a way to be more efficient

04:28p 10  and encompassing with respect to moderation by using this

11  system?

12  A.   Well, not quite.  We're trying to keep the escorts from

13  posting in personals and adult jobs.

14  Q.   Okay.  Underneath -- it looks like No. 4.  Let's go to

04:28p 15  No. 4.  "Created 'Edited ad' queue is built with 15 minute

16  window."  What does that mean?

17  A.   That means that queue -- well, give me a moment.

18  Q.   Sure.

19  A.   The edited ad queue is ads that have been edited.  They

04:29p 20  go into a queue.  I can't remember exactly what the 15-minute

21  window meant.  It may mean that they're only going to be in

22  the queue for fifteen minutes but I -- I'm not clear about

23  that anymore; but I can say edited ads, they're going into a

24  queue for potential review.

04:29p 25  Q.   Okay.  So is it safe to say even though you can't recall

CARL FERRER - CROSS-EXAM BY MR. EISENBERG                    121

```
    1   exactly what 15-minute window means, it's a way in order to
    2   make moderation easier?
    3   A.    No.
    4   Q.    Or is it a way to just -- after fifteen minutes something
04:29p  5   happens?
    6   A.    I think the edited queue is just like a lot more work for
    7   the moderators.  You know, we can't even really get to it.
    8   Q.    Okay.  Lot more work so it's a tough job, right?
    9   A.    I do agree with you that moderation is a tough job.
04:30p 10   Q.    Okay.  Then, sir, No. 6 says "Staff requests," and this
   11   includes "a check box to delete pics easier."
   12         Do you remember what that meant?
   13   A.    I do.
   14   Q.    What does that mean?
04:30p 15   A.    This way you could just check those pics that you wanted
   16   to delete and then hit "submit" because some pics, they may
   17   show just a little too much nudity --
   18   Q.    Okay.
   19   A.    -- beyond the HBO standard.
04:30p 20   Q.    Well, let's -- let's go down to "Recommendations" and
   21   underneath --
   22             THE COURT:  Mr. Eisenberg --
   23             MR. EISENBERG:  Ma'am?
   24             THE COURT:  -- I want to point out that we are at
04:30p 25   the 4:30 minute mark, and I suspect you have more to go --
```

1    MR. EISENBERG:  I do.

2    THE COURT:  -- forward with this exhibit; is that

3  correct?

4    MR. EISENBERG:  I can end this exhibit in a minute.

04:30p  5    THE COURT:  Okay, let's forge ahead.

6  BY MR. EISENBERG:

7  Q.   Under category -- oh, no, I'm sorry.  Under "Comments,"

8  "illegal content removed is usually money for sex act," we've

9  seen that before, right?

04:31p 10  A.   Yes.

11  Q.   Then, "The content is pretty clean after removing pics,"

12  what does that mean?

13  A.   We're just getting rid of the hard core nudity.

14  Q.   Okay.

04:31p 15  A.   By not having any pics, the adult jobs content is just

16  taxed and it's a lot tamer.

17  Q.   Okay.  Let's just go over -- and this is the last area.

18    Let's go to "Standards" on the next page, and I'll just

19  go right down to "no hourly rate for service."

04:31p 20    Does that mean -- well, what does that mean?

21  A.   That means -- that's a -- that's a standard for the

22  personals section so that escorts will not post, you know,

23  15-minute, 30-minute, 60-minute --

24  Q.   Right.

04:32p 25  A.   -- pricing.

Q.    Increments?

A.    Kind of defeats the purpose of personals.

Q.    Thank you, Mr. Ferrer.

        MR. EISENBERG:  I'm done with this, Your Honor.

04:32p        THE COURT:  All right.  Thank you, Mr. Eisenberg.

        Now, Members of the Jury, we are at our ending point and we have one week off; and, again, I remind you so far we are still on the schedule to -- even if there is a Government shutdown, to have you come back on Tuesday, October 10th at
04:32p 9:00 o'clock unless you hear otherwise in the interim period from our jury administrator.

        Because we have this lengthy period off, I'm going to give you a more full admonishment.  So, first, continue to keep an open mind throughout the trial and do not decide what
04:33p the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

        Second, because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other
04:33p information about the case or to the issues it involves during the course of your jury duty.

        Thus, until the end of the case, or unless I tell you otherwise, do not communicate with anyone in any way and do not let anyone else communicate with you in any way about
04:33p the merits of the case or anything to do with it.  This

restriction includes discussing the case in person, in

writing, by phone, tablet or computer or any other means via

e-mail, via text messaging or any Internet chat room, blog,

website or application including, but not limited, to

04:33p    Facebook, YouTube, X, Instagram, LinkedIn, Snapchat, TikTok or

any other forms of social media.

This restriction also applies to communicating with

your fellow jurors until I give you the case for deliberation

and it applies to communicating with everyone else, including

04:34p    your family members, your employer, the media or press, and

the people involved in the trial, although you -- again, of

course, obviously, your family and your employers know that

you are performing jury service; but if you are asked or

approached in any way about your jury service or anything

04:34p    about this case, you must respond that you have been ordered

not to discuss the matter.  In addition, you must report the

contact to the Court.

Because you will receive all the evidence and legal

instruction you properly may consider to return a verdict, do

04:34p    not read, watch or listen to any news or media accounts or

commentary about the case or anything to do with it.

Do not do any research such as consulting

dictionaries, searching the Internet or using other reference

materials, and do not make any investigation or in any other

04:35p    way try to learn about the case on your own.  Do not visit or

view anyplace discussed in this case.  Do not use the Internet

or any other research -- resource to search for or view

anyplace discussed during the trial.

04:35p
Also, do not do any research about the case, the law

or the people involved, including the parties, the witnesses

or the lawyers, until you have been excused as jurors; and if

you happen to hear anything touching on the case in the media,

turn away and report it to me as soon as possible.

04:35p
Now, a juror who violates these restrictions does

jeopardize the fairness of these processes and a mistrial

could result that would require the entire process to start

all over again; and if any juror is exposed to any outside

information, please notify the Court immediately.

04:36p
Probably best if you just concentrate on what's

going on with Taylor Swift and Travis Kelce and you'll be

safe; but do recall that you will come back into the court in

the morning Tuesday, October 10th; and, also, I'll remind you

because we believe at that point we will be in a shutdown

situation, you may wish to bring your own lunch, and so just

04:36p
be prepared for that as well.  Again, and this caveat applies

unless you are otherwise contacted by the jury administrator.

So with that, I hope you have an enjoyable week off

and are ready and raring to go when you come back for the

trial.  With that, please all rise for the jury.

04:37p
(Jury out 4:37 p.m.)

UNITED STATES DISTRICT COURT

1           THE COURT:  All right.  And, again, please give the

2    jurors a little bit of time to exit the area uninterrupted;

3    and, again, I do remind counsel that you should take all of

4    your work product, except for the exhibits that are in front

04:37p  5    of Liliana, we'll have that stored away, but the entire

6    courtroom will have to be cleared for tomorrow's ceremony.

7           So -- and I've instructed Liliana if you need to

8    meet with the Court, I have time tomorrow morning and we can

9    also reconvene -- I believe it is on Friday the 6th of October

04:38p 10    if you need some time with the Court.

11           All right, we'll stand in adjournment.

12           MR. LINCENBERG:  Your Honor, may I raise one quick

13    point?

14           THE COURT:  Yes, you may.

04:38p 15           MR. LINCENBERG:  Thank you, Your Honor.

16           Your Honor, on behalf of all of the defendants, we

17    renew -- we've renewed it many times, but we renew our demand

18    for discovery with a specific -- with specific focus on the

19    notes of interviews of Mr. Ferrer.

04:38p 20           THE COURT:  I was unaware of a first demand so I

21    don't know what -- I don't know if I heard the first demand

22    for notes regarding Mr. Ferrer.  So let me hear from the

23    Government.

24           MR. RAPP:  Well, I -- this is the first I've heard

04:39p 25    of a demand for rough notes.  So I just recall during the

1    testimony there would be changes in the nomenclature.  They'd

2    be talking notes when I believe they're talking about

3    finalized reports.  So that's one thing.  They have all those.

4         If they're talking about the rough notes, they're

04:39p 5    here somewhere, but they're not Jencks.  They haven't been

6    adopted.  They're simply the rough notes of the investigating

7    agent.  I don't know of a case that entitles the defense under

8    Rule 16 to those notes.

9         THE COURT:  Well, I think because we're talking

04:39p 10   about a year's long period of time, you'll have to be a little

11   bit more precise in the request --

12         MR. LINCENBERG:  Well --

13         THE COURT:  -- and with respect to the Jencks issue.

14         So why don't you see if you can work it out with the

04:40p 15   Government, and then we can move forward from there; but I

16   think a more precise request is in order.

17         MR. LINCENBERG:  We've made requests.  If counsel is

18   saying that the notes are available for our inspection, then

19   we would take that as the next step.

04:40p 20         THE COURT:  Well, you can ask Mr. Rapp.

21         All right.  If there's nothing further, we're

22   adjourned.

23         COURTROOM DEPUTY:  All rise.

24   *(Whereupon the proceedings adjourned at 4:40 p.m.)*

0:0:0 25

UNITED STATES DISTRICT COURT

1                          *REPORTER'S CERTIFICATION*

2

3                  I, TERI VERES, do hereby certify that I am duly

4      appointed and qualified to act as Official Court Reporter for

5      the United States District Court for the District of Arizona.

6                  I FURTHER CERTIFY that the foregoing pages

7      constitute a full, true, and accurate transcript of all of

8      that portion of the proceedings contained herein, had in the

9      above-entitled cause on the date specified therein, and that

10     said transcript was prepared under my direction and control.

11                 DATED at Phoenix, Arizona, this 29th of

12     September, 2023.

13
                                        _____s/Teri Veres_____
14                                      TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT