1

**UNITED STATES DISTRICT COURT**


**FOR THE DISTRICT OF ARIZONA**


_____


| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | September 25, 2023 |
| Michael Lacey, et al. | ) | 3:46 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |




**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**


**REPORTER'S TRANSCRIPT OF PROCEEDINGS**


**IN-COURT HEARING**






Official Court Reporter:
Hilda Elizabeth Lopez, RMR, FCRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 30
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **A P P E A R A N C E S**

2

     For the Government:
3        UNITED STATES ATTORNEY'S OFFICE
         By:  **Mr. Kevin M. Rapp, Esq.**
4             **Mr. Peter S. Kozinets, Esq.**
              **Mr. Andrew C. Stone, Esq.**
5             **Ms. Margaret Wu Perlmeter, Esq.**
         40 North Central Avenue, Suite 1200
6        Phoenix, Arizona 85004
         kevin.rapp@usdoj.gov
7        peter.kozinets@usdoj.gov
         andrew.stone@usdoj.gov
8        margaret.perlmeter@usdoj.gov

9    For the Government:
         UNITED STATES DEPARTMENT OF JUSTICE
10       By:  **Mr. Austin Berry, Esq.**
         1301 New York Avenue, NW, 11th Floor
11       Washington, DC 20005
         austin.berry2@usdoj.gov

12

     For the Defendant Michael Lacey:
13       LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
         By:  **Mr. Paul J. Cambria, Jr., Esq.**
14       42 Delaware Avenue, Suite 120
         Buffalo, NY 14202
15       pcambria@lglaw.com

16

     For the Defendant Scott Spear:
17       FEDER LAW OFFICE, P.A.
         By:  **Mr. Bruce S. Feder, Esq.**
18       2930 East Camelback Road, Suite 160
         Phoenix, AZ 85016
19       bf@federlawpa.com
         - and -
20       KESSLER LAW OFFICE
         By:  **Mr. Eric Walter Kessler, Esq.**
21       6720 N. Scottsdale Road, Suite 210
         Scottsdale, AZ 85253
22       eric.kesslerlaw@gmail.com

23

24

25

```
 1   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 2        LINCENBERG & RHOW, P.C.
          By:  Mr. Gopi K. Panchapakesan, Esq.
 3             Mr. Gary S. Lincenberg, Esq.  - (Telephonic)
          1875 Century Park E, Suite 2300
 4        Los Angeles, CA 90067
          gpanchapakesan@birdmarella.com
 5        glincenberg@birdmarella.com

 6
     For the Defendant Andrew Padilla:
 7        DAVID EISENBERG, P.L.C.
          By:  Mr. David S. Eisenberg, Esq.
 8        3550 North Central Avenue, Suite 1155
          Phoenix, AZ 85012
 9        david@deisenbergplc.com

10
     For the Defendant Joye Vaught:
11        JOY BERTRAND, ESQ., L.L.C.
          By:  Ms. Joy M. Bertrand, Esq.
12        P.O. Box 2734
          Scottsdale, AZ 85252
13        joy@joybertrandlaw.com

14
     Michael Lacey - Appears by telephone
15   Andrew Padilla - Presence waived
     Joye Vaught - Presence waived
16   Scott Spear - Presence waived
     John Brunst - Present
17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2

 3         (Proceedings commence at 3:46 p.m.)

 4         COURTROOM DEPUTY:  Calling the Court to order.  This

 5   is Case No. CR 18-422, United States of America vs.            15:46:33

 6   Michael Lacey and others, on for in-court hearing.

 7         Counsel, please announce for the record with the

 8   government going first.

 9         MR. BERRY:  Good afternoon, Your Honor, Austin Berry

10   for the United States.  With me here is Peter Kozinets,       15:46:47

11   Kevin Rapp, Peggy Perlmeter and Andy Stone from the United

12   States.

13         THE COURT:  Good afternoon.

14         MR. CAMBRIA:  Good afternoon, Your Honor,

15   Paul Cambria, and my client, Mr. Lacey, is on the phone.  Good  15:46:57

16   afternoon.

17         THE COURT:  Good afternoon.

18         MR. EISENBERG:  Good afternoon, Your Honor,

19   David Eisenberg on behalf of Andrew Padilla.  Mr. Padilla,

20   well, I will waive his presence for this hearing.             15:47:08

21         THE COURT:  Good afternoon.

22         MR. PANCHAPAKESAN:  Good afternoon, Your Honor,

23   Gopi Panchapakesan on behalf of Mr. Brunst who is present in

24   the courtroom, and Mr. Lincenberg is on the phone.

25         THE COURT:  Good afternoon to you.                      15:47:20
```

```
1              MR. FEDER:  Bruce Feder for Scott Spear --

2              MS. BERTRAND:  Good afternoon, Your Honor, this is

3    Joy Bertrand representing Joye Vaught.  She has been excused

4    for today.  Thank you.

5              THE COURT:  All right.  Mr. Feder, go ahead.          15:47:31

6              MR. FEDER:  Bruce Feder for Mr. Spear, who waives his

7    presence.

8              THE COURT:  And good afternoon to you.  I note

9    Mr. Lincenberg has dialed in as well, and so we have everyone

10   here.  Please be seated.                                        15:47:46

11             I recognize today is a High Holy Day for some of you,

12   and so I hope to shorten the proceeding, but that will also

13   depend on what you all have to say, so I appreciate your being

14   here on this day.  It shows a commitment to your clients in the

15   case, but nevertheless, I take serious note of it.              15:48:12

16             I have once again reviewed the prior objections to the

17   exhibits, the response thereto, and the government's reply, and

18   I'm going to make my findings and ruling and then I'll let you,

19   once I make my findings and ruling with the specific

20   categories, I will let you make a record as to any other        15:48:40

21   argument you wish me to consider, but let me just -- oh, I note

22   that Mr. Kessler was in a prior court and he will be joining

23   us, and we'll continue, though, without him, but he'll be here

24   shortly as Mr. Feder is here on behalf of their client.

25             I mentioned to you that I'd like you to meet and       15:49:06
```

1    confer and review the court transcript related to the

2    subpoenas, the multiple exhibits related to subpoenas, subpoena

3    responses --

4            (Mr. Kessler is present.)

5            THE COURT:  -- that were outlined in Attachment B of        15:49:23

6    the government's filing, Document 1801-2, all of these subpoena

7    responses that were outlined from defense Exhibit 5555 through

8    5887.  And so here's what I have found by my review of the

9    record:

10           On the 13th of September Mr. Ferrer testified that        15:49:53

11   Backpage was receiving subpoenas and that he was involved in

12   responding to them authenticating records, e-mails, payment and

13   phone information to turn over, but he did not testify as to

14   the content of the request that the subpoenas made, or he did

15   not testify to the agencies that made the request.              15:50:22

16           He also testified, and the government did not clearly

17   indicate the date, but at some point in 2007 there was a person

18   by the name of Tamara Nickel that was hired to respond to the

19   subpoenas because of the high volume that was received.

20           And on the 14th he testified in reference to             15:50:52

21   Exhibit 804 that they responded to a subpoena regarding child

22   trafficking in 2010.  The exhibit, by my review, was an e-mail

23   that included Mr. Lacey and Mr. Spear.  So the defense can

24   cross-examine him as to his -- this response to that subpoena,

25   whatever that was, related to Exhibit 804.  There was also a    15:51:23

reference in that testimony to Exhibit 49.  Though I did not

pull up that exhibit, I think it was responsive to whatever

that subpoena was.

On the 15th of September he testified about an ad,

this was after the Amber CNN story, Mr. Ferrer testified about

an ad related to a Salina posting in Las Vegas and Washington

D.C., and this was in relation to checking all subpoenas in

those areas for a match as to this Salina ad.  So the

defendants are permitted to introduce any responsive documents

to that subpoena related to this Salina ad and whatever was

produced out of Backpage's finding in Las Vegas and Washington

D.C.

On the 19th Mr. Ferrer testified about receiving an

Arizona Grand Jury subpoena, Exhibit 1911, which he received in

his Dallas office and which he testified he was compelled to

answer.  So the defendants can cross-examine him regarding the

responsive documents to that subpoena.

On the 20th he testified about receiving a subpoena

related to Exhibit 1204.  This was in regard to a single ad in

the form of a cyber tip response.  The exhibit was an e-mail to

Mr. Padilla regarding a 404 lead, and in response to a Sergeant

Fassett e-mail in June 2012.  I think this was reference

Exhibit 20 -- excuse me, 1208.  And so the defense can

introduce any responsive documents to that inquiry.

Now, as I mentioned on Friday, there was testimony

1     about this PSI subpoena request for all e-mails regarding

2     moderation, and that was a subpoena that was issued in 2016,

3     and so I'm not entirely sure that the exhibits enumerated in

4     Attachment B are responsive to that PSI subpoena.  And if they

5     are, as I mentioned on Friday, then the defense is able to          15:54:21

6     question Mr. Ferrer about that.

7            But by my view, beyond that, in looking at a sampling

8     of these defense exhibits in Attachment B, they are, in my

9     view, very generic responses.  They are generic responses in

10    that someone has dug up a phone number on an X, Y, Z site, just    15:54:56

11    using X, Y, Z as an example, and some other non-Backpage site

12    that just says:  Hey, we found this on X, Y, Z site.  It may

13    respond to your inquiry.  And there are multiple e-mail

14    communications in that way.  Therefore, those types of

15    responses are irrelevant and they will lead to confusion.         15:55:28

16           But to the extent that Mr. Ferrer has mentioned

17    particular subpoenas from agencies and entities, any that I may

18    have missed beyond what I just recited, so long as the exhibits

19    are related to that, including the date and time frame in which

20    he testified receiving those subpoenas, then you may examine     15:55:56

21    him on that, but I'm going to limit you to five exhibits

22    because beyond that, if the government objects to cumulative,

23    then I will likely sustain it.

24           Any further discussion or points that anyone from the

25    defense side wishes to make?  Let me just go down the road        15:56:27

1    here, Mr. Cambria.

2           MR. CAMBRIA:  Yes, Your Honor, are we going to be

3    permitted to ask him general questions about the nature of his

4    response; in other words, his interaction with the authorities?

5    For example, you received a subpoena, they would ask for, let's      15:56:55

6    say identification information or financial information and so

7    on, I assume we're going to be able to ask that so that we can

8    show that they were assisting the police.  That's obviously

9    very important, and that they developed procedures to

10   streamline that process, including a handbook, if you will, for      15:57:15

11   the authorities showing them how to rapidly and efficiently get

12   the information that they need.

13          I mean, those are general questions about basically

14   what their relationship was with the authorities, and I think

15   it's clearly relevant as to intent, so I would hope that that's      15:57:35

16   not going to be an issue as far as going through generally what

17   they did.

18          THE COURT:  Well, so is there an exhibit associated

19   with those line of questions?

20          MR. CAMBRIA:  Well, there are probably many, but              15:57:58

21   there's a general procedure, and I think we're entitled to show

22   the relationship, and that -- that they had a procedure.  They

23   would get a subpoena; they would be asked for the following

24   kinds of information; they kept that information; they provided

25   that information.  They even had a cross-referencing system, if      15:58:20

1    you will, where they would say, "Yes, and that ad, by the way,

2    relates to this ad," and they would do that.  Plus, they, in

3    addition to that, appeared in cases and testified.  I mean, all

4    of that is critical to the defense, and that's just generally

5    showing what their procedure was.                              15:58:46

6         There are, you know, specific instances, but I want to

7    show that there was a general cooperation here, and a lot of it

8    was created by, you know, the people at Backpage to assist

9    in -- to assist the police in preventing certain things from

10   happening.                                                     15:59:14

11        THE COURT:  Well, without knowing what the question is

12   and what the exhibit is, I can't make a ruling, but what I can

13   say is that because Mr. Ferrer has testified previously to, I

14   think at one point he said they were averaging like a hundred a

15   month or something like that, I think you could ask him what    15:59:39

16   agencies they responded to.  I mean, that's relevant.  It's

17   going to take a long time, but, you know, I think that's, you

18   know, a question that you can.  And I don't know what prevents

19   you from asking and it, and if he can answer it, then I don't

20   think that the question or the response would be objectionable,  16:00:01

21   but I won't make a predetermined ruling as to an exhibit that I

22   have not seen and to questions that have yet to be asked.

23        So with that guidance, I think that's what I can give

24   you.

25        MR. CAMBRIA:  Thank you.  Yeah, like I say, I wanted       16:00:22

1   to set up basically with him the general routine that he

2   established with all the authorities.  They had a general

3   routine.  They would call, they would look, they would respond.

4   They developed a manual.  They showed the police how to use the

5   manual, how to get the information.                          16:00:39

6        THE COURT:  As I noted before, there was that

7   testimony that he -- that there was a hiring of some individual

8   in 2007 just to respond to subpoenas.  So you know, if he has

9   some prior knowledge about that beyond 2007, that's probably

10  also relevant too.                                           16:01:01

11       All right.  With regard to my ruling in -- with regard

12  to the Attachment B, anyone else wish to make a record or,

13  Mr. Eisenberg?

14       MR. EISENBERG:  Thank you, Your Honor.  There are, I

15  don't know how many of those e-mails, we refer to them on the  16:01:21

16  defense side as attaboys, but I think Your Honor will get the

17  idea that they are very praise worthy of the cooperation that

18  was extended to law enforcement by Backpage, including my

19  client.

20       What I see in all of those, well, actually what I       16:01:43

21  don't see in any of them, is any accusations by law enforcement

22  that Backpage or anybody there is committing a crime.  And it

23  builds up, and perhaps revealing something I would think twice

24  about, but it builds up an impression that what Backpage is

25  doing has not been considered by law enforcement to the extent  16:02:13

1    of prosecuting them or seeking that they should be prosecuted,

2    and that does have an impact on a lot of people connected with

3    Backpage.

4            So by limiting us to, I think Your Honor said five,

5    and I'm not sure if you mean five of this type of e-mail.          16:02:34

6            THE COURT:  Yes, this type of e-mail.

7            MR. EISENBERG:  Yes, ma'am.

8            THE COURT:  The e-mails that go along the lines:  Here

9    is the match to the phone number that we found on X, Y, Z web

10   page.  Those are extraordinarily cumulative, and so those are     16:02:49

11   the e-mails that I'm telling you, pick five, and beyond that I

12   am going to be thinking about a cumulative effect of those

13   exhibits because they are, I mean, there is tons of them in

14   which they are responding.  Apparently they are getting one

15   hundred subpoenas a month at some point.  So they are            16:03:09

16   responding to these it seems like daily, and so I think they

17   are going to be cumulative.  Those are the responses that I'm

18   talking about.

19           I didn't see any of the -- like I said, I saw sampling

20   of them, but I didn't see any of these, whatever you call them,   16:03:30

21   attaboy letters or whatever they are.  I haven't looked at

22   those.

23           MR. EISENBERG:  Well, Your Honor, those are actually,

24   they proceed in almost every e-mail, or follow in almost every

25   e-mail on the same exhibit, the response from law enforcement.    16:03:44

THE COURT:  It says essentially, "Thank you for your
help."

MR. EISENBERG:  And other things, "You guys are great.
Thank you for your cooperation.  We really appreciate it."  But
nothing in there with respect to anything pertaining to            16:03:58
Backpage itself as being involved in allegations pertaining to
this case.

THE COURT:  Well, here too, I am going to limit you
because here too only, unless they refer back to these
particular areas that Mr. Ferrer has previously testified to,     16:04:17
are you going to introduce a subpoena through him?  I don't
know what the subpoena asked for.  It may ask for some generic
information, it may ask for a particular phone number, it may
ask for the identity of an individual that's been listed
presumably on Backpage.  It could be anything.  And so I don't     16:04:40
have the context of which to make a relevancy determination
when I don't know what the information was that's being asked
for when these are very generic responses.

So in that regard, I would say no.  Be very cautious
about that.  All right.                                            16:04:59

MR. EISENBERG:  Thank you, Your Honor.  Just let me
add that the subpoenas do pertain to specific individuals or
specific postings, because otherwise the subpoena response
would be meaningless.

THE COURT:  Okay.  Mr. Panchapakesan, is there          16:05:19

1   something else you wanted to add?

2           MR. PANCHAPAKESAN:  No, Your Honor.

3           THE COURT:  Mr. Feder.

4           MR. FEDER:  Three specifics, Judge.  You may recall

5   that the, over objection, that the government brought out from          16:05:29

6   Mr. Ferrer a letter from a, some kind of law enforcement

7   officer from Montgomery County, Maryland, and the letter

8   accusing Backpage of doing something wrong was allowed into

9   evidence.  There are three of these letters in this category

10  that are from Montgomery County law enforcement.  Two from          16:05:48

11  Montgomery County; one from Baltimore County, on or about the

12  same time that are on the list of the ones that the government

13  opposes that we should be able to bring in to counter the

14  impression that was created by that; that at least some law

15  enforcement people in the very same county thought well of          16:06:07

16  Backpage and weren't making these accusations.

17          THE COURT:  What are the exhibit numbers?

18          MR. FEDER:  They are, either I made a mistake, and

19  it's certainly possible, or the government did.  One of them

20  is, I think we're unclear on 5638, but also 5653 and 5618.          16:06:20

21          MR. BERRY:  Can I get those numbers again?

22          MR. FEDER:  5618, 5638, 5653.

23          MR. BERRY:  5353 --

24          MR. FEDER:  The one you guys are on is 5638 on your

25  list is from Phoenix.  I thought it was Montgomery County.          16:06:45

1          THE COURT:  I have 5618, 5638 and 5653.

2          MR. FEDER:  Right.

3          THE COURT:  I'll look at that.

4          MR. FEDER:  Thank you.

5          THE COURT:  And Ms. Bertrand.                    16:07:06

6          MS. BERTRAND:  Your Honor, I have nothing further to

7    add.  Thank you.

8          THE COURT:  All right.  Let's move on to -- I'm going

9    to take the Dart litigation next.  It is true that Mr. Ferrer

10   did testify using this term "credit card Armageddon," and but I   16:07:39

11   think the defense even acknowledges that he did not refer to

12   any litigation including the Dart litigation.  And so to the

13   extent that he testified inconsistently to a declaration in a

14   prior court proceeding, you'd have to let me know what that

15   declaration includes and point me to the prior inconsistent      16:08:16

16   statement that he made.

17         But I can tell you that I'm not going to permit you to

18   bring any of that Dart litigation in because it is not related

19   to the charges in this case.  It's a complete different

20   litigation on a complete different set of facts.  And so at      16:08:36

21   this juncture, unless you can point to some inconsistent

22   statement that he made in trial with his, any prior court filed

23   declaration, then you're not going to be permitted to ask him

24   about that lawsuit.

25         Do you wish to make a further record, Mr. Cambria?         16:09:10

```
 1              MR. CAMBRIA:  No, Your Honor.

 2              THE COURT:  Mr. Eisenberg?

 3              MR. EISENBERG:  No, Your Honor.

 4              THE COURT:  Mr. Panchapakesan?

 5              MR. PANCHAPAKESAN:  I do, Your Honor.  Can I approach      16:09:20

 6    the lectern?

 7              THE COURT:  Oh, you know, I am so sorry, before you do

 8    that, I forgot to give the government the opportunity if you

 9    wanted to respond on the subpoena issue.

10              MR. BERRY:  Your Honor, the only thing I wanted to        16:09:30

11    just clarify for the record is you've been talking about

12    Attachment B to our 1801, which are the e-mails that we were

13    objecting to --

14              THE COURT:  Yes.

15              MR. BERRY:  -- and Mr. Eisenberg was talking about        16:09:43

16    e-mails and the attaboys and that sort of thing.  There are two

17    categories.  We stipulated that they can introduce basically

18    the hundred or so in Attachment 1, and so I wanted to clarify

19    that for the record.  To the extent that the Court is limiting

20    them to the five, we are talking about Attachment B, and         16:10:01

21    you're, and I think your ruling, and just seeking clarification

22    for the defenses' benefit and ours, if they choose to move in

23    those hundred that we're stipulating to, that they are

24    permitted to do so; is that correct?

25              THE COURT:  Yes.                                          16:10:16
```

1    MR. BERRY:  So to the extent they are worried we can

2    only do five, we are letting in a hundred in this category of

3    attaboys.  It's a second category that we're saying at some

4    point it becomes cumulative, and that's what you're talking

5    about.                                                          16:10:32

6            THE COURT:  Yes.

7            MR. BERRY:  Okay.  That's all I wanted to address on

8    the record, Your Honor.

9            THE COURT:  Okay.

10           Mr. Panchapakesan.                                      16:10:36

11           MR. PANCHAPAKESAN:  So Your Honor, in terms of the

12   Dart litigation, you know, the facts we intend to present, we'd

13   ask to present, the narrative is essentially, one, in late

14   June 2015 Sheriff Dart, who is a sheriff in Chicago, sends

15   threatening letters to Visa and Mastercard.  Those are actually 16:10:57

16   government exhibits, Government Exhibits 459, 478.  Within a

17   matter of days those credit card companies terminated the

18   relationship with Backpage.

19           The first thing that Backpage does, and keep in mind,

20   this is post sale of the business when Carl Ferrer is the       16:11:12

21   owner, when he's the CEO, Backpage sues Sheriff Dart in federal

22   court, and the goal of that lawsuit, we think Ferrer will

23   acknowledge this, is to get their credit card processing back

24   because what Backpage believes is that these threats from

25   Sheriff Dart are what caused the terminations rather than       16:11:30

1    anything they had done.

2          During this time period, which is June to

3    November 2015, Backpage, including Mr. Ferrer, is actively

4    communicating with the credit card companies.  So he's trying

5    to get their processing back.  He's communicating with the          16:11:46

6    credit card processors, he is communicating with Visa,

7    Mastercard about this notion of suing Sheriff Dart in an effort

8    to try to convince the credit card companies to come back.

9          And ultimately, in November 2015 the Seventh Circuit

10    issues an opinion that says Dart has been enjoined from          16:12:05

11    threatening Backpage's credit card relationships, and that is a

12    decision that Ferrer is aware of.  He's deposed in the case; he

13    submits a declaration in the case, so he's acutely aware of

14    litigation, and he's talking to our clients, my client in

15    particular, about the result in that case and what it means.          16:12:23

16          Now, Your Honor is correct that I think Mr. Ferrer, I

17    would say artfully avoided referencing Dart during his

18    testimony, but he was asked on September 21st at page 78 of the

19    transcript, he was asked, "Do you come to learn why they are

20    terminating your accounts," meaning the credit card accounts.          16:12:41

21    He says, "I do.  There was pressure put on them.  They didn't

22    want to be involved in content that was affiliated with the

23    prostitution."

24          So we would think if we would ask him, what pressure

25    were you referring to, he is going to acknowledge that pressure          16:12:55

1    came from Sheriff Dart.

2         And furthermore, I think what the Court should

3    understand is that throughout Mr. Ferrer's interviews with the

4    government, there's ten or 15 interviews or something like

5    that, they are documented in FBI 302s and he's adopted them,        16:13:08

6    Ferrer makes references to Dart, something like 35 to 40 times.

7    So when the government is questioning Mr. Ferrer about the

8    credit card ban in advance of trial, Mr. Ferrer is orienting

9    himself in terms of Dart.  He uses words like -- he talks about

10   the "Dart incident," the "Dart credit card ban."  He uses terms     16:13:33

11   like "credit card Armageddon/Dart incident."  That's what he is

12   saying in the interviews with the government.  These are prior

13   statements that we think we ought to be able to impeach him

14   with.

15        THE COURT:  Before you go on, I guess I can tell you           16:13:46

16   this:  You can ask him to clarify what he meant by the "credit

17   card Armageddon."  If he says, well, Sheriff Dart, and I think

18   his testimony was Sheriff Dart was writing these letters, and

19   so it concerned the credit card companies.  But what I'm saying

20   is you cannot bring in anything related to the litigation.          16:14:14

21   It's confusing and it doesn't relate to this particular case or

22   the counts in the case.

23        So you can probe what he meant by "credit card

24   Armageddon," you can probe what happened as a result of

25   Mr. Dart's inquiries, but do not bring up the litigation.           16:14:35

1   That's all I am telling you.

2        MR. PANCHAPAKESAN:  Just briefly, if I can address the

3   litigation piece and then move on.  So there are

4   contemporaneous exhibits.  One of them is a government exhibit,

5   for example, which is, this is -- so there's Exhibit 6025,                16:14:48

6   which is a defense exhibit.  That's a communication between

7   Mr. Ferrer and Trent Voigt, who was the CEO of JetPay, that

8   that's their payment processor.  He tells Mr. Voigt essentially

9   in this exhibit, he says, quote, "If we win on Dart, then Visa

10  has cover for protected speech."                                          16:15:10

11       So in other words, during the course of this

12  litigation, Ferrer is of the state of mind, and keep in mind,

13  the government is claiming he is in a conspiracy with our

14  clients at this time, so his state of mind is relevant, he's of

15  the state of mind that this litigation is important because, A,    16:15:21

16  it's what Backpage does immediately in response to credit card

17  Armageddon; and B, he thinks that prevailing in a litigation,

18  he is telling these credits card companies, telling the

19  processors, he thinks that is the key to getting the credit

20  card companies back.  That's one exhibit.                                 16:15:38

21       Another one, for example, is Government Exhibit 1127.

22  So this is July 1st, 2015 email from Ferrer, and then it's

23  internal at Backpage, and he says:  Mastercard and Sheriff Dart

24  are now deciding what is legal in their legal speech.  We have

25  a good track record on these issues.                                      16:16:00

UNITED STATES DISTRICT COURT

1          Ferrer is communicating internally in this time period

2    that there is this litigation, he thinks they are going to win,

3    and they can get their credit card processing back.

4          In terms of the litigation broadly, I think my

5    response is this:  We think it's relevant because the                    16:16:15

6    government has used this sort of term "credit card Armageddon"

7    to suggest that the cancellation of the credit cards put our

8    clients on notice that -- that there was something illegal

9    going on on the website; that the termination established that

10   notice.                                                                   16:16:30

11         And so the litigation is relevant to show that, A,

12   here's what they did in response, which is to sue; and B, the

13   result, which was favorable for them, affects their state of

14   mind because it's something they are relying on to say, no,

15   it's not something we did.  It was just this threat from a law           16:16:48

16   enforcement officer, which is what caused the termination as

17   opposed to something wrong with Backpage website.

18         In terms of the notion toward litigation generally, I

19   just have two points.  One, we would ask to be able to do what

20   the government did with the PSI report.  So the PSI report, as          16:17:05

21   the Court recognizes, that's a Senate hearing.  It's sort of a

22   quasi-judicial hearing that produces this report, right, that

23   has factual findings.  It's almost like court opinion.

24   Mr. Ferrer is asked, "Did you read this?  Was it publicly

25   available?  Did you discuss it with the defendants?  Did you            16:17:24

1   have a reaction to it?"  And there is testimony elicited about

2   what it put him on notice of.

3        We think in fairness, since that sort of testimony is

4   out there about prior proceedings, that we ought to be able to

5   do something similar, you know, within reason with foundation     16:17:39

6   in terms of the litigation.

7        THE COURT:  Well, I'll just say this to that:  But

8   that litigation is irrelevant because it's premised on a

9   different set of accusations and facts, and the Court made

10  findings based on a different record, and so it leads to       16:18:01

11  confusion and it's not relevant to the charges here.  So I'll

12  give the other comment some consideration, but that's my

13  comment for now.

14       MR. PANCHAPAKESAN:  Okay.  Thank you, Your Honor.

15       THE COURT:  Mr. Feder, did you have anything to add to    16:18:19

16  the record with regard to the Dart?

17       MR. FEDER:  Not to Dart.  I want to talk about the

18  McKenna case.

19       THE COURT:  Well, let me move on then because -- what

20  is it with regard to McKenna that you want to discuss?         16:18:31

21       MR. FEDER:  One second.  On the 19th, both in the a.m.

22  and p.m. sessions, on numerous occasions the government asked

23  Mr. Ferrer about some correspondence with Mayor McGinn of

24  Seattle, and was allowed, over objection, to bring in a letter

25  from him talking about age verification, why can't Backpage do  16:19:14

age verification procedures.

They then went on to talk about Attorney General McKenna, who they had meetings with.  Again, the subject matter was age verification, you should implement them and you would save a lot of people.  And the implication was from Mr. Ferrer that Backpage refused to do that because they wanted to make more money and it would cost them money.

They even went to the extent of talking about, well, if you -- you could have age verification in bars, and that's easy enough, why can't you do it in the -- in the Internet situation?  And here's a quote from McKenna because they obviously know about McKenna.

THE COURT:  What is the exhibit that you're referring to that you want to introduce?

MR. FEDER:  Pages are in the a.m. session, pages 61, 77-78, 80-81, 85-86; and then in the p.m., pages 9-10, 41-42.

THE COURT:  You didn't respond to my question.

MR. FEDER:  I misheard it.

THE COURT:  What was the exhibit, if any, that you're referring to?

MR. FEDER:  Oh, the exhibits that they were using, you mean?

THE COURT:  That you intend to use.

MR. FEDER:  That I intend to use would be Exhibit 5079, which is the McKenna decision.

1          Let me just -- it's very specific.  I understand your

2    rulings, Judge, on cases that have different facts, different

3    laws, but this was very specific because what happened in

4    Washington state is after Backpage didn't do what the A.G.

5    McKenna wanted and Seattle Mayor McGinn, they passed a law, a          16:21:03

6    criminal law, that says, if an underage person is published,

7    then the publisher is going to be criminally prosecuted.

8          And as a result of that, Backpage brought litigation,

9    brought a lawsuit, an injunction lawsuit, against Washington

10   State in federal court.  And specifically, here's the part of         16:21:23

11   McKenna that answers what the government has done, which is to

12   basically skew the truth-seeking process to go all the way up

13   to, hey, you can have age verification process, and Backpage

14   refused to do it.  When in fact, in the litigation, here's what

15   the Judge said in McKenna.  At first blush, quote, on page 14,        16:21:45

16   this is the Westlaw:  At first blush, requiring publishers to

17   check identification before publishing an escort ad seems as

18   commonsensical as requiring bar owners to check identification

19   before allowing patrons to enter the door, period.

20          There is, however, a few differences between these two        16:22:11

21   scenarios.  The latter is an identification requirement related

22   to conduct, drinking alcohol in a bar.  The former is an

23   identification requirement imposed by the government and

24   punishable by imprisonment related to speech.  Since there is

25   no constitutional right to drink alcohol, Court is tasked with       16:22:30

1   upholding the constitution if a bar identification verification

2   process results in a line forming outside the door, or causing

3   some restaurants to stop serving -- to liquor -- however,

4   because there is a constitutional right to free speech, the

5   constitution cannot permit similar collateral consequences in

6   the First Amendment context.

7           They intentionally put this evidence on leading right

8   up to the door of the filing of the lawsuit.  They even used

9   the example that then became part of the McKenna decision.  And

10  to allow them to get away with that, Judge, would just be

11  simply an egregious violation of the Sixth Amendment, and to

12  allow them to use this Court's orders as both a sword and a

13  shield instead of just a shield.

14          They are abusing this Court's order.  If they stayed

15  away from it and they didn't put that, the letter in from Mayor

16  McGinn or they didn't talk about A.G. McKenna, that would have

17  been one thing.  They did purposefully.  There is no way around

18  it, done that.  And our only response to that cannot be, well,

19  how come you didn't get an I.D.?  Because they litigated it,

20  and the judge, of course, found that -- that what the mayor and

21  the A.G. were asking for was unconstitutional, a violation of

22  the First Amendment.

23          And if the Court is going to let them get away with

24  it, that's fine, but that's the record.  We should be able at

25  the very least, I hope, artfully steer around what the

1    litigation, other aspects were, but certainly as to that

2    paragraph that I just put on the record, Mr. Ferrer should not

3    be able to get away with what is in essence misrepresentations

4    or half truths.

5         THE COURT:  I will look at the exhibit, but I'm going          16:24:21

6    to tell you that nothing I've heard, Mr. Feder, at this point

7    has persuaded me to change my ruling or to adjust it in any

8    way.  And in particular, not to introduce some prior litigation

9    about a specific Washington state statute that has nothing to

10   do with this, the charges in this case.                            16:24:40

11        MR. FEDER:  It has to do with the I.D. verification

12   that they went to great lengths to talk about that Backpage

13   refused to do, and it left an unfair impression with the jury

14   that they were just refusing to do something as opposed to

15   doing what parties are supposed to do to, settle their             16:25:00

16   differences, and that is go to court and resolve it.  And there

17   is an opinion that says they didn't have to do that because it

18   was an unconstitutional imposition on the First Amendment.

19        I will steer around if the Court orders, the rest of

20   the decision, but this cannot stand.  That will be simply          16:25:18

21   outrageous.

22        THE COURT:  Well, I may be simply outrageous then.  I

23   am not going to change my ruling.

24        MR. FEDER:  The testimony -- there is a number of

25   exhibits that are mentioned.  I can give them to you, but in       16:25:30

1    the transcript that I just gave you it talks about the McGinn

2    letter and various other things.

3            THE COURT:  Thank you, Mr. Feder.

4            MR. PANCHAPAKESAN:  Sorry to interrupt.  I heard that

5    the line is silent, is what I'm being told, the dial-in line?        16:25:45

6            THE COURT:  Let me try.  Ms. Bertrand, can you hear

7    me?  We'll try rebooting it.

8            COURTROOM DEPUTY:  Counsel, can the parties hear us?

9            MS. BERTRAND:  We can.  Thank you.

10           THE COURT:  I heard Ms. Bertrand.        16:26:56

11           Mr. Lincenberg, can you hear us?

12           MR. LINCENBERG:  Yes.  Can you hear me?

13           THE COURT:  Yes.  All right.  I don't know where we

14   dropped you off.  Mr. Feder has finished speaking about

15   McKenna.  Did you hear that?        16:27:11

16           MR. LINCENBERG:  No, we were dropped off about ten

17   minutes ago.  I can obviously get filled in by other counsel or

18   a summary of where the Court is at.  That would be helpful.

19           THE COURT:  I will not recount Mr. Panchapakesan's

20   statement to the Court because I think he can probably brief        16:27:31

21   you on that, or you can receive a transcript of the proceeding.

22           MR. LINCENBERG:  We heard the Dart argument.  We got

23   dropped off right before that.

24           THE COURT:  As I said, you can review the transcript

25   of that, but Mr. Feder laid a record as to why he should be        16:27:51

1    able to read in paragraphs of the McKenna decision, and I have

2    so far denied that.

3            And so let me inquire, Ms. Bertrand, with regard to

4    what I had previously discussed, which was actually related to

5    the Dart litigation, did you have anything further to add?        16:28:20

6            MS. BERTRAND:  No, not regarding the Dart litigation.

7    Thank you.

8            THE COURT:  All right.  Let me see if government

9    wishes to respond to either the Dart litigation or McKenna?

10           MR. BERRY:  Your Honor, with regard to, I am going to    16:28:36

11   start in reverse order here, just for my memory's sake.

12           With regards to McKenna issue, I think the Court is

13   obviously leaning in the direction of excluding that, and we,

14   of course, would strenuously object to reading to the jury or

15   cross-examining Mr. Ferrer with portions of a Court opinion.    16:28:54

16           Yes, Judge Posner said some things the defense liked;

17   the court in Washington said things the defense liked, but as

18   Your Honor has repeatedly pointed out, those are different

19   facts, different cases, different statutes, and it would be

20   extremely confusing to the jury for us to have to hash that out    16:29:11

21   in front of them.

22           And that transitions to the Dart issue.  In Document

23   516 filed with this court, we filed an attachment which was

24   listed as Exhibit A, so 516-1, that is the order from the

25   Northern District of Illinois sanctioning Backpage for their    16:29:36

```
1   misrepresentations in the Dart litigation.  And so if any of
2   this Dart litigation comes up, we don't have any choice but to
3   start trying to explain to the jury, well, how did it actually
4   shake out?  And one of the things that shook out was Backpage
5   was sanctioned $250,000 for their misrepresentations in that       16:29:55
6   litigation that occurred before Judge Posner issued that
7   decision that they liked so much.  So they want to get into
8   that great favorable decision that we didn't have to do this.
9   That's exactly what the mini trial is that 403 says we should
10  not engage in, so we think the Court is correct leaning towards    16:30:14
11  excluding that stuff all together.
12          THE COURT:  All right.
13          MR. PANCHAPAKESAN:  Can I just briefly respond on this
14  point?
15          THE COURT:  Yes, Mr. Panchapakesan.                        16:30:24
16          MR. PANCHAPAKESAN:  My understanding, I don't have the
17  document in front of me, my understanding is that Sheriff Dart
18  sought sanctions before the District Court when the indictment
19  in this case was issued, and that's because Ferrer's
20  declaration in that case was inconsistent with what the            16:30:39
21  indictment here says.
22          My understanding is that Ferrer defaulted in that case
23  so there was a sanctions order issued, but I don't understand
24  the sanction order to be, to predate Judge Posner's opinion,
25  but that's my understanding.                                       16:30:54
```

```
1          THE COURT:  So here's exactly an example of why we're

2   not going to get into Dart litigation because it leads down

3   this path of what occurred in the litigation and has nothing to

4   do with the allegations in the case, and so I think counsel are

5   making my point.                                                16:31:15

6          Let me move to --

7          MR. LINCENBERG:  Your Honor, may I -- Your Honor, will

8   the Court indulge me to have a short reply to what government

9   counsel just argued?

10          THE COURT:  Well, you have Mr. Panchapakesan here, but   16:31:28

11   I will permit you, yes.

12          MR. LINCENBERG:  I'll keep it short, Your Honor.  Your

13   Honor, if the facts as the government's position is that the

14   facts are irrelevant, or the Court's position is it's relevant

15   because Dart wasn't a Travel Act case, but for the same reason  16:31:46

16   all of the government's evidence of credit card Armageddon

17   should have been excluded and should be excluded as irrelevant

18   because it's not a Travel Act case.

19          To the extent that those facts that the government

20   claims underlie the termination of credit cards are relevant,   16:32:04

21   then they are equally relevant for the defense to explore.  And

22   so if the Court is not going to explore the litigation itself,

23   then the Court should exclude all evidence based upon those

24   same facts.

25          THE COURT:  All right.  Let's move forward.  With        16:32:28
```

1    regard to specific exhibits, and I asked in particular that the

2    government reply to the outline of cases in defendant's

3    response at Document 1803 regarding these cases and

4    nonprivileged letters and memorandum from, quote-unquote,

5    professionals, and I've looked at the cases.  I've looked at          16:33:02

6    both parties' description of them.  And let me just say that I

7    think there are differences, which don't change this Court's

8    analysis on the advice of counsel.

9          Let me point out in *Cheek vs. United States*, there the

10   Court did not opine on the admissibility of the evidence, and        16:33:34

11   that case does not stand for the proposition that defendants

12   can use certain exhibits to cross-examine Mr. Ferrer about the

13   advice from attorneys that he or any other defendant received

14   without first establishing those four elements that go to

15   advice of counsel.                                                    16:34:09

16         The *State vs. Munoz* case, the Ninth Circuit's 2000

17   opinion, this related to the admissibility of the attorney

18   opinion letter that was not contested at trial because that --

19   that attorney was a key witness for the government, and so

20   there was no question or argument about the admissibility of         16:34:38

21   that letter, so it doesn't fit squarely here.

22         And I will say just in terms of looking at these

23   exhibits, Exhibit 5329, this is a general introduction letter

24   from some lawyer about:  I was newly hired.  And it then offers

25   some broad statements.  I don't think it's relevant.  It is         16:35:19

1    actually an attorney-client letter.  Again, I don't know

2    whether or not there's a privileged communication that's been

3    waived there.  It doesn't seem to me that that letter was in

4    response to any particular question.  These are just general

5    statements about really not anything that I can tell, and so          16:35:52

6    that exhibit is, in my view, not admissible.

7           Exhibit 5507 clearly discusses the CDA and Section

8    230.  I've already ruled that any exhibits that reference the

9    CDA or rely upon it are not relevant.

10          I'm not entirely sure what 6025 relates to, what the          16:36:26

11   impetus for that particular exhibit and statement was, and so

12   at this juncture I don't find it relevant.  I'm trying to read

13   my own handwriting on this.

14          6043, this was some sort of a communication by

15   Scott Spear regarding the assistance of counsel.  Here too, I          16:37:10

16   don't know that there's any waiver and what the question was

17   specific to receiving the assistance of counsel, what the

18   question was posed, and, therefore, my prior ruling stands.

19          There is also this communication by Mr. Suskin in

20   Exhibit 6109 regarding his opinion that there's no liability.          16:37:46

21   But there again, I don't know what the question was to

22   Mr. Suskin.  I don't know if there's been a waiver that has not

23   been shown to me.  I don't know what the four factors that are

24   required by the Ninth Circuit in advancing an advice of counsel

25   defense is, and so on my review those particular exhibits are          16:38:17

1    not admissible.

2          And I want to point something out the government

3    pointed out in their reply that at some point defense counsel,

4    I think it was Mr. Cambria, used the term "professional," that

5    this was a professional outfit, a professional operation, and I          16:38:48

6    went back to look at that *McLennan* opinion where that Court

7    basically said:  Defendants who claim good faith based upon

8    reliance of a professional must show those four factors.

9          So whether or not you call them professional, if they

10   are attorneys that are hired to provide this kind of advice,          16:39:20

11   what have you, that's irrelevant.  The four factors must be

12   linked before the Court before making that argument, and so I

13   don't find any reason in the briefing to change my -- my prior

14   ruling that any lawyer advice that is given is meaningless

15   unless you know what the question was that was put before them.          16:39:58

16   And until we have that, and the response was related to that

17   question, you can't bring it in.  It's just -- that's my ruling

18   and I am not going to adjust it.

19          MR. CAMBRIA:  May I be heard, Your Honor?

20          THE COURT:  Yes, you may be further heard.          16:40:19

21          MR. CAMBRIA:  First thing is first, there is a

22   commingling, if you will, by the government of the good faith

23   defense and the advice of counsel defense.  They are two

24   separate things.  The cases do not require a specific

25   foundation like in an advice of counsel for good faith.  For          16:40:43

example, in the cases that we cited, one of which was, if you

recall this, some of it was involved in marketing, and they

called an individual to testify about highs and lows and

averaging in marketing, that's not an attorney at all.  And

there wasn't any requirement in any of those cases that there

are four specific or two or even one factor as opposed to a

fact that may affect the state of mind of the defendant.

Look at *Cheek*, for example, *Cheek* is different.  *Cheek*

obviously is an IRS case, and specific intent, as in the Travel

Act, is relevant.  And basically there it was a matter of,

here's somebody that goes to people who aren't even lawyers and

listens to what they have to say and is -- is allowed,

according to the decisions, to come in and say, "Well, I can't

have a criminal intent.  I believed what I was told by lay

people," if you will.  In some cases it's, "I believed what I

was told by certain lawyers who wrote letters."  Not even that

fellow's lawyer, but just a lawyer that wrote letters.

They didn't have a lawyer-client relationship, and

those types of things are admissible and there isn't any

foundation of four different factors.

The government keeps trying to weld these two

together, advice of counsel and good faith.  They are

different.  And it may very well be that we would have evidence

of good faith if we were able to satisfy the several factors,

then we might also have evidence of advice of counsel and be

1    entitled to an instruction on that, but they are not mutually

2    exclusive.

3          And so each of these cases, especially the Sixth

4    Circuit case that we cited, that talked about the Travel Act,

5    and if you'll recall there that was a case where an individual          16:43:06

6    was doing bingo, I guess in Kentucky, and his good faith

7    evidence that he wanted to put in was that he was told he

8    couldn't, was that an assistant D.A. told him that if things

9    are legal in Kentucky and a deputy sheriff told him things are

10   legal in Kentucky, and they had excluded that, and the Court          16:43:32

11   found that that was reversible because it affected his argument

12   that he was operating in good faith as opposed to demonstrating

13   a specific intent to break the law.

14         So first of all, there is no case that says good faith

15   has a four-prong foundation.  That's advice of counsel.  They          16:43:53

16   are different things.  And so what we're saying is anything

17   that could affect the specific intent of our clients, that

18   would affect their state of mind, is admissible as good faith.

19         The government here, for example, they've put in what

20   they felt was evidence of criminal mind, criminal intent; for          16:44:20

21   example, the Attorney General's letters and so on, and they are

22   not tied to the Travel Act.  They are not tied to the 50 ads

23   that are in this indictment.  They are not tied to anything.

24   They are just a dump of information which the government says,

25   oh, well, see, this shows that they are being told they were          16:44:45

violating the law, and we should be able to put in the answer
to demonstrate, no, our state of mind is influenced by this,
which was the response, and that would demonstrate our good
faith.  That would be our position to argue that.  That
demonstrates our good faith.

16:45:09

None of the cases that deal with good faith have a
cataclysmic, if you will, foundation except to say, "Here's
what I was told."  And the courts have even gone so far to say
that you could be told something that's laughable and it's
still admissible at that point.

16:45:30

So here we are, we're saying all we want to show is
that -- here's what is unfair about what they have done:  They
put in the Attorney General's letter, so now you have all these
Attorney Generals, and the jury is sitting here going, wow, all
these chief law enforcement people around the country are
telling these people they are doing something wrong, they must
be doing something wrong.  We have a response to that.

16:45:50

106 says that a response should be given when it
fair -- when it's fair.  Without the response, the jury could
very well conclude, well, they didn't even respond.  That would
be like me accusing you of something, Your Honor, God forbid,
and you would not answer and then somebody goes, well, must
have been true; there was no response.

16:46:09

So here we are sitting here, we have good faith
evidence.  We have decisions from courts, we have statements

16:46:30

UNITED STATES DISTRICT COURT

1    from attorneys, we have activities that occurred that would

2    influence our state of mind.  There is no case that says this,

3    this, this and this needs to be established before you can put

4    in state of mind evidence.  That's advice of counsel.  It's in

5    two stages.  I could have both.  I could have state of mind and          16:46:55

6    then if I achieve the foundation I could get an instruction on

7    advice of counsel, but right now we would like to put in, for

8    example, the answers to the accusations to show our state of

9    mind was influenced by those answers that were created by lay

10   people, by lawyers, by others.                                           16:47:22

11          I mean, if you look at *Cheek* and some of the other

12   cases, they didn't have a lawyer-client relationship with

13   individuals that generally put out opinions, but they use them,

14   and the Court said that that was -- that it was appropriate to

15   do so.  What I find really appropriate about *Cheek* is that the         16:47:42

16   lady that's in the hall down here in this courtroom whose named

17   after was in the majority opinion there as well, and it seems

18   to me that when you read these cases, there is no special

19   foundation.  All there is is somebody said something or you've

20   seen something, including, including public documents, public            16:48:05

21   documents have been included in good faith and you can rely on

22   them.

23          In one case we had a situation where the individual

24   said, "Well, my mother was a citizen, so I didn't think I had

25   to check in," and so on, and they put -- they will put those            16:48:22

1    records in, and they said you could rely on those.  The jury

2    may not buy it, but it's evidence that you are able to put in

3    on good faith.  So here, we're sitting here.  Right now they

4    created this impression where the Attorney General letter, just

5    as an example, that we were accused of these things and we          16:48:44

6    never responded, so we must be guilty.

7         In fairness, we should be able to put our response in

8    and we should be able to be in a position to argue to the jury

9    in the end, look, they had this response.  In good faith they

10   felt they were doing the right thing.  That is a distinct           16:49:01

11   defense separate from advice of counsel, and we should be able

12   to do it.

13         THE COURT:  Are you finished?

14         MR. CAMBRIA:  It looks like I am.  Yes.

15         THE COURT:  All right.  Mr. Berry.                            16:49:16

16         MR. BERRY:  Well, that was a lot.  I will try to be

17   brief about this.  I think that we have litigated this ad

18   nauseam, was the reason we filed the Motion in Limine.  We have

19   addressed this multiple times before Your Honor, and I think

20   you have correctly consistently ruled that there are four          16:49:31

21   factors that they have to go through to be able to meet this

22   defense.

23         As we put in our most recent filing, we are not afraid

24   of this defense.  We are not trying to prevent them from

25   engaging in advice of counsel defense if they comply with the      16:49:44

law.  If they are not willing to do that, then it's not fair to

the United States to have them get up there and say, "And now

who was it that said this to you, Mr. Ferrer, who gave you this

advice," so and so, "and was that person an attorney?"  And

turn and wink at the jury.                                    16:50:03

You can call it professional, you can call it

nonprofessional attorney opinion.  My father-in-law would say

you can call it bananas because the bottom line is they are

trying to smuggle in this defense with this idea it's good

faith.  On that point, we are also not shying away that the    16:50:19

Ninth Circuit says good faith is a valid defense.  We are not

suggesting that is not true and that's not the law in the Ninth

Circuit.  That's absolutely the law, but you can't do it the

way that they are doing it.

And what they are trying to do is just say that it's    16:50:32

general good faith and, oh, by the way, it happened to be an

attorney.  Wouldn't you rely on that too, ladies and gentlemen

of the jury?

So we think Your Honor is correct in these rulings and

we ask you to stand by those rulings.  If Your Honor is         16:50:44

inclined to be receptive to any of the arguments that you've

heard today from the defense, we would be happy to brief this

further, but as I said, I think you've heard enough on this.

THE COURT:  Just so I will reflect on Mr. Cambria's

statements, but at this juncture I am not inclined to change my  16:51:01

```
1    ruling.
2              I think those were the only issues that you raised in
3    your objections to exhibits; is that correct?
4              MR. BERRY:  I wanted to double-check that, Your Honor.
5    We went through each of the advice of counsel exhibits that we    16:51:19
6    listed.  I think the only one that I don't have a note that you
7    addressed was -- was 6066, and if you addressed that I
8    apologize, but I didn't make a note about that.  I assume your
9    ruling would be the same on that one.  That is --
10             THE COURT:  That was the e-mail between Mr. Ferrer,     16:51:51
11   Mr. Spear and someone named Alex about the Terms of Use and
12   banner ads; is that right?
13             MR. BERRY:  Yes.
14             THE COURT:  This falls into one of those categories.
15   I don't know what the question was.                              16:52:07
16             MR. BERRY:  Right.
17             THE COURT:  I don't know whether or not there's a
18   waiver, and so as far as I can see it is not admissible under
19   those prior statements I made.
20             MR. BERRY:  And then --                                16:52:26
21             THE COURT:  Just let me just note for the record,
22   Ms. Bertrand also has disconnected and she's not --
23             MS. BERTRAND:  I am here.
24             THE COURT:  Oh, okay.  Did you not disconnect?
25             MS. BERTRAND:  I am here.                              16:52:37
```

1          THE COURT:  Okay.

2          MR. PANCHAPAKESAN:  Sorry to interrupt.

3          MS. BERTRAND:  Looks like Mr. Lincenberg is with that

4    same group.  I have been here.  I have heard everything.

5          THE COURT:  Mr. Lincenberg, are you still there?          16:52:50

6          MR. LINCENBERG:  I am, Your Honor.

7          THE COURT:  Okay.  All right.  You can continue.

8          MR. BERRY:  Yes, Your Honor, sorry.  Just very

9    quickly.  Going through our brief in 1801 section 2, subsection

10   (a), other litigation, I take your ruling without going exhibit   16:53:04

11   by exhibit is those are not admissible, and then the same with

12   section B, the ones listed there.  If I am incorrect, we'd like

13   a clarification on that.

14         THE COURT:  No.  That is -- my ruling will stand with

15   those as well.                                                    16:53:20

16         MR. BERRY:  With regards to Attachment A, the ones we

17   are stipulating to, obviously no problem there.  They can do

18   what they want with those.

19         Then with Attachment B, the 220 additional, here, go

20   find some other links to these other websites, your ruling was   16:53:37

21   on the five there.

22         THE COURT:  Well, my ruling -- yes, yes, and it's

23   confined again to what Mr. Ferrer testified on those particular

24   days that I outlined at the very beginning, and that relates

25   there to the five that they are permitted to introduce.          16:54:01

```
 1              MR. BERRY:  That's all from me, Your Honor.

 2              THE COURT:  Let me just, sorry, Mr. Feder, you were

 3   saying something.

 4              MR. FEDER:  I thought the Court was still considering

 5   the three, three that we discussed that were from Maryland in      16:54:14

 6   response to the Ferrer's testimony about the law enforcement

 7   person from Montgomery County.

 8              THE COURT:  I was going to look at that and I will let

 9   you know tomorrow.

10              MR. PANCHAPAKESAN:  There was a specific exhibit I       16:54:29

11   wanted to be heard on briefly.

12              THE COURT:  What was that?

13              MR. PANCHAPAKESAN:  5507, I wanted to be heard on

14   that.

15              THE COURT:  That was raised by the government.           16:54:35

16              MR. PANCHAPAKESAN:  Yes, Your Honor.

17              THE COURT:  What is it 5507?

18              MR. PANCHAPAKESAN:  On page 3 of Docket 1801.

19              THE COURT:  Okay.  What do you wish to say?

20              MR. PANCHAPAKESAN:  So 5507, Your Honor, there is       16:54:47

21   actually a companion exhibit, which is 5508, that was not in

22   the government's filing, that's an October 18th, 2010, e-mail

23   from my client to the Bank of Montreal.

24              THE COURT:  Sorry, I am sorry, 5507; is that right?

25              MR. PANCHAPAKESAN:  5507 is an attorney opinion         16:55:12
```

1    letter.

2              THE COURT:  And is that listed in Attachment A or

3    Attachment B?

4              MR. PANCHAPAKESAN:  It's actually in their brief.

5    It's in the chart.  I can look at the top of page 3.          16:55:25

6              THE COURT:  Not one of the stipulated --

7              MR. PANCHAPAKESAN:  Right.

8              THE COURT:  Okay.  Yes.

9              MR. PANCHAPAKESAN:  Just a little background on this.

10   So the companion exhibit is 5508, which is not listed there,   16:55:39

11   but that's an October 2010 e-mail from my client, Mr. Brunst,

12   to Mary Latta, who is a representative of Bank of Montreal.  As

13   the Court knows at this point, Bank of Montreal was a major

14   lender to the parent company of Backpage from about 2006 to

15   2014, and so my client's role as CFO was to communicate this   16:56:00

16   sort of thing to lenders, meaning the business and legal risk

17   involved with Backpage.

18             Further, Mr. Ferrer testified to a couple of exhibits

19   involving the Bank of Montreal, Exhibit 616a was one of them.

20   That's November 10th communication with the bank.  Exhibit 886 16:56:18

21   is another one.  And the gist in Mr. Ferrer's testimony, for

22   example, the transcript is 9-21 at page 92 to 93, the gist of

23   Mr. Ferrer's testimony is that my client acted deceptively to

24   the bank.

25             And so what this e-mail and memo goes to is, one, my  16:56:36

1    client's good faith towards disclosing the legal risks of the

2    Backpage enterprise to the bank; and then two, to rebut this

3    charge of Mr. Ferrer that my client was acting deceptively

4    toward the bank.

5           As to the memo, Your Honor is correct that it does       16:56:54

6    largely deal with the CDA, but on page 21 of the memo, page 21,

7    5507, it specifically talks about criminal liability; talks

8    about aiding and abetting prostitution; it talks about

9    promotion of prostitution.  There is even a section, I think on

10   page 23, that the heading is, even if Section 230 does not       16:57:13

11   apply, the First Amendment would prevent imposition of criminal

12   liability.  So it is -- in a sense it's talking about the

13   Travel Act.  It doesn't say those words, but that is what the

14   Travel Act is, is the criminal aiding and abetting of

15   prostitution.                                                    16:57:30

16          And I think the best case for the admission of this

17   letter is the *U.S. vs. Way* case.  That's --

18          THE COURT:  It's kind of, as you've already described

19   it, and I will look at it again, criminal liability, aiding and

20   abetting of prostitution, is shielded by the, I think you said  16:57:48

21   something about the First Amendment, it's wrong.  It's not a

22   correct statement of the law.

23          MR. PANCHAPAKESAN:  Well, Your Honor, I mean, under

24   the case law, it's not -- it wouldn't be coming in for the

25   truth of the matter.  It would be coming in to show that my     16:58:09

1   client is making a good faith attempt to disclose to the bank,

2   look, here's the risk.  It's not only a civil risk, but it's a

3   criminal risk; right?  Here's what our attorney is saying in a

4   nonprivileged communication.  And so it's not the truth.  It

5   just goes to the fact that the CFO is trying to make an attempt        16:58:25

6   to be open and honest with the bank, and it counters this

7   notion that he is being deceptive or tricking the bank.

8          And just sort of the last point I want to make more

9   broadly is, is that there are numerous exhibits that were

10  introduced in Mr. Ferrer that are attorney communications.  So         16:58:43

11  anytime the Court sees names like Steve Suskin or Samuel Fifer

12  or Ed McNally, or Liz McDougall, all of them are attorneys, and

13  I think there was some testimony to that effect, at least as to

14  Mr. Suskin, that he was in-house counsel.  There is also

15  government exhibit, like Exhibit 588, slide 23, which talks            16:59:03

16  about legal strategy for 2010, and the government elicited

17  testimony from Mr. Ferrer as to what that means, this sort of

18  slow dance with the Attorneys General.

19         So the point is the government, through Mr. Ferrer,

20  has used the fact of attorney communication, the fact of legal        16:59:19

21  strategy as evidence that our clients are engaged in bad faith.

22  So I think to some extent that opens the door to us being able

23  to come back and say, no, the existence of attorneys is

24  actually good faith, and I think that door is opened by some of

25  the specific testimony and exhibits that Mr. Ferrer was asked         16:59:38

1    about.

2           THE COURT:  And I think I just make the observation

3    that there's a reason why the Courts treat communication by

4    lawyers differently, and that's why you have these bright-line

5    requirements and all of the hurdles that have to be met before          17:00:00

6    even generic communications by lawyers comes about.

7           And so anything further, Mr. Panchapakesan?

8           MR. PANCHAPAKESAN:  Only thing I would point out, Your

9    Honor, is I think one of the cases, I don't know if Your Honor

10   mentioned this case, *United States vs. Way*, that's an Eastern        17:00:22

11   District of California case that we site in our briefing.

12          THE COURT:  I read it.

13          MR. PANCHAPAKESAN:  And what that court says is

14   evidence regarding this letter, attorney opinion letter, and

15   defendants' awareness of its content are admissible on the             17:00:32

16   question of whether defendant acted with a culpable state of

17   mind.

18          The Court goes on to say:  Whether the defendant is

19   entitled to an --

20          THE REPORTER:  Slow down.                                        17:00:43

21          MR. PANCHAPAKESAN:  The Court says:  Whether the

22   defendant is entitled to an advice of counsel jury instruction

23   will be resolved at the appropriate time.

24          So in other words, what the Court is saying is there

25   is a bright-line distinction.  On the one hand, evidence              17:00:53

negates intent, and on the other an advice of counsel defense

for which the Court accurately points out there are certain

predicates required for that.  And so I think that's part of

what Mr. Cambria is saying is there is a distinction, I think,

between on the one hand evidence, even if it's a nonprivileged          17:01:09

attorney communication that negates intent on the one hand, and

on the other advice of counsel which requires a jury

instruction.

        THE COURT:  All right.  Well, again, I will think

about Mr. Cambria's oral presentment, but at this juncture my           17:01:25

ruling stands.

        Now, we are at the 5:00 o'clock hour.  And let me just

say this, Mr. Feder, and to all counsel, I understand that

folks get fatigued.  This is a very long trial, very long days,

lots of exhibits, but I ask each of you to remember your                17:01:54

professional responsibility in presentment to the Court.

        Mr. Feder, while the record did not reflect when I

sustained an objection on Friday, you fairly well stomped your

foot, stopped, dropped your jaw and rolled your eyes at me.  I

didn't take kindly to it.  And I suspect more importantly for           17:02:32

your, on your behalf, the jury I'm sure may not have deemed it

in the best of light.

        So be aware, be mindful that the jury is always

watching, and don't become argumentative with the witness

because you're passionate about your case.  I understand that          17:03:00

```
1    sometimes it will happen, but I will not hesitate to remind you

2    to take a moment to step back and cool off.  Do bear that in

3    mind.

4            If there's nothing further, then I will look at these

5    other few matters and I will visit with you right before we         17:03:20

6    bring the jury in.  Do be mindful that we start at 8:45

7    assuming all our jurors are there.

8            Let me make one last comment while it's on my mind.

9    We have a looming government shutdown.  Assuming that the folks

10   can get their act together, we won't have to worry about it,        17:03:41

11   but I only say this because I'd like government counsel to give

12   me assurances that after next -- after when do we come back the

13   10th of October, if we are still in a government shutdown, that

14   government counsel will be here because the Court will be in

15   operation, and I'll let the jurors know that as well.  So           17:04:07

16   please let me know that tomorrow if you would.

17           MR. BERRY:  I think Mr. Rapp has a response.

18           MR. RAPP:  Judge, we are all, believe it or not, we

19   are all essential.  All the attorneys on this team, we intend

20   to be here.                                                         17:04:25

21           MR. CAMBRIA:  Objection.

22           THE COURT:  And that is duly noted.  All right.  With

23   that, I will see you tomorrow.

24      (Proceedings concluded at 5:04 p.m.)

25
```

UNITED STATES DISTRICT COURT

1

2

3

4

5                    **C E R T I F I C A T E**

6

7          I, HILDA E. LOPEZ, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 12th day of October,

16  2023.

17

18

19                          s/Hilda E. Lopez_____

20                          HILDA E. LOPEZ, RMR, FCRR

21

22

23

24

25