UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) No. 2:18-cr-00422-DJH |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Phoenix, Arizona |
| Michael Lacey, et al., | ) October 17, 2023 |
| | ) 1:15 p.m. |
| Defendants. | ) |
| | ) |

**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL – DAY 19**

**(P.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2    For the Government:
           UNITED STATES ATTORNEY'S OFFICE
 3         By:  Mr. Kevin M. Rapp, Esq.
                Mr. Andrew C. Stone, Esq.
 4              Mr. Peter Shawn Kozinets, Esq.
                Ms. Margaret Wu Perlmeter, Esq.
 5              Mr. Daniel G. Boyle, Esq.
           40 North Central Avenue, Suite 1800
 6         Phoenix, Arizona  85004-4408
           kevin.rapp@usdoj.gov
 7         peter.kozinets@usdoj.gov
           andrew.stone@usdoj.gov
 8         margaret.perlmeter@usdoj.gov
           - and -
 9         UNITED STATES DEPARTMENT OF JUSTICE
           By:  Mr. Austin Berry, Esq.
10         1301 New York Avenue NW, 11th Floor
           Washington, DC  20005
11         austin.berry2@usdoj.gov

12    For the Defendant Michael Lacey:
           LIPTSITZ GREEN SCIME CAMBRIA, LLP
13         By:  Mr. Paul J. Cambria, Esq.
           42 Delaware Avenue, Suite 120
14         Buffalo, New York  14202
           pcambria@lglaw.com
15
      For the Defendant Scott Spear:
16         KESSLER LAW OFFICE
           By: Mr. Eric Walter Kessler, Esq.
17         6720 North Scottsdale Road, Suite 210
           Scottsdale, Arizona  85253
18         eric.kesslerlaw@gmail.com
           - and -
19         FEDER LAW OFFICE, PA
           By:  Mr. Bruce S. Feder, Esq.
20         2930 East Camelback Road, Suite 160
           Phoenix, Arizona  85016
21         bf@federlawpa.com

22

23

24

25
```

<u>**A P P E A R A N C E S (Cont'd)**</u>

For the Defendant John Brunst:
     BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
     By:  **Mr. Gopi K. Panchapakesan, Esq.**
          **Mr. Gary S. Lincenberg, Esq.**
          **Mr. Ariel A. Neuman, Esq.**
     1875 Century Park E, Suite 2300
     Los Angeles, California  90067
     gpanchapakesan@birdmarella.com
     glincenberg@birdmarella.com
     aneuman@birdmarella.com

For the Defendant Andrew Padilla:
     DAVID EISENBERG, PLC
     By:  **Mr. David S. Eisenberg, Esq.**
     3550 North Central Avenue, Suite 1155
     Phoenix, Arizona  85012
     david@deisenbergplc.com

For the Defendant Joye Vaught:
     JOY BERTRAND, ESQ, LLC
     By:  **Ms. Joy Malby Bertrand, Esq**
     P.O. Box 2734
     Scottsdale, Arizona  85252-2734
     Joy@joybertrandlaw.com

UNITED  STATES  DISTRICT  COURT

# I N D E X

**SUMMARY OF COURT PROCEEDINGS:**                          **PAGE**

Proceedings Outside the Presence of the Jury             5
Proceedings Outside the Presence of the Jury            12
Proceedings Outside the Presence of the Jury            16
Motion for Mistrial                                     17
Proceedings Outside the Presence of the Jury           141


**WITNESSES FOR THE GOVERNMENT:**                          **PAGE**

Astrid Cervantes
        Direct Examination by Ms. Perlmeter             29
        Cross-Examination by Mr. Eisenberg              49
Andrea Benson
        Direct Examination by Ms. Perlmeter             54
        Cross-Examination by Mr. Eisenberg              71
        Cross-Examination by Mr. Cambria                77
        Cross-Examination by Mr. Feder                  79
Arshana Sanders-Willis
        Direct Examination by Mr. Berry                 89
Derek Fritze
        Direct Examination by Mr. Berry                102
        Cross-Examination by Mr. Kessler               132


## EXHIBITS

| NO.   | DESCRIPTION                                          | REC'D |
|-------|------------------------------------------------------|-------|
| 1606  | Email from Officer Fritze to Backpage "Post ID 80670844", 07/16/2012, DOJ-BP-0000162047 | 119 |
| 1606a | Email from Officer Fritze to Backpage "Post ID 5656110", 07/16/2012, DOJ-BP-0000164992 | 119 |
| 1606b | Email from Officer Fritze to Backpage "Post ID 7756616", 07/16/2012, DOJ-BP-0000164226 | 119 |
| 1606c | Email from Officer Fritze to Backpage "Post ID 804357", 07/16/2012, DOJ-BP-0000166089 | 119 |

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (Proceedings reconvene at 1:15 p.m.) |
| 3 | (Jury not present at 1:15 p.m.) |
| 4 | THE COURT:  All right.  Please be seated. |
| 5 | Before -- before we bring any witness in, it has come |
| 6 | to my attention that -- and the record will reflect counsel are |
| 7 | only present.  No witness; no jurors. |
| 8 | It has come to my attention that upon entering the |
| 9 | building, one of our jurors -- and Liliana will retrieve the |
| 10 | jurors -- was greeted by a CSO.  And the CSO essentially |
| 11 | recognized him as one of the Lacey jurors, stated something to |
| 12 | the effect of, oh, so you're in it for the long haul, and then |
| 13 | proceeded to ask him the question, didn't one of the defendants |
| 14 | commit suicide? |
| 15 | And the juror essentially just extracted him away -- |
| 16 | himself away from the conversation. |
| 17 | And as that juror reported this incident to Liliana, |
| 18 | he did so in front of two other jurors, who clearly heard the |
| 19 | statement. |
| 20 | So what I intend to do is call the juror in |
| 21 | individually, ask him about the incident.  And I don't |
| 22 | recall -- my memory is not fresh on the particular jurors that |
| 23 | have been seated that may or may not have had prior knowledge. |
| 24 | I do remember Mr. Cambria making some statement in his |
| 25 | opening as to, we all know what happened to Mr. Larkin.  And I |

13:15:46
13:16:17
13:16:44
13:17:06
13:17:38

```
 1    admonished him on that.
 2            So I think that's the appropriate procedure.
 3            I have relayed my concern to the acting U.S. Marshal
 4    to admonish the CSOs not to engage in that type of that sort of
 5    conversation or communication going forward.                    13:18:01
 6            And so does the government wish to be heard?
 7            MS. PERLMETER:  No, Your Honor.
 8            THE COURT:  Anyone from the defense?
 9            MR. CAMBRIA:  I don't remember making that statement,
10    Your Honor, in the opening.                                      13:18:14
11            THE COURT:  I remember it clearly.
12            MR. FEDER:  What's a CSO?
13            THE COURT:  Court security officer.
14            MS. BERTRAND:  The blue coats.
15            THE COURT:  The individuals who guard the entry of the   13:18:26
16    courthouse.
17            All right.  So we will bring in the first juror who
18    had the interaction.
19            MR. BERRY:  Your Honor, we -- I'd ask Liliana if we
20    could have a couple minutes before the jury comes in to discuss  13:18:36
21    some issues.  Obviously this is more important right now.  I
22    would like to take something up before we bring the whole panel
23    back in to start the afternoon.  It relates to one witness
24    that's coming.  I don't know if you want to hear it now or
25    later.                                                           13:18:49
```

```
 1              THE COURT:  Let's hear it later.

 2              MR. BERRY:  That's fine.

 3              MR. KESSLER:  Your Honor, I have the same issue, that

 4    I asked Liliana if I could make a point.  It has to do with

 5    upcoming witnesses.  And so whenever Your Honor is able to hear    13:19:01

 6    that.

 7              MR. CAMBRIA:  And my recollection, Your Honor, I said

 8    he was deceased.  I don't remember anything else.  If there's

 9    something specific, I'd like to know what it is, please.

10              THE COURT:  I'll give you your opening transcript.       13:19:17

11    How's that?

12              MR. CAMBRIA:  Thank you.

13              MR. FEDER:  Judge, could -- could we address or --

14              THE COURT:  One thing at a time.  Let's -- let's

15    concentrate on one thing at time, please.                         13:19:30

16              MR. FEDER:  Okay.

17         (Juror Number 10 joins the proceedings.)

18              THE COURTROOM DEPUTY:  Let me grab a mic for him.

19              THE COURT:  Okay.

20              THE COURTROOM DEPUTY:  Can you just speak into this       13:20:33

21    one?  Let me go turn it on.  Let me see, 2, the number 2.

22              Oh, it's on.  It's on.

23              JURY PANEL MEMBER:  It's on.

24              THE COURT:  I have my reading glasses on.  I can't

25    tell your juror number.  I'm sorry.                               13:20:45
```

```
 1              JURY PANEL MEMBER:  Oh, yeah.  I'm Juror Number 10.

 2              THE COURT:  Juror Number 10.  Okay.

 3              Thank you, Juror Number 10.

 4              I called you in because I was told that you had a -- a

 5     brief interaction, one of -- with one of our court security        13:20:59

 6     officers today --

 7              JURY PANEL MEMBER:  Right.

 8              THE COURT:  -- who acknowledged that you were serving

 9     as a juror in this trial.

10              JURY PANEL MEMBER:  Right.                                 13:21:10

11              THE COURT:  And what time of the day was this?  Do you

12     recall?

13              JURY PANEL MEMBER:  It was when I got here, so it was

14     probably --

15              THE COURT:  Can you use the microphone.                    13:21:18

16              JURY PANEL MEMBER:  -- 8:35 or so when I got here.

17              THE COURT:  8:35.

18              JURY PANEL MEMBER:  Uh-huh.

19              THE COURT:  Okay.  And can you just briefly describe

20     for us what that exchange -- what -- what occurred in that         13:21:27

21     exchange.

22              JURY PANEL MEMBER:  Okay.  Yeah, usually when I come

23     in, they say hi or -- because they've seen us so much.  And he

24     said:  Welcome back.  And he said:  Yeah, you're on the Lacey

25     case.                                                              13:21:41
```

```
 1            And I said:  Yes.
 2            And he said:  Oh, didn't one of the owners kill
 3  himself?
 4            And I said:  Well, I don't know.
 5            And I didn't know why he was even asking me questions,   13:21:58
 6  so -- and that was really it.  And I walked off.
 7            THE COURT:  All right.  Juror Number 10, prior to
 8  being asked that question, had you had any prior knowledge
 9  about any of that?
10            JURY PANEL MEMBER:  No.  I -- I haven't.            13:22:17
11            THE COURT:  And now, having been asked the question,
12  or having been suggested that, has that changed your ability in
13  any way to remain a fair and impartial juror?
14            JURY PANEL MEMBER:  No.  Not at all.
15            THE COURT:  All right.  Is there anything from the   13:22:39
16  government?
17            MS. PERLMETER:  No, Your Honor.
18            THE COURT:  Anything from defense?
19            Mr. --
20            MR. LINCENBERG:  Lincenberg.                        13:22:53
21            THE COURT:  -- Lincenberg, do you --
22            MR. LINCENBERG:  Your Honor, maybe I missed it.  I
23  think there was something you conveyed to us that you had --
24  that you didn't explore with Juror Number 10.  I don't know if
25  the Court wanted to do that.  In terms of others.            13:23:06
```

1          THE COURTROOM DEPUTY:  Huh?

2          THE COURT:  Well -- oh, yes.

3          Just to be clear, Juror Number 10, when you conveyed

4  this conversation to my courtroom deputy, were there other

5  jurors present?                                          13:23:31

6          JURY PANEL MEMBER:  There was.  And I probably

7  shouldn't have -- I should have said it just to Elizabeth, but,

8  yeah.

9          THE COURT:  And do you recall the juror numbers who

10  were present?                                           13:23:44

11          JURY PANEL MEMBER:  I --

12          THE COURT:  If not, it's okay.

13          JURY PANEL MEMBER:  I don't know the numbers.  I think

14  we know which ones.

15          THE COURT:  Yeah.  I think Liliana can provide that to  13:23:53

16  me.

17          JURY PANEL MEMBER:  Yeah.

18          THE COURT:  All right.  Mr. Lincenberg, anything else?

19          MR. CAMBRIA:  Yeah.

20          THE COURT:  I'm sorry?                           13:24:04

21          MR. CAMBRIA:  I just wondered what was said.

22          THE COURT:  What --

23          MR. CAMBRIA:  If -- with the other jurors.

24          THE COURT:  You want him to reiterate what the court

25  security officer said?  He just --                      13:24:14

```
 1          MR. CAMBRIA:  No, no, no, no.  I just didn't know
 2  whether there was a conversation other than the court security
 3  officer in the presence of the jurors.
 4          THE COURT:  No.  My understanding is -- and you can
 5  correct me if I'm wrong, Juror Number 10 -- you essentially      13:24:27
 6  just told Liliana what the court security officer said to you
 7  this morning; is that correct?
 8          JURY PANEL MEMBER:  Correct.
 9          THE COURT:  All right.
10          All right.  Anything from you, Ms. Bertrand?  I lost      13:24:39
11  you.  I didn't see you back there.
12          MS. BERTRAND:  I can't see from my seat, so I -- I
13  moved.  Thank you.
14          No.  Thank you, Your Honor.
15          THE COURT:  Mr. Cambria?                                  13:24:53
16          MR. CAMBRIA:  No, Your Honor.
17          THE COURT:  Mr. Eisenberg?
18          MR. EISENBERG:  No, Your Honor.  Thank you.
19          THE COURT:  Mr. Feder?
20          MR. FEDER:  No, thanks.                                   13:25:00
21          THE COURT:  All right.  Thank you.
22          You may return.  And, again, just don't discuss
23  anything that we've talked about so far.  And Liliana will take
24  you back into the jury room.
25          And you can retrieve one of the two individuals that      13:25:11
```

```
 1    was present.

 2           Thank you.

 3        (Juror Number 10 leaves the proceedings.)

 4        (Jury not present at 1:25 p.m.)

 5           MR. LINCENBERG:  Your Honor, outside of the jurors --    13:25:27

 6    and you'd like, I can wait --

 7           THE COURT:  Yes.

 8           MR. LINCENBERG:  I -- I think some type of inquiry

 9    maybe should be made of all of the jurors, even if it's in

10    muted questions, because the fact that one juror came forward   13:25:39

11    and talked --

12           THE COURT:  Stop.

13        (Juror Number 6 joins the proceedings.)

14           THE COURTROOM DEPUTY:  Use this microphone to speak.

15           THE COURT:  Okay.  Good afternoon.                       13:26:02

16           I'm just going to ask you to hold the microphone to

17    your -- close to your mouth --

18           JURY PANEL MEMBER:  Okay.

19           THE COURT:  -- and identify yourself.  You are juror

20    number?                                                         13:26:13

21           JURY PANEL MEMBER:  6.

22           THE COURT:  And, Juror Number 6, I have been informed

23    that you were present when Juror Number 10 conveyed to you --

24    or, I'm sorry -- conveyed to my courtroom deputy in front of

25    you a conversation that took place between a court security     13:26:30
```

UNITED STATES DISTRICT COURT

```
 1   officer and Juror Number 10; is that correct?

 2             JURY PANEL MEMBER:  Vaguely, yeah.

 3             THE COURT:  And do you recall what it is that you

 4   heard?

 5             JURY PANEL MEMBER:  That one of the security guards    13:26:42

 6   was mentioning something about one of the people from this

 7   case.

 8             THE COURT:  And do you recall what it was that he said

 9   to Juror Number 10?

10             JURY PANEL MEMBER:  I didn't really hear all of it.  I  13:26:55

11   just heard that he was saying something about Mr. Larkin, and

12   didn't he die or kill himself?

13             THE COURT:  All right.  And is that information that

14   you had previously had prior to being selected as a juror here?

15             JURY PANEL MEMBER:  Like, did I already know that?     13:27:22

16             THE COURT:  Yes.

17             JURY PANEL MEMBER:  No.

18             THE COURT:  And now, having heard that statement, has

19   that any -- in any way affected your ability to be fair or

20   impartial going forward?                                        13:27:35

21             JURY PANEL MEMBER:  No.

22             THE COURT:  And at this point, Juror Number 6, have

23   you conveyed or shared that conversation with anyone else in

24   the jury?

25             JURY PANEL MEMBER:  No.                               13:27:50
```

```
 1              THE COURT:  All right.  Is there anything from the
 2    government?
 3              MS. PERLMETER:  No, Your Honor.
 4              THE COURT:  Anything from the defense?
 5              I'll go down with Mr. Cambria first.                    13:27:56
 6              MR. CAMBRIA:  No, Your Honor.
 7              THE COURT:  Ms. Bertrand?
 8              MS. BERTRAND:  No, thank you.
 9              THE COURT:  Mr. Lincenberg?
10              MR. LINCENBERG:  No, Your Honor.                        13:28:01
11              THE COURT:  Mr. Feder?
12              MR. FEDER:  No, thank you.
13              THE COURT:  Mr. Eisenberg?
14              MR. EISENBERG:  No, Your Honor.
15              THE COURT:  All right.  You may return to the jury      13:28:06
16    room.  And just do not communicate anything that we've
17    discussed so far.
18              Thank you.
19         (Juror Number 6 leaves the proceedings.)
20         (Juror Number 15 joins the proceedings.)                    13:28:34
21              THE COURT:  All right.  And would you identify
22    yourself by your juror number.
23              JURY PANEL MEMBER:  Number 15.
24              THE COURT:  Juror Number 15, it has come to my
25    attention that you were present when Juror Number 10 conveyed     13:28:48
```

1    some communication that -- an exchange he had with one of the

2    court security officers this morning and that you were present

3    when he was relaying this information to my courtroom deputy;

4    is that correct?

5              JURY PANEL MEMBER:  That's correct.                    13:29:08

6              THE COURT:  And, to the best of your recollection,

7    what is it that you recall Juror Number 10 telling my courtroom

8    deputy?

9              JURY PANEL MEMBER:  He inquired the -- the deputy --

10   the security officer asked him if we were on the long case or   13:29:21

11   something, mentioned the case by one of the names, and then

12   asked something about one of the prior owners or something.

13             THE COURT:  And do you recall what it is that he said

14   about the prior owner?

15             JURY PANEL MEMBER:  That the security guard said that  13:29:37

16   he thought he was deceased now or something.

17             THE COURT:  Okay.  And prior to overhearing this

18   conversation between Juror Number 10 and my courtroom deputy,

19   had you had any previous knowledge related to that statement

20   about the prior owner?                                          13:29:59

21             JURY PANEL MEMBER:  No.

22             THE COURT:  And now, having heard such a statement,

23   would that in any way change your ability to be fair and

24   impartial to the parties in this case?

25             JURY PANEL MEMBER:  No.  It has no bearing to me.      13:30:14

```
 1              THE COURT:  All right.  Thank you.

 2              Is there anything from the government?

 3              MS. PERLMETER:  No, Your Honor.

 4              THE COURT:  Anything from you, Mr. Cambria?

 5              MR. CAMBRIA:  No, Your Honor.                    13:30:23

 6              THE COURT:  Ms. Bertrand?

 7              MS. BERTRAND:  No, thank you.

 8              THE COURT:  Mr. Lincenberg?

 9              MR. LINCENBERG:  No, Your Honor.

10              THE COURT:  Mr. Eisenberg?                       13:30:29

11              MR. EISENBERG:  No, Your Honor.

12              THE COURT:  Mr. Feder?

13              MR. FEDER:  No, thanks.

14              THE COURT:  All right.  Thank you.

15         And when you return to the jury room, please don't   13:30:34

16    discuss any matters that we've covered so far and just wait

17    patiently until you're called in.

18              JURY PANEL MEMBER:  Thank you.

19              THE COURT:  Thank you.

20       (Juror Number 15 leaves the proceedings.)              13:30:47

21              THE COURT:  Now, there's a suggestion that all of the

22    jurors be polled in this fashion, but to do so would

23    essentially open the door to suggest the information that some

24    of them may not have.  And so I think that's problematic.

25              And my understanding is that those were the only two  13:31:26
```

UNITED STATES DISTRICT COURT

```
 1    individuals that were present when the statement was reiterated
 2    to my courtroom deputy.  So I don't necessarily feel the need
 3    or find the necessity to go any further.  I don't want to bring
 4    new information to jurors that may not have had any such
 5    information at present.                                          13:31:50
 6            And so does the government wish to be heard?
 7            MS. PERLMETER:  No, Your Honor.  We agree with the
 8    Court.
 9            THE COURT:  Anyone from the defense?
10            MR. LINCENBERG:  Well, Your Honor, first, we would      13:32:04
11    move for a mistrial, not simply -- not really solely based on
12    what these jurors are saying, but at the Court's lack of
13    follow-up on this issue.  And it really compounds what we felt
14    was insufficient opportunity to explore this during voir dire.
15            I think one other --                                    13:32:24
16            THE COURT:  Explore this, meaning what?
17            MR. LINCENBERG:  Meaning the effect of publicity and
18    the like.
19            Now, the -- the other thing the Court could do would
20    be to question the chief security officer -- or the courtroom   13:32:34
21    security officer as to whether he has had conversations with
22    other jurors, made comments to other jurors in a similar vein.
23            THE COURT:  Well, number 1, I'm going to --
24            Oh, and I saw Mr. Cambria reaching for the microphone.
25    Did you wish to say something, Mr. Cambria?                     13:32:54
```

 1           MR. CAMBRIA:  The only thing I was going to say,

 2    Your Honor, is I assume that the security officers will be told

 3    not to converse with the jurors.

 4           THE COURT:  Well, that was -- you can be assured that

 5    that was the very first thing I did.  And going forward, they          13:33:08

 6    will be admonished by their employer.

 7           Now, with regard to the motion to dismiss based on the

 8    Court's, I guess what's characterized by Mr. Lincenberg as not

 9    going into voir dire in this subject area, I believe the record

10    will show that the Court did go through it.  I also believe          13:33:36

11    that the record will show that oftentimes defense counsel were

12    raising the issue repeatedly, and I, therefore, carefully went

13    into the area, not seeking to taint any potential jurors

14    because of those recent events.

15           And so, further, I understand Mr. Lincenberg's motion          13:34:00

16    to encompass the fact that the Court will not one by one call

17    jurors in to somehow ask them a question without revealing to

18    them that one of the owners is deceased or committed suicide.

19    To do that would essentially undercut what you wish to prevent

20    in the first instance.                                               13:34:28

21           So for that reason, I am also denying the motion to

22    dismiss.

23           MR. LINCENBERG:  And, Your Honor --

24           THE COURT:  There was a --

25           MR. LINCENBERG:  Excuse me.                                    13:34:38

1           THE COURT:  There was an issue that the government

2      wished to receive -- I made my ruling, Mr. Lincenberg.  Do you

3      have --

4           MR. LINCENBERG:  It's not about the ruling.

5           Your Honor, I was just going to ask, you have a light    `13:34:44`

6      in front of you that is sort of tilted at us now I think for

7      the first time, and it's the way it's tilted, it's now kind of

8      causing a glare.

9           THE COURT:  It's illuminating me as though I'm on

10     high.  Didn't you -- didn't you get that?                      `13:34:58`

11          MR. LINCENBERG:  Yes.

12          THE COURT:  Is it distracting still?

13          MR. LINCENBERG:  Now it's good.  Thank you,

14     Your Honor.

15          THE COURT:  Okay.                                         `13:35:04`

16          MR. LINCENBERG:  It just hasn't been that way all

17     trial.  And thank you.

18          THE COURT:  Okay.  First, Mr. Stone, then Mr. Kessler,

19     and then somebody else wanted to speak to me.

20          I'm sorry.  Was it you, Mr. Feder, or Mr. Kessler?       `13:35:19`

21          MR. FEDER:  It was -- it was me.  There may be others

22     but --

23          THE COURT:  Okay.  Mr. Stone?

24          MR. BERRY:  I appreciate you thinking I'm as dashing

25     as Mr. Stone.                                                  `13:35:30`

1           THE COURTROOM DEPUTY:  It's Mr. Berry.

2           THE COURT:  I'm sorry.  Mr. Berry.  I'm sorry.  I'm

3    sorry.

4           MR. BERRY:  That's okay.

5           THE COURT:  Can you turn -- do we have the microphone          13:35:35

6    on?  Okay.  Thank you.

7           MR. BERRY:  Yes, Your Honor.

8           What I wanted to mention is, we have the witness

9    Arshana Sanders coming up in a little bit, and before we put

10   her on, so we didn't have to take a break right before that, I   13:35:45

11   just wanted to make the Court aware of -- of who she is and

12   what the sort of a proffer of her testimony's going to be,

13   because I foresee there being some objections and some concerns

14   that I want the Court to be aware that I'm going to try to

15   navigate around.                                                 13:36:02

16          So Ms. Sanders is not someone who was posted on

17   Backpage, but her sister was.  Her sister's name is Cynthia

18   Worthy.  Her sister responded to a Backpage ad in August of

19   2015 and was ultimately murdered by the person who responded to

20   that ad.                                                         13:36:22

21          Obviously I am not going to get into that.  And I'm

22   going to try to steer around where she is, why she's not here,

23   what happened when she responded to the ad, any of that.  But

24   obviously, because this is a little bit different witness than

25   what we've been putting on, I want the Court to be aware that    13:36:39

1    I'm putting on someone who wasn't herself posted.  But she has

2    personal knowledge of her sister's activity on Backpage;

3    personally witnessed postings, personally witnessed her going

4    to CVS and purchasing things to go along with her dates, and

5    personally sat outside a couple of dates for a period of time          13:36:59

6    when her sister went in.

7         Obviously she can't put her in the room, can't be in

8    the room and say what actually transpired, but I think her

9    testimony is sufficiently based on her personal knowledge and

10   observations and does not include hearsay, that she can               13:37:15

11   adequately testify about what her sister was doing on Backpage.

12   And we'll also identify her sister's ad.

13        That's the limited purpose for which I intend to put

14   her on the stand, and I just wanted the -- Your Honor to be

15   aware of that and the defense.                                        13:37:32

16        I have told -- I've counseled Ms. Sanders that we're

17   going to try to steer around what happened to her sister and

18   not talk about that.  But I've also told her that if the

19   defense asks you a question, where's your sister, what happened

20   to her, that she has to answer truthfully.                            13:37:48

21        And so I just want the Court to be aware of that.  I

22   want the defense to be aware of that.  I don't want them

23   walking into a buzz saw.  I'm definitely going to try to steer

24   around that, and I just wanted the Court to be aware of that.

25        THE COURT:  All right.  So long as you can establish            13:38:02

```
 1    personal knowledge of her awareness of the ad, what she saw,
 2    what she did.  Nothing related to hearsay --
 3              MR. BERRY:  That's right.
 4              THE COURT:  -- will come in through her.  And just
 5    adhere to the Court's prior orders with regard to any other        13:38:18
 6    affiliated crimes --
 7              MR. BERRY:  That's right.
 8              THE COURT:  -- by third parties, and we should be
 9    fine.
10              MR. BERRY:  That's the plan, Your Honor.                 13:38:29
11              THE COURT:  All right.  Mr. Feder?
12              MR. FEDER:  That's actually what I wanted to talk to
13    the Court about.
14              This is cumulative.  It's obviously extraordinarily
15    concerning that something will come out that will violate 401     13:38:39
16    and 403.  The idea that they've brought this woman down from
17    Detroit to basically talk about hearsay and observations of an
18    alleged victim that, as Mr. Berry just said, she didn't really
19    see anything happen.
20              Their big relevance in regard to the 302 is that she    13:38:57
21    observed her -- her sister buy a credit card.  And I just don't
22    see the point of doing this at the risk of an obvious mistrial
23    if one word is mentioned by this woman.
24              THE COURT:  Well --
25              MR. FEDER:  I mean, we've had how many witnesses now    13:39:15
```

UNITED STATES DISTRICT COURT

1    that have talked about this same stuff, except they're actually

2    first-party witnesses to what happened.  And now it's another

3    one?

4           Just -- it just seems an un- -- an unnecessary risk.

5    It's 403 -- you know, definitely potential 403 that I could          13:39:31

6    promise you if one word comes out of her lips that -- that is

7    anything close to that something happened to her sister -- and

8    it's going to be obvious that she's here talking about her

9    sister, who is not here.  What do you think that's going to

10   infer to the jury?                                                   13:39:51

11          So I would ask the Court to preclude her as a risk

12   that you should not take and it's cumulative.

13          THE COURT:  Well, with respect to the cumulative

14   argument, I'll remind the parties that there are 51 counts

15   related to individual ads.  And so I don't find it to be           13:40:08

16   cumulative.  Now, it would be cumulative if the next witness

17   starts referring to ads that other of these witnesses have

18   testified about.  And so it's not cumulative, in my view.

19          There is the potential for the prejudicial statement

20   to come out that the sister is deceased, or what have you, but      13:40:34

21   all counsel have the obligation now, knowing that there's the

22   potential for that prejudice, not to probe the witness on that

23   area.

24          And so she's only offered for the narrow purpose of

25   identifying her sister's ad, watching what her sister's acts        13:40:52

UNITED STATES DISTRICT COURT

1   were with regard to paying for the ad, receiving cards or

2   whatnot to pay for those ads.  I think Mr. Berry said something

3   about watching her meet a person outside of a hotel room or

4   something of that nature.

5          And if it relates to the ad that is charged, then it          13:41:15

6   is relevant.  And so that's how we will proceed with that

7   witness.

8          Mr. Feder?

9          I'm sorry.  Mr. Kessler?

10          MR. KESSLER:  I wasn't going to talk about this, but          13:41:30

11   I -- I have to ask the government whether or not this is one

12   one of the charged ads.  I don't believe it is, but I could be

13   wrong.

14          Is it?

15          MR. BERRY:  Victim 16, Count 24.          13:41:48

16          MR. KESSLER:  Okay.

17          THE COURT:  All right.

18          MR. KESSLER:  I stand corrected.

19          Your Honor, just following up on Mr. Lincenberg's

20   concerns about sort of gratuitous and unnecessary evidence of          13:41:57

21   underaged prostitution, you know, what -- what's gone, you

22   know, before us is -- is done, but with any upcoming witnesses

23   that have been posters or the sister of a poster, contrary to

24   what Your Honor said, you said we can't do anything about it,

25   about the evidence of the age because they were, in fact, the          13:42:33

1   age that they were when they advertised.

2          But we can.  We can stop asking, for example, the

3   witness their age now, what their current age is.  It's

4   unnecessary.  It's not relevant.  But it does allow the jury to

5   do the math and determine that this person was underage.        13:42:55

6          Secondly, we can refrain from questions that are

7   clearly designed to draw out the fact that they were underage.

8   For example, did you rent the hotel room?  Well, if she's

9   underage, she can't, and she's going to tell us that.

10         That's not relevant to anything, other than that she     13:43:17

11  was underaged.  So --

12         THE COURT:  No, I -- you know, let me just stop you

13  there.  I've heard the arguments before, as has the prior

14  Court.  There was a ruling on this with regard to -- and it's

15  the same set of circumstances that necessarily child           13:43:34

16  prostitution is part of this as well and that they're clearly

17  advertisements where people were underage, as here.  And so it

18  is simply part of the case.

19         Now, we can't talk about child trafficking or things

20  of that nature, to the extent that the Court has already        13:43:56

21  admonished the government.  But it is relevant in terms of the

22  time that the ad was posed, the allegations in the indictment.

23         And so if it just so happens to be that one of these

24  individuals who posted the ad was 17 or 16 at the time, those

25  are facts.  And we are to put the facts before the jury so that 13:44:25

```
 1    they can find for themselves what is or is not relevant to the
 2    charges in the indictment.
 3            And so we're going to go forward in the manner in
 4    which I already -- --
 5            MR. KESSLER:  Judge --                                    13:44:43
 6            THE COURT:  -- instructed the parties.
 7            And let's move on to whatever it was you originally
 8    were going to talk about.
 9            MR. KESSLER:  Well, that's -- that's what I was going
10    to talk about.                                                   13:44:52
11            THE COURT:  Okay.  So then we'll --
12            MR. KESSLER:  It's --
13            THE COURT:  We'll reserve whatever else you're going
14    to talk about until the break.  We have a jury that's waiting,
15    and let's move forward.                                          13:45:00
16            MR. KESSLER:  Your Honor, I have -- I get the feeling
17    that there's a disconnect, that -- that the Court is not
18    understanding the point I'm trying to make.
19            They may have been 14 years old when they posted.  We
20    can't change that.  But by asking them what their age is now,   13:45:16
21    I'll -- that just points out.  It's like gratuitous evidence of
22    child prostitution, which I had been led to believe was
23    something we were going to try to mitigate against.
24            THE COURT:  The argument has been made, and it hasn't
25    been lost on me, Mr. Kessler.  There is no disconnect.  There's  13:45:43
```

```
 1    a prior order that specifically speaks to this.  I've made

 2    numerous oral pronouncements related to it.  And you can

 3    grimace all you want.

 4            MR. KESSLER:  I'm --

 5            THE COURT:  At some point it becomes exhausting, yes,     13:45:59

 6    for me as well.  But I'm going to -- I'll give you the precise

 7    order, I have them all here, the one that addresses this

 8    particular issue.  And I'll have you review it tonight.  And if

 9    you feel differently, if you feel that it says something

10    different, then you can come back and make a record.  But at     13:46:25

11    this juncture we're going to proceed in the way that I have

12    described previously, this morning and last week.  And that's

13    how we are going to proceed.

14            MR. KESSLER:  Very well.  Thank you.

15            THE COURT:  All right.  Let's have our jury in.          13:46:44

16            MR. CAMBRIA:  Could I make one comment?

17            I pulled up my opening, Your Honor.

18            THE COURT:  Okay.

19            MR. CAMBRIA:  And all I said was, "He, along with

20    Mr. Larkin, who you know is deceased, started when they were     13:46:55

21    students."

22            THE COURT:  Well, again --

23            MR. CAMBRIA:  That's it.  Nothing about how deceased

24    or whatever.

25            THE COURT:  Well, who you know is deceased --            13:47:05
```

UNITED STATES DISTRICT COURT

```
 1              MR. CAMBRIA:  Yeah.

 2              THE COURT:  -- is the issue.  The jurors, half of them

 3    didn't know that he was deceased.

 4              MR. CAMBRIA:  I don't think that's true at all.

 5              THE COURT:  I do believe so.  I think the voir dire      13:47:15

 6    will show that, Mr. Cambria.

 7              MR. CAMBRIA:  No.

 8              THE COURT:  All rise for the jury.

 9        (Jury present at 1:47 p.m.)

10              THE COURT:  All right.  Please be seated.              13:48:19

11              The jury is welcomed back from the extended lunch.  It

12    has been one of those moments where we had some things to

13    discuss that -- of a legal nature, and so I apologize for

14    keeping you waiting.

15              The government may call its next witness.             13:48:38

16              MS. PERLMETER:  Thank you.

17              The United States calls Astrid Cervantes.

18              THE COURT:  Ma'am, please come forward to my courtroom

19    deputy here and be sworn.

20              THE COURTROOM DEPUTY:  Please raise your right hand.   13:48:55

21        (ASTRID CERVANTES, a witness herein, was duly sworn or

22    affirmed.)

23              THE COURTROOM DEPUTY:  Thank you.

24              Please proceed to the witness stand.

25              MS. PERLMETER:  May I proceed, Your Honor?            13:49:26
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Yes, you may.
 2                      DIRECT EXAMINATION
 3   BY MS. PERLMETER:
 4   Q.  Good afternoon.
 5   A.  Good afternoon.                                    13:49:30
 6   Q.  Could you please introduce yourself to the members of the
 7   jury.
 8   A.  My name is Astrid Cervantes.
 9   Q.  Can you spell your first name.
10   A.  A-S-T-R-I-D.                                       13:49:38
11   Q.  And your last name.
12   A.  C-E-R-V-A-N-T-E-S.
13   Q.  Where are you from, Ms. Cervantes?
14   A.  Montana, California.
15   Q.  And for those of us unfamiliar, where in California is  13:49:47
16   that?
17   A.  Southern California.
18   Q.  And did you graduate from high school?
19   A.  Yes.
20   Q.  Do you have any licenses?                          13:49:54
21   A.  I have my cosmetology license and my NASM certification for
22   fitness training.
23   Q.  And what kind of work do you do?
24   A.  I'm a fitness trainer part time.
25   Q.  Do you have any children?                          13:50:08
```

ASTRID CERVANTES - DIRECT EXAMINATION

30

```
 1    A.  I have two boys.

 2    Q.  Okay.  And how old are you?

 3    A.  Me?

 4    Q.  Yes.

 5    A.  26.                                              13:50:14

 6    Q.  Okay.  What do you like to do in your free time?

 7    A.  I like to read.  Exercise mainly.

 8    Q.  Ms. Cervantes, have you heard of a web -- the website

 9    Backpage.com?

10    A.  Yes.                                             13:50:27

11    Q.  Now, what is Backpage.com?

12    A.  It's a website, based on my understanding, where you go and

13    advertise --

14         MR. KESSLER:  Objection.  That calls for speculation

15    and lacks foundation.                               13:50:39

16         THE COURT:  You can lay some foundation.

17         MS. PERLMETER:  Okay.

18         THE COURT:  I'll sustain the objection.

19    BY MS. PERLMETER:

20    Q.  Ms. Cervantes, were you advertised on Backpage.com?  13:50:46

21    A.  Yes.

22    Q.  So what do you know as to -- what do you know -- what --

23    what is Backpage.com?

24    A.  You go and advertise anything you want to sell.

25    Q.  And do you remember -- you told us you were advertised on  13:51:00
```

UNITED STATES DISTRICT COURT

1    Backpage.

2         Do you remember when you were advertised on

3    Backpage.com?

4    A.  You mean what year?

5    Q.  Yes.  What year or number of years were you advertised on        13:51:13

6    Backpage.com?

7    A.  2014, November, through January 2015.

8    Q.  Okay.  And were you involved in the creation of your

9    advertisements on Backpage.com?

10   A.  I was never the one posting.        13:51:31

11   Q.  I'm sorry?  What did you say?

12   A.  Can you rephrase your --

13   Q.  Sure.

14   A.  -- question?

15   Q.  And when you -- if you could do me a favor.  When you        13:51:38

16   answer the question, if you could please pull the microphone up

17   close to you and try to speak loudly so that we can all hear

18   you.

19         Is that okay?

20   A.  Yeah.        13:51:49

21   Q.  Okay.  Were you involved in the creation of the

22   advertisements that were made for you on Backpage.com?

23   A.  Yes.  I was posted, but --

24   Q.  Okay.

25   A.  -- I never --        13:52:01

```
 1    Q.  So what I mean is, did you create the ad?  Did you type the
 2    words or did you --
 3    A.  Never.
 4    Q.  Okay.  Do you know what you were advertised for?
 5    A.  For trafficking.                                              13:52:13
 6    Q.  What does that mean to you?
 7    A.  It means an act of -- exchange of money for sex acts.
 8    Q.  Now, you said you didn't post your ads.  Who created the
 9    advertisements that were advertising you on Backpage.com?
10    A.  Someone named -- that goes by the name L.G.                   13:52:33
11    Q.  Anyone else?
12    A.  Star.
13    Q.  Okay.  And are those the names that you know these people
14    as?
15    A.  Yeah.                                                         13:52:42
16    Q.  Okay.  So who was L.G.?
17    A.  He was the pimp, mainly.
18    Q.  And what does pimp mean to you?
19    A.  Well, the one that was doing -- he was the guy doing all
20    the trafficking, everything for me.                              13:52:56
21    Q.  Okay.  And who is Star?
22            MS. BERTRAND:  Your Honor, objection.  Move to strike
23    as to prior orders.
24            THE COURT:  Overruled, as the witness has provided a
25    definition.                                                      13:53:09
```

```
 1   BY MS. PERLMETER:
 2   Q.   And who is Star?
 3   A.   She was one of the girls that was also being trafficked.
 4   Q.   Okay.  And can you tell us what she looked like?
 5   A.   She was Caucasian, blonde.                          13:53:22
 6   Q.   Okay.  And was she also advertising -- do you know if she
 7   was advertising as well on Backpage.com?
 8   A.   Yes.
 9   Q.   So were you aware that there were photographs -- like were
10   there photographs taken of you to use in the Backpage      13:53:39
11   advertisements?
12   A.   Yeah.
13   Q.   Okay.  Who took those photos?
14   A.   It was both of them, L.G. and Star.
15   Q.   Where were those photos taken?                      13:53:51
16   A.   In a motel room in San Bernardino.
17   Q.   Okay.  Is that in California?
18   A.   Yes.
19   Q.   How did you get to the motel?
20   A.   L.G. picked me up from home and drove me to San Bernardino.  13:54:01
21   Q.   Okay.  Were you given instructions, for example, what
22   clothes to bring for the photos?
23   A.   Yeah.  He told me what to bring.
24   Q.   What clothing did you bring for the purpose of taking
25   photographs?                                             13:54:19
```

34

```
 1    A.  He told me to bring different pairs of underwears and bra.
 2    Basically lingerie.
 3    Q.  And then when you got to the motel room, did L.G. and Star
 4    take photos of you?
 5    A.  Yeah.                                                          13:54:31
 6    Q.  And what -- did those photographs, were they later used to
 7    post ads for you on Backpage.com?
 8    A.  Yeah.
 9    Q.  Okay.  Now, I think you told us that you did not write any
10    of the words that went into your advertisements; is that right?   13:54:41
11    A.  Yes, that's correct.
12    Q.  Do you know who did?
13    A.  It was mainly L.G.
14    Q.  Did anybody else write any of the words that went into your
15    ads?                                                              13:54:52
16    A.  I don't remember.
17    Q.  Do you know how L.G. created your ads?  And what I mean is,
18    did -- what kind of device L.G. may have used.
19            MS. BERTRAND:  Objection.  Relevance.
20            THE COURT:  Overruled.                                    13:55:06
21            THE WITNESS:  A cell phone.
22    BY MS. PERLMETER:
23    Q.  And did you happen to see your ad at some point after it
24    was posted on Backpage.com?
25    A.  Yeah.  He showed me.                                          13:55:18
```

```
 1   Q.  Okay.  What name did you use on your Backpage.com
 2   advertisements?
 3   A.  He came up with the name Fire.
 4   Q.  And is that the name that you went by when you were posted
 5   on Backpage?                                                      13:55:33
 6   A.  Yes.
 7   Q.  Now, what would happen after your ad on Backpage was
 8   posted?
 9   A.  So basically just wait around for clients to call and text
10   for the service.                                                  13:55:50
11   Q.  Okay.  And what do you mean by "client"?
12   A.  Well, that's what we called them, the men that would want
13   to exchange the money for sex.
14   Q.  Okay.  And what do you mean by "service"?
15   A.  Well, that sex is a service.                                  13:56:03
16   Q.  Okay.  So who handled the phone calls and the making of the
17   arrangements?
18   A.  Star was answering the phone for me so that -- because I
19   didn't know what to do.  So she'll be the one that was doing
20   all the talking for me.                                           13:56:22
21   Q.  Okay.  So then what would -- would then a -- a client come
22   to -- well, where did the meetings take place, the meetings
23   with the clients?
24   A.  In a hotel room.
25   Q.  Okay.  And, in general, how would you get to these motel     13:56:34
```

1    rooms or hotel rooms?

2    A.  Well, L.G. would pick me up from my house, and then we

3    would start as soon as we arrived at the motel.

4    Q.  Okay.  And then once you're in the motel room or the hotel

5    room and the client appears, what happens?                    13:56:58

6    A.  Well, the client would text me saying that he's here, and

7    then everybody, like Star and L.G., would leave the room.

8    Q.  Okay.  Do you know where Star and L.G. would leave when the

9    client arrived?

10   A.  I don't know.                                             13:57:15

11   Q.  Okay.  And then what happened when they left and the client

12   was in the room?

13   A.  Well, I would -- I think I remember I would, like, accept

14   the money first, and then I would text L.G., got money --

15   Q.  Okay.                                                     13:57:35

16   A.  -- so that he'll know.

17   Q.  And what happened after you received the money and texted

18   L.G. that you got the money?

19   A.  Then the service will begin.

20   Q.  Okay.  And is that when you exchanged the sex acts with the 13:57:44

21   client?

22   A.  Yes.

23   Q.  Okay.  And I don't mean to be graphic, but can you just --

24   it's important for the jury to understand what you mean by "sex

25   acts."  So can you just define for us generally what -- what   13:58:00

```
 1   you -- what that means to you.
 2   A.  Sexual intercourse.
 3   Q.  What happened after the -- the meeting was over?
 4   A.  The client would leave, and I would text L.G. that it's
 5   done.                                                          13:58:16
 6   Q.  Okay.  After you texted L.G. you were done, what happened
 7   after that?
 8   A.  Well, he would come back into the room and he held onto the
 9   money.
10   Q.  Okay.  You gave him the money?                             13:58:25
11   A.  Yes.
12   Q.  The hotel rooms where these dates took place, did you pay
13   for these rooms?
14   A.  No.
15   Q.  Do you know who did?                                       13:58:36
16   A.  Either Star or L.G.
17   Q.  And where did these dates take place?  Like in, like, what
18   cities?
19   A.  Mainly in San Bernardino, but we also went to Oceanside and
20   a little bit in Apple Valley.                                  13:58:52
21   Q.  Okay.  So did L.G. or Star also advertise for you in other
22   places in California?
23   A.  It was mainly on -- outside of California?
24   Q.  No.  In California.  I think you said Oceanside?
25   A.  Yeah.                                                      13:59:09
```

1    Q.   Is that in California?

2    A.   Yes.  It's towards --

3    Q.   I --

4    A.   -- San Diego.

5    Q.   Okay.  It's close to San Diego?                          13:59:14

6         Were -- did L.G. or Star ever post or advertise you

7    somewhere other than California?

8    A.   No.

9         Oh, other than California, yes.

10   Q.   Outside of California.  Did they post you in a different  13:59:26

11   city or state?

12   A.   In Arizona.

13   Q.   Okay.

14   A.   Yes.

15   Q.   So they posted an advertisement for you on Backpage in    13:59:33

16   Arizona?

17   A.   Yes.

18   Q.   Okay.  When was this?

19   A.   2015, January -- around the Super Bowl time in January --

20   Q.   Okay.                                                      13:59:47

21   A.   -- 30th.

22   Q.   So in January of 2015, was it towards the end of the month?

23   A.   Yeah.

24   Q.   And where was the Super Bowl taking place?

25   A.   I believe it was Phoenix, Arizona.                         13:59:59

```
 1    Q.   Okay.  So did L.G. decide that he would come out here with

 2    you and post you on Backpage out here?

 3               MR. CAMBRIA:  Objection.

 4               MS. BERTRAND:  Objection.  Leading.

 5               MR. CAMBRIA:  Leading.                          14:00:14

 6               THE COURT:  Sustained.

 7    BY MS. PERLMETER:

 8    Q.   All right.  Whose idea was it to come out to Arizona and

 9    post Backpage ads here?

10    A.   His idea.                                             14:00:20

11    Q.   Okay.  And do you know why he decided to do that?

12    A.   Well, he thought we would make a lot of money coming here.

13    Q.   Okay.  Ms. Cervantes, do you know someone named Storm?

14    A.   Yes.

15    Q.   Okay.  Who is Storm?                                 14:00:34

16    A.   She was one of the new girls that joined the same weekend

17    when we came out to Arizona.

18    Q.   Okay.  So did you meet -- where did you -- where did you

19    meet Storm, like a -- a few days before you came out to

20    Arizona?                                                  14:00:50

21    A.   I met her the night before we drove out here in Arizona.

22    Q.   Okay.  What does -- what -- what did Storm look like?

23    A.   She was African-American.  And that's all I remember.

24    Q.   Okay.  And when you met Storm, were you and L.G. all still

25    in California?                                            14:01:07
```

```
 1    A.  Yeah.

 2    Q.  Okay.  How -- and then did you guys all travel together

 3    from California to the Phoenix area?

 4    A.  Yeah.  All four of us did.

 5    Q.  Okay.  And when you said "all four," who were the four      14:01:15

 6    people that came from --

 7    A.  So me, Storm, L.G., and Star.

 8    Q.  Okay.  How did you get out here?

 9    A.  L.G. and Star were taking turns driving.

10    Q.  Okay.  Do you know whose car it was?                       14:01:28

11    A.  I'm not sure if it was Star's or L.G.

12    Q.  Okay.  Did you pay for any of the gas?

13    A.  No.

14    Q.  Did you pay for any of the food or snacks you guys may have

15    eaten on the way out?                                          14:01:37

16    A.  No.

17    Q.  When you arrived to Arizona, was it the Phoenix area?

18    A.  I believe so.

19    Q.  Okay.  Where did you go?

20    A.  When we arrived?                                           14:01:49

21    Q.  Yes.

22    A.  In a motel, but I'm not sure which one it was.

23    Q.  Okay.  Was it a motel here in the Phoenix area somewhere?

24    A.  Yeah.

25    Q.  And what happened once you got to the -- this motel?       14:02:00
```

UNITED STATES DISTRICT COURT

1    A.  Firstly, we started setting up our profiles.  But I wasn't

2    the one setting it up.  It was L.G.

3    Q.  Okay.

4    A.  So everybody was just doing their profiles.

5    Q.  Okay.  What do you mean everybody -- what do you mean by          14:02:14

6    "profile"?

7    A.  Their Backpage profile ad.

8    Q.  Okay.  And you said everyone was doing their profile.  So

9    who was everyone?

10   A.  Storm was.  Star.  And L.G. was doing mine.                       14:02:23

11   Q.  Okay.  So did L.G. post a Backpage ad of you here in the

12   Phoenix area once you got here?

13   A.  Yeah.

14   Q.  Okay.  And did you do any dates here in Phoenix?

15   A.  I did a few.                                                      14:02:39

16   Q.  Okay.  Did -- where did they take place?

17   A.  In a motel room.

18   Q.  And what happened with the money when you were here in

19   Phoenix?  Was it similar to what would happen in California?

20   A.  Yeah.                                                             14:03:00

21   Q.  Where were -- where was L.G. when you were having your

22   dates?

23   A.  I'm not sure.

24   Q.  Okay.  Do you -- was -- do you know where Star was?

25   A.  Star?                                                            14:03:14

```
 1   Q.  Yeah.
 2   A.  I'm not sure.  She might have been doing her own.
 3   Q.  Okay.  And how about Storm?  Do you know where she was?
 4   A.  No.
 5   Q.  Okay.  Did you eventually move to a different motel?        14:03:22
 6   A.  Yes.
 7   Q.  And when was that?
 8   A.  When?
 9   Q.  Yeah.
10   A.  I think it was the next day.  The next --                   14:03:28
11   Q.  Okay.
12   A.  -- morning, I believe.
13   Q.  So the next day you switched to a different motel?
14   A.  Yeah.
15   Q.  And then were there more Backpage ads or the same ads still 14:03:38
16   being used to advertise you?
17   A.  Yeah.
18   Q.  Okay.  Did -- did you learn that there was a client who
19   wanted a two girl special?
20           MS. BERTRAND:  Objection.                               14:03:54
21           THE WITNESS:  Yes.
22           MS. BERTRAND:  Leading.
23           THE COURT:  Sustained.
24   BY MS. PERLMETER:
25   Q.  Okay.  Did you learn about a particular date that a client  14:03:57
```

UNITED STATES DISTRICT COURT

ASTRID CERVANTES - DIRECT EXAMINATION

43

```
 1   requested in the second motel?
 2            MS. BERTRAND:  Same objection.  Leading.
 3            THE COURT:  Sustained.
 4   BY MS. PERLMETER:
 5   Q.  What happened in the second motel?                      14:04:14
 6   A.  Well, I think we just -- we just got there, right, and I
 7   think somebody requested a two girl special.
 8   Q.  Okay.
 9   A.  Looking for a threesome.
10            So I don't know whose phone it might have been.  It   14:04:28
11   wasn't -- I don't know if it was mine or Storm's.
12            MS. BERTRAND:  Your Honor, objection to this line of
13   questioning as to relevance and 403.
14            THE COURT:  Overruled.  I'll give Ms. Perlmeter
15   limited leeway.                                              14:04:42
16   BY MS. PERLMETER:
17   Q.  And what was your understanding as to what was -- what was
18   expected of you for this client?
19            MS. BERTRAND:  Same objection.
20            THE COURT:  Overruled.                              14:04:51
21   BY MS. PERLMETER:
22   Q.  You can answer, if you know.
23   A.  Can you repeat it?
24   Q.  Sure.
25            What was -- what was the -- what did you think was   14:04:59
```

UNITED STATES DISTRICT COURT

1  expected of you in regards to this client who wanted the
2  threesome?
3  A.  Well, basically the same thing, I guess, as having a
4  service.
5  Q.  Okay.  Having a service with you?                    14:05:16
6  A.  And Storm.
7  Q.  And Storm.  Okay.
8        So was she -- was Storm with you in the motel when --
9  on that second day?
10 A.  Yeah.                                                 14:05:28
11 Q.  Okay.  Did somebody show up -- did somebody show up for
12 this date?
13 A.  Yes.
14 Q.  And did the person who showed up turn out to be an
15 officer working undercover?                               14:05:40
16 A.  Yes.
17 Q.  Okay.  And after that, did you stop working for L.G.?
18 A.  Yeah.
19 Q.  Okay.  And during this time that you were with L.G., did
20 you observe him to have any legitimate form of employment?  14:05:53
21        MS. BERTRAND:  Objection.  Calls for speculation.
22        THE COURT:  Overruled.
23        She can answer if she has knowledge.
24        THE WITNESS:  Can you repeat that?
25    ///

ASTRID CERVANTES - DIRECT EXAMINATION
                                                                        45

```
 1   BY MS. PERLMETER:

 2   Q.   During the time that you were with L.G., did you observe

 3   him to have any legitimate form of employment?

 4            MR. FEDER:  Relevance.

 5            THE WITNESS:  He did not.                          14:06:13

 6            THE COURT:  Overruled.

 7            MS. PERLMETER:  Okay.

 8            THE COURT:  The answer will stand.

 9   BY MS. PERLMETER:

10   Q.   Now, Astrid, I want to show you a few exhibits that have  14:06:23

11   already been admitted.

12            MS. PERLMETER:  I'm showing the witness Exhibit 217a,

13   which is in evidence.

14            THE COURTROOM DEPUTY:  Ms. Perlmeter, are you

15   connected?                                                 14:06:46

16            THE COURT:  It doesn't appear you're connected.

17            MS. PERLMETER:  Oh.

18   BY MS. PERLMETER:

19   Q.   Ms. Cervantes, do you see the exhibit?

20   A.   Yeah.                                                 14:07:15

21   Q.   Okay.  What is the date of this posting?

22   A.   January 29th, 2015.

23   Q.   And where was it posted?

24   A.   Inland Empire.

25   Q.   Okay.  Where is the Inland Empire?  Do you know?      14:07:39
```

46

```
 1   A.  San Bernardino County, California.

 2   Q.  I'm going to scroll down a few pages.  I'm going to show

 3   you a series of photographs; one, two, three, four.

 4         Do you recognize the person in these photos?

 5   A.  Yes.                                                    14:08:06

 6   Q.  Who is it?

 7   A.  Storm.

 8         MS. PERLMETER:  Okay.  I'm showing the witness Exhibit

 9   Number 217, which is in evidence.

10   BY MS. PERLMETER:                                           14:08:20

11   Q.  Ms. Cervantes, where was this exhibit posted?

12   A.  In Phoenix.

13   Q.  And on what day was it posted?

14   A.  January 31st.

15   Q.  And what year?                                          14:08:41

16   A.  2015.

17   Q.  Is this when you were in Phoenix for the Super Bowl?

18   A.  Yes.

19   Q.  I'm going to scroll down and show you the photos.

20         Do you recognize the person in these pictures?        14:08:58

21   A.  Yes.

22   Q.  Who is it?

23   A.  It's Storm.

24   Q.  Now I'm going to show you Exhibit 215a, which is also in

25   evidence.                                                  14:09:28
```

ASTRID CERVANTES - DIRECT EXAMINATION
47

```
 1              Can you tell me what date this was posted?

 2   A.   November 23rd, 2014.

 3   Q.   And in what city was this ad posted in?

 4   A.   San Diego.

 5   Q.   Okay.  I'm going to scroll through, and I'd like you to        14:09:53

 6   please take a look at the photos.

 7              Do you recognize the person in these pictures?

 8   A.   Yes.

 9   Q.   Who is it?

10   A.   Me.                                                            14:10:11

11   Q.   Okay.  Are these the photos that you were telling us about

12   earlier that L.G. took of you in the motel?

13   A.   Yeah.

14   Q.   Okay.  I'm showing you Exhibit 215, which has also been

15   admitted into evidence.                                             14:10:29

16              Astrid, can you tell us what date that this ad was

17   posted?

18   A.   January 31st, 2015.

19   Q.   And in what city was the ad posted in?

20   A.   Phoenix.                                                       14:10:47

21   Q.   Okay.  Is this when you traveled with L.G. and Star and

22   Storm from California to Phoenix for the Super Bowl?

23   A.   Yeah.

24   Q.   If you could also briefly look at these photos, and let me

25   know if you recognize who that person is.                          14:11:02
```

UNITED STATES DISTRICT COURT

1          Do you recognize the person in the photos?

2    A.  Yeah.

3    Q.  Who is it?

4    A.  It's me.

5    Q.  Okay.  Astrid, just a couple more questions for you.          `14:11:16`

6          I want to ask you if you know any -- I'm going to

7    ask -- I'm going to give you a couple names, and I'm going to

8    ask you if you know any of them.  Okay?

9          Do you recognize any -- do you know anyone named

10   Michael Lacey?          `14:11:36`

11   A.  No.

12   Q.  Do you know anyone named Scott Spear?

13   A.  No.

14   Q.  Do you know anyone named Jed Brunst?

15   A.  No.          `14:11:42`

16   Q.  How about Andrew Padilla?

17   A.  No.

18   Q.  And how about Joye Vaught?

19   A.  No.

20   Q.  Okay.          `14:11:45`

21          MS. PERLMETER:  Okay.  No further questions for the

22   witness, Your Honor.

23          THE COURT:  All right.  Who is cross-examining this

24   witness?

25          Mr. Eisenberg.  I see you're at the ready.          `14:11:57`

UNITED STATES DISTRICT COURT

1           May I proceed, Your Honor?

2           THE COURT:  Yes, you may.

3                     CROSS-EXAMINATION

4    BY MR. EISENBERG:

5    Q.  Good morning -- good afternoon.                    14:12:09

6    A.  Good afternoon.

7    Q.  I represent Mr. Padilla, the gentleman to my left.

8           You have never seen him before today, I take it?

9    A.  No.

10   Q.  Ms. Cervantes, you have indicated that you didn't actually   14:12:19

11   post the ad.  Somebody else did; is that correct?

12   A.  Correct.

13   Q.  And you didn't pay for the ads.  Somebody else did;

14   correct?

15   A.  Right.                                             14:12:37

16   Q.  And that you didn't take the photographs that we've seen of

17   yourself.  Somebody else did; is that correct?

18   A.  Right.

19   Q.  And that when you got money and money you gave -- you gave

20   to, is it L.G.?                                        14:12:56

21   A.  Yeah.

22   Q.  Is L.G. also known as Jerome?

23   A.  He is.

24   Q.  And when you gave the money to Jerome, you don't know what

25   he did with it; correct?                              14:13:05

```
 1    A.  I have no idea.
 2    Q.  Okay.  As far as you know, though, he didn't pay Backpage
 3    except for the ad; is that right?
 4    A.  I'm -- I'm guessing.
 5    Q.  Well, we don't want you to guess, so --              14:13:19
 6    A.  Well, I don't know the answer.
 7    Q.  Okay.  That's fine.
 8         Now, when you came out here during Super Bowl time,
 9    you came out with a couple of other people; correct?
10    A.  Yeah.                                                 14:13:29
11    Q.  And then there came a time when an ad was posted; correct?
12    A.  Correct.
13    Q.  And that ad -- one of the ads is number 215.
14         MR. EISENBERG:  May we have that back up on the
15    monitor again?                                            14:13:43
16    BY MR. EISENBERG:
17    Q.  Ma'am, do you recognize this ad?
18    A.  Yes.
19    Q.  That ad is -- this is you; is that correct?
20    A.  Yeah.                                                 14:13:50
21    Q.  And in this first picture, ma'am, would you agree with me
22    you're fully clothed, aren't you?
23    A.  Yeah.
24    Q.  And would you agree with me in all of the other pictures
25    you are fully clothed; right?                             14:14:03
```

1  A.  Right.

2  Q.  There's no place in this ad where it says "sex for money,"

3  is there?

4  A.  Well, I don't know.  I've never even wrote it, so --

5  Q.  Okay.                                                      14:14:14

6  A.  -- whatever it is, I didn't -- I didn't even know about it.

7  Q.  I -- I understand that.

8          But if you look at the ad, in no place does it say

9  "sex for money," does it?

10 A.  No.                                                        14:14:25

11 Q.  Okay.  Now, my understanding -- excuse me.

12         You weren't forced to work this type of work, were

13 you?

14 A.  Well, I was in -- already stuck in this situation with this

15 guy.  So, I mean, it was consensual, but it was also           14:14:44

16 uncomfortable for me to do.

17 Q.  I understand that.  But you weren't forced to do it, were

18 you?

19         MS. PERLMETER:  Objection.

20         THE WITNESS:  No.                                      14:14:56

21         MS. PERLMETER:  Relevance.

22         THE COURT:  Sustained.

23 BY MR. EISENBERG:

24 Q.  You weren't brought to Phoenix against your will, were you?

25         MS. PERLMETER:  Objection.  Relevance.                 14:15:05

UNITED STATES DISTRICT COURT

 1          MR. EISENBERG:  Your Honor, it goes to --

 2          THE COURT:  I'll permit him some leeway.

 3   Mr. Eisenberg can have a little leeway.

 4          MR. EISENBERG:  Thank you, Your Honor.

 5          THE COURT:  You may answer the question.          14:15:17

 6   BY MR. EISENBERG:

 7   Q.  You weren't forced to come to Phoenix, were you?

 8   A.  No.

 9   Q.  And with respect to all of the other postings and issues --

10   I'm sorry.  Let me revise that.          14:15:26

11          All of the other visitations, can I use that word, by

12   johns, you weren't forced to do that either, were you?

13   A.  No.

14          MR. EISENBERG:  Thank you, ma'am.

15          That's all I have, Your Honor.          14:15:37

16          THE COURT:  All right.  Anyone else from defense?

17          Mr. Cambria?

18          MR. CAMBRIA:  No, Your Honor.

19          THE COURT:  Ms. Bertrand?

20          MS. BERTRAND:  No, thank you.          14:15:46

21          THE COURT:  Mr. Lincenberg?

22          MR. LINCENBERG:  No, Your Honor.

23          THE COURT:  Mr. Kessler or Mr. Feder?

24          MR. FEDER:  No, thanks.

25          THE COURT:  All right.  Ms. Perlmeter, any redirect?          14:15:52

 1          MS. PERLMETER:  No, Your Honor.

 2          THE COURT:  May the witness be excused from subpoena?

 3          MS. PERLMETER:  Yes.

 4          THE COURT:  Any objection from the defense?

 5          MR. EISENBERG:  No, Your Honor.                    14:16:05

 6          MR. KESSLER:  No.

 7          THE COURT:  And, ma'am, we thank you for your

 8   testimony.  You are released from your subpoena, and you may

 9   step down.

10          THE WITNESS:  Thank you, Your Honor.               14:16:13

11          THE COURT:  Call your next witness.

12          MS. PERLMETER:  The next witness is Andrea Benson.

13          THE COURT:  Ma'am, please come forward and be sworn by

14   my courtroom deputy.

15          THE COURTROOM DEPUTY:  Please raise your -- please     14:17:03

16   raise your right hand.

17      (ANDREA BENSON, a witness herein, was duly sworn or

18   affirmed.)

19          THE COURTROOM DEPUTY:  Please step over to the witness

20   stand.  Thank you.                                       14:17:18

21          MS. PERLMETER:  May I proceed, Your Honor?

22          THE COURT:  You may.

23          MS. PERLMETER:  Okay.

24      ///

25      ///

```
 1                        DIRECT EXAMINATION

 2    BY MS. PERLMETER:

 3    Q.   Good afternoon.

 4          Could you please introduce yourself to the jury.

 5    A.   Andrea Benson.                                        14:17:39

 6    Q.   Okay.  Please spell your first name and then your last

 7    name.

 8    A.   A-N-D-R-E-A, B-E-N-S-O-N.

 9    Q.   And, Ms. Benson, do you have a little bit of a cold today?

10    A.   I do, yes.                                            14:17:49

11    Q.   Okay.  So just for the safety of all of us in the

12    courtroom, could you please put a mask on.

13    A.   Yes.  I just have to put a cough drop in my mouth, too.

14    Q.   Okay.  And there's also a cup of water at the table if you

15    need it.                                                  14:18:03

16    A.   Thank you.

17    Q.   All right.  Ms. Benson, where -- where are you traveling

18    from today?

19    A.   The Bay area.

20    Q.   Okay.  And is that where you live?                   14:18:17

21    A.   Yes, it is.

22    Q.   Okay.  And how far did you get in school?

23    A.   I have my master's degree.

24    Q.   Okay.  What did you get your undergraduate in?

25    A.   Psychology.                                          14:18:27
```

```
 1    Q.   Okay.  And what is your master's in?

 2    A.   Sport and performance psychology.

 3    Q.   Okay.  Are you working currently?

 4    A.   I'm on maternity leave currently.

 5    Q.   Okay.  Did you recently have a baby?                    14:18:37

 6    A.   I did.

 7    Q.   Okay.  When you were working, what type of work do you do?

 8    A.   I did finance for about six years, and then I went into

 9    personal training, got my master's, and now I'm in staffing.

10    Q.   Okay.  And how old are you, Ms. Benson?                 14:18:53

11    A.   33.

12    Q.   Okay.  Have you ever heard of a website called

13    Backpage.com?

14    A.   Yes, I have.

15    Q.   And what is Backpage.com?                               14:19:01

16    A.   Classifieds and escort ads.

17    Q.   Okay.  And what are escort ads to you in relation to

18    Backpage.com?

19    A.   Escort ads are used to sell sex.

20    Q.   Okay.  Have you ever been advertised on Backpage.com?  14:19:14

21    A.   Yes, I have.

22    Q.   Can you tell us what year or years you were posted on

23    Backpage?

24    A.   I would say November or December of 2012 through March of

25    2015.                                                       14:19:29
```

1  Q.  Okay.  What were you advertised for on Backpage?

2  A.  Sexual acts.

3  Q.  Okay.  Did you create your ads, or were your ads created by

4  somebody else, or both?

5  A.  Both.                                                    14:19:43

6  Q.  Okay.  Let's talk about the time when your advertisements

7  were being created by somebody else first.  Okay?

8  A.  (No audible response.)

9  Q.  Do you know somebody named Michael Knight?

10  A.  I do.                                                   14:19:56

11  Q.  Okay.  And who is he?

12  A.  He was my pimp.

13  Q.  Okay.  And is he the person that was creating ads for you

14  on Backpage?

15  A.  Yes, he was.                                            14:20:05

16  Q.  Okay.  Do you know where -- in what cities or where he was

17  posting you on Backpage?

18  A.  The Portland, Oregon, area, and Salem, Oregon, area.

19  Q.  Okay.  And what would happen when Mr. Knight would post an

20  advertisement for you on Backpage?                          14:20:28

21  A.  I would start receiving phone calls and text messages for

22  my services.

23  Q.  Okay.  And did Mr. Knight have other females working for

24  him at this same time?

25  A.  Yes.  He had five to six other girls.                   14:20:39

1    Q.  Okay.  And what were they doing?  Were they doing the same

2    thing as you?

3    A.  Yes, they were.

4    Q.  Okay.  Did the advertisements that Mr. Knight posted for

5    you on Backpage include any photos?                                14:20:55

6    A.  Yes, they did.

7    Q.  Did you happen to see the ads that Mr. Knight posted for

8    you?

9    A.  I did at some point.  Not initially.

10   Q.  Okay.  But when they were being posted, how did those         14:21:04

11   photographs -- like, when were those photographs taken?

12   A.  Those photographs were taken in November of 2012.

13   Q.  Okay.  Where were they taken?

14   A.  They were taken in our home and a hotel.

15   Q.  Okay.  And were you provided any instructions on what to       14:21:22

16   wear or how to pose, for example?

17   A.  Yes, I was.

18   Q.  And how -- and what were you told to wear?

19   A.  Sometimes I would wear provocative clothing, and there are

20   also photos of me not wearing any clothing.                       14:21:34

21   Q.  Okay.  Were you at this point part of the drafting on which

22   words or what text would be included in your ad?

23   A.  No.

24   Q.  Okay.  And who was in charge of that?

25   A.  Michael was.                                                   14:21:48

1    Q.  Okay.  Did you have a particular name that you used, or did

2    you use your real name when Mr. Knight was posting these ads?

3    A.  I used the name Rachel.

4    Q.  Okay.  Did you pay for the Backpage ads at this point in

5    time?                                                        14:22:04

6    A.  No, I did not.

7    Q.  Okay.  Do you know who did?

8    A.  Michael did.

9    Q.  Okay.  And then once the ads went live, you said that the

10   phone would start ringing.  And then what would you do at that   14:22:13

11   point, if anything?

12   A.  I would answer the phone.

13   Q.  Okay.  What was Mr. Knight doing?

14   A.  He would answer text messages.

15   Q.  Okay.  And so when you answered the phone, what -- what      14:22:23

16   were you having conversations about, generally?

17   A.  We were having conversations about the sexual services that

18   I would provide and how much those would cost.

19   Q.  Okay.  And then after those conversations, what would

20   happen next?                                                  14:22:39

21   A.  They would come to my hotel.

22   Q.  Okay.  And did you guys use -- go to different hotels on

23   different days?

24   A.  Yes, we did.

25   Q.  Okay.  So what would happen when a -- when -- when a john    14:22:49

1    would come to the hotel?

2    A.  He'd knock on the door.  I would let him in.  I would ask

3    for the donation, which is the -- the payment.  And then I

4    would take it into the bathroom to count it, hide it, and then

5    we would proceed with performing whatever sexual acts they had          14:23:08

6    asked for.

7    Q.  Okay.  And where was Mr. Knight when this was happening?

8    A.  Either the car or the lobby.

9    Q.  Okay.  After the act was over or after the date was over --

10   before we go there, let me just ask you, so that the jury               14:23:30

11   understands, what sexual acts mean to you.

12          What would happen -- what would you do with the johns

13   that came to the hotel room after they gave you money?

14   A.  Oral sex or vaginal sex.

15   Q.  Okay.  And then after that was completed, did the john             14:23:45

16   leave?

17   A.  Yes.

18   Q.  And then did you ask Mr. Knight to come back to the room?

19   A.  Yes, I did.

20   Q.  And then what would happen with the money?                         14:23:54

21   A.  He would take the money with him.

22   Q.  Okay.  Do you know -- or did you pay for these hotel rooms

23   when you were with Mr. Knight?

24   A.  No, I did not.

25   Q.  Okay.  Do you know who did pay for them?                           14:24:16

 1    A.  He did.

 2    Q.  Okay.  Did you observe Mr. Knight having a legitimate

 3    source of employment during the time that you were with him?

 4          MS. BERTRAND:  Objection.

 5          THE WITNESS:  No.                                    14:24:26

 6          MS. BERTRAND:  Speculation.

 7          THE WITNESS:  This was --

 8          THE COURT:  Overruled.  She can testify as to what she

 9    observed.

10    BY MS. PERLMETER:                                          14:24:32

11    Q.  Did you observe Mr. -- during the time that you were with

12    him whether Mr. Knight had any legitimate form of employment?

13    A.  No.  We were always together, and he did not do anything

14    else.

15    Q.  Okay.  So how did he pay for the Backpage ads?          14:24:42

16    A.  With his debit card.

17    Q.  Okay.  And where did the money come from that went into his

18    debit card?

19    A.  From me.

20    Q.  Okay.  And was it from the -- the dates that you were going  14:24:52

21    on?

22    A.  Yes, it was.

23    Q.  About how long did -- did -- were you working for

24    Mr. Knight?

25    A.  Four months.                                           14:25:02

1    Q.  Okay.  And at some point did you stop working for him?

2    A.  Yes, I did.

3    Q.  Do you remember when that was?

4    A.  It was in March of 2013, March 19th.

5    Q.  Okay.  And was that the day when a john -- what -- who you     14:25:14

6    thought was a john came to a hotel to have sex with you?

7    A.  Yes.

8    Q.  And that person ended up being an undercover police

9    officer?

10   A.  Yes.                                                          14:25:29

11   Q.  And after that day, did you stop working for Mr. Knight?

12   A.  Yes.

13   Q.  What city were you in when this happened?

14   A.  Portland.

15   Q.  Okay.  Is that in Oregon?                                     14:25:37

16   A.  Yes.

17   Q.  Okay.  After you stopped working for Mr. Knight, did you

18   continue to have ads posted on Backpage?

19   A.  Yes, I did.

20   Q.  Okay.  And who was posting at this point?                     14:25:49

21   A.  I was.

22   Q.  Okay.  Now, with Mr. Knight, you did not post ads.  So how

23   did you learn how to create an advertisement for yourself on

24   Backpage?

25   A.  By looking at my old ads and looking at other girls' ads.    14:26:03

1   Q.  Okay.  How were you able to find your old ads on

2   Backpage.com?

3   A.  Looking for my phone number.

4   Q.  Okay.  So how did -- like, can you tell the jury how that

5   worked?  How did you use your phone number to find other ads          14:26:17

6   that were on Backpage for you?

7   A.  You just type it into Google.

8   Q.  Okay.  Okay.  And what kind of pictures did you use at this

9   point when you were creating your own ads?

10  A.  Provocative and nude pics --                                      14:26:35

11  Q.  Okay.

12  A.  -- pictures as well.

13  Q.  Were they of you?

14  A.  Sometimes they were; sometimes they weren't.

15  Q.  Okay.  What cities did you post in?                               14:26:43

16  A.  I posted in the Portland area, the Seattle/Tacoma area, and

17  the San Francisco Bay area.

18  Q.  Okay.  And did you use your real name when posting ads on

19  Backpage?

20  A.  No, I did not.                                                    14:26:58

21  Q.  Okay.  Why not?

22  A.  It was not safe to do so.

23  Q.  Okay.  What's -- what section on Backpage were you posting

24  in at this time?

25  A.  I believe it was called the escort section.                      14:27:07

```
 1   Q.  Okay.  And what was the purpose of your advertising on
 2   Backpage?  What were you selling?
 3   A.  I was selling myself.
 4   Q.  Okay.
 5   A.  Sex.                                                      14:27:18
 6   Q.  Now, were your ads, did they -- did you phrase your
 7   advertisements so that there were words in the ad that were
 8   very explicitly stating that you were selling sexual services
 9   for money?
10           MS. BERTRAND:  Objection.  Leading.                  14:27:33
11           MR. FEDER:  Leading.
12           THE COURT:  What was -- I'm sorry, Mr. Feder.  What
13   did -- what was your objection?
14           MR. FEDER:  Probably the same one that Ms. Bertrand
15   said.                                                        14:27:48
16           THE COURT:  Oh.
17           MR. FEDER:  Leading.
18           THE COURT:  Sustained.
19           MS. PERLMETER:  Okay.
20           THE COURT:  You can rephrase.                        14:27:51
21   BY MS. PERLMETER:
22   Q.  Did your advertisements on Backpage say, I'm going to have
23   sex with you if you give me money?
24   A.  No.
25           MR. FEDER:  Leading.                                 14:27:58
```

UNITED STATES DISTRICT COURT

 1               THE COURT:  Sustained.

 2               MS. PERLMETER:  Okay.

 3    BY MS. PERLMETER:

 4    Q.  Were you -- was your intent to advertise a prostitution ad

 5    on Backpage?                                          14:28:09

 6               MR. CAMBRIA:  I object to that.

 7               THE WITNESS:  Yes.

 8               MS. BERTRAND:  And relevance.

 9               THE COURT:  I'm sorry.  I thought I heard Mr. Cambria

10    say something.                                        14:28:20

11               MR. CAMBRIA:  I did, Your Honor.  I think that --

12               THE COURT:  What was the form of the objection?

13               MR. CAMBRIA:  The objection is that it's irrelevant

14    and it's speculative.

15               MR. FEDER:  And leading.                    14:28:26

16               Bruce Feder.

17               THE COURT:  Well, I'll sustain the leading objection.

18    BY MS. PERLMETER:

19    Q.  Okay.  What kind of ads were you creating for yourself on

20    Backpage?  Like what were you -- what services were you trying  14:28:35

21    to sell?

22    A.  I was trying to sell sex.

23    Q.  Okay.  And how did you do that?  Can you tell us what words

24    you used and -- and maybe how you create -- designed your ad?

25    A.  Yes.  I used words like busty, young, freaky, eager to    14:28:48

1   please.  Words that clearly were advertising sex.

2   Q.  Okay.  Did you use the word "sex"?

3   A.  No.

4   Q.  How come?

5   A.  That would not be allowed.                           14:29:02

6   Q.  Okay.  What would happen if you -- did you ever try just

7   typing out "sex"?

8   A.  No.

9   Q.  Okay.  When -- are you familiar with, like, words that --

10  like in -- words that are coded words for prostitution?    14:29:16

11  A.  Yes.

12  Q.  What are some examples?

13  A.  So you may say "roses" for the amount of money, because

14  you're not allowed to use dollar signs.  Or you may say

15  "donation."  There's words that are, like, acronyms for certain  14:29:33

16  services, like your menu.  So the letters BB would stand for

17  bareback, meaning not having to use a condom.

18  Q.  All right.  And are these words that you learned through

19  the process of posting on Backpage?

20  A.  Yes.                                                  14:29:53

21  Q.  Okay.  While you were advertising yourself, did you observe

22  that the ad that you were creating was not necessarily the one

23  that ended up being posted live?

24  A.  Yes.

25  Q.  What did you see?                                     14:30:07

```
 1   A.  I would see photos that I had put in my ad initially not be

 2   posted, or words switched or removed.

 3   Q.  Okay.  Did that result in -- did you still receive callers

 4   in response to your ad?

 5   A.  Yes.                                                        14:30:26

 6   Q.  Okay.  Did you ever receive communications from Backpage

 7   that what you were posting was not permissible?

 8   A.  No.

 9   Q.  Okay.  Did you ever get a notice from Backpage that your

10   photo, for example, was not allowed?                           14:30:41

11   A.  No.

12   Q.  Did you ever receive any messages from Backpage that you

13   were violating any terms of use?

14   A.  No.

15   Q.  Did you give any -- did you receive any communications from 14:30:51

16   Backpage that, hey, if you continue posting certain photos,

17   then we're going to ban you from the website?

18          MS. BERTRAND:  Objection.  Leading.

19          THE COURT:  Overruled.

20   BY MS. PERLMETER:                                               14:31:11

21   Q.  You can answer.

22   A.  No.

23   Q.  Okay.  All right.  Ms. Benson, I'm going to show you an

24   exhibit.  It's already in evidence.  It's 1546.

25          Do you recognize the exhibit?                           14:31:38
```

1    A.  Yes, I do.

2    Q.  And what is it?

3    A.  That's the ad that was posted on the day that the

4    undercover sting happened.

5    Q.  Okay.  And can you tell us what date that was?        14:31:59

6    A.  March 19th, 2013.

7    Q.  Okay.  And was it posted in Portland, where the undercover

8    officer showed up?

9    A.  Yes.

10   Q.  Do you recognize the photos in the ad?                14:32:09

11   A.  I do.

12   Q.  Who are they of?

13   A.  They're of me.

14   Q.  Okay.  I want to ask you some questions about the words in

15   the ad.                                                   14:32:36

16        Is this -- is this one of the advertisements from your

17   time with Mr. Knight?

18   A.  Yes, it is.

19   Q.  Okay.  And you were going by the name Rachel at the time?

20   A.  Yes.                                                  14:32:46

21   Q.  Now, are there indicators in this -- what language in this

22   ad suggests to you that this is an advertisement for

23   prostitution?

24   A.  Busty.  Round booty.  Freaky.  Satisfaction.  A real

25   pleaser.                                                  14:33:05

 1    Q.   Do you see a telephone number in the ad?

 2    A.   I do.

 3    Q.   Do you see how there's a combination of numbers and letters

 4    used to list out the phone number?

 5    A.   Yes.                                                              14:33:24

 6    Q.   Did you also, when you were posting yourself, type your

 7    phone number in this way?

 8    A.   Yes.

 9    Q.   Why would you do that?

10    A.   So that the police can't track your ads as easily.              14:33:32

11    Q.   Okay.  So when you -- when you said you were looking at --

12    when you were telling the jury earlier about looking for old

13    ads on Backpage, did you search in this way or did you search

14    them in a different way?

15    A.   I searched in this way.                                          14:33:50

16    Q.   Okay.  But if you did not know that that's the way it

17    looked, would it be more difficult to search a phone number?

18    A.   It would.

19    Q.   Okay.  And, Ms. Benson, it says that you're well reviewed

20    in your ad.                                                           14:34:10

21         At this time, in March of 2015 -- 2015, did you know

22    that you had reviews?

23    A.   I did not.

24    Q.   Okay.  Did you learn at some point -- or let me ask you

25    this:  Do you now know about something -- a website called The       14:34:28

1   Erotic Review?

2   A.  Yes.

3   Q.  What is The Erotic Review to you?

4   A.  Website where johns review their sexual experiences with

5   escorts.                                                        14:34:39

6   Q.  And at the time of the undercover, you know, sting, did you

7   know that you had reviews on The Erotic Review, whether or not

8   you did?

9        MR. FEDER:  Objection.  Leading.

10       THE WITNESS:  I didn't.                                    14:34:52

11       THE COURT:  Well, I think she rephrased to "whether or

12   not you did."

13       So in that context, the answer -- excuse me -- the

14   witness may answer.

15       THE WITNESS:  I did not know until the undercover          14:35:02

16   police told me.

17       MS. PERLMETER:  Okay.

18       MR. FEDER:  Objection.  Hearsay.  Move to strike.

19       THE COURT:  Sustained.

20       And the jury will disregard the last statement of the      14:35:10

21   witness.

22   BY MS. PERLMETER:

23   Q.  Okay.  So don't tell me what somebody else told you.  But

24   did you learn at a later point that you had a profile on The

25   Erotic Review?                                                 14:35:21

```
 1              MR. FEDER:  Calls for hearsay.

 2              THE COURT:  Overruled.

 3              She can answer --

 4              THE WITNESS:  Yes.

 5              THE COURT:  -- if she learned.              14:35:26

 6    BY MS. PERLMETER:

 7    Q.  What did you say?

 8    A.  Yes.

 9    Q.  Okay.  Did you actually -- have you ever gone on The Erotic

10    Review to view your -- to see what your profile may look like?  14:35:32

11    A.  No.

12    Q.  Okay.  So is it -- so this might seem silly, but did you

13    create any profile on The Erotic Review for yourself?

14    A.  No.

15    Q.  Okay.  Did you know that Backpage had a business          14:35:58

16    relationship with The Erotic Review?

17              MS. BERTRAND:  Objection.

18              THE WITNESS:  No.

19              MS. BERTRAND:  Leading.

20              THE COURT:  Sustained.                        14:36:07

21    BY MS. PERLMETER:

22    Q.  Okay.  Did you at some time stop posting advertisements on

23    Backpage?

24    A.  Yes.

25    Q.  Okay.  And was that in, I think you told us earlier, March  14:36:15
```

 1  of 2015?

 2  A.  Yes.

 3         MS. PERLMETER:  Okay.  Nothing further at this time.

 4  Thank you.

 5         THE COURT:  All right.  Mr. Eisenberg?                    14:36:27

 6                      CROSS-EXAMINATION

 7  BY MR. EISENBERG:

 8  Q.  Good afternoon, Ms. Benson.

 9  A.  Hello.

10  Q.  You needn't be afraid.  I'm Dave Eisenberg.  I represent    14:36:52

11  Andrew Padilla, the gentleman to my left.

12         You've never met him, have you?

13  A.  No.

14  Q.  In fact, you haven't heard the name, perhaps, until this

15  case began; is that correct?                                    14:37:04

16  A.  Correct.

17  Q.  There are several other people seated here up at counsel

18  table on the defense side.  There's -- well, do you recognize

19  any of them?

20  A.  I do recognize them.                                        14:37:17

21  Q.  Who?

22  A.  The guy with the glasses.

23  Q.  Who is that?

24  A.  Is that Larkin?

25  Q.  And where do you recognize him from?                        14:37:28

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION
72

```
 1   A.  Since the case has happened, I've --

 2   Q.  Oh, okay.

 3   A.  I don't live under a rock, so ...

 4   Q.  All right.  But, I mean, by the time you were posting ads,

 5   you didn't have any of the dealings with any of the people on      14:37:39

 6   this side of the courtroom, did you?

 7   A.  No.

 8   Q.  When did you graduate from college, ma'am?

 9   A.  2011.

10   Q.  So that was before the ads began being posted --               14:37:48

11   A.  Yes.

12   Q.  -- is that correct?

13   A.  Yes.

14   Q.  These ads are 2013; right?

15   A.  2012 through 2015.                                             14:37:58

16   Q.  Okay.  Now, one of the ads that you've identified -- or the

17   ad that you have identified is Document -- or Exhibit 1546.

18           MR. EISENBERG:  Can we just get that back up on the

19   screen just for a moment.

20   BY MR. EISENBERG:                                                  14:38:16

21   Q.  And this was shown to you by the government.  1546.

22           Okay.  Do you see it there, ma'am?

23   A.  Yes.

24   Q.  Okay.  Now, this ad has your -- has the name that you

25   posted, and that's Rachel; is that correct?                       14:38:37
```

1   A.  Yes.

2   Q.  And it has your age of 21 --

3   A.  Yes.

4   Q.  -- is that correct?

5       You were at least 21, were you not?                    14:38:43

6   A.  Yes.

7   Q.  And then there's this telephone number that you were asked

8   about.

9       Can you read that to the jury, ma'am.

10  A.  "702six7four6077" [as read].                            14:38:52

11  Q.  And that was the telephone number that was posted in this

12  ad; correct?

13  A.  Yes.

14  Q.  And that's the number that the johns called you at in order

15  to get ahold of you; correct?                              14:39:04

16  A.  Yes.

17  Q.  So they didn't have any problem getting ahold of you;

18  right?

19  A.  Right.

20  Q.  So there came a time after Mr. Knight -- I think that's    14:39:20

21  what his name was.  Was he the man who originally was posting

22  ads for you?

23  A.  Yes.  He was my pimp.

24  Q.  Okay.  And you lived with him for a time; is that correct?

25  A.  Yes.                                                    14:39:32

```
 1   Q.  And then after a point -- there came a point in time when
 2   he -- he was the one who took the photographs of you; is that
 3   correct?
 4   A.  Yes.
 5   Q.  And he's the one who did the texts with customers; is              14:39:44
 6   that --
 7   A.  Yes.
 8   Q.  -- correct?
 9   A.  Yes.
10   Q.  Okay.  And he's the one who wrote the language that went           14:39:50
11   into the posts --
12   A.  Yes.
13   Q.  -- is that correct?
14           There came a time when he came -- or fell out of the
15   picture; right?                                                        14:39:59
16   A.  Yes.
17   Q.  And then you continued on your own to post ads --
18   A.  Yes.
19   Q.  -- is that correct?
20           So at that point in time, you didn't have a pimp?              14:40:06
21   A.  Correct.
22   Q.  And that lasted for about two and a half years; is that
23   correct?
24   A.  Correct.
25   Q.  Okay.  So at some point in time when you were posting ads,         14:40:13
```

```
 1    you, yourself, were posting ads on Backpage, there came points

 2    in time when words were taken out of your ads; right?

 3    A.  Yes.

 4    Q.  And there came a -- a point in time when photographs were

 5    taken out of your ads.  They were missing; right?          14:40:39

 6    A.  Yes.

 7    Q.  And those photographs, I believe, were ones where you

 8    were -- had posted naked photographs of yourself; right?

 9    A.  Yes.

10    Q.  And so those were the ones that were removed; right?     14:40:51

11    A.  Yes.

12    Q.  Okay.  There were times, too, when you tried to use

13    terminology that was sexually explicit; correct?

14    A.  Yes.

15    Q.  And give me an example of that that you used that was    14:41:13

16    sexually explicit.

17    A.  I can't recall.

18    Q.  Okay.  But that language got taken out of ads, too, didn't

19    it?

20    A.  Yes.                                                     14:41:27

21    Q.  Okay.  And there became a point in time when some of your

22    ads were published; is that correct?

23    A.  No.  They were always published.

24    Q.  Always published?

25    A.  Yes.                                                     14:41:40
```

ANDREA BENSON - CROSS-EXAMINATION

76

```
 1    Q.  The only one that you can identify, however, is the one
 2    that you've shown that's here today, 1546; is that correct?
 3    A.  It's the only one that's in evidence.
 4    Q.  That's the only one that's in evidence; right --
 5    A.  Right.                                                    14:41:54
 6    Q.  -- as far as you know?
 7            It's really not a fair question.  Okay.
 8            And at the time this ad, 1546, was posted -- I believe
 9    you've told us what your age is.
10            Ma'am, is that your picture in the ad?              14:42:11
11            And I think we've taken it off, but we needn't bring
12    it back up.
13            That is your picture in the ad?
14    A.  Yes.
15    Q.  Okay.  The top picture and middle picture as well?      14:42:20
16    A.  Yes.
17    Q.  And the bottom picture as well?
18    A.  Yes.
19    Q.  All right.  And in the bottom picture, you're covering your
20    breasts; is that correct?                                   14:42:29
21    A.  Yes.
22    Q.  You did that deliberately.  I mean, that was planned,
23    wasn't it?
24    A.  By Michael, yes.
25    Q.  Yes.  Okay.                                             14:42:35
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

```
 1          MR. EISENBERG:  No further questions, Your Honor.
 2          THE COURT:  Mr. Cambria?
 3                    CROSS-EXAMINATION
 4   BY MR. CAMBRIA:
 5   Q.  Good afternoon.                                        14:42:47
 6          You indicated that at one point in time a -- an
 7   undercover police officer responded to you.  Is that what
 8   happened?
 9   A.  Yes.
10   Q.  And was there a conversation with that police officer that  14:42:59
11   led to you being arrested?
12   A.  No.
13   Q.  Well, the officer -- well, were you at a hotel or
14   something?
15   A.  Yes.                                                   14:43:13
16   Q.  And an officer knocked on the door?
17   A.  Yes.
18   Q.  All right.  Was there a discussion then about sex for
19   money?
20   A.  No.                                                    14:43:21
21   Q.  Okay.  As a result of being arrested at that time, did you
22   cease performing any prostitution work after that experience?
23          MS. PERLMETER:  Objection.  Misstates testimony.
24          MR. CAMBRIA:  I'm sorry.  I didn't hear that.
25          MS. PERLMETER:  I can -- I don't want to do a speaking  14:43:46
```

UNITED STATES DISTRICT COURT

 1    objection, but I can point to the part of the question if the

 2    Court would like.

 3              MR. CAMBRIA:  I'm just asking if she quit doing it.

 4              THE COURT:  Overruled.  She can answer yes or no.

 5    BY MR. CAMBRIA:                                                    14:43:57

 6    Q.  Did you quit?

 7    A.  I cannot answer yes or no because the question was not

 8    phrased in a way that I can do that.

 9              He put incorrect information in the question.

10              THE COURT:  Rephrase your question.  She's unable to    14:44:07

11    answer the current one.

12    BY MR. CAMBRIA:

13    Q.  Okay.  The question was, after that arrest experience, did

14    you stop doing prostitution work?

15    A.  I still cannot answer the question.                           14:44:19

16    Q.  I'm sorry?

17    A.  I still cannot answer that question.  I was not arrested.

18    Q.  Oh, I'm sorry.

19              The police officer -- I thought that you said that an

20    undercover police officer encountered you on that day?           14:44:30

21    A.  But I was not arrested.

22              MR. CAMBRIA:  Okay.  Very good.  That's all.

23              THE COURT:  Ms. Bertrand?

24              MS. BERTRAND:  Nothing.  Thank you, Your Honor.

25              THE COURT:  Mr. Lincenberg?                             14:44:40

```
 1              MR. LINCENBERG:  No, Your Honor.

 2              THE COURT:  Mr. Feder?

 3                      CROSS-EXAMINATION

 4  BY MR. FEDER:

 5  Q.  I just want to follow up on something.          14:44:57

 6              MR. FEDER:  Could you bring 1546 back up, please.

 7  BY MR. FEDER:

 8  Q.  Do you see where it says "credit cards accepted"?

 9  A.  Yes.

10  Q.  Is that true?                                   14:45:20

11  A.  Yes.

12  Q.  Which credit cards were accepted by you and -- and -- I'm

13  sorry -- Mr. -- your friend was?

14              MS. PERLMETER:  Objection.  Misstates testimony.

15              THE COURT:  Sustained.                  14:45:33

16  BY MR. FEDER:

17  Q.  Were your actions paid for by credit cards?

18  A.  Sometimes, yes.

19  Q.  Which ones?

20  A.  Any that the Square would take.                 14:45:41

21  Q.  So Visa, MasterCharge, American Express?

22  A.  I don't know for sure if it took American -- American

23  Express, because that's not always taken --

24  Q.  Yeah.

25  A.  -- actually.                                    14:45:53
```

```
 1   Q.  And then, to your knowledge, how would -- how would you get
 2   paid from the credit card companies?
 3   A.  That would go into my bank account.
 4   Q.  Did you have a personal bank account, or did you have some
 5   kind of corporate name for your -- for your business that        14:46:07
 6   would -- that the credit card companies would pay?
 7   A.  You could choose whatever name you wanted on the Square
 8   app.
 9   Q.  So what name did you choose?
10   A.  I did not choose it.  Michael did.  And I don't recall the   14:46:18
11   name.
12   Q.  Okay.  Did you ever see any -- any of the checks that were
13   paid to Michael or anything else so you might know that?
14   A.  No.
15   Q.  How long did that go on?  I mean, in other words, from the   14:46:29
16   time that you were with Michael, I think you testified
17   four months?
18   A.  Right.
19   Q.  Paid on a monthly basis from the credit cards?
20   A.  I imagine that there were only maybe less than five people   14:46:40
21   that even wanted to pay with a credit card considering what
22   they were purchasing.
23   Q.  Okay.  Do you -- I mean, do you know anything about how
24   the -- the act was set up with Visa and MasterCharge?
25           MS. PERLMETER:  Objection.  Calls for speculation.       14:46:55
```

1           THE COURT:  Well, she can answer if she knows.  He

2     asked her, "Do you know?"

3           THE WITNESS:  No.

4     BY MR. FEDER:

5     Q.  When you went out on your own and started to -- to go into          14:47:02

6     business independently, did you also accept credit cards?

7     A.  I do not recall.

8     Q.  You don't recall?

9     A.  Well, we've dragged court on for six years, so, no.  It's

10    been a long time.                                                       14:47:17

11    Q.  Okay.  You testified that when you went out on your own you

12    were able to retrieve your old ads from Google?

13    A.  Yes.

14    Q.  And was it -- was it the actual ad?

15    A.  Yes.                                                                14:47:36

16    Q.  So you would -- you typed in to Google, you put in your

17    phone number, and all of the ads that had been posted in regard

18    to your services were right there?

19    A.  I believe when you repost you're not seeing all of the ads.

20    You're just seeing the most recent one.                               14:47:51

21    Q.  Okay.  Did you ever get any calls from the ads that were on

22    Google?

23    A.  No.

24    Q.  But the -- but the ads that -- the 15 -- 1546 that -- the

25    ad was read on Google?                                                 14:48:05

ANDREA BENSON - CROSS-EXAMINATION

82

```
1    A.  And then you click on Backpage.

2    Q.  Okay.  All right.

3         How many times have you talked to the -- to the

4    prosecutors?  If you know.

5    A.  I think, like, four or five times.                    14:48:27

6    Q.  And where did those discussions take place?

7    A.  Sometimes in person.  Sometimes over, like, Microsoft

8    Teams.

9    Q.  I'm sorry?  Could you give the -- give me that again.

10   A.  Sometimes in person, and sometimes over Microsoft Teams.  14:48:44

11   Q.  Of the times in person, where did -- where was that --

12   where did that take place?

13   A.  Portland and Tampa.

14   Q.  And, if you recall, how many people from the government

15   came up to see you on those occasions?                    14:48:55

16   A.  I believe both times it was three people.

17   Q.  Do you see any of those folks in the -- in the courtroom

18   here?

19   A.  Yeah.

20   Q.  Could you point them out and tell me?                 14:49:05

21   A.  Peggy and Desirae.  But I believe that the third person,

22   Amy, is not here.

23   Q.  Okay.  Were any of those visits or calls on Teams

24   tape-recorded, to your knowledge?

25   A.  I do not recall.                                      14:49:23
```

UNITED STATES DISTRICT COURT

ANDREA BENSON - CROSS-EXAMINATION

83

1   Q.  Presumably you've never heard the -- a recording of any of

2   those meetings?

3   A.  I have not.

4   Q.  How long did those meetings last, if you recall?

5   A.  I believe the first one was several hours.  The second one      14:49:32

6   was probably more like an hour.

7   Q.  Okay.  You were asked a number of questions about what

8   happened -- that some of your ads -- your ads and Mr. Knight's

9   ads were edited; is that right?

10  A.  Right.                                                           14:49:57

11  Q.  So both -- Mr. -- to your knowledge, both Mr. Knight's ads

12  on behalf of you and then your own ads on behalf of yourself

13  were edited?

14  A.  I can only speak on the ads that I posted.

15  Q.  You never saw the ads that -- that Mr. Knight posted for      14:50:08

16  you?

17  A.  By the time I did see them, he wasn't sharing information

18  like this with me.

19  Q.  Understood.  Okay.

20         As to your own ads, have you -- have you been shown      14:50:17

21  your own ads since you've started cooperating with the

22  government?

23  A.  I think that -- I don't recall if we found my ads or not.

24  Q.  Okay.  In regard to your own ads, you said -- I think you

25  testified that you looked at your own ad on -- on Google,      14:50:40

UNITED STATES DISTRICT COURT

```
 1    number 1, and that you went on to Backpage and found --
 2    basically tried to copy -- kind of copy and paste from the --
 3    from those ads, too.
 4         Did you look at any other source to get some -- to get
 5    ideas?                                                          14:50:56
 6    A.  No.
 7         THE COURT:  What was the objection?
 8         MS. PERLMETER:  It's -- it's a 412 objection.  I'd ask
 9    counsel to ask a more direct question that does not trigger
10    412.                                                            14:51:11
11         THE COURT:  Overruled as to the question before the
12    witness.
13    BY MR. FEDER:
14    Q.  Did you go to any other sources other than your own ad on
15    Google or Backpage to get ideas on how to craft the ads that   14:51:22
16    you posted?
17    A.  No.
18         MS. PERLMETER:  Objection.  412.
19         THE COURT:  Overruled.  And the answer will stand.
20    BY MR. FEDER:                                                   14:51:40
21    Q.  Did you meet Michael on Facebook?
22         MS. PERLMETER:  Objection.  Relevance.
23         THE COURT:  Sustained.
24    BY MR. FEDER:
25    Q.  Did you tell the government that you met Michael on         14:51:58
```

 1   Facebook?

 2          MS. PERLMETER:  Objection.  Relevance.

 3          THE COURT:  Sustained.

 4   BY MR. FEDER:

 5   Q.  When you were crafting your own ads after you left Michael,        14:52:07

 6   you testified that essentially you would see the ad and some

 7   part of it would have been edited out; right?

 8   A.  Correct.

 9   Q.  And that included some of the photographs that you had

10   taken of yourself; right?                                             14:52:27

11   A.  Yes.

12   Q.  Some of the words that you had used in those ads were taken

13   out?

14   A.  Yes.

15   Q.  Would the result be an ad that was mush or didn't make any        14:52:34

16   sense?

17   A.  Not at all.

18   Q.  No?

19          But the things that were -- that were edited out were

20   things that -- that you had been warned about when you went          14:52:48

21   into Backpage and went through the terms of use and the posting

22   rules; right?

23   A.  Some.

24   Q.  Well, no nudity; right?

25   A.  I can't recall the rules.  I have not posted since 2015.          14:53:00

ANDREA BENSON - CROSS-EXAMINATION

86

1    Q.  No sex-for-money ads; right?

2    A.  I can't recall.

3    Q.  You haven't -- you didn't -- you weren't shown them when

4    you were practicing for your testimony with the prosecutors?

5    A.  No.                                                          14:53:17

6    Q.  So you would look at the ad that you had posted.  You would

7    see that parts of it are missing; right?

8           MS. PERLMETER:  Objection.  Asked and answered.

9           THE COURT:  Well, I'll sustain.  It's a form of a

10   prior question.                                                  14:53:33

11   BY MR. FEDER:

12   Q.  How many -- when you were on your own, how many ads would

13   you say -- independent -- or, I'm sorry -- original ads would

14   you say you posted on Backpage?

15   A.  Can you clarify that question?  Original versus what?        14:53:44

16   Q.  Versus reposting or something like that.

17          Do you know what reposting is?

18   A.  Yes, I do.

19   Q.  Okay.  When you repost, you're just reposting the same old

20   ad; right?                                                       14:54:00

21   A.  I used a lot of original ads because I used different names

22   and phone numbers frequently once I was posting myself.

23   Q.  Okay.  And would -- how many different ads would you say

24   you crafted your own and posted on Backpage?

25   A.  If I had to guess, I would say at least six.                 14:54:16

ANDREA BENSON - CROSS-EXAMINATION

87

1   Q.  Six?

2   A.  If I had --

3   Q.  And of those six ads that you created on your own, how many

4   of them were edited in some fashion?

5   A.  Most of them were edited photo-wise.                    14:54:32

6   Q.  How about terminology?

7   A.  I figured out the terminology pretty quick.

8   Q.  Well, I mean, anybody can take one word and try to scramble

9   it up to make it not the same word; right?

10  A.  Right.                                                  14:54:50

11  Q.  And you're a college graduate, so, I mean, you were pretty

12  good at doing that; right?

13          MS. PERLMETER:  Objection.  Argumentative.

14          THE COURT:  Well, sustained as to the form of the

15  question.                                                   14:55:00

16          MR. FEDER:  That's all I have.  Thanks.

17          THE COURT:  Thank you.

18          Ms. Perlmeter?

19          MS. PERLMETER:  No, Your Honor.  Thank you.

20          THE COURT:  May the witness be released from subpoena?  14:55:20

21          MS. PERLMETER:  Yes, please.

22          THE COURT:  Is there any objection from the defense?

23          MR. CAMBRIA:  No, Your Honor.

24          MS. BERTRAND:  No.

25          THE COURT:  All right.  Ma'am, you are released from   14:55:27

UNITED STATES DISTRICT COURT

1   subpoena.  We thank you for your testimony.  You may step down.

2           THE WITNESS:  Thank you.

3           THE COURT:  And I had anticipated taking a break at

4   3:00 o'clock, but let's -- since we're at a transition point

5   and counsel have been here since 1:15, let's go ahead and take     14:55:45

6   our afternoon recess.

7           Members of the jury, again I remind you of the

8   admonishment.  It's critical, as we are progressing forward,

9   not to come to any conclusions.  We're still receiving

10  testimony.  And not to do any sort of research and just to         14:56:03

11  simply keep an open mind.

12          And with that, we will stand in recess for 20 minutes.

13          Please all rise for the jury.

14      (Jury not present at 2:56 p.m.)

15          THE COURT:  All right.  Mr. Kessler, my law clerk will     14:56:35

16  give you the order that I referred to, and we will stand in

17  recess.

18      (Recess from 2:56 p.m. to 3:20 p.m.)

19      (Jury not present at 3:20 p.m.)

20          THE COURT:  All right.  Let's have the jury in.           15:20:06

21          All rise for the jury.

22      (Jury present at 3:20 p.m.)

23          THE COURT:  All right.  Welcome back, members of the

24  jury.  Please be seated.

25          And the government may call its next witness.             15:21:03

1    MR. BERRY:  Thank you, Your Honor.  The United States

2  calls Arshana Sanders.

3    THE COURT:  Ma'am, please come forward and be sworn by

4  my courtroom deputy.

5    THE COURTROOM DEPUTY:  Please raise your right hand.                      15:21:21

6    (ARSHANA SANDERS-WILLIS, called as a witness herein, was

7  duly sworn or affirmed.)

8    THE COURTROOM DEPUTY:  Please proceed to the witness

9  stand.

10    THE COURT:  You may proceed when you're ready.                      15:21:47

11    MR. BERRY:  Thank you, Your Honor.

12                    DIRECT EXAMINATION

13  BY MR. BERRY:

14  Q.  Good afternoon, Arshana.

15    Would you please state and spell your first name for                      15:21:54

16  the jury.

17  A.  Arshana, A-R-S-H-A-N-A.

18  Q.  All right.  That was really fast.  Can you spell it slowly

19  a little bit.

20  A.  A-R-S-H-A-N-A.                      15:22:03

21  Q.  Thank you.

22    And what's your last name, Arshana?

23  A.  It's hyphenated.  So Sanders, S-A-N-D-E-R-S, Willis,

24  W-I-L-L-I-S.

25  Q.  All right.  Thank you.                      15:22:17

```
 1              And where do you live?

 2    A.  Right outside Detroit, Michigan.

 3    Q.  Okay.  Is that where you traveled from to be here this

 4    week?

 5    A.  Yes.                                                   15:22:30

 6    Q.  Do you have any children?

 7    A.  No.

 8    Q.  Where do you -- what do you do for a living?

 9    A.  I work for Detroit Light Company and Kroger grocery store.

10    Q.  All right.  And what do you do for the Detroit Light        15:22:45

11    Company?

12    A.  Customer service for low income.

13    Q.  Okay.  And for Kroger, what do you do?

14    A.  Cashier.

15    Q.  And how old are you, Arshana?                               15:22:55

16    A.  29.

17    Q.  Are you familiar with Backpage.com?

18    A.  Yes.

19    Q.  When did you first -- approximately when did you first

20    become aware of Backpage?                                       15:23:11

21    A.  Year 2014.

22    Q.  Okay.  And what was the -- the -- how did you become aware

23    of it?

24    A.  My sister was using -- she was posting on Backpage.

25    Q.  Okay.  And who -- what was your sister's name?              15:23:31
```

 1   A.   Cynthia Worthy.

 2   Q.   And what's the difference in age between you and Cynthia?

 3   A.   She's three and a half years older than me.

 4   Q.   So you learned that your sister was utilizing Backpage in

 5   approximately 2014; is that right?                           15:23:55

 6   A.   Yes.

 7   Q.   All right.  Did you ever observe your sister utilizing

 8   Backpage?

 9   A.   Yes.

10   Q.   What do you recall personally observing her doing on      15:24:06

11   Backpage?

12   A.   She would post pictures and, like, lingerie.  Like,

13   would -- oh, okay.  Yeah, she would post pictures and -- I

14   mean, I don't know.  Like what else?

15   Q.   Were there pictures of herself?                           15:24:34

16   A.   Oh, yeah, of herself in lingerie.

17   Q.   All right.  And would those pictures be part of an

18   advertisement of some kind?

19   A.   Yeah.  She would actually -- she would call it like she had

20   to post an ad.  That's what she would say.                    15:24:47

21   Q.   Okay.  And you would see her do this yourself?

22   A.   Yes.

23   Q.   And it's important as we keep going forward through this,

24   Arshana, that as best you can, I'm going to ask you questions

25   about what you saw as opposed to what she said.  Okay?        15:25:00

     1    A.  Okay.

     2    Q.  So let's try to stick to that as best we can.  I understand

     3    that that's sometimes a little challenging.

     4    A.  Okay.

     5    Q.  So you said that you saw her posting these ads; correct?          15:25:11

     6    A.  Yes.

     7    Q.  And do you know in what section on Backpage she would post

     8    ads?

     9    A.  Yes.

    10    Q.  What sections?                                                    15:25:22

    11    A.  Oh, there was a section for escorts.

    12    Q.  Okay.  And what did you understand your sister's ads in the

    13    escort section on Backpage to be about?

    14            MR. FEDER:  Objection.  Hearsay.

    15            MR. BERRY:  I asked what she understands.                     15:25:42

    16            THE COURT:  Overruled.  She can answer if she -- if

    17    she can.

    18            THE WITNESS:  She would post, like, ads of herself

    19    through -- for other people to, like, get online to see them so

    20    she can meet with them to have sex for money.                        15:25:59

    21    BY MR. BERRY:

    22    Q.  Okay.  And you said that she would post in these ads

    23    pictures of herself in lingerie; correct?

    24    A.  Yes.

    25    Q.  What other features of the ad do you recall seeing              15:26:16

 1   yourself?  Like the -- what different parts of the ad?

 2   Describe it as best you can to the jury.

 3   A.  I recall seeing, like, pictures of her, like, of course in

 4   the lingerie or -- or identified that it was her from, like,

 5   tattoos that she had.  What she would name -- what she -- the                15:26:40

 6   name that she went by when she would post ads.  Her, like,

 7   telephone number, like -- things like that.

 8   Q.  All right.  And what name did she go by on Backpage escort

 9   section?

10   A.  Lady.                                                                    15:26:58

11   Q.  Okay.  And you said you also recognized the phone number

12   that she utilized in the ad?

13   A.  Yes.

14   Q.  Okay.  Do you remember whether her ads had any kind of

15   emojis in them?                                                             15:27:12

16   A.  Yeah.  She always would use, like, emojis, yeah.  She used

17   emojis in her ads.

18   Q.  Okay.  And can you describe for the jury, as best you

19   recall, what type of emojis you saw her use in these ads.

20   A.  It was a variety.  She would use, like, hearts, kissy              15:27:29

21   faces, the three, like, water, like, dripping inside.  And

22   then, like, the candy, like, lollipop ones.  I've seen that

23   before.

24   Q.  Okay.  And did you have any understanding as to whether

25   those emojis had any specific meaning in the context of her               15:27:56

1   ads?

2   A.  Yeah.  The water sign.

3   Q.  What did that mean, in your understanding?

4          MS. BERTRAND:  Objection.  Calling for speculation.

5          MR. FEDER:  And hearsay.                              15:28:12

6          THE COURT:  Overruled.

7   BY MR. BERRY:

8   Q.  You can answer.

9   A.  It -- I -- I don't know how to answer this.

10  Q.  Is this -- is this a difficult topic to talk about?     15:28:26

11  A.  No.  It's just uncomfortable.  I guess it just meant

12  like -- it was like -- it was sexual.

13  Q.  All right.  That's fine.  So you -- the three droplets was

14  sexual in nature is your understanding?

15  A.  Yes.                                                     15:28:43

16  Q.  All right.  What about the lollipop?  Was that also sexual

17  in nature?

18          MS. BERTRAND:  Same objection.  Leading and

19  speculation.

20          THE COURT:  Well --                                  15:28:52

21          MR. FEDER:  And hearsay.

22          THE COURT:  -- I'll sustain just as to leading.

23          MR. BERRY:  Yes, Your Honor.

24  BY MR. BERRY:

25  Q.  What was your understanding as to the meaning behind the  15:28:59

1    lollipop emoji that your sister used in these ads?

2           MS. BERTRAND:  Same objections.

3           THE COURT:  Overruled.  She can answer if she had an

4    understanding.

5           THE WITNESS:  I understood that it meant -- because    15:29:10

6    I've seen her, like -- I've seen her in her ads say something

7    like sweet as candy.  So that's what I kind of understood that

8    to be.

9    BY MR. BERRY:

10   Q.  Okay.  Do you know if your sister made any money off of the   15:29:24

11   ads that she posted on Backpage?

12   A.  Off the ads, per se, no.  But I know that she posted the

13   ads to make money, to meet with people to make money.

14   Q.  And that's what I was getting at.  So you -- you got there,

15   so thank you.                                                 15:29:52

16   A.  Uh-huh.

17   Q.  Where would you all typically be when she would go to post

18   her ad?

19   A.  We pretty much hung out every day.  So we would do things

20   like go to the beach.  We spent a lot of time with my nieces   15:30:10

21   and my little sister.  So we would always be, like, at a family

22   member house, like, or maybe go to a club.  And then we would

23   always just be out, and she would post ads after we leave.

24   Q.  And why was she posting the ads?

25   A.  She was more so like -- she was our big sister.  So she --   15:30:33

1    anytime we went out, she always took care of a lot of stuff, so

2    she would say she would have to make her money back.

3    Q.  Okay.  And when she posted an ad, what happened after that,

4    typically after her ad would go live?

5              MS. BERTRAND:  Objection.  Speculation.          15:30:52

6              THE COURT:  Lay some foundation.

7              MR. BERRY:  Sure.

8    BY MR. BERRY:

9    Q.  Were you ever with her -- I think you already testified

10   that you were with her when you watched her post ads; correct?   15:31:01

11   A.  Yes.

12   Q.  All right.  Were you ever with her after the ad went live?

13   A.  Yes.

14   Q.  And do you know what would happen to her phone after her ad

15   went live?                                                  15:31:13

16             MS. BERTRAND:  Objection.  Vague as to time.

17             THE COURT:  Well, overruled.

18             But then I'll just put Mr. Berry on notice that he

19   needs to perhaps lay some foundation as to time.

20             MR. BERRY:  Sure.                                15:31:26

21   BY MR. BERRY:

22   Q.  So you testified that you first became aware of her utility

23   of Backpage in 2014; correct?

24   A.  Yes.

25   Q.  Did that end sometime in August of 2015?              15:31:33

1    A.  Yes.

2    Q.  All right.  So between 2014 and August of 2015.  All my

3    questions to you are relating to that time period.  Okay?

4    A.  Okay.

5    Q.  All right.  So when she would post these ads during that          15:31:48

6    time frame and you were with her, do you know what, if

7    anything, would happen to her phone?

8    A.  Yeah.  Her phone would start ringing.

9    Q.  All right.  And how soon after her ad went live would her

10   phone start ringing?                                                  15:32:08

11   A.  Fairly quickly.  And if not, she would post again.

12   Q.  Okay.  Were you ever -- do you know if the -- she would

13   ever repost the ad back at the top?

14   A.  Yes.

15   Q.  Was this her main source of income, or did she have another      15:32:27

16   income?

17          MR. FEDER:  Calls for hearsay.

18          THE COURT:  Overruled.

19   BY MR. BERRY:

20   Q.  You can answer.                                                   15:32:39

21   A.  It was her main source of income.

22   Q.  How often was she posting her ads in the escort section on

23   Backpage between 2014 and 2015?

24   A.  When I learned in 2014, she would post every day.  Towards

25   August 2015, it probably, like, once or twice a week.                15:33:09

 1    Q.  Okay.  How would she -- well, let me ask you.  Do you know

 2    how she would pay for the ad, like, physically?  Do you know

 3    how she would physically pay for the ad?

 4    A.  Yes.  We would go to, like, CVS, like a drugstore, like a

 5    Walmart.  She would get prepaid Vanilla cards.                    15:33:37

 6    Q.  Vanilla cards?

 7    A.  Yes.

 8    Q.  Okay.  And you watched her do that?

 9    A.  Yes.

10    Q.  Did she have a regular bank account?                          15:33:44

11    A.  Yes.

12    Q.  And did she have, like, a debit card associated with that

13    bank account?

14    A.  Yes.

15    Q.  Did she use that regular bank account and debit card for      15:33:53

16    her Backpage activity?

17    A.  Yes.

18    Q.  She would use a regular debit card, or she would use --

19    A.  Oh, I'm sorry.

20    Q.  -- the Vanilla cards?                                         15:34:04

21    A.  She would use Vanilla cards.

22    Q.  Okay.  So she would not use her regular bank account?

23    A.  No.

24    Q.  Okay.  You said you went with her and saw her buy these

25    Vanilla cards to post the ads.                                    15:34:20

UNITED STATES DISTRICT COURT

1        Did you ever go with her to any other stores that were

2   associated with her Backpage activity?

3   A.   Like lingerie stores.

4   Q.   Okay.  Did you ever --

5   A.   Like --                                                      15:34:33

6   Q.   Did you ever go to CVS with her?

7   A.   Yes.

8   Q.   And what would you see her purchase at CVS?

9   A.   She would get lubricant, like Y condoms.

10  Q.   Did you -- were you ever in the car with her when someone    15:34:50

11  would call responding to her ad?

12  A.   Yes.

13  Q.   Okay.  Did you have an opportunity to overhear those

14  conversations?

15  A.   Yes.                                                         15:35:03

16  Q.   After you heard those conversations, did you ever ride with

17  her to a meet location?

18  A.   Yes.

19  Q.   And what would you do and what would she do when you were

20  at that location, to the best of your knowledge?                  15:35:23

21  A.   I'll wait in the car.  She would take -- she probably would

22  drink some wine and take the condoms and the lubricant, and

23  she'll go inside.

24  Q.   And how long would she typically be inside?

25  A.   It depends.  Like 30 minutes, 45 minutes.                    15:35:43

UNITED STATES DISTRICT COURT

1  Q.  Never more than that?

2  A.  Poss- -- possibly.  I've only been with her twice.

3  Q.  Okay.  Have you ever been inside her apartment?

4  A.  Yes.

5  Q.  And did you ever observe anything in her apartment that you          15:36:02

6  believed was connected to her Backpage activity?

7  A.  Yes.

8  Q.  Like what?

9  A.  Vanilla cards.

10  Q.  Okay.  Did you see -- how -- you know, how many of them did          15:36:16

11  you see?

12  A.  A lot.  They were, like, on her nightstand.  They were

13  just -- they were just, like, around the house.

14  Q.  And do you -- do you know whether she used those for

15  anything other than Backpage?                                           15:36:28

16  A.  Not to my knowledge.

17  Q.  Okay.  All right.  I'm going to show you what's already in

18  evidence as Government's Exhibit 221.  And I'm going to scroll

19  through these photographs.

20          Do you recognize the person in these photographs?              15:36:54

21  A.  Yes.

22  Q.  Who is it?

23  A.  Cynthia.

24  Q.  And were you able to identify her by some of the tattoos

25  and things like that in her ad?                                         15:37:12

ARSHANA SANDERS-WILLIS - DIRECT EXAMINATION

101

```
1    A.   Yes.

2    Q.   In addition to seeing her face?

3    A.   Yes.

4    Q.   This phone number down here, do you recognize that?

5    A.   Yes.                                                      15:37:32

6    Q.   What is it?

7    A.   Cynthia's phone number.

8    Q.   And what about this name here?

9    A.   This was the name that she went by.

10   Q.   Just for purposes of the record, what is the date on this  15:37:48

11   particular ad?

12   A.   August 15th, 2015.

13             MR. BERRY:  Okay.  Pass the witness, Your Honor.

14             THE COURT:  Who's going to examine for the defense?

15             Mr. Cambria.                                          15:38:31

16             MR. CAMBRIA:  No questions.

17             THE COURT:  Ms. Bertrand?

18             MS. BERTRAND:  None.  Thank you.

19             THE COURT:  Mr. Lincenberg?

20             MR. LINCENBERG:  No, Your Honor.                      15:38:37

21             THE COURT:  Mr. Kessler?

22             MR. KESSLER:  No, Your Honor.

23             THE COURT:  Mr. Eisenberg?

24             MR. EISENBERG:  No, Your Honor.

25             THE COURT:  All right.  May the witness be excused    15:38:42
```

UNITED STATES DISTRICT COURT

 1    from subpoena?

 2              MR. BERRY:  Yes.

 3              THE COURT:  Any objection from defense?

 4              MR. CAMBRIA:  No, Your Honor.

 5              THE COURT:  Ma'am, we thank you for your testimony.        15:38:49

 6    You are excused from subpoena.  You may step down.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  The government may call its next witness.

 9              MR. BERRY:  Thank you, Your Honor.  The United States

10    calls Derek Fritze.                                                  15:39:04

11              THE COURT:  Sir, please come forward to my courtroom

12    deputy and be sworn.

13              THE COURTROOM DEPUTY:  Please raise your right hand.

14        (DEREK FRITZE, a witness herein, was duly sworn or

15    affirmed.)                                                           15:39:39

16              THE COURTROOM DEPUTY:  If you will please step over to

17    the witness stand.  Thank you.

18              THE COURT:  And you may proceed when ready.

19              MR. BERRY:  Thank you, Your Honor.

20                         DIRECT EXAMINATION                             15:40:02

21    BY MR. BERRY:

22    Q.  Good afternoon, Mr. Fritze.

23              Would you please state your first name and spell it

24    for the jury.

25    A.  Derek, D-E-R-E-K.                                               15:40:10

                    UNITED STATES DISTRICT COURT

1   Q.  And would you please state your last name and spell it for

2   the jury.

3   A.  It's Fritze, F-R-I-T-Z-E.

4   Q.  In what state do you live, sir?

5   A.  State of Minnesota.                                              15:40:25

6   Q.  And did you travel from there to be here for this trial

7   this week?

8   A.  Yes, I did.

9   Q.  How old are you, sir?

10  A.  43 years old.                                                    15:40:37

11  Q.  And where do you work?

12  A.  I work for the Maplewood Police Department in Maplewood,

13  Minnesota.

14  Q.  And, if you would, please give the ladies and gentlemen of

15  the jury a little sense about the size of your community and    15:40:49

16  the size of your police department.

17  A.  The city of Maplewood is a first-ring suburb of St. Paul.

18  We have -- population is about 40,000 people.  Our department

19  has approximately 53 sworn officers right now.

20  Q.  Okay.  And what is your -- your present title, job?         15:41:12

21  A.  Currently I'm a detective.

22  Q.  Do you have any college education?

23  A.  Yes, I do.

24  Q.  Please explain that to the jury.

25  A.  I have a bachelor's degree in criminal justice, a master's  15:41:32

1    degree in sport management, and a master's degree in police

2    leadership.

3    Q.  How long have you worked with the Maplewood Police

4    Department?

5    A.  About 16 years.                                          15:41:47

6    Q.  If you would, please, explain to the jury your work history

7    in law enforcement during those 16 years.

8    A.  I've had several different positions.  I've -- was a patrol

9    officer.  I was part of a street crimes unit.  I was a school

10   resource officer and a juvenile investigator.  I was a retail    15:42:12

11   crime investigator and a -- a detective for several years.  And

12   then I was a patrol sergeant for three years.

13           And then as of the beginning of January this year, I'm

14   a detective again.

15   Q.  So several different investigative jobs with Maplewood?        15:42:31

16   A.  Yes.

17   Q.  Okay.  Did you receive any kind of general training on how

18   to be a police officer when you first started?

19   A.  Yes, I did.

20   Q.  Explain that to the jury.                                    15:42:47

21   A.  Minnesota has a police officer licensing certificate, so it

22   involved specific courses and then a practical skills

23   application before getting hired as a -- as a police officer.

24   Q.  Okay.  So you did that before you even got on with the

25   police department?                                              15:43:06

1   A.  Yes.

2   Q.  All right.  And then did you ever have any more specific

3   training on how to investigate prostitution offenses?

4   A.  Yes, I did.

5   Q.  Explain that to the jury.                                15:43:17

6   A.  While I was working in the street crimes unit, I was --

7   took a course, a training course with the St. Paul Police

8   Department.  It was a learning and a practical training on

9   prostitution operations and kind of the procedure and how to go

10  about it.                                                    15:43:36

11  Q.  All right.  And you say a -- a practical training.  Help

12  the jury understand what that means.

13  A.  As part of the class, St. Paul Police Department did a

14  actual prostitution sting operation, and we participated in --

15  in that.                                                     15:43:54

16  Q.  All right.  So you had hands-on training, basically, with

17  doing these types of stings?

18  A.  Yes.

19  Q.  Okay.  After this training, did it -- did you then go back

20  to Maplewood and conduct similar type stings?               15:44:04

21  A.  Yes.

22  Q.  All right.  And we'll talk about that in a -- in a second.

23       About how many prostitution-related investigations

24  could you estimate that you've worked in the course of your

25  career?                                                      15:44:19

```
 1    A.   I'd say probably approximately a hundred or so.

 2    Q.   Okay.  Are you familiar with a website Backpage.com?

 3    A.   Yes, I am.

 4    Q.   How did you first become aware of Backpage?

 5    A.   It was through that -- the training that I took with the       15:44:38

 6    St. Paul Police Department.

 7    Q.   Okay.  So was that utilized in that training?

 8    A.   Yes, it was.

 9    Q.   And what was it that you learned -- well, let's -- let's

10    establish a time frame here.                                         15:44:51

11         When was that training approximately?

12    A.   Approximately 2011.

13    Q.   Okay.  And what was it that you learned about Backpage

14    during that training?

15    A.   That was the method used for the prostitution stings,           15:45:04

16    whether they were stings or reverse stings.

17    Q.   Okay.  And why was Backpage the place you went to do those

18    types of stings?

19    A.   Because that's where prostitution-related offenses were --

20    were found at that time.                                             15:45:25

21    Q.   And so when you went back to Maplewood after your training

22    at St. Paul, so we're talking about 2011 and later, did you

23    utilize Backpage in your law enforcement investigations?

24    A.   Yes, I did.

25    Q.   Did you do stings of your own?                                  15:45:45
```

DEREK FRITZE - DIRECT EXAMINATION                    107

1   A.  Yes.

2   Q.  If you would, please, explain to the jury what the -- what

3   the stings entailed.  And it -- you can distinguish and

4   articulate sting versus reverse sting, or however you referred

5   to it.                                                         15:46:05

6   A.  Yeah.  So we would -- as a department, we would typically

7   have a two-day operation, and we'd do it about

8   every approximately three months, where we would get a hotel

9   room within the city of Maplewood.  One day we would do a

10  prostitution sting, where we would use Backpage to look for ads 15:46:22

11  of females and have them come to us.  And then on a second day,

12  we would do the reverse sting and have the -- we would post ads

13  on Backpage and have the -- the males call us and respond to

14  our location.

15  Q.  All right.  So you would have two-day ops.  One day was you 15:46:46

16  were going after the people posting the ads?

17  A.  Yes.

18  Q.  And one day you're going after the people responding to the

19  ads?

20  A.  Yes.                                                        15:46:58

21  Q.  Okay.  When doing the -- the stings, where you're

22  responding to an ad already published, did you look at those

23  ads to investigate them?

24  A.  Yes.

25  Q.  How -- explain to the jury how that would work, when you    15:47:17

DEREK FRITZE - DIRECT EXAMINATION

 1  would do those types of stings.

 2  A.  Well, typically part of our investigation, we would look

 3  for ones that posted in close to our area, posted in Maplewood.

 4  We would look for -- depending on if they had given an age, or

 5  looking at the photographs, if it were -- if they gave, like, a          15:47:38

 6  younger age, closer to 18 or younger -- or, sorry.  If they

 7  looked younger in pictures, we would try to get them hoping it

 8  was an underage person that's -- has that ad.  And more to

 9  locate, I guess, more victims of prostitution.

10  Q.  Is that where you were focusing your resources, is on those          15:48:06

11  types of people being posted?

12  A.  For the -- those stings, yes.

13  Q.  Okay.  Would you then call those ads to set up a date?

14  A.  Yes.

15  Q.  How many ads would you say you have reviewed in your law             15:48:19

16  enforcement career in the escort section on Backpage?

17  A.  Hundreds.

18  Q.  Okay.  In the course of reviewing those hundreds of ads,

19  did you come to understand or learn the terminology that was

20  commonly used in the content of those ads?                               15:48:41

21  A.  Yes.

22  Q.  What were some of those commonly used terms, to the best of

23  your memory?

24  A.  There are several.  I mean, it started with incall or

25  outcall.  And having them come to you or you going to them.              15:49:00

1    Age of the -- the person.  Physical descriptions.  Body

2    measurements.  Breast size.  Things like that.

3    Q.  Okay.

4    A.  Language.  Talking about different -- coded -- coded

5    language talking about different acts or different features of      15:49:27

6    a body, like -- as an example, like, kitty meaning vagina, or

7    Greek, meaning anal sex.  Talking about money and dollar

8    amounts.  Like they would use words like donations or roses.

9          Those are just some of the examples.

10   Q.  Okay.  When you did -- let's pivot.  So let's do the           15:49:54

11   other -- the flip side of that.  Let's talk about the reverse

12   stings.  And, again, the reverse stings were when you all --

13   the police department would post an ad and try to get johns; is

14   that correct?

15   A.  Yes.                                                           15:50:17

16   Q.  All right.  Were you ever involved in creating the ads for

17   those reverse stings?

18   A.  Yes.

19   Q.  How did you know what content to include in the ads?

20   A.  Basically looking at other ads that were out there and         15:50:33

21   using similar language and similar photos.

22   Q.  Okay.  So let's start at the top.  Where -- what's the

23   first thing that you're going to go look for to figure out how

24   to post an ad?

25   A.  Just looking at some of those -- the language that was         15:50:49

```
 1   used.
 2   Q.  All right.  What about the -- the location where the ad was
 3   posted?
 4   A.  Oh, we always put it in a Backpage ad, the escorts.
 5   Q.  So on Backpage in the escort section?                    15:51:01
 6   A.  Yes.
 7   Q.  Okay.  So you wouldn't go to buy/sell/trade on Craigslist
 8   or anywhere else?
 9   A.  No.
10   Q.  Okay.  What about the amount of time and money?  Would that  15:51:11
11   be something that you would include in the ad?
12   A.  Yes.
13   Q.  And how would that typically be designated in the ad?
14   A.  It would be -- typically we would put either a half hour or
15   an hour time increment.  We'd -- we'd try to put a lower dollar  15:51:25
16   amount, because we obviously knew we weren't going to be, you
17   know, paying.  We were hoping that people would respond more by
18   seeing a lower dollar amount.
19   Q.  Gotcha.
20           And would you typically put in there incall or         15:51:46
21   outcall?
22           MR. KESSLER:  Objection.  Leading.
23           THE COURT:  Sustained.
24   BY MR. BERRY:
25   Q.  What are some other terms that you would include in the ads  15:51:55
```

1   when you were creating them?

2   A.  Well, since we were doing it at our -- at a hotel, I mean,

3   we'd put in there that it's incall.

4   Q.  Okay.  You were never going to go to the john in this

5   scenario?                                                    15:52:11

6   A.  I'm sorry?  What was that?

7   Q.  You were never going to go to the john in this scenario;

8   correct?

9   A.  No.

10  Q.  All right.  What other language do you remember being put  15:52:17

11  in the content of these ads when you were creating them?

12  A.  We'd put a lot of physical descriptions.  Put things, you

13  know, trying to entice them, you know, that we're -- we'll do

14  anything, anything for the right price.  And putting some of

15  those even, you know, more playful words, kind of like fun and, 15:52:41

16  I'm going to entertain you, or, you know, things like that.

17  Q.  All right.  Would you put in there, I will have sex with

18  you for money?

19          MR. KESSLER:  Objection.  Leading.

20          THE COURT:  Sustained.                               15:52:59

21  BY MR. BERRY:

22  Q.  Would you put in explicit sex-for-money language?

23  A.  No.

24  Q.  Why not?

25  A.  Ad, it would be taken down by Backpage if we did.         15:53:08

Q.  After the ads that you all created were posted, what would

happen next?

A.  We would get phone calls immediately.

Q.  When you say "immediately," can you give the jury a sense

of the time frame?                                                    15:53:30

A.  Within minutes.

Q.  What did the escort term on Backpage mean to you as an

investigator?

        MR. KESSLER:  Objection.  Relevance.

        THE COURT:  Overruled.                                        15:53:55

BY MR. BERRY:

Q.  You can answer.

A.  That -- that it's prostitution.

Q.  Did you send any emails to Backpage in July of 2012?

        MS. BERTRAND:  Objection.  Leading.                           15:54:11

        THE COURT:  Sustained.

BY MR. BERRY:

Q.  Did you ever send any emails to Backpage?

        MS. BERTRAND:  Same objection.  Leading.

        THE COURT:  Overruled.                                        15:54:23

        THE WITNESS:  Yes.

BY MR. BERRY:

Q.  Do you know approximately when you sent them?

A.  Probably in July of 2012.

Q.  Okay.  And before we keep going to those, back to the ads        15:54:32

1  that you were posting, how did you and your fellow officers

2  know how to post ads on Backpage and what the content should

3  include?

4  A.  From -- from the training we'd -- or that I took and just

5  by viewing ads on Backpage.                                  15:54:56

6  Q.  Just looking at what else is already out there?

7  A.  Yeah.

8  Q.  Okay.  Okay.  So you said in 2012 you sent some emails to

9  Backpage?

10  A.  Yes.                                                      15:55:10

11  Q.  Why were you sending those emails to Backpage?

12  A.  It was a -- in response to -- we had done a prostitution

13  sting.  It was a response to some of the arrests that we made

14  based on the ads that were on Backpage.

15  Q.  All right.  So flush that out a little bit for the jury.  15:55:27

16  What -- what had happened, and what did -- what steps did you

17  take next?

18  A.  So we had done a prostitution sting.  We had made -- used

19  Backpage to call females incall to us at the hotel.  They

20  responded, and we made arrests based on the ads that were      15:55:46

21  posted on Backpage.

22  Q.  And what kind of arrests were those?

23  A.  For prostitution, and I believe one was for promotion of

24  prostitution.

25  Q.  All right.  So you had done this many times before at this  15:56:02

1    point; correct?

2    A.  Yes.

3    Q.  All right.  And so what prompted you to send these emails

4    to Backpage at that time?

5    A.  I think just -- I think it got to that point where we're        15:56:12

6    seeing it happen over and over again and not understanding how

7    they could allow this to continue.

8         MS. BERTRAND:  Your Honor, objection.  Relevance.

9    Move to strike.

10        MR. BERRY:  I'm laying foundation for four exhibits,           15:56:29

11   Your Honor.

12        THE COURT:  I'll overrule the objection.

13   BY MR. BERRY:

14   Q.  You can answer.

15   A.  I'm sorry.  What was it?  Can you repeat the question?           15:56:39

16   Q.  Sure.  Yeah.  So you had done this sting before.  Why --

17   why now?  What triggered you --

18   A.  Right.

19   Q.  -- to do this now?

20   A.  It was -- it was more of just a feeling that, how does          15:56:49

21   Backpage allow this to -- to happen, because every -- every ad

22   on there, in my --

23        MR. EISENBERG:  Objection.  Objection.  He's answered

24   the question.

25        THE COURT:  Yes, he has.  Let's move on.                        15:57:05

UNITED STATES DISTRICT COURT

BY MR. BERRY:

Q.  Did you email them about some specific ads?

A.  Yes.

Q.  All right.  What do you remember about the ads that you were emailing Backpage about?                                  15:57:13

A.  They -- like specific content of the ad or --

Q.  Yeah.

A.  They were similar to all the other ads.  I know one -- some of them were just local area, but they were just -- you know, the photos in them were provocative photos.  It was all the     15:57:35 same kind of language as every other ad that we had seen.

Q.  And they had photos of females?

A.  Yes.

Q.  And you said provocative photos, you said?

A.  Yes.                                                        15:57:51

Q.  How were they dressed?

        MR. KESSLER:  Objection.  Foundation.  It sounds like there was more than one.

        THE COURT:  Well, I'll overrule.

        And I guess, Mr. Berry, you can lay some additional     15:58:01 foundation as to --

        MR. BERRY:  Sure.

        THE COURT:  -- how he knows.

        MR. BERRY:  Let's do that.

    ///

BY MR. BERRY:

Q.  So we're talking about -- about four ads --

A.  Uh-huh.

Q.  -- correct?

A.  Yeah.                                                    15:58:11

Q.  Were each of these ads similar in nature?

A.  Yes.

Q.  Was there any critical differences between them from --

from the four ads versus any ads that you posted or that you

observed on Backpage?                                       15:58:25

A.  No.

Q.  Just run-of-the-mill escort ads on Backpage?

A.  Yes.

Q.  All right.  So how were the -- were all of the females in

these four ads dressed in a similar fashion?                15:58:38

A.  Yes.

Q.  And what was that?

A.  Dressed -- typically without fully clothed.  Showing, you

know, in a bra or underwear.  Just showing body parts.

        MR. BERRY:  Okay.  I'm going to show for the witness's  15:58:56

eyes only United States 1606.

BY MR. BERRY:

Q.  Do you see this, sir?

A.  Yes, I do.

Q.  Do you recognize it?                                     15:59:22

DEREK FRITZE - DIRECT EXAMINATION

1   A.  Yes.

2   Q.  How do you recognize it?

3   A.  It has my email address on it.  It's an email that I sent

4   to Backpage.

5   Q.  Is this -- is this one of several emails?                15:59:33

6   A.  Yes.

7   Q.  And approximately when did this take place?

8   A.  July 16th, 2012.

9   Q.  All right.  And I'm going to --

10         MR. BERRY:  Your Honor, I'm going to go through, just   15:59:48

11  lay the foundation for four exhibits, and then come back and

12  move them all in, as best I can.

13         So let me show you -- just for the witness's eyes --

14  1606a.

15  BY MR. BERRY:

16  Q.  I'm showing 1606a for the witness only.  Do you recognize

17  it?

18  A.  Yes.

19  Q.  How do you recognize it?

20  A.  It's an email that I sent.                               16:00:10

21  Q.  To?

22  A.  To Backpage.

23  Q.  Okay.  And it's -- you recognize your email address?

24  A.  Yes.

25  Q.  And was this on the same day as the previous exhibit we   16:00:17

1    just looked at?

2    A.  Yes.

3    Q.  But it's a different email, different time?

4    A.  Yeah, a few minutes later.

5    Q.  Was it in relation to a different ad?                16:00:27

6    A.  Yes, it was.

7            MR. BERRY:  I'm now showing, for the witness only,

8    1606b.

9    BY MR. BERRY:

10   Q.  Do you recognize that, Detective?                    16:00:41

11   A.  Yes, I do.

12   Q.  What is it?

13   A.  Another email that I sent with my email address, same

14   time -- same date, again, just a few minutes later with a

15   different ad.                                            16:00:54

16   Q.  Okay.  Finally, 1606c.

17           Do you recognize that?

18   A.  Yes, I do.

19   Q.  And how do you recognize it?

20   A.  It's an email I sent to Backpage with my email address, and  16:01:08

21   same date and a couple minutes later.

22   Q.  Is that about a different ad?

23   A.  Yes, it was.

24   Q.  Do all four of these emails contain similar content and

25   message that you were trying to convey to Backpage?      16:01:25

1   A.  Yes.

2          MR. BERRY:  At this time, Your Honor, the United

3   States moves for the admission of Government's Exhibits 1606,

4   1606a, 1606b, and 1606c.

5          MS. BERTRAND:  Objection.                              16:01:40

6          Go ahead, Eric.

7          Foundation.  Relevance.  Hearsay.

8          THE COURT:  Overruled.

9          MS. BERTRAND:  Hearsay within hearsay.

10         THE COURT:  Overruled within each -- with -- I'm        16:01:53

11  sorry.  Overruled, each objection.

12         They may be admitted.  They may be published.

13         MR. BERRY:  Thank you, Your Honor.

14     (Exhibits 1606, 1606a, 1606b and 1606c admitted into

15  evidence.)                                                    16:02:04

16  BY MR. BERRY:

17  Q.  All right.  So now -- now we're looking at 1606 now in

18  evidence.

19         Is this your email address here at the top?

20  A.  Yes, it is.                                                16:02:19

21  Q.  And what address did you send it to?

22  A.  At abuse@backpage.com.

23  Q.  And what date and time did you send it?

24  A.  July 16th, 2012.

25  Q.  All right.  So let's go through this top portion of the   16:02:33

```
 1   email.  And, actually, we'll just clarify here.
 2          This is just a one-page email; correct?
 3   A.  Correct.
 4   Q.  Each one of these is just one page; correct?
 5   A.  Yes.                                                    16:02:49
 6   Q.  All right.  So let's start at the top.
 7          If you would, please, read that out to the jury, and
 8   I'll tell you when to stop.
 9   A.  "Backpage.com, I'm contacting you regarding a listing that
10   violated the following terms or use.  User conduct:  4(c),    16:03:05
11   posting any solicitation directly or in 'coded' fashion for any
12   illegal service exchanging sexual favors for money or other
13   valuable consideration."
14   Q.  All right.  Stop there for just a second.
15          So you told them that you believe it violated their    16:03:24
16   terms of use.  Explain to the jury what you did to go get these
17   items under the user conduct and -- and put it in this email.
18   A.  I copied and pasted them directly from Backpage's website.
19   Q.  Okay.  And one of -- one of the terms of use that you found
20   on Backpage, they say is, you can't use coded fashion for any    16:03:51
21   illegal service; correct?
22   A.  Correct.
23   Q.  Did that strike you as odd considering your investigations?
24   A.  Yes.
25   Q.  Why?                                                    16:04:05
```

DEREK FRITZE - DIRECT EXAMINATION

121

A.  Because I believed every -- every ad on there had some sort

of coded language regarding prostitution.

Q.  All right.  Move on to the next one, 4(e).

A.  "4(e):  Posting any material on the site that in any way

constitutes or assists in human trafficking."                    16:04:23

Q.  Number 5?

A.  "Posting any ad for products or services, use or sale of

which is prohibited by any" -- "any law or regulation."

Q.  And why did you put that one on there?

A.  Because I -- I believed the ads were for prostitution,       16:04:38

which is illegal.

Q.  An illegal service in Minnesota; correct?

A.  Yep.

Q.  And what about 16?  What does that one say?

A.  "Using the site to engage in or assist another individual    16:04:56

or entity to engage in fraudulent, abusive, manipulative" --

"manipulative or illegal activity."

Q.  And explain to the jury why you included that one.

A.  Again, because it -- the site assists in prostitution,

which is an illegal activity.                                    16:05:16

Q.  The site itself?

A.  Yeah.

Q.  Okay.  All right.  Now let's move down in the email a

little bit.

        What is this section right here that has a -- appears    16:05:27

UNITED STATES DISTRICT COURT

```
 1   to be a hyperlink to a -- a website?  What is that?
 2   A.  The hyperlink is just a link to the actual ad of one -- of
 3   what we used or found on the prostitution sting, one of the
 4   ads.
 5   Q.  And in what part of Backpage was it posted?  What city?        16:05:45
 6   A.  It's in Minneapolis.
 7   Q.  All right.  And what section on Backpage?
 8   A.  Female escorts.
 9   Q.  And can you tell from this link here what the title of the
10   ad was?                                                            16:05:58
11   A.  Yes.
12   Q.  How do you tell that?  Or where is that?
13   A.  Just after the -- the female escorts.
14   Q.  And what did it say?
15   A.  "New-ultimate-pleasure-25."                                    16:06:07
16   Q.  All right.  And then below that you had some more message
17   for Backpage, and this is kind of the end of it.
18        Read that part to the jury, where it starts with "this
19   listing."
20   A.  "This listing under the adult services-escort section of      16:06:30
21   your site resulted in the arrest of three people for engaging
22   in prostitution and promoting the prostitution of others.
23   Although Backpage.com legally defends that they do not support
24   illegal activity such as prostitution and human trafficking,
25   any reasonable person knows that every listing in the adult        16:06:47
```

DEREK FRITZE - DIRECT EXAMINATION

123

1    services-escort section is an advertisement for illegal

2    prostitution.  Every listing violates each of the above listed

3    items in the user conduct agreement and should not be allowed

4    to be posted at all.  Please take responsible" -- "or

5    reasonable steps as a business to ensure these people do not          16:07:06

6    use Backpage.com as a means to advertise prostitution."

7    Q.  And what were you trying to convey to whoever would listen

8    at Backpage?

9            MR. KESSLER:  Objection.  It's in the email.

10            THE COURT:  Well, I'll sustain.                              16:07:28

11   BY MR. BERRY:

12   Q.  Did each of these four emails say basically the same thing?

13   A.  Yes.

14   Q.  What was different about any of the four in this section of

15   the email?                                                           16:07:40

16   A.  Just the resulted in the arrest of -- depend.  Just

17   different people.

18   Q.  All right.

19   A.  One or two words.

20   Q.  So this one happens to say three people.  The other ones        16:07:50

21   might say one person?

22   A.  Yes.

23   Q.  Do each of them say they were arrested for prostitution?

24   A.  Yes.

25   Q.  And then after that sentence, so starting with "although,"      16:07:59

DEREK FRITZE - DIRECT EXAMINATION

124

1   is everything the same in those subsequent three emails?

2   A.  Yes.

3   Q.  And they were, each one, conveying the same message?

4   A.  Yes.

5   Q.  All right.  Have you ever arrested someone for prostitution        16:08:13

6   in Minnesota based solely on the face of the ad?

7   A.  No.

8   Q.  Okay.  Why not?

9   A.  Most of the time we're doing stings, so I'm getting the

10  actual identification of the person, getting them to come to us      16:08:50

11  so we can identify them.

12          Other than that, just building a stronger case for an

13  actual prosecution, not just an arrest.

14  Q.  Okay.  When you've called ads on Backpage, have you ever

15  encountered prostitutes?                                             16:09:14

16  A.  Yes.

17  Q.  What percentage of the time?

18  A.  Every time.

19  Q.  100 percent?

20  A.  Every time.                                                      16:09:23

21  Q.  Have you ever called an ad and it turned out to not be a

22  prostitute?

23  A.  No.

24  Q.  You are at least generally familiar with the prostitution

25  statutes in Minnesota; correct?                                      16:09:40

```
 1   A.  Yes.
 2   Q.  Do you know the difference between the prostitution statute
 3   in Minnesota and the federal crime of promotion of a
 4   prostitution business enterprise?
 5           MR. CAMBRIA:  Objection.                          16:09:54
 6           MS. BERTRAND:  Objection.  Calls for a legal
 7   conclusion.
 8           MR. BERRY:  I'm asking if he knows the difference.
 9           THE COURT:  The question is, "Do you know the
10   difference between?"                                      16:10:00
11           He can answer yes or no if he knows the difference.
12           THE WITNESS:  No.
13   BY MR. BERRY:
14   Q.  You don't know?
15   A.  No.                                                   16:10:06
16   Q.  Do you know -- yes or no, do you know whether Backpage used
17   something called a strip ad filter?
18   A.  No.
19   Q.  Do you know -- are you aware -- or are you aware whether
20   Backpage would remove the most obvious sex-act-for-money    16:10:30
21   language from ads?
22           MS. BERTRAND:  Objection.  Leading.
23           THE COURT:  Overruled.
24   BY MR. BERRY:
25   Q.  You can answer.                                       16:10:38
```

1  A.  No.

2  Q.  You don't know?

3  A.  No.

4  Q.  Okay.  Are you aware of Backpage's moderation practices?

5  A.  No.                                                          16:10:47

6  Q.  Do you know what The Erotic Review is?

7  A.  Yes.

8  Q.  Explain to the jury what that is.

9  A.  It's a website that -- where prostitution -- prostitutes

10  could be rated and given, you know, comments about things that   16:11:06

11  they've done based on searchable features, like phone numbers

12  or names or things like that.

13  Q.  Did you ever utilize that in connection with your Backpage

14  investigations?

15  A.  Yes.                                                         16:11:21

16  Q.  Explain that to the jury.

17  A.  If we had an ad that had a phone number or name or

18  anything, we'd look on The Erotic Review to see if they had any

19  reviews or any -- any comments about what they've done, more

20  explicit comments.                                               16:11:39

21  Q.  Did you ever see anything about The Erotic Review on the

22  Backpage ads?

23  A.  Not that I could -- not that I could recall.

24  Q.  All right.  That you would -- would you go do the

25  investigation yourself --                                        16:11:55

 1   A.   Yeah.

 2   Q.   -- based on the ad?

 3   A.   Yeah.

 4   Q.   Okay.  Is that a yes?

 5        Are you saying yes?                                    16:12:02

 6   A.   Yeah.  Yeah.

 7   Q.   Okay.  Are you aware of any relationship between Backpage

 8   and The Erotic Review?

 9   A.   No.

10   Q.   Are you aware that Backpage was paying The Erotic Review?   16:12:13

11        MS. BERTRAND:  Objection.  Counsel's testifying.

12   Leading.

13        THE COURT:  Overruled.

14        THE WITNESS:  No.

15        THE COURT:  He can --                                  16:12:24

16   BY MR. BERRY:

17   Q.   So you're not aware --

18   A.   No.

19   Q.   -- that they were paying?

20   A.   No.                                                    16:12:28

21   Q.   Okay.  Are you aware of any relationship between Backpage

22   and so-called super posters?

23   A.   No.

24   Q.   Are you aware of Backpage's aggregation methods?

25   A.   No.                                                    16:12:38

1  Q.  Are you aware of whether Backpage took ads from Craigslist

2  and posted them on Backpage?

3  A.  No.

4  Q.  Are you aware of any meetings between the owners of

5  Backpage and the people at NCMEC?                              16:12:49

6          MS. BERTRAND:  Objection, Your Honor.  What's the

7  foundation for even asking this person these questions?  And

8  they're presuming the -- the truth of the question.

9          MR. BERRY:  I'm actually --

10         THE COURT:  All right.                                 16:13:01

11         MR. BERRY:  -- laying the foundation by asking if he's

12  aware.

13         THE COURT:  Let's lay some foundation then, Mr. Berry.

14         MR. BERRY:  Yes, Your Honor.  That's what I'm

15  attempting to do by asking if he's aware, yes or no.  And then  16:13:10

16  if the answer's yes, then we go forward.  If we don't, we move

17  on to the next question.

18  BY MR. BERRY:

19  Q.  Are you aware of any meetings between Backpage and NCMEC?

20  A.  No.                                                       16:13:20

21  Q.  Are you aware of any meetings between Backpage and the

22  people at Polaris?

23  A.  No.

24  Q.  Are you aware of any meetings between the owners of

25  Backpage and people at Auburn Theological Seminary?           16:13:30

 1    A.  No.

 2            MR. FEDER:  Judge, I'm going to object to this.

 3    They've met with this guy.  Clearly he doesn't know this, and

 4    they're trying to summarize their case with someone who

 5    obviously doesn't know the answer.                          16:13:44

 6            THE COURT:  Is there an objection based on the rule?

 7            MR. FEDER:  Yes.  Foundation and relevance and

 8    cumulative.

 9            THE COURT:  Overruled.

10            MR. BERRY:  Just one second, Your Honor.            16:14:01

11    BY MR. BERRY:

12    Q.  Did you ever see any of your original changes to the

13    Backpage ads after sending them emails about every ad being a

14    prostitution ad?

15    A.  I never checked to see if it -- are you saying if -- were  16:14:28

16    they still there?

17    Q.  Sure.

18    A.  I don't know if they were taken down or not.

19    Q.  Okay.  So let's actually go back to that.  That's a good

20    point.                                                      16:14:42

21            After you sent these four emails telling them

22    prostitution, prostitution, prostitution, did you get a

23    response?

24    A.  Yes.

25    Q.  From Backpage?                                          16:14:50

1   A.  Yes.

2   Q.  Do you recall the -- the general substance of that?

3   A.  It was one email response to the -- I don't know which ad

4   it was, but it said, thank you for letting us know, and -- and

5   we'll take -- remove these ads.                              16:15:05

6   Q.  Okay.  We'll remove these ads.

7          Did they engage you on the substance of what you were

8   saying about how you're using coded terms, violating the

9   service, it's all prostitution?

10         Did they engage you on the substance of that at all?  16:15:18

11         MS. BERTRAND:  Objection.  Leading.

12         MR. EISENBERG:  Objection.  Asked and answered.

13         THE COURT:  Overruled.

14  BY MR. BERRY:

15  Q.  You can answer.                                          16:15:24

16  A.  No.

17  Q.  Just thanks for letting us know.  We took them down.

18  A.  Yeah.

19  Q.  All right.  Was Backpage a good resource for you in

20  investigating prostitution offenses?                         16:15:34

21         MS. BERTRAND:  Objection.  Leading.

22         THE COURT:  Overruled.

23         THE WITNESS:  Yes, it was.

24  BY MR. BERRY:

25  Q.  Were -- was Backpage a good partner to you in law        16:15:42

1   enforcement in your investigations?

2   A.   I don't think it was a -- it was not a good partnership

3   because -- because a partnership would have similar goals, and

4   I don't think we had similar goals in terms of what we were

5   trying to do.                                                     16:16:01

6   Q.   And what were those differences?

7           MR. KESSLER:   Objection.   That's speculation.

8           THE COURT:   Overruled.

9           THE WITNESS:   We were trying to remove or get rid of

10  prostitution and -- and means to -- to have it, you know, to     16:16:12

11  operate it, prostitution, and they were allowing it to happen.

12          MR. FEDER:   Objection.   Beyond the scope, and improper

13  opinion.

14          THE COURT:   Overruled.

15  BY MR. BERRY:                                                     16:16:27

16  Q.   Keep going.

17          THE COURT:   I think he's answered the question.

18          MR. BERRY:   All right.   I felt like the objection was

19  inter- -- interrupting him, but, all right.   I'll move on.

20  BY MR. BERRY:                                                     16:16:38

21  Q.   In your prostitution stings, you used the phone to call --

22  to talk to people, correct, that were either seeking sex for

23  money or the girls that were advertising it; correct?

24  A.   Correct.

25  Q.   Did you ever consider charging the phone company for        16:16:54

1    facilitating the crime of prostitution?

2    A.  No.

3    Q.  Why not?

4    A.  A couple reasons.  It -- I mean, it just comes down to

5    knowledge.  I don't think phone companies had the same                16:17:09

6    knowledge that Backpage did about the extent of the -- the

7    prostitution.  Also, just the -- I guess the -- you know, I

8    guess the volume.  When I say, you know, Backpage, every

9    listing is -- in my opinion is prostitution.  You know, phone

10   calls, how did -- how do we know what phone calls are -- are    16:17:33

11   all prostitution?

12           So there's a lot of non-illegal phone calls.

13           MR. BERRY:  Thank you.

14           Pass the witness.

15           THE COURT:  Who's examining?                              16:17:45

16           Mr. Kessler, please come forward.

17           And, Mr. Kessler, we'll go through to 4:30.

18           MR. KESSLER:  Okay.  Thank you.

19           THE COURT:  Whenever you're ready.

20                   CROSS-EXAMINATION                                  16:18:23

21   BY MR. KESSLER:

22   Q.  Hello.

23   A.  Hello.

24   Q.  Could you get a little closer to your microphone.

25           Thank you.                                                16:18:28

```
 1              We've never met, have we?

 2   A.  No.

 3   Q.  My name is Eric Kessler.  I represent -- I'm one of the

 4   attorneys that represents Scott Spear, one of the former owners

 5   of Village Voice.                                                16:18:45

 6              Do you understand that?

 7   A.  Yeah.

 8   Q.  Okay.  I want to talk to you a little bit about your work

 9   history in Maplewood.

10              As I understand, that's a suburb of the Twin Cities;  16:19:02

11   correct?

12   A.  Correct.

13   Q.  About 40,000 population?

14   A.  Yes.

15   Q.  You worked in the street crimes unit at one point; correct? 16:19:12

16   A.  Yes.

17   Q.  What does that mean, street crimes unit?

18   A.  It's a -- it's more of a proactive investigation unit

19   within just our -- our jurisdiction, our city.

20   Q.  What did you typically investigate while working in that     16:19:31

21   unit?

22   A.  My focus on -- during that time was hotel issues and

23   supervise prostitution-related and narcotics related, which was

24   kind of all encompassing hotels.

25   Q.  Okay.  So a street crimes unit included prostitution?        16:19:56
```

DEREK FRITZE - CROSS-EXAMINATION

134

```
 1    A.  It can, yes.

 2    Q.  And you've testified that you received specialized training

 3    in the investigation of prostitution; correct?

 4    A.  Yes.

 5    Q.  And that occurred in roughly 2011?                        16:20:13

 6    A.  I believe so, yes.

 7    Q.  You said that you've been on the force in Maplewood for

 8    16 years; is that correct?

 9    A.  Correct.

10    Q.  That would put you joining the force roughly 2007?        16:20:27

11    A.  Correct.

12    Q.  Did you have law enforcement experience before that?

13    A.  No.

14    Q.  Other than working for Maplewood Police Department, have

15    you been engaged in law enforcement in any other capacity     16:20:52

16    during your life?

17    A.  Yes.

18    Q.  Tell me about that.

19    A.  Prior to that, I was a community service officer with the

20    Cottage Grove Police Department, which is another suburb of   16:21:04

21    St. Paul.  Just more of a non-licensed law enforcement role.

22    Q.  You mean you were not a sworn officer at that time?

23    A.  No.

24    Q.  Couldn't carry a gun?

25    A.  No.                                                       16:21:20
```

```
 1    Q.  Okay.  Anything else?

 2    A.  Not -- I've done loss prevention of catching shoplifters

 3    before that as well.

 4    Q.  So while working for Maplewood -- well, first, when you go

 5    through the Minnesota police officer training, I'm -- and, I'm          16:21:39

 6    sorry.  I don't know the exact name of that program.  Could you

 7    tell us what that is.

 8    A.  Yep.  It's the Minnesota Peace Officer Standards and

 9    Training.  It's a certification where you have certain class --

10    classroom credits.                                                      16:22:01

11    Q.  Okay.

12    A.  And it's --

13    Q.  And while you're not expected to be a lawyer, in terms of

14    knowledge of laws, you are taught about criminal laws; correct?

15    A.  Correct.                                                            16:22:17

16    Q.  You have to be proficient in understanding what constitutes

17    a violation of one of the state's criminal laws; correct?

18    A.  Correct.

19    Q.  And that includes prostitution?

20    A.  Correct.                                                            16:22:35

21    Q.  And then you go to work for Maplewood, a relatively small

22    community, but it's close to a couple very large ones; right?

23    A.  Yes.

24    Q.  And you're there a decade and a half.

25            At some point are you expected to have a pretty good           16:22:52
```

1    handle on the Maplewood city or municipal code?

2    A.  Yes.

3    Q.  Okay.  Now, to be clear, Maplewood is governed by, like, a

4    city council; correct?

5    A.  Yes.                                                              16:23:17

6    Q.  And the city council members are elected by the citizens of

7    Maplewood; correct?

8    A.  Correct.

9    Q.  Yeah.  And the city council then carries out the wishes of

10   its constituents in passing the city code; correct?               16:23:31

11   A.  Correct.

12   Q.  And are you familiar with that code?

13   A.  And, just to be clear, there's -- we have a state statute

14   and criminal code for city ordinance.

15   Q.  Right.  I thought I covered that.  We --                       16:23:52

16   A.  Right.

17   Q.  We talked about you, before you became a police officer,

18   when you were in the Minnesota State training --

19   A.  Yeah.

20   Q.  -- for police, that's where you learn about the criminal      16:24:02

21   laws for the state of Minnesota as a whole; correct?

22   A.  Yes.

23   Q.  But there are individual cities within Minnesota, Maplewood

24   being one of them, and most of them have city councils that

25   pass laws pertaining to just those cities; right?                 16:24:21

1    A.   Yes.

2    Q.   And that's the case in Maplewood?

3    A.   Yeah.   If -- if I could clarify?

4    Q.   Sure.

5    A.   I know there's -- there's city ordinance.  We -- the -- the    16:24:33

6    city ordinance is not strictly based on what we, you know, try

7    to -- I mean -- what am I trying to say?  It's not the only

8    thing that we use to enforce crimes.

9    Q.   No.   Understood.

10   A.   It's more -- it's more state statute --    16:24:56

11   Q.   Yeah.

12   A.   -- that we do.

13   Q.   I understand.

14   A.   Okay.

15   Q.   I'm just trying to establish that you are familiar with the    16:25:01

16   Maplewood city code.

17   A.   Yeah.   In a -- and if there's -- I mean, I wouldn't say

18   I've ever memorized it, but I know where to look things up and

19   find things.

20   Q.   Okay.   Fair enough.    16:25:14

21        In your career at Maplewood, you spent some time

22   investigating illegal massage parlors; is that correct?

23   A.   Yes.

24   Q.   And, as you've testified, you participated in a number of

25   sting operations targeting potential prostitutes; correct?    16:25:49

DEREK FRITZE - CROSS-EXAMINATION

138

1    A.  Correct.

2    Q.  Your department would place a fake ad in Backpage.  The

3    officer, usually female, would pose as a prostitute and would

4    make contact with individuals who responded to the ad.

5         Is that basically the way it worked?                    16:26:17

6    A.  Yes.

7    Q.  When you placed the ads with Backpage, I -- did you ever do

8    that yourself?

9    A.  One of my partners would usually do -- we'd -- we'd talk

10   about the ad, but he would be the one -- be the one that would  16:26:39

11   post them --

12   Q.  Okay.

13   A.  -- physically post them.

14   Q.  So my question is, did you ever place or post an ad on

15   Backpage yourself?                                           16:26:48

16   A.  It -- I -- I've physically been there when it's posted,

17   yes.  I haven't pressed the button of --

18   Q.  Okay.

19   A.  -- that.

20   Q.  But you've watched it happen?                            16:27:03

21   A.  Yes.

22   Q.  All right.  And as a person begins to post an ad in, let's

23   say, the adult services, and be more specific, if you want, the

24   escort section of adult services, there are some, shall we say,

25   warnings that you have to go through before you can actually   16:27:31

UNITED STATES DISTRICT COURT

 1   place the ad; correct?

 2   A.  I don't -- I don't remember --

 3   Q.  Well --

 4   A.  -- what they were.

 5   Q.  -- let me point you to it.                              16:27:43

 6          The first thing that you come across is a notification

 7   that this is an adult site?

 8          MR. BERRY:  Objection, Your Honor.  He just said he

 9   doesn't remember.

10          THE COURT:  Sustained.                              16:27:56

11          MR. KESSLER:  No.  He also said he was there.

12   BY MR. KESSLER:

13   Q.  So let me ask you this again.

14          Did you watch somebody post these ads?

15   A.  Yes.                                                   16:28:05

16   Q.  Okay.  And did you watch when the age verification warning

17   came up?

18   A.  I don't -- honestly, I don't remember what was on there

19   when it was being posted.

20   Q.  You said that every ad for escorts was a prostitution ad;   16:28:21

21   correct?

22   A.  Correct.

23   Q.  But you never posted an ad yourself; correct?

24   A.  I was there when they were posted.

25   Q.  Did you ever see the age verification warning?          16:28:39

```
 1              MR. BERRY:  Objection.  Asked and answered.
 2              THE COURT:  Sustained.
 3   BY MR. KESSLER:
 4   Q.  Did you ever see the terms of use?
 5   A.  I've looked them up.                                    16:28:49
 6   Q.  Well, you must have, because they're in your email, all
 7   four of them; correct?
 8   A.  Correct.
 9   Q.  And so you understand that in order to lawfully -- or at
10   least within the terms allowed by Backpage.com, you have to   16:29:11
11   agree to a number of terms of use; correct?
12              MR. BERRY:  Objection.  Compound question.
13              THE COURT:  Overruled.
14              But we'll leave it at that.
15              Members of the jury, we are at 4:30, so it is time to  16:29:32
16   adjourn for the afternoon.
17              I do again remind you of the admonishment.  It's very
18   important not to come to any conclusions, not to conduct any
19   research, discuss the matter amongst yourselves or anyone else.
20   Continue to have an open mind and just enjoy the evening.  And   16:29:47
21   we will see you promptly in court at 9:00 a.m. tomorrow.  So
22   have a pleasant evening.
23              All rise for the jury.
24        (Jury not present at 4:30 p.m.)
25              THE COURT:  And the witness may step down.            16:30:21
```

UNITED STATES DISTRICT COURT

1           And I'd like to discuss a couple of issues and

2     scheduling matters with counsel.

3           I see that at the time of -- including this gentleman

4     here, there are roughly 14, 15 government witnesses on the

5     witness list that are to be called.  Today, obviously, we got          16:30:55

6     through about five.  And so if the government continues at this

7     pace, I suspect we're going to possibly finish if not Friday,

8     but possibly bleed into Tuesday of next week with the

9     government's case.

10          So that prompts me to do this.                                     16:31:20

11          MR. RAPP:  Judge?

12          THE COURT:  Unless there's some sort of firm

13    objection, counsel has other matters to attend to, I would like

14    you to keep your Friday afternoon calendars clear beginning

15    this Friday at 1:30 to 3:30, roughly 4:00 o'clock, so that we          16:31:38

16    can do a number of things:

17          First, I'd like you to start reviewing the current

18    jury instructions that have been already agreed to, provide to

19    the Court by Friday any amended jury instructions, if there's

20    language to be altered or any of that sort of thing.                    16:32:06

21          But, again, I think Friday afternoon you should have

22    to me any amended -- amendments to the already predetermined

23    jury instructions.

24          Now, I suspect one or more of you may want to move for

25    new instructions, and so I want to build time to hear your             16:32:31

argument on those Fridays.  My Monday is completely booked with

criminal and civil matters.

        And so in addition to that, I, once again, reviewed

the forms of verdict.  And because I don't want to be caught

behind and keeping the jury waiting, I want the government to          16:32:54

look at its form of verdict.  I think there are edits,

substantive edits that need to go into that form of verdict.  I

think the descriptions in the current form of verdict are

confusing, not helpful, do not precisely track the counts and

perhaps the exhibits that relate to the counts, and so you           16:33:25

should look at that.  Nowhere in the proposed form of verdict

does it mention the states in which the violation is alleged to

have occurred.  So do be mindful of that, and also remain --

remove the defendant who is not a party to this case.  So do be

mindful of that.  And then we will discuss when to have that          16:33:51

ready for the Court's review.  We can do that on Friday.

        But, in any event, please keep this Friday, next

Friday, November the 3rd, Friday afternoon clear.  If you have

a conflict, you can send me a note as to whether or not you're

anticipated in another court, or you can tell me why it is you        16:34:17

cannot be here and present so that we can make sure that the

jury remains on schedule.

        Mr. Rapp?

        MR. RAPP:  Judge, I think we're going to rest on

Thursday.                                                             16:34:33

1          THE COURT:  Well, there we go.

2          MR. RAPP:  We think we have about five witnesses that

3   we're going to put on.  We're going to end -- we're going to

4   finish up --

5          THE COURT:  Can you speak into the mic.                    16:34:44

6          MR. RAPP:  I thought I was.  Sorry about that.

7          We're going to finish, obviously, with Detective --

8   Detective Fritze.  We are then going to proceed to Jordan

9   Thurman, who is a substantive count victim.  Then we're going

10  to have Brad Myles.  We're going to have John Shehan, which we    16:34:59

11  noticed a couple of weeks ago.  And then depending on flight

12  scheduling, we're either going to have Dan Hyer, then Megan

13  Lundstrom, or Megan Lundstrom, Dan Hyer.  Then we're going to

14  be ready to rest.

15         So we -- we think that could happen as early as          16:35:19

16  Thursday, so we believe that the defense should have witnesses

17  in the building on Thursday.

18         THE COURT:  All right.  You have been put on notice,

19  and you will have your witness -- your witnesses identified and

20  provided to the government three days in advance of Thursday,    16:35:37

21  which is -- we're -- we're within that time period.

22         And, so, then, again, it's necessary for us then to

23  use the afternoon on Friday to address some of these other

24  miscellaneous matters.  And so that's how we will proceed.

25         MR. LINCENBERG:  Your Honor, can I raise a question        16:36:05

```
 1   about what Mr. Rapp just indicated?

 2            THE COURT:  Yes.

 3            MR. LINCENBERG:  Thank you.

 4            THE COURT:  Question to Mr. Rapp or to me?

 5            MR. LINCENBERG:  Well, it's really for both.        16:36:12

 6       We've been advised of about 15 witnesses that were

 7   going to be called this week.  We've been spending the entire

 8   weekend and so forth preparing for them.  Can I take it from

 9   Mr. Rapp's representation that the individuals who Mr. Rapp did

10   not just identify are not going to be called?                16:36:31

11            MR. RAPP:  Yes.  They will not be called in our

12   case-in-chief.  They -- they may still be called in rebuttal,

13   depending what the defense puts on.

14            MR. LINCENBERG:  Okay.  That's helpful.

15       I'd like to make one other point, if I may,             16:36:43

16   Your Honor.

17            THE COURT:  Yes.

18            MR. LINCENBERG:  This is just for the record with

19   regard to the current witness, to note our objections with

20   respect to the Court's not allowing, for example, reference to 16:36:57

21   Communication Decency Act, Section 230.

22       What we see is yet another state law law enforcement

23   person who comes into court, and the prosecution, knowing that

24   we can't ask these questions, sort of has the witness suggest

25   that he could have made arrests of Backpage or that Backpage    16:37:18
```

UNITED STATES DISTRICT COURT

1  was somehow violating the law, even though he full well knows,

2  based upon all of the court cases, that there was no violation

3  of state criminal laws in Minnesota, because of the CDA.

4        THE COURT:  Well, I don't think there was any

5  testimony by this witness that he knows about any court cases      16:37:36

6  related to the CDA.  Of course, the government wasn't permitted

7  to ask that area of questioning.  So there's no evidence in

8  the -- no testimony in the record as to his knowledge of court

9  cases relating to the CDA.

10        MR. LINCENBERG:  That's not what we suggested.  That's     16:37:55

11  not what we suggested.

12        THE COURT:  No.  That's exactly what you said,

13  Mr. Lincenberg.

14        MR. LINCENBERG:  No.

15        THE COURT:  I saw it, I heard it, and I see it on the      16:38:02

16  record.  All right.

17        MR. LINCENBERG:  That's not correct.

18        THE COURT:  Well --

19        MR. LINCENBERG:  Can I restate my point to make it

20  clear if I wasn't clear?                                         16:38:08

21        THE COURT:  Yes, please.

22        MR. LINCENBERG:  Thank you, Your Honor.

23        What we said is that this is another state law

24  enforcement witness who comes into court and makes it seem like

25  he could have easily gone out and arrested people at Backpage.   16:38:18

```
 1    You know, Mr. Berry's questioning, for example, was sort of
 2    preempting other lines of cross that have been used with other
 3    witnesses.  Mr. Berry says, now, you didn't make any arrests
 4    based upon the ads, right?  Right.  Well, it's just because we
 5    were -- we wanted to do further work.                              16:38:42
 6         The suggestion that he could have, that these are
 7    clear violations of the laws that he's involved with, when he
 8    knows that's not the case, and the prosecution knows that we're
 9    forbidden from cross-examining to bring out the whole story.
10    That's my point.                                                   16:38:57
11         THE COURT:  Well, I think what gets lost in these
12    discussions is I have not been given by the defense, by the
13    government, anyone else, I've not seen a criminal prosecution
14    under the CDA.  That is a civil tool.  I've not seen any case.
15    You can bring it to my attention if you wish.  Research all        16:39:18
16    night.  I -- I'd like to see it.  Provide that to me, and then
17    maybe I'll reevaluate the prior orders.  But, as far as I know,
18    this is not a civil prosecution.
19         MR. LINCENBERG:  Right.
20         THE COURT:  This is a criminal prosecution.  This             16:39:36
21    individual was not, as my -- my understanding of his testimony,
22    he was investigating prostitution crimes.
23         MR. LINCENBERG:  Under state law.
24         THE COURT:  Yes.
25         MR. LINCENBERG:  For which they're immune under the           16:39:48
```

```
 1   CDA.
 2            THE COURT:  Well, he wasn't investigating, I don't
 3   think, the CDA.
 4            MR. LINCENBERG:  No.  It's not a --
 5            THE COURT:  Mr. Berry?                                16:39:57
 6            MR. LINCENBERG:  It's not a matter of him
 7   investigating the CDA.  Of course not.
 8            THE COURT:  Yes, it is.
 9            MR. RAPP:  He --
10            THE COURT:  All right.  Mr. Berry?                    16:40:03
11            MR. RAPP:  Well, he --
12            THE COURT:  Mr. Rapp.
13            MR. RAPP:  Well, he's conflating the Travel Act, which
14   is a federal criminal prosecution with state prostitution
15   offenses.  And so he's investigating state prosecution        16:40:14
16   offenses.  There is a carve-out, as the defense knows, for
17   federal criminal prosecution for violation of the Travel Act.
18   That's what we're -- that's what this case is.
19            MR. LINCENBERG:  Exactly.  He doesn't bring Travel Act
20   investigations or cases.  He's a state law prosecutor.  They're 16:40:28
21   using him to come in and talk about how Backpage -- how he had
22   jurisdiction and he's doing these investigations because
23   Backpage folks are violating these laws, when he knows that the
24   CDA makes all of our clients immune under the state of
25   Minnesota laws.  But we can't -- we can't counter that --      16:40:46
```

```
 1              THE COURT:  Well, why don't you --

 2              MR. LINCENBERG:  -- because of the Court's ruling.

 3              THE COURT:  -- give me your line of questioning for

 4    this witness in that category, and I'll evaluate it and see

 5    based on -- and I'll look at his testimony.                        16:41:02

 6              MR. LINCENBERG:  Do you want me to give it to --

 7              THE COURT:  But --

 8              MR. LINCENBERG:  -- you now or --

 9              THE COURT:  No.  I want you to give it to me in

10    written form.                                                      16:41:06

11              MR. LINCENBERG:  When?  Overnight?  Today.

12              THE COURT:  Yes.

13              MR. LINCENBERG:  Okay.

14              THE COURT:  I mean, the witness is testifying.  He's

15    on the stand.  He's on cross-examination.                          16:41:10

16              And while I'm on the point, those of you who have two

17    counsel, the person who makes the objection is the person who

18    is taking the witness.

19              So, Mr. Feder, try to refrain from objecting when it

20    was Mr. Kessler's witness.  Mr. Kessler and you were objecting     16:41:31

21    on the same witness.  So let's make sure that that doesn't

22    happen again.

23              I see Mr. Cambria waiting patiently.  So you wish to

24    make a record of some sort?

25              MR. CAMBRIA:  No.  I wish to ask a question.             16:41:43
```

1          Our -- is the suggestion here that the defense is

2    supposed to have witnesses ready this Thursday or a week from

3    Thursday?

4          THE COURT:  This Thursday.  You just heard Mr. Rapp

5    say they might rest on Thursday.                              16:41:57

6          MR. CAMBRIA:  Well, the problem is, using this Friday,

7    that was one of the days that I had witnesses set up for me to

8    prepare.  So I do have a conflict with being in court on

9    Friday.

10          THE COURT:  Well, as you know, we have trial on Friday  16:42:15

11    morning.

12          MR. CAMBRIA:  Just on the morning.

13          THE COURT:  Yes.  And so you can delay your

14    preparation of your witnesses, as we all do, on the weekends.

15    I've been working on the weekends.  Many of you have as well.  16:42:28

16          So that's what we're going to do.  We're not going to

17    waste any of the jury's time.  We're going to maximize the use

18    of what we have.  We only have, as I noted, on this accelerated

19    schedule now possibly only two Fridays to work with.

20          Mr. Panchapakesan?                                     16:42:51

21          MR. PANCHAPAKESAN:  Good afternoon, Your Honor.  I had

22    a quick question on the jury instructions.

23          So there's the preliminary ones the Court gave at the

24    outset of the case.  I have, I think, a July 20th, 2023, draft

25    that I think was circulated in hard copy.  And I just want to  16:43:06

```
 1   make sure we're working off the same copy.  This one is, I
 2   think, 62 pages.  As to some of the instructions, the Court, I
 3   think, kept the objection in, and so I just want to make sure
 4   I -- we know what we're dealing with.
 5           THE COURT:  I will double-check, but I thought we had      16:43:22
 6   gone over that at a subsequent final pretrial conference.  And
 7   so there might be a different version that's beyond that.  And
 8   I'll double-check that, and I'll have my law clerk send you a
 9   note so that you can begin reviewing that.
10           MR. PANCHAPAKESAN:  Okay.  Thank you.                      16:43:43
11           THE COURT:  All right.  Anything further from the
12   government?
13           MR. RAPP:  Oh, well, obviously we'd like the -- the
14   defense witnesses on -- in that same vein with these witnesses,
15   we've asked repeatedly -- of course there's scheduling orders   16:44:01
16   in this regard, but we've asked repeatedly for 26.2 statements
17   of these witnesses.  We have never gotten a confirmation, a
18   definitive confirmation from the defense that they have
19   disclosed those 26.2 statements for every, you know, now
20   150 witnesses.                                                    16:44:21
21           And so we've been sending them emails, giving them
22   case law, giving them examples of -- of judges in this district
23   who have compelled the defense to disclose those statements.
24   We have not got a confirmation of that.  And so not only would
25   we like the witnesses that they should be prepared to put on     16:44:42
```

the stand this week, we also would like them to disclose their

26.2 statements that they have been obligated to do so for the

last two or three years based upon scheduling orders.  So ...

THE COURT:  All right.  Well, that's not an

unreasonable request.                                        16:45:02

Who's responsible for the witnesses?

MR. LINCENBERG:  I -- I'm not here --

THE COURT:  I would assume that each of you are.

MR. LINCENBERG:  Yeah.  I'm here to just note the

unfairness of what is happening here, where the government gave   16:45:12

us a list of 15 witnesses, which would have clearly taken us

through the week, and they decide to wait until Tuesday at

night to tell us:  You know what?  We may be ending Thursday.

You have to get your witnesses here Friday morning.  We're only

going to call seven of the 15 that -- that we said.          16:45:30

So that the Court, which I understand, wants to keep

the trial moving, but now it puts the -- the defense, like

Mr. Cambria, who has been anticipating, based upon the

representations from -- from the prosecution, that those

witnesses would become no -- be coming no earlier than next   16:45:47

week.

THE COURT:  Well, your statement is noted, but I will

say that on balance there has been a lack of cooperation

amongst the parties.  Everything is a fight.

On Friday at 4:30, Mr. Feder all of a sudden says   16:46:10

1    everybody's left town, we don't know who our witnesses are,

2    compelling me to direct you to at least identify the first

3    five.  What I received in response was not a listing on

4    Saturday, as I ordered, but a filing early this week saying:

5    We don't intend to call these seven odd witnesses, and we          16:46:35

6    possibly may call these five city ordinance people.

7            So I'm operating on the assumption that at the very

8    least those people that you've identified, in Mr. Cambria's

9    filing earlier this week, are going to be the witnesses you're

10   going to call.  And you better have your witnesses available to   16:46:57

11   testify if the government rests on Thursday.

12           I don't think any of us anticipated that we would get

13   through five witnesses today.  I certainly didn't.

14           And so that has been my observation.

15           Provide the statements that are necessary.  Provide       16:47:22

16   the identity of the witnesses that you intend to call this

17   week.  Make yourselves available from 1:30 to 4:00 o'clock on

18   Friday to address these other matters.  And that's all I'm

19   asking.

20           MR. BERRY:  Your Honor, could you please give the         16:47:47

21   defense a time by which they need to file these -- or notify us

22   of these 26.2 statements and the exhibits for Thursday?

23           THE COURT:  Wednesday at 4:00 o'clock.

24           I think the fact that this is the retrial should have

25   generated that information and the production of it by now.       16:48:12

1          And so is there anything further from the government?

2          MR. RAPP:  Just the last -- our last point is we

3     actually have been researching some of these witnesses, and we

4     have found that many of these witnesses were surprised to hear

5     they were defense witnesses in this case.  Many of them do not          16:48:35

6     have subpoenas.  For sure the federal agent witnesses don't

7     even have subpoenas.  And there's -- of course there's the --

8     the Touhy regulations that need to be complied with.  So, you

9     know, we're a little bit perplexed about who it is the defense

10    is intending to call.                                                    16:48:57

11         To the extent that they have a question about whether

12    they are obligated to disclose 26.2 statements and they have

13    some statements of these witnesses in their possession, we ask

14    that they bring them to court so there's not a delay, so they

15    don't put a witness on the stand and our first question is, did          16:49:11

16    you give statements to the defense in the form of emails or

17    whatever, and they say, yeah, we did; and the defense says,

18    well, we didn't think we were obligated to bring -- to disclose

19    them, and we don't have them in court.

20         We would ask that they bring them in court so that if              16:49:27

21    there is a -- a dispute over it, the Court can look at them in

22    camera so there's not a delay in -- and that we are at a

23    disadvantage in our cross-examination.

24         THE COURT:  I've just ordered the production of those

25    statements by tomorrow -- excuse me -- Wednesday -- well, I             16:49:42

guess that's tomorrow -- Wednesday at 4:00 for the first

witnesses to be called.  Beyond that, you should be starting to

prepare those additional statements.  Again, they're long

overdue.

       And I am not yet at the point where I think about

sanctions for not complying with your obligations.  And I say

that only because the government's case has moved rapidly along

these last two weeks.  You've produced a witness list of 156.

They produced a witness list of almost 50.  And we've gone

through a number of those individuals today and last week.  But

that's the nature of trial work.

       Be prepared.  Be ready.  Block out that time so we can

get these other additional important matters done and done

correctly.

       And we will stand in recess.

   (Proceedings adjourn at 4:51 p.m.)

               ---oOo---

1

2

3

4

5                          **C E R T I F I C A T E**

6

7              I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10             I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15             DATED at Phoenix, Arizona, this 17th day of October,

16   2023.

17

18

19                              /s/ Cathy J. Taylor
                                _____
20                              Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25