UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )
              Plaintiff,       )   NO. 2:18-cr-00422-DJH
v.                             )
                               )   Phoenix, Arizona
Michael Lacey, et al.,         )   October 18, 2023
                               )   8:59 a.m.
              Defendants.      )
_____)

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL DAY 20**
**A.M. SESSION**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

```
 1                    A P P E A R A N C E S

 2   For the Plaintiff:
          UNITED STATES ATTORNEY'S OFFICE
 3        By:  Kevin M. Rapp, Esq.
               Andrew C. Stone, Esq.
 4             Peter Shawn Kozinets, Esq.
               Margaret Wu Perlmeter, Esq.
 5        40 North Central Avenue, Suite 1800
          Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
          LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8        By:  Paul J. Cambria, Jr. Esq.
          42 Delaware Avenue, Suite 120
 9        Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
11        By:  David S. Eisenberg, Esq.
          3550 North Central Avenue, Suite 1155
12        Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
          KESSLER LAW OFFICE
14        By:  Eric Walter Kessler, Esq.
          6720 North Scottsdale Road, Suite 210
15        Scottsdale, Arizona 85253
          - and -
16        FEDER LAW OFFICE, PA
          By:  Bruce S. Feder, Esq.
17        2930 East Camelback Road, Suite 160
          Phoenix, Arizona 85016
18

19   For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20        By: Gary S. Lincenberg, Esq.
               Gopi K. Panchapakesan, Esq.
21        1875 Century Park E, Suite 2300
          Los Angeles, California 90067
22

23   For the Defendant Joye Vaught:
          JOY BERTRAND, ESQ, LLC
24        By:  Joy Malby Bertrand, Esq.
          P.O. Box 2734
25        Scottsdale, Arizona 85252-2734
```

1                          *I N D E X*

2

3    **GOVERNMENT WITNESS:**                                    **PAGE**

4    DEREK FRITZE
     Continued Cross-Examination by Mr. Kessler.................13
5    Redirect Examination by Mr. Berry.........................47

6    JORDAN THURMAN
     Direct Examination by Ms. Perlmeter.......................55
7    Cross-Examination by Mr. Eisenberg........................80

8    BRADLEY MYLES
     Direct Examination by Mr. Rapp............................90

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
        1              P R O C E E D I N G S

        2   (Whereupon the proceedings began at 8:59 a.m.)

        3            COURTROOM DEPUTY:  All rise, court is now in

        4   session.

08:59a  5            THE COURT:  All right, please be seated.

        6            And the record will reflect that we have counsel

        7   present.  There is no witness or juror present.  I thought a

        8   little bit more about the schedule.  Now, if it is the fact

        9   that the Government is going to rest either Thursday --

09:00a 10   whether it be Thursday early afternoon or towards the end of

       11   the day, I think it would -- I anticipate that there would be

       12   a number of motions then presented by defense counsel; and so

       13   if it is the case that they do, indeed, rest on Thursday, what

       14   we could do is release the jurors for the weekend, use Friday

09:00a 15   morning -- and even if the Government rests on Friday morning,

       16   use the remainder of the day to take up those motions, the

       17   responses and the replies and that way the defendants may have

       18   until Tuesday to begin their case in chief.

       19            I think that's the better course.  So that's how we

09:01a 20   will plan for it.  We'll have to see what it looks like

       21   Thursday midday in terms of how far the Government gets.

       22            Ms. Perlmeter, you wish to raise something?

       23            MS. PERLMETER:  Yes, thank you.  I just wanted to

       24   let the Court know that our next witness after Detective

09:01a 25   Fritze is finished is Jordan Thurman.  She is a woman who was
```

1    advertised on Backpage.  What is different -- slightly

2    different from what her testimony -- what we expect her

3    testimony to be is that she actually was arrested and charged

4    and has pleaded guilty and been convicted of money laundering

09:01a  5    related to the prostitution-related offenses she was

6    originally charged with.

7           She was originally indicted for sex trafficking of a

8    minor, the 1591 charge.  We do not intend to -- when we --

9    when we ask her questions, we don't intend to elicit the fact

09:02a 10    that there was a minor involved.  We will talk about it in

11    terms of another female, another person.

12          So I just wanted to let the Court -- when we talk

13    about the recruitment and the postings of who was the minor,

14    we will refer to it as another female.  So I just wanted to

09:02a 15    let the Court know that we don't intend or we're not trying to

16    elicit testimony about minors or children, but that is a fact

17    in the case and our plan moving forward is to have her

18    referred to as "the other female."

19          Her Backpage posting name was Snowflake.  So if you

09:02a 20    hear the witness talking about Snowflake, that is the person

21    that is being referenced.

22          THE COURT:  Okay.  All right.  Well, thank you for

23    the notice.

24          I also wanted to raise an issue that Mr. Lincenberg

09:03a 25    raised yesterday with regard to this witness who's on the

1    stand.  By my review of his testimony, I think that there --

2    the defense may be permitted to ask this witness whether he

3    pursued an investigation -- a state -- whether he pursued an

4    investigation related to prostitution claims against Backpage

09:03a  5  or any of the named defendants, and certainly whether or not

6    this witness says he did it's probative to ask him why or why

7    he did not.

8           Now, beyond that, depending on what he says, I don't

9    want anyone to mention, "Well do you know what the

09:04a 10  Communications Decency Act is?"  "Do you know what Section 230

11   of the Communications Decency Act is?"

12          Those are the type of questions that I'm not going

13   to permit, but depending on -- because the Government has laid

14   foundation for his investigation into these matters and

09:04a 15  because he pursued the matters related to sending the e-mail

16   to notice Backpage that they were in violation of their own

17   terms, I think it is probative to determine whether or not he

18   opened his own investigation into whether or not Backpage or

19   any of the named defendants did violate the laws that he was

09:04a 20  in charge of investigating.  So that's -- that's what I will

21   permit.

22          MR. LINCENBERG:  Can I ask --

23          THE COURT:  No, wait, Mr. Lincenberg.

24          But as an example, there was an earlier

09:05a 25  cross-examination question that began with the phrase,

1    "Section 230 of the CDA is X, Y and Z."

2              Nothing like that.  I'm not going to permit it.  It

3    is confusing and it is irrelevant.  It doesn't apply to the

4    case.  So those are the parameters.

09:05a  5              MR. LINCENBERG:  Can I ask a question of

6    clarification?

7              THE COURT:  You can.

8              MR. LINCENBERG:  So if I understand, the Court is

9    saying you can ask the witness whether he pursued an

09:05a 10    investigation, but we can't point out that the reason why he

11    didn't is because there's no state law that Backpage would

12    have violated?  Is that my understanding?

13              THE COURT:  Well, I think when you refer to "no

14    state law" --

09:06a 15              MR. LINCENBERG:  Because of the CDA.

16              THE COURT:  -- remember where he's from.

17              MR. LINCENBERG:  Right.

18              THE COURT:  And his knowledge only goes so far as to

19    what he has been trained on, what he understands the code to

09:06a 20    be as he was testifying in response to Mr. Kessler's

21    cross-examination; but you can't offer to him, "Isn't it true

22    that the Communications Decency Act operates to X, Y and Z?"

23    because he has not testified about his knowledge related to

24    the Communications Decency Act.

09:06a 25              MR. LINCENBERG:  All right.  So -- so then, as I

understand it, it's really not worth the defense pursuing

because if the witness says just says, "I don't..." whatever

he did to pursue it, but can't say, "The reason I didn't

pursue it is because" -- he should know given what he's doing,

09:07a 5    that the Communication Decency Act would preclude him from

bringing any charge under state law, then it's not worth

pursuing; and as I understand it, the Court is saying we can't

do that so that helps us with clarification.

9        THE COURT:  Well, you're going to have to make the

09:07a 10   determination whether or not it's worth pursuing.  I'm not

going to tell you that it is or it isn't, but that's what I'm

telling you.

13       You're permitted to ask him why he investi -- or

didn't investigate or if he did and if he didn't, why not?

09:07a 15   But when you raise this Communication Decency Act, without

more it is confusing to the jury.  It's -- and it's an issue

that isn't relevant to the specific charges in the case, and

so you can make that determination on your own as to whether

or not you wish to pursue it, but those are the parameters.

09:08a 20       MR. LINCENBERG:  Thank you, Your Honor.

21       MR. FEDER:  Judge, could I ask one other question in

that same vein?

23       THE COURT:  Yes.

24       MR. FEDER:  Without mentioning Section 230, is it

09:08a 25   permissible to ask him, "You're aware that federal law

```
  1   precludes -- federal law precludes any state prosecutions?"

  2             THE COURT:  You can and he can answer "yes" or "no."

  3             MR. FEDER:  And then if he says, "Yes, I'm aware of

  4   that," is there follow-up again without --

09:08a  5        THE COURT:  I -- I don't know.

  6             MR. FEDER:  -- without --

  7             THE COURT:  I don't know if there's follow-up.

  8   We'll have to see.

  9             MR. FEDER:  You just did it to me, what I've been

09:08a 10   doing to you.

 11             THE COURT:  I know, I know.

 12             MR. FEDER:  To ask him, again, without mentioning

 13   the actual term, "You're aware about this federal law and what

 14   the federal law is about?" because, I mean, yesterday

09:08a 15   Mr. Berry was asking all kinds of questions of this guy that

 16   he obviously didn't know.

 17             We objected, and the Court allowed them to go into,

 18   basically, chapter and verse of their case themes, all the

 19   things that he would have no reason to know; and I think we're

09:09a 20   entitled, conversely, to be able to do that without mentioning

 21   230 by name.

 22             THE COURT:  Well, we'll see.

 23             MR. BERRY:  May I be heard on this, Your Honor?

 24             THE COURT:  We'll see.

09:09a 25             Quickly.
```

1          MR. BERRY:  Your Honor, what it sounds like

2    Mr. Feder wants to do is ask the same series of questions that

3    Your Honor just said they can't ask but just do it in another

4    way.  So it asks the Court to reconsider whether they can

09:09a  5    actually question this witness, "Are you aware that there's a

6    federal law that prohibits you from going after Backpage for

7    certain crimes?"

8          That door was not opened and attempting to do it by

9    -- even if they're just not saying Section 230 or CDA, it's

09:09a  10   the same effect.  It injects in front of the jury the idea

11   that there is some other law out there that actually impacts

12   the outcome of this case; and this Court has issued orders in

13   793, 840 and 1643 that have clearly, clearly held that there

14   should be no references to that.

09:10a  15        And "reference" means not just using the letters

16   "CDA" or the numbers "230."  It means referencing the law, and

17   that's clearly what they're trying to do by saying, "Are you

18   aware there's a federal law?"  Just because he doesn't know

19   the name of it is kind of irrelevant, and just the fact he

09:10a  20   doesn't use the numbers or letters is also irrelevant.  I

21   think anything along those lines violates your prior orders.

22          MR. FEDER:  Can I respond briefly?

23          THE COURT:  Quickly.

24          MR. FEDER:  I mean, it's a little bit off track, but

09:10a  25   the Court has ordered that we are allowed to use an expert

UNITED STATES DISTRICT COURT

```
 1   named Eric Goldman to talk about CD 230, that incentivizes
 2   moderation, et cetera, and --
 3           THE COURT:  Well, okay, let's stick to this witness
 4   and this cross-examination.
 5           MR. FEDER:  The question is:  If we're not gonna be
 6   able to use -- I mean, if we're going to be able to use him,
 7   then this is a segue into that where Mr. Goldman can explain
 8   that and make the connection so that it's not confusing.
 9           THE COURT:  All right.  I'm not going to permit you
10   to put forward before this witness questions about, "Are you
11   aware that there's a federal law that immunizes Backpage or
12   the defendants from X, Y and Z?"  So that's -- that's off the
13   table; but as I mentioned before, there -- I will give you
14   some leeway to ask those questions that I presented to you.
15           I saw Mr. Kessler's draft of questions.  Don't
16   reference Dart.  Don't reference Section 230.  I think your
17   question about whether or not -- if he knows whether or not a
18   prostitution or pimp commits a crime in Minnesota where they
19   -- the question is -- it's a -- it's an oddly-worded question
20   but, in any event, Question No. 6, for example, but none of
21   these questions that relate to the Communications Decency Act,
22   No. 3, 4, No. 7 as you've presented them, those are -- are
23   going to be prohibited so --
24           MR. KESSLER:  Your Honor, point of clarification.
25           Following Mr. Feder's argument, I believe you said
```

09:10a 5
09:11a 10
09:11a 15
09:12a 20
09:12a 25

```
 1    it was okay to -- or permissible to ask whether this witness
 2    is aware that federal law prohibits state prosecution of
 3    Internet platforms such as Backpage, just -- just that.
 4              THE COURT:  No, no, I did not say that.  I listened
 5    to the argument of the Government.  I listened to Mr. Feder,
 6    who, by the way, is not examining this witness but -- so, no.
 7    I changed my position with regard to that.  So as I started
 8    out before, those are the parameters.
 9              All right, the record has been made.  Let's have the
10    jury in.
11              MR. FEDER:  Judge, since I'm not examining him,
12    could I briefly take a walk outside and come right back in?
13              THE COURT:  What was that, I'm sorry?
14              MR. FEDER:  Can I be excused for about two minutes?
15    You can go ahead and --
16              THE COURT:  Yes, yes.
17              MR. FEDER:  Thanks.
18              THE COURT:  Oh, we don't -- where's our witness?
19              Let's have our witness in.
20              MR. RAPP:  While we're getting the witness, can I
21    just raise a scheduling issue just quickly?
22              THE COURT:  Yes.
23              MR. RAPP:  Our lineup today is, obviously, this
24    witness, then Jordan Thurman, then Brad Myles.  We are having
25    a little bit of a flight issue with one of our issues.
```

 1              Depending on what time we start this third -- we

 2   finish Brad Myles, we would like to put Dan Hyer on the stand

 3   and then take him off in our direct and put John Shehan on the

 4   stand, get him finished up, get him back on a plane, and then

09:14a  5   continue with Mr. Hyer.

 6              THE COURT:  Well, we'll see how it goes.

 7              MR. RAPP:  Thank you.

 8              THE COURT:  Thank you for the heads up.

 9              All rise for the jury.

09:16a 10              (Jury in at 9:15 a.m.)

11              THE COURT:  Okay, please be seated.

12              Welcome back to our jury members.  Again, we thank

13   you for your patience this morning, and we do have the witness

14   on the stand.  Sir, you remain under oath.

09:16a 15              And, Mr. Kessler, you may continue.

16              MR. KESSLER:  Thank you, your Honor.

17              If we could have Exhibit 1606, which is in evidence,

18   brought up; and if you could, enlarge the top half.

19              Thank you.

09:17a 20                  CONTINUED CROSS-EXAMINATION

21   BY MR. KESSLER:

22   Q.   Good morning, detective.

23   A.   Good morning.

24   Q.   You have on the screen in front of you what's already

09:17a 25   been admitted as Exhibit 1606, which is one of four similar

1    e-mails that you sent to Backpage July 12th of 2012, correct?

2    A.   Correct.

3    Q.   And we had just begun to talk at the conclusion of

4    yesterday's proceedings about the terms of use on the Backpage

09:17a 5    site.  Do you remember that?

6    A.   Yes.

7    Q.   We had discussed whether you had ever tried to post, and

8    I believe that you said you may not have, but you were present

9    when it was being done and you had the opportunity to at least

09:18a 10   watch somebody else do it, correct?

11   A.   Yes.

12   Q.   Nonetheless, you have taken the time, have you not, to

13   look at Backpage's Terms of Use specifically to determine

14   whether these advertisers are violating any of those Terms of

09:18a 15   Use, correct?

16   A.   Correct.

17   Q.   And based on that research, you were able to compose this

18   e-mail?

19   A.   Yes.

09:18a 20   Q.   Take a look at -- on the e-mail what you have identified

21   as 4(c).  Do you see that?

22   A.   Yes.

23   Q.   Is that the number and letter designation of the Term of

24   Use found on the Backpage site?

09:19a 25   A.   Yes.

 1   Q.   Following that you wrote, "Posting any solicitation

 2   directly or in 'coded' fashion for any illegal service

 3   exchanging sexual favors for money or other valuable

 4   consideration."  Correct?

09:19a 5   A.   Correct.

 6   Q.   And did you take that verbatim or word for word from the

 7   Terms of Use and put it into this e-mail?

 8   A.   Yes.

 9   Q.   And so your -- your e-mail to Backpage, this July 12th

09:19a 10  e-mail, is telling Backpage that some of the advertisers are

 11  violating that particular Term of Use, correct?

 12  A.   Yes.

 13  Q.   And that particular Term of Use deals with the specific

 14  content of the ad, correct?

09:20a 15  A.   Correct.

 16  Q.   Now, when your department engaged in some sting

 17  operations --

 18         THE COURT:  Mr. Kessler, can I just ask you to move

 19  that microphone up.  It's rubbing against your shoulder, I

09:20a 20  think, and making that --

 21         MR. KESSLER:  I'm so sorry.

 22         THE COURT:  That's okay.

 23         MR. KESSLER:  I didn't know that.  I was wondering

 24  what that was.

09:20a 25  BY MR. KESSLER:

1  Q.   When your department decided to run some sting ads -- I

2  think you may have testified to this on direct examination;

3  but, nonetheless, it would be fair to say that some of the ads

4  that your department posted did, in fact, violate 4(c) and

09:21a  5  were either rejected or modified by Backpage, correct?

6  A.   The -- I -- I recall one time that we had one that was

7  rejected based on the wording.

8  Q.   There was also a time when a photograph was removed,

9  correct?

09:21a  10  A.   Yeah, we had one -- I believe a photograph.

11  Q.   So was that the same e-mail that your department composed

12  that was rejected on the one hand because of a photo and on

13  the other hand because some of the text or were there two

14  separate e-mails?

09:22a  15  A.    I -- I don't -- honestly, I don't remember which one was

16  which.

17  Q.   Okay, not important.  The point is that Backpage rejected

18  an ad or two from your department because it violated Terms of

19  Use 4(c), correct?

09:22a  20  A.   Correct.

21  Q.   Are you aware of any of the moderation efforts Backpage

22  employed back in 2012 or the years leading to 2012 to try to

23  weed out improper words, improper coded words and improper

24  pictures?

09:22a  25  A.   No.

1    Q.    Are you aware that Backpage employed many dozens of

2    individuals not only in this country, but in India and in the

3    Philippines, that were hired specifically to address 4(c),

4    namely, making sure that there aren't any naked pictures and

**09:23a** 5    there aren't any terms that would suggest sex for money?

6         Are you aware of that?

7    A.    No.

8    Q.    Are you aware that Backpage paid a significant sum every

9    money -- or every month for computers at a different site to

**09:23a** 10   perform a similar search for offensive words or terms?

11   A.    No.

12   Q.    Did you know that Backpage had developed a list of

13   hundreds of words, abbreviations, codes that might be

14   considered an effort for an advertiser to be suggesting that

**09:24a** 15   there was sex for money involved in the ad?

16   A.    No.

17   Q.    You don't know about any of that?

18   A.    No.

19   Q.    Does it surprise --

**09:24a** 20        THE COURT:  Could I interrupt you just --

21        MR. KESSLER:  Sure.

22        THE COURT:  -- one moment, Mr. Kessler.

23        I'm sorry, Mr. Lincenberg.  I have very sensitive

24   hearing and I can hear that you're carrying on a conversation

**09:24a** 25   back there.  Perhaps make sure that your microphone is off but

```
      1    I can -- it's a little bit distracting, so thank you.

      2              MR. LINCENBERG:  It is off, but I apologize.

      3              THE COURT:  All right, thank you.

      4              You can continue, Mr. Kessler.

09:24a  5              MR. KESSLER:  Okay.

      6    BY MR. KESSLER:

      7    Q.  Well, you may not have known that and you may not have

      8    any reason to know it, but you experienced the end result of

      9    that when ads your department placed were rejected for the

09:25a 10    reasons we talked about, right?

     11              MR. BERRY:  Objection.  Foundation, Your Honor.

     12              He just said he didn't know.

     13              MR. KESSLER:  That was an entirely different issue,

     14    Judge.

09:25a 15              THE COURT:  Overruled.

     16              THE WITNESS:  Can you repeat that?

     17              MR. KESSLER:  Sure.

     18    BY MR. KESSLER:

     19    Q.  While you may not have known about all the moderation

09:25a 20    practices employed by Backpage, you at least experienced the

     21    end result, namely, you post an ad that has a photograph that

     22    violates the Terms of Use or has any text that violates the

     23    Terms of Use, that those items are going to be stripped out of

     24    the ad or the ad is going to be rejected, correct?

09:26a 25              MR. BERRY:  Objection, he's assuming facts that are
```

```
 1   not in evidence asked to this witness.
 2            THE COURT:  Well, I'll overrule.
 3            He can answer if he can.
 4            THE WITNESS:  I'd say in this way experienced one or
 5   very minimal out of --
 6            MR. KESSLER:  I didn't ask you that.
 7            MR. BERRY:  Objection.  He's trying to answer the
 8   question, Your Honor.
 9            MR. KESSLER:  It's a "yes" or "no" question.
10            MR. BERRY:  It was a very compound question so it
11   wasn't really "yes" or "no."
12            THE COURT:  Well, let's have the witness complete
13   his answer, and then Mr. Kessler can ask another question.
14            You can complete your answer, sir.
15            THE WITNESS:  Okay.  Out of, I mean, the many over
16   and over ads that we've -- we posted, one or maybe two, I
17   don't recall if it was the same ad or not, with very similar
18   coded language, there had to have been -- I don't recall the
19   exact language on it that got rejected, but all of our ads had
20   a similar coded language on it.
21   BY MR. KESSLER:
22   Q.   Well, we haven't seen any of those ads, but you've told
23   us about one or two ads that were rejected, correct?
24   A.   Yep.
25   Q.   All right.  And now you understand why they were
```

09:26a  (line 5)
09:26a  (line 10)
09:26a  (line 15)
09:27a  (line 20)
09:27a  (line 25)

1    rejected, correct?

2           MR. BERRY:  Objection, foundation.  He says he

3    doesn't know.

4           THE COURT:  Sustained.

09:27a  5           MR. KESSLER:  Could we have 1606 back up.

6    BY MR. KESSLER:

7    Q.   Okay.  You also listed Item No. 5.  Again, that refers to

8    Terms of Use No. 5, correct?

9    A.   Correct.

09:28a 10    Q.   And what you wrote is, "Posting any ad for products or

11    services, use or sale of which is prohibited by any law or

12    regulation."  Is that correct?

13    A.   Correct.

14    Q.   Did you take that verbatim from Backpage's Terms of Use?

09:28a 15    A.   Yes.

16    Q.   You understand that Backpage as a publisher of ads sold

17    advertising space?  Do you understand that?

18    A.   I understand that.

19    Q.   Okay.  And Backpage could control, to a certain extent,

09:28a 20    what was in the ad and, as we've seen in some cases, modified

21    the ad; is that correct?

22    A.   Correct.

23    Q.   But would you agree that Backpage has no control over

24    what happens after an ad is placed with respect to that

09:29a 25    particular advertiser; isn't that correct?

```
 1   A.   I believe there's an obligation to -- for Backpage to --

 2   Q.   I would like you to answer my question.  It was a "yes"

 3   or "no."

 4        Backpage has no control what the advertiser does with his

 5   or her life once they post the ad, correct?

 6   A.   If you're asking that specific question, yes.

 7   Q.   All right, thank you.

 8        And to the extent that any of these ads were, as you put

 9   it, prostitution ads, in order to establish that it was a

10   prostitution ad you would need, No. 1, a person to respond to

11   the ad, correct?

12   A.   There's an advertisement for prostitution so your --

13   Q.   But to establish that prostitution occurred or there was

14   an agreement to engage in prostitution, it would require

15   somebody to respond to the ad, right?

16   A.   And I'm just going based on Minnesota law, which is the

17   offer -- it's a offer to hire for sexual contact, sexual

18   penetration.  So even the offers or the ad by itself by

19   Minnesota law would be an offer just based on all of the

20   content.

21   Q.   Okay.  So it was illegal just because it was suggestive

22   of prostitution; is that what you're saying?

23   A.   It's because of the content in the ad, because where it

24   is, they all point probable cause to believe that that's where

25   there is prostitution.
```

09:29a  (line 5)
09:30a  (line 10)
09:30a  (line 15)
09:31a  (line 20)
09:31a  (line 25)

1        MR. BERRY:  Objection, Your Honor.  He's still

2    trying to finish his answer, and Mr. Kessler is interrupting

3    him.

4        MR. KESSLER:  I let him finish.

09:31a    5        THE COURT:  Yes, you may finish your answer.

6        MR. KESSLER:  I think he did.

7        Did you finish your answer?

8        THE WITNESS:  Yes.

9        MR. KESSLER:  All right, thank you.

09:31a    10    BY MR. KESSLER:

11    Q.   So are you suggesting that you could go out to whoever

12    posted and arrest that person just because of the post?

13    A.   Yes.

14    Q.   You were asked the question on direct examination, "You

09:32a    15    can't go out and arrest people just because they posted this

16    ad?" and you agreed with that statement?

17    A.   I said I don't necessarily would.  It doesn't mean I

18    couldn't.

19    Q.   Okay.  Have you ever arrested anybody because of just

09:32a    20    what was posted in the ad?

21    A.   Not -- no.

22    Q.   And that's because you don't have probable cause to make

23    an arrest, correct?

24    A.   I believe I do have probable cause.

09:32a    25    Q.   So you are knowingly and willingly allowing people to

```
      1  commit crimes in your jurisdiction related to prostitution and

      2  you've never arrested any of them based solely on the ad; is

      3  that correct?

      4  A.   Well, can I add context to that question?

09:33a 5  Q.   Just try to answer the question.

      6  A.   Well, there's -- most of the time we don't know who the

      7  person is so we have to take steps to identify them, which

      8  includes setting up a time for them to meet, to come.

      9       So there were times where we made arrests just by the

09:33a 10  person showing up because we could identify them.  So it's

      11  based solely on the ad and them responding to the ad and

      12  showing up.

      13  Q.   Okay, "and them responding to the ad."  That gets back to

      14  my original question, which is that in order for you to make

09:33a 15  an arrest for prostitution or for the solicitation of

      16  prostitution, you need somebody to respond to the ad, right?

      17  A.   Not necessarily.

      18  Q.   Well, if the -- by the way, you've told us that now you

      19  believe you could arrest advertisers in Maplewood simply on

09:34a 20  the strength of the ad and nothing else, correct?

      21  A.   Correct.

      22  Q.   And the reason you haven't done that ever is because you

      23  need to identify who they are; is that correct?

      24  A.   Along with identifying who they are and there's -- in

09:34a 25  terms of the way even our attorneys, our prosecutors, they
```

```
 1    want more information for a prosecution, not necessarily just

 2    an arrest or probable cause.

 3    Q.   Well, finding them can't be too hard.  They put their

 4    phone number in the -- in the ad, don't they?
```

09:34a   5    A.   They put their phone number in there, yeah.

```
 6    Q.   And you can call them up -- doesn't have to be a sting.

 7    You can call them up and find out where they are.  Under some

 8    pretext, go to their home and arrest them, right, under your

 9    theory?
```

09:35a  10    A.   If, per se, they were right in front of me, they posted

```
11    the ad right in front of me and I had them right there, there

12    would be probable cause to arrest.

13    Q.   I appreciate that, but that isn't the question I asked

14    you.
```

09:35a  15         You told us that the reason you have never arrested

```
16    anyone based solely on the ad is you have to identify who they

17    are and where they are, correct?

18    A.   Yes.

19    Q.   Okay.  Can't you just use the phone number that's in the
```

09:35a  20    ad to locate them?  You're a detective.

```
21    A.   Some people use spoof numbers, they use other people's

22    phone numbers, other people's phones.

23    Q.   Have you ever taken a day and pulled up all the Backpage

24    ads for the escort section for Maplewood and called every
```

09:36a  25    single one of those people?  Have you ever done that?

1    A.    I have looked them up.  I've sent subpoenas to

2    Backpage --

3    Q.    That's not what I'm asking you.  Listen to my question.

4          Have you ever taken a day -- because Backpage comes out

09:36a  5    every day, right?

6    A.    Yep.

7    Q.    It changes almost in realtime, correct?

8    A.    Yes.

9    Q.    Have you ever -- have you ever called everybody that has

09:36a 10    posted in Maplewood under the escort section?

11    A.    Not everybody.

12    Q.    Okay.  Whether or not a person responds to the ad, the

13    so-called john, that's not something that Backpage has any

14    control over, correct?

09:37a 15    A.    It's a "yes" because the ads are posted in the first

16    place.

17    Q.    So your answer is "yes"?

18    A.    'Cuz the ads are there, yes.

19    Q.    Once somebody responds to the ad, law enforcement needs

09:37a 20    to know before making an arrest for prostitution what the

21    agreement is going to be.  In other words, what service is the

22    advertiser going to provide and what amount of money the

23    so-called john is willing to pay, correct?

24    A.    It doesn't have to be that specific, according to

09:38a 25    Minnesota law.

```
 1   Q.   Well, in order to determine if it's an unlawful act, you

 2   need evidence that somebody solicited prostitution and another

 3   person agreed to pay for it?

 4            MR. BERRY:  Objection, Your Honor, asked and

 5   answered.

 6            THE COURT:  Sustained.

 7   BY MR. KESSLER:

 8   Q.   You cannot possibly -- you yourself cannot possibly be

 9   present for that meeting unless it's a sting, correct?

10   A.   Meeting between --

11   Q.   The alleged prostitute and the alleged john.

12   A.   No, I'm not present for those.

13   Q.   Okay.  So you have no way of knowing what kind of deal

14   they made, if any?

15   A.   No.

16   Q.   In fact, your department ran a series of stings and there

17   were at least on two occasions men who responded to the sting

18   ad and they were not arrested and they were turned away

19   because they were not -- they did not engage in prostitution

20   or they didn't agree to engage in prostitution, correct?

21   A.   I -- I don't remember specifics.

22            MR. KESSLER:  Could we have --

23            THE COURT:  Please silence your phone or leave.

24            MR. KESSLER:  Could we have Exhibit EK-DF-1 for the

25   witness' eyes only.
```

09:38a 5
09:38a 10
09:38a 15
09:39a 20
09:40a 25

 1          I have to apologize, I identified the wrong exhibit.

 2          The exhibit I intended was EK-DF-5 for the witness'

 3   eyes only, and if you could highlight the bottom paragraph.

 4          And, detective, if you would just read that to

09:41a  5   yourself, please.

 6   BY MR. KESSLER:

 7   Q.    Okay.  Does that help refresh your recollection of --

 8   A.    Yeah.

 9   Q.    -- about there being two men, two males who were let go

09:41a 10   because they were not involved in prostitution when they

11   responded?

12   A.    They were not arrested on this detail, yes.

13   Q.    Okay.  And they weren't arrested because they were unable

14   to make a deal with the decoy female officer, correct?

09:42a 15   A.    They did not, yes.

16   Q.    And that's why they were let go, right?

17   A.    Yes.

18   Q.    Okay, thank you.

19          And I'm sure I'll be corrected if I already asked you

09:42a 20   this, I just don't recall.  Backpage doesn't play a role in

21   the negotiation of the deal, so to speak, between the alleged

22   prostitute and the alleged john, correct?

23   A.    No.

24   Q.    All right.  At the bottom of each of the four e-mails

09:43a 25   that you sent on July 12th of 2012 to Backpage you wrote the

1    following:  "Every listing in the adult services escort

2    section is an advertisement for illegal prostitution.  Every

3    listing violates each of the above listed items in the user

4    conduct agreement and should not be allowed to be posted at

09:43a  5    all."

6         Is that what you wrote?

7    A.   Yes.

8    Q.   Now, you didn't take that from anywhere else.  That was

9    your thought, correct?

09:44a 10    A.   Correct.

11    Q.   That was your opinion?

12    A.   Yep.

13    Q.   That was your assumption, correct?

14    A.   Based on my experience, yes.

09:44a 15    Q.   Okay.  But the only way you would know that as a

16    detective -- I assume that you don't arrest people on

17    assumptions, correct?

18    A.   Correct.

19    Q.   And you don't arrest people because you have an adverse

09:44a 20    opinion of them, correct?

21    A.   No.

22    Q.   You arrest people when you have sufficient evidence to

23    establish probable cause, correct?

24    A.   When there's a -- yes, a series of facts leading to

09:44a 25    probable cause.

1  Q.   Correct.  To you, based on your training and experience,

2  how could you best define "probable cause" as you use it in

3  making decisions whether to arrest somebody?

4  A.   Simply put -- I mean, exactly what I put in that message,

09:45a  5  a reasonable person based -- if they knew all the facts, a

6  reasonable person, based on everything they know about the

7  situation, that's probable cause.

8  Q.   In order to get probable cause sufficient to arrest, you

9  need to know what the agreement is between the john and the

09:46a 10  prostitute, right?

11          MR. BERRY:  Objection, Your Honor, asked and

12  answered.

13          THE COURT:  Sustained.

14  BY MR. KESSLER:

09:46a 15  Q.   Do you know what or how prostitution is defined in

16  Minnesota?

17  A.   Yes.

18  Q.   Let me read this to you, and you tell me if this sounds

19  similar to what you recall.

09:46a 20      (Reading) Prostitution means hiring, offering to hire or

21  agreeing to hire another individual to engage in sexual

22  penetration or sexual conduct or being hired, offering to be

23  hired or agreeing to be hired, by another individual to engage

24  in sexual penetration or sexual contact.

09:46a 25      Is that what you understand prostitution to be?

1    A.    Yes.

2    Q.    There is a definition of what "sexual contact" means in

3    the Minnesota laws within the context of that statute,

4    correct?

09:47a 5    A.    Yes.

6    Q.    And "sexual contact" means any of the following:  If the

7    acts can reasonably be construed as being for the purpose of

8    satisfying the actor's sexual impulses, No. 1.  The

9    intentional touching by an individual of a prostitute's

09:47a 10   intimate parts or the intentional touching by the prostitute

11   of another individual's intimate parts.

12        In other words, you either have to have penetration of a

13   bodily orifice or you need to have such sexual contact, which

14   means either the john touches the alleged prostitute's

09:47a 15   intimate parts or vice versa, correct?

16   A.    Correct.

17   Q.    But short of that, any other sexual behavior between the

18   two people standing alone is not sufficient to satisfy the

19   prostitution statute, correct?  For example, hugging?

09:48a 20              MR. BERRY:  Objection, compound, Your Honor.

21              THE COURT:  Yes, let's stick with the first part of

22   the question.

23              MR. KESSLER:  Okay.  Can you answer the first

24   question?

09:48a 25              THE WITNESS:  Can you repeat the first part?

1          MR. KESSLER:  Madam court reporter, can you repeat

2   that?

3          (The reporter read back the question.)

4          MR. KESSLER:  Can you answer the first question?

09:49a  5          THE WITNESS:  I'm sorry, could you repeat that one

6   more time.

7          (The reporter read back the question.)

8          THE WITNESS:  Correct.

9   BY MR. KESSLER:

09:49a 10   Q.   As an example I gave, hugging is not gonna do it, right?

11   A.   No.

12   Q.   Kissing is not gonna do it?

13   A.   No.

14   Q.   Both of them taking off their clothes is not gonna do it?

09:49a 15   A.   No.

16   Q.   Asking the prostitute to take off her clothes and dance

17   in a seductive way without there being any touching, that's

18   not gonna do it, is it?

19   A.   That would not, no.

09:50a 20   Q.   So you have to get information that satisfies the

21   definition of prostitution before you can make an arrest,

22   right?

23          MR. BERRY:  Asked and answered, Your Honor.

24          THE COURT:  Sustained.

09:50a 25   BY MR. KESSLER:

```
      1    Q.   I asked you some questions yesterday during the short

      2    time we had about your understanding of the Maplewood City

      3    ordinances.  Do you remember those questions?

      4    A.   Yeah.

09:50a 5    Q.   And you know that in Maplewood escorts are licensed;

      6    isn't that true?

      7    A.   Massage therapists are.  I don't recall if escorts are.

      8         MR. KESSLER:  Could we pull up EK-DF-3 for this

      9    witness' eyes only.

09:51a 10   BY MR. KESSLER:

     11    Q.   The first page describes this document as they call it a

     12    muni code, but the City code for Maplewood, Minnesota.

     13         Do you see that?

     14    A.   Yes.

09:51a 15   Q.   If we could turn to the second page.  You see at the top

     16    Section 14-886.  If you would read that paragraph.

     17         MR. BERRY:  Objection, Your Honor, to reading in  a

     18    municipal city code that is not in evidence.

     19         MR. KESSLER:  I'm asking him to read it to himself.

09:52a 20        I'm sorry, I should have been clearer.

     21         THE COURT:  Yes, he may read it to himself.

     22         MR. BERRY:  Okay.

     23         THE WITNESS:  All right.

     24         MR. KESSLER:  Thank you.

09:52a 25   BY MR. KESSLER:
```

1   Q.   Does that help refresh your recollection about whether

2   escort services are licensed in Maplewood, Minnesota?

3   A.   Yes.

4   Q.   They are, aren't they?

09:52a  5   A.   They should be if they're escorts, yeah.

6   Q.   Right.  The code provides that to be an escort you have

7   to be licensed?

8   A.   Yes.

9   Q.   Okay.  Do you know what the prohibited acts are of

09:53a  10  licensed escorts?

11  A.   No.

12         MR. KESSLER:  Could we go to the third page, please,

13  and to yourself read the paragraph following Section 14-891.

14         THE WITNESS:  Okay.

09:53a  15  BY MR. KESSLER:

16  Q.   Does that help refresh your recollection of what escorts

17  are not permitted to do?

18  A.   Yes.

19  Q.   And that would be essentially to commit acts of

09:54a  20  prostitution?

21  A.   Yes.

22  Q.   Okay.

23         MR. KESSLER:  Could we turn to the fourth page,

24  please.

09:54a  25  BY MR. KESSLER:

1  Q.   Do you recall, sir, that escorts have to pay a fee for

2  their license?

3  A.   No.

4  Q.   Well, if you would to yourself, please read Section

09:54a  5  14-916.  Are you done?

6  A.   Yep.

7  Q.   Okay, thank you.  Does that help refresh your

8  recollection about the requirement that escorts pay a fee for

9  their license?

09:55a  10  A.   Yes.

11  Q.   And they have to, don't they?

12  A.   Yes.

13  Q.   In fact, that's not the only fee they have to pay.  They

14  have to pay what's called an investigative fee on top of that.

09:55a  15       Do you know that?

16  A.   No.

17  Q.   Okay.  On that same page, if you would to yourself, read

18  Section 14-917 paragraphs (a) and (b).

19  A.   Okay.

09:55a  20  Q.   Have you read that?

21  A.   Yeah.

22  Q.   All right, thank you.  Does that help refresh your

23  recollection about whether there is a separate investigative

24  fee that is required of escorts who initially apply for a

09:56a  25  license?

  1  A.    Yes.

  2  Q.    They have to pay that fee, correct?

  3  A.    Correct.

  4  Q.    And that fee is so the City before issuing a license can

09:56a 5  do a background check on the applicant, correct?

  6  A.    Correct.

  7  Q.    We talked a little bit about the city government in

  8  Maplewood.  This is a community of about 40,000 and it has an

  9  elected -- is it a city council?

09:57a 10  A.    Yes.

  11  Q.    Okay.  And you understand the City Council carries out

  12  the wishes of its constituents and passes laws, correct?

  13  A.    Yes.

  14  Q.    That are related solely to Maplewood?

09:57a 15  A.    Yes.

  16  Q.    So it would be fair to say that the elected officials of

  17  Maplewood, Minnesota, have determined that escorts may act as

  18  escorts provided they have a license and they pay all the fees

  19  associated with it, correct?

09:57a 20  A.    Without giving a "yes" or "no" answer, could I give some

  21  context to that?

  22  Q.    Can you answer it with a "yes" or "no"?

  23  A.    I can.

  24  Q.    Please do so.

09:57a 25  A.    Yes.

1   Q.   Great.  The City Council passed these ordinances, right?

2   A.   Yes.

3   Q.   And the City generates revenue for its own purposes by

4   virtue of collecting fees from applicants for escort licenses,

09:58a   5   correct?

6            MR. BERRY:  Objection, asked and answered.

7            THE COURT:  Sustained.

8            MR. KESSLER:  I haven't asked about whether they

9   collect fees.

09:58a  10           MR. BERRY:  You asked about 14-916, which is fees.

11  You asked about 14-917, which is investigative fees.

12           THE COURT:  Sustained.

13  BY MR. KESSLER:

14  Q.   Well, the City is generating revenue off these escorts,

09:58a  15  correct?

16           MR. BERRY:  Objection, asked and answered.

17           THE COURT:  Well, I'll overrule that question -- I

18  mean that objection.

19           You may answer if you know.

09:58a  20           THE WITNESS:  I don't know if the City generates

21  money.

22  BY MR. KESSLER:

23  Q.   Do you know where that money goes?

24  A.   I don't even know if they do generate any money from it.

09:59a  25  Q.   Do you know where the money from the fees goes?

1          MR. BERRY:  Objection, asked and answered.

2          THE COURT:  Sustained.

3     BY MR. KESSLER:

4     Q.   Aside from Backpage, where in Maplewood might an escort

09:59a  5     advertise her services?

6          MR. BERRY:  Objection, calls for speculation, not

7     relevant to this trial.

8          THE COURT:  Sustained.

9     BY MR. KESSLER:

09:59a 10     Q.   Well, escorts would reasonably be expected to -- licensed

11     escorts would be reasonably expected to advertise their

12     services somewhere, correct?

13          MR. BERRY:  Objection, calls for speculation.

14          THE COURT:  He can answer if he has knowledge.

09:59a 15          THE WITNESS:  I don't know where they would besides

16     for Backpage.

17     BY MR. KESSLER:

18     Q.   Right.  That's where they would probably advertise,

19     correct?

10:00a 20     A.   Yes.

21     Q.   Okay.  So the City has created a legal mechanism for

22     escorts to work as escorts and not as prostitutes, and they

23     are most likely to advertise in the escort section of

24     Backpage, correct?

10:00a 25          MR. BERRY:  Objection, calls for speculation.

1          MR. KESSLER:  He's already answered that.

2          THE COURT:  I'm going to sustain the question --

3  sustain the objection, form of the question.  You can reask a

4  new question, Mr. Kessler -- or ask a new question, excuse me.

**10:00a**  5  BY MR. KESSLER:

6  Q.   Escorts would advertise in Maplewood in Backpage,

7  correct?

8  A.   I don't -- I suppose they would.

9  Q.   Right.  Because you don't know where else they would,

**10:01a**  10  right?

11  A.   I honestly don't know if we're distinguishing escorts and

12  prostitution as --

13  Q.   Pardon me?

14  A.   -- two different things.

**10:01a**  15  Q.   Pardon me?

16  A.   I don't -- I don't focus on escorts in my position.

17  Q.   When you make the rather broad statement that every

18  escort ad in Maplewood in Backpage is really a prostitution

19  ad, you're including legal escorts in there, aren't you?

**10:01a**  20  A.   I don't believe that any advertisement on Backpage was

21  just escorts.

22  Q.   So that we're clear, that is your personal belief,

23  correct?

24  A.   Based on my experience and my training and what I've

**10:02a**  25  learned on the job --

1  Q.   There is --

2  A.   -- I've never had a situation where it wasn't

3  prostitution.

4  Q.   About how many ads are posted in Maplewood under escort

10:02a  5  sections back in 2012?  Would you imagine every day?

6  A.   A handful every day and they would vary because St. Paul

7  was so close.  A lot of them would just be St. Paul.

8  Q.   What does a "handful" mean to you?

9  A.   With specific Maplewood as a location, probably ten --

10:02a 10  five to ten.

11  Q.   Now, escorts can still have sex with their clients, just

12  not for money, right?  Isn't that true?

13  A.   Sure.

14  Q.   Okay.

10:03a 15  A.   It would depend on if they're exchanging something.

16  Q.   Well, let me give you a -- sorry about that.

17       Let me give you a short example.

18       Bob, he's responding to Betty's escort ad.  Betty is a

19  licensed escort, and they get together and they agree that Bob

10:03a 20  will pay her for her time as an escort.  Let's say five

21  hundred dollars for two hours because he's going to a class

22  reunion and he wants somebody that looks sharp to be with him.

23       That's legal, isn't it?

24            MR. BERRY:  Objection, Your Honor.  This witness

10:03a 25  does not have the foundation about this municipal code that

```
         1  he's been asking about, and it's calling for a legal
         2  conclusion about that.
         3          THE COURT:  Sustained.
         4  BY MR. KESSLER:
10:04a   5  Q.   You sent four e-mails on a single day to Backpage,
         6  correct?
         7  A.   Correct.
         8  Q.   Did you ever send an e-mail to Backpage on any other
         9  occasion?
10:04a  10  A.   No.
        11  Q.   Each of these e-mails -- please correct me if I'm
        12  wrong -- asked for two -- well, conveyed two things.
        13      No. 1, here is the website address of somebody we believe
        14  to be a prostitute and you wanted it taken down, correct?
10:04a  15  A.   It was after the actual --
        16  Q.   Right.  But you wanted it taken down, right?
        17  A.   Oh, yes, of course.
        18  Q.   And Backpage did that?
        19  A.   I don't know for sure.  I didn't check after the fact if
10:04a  20  they did.
        21  Q.   Okay.  I think you testified yesterday that you did get a
        22  response to at least one of those ads and they confirmed that
        23  the ad had been taken down.
        24      That's what you said yesterday, correct?
10:05a  25  A.   Yes.
```

1  Q.   All right.  The other purpose, it appears to be, of these

2  four on the same day e-mails is you wanted to, for lack of a

3  better word, lecture BP about your opinion about the ads in

4  the escort section, correct?

10:05a  5  A.   My opinion is more of what I've been dealing with --

6  Q.   Can you answer my question?  Wasn't that --

7  A.   It was not facts that created my opinion.

8  Q.   Right.  Wasn't the purpose -- rather than sending a

9  single ad on July 12th with the four escorts that you want ads

10:06a 10  taken down and then inserting your opinion at the bottom, you

11  sent four separate ads, correct?

12  A.   Yep.

13  Q.   And that was so that you could lecture BP four times on

14  the same day about Detective Fritze's opinion about these ads,

10:06a 15  correct?

16  A.   There were four different ads and they had four different

17  type -- because they were four different -- they just had some

18  of the same language in it.

19  Q.   Can you answer my question, please?

10:06a 20  A.   It wasn't specific just to -- I wanted to let Backpage

21  know that this was going on.

22  Q.   Okay.  And you let them know four times on the same day?

23  A.   Yes.

24  Q.   Have you ever e-mailed them, Backpage, after this, after

10:07a 25  July 12th of --

1  A.   No.

2  Q.   -- 2012?

3  A.   No.

4           MR. BERRY:  Objection, asked and answered.

10:07a  5           THE COURT:  Overruled.

6           THE WITNESS:  No.

7  BY MR. KESSLER:

8  Q.   Okay.  So July 12th is the only day that you ever

9  communicated with Backpage?

10:07a 10           MR. BERRY:  Objection, asked and answered.

11           THE COURT:  Sustained.

12  BY MR. KESSLER:

13  Q.   However, your department sent a number of subpoenas to

14  Backpage over the years, correct?

10:07a 15  A.   Yes.

16  Q.   Did you play any role in the creation of or the decision

17  to send those subpoenas to Backpage?

18  A.   Yes.

19  Q.   What was your role?

10:07a 20  A.   I sent them.

21  Q.   You mean you transmitted them by some means?

22  A.   Yes, I e-mailed them to Backpage.

23  Q.   How many would you estimate?

24  A.   I don't recall.  I know it was at least a handful.

10:08a 25  Q.   Again, what does that mean in this context?

1    A.    Five to ten.

2    Q.    Okay.

3    A.    I don't know exactly, though.

4    Q.    And besides transmitting those five to ten subpoenas, did

10:08a  5    you know what those subpoenas were asking for?

6    A.    Yes.

7    Q.    You read the subpoenas?

8    A.    Yes.

9    Q.    Did you participate in the creation of the document that

10:08a  10   was a subpoena?

11   A.    Yes.

12   Q.    And you created the -- or helped create the list of

13   documents that you wanted to get from Backpage by virtue of

14   that subpoena, correct?

10:08a  15   A.    Correct.

16   Q.    And in every case that you transmitted those subpoenas to

17   Backpage you got a prompt and thorough response; isn't that

18   correct?

19   A.    Yes, I believe so.

10:09a  20   Q.    In other words, to the extent you were asking for help

21   from Backpage relative to potential violation of the law in

22   the area of prostitution, Backpage gave you the help you were

23   asking for, correct?

24   A.    They complied with subpoenas, yes.

10:09a  25   Q.    And typically how long -- what was the turnaround time?

```
 1  From the time you e-mailed it to the time you got the

 2  documents you were asking for, typically how long was that?

 3  A.    I honestly don't remember.

 4  Q.    Was it --

 5  A.    It was not a long period of time.

 6  Q.    A day or two?

 7  A.    I don't recall exactly, but it was a shorter period of

 8  time.

 9  Q.    It was never long enough that you had to contact BP and

10  give them a little nudge to get them to comply, right?

11  A.    Correct.

12  Q.    Are you aware that Backpage has been recognized by dozens

13  of law enforcement agencies throughout the country for its,

14  Backpage's, assistance to law enforcement?

15  A.    No.

16  Q.    Do you know that the then president and subsequent owner

17  of Backpage even got a certificate signed by Bob Mueller with

18  the FBI, a FBI certificate that was a recognition of the work

19  that Backpage had done to further FBI investigations?

20  A.    No.

21  Q.    Not aware of that.

22        Now, Backpage -- do you know it shut down in 2018?

23  A.    Yes.

24  Q.    Does prostitution continue in your community?

25              MR. BERRY:  Objection.  Relevance, Your Honor.
```

The timestamps in the left margin are:
- Line 5: 10:09a
- Line 10: 10:09a
- Line 15: 10:10a
- Line 20: 10:10a
- Line 25: 10:11a

 1              THE COURT:  Sustained.

 2    BY MR. KESSLER:

 3    Q.   Where did all those prostitution ads go?

 4              MR. BERRY:  Objection.  Relevance, Your Honor.

**10:11a**  5              THE COURT:  Sustained.

 6    BY MR. KESSLER:

 7    Q.   You no longer have a source like Backpage; isn't that

 8    correct?

 9              MR. BERRY:  Objection, relevance.

**10:11a** 10              MR. KESSLER:  I didn't even finish my question.

11              THE COURT:  I thought you said "isn't that correct"?

12              MR. KESSLER:  No, I started a new question.

13         It will probably generate the same objection and

14    ruling, but I am entitled to ask it.

**10:11a** 15              THE COURT:  Well, your question was, "You no longer

16    have a source like Backpage; isn't that correct?" and I

17    sustained the objection.  So I thought the question was

18    completed, Mr. Kessler.

19              MR. KESSLER:  Okay, let me -- let me reask it then

**10:12a** 20    and make sure I -- I covered what I wanted to.

21    BY MR. KESSLER:

22    Q.   You do not have -- you are not receiving assistance from

23    any other Internet platform like you did with Backpage?

24              MR. BERRY:  Objection.  Same objection regarding

**10:12a** 25    relevance.

1        THE COURT:  Sustained.

2        MR. KESSLER:  Let me -- let me finish with -- with

3  this.

4  BY MR. KESSLER:

10:12a  5  Q.   Those four e-mails that you took the time to send

6  separately and each contained your opinion -- your personal

7  opinion about the nature of escort ads in your community, were

8  you accusing Backpage of committing a crime?

9  A.   In terms of Minnesota law?

10:13a 10  Q.   Anywhere.

11  A.   No.

12  Q.   Were you accusing Backpage of violating a criminal

13  statute of any kind that you know of?

14  A.   No.

10:13a 15  Q.   And you didn't, for example, cite a particular statute,

16  whether it be state or federal, that Backpage was violating by

17  virtue of the kind of ads that were coming out in your

18  community?

19        MR. BERRY:  Objection, he said he wasn't accusing

10:13a 20  Backpage of violating any law.

21        THE COURT:  Overruled, he can answer the question.

22        THE WITNESS:  I was going based on state law and

23  there was -- there was no state law that Backpage fit in.

24  BY MR. KESSLER:

10:14a 25  Q.   The answer to my question is "no," you didn't identify a

 1  particular statute that you thought they might be violating?

 2  A.   No.

 3  Q.   Okay, thank you.

 4          MR. KESSLER:  That's all I have.

10:14a  5          THE COURT:  Mr. Eisenberg?

 6          MR. EISENBERG:  No, Your Honor, thank you.

 7          THE COURT:  Mr. Cambria?

 8          MR. CAMBRIA:  No, Your Honor.

 9          THE COURT:  Ms. Bertrand?

10:14a 10          MS. BERTRAND:  No, Your Honor.

11          THE COURT:  Mr. Lincenberg?

12          MR. LINCENBERG:  No, Your Honor.

13          THE COURT:  Mr. Berry?

14          MR. BERRY:  Thank you, your Honor.

10:14a 15                    REDIRECT EXAMINATION

16  BY MR. BERRY:

17  Q.   You were asked a bunch of questions about the municipal

18  code of which you were unaware in Maplewood regarding escorts.

19          Do you remember those questions?

10:15a 20  A.   Yes.

21  Q.   Have you ever in your experience come across someone who

22  is licensed as an escort in Maplewood who had advertised on

23  Backpage?

24  A.   No.

10:15a 25          THE COURT:  Can you move closer to the microphone,

1    thank you.

2              MR. BERRY:   Sorry.  I have a little softer voice

3    today, I apologize.

4    BY MR. BERRY:

10:15a 5   Q.   In fact, who were the people you came across who were

6    advertising on Backpage?

7    A.   The people who are advertising for prostitution.

8    Q.   Were any of them -- so none of them were licensed as

9    escorts?  They were all prostitutes?

10:15a 10            MR. KESSLER:  Objection, leading.

11             THE COURT:  Sustained.

12   BY MR. BERRY:

13   Q.   You asked -- you were asked a question something about

14   escorts can act as escorts and then you said, may I give some

10:16a 15  context?  Do you remember that?

16   A.   Yes.

17   Q.   You weren't allowed to give that context.  Why don't you

18   go ahead and give it now.

19   A.   Just looking at -- I looked at the municipal code.  I

10:16a 20  mean, the date on it was 1982.  Backpage wasn't even a thing

21   then.  That's back when escorts were -- and prostitution was

22   completely different.  It was more -- I mean, it was street

23   prostitution.  It was done on-line so I've never -- in

24   investigations I've never seen a license for escorts.

10:16a 25      I've never even heard of it happening in the City.  I

 1   started as a police officer in 2007.  Never even knew or seen

 2   that there was any sort of license for escorts.

 3   Q.   You were also asked a question, so you're knowingly

 4   allowing people to commit prostitution and not arresting them,

**10:17a** 5   and you asked if you could add some context to that question.

 6        Do you remember that?

 7   A.   Yes.

 8   Q.   Would you please go ahead and add that context now.

 9   A.   To say every ad on Backpage is prostitution doesn't mean

**10:17a** 10  that we're arresting everybody.  Mostly -- and I said it was

 11  just for identification purposes, but also just for

 12  prosecution purposes.  We want to build solid cases, not just

 13  go out and arrest somebody for specific -- you know, just 'cuz

 14  I have probable cause doesn't mean that it's a solid case.

**10:18a** 15  Q.   Okay, thank you.  And then you were asked Backpage

 16  doesn't play a role in the negotiation of a deal between a

 17  prostitute and a john.  Do you remember that?

 18  A.   Yep.

 19  Q.   Does Backpage play a role in bringing those two people

**10:18a** 20  together?

 21  A.   Yes.

 22  Q.   How?

 23  A.   By having a -- allowing the ads to be placed in the first

 24  place, having a platform where there can be deals like that

**10:18a** 25  made.

```
 1   Q.   Does Backpage help or assist in some way for that
 2   negotiation to actually take place?
 3             MR. KESSLER:  Objection, leading.
 4             THE COURT:  Sustained.
 5             MR. BERRY:  No further questions, your Honor.
 6             THE COURT:  May the witness be excused from
 7   subpoena?
 8             MR. BERRY:  Yes.
 9             THE COURT:  Is there any objection from defense?
10             MR. KESSLER:  No.
11             THE COURT:  All right.  Sir, thank you very much for
12   your testimony.  You are released from your subpoena.  You may
13   step down and have a safe trip home.
14             Please call your next witness.
15             MS. PERLMETER:  The next witness will be Jordan
16   Thurman.
17             MR. EISENBERG:  Your Honor, may I have a sidebar --
18   excuse me.  May I have a sidebar just briefly with respect to
19   this witness?
20             THE COURT:  Yes.
21             MR. EISENBERG:  I'm sorry I didn't bring it up
22   before.
23             (Following discussion held at sidebar.)
24             MR. EISENBERG:  Your Honor, Ms. Perlmeter said
25   something at the beginning of the day with respect to this
```

Lines with timestamps: 10:18a (line 5), 10:19a (line 10), 10:19a (line 15), 10:19a (line 20), 10:19a (line 25)

1   witness, and she informed the Court that this witness has a

2   conviction in this Court with respect to events that are

3   surrounding sexual -- I guess sex for money.

4            My concern is that if that conviction is brought

10:20a   5   out, it will include the fact that Ms. Thurman was convicted

6   in CR16-1375 before Judge Campbell for money laundering and

7   I'm afraid that that's gonna cause prejudice to our clients,

8   who have been accused of the same thing.

9            The circumstances involving Ms. Thurman are

10:20a   10   dissimilar in one way, doesn't have to do specifically with

11   posting on Backpage, although it may have.  I'm not sure as to

12   the circumstances.

13           However, it did involve, I'll say this, sex

14   trafficking.  She was sentenced to eighteen months, and the

10:21a   15   information I have is that between the dates of January 1, '16

16   -- I believe it's '16 --

17           THE COURT:  Come a little closer to the microphone.

18           MR. EISENBERG:  I'm sorry, Judge.

19           January 1st of '16 through April 28th of '16 in

10:21a   20   Arizona Ms. Thurman was involved in a financial transaction

21   that represented the proceeds of some form of unlawful

22   activity, that is, intent to carry out sex trafficking of a

23   minor.

24           She was here at that time in which an ad was posted

10:21a   25   that is the subject of this case.  So she herself prostituted

 1  herself.  I just think when we start talking about money

 2  laundering, it's going to redound to the detriment of our

 3  clients.  Now, my client has not been accused of money

 4  laundering but others have --

10:22a 5          MS. PERLMETER:  I don't mean to interrupt, but maybe

 6  I can short circuit this.

 7          MR. EISENBERG:  Go ahead.

 8          MS. PERLMETER:  If the defense would prefer not to

 9  elicit testimony regarding her felony conviction for money

10:22a 10  laundering, the United States has no objection.

11          However, it is a felony offense.  It is impeachable

12  and it does qualify within Rule 609.  However, if you wish to

13  waive that, then we won't ask her any questions about it,

14  about the conviction.

10:22a 15          MR. EISENBERG:  That solves the problem, Your Honor.

16          THE COURT:  That's how we will proceed.

17          MS. PERLMETER:  She is --

18          THE COURT:  Wait, wait.

19          MS. PERLMETER:  So she is prepared to, you know,

10:23a 20  tell the Court that she has a felony conviction.  So given

21  this change, would it be appropriate to take, perhaps, the

22  bathroom break now and during the break I can tell her about

23  the change?

24          THE COURT:  Well, yes.

10:23a 25          MS. PERLMETER:  Because optically I think it looks

```
 1   weird.
 2              THE COURT:  Yes.
 3              MR. EISENBERG:  Thank you, Your Honor.
 4              THE COURT:  Thank you.
 5              (End of discussion at sidebar.)
 6              THE COURT:  Okay.  Members of the Jury, there's just
 7   been one technical issue that we have to work out.  So we're
 8   going to take -- I had anticipated we would go a little bit
 9   longer this morning just because you came in at a quarter
10   after 9:00, but I think at this point we'll go ahead and take
11   our morning break of our usual twenty minutes.
12              And just again, remember the admonishment not to
13   come to any conclusions or to discuss the matter amongst
14   yourselves or anyone else.  Just be prepared to come back into
15   the courtroom at a quarter 'til the hour.  So with that,
16   please all rise for the jury.
17              (Jury out at 10:24 a.m.)
18              THE COURT:  All right, we will stand in recess.
19              (Recess taken at 10:24 a.m.)
20              COURTROOM DEPUTY:  All rise, court is now in
21   session.
22              (Back on the record at 10:44 a.m.)
23              THE COURT:  I understood Mr. Kessler wanted five
24   minutes.  So I don't know where he is, but five minutes
25   usually turns in to 15 so --
```

10:23a (line 5)
10:23a (line 10)
10:24a (line 15)
10:44a (line 20)
10:44a (line 25)

1           MR. EISENBERG:  I'll take a look.

2           MS. BERTRAND:  May we be seated?

3           THE COURT:  Yes, please.

4           MR. KESSLER:  Thank you, Your Honor.  I'm sorry I

10:45a  5  was a moment late.

6           I just want to make a record.  Towards the end of

7  the cross-examination on Detective Fritze I had asked a series

8  of questions about sort of the landscape of prostitution in

9  his town following the closure of Backpage.

10:46a 10           They were all objected to and sustained on the

11  ground of relevance.  My argument about that -- about

12  relevance was this particular witness took a rather aggressive

13  approach to his reading of the Backpage ads, at least in terms

14  of what we've heard others testify to, and because he said

10:46a 15  that all escort ads were, in fact, prostitution ads, I thought

16  it was relevant to determine what happened to the volume of

17  prostitution when Backpage was no longer publishing.

18           I thought it was relevant because of his statement

19  that they're all prostitution ads.  So I just wanted to make

10:46a 20  that record.

21           THE COURT:  All right.

22           MR. KESSLER:  Thank you.

23           THE COURT:  Okay.  Are we ready for the witness and

24  the jury?

10:47a 25           MS. PERLMETER:  Yes.

```
 1              THE COURT:  All right, let's have the jury in.

 2              All rise for the jury.

 3              (Jury in at 10:47 a.m.)

 4              THE COURT:  All right, please be seated.

 5              The record should reflect the presence of our jury.

 6              Ms. Perlmeter, you may call your next witness.

 7              MS. PERLMETER:  The next witness is Jordan Thurman.

 8              THE COURT:  Ma'am, please come forward to my

 9   courtroom deputy and be sworn.

10              COURTROOM DEPUTY:  Please raise your right hand.

11   (Witness is sworn.)

12              COURTROOM DEPUTY:  Please step over to the witness

13   stand.

14              THE COURT:  And you can proceed when ready and just

15   remember to slow your cadence down, Ms. Perlmeter.  Thank you.

16              MS. PERLMETER:  I will, thank you.

17                         DIRECT EXAMINATION

18   BY MS. PERLMETER:

19   Q.   Good morning.

20   A.   Good morning.

21   Q.   Please pull the microphone up to your face and speak

22   directly into it, okay?

23   A.   Yes, ma'am.

24   Q.   Could you please introduce yourself to the Members of the

25   Jury.
```

10:48a (line 5)
10:48a (line 10)
10:49a (line 15)
10:49a (line 20)
10:49a (line 25)

```
     1   A.   I'm Jordan Thurman.

     2   Q.   Spell your first name.

     3   A.   J-o-r-d-a-n, T-h-u-r-m-a-n.

     4   Q.   And where do you live, Ms. Thurman?

10:49a 5   A.   In Dallas, Texas.

     6   Q.   How far did you get in school?

     7   A.   I graduated from high school.

     8   Q.   Do you work?

     9   A.   Yes.

10:49a 10  Q.   Where do you work?

    11   A.   I have two jobs.  I work at Whataburger and a smoke shop.

    12   Q.   Do you have any children?

    13   A.   Yes, I have two, a boy and a girl.

    14   Q.   How old are -- oh, you have a boy and a girl.

10:50a 15       And how old are you?

    16   A.   I'm 28.

    17   Q.   Ms. Thurman, have you ever been advertised on

    18   Backpage.com?

    19   A.   Yes.

10:50a 20  Q.   What is Backpage.com?

    21   A.   It is a website where women go and post ads to do sexual

    22   activity on.

    23   Q.   In what year or what years were you advertised on

    24   Backpage.com?

10:50a 25  A.   2015 to 2016.
```

1    Q.   Were you living in the Phoenix area during that time?

2    A.   Yes, ma'am.

3    Q.   In what sections of the website were you posted in, if

4    you recall?

10:50a   5    A.   Escorts.

6    Q.   And do you recall in what cities or what states you were

7    posted in?

8    A.   I posted in Texas -- I mean in Arizona and in California.

9    Q.   Now, who created the ads that featured you on Backpage?

10:51a  10   Was it you or other people or perhaps a combination?

11   A.   It was a combination.

12   Q.   So who posted you on Backpage?

13   A.   Myself and Derek Terry.

14   Q.   Who is Derek Terry?

10:51a  15   A.   He was my pimp.

16   Q.   What does "pimp" mean to you?

17   A.   It means a lot of different things.  Somebody that has

18   control over what you do or, like, controlling, a boss.

19   Q.   A boss.  So during the time you were being -- were you --

10:52a  20   during the time that you were posted on Backpage.com, were you

21   working for Mr. Terry?

22   A.   Yes.

23   Q.   Did he have other women working for him at the same time

24   that you were?

10:52a  25   A.   Yes.

1    Q.   About how many?

2    A.   Four or five.

3    Q.   Now, I want to talk to you about the ads, okay.

4         So in the beginning Mr. Terry posted the ads for you; is

10:52a  5    that what you said?

6    A.   Correct.

7    Q.   Okay.  Were you aware that there were photos as part of

8    the advertisements?

9    A.   Yes.

10:52a 10    Q.   Let's talk about the photos.  Who took photos of you for

11   your Backpage ad?

12   A.   Derek Terry and myself.

13   Q.   And where were those photos taken?

14   A.   Hotels.

10:52a 15    Q.   Were you given any instructions on what to wear or what

16   to bring to the hotel for the photos?

17   A.   Yes.

18   Q.   Who gave you those instructions?

19   A.   Derek.

10:52a 20    Q.   And what clothing did you bring?

21   A.   Lingerie.

22        THE COURT:  I'm going to stop the both of you just

23   for a moment.  We have a court reporter taking down everything

24   that's said.  You both have very quick cadence.  In other

10:53a 25   words, you both speak very quickly; and so just take a moment

UNITED STATES DISTRICT COURT

```
 1   to let the question lie on the record and then you can answer,

 2   because you kinda tend to, you know, tightly answer the

 3   question.  I know you're a little bit nervous.

 4          THE WITNESS:  I am.

 5          THE COURT:  Take a breath, okay, and let's move a

 6   little bit slowly so we can make sure that we take everything

 7   down.  Thank you very much.  Okay, Ms. Perlmeter.

 8   BY MS. PERLMETER:

 9   Q.   Did Mr. Terry tell you how to stand or pose for the

10   photographs?

11   A.   Yes.

12   Q.   Now, in the beginning were you involved in the drafting

13   of what words would go in to your Backpage ad?

14   A.   Say that again, I'm sorry.

15   Q.   In the beginning were you involved in choosing what words

16   or what text would be included in your Backpage ad?

17   A.   We went on other ads and just took what bits and pieces

18   of other people posted.

19          MR. EISENBERG:  Objection, Your Honor,

20   non-responsive.

21          THE COURT:  Overruled.

22          MS. PERLMETER:  You can answer the question.  If you

23   don't recall it, I can ask you again or -- would you like me

24   to ask you again?

25          THE WITNESS:  Yeah, go ahead and ask.
```

10:53a (line 5)
10:53a (line 10)
10:53a (line 15)
10:54a (line 20)
10:54a (line 25)

JORDAN THURMAN - DIRECT EXAMINATION BY MS. PERLMETER        60

1          MS. PERLMETER:  Okay.

2    BY MS. PERLMETER:

3    Q.   My question was, were you -- were you the one that was

4    writing -- writing the words that were in the ad?

10:54a  5    A.   Oh, yes, me and Derek Terry.

6    Q.   Okay.  And how did that work?

7    A.   I would go on the other women's ads and we would copy and

8    paste bits and pieces of other people's ads and put them on

9    our own ad.

10:54a 10    Q.   And do you know who paid for these ads in the beginning?

11    A.   Derek.

12    Q.   Do you know how he paid for them?

13    A.   With a Visa card, like a gift card.

14    Q.   And what name were you using for the Backpage ads?

10:55a 15    A.   Karma.

16    Q.   Did you get a chance to see the ads after they were

17    posted and were on-line?

18    A.   Yes.

19    Q.   What happened after the ad was posted and on-line?

10:55a 20    A.   About five minutes later my phone would ring for about an

21    hour or two with calls and text messages.

22    Q.   Okay.  And how would you handle that?

23    A.   Just reply back.

24    Q.   Okay.  And what were the conversations or the reply texts

10:55a 25    back to the callers about?

UNITED STATES DISTRICT COURT

 1  A.   We would just make sure they weren't law enforcement,

 2  like have them send pictures of themselves.  Briefly have a

 3  conversation just so we would feel comfortable.

 4  Q.   Okay.  And when you were -- in having these conversations

10:56a  5  with the callers, were you trying to make dates for them to

 6  come see you?

 7  A.   Yes.

 8  Q.   And what -- what was the purpose of them coming to see

 9  you?

10:56a 10  A.   To make money.

11  Q.   Okay.  And what would you do to make the money?

12  A.   Sexual activity.

13  Q.   Where did you -- where did these meetings take place?

14  A.   Hotels.

10:56a 15  Q.   And the people who came to see you, what do you call

16  them?

17  A.   Tricks.

18  Q.   Okay.  And in your view what is a "trick"?

19  A.   It's a person that pays for sexual activity or time.

10:56a 20  Q.   Okay.  And how would you instruct the tricks to -- to

21  come see you?  Like what instructions would you give them?

22       What would happen?

23  A.   Depending on where my room was located, I would have them

24  pull to where I could see them pulling in to verify that they

10:57a 25  were not police and just -- it was -- be very cautious.

1   Q.   And who taught you how to do that?  Who taught you to

2   talk to the tricks so that you could minimize the possibility

3   they would be police?

4              MR. EISENBERG:  Objection.  Objection, Your Honor.

10:57a  5   Calls for hearsay.  It calls for speculation.

6              THE COURT:  Overruled as to the question.

7              THE WITNESS:  Can you repeat the question?

8              MS. PERLMETER:  Yes.

9   BY MS. PERLMETER:

10:57a  10  Q.   Who taught you to -- you know, to take these steps to

11  verify that the tricks were not police?

12  A.   Derek Terry.

13  Q.   So what happens once the trick arrives and knocks on your

14  room, knocks on your door?

10:57a  15  A.   They would come in.  We would have a conversation, kinda

16  make ourselves feel comfortable, and then we would have sexual

17  activity and they would leave the money and leave.

18  Q.   Okay.  And so just to be clear to make sure the jury

19  understands what's happening in the room, when you say "sexual

10:58a  20  activity," what do you mean by that?

21  A.   Sexual intercourse.

22  Q.   Where was Derek Terry when these dates were happening?

23  A.   Gone.

24  Q.   What happened after the date finished and the trick left?

10:58a  25  A.   Sorry, say that one more time.

1   Q.   What happened when your date finished and the trick left

2   your room?

3   A.   I would take a shower and get back on my phone and wait

4   for another trick.

**10:58a** 5   Q.   And then would you repeat --

6   A.   Yes, ma'am.

7   Q.   -- the same process?

8   A.   Yes, ma'am.

9   Q.   Okay.  And do you recall how many generally tricks you

**10:58a** 10   might see in a day?

11   A.   Ten to fifteen.

12   Q.   And at the end of the day do you recall generally how

13   much money you would have made?

14   A.   Between 3,000 to 5,000.

**10:59a** 15   Q.   What would you do with that money?

16   A.   Give it to Derek Terry.

17   Q.   Did you get to choose which motel or hotel you would

18   conduct these dates out of?

19   A.   No.

**10:59a** 20   Q.   Who told you where to go?

21   A.   Derek.

22        MS. BERTRAND:  Objection, relevance as to the counts

23   in this indictment.

24        THE COURT:  Overruled.

**10:59a** 25   BY MS. PERLMETER:

1  Q.   So after a while did you learn how to create your own ads

2  on Backpage?

3  A.   Yes.

4  Q.   Okay.  And who showed you how to do it?

10:59a  5  A.   Derek Terry.

6  Q.   Did Derek also have other girls that were posting that

7  you learned from?

8           MR. EISENBERG:  Objection, relevance.

9           THE COURT:  Overruled.

10:59a 10           THE WITNESS:  Can you repeat that?

11  BY MS. PERLMETER:

12  Q.   Did Derek Terry also have other women who were posting

13  that you learned from?

14  A.   Yes.

10:59a 15  Q.   So when you're posting advertisements for yourself, are

16  you using your own photos?

17  A.   Yes.

18  Q.   And for the words, what words are you using?

19  A.   We would use "incall," "outcall."  That means either they

11:00a 20  would come in the hotel or we would go to their location.

21       We would post "leave satisfied," "happy ending," which

22  means you'll get what you come for as far as sexual activity.

23  Q.   Now, when you were posting, how were you paying for the

24  ads?

11:00a 25  A.   I was buying a Visa prepaid gift card from, like, a

1    convenience store or, like, Walgreens and I would -- the money

2    would be on there and I would put it -- the card information

3    on Backpage to post the ad.

4    Q.   Okay.  And where would you get the money to buy the

11:00a  5    Vanilla Visa gift card?

6    A.   From Derek Terry.

7    Q.   And so what -- when you posted the ad, did you receive

8    calls and make appointments for tricks to see you like you

9    told us a few minutes ago?

11:01a 10    A.   Yes.

11           MR. EISENBERG:  Objection, Your Honor, asked and

12    answered.

13           THE COURT:  Sustained.

14    BY MS. PERLMETER:

11:01a 15    Q.   Were there times when the calls would slow down or stop?

16    A.   Yes.

17    Q.   What would you do when that happened?

18    A.   I would repost.

19    Q.   When you reposted, did you have to pay an additional fee

11:01a 20    to Backpage to do that?

21    A.   Yes, you have to pay every time you post.

22    Q.   And what happened when you reposted?

23    A.   You would get brought to the top of the page.

24    Q.   For the rooms that you conducted these dates with the

11:01a 25    tricks, who paid for the rooms?

1    A.    We did.   I did.

2    Q.    What do you mean by "we"?

3    A.    Me 'cuz I give the money to Derek and Derek would give it

4    back to me to pay for the room.

11:02a  5    Q.    Did Derek, Mr. Terry, give you money to do other things?

6    A.    Yes.

7    Q.    Like what?

8    A.    Like get my nails done or my hair or buy clothes or food.

9    Q.    If you needed money for something, would you ask Derek

11:02a 10    for it?

11    A.    Yes.

12    Q.    Was he in charge of the money that you made?

13    A.    Yes.

14    Q.    Now, you mentioned that you had posted -- or there are

11:02a 15    ads posted of you here in the Phoenix area as well as other

16    places?

17    A.    Yes.

18    Q.    What were the other places?

19    A.    San Bernardino, California.   Ontario, California.   Mesa,

11:02a 20    Arizona.

21    Q.    Okay.   So would you travel back and forth between Arizona

22    and Southern California to have dates as a result of ads being

23    posted on Backpage?

24    A.    Yes.

11:02a 25              MS. BERTRAND:   Objection, leading.

1              MR. EISENBERG:  Objection, leading.

2              THE COURT:  Overruled.

3    BY MS. PERLMETER:

4    Q.   Who went on these trips?  Like how would you get to

11:03a  5    Phoenix to, you know, Southern California, for example?

6    A.   We rented a car --

7              MS. BERTRAND:  Objection, relevance.  Rule 403.

8              THE COURT:  Just a reminder, because of the multiple

9    objections, if an objection is being made, can you wait for

11:03a 10    one another due to the court reporter's challenge.

11             Okay, thank you.

12    BY MS. PERLMETER:

13    Q.   How would you get from Phoenix to Southern California?

14    A.   We would rent a car and then we bought -- we bought a

11:03a 15    car.  I bought a car and we would use that.

16    Q.   Okay.  What kind of car were you able to purchase?

17    A.   I bought a BMW.

18    Q.   And with what money did you use to purchase this BMW?

19             MR. EISENBERG:  Objection, Your Honor, relevance,

11:03a 20    403.

21             THE COURT:  Overruled.  I'll give Ms. Perlmeter a

22    little bit of leeway.

23             THE WITNESS:  Can you repeat yourself?

24    BY MS. PERLMETER:

11:04a 25    Q.   Where did you get the money to purchase the BMW?

1    A.    From dates.

2    Q.    And so generally who went from Phoenix to California to

3    post Backpage ads in California?

4    A.    Me, Derek and the other women that was working for him.

11:04a  5    Q.    And did that sometime -- was there more than one trip?

6    A.    Like at a time?

7    Q.    Like would you go to California, come back to Phoenix?

8    A.    Yes.

9    Q.    At a later point go back to California?

11:04a 10    A.    Yes.

11    Q.    So a little bit of a back and forth?

12    A.    Yes.

13    Q.    Okay.  So when you went to California, generally how long

14    would you stay there?

11:04a 15    A.    Like two to three weeks, a month.  It just -- it varies.

16    We -- we never knew.

17    Q.    Did it depend on what Mr. Terry wanted to do?

18    A.    Correct.

19    Q.    And while you were in California, did you and the other

11:04a 20    women post ads on Backpage in those cities?

21    A.    Yes.

22    Q.    And then were there -- where did you guys stay in

23    California?

24    A.    I'm sorry, say that again.

11:05a 25    Q.    Where did you guys stay when you were in California?

1    A.    We would stay in the hotels that we worked out of.

2    Q.    Okay.  And who paid for those hotels?

3    A.    I did.

4    Q.    What did you do with the money that you earned when you

11:05a  5    were seeing tricks in California?

6    A.    I would give the money to Derek Terry.

7    Q.    During the time you were with Mr. Terry, did you observe

8    him to have any legitimate form of employment?

9    A.    No.

11:05a 10    Q.    Ms. Thurman, was there a time when paying for the ads

11    using the Vanilla Visa gift cards you've told us about, was

12    there a time that stopped working?

13    A.    Yes.

14    Q.    And when that happened, did you tell Mr. Terry?

11:05a 15    A.    Yes.

16    Q.    And were you -- were ads posted for you after that on

17    Backpage?

18    A.    Yes.

19    Q.    Okay.  So did Mr. Terry somehow figure out how to get the

11:06a 20    ad to work?

21          MR. EISENBERG:  Objection, Your Honor.  It's

22    testifying by counsel.  It's leading.

23          THE COURT:  Sustained.

24    BY MS. PERLMETER:

11:06a 25    Q.    Were you able to have ads posted on Backpage of you after

1  you had trouble with the Vanilla Visa cards?

2  A.   Yes.

3  Q.   Were there times that you noticed there were changes to

4  your Backpage ad after it went on-line?

11:06a  5  A.   Yes.

6  Q.   Can you tell us about that?

7  A.   It would disappear.  It would really just disappear.

8  Q.   Okay.  So you noticed that your ad would disappear?

9  A.   Uh-huh.

11:06a  10  Q.   Sorry --

11  A.   Sorry, yes.

12  Q.   Sorry, you can't go "uh-huh."

13       Was there a function on Backpage on the website that

14  allowed a user to report ads?

11:06a  15  A.   Yes.

16  Q.   Okay.  Are you okay?

17  A.   Yeah.

18  Q.   Okay.  Have you done that?

19  A.   Yes, I have.

11:06a  20  Q.   Okay.  Under what circumstances would you do that?

21  A.   Derek --

22  Q.   Let me break that down a bit, okay?

23       So you worked for Mr. Terry?

24  A.   Yes.

11:07a  25  Q.   Did Mr. Terry have a competing pimp?

UNITED STATES DISTRICT COURT

1  A.   Yes.

2  Q.   And did Mr. Terry's competing pimp have other girls

3  working for him?

4  A.   Yes.

11:07a  5            MR. EISENBERG:  Objection, Your Honor, relevance.

6            THE COURT:  Sustained.

7  BY MS. PERLMETER:

8  Q.   Did Mr. Terry try to maximize the amount of money and

9  opportunities for you and the girls that were working for him?

11:07a  10  A.   Yes.

11            MR. EISENBERG:  Objection, leading.

12            THE COURT:  Sustained.

13  BY MS. PERLMETER:

14  Q.   So you told us that you did report ads on Backpage?

11:07a  15  A.   Yes.

16  Q.   Whose ads did you report?

17  A.   The other women that worked for the other pimp.

18  Q.   Ms. Thurman, are you familiar with The Erotic Review?

19  A.   Somewhat.

11:07a  20  Q.   What do you know about it?

21            MR. EISENBERG:  Objection, Your Honor.  It's an

22  open-ended question, calls for speculation, no foundation, and

23  it's irrelevant to this proceeding with this witness.

24            THE COURT:  I'll sustain as to foundation and then

11:08a  25  determine whether it's relevant.

 1   BY MS. PERLMETER:

 2   Q.   Did you look at The Erotic Review?

 3   A.   I have.

 4   Q.   Okay.  What did you see?

11:08a  5   A.   It's women that post on there that work on other sites to

 6   get reviews to let other tricks know that they're not the

 7   police, like they're 100 percent guarantee.

 8   Q.   Okay.  So, Ms. Thurman, was there a time when you decided

 9   that you didn't want to work for Mr. Terry anymore?

11:08a 10   A.   Yes.

11   Q.   Did Mr. Terry say, "Okay" --

12          MR. EISENBERG:  Objection, Your Honor.

13          MS. PERLMETER:  -- "you can quit"?

14          MR. EISENBERG:  Objection, it calls for hearsay.

11:09a 15          THE COURT:  Sustained.

16   BY MS. PERLMETER:

17   Q.   What did you do when you decided you wanted to stop

18   working for Mr. Terry?

19   A.   I recruited another woman.

11:09a 20   Q.   Were you looking for a replacement?

21   A.   Yes.

22   Q.   And did you -- and you found another woman?

23   A.   Yes.

24          MR. EISENBERG:  Objection, relevance.

11:09a 25          THE COURT:  Overruled.

1  BY MS. PERLMETER:

2  Q.   What was her name -- her Backpage name?

3  A.   Snowflake.

4  Q.   Did you introduce Snowflake to Mr. Terry?

11:09a  5  A.   Yes.

6  Q.   Did you train Snowflake on how to make money?

7          MR. EISENBERG:  Objection -- sorry, ma'am.

8          Sorry, leading.

9          THE COURT:  Sustained.

11:09a 10  BY MS. PERLMETER:

11  Q.   What did you tell -- what did you show Snowflake how to

12  do?

13  A.   How to post pictures -- like how to take pictures to post

14  on Backpage.

11:09a 15  Q.   And then did Snowflake begin working for Mr. Terry?

16  A.   Yes.

17          MR. EISENBERG:  Objection, Your Honor, leading.

18          THE COURT:  Sustained.

19  BY MS. PERLMETER:

11:10a 20  Q.   Did you and Snowflake travel to California together to

21  work off your Backpage ads?

22  A.   Yes.

23          MS. BERTRAND:  Objection, leading.

24          THE COURT:  Sustained.

11:10a 25  BY MS. PERLMETER:

```
 1    Q.    What did you do with Snowflake after you met her and

 2    trained her?

 3              MR. EISENBERG:  Objection, Your Honor.  It's open

 4    ended, vague.

 5              MS. BERTRAND:  Objection, relevance, 403.

 6              THE COURT:  I'll sustain as to vague.

 7    BY MS. PERLMETER:

 8    Q.    Was -- did Ms. -- did Snowflake become like a -- become

 9    part of the group of women that were working for Mr. Terry?

10    A.    Yes.

11              MS. BERTRAND:  Objection, leading.

12              THE COURT:  Overruled.

13              Ms. Perlmeter, please refrain from leading the

14    witness.  You're not on cross-examination, you're on direct.

15    BY MS. PERLMETER:

16    Q.    So let's move forward to April of 2016, okay?

17          Did Snowflake have a date with -- did Snowflake have a

18    date?

19    A.    Yes.

20              MR. EISENBERG:  Objection, foundation and leading.

21              THE COURT:  Sustained as to foundation.

22    BY MS. PERLMETER:

23    Q.    In April of 2016 do you know if Snowflake had an ad

24    posted on Backpage?

25    A.    Yes.
```

11:10a (line 5)
11:10a (line 10)
11:11a (line 15)
11:11a (line 20)
11:11a (line 25)

1   Q.   And did she have -- and were you given any instructions

2   on what to do in regards to that?

3   A.   Yes.

4           MR. EISENBERG:   Objection, Your Honor, foundation.

11:11a  5           MS. BERTRAND:   Objection, leading.

6           THE COURT:   Overruled as to leading, and I'll

7   sustain as to foundation.

8   BY MS. PERLMETER:

9   Q.   How do you know that Snowflake had an ad on Backpage in

11:11a 10   that time period, April of 2016?

11   A.   Because it was on the ad.   I mean, it was on the page.

12   Q.   Okay.

13   A.   I was able to see.   I watched her post it.

14   Q.   And did she have -- what did you do -- what did she need

11:12a 15   done?

16   A.   To take her to dates.

17   Q.   And did you take her to the date?

18   A.   I did.

19   Q.   And where was the date?

11:12a 20   A.   ASU campus in Tempe.

21   Q.   And what car did you take her to the date in?

22   A.   The BMW.

23   Q.   And then did you drop her off?

24   A.   I did.

11:12a 25   Q.   At some point after that did you stop working for

1    Mr. Terry?

2    A.   Yes.

3    Q.   Ms. Thurman, I'd like to show you some exhibits.

4         MS. PERLMETER:   I'm calling up Exhibit No. 222.

11:13a   5    It's already in evidence.   If it could be published, please.

6         THE COURT:   Yes, it may be published.

7    BY MS. PERLMETER:

8    Q.   Ms. Thurman, do you see the exhibit?

9    A.   Yes.

11:13a   10   Q.   I just want to highlight here if you could tell us when

11   this posting happened and in what location?

12        Like what day was it posted?

13   A.   Wednesday, July 1st, 2015, at 12:49 a.m. in Phoenix,

14   Arizona.

11:14a   15   Q.   And I'm going to scroll through the photos quickly and

16   just have you -- do you recognize these pictures?

17   A.   Yes.

18   Q.   Who are they have?

19   A.   Me.

11:14a   20   Q.   Okay.   I want to go to this text image.

21        Do you see here it says "Caution slippery when wet"?

22   A.   Uh-huh.

23   Q.   Was this part of your Backpage ad?

24   A.   Yes.

11:14a   25   Q.   What did this mean to you?

1  A.   It's just something to catch men's eyes to draw them to

2  come see me.

3  Q.   Is this something you observed when viewing other women's

4  ads on Backpage?

11:15a  5  A.   Yes.

6  Q.   What about this, the text about how donations are for

7  time and companionship only?

8  A.   It's there so tricks would know that we're not law

9  enforcement to make them feel comfortable.

11:15a  10  Q.   And down below it says, "By contacting me you agree that

11  you are not affiliated with any form of law enforcement."

12  A.   Correct.

13  Q.   Why is that there or what does this mean to you?

14  A.   It just means that -- to let them know that we're two

11:15a  15  adults and we're doing what we want to do and they -- we were

16  trying to make sure that they're not law enforcement so we

17  don't get in trouble.

18  Q.   Why were you worried about getting in trouble?

19  A.   Because it's against the law.

11:16a  20  Q.   It's against the law to do what?

21  A.   To sell your body.

22  Q.   In what way?

23  A.   Prostitution.

24  Q.   Okay.  Ms. Thurman, I'm showing you the words here in the

11:16a  25  ad.  Does it say here that "I'm Karma"?

```
 1   A.   I'm sorry, say that again.

 2   Q.   Does the ad here say that "I'm Karma"?

 3   A.   Yes.

 4   Q.   And is that you?

11:16a  5   A.   Yes.

 6   Q.   In the ad here it says "100% independent."  Do you see

 7   that?

 8   A.   Yes.

 9   Q.   What does that mean?

11:16a  10   A.   That we do not have a pimp involved.

11   Q.   And was that true in your case?

12   A.   No.

13   Q.   Why would you want tricks to see that you were 100

14   percent independent?

11:17a  15   A.   Because normally they would not come see you because they

16   -- pimps rob tricks.

17   Q.   Now, do you see how it says "unrushed experience"?

18   A.   Yes.

19   Q.   What does that mean?

11:17a  20   A.   That I'm experienced and I'm gonna take my time.

21   Q.   Okay.  Where it says "incalls only," do you see that?

22   A.   Yes.

23   Q.   What does that mean?

24   A.   That they come to me.

11:17a  25   Q.   Okay.  And then towards the end it says, "Sorry, but NO
```

 1   BLACK MEN."  Do you see that?

 2   A.   Yes.

 3   Q.   What does that mean?

 4   A.   We're not allowed to date black men because they were

11:17a  5   pimps -- majority of pimps and they would try to recruit us to

 6   work for them.

 7   Q.   So is that something Mr. Terry did not want to happen to

 8   you?

 9   A.   Correct.

11:17a 10   Q.   Okay.  Ms. Thurman, I'm showing you what's been admitted

11   as 222a.  Can you tell us when this ad was posted?

12   A.   Thursday, July 2nd, 2015 at 1:03 a.m. in Phoenix,

13   Arizona.

14   Q.   And are these photographs of you?

11:18a 15   A.   Yes.

16   Q.   Okay.  Just a few wrap-up final questions, Ms. Thurman.

17        Do you know any of the defendants in this case?

18   A.   I'm sorry, say that --

19   Q.   Do you know any of the defendants in this case?

11:19a 20   A.   I do not.

21   Q.   Okay.  So do you know anyone named Michael Lacey?

22   A.   No.

23   Q.   Or Scott Spear?

24   A.   No.

11:19a 25   Q.   Or Jed Brunst?

```
 1   A.   No.

 2   Q.   Or Andrew Padilla?

 3   A.   No.

 4   Q.   Or Joye Vaught?

 5   A.   No.

 6   Q.   Okay.

 7           MS. PERLMETER:  I have no further questions for the

 8   witness.

 9           THE COURT:  Who is -- Mr. Eisenberg.

10           MR. EISENBERG:  Thank you, your Honor.

11                        CROSS-EXAMINATION

12   BY MR. EISENBERG:

13   Q.   Morning, ma'am.

14   A.   Hi.

15   Q.   Hi, how are you?

16   A.   I'm good, how are you?

17   Q.   I'm doing well, thank you.

18   A.   That's good.

19   Q.   So, Ms. Thurman, the advertisement that you were just

20   shown, it's No. 222 --

21           MR. EISENBERG:  Could we have that one back up on

22   the monitor again please, Ms. Ellig.

23           That's the one, thank you.

24   BY MR. EISENBERG:

25   Q.   So as you have testified, that is you, correct?
```

1   A.   Yes.

2   Q.   Now, if you wanted to have someone give you a call, there

3   had to be a way that they would be able to do that, right?

4   A.   Correct.

11:20a  5   Q.   And so your telephone number is on this ad, isn't it?

6   A.   Correct.

7   Q.   Yeah.  And, also, as well, if you look up on the first

8   page there, the one that you're looking at right now, there's

9   an e-mail address; is that correct?

11:20a 10   A.   Correct.

11   Q.   Whose e-mail is that?

12   A.   Derek Terry's.

13   Q.   And that's his true e-mail, isn't it?

14   A.   Yes.

11:20a 15   Q.   And the telephone number that's on this ad, that's also a

16   correct telephone number in that whoever called it would be

17   able to get a hold of you, correct?

18   A.   Correct.

19   Q.   So the police would be able to do that as well, right?

11:20a 20   A.   Correct.

21   Q.   So, okay.  Now, my understanding from what's gone on here

22   is that you were -- there were times when you posted the ads

23   yourself, correct?

24   A.   Correct.

11:21a 25   Q.   And there were times -- of course, all these ads were

```
  1   paid for, correct?

  2   A.   I'm sorry, say that one more time.

  3   Q.   They were all paid for?

  4   A.   The ads were paid for?

11:21a  5   Q.   Yes, ma'am.

  6   A.   Correct.

  7   Q.   Okay.  And at times you were the one who arranged to have

  8   them paid, right?

  9   A.   Correct.

11:21a 10   Q.   Did you ever call Backpage and talk to anybody at

 11   Backpage?

 12   A.   I did not.

 13   Q.   And do you know -- just it's a "yes" or "no."

 14        Did Mr. -- is his name Derek?

11:21a 15   A.   Yes.

 16   Q.   Did Derek ever call anybody at Backpage?

 17   A.   No -- I mean, I don't know so --

 18   Q.   Okay.

 19   A.   -- I don't know how to really answer that.

11:21a 20   Q.   There were times, however, when -- and I think you've

 21   testified to this -- where your ads disappeared or --

 22   disappeared; is that correct?

 23   A.   Yes.

 24   Q.   And sometimes when they disappeared there were photos --

11:22a 25   excuse me, let me rephrase that.
```

JORDAN THURMAN - CROSS-EXAMINATION BY MR. EISENBERG      83

1    There were other ads where the ads may have appeared and

2  continued to appear but words were taken out, correct?

3  A.   I mean, I don't recall that with me so I can't answer

4  that.

11:22a 5  Q.   Well, did you ever see that with respect to any of the

6  other ads that were posted?

7  A.   Not with my ads, no.

8  Q.   Did you have ads that were taken down completely?

9  A.   Yes.

11:22a 10  Q.   And then they would be reposted?

11  A.   Correct.

12  Q.   And at times they were reposted but they were missing

13  certain things like words, correct?

14  A.   I don't -- I didn't pay attention to that 'cuz the ad was

11:22a 15  deleted and I just reposted and it just posted.  So I wasn't

16  worried about really looking in to all the details on the ad.

17  Q.   So you didn't really see the ad after it got reposted,

18  right?  Correct?

19  A.   I did -- I did see the ad repost.

11:23a 20  Q.   And it wasn't --

21  A.   But I didn't pay attention to every detail as far as --

22  Q.   Okay.

23  A.   -- letters on there.

24  Q.   Or as far as words on there?

11:23a 25  A.   Correct.

1   Q.   So you don't know precisely why that ad reposted or had

2   to be taken down or was taken down, correct?

3   A.   Correct.

4   Q.   Okay.  Now, as far as you know -- well, let me just

11:23a  5   revise that.  So there came a time when -- excuse me.

6        There were times when your ads were kicked back to you

7   because Backpage did not allow certain text pictures; is that

8   correct?

9            MS. PERLMETER:  Objection, calls for speculation.

11:24a 10            THE COURT:  Sustained.

11            MR. EISENBERG:  Well, may the witness be shown

12   DE-J2-7.

13            MS. BERTRAND:  Ms. Ellig needs the number.

14            MR. CAMBRIA:  Repeat the number.

11:24a 15            MR. EISENBERG:  It would be DE-J2-7.

16   BY MR. EISENBERG:

17   Q.   Now, ma'am, if you would look at that and look down at

18   about the fourth paragraph and just read it to yourself.

19        It starts, "When Thurman..." and I think that's the

11:24a 20   fourth paragraph.  Do you see where I'm indicating?

21   A.   Yes, I do.  I'm sorry, I'm reading.

22   Q.   Okay.  And, ma'am, would you read that whole paragraph

23   and look up when you're done, if you will.

24   A.   Oh, do I need to read this out loud?

11:25a 25   Q.   No, no.

 1   A.   Okay, I'm sorry.

 2   Q.   We call it refreshing your recollection.

 3   A.   Yes.

 4   Q.   Okay.  So does that refresh your recollection and I'll go

11:25a  5   back --

 6   A.   Yes.

 7   Q.   It does?

 8   A.   Yes.

 9   Q.   Let me ask the question again.  Okay, all right.

11:25a 10        The question was:  Sometimes is it true that your ads get

11   -- would get kicked back because they, Backpage, did not allow

12   certain text pictures?

13   A.   Yes.

14   Q.   Okay.  When was the last time you may have reviewed

11:25a 15   reports of your meetings with the Government?

16   A.   Say this one more time.

17   Q.   Yeah, I'll rephrase.

18        This is a report of a meeting you had with the

19   Government, correct?

11:26a 20   A.   Yes.

21   Q.   When was the last time you read this report?

22   A.   Last night.

23   Q.   You did, okay.  So you are nervous, right?

24   A.   Yes.

11:26a 25   Q.   Okay, we'll chock it up to that.

JORDAN THURMAN - CROSS-EXAMINATION BY MR. EISENBERG      86

```
 1          Isn't it a fact, ma'am, that you never posted ads that
 2   had explicit pictures?  Let me just stop there.
 3          Isn't that correct?
 4   A.    Yes.
 5   Q.    "Explicit picture" would be what?
 6   A.    Nudity.
 7   Q.    Okay.  See the ad -- well, it's gone now, but we don't
 8   have to put it back up.  Remember that ad, Exhibit 222?
 9   A.    Yes.
10   Q.    There were pictures of you --
11   A.    Yes.
12   Q.    -- in that ad, okay.
13          So that ad did not have nudity in it, correct?
14   A.    Yes, it did; but, no, it didn't.
15   Q.    Okay.
16   A.    I mean, it's a "yes" and a "no" because I am in a thong,
17   but nudity is like showing actual -- I mean, yes, my butt is
18   showing --
19   Q.    Yeah.
20   A.    -- but it's not anything else.
21   Q.    Anything else, okay.
22   A.    Right.
23   Q.    So when you mean you didn't post ads that had explicit
24   pictures, I think what you said before was they didn't have
25   nudity in them, correct?
```

11:26a (line 5)
11:26a (line 10)
11:27a (line 15)
11:27a (line 20)
11:27a (line 25)

 1    A.    Correct.

 2    Q.    Okay.  And among the other things that -- well, let me

 3    ask you this:  One thing that you didn't -- there's language

 4    in these ads, right?

**11:27a**  5    A.    Say that again.

 6    Q.    There's language in the ads?

 7    A.    Language?

 8    Q.    Yes.  In other words, when you looked up at the top of

 9    that ad, Exhibit 222, there was language there, words?

**11:27a** 10    A.    Like the -- I'm trying to understand.

11    Q.    Let's put it back up on the screen.

12    A.    You're talking about the title?

13    Q.    Let's put it back up on the screen.

14    A.    Yeah, 'cuz I'm trying to understand what you mean.

**11:28a** 15    Q.    Okay.  See the top there, those are words; would you

16    agree?

17    A.    You're talking about the "AbSoLuTeLy AmAziNg"?

18    Q.    Yes, ma'am.

19    A.    Okay, yes.

**11:28a** 20    Q.    That's what I mean when I say words or phrases.

21          Do you understand what I mean --

22    A.    Uh-huh.

23    Q.    -- about that?

24          Okay.  You, however, never used words or phrases such as

**11:28a** 25    "money for sex"?

1  A.   Correct.

2  Q.   Okay.  Now -- so over a period of time, Ms. Thurman, you

3  posted ads, correct?

4  A.   Correct.

11:28a 5  Q.   Some of those ads were taken down, correct?

6  A.   Correct.

7  Q.   None of those ads had "sex for money" in them?

8         MS. PERLMETER:  Objection, asked and answered.

9         MR. EISENBERG:  I'll withdraw.

11:29a 10        THE COURT:  Yes, sustained.

11  BY MR. EISENBERG:

12  Q.   And at no time, ma'am, did you -- did you advertise

13  yourself by saying any sexual act, let me just put it that

14  way?

11:29a 15  A.   Can I, like, answer this question --

16  Q.   Sure.

17  A.   -- or is this like a "yes" or "no" question?

18  Q.   Yeah, it's a "yes" or "no" question.

19  A.   Can you repeat your question, please.

11:29a 20  Q.   Yes, it's a little clumsy.  Let me put it this way:  At

21  no time in any ad did you say that, "I will F you"?

22  A.   No, we did not.

23  Q.   Okay.  And you know what I mean?

24  A.   I do.

11:29a 25  Q.   And at no time did you use the term "BJ" in an ad?

JORDAN THURMAN - CROSS-EXAMINATION BY MR. EISENBERG      89

```
     1   A.    Correct.

     2   Q.    Correct?

     3   A.    We did not.

     4   Q.    There came a time, ma'am, when you stopped working for

11:30a 5   Mr. -- was it Derek; is that correct?

     6   A.    Correct.

     7   Q.    And at that point in time you ceased doing this kind of

     8   work; is that correct?

     9   A.    Say that one more --

11:30a 10  Q.    Prostitution?

     11  A.    Yes.

     12  Q.    Okay.

     13        MR. EISENBERG:  I have no further questions, your

     14  Honor.

11:30a 15        THE COURT:  All right.

     16        Anyone else?  Mr. Cambria?

     17        MR. CAMBRIA:  No, Your Honor.

     18        THE COURT:  Ms. Bertrand?

     19        MS. BERTRAND:  No, thank you.

11:30a 20        THE COURT:  Mr. Lincenberg?

     21        MR. LINCENBERG:  No, Your Honor.

     22        THE COURT:  Mr. Kessler?

     23        MR. KESSLER:  No, Your Honor.

     24        THE COURT:  All right.  Ms. Perlmeter?

11:30a 25        MS. PERLMETER:  No redirect, Your Honor, thank you.
```

1          THE COURT:  All right.  May the witness be excused

2   from subpoena?

3          MS. PERLMETER:  Yes, your Honor.

4          THE COURT:  Is there any objection from defense?

11:30a  5      MR. EISENBERG:  No.

6          THE COURT:  Ma'am, you are excused from your

7   subpoena.  We thank you for your testimony.  You may step

8   down.

9          THE WITNESS:  Thank you.

11:31a 10      THE COURT:  All right, the Government may call its

11  next witness.

12         MR. RAPP:  The United States calls Bradley Myles.

13         THE COURT:  And we will power through to about a

14  quarter after lunch, unless the jury strenuously objects and

11:31a 15  we'll try to power on and take our hour lunch at that time.

16         Sir, please come forward to my courtroom deputy and

17  be sworn.

18         COURTROOM DEPUTY:  Please raise your right hand.

19  *(Witness is sworn.)*

11:31a 20      COURTROOM DEPUTY:  Thank you.  Please go to the

21  witness stand.

22         THE COURT:  When you're ready, Mr. Rapp.

23         MR. RAPP:  Thank you, your Honor.

24                    DIRECT EXAMINATION

11:32a 25  BY MR. RAPP:

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP                91

1    Q.   Sir, could you state your full name, spell your last name

2    for the record, please.

3    A.   My full name is Bradley Warren Myles.  Last name

4    M-y-l-e-s.

11:32a 5    Q.   Where you from, Mr. Myles?

6    A.   Born in New Jersey, raised in Texas, and now live in

7    Washington, D.C.

8    Q.   How long have you lived in Washington, D.C.?

9    A.   For the past twenty-one years, since 2002.

11:32a 10    Q.   Sir, what do you do for a living?

11    A.   For twenty years I worked on the issue of human

12    trafficking, combating human trafficking.  Much of that is

13    with an organization called Polaris.

14        I currently now work at an organization called Panorama

11:32a 15    working on the issue of image-based abuse.

16    Q.   All right.  Can you explain what "image-based abuse" is?

17    A.   It's the threat or act of disseminating non-consensual

18    images of somebody to either harass or threaten or try to

19    shame them.

11:33a 20    Q.   Can you explain to the jury, sir, your educational

21    background?

22    A.   Sure.  Educational background, undergrad at Stanford

23    University.  Also did a graduate program, a certificate

24    program, at the Stanford School of Business.

11:33a 25    Q.   Sir, are you married?

UNITED STATES DISTRICT COURT

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP          92

```
 1   A.   Yes.
 2   Q.   Do you have any kids?
 3   A.   Two, a seven-year-old and a nine-month old.
 4   Q.   Sir, how old are you?
 5   A.   I am 43.  I turn 44 next week.
 6   Q.   All right, terrific.  Can you tell us a little bit about
 7   Polaris?  Part of your résumé that you've given us you
 8   indicated that you worked for a organization by the name of
 9   Polaris.  Can you explain to the jury what that organization
10   does?
11   A.   Sure.  So Polaris exists to combat the issue of human
12   trafficking.  It was founded in the year 2002, and it does a
13   range of programs, policy, training, capacity building all
14   around building a movement against trafficking.
15        The biggest thing it is does is operate the National
16   Human Trafficking Hotline for the United States, which is a
17   24/7 hotline.  Covers the entire country.  So Polaris stays
18   awake 24/7 taking in trafficking cases and referring them to
19   law enforcement.
20   Q.   All right.  And can you just explain what this hotline
21   is, what the purpose of this hotline is, this national hotline
22   you've described?
23   A.   The US Federal Government decided to create a national
24   human trafficking hotline for the public and victims and
25   people with information to call.
```

11:33a  (line 5)
11:33a  (line 10)
11:34a  (line 15)
11:34a  (line 20)
11:34a  (line 25)

1          They decided they wanted a non-governmental organization

2    to operate that hotline, which would naturally have trust with

3    victims who might be willing to come forward.

4          Polaris was selected by the US Government to operate that

11:34a  5    hotline, and the organization began answering calls on

6    December 7th, 2007, and has operated the hotline since then on

7    a 24/7 basis.

8    Q.   Does Polaris in this -- in the capacity of targeting

9    human trafficking, do you work with law enforcement?

11:35a 10    A.   One of the functions of the hotline is reporting tips.

11   So Polaris has formed relationships with FBI offices and

12   Homeland Security offices and police departments all across

13   the country so that when a tip comes in that meets a certain

14   threshold of indicators of force, fraud or coercion, that tip

11:35a 15   is then referred on to law enforcement.

16   Q.   All right.  Do you also work in addition to -- do you

17   work with both federal and state law enforcement?

18   A.   Yes.

19   Q.   In addition to law enforcement, do you work with any

11:35a 20   other similar non-governmental organizations?

21   A.   There are many cases that come into the hotline that

22   don't want a law enforcement response.  The victim wants to be

23   referred to services or to a shelter.  So Polaris made an

24   effort to map out non-governmental organizations across the

11:36a 25   country that are working on trafficking and figured out who

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP                    94

1    the people are who work on trafficking in every city, built a

2    database of all of them, and then can refer those cases to

3    non-governmental organizations when you don't need a law

4    enforcement response.

11:36a   5    Q.   All right.   Before the Judge says something, I'm going to

6    ask you just to slow down --

7    A.   Oh --

8    Q.   -- just a little bit.

9    A.   -- sorry.

11:36a  10   Q.   So just remind us how long you were with this

11   organization called Polaris.

12   A.   I began there in spring of 2004.   I departed in fall of

13   2019.   So it was about a 15-year time period.

14   Q.   All right.   And while at Polaris what -- what was your

11:36a  15   position?   What role did you have there?

16   A.   My first role was building the Washington, D.C.

17   human trafficking task force and working on a crisis response

18   team with law enforcement where we would get called out by law

19   enforcement on a 24/7 basis to respond to cases that they were

11:37a  20   dealing with in the community to serve victims.

21        My role then evolved to join the executive team, and then

22   I later became the CEO of the organization for about nine

23   years.

24   Q.   All right.   During your time there, from approximately

11:37a  25   2004 to 2019, did you observe in the involvement or the

        1   increase of the Internet in human trafficking?

        2   A.   Yes, for sure.

        3   Q.   Can you explain how you saw that evolve during your time

        4   at Polaris?

11:37a  5   A.   Polaris works on all forms of trafficking, meaning both

        6   adults  and children, foreign nationals and domestic, and

        7   there are certain types of trafficking, particularly sex

        8   trafficking, that leverage the Internet to advertise and to

        9   help market the different networks.

11:38a 10        On the labor trafficking side, for example, domestic work

       11   or farm work or fishing or construction, they may not use the

       12   Internet in similar ways; but on the sex trafficking side of

       13   both adults and children there is a role for the Internet to

       14   play, and we certainly saw that role grow throughout the time

11:38a 15   I was there.

       16   Q.   All right.  Taking you back to 2010, did there come a

       17   time during that year that you were contacted by

       18   representatives from a website known as Backpage.com?

       19   A.   Yes.

11:38a 20   Q.   Can you explain to the jury how that contact occurred?

       21   A.   We were contacted by representatives who were working

       22   with Backpage around November or December of 2010 asking for a

       23   phone call.

       24   Q.   All right.  Well, first, were you familiar with

11:39a 25   Backpage.com in 2010?

1    A.   We had heard cases about Backpage and trafficking cases

2    that occurred where there was a nexus with Backpage through

3    the national hotline.  We'd also been in touch with law

4    enforcement partners about cases they had seen on Backpage.

11:39a  5    So we were becoming more familiar at that time.

6    Q.   All right.  Just so we're clear on this, were you

7    reaching out to Backpage for some type of dialogue or was it

8    the other way around?

9    A.   They contacted us.  We had not approached the company.

11:39a  10   Q.   All right.  I'm showing you what is marked as United

11   States 1611.  I believe it's in evidence.

12        Do you see that on your screen, sir?  No.

13            COURTROOM DEPUTY:  Are you logged in?

14            MR. RAPP:  I am.

11:40a  15   BY MR. RAPP:

16   Q.   While we're working with that, did you -- did you receive

17   e-mails -- some type of an e-mail exchange regarding this

18   meeting?

19   A.   There was an e-mail exchange in December of 2010, yes.

11:40a  20   Q.   All right.  And who from Backpage.com was -- made contact

21   with you?

22   A.   The initial e-mails were someone named Scott Spear.

23   Q.   And what did you understand was Scott Spear's role with

24   Backpage, if any?

11:40a  25   A.   I assumed that he was in executive leadership somewhere.

```
 1  Q.   All right.  And what was the -- what was the nature of

 2  the contact that you received from him?

 3  A.   He had reached out to say they were seeking to learn from

 4  Polaris and had heard that we had expertise on the issue and

 5  wanted to see if our expertise could inform the moderation

 6  that they were looking to do of the ads.

 7  Q.   All right.  And in the latter part of --

 8        MR. RAPP:  Thank you.  Too many computers.

 9        If I could ask that 1611 be put up on the screen --

10  published, as it's in evidence.

11        Okay, so if you could magnify some of this.

12  BY MR. RAPP:

13  Q.   Just to orientate ourselves, is this -- do you recognize

14  this as being the e-mail exchange?

15  A.   Yes.

16  Q.   And are you -- what are you doing -- what are you

17  communicating with Mr. Spear with respect to this possible

18  meeting?

19  A.   We were discussing times for an initial phone call to

20  take place sometime in December of 2010.

21  Q.   All right.  And then just going down this thread quickly,

22  is it Mr. -- does Mr. Spear respond to you earlier with his

23  arrangements or interest in meeting with you?

24  A.   Yes.

25  Q.   Okay, thank you.
```

11:41a 5
11:41a 10
11:42a 15
11:42a 20
11:42a 25

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP          98

1        Now, in -- just jumping ahead a little bit, did you

2   actually meet with representatives from Backpage?

3   A.   We did the phone call, yes, in December of 2010; and then

4   there was an in-person meeting in March of 2011.

11:43a  5   Q.   All right.  Can you just tell us about the phone call?

6   Do you recall who you spoke with?

7   A.   It was -- I recall it was Scott and Carl Ferrer.

8   Q.   And do you recall what -- what you spoke with Mr. Ferrer

9   and Mr. Spear about?

11:43a 10   A.   It was general introductions of both organizations and

11   the work of Polaris and our work on the national hotline and

12   our familiarity with the totality of the issue of trafficking.

13   Q.   All right.  And so I think your testimony was you did at

14   some point meet with them and have a face-to-face meeting; is

11:43a 15   that right?

16   A.   There was a face-to-face meeting in March of 2011 when

17   they visited Washington, D.C. and came to our offices.

18   Q.   All right.  In preparation for that meeting, what, if

19   anything, did you do?

11:43a 20   A.   I reviewed a number of cases that had come in to the

21   national hotline where the person calling was alleging a nexus

22   with Backpage.  So I connected with staff members.  I reviewed

23   our case files.  I compiled a number of actual printouts of

24   advertisements that I believed were trafficking cases where

11:44a 25   there were actual children or adults who may have had a pimp;

1    and so I tried to do my homework and make sure that I come

2    prepared to the meeting --

3    Q.    Okay.

4    A.    -- with actual helpful evidence to present to them.

11:44a  5    Q.    All right.  And what was -- once you located some

6    relevant postings, what was your intent with those postings

7    for this meeting in 2011?

8    A.    I wanted to share the postings with them and make very

9    clear the point that trafficking was happening on their site

11:44a  10   and that traffickers were using their site and that it

11   shouldn't be misinterpreted or assumed, but these are actual

12   real cases that we're learning about through law enforcement

13   partners and through calls into the hotline.

14   Q.    All right.  And so do you recall the actual date that the

11:45a  15   meeting took place?

16   A.    I believe it was March 1st of 2011.

17   Q.    And where did the meeting take place?

18   A.    We -- our house -- our office was a townhouse at that

19   time.  It was a four-story townhouse.  On the first floor we

11:45a  20   had a conference room, and so they came in the front door and

21   we went straight to the conference room and stayed there on

22   the first floor.

23   Q.    Just to be clear, though, the office is located somewhere

24   in the D.C. area?

11:45a  25   A.    Yeah, Washington, D.C.

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP                 100

1   Q.   And did you come to learn that the representatives from

2   Backpage were having some other meeting on the same day?

3   A.   Yes, I learned that they had gone to the National Center

4   for Missing and Exploited Children, NCMEC, that morning and

11:45a   5   then a group had also come to Polaris that afternoon.

6   Q.   All right.  And once they came to your D.C. office at the

7   townhouse, do you recall the actual -- the actual

8   representatives from Backpage who appeared at this meeting?

9   A.   The three representatives were Jim Larkin, Scott Spear

11:46a   10   and Carl Ferrer.

11   Q.   All right.  Was there anybody else representing Backpage

12   in any capacity?

13   A.   I think they brought two consultants with them who worked

14   for a company called SSP Blue.

11:46a   15   Q.   All right.  Do you recall their names?

16   A.   Hemu and Simrin.

17   Q.   Was a person by the name of Michael Lacey present during

18   this meeting?

19   A.   No.

11:46a   20   Q.   And once they came into your office, did you go to some

21   kind of a conference room or some -- someplace --

22   A.   We just --

23   Q.   -- within the townhouse?

24   A.   We went to our main conference room, yes.

11:46a   25   Q.   All right.  And when you went into the -- this conference

UNITED STATES DISTRICT COURT

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP

1    room can you -- to the best of your recollection, I know this

2    is quite some time ago, but can you -- do you know where

3    everybody was seated?

4    A.   I don't recall the exact positioning, but we were all

11:47a  5    seated around wood conference room tables.

6    Q.   All right.  And now contemporaneous with this meeting --

7    approximately how long did this meeting last?

8    A.   I recall it lasted from about 2:00 o'clock in the

9    afternoon 'til 4:15.  So roughly two hours and fifteen

11:47a 10    minutes.

11    Q.   All right.  Contemporaneous with this meeting, did you

12    take any notes?

13    A.   I had a colleague there named Beth Pfenning and she was

14    taking some notes, but I was more focused on engaging with the

11:47a 15    participants so I wasn't taking notes myself.

16    Q.   All right.  After the meeting, did you memorialize this

17    meeting in any respect?

18    A.   Yes, I both talked to my colleague, Beth, but I also

19    wrote an e-mail to the CEO of NCMEC, Ernie Allen, with a

11:48a 20    recollection of the meeting while it was all fresh in my mind.

21    So I wrote it that evening.

22    Q.   Okay.  And as you met with the -- as you were starting

23    the meeting, can you explain to the jury how this meeting

24    began?

11:48a 25    A.   The meeting began with organizational introductions.  I

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP                102

1    gave an overview of Polaris, our work on human trafficking,

2    our founding story.  I also gave an overview of the issue of

3    human trafficking, both adults and children, and I generally

4    talked about the range of what we do as an organization,

11:48a  5    including the National Human Trafficking Hotline, and then Jim

6    Larkin gave an overview of Village Voice Media and the

7    different aspects of their company.

8         So it was a round of introductions and then two

9    spokespersons for each organization giving an overview.

11:49a 10    Q.   All right.  During this introduction, did you raise any

11    specific issues with Mr. Spear and Mr. Larkin about the

12    website Backpage.com?

13    A.   During the introductions not particularly, no.

14    Q.   All right.

11:49a 15    A.   I mostly focused on the founding story of Polaris.

16    Polaris came out of Brown University.  There was a case of an

17    illicit massage business that happened a mile away from Brown

18    University in Providence, Rhode Island, where there were

19    indicators of trafficking; and that led the founders of

11:49a 20    Polaris to learn that there was a case right in their

21    backyard, and they wanted to work on that.  So I touched on

22    that one particular type of trafficking.

23    Q.   What, if any, response did they have to that specific

24    area of trafficking that you were talking about if you -- if

11:49a 25    you recall?

A.    I remember that Mr. Larkin had a number of questions and

demonstrated an interest in that particular type of

trafficking.  How did the women get into the country?  How are

these locations run?  How does this network operate?

11:50a      So there was kind of a side conversation that we had

about that particular topic, and it was mostly Mr. Larkin

speaking.

Q.    Okay.  And following that did -- after the introductions,

was there any type of a formal presentation from Backpage?

11:50a  A.    Yes, Carl Ferrer had brought a PowerPoint and we pulled

up the PowerPoint screen and he walked through a number of

slides and gave an overview presentation about Backpage.

Q.    During that presentation did Mr. Ferrer discuss the area

of moderation?

11:50a  A.    Yes, he -- he touched on some of their moderation

practices and the staff that they had who were focused on

moderation.

Q.    And in that discussion do you recall if he -- he

discussed certain terms that they were attempting to moderate

11:51a  on the site?

A.    I don't think he listed specific terms, but he referenced

the concept of a banned term list.

Q.    Okay.  And how about images, did he talk about the

moderation of images during this presentation?

11:51a  A.    He mentioned a number of safeguards that they were trying

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP          104

1  to put in place, such as a prohibition on nudity in the ads,

2  prohibition that the two people or if there were multiple

3  people in an ad couldn't be touching each other, text boxes

4  over genitalia.

11:51a 5     So there were a number of measures that they were trying

6  to take to moderate the images, and he gave an overview of

7  those.

8  Q.   Okay.  During that discussion -- are you familiar with a

9  website known as The Erotic Review?

11:52a 10  A.   Yes.

11  Q.   How is it, sir, that you are familiar with that website?

12  A.   There are a series of websites where sex buyers describe

13  their experiences and share information.  They're known as

14  john boards or hobby boards, and The Erotic Review, World Sex

11:52a 15  Guide, USA Sex Guide, there's a series of sites that play that

16  role in the landscape of the sex trade; and The Erotic Review

17  is certainly one of the well-known ones.

18  Q.   During his presentation did Mr. Ferrer reference this

19  website in any respect?

11:52a 20  A.   No, it didn't come up at all in the meeting.

21  Q.   Did he volunteer that Backpage had a relationship with

22  The Erotic Review?

23  A.   No.

24  Q.   Did he talk to you during his presentation about content

11:52a 25  aggregation?

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP                105

1   A.    No.

2   Q.    Do you know what "content aggregation" is?

3   A.    No.

4   Q.    All right.  How about super -- a super poster?  Did he

11:53a 5   discuss with you during this presentation any relationship

6   Backpage had with super posters?

7   A.    No.

8        MS. BERTRAND:  Your Honor, objection, leading and

9   lack of foundation.

11:53a 10        THE COURT:  Well, overruled as to leading; and I

11   guess you can lay some foundation, Mr. Rapp.

12        MR. RAPP:  That's fine, I'll move on.

13   BY MR. RAPP:

14   Q.    After Mr. Ferrer gave a presentation on Backpage, did you

11:53a 15   make any recommendations to the Backpage representatives about

16   perhaps other groups that they should have a dialogue with?

17   A.    During his presentation they expressed an interest to

18   meet the Internet Crimes Against Children task forces at a

19   conference of Internet Crimes Against Children task forces.

11:54a 20   Those are known as ICACs, and there are other types of human

21   trafficking task forces.  There's also Department of Justice

22   human trafficking task forces.  There's also FBI Innocence

23   Lost task forces.

24        So I subjected if they're going to meet the ICACs, they

11:54a 25   should also meet other forms of task forces that exist across

1    the country so that they can cover the full range of task

2    forces that exist.

3    Q.   All right.  Now, following his presentation, was there

4    any discussion whatsoever with the Backpage representatives,

11:54a  5    including Mr. Spear and Mr. Larkin, about the Backpage ads

6    being referred to law enforcement?

7    A.   There was a discussion that Backpage responds to

8    subpoenas and that Mr. Ferrer had talked about the number of

9    subpoenas they respond to; but the point that I wanted to make

11:54a 10    is that if they were having 80 to 100,000 ads posted per

11    day --

12              MR. CAMBRIA:  Not responsive.

13              THE COURT:  Sustained.

14              MR. RAPP:  Yeah, let me break that down.

11:55a 15              THE WITNESS:  Sure.

16    BY MR. RAPP:

17    Q.   In response -- in response to their representation about

18    responding to subpoenas, did you express any concerns to the

19    Backpage representatives about the percentage of referrals to

11:55a 20    law enforcement?

21              MR. CAMBRIA:  Object to the leading.

22              THE COURT:  Sustained.

23    BY MR. RAPP:

24    Q.   What concerns, if any, did you have with -- with what

11:55a 25    they were telling you about the referrals?

A.   My concern was that law enforcement is only able to
respond to a fraction of the ads that were on Backpage, and
the majority of ads that are posted there don't get a law
enforcement response.

11:55a      So if you're only getting subpoenas for the fraction of
ads that do, the majority of ads aren't being touched or
looked at by law enforcement and, therefore, the majority of
the problem is still existing and being facilitated.  So
responding to subpoenas is a small measure compared to the
11:56a  volume of the totality of the problem that's existing.

Q.   And what, if any, response did they have to this concern
that you brought to their attention?

A.   I remember that Mr. Larkin said that he agreed that that
was a good point.

11:56a  Q.   Okay.  Now, you have testified that you were familiar
with Backpage before they even reached out to you?

A.   Yes.

Q.   And did you have occasion to look at the site?

A.   Hundreds of times, yes.  We had staff that were counting
11:56a  ads per day so that we could understand the volume of ads.

        MR. CAMBRIA:  Object to the response.  It's a "yes"
or "no" response.

        THE COURT:  Sustained.  He can answer the question,
and you can follow up with another one, Mr. Rapp.

11:57a  BY MR. RAPP:

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP                    108

1    Q.   Okay.  You looked at the site?

2    A.   Yes.

3    Q.   Okay.  Did you express to Mr. Spear and Mr. Larkin any

4    concerns that you had about what you observed on the site?

11:57a  5    A.   The concerns that I expressed were that the measures that

6    they were taking I thought were incremental measures, but

7    wouldn't fully address the trafficking that was happening on

8    the site and that trafficking would continue to find a way to

9    exist even despite those measures.

11:57a 10    Q.   All right.  Was there any discussion with Mr. Spear and

11    Mr. Larkin about the sex trade in general in relationship to

12    the Backpage site?

13    A.   I did talk about some of the prevailing debates that

14    exist in the field, which is, should you embrace that the sex

11:57a 15    trade is going to exist --

16           MR. CAMBRIA:  Object to the response.

17           THE COURT:  Sustained.

18    BY MR. RAPP:

19    Q.   Is your answer right now what you expressed to them about

11:58a 20    your concerns?

21    A.   Yes.

22    Q.   And about the sex trade?

23    A.   Yes.

24    Q.   Okay.  Can you explain what you explained to Mr. Spear

11:58a 25    about the sex trade and in relationship to Backpage?

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP

1    A.    I directly expressed to him that there is a debate in the

2    human trafficking field about whether or not the sex trades

3    should be embraced and legalized or whether or not the sex

4    trade is unable to be regulated effectively and will continue

11:58a  5    to exist and will continue to have trafficking as part of it

6    and, therefore, we should be trying to shrink as much of the

7    sex trade and the place where trafficking could happen as

8    possible; and that kind of abolition versus regulation debate

9    is a longstanding debate in the human trafficking field, which

11:58a 10    I described.

11    Q.    What response, if any, did any of the representatives of

12    Backpage have to that -- to your concerns?

13    A.    The only person who responded was Mr. Larkin who said,

14    "Those are some of the very questions we're grappling with

11:59a 15    right now as a company, and I really appreciate that

16    description of that dichotomy."

17    Q.    How about in response to Mr. Ferrer's explanation of

18    Backpage's moderation, did you discuss in any fashion what

19    concerns you might have had with their moderation that they've

11:59a 20    implemented?

21    A.    We did discuss that, and I expressed that I appreciated

22    that they were making some efforts to moderate, but that real

23    trafficking cases were still making their way onto the site

24    despite their moderation; and so I brought a number of

11:59a 25    printouts of actual trafficking cases that did have

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP                    110

1   advertisements on the site and I laid them out across the

2   conference table, and we all began to look at those ads.

3   Q.   All right.  And just so we're clear, are these the ads

4   that -- in preparation for this March 1st meeting, are these

12:00p  5   the ads that you had your staff obtain in advance of the

6   meeting?

7   A.   Yes.

8   Q.   Okay.  And so can you kind of explain sort of the

9   atmospherics in the room that you now have displayed these ads

12:00p  10   to them?  Can you just walk us through that?

11   A.   Sure.  So the atmosphere in the room, we all stood up out

12   of our chairs.  We adjusted positions in the room so that we

13   could hunch over and look at the ads, and we were all looking

14   at the different papers and holding them up and getting a

12:00p  15   sense of the variety of papers that were on the table.

16   Q.   All right.  And Mr. Spear was looking at the ads?

17   A.   All of us were.

18   Q.   All right.  And is there anything that you directed them

19   to within these postings that you thought was relevant to the

12:01p  20   discussion?

21   A.   I was pointing out some of the indicators that I thought

22   that existed of potential trafficking there.  You don't have

23   an exact indicator.  Trafficking, there isn't a single silver

24   bullet that you can test; but there are a number of indicators

12:01p  25   that you can tell, and I was pointing out the indicators that

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP                111

1   existed in those ads.

2   Q.   All right.   And can you tell us what you told Mr. Spear

3   and Mr. Larkin what indicators you observed in the Backpage

4   postings that you had displayed in the conference room?

12:01p 5   A.   Some were incredibly youthful appearance of the people in

6   the ads.   Some were faces turned away from the camera so you

7   can't see the person's facial features.   Some were photos of

8   someone from the neck down that looked very young.   Others

9   were the demeanor of the person in the ad and the angle of the

12:02p 10   camera.

11      There's a varying -- a number of different indicators

12   that you could point out, none of which is an exact telltale

13   crime -- sign of trafficking, but they're all things to look

14   at to assess the situation.

12:02p 15   Q.   When you were pointing out in this array of ads in the

16   conference room, did you have the opportunity to observe the

17   demeanor of the Backpage representatives while they were

18   looking at them?

19          MR. CAMBRIA:   That's objected to.   Calls for a

12:02p 20   conclusion, speculation.

21          THE COURT:   Overruled, he can testify what he

22   observed.

23   BY MR. RAPP:

24   Q.   What, if anything, did you observe?

12:02p 25   A.   I observed that the level of tension in the room

1  increased.  The discomfort in the room certainly increased and

2  certain people kind of red cheeks, red neck, clearly blood

3  rushing to the face.

4          MR. CAMBRIA:  Your Honor, I object to this.  No

**12:03p**  5  foundation for him to be giving that.  Is he some expert?

6          MR. RAPP:  It's his personal observations.

7          MR. CAMBRIA:  Yes, and a conclusion.

8          MR. FEDER:  And it's relevance, too.

9          THE COURT:  Well, overruled as to Mr. Cambria's

**12:03p** 10  objection.  Overruled as to Mr. Feder's.  Move on, Mr. Rapp.

11          MR. RAPP:  Okay.

12  BY MR. RAPP:

13  Q.   All right.  And then did -- in addition to -- well, let's

14  talk about Mr. Spear.

**12:03p** 15      Did you observe any reaction he had -- he might have had

16  to these -- to these ads?

17          MR. FEDER:  Relevance, speculation.

18          THE COURT:  Overruled, he can testify as to what he

19  observed.

**12:03p** 20          THE WITNESS:  I observed him picking up the papers

21  and looking at the ads, and he didn't say anything in the

22  meeting.

23  BY MR. RAPP:

24  Q.   Did -- did Mr. Larkin when he was looking at these ads,

**12:04p** 25  did he say anything?

```
 1   A.    He did say one comment where he said, "That one looks

 2   like she has a pimp and may be a trafficking victim."

 3   Q.    All right.  During this meeting did you discuss what is

 4   known as Asian brothels?  Did you discuss that with them?
```

**12:04p** 5   A.    Yes.

```
 6   Q.    And how did that subject come up during this two-hour

 7   meeting?

 8   A.    That subject first came up in the introductions when I

 9   talked about the founding of Polaris, but it came up again
```

**12:04p** 10   when we were talking about the types of trafficking that

```
11   existed on the site.

12         There are different networks of trafficking, and I

13   described that there were a number of Asian massage parlors or

14   illicit massage businesses that were posting advertisements on
```

**12:04p** 15   Backpage that I had believed were at high risk of engaging in

```
16   trafficking of the women.

17   Q.    Okay.  And in -- with respect to that particular topic,

18   the Asian brothels, did -- did any of the Backpage

19   representatives have any follow-up questions to that?
```

**12:05p** 20   A.    There were a number of follow-up questions about that

```
21   particular type of trafficking, yes.

22   Q.    Who asked the questions?

23   A.    Both Mr. Larkin and Mr. Ferrer.

24   Q.    Okay.  And what questions, if any, did they ask, if you
```

**12:05p** 25   recall?

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP                114

1    A.   I recall that they were asking about the network

2    operations of that particular type of trafficking, how that

3    network operates.  Are those locations all individual

4    locations or is there a network aspect to them?

12:05p 5         So they were asking various operational and network

6    questions about that trafficking type.

7    Q.   All right.  You had discussed earlier in your testimony

8    about Polaris' national hotline.  Do you recall that?

9    A.   Yes.

12:06p 10   Q.   Did the national hotline come up in some fashion with

11   respect to Backpage?

12   A.   Yes.

13   Q.   Can you explain how that might have come up?

14   A.   Mr. Ferrer asked if we would be comfortable with Backpage

12:06p 15   posting the national hotline number on a page on Backpage so

16   that Backpage users could see it.

17   Q.   Okay.  And was that a decision that you made at that time

18   during the meeting?

19   A.   No.

12:06p 20   Q.   As the -- as the meeting began to wind down, did you --

21   and after this discussion you had with them, did you make any

22   recommendations to the Backpage representatives?

23   A.   Yes, I did.

24   Q.   What were the recommendations, sir, that you made to

12:06p 25   them?

BRADLEY MYLES - DIRECT EXAMINATION BY MR. RAPP          115

1   A.   The recommendation was that I believe that they should

2   shut the site down as the only sure way that they can make

3   sure there wasn't trafficking happening on it.

4   Q.   Why, sir, based upon your experience at Polaris by this

12:07p 5   point in 2010, why did you make that recommendation to

6   Mr. Spear and Mr. Larkin?

7   A.   I made that recommendation because I believed that

8   attempts at safeguards and attempts at moderation would fall

9   short and that traffickers would continue to find a way to use

12:07p 10   the site as long as it was there, and the best way to address

11   that is to make sure that you're not providing that platform

12   and to not be in that business.

13   Q.   Okay.  Did you discuss with them at all about how they

14   could effectively regulate Backpage?

12:07p 15   A.   We had suggestions that if they weren't gonna shut the

16   site down, other things they could continue to do, trainings

17   of the moderators, other steps they could do, other partners

18   they could meet with.

19   Q.   Okay.  Was there -- after this meeting, was there any

12:08p 20   follow-up with them?

21   A.   There was one follow-up exchange three or four months

22   later when Mr. Ferrer reached out to ask about posting the

23   hotline on Backpage.

24   Q.   All right.  Was there any effort from the Backpage --

12:08p 25   from Backpage to have Polaris do any training for Backpage?

1    A.    No.

2    Q.    Was that a "no"?

3    A.    No, sorry.

4    Q.    In concluding your meeting, did you -- did you direct

12:09p  5    them to -- we talked about how you directed them to meet with

6    certain other organizations earlier on in your testimony.

7          Remember that?

8    A.    Yes.

9    Q.    Was there anybody in particular that you directed

12:09p  10   Backpage to meet with?

11   A.    I suggested that since they're in Dallas there's an

12   excellent detective there named Sergeant Byron Fassett, and I

13   suggested that they could meet with him in Dallas.

14   Q.    Okay.  At some point -- at some point in 2011 following

12:09p  15   this meeting were you involved in the authorship of a letter

16   that was provided to Backpage?

17   A.    Yes, I was one of a number of authors.

18   Q.    All right.  Can you -- can you explain what this letter

19   was all about?

12:09p  20   A.    The letter was organizing a group of anti-trafficking

21   NGOs to speak with a collective voice to Backpage about

22   shutting down the adult services section of the site.

23   Q.    Okay.  And who, in particular, was this letter sent to?

24   A.    Mr. Jim Larkin.

12:10p  25   Q.    All right.  And who -- were you involved at all -- in any

1   respect in actually writing this letter?

2   A.   I was one of the few people that authored it.   There was

3   a few of us.

4   Q.   All right.   And I'm now showing you Exhibit 131a.   It

12:10p  5   should be on your screen.   It's on your screen there.

6        Do you see that there, sir?

7   A.   Yes.

8   Q.   Is that the -- is that the letter that you authored?

9   A.   Yes.

12:10p 10   Q.   And could we just go to the last page, and I think you

11   were talking about the fact that there were other signatories

12   from -- from other, I believe, non-governmental organizations

13   and is -- are those people listed on that letter?

14   A.   Yes, that's the first page of signatories.   There's a few

12:11p 15   other pages, I think.

16   Q.   All right.   And then going back to the first page, is it

17   directed to Mr. Larkin?

18   A.   Yes.

19        MR. RAPP:   I would move to admit Government's 131a.

12:11p 20        MR. CAMBRIA:   Your Honor, we object to this.   Could

21   we have sidebar on this letter?

22        THE COURT:   Let me take a look at it closer.

23        All right, I think at this juncture let's go ahead

24   and take our lunch break.   Members of the Jury, I will again

12:12p 25   just remind you of the admonishment not to come to any

conclusions or discuss amongst yourselves or with anyone else

what we have heard so far in the trial, just to simply have a

peaceful lunch hour.

     Do be prepared to come back into the courtroom at a

**12:12p**  quarter after 1:00 o'clock, and so we will stand in lunch

recess.  Please all rise for the jury, and the witness may

step down.

     (Jury out at 12:12 p.m.)

     THE COURT:  All right, please be seated.

**12:13p**     Let me have a hard copy of the letter and let me

have -- Mr. Cambria can state his -- give his statement here

and I will over the lunch hour consider his objection and the

Government's response and look at the letter a little bit

closely.

**12:13p**     All right, Mr. Cambria.

     MR. CAMBRIA:  Couple of things, Your Honor.

     First of all, this letter is littered with

references and accusations of child trafficking, and it

actually in one area contains more prejudicial information

**12:14p**  than was the basis for the mistrial in the last trial; but in

addition to that, however, this is apparently being offered --

you know, the usual refrain will be, "Oh, we're not offering

it for the truth," which is nonsense; but if it's so-called

notice, they have to establish that somebody over here

**12:14p**  received it.

UNITED STATES DISTRICT COURT

1          Mr. Larkin, obviously, is no longer a recipient and

2     there's nothing to indicate that he received it in the first

3     place; but, certainly, if it's so-called notice, they would

4     have to connect it to one of the defendants in order to -- and

**12:14p** 5     even Mr. Larkin.  There's nothing that indicates that he

6     received it either.

7          So two things.  Extremely prejudicial because of all

8     the accusations of the child stuff that's in there, all

9     hearsay and all accusatory.  403 and 401, as far as I'm

**12:15p** 10    concerned, and no foundation for notice for -- so-called

11    notice without demonstrating that one of the defendants

12    actually received it.

13         THE COURT:  All right.  Mr. Rapp.

14         MR. RAPP:  Well, with respect to the argument on

**12:15p** 15    Mr. Larkin, he's a co-conspirator and so -- a co-conspirator

16    and an owner and so it's presumed that he received this.

17         MR. CAMBRIA:  Why presumed?

18         THE COURT:  Let Mr. Rapp --

19         MR. CAMBRIA:  I'm sorry, it just struck me the wrong

**12:15p** 20    way.  I'm sorry, Your Honor.

21         MR. RAPP:  We have removed the references that we

22    think are violative of the Court's previous orders.  We've

23    taken out ages.  We have taken out references to morality, but

24    this is a -- this is yet another letter that is not from the

**12:16p** 25    National Attorney Generals Association, but this is from the

```
 1    NGOs that have now met with Backpage.  They have now met with
 2    the NCMEC.  They have met with Polaris.  They have -- by
 3    December of 2011 are beginning to receive letters from the
 4    Auburn Theological Seminary and so this is -- there are
12:16p  5    numerous anti-trafficking organizations that are signatories
 6    to this letter that are putting Backpage on notice about their
 7    site, and so that's why this letter is relevant.
 8              THE COURT:  All right.  I will consider that over
 9    the lunch hour.  We will stand at our lunch recess.  We will
12:16p 10    reconvene at a quarter after the hour.
11              COURTROOM DEPUTY:  All rise.
12    (Whereupon the proceedings adjourned at 12:17 p.m.)
13
14
0:0:0 15
16
17
18
19
0:0:0 20
21
22
23
24
0:0:0 25
```

UNITED STATES DISTRICT COURT

1            ***REPORTER'S CERTIFICATION***

2

3                I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6                I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11               DATED at Phoenix, Arizona, this 18th of

12   October, 2023.

13
                                    ____s/Teri Veres____
14                                  TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT