UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) No. 2:18-cr-00422-DJH |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Phoenix, Arizona |
| Michael Lacey, et al., | ) October 19, 2023 |
| | ) 9:03 a.m. |
| Defendants. | ) |
| | ) |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 21**

**(A.M. SESSION)**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2    For the Government:
           UNITED STATES ATTORNEY'S OFFICE
 3         By:  Mr. Kevin M. Rapp, Esq.
                Mr. Andrew C. Stone, Esq.
 4              Mr. Peter Shawn Kozinets, Esq.
                Ms. Margaret Wu Perlmeter, Esq.
 5         40 North Central Avenue, Suite 1800
           Phoenix, Arizona  85004-4408
 6         kevin.rapp@usdoj.gov
           peter.kozinets@usdoj.gov
 7         andrew.stone@usdoj.gov
           margaret.perlmeter@usdoj.gov
 8         - and -
           UNITED STATES DEPARTMENT OF JUSTICE
 9         By:  Mr. Austin Berry, Esq.
           1301 New York Avenue NW, 11th Floor
10         Washington, DC  20005
           austin.berry2@usdoj.gov
11
      For the Defendant Michael Lacey:
12         LIPTSITZ GREEN SCIME CAMBRIA, LLP
           By:  Mr. Paul J. Cambria, Esq.
13         42 Delaware Avenue, Suite 120
           Buffalo, New York  14202
14         pcambria@lglaw.com

15    For the Defendant Scott Spear:
           KESSLER LAW OFFICE
16         By: Mr. Eric Walter Kessler, Esq.
           6720 North Scottsdale Road, Suite 210
17         Scottsdale, Arizona  85253
           eric.kesslerlaw@gmail.com
18         - and -
           FEDER LAW OFFICE, PA
19         By:  Mr. Bruce S. Feder, Esq.
           2930 East Camelback Road, Suite 160
20         Phoenix, Arizona  85016
           bf@federlawpa.com
21

22

23

24

25
```

**A P P E A R A N C E S (Cont'd)**

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
         **Mr. Gary S. Lincenberg, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, California  90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com
    aneuman@birdmarella.com

For the Defendant Andrew Padilla:
    DAVID EISENBERG, PLC
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, Arizona  85012
    david@deisenbergplc.com

For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ, LLC
    By:  **Ms. Joy Malby Bertrand, Esq**
    P.O. Box 2734
    Scottsdale, Arizona  85252-2734
    Joy@joybertrandlaw.com

UNITED STATES DISTRICT COURT

1                          **I N D E X**

2      **WITNESSES FOR THE GOVERNMENT:**                    **PAGE**

3      Daniel Hyer
              Direct Examination by Mr. Stone              6
4             Cross-Examination by Mr. Feder              99

5

6                          **EXHIBITS**

7      **NO.**      **DESCRIPTION**                          **REC'D**

8      27        Emails between Hyer and Ferrer, 05/07/2009    27
                 DOJ-BP-0002132562- DOJ-BP-0002132568
9

10     40        Email from Hyer to Spear and Ferrer,          51
                 12/29/2010
11               DOJ-BP-0004602791- DOJ-BP-0004602792

12     93        Email from "licksalot" to Ferrer (with        96
                 attachment), 02/03/2011
13               DOJ-BP-0000012789- DOJ-BP-0000012791

14     93a       Attachment. "Licksalot" ad.                   96
                 DOJ-BP-0000012792

15     109       Emails between Hyer and Sean Kim,             58
                 06/08/2011
16               DOJ-BP-0000004441- DOJ-BP-0000004450

17     798       Emails from Ferrer and Hyer, re TER links,    34
                 08/31/2010,
18               DOJ-BP-0001379194 - DOJ-BP-0001379195

19     1150      Emails to Hyer and Ferrer, "Is              15
                 mb.bpgator@gmail.com Phoenix?",
20               08/31/2007,
                 DOJ-BP-0004602612 - DOJ-BP-0004602613

21

22

23

24

25

**EXHIBITS (Cont'd)**

| NO. | DESCRIPTION | REC'D |
|-----|-------------|-------|
| 1670a | Attachment, Statistics Report for All Sections on Friday April 17 DOJ-BP-0002711109  DOJ-BP-0002711113 | 95 |
| 1837 | Emails from Hyer and Ferrer, "Moving adult and personals clean up to dallas", 03/13/2008 DOJ-BP-0002125428 | 20 |

1                    **P R O C E E D I N G S**

2          (Court was called to order by the courtroom deputy.)

3          (Proceedings reconvene at 9:03 a.m.)

4               THE COURT:  Please be seated.

5               The last we checked about five minutes ago, we're          09:03:05

6     missing two jurors, but they should hopefully be making their

7     way in.  And so I'll have Liliana check in another minute.

8          (The Court and the courtroom deputy confer.)

9               THE COURT:  Okay.  All right.  They are all present,

10    and so let's have the jury in.                                      09:03:41

11               Oh, let's have our witness take the stand, please.

12               All rise for the jury.

13          (Jury present at 9:04 a.m.)

14               THE COURT:  All right.  Please be seated.

15               Good morning, members of the jury.                        09:05:31

16               And the witness [sic] will reflect we have our witness

17    on the stand.  Recall that you remain under oath.

18               And you may proceed.

19               MR. STONE:  Thank you, Your Honor.

20                        DIRECT EXAMINATION                               09:05:42

21    BY MR. STONE:

22    Q.  Good morning, Mr. Hyer.

23    A.  Good morning.

24    Q.  Make sure the mic is close to you.

25    A.  Yes, sir.                                                        09:05:48

UNITED STATES DISTRICT COURT

```
 1   Q.  We left off yesterday afternoon reviewing Exhibit 2046.

 2            MR. STONE:  I ask that that be published again.

 3   BY MR. STONE:

 4   Q.  Is it on your screen, sir?

 5   A.  Yes.                                                    09:06:05

 6   Q.  I think we left off with this ad.  You mentioned that this

 7   was a banner ad?

 8   A.  Sponsored ad.

 9   Q.  Sponsored ad.  Sorry.

10            And you testified yesterday about The Erotic Review.  09:06:14

11            In -- in 2008, were you -- were you at Backpage

12   working with The Erotic Review?

13   A.  This was during the time that we had a reciprocal link

14   relationship or a reciprocal relationship.

15   Q.  So, yes, this was -- you had a relationship with The Erotic 09:06:31

16   Review --

17   A.  Yes.

18   Q.  -- at this time?

19            MR. STONE:  This is page 2.  Let me just highlight so

20   it's easier to see the first part of the exhibit.            09:06:46

21            THE WITNESS:  Yes.

22   BY MR. STONE1:

23   Q.  You testified yesterday, I believe, that these are ad

24   titles?

25   A.  Yes.                                                    09:06:56
```

UNITED STATES DISTRICT COURT

1   Q.  Are there ad titles here that are indicative of

2   prostitution?

3   A.  Yes.

4   Q.  Could you point a few of them out?

5   A.  One, two, three, four, five -- the fifth one down from the    09:07:04

6   top.

7   Q.  That one?

8   A.  Yes.

9   Q.  What about the one below it?

10  A.  It contains "F/S," which is an abbreviation for full    09:07:18

11  service.  It says, "30 minutes, $40."

12  Q.  What does "full service" mean to you?

13  A.  That would mean the full sexual act of intercourse.

14  Q.  What about the last one on your screen?

15  A.  Yes.  The middle part of that after the asterisk, where it    09:07:44

16  states, "cum sucking honey," that would be indicative of an

17  escort ad.

18  Q.  And when you say "escort ad," what do you mean?

19  A.  Prostitution.

20  Q.  How about the ads at the bottom half of this page?    09:08:11

21  A.  Starting with February 8th, "I have two holes.  Can you

22  fill them?"

23          That's a prostitution ad.

24  Q.  What about up here?

25  A.  There's the GFE abbreviation that we talked about    09:08:34

1    previously, so that's a prostitution ad.

2    Q.  Another one there?

3    A.  It's got GFE in it again.  Prostitution term.

4    Q.  Now, all the ads, scrolling up to page 1, do you see where

5    it says "Saturday, February 9th"?                           09:08:54

6    A.  Yes.

7    Q.  Are all these ads that were posted on that day?

8    A.  Not necessarily.

9    Q.  What do you mean?

10   A.  We offered a feature called automatic repost, which a user  09:09:02

11   could post -- a poster could post an ad and select the option

12   to automatically repost the ad at a duration of different

13   times.

14          So some of those ads from February 7th could have been

15   posted a couple of weeks, a couple of months ago, depending   09:09:21

16   upon what duration of time they selected for the automatic

17   repost.

18   Q.  So, if I understand your testimony, the ads that are posted

19   on Saturday, February 9th, are either ads posted that day or

20   ads that the user selected auto repost?                     09:09:39

21   A.  Yes.

22   Q.  Looking at the top half of the third page, are there ads

23   here that you believe are indicative of prostitution?

24   A.  The one that has all the exclamation points, almost in the

25   middle, in all caps, "Get some good night Greek," that's Greek,  09:10:24

1   a prostitution term.

2          Two below that, hotty -- hottest, kinkiest, the

3   term -- or the phrase, the GFE appears.

4   Q.  What about two below?

5   A.  "$50 more for backdoor" is indicating this user will do          09:10:45

6   anal sex for $50 on top of the 60 or 100 -- 120.

7   Q.  And these are ads that are posted in February of 2008 on

8   the Dallas escort section; correct?

9   A.  Yes.

10  Q.  Are these ads indicative of what the escort sections looked      09:11:08

11  like in other cities?

12  A.  Yes.

13  Q.  Not -- I'm not going to go through every page here.  So

14  just scrolling down, fair to say that the ads on these other

15  pages are similar to the ones we already looked at?                  09:11:28

16  A.  Yes.

17  Q.  I'm on page 8, Thursday, February 7th.  What does that

18  mean?

19  A.  So that's the date of Thursday, February 7th.

20  Q.  And the ads below that, were those the ones that are either      09:11:50

21  posted on that day or the user selected auto repost?

22  A.  Yes.

23  Q.  So this is page 10.  Again, fair to say that the ads on all

24  ten pages are similar to the ads that you highlighted?

25  A.  Yes.                                                             09:12:14

DANIEL HYER - DIRECT EXAMINATION

11

```
 1    Q.  And this year -- or this web page was from 2008.  Did the
 2    ads change moving forward?
 3            And let me -- let me just clarify that question.
 4            When I'm talking about "the ads," what the individuals
 5    are advertising for in the female escort section.          09:12:32
 6    A.  Can you just rephrase that so I understand that?
 7    Q.  Absolutely.  It was a tough question.
 8            So my question's, this is 2008.  You worked at
 9    Backpage until when?
10    A.  2018.                                                  09:12:47
11    Q.  Okay.  So for the next ten years, were the ads on the
12    female escort section advertising anything different than what
13    they were in 2008?
14    A.  No.
15    Q.  What were the ads for?                                 09:12:58
16    A.  Prostitution.
17    Q.  Now, at the bottom of this page I'm highlighting something
18    that reads "popular adult searches."
19            Do you see that?
20    A.  Yes.                                                   09:13:10
21    Q.  And let me just pop it out, because it's hard -- I know it
22    can be hard to see.
23            All right.  What does "popular adult searches" mean?
24    A.  At this time there was a feature of the website we offered
25    in which if a user clicked on popular adult searches, they     09:13:24
```

UNITED STATES DISTRICT COURT

1    would return a page that would show them the highest number --

2    or by the number of searches that was done keywords that you

3    could search.  At the very top of the page, there's a space

4    where it says "enter keyword here."  And the most frequently

5    used keyword we would display in numeric order if a user was to      09:13:48

6    click this link.

7    Q.  Why would you display it?  Was it a feature for the user?

8    A.  Yes.

9    Q.  All right.  I'm going to show you what's been admitted into

10   evidence as Exhibit 547.                                            09:14:08

11          Do you recognize this page, sir?

12   A.  Yes.

13   Q.  What is it?

14   A.  This is the page that I was just describing that shows the

15   popular adult term searches.                                        09:14:23

16   Q.  All right.  Now I'm going zoom in on the escorts part of

17   this exhibit.

18          What is the jury seeing on their screens here, sir?

19   A.  So what you're seeing here is the -- you know, by the

20   number of searches.  The number 1 is the most highly searched      09:14:41

21   term in escorts; number 2, the second highly -- most highly

22   searched term; number 3, et cetera.

23   Q.  All right.  And the number 2 most highly searched term is

24   what?

25   A.  Greek.                                                          09:14:58

```
 1   Q.  Indicative of prostitution?

 2   A.  Yes.

 3   Q.  What about number 5?  What's TS?

 4   A.  That's transsexual.

 5   Q.  6?                                                    09:15:07

 6   A.  GFE.

 7   Q.  GFE indicative of prostitution?

 8   A.  Yes.

 9   Q.  Number 8?

10   A.  BBBJ.                                                 09:15:15

11   Q.  Indicative of prostitution?

12   A.  Yes.

13   Q.  All right.  Sir, I'm going to switch gears, move to another

14   topic.  Okay?

15        In August of 2018, were you in this courthouse?     09:15:38

16   A.  Yes.

17   Q.  Why?

18   A.  I was pleading guilty.

19   Q.  What did you plead guilty to?

20   A.  Facilitation of prostitution.                        09:15:49

21   Q.  Where did you plead guilty?

22        Not -- that was an unfair question?

23        Was it in this courtroom?

24   A.  It might not have been in this specific courtroom.  I think

25   it was one that was over there.                          09:16:09
```

 1   Q.  In this courthouse, though?

 2   A.  Yes, sir.  Yes.

 3   Q.  Did you enter into a plea agreement with the United States?

 4   A.  Yes.

 5   Q.  In that plea agreement, did you agree to cooperate?          09:16:15

 6   A.  Yes.

 7   Q.  That cooperation include testimony?

 8   A.  Yes.

 9   Q.  Do you understand that you'll be sentenced by this Court at

10   some point in the future?                                        09:16:27

11   A.  Yes.

12   Q.  Do you know if the United States will share the nature and

13   extent of your cooperation with the Court?

14   A.  Yes.

15   Q.  Are you hoping that your cooperation will be considered by    09:16:39

16   this Court?

17   A.  Yes.

18   Q.  Are you hoping that your sentence may be reduced because of

19   your cooperation?

20   A.  Yes.                                                          09:16:54

21   Q.  Have there been any promises made to you about what your

22   sentence will be?

23   A.  No.

24   Q.  And who will be the person who decides your sentence

25   ultimately?                                                       09:17:04

 1   A.  Your Honor, the judge.

 2   Q.  All right.  I'm going to move now to another topic.

 3          I'm going to show just on your screen, not for the

 4   jury, Exhibit 1150.

 5          Sir, can you see that on your screen?                    09:17:26

 6   A.  Yes.

 7   Q.  Do you recognize it?

 8   A.  Yes.

 9   Q.  What is it?

10   A.  This is an email that I'm sending to Carl Ferrer on Friday,  09:17:32

11   August 31st, 2007.

12   Q.  And then at the bottom part, are there additional emails

13   between you and Carl Ferrer?

14   A.  Yeah.  It's an ongoing dialogue back and forth, responding

15   and replying.                                                  09:17:57

16   Q.  Two-page document?

17   A.  Yes.

18          MR. STONE:  Move to admit Exhibit 1150.

19          THE COURT:  Hearing no objection, it may be admitted.

20   It may be published.                                           09:18:15

21          (Exhibit 1150 admitted into evidence.)

22          MR. CAMBRIA:  We objected, Your Honor, as hearsay.

23          THE COURT:  I didn't -- I'm sorry.

24          MR. CAMBRIA:  I had my microphone off.  I'm sorry,

25   Your Honor.  I apologize.                                      09:18:36

1      We object as hearsay.

2      THE COURT:  All right.  Overruled.

3  BY MR. STONE:

4  Q.  All right.  Sir, this has now been published to the jury.

5  And I've zoomed in on the top portion of the email.          09:18:47

6      Is the top portion an email from you to Carl Ferrer?

7  A.  Yes.

8  Q.  All right.  I'm going to direct your attention to the

9  bottom of this exhibit, an email from Carl Ferrer on

10  August 31st.                                                 09:19:25

11      Do you see that, sir?

12  A.  Yes.

13  Q.  Mr. Ferrer writes, "Don't change these pages, we have a

14  deal with the TER.  It's a reciprocal link program where we get

15  an additional million page views from TER."                 09:19:37

16      Is he referring to the reciprocal link program that

17  you've testified about?

18  A.  Yes.

19  Q.  "These are clients who had Craigslist URLs in reviews that

20  are changed to Backpage URLs."                              09:19:50

21      What does that mean?

22  A.  So on The Erotic Review, on the profile page of a provider

23  of an escort or of a prostitute, there was a place on that page

24  where a user of the website could notate the ad -- or the link

25  to the ad that they had found and possibly contacted the user. 09:20:14

1          So the Craigslist URL he's referring to is that ad

2    link.

3    Q.  Was this an important aspect and strategy for Backpage's

4    growth?

5    A.  Yes.                                                          09:20:32

6    Q.  The next line, Mr. Ferrer writes, "So, if you changed any

7    of them, change them back.  This TR" -- "TER deal is very big

8    for us."

9          Was that accurate?

10   A.  Yes.                                                          09:20:45

11   Q.  And why was it very big for Backpage?

12   A.  It's 2007.  We were still in the infancy or adolescence of

13   our site at the time, and it was important for us to continue

14   to gather as many page views or visitors or users of our

15   website as possible.  And TER was a great contributor to those  09:21:06

16   page views or those visitors or those users.

17   Q.  Why was it a great contributor?

18   A.  Because they would have a link to our site that they may

19   not have formally known about.  And if they were on The Erotic

20   Review looking at a provider's escort profile page and clicked  09:21:27

21   on the Backpage link, it would go directly to our site, and

22   there was a possibility that they would become a frequent

23   visitor and user of our website.

24   Q.  You used the term "they" when you were -- when you were

25   testifying right there.  Who is "they" referring to?            09:21:48

 1   A.  Well, the -- the users of The Erotic Review could be a

 2   number of different people.  Johns, people who use escorts.

 3   Hobbyists, sometimes they're called.  It could be other

 4   escorts.

 5   Q.  But the important aspect was that this relationship with          09:22:09

 6   TER helped direct traffic to Backpage?

 7   A.  Yes.

 8   Q.  Okay.  And I just highlighted another portion of the email

 9   chain.

10          Is this an email from you?                                    09:22:43

11   A.  Yes.

12   Q.  And the second paragraph you write, "What is most

13   unfortunate is that out of all the papers in the chain, they

14   require the most aggregating because their site sucks so bad."

15          What are you referring to?                                    09:23:00

16   A.  Referring to the Minneapolis.Backpage.com.

17   Q.  And what does "require the most aggregating" mean?

18   A.  More man-hours, more staff participation in aggregating or

19   getting Craigslist users to post there than other metropolitan

20   cities that were in the New Times chain at that time.                09:23:26

21   Q.  The third paragraph reads, "I don't want to throw Alan

22   under the bus, but if the adult guy in any given market doesn't

23   buy in, it's counterproductive."

24          What does it mean when you write, "doesn't buy in"?

25   A.  Well, there was a lot of disdain, displeasure, dislike of        09:23:41

1    Backpage.com by the print employees.  I know this because I was

2    a print employee.  And there -- what Alan did that prompted

3    this email in removing the ad and devaluing the ad that the

4    user purchased on Backpage.com is one of the things that the

5    adult guy that I'm referring to, the print guy in adult from          09:24:09

6    Minneapolis.com, it's one of the things that he could do to

7    make it -- make it not productive, make it not work, make it

8    not as -- not grow as fast.

9    Q.  How are the print revenues doing at this point in 2007?

10   A.  They were on a steady decline.                                     09:24:30

11   Q.  And who was the beneficiary of the decline in revenue for

12   print?

13   A.  I don't understand that question.

14   Q.  Fair.

15        You had testified yesterday about how the revenue at           09:24:40

16   the Dallas Observer declined during your time there --

17   A.  Yes.

18   Q.  -- correct?

19        And I think you also testified that you came to

20   understand why there was a decline in revenue.                         09:24:53

21   A.  Yes.

22   Q.  Did that continue -- and your testimony, correct me if I'm

23   wrong, was that the Internet was -- was pulling revenue from

24   print.

25   A.  Yes.                                                               09:25:03

1    Q.  Did Internet continue to pull revenue from print in 2007?

2    A.  Yes.

3    Q.  How about moving forward?

4    A.  Yes.

5    Q.  All right.  I'm going to show you another exhibit for your          09:25:09

6    eyes only, Exhibit 1837.

7             Sir, do you recognize this exhibit?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is an email that I am replying to an email that was           09:25:30

11   sent to me on Thursday, March 3rd, 2008, sent to Carl Ferrer

12   and Andrea Sennet.

13   Q.  March 13?

14   A.  Yes.

15   Q.  Email exchange between you and Mr. Ferrer?                         09:25:45

16   A.  Yes.

17            MR. STONE:  Move to admit Exhibit 11 -- I'm sorry --

18   Exhibit 1837.

19            THE COURT:  It may be --

20            MR. FEDER:  Hearsay.                                          09:26:00

21            THE COURT:  -- admitted.

22            MR. FEDER:  Hearsay.

23            THE COURT:  Overruled.

24            It may be admitted.  It may be published.

25            (Exhibit 1837 admitted into evidence.)                       09:26:10

1    BY MR. STONE:

2    Q.  I'm zooming in on the top portion of this email.

3         Do you see that?

4    A.  Yes.

5    Q.  And this is an email from you?                        09:26:16

6    A.  Yes.

7    Q.  Second line down you write, "She's currently on the TER

8    project."

9         What does that mean, "the TER project"?

10   A.  I'm referring to The Erotic Review reciprocal link project  09:26:26

11   or job that we had previously discussed.

12   Q.  Just to refresh the jury's recollection, what did that

13   entail?

14   A.  So in the reciprocal link process, we would identify ads or

15   profile pages on The Erotic Review that had links that went to  09:26:53

16   Craigslist.org, and we would either replicate or create an ad

17   on Backpage that had a link, a URL, that went to The Erotic

18   Review.

19         And then we would submit that ad on Backpage to The

20   Erotic Review so that they would override the Craigslist link  09:27:19

21   with the Backpage link.

22   Q.  You're removing Craigslist's links out of The Erotic Review

23   and putting in Backpage?

24   A.  Yes.

25   Q.  I think you testified that you sometimes would create an   09:27:31

UNITED STATES DISTRICT COURT

 1   ad; is that right?

 2   A.  Yes.

 3   Q.  So an ad that the poster didn't actually post?

 4   A.  Yes.

 5   Q.  Why were you creating ads?                                  09:27:42

 6   A.  Again, in 2008 we were in the business survival mode, grow

 7   our website at no cost -- or with no -- I mean, we're doing

 8   everything we could to grow the site.  So we'd see an ad that

 9   was on Craigslist that was found by going through The Erotic

10   Review.  Go to The Erotic Review profile page of an escort, and  09:28:11

11   there's a link that goes to Craigslist.  So you click on that

12   link that goes to the Craigslist ad, which is an escort or a

13   prostitute on Craigslist, and there's the ad that you could use

14   to create the ad on Backpage.

15   Q.  You'd do it to drive traffic to Backpage?                   09:28:29

16   A.  Yes.

17   Q.  Highlighting a portion of Carl Ferrer's email to you.

18        Do you see that on your screen?

19   A.  Yes.

20   Q.  And under number 1, it reads, "Move or delete escorts out   09:28:58

21   of personals and adult jobs."

22        Do you have an understanding of why that was something

23   Backpage wanted to do?

24   A.  Yes.

25   Q.  Why?                                                        09:29:10

1    A.   Personals and adult jobs were free, so some users who would

2    post -- who should be posting in escorts would post in adult

3    jobs or personals to get a free ad.

4    Q.   So moving them out of personal and adult jobs in -- were

5    you trying to move them into escorts?                                    09:29:30

6    A.   Yes.

7    Q.   For what purpose?

8    A.   Money.   To make revenue.

9    Q.   All right.   I'm going to show you what's already been

10   admitted as Exhibit 1168.                                               09:29:47

11        Highlighting the top portion, and zooming in on the

12   top portion of Exhibit 1168, do you recognize this email, sir?

13   A.   Yes.

14   Q.   It's an email from Mr. Ferrer?

15   A.   Yes.                                                               09:30:14

16   Q.   And you're one of a number of recipients who received it?

17   A.   Yes.

18   Q.   Do you recognize anyone else in that to line?

19   A.   Yes.

20   Q.   Who do you recognize?                                             09:30:26

21   A.   A lot of these people are my employees.   So I recognize --

22   it would be easier to say who don't I recognize.

23   Q.   Okay.   How about this:  Do you recognize Andrew Padilla?

24   A.   Yes.

25   Q.   Who is Mr. Padilla?                                              09:30:42

1    A.  Andrew was the operations -- chief operations officer,

2    operations manager for Backpage.com.

3    Q.  Was -- did he have a specialty, or was he in charge of any

4    program at Backpage?

5    A.  His department handled fraud, support, and moderation.                09:30:59

6    Q.  All right.  And turning to the body of the email, do you

7    recall what's -- what Mr. Ferrer is emailing you about?

8    A.  Yes.

9    Q.  What is it?

10   A.  He's referring to a national ad that was posted by Erotic           09:31:20

11   MP.  A moderator removed it.  And Carl's referring to this

12   being an errant removal.

13   Q.  An errant removal.  So in error?

14   A.  It shouldn't have been removed.

15   Q.  You mentioned national ad.  What does that mean?                     09:31:42

16   A.  Backpage also offered posting users a way with which they

17   could post an ad that would run in every city.  A convenient

18   way to -- rather than have to post -- I don't remember the

19   number of cities we had in 2008, but if we had, let's say, a

20   hundred cities, rather than having to post 100 different ads,           09:32:07

21   you would be able to post one ad.

22   Q.  Fair to say that a national ad, more revenue than an ad

23   that was posted in just one city?

24   A.  Yes.

25   Q.  All right.  I'm highlighting the second part -- or the              09:32:21

DANIEL HYER - DIRECT EXAMINATION
25

```
 1   second half of this email.

 2           Do you see that, sir?

 3   A.  Yes.

 4   Q.  What is the jury seeing on their screens?

 5   A.  This is an HTML coded -- when you see forward -- alligator    09:32:33

 6   open B, alligator close B, that's just the HTML code.  But the

 7   text there is what appeared in the ad.

 8   Q.  So this is what the national ad was on Backpage?

 9   A.  Yes.

10   Q.  The user says "erotic MP@gmail.com."                          09:32:56

11   A.  Yes.

12   Q.  Are you familiar with that user?

13   A.  Yes.

14   Q.  Who is it?

15   A.  It's a website that does reviews, much in the way that The    09:33:06

16   Erotic Review did, but it's for brick and mortar massage

17   places.

18   Q.  You say similar to The Erotic Review.  So how is it

19   similar?

20   A.  So if you were to consider Erotic Review a Yelp or escorts,   09:33:22

21   then Erotic MP was a Yelp for massage parlors.

22   Q.  And this ad towards the bottom reads, "The dirty details on

23   the Erotic Massage Parlor.  Find out what they do, such as

24   Happy Endings.  Do they go down, do they let you go down, FSBM,

25   FS and much more."                                               09:33:56
```

UNITED STATES DISTRICT COURT

DANIEL HYER - DIRECT EXAMINATION

26

1          Is that fair?

2     A.   Yes.

3     Q.   Do you have an understanding for what happy endings means?

4     A.   Yes.

5     Q.   What?                                                    09:34:04

6     A.   In the context of a massage parlor, that would be after the

7     massage that was therapeutic, the provider of the massage would

8     conclude it with a masturbation -- or bringing the person

9     getting the massage to ejaculation.

10    Q.   So if there was money exchanged, that would be a          09:34:35

11    prostitution act?

12    A.   Yes.

13    Q.   What about "do they go down?"  Do you have an understanding

14    of what that means?

15    A.   That would -- do they give oral sex.                      09:34:43

16    Q.   How about the next line, "do they let you go down?"

17    A.   So do they receive oral sex.

18    Q.   "FSBM."  Do you have an understanding what that is?

19    A.   That's full service body massage.

20    Q.   What does that mean?                                      09:35:00

21    A.   It's the sexual term.  "Full service" means to intercourse.

22    So in addition to the body massage, they would do intercourse.

23    Q.   And "FS"?

24    A.   That's no massage, just the -- just the full service.

25    Q.   And what -- is this the last line of the ad?  Do you know? 09:35:17

```
 1   What I just highlighted.
 2   A.  I think so, yes.
 3   Q.  "Erotic MP is a great beginning for your Happy Ending"?
 4   A.  Yes.
 5   Q.  All right.  Now I'm going to show for your eyes only          09:35:31
 6   Exhibit 27.
 7           Sir, do you recognize this exhibit?
 8   A.  Yes.
 9   Q.  What is it?
10   A.  It is an email that I'm responding to.  It was initially     09:35:57
11   sent to Carl.  I'm responding to his email on May 7th, 2009.
12   Q.  The bottom part, there's a forwarded message?
13   A.  Yes.
14   Q.  Seven-page exhibit?
15   A.  Yes.                                                         09:36:33
16           MR. STONE:  Your Honor, move to admit Exhibit 27.
17           MR. FEDER:  Hearsay.
18           THE COURT:  Overruled.
19           It may be admitted and published.
20           (Exhibit 27 admitted into evidence.)                    09:36:46
21   BY MR. STONE:
22   Q.  Do you see that on your screen, sir?
23   A.  Yes.
24   Q.  Okay.  Let me make it a little bit bigger on what I want to
25   focus on.                                                       09:37:04
```

1          And this is an email from Carl Ferrer.  And in the to

2    line it's Fred Magid.

3          Is that how you pronounce his name?  Do you know?

4    A.  Yes.

5    Q.  Do you know this Fred Magid?                          09:37:13

6    A.  I know of him.

7    Q.  Who is he?

8    A.  He was one of the principals or one of the executives for

9    The Erotic Review.

10   Q.  What about John Giorgio?  Do you know who that individual  09:37:20

11   is?

12   A.  Yes.

13   Q.  Who?

14   A.  He, too, was one of the principals, one of the executives

15   for The Erotic Review.                                   09:37:29

16   Q.  Is this part of the email from Mr. Ferrer to these two

17   individuals at The Erotic Review?

18   A.  Yes.

19   Q.  What is Mr. Ferrer discussing in this email?

20   A.  This is a way to try to maximize the reciprocal link  09:37:48

21   program, the agreement that we were in with them.

22   Q.  How were you trying to maximize it?

23   A.  Well, Carl, in the third line, "I can delete the TER link.

24   Or, you can import it into the personal website if it is empty?

25          He's making a proposal here on The Erotic Review where  09:38:13

1    the profile page of The Erotic Review didn't have a link to the

2    Backpage ad.  He's suggesting here that The Erotic Review add a

3    link to Backpage in that empty space.

4    Q.  Okay.  So some technical back and forth about how best to

5    maximize this relationship?                                    09:38:38

6    A.  Yes.

7    Q.  The bottom line is that Backpage was -- was attempting to

8    get the most out of the reciprocal link program.  Is that fair?

9    A.  Yes.

10   Q.  And this is an email from Mr. Ferrer to you on May 7th,     09:38:51

11   2009?

12   A.  Yes.

13   Q.  What's Mr. Ferrer emailing you about?

14   A.  This is him giving us the -- the recipe or the playbook on

15   how internally, on our side of the reciprocal link program, our 09:39:24

16   staff was to do our part.

17   Q.  "If they do not have our link, verify TER has a place for

18   our link."

19         Was that part of it?

20   A.  "If personal website is empty, copy link and TER ID.  If    09:39:46

21   they do not have room for our link, kill the ad for larger

22   markets."

23         So that's all, as you described it, the recipe or

24   playbook for maximizing this relationship?

25   A.  Yes.                                                        09:40:03

DANIEL HYER - DIRECT EXAMINATION

30

 1   Q.  You respond to Mr. Ferrer, "Awesome.  Andy, Thomas and I

 2   can attack this today."

 3          What did that mean?

 4   A.  That we would start using that playbook that day.

 5   Q.  And did you?                                          09:40:24

 6   A.  Yes.

 7   Q.  All right.  Sir, during your time at Backpage, were you

 8   familiar with Google Analytics reports?

 9   A.  Yes.

10   Q.  How were you familiar with them?                      09:40:36

11   A.  As my job as sales and marketing director, one of the

12   important considerations was, are we growing?  How many people

13   are visiting the site?  Where are they coming from?  And a

14   number of other related things with traffic.

15          The -- the Google Analytics reports could tell you the  09:41:01

16   device, they could tell you how long the person was visiting,

17   what -- what -- where they visited, what site, what ad.

18          So it was very important tool.

19   Q.  When you say "traffic," what does that mean?

20   A.  Traffic would be a visitor, somebody who went to our site.  09:41:18

21   And then traffic usually means -- not -- not -- so traffic

22   would be people coming to the site.

23   Q.  Okay.  Now I'm going to show you what's already admitted as

24   Exhibit 311.

25          Sir, do you recognize this exhibit?                09:41:47

UNITED STATES DISTRICT COURT

```
 1    A.  Yes.

 2    Q.  Is this one of those Google Analytic reports?

 3    A.  Yes.

 4    Q.  I've highlighted a portion here.

 5         What are we seeing on our screens?                    09:42:02

 6    A.  So this is a -- it's under the banner of site usage for

 7    March 22nd, 2010.  It's showing us here the number of visits,

 8    the number of page views, the number of pages consumed by each

 9    visit.  Bounce rate is an indication of how many times a user

10    came to the site, looked at one page, and exited.  And then   09:42:24

11    average time on the site, pretty self-explanatory.  And then

12    the new visits would be users that hadn't visited before.

13    Q.  Okay.  And I highlighted the next part of this exhibit.

14         How about this portion?

15    A.  On the right there, it's showing by the highest referring  09:42:42

16    site, starting with The Erotic Review.

17    Q.  And so The Erotic Review was the highest referring site on

18    this date?

19    A.  Yes.

20    Q.  And this date is March 22nd, 2010?                   09:43:03

21    A.  Yes.

22    Q.  All right.  What about this portion here, traffic sources

23    overview?  First bullet point here as referring sites.

24         What's that mean?

25    A.  That's the number of -- 893,012 was the number of referrals  09:43:19
```

UNITED STATES DISTRICT COURT

```
 1   that we got to Backpage.com.
 2   Q.  From other websites?
 3   A.  Some of those are self-referrals.
 4   Q.  Meaning somebody within Backpage moved to another page and
 5   it was counted here?                                        09:43:44
 6   A.  Yes.
 7   Q.  What about this search engines --
 8   A.  So that's --
 9   Q.  -- form?
10   A.  That's encapsulating Google, Yahoo, Bing.  Search engines 09:43:53
11   and the number of visits we got and the percentage of overall.
12   Q.  And, finally, there's a content drilldown.
13        What's that refer to?
14   A.  That's showing the most highly visited categories.
15   Q.  Which was?  What was number 1?                          09:44:35
16   A.  Female escorts.
17   Q.  What would have happened to Backpage.com if the female
18   escorts category was removed?
19        MS. BERTRAND:  Objection.  Calls for speculation.
20        THE COURT:  Sustained.                                 09:44:48
21   BY MR. STONE:
22   Q.  Do you have a sense, during your 12 years at Backpage,
23   about the importance of the female escorts section to the
24   business?
25   A.  Yes.                                                    09:44:59
```

1    Q.   How was it important?

2    A.   The impact to Village Voice Media would have been

3    catastrophic.

4    Q.   Why do you say that?

5    A.   We wouldn't have survived.                                    09:45:11

6    Q.   When you say "we," who are you referring to?

7    A.   The company.

8    Q.   Backpage?

9    A.   I'm talking about Village Voice Media.

10   Q.   The company that owned Backpage?                              09:45:21

11   A.   Yes.

12   Q.   And why do you say that it wouldn't have survived?

13   A.   This is a time in history where everything that was in

14   print was going to the Internet.  And we had no other vehicle

15   to make revenue to -- to continue as a business.  So the -- you  09:45:37

16   know, the supplemental revenue that we got from Backpage was

17   how we survived through -- you know, it -- through the -- the

18   next several years.

19   Q.   Which category on Backpage was bringing in the most

20   revenue?                                                          09:46:01

21   A.   Adult.

22   Q.   And which category within adult was bringing in the most

23   revenue?

24   A.   Female escorts.

25   Q.   Okay.  I'm going to show you another exhibit for your eyes    09:46:07

1    only, Exhibit 798.

2         Sir, do you recognize this portion of the exhibit that

3    I'm highlighting?

4    A.  Yes.

5    Q.  What is it?                                              09:46:49

6    A.  This is an email that I am providing Carl with information

7    he requested via email on the 31st, 2010 -- 31st of August,

8    2010.

9    Q.  The top portion here, you recognize the email addresses for

10   these individuals?                                           09:47:13

11   A.  Yes.

12   Q.  These individuals, at least Fred Magid and John Giorgio,

13   are -- they work at The Erotic Review?

14   A.  Yes.

15        MR. STONE:  I move to admit Exhibit 798.                09:47:24

16        MR. FEDER:  Hearsay.

17        THE COURT:  Overruled.

18        798 may be admitted and published.

19        (Exhibit 798 admitted into evidence.)

20   BY MR. STONE:                                                09:47:35

21   Q.  All right.  The jury can now see this, sir.

22        I'm going to back out and then zoom in on the portion

23   of your email exchange with Carl Ferrer.

24        Is that what's zoomed in here?

25   A.  Yes.                                                     09:47:54

1    Q.  And what is Mr. Ferrer asking you to do?

2    A.  He's asking me to provide a link of The Erotic Review page

3    of the escort that had emailed in to us and then a link to the

4    escort's profile page on CityVibe.

5    Q.  You -- he writes that suddenly has a troubled ticket.          `09:48:18`

6            Do you see that?

7    A.  Yes.

8    Q.  What does a troubled ticket mean?

9    A.  That's another way to say that the user emailed into

10   support with a complaint -- Backpage support with a complaint.    `09:48:31`

11   Q.  Okay.  And you respond to Mr. Ferrer with two links?

12   A.  Yes.

13   Q.  What do those links represent?

14   A.  The easiest way to describe this is that CityVibe was doing

15   exactly what we were doing to Craigslist.                         `09:48:45`

16   Q.  And what does -- well, let me back up.

17           Who is CityVibe?

18   A.  CityVibe was -- was an escort website.

19   Q.  And you said CityVibe was doing the exact thing to us that

20   we were doing to Craigslist.  Explain that a little bit to the    `09:49:00`

21   jury.

22   A.  So CityVibe was also engaged in a reciprocal link program

23   with The Erotic Review in which they were working with The

24   Erotic Review to publish ad links to CityVibe, so that when a

25   user, a hobbyist, a john, somebody who was using The Erotic       `09:49:19`

 1    Review would see the link that went to CityVibe, they could

 2    click on it, and they would go to CityVibe.

 3    Q.  What did you and Mr. Ferrer and others at Backpage think

 4    about that practice?

 5    A.  I'm sorry.  That question's a little open-ended.          09:49:36

 6    Q.  Totally fair.

 7            Was it troubling that CityVibe had this relationship

 8    with The Erotic Review?

 9    A.  Yes.  At the time it was infuriating.

10    Q.  Why?                                                      09:49:51

11    A.  I mean, it's -- we didn't know what was going to happen a

12    couple of months later, in September of 2010.  We still felt

13    like we were in a -- kind of in the wild west days of the

14    Internet fighting for survival, fighting to be the next biggest

15    site behind Craig.  And we had spent a lot of money and         09:50:09

16    personnel resources and emotional energy on trying to build

17    that relationship with The Erotic Review.  It had gone on for

18    years.  And here we were -- I mean, we kind of felt like we

19    were getting stabbed in the back.

20    Q.  Stabbed in the back by who?                               09:50:27

21    A.  The Erotic Review.

22    Q.  Was it a problem for Backpage's business?

23    A.  Potentially.

24    Q.  Because why?

25    A.  Because then we wouldn't be the biggest site.  Another site  09:50:38

1    would be.

2    Q.  And why were you worried that you wouldn't be the biggest

3    site if you didn't have this relationship with The Erotic

4    Review?

5    A.  Man, I don't understand that question.                    09:50:48

6    Q.  Let me see if I can do better.

7            You just testified that this was an important part of

8    Backpage's business, this relationship with The Erotic Review?

9    A.  Yes.

10   Q.  And so let me simplify the question by asking, why was it   09:51:02

11   so important?

12   A.  Because we needed traffic to survive.

13   Q.  And what type of traffic were you receiving from The Erotic

14   Review?

15   A.  Users that had a high likelihood of going to the escort     09:51:12

16   section and then coming back to the escort section and then

17   coming back.  You know, active participants of consuming

18   content, viewing content, posting content on our site.

19   Q.  Repeat users?

20   A.  Yes.                                                        09:51:31

21   Q.  Was the escort section, as compared to other sections,

22   provide more of an arena for repeat users?

23   A.  Certainly in comparison to a section like employment or

24   jobs.

25   Q.  So, yes?                                                    09:51:50

DANIEL HYER - DIRECT EXAMINATION

38

```
 1   A.  Yes.

 2   Q.  And Mr. Ferrer emails The Erotic Review in this portion

 3   that's highlighted on everyone's screens?

 4   A.  Yes.

 5   Q.  And is -- well, what's he doing in this email?          09:52:05

 6   A.  He's in a much more eloquent way explaining what CityVibe

 7   was doing to us and proposing to The Erotic Review that they

 8   put a stop to it.

 9   Q.  Asking The Erotic Review to help you put an end to this

10   problem?                                                    09:52:27

11   A.  Yeah.  We wanted to be their preferred provider.

12   Q.  And The Erotic Review, Mr. Magid, responds, "I will pass

13   this on to our support manager to see if he has any comments

14   regarding this"; right?

15   A.  Yes.                                                    09:52:48

16   Q.  Take it under consideration?

17   A.  Yes.

18   Q.  All right.  I'm going to show you another Google Analytics

19   report that's already in evidence as Exhibit 641.

20          Do you recognize the top portion of this exhibit, sir?  09:53:04

21   A.  Yes.

22   Q.  What's the date range?

23   A.  January 1st, 2011, to January 31st, 2011.

24   Q.  I believe the emails we were just looking at were in August

25   of 2010?                                                    09:53:24
```

DANIEL HYER - DIRECT EXAMINATION

39

1    A.   Yes.

2    Q.   And so this is a number of months after that?

3    A.   Yes.

4    Q.   Do you see that on your screen?

5    A.   Yes.                                                    09:53:39

6    Q.   There's a source in the left-hand column, a number 1 reads

7    "TheEroticReview.com."

8            What is the significance of that?

9    A.   Well, it's showing ranking by volume, percentage, traffic

10   statistics.                                                  09:53:59

11   Q.   Okay.  And there's a number of columns moving right?

12   A.   Yes.

13   Q.   And The Erotic Review, number 1.  And number 1

14   significantly over number 2.  Fair?

15   A.   Yes.                                                    09:54:16

16   Q.   "Average Session Duration," which is the farthest right

17   column, what does that refer to?

18   A.   That's by minutes.  The amount of time that somebody

19   visited Backpage from that referring link spent on the site, on

20   our site.                                                    09:54:39

21   Q.   More time the better for Backpage?

22   A.   Yes.

23   Q.   The number 2 source here is eccie.net.

24           Am I pronouncing that correctly?  Do you know?

25   A.   I'm not sure how that's pronounced, but it sounds right.  09:54:52

UNITED STATES DISTRICT COURT

DANIEL HYER - DIRECT EXAMINATION

40

```
 1   Q.  Besides the pronunciation, are you familiar with that
 2   website?
 3   A.  Yes.
 4   Q.  What is it?
 5   A.  That is another escort forum.                          09:55:00
 6   Q.  When you say "escort forum," what do you mean?
 7   A.  It's another site where people who use the services of
 8   escorts or prostitutes can talk about their experiences with
 9   the -- give a review.
10   Q.  You've -- in your testimony, you're often saying "escort"  09:55:13
11   and then also "prostitution."
12           Is there a difference between those two terms to you?
13   A.  No.
14   Q.  And when you are dealing with the escort section of
15   Backpage, or the escort section of The Erotic Review, is there  09:55:29
16   a difference between the terms "escort" and "prostitution" on
17   those sections?
18   A.  No.
19   Q.  Number 3 here reads "usasexguide.info."
20           Are you familiar with that website?              09:55:46
21   A.  Yes.
22   Q.  What is it?
23   A.  That's another escort review site.
24   Q.  Similar to The Erotic Review and eccie.net?
25   A.  Yes.                                                  09:55:59
```

UNITED STATES DISTRICT COURT

 1   Q.  Yeah.  I'm sorry.

 2          How about number 6, bestgfe.com?  Are you familiar

 3   with that website?

 4   A.  Yes.

 5   Q.  What is it?                                          09:56:05

 6   A.  That is also an escort review site.

 7   Q.  So four of the top six referral sources are all escort

 8   review sites?

 9   A.  Yes.

10   Q.  On this Google Analytics report for January 2011; right?  09:56:25

11   A.  Yes.

12   Q.  All right.  I'm going to show you another exhibit that's in

13   evidence, Exhibit 342a.

14          Sir, do you recognize this exhibit?

15   A.  Yes.                                                 09:56:47

16   Q.  What is it?

17   A.  We called it a statistical report.  It's a report that's

18   showing by category, by ad, by ad type from -- it looks like

19   it's a week, for July 30th, 2012, to August 5th, 2012.  And

20   it's a -- a macro look at our website in terms of those things.  09:57:11

21   Q.  Okay.  "Macro look" meaning what?

22   A.  The overall look.  Rather than, say, Dallas.Backpage.com,

23   this is showing all of the sites.

24   Q.  Okay.  And there's different -- are these different

25   categories in this part right here?                      09:57:32

DANIEL HYER - DIRECT EXAMINATION

42

```
 1    A.   Yes.

 2    Q.   Female escorts is one of them?

 3    A.   Yes.

 4    Q.   And then if you trace female escorts all the way to the

 5    right, what does that show?                                    09:57:48

 6    A.   The subtotal column is showing the revenue for that time

 7    period.

 8    Q.   And the revenue for female escorts here is just under

 9    1.4 million.  Is that fair?

10    A.   Yes.                                                       09:57:59

11    Q.   And the revenue, which may be a little hard to see, for all

12    of adult entertainment is 1.871 million?

13    A.   Yes.

14    Q.   Let me highlight just a portion of this top part.

15         Do you see the column that says, "Move to top"?           09:58:20

16    A.   Yes.

17    Q.   What does that mean?

18    A.   That was a feature where a user could have an existing ad

19    that had previously been posted and with a click and a payment

20    move their ad to the top of the listings.                      09:58:42

21    Q.   There's a -- an amount at the bottom of this move to the

22    top column.

23         Do you see that, sir?

24    A.   Yes.

25    Q.   What does that represent?                                  09:58:54
```

UNITED STATES DISTRICT COURT

1    A.  So that's a summary of all of the move to the top

2    feature -- or purchases during that time period from all of the

3    sections that we were looking at in adult.

4    Q.  Make up a fairly significant chunk of the total amount;

5    correct?                                                        09:59:10

6    A.  Yes.

7    Q.  And this amount here, what does that indicate?

8    A.  I think that's the escort column of -- so it's the -- it's

9    the dollar amount equated to the -- the move to the top

10   purchases in escorts for that time period.                    09:59:26

11   Q.  So fair to say quite a bit of revenue Backpage was earning

12   on move to the top in female escorts?

13   A.  Yes.

14   Q.  At least compared to the total amount, by my rough math,

15   it's 50 percent or a little bit more --                       09:59:47

16   A.  Yes.

17   Q.  -- fair?

18        Why was move to the top so successful in the female

19   escort category?

20   A.  It was very easy to use.  I think at its peak we had a way, 10:00:03

21   from my recollection, where you would get an SMS as a user, a

22   text message, where you simply could click a link on your text

23   message, and it would move it to the top with that much ease.

24   It was very easy to do.  It took no time.  Rather than, you

25   know, having to go and go through posting a brand-new ad,     10:00:27

1    uploading new photos, those kinds of things.

2    Q.  Okay.  So there was an ease factor to it?

3    A.  Yes.

4    Q.  Did you see success in the other categories of Backpage on

5    this move to the top feature?                              10:00:39

6    A.  Not all of them.

7    Q.  Do you have any understanding why not?

8    A.  There was so much volume in escorts that if you didn't use

9    a feature like move to the top, there was so many people

10   posting that within an hour or two or five, depending upon your   10:00:54

11   city, your ad would be buried behind hundreds of other posters

12   who had posted since you last posted your ad.

13   Q.  And what happens when your ad gets buried?

14   A.  It's much more unlikely that people won't see it and

15   respond to it.                                             10:01:16

16   Q.  The next category is automotive?

17   A.  Yes.

18   Q.  And this refers to all the revenue that Backpage earned

19   during this week in automotive ads?

20   A.  Yes.                                                   10:01:31

21   Q.  Total amount is over one -- 1,300?

22   A.  Yes.

23   Q.  Move to the top, nothing; correct?

24   A.  It looks to be nothing, yes.

25   Q.  Next category is buy/sell/trade; right?               10:01:53

```
 1   A.  Yes.
 2   Q.  And what's the total revenue for buy/sell/trade for this
 3   week?
 4   A.  It looks like 18,900.
 5   Q.  And move to the top, any revenue?                          10:02:07
 6   A.  No.
 7   Q.  Scrolling to the bottom of this exhibit on page 3, does it
 8   give grand totals of the ads and the revenue for this week?
 9   A.  Yes.
10   Q.  And I highlighted, it may be a little difficult to read,   10:02:34
11   the revenue associated with move to the top and the total
12   revenue earned for that week; correct?
13   A.  Yes.
14   Q.  Fair to say that the vast bulk of this money was earned in
15   the adult category?                                           10:02:54
16   A.  Yes.
17   Q.  And within the adult category, female escorts?
18   A.  Yes.
19   Q.  I'm going to show you what's been admitted into evidence as
20   Exhibit 1835a.                                                10:03:19
21        Sir, do you recognize this exhibit?
22   A.  Yes.
23   Q.  What is it?
24   A.  This looks to be a profile page of a user named Ashley on
25   The Erotic Review.                                            10:03:37
```

UNITED STATES DISTRICT COURT

1   Q.  And did you review profiles on The Erotic Review during

2   your time at Backpage?

3   A.  Yes.

4   Q.  What's the information that is zoomed in on the screen?

5   A.  Well, there's a lot here.  The ad website field is what we          10:03:52

6   had previously talked about.  And it looks like it's

7   Tucson.Backpage.

8   Q.  Okay.  You said we previously talked about it.  What are

9   you referring to?

10  A.  So in the reciprocal link relationship, this would be an          10:04:12

11  example of that reciprocation, at least from The Erotic Review

12  side, where the ad website field has a link to Backpage on it.

13  Q.  What would happen if you were on The Erotic Review on this

14  Ashley's profile and you clicked that link?

15  A.  You would be taken to Backpage.          10:04:36

16  Q.  And if you were on Backpage, might there be a link for The

17  Erotic Review that you could click and be taken to this

18  profile?

19  A.  There might be.

20  Q.  And is that the reciprocal link program?          10:04:47

21  A.  Yes.

22  Q.  The service for this individual is listed as what?

23  A.  Escort.

24  Q.  All right.  The next two categories.  The first one says,

25  "Appearance."          10:05:09

1      And what information's contained in this appearance

2    category?

3    A.  Would you like me to read them?

4    Q.  No, just generally.

5    A.  So height, weight, build, ethnicity, tattoos, piercings.      10:05:18

6    Q.  It talks about breasts?

7    A.  Yes.

8    Q.  It talks about pussy?

9    A.  Yes.

10   Q.  All right.  The services offered?      10:05:33

11   A.  Yes.

12   Q.  That's the next part?

13   A.  Yes.

14   Q.  And would this be, if you -- if you know, when you visited

15   The Erotic Review, would anyone who visited The Erotic Review      10:05:45

16   be able to access this page?

17   A.  It depended on the time, as eventually they put this kind

18   of information behind a paywall.

19   Q.  You testified eventually.  So at one point this was not

20   behind a paywall?      10:06:03

21   A.  Correct.  Yes.

22   Q.  And then under services offered, fair to say that it

23   relates to prostitution acts?

24   A.  Yes.

25   Q.  Just quickly moving back up to the top, if someone clicked      10:06:12

    1   that link and was taken to -- taken to Backpage's website,

    2   would that count as a referral?

    3   A.  Yes.

    4   Q.  Would it then show up on some of those Google Analytic

    5   reports that we've seen?                                    10:06:32

    6   A.  Yes.

    7   Q.  I'm going to show you what's admitted into evidence as

    8   1835b.

    9        You've seen this type of page before, sir?

   10   A.  Yes.                                                    10:06:56

   11   Q.  What is it?

   12   A.  This is a review posted by a user on The Erotic Review

   13   named DATYGMAN of a escort named Felicia.

   14   Q.  And without going into the details here, fair to say that

   15   it's describing a prostitution act?                         10:07:18

   16   A.  Yes.

   17   Q.  I'll take you to what's been admitted as 1835c.

   18        Have you seen this type of page before, sir?

   19   A.  Yes.

   20   Q.  What is it?                                             10:07:39

   21   A.  This is a list of the reviews by provider, by date, by area

   22   code on The Erotic Review.

   23   Q.  And the city here's Phoenix.  So are you aware if users

   24   could do a search and find all the reviews for prostitutes in

   25   Phoenix?                                                    10:08:04

DANIEL HYER - DIRECT EXAMINATION

49

1   A.  Yes.

2   Q.  And it shows them by date there on the left-hand side?

3   A.  Yes.

4   Q.  I'll take you back quickly to 1835b.

5        Just highlighting the top right-hand portion of this          10:08:28

6   exhibit.  What is that?

7   A.  It's a button ad for Backpage.com.

8   Q.  What's a button ad?

9   A.  It's an Internet term for an advertisement that's, you

10  know, smaller, a square, rather than take up the whole page or     10:08:50

11  a banner.  It's a -- a button.  A smaller-sized ad.

12  Q.  Okay.  And smaller-sized ad, and the ad reads, "Find

13  escorts here at Backpage.com"?

14  A.  Yes.

15  Q.  Is that an ad that Backpage would have had to place on The     10:09:05

16  Erotic Review?

17  A.  Yes.

18  Q.  I'll bring up quickly Exhibit 20, which is in evidence.

19  This is a -- an exhibit that we've seen before, but I'm

20  highlighting a portion Mr. Ferrer wrote to you.                    10:09:27

21        Do you see that?

22  A.  Yes.

23  Q.  And you -- this talks about, "Without TheEroticReview

24  traffic you might as well kiss any growth in Minneapolis good

25  bye."                                                              10:09:40

UNITED STATES DISTRICT COURT

1          But my question to you, sir, is eliminate Minneapolis,

2    do you agree with this statement, "Without TheEroticReview

3    traffic you could kiss any growth for Backpage good bye"?

4          MR. FEDER:  Calls for speculation.  And hearsay.

5          THE COURT:  Sustained.                              10:09:58

6    BY MR. STONE:

7    Q.  Let me rephrase.

8          The Erotic Review traffic, fairly important to the

9    growth of Backpage?

10   A.  Yes.                                                  10:10:08

11   Q.  Without The Erotic Review traffic, would Backpage have

12   grown the way it did?

13   A.  No.

14   Q.  All right.  I'm going to switch topics, sir.

15          During your time at Backpage, were you familiar with  10:10:24

16   the -- a program referred to as the affiliate program?

17   A.  Yes.

18   Q.  What was it?

19   A.  The affiliate program was intended to be a way where we

20   would award users who had websites who put links to Backpage on  10:10:41

21   their websites and referred us traffic.

22   Q.  Okay.  What about the term "super poster"?  Does that mean

23   anything to you?

24   A.  Yes.

25   Q.  What does super poster mean?                          10:10:59

1    A.  A super poster is a user on Backpage who posts a bunch of

2    ads.

3    Q.  Were you aware of certain super posters on Backpage?

4    A.  Yes.

5    Q.  I'm going to show you an exhibit for your eyes only.  It's          10:11:12

6    Exhibit 40.

7             Do you recognize this exhibit, sir?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is an email of the marketing agenda that I wrote for           10:11:29

11   2011 in an email that I sent to Carl Ferrer and Scott Spear.

12   Q.  So Sales and Marketing 2011 Working Agenda, that's the

13   subject?

14   A.  Yes.

15   Q.  Two-page document?                                                   10:11:48

16   A.  Yes.

17             MR. STONE:  Your Honor, the government moves to admit

18   Exhibit 40.

19             MR. FEDER:  Hearsay.

20             THE COURT:  Overruled.                                         10:11:59

21             It may be admitted, and it may be published.

22             MR. STONE:  Thank you, Your Honor.

23             (Exhibit 40 admitted into evidence.)

24   BY MR. STONE:

25   Q.  So this is an email from you end of 2010; correct?                  10:12:15

A.   Yes.

Q.   And you've alluded to it, but was there something that happened earlier in 2010 that affected Backpage's business?

A.   Yes.

Q.   What was it?                                                    10:12:29

A.   It was in September of 2010, Craigslist shuttered or shut down erotic services section.

Q.   And what was the result of Craigslist shutting down the adult services section?

A.   We saw exponential growth in traffic and users in our          10:12:44
female escort and other adult sections.

Q.   Did that lead to increased revenue?

A.   Yes.

Q.   That changed the way that you, as the sales and marketing director, did business?                                                10:13:00

A.   It changed the geography in which we tried to promote the business.

Q.   Okay.  What does that mean?

A.   There was no longer any need for us to try to grow female escorts or the adult category in the U.S. after Craig --          10:13:15
Craigslist made its change.

Q.   What were some of the ways that you were trying to grow the female escort section before Craigslist made the change?

A.   The number one way was the aggregation.

          The secondary way would have -- would have been the      10:13:31

1    reciprocal link program.

2           And then the third way would be to try to keep spam --

3    you know, keep the site free of spam.

4    Q.  And after Craigslist made its change, you no longer had to

5    worry about those strategies?                                    10:13:51

6    A.  Certainly not number 1 or number 2.

7    Q.  This is part of your email.  It's number 6.  Reads,

8    "Escorts, body rubs, TS, Dom.  I have a fairly sophisticated

9    spreadsheet outlining date of last increase, amount,

10   recommended increase date, etc.  There is substantial revenue   10:14:19

11   to pick up here."

12          What are you referring to here when you write that

13   there's substantial revenue to pick up?

14   A.  Well, because if it was September and this is December, it

15   was roughly three to four months ago.  We had held rates at     10:14:33

16   a -- to try to give us a competitive advantage versus

17   Craigslist.  So there were many markets where we were $1 or $3

18   or $5.  And what I'm indicating here is that we could go from

19   $1 to $2, or $2 to 3, or 3 to 5, et cetera, and we would see an

20   increase in revenue and little to no decrease in ad count.      10:14:59

21   Q.  Increased revenue because it would just cost more money to

22   post an ad.  Fair?

23   A.  Yes.

24   Q.  Did you actually implement this increase for pricing?

25   A.  Yes.                                                        10:15:13

 1    Q.   Did you see any decrease in ads posted?

 2    A.   We saw nominal decreases.

 3    Q.   "Nominal" meaning what?

 4    A.   Negligible.

 5    Q.   Also a tough word, "negligible."  Meaning minimal?          10:15:25

 6    A.   So if we had 100 percent users posting at a buck, we had

 7    95 percent posting at 2 bucks.

 8    Q.   Revenue increase?

 9    A.   Yes.

10    Q.   All right.  Number 11, you write, "Somad, Bill and New York   10:15:38

11    Platinum rate increase"; correct?

12    A.   Yes.

13    Q.   Who is Somad?

14    A.   Somad was an escort posting service, a super poster in

15    New York City.                                                  10:15:59

16    Q.   "Super poster" meaning they posted a whole bunch of ads?

17    A.   Yes.

18    Q.   Any sense for how many ads per month Somad was posting on

19    Backpage?

20    A.   By month would be a difficult -- difficult time frame to --  10:16:10

21    to guess, because in the user account, or the view of the

22    users' ads posted, they were in increments of 50.  And so a --

23    a safe estimate would be at least 50 ads a day.

24    Q.   So Somad was posting at least 50 ads a day on Backpage?

25    A.   Yes.                                                        10:16:34

DANIEL HYER - DIRECT EXAMINATION

55

 1   Q.  And that's why they were referred to as a super poster?

 2   A.  Yes.

 3   Q.  And you mentioned that they were posting -- what type of

 4   ads -- or let me ask you this:  What type of ads and where were

 5   they posting?                                                      10:16:43

 6   A.  They were posting escort ads in the escort section, adult

 7   ads or prostitution ads.

 8   Q.  And in a certain city or area?

 9   A.  My recollection was that they were almost exclusively in

10   New York.                                                          10:16:58

11   Q.  And they were posting escort or prostitution ads?

12   A.  Yes.

13   Q.  All right.  Bill.  Who is Bill?

14   A.  Bill was a user named, I think it's William Mercer --

15   Mercer.  William Mercer.  He had a lot of nicknames.  Wild        10:17:13

16   Bill.  Psycho Billy.  Psycho Roundup.  I mean, he had a lot of

17   different internal and, I guess, external names that he called

18   himself and we called him.

19   Q.  Did he publish a blog?

20   A.  Yes.                                                           10:17:30

21   Q.  Did you have an opportunity to review that blog?

22   A.  Yes.  I visited it.

23   Q.  What was that blog about?

24   A.  It was a editorial or a biography of his experiences with

25   escorts in New York in every imaginable detail.                   10:17:46

DANIEL HYER - DIRECT EXAMINATION

56

1    Q.   Okay.  When you say "escorts," what do you mean?

2    A.   Prostitutes.

3    Q.   And he laid that out in this blog?

4    A.   Yes.

5    Q.   Was he also a super poster?                                    10:17:57

6    A.   Yes.

7    Q.   So posting what, at least 50 ads a day?

8    A.   Yes.

9    Q.   What about New York Platinum?  Similar to the other two?

10   A.   Yes.                                                           10:18:07

11   Q.   Another super poster?

12   A.   Yes.

13   Q.   All right.  I'm just highlighting the top portion of your

14   email, sir.

15        Do you see that?                                              10:18:41

16   A.   Yes.

17   Q.   And this, number 1, in the email reads, "Employment."

18        What are you referring to in this portion of the

19   email?

20   A.   I'm proposing a method with which we could stop spam and      10:18:48

21   try to copy Craig and charge for employment.

22   Q.   Charge for employment.  So charge for employment ads?

23   A.   Yes.

24   Q.   Did you ever -- did Backpage ever charge for employment

25   ads?                                                               10:19:11

UNITED STATES DISTRICT COURT

1    A.  We tried.

2    Q.  What happened?

3    A.  We failed.

4    Q.  What does that mean?

5    A.  We -- we turned on the -- you know, it was pretty simple to          10:19:15

6    change the mechanism, where instead of it being free, it was a

7    buck.  So we turned that on, where it would cost a dollar to

8    post an ad in employment on Backpage or in jobs on Backpage.

9    And within about 60 days, maybe less, we went from having ads

10   to not having ads.                                                       10:19:40

11   Q.  Having ads on the website?

12   A.  Having ads in jobs on the website.

13   Q.  So after 60 days when you were charging for ads, there were

14   no more employment ads?

15   A.  It -- it dropped from 100 percent of users posting free ads          10:19:51

16   to 3 percent of users posting paid -- paid ads.

17   Q.  Okay.  So the traffic -- the number of ads were reduced, in

18   your testimony, by 97 percent?

19   A.  Yeah.  As an estimate.

20   Q.  Yeah.  Understood.                                                   10:20:07

21        All right.  I'm going to show you what's not in

22   evidence yet.  So it's for the witness's eyes only.

23   Exhibit 109.

24        Sir, I'm highlighting the top portion of this email.

25        Do you see that?                                                    10:20:32

```
 1   A.  Yes.

 2   Q.  Do you recognize this email?

 3   A.  Yes.

 4   Q.  How do you recognize it?

 5   A.  I am sending it in response to Sean Kim on June 8th, 2011,    10:20:36

 6   and I copied Carl Ferrer.

 7           MR. STONE:  Move to admit Exhibit 109.

 8           THE COURT:  Yes.

 9           MR. FEDER:  Hearsay.

10           THE COURT:  Overruled.                                    10:20:54

11           It may be admitted, and it may be published.

12           (Exhibit 109 admitted into evidence.)

13   BY MR. STONE:

14   Q.  All right.  And it's now published for the jury, sir.

15           Who is Sean Kim?                                          10:21:02

16   A.  Sean Kim is another super poster -- poster.

17   Q.  What kind of ads did Sean Kim post?

18   A.  Escort ads.

19   Q.  Prostitution ads?

20   A.  Yes.                                                          10:21:12

21   Q.  In the second email down, that's an email from you to this

22   Sean Kim; correct?

23   A.  Yes.

24   Q.  You write, "We just cut you a check for nearly $20,000.  If

25   you take the 10 percent for affiliate commissions plus your      10:21:25
```

DANIEL HYER - DIRECT EXAMINATION
59

```
 1   20 percent discount, that's 30 percent.  If someone is getting

 2   a bigger discount, please tell us who."

 3              What does that refer to?

 4   A.  So the $20,000 is what the affiliate program actually --

 5   it's -- the -- the revenue that this guy earned related to the      10:21:43

 6   affiliate program.

 7              So our intention with the affiliate program was that

 8   people would have websites, they would place links to Backpage,

 9   somebody would click on the Backpage link on the website, come

10   to us, somebody would post a paid ad, and we would give them a      10:22:00

11   commission for that.

12              What actually happened is users would sign up as

13   affiliates for themselves.  And the affiliate program became a

14   buyback reward program for the users who posted ads.

15              So Sean here getting a check for 20K means that he       10:22:16

16   posted enough ads where he earned back $20,000.

17   Q.  At some point did this affiliate program fizzle out at

18   Backpage?

19   A.  We fizzled it out.

20   Q.  What does that mean?                                            10:22:31

21   A.  I mean, we were offering a discount to users to post, so

22   users kept posting.  We just simply took the affiliate program

23   away from them.

24   Q.  Okay.  Meaning you removed the discount?

25   A.  We -- we removed the commission -- the category in which        10:22:45
```

UNITED STATES DISTRICT COURT

```
 1    people would get commissions from.  We eventually disallowed

 2    getting commissions for ads posted by a user as an affiliate in

 3    escorts or in adult.

 4    Q.  When did you make that change, roughly?

 5    A.  I don't remember.                                          10:23:03

 6    Q.  Okay.

 7    A.  I -- I don't -- I'm sorry.  I don't remember.

 8    Q.  Do you think it was after September 2010, when Craig

 9    removed the erotic --

10    A.  Yes.                                                       10:23:14

11    Q.  Let me just finish that question.

12            -- Craig's erotic services was removed?

13    A.  Yes.

14    Q.  All right.  Sir, I'm going to show you what's been admitted

15    as Exhibit 579.                                                10:23:35

16            Do you see the top portion here?  Do you recognize

17    this email, sir?

18    A.  Yes.

19    Q.  Who's the email from?

20    A.  From Andrew Padilla.                                       10:23:57

21    Q.  Just highlighting the bottom portion, do you recall what

22    this email is about?

23    A.  Yes.

24    Q.  And what is it about?

25    A.  This is an email about Backpage.  I put it in quotes, so,  10:24:14
```

 1    you know, the -- the website Backpage.com, our website, was

 2    found in an article listed here about South Carolina eyeing a

 3    criminal investigation of Craigslist.

 4    Q.  Did that -- did this Google alert cause you at Backpage

 5    to -- to do anything?                                          10:24:39

 6    A.  Yes.

 7    Q.  What?

 8    A.  Listed specifically here is South Carolina, so we knew

 9    there were going to be a number of new users, media, law

10    enforcement who -- you know, a lot of people looking at South  10:24:59

11    Carolina because of these news reports.  So the -- the goal was

12    to clean up the content.

13    Q.  What does "clean up the content" mean?

14    A.  Make it less overt.

15    Q.  Make what less overt?                                      10:25:15

16    A.  The escort section or the prostitution.

17    Q.  And "overt" meaning what?

18    A.  Blatant.

19    Q.  So to reduce the blatant prostitution ads on the escort

20    section.                                                       10:25:32

21          Is that your testimony?

22    A.  Yes.

23    Q.  And to do that, is the playbook here listed by Mr. Ferrer?

24    A.  Yeah.  It was a pretty simple play.

25    Q.  What's the play?                                           10:25:45

```
 1    A.  If the ad contains sex for money, either the term or the

 2    picture, remove it.

 3    Q.  Remove the term or remove the picture?

 4    A.  Yes.

 5    Q.  The top portion's an email from Mr. Padilla where he        10:25:57

 6    writes, in part, "We'll implement the text and pic cleanup in

 7    South Carolina only, on Monday as well."

 8         Why was Mr. Padilla responding to Mr. Ferrer here, if

 9    you know?

10    A.  Well, that was -- part of his job function was moderation.  10:26:21

11    Q.  So he was in charge of cleaning up the website?

12    A.  He was in charge of moderating the website.

13    Q.  And in this instance, it was cleaning up South Carolina

14    only; correct?

15    A.  Yes.                                                        10:26:41

16         MR. EISENBERG:  Your Honor, excuse me.  I object to

17    the characterization of cleaning up the website.  I don't think

18    that's accurate.

19         MR. STONE:  Just using the language in the email.

20         THE COURT:  I'll overrule.  It is in the email.           10:26:56

21    BY MR. STONE:

22    Q.  All right.  Let's go to the another exhibit that's in

23    evidence, Exhibit 49.

24         THE COURT:  And let me just say, Mr. Stone, this will

25    be your last exhibit, as we are about to our morning break      10:27:24
```

 1    period.

 2              MR. STONE:  Yes, Your Honor.

 3    BY MR. STONE:

 4    Q.  Sir, do you recognize this exhibit?

 5    A.  Yes.                                                          10:27:40

 6    Q.  Who's it from?

 7    A.  Andrew Padilla.

 8    Q.  All right.  And you received it, and Mr. Ferrer's cc'ed on

 9    it; correct?

10    A.  Yes.                                                          10:27:54

11    Q.  The subject's new moderation rules.

12              Did you have an understanding for the implementation

13    of new moderation rules at Backpage?

14    A.  Yes.

15    Q.  First line reads, "Scott had a meeting with us today and     10:28:06

16    he's pushing me hard to get the site as clean as possible in

17    the next seven days."

18              Who is Scott?

19    A.  Scott Spear.

20    Q.  Do you have an understanding when Mr. Padilla writes, "he's   10:28:17

21    pushing me hard to get the site as clean as possible in the

22    next seven days," what that refers to?

23    A.  Well, the email was sent on September --

24              MR. FEDER:  Speculation.

25              THE WITNESS:  -- 1st --                                 10:28:32

```
 1            THE COURT:  What was the objection?

 2            MR. FEDER:  Speculation, on what Padilla thought.

 3            THE COURT:  Overruled.

 4   BY MR. STONE:

 5   Q.  You can answer.                                              10:28:37

 6   A.  I think I forgot what you asked.

 7   Q.  Fair.

 8            Just asking about your understanding of what

 9   Mr. Padilla writes here where he writes, "He's pushing me hard

10   to get the site as clean as possible in the next 7 days."       10:28:51

11   A.  Yeah.  So the date of September 1st, 2010, I don't remember

12   the exact date that Craig shuttered his section, but at this

13   point we knew, and the public knew, because Craig had

14   telegraphed that he was going to do something.  My

15   recollection, it was on the website, it actually -- I think it  10:29:13

16   said -- on Craigslist, he put a banner in --

17            MS. BERTRAND:  Objection.  Your Honor.  Hearsay.  Move

18   to strike.

19            THE COURT:  Overruled.

20   BY MR. STONE:                                                    10:29:28

21   Q.  Craig put a banner?

22   A.  It said "censored."  And he left it there for about a week.

23   And then he removed it.

24   Q.  Okay.  Did you have a thought that Craigslist shuttering

25   the -- his adult section would have an impact on Backpage?       10:29:41
```

DANIEL HYER - DIRECT EXAMINATION
65

```
 1   A.  Yes.  All of the executives and -- that's what was the
 2   purpose of this email, from my recollection.
 3   Q.  You're going to get more people to the website very, very
 4   soon?
 5   A.  Yes.                                                          10:29:56
 6   Q.  And your understanding then is that's why Scott Spear's
 7   saying, get the site as clean as possible?
 8           MR. FEDER:  Hearsay.  Speculation.
 9           THE COURT:  Sustained.
10   BY MR. STONE:                                                     10:30:08
11   Q.  Did you have an understanding for what Scott Spear was
12   referring to?
13           MR. EISENBERG:  Objection.  Foundation.
14           MR. FEDER:  Same.  Also hearsay.  Speculation.
15           THE COURT:  I'll -- well, I'll sustain as to             10:30:19
16   foundation.
17           Overrule the other objection, Mr. Feder.
18           And at this point why don't we let it lie there, and
19   we'll take our morning recess.
20           Members of the jury, we will take our morning recess,    10:30:35
21   the standard 20 minutes.  So do be prepared to come back into
22   court at ten till the hour.  And just remember the admonition.
23   Enjoy your morning break.
24           All rise for the jury.
25       (Jury not present at 10:30 a.m.)                             10:30:50
```

UNITED STATES DISTRICT COURT

DANIEL HYER - DIRECT EXAMINATION
66

```
 1              THE COURT:  All right.  We will stand in recess.

 2         (Recess from 10:31 a.m. to 10:51 a.m.)

 3         (Jury not present at 10:51 a.m.)

 4              MR. STONE:  Should I bring the witness in, Your Honor?

 5              THE COURT:  Yes, please.                              10:51:41

 6              All rise for the jury.

 7         (Jury present at 10:53 a.m.)

 8              THE COURT:  All right.  Please be seated.

 9              And the record will reflect the presence of the jury.

10              The witness is on the witness stand.                 10:54:18

11              Mr. Stone, you may continue.

12              MR. STONE:  Thank you, Your Honor.

13    BY MR. STONE:

14    Q.  Move to a new exhibit here, Mr. Hyer, and I'm going to show

15    you what's been admitted as Exhibit 1187.                      10:54:26

16              Sir, do you see that exhibit?

17    A.  Yes.

18    Q.  Do you recognize it?

19    A.  Yes.

20    Q.  What is it?                                                10:54:45

21    A.  This is a screenshot of the administrative side of

22    Backpage.com.  It's showing a filtered term page.

23    Q.  What does a filtered term page mean?

24    A.  Filtered term was a technology that we used to take a

25    variety of actions on terms.  In this case, the action looks to 10:55:14
```

UNITED STATES DISTRICT COURT

DANIEL HYER - DIRECT EXAMINATION

67

```
 1    be ban.
 2    Q.  And what's the term?
 3    A.  Cum.
 4    Q.  Who -- who -- which Backpage employee, if you know,
 5    inputted this term?                                        10:55:33
 6    A.  Well, the filter looks to have been originally posted on
 7    September 1st, 2010.  And then the description shows the same
 8    date of 09-01-10.  And ADP is Andrew Padilla.
 9    Q.  All right.  And so this term -- the term is "cum," and the
10    action is "ban."  What does that mean?                     10:55:58
11    A.  So if a user were to attempt to post an ad that had C-U-M
12    in it, they wouldn't be able to.
13    Q.  What would happen?
14    A.  The sub-  -- the subsequent screen, after the posting
15    screen, would show an error at the top of the screen that would  10:56:20
16    say, oops -- well, in this case, it would say "cum is a
17    forbidden word in this category."
18    Q.  This is -- what I've highlighted is on page 2 under
19    forbidden text.
20          So what is this forbidden text?                      10:56:35
21    A.  The forbidden text, as stated here, it's -- it's a way
22    where we could give a custom message that would show, instead
23    of the default message, which was, oops, your ad can't be
24    posted at this time, please contact support for more
25    information.                                               10:56:57
```

UNITED STATES DISTRICT COURT

1   Q.  Why were you sending a custom message?

2   A.  We were trying to retain as many users as we could during

3   the time when we were revising our posting rules, revising what

4   was allowed, what was permissible, and what wasn't.

5   Q.  Why would this help retain customers?                    10:57:18

6   A.  Otherwise users would be confused as to why ads that they

7   previously posted could not be posted.

8   Q.  Okay.  So if you -- if there was a user who tried to post

9   an ad with the word C-U-M in it, the ad would not post?

10  A.  Correct.                                                 10:57:38

11  Q.  And this error message would appear on the user's screen;

12  is that correct?

13  A.  Yes.

14  Q.  What would happen if the user then tried to post again but

15  changed C-U-M to C-O-M-E?                                    10:57:51

16  A.  The ad would post.

17  Q.  I'm going to show you another exhibit here that's admitted.

18  It's Exhibit 51.

19          Sir, do you recognize this email?

20  A.  Yes.                                                     10:58:18

21  Q.  Who's it from?

22  A.  From Andrew Padilla.

23  Q.  And that's to Carl, and you and Scott Spear are cc'ed?

24  A.  Yes.

25  Q.  Is there an attachment to this email?                   10:58:29

DANIEL HYER - DIRECT EXAMINATION

69

1   A.   Yes.

2   Q.   And what's Mr. Padilla referring to here in this email?

3   A.   He's showing -- talking about the attachment that has a

4   list of filtered terms and their variations on a spreadsheet or

5   a Word document.                                                      10:58:56

6   Q.   What are the filtered terms?

7   A.   Like the exhibit that we just looked at, one of those

8   filtered terms would be C-U-M.  There were several.

9   Q.   Could you classify these terms into some category?

10  A.   Many of them were escort terms.                                  10:59:14

11  Q.   Yeah.

12  A.   Or prostitution terms or --

13  Q.   When you say "escort terms," do you mean prostitution

14  terms?

15  A.   Yes.                                                             10:59:24

16  Q.   The title of this attachment is what?

17  A.   Some enumeration or code, CHILIB1, and 12793061-v1-Backpage

18  list of escort services terms, adp.DOC.

19  Q.   All right.  So it's listed as -- or it's titled List of

20  Escort Service Term; correct?                                        10:59:49

21  A.   Yes.

22  Q.   All right.  Let's look at the attachment, which is admitted

23  at Exhibit 51a.

24       There's a writing at the very top of this page.  Fair?

25  A.   Yes.                                                             11:00:13

1   Q.  The first part reads, "The following terms, service and

2   code words are not allowed in the adult escort category on

3   backpage.com as they imply a sex for money transaction";

4   correct?

5   A.  Yes.                                                      11:00:26

6   Q.  So all of these terms on this document that's titled Escort

7   Terms refer to prostitution terms?

8   A.  They imply a sex-for-money transaction.

9   Q.  Some of these are terms that we -- that you've testified

10  about already; correct?                                       11:00:50

11  A.  Yes.

12  Q.  And the second page of this exhibit has a note that there

13  are many creative spellings for the terms above which are too

14  numerous to include in any list; correct?

15  A.  Yes.                                                       11:01:10

16  Q.  All right.  I'm going to show you what's been admitted as

17  Exhibit 58.

18          Is this an email you received?

19  A.  Yes.

20  Q.  Sent by Andrew Padilla?                                    11:01:31

21  A.  Yes.

22  Q.  Is he attaching documents that relate to some of those

23  filtered terms that we were just looking at?

24  A.  Yes.

25  Q.  He also writes in the highlighted portion, "Images aside,  11:01:51

UNITED STATES DISTRICT COURT

```
 1    it's the language in ads that's really killing us with the

 2    Attorneys General."

 3              Did you -- do you have an understanding of what he's

 4    referring to with "killing us with the Attorneys General"?

 5              MS. BERTRAND:  Objection.  Calls for speculation.         11:02:13

 6    Foundation.

 7              THE COURT:  Well, he can answer yes or no to that

 8    question, but otherwise I would say lay some foundation.

 9              I'll sustain that.

10              MR. STONE:  May he answer the question, Your Honor?       11:02:28

11              THE COURT:  Yes, if he knows.

12    BY MR. STONE:

13    Q.  If you know what he's referring to, you can answer yes or

14    no.

15    A.  At this time the pressure --                                   11:02:35

16    Q.  Just say yes or no, and then --

17    A.  I didn't understand there was a yes-or-no question, so can

18    you ask it again?

19    Q.  Sure.

20              Do you have an understanding of what Mr. Padilla's       11:02:44

21    referring to when he writes, "That's really killing us with the

22    Attorneys General"?

23    A.  Yes.

24    Q.  What's he referring to?

25    A.  Well, the text in ads -- at this time I think we had 500       11:02:53
```

1   characters that were allowed.  So the sex-for-money language in

2   the ads were more blatant prostitution than a picture of a

3   scantily clad or nude escort.

4   Q.  What about this issue with the Attorneys General?

5   A.  At this time we had been getting a lot of pressure from the        11:03:24

6   Attorneys Generals to do a better job on our site of

7   eliminating prostitution.

8   Q.  You had an understanding at the time that you were

9   receiving pressure from the Attorneys General?

10  A.  Yes.                                                               11:03:43

11  Q.  Do you have an understanding of if there were letters

12  written back and forth between the Attorneys General and

13  Backpage?

14          MR. EISENBERG:  Objection, Your Honor.  Leading.

15          THE COURT:  Sustained.                                         11:03:54

16          MR. STONE:  All right.  That's fine.  I'll move on.

17  BY MR. STONE:

18  Q.  Let me show you another exhibit that's been admitted, 201.

19          Sir, do you recognize this exhibit?

20  A.  Yes.                                                               11:04:18

21  Q.  Is this an email you received from Carl Ferrer?

22  A.  Yes.

23  Q.  Andrew Padilla and Scott Spear also received it?

24  A.  Yes.

25  Q.  Do you know what this email is about?                              11:04:29

DANIEL HYER - DIRECT EXAMINATION

73

 1    A.  Yes.

 2    Q.  What is it?

 3    A.  It's an email where Carl is talking about providing

 4    training for moderation staff, or a reference for moderation

 5    staff on the page known as the queue, which was where we would      11:04:50

 6    moderate ads, or moderators would moderate ads.  And this is

 7    Carl's suggestion of giving them guidelines that they should

 8    follow on that specific page.

 9    Q.  Okay.  I'm going to zoom in on the final part of this

10    email, which has a number 3 and then has adult next to it.         11:05:10

11         Do you see that?

12    A.  Yes.

13    Q.  Which -- where would this -- well, is this language that

14    would appear on the website?  Do you know?

15    A.  Yes.                                                           11:05:23

16    Q.  Where would it appear?

17    A.  In the female escorts section.

18         As Carl mentions here, body rubs.  There was also TS,

19    domination, adult jobs, phone and web.

20    Q.  Okay.  And in the -- in here, Carl writes -- Carl Ferrer      11:05:37

21    writes, "No coded sex act for money," and lists GFE, PSE, BBBJ,

22    DATY, et cetera; correct?

23    A.  Yes.

24    Q.  So at this point you understood that those were coded sex

25    terms.  Fair?                                                     11:06:00

UNITED STATES DISTRICT COURT

1    A.  I understood them to be prostitution terms.

2    Q.  And this is in 2010?

3    A.  Yes.

4    Q.  And then at the bottom there's some things that are allowed

5    at this point on Backpage; correct?  "Pics of bare breasts,      11:06:18

6    bare butt, g-string or thongs are okay."  And, "Hourly rates

7    are okay"; is that right?

8    A.  Yes.

9    Q.  Let me show you what's been admitted as Exhibit 73.

10           Sir, do you recognize this email?                        11:06:45

11   A.  Yes.

12   Q.  Email from Carl Ferrer to you and Andrew Padilla?

13   A.  Yes.

14   Q.  Talking about "the content looks great"; right?

15   A.  Yes.                                                         11:06:57

16   Q.  And what's he referring to?  What content is he referring

17   to?

18   A.  The content in the adult section, and specifically in the

19   female escort section.

20   Q.  Zoomed in on a part of the email that reads, "Items I        11:07:09

21   agreed to implement."

22           Do you have an understanding of what that's referring

23   to?

24   A.  He's itemizing here -- listing here some other things that

25   Carl said we could do.                                          11:07:35

UNITED STATES DISTRICT COURT

1    Q.  To the website?

2    A.  Yes.

3    Q.  The first one is talking about "More banned terms.  XXX,

4    strip it out as even a partial term.  Wet, strip out as a whole

5    term.  Lolita, ban or strip out.  It is code for underaged          11:07:49

6    girl.  Pregnant, strip out term."  Correct?

7    A.  Yes.

8    Q.  All right.  I'm not sure that you testified about strip

9    out.  Do you know what that means?

10   A.  Yes.                                                             11:08:02

11   Q.  What does that mean?

12   A.  When we were previously talking about ban, another filtered

13   term ban, another action that a filtered term could take was

14   strip out.  If the filtered term was set to strip out, it would

15   extract that text from the ad.  So the user would post the ad,      11:08:24

16   they would go to the screen, the subsequent screen that would

17   show that their ad was going to be posted, but it would remove

18   whatever was said.  In Carl's example here, XXX or wet or

19   pregnant or Lolita.

20   Q.  So if those terms were stripped out, if a user tried to         11:08:48

21   post it in their ad, the ad would publish, just that term

22   wouldn't be on it.  Is that fair?

23   A.  Yes.

24   Q.  All right.  Now I zoomed in on another part of that email

25   under Pricing; correct?                                             11:09:16

1    A.  Yes.

2    Q.  And the email reads, "They think pricing numbers by

3    themselves should be left alone."

4         And it gives some examples, $80, $120, $240, as

5    examples of what things that can be left in the ad?        11:09:31

6    A.  Yes.

7    Q.  The next line reads, "They just want quickees, 15 minutes,

8    and 30 minutes.  I need a list of examples to get approved by

9    Scott."

10        Do you know who Scott is in this reference?           11:09:44

11   A.  He's referring to Scott Spear.

12   Q.  All right.  And this email was sent in November 2010.  And

13   under number 9, it says, "Kill TER links in ads on

14   January 1st."  And under that reads, "But allow users to put in

15   TER IDs, just no live links."                              11:10:10

16        Did I read that more or less correctly?

17   A.  Yes.

18   Q.  So what does this mean, "kill TER links"?

19   A.  Well, this would indicate the end of the reciprocal link

20   relationship or program, because we would be disallowing The   11:10:24

21   Erotic Review.com -- so The Erotic Review.com to appear in any

22   ads.

23   Q.  Why at this point, after all that work that you testified

24   to to maximize that relationship, why are you killing the links

25   now?                                                       11:10:47

1    A.  This is a little bit over a month after Craigslist

2    shuttered his section.  We had received an exponential

3    increase, a whole bunch more ads, a whole bunch more posters, a

4    bunch more -- a lot more visitors and viewers.  So the

5    previously critical relationship that we had was no longer                    11:11:10

6    necessary.

7    Q.  The part that says, "Allow users to put in TER IDs, just no

8    live links," do you know what that means?

9    A.  Yes.

10   Q.  What?                                                                      11:11:29

11   A.  A while back we looked at Ashley's profile page, and on

12   that page it -- at the top -- every profile page has a ID

13   number for an escort, and it says TER ID and then a number.

14        So what Carl's suggesting here is we allow users to

15   put that TER ID in the ad but just not the literal link of              11:11:49

16   www.TheEroticReview.com, forward slash, whatever?

17   Q.  All right.  I'm going to show you another exhibit that's

18   been admitted, Exhibit 643.

19        Sir, do you recognize this email?

20   A.  Yes.                                                                       11:12:34

21   Q.  What is it?

22   A.  This is an email sent from our forum on which we

23   communicated with our developers, DesertNet.  The forum was

24   called Mantis.  And if you were the writer of a task in Mantis,

25   or if you followed the task in Mantis, you would also receive           11:12:54

DANIEL HYER - DIRECT EXAMINATION

78

1    an email whenever that task was updated or closed or resolved.

2    Q.  Was there a task for this particular email?

3    A.  Yes.

4    Q.  What was it?

5    A.  Well, listed there, Carl's described it as removing the        11:13:13

6    terms below from every old ad in the database.

7    Q.  And what's the summary as listed right there?

8    A.  He described it as a deep cleaning stripout.

9    Q.  And was this the date that this task was submitted?

10   A.  Yes.                                                          11:13:38

11   Q.  December 2nd, 2010?

12   A.  Yes.

13   Q.  So what's that, just a few months after Carl shuttered his

14   adult section?  Not Carl.  Craig.

15   A.  Yes, Craig.                                                   11:13:49

16   Q.  I'm going too fast.

17          All right.  So what does this mean, deep clean

18   stripped out terms?  There's a number of terms listed at the

19   bottom of this email.

20   A.  Well, so the stripout is the important part of this.  I      11:14:00

21   think deep clean, I -- deep cleaning is suggesting very

22   thorough, complete.  So we are going to go through -- the

23   developer's are going to go through the database, and every ad

24   that had been posted, we were going to extract or remove --

25   Carl listed there the terms; half hour, half HR, 15 min,         11:14:26

1    15-minute, et cetera.

2    Q.  Why were you stripping out these terms from ads?

3            MR. FEDER:  Hearsay.  Speculation.

4            THE COURT:  Overruled.

5            THE WITNESS:  Well, I can speak to the first up to    11:14:44

6    30 minutes and from half hour to 30 minutes.  That was based on

7    this previous exhibit we looked at, where we were going to

8    eliminate what's known in escort terminology as a quickie.

9    These are all terms that would indicate a quickie.

10           I can speak to the A-N-A-L, or the ampersand N,    11:15:05

11   ampersand L.  It's another way to say anal.

12           I don't know what 3B-&, forward slash -- or 1J is.  I

13   don't know what that is.

14   BY MR. STONE:

15   Q.  Leaving that aside, what do the other terms refer to?    11:15:28

16   A.  Prostitution.

17   Q.  Why was there a push in December of 2010 to strip out

18   prostitution terms?

19   A.  We were now the largest classified website in the United

20   States with an escort section, so the transition time here was    11:15:46

21   to have less overt prostitution.

22   Q.  Scrolling down to page 5 of Exhibit 643, and zooming in on

23   a certain section, is this a message that you sent?

24   A.  Yes.

25   Q.  How do you know that?    11:16:16

1    A.  Because it says my last name, first initial, HyerD.

2    Q.  All right.  And in your message you write, "We need to

3    strip out the following URLs from all old and new ads."

4         And then you list six websites; is that right?

5    A.  Yes.                                                    11:16:32

6    Q.  What -- what are these six websites?

7    A.  They are forums on which users of escort services, obvious

8    johns, talking graphic detail about their experiences of using

9    the service of an escort or a prostitute.

10   Q.  Why was -- were you and why was Backpage now stripping out 11:16:53

11   these old -- or stripping out these websites from ads?

12   A.  Again, Craigslist had made its change a few months prior.

13   We were now the dominant classified website in the U.S.  And it

14   was around this time that I began hearing the word optics.  It

15   was better for our site to just have a cleaner, less overt,     11:17:18

16   racy, over-the-top escort section.

17   Q.  So around this time, you just testified that you began

18   hearing the term optics?

19   A.  Yes.

20   Q.  Optics for the website?                                    11:17:33

21   A.  My understanding of optics would be what people thought of

22   our website, how they perceived it.

23   Q.  And fair to say by stripping out all these terms, you were

24   trying to clean it up?

25   A.  Yeah.  The task, deep clean, strip out is why it made sense 11:17:52

```
 1    to have this on there, so it -- yes.
 2    Q.  All right.  I'm going to show you another exhibit that's
 3    been admitted, Exhibit 146.  I'm going zoom in on the bottom
 4    portion of this exhibit.
 5            Do you see that, sir?                              11:18:22
 6    A.  Yes.
 7    Q.  Is that an email from you?
 8    A.  Yes.
 9    Q.  And what are -- what's your email about?
10    A.  Well, the part that I sent I can't see.               11:18:34
11            I guess I'm forwarding a message with no commentary.
12    I'm simply forwarding something.
13    Q.  All right.  This part is from you; correct?
14    A.  Yes.
15    Q.  So below that, there's a message.  You think you're just 11:18:51
16    forwarding that?
17    A.  Yes.
18    Q.  Okay.  Well, what are you forwarding?
19    A.  So the link there, http://admin, is a link to a national
20    advertisement, a national ad.  And what's being referenced here 11:19:09
21    is that the ad was edited by a moderator, AT19.
22    Q.  Does that refer to a certain moderator?
23    A.  Yes.
24    Q.  Okay.  And then there's -- in the email it reads, "We
25    already added time" -- "We already added time to the $2,000 to 11:19:34
```

DANIEL HYER - DIRECT EXAMINATION

82

1    buy" -- "2,000" -- let me read that again.

2         "We already added time to the $2,000 buy to pacify

3    this client." [as read]

4         What's that mean?

5    A.  So the user made a purchase, which resulted in that -- in        11:19:47

6    an ad that would appear at this link.  And the ad got edited.

7    So in editing the ad, it made the ad not -- not valuable,

8    useless.

9         So we fixed it and added more -- additional time to

10   make the client happy.                                             11:20:13

11   Q.  Is this an email from Andrew Padilla?

12   A.  Yes.

13   Q.  And he writes, "Can you take AT19 off of moderation and

14   have them retrained?  I'd rather see zero edits from a

15   moderator than any edits that were unnecessary."                   11:20:30

16        Do you know what Mr. Padilla's referring to in this

17   email?

18   A.  Do I -- I'm sorry.  Do I know what?

19   Q.  Do you know what Mr. Padilla's referring to in this email?

20   A.  Yeah.  This is a quality control correspondence with           11:20:45

21   Monita, who was the -- one of the leads for a BPO service,

22   business processing outsource service, that we internally

23   called the Indians or El Camino.

24        And what he's suggesting here is quality control,

25   further training of this moderator in India named -- that was      11:21:08

DANIEL HYER - DIRECT EXAMINATION                83

 1   given this AT19.

 2   Q.   And writes, "It would be better to have no edits than to

 3   have unnecessary edits"; right?

 4   A.   Yes.

 5   Q.   Okay.  I'm going to show you what's been admitted as          11:21:28

 6   Exhibit 1830.

 7          Do you recognize this email, sir?

 8   A.   Yes.

 9   Q.   The subject's filtered term with false positives; correct?

10   A.   Yes.                                                          11:22:02

11   Q.   And, generally, what's the email about?

12   A.   We had a way to determine if a filter was triggered or if a

13   figured term took action on an ad we would know about it.  And

14   in this email, it's referencing that the filtered term -- I

15   think it's showers, or shower, had 160 times that it worked and   11:22:28

16   shouldn't have.

17   Q.   In the middle portion, and what I'm highlighting, that was

18   an email from Carl Ferrer?

19   A.   Yes.

20   Q.   And he writes, "I'd like to verify all the banned messages   11:22:45

21   have errors that says, 'Sorry, this term X is a banned term.'"

22          What's that referring to?

23   A.   We looked in the -- on the filtered term ban exhibit.  At

24   the bottom there was a forbidden text message where we could

25   put in a custom message that a user would receive if they post    11:23:11

DANIEL HYER - DIRECT EXAMINATION
84

```
 1    an ad and the ad got blocked, that they would on the next
 2    screen, when their ad didn't post they would see, sorry, this
 3    term, whatever the term was for the filtered term, is a banded
 4    term in this category.
 5    Q.  And why was that important?                                 11:23:27
 6    A.  There was a lot of confusion by users on what they could
 7    and couldn't post.  We had changed the rules a number of times.
 8    And we didn't want to confuse or alienate users from posting.
 9    Q.  The top portion here that I've zoomed in on, an email from
10    Mr. Padilla?                                                    11:23:53
11    A.  Yes.
12    Q.  He talks about an attachment to the email that reads,
13    "Filtered term"?
14    A.  Yes.
15    Q.  Okay.  Let's look at that attachment, which is already in   11:23:58
16    evidence as 1830b.
17               THE COURTROOM DEPUTY:  1830; right?
18               MR. STONE:  I thought that 1830b was what got
19    admitted, but 1830 --
20               THE COURTROOM DEPUTY:  It says "a".                  11:24:23
21               MR. STONE:  It's the same.  It's the PD- -- this is
22    1830b.
23         (The Court and the courtroom deputy confer.)
24               THE COURT:  What was -- what was the issue with --
25               MR. STONE:  1830b is in evidence.  And this is 1830b 11:24:39
```

DANIEL HYER - DIRECT EXAMINATION

85

1   despite the fact that on the upper left it says 1830a.

2        THE COURTROOM DEPUTY:  Okay.

3        THE COURT:  Yes, it may be admitted -- I mean -- I'm

4   sorry.  You may publish.

5        MR. STONE:  Thank you, Your Honor.                    11:24:52

6   BY MR. STONE:

7   Q.  All right.  This is the attachment to Mr. Padilla's email?

8   A.  Yes.

9   Q.  And what's the -- what's the upshot on what we're looking

10  at?                                                         11:25:05

11  A.  This is a list, it looks like it's an Excel spreadsheet or

12  an export, from the filtered terms that we were talking about a

13  minute ago, in which in column H it shows the -- a snippet of

14  the forbidden term text.

15  Q.  And then what about column D?  What does that refer to?   11:25:29

16  A.  That is the action, the -- the action that the filter is

17  going to take.

18  Q.  And for all of these banned terms, do they now have a -- a

19  message that would appear to the user if the user tried to post

20  with a banned term?                                         11:25:52

21  A.  Yes.

22  Q.  All right.  I'm going to put on your screen two exhibits

23  side by side.  One is this exhibit that we're looking at right

24  here, Exhibit 1830b.  The other is the exhibit we started with

25  this morning, which is 2046.  Okay?                         11:26:15

UNITED STATES DISTRICT COURT

DANIEL HYER - DIRECT EXAMINATION
86

A.  Yes.

Q.  All right.  And then I highlighted an ad, the one on top,
that says, "Let me entice you to my GR-" -- is that an & --
&&K?

A.  Yes.                                                       11:26:43

Q.  Underneath I've now highlighted from 1830b all of the
variations of Greek that are banned terms.  Is that fair?

A.  Yes.

Q.  Maybe I just missed it.  Let me make sure I got every one.

        Okay.  You see that there are a number of different    11:27:12
variations of the word Greek; correct?

A.  Yes.

Q.  What about the Greek that appears in -- in that ad?  Is
that contained in the banned term?

A.  No.                                                        11:27:26

Q.  So even with all these banned terms for Greek, could a user
get around it by putting in different symbols to indicate the
same word?

A.  Yes.

Q.  All right, sir.  Just a few more exhibits that I want to    11:27:42
show you.

        Next one has been admitted into evidence as
Exhibit 173.

        Sir, do you recognize this email?

A.  Yes.                                                       11:28:13

DANIEL HYER - DIRECT EXAMINATION

87

```
 1   Q.  And you received it?
 2   A.  Yes.
 3   Q.  What's this referring to?
 4   A.  This is referring to an error message that Patrick received
 5   when he tried to use a Chase card to post an ad.              11:28:27
 6   Q.  Okay.  What's the -- what's the error message?
 7   A.  In bold, and below in quotes, "Beginning this month,
 8   September, Chase" -- well, it looks like he's iterating it.
 9            But, "Beginning this month, September, Chase was no
10   longer accepting transactions from Backpage due to their      11:28:50
11   involvement in human trafficking."
12   Q.  The next part reads, "I told her the add was for antiques
13   for sale, and the rep apologized again, and repeated the
14   above"; correct?
15   A.  Yes.                                                       11:29:07
16   Q.  That's what it reads?
17            Do you have an understanding that at some point when
18   you were working at Backpage that Chase -- that this occurred
19   with Chase Bank?
20   A.  Yes.                                                       11:29:18
21   Q.  Did that have an impact on Backpage's business?
22   A.  Yes.
23   Q.  How so?
24   A.  Previously it was easy to post.  This made it more
25   difficult.                                                     11:29:34
```

UNITED STATES DISTRICT COURT

DANIEL HYER - DIRECT EXAMINATION

1   Q.  Did Backpage find alternative ways to receive payments?

2   A.  Yes.

3   Q.  Could you give some examples of those alternative ways.

4   A.  Use other credit cards.  Bitcoin.  Money orders.

5           Eventually we had a way where you could go to another        11:29:56

6   site, like EasyPost123 or PostFaster or Trucker Jobs, Pet

7   Seeker, and purchase credits on those sites, which you could

8   then, in turn, use on Backpage to post ads.

9   Q.  You mentioned a number of sites.  Were those sites that

10  Backpage controlled?                                                 11:30:22

11  A.  Yes.  We owned those sites.

12  Q.  So you created those sites?

13  A.  Yes.

14  Q.  What was the purpose of creating those sites?

15  A.  Initially they were some -- it depends upon the site.           11:30:29

16  Trucker Jobs, we thought we could have a Trucker Jobs site.

17  Drivers.

18          Pet Seeker, we thought we could have a pets vertical.

19          EasyPost123, PostFaster, some of those became attempts

20  at alternatives to Backpage.com.  From my memory, some of them      11:30:56

21  didn't have an adult section.  But it was an attempt to broaden

22  our reach, help us with optics, and also give users an

23  alternative to post, because it was getting real hard to post

24  in a traditional way with a credit card on Backpage.

25  Q.  All right.  You mentioned purchasing credits on other           11:31:24

```
 1    websites.

 2              Is that -- is that what your testimony was?

 3    A.  Yes.

 4    Q.  And then what could you do once you purchased a credit on

 5    another website?                                              11:31:34

 6    A.  You could use those credits to post ads.

 7    Q.  On Backpage?

 8    A.  Yes.

 9    Q.  Why did you need to have this system set up where you -- a

10    user would buy credits on another website?                    11:31:43

11    A.  Can you ask that again?

12    Q.  Sure.

13              Why was it necessary to have another website where

14    users could post -- or could buy credits to then post an ad on

15    Backpage?                                                     11:31:58

16    A.  Because they couldn't buy those credits on Backpage.

17              MR. FEDER:  Calls for hearsay.

18              THE COURT:  Overruled.

19    BY MR. STONE:

20    Q.  Would you just give that answer again.                    11:32:05

21    A.  I'm sorry.  I didn't hear that objection.

22              Because you couldn't buy those credits on Backpage.

23    Q.  And why not?

24    A.  Because the credit card companies stopped allowing --

25              MR. FEDER:  Hearsay.                                11:32:19
```

DANIEL HYER - DIRECT EXAMINATION
90

 1            THE COURT:  I'm sorry.  What was the objection?

 2            MR. FEDER:  Hearsay.

 3            THE COURT:  Overruled.

 4            THE WITNESS:  Because the credit card companies

 5   stopped allowing transactions that were from Backpage.com.        11:32:26

 6   BY MR. STONE:

 7   Q.  All right.  I've zoomed in on the top portion of this

 8   email.  It's an email from Carl Ferrer to Jim Larkin, Jed

 9   Brunst, and Scott Spear.

10            Do you see that?                                         11:32:40

11   A.  Yes.

12   Q.  In the email, Mr. Ferrer writes about -- or writes, "We are

13   preparing to give users free ads if they complain while we wait

14   on directing transactions to another processor."

15            Did you have an understanding of that being Backpage's   11:32:52

16   position?

17            MR. FEDER:  Calls for hearsay.

18            THE COURT:  Overruled.

19            THE WITNESS:  Yes.

20   BY MR. STONE:                                                     11:33:00

21   Q.  And did that happen, best of your knowledge?

22            MR. FEDER:  Same.

23            THE COURT:  Overruled.

24            THE WITNESS:  Yes.

25       ///

```
 1   BY MR. STONE:
 2   Q.  Okay.  Let me show you another admitted exhibit.  This is
 3   469.
 4           Do you recognize this email, sir?
 5   A.  Yes.                                                        11:33:23
 6   Q.  I'll highlight the middle portion.  That's an email from
 7   you?
 8   A.  Yes.
 9   Q.  And you write, "Good feedback.  I tweaked slightly.  Here's
10   the proposed final version."                                   11:33:36
11           And let's look at that final version.
12           What's this email referring to?
13   A.  It's an email that we were going to send to users who had
14   formerly been posting paying with ads -- paying for ads using
15   AMEX, American Express, and offering them the alternative      11:33:58
16   listed here.
17   Q.  Okay.  There was an issue with American Express?
18   A.  Yes.
19   Q.  And what was that?
20   A.  American Express was no longer going to work.  If you tried 11:34:10
21   to post an ad in the escort section on Backpage or the adult
22   section on Backpage, American Express wouldn't work.  You'd get
23   an -- you'd get an error message from American Express.
24   Q.  And you were reaching out to the customers who used
25   American Express?                                              11:34:32
```

1    A.  Yes.

2    Q.  Any reason why?

3    A.  Yes.

4    Q.  What was the reason?

5    A.  We didn't want to lose those users.                    11:34:42

6    Q.  All right.  I'll show you what has already been admitted

7    into evidence as Exhibit 1665.

8           Sir, you're not on this email; correct?

9    A.  No.

10   Q.  There's an attachment, though.  The subject's Budget 2013,  11:35:19

11   and there's an attachment.  And that's been admitted as 1665a.

12   Let me pull that up.

13          Do you recognize this exhibit?

14   A.  Yes.

15   Q.  What is it?                                             11:35:38

16   A.  That is a statistical report.

17   Q.  What's the date on the report?

18   A.  It's for Monday, February 18th, 2013.

19   Q.  Okay.  So just one day?

20   A.  Yes.                                                    11:35:50

21   Q.  And similar to the statistical report that we looked at

22   earlier this morning, it includes information about revenue?

23   A.  Yes.

24   Q.  And about auto repost?

25   A.  Yes.                                                    11:36:03

DANIEL HYER - DIRECT EXAMINATION                              93

```
 1   Q.  And about move to the top?

 2   A.  Yes.

 3   Q.  Revenue numbers look similar to -- well, let me strike

 4   that.

 5          Backpage still earning the bulk of its money in the      11:36:21

 6   adult categories?

 7   A.  Yes.

 8   Q.  And specifically female escorts?

 9   A.  Yes.

10   Q.  All right.  I'm showing you what's been admitted into       11:36:29

11   evidence as 1670.  This is another email that you are not on,

12   but I want to ask you -- there's a -- a mention here about

13   PostFaster and buying credits.

14          Do you know what that refers to?

15   A.  PostFaster was one of our sites.  And buying credits is the  11:36:57

16   action of purchasing credits on PostFaster.

17   Q.  So that you could use those credits to post ads on

18   Backpage?

19   A.  Yes.

20          MR. STONE:  All right.  For the witness's eyes only.      11:37:14

21   BY MR. STONE:

22   Q.  I want to show you the attachment to this email.

23          Sir, is this another statistical report that we

24   just -- it's similar to the one we just looked at?

25   A.  Yes.                                                         11:37:37
```

UNITED STATES DISTRICT COURT

DANIEL HYER - DIRECT EXAMINATION

94

```
 1              MR. STONE:  Your Honor, move to admit 1670a.

 2              MR. LINCENBERG:  Objection.  No foundation.  This is

 3    an attachment to an exhibit that the witness was not on, and

 4    the proffer is simply that it's similar to other reports that

 5    he had familiarity with.                                        11:37:54

 6              MR. STONE:  Happy to lay more foundation, Your Honor.

 7              THE COURT:  I'll sustain the objection.

 8              You can move forward.

 9              MR. STONE:  If I lay more foundation?

10              THE COURT:  You may --                                 11:38:03

11              MR. STONE:  Yes.

12              THE COURT:  -- move forward doing so.

13    BY MR. STONE:

14    Q.  Does this exhibit look similar to the other reports that

15    we've reviewed?                                                  11:38:09

16    A.  It's the same page but a different date.

17    Q.  Okay.  And are these reports that you reviewed while you

18    were employed at Backpage?

19    A.  Yes.

20    Q.  Did you review them often?                                  11:38:20

21    A.  Yes.

22    Q.  Does it show the revenue earned from Backpage during a

23    certain time period?

24    A.  Yes.

25    Q.  This particular exhibit, what was the time period?         11:38:28
```

UNITED STATES DISTRICT COURT

 1   A.  April 17th, 2015.

 2   Q.  And were you employed at Backpage on that date?

 3   A.  Yes.

 4           MR. STONE:  All right.  Move to admit 1670a.

 5           MR. LINCENBERG:  Your Honor, there would be foundation   11:38:44

 6   if the witness remembered that he reviewed this report but not

 7   similarly -- not simply because he reviewed reports of the

 8   like.

 9           THE COURT:  Overruled.

10           It may be admitted, and it may be published.   11:38:54

11           (Exhibit 1670a admitted into evidence.)

12   BY MR. STONE:

13   Q.  All right.  So this shows the -- the date for this

14   statistical report?

15   A.  Yes.   11:39:07

16   Q.  And does this -- is this report consistent with the others

17   in terms of where Backpage is earning its money?

18   A.  Yes.

19   Q.  And how, for example, move to the top in the escort section

20   is a very large portion of the revenue.  Fair?   11:39:28

21   A.  Yes.

22   Q.  All right.  I'm going to show you, just for the witness's

23   eyes, Exhibit 93.

24           Sir, do you recognize this exhibit?

25   A.  Yes.   11:39:57

DANIEL HYER - DIRECT EXAMINATION
96

```
 1   Q.  What is it?
 2   A.  It's an email that I have sent to Carl Ferrer and Monita,
 3   and I cc'ed Andrew and Lily Dixon.
 4   Q.  All right.  Is there an attachment to the email?
 5   A.  Yes.                                                        11:40:28
 6   Q.  Is the attachment now on your screen?
 7   A.  Yes.
 8           MR. STONE:  Your Honor, move to admit Exhibit 93 and
 9   93a.
10           THE COURT:  Yes.  They may be admitted and published.   11:40:37
11      (Exhibits 93-93a admitted into evidence.)
12   BY MR. STONE:
13   Q.  Start by focusing on the email.  And I went to the bottom
14   of the email.
15           Do you see who this email is from?                      11:40:55
16   A.  It says "redacted for privacy," but it does say "Licks
17   Alot."
18           And there's an email from Carl asking you about an ad
19   posted by this Licks Alot.
20   A.  Yes.                                                        11:41:20
21   Q.  What's Carl Ferrer asking you?
22   A.  He sent this on February 9th at 9:17 p.m.  So he's saying,
23   "Tomorrow morning check and see who moderated this ad."
24           And then he provides a link of the ad that he's
25   talking about and then asks for somebody from our department,  11:41:36
```

UNITED STATES DISTRICT COURT

```
 1   my department, to call the user and calm her down.
 2   Q.  Does it look like he also includes Monita and Andrew
 3   Padilla?
 4   A.  He wrote, "Monita and Andrew, just an FYI."
 5            Yes.                                              11:41:53
 6   Q.  And then your email is on top.  And what are you discussing
 7   in your email?
 8   A.  Basically stating here that the -- Carl's request had been
 9   received and that the second photo we would remove, and then a
10   commentary that we get a lot of calls and emails like this     11:42:30
11   every day and that many of them are more pissed off than this
12   user.
13   Q.  "Most are much crazier and more pissed off than this user";
14   right?
15            That's what you wrote?                            11:42:43
16   A.  Yes.
17   Q.  What were -- what did you mean?
18   A.  I mean we were going through this process of tamping down
19   or making less overt or changing our posting terms, and users
20   were confused and very frustrated because they didn't          11:43:00
21   understand.  At the same time we were trying to train our BPO
22   service, business process outsourcing service, El Camino, the
23   Indians, on what the standards were.
24            Those standards changed, so it was a very, you know,
25   changing time.  Difficult time.                               11:43:22
```

DANIEL HYER - DIRECT EXAMINATION

98

```
 1   Q.  And this was the ad that you were referring to; correct?
 2   A.  It's the text from it, yes.
 3   Q.  "Special.  $100.  Flat rate.  Upscale, Safe, Clean, Mature
 4   & Discrete.  Very low mileage Boys.  You be the judge";
 5   correct?                                              11:43:45
 6   A.  Yes.
 7   Q.  What type of ad was this?
 8   A.  It's an ad in escorts.  It's a prostitution ad.
 9   Q.  And when you referred to the images, were you referring to
10   these?                                                11:43:57
11   A.  Yes.
12   Q.  And you mentioned the second photo that would probably be
13   removed.
14       Is that what you were indicating?
15   A.  Yes.                                              11:44:05
16   Q.  Why would the second photo be removed?
17   A.  It's a little grainy on the image, but you can -- I believe
18   not a physician, so I don't know what to call it, but you can
19   kind of see her vagina through the thong.
20   Q.  So you were saying that that image would be removed?  11:44:29
21   A.  It seemed to be over the top.
22   Q.  Okay.  Otherwise the ad would post; right?
23   A.  I don't understand what -- your question.
24   Q.  Well, you're referring to the image.  The second photo
25   would be removed, but what would happen to the ad after the  11:44:44
```

```
 1   second photo would be removed?

 2   A.  Nothing.  It would stay live.

 3   Q.  Stay live on Backpage.com?

 4   A.  Yes.

 5   Q.  And you mentioned in this email that you're getting          11:44:52

 6   hundreds of emails and calls like this every week; correct?

 7   A.  Yes.

 8   Q.  Were those hundreds of emails and calls from people who

 9   were posting on the escort section?

10   A.  Yes.                                                         11:45:05

11          MR. STONE:  That's all I have, Your Honor.

12          THE COURT:  All right.  Thank you, Mr. Stone.

13          Mr. Cambria?

14          MR. CAMBRIA:  I'm going to pass to Mr. Feder.

15          THE COURT:  Mr. Feder, come forward.                      11:45:25

16          MR. FEDER:  How much time do I have this morning?

17          THE COURT:  Oh, I think we'll go till noon.

18                        CROSS-EXAMINATION

19   BY MR. FEDER:

20   Q.  Good morning, Mr. Hyer.                                      11:46:04

21   A.  Good morning.

22   Q.  Mr. Hyer, you pled guilty in April of 2000 -- I'm sorry.

23   When in 2018?

24   A.  August.

25   Q.  And prior to pleading guilty, you had a number of           11:46:27
```

 1   discussions with the prosecutors to my right?

 2   A.  I'm not sure what you mean by "a number of."

 3   Q.  You talked to them about what you could help them with?

 4   A.  I don't remember talking to them about what I could help

 5   them with.                                                          11:46:52

 6   Q.  You talked to them about what you could testify to that

 7   might help them in their prosecution?

 8   A.  I'm not sure what I talked to them about related to what I

 9   could testify to.

10   Q.  Okay.  Well, before testifying today, you've -- have you    11:47:08

11   reviewed any of the what are called FBI 302s, which are

12   summaries of what you've told to the prosecutors?

13   A.  Is that known as an MOI?

14   Q.  Yes.

15   A.  Yes.                                                          11:47:24

16   Q.  And the first one started in July, on July 26th of 2018; is

17   that right?

18   A.  It's possible.

19   Q.  Okay.  And then you continued talking to them throughout

20   2019, 2020, 2021; right?                                         11:47:37

21   A.  Yes.

22   Q.  And there were MOIs from all of those conversations; right?

23   A.  Yes.

24   Q.  And in those occasions, you were living in Dallas; right?

25   A.  Yes.                                                          11:47:50

1    Q.  And some of those occasions, some of the prosecutors and

2    agents to my right would fly over to Dallas and talk to you;

3    right?

4    A.  They would fly to Flower Mound, which is a suburb of Dallas

5    and Fort Worth, which --                                        11:48:04

6    Q.  Okay.

7    A.  -- is the metroplex.

8    Q.  Okay.  So you would meet in the the U.S. Attorney's Office,

9    or something comparable, in the Fort Worth/Dallas area; right?

10   A.  The Post Office and the IRS office.                          11:48:16

11   Q.  Okay.  And you would have one or more of your lawyers come

12   with you; right?

13   A.  And during the pandemic, sometimes it would be -- a lawyer

14   would be present via video or phone.

15   Q.  Sometimes your lawyer was in person; sometimes the lawyer,  11:48:33

16   for safety reasons, was on the phone; right?

17   A.  Yes.

18   Q.  And those occasions were -- lasted what, an hour, hour and

19   a half, two hours, three hours?

20   A.  Yes.                                                         11:48:51

21   Q.  And then the last MOI that I have is May 10 of 2021.

22        Does that sound about right?

23   A.  Yes.

24   Q.  Since May 10 of 2021, have you also talked to the

25   prosecutors and agents about what your testimony might be?      11:49:08

1  A.  Yes.

2  Q.  You've been preparing with them since that time; correct?

3  A.  Yes.

4  Q.  Are there any MOIs that you have reviewed after May 10 of

5  2021 in order to prepare for today's testimony and yesterday's?   11:49:26

6  A.  The dates after five years of this are not things that I

7  have memorized, so I'm going best -- from -- best from my

8  memory.  I think I've looked at everything, but, man, I don't

9  know.

10 Q.  Well, let's see.  We are in October of 2023.  And the last   11:49:43

11 MOI that at least I know of is May 10 of 2021.

12         Understand that?

13 A.  I understand the dates that you gave, yes.

14 Q.  You're telling -- and, I'm sorry.  When did you last read

15 all of the MOIs in order to prepare yourself for testifying?   11:50:04

16 A.  I've read them off and on for the last couple of months in

17 preparation of this very day.

18 Q.  When was the last time you read them?

19 A.  It's been within the last week.

20 Q.  Okay.  And you don't have any recollection of any other   11:50:19

21 MOIs after May 10 of 2021?

22 A.  Any recollection of?

23         I don't know the dates, sir.  I know the content, but

24 I don't know the dates.

25 Q.  And let me try to put it another way.  Do you have a   11:50:34

UNITED STATES DISTRICT COURT

1    recollection of reading an MOI that has a date after May 10 of

2    2021?

3            MR. STONE:  Objection.  Asked and answered.

4            THE COURT:  Overruled.

5            THE WITNESS:  Can you ask that again?                11:50:51

6            MR. FEDER:  Please read it back to him, madam court

7    reporter.

8        (Record read.)

9            THE WITNESS:  No.

10   BY MR. FEDER:                                                 11:51:10

11   Q.  So you've only read MOIs that are May 10, 2021, and before;

12   right?

13   A.  I don't have a recollection of what the dates are, sir.

14   Q.  All right.

15   A.  I wish I had a memory that could do it, but --           11:51:24

16   Q.  I'm sorry?

17   A.  I wish I had the memory that would be able to remember the

18   dates.  I know you're referring to the dates on there, but I

19   don't know what the dates are.

20   Q.  Did you keep -- did you have a copy of the MOIs?          11:51:32

21   A.  Yes.

22   Q.  Did you get a notebook or something?

23   A.  Electronic.

24   Q.  Huh?

25   A.  Electronic.                                               11:51:44

```
 1    Q.  Electronic.  Okay.

 2         And do you have a recollection of how many pages of

 3    MOIs you reviewed in order to prepare yourself for testimony

 4    today?

 5    A.  I think there were 40 plus.  41 maybe.              11:51:56

 6    Q.  41 pages?

 7    A.  I think so.

 8         MR. FEDER:  Could the witness be shown for his eyes

 9    only BF-DH-14.

10    BY MR. FEDER:                                            11:52:44

11    Q.  Do you see that on your screen, Mr. Hyer?

12    A.  Yes.

13         MR. FEDER:  Just for our purposes, could you -- I'm

14    sorry.  Could -- could the -- could the MOI be scrolled through

15    so we can get a page number.                            11:52:54

16    BY MR. FEDER:

17    Q.  Doesn't it say it's about ten pages?

18         Do you see that at the bottom left-hand corner?

19    A.  Yes.

20    Q.  All right.  So there's ten pages.                   11:53:08

21         MR. FEDER:  Could the witness be shown BF-DH-15.

22    BY MR. FEDER:

23    Q.  Do you see that, Mr. Hyer?

24    A.  Yes.

25    Q.  Do you see on the bottom left-hand corner how many pages  11:53:26
```

1   that one is?

2   A.  Yes.

3   Q.  11?

4   A.  Yes.

5   Q.  By my count, that's 21.                                    11:53:32

6        MR. FEDER:  Could the witness be shown BF-DH-16.

7        Wrong one.  BF-DH-18.

8   BY MR. FEDER:

9   Q.  Do you see that one, Mr. Hyer?

10  A.  Yes.                                                       11:53:55

11  Q.  That's 13 pages; right?

12  A.  Yes.

13  Q.  That's another MOI?

14  A.  Yes.

15       MR. FEDER:  How about BF-DH-19?                           11:54:03

16  BY MR. FEDER:

17  Q.  Do you see that one, Mr. Hyer?

18  A.  Yes.

19  Q.  13 pages; right?

20  A.  Yes.                                                       11:54:21

21  Q.  That's over 41 now.  And by my count, and you tell me if

22  I'm wrong, there is one, two, three -- as at least three more.

23       So wouldn't it be more accurate to say that there's at

24  least 50 to 100 pages of MOIs that you've been reviewing?

25  A.  I remember the number 41 because I had to download a PDF   11:54:50

1    app on my laptop to look at the pages, and at the bottom it

2    said 41.  Now, there may be others, but, like I said, I don't

3    remember the dates.

4            MR. FEDER:  Okay.  Could the witness be shown

5    BF-DH-20.                                                      11:55:18

6    BY MR. FEDER:

7    Q.  Do you see that one on your screen?

8    A.  Yes.

9    Q.  That's just a three-pager; right?

10   A.  Yes.                                                       11:55:25

11           MR. FEDER:  How about BF-DH-21?

12   BY MR. FEDER:

13   Q.  Just a one-pager?

14   A.  Yes.

15           MR. FEDER:  How about BF-DH-22?                        11:55:36

16   BY MR. FEDER:

17   Q.  Two-pager?

18   A.  Yes.

19   Q.  Does that appear to be the sum total of the MOIs that you

20   reviewed to prepare for your testimony?                       11:55:54

21   A.  Yes.

22   Q.  And then could you estimate for us how many times after

23   May 10 of 2021 you have met with the government prosecutors and

24   agents in order to prepare for your testimony yesterday and

25   today?                                                        11:56:16

 1    A.   I'm not sure how many times.

 2    Q.   You don't have an estimate?

 3    A.   It wasn't -- I mean, it wasn't like a day I was super

 4    excited about that I kept track on my calendar, like going to

 5    the park or something, you know.  So I don't know.        11:56:29

 6    Q.   Do you have your calendar there?

 7    A.   Do I have a --

 8    Q.   Your calendar with you.

 9    A.   I don't -- I don't use my calendar on my phone very much,

10    but I do have a calendar on my phone.                     11:56:43

11    Q.   So was it more than five times since May 10 of 2021?

12    A.   Yes.

13    Q.   More than ten times?

14    A.   Yes.

15    Q.   20?                                                  11:56:52

16    A.   2021, 2022, 2023.  That's five times.  Yeah.  More than

17    that.

18    Q.   More than 20?

19    A.   Yeah.

20    Q.   More than 50?                                        11:57:01

21    A.   I'm not sure that it was 50.

22    Q.   So roughly how about 20 to 50 additional times that you

23    have met with the prosecutors and government agents in order

24    for -- to prepare for your testimony; right?

25              MR. STONE:  Objection.  Misstates the testimony.  11:57:19

```
 1              THE COURT:  Sustained.
 2   BY MR. FEDER:
 3   Q.  In the time period since May 10, 2021, to the beginning of
 4   your testimony yesterday, how much time would you say you spent
 5   with the prosecutors and agents talking to them about what your    11:57:35
 6   testimony might be?
 7   A.  Are you asking in hours or days or --
 8   Q.  Well, I mean, I don't know what would be easier.  Whatever
 9   would be easier.
10   A.  You said 20 to 50.  Split the difference.  That's 35 --        11:57:50
11   Q.  Fair.
12   A.  -- so --
13   Q.  Okay.  35 times times X hours or days, would you say?
14   A.  Yes.
15   Q.  We lost each other.                                            11:58:09
16          How many -- how many hours or days have you been with
17   the prosecutors and agents since May 10 of 2021 to prepare for
18   your testimony?
19   A.  I mean, some of them were an hour.  Some of them would be
20   three hours.  Sometimes we'd do two hours and take a break.  So    11:58:23
21   the number of hours is difficult to -- to project.
22   Q.  Math is not my strength, but let's call it 35 additional
23   times after May 10 of 2021.
24   A.  Sure.
25   Q.  And we'll split the difference between an hour and            11:58:41
```

1   three hours.  Okay?  So we'll call it two.

2         70 hours?  Two times 35 equals 70; right?

3   A.  Yes.

4   Q.  Fair?

5   A.  Yes.                                          11:58:54

6   Q.  Did you take any notes during those meetings?

7   A.  I would take notes of the projected next meeting, but it

8   was not probably the way that you take notes.  It would be on a

9   Post-It which I would later discard.

10   Q.  Well, in order to prepare for your testimony yesterday and   11:59:20

11   today, did you review any of your notes that you took --

12   A.  No.

13   Q.  -- of the meetings post-2021?

14   A.  No.

15   Q.  Did you review any notes of anybody else of those meetings   11:59:35

16   since May of 2021?

17   A.  For today or yesterday?

18   Q.  For today or yesterday, yes.

19   A.  No.

20   Q.  So, by elimination, the only MOIs in writing were on a   11:59:47

21   computer that you reviewed for your testimony today is the MOIs

22   that we've already discussed; right?

23   A.  Yes.

24   Q.  No other notes, no other writings, no other communications

25   did you view to get prepared for your testimony yesterday and   12:00:08

1    today; true?

2    A.   No.

3              THE COURT:   Well --

4              THE WITNESS:   I looked at exhibits.

5              MR. FEDER:   Okay.                              12:00:18

6              THE COURT:   All right.   We'll leave it at that,

7    Mr. Feder --

8              MR. FEDER:   Yes.

9              THE COURT:   -- and we'll take our lunch break.

10             Members of the jury, just remember the admonishment.   12:00:23

11   We'll take a full hour for our lunch this afternoon.   And just

12   enjoy your lunch.   Don't come to any conclusions.   Just

13   continue to keep an open mind.

14             Please all rise for the jury.

15       (Jury not present at 12:00 p.m.)                     12:00:36

16             THE COURT:   Sir, you may step down.

17             And we will stand in recess.

18       (Recess taken at 12:01 p.m. )

19                        ---oOo---

20

21

22

23

24

25

# C E R T I F I C A T E

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 19th day of October, 2023.

*/s/ Cathy J. Taylor*
Cathy J. Taylor, RMR, CRR, CRC