**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

United States of America,       )
                                )    2:18-cr-00422-DJH
          Plaintiff,            )
                                )
          vs.                   )         Phoenix, Arizona
                                )         October 19, 2023
Michael Lacey, et al.,          )
                                )
          Defendants.           )
_____ )


**BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**


<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>


<u>**JURY TRIAL - DAY 21**</u>


<u>**P.M. SESSION**</u>


Official Court Reporter:
Christine M. Coaly, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 37
Phoenix, Arizona 85003-2151
(602) 322-7248

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

<u>**A P P E A R A N C E S**</u>

FOR THE GOVERNMENT

      U.S. ATTORNEY'S OFFICE
      By: **Mr. Kevin M. Rapp, Esq.**
           **Mr. Andrew C. Stone, Esq.**
           **Ms. Margaret Wu Perlmeter, Esq.**
           **Mr. Peter S. Kozinets, Esq.**
      40 North Central Avenue, Suite 1800
      Phoenix, Arizona 85004

      U.S. DEPARTMENT OF JUSTICE
      By: **Mr. Austin M. Berry, Esq.**
      1301 New York Ave. NW, 11th Fl.
      Washington, D.C.  20005


FOR THE DEFENDANT MICHAEL LACEY:

      LIPSITZ GREEN SCIME CAMBRIA
      By: **Mr. Paul John Cambria, Jr., Esq.**
      42 Delaware Avenue, Suite 120
      Buffalo, New York 14202


FOR THE DEFENDANT SCOTT SPEAR:

      KESSLER LAW OFFICE
      By: **Mr. Eric W. Kessler, Esq.**
      6720 North Scottsdale, Road, Suite 210
      Scottsdale, Arizona 85253
      - and -
      FEDER LAW OFFICE, PA
      By: **Mr. Bruce S. Feder, Esq.**
      2930 East Camelback Road, Suite 160
      Phoenix, Arizona 85016


FOR THE DEFENDANT JOHN BRUNST:

      BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
      LINCENBERG & RHOW, PC
      By: **Mr. Gary S. Lincenberg, Esq.**
           **Mr. Gopi K. Panchapakesan, Esq.**
      1875 Century Park E, Suite 2300
      Los Angeles, California 90067

1                    **A P P E A R A N C E S**

2   FOR THE DEFENDANT ANDREW PADILLA:

3           DAVID EISENBERG, PLC
            By:  **Mr. David S. Eisenberg, Esq.**
4           3550 North Central Avenue, Suite 1155
            Phoenix, Arizona 85012
5

6   FOR THE DEFENDANT JOYE VAUGHT:

7           JOY BERTRAND, ESQ, LLC
            By:  **Ms. Joy M. Bertrand, Esq.**
8           P.O. Box 2734
            Scottsdale, Arizona 85252-2734
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

**GOVERNMENT WITNESS:**                                    **PAGE:**

DANIEL HYER
    Continued Cross-Examination by Mr. Feder        5
    Cross-Examination by Mr. Eisenberg              51
    Cross-Examination by Ms. Bertrand               92
    Cross-Examination by Mr. Cambria                111

MEGAN LUNDSTROM
    Direct Examination by Ms. Perlmeter             113

**E X H I B I T S**

**EXHIBIT**                                               **RECEIVED**

NO.        DESCRIPTION

90         Email from Ferrer to Hyer and
           Padilla, 01/13/2011
           DOJ-BP-0000004683- DOJ-BP-0000004684         82

5934       09.02.10 Email from D. Hyer to C.
           Ferrer re: "Guide to Posting Escort Ads"
           DEFENSE 021281                                47

1                       **P R O C E E D I N G S**

2    (Whereupon, the proceedings began at 1:02 p.m.)

3              COURTROOM DEPUTY:  All rise.  Court is now is session.

4              THE COURT:  All right.  Let's have the jury in, and

5    let's have the witness in as well.  Thank you.                    00:00

6              (The jury entered the courtroom, 1:03 p.m.)            00:01

7              THE COURT:  All right.  Please be seated.              00:01

8              And the record will reflect the presence of the jury. 00:01

9    The witness is on the witness stand.                             00:01

10             Mr. Feder, you may continue.                           00:01

11             MR. FEDER:  Thank you.                                 00:01

12                       DANIEL HYER,

13   called as a witness herein, having been previously duly sworn,

14   resumed the stand and continued to testify as follows:

15                  CROSS-EXAMINATION (Continued)

16   BY MR. FEDER:

17   Q.  Mr. Hyer, we were testing our mathematical abilities before  00:02

18   we left for lunch, so let me ask you a question.                 00:02

19             Were any of the meetings that you had with the         00:02

20   prosecutors and agents tape recorded by you, your lawyer, or     00:02

21   them?                                                            00:02

22   A.  No.                                                          00:02

23   Q.  Do you know why that was?                                    00:02

24             MR. STONE:  Objection.  Calls for speculation.         00:02

25             THE COURT:  Sustained.                                 00:02

1        MR. FEDER:  He can speak as to himself.                    00:02

2        THE COURT:  Well, I guess he can answer if he knows        00:02

3  why that was.                                                    00:02

4  BY MR. FEDER:                                                    00:02

5  Q.  Did you tape record it?                                      00:02

6        THE COURT:  Well, he can answer the question you just      00:02

7  last asked.                                                      00:02

8        MR. FEDER:  Oh, I'm sorry.  Good.                          00:02

9        THE COURT:  The question -- the question -- why don't      00:02

10  you repeat that original question and we'll see if he can       00:02

11  answer.                                                          00:02

12  BY MR. FEDER:                                                    00:02

13  Q.  You did not tape record it, right?                          00:02

14  A.  No.                                                          00:02

15  Q.  To your knowledge, no one else did, right?                  00:02

16  A.  To my knowledge, no one else tape recorded it.              00:02

17  Q.  You have not heard any recordings or read any transcripts   00:02

18  of recordings of those meetings, both when there were 302s      00:03

19  available from those meetings, and after when there were no     00:03

20  writings, correct?                                              00:03

21        It's kind of a long question, right?                      00:03

22  A.  It was.  I just want to make sure I answer it accurately.   00:03

23  Q.  Let me try it again.                                        00:03

24        You have not read any -- you have not listened to any     00:03

25  tape recordings of your conversations with the prosecutors?     00:03

1   A.  No.                                                        00:03

2   Q.  You have not read any transcripts of those conversations?  00:03

3   A.  No.                                                        00:03

4   Q.  When was the last time you talked to Carl Ferrer?         00:03

5   A.  April 4th, probably, April 3rd of 2018.                   00:03

6   Q.  You don't keep in touch?                                  00:03

7   A.  Part of the condition -- no.  Part of the conditions of my  00:03

8   release are not to communicate with anybody that could be a   00:03

9   defendant or a witness.                                       00:04

10  Q.  And, Mr. Hyer, are you aware of -- you were indicted in    00:04

11  April of 2018, right?                                         00:04

12  A.  Yes.                                                       00:04

13  Q.  Are you aware of the penalties that you faced had you not  00:04

14  made an agreement with the government?                        00:04

15  A.  Yes.                                                       00:04

16  Q.  What were they?                                            00:04

17  A.  There were 59 to 69 -- 59 to 60 counts of money laundering.  00:04

18  Q.  Plus the 50-plus travel act --                            00:04

19  A.  Yes.                                                       00:04

20  Q.  -- charges, right?                                         00:04

21  A.  Yes.                                                       00:04

22  Q.  Totaling about 96 or so?                                   00:04

23  A.  My math as a liberal arts major, it's not as good as yours,  00:04

24  but I remember it was around 59 to 63, I think.               00:04

25  Q.  I was a liberal arts major too, so we're in the same boat?  00:04

1    A.  I should have been a lawyer.                                      00:04

2    Q.  That's why I became a lawyer.                                     00:05

3    A.  That's why I became a musician.                                   00:05

4    Q.  No talent.                                                        00:05

5         So what were you facing?                                        00:05

6    A.  I'm not sure what you mean.  The penalty for those crimes?        00:05

7    Q.  Yes, I'm sorry.                                                   00:05

8    A.  I know it was 10 to 20 years, I think, is per count for          00:05

9    money laundering, so I looked at it as though it was, you know,      00:05

10   100-plus years.                                                       00:05

11   Q.  Conceivably, you could be in prison for the rest of your         00:05

12   life?                                                                 00:05

13   A.  Conceivably.                                                      00:05

14   Q.  Your hope for your cooperation is that you get probation,        00:05

15   right?                                                                00:05

16   A.  Yes.                                                              00:05

17   Q.  Has there been any discussion with the prosecutors about        00:05

18   probation, to your knowledge?                                        00:05

19   A.  No.                                                               00:05

20   Q.  Your agreement requires you to cooperate, correct?              00:05

21   A.  Yes.                                                              00:06

22   Q.  And what's your understanding of the discretion that the        00:06

23   prosecutors have to bring to the attention of the sentencing        00:06

24   court your cooperation?                                              00:06

25         MR. STONE:  Objection.  Compound and speculation.             00:06

1          THE COURT:  I would sustain as to form of the                    00:06

2     question, it's a bit disjointed, as well as speculation.              00:06

3          You can rephrase the question.                                   00:06

4          MR. FEDER:  I did use, what's your understanding, but            00:06

5     I'll try something again.  Okay?                                      00:06

6          THE COURT:  Yes.                                                 00:06

7     BY MR. FEDER:                                                         00:06

8     Q.  You testified on direct that the prosecutors are going to         00:06

9     bring to the attention of the sentencing court the extent of         00:06

10    your cooperation, right, and value I think was their word,           00:06

11    right?                                                               00:06

12    A.  I don't remember the word value, but I definitely remember       00:06

13    the word -- or the -- that they were going to communicate my         00:07

14    cooperation to the Court.                                            00:07

15    Q.  And what they communicate to the Court is strictly in their      00:07

16    discretion, true?                                                    00:07

17    A.  Yes.                                                             00:07

18    Q.  You don't have any say so, right?                                00:07

19    A.  No.                                                              00:07

20    Q.  So if they like what you say, they can say good things           00:07

21    about you, right?                                                    00:07

22    A.  Yes.                                                             00:07

23    Q.  And that's their discretion, right?                             00:07

24    A.  Yes.                                                             00:07

25    Q.  And if they don't like what you said, then they can either      00:07

1    say nothing or not something so favorable, true?                    00:07

2            MR. STONE:  Object to the form.  It's argumentative.        00:07

3            THE COURT:  Overruled.                                      00:07

4            THE WITNESS:  I don't mean to be obtuse, but I forgot       00:07

5    what you just asked.  I want to make sure I answer it the           00:07

6    correct way.                                                        00:07

7    BY MR. FEDER:                                                       00:07

8    Q.  As we get older, Mr. Hyer, you kind of forget what was          00:07

9    asked?                                                              00:07

10           MR. FEDER:  Could you read that question back to him.       00:07

11           (The record was read back by the reporter.)                 00:08

12           THE WITNESS:  Yes.                                          00:08

13   BY MR. FEDER:                                                       00:08

14   Q.  So even if you gave untruthful testimony, but the              00:08

15   government liked it, they could bring that to the attention of     00:08

16   the Court in a favorable way, right?                               00:08

17           MR. STONE:  Objection.  Argumentative.                     00:08

18           THE COURT:  Sustained.                                     00:08

19   BY MR. FEDER:                                                       00:08

20   Q.  Even if you were completely truthful but the government        00:08

21   didn't like it, then they wouldn't have to bring that to the       00:08

22   attention of the Court, right?                                     00:08

23           MR. STONE:  Same objection.                                00:08

24           THE COURT:  Sustained.                                     00:08

25

BY MR. FEDER:                                                              00:09

Q.  Who has been representing you, Mr. Hyer, in regard to your            00:09

initial indictment and then to -- to come to an agreement with           00:09

the government?                                                          00:09

        MR. STONE:  Objection.  Relevance.                               00:09

        THE COURT:  Sustained.                                           00:09

BY MR. FEDER:                                                            00:09

Q.  Who has been paying your -- your -- you have a lawyer and            00:09

she's being paid, right?                                                00:09

A.  I have a lawyer, yes.                                                00:09

Q.  And she's being paid, right?                                        00:09

        MR. STONE:  Objection.  Relevance.                              00:09

        THE COURT:  Sustained.                                          00:09

BY MR. FEDER:                                                            00:09

Q.  Is the money that's being used to pay your lawyer Backpage          00:09

funds or independent funds of yours?                                    00:09

A.  That was money that was paid prior to my indictment when            00:09

Backpage was still a website, so it was Backpage funds.                 00:09

Q.  Do you have any idea how much your lawyer has been paid --          00:09

        MR. STONE:  Objection.                                          00:10

BY MR. FEDER:                                                            00:10

Q.  -- as we sit here today?                                            00:10

        MR. STONE:  Relevance.                                          00:10

        THE COURT:  Yes, what's the relevance, Mr. Feder?               00:10

        MR. FEDER:  I'm sorry, Judge?                                   00:10

```
 1            THE COURT:  I'll sustain.                              00:10

 2            MR. FEDER:  Okay.  Could you bring up Exhibit 73, I    00:10

 3   believe.                                                       00:10

 4   BY MR. FEDER:                                                  00:11

 5   Q.  You've testified on direct, Mr. Hyer, that, first, the     00:11

 6   2005, '6, '7, '8 years were, I believe you said, the Wild Wild 00:11

 7   West of the internet.  Does that sound right?                  00:11

 8   A.  Sounds accurate.                                           00:11

 9   Q.  That means the internet sites, not just Backpage, but all  00:11

10   of them, were kind of printing everything that they wanted to, 00:11

11   right?                                                         00:11

12   A.  What I meant was that the consumption of content that was  00:11

13   formerly print in any magazine or any -- the internet was not  00:11

14   the thing that it became.  So the Wild West was that there was 00:11

15   different attempts at business models that formerly were brick 00:11

16   and mortar, or physical things that you could touch, taste,    00:12

17   hold in your hands, which ultimately became an internet        00:12

18   product.                                                       00:12

19            So in reference to the Wild West, it was the early    00:12

20   days of the internet where the bandwidth, technology got       00:12

21   better, you could look at stuff on your phone in 2010 that in  00:12

22   2005 it wouldn't work.  So the Wild West comment was -- it was 00:12

23   the early days of the internet, not the beginning of it, but   00:12

24   the early days of it.                                          00:12

25   Q.  Well, that would -- in the early 2000s, that was when the  00:12
```

13

1    Facebooks and the Googles, I don't even remember when Twitter    00:12

2    began, but all of those big companies, and many, many small    00:12

3    ones, were starting up, right?    00:12

4    A.  I don't remember the founding day of -- of those sites.  I    00:12

5    think Myspace was probably more popular back then.  I can    00:12

6    remember Facebook being a thing, hearing about it from a kid    00:12

7    who had just graduated somewhere in the 2000s.  So I'd say,    00:12

8    yeah, I mean, the -- the exact dates of those things was murky,    00:13

9    but that was when sites and the internet use was growing, and    00:13

10   growing, and growing.  So there are a lot of things being tried    00:13

11   at that time that made it seem like it was the Wild West.    00:13

12   Q.  Okay.  We are in the west, right?    00:13

13   A.  Yes.    00:13

14   Q.  And then you've testified that, as time has gone on,    00:13

15   specific to Backpage, where -- strike that.    00:13

16        You defined moderation during your direct examination,    00:13

17   right?    00:13

18   A.  I don't know that I defined it, but I used the term.    00:13

19   Q.  And that's a fancy word for editing, right?    00:13

20   A.  No, I wouldn't describe it as that.    00:13

21   Q.  Well, moderation is to edit out either offensive or    00:13

22   improper, according to the websites, words from ads, right?    00:14

23   A.  No.    00:14

24   Q.  No?    00:14

25   A.  No.    00:14

DANIEL HYER - CONT'D CROSS-EXAMINATION BY MR. FEDER          14

1    Q.  How would you define it?                                    00:14

2    A.  Moderation would be defined as moderating, reviewing,       00:14

3    evaluating, looking at.                                         00:14

4    Q.  Editing?                                                    00:14

5    A.  I don't know that I would include editing in the word of    00:14

6    moderation, not being in the moderation department, not being a 00:14

7    moderator.  But if somebody was to say, what's your definition  00:14

8    of moderation, my definition of moderation is you are           00:14

9    evaluating, looking at, and reviewing ads.                      00:14

10   Q.  And changing it as you -- as you want to, right?            00:14

11   A.  I wouldn't include that as part of the definition, no.      00:14

12   Q.  Moderation was encouraged, was it not?                      00:14

13   A.  Yes, moderation was encouraged.                             00:14

14   Q.  Incentivized, one might say, right?                         00:14

15          MR. STONE:  Objection.  Vague and foundation.            00:15

16          THE COURT:  Sustained.                                   00:15

17   BY MR. FEDER:                                                   00:15

18   Q.  How would you define edit then?                             00:15

19   A.  Change.                                                     00:15

20   Q.  And you've testified about how Backpage was in the 2007,    00:15

21   '8, '9 arena, and then in 2010 there was a big substantial      00:15

22   change in the ads on Backpage, right?                           00:15

23   A.  The volume, yes.                                            00:15

24   Q.  Where things that used to be allowed on Backpage were no    00:15

25   longer, at least they were not supposed to be, right?           00:15

1    A.  Yes.                                                          00:15

2    Q.  Words were no -- certain words suggestive of sex were          00:15

3    take -- were no longer allowed, right?                             00:15

4    A.  Yes.                                                          00:15

5    Q.  And as 2010 ended and it went into 2011, 2012, and on, and     00:15

6    on, at least until 2015, Backpage became more and more rigid       00:16

7    about what could be on its site, true?                             00:16

8    A.  Yes.                                                          00:16

9    Q.  That list that you were shown, I'm going to show it to you     00:16

10   in a minute, where the prohibits words, one that needed to be      00:16

11   either banned, or -- what's the other phrase -- taken out, that    00:16

12   grew from 12 inches to multiple pages, right?                      00:16

13   A.  Yes, the list grew.                                           00:16

14   Q.  Hundreds and even thousands of terms were no longer allowed    00:16

15   on Backpage, right?                                                00:16

16   A.  Yes.                                                          00:16

17   Q.  And the way that Backpage improved their site was both by      00:16

18   human moderators who would look at the ads, right?                 00:16

19   A.  You asked me the way that Backpage improved the site was       00:17

20   that human moderators looked at the ads?                           00:17

21   Q.  The way that Backpage started to and continued                 00:17

22   progressively to get rid of terms that they didn't want on         00:17

23   their site was -- was done by human moderators, right?             00:17

24   A.  Yes.                                                          00:17

25   Q.  And by a computer that automatically took out words or         00:17

```
 1   phrases or ads, right?                                      00:17
 2   A.  Yes.                                                    00:17
 3   Q.  So they had at least a two-tiered, if not a three-tiered, 00:17
 4   system of moderation, true?                                 00:17
 5   A.  Yes.                                                    00:17
 6   Q.  So, ad would come in, at some point when once -- strike 00:17
 7   that.                                                       00:17
 8          There was a company called DesertNet, right?         00:17
 9   A.  Yes.                                                    00:17
10   Q.  And DesertNet was employed by Backpage to come up with an 00:17
11   automatic filter for the computers, right?                  00:18
12   A.  It was for the ads.                                     00:18
13   Q.  I'm sorry, I didn't say for the ads.  An automatic filter 00:18
14   for the ads, right?                                         00:18
15   A.  Yes.                                                    00:18
16   Q.  That happened around 2010, 2011, 2009?                  00:18
17   A.  I don't remember when Mantis started exactly or when    00:18
18   DesertNet started.  I don't remember exactly when that was. 00:18
19   Q.  Fair.  Mr. Will Gerken was the head of DesertNet, right, at 00:18
20   least from the technical standpoint?                        00:18
21   A.  Yes.                                                    00:18
22   Q.  And so Mr. Gerken and his people came up with a method  00:18
23   where they could have a computer that was fed the ads, right? 00:18
24   A.  It wasn't a computer.  It was a technology that happened on 00:18
25   God knows how many servers.  It was a program.  A computer  00:18
```

1    would -- I kind of picture like --                          00:19

2    Q.  Remember that I'm an old guy and not very technologically  00:19

3    advanced.                                                   00:19

4    A.  I'm just trying to be accurate, sir.                    00:19

5    Q.  Forgive me for my terminology.  Please correct me if I'm  00:19

6    going astray.  Okay?                                        00:19

7    A.  I just want to be accurate.                             00:19

8    Q.  Okay.  Somehow this computer technology would get the   00:19

9    hundreds, thousands, tens of thousands, millions of ads that  00:19

10   were coming into Backpage, and would filter words, phrases, and  00:19

11   ads that Backpage did not want on its site, right?          00:19

12   A.  Yes.                                                    00:19

13   Q.  And it would -- if it was to filter out an ad -- I'm sorry,  00:19

14   filter out a word, it would just automatically take that word  00:19

15   out of the ad, right?                                       00:19

16   A.  That's not a yes or no question.                        00:19

17   Q.  Okay.  Please explain.                                  00:19

18   A.  So the filter had many types.  The filter could ban, it  00:20

19   could strip term from ad, it could ghost all future ads, it  00:20

20   could fraud alert term, it could flag as spam.              00:20

21   Q.  Whew.  Ban, strip, ghost, fraud?                        00:20

22   A.  Fraud alert.                                            00:20

23   Q.  Fraud alert.  What was the last one?                    00:20

24   A.  Flag as spam.                                           00:20

25   Q.  Fancy.                                                  00:20

1     What's the difference between ban and strip?                    00:20

2  A.  So ban would prohibit, strip -- strip would extract.          00:20

3  Q.  Ban the word or ban the ad?                                   00:20

4  A.  Ban would disallow the ad.                                    00:20

5  Q.  So one of the things that this filter, this computer filter   00:20

6  did is it -- if there was something in that ad that Backpage's    00:20

7  rule makers decided, it would throw the ad out, right?            00:20

8  A.  It would prevent it from being posted.                        00:21

9  Q.  Okay.  The whole ad?                                          00:21

10  A.  Yes.                                                          00:21

11  Q.  And that happened from starting when until when?             00:21

12  A.  I don't know the start date.  The end date would have been   00:21

13  April 6, 2018.                                                   00:21

14  Q.  Okay.  So banning was going on from whenever it started      00:21

15  sometime in the early 2000s until 2018?                          00:21

16  A.  Yes.                                                         00:21

17  Q.  What about stripping, when did that start?                   00:21

18  A.  I don't know the start date.                                 00:21

19  Q.  2010 sound about right?                                      00:21

20  A.  Could be.                                                    00:21

21  Q.  Okay.  Stripping just meant -- I'll give you an example.     00:21

22  Come put it in the hole for one hundred dollars.                 00:21

23     Understand that?                                              00:21

24  A.  Yes.                                                         00:21

25  Q.  Let's say hole was one of those terms on the list that was   00:21

1    forbidden by Backpage, right?                                    00:21

2    A.  Okay.                                                        00:22

3    Q.  So to strip would take out the "hole" so all you would be    00:22

4    left with on that on that ad would be, put it in the blank for   00:22

5    a hundred dollars, right?                                        00:22

6    A.  It would actually say, come put it in the blank for a        00:22

7    hundred dollars.                                                 00:22

8    Q.  There we go, C-O-M-E not C-U-M, right?                       00:22

9    A.  Depends on how you spelled it.                               00:22

10   Q.  Well, if C-U-M was in there, that would be also stripped     00:22

11   out too, right?                                                  00:22

12   A.  Depends on when it was posted.                               00:22

13   Q.  So you could have, technically, that would have, blank in    00:22

14   the blank for a hundred dollars, right?                          00:22

15   A.  Yes.                                                         00:22

16   Q.  And that's what the customer would get for their five        00:22

17   bucks, right?                                                    00:22

18   A.  Yes.                                                         00:22

19   Q.  And the strip out could do not only a word but a phrase,     00:22

20   right?                                                           00:22

21   A.  Yes.                                                         00:22

22   Q.  Was this an automatic or was this something that had to be   00:22

23   operated by a human being?                                       00:23

24   A.  The filter was automatic.                                    00:23

25   Q.  And all ads from Backpage went into the filter, or only      00:23

UNITED STATES DISTRICT COURT

1  some?                                                              00:23

2  A.  The filter could be set to only impact specific categories    00:23

3  or sections.                                                       00:23

4  Q.  But you -- I think you testified and were shown some           00:23

5  exhibits where some customers would try to post in a free part     00:23

6  of Backpage even though it should have been in a paid part of      00:23

7  Backpage, right?                                                   00:23

8  A.  Yes.                                                           00:23

9  Q.  So the owners and executives and supervisors of Backpage       00:23

10  wanted to make sure that the words, phrases, and types of ads     00:23

11  that they didn't want on there got taken care of, right?          00:23

12  A.  The words, the phrases, yes.                                  00:23

13  Q.  So they applied this filter pretty much across the board,     00:23

14  did they not?                                                     00:24

15  A.  No, it wasn't across the board.                              00:24

16  Q.  All adult, yes?                                               00:24

17  A.  In some cases.                                                00:24

18  Q.  Okay.  Massage?                                               00:24

19  A.  In some cases.                                                00:24

20  Q.  Personals?                                                    00:24

21  A.  Depending upon the filter.                                    00:24

22  Q.  Now, what was ghosting?                                       00:24

23  A.  Ghosting would --                                             00:24

24  Q.  Actually, before you answer that question.                    00:24

25          You said banning, whenever it started, continued          00:24

1    through the end of the site in 2018, right?                      00:24

2    A.  Yes.                                                         00:24

3    Q.  What about stripping?                                        00:24

4    A.  Strip term from ad continued through the end of the site,    00:24

5    April 6, 2018.                                                   00:24

6    Q.  Okay.  Now let's talk about ghosting.                        00:24

7         What's ghosting?                                            00:24

8    A.  Ghosting is a filter type in which if the term used in the   00:24

9    filter would say -- let's say Dan was used in the ad, and there  00:25

10   was a filtered term for Dan, and it was set as the action:       00:25

11   Ghost all future ads.  If a user tried to post an ad that said   00:25

12   Dan in it, it would ghost that ad and ghost all the future ads   00:25

13   of that user.                                                    00:25

14   Q.  What does ghost mean, though?  Would the advertiser know     00:25

15   that that had happened to his ad?                                00:25

16   A.  No.                                                          00:25

17   Q.  Or her ad?                                                   00:25

18   A.  They might detect it on their own, but they -- the user      00:25

19   account in which they could see their ads, it would look as      00:25

20   though their ad was live.                                        00:25

21   Q.  But it wouldn't be for anybody else?                         00:25

22   A.  It wouldn't be live for them or anybody else.                00:25

23   Q.  Okay.  And then the fourth category was fraud?               00:25

24   A.  Yes.                                                         00:26

25   Q.  What's that?                                                 00:26

```
 1   A.  That was a filter type to apply to users who might have          00:26

 2   committed credit card fraud.  I think there were instances in        00:26

 3   which it was -- it was a filter for an elevated -- it -- the          00:26

 4   intent of that filter was to create a higher sense of urgency        00:26

 5   to look at what ad caused that filter to fire, or filter to          00:26

 6   trigger.                                                             00:26

 7   Q.  Backpage didn't want people using stolen credit cards on         00:26

 8   it, right?                                                           00:26

 9   A.  No.                                                              00:26

10   Q.  They wanted to protect the credit card companies, right,         00:26

11   and the person that owned that former -- that former credit          00:26

12   card of theirs, right?                                               00:26

13   A.  Yes.                                                             00:26

14   Q.  And the last one was -- and that -- I'm sorry, that went on      00:26

15   from whenever it started to 2018?                                    00:26

16   A.  Yes.                                                             00:27

17   Q.  And then flag as spam, what does spam mean?                      00:27

18   A.  For clarity, are you asking me what spam means or what that      00:27

19   filter did?                                                          00:27

20   Q.  Let's start with what spam means, and then we'll go to that      00:27

21   next question.                                                       00:27

22   A.  Okay.  So spam is -- spam is like the ads that I have in my      00:27

23   inbox at this very minute that get thrown into the junk filter       00:27

24   that are for Home Depot purchases that I didn't make, or for         00:27

25   sign up for this website, or a myriad of other things that I         00:27
```

| | | |
|---|---|---|
| 1 | didn't ask for.  It's an advertisement that's usually sent by a | 00:27 |
| 2 | robot and it's sent over, and over, and over, and over again. | 00:27 |
| 3 | Q.  The kind of stuff that you hope that goes into your junk | 00:27 |
| 4 | mail on your e-mail account, right? | 00:27 |
| 5 | A.  Yes. | 00:27 |
| 6 | Q.  And Backpage didn't want that on their site either, right? | 00:27 |
| 7 | A.  No. | 00:28 |
| 8 | Q.  So this filter had a way of trying to get rid of that too, | 00:28 |
| 9 | right? | 00:28 |
| 10 | A.  Yes. | 00:28 |
| 11 | Q.  And that happened from whenever it started until 2018, | 00:28 |
| 12 | right? | 00:28 |
| 13 | A.  Yes. | 00:28 |
| 14 | Q.  And then on top of this auto filter, there were a number of | 00:28 |
| 15 | -- I mean, there were moderators, humans, that were hired by | 00:28 |
| 16 | Backpage in all of its places around the country to look at the | 00:28 |
| 17 | ads too? | 00:28 |
| 18 | A.  Yes. | 00:28 |
| 19 | Q.  To make sure that -- that if it had a word in it that | 00:28 |
| 20 | Backpage didn't want in it, that was either obnoxious or they | 00:28 |
| 21 | thought it suggested sex, they wanted it out, right? | 00:28 |
| 22 | A.  Specifically, sex for money. | 00:28 |
| 23 | Q.  Okay.  Well, they also had something called -- you ever | 00:28 |
| 24 | heard of the phrase "Playboy standard"? | 00:28 |
| 25 | A.  Yeah, I've heard of that. | 00:28 |

1   Q.  There was a rule from the executives at Backpage that they      00:28

2   wanted their site not to look like Hustler Mag -- like the old      00:29

3   Hustler Magazine.                                                   00:29

4         Do you know what the old Hustler Magazine is?                 00:29

5   A.  I'm ashamed to say I am familiar with the publication.          00:29

6   Q.  You're old enough to remember that, right?                      00:29

7         THE COURT:  Don't speak over one another, please.            00:29

8         MR. FEDER:  I'm sorry.                                        00:29

9   BY MR. FEDER:

10  Q.  You're old enough to remember that one, right?                  00:29

11  A.  Yes.                                                            00:29

12  Q.  It's pretty raunchy, right?                                     00:29

13  A.  It ain't National Geographic.                                   00:29

14  Q.  And then there was a magazine, you remember Playboy, right?     00:29

15  A.  Yes.                                                            00:29

16  Q.  Hugh Hefner, right?                                             00:29

17  A.  Yes.                                                            00:29

18  Q.  That was quite a bit less raunchy, right?                       00:29

19  A.  Yes.                                                            00:29

20  Q.  Tasteful, but still nude women on its site and things like      00:29

21  that, right?                                                        00:29

22  A.  I don't know if I --                                            00:29

23         MR. STONE:  Object to the form.                             00:29

24         THE COURT:  Sustained.                                      00:29

25

1    BY MR. FEDER:                                                      00:29

2    Q.  The Backpage executives incorporated a Playboy started not     00:29

3    a Hustler standard, right?                                         00:29

4    A.  Yes.                                                           00:30

5    Q.  So in addition to getting rid of words suggestive of sex,      00:30

6    not sex for money, but actually just suggestive words, they        00:30

7    also didn't want things that were Hustler kind of material on      00:30

8    their site, right?                                                 00:30

9    A.  Yes.                                                           00:30

10   Q.  So over the years -- you were shown some exhibits on direct    00:30

11   where at some point they allowed nudity, bare breasts, right?      00:30

12   A.  Yes.                                                           00:30

13   Q.  But as the years went by and Backpage became more and more     00:30

14   rigid, more and more strict, breasts were out, right?             00:30

15   A.  Naked breasts, yes.                                            00:30

16   Q.  Butts were out, right?                                         00:30

17   A.  Yes.                                                           00:30

18   Q.  So on the one hand from -- until summer of 2010, Backpage      00:30

19   is trying to grow its site by getting content, right?             00:31

20   A.  Yes.                                                           00:31

21   Q.  All websites want content, right?                             00:31

22   A.  Yes.                                                           00:31

23           MR. STONE:  Object to foundation.                          00:31

24           THE COURT:  Sustained.                                     00:31

25

BY MR. FEDER:                                                    00:31

Q.  Do you know anything about the internet, Mr. Hyer?          00:31

A.  I used to think I knew a lot about it, but in the last five  00:31

years I have taken a bit of a departure about the internet --   00:32

or from the internet.  But, yeah, I know enough to --           00:32

Q.  How about from 2000 to 2018, you knew a lot about the       00:32

internet and social media sites, right?                        00:32

A.  Yes.                                                         00:32

Q.  That was your job?                                           00:32

A.  Yes.                                                         00:32

Q.  And in order to build a successful site, you need content,  00:32

right?                                                          00:32

A.  Yes.                                                         00:32

Q.  Isn't that called like SEO?                                 00:32

A.  No.                                                          00:32

Q.  Search -- I know you'll be impressed -- search engine       00:32

optimization, right?                                            00:32

A.  I'm impressed that you knew what SEO stood for.             00:32

Q.  Lawyer ads that we hate.                                     00:32

       So what's the phrase for building content on a site,     00:33

if there is one?                                               00:33

A.  I don't know if there is -- I don't know of a technical     00:33

name for building content.  I guess maybe achieving content on  00:33

your site en masse would -- I know that -- I would think of the 00:33

term critical mass.                                             00:33

| | | |
|---|---|---|
| 1 | Q.  SEO is not one of them? | 00:33 |
| 2 | A.  For building content on your site, no. | 00:33 |
| 3 | Q.  To optimize the amount of content on your site? | 00:33 |
| 4 | A.  I'm sorry.  I'm not sure of that question. | 00:33 |
| 5 | Q.  Okay.  Anyhow, you want content because, I think you | 00:33 |
| 6 | testified this on direct, when people are out roaming the web, | 00:33 |
| 7 | or searching the web, whatever it's called, they're not going | 00:33 |
| 8 | to go to a site that doesn't look like it has much in it, | 00:33 |
| 9 | right? | 00:34 |
| 10 | A.  Yes. | 00:34 |
| 11 | Q.  That wouldn't be very interesting? | 00:34 |
| 12 | A.  No. | 00:34 |
| 13 | Q.  You want to go to a site that has a lot of stuff that might | 00:34 |
| 14 | be interesting, right? | 00:34 |
| 15 | A.  Yes. | 00:34 |
| 16 | Q.  And having adult, especially things like personals, is -- | 00:34 |
| 17 | whether nice or good -- interesting to a lot of people that are | 00:34 |
| 18 | searching the web, right? | 00:34 |
| 19 | A.  Yes. | 00:34 |
| 20 | Q.  Adult sites draw customers, correct? | 00:34 |
| 21 | A.  Yes. | 00:34 |
| 22 | Q.  And the hope of Backpage, and other sites like it, was that | 00:34 |
| 23 | if somebody came to that site to look at the personals, man | 00:34 |
| 24 | seeking man, woman seeking woman, et cetera, they'd also look | 00:34 |
| 25 | at the rest of the site and maybe buy a couch, right? | 00:34 |

1              MR. STONE:  Objection.  Foundation to all sites.                 00:34

2              THE COURT:  Overruled.                                           00:34

3              THE WITNESS:  Man, I'm sorry, can you have her read it          00:34

4       again?                                                                  00:34

5              MR. FEDER:  There is not any way I'm going to be able           00:34

6       to do that again?                                                      00:35

7              Madam Court Reporter, could you try to read that back.         00:35

8              (The record was read back by the reporter.)                     00:35

9              THE WITNESS:  I would say that there is -- that they           00:35

10      would not buy accounts.  I mean, I don't know that we sold            00:35

11      accounts.                                                              00:35

12      BY MR. FEDER:

13      Q.  I said couch, C-O-U-C-H, couch.                                    00:35

14      A.  Oh, I thought you said couch, and then I was going to say         00:35

15      no.                                                                    00:35

16      Q.  No couches on Backpage?                                            00:35

17      A.  We were never in the business of trying to sell couches on       00:35

18      Backpage.                                                              00:35

19      Q.  Employment, you had employment ads on there, right?              00:35

20      A.  Yes.                                                               00:36

21      Q.  Personals you had on there, right?                                00:36

22      A.  Yes.                                                               00:36

23      Q.  And personals were not supposed to be sex for money, but         00:36

24      just could be an ad for somebody to seek the companionship, or       00:36

25      more, from somebody else, right?                                      00:36

1    A.  Yes.                                                        00:36

2    Q.  As long as there was not an exchange of money, right?      00:36

3    A.  Yes.                                                        00:36

4    Q.  And that could be, speaking of Hustler, that could be      00:36

5    pretty graphic, right?                                         00:36

6    A.  Yes.                                                        00:36

7    Q.  It could be all kinds of sex terms, just not sex for money, 00:36

8    right?                                                         00:36

9    A.  Yes.                                                        00:36

10   Q.  So you -- Backpage was trying to get content, right?       00:36

11   A.  Yes.                                                        00:36

12   Q.  And there is absolutely nothing wrong with that, true, as  00:36

13   long as the ads are legal?                                     00:36

14   A.  Yeah, as long as the ads are legal.                        00:36

15   Q.  Okay.  You've testified that Craigslist decides not to have 00:36

16   -- it closes its adult site in the summer of 2010, right?      00:37

17   A.  Yes.                                                        00:37

18   Q.  But you also understand that a lot of that adult content   00:37

19   migrated to their personals section, right?                    00:37

20   A.  Yeah, I don't remember focusing on that too much in 2010.  00:37

21   Q.  But you know that happened, right?                         00:37

22   A.  I'd say, rather than say happened, I'd say happens.  I      00:37

23   don't know conclusively what went there.  I don't really       00:37

24   remember that part of it.                                      00:37

25   Q.  They were your main competitor, were they not?             00:37

```
 1   A.  Yes.                                                     00:38
 2   Q.  So you and Mr. Ferrer especially were hyper focused on what  00:38
 3   was going on at Craigslist, right?                          00:38
 4   A.  Yes.                                                     00:38
 5   Q.  And you know and you were -- complained about that it was  00:38
 6   kind of a fake closure of their adult section, because a lot of  00:38
 7   their adult ads migrated to the personals, right?           00:38
 8         MR. STONE:  Objection.  Misstates testimony and       00:38
 9   foundation.                                                  00:38
10         THE COURT:  Well, he can answer the question.          00:38
11         I'll overrule.                                         00:38
12         THE WITNESS:  I'd say yes, semi colon, also massage.   00:38
13   BY MR. FEDER:                                                00:38
14   Q.  Okay.  So the escort parts of Craigslist migrated to    00:38
15   massage and personals, right?                               00:38
16   A.  Yes.                                                     00:38
17   Q.  And that -- is that still going on, to your knowledge?  00:38
18         MR. STONE:  Objection.  Relevance.                    00:38
19         THE COURT:  Sustained.                                 00:38
20   BY MR. FEDER:                                                00:39
21   Q.  So summer of 2010 Craigslist makes a big announcement that  00:39
22   they are -- they're closing their adult site, right?        00:39
23   A.  Yes.                                                     00:39
24   Q.  And they put on their website, censored, C-E-N-S-O-R-E-D,  00:39
25   right?                                                       00:39
```

```
 1    A.  Yes.                                                        00:39

 2    Q.  Because they felt that they had been forced to do that,    00:39

 3    right?                                                         00:39

 4           MR. STONE:  Objection.  Calls for speculation.          00:39

 5           THE COURT:  Sustained.                                  00:39

 6    BY MR. FEDER:                                                  00:39

 7    Q.  And in anticipation of some of their ads, many of their    00:39

 8    ads, coming to Backpage, there is a real accelerated effort by 00:39

 9    the folks at Backpage to make sure that their site is much more 00:39

10    rigid than it had been, true?                                  00:39

11    A.  Yes.                                                       00:39

12    Q.  And that means implementing some of the moderation -- or,  00:39

13    actually, all of the moderation practices that we were just    00:40

14    talking about, right?                                          00:40

15    A.  Yes.                                                       00:40

16    Q.  And -- and from that moment on, those moderation practices 00:40

17    became more and more rigid, right?                             00:40

18    A.  Yes.                                                       00:40

19           MR. FEDER:  Could we bring up 643.                      00:40

20    BY MR. FEDER:                                                  00:40

21    Q.  Do you remember this exhibit?                              00:40

22    A.  Yes.                                                       00:40

23    Q.  When there was an old ad on Backpage, it would go -- it    00:40

24    would be -- I'm going to use another term that I'm sure is not 00:40

25    right -- like storage, right?                                  00:40
```

| | | |
|---|---|---|
| 1 | A.  Like what? | 00:40 |
| 2 | Q.  It would go into like a storage, some kind of storage, | 00:40 |
| 3 | right?  Once it -- once it was no longer running. | 00:40 |
| 4 | A.  It would become expired. | 00:41 |
| 5 | Q.  And then where would it be on the site, if anywhere? | 00:41 |
| 6 | A.  It would exist on our servers, but it would not be found in | 00:41 |
| 7 | the listings. | 00:41 |
| 8 | Q.  But if -- if that advertiser wanted to reclaim their old | 00:41 |
| 9 | ad, could they?  Could they? | 00:41 |
| 10 | A.  Yes. | 00:41 |
| 11 | Q.  And that ad had been moderated, right? | 00:41 |
| 12 | A.  I mean, it's -- I mean, if -- it depends on the date of | 00:41 |
| 13 | what you're talking about. | 00:41 |
| 14 | Q.  Let's call it 2010 forward. | 00:41 |
| 15 | A.  Okay. | 00:41 |
| 16 | Q.  This exhibit is in February of 2011, right? | 00:41 |
| 17 | A.  Yes. | 00:41 |
| 18 | Q.  And one of the purposes of this e-mail was to make sure | 00:41 |
| 19 | that there were no -- that -- that the new moderation practices | 00:41 |
| 20 | implemented in 2010 did not allow an old ad that had not been | 00:41 |
| 21 | moderated according to the new standards to get back up on your | 00:42 |
| 22 | site, right? | 00:42 |
| 23 | A.  Yes. | 00:42 |
| 24 | Q.  Because old ads that some old advertiser brings back up | 00:42 |
| 25 | might not get -- might -- might not get moderated the same way | 00:42 |

1    it would presently, right?                                    00:42

2    A.  Yes.                                                      00:42

3    Q.  So this Mantis e-mail, I guess I'll call it, was a way of  00:42

4    trying to make sure that, across the board, no formerly allowed  00:42

5    ad that would no longer be allowed got back on the site, right?  00:42

6    A.  Man, there was too many nos in that one.                  00:42

7    Q.  I admit that was terrible.  Sorry.                        00:42

8    A.  That's all right.                                         00:42

9    Q.  It's okay.  I'm trying hard.                              00:42

10   A.  Me too.                                                   00:42

11   Q.  The deep cleaning was to assure that old ads that were not  00:43

12   moderated according to the new moderation standards wouldn't  00:43

13   get back on the site?                                         00:43

14   A.  Yes.                                                      00:43

15   Q.  So that across the board everyone hoped the new standards  00:43

16   would be implemented for all content on Backpage?            00:43

17   A.  Yes.                                                      00:43

18   Q.  I'm not answering a phone, just looking for something.    00:43

19   Sorry.                                                        00:43

20           You've testified --                                   00:44

21           MR. FEDER:  Actually, could the witness be shown      00:44

22   Exhibit 600.                                                  00:44

23           And scroll, please.                                   00:44

24           Isn't there another page?                            00:44

25           Not what I want.                                      00:45

1    BY MR. FEDER:                                                          00:45

2    Q.  You've testified that basically right after Craigslist           00:45

3    closes their adult site, there was no longer a need for adult        00:45

4    aggregation, right?                                                  00:45

5    A.  No.                                                              00:45

6    Q.  No?                                                              00:45

7    A.  No.                                                              00:45

8    Q.  Okay.  Did the -- the adult aggregation stop pretty much         00:45

9    after Craigslist stopped their adult site?                           00:45

10   A.  No.                                                              00:45

11   Q.  How long did it go on.                                           00:45

12   A.  Through April 6th of 2018.                                       00:45

13   Q.  For adult?                                                       00:45

14   A.  Yes, just not in the U.S.                                        00:45

15   Q.  Ah, but not in the U.S.?                                         00:45

16   A.  Correct.                                                         00:46

17   Q.  Okay.  Because Backpage was now expanded into Europe and         00:46

18   other places in the country outside of the United States,           00:46

19   right?                                                               00:46

20   A.  Yes.                                                             00:46

21   Q.  But as to what was going on in the United States, there was      00:46

22   no further adult aggregation almost immediately after                00:46

23   Craigslist asserted that they were closing their adult site?        00:46

24   A.  Yes.                                                             00:46

25   Q.  Right?                                                           00:46

1        Also, right in that same time frame of summer of 2010    00:46
2   going forward, the terms GFE, PSE, BBBJ, all those terms were    00:46
3   no longer allowed on the site, right?    00:46
4   A.  Yes.    00:46
5   Q.  As of that same time frame, TER was no longer allowed,    00:46
6   right?    00:46
7   A.  It was in that general --    00:46
8   Q.  No, that's a bad question.    00:46
9        There was an e-mail -- I think you were shown either    00:47
10  646 or 647.  Let's try 6 -- well, let's try 73 first.    00:47
11       So down at the bottom where it's on Number 9, as of    00:47
12  November 17 of 2010, TER links were no longer allowed after    00:47
13  January 1, right?    00:47
14  A.  Yes.    00:47
15  Q.  But after that -- did you ever meet a guy named Hemu Nigam?    00:47
16  A.  Did I what Hemu?    00:47
17  Q.  Did you ever meet a person named Hemu Nigam?    00:47
18  A.  Hemu, no.    00:47
19  Q.  No.    00:47
20       You were aware that Backpage hired a consultant to    00:48
21  help them modify their site, right?    00:48
22       MR. STONE:  Objection.  Foundation.    00:48
23       THE COURT:  Sustained.    00:48
24  BY MR. FEDER:    00:48
25  Q.  Were you aware that Backpage hired somebody named Hemu    00:48

| | |
|---|---|
| 1 | Nigam, SSR Blue, to help them modify their site? | 00:48 |
| 2 | A.  Yes. | 00:48 |
| 3 | Q.  And he suggested -- I'm sorry, did you know, are you aware | 00:48 |
| 4 | that he suggested some further restrictions on TER? | 00:48 |
| 5 | A.  Yes. | 00:48 |
| 6 | Q.  There was a time when not only could there not be TER | 00:48 |
| 7 | number blank, blank, blank on it, but they wanted to take out | 00:48 |
| 8 | the acronym TER, right? | 00:48 |
| 9 | A.  Yes. | 00:48 |
| 10 | Q.  So that the only thing that could be on a site would be a | 00:48 |
| 11 | bunch of numbers, right? | 00:48 |
| 12 | A.  Yes. | 00:48 |
| 13 | Q.  And the only way somebody would know that those are TER | 00:48 |
| 14 | numbers versus some other numbers would be they'd have to be | 00:48 |
| 15 | aware of TER, right? | 00:49 |
| 16 | A.  Yes. | 00:49 |
| 17 | Q.  I mean, you had account numbers on your -- on your ads, | 00:49 |
| 18 | right, like internal numbers for Backpage? | 00:49 |
| 19 | A.  I remember it being e-mails were used for accounts on | 00:49 |
| 20 | Backpage. | 00:49 |
| 21 | Q.  You didn't have Backpage numbers on those accounts to be | 00:49 |
| 22 | able to -- like a reference? | 00:49 |
| 23 | A.  There is a thing called an oid option identifying | 00:49 |
| 24 | delineator that appeared at the end of ads that was a number. | 00:49 |
| 25 | Maybe that's what you're talking about. | 00:49 |

```
 1              MR. FEDER:  Could the witness be shown 646.        00:49

 2              No.  How about 647?                                00:50

 3              Is this in evidence?                               00:50

 4              MR. STONE:  Yes.                                   00:50

 5              MR. FEDER:  Thanks.                                00:50

 6   BY MR. FEDER:                                                 00:50

 7   Q.  See this e-mail, Mr. Hyer?                                00:50

 8   A.  Yes.                                                      00:50

 9   Q.  This is already in evidence.                              00:50

10              February 18 of '11.  Are you on here somewhere?   00:50

11   A.  I don't think so.                                        00:50

12   Q.  Are you aware of this e-mail?                             00:50

13   A.  I'm aware of what they're talking about here.            00:50

14   Q.  You would have been told that -- that as of February 11 -- 00:50

15   I'm sorry, February of 2011, that TER -- the abbreviation TER 00:51

16   was, as this one says, another term bites the dust, right?   00:51

17   A.  Yes.                                                      00:51

18   Q.  Leaving only a number on there, right?                   00:51

19   A.  Yes.                                                      00:51

20   Q.  I think you testified on direct that the affiliate program 00:51

21   was gone too by, roughly, 2010, 2011, right?                 00:51

22   A.  For accuracy sake, the affiliate program continued, but the 00:51

23   commissions paid for affiliates in escorts or adult was      00:51

24   eliminated.  I don't remember the exact time that it was     00:51

25   eliminated, but the affiliate program sustained, but paying  00:51
```

1   affiliates for adult revenues or commissions gained on adult      00:51

2   revenues ended.                                                   00:51

3   Q.  Because the revenues that were coming out of the Craigslist   00:51

4   migration were adequate and they didn't need the affiliates       00:52

5   anymore, right?                                                   00:52

6   A.  Yes.                                                          00:52

7   Q.  Is it fair to say that from the time that you joined          00:52

8   Backpage, at least until 2000 -- I'm sorry, April of 2015, that   00:52

9   the standards on Backpage in regard to content of adult ads got   00:52

10  stricter and stricter and stricter?                               00:52

11  A.  I think you meant April of 2018, and answer is yes.           00:52

12  Q.  Well, I'm actually talking about April of 2015 when the       00:52

13  site was sold to Mr. Ferrer.                                      00:52

14          But, I mean, I'm okay with '18.  It got stricter and      00:52

15  stricter that whole time?                                         00:53

16  A.  Yes.                                                          00:53

17  Q.  Okay.  But after the sale, Mr. Ferrer allowed some of the     00:53

18  former abbreviations to get back on the site, right?             00:53

19          MR. STONE:  Objection.  Foundation.                       00:53

20          THE COURT:  Sustained.                                    00:53

21  BY MR. FEDER:                                                     00:53

22  Q.  After the sale to Mr. Ferrer in April of 2015, do you know    00:53

23  if Mr. Ferrer allowed some of the old abbreviations to get back   00:53

24  on the site?                                                      00:53

25  A.  The only thing I remember is some fluctuation with GFE, but   00:53

1   outside of that -- and I don't even remember what the timeline        00:53

2   was, the dates.  I don't remember when that was, if it was            00:53

3   pre-sale, post-sale.                                                  00:53

4   Q.  Okay.  Fair to say that when it came to the stricter and          00:53

5   stricter, more and more rigid regulations in regard to content        00:53

6   on Backpage, that Mr. Spear was involved in that, setting those       00:54

7   standards?                                                            00:54

8   A.  Yes.                                                              00:54

9   Q.  You're aware that Mr. Spear, up until the sale of New Times       00:54

10  to the editors in 2012, that he was working both the paper and        00:54

11  the Backpage?                                                         00:54

12  A.  I knew that he had a history with New Times and that he was       00:54

13  the -- my boss's boss with Backpage, but, you know, the               00:54

14  timeline or when those things crossed over or any of that             00:54

15  stuff, I don't remember any of that.                                  00:54

16  Q.  No problem.                                                       00:54

17       Did you ever live in Phoenix or always in Dallas?                00:54

18  A.  Dallas in -- well, always --                                      00:54

19  Q.  I mean --                                                         00:54

20  A.  Yeah.                                                             00:54

21  Q.  -- when you moved there to work for the Observer until, I         00:54

22  guess today, you're living in Dallas, right?                          00:54

23  A.  Yeah, from around '96, '97, to now.                               00:54

24  Q.  In 2012, February, did anything happen in regard to who was       00:55

25  in control of moderation at Backpage?                                 00:55

1    A.  If something happened, I don't know what you're talking          00:55

2    about.          00:55

3    Q.  You ever heard of Elizabeth McDougall?          00:55

4    A.  Yes.          00:55

5    Q.  Did you ever talk to her?          00:55

6    A.  Yes.          00:55

7    Q.  Ever have e-mails from her?          00:55

8    A.  If I got an e-mail from Liz, I don't remember it.          00:55

9    Q.  Okay.  Liz McDougall took over moderation and other parts          00:55

10   of the operation of Backpage in February of 2012, right?          00:55

11              MR. STONE:  Objection.  Foundation.          00:55

12              THE COURT:  Sustained.          00:55

13   BY MR. FEDER:          00:55

14   Q.  Do you know when Ms. McDougall took over the moderation, et          00:55

15   cetera, at Backpage?          00:55

16              MR. STONE:  Same objection.          00:56

17              THE COURT:  He can answer yes or no, if he knows.          00:56

18              THE WITNESS:  Do I -- do I -- do I know that Liz took          00:56

19   over?          00:56

20   BY MR. FEDER:          00:56

21   Q.  Yes.          00:56

22   A.  I'd say no.          00:56

23   Q.  Okay.          00:56

24              MR. FEDER:  Could the witness be shown 5961.          00:56

25              We'll come back to that one.          00:56

1        How about 5324?                                    00:56

2        Not right.                                         00:57

3   BY MR. FEDER:                                           00:57

4   Q.  While I'm looking, do you recall when Ms. McDougall started  00:57

5   at Backpage?                                            00:57

6   A.  I recall it was after Craigslist shuttered its section, but  00:57

7   the exact date of when I first heard her name, I don't  00:57

8   remember.                                               00:57

9   Q.  And was she the person that you went to in regard to  00:57

10  questions about moderation, her or Mr. Ferrer?          00:57

11  A.  I would have gone to Carl before I went to Liz.     00:57

12  Q.  Okay.  But you also went to Liz too, right?         00:57

13  A.  I don't ever remember going to Liz directly.  I may have,  00:57

14  but I don't ever remember doing that.                   00:58

15  Q.  Did you ever meet her in person?                    00:58

16  A.  Couple of times.                                    00:58

17  Q.  She came to Dallas, right, to talk to you and others there?  00:58

18  A.  I don't know if she came to specifically talk to me, but  00:58

19  she came to Dallas and I met her a couple of times.     00:58

20  Q.  What do you recall talking to her about, generally?  00:58

21  A.  I remember talking about the sporting equipment category.  00:58

22  Q.  Okay.  Anything else?                               00:58

23  A.  I'm sure there were topics that were related to -- I didn't  00:58

24  talk to her but two or three times in person, maybe it was more  00:58

25  than that, but I don't really remember talking to her about  00:58

```
 1   much.                                                    00:58
 2   Q.  If one of your ads said, put it in the hole, cum put it in   00:58
 3   the hole, C-U-M, put it in the hole for a hundred dollars, is    00:59
 4   that a prostitute ad?                                    00:59
 5           MR. STONE:  Objection.  Foundation.              00:59
 6           THE COURT:  Overruled.                           00:59
 7           THE WITNESS:  Yes.                               00:59
 8   BY MR. FEDER:                                            00:59
 9   Q.  Could it also be a billiards tournament?            00:59
10   A.  Not on Backpage.                                     00:59
11   Q.  All right.  Okay.  So your testimony is by the very fact    00:59
12   that somebody puts an ad in the adult section on Backpage and   00:59
13   has any of the words that we've talked about, it becomes a     00:59
14   prostitution ad?                                         00:59
15           MR. STONE:  Object to the form.                  00:59
16           THE COURT:  Sustained.                           00:59
17   BY MR. FEDER:                                            00:59
18   Q.  You've used the word escort on a number of occasions during 00:59
19   the direct examination.                                  00:59
20           Do you recall that?                              00:59
21   A.  Yes.                                                 00:59
22   Q.  And then you changed it to prostitution ad, either --      00:59
23   prostitution, either at the urging of Mr. Stone or on your own, 00:59
24   right?                                                   00:59
25           MR. STONE:  Object to the form.                  01:00
```

```
 1              THE COURT:  Sustained.                        01:00
 2   BY MR. FEDER:                                            01:00
 3   Q.  Have you been practicing with the prosecutor to make the --  01:00
 4   the prosecutors over the years to make sure that when you say    01:00
 5   escort, you make it into prostitution?                  01:00
 6              MR. STONE:  Object to the form.               01:00
 7   BY MR. FEDER:                                            01:00
 8   Q.  Is that a no?                                        01:00
 9              THE COURT:  Well, let me rule on the objection.  01:00
10              MR. FEDER:  I'm sorry.                        01:00
11              THE COURT:  I'm going to sustain the objection.  01:00
12              MR. FEDER:  Okay.                             01:00
13   BY MR. FEDER:                                            01:00
14   Q.  Did you ever meet a person named Don Moon?          01:01
15   A.  I didn't catch the first part of that.              01:01
16   Q.  Don Moon.                                           01:01
17   A.  That's the second part.  What was the first part?   01:01
18   Q.  Did you ever meet Don Moon?                         01:01
19   A.  No.                                                 01:01
20   Q.  Did you ever talk to Don Moon?                      01:01
21   A.  No.                                                 01:01
22   Q.  Did you ever get an e-mail from Don Moon?           01:01
23   A.  Not that I recollect.                               01:01
24   Q.  Okay.  To your knowledge, did Liz McDougall continue to  01:01
25   work with Backpage until 2018?                          01:01
```

1    A.  Yes, to my knowledge, she worked through 2018.                    01:01

2          MR. FEDER:  Could the witness be shown 5894.  For his           01:02

3    eyes only.                                                            01:02

4    BY MR. FEDER:                                                         01:02

5    Q.  Mr. Hyer, you were getting paid pretty good money working         01:02

6    for Backpage, right?                                                  01:02

7    A.  Depends on your definition of pretty good, but I was paid         01:02

8    by Backpage, yes.                                                     01:03

9    Q.  I knew you were going to say that.                                01:03

10         THE COURT:  I'm sorry.  I didn't hear that.                     01:03

11         MR. FEDER:  I said, I knew you were going to say that.          01:03

12         THE COURT:  No, don't comment on the answer,                    01:03

13   Mr. Feder, please.                                                    01:03

14         MR. FEDER:  Okay.                                               01:03

15   BY MR. FEDER:                                                         01:03

16   Q.  At any time while you were working for Backpage -- strike         01:03

17   that.                                                                 01:03

18         What was your title while you worked for Backpage               01:03

19   from, say, 2012 to 2000 -- to April of 2015?                         01:03

20   A.  I remember it being sales and marketing director.                01:03

21   Q.  For the entirety of Backpage nationwide?                          01:03

22   A.  Yes.                                                              01:03

23   Q.  Did you ever make any money outside of your salary from          01:03

24   Backpage?                                                             01:03

25   A.  Yes.                                                              01:03

1   Q.  How much?                                                    01:03

2   A.  Well, it depends.  I had a couple of side gigs.  One         01:03

3   venture that did not succeed was my band.  I'm still trying to   01:03

4   pay off the $10,000 investment that I had there.  I also had     01:04

5   affiliate marketing interests.                                   01:04

6   Q.  Affiliate marketing interests?                               01:04

7   A.  Yes.                                                         01:04

8   Q.  Is that what you said?                                       01:04

9        Is this the affiliate marketing interest that you and       01:04

10  Mr. Ferrer participated in?                                      01:04

11  A.  Yes.                                                         01:04

12  Q.  How much money did you make from the affiliate marketing     01:04

13  program?                                                         01:04

14  A.  I don't remember the exact amount.  If I were to estimate    01:04

15  it, 7 -- about 350,000 over a five-year period, maybe a little   01:04

16  bit more than that.                                              01:04

17  Q.  Did you ever tell anybody at Backpage, at least the          01:04

18  executives, that you were posing as an affiliate for Backpage?   01:04

19  A.  I was not posing as an affiliate for Backpage, so I can't    01:04

20  answer that question with a yes or no question.                  01:05

21  Q.  Okay.  To your knowledge, did any of the executives or       01:05

22  accountants or anything at Backpage know that you were making    01:05

23  money outside of what you were being paid as your salary for     01:05

24  your full-time employment at Backpage?                           01:05

25  A.  Carl Ferrer.                                                 01:05

```
 1    Q.  Anybody else?                                                01:05

 2    A.  Not that I'm aware of.                                       01:05

 3    Q.  But you and Carl Ferrer were participating together in this  01:05

 4    affiliate program, right?                                        01:05

 5    A.  Yes.                                                         01:05

 6    Q.  There were times, were there not, when Mr. Spear or          01:05

 7    somebody else in the executive part of Backpage would tell       01:06

 8    Mr. Ferrer to do something and he would do something different,  01:06

 9    right?                                                           01:06

10           MR. STONE:  Object to the foundation.                     01:06

11    BY MR. FEDER:                                                    01:06

12    Q.  If you know?                                                 01:06

13           THE COURT:  Sustained.                                    01:06

14           And really as to the form of the question, Mr. Feder.     01:06

15           MR. FEDER:  Okay.                                         01:06

16           THE COURT:  It's very compound and confusing.             01:06

17           MR. FEDER:  Could the witness be shown 5934.              01:07

18    BY MR. FEDER:                                                    01:07

19    Q.  Do you recall this e-mail, Mr. Hyer?                         01:07

20    A.  I'm still reading it.                                        01:07

21    Q.  Okay.  Tell me when you're ready.                           01:07

22    A.  I say I don't recall it, but it looks like it came from me,  01:07

23    so I must have wrote it, or edited it.  I guess it says edits    01:07

24    or suggestions.                                                  01:07

25           MR. FEDER:  Move to admit.                                01:08
```

1          MR. STONE:  Is there more than one page?                01:08

2          MR. FEDER:  Could you scroll down, please, so he can    01:08

3    see everything.                                               01:08

4          MR. STONE:  There is an indication that it's just one.  01:08

5          No objection.                                           01:08

6          THE COURT:  Yes, it may be admitted and it may be       01:08

7    published.                                                    01:08

8          (Exhibit No. 5934 was admitted.)                        01:08

9    BY MR. FEDER:                                                 01:08

10   Q.  Do you recall Mr. Ferrer came up with some --             01:08

11         THE COURT:  Can you move to the microphone?  Can you    01:08

12   move to the microphone?                                       01:08

13         MR. FEDER:  Sorry.                                      01:08

14         THE COURT:  Thank you.                                  01:08

15   BY MR. FEDER:                                                 01:08

16   Q.  -- went back to posting escort ads?                       01:08

17   A.  Man, I'm sorry, that was so fragmented, I didn't hear you.01:08

18   What did you say?                                             01:08

19   Q.  This e-mail is entitled, Guide to Posting Escort Ads,     01:08

20   right?                                                        01:08

21   A.  The subject is re, which is a reply to an e-mail that was 01:08

22   sent, Guide for Posting Escort Ads.                           01:08

23   Q.  And you -- is that from -- is that e-mail from you?       01:09

24   A.  I'm replying to an e-mail.                                01:09

25         MR. FEDER:  Okay.  Could we be shown 5930 -- I'm        01:09

1   sorry, 5938.                                                        01:09

2          I'm sorry, 5938.                                             01:10

3   BY MR. FEDER:                                                       01:10

4   Q.  Have you seen this, Mr. Hyer?                                   01:10

5          MR. STONE:  Your Honor, this is just Exhibit 73.             01:10

6          MR. FEDER:  This is 73.                                      01:10

7          MR. STONE:  It's the same exhibit.                           01:10

8          MR. FEDER:  Okay.  No problem.  So we won't talk about       01:10

9   this since we've already talked about 73, haven't we?              01:10

10         MR. STONE:  Yes.                                             01:10

11         MR. FEDER:  Can we bring up 73, speaking of 73.              01:11

12         I'm sorry, 1830b.                                            01:12

13         THE COURT:  Can you restate the exhibit number again.       01:12

14         MR. FEDER:  1830b.                                           01:12

15         While I'm looking, could you bring back up                  01:13

16  Exhibit 311.                                                        01:13

17  BY MR. FEDER:                                                       01:13

18  Q.  Mr. Hyer, you were asked a number of questions about Google    01:13

19  Analytics documents, right?                                        01:13

20  A.  Yes.                                                            01:13

21  Q.  And that the Erotic Review was an important source for         01:13

22  Backpage during the time prior to, roughly, 2011, right?           01:14

23  A.  Yes.                                                            01:14

24  Q.  I'm looking at Exhibit 311.  There were 43,000 and change      01:14

25  visits from the Erotic Review, out of a million 730 and change,    01:14

1   right, on that particular exhibit?                          01:14

2   A.  Yes.                                                    01:14

3   Q.  And even though we're not math majors, what would you say  01:14

4   the percentages of the Erotic Review visits to the amount of  01:14

5   visits on that day, 43,000 to a million 730 and change?     01:14

6   A.  I couldn't calculate that in my head, sir.              01:14

7   Q.  Under five percent?                                     01:14

8   A.  I -- perhaps.  I would need a calculator, and then I    01:14

9   wouldn't know how to do it on a calculator.                 01:15

10  Q.  There we go.                                            01:15

11       MR. FEDER:  All right.  I'm sorry.  Bring back up --   01:15

12  or put up Exhibit 547.                                      01:15

13  BY MR. FEDER:                                               01:15

14  Q.  Do you remember this exhibit that you talked about on   01:15

15  direct?                                                     01:15

16  A.  Yes.                                                    01:15

17  Q.  First of all, if there is a banned word, let's just use  01:15

18  Greek as an example, even though we're not mathematics majors,  01:15

19  nor statisticians, there would probably be a thousand ways that  01:15

20  one could try to spell Greek with a bunch of letters, marks, et  01:15

21  cetera, right?                                              01:15

22  A.  Yes.                                                    01:15

23  Q.  It would be near impossible to get every permutation of  01:15

24  Greek, right?                                               01:15

25  A.  Maybe with AI you could do it.                          01:15

1   Q.  Well, but AI wasn't in effect in -- before 2018, right?          01:16

2   A.  Not in its present form, no.          01:16

3   Q.  Okay.  And looking at this exhibit, under escorts, the          01:16

4   first one was -- I think you identified, quote-unquote, sex          01:16

5   terms as Greek, Number 2, right?          01:16

6   A.  Yes.          01:16

7   Q.  GFE, Number 6?          01:16

8   A.  Yes.          01:16

9   Q.  Number 8, BBBJ, right?          01:16

10  A.  Yes.          01:16

11  Q.  What kind of sex term is Mesa, Number 4?          01:16

12  A.  I'm not familiar with that being a sex term.          01:16

13  Q.  How about Asian, Number 1?          01:16

14  A.  That's not a sex term.          01:16

15  Q.  How about Latina, Number 3?          01:16

16  A.  No, that's not a text term.          01:16

17  Q.  Number 7, couple?          01:17

18  A.  I don't think I would consider that a sex term.          01:17

19  Q.  Maybe Michelle, is that a sex term?          01:17

20  A.  No.          01:17

21  Q.  How about French, is that a sex term?          01:17

22  A.  It might be in the context of classified ads and escorts in          01:17

23  2010, but if it was, I don't remember what that meant.          01:17

24  Q.  Well, there is a French kiss, right?          01:17

25  A.  I don't think it was referring to that.          01:17

1    Q.   Okay.  Is that a sex term, in your opinion?                    01:17

2    A.   It is but I don't remember what it meant.                      01:17

3    Q.   A lot of women's names, right?                                 01:17

4    A.   Yes.                                                           01:17

5    Q.   Any of those sex terms, in your opinion?                       01:17

6    A.   None of the ones that I see on the screen.                     01:17

7    Q.   How about Scottsdale, that's a sex term, right?                01:18

8    A.   No.                                                            01:18

9            MR. FEDER:  I think that's about all I have.  Thanks.       01:18

10           THE COURT:  All right.  Thank you, Mr. Feder.               01:18

11        Mr. Eisenberg.                                                 01:18

12           MR. EISENBERG:  Your Honor, may I use the mic?              01:18

13           THE COURT:  Yes.                                            01:18

14                        CROSS-EXAMINATION                              01:19

15   BY MR. EISENBERG:                                                   01:19

16   Q.   Just give me a moment, sir.                                    01:19

17   A.   Thank you.                                                     01:19

18   Q.   Good afternoon, Mr. Hyer.                                      01:19

19   A.   Good afternoon.                                                01:19

20   Q.   I'm Dave Eisenberg.  I represent Mr. Padilla.                  01:19

21   A.   Hi, Dave.                                                      01:19

22   Q.   Hi.  How are you, sir?                                         01:19

23   A.   Doing all right.                                               01:19

24   Q.   Good.  I just want to make sure that when you were talking     01:19

25   about moderation and the process, process of moderation --         01:19

1  well, let me start.  That's Mr. Padilla's job.  He was director    01:19

2  of operations, correct?                                            01:19

3  A.  Yes, operations -- chief operations officer and operations     01:19

4  manager, director of operations.                                   01:20

5  Q.  One of those terms?                                            01:20

6  A.  Yes.                                                           01:20

7  Q.  Okay.  And, within that, one of the things he was              01:20

8  responsible for was moderation, right?                             01:20

9  A.  Yes.                                                           01:20

10  Q.  And, within moderation, the idea is, either through a          01:20

11  filter that's automatic or through a human, the ad, the            01:20

12  potential ad, or even one that had been posted, would be           01:20

13  reviewed, right?                                                   01:20

14  A.  Yes.                                                           01:20

15  Q.  And the idea was if there was a bad term -- my language --     01:20

16  but a term that needed to be taken out, the term was taken out,    01:20

17  right?                                                             01:20

18  A.  I would say that's not a yes or no.  I couldn't answer that    01:20

19  with a yes or no.                                                  01:20

20  Q.  Well, it would -- terms were stripped, right?                  01:20

21  A.  That was one of the features of the filters.                   01:20

22  Q.  And other features of the filters were, well, it could be      01:21

23  deleted, might be the same idea, right?                            01:21

24  A.  I can't say that is the same idea.                             01:21

25  Q.  Okay.  Well, what about photographs?  The idea is if a         01:21

| | |
|---|---|
| 1 | photo is not -- doesn't pass the standard, then the photo would | 01:21 |
| 2 | be taken out, correct? | 01:21 |
| 3 | A.  Yes. | 01:21 |
| 4 | Q.  All right.  So the idea, though, was not that a moderator | 01:21 |
| 5 | would add to an ad, put something in an ad? | 01:21 |
| 6 | A.  Was the question the idea was not to add content to an ad? | 01:21 |
| 7 | Q.  Correct, they wouldn't add content? | 01:21 |
| 8 | A.  No. | 01:21 |
| 9 | Q.  Okay.  Now, sir, you were shown an Exhibit Number 27. | 01:21 |
| 10 | MR. EISENBERG:  Could we have that, please, up on the | 01:21 |
| 11 | monitor. | 01:21 |
| 12 | BY MR. EISENBERG: | 01:22 |
| 13 | Q.  Sir, this is Exhibit Number 27.  And I think you've -- it's | 01:22 |
| 14 | already been identified.  It's in evidence, so -- all right. | 01:22 |
| 15 | There you go. | 01:22 |
| 16 | So, if you look at this exhibit, I think your | 01:22 |
| 17 | testimony was that it had to do with Mr. Ferrer trying to | 01:22 |
| 18 | maximize the reciprocal link to TER.  Did I say that correctly? | 01:22 |
| 19 | A.  Yeah, maximize the benefit from our reciprocal link | 01:22 |
| 20 | relationship with TER. | 01:22 |
| 21 | Q.  Okay.  And I think you were shown, in fact, I'm sure you | 01:22 |
| 22 | were shown by the government that there were people who were -- | 01:22 |
| 23 | actually, this is -- the e-mail itself is from you, and it's to | 01:22 |
| 24 | Mr. Ferrer; is that correct? | 01:22 |
| 25 | A.  Yes. | 01:22 |

```
 1    Q.  And then down at the bottom someone has written in awesome.     01:22
 2          Let me just stop there.  Did Mr. Ferrer write that in         01:23
 3    or did you?                                                         01:23
 4    A.  That's my word.                                                 01:23
 5    Q.  Okay.  And then Andy, Thomas, and I can attack this today.      01:23
 6          Did I read that correctly?                                    01:23
 7    A.  Yes.                                                            01:23
 8    Q.  That Andy is Andy Goldstein, isn't it?                          01:23
 9    A.  Yes.                                                            01:23
10    Q.  Not Andy Padilla?                                               01:23
11    A.  No.                                                             01:23
12    Q.  In fact, he was never known as Andy, was he?                    01:23
13    A.  I didn't really know Andy Padilla, but I didn't know how        01:23
14    he -- how he was known.                                            01:23
15    Q.  Okay.                                                           01:23
16    A.  Or the way that -- I didn't know if he was known as Andy or     01:23
17    Andrew.  I never met him.                                          01:23
18    Q.  You never met Mr. Padilla?                                      01:23
19    A.  Wait a second.  Andrew, Andrew, Andrew.  Sorry.                 01:23
20    Q.  My client is Andrew Padilla.                                    01:23
21    A.  Yes, yes, yes, yes.  My apologies.                              01:23
22    Q.  That's all right.  So he's known, first name known as           01:23
23    Andrew, right?                                                      01:23
24    A.  Always, yes.                                                    01:23
25    Q.  Okay.  So Andrew Padilla had nothing to do with, awesome,       01:23
```

1    dot, dot, dot, Andy, Thomas, and so forth?                          01:23

2    A.  No.                                                             01:23

3    Q.  Thank you.  Would --                                           01:23

4         MR. EISENBERG:  Can we go to 1168, ma'am.  This is            01:24

5    also in evidence.                                                  01:24

6    BY MR. EISENBERG:                                                  

7    Q.  All right.  Do you see that, sir?                              01:24

8    A.  Yes.                                                           01:24

9    Q.  Now there are -- just to refresh, this is from Mr. Ferrer      01:24

10   on September the 9th of 2008, correct?                             01:24

11   A.  Yes.                                                           01:24

12   Q.  And it's at 12:06 in the morning, right?                       01:24

13   A.  Yes.                                                           01:24

14   Q.  And then there are a number of people who are listed in the    01:24

15   to form there.  You are one of them; is that correct?              01:24

16   A.  Yes.                                                           01:24

17   Q.  Okay.  Now, the down -- let's go down to under the HTTP         01:24

18   designation where it starts, I restored it.                        01:24

19         Okay.  Do you see that?                                      01:24

20   A.  Yes.                                                           01:24

21   Q.  The guy is not a scam.  The next part is somebody community     01:24

22   removed it.  Let's just stop there.                                01:24

23         What does community removed mean?                            01:24

24   A.  Another way to say that would be delete.                       01:25

25   Q.  Okay.  Somebody deleted this ad?                               01:25

1    A.  Yes.                                                          01:25

2    Q.  And this doesn't say who it was, but, anyway, it got         01:25

3    deleted, correct?                                                01:25

4    A.  Yes.                                                          01:25

5    Q.  All right.  And let's go to -- well, before we move on with  01:25

6    that, that's the process of moderation, one form or another,     01:25

7    somebody deleted the ad, correct?                                01:25

8    A.  That's one of the tools or job functions of moderation,      01:25

9    yes.                                                             01:25

10   Q.  All right.  And Mr. Ferrer wants this to get reposted, if    01:25

11   you will?                                                        01:25

12   A.  Changed from status of community removed to status of live.  01:25

13   Q.  Live, meaning live is live, I guess.  You could see it,      01:25

14   right?                                                           01:25

15   A.  Yes.                                                          01:25

16   Q.  Okay.  Mr. Padilla didn't have anything to do with that,     01:25

17   though, did he?                                                  01:25

18   A.  No.                                                           01:25

19        MR. EISENBERG:  Let's go to 579.                            01:26

20   BY MR. EISENBERG:

21   Q.  Now -- and this is also admitted, sir.                       01:26

22        Correct me if I'm wrong, because sometimes these           01:26

23   e-mails, in their progression, are a little confusing.  Okay.    01:26

24        So if -- the way I'm reading this, if you go down to        01:26

25   the bottom, that's where it begins.  This is -- I believe this   01:26

1    is -- well, it's basically a one-page document.                      01:26

2            So if we start at the bottom, my question is:  Does it       01:26

3    start with, from Google alerts, May 16th, 2009?                      01:26

4    A.  Yes.                                                             01:26

5    Q.  Okay.  And then it is to Mr. Ferrer; is that correct?            01:26

6    A.  Yes.                                                             01:26

7    Q.  And then the part of it, I guess, that's most relevant here      01:26

8    is South Carolina eyes criminal investigation of Craigslist,         01:26

9    and so forth; is that correct?                                       01:27

10   A.  Yes.                                                             01:27

11   Q.  So then the next thing that appears to happen is if we go        01:27

12   up a little bit further, is this next part an e-mail from            01:27

13   Mr. Ferrer?                                                          01:27

14   A.  Yes.                                                             01:27

15   Q.  Okay.  And it's a -- well, just to give context, May 17,         01:27

16   2009, at 9:09 in the morning, right?                                 01:27

17   A.  Yes.                                                             01:27

18   Q.  Now, this appears to be -- well, get ahead of myself.            01:27

19           What he is writing is we are probably -- probably           01:27

20   needing -- to start the process of cleaning up adult Monday          01:27

21   a.m.                                                                 01:27

22           Did I read that correctly?                                   01:27

23   A.  Yes.                                                             01:27

24   Q.  Okay.  And then there is some other parts to it, but it          01:27

25   appears as though it goes to Mr. Padilla; is that correct?           01:27

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG

1    A.  Yes.                                                        01:27

2    Q.  And then -- okay.                                           01:28

3           And then Mr. Padilla says, right there at the top, on    01:28

4    Sunday, right, May 17, 2009, at 7:31 p.m., right?               01:28

5    A.  Yes.                                                        01:28

6    Q.  And he writes back to Mr. Ferrer and to you.                01:28

7           So far, so good?                                         01:28

8    A.  Yes.                                                        01:28

9    Q.  Okay.  And what he says is, I started Martina and Amanda on 01:28

10   adult picture cleanup in all markets on Friday.                 01:28

11          Did I read that correctly?                               01:28

12   A.  Yes.                                                        01:28

13   Q.  Fair to say, sir, what he is doing is responding to a       01:28

14   directive from Mr. Ferrer?                                      01:28

15   A.  Yes.                                                        01:28

16   Q.  And Mr. Ferrer is his boss, correct?                        01:28

17   A.  Yes.                                                        01:28

18   Q.  Okay.  Then he says, we'll continue this Monday.  Okay.     01:28

19   Zeke, Michael, and Amanda will be working on adult for as long  01:28

20   as we need to.                                                  01:28

21          And the interpretation there, sir, would you agree       01:28

22   with me, is he's assigned people who are going to clean up      01:28

23   whatever the problem is, and they will work on it as long as    01:29

24   it's necessary; is that correct?                                01:29

25   A.  Yes.                                                        01:29

```
 1   Q.  Okay.  The last -- well, next part is, will implement the    01:29
 2   text and pic cleanup in South Carolina only on Monday as well.   01:29
 3        Did I read that correctly?                                  01:29
 4   A.  Yes.                                                         01:29
 5   Q.  Okay.  So it appears to be -- well, words speak for          01:29
 6   themselves.                                                      01:29
 7        So he is trying to carry out, would you agree with me,      01:29
 8   what he's been directed to do by his boss?                       01:29
 9   A.  Yes.                                                         01:29
10   Q.  All right.  Sir, let's go to 49 now.  I think this is        01:29
11   also -- it is in evidence.  And this one is from Mr. Padilla to  01:29
12   you, correct?                                                    01:29
13   A.  Yes.                                                         01:29
14   Q.  And also cc'd to Mr. Ferrer, correct?                        01:29
15   A.  Yes.                                                         01:29
16   Q.  Title, New Moderation Rules, right?                          01:29
17   A.  Yes.                                                         01:30
18   Q.  The moderation rules were changing all the time; isn't that  01:30
19   true?                                                            01:30
20   A.  Yes.                                                         01:30
21   Q.  And the moderation rule changes came from, well,             01:30
22   Mr. Ferrer, right?                                               01:30
23   A.  Yeah, Ferrer and above.                                      01:30
24   Q.  And above.  But Mr. Ferrer also had consultation with other  01:30
25   people, you said from above, correct?                            01:30
```

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG          60

```
1    A.  Yes.                                                      01:30

2    Q.  And from above would be -- well, would consultation, I    01:30

3    should say, would include people like Liz McDougall?          01:30

4          MR. STONE:  Object to foundation.                       01:30

5    BY MR. EISENBERG:

6    Q.  Well, if you know?                                        01:30

7          THE COURT:  Sustained.                                  01:30

8          THE WITNESS:  Sustained, does that mean I -- sorry.     01:30

9          THE COURT:  Sustained.                                  01:30

10          MR. STONE:  You don't have to answer.                  01:30

11          THE COURT:  Sustained.                                 01:30

12          MR. EISENBERG:  I'll ask it --                         01:30

13          THE COURT:  Okay.  Let me finish.  I sustained the     01:30

14   objection.  Now you can start.                                01:31

15          MR. EISENBERG:  Thank you, ma'am.                      01:31

16   BY MR. EISENBERG:                                             01:31

17   Q.  Was -- do you know who some of the people were that       01:31

18   Mr. Ferrer consulted with?                                    01:31

19   A.  Yes.                                                      01:31

20   Q.  Was one of them Ms. McDougall?                            01:31

21   A.  Yes.                                                      01:31

22   Q.  Do you know who -- let me revise that.  Okay.             01:31

23          To continue on with this e-mail, it's to you.  Hey,    01:31

24   Dan, right?                                                   01:31

25   A.  I'm Dan.  It's to me and Carl.                            01:31
```

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG                    61

1    Q.  Yeah, okay.  But he's starting off with, hey, Dan?          01:31

2    A.  Yes.                                                        01:31

3    Q.  Okay.  And he says, Scott had a meeting with us today,      01:31

4    right?                                                          01:31

5    A.  Yes.                                                        01:31

6    Q.  Do you know who the "us" is?                                01:31

7    A.  Um, I know it would be Andrew, outside of who else, I'm not 01:31

8    exactly sure.                                                   01:32

9    Q.  Okay.  Might Mr. -- well, I don't want you to speculate.    01:32

10         And he's pushing me hard to get the site as clean as      01:32

11   possible in the next seven days; is that correct?              01:32

12   A.  Yes.                                                        01:32

13   Q.  Fair to read this that what his -- what Scott is doing is   01:32

14   telling him, get the site cleaned up?                           01:32

15   A.  Yes.                                                        01:32

16   Q.  Okay.  And then he says, I'm empowering the Phoenix staff   01:32

17   to start deleting ads.  Let me just stop there.                 01:32

18         Earlier on I -- I asked you about what it meant to        01:32

19   delete, and maybe I didn't get that right.  What -- what does   01:32

20   it mean here when he's saying to delete ads?                    01:32

21   A.  I think, to clarify, so delete would be the process of      01:32

22   removing the ad, and the status of the ad would change from     01:32

23   live to community removed.                                      01:32

24   Q.  Okay.  It's taking the ad out?                              01:32

25   A.  Yes.                                                        01:33

1    Q.  In effect.  All right.                                      01:33

2            When the violations are extreme and repeat offenses,    01:33

3    correct?                                                        01:33

4    A.  Yes.                                                        01:33

5    Q.  All right.  And when we delete ads, we're going to send an  01:33

6    e-mail, this says from sales.                                   01:33

7            You're in charge of sales, right?                       01:33

8    A.  Yes.                                                        01:33

9    Q.  So from sales indicates that an e-mail is going to come     01:33

10   from you, if I have this correct.  Is that -- so far, so good?  01:33

11   A.  Well, it says, we're going to, which I think would indicate 01:33

12   that it would come from -- I'm not sure.  We had sales at       01:33

13   Backpage.com as an e-mail, so I think I'm -- I'm confused as to 01:33

14   whether it would have been from sales at Backpage.com, or if    01:33

15   the sales department would send an e-mail.                      01:33

16   Q.  All right.                                                  01:33

17   A.  I'm not exactly sure of that process.  I don't know that we 01:33

18   ever decided on a process to notify users that their ads were   01:33

19   removed.                                                        01:34

20   Q.  But this appears to be what he's saying, that it would come 01:34

21   from sales, right?                                              01:34

22   A.  He's specific -- yes, he says that.                         01:34

23   Q.  Okay.  And you're in charge of sales?                       01:34

24   A.  Yes.                                                        01:34

25   Q.  And then he says, when we ban a user, we need the ban to    01:34

1    stick for at least 30 days, correct?                                01:34

2    A.  Yes.                                                            01:34

3    Q.  All right.  That means when the -- well, what does that         01:34

4    mean when you ban a user?                                           01:34

5    A.  The filters that I previously testified on had a feature in     01:34

6    which you could set a date for the filter to expire.                01:34

7    Q.  Okay.  Then he says, when we delete from the queue, we will     01:34

8    use delete and notify.  Notify means what?                          01:34

9    A.  Let know.                                                       01:34

10   Q.  Let who know?                                                   01:34

11   A.  The person whose ad was deleted.                                01:34

12   Q.  Okay.  So, now this is as of September the 1st, 2010; is        01:34

13   that correct?                                                       01:34

14   A.  Yes.                                                            01:34

15   Q.  If we go to Exhibit 51 --                                       01:35

16          THE COURT:  Why don't we save that exhibit for after        01:35

17   our afternoon break, Mr. Eisenberg.                                 01:35

18          And so, members of the jury, we will stand in our           01:35

19   20-minute afternoon break, and then resume for the remainder of    01:35

20   the day.  Just remember the admonition.  Be prepared to come in    01:35

21   in 20 minutes.                                                      01:35

22          Liliana or Christine will come and get you.                 01:35

23          Please all rise for the jury.                                01:35

24          (The jury panel left the courtroom, 2:37 p.m.)              01:35

25          THE COURT:  All right.  We will stand in recess.            01:35

1          (Recess taken, 2:37 p.m. - 2:58 p.m.)                      01:35

2          THE COURT:  Please be seated.  And let's go ahead and      01:56

3     check on the jury.                                              01:56

4          (The jury panel entered the courtroom, 3:00 p.m.)          01:58

5          THE COURT:  Please be seated.                              01:58

6          The record will reflect the presence of the jury.  We     01:58

7     have the witness on the stand.                                  01:58

8          Mr. Eisenberg, you may continue.                          01:58

9          MR. EISENBERG:  Thank you, Your Honor.                     01:58

10         May the witness be shown Exhibit 51, which is in           01:58

11    evidence.                                                        01:58

12    BY MR. EISENBERG:                                               01:58

13    Q.  So, let's see, there it is.                                 01:58

14         Mr. Hyer, let's -- let's start from the top.  This is      01:59

15    an exhibit from -- I'm sorry, this is an e-mail from            01:59

16    Mr. Padilla to Mr. Ferrer, correct?                            01:59

17    A.  Yes.                                                        01:59

18    Q.  And then you're courtesy copied on it, along with          01:59

19    Mr. Spear, right?                                               01:59

20    A.  Yes.                                                        01:59

21    Q.  And the date of the e-mail, September the 6th, 2010.       01:59

22         So far, so good?                                          01:59

23    A.  Yes.                                                        01:59

24    Q.  At 12:31 in the morning, right?                            01:59

25    A.  Yes.                                                        01:59

1    Q.  Okay.  And then he's saying to Mr. Ferrer, my additions are    01:59

2    at the end of your list.  And I'll get to that in a minute,    01:59

3    but, I read that correctly, right?    01:59

4    A.  Yes.    01:59

5    Q.  Then he says, these additional terms are currently filtered    01:59

6    in their common forms and removed manually in their variations.    01:59

7    So let me stop.    01:59

8         I think you were talking before at the beginning of my    02:00

9    examination here, our discussion, the term filtered.  So what    02:00

10   he's saying here is these terms are filtered in their common    02:00

11   forms.    02:00

12        Okay.  What does that mean?    02:00

13   A.  Common spellings or common misspellings.    02:00

14   Q.  And filter --    02:00

15        MS. BERTRAND:  Mr. Eisenberg, can you speak up just a    02:00

16   little bit?  We're having a hard time hearing you.    02:00

17        MR. EISENBERG:  Me?

18        MS. BERTRAND:  Yes, please.

19        MR. EISENBERG:  Oh, me.  Okay.    02:00

20        THE COURT:  You don't have the microphone on, do you?    02:00

21        MR. EISENBERG:  I do, Judge.  I'll try to speak into    02:00

22   this.    02:00

23   BY MR. EISENBERG:

24   Q.  Can you hear me, sir?    02:00

25   A.  Yes, sir.

1   Q.  Okay.  And the filter there means it's automatically taken    02:00

2   out by whatever that filtration process is?    02:00

3   A.  It would be automatically acted upon, be it ban, or strip    02:00

4   term from ad.    02:00

5   Q.  Right.  And then, but there is another part that -- that    02:00

6   goes on.  It says, and remove manually in their variations.    02:00

7        Now, manually, by hand, right?    02:01

8   A.  Yes.    02:01

9   Q.  That would mean there would be a moderator actually looking    02:01

10  at the posted -- looking at the advertisement, right?    02:01

11  A.  Yes.    02:01

12  Q.  And then when it says, in their variations, I think we've    02:01

13  talked -- you've talked about that.  Words are -- are spelled    02:01

14  differently, correct?    02:01

15  A.  Yes.    02:01

16  Q.  And sometimes they have asterisks or characteristics in    02:01

17  between the letters, right?    02:01

18  A.  Yes.    02:01

19  Q.  Okay.  So what he's saying is -- what he's saying is that    02:01

20  there are variations, and those are going to be removed by    02:01

21  somebody looking at the advertisement, right?    02:01

22  A.  Yes.    02:01

23  Q.  Okay.  And then, actually, I think that was preceded by    02:01

24  Mr. Ferrer's e-mail of September the 4th, in which he's tasking    02:01

25  Andrew, and he's saying, could you add to the banned terms on    02:02

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG                67

| | | |
|---|---|---|
| 1 | the attached Word doc, right? | 02:02 |
| 2 | A.  Yes. | 02:02 |
| 3 | Q.  Okay.  And then there is somebody -- well, Mr. Ferrer is | 02:02 |
| 4 | also referring to you, Number 2, Dan, right? | 02:02 |
| 5 | A.  Yes. | 02:02 |
| 6 | Q.  Tuesday, a.m. -- I'll say that's morning, would you agree? | 02:02 |
| 7 | A.  Yes. | 02:02 |
| 8 | Q.  -- we'll pull all the staff off marketing and have them do | 02:02 |
| 9 | moderation. | 02:02 |
| 10 | So -- and I read that correctly, right? | 02:02 |
| 11 | A.  Yes. | 02:02 |
| 12 | Q.  Now, apparently, what's happening here is part of your | 02:02 |
| 13 | staff is going to be taken from whatever they're doing for you | 02:02 |
| 14 | and they're going to be put into the moderation task force, if | 02:02 |
| 15 | you will. | 02:02 |
| 16 | A.  Yes. | 02:02 |
| 17 | Q.  And then he says, I will be there to train.  Let me just | 02:02 |
| 18 | stop there. | 02:02 |
| 19 | Did you attend that training? | 02:02 |
| 20 | A.  Yes. | 02:02 |
| 21 | Q.  Do you know where -- what -- where it was? | 02:02 |
| 22 | A.  It would have been at our office at 2501 Oak Lawn, in | 02:03 |
| 23 | Dallas. | 02:03 |
| 24 | Q.  Okay.  At the Observer building? | 02:03 |
| 25 | A.  Yes. | 02:03 |

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG

1    Q.  Do you remember how many people were there?                    02:03

2    A.  No, sir.                                                        02:03

3    Q.  Okay.  But you do remember the fact that some of your staff     02:03

4    was pulled off in order to aid in the moderation process?          02:03

5    A.  Yes.                                                            02:03

6    Q.  Okay.  And then he goes on to say, it will be a daily           02:03

7    routine for a while.                                                02:03

8            So do you know how long some of your staff were            02:03

9    seconded to the moderation staff?                                   02:03

10   A.  I don't remember the time frame that that happened.            02:03

11   Q.  Okay.  And then he says, the goal is to make sure we are       02:03

12   clean when the many new users check out our site, right?          02:03

13   A.  Yes.                                                            02:03

14   Q.  Okay.  And what does he mean by clean, or, at least, how       02:03

15   did you interpret that?                                             02:03

16   A.  I've used the word overt, so less overt, meeting our new       02:03

17   standards that were ever-changing.                                 02:04

18   Q.  Would be applied at that point in time?                        02:04

19   A.  Yes.                                                            02:04

20   Q.  Okay.  So, if you go to 51a, which was shown to you            02:04

21   earlier, I won't belabor all these words here, but I do want to    02:04

22   point -- I do want to ask you.                                     02:04

23           Do you know who wrote this inscription at the top, the     02:04

24   following terms and service codes, et cetera?                      02:04

25   A.  No, I don't know who wrote that.                               02:04

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG

| | |
|---|---|
| 1 | Q.  Okay.  But it's clear this came from an e-mail that was | 02:04 |
| 2 | sent as an attachment by Mr. Padilla; is that right? | 02:04 |
| 3 | A.  Yes. | 02:04 |
| 4 | Q.  Okay.  The last second -- the second sentence, I'm not sure | 02:04 |
| 5 | if it was read earlier today, but I'll just point it out now. | 02:04 |
| 6 | And it says, post containing these terms will be removed, | 02:04 |
| 7 | right? | 02:04 |
| 8 | A.  Yes. | 02:04 |
| 9 | Q.  And continued use of these terms by a poster will result in | 02:04 |
| 10 | that person being banned from using the site. | 02:04 |
| 11 | Did I read that correctly? | 02:05 |
| 12 | A.  Yes. | 02:05 |
| 13 | MR. STONE:  No objection to have this published. | 02:05 |
| 14 | THE COURT:  Yes, it can be published.  It has been | 02:05 |
| 15 | admitted. | 02:05 |
| 16 | MR. EISENBERG:  I'm sorry.  Thanks. | 02:05 |
| 17 | THE COURT:  Yes.  And I think it would be helpful for | 02:05 |
| 18 | the jury. | 02:05 |
| 19 | MR. EISENBERG:  Yes.  I'm sorry. | 02:05 |
| 20 | BY MR. EISENBERG: | 02:05 |
| 21 | Q.  So just, continued use of these terms by a poster will | 02:05 |
| 22 | result in that person being banned from using the site. | 02:05 |
| 23 | Did I read that correctly? | 02:05 |
| 24 | A.  Yes. | 02:05 |
| 25 | Q.  And banned means they can't post? | 02:05 |

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG

1   A.  Yes.                                                          02:05

2   Q.  Then there is another page to this.  And you see there is    02:05

3   bold type on the second page?  It starts with note?              02:05

4   A.  Yes.                                                          02:05

5   Q.  And then, again, I'm going to ask you the same question,      02:05

6   but if you don't know, that's okay.  Do you know who wrote this   02:05

7   inscription up at the top?                                        02:05

8   A.  No.                                                           02:05

9   Q.  Okay.  Note, there are many creative spellings for the        02:05

10  terms above, which are too numerous to include in any list.       02:05

11  Let me just stop there.                                           02:05

12        That's true, isn't it?                                      02:05

13  A.  Yes.                                                          02:05

14  Q.  There could have been dozens, upon dozens of way to spell,    02:05

15  I think we've seen the word -- whatever the word is -- Greek,     02:06

16  for example, many variations on that, correct?                    02:06

17  A.  Yes.                                                          02:06

18  Q.  And then he goes -- this goes on to say, but these terms,     02:06

19  however they may be spelled, will be considered off limits, in    02:06

20  quotes.                                                           02:06

21        So off limits means you can't put that term in either,      02:06

22  right?                                                            02:06

23  A.  Yes.                                                          02:06

24  Q.  Now, this is something that I -- I believe has to be          02:06

25  determined, that is, the variation on the word, that has to be    02:06

1  determined by a human moderator sitting there looking at the          02:06
2  advertisement?                                                         02:06
3  A.  Yes.                                                               02:06
4  Q.  Okay.  Also this list may be amended from time to time and         02:06
5  is no way meant to be a limitation on what terms may be banned         02:06
6  or excluded by Backpage.com, right?                                    02:06
7  A.  Yes.                                                               02:06
8  Q.  Now, this is an internal document, isn't it?                       02:06
9  A.  Yes.                                                               02:06
10 Q.  So we're not trying to impress the attorneys general, or           02:06
11 NCMEC, or anybody else.  This is an internal document, isn't           02:07
12 it?                                                                    02:07
13 A.  Yes.                                                               02:07
14 Q.  All right.  And then the next part says, the following            02:07
15 services and terms are examples of terms that have been deemed         02:07
16 to be acceptable in the past in the adult section of Backpage,         02:07
17 and this list may be amended from time to time, and so on and          02:07
18 so forth.  And there is a list of terms, correct?                      02:07
19 A.  Yes.                                                               02:07
20         MR. EISENBERG:  Okay.  Let's go to Exhibit 58.                 02:07
21         And I believe this is in evidence, Your Honor.                 02:07
22         May it be published?                                          02:07
23         It is in evidence, yes.                                       02:07
24 BY MR. EISENBERG:                                                      02:07
25 Q.  All right.  So here, Mr. Hyer, this is another e-mail from         02:07

1    Mr. Padilla, and it's -- it's to a lot of people, but then                02:07
2    you're cc'd and so is Mr. Ferrer; is that correct?                       02:07
3    A.  Yes.                                                                  02:08
4    Q.  And would you agree with me that it was sent on Sunday at             02:08
5    12:11 a.m., on October 17, 2010?                                         02:08
6    A.  Yes.                                                                  02:08
7    Q.  All right.  Now, there are lots of names in here, I haven't           02:08
8    counted them, but the point is do you recognize these people to          02:08
9    be moderators?                                                           02:08
10   A.  Yes.                                                                  02:08
11   Q.  And then he -- he refers to a presentation by Gtalk.                  02:08
12          Do you know what Gtalk is?                                         02:08
13   A.  Yes.                                                                  02:08
14   Q.  What is it, sir?                                                      02:08
15   A.  It's a way with which two computer users could communicate           02:08
16   in a chat.  It was a Google product, and it would be much like           02:08
17   SMSs that we used today where you send somebody a text, but it           02:08
18   would be on your computer and be instant.                                02:08
19   Q.  So is it fair to say that what he's saying here is that              02:09
20   there are things that were presented to the moderators by this          02:09
21   Gtalk system?                                                            02:09
22   A.  Yes.                                                                  02:09
23   Q.  It's kind of like maybe Zoom or something like that?                02:09
24   A.  It's like e-mail but it pops up on your screen, so you see          02:09
25   it the second you get it.                                                02:09

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG

1    Q.  Okay.  And then he says, for the slides that say fail, you          02:09
2    shouldn't actually use the fail button in the queue.  Whether          02:09
3    in the queue or in manual review, images that fit the fail             02:09
4    criteria should be removed from the ads.                               02:09
5          At the risk of saying the obvious, that -- based upon            02:09
6    that training that was in the slides that say fail, that stuff         02:09
7    comes out of the ad?                                                   02:09
8    A.  Yes.                                                               02:09
9    Q.  Okay.  And then he says, for images described as graphic           02:09
10   sex acts, the entire ad should be removed, right?                      02:10
11   A.  Yes.                                                               02:10
12   Q.  Now, how is that different than taking something and               02:10
13   removing it from the ad?                                               02:10
14          Well, let me -- let me --                                       02:10
15          Go ahead.                                                       02:10
16   A.  Well, it would -- it requires a manual action.                     02:10
17   Q.  And the ad goes off?                                               02:10
18   A.  In which a human being is looking at it and determining            02:10
19   that the image needs to be removed, or the ad itself needs to          02:10
20   be removed.                                                            02:10
21   Q.  Okay.  This talks about the language in ads that's really          02:10
22   killing us with the attorneys general, correct?                        02:10
23   A.  Yes.                                                               02:10
24   Q.  And then he's saying, I'm attaching this -- down at the            02:10
25   bottom -- I'm attaching a list of terms that are either banned         02:10

UNITED STATES DISTRICT COURT

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG          74

1    or stripped out automatically by filters.                        02:10

2           You should be looking for the misspellings that the       02:10

3    filters and bans are missing.                                    02:10

4           So, I read that correctly, I believe, correct?            02:10

5    A.  Yes.                                                          02:10

6    Q.  All right.  So what he's doing is he's saying that, look,     02:10

7    there is going to be misspellings.  We've seen this before --    02:10

8    I'm sorry.  There are going to be misspellings, take them out.   02:11

9    A.  Yes.                                                          02:11

10   Q.  And that's going to have to be done manually?                02:11

11   A.  Yes.                                                          02:11

12   Q.  If you go to 58b, there is a sheet of --                     02:11

13          MR. EISENBERG:  And believe this is also in evidence.     02:11

14   It can be posted.                                                02:11

15   BY MR. EISENBERG:                                                02:11

16   Q.  Okay.  These are the -- can't really see that but these are  02:11

17   the terms?                                                       02:11

18   A.  Yes.                                                          02:11

19          MR. EISENBERG:  Let's go to Exhibit 201.                  02:11

20   BY MR. EISENBERG:                                                02:11

21   Q.  So here, sir, this is from Mr. Ferrer, and you're courtesy   02:11

22   copied -- I'm sorry, to you and Mr. Padilla, right?             02:11

23   A.  Yes.                                                          02:11

24   Q.  Now we're in October of 2010, correct?                      02:11

25   A.  Yes.                                                          02:11

1  Q.  And even -- well, and this is at 4:30 in the morning,          02:12

2  right?                                                              02:12

3  A.  Yes.                                                            02:12

4  Q.  Now, so what he's saying is we need to have the guidelines      02:12

5  on the queue to help in training.  Okay.  Let me stop there.       02:12

6       Do you recall what training Mr. Ferrer is referring           02:12

7  to?                                                                 02:12

8  A.  Yes.  There were training to adhere to our ever-changing       02:12

9  standards was constant.                                            02:12

10 Q.  In other words, training -- training sessions would go on,      02:12

11 and on, and on, very repetitive?                                    02:12

12 A.  Yes.                                                            02:12

13 Q.  Okay.  So it's the standard change, you had to do the          02:12

14 training, right?                                                    02:12

15 A.  Yes.                                                            02:12

16 Q.  Because you need to educate the moderators in what they         02:12

17 should be following, correct?                                       02:12

18 A.  Yes.                                                            02:12

19 Q.  And they were taking direction from, in this case -- well,      02:12

20 whatever the training said, they were supposed to follow it,        02:12

21 correct?                                                            02:12

22 A.  Yes.                                                            02:12

23 Q.  And that would include Mr. Padilla?                             02:12

24 A.  Yes.                                                            02:13

25 Q.  All right.  And so where it says, under adult jobs not          02:13

1  allowed.  No escort type price menus.  We are keeping out                     02:13

2  escorts.                                                                       02:13

3          Okay.  Next part.  No sex act for money, right?                        02:13

4  That's been a constant throughout all moderation, isn't it?                    02:13

5  A.  Yes.                                                                        02:13

6  Q.  You see that phrase, it comes out, right?                                  02:13

7  A.  Yes.                                                                        02:13

8  Q.  A user cannot say, I'll pay $50 for oral sex.  That's an                   02:13

9  example of what has to come out?                                               02:13

10 A.  Yes.                                                                        02:13

11 Q.  Okay.  Then there is stuff that is allowed.  And then it                   02:13

12 goes down to -- let's go down to Number 3.  You see down there                 02:13

13 at the bottom, not allowed?                                                     02:13

14 A.  Yes.                                                                        02:13

15 Q.  And it says no pics of, so forth, whatever, all these                      02:13

16 terms, penis, labia, whatever.  That comes out.  That can't go                 02:13

17 in -- well, it's not allowed, right?                                           02:13

18 A.  Yes.                                                                        02:14

19 Q.  Or simulated sex act, right?                                               02:14

20 A.  Yes.                                                                        02:14

21 Q.  Okay.                                                                       02:14

22          MR. EISENBERG:  Let's go to 62.  And this is in                       02:14

23 evidence too, I believe.                                                        02:14

24 BY MR. EISENBERG:                                                               02:14

25 Q.  Sir, you're going to have to help me out on these e-mails                  02:14

1    that seem to be in series.                                    02:14

2            If you go to the second page where it starts, from     02:14

3    Carl Ferrer to you and to Mr. Padilla.                        02:14

4            Do you see that?                                       02:14

5    A.  Yes.                                                       02:14

6    Q.  Okay.  And do I have this correctly, what follows all the 02:14

7    way down to the bottom is the content of this e-mail, correct? 02:14

8    A.  Yes.                                                       02:14

9    Q.  Okay.  And here's what he's saying.  Now, would you agree 02:14

10   with me this is -- strike that.                               02:14

11           What he's saying is we will not remove ads with       02:15

12   vaginas or penis showing, just the images, correct?          02:15

13   A.  Yes.                                                       02:15

14   Q.  So that means the ad less the image can go forward, but not 02:15

15   with the image in it?                                         02:15

16   A.  Yes.                                                       02:15

17   Q.  Okay.  Now, he says there, unless they are -- they -- they 02:15

18   are a frequent offender.                                      02:15

19           What's a frequent offender?                           02:15

20   A.  Somebody that violated our terms of use over, and over    02:15

21   again.                                                         02:15

22   Q.  So that person, what happens in that case?  Are they      02:15

23   totally banned?                                                02:15

24   A.  The way I read this is that the ad would be removed because 02:15

25   they kept posting the repeating image, the offending image, the 02:15

1    violating image over, and over again.  So rather than remove    02:15

2    the image, they would remove the ad.    02:15

3    Q.  Okay.  If you go down just above where it says any    02:15

4    questions, just above it, do not post obscene images.  That is    02:16

5    uncovered genitalia.    02:16

6         Did I read that correctly?    02:16

7    A.  Yes.    02:16

8    Q.  That seems to be a repeat of what's just above.  You can't    02:16

9    have this kind of image in an ad, right?    02:16

10   A.  Yes.    02:16

11   Q.  And then, do not post content which advertises an illegal    02:16

12   service, correct?    02:16

13   A.  Yes.    02:16

14   Q.  Now, sir, this is an internal e-mail, right?    02:16

15   A.  Yes.    02:16

16   Q.  And we're not showing -- we're not sending this e-mail out    02:16

17   to third parties.  This is within the context of people who    02:16

18   work at Backpage?    02:16

19   A.  Yes.    02:16

20   Q.  Okay.  And down at the bottom he says, the hard part of    02:16

21   this job is the rules keep changing; is that right?    02:16

22   A.  Yes.    02:16

23   Q.  I think you would agree with him, wouldn't you?    02:16

24   A.  Yes.    02:16

25   Q.  So there is another -- there is an e-mail that follows on.    02:16

1    So if you go to the bottom of the first page, if I have this      02:17
2    right, it says, from Andrew Padilla, and it's October 26th.       02:17
3    Would you agree this is in response to what Mr. Ferrer has        02:17
4    posted?                                                           02:17
5    A.  Yes.                                                          02:17
6    Q.  And this is at 10:21 in the evening, right?                   02:17
7    A.  Yes.                                                          02:17
8    Q.  Okay.  And then he says -- if you flip it back over -- it     02:17
9    says, do not post obscene images, that is uncovered genitalia,    02:17
10   sex acts, erect penises, et cetera.  And then he asks a          02:17
11   question:  This means no nudity below the waist, right?          02:17
12   A.  Yes.                                                          02:17
13   Q.  Okay.  I think we can just go up to the -- to the top where   02:17
14   it says, Andrew Padilla on October the 27th.  It's right         02:18
15   underneath the term cool.                                        02:18
16          Do you see that?                                           02:18
17   A.  Yes.                                                          02:18
18   Q.  Okay.  And then he says, I told Monita she could start       02:18
19   enforcing the rules listed in the queues and my crew is going    02:18
20   to do the same.                                                   02:18
21          Monita is Monita Mohan?                                    02:18
22   A.  Yes.                                                          02:18
23   Q.  She's with El Camino?                                         02:18
24   A.  Yes.                                                          02:18
25   Q.  And it's been referred to earlier, those are the moderators  02:18

1   that are in India, correct?                                    02:18

2   A.  Yes.                                                       02:18

3   Q.  Okay.  And then he says, as far as the ban on under an hour 02:18

4   and bare butts, I might start as earlier -- as early as after  02:18

5   lunch; is that correct?                                        02:18

6   A.  Yes.                                                       02:18

7        MR. EISENBERG:  All right.  Let's go to 73.  This is      02:18

8   also in evidence.                                              02:18

9   BY MR. EISENBERG:

10  Q.  And this one is an e-mail from Mr. Ferrer to you and        02:19

11  Mr. Padilla; is that right?                                    02:19

12  A.  Yes.                                                       02:19

13  Q.  Now, this is November 17 at 7:05 in the morning in 2010?    02:19

14  A.  Yes.                                                       02:19

15  Q.  Okay.  You may have answered this question previously, but  02:19

16  you see it says, the consensus is we took a big step in the    02:19

17  right direction.                                               02:19

18        Who is involved with the consensus, do you remember?     02:19

19  A.  I knew that to be people above Carl, so executives, you     02:19

20  know.                                                          02:19

21  Q.  Okay.                                                      02:19

22  A.  Principals.                                                02:19

23  Q.  Okay.  And, sir, did you agree that there was a big step in 02:19

24  the right direction?                                           02:19

25  A.  Yes.                                                       02:19

1   Q.  Okay.  And then down below it's items I agreed to                   02:19

2   implement.  More banned terms, right?                                  02:19

3   A.  Yes.                                                               02:20

4   Q.  Number 2 says, remove pregnant ads, right?                         02:20

5   A.  Yes.                                                               02:20

6   Q.  Number 3 has pricing about bad policy to have 30 minutes in        02:20

7   escorts, right?                                                       02:20

8   A.  Yes.                                                               02:20

9   Q.  Number 7 is move to 500 characters max.  That refers to the       02:20

10  ad can't any have anymore than, is it 500 letters, characters?        02:20

11  A.  Yeah, 500 characters, numbers, those, you know, pound sign.        02:20

12  Q.  Right.  The idea there was to try to eliminate as much as          02:20

13  possible obscenities, or things that are graphic, et cetera,          02:20

14  that kind of thing?                                                   02:20

15  A.  I think the idea there was to try to give the moderators          02:20

16  less stuff that they had to moderate in an ad.                        02:20

17  Q.  All right.  Exhibit 90 --                                         02:20

18       MR. EISENBERG:  And I'm not sure this is admitted into           02:20

19  evidence.  I don't think it is.                                       02:20

20       THE COURT:  It is not.                                          02:21

21       MR. EISENBERG:  It is not?                                       02:21

22       THE COURT:  No, it is not.                                      02:21

23       MR. EISENBERG:  Thank you.                                      02:21

24  BY MR. EISENBERG:                                                    02:21

25  Q.  Sir, just for your eyes only.  Could you look at this            02:21

1    exhibit and tell us, is it from you?                           02:21

2    A.  It's an e-mail that I am responding to.                    02:21

3    Q.  Okay.                                                       02:21

4    A.  Because it says subject re, colon, and it's responding --  02:21

5    I'm responding and I'm responding to Andrew and Carl Ferrer.   02:21

6    Q.  Okay.  And it has to do with something that involves a     02:21

7    meeting; is that right?                                        02:21

8    A.  Yes.                                                        02:21

9    Q.  Would you agree that's a meeting that has to do with       02:21

10   persons who are involved with moderation?                      02:21

11   A.  Yes.                                                        02:21

12   Q.  Okay.                                                       02:21

13        MR. EISENBERG:  I'd move the admission of Exhibit 90,      02:21

14   Your Honor.                                                     02:21

15        MR. STONE:  No objection.                                 02:21

16        THE COURT:  Exhibit 90 may be admitted.  It may be        02:21

17   published.                                                     02:21

18        (Exhibit No. 90 was admitted.)                            02:21

19   BY MR. EISENBERG:                                              02:21

20   Q.  So in order to kind of cut to the chase on this.  If you   02:21

21   look down on this first page on January 14, 2011, at          02:21

22   12:02 p.m., Mr. Padilla writes, it looks good to me.  And he   02:22

23   says, I want to get the moderators started on the new image    02:22

24   policy as soon as possible, and so forth.                      02:22

25        Is he referring to what's underneath?  It looks to me     02:22

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG

1    as though there are things that Mr. Ferrer has written with        02:22

2    respect to a new policy.                                           02:22

3    A.  Yes.                                                           02:22

4    Q.  Okay.  And it's all listed on the second page, correct?       02:22

5    A.  Yeah, there is -- it looks like a couple on the first page,   02:22

6    1 and 2, and then everything else is on the second page.          02:22

7    Q.  Right.  And not to belabor it, let's just go down to Number   02:22

8    8 on the second page.  That talks about image standard changes.   02:22

9    More changing coming up, right?                                   02:22

10   A.  Yes.                                                           02:22

11   Q.  And he talks about, we need to update moderation guidelines   02:22

12   and posting rules, right?                                         02:23

13   A.  Yes.                                                           02:23

14   Q.  And he talks about things that you -- no for whatever it is   02:23

15   that's listed there, correct?                                     02:23

16   A.  Yes.                                                           02:23

17   Q.  Those things cannot be put into an image; is that right?      02:23

18   A.  Yes.                                                           02:23

19          MR. EISENBERG:  Let's go to 643.  And this one is in       02:23

20   evidence.                                                          02:23

21   BY MR. EISENBERG:                                                  02:23

22   Q.  And the only question I have for you, sir, is if you go to    02:23

23   page 4, you look down at the bottom -- yeah, look down at the     02:23

24   bottom.  It starts with, we have a script ready to go.           02:23

25          Do you see where I'm referring?                            02:23

1  A.  Yes.                                                                    02:24

2  Q.  Okay.  The way -- does this come from Mr. Padilla?                     02:24

3  A.  The, we have a script ready to go, comes from DesertNet.              02:24

4  Q.  Okay.  And is it going to Mr. Padilla?  It looks like it              02:24

5  is?                                                                        02:24

6  A.  It's a forum, Mantis was a forum, so anybody who was -- I             02:24

7  think in this they're responding to Andrew.                              02:24

8  Q.  All right.  And he's saying -- or it's saying, our approach          02:24

9  is going to be a full scrub of every filtered term that should           02:24

10 be removed over every ad in these specific categories.                    02:24

11        Did I read that right?                                             02:24

12 A.  Yes.                                                                   02:24

13 Q.  Okay.  And if you go back to page 3 and 2, those two pages           02:24

14 have a list of words, correct?                                            02:25

15 A.  Yes.                                                                   02:25

16 Q.  And then if you go to page 1, again, to try to get to the            02:25

17 bottom of this, what's being referred to here under deep clean,          02:25

18 it's about a third of the way down the page, deep clean                   02:25

19 stripped out terms.                                                       02:25

20        Did I read that right?                                             02:25

21 A.  Yes.                                                                   02:25

22 Q.  What does deep clean mean in this context?                           02:25

23 A.  The way that I would interpret that in this context would           02:25

24 be thorough or complete.                                                  02:25

25 Q.  And this refers to ads that were from every old ad in the            02:25

1    database, right?                                                    02:25

2    A.  Yes.                                                            02:25

3    Q.  That would be a Herculean task, I should think, wouldn't       02:25

4    it?                                                                 02:25

5    A.  Yeah.  That's a good way to put it.                             02:25

6         MR. EISENBERG:  Okay.  And let's go to 93.  This is in         02:25

7    evidence.                                                           02:25

8    BY MR. EISENBERG:

9    Q.  And this is also a series of e-mails.  So if we go to          02:26

10   page 3 -- first of all -- well, we go to page 3.  This is from     02:26

11   Mr. Ferrer.  It has to do with the monicker, Licks Alot, right?    02:26

12   A.  Yes.                                                            02:26

13   Q.  And she's complaining here -- or whoever that person is is     02:26

14   complaining, I guess.  Is that a good way to put it?               02:26

15   A.  Yes.                                                            02:26

16   Q.  She says, hi there, Carl.  I'm Samantha and I'm an issue,      02:26

17   and I'm wondering, can you help me, please, help me solve it.      02:26

18   I have an ad under your escort section, and whenever I repost      02:26

19   it, someone from Backpage is always removing my butt pic, and,     02:26

20   truthfully, there is absolutely nothing wrong with it, right?      02:26

21   A.  Yes.                                                            02:26

22   Q.  Okay.  Then Mr. Ferrer says -- well, let me back up.           02:26

23        I guess what she's saying is she's trying to post            02:26

24   something and it keeps getting removed?                            02:27

25   A.  Yes.                                                            02:27

DANIEL HYER - CROSS-EXAMINATION BY MR. EISENBERG

1    Q.  And, apparently, it keeps getting removed because the        02:27
2    picture?                                                          02:27
3    A.  I think the picture keeps getting removed.                    02:27
4    Q.  Okay.  Sorry.                                                 02:27
5            And then it's -- from Mr. Ferrer, it says, send me the   02:27
6    pic, right?                                                       02:27
7    A.  Yes.                                                          02:27
8    Q.  Then, again, there is another e-mail from Mr. Ferrer.  This   02:27
9    one is at 11:29 p.m. on February the 3rd, so I think it's the     02:27
10   same day, but it looks to me like, again, this is in response     02:27
11   to Licks Alot, right?                                             02:27
12   A.  Yes.                                                          02:27
13   Q.  And then what he's saying is the moderators are human,        02:27
14   correct?                                                          02:27
15   A.  Yes.                                                          02:27
16   Q.  And they are, aren't they?                                    02:27
17   A.  Yes.                                                          02:27
18   Q.  And they make mistakes all the time?                          02:27
19   A.  I don't know about all the time, but they do make mistakes.   02:27
20   Q.  Okay.  And that's because the standards are changing,         02:27
21   right?                                                            02:28
22   A.  Yes.                                                          02:28
23   Q.  And sometimes it's hard to implement standards with           02:28
24   respect, particularly, to pictures, right?                        02:28
25   A.  Yes.                                                          02:28

1  Q.  They make mistakes, he says.  Our crazy internet safety                     02:28

2  experts -- let me stop there.                                                    02:28

3         Do you know who he's referring to there?                                 02:28

4  A.  Yes.  I think the way that -- what we did is we used                         02:28

5  internet safety experts as a way to explain to try to help                      02:28

6  understand -- help our users understand all these changes.  So                  02:28

7  were there people whose titles were internet safety experts,                    02:28

8  no, not to my knowledge.                                                         02:28

9  Q.  Was one of the internet safety people SSRP Blue?                           02:28

10  A.  That's a fair statement.                                                    02:28

11  Q.  Okay.  And then he says, do not want any genitalia showing                 02:28

12  up around the thong, right?                                                     02:28

13  A.  Yes.                                                                        02:29

14  Q.  Okay.  Then he says, my guess is the moderators are                        02:29

15  catching that, right?                                                           02:29

16  A.  Yes.                                                                        02:29

17  Q.  And that seems to be consistent with what Licks Alot --                    02:29

18  Licks Alot has sent to -- in a previous e-mail, right?                         02:29

19  A.  Yes.                                                                        02:29

20  Q.  Okay.  Then the next -- go to page 1.  Again, to try to get                02:29

21  to the bottom here.                                                             02:29

22         This is from Licks Alot and it's to Mr. Ferrer?                         02:29

23  A.  Yes.                                                                        02:29

24  Q.  Down at the bottom.  Okay.  And she says, Mr. Ferrer and                   02:29

25  Ms. Audrey and entire Backpage staff -- do you know who Audrey                 02:29

1    is?                                                          02:29

2    A.  No.                                                      02:29

3    Q.  Okay.  Can someone please explain to me exactly what is   02:29

4    wrong with your moderator staff?  I posted an ad under Fort   02:29

5    Worth escorts with four pics at 6:58, face pic, a body pic, and   02:30

6    two backside pics.  I just checked it and your staff has    02:30

7    removed all four pics.                                       02:30

8         Did I read that correctly?                              02:30

9    A.  Yes.                                                     02:30

10   Q.  Now, then there is something that goes to you, if I'm    02:30

11   reading this correctly, also on February the 9th.  And is it   02:30

12   from Mr. Ferrer, hey, Dan?                                   02:30

13   A.  Yes.                                                     02:30

14   Q.  It says, tomorrow a.m. check and see who moderated this ad;   02:30

15   is that correct?                                             02:30

16   A.  Yes.                                                     02:30

17   Q.  You can have someone call here from your department to calm   02:30

18   her down.                                                    02:30

19        Who is he referring to?  Is that Licks Alot?            02:30

20   A.  Yes.                                                     02:30

21   Q.  Okay.  And this is getting sent on to Monita and Andrew   02:30

22   Padilla?                                                     02:30

23   A.  Yes.                                                     02:30

24   Q.  And, finally, back at the top, looks like this is something   02:30

25   from you.  We probably would remove the second photo, her new   02:31

| | | |
|---|---|---|
| 1 | ad attached.  We'll reach out to her this morning. | 02:31 |
| 2 | This is from you; is that correct? | 02:31 |
| 3 | A.  Yes. | 02:31 |
| 4 | Q.  Then the last part here is, FYI, we get hundreds of e-mails | 02:31 |
| 5 | and calls like this every week, correct? | 02:31 |
| 6 | A.  Yes. | 02:31 |
| 7 | Q.  That's people complaining about the fact that something in | 02:31 |
| 8 | their ad, if not the entire ad itself, has been removed? | 02:31 |
| 9 | A.  Yes. | 02:31 |
| 10 | MR. EISENBERG:  Let's go to 146. | 02:31 |
| 11 | BY MR. EISENBERG: | |
| 12 | Q.  So, again, to try to get the -- follow this. | 02:31 |
| 13 | I think this one starts with Mr. Ferrer on the second | 02:31 |
| 14 | page and saying the ad was edited unnecessarily yesterday; is | 02:31 |
| 15 | that correct? | 02:32 |
| 16 | A.  Yes. | 02:32 |
| 17 | Q.  Okay.  And we fixed it.  Less than 12 hours later, it got | 02:32 |
| 18 | edited again.  Meaning something -- edited means what? | 02:32 |
| 19 | A.  Changed. | 02:32 |
| 20 | Q.  And probably not to the liking of the person who posted it? | 02:32 |
| 21 | A.  Correct. | 02:32 |
| 22 | Q.  And it says, by the safe staff member, correct? | 02:32 |
| 23 | A.  Yes. | 02:32 |
| 24 | Q.  That AT19, that refers to somebody on Ms. Mohan's staff; | 02:32 |
| 25 | isn't that right? | 02:32 |

1    A.  Yes.                                                          02:32

2            MR. EISENBERG:  Okay.  So let's go to 1830.              02:32

3    BY MR. EISENBERG:

4    Q.  And on this one, this is from Dan at Backpage?               02:32

5    A.  Yes.                                                          02:32

6    Q.  Okay.  Is that you?  You're Dan --                           02:32

7    A.  Yes, sir.                                                     02:32

8    Q.  -- in this ad?  Okay.                                        02:32

9            This is in May of 2012.  And it talks about this one     02:33

10   had 160 hits, all for massage parlors and so forth, big shower   02:33

11   cleansing, et cetera.  I took it off the line for now and        02:33

12   having a user try it again.  May need to delete it altogether,   02:33

13   meaning just get rid of it; is that correct?                     02:33

14   A.  To remove that filter altogether, yes.                       02:33

15   Q.  And then the last part here up at the top, this is from      02:33

16   Mr. Padilla, May 11 at 11:00 o'clock in the evening?             02:33

17   A.  Yes.                                                          02:33

18   Q.  And it's to you -- I'm sorry, to Mr. Ferrer.  Sorry.         02:33

19   A.  Yes.                                                          02:33

20   Q.  Okay.  And what he's saying here is everything with a "b"    02:33

21   in the E column is banned and now contains a forbidden text      02:33

22   error, correct?                                                  02:33

23   A.  Yes.                                                          02:33

24   Q.  So, and I think you pointed this out, there are exhibits --  02:33

25   sorry, not -- attachments to this exhibit that have a whole      02:33

UNITED STATES DISTRICT COURT

1    list of page of -- of banned terms, and at least the one I'm          02:34

2    looking at has 24 pages of those terms.  That's -- I'm sorry,         02:34

3    that's 1830a.                                                         02:34

4          MR. EISENBERG:  Actually, let's do it this way.  May            02:34

5    the witness be shown 1830b.  Might be easier.                         02:34

6          And this is also in evidence.                                   02:34

7    BY MR. EISENBERG:

8    Q.  Sir, I think you talked about this earlier on direct.             02:34

9          Do you remember this?                                           02:34

10   A.  Yes.                                                              02:34

11   Q.  These are the banned terms, correct?                              02:34

12   A.  Yes.                                                              02:34

13   Q.  If you go to the last page of this exhibit, it will tell          02:34

14   us, I believe, because of the number, just exactly how many           02:35

15   terms this includes.                                                  02:35

16          And if you go to page -- well, this one isn't                  02:35

17   numbered.  But if you finally get to the last page, and it ends       02:35

18   with youthful, the word youthful, 606 terms, right?                   02:35

19   A.  Yes.                                                              02:35

20   Q.  Okay.  So sufficed to say, there has been a lot of work           02:35

21   that's gone into this in terms of trying to moderate Backpage         02:35

22   throughout the period of time that moderation was part of what        02:35

23   Backpage did?                                                         02:35

24   A.  Yes.                                                              02:35

25   Q.  Okay.                                                             02:35

1        MR. EISENBERG:  Your Honor, may I have a second?        02:35

2        THE COURT:  Yes.                                         02:35

3        MR. EISENBERG:  Excuse me.                               02:35

4        That's all I have, Your Honor.  Thank you.               02:36

5        THE COURT:  All right.  Thank you, Mr. Eisenberg.        02:36

6        Mr. Cambria.                                             02:36

7        MS. BERTRAND:  May I go next, Your Honor?                02:36

8        THE COURT:  Yes.                                         02:36

9        MS. BERTRAND:  Good afternoon.                           02:36

10       May I proceed?                                           02:36

11       THE COURT:  Yes, please.                                 02:36

12       MS. BERTRAND:  Thank you.                                02:36

13                     CROSS-EXAMINATION

14  BY MS. BERTRAND:

15  Q.  Good afternoon, Mr. Hyer.                                 02:36

16  A.  Good afternoon.                                           02:36

17  Q.  My name is Joy Bertrand and I represent Joye Vaught.      02:36

18  A.  Hi, Joy.                                                  02:36

19  Q.  Makes it easy, right?                                     02:36

20       So you were part of the decision making regarding the    02:36

21  hiring of a whole batch of moderators in late 2009, 2010?     02:36

22  A.  I'm sorry, I didn't understand what -- did you ask me was I  02:36

23  part of the decision?                                         02:36

24  Q.  Yes.                                                      02:36

25  A.  No.                                                       02:36

| | | |
|---|---|---|
| 1 | Q.  But you're aware that a large number of moderators were | 02:36 |
| 2 | hired by Backpage? | 02:37 |
| 3 | A.  Yes. | 02:37 |
| 4 | Q.  And that was to deal with what was coming from Craigslist, | 02:37 |
| 5 | right? | 02:37 |
| 6 | A.  Yes. | 02:37 |
| 7 | Q.  And Craigslist allowed, I think the word we've used is | 02:37 |
| 8 | raunchier content than Backpage was willing to allow.  Is that | 02:37 |
| 9 | fair? | 02:37 |
| 10 | MR. STONE:  Object to foundation. | 02:37 |
| 11 | THE COURT:  Sustained. | 02:37 |
| 12 | THE WITNESS:  Yes. | 02:37 |
| 13 | THE COURT:  I sustained the objection, so don't | 02:37 |
| 14 | answer. | 02:37 |
| 15 | It's okay. | 02:37 |
| 16 | MS. BERTRAND:  It's okay.  You're fine.  It's late. | 02:37 |
| 17 | THE WITNESS:  Yeah, sorry. | 02:37 |
| 18 | THE COURT:  Ask a new question. | 02:37 |
| 19 | BY MS. BERTRAND: | 02:37 |
| 20 | Q.  Have you compared the content that was on Craigslist to | 02:37 |
| 21 | what was allowed on Backpage? | 02:37 |
| 22 | A.  Yes. | 02:37 |
| 23 | Q.  And, in your opinion, was the content on Craigslist | 02:37 |
| 24 | raunchier than what was on -- allowed on Backpage? | 02:37 |
| 25 | A.  I would call it the same. | 02:37 |

1   Q.  Well, Backpage had a different standard of -- the Playboy          02:38

2   standard, right?                                                       02:38

3   A.  Eventually.                                                        02:38

4   Q.  And one of the concerns was, as customers are moving from          02:38

5   Craigslist to Backpage, that Backpage didn't want to alienate          02:38

6   these incoming Craigslist customers.  Fair?                            02:38

7   A.  Yes.                                                               02:38

8   Q.  And moderation was set up, in large part, to moderate these        02:38

9   -- this onslaught of new ads coming in, correct?                       02:38

10  A.  Yes.                                                               02:38

11  Q.  Is it your understanding that moderation at Backpage was a         02:38

12  separate division from marketing at Backpage?                          02:38

13  A.  Yes.                                                               02:38

14  Q.  I noted in one of the e-mails there seems to be an all             02:39

15  hands on deck e-mail at one point where the marketing people           02:39

16  are going to come over and help with moderation, though, right?        02:39

17  A.  Yes.                                                               02:39

18  Q.  But that was just temporary until you could get the other          02:39

19  moderators up and running, right?                                      02:39

20  A.  Yes.                                                               02:39

21  Q.  And then the marketing people, once the new moderation             02:39

22  staff came in, the marketing people went back to marketing.            02:39

23  Fair?                                                                  02:39

24  A.  Yes.                                                               02:39

25  Q.  Are you familiar with how moderators at Backpage were              02:39

1   trained?                                                                    02:39

2   A.  In a general sense.                                                     02:39

3   Q.  Okay.  Then, if you don't know, I'll ask the questions, and             02:39

4   if you don't know, just say you don't know.  Okay?                         02:39

5   A.  Okay.                                                                   02:39

6   Q.  Do you know whether or not moderators were trained as part             02:39

7   of their jobs to click on links within the ads?                           02:39

8   A.  Boy, there is a lot to unpack in that, because there could             02:40

9   be a lot of links in ads.  There could be links to other ads              02:40

10  from this user.  There could be links that go to offsite sites            02:40

11  and internet savvy.  At this time, you wouldn't just click any            02:40

12  link, because you might go to a virus site or something crazy.            02:40

13  Q.  Right.  So is it fair to say that if moderators were                   02:40

14  required to also click on the links within these sites, they              02:40

15  would have, A, spent a lot of time doing just the links, right?           02:40

16  A.  Yes.                                                                   02:40

17  Q.  And they could have gone down all kinds of rabbit holes,              02:40

18  right?                                                                     02:40

19  A.  Yes.                                                                   02:40

20  Q.  Do you know whether or not moderators were trained to give            02:40

21  preference to super posters?                                              02:40

22  A.  I would say I know that they were trained not to give                  02:41

23  preference to anybody.                                                     02:41

24  Q.  Everybody got the same review by a moderator?                         02:41

25  A.  Yes.                                                                   02:41

1    Q.  Whether you were Bill Mersey or some escort in Boise,          02:41

2    Idaho, everyone went through the same moderation practice,        02:41

3    right?                                                             02:41

4    A.  Yes.                                                           02:41

5    Q.  And moderators were not trained to give preference to         02:41

6    affiliate ads, right?                                             02:41

7    A.  Can you clarify what you mean by affiliate ads?               02:41

8    Q.  So I understood your testimony to be that there were kind     02:41

9    of like the basic -- you get a basic escort ad, or you could      02:41

10   get a fancier one, and it would be in the margin on the side      02:41

11   and have more, I don't know, exposure -- it's kind of a --        02:41

12   probably the worst word to use in a case like this -- but         02:42

13   exposure to the reader, right?                                    02:42

14   A.  Yeah.  That would be called a sponsored ad.                   02:42

15   Q.  Okay.  Thank you for that clarification.                      02:42

16          Were the moderators trained to give sponsored ads          02:42

17   special preference?                                               02:42

18   A.  No.                                                           02:42

19   Q.  So sponsored ads, even if they were more expensive, had to    02:42

20   go through the same moderation practice, right?                   02:42

21   A.  Yes.                                                          02:42

22   Q.  Do you know whether or not moderators had a financial         02:42

23   incentive to allow an ad to get through?                          02:42

24   A.  I would say I know that they did not receive a financial      02:42

25   incentive to let an ad go through.                                02:42

```
 1  Q.  They were just hourly workers, right?                    02:42
 2  A.  Yes.                                                      02:42
 3  Q.  And they weren't paid on how many ads posted that they   02:42
 4  reviewed, right?                                             02:42
 5  A.  No, I don't think so.                                    02:42
 6  Q.  There were no quotas?                                    02:42
 7  A.  I don't remember or know of any quotas that they were    02:43
 8  given.                                                        02:43
 9  Q.  You mentioned --                                         02:43
10         MS. BERTRAND:  And if we could please, Ms. Ellig,     02:43
11  bring up Exhibit 201.                                        02:43
12         I believe this has been admitted into evidence.  I    02:43
13  believe it was.                                              02:43
14         May we publish to the jury?  Thank you.               02:43
15  BY MS. BERTRAND:                                             02:43
16  Q.  I believe it was in talking with Mr. Stone that you      02:43
17  mentioned that there were some optics concerns in the context 02:43
18  of this e-mail.  What -- what do you mean by optics concerns? 02:43
19  A.  Well, there is a lot related to the optics.  One of the  02:43
20  things was to disallow, which we did on -- in three months from 02:43
21  this e-mail, four months from this e-mail, disallow links going 02:43
22  to the Erotic Review.  We've talked a lot this afternoon about 02:44
23  making the content less overt.  So somebody going to the site 02:44
24  would see, using some of the defense terminology, of the     02:44
25  Playboy standard versus the Hustler standard.                02:44
```

1    Q.  So optics, in your -- I just want to make sure we're          02:44

2    talking about the same thing.  Optics to you is the public        02:44

3    image of Backpage.  Fair?                                          02:44

4    A.  Yeah.                                                          02:44

5    Q.  And, with regard to the guidelines that are being discussed   02:44

6    in e-mails like this October 26, 2010, e-mail, those rules and    02:44

7    the trainings had input from people like Hemu Nigam, correct?     02:44

8    A.  Yes.                                                          02:45

9    Q.  And he was one of the people at SSRP Blue, right?             02:45

10   A.  Yes.                                                          02:45

11   Q.  He would have been one of those internet safety experts      02:45

12   that Carl Ferrer calls crazy in talking with Ms., I don't know,  02:45

13   I'll call her Ms. Alot, correct?                                  02:45

14   A.  Yes.                                                          02:45

15   Q.  And part of that training and this moderation, if you know,  02:45

16   was to ensure that Backpage was following the law, correct?      02:45

17           MR. STONE:  Objection.  Foundation.                      02:45

18           THE COURT:  Sustained.                                   02:45

19   BY MS. BERTRAND:                                                  02:45

20   Q.  Do you know if moderation was intended to ensure that        02:45

21   Backpage complied with the law?                                  02:45

22           MR. STONE:  Object to the form.                          02:45

23           THE COURT:  Sustained.                                   02:45

24   BY MS. BERTRAND:                                                  02:45

25   Q.  Were you present in any discussions, with people such as     02:45

1   Mr. Nigam, regarding moderation ensuring that Backpage did not          02:45

2   violate the law?                                                        02:46

3             MR. STONE:  Objection.  Compound and form.                    02:46

4             THE COURT:  Sustained.                                        02:46

5   BY MS. BERTRAND:                                                        02:46

6   Q.  Were you present at training where moderators were told             02:46

7   they had to be extremely careful with their work?                      02:46

8   A.  Yes.                                                                02:46

9   Q.  Do you know how much, on average, Backpage spent on                 02:46

10  moderation in 2010?                                                     02:46

11  A.  I'd have to use my liberal arts math, say 40 K times 25.  I         02:46

12  don't know what that adds up to but --                                  02:46

13  Q.  Okay.  About a million dollars?                                     02:46

14  A.  I'd say that's a guesstimate.                                       02:46

15  Q.  Just paying moderators.  Fair?                                      02:47

16  A.  I'd say that's accurate.                                            02:47

17  Q.  And that was just the moderators here in the United States,         02:47

18  right?                                                                  02:47

19  A.  Yes.                                                                02:47

20  Q.  And then what about when we added to that the moderators            02:47

21  offshore, do you know?                                                  02:47

22  A.  They were a lot less than 40 K.  They were probably 12 K a          02:47

23  year, I think was the number, by --                                    02:47

24  Q.  Per?                                                                02:47

25  A.  -- person.                                                          02:47

1    Q.  Okay.  Do you know how much you guys were paying?                02:47

2    A.  I don't remember how many from the El Camino team.  I don't      02:47

3    know how many members were on it.                                    02:47

4    Q.  So, but did the -- after 2010, did the number of moderators      02:47

5    ever go down?                                                        02:47

6    A.  No.                                                              02:47

7    Q.  Did the moderation budget ever go down after 2010?              02:47

8    A.  Not that I'm aware of, no.                                       02:47

9    Q.  In fact, it consistently increased, as far as you're aware?     02:47

10   A.  Yes.                                                             02:48

11   Q.  By 2017, what would you estimate was the moderation budget      02:48

12   at Backpage?                                                         02:48

13   A.  If I use marketing as a template, I'd say you could easily      02:48

14   put that number up around 100 of the -- at that time, we had        02:48

15   changed to the Filipino group known as Avion -- so call it 100      02:48

16   times 12,000, and then I would say at least, what, 50 people        02:48

17   in -- in -- that worked directly for Backpage involved with         02:48

18   moderation, maybe less than that, but certainly not less than       02:48

19   the million dollars we mentioned a minute ago.                       02:48

20   Q.  Okay.  Let's back up.                                           02:48

21        For the -- for the Philippine offshore moderators in          02:48

22   2017, kind of the last full year, we have 100 -- 100 moderators     02:48

23   times 12,000 U.S., right?                                           02:49

24   A.  Yeah.  It's a guesstimate, but that's what I'd --              02:49

25   Q.  Okay.  I'm counting how many zeros that is.  That's five.      02:49

DANIEL HYER - CROSS-EXAMINATION BY MS. BERTRAND                101

1              So just on the Philippine moderators, $1.2 million.    02:49

2   Fair?                                                             02:49

3   A.  That seems accurate.                                         02:49

4   Q.  And then what did you say for the U.S. based?                02:49

5   A.  It's tough to come up with that number, because while this   02:49

6   was a long ways before the pandemic, to give 24-hour            02:49

7   moderation, seven days a week, some staff worked from home,     02:49

8   some staff worked remotely.  So I think the number we used a    02:49

9   minute ago was 25 employees, so I'd think that's a reasonable,  02:49

10  conservative estimate.  And, with cost of living, they were     02:49

11  probably closer to, I don't know, 50 K instead of 40 K at that  02:50

12  time.                                                            02:50

13  Q.  So 25 people here in the United States times 50,000, that's 02:50

14  the U.S. based moderation crew?                                 02:50

15  A.  Guesstimate.                                                 02:50

16  Q.  Okay.  I have 25 times 50,000, 2.5 million.  Sound about    02:50

17  right?                                                           02:50

18  A.  Could be.                                                    02:50

19  Q.  So by 2017, per year, Backpage was spending $3.7 million a  02:50

20  year on moderation, correct?                                    02:50

21              MR. STONE:  Your Honor, I just -- I hate to do it, but 02:51

22  I want to object to the math.  I think Ms. Bertrand did the     02:51

23  math a little incorrect there.  I have it at 1.25 million.      02:51

24              THE COURT:  Well, as well, I heard the witness answer, 02:51

25  could be.                                                        02:51

1              So rephrase your question.                              02:51

2              MS. BERTRAND:  Okay.                                    02:51

3              THE COURT:  Recalculate it.  I didn't realize we would  02:51

4    be taxed this afternoon with number crunching, but go ahead and  02:51

5    you can rephrase or perhaps ask a clarifying question.           02:51

6              MS. BERTRAND:  I have a math background so...           02:51

7              THE COURT:  Well, you are very fortunate in that.  Let  02:51

8    the rest of us catch up.                                         02:51

9              MS. BERTRAND:  Let's go slow.  Okay.                    02:51

10   BY MS. BERTRAND:                                                  02:51

11   Q.  1.2 million to the Philippines, right?                       02:51

12   A.  Yes, approximately.                                          02:51

13   Q.  Then in the United States I have an additional 2.5 million,  02:51

14   that's 25 times 50,000?                                          02:51

15   A.  Yeah.                                                        02:51

16   Q.  Okay.  1.2 --                                                02:51

17             MR. STONE:  And, Your Honor, for the record, 25 times   02:52

18   50,000 is 1.25 million, just to be accurate.                     02:52

19             MS. BERTRAND:  Oh, that's where the error is.  Thank    02:52

20   you.  Okay.                                                      02:52

21             MR. STONE:  I have a calculator.                        02:52

22             MS. BERTRAND:  Thank you.  Okay.  So that's where the   02:52

23   error was.                                                       02:52

24             Thank you very much, Mr. Stone.                        02:52

25   BY MS. BERTRAND:                                                  02:52

1   Q.  So we've got 1.2 in the Philippines and 1.25 in the states.          02:52

2   That gets us to 2.45, best estimate in 2017, right?                       02:52

3   A.  That's a good estimate.                                               02:52

4   Q.  Okay.                                                                 02:52

5        MS. BERTRAND:  Thank you, Mr. Stone, for the assist.                 02:52

6   BY MS. BERTRAND:

7   Q.  And that doesn't include training for the moderators,                 02:52

8   correct?                                                                  02:52

9   A.  Yeah, that's a management concept that there are a lot of             02:52

10  man hours that you put in, and the managers that report to you           02:53

11  put in to help manage staff.  And that's a number that, as a             02:53

12  manager, you can see that you're just never going to try to              02:53

13  calculate it, because there is no way to -- I mean, how do you           02:53

14  calculate every waking moment that you're ready to train                 02:53

15  somebody if you need to?                                                 02:53

16  Q.  That's a big investment.  Fair?                                      02:53

17  A.  Yes.                                                                 02:53

18        MS. BERTRAND:  Ms. Ellig, would you please put up                   02:53

19  Exhibit 40.  I believe this has been admitted into evidence.            02:53

20  And I'd ask that it be published.                                        02:53

21  BY MS. BERTRAND:

22  Q.  It seems like, please correct me if I'm wrong, the                    02:54

23  moderators did not have a lot of discretion in their work.  Is           02:54

24  that fair?                                                               02:54

25  A.  I mean, it wasn't -- we -- we try tried to make it black             02:54

1    and white, the rules just kept changing.  So did they have          02:54

2    creative input on, oh, I think I'll let this one go through and     02:54

3    I won't let this one go through, no.  There was a line, but the     02:54

4    line was always moving.                                             02:54

5    Q.  It was a moving target for the moderators?                      02:54

6    A.  Yes.                                                            02:54

7    Q.  And I want to now change topics a little bit to talking         02:54

8    about the super posters.  Going back to that for a minute.         02:54

9           So, if I understand the super poster arrangement,           02:55

10   they -- because was it just surely volume, or could they           02:55

11   actually just pay to be a super poster?                            02:55

12   A.  It was volume.                                                  02:55

13   Q.  So if somebody posts a large volume of ads, at some point       02:55

14   they get special treatment, correct?                               02:55

15   A.  No.                                                             02:55

16   Q.  Not from moderators, right?                                     02:55

17   A.  No.                                                             02:55

18   Q.  But they had access to Mr. Ferrer?                             02:55

19   A.  No.  The super poster listed in Number 11, those               02:55

20   relationships happened on the adolescence part of our website.     02:55

21   Q.  Well, let's use the word adolescence very carefully here.      02:55

22   A.  I mentioned it before.  I don't mean any offense.              02:55

23   Q.  No, no, no.  I mean, adolescence, you mean just the age of      02:56

24   the website itself, not a section on the website?                  02:56

25   A.  That's correct.                                                02:56

DANIEL HYER - CROSS-EXAMINATION BY MS. BERTRAND

1    Q.  Okay.  So when Backpage was developing?                          02:56

2    A.  Yes.                                                            02:56

3    Q.  Okay.  Is it fair to say that a super poster, if their ad       02:56

4    was blocked by a moderator, could contact Mr. Ferrer and he        02:56

5    could put the ad back up?                                          02:56

6    A.  Depending upon the super poster.                               02:56

7    Q.  Depending on the relationship?                                 02:56

8    A.  No, depending upon the super poster.                           02:56

9    Q.  What do you mean by that difference?                           02:56

10   A.  There were people who spent millions of dollars that were      02:56

11   super posters that we had virtually no -- or had no                02:56

12   communication with.                                                02:56

13        When we were building the site up, developing the site        02:56

14   up, growing the site, we relied on super posters, such as          02:56

15   Somad, Bill, and New York Platinum who had -- they would call      02:57

16   us.  We would answer their questions, deal with their problems.    02:57

17   Once September of 2010 happened, it's not that they were           02:57

18   irrelevant, but we didn't need to provide them this white glove    02:57

19   customer service or support.                                       02:57

20   Q.  Okay.  Thank you for that clarification.                       02:57

21        So, in a way, September 2010 leveled the playing field        02:57

22   a little bit?                                                      02:57

23   A.  Yes.                                                           02:57

24   Q.  Now, when you said they'd call us up, if a poster called       02:57

25   and had a complaint about their ad being taken down, or their      02:57

1    photo being taken out, did they talk to someone in moderation        02:57

2    or did they talk to somebody in marketing?                           02:57

3    A.  It would have been somebody in marketing.                        02:57

4    Q.  And someone in marketing could access the system and put         02:57

5    the ad back up?                                                      02:58

6    A.  They could.                                                      02:58

7    Q.  And, in fact, I think we saw one example of where someone        02:58

8    kept posting, and someone kept taking it down, and back and         02:58

9    forth, correct?                                                      02:58

10   A.  Yes.                                                             02:58

11   Q.  In your opinion, based on your experience at Backpage, did       02:58

12   a tension develop between the moderation staff work and the         02:58

13   marketing staff's work?                                             02:58

14          MR. STONE:  Objection.  Relevance.                           02:58

15          THE WITNESS:  Overruled.                                     02:58

16   BY MS. BERTRAND:                                                     02:58

17   Q.  Go ahead.                                                        02:58

18   A.  I don't know that there were -- there was a tension between     02:58

19   specific staff members of moderation and their job task and        02:58

20   specific staff members of marketing.  I don't know that there      02:58

21   was acrimony, animosity, disdain for each other.  They were        02:59

22   certainly separate departments, much reflecting on the             02:59

23   difference between editorial and advertising from the print        02:59

24   days, those were separate departments.  Didn't mean we didn't      02:59

25   like, love, enjoy spending time with each other, but the job       02:59

1    functions were different.                                          02:59

2    Q.  And sometimes the moderators' decisions made your customers    02:59

3    angry, correct?                                                    02:59

4    A.  Yes.                                                           02:59

5    Q.  And who then dealt with the angry customers, marketing or      02:59

6    moderation?                                                        02:59

7    A.  Marketing.                                                     02:59

8    Q.  I thought I heard you say, when talking with Mr. Stone --      02:59

9    and I welcome you to correct me if I misunderstood you -- that     02:59

10   the higher up you moved in the company, the more bosses it felt    03:00

11   you had.                                                           03:00

12        Do you remember that?                                         03:00

13   A.  I remember that, yes.                                          03:00

14   Q.  Can you say a little bit more about that?                      03:00

15   A.  I think this is a -- while I'm a liberal arts major, I         03:00

16   think that's a business concept.  When you are an entry level      03:00

17   employee, like an account executive, you aren't talking to your    03:00

18   boss's boss's boss.                                                03:00

19        When you grow, you become a manager, well, then you're       03:00

20   talking to your boss, and perhaps you're talking to your boss's    03:00

21   boss.                                                              03:00

22        And then when you get to your boss's position, you're        03:00

23   talking to your boss, and your boss's boss, and sometimes your     03:00

24   boss's boss's boss.                                                03:00

25   Q.  Correct.  Sometimes you're talking to the C-Suite, right?      03:00

| | | |
|---|---|---|
| 1 | A.  Yes. | 03:00 |
| 2 | Q.  So is it fair to say that at Backpage -- because you | 03:00 |
| 3 | started at a pretty, not, I'd say, entry level, but a pretty | 03:00 |
| 4 | lower level at Backpage, right? | 03:00 |
| 5 | A.  Yes. | 03:01 |
| 6 | Q.  Did you feel like the lower down the level -- or the lower | 03:01 |
| 7 | on the ladder an employee was at Backpage, the less control | 03:01 |
| 8 | over their job they had? | 03:01 |
| 9 | MR. STONE:  Objection.  Vague. | 03:01 |
| 10 | THE COURT:  Sustained. | 03:01 |
| 11 | BY MS. BERTRAND: | 03:01 |
| 12 | Q.  Did you have more control over your job as you climbed the | 03:01 |
| 13 | ladder? | 03:01 |
| 14 | A.  No. | 03:01 |
| 15 | Q.  Did you have more input on policy making at Backpage as you | 03:01 |
| 16 | climbed the ladder? | 03:01 |
| 17 | A.  Managers would let you think that, but any good manager | 03:01 |
| 18 | knows how to employ employees who feel like they're being able | 03:01 |
| 19 | to collaborate, but are they influencing?  To a certain extent. | 03:01 |
| 20 | Q.  Do you know whether or not the moderators, the floor | 03:02 |
| 21 | moderators, we'll put the people offshore for -- to the side | 03:02 |
| 22 | for a moment, just the floor moderators here in the U.S., do | 03:02 |
| 23 | you know whether or not the moderators knew about the affiliate | 03:02 |
| 24 | arrangements you and Mr. Ferrer had? | 03:02 |
| 25 | A.  No. | 03:02 |

1    Q.  No, I don't know if they knew; or, no, they didn't know?          03:02

2    A.  Do I know if they knew about the affiliate arrangement            03:02

3    Mr. Ferrer and I had, and the answer to that question is no.          03:02

4    Q.  You never told a moderator about these affiliate                  03:02

5    arrangements, correct?                                                03:02

6    A.  No.                                                               03:02

7    Q.  The moderation team that we're discussing that Backpage had       03:02

8    a significant investment in was assigned to specific parts of         03:03

9    Backpage, correct?                                                    03:03

10   A.  Yes.                                                              03:03

11   Q.  They weren't assigned to automotive, right?                       03:03

12   A.  I don't know the answer to that.                                  03:03

13   Q.  You don't know?                                                   03:03

14   A.  I'm not sure.                                                     03:03

15   Q.  Do you know whether or not they were primarily assigned to        03:03

16   adult -- the adult section?                                           03:03

17   A.  Primarily they were assigned to adult.                           03:03

18   Q.  It would be surprising to find out a moderator was assigned       03:03

19   to lost and found pets, right?                                        03:03

20   A.  Pets was a category rife with credit card fraud and               03:03

21   scamming people to try to buy imaginary puppies, so I know we         03:03

22   put some resources in pets.                                           03:03

23   Q.  Well, that's a fraud moderation, though, right?  That's a         03:03

24   slightly different moderation from the content moderation we're       03:03

25   talking about on an adult, right?                                     03:03

1   A.  It's moderation.                                              03:03

2   Q.  Okay.  You see those two things as comparable?               03:03

3   A.  Yeah.                                                         03:04

4   Q.  In your opinion, based on your experience at Backpage, was    03:04

5   being a moderator at Backpage an easy job?                       03:04

6          MR. STONE:  Objection.  Vague.                            03:04

7          THE COURT:  Sustained.                                    03:04

8   BY MS. BERTRAND:                                                 03:04

9   Q.  In your opinion, was it a demanding job to be a moderator     03:04

10  at Backpage?                                                     03:04

11  A.  Yes.                                                          03:04

12  Q.  It required a great deal of attention, correct, to do it      03:04

13  right?                                                            03:04

14  A.  Yes.                                                          03:04

15  Q.  Attention to detail, right?                                   03:04

16  A.  Yes.                                                          03:04

17  Q.  And you had to look at a lot of material day in and day       03:04

18  out, correct?                                                     03:05

19  A.  Yes.                                                          03:05

20  Q.  Did you ever hear moderators complain about the difficulty    03:05

21  of this work?                                                     03:05

22          MR. STONE:  Objection.  Relevance.  And hearsay.         03:05

23          THE COURT:  Sustained.                                   03:05

24          MS. BERTRAND:  May I ask on what grounds so I can        03:05

25  correct my question, Your Honor.                                 03:05

1          THE COURT:  Hearsay.                                    03:05

2    BY MS. BERTRAND:                                              03:05

3    Q.  Did you ever work as a moderator?                         03:05

4    A.  No.                                                       03:05

5    Q.  Never had to pitch in?                                    03:05

6    A.  I go back to the management comment I made.  I never sat  03:05

7    down and said, okay, this day I'm going to moderate, but if I 03:05

8    saw something that was violating our posting terms, I took    03:05

9    action on it, yes.                                            03:05

10         MS. BERTRAND:  Thank you.  I have nothing further.       03:05

11         Thank you, Your Honor.                                  03:05

12         THE COURT:  Mr. Lincenberg.                             03:05

13         MR. LINCENBERG:  No.  Thank you.                        03:05

14         THE COURT:  I guess I'm left with Mr. Cambria.          03:06

15         MR. CAMBRIA:  Yes.                                      03:06

16                   CROSS-EXAMINATION                             03:06

17   BY MR. CAMBRIA:                                               03:06

18   Q.  Afternoon, Mr. Hyer.  I'm Paul Cambria and I represent    03:06

19   Mr. Lacey.                                                    03:06

20   A.  Good afternoon.                                           03:06

21   Q.  You were asked by Mr. Feder about some interviews that you 03:06

22   did with the folks from the prosecution, correct?  He referred 03:06

23   to them as MOIs, remember that?                               03:06

24   A.  Yes.                                                      03:06

25   Q.  Memorandum of interviews, is that what you understood that 03:06

1   to mean?                                                        03:06

2   A.  I forget the I, but yes.                                    03:06

3   Q.  Okay.  In any event, you had a chance, did you not, to      03:06

4   review those for accuracy?                                      03:06

5   A.  Yes.                                                        03:06

6   Q.  And if you found something that you felt was inaccurate,    03:06

7   you called it to their attention?                              03:07

8   A.  Yes.                                                        03:07

9   Q.  All right.  Do you recall, sir, that -- telling the people  03:07

10  who interviewed you, that the first time that you met           03:07

11  Mr. Lacey, or encountered him, was when we first came here to   03:07

12  the courtroom?                                                  03:07

13  A.  Yes.                                                        03:07

14  Q.  And the -- and I guess you also said that you had no other  03:07

15  contact with him, ran into him or anything like that, true?     03:07

16  A.  True.                                                       03:07

17  Q.  And you said that you were a full-time employee at Backpage 03:07

18  for 12 years?                                                   03:07

19  A.  Yeah, I mean, I considered I worked for the company since   03:07

20  1998.                                                           03:07

21  Q.  Okay.  Very good.  Thank you.                               03:08

22          THE COURT:  All right.  Mr. Stone.                      03:08

23          MR. STONE:  No redirect, Your Honor.                    03:08

24          THE COURT:  All right.  May the witness be released     03:08

25  from subpoena?                                                  03:08

```
 1              MR. STONE:  Yes, Your Honor.                         03:08

 2              THE COURT:  Any objection from the defense?          03:08

 3              (No response.)                                       03:08

 4              THE COURT:  Hearing none.                            03:08

 5              Sir, you are released from your subpoena.  You may   03:08

 6    step down.  Watch your step.  And thank you for your testimony. 03:08

 7              Call your next witness.                              03:08

 8              MS. PERLMETER:  The United States calls Megan        03:08

 9    Lundstrom.                                                     03:08

10              THE COURT:  Ma'am, please come forward and let my    03:09

11    courtroom deputy swear you in.                                 03:09

12                         MEGAN LUNDSTROM,

13    called as a witness herein, having been first duly sworn, was

14    examined and testified as follows:                            03:09

15              THE COURT:  Whenever you are ready, Ms. Perlmeter.   03:09

16              MS. PERLMETER:  Thank you.                           03:09

17                     DIRECT EXAMINATION                            03:09

18    BY MS. PERLMETER:                                              03:09

19    Q.  Good afternoon, ma'am.                                     03:09

20    A.  Hello.                                                     03:09

21    Q.  Please introduce yourself to the jury, tell them your name, 03:09

22    then spell your first and your last, please.                  03:10

23    A.  My name is Megan Lundstrom, M-E-G-A-N, L-U-N-D-S-T-R-O-M.  03:10

24    Q.  Ms. Lundstrom, where do you live?                         03:10

25    A.  Washington, D.C.                                          03:10
```

1    Q.  How long have you lived there?                                  03:10

2    A.  I'm coming up on four months.                                   03:10

3    Q.  Before you moved to D.C., where did you live?                   03:10

4    A.  Colorado.                                                       03:10

5    Q.  How long did you live in Colorado?                             03:10

6    A.  I was born and raised there.                                    03:10

7    Q.  Okay.  I want to talk about your educational background.        03:10

8        Did you go to college?                                          03:10

9    A.  Yes, I did.                                                     03:10

10   Q.  What did you study and when did you graduate?                   03:10

11   A.  I studied finance for my undergraduate and I graduated in       03:10

12   2016.  And then I went on and pursued my master's degree in         03:10

13   applied sociology and graduated in 2020.                            03:10

14   Q.  And are you working currently?                                  03:10

15   A.  Yes.                                                            03:10

16   Q.  Where do you work?                                              03:10

17   A.  Polaris.                                                        03:10

18   Q.  And what is Polaris?                                            03:10

19   A.  It is an anti-trafficking organization.                        03:10

20   Q.  And what do you do for them specifically?                       03:10

21   A.  My title is the director of the resilience fund, which is a     03:11

22   direct cash assistance program for survivors of human              03:11

23   trafficking.                                                        03:11

24   Q.  And what did you do --                                          03:11

25       THE COURT:  Ms. Perlmeter, again, I'm going to ask you          03:11

UNITED STATES DISTRICT COURT

| | |
|---|---|
| 1 | just to slow your cadence down.  Thank you. | 03:11 |
| 2 |     MS. PERLMETER:  Yes. | 03:11 |
| 3 | BY MS. PERLMETER: | 03:11 |
| 4 | Q.  What did you do before you joined Polaris? | 03:11 |
| 5 | A.  I founded and ran a nonprofit organization that provided | 03:11 |
| 6 | direct services to survivors of commercial sexual exploitation | 03:11 |
| 7 | and sex trafficking. | 03:11 |
| 8 | Q.  And what was that nonprofit called? | 03:11 |
| 9 | A.  Originally, Free Our Girls, and then rebranded in 2020 as | 03:11 |
| 10 | The Avery Center. | 03:11 |
| 11 | Q.  And how long were you involved with the Free Our Girls, now | 03:11 |
| 12 | known as The Avery Center? | 03:11 |
| 13 | A.  Eight years. | 03:11 |
| 14 | Q.  Do you have any children? | 03:11 |
| 15 | A.  Yes. | 03:11 |
| 16 | Q.  How many? | 03:11 |
| 17 | A.  Three. | 03:11 |
| 18 | Q.  And how old are you? | 03:11 |
| 19 | A.  38. | 03:11 |
| 20 | Q.  Now, Ms. Lundstrom, was there -- are you familiar with the | 03:11 |
| 21 | website Backpage.com? | 03:11 |
| 22 | A.  Yes. | 03:12 |
| 23 | Q.  And how are you familiar with it? | 03:12 |
| 24 | A.  I sold sex on Backpage. | 03:12 |
| 25 | Q.  Were you advertised on Backpage for a number of years? | 03:12 |

1    A.  Yes.                                                           03:12

2    Q.  Can you tell us what year or what range of years?             03:12

3    A.  2008 to 2012.                                                 03:12

4    Q.  Okay.  Do you remember what section of Backpage you           03:12

5    advertised in?                                                    03:12

6    A.  I forget the exact name, but the adult services section       03:12

7    under the women who sold sex.                                     03:12

8    Q.  Let's talk about your advertisements.                         03:12

9         How were they created?  Did you create them yourself         03:12

10   or did you have assistance originally in the beginning?           03:12

11   A.  I was taught by my first pimp how to post the ads.            03:12

12   Q.  And then how did you create the ads?                          03:12

13   A.  Say that again.                                               03:12

14   Q.  With his assistance, or his instruction, what did your ads    03:12

15   look like in the beginning?                                       03:12

16   A.  So originally my ads were pretty informal, so a few           03:12

17   sentences that kind of described that I was available for         03:12

18   sexual services, combined with rates for different sexual         03:12

19   services, then increments of time, and then sexually explicit     03:13

20   photos?                                                           03:13

21   Q.  So between 2008 and 2013, how many cities -- or let's do it   03:13

22   this way.  How many states did you post advertisements on         03:13

23   Backpage.com in?                                                  03:13

24   A.  Twenty-three states.                                          03:13

25   Q.  Did you have a name that you used for your Backpage ads?      03:13

1   A.   I had a couple names.  The first name that I went by was            03:13

2   Marley, the second name that I went by was Adrielle Cordeaux,            03:13

3   and then my third name was Avery Day.                                    03:13

4   Q.   And when you were beginning to post, were you in the                03:13

5   Colorado area?                                                           03:13

6   A.   Yes.                                                                03:13

7   Q.   And, in the beginning, were your -- were the words that you         03:13

8   used in your advertisement different in the beginning and then          03:13

9   later on through the years?                                             03:13

10  A.   Yes, they changed over time.                                        03:13

11  Q.   Can you explain how you changed your advertisements over            03:14

12  the time -- over the years?                                              03:14

13  A.   Yeah.  So initially, like I said, it was less formal, a             03:14

14  little more graphic.  Over time I changed my wording and the            03:14

15  information that was available to attract a higher end                   03:14

16  clientele and to evade, like getting those ads flagged,                  03:14

17  essentially.                                                             03:14

18  Q.   Okay.  And what do you mean trying to attract -- changing           03:14

19  your ad to attract a different type of clientele?                        03:14

20  A.   Yeah.  So most of my clients were middle class, college            03:14

21  educated, gainfully employed, and often married men who were            03:14

22  very risk averse and wanted a lot of discretion.  And so I              03:14

23  wrote my ads and used photographs that appealed to that                  03:14

24  demographic.                                                             03:14

25  Q.   So, at this point, what did your photographs look like?            03:14

UNITED STATES DISTRICT COURT

1    A.  At that point, several of my regular customers were                  03:14

2    professional photographers, and so I traded sessions for                 03:15

3    photographs.                                                             03:15

4    Q.  Are you familiar with Backpage ads in the adult and female          03:15

5    section over the years?                                                  03:15

6    A.  Yes.                                                                 03:15

7    Q.  Are you familiar with the different types of words that are          03:15

8    used -- are you familiar with prostitution coded words?                  03:15

9    A.  Yes.                                                                 03:15

10   Q.  And can you give us some examples?                                   03:15

11   A.  So, generally, there is like the acronyms, so PSE would be           03:15

12   porn star experience, FS is full service, BBBJ is a bareback             03:15

13   blow job.  Though those are common acronyms.  But then there is          03:15

14   other language like new in town, let's play, or let's party, as          03:15

15   well.                                                                    03:15

16   Q.  Did you use these types of words in your ads in the                  03:15

17   beginning?                                                               03:15

18   A.  I used a lot of the acronyms in the beginning.                       03:15

19   Q.  And, as time moved on, as you developed your higher                  03:15

20   clientele, did you continue to use these words?                          03:15

21   A.  I didn't need to use them in my ads anymore.                         03:16

22   Q.  So, as time moved on, what sorts of words did you use in             03:16

23   your ad to convey that it was a prostitution ad?                         03:16

24   A.  So things like, let's get together; let's spend time                 03:16

25   together; let's have fun; let's play.  Those types of                    03:16

1   statements.                                                                    03:16

2   Q.  So when you posted advertisements with those fairly --                     03:16

3   slightly tamer words, did you still receive calls from men                     03:16

4   looking to have sex?                                                           03:16

5   A.  Yes.                                                                       03:16

6   Q.  Are you familiar with The Erotic Review?                                   03:16

7   A.  Yes.                                                                       03:16

8   Q.  What is that?                                                              03:16

9   A.  It's both a discussion forum and a review board for                        03:16

10  commercial sex.                                                               03:16

11  Q.  Did you have a profile on The Erotic Review?                               03:16

12  A.  Yes, I did.                                                                03:16

13  Q.  Did you include links from The Erotic Review on your                       03:16

14  Backpage ads?                                                                 03:16

15  A.  Yes, I did.                                                                03:16

16  Q.  Let me talk -- ask you some questions about how you paid                   03:16

17  for the ads.                                                                  03:17

18         Can you explain to the jury how you paid for the ads                    03:17

19  in the beginning, and if that changed over time?                              03:17

20  A.  Yeah.  So originally my pimp would take my money and then I                03:17

21  would be given a certain amount of that to go deposit in my                    03:17

22  bank account, and I would pay for my ads with my debt card and                 03:17

23  my personal bank account.                                                     03:17

24         And then over time, as I felt there was more risk at                    03:17

25  being detected, I started using prepaid gift cards that, again,               03:17

UNITED STATES DISTRICT COURT

1  my pimp would give me cash, and I would go to the store and        03:17
2  purchase those gift cards, and then pay for my ads with that.      03:17
3  Q.  Now, did your ads also include a phone number for sex          03:17
4  buyers to contact you?                                             03:17
5  A.  Yes.                                                           03:17
6  Q.  And what kind of phone did you use in the beginning, and if    03:17
7  -- what kind of phone did you use over time, if it changed?        03:17
8        MS. BERTRAND:  Objection.  Relevance.  Does not              03:17
9  pertain to any of the counts in the indictment.                   03:18
10        THE COURT:  Overruled.                                      03:18
11        THE WITNESS:  So initially, similar to my debit card,       03:18
12  I used a phone that was on my personal phone line.  And then,     03:18
13  again, over time, as I felt like it was becoming riskier, and I   03:18
14  didn't want the prostitution to be connected to me, I started    03:18
15  purchasing burner phones, or prepaid phones that you could just  03:18
16  buy at a grocery store, load minutes on it, and use the -- I      03:18
17  used that.                                                        03:18
18  BY MS. PERLMETER:                                                 03:18
19  Q.  Okay.  And then eventually did you stop working for your      03:18
20  pimp?                                                             03:18
21  A.  My first pimp, yes.                                           03:18
22  Q.  Okay.  You call him the -- so at some point did you stop      03:18
23  working for your first pimp?                                      03:18
24  A.  Yes.                                                          03:18
25  Q.  Later on did you start working for a second pimp?             03:18

1    A.  Yes.                                                          03:18

2    Q.  And is that when you moved from Colorado to the -- to Las    03:18

3    Vegas?                                                            03:19

4    A.  Yes.                                                          03:19

5    Q.  So for questions is it okay if I refer to the second pimp    03:19

6    as the Las Vegas pimp?                                           03:19

7    A.  Yes.                                                          03:19

8    Q.  Okay.  So when you moved to Las Vegas and began working for  03:19

9    the Las Vegas pimp, did you continue to post on Backpage and     03:19

10   continue having sex with men for money?                          03:19

11   A.  Yes.                                                          03:19

12   Q.  And how did it work now at this point?  Were you staying in  03:19

13   the Las Vegas area or traveling?                                 03:19

14   A.  Both.  So my pimp in Las Vegas would have us alternate       03:19

15   between working the casinos in Las Vegas and then traveling to   03:19

16   other cities and states.  And so, when we traveled, we posted    03:19

17   on Backpage.                                                      03:19

18   Q.  Okay.  So how did you decide what other cities or states to  03:19

19   travel to?                                                        03:19

20   A.  Some of it had been built up, again, from previous travel    03:19

21   where we knew that there were customers, there was demand for    03:19

22   commercial sex.  But also you could post an ad on Backpage like  03:19

23   a week in advance and see how many calls you got, and if that    03:19

24   area -- if you got a lot of phone calls from that area, then     03:19

25   you knew that you could start scheduling appointments and go     03:20

1    out there and work.                                                    03:20

2    Q.  Did you and other girls that Las Vegas pimp was associated         03:20

3    with travel to North Dakota?                                           03:20

4    A.  Yes.                                                               03:20

5    Q.  Was there a market on Backpage in North Dakota?                    03:20

6    A.  A huge one, yes.                                                   03:20

7    Q.  Okay.  So explain what happened in North Dakota, how you           03:20

8    worked sexual activities there for money in that market.              03:20

9    A.  Yeah.  So, in North Dakota, I was sent there by my pimp to         03:20

10   work the oil fields.  And so the ratio of men to women in the         03:20

11   oil fields at that time was around 30 to 1.  And so the very          03:20

12   first night that we were there, we all posted ads, and                03:20

13   immediately the phone started ringing.  And we were making, on        03:20

14   average, about $30,000 a week, and bringing that back to Las          03:20

15   Vegas to our pimp.                                                    03:20

16   Q.  So when you would come back -- back to Las Vegas, did you         03:20

17   -- what did you do with the $30,000?                                  03:21

18   A.  We were expected to hand it over immediately when we got          03:21

19   off the plane.                                                        03:21

20   Q.  Did Las Vegas pimp or first pimp have legitimate sources of       03:21

21   employment, as you were able to observe?                             03:21

22   A.  No.                                                               03:21

23   Q.  At some point did you stop working for Las Vegas pimp?            03:21

24   A.  Yes.                                                              03:21

25   Q.  Okay.  After you stopped working for Las Vegas pimp, did          03:21

1   you return back to Colorado?                                    03:21

2   A.  Yes.                                                        03:21

3   Q.  And when you returned back to Colorado, did you continue to 03:21

4   post ads on Backpage?                                           03:21

5   A.  Yes.                                                        03:21

6   Q.  At some point, did you develop like a working circuit using 03:21

7   Backpage?                                                       03:21

8   A.  Yes.                                                        03:21

9   Q.  Can you explain that to the jury.                           03:21

10  A.  Yeah.  So on Backpage if you would go to a certain state,   03:21

11  each state was typically broken down into smaller regions.  So  03:21

12  as an example, in Colorado you would have like the Western      03:21

13  Slope, Fort Collins, Denver, Colorado Springs, so different     03:22

14  regions like that.                                              03:22

15       And so when you would post in one region and be            03:22

16  advertising and selling sex in that region, you would get       03:22

17  messages from other regions of buyers asking if you could       03:22

18  please come to their region as well.  And so over time you      03:22

19  could develop a work circuit where you would have regulars in   03:22

20  these cities and you could pass through each of these regions.  03:22

21  And so I still advertised, but I also had a regular clientele   03:22

22  base at that point.                                             03:22

23  Q.  So I want to talk about -- now I want to move on to the     03:22

24  last -- one of the last Backpage ads that you posted.           03:22

25       So do you recall posting an ad in November of 2012 in      03:22

1    the Rockies section?                                          03:22

2    A.  Yes.                                                      03:22

3    Q.  And is Rockies Colorado?                                  03:22

4    A.  Yes.                                                      03:22

5    Q.  Okay.  And did you make -- did you have an appointment with  03:22

6    a sex buyer?                                                  03:22

7    A.  Yes.                                                      03:23

8    Q.  And what happened?                                        03:23

9    A.  It was not a sex buyer, it was an undercover officer.     03:23

10   Q.  Okay.  And was that the last time after that event that you  03:23

11   engaged in prostitution with men?                            03:23

12   A.  Yes.                                                      03:23

13        MS. PERLMETER:  Okay.  So I'm going to pull up 2036a,    03:23

14   which is not in evidence, so just for the witness's eyes only,  03:23

15   please.                                                       03:23

16   BY MS. PERLMETER:

17   Q.  Ms. Lundstrom, do you see the exhibit?                    03:23

18   A.  Yes.                                                      03:23

19   Q.  Do you recognize it?                                      03:23

20   A.  Yes.                                                      03:23

21   Q.  What is it?                                               03:23

22   A.  That was the last prostitution ad that I ever posted for  03:23

23   myself.                                                       03:23

24        MS. PERLMETER:  The United States moves Exhibit 2036a    03:23

25   into evidence.                                                03:23

| | | |
|---|---|---|
| 1 | MS. BERTRAND:  Objection.  Relevance.  Doesn't pertain | 03:23 |
| 2 | to any of the counts of the indictment. | 03:23 |
| 3 | THE COURT:  Overruled. | 03:23 |
| 4 | MR. FEDER:  It also has handwriting on it. | 03:23 |
| 5 | THE COURT:  I'm sorry, what did you say, Mr. Feder, it | 03:24 |
| 6 | also has what? | 03:24 |
| 7 | MR. FEDER:  Handwriting, the one I'm looking at. | 03:24 |
| 8 | THE COURT:  Well, lay some foundation for the exhibit. | 03:24 |
| 9 | BY MS. PERLMETER: | 03:24 |
| 10 | Q.  Ms. Lundstrom, is this your Backpage ad? | 03:24 |
| 11 | A.  Yes, it is. | 03:24 |
| 12 | Q.  Did you post this ad? | 03:24 |
| 13 | A.  Yes, I did. | 03:24 |
| 14 | Q.  Is this a Xerox copy of the ad? | 03:24 |
| 15 | A.  Yes. | 03:24 |
| 16 | Q.  Where did you get this copy from? | 03:24 |
| 17 | A.  It was in the evidence packet from my arrest. | 03:24 |
| 18 | Q.  So did you get it from the police station? | 03:24 |
| 19 | A.  Yes, I did. | 03:24 |
| 20 | Q.  Okay. | 03:24 |
| 21 | MS. PERLMETER:  Move to admit. | 03:24 |
| 22 | MR. FEDER:  Same objection.  There is handwriting all | 03:24 |
| 23 | over it. | 03:24 |
| 24 | MS. BERTRAND:  Same objection as to relevance. | 03:24 |
| 25 | THE COURT:  Why don't you discuss what it is that's | 03:24 |

UNITED STATES DISTRICT COURT

1   written on the exhibit, where that comes from, if she knows.      03:24

2   BY MS. PERLMETER:                                                 03:24

3   Q.  Ms. Lundstrom, do you see the handwriting on the bottom       03:24

4   half of the exhibit?                                              03:24

5   A.  Yes.                                                          03:24

6   Q.  Do you know what those writings are about?                    03:24

7   A.  Just from my memory of that evening, that was the officer's   03:24

8   taking notes when they had contacted me and were setting up the  03:24

9   sex transaction at their hotel.                                   03:24

10  Q.  Okay.  So was -- were those -- was that a -- them taking      03:25

11  notes about the conversation you had with them setting up the    03:25

12  date?                                                            03:25

13  A.  Yes.                                                          03:25

14          MR. FEDER:  Objection.  This would all be hearsay and     03:25

15  foundation, since this is allegedly a police record that has      03:25

16  nothing at all on it about being a police record.                03:25

17          THE COURT:  All right.  We'll let that objection          03:25

18  stand.  We'll adjourn for the afternoon.  I'll review the         03:25

19  exhibit a little closer and make my determination when we        03:25

20  reconvene.                                                        03:25

21          Let me just again remind the members of the jury not      03:25

22  to come to any conclusions, not to discuss it amongst             03:25

23  yourselves, with anyone else, your family members, to conduct     03:25

24  any research or anything of the sort.  And we will expect you     03:25

25  here in the courthouse to be able to come in and promptly take    03:25

1   your seats at 9:00 a.m. tomorrow morning.                    03:25

2           And, with that, please all rise for the jury.        03:25

3           (The jury panel left the courtroom, 4:28 p.m.)       03:25

4           THE COURT:  And, ma'am, you may step down.           03:26

5           Ms. Perlmeter, let me have a hard copy of that       03:26

6   exhibit.                                                     03:26

7           And we are adjourned.                                03:26

8           (Proceedings concluded at 4:28 p.m.)                 03:26

9                       *          *          *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3          I, CHRISTINE M. COALY, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12         DATED at Phoenix, Arizona, this 19th day of October,

13   2023.

14

15

16              /s/ Christine M. Coaly

17              Christine M. Coaly, RMR, CRR

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT