UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,  )
                           )
            Plaintiff,     )  NO. 2:18-cr-00422-DJH
v.                         )
                           )  Phoenix, Arizona
Michael Lacey, et al.,     )  October 20, 2023
                           )  9:01 a.m.
            Defendants.    )
_____)

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL DAY 22**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the Plaintiff:
         UNITED STATES ATTORNEY'S OFFICE
 3       By:  Kevin M. Rapp, Esq.
              Andrew C. Stone, Esq.
 4            Peter Shawn Kozinets, Esq.
              Margaret Wu Perlmeter, Esq.
 5       40 North Central Avenue, Suite 1800
         Phoenix, Arizona 85004-4408
 6

 7   For the Defendant Michael Lacey:
         LIPTSUTZ GREEN SCIME CAMBRIA, LLP
 8       By:  Paul J. Cambria, Jr. Esq.
         42 Delaware Avenue, Suite 120
 9       Buffalo, New York  14202

10   For the Defendant Andrew Padilla:
         DAVID EISENBERG, PLC
11       By:  David S. Eisenberg, Esq.
         3550 North Central Avenue, Suite 1155
12       Phoenix, Arizona 85012

13   For the Defendant Scott Spear:
         KESSLER LAW OFFICE
14       By:  Eric Walter Kessler, Esq.
         6720 North Scottsdale Road, Suite 210
15       Scottsdale, Arizona 85253
         - and -
16       FEDER LAW OFFICE, PA
         By:  Bruce S. Feder, Esq.
17       2930 East Camelback Road, Suite 160
         Phoenix, Arizona 85016
18

19   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
20       By:  Gary S. Lincenberg, Esq.
              Gopi K. Panchapakesan, Esq.
21       1875 Century Park E, Suite 2300
         Los Angeles, California 90067
22

23   For the Defendant Joye Vaught:
         JOY BERTRAND, ESQ, LLC
24       By:  Joy Malby Bertrand, Esq.
         P.O. Box 2734
25       Scottsdale, Arizona 85252-2734
```

1                                    *I N D E X*

2

3     **GOVERNMENT WITNESS:**                                    **PAGE**

4     MEGAN LUNDSTROM
      Continued Direct Examination by Ms. Perlmeter...............5
5     Cross-Examination by Mr. Eisenberg.........................9

6     Rule 29 Motion............................................19

7

8

9                                   *EXHIBITS*

10    **EXHIBIT**                                            **RECEIVED**

11    NO.       DESCRIPTION

12    2036a    Attachment: Backpage Ad dated 11/29/2012           5
                "New In Town … Bubbly Blonde … Lets Play-26"
13              USAO-BP-0034733

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2    (Whereupon the proceedings began at 9:01 a.m.)

 3              THE COURT:  Please be seated.  I believe all of our

 4    jurors are present so we will bring our jurors -- oh, let's

 5    have our witness come forward.

 6              MS. PERLMETER:  And, Your Honor, regarding the

 7    Exhibit 2036a, I did speak with a couple members of the

 8    defense yesterday afternoon about the redactions; and

 9    Mr. Feder informed me if I redacted the handwritten portions

10    of the exhibit out, that he would not have an objection to it.

11              So what I would propose, if the Court is okay with

12    this, is if we keep the same exhibit number and I would just

13    remove the yellow sheet from the current version and place it

14    on the redacted version.  For the record, the redacted version

15    will become the new 2036a.

16              THE COURT:  That's fine.

17              MS. PERLMETER:  Okay, thank you.

18              THE COURT:  All rise.

19              (Jury in at 9:03 a.m.)

20              THE COURT:  Okay, please be seated.

21              Members of the Jury, welcome back.  The record will

22    reflect the presence of the witness and, Ms. Perlmeter, you

23    may continue.

24              MS. PERLMETER:  I'll wait for Mr. Feder to sit

25    down.
```

CONTINUED DIRECT EXAMINATION

BY MS. PERLMETER:

Q.   Good morning, Ms. Lundstrom.

A.   Good morning.

09:04a   Q.   When we left off yesterday afternoon we had 26 -- 2036a

on the screen for your eyes only, and you had explained to us

that it is your Backpage ad?

A.   Yes.

Q.   And it was the very last Backpage ad that you posted for

09:04a   yourself?

A.   Yes.

Q.   Do you see the exhibit?

A.   Yes, I do.

Q.   Now, is the bottom part of the exhibit where the

09:04a   handwritten notes were made by the police officer, has that

been blacked out?

A.   Yes.

Q.   But other than that, is this still the same Backpage ad

you were looking at yesterday?

09:04a   A.   Yes.

         MS. PERLMETER:  Move to admit Exhibit 2036a.

         MR. EISENBERG:  No objection, Your Honor.

         THE COURT:  2036a may be admitted and it may be

published.

09:05a        (Exhibit No. 2036a admitted in to Evidence.)

BY MS. PERLMETER:

Q.   Ms. Lundstrom, can you please tell us where this ad was posted and on what date that it was posted?

A.   So it was posted on Backpage in the adult entertainment section in the Rockies subsection in Colorado.

Q.   Now, what words in your ad suggest prostitution?

A.   So in addition to the subject line, the title, in this part "I'm here for only a couple days," "meeting some new friends," "love having fun," "never play games," and "we can get together" all suggest a commercial sex transaction.

Q.   Are you focusing or directing your attention to the higher end clientele you were telling us about yesterday afternoon?

A.   Yes.

Q.   And was this particular ad -- like were you in Vail, Colorado, at this time?

A.   Yes.

Q.   Now, Ms. Lundstrom, at this point in time in roughly 2012, how much were your clients paying to have sex with you?

A.   Generally in Vail around $500 an hour or more.

Q.   All right, thank you.  Now, I want to fast forward to 2015.  Was there a time where in 2015 you posted ads on the Backpage website?

A.   Yes, I did.

Q.   Okay.  Was that in conjunction with a speaking

1  arrangement -- or a speaking engagement you had with a law

2  enforcement group?

3  A.   Yes, it was.

4  Q.   And in what city and state was this meeting in?

09:07a  5  A.   Greeley, Colorado.

6  Q.   Was part of your presentation to the law enforcement

7  group, was that involving the posting of Backpage ads?

8  A.   Yes.

9  Q.   Could you please explain to the jury --

09:07a  10       MR. EISENBERG:  Objection -- I'm sorry, ma'am.

11       Objection, Your Honor, relevance.

12       THE COURT:  Overruled.

13  BY MS. PERLMETER:

14  Q.   Could you please explain to the jury your posting of

09:07a  15  Backpage ads in 2015?

16  A.   So in 2015 I had just started my organization that at the

17  time was Free Our Girls, and I wanted to demonstrate to local

18  law enforcement that prostitution was happening in our

19  relatively rural community even though you couldn't see it

09:07a  20  like street prostitution, and so I set up a demonstration

21  using Backpage ads.

22  Q.   What did you use in this presentation?  Did you purchase

23  things in advance to demonstrate the posting of Backpage ads?

24  A.   Yes.

09:08a  25       MR. EISENBERG:  Again, Your Honor, I'm sorry,

 1    relevance.  This is an extension of something that's not

 2    contained within the charges.  It has nothing to do with the

 3    case.

 4         MS. PERLMETER:  Your Honor, this goes to Count 1.

**09:08a** 5         MR. EISENBERG:  Demonstrating to the police --

 6         THE COURT:  No, no more speaking about the objection

 7    yet.  Overruled.

 8         MS. PERLMETER:  Please continue.

 9         THE WITNESS:  So what I did was I went to a local

**09:08a** 10   grocery store and I purchased five or six prepaid Visa gift

 11   cards and then five or six disposable cell phones, and I

 12   registered all of those with fake names and addresses; and

 13   then I created one Backpage ad for each region in Colorado,

 14   and I paid for the ad with the prepaid gift card and used one

**09:09a** 15   of those prepaid cell phones for each ad and then I turned --

 16   I submitted all of those so that the ads went live and then

 17   demonstrated to police how quickly phone calls started coming

 18   in for those ads.

 19   BY MS. PERLMETER:

**09:09a** 20   Q.   Did you post the ads officially in front of the group

 21   that you were presenting before?

 22   A.   Yes, they witnessed the process.

 23   Q.   And how quickly after you posted each of the five or six

 24   ads did the burner phones begin to ring?

**09:09a** 25   A.   Less than five minutes.

MEGAN LUNDSTROM - CONT'D DIRECT EXAMINATION BY MS. PERLMETER9

1        MS. PERLMETER:  Your Honor, I have no further

2   questions for the witness.

3        THE COURT:  Who is coming forth to examine --

4        MR. EISENBERG:  I am, Your Honor.

09:09a   5                    CROSS-EXAMINATION

6   BY MR. EISENBERG:

7   Q.   Good morning, Ms. Lundstrom.

8   A.   Good morning.

9   Q.   The ad that's in 2036a --

09:09a  10        MR. EISENBERG:  Could we get that back up on the

11   screen, ma'am.  I can see it over there.

12        Can you take away your computer?

13   BY MR. EISENBERG:

14   Q.   So there's a -- if you look over to the right in the

09:10a  15   column, it looks to me like there are two pictures, right?

16   A.   Yes.

17   Q.   Would you agree with me they're awfully hard to see at

18   this point?

19   A.   Yes.

09:10a  20   Q.   They're very dark and almost non-visible, right?

21   A.   Yes.

22   Q.   Okay.  When you made a picture or posted a picture in an

23   ad of yourself, you determined that you wanted to do tasteful

24   photographs when you put them in Backpage; is that correct?

09:10a  25   A.   Yes.

MEGAN LUNDSTROM - CONT'D DIRECT EXAMINATION BY MS. PERLMETER    10

1    Q.   And that they didn't contain any nudity, right?

2    A.   Yes.

3    Q.   With respect to posting in Backpage, your ads did not

4    come back to you, if you will, either deleted or cancelled or

09:11a    5    anything of that nature; isn't that correct?

6    A.   Correct.

7    Q.   And the reason for that is that you looked like an adult;

8    is that right?

9    A.   I have no idea what the decision process was.

09:11a   10    Q.   Well, as far as you were concerned, the reason why they

11    didn't come back to you, I believe, is that you attributed

12    that to the fact that you were an adult and because there was

13    no nudity in your photos?

14            MS. PERLMETER:  Objection, compound question.

09:11a   15            MR. EISENBERG:  Okay.  One, you attributed --

16            THE COURT:  Sustained.

17    BY MR. EISENBERG:

18    Q.   You attributed the fact that you didn't get anything

19    rejected because there was no nudity in the photos, right?

09:11a   20    A.   I believe so, yes.

21    Q.   And, ma'am, if you look up on your ad right at the top

22    there, it says "Let's play - 26."  Do you see that?

23    A.   Uh-huh, yes.

24    Q.   You were actually -- at that time were you 26 years old?

09:12a   25    A.   No.

```
 1   Q.   You were 24?

 2   A.   No.

 3   Q.   Older?

 4   A.   Older.

09:12a  5   Q.   How old?

 6   A.   I believe I was 28 at the time.

 7   Q.   Okay.  So, obviously, you were an adult?

 8   A.   Yes.

 9   Q.   Okay.  I think in your direct you said that when you

09:12a 10  first started posting on Backpage things were like the Wild

11  West?

12   A.   Yes.

13   Q.   Wild West.  And that is -- basically, what you were

14  saying is anything goes, is that the idea?

09:12a 15   A.   Yes.

16   Q.   And you first started posting in 2008; is that correct?

17   A.   Yes.

18   Q.   At that time when you first started posting, you were

19  able to post hours and rates, correct?

09:13a 20   A.   Yes.

21   Q.   And then there came a time when things changed, right?

22   A.   Yes.

23   Q.   And what the change was, rates were no longer allowed,

24  right?

09:13a 25   A.   Yes.
```

```
 1    Q.   And the way you knew that is how?

 2    A.   Through websites like The Erotic Review.

 3    Q.   You learned that rates being posted in Backpage were not

 4    allowed; is that correct?

09:13a 5    A.   Yes.

 6    Q.   And you also knew that you -- by that time you knew that

 7    you shouldn't post sexually explicit pictures, right?

 8    A.   Yes.

 9    Q.   Or use terms that were descriptive of sex acts, correct?

09:13a 10   A.   Yes.

 11   Q.   And the reason that you knew -- well, your ad would be

 12   flagged and it would be rejected if you posted things like

 13   that; is that correct?

 14   A.   Correct.

09:13a 15   Q.   Okay.  Ma'am, do you know someone named Brad Myles?

 16   A.   Yes, I do.

 17   Q.   Who is he?

 18   A.   He is the former CEO of Polaris.

 19   Q.   And you're currently with Polaris?

09:14a 20   A.   As of January of this year, yes.

 21   Q.   Okay.  Did you know that he testified here yesterday or

 22   the day before?

 23   A.   I was aware that he testified.

 24   Q.   Did you and he talk about your testimony?

09:14a 25   A.   No.
```

1          MR. EISENBERG:  Thank you, Your Honor.

2          THE COURT:  Ms. Perlmeter?

3          MS. PERLMETER:  Does anyone else from the defense --

4          THE COURT:  Oh, I'm sorry, yes.  Thank you for the

09:14a 5   reminder.  Not enough coffee this morning.

6          Mr. Cambria?

7          MR. CAMBRIA:  No, Your Honor.

8          THE COURT:  Ms. Bertrand?

9          MS. BERTRAND:  No, thank you.

09:14a 10  THE COURT:  Mr. Lincenberg?

11         MR. LINCENBERG:  No, Your Honor.

12         THE COURT:  Mr. Kessler?

13         MR. KESSLER:  No, Your Honor.

14         THE COURT:  All right.  Ms. Perlmeter?

09:14a 15  MS. PERLMETER:  Thank you, your Honor.  We have no

16  redirect for the witness.

17         THE COURT:  May the witness be excused from

18  subpoena?

19         MS. PERLMETER:  Yes, please.

09:14a 20  THE COURT:  Any objection from defense?

21         MR. EISENBERG:  No, Your Honor.

22         THE COURT:  All right.  Ma'am, you are excused from

23  subpoena.  Thank you for your testimony.  You may step down

24  and be cautious of the stair right there, and you may leave

09:15a 25  the courtroom.  Thank you.

1           Call your next witness.

2           MS. PERLMETER:  Your Honor, at this time the United

3    States has completed its presentation of this case and we will

4    rest.

09:15a  5           THE COURT:  Okay.  Well, at this moment, Members of

6    the Jury, I'm going to have you go on a short break.  I'm

7    going to discuss some matters with the counsel.  I'll have

8    Liliana retrieve you in a few moments.

9           Simply because the Government has rested its case in

09:15a 10    chief does not mean that you should come to any conclusions.

11    We still have the defendants' case to proceed with, but in

12    that interim period just continue to keep an open mind and

13    don't discuss the matter.  Remember the admonition and I'll

14    have Liliana come and retrieve you in about 10, 15 minutes.

09:15a 15           Please all rise for the jury.

16           (Jury out at 9:15 a.m.)

17           THE COURT:  All right, please be seated.

18           At this point, let me ask whether or not there are

19    any motions that have been contemplated by defense counsel?

09:16a 20           What just happened there, Mr. Kessler?

21           MR. KESSLER:  I'm sorry, I just dropped. . .

22           THE COURT:  Okay, we'll have them retrieve it.

23           MR. PANCHAPAKESAN:  Your Honor, we intend to make a

24    Rule 29 motion.

09:17a 25           THE COURT:  And are you -- let me just ask in terms

```
 1   of procedure, are you each going to individually make those
 2   arguments?
 3            MR. PANCHAPAKESAN:  I think the procedure -- at
 4   least orally I plan to make a presentation, and then counsel
 5   will follow up.
 6            THE COURT:  Okay.  What order -- have you determined
 7   an order?
 8            MR. PANCHAPAKESAN:  I'll likely go first and broadly
 9   cover some joint issues.  And then, of course, if the Court at
10   some point wants briefing, we'd be prepared to do that; but
11   after that I think Mr. Cambria or Mr. Feder would go next.
12            THE COURT:  All right.  So I'm trying to get a sense
13   of time here because, obviously -- I'd like to get a sense as
14   to how long your motion -- your oral motion is going to take,
15   permit the Government to respond and, of course, permit a
16   reply and then I want to understand whether or not --
17   depending on how the motions are presented, whether you have a
18   witness available in the defense case in chief?
19            MS. BERTRAND:  Your Honor, I think we've been
20   relying on the Court's instruction that we could bring our
21   witnesses in on Tuesday.
22            THE COURT:  Okay.  And so at this juncture, then, I
23   guess what I can do is have -- is there an objection to that
24   process?
25            MR. RAPP:  Well, I don't think they -- I don't think
```

09:17a (line 5)
09:17a (line 10)
09:18a (line 15)
09:18a (line 20)
09:18a (line 25)

```
 1    they have witnesses here so we don't have an objection, no.
 2              THE COURT:  All right.  So at this point, then, I
 3    will bring the jury back in.  I will release them with the
 4    full admonition, inform them that we have to take up some
 5    legal issues in order for them to come back and begin fresh on
 6    Tuesday and that is how we will proceed and then I'll permit
 7    you -- I'll take a little bit of a break, and then I'll permit
 8    you to come forward with your motions.
 9              All right, let's go ahead and have the jury in.
10              (Jury in at 9:21).
11              THE COURT:  All rise for the jury.
12              All right, please be seated.
13              Members of the Jury, because we are at the end of
14    the Government's case in chief, as I instructed you in the
15    preliminary instructions, what will happen next is the
16    defendants will have an opportunity to present their case in
17    chief and then the Government will have an opportunity if they
18    wish to bring in any what we call rebuttal case, and then once
19    that occurs there will be further procedure; but at this
20    juncture it's necessary for me and the lawyers to all meet and
21    confer about some legal matters which will not involve you,
22    and so what that means is I'm going to release you for the
23    day, but I'm going to release you with the full admonition
24    that I gave you at the outset of your service.
25              And the reason that I'm going to do that with your
```

09:19a (line 5)
09:19a (line 10)
09:22a (line 15)
09:22a (line 20)
09:22a (line 25)

patience and your attention is because, as you know, you have

been diligently coming to court for now roughly five weeks and

so we want to make sure that we preserve the integrity of the

possible.

**09:23a**    And so I'm going to tell you to continue to keep an

open mind throughout the trial and do not decide what the

verdict should be until you and your fellow jurors have

completed your deliberation at the end of the case.  Because

you must decide this case based only on the evidence received

**09:23a**  in the case and on my instructions as to the law that applies,

you must not be exposed to any other information about the

case or to the issues it involves during the course of your

jury duty.

    Thus, until the end of the case or unless I tell you

**09:23a**  otherwise, do not communicate with anyone in any way and do

not let anyone else communicate with you in any way about the

merits of the case or anything to do with it.

    This restriction includes discussing the case in

person, in writing, by phone, tablet or computer or any other

**09:24a**  means via e-mail, via text messaging or any Internet chat

room, blog, website or application including, but not limited

to, Facebook, YouTube, X, Instagram, LinkedIn, Snapchat,

TikTok or any other forms of social media.

    This restriction also applies to communicating with

**09:24a**  your fellow jurors until I give you the case for deliberation

1   and it applies to communicating with everyone else, including

2   your family members, your employer, the media or press, and

3   the people involved in the trial.  Although you may notify

4   your family and, again, your employers that you've been

09:24a  5   selected as a juror to hear this case and how long you expect

6   the case to continue to go, if you are asked or approached in

7   any way about your jury service or anything about this case,

8   you must respond you have been ordered not to discuss this

9   matter.  In addition, you must report the contact to the

09:25a 10   Court.

11           Because you will receive all of the evidence and

12   legal instruction you properly may consider to return a

13   verdict, do not read, watch or listen to any news or media

14   accounts or commentary about the case or anything to do with

09:25a 15   it.  Do not do any research such as consulting dictionaries,

16   searching the Internet or using other reference materials, and

17   do not make any investigation or in any other way try to learn

18   about the case on your own.

19           Do not visit or view any place discussed in this

09:25a 20   case, and do not use the Internet or any other resource to

21   search for or view anyplace discussed during the trial.  Also,

22   do not do any research about this case, the law or the people

23   involved, including the parties, the witnesses or the lawyers

24   until you have been excused as jurors.  If you happen to read

09:26a 25   or hear anything touching on this case in the media, turn away

1    and report that to me as soon as possible.

2         A juror who violates these restrictions jeopardizes

3    the fairness of these proceedings and a mistrial could result

4    that would require the entire process to start over.  If any

**09:26a** 5    juror is exposed to any outside information, please contact

6    the Court immediately.

7         With those instructions, again, do bear in mind that

8    you are not to come to any conclusions and just simply enjoy

9    the extended Friday early dismissal for yourselves, and I

**09:26a** 10   expect you to be present and return Tuesday morning so that

11   you can take your seats promptly at 9:00 a.m.

12        With that, I thank you for your attention this week,

13   as well as all other weeks, and please all rise for the jury.

14        Thank you for the goodies this morning.

**09:27a** 15   (Jury out at 9:27 a.m.)

16        THE COURT:  Let's say we give you about a 15-minute

17   break and we can return.

18        (Recess taken at 9:27 a.m.)

19        (Back on the record at 9:47 p.m.)

**09:47a** 20   THE COURT:  All right, we may proceed.

21        MR. PANCHAPAKESAN:  Morning, Your Honor.

22        THE COURT:  Good morning.

23        MR. PANCHAPAKESAN:  So I'm going to make a

24   presentation jointly on behalf of the defendants and then

**09:47a** 25   others may come up individually as well.

1          So I'm going to start with the Travel Act and the

2   fifty substantive charges Counts 2 through 51, and so we'll

3   start with the legal standard.

4          The Travel Act requires the Government to prove that

09:47a  5   a defendant intentionally promoted or intentionally

6   facilitated the promotion of business enterprises involved in

7   state law prostitution offenses, and it's a specific intent

8   crime.  The Court's held this at Docket 946 at Page 14.  The

9   *US v. Polizzi* case, P-o-l-i-z-z-i, for example, at 500 F.2d

09:48a 10   856, that notes the required intent under the Travel Act is

11   quote "specific intent to facilitate an activity which the

12   accused knew to be unlawful," under state law; and so there's

13   sort of two main aspects to this, Your Honor.

14          One is a specific intent to facilitate a business

09:48a 15   enterprise, and second is that the defendant must know that

16   the advertisement, one of the fifty ads, advertised a

17   transaction that's unlawful under state law; and the backdrop

18   here, Your Honor, is that the Travel Act, it is not a

19   generalized prostitution statute.  It's not even a

09:48a 20   facilitation of prostitution statute.

21          The key here, the critical link that the Government

22   has to prove and we don't think they've proven, is the intent

23   to promote a business enterprise involved in one of the fifty

24   advertisements, and so I'll start with this business

09:48a 25   enterprise element.

<table>
<tr><td></td><td>1</td><td>What the Court's held -- and this is at Docket 946</td></tr>
</table>

```
            1           What the Court's held -- and this is at Docket 946

            2   at Pages 15 to 16, and this is in connection with a Motion to

            3   Dismiss we brought as to the Travel Act charges, the Court

            4   held, quote, "one cannot intend to promote/facilitate a

09:49a      5   business enterprise one does not know exists," and so we can

            6   start with that premise.

            7           The alleged business enterprises here and the

            8   testimony the Government's drawn out is that the individuals

            9   who posted the ads or a pimp who posted the ad, for example,

09:49a     10   the Government's theory is that is the business enterprise.

           11   That's why they've drawn out testimony about a pimp not having

           12   other legitimate employment or someone posting multiple ads.

           13           That's their theory.  That's the business

           14   enterprise; and if the Court looks, for example, at Docket

09:49a     15   776, Pages 1 to 2, that was the Government's opposition to our

           16   Motion to Dismiss the Travel Act, that lays out the

           17   Government's theory of what a business enterprise is.

           18           And to be clear, the business enterprise here is not

           19   Backpage itself.  The business enterprise, it's what the

09:50a     20   Government claims are these individual prostitution

           21   enterprises that have posted ads; and so when we focus on the

           22   business enterprise, there's no evidence that any defendant,

           23   including my client, Mr. Brunst, associated themselves in some

           24   meaningful, specific, intentional way with any one of the

09:50a     25   individuals who testified, whether it's a woman who was
```

1    advertised or a pimp who advertised her.

2           And, for example, as to my client, Mr. Brunst, it's

3    not enough to say that Mr. Brunst was at a budget meeting and

4    the agenda mentioned The Erotic Review or that third parties

09:50a  5    advised him or others that there were prostitution ads on the

6    site, right.

7           That's generalized information about the nature of

8    the ads on the site, but the Travel Act does not criminalize

9    being on notice that there's prostitution being advertised on

09:51a 10    a website platform; but that's precisely the type of case the

11    Government's put on as the Travel Act.

12           So, for example, in *US v. Gibson Specialty*, it's a

13    Ninth Circuit case, 507 F.2d 446, that case which the Court

14    has cited before, involves the sale of gambling materials to

09:51a 15    known gambling outfits under the Travel Act case.

16           What the Court said there, the Ninth Circuit said

17    is, quote, "...the prosecutor must show that the manufacturer

18    in some significant manner associated himself with the

19    purchaser's criminal venture for the purpose of its

09:51a 20    advancement."

21           The Court goes on to say, "Were we not to define

22    intent in the Travel Act in this manner, the act would be

23    plagued by the very overexpansiveness which Congress sought to

24    rule out by inclusion of an express *mens rea* requirement," and

09:51a 25    that's particularly apt here because the overexpansiveness

that Congress was concerned about is precisely the

overexpansiveness that you see in the Government's prosecution

where they're attempting to treat the Travel Act as this sort

of general intent, generalized notice statute as opposed to

09:52a 5   showing that my client or the other defendants in some

specific, significant, meaningful way associated themselves

with a business enterprise.

Now, second, Your Honor, is this element that a

defendant must know one of the fifty ads involved in activity

09:52a 10   that violates state law.

Now, there's multiple steps here, right.  There's an

advertisement.  There's a buyer and a seller that get

together.  They agree on a service for a fee, and then maybe

some sort of transaction is consummated.  There's no evidence

09:52a 15   that Mr. Brunst or the other defendants knew ahead of time

that one of these fifty charged ads would, in fact, lead to a

prostitution transaction.

Now, for example, there's been law enforcement

officers who have testified that they didn't even have

09:53a 20   probable cause under state law to arrest -- to make a

prostitution arrest on the face of an advertisement.

I believe one of the law enforcement officers

testified, it may have Mr. Murry or Mr. Griffen, that the

advertisement's, quote, "only the first step towards some sort

09:53a 25   of prostitution investigation."

1          And so, in effect, what the Government's theory on

2     knowledge is here, Your Honor, is -- is they are pointing to

3     what resulted from an ad.  They're saying these ads resulted

4     in prostitution, but the focus for the purpose of the Travel

09:53a  5     Act has to be on what the defendant knew beforehand under the

6     defendant's ex-ante knowledge about whether an advertisement

7     would, in fact, lead to prostitution.

8          And that theory of prosecution, it runs a foul of

9     the First Amendment.  Mr. Cambria is going to spend a bit of

09:53a 10     time on that but, for example, you have the -- there's a case

11     out of the Second Circuit.  It's *Locust Valley.*  It's 868 F.3d

12     104.  What that case says is quote, "...the First Amendment

13     offers no protection to speech that proposes a commercial

14     transaction if consummation of that transaction would

09:54a 15     *necessarily* constitute an illegal act.  However, if, as here,

16     there are plausible ways to complete a proposed transaction

17     lawfully, speech proposing that transaction 'concerns lawful

18     activity' and is therefore protected commercial speech," and

19     that's precisely what we have here.

09:54a 20          For example, Ms. Beck, one of the women who

21     testified, she said on a couple of occasions that despite the

22     advertisement, one instance it led to, like, a legal massage,

23     in another instance it led to a walk; and so these are

24     examples that sort of highlight not only is there no evidence

09:54a 25     that a defendant knew ahead of time something would lead to

prostitution, but there are even advertisements at issue with
advertisers who testified where the ad itself led to something
perfectly legal and there's no way for someone to predict
ahead of time what might happen with an ad.

09:55a      Now, given the Government's presentation in that
respect, they're likely to advance a theory of deliberate
ignorance.  We see that from the proposed jury instructions,
and so I'll deal with that briefly.

        First is, I'm not aware of a Ninth Circuit case in
09:55a  which this notion of deliberate ignorance has been adopted in
the context of a Travel Act case, that's one.

        Two is deliberate ignorance is not a substitute for
intent.  It's not a substitute for the Government to prove
specific intent to facilitate a business enterprise.  The only
09:55a  context in which we should be having this discussion about
deliberate ignorance is in the context of whether a defendant
had knowledge regarding, you know, was one of the fifty ads
for prostitution.

        And what the Ninth Circuit's held is that the only
09:55a  instance in which it's appropriate to give a deliberate
ignorance instruction for that framework to apply is where
there is evidence put on by the Government of a defendant's
willful ignorance.

        So, for example, in *US v. Alvarado*, 838 F.2d 311 the
09:56a  Court says, quote, "In determining whether a *Jewell*

instruction," meaning a deliberate ignorance instruction, "is

appropriate in this case, the government must present evidence

supporting an inference that" defendants "purposely avoided

obtaining actual knowledge that the suitcase contained the

**09:56a** 5   cocaine."  The Court goes on to say, "If the evidence

indicates" the defendants" had either actual knowledge or

lacked any knowledge of the presence of the cocaine, then

giving the *Jewell* instruction was inappropriate."

9         So stepping back, first of all, this kind of

**09:56a** 10  highlights the classic example of where a deliberate ignorance

framework is appropriate.  It's where you have a drug mule and

they've sort of put their head in the sand regarding what

might be in some compartment, right, drugs or the like.

That -- that doesn't really fit in this case.  That's one.

**09:56a** 15        Two is the Government has not put on a theory of

prosecution that aligns with the notion of deliberate

ignorance.  In fact, their presentation's been the exact

opposite.  Their presentation has been everyone knows these

are ads for prostitution.  There's third parties who have been

**09:57a** 20  consistently telling you these are ads for prostitution, and

so there's no evidence that my client or any of the defendants

deliberately ignored what an ad might be for, let alone one of

the fifty ads; and so the Government hasn't met this

foundational predicate of, you know, the application of a

**09:57a** 25  deliberate ignorance framework in this case.

1          And then further, let's explore the framework of

2     deliberate ignorance that the Government wants to pursue here.

3     So their proposed instruction is that, quote, "The defendant

4     was aware of a high probability that the vast majority of

**09:57a** 5     escort ads were for prostitution."  That's -- that's a

6     framework that they ask the Court to apply here; and that

7     instruction, that framework, I think, it highlights a problem

8     with this approach, right.

9          So what does "vast majority" even mean, right?  Is

**09:58a** 10    that 70 percent?  Is that 80 percent, right?  How do we play

11    that out?  Does that mean that these fifty ads my client's

12    never seen, do they fall with the majority?  Do they fall with

13    the minority?  What's a jury supposed to do with that?  Does

14    that mean 30 of the ads, 35 of the ads, 40 of the ads are for

**09:58a** 15    prostitution?  It highlights that this is an unworkable

16    approach in the context of what's being charged here.

17         In essence, this deliberate ignorance framework, it

18    would almost by fiat impute to my client or others that they

19    must have known a given ad was for prostitution without

**09:58a** 20    establishing any kind of foundation that they were

21    deliberately ignorant as to what one of these ads was for.

22         And so ultimately as to these Travel Act counts,

23    Your Honor, under Rule 29, no rational trier of fact could

24    find beyond a reasonable doubt the elements of, one, an intent

**09:59a** 25    to facilitate a business enterprise tied to one of the fifty

1    ads or, two, actual knowledge that one of the fifty ads

2    involves a state law prostitution offense.

3         In that context it's worth noting briefly that my

4    client wasn't even charged in any of the Travel Act counts in

09:59a  5  the initial indictment, either the conspiracy count or the

6    Travel Act counts; and I think the Government's presentation,

7    frankly, illustrates why, that there's been no connection made

8    between him and any business enterprise or any ad that's at

9    issue.

09:59a 10      Now, briefly, I'll address the conspiracy count and

11   the Government's *Pinkerton* theory as to the Travel Act counts.

12   So I think the initial starting point here, again, is the law

13   of the case.  So in an order denying our Motion to Dismiss in

14   the Travel Act counts, the defendants raise concerns in

10:00a 15  connection with the conspiracy count that it alleged some sort

16   of boundless conspiracy to violate the Travel Act, meaning

17   some unknown, unlimited amount of advertisements.

18        What the Court said in response in denying the

19   motion was, quote, "Such a claim is simply untrue.  Defendants

10:00a 20  were not indicted for facilitating the amorphous notion of

21   prostitution.  They were indicted for facilitating via

22   publishing ads on fifty distinct occasions for prostitutes,

23   prostitution-related businesses or other groups were involved

24   in the business of prostitution."

10:00a 25      This is an order the Court issued -- Judge Brnovich

|  | 1 | issued it in May of 2020.  This is the case that we've been |
|--|---|--|

1    issued it in May of 2020.  This is the case that we've been

2    defending against, and so the law of the case is that the

3    conspiracy charge here is, in fact, tied.  It's specific to

4    the fifty charged ads.  It doesn't go beyond that.

10:00a  5         THE COURT:  That was related to a Motion to Dismiss

6    the indictment, wasn't it?

7         MR. PANCHAPAKESAN:  It was, Your Honor, yes.

8         THE COURT:  And so she was applying a different

9    standard in reviewing that --

10:01a  10         MR. PANCHAPAKESAN:  Well --

11         THE COURT:  -- as to each of those -- each of the

12    arguments on each of the counts.

13         MR. PANCHAPAKESAN:  The standard the Court was

14    applying dealt -- of course, the Court assumed the truth of

10:01a  15    the allegations; but I think what the Court said in terms of

16    the scope of the conspiracy count, I think that still holds

17    true, right.

18         Because in May 2020 the Court is telling the parties

19    that this is not a boundless conspiracy, that the case you

10:01a  20    defendants are defending against on the conspiracy is tied to

21    the fifty counts; and so that's the case that we've been

22    preparing for and defending against and so -- and that's the

23    law of the case and I think to expand it to --

24         THE COURT:  And how -- how is that different from

10:01a  25    the -- my recollection is the conspiracy is alleged to have

UNITED STATES DISTRICT COURT

```
 1    occurred and begun in roughly 2004 up to sometime in 2018.

 2            How does that relate to the time frame?

 3            MR. PANCHAPAKESAN:  I believe the charged counts,

 4    the fifty counts start in, I think, September of 2013; and so

 5    in some sense there's a distinction between, on the one hand,

 6    evidence that might be relevant to the conspiracy.

 7            So, for example, the Government's put on evidence of

 8    a budget meeting or something, right, in 2007 or 2008, which

 9    might be relevant to this notion of an alleged conspiracy

10    during that time frame; but in terms of an agreement to commit

11    a substantive crime, right, which is a requirement to show a

12    conspiracy, those substantive crimes -- those alleged

13    substantive crimes are the fifty Travel Act counts.

14            I don't think -- the Court has held they don't --

15    they don't go beyond that into some unknown advertisements or

16    counts that, you know, we've never been put on notice of and

17    that the Court said we're not defending against.

18            And so a conspiracy requires -- it requires an

19    agreement, right, to engage in criminal activity.  It requires

20    overt acts and it requires an intent to commit the substantive

21    crime, that crime here being one of the fifty Travel Act

22    counts.

23            THE COURT:  So let me just pose a hypothetical.

24    Let's assume that they had a conspiracy charge and then they

25    allege Travel Act violations, but they weren't as descriptive
```

UNITED STATES DISTRICT COURT

1       in terms of this particular ad on this particular day.

2              How would that change the argument?

3              MR. PANCHAPAKESAN:  Well, there's a couple

4       responses, Your Honor.  One is the conspiracy has to be

10:03a  5       bounded by something, right.  I don't think it's appropriate

6       to allege a criminal conspiracy that -- because over the

7       course '04 to '18 millions, right, of escort ads and it would

8       be impossible practically, right, to defend against an unknown

9       set of advertisements; and that's why the Court previously

10:04a  10      said the crime that is the alleged objective of this

11      conspiracy, the crimes of the fifty counts, that's one and

12      then --

13             THE COURT:  So -- so would it be any different, for

14      example, if the Government alleged on or about May 1st through

10:04a  15      May 31st of 2014 these advertisements for sex acts for money

16      were posted on Backpage?  Would that be any different?

17             MR. PANCHAPAKESAN:  Well, I mean, I think there

18      needs to be some specificity, right.  I don't think that an

19      indictment or the Government's presentation can sort of just

10:04a  20      vaguely be there may have been ads that were posted that could

21      have been for prostitution, right.

22             The Travel Act, which is the object of a conspiracy,

23      it requires proof of the advertisement of the business

24      enterprise, right, that the act led to prostitution, that

10:05a  25      someone knew it was for prostitution; and so that's, I think,

why the Court in its order bound it to those fifty ads,
because that's all that they've charged in that respect or
endeavored to prove.

If they put someone up, you know, NCMEC or whoever
saying, "Yeah, I've looked at these ads broadly and our view
is they're for prostitution," that obviously doesn't come
close to establishing a Travel Act violation or conspiracy to
violate the Travel Act.

Now, under -- under *Pinkerton*, which I'll also
address, a *Pinkerton* theory of liability requires, one, a
conspiracy, which in our view has not been established here.
Two, it requires that another alleged co-conspirator -- and I
imagine they're going to say that person is Carl Ferrer, that
he actually committed one of these substantive Travel Act
violations; and then, three, it requires that the commission
of the offense is reasonably foreseeable.

And so, as the first point, the conspiracy, I think
we've made the argument there's not been a conspiracy
established here as to these fifty charged ads.

Taking the second point, as to whether Mr. Ferrer,
for example, committed one of these fifty charged offenses,
there has been no evidence that Mr. Ferrer or any alleged
co-conspirator in some meaningful, intentional way associated
themselves with one of the advertisers or pimps or what have
you who posted one of the fifty ads.

                    Now, the only communication I'm aware of that

Mr. Ferrer testified to is he -- there were communications

with one of the posters, Pamela Robinson, and so the

Government put in evidence use of an e-mail address.  It was

10:07a  carl@backpage.com, and this is on September 14th in the

afternoon.  It starts at Page 80 of the transcript.

                    So what the Government elicited was that there was

communications between Pamela Robinson -- she's the subject of

several of the fifty counts -- and this carl@backpage e-mail

10:07a  address, and the Government's questioning in this respect was

very careful.

                    The Government said, "What do you respond?" asking

Mr. Ferrer.  The next question is, "What does

carl@backpage.com respond?" and so what we elicited on

10:07a  cross-examination -- this is October 10th, the morning

transcript, Pages 103 to 104.

                    Carl Ferrer says, quote, "It really wasn't my e-mail

address."  He said others would use it.  He said it was this

sort of general Backpage marketing account that several people

10:07a  might use.  There's no evidence as to who actually sent those

e-mails, whether the person who sent those e-mails was part of

an alleged conspiracy.  There's been no testimony that every

marketing employee at Backpage is part of a conspiracy.

                    That hasn't been established, and so that's the only

10:08a  instance I'm aware of in which Mr. -- in which the Government

claims Mr. Ferrer might have had some direct communication

with one of the advertisers of the fifty ads; and even in that

instance, there is no competent evidence that he was the one

who was interacting with her.

10:08a   And then lastly in the context of *Pinkerton*, there's

-- there's due process constraints in terms of foreseeability.

So, for example, in *US v. Castenada* case, 9 F.3d 761, Court

says, "Several circuits, including this one, recognize that

due process constrains the application of *Pinkerton* where the

10:08a  relationship between the defendant and the substantive offense

is slight."

So, for example, as to my client, for example, just

because Mr. Brunst is aware there's a moderation function at

Backpage but he's not directly involved in it, the connection

10:09a  between that fact and one of the fifty ads is too slight.

These are fifty ads out of millions, right.  It's not

foreseeable to him, there's been no testimony in this respect,

that one of the fifty ads, for example, might be moderated in

some improper way, right, to facilitate prostitution.  There's

10:09a  multiple steps between what he knows and that potential fact

that haven't been established.

Now I'm going to turn to the money laundering

counts, Your Honor.  So I'll start with Counts 53 to 62 and

I'll come back to the conspiracy count later.  So these are --

10:09a  excuse me.  These are concealment money laundering charges in

```
 1   Counts 53 to 62.  These are charged under 18 U.S.C.
 2   1956(a)(1)(B)(i).
 3           What that statute says is the transaction that's the
 4   subject of the money laundering count.  It has to be designed,
 5   in whole or in part, to conceal or disguise the nature,
 6   location, source, et cetera, of the proceeds; and the
 7   operative word there is "designed."
 8            And so what the record is on these transactions,
 9   which are post April 2015 wire transfers from Website
10   Technologies to Cereus Properties, the only testimony on the
11   record on these counts was from Carl Ferrer; and what Ferrer
12   said is that there was a sale of Backpage in April 2015.
13   There were two loan agreements.  The larger loan was on the
14   sale on the U.S. portion of Backpage.  The smaller loan was on
15   the sale of the foreign business.
16           And so, for example, September 21st in the afternoon
17   at Page 91, starting at Line 1, Mr. Ferrer says, quote,
18   "Cereus Properties collected the interest and debt payments
19   from the 600 million dollar loan, referring to the sale.
20           He goes on to say -- later on that same page he
21   says, "Payments would be made to Cereus Properties.  We made
22   those payments from US banks and European banks.  We would
23   make a payment on the interest or principal of the loan.  That
24   was for Europe" -- meaning the foreign -- foreign
25   operations -- "and then interest payments for the loan in the
```

10:10a  5
10:10a  10
10:10a  15
10:11a  20
10:11a  25

1  US."

2  And he goes on to say on Page 93 of that same day,

3  September 21st in the afternoon.  He's asked, "What was the

4  purpose to go from Ad Tech B.V. to Cereus?"

**10:11a**  5  His answer was, "It was to make interest and

6  principal payments on the smaller note," meaning the sale of

7  the foreign -- the foreign operation of Backpage.

8  So the only testimony on these transactions from

9  Website Technologies to Cereus Properties, from Ad Tech B.V.

**10:12a**  10  to Cereus Properties is that there was a sale, the sale from

11  Lacey, Larkin, Brunst and Spear of Backpage to Ferrer and that

12  there were loan payments.

13  There has been no testimony whatsoever that the sale

14  itself or that these loan payments were, quote, "designed" to

**10:12a**  15  conceal or designed to effectuate some kind of money

16  laundering scheme.  The evidence, frankly, is to the opposite.

17  The evidence is that there's a documented

18  transaction with loan agreements, lawyers on both sides, a

19  major accounting firm.  BDO is involved.  There's forbearance

**10:12a**  20  agreements, and so all the evidence on this substantiates that

21  this is a legitimate transaction.

22  For example, the loan agreements which are in

23  evidence at Exhibits 5427 and 5459, the very top of the loan

24  agreements they say "Sale of Backpage's US Operations" or Sale

**10:12a**  25  of Backpage's Foreign Operations."  That's the opposite of

1    concealment.

2           There's no concealment that there's a sale of

3    Backpage or that a loan payment made from Ferrer to one of the

4    sellers necessarily involves Backpage proceeds.  It's not

10:13a  5    enough for concealment money laundering to establish the mere

6    movement of Backpage proceeds.  There has --

7           THE COURT:  How does -- how does the creation of

8    Website Technologies and Cereus Properties relate to your

9    argument?

10:13a 10           MR. PANCHAPAKESAN:  So Mr. Ferrer testified that

11   Cereus Properties received the payments from these loan

12   payments in connection with the sale.

13           THE COURT:  Well, my question more specifically is

14   the creation of these two entities.

10:13a 15           MR. PANCHAPAKESAN:  So what the Government's going

16   to argue -- they're going to say -- you know, they're going to

17   say Website Technologies is a front or something, right, for

18   Backpage.

19           That's what they're gonna say; but if we focus on

10:13a 20   the actual transaction, right, the transactions in these

21   counts, which is a transfer from Website Technologies to

22   Cereus Properties, the testimony is that there's a sale, it's

23   a loan payment, whatever they want to say about Website

24   Technologies and sometimes is a red herring because there's no

10:14a 25   testimony that any of these specific transactions were

1   designed to conceal anything from anyone.

2          So, for example, there's no testimony that the Bank

3   of Montreal or Arizona Bank and Trust, or whatever banks

4   they've mentioned, there's no testimony that it was -- this

10:14a   5   loan payment or this sale was designed to conceal it from

6   those banks, that these loan payments included Backpage

7   proceeds.  There's been no testimony to that effect as to

8   these specific transactions.

9          And so, for example, one case I think is guiding on

10:14a  10  this, it's a US Supreme Court case, it's *Cuellar v. US*,

11  C-u-e-l-l-a-r, 553 US 550, and what the Court says there is

12  that, quote, the statutory text makes clear, however, that a

13  conviction under this provision requires proof that the

14  purpose -- not merely the effect -- of the transportation was

10:15a  15  to conceal or disguise one of the elicited attributes.

16         The only testimony in the record about the purpose

17  of these transactions is that the purpose was to pay the

18  seller's loan payments for the sale of Backpage.  There's been

19  no testimony that the purpose of these transactions was to

10:15a  20  conceal, and it's not enough for the Government to say, well,

21  the effect or something may have been X, Y, Z, right.

22         They have to elicit testimony.  They need to have

23  direct evidence that the purpose of a loan payment on a sale

24  was to hide, was to conceal, to disguise that the source of

10:15a  25  the loan payments was from Backpage; and no one's saying that

1   was concealed because it's open.  It's known that Backpage is

2   being sold.  That's what the loan agreement says, that it's

3   for the sale of Backpage.

4          And so -- they're not saying it's a sale of some

10:16a  5   front or website technology -- on the loan agreement it says

6   sale of Backpage, and that's not being concealed.

7          Now, turning to Counts 63 to 68 which in turn --

8   which concern international promotional money laundering

9   that's 18 U.S.C. 1956(a)(2)(A), that statute requires the

10:16a  10  defendant acted with the intent to promote the carrying on of

11  some specified unlawful activity; and the key in connection

12  with Counts 63 to 68 is there has to be a specific intent to

13  promote.

14         So, for example, there's a case out of the Fifth

10:16a  15  Circuit, *US v. Brown*, 553 F.3d 768.  That case says, quote,

16  "The crime of money laundering promotion is aimed not at

17  maintaining the legitimate aspects of a business nor at

18  proscribing all expenditures of ill-gotten gains, but only at

19  transactions which funnel ill-gotten gains directly back to

10:17a  20  the criminal venture."

21         And so when we look at these counts, Counts 64

22  through 68, those two are loan payments on the sale.  So

23  Mr. Ferrer is asked September 21st in the afternoon, Page 93,

24  Lines 20 through 23, quote, "What was the purpose to go from

10:17a  25  Ad Tech B.V. to Cereus?"  His answer, quote, "It was to make

interest and principle payments on the smaller note," smaller
note referring to the sale of Backpage's foreign operations.

That's literally the only evidence in the record on
these transactions, and the purpose that Mr. Ferrer testified
10:17a  to is not a -- he didn't say this was to conceal or fool banks
or fool credit card companies.  He said the purpose was a loan
payment on a sale; and so not only does it fail to show an
intent to promote, it shows the opposite.

And, further, what the Court -- what the case law
10:18a  says is to promote, the money's got to be put back into the
criminal venture.  At most what this shows is money flowing
away from Backpage, to the sellers of Backpage.

There's no evidence in the record that Mr. Brunst or
Lacey or Spear took the money they received from the loan
10:18a  payments and then invested it back in Backpage or used it to
promote prostitution.  There's been no evidence of that, and
so at that level these counts fail as well.

Now, Count 63 is a little unique.  It's not a loan
payment, but it's a payment to a web developer.  That's what
10:18a  the Government alleges.  There's been no evidence on this
transaction.  I asked Quoc Thai about it.  He said he didn't
know what the purpose was.  I don't believe Ferrer testified
about Count 63 or what it was for or whether there was
promotion.  So there's no -- there's no evidentiary link there
10:19a  between that payment to a web developer and some sort of

1    intent to promote a Travel Act violation.

2          And then we shift to Counts 69 through 99, which

3    are -- which are transactional money laundering.  So that

4    statute is 18 U.S.C. 1957 and a requirement of transactional

**10:19a**  5    money laundering is that the property was, in fact, derived

6    from some specified unlawful activity; and what the model jury

7    instruction said, it says the property was, in fact, derived

8    from -- in brackets it says "describe the specified unlawful

9    activity alleged in the indictment."

**10:19a** 10          So it's -- it's got to be an SUA that the Government

11    alleges in the indictment, and what the predicate unlawful

12    activity -- alleged unlawful activity here is, is it's a

13    Travel Act violation.  It can't be a conspiracy, Your Honor,

14    right.  So if you look at 18 U.S.C. 1956(c)(7), if you also

**10:20a** 15    look at 18 U.S.C. 19611, those define what specified unlawful

16    activity is.

17          They include the Travel Act, but they don't include

18    a conspiracy, a general conspiracy or a conspiracy to violate

19    the Travel Act; and so necessarily what we're left with are

**10:20a** 20    the fifty charged ads in the indictment.

21          That just by default has to be the specified

22    unlawful activity that the Government alleges in the

23    indictment.  It can't go beyond that.  As a matter of what's

24    alleged in the indictment, it just is a matter of statutory

**10:20a** 25    interpretation.

1          And in our view, these counts, therefore, fail for

2   the same reason that the fifty Travel Acts counts fail because

3   if those fail, then there's no -- there's no predicate

4   specified unlawful activity.

10:21a  5          And then briefly as sort of an aside, there are a

6   handful of counts where my client is sort of named

7   secondarily, right.  So there may be some wire transfer from,

8   you know, Mr. Lacey or something to, like, a title company,

9   for example.  Those counts are, like, 69 through 70, 83

10:21a 10  through 84.  There's no -- there's been no evidence presented

11  as to why Mr. Brunst is included on those counts or what role,

12  if any, he may have had in the transfer.

13          Count 100 I'll let Mr. Cambria deal with as to

14  Mr. Lacey, and then lastly to address the money laundering

10:21a 15  conspiracy count.  There's -- there's no evidence here of an

16  agreement to commit money laundering in connection with these

17  -- these transactions.

18          And this notion that, well, you know, credit cards

19  might have terminated for reputational reasons or this

10:22a 20  testimony about allegedly circumventing credit card companies,

21  things of that nature, the Government has not made a

22  connection between that, that alleged conduct, and these

23  specific transactions; and what the record is on most of these

24  counts, I think like 37 of the 48 counts, as Ferrer testified,

10:22a 25  they're loan payments in connection with the sale and there's

been no connection made on the part of the Government between those loan payments and what they will contend is some broader effort to fool a bank or a credit card company.  That evidentiary link is missing.

10:22a          And so I'll conclude by noting and I'll yield to Mr. Cambria, as to my client, really, the state of the evidence is that he might have been at a budget meeting or an e-mail agenda says something like TER.  He might have been copied on e-mails.  He might have been aware that credit card 10:23a companies, banks, things of that nature, were canceling Backpage for reputational reasons.

          All of that does not come remotely close to establishing on his behalf either a criminal intent to facilitate business enterprises involved with fifty 10:23a advertisements or to engage in money laundering in connection with the legitimate sale of a business where Ferrer testified the purpose of those transactions was to pay back the sellers; and as to my client and, frankly, all these individuals, this is a deeply misguided attempt to use a statute, the Travel 10:23a Act, that requires specific intent as to particular business enterprises, to expand that into something the statute was not intended to cover.

          THE COURT:  Let me ask you, in terms of the specific intent requirement, is it or is it not sufficient to look at 10:24a individual communications, conversations related to the

1    years-long allegation that what the primary purpose of the

2    Backpage was was to provide a platform to offer sex acts for

3    money?

4          So, in other words, if, as alleged by the

10:24a  5    Government, the individuals who ran the company, who were the

6    governing board of the company, understood that with the

7    shutdown of Craigslist suddenly their profits skyrocketed and

8    in looking at their finances the skyrocketed activity was

9    occurring in the escort section and if you have an argument or

10:25a 10    you have witness testimony or evidence about years' worth of

11    meetings and reviewing financials and so on and so forth, at

12    some point doesn't that accumulate to specific intent?

13          MR. PANCHAPAKESAN:  So I think the response, Your

14    Honor, is to go back to the text of the Travel Act.  The

10:25a 15    Travel Act is -- it does not criminalize knowledge.  It does

16    not criminalize -- let's say hypothetical you have knowledge

17    for ten years that there are prostitution ads that are

18    appearing on the site, right.  That's not what the statute

19    criminalizes.

10:26a 20          The statute criminalizes an intent to facilitate

21    specific business enterprises involved in prostitution

22    offenses under state law, and those business enterprises have

23    to be tied to these fifty ads; and so the broad knowledge,

24    right, if third parties are telling folks or Craigslist is

10:26a 25    shut down that there are prostitution ads that are appearing

on your site, there's a missing link between that and the

fifty substantive counts which concern individual ads,

individual advertisers, individual pimps, what have you.

There's a missing link there, and there's no

10:26a  evidence that my client or others knew or would have known

that those fifty ads, those fifty individuals, would engage in

a prostitution transaction; and that's how the Travel Act is

framed.  It's not a general notice statute.

THE COURT:  I guess under that argument, though,

10:26a  then it would seem highly unprobable that any business like --

a business like Village Voice or Backpage would ever find

themselves liable for a Travel Act violation like this.

MR. PANCHAPAKESAN:  Right, and that's a point --

THE COURT:  Because that would require each

10:27a  individual defendant to look at the ad and know what it was

about and that there was a prostitution ring that was involved

in advertising these -- these individual women.  Is that --

MR. PANCHAPAKESAN:  And that's our position, Your

Honor, is that just because the Government's brought this

10:27a  prosecution does not mean that there, therefore, needs to be

liability under the Travel Act.

They chose to bring it under the statute.  That does

not fit the facts of this case.  The Travel Act is not

intended to be used in fairness, Your Honor, in the way that

10:27a  you're describing it or the way that the Government's trying

         1   to prosecute under it.

         2            THE COURT:  How does that differ, though, in cases

         3   related to gambling operations, for example?

         4            MR. PACHAPAKESAN:  Right.  So the *Gibson* case, for

10:28a   5   example, right, what the Court said there is that the

         6   manufacturer has to in some significant manner associate

         7   himself with the purchaser's criminal venture; and so it

         8   wasn't enough there that this company making -- I think it's

         9   like pull tabs, some sort of old school gambling

10:28a  10   paraphernalia, it wasn't enough that they knew with certainty

        11   that a criminal gambling operation would buy what they were

        12   selling.

        13            That wasn't enough under the Travel Act.  There has

        14   to be specific intent.  There has to be evidence that the

10:28a  15   manufacturer of this gambling paraphernalia in some specific

        16   way associated themselves with the person who was buying it.

        17   It's not enough to just know, right, and that's the constraint

        18   of the Travel Act; and, frankly, Your Honor, you heard a

        19   little bit about this with the Senate PSI hearings.

10:29a  20            There's been laws that were passed FOSTA, SESTA,

        21   that were passed to remedy the issue Your Honor is dressing,

        22   but that's not the charge here.  Those aren't the statutes

        23   they were charged under.  The Travel Act, frankly, just

        24   doesn't fit the facts of this case; but that's the statute

10:29a  25   they chose to bring their charges under, and there may be laws

     1    that address this sort of conduct, but it's not this law.

     2              THE COURT:  All right, thank you.

     3              Mr. Cambria, did I hear you're going next?

     4              MR. CAMBRIA:  I heard that as well, Your Honor,

10:29a  5    thank you.

     6              I'd like to start off by distinguishing the

     7    hypothetical that you asked about gambling cases.  Gambling

     8    cases do not have a First Amendment overlay.  That's one of

     9    the main differences.  Here we're dealing with speech, and as

10:30a 10    a result of that there is a First Amendment overlay.

    11              The other question that you asked was with regard to

    12    the language of Judge Brnovich.  I think clearly what -- what

    13    she did there was, first of all, define the criminal conduct

    14    and that was the part about it's not just amorphous

10:30a 15    prostitution, but it's a prostitution enterprise that was

    16    conducted through these 50 ads.

    17              Once she defined what the criminal conduct was, then

    18    she moved to the motion that was actually in front of her,

    19    which was that the indictment was insufficient; and she said,

10:30a 20    "You alleged these facts.  They fit in to what I've defined as

    21    the criminal conduct so it's sufficient."

    22              That didn't change the fact that she ruled that in

    23    this case the criminal conduct was as she defined it; and so

    24    the other thing is, you have to ask yourself, what is the

10:31a 25    relevance of the 50 -- 50 acts -- ads, if you will, that are

in the indictment unless they have some meaning to the case,

and the meaning to the case is that as Brnovich -- Judge

Brnovich said, the Government has to prove that these

so-called enterprises, if you will, were run by these 50 ads

10:31a   and there is no way that a person can be guilty of that unless

they know of the ads.

There has to be some proof that they know of these

specific ads.  Otherwise, we're in to this amorphous

prostitution that Judge Brnovich said they are not charged

10:32a   with and so that --

THE COURT:  Let me ask you this, Mr. Cambria:  There

was a witness, one of the organizational witnesses who

testified, for example, that they created this PowerPoint.

They listed ads from Backpage.  They put those PowerPoint

10:32a   slides directly in front of your client, and then would it be

sufficient then for the Government to have alleged that

particular ad that your client was then aware of?

MR. CAMBRIA:  No.

THE COURT:  And why not?

10:33a   MR. CAMBRIA:  Well, because there still has to be

some sort of aiding and abetting or some kind of action.  It

isn't simply a matter of here's something historically that we

claim was on a website.

This is to promote.  So you have to promote it and

10:33a   not just know that it's -- generally they say that it's there,

       1    but that you did something that would promote it; and, of
       2    course, we don't have that and, frankly, I don't remember who
       3    was present at that particular meeting but, again, it wouldn't
       4    be a pro-active thing on the part of the people there to
10:33a  5    simply merely be there and somebody says, "Here, look at this.
       6    This is a historic ad."
       7         The charge here is facilitating and promoting a
       8    specific operation.  So you would have to do something going
       9    forward.
10:34a 10         The other thing, Your Honor, is on the First
      11    Amendment aspect of the case, we in the past had submitted to
      12    the Court what we titled an objection to the Court's proposed
      13    jury instructions and it talked about the First Amendment.  I
      14    have another copy of that, and I'd like to hand it up as part
10:34a 15    of our argument here.
      16         Before I move to that, however, I'd like to say
      17    this:  Every charge in this indictment that requires the
      18    element of concealment has not been supported, prima facie,
      19    and Mr. Thai supplied the evidence that shows that that
10:34a 20    concealment was not supported.  I asked him specifically and
      21    for the reason of having him say, "I had no problem finding
      22    everything.  It was all in proper names.  There was no, you
      23    know, fake names, fake companies or anything like that."
      24         He said everything was readily available and I
10:35a 25    reviewed it; and not only that, but he did a chart and had all

1    the names and all the places and all the accounts and all the

2    rest of it.

3            If it was concealed, I don't know how he would

4    accomplish all that he accomplished; and I asked him

10:35a  5    specifically, was there anything hidden?  Was there anything

6    camouflaged, whatever?  No, not at all.  So there's no

7    concealment that has been -- that there was any proof of with

8    regard to any of these charges that have as a necessary

9    element concealment, including Count 100, which is my client's

10:36a  10   specific one on the trust.

11           Again, this memo, if we could resubmit it, there is

12   a First Amendment issue here and it's funny, you might recall

13   at the bench we talked about a certain issue and you said

14   well, I'm bound by the Ninth Amendment -- I'm sorry, the Ninth

10:36a  15   Circuit.  I got a little smile on my face because the Ninth

16   Circuit cases that we have in our memo demonstrate that the

17   proposed jury instruction and any argument in this case that

18   if the conduct is related to criminal activity, that it is not

19   protected by the First Amendment.

10:36a  20           Submitted case after case, Your Honor, that

21   absolutely refutes that.  The Ninth Circuit makes it

22   abundantly clear that the historic cases that they are talking

23   about and interpreting are *Hudson* and also *Pittsburgh* -- the

24   *Pittsburgh Press* case, and the Ninth Circuit said the ad

10:37a  25   necessarily has to be illegal on its face.  It isn't a matter

1   of it could relate to or a third party could use this

2   particular ad to submit a crime.  Necessarily on its face --

3         THE COURT:  Let me ask you, then, Mr. Cambria, just

4   for clarification procedurally, are you asking me to

**10:37a** 5   reconsider a prior ruling?

6         MR. CAMBRIA:  Well, you haven't instructed the jury

7   yet and, of course, we -- we believe at the whatever

8   appropriate time, if this is it, that the instruction of

9   "related to criminal activity" is clearly inconsistent with

**10:37a** 10   the Ninth Circuit.

11         So what I -- what I wanted to do was hand our memo

12   up again and it lays out our argument as to what these ads

13   have to have on their face and, frankly, we only had one such

14   ad in this indictment and then that -- and it was interesting,

**10:38a** 15   because then the police when they testified said, well, that

16   wouldn't be enough to go forward, you know, for an arrest.

17   That would be the first step kind of thing, but our position

18   has always been that the ad has to be -- has to necessarily

19   propose an illegal act on its face.

**10:38a** 20         If we think back to that *Pittsburgh Press* case,

21   there, of course, what they said was females only, males only

22   wanted kind of thing; and the Court said that was obvious on

23   its face it was illegal because it was gender specific and

24   that was discriminatory.

**10:39a** 25         And here we're saying that it isn't a matter of an

1   ad leading to or maybe a third party's gonna use it for.  It

2   has to say illegal activity on its face, and all those Ninth

3   Circuit cases support that, Your Honor.  So that's why I'd

4   like to submit this again so that you'd have the opportunity

**10:39a** 5   to, you know, at your pleasure consider it.

6            THE COURT:  All right, thank you.

7            MR. CAMBRIA:  Thank you.

8            THE COURT:  Ms. Bertrand.

9            MS. BERTRAND:  Good morning.

**10:39a** 10           THE COURT:  Good morning.

11           MS. BERTRAND:  From the outset, my client has been

12   uniquely situated in this case because she wasn't management.

13   She -- I don't think there's any evidence she participated in

14   any type of policy making and, in fact, she was hired to

**10:40a** 15   police the site and I don't believe that there's any -- that

16   any rational trier of fact could find beyond a reasonable

17   doubt that she knowingly joined any agreement to do anything

18   illegal.

19           She was hired with the understanding that she would

**10:40a** 20   keep illegal conduct from occurring on the site, and there's

21   been no testimony to the contrary.  There's a bunch of e-mails

22   that she's cc'd on where they talk about changes to the

23   policies that we heard Dan Hyer say yesterday were a moving

24   target; and she was the person at Backpage, along with the

**10:40a** 25   moderators, getting notices of this moving target sometimes on

1   a daily basis and scrambling to implement it.

2          There -- there's no evidence that she knew what Carl

3   Ferrer and whoever else was doing.  Carl Ferrer couldn't even

4   say the right name for her.  He called her Joyce, and when

10:41a  5   asked to identify her in court he struggled.  There's no

6   evidence that he ever even met her, and I found it notable a

7   couple moments ago when the Court was talking to, I think,

8   Mr. Panchapakesan that the Court referenced evidence about the

9   individuals who ran the company being at meetings with NGOs

10:41a 10   and government representatives.

11          Ms. Vaught was at none of those meetings.  There's

12   no evidence that anything that was stated at those meetings,

13   shared at that meetings trickled down to Ms. Vaught.

14          So while there might be these First Amendment

10:42a 15   concepts and really broad ideas about culpability here,

16   Ms. Vaught's is much more simple.  She had no idea, none; and

17   in a way, you know, almost used as a human shield by Ferrer

18   and the moderators, and what's really notable is we heard from

19   Ferrer and we heard from Hyer.

10:42a 20          The moderators are in the trenches every day dealing

21   with this craziness and the changes and looking for boobs one

22   day and not the next, and these guys are overmarketing

23   changing their work and undercutting the work they're doing

24   just because someone calls up and says, "Hey, I'm mad you

10:43a 25   pulled my ad," or "You pulled my photo," and the moderators

didn't even know.  They had no idea this was going on.

So there's no evidence here Ms. Vaught signed up for any of this; and, in fact, there's evidence of Ms. Vaught saying to moderators, "Look, if you don't pay attention and you don't follow these rules and enforce this -- if you don't police like we're telling you to police, you can be fired."

There's nothing, nothing that the Government has put into this that shows she ever took this lightly or that she was in any way intentionally ignorant.  She was facing it every day and fighting it.

So I -- I don't see how -- frankly, I don't see how Ms. Vaught ended up here in the first place.  Maybe it was pressure to cooperate that she's resisted because she has said to me, "I'm not gonna lie to save my skin.  I didn't know."

And I think the evidence has been consistent with that, Judge.  She didn't know, and there's been nothing in the government's case in chief to show that she knowingly joined an agreement to commit any of the crimes listed in the indictment.  The evidence shows the opposite.  Thank you.

THE COURT:  Thank you.

Mr. Kessler.

MR. CAMBRIA:  Your Honor, I'm sorry, may I ad something?  I got wrapped into the legal part of this, and I did want to say that with regard to Mr. Lacey, they really haven't put him anyplace or doing anything.  They allege that

1   he made some money; but, you know, that's not a crime that I

2   know of, but they have no statements.  They have no meetings.

3   He's not anyplace.

4        In fact, the last witness said in the twelve years

**10:45a** 5   he worked at Backpage he never even met Mr. Lacey.  So I

6   submit that they have not carried their case with regard to

7   him at this stage.  Thank you.

8        THE COURT:  Thank you.

9        Mr. Feder.

**10:45a** 10        MR. FEDER:  Obviously I join in the comments that

11   have already been made, Judge, and I just bring a couple of

12   things to the Court's attention.

13        The evidence was that the Government's theory about

14   TER and aggregation and moderation and the phrases of GFE and

**10:46a** 15   those kinds of things, the testimony from their main

16   cooperators has been by the time of the first of the 50 ads

17   and obviously after that aggregation, at least as to adult,

18   was gone.  No longer in effect.  Moderation had been taken

19   over by Liz McDougall such that Mr. Spear, at least, and none

**10:46a** 20   of these other defendants were involved with that anymore.

21        That GFE had already been prohibited, that TER was

22   gone per Mr. Hemu Nigam and others, that they did at the

23   suggestion of some of these NGOs and the AGs.  Took out stuff

24   that they were asked to do voluntarily.  There was no

**10:46a** 25   regulation law at all that made them take it out.  Unless the

ad was overtly sex for money, these were all suggestions and,

I mean, to go to -- if this world, this law, this case is

gonna say that something is illegal because of suggested, then

we're -- we are really lost in this country and we're Iran and

10:47a   Afghanistan.

None of these ads are overtly sex for money except

Ms. Beck, and Ms. Beck's count was after Mr. Ferrer purchased

the Backpage and then you have the testimony to reiterate from

the police officers that even on that ad they didn't even have

10:47a   probable cause to make an arrest, much less the standard for

Rule 29.

There's been no testimony whatsoever that any of

these defendants, including Mr. Spear, knew of any of the 50

ads, contributed to any of the 50 ads, talked to any of the

10:48a   advertisers, et cetera; that they received any money from that

specific ad as to the money laundering counts.

And then as to Mr. Spear, I mean, again, his primary

role, according to the testimony, has been that he was trying

to regulate moderation, which as Mr. Hyer said yesterday, got

10:48a   stricter and stricter, more and more rigid to avoid -- not to

encourage, not to aid and abet, but to avoid sex for money ads

on the site.  That's what they were doing, to avoid any overt

sex for money ads.

And the Government can have their theory that that's

10:48a   somehow an effort to hide what they were doing.  Well, under

Rule 29 they certainly have not proven that notwithstanding

them saying -- Mr. Ferrer and Mr. Hyer saying, "Well, these

are sex ads on their face," and their so-called victims

claiming that these are sex ads on their face when all they

10:49a  have is suggestive words that are in every ad in every

magazine in this country.  That's all I have, thanks.

THE COURT:  I don't know what magazines you're

reading, Mr. Feder, but in any event I appreciate the

argument.

10:49a  MR. FEDER:  I'll bring you the Sunday *New York Times*

magazine for the cosmetics and perfume.

THE COURT:  All right.

Mr. Eisenberg.

MR. EISENBERG:  Thank you, Your Honor.

10:49a  May it please the Court.  I want to first start by

going back to something that was said before by one of my

colleagues that has to do with the specific intent concept and

how it relates to *Pinkerton*.  *Pinkerton* is a theory of

evidence, if you will, and how it can be applied in a jury's

10:50a  determination of guilt or innocence whereas specific intent is

a much more higher level of law.  That is, it's an element.

So when we're dealing with specific intent and we

want to apply the *Pinkerton* theory to it, I have the following

concerns:

10:50a  Now, my math may be wrong and I'm gonna say ahead of

time that I'm gonna use the yard stick of 3,000,000 ads a year

-- it may have been more -- and I'm gonna use the time frame

running from Count 2 and it's Count 51, September 10, 2013,

through February 6th, 2018, and by my count that's roughly

four and a half years.

So if over four and a half years times 3,000,000

advertisements published in Backpage we have 13.5 million ads;

and, again, I'll stand corrected if it's only 2,000,000 a

year, whatever.  My point is that at that amount of

publication, how does one remotely conceptually extrapolate

using the *Pinkerton* theory to the idea that somebody has had

the specific intent to facilitate or promote the business of

prostitution on a specific ad?

You simply couldn't do it, and it allows the theory

to adulter -- not adulter -- well, it allows the theory to

overcome the element so that we're almost to the point of

dealing with an absurdity; and, of course, it applies to every

-- every defendant, including my client.

As to my client specifically, Your Honor, the

evidence shows that given his job for as long as he did it,

both Messrs. Ferrer and Hyer commented that it was a very

difficult job.  Neither one of them, they're co-conspirators

put on the stand to give whatever testimony they could with

respect to my client and others, said anything about the fact

-- or alleged fact that my client knowingly committed the act

1   of Travel Act prostitution or anything close to that, Your

2   Honor.

3           His job was just the opposite and, that is, not to

4   -- let me put it this way:  The rules changed.  The standards

10:53a  5   changed, but he was not the person who was in charge of making

6   those standards and making those rules.  He had the thankless

7   job of trying to implement those rules to see that an ad would

8   be acceptable.

9           So in our terms if we are looking at this to say,

10:53a 10   "Oh, yeah, but the ad is on its face an ad for prostitution,"

11   his intent and his job is to make sure those ads pass muster

12   by somebody above him, not his concept; and for what he got

13   paid in order to do this job, not only was it a thankless

14   task, but it was relatively -- I wouldn't say worthless with

10:54a 15   respect to him.  He did have a job and he respected the job

16   that he had.

17           So how do you rationalize -- oh, I know what the

18   Government will say.  He had these, I think, e-mails in which

19   he said we are not to leave notes about knowing that this is

10:54a 20   something from prostitution.

21           That can be looked at two ways.  We're here on a

22   beyond a reasonable doubt basis, and whether that means that

23   he's acknowledged prostitution in any ad or does it mean you

24   got to do your job and your job is to make sure that these

10:54a 25   rules apply so that there is no, as far as we are concerned,

ad for prostitution in what we are doing as moderators.

Four hundred moderators at the most -- the highest period of time, Judge, over -- well, I guess that might have been the last couple of years, but most of the time it was really 100, perhaps 200 moderators.  Indeed, when it started, there were only 40 people to do this thankless task; and I think that ties us right back into the specific intent content here.

How do you show that anybody, any moderator, irregardless of whether he's chief or not, and I could go on and on about that but not for the purposes here, how did anybody have any idea about any ad that goes through the queue and gets moderated?

Judge, in my view, the Government has overcharged this case.  They've done it with all of us, but they've particularly done it with the guy in the trench.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Eisenberg.

Who is coming forward from the Government?

MR. KOZINETS:  I am, Your Honor.

THE COURT:  Just -- just to be clear, Mr. Cambria, before I permit the Government to proceed, this objection is related to our prior discussion on proposed instruction, and for the Government's awareness it's Document 1657.  So I don't necessarily know that there needs to be a new response from

the Government.

MR. CAMBRIA:  Yeah, this is just our -- this is just all the First Amendment law that was in there so that's why I sent it up.

10:56a    THE COURT:  All right, thank you.

Mr. Kozinets.

MR. KOZINETS:   Thank you, Your Honor.

I think Your Honor hit the nail on the head with your question about the defendants' approach to the law here.

10:57a    Under their view, anybody who operated a website like Backpage knowing that their entire revenue generating business model was based on the sale of prostitution ads or other illegal goods or services, those people could never be held liable under the Travel Act unless they reviewed and saw every single

10:57a    ad that they posted or allowed to be posted.  That is not the law and it cannot be the law.

The notion that a website operator can simply hide behind the technology of how websites are run to avoid criminal liability is a theory that has been rejected in other

10:57a    cases, and I direct your court to *United States v. Ulbricht*, 31 F.Supp. 3d 540 from the Southern District of New York.

That involved the Silk Road case, a website where narcotics and other illegal goods and services were sold.  The website operator was successfully prosecuted.

10:58a    Now, he could not possibly have reviewed or seen

 1   every single ad or overseen every single transaction that

 2   transpired in the website, but the Court ruled that didn't

 3   matter.  As long as he had the knowledge and intent to set up

 4   a website that was designed to promote, facilitate, to create

10:58a  5   the sort of platform, that that -- that was enough.

 6           And we've litigated these legal -- these sort of

 7   preliminary legal issues almost ad nauseam over the

 8   approximately six-year history of the case.  The same legal

 9   arguments were made over and over again in multiple motions to

10:58a  10   dismiss, and I point the Court, for example, to Doc. 793 where

11   a lot of same time of intent and knowledge arguments were made

12   and the Court objected them.

13           On Page 16 of Doc. 793, for instance, the Court

14   discussed the *Michigan* case, 383 US at Page 503, which

10:59a  15   involved the level of intent required to prosecute an operator

16   of an adult bookstore; and the argument was made well, you

17   know, unless that proprietor had looked at every single book

18   in the bookstore, they can't be liable.  There's no liability

19   there, and the Supreme Court said no a scienter and intent

10:59a  20   requirement that shows that the defendants were, quote, "In

21   some manner aware of the character of the material they

22   attempted to distribute was sufficient," was enough.  That's

23   at Page 510 of that decision.

24           And in Doc. 793 the Court recognized that the

11:00a  25   Government's proposed mens rea standard, specific intent to

|        |     |                                                                              |
|--------|-----|------------------------------------------------------------------------------|
|        | 1   | promote or facilitate prostitution, is consistent with *Gibson*,             |
|        | 2   | *Tavelman*, *Polizzi,* the Ninth Circuit cases discussing the                |
|        | 3   | requirements of the Travel Act.  That's at page -- at Doc.                    |
|        | 4   | 793, Page 18.                                                                 |
| 11:00a | 5   | The Court went on to discuss that the alleged facts                          |

promote or facilitate prostitution, is consistent with *Gibson*, *Tavelman*, *Polizzi,* the Ninth Circuit cases discussing the requirements of the Travel Act.  That's at page -- at Doc. 793, Page 18.

11:00a  The Court went on to discuss that the alleged facts in the superseding indictment taken as true establish defendants have the specific intent to promote prostitution in violation of the Travel Act.  This is at Page 20 of that Doc. 793.  They conspired together to do so.  The conspiracy 11:00a was successful and resulted in the 50 ads for prostitution that make up the 50 counts of violating the Travel Act.

The Court also rejected this notion of kind of a boundless conspiracy.  That's in Doc. 946.  And so when counsel for Mr. Brunst first got up here, counsel referred to 11:01a this case as reflecting that the Court held that specific intent in the context of this case requires that the defendants knew that they had this sort of knowledge about each ad, and I refer the Court to page -- Pages 15 to 16. That was Judge Brnovich kind of restating the defendants' 11:01a argument.  It wasn't the holding of that order.

Instead, again, the Court referred back to its earlier ruling -- this is Page 15 of Doc. 946 -- its finding that the defendants had specific intent to promote or facilitate an unlawful activity as charged in the indictment.

11:02a  And with respect to this -- this notion of

UNITED STATES DISTRICT COURT

conspiracy being boundless, I think you need to look -- it's
important to look at the entire context of where that occurs
at Pages 13 and 14 of Doc. 946.

11:02a        After going over the language that Mr. Brunst's
counsel mentioned, the Court went on to say, quote, "Many of
the factual allegations place Defendants' roles at Backpage in
context and further illustrate this," the conspiracy.  To be
sure, the allegations certainly describe a course of conduct
where Defendants facilitated 'unlawful activity,' including
11:02a numerous pimps, prostitutes and traffickers in violation of
the Travel Act.  They also certainly describe how these
various groups continuously engaged in prostitution, which
plausibly fits within the definition of a 'business
enterprise.'"

11:03a        The Court went on to say, When read in its entirety
and construed according to common sense, the Superseding
Indictment adequately alleges the underlying businesses
involved in prostitution that defendants intended to
facilitate and thereafter facilitated or attempted to
11:03a facilitate.

        And then the Court went on to conclude there that
the Superseding Indictment alleges a continuous course of
criminal conduct, the operation of Backpage, supported on
fifty distinct occasions.

11:03a        So, essentially, Your Honor, I think a lot of the

 1   legal arguments that were just made have already been

 2   considered by the Court and do not preclude -- or do not

 3   support the arguments being made here.

 4          The *Gibson Specialty* case is an interesting case

11:03a  5   that counsel also mentioned, and in that case the Court talked

 6   about evidence showing that the manufacturer in some

 7   significant manner associated themselves with their -- with

 8   their customers, with the business enterprises that they were

 9   charged with promoting or facilitating.

11:04a 10          And I think what is -- what is very telling here --

11   or very key to looking at that issue is the *People v. Lurie*

12   case from California State Court.  This is a case that we have

13   cited in the proposed jury instructions and sort of the legal

14   discussion supporting our position on the instructions and,

11:04a 15   basically, what that case stands for -- and this is at page --

16   at Doc. 1626-3, Page 22.

17          That case stands for the proposition that intent can

18   be inferred from knowledge in a variety of circumstances,

19   including those that fit within the evidence here, and those

11:04a 20   indicia of intent that have been well recognized here are

21   proof of inflated charges for the goods or services that are

22   tied to illegal activity, evidence of an unusual volume of

23   business with prostitutes, evidence that it demands to a high

24   proportion of the seller's total business, you know, and we

11:05a 25   have introduced a very large amount of evidence showing that

1   Backpage derived the lion's share of its revenues from

2   prostitution.

3           Also, evidence that the sale of these illegal goods

4   or services have become the dominant portion of the seller's

11:05a 5   business.  We've shown that here.

6           THE COURT:  Well, let me ask you with respect to the

7   second element of the Travel Act violations, the way that the

8   jury was instructed in the preliminary instructions relates to

9   the defendant performed or attempted to perform an act that

11:06a 10   did promote, manage, established, carry on or facilitate the

11   promotion, management, establishment or carrying on of a

12   business enterprise involving prostitution offenses.

13           Given that element of these Counts 2 through 51, is

14   it necessary then for the Government to put forward specific

11:06a 15   evidence related to the business enterprise as it relates to

16   the specific ads that are stated in each of those counts?

17           MR. KOZINETS:  So --

18           THE COURT:  Do you understand the question?

19           MR. KOZINETS:  I -- I'm not entirely sure.  Are you

11:06a 20   referring to just the evidence about the business

21   enterprise --

22           THE COURT:  Yes.

23           MR. KOZINETS:  -- reflected in the ads?

24           THE COURT:  Yes, and what I'm trying to understand

11:06a 25   is you've determined the count based on a particular ad on a

```
 1    particular day.
 2              MR. KOZINETS:  Right.
 3              THE COURT:  And so what is the -- what is the
 4    necessity for the Government to put forward evidence related
11:07a  5   to a business enterprise to that particular charge?
 6              I don't know if that's any clearer.
 7              MR. KOZINETS:  I think that -- you know, as alleged
 8    under that second count, an act -- a subsequent act, you know,
 9    in furtherance of promoting or facilitating the promotion of
11:07a 10   the business enterprise.
11              So there has to be proof of something, you know --
12    facilitation or promotion which we contend, you know, is
13    written all over the trial evidence that's been presented over
14    the last 21 days; but as Your Honor focused more not so much
11:07a 15   on the defendants' act, but on the business enterprise being
16    promoted or facilitated?
17              THE COURT:  Yes.
18              MR. KOZINETS:  Well, we think there -- we've
19    litigated this to some extent and this was in Doc. 840, Motion
11:08a 20   to Dismiss the Superseding Indictment with respect to this
21    issue, and the Court recognized in that -- I'm sorry, it's not
22    Doc. 840.  That was the CDA.  It was Doc. 946.
23              THE COURT:  946?
24              MR. KOZINETS:  946.  And the Court recognized that
11:08a 25   that element -- it is -- it is part of the element, but
```

there's a very, very low bar to putting forward evidence of a

business enterprise and the Court in a footnote in that

decision cited to -- give me a moment.  I might be able to

find it -- cited to a Fourth Circuit case.  This is Doc. 946

11:08a   at 1104 where just the discovery of a triple-beam balance

scale in the defendant's premises, that was enough indicia of

a continuous heroin selling enterprise, just that really small

amount of evidence, something to show that there was some sort

of continuous course of -- of conduct.

11:09a            That is what a business enterprise is under the

Travel Act, and we believe that the record here contains ample

direct and circumstantial evidence that each of these fifty

ads were tied to something that was more than just a sporadic

or occasional solicitation for prostitution, and I'd be happy

11:09a   to elaborate further if Your Honor would like on that.

            THE COURT:  Can you move to -- with respect to the

remaining counts -- and, actually, I'd like to kind of get

your theory or what you believe the evidence is with regard

Count 63.  As Mr. Panchapakesan stated, that essentially money

11:10a   to a web developer is the allegation, how does that relate to

the substantive charge?

            MR. KOZINETS:  Sure.  Thank you, Your Honor.

            So on September 21st at about 3:18 p.m. Mr. Ferrer

did testify about this.  He talked about receiving fees from a

11:10a   company in India and how they were looking for non-adult

```
 1   content that we could import to increase the ad count in our
 2   categories that were not adult, and that's what this payment
 3   in Count 63 was for.
 4           And if Your Honor recalls -- so do you remember the
 5   exhibit -- I believe it was Exhibit 120 marketing presentation
 6   that Mr. Brunst and Mr. Ferrer put together in 2011?
 7           In that presentation, which showed that --
 8           THE COURT:  Well, let me -- let me just generally
 9   ask this question:  So is it your position that, essentially,
10   then, any proceeds that were received from the operation of
11   Backpage at that time then -- because they were considered
12   illegal proceeds, then whatever was used with that money to
13   purchase then could be alleged?
14           MR. KOZINETS:  Absolutely, Your Honor.
15           THE COURT:  That's the -- that's the position?
16           MR. KOZINETS:  Absolutely.  So -- go ahead.
17           So with respect to Count 63, which is charged as a
18   promotional money laundering transaction, the promotion was
19   the use of these Backpage derived funds to pay this website
20   developer in India for the purpose of further promoting the
21   Backpage business.
22           So they would take those fund and then supply
23   Backpage with these fees, which Mr. Ferrer testified were just
24   sort of -- kind of computer-generated or
25   automatically-generated sources of legitimate ads, you know,
```

1   trucking, employment, what have you, things that Backpage

2   wasn't actually in the process of selling to its own customers

3   but sort of imported almost fake content to make it appear

4   that Backpage's business was legitimate, that it really was

11:12a   5   another Craigslist, another very general purpose classic

6   advertising site that earned revenue from all kinds of ad

7   categories.

8        It was an effort to deceive and to mask the true

9   nature of the website, which was singularly focused on earning

11:13a   10   money from the sale of prostitution ads, and that's -- so this

11   Exhibit 120, we could look at it if Your Honor wants, we don't

12   have to, but that's -- that's the exhibit that shows that

13   approximately 94 percent of Backpage's revenue is from the

14   adult section.

11:13a   15        Mr. Ferrer testified -- and I think the exhibit

16   actually has another slide showing that about 80 percent of

17   that came from female escorts and when you ad body rubs and

18   the other escort categories, the percentage actually comes up

19   to 96 percent.  So 96 percent of the website's revenue is

11:13a   20   coming from the sale of prostitution ads and we've had witness

21   after witness after witness who's come here and testified

22   under oath right here that on Backpage when an ad was denoted

23   an escort ad, "escort" meant prostitution; and we've seen that

24   just in any number of overwhelming ways, and I could go

11:14a   25   through that chapter and verse, but I don't think we need to

1   because of the standard that applies here under Rule 29.

2          The sufficiency of the evidence standard is an

3   extraordinarily low one.  It's extraordinarily liberal in

4   terms of what is needed to present charges to the jury.

11:14a 5   Looking at the evidence in the light most favorable to the

6   Government, drawing all inferences in favor of the Government,

7   could any rational juror find guilt here?

8          It's under that -- we far exceed that standard here,

9   but that is what applies.

11:14a 10          THE COURT:  Let me ask you about -- there was a -- I

11   think Mr. Cambria is the one that raised this.  He suggests

12   that there is no evidence to -- well, there was no connection

13   between the loan payment and concealment, that essentially

14   there was no concealment that occurred.

11:15a 15          MR. KOZINETS:  So I think there are a few different

16   responses to that, Your Honor.

17          The first is that the entire sale was a sham, as

18   Mr. Ferrer testified to.  The sale itself was designed to

19   further distance the owners, three of the defendants here,

11:15a 20   from their connection to Backpage, put everything on paper in

21   Mr. Ferrer's name while they continued to reap all of the

22   profits.

23          Mr. Ferrer testified that these payments that he was

24   making, he was obligated to pay the owners eight million

11:15a 25   dollars a month under the so-called sale and loan agreements;

and he also testified that an elaborate web of companies were

created in connection with the sale, a whole chain of holding

companies on Mr. Ferrer's side and a whole chain of holding

companies on the defendants' side as well, Mr. Brunst,

11:16a  Mr. Spear and Mr. Lacey, to further distance the ultimate

owners from the business entities involved.  So the sale

itself had a deceptive purpose, a purpose of concealment.

Then we go into the entities that were used to make

these transactions.  Mr. Ferrer testified that Website

11:16a  Technologies itself was created to conceal the real source of

these funds, which was Backpage, which was 96 percent funded

by revenue from these prostitution ads.

So you have concealment with respect to this -- to

this money being funneled through Website Technologies.  Then

11:17a  you have concealment that it's being then paid to this Cereus

company, this holding company that is -- is not just created

for the purpose of taking in loan payments, but instead is

created for the purpose of taking in Backpage's revenues which

are coming in by way of loan payments, but taking Backpage's

11:17a  revenues and then using them to make -- to pay Backpage

obligations.

Carl Ferrer testified that the moment the money hit

Cereus' account there were distributions to the three owners

and a fourth owner and, in addition, Mr. Ferrer, and I believe

11:17a  even Mr. Quoc Thai testified, that Cereus also functioned as a

kind of payroll processing entity for Backpage.

So the money would go up to Cereus and then would come back out and be used to pay certain Backpage payroll expenses as well, and so these are all done in a way -- if one wanted to not conceal or not disguise, why have the money go through all these different entities and kind of go through all these sort of transactional gymnastics, if you will, if there was any sort of purpose of being completely transparent?

We submit that the evidence here is more than sufficient to show that the purpose was to conceal in whole or in part, or in part, as the statute says, and I don't know if -- okay, so then -- so does Your Honor have any other questions about that issue?

THE COURT:  Well, I do want to just ask you:  So the *Pinkerton* theory that you're advancing, I just want you to tell me -- Mr. Panchapakesan also pointed out Count 69 through 70 and 82 through 84 as it relates to his client.

That's the theory that you're -- you've alleged the allegations against Mr. Brunst.  Is that -- do I get that correctly?

MR. KOZINETS:  I think that's true as an alternative theory, but I don't think that's the whole -- the whole basis there.  I think the evidence shows that Mr. Brunst was the CFO of the entities that funneled the money involved in those accounts and that he was one of two signatories, one of two

```
 1    people connected to those accounts who had the authority to
 2    make those transactions.  So we think there is a direct theory
 3    of liability there.
 4            Alternatively, there's a --
 5            THE COURT:  And those relate to the Ad Tech and the
 6    Cereus Properties?
 7            MR. KOZINETS:  Mr. Stone can address this with more
 8    particularity.
 9            MR. STONE:  Your Honor, two of those counts, 69 and
10    70, relate to Camarillo, the company Camarillo Holdings.
11            THE COURT:  Ah, okay, okay.
12            MR. STONE:  And there was testimony and evidence
13    that Mr. Brunst was the CFO of Camarillo.
14            In addition, there was lots of testimony by
15    Mr. Ferrer about Mr. Brunst' role post sale in terms of being
16    the bill collector for all of Backpage's proceeds that were
17    being funneled back to the owners and the individuals who sold
18    the company, lots of testimony by Mr. Ferrer about that.
19            The other counts in 69 through 99 where Mr. Brunst
20    is charged relate to Cereus Properties where he's also the
21    CFO, according to the testimony and the evidence at trial, and
22    was one of two signatories on the bank account was Mr. Brunst
23    and Mr. Spear; but, again, there's ample evidence that it was
24    Mr. Brunst who was in charge of the banking transactions via
25    all the e-mails with the banks and all the discussions he had
```

Timestamps: 11:19a (line 5), 11:20a (line 10), 11:20a (line 15), 11:20a (line 20), 11:21a (line 25)

1    with Mr. Ferrer and that came out in testimony from

2    Mr. Ferrer.

3          So those -- that's our theory on the Counts 69

4    through 99, which are all transactional money laundering

11:21a  5    counts.  The individuals who are charged either received the

6    transaction or, in Mr. Brunst's case, were the ones who made

7    the transaction happen that went to the individual.

8          THE COURT:  All right, thank you.

9          Anything further?

11:21a 10          MR. KOZINETS:  There were several points made about

11    the individual defendants and the sufficiency of the evidence

12    as to each of them.  I'd be happy to address any questions you

13    have about any of the specific defendants.

14          THE COURT:  I would like you to take a moment and

11:22a 15    respond to Ms. Bertrand, her argument with regard to her

16    client, and Mr. Eisenberg's with regard to his client.

17          What is the evidence as the Government sees it?

18          MR. KOZINETS:  Thank you, your Honor.

19          So Mr. Padilla and Mr. -- and Ms. Vaught ran the

11:22a 20    moderation department.  The moderation department was the

21    engine room of Backpage, particularly during the years covered

22    by the substantive counts here.

23          All of the prostitution ads ran through that

24    department or were supposed to have run through that

11:23a 25    department, and what we see in the trial evidence is e-mail

after e-mail after e-mail showing that these two defendants
were managing that department, were instructing the employees
of that department and were actively engaged in this -- what
Mr. Ferrer described as making the ads look less obviously
11:23a 5  like prostitution ads, that being the purpose of the
moderation department during these years.

And so, for instance, in Exhibit 56 we have an
e-mail from Mr. Padilla to Jeff Lyons on which Ms. Vaught is
copied.  This is from October 8th, 2010, where he says until
11:23a 10 further notice do not leave notes in user accounts because
this particular moderator, Mr. Lyons, left a note saying,
"Hey, I think this is a prostitution ad," and he was
instructed by the people running the moderation department,
"We're not going to say anything in writing about whether
11:24a 15 these are prostitution ads."

Then we have e-mails, such as Exhibit 49, about
cleaning up the site as the Attorney Generals started to put
some pressure on Backpage and Mr. Padilla instructing that
only the "worst apples" quote/unquote should be affected.
11:24a 20 We have him disseminating e-mails about terms for
the strip out filter.  This is the filter that removed code
words, solid sex for money terms that the defendants had
identified and still allowed the ads to be published without
kind of interfering with the underlying purpose of the ads.
11:24a 25 Another example is Exhibit 1928 where Mr. Ferrer has

-- has said the terms GFE and PSE, which the Court has heard a
lot of about as being a prostitution -- prostitution terms,
those have to be removed; and Mr. Padilla says in response,
that will mean I have to edit -- you know, having to edit
11:25a  every ad on the site.  This is in October of 2010, knowledge
that these ads are prostitution ads.

        And kind of -- the e-mails go on and on.  There was
one exhibit, 610, from the same time period where Mr. Padilla
is instructing the moderation staff, "No nudity below the
11:25a  waist."  "No crotch shots."  You know..."g-strings are okay."
"Boobs are okay."  A list of prices with no time increments
are okay, like 60, 80, 100, 120; and he's basically putting
the word out these are -- this is what we have to do to make
these ads less obviously prostitution ads.

11:26a          And then if Your Honor recalls, at the end of that
e-mail he says, Scott, defendant Mr. Spear, "Scott's really
pleased with the work we've been doing and he's giving us all
movie passes, if not this week, then next.  If you work from
home, we'll mail yours."

11:26a          There are more and more e-mails showing all of this.
Eventually we get to the e-mail Exhibit 647 regarding The
Erotic Review and this is an e-mail where Mr. Padilla -- well,
first of all, there is a lot of evidence in the record now
about The Erotic Review, about what it was, what it meant, how
11:26a  it showed that ads associated with The Erotic Review were

1    unquestionably for prostitution.

2          The defendants -- Mr. Lacey was confronted with this

3    evidence and Mr. Spear when they met with NCMEC in 2011.  The

4    *Wall Street Journal* wrote about it.  It came up in other media

11:27a  5    accounts, public officials, non-government organizations.

6    Internally the company and the defendants knew what this

7    purpose of The Erotic Review was.

8          So now we're getting to a point, though, where the

9    Attorneys General are putting pressure on Backpage and they're

11:27a 10    trying to make the site look less obviously like prostitution.

11          So Carl Ferrer testified that he discussed this with

12    Mr. Spear and they decided to unthread the needle by taking

13    out these hyperlinks to The Erotic Review and maybe taking out

14    the words TER but leaving in the ID numbers so people could

11:27a 15    look up the reviews on their own, and so Mr. Padilla is

16    instructed by Mr. Ferrer and he disseminates this message to

17    all of the moderation staff in Exhibit 647 and he says leaving

18    the ID number is okay.  "If you have any questions, please ask

19    me or Joye," defendant Vaught.

11:28a 20          And later on in March of 2016 in Exhibit 199

21    Mr. Padilla writes to the staff, and he says the term GFE is

22    now back.  We can start using that again.

23          So the defendant as to Mr. Padilla -- and this is

24    just a slice, a sampling, of the kinds of e-mails and

11:28a 25    discussions and meetings that Mr. Padilla was involved in that

UNITED STATES DISTRICT COURT

 1   showed that he was -- that he and Ms. Vaught were really the

 2   ones who were the tip of the spear, if you will, in

 3   implementing this strategy of making these ads look less like

 4   prostitution.

**11:29a**  5        And as Mr. Ferrer and Mr. Hyer, other witnesses

 6   testified at trial, this was really deliberate and intentional

 7   effort to allow the continued promotion and facilitation of

 8   prostitution and to assist Backpage's customers by helping

 9   them continue to ply their wares, if you will, and to continue

**11:29a** 10   to use Backpage as this platform for doing that.

11        So with respect to Ms. Vaught, in particular, we

12   know that she was the second in command of the moderation

13   department -- and just to circle back, to take a step back,

14   one of the defendants today said something about Liz McDougall

**11:29a** 15   assuming control of the moderation department from 2012

16   onward.

17        That is not the case.  That is not consistent with

18   the trial testimony here.  Mr. Ferrer testified that

19   Ms. McDougall was, in his words, herself moderated by

**11:30a** 20   Backpage's owners.  She wasn't given all of the information

21   about revenue sources and other information about how the

22   company was being run and was essentially sidelined.

23        She wasn't involved in the day-to-day business

24   operations of the moderation department.  Instead, what we

**11:30a** 25   have is Mr. Padilla and Ms. Vaught, his second in command,

1   reporting directly to Carl Ferrer.  That's what the trial

2   evidence shows.

3          And Ms. Vaught in that position, helping to run the

4   moderation department, is copied on many of these e-mails that

**11:30a**  5   we've just discussed involving Ms. Vaught and sends many of

6   her own e-mails.  A good example is Exhibit 646 referring --

7   and this is from February 18th, 2011.  It's called "Edit Lock

8   Out" where Ms. Vaught writes the whole moderation department

9   and cc's Mr. Padilla and says, "We are giving the users a

**11:31a** 10  clean slate regarding editing rights.  Any ad that has

11  previously been locked out from editing, will have those

12  rights restored."

13         And if Your Honor recalls, lock out -- let me put it

14  this way:  After somebody posted an ad and it went up on

**11:31a** 15  Backpage, that wasn't the end of the story.  The poster could

16  still go back in and edit their ad and change them after they

17  had been moderated.  That was testimony from Mr. Ferrer as

18  well; but what the moderators did was if there was somebody

19  that they thought was an egregious or repeat offender, they

**11:31a** 20  could occasionally lock out, prevent the poster from editing

21  ads after they'd gone through moderation.

22         And what Ms. Vaught is saying here in this e-mail is

23  for those -- essentially, those worst offenders, we're going

24  to give them a clean slate.  We're going to start over with

**11:31a** 25  them and "This time around," she says, "we should go easy on

certain types of violations," and -- and goes on to say that

blank pricing, "69" in the age field, breasts covered by hands

or arms and thongs riding a little too low shouldn't be

treated the same as something that says, you know, explicitly

**11:32a** an offer for a blow job, for instance.  And then she says, "If

you aren't sure what this means please ask me or Andrew."  So

the two of them working together were -- were working to -- to

carry out this part of the conspiracy.

There are additional -- I mean, there were so many

**11:32a** e-mails introduced that relate to this.  Ones that involve

Ms. Vaught also include Exhibits 103a and b, Exhibits 1697 and

1697a where Ms. Vaught goes through certain images and ads and

says these are okay, these are not okay; but upon looking at

them and showing them to the jury, one can see that all of the

**11:33a** ads are -- fit within kind of the ads that have been

demonstrated to be ads for prostitution in the course of the

evidence that's been presented here.  The same thing with

Exhibit 1698 and 1698a.

In Exhibit 1219 Ms. Vaught writes, we've restored

**11:33a** images that were deleted by the Avion crew.  That's an

offshore moderation crew, because these do not break the

rules; but, again, the ads, the images, fit clearly within,

you know, the other ads and images that we've been looking at

that witnesses have identified as being prostitution ads.

**11:33a** In Exhibit 1816, this is from 2013, she's responding

1    to a moderator who took down an ad or wanted to report it and

2    she says, "I probably wouldn't have reported this one," and

3    the moderator tells her -- responds and says, "she looked

4    drugged and has bruises..."  That was really why I decided to

11:34a 5    slate it for reporting.  And Ms. Vaught responds, "She just

6    doesn't look under 18.  These are the kind of reports the cops

7    question us about.  I find them all the time, it's just

8    usually you who sends them."

9           So she's saying to this moderator, this isn't the

11:34a 10   kind of thing that we report up.

11          In Exhibit 1696, this is in 2011, she tells the

12   moderation staff, "We are going to start allowing users to

13   post the word prostate again.  If you have any questions let

14   me know.  Thank you.  Joye."

11:34a 15          In Exhibit 1909 Ms. Vaught is forwarded a lengthy

16   e-mail discussing Nicholas Kristof's documentary about the

17   victim, who actually is one of the victims who testified here,

18   Ms. Figueroa.  This was the -- a documentary that provided

19   further information and background.  He had been writing in

11:35a 20   the *New York Times* about prostitution occurring on Backpage.

21   This comes up to Ms. Vaught.  She is aware of that.

22          And then Exhibit 198 is an e-mail from Ms. Vaught to

23   the moderation staff also communicating that GFE, that very

24   well-known prostitution term, is now allowed back on the

11:35a 25   website.

1          So we think for purposes of Rule 29 and the

2     sufficiency of the evidence standard, drawing all the

3     inferences in favor of the Government that there is more than

4     enough to meet that very low threshold to get the charges

11:35a  5     involving Mr. Padilla and Ms. Vaught to the jury.

6          THE COURT:  All right, thank you.

7          Before I entertain any replies, I assume defense

8     wants to make replies, let's go ahead and take another

9     15-minute break.  After I hear those replies, I do want to

11:36a  10    take a moment to just ask some questions about each of your

11    proposed forms of verdict, and then we can adjourn for the

12    day.  All right, we'll stand in recess.

13         MR. LINCENBERG:  Your Honor, can I ask what time is

14    the Court anticipating adjourning for the day?

11:36a  15         THE COURT:  I don't know, it depends on how those

16    discussions go.

17         COURTROOM DEPUTY:  All rise.

18         (Recess taken at 11:36 a.m.)

19         COURTROOM DEPUTY:  All rise.

11:52a  20    (Back on the record at 11:52 a.m.)

21         THE COURT:  All right, please be seated.

22         At this point I will take up any reply by the

23    defendants.  Mr. Panchapakesan, yes.

24         MR. PANCHAPAKESAN:  Thank you, your Honor.

11:53a  25         So I'm going to start, I think, where the Court left

off during my argument and Mr. Kozinets addressed this notion

of, well, if the Travel Act is not a mechanism to deal with

this sort of situation, then what is?

And I highlight for the Court that in 2018 there

11:53a   were laws passed.  FOSTA's one of them.  It allow states and

victims to fight on-line sex trafficking act and in connection

with that act -- for example, there was a report from the

committee on the judiciary from the House in connection with

that act and it talks about Backpage and Craigslist and how do

11:53a   we address this issue?

And what that report says is, quote:  Importantly,

current federal criminal law which is unaffected by the CDA

presently lacks proper prosecutorial tools to combat these

websites."

11:54a   At the end it says, in connection with the sex

trafficking statute -- the federal trafficking statute --

further, general knowledge that sex trafficking occurs on a

website will not suffice as a knowledge element and must be

proven as to a specific victim.

11:54a   And so our position is that the Travel Act requires

specific intent as to business enterprises.  It's not enough

to say, for example, as to my client, that a five percent

minority owner, a CFO of a business is criminally liable

because some user may have posted illegal content on the site.

11:54a   And while I'm not suggesting that Facebook and

Backpage are the same thing, the Government's presentation of

evidence as to my client to say, for example, "You were aware

these ads were on the site," it's really no different than

what the case would be against a CFO of any website platform,

11:54a 5   that you were aware of the types of content that was on the

site; and the missing link there is specific intent as to the

business enterprises, right, the fifty ads, the advertisers,

pimps, et cetera who are posting those ads.

9          Second is there was a lot of discussion about Docket

11:55a 10  946, which is the Court's prior order on a Motion to Dismiss.

What we're relying on this order to show -- and I didn't hear

any push back on this from the Government -- is that the

conspiracy count is limited to the fifty ads, right, because

that's what we've been on notice of; and I think what the

11:55a 15  Government said is, well, in that order in denying the Motion

to Dismiss the Court says, well, the indictment sufficiently

talks about things like super posters and William Mersey,

right, and these individuals that the Government claims were

affiliated with Backpage.

11:55a 20         The problem is that at trial as to my client,

Mr. Brunst, there's been no evidence that he was affiliated

with a super poster, for example, but he was in a conspiracy

with Mr. Mersey, who I think the Government's called Dollar

Bill.  There's no evidence that a super poster, for example,

11:56a 25  was responsible for one of the fifty ads.

UNITED STATES DISTRICT COURT

1    So it's one thing for the Court to say, well,

2    looking at the allegations of the indictment, these types of

3    things might qualify as business enterprises.  It's another

4    thing at trial to establish the existence of the business

11:56a  5    enterprise, one, and, two, to show that my client, Mr. Brunst,

6    intended to facilitate those business enterprises and I

7    think -- Mr. Kozinets, he cited a California State case,

8    *People v. Lurie*, and I think it to some extent demonstrates

9    the Government's grasping at straws here, right.

11:56a 10    They don't site to a Ninth Circuit Travel Act case

11    that says, well, what's going on here is evidence of intent.

12    They site to an irrelevant State California -- California

13    State case on this notion of intent, which is -- it's not only

14    inapplicable here, but I think it demonstrates the problems in

11:57a 15    their case in terms of intent.

16    Now shifting to the money laundering counts, Count

17    63 was one of the counts that the Court referenced.  That was,

18    I think, a count dealing with a website developer and this is

19    one, of many instances, where Government counsel to some

11:57a 20    extent was sort of testifying in some extent -- to some

21    extent.

22    I didn't hear the Government cite testimony on this

23    specific transaction, about this transaction, what it was for,

24    what its purpose was.  I heard a reference to a PowerPoint and

11:57a 25    94 percent of the ads are for adult.

1    That doesn't come close as to this count or other

2  counts to establish what the specific purpose of it was; and

3  so, for example, in the US v. Brown case I cited in my initial

4  argument, the Fifth Circuit case, 186 F.3d 661, on promotional

11:58a 5  money laundering what the Court says is, quote, "The problem

6  with the government's position is that it ignores the *intent*

7  aspect of the promotion element.  Section 1956(a)(1)(A)(i) is

8  not satisfied by a showing that a financial transaction

9  involving the proceeds of specified unlawful activity merely

11:58a 10 promoted the carrying on of an unlawful activity.  The

11 provision has a specific intent element."

12    I think that's the element that's missing as to

13 these promotional counts.

14    And then lastly turning to the concealment money

11:58a 15 laundering counts, the Government's cases of these counts is

16 extraordinarily weak.  Mr. Kozinets in response to the

17 Government's -- in response to the Court's question said, "He

18 said the entire sale was a sham," right.

19    But the testimony, Your Honor, from Mr. Ferrer was

11:58a 20 the price was too high, the negotiations were unfair, the

21 interest rate was too high, the monthly payments were too

22 high.  At best, even construing that evidence in the

23 Government's favor, all Ferrer is saying is he thought the

24 sale was unfair, right.

11:59a 25    The undisputed testimony is that the purpose of

these payments, they were payments on loans.  Even the contemporaneous e-mails put in by the Government I think towards the end of Mr. Ferrer's direct, like Exhibit 1214, talks about, like, a default on the loan, right.

11:59a        So in these communications about these transfers, the parties are talking about them in the context of a loan, loan payments, forbearance on a loan.  There is no direct evidence that any of these loan payments, these specific transactions, were part of some effort to conceal or disguise the source of the payments.

        Now, Mr. Kozinets, I think, asked a question at the end when we were talking about these counts.  He says quote -- why have money go through all these entities is basically what he said.  That's not proof beyond a reasonable doubt.  It's not enough for -- it's not enough for the Government to just sort of pose the question.  Well, there's lots of entities here and why have the money go through them?  That must be concealment.  That's not direct evidence of concealment.

        There's been no testimony from Ferrer or anyone else that the sale structure itself, that the sale of Backpage was set up intentionally in some sort of deceptive or disguising manner.  That's not what the record is.

        And so, for example, I think Mr. Kozinets cited some testimony from Quoc Thai.  He's a former agent.  He said something to the effect of, you know, Cereus Properties pays

1    the bills of Backpage.

2           Cross-examination of Mr. Thai and he pretty clearly

3    stated multiple times he hasn't looked in to the purpose of

4    these transactions.  He doesn't know what these entities do.

**12:00p** 5    He said this repeatedly.  So he can't be the witness through

6    whom the Government is trying to establish the purpose of

7    these transactions and whether they were deceptive or

8    concealed something.  That had to have been through Ferrer,

9    and he didn't do that as to these transactions.

**12:01p** 10          And then, lastly, there's several transactional

11   money laundering counts where my client is sort of a secondary

12   defendant; and those counts, just for the record, are 69, 70,

13   78, 80 through 81, 83 through 84 and 86 through 93 and I think

14   the Government's argument there -- I think they said something

**12:01p** 15   to the effect of, you know, he's one of two signatories on the

16   account and that's the extent of their evidence.

17          They have no proof.  There's nothing in evidence

18   that he authorized these transactions or he signed something

19   effectuating these transactions.  It can't be the case that

**12:01p** 20   someone's responsible -- directly responsible for

21   transactional money laundering because they were one of two

22   signors on an account; and if that's the extent of their

23   evidence on that, and as I understand it is, then they've

24   clearly -- even construing that evidence in the Government's

**12:02p** 25   favor, no rational juror could find beyond a reasonable doubt

that my client was responsible for -- for those -- those

transactional money laundering counts.

THE COURT:  Thank you.

MR. PANCHAPAKESAN:  Thank you.

12:02p   THE COURT:  Mr. Cambria.

MR. CAMBRIA:  At one point, Your Honor, Mr. Kozinets

said, well, we can't have a situation where -- he says you're

not saying that you have to be aware of every single ad.

We didn't say that at all.  What we said was there

12:02p   needs to be proof of knowledge of the fifty ads that are in

the Indictment.  Why are they in the Indictment, unless

they're giving us notice?  And Judge Brnovich in her prior

decisions made it clear that they were the vehicle that would

be used to, if you will, advance the so-called enterprises.

12:03p   Well, you have to know about it.  I don't know why, but they

took those steps to try to prove at all that anybody knew

anything about any of these ads.

The other thing is this -- he cited the *Michigan*

case.  *Michigan's* an obscenity case, and it's certainly not a

12:03p   specific intent Travel Act case.  It's apples and oranges here

as far as this is concerned.

And finally, you know, talking about lack of things,

with regard to Mr. Lacey, they don't have him doing any

affirmative act.  The only thing they talked about was that he

12:03p   was at a meeting where there was shouting and red faces, and

        1    they didn't even go in the meeting.  They just -- after it was

        2    over.  There was nothing in there about signing anything,

        3    about ordering anything.  It's just none of -- none of that

        4    has occurred at all.

12:04p  5            So I submit that particularly with regard to the

        6    fifty ads there had to be proof somewhere of knowledge of

        7    these ads because they're the vehicle that supposedly is

        8    advancing this enterprise.  Thank you.

        9            THE COURT:  Thank you.

12:04p 10            Ms. Bertrand.

       11            MS. BERTRAND:  The Government's burden remains

       12    beyond a reasonable doubt and while this is simply -- you

       13    know, at this phase in the case the -- all we have is the

       14    Government's evidence.  They still have to prove beyond a

12:05p 15    reasonable doubt each element of the crimes alleged against

       16    each of these defendants, and it is not enough to say there's

       17    a reasonable inference if there is an alternative to that

       18    reasonable inference.

       19            So here, the Government cannot point to any evidence

12:05p 20    that Ms. Vaught knew about a conspiracy to violate the law.

       21    They show she got hired to do a specific job, and Carl Ferrer

       22    testified that she progressed in the organization because she

       23    did that job so well.  She was careful.  She was detail

       24    oriented.  She was hard working.  There's been nothing in this

12:06p 25    record that says "and she did it all with a wink and a nod."

1    In fact, there's nothing to show that these

2 moderators, thrown into a maelstrom of weird, knew that they

3 were doing anything other than trying to follow the law; and

4 the e-mails cited by the Government underscore that

12:06p 5 alternative inference, and if we have an alternative inference

6 they have not met their burden beyond a reasonable doubt.

7    And that alternative inference is that these e-mails

8 are coming in weekly, daily, several times a day saying this

9 is the new target, understanding the chaos that Ms. Vaught was

12:07p 10 trying to create order of.

11    There is nothing that shows that this woman did

12 anything other than try to follow the law in a very imperfect

13 situation, and that's underscored by the fact that the

14 evidence also shows she was helping law enforcement, and there

12:07p 15 is no evidence that shows she did anything in the vein of

16 plausible deniability.

17    She shows up and is helping law enforcement because

18 she thinks she is helping to fight crime, she's helping to

19 fight prostitution and it's more dastardly subsections.

12:07p 20    Ms. Vaught should not be here.  The Government's

21 evidence fails and supports this Court saying to Ms. Vaught,

22 "Today you can go home," and it doesn't mean that this Court

23 has to find anything other than the Government's case in chief

24 lacks the evidence to show beyond a reasonable doubt that this

12:08p 25 one woman, doing an impossible job, had anything but the

UNITED STATES DISTRICT COURT

1    intention to follow the law.  Thank you.

2              THE COURT:  Thank you.

3              Mr. Feder.

4              MR. FEDER:  Two quick points, Your Honor.

**12:08p**  5              No. 1, in Document 699 there's a response to the

6    Government's prior assertion about this Silk Road issue.

7              Silk Road was a overt sales of cocaine that are not

8    protected by the First Amendment versus what happened in this

9    case, which is that there are no overt sex act ads, and it's

**12:09p** 10    the inverse and the argument by the Government just is apples

11   and oranges.  That's No. 1.

12              No. 2, while potentially unwelcome, the Government's

13   entire argument about moderation is in violation of Section

14   230 of the Communications Decency Act.  It's the entire

**12:09p** 15   purpose of that law as demonstrated by the -- Congress'

16   passing of SESTA and FOSTA, which at some point were

17   characterized as the anti-Backpage cases demonstrating that

18   the Travel Act does not apply to Backpage pre-SESTA and FOSTA

19   because you can't have general -- I mean, the Government wants

**12:10p** 20   this to be a general intent crime.  That's what they've been

21   doing since the inception of this prosecution, and it just

22   doesn't work.  It's not what the Travel Act is for.

23              THE COURT:  Mr. Eisenberg.

24              MR. EISENBERG:  Your Honor, this is what the

**12:10p** 25   Government's case consists of with respect to my client,

1    Mr. Padilla, a series of e-mails.

2         The e-mails themselves never say anything about

3    acknowledging prostitution, whether they are coming from

4    Mr. Ferrer or from my client.  What they say and what they

**12:10p** 5  address are standards.  No witnesses come before the Court to

6    say that in any particular e-mail it was discussed with

7    Mr. Padilla that what he was doing was covering up for

8    prostitution.

9         We don't have that evidence.  So we're left with the

**12:11p** 10 inference, if you will, from an e-mail about trying to clean

11   up a site that what was the problem is that the site was for

12   facilitating the business of promoting prostitution, and there

13   hasn't been any acknowledgment by a moderator.  There hasn't

14   been any acknowledgment by any other witness in this entire

**12:11p** 15 case that what was discussed in these e-mails was designed to

16   cover up prostitution.

17        The bottom line here is that my client was given

18   certain rules, regulations, if you will, standards, and those

19   are the ones that he is to apply in order to do his job.  So

**12:11p** 20 what are we left with?  No particular ad was ever associated

21   with any of these e-mails, and the only ads that we really

22   have in this case is no proof he's ever seen them before.  No

23   proof he had anything to do with them.

24        And if you put this in the context of trying to

**12:12p** 25 reject ads, delete pictures, take out bad words, that seems to

UNITED STATES DISTRICT COURT

be, Your Honor, inconsistent with the idea that what he's

trying to do is to promote prostitution.  What he's trying to

do is take the concepts of standards and apply them as he is

told what those standards are.  He doesn't make those up.

**12:12p** Those are somebody else's standards.

So now we're saying with an ad we don't ever see,

because none of these e-mails relate to any specific ad that

we can find actually posted, he's contributing to facilitating

a prostitution.  We just don't -- you can't relate an e-mail

**12:13p** to anything specific in terms of an end result.  So you've got

e-mails going within the organization, but nothing actually

posted.

So even at its worst connotation if two individuals

or a group of moderators are being addressed with respect to

**12:13p** "These are the changes that we have to do," so even at its

worst concept doesn't ever -- doesn't actually result in

anything that the Government is able to show this is the

product of that discussion.  This is -- in other words, an ad

actually got published with respect to the new criteria.

**12:13p** My argument is, even if they could show that an ad

had been published, the intent of Mr. Padilla is the one --

the thing that is at issue; and if we're gonna be saying that

he can just disregard these standards or the standards mean

nothing to him, the rules mean nothing to him, he's just like

**12:14p** anybody else who would be viewing this, then we've got a

discussion of -- it's just, "Well, I'm trying to follow what

I've been told to do and am I wrong?  Here's my boss telling

me this is what I'm supposed to do and this is what I'm

supposed to apply."  What's the man to do?

**12:14p**   Thank you, Your Honor.

THE COURT:  Thank you, Mr. Eisenberg.

Well, counsel have given me a number of arguments,

cited cases, statutes.  We've been through about four weeks of

trial testimony and hundreds of exhibits, some of which were

**12:15p**   referenced in argument.  I'm going to take a look at those

arguments, the prior Court's orders that were referenced as

well and I will be reviewing those carefully, and so I'll take

the matter under advisement.

At this point I'd like to use the rest of our time,

**12:15p**   and depending how long you think it will go, I just want to

ask both sides whether or not you've had an opportunity to at

least review the proposed verdict forms.

Has the Government looked at the defendants'

proposed verdict form?

**12:15p**   MR. STONE:  Yes, your Honor.

THE COURT:  Have the defendants looked at the

Government's proposed verdict form?

MR. LINCENBERG:  Yes, your Honor.

THE COURT:  I'm sorry?

**12:16p**   MR. LINCENBERG:  Yes, Your Honor.

THE COURT:  All right.  So let me ask from the defendants' perspective what, if any, objections do you have to the Government's proposed form of verdict?

MR. LINCENBERG:  Your Honor, I would crystallize the differences into four quick points for the Court's consideration.

First is that the Government's proposed verdict form with regard to the Travel Act counts are somewhat argumentative in the sense of trying to highlight the language that is the title of the ads and so forth.

The jury will be going through the counts.  I think the defendants' proposed verdict form, which notes that the exhibit relating to that count is specified, so the jury can then look at -- if they're going through it one by one they can say, all right, Count 20, this is this ad, let's not take one point out of the entirety of it and decide.  So we believe ours is less argumentative and better.

The second point is the Government's -- in lining up whether to find a defendant guilty or not guilty, the Court may notice that we put first not guilty and guilty second. The Government puts guilty first and not guilty second.

We ask the Court to adopt ours because one is presumed not guilty unless proven otherwise, and so that should be the first point.

The third is -- well, the third I actually covered

about the defendant's tying things to exhibit numbers.  So
it's really part of the first.

      The third big point would then be we believe our
instructions better guard against an improper verdict.  For
example, with regard to the money laundering counts where we
note that -- if you take as an example, picking any of them,
Count 58, we the jury unanimously find defendant either not
guilty or guilty of committing concealment money laundering in
connection with the June 30, 2016, transfer of three million
dollars from Website Technologies to Cereus Properties, we
think it's a simple straightforward statement of the offense
and that's what it should be in the verdict form.

      THE COURT:  Well, let me -- and this is one of the
things that I considered in asking you to revisit the verdict
form.  I mean, in a -- in a case where you don't have a
speaking indictment that is over 100 pages or close to it,
normally I would have read the indictment to the jury at the
outset of the case, and in so doing then the Court would have
necessarily read the counts as they are listed and those
counts, as they are listed, include the description of the
alleged ad.

      And so the concern was here that the count in the
verdict form match the allegation.  So I understand that we
should not interfere with the fact-finding process of the jury
and, you know, it is part of their responsibility to sift

 1    through the, you know, thousands of exhibits; but given that,

 2    what is -- is there any concern about adding the description,

 3    at least part of it that is alleged in the indictment?

 4         MR. LINCENBERG:  Yes.  Well, the concern is really

**12:20p** 5    what I just indicated, that it's somewhat argumentative.  The

 6    fact that the indictment states it in an argumentative manner

 7    and the parties will be arguing these points is one thing, but

 8    a verdict form should be -- should guard against doing that

 9    and the jury will have a sufficient relationship between the

**12:20p** 10   count number and the ad by the exhibit number and that way

 11   they're voting based upon that ad if they -- if the Court --

 12   depending upon if we get to these ads after Rule 29, and I

 13   think that's a more straightforward way to do it.

 14        THE COURT:  So let me ask you this question then:

**12:21p** 15   If I adopted your form of verdict as to the Travel Act, then

 16   shouldn't I at least provide to the jury, at least in some

 17   fashion, maybe Paragraph 201 through the remainder of the

 18   listing of the Travel Act charge in the indictment?

 19        So, for example, Page 50.  Because, otherwise, I

**12:21p** 20   think it becomes a very tedious task for the jury to

 21   understand the charge, what they're asking to review if you

 22   don't give them some context.

 23        MR. LINCENBERG:  Well, the Court could do it that

 24   way.  I think some Courts would do it that way.  I don't think

**12:21p** 25   there would be anything erroneous with doing it that way.  I

think that if the Court alternatively said, "Ladies and Gentlemen, there's fifty Travel Act counts, 2 through 51, and Count 2, for example, relates to an Exhibit 120, Count 3 relates to this and so forth," I think that encourages the jury to consider the ad that is at issue as opposed to focusing on what the Government has chosen to include in the Indictment in terms of the title of the ad.

THE COURT:  Okay.  I guess I -- maybe I'm just not understanding the way that you're presenting it to me.

So you would not have an objection, for example, if I put forward to them in some modified fashion just in terms of the volume of pages in the Indictment beginning at Paragraph 201 of the Indictment, which are the alleged charges relating to Travel Act.  They outline the count, the date and the description and giving that to them in addition to all of the exhibits that are before them?

MR. LINCENBERG:  If what Your Honor is saying by "giving it to them," in other words, reading that portion of the indictment, is that what the Court is suggesting?

THE COURT:  Well, no, I'm -- well, I guess we could do it in that way.  I thought about just giving them that page -- those pages related to the Travel Act, because it's voluminous.  I guess my concern is it's voluminous.

It's -- each ad is very distinct as to date and so, I mean, I -- so what's your position with regard to that?

1        MR. LINCENBERG:  Well, I think the preferable thing

2   to do would be to simply note the exhibit number that relates

3   to each count.

4        If the Court decides that the Court wants to give

12:24p  5   more, it should be done either in the form of the Court

6   reading those counts or the Court's suggestion about giving

7   those pages of the Indictment.  That's not our preference.  We

8   don't think it's the best; but, in any event, it shouldn't --

9   it shouldn't be in the verdict form.  The verdict form should

12:24p 10   simply relate the exhibit to the count.

11        THE COURT:  Okay.  Then -- then in looking at the

12   Government's form of verdict, you have no objection to the

13   iteration of the date, the exhibit number?  Your objection is

14   with the ad title --

12:25p 15        MR. LINCENBERG:  Yes.

16        THE COURT:  -- being included?

17        What about the state?

18        MR. LINCENBERG:  No objection to the state.

19        THE COURT:  All right.  And then you wanted to

12:25p 20   address the specific money laundering counts with regard to

21   the jury's -- excuse me, the Government's description?

22        MR. LINCENBERG:  Right, and my argument was -- was

23   brief.  The Government has -- the Government's proposed counts

24   are fairly vanilla.  It's not -- it's not objectionable.  We

12:25p 25   had suggested adding in a little more, in part because we have

1  these three different types of money laundering.  So ours had

2  a heading.

3        For example, when you got to international

4  promotional money laundering at Count 63, put a little

12:26p  5  heading, and we just put we the jury unanimously find

6  defendant so and so not guilty or guilty and we put of

7  committing international promotional money laundering in

8  connection with the March 4 transfer of, you know, such and

9  such money from US Bank to such and such.

12:26p 10        THE COURT:  Okay.  All right, thank you.

11        From the Government, yes.

12        MR. STONE:  Let's start with the easy part.  We

13  don't object if not guilty goes before guilty.  So consensus,

14  it's good to give.

12:26p 15        The issue with the Travel Act counts as defense has

16  them is that we need -- the jury would need something to

17  understand what ad is being referred to.  I mean, we have the

18  exhibit number, but there needs to be something, as Your Honor

19  I think understands, so that they know that that exhibit

12:27p 20  number for that ad goes to that particular count; and what we

21  suggested in our verdict form is to eliminate some of the

22  other language that's in the Indictment that I thought was

23  objectionable to the defense, which Your Honor is now

24  suggesting would go back with the jury, and just include the

12:27p 25  title of the ad.

1    I'm not sure Mr. Lincenberg had taken a look at the

2  Paragraph 201 and all the information that's included in those

3  ads.  If it goes back, that's fine with us but we thought that

4  that was objectionable; and so it would make more sense and

12:27p   5  certainly be easier for the jury when they go through this

6  verdict form just to have the ad title there, along with the

7  state and exhibit number, and they will be able to pull it up

8  and review it during their deliberations.

9    So no objection to the paragraph -- or the

12:27p  10  Superseding Indictment with Paragraph 201 going back, but I

11  really think it should be part of the verdict form so it's

12  easier for the jury.  We're trying to make it easier, not more

13  difficult.  They're already going to have to sift through

14  hundreds of exhibits.  So why would we make them have two

12:28p  15  separate documents that they need to refer to when they're

16  looking at -- when they're looking at verdict form and

17  deliberating.

18    The other, I think main issue, with the defendants'

19  proposed verdict form on the Travel Act counts is they give

12:28p  20  sort of like a partial jury instruction on each count where

21  they talk about violating the Travel Act, fine, in connection

22  with the advertisement found at exhibit blank on a certain

23  date, that's fine; but then they say by specifically intending

24  to promote or facilitate the promotion of a business

12:28p  25  enterprise involved in prostitution offenses.

1      There's gonna be lots of jury instructions that they

2  need to refer to.  We shouldn't -- that's confusing to include

3  a partial jury instruction within the verdict form.  That

4  certainly should not remain.  I think other than that, we're

**12:29p**  5  fairly close.

6      The money laundering counts, I think we're even

7  closer.  Again, theirs is just wordier and I don't think we

8  need it.  They talk about on each count the fact that it's

9  committing concealment money laundering in connection with the

**12:29p** 10  transfer.  We have the headings -- the concealment money

11  laundering, for example, for Counts 53 through 62 and then

12  don't include the extra words on each count.

13      It's really not that big a deal, though.  I mean, I

14  think we're pretty close on the money laundering counts.  I

**12:29p** 15  just think ours esthetically looks a little better and that's

16  always helpful for the jury.

17      THE COURT:  Yes, I want to -- I want to point out --

18  let me have you look at the -- the actual description of the

19  allegation in each count includes wording that is now taken

**12:30p** 20  out by the Government.

21      So, for example, if you look at Count 2, it says

22  published ad depicting victim five.  And so the form of

23  verdict that they've proposed removes that type of language

24  and then -- but will give the jury what it is that they're

**12:30p** 25  examining as the allegation.

1          So is there an objection to it in it that form?

2          MR. LINCENBERG:  Well, first, I appreciate counsel's

3    professionalism because I didn't have the Indictment up here

4    with me when the Court was asking me about it; and he is

**12:30p** 5    correct, it would be something we would object to having the

6    Indictment read or going back, particularly because it's

7    discussing, quote, "victim," this person is a victim, so

8    forth.

9          With regard to -- so let me now answer the Court's

**12:30p** 10   question directly.  With regard to the caption that they put

11   in, you know, my problem is -- well, let me take a step back.

12   I think it's being proposed this way because there's so many

13   ads and, obviously, we aren't the ones who brought the

14   indictment that makes this problematic because there's so many

**12:31p** 15   different ads.  At the same time each count is something

16   that's important to each defendant and what the defendant is

17   -- what the jury is deciding on, if they do a count-by-count

18   review, is that ad and then whether the elements are made.

19          There's one other alternative that the Court could

**12:31p** 20   do, if the Court goes with our verdict form, would be to send

21   a hard copy back of the fifty exhibits so that if the Court's

22   concerned about their inability or difficulty of matching

23   things --

24          THE COURT:  They are going to have those exhibits

**12:31p** 25   that were introduced in hard copy --

UNITED STATES DISTRICT COURT

1          MR. LINCENBERG:  They are going to have hard copies

2    of them?

3          THE COURT:  -- and digital.

4          MR. LINCENBERG:  Okay, sorry.  So just to be clear,

**12:32p** 5    you have no objection to at least the exhibit number being

6    referenced?

7          MR. LINCENBERG:  Right.

8          THE COURT:  And you have no objection to the state

9    allegation?

**12:32p** 10          MR. LINCENBERG:  Right.

11          THE COURT:  You just have an objection to the

12    description even as modified from the Indictment?

13          MR. LINCENBERG:  Yes, your Honor.

14          THE COURT:  All right.

**12:32p** 15          All right.  Anything further, Mr. Stone?

16          MR. STONE:  Just that description is just the title.

17    I mean, we took just the title and we didn't even include --

18    sometimes there's little characters in the title.  We just did

19    the words in the title, something so that the jury understands

**12:32p** 20    when they're looking at the exhibit that this is the ad that

21    is Count 2, for example.

22          THE COURT:  Yes.

23          MR. STONE:  That's it.

24          THE COURT:  No, I understand.

**12:32p** 25          Is there -- well, I think what I'm inclined to do is

1  see how we go on Tuesday, how far we get, and then at that

2  point try to get a read from all parties as to a point in time

3  to finalize those final jury instructions.

4        I think we've circulated and I think my law clerk

**12:33p** 5  has circulated to you a Word version of the -- what we have

6  determined are the final proposed instructions and that should

7  have gone out today or, if not, it will.

8        And, again, here I don't want to re-examine anything

9  that I've already settled upon unless you can point to some

**12:33p** 10  reason that they should be changed.  If there's some legal

11  reason or evidence that was or was not presented that makes

12  you conclude that there should be a change in those

13  instructions, and that's how we should proceed.

14        You're standing there, Mr. Lincenberg.  Do you wish

**12:34p** 15  to be heard on something?

16        MR. LINCENBERG:  Yes.  Well, first, briefly, we'll

17  look at the Court's jury instructions.  My sense from talking

18  to defense counsel is we'll probably want to argue on about a

19  half a dozen, and we're going to submit a theory of the

**12:34p** 20  defense instruction for the Court's consideration as well.

21        I also wanted to just briefly note -- and I was

22  speaking with Government counsel at the break in terms of some

23  scheduling issues.

24        So the Court saw that we filed a brief this morning

**12:34p** 25  in connection with our client potentially testifying, and

government counsel wants to respond to that.  The Court -- the

Court set a time for them to respond by the close of business

on Monday.

THE COURT:  Yes.

**12:34p**     MR. LINCENBERG:  So first, I'd request that that be

close of business on Sunday so that we have a chance to review

that and potentially argue the point if the Court wants

argument on Tuesday; and part of the reason why I raise this

and part of the reason why we filed the brief is how the Court

**12:35p** rules on what we've submitted is going to have a huge impact

on whether the trial continues with one or two days more of

testimony or two or three weeks more of testimony.

We submitted that brief.  Consultation with other

counsel, I know that that they're going through similar

**12:35p** questions, for example, as to whether or not their clients may

testify and the like.

So if, for example, the Court rules against us and

says, "Mr. Lincenberg, you've raised this and I've decided I'm

not changing my ruling," we could be getting to argument -- I

**12:36p** don't want to speak out of turn.  I know counsel are still

considering different witnesses and so forth, but we could be

getting to argument fairly quickly; and if not, the defense

may be scrambling in terms of all sorts of witnesses who may

have to then be brought into court or things like that.

**12:36p** So there's an interest, I think on both sides, in

1    trying to address this sooner rather than later.  We

2    understand it can't be addressed Monday, the Court has a full

3    calendar; but even in terms of the briefing or getting a sense

4    from the Court, it's really going to make a big difference in

**12:36p**  5    scheduling.

6         THE COURT:  Well, why don't I do this:  Let me -- I

7    haven't looked at the motion so I don't know how detailed it

8    is.  I'm going to give the Government until 10:00 a.m. on

9    Monday to file its response, no reply.

**12:37p** 10         So disregard if my diligent courtroom deputy has

11   already sent out a directive.  So you'll have until 10:00 a.m.

12   on Monday to submit your response.

13        I would propose what we do then is we'll have our

14   jury administrator alert our jurors not to report until

**12:37p** 15   10:00 a.m. on Tuesday, and I'll expect you here at 9:00 a.m.

16   so we can address any of those legal issues because you ask

17   for five minutes and I find that usually turns in to 15 or 20

18   and I don't want to bring our jury in if we're going to do

19   that.

**12:37p** 20        So I'll have our jury administrator today reach out

21   to those jurors and tell them to report to be here by

22   10:00 a.m.  We'll take any argument related to that motion up

23   on Tuesday morning.

24        Now, because of the schedule as you've proposed, I

**12:38p** 25   would ask that you provide to the Court whatever your proposed

changes or new jury instructions or defense theory instruction

may be by close -- well, by the end of the day on Tuesday.

So I'll start looking at those and that way we're

not losing time.  If, in fact, it ends up being a shorter

**12:38p** 5 week, then I'll have some time to review those changes,

consider them and hear argument and set some time for

argument.

All right, so Mr. Rapp.

MR. RAPP:  Yes, just briefly, Judge.  Just to

**12:38p** 10 maximize the jury's time, we have assessed the defense

witnesses and we do not believe that those witnesses, at least

the ones slated for Tuesday, are going to take very long.

To put it mildly, we don't view them as -- some of

them -- we don't view them as defense witnesses and some we

**12:39p** 15 feel are irrelevant and likely would not be allowed to

testify.

That being the case, that Tuesday could be a very

abbreviated day for the jury; and so I'm just wondering since

we are possibly resolving jury instructions in the morning and

**12:39p** 20 let's say --

THE COURT:  Well, I'm not -- I'm not resolving jury

instructions in the morning on Tuesday.  I'm resolving the

pending motion that was filed last night or this morning --

MR. RAPP:  This morning.

**12:40p** 25 THE COURT:  -- and my decision on that on Tuesday

1    morning is going to determine, I guess, what the ultimate

2    defense witnesses will look like for the remainder of the day.

3           That's -- so that's my understanding.  Am I

4    incorrect on that, Mr. Lincenberg?

**12:40p**  5           MR. LINCENBERG:  I don't know that it will affect

6    the remainder of the day.  The proposed witnesses on Tuesday

7    are not our witnesses so I can't speak to that, but it will

8    affect the trial.

9           MR. RAPP:  Okay.  I -- I was only -- I was

**12:40p** 10 suggesting that if we could resolve the jury instructions in

11   addition to that motion and let's say it's a very abbreviated

12   defense case in light of the Court's possible ruling on that

13   motion, and we have our own opinions on the defense witnesses

14   that have been proposed, it is possible that we could use --

**12:40p** 15 maximize the jury time and even start -- you know, I don't

16   want to be presumptuous about the Rule 29 motion, but we could

17   start closing arguments on Tuesday afternoon.

18          THE COURT:  Well, how -- how close are you at

19   sending to my chambers your proposed jury instructions?  I

**12:41p** 20 guess that's -- that's the question.

21          MR. LINCENBERG:  Well, I guess I'll speak.  I have

22   to talk to counsel, Your Honor, but the Court had indicated

23   asking us by the close of Tuesday.  We could probably get

24   something by the close of Monday.

**12:41p** 25          THE COURT:  Okay, why don't we do that.  Let's go by

1     the close of Monday.

2              Any objection to having the jury appear at 1:00?

3              MR. RAPP:  Not from the United States.

4              MR. LINCENBERG:  No objection.

**12:41p** 5              MR. RAPP:  On Tuesday?

6              THE COURT:  On Tuesday.

7         I mean, I think at that point it will give me

8     sufficient time then to resolve the pending motion and then

9     give me time to also hear abbreviated argument on jury

**12:42p** 10    instructions, especially if we've already entertained those

11    arguments before; and I want you to be very concise as to why

12    I should revisit any ruling in any prior decision I have made,

13    although tentatively with regard to final instructions,

14    because then what I anticipate would happen, then, is that the

**12:42p** 15    jury would come in, take their seats at 1:00.  We would go

16    until 4:30; and depending on whatever the decisions are that

17    the defendants and their counsel make, then my sense is we

18    would push through then Wednesday and at least be at a point

19    where we have the ability to only take maybe a couple of

**12:43p** 20    breaks and finish up whatever the case may be.

21             You know, I -- I just -- I appreciate the fact that

22    I don't like to waste the time of the jury in them waiting

23    around and -- because we don't have our work done.  So that's

24    how we will proceed, unless there's any objection.

**12:43p** 25             MR. PANCHAPAKESAN:  Your Honor, I just had a quick

1    question.  The jury instructions we have, I think Christine

2    Ritland sent them Wednesday.  I didn't know if there is

3    something else we should be looking at in terms of final

4    instructions?

12:43p  5          THE COURT:  Oh, no, she's going to send you a Word

6    version of those.  Those were in PDF form.  So she'll send you

7    a Word version of those.

8          MR. LINCENBERG:  The only other comment, with regard

9    to the Court's consideration of the Rule 29, I mean, the Court

12:44p 10    took in a lot today; and if the Court wants any further

11    briefing on a specific point, we can try to turn that around

12    as soon as possible if the Court lets us know.

13          THE COURT:  I don't think further briefing at this

14    juncture's necessary.  You've given me a lot already and so --

12:44p 15    I appreciate the offer, though.

16          Mr. Rapp.

17          MR. RAPP:  Just a couple more points.

18          THE COURT:  Yes.

19          MR. RAPP:  One is, we do have five witnesses noticed

12:44p 20    by the defense for Tuesday.  We appreciate that.

21          If there are going to be additional witnesses for

22    Wednesday, we would like to get that by Sunday with their

23    corresponding exhibits.

24          The one witness that still is under subpoena and has

12:44p 25    not been excused is Carl Ferrer.  That is not one of the

|  |  |  |
|---|---|---|
|  | 1 | witnesses they have noticed us for Tuesday.  I just want to |
|  | 2 | know what's going on with that.  He does have a lawyer, but he |
|  | 3 | is under a cooperation plea.  I don't want there to be a |
|  | 4 | delay.  I don't want to look up on Tuesday and the defense |
| 12:45p | 5 | starts saying, "Hey, we want this witness back here," and we |
|  | 6 | have to -- we have some obligation, I suppose, and we don't |
|  | 7 | want to be scrambling to secure that witness for the defense. |
|  | 8 | So I would like -- |
|  | 9 | THE COURT:  Well, because of the decisions that need |
| 12:45p | 10 | to be made, I'll give them until Tuesday morning to make that |
|  | 11 | determination and let you know about Mr. Ferrer. |
|  | 12 | MR. RAPP:  All right.  Very well, thank you. |
|  | 13 | THE COURT:  Anything further, Mr. Rapp? |
|  | 14 | MR. RAPP:  No, thank you. |
| 12:45p | 15 | THE COURT:  Mr. Cambria? |
|  | 16 | MR. CAMBRIA:  No. |
|  | 17 | THE COURT:  Ms. Bertrand? |
|  | 18 | MS. BERTRAND:  No, thank you. |
|  | 19 | THE COURT:  Mr. Lincenberg? |
| 12:45p | 20 | MR. LINCENBERG:  No, Your Honor. |
|  | 21 | THE COURT:  Mr. Feder? |
|  | 22 | MR. FEDER:  No. |
|  | 23 | THE COURT:  Mr. Eisenberg? |
|  | 24 | MR. EISENBERG:  No, Your Honor. |
| 12:45p | 25 | THE COURT:  All right.  Thank you, counsel. |

1              We will stand in adjournment.

2              COURTROOM DEPUTY:  All rise.

3    *(Whereupon the proceedings concluded at 12:45 p.m.)*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

*REPORTER'S CERTIFICATION*

1.

2.

I, TERI VERES, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 20th of October, 2023.

_____s/Teri Veres_____
TERI VERES, RMR, CRR

UNITED STATES DISTRICT COURT