UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | No. 2:18-cr-00422-DJH |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| Michael Lacey, et al., | ) | October 12, 2023 |
| | ) | 8:48 a.m. |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**JURY TRIAL - DAY 17**</u>

<u>**(A.M. SESSION)**</u>

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
1                      A P P E A R A N C E S

2    For the Government:
         UNITED STATES ATTORNEY'S OFFICE
3        By:  Mr. Kevin M. Rapp, Esq.
              Mr. Andrew C. Stone, Esq.
4             Mr. Peter Shawn Kozinets, Esq.
              Ms. Margaret Wu Perlmeter, Esq.
5        40 North Central Avenue, Suite 1800
         Phoenix, Arizona  85004-4408
6        kevin.rapp@usdoj.gov
         peter.kozinets@usdoj.gov
7        andrew.stone@usdoj.gov
         margaret.perlmeter@usdoj.gov
8        - and -
         UNITED STATES DEPARTMENT OF JUSTICE
9        By:  Mr. Austin Berry, Esq.
         1301 New York Avenue NW, 11th Floor
10       Washington, DC  20005
         austin.berry2@usdoj.gov
11
     For the Defendant Michael Lacey:
12       LIPTSITZ GREEN SCIME CAMBRIA, LLP
         By:  Mr. Paul J. Cambria, Esq.
13       42 Delaware Avenue, Suite 120
         Buffalo, New York  14202
14       pcambria@lglaw.com

15   For the Defendant Scott Spear:
         KESSLER LAW OFFICE
16       By: Mr. Eric Walter Kessler, Esq.
         6720 North Scottsdale Road, Suite 210
17       Scottsdale, Arizona  85253
         eric.kesslerlaw@gmail.com
18       - and -
         FEDER LAW OFFICE, PA
19       By:  Mr. Bruce S. Feder, Esq.
         2930 East Camelback Road, Suite 160
20       Phoenix, Arizona  85016
         bf@federlawpa.com
21

22

23

24

25
```

**A P P E A R A N C E S (Cont'd)**

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    By:  **Mr. Gopi K. Panchapakesan, Esq.**
         **Mr. Gary S. Lincenberg, Esq.**
    1875 Century Park E, Suite 2300
    Los Angeles, California  90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com
    aneuman@birdmarella.com

For the Defendant Andrew Padilla:
    DAVID EISENBERG, PLC
    By:  **Mr. David S. Eisenberg, Esq.**
    3550 North Central Avenue, Suite 1155
    Phoenix, Arizona  85012
    david@deisenbergplc.com

For the Defendant Joye Vaught:
    JOY BERTRAND, ESQ, LLC
    By:  **Ms. Joy Malby Bertrand, Esq**
    P.O. Box 2734
    Scottsdale, Arizona  85252-2734
    Joy@joybertrandlaw.com

1                          **I N D E X**

2      **SUMMARY OF COURT PROCEEDINGS:**                        **PAGE**

3      Proceedings Outside the Presence of the Jury          5
       Proceedings Outside the Presence of the Jury         63
4      Proceedings Outside the Presence of the Jury        121

5


6      **WITNESSES FOR THE GOVERNMENT:**                        **PAGE**

7      Mickey Hansen
               Direct Examination (Cont'd) by Mr. Kozinets    17
8              Cross-Examination by Mr. Panchapakesan          19
               Redirect Examination by Mr. Kozinets           66
9      Anya Beck
               Direct Examination by Mr. Rapp                 72
10             Cross-Examination by Mr. Feder                 89
               Cross-Examination by Mr. Eisenberg            118
11             Redirect Examination by Mr. Rapp              120

12


13                         **EXHIBITS**

14     **NO.**       **DESCRIPTION**                              **REC'D**

15     462       Email from Ferrer to Snedden re American      41
                 Express, 01/27/2015
16               DOJ-BP-0004927330-DOJ-BP-0004927331

17

18     1602      Recreation of ad with Object ID 56338699      89
                 posted by Victim #13
                 (User ID 55827398) 08/15/2015,
19               USAO-BP-0033030 -USAO-BP-0033034

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2    (Proceedings reconvene at 8:48 a.m.)

3    (Jury not present at 8:48 a.m.)

4        THE COURT:  All right.  Please be seated.

5        We are waiting for one juror to arrive, but we'll use    08:48:25

6    the time to go over the matters that were raised yesterday and

7    last week.

8        And last evening I had an opportunity to review the

9    transcript of Mr. Luria.  And with respect to the renewed

10   motion for a mistrial, the -- he -- in response to a question   08:49:04

11   about why this meeting of the Union Theological Society

12   occurred in 2011, he answered that they gathered a group of

13   faith leaders who were outraged over sex trafficking occurring

14   on the site, specifically the prostitution of children.  And he

15   continued to use the -- the phrase "child prostitution" as    08:49:50

16   the -- as the majority of his testimony related to their trying

17   to shut down the site because they believed it had child

18   prostitution ads on them.

19       And, again, in considering the prior orders of the

20   Court, it has been clearly laid out that child prostitution is   08:50:27

21   permitted to be gone into in testimony here.  And I think,

22   though, that the most repetitive phrase by defense counsel,

23   which was only iterated once by this witness, was that -- the

24   inflammatory statement about what happened after the meeting

25   occurred, that they started going to businesses who were    08:51:03

1   putting their advertisements on Village Voice Media or

2   Backpage.  And, in addition to that, they laid shoes at the

3   door -- children's shoes at the door of Village Voice Media in

4   New York.  That seemed to have been the predominant concern of

5   defense counsel.                                       08:51:34

6          And, in my review -- again, I -- I do believe that in

7   some ways this witness put forth his -- his own -- and it was

8   very clear in his statements to Mr. Cambria that he was putting

9   forward his own beliefs and the beliefs of his prior employer

10  at the time.  Not necessarily responsive 100 percent of the   08:52:07

11  time, volunteering -- volunteering many, many comments that

12  were not necessary.

13         But, in any event, I think the jurors could glean for

14  themselves the character of the witness and what his motives

15  were for testifying, and so on and so forth.  But I also    08:52:29

16  believe that this witness -- during his examination, there were

17  areas gone into by defense counsel about the assistance of

18  Mr. Larkin and Lacey and Backpage to law enforcement.  They

19  also pulled out questions related to, what about Facebook, what

20  about TikTok, and bringing those matters forward as well.    08:52:56

21         And, in addition to that, the numerous exhibits that

22  are now in evidence.  Some were put in evidence en mass that

23  relate to law enforcement being very congratulatory about

24  helping with identifying children who've been trafficked,

25  juveniles who've been put up for prostitution, and so on.    08:53:35

         And so I think on balance at this point there is no

necessity to declare a mistrial.  And so that's my ruling

there.

         Now, let me just say a word about the 412 objections.

I had an opportunity to have some research and looked at a                   08:54:06

little bit more closely the -- the rule.  While it's not

crystal clear, I have found Circuit precedent that permits the

government to make such an objection in these types of cases.

And, for example, in the Ninth Circuit, there have been

rulings.  I looked at the -- there's the *United States vs.*                 08:54:48

*Haines* decision, *United States vs. Lockhart* decision that

concludes, at least in sex trafficking prosecutions, that

victims' prior convictions or -- or acts of prostitution is

inadmissible.

         And so, in that regard, though, these individuals --              08:55:09

or excuse me.  The cases don't necessarily speak to Travel Act

violations for purposes of the case.  The rule is designed to

shield individual victims, or those who have been victimized in

any sexual way here, whether they were solicited by -- as in

this instance, of this witness, pimps or -- or johns, as she                 08:55:51

testified, then she qualifies as a victim.

         And so under that umbrella, therefore, the 412

objection is appropriate.  And so defense counsel are not

permitted to go into those prior sexual acts or conduct of

victims.                                                                     08:56:19

1          Let me quickly try to give you my ruling on the

2    objections that were lodged last week or requests to renew an

3    objection and for the Court to reconsider its ruling.

4          I don't find any of the exhibits that were identified

5    by the defendants squarely fit within the curative measure of          08:56:44

6    Rule 106.  The precedent provides that initially omitted parts

7    of a writing ought to be considered in fairness, which means

8    when one party has made use of a portion of a document such

9    that misunderstanding or distortion can be averted only through

10   presentation of another portion, the material required for          08:57:20

11   completeness -- for completeness is admissible.  And that's the

12   *Beach Aircraft Corp.* case that was cited by, I think, both

13   sides.

14         So there has to be a prerequisite to trigger Rule 106,

15   and that is prejudicial misimpressions.  And if the completed          08:57:39

16   statement would not serve to correct a misleading impression in

17   the edited statement, then the rule does not apply.

18         So first address Exhibit 616a, which is the email

19   correspondence between BMO.  And the government introduced this

20   exhibit to show that Mr. Brunst and others were aware of          08:58:12

21   questions raised by BMO about Backpage's activities.  And

22   Exhibit 616a is the redacted -- was redacted to show an email

23   from Mr. Spear to BMO in which Mr. Brunst was copied regarding

24   BMO's questions of which Backpage categories were suspended and

25   which would be reinstated.          08:58:47

1          Exhibit 616 is the completed unredacted version, and

2     that includes an additional email that was written by

3     Mr. Larkin to BMO describing other moderation steps by Backpage

4     in response to concerns by States Attorney General.

5          And the defendants here have not sufficiently          08:59:14

6     identified how Mr. Spear's responding to BMO's question of

7     which categories were suspended and which were reinstated

8     creates any misimpression that is taken out of context.

9          And I think it's the defendants' -- defendants'

10    position that the redaction leaves a false impression that    08:59:36

11    Mr. Brunst was aware this site was being used for an illegal

12    purpose.  But the redacted email does not mention any illegal

13    activity.  It only outlines moderation actions.

14          And so the redaction does not distort the initial

15    exhibit, and so the rule, in my view, does not apply.         09:00:05

16          And then I don't recall that the defense ever even

17    attempted to admit Exhibit 616 on cross-examination.  So my

18    ruling will stand with regard to those exhibits.

19          Let me now turn to Exhibit 836a, which is the email

20    correspondence between the Wall Street Journal and the        09:00:35

21    defendants.  The government introduced this exhibit, which is

22    redacted, to show the reporter's question to Ms. McDougall

23    about the presence of The Erotic Review on Backpage.  And the

24    complete unredacted version includes greater email content or

25    comments that was -- that were made by Ms. McDougall.  And here  09:01:03

1    I think it's, from what I understand the defendants' arguments,

2    that they -- that I should have permitted them to ask

3    Mr. Ferrer about his reaction to Ms. McDougall's redacted

4    comments because she was cc'ed on the email thread.

5            But, again, here defendants have not stated how          09:01:25

6    introducing the completed exhibit is needed to correct any

7    misleading impression from the redacted version, which is the

8    reporter's question about the presence of The Erotic Review on

9    Backpage.  And the rule does not require the introduction of an

10   unedited writing or statement just because an adverse party has   09:01:51

11   introduced an edited version.  And that was cited in the

12   briefing that is the *Vajellos* case.

13           And so here because there has been no showing that the

14   redacted exhibits would create a -- or cure a misimpression,

15   the Court is not inclined to revisit its ruling there.           09:02:23

16           Let me turn to, now, the Exhibits 52, 119, and 902,

17   which were the Attorney General letters.  And here the

18   defendants argue that the Court improperly precluded admission

19   of the corresponding respondents to those initial letters

20   because the AG letters directly reference the response letters;   09:03:00

21   and, therefore, the government put those response letters at

22   issue.  But that's not the standard under Rule 106.  106

23   allows, again, introduction of parts of a writing when

24   necessary to avert misunderstanding or distortion created by

25   another writing.  And nowhere in the -- in the filing have       09:03:25

1  defendants identified any specific statements in those AG

2  letters that are misleading or distorting, nor do they explain

3  fully how the responsive letters would correct that

4  misunderstanding.  And so I decline to revisit my ruling there.

5         Let me briefly turn to the attorney-client privilege          09:03:52

6  issues of Mr. Ferrer.  I did review the motion at Document 1822

7  to bar the government from asserting the attorney-client

8  privilege on behalf of Mr. Ferrer.  I'll only address this

9  issue as to Mr. Ferrer and no other pending witness.  We can

10 cross that bridge if it's necessary.                              09:04:22

11        As Mr. Ferrer's counsel, Mr. Baum in his notice

12 pointed out, and as the government also notes, in these types

13 of circumstances when a witness is on the stand and being

14 examined, the government can raise this issue.  In fact,

15 it's -- it's important to let people know if they are shielded   09:04:52

16 by an attorney-client privilege.  Someone's got to let them

17 know that they have that right.  And so here, in an abundance

18 of caution, because his counsel was present, I permitted him to

19 be present here to assert the right on behalf of the client.

20        So the motion is granted in part, just from the           09:05:18

21 previous testimony and permitting his counsel to be present to

22 make him aware that he has the privilege.  And should he be

23 recalled, I will permit the same.  But, again, if there's a

24 witness on the stand who has an attorney-client privilege and

25 there's an area that's being gone into by any side, I would      09:05:50

expect someone to let them know that they have the privilege

and that they should not answer any other questions until they

consult with counsel.  And so that's how that will proceed.

Now I want to address these Exhibits GL-CF-36 and 37.

I here, too, also read the government's response and

Mr. Ferrer's counsel at Steptoe & Johnson, Mr. Baum, his

notice, and I am troubled by Mr. Baum's statements that the

email, which transmits this Exhibit GL-CF-36 which transmits

this Document 37, was sent a month before his purported joint

defense agreement was signed; that is, that the email appears

to be sent on May -- in May of 2017, and his joint defense

agreement was signed in June of 2017.  And that email is what

transmitted the document.  So it's difficult for the Court to

see how any attorney-client communication is covered before the

JDA was executed.

Now, I also remain troubled because I have not heard a

clear explanation as to how the defense came into possession of

this document, which, again, clearly looks like a draft, a

working draft, redline strike-outs, modifications to language,

back and forth between Mr. Ferrer and his counsel.

It does not appear that it came from Mr. Ferrer.  It

was first described to the Court as offered as part of a

Court's -- this Court's docket as an attachment to a filing.

The Court looked into that; could not find it as cited to by

defense counsel.  And then it was described as filed in another

09:06:16

09:06:48

09:07:20

09:07:45

09:08:09

UNITED STATES DISTRICT COURT

docket.  But it is not a final writing.  It's not signed.  It

has no seal, Court seal or docket entry number affixed to it.

So I'm -- I'm troubled by that.  And it appears to be a work in

progress.  And so whether or not the exhibit contain

impeachment material at this juncture is not my primary                09:08:36

concern.  My concern is it appears to be attorney-client

protected documentation.  And so I'm not going to revisit my

ruling with regard to that.

        And so with that, let's check on the jury and have

them in.                                                               09:09:03

        MR. FEDER:  Judge, there was a notice of joinder that

talked about CDA 230 and this Court's rulings that appear to be

well beyond the Court's prior orders about what can be brought

into in regard to those -- to that law.

        THE COURT:  Well, yes.  Thank you for reminding me            09:09:20

about that, Mr. Feder.

        I looked at that joint filing, and I'm not inclined to

change my ruling.  There are two orders on this issue.  The two

orders, I think, stand for themselves.  They're clear.  And

the -- going forward, I just ask you to keep that in mind.            09:09:40

        And the reason -- and, Mr. Feder, you can react in any

way that you want, out of frustration or what have you, but the

reason that I issued the admonishment to counsel, we -- was

because you specifically asked the witness about a definition

as it is defined by the Communications Decency Act,                   09:10:06

1    Section 230.  And that is what I sustained the objection to.

2    It is not permitted because it is not relevant to the case.

3           So you can try to see if there's other relevance to

4    other issues or questions that you wish to ask, and we can go

5    from there.                                                    09:10:36

6           MR. FEDER:  Judge, I wasn't reacting to your ruling.

7    I was trying not to talk over you, which is what you pointed

8    out yesterday.  So I was just -- so the record's clear, but --

9           THE COURT:  You were speaking with your hands.  Okay.

10   That's fine.                                                   09:10:50

11          MR. FEDER:  My hands have a mind --

12          THE COURT:  That's fine.

13          MR. FEDER:  They have a mind of their own.

14          The question that's in -- in -- at issue is I -- the

15   question was, I started to talk about Section 230.  There was  09:10:59

16   no question before it.  It was just by itself.  The government

17   objected, and the Court sustained the objection, meaning the

18   mere mention of CDA 230 was sustained.

19          And -- and the two orders do not -- your -- your

20   Court -- the Court's two orders do not say that, not --        09:11:19

21          THE COURT:  It doesn't say that the CDA Section 230 is

22   irrelevant?

23          MR. FEDER:  It says --

24          THE COURT:  This is not about that case.

25          MR. FEDER:  You can't use it to -- you claim -- you     09:11:28

1    can't claim that it immunizes the activity.  That's what it

2    says.

3          THE COURT:  I don't believe that's what it says.  And

4    we can bat around what your interpretation of what I think

5    is -- are two clear orders and many oral admonishments, and          09:11:45

6    I -- I -- I will let you scour the record to build up your case

7    that I'm not clear.  And you can do that.  And I will

8    reconsider whether or not there are other parameters that I

9    must lay in order to get there.

10          Mr. Panchapakesan is standing, which reminds me I have       09:12:08

11   the final issue regarding his two exhibits.

12          I will permit you to examine the witness related to

13   the exhibits, and we will see how it goes with regard to the

14   first email, if you can lay foundation.  I'm not inclined to

15   let you introduce the Sheriff Dart letter because of the -- the     09:12:35

16   other content that's included in there.  So you can inquire

17   about it.  If he has a recollection or if you can lay some

18   foundation for that, then we'll see how that goes.

19          All right.  Anything further from either party?

20          MR. RAPP:  Not from -- not from the United States.          09:13:00

21          MS. BERTRAND:  Your Honor, I have one matter.

22          THE COURT:  Can it wait for the break, or do I need to

23   rule on it now?

24          MS. BERTRAND:  It's not an emergency.  It's just about

25   an upcoming witness.                                                09:13:11

```
 1            THE COURT:  Oh, all right.  And we received a late
 2   notice from the government as well that you have
 3   supplemented -- included two more witnesses that you were --
 4   originally were not going to call but have now decided to call.
 5            MR. RAPP:  Well, I don't know that we never -- we          09:13:30
 6   never said we weren't going to call them.  We just -- we're
 7   just -- our pace is going faster than we anticipated --
 8            THE COURT:  Okay.
 9            MR. RAPP:  -- and we either tell this Court we've run
10   out of witnesses or we have somebody waiting.                      09:13:42
11            THE COURT:  And that would be a bad thing, so --
12            MR. RAPP:  Well, we -- we -- we -- we agree.  So we
13   have a witness that's coming in today.  We have not notified --
14   we -- we were not within the -- or outside of the 72 hours, but
15   this is a witness that they can't really be prejudiced by.        09:14:02
16   This is a witness that testified in the previous trial.  Her
17   exhibits came into evidence already.  The witness -- the
18   witness is well known to them.  So in an abundance of caution,
19   we brought that witness in.
20            THE COURT:  All right.  Thank you.                        09:14:17
21            MS. BERTRAND:  And that's what I wanted to raise.  So
22   we can talk about that on a break.
23            THE COURT:  Okay.  All right.  Let's have the jury in.
24            All rise for the jury.
25       (Jury present at 9:14 a.m.)                                    09:14:59
```

 1          THE COURT:  Okay.  Please be seated.

 2          And thank you, members of the jury, for your patience.

 3    As happens from time to time, there are, again, those matters

 4    that we have to resolve and take the time to do so in a careful

 5    way.  I'm surprised I don't see a sea of red, but                    09:16:07

 6    congratulations to us all.  And, in particular, my courtroom

 7    deputy, whose family members were at the game.  She is working

 8    overtime now.

 9          And so we have the witness on the stand.

10          And, Mr. Kozinets, you may continue.                           09:16:28

11          MR. KOZINETS:  Thank you, Your Honor.

12      (MICKEY HANSEN, a witness herein, was previously duly sworn

13    or affirmed.)

14                    DIRECT EXAMINATION (Cont'd)

15    BY MR. KOZINETS:

16    Q.  And good morning, Mr. Hansen.

17          Yesterday you mentioned that when you reached out to

18    get additional information from Mr. Ferrer, he shared with you

19    certain information about controls and operations at Backpage.

20    A.  Yes.                                                             09:16:58

21    Q.  Did he include within that information -- or disclosure to

22    you any information about Backpage's years-long relationship

23    with The Erotic Review?

24          MR. PANCHAPAKESAN:  Lacks foundation.

25          THE WITNESS:  I'm sorry.  Can you say that again?             09:17:21

 1          THE COURT:  Well --

 2          THE WITNESS:  Can you repeat that again?

 3          MR. KOZINETS:  Is there an objection?

 4          THE COURT:  I'm sorry.  Was there an objection?

 5          MR. PANCHAPAKESAN:  I said it lacks foundation.          09:17:29

 6          THE COURT:  Well, I think he can answer if -- well,

 7    I'll sustain the objection.

 8    BY MR. KOZINETS:

 9    Q.  Did Mr. Ferrer tell you about any of Backpage's marketing

10    efforts regarding prostitution advertisements?          09:17:52

11          MR. PANCHAPAKESAN:  Same objection.

12          MR. FEDER:  Also relevance.

13          THE COURT:  Overruled.

14          THE WITNESS:  No, he didn't use any marketing

15    information.  It was more on the controls as they review ad          09:18:07

16    submissions.

17    BY MR. KOZINETS:

18    Q.  Okay.  Did Mr. Ferrer disclose to you any information about

19    how Backpage had enhanced its website to make it easier to shop

20    for prostitutes?          09:18:36

21          MS. BERTRAND:  Objection.  Leading.

22          MR. FEDER:  Also relevance.

23          MR. PANCHAPAKESAN:  Lacks foundation as well.

24          THE COURT:  Overruled.

25          THE WITNESS:  No.          09:18:48

19

1          MR. KOZINETS:  Okay.  I pass the witness.

2          THE COURT:  Mr. Panchapakesan?

3                       CROSS-EXAMINATION

4    BY MR. PANCHAPAKESAN:

5    Q.  Good morning, sir.                                    09:19:11

6    A.  Good morning.

7    Q.  My name's Gopi Panchapakesan.  I represent Jeff Brunst.

8          Now, on direct exam you testified to a number of

9    discussions you had with Carl Ferrer in the 2014-2015 time

10   period.                                                   09:19:28

11         Do you recall that?

12   A.  Correct.

13   Q.  And those discussions also included a man by the name of

14   Trent Voigt; is that right?

15   A.  Correct.                                              09:19:37

16   Q.  And you understood Trent Voigt to be the CEO of Jetpay?

17   A.  Correct.

18   Q.  And was Jetpay an AMEX business partner?

19   A.  They are.

20   Q.  And they're a payment processor; is that right?       09:19:47

21   A.  They are.

22   Q.  And a payment processor, is that sort of a -- a middleman

23   between the merchant and AMEX?  Is that fair?

24   A.  That is correct.

25   Q.  Now, during these discussions in late 2014, early 2015, do   09:19:59

```
 1    you ever recall my client, Mr. Brunst, being part of those

 2    discussions?

 3    A.  No, I do not.

 4         MR. PANCHAPAKESAN:  If you could please show the

 5    witness Exhibit 475, which is in evidence.  And request to      09:20:15

 6    publish.

 7    BY MR. PANCHAPAKESAN:

 8    Q.  Now, Mr. Hansen, you recall testifying on direct exam about

 9    this merchant guide from 2015; right?

10    A.  I do.                                                       09:20:48

11    Q.  Okay.  So why don't we take a look at page 14 of the

12    document, Section 3.2.

13         MR. PANCHAPAKESAN:  And if you could kind of blow up

14    just that top, that very top paragraph.

15    BY MR. PANCHAPAKESAN:                                           09:21:03

16    Q.  Okay.  And, Mr. Hansen, could you read that, that

17    paragraph.

18    A.  Sure.  It's in the treatment of American Express brand.

19         It says, "American Express has built a brand that is

20    synonymous with trust, integrity, security, quality, and       09:21:15

21    customer service.  We work diligently to uphold our reputation

22    and restrict merchants from engaging in activities that would

23    harm our business or brand."

24    Q.  And so, Mr. Hansen, you understood that American Express's

25    reputation and brand were factors that AMEX might consider in   09:21:31
```

 1   its merchant termination decision; correct?

 2   A.  Correct.

 3   Q.  In fact, those are factors that American Express considered

 4   in eventually terminating Backpage; correct?

 5   A.  Correct.                                          09:21:44

 6        MR. PANCHAPAKESAN:  Now can we go to page 16,

 7   Section 3.3.

 8   BY MR. PANCHAPAKESAN:

 9   Q.  Now, you recall testifying yesterday about this list of --

10   of prohibited uses of AMEX cards; right?              09:21:57

11   A.  Correct.

12   Q.  So let's take a look at -- it's been blown up -- this first

13   bullet that says, "Adult digital content."

14        Do you see that?

15   A.  Yep.                                              09:22:08

16   Q.  Now, and that's -- that's a prohibited use of the card.

17   Someone cannot use an AMEX card to buy adult content online;

18   right?

19   A.  Correct.

20   Q.  Does that refer -- does that include online pornography,   09:22:19

21   for example?

22   A.  Correct.

23   Q.  And that would include adult ads?

24   A.  If they were selling that content, then, yes.

25   Q.  So -- so if someone was selling an ad for an escort or a   09:22:30

```
 1    stripper online, they couldn't use the AMEX card to -- to pay

 2    for that; right?

 3    A.  The escort service, because that's not illegal, then that

 4    would be allowed.  But if there was implications or inferences

 5    that it was more than that, then it would not be.          09:22:48

 6    Q.  I see.  So -- so your testimony is that if -- if there's an

 7    advertisement and it's not a sex-for-money advertisement, is it

 8    your testimony that an AMEX card could be used to buy that ad?

 9    A.  We could --

10         MR. KOZINETS:  Objection.                             09:23:07

11         I'm sorry.

12    BY MR. PANCHAPAKESAN:

13    Q.  Under your rules in 2015 --

14         THE COURT:  Wait.

15    BY MR. PANCHAPAKESAN:                                      09:23:11

16    Q.  -- it could --

17         THE COURT:  Let -- there's an objection.

18         MR. PANCHAPAKESAN:  I'm sorry.  Go ahead.

19         THE COURT:  What's the objection?

20         MR. KOZINETS:  Just misstates prior testimony.        09:23:16

21         THE COURT:  Overruled.

22         THE WITNESS:  Yes.  If it was not illegal and we

23    didn't view it as a risk to our brand, then, yes.

24    BY MR. PANCHAPAKESAN:

25    Q.  And so that second part, "risk to brand," that's not a    09:23:27
```

1    question of legality or illegality?  That's a reputational

2    concern; right?

3    A.  Correct.

4    Q.  Now, why don't we go to the fourth bullet point.  Okay.

5    And that talks about payday loans.                        09:23:43

6            What's a payday loan, if you know?

7    A.  I'm sorry.  Repeat your question.

8    Q.  Sure.  There's a reference here to payday loans.  What's a

9    payday loan, if you know?

10   A.  Payday loans, because we -- actually, many of those look    09:23:54

11   like they're more predatory lending, and so we prohibit that.

12   Q.  And so that's another example of something that may not be

13   illegal, but AMEX views it as a risk to its brand?

14   A.  Correct.

15   Q.  All right.  Then why don't we go to the ninth bullet point.   09:24:14

16   Okay.

17           And do you see that reference is gambling?

18   A.  I --

19   Q.  So -- so if I wanted to go to Vegas and buy chips at a

20   blackjack table using my AMEX card, I couldn't do that under    09:24:25

21   these rules; right?

22   A.  You could not at that time, yep.

23   Q.  And if I wanted to at this time go buy a Powerball ticket

24   using an AMEX card, I couldn't do that either; right?

25   A.  Correct.                                               09:24:38

MICKEY HANSEN - CROSS-EXAMINATION
24

```
 1   Q.  And that's despite the fact that it's legal to buy a
 2   lottery ticket; right?
 3   A.  Correct.
 4         MR. PANCHAPAKESAN:  Now, let's go to the last bullet
 5   point.  It says, "Other items of which we notify."        09:24:47
 6         Yeah.
 7   BY MR. PANCHAPAKESAN:
 8   Q.  Right.  Now, I -- I believe you testified yesterday that
 9   this is sort of a catch-all bullet that deals with -- I think
10   your words were risk to the brand; is that right?          09:25:03
11   A.  Correct.
12   Q.  And you were referring to something called reputational
13   risk.  Is that fair?
14   A.  Correct.
15   Q.  And, as you understand that, reputational risk means    09:25:11
16   negative reputation that can result to American Express's brand
17   from being associated with a certain product or service.  Is
18   that fair?
19   A.  That's correct.
20   Q.  Now, if we go to the last bullet at the bottom of the page, 09:25:23
21   it says, "Merchants must not use the card to verify a
22   customer's age."
23         Do you see that?
24   A.  I do.
25   Q.  So is it true that in 2015 AMEX had a policy that a      09:25:35
```

1    merchant could not use an AMEX credit card from a customer to

2    verify that customer's age; is that right?

3    A.  Correct.

4    Q.  Okay.  So in 2015, if Backpage wanted to use an

5    advertiser's credit card to verify their age, under your rules,    09:25:53

6    they couldn't do that; right?

7    A.  Correct.

8    Q.  Now, ultimately in July 2015, AMEX completely cuts ties

9    with Backpage; right?

10   A.  We have.                                                       09:26:06

11   Q.  Meaning that an AMEX card cannot be used to buy any ad on

12   Backpage even if it was a non-adult ad; is that right?

13   A.  Correct.

14   Q.  All right.  Now, isn't it true, sir, that Backpage's adult

15   ads were not a violation, per se, of the merchant guide?           09:26:22

16   A.  I'm sorry.  They weren't in violation of which?

17   Q.  Sure.  Let me -- isn't it true that Backpage's adult ads

18   were not a, per se, violation of the merchant guide?

19   A.  They -- they were because we were on the reputational risk

20   because we were being -- we had questions, lots of them, if we     09:26:43

21   were linked to what that could infer.  And so that's why we

22   reached out to -- requested cancellation originally.

23   Q.  Now, sir, you recall that you were interviewed by the

24   prosecutors in this case?

25           Do you recall that?                                        09:27:02

UNITED STATES DISTRICT COURT

MICKEY HANSEN - CROSS-EXAMINATION

26

```
 1    A.   Yep.

 2    Q.   And I think you had counsel with you from American -- from

 3    American Express; is that right?

 4    A.   Yeah.

 5    Q.   Yes?                                                          09:27:09

 6    A.   Yes.  Sorry.  Sorry.

 7    Q.   And you sought to tell the truth during that interview;

 8    correct?

 9    A.   Yes.

10    Q.   Now, isn't it true that during that interview you told the   09:27:14

11    government that with respect to American Express's merchant

12    guide, Backpage's adult ads were not a violation, per se?

13              Didn't you tell them that?

14    A.   There -- outside of the reputational risk, there was not

15    a -- that they were doing anything illegal, if that's what your   09:27:35

16    question is.

17    Q.   Okay.

18    A.   Yes.

19    Q.   So your testimony, then, is that the reason that AMEX

20    cancelled Backpage was because of reputational risk, not          09:27:43

21    because of illegality.  Is that fair?

22    A.   That is correct.

23    Q.   Now, getting back to this discussion about payment

24    processing, in your role at American Express, I think you said

25    you do global acquisitions.  You manage relationships with        09:28:03
```

MICKEY HANSEN - CROSS-EXAMINATION

1   third-party partners, like Jetpay, who acquire merchants; is

2   that right?

3   A.   That is correct.

4   Q.   And in the Backpage context, that third-party partner was

5   Jetpay; right?                                          09:28:18

6   A.   Correct.

7   Q.   And so in the onboarding process for a merchant like

8   Backpage, would -- would Backpage submit an application to

9   Jetpay?  Is that how it works?

10  A.   Yes, that's correct.                               09:28:32

11  Q.   And then Jetpay would have the initial responsibility of

12  vetting Backpage; right?

13  A.   Correct.

14  Q.   And so Jetpay would initially have to confirm that the

15  merchant, Backpage, is not in a prohibited industry like we   09:28:47

16  just saw; right?

17  A.   Correct.

18  Q.   Okay.  And, again, prohibited industry's not synonymous

19  with illegality.  It can refer to a number of things that are

20  perfectly legal; right?                                 09:28:59

21  A.   Correct.

22  Q.   And I take it that when Backpage first became an AMEX

23  merchant, is it true that Jetpay did not make a determination

24  that Backpage was in a prohibited industry; right?

25  A.   Correct.                                           09:29:13

```
 1    Q.  In fact, isn't it true that American Express at that time

 2    had numerous merchant accounts with Jetpay?

 3    A.  We did.

 4    Q.  So it's not like Backpage was the only game in town.

 5    Jetpay had helped you acquire other merchants; right?          09:29:31

 6    A.  Correct.

 7    Q.  And so you in your role had relied previously with other

 8    merchants on -- on what Jetpay was telling you; right?

 9    A.  Correct.

10    Q.  Now, as part of the onboarding process of a merchant,      09:29:43

11    American Express at the outsite -- outset might also verify a

12    merchant's suitability; is that right?

13    A.  We could, yes.  We retain that right.

14    Q.  And, again, suitability and legality are -- are not the

15    same thing; right?                                             09:30:04

16    A.  Right.

17    Q.  Okay.  Suitability could also refer to something like

18    reputational risk, like we talked about; right?

19    A.  It could, yes.

20    Q.  And do you know if when Backpage first became an American   09:30:13

21    Express merchant, do you know if AMEX conducted a -- a

22    suitability review?

23    A.  We -- if they had a direct relationship with us, we would

24    go through our standard risk review, which is underwriting.  We

25    validate that they're in the right industry that they claim to  09:30:29
```

UNITED STATES DISTRICT COURT

```
 1   be and that they have the financial wherewith.
 2   Q.  And do you know if that happened, if AMEX did that with
 3   Backpage?
 4   A.  If we had a direct relationship, yes.  For this particular
 5   case, through Jetpay, Jetpay would be responsible for          09:30:43
 6   conducting that.
 7   Q.  Okay.  And so in this -- in this instance, Jetpay did the
 8   suitability review, and you relied on that review?
 9   A.  Correct.
10   Q.  Now, you talked a bit about something called the Merchant  09:30:52
11   Evaluation Cancellation Committee.
12          Do you recall that?
13   A.  I did.
14   Q.  And so just sort of taking a step back, there may be any
15   number of reasons why AMEX terminates a merchant; right?       09:31:10
16   A.  Correct.
17   Q.  One of those could be excessive charge-backs, for example?
18   A.  Correct.
19   Q.  And that's where too many folks are disputing credit card
20   charges and getting refunds; right?                            09:31:23
21   A.  Correct.
22   Q.  Another could be reputational risk we talked about?
23   A.  Yes.
24   Q.  Another could be if -- if there's negative publicity around
25   a merchant, AMEX might just say, you know, we don't want to     09:31:31
```

1   deal with this merchant.  Is that fair?

2   A.  That is correct.

3   Q.  All right.  Now, the Merchant Evaluation Cancellation

4   Committee, I mean, you testified this is an internal committee

5   at AMEX that in the 2014-2015 time period was meeting regularly    09:31:46

6   to discuss cancelling potential merchants; right?

7   A.  That's correct.

8   Q.  And going forward I might refer to it as the committee, and

9   you'll know what I'm saying?

10  A.  Okay.    09:32:00

11  Q.  Now, this committee, is it comprised of various department

12  heads or vice presidents across AMEX?

13  A.  It is.

14  Q.  And during the 2014 to 2015 time period, you attended these

15  meetings; correct?    09:32:13

16  A.  Yes.

17  Q.  And Backpage was a topic of discussion at the meetings;

18  right?

19  A.  They were.

20  Q.  And, in fact, at these meetings you would often be the one    09:32:19

21  presenting material regarding Backpage; right?

22  A.  Correct.

23  Q.  Now, in late 2014, so I'm talking like December 2014, isn't

24  it true that amongst the committee members within this

25  committee that there was a disagreement about how to proceed    09:32:39

MICKEY HANSEN - CROSS-EXAMINATION

31

```
 1   with Backpage?  Isn't that true?
 2   A.  There were some who -- who wanted to cancel right away, and
 3   others were more open to if there was a solution to block the
 4   adult section only.
 5   Q.  Now, isn't it true that in 2014, and this time period, you      09:32:53
 6   understood that Backpage's revenue came from selling ad space;
 7   is that right?
 8   A.  Correct.
 9   Q.  In other words, you understood Backpage was not receiving
10   revenue from a commercial transaction that might later happen       09:33:12
11   between a buyer and a seller; right?
12   A.  We were not aware of that.
13           MR. KOZINETS:  Objection.
14           THE WITNESS:  It was an advertising --
15           MR. KOZINETS:  Well --                                       09:33:24
16           THE WITNESS:  -- merchant.
17           THE COURT:  Was there -- I thought I heard an
18   objection.
19           Is your microphone on, Mr. Kozinets?
20           MR. KOZINETS:  Sorry.  It is, yes.                           09:33:32
21           I was going to say objection.  Foundation.
22           THE COURT:  All right.  Well, I'll sustain the
23   objection.
24           And you can ask a new question, Mr. Panchapakesan.
25           ///
```

UNITED STATES DISTRICT COURT

1    BY MR. PANCHAPAKESAN:

2    Q.  Well, through this process of reviewing the Backpage

3    site -- well, let me step back.

4         You said you reviewed the Backpage site in 2014-2015;

5    right?

6    A.  Yes.

7    Q.  And you were familiar with the site through your

8    discussions with Mr. Ferrer and Mr. Voigt of Jetpay; right?

9    A.  Correct.

10   Q.  Okay.  And did you have an understanding based on that that   09:34:02

11   Backpage was not receiving money from any commercial

12   transaction between an advertiser and a buyer?

13        MR. KOZINETS:  Objection.  Foundation.

14        THE COURT:  He can ask -- answer if he had an

15   understanding.                                                     09:34:20

16        THE WITNESS:  I didn't.  I -- my understanding was

17   that the revenue came through advertising.

18   BY MR. PANCHAPAKESAN:

19   Q.  Meaning someone pays a fee to post an ad?

20   A.  Right.                                                         09:34:29

21   Q.  That's your understanding?

22   A.  Correct.

23   Q.  Okay.  Now -- now, in fairness, at these committee

24   meetings, you know, some folks in the committee had concerns

25   about the effect of Backpage on -- on American Express's brand;   09:34:42

 1   right?

 2   A.  Correct.

 3   Q.  Now, in 2014-2015, there were minutes kept of these

 4   committee meetings; correct?

 5   A.  Correct.                                            09:34:55

 6   Q.  And so I take it that there were a -- a scribe who would

 7   have taken down notes from the meetings; right?

 8   A.  I'm sorry.  That there was a what?

 9   Q.  A scribe, or someone taking down notes --

10   A.  Yes.                                                09:35:07

11   Q.  -- from the meeting?

12   A.  Yes.

13   Q.  And the minutes would reflect who had attended the

14   meetings; right?

15   A.  Correct.                                            09:35:14

16   Q.  And they would reflect the deliberations in the meetings?

17   A.  Yes.

18   Q.  And they would reflect if there was any vote taken in terms

19   of how to proceed; right?

20   A.  Yes.                                                09:35:22

21        MR. PANCHAPAKESAN:  Let me show the -- for the

22   witness's eyes only Exhibit 6026.

23        It's not on my screen, but I'm not sure if it's on his

24   screen.

25        THE COURT:  It is on his screen.                   09:35:52

```
 1              THE COURTROOM DEPUTY:  It should be on yours.  Is the

 2   monitor on?

 3              MR. PANCHAPAKESAN:  It's all right.  Let me see if I

 4   can deal without the screen potentially.  Oh.

 5   BY MR. PANCHAPAKESAN:                                            09:36:53

 6   Q.  Now, Mr. Hansen, are these meeting minutes for a

 7   December 12th, 2014, meeting of the AMEX Merchant Evaluation

 8   Cancellation Committee?

 9   A.  Yes, they are.

10   Q.  And if you look at -- I think we have to go down a bit to   09:37:08

11   the next table, to ad hoc attendance.

12              And you're listed there as being in attendance at this

13   meeting; right?

14   A.  Correct.

15   Q.  All right.  And then if you look at the top, sort of the    09:37:21

16   gray portion, it indicates there was a -- a scribe at the

17   meeting.

18              Do you see that?

19   A.  Correct.

20   Q.  And I assume that's the person who would have taken         09:37:30

21   the minutes from the meeting?

22   A.  Correct.

23   Q.  And based on your attendance at these meetings in

24   2014-2015, it was a regular practice for American Express to

25   maintain these types of minutes; right?                        09:37:46
```

A.  Correct.

Q.  Now, if you look at the agenda on page 2, that top table,
there's a reference to Backpage under point 2.

        Do you see that?

A.  Yes.                                                                09:38:00

Q.  And so Backpage was discussed at this committing meeting?

A.  Correct.

Q.  And you were the presenter, it looks like, on that issue?

A.  Correct.

Q.  Okay.  And then if you look at pages 3 to 4 of the exhibit,       09:38:08
this reflects the deliberations of the committee regarding
Backpage; right?

A.  Correct.

Q.  If you look at page 5, that reflects a vote of the
committee at this meeting; correct?                                    09:38:25

A.  Correct.

        MR. PANCHAPAKESAN:  I move to admit Exhibit 6026.
It's a business record under 803(b).

        MR. KOZINETS:  Objection, Your Honor.  Hearsay.  The
document contains an amalgamation of statements by a number of        09:38:42
people.  Those are all out-of-court statements.  And
particularly if this is being offered for truth, it's classic
hearsay.

        MR. PANCHAPAKESAN:  It's a business record.
It's minutes of a regularly conducted meeting.  It's a classic        09:38:59

 1    business record.

 2              MR. KOZINETS:  It --

 3              THE COURT:  Well --

 4              MR. KOZINETS:  It contains -- I'm sorry.

 5              THE COURT:  Well, I guess the question, though, is          09:39:08

 6    what the other content is.  I see some redactions.  There's

 7    other content with respect to other business decisions.  I'm

 8    not entirely clear what the other content is.

 9              MR. PANCHAPAKESAN:  Well, the redactions are for

10    privilege by AMEX's counsel.  Those are the redactions.  And --     09:39:28

11              THE COURT:  Scroll to the prior page.

12              MR. PANCHAPAKESAN:  Sure.  And it's not being offered

13    for the truth.  It's being offered to show there were

14    deliberations, there was a meeting, there was a vote.

15              THE COURT:  I'm going to sustain the objection.          09:39:49

16              MR. PANCHAPAKESAN:  May I ask questions about it or --

17              THE COURT:  Yes.

18              MR. PANCHAPAKESAN:  All right.  So if you could go to

19    page 3 of the exhibit, bullet point 4.  It's for the witness's

20    eyes only.                                                          09:40:15

21          Yeah, if you would.

22    BY MR. PANCHAPAKESAN:

23    Q.  And so -- so you were making a report to the -- to the

24    committee about Backpage; right?

25    A.  Correct.                                                        09:40:29

1   Q.  And so -- and I believe you testified to this on direct,

2   but you related to the committee that Mr. Ferrer, the CEO of

3   Backpage, had reached out to you; right?

4   A.  Yes.

5   Q.  And you related to the committee that Mr. Ferrer          09:40:42

6   represented that Backpage was working with law enforcement;

7   correct?

8   A.  Yes.

9   Q.  Okay.  And you related to the committee that Mr. Ferrer

10  represented Backpage, had a comprehensive set of controls; is  09:41:00

11  that right?

12  A.  Yes.

13  Q.  Okay.  Now, why don't we go to -- to bullet point 7 on that

14  same page.

15       Now, isn't it true that -- that during this time frame    09:41:14

16  Jetpay, your business partner, represented to you that in their

17  view Backpage had been very open with them?

18  A.  That's what they said, yes.

19  Q.  And do you ever recall a time when Backpage or Jetpay

20  invited you to visit Backpage's offices?                       09:41:34

21  A.  They did.

22  Q.  Okay.  And do you know if that ever happened?

23  A.  No, we did not go.

24       ///

25       ///

1          MR. PANCHAPAKESAN:  And if you go to bullet point 8 on

2    the same document.  If you'd just blow that up for the witness,

3    the eighth bullet point.

4    BY MR. PANCHAPAKESAN:

5    Q.  Now, again, and I believe you testified to this on direct,          09:42:07

6    Jetpay and Mr. Ferrer represented to you that law enforcement

7    had encouraged them to keep the adult section open.

8          Do you recall that?

9    A.  Yes, that is what they said.  Yeah.

10          MR. PANCHAPAKESAN:  Okay.  Now if we can turn to          09:42:27

11    page 4 of the document, bullet point 5.

12    BY MR. PANCHAPAKESAN:

13    Q.  Okay.  Now, does this refresh your recollection that you

14    conveyed to the -- to the committee that you understood where

15    Backpage's revenue was coming from, that it was coming from          09:42:46

16    selling ad space?

17    A.  This is what I was informed in conversations with -- with

18    Mr. Ferrer and -- and Mr. Voigt, yes.

19    Q.  And isn't it true that you relayed that information to the

20    committee to give some of the other folks in the committee at          09:43:03

21    this time comfort about Backpage?

22    A.  I was giving them the background so they understood all the

23    facts.

24    Q.  And -- and by "all the facts," you're referring to the fact

25    that Backpage gets paid through selling ad space, not through          09:43:24

UNITED STATES DISTRICT COURT

```
 1    some other transaction; right?

 2    A.  I was sharing the -- the information that I was given on

 3    this particular merchant.

 4    Q.  From Jetpay and Mr. Ferrer?

 5    A.  Correct.                                           09:43:34

 6         MR. PANCHAPAKESAN:  Now, if you'd go to bullet point 6

 7    on that same page.

 8    BY MR. PANCHAPAKESAN:

 9    Q.  It's a reference to someone called Oguz.

10         Do you know who Oguz is?                          09:43:53

11    A.  Yes.

12    Q.  Okay.  Was he a committee member at the --

13    A.  Yes.

14    Q.  Okay.  Was he a V -- a vice president dealing with -- with

15    risk?                                                  09:44:01

16    A.  He is.  He's a vice president in our risk organization.

17    Q.  Now, isn't it true that during this committee meeting he

18    expressed a concern about singling out Backpage?

19         MR. KOZINETS:  Objection.  Hearsay.

20         THE COURT:  Sustained.                            09:44:16

21    BY MR. PANCHAPAKESAN:

22    Q.  Well, stepping back, during your deliberations at this

23    committee meeting, was there any disagreement about whether or

24    not AMEX would be singling out Backpage?

25    A.  There was conversation about whether we should cancel them 09:44:37
```

1    or not, yes.

2    Q.  And part of that was out of a concern that AMEX might be

3    singling out Backpage versus a newspaper, for example?

4              MR. KOZINETS:  Objection.  Foundation.

5              THE COURT:  Well, he can answer the question if he has          09:44:58

6    an opinion about that or has familiarity with it.

7              THE WITNESS:  Other than we wanted to make sure that

8    we were looking at it and considering all of the facts with it.

9    And so there was a comparison of is it similar to a newspaper

10   who does ads, and what action would we take.                            09:45:23

11   BY MR. PANCHAPAKESAN:

12   Q.  And -- and that comparison was made by some of the folks at

13   the committee; right?

14   A.  Correct.

15   Q.  Now, if you look at the last page, page 5, there was a vote          09:45:34

16   taken at -- at this committee meeting, right, regarding

17   Backpage?

18   A.  Correct.

19   Q.  And it was a -- there were, it looks like, five committee

20   members who voted?                                                      09:45:53

21   A.  Correct.

22   Q.  And the vote was split, it -- on Backpage.  It was 3 to 2;

23   right?

24   A.  Correct.

25             MR. PANCHAPAKESAN:  Okay.  You can take that down.            09:46:04

```
 1    Thank you.
 2            Now I'm going to -- I'm going to show for the
 3    witness's eyes only Exhibit -- Government Exhibit 462.
 4    BY MR. PANCHAPAKESAN:
 5    Q.  Sir, do you recognize this as a -- a -- a January 27th,    09:46:30
 6    2015, email between yourself, Mr. Ferrer, and Mr. Voigt?
 7    A.  Yes.
 8    Q.  And this is in this time period where you were having
 9    discussions with Ferrer and Voigt about what to do about
10    Backpage going forward; right?                                 09:46:50
11    A.  Correct.
12    Q.  And fair to say this is sort of a -- a -- a lead-up to some
13    of the emails that Mr. Kozinets showed you yesterday a
14    couple months later; right?
15    A.  Correct.                                                   09:47:01
16            MR. PANCHAPAKESAN:  Okay.  I move for the admission of
17    Government Exhibit 462.
18            MR. KOZINETS:  No objection.
19            THE COURT:  Yes, it may be admitted and published.
20            (Exhibit 462 admitted into evidence.)                 09:47:11
21    BY MR. PANCHAPAKESAN:
22    Q.  If you take a look at this email, this is a communication
23    from Mr. Ferrer to you and others at AMEX, January 2015; right?
24    A.  Correct.
25    Q.  And if you take a look at that top portion there,         09:47:29
```

 1   Mr. Ferrer, he says, "Mickey, Craigslist and Backpage are the

 2   same except for," and then he says, "Craig is much stronger in

 3   private party items for sale.  Craig allows hard core porn and

 4   sex acts."

 5          Do you see that?                                      09:47:50

 6   A.  I do see that.

 7   Q.  So Mr. Ferrer's position with respect to -- to AMEX was at

 8   this time he thought Craigslist's content was in some sense

 9   worse than Backpage's; right?

10          MR. KOZINETS:  Objection.  Speculation.  Foundation.  09:48:04

11          THE COURT:  Sustained.

12   BY MR. PANCHAPAKESAN:

13   Q.  Well, in looking at this email, did you have an

14   understanding that Ferrer's view was Craigslist allowed

15   hard-core porn and sex acts?                                 09:48:18

16   A.  I'm sorry.  Can you repeat --

17   Q.  Sure.

18   A.  -- the question again?

19   Q.  Sure.  In looking at this email, did you have an

20   understanding that Mr. Ferrer was representing that Craigslist 09:48:26

21   allowed hard-core porn and sex acts at the time?

22   A.  That's what he stated in the email.

23   Q.  And then he lists a bunch of links, and it says, "Porn

24   NSFW."

25          Do you understand NSFW to mean not safe for work?     09:48:41

1    A.  I do not -- I don't -- I don't know all that.

2    Q.  Fair enough.

3         Did you -- did you click on these Craigslist links

4    after you received the email?

5    A.  I think -- I believe -- if I recall, I potentially did      09:48:53

6    some, but not all of them.

7    Q.  Okay.  And so you clicked on them, and -- and did it appear

8    that -- that these were pornographic-type ads with hard-core

9    sex acts?

10   A.  I'm sorry.  I don't recall.  It's a long time ago.          09:49:08

11   Q.  But sitting here today, you have no reason to dispute that

12   that's what these ads were for; right?

13   A.  Right.

14   Q.  Okay.  Now, if you go to the -- it's literally the third

15   paragraph where he says, "We are asking for a level playing      09:49:21

16   field."

17         Do you see that?

18   A.  Yes.

19   Q.  So you understood that Mr. Ferrer felt like Backpage was

20   not on a level playing field with Craigslist vis-a-vis AMEX;    09:49:34

21   right?

22   A.  He stated that, yes.

23   Q.  All right.  Now, at this time, in January 2015, could

24   someone use an AMEX card on Craigslist?

25   A.  I believe you could.                                        09:49:47

1   Q.  And, as we sit here today, can American Express cards be

2   used on Craigslist?

3   A.  They can.

4   Q.  Now, if you look at the fourth paragraph of this email, it

5   starts, "Losing AMEX."                                          09:50:00

6          Do you see that?

7   A.  I do.

8   Q.  So you understood Mr. Ferrer to be representing to you that

9   losing the ability to have AMEX cards would hurt Backpage in

10  the jobs and automotive category.                               09:50:14

11         Do you see that?

12  A.  Correct.  Yes.

13  Q.  And then at the end of that paragraph, he says, "This is a

14  great opportunity for us."

15         Do you see that?                                         09:50:23

16  A.  Yes.

17  Q.  And so Ferrer was representing to you that Backpage may

18  start charging in those sections; right?

19  A.  Correct.

20         MR. PANCHAPAKESAN:  And please place before the          09:50:31

21  witness Exhibit 466, which is in evidence.  And request to

22  publish.  Thank you.

23  BY MR. PANCHAPAKESAN:

24  Q.  Now, this was an email you looked at yesterday, an

25  April 22nd, 2015, email between you and Mr. Ferrer; right?      09:51:00

 1   A.  Yes.

 2   Q.  Now, there's a reference in this top portion to -- to

 3   Univision.

 4        Do you see that?

 5   A.  Yes.                                                    09:51:10

 6   Q.  So you understood Ferrer to be saying that one of

 7   Backpage's partners was Univision; right?

 8   A.  Yes.

 9   Q.  And you understand Univision to be a Spanish or a Latin

10   media company; right?                                       09:51:24

11   A.  Yes.

12   Q.  Okay.  And he's asking you that -- he's asking you not to

13   cancel the AMEX cards because it might affect Univision, for

14   example; right?

15   A.  Correct.                                                09:51:35

16   Q.  Now, there's a screenshot that's attached to this, which

17   is -- which is 466a.

18        I don't know that we have to show that, but isn't it

19   true that in 2015, AMEX tested the Backpage site by attempting

20   to use an AMEX card to buy an adult ad; correct?            09:51:56

21   A.  Correct.

22   Q.  And -- and you confirmed that an AMEX card couldn't be used

23   for that purpose; correct?

24   A.  Correct.

25        MR. PANCHAPAKESAN:  You can take that down.  Thank      09:52:10

1   you.

2   BY MR. PANCHAPAKESAN:

3   Q.  So you testified yesterday that you became aware in

4   July 2015 that AMEX credit cards could be used to purchase

5   something called credits on the Backpage site; right?          09:52:28

6   A.  Correct.

7   Q.  All right.  Now, isn't it true that you became aware of

8   that fact because a -- a sheriff had raised that issue with

9   AMEX?

10  A.  It was -- I believe it was, but it was an external party   09:52:41

11  had reached out to us and asked that question, if we were aware

12  of it.

13  Q.  And that external party was a law enforcement official;

14  right?

15  A.  They were.                                                  09:52:51

16  Q.  And do you understand that to be someone called

17  Sheriff Dart?

18          MR. KOZINETS:  Objection.  Foundation and hearsay as

19  to this line of, you know, questions.

20          THE COURT:  Well, he can answer the question if he      09:53:04

21  understood it to be someone by that name.

22          THE WITNESS:  I don't recall the -- the name of the

23  sheriff.

24  BY MR. PANCHAPAKESAN:

25  Q.  Okay.  Well, do you understand that AMEX had a back and     09:53:13

UNITED STATES DISTRICT COURT

1    forth with that sheriff's office during this time period?

2            MR. KOZINETS:  Foundation.

3            THE WITNESS:  What do you mean by "back and forth"?

4            Sorry.

5            MR. KOZINETS:  That's okay.                          09:53:32

6            THE COURT.  Yes.

7            MR. PANCHAPAKESAN:  I can rephrase.

8            THE COURT:  Yes, please rephrase.

9    BY MR. PANCHAPAKESAN:

10   Q.  Do you understand that during this time period, after the   09:53:37

11   sheriff made AMEX aware of the issue, do you recall if AMEX and

12   the sheriff's office traded information with each other?

13   A.  I was not involved in that --

14           MR. KOZINETS:  Objection.

15           THE WITNESS:  -- so I don't --                       09:53:50

16           MR. KOZINETS:  Sorry.

17           THE WITNESS:  -- know that information.

18           THE COURT:  Overruled.

19           And his answer will -- will stand.  He said he didn't

20   know that.                                                   09:53:54

21   BY MR. PANCHAPAKESAN:

22   Q.  Now, at this time, July 2015, did you have an understanding

23   that the sheriff had also sent letters to other credit card

24   companies like Visa and MasterCard?

25           MR. KOZINETS:  Foundation.                          09:54:16

```
 1              THE WITNESS:  Sustained.
 2     BY MR. PANCHAPAKESAN:
 3     Q.  Well, I mean, it's really a yes or no.
 4              Did -- did you do -- do you have any recollection of
 5     that?                                                          09:54:25
 6              MR. KOZINETS:  Same.
 7              THE COURT:  He can answer that question.
 8              THE WITNESS:  I didn't -- I wasn't aware of it at that
 9     time.
10     BY MR. PANCHAPAKESAN:                                          09:54:36
11     Q.  Okay.  Fair enough.
12              So you -- you said "at that time."
13              Did -- at some point did you become aware of that?
14     A.  Sorry.  No.  They did that.
15     Q.  So you --                                                  09:54:46
16     A.  They just made us aware of -- that you could purchase
17     credits with that.  I wasn't aware of if they were contacting
18     other entities.
19     Q.  And sitting here today, that's not something you're --
20     you're familiar with?                                         09:54:55
21     A.  No.
22              MR. PANCHAPAKESAN:  Okay.  Can I place before the
23     witness Exhibit 6234 for his eyes only.
24              Now, if you'd go to the very end of this email chain,
25     bottom of page 3.  All right.                                 09:55:32
```

```
 1   BY MR. PANCHAPAKESAN:

 2   Q.  Now, there's a name there, Molly Faust.

 3          Was she part of the cancellation committee?

 4   A.  She -- she is.  She was, yes.

 5   Q.  And what -- do you know what her role at AMEX was at the        09:55:47

 6   time?

 7   A.  Sorry?

 8   Q.  Do you know what her role at AMEX was at the time?

 9   A.  She was our communication -- external communication, public

10   communication.                                                    09:55:58

11   Q.  And what about Marina Norville?  Do you know who that is?

12   A.  I do not recall that name.  I don't remember her.

13   Q.  But Molly Faust was in charge of communications, so she

14   would have dealt with communications with external third

15   parties; is that right?                                           09:56:18

16   A.  Correct.

17   Q.  Okay.  Now, do you recognize these two emails here as -- as

18   American Express email accounts, the aexp.com?

19   A.  Yes.

20   Q.  And if you look at this email, does this appear to be a        09:56:35

21   communication from a sheriff's office to American Express

22   about -- about some credit card issues?

23          MR. KOZINETS:  Objection.  Foundation.

24          THE COURT:  Sustained.

25          MR. PANCHAPAKESAN:  Okay.  Well, if you'd go to -- if       09:56:56
```

```
 1    you'd go to the second page of this email, middle of the page.
 2    BY MR. PANCHAPAKESAN:
 3    Q.  And you see there's a -- there's a communication from a --
 4    a sheriff's office to AMEX.
 5            Do you see that?                                    09:57:26
 6    A.  Yes.
 7    Q.  Now, given your awareness that a sheriff brought this
 8    credit issue to your attention, does this appear to be a
 9    communication from that sheriff's office flagging for
10    Backpage -- excuse me -- flagging for American Express that  09:57:41
11    credits could be used on Backpage?
12            MR. KOZINETS:  Objection.  Hearsay.
13            THE COURT:  Sustained.
14            MR. KOZINETS:  Foundation.
15    BY MR. PANCHAPAKESAN:                                        09:57:53
16    Q.  Well, let me -- let me go about it this way then:  This
17    sheriff, after you became -- he made you aware that AMEX cards
18    could be used to buy credits on Backpage, fair to say that that
19    month AMEX stopped allowing its cards to be used for any
20    purpose on -- on the Backpage website; right?               09:58:23
21    A.  During that month we did, because we'd reached out to see
22    if there was a way to stop using AMEX on credits for that --
23    for the adult section.
24    Q.  And it postdates this July 7th email we looked at right --
25    A.  Right.                                                   09:58:45
```

UNITED STATES DISTRICT COURT

1    Q.   -- that decision?

2         Okay.  And at some point did that sheriff stop making

3    contact with AMEX?  Do you know?

4         MR. KOZINETS:  Objection.  Relevance.  Hearsay.

5    Foundation.                                                    09:59:00

6         THE COURT:  Sustained.

7    BY MR. PANCHAPAKESAN:

8    Q.  Now, Mr. Hansen, why don't we take a look at Exhibit 474,

9    which is in evidence.

10        MR. PANCHAPAKESAN:  And request to publish.               09:59:37

11   BY MR. PANCHAPAKESAN:

12   Q.  Now, if you look, there's a second email there from -- from

13   Mr. Ferrer to you dated July 20th, 2015.

14        Do you see that?

15        Now, there's a reference here to -- it says, "We'd        09:59:51

16   still like your counsel to meet with our counsel."

17        Do you see that?

18   A.  Yes.

19   Q.  Do you know if that meeting ever occurred?

20   A.  I don't -- I believe it did not.                           10:00:03

21   Q.  Okay.  And if you'd go to the -- to the top email.

22        Now, at the bottom of that, you note that Backpage

23   requested a topic of discussion before this potential meeting.

24        Do you see that?

25   A.  Correct.                                                   10:00:25

1  Q.  And do you know if -- if Ferrer ever communicated with you

2  what the topics of discussion would be?

3  A.  No.  The -- they never were shared.

4  Q.  In connection with this potential meeting, did Ferrer ever

5  share with you that -- that he thought Backpage's conduct          10:00:41

6  was -- was First Amendment protected?

7          Did he ever say that?

8          MR. KOZINETS:  Foundation.

9          THE COURT:  Overruled.

10          THE WITNESS:  No.                                          10:00:53

11  BY MR. PANCHAPAKESAN:

12  Q.  Now, do you believe that Mr. Ferrer did his best to comply

13  with your request during this time period?

14          MR. KOZINETS:  Objection.  Speculation.  Foundation.

15          THE COURT:  Sustained.                                     10:01:11

16  BY MR. PANCHAPAKESAN:

17  Q.  I'm asking you.  So you dealt with Mr. Ferrer for about --

18  it looks like half a year; right?

19  A.  That's correct.

20  Q.  And you were dealing with him on issues concerning the        10:01:21

21  Backpage website; right?

22  A.  (No audible response.)

23  Q.  Yes?

24  A.  Yes.

25  Q.  And you were dealing with this issue of credits; right?       10:01:29

MICKEY HANSEN - CROSS-EXAMINATION

53

1  A.  We did not deal with credit until, like you said, in this

2  time frame where we were made aware of that.  They never came

3  up before.

4  Q.  So in this time frame on this issue of credits, since you

5  were dealing with him --                                    10:01:46

6  A.  Yes.

7  Q.  -- do you believe that Mr. Ferrer did his best to comply

8  with -- with your requests?

9  A.  On credits, because we requested that you block AMEX for

10 using the credits at that time, and the answer was that they   10:02:00

11 could not.

12 Q.  Right.  And so my -- my question is, in connection with

13 this credits issue --

14 A.  Uh-huh.

15 Q.  -- since you dealt with him, do you believe Ferrer did his  10:02:09

16 best to comply with your requests?

17        MR. KOZINETS:  Speculation.

18        THE COURT:  Sustained.

19 BY MR. PANCHAPAKESAN:

20 Q.  Now, if Ferrer ever testified under oath that in his view   10:02:19

21 he did his best to comply with your requests, would that be

22 truthful?

23        MR. KOZINETS:  Hearsay.

24        THE WITNESS:  I'll sustain.

25        ///

```
 1    BY MR. PANCHAPAKESAN:
 2    Q.  So sitting here today as -- as the person who was dealing
 3    with all this from December 2014 to mid-2015, you have no view
 4    as to whether Ferrer and Backpage were -- were complying with
 5    your -- your requests?                                         10:02:48
 6           MR. KOZINETS:  Relevance.  Foundation.
 7           THE COURT:  Well, I think, Mr. Panchapakesan, you have
 8    to identify what the meaning of "request" is.  There were
 9    several that were made.  And I think the question is confusing.
10    It's compound.  And so I'll sustain the objection.             10:03:11
11    BY MR. PANCHAPAKESAN:
12    Q.  So let's take it piece by piece then.
13           THE COURT:  And there's a foundational issue here as
14    well as to what Mr. Ferrer was or was not doing, so that's the
15    reason for my sustaining the objections.                       10:03:24
16    BY MR. PANCHAPAKESAN:
17    Q.  Well, let's take it piece by piece then.
18           On this credits issue, meaning the use of American
19    Express cards to purchase credits, you're familiar with what
20    I'm talking about; right?                                      10:03:44
21    A.  Yes.
22    Q.  Okay.  That's an issue that came to your attention.  You
23    then raised it with Mr. Ferrer directly; correct?
24    A.  Correct.
25    Q.  Okay.  And then Mr. Ferrer had a response; correct?        10:03:54
```

1    A.  He did.

2    Q.  Okay.  And you considered and evaluated that response;

3    right?

4    A.  We did, yes.

5    Q.  Okay.  And I'm just talking about this specific interaction          10:04:08

6    on credits.

7            In that context, did you, in your view, since you were

8    dealing with him, did you believe that Mr. Ferrer was -- was

9    doing his best to comply with what you'd asked him to do?

10           MR. KOZINETS:  Speculation.  Foundation.                         10:04:27

11           THE COURT:  Sustained.

12   BY MR. PANCHAPAKESAN:

13   Q.  Did you have any reaction to Mr. Ferrer's actions in

14   response to your requests on -- on this credits issue?

15           MR. KOZINETS:  Objection.  Vague.                                10:04:48

16           THE COURT:  Overruled.  He can answer if he had any

17   action -- reaction.

18           THE WITNESS:  Well, when I -- we had asked him if they

19   could remove credits, and he said he would look into it and

20   then came back and said that he couldn't.                                10:05:09

21   BY MR. PANCHAPAKESAN:

22   Q.  That he could not?

23   A.  Could not.

24   Q.  Okay.  And did you think he was being truthful?

25   A.  In that view --                                                      10:05:16

```
 1              MR. KOZINETS:  Sorry.  Speculation.  Foundation.

 2              THE COURT:  Sustained.

 3   BY MR. PANCHAPAKESAN:

 4   Q.  Did you have any view as to his response, any reaction to

 5   his response that he couldn't do it?                              10:05:25

 6              MR. KOZINETS:  Asked and answered.

 7              MR. PANCHAPAKESAN:  That's --

 8              THE COURT:  Overruled.  He can answer if he can.

 9              THE WITNESS:  Yes.  When he said he couldn't, then

10   that -- we took that as the fact that he would not be able to    10:05:35

11   remove AMEX for credits.

12   BY MR. PANCHAPAKESAN:

13   Q.  Okay.  Now, you testified that you are a VP of Global

14   Acquisitions Capabilities.  So I take it that -- now, you

15   testified that you're VP of Global Acquisition Capabilities, so   10:06:03

16   I take it you're -- you're dealing with global merchants in

17   that respect?

18   A.  Global partners.

19   Q.  Okay.  And in dealing with global partners, in your

20   experience, AMEX also has global merchants.  Is that accurate?    10:06:22

21   A.  We do have global merchants.

22   Q.  Okay.  And so the jury understands, "merchant" meaning a

23   business selling something; right?

24   A.  Yes.

25   Q.  Okay.  And I would assume AMEX has hundreds, if not           10:06:35
```

 1   hundreds of thousands of global merchants; is that right?

 2   A.  Correct.

 3   Q.  Okay.  And so just because a business is abroad, that's not

 4   a reason for AMEX to deny use of their cards; right?

 5            MR. KOZINETS:  Objection.  Speculation.                10:06:55

 6            THE COURT:  He can answer if he knows.  Overruled.

 7            THE WITNESS:  We have merchant rules, and they -- they

 8   can vary from region to region.

 9   BY MR. PANCHAPAKESAN:

10   Q.  But you can have a merchant abroad.  That's not in and of   10:07:08

11   itself a violation of your policies; right?

12   A.  Right.  We have merchants in many -- many countries.

13   Q.  And you're also aware, since you are the VP of Global

14   Acquisition Capabilities, AMEX itself as a company has its own

15   affiliated, and the company's and subsidiary's abroad; right?   10:07:29

16   A.  We may.  I don't know all of the -- all of the workings in

17   those relationships.

18   Q.  But you're generally aware that American Express within its

19   corporate structure has foreign affiliates, foreign

20   subsidiaries, that sort of thing; right?                       10:07:49

21   A.  Yes.

22   Q.  Okay.  And some of these affiliates/subsidiaries, they

23   might be in the Netherlands or the U.K.  Is that fair?

24   A.  That's correct.

25   Q.  Okay.  Are you familiar with an AMEX-affiliated company in  10:07:59

```
 1    the United Kingdom called Interactive Transaction Solutions,

 2    Limited?

 3              Have you heard of that before?

 4    A.  I have not.

 5    Q.  Okay.  Do you have any idea what that company does?        10:08:11

 6    A.  No.

 7    Q.  But you are aware that on occasion AMEX has to set up local

 8    companies abroad to do business there; right?  You're aware of

 9    that?

10              MR. KOZINETS:  Yeah.  Objection.  Relevance.          10:08:24

11              THE COURT:  Sustained.

12    BY MR. PANCHAPAKESAN:

13    Q.  Now -- now, turning back to your discussions with

14    Mr. Ferrer to just be more precise about this, you -- you set

15    forth certain conditions for Mr. Ferrer and Backpage to comply  10:08:46

16    with; is that correct?

17    A.  Correct.

18    Q.  And you -- you personally conveyed what those conditions

19    were to Mr. Ferrer; right?

20    A.  Correct.                                                    10:08:59

21    Q.  Okay.  And so my question is, in your view, did Mr. Ferrer

22    do his best to comply with those conditions that you set forth

23    for him?

24              MR. KOZINETS:  So objection.  Asked and answered.

25    Speculation.  Foundation.                                      10:09:13
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  Yes.  Sustained.  It's been asked and

 2   answered.

 3              MR. PANCHAPAKESAN:  Okay.

 4   BY MR. PANCHAPAKESAN:

 5   Q.  Now, during the 2015-2015 time period, I believe you        10:09:19

 6   testified that you reviewed some of the ads on Backpage;

 7   correct?

 8   A.  I'm sorry.  Can you repeat the question?

 9   Q.  Sure.  During the 2014-2015 time period, you testified on

10   direct you reviewed some of the ads on Backpage; right?         10:09:35

11   A.  Correct.

12   Q.  And I believe your direct testimony was you thought the

13   ads, quote, "could insinuate other services besides dating."

14              Do you recall that testimony from yesterday?

15   A.  Correct.                                                    10:09:48

16   Q.  You also testified you had concerns that the ads, quote,

17   "implied prostitution."

18              Do you recall that testimony?

19   A.  Correct.

20   Q.  So, in other words, when you were looking at these ads, you 10:09:56

21   obviously -- you didn't contact an advertiser on an ad to see

22   if it was for prostitution; right?

23   A.  Correct.

24   Q.  You looked at the ad and -- and you took a guess, and you

25   thought, okay, this -- maybe this is for prostitution; maybe    10:10:11
```

 1    it's not; right?

 2            MR. KOZINETS:  Objection.  Form.  And just misstates

 3    prior testimony.

 4            THE COURT:  Sustained.

 5            MR. PANCHAPAKESAN:  Okay.                          10:10:23

 6    BY MR. PANCHAPAKESAN:

 7    Q.  When you looked at those ads that you said implied

 8    prostitution, you did not know for a fact whether they were for

 9    prostitution; correct?

10            MR. KOZINETS:  Objection.  Foundation.             10:10:34

11            THE COURT:  Sustained.

12    BY MR. PANCHAPAKESAN:

13    Q.  You used the word "implied."  The opposite of that would be

14    express; right?

15            MR. KOZINETS:  Objection.  Vague.                  10:10:57

16            THE COURT:  What's -- I'm sorry?  Re- -- rephrase.

17            MR. PANCHAPAKESAN:  Sure.

18    BY MR. PANCHAPAKESAN:

19    Q.  Yesterday you -- you said you had concerns with ads, quote,

20    "being implied prostitution."                              10:11:05

21            That was your testimony; right?

22            MR. KOZINETS:  Objection.  Asked and answered.

23            MR. PANCHAPAKESAN:  I'm trying to lay some foundation.

24            THE COURT:  I -- well, I think he can answer the

25    question as to -- as it was stated, that yesterday you said you  10:11:25

1    had concerns with ads, quote, "being implied prostitution."

2              He can answer it yes or no if he said that.

3              THE WITNESS:  Yes.

4    BY MR. PANCHAPAKESAN:

5    Q.  Okay.  And so I take it, just to kind of paint a picture,          10:11:44

6    you -- in 2014, you pull up the Backpage website.  You look at

7    several ads; is that right?

8    A.  We did as a committee.

9    Q.  Okay.  And you did personally; right?

10   A.  Yep.                                                               10:12:00

11   Q.  And when you said that you thought the ads implied

12   prostitution, that's because you didn't think that they

13   explicitly or expressly were for prostitution; right?

14             MR. KOZINETS:  Objection.  Foundation.

15             THE COURT:  Sustained.                                       10:12:15

16   BY MR. PANCHAPAKESAN:

17   Q.  Now, in reviewing the ads on the site in 2014-2015, isn't

18   it true you believed that Backpage looked like the back of

19   small weeklies?

20             Isn't that something you thought?                           10:12:33

21   A.  Yes.

22   Q.  Okay.  And by "weeklies," you were referring to weekly

23   newspapers; right?

24   A.  Correct.  That was the reference, yes.

25   Q.  Okay.  And so the jury understands, these are old-school          10:12:44

```
 1   newspapers that might have adult ads in the back page of the
 2   newspaper; right?
 3           That's what you meant?
 4           MR. KOZINETS:  Objection.  Foundation.
 5           THE COURT:  Sustained.                           10:12:56
 6   BY MR. PANCHAPAKESAN:
 7   Q.  Okay.  Well, when you used the term "weeklies," what did
 8   you mean?
 9   A.  It was a -- where you can buy and sell things.  Ads.
10   Q.  Classified ads?                                      10:13:08
11   A.  Uh-huh.
12   Q.  In -- in hard paper copy?
13   A.  Correct.
14   Q.  And that's what you thought the website looked like; right?
15   A.  Correct.                                             10:13:16
16           MR. PANCHAPAKESAN:  I have no further questions.
17           THE COURT:  Well, members of the jury, although you
18   did come in later, we have been here since about a quarter to
19   the hour, so I think it's appropriate to give counsel and the
20   court staff the break.  We'll adhere to the schedule as I      10:13:28
21   promised yesterday.  We'll be on our morning recess until
22   10:35.  And so just remember the admonition and be prepared to
23   come in at that time.
24           Please all rise for the jury.
25       (Jury not present at 10:13 a.m.)                     10:13:45
```

1          THE COURT:  All right.  Please be seated.

2          Ms. Bertrand, wanted to raise an issue relating to a

3     witness?

4          MS. BERTRAND:  Yes.  Thank you.

5          As the Court noted, I believe the government noted, we          10:14:30

6     received notice last night that the government is adding

7     witnesses to its line-up for this week.  And those notices are

8     less than 24 hours, apparently not to mention 72 hours.  And

9     the -- and the assertion from the government was that, well, I

10    mean, this person's testified before.  They already know.          10:14:59

11         That's not -- that doesn't mean we've had fair notice

12    regarding this witness.  And this is a witness that I would

13    proffer to the Court they had to have made arrangements with

14    regarding her travel.  On information and belief, I believe

15    she's speaking at a conference in Arkansas this weekend.  It          10:15:15

16    would be surprising if she just suddenly was able to drop in

17    and help.

18         So we would object to the calling of Jessika Svengard

19    this week as lacking notice.  We rely on the government.  We

20    trust the government when it tells us these are the witnesses          10:15:31

21    it's going to call.  And much like the issue we had with the

22    She- -- Shehan's last week, you know --

23         THE COURT:  Ms. Bertrand, let me --

24         MS. BERTRAND:  Okay.

25         THE COURT:  -- stop you there.          10:15:45

1           I don't think it's appropriate to cast dispersions or

2   motive to -- or ill motive to any party.  I wouldn't permit the

3   government to do that to any one on the defense side.  I'm not

4   going to permit you to do that.  This -- the other witnesses

5   that had to travel out of state, we resolved that issue.                    10:16:04

6           MS. BERTRAND:  Uh-huh.

7           THE COURT:  Here my understanding of the government's

8   notice was because of their feeling of the accelerated nature

9   of the witnesses that appeared yesterday.  And so I'm certain

10  that they probably didn't want to have the Court be very upset             10:16:20

11  with them if they didn't have notices on -- witnesses on

12  standby and that we had to release the jury early for that

13  purpose.  So that's the way that I took that notice to mean.

14          So with regard to that, I am concerned that at least

15  with these two added witnesses that may be called today or                 10:16:43

16  tomorrow, again, we're half day tomorrow --

17          MS. BERTRAND:  Uh-huh.

18          THE COURT:  -- that at the very least that they have

19  been provided exhibits to be used with those witnesses.  They

20  are entitled to at least know what exhibits are going to be                 10:17:00

21  used for those witnesses.

22          And I also am concerned that the prior trial was two

23  years ago.  And so it's not fair to assume defense is prepared

24  to go forward on a cross-examination of someone that they

25  obviously haven't heard from, they don't know what the direct              10:17:21

```
 1   testimony's going to be like this time probably, and it should
 2   probably be somewhat different.  And so that is concerning.
 3   So -- but I am going to permit it if the other witnesses who
 4   have already been noticed to the defense have testified.  So
 5   only on those conditions.  If we get to Friday afternoon at the      10:17:47
 6   noon hour and you -- or 10:00 a.m., then I'll permit that.  All
 7   right?
 8               MS. BERTRAND:  Okay.  Thank you.
 9               THE COURTROOM DEPUTY:  All rise.
10       (Recess from 10:18 a.m. to 10:33 a.m.)                           10:18:07
11       (Jury not present at 10:33 a.m.)
12               THE COURT:  We seem to be missing counsel.
13               THE COURTROOM DEPUTY:  We're missing Mr. Cambria.
14               THE COURT:  All right.  Let's have the witness in.
15               Please come to order, counsel.                           10:34:29
16               And who is going to be up next for defense?
17               MR. EISENBERG:  I don't have any questions for this
18   witness.
19               THE COURT:  Mr. Cambria?
20               MR. CAMBRIA:  No, I have no questions.                    10:35:14
21               THE COURT:  Ms. Bertrand?
22               MS. BERTRAND:  None from Ms. Vaught.  Thank you.
23               THE COURT:  Mr. Feder?
24               MR. FEDER:  No.
25               THE COURT:  All right.  So we're passing back.  Okay.    10:35:21
```

UNITED STATES DISTRICT COURT

1    Let's have the witness -- the jury in.

2              All rise for the jury.

3         (Jury present at 10:36 a.m.)

4              THE COURT:  All right.  Please be seated.

5              And the record will reflect the presence of the jury.   10:36:38

6    The witness is on the stand.  The defense has passed the

7    witness back to Mr. Kozinets.

8              Mr. Kozinets, you may proceed.

9              MR. KOZINETS:  Thank you, Your Honor.

10                     REDIRECT EXAMINATION

11   BY MR. KOZINETS:

12   Q.  And welcome back, Mr. Hansen.

13             There was some discussion when Mr. Panchapakesan was

14   asking you questions about whether AMEX had tested and

15   confirmed that AMEX cards couldn't be used to buy adult ads on   10:37:12

16   Backpage.

17             Do you remember that?

18   A.  Yes.

19   Q.  Did that -- is that testing that occurred just after AMEX

20   had reached what it believed to be its agreement with           10:37:25

21   Backpage --

22   A.  Correct.

23   Q.  -- without limiting the use of the card just to non-adult

24   purchases?

25   A.  Correct.                                                     10:37:33

MICKEY HANSEN - REDIRECT EXAMINATION

67

```
 1    Q.  And when that testing occurred, AMEX wasn't aware that the

 2    card could still be used to buy credits, which could then be

 3    used to buy adult ads for Backpage?

 4              MR. FEDER:  Leading.

 5              THE WITNESS:  That is correct.                     10:37:55

 6              THE COURT:  I'm sorry.  Was there an objection?

 7              MR. FEDER:  There was.  Leading.

 8              THE WITNESS:  Okay.

 9              THE COURT:  Sustained.

10    BY MR. KOZINETS:                                             10:38:02

11    Q.  When that testing occurred, though, this issue of credits

12    wasn't known to American Express?

13              MS. BERTRAND:  Objection.  Leading.

14              THE COURT:  Sustained.

15    BY MR. KOZINETS:                                             10:38:18

16    Q.  When that testing occurred, had Backpage said anything to

17    you about their credits system?

18              MS. BERTRAND:  Objection.  Leading and now hearsay.

19              THE COURT:  Sustained.

20              MR. KOZINETS:  Well --                             10:38:37

21              THE COURT:  You can rephrase the question.

22              MR. KOZINETS:  Okay.

23    BY MR. KOZINETS:

24    Q.  Was AMEX aware of this kind of --

25              MS. BERTRAND:  Objection.  Calls for speculation.  10:38:48
```

UNITED STATES DISTRICT COURT

 1          THE COURT:  Overruled.  He hasn't finished his

 2    question.

 3          MS. BERTRAND:  Oh, sorry.

 4    BY MR. KOZINETS:

 5    Q.  Was AMEX aware at the time of this testing of this kind of          10:38:54

 6    credits alternative way of using AMEX on Backpage?

 7          MS. BERTRAND:  Objection.  Calls for speculation.

 8          THE COURT:  Overruled.

 9          THE WITNESS:  We were not.

10    BY MR. KOZINETS:          10:39:07

11    Q.  And Backpage had -- had Backpage alerted you to that?

12    A.  They did not.

13    Q.  Okay.  You were shown a couple of exhibits that contained

14    representations about Backpage was doing, like, percentage of

15    ads from jobs and automotive.          10:39:31

16          Do you -- do you remember that?

17    A.  I do.

18    Q.  Did you or American Express have any way of verifying those

19    representations?

20    A.  We do not.          10:39:40

21    Q.  And Mr. Ferrer told you about controls that he represented

22    Backpage had -- had put in place?

23    A.  Yes.

24    Q.  Did you have any way of kind of verifying what he was

25    telling you?          10:40:03

MICKEY HANSEN - REDIRECT EXAMINATION                    69

```
 1   A.  We did not.

 2   Q.  There was discussion of a Merchant Evaluation Cancellation

 3   Committee meeting that occurred in, I believe, November of

 4   2014.

 5            Do you recall seeing a document about that?      10:40:23

 6   A.  Yes.

 7   Q.  And there was some discussion of a vote that had taken

 8   place?

 9   A.  Correct.

10   Q.  Do you recall what was being voted on at that time?    10:40:33

11   A.  In our initial meeting, it was whether we would continue

12   our relationship with Backpage.com or to cancel their -- cancel

13   that relationship.

14   Q.  But then sub- -- but then subsequently at the -- sorry.  It

15   was the December 12th meeting that you were -- you were shown a  10:41:19

16   document about, at that meeting.

17            MR. KOZINETS:  And may -- may I show this just to the

18   witness only?  It's a -- Exhibit 6026.

19            THE COURT:  Yes, it may be shown to the witness.

20   BY MR. KOZINETS:                                           10:41:53

21   Q.  And just looking at this document, do you now see what was

22   voted on at this subsequent December 2014 meeting?

23   A.  Yes.

24   Q.  And what was being voted on?

25   A.  This was to -- to allow us to continue to do business with  10:42:07
```

70

1  them if they provided -- or they removed AMEX acceptance from

2  the adult services ad section.

3  Q.  So, in other words, if you voted yes, you'd be voting that

4  AMEX could continue on, but only if Backpage carved out its

5  adult section from --                                          10:42:32

6  A.  Right.

7  Q.  -- AMEX acceptance?

8         And if you voted no on this, what would that mean?

9  A.  That would mean cancel the relationship.

10 Q.  Okay.  And there was a little bit of discussion about the  10:42:41

11 view at American Express that Backpage ads raised a

12 reputational risk to the company.

13 A.  Yes.

14 Q.  And do you recall stating that was because American Express

15 didn't want to be associated with these types of ads?         10:43:21

16 A.  That is correct.

17 Q.  And when you started talking to Mr. Ferrer, he shared

18 articles with you about ads that had been the subject of

19 criminal investigations and prosecutions that were on Backpage?

20        MR. PANCHAPAKESAN:  It's outside the scope of cross.     10:43:45

21        THE COURT:  Sustained.

22 BY MR. KOZINETS:

23 Q.  When you -- the activities and transactions that American

24 Express did not want to be associated with, were those

25 reflected in the articles that Mr. Ferrer had shared with you?  10:44:08

1          MR. PANCHAPAKESAN:  Same -- same objection.

2          THE COURT:  Sustained.

3   BY MR. KOZINETS:

4   Q.  Did the concern that you had, the reputational concerns

5   that you talked about, those were routed in types of activities   10:44:34

6   that you were aware of were being advertised in these ads?

7          MR. PANCHAPAKESAN:  That's vague as to ads.

8          THE COURT:  Over- -- overruled.

9          THE WITNESS:  Yes.

10  BY MR. KOZINETS:                                                    10:44:50

11  Q.  And your concerns about those ads involved what kinds of

12  activities?

13  A.   Inferences that it could be prostitution and those type of

14  activities.

15         MR. KOZINETS:  Okay.  Thank you.                             10:45:04

16         No further questions, Your Honor.

17         THE COURT:  All right.  May the witness be released

18  from his subpoena?

19         Is there any objection by defense?

20         MR. PANCHAPAKESAN:  No objection, Your Honor.                10:45:14

21         THE COURT:  All right.  By the government?

22         All right.  Sir, thank you for your testimony.  You

23  are released from your subpoena, and you are free to go.

24         THE WITNESS:  Thank you.

25         THE COURT:  Please call your next witness.                   10:45:23

```
 1              MR. RAPP:  The United States calls Anya Beck.

 2              THE COURT:  Ma'am, please come forward and be sworn by

 3    my courtroom deputy.

 4              THE COURTROOM DEPUTY:  Here.

 5              THE COURT:  Right here.  Thank you.                    10:46:00

 6              THE COURTROOM DEPUTY:  Please raise your right hand.

 7         (ANYASTACIA BECK, a witness herein, was duly sworn or

 8    affirmed.)

 9              THE COURTROOM DEPUTY:  If you would step up to the

10    witness stand.  Speak into the microphone, please.  Thank you.   10:46:14

11              THE COURT:  Yes, you may proceed.

12              MR. RAPP:  Thank you, Your Honor.

13                         DIRECT EXAMINATION

14    BY MR. RAPP:

15    Q.  Ma'am, could you state your full name.  Spell your last      10:46:36

16    name for the record, please.

17    A.  Anyastacia [phonetic] Beck, and B-E-C-K.

18    Q.  Ma'am, where are you from?

19    A.  Los Angeles.

20    Q.  How long have you lived in Los Angeles?                      10:46:46

21    A.  About five years.

22    Q.  Did you grow up in Los Angeles?

23    A.  No.

24    Q.  Where did you grow up?

25    A.  Temecula.                                                    10:46:54
```

ANYA BECK - DIRECT EXAMINATION
73

| | | |
|---|---|---|
| 1 | Q. | All right.  Can you tell the jury where Temecula is. |
| 2 | A. | Near San Diego.  Southern California -- |
| 3 | Q. | All right. |
| 4 | A. | -- area. |
| 5 | Q. | Did you go to high school in Temecula? |
| 6 | A. | Yes. |
| 7 | Q. | All right.  Do you have any kids? |
| 8 | A. | What? |
| 9 | Q. | Do you have any kids? |
| 10 | A. | One. |
| 11 | Q. | All right.  How old? |
| 12 | A. | 4. |
| 13 | Q. | How old are you? |
| 14 | A. | 23. |
| 15 | Q. | Ma'am, I want to ask you some questions about Backpage.com. |
| 16 | | Are you familiar with that website? |
| 17 | A. | Yes. |
| 18 | Q. | Do you know any of the defendants in this case? |
| 19 | A. | No. |
| 20 | Q. | Do you know Michael Lacey? |
| 21 | A. | No. |
| 22 | Q. | Do you know Scott Spear? |
| 23 | A. | No. |
| 24 | Q. | Do you know the CFO, Jed Brunst? |
| 25 | A. | No. |

10:47:04
10:47:13
10:47:19
10:47:31
10:47:42

UNITED STATES DISTRICT COURT

1    Q.  Do you know Andrew Padilla?

2    A.  No.

3    Q.  Do you know Joye Vaught?

4    A.  No.

5    Q.  Ma'am, how were you introduced to this website,                    10:47:51

6    Backpage.com?

7    A.  Through a man named Reson.

8    Q.  Do you know what year that was?

9    A.  2015.

10            THE COURT:  Can I just ask, did you say Reson or Drees    10:48:03

11   or --

12            THE WITNESS:  Reson.

13            THE COURT:  Reson.

14            MR. RAPP:  Reson.

15            THE COURT:  Okay.  Thank you.                              10:48:10

16   BY MR. RAPP:

17   Q.  All right.  Just to be clear, this is -- this person named

18   Reson is somebody you knew?

19   A.  Somebody I had just met --

20   Q.  All right.                                                      10:48:20

21   A.  -- yeah.

22   Q.  And when you were introduced to Backpage.com, were you ever

23   posted on that website?

24   A.  Yes.

25   Q.  And -- and did that also happen in 2015?                       10:48:29

1    A.  Yes.

2    Q.  Can you explain to the jury how you were posted on

3    Backpage.com.

4    A.  Either I would post the ads myself or he would post them.

5    Q.  Can you explain how you would go about posting yourself on          10:48:47

6    Backpage.com?

7    A.  I would look at the other ads and see what they were saying

8    and copy and paste different parts of the descriptions and then

9    post pictures along with it.

10   Q.  All right.  When you say you would post pictures along with      10:49:10

11   it, can you explain how you went about doing that.

12   A.  Either I would take pictures of myself or Reson would take

13   pictures of me --

14   Q.  All right.

15   A.  -- that I would use.                                             10:49:25

16   Q.  Okay.  What type of device did you use to post?

17          Do you know what I mean?

18   A.  Phone.

19   Q.  All right.  Did you use any other electronic device other

20   than a phone?                                                        10:49:39

21   A.  No.

22   Q.  When you posted on Backpage, what category was this posted

23   in?

24   A.  In the dating, I believe, section.

25   Q.  Okay.                                                            10:50:03

```
 1   A.  The woman -- or, yeah, woman looking for man.  Or I can't
 2   remember, actually.  It was something like that.
 3   Q.  Okay.  Fair enough.
 4        When you say you were posting on Backpage, can you
 5   explain to the jury what the purpose of posting on Backpage         10:50:18
 6   was.
 7   A.  To get customers or to get people to pay for sex.
 8   Q.  Okay.
 9   A.  Sexual acts.
10   Q.  All right.  And can you -- can you tell us how long you --       10:50:37
11   this went on, posting on Backpage.com back in 2015?
12   A.  A couple months.
13   Q.  Do you know how many times you were posted on Backpage.com?
14   A.  Many times.
15   Q.  When you posted on Backpage.com, were -- was there ever an       10:50:54
16   occasion where you received some type of a message from
17   Backpage?
18   A.  Yes.
19   Q.  Okay.  Can you explain to us what -- what, if any, message
20   you received from Backpage.                                         10:51:13
21   A.  I had received -- I would receive an email saying that my
22   ad had been rejected and that I needed to change, like, certain
23   things in order for it to be reposted.
24   Q.  Okay.  Can you explain to the jury what it was that you
25   believe caused your posting or your ad to be rejected.             10:51:33
```

 1          MR. FEDER:  Speculation.

 2          THE COURT:  Overruled.

 3          THE WITNESS:  It was either words that I used, like

 4   specific words, or if a picture was too graphic.

 5   BY MR. RAPP:                                              10:51:54

 6   Q.  All right.  Ms. Beck, how was the -- was the ad -- did you

 7   have to pay for the ad to post it?

 8   A.  No.

 9   Q.  All right.  Were there instances where you did have to pay

10   Backpage for any reason?                                  10:52:08

11   A.  You could -- sometimes we would pay if we wanted to keep

12   the add at the top, like make it seen by more people.

13   Q.  Okay.  Is there a reason why you would want that?

14   A.  To get more hits on the ad.

15   Q.  All right.  After you posted -- well, let me ask you this:  10:52:28

16   When you posted the ad, was there a particular time during the

17   day that you would post your ad?

18   A.  Yes.

19   Q.  Okay.  Can you explain that to us.

20   A.  The times I would post are -- were around 3:00 in the     10:52:50

21   morning; around 12:00, like lunchtime, 12:00 p.m.; and around

22   5:00 or 6:00, when guys would get out of work.

23   Q.  Okay.  After you posted the ad, what, if anything,

24   happened?

25   A.  I would start getting calls and text messages from men.   10:53:14

```
 1   Q.  Okay.  And what, if anything, were these men who called or

 2   texted you, what were they looking for?

 3               MR. FEDER:  Objection.  Foundation.

 4               THE COURT:  Overruled.

 5               THE WITNESS:  They were looking for sex or something        10:53:32

 6   sexual.

 7   BY MR. RAPP:

 8   Q.  Okay.  Once you received these calls, did you go anywhere?

 9   A.  Sometimes.

10   Q.  All right.  Can you explain that to us.                            10:53:49

11   A.  Either they would come to me in the hotel that I was

12   staying at or I would go to wherever they wanted to meet at or

13   took me; their ho- -- a hotel, their house, a car.

14   Q.  Okay.  And would you meet with them -- when you met with

15   them, what, if anything, did you do?                                   10:54:10

16   A.  Sex or other sexual acts.

17   Q.  Okay.  Was this -- was this prostitution?

18   A.  Yes.

19   Q.  After you engaged in these acts, were you paid?

20   A.  Yes.                                                               10:54:32

21   Q.  What, if anything, would you do with the money once you

22   were paid?

23               MS. BERTRAND:  Objection.  Relevance.

24               THE COURT:  Overruled.

25               THE WITNESS:  I would give it to Reson.                    10:54:43
```

UNITED STATES DISTRICT COURT

```
 1    BY MR. RAPP:
 2    Q.  All right.  And what, if anything -- did you observe or
 3    come to learn what Reson would do with the money, Ms. Beck,
 4    once -- once you gave it to him?
 5             MS. BERTRAND:  Objection.                              10:55:03
 6             MR. FEDER:  Relevance.
 7             MS. BERTRAND:  Relevance.
 8             THE COURT:  Overruled.
 9             You may answer.
10             THE WITNESS:  Oh.  He would buy me clothes or outfits  10:55:14
11    to wear.  Get my nails done.  He bought a car to drive us
12    around.  Hotel rooms.
13    BY MR. RAPP:
14    Q.  All right.  And with regard to the hotel rooms, was that
15    something that you paid for or he paid for?                     10:55:33
16    A.  He paid for them.
17    Q.  All right.  Now, were there occasions where you -- were
18    there occasions where you would meet with some of these men and
19    you wouldn't engage in sexual acts?
20    A.  Only a couple.                                              10:56:04
21    Q.  All right.  But during the time period that you were
22    posting on Backpage, how many men did you meet with to have --
23    A.  Many.
24    Q.  -- to engage in sexual acts?
25    A.  Many.                                                       10:56:19
```

```
 1   Q.  Were you in a position to observe whether this individual,

 2   Reson that you've referred to, had some other employment,

 3   legitimate employment?

 4           MS. BERTRAND:  Objection.  Relevance.

 5           THE COURT:  Overruled.                            10:56:37

 6           THE WITNESS:  Can you repeat the question?

 7   BY MR. RAPP:

 8   Q.  I can.  Were you in a position to observe whether or not

 9   this individual, Reson that you've been talking about, were you

10   in a position to observe whether or not he had some type of     10:56:51

11   other employment, some other type of legitimate employment?

12   A.  Not while I was staying with him specifically.  But before

13   I had started staying with him, I know he had worked some odd

14   jobs.

15   Q.  All right.  Now, in preparation for your testimony today,    10:57:08

16   have you reviewed the ads that you had on Backpage?

17   A.  Yes.

18   Q.  All right.  I'm showing you what has already been admitted

19   as United States 218.

20           Do you see that on your screen, ma'am?               10:57:36

21   A.  Yes.

22   Q.  Okay.  Is this -- is this one of the ads that was posted on

23   Backpage.com that featured you?

24   A.  Yes.

25   Q.  Now, is the date accurate here?  Do you see the date there? 10:57:51
```

UNITED STATES DISTRICT COURT

 1   A.  Yes, it's accurate.

 2   Q.  And in terms of the -- the terms that are in the headline

 3   here, is that something that you wrote or this person you've

 4   been referring to as Reson wrote?

 5   A.  I can't remember specifically if he wrote this ad or I did,      10:58:21

 6   but, regardless, we both would put the same type of wording.

 7   Q.  All right.  In terms of the age here, is this -- is the age

 8   accurate, that -- when you posted this?

 9   A.  I wasn't 19, but I - --

10   Q.  Okay.                                                            10:58:40

11   A.  -- did post that I was 19.

12   Q.  All right.  Now, just looking quickly at this, there's some

13   figures.

14        Do you see that 80, 120, 150?  Do you see that in

15   there, in your -- in the text?                                      10:58:52

16   A.  Yes.

17   Q.  Can you -- can you tell the jury what that refers to.

18   A.  The prices that I would charge for the different acts.

19   Q.  Okay.  So -- and then there are some acts in the posting.

20   Can you tell the jury what those acts refer to.                     10:59:14

21        MR. FEDER:  Judge, it's not on our screen anymore.

22        THE COURT:  Yes, it's not on the screen.

23        MR. RAPP:  I know it's not on the screen.  I'm asking

24   her questions about it.

25        THE COURT:  Well, you're --                                    10:59:25

UNITED STATES DISTRICT COURT

 1              MR. RAPP:  I can put it back up.

 2              THE COURT:  I think that would be helpful for the

 3    witness.

 4              MR. RAPP:  All right.

 5    BY MR. RAPP:                                                    10:59:36

 6    Q.  Do you see that there?

 7    A.  Yeah.

 8    Q.  Can you -- can you explain what those -- what -- what

 9    those -- where the figures are, what those refer to.

10    A.  Like specifically?                                          10:59:46

11    Q.  Well, let me just ask you generally.

12              Do these -- do those -- do those figures refer to

13    sexual acts?

14    A.  Yes.

15    Q.  Okay.  And then in terms of the phone number there, was    10:59:59

16    that your phone number?

17    A.  It was.

18    Q.  Okay.  And then just going down here, was this the location

19    that you were being advertised in?

20    A.  Yes.                                                        11:00:18

21    Q.  Ms. Beck, were there other cities that you were also

22    advertised in?

23    A.  Yes.

24    Q.  And, matter of fact, down here, are these other ads that

25    you had or other postings that you had for -- for -- for       11:00:34

```
 1   example, at the bottom, Los Angeles, a different city?

 2   A.  Yes.

 3   Q.  Okay.  And so are these ads that were other postings on

 4   Backpage.com?

 5   A.  Yes.                                                    11:00:53

 6   Q.  Okay.  And, ma'am, is this one -- is the image here, is

 7   that one of the images that we were referring to earlier that

 8   was included in your ad?

 9   A.  Yes.

10   Q.  All right.  Going to page 2 of United States 218, are these   11:01:11

11   also images that were part of your ad?

12   A.  Yes.

13   Q.  Okay.  And going to page 3 that's also in evidence --

14   A.  Yes.

15   Q.  -- is that another one?                                 11:01:31

16          I just want to draw your attention down here.

17          Do you -- do you see this?  Do you see this term right

18   here?

19   A.  Yes.

20   Q.  Can you -- does that mean anything to you?              11:01:46

21   A.  I believe that's where I went -- I would go to when I

22   wanted to pay to have my ads, like, moved up or -- I can't

23   remember what else you could do with it, but --

24   Q.  Okay.  But is it your testimony that you recall going

25   somewhere where you -- you would use this -- it references buy   11:02:14
```

```
 1    credits.  You would purchase some type of credits to post your

 2    ad?

 3              MR. FEDER:  Leading.

 4              THE COURT:  Overruled.

 5              THE WITNESS:  Well, not to -- not to post my ad.  I      11:02:30

 6    didn't have to pay to post it.  But to have it, like, stay at

 7    the top or keep it moved up, yes.

 8    BY MR. RAPP:

 9    Q.  Okay.  And when you did that, did -- first, did you use

10    some type of a credit card or some type of a other form of       11:02:53

11    payment to buy those credits?

12    A.  Yes.

13    Q.  Okay.  Ms. Beck, was this your credit card?

14    A.  No.

15    Q.  Whose credit card was it?                                     11:03:07

16    A.  Reson's.

17    Q.  Reson's?

18    A.  Uh-huh.

19    Q.  Okay.

20              THE COURT:  Was that a yes?                             11:03:14

21              THE WITNESS:  Yes.

22              THE COURT:  Okay.  Thank you.

23    BY MR. RAPP:

24    Q.  In the text of this -- of your posting that we looked at a

25    few seconds ago is your name.                                     11:03:25
```

1        Do you use your real name in the posting?

2    A.   No.

3    Q.   Okay.  Is there a reason why?

4    A.   To hide my real identity, I guess.

5    Q.   Okay.                                              `11:03:40`

6    A.   And I saw everybody else not using their real name, so ...

7    Q.   Okay.  When you say you saw other people not using their

8    real name, what -- what, if anything, do you mean by that?

9            THE COURT:  Can you move closer to the mic, Mr. Rapp.

10           MR. RAPP:  Yes, ma'am.                          `11:03:55`

11           THE COURT:  Thank you.

12           THE WITNESS:  All the other ads that I would copy

13   from, the girls used names that obviously weren't their real

14   name.  So I just knew that was a part of it.

15   BY MR. RAPP:                                            `11:04:13`

16   Q.   Okay.  You just testified a few minutes ago about -- so,

17   just to be clear, when you posted your ad, did you have to pay

18   anything?

19   A.   No.

20   Q.   All right.  And, if I understood your testimony, you -- you  `11:04:23`

21   had to pay to -- to move your -- refresh your ad or move it to

22   the top?

23   A.   Yeah, like to keep it at the top.

24   Q.   All right.  And is there a reason why you'd want to keep it

25   at the top?                                             `11:04:38`

```
 1   A.  To get more people responding for a longer period of time.

 2   Q.  Okay.  And when you would move it to the top, how -- how

 3   would you pay to move it to the top?

 4   A.  Well, I don't really remember the exact process.

 5   Q.  Okay.  Was this a process that -- that you actually did and      11:05:09

 6   you just can't recall it, or did somebody else do it for you?

 7   A.  Reson would do it, but I would be right next to him.  But I

 8   don't remember --

 9   Q.  Okay.

10   A.  -- what --                                                       11:05:23

11   Q.  All right.  Now, in preparation for your testimony, have

12   you looked at some other postings that were on Backpage.com

13   that featured the same images that we've looked at today in

14   United States 218?

15   A.  Yes.                                                             11:05:40

16          MR. RAPP:  Okay.  I'm just showing the -- the witness

17   for her eyes only United States 1602.

18   BY MR. RAPP:

19   Q.  Do you see that on your screen?

20   A.  Yes.                                                             11:05:55

21   Q.  Okay.  Is -- is -- what is it?

22   A.  An ad.

23   Q.  Okay.  Is it -- are you in this ad?

24   A.  Yes.

25   Q.  And is this a different date than United States 2000 --         11:06:04
```

```
 1    218?

 2             Do you want me to go back and take a look at it?

 3    A.  Yeah.  I don't remember it.

 4    Q.  Okay.  You didn't memorize it.

 5             Okay.  Do you see that?                                    11:06:18

 6    A.  Yes, it's a different date.

 7    Q.  Okay.  And -- and how many days later is the posting in

 8    2000 -- in 218 for the posting in 160- -- 1602?

 9    A.  Two days.

10    Q.  All right.  And does this posting also have your -- the        11:06:37

11    same name that you used in the previous posting?

12    A.  Yes.

13    Q.  Does it have the same age?

14             I know that you have -- you've testified that the age

15    was inaccurate, but does it have the same name?                    11:06:50

16    A.  Yes.

17    Q.  Does it have some of the same language that we looked at,

18    for example, about the figures related to sex acts?  Does it

19    have that in there?

20    A.  Yes.                                                           11:07:05

21    Q.  And, importantly, does it have the same phone number?

22             Do you want me to go back?

23    A.  Yes, it does have the same phone number.

24    Q.  Okay.  And does it have the same location?

25    A.  Yes.                                                           11:07:16
```

 1          MR. RAPP:  Move to admit United States 1602 and

 2   publish.

 3          MS. BERTRAND:  Objection.  Lack of foundation

 4   regarding the second page in particular.  If the Court looks at

 5   the top header in red --                                    11:07:37

 6          THE COURT:  Well, if you can lay some foundation just

 7   with respect to that header.

 8          MR. RAPP:  Well, she doesn't know anything about the

 9   header.

10          THE COURT:  What was that?                           11:07:50

11          MR. RAPP:  She doesn't -- she's not going to be able

12   to identify it.

13          THE COURT:  This is the second page; right?

14          MR. RAPP:  This is the first page.

15          THE COURT:  Oh.                                      11:07:56

16          MS. BERTRAND:  Well, I'm looking at that top header.

17   And if she doesn't have the knowledge to lay a foundation, I

18   definitely object.

19          THE COURT:  Well --

20          MR. RAPP:  I can remove the top header.              11:08:03

21          MS. BERTRAND:  The top header's telling us what the

22   problem is.

23          THE COURT:  Well, she's sufficiently identified the

24   content of the exhibit, so overruled.

25          MR. RAPP:  All right.  Move to admit.  And just      11:08:14

 1    quickly -- we'll just quickly publish it.

 2            THE COURT:  Yes, it may be admitted and published.

 3            (Exhibit 1602 admitted into evidence.)

 4    BY MR. RAPP:

 5    Q.  Ms. Beck, are these also images?                          11:08:25

 6    A.  Yes.

 7    Q.  And you in the images?

 8    A.  Yes.

 9    Q.  And --

10            All right.  I don't have anything further.  Thank you.   11:08:34

11            THE COURT:  Thank you.

12            Cross-examination?

13            Mr. Cambria?

14            MR. CAMBRIA:  No.

15            THE COURT:  Mr. Feder?                                 11:08:47

16            MR. FEDER:  Short straw once again.

17            THE COURT:  All right.  Please come forward.

18                        CROSS-EXAMINATION

19    BY MR. FEDER:

20    Q.  Good morning.                                             11:09:16

21    A.  Good morning.

22    Q.  Ms. Beck, are you presently employed?

23    A.  I'm sorry?

24    Q.  Are you presently employed?

25    A.  Yes.                                                      11:09:52

1    Q.  Doing what?

2              MR. RAPP:  Objection.  Relevance.

3              THE COURT:  Sustained.

4    BY MR. FEDER:

5    Q.  Specifically, do you have some accounts where you model and    11:10:04

6    sell clothes and --

7              MR. RAPP:  Objection.  Relevance.

8    BY MR. FEDER:

9    Q.  -- wear clothing that's revealing and suggestive?

10             MR. RAPP:  Objection.  Relevance.  Move to strike.    11:10:14

11   412.

12             THE WITNESS:  Sustained.

13             MR. RAPP:  Admonish counsel.

14   BY MR. FEDER:

15   Q.  You were asked a number of questions by the prosecutors.    11:10:25

16             How many times have you met with them?

17   A.  I'm -- I'm not even sure.  I mean, this case has gone on

18   for years, so a handful of times.

19   Q.  One time?  Five times?  100 times?

20   A.  I'm not really sure.    11:10:43

21   Q.  Any idea how many hours you've spent with the prosecutors?

22   A.  I couldn't tell you.

23   Q.  How many times have you come to Phoenix to meet with them

24   before today?

25   A.  I don't think I've ever been to Phoenix before.    11:10:57

1    Q.   How many times have they come to see you?

2    A.   Maybe twice.  I'm not sure.

3    Q.   In Los Angeles?  In the Los Angeles area?

4    A.   I'm not -- I don't remember where, because I lived all

5    over.                                                          11:11:15

6    Q.   Do you know when you first met with them?

7    A.   I don't remember.  It's been so many years.

8    Q.   More than five years ago?  More than ten years ago?

9    A.   Five years ago.

10   Q.   Okay.  And where was that meeting, if you recall?       11:11:41

11   A.   I believe Oklahoma.  I don't even know.  I'm -- I don't

12   know.  I don't remember where it was.

13            MR. FEDER:  Could the witness be be shown BF-AB-01 for

14   her eyes only.

15            MR. RAPP:  Could we have a copy of that?             11:12:05

16            MR. FEDER:  I do.  It's your MOI.

17            MR. RAPP:  A copy.

18   BY MR. FEDER:

19   Q.   Would you take a moment to look at that, please.  Tell me

20   when you're ready.                                            11:12:53

21            MR. RAPP:  Well -- okay.  So this is a two-page

22   document.  She's supposed to read the entirety of this?

23            MR. FEDER:  It's up to her if she wants to familiarize

24   herself with it.

25            MR. RAPP:  Well --                                   11:13:02

 1              THE COURT:  Well, give her some time.

 2              You can look up when you're ready, ma'am.

 3              THE WITNESS:  I'm ready.

 4    BY MR. FEDER:

 5    Q.  Is this a summary of an interview that you had with some          11:13:08

 6    people from the United States Attorney's Office and the FBI on

 7    January 11 of 2018?

 8    A.  Yes.

 9    Q.  And have you ever seen this before?

10    A.  No.                                                               11:13:23

11    Q.  In preparing for your testimony, you did not review --

12    A.  Oh, yeah.

13    Q.  -- this?

14    A.  Yeah, I did review this.

15    Q.  Okay.  When did you last prepare for your testimony today?        11:13:30

16              MR. RAPP:  Objection.  Asked and answered.

17              THE COURT:  Sustained.

18              And I guess just to clarify, Mr. Feder, there's

19    several dates.  There's a date of entry, there's a date

20    drafted, and there's an investigative date.  And you implied         11:13:47

21    that there was only one date of a meeting.  So just want to

22    make sure that the record's accurate.

23              MR. FEDER:  Okay.

24    BY MR. FEDER:

25    Q.  Do you recall if you met with the United States -- well,         11:14:01

```
 1    strike that.
 2           Do you recall meeting with Mr. Rapp, who just asked
 3    you some questions, an agent named Amy Fryberger, an agent
 4    named Desirae Tolhurst, and an AUSA Peggy Perlmeter, and
 5    another attorney named Vincent Nappo in or about December of    11:14:22
 6    2017 or January of 2018?
 7    A.  Yes.
 8    Q.  And was that meeting in San Diego?
 9    A.  Yes.
10    Q.  And you met at the federal courthouse in San Diego?         11:14:34
11    A.  Yes.
12    Q.  And you were there with your mother?
13    A.  Yes.
14    Q.  And in looking through this document, have you ever looked
15    through this document to make sure it was accurate?             11:14:51
16           MR. RAPP:  Okay.  I'm going to object.  Asked and
17    answered.  And, again, this has already been asked.
18           THE COURT:  Overruled.  It wasn't asked as to the
19    accuracy of it.
20           And I -- and I think in fairness to the witness she      11:15:06
21    should have time to look at the entirety of the document if
22    you're going to pose that question to her.
23           MR. FEDER:  With all due respect, Judge, I did ask her
24    to look at that and take all the time she wanted, and then the
25    government objected, and you sustained the objection.           11:15:20
```

UNITED STATES DISTRICT COURT

```
 1                 THE COURT:  No.  That's not how -- what my memory is.
 2                 MR. FEDER:  Okay.  I'm happy for her to take as much
 3     time as she wants to review this document.
 4                 THE COURT:  I'm glad you're happy then -- of that.
 5                 MR. FEDER:  Thank you.                                     11:15:32
 6                 THE COURT:  And she's permitted to do so.
 7     BY MR. FEDER:
 8     Q.  Please.  Please feel free to.
 9                 THE COURT:  Take -- take your time.  Review the
10     document.                                                             11:15:38
11                 THE WITNESS:  I remember what it says.
12                 MR. FEDER:  Okay.
13                 THE WITNESS:  Yeah.  It's okay.
14     BY MR. FEDER:
15     Q.  You mentioned on direct examination -- pardon me -- that         11:15:49
16     you were not 19 when you first started advertising; true?
17     A.  Yes.
18     Q.  Do you recall going through the Backpage website when you
19     were trying to create the ad and place it on Backpage?
20     A.  Yes.                                                             11:16:49
21     Q.  And there was a place that said you have to be 18 years of
22     age, and you have to acknowledge that?
23     A.  Yes.
24     Q.  And you did acknowledge that; right?
25     A.  Yes.                                                             11:16:59
```

```
 1   Q.   Even though you weren't 18 when you did that?

 2   A.   Yes.

 3   Q.   And you knew that that was untrue; right?

 4   A.   Yes.

 5   Q.   And then further on in that website there were something        11:17:06

 6   called -- there were things called terms of use and posting

 7   rules; right?

 8   A.   I don't remember.

 9   Q.   So you didn't read it?

10   A.   No.                                                             11:17:21

11   Q.   You don't recall seeing some rules of saying that you can't

12   be doing anything illegal on this website?

13   A.   I don't -- I don't remember.

14   Q.   And that you can't do anything that's -- that's improper?

15   A.   No.                                                             11:17:41

16   Q.   Basically, you didn't -- you didn't read it; right?

17   A.   I didn't read it.

18   Q.   All you read was you saw that it said you have to be 18.

19   You checked that box, which wasn't true, and then you went on?

20   A.   I did.                                                          11:17:52

21   Q.   And was Reson with you then?

22   A.   Sometimes he was with me; sometimes he wasn't.

23   Q.   Reson is how old?  Or at least how old was he back in --

24   when you -- when you did these?

25   A.   I believe 24.  Around -- around that.  Around that age.         11:18:06
```

UNITED STATES DISTRICT COURT

 1    I'm not sure.

 2    Q.  Okay.  And when you first started placing ads in Backpage,

 3    how long had you known Reson?

 4    A.  I had only met him one time before that, months before

 5    that, but I had known him for a couple months before that.        11:18:37

 6    Q.  Okay.  You -- in -- in either December of 2017 or January

 7    of 2018, when you met with the prosecutors and some FBI agents

 8    in San Diego, you told them that there was one or more

 9    occasions where one of the people that called you on the phone

10    when you met them you didn't have any kind of sex act; right?    11:19:13

11    A.  Only two times.

12    Q.  And was that -- when you met, had you talked to that person

13    before?

14    A.  No.

15    Q.  You just showed up?                                          11:19:24

16    A.  Oh.

17    Q.  I mean, you had to talk to --

18    A.  Well, I was confused.

19    Q.  -- talk to them and tell them where to go; right?

20    A.  I was confused with what you were asking.                    11:19:31

21    Q.  That's okay.

22    A.  Yes, I had talked to them before.

23    Q.  And do you remember where you met?  Your place or his

24    place?

25    A.  One was at my hotel room, and one was we met up in public    11:19:38

```
 1    in Hollywood.
 2    Q.   And when -- when you talked to set up this meeting with
 3    these -- was it the same person or --
 4    A.   Two different people.
 5    Q.   I'm sorry?                                                11:19:54
 6    A.   Two different people.
 7    Q.   Okay.  And when you met with the first person and when you
 8    talked to that first person on the phone or by text, was it
 9    understood that you were just going to walk around and talk, or
10    did --                                                        11:20:09
11    A.   No.
12    Q.   -- that only happen when you met?
13    A.   When we met.
14    Q.   Do you remember what you talked about on the phone or by
15    text as to what was anticipated to happen?                   11:20:15
16    A.   The sex acts that were posted in the ad.
17    Q.   Okay.  So your understanding was there was going to be some
18    kind of sex act.  When you met, all he wanted to do was talk
19    and walk around; right?
20    A.   One of them, yeah.                                       11:20:35
21    Q.   And that's what you did?
22    A.   Uh-huh.  Yes.
23    Q.   Okay.  And were you paid the same amount that you were
24    ordinarily paid for that?
25    A.   Yes.                                                     11:20:47
```

1    Q.  And then the second time this happened was with a different

2    person?

3    A.  Yes.

4    Q.  Also responding to an ad?

5    A.  Yes.                                                    11:21:00

6    Q.  Also a phone call or a text that set up what was

7    anticipated to happen?

8    A.  Yes.

9    Q.  And then when they came out to meet with you, there was

10   another discussion, and it was decided that you would just    11:21:12

11   what, walk around and talk?

12   A.  We didn't just walk around and talk.

13   Q.  What did --

14   A.  He --

15   Q.  -- you do?                                              11:21:20

16   A.  He just gave me a massage.

17   Q.  That's it?

18   A.  Yes.

19   Q.  No sexual aspect to that?

20   A.  No.                                                     11:21:27

21   Q.  Same price?

22   A.  Yes.

23   Q.  You also told them back in either December of 2017 or

24   January of 2018 that you posted on some other websites; is that

25   true?                                                       11:21:54

1   A.  Yes.

2   Q.  What other websites, if you remember?

3   A.  I can't remember.  And -- yeah, I can't remember.

4   Q.  Facebook?

5   A.  No.       11:22:04

6   Q.  Craigslist?

7        MR. RAPP:  Well, objection.  She said she didn't

8   remember.

9        MR. FEDER:  Maybe I'll try to refresh her

10  recollection.       11:22:13

11        MR. RAPP:  That's not how you do it.

12        THE COURT:  Well, I'm going to overrule the objection.

13        You can go forward, Mr. Feder.

14  BY MR. FEDER:

15   Q.  Craigslist?       11:22:23

16        MR. RAPP:  Judge, I'm going to object under 412 as

17  well.

18        THE WITNESS:  Sustained.

19        MR. FEDER:  I'm sorry?  The what?

20        THE COURT:  Sustained.       11:22:29

21        MR. FEDER:  I didn't hear what the objection was.

22        THE COURT:  Rule 412.

23  BY MR. FEDER:

24   Q.  Look at page 2 of the document that's in front of you.

25        At the bottom paragraph, see where it talks about    11:22:54

1   Craigslist?

2   A.  Yes.

3   Q.  Does that refresh your recollection as to whether or not

4   you posted on another site that was Craigslist?

5           MR. RAPP:  Judge, same objection.                    11:23:14

6           THE COURT:  Sustained.

7           MR. FEDER:  Could the witness be shown BF-AB-02.

8   BY MR. FEDER:

9   Q.  Let me know once you've read it.

10          MR. RAPP:  For the record, this document's four pages  11:24:17

11  long, single spaced.

12          MR. FEDER:  While she's looking, Judge, can we

13  approach.

14          THE COURT:  Yes.

15      (Sidebar discussion begins on the record.)

16          MR. FEDER:  Is it the Court's ruling that Rule 412

17  covers other ads that this woman put up as opposed to a sex

18  act?

19          THE COURT:  Yes.  And --

20          MR. FEDER:  It covers --                              11:26:25

21          THE COURT:  And let me direct you to *United States vs.*

22  *Haines*, 918 F.3d 694.  It's a 2019 decision which cites to

23  *United States vs. Lockhart*, 844 F.3d 501.  And essentially that

24  talks about sex trafficking prosecutions that victim's prior

25  convictions for prostitution is inadmissible.  Although        11:26:54

1    normally those prior convictions are, Rule 412 trumps that.

2         So, in other words, you can't delve into other prior

3    postings where she was potentially a victim.  And the posting

4    of Reson in any other place other than Backpage then gets into

5    her prior sexual conduct.                                    11:27:17

6         MR. FEDER:  It gets into --

7         THE COURT:  So --

8         MR. FEDER:  I'm sorry.

9         THE COURT:  No, no, no.

10        MR. FEDER:  Are you done?                               11:27:23

11        THE COURT:  No, no.  That's okay.

12        So -- so that's the basis of my ruling.

13        I understand it's somewhat convoluted and -- and folks

14   have a difficulty with regard to Rule 412, but that

15   unfortunately or fortunately, depending on what position you   11:27:37

16   take, is the rule as it -- as I understand it applies.

17        Now, I've not seen it applied in a -- in a Travel Act

18   situation.  But because we're talking about prostitution, money

19   exchanged for sex acts, it applies.  And because there's an

20   allegation that, at least with regard to this witness and the   11:27:58

21   prior witness, that they were under the control of someone else

22   who was posting for them, it also applies in terms of a --

23        MR. FEDER:  Yeah.

24        THE COURT:  -- victim.

25        MR. RAPP:  You only get one attorney.

1           THE COURT:  So, Mr. Feder, it's your turn now.

2           MR. FEDER:  Nobody's said that she -- she testified

3    that she doesn't know that she wrote the ad, not Reson, or she

4    doesn't know if one or both of them --

5           THE COURT:  But the --                                  11:28:29

6           MR. FEDER:  Let me --

7           THE COURT:  Okay.  I won't interrupt you.

8           MR. FEDER:  We've got that deal now; right?

9           THE COURT:  Yes.

10          MR. FEDER:  Number 1.                                   11:28:37

11       Number 2, it's just an ad.  It has nothing to do with

12   whether or not it's a sex -- she's going to have a sex -- you

13   are blocking me from essentially talking --

14          MR. CAMBRIA:  Prior ads.

15          MR. FEDER:  -- about preliminary -- you know,          11:28:46

16   preliminary information of what she's been doing.  It has

17   nothing to do with prior conviction, nothing to do with a sex

18   act.

19          THE COURT:  Well, but it -- but the rule basically is

20   designed to prevent any victim from that type of embarrassment  11:28:56

21   or creating an impression of the sexual promiscuity of the

22   person.  That's the intent of the rule.  And that is how it's

23   been applied in the Ninth Circuit.  And I don't want to go

24   against Circuit precedent, so --

25          MR. CAMBRIA:  Huh?                                     11:29:15

```
 1              THE COURT:  Yes, that --

 2              MR. CAMBRIA:  I'll remember that.

 3              THE COURT:  If you can hold me to that, Mr. Cambria.

 4              MR. CAMBRIA:  I'll remember that.

 5              THE COURT:  All right.  So let's continue.        11:29:22

 6              MR. CAMBRIA:  But you were just showing prior ads as

 7    opposed to conduct.

 8              MR. FEDER:  That's the point.

 9              MR. CAMBRIA:  That's what you were trying to do.

10              MR. RAPP:  Well, I would just like to make a point   11:29:31

11    more for the record is that the witness yesterday was over 18

12    when she was posting on Backpage or these other ads.  This

13    particular victim was 15 when she was posting either by herself

14    or with Reson.  So I think it changes the calculus a little

15    bit.  So I -- I caution defense attorney not to open that door, 11:29:51

16    which we've been very careful not to.  So --

17              THE COURT:  Well, and I will just say that I had a

18    second thought about reversing my ruling, Mr. Rapp, in terms of

19    an objection when Mr. Feder asked about whether she posed or

20    modeled.  I don't think that gets to Rule 412.  So -- so he's   11:30:08

21    permitted some leeway in that avenue, but -- and he was only

22    talking about her prior work.  Did she model, that sort of

23    thing.  And I don't think 412 covers that.  She could have

24    said, yes, I model.  I model lingerie.

25              That isn't a sexual act.  So there's a distinction    11:30:27
```

1    there.

2              MR. RAPP:  What's the relevance of it?

3              THE COURT:  Well, you -- you made multiple layers of

4    objections and then you threw in 412.  I'm just saying for

5    clarity.                                                        11:30:38

6              MR. RAPP:  I see.

7              THE COURT:  Okay.  All right.

8              MR. CAMBRIA:  What's -- where is the establishment

9    here that she's a victim?  There's nothing on the --

10             THE COURT:  Mr. --                                    11:30:47

11             MR. CAMBRIA:  -- on the defense side of this.

12             THE COURT:  Okay.  Mr. Cambria, over the lunch hour,

13   why don't you look up the case that I cited.

14             MR. CAMBRIA:  I'll be glad to.

15             THE COURT:  Okay.  And then you can -- you can come    11:30:55

16   back and ask me that question.

17             MR. CAMBRIA:  But for me --

18             THE COURT:  Okay.

19             MR. CAMBRIA:  Thank you.

20        (End of sidebar discussion.)                               11:31:19

21             THE COURT:  All right.  Mr. Feder, you can continue.

22   BY MR. FEDER:

23   Q.  Ms. Beck, have you had an opportunity --

24   A.  Yes.

25   Q.  -- to read through it?                                      11:31:32

1          Thanks.

2          See the bottom of page 3 where it starts, "Anya said

3    she was"?

4    A.  Yes.

5    Q.  It names -- I -- did you tell the prosecutors that you                    11:31:43

6    posted on something called Smasher?

7          MR. RAPP:  Objection.  Same objection as previously.

8    412.

9          THE COURT:  Sustained.

10          MR. FEDER:  Could you pull up 218.                                      11:32:14

11    BY MR. FEDER:

12    Q.  And I'm sorry.  Before we get to 218, in your direct

13    testimony, you talked about that the money that you made,

14    whether they be sex acts or not sex acts, was given to Reson;

15    right?                                                                        11:33:07

16    A.  Right.

17    Q.  And that Reson, with that money, bought you clothes and

18    other things; right?

19    A.  Yes.

20    Q.  Didn't share any of the money with you, though?                          11:33:14

21    A.  No.

22    Q.  Paid for hotels?

23    A.  Yes.

24    Q.  Is that where you had your dates with these people, in a

25    hotel?                                                                        11:33:28

```
 1    A.  Sometimes.

 2    Q.  As to places where you -- where the person came to you

 3    instead of you going to them --

 4    A.  Yes.

 5    Q.  -- was it strictly hotels?                                    11:33:37

 6    A.  Yes.

 7    Q.  And the money that was paid -- that was paid to these

 8    hotels was from your performance of -- on these dates, whatever

 9    the acts might be?

10    A.  Yes.                                                          11:33:49

11    Q.  Have you been asked to prosecute any of the hotels that you

12    were using?

13              MR. RAPP:  Well, objection.  Relevance.

14              THE COURT:  Sustained.

15              MR. RAPP:  Foundation.                                  11:33:59

16    BY MR. FEDER:

17    Q.  Did you always go to the same hotel for -- for the time

18    period that you were -- that you were in this situation?

19    A.  No.

20    Q.  Different hotels in the Los Angeles metropolitan area?       11:34:08

21    A.  Yes.

22    Q.  Did you rent by the hour or the day?

23    A.  The day.

24    Q.  I'm sorry.  Where's -- 216.  I'm sorry.  Wait.

25              MR. FEDER:  Could you bring up 218.  Thanks.           11:34:35
```

```
 1    BY MR. FEDER:
 2    Q.  Is the clothing that you're -- that you're being portrayed
 3    in in these -- in these ads, is that from the -- from the money
 4    that you earned?  If you can tell.
 5    A.  I can't tell.                                              11:35:01
 6    Q.  I started to ask you when we first started talking what you
 7    were doing today or -- or for employment.
 8              What are you doing for employment today?
 9              MR. RAPP:  Objection.  Relevance.  412.
10              THE COURT:  Sustained as to relevance.              11:35:20
11              MR. FEDER:  Judge, what I'm going to bring out is that
12    she's posing in certain ways that are comparable to these
13    ads --
14              THE COURT:  Well, you're --
15              MR. FEDER:  -- for nonsexual purposes.              11:35:32
16              THE COURT:  I sustained the objection, Mr. Feder.
17              MR. RAPP:  And I move to strike that.
18              THE COURT:  I -- the jury will disregard Mr. Feder's
19    comment.
20              And you can ask a new question, Mr. Feder.          11:35:44
21              MR. FEDER:  Okay.  Thank you.
22    BY MR. FEDER:
23    Q.  Is this a banner ad, Ms. Beck?
24    A.  I'm sorry?
25    Q.  You indicated in your  -- your direct testimony that you --  11:36:12
```

1   that was an unpaid ad; right?

2   A.  Yes.

3   Q.  Do you see anywhere on this ad where it says that this is

4   in the women seeking men category or the dating category versus

5   the female escorts category?                                    11:36:31

6   A.  It's in the escorts category.

7   Q.  It's in the escorts category?

8   A.  Yes.

9   Q.  All right.  And -- and wasn't it your understanding when

10  you started advertising on Backpage and elsewhere, if you did,  11:36:42

11  that you had to pay for an escort ad?  $2?  $4?  $5?

12  A.  All the times I posted the ads, I never paid anything.  I

13  didn't even have a debit card.

14  Q.  You -- but you used your friend, Reson's --

15  A.  No.                                                          11:37:01

16  Q.  -- credit card?

17  A.  Not in the beginning, no.  I posted from my -- the house I

18  lived at with my mom.

19  Q.  On your own?

20  A.  Yes.                                                         11:37:09

21  Q.  So you only posted free ads while you were on your own;

22  right?

23  A.  Yes.

24  Q.  Did you --

25  A.  Even when I was with Reson.                                  11:37:17

1   Q.  I'm sorry.  Only with -- only with Reson did you start to

2   pay for -- to put your ad up at the top?

3   A.  I didn't pay to post the ad even with Reson.  Only to put

4   it to the -- back to the top or to have it stay at the top.

5   Q.  But you never did that on your own when you were posting          11:37:34

6   for yourself; right?

7   A.  Right.

8   Q.  Okay.  And you've only seen two ads.

9          Do you have any recollection of how many ads you

10  posted on Backpage?                                                   11:37:50

11  A.  Many.  I -- I couldn't even tell you how many.

12  Q.  Okay.  And when you put -- you put this free ad on, that

13  didn't bring many calls; right?

14  A.  It did.

15  Q.  And why put it up at the top?                                     11:38:11

16  A.  Less work than posting a whole new ad.

17  Q.  I'm sorry?

18  A.  It was less work than posting a whole new ad.

19  Q.  Okay.  How did you learn that?

20  A.  Learn what?                                                       11:38:25

21  Q.  Learn that you -- that it would be less work to -- to put

22  it up at the top?

23  A.  I -- I didn't.  I -- I don't know.  I don't -- I'm not sure

24  how to answer that.

25  Q.  You also testified on direct that you saw when you were --        11:38:39

1   when you were looking at these other ads trying to learn how

2   you should create your own ad that people had names, and your

3   testimony, I believe, was something to the effect of they were

4   all fake names.

5          Do you recollect that testimony?                    11:38:55

6   A.  Yes.

7   Q.  Did you call any of them to know if that was a fake name or

8   not?

9   A.  No.  It was just obvious.

10  Q.  Is Clove -- is using the name Clova that you were using, is  11:39:04

11  that obvious that's a fake name?

12  A.  No.

13  Q.  What is it about these other names that made you believe

14  they were fake versus your own?

15  A.  I'm not sure how to answer that.                        11:39:23

16  Q.  Okay.  That's a good answer.

17          MR. RAPP:  Judge, could we ask that the -- thank you.

18          MR. FEDER:  I'm sorry.

19          THE COURT:  I didn't catch it either, but go ahead.

20          MR. FEDER:  I didn't hear.  Was there a comment?       11:40:10

21          THE COURT:  No.  The -- let's move on.  I missed it,

22  too.

23          MR. FEDER:  Okay.

24          THE COURT:  You and I are in the dark.

25          MR. FEDER:  I guess so.                              11:40:18

BY MR. FEDER:

Q.  Look at page -- strike that.

When you talked to the prosecutors in December or November of 2019, did that meeting also take place in Los Angeles?

A.  Yes, it took place in Los Angeles.

Q.  And that was attended by you, your mother, a lawyer, Ms. Tolhurst again, another law enforcement person named Robinson, Mr. Rapp.

Anybody else that you recall?

A.  I don't recall anybody else.

Q.  Do you recall if any of these meetings that you had with the prosecutors were -- was tape-recorded?

A.  I'm sorry.  Can you repeat that?

Q.  Sure.  Do you recall if any of these meetings that you had with the prosecutors in preparation for your testimony was tape-recorded?

A.  Yes, it was -- I can't remember.

Q.  Well, you started to say yes, Ms. Beck, so --

A.  Well, I --

Q.  -- kind of important.

A.  I can't really remember if it was tape-recorded.  I think it was, but --

Q.  Was it your tape recorder or somebody else's?

A.  Not my tape recorder.  I'm not even -- I can't even -- I'm

1    not even exactly sure if it was recorded.

2    Q.  Well, when you've been appearing for your testimony, have

3    you ever listened to a tape-recording of your meetings with

4    prosecutors in this case?

5    A.  No, I haven't.                                          11:42:08

6    Q.  Have you ever seen a transcript of the tape-recording?

7    A.  No.

8    Q.  At some point did you change the name that you were using

9    in your ads from Clova to Desire?

10   A.  Yes.                                                    11:42:32

11   Q.  Was that your decision or somebody else's?

12   A.  Mine.

13   Q.  You thought that would be more attractive?

14   A.  No.  It's because I had gotten caught already one time by

15   my -- by -- I had already gotten caught using that name, so I  11:42:49

16   went back and used a different name.

17   Q.  Okay.  You testified about getting -- in your direct

18   examination about that you would post ads that would be

19   rejected, whether words in it or the images that were in it;

20   right?                                                      11:43:19

21   A.  Right.

22   Q.  And that you received an email --

23   A.  Right.

24   Q.  -- from Backpage.

25          Do you have that email?                             11:43:23

UNITED STATES DISTRICT COURT

1    A.  No.

2    Q.  Have you seen that email?

3    A.  Years ago.

4    Q.  It no longer exists; right?  To your knowledge.

5    A.  Not that I know of.                                    11:43:36

6    Q.  But your testimony was that the email said you did this

7    wrong and you're -- and -- and to correct it, you got to do

8    that; right?

9    A.  I'm -- I'm not sure if it said exact -- exact change this,

10   like in those words, but it -- it showed me what I had to do   11:43:57

11   to, like, repost it and it to be accepted.

12   Q.  It just told you that your ad had been rejected with no

13   reason; correct?

14   A.  I'm not sure.  No.  If it didn't tell me what I needed to

15   do, then how would I know how to change the ad and repost it?   11:44:18

16   Q.  But you've testified that you didn't change your ad, as you

17   just reposted it so you wouldn't have to do it again.

18          MR. RAPP:  Objection.  Misstates the testimony.

19          THE COURT:  Sustained.

20          MR. FEDER:  Could the witness be shown BF-AB-02 again.   11:44:42

21          THE COURT:  That's before her.  She has it.

22   BY MR. FEDER:

23   Q.  Ms. Beck, look at that document and look at page 3, second

24   full paragraph.  It starts with, "Anya could not recall."

25          Are you there?                                       11:45:22

```
 1   A.  I'm there.
 2   Q.  Didn't you tell the prosecutors that you couldn't recall
 3   specific term or terms removed from your ad?
 4   A.  Yes.
 5   Q.  And that you thought -- that's your word; right?          11:45:33
 6   A.  Yes.
 7   Q.  -- you received an email with a link to her ad citing terms
 8   or terms that were banned?
 9   A.  Yes.
10   Q.  When you say "thought," does that mean for sure that's what  11:45:46
11   you got or just you kind of remember it?
12   A.  I meant for sure.
13   Q.  And it says you told the prosecutors that you would know
14   there was something wrong with your ad when you stopped
15   receiving calls; right?                                       11:46:12
16   A.  Right.
17   Q.  And then when is it that you testified -- that you were
18   going to testify that you received this email from Backpage?
19            MR. RAPP:  Objection.  Vague and confusing.
20            THE COURT:  Sustained as to the form of the question.  11:46:30
21            MR. FEDER:  Okay.
22   BY MR. FEDER:
23   Q.  When one of your ads would no longer cause you to get
24   calls, how long after would you say you -- it was you received
25   an email allegedly from Backpage?                             11:46:49
```

UNITED STATES DISTRICT COURT

1    A.  I don't remember how long after.  Shortly.

2    Q.  Hour?  Day?  Week?

3            MR. RAPP:  Objection.  Asked and answered.

4            THE COURT:  Sustained.

5    BY MR. FEDER:                                           11:47:04

6    Q.  You also told the -- the prosecutors in that same paragraph

7    we're talking about that you -- you knew if that happened to go

8    check your email -- her email, your email, to see if something

9    was wrong with your ad; right?

10   A.  Right.                                              11:47:28

11   Q.  But you can't tell us where those emails are; right?

12           MR. RAPP:  Objection.  Asked and answered.

13           THE COURT:  Overruled.

14           THE WITNESS:  No.  It's been six years or so.

15   BY MR. FEDER:                                           11:47:42

16   Q.  Have you ever talked about those -- shown those emails to

17   the prosecutor?

18   A.  No.

19   Q.  Have they ever shown you any emails to that effect?

20   A.  No.                                                 11:47:49

21   Q.  And it's your testimony that the email said Photo Number 2

22   needs to be -- was -- was bad, so we took it out, or this term

23   was wrong, as opposed to just saying there's something wrong

24   with your ad, it's been rejected?

25   A.  I can't remember exactly what it said, but I knew what I     11:48:14

UNITED STATES DISTRICT COURT

```
 1    needed to change in order for it to be posted.

 2    Q.  Or you could experiment to see if it went through; right?

 3    A.  Not experiment.

 4    Q.  Okay.  Look at the next paragraph in that same document.

 5    See where it says, "Anya recalled having photos removed from     11:48:39

 6    her" --

 7              MR. RAPP:  Judge?

 8    BY MR. FEDER:

 9    Q.  -- "Backpage ads"?

10              MR. RAPP:  This is improper impeachment, if that's     11:48:47

11    what it is, or it's not refreshing her recollection.

12              THE COURT:  Yes.  I think you need to lay some

13    foundation --

14              MR. FEDER:  Sure.

15              THE COURT:  -- if you're going to use the document to  11:48:55

16    refresh her recollection.

17    BY MR. FEDER:

18    Q.  You've seen this document before; right?

19    A.  Yes.

20    Q.  You used it with the prosecutors to my right to prepare for  11:49:01

21    your testimony; right?

22    A.  Yes.

23    Q.  If you had any problems with the accuracy of it, you would

24    have told them; right?

25    A.  I'm sorry.  Problems with what?                              11:49:13
```

UNITED STATES DISTRICT COURT

 1   Q.  With the accuracy or completeness of this document, you

 2   would have told them; right?

 3   A.  Yes.

 4   Q.  Did you tell them anything that was wrong with it, whether

 5   it's inaccurate or incomplete?                                      11:49:24

 6   A.  No.

 7   Q.  Is everything in here correct, as far as you remember?

 8   A.  Yes.

 9   Q.  Did you tell them that you recalled having photos removed

10   from your ads due to nudity?                                        11:49:37

11   A.  Yes.

12   Q.  At the -- and then when the photo didn't come through on

13   your ad, you would just change the photo and resubmit; right?

14   A.  Yes.

15   Q.  And then you went on to tell them that when -- if you used   11:49:53

16   the word BJ, and then Backpage stopped allowing that term, then

17   you would just stop using it; right?

18   A.  Yes.

19   Q.  I think you were asked if you know any of the folks to my

20   left; right?                                                        11:50:31

21   A.  Yes.

22   Q.  Do you know anybody to my right other than when you met

23   with them to prepare for your testimony?

24   A.  Yes.

25   Q.  You do?                                                         11:50:39

```
 1              THE COURT:  She answered yes.
 2    BY MR. FEDER:
 3    Q.  Maybe you -- I think you misunderstand me.
 4              Other than having met with the people in the U.S.
 5    Attorney's Office or law enforcement to prepare for your        11:50:52
 6    testimony --
 7    A.  Oh, no.
 8    Q.  -- you don't know any of these people --
 9    A.  No.
10    Q.  -- right?                                                   11:50:59
11              Thank you.
12              MR. FEDER:  I think that's all I have.  Thanks.
13              THE COURT:  Mr. Rapp?
14              MR. EISENBERG:  Your Honor, I have --
15              THE COURT:  Oh, I'm sorry.  Yes.                      11:51:20
16              MR. EISENBERG:  Thank you.
17              THE COURT:  My -- my error, Mr. Eisenberg.
18              MR. EISENBERG:  Oh, no.  I understand.
19              May the Exhibit 218 be shown again to the witness.
20                        CROSS-EXAMINATION                          11:51:38
21    BY MR. EISENBERG:
22    Q.  Good morning, ma'am.
23    A.  Good morning.
24    Q.  Ma'am, if you look up at the top of the -- this exhibit,
25    which is in evidence, do you see where it says "posted," it    11:51:52
```

```
 1   gives a date?
 2   A.  Yes.
 3   Q.  And the -- can you read the date?
 4   A.  Thursday, August 13th, 2015.
 5   Q.  Okay.  And then is that about -- to the best of your        11:52:02
 6   recollection, that would be accurate --
 7   A.  Yes.
 8   Q.  -- correct?
 9          Okay.  And the other exhibit that was shown to you
10   that's in evidence, it was posted a few days -- was it later    11:52:13
11   than this one?
12   A.  Two days later.
13   Q.  Two days later.  Thank you, ma'am.
14          And if you go down to the bottom of this page, bottom
15   of page -- I think this is the third page, there's an          11:52:24
16   inscription there.  Starts "Inland Empire."
17          Right there.  Inland Empire, and so on and so forth;
18   right?
19   A.  Yes.
20   Q.  Okay.  I'm not going to ask you to read it except to note   11:52:36
21   that this was part of what was posted when you posted this ad;
22   is that correct?
23          It's on the ad?
24   A.  Yes.
25   Q.  Okay.  That's all I'm asking.                               11:52:49
```

120

```
 1    A.  Okay.
 2             MR. EISENBERG:  Okay.  Thank you, Your Honor.
 3             THE COURT:  All right.  Mr. Rapp?
 4             Oh, I'm sorry.  Well, I thought I went through all
 5    defense counsel, but is there anyone else?              11:52:59
 6             All right.  Mr. Rapp.
 7                      REDIRECT EXAMINATION
 8    BY MR. RAPP:
 9    Q.  Ms. Beck, I just have one question for you.  A couple
10    questions maybe.                                        11:53:10
11             When you were asked on cross-examination about you
12    misleading Backpage on your age -- do you remember those
13    questions from defense counsel?
14    A.  Yes.
15    Q.  What, if anything, did Backpage do to verify your actual  11:53:21
16    age?
17    A.  Nothing.
18             MR. FEDER:  Beyond the scope.
19             THE COURT:  Overruled.
20             THE WITNESS:  Nothing.                         11:53:34
21             MR. RAPP:  Nothing.
22             Thank you.
23             THE COURT:  All right.  May the witness be excused
24    from her subpoena?
25             Any objection from defense?                    11:53:42
```

1          All right.  Ma'am, you are excused from your subpoena.

2    We thank you for your testimony.  You may step down.

3          Well, we are at five minutes to noon.  Actually, we're

4    six minutes to noon.

5          And let me just inform counsel that I've been asked by          `11:54:04`

6    our members of the jury if they could have the full hour for

7    lunch.  I have agreed to compromise, and if the jury is

8    agreeable to stay until 4:15, then -- and I see lots of nodding

9    heads -- then I will permit an hour for lunch.  And so,

10   actually, an hour and five minutes, I guess.                         `11:54:30`

11         And so with that, we will again remind the members of

12   the jury not to come to any conclusions, to continue to keep an

13   open mind, and not discuss the matters presented so far but

14   just enjoy the extra added bonus five minutes.

15         All right.  Please all rise for the jury.                      `11:54:51`

16      (Jury not present at 11:54 a.m.)

17         THE COURT:  And that means that you all have a full

18   hour for lunch.

19         And, Mr. Rapp, who is your next witness?

20         MR. STONE:  Your Honor, it's Lin Howard.                       `11:55:30`

21         MR. FEDER:  Who?

22         MR. STONE:  Lin Howard.

23         MR. EISENBERG:  Who will it be after her?

24         MR. STONE:  Eric Murry.

25         THE COURT:  Do you feel that that'll take us through          `11:55:42`

1    the rest of the day?

2            MR. STONE:  We think it's going to be close, Your

3    Honor.  And there will be -- we're going to 4:15 now.  There

4    might be a half hour.  It's hard to guess, of course, Your

5    Honor, but we think there might be a little bit of time at the        11:55:55

6    end of the day for another witness.

7            THE COURT:  Okay.  Well, have that witness prepared to

8    come in.

9            And let me -- let me hand over to Mr. Cambria, so he

10   can do his research over the noon hour, the cases I mentioned.        11:56:11

11           And we will stand at lunch.

12        (Proceedings adjourn at 11:56 a.m.)

13                          ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                      **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 23rd day of October,

16   2023.

17

18

19

                             */s/ Cathy J. Taylor*
20                           Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25                                                            11:56:34

UNITED STATES DISTRICT COURT