1              **UNITED STATES DISTRICT COURT**

2

3              **FOR THE DISTRICT OF ARIZONA**

4                 _____

5    United States of America,     )
                                    )    No. 2:18-cr-00422-DJH
6              Plaintiff,           )
                                    )
7              vs.                  )    Phoenix, Arizona
                                    )    October 23, 2023
8    Michael Lacey, et al.          )    9:07 a.m.
                                    )
9              Defendants.          )
     _____)

10

11

12

13       **BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE**

14        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15         **TRIAL - DAY A.M. SESSION**

16

17

18

19

20   Official Court Reporter:
21   Hilda Elizabeth Lopez, RMR, FCRR
     Sandra Day O'Connor U.S. Courthouse, Suite 312
22   401 West Washington Street, Spc 30
     Phoenix, Arizona 85003-2151
23   (602) 322-7256

24   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription
25

<u>**A P P E A R A N C E S**</u>

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Mr. Kevin M. Rapp, Esq.**
        **Mr. Peter S. Kozinets, Esq.**
        **Mr. Andrew C. Stone, Esq.**
        **Ms. Margaret Wu Perlmeter, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov

For the Government:
    UNITED STATES DEPARTMENT OF JUSTICE
    By:  **Mr. Austin Berry, Esq.**
    1301 New York Avenue, NW, 11th Floor
    Washington, DC 20005
    austin.berry2@usdoj.gov

For the Defendant Michael Lacey:
    LIPSITZ GREEN SCIME CAMBRIA, L.L.P.
    By:  **Mr. Paul J. Cambria, Jr., Esq.**
    42 Delaware Avenue, Suite 120
    Buffalo, NY 14202
    pcambria@lglaw.com

For the Defendant Scott Spear:
    FEDER LAW OFFICE, P.A.
    By:  **Mr. Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
    bf@federlawpa.com
    - and -
    KESSLER LAW OFFICE
    By:  **Mr. Eric Walter Kessler, Esq.**
    6720 N. Scottsdale Road, Suite 210
    Scottsdale, AZ 85253
    eric.kesslerlaw@gmail.com

```
 1   For the Defendant John Brunst:
         BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
 2       LINCENBERG & RHOW, P.C.
         By:  Mr. Gopi K. Panchapakesan, Esq.
 3            Mr. Gary S. Lincenberg, Esq.
         1875 Century Park E, Suite 2300
 4       Los Angeles, CA 90067
         gpanchapakesan@birdmarella.com
 5       glincenberg@birdmarella.com

 6
     For the Defendant Andrew Padilla:
 7       DAVID EISENBERG, P.L.C.
         By:  Mr. David S. Eisenberg, Esq.
 8       3550 North Central Avenue, Suite 1155
         Phoenix, AZ 85012
 9       david@deisenbergplc.com

10
     For the Defendant Joye Vaught:
11       JOY BERTRAND, ESQ., L.L.C.
         By:  Ms. Joy M. Bertrand, Esq.
12       P.O. Box 2734
         Scottsdale, AZ 85252
13       joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

**P R O C E E D I N G S**

(The following proceedings took place outside the presence of the jury.)

(Proceedings commence at 9:07 a.m.)                    09:07:40

THE COURT:  All right.  Good morning.  Please be seated.  All right.  Let me just tell counsel that I have -- I looked at the transcript.  I looked at some of the cases with regard to the Rule 29 motion, and I did take the matter under advisement and I will reserve my decision on that motion as I    09:09:03 am permitted to do under Rule 29(b).

And so I want to this morning turn to the pending motions regarding Defendant Brunst's motion to testify about his state of mind and to which each of the defendants have filed a joinder and put forth specific proffers of testimony,    09:09:32 and I'd like to go through that with you so that you can then, as you had indicated, determine the extent of your case in chief.

So I want to say that on my review on the totality of the motions, the defendants basically take issue again with the    09:10:06 Court's prior ruling on the admissibility of advice-of-counsel testimony and the Court's preclusion of past litigation related to Backpage.

So as to the advice of counsel, I have already held that evidence of attorney advice, even when used to negate    09:10:37

UNITED STATES DISTRICT COURT

scienter, still has to show certain things to be relevant and
not unduly prejudicial, as I've previously ruled, before it can
come into evidence.  Before it can come into evidence.  So let
me restate the rule.  The defendants who claim a good-faith
basis on reliance of an attorney must show first that they made      09:11:11
a complete disclosure to the professional, complete disclosure
to the attorney, that they requested the professional's advice
as to the legality of the contemplated action; that they
received advice, that it was legal, whatever that contemplated
action was, was legal, and that then they relied in good faith       09:11:43
on that advice.

        Now, if that showing is not made, you cannot rely on
the professional's advice to negate scienter.  That was what
the Court ruled previously.  I've reiterated that ruling at
various stages throughout the trial.                                 09:12:09

        So as for Mr. Brunst's motion, Mr. Brunst says, quote,
he "rarely met with counsel who had handled litigation relating
to the adult advertising," end quote, but nevertheless wants to
introduce evidence that he relied on advice that counsel gave
to Backpage, quote, "on the lawfulness of Backpage's adult           09:12:33
advertising."  I will allow Mr. Brunst an opportunity to
proffer the necessary foundation for this evidence.

        So if Mr. Brunst can say that he made a complete
disclosure to an identified attorney, not just general
attorneys, throughout the course of the time period regarding        09:13:04

1    the legality of publishing these or like ads on Backpage, and

2    he received advice from an attorney, not some unnamed person in

3    a law firm, that Backpage's publishing these ads were legal and

4    that he relied in good faith on that specific advice, then the

5    evidence will be relevant and admissible and relate to his          09:13:40

6    good-faith defense.

7         But here again, all of the prerequisites must be

8    satisfied, and that's because we risk jury confusion, and I've

9    already said that to permit otherwise some generalized

10   good-faith advice because we hired lawyers is prejudicial to        09:14:09

11   the government because they would have an opportunity to probe

12   who those lawyers were, what it was that those lawyers were

13   opining on, what they relied on in order to make their

14   determinations.

15        Now, so I guess just to make it pretty clear, even if          09:14:36

16   a complete disclosure was made, the testimony may be found

17   irrelevant if the lawyers weren't asked for advice on whether

18   Backpage's publication of escort ads like those in the

19   superseding indictment were lawful, or if they didn't follow

20   that attorney's advice.  And so I adhere to the ruling, I           09:15:24

21   adhere to the prerequisites, and so if you can make a proffer

22   that you have met those prerequisites, then you can probe that

23   further with your client.

24        I want to also just say with regard to Mr. Brunst's

25   motion, the same prerequisites will be required for the             09:15:54

UNITED STATES DISTRICT COURT

1  Sableman memo, which is proffered at Exhibit 5507, and any

2  transfer of that memo to the defendants; any communications or

3  advice given by Hemanshu Nigam, Liz McDougall, Don Moon,

4  Samuel Fifer, and this includes the exhibits that are noted in

5  Mr. Lacey's motion.  No defendant has so far put forth any of          09:16:32

6  the four prerequisites, and I note that in all of your joinder

7  motions you've all relied on this good faith, I'm sorry, good

8  faith about general advice on nonrelated legal issues.

9         I noted that Mr. Brunst said, quote, "Mr. Brunst did

10  not have a lot of direct interaction with Mr. Moon, but was           09:17:10

11  familiar with Mr. Moons's advice on the First Amendment."  And

12  again, he says this without saying what Mr. Moon was asked to

13  provide advice about and what he relied on in making that

14  determination.

15         Now, I don't think it's an advice-of-counsel issue for        09:17:35

16  Mr. Brunst, Spear and Lacey to testify that they were all aware

17  of the expenses that they paid for hiring lawyers that

18  represented Backpage.  I want to also make clear because it was

19  mentioned in Mr. Lacey's motion that the Court here is not

20  saying that each defendant has to produce evidence that they          09:18:04

21  sought advice as to each of the 50 charged ads.  The Court has

22  nowhere made that requirement in no prior order, but rather

23  that they asked for legal advice about permitting users to post

24  sex-for-money ads on Backpage, and that Backpage was profiting

25  from those sex-for-money ads.  So I'm not limiting the defense        09:18:37

1   in that way.

2           Similarly, I want to address again the motions raised

3   prior litigation and the defendant's reliance on prior

4   litigation.  Let me just take a moment to say that indeed I did

5   look at one of the prior Court's rulings, and I have repeatedly     09:19:08

6   said that mention of Section 230, that the CDA does not -- is

7   not relevant here, but I noted in a prior ruling that as

8   Mr. Feder points out, and as I focused in on, there was a

9   limited ability to bring in testimony, and this was, quote,

10  "Testimony that Section 230 was meant to incentivize Internet       09:19:55

11  providers to engage in moderation practices will be allowed."

12  This is in response to motions in limine where the defendants

13  proffered an expert to talk about the CDA and Section 230.  The

14  prior court basically prohibited any testimony or evidence of

15  the policy behind the CDA, hypotheticals related to whether or      09:20:24

16  not it would apply to this litigation, but did say very

17  clearly, "Testimony that Section 230 was meant to incentivize

18  Internet providers to engage in moderation practices will be

19  allowed."

20          The issue there really for me is one that the prior         09:20:48

21  court did not have the benefit of subsequent briefing by the

22  parties.  And in looking over the time that followed and the

23  litigation that followed after the prior court made this ruling

24  on the motions in limine prior to the first trial, it, to me,

25  has become very crystal, crystalized, that to permit the           09:21:22

1    defendants to do that would indeed lead to confusion for the

2    jury and it would essentially, in my view, what would end up

3    happening is, if you get someone, somebody, perhaps law

4    professor or whomever, maybe one of the defendants who can say

5    they were aware that Section 230 was meant to incentivize          09:21:56

6    moderation, then what ends up happening is we're going to have

7    to have some explanation of what Section 230 is and what the

8    CDA is, and we go down this rabbit hole of irrelevant testimony

9    that will lead to confusion.

10          And so because, again, I've pointed out that nowhere        09:22:30

11   have I seen case law that the CDA or Section 230 immunizes this

12   type of activity posting sex-for-money advertisements, I'm

13   going to adhere to my ruling and not permit that type of

14   evidence to come in.

15          Now, I want to put forward my findings with regard to       09:23:06

16   the state of mind evidence that the defendants have

17   collectively and individually proffered.  I do find that some

18   of the proffered testimony would be admissible under the state

19   of mind exception to show good faith.

20          So for example, with regard to Mr. Brunst, he               09:23:50

21   certainly can testify that within the relevant time period that

22   no auditor ever told him they believed Backpage was unlawfully

23   facilitating prostitution or engaging in money laundering.  He

24   can also testify as to his understanding of why banks withdrew

25   work from Backpage or did not withdraw their business from        09:24:20

Backpage.  He can testify that the auditors sought letters from

counsel on litigation risks doing business with Backpage, and

he can testify whether or not he referred those auditors to

counsel, Backpage counsel or other counsel, but he cannot

testify as to what the lawyers told the auditors because that

would be inadmissible hearsay.

Now, Mr. Brunst's understanding of why Backpage had to

seek overseas moderators and banking, that's all relevant, and

he can testify to his understanding about why they went

overseas.  Testimony that Mr. Brunst, quote, was also "aware

that some state law enforcement attacked Backpage" and that

"He was also aware that none ever succeeded in their legal

threats or actions," however, is irrelevant because those legal

threats or actions are not relevant to the allegations here,

the indicted Travel Act violations.

Indeed, I want to point out in Mr. Brunst's motion, he

adds the caveat that they ever succeeded, and that testimony

will certainly open the door the litigation that the government

points out, which is contrary to that statement.

Testimony from Mr. Brunst, Spear, Padilla and

Ms. Vaught that they relied on statements from Mr. Ferrer,

Mr. Larkin and Mr. Lacey that the sex-for-money ads were

protected by the First Amendment or that they were not

promoting or facilitating prostitution by placing the

sex-for-money ads may also be introduced, but no defendant can

testify that Mr. Lacey, Mr. Larkin or Mr. Ferrer told them that

that understanding came from legal counsel.  Again, that would

be inadmissible hearsay.

Now, they can certainly put forward evidence of their

role and responsibility in Backpage.  For example, Mr. Lacey

can certainly tell the jury that he was the editor in chief and

what all of those responsibilities entailed.  He can also

testify that he oversaw the operation or the employees that he,

as he put it, oversaw the employees who created the content of

the publications.  He can also testify as to his belief and

understanding that he was protected by the First Amendment in

publishing sex-for-money ads.  But again, if he says that

Mr. Larkin told him that a lawyer told him that, then that's

inadmissible hearsay.

As for Mr. Padilla and Ms. Vaught, they certainly can

testify about their role as moderators, the supervisor, the

moderator, and they can also testify that they were encouraged

by their supervisors to work with law enforcement to attend

conferences on moderation or on law enforcement training.  They

too are entitled to put forward an advice-of-counsel defense

only if they meet the first prerequisites, and until then they

can't say that they relied on advice of counsel.  In

particular, Liz McDougall.

Now, Ms. Vaught certainly can testify that she went to

Liz McDougall's office one day, showed her one of the

1   advertisements or a similar advertisement offering sex for

2   money with a link to the TER, and said to Liz McDougall, "Is

3   this illegal?  Are we breaking any state, federal, regulatory

4   laws?"  She certainly can do that.  But we don't have the

5   foundation for that yet, and I don't know anything like that          09:29:58

6   has been produced in discovery.

7           As for Mr. Padilla, he can testify that he was told by

8   his supervisors, quote, "to remove entire ads rather than

9   merely stripping out terms," and that he was following that

10  directive.  But he can't in a backdoor way say that Liz               09:30:22

11  McDougall was a lawyer hired to supervise moderation,

12  therefore, because she was a lawyer being licensed to practice

13  law forms the basis basically of his good faith.  That is, as

14  we discussed ad nauseam, what the advice-of-counsel rule is for

15  to avoid that.                                                        09:30:54

16          And so there is testimony that certainly could come in

17  from each of the defendants in terms of their role, their

18  responsibilities, what they understood they were doing, but

19  again, you have to be mindful that much of what you've

20  proffered so far includes layers of hearsay run afoul of advice       09:31:23

21  of counsel and so, therefore, I'm restricting any testimony in

22  that way.

23          I think I've addressed the majority of what you've put

24  forward, and let me just ask counsel for Mr. Brunst, are there

25  any remaining questions that you might have?                          09:31:58

1          MR. LINCENBERG:  Thank you, Your Honor.  First, let me

2     ask the Court, is the Court open to any argument?  Government

3     counsel filed a brief yesterday morning.  I had prepared to

4     respond to some of the points.  I would propose to do it in the

5     context of the Court's tentative order or order on that, but I          09:32:27

6     first want to make sure that I'm understanding whether the

7     Court is going to permit argument.

8          THE COURT:  Well, I think what I had indicated last

9     week was I would permit the government some time to respond,

10    and I thought, and maybe I didn't do this, I thought I didn't          09:32:50

11    permit a reply.  I've looked at the government's response and

12    I've made my determination based on the totality of the filings

13    that are before me.  I mean, Mr. Lincenberg, really, on the one

14    hand, I don't want to revisit anything related to advice of

15    counsel, the Communications Decency Act.  Those matters in my          09:33:12

16    mind are settled.  I don't want to hear argument about the *Dart*

17    litigation.  I think I've settled that time and time again.

18    The proffered exhibits, for example, that you provided.  But if

19    you feel compelled to make a record with regard to that, you

20    can, and if you feel like you have or need clarity as to what          09:33:39

21    I've just ruled, then certainly I will let you ask questions

22    for that purpose.

23          MR. LINCENBERG:  Well, let me try to focus it then.  I

24    think what I'd like to do is, I don't want to rehash my

25    arguments.  I think we made them clearly.  The Court, I think          09:33:57

1    for the most part has issued a clear ruling.  There's a couple

2    questions I have.  Let me just hit one or two complete

3    misstatements in the government's opposition brief for the

4    record and then move on.

5        So one of them has to do with the *Dart vs. Backpage*    09:34:12

6    litigation, and it's been one the government's consistent

7    themes that these cases are irrelevant because people weren't

8    told about The Erotic Review.  I note that we specifically

9    addressed that at page 10 of our motion on the bottom where we

10   said, "Allegations regarding 'sponsored ads,' an affiliate    09:34:38

11   program, and reciprocal links were a part of the *Dart* record."

12   We cited to Exhibit 5902 at page 480 and 491, which is the

13   appendix in the *Dart* appeal.  Page 491, for example,

14   specifically lays out where the sheriff had talked about,

15   quote, "links to other well-known sex trafficking sites on its    09:35:03

16   website," some sites like myredbook, The Erotic Review, XC.net

17   and others, et cetera, et cetera.

18       So I wanted to point that out because it has been a

19   central part of their theme trying to distinguish these cases

20   as if that's relevant to notice when the government's entire    09:35:23

21   case has been putting in things like Attorney General letters

22   and so forth, which don't worry about what was or was not

23   present, this sort of general notice to the defense.  But I

24   will move on.  I wanted to make that point.  I will move on.

25       Just with regard to the Court's statements this    09:35:42

1    morning, first I would note, again, the Court started out

2    talking about the factors for advice of counsel.  As we stated

3    many times, Mr. Brunst's defense is not an advice-of-counsel

4    defense.  As the Court can see from our proffer, it's not an

5    advice-of-counsel defense, so I would respectfully suggest that      09:36:04

6    the Court's statements on this point are irrelevant unless the

7    Court is making a ruling that no defendant can argue good faith

8    based upon all the different factors in their mind unless they

9    first establish an advice-of-counsel defense.

10           Lawyers were one of the many parties that made               09:36:23

11   statements over the years in court cases that were part of

12   Mr. Brunst's brain when we're moving forward, and the, the

13   Court's ruling that, for example, there's a credit card

14   Armageddon, and then the jury is left to wonder, well, what is

15   Mr. Brunst doing after that?  And when the answer is lawyers         09:36:48

16   are dealing with this where they should deal with it, which is

17   in a courtroom, and he's paying attention to that, that's out.

18   That, in our view, goes to good faith.  Doesn't matter whether

19   he's part of a team that is sitting there going back and forth

20   with the lawyer as to what factors relate to this.                   09:37:06

21           Second, the Court made a comment about the Sableman

22   memo, Exhibit 5507, and I think the Court mentioned that it

23   can't be discussed that this was transferred to defendants.

24   Just to refresh the Court's recollection, this was a memo that

25   was transferred to BMO in 2010 and the Court precluded us from       09:37:34

UNITED STATES DISTRICT COURT

1    bringing that out on cross-examination of Mr. Ferrer, and so

2    we're left with a record where the government is arguing that

3    there was a lack of transparency, lies, however they phrased

4    it, in connection with the dealings with BMO and the other side

5    of that is not in.                                              09:37:59

6           Third, with regard to where Your Honor indicated that

7    some state of mind evidence would be admissible, and Your Honor

8    is referencing, for example, Mr. Brunst can testify that no

9    auditor said that it was unlawful.  As I understand the Court's

10   ruling, the testimony would simply be, "No auditor told me it   09:38:23

11   was unlawful," and not go into any of the bases for why that

12   might be reasonable or what steps were taken.  Not simply that

13   they were referred to attorneys, but that auditors engaged with

14   attorneys.  These were people that were reviewing litigation

15   coming to these determinations.  As I understand, we can't      09:38:48

16   really get to the meat of what underpins why this would be

17   relevant to Mr. Brunst.

18          THE COURT:  Well, the way that you characterize Mr.

19   Brunst's testimony was, well, he was arms length away from any

20   lawyer.  He wasn't involved in any of those communications.  So  09:39:06

21   the problem here is how then does he get to that information

22   but through what will amount to hearsay embedded in hearsay.

23          MR. LINCENBERG:  Oh, it is hearsay.

24          THE COURT:  Then you've got that hurdle to overcome.

25          The other part of this is, what is it that the          09:39:26

1  auditors were told or shown or given to make their

2  determination?  Now, certainly if Mr. Brunst can say, yes, I

3  pulled out a portfolio of either the charged ads or similar ads

4  and, oh, by the way, yes, I also told them about here's a link

5  that they can attach, and the link really is not -- the TER          09:39:51

6  link is really not necessary.  He can just show them a Backpage

7  ad, a sex-for-money ad, then, sure, he can say, yes, this is

8  what I gave to the auditors, and they looked at it and in their

9  view then they took that to their lawyer.  As far as I know,

10 then we maintained the contracts or whatever.                        09:40:15

11         So that's the missing part here, and this -- these are

12 the layers of hearsay that you're going to have a difficult

13 time overcoming unless you can say that Mr. Brunst can get on

14 the stand and say, yes, I gave them a portfolio of our

15 sex-for-money ads.                                                   09:40:38

16         MR. LINCENBERG:  The hearsay is an easy issue to

17 overcome because it's not being offered for the truth.  This is

18 being offered to show why he does whatever level of due

19 diligence he does, the feedback he gets to the auditors.  The

20 way a CFO interacts with an auditor in connection with the          09:40:54

21 portfolio, the part of the audit reported that deals with

22 contingent liabilities is putting auditors in charge with -- in

23 touch with outside counsel.

24         The auditors -- everybody is well aware of similar

25 ads, quote-unquote, similar ads.  It's all over the litigation      09:41:17

1    that is going back and forth with auditors.  It's all over

2    when -- if the auditors can be put in touch with counsel who

3    are doing this litigation, they can ask every question they

4    want, and Mr. Brunst is performing his role and that -- and

5    where his good faith stems from, it stems from the fact that          09:41:36

6    auditors -- he's doing what he should be doing.  Auditors,

7    there is outstanding litigation, these are the lawyers you can

8    talk to.  Auditors will take whatever steps they want to do,

9    which is fairly extensive because it's an audit, and then the

10   feedback is there is no going concern issues.                         09:41:57

11        So without being able to get into the meat of why his

12   state of mind is one of good faith, to simply say no auditor

13   said it was unlawful adds a little bit, but it doesn't provide

14   any of the depth of why that is good faith.

15        All right.  The next point I would make, Your Honor,            09:42:22

16   is the Court mentioned that if cases were brought in, the

17   government points out that some opinions were counter and it

18   would open the door.  It would absolutely open the door.  We

19   have no problem with opening the door.

20        THE COURT:  I know you don't because it's unrelated             09:42:39

21   litigation, civil litigation.

22        MR. LINCENBERG:  It's not unrelated.

23        THE COURT:  It's unrelated litigation, and I already

24   held that.

25        MR. LINCENBERG:  I would just say that the Court               09:42:50

1   indicated it would open the door to litigation involving,

2   quote-unquote, prostitution ads, we welcome that discussion

3   because at the end of the day it shows my client to be innocent

4   if the jury understands that, but the Court has ruled and I

5   just wanted to note, if there is any doubt, we have no problem          09:43:10

6   with the government exploring this.

7           There is a lot of evidence that they can explore that

8   goes to weight.  If they want to come in and cross-examine,

9   "Well, do you know what facts were disclosed to these lawyers?"

10  That's relevant cross-examination.  That's fine.  We would             09:43:25

11  welcome that.

12          The last point I would say, Your Honor, is, and this

13  is sort of a point of clarification, the Court, I think I just

14  missed some of what the Court said, the Court said something

15  about with regard to First Amendment protection that it can be         09:43:39

16  introduced but not that it came from counsel.  Now, correct me,

17  I am not sure I heard it right.  I just want to make sure I

18  understand what the Court's rulings are.

19          THE COURT:  What I said was all of the defendants can

20  testify that they relied on statements from Mr. Ferrer,                09:44:02

21  Mr. Larkin, Mr. Lacey that the sex-for-money ads that they were

22  publishing were protected by the First Amendment, but that was

23  their mantra or their belief, and to continue to do it because

24  they were protected by the First Amendment.  They just can't

25  come and say that Mr. Lacey, Mr. Larkin or Mr. Ferrer told them        09:44:28

```
1    that their understanding came from lawyers because we get into

2    that advice-of-counsel prerequisite again.

3          So of course, if Mr. Padilla, for example, says:

4    Yeah, Mr. Lacey held a big meeting and he said, look, I showed,

5    you know, lawyer X, Y and Z the ad and I asked them          09:44:54

6    point-blank, "Is this against the law, any federal, state law

7    regulation," what have you, and "I gave them the ad and this is

8    the advice letter that I have back," then we're getting

9    somewhere, but beyond that they can't do that.

10         So certainly if Mr. Padilla says, "Yes, I relied on    09:45:16

11   good faith by my president, my CEO, my CFO, that what I was

12   doing was okay under the First Amendment," they can testify to

13   that.

14         MR. LINCENBERG:  I'll have to leave to Mr. Lacey's

15   counsel what he may intend to do.  Obviously as we've          09:45:37

16   proffered, my client is not in those discussions.  His good

17   faith doesn't stem from that direct communication.  It stems

18   from the memos that he passed on to him and he forwards to the

19   bank and so forth.

20         I would note that on a number of occasions in our        09:45:53

21   crosses of Mr. Ferrer the Court precluded us from getting into

22   First Amendment references.

23         THE COURT:  No, I did not --

24         MR. LINCENBERG:  If I --

25         THE COURT:  No, I did not.                               09:46:06
```

1          MR. LINCENBERG:  If I may finish.

2          THE COURT:  No.  I want to make sure I don't miss this

3   point.  The only person I ever heard ask the question, and it

4   maybe was three times, was Mr. Cambria.  He asked specific

5   questions related to the First Amendment.  No other counsel          09:46:22

6   did.  I listened and I waited for it, in fact, and so that's

7   not because I prohibited it.

8          In fact, Mr. Cambria did it and was permitted to do

9   it.  So I just want to make the record clear on that.

10         MR. LINCENBERG:  Okay.  If I respectfully just can          09:46:41

11  finish.

12         THE COURT:  Yes.

13         MR. LINCENBERG:  I respectfully disagree, and I can

14  point to some examples.  So, for example, one of the e-mails to

15  BMO where the government blacked out the Larkin e-mail, the          09:46:56

16  Court, number one, allowed it all to be blacked out.  Number

17  two said, "Mr. Lincenberg, you can mention in there that Larkin

18  said the words 'free speech,'" it was like two or three words

19  in there, "but excluding the discussion of the First Amendment

20  there," and there's other examples of that.  But I think also          09:47:23

21  relevant to this and where the Court has left us is, you know,

22  if you want to say that Larkin mentioned the First Amendment,

23  you can do that, but you can't give the meat of why that would

24  be good faith to rely on it; that is, after enumerable

25  discussions with counsel and legal cases.          09:47:45

1          So I think that's where we're at and why we disagree

2    with the Court's ruling.  Thank you, Your Honor.

3          THE COURT:  Mr. Cambria.

4          MR. CAMBRIA:  Good morning, Your Honor.

5          THE COURT:  Good morning.                          09:48:04

6          MR. CAMBRIA:  I just wanted to add, I do agree --

7          THE COURT:  Can you pull the microphone a little

8    closer to you?  Okay.  Thank you.

9          MR. CAMBRIA:  Try to stop it.  I do join in the

10   comments of -- is this ringing here?  Maybe it's that.   09:48:18

11         I join in Mr. Lincenberg's arguments.  But the problem

12   that I see is that what's been allowed so far are statements

13   without any particular foundation that the defendants are

14   violating the law from whatever group, religious or otherwise,

15   to negate good faith without allowing what the defendants were  09:48:44

16   told from other groups, individuals, lawyers, et cetera, that

17   they were not violating the law.

18         So it seems to me what's happened is we have a

19   situation where the government has introduced all of this

20   information and no particular foundation whatsoever that we're  09:49:04

21   acting in bad faith, if you will, and then we can't counter it

22   with statements of the same cannon, if you will, from others,

23   and I just think that's a fundamental problem that's been

24   created in this case.

25         Thank you.                                         09:49:28

1          THE COURT:  All right.  Thank you.

2          Mr. Eisenberg.

3          MR. EISENBERG:  Yes, Your Honor, I just want to be

4     clear on what Your Honor said just a moment ago.  And that is,

5     Mr. Padilla can say, "I relied on Carl Ferrer, for example,          09:49:42

6     that what we were doing was legal," and that, did you also say,

7     Your Honor, that in the context of that discussion he would

8     have had to show Mr. Ferrer a specific ad?

9          THE COURT:  No.  I think what I said was not specific

10    to Mr. Ferrer, but with regard to the First Amendment because          09:50:08

11    Mr. Ferrer, as you know, is not a lawyer.  So with regard to

12    any conversations related to his supervisors telling him, "You

13    know, we're protected under the First Amendment," he can say

14    that, but what I also said -- oh, on that point, you can

15    continue.          09:50:35

16          MR. EISENBERG:  Well, so if there's a discussion not

17    relevant, not related to a specific ad, but simply in the

18    context of those two men meeting and this issue comes up, "Are

19    we doing this?  Are we legal?  Is what we're doing legal?"  And

20    Mr. Ferrer says, in effect, "Yes," Mr. Padilla could testify to          09:50:57

21    that?

22          THE COURT:  Yes.

23          MR. EISENBERG:  Okay.  All right.

24          THE COURT:  Mr. Feder.

25          MR. FEDER:  A little further clarification.  Exhibits          09:51:21

```
1    have been admitted where a person named Steve Suskin, who was
2    the general counsel of Backpage, makes a presentation to
3    everybody regarding the legalities, characterized as the
4    legalities of Backpage.  Is the Court saying he can testify as
5    to what he told everybody?                                        09:51:44
6              THE COURT:  Mr. Suskin?
7              MR. FEDER:  Yes.
8              THE COURT:  If it relates to Travel Act violations.
9    If he was presenting something related to a question as to
10   Travel Act violations, prostitution ads, sex for money.          09:51:59
11             MR. FEDER:  Well --
12             THE COURT:  The statutes are the multiple statutes
13   that are charged in the indictment, Washington state, Arizona,
14   A.R.S., prostitution, so the question has to be presented to
15   him.  And to the extent that he's opining on, "Are we breaking   09:52:23
16   any state laws that prohibit sex-for-money acts or
17   advertisement?" That to me is the critical part.  No one has
18   provided that query to any lawyer whether they be employed
19   internal to Backpage or external.  I have not seen that proffer
20   other than that far-removed memorandum by some unknown lawyer,   09:52:59
21   a junior associate someplace in New York, I have never seen any
22   evidence of documentation, e-mail questions posed to a lawyer,
23   "By the way, Mr. Suskin, will you cover whether or not we're in
24   violation of state laws that prohibit sex-for-money
25   advertisement or activity, prostitution?"  So that's the layer   09:53:31
```

1    that I'm looking for, yes.

2         MR. FEDER:  Second, if Mr. Suskin or anybody else were

3    to circulate the Sableman memorandum.

4         THE COURT:  Well, let's me look at that Sableman

5    memorandum because as my memory serves me, I saw a couple of        09:53:52

6    legal advice memos or letters and they were all over the board.

7    They were talking about First Amendment, Fourteenth Amendment,

8    search and seizure.  They were talking about all kinds of

9    things, and so I'd like to see specifically what that

10   circulated memorandum was.  And again, what prompted that          09:54:21

11   circulated memorandum?  What was the advice being sought?

12        MR. FEDER:  Well, there is two of them actually.  Both

13   of them are exhibits.

14        THE COURT:  Tell me what the exhibits are.

15        MR. FEDER:  I don't -- we just gave you one of them.          09:54:34

16   Hold on one second.  There is two of them that I think -- it's

17   probably 5507, 5508 or something like that, 'cause one of them

18   was to address the impending Washington state statute.

19        THE COURT:  Well, here, like I say, here again it's

20   reference to Section 230.                                          09:55:00

21        MR. FEDER:  It does.  It's a general advice memorandum

22   from a prominent First Amendment lawyer in Missouri who's a

23   partner in a firm there.  I mean, I think there's a preface in

24   there of what he's been asked to do and why.

25        THE COURT:  Yes, I recall seeing this, and --                 09:55:28

1    MR. FEDER:  There's two, Judge.  I would have to find

2    the other one, but -- and one of these is the one that

3    Mr. Brunst, I believe, attached to send to the bank.

4    MR. LINCENBERG:  That was the Sableman memo,

5    Mr. Feder.  That was 5507, 5508, the Sableman memo.                09:55:51

6    MR. FEDER:  There we go.  Thank you.

7    THE COURT:  So where is the request for work on this?

8    Who requested him to do this and what was the question that he

9    was asked?

10   MR. FEDER:  You know, I can't tell you that I remember  09:56:18

11   seeing a letter, here's what we want you to do.  One of them,

12   again, was to address the legality of the Washington, the

13   proposed Washington state statute.

14   THE COURT:  Right, which has nothing to do with this

15   case or the allegations in them.                                  09:56:33

16   MR. FEDER:  Well, but it does have to do with, I mean,

17   again, this is not hearsay, it is to give these folks advice on

18   what, on the effect this would have and its legality and how to

19   attack it, and it doesn't -- it's just giving them comfort that

20   what they are doing is proper versus the other evidence that     09:56:55

21   the Court has allowed over and over again which suggests that

22   they should have known, whoops, that they were doing something

23   wrong.  This is the counter, and it's the comeback, and it

24   shows good faith.

25   THE COURT:  But it's missing the layer because you're  09:57:15

1    bringing in as advice of counsel, and what you're talking about

2    is sort of a backdoor way to avoid the advice-of-counsel

3    dilemma that you're faced with.  And so certainly someone asked

4    him a question.  Certainly somebody said and paid for this very

5    lengthy memorandum, which is all over the board.  So if you can          09:57:43

6    produce to me what it was that was asked of him and that he

7    gave this advice, again, that's what you have to do, but you

8    just can't wave around memorandums that have generally talked

9    about the First Amendment, opined about pending state laws or

10   proposed state laws and not provide the Court or share with the          09:58:21

11   government what it was specifically that he was asked to base

12   his legal opinion on.  And so it is, I mean, for me that is --

13   that's what you have to do in order to get Mr. Suskin, excuse

14   me, Mr. Sableman to come in and testify about what he was asked

15   to do or to get any one of your clients or the other defendants         09:58:57

16   to do that.

17            So that's kind of where we are, Mr. Feder.  Anything

18   more?

19            MR. FEDER:  I don't think so, Judge.  I know the Court

20   hasn't had a chance to reread these memoranda, but my                    09:59:11

21   recollection is, the preface is I have been asked to do --

22   Mr. Sableman writes:  I've been asked to do A, B, C, to, for

23   instance, provide an analysis of proposed statute, Washington

24   statute such and such and so and so, and then he does the

25   analysis and it's pretty simple.                                         09:59:32

```
 1              THE COURT:  Well, his analysis is with regard to,

 2     again, a federal statute, and that federal statute being the

 3     CDA.

 4              MR. FEDER:  There's not any question that he talks

 5     about all of the reasons why this particular proposed                  09:59:44

 6     Washington state statute will fail because it's

 7     unconstitutional under the First Amendment, because it is

 8     protected by Section 230 of the CDA, and a variety of other

 9     bases, but it -- it's not irrelevant, but it is the effect that

10     it had on these defendants that is the important part, and that        10:00:06

11     is relevant to good faith without it being advice.  I mean, it

12     is kind of an advice of counsel.  But I believe's there's been

13     some case law submitted to the Court where somebody went to a

14     seminar and listened to a lawyer give tax advice and was able

15     to present that to a jury.                                             10:00:27

16              So this is, again, we're --

17              THE COURT:  The facts of that case were very distinct.

18     I remember that case.  I remember reading it and found it

19     doesn't apply to your motion at that time.  So anyway, that's

20     where we are, Mr. Feder.                                               10:00:45

21              MR. FEDER:  Okay.  Thank you.

22              THE COURT:  Ms. Bertrand.

23              MS. BERTRAND:  Thank you.  Your Honor, I ask for one

24     point of clarification regarding an issue discrete to

25     Ms. Vaught.                                                            10:01:05
```

1          THE COURT:  Yes.

2          MS. BERTRAND:  Ms. Vaught testified before a federal

3    Grand Jury in Washington.  In my review of her transcript it

4    appears that the investigation was very similar to the one that

5    ends up being brought here.  I don't believe the transcript          10:01:22

6    shows the specific charges being investigated, but to have

7    federal jurisdiction they would have to have something like the

8    Travel Act.  Is the Court allowing evidence that Ms. Vaught

9    testified before that Grand Jury in, I think, 2012?  And then

10   nothing came of it, and from that she didn't think -- it has          10:01:49

11   nothing to do with what lawyers told her.  It just has to do

12   with her own experience on a federal Grand Jury.

13         THE COURT:  I guess the question then becomes, let's

14   say Ms. Vaught gets on the witness stand and says that in fact

15   she was required or subpoenaed to testify in the Western             10:02:09

16   District of Washington before a Grand Jury, the question then

17   becomes, was she the target or was she a subpoenaed witness?

18   She would have known that if she received a target letter,

19   obviously.  So I don't necessarily know then that it's relevant

20   if she testified and she was not charged.  Do you see what the        10:02:37

21   dilemma is?

22         MS. BERTRAND:  Sure.

23         THE COURT:  Now, she certainly could say that she had

24   testified in proceedings about Backpage posting sex-for-money

25   ads.  I don't know why you couldn't ask her, "What ever came of       10:03:00

1    that Grand Jury investigation?"  And if she says to her

2    understanding nothing, I mean, I don't find that to be

3    inadmissible --

4              MS. BERTRAND:  Okay.

5              THE COURT:  -- based on her knowledge.                  10:03:16

6              MS. BERTRAND:  I just want to make sure we have a

7    clear record as we are talking.  I don't believe Ms. Vaught was

8    treated as a target in that investigation.  I know she did

9    receive a proffer letter that's discussed in her testimony.  I

10   guess the issue is, in terms of her state of mind, nothing came  10:03:37

11   of it, but she was also being asked about Backpage's practices.

12   So when she went back of the office and nothing came of it,

13   would that be evidence of good faith?  "Apparently we're not

14   doing anything wrong.  I went to Seattle and testified and told

15   them what I knew about Backpage, specifically talked about       10:03:56

16   moderation practices, and who were moderators, how they do it.

17   So looks like things are okay from my end."

18             That would be the kind of testimony that I think would

19   be -- I just want to make sure before we have any

20   misunderstandings that we're clear about that.  It's not only    10:04:17

21   her conduct, the organization she was working for didn't get in

22   trouble, so she would have no reason to think what they are

23   doing is illegal.

24             THE COURT:  It can come in in a limited fashion in

25   terms of what, in her mind, she relied upon, but again, in a     10:04:32

UNITED STATES DISTRICT COURT

1  limited fashion because what I don't want to do then is to

2  have -- to get into a position where the government is going to

3  have to produce evidence of what the Washington, Western

4  Washington District investigation was about and whether or not

5  it was related to a Travel Act violation charge or money          10:04:56

6  laundering charge or whatever it might be, because then it ends

7  up creating this mini trial within a trial, and that's -- I

8  don't want to waste the jury's time on that, and I don't want

9  to confuse the jury, and that's the dilemma that we get into

10  with that type of testimony, but she certainly can, in a          10:05:19

11  limited way, testify the effect it had on her in terms of

12  knowing she never heard about it again or whatever it was, and

13  she just went about her business.  I mean, I think that's fine

14  and that's relevant to her.

15       MS. BERTRAND:  Okay.  Thank you for that                    10:05:40

16  clarification.

17       THE COURT:  All right.  Who wishes to come forward if

18  there is anything in terms of clarification from the

19  government?

20       MR. KOZINETS:  I do, Your Honor.  Thank you.  Thank          10:05:52

21  you.  I just have a few brief points on all of this.  First of

22  all, with respect to the discussion of the Sableman memorandum,

23  in addition to the other prerequisites of advice of counsel

24  that Your Honor talked about in connection with that memo, we

25  think paramount is the lack of a complete disclosure of all      10:06:24

material facts.  We discussed that on page 8 of our response
brief.

And as Your Honor noted, the memo discusses a link,
the CDA, which is precluded by the Court's prior orders,
getting into discussion of that.  Then the memo makes
statements that indicate that there was in fact a lack of full
disclosure.  So pages 13 and 16 of the memo talk about how
Village Voice doesn't promote or even acquiesce in ads for
illegal serves, but takes efforts not to promote or publish
those kinds of ads.  We think that is really reflective of a
complete lack of full disclosure at the time.

And then on page 17, if Your Honor recalls the
argument we had on Friday morning, I mentioned the *People vs.
Lurie* case from the state of California, Mr. Sableman also
talks about that case in his memo on page 17.  He says, "Well,
there are cases like Lurie where intent to promote prostitution
may be inferred in situations such as where a grossly
disproportionate volume of the company's business involves
prostitution or prostitution-related advertising or services."
He says, "These exceptions clearly do not apply to Village
Voice Media."

And as the trial evidence shows, that clearly did not
reflect a full disclosure of all material facts because we have
Mr. Brunst just a year after this memo co-authoring Exhibit 120
showing that 94 percent of the company's revenue came from the

10:06:45

10:07:06

10:07:23

10:07:43

10:08:02

```
 1   adult section, and we have, you know, presented witness after

 2   witness and document after document showing that those ads were

 3   prostitution ads.

 4          So for all of these reasons, you know, we think that

 5   that memo simply cannot come in.                              10:08:22

 6          A brief comment or two regarding the western district

 7   matter that was just discussed.  As Your Honor noted, Doc 1444,

 8   that was the order that you issued on December 29th, 2021,

 9   page 12, Judge Logan had considered the relevance of that

10   matter and had made clear that it was wholly separate from this  10:08:49

11   case.  That's quoted in your order.  The time frame of that

12   matter corresponds with the McKenna case, it predates the Dart

13   case, it's been about 2012.  And we know that the evidence that

14   this case is based on predominantly comes from the internal

15   memoranda e-mails and other information that the company, that  10:09:13

16   Backpage was compelled to produce years later in 2016,

17   compelled by the U.S. Senate subpoena, compelled by the Arizona

18   Grand Jury investigation.

19          And so for those and other reasons that are reflected

20   elsewhere in the record, I think in sealed filings about orders  10:09:36

21   from that matter, that really was entirely separate from this

22   case.  So --

23          THE COURT:  Before you move on from that, though, but

24   I think although it may be wholly separate, and if it was a

25   2012 matter, nevertheless, the fact that Ms. Vaught was         10:09:55
```

```
1    subpoenaed to testify and she came away from that experience of

2    testifying before a Grand Jury, which I'm sure by any measure

3    would be important for any individual and leave some sort of

4    impression upon them, she certainly can say that because

5    nothing came of it, or she was never informed of any, anything          10:10:28

6    that came of it, that goes to her state of mind, and I think

7    that is permissible.

8         Of course, you can come up and say, well, didn't that

9    take place very early on, and they were looking at activities

10   in 2010 or, you know, 2009 that had nothing to do with what         10:10:52

11   we're talking about here.  You know, there's ways that you can

12   bring out the fact that this was a different case, a different

13   time, different statutes and so on.

14        MR. KOZINETS:  Right.  But I think as Your Honor

15   talked about, there is the danger of devolving into this kind        10:11:15

16   of mini trial and really going down a rabbit hole into matters

17   that are wholly separate and irrelevant to the matters that are

18   before the Court and the jury here, so --

19        THE COURT:  And I will make sure not to do that.  And

20   like I said, it's going to be very limited in terms of that          10:11:35

21   testimony to questions, I think, Ms. Bertrand proffered.  You

22   can have two questions on cross, and that's how we will address

23   it.

24        Anything further?

25        MR. KOZINETS:  Just one final point, Your Honor.              10:11:57
```

There was some discussion from counsel for Mr. Brunst about a,
some sort of misrepresentation in the government's brief, and
we respectfully disagree with that.  Mr. Brunst's counsel cited
Exhibit 5902, pages 480 and 491, for the proposition that there
was some sort of disclosure of Backpage's internal business
practices that had been made in the *Dart* litigation.

        In fact, that document that was cited was nothing came
from Sheriff Dart.  It was a civil complaint filed in District
Court in the District of Massachusetts in the *Doe vs. Backpage*
litigation, so there was just allegations in that civil
complaint.

        And the one or two references to TER or sponsorship
ads there come nowhere close to the mountain of evidence that
subsequently emerged showing Backpage's internal practices,
internal communications, including testimony from Backpage
insiders that was not available in that litigation.  So the
notion that the *Dart* litigation involved anything close to the
internal insider information we have here is simply not true.
That's all I have, Your Honor.

        THE COURT:  All right.  Thank you.

        MR. KOZINETS:  Thank you.

        THE COURT:  Now, let me -- let me just make an
inquiry.  I think the government was asked to revise the form
of verdict.  Have you been able to accomplish that?

        MR. STONE:  Yes, Your Honor, and I believe we sent the

10:12:20

10:12:42

10:13:06

10:13:24

10:13:54

1    e-mail last night to chambers.

2         THE COURT:  And I will give defense counsel an

3    opportunity to review that.  We made the revision as requested

4    by defense counsel, but otherwise we're going to use the

5    proposed form of verdict that the government presented for the          10:14:09

6    reasons that I did agree, after looking at it a little bit more

7    carefully, the defense proposal included what amounted to mini

8    instructions, and so I removed that verbiage and we'll use this

9    sort of box description that the government had in its proposed

10   form with modification taking out those descriptions of the 50          10:14:34

11   ads.

12        The other question that I left was the jury

13   instructions.  And upon further review, there were only a few

14   of them that really needed to be perfected, and what I intend

15   to do is I'd like to, I note defendants wish to meet with their         10:15:01

16   individual counsel to determine then what the next steps are.

17   I think, if I remember correctly, defendants had produced a

18   witness list of some five individuals.

19        MR. STONE:  I believe it's up to seven, Your Honor.

20        THE COURT:  All right.  And those are seven                        10:15:22

21   individuals that do not include your respective clients; is

22   that correct?  Hearing yes from Mr. Cambria.

23        So what we will do then is we have our jury coming in

24   at 1:00 o'clock and we can resume the trial with whomever is --

25   who is the first witness that you're intending to call?                 10:15:47

```
 1              MR. EISENBERG:  Mr. Snyder, Your Honor.

 2              THE COURT:  Mr. Snyder.  Okay.  And the witness,

 3     Mr. Snyder, do you have an idea of how long direct examination

 4     of that witness will go?

 5              MR. EISENBERG:  I will say not very long, Your Honor.    10:16:07

 6     I can't put it in minutes, but he will be straight to the

 7     point.

 8              THE COURT:  And then who is the second witness?

 9              MR. CAMBRIA:  I believe it's Mr. Becker, Your Honor.

10              THE COURT:  And do you have an idea, Mr. Cambria, I'm    10:16:26

11     just trying to get an idea as to how the afternoon will go, do

12     you have an idea of the --

13              MR. CAMBRIA:  I think it will probably take me

14     30 minutes to 45 minutes to put that in.

15              THE COURT:  All right.  And then I think what we can     10:16:44

16     do is give you the overnight to meet and confer with your

17     clients to determine whether or not what course you wish to

18     take with them, but then resume trial tomorrow with the

19     remainder of your three or -- doing the math wrong -- who is

20     our math major?                                                  10:17:11

21              MS. BERTRAND:  Wasn't a major --

22              MR. CAMBRIA:  Not Mr. Feder.

23              THE COURT:  The five remaining witnesses that you

24     have -- sorry.  Did I say five or seven, were there seven or

25     five?                                                            10:17:25
```

1      MR. CAMBRIA:  There was one witness that I had named

2  Dougherty, and Mr. Stone indicating they were objecting.  The

3  history on that is apparently when the Court said to us, is

4  there any way you can indicate that you can trim down your

5  witness list, both sides, the government gave a purported list,   10:17:42

6  we gave one, and what had happened was Dougherty apparently was

7  originally listed for Larkin, and so automatically anybody

8  listed for Larkin came off that list.

9      Subsequent to that, however, I interviewed

10  Mr. Dougherty, and it was my opinion that he had relevant   10:18:03

11  evidence as to my client.  So I properly noticed that.

12      And Mr. Stone, I believe it was, said, "Well, you took

13  him off the first list, so we are going to object because you

14  took him off the first list."  I think we took him off because

15  he was a Larkin witness and we just automatically took off all   10:18:23

16  the Larkin witnesses, but I believe that he's relevant.  And I

17  just recently spoke to him and came to that conclusion, and I

18  did give him the appropriate notice.  So I feel that I should

19  be able to call him.  He won't be very long.  There aren't any

20  exhibits in connection with him, and so I'd like to have that   10:18:43

21  clarified so I can schedule him.

22      THE COURT:  Well, if you think he has relevant

23  evidence to --

24      MR. CAMBRIA:  I do.

25      THE COURT:  -- to your client, then he should be   10:18:57

1    permitted to testify.  It can't be a surprise to the government

2    that he was on the witness list.  Certainly you've been noticed

3    of him for months now.  And so in any event, he can testify.

4              MR. CAMBRIA:  Thank you.

5              THE COURT:  Just one moment.  All right.  We will          10:19:14

6    leave your jury instructions for later, but I do want to just

7    tell you that, give you my thoughts again.  I opined on this

8    before.  To the extent that you put in the testimony that I've

9    discussed earlier regarding good faith, you certainly could

10   have the good-faith instruction.  It might be modified a bit,       10:20:17

11   but I'll keep that in for now.

12             I always had the question about deliberate

13   indifference, and I think depending on how the testimony goes

14   in the defense case, and depending on whether or not there's

15   testimony about reliance on others, I think it might, it might     10:20:48

16   come in, it might be used, but I'll make that determination

17   later.

18             We've already addressed some of the issues.  There was

19   an outstanding issue that, Mr. Cambria, you raised about the

20   definition of the New York State prostitution offenses that        10:21:14

21   were proposed by the government in their instruction, which at

22   that time is, or I think at this point is 18.1, and I permitted

23   you to provide the Court with additional briefing on your

24   argument, but I never received that.  I don't know if that's

25   something you wanted to raise or revisit, but I never received     10:21:36

1   any briefing and so I just wanted to point that out.

2            MR. CAMBRIA:  I didn't realize that we were invited to

3   do that.  I appreciate that, and we'll --

4            THE COURT:  Well, let me just remind you that I told

5   you you could do that back on July the 30th.                    10:21:56

6            MR. CAMBRIA:  I'm not disputing that, Your Honor.  I

7   just don't remember.

8            THE COURT:  All right.  So in any event, I wanted to

9   mention that.

10           As I understand it, you all, the defense, have          10:22:12

11  submitted your Revised Proposed Jury Instructions this morning

12  and I have not seen the government's, but I wanted to make sure

13  that you understood where we were.  There were two other

14  instructions that were lingering out there that I didn't really

15  see any argument about or response to.  There was an            10:22:40

16  August 18th filing of the Government's Proposed Forfeiture Jury

17  Instruction, and I frankly didn't see that on the docket.

18           I think we addressed the objection, the August 24th

19  defendant's objection to the government's proposed limiting

20  instruction, and that was at Document 1730, so look at that and 10:23:16

21  make sure that I resolve that.

22           Now, in prior rulings in the prior court, she did make

23  a finding that the money laundering counts remain even if the

24  jury determines that a Travel Act offense fails.  And because

25  of that ruling and because that is the law, at least with       10:23:55

```
 1   respect to Sections 1956(C) and 57(C), 1957(C), I wonder if
 2   there needs to be some short instruction to the jury about
 3   that.  And so I throw that out to you for your consideration
 4   and we can revisit that.
 5          And so I'll take a look at the Revised Proposed          10:24:30
 6   Instructions that the defendants have provided.  Again, I'm not
 7   going to revisit any of the ones I previously settled upon.
 8   There were just some of these that were out there and I had not
 9   made a final ruling on, and we can take that up in a manner
10   that is conducive to keeping the trial moving along.            10:24:56
11          So with that --
12          MR. STONE:  Two quick things.  We submitted a filing
13   yesterday about 4:00 o'clock on jury instructions.
14          THE COURT:  Okay.
15          MR. STONE:  I just pointed out a few minor issues.       10:25:10
16          THE COURT:  Okay.
17          MR. STONE:  Just to make sure you had that.
18          THE COURT:  Okay.
19          MR. STONE:  Second thing, Your Honor, this ties in
20   with the forfeiture jury instructions.  The defendants have the 10:25:20
21   right to elect, should there be a conviction here, whether to
22   try the forfeiture part of this trial to the jury or to Your
23   Honor, and we really need to know that sooner rather than
24   later, like maybe by today, so that we can get all -- so that
25   we make sure we are not wasting the jury's time.  We have       10:25:40
```

1    finalized jury instructions, finalized verdict form, and a

2    number of things that we with would roll right into that

3    presentation, should there be convictions, that would cause the

4    forfeiture aspect of the case to move forward.

5           If they elect to go before Your Honor, I think it          10:25:55

6    could be done through motions and you wouldn't have the time

7    pressure because the jury could be excused, but if they are

8    electing to try that aspect of the case to the jury, we need to

9    know.

10          THE COURT:  Well, you have that question to deal with      10:26:12

11   too.  I'll give you until tomorrow morning to make that

12   determination.  Tomorrow morning at 9:00 you can let the

13   government know what you elect to do with regard to that.

14          And anything more?

15          MR. RAPP:  Just a couple housekeeping matters.  One of     10:26:32

16   the witnesses that is not proposed by the defense is

17   Carl Ferrer, and I believe you gave until this morning whether

18   or not they were going to alert us to that so that we could

19   coordinate that, so I would like to have him released from his

20   subpoena.                                                          10:26:55

21          The second issue is if some or all the defendants

22   choose not to take the stand, there has to be some time carved

23   out for that questioning by the Court on that issue, and I am

24   not sure when that's going to take place.

25          THE COURT:  Well, I'm sorry if I wasn't clear.  I gave     10:27:11

counsel until tomorrow.  I gave them this evening to meet and

confer with their respective clients so that they can make that

determination and certainly let me know at the earliest

convenience.

Now, to be fair, a named defendant could change their

10:27:27

mind and I have no control, and I think they are permitted to

do that.  So to the extent they know, then I'd like you to give

that information over to the government by tomorrow so that we

understand what our timing looks like with this jury.  I feel

comfortable that we are within a good time frame that we have

10:27:53

this jury committed to, but I don't want to make that cause for

delay.  So you have -- you have at least until overnight to

meet with your respective clients and come to some

determination, at least to let the government know and to let

them prepare for that, and that should be done by tomorrow at

10:28:21

9:00 a.m.

Anything further from the government?

MR. RAPP:  No.

THE COURT:  Anything further from defense?

MR. CAMBRIA:  Yes.  We submitted a specific First

10:28:41

Amendment memo, Your Honor, yesterday with regard to our belief

as to the appropriate instructions that the Court should give,

so we did that so that you'd have in front of you the

authorities and the arguments in writing and you would be able

to take that as you wish.

10:29:01

1       THE COURT:  And really, I will say that I did read it.

2  I reread it because it was familiar to me.  I remembered it,

3  and it is essentially a reurging of my prior ruling on the

4  First Amendment, and at this point I don't find the legal basis

5  on which to do so.                                        10:29:30

6       And in fact, because of the, and I should say,

7  Mr. Cambria, even though you made it in the Motion for

8  Acquittal, as a legal proposition now at least there is some

9  evidence in the record that really distinguishes this case from

10 those cases that were cited in that memorandum, which in my    10:29:54

11 view makes them controlling but also bolster the Court's prior

12 order, and so I'll just say that about it, and I may have more

13 to say.

14      MR. CAMBRIA:  One of the discrete things is that the

15 Ninth Circuit cases which we've cited there specifically do not 10:30:21

16 authorize a "related to" language.  The cases clearly require

17 that the speech necessarily on its face be such that it's not

18 protected by the First Amendment as opposed to the language

19 which is included in your proposed instruction which talks

20 about "related to."  And that is a very glaring departure from  10:30:50

21 what the Ninth Circuit said, and we laid those cases out, Your

22 Honor.

23      THE COURT:  Thank you, Mr. Cambria.

24      Anything further from defense?

25      MR. CAMBRIA:  No.                                    10:31:06

1          MR. EISENBERG:  Yes, Your Honor, I do, and this is a

2     housekeeping issue.  I think the Court is pretty clear about

3     the fact that the scheduling is somewhat in flux because

4     counsel and client have to consult about whether the client is

5     going to testify, and I am raising it in the context about oral          10:31:26

6     arguments or final arguments to the jury.  It's pretty hard to

7     determine now when that will take place, but it appears to me

8     it would be sometime by the end of this week, but it's

9     impossible to really predict.  I just don't want to be caught

10    suddenly with having the arguments the very same day that we          10:31:46

11    perhaps find ourselves with no witnesses and no one else is

12    going to be testifying.  That would be a hardship.  I know we

13    can't predict that at this point.

14          THE COURT:  Well, you know, you're right.  It -- there

15    is going to have to be built in some flexibility to do that.          10:32:06

16    And as I recall at the opening of the case, the opening

17    arguments really amounted to almost two days when you look at

18    all the hours put together, and so I understand that we're

19    going to have to build that in.  We're also going to have to

20    build in time for me to read voluminous instructions to them          10:32:29

21    before those closing arguments, and the two should not be

22    separated.  That's my view.  And I will try to work the

23    schedule such that that doesn't happen because I want them to

24    have those instructions fresh in their minds when they are

25    listening to your arguments, and then the government's rebuttal          10:32:47

1    close.

2           So I think if we carve out two days for that process,

3    that's probably the safer choice.  So I'll look at and think

4    about the timing, excuse me, in that regard, but that is not to

5    say that you are to have your witnesses prepared and ready to          10:33:08

6    go, those that you have provided to the government and the

7    Court, promptly on time 9:00 a.m. tomorrow, 1:00 o'clock today,

8    so that we can keep on track to the best that we can.

9           If we need to adjourn early on Friday in order to

10   accommodate that not only perfecting those instructions but            10:33:32

11   reading them to the jury and then permitting you to go forward

12   with your closing arguments, then we can do that.  We can move

13   that next week, if necessary, but let's just see how it goes

14   today and midday tomorrow and then we can make those decisions.

15          MR. EISENBERG:  Thank you, Your Honor.                          10:33:53

16          MR. BERRY:  I just want to be clear that -- this is

17   Austin Berry speaking.  Sorry, Your Honor.  We just received

18   notice this morning of a list of additional witnesses that the

19   defense intends to recall.  You may recall back on Friday that

20   we asked for them to provide us whoever they were going to be          10:34:07

21   called on Wednesday by Sunday.  We received that this morning.

22   I wanted the Court to be aware of that.  They gave us a list

23   of, I don't know, ten plus witnesses and zero exhibits with any

24   of those witnesses, and I just want the Court to be aware of

25   that.                                                                  10:34:23

1          THE COURT:  Well, it sounds like the case is getting

2    longer, not shorter, Mr. Eisenberg.  Turn over those exhibits

3    not only to the government, but let Liliana know what you

4    intend to use with those witnesses.  It's a reciprocal

5    arrangement that I have between the two of you.  Adhere to it.          10:34:42

6          All right.  If there's nothing further, we are

7    adjourned until promptly 1:00 o'clock.

8      (Proceedings concluded at 10:34 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                          **C E R T I F I C A T E**

5

6           I, HILDA E. LOPEZ, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9           I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 25th day of October,

15  2023.

16

17

18                              s/Hilda E. Lopez_____
19                              HILDA E. LOPEZ, RMR, FCRR

20

21

22

23

24

25