UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) No. 2:18-cr-00422-DJH |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Phoenix, Arizona |
| Michael Lacey, et al., | ) October 27, 2023 |
| | ) 8:44 a.m. |
| Defendants. | ) |
| _____ | ) |

BEFORE:   THE HONORABLE DIANE J. HUMETEWA, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL - DAY 26

A.M. SESSION)

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                   **A P P E A R A N C E S**

2     For the Government:
          UNITED STATES ATTORNEY'S OFFICE
3         By:  **Mr. Kevin M. Rapp, Esq.**
                 **Mr. Andrew C. Stone, Esq.**
4                **Mr. Peter Shawn Kozinets, Esq.**
                 **Ms. Margaret Wu Perlmeter, Esq.**
5         40 North Central Avenue, Suite 1800
          Phoenix, Arizona  85004-4408
6         kevin.rapp@usdoj.gov
          peter.kozinets@usdoj.gov
7         andrew.stone@usdoj.gov
          margaret.perlmeter@usdoj.gov
8         - and -
          UNITED STATES DEPARTMENT OF JUSTICE
9         By:  **Mr. Austin Berry, Esq.**
          1301 New York Avenue NW, 11th Floor
10        Washington, DC  20005
          austin.berry2@usdoj.gov
11

      For the Defendant Michael Lacey:
12        LIPTSITZ GREEN SCIME CAMBRIA, LLP
          By:  **Mr. Paul J. Cambria, Esq.**
13        42 Delaware Avenue, Suite 120
          Buffalo, New York  14202
14        pcambria@lglaw.com

15    For the Defendant Scott Spear:
          KESSLER LAW OFFICE
16        By: **Mr. Eric Walter Kessler, Esq.**
          6720 North Scottsdale Road, Suite 210
17        Scottsdale, Arizona  85253
          eric.kesslerlaw@gmail.com
18        - and -
          FEDER LAW OFFICE, PA
19        By:  **Mr. Bruce S. Feder, Esq.**
          2930 East Camelback Road, Suite 160
20        Phoenix, Arizona  85016
          bf@federlawpa.com
21

22

23

24

25

1                    **A P P E A R A N C E S (Cont'd)**

2    For the Defendant John Brunst:
          BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
3         By:  **Mr. Gopi K. Panchapakesan, Esq.**
               **Mr. Gary S. Lincenberg, Esq.**
4         1875 Century Park E, Suite 2300
          Los Angeles, California  90067
5         gpanchapakesan@birdmarella.com
          glincenberg@birdmarella.com
6         aneuman@birdmarella.com

7    For the Defendant Andrew Padilla:
          DAVID EISENBERG, PLC
8         By:  **Mr. David S. Eisenberg, Esq.**
          3550 North Central Avenue, Suite 1155
9         Phoenix, Arizona  85012
          david@deisenbergplc.com
10
     For the Defendant Joye Vaught:
11        JOY BERTRAND, ESQ, LLC
          By:  **Ms. Joy Malby Bertrand, Esq**
12        P.O. Box 2734
          Scottsdale, Arizona  85252-2734
13        Joy@joybertrandlaw.com

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED  STATES  DISTRICT  COURT

**I N D E X**

**SUMMARY OF COURT PROCEEDINGS:**                                    **PAGE**

Closing Arguments
    Government                                                           6
    Defendant Lacey                                                     36
Proceedings Outside the Presence of the Jury                           35

UNITED STATES DISTRICT COURT

## **P R O C E E D I N G S**

1

2      (Court was called to order by the courtroom deputy.)

3      (Proceedings commence at 8:44 a.m.)

4      (Jury not present at 8:44 a.m.)

5           THE COURT:  All right.  Are our jurors present,      08:45:07

6   Liliana?

7           MR. RAPP:  Could you give me just one second?

8      (Brief pause.)

9           THE COURT:  Okay.  All right.  We will wait for them.

10          THE COURTROOM DEPUTY:  Let me go check to see.       08:45:22

11          THE COURT:  Okay.  Thank you.

12      (Brief pause.)

13          THE COURT:  Okay.  We're waiting for one juror, who's

14   approximately five minutes out, and so Liliana will let us know

15   when she arrives.                                           08:47:42

16      (Brief pause.)

17          THE COURTROOM DEPUTY:  All rise.

18      (Recess from 8:48 a.m. to 8:58 a.m.)

19      (Jury not present at 8:59 a.m.)

20          THE COURTROOM DEPUTY:  All rise.                     08:59:15

21          THE COURT:  All right.  Please be seated.

22          Let's have the jury in.

23          All rise for the jury.

24      (Jury present at 9:00 a.m.)

25          THE COURT:  All right.  Please be seated.            09:00:35

1        Welcome back, members of the jury.

2        And, Mr. Rapp, whenever you're ready.

3        MR. RAPP:  Thank you.

4        We're in the homestretch.  Thank you for staying with

5   me yesterday.                                              09:00:48

6        Before we left, we were about to talk about

7   conspiracy.

8        Three elements to conspiracy.  There was an agreement

9   between two or more persons to commit violations of the Travel

10  Act.  That's all we need, is two people.  But you know from the   09:01:01

11  testimony and the evidence that there were more than two.

12  There's these five defendants.  There's Mr. Ferrer.  Mr. Hyer.

13  There's Mr. Adams.  There's even Dollar Bill, Mr. Mersey.

14  There's David Elms, who was running The Erotic Review.  Those

15  were the conspirators.  Then every pimp who posted on          09:01:25

16  Backpage.com and used the money to run their criminal --

17  their -- their small criminal enterprise of prostitution, they

18  are your conspirators.

19       Defendant became members of the conspiracy knowing of

20  at least one of its objects and intending to help              09:01:50

21  accomplishment -- accomplish it.

22       What is the object in this case?  Well, one of the

23  object is to make money.  And they did.

24       And one of the members performed at least one overt

25  act for the purpose of carrying on the conspiracy.             09:02:05

1          What's the overt act?  Well, for a 14-year conspiracy,

2     there's probably a hundred overt acts per day.  Just turning on

3     the computer and engaging in moderation.  Going down and

4     meeting with NCMEC or Polaris, or whomever, and not disclosing

5     the internal prostitution marketing strategies.  Wiring money.     09:02:30

6     Those are the millions of acts that furthered this conspiracy.

7          The Travel Act.  So the conspiracy is to violate the

8     Travel Act.  They used the Internet with the specific intent to

9     promote or facilitate the promotion of any business enterprise

10    involving prostitution offenses in violation of state law.  Any    09:02:57

11    business enterprise.  The pimps, their own little business

12    enterprise.

13         Remember, we were asking questions of some of the

14    witnesses.  Well, what happened to the money?

15         Well, he used the money to pay for hotels.                    09:03:15

16         Remember Jessika's Svengard?  He used the money to buy

17    clothes for me, to take pictures.  He used the money for my

18    hair, for my nails, for the gas for the car, to take me to

19    these dates where I engaged in acts of prostitution.

20         Defendant performed an act that did promote or                09:03:36

21    facilitate the promotion of any business enterprise involved --

22    involving prostitution offenses by publishing on Backpage the

23    ads listed in Counts 2 through 51.

24         Well, what's Counts 2 through 51?  Those are the

25    postings.                                                          09:04:00

1          Let's just talk about a couple fundamentals of

2     conspiracy before we talk about the actual acts.

3          Conspirators do not have to make a formal agreement or

4     agree on every detail of the conspiracy.  In other words, they

5     don't sit around at a conference table and say, how are we          09:04:13

6     going to further this criminal enterprise?  It doesn't really

7     work like that.

8          It's not necessary for all members of the conspiracy

9     to join at the same time.  We heard that Mr. Padilla and

10    Ms. Vaught, in particular, came on later, 2009, 2010.  They          09:04:26

11    started Backpage in 2004.  They joined an ongoing conspiracy

12    and became the engine room of moderation.

13         One may became -- become a member of the conspiracy

14    without knowing the full knowledge of every detail.  Yeah, you

15    can be part of a conspiracy, and you don't have to know what          09:04:49

16    all the other co-conspirators are doing to further the

17    conspiracy.

18         Mr. Lacey might not know what a moderator in

19    particular is doing on a given day, and the moderator, in turn,

20    doesn't know that Mr. Lacey's going down to NCMEC or meeting          09:05:01

21    with the Auburn Theological Seminary.  They don't have to know

22    every detail.

23         You remember this posting.  This is Jessika Svengard.

24    This is a 2010 posting.  This is still very much part of the

25    conspiracy.  The conspiracy started in 2004.  This is one of          09:05:23

1    the postings.  This is one of the victims that we put on the

2    stand that talked about this posting.  This is Exhibit 11 --

3    211c.

4            2036a.  This is the posting of Megan Lundstrom.  You

5    can hardly even see this.  You remember she got on the stand        09:05:45

6    and testified that, yes, I was -- I was prostituted for a

7    number of years.  She now, coincidentally, works for Polaris.

8    You remember her testifying.  She testified.  She was the last

9    witness.  She's part of the conspiracy.  Her posting was part

10   of the conspiracy.  The pimps that posted her on Backpage.com     09:06:02

11   are part of the promoting a business enterprise.

12           Andrea Benson.  You might remember Andrea Benson.

13   When she took the stand, she had a cold.  She had a master's

14   degree.  She talked about her involvement in -- in prostitution

15   acts.                                                              09:06:26

16           Count 2.  These are now the substantive counts.  These

17   are the counts after March of 2013.  You might remember

18   Lieutenant Brian Griffin, Northborough, Massachusetts.

19   Remember he's outside of Motel 6 and he sees a couple women,

20   and he's -- he does vice investigations.  He investigates this.    09:06:49

21   Eventually he arrives at the hotel room, and he encounters a

22   woman by the name of Destinee Ortiz.  Do you remember?  And

23   they were engaged in prostitution.  In fact, there was actually

24   a john inside the -- the hotel -- the motel room.

25           This is Count 2.  And you could see -- this is           09:07:10

1    Exhibit 212 and 212a.  You see some of the text in the -- in

2    the posting; incalls and outcalls, the 2 girl for 1 or 2 girl

3    special.  All indicative of prostitution.

4           On Count 2, these five defendants are guilty.

5           You remember this bit of testimony with Mr. Ferrer.    09:07:34

6    He talked about this email exchange.  There's a number of email

7    exchanges between a woman by the name of Pamela Robinson.  Her

8    email address is clprovider@yahoo.com.  This is one of the

9    emails.  This is Exhibit 164.  She says:  I don't do this

10   because I want to.  I do it because I have to.              09:07:58

11          And you can look at her postings.  Look at a few -- at

12   least one of them.  You will see all the indicators of

13   prostitution.  You also know from the email exchange she had

14   problems with them deleting her posts -- her picture.

15          So is there any question that this -- these postings    09:08:14

16   related to this woman are for prostitution?  Here is picture.

17          Count 2 -- or Count 3, rather.  This is a Pamela

18   Robinson posting.  You'll see the indicators here.  The 50 red

19   roses.  We heard testimony that 50 red roses is code for $50.

20   100 percent independent and safe.                          09:08:41

21          This -- this is -- they have this term that you see in

22   a lot of these things because this is trying to give them, you

23   know, some type of plausible deniability and smoke out law

24   enforcement.  This is not an offer for prostitution.

25          All donations are for my time and companionship only.   09:08:56

1          We saw that in some form in a lot of the postings.

2     It's nonsense, though; right?  This is really for prostitution.

3          This is Exhibit 1737.

4          On Count 3, these five defendants are guilty.

5          Now, there's a series of Pamela Robinson postings all     09:09:11

6     basically saying the same thing.  The 50 red roses.

7          Count 7, Count 8, Count 9, Count 10, Exhibits 505,

8     507, 508, and 509, all taking place in Washington State.

9          Counts 11, 18, 25, 26, Exhibits 510, 511, 512, and

10    513.                                                          09:09:37

11         On the Pamela Robinson series of postings that are

12    part of the verdict in this case, the defendants are guilty.

13         Count 4.  This is Naiomy Figueroa.  You might recall

14    her.  She testified.  You might recall when she testified she

15    had something in her hand -- just so you can put this in      09:10:00

16    context.  I know it's been a couple months on a lot of

17    witnesses.  The thing broke in her hand, and she -- we had to

18    take a little break.  This is Naiomy Figueroa.  And she

19    explained, you know, that she was -- she had a pimp.  The pimp

20    posted her on Backpage.com.  She went through that in detail  09:10:19

21    with us.

22         This is Exhibit 214.  You'll see that also in her

23    posting at 214 is the incalls, indicative of prostitution.

24         These defendants on this Count 4 are guilty.

25         Naiomy Figueroa is also Count 5.  Same thing.  Same      09:10:35

UNITED STATES DISTRICT COURT

postings.  Pictures indicative of prostitution.  Doing

30-minute specials.  She's actually in two places.  It becomes

a little bit in court; right?  She's being posted in two

different markets, Walpole and New Hampshire.

On Count 5, these defendants are guilty.                    09:10:57

You might remember this.  There was some testimony

between both Mr. Ferrer and Naiomy Figueroa.  They never laid

eyes on each other, but they talked about this individual by

the name of Nick Kristof.  And Naiomy, who went by the name

Emily in the Nick Kristof article, talked about this.  And so  09:11:18

did Mr. Ferrer.

Yes, Nick Kristof did an article on somebody named

Emily.

And then there's this email.  This is an email from

somebody, a producer who is doing a story on Nick Kristof's    09:11:32

documentary A Path Appears, which focuses on sex trafficking in

America.  And one of the scenes from the documentary, which was

filmed on February 3rd, 2014, Nick Kristof and others are

looking for a woman who is missing when they discover her

photographs in the -- in a listing in the adult services escort  09:11:52

section on Backpage.com in the Boston area of Walpole.

This gets forwarded up to Joye Vaught and to Andrew

Padilla.  They're put on notice of this particular broadcast

and this particular victim.

Count 12.  Now, it looks like we skipped some counts,  09:12:13

1    but this is where the Pamela Robinson substantive counts have

2    come in, and now we're on Count 12.  And this is Astrid

3    Cervantes.  You might remember her.  Very long hair.  She

4    testified.  She also testified to the fact that she had been

5    prostituted.  She talked about her pimp and the money that was          09:12:33

6    spent on her.  Obviously the photographs are indicative of

7    prostitution.

8           On Count 12, these defendants are guilty.  And this is

9    Exhibit 215a.

10          This is somebody that Astrid Cervantes talked about.          09:12:55

11   This is Count 13.  This is both terms and images indicative of

12   prostitution.  You'll see that the deleted images of some -- of

13   the woman who is mostly nude, you'll also see that within her

14   ad tile was this reference to new in town.  And that becomes

15   somewhat significant.                                                  09:13:21

16          On this Count 13, the defendants are guilty.

17          You might remember -- let's talk about something in

18   relationship to Count 13.  You remember there was testimony

19   about this individual, Hemu Nigam.  Hemu Nigam was their safety

20   and security expert.  He came in 20- -- latter part of 2010.          09:13:37

21   Got them the meeting with Polaris and NCMEC.  And then, in the

22   words of Mr. Ferrer, he was put on a shelf.  They stopped

23   listening to him, and eventually they terminated the

24   relationship with him.  But he sends out -- in April of 2011,

25   he sends out a -- some recommendations.  And Scott Spear gets         09:13:59

these recommendations.  And one of the recommendations is new

in town is indicative of prostitution.  And they -- they let

them know, hey, your moderators should know about this.  Here

it is.  New in town.

        Count 14, the defendants are guilty.                    09:14:19

        New in town.  This is Exhibit 215.  This is, again,

another Astrid Cervantes new in town.

        Count 15.  Guilty.

        Count 16, this is Breahannah Leary.  You might

remember Breahannah Leary.  She talked about how she was       09:14:39

prostituted out.  These are her postings.  Obviously indicative

of -- of prostitution.  You can see the postings on my left.

Those are the ones that actually make it.  The ones are deleted

images on the right.  The difference is almost inconsequential.

Those are what the moderators are deleting.  The other ones     09:14:58

also very much indicative of prostitution.  They allow those to

be posted.

        On Count 16, the defendants are guilty.

        Count 17, another Breahannah Leary one.  Same type of

images.  Same type of -- of text of -- of -- of coded terms     09:15:13

in -- in her text.

        Count 17, the defendants are guilty.

        Count 19.  This is a couple of counts.  The images are

obviously indicative of prostitution, a woman in a -- in

lingerie.  The texts are very -- also indicative.  They also    09:15:35

have this -- this sort of CYA thing that they put in -- often

the pimps put in the postings, by contacting me, you agree that

you are not affiliated with any form of law enforcement.

That's to smoke out law enforcement coming after them.

On Count 19, the defendants are guilty.                    09:15:56

Count 20 is the same person as featured.  Same coded

terms.  Same images.  Deleted images indicative of

prostitution.

On Count 20, the defendants are guilty.

Counts 21.  This is Jordan Thurman.  Do you remember    09:16:12

she testified.  Terms within her posting indicative of

prostitution.  100 percent in- -- independent.  Incalls only.

She talked about her -- herself engaging in

prostitution acts.

The defendants are guilty on Count 21.                  09:16:32

Mr. Spear, Ms. Vaught, and Mr. Padilla absolutely,

because of their involvement in moderation, Mr. Spear directing

moderation, they know what incall/outcall know -- means.

But what about Mr. Lacey?  Remember, if you go back --

this is Exhibit 113a.  This is the article he's writing called   09:16:53

Backpage Understood.  He actually acknowledges -- even up at

his level, as a majority owner, he knows what incall and

outcall means.

This is Count 22.  Another Jordan Thurman count.

Defendants are guilty of this count as well.            09:17:14

1          Anya Beck.  You might remember her.  She was the young

2   woman.  She wore a -- a black -- a turtleneck.  She testified

3   that she had a pimp.  The pimp would take all the money.  He

4   would then, in turn, use that money -- he had no other

5   legitimate employment.  He would use that money to buy things          09:17:35

6   for her that were in furtherance of her prostitution acts;

7   hotels, gas for cars, stuff that would -- that she could wear

8   during -- when he was taking pictures.

9          On -- on Count 23, the defendants are guilty.

10         Count 24.  This was -- this is Exhibit 221.  This          09:17:58

11  is -- shows outcalls only.  Indicative of prostitution.

12         Now, the -- the person featured in this ad didn't

13  testify, but her sister testified.  If you remember that, she

14  testified, yes, I saw her buying Vanilla Visa cards.

15         I saw her going on dates where she would come out and          09:18:21

16  she -- I would observe her with money.  I actually did see her

17  posting on Backpage.

18         You might remember her testimony.  Defendants are

19  guilty on this count as well, Count 24.

20         Now let's talk about the girlfriend experience and the          09:18:37

21  porn star experience.  You heard lots of evidence as that these

22  two coded terms are indicative of prostitution.  And at one

23  point they stripped them out.  Okay?  That doesn't mean the ads

24  weren't for prostitution; right?  That means that we know

25  they're for prostitution.  Let's take them out and then post          09:18:55

UNITED STATES DISTRICT COURT

the ad.  So it went back and forth.  But -- but GFE and PSE are
indicative of prostitution.

         And this is an ad between Mr. Padilla and Mr. Ferrer:
Should I put the cruded look for misspellings of these or start
to remove the stuff that happened before I stripped out the
terms, because that will mean that I have to edit every ad on
the site?

         Here's another exhibit, 201.  No act for money.  No
coded sex -- this is with Scott Spear:  No coded sex act for
money.

         Take out these terms.  GFE and PSE.

         This is into 2016.  As far as I'm aware, we're no
longer removing ads for GFE.  I only saved the specific
example, but I've seen multiple removed ads where appears GFE
was the removal cause.

         Now, they're just kind of adding it back in,
Exhibit 198.  But, to be clear, when they were taking it out,
it was still an ad that was strongly indicative of
prostitution.  This is an email that Joye Vaught is on.

         Here's another one, Exhibit 199.  Andrew and I talked
about the GFE thing.  Going forward, we will not be removing
ads for GFE or any variation of GFE.  If you have any
questions, please let me know.

         Another one.  This is March 25th of 2016, 18 --
Exhibit 1819.  We've identified a few more terms that are

1   allowed but your team is removing.  Hey, you need to keep these

2   in.

3           Joye Vaught and Andrew are both on this ad.  This is a

4   smoking gun.  This note -- this demonstrates that they know

5   that these terms are for prostitution.                          09:20:35

6           Counts 27 through 31.  These -- each one of these ads

7   has GFE or PSE in it.  You'll see that.  Exhibit 17, 18, 19,

8   20, 21, and then Exhibit 1735.  Counts 27, 28, 29, 30, and 31.

9   All of these have references to GFE.  Some of them, as you see

10  the one down there on the bottom, Count 31, this also has --    09:21:05

11  and I'll talk about this in a minute.  These also -- some of

12  these ads also have references to The Erotic Review, which, as

13  we know, is 100 percent prostitution.

14          On these ads, 27 through 31, these defendants are

15  guilty.                                                         09:21:23

16          Counts 30 and 33.  These, again -- again, these

17  also -- this is 1721 and 1723.  These have the GFE, but they

18  also have -- they have incall and outcall.  They also have --

19  30 and 33 have a TER profile.  This is Exhibit 1953.

20          Do you see that?  Reviews.  These are the reviews that  09:21:44

21  correlate to those counts, 30 and 33.

22          Counts 32 through 36.  These are all GFE/PSE ads.

23  Some of these actually have the 30 minutes for $180; one hour

24  $200.  All indicative of prostitution.  Exhibit 1722, 1723,

25  1724, 25, and 26 support these counts.                          09:22:11

1          On these counts, Counts 32 through 36, the defendants

2     are guilty.

3          Counts 37 through 41.  They're guilty on these counts

4     as well.  37 -- Counts 37, 38, 39, 40, 41, all PSE counts.

5     Exhibits 17, 27, 28, 29, 30, and 31.  They also have some          09:22:32

6     references to new in town.

7          Counts 42 through 46.  Once again, GFE and PSE ads.

8     42, 43, 44, 45, 46 all have references to GFE or PSE in their

9     ads.  Exhibits 1732, 33.  Exhibit 223, 20 -- 224, 225.

10          They're guilty on these counts as well.                     09:22:55

11          47 through 51.  All GFE/PSE postings.  Exhibit 226,

12     227, 228, 229, 230.  You will see that some of these counts are

13     not entirely in the escort section.  They are in the

14     therapeutic massage.  You recall from Brad Myles, his testimony

15     that this is where you saw a lot of prostitution.  You can look   09:23:23

16     at those ads.  You can see the indicators that he talked about

17     during his testimony present in those ads.

18          They're guilty on Counts 47 through 51.

19          Here is 49.  Here's an example of a TER review.  See

20     this?  Goes -- goes to the review.                               09:23:44

21          19- -- Exhibit 288 and 1967.  This is in 2018.  So if

22     there's any question that this relationship, this -- this

23     allowance of the reference to TER remained beyond 2010, all the

24     way up to 2018.  You would find references to The Erotic

25     Review.                                                          09:24:08

1           Here's 49.  And here's the actual review.  1967b.

2           So on the conspiracy, the conspiracy to violate the

3    Travel Act, each one of those postings we looked at are in

4    furtherance of this conspiracy.

5           Michael Lacey, Scott Spear, John "Jed" Brunst, Andrew          09:24:26

6    Padilla, and Joye Vaught are not only guilty of Count 2 through

7    52, but they are guilty of Count 1, the conspiracy.

8           Money laundering.  What did they do with all this

9    money; right?  We said at the beginning, when it's not about

10   the money, really it is about the money.  Well, they had to do          09:24:49

11   something with this not inconsequential amount of money.

12   $100 million.  In 2014 at their peak, almost $140 million.

13   What are they going to do with it?

14          Well, moving money that is dirty, that is derived from

15   a criminal offense, like a violation of the Travel Act, like          09:25:12

16   running a criminal enterprise, which Backpage was.  They either

17   used the money to continue to promote the website, they plow it

18   back in, take the money, just like any legitimate business

19   takes the revenue and they put it back in to -- to grow it.

20   They did it here.  They have to conceal it.          09:25:35

21          You heard lots of evidence that they were having

22   banking issues, so they have to engage in activities that

23   conceal the origin, the source, the nature of that money.

24          And transactional.  They're just spending the money.

25   Just transferring the money to themselves is transactional          09:25:57

1    money laundering.

2          So let's talk about it.

3          Well, we know that MasterCard, Visa, and American

4    Express shut them down.  Can't use them.  So they had to --

5    they had to pivot; right?  They had to find some other way for          09:26:10

6    credit processing.

7          Those methods stopped after 2015, so they had to

8    switch to money orders, to Bitcoin, to both gift cards and the

9    Visa cards.  You heard even when they had credit card

10   processing -- remember this company Litle?  This -- the credit          09:26:34

11   card company Litle said, hey, 70 percent of your transactions

12   are these Visa cards, are these Vanilla Visa cards with

13   nobody's name on it.  So they already knew that -- that this is

14   what their customers were using.

15         You could see here -- this is Exhibit 17- -- 178a.           09:26:53

16   This is in 2014.  Dear Jed, please be advised that we've

17   elected to close your account with us.

18         This is US Bank.  This is 6189.  This is a defense

19   exhibit.  It's interesting.  It's a merchant application form.

20   This is where eMerchantPay, this is where they had to go           09:27:13

21   overseas, in this case, United Kingdom, to find credit card

22   processing.

23         Mr. Lacey, of course, is the beneficial owner.

24   Mr. John Brunst, as the -- also as a beneficial owner.  Here he

25   is as the director.  Cereus Properties' email address.  We'll          09:27:33

UNITED STATES DISTRICT COURT

talk about that in a bit.  This is -- this is important.

Because remember what Jessika Svengard said.  Remember what

Anya Beck said, and others:  We -- to -- to -- to really get

the phone calls, we had to move it to the top.  We had to move,

refresh, auto repost, and we had to pay for that.  We had to          09:27:56

pay to have our ad moved to the top.

        And this is exactly what Mr. Brunst is saying in this

application.  Ads and premius -- premium placement option.

This means move to the top.

        Here he is again.  This is Mr. Brunst.  This is 2015.       09:28:15

This is even after he sold -- this sort of shows the control

that Mr. Brunst, in particular, but also Mr. Lacey and

Mr. Spear, as the owners who unloaded it, still had over this

website.  Here they're saying to this person at BDO, which is

this consulting company:  Move to the top and re- -- and auto        09:28:39

repost.  Customers now only pay for premium upgrade features

such as those.

        And -- and we know that.  Why?  Because also Eric

Murry, who testified, Exhibit 2044, he talks about move to the

top listings and how important that is.  So Mr. Brunst has a         09:28:58

real understanding.  Of course, he does.  He's the chief

financial officer.  He knows where the revenue is generated.

        But we -- again, we know from these two women, and

others who testified, Jessika Svengard and Anya Beck.  Remember

Anya Beck said:  Yeah, I didn't actually post- -- I didn't pay       09:29:16

to post my ad.  I didn't pay.  We only paid in 2015 to move it
to the top.

All right?  And, remember, everybody really didn't
know what revenue Backpage was generating.  Remember there was
this AIMS report.  They sort of -- Backpage ownership and          09:29:33
Mr. Ferrer, they were sort of happy that they under-reported
their revenue.  They said:  We only made 20 million that year.
We made quite a bit more because they didn't know about the
charges we made for the move to the top.

Buy credits.  This is Mr. Ferrer and Mr. Brunst.  This   09:29:54
is where you had to buy credits.  And remember Mickey Hansen
testified this -- as this -- to this as well from
MasterCard [sic]:  Hey, they have this system of buying
credits.

And he kind of smoked that out on them.  Hey, what are   09:30:17
you using our cards for buying credits?

And this is an email exchange between Mr. Brunst and
Mr. Ferrer about rolling out buying credits.  We'll roll out
this in coming week to Backpage sites.

And who talks about this?  Well, Anya Beck does in her   09:30:35
posting, buy credits.  Oh, you know, I remember that.  I
remember, when I asked her:  Is it your testimony that you
recall going somewhere you would use this?  It references buy
credits.  You would purchase some type of credits to post your
ads?                                                              09:30:52

1          Well, no, not to post my add.  I didn't have to pay to

2     post it.

3          But to have it, like, stay at the top or keep it moved

4     up?

5          Yes.                                                      09:30:59

6          There's a direct line between this email Mr. Brunst

7     and Mr. Ferrer are having and Anya Beck on the buying of the

8     credits.  And this is -- this is the alternative now.  This is

9     what they have to do because they're not getting banking.

10         Mr. Brunst.  Is there any question Mr. Brunst doesn't     09:31:12

11    know about the content of the website where he was the CFO?

12    Didn't we go down to the Mauritius path once and the banks had

13    the same issue with our content?  Do we have a bank that we

14    know will take the transactions?

15         Exhibit 792.                                              09:31:31

16         They eventually switch to cash, right, because they

17    couldn't get banking.  And to prostitute bought ads on

18    Backpage, they paid with money orders, the money orders were

19    deposited to shell company bank accounts, and the money was

20    moved to other Backpage shell companies.  All about the        09:31:48

21    concealment of money laundering.

22         All right.  Counts 53 to 62.  Defendants conducted a

23    financial transaction involving property that represented the

24    proceeds of the violations of the Travel Act.  Plain English,

25    defendants sent Backpage funds to another bank.                09:32:09

UNITED STATES DISTRICT COURT

1          Now, you want to look at your notes.  Exhibit 1479.

2     This is the summary chart of all the money laundering counts.

3     And with testimony of Quoc Thai, it demonstrates that the funds

4     were wired from Website Technologies.  They changed Backpage to

5     Website Technologies to conceal the fact that Backpage was          09:32:29

6     actually receiving the revenue to Cereus Properties.  And what

7     do we know about Cereus Properties?  Mr. Brunst was in charge

8     of Cereus Properties.

9          Second, the defendants knew that the property

10    represented the proceeds of some form of unlawful activities.      09:32:42

11    The plain English is this.  The defendants knew -- they knew

12    that their money was coming from Backpage.com.  It was coming

13    from the female escort section.

14         The defendants knew that the transaction was designed,

15    in whole or in part, to conceal and disguise the nature, the       09:32:59

16    location, and, importantly, the source, ownership, or control

17    of the proceeds of the specified unlawful activity.  Defendants

18    knew that the funds from Website Technologies in plain English

19    was revenue from Backpage.

20         Financial transactions.  This is a transaction               09:33:18

21    involving the movement of funds by wire or other means that

22    affects interstate or foreign commerce in any way.

23         These funds were wired from the Website -- Website

24    Technologies' bank in Texas, where Backpage was now

25    headquartered because they couldn't get -- they couldn't get      09:33:35

1    a -- a property here to operate Backpage, and then it was wired

2    to the defendants' bank account in Arizona.  Here's how it

3    looks.  Either Bitcoin or money going through Website

4    Technologies to the bank.

5          And here's what Quoc Thai says:  All right.  You have          09:33:53

6    testified about Website Technologies.  I don't think we've

7    heard anything about Cereus Properties.  From your review of

8    the reports, do you have any understanding of what Cereus

9    Properties is?

10         Well, Cereus Properties appears to be an entity used          09:34:05

11   to pay the various payroll expenses.

12         This is the promotional money laundering.  Plowing the

13   money back in or the activity related to Backpage.com.

14         Do you know -- do you know if Cereus Properties had a

15   chief financial officer?                                            09:34:23

16         I do know that it was Mr. Brunst.

17         Okay.  Here's the counts, Counts 53, 54, 55, and 56.

18   These are wires from the Website Technologies to the Cereus

19   Properties bank account.

20         Counts 57, 58, 59, 60.  Once again, wires from Website       09:34:38

21   Technologies disguising the source of the money going to

22   Backpage, going to Cereus Properties, an account controlled by

23   Mr. Brunst.

24         For Counts 53 to -- through 62, these defendants are

25   guilty.                                                             09:35:02

1          What's the next set of counts?  Well, the defendant

2     transported money from a place in the United States to or

3     through a place outside the United States or to a place in the

4     United States from or through a place outside the United

5     States.  The defendants acted with the intent to promote a          09:35:17

6     violation of the Travel Act.

7          So here's just one count.  This is Count 63.  And you

8     remember Carl Ferrer's testimony.

9          And did you pay for that feed?

10         These were those feeds they were putting on the site.          09:35:33

11    This is a payment to an India-based web developer.

12         We didn't pay for the feeds, but we had to pay to have

13    the feeds normalized.  That is what this developer did in India

14    and his company, is that would take the feeds and put them into

15    a format that would be compatible for Backpage to import.          09:35:47

16         This $6,000 payment is promotional money laundering.

17    Count 63.

18         This is Defense Exhibit 5364.  This shows sort of the

19    web of concealment; right?  You see down here Backpage.com,

20    Website Technologies.  They -- they created all these holding          09:36:07

21    companies at the sale with the idea that they would actually

22    conceal the source of the money.

23         Here's this Ad Tech BV.  This is this Netherlands bank

24    company.  There was a bank account there.  Remember I asked

25    Mr. Ferrer:  Well, how many employees were over there?          09:36:27

1          We didn't have anybody.  This was just a shell.  And

2    when we sold this company, this was supposed to sort of conceal

3    the fact that it was Backpage income revenue.

4          So Count 64, this is this $5,000 payment.  You'll see

5    this in Exhibit 783.  This is from Jed Brunst.                    09:36:43

6          Oh, this just appeared in our account today.  This is

7    part of the payment, $5 million.  Count 64.

8          Count 65, coming from the Netherlands to Cereus

9    Properties controlled by Mr. Brunst.

10         Same with Count 66, 67, 68.  The defendants are guilty    09:36:59

11   of those counts.

12         Now, transactional money laundering.  It's also the

13   easiest of money laundering because you just have to show that

14   this was money that was generated by Backpage.com from the

15   female escort section and then they did something with the       09:37:17

16   money.  They just transferred the money.  Monetary transaction.

17   Criminally derived property.  Worth more than $10,000.  Derived

18   from Travel Act violations.  It occurred in the United States.

19         The first element, any financial transaction involving

20   a financial institution.  This was from one bank to another.     09:37:37

21   All 69 through 70 -- 99 counts all involve bank transactions.

22         Was it criminally derived property?  Absolutely.  The

23   defendants knew the money was derived from criminal offense.

24   They knew, and we proved during the course of this trial, that

25   they obtained the money from Travel Act violations, the          09:37:59

1    promotion of prostitution on Backpage.com.  Each one of these

2    transactions is in excess of $10,000.  And then all the money,

3    all the money had to be -- be derived, in whole or in part,

4    from Travel Act violations.

5         So Count 69 and 70.  This is from Backpage.com to

6    Camarillo Holdings and then from Camarillo Holdings to

7    Mr. Lacey.  This is a $30,000 check and a $60,000 check --

8    $62,000 check.

9         Count 71 through 77.  The money emanates from

10   Backpage.com.  This is Exhibit, again, 1479.  Each one of these

11   counts, 71, 72, 73, 74, 75, 76, 77, these are all Scott Spear

12   transactions.  These are all payments that he's receiving from

13   Backpage revenue.

14        And this Camarillo Holdings -- in case you want to

15   know who's the CFO of Camarillo Holdings, because this is also

16   an account that becomes a pass-through for money, it's

17   Mr. Brunst.  This is Exhibit 8, page 11.

18        Count 78, 79, 80, 81, these are all transfers of money

19   post-sale, 2015.  Some of them are prior to the sale, but then

20   mostly after the sale in -- in April of 2015.  These are

21   transfers from Website Technologies through Cereus Properties.

22   You'll notice that you'll see Mr. Spear and Mr. Brunst.  You'll

23   also see Mr. Larkin and Mr. Lacey.  But Cereus Properties, who

24   control that account, was Mr. Brunst as the person who was --

25   you can infer from the testimony that because he was the person

UNITED STATES DISTRICT COURT

emailing Mr. Ferrer, hey, where's our money, you need to send
us money, he was the one controlling this account and directing
these wires.

Count 82.  Count 82.  This is also a Website
Technology through Cereus Property to John Brunst for 20 --   09:40:31
$220,000.

Counts 83 through 84.  These are all Mr. Lacey counts.
Emanates from Website Technologies to the Cereus Properties.
You see this in the middle.  Mr. Brunst in charge of -- of
Cereus Properties.  Making sure that the owners, including   09:40:48
himself, get paid.  These go out to Mr. Lacey.

Counts 80 -- Counts 85 -- Counts 85, 86, and 87.
Website Technologies through Cereus Properties.  Either
Mr. Spear or Mr. Lacey or Mr. Larkin are the beneficiaries, but
Mr. Brunst is the one directing these wires.   09:41:15

88, 89, 90, 91.  Website Technologies, again, through
Cereus Properties.  Mr. Lacey on -- on all of these.

92, 93.  Again, Website Technologies to Cereus
Properties, Mr. Lacey, and Mr. Spear.

Here's some of the emails that are going on during   09:41:37
that time.  This is Mr. Brunst emailing Mr. Ferrer and asking
him for the money.  Hey, we need to talk about our cash
position after the -- we should add -- ask this guy, Chris
Kempel.  This is Exhibit 1238.

1239.  This is in February of 2017.  This kind of   09:42:01

shows that the ownership, including Mr. Brunst, still control

Backpage.com.  They're telling Carl Ferrer, who supposedly who

is now the owner, they're telling him that you can now pay

yourself.

1246.  I think you should send all you can.                    09:42:20

This is in 2018.  This is when things are beginning to

wind down.  Mr. Brunst continuing to make sure he gets that

money so it can be funneled through Cereus Properties, out to

himself, and out to the other ownership.

I think you should send all you can as a debt payment     09:42:39

rather than risk some unplanned event.

Counts 94 through 100.  This is Mr. Lacey.  These are

the -- the -- the counts that deal with the money -- remember

Mr. Thai testified to this.  This is the money that went into

this IOLTA account.  This is the lawyer who testified for the  09:43:06

defense.  Now, remember, you're relying for proof in this case

on the -- the United States' case.  But the defense put on a

witness, and this was the lawyer, and he talked about this.

So these are these -- these charges; right?  And these

are these -- these are the counts where the money is aggregated 09:43:37

into the lawyer's account and then it's sent out to Budapest,

Hungary, to this bank account.

So this is how it looks.  And we remember the

testimony in this regard; right?  This is in the -- the wire

takes place in 2017.  And there's a lot of things that have    09:44:00

1    happened up and to this point in 2017; right?  Lots of pressure

2    from the National Attorney Generals Association, all of these

3    law enforcement, NCMEC, Polaris, CNN, Wall Street Journal, and

4    in January of 2017, the United States Senate.

5            So Mr. Lacey wires money from -- not from his bank          09:44:20

6    account, not in his name, but in -- from his lawyer's IOLTA

7    account to Hungary.

8            Here it is.

9            So all of these accounts, all of these Counts, from 52

10   all the way to 100, some of the defendants are charged            09:44:46

11   singularly in those counts, some of them are charged in a

12   number of those counts, but they're all charged in Count 52

13   with conspiracy to commit money laundering.  Every one of them

14   did something, received the money in some fashion, to be part

15   of the conspiracy and knew that the money was being concealed.    09:45:08

16           They are guilty not only on the substantive money

17   laundering counts, but they are also guilty of the conspiracy

18   count.

19           And now, without further ado, the last count, 100.

20   It's also charged -- the same transaction is charged in           09:45:37

21   Count 99, transactional money laundering.  Mr. Lacey had

22   $16.5 million of Backpage revenue that he sent to Budapest,

23   Hungary, to this Primis bank account.  He's guilty on that.

24   It's Backpage.  It's dirty money from Backpage, and he's

25   committing a financial transaction, and it's going overseas.      09:46:01

1          The second -- the 100 deals with international

2     concealment money laundering.  He transported money from a

3     place in the United States to or through a place outside the

4     United States.  He knew that the money represented the proceeds

5     of a violation or violations of the Travel Act, and he knew          09:46:19

6     that the transportation was designed, in whole or in part --

7     the whole thing doesn't have to be concealed -- to disguise the

8     nature, the location, and, importantly, the source, Backpage

9     revenue or the control of the proceeds of the Travel Act.

10          And you remember the testimony in this regard.  First         09:46:40

11    you had this email.  This is the -- this is the -- the

12    individual, Mr. Becker.  Remember, the guy didn't want to be

13    hassled on Tuesday.  Do you remember this guy?  He -- he's --

14    this is his email.  Mr. Lacey's emailing him, you know:  Hey,

15    I -- I think I'd like to put this money away from governmental       09:46:59

16    agencies.

17          And you remember this woman, Lin Howard, the bank.  He

18    went down:  Hey, I want to get this money out of the country.

19    I don't want the government involved in that.

20          This is the concealment money laundering.  And, you           09:47:12

21    know, there was this -- some testimony in the opening statement

22    and through cross-examination and a little bit in the defense

23    witness, well, you know, they did this thing called the FBAR.

24          But this thing was not filed.  The toothpaste was out

25    of the tube by the time they filed that.  This was in August of      09:47:30

UNITED STATES DISTRICT COURT

2018.  Mr. Lacey was charged in April of 2018.  The money had
gone to Mr. Becker's account, not from Mr. Lacey's account to
an account, and then went from Mr. Becker's account to an
account, Primis Bank in Hungary, and put in the name not of
Mr. Lacey, but in a trust for his kids.                        09:47:50

        That is Count 100.  The defendant, Mr. Lacey, is
guilty of Count 100.

        That is the United States' case, ladies and gentlemen.

        So what -- where are we?  Well, the defense does not
have a right to run a criminal enterprise that facilitates      09:48:17
prostitution because prostitution is illegal.  They don't have
a right to claim that this was protected speech or that they
were helping out law enforcement.  They don't have that right.
But they do have a right to have their day in court, and they
got that two months ago.  They have a right to a fair and       09:48:40
impartial jury, and they got that, too.

        But what are we entitled to?  What is the United
States entitled to on the evidence in this case and on the law?
We are entitled to a guilty verdict on each one of these
counts.                                                         09:49:09

        MS. BERTRAND:  Objection, Your Honor.  Misstates the
law.  Fifth and Sixth Amendment.

        THE COURT:  Your objection is noted.  And -- your
objection is noted, Ms. Bertrand.

        Let's continue, Mr. Rapp.                               09:49:24

UNITED STATES DISTRICT COURT

```
 1            MR. RAPP:  That's all I have.  Thanks for listening.

 2            THE COURT:  Members of the jury, we will now hear from

 3   defense counsel.  Let me just ask you if you feel like you need

 4   a -- a break for about ten minutes.  You can give me a thumbs

 5   up if any one of you need that break.                            09:49:49

 6            Okay.  Let's stand in recess for about ten minutes.

 7            And please all rise for the jury.

 8       (Jury not present at 9:49 a.m.)

 9            THE COURT:  All right.  Please be seated.

10            And, Ms. Bertrand, when the jury comes back, I'll just   09:50:32

11   remind them that counsel's statements are argument.  And I

12   think the record will reflect what Mr. Rapp included.  And I

13   don't mind at this juncture that he erred in the context of his

14   statement.

15            And so we'll stand in a brief recess.                   09:50:57

16            Mr. Cambria, you're going to be ready to go?

17            MR. CAMBRIA:  Oh, yeah.

18            THE COURT:  Okay.

19            THE COURTROOM DEPUTY:  All rise.

20       (Recess from 9:51 a.m. to 9:59 a.m.)                         09:51:05

21       (Jury not present at 9:59 a.m.)

22            THE COURT:  All right.  Counsel, you may be seated.

23            And let me just remind you, as I failed to do with

24   Mr. Rapp.  He -- he was speaking very quickly.  And so just

25   remember to keep your cadence at an even pace so that our court   10:01:50
```

1    reporter can last through arguments.

2         All right.  So let's bring the jury in.

3         All rise for the jury.

4    (Jury present at 10:03 a.m.)

5         THE COURT:  All right.  Please be seated.            10:03:32

6         And, members of the jury, as I instructed you

7    yesterday, what the lawyers say in their closing summation is

8    not evidence, and so, again, your memory of the testimony and

9    evidence controls.

10        With that, is the defense ready?                      10:03:53

11        MR. CAMBRIA:  Yes, Your Honor.  Thank you.

12        THE COURT:  You may proceed, Mr. Cambria.

13        MR. CAMBRIA:  Thank you.

14        Good morning, everyone.

15        May it please the Court, ladies and gentlemen of the   10:04:05

16   jury, fellow counsel.

17        Obviously, Mr. Rapp wasn't there.  He wasn't a

18   witness.  And, as His Honor has indicated to you -- as Her

19   Honor has indicated to you, what the lawyers say, obviously, is

20   not evidence.  What you heard on the witness stand and what you  10:04:30

21   are able to read in the exhibits are what you make your final

22   decision on.

23        First, thank you so much.  All of us appreciate your

24   sacrifice to be here as citizens to judge other people.  It's

25   no accident that the jury stands between the accusers, the      10:04:51

government, and another citizen.  And you have the last word.
And we all have confidence in you that you'll do the job here
and justice will be done.  Justice will be done, I believe, if
my client is acquitted of every count.  And I'm going to go
through with you what I think that the evidence established or
failed to establish and why that is an appropriate verdict in
this case.

And you heard Her Honor read some law to you.  The law
only comes from the Court.  And they talked about presumption
of innocence and the burden of proof's on them and proof beyond
a reasonable doubt and so on.  Those aren't just slogans.
Those are the building blocks of our system of justice.  And
we're proud, as Americans, to have that system of justice
because we have a situation where citizens can come in off the
street and delay and impose -- and -- have an imposition on
their personal lives, but get to make a judgment for another
citizen that obviously will have an impact on him or her
forever.

And so let me begin this way:  Mr. Lacey relied in
good faith on Carl Ferrer and others that they operated
Backpage lawfully.  Her Honor read you a charge that she is --
has given you, and will maybe repeat it, but I'd like to read
it now as kind of a backdrop to my comments the rest of this
morning.

She said:  The government has the burden to prove

10:05:25

10:05:51

10:06:12

10:06:38

10:07:02

beyond a reasonable doubt that a defendant act -- acted with

criminal intent and did not act in good faith.  Good faith

encompasses a belief or opinion honestly held and in absence of

malice -- malice or ill will.  If a defendant carries out his

or her actions in good faith, there's no criminal intent.  A          10:07:27

person who acts on a belief or an opinion honestly held is not

punishable under the charges in the indictment merely because

the belief or the opinions turn out to be inaccurate,

incorrect, or wrong.  If the government fails to meet its

burden to prove the defendant lacked good faith, you must             10:07:48

return a not guilty verdict.

        What's the proof, and what substantiates my client's

good-faith belief that the people running Backpage were doing

it legally and correctly?  Because he was not one of the

individuals who was running Backpage.  I don't even think the         10:08:12

government disagrees with that one.  Maybe.

        But, in any event, first of all, Mr. Rapp, of course,

dwells on large amounts of money because I think that he hopes

that you'll be so distracted by those large numbers that you

won't listen to exactly what the evidence, or lack of evidence,       10:08:36

was in this case.  Yes, there were large numbers.  There were

21 newspapers at one time.  They were profitable.  The Backpage

was sold to Ferrer.  Yes, they're large numbers, but large

numbers are not proof of guilt.  And that's not what he's on

trial here for.                                                       10:09:00

1          The indictment alleges 50 ads, 50 specific ads.  He

2    referred to them this morning.

3          I'm sorry.  I got you in the wrong place there.

4          He referred to them this morning.  There is no proof

5    in this case that prior to this trial my client has even seen          10:09:17

6    any of those 50 ads and the content of those ads.

7          The government has to prove beyond a reasonable doubt

8    that he had a specific intent and intentionally facilitated a

9    prostitution business or enterprise and they did it through

10   ads, because that was the business that Backpage was in.          10:09:46

11         There is no proof in this case that Mike Lacey took

12   any steps to make this crime that they've charged here occur.

13   There's no proof that he conspired or agreed with anyone.  He

14   talks about conspiracy.  He says it requires an agreement.  It

15   does.  There is no testimony here of any agreement that he made          10:10:13

16   with anyone for purposes of violating the law.

17         You heard the testimony.  The logical person to --

18   that you would expect would have had that testimony would have

19   been Ferrer and -- or maybe Hyer, but there was no such thing.

20   And of course he'll say, well, it doesn't mean that you have          10:10:40

21   to, you know, sit down and say A, B, C.

22         There isn't anything.  There isn't even a sit-down.

23   There is no proof of any kind of agreement.

24         The -- Mr. Lacey, I said in my opening statement, was

25   an old-time newspaper guy.  And I don't think there's any          10:11:05

UNITED STATES DISTRICT COURT

question that that's exactly what the proof demonstrated here.
We had a couple of reporters and editors who were involved in
the papers who testified.  Nobody challenged their testimony
that Mr. Lacey's world was writing newspapers.  That was his
whole world.  Maybe he was a dinosaur, actually.  Maybe Carl          10:11:34
Ferrer, when he came up with, you know, getting into the
Internet business, took it to a place where Mr. Lacey
probably -- if you think about newspapers these days and how
quickly they're falling by the wayside because of electronics.
Newspapers and the Internet aren't bedfellows.  All right?            10:11:56
I -- there's obviously kind of a -- a hate, a resentment there.
Being left in the dust as a dinosaur, so to speak.

        So he was the editor-in-chief for the newspapers.
There were like 17 of them nationwide.  You saw what the proof
was here, that he traveled all over the country visiting the          10:12:26
other journalists.  He was a hands-on editor.  He was a writer.
You saw all of the advertise -- all of the awards that they
got, including the Pulitzer Prize.  I mean, that's a big deal.
Everybody knows that's a big deal.  And -- and that little
conglomerate of newspapers there figured out a way to do it.          10:12:50

        And there was no conflicting testimony by anybody on
the prosecution's side that disputed the fact that he was the
editor-in-chief, and so on, of the newspapers.  As a matter of
fact, you might remember when Mr. Ferrer got on the witness
stand, I asked him:  Did you give a statement to the                  10:13:11

 1    prosecutors in the many interviews that you had?

 2              He said:  Yes.

 3              And I said.  Didn't you characterize Mr. Lacey as the

 4    editor and so on?

 5              And the answer would -- yes.                        10:13:25

 6              And so now let's talk about what is it that supplies,

 7    if you will, or supports this good-faith belief that Mr. Lacey

 8    had that Ferrer and others were running this paper legally?

 9              Well, first of all, Lacey, the proof shows, wasn't the

10    person who created Backpage.  The testimony was that there was   10:13:51

11    a man named Jim Larkin, who was the business guy, and Carl

12    Ferrer.  And they sent Ferrer to San Francisco, and he then

13    came back and created Backpage.  And he was the CEO of

14    Backpage.  He was the boss.  He was the last word, if you will,

15    the hands-on business day-to-day guy.  That's -- that's what he   10:14:17

16    did.

17              And the proof demonstrated that Backpage was on the

18    so-called business side.  And you remember the two editor

19    reporters who testified here, and they said, there's in iron

20    curtain, if you will, between the business side and the          10:14:35

21    editorial side in newspaper world.  And the reason for that is

22    so that somebody who wants to write something about a business

23    isn't going to be stopped from doing that because that business

24    is a big advertiser.

25              So there's this wall, if you will.  And the -- the     10:14:54

1  person who testified, Dougherty, the first guy, he talked about

2  where Lacey was.  Lacey was across the hall from him in the

3  editorial part, the news part, if you will.

4        And then there was a -- some testimony -- and, in

5  fact, Mr. Rapp put up a chart and demonstrated.  It was a chart   10:15:23

6  of where everybody was in the business.  And Lacey was over on

7  the side with the newspapers, and then there was the business

8  side and the rest of it.

9        And could we put up 6243, please.

10       Now, 6243, if you remember this, it quite clearly   10:15:44

11  shows a division.  And way over to the left, you will -- there

12  you go.  Thank you.

13       Way over to the left you will see that there's

14  Mr. Lacey, and he's there with other people who are involved in

15  the writing aspect.  And then there's the middle area, which   10:16:09

16  includes, obviously, Mr. Larkin.  And then there's Backpage is

17  in that area.

18       So there were two of these that were created -- one

19  put on by Mr. Rapp, and the other put on now by me --

20  demonstrating exactly the separation that I just was discussing   10:16:32

21  with you.

22       So Carl Ferrer, the testimony was, reported to Jim

23  Larkin.  Carl Ferrer said -- and this is another piece of

24  information that supports the separation of Mr. Lacey from

25  Backpage.  Carl testified that Mike Lacey was a layer away from   10:16:58

Backpage.  And where he said that was he was interviewed by the
agents and by the attorneys here and at that time described
where Lacey fit in everything and -- and characterized him as a
layer away.  And, obviously, that layer was the newspapers.

        And it's graphically demonstrated here with this chart     10:17:26
that was created long before this trial ever was put into play.
So it wasn't something that somebody just created shortly.  It
was something the company put out indicating whose spot was
where.

        And remember this:  Mr. Ferrer and Mr. Hyre, they have     10:17:48
all the incentive in the world to try to testify in a way that
makes the prosecution happy.  You remember that their deal was
such that they were told that if the prosecution decided, in
its discretion, to file a motion asking the judge to be lenient
with them, that was solely in their discretion, in the          10:18:22
government's discretion.  So they were testifying here with
prison bars rattling in their ears because they want the
government to make an application to reduce his sentence.

        Now, remember, Ferrer has all the connection in the
world with Backpage.  He's obviously the one who started it.     10:18:45
He ran it.  He -- he made all the decisions.

        Think about this for a while:  When the moderators
were taking out terms, there would be times when Carl would
come back in and say:  No.  Put those terms back in, because
the advertiser called me and got mad.  Put them back in.         10:19:01

1          He's the boss.  He was the one who did it.  And you

2     remember that it was sold to him in 2015.  And I know they're

3     trying to downplay that and say, oh, no, it wasn't really sold.

4     But then you found out that as part of his plea bargain, he

5     gave Backpage to the government.                                  10:19:20

6          Well, if he didn't have control over Backpage, he must

7     have been, you know, Houdini or something.  How did he give

8     Backpage to the government?  He obviously had 100 percent

9     control over it.  And -- and that's what happened.

10          So, in any event, so now he had all the incentive in     10:19:35

11     the world to exaggerate in any way he could regarding Mr. Lacey

12     or Mr. Lacey's knowledge or his role or anything else.  And it

13     never happened.  He said he was a layer away and never put him

14     into any day-to-day business.  Never with regard to ads or song

15     or made rules about the -- how they ran Backpage or anything    10:20:04

16     like that.  None of that ever happened.  And this graphic is

17     consistent with that testimony of him being a layer away.

18          And it's -- it's important because the next thing that

19     we find out is that Mr. Hyre says -- and, now, Mr. Hyre, if you

20     recall, had a very high role at Backpage.  And, again, he's     10:20:31

21     another person who made a plea bargain.  And part of that plea

22     bargain, same thing.  Would like a motion made on his behalf so

23     that he has a lenient sentence.  And he even gave you his

24     knowledge as to what he thought he was -- he was originally

25     facing, these -- the charges that are here, 20 years, what have   10:20:58

1   you, to what he is now facing.  And he obviously wants the

2   government to be going to the judge and making a motion on his

3   behalf.

4          But what did he say?  And, remember, he was a

5   high-level person at Backpage.  What did he say?  He said:  I          10:21:19

6   worked there 12 years, and I never, ever talked to or met

7   Michael Lacey.

8          Now, ask yourself, how would that be possible if

9   Mr. Lacey played any role of any significance in Backpage?  How

10  would that be possible?                                                10:21:47

11         That's over -- that's almost 5,000 days, and nothing.

12  He -- he would have known the cleaning people more than he

13  would have known Michael Lacey.  And he never met him.  And he

14  said:  The first time I ever met him, we were in court.

15         So what I'm saying is, is it logical to conclude,             10:22:07

16  then, that there really was a separation of Mr. Lacey from

17  Backpage?

18         We have the reporters and editors telling you that.

19  We have this chart.  We have Carl Ferrer saying he's a layer

20  away.  We have Mr. Hyre saying, never even met the guy in           10:22:24

21  12 years.  I think you could pretty much conclude that it's

22  true that he was zero involved in Backpage.

23         So -- and, of course, well -- the government says,

24  well, but he owned a piece of a company that owned Backpage.

25         Well, that's great.  I own stock in, you know, General        10:22:46

Motors, too, and I don't have a thing to do with them.  And I'm
sure you know people who have ownership interest in things, and
they have nothing to do with the day-to-day business.

       And that's exactly what the situation was here.  No
proof at all that in any way he was involved in, like,                    10:23:05
hiring/firing, setting the rules of the policies, any monthly
meetings.  He wasn't involved with moderation.  Had no reason
to review these ads.  There's no proof that he ever saw them
before looking at this indictment.  He wasn't involved in the
financial aspects, the day-to-day sort of things like that.  No          10:23:30
proof that he told anyone what to do and that he had any sort
of a day-to-day role in the business.

       As we've indicated, obviously Ferrer's the one who --
who had the power.  And I -- I'll repeat it.  But the thing
that demonstrated that more than anything is when the                     10:23:56
moderators did their job and they took out words that were a
problem, he'd come back and say:  Oh, no, no, no, no.  I talked
to, you know, this advertiser.  Put that back in.

       And you notice that he bought -- in 2015 he bought the
place.  Before he bought the place, they had taken out nudity,           10:24:18
they took out The Erotic Review, they took out GFE.  And what
happened when Carl bought the place?  He put them all back in.
Put them all back in.  It shows you exactly what his mindset
was, what his temperament was.  That's what he did.

       So it appears that Lacey was the kind of person that               10:24:44

1    if somebody had an article or something had to be written or

2    something had to be responded to, he was the newspaper guy, and

3    that's where we see him show up.  We see a -- would you put

4    up -- let's see here.

5        You recall there was a mention here that Mr. Lacey had    10:25:15

6    written an article called Backpage Understood.  And I don't

7    know if you recall this testimony or not, but it turned out

8    that at some point in time Ferrer reviewed it.  And Ferrer

9    said:  I don't have prostitution ads.  I don't have

10   prostitution ads.  I, not we.  I don't have prostitution ads.    10:25:45

11       That's what he said.  So that's the information, the

12   guy that ran it day by day, said to Mr. Lacey.

13       Carl indicated, and he admitted when he was on the

14   stand, that he said that Backpage was working with the police

15   to prosecute others, pimps and so on.  You hear the fact that,    10:26:13

16   you know, he went out and testified.  And then we have the fact

17   that, again, Lacey knew that he was helping law enforcement.

18   And this is part of the basis for Michael Lacey to reasonably

19   believe in good faith that they were following the law.

20       Can we put up Exhibit 662, please.    10:26:42

21       I might have to move this a little closer to these

22   eyes.  There we go.

23       This particular exhibit -- sorry to turn my back to

24   you.

25       This particular exhibit is from -- it's in evidence.    10:27:12

UNITED STATES DISTRICT COURT

1    It says Carl Ferrer.  It is in 2011.  And he is sending it to a

2    number of people, Larkin, who was the business guy, and a copy

3    to Mike Lacey.  And it was about this Brian [sic] Fassett, who

4    it turns out was a sergeant.  And he headed up a high-risk

5    victims and trafficking unit.  And he would gather people to          10:27:45

6    have a conference, and they would exchange information and so

7    on.

8           But the thing that is very important about this is he

9    now is communicating to Michael Lacey:  Here's what we're doing

10   with the authorities.                                                 10:28:03

11          This is part of Michael Lacey's good faith, if you

12   will, belief.

13          Here's what we're doing with the authorities.

14          And we can read through this.  And I'll just highlight

15   a couple of things.  But one of the things he talked about is         10:28:16

16   that you had to actually respond to ads as opposed to just look

17   at them to in some way act affirmatively.  You had to respond.

18   And you'll see in here he makes a reference to that, that you

19   have to do that.

20          But the most important thing, in my opinion, starts at        10:28:39

21   the bottom.  And at the bottom he says -- this is --

22   Fassett says to the people on this, including Lacey, they would

23   like Backpage to do the following.

24          They would like Backpage.  Now, think about this.  If

25   you got this email and you're the guy that's running Backpage        10:29:03

says that he's at this legal conference, he's dealing with an
expert police officer in this area, and they are now asking
Backpage to do seven different things, seven different things,
would it not be reasonable for you to think that a police
organization would not work with you if there was any thought          10:29:35
in their mind that you were violating the law?

     And what they're saying is, we'd like you to do these
things.  Okay?  Build a tool law enforcement can access.

     I'm reading parts of it.

     Build an image hash so we can find and remove images.        10:29:56

     Include Backpage user name.

     Ask Backpage person to provide you with, et cetera.
All these things.

     And my point is, put yourself in the -- in Mike's
shoes.  Here's the guy running it.  He's working with police.        10:30:13
They're asking him to do things.  Why would you think you're
breaking the law if the police are asking you to work with
them?  And that's what they're doing.

     And you also know that we've introduced -- and it's
not here this morning.  I'm not going to bore you with it.        10:30:34
We'll be here another year and a half if we had to go through
it, but it's all these thank you's from police officers around
the country that Backpage helped.

     Now, there was a plan here on the prosecution side to
say, and you witnessed it anytime somebody brought up something        10:30:53

1    to do with police, Hyer or Carl, or whatever, would then be

2    asked:  Oh, did you tell them about Dollar Bill?  Oh, did you

3    tell them about The Erotic Review?  Oh.

4          Well, like all of a sudden that would cancel

5    everything that Backpage did for the police.  Oh, Dollar Bill?    10:31:19

6    Huh?  I'm sorry I rescued that person.  Oh, Dollar Bill?  What

7    a shame.  I can't believe I arrested that person and they got

8    convicted for being a pimp.

9          That's silly.  It's nuts.

10         And there wasn't a single one of those officers who    10:31:38

11   came in from any of those places around the country and said:

12   Oh, well, Mr. Cambria, as soon as I found out about Dollar

13   Bill, that was it.  Thank you.  Return it to me.

14         Never happened because Backpage helped them.

15         Another thing that Mike Lacey was told and knew that    10:32:04

16   enforced -- reinforced his good faith, that they were working

17   with the police.

18         And you remember Ferrer testified.  I said:  Did you

19   go testify on behalf of the prosecution against pimps?

20         Yes.    10:32:26

21         Were they convicted?

22         Yes.

23         Did you provide records?

24         Yes.

25         That's another thing.  They want to diminish the value    10:32:32

UNITED STATES DISTRICT COURT

1    of the records.

2              Oh, they responded to subpoenas.  They had no choice.

3              Yes, they did.  Number 1, they kept the records.

4    There was no law that required them to keep records.  They kept

5    the records.                                          10:32:53

6              Do you remember there was a -- a reference by Mr. Rapp

7    to my client talking to his wife at the time and saying:  Jim

8    and I -- Jim Larkin, you know, we believe in legalized

9    prostitution.

10             And then there was another comment which was:  For the  10:33:10

11   first time, one of the oldest professions, prostitution, got

12   recordkeeping and transparency.

13             Yes.  What Mike Lacey meant by that was, we kept

14   records on people who got charged as prostitutes and as

15   johns -- I'm sorry -- as pimps and so on.             10:33:33

16             The transparency was that Backpage gave the police

17   these records.  That's the transparency.  Here.  Here's what

18   we've got.  Here are the ads.  Here is the credit card

19   information.  Here is another thing cross-references.

20             Remember that?  I asked Carl about that.  And I said:  10:33:55

21   Well, but if they asked you for a particular operator, a

22   website, or whatever, did you then search your base to see if

23   there was anything related to that?

24             Yes.

25             And did you give them that?                 10:34:10

UNITED STATES DISTRICT COURT

1          Yes.

2          That was the extra stuff that they gave them.  So it

3   wasn't just a situation of, oh, you had no choice to respond to

4   the subpoena.  No.  They were proactive.  Proactive.

5          Mike Lacey knew that, knew they were testifying and so          10:34:28

6   on.  And that was a legitimate thing to say in good faith

7   they're doing the right thing.  Okay?

8          So now we have this with -- with Fassett, and that's

9   important.

10         And let's talk about -- let's talk a little bit about          10:34:58

11  the police officers and the cooperation and what we learned

12  about that.  And the most significant thing -- would you put up

13  6142, please.

14         6142, United States Department of Justice.  Federal

15  Bureau of Investigation.  Proud to recognize Carl Ferrer, Vice          10:35:38

16  President, Backpage.com, for your outstanding cooperation and

17  assistance in connection with an investigation of great

18  importance.  The FBI's ability to carry out its investigative

19  responsibilities to the American people has been greatly

20  enhanced through your help, and you can be very proud of your          10:36:02

21  valuable contributions to the success.  Robert Mueller, III,

22  director, as high as high as it gets.

23         Was it fair for Mike Lacey to believe that if the very

24  director of the FBI was thanking them for helping them in an

25  important investigation that they were doing, that they were          10:36:32

1    breaking the law?

2         Now, let's ask that question.  Would they have asked

3    the FBI if they came in here, would they have said, well, if

4    you knew about Dollar Bill, you knew about The Erotic Review,

5    if you knew about the super posters?  Well, guess what?  They          10:36:55

6    knew about all those things.

7         This nice lady right here, Mrs. Tolhurst, she's an FBI

8    agent.  Sat here through the whole case, interviewed the

9    witnesses, was --

10        MR. RAPP:  Objection.  Facts not in evidence.                      10:37:13

11        THE COURT:  Sustained.

12        MR. CAMBRIA:  Was there a single, single individual

13   who -- I'm sorry?  Was there an objection.

14        THE COURT:  Yes.  Yes.

15        MR. CAMBRIA:  I'm sorry.  I don't have my hearing aid             10:37:24

16   on.

17        THE COURT:  Yes.  And I sustained it.

18        And, again, the jury's memory controls of what was in

19   evidence.

20        MR. CAMBRIA:  Right.                                              10:37:35

21        And you do recall that when we talked about the

22   interviews of the various witness they identified FBI agents,

23   one named Tolhurst.  Do you recall that?  It was in the

24   statements that -- and in the questions about Mr. Ferrer, I

25   asked him:  Were you interviewed, et cetera, et cetera?              10:37:51

1       So think about this for a second:  We're talking about

2    the most elite crime-fighting organ- -- organization in the

3    entire world, the FBI.  And you can bet that they knew about

4    Dollar Bill and The Erotic Review and every other thing.  You

5    can bet.  You can bet they knew what Dollar Bill --                10:38:19

6          MR. RAPP:  I'm going to object to this.  This is not

7    in evidence.  This is misstating the facts of this case.

8          THE COURT:  Again, members of the jury, and -- and

9    this is summation, closing argument.  And, again, your memory

10   of all of the evidence and testimony controls.  What the        10:38:38

11   counsel say is not evidence.  It's not testimony.  It's merely

12   summation and argument.

13         And let's --

14         MR. CAMBRIA:  Thank you.

15         THE COURT:  -- move forward, Mr. Cambria.               10:38:52

16         MR. CAMBRIA:  Yes.

17         What I'm saying is you have knowledge of the -- we all

18   know what the FBI is; right?  We all know what they do.  And so

19   for one second to think that they didn't know about Dollar Bill

20   or the The Erotic Review or all this other stuff is ridiculous.  10:39:07

21   It's ridiculous.  Okay?

22         And could they send somebody in here and testify and

23   say, whoa, wait a minute, you know, when our head sent this

24   out, he didn't know about Dollar Bill, Mersey, and whatever --

25   whoever the other individuals were name-wise, Elms, Mr. Elms     10:39:34

1    and others?  No.  Why?  Because they actually did help law

2    enforcement.

3         Now, what does that mean, if they help law

4    enforcement?  Remember the charge?  The charge is facilitating

5    a prostitution business or enterprise.  Facilitating.                  10:39:55

6         If you are working with the authorities who are

7    prosecuting the pimps and the people who are in the

8    prostitution business, you aren't facilitating any kind of

9    business like that.  You are prosecuting them.  You are

10   bringing them to justice.                                              10:40:21

11        You heard Ferrer testify that he testified in, like,

12   three cases that got convicted and went to jail.  That's the

13   opposite of facilitating.

14        Every time that they responded with records, with

15   financial records, with testimony, every single time they did        10:40:38

16   that, they weren't facilitating it.  They were not in any way

17   facilitating it.

18        And now we have the highest, highest, highest

19   law-fighting organization that we're all proud of commending

20   their help.  Why for one second would somebody like Mr. Lacey,        10:41:05

21   who's not in the day-to-day of Backpage, not be entitled to

22   rely in good faith on that and say, we got to be doing the

23   right thing?  We got to be doing the right thing.

24        So -- so we have that.

25        All right.  Now, we had some police officers in here            10:41:32

who testified, and we have some statements like Fassett and so

on.  And what did they tell you about ads?  They said every one

of them, we can't arrest just by looking at the ads.  And what

do we know about the ads?  We had testimony, including

Fassett -- or the -- the email here from Fassett, and we also          10:42:03

had testimony.  And the testimony basically said that the ads

are unreliable.  Can't rely on the ads.

          Why?

          Well, people lie about their age.

          What else?                                                   10:42:20

          They put in pictures and they aren't pictures of them.

          What else?

          You really don't know what you're going to get unless

you answer the ad.  That's the only way.

          And that's what the police officers said.  They said:        10:42:34

We can't arrest people just based on looking at an ad.  We need

to meet them, and we need to then get propositioned.

          But they want you to convict these people over here on

the face of an ad.  And there's -- and there's no proof they

even saw the 20 that are in this particular indictment that are        10:43:00

the basis of the -- or part of the basis of this charge.

          And so -- and you heard the testimony about, well,

what do you mean the ads are not reliable?

          Well, sometimes one provider will make something up

about another one to either get them in trouble or to have            10:43:20

1    people not patronize them.  We find out that we -- we heard

2    testimony the other day that sometimes they're scammed, and,

3    you know, the people get assaulted.  They respond, and they

4    wind up getting assaulted.

5           Do you remember in my opening I did the Driving          10:43:39

6    Miss Daisy thing, you know, like the old days with the

7    newspapers?  You had ads in the back page of the newspapers,

8    you know, advertising cars saying it's wonderful and all that,

9    and then you go there, and the car's a piece of junk.  And so

10   you can't just rely on the ads.                                 10:43:56

11          And we found out that, you know, the reviews, that

12   people write fake reviews.  They try to, you know, say

13   somebody's bad or -- or that they're -- maybe they say they're

14   really good hoping they get arrested.  There are lots of

15   different things going on.  So they're not in any way reliable.  10:44:20

16   And the police told you that, because they told you:  We do not

17   and have not arrested anybody based on an ad.

18          The police officer who came in and testified said:

19   It's a step.  It's a first step.  Okay?

20          But they're asking you to convict these people of        10:44:46

21   serious lights-out felonies here based on an ad and what

22   picture is, if you will, in -- in the ad and the language.

23          And that's another thing.  Incall/outcall.  You know,

24   it's like every word they're trying to turn into prostitution.

25   Incall, you go there.  Outcall, they come to you.  Really?      10:45:17

1    Obviously that's what that means.  And I -- today, even, the

2    indication was that that in some way was some kind of sex term.

3    I don't know where that came from.

4         And the other thing, they tried to downplay this

5    moderation.  And, again, moderation doesn't promote                10:45:45

6    prostitution.  Moderation is something that hurts prostitution.

7    Why?  All right.  Well, their favorite example was Greek.  You

8    know, and Stavros in, and he's looking for Greek.  And so he

9    looks through ads and sees the term Greek and calls the

10   individual.  And then if they meet and there's an offer of sex    10:46:18

11   for money, okay, well, that's prostitution.

12        You wouldn't know that except you see this word Greek.

13   Okay?  But if they took the word Greek out of the ad, Stavros

14   doesn't call that number.  Okay?  And that means that there's

15   no connection.  That means they don't do anything that's          10:46:43

16   against the law, because the moderators took out the word that

17   would attract the individual.  Gone.

18        And they try to make this sound like a moderation

19   isn't something that fights prostitution.  Moderation is the --

20   is the enemy of prostitution because it takes out any words       10:47:06

21   that might attract somebody that might want to engage in some

22   kind of, you know, illegal conduct, if you will.

23        Another thing.  Mr. Shehan testified and -- and

24   Mr. Luria.  I almost forgot his name.  Isaac Luria.  They were

25   from religious groups.  Well, obviously, you know, they have a    10:47:38

different perspective on things.  They look at it from a
religious standpoint.  We're looking at it from a legal
standpoint.  But he said something interesting.  He said even
in their group of people there are two schools of thought, if
you will.  There are the abolitionists, and there are the          10:47:58
reformers.  The abolitionists say:  If there's any of this
going on, kill it.  Cancel it.  Put it out.  Gone.  The
reformers say:  Wait a minute.  Let's deal with it.  Let's use
the information.  Let's help the police and so on.

        Because, you see, every single thing that you kill,         10:48:28
all the millions of people in the United States that don't
commit crimes with these platforms are punished because it's
gone.  All right?

        Now, think about it.  In the -- in the days before the
Internet, telephones are invented.  Okay?  Well, people we         10:48:47
know -- and it's common knowledge that people commit crimes
with telephones.  Everybody knows that.  Do we kill the
telephones?  Do we outlaw them?  No.  We regulate it.  We
regulate it.  In fact, federal government has what they call
wire fraud.  And that works with telephones also.  So we don't     10:49:14
just eliminate it because a few people abuse it.

        So Mr. Shehan talked about that.  And he said:  Yep.
In our group there's, like, two schools of thought.  Okay?
Well, one school is if somebody commits a crime with something,
we eliminate it.  It's gone.  Take it out.  Kill it.  And the      10:49:40

1  other is, let's work with it.

2       Backpage worked with the authorities here.  Look, this

3  wasn't, like, two or three authorities.  There were, like, over

4  a hundred.  And we're talking the FBI.  Okay?  So this was,

5  like, serious stuff.                                    10:49:59

6       You know, Ferrer.  What did he say?  Oh, a ven- -- a

7  plausible denial, a veneer.

8       What was the other one?  The slow lock.

9       Baloney.  They went and testified at trials.  People

10 got convicted.  They had hundreds of people.  Remember there   10:50:15

11 was testimony about the ad?  They had hundreds of people that

12 would go through these terms and take them out.  And as, you

13 know, it was like Whac-A-Mole, you know, where you hit it and

14 the thing pops up.  And that's what was happening.  It was like

15 they'd take a term out, and somebody would write the same       10:50:36

16 thing, but this time there'd be dollar signs instead of Ss or

17 things like that.  And then they saw that, and they'd take that

18 out.  And then they did something else, and they took that out.

19      And you saw what happened.  They met with NCMEC at one

20 point, and apparently NCMEC requested that nudity be taken out.  10:50:52

21 They wanted The Erotic Review out and so on.  They took nudity

22 out, they took The Erotic Review out, and then Carl decided to

23 put it back in when Carl bought the various -- bus- -- bought

24 the business.

25      So -- so, anyway, as it turns out, we know a few          10:51:16

things for sure.  We -- we definitely had testimony from, for

example, Mr. Luria, where they would come in and say, oh, we

told you you've got this and you've got that.

        And he was particularly interesting, because I said --

as you might recall, I said:  Wait a minute.  Don't you have          10:51:45

all these various religious leaders who signed this letter?

        Yes.

        And isn't this one particular person the one who hired

a known priest pedophile?

        Yes.                                                         10:52:03

        Really?  Did you write them a letter?  Did you take

out an ad in the New York Times?

        No.

        Well, why?

        Well, because I guess -- you know what, in fact, I            10:52:11

think with him I said something about throw the first stone or

cast the first stone, or something.  And he -- I don't think he

liked that.  But my point was that, yes, people have views

about things, but what do they do to make a difference?  Okay?

        And I asked him:  Any people in your group testify for       10:52:33

the prosecution?  Did they ever give them any records or

anything?

        No, none of that.

        But Backpage, at least the way Carl was running it,

was cooperating with the authorities.  And to my client's            10:52:47

knowledge, to -- who's not a person that's there working in
Backpage, that was something that he in good faith believed was
contributing to the legality of running Backpage.

And that -- and ask yourself, just in your own
situation, if police were working with you, like Fassett giving
you seven things they want you to do for them, okay, or you got
the -- this citation and so on, would you not think that you
must not be doing something illegal?  Otherwise they'd be
going, well, we're not going to work with you.

Or do we think this, that all these police agencies
were so inept that they couldn't figure out what was going on?

You know, you talk about The Erotic Review and so on.
They -- they -- it was right on the site at one point, and then
it got taken off after a while because of the requests.  It was
taken off.  But it was there for people to see.  It was there
for them to see.  And so there wasn't anything hidden.  It
wasn't concealed.

Now, let's see.  We get to another subject.  You know,
there's the so-called concealment money laundering.  And a lot
of these charges that had to do with money use the word
conceal.

Now we all know what conceal means.  Hide in some way.
Correct?  Okay.

Anytime you look at one of these counts that they ask
you to find them guilty of and you see the word concealed I

think should be an automatic not guilty.  Why?

Well, let's start with Quoc Thai.  He is trained to find things apparently.  His background is the IRS.  Okay?  And he came in here.  And he's the one who had a chart, and he was showing you this account and that account, and the money went here and the money went there.

There's nothing illegal, by the way, about money going here or money going there.  Whether or not it is, as his word, dirty money on -- or illegal money, that's a different story.

But let's start with concealed.  Okay?  There wasn't anything concealed.  Quoc Thai was the proof there was no concealment.  Remember the questions I asked him:  Mr. Quoc Thai, were the names accurate?

Yes.

Were the names of the companies accurate?

Yes.

Was there any problem in finding these accounts and whose name they were in and the names of the -- of the -- of the businesses and so on?

No.  There was no problem with that whatsoever.

So where's the concealment?  Where's the concealment?

The other thing -- and this -- this bothers me, and I -- and I'll tell you why.  Count 100 is the trust that's over in Hungary.  Okay?  That requires concealment.  That requires concealment.  And we all know, and you saw the proof, there was

10:55:22

10:55:38

10:55:57

10:56:15

10:56:40

UNITED STATES DISTRICT COURT

1    nothing concealed there.

2         But think about this for a second:  Quoc Thai isn't

3    the one who found the FBAR.  Remember the FBAR is the document

4    that you have to file if you make some kind of investment

5    outside the United States.  You have to file this document.          10:57:05

6    And what it does is it puts the Department of Treasury on

7    notice that there is this existing investment.  And there's

8    also a corresponding form that you file with the IRS.

9         Now, Quoc Thai worked for the IRS before he had his

10   present job.  Do you not think that the first thing he would     10:57:33

11   say is, well, we have an investment out of the United States.

12   Let's see if there's an FBAR?  He said he didn't do that.

13        Well, wait a minute here.  If you're trying to be fair

14   and thorough and you know that an FBAR has to be filed for it

15   to be legal, why wouldn't you look to see if it's there?            10:58:08

16        Because once you found it and it was there, there is

17   no crime.  A person does not get charged.  They don't get

18   hauled into court on a charge.

19        And I asked him:  Did you -- did you look?  Did you

20   find it?                                                          10:58:29

21        No.

22        Did they give it to you, the prosecution?  Didn't they

23   tell you that there was an FBAR?

24        No.

25        It came from me.  I had to find the FBAR and put it in     10:58:40

UNITED STATES DISTRICT COURT

evidence.  And they're all in evidence.  Okay?  And -- and
let's get right to that.  That's Count 100.  All right.

That requires concealment.  There was nothing
concealed.  They filed five FBARs.  And the FBAR, it identifies
Mr. Lacey.  You have a -- you can look at them.  It identifies
Mr. Lacey.  It identifies where the money went.  It identifies
the beneficiaries.  It identifies everybody.  All the
information is in the FBAR.

And I want to then show you a couple of other things
here about that.

All right.  First and foremost, the testimony -- and
this was in Exhibit 1.  Exhibit 1 has a number of different
emails in it.  And in Exhibit 1, Mr. Lacey tells Mr. Becker,
who's an attorney, that, look, I'm not trying to hide any taxes
or anything.  I want to put my money in a place where it's not
going to be interrupted by litigious parties and so on,
including the government.

And Becker tells you:  He came to me and told me they
were closing his bank accounts.

Well, you can't operate with -- can you imagine
operating without a bank account; right?  So he was tired of
that.  Didn't want it to happen.

And Becker even told you that after he did this
transaction, they closed his bank account.  And -- and nobody
claims he did anything wrong; right?

1          So he says, Lacey:  I'm not trying to avoid any taxes

2    or anything.

3          And then you recall that there was another text

4    message from Mr. Lacey -- 6264, please.

5          And in this text message -- could you scroll down --          11:01:13

6    down to the first message.  Hang on.  There's one before this.

7          Well, all right.  This is the second message, but

8    let's look at it for a second.

9          Lacey specifically asks Becker -- you may recall this

10   when I had him on the stand -- who is going to take care of the     11:01:53

11   reporting that's required for this investment?

12         And then in this email, you get:  I believe Jacob --

13   Jacob Stein will receive the information needed for the report,

14   and your accountants will prepare it and file it.

15         There is no way that you can be guilty of concealing          11:02:19

16   this trust when you filed several, several FBARs, all of which

17   are in evidence for you to see with all the information

18   necessary.  Everything.  Amount.  People.  Everything.  Where

19   it went.  All the rest of it.

20         And you recall the testimony was there was no lien on         11:02:47

21   his money.  There were no restraints on it.  There were no

22   judgments on it.  There was no seizure of it.  He was free to

23   do whatever he wanted with the money.

24         And as far as when he filed it, he filed it on time.

25   There isn't any question that he filed it on time.  And           11:03:09

1    Mr. Becker told you that he and the accountants, apparently,

2    asked for this extension to file.  But that wasn't something

3    that Lacey did.  He didn't ask for it.  It was Becker.

4           And he mentions this IOLTA account to you.  That's

5    just a lawyer's account.  It's all it is.  Lawyer's account.    11:03:31

6    And Becker told you what he did.  He got the money from these

7    trusts which had been created as part of Mr. Lacey's estate.

8    He got estate planning.  He got the money from the trusts.  He

9    put it in his IOLTA account, and then he sent one check over

10   for the trust.                                                  11:03:55

11          Everything in everybody's name.  No hiding.  No

12   secrets.

13          So there wasn't a single person who testified here

14   that somebody tried to conceal something in any of the money

15   laundering or in this trust.  There was just no concealment.    11:04:12

16          There would have been testimony.  They would have

17   said, oh, well, I went in and it was under, you know, Mr. Blue

18   or it was under, you know, Sally X.

19          No.  There was none of that.  Everything was in

20   everybody's name.  Everybody -- every business was the real    11:04:28

21   business.  There wasn't anything like that that was

22   concealment.

23          Pardon me.

24          So -- and the other thing.  The other money laundering

25   counts that he talks about here, Mr. Lacey believed in good    11:04:48

UNITED STATES DISTRICT COURT

1    faith -- and we've gone through all the reasons why that makes

2    sense, and there's proof that supports it from the FBI, from

3    the police, from Carl Ferrer's statements, from Fassett's

4    statements, from all the things they were doing, the seven

5    things, all that stuff, if in good faith he believed that, he's        11:05:08

6    not guilty of the crimes that have been charged about

7    facilitating prostitution; and, therefore, the proceeds are not

8    dirty proceeds to be part of a money laundering count.  They're

9    simply not.

10         And I think you have a substantial basis here to see        11:05:31

11   why someone who was not connected with the day-to-day of

12   Backpage and who had all this information about working with

13   the authorities, which was substantiated by the authorities

14   thanking them, it was substantiated by the FBI report and so

15   on, that it was reasonable for him to believe that things were        11:05:57

16   being operated correctly and legally.

17         A couple of other things.

18         Mr. Dougherty testified, and I asked him about a -- an

19   email that he had sent where he made a -- a comment about they

20   traded that legacy in for a chase -- for a chase of gold        11:06:29

21   derived from prostitution.

22         What Mr. Dougherty explained was that comment related

23   to an article that he cited, which was in Reuters.  And it was

24   an article Backpage Chief Pleads Guilty.  And he was talking

25   about the fact that when Ferrer pled guilty, that somebody        11:06:56

obviously -- I think you can see what he was saying, that that
guilty plea would in some way, you know, tarnish their
reputation of the newspapers, or whatever.

        But there was certainly no indication there that there
was some sort of admission, if you will, that -- by Lacey that    11:07:11
he engaged in any kind of illegal conduct.

        We had another thing.  I think I mentioned this, but
maybe not.  There was another communication for -- with his
wife, and it was about:  Jim and I believe in legalized
prostitution.                                                      11:07:38

        That's different than I would violate the law.  Okay?
I believe in the Second Amendment, but I would have a license,
a permit.

        And so, you know, you can have a belief.  There are a
lot of people who believe -- in fact, some people -- and when     11:07:57
we were selecting the jury, it indicated they believe in things
like prostitution should be legalized and regulated,
healthcare, and all the rest of it.  That doesn't mean you're
going to break the law.

        And there was nothing in here, in this statement read     11:08:11
by Mr. Dougherty, that would indicate some kind of admission by
Mr. Lacey that they were committing a crime.  He was referring
to this article.

        They never put the article in, so you couldn't get all
the details.  All it said is that, you know, the chief, Ferrer,   11:08:29

1    pled guilty.

2          Another thing.  And this -- there was an -- an

3    Exhibit 171, who was -- which was put in.  And I believe at the

4    time that the point that Mr. Rapp was making, that this was

5    some request maybe by -- let's see.  What's the company here?        11:08:53

6    By NCMEC.  This was some kind of request that Backpage do

7    certain things.

8          And he said that they rejected those things, meaning

9    Backpage.  But what he left out was the -- the following

10   language.  And -- well, let me preface it first by saying this:    11:09:21

11   What he left out was that this was a meeting with Mr. Moon, a

12   person named Don Moon, who they've identified as a director or

13   somebody on behalf -- lawyer, director, I forgot how you

14   classified him.  But, anyway, that -- that this was a

15   conversation with Moon.  And there was suggestions from NCMEC      11:09:44

16   about some things to do, and they didn't adopt those

17   suggestions.

18         Well, what he didn't tell you is that there's a long

19   memo in here from Moon, and there's an indication to --

20         MR. RAPP:  I'm going to object to this.                       11:10:03

21         MR. CAMBRIA:  An indication --

22         MR. RAPP:  Object.  This didn't come into evidence.

23         MR. CAMBRIA:  This is in evidence.

24         THE COURT:  But let me --

25         MR. CAMBRIA:  This is -- this is in evidence.                 11:10:11

```
 1                THE COURT:  Let me -- let me rule first.

 2           I will overrule the objection.

 3           But let's move on, Mr. Cambria.

 4           MR. CAMBRIA:  What was the last part, Your Honor?

 5           THE COURT:  Let's move on.                        11:10:29

 6           MR. CAMBRIA:  Oh.  Thank you.  Okay.

 7           What he left out is the fact that Moon said:  Why

 8  don't we get together and -- and create some national standards

 9  for these platforms so that everybody's following those

10  national standards, and then that will help -- you know,      11:10:52

11  help -- help children and so on.  He says like -- well, let me

12  read this to you.

13           MR. RAPP:  Wait a minute.  This did not come into

14  evidence.

15           THE COURT:  Well, yes.                             11:11:06

16           Mr. Cambria, let's identify what it is you're reading

17  from to make sure that it is an exhibit that is in evidence.

18           MR. CAMBRIA:  Your Honor, I'm reading from a

19  memorandum to John Ryan.

20           THE COURT:  All right.  Let's identify the exhibit  11:11:19

21  number.

22           MR. CAMBRIA:  Oh.  171.

23           MR. RAPP:  Right.  That part of 171 didn't come in.

24           THE COURT:  Well --

25           MR. CAMBRIA:  Pardon?  Recheck the exhibits.        11:11:30
```

```
 1              THE COURT:  Let me have my courtroom deputy confirm.

 2         (The Court and the courtroom deputy confer.)

 3         (Discussion held off the record.)

 4              THE COURT:  We have it as fully admitted.

 5              Mr. Rapp, would you like to look at the exhibit?      11:13:15

 6              MR. RAPP:  All right.

 7              THE COURT:  What does that mean, "all right"?

 8              MR. RAPP:  I guess this came in.

 9              THE COURT:  All right.

10              MR. RAPP:  But it wasn't our attempt --             11:14:10

11              THE COURT:  And, members of the jury --

12              MR. CAMBRIA:  I can finally use it, Your Honor?

13              THE COURT:  And, members of the jury, it is important

14    that we try to be as accurate as possible.

15              And so, Mr. Cambria, yes, the exhibit was admitted.  11:14:20

16    You may refer to it.

17              MR. CAMBRIA:  Thank you.

18              May I read it?

19              THE COURT:  Yes, you may.

20              MR. CAMBRIA:  All right.  Thank you.                 11:14:29

21              What Mr. Rapp did not disclose to you is this

22    particular communication.  What he was talking about was that

23    Backpage refused to take some suggestions that were made, but

24    he didn't tell you about the rest of this.

25              Don Moon said as follows:  I appreciated the        11:14:54
```

UNITED STATES DISTRICT COURT

1    opportunity for Liz McDougall and me to meet with Staca and

2    other NCMEC staff to discuss the first-cut online adult

3    advertising standards proposals you provided to me in our

4    meeting with Senator DeConcini in June.  Health issues have

5    taken me out of service for such -- much of the time since, but        11:15:24

6    those have now been attended to and I look forward to resuming

7    our dialogue.

8         It has long been my view that a close collaboration

9    between stakeholders on crafting a set of industry standards

10   has much to offer in terms of minimizing child exploitation and       11:15:42

11   more effectively identifying, arresting and prosecuting those

12   who prey on children.  As I indicated to -- in the Conclusion,

13   I believe the involvement of a public interest, public policy

14   concern, The O'Connor House, founded by Retired Justice Sandra

15   Day O'Connor, might provide a valuable platform to move the           11:16:08

16   search for meaningable -- meaningful workable standards

17   forward.

18        As noted in a discussion of your first-cut proposals

19   with Staca and NCMEC staff, I do not believe online standards

20   can be productively separated from the First Amendment concerns       11:16:28

21   of the Internet speech and privacy communities, nor from the

22   unambiguous pronouncement of the federal courts on these

23   issues.  However, when I promised Staca that I would furnish a

24   memo setting out where I think those pronouncements --

25   pardon?                                                               11:16:53

1          Yeah, I -- I suppose I could do that.

2          Can we just publish this, please?  Maybe that would be

3    easier.

4          MR. RAPP:  This actually was not published during the

5    trial.                                                              11:17:03

6          THE COURT:  Well --

7          MR. CAMBRIA:  It could have.

8          THE COURT:  It was not.  You can continue on.

9          MR. CAMBRIA:  Just reading?  Okay.  That's fine.

10         THE COURT:  The jurors will have it with them.            11:17:11

11         MR. CAMBRIA:  Let's see here.  Where was I?

12         I would furnish a memo setting out where I think those

13   pronouncements would most impact potential industry standards.

14   It did not occur to me that I was volunteering for a task that

15   would cause the repeated destruction of draft after draft" --    11:17:28

16   now let me skip down to Background.

17         Following Kent State's shootings in the '70s, Michael

18   Lacey and Jim Larkin (with colleagues who would later depart

19   for other pursuits) founded a free mimeographed anti-war

20   newspaper called the New Times at Arizona State University.  At   11:17:47

21   the time, the local daily newspapers, the Arizona Republic and

22   Phoenix Gazette, were firmly pro-war and traditional

23   advertisers and had no interest in patronizing the New Times in

24   a state with the highest percentage of retirees -- military

25   retirees in the nation.  New Times weekly exercised the free      11:18:10

1    speech for small nightclubs, et cetera.

2            Let me skip on.

3            Well, let's see here.

4            Over a decade after beginning New Times, Lacey and

5    Larkin acquired their second paper, Westward in Denver.  Other          11:18:36

6    papers followed and a merger of New York -- of New Times

7    Holdings with five Village Voice newspapers in 2006 brought a

8    national total of 16 papers in all.  The combined company,

9    Village Voice Media Holdings, has won four Pulitzer Prizes and

10   numerous other awards for excellence in journalism and public          11:19:02

11   service.  I joined the board of the company as its only outside

12   director following the 2006 merger.

13           From its inception, the company has vigorously

14   defended First Amendment rights in a variety of contexts across

15   the country.  They've successfully challenged on First                 11:19:20

16   Amendment grounds conviction for publishing an advertisement

17   for abortional [sic] services.  It successfully challenged a

18   regulation restricting the distribution of newspapers on

19   university campuses.  And no media company in America has been

20   more aggressive in pursuing the public right to public                 11:19:39

21   information and public records exposing the decisions and

22   conduct of public officials.  The company successfully argued a

23   seminal case before the Texas Supreme Court reaffirming and

24   expanding the right to publish satire that holds public

25   officials up to ridicule.  And Lacey and Larkin recently won a         11:20:00

1   far-reaching victory in the Ninth Circuit Court of -- United

2   States Court of Appeals under the Civil Rights Act,

3   constricting police and prosecutor immunity for First Amendment

4   retaliatory conduct, a case that arose after they published

5   grand jury information, were subjected to late-night arrests at   11:20:20

6   their homes for an alleged violation of grand jury secrecy.

7         The foregoing is by no means exhaustive of the fights

8   Lacey and Larkin have fought in furtherance of First Amendment

9   values over many years.  It does, however, speak to the basic

10   proposition that their commitment to First Amendment values is   11:20:39

11   neither situational nor of recent vintage.

12         It has been said by critics that all the owners of

13   Backpage care about is money.  I would note the reason I agreed

14   to sit on the company's board is that I know better than that.

15   I watched this journalistic enterprise loose large   11:21:05

16   lucrative -- lose large lucrative advertisement accounts over

17   the years (Anheuser-Busch, J.C. Penney, Coors) because they

18   wouldn't soften or sacrifice their principles or content even

19   when they knew a given story or a series or review would cause

20   their profit arrow to point south.  I've had differences of   11:21:27

21   opinion with Lacey and Larkin over the years.  I am probably

22   less a First Amendment absolutist than they, but I respect

23   their views and their willingness to fight for them enormously.

24         As a host of third-party generated content, Backpage

25   has voluntarily implemented reasonable measures to counter the   11:21:47

1    use of its service to exploit men, women, children, and is

2    constantly looking for ways to improve.  But it has steadfastly

3    refused to succumb to statutory and regulatory censorship of

4    hosted content.

5            The company has established its immunity from civil          11:22:08

6    claims under the Communications Decency Act 6 and has enjoyed

7    the enforcement of three state criminal statutes on CDA and

8    First Amendment ground laws the courts found would plainly kill

9    free speech rights by subjecting Backpage and other online

10   hosts to state criminal liability for not ascertaining the age     11:22:29

11   of persons depicted in advertisements posted by its users.  It

12   has established that the First Amendment is not a stranger to

13   the attempted application of federal criminal law to online use

14   conduct, that First Amendment anonymity rights are not a

15   stranger to online adult advertising, and that the authority of   11:22:53

16   government to investigate the First Amendment space is

17   fundamentally more constricted than in normal investigative

18   contexts.

19           I'm not new to politics or public policy.  I've run

20   for and held public office.  As an elected prosecutor, I have      11:23:09

21   prosecuted crimes against children.  I've written statutes and

22   industry regulations.  I put forth First Amendment values in

23   trial and appellate courts.  So I understand why Backpage's

24   ability to assert the importance of Internet speech and privacy

25   rights in the political and public policy area --                  11:23:30

1     MR. RAPP:  Are we --

2     MR. CAMBRIA:  -- arenas --

3     MR. RAPP:  I'll object.

4     THE COURT:  Well, let -- there's -- what is the

5  objection?                                              11:23:37

6     MR. RAPP:  The objection --

7     THE COURT:  Please stand.

8     MR. RAPP:  Yes.  The objection was this document

9  wasn't shown to the jury during the trial.  He's just reading,

10  and it's something that wasn't published to the jury.   11:23:45

11     THE COURT:  And -- and, Mr. Cambria, again, this is

12  summation.  And to the extent you want to refer or summarize, I

13  think that would be the better course rather than reading an

14  entire multipage document to the jury.

15     MR. CAMBRIA:  All right.  Your Honor, I -- I obviously  11:24:05

16  can shift a little bit here.

17     So this will be available for you to read.  It's 171.

18  It gives a history of the company, and it gives a history of

19  the things that they were doing to help fight any kind of

20  illegal activity.  And, again, this -- it -- when you get the  11:24:30

21  opportunity to read this, you'll be able to have the full

22  picture of all of the things that have been done proactively by

23  this company through Ferrer and the people who ran it to not

24  facilitate prostitution, but to fight it.  And that's a big

25  deal.  Because unless they can prove that my client knowingly,  11:25:05

1    intentionally, and so on, violated these laws, there are no

2    illegal proceeds if there is no money laundering.  There is no

3    guilt.

4         Now, Mr. Rapp went down count by count:  Count 1,

5    guilty; Count 2, guilty.  Count -- I'm not going to do that to          11:25:25

6    you.  I'm just going to say in a collective mode that we, I

7    believe, have demonstrated a good-faith belief on the part of

8    Mr. Lacey, supported by all the various things that I

9    indicated, starting with the memo from Fassett asking them to

10   do the seven things, coupled with all of the police officers          11:25:52

11   who thanked them over the years, coupled with the highest law

12   enforcement person in the United States, the director of the

13   FBI.

14        If you had all of those, would you not think that you

15   were not violating the law?  And would it not be reasonable to          11:26:13

16   have that belief?  Would it not be reasonable?  It would be

17   reasonable to have that belief.

18        And all I can do is ask you to listen, to look at what

19   you've heard.  Look at what you've heard?  Think about what

20   you've heard and what you see -- and you'll have access to any          11:26:44

21   of these exhibits that you would like -- and realize that this

22   man should not be convicted of any of these offenses.

23        And I would ask you, as jurors, those of you who are

24   with us on this and feel that this good faith -- and, remember,

25   they have the burden of disproving good faith beyond a          11:27:09

reasonable doubt.  That is their burden.  And they haven't done

that, because, you see, they haven't shown that something was

concealed, which would, you know, give you some pause about the

honesty.  They haven't demonstrated that at all.  Nothing was

concealed.  They have not refuted the fact that all of these          11:27:35

police authorities thanked them for their assistance.

        Now, look, if you want to think that all of these

police authorities got fooled, okay, but it's impossible to

believe.  It's just not possible to believe that.  And

especially the FBI, and especially when the FBI has a person        11:27:53

that's been all over the testimony and the statements and so on

sitting right here.  And -- and so that's never happened.

        So now my words are sort of at an end here.  Mr. Rapp

does get a chance to speak again to you, and that's because

they have the burden of proof.  And I can't get up.  I'm           11:28:23

probably going to be over there, you know, doing -- twisting

and turning and -- and, you know -- I can't help it, Your

Honor.  I'm Italian.

        That I'm sure I'm going to be twisting and turning

over there when he's -- when he's talking.  But I ask -- I ask     11:28:41

you this:  Assume somebody near and dear to you is on trial

here.  Give them that same trial you would expect for somebody

close to you.  Just the same trial.  And -- and say to

yourself, is it unreasonable for somebody to think that when

they are working all of these various facets with various          11:29:10

1    police agencies and not one of them said, hey, wait, we're not

2    working with you, you guys are breaking the law?

3            That never happened.  And -- and when you know you're

4    helping them -- because people are going to jail.  These pimps

5    that prey on people are going to jail.  Why in any possible way      11:29:34

6    would you think you're doing something wrong and that you're

7    breaking the law?

8            And that's basically where we are.

9            So Michael has been with me for the last three years.

10   Been my baby.  And I'm proud to have represented him.  Very      11:30:01

11   proud.  I did my best.  And I -- I hope I haven't done anything

12   to offend you.  But if I have, tell me when we're out in the

13   hall.

14           But the last words that are going to be spoken in this

15   case that'll affect him will be yours.  And I hope that they      11:30:27

16   consist of two words.  Two words:  Not guilty on all counts.

17   Every one of these counts is a legal grenade.  Don't

18   compromise.  If you're with us, stay with us.

19           In a case where's there's doubt, in a case where

20   there's good faith, a not guilty verdict is the just verdict.      11:31:03

21   It is the sincere verdict.  It's the citizens standing between

22   the government and another citizen being accused.

23           I did my best.  I hope that I have persuaded you that

24   they haven't persuaded you beyond a reasonable doubt that my

25   client was guilty of any one of these charges.      11:31:32

1          And the last thing I do is thank you so much for your

2     service.

3          And I thank you, Your Honor.

4          THE COURT:  Thank you, Mr. Cambria.

5          Members of the jury, I think at this juncture it's not          11:31:45

6     reasonable to expect that any additional counsel will be able

7     to complete their summation by noon, as I promised we would

8     release you.  And so what we will do is resume those summation

9     arguments on Tuesday morning at 9:00.

10         But, again, at this juncture, even though we're in the          11:32:06

11    middle of the summation arguments of counsel, all counsel are

12    permitted to have their last summation made to you without you

13    having already come to conclusions simply because one counsel

14    has spoken on behalf of their client or because the government

15    has.                                                                 11:32:29

16         The case has not been officially handed over to you

17    yet for deliberation, so you remain under the admonishment not

18    to come to any conclusions yet, not to discuss the matter

19    amongst yourselves, or to conduct any research, but to continue

20    to have that open mind until the very end when I do hand the        11:32:47

21    case over to you, along with those instructions.

22         And so I expect you to be here promptly at 9:00 so we

23    can complete the summation arguments.  And with that, I wish

24    you a very good weekend.

25         And please all rise for the jury.                              11:33:06

1       (Jury not present at 11:33 a.m.)

2           THE COURT:  All right.  Please be seated.

3           And, again, those of you who are present in the public

4   area of the courtroom, please remain for a few minutes so our

5   jury can leave the building without any interruption.          11:33:41

6           And we will resume closing arguments.

7           I assume, Mr. Feder, you will be ready to go at

8   9:00 a.m.?

9           MR. FEDER:  I will be ready to go at 9:00 a.m.

10          THE COURT:  All right.                                  11:33:56

11          MR. FEDER:  What -- what was Mr. Cambria's comment?

12  He was born -- "I'm born ready."

13          I'm not born ready, but I'll do that.

14          THE COURT:  Okay.  Well, you can work on that.

15          All right.  We will stand in adjournment.               11:34:07

16          THE COURTROOM DEPUTY:  All rise.

17      (Proceedings adjourn at 11:34 a.m.)

18                          ---oOo---

19

20

21

22

23

24

25

1

2

3

4

5                    **C E R T I F I C A T E**

6

7          I, CATHY J. TAYLOR, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15          DATED at Phoenix, Arizona, this 27th day of October,

16  2023.

17

18

19                              /s/ Cathy J. Taylor
20                              Cathy J. Taylor, RMR, CRR, CRC

21

22

23

24

25

UNITED STATES DISTRICT COURT