Exhibit 1

# United States District Court

<u>**CENTRAL**</u>     **DISTRICT OF**     <u>**CALIFORNIA**</u>

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

Any and all funds held in Knab Bank Account
# NL15KNAB0255357664

**APPLICATION AND AFFIDAVIT**
**FOR SEIZURE WARRANT**

**CASE NUMBER:**    2:18-MJ-01000

**FILED**
CLERK, U.S. DISTRICT COURT

APR 26 2018

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

I, <u>**LYNDON A. VERSOZA**</u>, being duly sworn, depose and say:

**I am a United States Postal Inspector with the United States Postal Inspection Service, and I have reason to believe that in the** <u>**KINGDOM OF THE NETHERLANDS**</u> **and elsewhere there is now concealed a certain person or property, namely** (describe the person or property to be seized)

Any and all funds held in Knab Bank Account # NL15KNAB0255357664

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture under 18 U.S.C. § 981(a)(1)(A) and (C)

**concerning a violations of Title** _18_ **United States Code, Sections** <u>1952, 1956 and 1957</u>.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**

**Continued on the attached sheet and made a part hereof.**    _X_ Yes _ No

/s/
_____
**Signature of Affiant**

**Sworn to before me, and subscribed in my presence**

_____April 26 2018_____
**Date**

Los Angeles, CA

_____
Signature of Judicial Officer

**Hon. JOHN E. MCDERMOTT, U.S. Magistrate Judge**
**Name and Title of Judicial Officer**

**John Kucera:drb**

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Lyndon A. Versoza, being duly sworn, hereby depose and state as follows:

### I.   TRAINING AND EXPERIENCE

1.   I am a United States Postal Inspector employed by the United States Postal Inspection Service ("USPIS"), Los Angeles Division, in Los Angeles, California, where I have served since June 2005.  Currently, I am responsible for investigating criminal violations of money laundering and structuring laws, such as when United States Postal Service ("USPS") Money Orders or the United States Mail are used as a means to launder or structure funds.  During my career as a Postal Inspector, I have participated in or investigated financial violations including money laundering, darknet investigations, digital currency investigations, structuring, bank, wire and mail fraud, and identity theft.  In addition, I have received both formal and informal training from USPIS and other agencies regarding money laundering and financial crimes.  For approximately five years prior to investigating money laundering, I was assigned to investigate child exploitation and sex trafficking.  In that assignment, I worked both independently and in a task force where I led and participated in investigations related to crimes involving the exploitation of children and sex trafficking.

2.   Prior to my service as a U.S. Postal Inspector, I
attended the University of Southern California in Los Angeles,
where, in 2001, I received a bachelor's degree.  While in
college, I was the website administrator for a non-profit media
company in Los Angeles where, among other things, I learned
about domain names, domain name servers, and remote hosting.
Following college, from 2002 to 2005, I served as a law
enforcement officer with the U.S. Immigration and Naturalization
Service, which later became U.S. Customs and Border Protection.
There, among other things, I worked on cases involving human
smuggling and international sex trafficking.

3.   I am familiar with the facts and circumstances
described herein.  This affidavit is based upon my personal
involvement in this investigation, my training and experience,
and information obtained from various law enforcement personnel
and witnesses, including information that has been reported to
me either directly or indirectly.  This affidavit does not
purport to set forth my complete knowledge or understanding of
the facts related to this investigation.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and part only.  All
figures, times, and calculations set forth herein are
approximate.

DOJ-BP-0004598399

## II.   SUMMARY AND PURPOSE OF AFFIDAVIT

4.   This affidavit is made in support of applications for warrants to seize all funds held in certain SUBJECT ACCOUNTS, all owned or controlled by "Backpage.com" (referred to herein as "Backpage"), associated entities, and their owners and operators.

### A. Background

5.   This case is being investigated by the USPIS, the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service-Criminal Investigation ("IRS-CI"), with assistance from the Los Angeles Joint Regional Intelligence Center.

6.   The focus of the investigation has been on violations by Backpage, its associated entities, and their owners and operators, of Title 18, United States Code, Sections 1952(a)(3)(A) and (b)(i)(1) (Interstate and Foreign Travel in Aid of Racketeering Enterprise); and Title 18 U.S.C. §§ 1956 and 1957, (Money Laundering).

7.   From speaking with other agents in this investigation, and reviewing emails, internal documents, and other records related to this investigation, I know the following:

a.   Backpage.com, LLC, incorporated in Delaware in 2004, is an internet-based company that allows customers to post on-line classified advertisements.  These advertisements include sections dedicated to a variety of matters, including adult,

- 3 -

DOJ-BP-0004598400

automotive, community, dating, jobs, local places, musicians, rentals and services.  Backpage receives between 75 million to 100 million unique internet visitors per month.

        b.    Backpage realizes profits in the tens of millions of dollars per year from adult advertisement.  Historically, adult ads, where Backpage advertisers post sex trafficking ads, constitute less than ten percent of all advertisements posted on the website.  However, the adult ads generate over 90 percent of Backpage's revenue.  In short, Backpage derives almost all its revenue and profits from adult service ads, including advertising for sex trafficking.[1]

        c.    In or about 2004, operators Michael Lacey ("Lacey"), James Larkin ("Larkin"), and Carl Ferrer ("Ferrer") created Backpage.  There were also two minority owners; John Brunst ("Brunst"), who owned 5.67 percent; and Scott Spear

---

[1] According to Backpage accounting records, for the period May 1 to May 31, 2014, over 90% of Backpage's revenues derived from what they characterized as "adult entertainment."  Backpage's internal documents suggest that this 90% figure has been consistent since its 2004 inception.

 For example, between October 6, 2014, and May 31, 2015, Backpage grossed almost $105 million from advertising "adult entertainment."  During this same period, Backpage grossed only $1.6 million from all other advertisements combined.  Assuming that Backpage has accurately estimated that 90% of its revenues are generated from "adult" and "escort" ads, Backpage has generated as much as $500 million in prostitution-related revenue since 2004.

DOJ-BP-0004598401

("Spear"), who owned 4.09 percent.  From 2004 until 2015, Lacey
and Larkin oversaw the website's policies and strategic
direction.  In 2015, Lacy and Larkin purportedly sold all or
substantially all of their interests in Backpage to Ferrer.[2]
However Lacey and Larkin retained significant control over the
website, and both Lacey and Larkin continue to receive tens of
millions of dollars of annual distributions of Backpage revenue.

        d.    While not an original owner, Ferrer was one of
the original officers of Backpage, having initially served as
Backpage's vice-president, and later as CEO.  Ferrer is also the
CEO of several Backpage related entities in the Netherlands,
including "Website Technologies," "Amstel River Holdings," and
"Ad Tech BV."

        e.    Michael Thomas Gage ("Gage") has no formal
position at Backpage, but is the President, Chief Executive
Officer, Treasurer, and Secretary of another Backpage controlled
entity, "Posting Solutions," a wholly owned subsidiary of
Backpage that receives payments from Backpage advertisers.
According to his social media profile, Gage is also the Chief

_____

[2] From my review of financial records related to Ferrer's 2015
agreement to purchase Backpage, it appears that, through a
series of loans from other Backpage Operators to be repaid by
Ferrer, Ferrer agreed to purchase Backpage for approximately
$400 million.

- 5 -

DOJ-BP-0004598402

Financial Officer of Website Technologies.  Based on emails he has sent and wire transfer information, Gage appears to control much of the international and domestic financial transactions of Backpage and its related entities.

   f. Daniel Hyer ("Hyer") at one time was the Sales and Marketing Director of Backpage.  He remains an account signatory for Backpage controlled entities, including Website Technologies.

  8. Throughout this affidavit, the individuals identified in paragraphs 7(c) through (f), along with others not named in this affidavit, are collectively referred to as the "Backpage Operators."

  9. Based on a review of publicly available materials obtained in the course of the investigation, and my review of the Backpage website, I have learned the following:

   a. The majority of the paid advertisements on the Backpage website relate to prostitution activities in violation of 18 U.S.C. §§ 1591 and 1252.

   b. As further described below, Backpage itself, as well as its operators, who are in control of the SUBJECT ACCOUNTS (as defined below), is in the business of promoting the trafficking of children and adults for sex.  Sex trafficking of adults is a violation of 18 U.S.C. § 1952, and sex trafficking of children is a violation of 18 U.S.C. 1591, each of which

- 6 -

statutes is a Specified Unlawful activity ("SUA") within the meaning of federal law. (*see* 18 U.S.C. § 1956(c)(7)(vii)).

      c.    The SUBJECT ACCOUNTS are located both inside and outside the United States. The domestic accounts have received wire transfers from places outside of the United States or have received funds traceable to wire transfers from places outside of the United States, which funds Backpage has used to promote sex trafficking, in violation of 18 U.S.C. § 1956(a)(2)(A) (International Money Laundering). Some of the SUBJECT ACCOUNTS have received transfers or deposits in excess of $10,000 traceable to the SUA, in violation of 18 U.S.C. § 1957 (Money Laundering Spending Statute).

      d.    Backpage, until recently, controlled numerous domain names that have since been seized by the government pursuant to a seizure warrant issued in this district in case no. CR. Misc. 2:18-MJ-00711.[3] The Seized Domains are registered by "ASCIO TECHNOLOGIES INC" DBA "NETNAMES," a domain registrar that manages the reservation of internet domain names. A domain registrar serves to ensure that a registered domain name, like each of the Seized Domains, is not double sold. Additionally, a domain registration will allow the owner of the domain to direct

---

[3] The domain names seized pursuant to that warrant are referred to herein as the "seized domains."

internet traffic to a company's webserver.  The Seized Domains were found to have been acquired and maintained with funds traceable to the money laundering scheme described herein, specifically with funds from an account seized pursuant to a separate seizure warrant in case no. CR. Misc. 2:18-MJ-00721, and the Seized Domains were the mechanism Backpage used to promote the prostitution and sex trafficking activity described below.

    B.  <u>SUBJECT ACCOUNTS</u>

    10.  This affidavit is offered in support of applications for warrants to seize all funds and securities held in the following U.S. and foreign bank accounts [4] (hereinafter referred to collectively as the "SUBJECT ACCOUNTS"):

        a.  SUBJECT ACCOUNT 16A:[5] Republic Bank of Arizona

---

[4] Pursuant to 18 U.S.C. § 981(b)(3), this Court has authority to issue a seizure order for foreign accounts ("Notwithstanding the provisions of Rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued . . . in any district in which a forfeiture action may be filed . . . and may be transmitted to the central authority of any foreign state for service with any treaty or other international agreement").

[5] The numbering of the subject accounts picks up from prior warrant applications for different accounts, the contents of which have already been seized. *See* 18-MJ-711; 18-MJ-712; 18-MJ-713; 18-MJ-715; 18-MJ-716; 18-MJ-178; 18-MJ-720; 18-MJ-721; 18-MJ-722; 18-MJ-723; 18-MJ-724; 18-MJ-751; 18-MJ-752; 18-MJ-797; and 18-MJ-798.

- 8 -

DOJ-BP-0004598405

account number 11402485 is a money market account held in the
name of Lacey.

     b.   SUBJECT ACCOUNT 16B: Republic Bank of Arizona
account number 11101897 is a checking account held in the name
of Lacey.

     c.   SUBJECT ACCOUNT 16C: Republic Bank of Arizona
account number 11003126 is an account held in the name of Lacey.

     d.   SUBJECT ACCOUNT 16D:  Republic Bank of Arizona
account number 1021078316 is a Certificate of Deposit Account
Registry Service ("CDARS") account held in the name of Lacey.

     e.   SUBJECT ACCOUNT 16E: Republic Bank of Arizona
account number 1021078324 is a CDARS account held in the name of
Lacey.

     f.   SUBJECT ACCOUNT 16F: Republic Bank of Arizona
account number 1021078332 is a CDARS account held in the name of
Lacey.

     g.   SUBJECT ACCOUNT 16G: Republic Bank of Arizona
account number 1021078103 is a CDARS account held in the name of
Larkin.

     h.   SUBJECT ACCOUNT 16H: Republic Bank of Arizona
account number 1021078162 is a CDARS account held in the name of
Larkin.

     i.   SUBJECT ACCOUNT 16I: Republic Bank of Arizona
account number 1021078189 is a CDARS account held in the name of

- 9 -

DOJ-BP-0004598406

Larkin.

       j.   SUBJECT ACCOUNT 17: K&H Bank, located in Hungary, account number HU63104010935052676785761210, is an account held in the name of Primus Trust Company (Binghampton Trust) for the benefit of Lacey.

       k.   SUBJECT ACCOUNT 18A: Fio Bank, located in the Czech Republic, account number CZ9020100000002300995803, is an account held in the name of Ad Tech BV, with Ferrer as the ultimate beneficial owner.

       l.   SUBJECT ACCOUNT 18B: Fio Bank, in the Czech Republic, account number CZ1220100000002000995801, is an account held in the name of Ad Tech BV, with Ferrer as the ultimate beneficial owner.

       m.   SUBJECT ACCOUNT 18C: Fio Bank, in the Czech Republic, account number CZ7120100000002600995805, is an account held in the name of Ad Tech BV, with Ferrer as the ultimate beneficial owner.

       n.   SUBJECT ACCOUNT 18D: Fio Bank, in the Czech Republic, account number CZ7020100000002001002226, is an account held in the name of Gold Leaf SRO.  All funds and securities in this account are held for Backpage.com by a third party, Gold Leaf SRO.

       o.   SUBJECT ACCOUNT 18E: Fio Bank, in the Czech Republic, account number CZ7620100000002101002231, is an account

- 10 -

DOJ-BP-0004598407

held in the name of Gold Leaf SRO. All funds and securities in this account are held for Backpage.com by a third party, Gold Leaf SRO.

      p.   SUBJECT ACCOUNT 18F: Fio Bank, in the Czech Republic, account number CZ8520100000002501002230, is an account held in the name of Gold Leaf SRO. All funds and securities in this account are held for Backpage.com by a third party, Gold Leaf SRO.

      q.   SUBJECT ACCOUNT 18G: Fio Bank, in the Czech Republic, account number CZ4620100000002000914194, is an account held in the name of Protecctio SRO. All funds and securities in this account are held for Backpage.com by a third party, Protecctio SRO.

      r.   SUBJECT ACCOUNT 18H: Fio Bank, in the Czech Republic, account number CZ2720100000002300914196, is an account held in the name of Protecctio SRO. All funds and securities in this account are held for Backpage.com by a third party, Protecctio SRO.

      s.   SUBJECT ACCOUNT 18I: Fio Bank, in the Czech Republic, account number CZ0820100000002600914198, is an account held in the name of Protecctio SRO. All funds and securities in this account are held for Backpage.com by a third party, Protecctio SRO.

      t.   SUBJECT ACCOUNT 18J: Fio Bank, in the Czech

DOJ-BP-0004598408

Republic, account number CZ4820100000002801118083, is an account held in the name of Varicok Company SRO. All funds and securities in this account are held for Backpage.com by a third party, Varicok Company SRO.

      u.   SUBJECT ACCOUNT 18K: Fio Bank, in the Czech Republic, account number CZ2020100000002701118086, is an account held in the name of Varicok Company SRO. All funds and securities in this account are held for Backpage.com by a third party, Varicok Company SRO.

      v.   SUBJECT ACCOUNT 18L: Fio Bank, in the Czech Republic, account number CZ7620100000002901118080, is an account held in the name of Varicok Company SRO. All funds and securities in this account are held for Backpage.com by a third party, Varicok Company SRO.

      w.   SUBJECT ACCOUNT 19A: Bank Frick, located in Liechtenstein, account number LI09 0881 1060 7717 K000 K, is an account held in the name of Ad Tech BV, and Ferrer is the ultimate beneficial owner.

      x.   SUBJECT ACCOUNT 19B: Bank Frick, in Liechtenstein, account number LI30 0881 1060 7717 K000 U, is an account held in the name of Ad Tech BV, and Ferrer is the ultimate beneficial owner.

      y.   SUBJECT ACCOUNT 19C: Bank Frick, in Liechtenstein, account number LI74 0881 1060 7717 K000 E, is an

DOJ-BP-0004598409

account held in the name of Ad Tech BV, and Ferrer is the
ultimate beneficial owner.

      z.   SUBJECT ACCOUNT 19D: Bank Frick, in
Liechtenstein, account number LI90 0881 1060 7717 K001 E, is an
account held in the name of Ad Tech BV, and Ferrer is the
ultimate beneficial owner.

      aa.   SUBJECT ACCOUNT 20: Knab Bank, located in the
Netherlands, account number NL15KNAB0255357664, is an account
held in the name of Procop Services BV.  All funds and
securities in this account are held for Backpage.com by Procop
Services BV.

      bb.   SUBJECT ACCOUNT 21A: Rabo Bank, in the
Netherlands, account number NL44RABO0307182452, is an account
held in the name of Gulietta Group BV.  All funds and securities
in this account are held for Backpage.com by Guilietta Group BV.

      cc.   SUBJECT ACCOUNT 21B: Rabo Bank, in the
Netherlands, account number NL64RABO0307604721, is an account
held in the name of UniversAds BV.  All funds and securities in
this account are held for Backpage.com by UniversAds BV.

### III. **APPLICABLE LAW**

11.  There is probable cause to believe that funds and/or
securities on deposit in the SUBJECT ACCOUNTS are subject to
seizure and forfeiture by the United States under the following
provisions:

- 13 -

a.   18 U.S.C. § 981(a)(1)(A), because the funds and/or securities are involved in, and traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds). Pursuant to 18 U.S.C. § 981(a)(1)(A), any property involved in a transaction, or attempted transaction, in violation of 18 U.S.C. §§ 1956 or 1957, or any property traceable to such property, is subject to forfeiture to the United States; and

b.   18 U.S.C. § 981(a)(1)(C), because the funds and/or securities constitute and are derived from proceeds traceable to one or more violations of 18 U.S.C. § 1956(h), 18 U.S.C. § 1956(a)(2), and 18 U.S.C. § 1957.

12.   Title 18 U.S.C. § 1956 prohibits, among other things, financial transactions involving the proceeds of SUAs -- committed or attempted (1) with the intent to promote further predicate offenses; (2) with the intent to evade taxation; (3) knowing the transaction is designed to conceal the source, location, ownership or control of the proceeds; or (4) knowing the transaction is designed to avoid anti-laundering financial reporting requirements.   18 U.S.C. § 1956(h) prohibits two or more parties agreeing to accomplish the unlawful purpose of money laundering.

- 14 -

DOJ-BP-0004598411

13.   Title 18 U.S.C. § 1957 prohibits a party from knowingly engaging in a monetary transaction in excess of $10,000 with property that is criminally derived from some SUA.

14.   Title 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion) makes it a crime to transport, transmit, or transfer, or attempt to transport, transmit, or transfer, monetary instruments or funds (including funds that are not criminal proceeds) from the United States to or through a place outside the United States, or to the United States from or through a place outside the United States, with the intent to promote some SUA, as that term is defined in 18 U.S.C. § 1956(c)(7).

15.   The "Travel Act," 18 U.S.C. § 1952(a), an SUA, prohibits, in part, the use of the mail or any facility in interstate or foreign commerce with the intent to otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity, by any person who thereafter performs or attempts to perform an act to promote, manage, establish, carry on, or facilitate the promotion, management, establishment and carrying on of such unlawful activity.  "Unlawful Activity," as defined in 18 U.S.C. § 1952(b), includes prostitution offenses in violation of the laws of the state in which such acts are committed or in violation of the laws of the United States.

- 15 -

DOJ-BP-0004598412

Prostitution is illegal in the State of California.  (*See, e.g.*, Cal. Penal Code § 647(b).)

16.  Sex trafficking of juveniles or any person by means of force, fraud or coercion, is a violation of 18 U.S.C. § 1591, an SUA.

## IV.    DIGITAL CURRENCY/BITCOIN

17.  Digital currency (also known as crypto-currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (*i.e.*, currency created and regulated by a sovereign government).  It exists entirely on the Internet and is not stored in any physical form. It is not issued by any government, bank, or company, but is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Digital currency is not illegal in the United States and may be used for legitimate financial transactions.  However, it is often used to conduct illegal transactions, such as the sale of controlled substance, or as in this investigation, to purchase ads to promote prostitution.

18.  Bitcoin is a type of digital currency accepted by Backpage.  Bitcoin payments are recorded on a public ledger that is maintained by peer-to-peer verification, and is thus not maintained by a single administrator or entity.  Individuals can acquire Bitcoins either by "mining" them or purchasing Bitcoins

- 16 -

DOJ-BP-0004598413

from other individuals.  An individual can "mine" Bitcoins by allowing his/her computing power to verify and record the Bitcoin payments into a public ledger.  Individuals are rewarded for this by being given newly created Bitcoins.  Bitcoins can be bought and sold in fractions.

19.  Backpage also accepts other digital currencies, including Litecoin, Bitcoin Cash, and Ether.  Sometimes called "alt-coins," because they are alternatives to Bitcoins, these digital currencies were created after Bitcoin to address perceived weaknesses or problems with Bitcoin technology.  Based on my review of Backpage transactions, the majority of Backpage's digital currency transactions are in Bitcoin.

20.  An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker.  Such transactions can be done on any type of computer, including laptop computers and smart phones.

21.  Digital currency is generally stored in digital "wallets," which essentially store the access codes that allows individuals to conduct digital currency transactions on the public ledger.  To access digital currency on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key").  The public address can be analogized to a bank account number, while the private key is like a password used to access an online account.

- 17 -

DOJ-BP-0004598414

22.   Even though the public addresses of those engaging in Bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not.  If, however, an individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. For these reasons, digital currency transactions are described as "pseudonymous," meaning they are partially anonymous.

## V. STATEMENT OF PROBABLE CAUSE

### A. Buying a Backpage Ad

23.   In February 2018, I visited Backpage.com and, posing as an advertising purchaser, engaged in the regular process of posting an ad in the Backpage "Dating" section, which is one of the places on Backpage.com where prostitution ads are commonly found.  Through this process, I learned the following:

a.   A person looking to post an advertisement on Backpage (an "advertiser") must first create an account.  Once an account is created, the advertiser clicks on a link called "Post an ad," which will then toggle certain categories regarding where the ad should be posted (*e.g.*, "Los Angeles," "Riverside," etc.) and under what category the ad should appear (*e.g.*, "Dating," "Adult," etc.).  The advertiser also has the option to post pictures and videos.  In the adult sections, opting to post in more than one geographical area, or opting to

- 18 -

DOJ-BP-0004598415

post more frequently occurring ads will increase the advertisement price.  Currently, Backpage.com charges $5 per ad posted in the adult sections.  In some of the non-adult and non-dating sections I checked, there was no charge at all to post an ad.

    b.   Once an advertiser selects the desired options, he or she is required to enter a phone number, a link to a social media page (such as Facebook), and an email address.  The Backpage website claims to verify the advertiser's phone number before he or she can continue on to actually purchasing an ad.

    c.   In order to pay for Backpage ads, an advertiser must first buy "credits."  Backpage offers several ways for an advertiser to acquire credits:

        i.   A Backpage advertiser may mail gift cards, checks, and money orders to "Posting Solutions" at a P.O. Box in Dallas, Texas (as further described below, this P.O. Box is associated with Posting Solutions and SUBJECT ACCOUNT 1).[6]

---

[6] I have reviewed the cash purchase of USPS money orders subsequently directed to this P.O. Box.  Between September 2014 and June 2016, several millions of dollars in money orders were purchased in what appears to have been structured transactions (*i.e.*, transactions carried out in a manner intended to avoid certain reporting requirements that USPS maintains for money order purchases greater than $3000).  Based on my review, hundreds of these money orders include email addresses with words consistent with prostitution, such as "sex" or "sexy."

DOJ-BP-0004598416

       ii.     Backpage directly accepts credit card payment through a third-party credit card payment processor.

       iii.    Backpage also accepts several types of digital currency (specifically, Backpage accepts Bitcoin, Bitcoin Cash, Litecoin, and Ethereum).  If the advertiser selects this option, Backpage provides a digital currency wallet address where the advertiser can send the electronic transfer of the digital currency.

       iv.    Backpage also accepts cash, but only through third party payment processors.  Based on information gathered during this investigation, I believe that once the third-party payment processor receives cash, it converts the cash into digital currency and then electronically transfers that digital currency to a Backpage digital currency wallet.

24.  Digital Currency is processed through the subject accounts in the following way:

       a.   When Backpage receives digital currency, it will aggregate the digital currency and then transfer it to a third-party exchanger like GoCoin.[7]

---

[7] GoCoin is a digital currency exchanger that converts Bitcoin, Litecoin and another digital currency into fiat currency, like the U.S. Dollar or the Euro.  GoCoin is owned by Manx Broadcasting Corporation, based in the Isle of Man.  GoCoin has offices in Singapore and Santa Monica, California and appears to hold bank accounts in several countries outside the United States.

- 20 -

DOJ-BP-0004598417

b.   In exchange for the digital currency, the exchanger transfers U.S. dollars from its foreign bank accounts into Backpage operating accounts, such as SUBJECT ACCOUNT 1.  The exchanger, if it so elects, may then sell its Bitcoin on various Bitcoin markets.

25.   I reviewed records obtained from GoCoin.  From this review, I estimate that between 5 to 10 percent of the ads posted on Backpage.com are ads within the Central District of California (including Los Angeles and Orange Counties).  For example, between January 10 and February 3, 2016, approximately 500,000 ads were posted on Backpage.com and paid for with Bitcoin, for which Backpage received over $3,840,000 in revenue.  Of these approximately 500,000 ads, approximately 28,400 were posted only in LosAngeles.Backpage.com, Ventura.Backpage.com, SanLuisObispo.Backpage.com, OrangeCounty.Backpage.com, and SanGabrielValley.Backpage.com.  These specific ads generated approximately $184,479 in revenue.

B. Backpage Promotion of Prostitution and Sex Trafficking

26.   I have reviewed several Backpage ads that were used to sell minors for sex and forcibly traffic adult women for sex.  I have also reviewed the criminal records of certain of the pimps and sex traffickers, most of whom were convicted after having used Backpage to advertise their victims.  From this review, I learned the following:

- 21 -

DOJ-BP-0004598418

a.   Between 2014 and 2015, a pimp sold S.F., a minor girl, for sex.  The pimp advertised S.F. on Backpage's "Escort" section in the Los Angeles area of California and in Arizona.  The ad contained phrases such as "New In Town" and "Sexy Dark Asain Bombshell with a Nice & Tight {Booty}."  The ad selling S.F. on Backpage included multiple pictures showing her legs, stomach, shoulders and buttocks.  Later, the pimp was arrested and convicted on state sex trafficking charges, and sentenced to 196 years imprisonment.

b.   Between 2014 and 2015, the same pimp sold A.C., a minor girl, for sex.  In November 2014, at the age of 17, A.C. was first sold for sex through a Backpage ad using phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire."  The Backpage ad selling A.C. included pictures of her showing her legs, stomach, shoulder, and buttocks, and posed her in sexually provocative positions.

c.   Between November 2015 and December 2015, in a different incident, a pimp drove two women and four minor girls (T.S., S.L., K.O., and R.W.) from Columbus, Ohio to a hotel in St. Charles, Missouri.  The next day, the pimp told the girls to post ads on Backpage.com.  Some of the girls took calls and engaged in paid sex acts with Backpage customers who responded to the ads. The ads the girls posted included pictures of them sitting on the bed showing their buttocks.  Another image I saw was of a naked

- 22 -

DOJ-BP-0004598419

girl's body pressed against a mirror.  Other pictures appeared
more mundane, such as images of girls posing clothed in front of a
mirror.  However, these ads used phrases like "I'm sweet as a
treat maybe even sweeter" and "not a lot need to be said. my pic
are 100% real."  In 2017, this pimp was convicted on sex
trafficking charges and a federal court sentenced him to 300
months in prison.

        d.    In or around 2010, in Washington, J.S., a minor
girl, was sold for sex through the use of Backpage ads.  J.S.'s
pimp drafted the ads that were placed a Backpage that contained
words and phrases such as, "W'E'L'L_W'O'R'T'H_I'T***^***150HR" and
"IT WONT TAKE LONG AT ALL."  The ads also included pictures of
J.S. in provocative positions showing her breasts and buttocks.
On March 29, 2011, the pimp who sold J.S. for sex was sentenced to
over 26 years imprisonment on charges related to sex trafficking.

        e.    Between in or around 2011 and 2016, a female
victim, D.O., who was between the ages of 14 and 19 during those
years, was sold for sex through Backpage ads.  D.O.'s female pimp
instructed D.O. that Backpage was the safest place to advertise
because Backpage did not require age verification.  D.O.'s
Backpage ads included words and phrases that were indicative of
prostitution, such as "roses" (money) and "back door" (anal sex).
Some of the customers who responded to D.O.'s Backpage ads forced
D.O. to perform sexual acts at gunpoint, choked her to the point

- 23 -

DOJ-BP-0004598420

of having seizures, and gang-raped her.[8]

27.   I have reviewed documents and reports from multiple state and government agencies and authorities regarding Backpage's promotion of sex trafficking and prostitution.  From these reports, and from my review of internal Backpage correspondence following Backpage management receiving these reports, I am aware that all levels of Backpage management are aware of Backpage's role in promoting criminal activity.  For example:

a.   On September 21, 2010, a group of state attorneys general wrote a letter to Backpage observing that "ads for prostitution—including ads trafficking children—are rampant on the site," and arguing that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them

---

[8] Using these examples, I also reviewed financial transactions for some of these ads.  Using email addresses and other identifiers associated with the Backpage ads, I reviewed GoCoin records for some of these transactions.  From these records, I found bitcoin payments associated with the email addresses used to post the ads, which transactions were processed by GoCoin. For example, in the case involving victims S.F. and A.C. (described in paragraphs 28(a) and (b)) prosecuted in Arizona, the bitcoin payments for these ads were made in November and October 2015.   In the case involving T.S., S.L., K.O., and R.W. (described in paragraph 28(c)) prosecuted in Missouri, the bitcoin payments were made in October and November 2015.  As described in paragraph 48 of this affidavit, between December 2015 and June 2016, over 130 wires from Slovakia from GoCoin, totaling over $16.8 million was sent to a Website Technologies account at Branch Bank & Trust Company account number 1440001712008.  Between December 2015 and October 2016, 32 wires totaling $48 million were sent from the BBT Account to a Cereus Properties Account 9361116211 at Arizona Bank and Trust, which made its way into 11 accounts named in prior seizure warrants.

DOJ-BP-0004598421

altogether."  The state AGs acknowledged that this step would cause Backpage to, "lose the considerable revenue generated by the adult services ads," but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized in the marketplace provided by backpage."

      b.   Following this letter, on September 25, 2010, Ferrer wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund those customers' fees.

      c.   In January 2017, the U.S. Senate Subcommittee on Permanent Investigations ("Subcommittee") conducted a lengthy investigation into sex trafficking and Backpage.  I have reviewed the Subcommittee's 50-page report entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking."  This report concluded, among other things, that virtually all of Backpage's "adult" ads are actually solicitations for illegal prostitution services and that "Backpage has maintained a practice of altering ads before publication by deleting words, phrases, and images indicative of criminality, including child sex trafficking . . . .  Those practices served to sanitize the content of innumerable advertisements for illegal transactions—even as Backpage represented to the public and the courts that it merely hosted

- 25 -

content others had created." In response to the Subcommittee's report, Backpage purported to shut down the "adult" section of its website. However, based on my review of several thousands of Backpage ads, I believe that the prostitution ads simply migrated to other sections of the website, where they remain to this day.

       d.  On August 5, 2011, Backpage received a letter from the mayor of Seattle. This letter warned, "Seattle Police have identified an alarming number of juvenile prostitutes advertised on Backpage.com since January 2010," and explained that Backpage was dissimilar from other companies whose products and services are "occasionally or incidentally" utilized by criminals because "[y]our company is in the business of selling sex ads" and "your services are a direct vehicle for prostitution." The letter also recommended that Backpage require in-person age verification for all of the "escorts" depicted in its ads. Based on knowledge gained through this investigation, I do not believe that Backpage has ever instituted an in-person age verification.

    28.  I have reviewed internal documents, emails, and correspondence among Backpage employees and management. From those emails I have learned that Backpage has instituted policies and procedures designed to maintain its promotion of sex trafficking and prostitution, but which "sanitize" some of the language Backpage customers use to advertise in order to make the advertising of sex trafficking less overt. From my review of

- 26 -

DOJ-BP-0004598423

Backpage documents, I know that Backpage refers to this practice as "moderation."  For example:

a.  In April 2008, Ferrer wrote an email explaining that, although he was "under pressure to clean up phoenix's adult content," he was unwilling to delete prostitution ads because doing so "would put us in a very uncompetitive position with craig[slist]"[9] and result in "lost pageviews and revenue."  Thus, Ferrer instructed Backpage's technical staff to edit the wording of such ads by removing particular terms that were indicative of prostitution, and then allow the remainder of the ad to be featured on Backpage's website.

b.  On October 8, 2010, a Backpage manager sent an email threatening to fire any Backpage employee who acknowledged, in writing, that a customer was advertising prostitution: "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . .  This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

c.  On October 16, 2010, the same Backpage manager again sent an email to a large group of Backpage employees that

_____

[9] Craigslist is a competing internet based advertising company that features classified ads.

DOJ-BP-0004598424

contained two attachments providing guidance on how to "moderate"
ads.  The first was a PowerPoint presentation that displayed a
series of 38 nude and partially-nude photographs, some of which
depicted graphic sex acts.  Next to each picture was an
instruction as to whether it should be approved or disapproved by
a Backpage moderator.  These instructions included "Approve.  Nude
rear shots are okay as long the model is not exposing her anus or
genitalia." and "Approve.  Rear shot okay.  Transparent wet
panties okay."  The second was an Excel spreadsheet identifying 50
terms (all of which were indicative of prostitution) that should
be "stripped" from ads before publication.  The Backpage manager
concluded the email by stating, "[I]t's the language in ads that's
really killing us with the Attorneys General.  Images are almost
an afterthought to them."

        d.   On October 16, 2010, the same Backpage manager sent
a separate internal email explaining, "I'd like to still avoid
Deleting ads when possible," that "we're still allowing phrases
with nuance," and that "[i]n the case of lesser violations,
editing should be sufficient."

        e.   On October 25, 2010, Ferrer sent an email
acknowledging that the "[i]llegal content removed" through
Backpage's moderation processes was "usually money for sex act."
This email also explained that, after the "sex act pics are
removed," the "ad text may stay."

DOJ-BP-0004598425

f.   On October 27, 2010, a different Backpage manager sent an internal email stating that Backpage was "editing 70 to 80%" of the ads it received from customers.

g.   On June 7, 2011, Ferrer received an inquiry from a law enforcement official about a particular ad that included the term "amber alert."  In response, Ferrer acknowledged this might be "some kind of bizarre new code word for an under aged person." Ferrer then forwarded this exchange to a Backpage manager and instructed that the term "amber alert" be added to Backpage's "strip out" list.  I believe that this email indicates that Backpage did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage, but merely required that such ads be edited before publication.

h.   On August 31, 2011, Backpage managers exchanged emails in which they discussed a list of 100 "solid sex for money terms."  Later emails indicate that this list of terms would change but, in general, the list prohibited use of certain terms that Backpage management and employees too closely identified with the obvious promotion of sex trafficking and prostitution.

i.   Based on knowledge gained during this investigation and my training and experience, I believe that this manager acknowledged that a large proportion of the ads originally submitted by Backpage's customers contained text and pictures that

- 29 -

DOJ-BP-0004598426

were indicative of sex trafficking.  Nevertheless, Backpage would
still publish those ads after editing them to appear less obvious
in promoting illegal activity.  Using the words the Backpage
manager used in the email described in paragraph 28(d) above, I
believe that Backpage sex trafficking ads have adapted to
Backpage's moderation policy by using "phrases with nuance" when
promoting sex trafficking.  Also, based on knowledge gained during
this investigation, and my training and experience, I believe
that, following the implementation of "moderation," Backpage's
list of prohibited terms needed to change and evolve to adjust to
the reality of Backpage advertisers' use of new code words to
promote prostitution.  That is, once a coded word or phrase not
previously associated with sex-for-money would become too familiar
and associated with certain sex trafficking activities in the
Backpage community of advertisers, Backpage's "moderation" policy
would need to adapt by adding such words or phrases to the
"blocked" list or risk being too obvious in its promotion.

        29.  Based on my review of several thousand Backpage ads and
internal Backpage documents and correspondence, I believe that
Backpage's policy of "moderation" only caused ads explicitly
promoting sex trafficking to become more coded and implicit in the
ads' purpose.  I have reviewed several thousand Backpage ads
posted in the various "adult" categories of Backpage (including
"massage," "dating," "escort" and others).  From this review, I

DOJ-BP-0004598427

learned the following:

a.    Well over half of the Backpage classified ads in these categories use terms and phrases that, in my training and experience, I believe to be consistent with sex trafficking and prostitution.  These terms and phrases include, "roses" (money, *e.g.*, "150 roses/half hour"), "in-call" (where the customer goes to the prostitute's location), "outcall" (where the prostitute goes to the customer's location), "GFE" (girlfriend experience), and "PSE" (porn star experience).

b.    Other Backpage ads use language that can be mostly free of coded language, but that include sexually provocative pictures.  In my training and experience, the sexually suggestive images included in these ads are typical of ads for prostitution. For example, one such ad posted in Backpage's Los Angeles dating section depicted images of a woman on a bed with her buttocks presented in a sexual manner; another included a picture of a woman's cleavage; others included pictures of women posing in sexual positions wearing lingerie and pictures of a woman bending over revealing her naked buttocks.

c.    Based on knowledge gained through this investigation, and my training and experience, I believe that Backpage's policy of moderation has had its intended effect. Moderation has caused and allowed otherwise neutral or innocuous terms to be understood within the Backpage community as coded

- 31 -

DOJ-BP-0004598428

language for sex trafficking and prostitution.  Because of this
evolving use of coded terms, a reader of such ads who is familiar
with the particular vocabulary used in Backpage "adult" ads may
readily identify coded terms and images indicating an ad for
prostitution, while an uninitiated reader may not understand these
terms at all, or at least not as being associated with sex-for-
money.

    30.  Notwithstanding many Backpage advertisements' use of
seemingly innocuous language in promoting prostitution, based on
my conversations with law enforcement officers around the country
and from my review of law enforcement officers' statements and
reports regarding Backpage, I believe that the majority of
Backpage ads that appear in the traditionally "adult" categories
(such as "escort," "massage," or "body rubs") are actually
advertisements promoting sex trafficking or prostitution.  For
example, in August 2015, the Detective-Sergeant in charge of the
Seattle Police Department's Vice/High Risk Victims Unit and Human
Trafficking Task Force made a sworn statement that provided, in
pertinent part,

> Since 2014, the Seattle Police Department has made arrests
> that include hundreds of related charges, such as charges
> for patronizing a prostitute/sexual exploitation, hundreds
> of charges for prostitution, dozens of charges [of]
> Promoting Prostitution, up to 100 charges for Commercial
> Sexual Abuse against a Minor and have investigated dozens
> of rape reports involving victims who are prostitutes and
> one murder of a prostitute. As a result of hundreds of
> investigations, the Seattle Police Department Vice/High

- 32 -

DOJ-BP-0004598429

Risk Victims Unit has found that Backpage.com has become the primary web site in Seattle/Washington State for those looking to solicit a prostitute, post prostitution ads or traffic prostitutes and minors.

Vice/High Risk Victims Unit Detectives also make use of this site to respond to ads posted under the 'escorts' and 'body rubs' categories posing as male customers and successfully arrest females and males who charge undercover operatives money in exchange for sex. To date, no Detective within the Seattle Police Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort', (person who charges simply for companionship with no offer of sex) or 'masseuse', (person offering legitimate and licensed massage therapy rather than sex) while responding to ads placed in these categories on Backpage.com.

As stated previously, every time the Seattle Police Department Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity. The Seattle Police Department Vice/High Risk Victims Unit has not once found that the individual posting or responding to one of our decoy ads in the adult section of Backpage.com was in fact seeking any type of innocent, legal activity. In my professional experience, the adult section of Backpage.com not only contains ads for illegal activity, including prostitution, solicitation and trafficking, but it is a primary source for such ads and is well known for that purpose in the sex trafficking industry in the city of Seattle and State of Washington.

Additionally, in August 2015, the Sergeant Detective who is Commander of the Human Trafficking Unit ("HTU") for the Boston, Massachusetts Police Department made a sworn statement that provided, in pertinent part,

Since 2009, the [HTU] has made numerous arrests that include enticement of a minor into prostitution, sex trafficking of a minor, sex trafficking of an adult, forcible rape . . . and sex for a fee for soliciting a prostitute.

- 33 -

DOJ-BP-0004598430

As a result of investigations, the HTU has found that
Backpage.com is the go-to Web site in Boston for those
looking to solicit a prostitute, post prostitution ads,
and recruit and traffic young women and minors.  The
detectives have been able to identify numerous would-be
exploiters by setting up decoy ads and responding to ads
on the site.  The have arrested pimps, traffickers and
buyers who facilitate prostitution and fuel the harmful
and violent sex trade.  Backpage.com is the number one
site that detectives go to in order to look for underage
girls who are on the run and are being commercially
sexually exploited by pimps.

Since 2010, the HTU has arrested over 100 buyers of sex of
both adults and minors through Backpage.com ads
exclusively in hotel stings.

Since 2013, 12 individuals have been charged in federal
court for sex trafficking of both minors and adults.  In
all these aforementioned cases, Backpage.com played a
pivotal role in facilitating these crimes.

Detectives of the HTU often get tips about illegal
activity concerning ads posted on the escort, adult and
massage sections of Backpage.com.  In almost every case
detectives have found that in fact there was illegal
activity which resulted in fines, arrests, or further
investigations of sex trafficking.

Therefore, in my professional experience as a law
enforcement officer for over thirty years, the adult
section of Backpage.com not only contains ads for illegal
activity, including prostitution, solicitation and
trafficking, but it is also the primary source for such
ads and well known for that purpose in the sex trafficking
industry in Boston, Massachusetts.  Backpage.com's adult
section provides a vehicle and anonymity for its users who
exploit and traffic young women and girls.  . . . It is my
humble opinion that the adult section of Backpage.com
serves no legitimate service and nearly all the cases we
find associated with it involve pimp controlled
prostitution.

    31.  Almost all "adult"-type Backpage ads list phone numbers
or emails for a potential customer to use to make contact with the

- 34 -

DOJ-BP-0004598431

advertiser. I have compared a sample of phone numbers and emails found within Backpage ads with phone numbers and emails that frequently are included in the memo section of some of the checks that Backpage advertisers use to pay Backpage for those ads. From my review, I have found that very often the same number and/or email appears in multiple Backpage ads as the contact information to make an appointment. For example:

a. A $25 USPS Money Order purchased on June 15, 2017, in Duarte, California, made payable to "Posting Solutions PO BOX 802426, Dallas, TX," and thereafter deposited into a Seized Account, included writing on the money order listing a phone number and the words "Dulce Latina." From a search of Backpage ads, I found almost 800 advertisements listing the same phone number found on the $25 USPS Money Order.

b. A $20 USPS Money Order purchased in Sacramento, California, and later deposited into a Seized Account, included writing listing a phone number and the words "love my lips." From a search of Backpage ads, I found almost 1300 advertisements listing the same phone number found on the $20 USPS Money Order.

c. A $150 Wells Fargo Bank Money Order, purchased in Arizona, and made payable to "Posting Solutions," included an email and the words, "red hot stuff". From an internet search of the email address listed on this $150 money order, I found advertisements on several female escort websites that directed

- 35 -

DOJ-BP-0004598432

customers to contact an Arizona phone number ending in 2397. I
then searched Backpage.com records for this phone number and found
approximately 760 ads that included this same phone number. My
review of these Backpage ads revealed images indicative of
prostitution. For example, one such ad posted on Backpage's
"massage" section included sexual images such as a woman lying on
a bed wearing lingerie and a woman laying naked on her stomach.
One of the ads describes, "Pampering provider | Body Rub Massage |
Body Shampoo | Body Scrub | 4 hands | Walk ins or appointment."
From my training and experience, I know that legal massage
advertisements do not typically depict sexual images. This
advertisement depicted sexual images and included terms like "4
hands," which I know to be coded language describing a massage
given to a customer by two women. Such advertisements are often
indicative of prostitution.

32. Despite the fact that several thousand Backpage ads
shared the exact same phone number or email address to contact the
advertiser, these same ads included sexually suggestive images of
hundreds of *different* women. Based on my training and experience,
multiple different women do not share the same email address or
phone number when posting ads for dating. Rather, in my training
and experience, such ads are consistent with ads posted by pimps
or prostitution agencies that are using the same phone number or
email to advertise several different women (or girls) to

- 36 -

DOJ-BP-0004598433

prospective prostitution clients.

33.  On March 28, 2018, a grand jury returned a 93 count indictment charging certain Backpage Operators with criminal violations of 18 U.S.C. § 371 (Conspiracy), § 1952 (Travel Act—Facilitation of Prostitution), § 1956 (Money Laundering), § 1957 (Financial Transactions Involving Illicit Proceeds), and including Forfeiture Allegations pursuant to 18 U.S.C. §§ 981 and 982 (seeking criminal forfeiture of, among other assets, the Seized Accounts and the Seized Domains).  A copy of that indictment is attached hereto (as Exhibit A) and incorporated herein as though fully set forth.

C. THE SEIZED ACCOUNTS AND SUBJECT ACCOUNTS[10]

1. Seized Account 1

i.  Foreign Transfers Into SEIZED ACCOUNT 1

34.  While Backpage accepts payments for ads from third-parties, for the purpose of this affidavit, I will focus on advertising payments made via the Posting Solutions' P.O. BOX using cash, money orders, or digital currency.

35.  From my review of Posting Solutions' application for the USPS Dallas, Texas P.O. BOX, I learned that it was registered to

---

[10] Because of the extensive movement of money by the Backpage operators, it is necessary to include here a discussion of both the accounts targeted in the prior warrant applications (referred to herein as Seized Accounts 1 through 15G, and the SUBJECT ACCOUNTS.

- 37 -

DOJ-BP-0004598434

"Website Technologies, LLC/Backpage.com." Also listed on the P.O.
BOX Application were the names of several Backpage Operators,
including Ferrer.

36. I have reviewed bank records for Seized Account 1.
Based on my review, I know the following:

a. On February 15, 2017, Posting Solutions LLC,
located at 13601 Preston Rd., Ste. 801E, Dallas, Texas 75240,
opened Prosperity Bank account number 216887188 (Seized Account
1, which lists Gage as the sole signatory on the account).

b. Gage is the President, Chief Executive Officer,
Treasurer and Secretary of Posting Solutions LLC.

37. Based on my knowledge of this investigation, having
spoken to law enforcement personnel, and my review of the
financial records, when an advertiser purchases an ad for
prostitution using digital currency, the payments to Backpage (and
certain subsequent expenditures) then proceed in the following
manner:

a. A "poster" of a prostitution ad on backpage.com
would pick a payment method, for example, through Bitcoin payments
as previously described above.

b. The poster would already have Bitcoin or Backpage
would direct the poster to a third-party exchanger in order to buy
Bitcoin.

c. Backpage would then provide the poster with a

- 38 -

DOJ-BP-0004598435

wallet address to send the specific amount of Bitcoin.

d. The poster would receive credit to then post ads on Backpage.

e. In batches, generally valued in hundreds of thousands of dollars, Backpage would sell the Bitcoin to a third party exchanger, frequently "GoCoin," in order to convert the Bitcoin into U.S. or foreign currency, which GoCoin generally holds in foreign bank accounts.

f. GoCoin would wire funds from these foreign accounts to either 1) Backpage controlled foreign accounts, or 2) Backpage controlled domestic operating accounts.

g. Backpage operators would hold these receiving accounts in the names of entities controlled by Backpage, such as Ad Tech BV, Posting Solutions (Seized Account 1 is held in the name of Posting Solutions), Website Technologies, or Cereus Properties (Seized Account 2A is held in the name of Cereus Properties).

h. These funds that originated from foreign transactions would be used to pay for services, like Verizon in Los Angeles, or would be transferred to Backpage Operators' accounts and accounts held in their family members' names.

38. I have reviewed records of wire transfers from countries outside the United States deposited into the Seized Account 1. Just for the period of August 1 through September 1, 2017, Seized

- 39 -

DOJ-BP-0004598436

Account 1 received over $2.7 million in wire transfers from outside the United States.  For example:

  a. On or about August 16, 2017, a company called "Binary Trading SG PTE LTD" ("Binary Trading") wired $535,500 from an account in Singapore into Seized Account 1.  Based on my review of records related to this transaction, Binary Trading is a name used by GoCoin.[11]

  b. On or about August 17, 2017, Binary Trading wired another $528,500 from a Singapore account into Seized Account 1.

  c. On or about August 30, 2017, a company named "TRILIX PTE LTD," listing the same Singapore address as Binary Trading and GoCoin, in four wires ranging from $385,450 to $492,250, sent approximately $1,717,750 from a Singapore account into Seized Account 1.  Memo lines from these wires list "GC" or "GC FOR INTERNET SERVICES."  I understand "GC" to mean GoCoin.

  ii. <u>Seized Account 1 Payments for Backpage Operations</u>

 39. I have reviewed outgoing payments from Seized Account 1 and found that substantial percentages of these payments are for the operation of Backpage.com.  For example, between July and October, 2017, Seized Account 1 wired over $1.1 million to pay for the following:

---

[11] Further, according to GoCoin's website, GoCoin maintains offices at the Singapore address listed on the $535,500 wire from "Binary Trading."

DOJ-BP-0004598437

a. Between July and October 2017, Seized Account 1 wired $570,530 to Verizon Digital Media Services in Los Angeles.

b. On August 4, 2017, Seized Account 1 wired $4,137 to "Netnames," also known as ASCIO, to pay for the registration renewal of all the Seized Domains, including Backpage.com.

c. In August 2017, Seized Account 1 sent numerous automated clearinghouse payments to "Netchex Tax Prep Clients" totaling over $437,000. From a review of their website, I learned Netchex is a human resources company that provides payroll and other such services to Backpage.

d. Within a one-week period beginning on August 2, 2017, Seized Account 1 wired approximately $77,800 to S&W Payroll Services. An online search of S&W Payroll indicated that S&W Payroll is owned by Netchex. As stated above, Netchex is a human resource service, and S&W Payroll appears to be Netchex's payroll division.

e. On August 11, 2017, Seized Account 1 wired $5,319.79 to the Telesign Corporation, located in Marina del Ray, California. According to their website, Telesign is a communications platform that delivers security for websites.

f. On August 18, 2017, Seized Account 1 wired $1,497 and $6,984, respectively, to two separate data backup companies for Backpage's on-line data backup.

40. Based on my review of bank records for Seized Account 1

DOJ-BP-0004598438

throughout the existence of the account, these types of transactions and expenditures were typical.

### 2. Seized Account 2A

#### i. Transfers From Seized Account 1

41.  From my review of bank documents, I have learned that Seized Account 2A is a Compass Bank business bank account owned by "Cereus Properties LLC," identifying Spear as the sole signatory.  My review revealed that this account was funded with transfers from Seized Account 1.  On average, during each month of 2017, Seized Account 1 transferred several hundred thousand dollars into Seized Account 2A.  For example:

a.  On July 25, 2017, Seized Account 1 sent two wire transfers totaling about $566,562.47 to Seized Account 2A.

b.  On August 8, 2017, Seized Account 1 sent a wire totaling $62,198.51 to Seized Account 2A.

c.  On August 31, 2017, Seized Account 1 sent a wire transfer totaling $487,491.45 to SU Seized Account 2A.

d.  On September 15, 2017, Seized Account 1 sent a wire transfer totaling $91,672.67 to Seized Account 2A.

e.  On October 2, 2017, Seized Account 1 sent a wire transfer totaling $471,766 to Seized Account 2A.

#### ii.  Foreign Transfers into Seized Account 2A

42.  I have reviewed financial records from a foreign bank in the Netherlands (the "Foreign Account").  I have also

- 42 -

DOJ-BP-0004598439

reviewed emails related to this account.  From my review of these records, I learned the following:

      a.   The Foreign Account was opened in March 2015 and is held in the name of Ad Tech BV, a Netherlands based company, and identifies Ferrer as the CEO and Gage as the CFO.

      b.   From March 2015 through November 2017, the Foreign Account received millions of dollars from Binary Trading SG PTE, Limited, the same company GoCoin used to wire funds into Seized Account 1.  In an April 4, 2017, email to employees of the bank that maintains the Foreign Account, Gage explained,

> Binary Capital is our trading partner, they hold money in trust for Go Coin [sic].  Rather than incurring 3 sets of wire fees which make our transactions unprofitable, they act as our agent and disburse payments directly from our trust account to our merchant.

      c.   During this same period, the Foreign Account wire transferred several million dollars into Seized Account 2A.  For example, an April 25, 2017, an email from Gage to individuals at the bank holding the Foreign Account directed the bank to wire "USD $2,337,048" to Seized Account 2A.  Thereafter, I reviewed a wire record and confirmed that on April 25, 2017, the Foreign Account wired $2,337,048 into Seized Account 2A, as Gage directed in his email.  In reviewing the records, I found the following additional wires sent to Seized Account 2A:

      i.   In December 2016, the Foreign Account wired approximately $1 million dollars to Seized Account 2A.

- 43 -

DOJ-BP-0004598440

      ii.    On February 28, 2017, the Foreign Account
wired $2,324,390 into Seized Account 2A.

      iii.    On March 30, 2017, the Foreign Account wired
$2,247,858 into Seized Account 2A.

      iv.    On May 31, 2017, the Foreign Account wired
$2,335,076 to SUBJECT ACCOUNT 2A.

      v.    On June 28, 2017, the Foreign Account wired
$2,324,390 to Seized Account 2A.

      vi.    July 27, 2017, the Foreign Account wired
$10,928 to Seized Account 2A.

    iii.   Seized Account 2A Payments for Backpage Operations

43.  I then reviewed Seized Account 2A records for payments
to promote Backpage operations.  From March through December
2017, Seized Account 2A paid over $9,000 to "Cox
Communications," an internet services company that provides
voice-over-internet phone and cable services.  I believe that
Backpage uses Cox Communications to facilitate its internet
presence and promote its sale of prostitution advertising.

    3. Seized Account 2B

44.  I reviewed records Seized Account 2A and Seized
Account 2B.  On February 2, 2018, Seized Account 2A wired
transferred $135,956.59 into Seized Account 2B.  I am aware of
no other funding sources for Seized Account 2B.

DOJ-BP-0004598441

4. Seized Account 3A, 3B, 3C

45.   I have reviewed records for Seized Account 3A as well
as the following accounts:  Branch Banking & Trust account
number 1440001712008, belonging to Website Technologies (as
detailed above, a Backpage controlled entity), held in Arizona
("BBT Account"); Arizona Bank & Trust account number 9361116211
belonging to Cereus Properties, held in Arizona ("AZBT
Account").  From this review, I learned the following:

a.   Between December 14, 2015, and January 15, 2016,
in approximately 26 wires, a GoCoin account in Slovakia
transferred over $2.5 million to the BBT Account in the United
States.

b.   On January 15, 2016, the BBT account wired
$189,571 to Verizon in Los Angeles, California, in payment for
Backpage internet services.

c.   Between January 21, 2016, and August 31, 2016, in
approximately 27 wires, the BBT Account transferred
approximately $48 million to the AZBT Account.

d.   Between March 1, 2016, and July 1, 2016, the AZBT
Account wired $892,426 into Seized Account 3A.

46.  According to records for Seized Account 3A, 3B, and
3C:

a.   On September 14, 2017, Seized Account 2A wired
$50,162.05 into Seized Account 3A.

- 45 -

DOJ-BP-0004598442

b.   On October 12, 2017, Seized Account 3A wired approximately $21,500 into SUBJ Seized Account 3B.

c.   On January 5, 2018, Seized Account 3A wired approximately $600,000 into Seized Account 3C.

5. <u>Seized Account 4</u>

47.   From my review of the records for Seized Account 4 (belonging to Spear), I learned that on or about March 16, 2016, Seized Account 3A transferred $250,000 into Seized Account 4 as an opening deposit.  On March 20, 2018, Live Oak Bank confirmed that these funds have remained in Seized Account 4 since the account was opened.

6. <u>Seized Account 5A and 5B</u>

48.   I have reviewed financial records related to Seized Accounts 5A and 5B, held in the name of Natasha Spear, Scott Spear's adult daughter.  From this review, I learned the following:

a.   On February 23, 2017, Seized Account 3A wired approximately $50,000 into Seized Account 5A.

b.   On the February 23, 2017, Seized Account 3A wired $50,000 into Seized Account 5B.

7. <u>Seized Account 6</u>

49.   From my review of financial records related to Seized Account 2A, 2B and 6, I learned the following:

- 46 -

DOJ-BP-0004598443

a.   On October 2, 2017, Seized Account 2A wired approximately $297,795 into Seized Account 6.



8. Seized Accounts 7A through 7E

50.   From my review of financial records of Seized Accounts 2A and 2B, 7A through 7D, and 12A, I learned the following:

a.   On July 6, 2017, Seized Account 2A wired $971,651.51 into Seized Account 7A.

b.   On July 28, 2017, Seized Account 7A wired $400,000 into Seized Account 7B.

51.   From my review of financial records of Seized Account 1 and 7C, and those concerning the Veritex Bank account ending in -1462, held in the name of Posting Solutions ("Account -1462"),[12] I learned the following:

---

[12] Veritex Bank is a U.S. bank located in Dallas, Texas. Posting Solutions opened Veritex Bank account -1462 on or about January 5, 2017.

- 47 -

DOJ-BP-0004598444

a.    On January 13, 2017 and January 20, 2017, a GoCoin
account in Singapore wired a total of approximately $1,318,800
into Account -1462.

b.    In February 2017, Account -1462 wired a total of
$5,395 to Verizon, in Los Angeles.

c.    On August 8, 2017, Seized Account 1 wired $62,000 into
Seized Account 12A.

d.    On November 3, 2017, Seized Account 12A wired $100,000
to SUBJE Seized Account 7D.

     9. <u>Seized Account 8A, 8B, 8C, and 8D</u>

52.    From my review of the records for Seized Accounts 2A
and 2B, 8A, and 8B, I learned the following:

a.    On February 2, 2018, Seized Account 2A wired
$28,337 into Seized Account 8A.

b.    Also on February 2, 2018, Seized Account 2A wired
$28,337 into Seized Account 8B.

53.    From my review of Seized Account 1, 8C, and 8D, I
learned the following:

a.    On August 2 and August 8, 2017, Seized Account 1
wired $33,700 and $44,000, respectively, to S&W Payroll, a
company Backpage uses to pay its employees.

b.    Between August 11, 2017, and December 1, 2017,
S&W Payroll wired a total of $207,125.81 into Seized Account 8C.

DOJ-BP-0004598445

c.   Between November 3, 2017, and December 8, 2017, Seized Account 8C wired $57,500 into Seized Account 8D.

### 10.   Seized Account 9

54.   From my review of the records for Seized Account 2A 2B, and 9, I learned that on February 2, 2018, Seized Account 2A wired $734,603.70 into Seized Account 9.

### 11.   Seized Account 10

55.   From my review of records for Seized Accounts 2A and 10, I learned that on February 2, 2018, Seized Account 2A wired $94,154.89 into Seized Account 10.

### 12.   Seized Account 11

56.   From my review of Seized Accounts 1, 8C, 8D, and 11, as well as Account -1462 (as described above, a Posting Solutions' Veritex Bank account), I learned the following:

a.   On January 4, 2017, GoCoin's Singapore account wired $489,500 into Account -1462, and on January 20, 2017, GoCoin's Singapore account directed two additional wires, for $358,150 and $470,150, respectively, into Account -1462 (for a total of $1,317,800 wired from GoCoin's Singapore account into Account -1462).

b.   On January 24, 2017, Account -1462 wired approximately $1.3 million into S&W Payroll.

57.   On January 27, 2017, an S&W Payroll account wired a total of $9,913.53 into Seized Account 11.

DOJ-BP-0004598446

13.   Seized Accounts 12A and 12B

58.   From my review of financial records for Seized Account 1, 12A, and 12B, I learned the following:

a.   On August 8, 2017, Seized Account 1 wired $62,000 into Seized Account 12A.

59.   On December 8, 2017, Seized Account 12A wired $20,000 into Seized Account 12B.

14.   Seized Account 13

60.   From my review of financial records for Seized Accounts 1, 12A, and 13, I learned the following:

a.   In January 2017, eized Account 1 wired $62,000 into Seized Account 12A.

b.   On August 16, 2017, Seized Account 12A wired $20,000 into Seized Account 13.

15.   Seized Account 14

61.   I have reviewed records for Seized Account 14 as well as the following accounts:  the BBT Account; the AZBT Account; Charles Schwab account number 49074693 in the name of Larkin ("Schwab Account"); Northern Trust Company account number 2389562 under the name "Ocotillo Family Trust," belonging to James Larkin" ("Northern Trust Account"); and Morgan Stanley account number 237-061673 belonging to James Larkin and his wife, Margaret Larkin (the "Morgan Stanley Account"). Additionally, I have reviewed GoCoin transactions related to

- 50 -

DOJ-BP-0004598447

certain ads posted on Backpage, specifically including ads that related to child victims A.C., S.F., T.S., S.L., K.O., and R.W. (previously described in paragraph 26, above).[13]  Finally, I reviewed emails associated with the email addresses used to post some of the ads promoting the trafficking of A.C., S.F., T.S., S.L., K.O., and R.W.  From this review I observed the following:

    a.   On September 6, 2015, a bitcoin account associated with the owner of the email address who trafficked A.C. and S.F. paid Backpage about $4 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Palm Springs, California.

    b.   On September 15, 2015, an email from the same email address owner indicated a payment to Backpage of about $8 worth of bitcoin in order to "Fund Account" for palmsprings.backpage.com.  Based on information I have learned through this investigation, I believe that to "Fund Account" means that the email address owner provided bitcoin to Backpage as payment for credit to be used at a later time to pay for Backpage ads.

---

[13] As previously described, the pimp who trafficked A.C. and S.F. was convicted and sentenced to 196 years imprisonment, and the pimp who trafficked T.S., S.L., K.O., and R.W. was convicted and sentenced to 300 months imprisonment.

- 51 -

DOJ-BP-0004598448

c.   On October 6, 2015, the same email address owner
paid Backpage about $1 worth of bitcoin to "Fund Account" on
palmsprings.backpage.com.

d.   On October 30, 2015, a bitcoin account associated
with the owner of the email address who trafficked T.S., S.L.,
K.O., and R.W. paid Backpage about $1 worth of bitcoin in order
to post an ad promoting the trafficking of those victims in
Columbus, Ohio.

e.   On November 2, 2015, this same email address
owner paid Backpage about $1 worth of bitcoin to "Move Ad to Top
of Listings" in the Columbus, Ohio Backpage ads.

f.   On November 21, 2015, this same email address
owner paid Backpage about $1 worth of bitcoin to Backpage for
credit for that email owner's Backpage ad account.

g.   During the period of September 4, 2015, and
November 23, 2015, Backpage advertisers used bitcoin to purchase
about 1,000,000 "adult" ads from Backpage.  Backpage then sold
that bitcoin to GoCoin for approximately $8.6 million.  Included
among the bitcoin sold to GoCoin during this period were the six
payments the pimps made to Backpage to purchase ads to promote
child prostitution.

h.   During the period of December 14, 2015, through
December 29, 2015, a GoCoin account held in Slovakia wired over
$1.25 million to the BBT Account in the United States.  Based on

- 52 -

DOJ-BP-0004598449

my review of GoCoin's financial records and GoCoin's pattern of
payments to Backpage for bitcoin sales, I believe that this
$1.25 million represented GoCoin's partial payment to Backpage
for the bitcoin Backpage sold to GoCoin during the period of
September 4, 2015, through November 23, 2015.

      i.  On December 31, 2015, the BBT Account wired
$811,424 to the AZBT Account.

      j.  On January 11, 2016 the AZBT Account wired
approximately $1.3 million to the Schwab Account.

      k.  On January 14, 2016, the Schwab Account wired
approximately $13.5 million to the Northern Trust Account.

      l.  In July 21, 2017, the Northern Trust Account
wired $6.014 million to the Morgan Stanley Account.

      m.  In or about November 2017, Morgan Stanley elected
to terminate its business relationship with Larkin.

      n.  Following this, on November 30, 2017, Larkin
wired all the funds then held the Morgan Stanley Account, about
$10 million dollars, to Seized Account 14.

      o.  Some of the funds in Seized Account 14 were used,
among other things, to purchase bonds and/or securities, which
assets remain held in Seized Account 14.

    16.   Seized Accounts 15A through 15G

   62.  I have reviewed records for Seized Account 15 as well
as the following accounts:  the BBT; the AZBT Account; Wells

- 53 -

DOJ-BP-0004598450

Fargo Bank Account number 6324184891, belonging to John Brunst
("WFB Account -891"); and Wells Fargo Bank Account number
00007910147474, belonging to the Brunst Family Trust ("WFB
Account -474"). Additionally, I have reviewed GoCoin
transactions related to certain ads posted on Backpage,
specifically including ads that related to child victims A.C.,
S.F., T.S., S.L., K.O., and R.W. (previously described in
paragraph 26, above.) Finally, I reviewed emails associated
with the email addresses used to post some of the ads promoting
the trafficking of A.C., S.F., T.S., S.L., K.O., and R.W. From
this review I observed the following:

   a.  On September 6, 2015, a bitcoin account
associated with the owner of the email address who trafficked
A.C. and S.F. paid Backpage about $4 worth of bitcoin in order
to post an ad promoting the trafficking of those victims in Palm
Springs, California.

   b.  On September 15, 2015, an email from the same
email address owner indicated a payment to Backpage of about $8
worth of bitcoin in order to "Fund Account" for
palmsprings.backpage.com. Based on information I have learned
through this investigation, I believe that to "Fund Account"
means that the email address owner provided bitcoin to Backpage
as payment for credit to be used at a later time to pay for
Backpage ads.

DOJ-BP-0004598451

c.   On October 6, 2015, the same email address owner paid Backpage about $1 worth of bitcoin to "Fund Account" on palmsprings.backpage.com.

d.   On October 30, 2015, a bitcoin account associated with the owner of the email address who trafficked T.S., S.L., K.O., and R.W. paid Backpage about $1 worth of bitcoin in order to post an ad promoting the trafficking of those victims in Columbus, Ohio.

e.   On November 2, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to "Move Ad to Top of Listings" in the Columbus, Ohio Backpage ads.

f.   On November 21, 2015, this same email address owner paid Backpage about $1 worth of bitcoin to Backpage for credit for that email owner's Backpage ad account.

g.   During the period of September 4, 2015, and November 23, 2015, Backpage advertisers used bitcoin to purchase about 1,000,000 "adult" ads from Backpage.  Backpage then sold that bitcoin to GoCoin for approximately $8.6 million.  Included among the bitcoin sold to GoCoin during this period were the six payments the pimps made to Backpage to purchase ads to promote child prostitution.

h.   During the period of December 14, 2015, through December 29, 2015, a GoCoin account held in Slovakia wired over $1.25 million to the BBT Account in the United States.  Based on

DOJ-BP-0004598452

my review of GoCoin's financial records and GoCoin's pattern of
payments to Backpage for bitcoin sales, I believe that this
$1.25 million represented GoCoin's partial payment to Backpage
for the bitcoin Backpage sold to GoCoin during the period of
September 4, 2015, through November 23, 2015.

      i.  On December 31, 2015, the BBT Account wired
$811,424 to the AZBT Account.

      j.  On December 6, 2016 the AZBT Account wired
$161,459 to the WFB Account -891.

      k.  On January 4, 2017, the AZBT Account wired
another $258,841 to the WFB Account -891.

      l.  On January 5, 2017, the WFB Account transferred
$300,000 to WFB Account -474.

      m.  On May 19, 2017 the WFB Account -474 wired about
$1.5 million into Seized Account 15A.

      n.  On May 23, 2017 Seized Account 15A transferred
about $350,000 to Seized Account 15B.

      o.  On June 7, 2017, Seized Account 15A transferred
about $1.34 million to Seized Account 15C.

      p.  On September 13, 2017, Seized Account 15C
transferred about $581,000 to Seized Account 15D.

      q.  On September 13, 2017, Seized Account 15C
transferred about $250,000 to Seized Account 15E.

DOJ-BP-0004598453

r.   On September 13, 2017, Seized Account 15C
transferred about $250,000 to Seized Account 15F.

s.   On September 15, 2017, Seized Account 15C
transferred about $500,000 to Seized Account 15G.

17.   <u>SUBJECT ACCOUNTS 16A, 16B, 16C, 16D, 16E, 16F, 16G,
16H, and 16I</u>

63.   From my review of financial records related to Seized
Accounts 2A, 6, 7B, and 9, and Subject Accounts 16A, 16B, 16C,
16D, 16E, 16F, 16G, 16H, and 16I, I learned the following:

a.   On June 8, 2017, Seized Account 2A wired
approximately $297,795 into SUBJECT ACCOUNT 16A.

b.   On June 30, 2017 SUBJECT ACCOUNT 16A transferred
$600,000 to SUBJECT ACCOUNT 16B.

c.   On April 16, 2018, Lacey personally went into the
Republic Bank of Arizona, withdrew $500,000 from SUBJECT ACCOUNT
16A and opened SUBJECT ACCOUNT 16C with an initial deposit of
the $500,000 he had just withdrawn from SUBJECT ACCOUNT 16A.

d.   On or about February 15, 2018, Lacey drafted two
checks totaling $1.2 million, which he used to fund his "CDARS"
accounts at Republic Bank of Arizona.  The first check was drawn
from Seized Account 6 in the amount of $600,000 and deposited
into SUBJECT ACCOUNT 16D.  The second check also was drawn from
Seized Account 9, also in the amount of $600,000, but was split

- 57 -

DOJ-BP-0004598454

evenly into SUBJECT ACCOUNTS 16E (which received $300,000) and 16F (which received $300,000).

     e.   On or about February 8, 2018, Larkin drafted a $1 million check drawn from Seized Account 7B and made payable to Republic Bank of Arizona in order to fund his "CDARS" accounts at that bank.  SUBJECT ACCOUNT 16G received $500,000, SUBJECT ACCOUNT 16H received $250,000, and SUBJECT ACCOUNT 16I received $250,000.

     18.   <u>SUBJECT ACCOUNT 17</u>

   64.  I have reviewed records for SUBJECT ACCOUNT 17 as well as the following accounts: the BBT Account; the AZBT Account; Arizona Bank & Trust annuity trust account numbers 9361121967, 9361121972, 9361121986, 9361121991, and 9361122014, all held in Lacey's name ("AZBT Annuity Accounts"); and Johnson Financial account number 1000879992 held in an IOLTA with Lacey as the sole beneficiary.  From this review, I learned the following:

     a.   Between December 14, 2015, and January 15, 2016, in approximately 26 wires, a GoCoin account in Slovakia transferred over $2.5 million to the BBT Account in the United States.

     b.   On January 15, 2016, the BBT account wired $189,571 to Verizon in Los Angeles, California, in payment for Backpage internet services.

DOJ-BP-0004598455

Case 2:18-cr-01000-DJH Document 1966-3 *SEALED* Filed 11/13/23 Page 61 of 129
Case 2:18-cr-01000-DJH Document 3-1 *SEALED* Filed 04/26/18 Page 60 of
128   Page ID #:200

c.   Between January 21, 2016, and August 31, 2016, in approximately 27 wires, the BBT Account transferred approximately $48 million to the AZBT Account.

d.   Between April 1, 2016, through October 6, 2016, in approximately 12 transactions, the AZBT Account transferred over $18 million to the AZBT Annuity Trust Accounts.

e.   On December 29, 2016, Lacey's AZBT Annuity Trusts Accounts sent five wires totaling $16.5 million to the Johnson Financial Bank Account.

f.   On January 3, 2017, the Johnson Financial Account wired the $16.5 million to the SUBJECT ACCOUNT 17 in Hungary.

19.   <u>SUBJECT ACCOUNTS 18A, 18B, 18C, 18D, 18E, 18F, 18G,</u>

<u>18H, 18J, 18K, and 18L</u>

65.   On April 5, 2018, pursuant to a plea agreement in the District of Arizona, Ferrer plead guilty to a single-count information charging him with a violation of 18 U.S.C. § 371, conspiracy to violate 18 U.S.C. §§ 1952 (the Travel Act) and 1956 (money laundering).  As part of his plea agreement, Ferrer agreed to "take all steps within his power to forfeit to the United States all corporate assets and other property owned or controlled by Website Technologies, LLC, which own and operates the Backpage website, as well as corporate assets and other property owned or controlled by Backpage.com, LLC, Posting Solutions LLC, Amstel River Holdings, LLC, Ad Tech BV, and UGC

- 59 -

DOJ-BP-0004598456

Tech Group CV." That same day, also in the District of Arizona,
Backpage.com, LLC and related entities plead guilty to 18 U.S.C.
§ 1956(h) (money laundering conspiracy).

66. On April 17 and April 18, 2018, along with other law
enforcement agents and prosecutors, I spoke with Ferrer and his
attorneys in Phoenix, Arizona. Following this in-person
interview, I also have spoken with Ferrer on the phone and
communicated via email. From my review of Service Level
Agreements, financial records related to SUBJECT ACCOUNTS 18,
and records and statements provided by Ferrer, I know the
following:

a. SUBJECT ACCOUNTS 18A, 18B, 18C are accounts owned
by Ad Tech BV and controlled by Backpage. According to Ferrer,
all funds in this account are the criminally derived proceeds of
ads promoting prostitution. According to Ferrer, SUBJECT
ACCOUNTS 18A, 18B, and 18C are accounts receivable bank
accounts. Payment processors and merchant processors would take
credit card payments, and payments such as bitcoin payments from
Backpage customers for prostitution and other ads, and would
transfer these funds to accounts such as SUBJECT ACCOUNTS 18A,
18B and 18C. Per his plea agreement and his cooperation, Ferrer
has agreed to surrender these funds and/or securities to the
United States.

b. SUBJECT ACCOUNTS 18D, 18E, and 18F are accounts

- 60 -

DOJ-BP-0004598457

held by a third party, Gold Leaf SRO.  According to Ferrer and
Service Level Agreements ("SLA") between Ad Tech BV, a Backpage
owned company and Gold Leaf SRO, which I have reviewed, the
funds and/or securities in these accounts are the criminally
derived proceeds of Backpage ads, including ads promoting
prostitution.  The SLAs state that 99.5% of the net proceeds are
to be paid to Ad Tech BV, which is owned by Backpage.  According
to Ferrer, the arrangement between Gold Leaf, SRO, and Backpage
was put into place to evade what he called a "blockade by credit
card companies."  Ferrer explained that beginning around 2015,
U.S. credit card companies such as MasterCard and Visa refused
to process credit card payments for Backpage due to the negative
press surrounding sex trafficking and prostitution content on
Backpage.  As one of the ways around this "blockade," Backpage
Operators set up agreements with foreign persons and partners to
"franchise" websites for the sole purpose of accepting credit
card payments.  According to Ferrer, this use of foreign third-
parties and foreign accounts allowed Backpage to continue to
accept credit card payments for prostitution ads while
concealing from the credit card companies that the payments were
for Backpage ads.  Ferrer said that Gold Leaf SRO existed for
the sole purpose of funneling to Backpage accounts otherwise
prohibited credit card payments for Backpage ads.  Ferrer
explained that these accounts are owned by Backpage and are not

- 61 -

co-mingled with other funds, and are therefore subject to seizure and forfeiture to the United States.

        c.    SUBJECT ACCOUNTS 18G, 18H, and 18I are accounts held by a third party, Protecttio SRO.  According to Ferrer and an agreement between Protecttio SRO and Ad Tech BV, which I have reviewed, the arrangements between these entities are essentially the same as the Gold Leaf SRO arrangement.  This business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade.  Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.

        d.    SUBJECT ACCOUNTS 18J, 18K, 18L are accounts held by a third party, Varicok SRO.  According to Ferrer and an agreement between Varicok SRO and Ad Tech BV, which I have reviewed, the arrangement is essentially the same as the Gold Leaf SRO, and Protecttio SRO.  This business arrangement existed for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade.  Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.

- 62 -

DOJ-BP-0004598459

20.   <u>SUBJECT ACCOUNTS 19A, 19B, 19C, and 19D</u>

67.   From speaking with Ferrer and reviewing financial
records, I learned the following:

    a.   SUBJECT ACCOUNTS 19A, 19B, 19C, and 19D, are
owned by Ad Tech BV, with Ferrer as the ultimate beneficial
owner.  According to Ferrer, SUBJECT ACCOUNTS 19A, 19B, 19C and
19D are accounts receivable banking accounts.  Payment
processors and merchant processors would take credit card
payments, and payments such as bitcoin payments from Backpage
customers for prostitution and other ads, and would transfer
these funds to accounts such as SUBJECT ACCOUNTS 19A, 19B, 19C,
and 19D.  These accounts contain funds and/or securities that
are criminally derived and are subject to forfeiture.  Ferrer
and Backpage has agreed to surrender these funds and/or
securities as they are criminally derived.

21.   <u>SUBJECT ACCOUNT 20</u>

68.   From speaking with Ferrer and reviewing financial
records, I learned the following:

    a.   SUBJECT ACCOUNT 20 at Knab Bank in the
Netherlands is an account held by a third party, Procop Services
BV.  According to Ferrer the arrangement is essentially the same
as the Gold Leaf SRO and Protecttio SRO, as described with
respect to SUBJECT ACCOUNTS 19.  This business arrangement
existed for the sole purpose of allowing purchasers of

- 63 -

DOJ-BP-0004598460

prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.

22.   SUBJECT ACCOUNT 21A and 22B

69.   From speaking with Ferrer and reviewing financial records and business agreements, I learned the following:

a.   SUBJECT ACCOUNT 21A is an account in the Netherlands held in the name of Gulietta Group BV. According to Ferrer and the SLA, the funds and/or securities in this account are derived from selling advertisements online, most of which are for prostitution advertisements. The SLAs state that 99.5% of the net proceeds are to be paid to Ad Tech BV which is owned by Backpage. According to Ferrer, the arrangement between Guilietta Group BV and Ad Tech BV (Backpage) was put into place to evade the same credit card "blockade" described in with regard to SUBJECT ACCOUNTS 18D, 18E, and 18F. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.

b.   SUBJECT ACCOUNT 21B is an account in the Netherlands held in the name of UnivsersAds BV. According to Ferrer and the SLA between the companies, the funds and/or

- 64 -

securities in this account are derived from selling advertisements online, most of which are for prostitution advertisements. The Service Level Agreements state that 99.5% of the net proceeds are to be paid to Ad Tech BV which is owned by Backpage. According to Ferrer, the arrangement between UniversAds BV and Ad Tech BV or Backpage was put into place to evade the same credit card blockade described above. Ferrer explained that these accounts are owned by Backpage and are not co-mingled with other funds and/or securities, and are therefore subject to seizure and forfeiture to the United States.

VI.   **CONCLUSION**

70.  For the reasons stated above, there is probable cause to believe that the funds and/or securities on deposit in the SUBJECT ACCOUNTS are subject to seizure and forfeiture by the United States under the following provisions:

a.    18 U.S.C. § 981(a)(1)(A), because the funds and/or securities in each of the SUBJECT ACCOUNTS are involved in, and traceable to, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(h) (Conspiracy to Launder Money), 18 U.S.C. § 1956(a)(2) (International Money Laundering for Promotion), and 18 U.S.C. § 1957 (Financial Transactions Involving Illicit Proceeds); and

b.    18 U.S.C. § 981(a)(1)(C), because the funds and/or securities in the SUBJECT ACCOUNTS constitute and are

- 65 -

DOJ-BP-0004598462

derived from proceeds traceable to one or more violations of 18

U.S.C. § 1952, and 18 U.S.C. § 1591).


                                        /s/
                              _____
                                   Lyndon Versoza
                                   U.S. Postal Inspector

Subscribed to and sworn to me
this 26th day of April, 2018

_John E. McDermott___

                                      _
                                      e

DOJ-BP-0004598463

_____ RECEIVED _____ COPY

MAR 2 8 2018

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ M DEPUTY

# SEALED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

        Plaintiff,

        v.

1. Michael Lacey
Counts 1-70, 81, 83-84, 86, 88-92

2. James Larkin
Counts 1-68, 80, 87

3. Scott Spear
Counts 1-68, 71-78, 85, 93

4. John "Jed" Brunst
Counts 52-70, 78-84, 86-93

5. Dan Hyer
Counts 1-68

6. Andrew Padilla
Counts 1-51

7. Joye Vaught
Counts 1-51

        Defendants.

CR-18-00422-PHX-SPL (BSB)

## INDICTMENT

VIO:   18 U.S.C. § 371
(Conspiracy)
Count 1

18 U.S.C. § 1952(a)(3)(A)
(Travel Act—Facilitate Prostitution)
Counts 2-51

18 U.S.C. § 1956(h)
(Conspiracy to Commit Money
Laundering)
Count 52

18 U.S.C. § 1956(a)(1)(B)(i)
(Concealment Money Laundering)
Counts 53-62

18 U.S.C. § 1956(a)(2)(A)
(International Promotional Money
Laundering)
Counts 63-68

18 U.S.C. § 1957(a)
(Transactional Money Laundering)
Counts 69-93

18 U.S.C. §§ 981, 982
21 U.S.C. § 853, 28 U.S.C. § 2461
(Forfeiture Allegations)

THE GRAND JURY CHARGES:

A.   Introduction

    1.     The website www.backpage.com ("Backpage") is notorious for being the

internet's leading source of prostitution advertisements. Backpage derives the overwhelming majority of its revenue from such ads. These practices have enabled Backpage to earn over $500 million in prostitution-related revenue since its inception.

2. Backpage was created in 2004 by defendant MICHAEL LACEY ("LACEY"), defendant JAMES LARKIN ("LARKIN"), and a third individual, C.F. From 2004-15, LACEY and LARKIN oversaw the website's policies and strategic direction. Additionally, LACEY and LARKIN have retained significant control over the website (and have continued receiving tens of millions of dollars of Backpage-related distributions) since purportedly selling their interests in Backpage in 2015.

3. Defendant SCOTT SPEAR served as the Executive Vice President of one of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 4%.

4. Defendant JOHN "JED" BRUNST ("BRUNST") served as the Chief Financial Officer of Backpage and several of Backpage's parent companies and held, at times, an ownership interest in Backpage of approximately 6%.

5. Defendant DAN HYER ("HYER") joined Backpage's marketing department in or around 2006 and served as Backpage's Sales and Marketing Director.

6. Defendant ANDREW PADILLA ("PADILLA") served as Backpage's Operations Manager.

7. Defendant JOYE VAUGHT ("VAUGHT") served as Backpage's assistant Operations Manager.

8. The defendants identified above are referred to at times in this indictment as the "BACKPAGE DEFENDANTS."

9. As explained in detail below, the BACKPAGE DEFENDANTS have utilized a variety of strategies to make it appear that the prostitution ads appearing on Backpage are actually ads for "escort" services, "adult" companionship, dating, or other lawful activities. For example, Backpage purports to bar customers from offering illegal services

-2-

DOJ-BP-0004598465

and has periodically used computerized filters and human "moderators" to edit the wording of (or block) ads that explicitly offer sexual services in return for money.

10. These strategies are a fiction designed to conceal the true nature of Backpage's ads and customers. Indeed, the BACKPAGE DEFENDANTS have admitted—in internal company documents and during private meetings—that they know the overwhelming majority of the website's ads involve prostitution. In one internal document, LACEY actually bragged about the company's contributions to the prostitution industry: "Backpage is part of the solution. Eliminating adult advertising will in no way eliminate or even reduce the incidence of prostitution in this country. . . . For the very first time, the oldest profession in the world has transparency, record keeping and safeguards."

11. Notwithstanding these private admissions, the BACKPAGE DEFENDANTS have taken pains to mislead the public, regulators, and law enforcement officials concerning the supposed sincerity of Backpage's efforts to prevent the publication of prostitution-related ads. For example, after reviewing LACEY's written description of Backpage's contributions to the prostitution industry and editing practices, LARKIN instructed C.F. to prevent "any of the information in this being made public." PADILLA, who helped supervise Backpage's moderators, threatened to fire any employee who acknowledged in writing that the "escorts" depicted in the website's ads were actually prostitutes: "Leaving notes . . . implying that we're aware of prostitution . . . is enough to lose your job over." And in one internal document, Backpage's media strategy was described simply as "Do not acknowledge the prostitution."

12. Many of the ads published on Backpage depicted children who were victims of sex trafficking. Once again, although Backpage has sought to create the perception that it diligently attempts to prevent the publication of such ads, the reality is that Backpage has allowed such ads to be published while declining—for financial reasons—to take necessary steps to address the problem. For example, for several years, Backpage's official policy, when presented with an ad featuring the prostitution of a child, was to delete the particular

- 3 -

DOJ-BP-0004598466

words in the ad denoting the child's age and then publish a revised version of the ad. Such editing, of course, did nothing to change the fact the ad featured the prostitution of a child— it only created a veneer of deniability and helped Backpage's customers (*i.e.*, pimps trafficking children) evade detection.

13.     Backpage has also contributed to the proliferation of ads featuring the prostitution of children in other ways. For example, an anti-sex trafficking organization once suggested that Backpage provide an automatic warning message whenever a customer searched for particular terms indicative of the prostitution of a child. In response, C.F. acknowledged the proposal was a good one but declined to adopt it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AGs [state attorneys general] so it has little PR value. It is a low priority." Backpage has also claimed it does everything in its power to alert the National Center for Missing and Exploited Children ("NCMEC") whenever it becomes aware that a child is being advertised on its website. However, the BACKPAGE DEFENDANTS implemented policies to artificially limit such referrals. In one email, PADILLA instructed VAUGHT that "if we don't want to blow past 500 [referrals to NMCEC] this month, we shouldn't be doing more than 16 per day." In another training document, moderators were instructed not to send emergency alerts to NCMEC in response to complaints filed by the grandparents and other extended family members of children being advertised on the website: "Neice [sic], nephew, grandchild, cousin, etc. doesn't count."

14.     Virtually every dollar flowing into Backpage's coffers represents the proceeds of illegal activity. In fact, by 2015, the major credit card companies stopped processing payments for Backpage and some banks closed Backpage's accounts out of concern they were being used for illegal purposes. In response, the BACKPAGE DEFENDANTS have pursued an array of money laundering strategies. These strategies have included (a) instructing customers to send checks and money orders to particular Post Office box, depositing those payments in bank accounts held in the name of entities with

-4-

DOJ-BP-0004598467

1   no apparent connection to Backpage, and then giving customers a corresponding "credit"
2   on Backpage to purchase new ads, (b) wiring the proceeds of Backpage's business to bank
3   accounts held in foreign countries and then redistributing the funds to certain BACKPAGE
4   DEFENDANTS (as compensation) or redepositing the funds in bank accounts held in the
5   United States (to conceal the nature of those funds and promote Backpage's ongoing
6   operations), and (c) converting customer payments, and the proceeds of Backpage's
7   business, into and out of cryptocurrency.

8       15.   The BACKPAGE DEFENDANTS have also engaged in other financial
9   transactions designed to conceal their misconduct and evade seizure by law enforcement.
10  For example, in November 2016, LACEY asked employees of an Arizona-based bank for
11  advice on how to move his assets "offshore" to protect them from seizure by the
12  government.  Soon afterward, $16.5 million in Backpage-derived cash was wired from
13  LACEY's bank accounts in the United States to an overseas bank account in Hungary.

14      16.   For all of these reasons, the BACKPAGE DEFENDANTS are charged in this
15  indictment with the crimes of facilitating prostitution (18 U.S.C. § 1952), concealment,
16  transactional, and international promotional money laundering (18 U.S.C. §§ 1956 and
17  1957), and/or conspiracy to commit these offenses (18 U.S.C § 371 and 1956).

18  B.   Backpage's Origins, Ownership, and Control

19      17.   LACEY and LARKIN are the founders of the *Phoenix New Times*, an
20  alternative newspaper based in Arizona.  Over time, LACEY and LARKIN acquired
21  several other alternative newspapers, which they came to operate through an entity called
22  Village Voice Media Holdings ("VVMH").  Additionally, SPEAR served as VVMH's
23  Executive Vice President and BRUNST served as VVMH's Chief Financial Officer.

24      18.   The publications within the VVMH newspaper chain routinely featured
25  illegal prostitution ads.  In fact, more than 30 years ago, a federal court affirmed the
26  conviction of the operator of a prostitution business (which masqueraded as a massage
27  parlor) for publishing ads in the classified section of the *Village Voice*. *See United States*

28

- 5 -

DOJ-BP-0004598468

*v. Sigalow*, 812 F.2d 783 (2d Cir. 1987). The conviction was for violating 18 U.S.C. § 1952, one of the same crimes charged in this indictment.

19.   By 2000, the rise of the internet—and, in particular, the website www.craigslist.com ("Craigslist"), which offered free classified ads—began to significantly disrupt VVMH's business model, which depended on classified advertising revenue for survival.

20.   LACEY and LARKIN, with assistance from C.F., sought to address this threat by creating Backpage. Their decision to create Backpage was later described in an internal company document as follows: "In 2004, in response to the Craigslist threat that was decimating daily newspapers, VVM launched its own online classified site, Backpage.com, named after the back page of VVM's print publication."

21.   During its first few years of operation, Backpage accounted for only a fraction of VVMH's overall revenue. In January 2006, for example, VVMH estimated that Backpage supplied only 1% of its overall advertising revenue but also noted that Backpage had "tremendous upside potential."

22.   This prediction proved prophetic. By 2008, Backpage was generating over $5 million in annual profit. This annual profit figure increased to over $10 million in 2009.

23.   In 2010, Craiglist chose to shut down its "adult" section due to the prevalence of ads for prostitution and other illegal services. The BACKPAGE DEFENDANTS, sensing an opportunity, made an aggressive push for Backpage to capture Craiglist's share of this market. In one internal document, LARKIN commented: "Craigslist has folded . . . . It is possible that this will mean a deluge of adult content ads for backpage.com . . . . We have with the Village Voice probably the longest run of adult content advertising in the US and it is, like it or not, in our DNA."

24.   This push was successful. In internal documents, Backpage stated that it experienced "explosive growth" by "capitalizing on displaced Craigslist ad volume." Backpage's annual profits grew to over $26 million in 2010, over $52 million in 2011, and

- 6 -

DOJ-BP-0004598469

1    over $78 million in 2012.

2    25.    These figures dwarfed the profits that VVMH's print publications were
3    generating. In fact, Backpage became so profitable that the BACKPAGE DEFENDANTS
4    decided to get rid of VVMH's publishing business so they could focus on Backpage's
5    further development and expansion.  Accordingly, in or around November 2012, the
6    BACKPAGE DEFENDANTS spun off VVMH's print publications and began utilizing
7    several new corporate entities, including Medalist Holdings, Inc. ("Medalist"), Dartmoor
8    Holdings LLC ("Dartmoor"), and Camarillo Holdings, LLC ("Camarillo"), to serve as
9    Backpage's parent companies.

10   26.    Following these transactions, LACEY held an ownership interest in Medalist
11   (and, therefore, in Backpage) of approximately 45%, LARKIN held an ownership interest
12   of approximately 43%, BRUNST held an ownership interest of approximately 6%, and
13   SPEAR held an ownership interest of approximately 4%.

14   27.    Backpage's annual profits continued to skyrocket during and after these
15   changes. They grew to over $112 million in 2013 and over $134 million in 2014.

16   28.    In or around April 2015, LACEY, LARKIN, SPEAR, and BRUNST
17   purported to sell their ownership interests in Backpage and several related entities for
18   around $600 million to various Dutch entities. These Dutch entities included Atlantische
19   Bedrijven, C.V., which agreed to purchase Backpage's U.S. operations for around $526
20   million, and UGC Tech Group C.V., which agreed to purchase Backpage's overseas
21   operations for around $77 million.

22   29.    In fact, these Dutch entities were controlled by C.F., who borrowed most of
23   the $600 million from entities controlled by the sellers to finance the purchase. Due to this
24   financial arrangement, LACEY, LARKIN, SPEAR, and BRUNST retained a significant
25   financial interest in Backpage after the transactions were completed.

26   30.    Additionally, LACEY, LARKIN, SPEAR, and BRUNST retained significant
27   operational control over Backpage following these transactions. For example, the April

28

-7-

1   2015 loan agreement required C.F. to sign a six-year employment agreement, required C.F.

2   to provide the lenders with full access to Backpage's books and records, required C.F. to

3   provide the lenders with an annual listing of all of C.F.'s personal assets, and prohibited

4   C.F. from opening any new bank accounts on Backpage's behalf without the lenders'

5   consent.

6   C.   Backpage's Knowledge And Facilitation Of Prostitution Ads

7         31.   By 2008, if not earlier, the BACKPAGE DEFENDANTS were aware that

8   the overwhelming majority of the website's "adult" ads involved prostitution.

9   Nevertheless, the BACKPAGE DEFENDANTS made a financial decision to continue

10   displaying those ads.

11        32.   The BACKPAGE DEFENDANTS also sought to sanitize the ads by editing

12   them—that is, by removing terms and pictures that were particularly indicative of

13   prostitution and then publishing a revised version of the ad. This process was sometimes

14   referred to as "moderation."

15        33.   For example, in April 2008, C.F. wrote an email explaining that, although he

16   was "under pressure to clean up phoenix's adult content," he was unwilling to delete

17   prostitution ads because doing so "would put us in a very uncompetitive position with

18   craig[slist]" and result in "lost pageviews and revenue." Thus, he instructed Backpage's

19   technical staff to edit the wording of such ads, by removing particular terms that were

20   indicative of prostitution, and then allow the remainder of the ad to be featured on

21   Backpage's website.

22        34.   On February 26, 2009, C.F. received an email from the classified-ads

23   manager of a newspaper within the VVMH chain asking why Backpage's terms of service

24   purported to prevent customers from "suggest[ing] an exchange of sexual favors for

25   money" in light of the fact that "[c]learly everyone on the entire backpage network breaks

26   the rules." In response, C.F. didn't dispute the author's characterization and explained that

27   Backpage had simply added the terms of service at the behest of "our attorney in SF" in an

28

-8-

DOJ-BP-0004598471

attempt to avoid liability in civil lawsuits.

35.   On May 25, 2009, SPEAR received an email summarizing a plan to begin "remov[ing] sex act pics and coded terms" from Backpage ads.  Later that day, C.F. forwarded this email to HYER with the explanatory note that "We do not intend to be a craig[slist] here, just get out the most egregious stuff."

36.   On March 8, 2010, C.F. testified in federal court (the United States District Court for the Southern District of Florida) in the criminal trial of a pimp who had used Backpage to post prostitution ads.  During his testimony, C.F. acknowledged the defendant had used the email address "Youngpimpin86" when posting the ads.  C.F. also acknowledged that the ads described one so-called escort as "five-foot-three, with a small waist and amazing ass you'll have to see to believe. XL, XL, XL, Lollipop" and described a different so-called escort as "discrete, sincere and extremely naughty. I am the type of girl who absolutely adores a man who understands the many desires of a young beautiful woman and how to accommodate a variety of fantasies."  This episode provided notice to Backpage that it was implausible to pretend such ads were merely offering lawful escort services.

37.   On September 1, 2010, PADILLA sent an email to HYER and C.F. stating that customers who engaged in "extreme and repeat" violations of Backpage's posting rules would have their ads deleted and be banned from the website.  However, PADILLA also stated the bans would only be temporary and that "we'll do everything we can to affect only the worst apples."

38.   On September 1, 2010, SPEAR received an email acknowledging that Backpage's moderators were being instructed to "Remove any sex act pics in escorts [ads]" and "Remove any illegal text in escorts [ads] to include any code words for sex act for money."

39.   On September 21, 2010, a group of state attorneys general wrote a letter to Backpage.  This letter observed that "ads for prostitution—including ads trafficking

- 9 -

DOJ-BP-0004598472

children—are rampant on the site" and argued that "[b]ecause Backpage cannot, or will not, adequately screen these ads, it should stop accepting them altogether." The letter acknowledged that this step would cause Backpage to "lose the considerable revenue generated by the adult services ads" but stated that "no amount of money can justify the scourge of illegal prostitution, and the misery of the women and children who will continue to be victimized, in the marketplace provided by backpage."

40.     On September 25, 2010, C.F. wrote an email explaining that Backpage was unwilling to delete ads that included terms indicative of prostitution because doing so would "piss[] off a lot of users who will migrate elsewhere" and force Backpage to refund those customers' fees. Thus, C.F. announced that Backpage would "go back to having our moderators remove bad content in a post . . . ."

41.     On September 30, 2010, C.F. testified in federal court (the United States District Court for the District of Minnesota) in the criminal trial of a pimp who had used Backpage to post prostitution ads. During his testimony, C.F. acknowledged that Backpage's servers are located in Arizona and that the ads posted by the Minnesota-based defendant had therefore "traveled across state lines."

42.     On October 8, 2010, PADILLA sent an email (on which VAUGHT was cc'd) threatening to fire any Backpage employee who acknowledged, in writing, that a customer was a prostitute: "Leaving notes on our site that imply that we're aware of prostitution, or in any position to define it, is enough to lose your job over. . . . This isn't open for discussion. If you don't agree with what I'm saying completely, you need to find another job."

43.     On October 16, 2010, PADILLA sent an email to a large group of Backpage employees (including HYER and VAUGHT). The email had two attachments that provided guidance on how to "moderate" ads. The first was a Powerpoint presentation that displayed a series of 38 nude and partially-nude photographs, some of which depicted graphic sex acts. Next to each picture was an instruction as to whether it should be

- 10 -

approved or disapproved by a Backpage moderator. These instructions included "Approve. Nude rear shots are okay as long the model is not exposing her anus or genitalia." and "Approve. Rear shot okay. Transparent wet panties okay." The second was an Excel spreadsheet identifying 50 terms (all of which were indicative of prostitution) that should be "stripped" from ads before publication. PADILLA concluded the email by stating: "[I]t's the language in ads that's really killing us with the Attorneys General. Images are almost an afterthought to them."

44.   On October 16, 2010, PADILLA sent a separate internal email (which also included HYER and VAUGHT as recipients). In this email, PADILLA explained that "I'd like to still avoid Deleting ads when possible," that "we're still allowing phrases with nuance," and that "[i]n the case of lesser violations, editing should be sufficient."

45.   On October 25, 2010, C.F. sent an email to SPEAR, HYER, and PADILLA acknowledging that the "[i]llegal content removed" through Backpage's moderation processes was "usually money for sex act." This email also explained that, after the "sex act pics are removed," the "ad text may stay."

46.   On October 26, 2010, HYER and PADILLA received an email explaining: "We will not remove ads with vaginas or penis showing, just the images unless they are a frequent offender. We will not remove ads with rates under an hour, just the text with the minimum rates. Users need time to react to this change."

47.   On October 27, 2010, PADILLA sent an email to the head of a group of contractors from India who had been hired to moderate Backpage's adult ads. In this email, PADILLA criticized the contractors for deleting too many ads, stated that this approach was bad for business, and instructed the contractors to simply edit the ads to remove the more-obvious language: "As long as your crew is editing and not removing the ad entirely, we shouldn't upset too many users. Your crew has permission to edit out text violations and images and then approve the ad."

48.   On October 27, 2010, HYER sent an internal email stating that Backpage

- 11 -

DOJ-BP-0004598474

was "editing 70 to 80%" of the ads it received from customers. In other words, HYER acknowledged that a large proportion of the ads originally submitted by Backpage's customers contained text and pictures that were indicative of prostitution and that Backpage was still choosing to publish those ads after editing them.

49. On November 4, 2010, C.F. sent an email to Backpage's India-based moderators (on which PADILLA was cc'd) explaining that "[m]any of the ads need to have 15 minute and 30 minute pricing removed" and that "I'm being evaluated by lawyers [*i.e.*, state attorneys general] later this week so cleaning up old stuff is important."

50. On November 17, 2010, HYER and PADILLA received an email acknowledging that the term Lolita is "code for under aged girl" but explaining that this term could simply be stripped out from ads (as opposed to refusing to publish the ad). The email also explained that customers should be allowed to include their identification numbers from a notorious prostitution website, The Erotic Review: "[A]llow users to put in TER IDs (just no live links)."

51. On November 30, 2010, LARKIN, SPEAR, and other Backpage representatives participated in a conference call with representatives from NCMEC. During this call, the Backpage representatives were advised that a large portion of the ads on Backpage were blatant prostitution ads, that many of those ads featured children, and that the posting of such ads was illegal in every state.

52. In December 2010, HYER, PADILLA, and others exchanged a series of emails entitled "Deep cleaning strip out." These emails identified a lengthy list of terms that were indicative of prostitution and discussed plans for removing the terms from the old ads in Backpage's archives. During this exchange, C.F. stated that Backpage wasn't willing to delete the old prostitution ads because "our users love" having access them, "[s]o, best to do deep cleaning and not kill a valuable feature." C.F. later encouraged Backpage's staff to complete the project quickly to avoid scrutiny: "This task is urgent since CNN is runing [sic] a report soon."

- 12 -

DOJ-BP-0004598475

53. On January 13, 2011, HYER and PADILLA received an email summarizing instructions that had been provided to members of Backpage's technical staff. It explained that the technical staff had been instructed "not to display the moderation log" in a particular section of Backpage's database "since we pdf this page for subpoenas. I would rather not testify in court as to why my staff 'approved' . . . postings."

54. In January 2011, LARKIN and LACEY met with a representative from NCMEC. During this meeting, LACEY asked which types of sex ads would be acceptable from NCMEC's perspective. When the NCMEC representative declined to say that any such ads would be acceptable, LACEY made a statement to the effect of "adult prostitution is none of your business."

55. On January 31, 2011, and February 1, 2011, C.F. engaged in an email exchange concerning whether to remove links to other prostitution websites (such as The Erotic Review) from expired Backpage ads. C.F. stated that, although SPEAR and his "internet safety guy" were recommending that such ads be removed, he thought this would "be a stupid move" because it would hurt Backpage financially (by reducing the number of referrals from other sites). C.F. added that "this overly zealous focus on moderation at the expense of other development is a lot of bullshit . . . ."

56. On February 2, 2011, C.F. sent an email acknowledging that "[t]he strip out affects almost every adult ad." In other words, C.F. acknowledged that "almost every adult ad" on Backpage was a prostitution ad that had been edited to remove the most damning text and pictures.

57. On February 3, 2011, a Backpage customer who went by the name "Licks Alot" wrote an email to Backpage complaining that all of the pictures in one of her ads (entitled "Athletic SWF Guaranteed Low Mileage Boys!!!") had been deleted. C.F. responded to "Licks Alot" by explaining that one of her photos had been removed because "[o]ur crazy internet safety experts do not want any genitalia showing up around the thong." However, C.F. proceeded to apologize to "Licks Alot" over the removal of her

- 13 -

DOJ-BP-0004598476

1    remaining photos, allowed her ad (which was obviously for prostitution) to remain on the

2    website, and offered her a free upgrade.

3          58.    On February 8, 2011, C.F. testified in federal court (the United States District

4    Court for the Middle District of Florida) in the criminal trial of a pimp who had used

5    Backpage to post prostitution ads. During his testimony, C.F. authenticated one of the ads

6    the defendant had placed on Backpage, whose title was "Extra horny sexy newbie,"

7    confirmed that Backpage had allowed this ad to be posted multiple times in various East

8    Coast cities, and acknowledged that Backpage published "a lot" of similar ads. This

9    episode provided further notice to Backpage that it was implausible to pretend such ads

10    were merely offering lawful escort services.

11          59.    On February 16, 2011, PADILLA sent an email to Backpage's India-based

12    moderators (on which VAUGHT was cc'd) explaining that Backpage was adopting a

13    "more lenient policy" and that he was instructing his Phoenix-based employees to "go easy

14    on some types of violations." PADILLA acknowledged this approach would "likely" result

15    in more "violations" but emphasized that "moderators should err on the side of the user."

16          60.    On February 16, 2011, PADILLA sent a separate email discussing whether

17    several terms should remain on Backpage's "filtered terms" list. During this discussion,

18    PADILLA acknowledged—by placing quote marks around the term "companionship"—

19    that he didn't actually believe the women being advertised on Backpage were providing

20    lawful escort services: "[The term] implies some exchange of bodily fluids which kills our

21    'companionship' argument, but i don't think we've ever really gotten in trouble for it."

22          61.    On February 22, 2011, PADILLA received an email requesting Backpage's

23    "list of banned, stripped out adult terms." In response, PADILLA sent an Excel

24    spreadsheet entitled "Phrase List 02211," which PADILLA described as "the latest greatest

25    version of the list." The enclosed spreadsheet identified over 660 words or phrases that are

26    indicative of prostitution, including an array of terms that are suggestive of child

27    prostitution (*e.g.*, "lolita," "fresh," "high school," "tight," "young"). The spreadsheet

28

- 14 -

DOJ-BP-0004598477

1   explained that most such terms were simply to be "filtered" from the ads in which they
2   appeared.

3        62.    On February 23, 2011, PADILLA received an email concerning a particular
4   ad that had recently been edited by Backpage's India-based moderators. The ad was
5   obviously for prostitution——its title was "new-new-new-put me in your favorite position"
6   and the poster had attempted to include two photographs that violated Backpage's posting
7   rules. In response, the India-based moderators had deleted both of those photos, as well as
8   a third photo that depicted the prostitute's face, and then allowed the ad to be published.
9   The email received by PADILLA did not criticize the moderators for allowing an obvious
10  prostitution ad to be published after editing. To the contrary, it emphasized that the ad
11  should remain on Backpage and criticized the moderators for removing the third photo,
12  threatening to fire them if they did it again: "2 out of 3 pics should have been removed.
13  But [the] moderator deleted all three pics. This is plain wrong . . . . I would fire a moderator
14  in Phoenix if they did this."

15       63.    In March 2011, LARKIN, LACEY, SPEAR, and other Backpage
16  representatives met with representatives from NCMEC. During this meeting, the Backpage
17  representatives were again advised that a large portion of the ads on Backpage were blatant
18  prostitution ads. The Backpage representatives also were advised they could be criminally
19  prosecuted under federal law for their conduct.

20       64.    On April 5, 2011, PADILLA sent an email whose recipients included
21  VAUGHT and the supervisor of Backpage's Indian moderation team. The email was
22  entitled "relaxed image standards" and included, as an attachment, a document that
23  displayed a series of 30 nude and partially-nude photographs. Next to each picture was an
24  instruction as to whether it should be approved or disapproved by a moderator. One picture
25  showed a woman sitting on a bed, wearing only a bra and panties, with her legs spread
26  open and her hand partially covering her crotch. The caption provided in part: "okay –
27  but barely."

28

- 15 -

65. Between April 2011 and March 2012, PADILLA, C.F., and others participated in an email exchange acknowledging that Backpage was deleting thousands of pictures from customer ads each week and seeking assistance in collecting all of the deleted pictures so they could be used for "entertainment" or to generate user "traffic for other projects." The email explained that the deleted pictures could be made available to the public on a new website called "nakedpics.backpage.com" or "badpics.backpage.com."

66. On April 19, 2011, LARKIN and SPEAR received an email seeking permission to terminate the contract of a third-party vendor that had been receiving $17,000 per month to "remov[e] any nude pics" from the expired ads in Backpage's database. LARKIN responded: "do it!"

67. On June 7, 2011, C.F. received an inquiry from a law enforcement official about a particular ad that included the term "amber alert." In response, C.F. acknowledged this might be "some kind of bizarre new code word for an under aged person." C.F. then forwarded this exchange to PADILLA and stated that he had instructed HYER to add "amber alert" to Backpage's "strip out" list. In other words, HYER, PADILLA, and C.F. did not require all future ads involving this particular coded term for the prostitution of a child to be blocked from Backpage—they merely required such ads to be edited before publication.

68. On June 30, 2011, several Backpage representatives met with representatives from the office of the Washington State Attorney General. During this meeting, the Backpage representatives initially attempted to claim that no prostitution ads appeared on their website. In response, a representative from the Attorney General's office stated: "You mean to tell me that if someone responded to an advertisement, the woman they called for services would be offering to go out for coffee?" A Backpage representative responded to this question by looking at C.F., laughing, and acknowledging that Backpage couldn't "deny the undeniable."

69. On July 27, 2011, C.F. sent an email to HYER and PADILLA, and a nearly-

- 16 -

DOJ-BP-0004598479

1   identical email to LARKIN and LACEY, concerning the possibility of using age-
2   verification software. In this email, C.F. acknowledged the software might be beneficial
3   ("This might be our solution") but recommended against its wholesale adoption because it
4   would cost "79 to 99 cents per query" and would thus cut into Backpage's profits.

5       70.    On July 28, 2011, LACEY sent LARKIN a draft editorial entitled "BackPage
6   understood." In this document, LACEY bragged about Backpage's contributions to the
7   prostitution industry: "Backpage is part of the solution. Eliminating our adult advertising
8   will in no way eliminate or even reduce the incidence of prostitution in this country. . . .
9   For the very first time, the oldest profession in the world has transparency, record keeping
10   and safeguards." LACEY also acknowledged that Backpage used an automatic filter to
11   remove particular phrases from ads that were indicative of prostitution but still published
12   the ads after editing them.

13       71.    Soon afterward, LARKIN forwarded the editorial to C.F., with a cover note
14   cautioning against some of LACEY's statements "being made public" because "we need
15   to stay away from the very idea of 'editing' the posts, as you know." C.F., in turn, revised
16   the editorial to take out the paragraph lauding Backpage's contributions to the prostitution
17   industry.

18       72.    On August 5, 2011, Backpage received a letter from the mayor of Seattle.
19   This letter warned that "Seattle Police have identified an alarming number of juvenile
20   prostitutes advertised on Backpage.com since January 2010" and explained that Backpage
21   was dissimilar from other companies whose products and services are "occasionally or
22   incidentally" utilized by criminals because "[y]our company is in the business of selling
23   sex ads" and "your services are a direct vehicle for prostitution." The letter also
24   recommended that Backpage require in-person age verification for all of the "escorts"
25   depicted in its ads. Afterward, Backpage declined to adopt these recommendations.

26       73.    On August 15, 2011, PADILLA received an email containing an updated
27   version of Backpage's moderation guidelines. This six-page document provided the
28

- 17 -

DOJ-BP-0004598480

following instructions concerning photographs: "Nude rear shots are okay as long the model is not exposing her anus or genitalia," "Transparent wet panties okay should not be able to see personal private part," and "cherry, Ice-cream keeping in mouth [is okay]." The document also explained that "Bikini, lingerie, g-string, thong, and hands covering nipples are all allowed," "Hourly rates are OK," and "Sessions are okay. E.g $50 session."

74.     On August 31, 2011, Backpage received a letter from the National Association of Attorneys General. This letter characterized Backpage as "a hub" for human trafficking, identified "more than 50 instances, in 22 states over three years, of charges filed against those trafficking or attempting to traffic minors on Backpage.com," and noted that "[n]early naked persons in provocative positions are pictured in nearly every adult services advertisement on Backpage.com and the site requires advertisements for escorts, and other similar 'services,' to include hourly rates. It does not require forensic training to understand that these advertisements are for prostitution."

75.     On October 6, 2011, C.F. sent an email discussing various proposals for addressing "the under aged issue." With respect to one particular proposal, C.F. acknowledged it was a good one but recommended against adopting it because Backpage would not derive any public-relations benefit from doing so: "This is a good idea but it is not visible to AG's [state attorneys general] so it has little PR value. It is a low priority."

76.     In the fall of 2011, Backpage sought the assistance of a public relations firm based in Washington, D.C. On October 12, 2011, C.F. received a written copy of the firm's presentation. Later, some of the BACKPAGE DEFENDANTS attended a meeting at which the presentation was discussed in more detail. The presentation warned that Backpage's business practices would inevitably result in legal trouble ("One day the proverbial is going to hit the fan") and characterized Backpage's "media strategy" as "Do not acknowledge the prostitution." The presentation also noted that the "ads on the backpage.com site" generally fall into three categories, one of which is "Pimps and Men Looking for Kids."

DOJ-BP-0004598481

77.   On October 21, 2011, LARKIN received an email discussing whether the Backpage website should include a warning message concerning the prostitution of children. This email contained the following joke: "Andrew [PADILLA] thinks it to[o] heavy handed and thinks our web site name will be entrapment.com (Hilarious)."

78.   On November 16, 2011, HYER and PADILLA received an email asking for "urgent" assistance in eliminating the word "teen" from the ads appearing on Backpage's website: "Remove ads with teens or remove the text teen from . . . ads." The following day, PADILLA wrote back with an update that he had found "76 pages of results" and that he had simply "edited" all of the ads posted within the last two months (*i.e.*, allowed those ads to remain on the website after sanitizing them).

79.   Between around January and March 2012, many of Backpage's moderators (who were supervised in part by PADILLA and VAUGHT) underwent performance appraisals. These appraisals revealed that many of the moderators did "not report young looking escorts." Nevertheless, these moderators were allowed to keep their jobs, and sometimes were given strong overall performance ratings.

80.   On February 16, 2012, PADILLA sent an email to VAUGHT stating that Backpage should limit the number of child-exploitation referrals it was making to NCMEC: "If we don't want to blow past 500 this month, we shouldn't be doing more than 16 a day."

81.   On February 23, 2012, C.F. was forwarded a legal notice claiming that several of Backpage's ads included copyrighted content from two competing websites called RubMaps.com and EroticMP.com. C.F. also received copies of the underlying ads from the competing websites, which clearly involved prostitution. In one of the ads, a customer stated that, in return for $45 and a $5 tip, he had received a "Blow Job . . . w/ condom" from a woman who "had nice breasts." In a different ad, a customer stated that, in return for $60, he had oral and vaginal sex with a prostitute. And in a different ad, a customer stated: "Her bj was slow and erotic, and she was happy to go with whatever

- 19 -

DOJ-BP-0004598482

position I wanted." When C.F. forwarded these materials to Backpage's staff, he was asked whether the corresponding ads appearing on Backpage's website should be removed immediately. C.F. replied that they should be allowed to remain on Backpage for another few weeks without any modification.

82. On March 15, 2012, HYER received an email concerning the ads with the copyrighted material. This email stated that the ads shouldn't be deleted and that Backpage's technical staff should merely "strip out" the names of the competing prostitution websites: "Copyright infringement issue. We need to strip out every appearance of rubmaps.com and eroticmp.com." When a staff member sought more guidance, HYER interjected: "We don't need to delete ads or users."

83. On April 7, 2012, PADILLA was informed that a woman had contacted Backpage to report that one of the "escorts" depicted on the site was only 17 years old. The woman provided the juvenile's full name and birth year and further stated that the juvenile had been attempting to recruit the complaining party's daughter (who was 15). In response, PADILLA instructed his staff to refuse to remove the ad because "she's isn't claiming her own daughter is in the ad."

84. On April 8, 2012, LACEY sent an email emphasizing that "jim [LARKIN] and I believe in legalized prostitution" and stating that Backpage's efforts to prevent the prostitution of children on the site were "not perfect, by any means."

85. On April 25, 2012, a Backpage representative spoke at a meeting of the New York City Council's Women's Issues Committee. During this meeting, the representative stated it was better to have ads for sex work appear on Backpage than have them move to other places on the internet. The representative further stated: "I don't deny that Backpage is part of the problem, but the problem is the internet."

86. On April 27, 2012, a woman wrote an email to Backpage's support department stating that her underage daughter had been kidnapped, drugged, and was being advertised as a prostitute against her will. The email identified the specific phone number

- 20 -

1   associated with the ads (754-229-xxxx), stated that the ads appeared on a website called
2   BackpagePics.com, and asked that the ads be removed immediately: "This is a drugged
3   and held against her will child who had photos taken under threat and duress . . . . Please
4   remove." This email was forwarded to PADILLA by a subordinate, who asked "should
5   we respond?" PADILLA replied by explaining that, because the website
6   BackpagePics.com wasn't owned by Backpage, there was no need to respond to the
7   mother.

8       87.    On April 30, 2012 (three days later), the same woman wrote another email
9   to Backpage's support department. In this email, the woman stated that "I have contacted
10  backpage on several occassions [sic] to remove these pictures which were posted against
11  her will and while she was drugged and held captive. I have yet to receive a reply." This
12  time, the woman provided a link to her daughter's ad on Backpage (not
13  BackpagePics.com), which included the same phone number (754-229-xxxx) that had been
14  included in the other ad.

15      88.    On May 1, 2012 (the next day), the same woman wrote a third email to
16  Backpage's support department. In this email, the woman included a link to another ad on
17  Backpage depicting her underage daughter and stated: "I also found a pix of my daughter
18  within this url both girls are in protective custody." Later that day, the woman received an
19  email from Backpage's support department stating: "The post is confirmed removed."

20      89.    Some of these emails were forwarded to LACEY and LARKIN. In response,
21  LARKIN applauded Backpage's "good solid response" to the woman and remarked: "this
22  whole rigamarole seems a little odd to me."

23      90.    On May 10, 2012, the television news station CNN ran an expose on
24  Backpage that emphasized "how young some of these girls look" and deemed the website
25  "a hub for the sex trade."

26      91.    On May 11, 2012, PADILLA sent an email to VAUGHT and other Backpage
27  employees entitled "forbidden planet." Enclosed with the email was an Excel spreadsheet

28

- 21 -

that identified over 600 words and phrases that are indicative of prostitution. The spreadsheet also specified, for each word and phrase, whether an ad containing the offending language should be banned or whether Backpage should simply "strip term from ad" and then publish it after the revision.

92. On July 12, 2012, PADILLA sent an email (which was also shared with VAUGHT) to the head of Backpage's Indian moderation team. In this email, PADILLA criticized the moderators for deleting too many ads and provided the following instruction: "I agree that 'over cautiousness' is as big of a problem as moderators that miss a lot of violations."

93. In or around November 2012, a researcher at Arizona State University published a study concluding that most of the ads on Backpage's Phoenix page involved prostitution and that many of the ads depicted juvenile trafficking victims. On December 19, 2012, LACEY was forwarded a copy of the study's results. The researcher responsible for the study also met with a Backpage representative to propose various mechanisms for reducing or eliminating the prostitution of children on the website. Backpage declined to adopt these proposals.

94. Between around September 2010 and October 2012, C.F. became aware that a particular Backpage customer, P.R., was posting prostitution ads. Rather than bar this customer from posting future ads, C.F. repeatedly restored her posting privileges and gave her advice on how to conform to Backpage's publication standards. The communications involving this woman's ads included the following:

• On September 26, 2010, C.F. received an email from a woman who was obviously posting prostitution ads on Backpage. The woman, whose email address included the phrase "provider4u," wrote to complain that her escort ad ("50 Red Roses special — Dont Miss out !!!") had been removed even though "[o]ther women have more explicit ads than me and they are up!" The woman continued: "I can not afford to have this ad removed. This is the only way I can get by and if its not on all the time I will not

- 22 -

DOJ-BP-0004598485

be able to pay my bills . . . . My fiancé is in jail and he is not able to help me at this point." In response, C.F. arranged for the woman to be allowed to continue posting ads.

• On October 6, 2010, C.F. received another email from the same woman. In this email, she complained that her most recent ad had been removed because it included an explicit picture of her body. She provided a copy of the picture to C.F. and stated: "If the person [who removed the ad] is such a prude well maybe they should check out the other women's ads in that [escorts] section." On November 15, 2010, C.F. wrote back to the woman to encourage her to edit the ad so it could be re-posted: "Ok, please try editing the ad now." After this exchange, the woman was permitted to resume posting ads on Backpage.

• On June 6, 2011, C.F. received another email from the same woman. It stated: "I would really appreciate it if you would please take the block off my ad for editing . . . . I wont post any more objectionable pics, ok?" In response, C.F. arranged for the woman's editing and posting privileged to be restored: "You should be able to edit now. Please let us know if you are still having any trouble." After this exchange, the woman resumed posting ads on Backpage.

• On July 14, 2012, C.F. received another email from the same woman. It stated: "would you please take the edit block off my ad. I need to change some info on it and update it. I promise i wont put no more nude pics in it, you have my word. . . . [M]y ad says: 50 red roses special — dont miss out." After this exchange, the woman was allowed to continue posting ads on Backpage.

• On September 17, 2012, C.F. received another email from the same woman. This time, she complained that Backpage was editing her ads (whose title continued to feature the obvious prostitution term "50 Red roses special") to remove the most explicit pictures. She stated: "I would like to know why my ad in the escort section of backpage keeps getting messed with. . . . [S]omeone keeps erasing the link to my pics on the ad. that is so wrong. I am being deprived of income that I sorely need . . . . There

- 23 -

1    are other woman posting pics on their ads that show more nudity . . . ." After this exchange,

2    the woman was permitted to continue posting ads on Backpage.

3           •      On October 16, 2012, the woman wrote another email to Backpage. In this

4    email, she again complained about how Backpage was editing her ads to remove the most

5    explicit pictures. She stated: "It is very hard for me to make any income from this ad as

6    they continually go into my ad and remove the link from the ad that goes to my

7    pictures. They wont allow me to post my pics on the ad yet other women with other ads

8    show more nudity than my pictures ever did."

9           •      This email was forwarded to VAUGHT and to PADILLA, who asked

10   another Backpage employee to "dig into this one a little." On October 17, 2012, PADILLA

11   received a follow-up email from his co-worker stating that the woman's ad had been posted

12   on September 27, was still on the Backpage website, and that the pictures the woman had

13   originally attempted to include in the ad (which had been stripped by Backpage) were

14   "topless shots."

15          •      Following these exchanges, between October 2012 and November 2015, the

16   same customer was allowed to post over a dozen new ads on Backpage, many of which

17   utilized the same identifying information, coded prostitution terms, and contact phone

18   number as before.

19   95.    On January 7, 2013, VAUGHT was informed by a moderator that Backpage

20   wasn't diligently pursuing reports of child exploitation: "We've supposedly been checking

21   them, but some seem to be ignored. They get 'marked as read', but nothing gets done with

22   them. It's aggravating and irresponsible."

23   96.    On June 6, 2013, Backpage received a letter from NCMEC recommending

24   the adoption of several specific security measures to prevent the trafficking of children.

25   The recommended security measures included (a) verifying the age and identity of users

26   who submitted adult ads, (b) verifying the age and identity of individuals depicted in

27   photographs within adult ads, (c) prohibiting the use of anonymous payment sources such

28

                                          - 24 -

as prepaid credit cards, and (d) requiring users to utilize verified email addresses and telephone numbers.   Afterward, Backpage declined to follow any of these recommendations.

97.   On August 30, 2013, LARKIN, SPEAR, BRUNST, HYER, and C.F. received an email notifying them that "Chase [Bank] was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking." In response, C.F. informed the group that he intended to begin "giv[ing] users free ads if they complain while we wait on directly transactions to another processor."

98.   On September 11, 2013, a Backpage representative made a presentation to the Arizona Governor's Task Force on Human Trafficking. Following this presentation (which took place in Phoenix), the representative was asked whether there would be any "cons" to requiring verifiable identification of all escorts being advertised on Backpage's website. In response, the representative did not identify any financial or logistical hurdles to the adoption of such a requirement.   Instead, the representative stated that such a requirement would simply cause Backpage to lose business to other prostitution websites like myRedBook.com or to overseas prostitution websites. During this meeting, members of the task force also provided the representative with evidence showing that Backpage's moderation efforts were ineffective at preventing the publication of prostitution ads.

99.   On April 3, 2014, PADILLA and VAUGHT were forwarded an email that had been sent to Backpage by a credit card processing company in Canada.  The email stated that "[w]e have multiple user accounts that are paying for your services for what I understand to be prostitution advertisements" and sought information about "how you are processing these transactions."

100.   On April 14, 2014, LARKIN and BRUNST received an email from C.F. discussing why Backpage had experienced "past high growth" and identifying various ideas for achieving "future growth."   This email stated that Backpage had been the beneficiary of "[m]igration of content from other . . . marketplaces to the internet" and

- 25 -

DOJ-BP-0004598488

identified one particular marketplace as a key source of Backpage's customers: "[N]et loss
for brick and mortar marketplaces: Strip clubs, hotels, and gathering spots displaced by the
internet." In other words, the email acknowledged that the supposed "escorts" advertising
on Backpage were actually prostitutes (lawful escorts did not congregate at strip clubs,
hotels, and other brick-and-mortar "gathering spots" during the pre-internet age).  This
email also attributed Backpage's success in part to its adoption of policies that allowed
customers to post ads without leaving any meaningful identifying information——in a list of
Backpage's advantageous policies, it identified "Anonymous," "Prepaid card friendly,"
"User can post paid ads without a valid email address," and "bitcoin."

101.  On April 24, 2014, VAUGHT sent an email to Backpage's moderators (while
cc'ing PADILLA). In this email, VAUGHT explained that if a moderator came across an
ad containing a link to a "sex for money" website, the moderator should add the link to a
list of banned terms but "don't bother removing it from the current ad."

102.  On September 4, 2014, Backpage was served with a brief that had been filed
by NCMEC in a lawsuit in Washington state court.  In this brief, NCMEC criticized the
sincerity of Backpage's efforts to prevent child sex trafficking: "Backpage has repeatedly
claimed in public statements and court filings that it is working to reduce child sex
trafficking on its website.  The unpleasant reality is that Backpage publicizes carefully
selected operational processes as a subterfuge to avoid increased scrutiny, while providing
traffickers with easy access to an online venue to sell children for sex.  In practice,
Backpage's stated interest in doing something meaningful to stop child sex trafficking ads
on its site is apparently overridden by the enormous revenue it generates from its escort
ads, including ads selling children for sex."

103.  On March 17, 2015, a law enforcement officer with the California
Department of Justice spoke with a Backpage representative concerning the prevalence of
blatant prostitution ads on Backpage.  In response, the representative did not dispute the
officer's characterization and said the internet and prostitution were not going away.

- 26 -

DOJ-BP-0004598489

Case 2:18-cr-01000-DLR Document 1966-1 Filed 11/13/23 Page 95 of 129
Case 2:18-cr-01000-DJH SEALED Document 3-1 SEALED Filed 04/26/19 Page 94 of
128   Page ID #:234

1    104.   On July 30, 2015, a document entitled "trainingJuly2015" was distributed to

2  Backpage's moderators.  This training manual specifically told moderators that, if they saw

3  a photograph depicting "a person [who] looks young/minor," they should "approve dont

4  delete the ad unless it has a banned term."  The training manual also identified, under the

5  heading "THESE ARE ALL OKAY," a long list of terms that are indicative of prostitution,

6  such as "99% CUM BACK FOR MORE," "car service," and "lollipop special."

7    105.   In or around August 2015, as part of a lawsuit in Illinois, Backpage was

8  served with an affidavit from a detective employed by the Seattle Police Department.  In

9  this affidavit, the detective avowed that "[t]o date, no Detective within the Seattle Police

10  Department's Vice/High Risk Victims Unit has ever found a legitimate 'escort' (person

11  who charges simply for companionship with no offer of sex) or 'masseuse' (person offering

12  legitimate and licensed massage therapy rather than sex) while responding to ads placed in

13  these categories on Backpage.com" and that "every time the Seattle Police Department's

14  Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com,

15  we have found that the ad was a posting for illegal activity."

16    106.   In or around August 2015, during the same lawsuit in Illinois, Backpage was

17  served with a different affidavit from a detective employed by the Boston Police

18  Department. In this affidavit, the detective avowed that "Backpage.com is the number one

19  site in Boston for prostitution and sex trafficking," that his unit had "[s]ince 2010 . . .

20  arrested over 100 buyers of sex of both adults and minors through Backpage.com ads," and

21  that "nearly all the cases we find associated with it [Backpage] involve pimp controlled

22  prostitution."

23    107.   On October 7, 2015, PADILLA received an email from another Backpage

24  employee (which was later forwarded to VAUGHT) disclosing that there were "massive

25  numbers of live ads with banned terms and pictures out on the site."

26    108.   On December 9, 2015, Backpage received an email from a reporter stating

27  that "[o]f the 359 sex trafficking incidents Toronto Police have been involved in since

28

- 27 -

DOJ-BP-0004598490

2013, every single girl that was rescued was advertised on Backpage." The email also asked: "Why hasn't Backpage closed down the adult escort ads portion of its site like Craigslist when it's known that underage girls are being exploited via Backpage?"

109.    In or around January 2016, Company A was retained to serve as a payment processor for some of Backpage's websites. On April 29, 2016, Company A informed C.F. that it had conducted "a review of your website, and unfortunately we had to suspend your account . . . [because] advertising of illegal activities is strictly forbidden."

110.    Beginning in or around January 2016, Backpage's moderators were instructed to stop removing ads that contained the phrase "GFE." For example, on January 28, 2016, VAUGHT was sent an email from a Backpage moderator explaining that "As far as I am aware we are no longer removing ads for GFE." Similarly, on March 9, 2016, a Backpage moderator sent an email to his coworkers explaining that "Andrew [PADILLA] and I talked about the GFE thing, going forward we will not be removing ads for GFE" and clarifying "this includes even gfe with price." And again, on March 25, 2016, an email was sent to Backpage's moderation staff stating that "We are no longer removing ads for 'GFE' or 'PSE.'"

111.    In fact, the BACKPAGE DEFENDANTS repeatedly acknowledged that the term "GFE" (girlfriend experience) is a coded term for prostitution. For example:

• On October 26, 2010, SPEAR, HYER, and PADILLA received an email from C.F. that explained: "No coded sex act for money: GFE, PSE, BBBJ, DATY, etc."

• On May 4, 2011, HYER sent an email to PADILLA and others identifying GFE as a "code word" that should be forbidden.

• On August 31, 2011, PADILLA and C.F. exchanged emails in which they discussed a list of 100 "solid sex for money terms." The list included "GFE = girlfriend experience."

• On November 2, 2011, PADILLA and VAUGHT received an email from a co-worker identifying GFE in a list of "sex phrases and coded terms" that are "not

- 28 -

DOJ-BP-0004598491

1    allowed."

2          112.   HYER, PADILLA, and other BACKPAGE DEFENDANTS periodically

3    received a "Google alert" when articles discussing Backpage appeared in the news. Many

4    of the news articles identified in these alerts discuss instances in which prostitutes who had

5    been advertised on Backpage were kidnapped, raped, or murdered.

6          113.   In January 2017, after conducting a lengthy investigation, the Senate

7    Subcommittee on Permanent Investigations ("Subcommittee") issued a 50-page report

8    entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking." This report

9    concluded, among other things, that virtually all of Backpage's "adult" ads are actually

10   solicitations for illegal prostitution services and that "Backpage has maintained a practice

11   of altering ads before publication by deleting words, phrases, and images indicative of

12   criminality, including child sex trafficking . . . . Those practices served to sanitize the

13   content of innumerable advertisements for illegal transactions—even as Backpage

14   represented to the public and the courts that it merely hosted content others had created."

15         114.   In response to the Subcommittee's report, Backpage purported to shut down

16   the "adult" section of its website. However, the prostitution ads simply migrated to other

17   sections of the website, where they remain to this day.

18   D.    International Operations

19         115.   In addition to facilitating prostitution through its U.S. website, Backpage has

20   also facilitated prostitution through its websites in foreign countries. In this context,

21   Backpage often affirmatively creates the content of the illegal prostitution ads being

22   published.

23         116.   Around 2013 or 2014, Backpage hired a Philippines-based company

24   (Company B) in an attempt to increase the profitability of Backpage's international

25   operations. Company B's employees were instructed to (1) visit rival prostitution websites

26   in other countries, (2) obtain the email addresses of prostitutes who were posting ads on

27   those websites (often by falsely posing as prospective customers), (3) use the information

28

- 29 -

from the other website to create a competing prostitution ad on Backpage (a process referred to internally as "preboarding"), and then (4) transmit the new ad to the prostitute, often using the previously-harvested email account information, in an attempt to persuade the prostitute to become a Backpage customer. Company B's employees were paid bonuses based on the amount of ad revenue they generated for Backpage using these techniques.

117.    Backpage's executives were fully aware of the plan to use Company B to create prostitution ads outside the United States. For example, on or around November 6, 2013, C.F. made a presentation to LARKIN, SPEAR, and BRUNST. Among other things, this presentation summarized Backpage's plans for "International Planning and Expansion." One of the plans was to use the Philippines as a "test" market and hire Filipino contractors to "contact by email leads, secure email address, add ad and email address in [computer system] and assign to American staff. American staff makes contact."

118.    On August 7, 2014, HYER sent an email stating that Company B was "an efficient and cost effective way for us to bring new users to backpage." This email also contained the following summary of how Company B would operate: "Process after hiring company offering BPO services: 1. Backpage provides BPO with sites, categories & countries to target. Backpage also provides sample 'scripts' and examples of phone calls. 2. BPO contacts users via phone from sites backpage provided, obtains user email address & permission to preboard ad. 3. BPO preboards ad as public user. 4. After ad is preboarded, users receive verification link to verify the ad." This email also stated that Backpage would offer a "bonus per verified authenticated ad."

119.    On April 10, 2015, a "five-year business plan" was emailed to LARKIN, BRUNST, SPEAR, and C.F. One of the goals for 2015 was "Off shore marketing staff in the Philippines to grow to 166 and main task is international market content acquisition." This email also included a separate attachment stating that HYER should be considered for promotion because "his strengths are strong marketing and revenue growth skills" and he

- 30 -

DOJ-BP-0004598493

had been "heavily involved in the user experience development" and that VAUGHT should be considered for a promotion because "[h]er strengths include six years of experience managing moderators."

120.   On May 15, 2015, a Company B employee posing as a Backpage employee sent an email to an apparent prostitute. The subject line was "Offering Free Advertisement from Backpage.com" and the text of the email sought to persuade the prostitute to "upgrade your ad with sponsor placement or automatic repost." In response, the prostitute wrote back that she had "managed to activate my ad and could buy credits as well, thanks for your help. I'm traveling today to [London] how can I change my location." This email exchange was later forwarded by HYER to C.F. with a cover note stating: "[I]deal scenario for [Company B] agent – user activates ad, user purchases credit."

121.   On December 14, 2015, C.F. was part of an email exchange concerning an ad that had an IP address associated with Company B. This email contained the following description of Company B's process for creating and selling prostitution ads on Backpage: (1) "Staff found lead in assigned area." (2) "Staff entered all relevant into [database] (phone/email/etc.)" (3) "Staff called lead to discuss creation of free ad" (4) Staff created free ad for lead (verification email sent). (5) Staff followed under with an email reminding lead of phone conversation and detailing verification of ad."

E.   Select Victim Summaries

122.   Between in or around 2009 and 2013, Victim 1 was sold for sex, through the use of Backpage ads, in Ohio, Indiana, and Georgia. Victim 1's Backpage ads often included words and phrases that were indicative of prostitution, such as "roses" (money). On at least one occasion, Victim 1 contacted Backpage after a proposed ad had been rejected because it contained banned words and phrases. In response, a Backpage representative coached Victim 1 on how to re-write the ad using different words. Victim 1's trafficker took all of the money that was earned through her acts of prostitution.

123.   Between in or around 2009 and 2011, Victim 2 was sold for sex, through the

- 31 -

DOJ-BP-0004598494

use of Backpage ads, in Arizona, Georgia, North Carolina, Texas, New York, New Jersey,
and Louisiana.  Victim 2's trafficker drafted her Backpage ads and Victim 2 initially did
not know she was being offered on Backpage.  The ads contained words and phrases to
make customers believe Victim 2 was "barely legal" and also contained words and phrases
indicative of prostitution, such as "roses" (money).

124.    Between in or around 2009 and 2012, Victim 3 was sold for sex, through the
use of Backpage ads, in Colorado and North Dakota.  Victim 3's pimp instructed her to
review existing prostitution ads on Backpage to learn how to draft her own ads.  During a
portion of this period, Victim 3 was required by her pimp to make week-long trips to North
Dakota to work as a prostitute.  During these trips, which would generate as much as $2,000
in prostitution-derived revenue each day, Victim 3 was forced to leave her children at home
in the care of her pimp.

125.    In or around 2010, Victim 4 was sold for sex, through the use of Backpage
ads, in Washington.  During this period, Victim 4 was a juvenile (15 years old).  Victim
4's pimp drafted the ads that were placed on Backpage.  The wording of these ads was
edited by Backpage before publication.  The ads contained words and phrases such as
"W'E'L'L_W'O'R'T'H_I'T***^***150HR" and "IT WONT TAKE LONG AT ALL"
and included pictures of Victim 4 in provocative positions showing her breasts and
buttocks.

126.    Between in or around 2011 and 2016, Victim 5 was sold for sex, through the
use of Backpage ads, in Massachusetts and Rhode Island.  During much of this period,
Victim 5 was a juvenile (14-19 years old).  Victim 5's female pimp instructed Victim 5
that Backpage was the safest place to advertise because it did not require age verification.
On one occasion, Backpage declined to accept a proposed ad that indicated Victim 5 was
only 17 years old.  In response, the ad was simply resubmitted with a new (false) age of
19.  On other occasions, Backpage removed provocative pictures of Victim 5 from ads and
then allowed edited versions of the ads to be published.  Victim 5's Backpage ads included

- 32 -

DOJ-BP-0004598495

words and phrases that were indicative of prostitution, such as "roses" (money) and "back door" (anal sex). Some of the customers who responded Victim 5's Backpage ads forced Victim 5 to perform sexual acts at gun point, choked her to the point of having seizures, and gang-raped her.

127.   In or around June 2012, Victim 6 was sold for sex, through the use of Backpage ads, in Arizona. Her traffickers utilized Backpage ads that did not offer a specific person but instead generally offered a woman with a particular type of hair color and build. On June 22, 2012, Victim 6 was dispatched to a customer who had responded to a Backpage ad featuring "Nadia," who was described as a slender brunette woman. Upon her arrival at the location, Victim 6 was stabbed to death.

128.   Between in or around 2012 and 2015, Victim 7 was sold for sex, through the use of Backpage ads, in Washington and Oregon. Victim 7's pimp drafted the ads that were placed on Backpage. The wording of these ads was edited by Backpage before publication. The ads contained provocative nude pictures of Victim 7.

129.   Between in or around 2013 and 2014, Victim 8 was sold for sex, through the use of Backpage ads, in Maine, Connecticut, and Massachusetts. During this period, Victim 8 was a juvenile (15 years old). Victim 8's uncle, as well as his friends, placed the ads on Backpage, which included words and phrases that were indicative of prostitution, such as "roses" (money), "fetish friendly," and 150 for 1/2 hour, 200 for full hour. Through these ads, Victim 8 was forced to do "in-calls" (where she was raped in hotels) as well as "out-calls" (where she was raped at other locations chosen by the men paying for her).

130.   In or around 2013, Victim 9 was sold for sex, through the use of Backpage ads, in Florida. Victim 9's pimp taught her how to use code words in her Backpage ads to indicate how much she was charging for certain sex acts. Victim 9 was brutally attacked by her trafficker, causing bruises and a fractured cheek bone.

131.   Between in or around 2014 and 2015, Victim 10 was sold for sex, through

- 33 -

DOJ-BP-0004598496

the use of Backpage ads, in California and Arizona. During some of this period, Victim 10 was a juvenile (17 years old). An associate of Victim 10's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "NEW IN TOWN," "sexy sweet," and "sweet like honey but super hot like fire" and included pictures of Victim 10 in provocative positions showing her legs, stomach, shoulder, and buttocks.

132.    Between in or around 2014 and 2015, Victim 11 was sold for sex, through the use of Backpage ads, in Arizona, Colorado, Minnesota, Oregon, California, Montana, Nevada, New Mexico, and Utah. The Backpage ads contained words and phrases indicative of prostitution and included pictures of Victim 11 in provocative positions. On some occasions, Backpage would remove certain explicit photos from the ads but publish the remaining text and other photos. Victim 11's trafficker gave her drugs, took her identification documents, sexually assaulted her with a firearm, and forced her to work full-time as a prostitute.

133.    In or around 2015, Victim 12 was sold for sex, through the use of Backpage ads, in California and Arizona. Victim 12 was first advertised on Backpage in San Bernardino, California, but moved to the Phoenix metro area because the Super Bowl was being held there. Victim 12's advertisements on Backpage contained words and phrases such as "New In Town" and "Sexy Dark Asian Bombshell with a Nice & Tight {Booty}" and included pictures showing Victim 12's legs, stomach, shoulders and buttocks.

134.    In or around 2015, Victim 13 was sold for sex, through the use of Backpage ads, in California. During this period, Victim 13 was a juvenile (15 years old). Victim 13 and her trafficker both posted the Backpage ads, which falsely represented that Victim 13 was 19 years old and showed pictures of her face and body. On at least one occasion, a Backpage representative contacted Victim 13 with instructions on how to fix an ad so it could be published.

135.    In or around June 2015, Victim 14 was sold for sex, through the use of a

- 34 -

DOJ-BP-0004598497

Backpage ad, in Texas. This ad contained words and phrases such as "fun, young, exotic," "Ready to be your fantasy girl," "OUT CALLS ONLY," and "NO BLACK MEN" and included pictures of Victim 14's stomach, breasts, shoulders, and buttocks. On or around June 20, 2015, Victim 14 was murdered by a customer. Afterward, the customer attempted to destroy Victim 14's corpse by lighting it on fire. Victim 14's father later contacted Backpage to request that the ads showing his deceased daughter be removed. Backpage did not immediately comply with this request.

136.   In or around June 2015, Victim 15 was sold for sex, through the use of Backpage ads, in Texas and Louisiana. These ads contained words and phrases such as "Thick Glass of Chocolate Milk Looking for a GoodTime!!!" and "sexy certified freak" and contained pictures showing Victim 15's legs, shoulders and buttocks. On June 10, 2015, Victim 15 was forced into a vehicle with her trafficker, who was attempting to take her to Texas against her will. In an attempt to escape, Victim 15 jumped out of the vehicle onto Interstate 10 and was killed after being hit by several vehicles at high speeds.

137.   In or around July and August 2015, Victim 16 was sold for sex, through the use of Backpage ads, in Michigan. These ads contained words and phrases such as "OUTCALLS ONLY," "Juicy Caramel Lady On Duty," "Sexy, Erotic Caramel Dream," and "No Thugs, Pimps Or Weirdos" and contained pictures showing Victim 16's breasts, legs, lips, buttocks, and face. On August 15, 2015, Victim 16 was murdered by a customer. Afterward, the customer dumped her corpse in a park.

138.   Between in or around 2015 and 2016, Victim 17 was sold for sex, through the use of Backpage ads, in Arizona and California. Victim 17 averaged ten customers a day during this time and turned over all of her prostitution earnings (approximately $1,500 per day) to her pimp. An associate of Victim 17's pimp took pictures of her and drafted the ads that were placed on Backpage. The Backpage ads contained words and phrases such as "IN/CALLS ONLY," "I'm here to make your wildest fantasies come true!" and "Sorry, but NO BLACK MEN" and included pictures of Victim 17's buttocks and face.

- 35 -

F.   Money Laundering Activities

139.   Backpage's customers have overwhelmingly used the proceeds of criminal activity (*i.e.*, money earned from pimping and prostitution) when purchasing ads on Backpage.   In addition, because Backpage's publication of such ads is an independent crime (*e.g.*, violation of 18 U.S.C. § 1952), the fees it collects from customers posting prostitution ads——estimated at more than $500 million since 2004——constitute the proceeds of unlawful activity.

140.   For these and other reasons, banks and financial institutions have repeatedly refused to do business with Backpage. In response, the BACKPAGE DEFENDANTS have pursued a variety of money laundering strategies. For example, on August 27, 2013, C.F. was forwarded an array of emails from Backpage customers who were complaining that their credit card companies had refused to process Backpage-related transactions.   One customer wrote:   "Have you resolved the issue of Chase Bank not honoring payment for you for ethical reasons?" C.F. forwarded these complaint emails to LARKIN, SPEAR, and BRUNST and proposed, as a "solution" to the problem, that Backpage reconfigure its website to fool credit card companies into believing the charges were being incurred on a different website.

141.   During a November 2013 presentation by C.F. to LARKIN, SPEAR, and BRUNST, C.F. again discussed strategies for fooling credit card companies into believing that Backpage-associated charges were being incurred on different websites, including a proposal to set up shell companies without any apparent connection to Backpage ("create new companies with new principals") and use their bank accounts to accept payment. Another "solution" was to "allow users to fund an account thru several other sites" that "have no adult or images."

142.   On November 6, 2013, LARKIN, SPEAR, and BRUNST received an email entitled "Options for the future of Backpage." This email discussed various strategies for creating new entities to process Backpage-related payments "without ever disclosing ties

- 36 -

to Backpage."

143. On April 1, 2015, BRUNST and C.F. were informed that Mastercard was "snooping around" Backpage and might stop processing payments for Backpage. In response, C.F. offered several suggestions for setting up new payment channels that would conceal Backpage's involvement. One such proposal was to begin routing Backpage-related transactions through banks located in the country of Mauritius. In response, BRUNST stated: "Didnt we go down the Mauritius path once and the banks had the same issue with our content?"

144. Notwithstanding these strategies, the three major credit card companies stopped doing business with Backpage. On or about April 30, 2015, Backpage learned that American Express would no longer allow its cards to be used for any purchases in Backpage's adult section. In or around July 2015, Backpage learned that Mastercard would no longer allow its cards to be used for Backpage-related transactions. When discussing this decision, MasterCard stated that it "has rules that prohibit our cards from being used for illegal activities." Around the same time, Backpage learned that Visa would no longer allow its cards to be used for Backpage-related transactions. When discussing this decision, Visa stated that its "rules prohibit our network from being used for illegal activity."

145. Similarly, some banks closed accounts that were held by Backpage (or Backpage-related entities) out of concern the accounts were being used for illegal purposes. For example, on April 2, 2014, BRUNST received a letter from U.S. Bank that was addressed to "Backpage.com." The letter explained: "Dear Jed . . . please be advised that we have elected to close your Account with us."

146. Backpage responded to these developments in several ways. One was to encourage customers to send checks and money orders to a Post Office box held in the name of a seemingly-unrelated entity called Posting Solutions LLC ("Posting Solutions") and give such customers a corresponding credit on Backpage. For example, on July 31,

DOJ-BP-0004598500

2015, C.F. exchanged email correspondence with a representative from a payment processing company. In this email, C.F. identified himself as the CEO of Posting Solutions, described Backpage as a "brand" operated by Posting Solutions, and explained he was seeking to "find a way to position payments under another company."

147. The following episode provides an example of how the Posting Solutions payment process worked. On October 16, 2015, Backpage received an email from a customer complaining about her inability to pay for ads using a credit card. In response, a Backpage representative explained—in an email exchange later forwarded to VAUGHT— that "[i]f you would like to pay for upgrades or buy credits, we suggest posting with alternative payment methods such as Bitcoin. If you are in the United States, you can also pay by check or money order. Please make payable to 'Posting Solutions.' WE CAN ONLY ACCEPT CHECKS OR MONEY ORDERS MADE OUT TO 'POSTING SOLUTIONS.' Posting Solutions. Attn: Accounts. P.O. Box 192307, Dallas, TX 75219. Please send through the United States Postal Service. FedEx, UPS, or other mail delivery alternatives cannot deliver to a P.O. Box. When sending your payment please be sure to include your email address. Please do not make your payments out to backpage.com as we will no longer be able to accept them."

148. Between around September 2015 and June 2016, over $7.1 million of checks and money orders sent by Backpage customers were deposited in bank accounts held by Posting Solutions.

149. Backpage also utilized a different entity, called Website Technologies, LLC ("Website Technologies"), to process Backpage-related funds and took steps to make it appear that Backpage and Website Technologies were independent entities. For example, on March 10, 2014, BRUNST, SPEAR, and others participated in an email exchange with the subject line "Website Technologies vs Backpage (Vendors, audits, risk assessments, email)." During this exchange, one person stated "[C.F.] and I were just discussing company names and the possibility of updating our email addresses to

- 38 -

websitetechnologies.com." In response, BRUNST cautioned: "We need to think this thru or all the work to separate it from BP will be lost." Similarly, on April 3, 2014, BRUNST sent an email to SPEAR and others explaining that "[b]y May 1 we will have to be out of US Bank. We will move all banking under Website Technologies at [a different bank, BMO Harris]."

150.   In many instances, Backpage-related money that was initially deposited into accounts held by Posting Solutions was later transmitted to accounts held by Website Technologies. For example:

• On October 27, 2015, C.F. received an email entitled "Two packages coming your way! (Money Orders)." The email stated that two UPS packages filled with money orders were being sent—one containing $47,647.25 of money orders made out to Backpage and the other containing $52,251.48 of money orders made out to Posting Solutions.

• Similarly, on November 16, 2015, C.F. received an email entitled "Three packages sent today $441,408.69." The email stated that three packages filled with money orders were being sent—one containing $129,193.61 of money orders made out to Backpage, another containing $244,353.63 of money orders made out to Posting Solutions, and the last containing an additional $67,861.75 of money orders made out to Posting Solutions.

• And again, on January 29, 2016, a Posting Solutions account wired $2.4 million to a Website Technologies account. PADILLA and C.F. were both authorized signers on the recipient account.

151.   In addition to receiving millions of dollars from Posting Solutions, the Website Technologies accounts also served as the repository for millions of dollars of wires from international bank accounts controlled by Backpage-associated entities. For example, between January 2015 and December 2016, Website Technologies accounts received over $45.4 million in wire transfers from Backpage-associated bank accounts in Liechtenstein, over $30.1 million in wire transfers from Backpage-associated bank accounts in Iceland,

DOJ-BP-0004598502

1   and over $3.9 million in wire transfers from Backpage-associated bank accounts in the
2   Netherlands.

3       152.   In many instances, the next stage of the money-laundering process was for
4   money to be wired from Website Technologies accounts to bank accounts held by a
5   different entity called Cereus Properties LLC ("Cereus Properties").  The authorized
6   signers on the Cereus Properties accounts included SPEAR and BRUNST.  Between
7   around December 2015 and October 2016, Website Technologies accounts sent wire
8   transfers totaling over $47 million to accounts held by Cereus Properties.

9       153.   Accounts held by Cereus Properties also received money directly from
10  international bank accounts controlled by Backpage-associated entities.  For example,
11  between around August 2016 and November 2016, Cereus Properties accounts received
12  over $11.3 million in deposits and wire transfers from Backpage-associated accounts in the
13  Netherlands.

14      154.   After money reached Cereus Properties, large portions of it were funneled
15  back to Backpage or to certain BACKPAGE DEFENDANTS.  For example, between
16  January 2016 and January 2017, LACEY (and LACEY's family members) received
17  distributions totaling over $30.3 million and LARKIN separately received distributions
18  totaling over $21 million.

19      155.   Backpage also furthered its money laundering efforts through the use of
20  bitcoin processing companies.  Over time, Backpage utilized companies such as CoinBase,
21  GoCoin, Paxful, Kraken, and Crypto Capital to receive payments from customers and/or
22  route money through the accounts of related companies.

23      156.   Backpage also furthered its money laundering efforts by developing ways for
24  customers to purchase ads using gift cards issued by third-party vendors.  This process was
25  described in a July 23, 2015, email exchange between various Backpage employees on
26  which HYER and others were copied.  This exchange included the following: "[W]hat if
27  we used a customers [sic] payment method, say visa prepaid card, to buy [bitcoin] from

28

- 40 -

1  our seller account . . . giving said bitcoin to our catch-all wallet elsewhere (instead of to
2  user), simultaneously adding credits/purchasing paid ad or upsells?  From the user's
3  perspective they just input their prepaid card and get their credits or purchase."

## COUNT 1

### (Conspiracy)

6  157.  The factual allegations in Paragraphs 1-156 are incorporated by reference
7  and re-alleged as though fully set forth herein.

8  158.  Beginning in or around 2004, and continuing through the present, in the
9  District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, HYER,
10  PADILLA, and VAUGHT, and others known and unknown to the grand jury, knowingly
11  and intentionally agreed, confederated, and conspired with each other, and with others
12  known and unknown to the grand jury, to commit the following offenses against the United
13  States:

14        a.   18 U.S.C. § 1952(a)(3)(A) (Travel Act—Facilitate Prostitution).

### OBJECT OF THE CONSPIRACY

16  159.  The object of the conspiracy was to obtain money.

### MANNER AND MEANS OF THE CONSPIRACY

18  160.  The manner and means of the conspiracy are described in paragraphs 1-156
19  above, incorporated by reference and re-alleged as though fully set forth herein.

### OVERT ACTS

21  161.  Overt acts were committed in furtherance of the conspiracy, including but
22  not limited to those described in paragraphs 1-156 above, incorporated by reference and
23  re-alleged as though fully set forth herein.

24  In violation of 18 U.S.C. § 371.

- 41 -

**COUNTS 2-51**

**(Travel Act—Facilitate Prostitution)**

162.    The factual allegations in Paragraphs 1-161 are incorporated by reference and re-alleged as though fully set forth herein.

163.    On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, HYER, PADILLA, and VAUGHT, and others known and unknown to the grand jury, used the mail and any facility in interstate and foreign commerce with intent to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: prostitution offenses in violation of the laws of the State in which they are committed and of the United States, including but not limited to Title 13, Arizona Revised Statutes, Section 13-3214, and thereafter performed and attempted to perform an act that did promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of the unlawful activity, as follows:

| Count | Date | Description |
|---|---|---|
| 2. | Sept. 10, 2013 | Publish ad depicting Victim 5 entitled "Get freaky Tuesday . . Come spend ur day with us – 19," with accompanying text "Doin incalls and outcalls" |
| 3. | Jan. 27, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 4. | Jan. 29, 2014 | Publish ad depicting Victim 8 entitled "Puerto Rican mami in walpole area INCALLS --19" after deleting one picture from the originally-submitted ad |
| 5. | Jan. 31, 2014 | Publish ad depicting Victim 8 entitled "Exotic latina, south portland area, ready to play, INCALLS, 30 min specials!!! -- |

- 42 -

DOJ-BP-0004598505

| | | |
|---|---|---|
| | | 19" after deleting one picture from the originally-submitted ad |
| 6. | Feb. 6, 2014 | Publish ad involving P.R. entitled "75 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 7. | Apr. 20, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 8. | May 7, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 9. | May 31, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 10. | July 1, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 11. | Aug. 19, 2014 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  - DONT MISS OUT!!!!!" |
| 12. | Nov. 23, 2014 | Publish ad depicting Victim 10 entitled "New in Town Super Hot Skinny Mixed Cuban Girl With Long Black Hair – 18" after deleting picture from originally-submitted ad |
| 13. | Jan. 29, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asain Bombshell with a Nice & Tight {Booty} – 23" after deleting one picture from the originally-submitted ad |
| 14. | Jan. 31, 2015 | Publish ad depicting Victim 10 entitled "NEW IN TOWN sexy sweet European mixed Cuban California girl – 21" |
| 15. | Jan. 31, 2015 | Publish ad depicting Victim 12 entitled "New in Town Sexy Dark Asian mixed Bombshell – 23" after deleting one picture from the originally-submitted ad |
| 16. | Feb. 4, 2015 | Publish ad depicting Victim 11 entitled "Upscale Independent BRUNETTE BOMBSHELL 5-Star Fantasy – 26," after |

- 43 -

| | | |
|---|---|---|
| | | deleting pictures from originally-submitted ad |
| 17. | Feb. 18, 2015 | Publish ad depicting Victim 11 entitled "Alexis Foxx the HOTTEST in town!!!!! – 26," after deleting six pictures from the originally-submitted ad |
| 18. | Feb. 26, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  – DONT MISS OUT!!!!!" |
| 19. | May 18, 2015 | Publish ad depicting Victim 15 entitled "GORGEOUS ebony PLAYMATE Perfect Curves...Skills to make ur TOES CURL – 19," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "Incalls & Outcall!!!" |
| 20. | May 19, 2015 | Publish ad depicting Victim 15 entitled "Hot & Driping Submissive Ebony Playmates – 20," after removing one picture of originally-submitted ad, with accompanying text "you agree . . . you are not affiliated with any law enforcement agency" and "We're ready to please and accommodate all of your needs and wants!!  With a mouth that'll ROCK your [] and a [picture of cat] that'll leave you purring for more" |
| 21. | July 1, 2015 | Publish ad depicting Victim 17 entitled "AbSoLuTeLy AmAziNg CoMe PLaY WiTh Me #1 MoST WaNtEd SwEeT SEXii PlAymate – 20," with accompanying text "By contacting me you agree that you are not affiliated with any form of law enforcement," PERFECT & Will satisfy your every need," and "IN/CALLS – ONLY" |
| 22. | July 2, 2015 | Publish ad depicting Victim 17 entitled "SeXy!! Exotic playmate Call me! the girl you NEED to See! – 20," with |

- 44 -

DOJ-BP-0004598507

| | | | |
|---|---|---|---|
| | | | accompanying text "I DO NOT OFFER 40$, 50$, 60$ SPECIALS" and "IN/CALLS — ONLY" |
| 23. | Aug. 13, 2015 | Publish ad depicting Victim 13 entitled "Young SEXY PUERTO RICAN — 19," which accompanying text "I do half hour sessions that vary in donation prices, 80 for head, 120 for hooking up without head and 150 for hooking up with head" |
| 24. | Aug. 15, 2015 | Publish ad depicting Victim 16 entitled "Outcalls Now Freaky Curvy Caramel Lady OUTCALLS NOW — 23" |
| 25. | Sept. 13, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  — DONT MISS OUT!!!!!" |
| 26. | Nov. 28, 2015 | Publish ad involving P.R. entitled "50 Red R*O*S*E*S S*P*E*C*I*A*L  — DONT MISS OUT!!!!!" |
| 27. | Apr. 21, 2016 | Publish ad entitled "Finally!!  PSE & GFE — Kimber Rae and MIA Marie Together BOOK NOW" |
| 28. | Nov. 3, 2016 | Publish ad entitled "GFEE New — 18" |
| 29. | Nov. 11, 2016 | Publish ad entitled "Mind blowing Tiffany. Incall in Taunton — 37," with accompanying text "Soft GFE . . . Im real and reviewed" |
| 30. | Nov. 14, 2016 | Publish ad entitled "Top Model 2016 Special 'Best Looking Young Asian' . . . — 22," with accompanying text "Sexy Asian Girl Incall Service" and "GFE" |
| 31. | Nov. 14, 2016 | Publish ad entitled "Sometimes It's All About The Journey, And The Destination.....Erectile Dysfunctional G F E Provider — 44," with accompanying test "You can find a few current reviews at T3R xxxxxx#" and "I have been EROS authenticated" |

- 45 -

DOJ-BP-0004598508

| 32. | Nov. 19, 2016 | Publish ad entitled "The True (G)irl (F)riend (E)xperience… Visiting November 27th Sunday ~ PRE-BOOKING SPECIAL ~ - 100," with accompanying text "Let's blur restrictions between financial transaction & Romantic Connection" |
| 33. | Nov. 24, 2016 | Publish ad entitled "Top Asian Grand Opening 100% Young 100% Sexy … -- 23," with accompanying text "BEST INCALL IN TOWN!" and "GFE" |
| 34. | Nov. 26, 2016 | Publish ad entitled "I LOVE MEN!! I'm a GFE, OutCall and Incall with exception on the Incall!! -- 42" |
| 35. | Dec. 20, 2016 | Publish ad entitled "OMG  Sexy Sensual 36DD-24-36 Stacked College Coed With The Best Mouth Ever! BOOK NOW! -24," with accompanying text "I do ALL the things YOU Wish Your Wife Did!!" and "(G).(F).(E) 30 min/$180" |
| 36. | Jan. 15, 2017 | Publish ad entitled "Real & Reviewed Girlfriend Theonesweet.weebly.com -- 30," with accompanying text "250 G F E" |
| 37. | Apr. 4, 2017 | Publish ad entitled "KISSING & GFE KOREAN GIRLS -- 20" |
| 38. | Apr. 11, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 -- 39," with accompanying text "complete GFE experience" |
| 39. | July 3, 2017 | Publish ad entitled "WANNA HANG OUT NOW UpScale New In Town! Call ME now for an unforgettable visit -- 20," with accompanying text "100% GFE with 100% no Pimps" |
| 40. | July 15, 2017 | Publish ad entitled "Ready for some fun daddy? This is your chance too have a amazing time - 21," with accompanying text "Slim body, nice tits, freaky, GFE" |

- 46 -

DOJ-BP-0004598509

| | | |
|---|---|---|
| 41. | July 15, 2017 | Publish ad entitled "New in town BiGBubble Booty SWEETLiPS HOT BODY – 24," with "GFE" in accompanying text |
| 42. | July 21, 2017 | Publish ad entitled "Pettit Sexy #Corey# 4407239339 – 30," with accompanying text "complete GFE experience" |
| 43. | July 23, 2017 | Publish ad entitled "ASIAN GODDESS young – 20," with accompanying text "100% Discreet service" and "#GFE" |
| 44. | Jan. 26, 2018 | Publish ad entitled "GFE Service Available!  Private Encounters w/ Pampering Beauty" |
| 45. | Jan. 30, 2018 | Publish ad entitled "241 & white plans area  Carfun  Perfect Treat  Available No Rush," with "Sweet Sexy GFE" in accompanying text |
| 46. | Jan. 30, 2018 | Publish ad entitled "GFE REAL HOT Sweet DREAM AMAZING BEST RELAX" |
| 47. | Jan. 30, 2018 | Publish ad entitled "Tall, Slim & Sexy Luxe Goddess * NARCISA * Sensual Body Rub + Fetish Sessions," with accompanying text "gfe Hh: $160 H: $220" |
| 48. | Jan. 31, 2018 | Publish ad entitled "Exotic Asian Beauty," with accompanying text "I am an independent GFE with excellent massage skills" |
| 49. | Feb. 1, 2018 | Publish ad entitled "Nuru (Best GFE ever) incall only" |
| 50. | Feb. 6, 2018 | Publish ad entitled "Tuesday with Ashleigh. Available now," with "GFE" in accompanying text |
| 51. | Feb. 6, 2018 | Publish ad entitled "GFE  Kisskisspop 100% Real Photo Choice 9Asian girl Nurunude" |

In violation of 18 U.S.C. § 1952(a)(3)(A) and (b)(1)(i).

- 47 -

1                                 **COUNT 52**

2                  **(Conspiracy To Commit Money Laundering)**

3        164.   The factual allegations in Paragraphs 1-163 are incorporated by reference

4 and re-alleged as though fully set forth herein.

5        165.   Beginning in or around 2004, and continuing through the present, in the

6 District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and

7 HYER, and others known and unknown to the grand jury, knowingly and intentionally

8 agreed, confederated, and conspired with each other, and with others known and unknown

9 to the grand jury, to commit the following offenses against the United States:

10               a.     18 U.S.C. § 1956(a)(1)(A)(i) (Promotional Money Laundering)

11               b.     18 U.S.C. § 1956(a)(1)(B)(i) (Concealment Money Laundering)

12               c.     18 U.S.C. § 1956(a)(2)(A) (Int'l Promotional Money Laundering)

13               d.     18 U.S.C. § 1956(a)(2)(B)(i) (Int'l Concealment Money Laundering)

14               e.     18 U.S.C. § 1597 (Transactional Money Laundering)

15       In violation of 18 U.S.C. § 1956(h).

16                             **COUNTS 53-62**

17               **(Concealment Money Laundering)**

18        166.   The factual allegations in Paragraphs 1-165 are incorporated by reference

19 and re-alleged as though fully set forth herein.

20        167.   On or about the dates set forth below, each instance constituting a separate

21 count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY,

22 LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand

23 jury, knowing that the property involved in a financial transaction represented the proceeds

24 of some form of unlawful activity, conducted and attempted to conduct such a financial

25 transaction which in fact involved the proceeds of specified unlawful activity knowing that

26 the transaction was designed in whole and in part to conceal and disguise the nature, the

27 location, the source, the ownership, and the control of the proceeds of the specified

28

                                              - 48 -

unlawful activity, as follows:

| Count | Date | Amount | Description |
|---|---|---|---|
| 53. | May 18, 2016 | $1,476,505.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 54. | May 18, 2016 | $264,438.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 55. | May 31, 2016 | $3,171,675.80 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 56. | May 31, 2016 | $432,961.87 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 57. | June 20, 2016 | $842,878.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 58. | June 30, 2016 | $3,076,147.75 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 59. | July 27, 2016 | $3,252,681.62 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 60. | July 27, 2016 | $438,818.86 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 61. | Aug. 16, 2016 | $804,250.00 | Website Technologies (x2008) to Cereus Properties (x6211) |
| 62. | Aug. 31, 2016 | $3,171,264.42 | Website Technologies (x2008) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(1)(B)(i).

- 49 -

## COUNTS 63-68

### (International Promotional Money Laundering)

168.  The factual allegations in Paragraphs 1-167 are incorporated by reference and re-alleged as though fully set forth herein.

169.  On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the District of Arizona and elsewhere, defendants LACEY, LARKIN, SPEAR, BRUNST, and HYER, and others known and unknown to the grand jury, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds from a place in the United States to and through a place outside the United States, and to a place in the United States from and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity, as follows:

| Count | Date | Amount | Description |
|---|---|---|---|
| 63. | Mar. 4, 2014 | $6,450.00 | U.S. Bank (x1165) to S.B. (web developer in India) |
| 64. | Aug. 5, 2016 | $5,005,732.86 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 65. | Sept, 22, 2016 | $2,916,955.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 66. | Oct. 3, 2016 | $354,050.84 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 67. | Nov. 2, 2016 | $2,726,170.00 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |
| 68. | Nov. 15, 2016 | $351,403.54 | Ad Tech B.V. (Netherlands) to Cereus Properties (x6211) |

In violation of 18 U.S.C. § 1956(a)(2)(A).

- 50 -

DOJ-BP-0004598513

## COUNTS 69-93

### (Transactional Money Laundering)

170.  The factual allegations in Paragraphs 1-169 are incorporated by reference and re-alleged as though fully set forth herein.

171.  On or about the dates set forth below, each instance constituting a separate count of this Indictment, in the United States and in the District of Arizona and elsewhere, the specified defendant, and others known and unknown to the grand jury, knowingly engaged and attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, as follows:

| Count | Defendant | Date | Amount | Description |
|---|---|---|---|---|
| 69. | LACEY, BRUNST | Aug. 21, 2013 | $30,000.00 | Bank of America (x1793) to Stewart Title (partial payment for Sedona property) |
| 70. | LACEY, BRUNST | Sept. 13, 2013 | $62,491.47 | BMO Harris to Stewart Title (partial payment for Sedona property) |
| 71. | SPEAR | June 11, 2014 | $300,000.00 | National Bank of Arizona (x0178) to Spear Family Trust |
| 72. | SPEAR | June 20, 2014 | $200,000.00 | National Bank of Arizona (x0178) to TD Ameritrade |
| 73. | SPEAR | Nov. 4, 2014 | $1,000,000.00 | National Bank of Arizona (x0178) to UBS Financial |
| 74. | SPEAR | May 14, 2015 | $250,000.00 | National Bank of Arizona (x0178) to Lincoln National Life |
| 75. | SPEAR | May 26, 2015 | $50,000.00 | National Bank of Arizona (x0178) to Industrial Property |

- 51 -

DOJ-BP-0004598514

| | | | | |
|---|---|---|---|---|
| | | | | Trust |
| 76. | SPEAR | Nov. 3, 2015 | $300,000.00 | National Bank of Arizona (x0178) to Ally Bank |
| 77. | SPEAR | Dec. 1, 2015 | $200,000.00 | National Bank of Arizona (x0178) to Wells Fargo |
| 78. | SPEAR, BRUNST | Jan. 11, 2016 | $133,045.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |
| 79. | BRUNST | Jan. 26, 2016 | $101,974.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 80. | LARKIN, BRUNST | Feb. 3, 2016 | $1,507,944.00 | Cereus Properties (x6211) to Charles Schwab |
| 81. | LACEY, BRUNST | Mar. 1, 2016 | $1,692,020.00 | Cereus Properties (x6211) to Bank of America (x5554) |
| 82. | BRUNST | Apr. 1, 2016 | $220,944.00 | Cereus Properties (x6211) to Wells Fargo (x4891) |
| 83. | LACEY, BRUNST | June 27, 2016 | $397,9500.00 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 84. | LACEY, BRUNST | July 20, 2016 | $12,859,152.57 | Arizona Bank & Trust (x1793) to Fidelity Title (partial payment for San Francisco property) |
| 85. | SPEAR | July 22, 2016 | $50,000.00 | National Bank of Arizona (x0178) to Strategic Storage Trust II |
| 86. | LACEY, BRUNST | Aug. 2, 2016 | $16,243.00 | Cereus Properties (x6211) to Wells Fargo (x0495) |

DOJ-BP-0004598515

| 87. | LARKIN, BRUNST | Oct. 6, 2016 | $1,206,356.00 | Cereus Properties (x6211) to Charles Schwab (x4693) |
|-----|----------------|--------------|----------------|------------------------------------------------------|
| 88. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1967) |
| 89. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1972) |
| 90. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1986) |
| 91. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x1991) |
| 92. | LACEY, BRUNST | Oct. 6, 2016 | $268,016.00 | Cereus Properties (x6211) to Arizona Bank & Trust (x2014) |
| 93. | SPEAR, BRUNST | Oct. 6, 2016 | $141,444.00 | Cereus Properties (x6211) to National Bank of Arizona (x0178) |

In violation of 18 U.S.C. § 1957.

- 53 -

DOJ-BP-0004598516

## FORFEITURE ALLEGATION ONE

[18 U.S.C. 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.     Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction under Counts 1 through 51 of this Indictment. Each defendant so convicted shall forfeit to the United States the following:

a.     All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense. Such property includes, but is not limited to, the real property located at the following addresses:

i.     1100 UNION ST #0700 SAN FRANCISCO CA 94109-2019

ii.    2043 PLEASANT HILL RD SEBASTOPOL CA 95472-4947

iii.   343 PRESIDIO AVE, SAN FRANCISCO, CA 94115

iv.    2755 FILLMORE ST, SAN FRANCISCO, CA 94123

v.     5300 STELLA LANE, PARADISE VALLEY, AZ 85253

vi.    16901 COLEGROVE DR., DALLAS, TX 75248

vii.   10647 NORTH STATE ROUTE 89A, SEDONA, AZ

viii.  493 ZINFANDEL LN, ST HELENA, CA 94574

ix.    5555 N. CASA BLANCA DR, PARADISE VALLEY, AZ 85253

x.     1308 E. 56TH ST UNIT 2, CHICAGO, IL 60637

Such property also includes, but is not limited to, funds held in the following bank accounts:

i.     Prosperity Bank account number XXXXX7188

ii.    Compass Bank Account number XXXXXX3873

iii.   Compass Bank Account number XXXXX3825

DOJ-BP-0004598517

| | | |
|---|---|---|
| 1 | iv. | National Bank of Arizona Account number XXXX0178 |
| 2 | v. | National Bank of Arizona Account number XXXX0151 |
| 3 | vi. | National Bank of Arizona Account number XXXX3645 |
| 4 | vii. | Live Oak Bank Account Number XXXXXXXXXX2523 |
| 5 | viii. | Ascensus Broker Dealer Services Account Number XXXXX6943-01 |
| 6 | ix. | Ascensus Broker Dealer Services account Number XXXXX5280-01 |
| 7 | x. | First Federal Savings & Loan of San Rafael account number XXXX3620 |
| 8 | xi. | Republic Bank of Arizona account number XXXX1889 |
| 9 | xii. | Republic Bank of Arizona account number XXXX2592 |
| 10 | xiii. | Republic Bank of Arizona account number XXXX2912 |
| 11 | xiv. | Republic Bank of Arizona account number XXXX2500 |
| 12 | xv. | Republic Bank of Arizona account number XXXX1938 |
| 13 | xvi. | Bank of America Account number XXXXXXXXXXXX8225 |
| 14 | xvii. | Bank of America Account number XXXXXXXXXXXX7054 |
| 15 | xviii. | Bank of America Account number XXXXXXXXXXXX9342 |
| 16 | xix. | Bank of America Account number XXXXXXXXXXXX0071 |
| 17 | xx. | San Francisco Fire Credit Union Account Number XXXXXXXXX2523 |
| 18 | xxi. | Ally Bank Account Number XXXXXX6292 |
| 19 | xxii. | Branch Banking and Trust Bank account number XXXXXXXXX0218 |
| 20 | xxiii. | Green Bank Account number XXX4832 |
| 21 | xxiv. | Green Bank Account number XXXXX4293 |
| 22 | xxv. | Plains Capital Bank account number XXXXXX1098 |
| 23 | | Such property further includes, but is not limited to, the following domain names: |
| 24 | i. | atlantabackpage.com |
| 25 | ii. | backpage.be |
| 26 | iii. | backpage.com |
| 27 | iv. | backpage.com.br |
| 28 | | |

- 55 -

DOJ-BP-0004598518

| | | |
|---|---|---|
| 1 | v. | backpage.cz |
| 2 | vi. | backpage.dk |
| 3 | vii. | backpage.ee |
| 4 | viii. | backpage.es |
| 5 | ix. | backpage.fi |
| 6 | x. | backpage.fr |
| 7 | xi. | backpage.gr |
| 8 | xii. | backpage.hu |
| 9 | xiii. | backpage.ie |
| 10 | xiv. | backpage.it |
| 11 | xv. | backpage.lt |
| 12 | xvi. | backpage.mx |
| 13 | xvii. | backpage.net |
| 14 | xviii. | backpage.no |
| 15 | xix. | backpage.pl |
| 16 | xx. | backpage.pt |
| 17 | xxi. | backpage.ro |
| 18 | xxii. | backpage.si |
| 19 | xxiii. | backpage.sk |
| 20 | xxiv. | backpage.us |
| 21 | xxv. | backpage-insider.com |
| 22 | xxvi. | bestofbackpage.com |
| 23 | xxvii. | bestofbigcity.com |
| 24 | xxviii. | bigcity.com |
| 25 | xxix. | chicagobackpage.com |
| 26 | xxx. | denverbackpage.com |
| 27 | xxxi. | newyorkbackpage.com |
| 28 | | |

DOJ-BP-0004598519

1    xxxii.   phoenixbackpage.com

2    xxxiii.  sandiegobackpage.com

3    xxxiv.   seattlebackpage.com

4    xxxv.    tampabackpage.com

5          b.      To the extent such property is not available for forfeiture, a sum of

6    money equal to the total value of the property described in subparagraph (a).

7          2.      Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

8    Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute

9    property, up to the total value of the property described in the preceding paragraph if, as

10   the result of any act or omission of the defendant, the property described in the preceding

11   paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence;

12   (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond

13   the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been

14   commingled with other property that cannot be divided without difficulty.

15                        **FORFEITURE ALLEGATION TWO**

16                          [18 U.S.C. § 982(a)(1)]

17         1.      Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is

18   hereby given that the United States will seek forfeiture as part of any sentence, pursuant

19   Title 18, United States Code, Section 982(a)(1), in the event of any defendant's conviction

20   under Counts 52 through 93 of this Indictment. Each defendant so convicted shall forfeit

21   to the United States the following:

22         a.      All right, title, and interest in any and all property, real or personal,

23   involved in or traceable to any transaction set forth in Counts 52 through 93 of this

24   Indictment. Such property includes, but is not limited to, the real property located at the

25   following addresses:

26   i.    1100 UNION ST #0700 SAN FRANCISCO CA 94109-2019

27   ii.   2043 PLEASANT HILL RD SEBASTOPOL CA 95472-4947

28

                                   - 57 -

iii.    343 PRESIDIO AVE, SAN FRANCISCO, CA 94115

iv.    2755 FILLMORE ST, SAN FRANCISCO, CA 94123

v.    5300 STELLA LANE, PARADISE VALLEY, AZ 85253

vi.    16901 COLEGROVE DR., DALLAS, TX 75248

vii.    10647 NORTH STATE ROUTE 89A, SEDONA, AZ

viii.    493 ZINFANDEL LN, ST HELENA, CA 94574

ix.    5555 N. CASA BLANCA DR, PARADISE VALLEY, AZ 85253

x.    1308 E. 56TH ST UNIT 2, CHICAGO, IL 60637

Such property also includes, but is not limited to, funds held in the following bank accounts:

i.    Prosperity Bank account number XXXXX7188

ii.    Compass Bank Account number XXXXXX3873

iii.    Compass Bank Account number XXXXXX3825

iv.    National Bank of Arizona Account number XXXX0178

v.    National Bank of Arizona Account number XXXX0151

vi.    National Bank of Arizona Account number XXXX3645

vii.    Live Oak Bank Account Number XXXXXXXXXX2523

viii.    Ascensus Broker Dealer Services Account Number XXXXX6943-01

ix.    Ascensus Broker Dealer Services account Number XXXXX5280-01

x.    First Federal Savings & Loan of San Rafael account number XXXX3620

xi.    Republic Bank of Arizona account number XXXX1889

xii.    Republic Bank of Arizona account number XXXX2592

xiii.    Republic Bank of Arizona account number XXXX2912

xiv.    Republic Bank of Arizona account number XXXX2500

xv.    Republic Bank of Arizona account number XXXX1938

xvi.    Bank of America Account number XXXXXXXXXXX8225

DOJ-BP-0004598521

xvii.   Bank of America Account number XXXXXXXXXXXX7054

xviii.  Bank of America Account number XXXXXXXXXXXX9342

xix.    Bank of America Account number XXXXXXXXXXXX0071

xx.     San Francisco Fire Credit Union Account Number XXXXXXXXXX2523

xxi.    Ally Bank Account Number XXXXXX6292

xxii.   Branch Banking and Trust Bank account number XXXXXXXXX0218

xxiii.  Green Bank Account number XXX4832

xxiv.   Green Bank Account number XXXXXX4293

xxv.    Plains Capital Bank account number XXXXXX1098

Such property further includes, but is not limited to, the following domain names:

i.      atlantabackpage.com

ii.     backpage.be

iii.    backpage.com

iv.     backpage.com.br

v.      backpage.cz

vi.     backpage.dk

vii.    backpage.ee

viii.   backpage.es

ix.     backpage.fi

x.      backpage.fr

xi.     backpage.gr

xii.    backpage.hu

xiii.   backpage.ie

xiv.    backpage.it

xv.     backpage.lt

xvi.    backpage.mx

- 59 -

1  xvii.   backpage.net

2  xviii.  backpage.no

3  xix.    backpage.pl

4  xx.     backpage.pt

5  xxi.    backpage.ro

6  xxii.   backpage.si

7  xxiii.  backpage.sk

8  xxiv.   backpage.us

9  xxv.    backpage-insider.com

10 xxvi.   bestofbackpage.com

11 xxvii.  bestofbigcity.com

12 xxviii. bigcity.com

13 xxix.   chicagobackpage.com

14 xxx.    denverbackpage.com

15 xxxi.   newyorkbackpage.com

16 xxxii.  phoenixbackpage.com

17 xxxiii. sandiegobackpage.com

18 xxxiv.  seattlebackpage.com

19 xxxv.   tampabackpage.com

20

21        b.    To the extent such property is not available for forfeiture, a sum of

22 money equal to the total value of such property.

23        2.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by

24 Title 18, United States Code, Section 982(b), each defendant convicted under Counts 52

25 through 93 of this Indictment shall forfeit substitute property, if, by any act or omission of

26 that defendant, the property described in the preceding paragraph, or any portion thereof,

27 cannot be located upon the exercise of due diligence; has been transferred, sold to, or

28

- 60 -

DOJ-BP-0004598523

deposited with a third party; has been placed beyond the jurisdiction of the court; has been

substantially diminished in value; or has been commingled with other property that cannot

be divided without difficulty.

A TRUE BILL

S/
FOREPERSON OF THE GRAND JURY
Date: March 28, 2018

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

JOHN P. CRONAN
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

S/
KEVIN M. RAPP
DOMINIC LANZA
MARGARET PERLMETER
JOHN J. KUCERA
Assistant U.S. Attorneys

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
Child Exploitation and Obscenity Section

- 61 -

DOJ-BP-0004598524