1  Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
   Erin McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
2  LIPSITZ GREEN SCIME CAMBRIA LLP
3  42 Delaware Avenue, Suite 120
   Buffalo, New York 14202
4  Telephone: (716) 849-1333
   Facsimile:   (716) 855-1580
5  pcambria@lglaw.com
6  emccampbell@lglaw.com
   *Attorneys for Michael Lacey*
7
   Gary S. Lincenberg (CA Bar No. 123058, *admitted pro hac vice*)
8  Ariel A. Neuman (CA Bar No. 241594, *admitted pro hac vice*)
9  Gopi K. Panchapakesan (CA Bar No. 279856, *admitted pro hac vice*)
   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
10 DROOKS, LINCENBERG & RHOW PC
11 1875 Century Park East, 23rd Floor
   Los Angeles, California 90067-2561
12 Telephone: (310) 201-2100
   Facsimile: (310) 201-2110
13 glincenberg@birdmarella.com
   aneuman@birdmarella.com
14 gpanchapakesan@birdmarella.com
15 *Attorneys for John Brunst*

16 Additional counsel listed on next page

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | NO. CR-18-00422-PHX-DJH |
| Plaintiff, | **DEFENDANTS' MOTION TO DISMISS OR TO STRIKE TESTIMONY, AND REQUEST FOR A HEARING DUE TO THE GOVERNMENT'S JENCKS AND BRADY VIOLATIONS** |
| vs. | |
| Michael Lacey, *et al.*, | |
| Defendants. | |

Eric Kessler
KESSLER LAW GROUP
6720 N. Scottsdale Rd., Suite 210
Scottsdale, AZ 85253
Telephone: (480) 644-0093
eric@kesslerlawgroup.com
*Attorney for Scott Spear*

Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Attorney for Scott Spear*

David Eisenberg (AZ Bar No. 017218)
DAVID EISENBERG PLC
3550 N. Central Ave., Suite 1155
Phoenix, Arizona 85012
Telephone: (602) 237-5076
Facsimile: (602) 314-6273
david@deisenbergplc.com
*Attorney for Andrew Padilla*

Joy Malby Bertrand (AZ Bar No. 024181)
JOY BERTRAND ESQ LLC
P.O. Box 2734
Scottsdale, Arizona 85252
Telephone: (602)374-5321
Facsimile: (480)361-4694
joy.bertrand@gmail.com
*Attorney for Joye Vaught*

**Motion**

The Defendants, by and through their undersigned counsel, move for a dismissal of the indictment or, in the alternative, for an order striking the testimony of government witnesses Carl Ferrer and Quoc Thai relating to money transfers through accounts referenced in Exhibit "A," the 90-page November 4, 2021, Asset Tracing Report by Quoc Thai and Lyndon Versoza (hereafter, the "Thai Report"). This motion is premised on the government's failure to disclose a statement co-authored by Mr. Thai until after the close of evidence, in violation of both 18 U.S.C. § 3500 and the requirements of *Brady v. Maryland*, 373 U.S. 83 (1963). Because the full extent of the government's disclosure violation is not yet known, Defendants respectfully request an evidentiary hearing to fully develop the record on the violation to guide this Court as to the proper remedy.

**Memorandum**

**1.    The Government's Untimely Disclosure**

On November 8, 2023, government counsel emailed the Thai Report to defense counsel, saying it "may" be considered a "statement" subject to disclosure under 18 U.S.C. § 3500 because the statement was co-authored by government witness Quoc Thai. Along with the Thai report, the government transmitted to defense counsel an October 18, 2023, email from Mr. Thai to government counsel describing the Thai Report as a report "Lyndon [Versoza] and I put together years ago" (Exhibit B).

In his October 18 email to government counsel, Mr. Thai said: "I wanted to share with you the latest draft of the tracing document that Lyndon and I put together years ago. You might already have a copy of a prior draft." The Thai Report is a Microsoft Word file with the name "2018-07-20 TRACING FOR ALL ASSETS QT_LV Edits 5.docx," suggesting that the Report initially was created more than five years ago *and* that there are four earlier versions of the Report that have yet to be produced. On its cover page, the Report says that it was updated November 4, 2021. Moreover, the text of the Report suggests there also is a version 6 of the Report, as the Report says on the page numbered 71: "As set forth below, financial

transactions involving illicit proceeds were deposited (TRACING TO BE COMPLETED ON MONDAY)." *The government has yet to produce any prior or subsequent versions of the Thai Report.*

The government has long possessed the Thai Report. It was part of an October 18, 2023 email between Mr. Thai and government counsel (the day after Thai completed his trial testimony and well before the close of evidence in this case). Nonetheless, government counsel withheld the Thai Report until after the conclusion of the trial.

**2.     The Thai Report Was Material**

The defense plainly could have used the untimely Jencks material to cross-examine Quoc Thai and Ferrer on the indictment's money laundering counts. The following statements of Mr. Thai from the Thai Report could have been using during cross:

- The Thai Report states that "M.G." (presumably Michael Gage, the CFO of Backpage after its sale to Ferrer in April 2015) was the "sole signatory" on the Posting Solutions, LLC account. Exh. A at ¶ 1. This statement could have been used to counter the impression delivered by Ferrer and the government that Brunst and other Defendants still maintained control over Backpage bank accounts following the sale of the business.

- Throughout his Report, Thai referenced "Backpage Operators" in regard to the individuals who formed companies, opened bank accounts, and purportedly engaged in deceptive conduct towards banks and credit card companies. These discussions in the Report could have been used to examine Thai regarding whom he considered to be a "Backpage Operator." Ferrer appears to be the only individual identified in this respect. *Id.* at ¶ 2.

- Thai states in the Report that "[a] go-between is an account set up for the main purpose of transferring funds from one or more bank accounts to one or more other bank accounts. Commonly used as a means of concealing the original source of the funds." *Id.* at p. 9 n.1. As to the indictment's concealment money laundering counts, the defense could have cross-examined Thai regarding whether and to what extent the Cereus Properties account at BBVA Compass Bank identified in these counts was used as a "go-between" account for the purposes of concealment, as opposed to an account

4

that the sellers of Backpage (Lacey, Larkin, Spear, and Brunst) merely used to receive loan payments on the sale of Backpage per Ferrer's direct testimony. The Thai Report does not identify the Cereus Properties account as a "go-between" account (yet makes this claim about other accounts), an omission that could have been used during cross of Thai to establish that the Cereus Properties account was not used to conceal the source of funds as to the indictment's concealment money laundering counts (Counts 53-62).

- Throughout his Report, Thai said "[i]n furtherance of their money laundering scheme, and in an attempt to further conceal the true nature of the money," as a preface to his description of a bank account. *See, e.g., id.* at ¶¶ 8, 13, 14, 16, 18, 24, 27, 28, 61, 146(a). This places the Report in its proper context, namely that it is a report concerning the indictment's money laundering allegations, not merely forfeiture as now claimed by the government.

- Throughout his Report, Thai said that – based on statements Ferrer made to him – foreign companies and agreements with foreign partners were set up by Backpage "for the sole purpose of allowing purchasers of prostitution ads to purchase ads on Backpage websites while evading the credit card company blockade." *See, e.g., id.* at ¶¶ 34, 36, 39, 41, 46, 54, 65 (referencing companies like Gold Leaf SRO, Protecctio SRO, and Varicok Company SRO). The implication from the Thai Report is that *it was Ferrer* – not Brunst or any other Defendant – who set up these companies and made these arrangements. With the benefit of this Report, the defense could have combatted the government's sweeping claim that Brunst or other Defendants were involved in setting up foreign bank accounts and managing them, even after the sale of Backpage in April 2015.

Additionally, the defense could have used the Thai Report to directly impeach Mr. Thai on a critical issue pertaining to the money laundering charges. Specifically, the government elicited (false) testimony from Thai that "Cereus Properties appears to be an entity used to pay the various payroll expenses of the . . . activity relating to the Backpage.com." Trial Tr.,

5

10/13/23 a.m., at 136/16-20. This testimony was made with reference to the indictment's money laundering charges concerning wire transfers to Cereus Properties, each of which occurred ***after*** the April 2015 sale of Backpage. *E.g.,* Doc. 230 at Counts 53-62, 64-68. There was not a shred of evidence at trial or anything in the discovery produced by the government corroborating Thai's assertion regarding Cereus Properties. Yet the government repeated this testimony during its closing argument in support of the indictment's promotional money laundering counts. Trial Tr., 10/27/23 a.m., at 26:5-13 ("Well, Cereus Properties appears to be an entity used to pay the various payroll expenses. This is the promotional money laundering. Plowing the money back in or the activity related to Backpage.com.").

The Thai Report, however, ***confirms the opposite***, noting that "[o]n August 2 and August 8, 2017, Prosperity Account bank '7188 wired $33,700 and $44,000, respectively, to S&W Payroll, *a company Backpage uses to pay its employees*." Exh. A at ¶ 21(a) (emphasis added). In other words, Thai admitted, in a document he co-authored, that (1) S&W Payroll (not Cereus Properties) was Backpage's payroll company following the sale of Backpage and (2) the funds for Backpage's payroll came from Prosperity Bank. As noted above, Thai stated in his Report that Michael Gage (Backpage's CFO following the sale) was the sole signatory on the Prosperity Bank account (not Brunst or any of the other Defendants) and that the account was held by Posting Solutions, LLC (not Cereus Properties). *Id.* at ¶ 1. Without this obviously impeachable testimony from Mr. Thai, the government has no case as to promotional money laundering.

Finally, in its opening statement,[1] in its closing statements,[2] and through testimony the government repeatedly elicited during the trial,[3] the government told the jury that Backpage had its customers pay for ads by mailing money orders to Posting Solutions, LLC's post office box (*e.g.*, Gov't. Exh. 2044, p. 26), with the aim of concealing that those payments were associated with Backpage. The Thai Report discloses, however, that when Posting Solutions applied for its post office box in Dallas, Texas, it disclosed on the application that Backpage.com, Website Technologies, Carl Ferrer, and other "Backpage Operators" would be registered users of the post office box:

> 2. "Posting Solutions' application for the USPS Dallas, Texas P.O. BOX, lists the box being registered to "Website Technologies, LLC/Backpage.com." Also listed on the P.O.

---

[1] "Money orders deposited into shell company bank accounts, and money moved to other Backpage shell companies." (Tr. Trans., 8/31/23 p.m., p. 171:3-8)

[2] "You heard lots of evidence that they were having banking issues, so they have to engage in activities that conceal the origin, the source, the nature of that money." (Tr. Trans., 10/27/23, p. 20:21-23); "[P]rostitute[s] bought ads on Backpage, they paid with money orders, the money orders were deposited to shell company bank accounts, and the money was moved to other Backpage shell companies. All about the concealment of money laundering." ((Tr. Trans., 10/27/23, p. 24:16-21); "This is Defense Exhibit 5364. This shows sort of the web of concealment; right? … [T]hey created all these holding companies at the sale with the idea that they would actually conceal the source of the money." (Tr. Trans., 10/27/23, p. 25:18-22); "Counts 53 to 62 are concealment money laundering. It's shown through the use of numerous shell companies that they didn't need for the first eight years of Backpage's existence." (Tr. Trans., 11/01/23, p. 68:7-9).

[3] "[W]e're asking customers to mail us money orders. So they would go to 7-Eleven or the Post Office and then mail us a money order…. And some days were $70,000 a day coming in on money orders." (Tr. Trans., 9/21/23 p.m., p. 45:19-46:4); "Well, we had a company called Posting Solutions. So then we would open up a bank with the company Posting Solutions and then deposit the checks under Posting Solutions…. [U]usually Monday was an extremely busy day because you had the mail for, you know, Saturday, Monday, you had multiple days and so there were times when it was over $100,000 in money orders being deposited. Q. Did you ever advise the posters to make the money order out to Backpage? A. No. We would not advise them because we didn't have a bank called Backpage so we wouldn't be able to deposit them." (Tr. Trans., 9/21/23 p.m., p. 47:18-48:20); "Posting Solutions was another shell company similar to, like, Website Technologies, very generic sounding company that we could open bank accounts with….It was used to open up a banking account and for money orders to be made in the name of Posting Solutions and then those money orders would be deposited into the bank account." (Tr. Trans., 9/21/23 p.m., p. 89:6-24);

BOX Application were the names of several Backpage Operators, including FERRER.

If the government had timely disclosed the Thai Report, the defense would have cross-examined both Thai and Ferrer about Posting Solutions' disclosure to the federal government of information that the prosecution claimed Backpage sought to conceal. Separate from and in addition to its obligations under the Jencks Act, the government also was obligated to turn the Thai Report (and related communications) over to the defense under *Brady*, as the Report was "both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020). "'Brady evidence' can be favorable 'either because it is exculpatory or impeaching'"—and this information was both. *Id*. The prosecution has an affirmative obligation to learn of potentially favorable evidence and provide it to the defense. *Id*. at 1038. Here, however, the government knew of the favorable evidence, but kept it from the defense until after the close of evidence.

In sum, there are numerous statements in the Thai Report that could have been used to cross-examine, impeach, and refresh recollection. These statements go to the heart of the government's money laundering case, namely the alleged concealment of Backpage funds, promotion of Backpage through wire transfers, and the role Ferrer played in these purported schemes (and the comparative lack of a role Brunst and the other Defendants played).

**3. The government's disclosure obligations**

As discussed below in greater detail, the Thai Report (and its prior versions and any subsequent versions) should have been disclosed to the defense long before the start of trial as both Jencks and *Brady* material.

Under the Jencks Act, the government is required to produce any statement of the witness in the possession of the United States that relates to the subject matter on which the witness testified. "The purpose of production of statements is to give defendants impeachment materials at a time when they can effectively use them." *United States v. McKoy*, 78 F.3d 446, 452 (9th Cir. 1996). This disclosure implicates more than just a defendant's statutory rights. It is a matter of due process and fundamental fairness as recognized by the Supreme Court in *Jencks v. United States*, 353 U.S. 657, 667-72 (1957). Further, the Supreme

Court has recognized that, "in some situations, denial of production of a Jencks Act type of a statement might be a denial of a Sixth Amendment right." *United States v. Augenblick*, 393 U.S. 348, 356 (1969). Additionally, the Ninth Circuit has recognized that when a conviction "rests heavily on the credibility of a single accomplice…the unproduced Jencks material may well implicate confrontation clause or compulsory process issues." *United States v. Wallace*, 848 F.2d 1464, 1471 (9th Cir. 1988).

"The Jencks Act requires the government to produce any written statements by a government witness that relate to the subject matter of any direct testimony by the witness." *United States v. Brumel-Alvarez*, 991 F.2d 1452, 1463 (9th Cir. 1992). "Moreover, it is sufficient that, in determining whether the statements in question 'related to' the direct testimony of the witness, it must relate **generally to the events and activities testified to**." *Id.* at 1464 (quoting *United States v. O'Brien*, 444 F.2d 1082, 1086 (7th Cir. 1971)) (alterations and quotations omitted, emphasis in original). "There are no exceptions to the Jencks rule that all statements relevant to the subject matter of the witness' testimony must be produced after direct examination of the witness." *United States v. Bibbero*, 749 F.2d 581, 585 (9th Cir.) (reversing conviction because government failed to produce all versions of a DEA report); *see also United States v. Carrasco*, 537 F.2d 372, 375-76 (9th Cir. 1976) (reversing conviction because trial court failed to strike witness testimony under Jencks concerning the government's failure to disclose that the witness provided the government with a "diary" that the witness referred to as the "original report" concerning drug transactions, even though the government's agent claimed that the agent had included all information from the "original report" in his notes of the witness's interview).

Courts routinely order pretrial disclosure of all Jencks materials, as this Court did here, ordering the government to produce all Jencks Act statements on or before February 25, 2019, and then ordering a final disclosure no later than August 20, 2019. (Docs. 131, 730.)[4] Here,

---

[4] Notably, upon the filing of an *ex parte* motion by the government, the Court extended the deadline for disclosure of Jencks Act statements by Mr. Ferrer to June 25, 2019. (Doc. 535.) When the government failed to comply with this order, the Defendants filed a motion to compel. (Doc. 662.) The Court then ordered the government to disclose all Jencks Act

the Court took such a broad view of the disclosure requirements that the Defendants were required to disclose text messages in which a defense witness texted a link to his published resume and an email from a defense investigator in which the investigator transmitted a handful of government exhibits to the witness, on the bases that these communications could be deemed to be "statements" of the witnesses under Rule 26.2. As discussed below, the Thai Report has far more relevance to the substance of witness testimony than these ordered disclosures.

### 4. Jencks Act Remedies

Critically, the Jencks Act provides remedies for the defense when, like here, the government fails to comply with its disclosure obligations. "Enforcement of the Jencks Act is an affirmative duty of the trial court," which "may not rely on government assertions alone to resolve disputes about the adequacy of disclosure under the Act." *United States v. McKenzie*, 768 F.2d 602, 607-08 (5th Cir. 1985). "If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared." 18 U.S.C. § 3500(d). Further, under Rule 26.2 of the Federal Rules of Criminal Procedure ("Rule 26.2"), "which basically implements the Jencks Act," if the government fails to comply with its disclosure obligations, the district court "shall declare a mistrial if required by the interest of justice." *United States v. Riley*, 189 F.3d 802, 805 (9th Cir. 1999) (quoting Rule 26.2(e)). "In imposing sanctions against the government for violations of the Jencks Act, the district court should consider the culpability of the government . . . and the injury to the defendants." *United States v. McKoy*, 78 F.3d 446, 451 (9th Cir. 1996) (affirming grant of mistrial due to government's unintentional failure to disclose Jencks Act material).

---

material not previously disclosed no later than August 20, 2019. (Doc. 730.) The disclosure of the Thai Report occurred on November 8, 2023, more than four years after the deadline for Jencks Act disclosures and, more importantly, after the close of evidence.

"It is now well established that individual 'notes and reports' of agents of the Government who testify for the Government, made in the course of a criminal investigation, are the proper subject of inquiry and may be subject to production under the Jencks Act." *United States v. Johnson*, 521 F.2d 1318, 1319 (9th Cir. 1975) (vacating conviction because, although the government disclosed the case agent's report, the government failed to disclose the case agent's written notes and, if the notes constituted a Jencks Act "statement," which the district court was required to determine on remand, the district court must grant the defendant a new trial if his substantial rights were affected by the failure to make the statement available). The lengthy Thai Report clearly constitutes "notes or a report" of a government witness. There can be no dispute that the content of the Report 'related to' the direct testimony of Thai and Ferrer. The Thai Report discusses financial transactions, statements by Ferrer, and facts about Ferrer (such as his ownership interest in various entities) that were the focus of the government's case in chief. As a result, the tracing report is subject to this Court's disclosure orders. *See, e.g.*, *Brumel-Alvarez*, 991 F.2d at 1463-64 (reversing conviction because government's failure to disclose a memorandum written by a government witness that related to the testimony of the witness violated the Defendant's rights under the Jencks Act, among other rights).

It also is troubling that the only reason the government has now produced the Thai Report seems to be that Mr. Thai put it at the top of the prosecutors' in-box during trial. Once he did so, the government faced the dilemma of continuing to withhold the Jencks material hoping the defense would never learn of it versus disclosing it late and risking that the Court would strike Mr. Thai's trial testimony. On October 18, the government apparently chose the former, to continue to withhold the Report. Post-trial, in anticipation of Mr. Thai testifying again, the government apparently chose the latter (hoping this Court would not sanction it for the discovery violation). Of course, the government's decision not to produce the Thai Report on October 18 further precluded defense counsel from considering the Report in formulating strategy over what defense witnesses to call, what to say in response to the government's closing arguments on the wire transfers, and how to respond to the government's arguments

regarding the purpose of the establishment of entities such as Website Technologies and Posting Solutions.

Moreover, the prejudice to the Defendants is particularly egregious here because the Jencks Act material at issue concerns the government's *only* witness on the wires relating to the 49 money laundering counts, Mr. Thai, and its most important witness in the case, Mr. Ferrer. While prejudice need not be shown to establish a discovery violation, the deprivation has caused undue prejudice to the Defendants because "the withheld evidence could have affected the outcome of the trial." *See, e.g.*, *Brumel-Alvarez*, 991 F.2d at 1464 (concluding that the failure to disclose a memorandum concerning a case agent's impressions of a central government witness was not harmless and undermined the outcome of the trial).

**5.      The Court Should Hold an Evidentiary Hearing**

Defendants are entitled to a hearing to develop the full record on the violation and to enable this Court to fashion an appropriate remedy. The hearing is particularly important here, where the document at issue refers to prior versions and a future version, the document contains statements from witnesses (such as Ferrer's contributions), and the circumstances that led to the failure to timely disclose the statement are unknown.

In *United States v. Miller*, 771 F.2d 1219 (9th Cir. 1985), the Ninth Circuit explained that the district court commits error when it relies on statements from government counsel claiming that a particular witness statement is not Jencks material. *See id.* at 1231-33. Instead, the proper course of action is to conduct a hearing to determine whether the statement is Jencks material and, if so, the circumstances that led to the failure to disclose the statement. *See id.*; *accord Campbell v. United States*, 365 U.S. 85, 92-99 (1961) (indicating that an evidentiary hearing is "a proper, even a required, proceeding" when the government disputes whether a statement constitutes Jencks material and when the creation of the statement is at issue); *United States v. Smith*, 746 F.2d 1183, 1184 (6th Cir. 1984) (reversing conviction for district court's acceptance of government statement and failure to hold a hearing and noting that "[our] cases have held that such a hearing is required whenever there is a disputed request for Jencks Act

material in order to determine whether the documents in question are actually statements of a witness").

RESPECTFULLY SUBMITTED this 13th day of November, 2023,

                              Paul J. Cambria, Jr.
                              Erin McCampbell Paris
                              LIPSITZ GREEN SCIME CAMBRIA LLP

                              By:    /s/ Paul J. Cambria, Jr.
                                        Paul J. Cambria, Jr.
                                        Attorneys for Michael Lacey

*Pursuant to the District's Electronic Case Filing Administrative Policies and Procedures Manual (Jan. 2020) § II (C) (3), Paul J. Cambria hereby attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content, and have authorized its filing.*

                              Gary S. Lincenberg
                              Gopi K. Panchapakesan
                              BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
                              DROOKS, LINCENBERG & RHOW, P.C.

                              By:    /s/ Gary Lincenberg
                                        Gary Lincenberg
                                        Attorneys for John Brunst

                              Eric W. Kessler
                              KESSLER LAW OFFICE

                              By:    /s/ Eric W. Kessler
                                        Eric W. Kessler
                                        Attorneys for Scott Spear

                              Bruce Feder
                              FEDER LAW OFFICE, P.A.

                              By:    /s/ Bruce Feder
                                        Bruce Feder
                                        Attorneys for Scott Spear

David Eisenberg
DAVID EISENBERG, P.L.C.

By:   <u>/s/ David Eisenberg</u>
      David Eisenberg
      Attorneys for Andrew Padilla

Joy Bertrand
JOY BERTRAND, ESQ.

By:   <u>/s/ Joy Bertrand</u>
      Joy Bertrand
      Attorneys for Joye Vaught

On November 13, 2023, a PDF version of this document was filed with Clerk of the Court using the CM/ECF System for filing and for Transmittal of a Notice of Electronic Filing to the to the CM/ECF registrants who have entered their appearance as counsel of record