Paul J. Cambria, Jr. (NY Bar No.1430909, admitted *pro hac vice*)
Erin E. McCampbell Paris (NY Bar No. 4480166, admitted *pro hac vice*)
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
Telephone: (716) 849-1333
Facsimile:   (716) 855-1580
pcambria@lglaw.com
emccampbell@lglaw.com
*Attorneys for Michael Lacey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>Michael Lacey, *et al.*,<br><br>　　　　　　Defendants. | NO. CR-18-00422-PHX-SMB<br><br>**DEFENDANT MICHAEL LACEY'S SUPPLEMENT TO RULE 29 MOTION CONCERNING COUNT 100 AND JOINDER IN RULE 29 SUPPLEMENTS OF JOHN BRUNST AND SCOTT SPEAR**<br><br>(Oral argument requested) |

　　　　Defendant Michael Lacey, by and through his undersigned counsel, files the instant supplement to his oral motion for acquittal of the international concealment money laundering charge ("Count 100") under Rule 29 of the Federal Rules of Criminal Procedure, and additionally, joins in the Rule 29 supplements filed by Defendants John Brunst and Scott Spear for all other counts for all the same reasons stated in their supplements, which are incorporated by reference

herein as to Michael Lacey. As discussed in greater detail below, with respect to Count 100, there is insufficient proof of the following requisite elements: (1) concealment of any attribute of the funds at issue; (2) intent to conceal; and (3) knowledge that the funds at issue were the proceeds of specified unlawful activity.

## DISCUSSION

Under 18 U.S.C. § 1956(a)(2)(B)(i), it is unlawful to engage in international concealment money laundering. However, it is well-settled that money spending, alone, is not unlawful under Section 1956. *See United States v. Caldwell*, 560 F.3d 1214, 1222 (10th Cir. 2009) ("Money laundering requires more than simply writing a check with the proceeds of unlawful activity. We have repeatedly stated that § 1956 is not a 'money spending statute.'"); *see also United States v. Olaniyi-Oke*, 199 F.3d 767, 771 (5th Cir. 1999) ("Money spending is not criminal under § 1956(a)(1)."); *United States v. Shoff*, 151 F.3d 889, 892 (8th Cir. 1998) ("[T]he money laundering statute may not be so broadly construed that it becomes a "money spending statute.").

To obtain a conviction for international concealment money laundering under 18 U.S.C. § 1956(a)(2)(B)(i), the government must establish that the defendant: (1) "attempted to transport funds from the United States" to a foreign county; (2) "knew that these funds represented the proceeds of some form of unlawful activity," and (3) "knew that such transportation was designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the funds." *Cuellar v. United States*, 553 U.S. 550, 561 (2008). With respect to concealment, the Supreme Court explained that "hiding funds during transportation is not sufficient to violate the statute, even if substantial efforts have been expended to conceal the money." *Id.* at 563. Under this Section 1956, the term "'design' means purpose or plan, *i.e.*, the intended aim of the transportation." *Id.* The Court explained that "[t]here is a difference between concealing something to transport it, and transporting something to conceal it; that is, *how* one moves the money is distinct from *why* one moves the money." *Id* at 566 (emphasis in original). Thus, "a conviction under this provision requires proof that the

2

purpose—not merely effect—of the transportation was to conceal or disguise a listed attribute." *Id.* at 567; *see also United States v. Ness*, 565 F.3d 73, 78 (2d Cir. 2009) (reiterating that "why" the money is moved is more important than "how" the money is moved).

In *Cuellar*, the Supreme Court vacated the defendant's conviction because the government failed to establish the third element – that the defendant "knew that such transportation was designed to conceal or disguise the nature, the location, the source, the ownership, or the control of the funds." In that case, the defendant was stopped at the border, and upon inspecting his vehicle, a secret compartment with $81,000 in cash was found. The cash was bundled in plastic with animal hair spread around nearby, likely to evade detection of drugs. *Id.* at 553-54. The Court noted that "[a]lthough the evidence suggested that petitioner's transportation would have had the effect of concealing the funds, the evidence did not demonstrate that such concealment was the purpose of the transportation." *Id.* at 567. Instead, the proof at trial indicated that "the purpose of the transportation was to compensate the leaders of the operation." *Id.* at 566.

In *United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007), a case cited favorably by the Ninth Circuit, the Court explained that "[t]he money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; ***it has no application to the transparent division or deposit of those proceeds***." *Id.* at 322 (emphasis added). Instead, "the necessary intent to conceal requires ***something more*** than the mere transfer of unlawfully obtained funds, though that something more is hard to articulate." *Id.* (quotations omitted, emphasis added). The Court explained that the "subsequent transactions must be specifically designed to hide the provenance of the funds involved" noting that "simple transactions that can be followed with relative ease, or transactions that involve nothing but the initial crime" are not concealment money laundering. *Id.* at 323. Consequently, the Court vacated the domestic concealment money laundering conviction involving a defendant who moved proceeds among various accounts he or his corporation controlled because "an observer who reads the endorsement on the initial check

3

and studies the names and numbers on the subsequent deposit slips and checks could discern the money trail with ease." *Id.*

## I. There is no proof of concealment.

"Evidence of concealment must be substantial." *United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006). Concealment is satisfied when there is proof that a defendant used "fictitious names" on bank accounts, structured a transaction to avoid detection of reporting requirements, transferred funds through accounts of shell companies with numerous signatories, or transferred funds through bank accounts that had been opened with misleading applications. *See id.* at 1291-93. In contrast, there is no proof of concealment when the case involves "simple and straightforward banking transactions, easily discovered through a cursory review of [the defendant's] bank accounts." *Id.* at 1293.

Here, there is no proof of concealment by Michael Lacey for two reasons. First, it is undisputed that all bank accounts accurately reflected that the funds at issue belonged to Michael Lacey because he was the owner or the beneficiary of each of the bank accounts at issue. Mr. Thai testified that all of the accounts had accurate names for the account holders. (Day 19 AM Tr. at 62.) Mr. Thai testified that he was able to trace the flow of funds from account to account. (*Id.*) He testified that an attorney IOLTA account is "an account held in the name of a client . . . [b]y an attorney." (*Id.* at 64-65.) Michael Lacey's transparent relationship to the funds at issue was documented in the government's own exhibit, Trial Exhibit 1479. The final page of that exhibit shows that: (1) Michael Lacey had five bank accounts in his name with his attorney, John Becker, identified as the account Trustee; (2) Becker consolidated the funds held in those five accounts into his IOLTA account, which, as Mr. Thai testified, is "an account held in the name of a client . . . [b]y an attorney"; and then (3) Becker transferred the funds to a bank in Hungary that the government's own proof shows was a bank account "for the benefit of LACEY." (Ex. 1479.)

As discussed above, when accounts are held in the proper name of an individual and the individual's relationship to the account is transparent, as it was here, concealment is absent as a matter of law. *See Adefehinti*, 510 F.3d at 323 (vacating concealment money laundering conviction

4

and recognizing that "simple transactions that can be followed with relative ease" do not involve concealment); *accord United States v. Esterman*, 324 F.3d 565, 571 (7th Cir. 2003) (concluding that the "government's proof" of concealment "fell short" because all the defendant did was "simply ma[ke] deposits into other bank accounts that were correctly identified"); *see also United States v. Enbry*, 644 F. App'x 565, 570 (6th Cir. 2016) (recognizing that there is no proof of "a ploy to disguise the nature, location, source, ownership, or control of the proceeds" when the defendant's "name was on the account at issue).

To the extent that there can be any argument made that the consolidation of the five grantor trust bank accounts into the IOLTA account somehow concealed an attribute of the funds – and this argument is meritless because, as Mr. Thai stated, an IOLTA account is "an account held in the name of the client" – Michael Lacey had nothing to do with that consolidation.  Critically, the funds at issue – the five grantor trusts that were consolidated into the IOLTA and then transferred to Hungary – were under Becker's control when in the United States, not Lacey's.  (Day 23 PM at 70, 131.)  Becker testified that he "transferred [his] client's money into the [IOLTA] account" from the five separate accounts, and then he "wired it out" to Hungary.  (*Id.* at 114.)  Becker testified that the only way Lacey could have sent the funds himself would have been if Becker, as trustee, had written checks to Lacey from the five grantor trust bank accounts, and Lacey then deposited the checks into a new account, and then wired the funds from that new account.  (*Id.* at 131.)  As a result, Lacey had no involvement in Becker's decision to consolidate the accounts and that act cannot provide a basis for the conviction.  However, even if Lacey had been involved in the decision to consolidate – and the proof is the opposite – Mr. Thai testified that he was able to trace the flow of funds from account to account even with use of the IOLTA account (Day 19 AM Tr. at 62) – which means that the proof on concealment was insufficient as a matter of law.  In fact, even if Lacey had taken the step of depositing the funds into an account held in the name of a relative, rather than an IOLTA account held in his name for his benefit – as long as the bank account properly identified the relative as the account holder, there would be no proof of concealment.  *See Johnson*, 440 F.3d at 1293 (concluding

that defendant's transfer of funds from his accounts to his mother's bank account in Luxemburg was insufficient to establish concealment because the transactions were simple and transparent).

Second, the formation of the offshore trust, the location of the trust, its monetary value, and its associated tax payer – Michael Lacey – were reported to the government through the timely filing of a form entitled, "Foreign Bank Account Report." (Ex. 5541, *see also* Exs. 5545, 5546.) Mr. Thai testified that people who own offshore bank accounts use a Foreign Bank Account Report ("FBAR") "[t]o report the existence of a foreign bank account" to the federal government. (Day 19 AM Tr. at 63; *see also* Day 23 PM Tr. at 81 (Becker testified that the filing of an FBAR "puts the government on notice that a U.S. taxpayer has established a foreign account.").) By filing the FBAR, Michael Lacey informed the government of the attributes of the funds, rather than concealed them. (*See* Exs. 5541, 5545, 5546.)

Notably, in *United States v. Gotti*, 457 F. Supp. 2d 411 (S.D.N.Y. 2006), the District Court rejected the government's claim of concealment when the defendant had put the government on notice about the attributes of the funds at issue. *See id.* at 427-29. In that case, the defendant pleaded guilty to an earlier indictment and, as part of the plea, had admitted that one of his properties had been purchased with proceeds of racketeering. Under the terms of the plea, Gotti was able to keep the property and pay the government a monetary forfeiture of equal value. At some time after the plea had concluded, he sold the property and used the proceeds to pay living expenses and legal fees. The government then charged him with concealment money laundering based on those purchases. The District Court found that "it strains credulity for the Government to suggest that Gotti is now somehow attempting to conceal" facts that were disclosed to the government. *Id.* at 428. But even if Gotti had not disclosed the attributes of the funds as part of his plea, the Court went on to find that the transactions at issue bore "very little indicia of concealment or deception, and none [had] the effect of making the illicit origin of the funds any less apparent than before." *Id.* This was because the transactions at issue were "open and obvious," and transactions "that can be followed with relative ease . . . do not constitute money laundering." *Id.* at 428-29.

6

Finally, to the extent that there is any concern that an extension was sought for the filing deadline for the first FBAR, and that extension somehow reflects an effort at concealment, that fact has no relevance to Count 100. It is undisputed that John Becker sought an automatic extension of the filing decision (Day 23 PM Tr. at 79, 132; *see also* Exs. 5540, 5542), and that such automatic extensions are available to all taxpayers.[1] The decision to seek the extension was solely Becker's. Lacey had nothing to do with that decision. (Day 23 PM Tr. at 132.) The first reporting of the trust was due in April 2018, but was filed in August 2018 based on the automatic extension. (Day 23 PM Tr. at 124.) Any assertion that Lacey should have filed in April 2017 (*id.* at 123) is false and misleading. Taxpayers file forms and pay taxes at the close of the year based on all taxable events that occurred during the previous calendar year. It is undisputed that Lacey transferred the funds to Hungary on January 3, 2017 (*see* Ex. 1479), which means that his disclosures and tax filings were not due until April 2018. (Day 23 PM Tr. at 124 ("So the documents are required to be filed for the first year. So they need to be filed in 2018, not 2017.").)

## II. There is no proof of intent to conceal any attribute of the funds at issue.

There is no proof of intent to conceal, and instead, proof of intent to disclose the attributes of the funds to the federal government. First, the idea of an offshore account did not originate with Michael Lacey. John Becker testified that he had assisted Michael Lacey with estate planning for years and that, at one point, Lacey informed Becker that he had been experiencing difficulty stabilizing banking, with banks closing his accounts. (Day 23 PM at 67.) Becker controlled five grantor trust accounts for Lacey with distributions due to Lacey, and no domestic bank that would accept and keep the funds. (*Id.* at 70.)[2] Becker suggested to Lacey that he "he may want to look

---

[1] *See Report of Foreign Bank and Financial Accounts (FBAR)*, available at: https://www.irs.gov/businesses/small-businesses-self-employed/report-of-foreign-bank-and-financial-accounts-fbar (last visited Nov. 21, 2023) ("The FBAR is an annual report, due April 15 following the calendar year reported. You're allowed an automatic extension to October 15 if you fail to meet the FBAR annual due date of April 15. You don't need to request an extension to file the FBAR.").

[2] Becker's testimony concerning Lacey's difficulty in maintaining banking was corroborated by Lin Howard, a banker who testified that her bank ended its relationship with

7

into a structure where the accounts are outside of the United States in order to keep them open and from being closed." (*Id.* at 67) Becker referred Lacey to Jacob Stein, an attorney from California who specialized in offshore trusts at banks where his accounts would not be closed. (*Id.* at 68.) Becker and Lacey met with Stein. (*Id.* at 68-69.) From that point, Becker worked with Stein to form and fund a Hungarian trust which identified Michael Lacey's sons as beneficiaries. (*Id.* at 69; Ex. 5516 at 17.) Thus, from the inception, the creation and formation of this offshore trust was on the advice of counsel.

Second, there is no proof that the purpose of the transfer was to conceal any attribute of the funds. Instead, the purpose of the transfer was to deposit the grantor trust distributions into a bank that would not close the account thereby causing further banking instability, and to fund a trust that had been created for Lacey's sons. (Day 23 PM Tr. at 67-70, Exs. 1, 5516 at 17.) Because these purposes are not concealment, there is no viable concealment money laundering charge here, just as there was no viable claim in *Cuellar*. *See Cuellar*, 553 U.S. at 553-66 (vacating conviction for international concealment money laundering even though the $81,000 was stowed in a secret compartment in a car, bundled in plastic with animal hair nearby, because the purpose of the secretive transportation of the funds was not concealment, but instead, "to compensate the leaders of the [drug] operation"). Becker testified that his "client's motivation" for forming and funding the Hungarian trust was "to place his monies in an account that won't be closed." (*Id.* at 121.) Critically, the act of transferring funds to be able to have access to the funds demonstrates an intent to access funds, not an intent to conceal attributes of the funds. *See United States v. Blankenship*, 382 F.3d 1110, 1129 (11th Cir. 2004) (concluding that the defendant's creation of a d/b/a account to have an account to deposit funds when the defendant knew that he could not deposit the funds in his personal account "strongly suggests that his purpose . . . was not to conceal the money or its origins, but simply to be able to access it"; which is not concealment money laundering).

---

Lacey for no reason other than that "he wasn't the type of customer that we wanted." (Day 17 PM Tr. at 15.)

Moreover, the use of funds, even if the funds at issue are proceeds of crime (and that has not been established in this case against Michael Lacey), is not proof of intent to conceal when the transaction is straightforward and easy to follow. For example, in *United States v. McGahee*, 257 F.3d 520 (6th Cir. 2001), the Sixth Circuit vacated thirteen concealment money laundering convictions because the defendant's use of funds held in a corporate account for a corporation that he controlled for expenses like payment of his personal mortgage did not reflect an intent to conceal, but instead, was proof of "the intent to sustain his personal living quarters." *Id.* at 527; *see also United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995) (This straightforward real estate transaction and Rockelman's conspicuous connection with the property bought with the proceeds of his drug sales convinces us that the evidence here cannot support a finding that Rockelman had the necessary intent to conceal that would satisfy the money laundering statute."). Here, too, Lacey's open and obvious connection to the funds to fund a trust, even if the funds can be labelled proceeds, does not reflect an intent to conceal.

In fact, there is insufficient proof of purpose or intent to conceal as required under *Cuellar*, even when the method of transportation of the funds is covert or secretive so long as there is proof of a non-concealment purpose. In *United States v. Garcia*, 587 F.3d 509 (2d Cir. 2009), the Second Circuit vacated a conviction for domestic concealment money laundering because the proof of intent or purpose to conceal was insufficient as a matter of law under *Cuellar*. *See id.* at 517-19. In that case, the defendant transported approximately two million dollars in cash in two duffle bags in a van from Pennsylvania to either California or Texas. *See id.* at 512. He was convicted of domestic concealment money laundering. The Second Circuit vacated his conviction because the government failed to meet its burden of proof of purpose of intent to conceal the attributes of the funds as required under *Cuellar*. Although the defendant transported the funds in a secretive manner, and knew that the recipient would not be reporting the funds as income, there was no proof of intent to conceal any attribute of the funds because the intent of the defendant was to pay off a debt to a drug dealer.

9

The government may claim that Lacey's isolated statement to Lin Howard and his email to Becker (Ex. 1) reflect an intent to conceal; but that claim is meritless when Lacey's full communication is considered. In both communications, Lacey was emphatic that he did not want to avoid taxes. (*See* Day 17 P.M. at 11 (Howard testified that: "[H]e wanted to make it clear that he wasn't looking to avoid paying taxes, that he had a BDO he directed to make sure that all taxes were paid and no tax shelters were taken."); Ex. 1 ("I think I am ready to move forward with the visit to the Los Angeles lawyer you recommended who has expertise in off-shore. [T]o revisit for just a moment, I am not interested in any tax avoidance.").) The act of paying taxes is a declaration to the government of what you have. (Day 17 PM Tr. at 17.) If you want to hide an offshore asset from the government, you would not have the intent to pay taxes on the asset because the information that would be disclosed on the tax return would identify and disclose the asset to the government. Further, Lin Howard testified that Lacey did not ask for help concealing anything. (Day 17 PM Tr. at 16, 22.) When, like here, "nothing about the transaction suggests a motive to conceal the existence or source of the funds or [the defendant's] relationship to them," there is no intent to conceal. *See Blankenship*, 382 F.3d at 1129 (vacating concealment money laundering convictions because there was no concealment when the defendant transferred funds into and out of a d/b/a account to ultimately deposit them in his personal account).

Third, contemporaneous records demonstrate that both before and after the transfer of funds to Hungary, Lacey expected the location and existence of the trust and its funds to be reported to the government. On July 29, 2016, approximately six months before the transfer of the funds to Hungary, Lacey emailed Becker stating: "I think I am ready to move forward with the visit to the Los Angeles lawyer you recommended who has expertise in off-shore. [T]o revisit for just a moment, *I am not interested in any tax avoidance*." (Ex. 1 (emphasis added).) Then, on February 21, 2017, approximately six weeks after Becker transferred the funds to Hungary, Lacey wrote to Becker asking: "*do you or jacob stein do the reporting to gov't on the money that was moved?*" (Ex. 6264.) Becker responded that same day, stating that: "I believe Jacob Stein will

10

receive the information needed for the report, and your accountants will prepare it from the information he furnishes." (*Id.*)  Lacey's contemporaneous concern about complying with all tax and reporting requirements reflects an intent to put the government on notice of the location of the trust and its funds, not to disguise or conceal that information.

Lacey's indication that he wanted to comply with all tax and reporting requirements was consistent with Becker's advice on the transaction.  Becker advised Lacey that "if he was going to structure an account overseas, he has to comply with all of the disclosures required by the Treasury Department. Not only does he have to provide all the disclosures, he must report the income on his tax return," and that Becker aided Lacey in accomplishing each of those requirements.  (*Id.* at 69-70; *see also id.* at 90 ("I advised him it needed to be -- we needed to satisfy all of the U.S. filing requirements, and I advised him that we need to report all of -- he needs to report all of the income on his individual income tax return.").)

Finally, Becker advised Lacey that all the requirements were satisfied.  (*Id.* at 90-91.) Becker testified that the transaction was "absolutely legal" and he made sure that all of the reporting requirements were satisfied.  (Day 23 PM Tr. at 69-70, 132.)  There were no liens or restraints on the funds that were transferred.  (Day 17 PM Tr. at 19.)

**III.   There is no proof that Lacey had knowledge that the funds at issue were the proceeds of specified unlawful activity.**

There is no proof of this requisite element.  Becker testified that Lacey told him that the source of the funds was revenue from the sale of Backpage. (Day 23 PM Tr. at 117.)  This statement cannot be equated with knowledge that the funds at issue were the proceeds of specified unlawful activity, meaning the proceeds from one of the 50 charged ads.  There is no proof that Michael Lacey knew that the funds were the proceeds of one of the 50 charged ads or even that he knew that the funds were the proceeds of prostitution in general.  This lack of proof as to his knowledge of the specified unlawful activity at issue in this case is reinforced the jury's refusal to convict him of any of the conspiracy or Travel Act charges.

11

Critically, there was no proof that Lacey had ever seen any of the charged ads, had ever spoken to anyone associated with the ads, had conspired with Ferrer or any other party to facilitate prostitution concerning the 50 charged ads, or in general, had ever heard of Dollar Bill or The Erotic Review, had any knowledge of marketing or moderation practices, or that he had ever reviewed the website when it was operational. Instead, the proof demonstrated that he ran the Editorial side of the parent company to Backpage and that, as a matter of journalistic ethics, the Editorial and publishing sides of the company did not interact, with Backpage located under the publishing side of the company. This division was described as being as sacred as separation of church and state. In the words of the government's lead witness, Lacey was a "layer away" from Backpage. (Day 27 A.M. Tr. at 11.) Ferrer's interactions with Lacey were limited to Lacey gathering information from Ferrer either for his own curiosity or to write something for the newspapers about Backpage. During one such communication, Ferrer told Lacey, "I do not have prostitution ads." (Ex. 115b at 9.) Another long-term Backpage employee who testified for the government, Daniel Hyer, testified that in his twelve years working for Backpage, he had never even met Michael Lacey. (10/19/23 P.M. Tr. at 112.)

Further, the government's own proof failed to overcome the presumption that the ads were 50 instances of protected expression. The evidence shows that law enforcement could not make arrests based on the face of an ad, even with respect to the one ad that arguably referenced an exchange of sex for money. The evidence shows that there are many forms of lawful commercial sex that are not prostitution and even a commercial sex expert would not know that a particular ad was affiliated with prostitution or one of those lawful forms of commercial sex unless the expert contacted and met with the person who posted the ad. As a result, even if there was some awareness after publication that a particular ad was associated with wrong-doing, Lacey was in no better position than law enforcement or a commercial sex expert to know that fact prior to Backpage's publication of the ad – an activity with which Lacey had no involvement as stated by the government's own witnesses. But even if he had

been involved with Backpage's operation (and he was not), Backpage and its operators understood that the operation of a platform for third-party speech and the third-party speech itself was First Amendment protected activity, as discussed in detail in the memorandum from Don Moon, counsel for Backpage, to NCMEC. (*See* Ex. 171.)

Finally, as set forth in greater detail in the Brunst supplement, there is no proof that any of the funds associated with Count 100 were the proceeds of specified unlawful activity. Lacey was not convicted of conspiracy or any Travel Act count. The transfer at issue in Count 100 occurred on January 3, 2017 – nearly two years after the sale of Backpage to Ferrer. The only Travel Act convictions are those of co-defendant Scott Spear, and in addition to the proof of those charges being patently insufficient, the publication of those ads pre-dated the sale of Backpage, and there is no proof of revenue generated by those ads, and whether that revenue is in any way traceable to the funds at issue in Count 100.

## **CONCLUSION**

This case does not involve the smuggling of cash covered in animal hair in a secret compartment of a vehicle over international borders, which, as the Supreme Court has explained, is insufficient as a matter of law to maintain a conviction for international concealment money laundering. Count 100 is premised on a substantially different and lesser record on concealment. Here, the proof demonstrates that Count 100 involved a simple and straightforward international transfer of funds for which Michael Lacey sought, obtained, and followed the advice of two lawyers. He authorized his attorney to undertake that international transfer to solve the practical problem of unstable banking and to fund a trust that he had formed for his two sons. The government's own proof demonstrates that Michael Lacey was identified as being the owner of the funds in each account that held the funds at issue and that the government was able to follow the flow of funds. These facts do not demonstrate an intent to conceal any attribute of the funds, but instead, the attributes of the funds were readily identifiable every step of the way. More importantly, the contemporaneous documentation of Michael Lacey's intent was the intent to disclose the existence of the offshore funds to the government through reporting and tax

filings.  And he did just that.  Over and over again.  The conviction for international concealment money laundering must be changed to an acquittal.

RESPECTFULLY SUBMITTED this 4th day of December, 2023,

          Paul J. Cambria, Jr.
          Erin McCampbell Paris
          LIPSITZ GREEN SCIME CAMBRIA LLP

By:   /s/ Paul J. Cambria, Jr.
      Paul J. Cambria, Jr.
      Attorneys for Michael Lacey

On December 4, 2023, a PDF version of this document was filed with Clerk of the Court using the CM/ECF System for filing and for Transmittal Of a Notice of Electronic Filing to the Following CM/ECF registrants:

Kevin Rapp, kevin.rapp@usdoj.gov
Peter Kozinets, peter.kozinets@usdoj.gov
Daniel Boyle, daniel.boyle2@usdoj.gov
Margaret Perlmeter, margaret.perlmeter@usdoj.gov
Andrew Stone, andrew.stone@usdoj.gov
Austin Maxwell Berry, austin.berry2@usdoj.gov