Bruce Feder (AZ Bar No. 004832)
FEDER LAW OFFICE PA
2930 E. Camelback Road, Suite 160
Phoenix, Arizona 85016
Telephone: (602) 257-0135
bf@federlawpa.com
*Knapp Counsel for Scott Spear*

Eric W. Kessler, Esq. (AZ Bar No. 009158)
KESSLER LAW GROUP
9237 E. Via De Ventura
Suite 230
Scottsdale, AZ 85258
Telephone: 480.644.0093
Eric@kesslerlawgroup.net
*Attorneys for Scott Spear*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br>vs.<br><br>Scott Spear, *et al.*,<br><br>    Defendants. | Case No. CR18-00422-PHX-DJH<br><br>**DEFENDANT SCOTT SPEAR'S SUPPLEMENT TO HIS RULE 29 MOTION CONCERNING ALL COUNTS OF CONVICTION, AND JOINDER IN RULE 29 SUPPLEMENTS OF MICHAEL LACEY AND JOHN BRUNST**<br><br>*(Assigned to the Hon. Diane J. Humetewa)* |

Defendant Scott Spear, by and through his attorneys undersigned, and pursuant to Rule 29 of the Federal Rules of Criminal Procedure, hereby supplements his verbal motions challenging the sufficiency of the evidence as to all counts of the indictment and specifically regarding all counts of conviction (Counts 1-18, 52-62, 71-78, 85 & 93), and files this supplement to further explain some of the challenged issues. He also joins in the supplements filed by defendants Michael Lacey and John Brunst.

This supplement and the joinders are based on the attached memorandum of

1

points and authorities, the file in this matter and such other arguments and evidence as may be presented.

RESPECTFULLY SUBMITTED this 4th day of December, 2023.

**FEDER LAW OFFICE, P.A.**

*s/ Bruce Feder*
Bruce Feder
*Knapp Counsel for Scott Spear*

**KESSLER LAW GROUP**

*s/ Eric Kessler*
Eric Kessler
*Attorneys for Scott Spear*

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.     FACTUAL BACKGROUND.

The defendants were originally indicted 3/28/2018 and a superseding indictment was filed 7/25/2018. Although the alleged Travel Act conspiracy asserts a beginning/end date of 2004-2018, the 50 specific ads in counts 2-51 are dated beginning 9/10/2013, and within the applicable five year Statute of Limitations allowed by 18 U.S.C. § 3282. Of these 50 ads, Mr. Spear was convicted of counts 2-18, which ads are dated from 9/10/2013 to immediately before the sale of Backpage to Carl Ferrer in April, 2015 (attached as Exhibits 1A-R). A review of these ads indicates: none contain GFE or PSE. Two contain the words 'In call'. Eight others contain the words '50 or 75 roses'. Four others contain the words 'new in town'. None of these ads contain any sex act terms or acronyms, nor do they propose any illegal sex act. All ads state an age for the advertiser/poster of 18 years or older.

A review of the trial transcripts and exhibits indicates there was no testimony or exhibit which asserts or demonstrates that any defendant, including Mr. Spear, or even cooperators Carl Ferrer or Dan Hyer, ever had any contact with any of the advertisers in

these counts or any other counts. There was no testimony or exhibit that indicates any of the defendants, or Ferrer or Hyer, ever saw any of these ads, or knew their content. Also, there was no testimony or exhibit that indicated any of these ads were ever moderated in any fashion, were the result of aggregation, were posted by or otherwise associated with an alleged 'super poster' or 'affiliate'. There was no testimony or exhibit that indicates these ads were in any way associated with The Erotic Review ('TER'), or any number associated with TER. This absence is consistent with the testimony of Ferrer and Hyer that moderation was completely controlled by Elizabeth McDougal as of April 2012, and that aggregation, super posters, and affiliates was no longer existent as of 2012.  Although the allowance of TER numbers was apparently allowed in ads after Ferrer's purchase of Backpage in 2015, there was no ad that Mr. Spear was convicted of that has any reference to TER or a TER number. There was no testimony, admitted exhibit, or, most importantly, expert testimony that moderation, aggregation, super posters, affiliate programs, or TER was an illegal program, practice, or organization.

A review of the admitted exhibits indicates no internal budget or other type of meeting or itinerary where Mr. Spear was present after 1/1/2013 nor any external meetings with state prosecutors, non-profits (NCMEC, etc.), or the media after 1/1/2013.

Although it was clear from the nature and extent of Ferrer's and Hyer's testimony that they were willing to assert almost anything to substantiate the prosecution theory or requests, there was no testimony that either Ferrer, Hyer or both ever discussed between themselves, or with any defendant, the overt agreement to violate the charged travel act or the money laundering statutes. There were no emails or other written exhibits discussing the same.

In regard to the money laundering counts of conviction against Mr. Spear (Counts 52-62,71-78, 85 & 93), the only testimony or admitted exhibit indicates Mr. Spear was paid from the Cereus account directly to his and his spouse's (Ellon Spear) National Bank of Arizona accounts existing in their names, and that any transfers from this account was to accounts also in their names (to an interest bearing account in their names

or for a Section 529 education account for their daughter). There was no evidence of any action or effort to hide or obscure in any way the receipt of payments from any account associated with Backpage or Ferrer.

Following the conclusion of the government's case, Defendant Scott Spear orally moved for a judgment of acquittal on all counts. The Court reserved decision on the motion and has not yet ruled. Meanwhile, the jury acquitted Spear on thirty-three of fifty counts of violating the Travel Act (Counts 19-51) and six counts of International Promotional Money Laundering (Counts 63-68), while convicting him of conspiracy to violate the Travel Act (Count 1), seventeen counts of violating the Travel Act, conspiracy to commit money laundering (Count 52), and Transactional Money Laundering (Counts 53-62, 71-78, and 93). Spear's convictions are legally unsupportable and based on insufficient evidence. This brief supplements Spear's previous arguments considering the government's closing argument and the verdict.

**II.   THE LAW.**

   **a.   There Was Insufficient Evidence Admitted Against Mr. Spear To Support Any Conviction.**

A review of the evidence admitted, both from testimony and exhibits demonstrates there was virtually no evidence indicative of criminality submitted against Mr. Spear to justify the convictions. There is no better demonstration of this evidentiary absence than reviewing the exhibits the prosecution referenced in its rebuttal closing argument as being its best evidence. Mr. Berry referenced exhibits 19, 23, 652A, 684A and 804 for Mr. Spear (RT 11/1/2023, pgs. 38:20-25 and 39:1-19). A review of these exhibits, attached as exhibits 2A-E, indicates: all are dated before 2012, none demonstrate any actions taken by Mr. Spear, none demonstrate any statements made by Mr. Spear that is inculpatory or indicates any specific intent to commit a travel act conspiracy or substantive act or a money laundering conspiracy or substantive act, and none indicate the commission of any crime by any of the defendants or anyone else.

In *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1079), the Supreme Court asserted

4

that the issue determined by a Rule 29 motion is whether" …after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." As discussed below in the subsection on the preclusive effect of the applicable statute of limitation, there was virtually no evidence against Mr. Spear concerning the operation of Backpage after he was relieved of any responsibility for the legitimate moderation efforts of Backpage after Ms. McDougal and Mr. Moon assumed these responsibilities in late 2011/early 2012. Since the government appears to assert that the ads posted on Backpage are the basis of its travel act charges, and the proceeds from these ads are the basis of the money laundering charges, the evidence of any criminality is lacking.

**b.   The Government Failed, As A Matter Of Law, To Establish That Backpage.com's Publication Of The Ads Underlying Counts 2-18 Was Unprotected By The First Amendment.**

All speech, including the publication of adult advertisements, is presumptively protected by the First Amendment to the United States Constitution and the government has the burden to prove that particular expressions of speech are outside the protection of the First Amendment. *Bursey v. United States*, 466 F.2d 1059, 1082 (9th Cir. 1972) ("All speech, press, and associational relationships are presumptively protected by the First Amendment; the burden rests on the Government to establish that the particular expressions or relationships are outside its reach."). "From 1791 to the present, the First Amendment has permitted restrictions upon the content of speech in a few limited areas, and has never included a freedom to disregard these traditional limitations." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 791 (2011) (cleaned up). Those limited areas, which represent "well-defined and *narrowly limited* classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem," include obscenity, incitement to violence, and fighting words. *Id.* (emphasis added). Those narrowly limited areas also include speech that "proposes an illegal transaction." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 821 (9th Cir. 2013).

When addressing exceptions to the First Amendment, the watchword is "narrowly limited." Yet, from the start of its opening statement to the final seconds of its rebuttal closing, the government ignored that watchword, encouraging the jury to convict defendants because they did not stop publishing adult-oriented classified advertising on Backpage.com even though they knew some of the millions of ads Backpage.com published would be associated with unlawful activity and also knew that numerous third parties claimed that many or most of the adult-oriented classified ads on Backpage.com were associated with unlawful activity. Virtually all the evidence the government presented at trial was aimed at supporting these claims of the government—not whether the specific classified ads at issue "proposed illegal transactions," as that phrase has been "narrowly limited" by the Ninth Circuit and other courts. Because the government failed to prove that the classified ads underpinning Counts 2-18 "proposed illegal transactions," the government failed to overcome the presumption that Backpage's publication of those ads was protected by the First Amendment and, therefore, could not be the basis for a criminal prosecution or conviction.[1]

In presenting its case and arguing it to the jury, the government treated the exception for speech that "proposes an illegal transaction" as if it could be satisfied by the government showing that speech might lead to, or be associated with, illegal activity, but the exception for speech that proposes an illegal transaction is far more constrained,

---

[1] Of course, even if the government had proved that one of the charged ads proposed an illegal transaction and, therefore, was outside of the protection of the First Amendment, that only would mean that the government could then seek to prove all the elements of a Travel Act offense, including that a defendant took some action relating to an ad with the specific intent to facilitate an illegal prostitution enterprise associated with the ad— something the government failed to prove as to any ad at issue in this case as to any defendant. To the contrary, the government, in its rebuttal closing, disclaimed any obligation to show that any defendant had any knowledge about any of the charged ads. ("Next, the defendants argue, well, they had [no] knowledge of these specific 50 ads….what I'm not going to show you is a jury instruction says we must prove that any defendant had specific knowledge of these particular ads because it isn't in there. We don't have to do that.") 11/01/23 a.m. Tr. at 50:6-14.

encompassing only speech that *itself* proposes an illegal transaction, not speech that might lead to unlawful activity. In *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980), the Supreme Court said that the First Amendment did not protect speech "related to unlawful activity." The Ninth Circuit, like most courts, has construed that exception quite narrowly. In *Valle Del Sol*, the Ninth Circuit said that "Central Hudson's legality requirement…has traditionally focused on the content of affected speech—*i.e.*, whether the speech proposes an illegal transaction—*instead of whether the speech is associated with unlawful activity*." 709 F.3d at 821 (emphasis added). The Ninth Circuit further said that "[n]othing in *Pittsburgh Press*[2]…suggests that we should expand our inquiry beyond whether the affected speech proposes a lawful transaction to whether the affected speech is conducted in a lawful manner." *Id*. at 822. The Ninth Circuit subsequently put an even sharper edge on its holding in *Valle del Sol*, saying: "*Pittsburgh Press* implicates only those instances when the state restricts *speech that itself proposes an illegal transaction*." *IMDb.com Inc. v. Bacerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) (emphasis added). "When the legality of a proposed commercial transaction depends on circumstances outside the content of the speech, the activity is lawful and the speech is entitled to protection under *Central Hudson*." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 128 F. Supp. 3d 597, 614-15 (E.D.N.Y. 2015), *aff'd*. 868 F.3d 104, 114 (2d Cir. 2017).

The government also inaccurately told the jury that the exception for speech that "proposes an illegal transaction" could be applied to classified ads on Backpage.com ads even if they did not expressly propose facially illegal transactions, either because ads on Backpage.com had to be read in "context, " "because context matters,"[3] or because ads on Backpage.com included "code words" that some might interpret as proposing illegal

---

[2] *Pitt. Press Co. v. Pitt. Comm. on Human Relations*, 413 U.S. 376, 377-80 (1973).
[3] 11/01/23 a.m. Tr. at 42:1-14.

activity.[4] But that position, too, is directly at odds with the narrow manner in which the courts have construed the exception for speech that proposes an illegal transaction, because ambiguous speech which might, or might not, propose an illegal transaction is protected by the First Amendment. *Centro de la Comunidad*, 868 F.3d at 114 ("[T]he First Amendment offers no protection to speech that proposes a commercial transaction if consummation of that transaction would *necessarily* constitute an illegal act. However, if, as here, there are plausible ways to complete a proposed transaction lawfully, speech proposing that transaction 'concerns lawful activity' and is therefore protected commercial speech.") (emphasis in original); *Greater Phila. Chamber of Comm. v. City of Phila.*, 949 F.3d 116, 142 & n.170 (3d Cir. 2020) (rejecting city's argument that speech "concern[ed] unlawful activity," where the speech might relate to unlawful activity, because "commercial speech should not lose the protection of the First Amendment simply because a legislature has prohibited one of many uses of the regulated speech," unlike restricting "advertising of the sale of cocaine, for example, [which] would present a speech restriction that *always* and *only* related to illegal activity because there are no other legal uses/purposes behind the sale of cocaine") (emphasis in original)).[5]

---

[4] *See*, *e.g.*, 08/31/23 p.m. Tr. at 150:14-16 ("The biggest coded term of all was "escort." Because when "escort" was used on Backpage, it meant prostitution.").

[5] *Accord Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1279 (W.D. Wash. 2012) (striking down state statute as unconstitutionally vague under the First Amendment, saying "what does it mean for the website operator to 'know' that an advertisement 'implicitly' offers sex?... [W]here an online service provider publishes advertisements that employ coded language, a reasonable person could believe that facts exist that do not in fact exist: an advertisement for escort services may be just that."); *Backpage.com, LLC v. Hoffman*, Case No. 13–cv–03952 (DMC)(JAD), 2013 WL 4502097 (D.N.J. Aug. 20, 2013) (striking down, under First Amendment, state statute criminalizing the publication of advertisements "that would appear to a reasonable person to be for the purpose of engaging in what would be a commercial sex act…with a minor" and rejecting state's claim that the statute "regulates illegal advertisements…not protected by the First Amendment" because, among other things, "[d]escribing criminal conduct as anything that is 'implicit' is inherently vague, because

The government's opening statement provides two textbook examples of why the courts narrowly construe the exception for speech that proposes an illegal transaction to encompass only speech that *necessarily* proposes an illegal transaction. During its opening, the government said: "[T]here is such a thing as a legal escort, someone who is paid for companionship. You think of going to your high school reunion. You don't have a date, so you pay someone to be your date." 08/31/23 p.m. Tr. at 149:25-150:3. Only moments later, the government contrasted "legal escorts" with escorts advertising on Backpage.com, claiming that, when the term "'escort' was used on Backpage, it meant prostitution." *Id*. at 150:14-16. Just after that, the government claimed that, on Backpage.com, escorts offering to act as your "girlfriend" were not proposing to act like your girlfriend at a high school reunion, because on Backpage.com "Girlfriend Experience" "means sex" and other "things that a girlfriend might do: open-mouth kissing, or closed-mouth kissing." *Id*. at 151:6-11.

Over just three transcript pages, the government said that escorts were lawful, except if they advertised on Backpage.com, and that it was legal for an escort to act like your girlfriend except for girlfriend experiences. If the government could prosecute publishers for publishing speech that *might* propose an illegal transaction, but also might not, a publisher of third-party adult-oriented speech would only be able to avoid criminal liability by refusing to publish any such content, because the publisher has no means to determine whether a person wishing to post an escort (or massage or dating) ad intends to engage in legal or illegal activity, or whether an escort (or masseuse or potential date) who proposes to act like your girlfriend means doing so legally or illegally. But the First Amendment simply does not allow the government to suppress protected speech as the means to suppress unlawful speech. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1738 (2017) ("the Government 'may not suppress lawful speech as the means to suppress unlawful speech'"); *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255

---

it means '[n]ot directly expressed [and] existing [only] inferentially' and 'fails to clearly mark the boundary between what is permissible and impermissible'").

(2002) ("The government may not suppress lawful speech as the means to suppress unlawful speech."); *Centro de la Comunidad*, 868 F.3d at114; *Greater Phila. Chamber of Comm.*, 949 F.3d at 142 & n.170; *McKenna*, 881 F. Supp. 2d at 1277 ("a speaker may not be put at complete peril in distinguishing between protected and unprotected speech," "[o]therwise, he could only be certain of avoiding liability by holding his tongue, causing him 'to make only statements which 'steer far wide [ ] of the unlawful zone.''") (quoting *United States v. United States Dist. Ct. for the Cen. Dist. of Cal.*, 858 F.2d 534, 539 (9th Cir. 1988).  Here, the Court need not wonder whether the government's aim in this prosecution has been to unconstitutionally punish the defendants for refusing to accede to demands that Backpage.com stop publishing what numerous courts previously held was First Amendment protected speech as the means to suppress any ads that might be related to prostitution on Backpage.com, because the government *expressly* said so in its rebuttal closing argument urging the jury to convict the defendants.[6]

The jury convicted Mr. Spear of violating the Travel Act based on Backpage.com's publication of seventeen ads.  The government told the jury in its rebuttal closing that it was "clear and obvious" that those ads were for prostitution, but not only is that simply untrue, it also is irrelevant.  Nine of those seventeen ads expressly disclaimed being solicitations of prostitution and, therefore, plainly did not propose transactions that necessarily would have been illegal. Exhs. 216-a, 504-511.  Moreover, whatever the government or the jury may have surmised about the intended activities of the persons posting or responding to those ads (and regardless of whether the persons

---

[6] 11/01/23 a.m. Tr. at 43:16-24 ("They knew that this site was replete with these ads, and they used coded language like GFE, which is in this one, Greek, boococky [sic].  It's the name of the game, the coded language. They knew the codes were sex for money and they knew the codes were endless.  They knew the only way to actually prevent the promotion of prostitution enterprises was to do one thing, shut the site down, but they didn't want to do that because of the object of the conspiracy, which was to make money.")

posting or responding to those ads intended to engage in illegal activity), not one of those ads *necessarily* proposed an illegal transaction. The government repeatedly urged the jury in its closings to convict the defendants based on Backpage.com's publication of those ads, but, as a matter of law, the government failed to establish that the publication of those ads was outside the protection of the First Amendment.[7] Therefore, the jury's verdict against Mr. Spear on Counts 2-18 cannot stand.

    **c.    The Government Failed, As A Matter Of Law, To Establish That Any Of The Defendants Conspired For Backpage.com To Publish Any Adult Ads That Were Unprotected By The First Amendment.**

The government likewise failed to prove that any defendant, including Mr. Spear, agreed to have Backpage.com publish any classified ads that proposed illegal transactions. The government, therefore, failed to establish that any defendant conspired to publish one or more classified ads whose publication by Backpage.com was not protected by the First Amendment.

Of all the ads that the government introduced into evidence at trial, just two proposed what, at least arguably, were illegal transactions. Those were exhibit 218, relating to Count 23 (as to which both Messrs. Spear and Brunst were found not guilty) and exhibit 1602. Both exhibits related to trial witness Anya Beck. The government presented absolutely no evidence that any defendant, or any purported co-conspirator (including the government's cooperators), (a) had any knowledge of those ads or of Ms. Beck or her pimp, (b) had any knowledge that Anya Beck or her pimp were engaged in an illegal prostitution enterprise, (c) was involved in any manner with the publication of

---

[7] The government also failed to prove that Mr. Spear (a) had any knowledge of the ads or the persons posting them, (b) had any knowledge that the persons who posted those ads were engaged in an illegal prostitution enterprise, or (c) was involved in any manner with the publication of those ads. Therefore, the government has no basis to contend that First Amendment's presumptive protections would not apply to Counts 2-18, on the grounds that Mr. Spear had actual knowledge that those ads were associated with prostitution and took some action to publish the ads with the intent to facilitate the crimes of those posting the ads.

those ads, or (d) agreed in any manner that those ads should be published. To the contrary, the evidence at trial clearly established that, after Backpage.com started moderating ads, ads like those in exhibits 218 and 1602 were never permitted on Backpage.com. In the absence of any evidence of a conspiracy to publish exhibits 218 or 1602, even if Backpage.com's publication of those ads was outside of the protection, those ads cannot support the convictions of Messrs. Spear or Brunst under Count 1.

As the remaining ads the government introduced into evidence at trial did not propose illegal transactions, Backpage.com's publication of those ads was presumptively protected the First Amendment (as was Backpage.com's publication of the millions of adult ads to which the government merely alluded during the trial).

The *only* evidence that the government presented in an attempt to show that Ferrer had contemporaneous knowledge of the charged ads, took any action to cause the publication of the charged ads, or had the specific intent to facilitate any of the business enterprises associated with any of the charged ads was Ferrer's testimony relating to emails with "P.R." 9/14/23 PM Tr. at 80:4-104:19. *See*, exhibits 504-513. Although the government sought to convey the impression during its examination these emails were exchanged between Ferrer and P.R., the government's questions and Ferrer's responses were carefully phrased to characterize the communications as being between carl@backpage.com (an email address) and P.R. On subsequent cross-examination, Ferrer admitted that carl@backpage.com was *not* his email address, but was an email address used by his staff. 10/10/23 AM Tr. at 104:3-23 ("It really wasn't my email address."). Moreover, the government presented no evidence to tie any charged ad to those emails, which were exchanged from October 2010 to September 2012, one to three years before the *first* charged ad was published on September 10, 2013.

**d.    The Mere Presence of Spear At Backpage Was Insufficient To Convict On Any Count.**

Given the lack of any role played by Mr. Spear in any alleged conspiracy or substantiative charge from March 28, 2013 to March 28, 2018, he must be acquitted

pursuant to Rule 29.  The Defense requested that the jury be instructed on mere presence but this instruction was rejected. Even if the Court found Mr. Spear knew there were travel act and/or money laundering conspiracies, or the substantiative counts of conviction, there was no action of Mr. Spear demonstrated in the testimony or admitted exhibits to show the necessary participation element of these crimes. There was further insufficient evidence of the required specific intent needed to convict. The Ninth Circuit mere presence instruction submitted, 5.12, requires participation.  However, from March 23, 2013 to March 28, 2018, Mr. Spear did not participate. *See*, *Dennis v. United States*, 302 F.2d 5, 12-13 (10th Cir. 1962); *United States v. Lee*, 991 F.2d 343,348 (6th Cir. 1993).

    **e.**     **The Applicable Statute Of Limitation Precludes Conviction Because The Primary Basis Of Conviction Are Allegations And Evidence Of Events And Conversations That Occurred Before March 28, 2013.**

Over defense objection, the substantial majority of the evidence presented by the prosecution occurred before March 28, 2013.  This includes, but is not limited to: 1) the alleged marketing strategy that included aggregation of ads from Craigslist, Google and other sources, reciprocal link relationship with The Erotic Review, discounts to the Super Posters (William Mercer "Dolla Bill", SOMAD, etc.) and affiliate programs, 2) moderation (as allowed and encouraged by Communications Decency Act, section 230), and 3) the alleged non-disclosure of these actions to NAAG, NCMEC, and other groups. An overt act in furtherance of the conspiracy must occur within the applicable period of limitation. *Grunewald v. U.S.*, 353 U.S. 391, 396-397 (1957). The jury must have found an overt act that occurred after March 28, 2013.  *U.S. v. Fuchs*, 218 F.3d 957, 961 (9th Cir. 2000).  The acts occurring after this date were the ads constituting Counts 2-18, the sale of Backpage to Ferrer in April of 2015, and the loan re-payments of the seller-financed sale.  Any alleged conspiracy involving the pre-2013 actions had ended by the cessation of aggregation, etc.  Mr. Spear's role in moderation ended with the publicized transfer of responsibility for/substantial charge in moderation by Ms. McDougal and Mr. Moon in 2011-2012. *See*, *U.S. v. Koonin*, 361 F.3d 1250, 1251, 1253 (9th Cir. 2004).

There can be no liability from a pre-2013 conspiracy. *See*, *United States v. Kotteakos*, 328 U.S. 750 (1946).

      RESPECTFULLY submitted this 4th day of December, 2023.

**FEDER LAW OFFICE, P.A.**

*s/ Bruce Feder*
Bruce Feder
*Knapp Counsel for Scott Spear*

**KESSLER LAW GROUP**

*s/ Eric Kessler*
Eric Kessler
*Attorneys for Scott Spear*

# CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

Clerk of the Court
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street
Phoenix, AZ 85003
Efiling: https://ecf.azd.uscourts.gov/cgi-bin/login.pl

THE HONORABLE DIANE J. HUMETEWA
United States District Court
Email: Humetewa_chambers@azd.uscourts.gov

Erin E. McCampbell, emccampbell@lglaw.com
Paul J. Cambria, pcambria@lglaw.com
Gary S. Lincenberg, glincenberg@birdmarella.com
Gopi K. Panchapakesan, gpanchapakesan@birdmarella.com
*Attorneys for Defendants*

Andrew Stone Andrew.Stone@usdoj.gov
Daniel Boyle Daniel.Boyle2@usdoj.gov
Peter Kozinets Peter.Kozinets@usdoj.gov
Joseph Bozdech Joseph.Bozdech@usdoj.gov
Margaret Perlmeter Margaret.Perlmeter@usdoj.gov
Kevin Rapp Kevin.Rapp@usdoj.gov
Austin Berry berry2.austin@usdoj.gov
*Attorneys for United States of America*

By:  */s/ M. Evans*