GARY M. RESTAINO
United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

AUSTIN M. BERRY (Texas Bar No. 24062615, austin.berry2@usdoj.gov)
U.S. Department of Justice
Child Exploitation and Obscenity Section
1301 New York Avenue, NW, 11th Floor
Washington, D.C. 20005
Telephone (202) 412-4136
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | CR-18-422-PHX-DJH |
| Plaintiff, | **UNITED STATES' RESPONSE TO DEFENDANT SCOTT SPEAR'S SUPPLEMENT TO HIS RULE 29 MOTION (Doc. 2006)** |
| v. | |
| Michael Lacey, et al., | |
| Defendants. | |

**PRELIMINARY STATEMENT**

Defendant Scott Spear was an instrumental part of Backpage's ownership and executive team for most of the website's 14-year existence. Spear directly supervised and managed Carl Ferrer, who ran the website's daily operations. Spear launched or oversaw the prostitution marketing strategies that cemented Backpage's place as the internet's leading source of prostitution advertisements after Craigslist shut its Adult section. His efforts helped establish the reputation of Backpage's Escorts section as synonymous with sex-for-money among sellers and buyers of commercial sex. And when Backpage's success created reputational problems that triggered a banking crisis for the company, Spear turned his attention to helping Backpage shift its banking and credit card processing overseas. For these efforts, Backpage paid Spear millions of dollars, with his annual compensation reaching nearly $3 million per year in 2013-2015.

Following a 34-day trial at which 21 government witnesses testified, the jury found Spear guilty of counts 1-18, 52-62, 71-78, 85, and 93 of the Superseding Indictment. Doc. 1977 at 1. The trial evidence far surpasses the minimum required to overcome Spear's Rule 29 challenge to the jury's verdicts, and Spear's Rule 29 motion should be denied.

**FACTUAL BACKGROUND**

**I.   Spear Supervised Ferrer, and Reported to Larkin**

Spear owned Backpage.com (Backpage), along with Michael Lacey, Jim Larkin, and Jed Brunst. 9/12/23 p.m. Tr. at 11:23-12:5, 78:25-79:1. After Backpage started in 2004, Spear became Ferrer's immediate supervisor. 9/12/23 p.m. Tr. at 10:5-20. Spear, in turn, reported directly to Larkin—the company's CEO. 9/12/23 p.m. Tr. at 15:15-19. Spear's title was Executive Vice President of Backpage's parent company. Ex. 5.

In 2013, 2014, and 2015, the great majority of Spear's income—nearly $3,000,000, $4,360,000, and $2,800,000, respectively—came from Backpage. 10/13/23 a.m. Tr. at 127:7-133:14; Ex. 1481.

Spear and Ferrer worked "together very closely," and "were joined at the hip," often meeting "three times a day." 9/12/23 p.m. Tr. at 10:10-14. Spear was a "micromanager."

9/13/23 a.m. at 15:4-8. He required detailed feedback about Ferrer's work, 9/13/23 a.m. Tr. at 15:4-8, which "was to run the site[.]" 9/12/23 p.m. Tr. at 16:7-12.

## II. Spear Oversaw the Marketing Strategies that Accelerated Backpage's Growth

Spear and Ferrer quickly recognized that Female Escorts was the most profitable section on Backpage, and that Female Escorts meant "hooker ads." 9/12/23 p.m. Tr. at 90:12-91:22; Exs. 1056, 1056a; *see* Ex. 1057. They focused on escort ads because, based on their experience, they "knew the revenue implications": "Money." 10/18/23 p.m. Tr. at 96:1-15. Unlike a job ad, where the need to advertise ends after a position is filled, escorts "needed repeat business" and wanted to advertise "everyday." 10/18/23 p.m. Tr. at 95:8-18. Escorts was the vehicle to "grow money on Backpage." 10/18/23 p.m. Tr. at 96:1-15.

### A. Content Aggregation

To expand escort ads, Spear directed the roll-out of Backpage's "content aggregation" marketing strategy, "which was internal code for stealing ads from Craigslist"—primarily "their Erotic Services" ads. 9/12/23 p.m. Tr. at 26:16-24. Spear and Ferrer presented aggregation to Larkin and Brunst as a strategy to meet growth goals in 2009. 9/13/23 p.m. Tr. at 42:16-43:11. They obtained Brunst's approval to hire staff to execute it. 9/12/23 p.m. Tr. at 30:6-12; *id*. at 89:1-90:1-7 (discussing plan to "seed the site, the Female Escorts category, with 200 independent escorts"). Spear authorized using the strategy "in every major metro market in the U.S." 9/12/23 p.m. Tr. at 29:24-25; *see* 9/13/23 a.m. Tr. at 16:18-20:9; Exs. 10 and 10a.

### B. The Erotic Review

Spear also approved and tracked Backpage's partnership with The Erotic Review or TER, a prostitution review website where "Johns" (purchasers of sex from prostitutes) provided "[t]he price of the services and a description of the sexual services along with a description of the escort[.]" 9/12/23 p.m. Tr. at 32:1-6; *see* 9/13/23 a.m. Tr. at 21:21-27:5. As Ferrer testified, this partnership "was the secret sauce": "[B]y having a relationship with The Erotic Review, we could make those ads that we stole from Craigslist, we could make their phone numbers ring." 9/12/23 p.m. Tr. at 31:11-16. *See id*. at 41:23-25 (TER was a

reason why "Backpage became the default choice" when Craigslist shut its Adult section).

Spear was the "main author" of the 2008 budget plan, which informed Larkin and Brunst that "we struck a deal with TheEroticReview.com, TER, with reciprocal links it created huge brand awareness in this niche industry and increased page views from TER by 120,000 per day." Ex. 23 at 3; 9/13/23 a.m. Tr. at 70:10-73:20. *See also* 9/13/23 p.m. Tr. at 43:12-44:1; Exs. 19, 20. Along with hyper-linking Backpage ads to TER prostitution reviews (and vice-versa), *see* 10/10/23 p.m. Tr. at 134:20-136:9, the TER relationship included a "banner ad exchange program" where each website featured banner ads for the other. 9/12/23 p.m. Tr. at 35:18-37:2.

Spear closely tracked the relationship, 9/13/23 p.m. Tr. at 65:5-24, and understood that "the traffic from The Erotic Review was very, very important for Backpage's success." 9/13/23 p.m. Tr. at 84:24-85:4. For years, Spear, Brunst, and Larkin regularly received Google Analytics reports showing The Erotic Review as the number one source of non-search engine referrals to Backpage. *See, e.g.*, 9/12/23 p.m. Tr. at 35:6-12, 41:1-7; 9/13/23 a.m. Tr. at 21:21-27:5; Exs. 19, 986, 986a, 1151, 1151a, 1919, 1919a, 1924, 1926.

Backpage paid TER $4,000 per month for years as part of this relationship. 9/12/23 p.m. Tr. at 35:18-37:2. Ferrer submitted the invoices to Spear and Brunst for approval. 9/13/23 p.m. Tr. at 27:17-28:6; *id*. at 35:11-12. Spear signed the checks for these payments. 10/10/23 p.m. Tr. at 142:13-143:5.

### C. Super Posters

Backpage also developed an affiliate program with bulk prostitution advertisers, or "super posters." 9/12/23 p.m. Tr. at 41:8-19. Larkin and Spear sent Ferrer to New York "to make Backpage successful," and "early on we identified reaching out to those [super] posters[.]" 9/12/23 p.m. Tr. at 41:20-42:23. Super posters received "VIP treatment," including advice on how to tailor their ads for Backpage. 9/12/23 p.m. Tr. at 46:23-47:4.

### D. "Moderation"

Spear launched Backpage's moderation efforts in 2006 with a "PowerPoint to get rid of explicit nudity." 9/12/23 p.m. Tr. at 58:2-5. He coined a standard of "between *Hustler*

and *Playboy*." 9/12/23 p.m. Tr. at 58:15-19. Users weren't blocked for posting sex act pics; "[t]hey could just post again." 9/12/23 p.m. Tr. at 60:7. Backpage also began sanitizing the site of certain "terms [that] made the ads more obvious prostitution[.]" 9/12/23 p.m. Tr. at 60:8-10, 60:15-17. As Ferrer testified, "we started removing those words from the ad but not deleting the ad." 9/12/23 p.m. Tr. at 60:17-18. Spear approved changes to the terms and images that were allowable, and sent Ferrer emails with ads "that need to be cleaned up, edited." 9/13/23 a.m. Tr. at 92:7-10; 9/13/23 p.m. Tr. at 10:2-8. Spear, Larkin, and Brunst approved budget increases for moderation, 9/13/23 p.m. Tr. at 106:21-107:2, with Spear responding to one such request: "Approved. Go get em." 9/14/23 a.m. Tr. at 31:13.

By 2010, after Craigslist closed its Adult section, Backpage experienced exponential growth in "revenue from online prostitution ads," as shown in media reports that Spear and Ferrer discussed. 9/14/23 a.m. Tr. at 35:23-36:9. At the time, several state Attorneys General (AGs) began criticizing Backpage's "rampant" prostitution advertising. 9/12/23 p.m. Tr. at 47:9-49:12; Ex. 52. Spear, Ferrer, and Larkin had "watched Craigslist be attacked by the Attorney Generals and were very concerned that we're next[.]" 9/12/23 p.m. Tr. at 48:18-25, 49:7-15. They discussed "the slow dance strategy with the Attorney Generals"—"give them very, very little but create the impression that we're doing something" without harming revenue. 9/13/23 p.m. Tr. at 93:9-22, 94:1-4.

Backpage also started receiving thousands of prostitution investigation subpoenas. *See, e.g.*, 9/13/23 a.m. Tr. at 62:16-25. In April 2010, responding to a Lacey email asking "is there any evidence of child trafficking anywhere?," Spear replied: "We have had subpoenas that deal with this exact issue. . . . We get a ton of subpoenas that we comply with on a daily basis." Ex. 804. Spear and Brunst approved hiring staff to handle the subpoenas. 9/13/23 a.m. Tr. at 62:11-15, 63:11-21, 65:4-9.

To gain the AGs' "blessing" (Ex. 1021), Larkin and Spear directed Ferrer to "not throw the baby out with the bathwater" and "implement the changes gradually, [so] we won't lose revenue[.]" 9/14/23 p.m. Tr. at 25:20-26:7. *See also* 9/19/23 a.m. Tr. at 30:3-4; Ex. 1021. Spear and Ferrer agreed on "cosmetic changes" that didn't impact revenue.

9/15/23 a.m. Tr. at 9:1-10:23. Ferrer continued to meet with Larkin and Spear about moderation changes, communicated the results to staff, and solicited further changes "to get approved by Scott." 9/15/23 a.m. Tr. at 20:11-14, 22:11-12; Ex. 73. One manager emailed staff that "Scott's really pleased with the work we've been doing[.]" Ex. 610.

Spear and Ferrer also agreed on a strategy of removing "TER links in ads" by January 2011, "[b]ut allow[ing] users to put [in] TER IDs (just no live links)." 9/15/23 a.m. Tr. at 24:10-19; Ex. 73. Ferrer testified Johns knew "that when it says 'highly reviewed' and then an ID number that [TER] is the place to go." 9/15/23 a.m. Tr. at 25:12-19.

Backpage also hired internet safety experts, who recommended screening ads bought with prepaid cards—an "indicator [of] a potential trafficking ad." 9/19/23 a.m. Tr. at 36:2-8. Spear, Larkin, and Ferrer rejected that change, because "up to 70 percent of our transactions came from prepaid cards[.]" 9/19/23 a.m. Tr. at 36:9-19. They also ignored recommendations to remove ads visited from TER. 9/19/23 a.m. Tr. at 37:13-38:11.

In late 2010, Backpage learned CNN was planning an exposé about the site. 9/14/23 a.m. Tr. at 80:20-21. Anticipating the story, Spear approved hiring moderators from an India-based company. 9/14/23 a.m. Tr. at 86:19-87:5. Backpage management watched and discussed the CNN report in early 2011. 9/15/23 a.m. Tr. at 43:15-44:7. It showed CNN's Amber Lyon posting an ad of herself on Backpage's Escorts section, using text from a Backpage ad selling a 12-year-old girl. Ex. 1052b1. When Lyon posted, her phone "start[ed] ringing off the hook." 9/15/23 a.m. Tr. at 59:16-23. Lacey, Spear, and Brunst tried to stop rebroadcasts of the story. 9/15/23 a.m. Tr. at 60:10-62:13.

Following the broadcast, Backpage faced more pressure to remove any references to The Erotic Review. 9/15/23 a.m. Tr. at 82:7-16. Ferrer and Padilla discussed leaving ID numbers on the site, which Spear approved. 9/15/23 a.m. Tr. at 82:1-24; Ex. 647.

Spear was responsible for Backpage's terms of use, which he continually modified. 9/13/23 a.m. Tr. at 14:15-21. He also continued to approve changes to moderation guidelines. *See, e.g.*, 9/15/23 a.m. Tr. at 92:10-19; Ex. 1612b; 9/19/23 p.m. Tr. at 98:14-19 and Exs. 725 and 725b. Near the end of 2012, Larkin, Brunst, and Spear asked Ferrer to

provide a comparison of revenue growth by sections from October 2010 to November 2012. 9/20/23 a.m. Tr. at 64:6-66:1; Exs. 355, 355b. The comparison showed huge growth in Adult compared to all other sections, which Ferrer attributed to the success of the company's moderation strategy. 9/20/23 a.m. Tr. at 65:19-20. *See id*. at 65:23-66:1.

While Backpage hired Elizabeth McDougall in 2012, "she was sidelined a good portion" of the time. 9/26/23 p.m. Tr. at 59:17-60:7; *see id*. at 60:9-10. The goals of the moderation strategy established under Spear never changed: revenue continued to grow, with prostitution advertising remaining at the forefront of Backpage's business until its closure in April 2018. *See* Exs. 1481, 1049b.

### IV.    Spear Met with NCMEC and Polaris

In late 2010, in response to trafficking concerns raised by the Polaris Project, Spear instructed Ferrer to hire a Florida-based moderation vendor to intensify clean-up efforts. 9/15/23 a.m. Tr. at 33:16-34:13; Ex. 605. Spear then set up a meeting with Polaris. 9/15/23 a.m. Tr. at 35:8-11; Ex. 1611. Backpage also arranged a meeting with the National Center for Missing and Exploited Children (NCMEC). *See* 9/15/23 a.m. Tr. at 93:12-94:22. Lacey, Larkin, Spear, and Ferrer met with NCMEC on March 1, 2011. 10/18/23 p.m. Tr. at 26:23-24, 28:5-12. NCMEC presented examples of Backpage ads selling minors for sex and referencing their TER reviews. 10/18/23 p.m. Tr. at 34:3-42:4; Ex. 652a. Larkin, Spear, and Ferrer then met with Polaris. 10/18/23 a.m. Tr. at 99:16, 100:6-10. Polaris explained that, despite moderation, "real trafficking cases were still making their way onto the site," and presented several examples. 10/18/23 a.m. Tr. at 109:21-110:2.

### V.    Backpage's "Escorts" Section Became Synonymous with Prostitution

By 2013, Backpage's Escorts section had become synonymous with "sex for a fee" among buyers and sellers of commercial sex. 10/13/23 a.m. Tr. at 58:19-23 (testimony of Lt. Griffin, who investigated the pimps behind Count 2); 10/17/23 a.m. Tr. at 82:1-83:10 (testimony of N.F.—the victim in Counts 4 and 5—that "Backpage . . . was known for girls to use it to escort and to get trafficked," and "escort" meant the "exchange of sex acts for money"); 10/17/23 p.m. Tr. a 35:7-15, 36:23-37:2 (A.C.—the victim in Counts 12 and

14—testifying that after her Backpage ads posted, men would call who "would want to exchange money for sex"—i.e., "sexual intercourse").

Even when a pimp, prostitute, or undercover cop posted in the Escorts section without using overt sex-for-money language, the poster's phone would immediately start ringing with calls from Johns. 10/11/23 a.m. Tr. at 123:22-124:4 (B.L.—the victim in Counts 16-17—testifying that she would "just copy[ ] the lingo" from other Backpage Escort ads, and after she posted on the website "[w]ithin a minute my phone was ringing off the hook"); 10/17/23 a.m. Tr. at 85:14-86:3 (N.F. testifying that after her ads posted on Backpage's Escorts section "I started getting a lot of phone calls" and "text messages" "within minutes"); 10/12/23 a.m. Tr. at 75:5-9, 77:23-20 (A.B. would "copy and paste" from other Backpage ads, and then "start getting calls and text messages" from Johns).

**VI.   As Backpage Grew Toxic, Banking Became the Primary Focus**

In 2013, Spear continued to supervise Ferrer, and Brunst served as Backpage's CFO. 9/20/23 p.m. Tr. at 13:9-14:1. But Spear and Brunst avoided using a "backpage.com" email address because of "reputational risk"— Backpage's name had become toxic. 9/20/23 p.m. Tr. at 14:2-9. That toxicity triggered a banking crisis: Moderation was "on the back burner" "[b]ecause the barn is on fire[.]" 9/20/23 p.m. Tr. at 47:23-48:7. From 2013 forward, company's "entire focus . . . is banking, is trying to get payments, ways for users to be able to pay for ads and then find treasury banking solutions." 9/20/23 p.m. Tr. at 29:7-16.

In 2013, Backpage's U.S.-based credit card processor, Litle, announced it was dropping Backpage. 9/12/23 p.m. Tr. at 69:17-70:8. Ferrer then "worked] closely" with Brunst, Spear, and Larkin "to secure credit card processing from Europe." 9/20/23 p.m. Tr. at 14:22-15:7. When Chase Bank informed Backpage that it "was no longer accepting transactions from Backpage.com, due to their involvement in human trafficking," Ex. 173, Backpage responded by directing Chase credit card purchasers to EMP (e-Merchant Pay), a European processor that would "use a different billing descriptor that won't say Backpage.com on it." 9/20/23 p.m. Tr. at 21:7-22; Ex. 173; *see also* Ex. 1110.

In September 2013, Ferrer wrote Spear and Brunst about Netcash, a Cyprus-based

credit card processor. 9/20/23 p.m. Tr. at 13:3-8; Ex. 1092. Ferrer sent the Netcash agreement "to Spear to vet," and updated him about another processor, CCBill. 9/20/23 p.m. Tr. at 16:19-17:6; *see also* Ex. 1111. In October 2013, Ferrer emailed Brunst, copying Larkin and Spear, about the CCBill contract. 9/20/23 p.m. Tr. at 31:12-37:23; Ex. 752.

In November 2013, Ferrer sent Larkin, Brunst, and Spear a consultant's recommendations on credit card transactions. 9/20/23 p.m. Tr. at 37:24-40:13; Ex. 175. The recommendations included using names, internet addresses, and billing descriptors that don't include "Backpage." 9/20/23 p.m. Tr. at 38:24-42:22. Backpage's executives started "open[ing] up holding companies with innocuous names like Classified Solutions, Payment Solutions, just general-sounding companies that you don't know really—they don't say Backpage." 9/20/23 p.m. Tr. at 15:12-23; 10/10/23 p.m. Tr. at 74:13-14.

The recommendations also included "load balancing across many banks with different billing descriptors"; this meant "adding a lot of banks" and "distributing . . . transactions" to stay below thresholds that would otherwise trigger reviews by Mastercard and Visa. 9/20/23 p.m. Tr. at 38:10-23. Backpage accordingly used Classified Solutions (in England) for credit card processing with EMP (in Bulgaria), and spread payments from EMP across other banks including Borgun (in Iceland) and Bank Frick (in Liechtenstein). 9/20/23 p.m. Tr. at 43:18-44:6; 9/21/23 p.m. at 76:3; Ex. 6189.

These funds were then sent to BMO in the United States, where Backpage had an account under the name of "Website Technologies." 9/20/23 p.m. Tr. at 27:10-28:12. As Ferrer testified, Brunst "want[ed] to ensure that [Website Technologies'] reputation is protected, not affiliated with Backpage." 9/20/23 p.m. Tr. at 72:2-4; Ex. 177.

In late 2013, Ferrer and Spear presented an annual business plan to Larkin and Brunst. 9/20/23 p.m. Tr. at 44:8-19; Exs. 1116, 1116a. In January 2014, Ferrer sought signatures to open an account at still another bank, Werther/PrivatBank, to receive payments from EMP. 9/20/23 p.m. Tr. at 69:8-11; Ex. 869. Ferrer wrote Spear and Brunst because they "sign . . . and vet the agreements[.]" 9/20/23 p.m. Tr. at 70:21-71:1.

When US Bank gave notice in April 2014 of dropping the company, Brunst wrote

Spear, Ferrer, and others that "[w]e will move all banking under Website Technologies at BMO." 9/20/23 p.m. Tr. at 72:5-73:4; Exs. 178, 178a. Ferrer then updated Spear and Brunst that Chase had "figured . . . out" that Backpage was allowing customers to use Chase cards by using "a different billing descriptor," "so we just have to change again." Ex. 1120; 9/20/23 p.m. Tr. at 90:17-24, 91:25-92:4. "[B]ecause Scott Spear likes to take his time vetting these agreements," Ferrer urged quick action. 9/20/23 p.m. Tr. at 92:14-15.

### VII.  Spear's Involvement Continued Post-Sale

In April 2015, Lacey, Larkin, Brunst, and Spear purported to sell Backpage to Ferrer for $600 million. 9/12/23 p.m. Tr. at 78:1-8. The price would be paid as an "earn-out"—"whenever money came in [to Backpage's accounts], [the sellers] would find a way to get [the money] swept to . . . their banks accounts." 9/12/23 p.m. Tr. at 78:3-14. Spear, Brunst, and Larkin received a five-year business plan on April 10, 2015, because they were "monitoring the business very closely." 9/21/23 a.m. Tr. at 71:22-11; Exs. 884, 884a. Ferrer then emailed Spear and Brunst to inform them that customers could now purchase credits on seemingly unrelated sites and use those credits to buy Backpage Escort ads. 9/21/23 a.m. Tr. at 73:14-75:2; Ex. 1670. In February 2018, Spear met with Larkin and Ferrer to discuss taking over Backpage's operations. *See* Ex. 1796; 9/22/23 a.m. Tr. at 55:14-59:9.

## ARGUMENT

### I.  The Evidence Shows Backpage Published Prostitution Ads

#### A.  The Ads in Counts 2-18 Were for Prostitution

Spear's primary argument is that the United States didn't prove that the ads underlying Counts 2-18 "proposed illegal transactions" and thus fell outside the First Amendment. Mot. at 6. The Court agreed with Defendants' request to instruct the jury on the First Amendment, and provided the following instruction:

> All speech is presumptively protected by the First Amendment to the United States Constitution. However, the First Amendment does not protect speech that proposes an illegal transaction. Prostitution is illegal in 49 states and most of Nevada. It is the government's burden to establish that each of the ads alleged in this case is an ad for prostitution and not for another purpose such as an ad for an escort, dating or massage service. If you find that an ad proposes an illegal transaction, it is not protected by the First Amendment.

Doc. 1998 at 48. Spear agrees that the instruction "included the correct legal standard." Doc. 2009, Mot. at 17. The jury is presumed to have followed it. *United States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011). To overturn the jury's verdicts, Spear must overcome the steep hurdle of showing that the evidence—"'view[ed] . . . in the light most favorable to the prosecution'"—could not have allowed "'*any* rational trier of fact'" to find that the ads proposed illegal transactions. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

For several reasons, Spear cannot meet this heavy burden. First, posting in Backpage's Escorts section—where the ads in Counts 2-18 appeared—itself indicated that the ads were for prostitution. *Supra* at 6-7; *see also* Exhibit A (chart summarizing the evidence showing that each of the 17 ads in Counts 2-18 were for prostitution).

Second, eight of the ads (Counts 3, 6-11, and 18) were posted by P.R., whom Ferrer knew to be a prostitute. Exs. 504-511; 9/14/23 p.m. Tr. at 79:7-80:6. Ferrer emailed with her from about 2010 to 2018. 9/14/23 p.m. Tr. at 797-12. He repeatedly assisted her with her Backpage advertising. *See* 9/14/23 p.m. Tr. at 80:7-108:8; 9/15/23 a.m. Tr. at 7:19-21.

Third, all the ads used language indicative of prostitution. P.R.'s ads included the prostitution transaction code word "roses"—"shorthand for dollars," "donation"—indicating payment, and "independent"—meaning not under a pimp's control. Exs. 504-511; 10/18/23 p.m. Tr. at 37:11; 10/12/23 p.m. Tr. at 32:3-11; 9/21/23 a.m. Tr. at 16:12-16, 48:23-25. Other ads used "New In Town," which Spear and Ferrer knew was code for prostitutes or victims who traveled a circuit or were shuttled among different locations. Exs. 215, 215a, 217, 217a; 9/21/23 a.m. Tr. at 21:20-22:15; Exs. 104, 104a; 9/19/23 a.m. Tr. at 33:10-20; 9/19/23 p.m. Tr. at 53:18-54:7. Several included "in call"—prostitution code for when the John goes to the prostitute. Exs. 212a, 214, 214a; 9/13/23 a.m. Tr. at 30:3-31:21; 10/13/23 a.m. Tr. at 59:23-60:7. Many had other prostitution code terms like "real pics," "clean," "hygienic," and "discrete." Exs. 212a, 216, 216a, 504-511; 9/21/23 a.m. Tr. at 16:3-11; 10/13/23 a.m. Tr. at 76:3-77:22. Some had spelled-out phone numbers, often seen in prostitution ads where the posters sought to evade law enforcement. Ex. 212a,

10/13/23 a.m. Tr. at 60:13-61:7. While Spear asserts that the ads didn't contain "sex act terms or acronyms" (Mot. at 2), Backpage's moderation strategy—*which Spear launched*—was intentionally designed to remove such overt terms. *See supra* at 3-6.

Fourth, seven ads (Counts 4, 5, 12, 13, 15, 16, and 17) were "moderated" before publication by having one or more pictures removed from the originally submitted ads. *See* Exs. 214, 214a, 215a, 216, 216a, 217, 217a; Doc. 230, ¶ 201. Ferrer and his staff were carrying out moderation policies that Spear had originated when they published the ads.

Spear asserts the ads didn't propose illegal prostitution because several "disclaimed being solicitations of prostitution[.]" Mot. at 10. But this was a prostitution marketing tool. Victim B.L. testified that her pimp included disclaimers in the Count 16 and 17 ads (Exs. 216, 216a) *because* "[h]e was trafficking." 10/11/23 p.m. Tr. at 27:12-29:16. Another victim, J.T., testified that similar language—"donations are for time and companionship only"—was "there so tricks [*i.e.*, Johns] would know that we're not law enforcement to make them feel comfortable." 10/18/23 a.m. Tr. at 77:6-9. *See also* 10/18/23 a.m. Tr. at 77:10-21 (disclaimers aimed to minimize law enforcement attention "so we don't get in trouble" "[b]ecause it's against the law" "[t]o sell your body"). In sum, the disclaimers were more proof that the ads offered illegal services. And if they posed any conflict in the evidence, Rule 29 requires the Court to resolve all such conflicts in favor of the verdicts. *Nevils,* 598 F.3d at 1164. Under the *Jackson*/*Nevils* standard, Spear's motion fails.

### B.   Spear's Recycled First Amendment Challenge Fails

Spear's argument that the United States had to prove that the ads "expressly propose[d] facially illegal transactions" attempts to relitigate the First Amendment instruction—and is barred by law of the case. Mot. at 7-8. On October 26, 2023, the Court decided this exact issue. *See* 10/26/23 a.m. Tr. at 60:21-25. Defendants' position confusingly suggested that the jury could not consider abundant evidence that the ads' text *and* context—including their use of coded prostitution transaction terms and placement in Backpage's Escorts section—showed the ads proposed illegal transactions. 10/26/23 a.m. Tr. at 60:3-8, 60:20-61:9; 63:11-64:20. It also contradicted evidence that Spear and others

at Backpage had deliberately embraced a moderation strategy of scrubbing the most overt sex-for-money references in Backpage's ads, while still conveying the illegal message. 10/26/23 a.m. Tr. at 60:9-18. And it went against the law of the case, including Doc. 793 at 9-12, which recognized the United States could satisfy the First Amendment by showing that Defendants published veiled prostitution ads. 10/26/23 a.m. Tr. at 61:10-62:21.

The Court agreed with the United States when it finalized the First Amendment instruction. 10/26/23 a.m. Tr. at 66:18-67:8. Spear's motion doesn't add anything new—it merely recycles the same arguments the Court rejected. *See* Mot. at 5-11; Doc. 1666 at 2-3; 10/26/23 a.m. Tr. at 64:21-65:23.

Spear's arguments still lack merit. This case is about commercial speech—advertising. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 818 (9th Cir. 2013). Commercial speech is subject to lesser protection—and "commercial speech related to illegal activity" has no First Amendment protection. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commn. of New York*, 447 U.S. 557, 563-64 (1980). Prostitution ads are not protected. Doc. 793 at 14; *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973).

There is no requirement that an ad "necessarily" or explicitly propose an illegal transaction on its face to fall outside of First Amendment. Jurors may consider both text and context in assessing the ads, including use of coded prostitution terms, cross-references to reviews on prostitution websites, and placement in categories synonymous with prostitution. *See* Doc. 793 at 9-11; *Pittsburgh Press*, 413 U.S. at 388 (employment ads were unlawful based on the context of their placement in gender-specific categories); *United States v. White*, 610 F.3d 956, 960 (7th Cir. 2010) ("that a request for criminal action is coded or implicit does not change its character as [unprotected] solicitation").

Spear doesn't provide any contrary Ninth Circuit cases. For example, in *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1123 (9th Cir. 2020) (Mot. at 7), the court distinguished *Pittsburg Press* from situations involving the publication of truthful, fact-based information that was lawfully obtained. *IMDb* is not a commercial speech case, and it says nothing about whether the legality of a proposed transaction must be determined solely

from an ad's express language, without considering coded terms or other text and context.

*Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 814, 823 (9th Cir. 2013) (Mot. at 5, 7), held that Arizona could not target day laborers for harsher punishment when, while soliciting lawful work (*i.e.*, engaging in lawful commercial speech), they violated an unrelated traffic law. *Whiting* contains no analysis or discussion of any ads or solicitations that use code words or other indicia of illegal activity. It nowhere holds that such evidence cannot be used in evaluating the meaning of an advertisement.

Spear's out-of-circuit cases also miss the mark—they say nothing about coded solicitations for illegal transactions, including whether jurors may consider the use and meaning of coded terms and similar information. *See* Mot. at 7-8; Doc. 1626-3 at 166-67. And the United States has repeatedly distinguished cases like *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012)—which were decided in part under the inapplicable Communications Decency Act (Doc. 840 at 4-12), and resolved in a vastly different procedural and evidentiary landscape. *See* Mot. at 8 n.5; Doc. 649, Resp. at 22-26; Doc. 1626-3 at 166-67.

## II.   Spear's Remaining Arguments Lack Merit

### A.   The Evidence Supports Spear's Count 1 Conviction

The evidence—viewed in the light most favorable to the prosecution—showed that Spear agreed with Larkin, Lacey, Ferrer, Brunst, and others to promote, or facilitate the promotion of, business enterprises involved in prostitution offenses. *See* Doc. 1998 at 24. The co-conspirators played different but mutually-beneficial and complimentary roles.[1]

For his part, Spear, an owner of Backpage, did the following and more: supervised Ferrer and reported to Larkin; launched Backpage's moderation strategy of coaching advertisers to make their prostitution ads less overt; oversaw the multi-city rollout of content aggregation; approved and closely tracked the company's business partnership with The Erotic Review; and worked with Larkin, Brunst, and Ferrer on finding alternative

---

[1] It doesn't matter whether the crime agreed upon—here, violating the Travel Act—was actually committed. Doc. 1998 at 24.

solutions as Backpage became un-bankable. *See supra* at 1-9. Spear, Brunst, Larkin, Lacey, and Ferrer worked together to help Backpage navigate the reputational challenges posed by its prostitution-driven business. *See supra* at 5-6.

This evidence was more than enough to support proof of a conspiratorial agreement. Proving an explicit agreement isn't required. *Iannelli v. United States,* 420 U.S. 770, 777 n.10 (1975). An agreement can be inferred from the facts. *Id.* Moreover, by approving or directing many strategies that cemented Backpage's place as a leading online source of prostitution ads—and that resulted in hundreds of millions of dollars of profits—Spear became a member of the conspiracy knowing of at least one of its objects (to make money) and intending to help accomplish it. *See* Doc. 1998 at 24; Doc. 230 ¶¶ 195-199.

The evidence also shows that members of the conspiracy performed overt acts on or after March 28, 2013. *See* Doc. 1998 at 24. In addition to acts by Ferrer, Brunst, Larkin, and others (which alone are sufficient), Spear personally engaged in many acts to keep Backpage's afloat and profitable from March 28, 2013 onward. He vetted and was updated about agreements with various European banks and credit card processors as Backpage's executives searched for alternative payment and banking solutions in 2013-14. *See supra* at 7-9. Spear, Brunst, Larkin, and Ferrer followed recommendations to use holding companies with names other than Backpage, contract with European credit card processors, and spread resulting payments across various overseas banks. *See supra* at 8. The resulting revenues were sent to BMO in the United States, where Backpage had an account under the non-Backpage name "Website Technologies." *See supra* at 8.

Spear also continued to work with Ferrer on business plans for Backpage in 2013-14, which included funding for Google Analytics reports. *See* 9/20/23 p.m. Tr. at 44:8-19; Exs. 1116, 1116a at 2. Those reports showed The Erotic Review as a leading source of referrals well into 2015. *See, e.g.*, Ex. 1995. Spear was paid of millions of dollars by Backpage during this period, in 2013-15. 10/13/23 a.m. Tr. at 127:7-133:14; Ex. 1481.

Spear's assertion that he was "merely present" doesn't square with this evidence. *Cf.* Mot. at 12-13. And even his cases recognize that "[e]very member of the conspiracy

need not be an active participant in every phase of the conspiracy[.]" *United States v. Lee*, 991 F.2d 343, 348 (6th Cir. 1993) (Mot. at 13). While he faults the Court for not including a "mere presence" instruction, Mot. at 13, that instruction is not warranted where, as here, "the government's case is not solely based on the defendant's presence and the jury has been instructed on the elements of the crime." 9th Cir. Model. Crim. JI 5.2.

Spear's argument that the statute of limitations cut-off the jury's ability to consider his actions before March 28, 2013 also lacks merit. Mot. at 13-14. The Court has repeatedly found that Count 1 alleges a 14-year conspiracy spanning 2004 to 2018, and that conduct before 2013 is relevant to that charge. Doc. 1643 at 4, 6. The evidence showed that Spear played a critical role in overseeing Backpage's development into a prostitution advertising website—setting the stage for Backpage's publication of the charged ads—and that his involvement in the company continued while the ads were published. *See supra* at 1-9. This was more than sufficient to prove a single, continuous conspiracy from 2004 to 2018, not a separate "pre-2013" conspiracy. *Cf.* Mot. at 13-14.

Moreover, the record shows that co-conspirators Brunst, Larkin, Ferrer, and others committed overt acts within the limitations period. *See supra* at 1-9. There's also ample evidence of Spear's ongoing participation from 2013 forward. *See supra* at 7-9. Under the *Jackson/Nevils* standard, Spear's Rule 29 motion should be denied.

**B.   The Evidence Supports Spear's Count 2-18 Convictions**

The evidence supports Spear's convictions for the Travel Act violations in Counts 2-18 because Spear oversaw and directed Backpage's development into the prostitution advertising website that published the underlying ads, and because Spear directly supervised and "micromanaged" Ferrer, who ran the website's day-to-day operations. When the pimps and prostitutes who posted the ads in Counts 2-18 used Backpage to advertise their illegal commercial services, they utilized a website tailored-made to promote, and facilitate the promotion of, prostitution enterprises like theirs. That website did not spring up out of whole cloth; it existed because of the determined, yearslong effort of Spear and others to build the website into a business that had all but cornered the market

on online prostitution advertising. And during the period when the ads were published, Spear continued to engage in overt acts related to ensuring that Backpage's posters had viable payment channels to purchase ads on the website. *See* supra at 7-9. Based on the totality of the evidence about his intent and actions, the jury could rationally have convicted Spear of violating the Travel Act in Counts 2-18 through his direct conduct.

Moreover, under the *Pinkerton* doctrine, "'a conspirator [is] criminally liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy.'" Doc. 793 at 19 (quoting *United States v. Long*, 301 F.3d 1095, 1103 (9th Cir. 2002)). Because the jury convicted Spear of the conspiracy in Count 1, the jury could also find him guilty of Counts 2-18 if the United States proved that: a member of the conspiracy committed the Travel Act offense in furtherance of the conspiracy; Spear belonged to the conspiracy when the offense was committed; and the offense fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement. Doc. 1998 at 27. Ample evidence supported all these elements.

First, from September 2023 to February 2015, when the ads in Counts 2-18 were published, Spear's co-conspirator and direct-report Ferrer ran the website's day-to-day operations, including its publication of prostitution ads. *See* Doc. 1978 at 2-10; 9/12/23 p.m. Tr. at 7:10-12, 8:3-6, 16:2-12. Ferrer supervised Andrew Padilla, the head of moderation, and Dan Hyer, the head of sales and marketing. 9/12/23 p.m. Tr. at 12:21-11, 14:24-9. Given Ferrer's position and duties, a rational juror could find that Ferrer was responsible for publication of the 17 ads underlying Counts 2-18. Ferrer also assisted P.R. with her advertising on Backpage, and Spear's suggestion that Ferrer didn't communicate with her (Mot. at 12) is incorrect for the reasons in the United States' Response to Defendants' Rule 33 Motion at 3-5, incorporated by reference.

Second, the record shows that Spear was a member of the conspiracy when the Travel Act offenses were committed. Doc. 1998 at 27. Spear joined the conspiracy when he started supervising Ferrer, as early as 2005, and he continued to contribute to

Backpage's operations when the ads were published. *See supra* at 1-9.

Third, the evidence shows that publication of the ads in Counts 2-18 fell within the scope of the conspiracy and were a reasonably foreseeable consequence. Publication of these and other prostitution ads on Backpage was the logical consequence of Spear's actions in launching the site into what became a near-monopoly on online prostitution advertising. *See, e.g.*, 9/12/23 p.m. Tr. at 30:18-23; 9/15/23 a.m. Tr. at 38:16-39:17 (Backpage's aggregation, TER, and super-poster strategies positioned it to "logically inherit the prostitution ads from Craigslist").

    **C.**    **The Evidence Supports Spear's Money Laundering Convictions**

Finally, contrary to Spear's assertions on pages 3-4 of his motion, the trial evidence supports Spear's convictions on counts 52-62, 71-78, 85 and 93. First, with respect to conspiracy and the concealment money laundering counts (52-62), Spear is guilty for the same reasons discussed in the United States' Response to Brunst's Supplemental Rule 29 Motion. Doc. 2019 at 10-14, 17. The transactions at issue in those charges involve criminal proceeds and demonstrate an intent, at least in part, to conceal. *Id*. That's sufficient. Second, Spear argues that he's not guilty of the transactional money laundering counts (71-78, 85, 93) because he purportedly made no "effort to hide or obscure . . . the receipt of payments." Mot. at 4. But those aren't elements of the crime. Doc. 1998 at 44-45. The United States need only prove that Defendant knowingly engaged in a domestic monetary transaction, knowing that the funds were criminally derived, over $10,000, and actually derived from Travel Act violations. For all the reasons stated above and at trial, the United States has proved these elements against Spear.

**CONCLUSION**

Defendant Scott Spear's Rule 29 motion should be denied.

Respectfully submitted this 22nd day of December, 2023.

GARY M. RESTAINO
United States Attorney
District of Arizona

NICOLE M. ARGENTIERI
Acting Assistant Attorney General
Criminal Division, U.S. Department of Justice

*s/ Peter S. Kozinets*
KEVIN M. RAPP
MARGARET PERLMETER
PETER KOZINETS
ANDREW STONE
DANIEL BOYLE
Assistant U.S. Attorneys

AUSTIN M. BERRY
Trial Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Daniel Parke*