Gary S. Lincenberg *(admitted pro hac vice)*
  glincenberg@birdmarella.com
Ariel A. Neuman *(admitted pro hac vice)*
  aneuman@birdmarella.com
Gopi K. Panchapakesan *(admitted pro hac vice)*
  gpanchapakesan@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Attorneys for Defendant John Brunst

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | CASE NO. 2:18-cr-00422-004-PHX-DJH |
| Plaintiff, | **BRUNST'S REPLY IN SUPPORT OF RULE 29 MOTION FOR ACQUITTAL** |
| vs. | |
| Michael Lacey, et al., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

3912041.4

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................... 1

II. ARGUMENT .................................................................................................................. 2

    A. The Travel Act Conspiracy Conviction Rests on a Series of Inferences That Do Not Establish the Requisite Intent. ....................................................... 2

        1. Purported Marketing Strategies ............................................................. 2

        2. Outside Scrutiny .................................................................................... 3

        3. Banking and Credit Cards ..................................................................... 3

        4. Website Technologies ........................................................................... 4

    B. The Government's Key Concessions Require Dismissal of the Money Laundering Charges Against Brunst. ............................................................... 4

        1. The Government Tacitly Concedes a Failure to Prove a Specified Unlawful Activity .................................................................. 4

        2. The Government Ignores the Purpose of the Transactions at Issue in the Concealment Money Laundering Counts (Counts 53 to 62) ..................................................................................................... 6

        3. The Government Failed to Prove that Loan Payments Promoted Travel Act Violations (Counts 64 to 68). ........................... 7

        4. There Can be No Transactional Money Laundering Without an Underlying SUA (Counts 69-70, 78-84, and 86-93). ........................... 9

        5. No Rational Juror Could Find That Brunst Participated in a Money Laundering Conspiracy (Count 52) ..................................... 10

III. CONCLUSION ............................................................................................................ 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brinegar v. United States*
   338 U.S. 160 (1949) ................................................................................................ 6

*Ingram v. United States*
   360 U.S. 672 (1959) ...................................................................................... 1, 2, 10

*United States v. Jolivet*
   224 F.3d 902 (8th Cir. 2000) ................................................................................... 8

*United States v. Montoya*
   945 F.2d 1068 (9th Cir. 1991) ................................................................................. 8

*United States v. Rutgard*
   116 F.3d 1270 (9th Cir. 1997) ............................................................................ 5, 9

*United States v. Sun*
   673 F. App'x 729 (9th Cir. 2016) ........................................................................... 7

*United States v. Wilkes*
   662 F.3d 524 (9th Cir. 2011) ................................................................................... 8

**Statutes**

18 U.S.C.
   § 1952 ............................................................................................................ *passim*
   §§ 1961, *et seq.* ....................................................................................................... 5

## I. INTRODUCTION

The Government impermissibly tries to draw inferences from general business meetings to support the Count One conviction. *See Ingram v. United States*, 360 U.S. 672, 680, (1959) (granting motions for acquittal as to conspiracy charge regarding evasion of taxes on lottery operations where Government's approach involved "piling inference upon inference, thus fashioning a dragnet to draw in all substantive crimes").[1]  Even when viewed in the light most favorable to the Government, evidence that Brunst understood the revenue implications of adult advertising, was aware of staffing increases, and conveyed to investors the pressures facing a challenged company does not establish that Brunst conspired with Ferrer with the specific intent to foster the business enterprises of particular pimps or prostitutes.

The existence of specified unlawful activity ("SUA") is an essential element of each money laundering charge. The Government concedes that a Travel Act conspiracy is not an SUA under the applicable statutes. Further, the jury acquitted Brunst of the SUA charged in Counts 2-51 (substantive Travel Act violations), *and* the Government never introduced evidence of some *other* specified Travel Act violations that were tied to the charged wires. The Government simply avoids addressing the fact that, without SUA, there is no money laundering. Instead, the Government asks the Court to presume that because the charged transactions involved funds from Backpage, they must also have involved funds obtained from Travel Act violations. But there was no proof of that at trial. The Government had Ferrer make some broad assertions, but made no attempt at trial to show that *all Backpage revenue* was derived from Travel Act violations. Indeed, the Government introduced evidence of the contrary. Accordingly, the money laundering counts all must be dismissed.

---

[1] Unless otherwise noted, internal citations and quotation marks have been omitted.

## II. ARGUMENT

### A. The Travel Act Conspiracy Conviction Rests on a Series of Inferences That Do Not Establish the Requisite Intent.

The Government's best evidence falls woefully short of establishing an intent on Brunst's part to enter into an agreement to violate the Travel Act. As the Supreme Court has repeatedly held: as to a criminal conspiracy charge, "[w]ithout the knowledge, the intent cannot exist. Furthermore, to establish the intent, *the evidence of knowledge must be clear, not equivocal*." *Ingram*, 360 U.S. at 680 (emphasis added). As demonstrated by the Government's own response, the evidence of Brunst's knowledge in the context of the Travel Act conspiracy charge is, at best, equivocal.

#### 1. Purported Marketing Strategies

The Government argues that Brunst "focused on growing escort advertising" and "knew the revenue implications," *e.g.*, through PowerPoint presentations. Dkt. 2019 at 2. But knowing the revenue implications of adult advertising generally is not the same as willfully entering into a criminal agreement to violate the Travel Act through the promotion of particular business enterprises involving prostitution. In terms of budget approval, Ferrer clarified that the only instance in which he recalled Brunst dealing with a specific line item was in the context of salaries. 09/27/23 PM Trial Tr. at 14:14-25. There was insufficient evidence that Brunst himself approved any kind of strategy that the Government claims was used by Ferrer to drive unlawful ads to the site. Indeed, the Government presented no evidence that Brunst—at any point during the alleged 14-year conspiracy—even viewed an adult ad (let alone a "prostitution" ad) on the Backpage site.

As to TER, there was no evidence that Brunst ever reviewed the TER site, had any knowledge about the content on the site, or interacted with any TER representatives. There also was no evidence that Brunst ever dealt with TER or signed any checks made out to TER. Jess Adams, who managed the accounting process with regard to TER, testified that it was Spear—not Brunst—who approved and signed the TER checks. 10/10/23 PM Trial Tr. at 142:5-143:5. Further, the only substantive reference to TER

pertaining to Brunst is found in Exhibit 23 (p. 3), a lengthy budget plan presented by Ferrer that merely states "we *struck* a deal" with TER. In other words, there was no evidence that Brunst was involved in consummating, or approving of, any deal with TER.

With regard to moderation, the Government infers conduct on the part of Brunst as to which there was no supporting evidence. Ferrer testified generally that Brunst was part of an executive team that approved an "increase" in terms of "marketing staff and efforts" (09/13/23 PM Tr. at 106-107), but did not testify about any corresponding discussions with Brunst about prostitution, moderation practices, coded language, or the like. And, of course, no other witness gave any incriminating testimony whatsoever about Brunst.

### 2. Outside Scrutiny

The Government argues guilt by innuendo. That Brunst was aware Backpage received subpoenas or conveyed to investors that various government officials were applying pressure on Backpage (Dkt. 2019 at 4-5) proves nothing. On the contrary, most major companies, including internet and social media companies like Google, Meta, X, and TikTok, are regularly faced with these same types of challenges.[2]

### 3. Banking and Credit Cards

At best, the evidence in this respect establishes that various financial institutions and credit card companies ceased doing business with Backpage for ***reputational reasons***. Mickey Hansen of AmEx (the only credit card, bank, or processing company witness to testify) said as much. He was not concerned that AmEx was facilitating a prostitution business; he made clear that the concern was reputational. 10/12/23 AM Trial Tr. at 20:16-21:2. No witness suggested that Brunst should have concluded otherwise. There was no testimony that any such institution made a determination Backpage was engaged in illegal conduct. Nor was there evidence that seeking credit card processing in Europe is illegal or indicative of criminal conduct.

---

[2] And as to the CNN piece, there is not a shred of evidence that Brunst discussed it with others or was involved in the response. The cited testimony only references Larkin and Spear.

Evidence regarding the use of Backpage affiliates for processing purposes, or the use of different billing descriptors, completely missed the mark. This is not a bank fraud case. And the Government made no attempt to show that any particular advertisement leading to an act of prostitution or to an alleged money laundering transaction involved the use of a misleading billing descriptor to disguise the transaction. In other words, even if a rational juror could find the existence of an agreement to avoid the reputational concerns raised by financial institutions, there was no proof that any such agreement extended to the facilitation of particular business enterprises engaged in prostitution.

### 4. Website Technologies

The Government claims that using Website Technologies to bank with BMO, or to handle payroll or 401(k) payments, was not above board. But again, this is not a bank or tax fraud case—instead, the Government was required to show that Brunst was part of a criminal agreement to use Website Technologies to commit Travel Act violations. That critical connection between Website Technologies and a particular advertisement or prostitution business enterprise was never established.

### B. The Government's Key Concessions Require Dismissal of the Money Laundering Charges Against Brunst.

#### 1. The Government Tacitly Concedes a Failure to Prove a Specified Unlawful Activity.

The central reason Brunst must be acquitted as to the money laundering counts is because the Government failed to prove the existence of any SUA, *i.e.*, Travel Act violations, that the jury rationally could have found forms the basis for those counts. When the Government finally gets around to acknowledging this key gap in proof (Dkt. 2019 at 12:22-26), it erroneously responds that the prior Court resolved the issue. But the prior Court in ruling on a motion to dismiss merely pointed to the *mens rea* requirement of concealment money laundering, as reflected in the second element of the Court's jury instruction. Dkt. 946 at 17; Dkt. 1998 at 41 ("Second, the defendant knew that the property represented the proceeds of some form of unlawful activity."). The Government

ignores the first element of that crime, which requires that the defendant "conducted a financial transaction ***involving property that represented the proceeds of a violation or violations of the Travel Act.***" Dkt. 1998 at 41 (emphasis added). The other charges have similar requirements. Dkt. 1998 at 44 (transactional money laundering requires that "the property was, in fact, derived from violations of the Travel Act."); Mtn. at 21 (SUA required for money laundering conspiracy); Dkt. 1998 at 42 (requiring the "intent to promote a violation of the Travel Act" under a charge of promotional money laundering).

The Government then claims that (1) Backpage "primarily derived its revenue from promotion of business enterprises that posted prostitution advertisements" and (2) the transactions at issue "included Backpage revenue." Dkt. 2019 at 13:19-23. But there was no proof at trial that *all Backpage revenue* was presumptively derived from Travel Act violations. *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997) is instructive in this regard. There, in a case involving alleged fraudulent surgeries performed by a physician, the Ninth Circuit reversed convictions as to transactional money laundering. In *Rutgard*, the Government premised its money laundering case on the notion that Rutgard's "entire medical practice was an insurance fraud." *Id*. The Ninth Circuit held that the Government failed to prove this theory of money laundering because: (1) it did not charge or prove that the subject medical practice "was a criminal enterprise of the kind condemned by RICO;" (2) "there are portions of Rutgard's practice where no fraud was suggested;" and (3) "no fraud was shown on the counts" where the Court reversed. *Id*. at 1288-1289.

Likewise, here, the Government (1) premised its money laundering case not on the source of funds tied to individual transactions, but on the generalized notion that all Backpage revenue was tainted and (2) did not charge or prove that Backpage itself was a criminal enterprise, such that all revenues it generated were illegally obtained. Specifically, as to the millions of ads posted on the site, it was established at trial that (a) Backpage hosted non-adult ads, (b) even experienced law enforcement officers could not

determine just from looking at an ad whether the ad related to prostitution,[3] and (c) not all adult ads posted on the site resulted in prostitution. *See, e.g.*, 10/12/23 PM Trial Tr. at 117:11-118-9 (Detective Murry testifying that he has never made an arrest based on an ad like Exhibit 218, which was tied to a substantive Travel Act count); 10/13/23 AM Tr. at 89:6-11 (Detective Griffen testifying to the same); 09/26/23 PM Tr. at 94:18-96:1 (Ferrer testifying that certain terms in ads were suggestive of prostitution and that he was making an "educated guess"); 10/12/23 AM Trial Tr. at 97:6-98:22 (one of the subjects of the substantive counts testifying that in two instances, advertisements did not result in sex). There was simply no competent testimony at trial that would permit a rational juror to infer that every transfer of funds involving Backpage revenues necessarily resulted from a Travel Act violation. Such an inference not only would have been contrary to the evidence, but it also would have violated the Court's instruction that the jury was to presume that Backpage's publication of every ad was protected by the First Amendment unless and until the government proved that "each ad" "propose[d] an illegal transaction" (Dkt. 1998 at 48:1-7), which necessarily turned on the content of each individual ad. The Government presented evidence about the content of only an infinitesimal percentage of the adult ads that ran on Backpage.com.

### 2. The Government Ignores the Purpose of the Transactions at Issue in the Concealment Money Laundering Counts (Counts 53 to 62).

The Government tacitly concedes that, as Ferrer testified, payments from Website Technologies to Cereus Properties were loan payments in connection with the sale of Backpage. Nor does the Government dispute that the *purpose* of a given transaction must be to conceal in order to support the charge. But there was no evidence that the loan

---

[3] The law enforcement witnesses all testified that adult advertisements on Backpage did not provide probable cause to make arrests for prostitution. Probable cause requires "more than bare suspicion," but is a low bar requiring only "facts and circumstances . . . sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949).

payments themselves were intended to conceal that the source of the payments was Backpage. Indeed, the sale and loan documents themselves reference the sale of Backpage and were prepared with the involvement of lawyers and accountants who understood it was Backpage—not some "shell" company—being sold. *See, e.g.*, Exh. 5427 (Loan Agreement referencing "Backpage US Operations" in the heading); 09/28/23 AM Trial. Tr. at 52:2-8 (Ferrer testifying that the accounting firm BDO set up the corporate structure of the sale of Backpage); Exh. 5364 (April 16, 2015, BDO document entitled "Backpage – Restructuring and Sale of Business").

That the subject transactions involved Backpage proceeds is plainly insufficient to prove concealment. The Government's own cases support this proposition, and that more is required. *See, e.g.*, *United States v. Sun*, 673 F. App'x 729, 733 (9th Cir. 2016) ("From Sun's statement to investigators that he deposited the proceeds into his personal account ***to avoid reporting them to the IRS***, among other evidence, a rational jury could infer that Sun had the purpose to conceal their illegal nature or source.") (emphasis added).

And even if a rational juror could believe that Website Technologies was established to get access to banking or credit card processing, that finding reflects dealings that are wholly separate from the specific loan payments from Ferrer to the sellers of Backpage charged in these counts. *See* 09/21/23 AM Trial Tr. at 61-62 (describing loan payments made from Ferrer to Cereus Properties, owned by certain of the Defendants); 09/28/23 AM Tr. at 97:16-21 (Ferrer testifying that his CFO, Michael Gage, accounted for the wire transfers to Cereus Properties as Backpage sale loan payments); 09/21/23 PM Trial Tr. at 91:1-25 (Ferrer testifying that post-sale wire transfers to Cereus Properties were loan payments made by Website Technologies and Ad Tech B.V.).

### 3. The Government Failed to Prove that Loan Payments Promoted Travel Act Violations (Counts 64 to 68).

As to the promotional money laundering counts, the Government again ignores Ferrer's uncontroverted testimony that the purpose of these transactions was for Ferrer to make loan payments on the sale of Backpage. Loan payments *out of Backpage* to the

sellers of the company do not establish promotion. *See United States v. Wilkes*, 662 F.3d 524, 548 (9th Cir. 2011) ("Promotional money laundering is 'different from traditional money laundering because the criminalized act is the reinvestment of illegal proceeds rather than the concealment of those proceeds.'") (quoting *United States v. Jolivet*, 224 F.3d 902, 909 (8th Cir. 2000)). There simply was no evidence that Brunst—who, as the CFO of Cereus Properties, collected on these loan payments—acted with the intent to promote Travel Act violations by doing so.

The Government takes issue with the notion that promotion requires the "plowing" of money back into an illegal enterprise—phrasing that the Government itself used during its closing argument. 10/27/23 AM Tr. at 26:5-13. But even under the cases cited by the Government, for there to be promotion, the transaction at issue must be required to *carry out* the alleged illegal scheme. *See, e.g.*, *United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir. 1991) ("[D]epositing the check provided an opportunity for Montoya to **carry out the illegal bribery** by characterizing the funds as a legitimate honorarium.") (emphasis added). Here, there was no evidence that loan payments tied to the sale of Backpage (1) resulted from Travel Act violations, (2) completed any Travel Act violations, or (3) were characterized as loan payments to promote Travel Act violations. Indeed, even if any such Travel Act violation occurred, it would have been completed *prior* to the later transfer of funds in connection with a loan payment. By the Government's logic, if Ferrer had taken out a loan from a bank to pay for the purchase of Backpage, the bank's mere receipt of loan payments would make it guilty of promotional money laundering.[4]

---

[4] The Government hangs its hat on the testimony of Quoc Thai that Cereus Properties was a "payroll company" for Backpage employees. But there was no evidence of that. The Government concedes that no fact witness—including Ferrer—testified to this effect. And the Government ignores that, as discussed in the Motion, a late-produced Backpage Investigation Report reviewed by Thai—and that Defendants never had an opportunity to use on cross-examination—*contradicts* Thai in this respect. Nor does the Government cite any cases supporting the notion that the payment of employee salaries establishes "promotion" under the statute.

### 4.  There Can be No Transactional Money Laundering Without an Underlying SUA (Counts 69-70, 78-84, and 86-93).

The Government's argument amounts to *ipse dixit*, stating without explanation that the funds wired in these transactions were "all derived from Travel Act violations" (Dkt. 2019 at 17:21-22), violations that the Government never even sought to prove.  For this theory to work, every dime made by Backpage must not only have been tied to an ad proposing an illegal transaction, but every dime also must have been tied to an ad intended by Ferrer or one of the Defendants to promote a business enterprise involved in prostitution.  But there was no proof to that effect at trial; indeed, the Government never even made an effort to show the source of revenue tied to these transactions.  The Ninth Circuit has rejected the general presumption the Government asks the Court to apply here as to Backpage's revenues (in *Rutgard*, a case with no First Amendment implications). *See* 116 F.3d at 1293 ("To create such a presumption in order to sustain a conviction under § 1957 would be to multiply many times the power of that draconian law.  It would be an essay in judicial lawmaking, not an application of the statute. As the government did not prove that any fraudulently-derived proceeds left the account on May 5 or May 6, 1992, the monetary transfer counts, Counts 216 and 217, were not proved beyond a reasonable doubt.").  Here, the Government also, in effect, asks the Court to reverse the presumption required by the First Amendment and to presume that all ads published by Backpage.com were unprotected, which the First Amendment does not allow.  Mtn. at 14.

As to Counts 68-70 and 83-84, which reflect Lacey's personal transactions, the Government obfuscates.  None of these counts, as alleged in Indictment, concerns transfers from Cereus Properties.  The charged transactions undisputedly concern only transfers from Lacey's personal bank accounts to residential title companies for real property he purchased.  That Brunst was a signatory on the Cereus Properties account is irrelevant; he was not a signatory on the subject Lacey accounts.  The Government asserts that Lacey could not have transferred money between his personal accounts "without Brunst sending him the money." Dkt. 2019 at 18.  By the Government's logic, every person or entity in

the chain of fund transfers preceding the charged transfer—from the ad poster, to the credit card company, to the processor, to the bank—would be guilty of transactional money laundering because Lacey could not have received the underlying funds but for their actions. The Government provides no support for this argument because there is none. Section 1957 instead focuses on the conducting of individual transactions above $10,000— not the transfer or series of transfers preceding the subject transaction.

### 5. No Rational Juror Could Find That Brunst Participated in a Money Laundering Conspiracy (Count 52).

As discussed in the Motion, the lack of an identifiable SUA is fatal to the conspiracy charge. As to the creation of Website Technologies, the Government failed to prove that any revenues that flowed through Website Technologies were tied to Travel Act violations, or that Brunst hid Website Technologies' affiliation with Backpage for the purpose of concealing or promoting Travel Act violations. *See, e.g.*, Exh. 885 (Brunst extensively disclosing to Bank of Montreal the ties between Backpage and Website Technologies). At a minimum, the evidence of Brunst's knowledge in this respect was "equivocal"—*i.e.*, that ties to Backpage were disclosed in payment processing and banking applications, but more could have been disclosed—which is insufficient to support a conspiracy charge. *Ingram*, 360 U.S. at 680; 09/27/23 PM Trial Tr. at 53:14 (Ferrer testifying, "We knew we couldn't lie" on payment processing applications), 76:4-6 ("Q. Were you concealing that Backpage was connected with this application? A. No, 'cuz my e-mail address has backpage.com in it."). And, in any event, the only money laundering charges that involve Website Technologies reflect innocuous loan payments on the sale of Backpage (discussed above).

Nor does the Government point to even circumstantial evidence concerning a criminal agreement in this regard. The Government merely argues that "[w]ithout Brunst, Defendants could not have continued to reap the benefits of their criminal scheme." Dkt. 2019 at 18. The Government speaks in generalities, when specifics are necessary to sustain a conspiracy conviction.

## III. CONCLUSION

Brunst respectfully requests that the Court grant his motion for acquittal, and reiterates his request to serve targeted interrogatories to jurors to support his objection to the *Allen* instruction.

DATED: January 16, 2024         Respectfully submitted,

>Gary S. Lincenberg
>Ariel A. Neuman
>Gopi K. Panchapakesan
>Bird, Marella, Boxer, Wolpert, Nessim,
>Drooks, Lincenberg & Rhow, P.C.
>
>By:     */s/ Gary S. Lincenberg*
>                Gary S. Lincenberg
>       Attorneys for Defendant John Brunst