1

2                    **UNITED STATES DISTRICT COURT**

3                   **FOR THE DISTRICT OF ARIZONA**

4                    _____

5

6    United States of America,        )
                                       )   No. 2:18-cr-00422-DJH
              Plaintiff,               )

7                                      )
              vs.                      )        Phoenix, Arizona

8                                      )        January 6, 2025
     Scott Spear and John Brunst,      )        10:01 a.m.

9                                      )
              Defendants.              )

10   _____ )

11

12

13        **BEFORE:  THE HONORABLE DIANE J. HUMETEWA, JUDGE**

14

15            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

              **RESTITUTION HEARING - DAY 2 - Pages 103-201**

16

17

18

19

20

21   Official Court Reporter:
     Hilda Elizabeth Lopez, RMR, FCRR

22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc 30

23   Phoenix, Arizona 85003-2151
     (602) 322-7256

24
     Proceedings Reported by Stenographic Court Reporter

25   Transcript Prepared by Computer-Aided Transcription

<u>**A P P E A R A N C E S**</u>

For the Government:
    UNITED STATES ATTORNEY'S OFFICE
    By:  **Kevin M. Rapp, Esq.**
        **Peter S. Kozinets, Esq.**
        **Margaret Wu Perlmeter, Esq**
        **Joseph Franklin Bozdech, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
    kevin.rapp@usdoj.gov
    peter.kozinets@usdoj.gov
    andrew.stone@usdoj.gov
    margaret.perlmeter@usdoj.gov

For the Defendant Scott Spear:
    FEDER LAW OFFICE, P.A.
    By:  **Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016
    bf@federlawpa.com

For the Defendant John Brunst:
    BIRD MARELLA BOXER WOLPERT NESSIM DROOKS
    LINCENBERG & RHOW, P.C.
    By:  **Gopi K. Panchapakesan, Esq.**
        **Gary S. Lincenberg, Esq.** (Via Zoom)
    1875 Century Park E, Suite 2300
    Los Angeles, CA 90067
    gpanchapakesan@birdmarella.com
    glincenberg@birdmarella.com


<u>Attorneys present for the victims:</u>

For Victims 3 and 6:
DONNELLY, CONROY & GELHAAR, LLP
By:  **Emma Notis-McConarty**, Esq.
260 Franklin Street, Suite 1600
Boston, MA 02110

For Victims 3 and 6:
ROPES & GRAY
By:  **John T. Montgomery**, Esq.
Prudential Tower 800 Boylston Street
Boston, MA 02199-3600

1    Attorneys present for victims - Continued

2    For Victims 3 and 6:
     ROPES & GRAY
3    By:  **Kate Tian**, Esq. (Via Zoom)
     1211 Avenue of the Americas
4    New York, NY 10036-8704

5    For Victims 4 and 5:
     WOMBLE BOND DICKINSON
6    By:  **Stephen M. Bressler**, Esq.
               - and -
7        **Andrew Jacobsohn**, Esq.
     201 W. Washington Street, Suite 1200
8    Phoenix, AZ 85004

9    For Victim 8:
     By:  **Christopher V. Parente**, Esq.  (Via Zoom)
10   CHERONIS & PARENTE, LLC
     140 S. Dearborn Street, Suite 404
11   Chicago, IL 60603

12   For Victim 8:
     By:  **Gina DeBoni**, Esq.  (Via Zoom)
13   ROMANUCCI BLANDIN LAW
     321 North Clark Street, Suite 900
14   Chicago, IL 60654
     gdeboni@rblaw.net
15
     For Victim 1:
16   Joel Shapiro

17   For Victim 9:
     Brent Woody
18
     For Victim 10:
19   Abby Chin

20

21

22

23

24

25

**I N D E X**

| WITNESS: | PAGE: |
|---|---|
| **STAN V. SMITH, Ph.D.** | |
| Direct Examination by Mr. Rapp | 109 |
| Cross-Examination by Mr. Panchapakesan | 117 |
| **DAVID S. GIBSON** | |
| Direct Examination by Mr. Rapp | 148 |
| Cross-Examination by Mr. Landman | 156 |

**E X H I B I T S**

| EXHIBIT NO. | | PAGE: |
|---|---|---|
| 111 | Destinee Ortiz, Report of Dr. Smith | 118 |
| 126 | Naiomy Figueroa 2020-01-23 SEG Questionnaire | 127 |
| 128 | Naiomy Figueroa, Report of Dr. Smith | 118 |
| 130 | Child Sexual Abuse & Employment Earnings in Adulthood | 137 |

1                    **P R O C E E D I N G S**

2

3        (Proceedings commence at 10:01 a.m.)

4              THE COURT:  All right.  Please be seated.

5              COURTROOM DEPUTY:  We're on the record in case number        10:01:28

6    CR 18-422, as to Defendants 3 and 4, United States of America

7    vs. Scott Spear and John Brunst, on for continuation of

8    restitution hearing.

9              Counsel, please announce for the record.

10             MR. RAPP:  Good morning, Kevin Rapp, Joseph Bozdech,        10:01:42

11   Margaret Perlmeter and Peter Kozinets on behalf of the United

12   States.

13             THE COURT:  Good morning.

14             MR. FEDER:  Bruce Feder for Mr. Spear.

15             THE COURT:  Good morning.                                   10:01:53

16             MR. PANCHAPAKESAN:  Good morning, Your Honor,

17   Gopi Panchapakesan, Michael Landman and Mr. Lincenberg is on

18   Zoom for Mr. Brunst.

19             THE COURT:  Good morning to you.  Before we begin,

20   there was a request for the court to consider permitting          10:02:07

21   Mr. Landman to introduce Exhibits 108 and 109.  I will, and I

22   will consider the, as to each of those exhibits, the SEG

23   questionnaire, but not the attached 302.

24             I want to ask the government for clarification as to

25   this chart.  As I pointed out previously, there was the           10:02:50

discrepancy in delineating the document number associated with each of, well, several of these victims, exhibits. I cannot find with regard to document, excuse me, Victim Number 7, this referenced exhibit. So if you can point me to -- I did locate just one questionnaire. So if that's the -- if that's the complete document that you're referring to, then I guess I have it, but otherwise this exhibit doesn't exist in my docket and there's no page associated with it. There is no Exhibit 1. 10:03:36

MR. RAPP: So it is what she submitted with the Victim Impact Statement. 10:04:05

THE COURT: All right. Okay. So let's proceed forward. We have our witness present and we can swear in the witness.

MR. RAPP: Very well.

(STAN V. SMITH, Ph.D., a witness herein, was duly sworn or affirmed.) 10:04:18

THE COURT: Sir, you are on mute. We're trying to unmute you.

THE WITNESS: This is Stan.

COURTROOM DEPUTY: Great. Thank you. 10:04:59

THE WITNESS: I do.

COURTROOM DEPUTY: If you would please state your full name and spell it for record.

THE WITNESS: Sure. Stan V. Smith.

COURTROOM DEPUTY: Thank you. 10:05:23

Direct Examination of Stan V. Smith, Ph.D.

1    THE WITNESS:  S-M-I-T-H.

2    THE COURT:  All right.  Mr. Rapp.

3                    DIRECT EXAMINATION

4  BY MR. RAPP:

5  Q.  Let me introduce myself to you because we never met in          10:05:32

6  person.  My name is Kevin Rapp.  I am one of the Assistant

7  United States Attorneys on this case.

8         Mr. Smith, for the record, can you just briefly

9  describe your background and qualifications, please.

10 A.  Sure.  Simply, I'm a Ph.D. in economics from the University     10:05:48

11 of Chicago, and I've been in an economic and financial

12 consulting firm for the last 40 years where we analyzed damages

13 in litigation, primarily things like wages, et cetera, impacts

14 for various different reasons, personal injury or car crashes,

15 medical malpractice.  We have done criminal restitution.          10:06:13

16        You may know that there's a case that went to the

17 Supreme Court that resulted in a new criminal restitution law

18 called the Amy, Vicky, Andy Act, those are my cases.  So we've

19 done these types of damages before that have had some national

20 consequences.                                                      10:06:32

21 Q.  All right.  Thank you, sir.  Were you asked to prepare

22 reports on behalf of two victims, and I am going to refer to

23 them by initials N.F. and D.R.?

24        MR. RAPP:  And that's Victim 3 and Victim 6, Your

25 Honor, on the chart.                                               10:06:49

UNITED STATES DISTRICT COURT

Direct Examination of Stan V. Smith, Ph.D.

1      THE WITNESS:  Yes.

2  BY MR. RAPP:

3  Q.  All right.  And did the reports that you were asked to

4  prepare, do they address the cost of future life care medical

5  needs, the cost of lost income, past and future?                    10:07:04

6  A.  Yes, they do.

7  Q.  And can you explain to the Court what is the -- what is the

8  basis for your report?

9  A.  Well, the two different elements of damages that we

10 calculated, the medical costs are based on the life care plan        10:07:21

11 that was presented by Dr. -- let me get the name right here,

12 Cooper, Sharon Cooper, and the loss of wages is based on U.S.

13 government statistics on average earnings of people with

14 college degrees, some college, et cetera, so those are the

15 bases.                                                               10:07:50

16 Q.  All right.  Was there also a questionnaire that you

17 considered that was completed by both of these victims?

18 A.  Yes.

19 Q.  All right.  Now, with regard to Victim 3, N.F., were there

20 any preexisting conditions that she had that were excluded from      10:08:08

21 your calculation of future medical costs?

22 A.  Yes, I think, as noted in my report, there were some

23 conditions.  It's my understanding that there are certain costs

24 that will not be incurred.  For example, she would not need any

25 medical cost if she receives the -- she will not need the            10:08:40

─Direct Examination of Stan V. Smith, Ph.D.─

1    endoscopic surgery if she receives -- she won't need the

2    ongoing cost if she receives the surgery.  And there are some

3    other procedures, I think, Dr. Cooper may be more competent to

4    testifying to those than I, but I do have a list of them.

5    Q.  One of these, I think, you were referring to it, but just          10:09:08

6    for clarity purposes, is this the bee sting anaphylaxis?  It's

7    on page 9.

8    A.  Yes.  Yes, nor any PID episodes.  And candidly, I don't

9    recall what PID stands for.

10   Q.  All right.  With respect to Victim 6, D.O., same question,         10:09:24

11   were there any preexisting conditions that she had that were

12   excluded from your calculation of future medical costs?

13   A.  All right.  Let me just turn to that section of my report

14   'cause --

15   Q.  I think that's also page 9.                                        10:09:45

16   A.  Yes.  So there's costs related to post COVID condition and

17   ADHD.

18   Q.  All right.  Terrific.  Now, with regard to future life

19   care, did you calculate the cost of future life care for each

20   of these two victims based upon the reports of Dr. Sharon            10:10:12

21   Cooper?

22   A.  Yes, I did, and there was one more cost for D.O., victim

23   D.O., that I didn't mention, which was the cost of refractive

24   surgery.

25   Q.  All right.  And was that one that was excluded?                    10:10:30

Direct Examination of Stan V. Smith, Ph.D.

1    A.  Yes.

2    Q.  Okay.  Thank you.  Now, where Dr. Cooper provided a range

3    for the cost of treatment, how did you calculate the cost of

4    future care?

5    A.  All right.  Very simply, I will give you an example.  Dr.    10:10:46

6    Cooper said something would cost, say, between $4 and $6, this

7    is a hypothetical, then I would use the average of those two, I

8    would use $5 as the expected cost 'cause it could be some years

9    a little lower, some years a little higher, but I would expect

10   over the course of time you don't always get things on the low    10:11:08

11   side, you don't always get things on the high side, so I took

12   the average of the two because that's the most likely and the

13   fairest.  I should say the least biased statistically speaking.

14   Q.  All right.  And then just for the Court's edification, for

15   N.F., Victim 3, that's on page 8 through 9 of your report, and    10:11:30

16   for Victim 6, D.O., is on page 9, would it be possible, sir, to

17   provide an updated calculation for future life care based upon

18   specific findings from this court about the conditions and

19   annual cost from Dr. Cooper's report?

20   A.  Sure.  Absolutely.    10:11:53

21   Q.  And --

22   A.  And very simple.

23   Q.  And would you be in a position to provide a supplemental

24   report in that regard?

25   A.  No problem.  Certainly we can.    10:12:03

Direct Examination of Stan V. Smith, Ph.D.

1  Q.  All right.  Now, let me just turn to future lost wages, did

2  you calculate the cost of lost wages for both of these victims

3  D.O. and N.F.?

4  A.  Yes, I did, and but also some past losses.

5  Q.  All right.  Well, can you explain to the Court what the          10:12:22

6  basis of those calculations are?

7  A.  Sure.  We looked -- and again, based on the questionnaire,

8  the prospect of these two victims and their future education,

9  their future educational plans, I don't have a crystal ball to

10  say that they absolutely would have gone to college, although      10:12:48

11  that's what the expectation was that, and the preference was,

12  but I looked at not only going to college, but not completing

13  college as well as not even going to college.  So I looked at

14  the scenarios of college education, only some college, and no

15  college.                                                            10:13:10

16          And each of those were, I believe, reasonable

17  prospects in the future.  The preferred ones that I think the

18  victims themselves will testify that they want to graduate

19  college, but I can't say that that's absolutely certain, so I'm

20  offering the trier of fact, the judge, the other prospects        10:13:27

21  also.

22          Now, we know from government statistics that when

23  people have various different traumas in their life that lead

24  to impairments, it could be you become blind, it could be you

25  can't walk, it could be you can't stand, physical impairments,    10:13:42

UNITED STATES DISTRICT COURT

1    there is also emotional and mental impairments.  Government has

2    statistics that show us what those impairments impact has on

3    two factors that contribute to your earnings.

4          One, how -- how much you owe will be employed in the

5    rest of your life.  So most people expect to work a normal          10:14:03

6    workweek, and they expect to work, you know, from age when they

7    graduate college from age 22, let's say to age 65, I have all

8    the numbers in the report, but not -- but when you have an

9    impairment, your level of employability is significantly less.

10   You may be out for medical reasons, you may be terminated for       10:14:22

11   various reasons because of difficulties and incapacities, so

12   your, what we call work life, the amount of time in the future

13   labor, is reduced.

14         And then secondly, you don't rise to the same level of

15   earnings that you might have.  So you may not get the                10:14:41

16   promotions and the successions and the progressions that we

17   expect.

18         The government gives us the impact of both the reduced

19   number of years in the workforce as well as the reduced level

20   of earnings from impairments.  They do give us that for the          10:15:00

21   depression and anxiety that I understand both victims have been

22   diagnosed with.  They don't give us all that we'd like if we

23   looked only at sexual abuse, which is another level that the

24   government has studied, but the government has studied only the

25   reduced employability, not the reduced earnings.                     10:15:30

**Direct Examination of Stan V. Smith, Ph.D.**

1          So we have a partial look at the impact if one were to

2     consider only sexual abuse victim input and ignore the

3     depression and anxiety.  But I think if you take them both into

4     account, we can see a pretty full picture once we get into that

5     level of detail 'cause I do believe that if the government did          10:15:53

6     produce statistics on the reduced level of income, as well as

7     employability, with sexual abuse, we would find them almost

8     equivalent impact.

9     Q.  All right.  If this Court finds that it is reasonably

10    certain that both victims, N.F. and D.O., would have graduated          10:16:14

11    high school or completed some but not all of college, is there

12    support in your report for the Court to order restitution based

13    on that finding?

14    A.  Yes.  That's the middle level scenario, some college.

15    That, in fact, by the way, is the average amount of education          10:16:33

16    these days for people.

17    Q.  All right.  Do calculations on future lost wages account

18    for the fact that N.F. and/or D.O. may have worked

19    intermittently since 2016?

20    A.  We do show some past impact offset, I should say, so there          10:16:54

21    is a reduced -- yes, so I show the reduction, assuming that

22    they had some ability to work in the past at a reduced level.

23    I don't know exactly what they did earn, but if that were told

24    to me, I could calculate and see is what they earned in line

25    with what we projected that they should have earned so to          10:17:23

**Direct Examination of Stan V. Smith, Ph.D.**

1    speak.

2         Now --

3    Q.  All right.  You calculated future lost wages based on the

4    assumption that each victim would work until the going

5    retirement age of 67; correct?                                          10:17:39

6    A.  That shows up in the summary, that's correct, but the

7    individual tables actually allow a trier of fact to pick 66 or

8    62 or 71 because we know people are working longer than ever,

9    and 50 years from now when these two young ladies would have

10   otherwise been in the labor force, we would expect people to be    10:18:00

11   working longer just as we know people today are working much

12   longer than people who -- than 50 years ago.

13   Q.  All right.  And if the Court finds that it is only

14   reasonably certain that they would work until a younger age, is

15   there support for ordering calculating restitution on that       10:18:20

16   basis?

17   A.  Yes, you could just use the exact percentage in the report

18   not just for age 67, but you could do it for age 65 or age 62.

19   Q.  All right.  And just to direct the Court on that, is that

20   at Table 7, 14 or 21 based upon the educational outcome the       10:18:41

21   Court would -- that could reasonably be certain in finding?

22   A.  Yes.  Yes, and then you would also use the percentage on

23   page 11 of -- let me just make sure it's both reports --

24   page 11, should be, but on page 11 we see the impairment of

25   almost 80 percent, 79 percent, the impairment for anxiety and    10:19:08

Cross-Examination of Stan V. Smith, Ph.D.

1    depression disorder.  So that's an 80 percent reduction that

2    you would apply to the figures whether they be Table 7, 14 or

3    21, which is high school, some college, and then college.

4    Q.  All right.

5            MR. RAPP:  Could I just have a minute, Your Honor?        10:19:29

6            THE COURT:  Yes.

7            MR. RAPP:  I don't have any further questions.

8            THE COURT:  All right.  Who is going to question the

9    witness?

10           MR. PANCHAPAKESAN:  Me, Your Honor.                       10:19:37

11           THE COURT:  All right.  You may come forward.

12                        CROSS-EXAMINATION

13   BY MR. PANCHAPAKESAN:

14   Q.  Good morning, Mr. Smith.  My name is Gopi Panchapakesan.  I

15   represent Mr. Brunst in this case.                               10:20:08

16           Do you have both of the reports in front of you?

17   A.  Yes, I do.

18   Q.  And I know you have the individual submit questionnaire

19   responses, do you have those in front of you as well?

20   A.  Yes, I do.                                                   10:20:22

21   Q.  Now, I am trying to go through this as efficiently as

22   possible, so I would appreciate yes or no answers, if you could

23   provide them.

24           MR. PANCHAPAKESAN:  And for the Court's convenience,

25   the reports are Exhibits 111 and 128, and I'd like to move to   10:20:35

Cross-Examination of Stan V. Smith, Ph.D.

1  admit those for the record.

2          THE COURT:  111 and 128?

3          MR. PANCHAPAKESAN:  That's correct, Your Honor.

4          THE COURT:  Yes, they may be admitted.

5      (Exhibit Nos. 111 and 128 were admitted.)          10:20:51

6  BY MR. PANCHAPAKESAN:

7  Q.  Mr. Smith, the methodology you used for N.F. and D.O., it's

8  essentially the same for both individuals; correct?

9  A.  Yes.  It's a fairly standard methodology for this level of

10  impairment.          10:21:08

11  Q.  And the loss figures that you ultimately generate for N.F.

12  and D.O. are essentially the same; correct?

13  A.  Yes.  Because they are both female of similar age, and the

14  amount of, you know, the average female is what I assume

15  average female earnings or college and some high school          10:21:25

16  wouldn't matter no matter how you spelled her name.  It's the

17  same for any average prospect.

18  Q.  So in other words, Mr. Smith, you did not conduct an

19  individualized analysis as to either of these individuals

20  regarding their future potential earnings.  You looked at          10:21:42

21  general statistics and used that methodology, fair?

22  A.  Well, it's individualized to their degree, the age, race,

23  gender, their date of birth, their date of the injury, the

24  expected year of graduations.  And also the life care plan is,

25  of course, individualized, and then the impairment is the same          10:22:03

Cross-Examination of Stan V. Smith, Ph.D.

1   for both, but it's individual.  Not everybody has impairment of

2   the depression, anxiety.  We deal with 50 different levels of

3   impairment, but it's individualized to them.  They happen to

4   have very similar cases.

5        So while it's individualized to each, they do appear          10:22:21

6   very similar because they happen to have had similar damages.

7   Q.  So my question, Mr. Smith, to be precise, for example,

8   D.O., as you know, has a congenital disability that's in

9   Dr. Cooper's report.  You did not take that into account in

10  determining her baseline earnings; correct?                        10:22:38

11  A.  Could you -- when you say "congenital disability," can you

12  be more precise?

13  Q.  So D.O. --

14        THE COURT:  Don't talk over one another,

15  Mr. Panchapakesan.                                                 10:22:48

16  BY MR. PANCHAPAKESAN:

17  Q.  So Mr. Smith, have you had a chance to review Dr. Cooper's

18  report?

19  A.  I didn't memorize it.  I reviewed it thoroughly.  I didn't

20  memorize it.  I have the numbers in my report.  That's what is     10:23:01

21  important.  I didn't memorize all her text.

22  Q.  So I will represent to you, in Dr. Cooper's report she

23  notes that D.O. has a significant congenital disability that is

24  physically impairing.  Did you or did you not consider that in

25  determining her baseline potential earnings?                       10:23:24

Cross-Examination of Stan V. Smith, Ph.D.

1    A.  If you could refer me, because I believe I would have.

2    What page?  One more time, D.O. report.

3         MR. PANCHAPAKESAN:  For the Court's convenience, I am

4    looking at Dr. Cooper's report, which is Exhibit 110, and this

5    is the report, Mr. Smith, for D.O., and I am taking a look at    10:23:41

6    page 15 of that report under the subheading, "Distal

7    Arthrogryposis Multiplex Congenita," Dr. Cooper writes --

8    A.  Page number, sir, sorry?

9    Q.  Page 15.

10   A.  Oh, thank you.    10:24:06

11   Q.  This is of Dr. Cooper's report, and so on Dr. Cooper's

12   report, page 15 for D.O., she notes the genetic issue, she

13   says, quote, "D.O. had already become an impaired and disabled

14   person by the time she reached her teenage years."  You did not

15   consider that in determining her potential lifetime earnings;    10:24:27

16   correct?

17   A.  Well, it is considered in the sense that if one thinks that

18   the impairment may have prevented her from completing college,

19   one could look at a lower level.  But what impairment

20   specifically because I didn't memorize all 50, all 50 pages of    10:24:41

21   both combined reports, what specific impairment are you

22   referring to that she refers to here?

23   Q.  I'm referring to a congenital disability called distal

24   arthrogryposis multiplex congeniti.  And Dr. Cooper notes that

25   D.O. was already a disabled person by the time she reached her    10:25:00

Cross-Examination of Stan V. Smith, Ph.D.

1  teenage years.  And my question is simple, Dr. Smith, you did

2  not take that particular diagnosis into account in determining

3  D.O.'s potential earnings capacity.  Instead, you looked at

4  general statistics for women who may have attended college or

5  high school; correct?                                                    10:25:21

6  A.  Yes.  But the report allows that to be taken into account

7  in the sense that if someone believes that but for some

8  particular preexisting condition a person would have completed

9  college, but given the preexisting condition they would likely

10 only have some college, you can take it into account that way.   10:25:38

11 Q.  And that's the level of granularity in your report;

12 correct?

13 A.  Correct.

14 Q.  Now, going back to the D.O. report, your report, I believe

15 on page 4 of that report you looked at an earning study from     10:25:56

16 2017; correct?

17 A.  Yeah, average earnings, it's databased on 2017.

18 Q.  And --

19 A.  But it was published -- let me look at the publication year

20 because if you give me one moment.  So we looked at benefits     10:26:15

21 based on studies published in December of 2023, the latest of

22 that, and the American Community Survey that was published in

23 2019, yes.

24 Q.  If I'm looking at page 4 of your report, there's a

25 reference to an earning study, and it has this clarifier.  It's  10:26:40

Cross-Examination of Stan V. Smith, Ph.D.

1   in Shawnee Mission, Kansas, do you see that?

2   A.  Yes.

3   Q.  Do you know what that refers to, if you know what that

4   means?

5   A.  Well, this is a publication, and I know -- and I know the        10:26:51

6   company that publishes it, that digests government data in a

7   useful compendium, but it's government data that it's based on,

8   and we have access to the same American Community Survey.  They

9   just digest it in a manner which reduces a little bit of our

10  having to manipulate the data.        10:27:14

11  Q.  So --

12  A.  We could produce -- and any economist can reproduce the

13  identical numbers and come to the identical numbers that are in

14  that manual.

15  Q.  Mr. Smith, you took that manual and you outlined what you        10:27:27

16  call pre-sex trafficking wages, and you looked at three

17  scenarios, women with a high school degree, women with at least

18  one year of college, and one with a college degree, fair?

19  A.  Yes.

20  Q.  Okay.  And you calculated those wages through the ages of        10:27:43

21  67 and 82.3, fair?

22  A.  Well, every age, as I said earlier, every year is in the

23  table, and on the summary page we gave age 67 as an example for

24  the trier of fact that they may consider, but they may consider

25  age 66 or age 62.  I have no recommendation other than people        10:28:05

UNITED STATES DISTRICT COURT

Cross-Examination of Stan V. Smith, Ph.D.

1  normally work into their 60s these days and likely later in

2  future years.

3  Q.  To be fair, Mr. Smith, you didn't conduct an individualized

4  analysis as to D.O. or N.F. regarding when, regarding a likely

5  retirement age, fair?                                        10:28:25

6  A.  At age 20, did you know when you would retire?  You

7  probably still don't know, and I don't know.  So no, there is

8  no way to do that.  What I do find, and the government's

9  surveys find that when people get closer to retirement, they

10 defer it because they find that they like earning money more  10:28:41

11 than living on a reduced, significantly reduced income, but,

12 no, I am sure you die, you nor I knew at age 20 when we were

13 going to retire.  I actually, at age 78, still don't know.

14 Q.  And so Mr. Smith, that's a long way of saying you don't

15 know, fair?                                                   10:29:01

16 A.  It's a long way of saying nobody knows, which is why I give

17 the judge every single year so she can decide on her own

18 because these young children would have no clue, just as I and

19 you now have no clue.

20 Q.  And so, then, sticking with the age 67 scenario, which you  10:29:18

21 note in the written portion of your report, you came up with

22 projected lifetime earnings of roughly between 2.5 million and

23 4.6 million, is that fair for these three scenarios?

24 A.  On an unimpaired basis, yes.

25 Q.  By "unimpaired" you mean in a non-Backpage world, is that   10:29:40

Cross-Examination of Stan V. Smith, Ph.D.

1  fair?

2          THE COURT:  I'm sorry, what was that?

3          THE WITNESS:  Sorry.

4  BY MR. PANCHAPAKESAN:

5  Q.  By "unimpaired" you mean in a world without Backpage is        10:29:48

6  essentially what you're saying; right?

7  A.  What -- yes, what they would have earned statistically

8  speaking on average.

9  Q.  And then we will get into this in a little more detail

10  because there is some studies you cite, but you then calculated    10:30:03

11  reductions in earning capacity from alleged harm tied to sexual

12  abuse, anxiety and depression; right?

13  A.  Well, two categories, sexual abuse, Category 1; and

14  Category 2, depression and anxiety, which is a single category

15  with two words.                                                    10:30:26

16  Q.  And in calculating those reductions you assigned

17  percentages to calculate the reduction; right?

18  A.  The government assigns the percentage.  I merely used them,

19  and the government assigns percentages regarding sexual abuse

20  only with regard to employability.  They do not get statistics    10:30:44

21  on the expected reduced earnings when employed.

22  Q.  And so, for example, for the bucket of depression and

23  anxiety, I believe you reduced their potential earnings by

24  about 80 percent.  You didn't, for example, seek to determine

25  how anxious or how depressed these individuals are.  You just     10:31:08

Cross-Examination of Stan V. Smith, Ph.D.

1   assigned that figure; correct?

2   A.  Statistically average impact, yes.

3   Q.  Now, you were asked to assume, I think, that neither D.O.

4   or N.F. completed college, are you offering an opinion that

5   these individuals are incapable of attending college now?          10:31:36

6   A.  I have no opinion about what their prospects are.

7   Q.  And beyond the questionnaire they provided you, did you

8   review any of their academic records?

9   A.  I don't have records.  It wouldn't be important only

10  because we know C students make millions of dollars a year and     10:31:56

11  A students make a lot less, so grades are not indicative of

12  income.  We know that.  I say that as a labor economist.  So

13  while some people may think, oh, A students do better, the

14  truth is they don't.

15  Q.  So then to be fair, you didn't take these individuals'          10:32:17

16  particular academic records or intelligence in forming your

17  opinions; you just looked at these general statistics, fair?

18  A.  Well, what I'm telling you is there is nothing about a

19  transcript to take into account because C students don't,

20  statistically speaking, earn higher than A students or B           10:32:39

21  students.  Grade levels, after a few years, the first few years

22  out of college, after ten years out of college there is no

23  distinction on transcript levels and earnings.

24  Q.  And you're talking about college transcripts, is that what

25  you're saying?                                                     10:32:57

Cross-Examination of Stan V. Smith, Ph.D.

```
 1   A.  High school.  Any transcript.  High school transcripts --
 2           THE COURT:  Wait.  Wait.  Wait.  Wait.  Wait.  Mr.
 3   Panchapakesan, please let him finish and then you can ask your
 4   clarifying question.  Remember, we have our transcript.  It's
 5   necessary to keep a clean transcript.                            10:33:13
 6           MR. PANCHAPAKESAN:  Understood.  It's a little tricky
 7   with the Zoom.  Go ahead, Mr. Smith.
 8           THE WITNESS:  What I was saying was, if you look at a
 9   person's high school transcript who does not have any further
10   education, if you look at transcripts of A students, B students 10:33:27
11   and C students, ten years later you will see no distinction in
12   the earnings.
13   BY MR. PANCHAPAKESAN:
14   Q.  And where is that in your report?  Where is that analysis
15   in your report?                                                  10:33:39
16   A.  It's not needed to be in my report.  There is 40 billion
17   things that are not needed in the report.  And that's why I am
18   telling you, I do not need to know their height.  I don't need
19   to know their hair color.  It is not on my report that hair
20   color has no impact on earnings.  It is not in my report that   10:33:56
21   weight has no impact on earning.  It is not in my report that
22   high school grade point does not have an impact on earnings.
23   It is not in my report that their middle name has no impact.
24   There is a billion things that have no impact, and I did not
25   list in my report the billion things that you might think have  10:34:13
```

Cross-Examination of Stan V. Smith, Ph.D.

1    impact that do not.

2    Q.  Now, are you familiar with the term "personal consumption,"

3    Mr. Smith?

4    A.  Yes.  It has no application in this case whatsoever.

5    That's why it's not mentioned.                              10:34:28

6    Q.  So the Court understands, personal consumption is the

7    amount someone might expend in their life, right, expenses?

8    A.  Yes.

9    Q.  And you did not deduct from your earnings projections what

10   these individuals might spend over the course of their lives;  10:34:45

11   correct?

12   A.  They still have to eat, they still have to pay rent, they

13   still have to buy clothing.  Yes, personal consumption is taken

14   into account in a fatal injury case or if someone is

15   institutionalized in an institution where they do not have a   10:34:59

16   housing, a clothing or a food expense.

17   Q.  Now, Mr. Smith, let's move on to the questionnaire you

18   received for N.F., and do you have that in front of you?

19   A.  Just one moment.  Yes, I do.

20        MR. PANCHAPAKESAN:  And for the Court's convenience,      10:35:25

21   it's Exhibit 126.  And I would move to admit Exhibit 126 for

22   the record.

23        THE COURT:  Yes.  I think I already -- it's admitted.

24     (Exhibit No. 126 was admitted.)

25        THE WITNESS:  Both questionnaires show the students       10:35:50

UNITED STATES DISTRICT COURT

Cross-Examination of Stan V. Smith, Ph.D.

1    were quite good students.

2    BY MR. PANCHAPAKESAN:

3    Q.  And that's your only basis for making that assumption;

4    right?

5    A.  It's not a basis; it's a fact.  The questionnaires reflect    10:36:01

6    an honor student for D.O. and a B student for N.F.  It's

7    factual.  I have no basis.  It's just factually reported in the

8    questionnaire.

9    Q.  And in other words, you're relying on the self-reported

10   answers, again, you did not independently verify if the answers    10:36:20

11   were true; correct?

12   A.  I am not relying on anything.  I merely reported.  The

13   questionnaire factually states that.

14          THE COURT:  Let's move forward from this area, Mr.

15   Panchapakesan, please.    10:36:35

16   BY MR. PANCHAPAKESAN:

17   Q.  Now, Mr. Smith, the questionnaires -- so, for example, if

18   you look at N.F., if we look at answer 3 B, do you see that

19   it's on the first page under "Earnings"?

20   A.  One moment.  3 B, yes.    10:36:51

21   Q.  So you see where it says, "Became a mom at 17."  Do you see

22   that?

23   A.  Yes.

24   Q.  Did you take that into account in assessing N.F.'s

25   potential lifetime earning capacity the fact that she was a    10:37:04

Cross-Examination of Stan V. Smith, Ph.D.

1    teen mom?

2    A.  I have interviewed hundreds of teen moms who make excellent

3    incomes, so, yes, taken into account because it has no impact.

4    Q.  So just to be clear, you didn't specifically consider it.

5    You didn't look at any studies regarding the earning capacities    10:37:22

6    of teen moms; correct?

7    A.  No.  The government statistics show that there is no

8    impact.

9    Q.  Are those statistics --

10   A.  If you look at the educational earnings, there is no    10:37:35

11   category that says college grad with child, college grad

12   without child.  There is no distinction because the government

13   has found none.  You -- you -- look, lots of people that don't

14   study economics think that things have impact, but as it turns

15   out, they don't.  If there were impacts, we would have a    10:37:53

16   statistic about it because one thing economists like to do is

17   to publish papers on interesting new things.  There is no paper

18   that says being a teen mom at 17 is different than being a mom

19   at 27 or 37.

20   Q.  And to be clear, are you aware or not aware of any economic    10:38:12

21   studies regarding the potential lifetime earnings of teen moms?

22   A.  I'm not aware that any studies found a distinction between

23   17-year-old motherhood, 27-year-old motherhood or 37-year-old

24   motherhood.  Many women become moms, and I have not seen any

25   studies that show that the income is different depending upon    10:38:37

Cross-Examination of Stan V. Smith, Ph.D.

1   the age of the firstborn.

2   Q.  And so to be clear, Mr. Smith, and I am not going to go

3   through every part of her questionnaire, but if there are any

4   losses in earning capacity that N.F. would have suffered

5   regardless of Backpage, you would agree those aren't proper          10:38:59

6   damages, fair?

7   A.  What losses are you referring to?

8   Q.  Well, so hypothetically, right, I know you disagree with me

9   on this, but hypothetically, if becoming a teen mom at 17 would

10  have taken her out of the workforce for ten years, you would         10:39:19

11  agree that's not attributable to my client, fair?

12  A.  That would be voluntary because there are teen moms who go

13  back into the workforce.  So I'm not saying that these -- that

14  someone who has the possibility of going to college and can

15  earn money may choose not to work.                                    10:39:39

16          But I have a young lady who works for me, she has

17  three children.  Her first child was at age 17.  She's only 25.

18  She has three children and she works full-time making a darn

19  good income at my company.  So being a teen mom does not

20  preclude you from working.  One may choose not to, but it's not      10:39:59

21  the same as having your legs cut off in a train accident.  That

22  does impair your income.  People may choose not to work.  I'm

23  not saying that being -- that she might have made certain

24  choices but for Backpage being a teen mom, but I know plenty of

25  teen moms who at age 17, 18, and 19 work full-time and have a        10:40:18

Cross-Examination of Stan V. Smith, Ph.D.

1   child.

2   Q.  Now, you testified, Mr. Smith, yes, you have someone

3   working for you who is a teen mom who is successful.  As an

4   economist for years, is that typically the kind of evidence you

5   rely on in forming an expert opinion?                          10:40:35

6   A.  I am trying to tell you that there are no statistics that

7   I'm aware of that you imagine may exist but you have not

8   produced any that show that teen moms earn less than non-teen

9   moms, and you -- no more than you show statistics that people

10  5 foot 2 earn more money than people 5 foot 3.                 10:40:54

11  Q.  Now, you testified that academic achievement, that those

12  levels don't impact earnings.  To be clear, you did not take

13  into account N.F.'s academic achievement in assessing her

14  potential lifetime earnings?

15          THE COURT:  Mr. Smith, you don't have to answer.       10:41:22

16          Mr. Panchapakesan, it has been asked and it has been

17  answered, so let's move forward.

18  BY MR. PANCHAPAKESAN:

19  Q.  Let's move forward to D.O., Mr. Smith, and I am looking at

20  Exhibit 109.  This is her questionnaire.                       10:41:35

21  A.  Yes.

22  Q.  Do you have that in front of you?

23  A.  I do.

24  Q.  Now, just briefly, the answers here, they appear to be

25  written in the third person, do you know who filled out this   10:41:50

Cross-Examination of Stan V. Smith, Ph.D.

1  questionnaire?

2  A.  I assume the answers were given by Destinee Ortiz, but they

3  were transcribed into here by perhaps some clerical assistant.

4  So no, I don't know the name of that clerk.  I am told these

5  are, excuse me, these are D.O.'s answers.                    10:42:09

6  Q.  Now, if we take a look at the first page of the

7  questionnaire --

8          THE COURT:  One moment.  I am going to instruct

9  everyone again to use the initials of the victims or the

10 enumerated reference in the government's chart.              10:42:25

11          For those in the public viewing gallery, I am going to

12 order you not to publish that victim's name.  All right.

13          THE WITNESS:  So I apologize, Your Honor.

14 BY MR. PANCHAPAKESAN:

15 Q.  We are going to stick to D.O. and N.F.                   10:42:43

16 A.  Thank you.  Thank you.

17 Q.  If we are taking a look at this questionnaire and

18 Exhibit 109, page 1, there is a section under "Earnings," 3 C,

19 you asked, "What is your father's educational background,

20 occupation, current earnings?"  Now, you asked that question in 10:43:03

21 a questionnaire you put together because you thought it was

22 relevant to her potential earnings; right?

23 A.  I think some background can be relevant, but that's really

24 up to the trier of fact.  If we have someone who's a

25 neurosurgeon earning $500,000 a year, that can have an        10:43:23

─Cross-Examination of Stan V. Smith, Ph.D.─

1   influence on a child's future career aspects.  If both parents

2   are doctors, we often find that a career is influenced by that.

3   If both parents only have high school, there is a lesser

4   impact.

5   Q.  And so the answer here notes that the individual is        10:43:39

6   estranged from her father, that the father is on SSI, meaning

7   disability benefits, he's unemployed, and he's an alcoholic,

8   you did not discount D.O.'s potential earnings because of that,

9   fair?

10  A.  It's simply, I think, for the trier of fact.  No, there is  10:43:59

11  no numerical discount published in any study to take that into

12  account, but I do believe background for a trier of fact to

13  look at what level, what's the family culture.  So her family

14  culture is less supportive of future education than someone who

15  has two parents that are both neurosurgeons.  That's factually  10:44:20

16  true.

17  Q.  And then if you look at 3 E, for example, you asked a

18  question about her siblings.  It notes they are estranged and

19  that the sister is an addict and the brother does not work.

20  True, you did not take that into account with respect to D.O.'s 10:44:42

21  potential lifetime earnings?

22          THE COURT:  To be fair, Mr. Panchapakesan, you left

23  out the fact that the brother and sister completed high school,

24  the brother attended some college, so the totality of the

25  answer, I think, should be presented.                          10:45:00

Cross-Examination of Stan V. Smith, Ph.D.

```
 1  BY MR. PANCHAPAKESAN:
 2  Q.  Mr. Smith, if you look, I can read the answers.  It says,
 3  "D.O. has a brother and a sister, but they are estranged.  Both
 4  her brother and sister completed high school.  Her brother
 5  attended one semester of college.  Her sister is an addict and       10:45:13
 6  does not work.  Her brother also does not work."
 7          Did you take this answer into account in projecting
 8  D.O.'s potential lifetime earnings?
 9  A.  I used simply statistically average earnings.  That would
10  include people who's siblings went to -- got law degree, as         10:45:31
11  well as sibling who didn't even graduate high school.  I took
12  average.  So I see no discounting needed.  It's simply a
13  environmental background that would support, you know, it
14  doesn't support placing her above average and I don't think it
15  supports placing her below average.  There is many factors to       10:45:55
16  take into account, and obviously people overcome difficult
17  circumstances and some people don't.  These circumstance we see
18  here, they are not ideal.  Having a dad who is not successful,
19  having a sister who is not successful, those aren't ideal, but
20  I leave it to the trier of fact to determine if she believes        10:46:13
21  she should notch this down below average.  I don't have a
22  statistic to do so, but I can't say that someone might not say,
23  well, let's take off ten percent because the background, the
24  cultural support, the family support is less than ideal.  I
25  think that's a perfectly fair approach to consider.                 10:46:32
```

Cross-Examination of Stan V. Smith, Ph.D.

1   Q.  And so Mr. Smith, you talk about the average.  When we're

2   dealing with this study you looked at for earnings for women

3   across the population, did you analyze the underlying data to

4   see where these individuals might appropriately fit, or you

5   just said, "I am going with the average"?                        10:46:52

6   A.  No.  There is only one category.  There are no multiple

7   categories.  The same category for, if Bill Gates has a sister

8   who graduated college, she would be in the average category.

9   Q.  Now, Mr. Smith, the last thing I want to hit on this

10  questionnaire.  It's the second page, and it's question J.  And  10:47:13

11  you seek D.O.'s employment history, and I am not going to read

12  all of it because it's pretty lengthy, but you note, or she

13  notes a number of jobs she previously held.  But then the

14  portion I want to focus on is the last sentence, which says,

15  "With SSI she couldn't work many hours without jeopardizing the  10:47:36

16  benefits."  You understand that SSI is supplemental security

17  income; right?

18  A.  Yes.

19  Q.  And you understand that's a federal benefit given to

20  someone with a long-term disability; right?                      10:47:54

21  A.  Yes.

22  Q.  Now, the implication here is that D.O. was not working

23  full-time so she could continue to receive those benefits, did

24  you consider that in your analysis?

25  A.  Well, she earned what she earned, so the benefits actually   10:48:13

Cross-Examination of Stan V. Smith, Ph.D.

1  are not a whole lot different from those earnings.

2  Q.  Right --

3  A.  It's pretty much six of one, half dozen of the other.  But

4  if she is on SSI, I believe that's in most states considered to

5  be collateral source.  So if she is permanently disabled, that    10:48:31

6  would be a hundred percent loss; not the 80 percent loss.

7  Q.  It would be a hundred percent loss because she's disabled,

8  and you don't know why she's disabled; correct?

9  A.  I have not seen her SSI filing.

10 Q.  And so you're not offering an opinion that my client caused   10:48:52

11 her disability; right?

12 A.  Correct.

13 Q.  Now, moving forward, in your report, and so I'm back at

14 Exhibit 111, and Mr. Smith, this is a report for D.O., and I'm

15 looking at page 7 of your report, toward the middle of page 7,    10:49:13

16 second full paragraph.  You cite a study called "Child Sexual

17 Abuse and Employment Earnings in Adulthood," do you see that?

18 A.  Yes.

19 Q.  And you rely on that study to calculate a 48.9 percent

20 reduction in earnings for N.F. and D.O. tied to alleged abuse;    10:49:40

21 correct?

22 A.  Yes.

23 Q.  Now, I'd like to put that study in front of you.  Do you

24 have that study with you or no?

25 A.  I didn't print it out, but --                                 10:49:59

Cross-Examination of Stan V. Smith, Ph.D.

1    MR. PANCHAPAKESAN:  And for the Court's convenience,

2    it's at Exhibit 130, and I can put it on the screen for you.

3    Your Honor, this is part of his report.  I ask that it be moved

4    into evidence.

5            THE COURT:  Yes, it may be.  Exhibit 130.            10:50:32

6        (Exhibit No. 130 was admitted.)

7            MR. PANCHAPAKESAN:  Ms. Figueroa, are you able to just

8    show the first page?  Thank you.

9    BY MR. PANCHAPAKESAN:

10   Q.  I want to understand the parameters of the study.  So if    10:50:52

11   you look at the methods, it's second paragraph, it says, "The

12   Quebec Longitudinal Study of Kindergarten Children database was

13   linked to child protection services," and then it goes on to

14   note that the sample was of 3,020 individuals in Quebec French-

15   language school Kindergartens.                                 10:51:15

16            Do you see that?

17   A.  Yes.

18   Q.  So that we understand the parameters of this, this is a

19   Canadian study tied to the abuse of children starting in

20   Kindergarten; is that right?                                   10:51:28

21   A.  Some, yes.

22   Q.  Did you review the underlying data in the study to

23   understand when the abuse occurred in the individuals who were

24   part of the study?

25   A.  The data wasn't published.                                 10:51:46

Cross-Examination of Stan V. Smith, Ph.D.

1   Q.  And so sitting here today, it's entirely possible that this

2   study deals with folks who were abused at five or six years old

3   in Kindergarten by their family; right?

4   A.  An instance of abuse as opposed to the repeated multiple

5   ongoing rape.  So I believe the victims in this case are                10:52:08

6   probably much greater, have an amount of high severity of abuse

7   than those in the study.

8   Q.  And you're speculating, right, you're not offering that

9   opinion?

10  A.  No.  No.  I'm saying it's unlikely that anybody in the             10:52:28

11  study had higher sexual abuse than these two victims here

12  today.

13  Q.  And you have not looked at the underlying data or the

14  individuals who are part of the study to make that

15  determination, fair?                                                    10:52:47

16  A.  I just think it's almost impossible to believe that there

17  could be more abuse than these two victims had and, therefore,

18  they are probably at the top end of the study of the people,

19  compared to the individuals in this study, some of whom you

20  must agree would have had only perhaps one instance in their           10:53:04

21  childhood as opposed to the dozens upon dozens upon dozens of

22  instances of these two victims.

23          That's why I believe the results of this study are

24  frankly conservative for two reasons.  One, the one I just

25  mentioned; and secondly, we don't have the earnings impact.            10:53:21

Cross-Examination of Stan V. Smith, Ph.D.

 1   Q.  And so Mr. Smith, did you look at the underlying data here

 2   to understand, for example, if any of these individuals were

 3   advertised on websites as teenagers?  You don't know; right?

 4   A.  That's not published in the study, correct.

 5   Q.  And if you take a look, for example, I'm going to page 2 of        10:53:37

 6   the study, and if you take a look at the second column, that --

 7   that top paragraph, that partial paragraph there, you see where

 8   it says, "Results can inform public health departments and

 9   policymakers about the economic disparities associated with

10   child sexual abuse and underscore the need for sound investment      10:54:15

11   to support survivors of child sexual abuse."

12         Do you see that?

13   A.  Yes.

14   Q.  It's fair to say there is nothing in the study that

15   indicates it was intended to be used by an economist to             10:54:27

16   estimate damages in a case; right?

17   A.  That's a wonderful question because it's also true that the

18   United States Life Tables, which I used, are not published with

19   the express purpose of being used in any personal injury case,

20   and yet they are accepted in thousands of counties around the       10:54:46

21   country because they are used.

22         The vast majority of published data does not specify

23   the purpose to which it can be used.  The vast, vast majority,

24   in fact, nothing have, in none of the citations in my report

25   here, indicate that they either should or shouldn't be used for     10:55:05

Cross-Examination of Stan V. Smith, Ph.D.

1    any particular purpose.  Just as the United States Life Tables

2    do not say:  Please don't use them for this, or please do use

3    them for that.  Research is purely research.  The purpose to

4    which it can be put, if it's intelligently put, there is no

5    objection whatsoever.                                    10:55:26

6    Q.  And to effectively use research like this, it will help to

7    understand the underlying data, fair?

8    A.  I can't say that that's true because this is simply the

9    average impact of all the people who report child sexual abuse,

10   which certainly would include instances of a single type, as    10:55:43

11   well as on the upper end, the multiple dozens upon dozens of

12   instances that these particular -- these two victims have

13   sustained, which I think put them at the high end of the study,

14   but the study doesn't give us the impact per instance of child

15   abuse.                                                   10:56:03

16   Q.  And so then if we look, sir, at page 7 of the study,

17   there's a paragraph that says, "Limitations."  And -- there you

18   go.  And then if I'm looking at the second paragraph under --

19   there you go.  And it says, "Second, child and parental mental

20   health were not controlled for, thus income gaps may not be     10:56:44

21   solely due to sexual abuse."

22        Now, you understand that to mean that if an individual

23   or their parents have mental health issues, this study does not

24   control for that; right?

25   A.  It says it does not, but also the studies by the government  10:57:02

Cross-Examination of Stan V. Smith, Ph.D.

1    that shows average earnings by college level or high school

2    level, they also do not control for whether the parents had

3    mental health issues or not.

4    Q.  Right, and so --

5    A.  I have never seen -- I have never seen an income study          10:57:14

6    control for whether the parents had mental health issues or

7    not.  Some do, some don't.  It's just the average earnings.

8    Q.  Then to be clear, to the extent N.F. or D.O. or their

9    parents have mental health issues, this study says it would

10   limit its applicability; right?                                     10:57:34

11   A.  Well, that's true of the study for the American Community

12   Survey that the government publishes.  The government

13   publications on average earnings, forget the study you're

14   looking at here, the study that shows the pre-impairment level

15   of earning of an average college grad does not adjust for          10:57:51

16   whether the parents had mental health issues, it doesn't adjust

17   for parents that earn a lot of money, it doesn't adjust for

18   parents that are unemployed.  That particular adjustment is not

19   there.  It's simply an average.

20         We just don't have the particular, you know, no study         10:58:08

21   now no study is perfect, but no study controls for all the

22   things that we ideally love a study to control for, but these

23   studies are peer reviewed and they are used, you know, with a

24   certain degree of intelligence.

25   Q.  And so, then, to summarize, and we can move on, the studies    10:58:27

─Cross-Examination of Stan V. Smith, Ph.D.─

1   you're relying on, both this study and the ACS survey, do not

2   control, do not take into account individual or parental mental

3   health issues; right?

4   A.  Nor individual parental earnings, nor individual parental

5   level of education, nor parental individual IQ.  There is a          10:58:46

6   billion things they do not take into account.  We simply have

7   the average.  It's all we have.

8   Q.  Now, moving forward, Mr. Smith, I'm looking back at your

9   report --

10          THE COURT:  Well, let me just clarify the record,            10:59:02

11  Mr. Panchapakesan.  In the American Journal of Preventive

12  Medicine, in the introduction it does expand on the study as it

13  results to severity types of abuse and chronicity as to whether

14  it's single or multiple episodes.  So I think that addresses

15  one of the questions that you posed to the witness.                  10:59:27

16          All right.  You can move forward.

17  BY MR. PANCHAPAKESAN:

18  Q.  Sure.  So if we move forward, and I am sorry, I am jumping

19  back and forth, but we'll look back at Exhibit 111, which is

20  your report for D.O., and I think this is to the last part of       10:59:43

21  your earnings analysis, if we look at page 7 to 8, this is

22  where you discount D.O. and N.F.'s potential earnings for the

23  combined bucket of anxiety and depression; right?

24  A.  Yes.

25  Q.  And you discount their lifetime earnings, and this is          11:00:15

Cross-Examination of Stan V. Smith, Ph.D.

1   toward the middle of page 8, by 79.28 percent, do you see that?

2   A.  Yes.  It's not just earnings, but also employability.

3   Q.  And so your testimony is that because you have been told

4   N.F. and D.O. are anxious or depressed, you're projecting a

5   lifetime reduction in earnings of almost 80 percent; right?          11:00:41

6   A.  If you consider that category, yes.

7   Q.  And so then hypothetically, sir, just so I understand how

8   your method works, if you had, for example, a depressed and

9   anxious lawyer making $300,000 per year, your opinion is that

10  they would be making $540,000 per year if they weren't             11:01:02

11  depressed; is that right?

12          THE COURT:  Let me stop you there.  I am not going to

13  permit an answer.  It's not a relevant hypothetical,

14  Mr. Panchapakesan, at least for my purposes, and I think that's

15  why we're here.                                                    11:01:21

16  BY MR. PANCHAPAKESAN:

17  Q.  Fair enough.  Let me put it this way, Mr. Smith, it doesn't

18  matter who the individual is, what their profession is, what

19  their background is, the 80 percent is what you'd apply across

20  the board?                                                         11:01:34

21  A.  It's the average.  I'm not saying people don't overcome

22  disabilities in a magnificent way, and I am not saying people

23  sometimes succumb to disabilities in a far more tragic manner

24  than we might imagine.  This is simply the average.

25  Q.  Because it's an average, it's entirely possible an anxious     11:01:54

Cross-Examination of Stan V. Smith, Ph.D.

1   or depressed person could earn more than an average wage;

2   right?

3   A.  If you asked me is it possible that D.O. could go back to

4   school, go to medical school, become a neurosurgeon, I would

5   say if it's possible, I would pray that she would do so.                    11:02:10

6   Q.  Again, you're not offering that opinion; right?

7   A.  I can never imagine that we would place limitations on

8   people.  I'm just talking about the average impact.  We would

9   pray, we would hope that both these victims would do as best as

10  possible in the future.                                                     11:02:29

11  Q.  And lastly, sir, the last part of your report deals with

12  future medical costs, and I am looking at page 9 of your

13  report.  And so if we're staying with D.O., just so I

14  understand your methodology, you take Dr. Cooper's report and

15  you assume that D.O. would incur each of the annual costs       11:02:54

16  outlined in Dr. Cooper's report through the age of 65; is that

17  right?

18  A.  Yes.

19  Q.  And that includes, and I am not going to go through every

20  illness, you exclude some things here, but you don't exclude    11:03:12

21  allergic rhinitis, for example; right?

22  A.  I don't exclude anything that's not listed as an exclusion.

23  Q.  For example, in Dr. Cooper report, she notes D.O. would

24  have lifetime costs for spectacles and contact lenses of about

25  $340,000.  You don't back that out; right?                      11:03:34

145

1    A.  We did not include that, sorry, yes, we did include that.

2    Q.  And as D.O. is --

3    A.  I have no opinion on what should or shouldn't be included,

4    just so you know.

5    Q.  And so for example, treatment for D.O.'s congenital                11:03:49

6    disability, you don't back that out from your analysis; right?

7    A.  I don't see that in here.

8    Q.  And it seems like I think the only things you back out for

9    D.O. are, I think, this post COVID condition and treatment for

10   attention deficit hyperactivity disorder; is that right?              11:04:09

11   A.  Well, we haven't included the cost of retractive surgery,

12   nor the cost associated with the post COVID ADHD.

13   Q.  Okay.  And then, Mr. Smith, sitting here today, as to these

14   costs, you projected about 2.3 million, you don't know if D.O.

15   will actually incur these cost; fair?                                 11:04:46

16   A.  Simply based on Dr. Cooper, and I can't say.  It's just an

17   average projection she may incur higher or lower, but these are

18   what is projected.

19   Q.  And then if you take a look --

20          MR. PANCHAPAKESAN:  For the Court's convenience, it's          11:05:04

21   Exhibit 128.

22   BY MR. PANCHAPAKESAN:

23   Q.  And Mr. Smith, that is the other report for N.F.?

24   A.  Yes.

25   Q.  Same topic, so I'm looking at page 8 through 9, costs of           11:05:12

─Cross-Examination of Stan V. Smith, Ph.D.─

1    future life care, the only thing you back out here, and I am

2    looking at, I think, top of page 9, is the bee sting

3    anaphylaxis; right?

4    A.  Yes.

5    Q.  And same with N.F., you offer no opinion as to whether she          11:05:38

6    will in fact incur these costs; correct?

7    A.  I can't -- I do not project that she will or won't.  I only

8    project these are the costs.  This is the value if she does

9    incur if she does have these needs.

10   Q.  Now, last set of questions, Mr. Smith.  Isn't it true that          11:06:01

11   your expert opinions have been precluded by over 20 federal

12   courts across the country?

13   A.  Never on lost wages.  Never on medical services.  I do

14   testify on loss of quality of life, a very controversial topic

15   that has been codified by the supreme courts of New Mexico,              11:06:22

16   Nevada, et cetera.  But some courts have not allowed it, that's

17   true.

18   Q.  And it's over --

19   A.  One federal court -- one federal court, the appellate court

20   here in the Seventh District, called it an invaluable guide to          11:06:33

21   the jury.  Other federal courts have not found it so valuable,

22   that is true.  You are correct.

23   Q.  All right.

24          MR. PANCHAPAKESAN:  All right.  I have no further

25   questions, Your Honor.                                                   11:06:47

────Cross-Examination of Stan V. Smith, Ph.D.────

1          THE COURT:  Thank you.  Mr. Feder.

2          MR. FEDER:  Can we take a break right now so I can go

3    through my notes with Mr. Panchapakesan?

4          THE COURT:  I will give you ten minutes.

5          MR. FEDER:  Thanks.                                    11:07:02

6          (A recess was taken at 11:07 a.m.)

7       (Proceedings reconvened at 11:20 a.m.)

8          THE COURT:  All right.  Please be seated.  Mr. Feder.

9          MR. FEDER:  No questions.  Thanks.

10          THE COURT:  Mr. Rapp?                                  11:20:14

11          MR. RAPP:  No redirect.  Thank you.

12          THE COURT:  Is the witness -- can we excuse the

13    witness?

14          MR. RAPP:  As far as the government is concerned, yes,

15    Your Honor.                                                 11:20:27

16          MR. PANCHAPAKESAN:  No objection.

17          THE COURT:  Sir, thank you very much for your

18    testimony, and you are excused.

19          THE WITNESS:  Thank you, Your Honor.

20          THE COURT:  All right.  Mr. Rapp.                     11:20:32

21          MR. RAPP:  All right.  So I believe Mr. Gibson should

22    be in the waiting room.

23          THE COURT:  Mr. Gibson, can you hear the Court?

24          THE WITNESS:  I can.

25          THE COURT:  And we can hear you.  We will have the     11:20:54

─Direct Examination of David S. Gibson─

```
 1    witness sworn.

 2        (DAVID S. GIBSON, a witness herein, was duly sworn or

 3    affirmed.)

 4            COURTROOM DEPUTY:  Please state your full name for the

 5    record.                                                    11:21:10

 6            THE WITNESS:  Dave S. Gibson, spelled G-I-B-S-O-N.

 7            COURTROOM DEPUTY:  Thank you.

 8            THE COURT:  You may proceed.

 9                        DIRECT EXAMINATION

10    BY MR. RAPP:                                               11:21:20

11    Q.  Good morning, Mr. Gibson.  My name is Kevin Rapp.  I am the

12    Assistant United States Attorney assigned to this case.  You

13    and I haven't met?

14    A.  We have not.  Good morning.  We have not.  Good morning.

15    Q.  So, sir, just let me just go briefly through your         11:21:33

16    background, but your background is also included in your report

17    to a point?

18    A.  Yes.

19    Q.  How often have you done an analysis for projected lifetime

20    earnings of individuals?                                   11:21:51

21    A.  Probably 2 to 3000 times.

22    Q.  Have you testified in court as an expert?

23    A.  I have approximately 300 times.

24    Q.  And did that include federal court such as where we are

25    today?                                                     11:22:06
```

UNITED STATES DISTRICT COURT

Direct Examination of David S. Gibson

1  A.  Yes.  I estimate that probably 10 percent of my cases are

2  in federal court.

3  Q.  Have you done this projection for both injured and deceased

4  subjects?

5  A.  I have.                                                           11:22:17

6  Q.  All right.  Can you put a percentage on that, sir?

7  A.  It's probably 10 to 15 percent.  10 to 20 percent, I would

8  say, would be deceased, and then the rest would deal with the

9  loss of earnings due to a disability.

10 Q.  All right.  Thank you, sir.                                       11:22:33

11        Has your analysis been accepted by the courts in the

12 cases you've testified in?

13 A.  Yes.

14 Q.  Is there any exception to that?

15 A.  There was one exception in a federal court in South Bend,         11:22:44

16 Indiana.

17 Q.  All right.  But how many times has your opinion regarding

18 lifetime, projected lifetime earnings of individuals been

19 accepted in court?

20 A.  300.                                                              11:23:06

21 Q.  All right.  What factors do you take into account when

22 doing this type of an analysis?

23 A.  When analyzing earnings of a child or a minor, obviously

24 there's no, no earnings history to run on.  You need to use

25 some economic data that breaks out the expected earnings and       11:23:31

UNITED STATES DISTRICT COURT

—Direct Examination of David S. Gibson—

1  work life expectancy or number of years of employment that is

2  specific to the level of education that you would project for

3  the child.

4          So I focus on level of education.  And to derive that

5  education, I will look at a number of different measures          11:23:50

6  available through the U.S. Census Bureau, American Community

7  Surveys, to show earnings and employment levels at each level.

8  Q.  All right.  In this case, and if I didn't make this clear

9  from the outset, my apologies, we're referring to the victim in

10 this case as D.R., and appreciate if going forward you would    11:24:09

11 just refer to as D.R.

12 A.  I understand.

13 Q.  With regard to D.R.'s high school education, what, if

14 anything, do you know about where she was enrolled in high

15 school?                                                          11:24:31

16 A.  By the data from death, she was within the Air Force

17 Academy High School within the Chicago public schools.  I know

18 that she had been with a different school for some time, but

19 shortly before that she had transferred to the Air Force

20 Academy.                                                         11:24:49

21 Q.  And did you have occasion, as part of your analysis, to

22 review her school records?

23 A.  I did.

24 Q.  And can you give the -- can you give the Court, were these

25 just a few or were they voluminous, can you put a, give the      11:25:02

UNITED STATES DISTRICT COURT

Direct Examination of David S. Gibson

1  Court an idea of the amount of records associated with her

2  transcripts?

3  A.  I would say that there's -- that the number of pages I have

4  would sum to about 266, however, I know there are a number of

5  duplications within those pages.                          11:25:25

6  Q.  And reviewing D.R.'s academic file with the -- with

7  material information specific to her, did it inform your

8  opinion in any respect of how long, how long she would have

9  gone in school had she lived?

10  A.  Yes and no.  Obviously I can't use a crystal ball to say   11:25:46

11  exactly where she would end up education-wise.  Usually to

12  predict a child's level of education, I will look to the

13  highest correlation for that, and that is the parental level of

14  education.

15       And so here in this case I know that D.R.'s mother had  11:26:07

16  several credit hours accrued, but no diploma in college, so she

17  would be classified as a person with some college but no

18  education.  I would generally look, were I to do a projection

19  on that, is that as a starting point and tend to offer the

20  trier of fact an education based upon that same level going    11:26:32

21  back one level to say high school diploma, and also going up

22  one level to say an associate's degree to get the range of

23  potential education that I would explore, with the exception

24  that if I had somebody who was much more advanced in school and

25  obviously already accepted into a university or something of   11:26:54

Direct Examination of David S. Gibson

1    that nature, then I would have exceptions.

2    Q.  All right.  Thank you, sir.

3         With respect to D.R. specifically, did she have any

4    academic issues based upon the information that you were

5    provided?                                                    11:27:09

6    A.  She had some disciplinary issues that I know that she was

7    struggling with, and that was part of the reason that she

8    changed schools to the Air Force Academy.  I can't predict that

9    disciplinary issues would necessarily impact her level of

10   education.  I do note that she also had not stellar             11:27:26

11   standardized scores.  They weren't scores that I would use to

12   predict that somebody would be able to go into a more advanced

13   levels of education.

14   Q.  All right.  And can you -- did you receive information

15   regarding something known as a 504 plan?                       11:27:46

16   A.  I did.

17   Q.  All right.  Can you explain to the Court what that is?

18   A.  A 504 plan is put into place to help students that may have

19   a medical issue or condition that needs to be potentially

20   accommodated or at least monitored.  And when D.R.'s plan was   11:28:07

21   put into place a few years before her death, they noted that

22   she had had severe migraines and issues with depression, and,

23   therefore, they allowed for potential rest breaks or frequent

24   restroom breaks to help accommodate for when the conditions

25   should come on and also to monitor and make available          11:28:37

—Direct Examination of David S. Gibson—

1    medication, should she need that.

2    Q.  All right.  You had talked about the family education

3    levels as being an important factor in your analysis, did you

4    have occasion to interview D.R.'s mother on this topic?

5    A.  I did.                                                          11:29:00

6    Q.  And what, if anything, did you learn that was relevant to

7    your analysis?

8    A.  I learned that she had quite a number of hours, about

9    127 hours of college credit accumulated, but still did not have

10   a diploma from that, but obviously if you took that into a       11:29:17

11   typical relationship, that would equate to about four years

12   worth of college.  I noted also that her brother, her younger

13   brother, who was still at home, did not go to college but was

14   out in the working world.

15   Q.  All right.  And with regard to the mother having some       11:29:37

16   college, what, if anything, would that tell you about D.R.'s

17   likelihood that she would pursue college?

18   A.  It -- the statistical studies that have been done

19   predicting educational attainment for a child all show that an

20   apple doesn't fall far from the tree, however, they also show    11:30:03

21   education levels tend to increase with each successive

22   education slightly.  So the fact that her mother did have some

23   college but no degree makes me tend to use that as the

24   grounding point for my analysis, and then offer a level of

25   education per my evaluation as well as one above and one below.   11:30:26

Direct Examination of David S. Gibson

1  Q.  All right.  Now, with regard to D.R.'s potential future

2  earnings within your report, you have a table, can you explain

3  for the Court's edification the calculations in your report?

4  A.  Yes.  My -- there is actually three different tables.  One

5  that looks at annual earning capacity or how much D.R. would

6  earn per year.  Another looked that -- looks at work life

7  expectancy or how many years she would be expected to be

8  employed.  And then finally one that rolls it all together to

9  say, here's how much she would earn over a lifetime by

10 combining those two.

11        The data that I employed comes from the American

12 Community Survey from the U.S. Census Bureau.  They allow me to

13 segregate data based upon level of education and by gender.

14 Obviously I used female here, and to show what the age-specific

15 earnings would be for each age at each level of education.  I

16 show that pictorially on page 2 of my report in figure number

17 one.

18        When I do that, I could then average those median

19 earnings, so I use medians.  I don't use the average earnings

20 at each age.  I use the middle value, which is more

21 conservative.  By using those median earnings and averaging

22 them over her work life expectancy, I come up with a lifetime

23 average expected earnings by level of education to show on

24 table one on page 2.

25 Q.  All right.  And so on table 3 you break it down based upon

11:30:56

11:31:14

11:31:36

11:31:55

11:32:13

Direct Examination of David S. Gibson

1    education, fair?

2    A.  Yes.

3    Q.  And you start with her finishing high school all the way to

4    if she were to have a doctorate; correct?

5    A.  Correct.                                                      11:32:43

6    Q.  And so based on D.R.'s academic records and the information

7    provided by her mother, do you have an actual opinion on what

8    education level D.R. would have likely obtained had she not

9    been murdered in 2016?

10   A.  Yes.  I don't give an opinion on the precise level of       11:33:01

11   education, but I believe that the reasonable relevant range for

12   her would be from the high school level.  And I will round the

13   numbers here.  Having a lifetime value of $1.6 million through

14   the associate level which would be about $2.3 million.

15   Q.  All right.  And so that would be in the range of            11:33:24

16   1.5 million to how much?

17   A.  2.3.

18   Q.  2.3.  All right.

19   A.  Yes.

20          MR. RAPP:  I don't have anything further.                11:33:42

21          THE COURT:  Thank you.  Who is going to question the

22   witness?

23          MR. LANDMAN:  I am, Your Honor.

24

25

Cross-Examination of David S. Gibson

1           THE COURT:  Please come forward, Mr. Landman.

2                        CROSS-EXAMINATION

3    BY MR. LANDMAN:

4    Q.  Good morning, Mr. Gibson.  My name is Michael Landman.  I

5    represent Mr. Brunst.                                            11:34:22

6    A.  Good morning.

7    Q.  You and I haven't met before; correct?

8    A.  That is correct.

9    Q.  Now, you testified you reviewed, and I will refer to her as

10   Claimant Number 8 for today, but you've reviewed claimant       11:34:37

11   Number 8's file, is that correct, academic file; correct?

12   A.  I assume so.  I reviewed, as I indicated, 260 pages from

13   that file.  I can't testify whether that's the complete file.

14   Q.  Who provided that information to you?

15   A.  That was provided by the law firm of Romanucci & Blandin.    11:35:01

16   Q.  When did they provide it to you?

17   A.  Around the time of my retention, which was approximately

18   July 24th of this year.

19   Q.  And did they provide any other written materials to you?

20   A.  Let me just -- I -- some are not necessarily relevant, but   11:35:28

21   the death certificate for D.R., the, and some -- some filings

22   as far as declaring airship for D.R., and some administrative

23   documents.

24   Q.  Did you provide your assessment prior to the finalizing of

25   your report, did you provide via e-mail or other means          11:36:01

Cross-Examination of David S. Gibson

```
1    documents to those attorneys?
2    A.  I think you're asking, did I give them a draft of my report
3    before I finalized it?
4    Q.  That would be one example.
5    A.  Okay.  No, I don't.                                        11:36:17
6    Q.  How about e-mails, did you trade substantive e-mails back
7    and forth with those attorneys?
8    A.  No substantive.  There is definitely e-mails as far as
9    scheduling and sending fee agreements and such, but nothing
10   substantive.                                                   11:36:33
11   Q.  Did you communicate with them about your findings regarding
12   Claimant Number 8's academic background?
13   A.  No.
14   Q.  And fair to say your report doesn't reference any review of
15   Claimant Number 8's academic records; correct?               11:36:56
16   A.  That's correct, yes.
17        MR. LANDMAN:  Your Honor, we weren't provided a copy,
18   with a copy of Claimant Number 8's academic records, so we have
19   no basis to know what was in there, and --
20        THE COURT:  Well, the basis to know is his testimony     11:37:22
21   at this point.
22        MR. LANDMAN:  Sure.  And you know, we feel like we're
23   entitled to discovery to understand the records that Mr. Gibson
24   received and relied on in preparing for his report, and it was
25   not until today that we learned that Mr. Gibson was given a lot 11:37:39
```

Cross-Examination of David S. Gibson

1  of information about Claimant Number 8's academic record that

2  we haven't had an opportunity to review and won't have an

3  opportunity to examine Mr. Gibson on.

4       THE COURT:  Well, as I've indicated previously, the

5  traditional rules of evidence do not necessarily apply to these        11:37:59

6  types of restitution sentencing hearings, and so to the extent

7  you wish to question the witness, Mr. Gibson, about the records

8  he has reviewed with regard to the academic history of the

9  decedent, you can do so now.

10 BY MR. LANDMAN:                                                         11:38:24

11 Q.  So what was the latest in time academic record that you

12 had?

13 A.  I did not index them by date, so I can't give you a precise

14 answer to that.  I did see some updates of her 504 plan which

15 is the only date I have noted here that was June 14th of 2016,          11:38:48

16 but I can't say that there aren't records other than that that

17 are more current.

18 Q.  And what is a 504 plan?

19 A.  That's one that we talked about a little bit earlier.

20 That's a plan for students that might have medical or other             11:39:05

21 issues that need monitoring or may need accommodations.

22 Q.  And are you aware of what circumstance give rise to Number

23 8 being on a 504 plan?

24 A.  Yes, it is.  We discussed earlier that it was her migraines

25 and depression.                                                         11:39:29

Cross-Examination of David S. Gibson

1   Q.  Anything else?

2   A.  No.

3   Q.  Did the academic records provide further information about

4   the source of her depression?

5   A.  No.                                                              11:39:43

6   Q.  And did the records provide information about when she

7   first started on the 504 plan?

8   A.  Yes.  That appears to be April of 2014.

9   Q.  And how old was Number 8 in April of 2014?

10  A.  She would have been 14 years old.                                11:40:07

11  Q.  All right.  And in the June -- the records from June, do

12  you see anything about her test scores that year, I guess the

13  year that would have ended the school year, that would have

14  ended I would expect June 2016?

15  A.  I don't recall, to tell the truth.  As I indicated, I saw        11:40:36

16  test scores that did not indicate she would be an advanced

17  degree candidate, but I don't recall the specific date of those

18  test scores.

19  Q.  Do you recall what level of test scores they were?

20  A.  They varied.  So I am talking standardized test scores           11:41:01

21  here, which are the more, more accurate predictor of how

22  somebody will do, and they varied from the below average to

23  above average depending upon the subject, but overall I would

24  say that no better than average.

25  Q.  Do you have one of those that you're looking at right now?       11:41:21

UNITED STATES DISTRICT COURT

Cross-Examination of David S. Gibson

1    A.  I don't.  My -- the documents I have are a couple hundred

2    pages long.  I could attempt to find one in there, but it's not

3    anything I would have relied upon specifically.

4    Q.  Okay.  So in calculating your report, you didn't consider

5    that Number 8 had below average test scores in certain      11:41:46

6    subjects?

7    A.  I don't consider that specific career, however, that's part

8    of what my overall opinion is that we just talked about where I

9    did not believe that she would have been a candidate for

10   advanced levels of education beyond the associate's degree,   11:42:07

11   which is the higher version that we just discussed.

12   Q.  And did you -- you understand -- you agree that an

13   individual's academic performance in high school can be an

14   indicator for their earned income in the future; correct?

15   A.  No.                                                        11:42:31

16   Q.  No?  Is your --

17   A.  Yes, sir.

18   Q.  -- testimony there is no correlation?

19   A.  That's correct.  There's a good -- the highest correlation

20   may come from standardized test scores, but how they actually  11:42:43

21   do in their courses in high school, no, I won't say that that's

22   a good predictor.

23   Q.  You agree that an individual's educational level of

24   achievement, i.e., graduating high school versus graduating

25   college, has an effect on the ability to earn income?          11:43:01

UNITED STATES DISTRICT COURT

Cross-Examination of David S. Gibson

1    A.   Yes.

2    Q.   And you agree that an individual's grades in high school

3    has an effect on the ability of that person to matriculate to

4    college?

5    A.   They may, depending upon the grades that we're talking          11:43:17

6    about.

7    Q.   I think you already said, but I just want to confirm we

8    agree when it comes to standardized test scores, you agree that

9    standardized test scores can have an effect both on the ability

10   to matriculate to college and earn income in the future?          11:43:34

11   A.   No, there is two questions in there.

12   Q.   I'll separate that.  So --

13   A.   Yes.  I can say that the standardized test score can impact

14   how a person's ability to be accepted into appropriate

15   universities or collegiate levels.  I don't believe that a          11:43:54

16   standardized test score will impact their earnings.

17   Q.   And for the standardized test score, you testified that her

18   test scores were substandard?

19   A.   In some areas, above standard in others.

20   Q.   Overall substandard?          11:44:15

21   A.   I said -- I think I said overall no better than average.

22   Q.   But you don't have a -- you're not able to actually cite to

23   any of those records as we sit here today?

24   A.   That's right.

25   Q.   Have you -- have you been retained in the civil lawsuit          11:44:35

Cross-Examination of David S. Gibson

1   that Number 8 estate filed against Backpage.com?

2   A.  No.

3   Q.  So we talked a little bit -- you talked a little bit about

4   a parent's education as having an effect on or a potential

5   effect on the ability of an individual to earn income in the          11:45:08

6   future, do you recall that testimony?

7   A.  Yeah.  I think more precisely what I'm saying is that it

8   has a correlation.

9   Q.  And are you aware that at the time that Number 8 ran away

10  she wasn't living with her parents?                                    11:45:30

11  A.  Well, I guess I'm a little confused because running away

12  means that she was not living with her parents.

13  Q.  She could be living -- she could be living with, for

14  example, her grandparents?

15  A.  That's possible.                                                   11:45:46

16  Q.  So are you aware that at the time she ran away from

17  someone other than her parents, she wasn't living with her

18  parents?

19  A.  No.

20  Q.  And you would agree that if you're not living with your            11:45:59

21  parents, your parents' educational background may have less

22  significance to your earning capacity in the future?

23  A.  No.

24  Q.  You disagree?

25  A.  I do.                                                             11:46:14

Cross-Examination of David S. Gibson

1  Q.  Okay.  So you think that someone who doesn't live with

2  their parents has the same earning capacity as someone who

3  does?

4  A.  Depending upon the circumstances, yes.  If you're talking

5  about somebody whose been with their parents most of their          11:46:28

6  developmental years, then the parents' education level is

7  probably going to have a great impact on the child's

8  educational level.  If you're talking about somebody who's

9  separated from their biological parents at birth, then there's

10  obviously the long lasting conundrum about biology versus         11:46:47

11  inherited nature or sociology.

12  Q.  And you don't know the circumstances that caused Number 8

13  to not live with her biological parents?

14  A.  That's right.

15  Q.  Now, you're aware that Number 8 ran away from the home that   11:47:10

16  she was living in; correct?

17  A.  Yes.

18  Q.  And you're aware that running away from the home as a

19  teenager can have an effect on your ability to maintain the

20  academic progress that you're achieving prior to running away?   11:47:31

21  A.  It can, depending upon the permanency of the separation.

22  Q.  And you don't know what, if any, effect Number 8's running

23  away had on her academic level of achievement?

24  A.  Well, there's no way of knowing what level that would have

25  had since she wasn't ever offered the ability to come back or     11:47:55

Cross-Examination of David S. Gibson

1   to re-establish her relationship.

2   Q.  Well, for example, when she was away from her home, you

3   don't know whether she was attending school or not?

4   A.  That's right.

5   Q.  Now, you agree that the ability to maintain employment for      11:48:20

6   a period of time is highly fact dependent; correct?

7   A.  Sorry.

8   Q.  The ability to maintain employment for a period of let's

9   say 30 years, as you indicated in your report, is highly fact

10  dependent?                                                           11:48:47

11  A.  I really don't know what you mean by "fact dependent."  Can

12  you be a little more specific?

13  Q.  Well, some individuals -- people leave the workforce for

14  various reasons; correct?

15  A.  Yes.                                                             11:49:03

16  Q.  Some leave the workforce to raise a family?

17  A.  That's right.

18  Q.  Some are disabled, and so they leave the workforce --

19  A.  Yes.

20  Q.  -- as a result of their disability.  Others simply just         11:49:12

21  leave voluntarily; correct?

22  A.  True.

23  Q.  And you agree that an indicator of whether someone is

24  likely to remain in the workforce for 29, 30 years, as

25  indicated in your report, is a relevant indicator of whether        11:49:31

Cross-Examination of David S. Gibson

1   their parents remained in the workforce; correct?

2   A.  No, not at all.

3   Q.  And you don't know the impact that the -- well, just to

4   back up for a moment.  The 504 plan, is that a plan for

5   children who are educationally, would you classify them as          11:50:00

6   disabled?

7   A.  No.  No.  You're thinking of an IEP, which is different

8   than a 504 plan.

9   Q.  And how would you classify them?

10  A.  Again, somebody that has a medical condition that needs         11:50:17

11  monitoring and may need accommodation.

12  Q.  And you agree that someone who has a medical condition that

13  needs monitoring and accommodation in high school may need that

14  medical -- may need monitoring and accommodation at any future

15  employment in the future?                                           11:50:41

16  A.  I've seen -- that's a medical opinion you're asking for,

17  and I have seen no medical opinion that supports that.

18  Q.  So you don't know one way or the other whether Number 8's

19  medical condition in high school would have affected her

20  ability to earn income in the future?                               11:50:58

21  A.  That's true.

22  Q.  Now, just one more topic.  On page 4 of your report you

23  indicate that your estimated economic loss is not reduced for

24  personal consumption, do you recall that?

25  A.  I do.                                                           11:51:25

UNITED STATES DISTRICT COURT

Cross-Examination of David S. Gibson

```
 1   Q.  So that means you didn't take into account Number 8's
 2   estimated lifetime expenses; correct?
 3   A.  That's right.
 4   Q.  So things such as housing, food, clothes, childhood, child
 5   care expenses?                                                    11:51:39
 6   A.  Well, child care doesn't enter into play.  If it did, the
 7   impact personal consumption would be -- would be less.  So the
 8   real issue is the expenses of a single female.
 9   Q.  Thank you for the clarification.  And you didn't take into
10   those -- you didn't take those into account; correct?            11:51:58
11   A.  That's right.
12   Q.  And you don't know what they would be because you didn't
13   take those into account?
14   A.  I wouldn't say that's right.  I take them into account
15   because it's really a legal question on when personal            11:52:16
16   consumption is computed.  Some jurisdictions require it and
17   some don't.  The attorneys who retain me said that given that
18   this was not a personal injury matter but a filing in a
19   criminal sentencing, that they did not believe it applied.
20   Q.  But typically in your personal injuries cases, you would     11:52:34
21   calculate the expenses that someone would incur?
22   A.  It's yes and no.  It depends on the jurisdiction.  Again,
23   it's a legal question.  There is some jurisdictions like
24   Kentucky where I would be forbidden from doing.  So other
25   jurisdictions like Indiana where I would be mandated to do so,   11:52:57
```

—Cross-Examination of David S. Gibson—

1    so it depends what the legal mandate is.

2    Q.  It's possible for a high school graduate, for example, or

3    someone that doesn't even graduate high school, that someone's

4    living expenses could exceed their income?

5    A.  It's possible.                                        11:53:14

6          MR. LANDMAN:  Just one moment, Your Honor.  Thank you,

7    Your Honor.  No further questions.

8          THE COURT:  Thank you.  Mr. Feder.

9          MR. FEDER:  No questions.

10         THE COURT:  All right.  Mr. Rapp?                    11:53:46

11         MR. RAPP:  No redirect.  Thank you, Your Honor.

12         THE COURT:  May the witness be excused?

13         MR. RAPP:  As far as the United States is concerned,

14   yes.

15         MR. PANCHAPAKESAN:  No objection, Your Honor.        11:53:55

16         THE COURT:  Sir, thank you very much for your

17   testimony.  You are excused.

18         THE WITNESS:  Thank you.

19         THE COURT:  All right.  We are about ten minutes to

20   the lunch hour.  Mr. Panchapakesan, are you presenting your  11:54:04

21   rebuttal witness?

22         MR. PANCHAPAKESAN:  We are not, Your Honor, so we have

23   no witnesses of our own.

24         THE COURT:  All right.  Anything further from the

25   government?                                               11:54:16

1          MR. RAPP:  No, Your Honor.

2          THE COURT:  All right.  Well, let me just ask again.

3   I mentioned this on Friday, Mr. Rapp, I'm inclined, if you've

4   had an opportunity to consult with the victim representatives

5   as to whether or not I should hold the record open for          11:54:39

6   supplemental documentation.  Did you have that conversation?

7          MR. RAPP:  I did, and they would appreciate that very

8   much, and they understand the Court is not going to give them

9   forever, but a sum amount of time.

10         THE COURT:  Well, did you happen to come to a           11:54:56

11   consensus what that sum amount of time is?

12         MR. RAPP:  No.  But if the Court would allow the

13   record to remain open for 30 days to allow, in the event there

14   is any additional supplemental information.  I know that some

15   of the victim representatives, for example, these experts that   11:55:20

16   have testified, they believe under the law they would be

17   entitled to restitution for their opinions.  They don't have

18   those figures finalized.  That's just an example, but I think

19   30 days.

20         There is no one here that would like this to come to a   11:55:42

21   close more than myself, but I do think that would be sufficient

22   for any opportunity for supplemental supporting documents or

23   any supplemental briefing the Court feels appropriate.

24         THE COURT:  All right.  Mr. Panchapakesan.

25         MR. PANCHAPAKESAN:  Your Honor, only thing I would say   11:56:04

```
 1   is, you know, these are individuals who have had, you know, not

 2   only months, but years to submit information.  Some of these

 3   impact statements are from 2018, and these are folks who have,

 4   I think, for the most part been coordinating with the

 5   government during that time.  And so our view is that if their      11:56:22

 6   record is incomplete now, that there is a remissions process

 7   with the claims administrator who can follow up on

 8   documentation.  But sort of given the timing of all this, we'd

 9   ask that the record be closed.

10          THE COURT:  Mr. Feder?                                       11:56:44

11          MR. FEDER:  Join.

12          THE COURT:  What I'm inclined to do is I would like,

13   because I think this information is going to help me make a

14   determination as to the appropriate restitution order that this

15   Court can make, I'm going to open -- keep the record open for      11:56:57

16   no more than 21 days.  So everything has to be to the Court

17   within 21 days with appropriate citation.

18          And now, I will give the government, and I will like

19   to have supplemental briefing, not back-and-forth briefing, on

20   the issue as to whether the statute authorizes restitution for     11:57:26

21   victims who are not charged in the case.

22          And in particular, I'd like the government to focus on

23   Mr. Brunst's argument at their response to your restitution

24   memorandum at page 22 given this Court's finding that they cite

25   to in terms of the ending of the conspiracy, and so I'd like       11:57:52
```

1    you to concentrate your supplementation on that.  And I'd like

2    that within 14 days of today.

3          And if, Mr. Panchapakesan, Mr. Feder, if you wish to

4    provide additional supplementation in support for your

5    argument, I'd like to see that, but it will be simultaneous.      11:58:21

6    No responses or replies permitted.  So 21 days to complete the

7    record with respect to these 12 submissions.  I'm not going to

8    open it for any other submissions.  We're going to keep it to

9    the 12 delineated in the government's chart.

10         Anything further, Mr. Rapp?                                  11:58:39

11         MR. RAPP:  Judge, restitution is a part of sentencing

12   and the CVRA and the MVRA and the VWPA all apply to it, and the

13   victims do have a right to be heard.  I do have victim

14   representatives here.  Would the Court be willing to hear from

15   them today?                                                       11:59:00

16         THE COURT:  If you have -- if there's a victim or

17   victims' representative who wish to be heard on the issue of

18   restitution, yes.  We've already gone through the sentencing

19   proceeding.  I've heard some -- I've heard from particular

20   victims at the sentencing proceeding, but if there are victims   11:59:18

21   whose representative wish to make a statement as to

22   restitution, I can hear that at 1:00 o'clock.

23         MR. RAPP:  They pointed out to me that two weeks from

24   today is Martin Luther King day, a federal holiday.

25         THE COURT:  One additional day?                             11:59:36

1          MR. RAPP:  Yes.

2          THE COURT:  21st.  End of business on the 21st of

3    January.

4          MR. RAPP:  Okay.

5          THE COURT:  Will you let me know if someone is going      11:59:45

6    to be here at 1:00 o'clock.

7          MR. MONTGOMERY:  Yes, Your Honor.  John Montgomery.  I

8    certainly would like to make a statement to the Court.

9          THE COURT:  At 1:00 o'clock we will reconvene.

10          MR. PANCHAPAKESAN:  Your Honor, just very briefly, I      11:59:59

11    was prepared, as Mr. Rapp probably was as well, to argue some

12    of these issues to the Court.  I don't know if the Court wants

13    to entertain that now or in briefing.

14          THE COURT:  I don't necessarily feel like I need a

15    summation argument.  I feel like I've had good briefing on the   12:00:11

16    issues, but if you wish to make a particular point I will let

17    you on that point.  We will reconvene at 1:00 o'clock.  Let's

18    make it 1:15.  Thank you.

19      (Proceedings concluded at 12:00 p.m.)

20      (Proceedings reconvened at 1:16 p.m.)                         13:16:06

21          THE COURT:  All right.  Please be seated.  Mr. Rapp.

22          MR. RAPP:  So Judge, three representatives

23    representing four victims would like to address the Court.  The

24    first one is John Montgomery.  He's representing victims N.F.

25    and victim D.O.                                                 13:16:24

UNITED STATES DISTRICT COURT

1          THE COURT:  Yes.  Please come forward.

2          MR. MONTGOMERY:  Thank you, Your Honor, for this

3    opportunity to speak for a few minutes about N.F. and D.O.

4    Your Honor, you've expressed some discomfort, some hesitation

5    about the quantum of evidence that victims have been able to          13:16:52

6    present on their behalf of these applications for restitution,

7    and I want to spend a few minutes talking about the limitations

8    that our clients face in their ability to provide that evidence

9    to you as a result of their experience on Backpage.com.

10          We have represented D.O., or Victim Number 6, for more          13:17:22

11    than ten years, and N.F. for eight years.  And our clients,

12    Your Honor, fight everyday just to get by.  And the impact of

13    being trafficked on Backpage.com continues to make it difficult

14    for them to manage their lives.

15          For example, as you heard on Friday from Dr. Cooper,          13:17:51

16    both of these young women suffer from debilitating depression,

17    and I can tell you that that depression leaves them spending

18    days upon days just in bed.  Both of these women have struggled

19    to keep custody of their children, and, therefore, are often

20    devoting significant amounts of their time to dealing with          13:18:19

21    child services agencies in an effort to either retain or regain

22    custody of their children.

23          Right now N.F. has custody of her three children, but

24    just as recently as late 2024 she had to turn over custody of

25    her kids.          13:18:43

1          D.O. currently has custody only of her newborn, a

2    child born several weeks ago, and her other three children are

3    in foster care.

4          Both of these young women have struggled to maintain

5    consistent housing.  In the span of the period we have                13:19:00

6    represented D.O., she has moves to Boston, to Detroit, and now

7    been for several years in Atlanta, and just in the last year in

8    Atlanta has moved three, maybe four times to different

9    locations for housing.

10          In addition to that, Your Honor, circumstances arise,          13:19:26

11    urgent circumstance, resulting from their trafficking on

12    Backpage.  For example, late last year, 2024, N.F. was forced

13    to seek a restraining order when an individual was posting

14    notices in her, with her name, her address, her phone number

15    and her photo in the neighborhood where she knows that her         13:19:55

16    former trafficker currently lives.

17          When -- just to use N.F. as an example, when she seeks

18    medical care, she relies on emergency rooms where, of course,

19    she gets care, but only for the singular symptom that she's

20    presenting and not at the level of expertise that she needs.       13:20:23

21          The conditions of both of these young women and their

22    health care needs require specialized expertise, as Dr. Cooper

23    has pointed out, because victims often can't or are reluctant

24    to be candid with health care professionals.  Indeed, we chose

25    Dr. Cooper to prepare the report that you have seen here            13:20:50

```
1    because she's trained in forensic techniques which enhance her

2    ability to do a complete medical evaluation.

3         So we understand the Court's caution in light of the

4    limitations on the evidence, and we appreciate the opportunity

5    that you're affording to us to make a supplemental submission,    13:21:21

6    and we intend to explore with our clients whether it's feasible

7    to provide you with that information, and if we can't, we

8    intend to explain to you exactly what the limitations are that

9    make us unable to do so.

10        Now, in addition to all of that, you know, you're    13:21:43

11   going to certainly hear from the government in a couple of

12   weeks, and we intend to provide all the support to the

13   government that we can that we believe you have ample legal

14   authority to award restitution on the very evidence that you

15   have before you now for these two clients.  You are going to    13:22:10

16   see, Your Honor, a lot of cases in which courts have awarded

17   restitution for future medical and treatment expenses based

18   upon exactly the same quantum of evidence that you have on N.F.

19   and D.O.

20        THE COURT:  Let me interrupt you.  I'm only interested    13:22:32

21   in cases that have proceeded to trial.  Again, I mentioned to

22   the government and to defense counsel that I am used to

23   normally seeing plea agreements in which defendants agree to

24   make that type of restitution in those agreements.  That is not

25   the case here, so I'd like something analogous to this.    13:22:55
```

1              MR. MONTGOMERY:  What you are going to see, Your

2    Honor, and I know this is not the time to get into it, but a

3    list of cases from across the country either involving

4    sentencing in either tried cases, or cases where there has been

5    a plea, and then subsequent sentencing proceedings, including           13:23:14

6    restitution.  So these are all cases under either the Mandatory

7    Victim Restitution Act or the, I am going to forget the

8    acronym, the VWPA.  All of these cases are in that setting and,

9    therefore, I think will be very useful to you.

10             The leading case is In Re *Sealed* case decided by the         13:23:39

11   D.C. Court of Appeals, which expressly addresses the issues

12   that you were grappling with on Friday, the absence of evidence

13   of past treatment, the uncertainty whether the future

14   treatment, which is the subject of the analysis before the

15   Court, will ever be obtained, and In Re *Sealed* cases when           13:24:05

16   followed in the Fourth Circuit, the Seventh Circuit, the

17   Eleventh Circuit, and in numerous district courts.

18             We're also going to provide to you citations, again,

19   very, very similar cases all involving restitution in criminal

20   cases in which the testimony of Dr. Cooper was relied on where          13:24:27

21   she provided a record to the Court very, very similar to what

22   is before you with respect to D.O. and N.F.

23             And as to future lost wages, similarly, the law

24   couldn't be clearer that you have the authority based on the

25   evidence before to award future lost wages.  The *Cienfuegos*          13:24:54

1    case in the Ninth Circuit, and cases following *Cienfuegos* from

2    a number of other circuits, the Second Circuit, the Fifth

3    Circuit, district courts, so I think these cases will be very

4    helpful to Your Honor.  What they lead us to conclude is that

5    in the final analysis, you know, restitution is part of the    13:25:23

6    sentencing process.  It's really a sui generis process, as I

7    think that you have observed, and it comes with a certain

8    amount of inherent uncertainty.

9         Our clients are not before you as traditional

10   plaintiffs.  This is a different setting.  They are victims who    13:25:44

11   Congress has made clear are entitled to recovery of the losses

12   that flow naturally from the crime with respect to which they

13   have been victims.

14        And in that process, we believe, Your Honor, that you

15   have an extraordinary amount of discretion.  You have seen at    13:26:13

16   least some of these victims, you have heard the trial

17   testimony, and you are in the best position to fashion an

18   outcome here which satisfies the goals of the statute, the

19   goals of the criminal justice process, and that produces a

20   just, and I would say imprecise necessarily and approximate    13:26:41

21   result.

22        And we believe you have plenty of authority to do

23   that, and we're hoping to give you as much help as we can in

24   that process with additional law.  And to the extent we can,

25   additional information about our clients.    13:27:00

1            I just want to make briefly two additional points.

2    Remission is not the appropriate alternative to restitution.

3    None of us, certainly the victims, nor the defendants, would be

4    here in the last several days if we thought remission was going

5    to be sufficient.  If you compare section 3663 with the CFR           13:27:26

6    regulations governing remission, you can see that remission is

7    much more limited.  It's a process really designed to address

8    financial fraud.  There's really nothing in those regulations

9    to suggest that the process is going to be sufficient to

10   address the nature of the injuries that have resulted from the        13:27:55

11   crimes here.

12           So the last point I want to make is that we will be

13   supplementing our submission with a presentation to you on our

14   expert fees for both Dr. Cooper and for Dr. Smith.

15           The law, we think, is clear under the language of the         13:28:26

16   statute that we're also probably entitled to attorneys' fees.

17   We will confer with the other lawyers in this case.  To the

18   extent that they -- that they are not going to make submissions

19   to you about attorneys' fees for the portion of our work

20   shepherding our clients through the criminal process, then we         13:28:50

21   certainly will not burden you with that application either.

22           I thank you very, very much for the time, Your Honor.

23           THE COURT:  Thank you.

24           MR. RAPP:  And so the next victim representative that

25   would like to address the Court is Chris Parente, and he is           13:29:07

UNITED STATES DISTRICT COURT

1    representing the estate of D.R., in particular Yvonne Ambrose,

2    and the Court will recall Ms. Ambrose addressed the Court at

3    sentencing.

4              THE COURT:  Yes.

5              MR. RAPP:  He is on Zoom.                              13:29:25

6              THE COURT:  Yes.  Sir, we can see you, and you may

7    begin.

8              MR. PARENTE:  Thank you, Your Honor.  Your Honor, just

9    to start out, I just want to make clear -- so again, I

10   represent Victim 8 in the government's chart, goes by initials  13:29:38

11   D.R -- what it is we're exactly seeking in terms of restitution

12   because I know the filings, going through the government, have

13   kind of been confused.

14             You know, D.R.'s estate is only seeking recovery for

15   three parts of the restitution here.  That's the lost income,   13:29:53

16   that's expenses that D.R.'s mother incurred in participation in

17   this investigation, and the funeral expense.  So just those

18   three expenses are what we are actually seeking in restitution,

19   just to clear that up.

20             Two, Judge, I want to turn to why restitution is       13:30:11

21   important.  You know, D.R.'s mother was on the witness list in

22   this case.  I know she's not a charged victim in the case, and

23   I will get to that, but her mother was on the witness list in

24   this case; she was prepped to testify; she's receiving all the

25   victim notifications from the U.S. Attorney's Office; she's      13:30:28

1   followed this case, and I can assure Your Honor that she

2   considers the gentlemen that were convicted in this case as

3   people who are responsible in part for D.R.'s death.

4        It is important for D.R.'s family that restitution be

5   ordered in this case not just for the financial reasons, but       13:30:45

6   because they view these men as being responsible for her

7   daughter's death.  They view the money that went from both

8   D.R.'s murderer and D.R.'s trafficker that went directly to

9   Backpage.com and these individuals.  That money went right to

10  these individuals will be part of that restitution, and they       13:31:02

11  believe there is symbolism in that money coming back to the

12  estate through the restitution process.

13       Your Honor has heard all about this remission process.

14  I want to be clear how that works in California.  The

15  government agreed to get $220 million, and they gave back these     13:31:17

16  defendants $40 million.  So that court in California were told

17  that these defendants were getting 40 million back.  The

18  government was taken 220 million.  And there was a specific

19  paragraph in that agreement that said this will not affect the

20  hearing that's going on here today; that the criminal               13:31:35

21  restitution hearing will still proceed.  That Judge, whose Your

22  Honor, will make a determination, and that restitution order

23  will not be affected by this.

24       Defense counsel worked on an arrangement where if you

25  do order restitution, that money can be satisfied from that        13:31:50

1  220, but it does not have to be.  So to just let these

2  individuals say, "Oh, there is a remission process.  Let it go

3  there."  That's not fair, and that's not what was told in the

4  California court, and I have not heard the fact that they

5  returned $40 million of proceeds as part of that argument.          13:32:06

6          So I want it to be clear that that's what happened in

7  that arrangement, and that we think --

8          THE COURT:  Can you slow down just a bit?

9          MR. PARENTE:  Yes, Your Honor.

10         THE COURT:  Thank you.                                       13:32:19

11         MR. PARENTE:  To Your Honor's questions about D.R. not

12  being named in the indictment, that is true, but that under the

13  statute does not limit recovery; right?  The way the statute

14  works is the victim is anyone directly or proximately harmed by

15  the commission of the offense.  When it's a conspiracy or a        13:32:34

16  scheme, it could be anyone during the course of the conspiracy

17  or scheme.

18         In fact, the case law says it doesn't even have to be

19  part of a charged count at all to get recovery.  And we'll cite

20  this in the filing to the Court, but there is case law that       13:32:49

21  says it includes not harm, not only harm caused about a

22  particular count of conviction, but also related to uncharged

23  conduct that is part of the fraud scheme.

24         And I understand Your Honor's ruling in the Rule 29

25  order that limited this presale post sale line that you drew.     13:33:07

One, I would note that that's under a different standard.

Right now we are under preponderance standard, so that's one

difference; but, two, I would argue that the counts of

conviction went from 2004 to 2018, both on Count 1 conspiracy

and the money laundering conspiracy.  D.R. was killed in                13:33:24

December 24th of 2016.

            And Your Honor notes in that same Rule 29 order that

even after the sale that these individuals were still involved

in this scheme and in this conduct.  And I am reading from

page 13 of your Rule 29 order where Your Honor says:                    13:33:42

Mr. Ferrer testified that the sale of Backpage was intended to

distance the defendants from Backpage's businesses of selling

illegal ads for prostitution, but Mr. Ferrer also testified

that even after the sale, Mr. Brunst and Spear stayed involved

in the business of Backpage.                                            13:34:00

            And then you talk about how Mr. Brunst specifically

was involved in helping them fix the financial issues, which

included making sure credit card payments worked, and it was

Mr. Ferrer's -- sorry -- Mr. Brunst's role in which Your Honor

wrote:  Mr. Brunst also helped find alternative methods for             13:34:15

receiving money from posters on Backpage, including evidence --

including receiving payment by cryptocurrency.

            Now, that's important to our claim, Your Honor,

because D.R.'s ads, as you heard in the testimony of

Ms. Landau, were paid by bitcoin.  So even post sale, it's             13:34:31

1    Mr. Ferrer who is having daily calls with Backpage's CFO

2    teaching them how to accept cryptocurrency while this scheme is

3    still ongoing and is guiding them through that, and that's the

4    cryptocurrency that D.R.'s trafficker is paying to Backpage so

5    that she can be put out there and trafficked and later killed.    13:34:51

6         So we would argue, Judge, under the very broad

7    definition of "victim" in these restitution statutes that this

8    scheme was, one, ongoing throughout 2016, but specifically

9    Mr. Brunst was still actively involved, as the trial testimony

10   showed, and in fact, is the one that came up with the scheme to    13:35:09

11   allow for cryptocurrency, which was the way that D.R. was

12   actually trafficked on Backpage.  So all those bitcoins that

13   her trafficker paid to Backpage throughout December of 2016

14   went right into their pockets thanks to Mr. Brunst and his

15   actions.    13:35:25

16        So we would submit, Judge, that under that reading of

17   the statute, she's certainly a victim and she doesn't need to

18   be named in the indictment as the case law makes clear, and we

19   will provide that to Your Honor in our supplemental filings.

20        Unless the Court has any specific questions of me    13:35:41

21   related to victim D.R., that's our presentation for today.

22        THE COURT:  Thank you.

23        MR. RAPP:  The last individual would like to address

24   the Court on behalf of the victims is Andrew Jacobsohn on

25   behalf of Victim 4 and Victim 5.    13:36:00

1            THE COURT:  Sir.

2            MR. JACOBSOHN:  Thank you, Your Honor.  I'd like to

3    start by echoing the comments that Mr. Montgomery made

4    regarding his clients.  Many of those are applicable, equal in

5    force to our clients.  For example, we were retained by B.L.,          13:36:23

6    Victim 4, only in October of this year.  So in these past few

7    months, she's already moved twice in the amount of time that

8    we've known her.  We also know that she's begun custody

9    proceedings in that short time as well.

10           So the difficulties that our clients faced are similar     13:36:48

11   to those that Mr. Montgomery described.  And similarly, the,

12   excuse me, the reports by Dr. Cooper and testimony and

13   testimony of Dr. Smith, much of that is applicable to our

14   clients as well.

15           Specifically as to B.L., I would note that besides --    13:37:11

16   excuse me -- we obtained a letter from her treating physician.

17   It's attached to the materials.  I note that there's not a

18   dollar figure attached to that.  We received that letter on the

19   day that the government's materials were to be submitted.

20   Again, it's showing sort of the difficulty of obtaining some of    13:37:39

21   this background documentation.  I'd like to forecast for the

22   Court one thing we intend to supplement with is to attach a

23   dollar figure to that and provide some more background.

24           As to the medical cost that she has incurred and will

25   incur, outside of that, her claim also includes $66,300, which    13:37:59

1    is broken into generally two categories from her Victim Impact

2    Statement.  One is $1,300 of various out-of-pocket medical

3    bills, again, approximation of the care she's incurred, various

4    co-pays over the last few years, and then also $65,000 in lost

5    past wages for the two and a third years that she was                13:38:28

6    trafficked, an approximation of what her current earnings level

7    is.

8          Again, we -- that is something that we intend to -- so

9    we can supplement that information as well.  We're working on

10   that with the client on that.  But to -- yes, to forecast, we        13:38:45

11   do intend to supplement on the medical expenses she's incurred.

12         And then as to Victim 5, M.L., we submitted a report

13   from Ms. Kate Keisel.  That report, I note, is intended to not

14   be a comprehensive list of every medical condition that she has

15   suffered as a result of the trafficking and by extension            13:39:17

16   defendants.  Instead, that is a slice based off of her PTSD

17   diagnosis and the treatments listed therein and the costs

18   listed therein.  Again, derived from the PTSD diagnosis.

19         Your Honor made a comment on Friday regarding the

20   background and proof regarding whether the clients or whether        13:39:45

21   the victims had received past treatment for these conditions,

22   and I'd note that both Victim 4 and Victim 5 have stated in

23   their victim impact statements to varying degrees of

24   specificity that they have been seeking treatment for PTSD,

25   among numerous other conditions.                                     13:40:07

1          In fact, with regards to Victim 4's statement, she

2     indicated that she's probably incurred a half million dollars

3     in various outpatient stays and mental health treatments over

4     the past few years as well.  So all that is to say, the victims

5     have indicated that they have been seeking treatment.  Our

6     understanding from speaking with them is that they do intend to

7     continue treatment just, you know, as they have been moving

8     around, as they have been relocating, and that's something that

9     we intend to explore if we are able to supplement that as well.

10          THE COURT:  All right.

11          MR. JACOBSOHN:  Thank you.

12          THE COURT:  Anything further, Mr. Rapp?

13          MR. RAPP:  I don't have anything further and I don't

14     intend to address the Court on all of these legal issues.

15     We'll just defer to our filings.

16          THE COURT:  Mr. Panchapakesan.

17          MR. PANCHAPAKESAN:  Thank you, Your Honor.  So Your

18     Honor, I want to start with the backdrop here, which is the

19     statutory scheme that applies to this case in the context of

20     restitution.  Both sides agree it's the Victim Witness

21     Protection Act, the VWPA, that's 18 U.S.C. 3663, not the MVRA,

22     which is 3663A.  The MVRA does not apply the Travel Act on its

23     face.  It only applies to offenses against property that

24     includes fraud and deceit.  And the Court found that there was

25     no restitution applicable to Mr. Lacey, who was only convicted

1    of a single money laundering offense.

2         The *Luis* case we cite in our briefing, 765 F.3d 1061,

3    it's an MVRA case, says that for money laundering to cause harm

4    to an individual under the MVRA, it needs to impair an alleged

5    victim's property interest, and so that case was a bank fraud          13:42:13

6    case where the bank had interest in the mortgage and their

7    property interest was harmed.

8         But *Theranos* case, for example, Ms. Holmes, the

9    government pointed that case out to us.  Same issue, right,

10   these are investments by individuals, by companies, that had          13:42:28

11   property interest in that investment.

12        The government tacitly concedes that the MVRA does not

13   apply here.  In their briefing, for example, Doc 2274 at 3, the

14   government says, quote, "Restitution may be ordered against

15   Brunst under 18 U.S.C. 3663," that's a VWPA.  So when Mr.             13:42:45

16   Parente, for example, the attorney for D.R. and Ms. Ambrose,

17   talks about his clients' harm, it's important to separate the

18   MVRA and the VWPA.  There is no argument that D.R. had a

19   property interest that was damaged under the MVRA.  Her only

20   potential claim for restitution is under the VWPA, which within       13:43:12

21   the Court's discretion can apply to the Travel Act, but her

22   murder and her being advertised on the website occurred all

23   during November and December of 2016, which is a year and a

24   half after the Court ruled the conspiracy ended.

25        This is important because some number of cases the              13:43:30

1    government and private counsel cite, the Cienfuegos case, there

2    is a case called *Laney* that the government cites in the reply

3    brief, *Theranos* and Holmes, these are all under different

4    statutes.  They are under the MVRA or they are under the

5    pornography statutes that have a different restitution scheme.    13:43:48

6    That's the first point.

7            Second point is this issue of causation.  So as the

8    Court knows, government has a burden of proving not only

9    but-for causation, but proximate causation.  Proximate

10   causation, that inquiry is intended to preclude restitution    13:44:03

11   where there is prior causes, ultimate causes, intervening

12   causes.  As the Court has heard, there is a constellation of

13   alternate causes for the physical, the emotional trauma some of

14   these people are dealing with like custody battles, for

15   example.  You have intrafamilial abuse at a young age, you have    13:44:20

16   runaway children, you have teen pregnancies, you have

17   disabilities from birth, for example.  These are all things

18   that would have existed outside of my client's conduct.  And by

19   definition, it means that my client is on a but-for cause of

20   those things.    13:44:37

21           So taking, for example, the counseling bucket.  The

22   government in their reply relies on the *Laney* case.  They say

23   that's a case that shows, you know, counseling is appropriate

24   here.  That case was decided under 18 U.S.C. 2259.  That's a

25   mandatory restitution statute for child pornography cases.  And    13:44:54

1    the language of that statute expressly says that losses include

2    costs, quote, "reasonably projected to be incurred in the

3    future."  And furthermore, there is no bodily injury limitation

4    in that statute.

5         Here, we are under a different statute.  The VWPA          13:45:11

6    doesn't have that language.  It doesn't -- it further -- the

7    VWPA requires bodily injury be shown.  The losses have to flow

8    from that injury.  And what the VWPA says is loss can be,

9    quote, "to pay an amount equal to the cost of necessary

10   physical and occupational therapy."  The operative word there   13:45:32

11   being "necessary," not what is estimated or projected in the

12   future.

13        Furthermore, in the *Laney* case, the government cites

14   there the victims treating psychiatrist calculated an amount of

15   $60,000 over six years.  That's not all we have here.  We have   13:45:48

16   Dr. Cooper, a nontreating physician, who does not know if these

17   individuals actually have these illnesses, she is not

18   estimating what portion of that my client may have caused, and

19   she is essentially projecting millions of dollars of lifetime

20   costs between the two individuals with respect to over 30        13:46:05

21   different illnesses that she herself has not diagnosed.

22        We think the Court should instead look at the *Follett*

23   case, F-O-L-L-E-T-T, that's 269 F.3d 996.  That's a case under

24   the VWPA where the Ninth Circuit reversed the trial court's

25   restitution order for future counseling.  What the court says    13:46:25

UNITED STATES DISTRICT COURT

1    there is that:  As the presentence report indicates and nothing

2    in the record refutes, that the victim would incur future

3    therapy cost was at that point nothing more than a possibility.

4         The Court goes on:  The statutory scheme simply does

5    not allow for restitution orders based on such speculation          13:46:42

6    rather than proof.  Rather, the statute specifically requires

7    that the presentence report provide an accounting of the losses

8    to the victim and places the burden of proof in demonstrating

9    the amount of the victim loss on the government.

10        The court concludes:  One cannot bear the burden of          13:46:58

11   proving the amount of a loss by a preponderance of the evidence

12   when it is no more than possible that the loss will occur at

13   all.

14        That's precisely my view what is going on here in

15   light of Dr. Cooper's testimony.                                   13:47:11

16        The next bucket I'll address broadly is this lost

17   earnings bucket.  We'd ask the Court to look at the *Fountain*

18   case.  It's a Seventh Circuit case, 768 -- *Fountain*, 768 F.2d

19   790.  What that court said, again, under the VWPA, quote,

20   "Projecting lost future earning has no place in criminal          13:47:37

21   sentencing if the amount or present value of those earnings is

22   in dispute."  Again, we think it's what is happening here.

23        *Cienfuegos*, which is the only case the government so

24   far cites regarding future lost earnings.  It's a homicide

25   case, someone pled guilty, and the Court there said, quote,      13:47:55

1    "Only by making restitution for future lost income can the

2    perpetrator of the homicide fully pay the debt owed to victim

3    and to society."  There's been no finding that my client was a

4    perpetrator of a homicide.  That was not an object of the

5    conspiracy here, and we submit it would be a leap of logic in          13:48:12

6    law to assign that blame to him.

7          Now, a couple of other buckets, Your Honor, that we'd

8    like to bring to the Court's attention.  An individual cannot

9    recover for restitution if they have engaged in criminal acts.

10   And I know the government, through the restitution process, has        13:48:33

11   tried to show that some of these individuals were trafficked.

12   I think it's important to keep in mind that's not how this case

13   was charged.  This case was charged as a Travel Act case.  The

14   object of the conspiracy was to facilitate state law

15   prostitution offenses.                                                 13:48:51

16         So when the government says ad nauseam "all the pimps

17   are co-conspirators," it's important to keep in mind that the

18   individuals who committed the state law prostitution offenses,

19   they are also, under the government's definition,

20   co-conspirators.                                                       13:49:06

21         Furthermore, this is even more so the case for

22   individuals who are adults.  So there is no dispute that most

23   of these individuals were adults at the time of these offenses,

24   individuals 1, 4, 5, 7, 9, 10, and 11 and 12 were the same

25   person.  They are individuals who, in their 302s that we've            13:49:26

1    attached to our briefing, they say things like, quote, "my

2    customers," "my clients."  They say they are loyal to Backpage.

3    One of them, Number 5, says in her declaration she made over

4    $200,000.  None of that is consistent with trafficking.  It's

5    consistent with prostitution.                                    13:49:45

6            And under the Ninth Circuit, the *Lazarenko* case, 624

7    F.3d 1247, the Court says, quote, "As a general rule, a

8    participant in a crime cannot recover restitution."

9            Now, I am prepared to go through the individual

10   claimants, but I will -- what I will do is I will point the     13:50:06

11   Court to the chart we filed in Doc 2290, it's a 40-page chart

12   that goes through claimant by claimant.  Today I will just

13   briefly address the counsel who spoke on behalf of these

14   individuals.

15           As to individual Number 4, B.L., she seeks around       13:50:21

16   $900,000 in prior medical costs, future counseling costs, and

17   what appears to be an emergency room stay.  It's all very

18   vague.  Based on the statement, there is no documentation,

19   there is no medical bills.  This is statement from a Dr. Brett.

20   He didn't testify, but he says things in his letter like she    13:50:40

21   has, quote, "a fungal respiratory infection that's common in

22   Arizona."  He says, quote, he learned of multiple medical

23   problems that she acquired at an early age.  So these appear to

24   be preexisting conditions.  There is really no effort to

25   quantify any additional harm that is purportedly caused by my   13:50:57

1    client.

2          Individual Number 5, M.L., she seeks future treatment

3    as well in a range of 285,000 to 1.4 million.  There is a

4    letter from a Dr. Keisel, who did not testify, but her approach

5    is similar to that of Dr. Cooper.  Again, there is no                    13:51:15

6    documentation of any prior treatment, no evidence that these

7    costs will, in fact, be incurred in the future.  She attaches

8    this statement from Dr. Keisel that says, I think it's attached

9    to the PSR report, so 2144-1, at page 53.  It seeks costs for

10   things like hyperbaric oxygen chamber, neurofeedback.  There is   13:51:39

11   just no testimony as to what any of this stuff is.  And under

12   the statute, 18 U.S.C. 3663, sub b 2A, the medical treatment

13   has to be, quote, necessary.  It has to be a method of

14   recognized healing by law, the place of treatment.  There is

15   really no testimony that that's what this is.                             13:51:58

16         As to Number 5, M.L., this is someone who is in her

17   late 20s.  Her declaration says that she made over $200,000.

18   In her testimony at trial, this is Docs 1092, 1093.  At 1092

19   it's pages 117 to 118.  And then Doc 1093 it's at page 11.  She

20   talks about, quote, "my clients," quote, "my customers."  She    13:52:23

21   says her clientele were largely married men, college educated,

22   totally inconsistent with the notion that she was being

23   trafficked as opposed to engaged in unlawful acts.

24         Then as to D.R., Number 8, Agent Landau confirmed that

25   the murder occurred on December 24, 2016, and that she was              13:52:47

1    being posted on the site during that time period.  It's a year

2    and a half after the Court ruled the Travel Act conspiracy had

3    ended.  And in any event, murder was not an object of that

4    conspiracy.  Now, we will also point out that we attached the

5    restitution order in the underlying trafficking case, so that          13:53:07

6    is Doc 2280, Exhibits C and D.  There is an order against two

7    individuals, jointly and severely, and there is just no

8    evidence that that hasn't been paid or that this Court has the

9    ability to order it for a third time.

10            I will note that Mr. Parente, who is counsel for D.R.,          13:53:27

11    he was the prosecutor in that case and so we attached the

12    sentencing memo in which he sought $14,000 in restitution, and

13    there is no explanation as to why this case they are seeking

14    millions in lost income.

15            Now, the last point I'll make is tied to this                  13:53:46

16    remission process, and the Court flagged this last Friday.

17    Under the VWPA the Court, within its discretion, can send this

18    case to remission, and there is, of course, an ongoing

19    remission process in the Backpage case.  Under 18 U.S.C. 3663

20    sub a(1)(b) romanette (ii), the Court can determine that the           13:54:07

21    causation inquiries here, the potential prolongation of the

22    sentencing process warrant kicking this to remission.

23            The backdrop here, Your Honor, is important.  This was

24    a month's long settlement negotiation and collectively

25    $215 million was forfeited by Mr. Lacey, Larkin's estate,             13:54:29

1  Brunst, Spear, and the company, and this includes interest my

2  client had tied to the sale of the business.  And so not only

3  did he forfeit over 7 million of his own funds, but given his

4  interest in the company, he forfeited more, something like

5  $15 million, and he did so precisely for the purpose of          13:54:49

6  compensating potential victims through a remission process.

7        Mr. Parente notes that these defendants got back 40

8  million.  Right?  That's not the case as to my client.  Right?

9  My client, I believe, only received back, as part of the

10 settlement, a couple of million dollars.  That was carefully     13:55:07

11 calibrated to cover fees.

12        THE COURT:  How much?

13        MR. PANCHAPAKESAN:  I believe it was 2 to 2.5 million

14 is what he received back.  And the structure of the settlement

15 was that he forfeited his largest bank account, and then the    13:55:21

16 remaining bank accounts, I believe, were valued around 2 to

17 2.5 million.  And that was a negotiated amount to ensure that

18 he would have enough money to cover his fees in this case in

19 the pending appeal.  His wife is in her 50s, so to ensure that

20 his family will be taken care of while he serves his prison      13:55:44

21 term.

22        The reason the settlement was structured this way is

23 because for months the government has signaled that restitution

24 is not appropriate here.  And so this was a mechanism to create

25 a remission fund.  The Court e-mailed the government in          13:55:59

```
1    September saying there is a settlement pending.  It will likely

2    moot the restitution hearing.  The government sought a

3    continuance of the hearing pending the settlement.

4         THE COURT:  Well, I take issue with that because I've

5    read some of the letters back and forth from the Department of      13:56:13

6    Justice that actually says the opposite; that this doesn't mean

7    restitution is not off the table.  So I guess it depends on

8    which letter you want me to refer to, but so --

9         MR. PANCHAPAKESAN:  Right.  Fair enough, Your Honor.

10   At a minimum, it's been confusing; right?  In December, you        13:56:32

11   know, we reached out to the government and said, "Look,

12   settlement has been approved.  It's been entered.  Can we agree

13   to take this hearing off calendar?"  In no uncertain terms, and

14   this is an e-mail from government's counsel to us, it's

15   attached to Doc 2280, the government says, "We agree.  We will     13:56:49

16   draft a stipulation for your review to vacate this.  We agree

17   these claims should be heard, should be dealt with in the

18   remission process on Backpage."  It's unequivocal; right?

19        And so when counsel for N.F. and D.O. says, "We're

20   wrong that this is a remission case," we are not because the        13:57:07

21   government has agreed in the Backpage case, right, with

22   potentially hundreds of --

23        THE COURT:  Well, let me refer you to Document 2274-2.

24   This is the Department of Justice to Mr. Landman, and it's

25   Mr. Rapp's letter.  And on page 2 of the first full paragraph      13:57:35
```

1  says, "To be clear, the stipulated settlement does not preclude

2  a restitution order and, in fact, contemplates one."

3        MR. PANCHAPAKESAN:  And so I will point the Court to

4  Doc 2280-2, which is page 4 of that document, and this is a

5  December 6, 2024, e-mail from Mr. Rapp to Mr. Feder and others,    13:57:58

6  and it says, "All, we agree that the remission process would

7  apply equally to claimants in *United States vs. Lacey*.  We

8  believe that it makes sense for those claimants to submit

9  petitions for remission in *U.S. vs. Backpage* to be considered

10  by MLARs rather than have the Court issue restitution orders.    13:58:17

11  Accordingly, we will draft a stipulation"  --

12        THE COURT:  Well, United States vs. Backpage.

13        MR. PANCHAPAKESAN:  No, Your Honor.  We agree that the

14  remission process would apply equally to claimants in United

15  States vs. Lacey.  We agree -- we believe that it made sense    13:58:36

16  for those claimants, meaning these, to submit petitions for

17  remission in United States vs. Backpage.  They are clearly

18  saying they agree --

19        THE COURT:  We have competing statements here, then.

20        Mr. Rapp, and perhaps you can clarify it.  I am    13:58:54

21  assuming because the government is present and here and

22  provided this documentation they are seeking restitution.

23        MR. RAPP:  They are.  They are.

24        THE COURT:  So let's move on.

25        MR. PANCHAPAKESAN:  Fair enough.  What I would say,    13:59:05

1   Your Honor, is what the government says in their briefing is

2   that restitution is not appropriate in the Backpage case

3   because it is too complex given causation, given the number of

4   potential victims.  And I would submit, given the nature of the

5   evidence here, the evidence is not particularized as to my          13:59:26

6   client.  The evidence is Backpage caused these individuals

7   harm; right?  And so if there are too many victims in the

8   Backpage case, that same logic, in fairness, ought to apply

9   here, and there is good reason to preferentially treat 12

10  individuals when the government is saying in the Backpage case,     13:59:45

11  the case about the website, right, they can't move forward with

12  restitution because it's too unwieldy.  Right?  And so, I

13  think, in fairness, logically, that notion ought to apply here

14  as well.

15          The last point I would make, Your Honor, to the extent     14:00:04

16  the Court is inclined to issue a restitution order here, the

17  Court is within its discretion to look to the 215 million to

18  satisfy any such restitution order.  And there's a case we cite

19  in our briefing, it's the *Caulder* case, C-A-U-L-D-E-R.  It's a

20  Northern District of California case, 2006 Westlaw 1646100,         14:00:27

21  where even over the government's objection in the VWPA case,

22  the Court ordered that any restitution be paid out of the

23  forfeited funds.

24          I would submit that makes sense here given that the

25  nature of the arguments for restitution are that Backpage, the     14:00:46

1    enterprise, the website, caused harm.  Any restitution should

2    not be pinned solely on my client or Mr. Spear when there's a

3    corpus of funds forfeited by the prior owners, by the website,

4    intended to satisfy these potential claims.  And the government

5    hasn't given the Court a good reason as to why it needs to keep      14:01:11

6    that entire 215 million in reserve.  It seems like plenty of

7    money to deal with any kind of potential restitution that the

8    Court might think is appropriate here.

9            THE COURT:  All right.  Thank you.

10           Mr. Feder, can you begin by telling me what amount was      14:01:26

11   returned to your client?

12           MR. FEDER:  Judge, I don't have the exact figures.

13   Under $500,000.

14           THE COURT:  Under?

15           MR. FEDER:  Under 500, 400 and something.  Which we,      14:01:46

16   by the way, we have not received a dime as of yet.

17           THE COURT:  All right.

18           MR. FEDER:  Mr. Spear joins in the remarks of

19   Mr. Brunst.  And I just ask the Court, there was an exhibit

20   list that was submitted, and we would ask that the entirety of      14:02:07

21   that exhibit list be admitted for this primary reason.

22           THE COURT:  What -- what is included in the exhibit

23   list?

24           MR. FEDER:  There's a number of 302, for instance.

25           THE COURT:  No, I am not going to consider 302s.      14:02:21

UNITED STATES DISTRICT COURT

1          MR. FEDER:  If I could make a record.

2          THE COURT:  You can.

3          MR. FEDER:  There is trial testimony of Ms. Leary from

4    a case where her pimp was prosecuted that conflicts with

5    statements and evidence and conclusions, et cetera, made by the      14:02:33

6    experts that the court has allowed that would undermine the

7    credibility and accuracy of those -- that testimony.  And so --

8          THE COURT:  Well, you should have brought that to my

9    attention when the witness was testifying and you had an

10   opportunity to examine her, so I am not going to consider           14:02:55

11   anything that has not been already put forward on the record.

12   In particular, I am not going to consider 302s.

13         MR. FEDER:  Otherwise, Judge, you have a situation

14   where, for instance --

15         THE COURT:  Well, you've lost the opportunity, Mr.            14:03:12

16   Feder.

17         MR. FEDER:  There was no -- the Court did not --

18         THE COURT:  You had an opportunity when the witness

19   was here, and you had an opportunity to question the witness

20   with regard to what she examined with respect to that              14:03:24

21   particular individual.  So let's move forward.

22         MR. FEDER:  If my recollection is correct, the Court

23   denied Mr. Landman trying to admit a 302 that would have been

24   used for Mr. Smith, number one.  So we -- and we ask --

25         THE COURT:  So you're reurging my consideration of it        14:03:46

1    and I am going to say no, so let's move forward.

2         MR. FEDER:  We asked the Court to allow us to call the

3    alleged victims, and that was denied.

4         THE COURT:  Yes.

5         MR. FEDER:  This is an alternative way.                    14:03:57

6         THE COURT:  Let's move forward.

7         MR. FEDER:  That's all I have, Judge.  We object to

8    their 302s and the prior testimony of Ms. Leary in the federal

9    trial of her pimp to be admitted so that the Court can make

10   accurate recollections of what the facts are and how they might   14:04:12

11   be inconsistent with the testimony and documents that have been

12   submitted.

13        THE COURT:  Is that it?

14        MR. FEDER:  That's it.

15        THE COURT:  All right.  Thank you.  All right.  You        14:04:23

16   have my order with respect to the supplementation of the

17   record.  And there being nothing further, then we are.

18        MR. RAPP:  Thank you, Your Honor.

19        MR. PANCHAPAKESAN:  Thank you, Your Honor.

20        (Proceedings concluded at 2:04 p.m.)                        14:04:39

21

22

23

24

25

1

2

3                      **C E R T I F I C A T E**

4

5           I, HILDA E. LOPEZ, do hereby certify that I am duly

6    appointed and qualified to act as Official Court Reporter for

7    the United States District Court for the District of Arizona.

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 10th day of January,

14   2025.

15

16

17                              s/Hilda E. Lopez_____
                                HILDA E. LOPEZ, RMR, FCRR
18

19

20

21

22

23

24

25